# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, _et al._,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.[1]** | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION
OF DEBTORS FOR INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING,
(B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND
PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (III) MODIFYING AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED.  RELIEF IS REQUESTED NOT LATER THAN 9:00 A.M. (PREVAILING CENTRAL TIME) ON OCTOBER 1, 2025.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**THE DEBTORS HAVE REQUESTED THAT A HEARING WILL BE CONDUCTED ON THIS MATTER ON OCTOBER 1, 2025, AT 9:00 A.M. (PREVAILING CENTRAL TIME).**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT 1-832-917-1510.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153.  VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and together with the Debtors' non-debtor affiliates, "**FBG**" or the "**Company**"),[2] respectfully represent as follows:

### Preliminary Statement

1.      FBG is a leading supplier of after-market automotive parts with world-wide operations employing approximately 26,000 individuals globally (including approximately 6,000 in the United States), with a global network of manufacturing and distribution centers that spans over 30 countries and across five continents. Recent headwinds, including newly imposed tariffs, the incurrence of significant up-front capital expenditures over the past 12 months in connection with the Company's brand acquisition strategy, and remedies taken by various lenders, led to a precipitous decline in the Debtors' liquidity. This significant decline in liquidity, on top of a highly-leveraged capital structure with over $10 billion of aggregate debt, has required the Debtors to prepare at warp speed for a chapter 11 filing and negotiate $1.1 billion of new-money postpetition financing (plus certain roll-up amounts) with an ad hoc group of cross-holders of the Debtors' first and second lien indebtedness (the "**Ad Hoc Group**").

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms as set forth below, in the First Day Declaration, the Interim Order, or in the DIP Credit Agreement, as applicable.

2

2. The Debtors file these chapter 11 cases with only approximately $14 million of cash on hand and urgently require an injection of capital to stabilize their business. Moore Decl. ¶ 7. Absent an immediate infusion of cash and access to the proposed DIP Financing, the Debtors will be forced into a value-destructive liquidation process. The DIP Financing will provide the financing necessary to stabilize the Company's operations and explore a value-maximizing transaction.

3. Prior to the commencement of these chapter 11 cases, the Debtors took protective steps to try to address their liquidity challenges. In July 2025, the Company launched a refinancing process seeking to raise approximately $6.2 billion that would be used to comprehensively refinance its capital structure by paying down its existing funded debt obligations. However, this process was paused in August 2025 when potential lenders required further diligence before committing capital, including completing a "quality of earnings" report. With liquidity rapidly declining and disputes with certain prepetition lenders and other stakeholders coming to a head, the Company engaged Weil, Gotshal & Manges LLP ("**Weil**") and Lazard Frères & Co. LLC ("**Lazard**") to explore strategic alternatives to enhance the Debtors' liquidity and address near-term payment obligations and the Debtors' capital structure in a holistic manner.

4. Beginning in early August 2025, the Debtors and their advisors worked diligently to identify potential sources of financing (including existing lenders and parties outside of their capital structure). By early September, it became clear that no party was willing to provide the Debtors with the out-of-court financing it needed to fund operations, complete a "quality of earning report," and run an M&A process. Raising out-of-court financing only became more challenging as the Company's financial position worsened and certain information became

available, including (i) updated financial information on the available collateral for new financings, (ii) additional detail behind the Company's accounts receivable factoring programs and off-balance sheet supply chain and inventory financings, and (iii) updated liquidity information that demonstrated a material decline in liquidity throughout August and early September (resulting in a larger overall financing need).  As a result, no parties were willing to lend under these circumstances.

5.     The Debtors therefore pivoted to engage their existing lenders, including the Ad Hoc Group and the ABL Lenders.  The Ad Hoc Group has stepped up to provide postpetition financing that is urgently needed to stabilize the Debtors' operations and provide adequate runway to prepare for and implement a value-maximizing process under the Court's supervision.  To say that the parties have worked at lightening-speed with incomplete diligence and information would be an understatement.  Specifically, over the past twelve days, the Debtors and the Ad Hoc Group (which holds approximately 86% of the First Lien Term Loans, 100% of the Side-Car Term Loans, and 78% of the Second Lien Term Loans) have worked around the clock to negotiate and finalize a comprehensive DIP financing package that meets the Company's needs and will allow the Debtors to run an orderly, in-Court process to implement a transaction that maximizes value for the estate.

6.     Despite only having a few weeks to conduct diligence and underwrite the proposed DIP financing, certain members of the Ad Hoc Group agreed to anchor $1.1 billion in new money postpetition financing.  In addition, in the week leading up to the filing, the Ad Hoc Group agreed to provide $24.5 million in emergency bridge financing after a supply chain financing lender unexpectedly swept nearly all of the Debtors' remaining unrestricted cash, leaving the Debtors with virtually no cash and only 24 hours to make payroll and other critical payments.

This emergency financing provided the Debtors with four (4) critical days to prepare for a more orderly chapter 11 filing and funds to pay employees and other critical expenses to allow additional time to negotiate comprehensive DIP financing and consensual use of cash collateral.

7. Accordingly, to stabilize operations and enable the Debtors to execute a value-maximizing transaction for the benefit of all stakeholders, the Debtors request that the Court approve a $1.1 billion senior secured, superpriority and priming multi-draw term loan facility (the "**DIP Facility**"). All First Lien Lenders have been or will be offered the opportunity to participate in the syndication of the DIP Facility. Indeed, the Ad Hoc Group continues to grow as additional holders elect to participate in the DIP Facility join (with 86% of the First Lien Term Loans, 100% of the Side-Car Term Loans, and 78% of the Second Lien Term Loans) and the Ad Hoc Group remains committed to engaging with any other First Lien Lenders who express interest in participating.

8. If approved, the proposed DIP Facility will provide the Debtors with access to $1.1 billion of liquidity, $500 million of which will be available upon entry of the Interim Order. The New Money DIP Loans are critical to, among other things, pay the Debtors' employees, purchase inventory and other goods required to fulfill customer orders and generate revenue, and pay critical vendors. Prior to the Petition Date, the Debtors and their advisors undertook a detailed examination of the Debtors' liquidity, cash flows and need for post-petition financing during these chapter 11 cases. Based on that examination the Debtors and their advisors concluded that financing these cases would require $1.1 billion in new money, with $500 million during the interim period. *See* Moore Decl. ¶¶ 11–12.

9. The key terms of the DIP Financing are as follows:

a. **Amount/ Structure**. An aggregate principal amount of $4.4 billion, consisting of:

    i.    *New Money DIP Loans*. $1.1 billion multi-draw term loan facility (the "**New Money DIP Loans**") comprised of $500 million of New Money DIP Loans available upon entry of the Interim Order (a portion of which will be funded into escrow) and $600 million of New Money DIP Loans to be funded into escrow and made available to the Debtors in accordance with the DIP Documents upon entry of the Final Order;

    ii.    *Roll-Up*. A "creeping" roll-up of the participating DIP Lenders' share of outstanding obligations under the First Lien Term Loan Agreement in an amount equal to three times the amount of New Money DIP Loans borrowed under the DIP Facility, calculated in accordance with the DIP Documents and the Syndication Procedures, consisting of (a) $1.5 billion rolling up subject to, and effective upon, entry of the Interim Order and funding of the Initial Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of the Interim Order and (b) $1.8 billion rolling up subject to, and effective upon, the date of entry of the Final Order and funding of the Final Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of the Final Order.

b.  **Bridge Repayment**. Upon entry of the Interim DIP Order, the Bridge Obligations will be indefeasibly repaid in full in cash.

c.  **Interest Rates**.

    i.    New Money DIP Loans: SOFR cash *plus* 1.55% cash *plus* 8.45%, payable monthly in kind.

    ii.    Roll-Up Loans: SOFR + 7.0%, payable monthly in kind (the default rate under the First Lien Term Loan Agreement).

d.  **Participation**. Each First Lien Lender has been or will be offered the opportunity to participate in the DIP Facility and have their prepetition First Lien Claims rolled-up.

e.  **Anchor Premium**. Certain members of the Ad Hoc Group will receive a fee equal to 10.0% (payable-in-kind) of the aggregate $1.1 billion new-money commitment upon entry of the Interim Order.

f.  **Upfront Premium**. 5.0% payable in kind, which shall be earned and payable to all DIP Lenders *pro rata* upon entry of the Interim Order and/or Final Order, as applicable.

g.  **Exit Premium**. 5.0% cash, which shall be earned upon entry of the Interim Order and/or Final Order, as applicable, and payable to all DIP Lenders *pro rata* upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

h.  **Extension Fee**. 0.75% per each 45-day extension.

i.  **Collateral**. The DIP Loans will be secured by the following collateral

      i.  Super-priority priming first liens on First Lien Term Loan Collateral (i.e., self-priming liens) and priming *second* liens on ABL Priority Collateral (senior to First Lien Term Loan Obligations);

      ii.  First lien on substantially all unencumbered assets, including avoidance actions and proceeds thereof and commercial tort claims (subject to entry of the Final Order), Deposit Account Control Agreements, and pledges of equity in certain foreign subsidiaries of the Debtors; and

      iii.  Super-priority administrative claim status.

j.  **Maturity**.   270-day term with (i) two (2) 45-day extensions at the Debtors' discretion and (ii) four (4) additional 30-day extensions with the consent of the Debtors and DIP Lenders holding at least 50.1% of the DIP Facility.

k.  **Milestones**.

      i.  <u>Entry of Interim Order</u>: Five (5) business days from Petition Date.

      ii.  <u>Execution of Transaction Support Agreement</u>: Thirty (30) calendar days from Petition Date.

      iii.  <u>Entry of Final Order</u>: Forty-five (45) calendar days after the Petition Date.

      iv.  <u>Delivery of Quality of Earnings Report</u>: Seventy-five (75) calendar days after the Petition Date.

10.    The proposed terms of the DIP Facility, including the Roll-Up, fees, interests rates, and milestones are more than justified under the circumstances. As stated, effective upon each funding of the $1.1 billion of New Money DIP Loans, the Prepetition 1L Loans held by DIP Lenders shall be automatically deemed exchanged via assignment on a cashless basis into DIP Obligations pursuant to a "creeping" roll up on a 3:1 basis. Importantly, the Roll-Up Loans do not (i) prime any party's liens other than the consensual priming of the Prepetition 1L Loans and ABL Loans (with respect to the ABL Lenders' third-priority lien on Term Loan Collateral) or (ii) increase the amount of secured indebtedness (interest on the Roll-Up Loans is payable in kind at the default rate under the First Lien Term Loan Agreement). In addition, approximately 86% of the First Lien Lenders and 100% of the Side Car Lenders have agreed to an allocation of DIP Proceeds. The Debtors submit that the interest rate, fees and other terms of the proposed DIP Facility are reasonable and fairly compensate the DIP Lenders, particularly given the extremely compressed timeframe within which the lenders were asked to commit funding, the lack of

comprehensive accounting and financial diligence completed, and the sheer magnitude of the financing.

11.     Moreover, as further discussed below, the proposed DIP financing and the DIP Order provides adequate protection for each of the Debtors' secured lenders, including the ABL Lenders.  Notably, the ABL Lenders are deemed to have consented to the proposed DIP Facility (including the priming of the ABL Lenders' third-priority lien in Term Loan Collateral) pursuant to the 1L/ABL Intercreditor Agreement  The Debtors have been in negotiations with the ABL Lenders regarding the consensual use of cash collateral and adequate protection.  As of the filing of this Motion, the Debtors have not reached an agreement with the ABL Lenders, but will continue to work with the ABL Lenders to achieve consensus.  If not, the Debtors believe their proposed terms for the use of collateral and related adequate protection represent a fair and appropriate resolution and should be approved by the Court.  As set forth in the Moore Declaration, the ABL Lenders enjoy a massive equity cushion well in excess of 20% on their first-priority lien on inventory and receivables (which is not being primed by the DIP Facility).  Moreover, the ABL Lenders are a major beneficiary of the proposed DIP Financing.  As reflected in the Initial Budget, the Debtors will use proceeds from the DIP Financing to build up the ABL Lenders' inventory collateral, including over the interim period.  Over the course of these cases, the Debtors' continued operations, financed by the DIP Facility, are forecasted to increase the total ABL Priority Collateral (as defined herein) of inventory and accounts receivable from an estimated $1.388 billion as of the Petition Date, to an estimated $1.6 billion by the end of October and $1.638 billion by the end of December.  *See* Moore Decl. ¶¶ 17–19.  During the interim period, from date of entry of the Interim Order to date of entry of the Final Order (the "**Interim Period**"), as the first lien holders, the ABL Secured Parties are the direct beneficiaries of this value increase.

12.     The Debtors have also agreed to provide the ABL Lenders with a comprehensive adequate protection package consisting of (i) senior replacement liens on postpetition ABL Priority Collateral (subject and subordinate to the Carve-Out), (ii) junior replacement liens on post-petition Term Priority Collateral and unencumbered assets of the Debtors (including proceeds from avoidance actions and commercial tort claims, subject to entry of the Final Order) of the same type as Term Priority Collateral (to the extent such assets secure the DIP financing), (iii) current payment in cash as adequate protection at the default rate under the ABL Facility (excluding any of the supply chain financing obligations), and (v) payment of reasonable and documented fees of the ABL Lenders' professionals.

13.     Moreover, as discussed further below, the proposed DIP Financing provides adequate protection for the Debtors' inventory financing counterparties (the "**SPV Lenders**"). The Debtors have been in negotiations with each of the SPV Lenders regarding the consensual use of cash collateral and adequate protection. As of the filing of this Motion, the Debtors have not reached an agreement with the SPV Lenders. However, the Debtors believe their proposed terms for the use of collateral and related adequate protection represent a fair and appropriate resolution and should be approved by the Court. As set forth in the Cowan Declaration, the Debtors have proposed terms and conditions for use of each of the SPV Lender's inventory collateral (to the extent they are secured) that preserves the status quo and the SPV Lenders' interests during the interim period. The Debtors have been negotiating separate stipulations with each of the SPV Lenders. To the extent consensus is not reached, the Debtors are prepared to demonstrate that each SPV Lender is adequately protected. The Interim DIP Order clarifies that the DIP Liens and Adequate Protection Liens will not extend to the SPV Debtors. But the SPV Debtors must bear their fair share of costs fairly allocable to the SPV Debtors on terms to be agreed or later

determined by the Court. Therefore, amounts paid by Debtor First Brands Group Holdings, LLC and its direct and indirect subsidiaries for the benefit of the SPV Debtors will be entitled to be repaid on a senior secured basis. Cowan Decl. ¶ 34(c).

14. Accordingly, the relief requested in this Motion is necessary, both to preserve the Debtors' operations and provide funds necessary to pursue and implement a value-maximizing transaction, as well as avert a the risk of degradation of value of the entire enterprise. For the reasons set forth in this Motion, the First Day Declaration, and the DIP Declarations, the Debtors firmly believe that the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and in the best interests of the Debtors, their estates, and all stakeholders, and satisfy the requirements of the Bankruptcy Code. The Debtors respectfully request that the Court enter the Interim Order.

## Relief Requested

15. By this motion (the "**DIP Motion**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), 507 and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**") the Debtors request entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit A**:

     i.    authorizing First Brands Group, LLC, a Delaware limited liability company (the "**Borrower**" or the "**Company**") to obtain postpetition financing ("**DIP Financing**") pursuant to a senior secured, superpriority and priming debtor-in-possession term loan credit facility (the "**DIP Facility**") subject to the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached to the Interim Order in substantially final form as <u>Exhibit 1</u> (as amended, restated, amended and restated, supplemented, or

otherwise modified from time to time, the "**DIP Credit Agreement**"), in an aggregate principal amount of $4.4 billion (inclusive of the New Money DIP Loans (as defined herein) and the Roll-Up Obligations (as defined herein)) (the commitments in respect thereof, the "**DIP Commitments**," and such loans, the "**DIP Loans**") from the DIP Lenders (as defined herein) by and among the Borrower, First Brands Group Intermediate, LLC, a Delaware limited liability company (the "**Parent**"), the several financial institutions or other entities from time to time party thereto as "Lenders" (the "**DIP Lenders**"), Wilmington Savings Fund Society, FSB, as administrative agent, escrow agent, and collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Agent**" and, collectively, with the DIP Lenders, the "**DIP Secured Parties**"), consisting of :

    a.  $1.1 billion new money term loans (the "**New Money DIP Loans**") of which (i) $175 million will be available immediately upon entry of the Interim Order, (ii) $325 million will be funded into the Escrow Account (defined below) upon entry of the Interim Order (the "**Intermediate Amount**" and together with clause (i), the "**Initial Draw**"), and (iii) $600 million will be funded into the Escrow Account subject to and upon the date of entry of the Final Order (the "**Final Draw**"); *provided*, that the Intermediate Amount shall accrue interest and fees pursuant to the DIP Credit Agreement commencing with the funding into the Escrow Account; and

    b.  $3.3 billion of Roll-Up Obligations (as defined herein), in each case, calculated in accordance with the DIP Documents and the Syndication Procedures, with:

        i.  <u>Interim Roll-Up Obligations</u>:  $1.5 billion rolling up subject to, and effective upon, entry of this Interim Order and funding of the Initial Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of this Interim Order; and

        ii.  <u>Final Roll-Up Obligations</u>:  $1.8 billion rolling up subject to, and effective upon the date of entry of the Final Order and funding of the Final Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of the Final Order;

ii.  authorizing each of the relevant Debtors and, to the extent required by the DIP Documents, any additional Debtors and/or non-Debtors party thereto from time to time as guarantors, to jointly and severally guarantee the DIP Loans and the other DIP Obligations (such Debtors, other than the Borrower, the "**DIP Guarantors**," and together with the Borrower, the "**DIP Loan Parties**"); *provided*, that in the case of Viceroy Private Capital, LLC and First Brands Group Holdings, LLC (collectively, the "**Parent Guarantors**") such entities will only execute a separate parent guarantee (the "**Parent Guarantee**") attached to the Interim Order in substantially final form as <u>Exhibit 2</u> (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time);

11

iii.    authorizing the DIP Loan Parties and the Parent Guarantors, as applicable, to execute, deliver and perform under the DIP Credit Agreement and Parent Guarantee, as applicable, and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the Fee Letter, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the Parent Guarantee, and any other Loan Documents, including the Initial DIP Budget and each Approved Budget (each as defined herein), the "**DIP Documents**");

iv.    authorizing the DIP Loan Parties and the Parent Guarantors to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, the Upfront Premium, Exit Premium, Anchor Premium, Extension Premium (each as defined in the DIP Credit Agreement), administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

v.    upon entry of the Interim Order, authorizing the Debtors to indefeasibly repay in full the Bridge Loans and pay any reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the Bridge Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the Bridge Documents (each as defined herein);

vi.    subject and subordinate only to the Carve-Out (as defined herein), authorizing the Adequate Protection Claims (as defined herein) with respect to the Prepetition Collateral (as defined herein) and such other claims as and solely to the extent set forth in the Interim Order;

vii.    subject and subordinate only to the Carve-Out, granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties;

viii.    granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to

sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral and any Avoidance Proceeds (each as defined herein) subject to entry of the Final Order, on the terms described herein, in each case subject and subordinate to the Carve-Out, the ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as, and solely to the extent, set forth in the Interim Order;

ix.   authorizing the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

x.   upon entry of the Interim Order, waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) (excluding ABL Collateral) and the DIP Collateral (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code, except with respect to the ABL Secured Parties; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order;

xi.   upon entry of the Interim Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral), excluding ABL Collateral, for the benefit of any party other than the Prepetition Secured Parties (as defined herein), except with respect to the ABL Secured Parties; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order;

xii.   authorizing the DIP Loan Parties to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with the Interim Order and the other DIP Documents, including the Final Order;

xiii.   authorizing the DIP Loan Parties, upon entry of the Interim Order and as set forth herein, to satisfy the Bridge Obligations (as defined herein) indefeasibly in full in cash (the "**Bridge Repayment**");

xiv.   authorizing the Borrower to incur, and the DIP Guarantors and Parent Guarantors to guarantee, on an unconditional joint and several basis, the principal, all unpaid and accrued interest, fees, premiums, reimbursements, interest on interest, costs, expenses, obligations (whether contingent, unmatured, or otherwise due), and all other amounts and obligations owing under and/or secured by and/or payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

xv.   subject to the terms and restrictions set forth in the DIP Documents and the Interim Order, authorizing the DIP Loan Parties to use the Prepetition Collateral (as defined

herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Credit Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties to the extent of any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

xvi.   vacating and modifying the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

xvii.   on the terms and conditions set forth in the syndication procedures (the "**Syndication Procedures**") attached to the Interim Order as Exhibit 3, upon the entry of the Interim Order, each First Lien Lender shall be offered the right to purchase their specified allocation of the DIP Loans and DIP Commitments (with such allocation backstopped by the certain members of the Ad Hoc Group (as defined in the DIP Motion) (the "**Allocation Parties**"));

xviii.   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

xix.   scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order(the "**Final Order**," and together with the Interim Order, the "**DIP Orders**"), as set forth in the DIP Motion and the DIP Documents filed with the Court.

**Jurisdiction and Venue**

16.   The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14

**Summary of Terms of DIP
Financial and Use of Cash Collateral**

17.     In accordance with Bankruptcy Rules 4001(b)–(d) and the Complex Case Procedures, as incorporated by Bankruptcy Local Rule 1075-1, the below chart summarizes the significant terms of the Interim Order and the DIP Credit Agreement.[3]

| MATERIAL TERMS | | Location |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | First Brands Group, LLC, a Delaware limited liability company (the "**DIP Borrower**" or "**Borrower**") | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | (i) First Brands Group Intermediate, LLC, a Delaware limited liability company;<br>(ii) Certain Debtors Subsidiaries that are "Loan Parties" under the First Lien Term Loan Agreement;<br>(iii) Viceroy Private Capital, LLC, a Delaware limited liability company; and<br>(iv) First Brands Group Holdings, LLC, a Delaware limited liability company | DIP Credit Agreement, § 1.01;<br>DIP Order, paragraph (ii) |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Morgan Stanley Senior Funding, Inc. (together with its permitted assigns, the "**DIP Lenders**"). | DIP Credit Agreement, Signature Pages |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB. | DIP Credit Agreement, Preamble |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B) | (i) New Money Term Loans in an aggregate principal amount of $1,100.0 million under the New Money Facility.<br>(ii) Roll-Up Loans in an aggregate principal amount not to exceed $3,300.0 million under the Roll-Up Facility. | DIP Credit Agreement, § 2.01 |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | The Borrower may draw up to $500.0 million of Interim New Money Term Loans upon entry of the Interim Order, of which (i) $175 million will be available immediately, and (ii) $325 million will be deposited with the Escrow Agent and withdrawn thereafter upon satisfaction of certain conditions.  The Borrower may draw up to $600.0 million of Final New Money Term Loans upon entry of the Final Order, which will be deposited with the Escrow Agent and withdrawn thereafter upon satisfaction of certain conditions . | DIP Credit Agreement, § 2.01; 2.04; 4.01; 4.02 |
| **Budget** | Initial DIP Budget will be agreed to by the Borrower and the Required Lenders before the Closing Date and will be attached as Exhibit M to | Interim Order 19 |

---

[3]   The following summary of the terms of the DIP Facility is subject entirely to the express terms of the DIP Credit Agreement or Interim Order, as applicable.  If there are any inconsistencies between the summary below and the DIP Credit Agreement, then the DIP Credit Agreement shall control.  If there are any inconsistencies between the summary below and the Interim Order, then the Interim Order shall control.

| MATERIAL TERMS | | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | the DIP Credit Agreement (the "**Initial DIP Budget**").The Initial DIP Budget may be modified, amended, extended and updated from time to time as once approved (or deemed approved) by the Required Lenders, (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "**Approved Budget**"). | DIP Credit Agreement, § 6.17 |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) | <u>New Money Term Loans</u>: (i) SOFR or EURIBOR, as applicable, plus 10.00%, of which 1.55% shall be paid in cash and 8.45% shall be Paid in Kind, or (ii) Base Rate plus 9.00%, of which 1.55% shall be paid in cash and 7.45% shall be Paid in Kind, payable quarterly.<br><br><u>Roll-Up Loans</u>: (i) SOFR or EURIBOR plus 7.00%, all of which shall be Paid in Kind, or (ii) Base Rate plus 6.00%, all of which shall be Paid in Kind, payable quarterly. | DIP Credit Agreement, § 2.08 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) | In addition to any fees payable under the Fee Letter or agent fee letter:<br><br><u>Upfront Premium</u>:  payable to the DIP Agent, for the ratable account of the DIP Lenders, ratably based on their New Money Term Loans, an upfront premium (the "**Upfront Premium**") in the amount equal to 5.0% of the New Money Term Commitments), which is paid in kind upon (a) the funding of the New Money Term Loans, or (b) the entry of the Final DIP Order, as applicable.<br><br><u>Anchor Premium</u>:   payable to the DIP Agent, for the ratable benefit of certain Allocation Parties, an anchor premium (the "**Anchor Premium**") equal to 10.0% of the New Money Term Commitments, which shall be fully earned on the Closing Date and Paid in Kind on the date that each of the Interim New Money Term Loans and Final New Money Term Loans are funded.<br><br><u>Exit Premium</u>:  payable to the DIP Agent for the ratable account of the DIP Lenders ratably , exit premiums in the amount equal to  5% of the outstanding DIP Term Loans  (the "**Exit Premium**"), which shall be  (a) as to New Money Term Loans made on the Closing Date, fully earned as of the Closing Date, and (b) as to New Money Term Loans made after the Closing Date, fully earned as of the entry into the Final DIP Order, and in each case, shall be payable in cash upon the earliest of  to occur of maturity, acceleration, termination, conversion, payment, prepayment, or repayment.<br><br><u>Extension Fee</u>: payable to the DIP Agent for the ratable account of the DIP Lenders ratably, (a) an extension premium in the amount equal to 0.75% of the DIP Term Loans outstanding on such date of extension(the "**Extension Fee Amount**") which shall be earned, due, and payable in kind on the date the Borrower makes a Borrower Maturity Extension, and (b) an extension fee in an amount equal to the Extension Fee Amount which shall be earned, due and paid in kind on the date the Borrower makes a Mutual Maturity Election. | DIP Credit Agreement, § 2.09; 11.04 |

16

| MATERIAL TERMS | | Location |
|---|---|---|
| **Maturity Date; Duration for Use of DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The date that is the earliest to occur of (a) 270 days from the initial funding date, with two (2) forty-five (45) day extensions to the extent requested by the Borrower and four (4) thirty (30) additional day extensions with the consent of the Required Lenders holding at least 50.1% of the DIP Facility, (b) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the initial funding date, constitutes a sale of all or substantially all of the assets of the Borrower and the Guarantors; (c) the Plan Consummation Date (as defined in the DIP Credit Agreement); (d) the first business day after the date on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and becomes effective prior thereto; and (e) the date that the Final Order is vacated, terminated, rescinded, revoked, declared null and void (as finally determined in a non-appealable decision by a court of competent jurisdiction) or otherwise ceases to be in full force and effect (unless, in each case, as otherwise consented to by the Required Lender. | DIP Credit Agreement, § 1.01; 2.18 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | Voluntary Prepayments:  The Borrower shall have the right at any time and from time to time to prepay any Term Loan in whole or in part, without premium or penalty (but subject to payment of the applicable Exit Premium and break funding payments), in an aggregate principal amount that is an integral multiple of $500,000 and not less than $100,000 or, if less, the amount outstanding, subject to prior notice (3 U.S. Government Securities Business Days for SOFR Loans, 3 Business Days for EURIBOR Loans and same day for ABR Loans). Mandatory Prepayments: The Borrower shall apply all Net Proceeds from non-ordinary course asset sales, casualty events and incurrences of non-permitted indebtedness promptly upon receipt thereof to prepay Term Loans (on a pro rata basis), together with the applicable Exit Premium. | DIP Credit Agreement, § 2.05 |
| **Conditions to Closing** Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type. | DIP Credit Agreement, § 4.01 |
| **Superpriority Expense Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out, the DIP Agent is granted, pursuant to Bankruptcy Code sections 364(c)(1), 503, and 507, an allowed superpriority administrative expense claim in each of these chapter 11 cases for all DIP Obligations, including the Roll-Up Loans (the "**DIP Superpriority Claims**"). | DIP Credit Agreement, § 5.08; Interim Order 8 |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | As security for the DIP Obligations, effective and perfected as of the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent or any Lender of, or over, any DIP collateral, the following security interests and liens (the "**DIP Liens**") are granted to the DIP Agent, for its own benefit and the | Interim Order 11 DIP Credit Agreement, § 1.01 |

17

| MATERIAL TERMS | Location |
|---|---|
| benefit of the DIP Secured Parties, subject only to (x) Prior Senior Liens, (y) the Excluded Assets and (z)] the Carve Out:<br><br>(a)  pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in, and lien upon, unemcumbered property of the Debtors (now or hereafter acquired and all proceeds thereof);<br><br>(b)  pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in, and lien upon, Prepetition Term Priority Collateral (the "**DIP Term Priority Collateral**"), regardless of where located (the "**DIP Priming Liens**").  DIP Priming Liens shall be (i) senior in all respects to the other Prepetition Liens on DIP Term Priority Collateral, (ii) senior to any Adequate Protection Liens on DIP Term Priority Collateral and (iii) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.<br><br>(c)  pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to either (i) valid, perfected and non-avoidable Prepetition Permitted Senior Liens (, or (ii) valid and non-avoidable Prepetition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be (x) immediately junior and subordinate to any such Prepetition Permitted Senior Liens and (y) junior to the Adequate Protection Liens (as defined in the Interim Order) and the Prepetition Liens; and<br><br>"Excluded Assets" means all licenses and any other property and assets (including any lease, license, permit or agreement) (i) the stock or securities of (x) any Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person (other than any such subsidiaries that are "first-tier" subsidiaries that are directly owned by a Debtor Entity) and (y) any Domestic Subsidiary that is a direct or indirect Subsidiary of any entity described in the preceding clause (x); provided that, the stock or securities of such Subsidiaries listed in the preceding clauses (x) and (y) shall cease to be Excluded Assets following a period of 30 days from the Closing Date, unless the Borrower reasonably demonstrates to the Administrative Agent (acting at the Direction of the Required Lenders) that the burden or cost (including tax consequences) of pledging such stock or securities described in the preceding clauses (x) and (y) would be excessive in view of the benefits afforded thereby, (ii) to the extent that the Collateral Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate | |

| MATERIAL TERMS | | Location |
|---|---|---|
| | thereof and that exists on the Closing Date, or (iii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (ii) and (iii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation; provided, however, that Excluded Assets shall not include any proceeds, substitutions, replacements, economic interest and economic value unless such proceeds, substitutions, replacements economic interest and economic value constitute Excluded Assets in accordance with clause (ii) or (iii) above | |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B) | Affirmative and Negative Covenants: Usual and customary covenants for debtor-in-possession financings of this type.<br><br>Financial Covenants:<br>(a) Minimum Liquidity: The Parent shall maintain at all times a minimum Liquidity of $50,000,000.<br><br>(b) Permitted Variance: The Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for the cumulative period beginning with the first week covered by the then Approved Budget through the end of the week immediately prior to the date on which the Approved Budget Variance Report is required to be delivered pursuant to the DIP Credit Agreement (each such period, a "**Variance Testing Period**"), by more than 20% for any such Variance Testing Period ending on or prior to November 7, 2025 and 15% for each Variance Testing Period thereafter; provided that notwithstanding anything to the contrary contained herein, Actual Cash Receipts shall not be tested until the end of the sixth week following the Petition Date; and (y) "Total Operating Disbursements" to exceed the Budgeted Disbursement Amounts (for the avoidance of doubt, excluding Budgeted Borrower Professional Fees) (each calculated weekly on a cumulative basis (against the then-existing Approved Budget) as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than 20% for any Variance Testing Period ending on or prior to November 7, 2025 and 15% for each Variance Testing Period thereafter (the "**Permitted Variances**"). | DIP Credit Agreement, § 6; 7 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type. | DIP Credit Agreement, § 9.01 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | The DIP Credit Agreement contains the following milestones (collectively, the "**Milestones**"): | DIP Credit Agreement, § 6.16 |

19

| | MATERIAL TERMS | Location |
|---|---|---|
| | • Interim Order.  By the date that is no later than five days after the Petition Date, the Debtors shall obtain entry of the Interim Order;<br><br>• Entry of Transaction Support Agreement.  By the date that is no later than 30 days after the Petition Date, the Debtors shall have provided a go-forward business plan for the Debtor and non-Debtor affiliates (the "Approved Business Plan") and entered into a restructuring support agreement with the Prepetition Lenders, in each case, that is in form and substance satisfactory to the Ad Hoc Group;<br><br>• Final Order: By the date that is no later than 45 days after the Petition Date, the Debtors shall obtain entry of the Final Order;<br><br>• Delivery of QOE Report: By the date that is no later than 75 days after the Petition Date, the Debtor shall deliver a final quality of earnings report to the DIP Lenders prepared by Alvarez & Marsal (or such other institution appointed by the Borrower that is acceptable to the Required Lenders) | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The "**Carve Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717; (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $125,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) subject, in each case, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued but unpaid claims for fees and expenses (including any monthly restructuring, sale, success or other transaction fees, but excluding any fee payable under any "tail" obligation that has not been earned and accrued) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Professional Persons**") pursuant to sections 328 or 1103 of the Bankruptcy Code, at any time before the date of delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after the Carve-Out Trigger Notice Date (as defined below) and without regard to whether such fees and expenses are provided for in the Approved DIP Budget (the amounts set forth in the foregoing clauses (i)–(iii), the "Pre Carve Out Notice Amount"); (iv) Allowed Professional Fees of Professional Persons incurred on or after the date of delivery by the DIP Agent of a Carve Out Trigger Notice in an aggregate amount not to exceed $25,000,000 (the amount set forth in this clause (iv) being the "**Post Carve-Out Notice Amount**" and, together with the Pre Carve-Out Notice Amount, the "**Carve-Out Amount**").  The "**Carve-Out Notice**" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the Required Lenders) to Weil, Gotshal & Manges LLP ("**Weil**"), as lead restructuring counsel to the Debtors, the U.S. Trustee, and the lead counsel to the Creditors' Committee (if appointed) and any other official committee appointed in the Chapter 11 Cases, which notice may be delivered following the | Interim Order 7(b) |

| MATERIAL TERMS | | Location |
|---|---|---|
| | occurrence and during the continuation of an Event of Default under the DIP Credit Agreement, stating that the Carve Out has been invoked. | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(c)(1)(B) | <u>Use of Proceeds</u>.  The proceeds of the Term Loans shall be subject to and used in accordance with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions of the DIP Credit Agreement, the "first day" orders (solely to the extent permitted under the Approved Budget (subject to Permitted Variances)) and the DIP Order to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and sales under Section 363 of the Bankruptcy Code, (iii) make any other payments consistent with the Approved Budget, in each case, subject to Permitted Variances, (iv) repay in full in cash the Prepetition Bridge Facility (as defined in the DIP Credit Agreement), and (v) in accordance with any wind-down budget in any restructuring or transaction support agreement, as applicable.<br><br><u>Limitations on Use</u>.  The proceeds of the DIP Facility (including the Carve-Out) may not be used for certain enumerated purposes that are contrary to the rights and interests of the DIP Secured Parties or the Prepetition Secured Parties (as defined in the Interim Order) (*e.g.*, for investigations and litigation against such parties, etc.); *however*, the Interim Order provides a budget of $50,000 of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, to be used by the Creditors' Committee to investigate but not prosecute the validity, enforceability, perfection, priority or extent of the Prepetition Liens or any potential challenges against the Prepetition Secured Parties. | DIP Credit Agreement, § 5.19 Interim Order 29 |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The Prepetition Secured Parties. | Interim Order (H)(v) |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | <u>Adequate Protection Liens</u>: With respect to the ABL Obligations, First Lien Term Loan Obligations and Second Lien Term Loan Obligation, as security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "**Adequate Protection Liens**"), subject to the Carve-Out and have relative rank and priority set forth in the Prepetition Intercreditor Agreements and the DIP Orders.<br><br>As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "**Adequate Protection Claims**"), but subject to the Carve Out and have the relative rank and priority set forth in the Prepetition Intercreditor Agreements and the DIP Orders. | Interim Order 23 |

21

| MATERIAL TERMS | | Location |
|---|---|---|
| | Fees and Expenses: With respect to the ABL Obligations, First Lien Term Loan Obligations and Second Lien Term Loan Obligations, payment of all reasonable and documented fees and expenses, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the Interim Order. | |
| | Postpetition Interest Payments: Payment of accrued interest and default interest with respect to the ABL Obligations, the First Lien Term Loan Obligations and the Second Lien Term Loan Obligations as provided for in the DIP Documents and the Interim Order. | |
| | Information: The Debtors shall provide the ABL Agent, the First Lien Term Agent and the Second Lien Term Loan Agent with all reporting and other information required to be provided to the DIP Agent under the DIP Documents (without, for the avoidance of doubt, any approval rights with respect thereto). | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations.  Subject to the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors and all other parties in interest. | Interim Order G |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, liens are granted on all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement or otherwise, Avoidance Actions | Interim Order 8 |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations.  Subject to the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors and all other parties in interest. | Interim Order ¶ G |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically modified with respect to the DIP Secured Parties and the Prepetition Secured Parties, as applicable, at the end of the Remedies Notice Period, without further notice or order of the Court, unless (A) the DIP Agent (at the direction of the Required Lenders) and the Prepetition Agents (at the direction of the applicable requisite lenders), as applicable, elect otherwise in a written notice to the Debtors, and/or (B) the Court has determined that an Event of Default has not occurred and/or is not continuing and/or (C) the Court orders otherwise.<br><br>In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in the Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of the Interim Order | Interim Order, ¶¶ 11(f), 50 |

| MATERIAL TERMS | Location |
|---|---|
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | Events of Default:<br><br>(a)   the entry of an order by the Bankruptcy Court appointing, the filing of an application by any Debtor or any Debtor consenting to or supporting an application by any other Person, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under Section 1104 of the U.S. Bankruptcy Code in any Chapter 11 Case in each case with expanded powers (beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) of the U.S. Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors;<br><br>(b)   other than circumstances whereby the DIP Lenders are paid the Obligations (as defined in the DIP Credit Agreement) in full in cash, the consummation of a sale of all or substantially all of the Debtors' assets pursuant to a sale under Section 363 of the U.S. Bankruptcy Code, a confirmed plan in the Chapter 11 Cases or otherwise or any Loan Party shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking any of the foregoing, in each case, without the prior written consent of the Required Lenders;<br><br>(c)   subject to the Carve-Out, the creation or incurrence by the Debtors of any claim that is senior to or pari passu with the Adequate Protection Superpriority Claims (as defined in the DIP Credit Agreement) without the prior written consent of the Required Lenders;<br><br>(d)   the conversion of any Chapter 11 Case of a Debtor from one under chapter 11 to one under chapter 7 of the U.S. Bankruptcy Code or any Debtor shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking the conversion of any Chapter 11 Case of a Debtor under Section 1112 of the U.S. Bankruptcy Code or otherwise;<br><br>(e)   (i) the entry by the Bankruptcy Court of any order terminating the Debtors' exclusive periods to file a Chapter 11 Plan of reorganization or liquidation and solicit acceptances thereon under Section 1121 of the U.S. Bankruptcy Code or (ii) the expiration of any Loan Party's exclusive right to file a Chapter 11 Plan of reorganization or liquidation;(f)   the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case, or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the U.S. Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence thereof or (ii) except as provided in the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the U.S. Bankruptcy Code or any equivalent provision of relevant applicable law without the prior written consent of the Required Lenders; | DIP Credit Agreement, §§ 9.01(m) |

23

| MATERIAL TERMS | Location |
|---|---|
| (f)  the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is pari passu or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under th DIP Credit Agreement or the DIP Order (including the Carve-Out); | |
| (g)  other than the Carve-Out, the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order, or the Cash Management Order, in each case, in a manner that is adverse to the DIP Lenders, in their capacities as such, without the prior written consent of the Required Lenders; | |
| (h)  subject to the Carve-Out and except as otherwise provided herein, the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under the DIP Credit Agreement or the other Loan Documents; | |
| (i)  the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding the Administrative Agent, the Prepetition First Lien Collateral Agent, Prepetition First Lien Administrative Agent, Prepetition Second Lien Administrative Agent and Prepetition Sidecar Agents to have the right to or be permitted to "credit bid"; | |
| (j)  the filing by any Loan Party of any Chapter 11 Plan or disclosure statement attendant thereto, or any amendment to such plan or disclosure statement, that (a) does not provide for the payment in full in cash of the Obligations and (b) is not otherwise acceptable to the Required Lenders (which approval may be communicated via email from any of the Lender Advisors); | |
| (k)  the Debtors' filing of a Definitive Document that is not reasonably acceptable to the Required Lenders or the filing of a Chapter 11 Plan that provides for any treatment or recovery on account of DIP Term Loan Claims, Prepetition First Lien Term Loan Claims or Prepetition Sidecar Claims that are not consented to by the Required Lenders in their sole discretion; | |
| (l)  other than as contemplated in the Chapter 11 Plan, the DIP Orders, or the First Day Pleadings, or any other orders of the Bankruptcy Court, any Loan Parties incur any indebtedness, guarantee any indebtedness of another entity, and/or guarantee any liabilities, in each case in excess of $500,000, relating to the Loan Parties' material contracts and facilities (including, for the avoidance of doubt, with respect to any of the Loan Parties' non-Debtor | |

24

| MATERIAL TERMS | | Location |
|---|---|---|
| | Affiliates) without the prior written consent of the Required Lenders (not to be unreasonably withheld); provided that, for the avoidance of doubt, any indebtedness incurred pursuant to the DIP Credit Agreement or a debtor-in-possession facility or agreement regarding the use of cash collateral in connection with the Prepetition ABL Credit Agreement shall not be subject to this subsection. | |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | Without in any way limiting the automatically valid effective perfection of the DIP Liens granted as described in the Interim Order and the Adequate Protection Liens, the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties are authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties and the Prepetition Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them under the Interim Order. | Interim Order, ¶ 25 |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective upon entry of the Interim Order, each of the Debtors and (subject only to the Challenge Period) the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Participating Lenders (in their capacity as DIP Lenders and Prepetition Secured Parties), the DIP Secured Parties and each of their respective Representatives (as defined in the Interim Order) in such capacity (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Credit Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order. For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents and the DIP Secured Parties | Interim Order G(xxi) |

25

| MATERIAL TERMS | | Location |
|---|---|---|
| | and the Debtors reserve all rights in respect of any breaches of the DIP Documents by any DIP Secured Parties or the Debtors, as applicable. | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement. | Interim Order ¶ 30; DIP Credit Agreement § 11.05 |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral (excluding the ABL Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, and/or the Second Lien Term Loan Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, the ABL Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties (excluding the ABL Secured Parties), and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Secured Parties, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties (excluding the ABL Secured Parties) to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. | Interim Order ¶ 13 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | Each of the Prepetition Secured Parties and DIP Secured Parties (excluding the ABL Secured Parties) shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties (excluding the ABL Secured Parties) and DIP Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral (excluding the ABL Collateral) or DIP Collateral; provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order. | Interim Order H(xiv) |

### Statement Regarding Significant Provisions

18. Pursuant to paragraph 8 of the Complex Case Procedures, the DIP Credit Agreement, the Interim Order, and/or the Final Order contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones** Complex Case Procedures ¶ 8(a) | The DIP Credit Agreement requires the Debtors to comply with the following Milestones including: <ul><li>By the date that is no later than 5 business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;</li><li>By the date that is no later than 30 days after the Petition Date, the Borrower and DIP Lenders shall enter into a Transaction Support Agreement in form and substance acceptable to the Required Lenders;</li><li>By the date that is no later than 45 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; and</li><li>By the date that is no later than 75 days after the Petition Date, the Debtors shall have delivered a quality of earnings report prepared by an independent accounting firm to the DIP Lenders.</li></ul> Justification:  These Milestones are appropriate given the amount of funding the DIP Lenders are willing to make available to the Debtors to fund these chapter 11 cases and pursue a value-maximizing reorganization.  The Debtors believe that the DIP Lenders would not have otherwise provided the DIP Loans. |
| **Cross-Collateralization** Complex Case Procedures ¶ 8(b) | The Interim Order does not provide for cross-collateralization. |
| **Roll-Ups** Complex Case Procedures ¶ 8(c) | Up to $3.3 billion in the aggregate of the obligations under the First Lien Term Loan Agreement held by the DIP Lenders shall be automatically deemed exchanged via assignment on a cashless basis into an equivalent principal amount of Roll-Up Loans deemed to be made under the DIP Credit Agreement, subject to the provisions of paragraph 20 of the Interim Order (the "**Roll-Up**").  Interim Order, Recitals. Justification:  The Roll-Up reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Roll-Up was an integral term of the proposed DIP Facility and was required as a condition to the proposed DIP Facility.  *See* Cowan Declaration, ¶ 28.  Importantly, the Roll-Up only becomes effective upon the Debtors obtaining access to and drawing on the new-money financing.  *See* Cowan Declaration, ¶ 27.  Further, the Debtors and the DIP Secured Parties engaged in arm's-length negotiations.  Finally, the Roll-Up does not harm any party in interest because the only impacted party, the Prepetition Secured Parties, have consented to the Roll-Up. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** Complex Case Procedures ¶ 8(d) | Subject to entry of the Final Order, the DIP Lenders will receive a lien on the Avoidance Proceeds.  Interim Order, ¶ 8. Justification:  The Debtors submit that granting DIP Liens on Avoidance Proceeds is appropriate because the DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' operations and provides a path to implementing a comprehensive restructuring. Moreover, the liens were required by the DIP Secured Parties as a condition to extending the DIP Financing.  The Debtors respectfully submit that granting liens on Avoidance Proceeds is appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |

27

| DIP Facility Term | Relief Requested |
|---|---|
| **Default Provisions and Remedies**<br>Complex Case<br>Procedures ¶ 8(e) | The Interim Order and DIP Credit Agreement provide for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Interim Order by the Debtors, conversion or dismissal of the Debtors' cases, or appointment of a chapter 11 trustee. Interim Order, ¶ 26; *see also* DIP Credit Agreement, § 11.<br><br>Justification.  These Events of Default appropriately balance, in the Debtors' view, the DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral.  In addition, the DIP Agent must provide five business days' prior written notice prior to exercising its rights under the DIP Documents and, as applicable, file a Stay Relief Motion. Until such time as the Stay Relief Motion has been adjudicated by the Court, the DIP Lenders are not authorized to exercise any remedies against the Debtors' assets and the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral as necessary for the Debtors to pay employee and tax related obligations and pay expenses reasonably necessary to avoid any disruption in operations or material harm to the Debtors, in each case, in accordance with the Approved Budget (including any permitted variances) and the DIP Orders.  Therefore, the Interim Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default.  Interim Order, ¶ 12. |
| **Releases of Claim Against Lender or Others**<br>Complex Case<br>Procedures ¶ 8(f) | Subject to the challenge provisions of paragraph 27 of the Interim Order, the Interim Order provides for a releases by the Debtors of claims held by the Debtors against the Participating Lenders (in their capacity as DIP Lenders and Prepetition Secured Parties), the DIP Secured Parties and each of their representatives related to the DIP Documents, DIP Facility, or Roll-Up Loans, the negotiation thereof, and the transactions and agreements reflected thereby.<br><br>Justification.   The release of the DIP Secured Parties and Participating Lenders (in their capacity as DIP Lenders and Prepetition Secured Parties) is appropriate because (i) the Debtors are being provided consideration in the form of the DIP Facility, which is essential to the Debtors' ability to maximize value for their estates and (ii) the release complies with the requirements of paragraph 9 of the Complex Case Procedures because the release is subject to the Challenge Period, which is (i) for the official committee of unsecured creditors (the **"Committee"**), if any, 60 days from the date of the formation of the UCC, and (ii) for all other parties in interest, 60 days from the date of entry of the Interim Order.  *See* Interim Order ¶ 28. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case<br>Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the DIP Lenders, the DIP Agent, and Senior Secured Parties (as defined herein) (*e.g.*, for investigations and litigation against such parties); *however*, the Interim Order provides a budget of $50,000 of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, to be used by the Committee to investigate the validity, enforceability, perfection, priority or extent of the Prepetition Liens or any potential Challenges against the Senior Secured Parties.  *See* Interim Order ¶ 29.<br><br>Justification.   These limitations are usual and customary.  The Debtors, having engaged in arm's-length negotiations with the DIP Lenders and certain Senior Secured Parties, agreed to certain limitations on the  use of Cash Collateral as consideration for the Senior Secured Parties' consent to |

28

| DIP Facility Term | Relief Requested |
|---|---|
| | the use of cash collateral and the provision of new money financing.  These limitations are reasonable given the facts and circumstances of these chapter 11 cases. |
| **Non-Consensual Priming Liens** Complex Case Procedures ¶ 8(h) | The proposed DIP Facility does not provide any non-consensual priming liens.  The DIP Priming Liens (defined below) granted to the DIP Lenders are only priming the liens of the Senior Secured Parties, who have consented to such priming.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtors of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "**DIP Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) senior in all respects to the other Prepetition Liens on DIP Term Priority Collateral, (ii) senior to any Adequate Protection Liens on DIP Term Priority Collateral and (iii) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Term Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens. ¶ 10(b).  Justification.  It is appropriate to provide priming liens to the DIP Lenders to secure the DIP Obligations because the Senior Secured Parties have consented to the priming of their liens.  The Interim Order does not provide for any non-consensual priming liens.  Furthermore, the Senior Secured Parties are receiving adequate protection. |

## Background

19.     On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

20. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules.

21. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

22. Additional information regarding the DIP Facility is set forth in the *Declaration of Tyler W. Cowan in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (C) Grant Liens and Provide Claims With Superpriority Administrative Expense Status, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**Cowan Declaration**"), and the *Declaration of Charles M. Moore in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (C) Grant Liens and Provide Claims With Superpriority Administrative Expense Status, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**Moore Declaration**" and, together with the Cowan Declaration, the "**DIP Declarations**"), both which have been filed with the Court contemporaneously herewith and incorporated by reference.

**A.      Debtor's Prepetition Capital Structure**

> **1.      Prepetition Debt Capitalization[4]**

23.      As of the Petition Date, the Debtors had approximately $6.1 billion in aggregate principal amount of on-balance sheet outstanding funded debt obligations, $2.3 billion in aggregate "off balance sheet" financings incurred through special purpose vehicles, and approximately $800 million in unsecured supply chain financing liabilities.  The Company, additionally, has approximately $2.3 billion in factoring liabilities.  Debtor First Brands Group Holdings, LLC and its Debtor subsidiaries (the "**FBG Debtors**") hold the approximately $6.1 billion in aggregate principal amount of funded debt obligations outstanding, and Debtor Viceroy Private Capital, LLC ("**Viceroy**") and its Debtor subsidiaries hold the approximately $2.3 billion in off-balance sheet debt obligations outstanding.

24.      The table below summarizes the Debtors' total prepetition debt capitalization.

| Prepetition Indebtedness | Principal Amount Outstanding |
|---|---|
| **ABL Obligations[5]** | |
| ABL Loans/Letters of Credit Obligations | $226.9mm[6] |
| ABL Supply Chain Financing/Cash Management | $369.4mm |
| **Total ABL Obligations** | $596.3mm |
| **Term Loan Obligations[7]** | |
| First Lien L/C Facility | $100mm |
| First Lien Term Loans (USD) | $3,886.9mm |

---

[4]    The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

[5]    ABL Obligations include a bridge loan of $24.5 million provided by the Ad Hoc Group on September 24, 2025.

[6]    Includes approximately $133 million in borrowings and approximately $93 million of undrawn letters of credit.

[7]    Outstanding balances listed as of June 30, 2025; amount excludes $24.5 million bridge loan.

| Prepetition Indebtedness | Principal Amount Outstanding |
|---|---|
| First Lien Term Loans (EUR) | $763mm[8] |
| Side Car Term Loans | $250mm[9] |
| Second Lien Term Loans | $540mm |
| **Total Term Loan Obligations** | $5,539.9mm |
| **Off-Balance Sheet Obligations (SPV Debtors' Obligations)[10]** | |
| Aequum Facilities | $77.8mm |
| CarVal Facilities | $159.0mm |
| Evolution Facilities | $230mm |
| Onset Lease | $1,880mm |
| **Total Off-Balance Sheet Obligations** | $2,346.8mm |
| **Select Unsecured Obligations** | |
| Supply Chain Financing Obligations | $812.4mm |
| **TOTAL DEBT OBLIGATIONS OF DEBTORS** | $9,295.4mm |

25.     The priority of security interests against the FBG Debtors' assets is summarized below:[11]

| Collateral | ABL Priority Collateral | Term Priority Collateral | Previously Unencumbered Assets[12] |
|---|---|---|---|
| **Priority** | 1.   ABL Secured Parties<br>2.   ***Proposed DIP Facility*** | 1.   ***Proposed DIP Facility***<br>2.   First Lien Secured Parties / Side-Car Secured Parties | 1.   ***Proposed DIP Facility*** |

---

[8]     Assuming EUR:USD conversion rate of 1.19:1.00.

[9]     Excludes make whole amount of approximately $26 million.

[10]    Each of the Aequum Facilities, CarVal Facilities, and Evolution Facilities' outstanding balances are listed as of July 31, 2025.

[11]    The ABL Secured Parties maintain a higher priority interest in the ABL Priority Collateral, while the First Lien Secured Parties and the Second Lien Secured Parties maintain a higher priority interest in the Term Priority Collateral.  The ABL Priority Collateral explicitly excludes equipment and real property interests therein, intellectual property rights, and equity interests, among other things, which are, in each case, Term Priority Collateral.  The rights of the ABL Secured Parties, and the First Lien Secured Parties, the Side-Car Secured Parties and the Second Lien Secured Parties are set forth in that certain *Amended and Restated Intercreditor Agreement*, dated as of February 26, 2019.

[12]    The Proposed DIP facility priorities in the above chart include any adequate protection obligations under the DIP. Collateral negotiations between the Debtors and the Ad Hoc Group are ongoing and are subject to change. Notwithstanding anything herein to the contrary, the terms of any entered final order approving the DIP shall control.

32

| Collateral | ABL Priority Collateral | Term Priority Collateral | Previously Unencumbered Assets[12] |
|---|---|---|---|
| | 3. First Lien Secured Parties / Side-Car Secured Parties<br><br>4. Second Lien Secured Parties | 3. Second Lien Secured Parties<br><br>4. ABL Secured Parties | |
| Description | • All Accounts (other than Accounts from sale of Term Priority Collateral)<br>• Inventory<br>• Payment Intangibles (other than Payment Intangibles from sale of Term Priority Collateral)<br>• Deposit Accounts, Securities Accounts, Commodity Accounts and all Money therein<br>• 50% of business interruption insurance and all rights to credit insurance with respect to Accounts<br>• General Intangibles evidencing the above<br>• Relevant collateral, guarantees and Supporting Obligations<br>• Relevant books and records<br>• Products and Proceeds of the above | • Equipment and real property interests therein and fixtures<br>• Intellectual Property<br>• Equity Interests and other Investment Property (other than Payment Intangibles being ABL Priority Collateral)<br>• Instruments, Documents and General Intangibles that are not ABL Priority Collateral<br>• Term Priority Accounts<br>• Insurance policies relating to Term Priority Collateral<br>• Commercial Tort Claims<br>• Other collateral not constituting ABL Priority Collateral<br>• Relevant collateral, guarantees and Supporting Obligations<br>• Relevant books and records<br>• Products and Proceeds of the above | • Substantially all previously unencumbered assets (including proceeds of avoidance actions and commercial tort claims)<br>• Pledges of equity in certain non-Debtor subsidiaries |

26.     In addition to the FBG Debtors' funded indebtedness obligations, the SPV Debtors participate in several lease, inventory, and equipment financing arrangements (the "**Off-Balance Sheet Obligations**"). The obligors on Off-Balance Sheet Obligations are subsidiaries of Debtor entity Viceroy Private Capital, LLC ("**Viceroy**") and Carnaby Capital Holdings, LLC (together with Viceroy and its Debtor subsidiaries, the "**SPV Debtors**"), and are not subsidiaries of FBG. The SPV Debtors are not obligors under the prepetition term loan or ABL facilities. Moreover, DIP and adequate protection liens will not be granted against the SPV Debtors.

1.     **FBG Debtors' Obligations**

27.     *ABL Facility*.   On February 2, 2018, FBG entered into that certain *ABL Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise

modified from time to time, the "**ABL Credit Agreement**") by and among FBG, as lead borrower, Trico Limited, a limited company incorporated under the laws of England and Wales, as a borrower ("**Trico Limited**"), Trico Belgium SA, a Belgian limited liability company incorporated under the laws of Belgium, as another borrower, First Brands Group Intermediate, LLC (f/k/a Trico Group Holdings, LLC), as parent, Bank of America, N.A. ("**BOA**") (as successor to Goldman Sachs Bank USA), as administrative agent and collateral agent  (in such capacities, the "**ABL Agent**") and the lenders parties thereto from time to time (the "**ABL Lenders**" and, together with the ABL Agent and any other "Secured Parties" (as defined in the ABL Credit Agreement), collectively, the "**ABL Secured Parties**"), providing for an asset-based senior secured revolving credit facility (the "**ABL Facility**") with an original aggregate principal amount of up to $80 million.  The total commitments under the ABL Facility are up to $250 million.

28.     FBG's obligations under the ABL Facility are guaranteed by certain Debtor affiliates of FBG (collectively, the "**ABL/Term Loan Obligors**"), and the obligations of the ABL/Term Loan Obligors under the ABL Facility are secured by (i) a **first** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement (as defined below)) of the ABL/Term Loan Obligors and (ii) a **third** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

29.     As of the Petition Date approximately $227 million of principal obligations under the ABL Facility are outstanding, consisting of approximately $133 million in borrowings and approximately $93 million of undrawn letters of credit.

30.     *First Lien Facility*.  On February 2, 2018, FBG entered into that certain *First Lien Term Loan Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Term Loan Agreement**") by and among

34

FBG, as borrower, FBGI, as parent, Jefferies Finance LLC ("**Jefferies**") (as successor to Credit Suisse AG, Cayman Island Branch, which was successor to Goldman Sachs Bank USA), as administrative agent and collateral agent (in such capacities, the "**First Lien Agent**") and the lenders from time to time party thereto (the "**First Lien Lenders**" and, together with the First Lien Agent and any other "Secured Parties" (as defined in the First Lien Term Loan Agreement), including any L/C Issuer (as defined in the First Lien Term Loan Agreement) collectively, the "**First Lien Secured Parties**").  Under the First Lien Term Loan Agreement, term loans in an aggregate original principal amount of $3,862.4 million and $763 million are outstanding.  These amounts include a bridge loan with a principal amount of $24.5 million that was provided to the Debtors on September 24, 2025 by certain First Lien Lenders pursuant to the Bridge Amendment (as defined below) in the lead up to the Debtors' chapter 11 filing so that the Debtors had sufficient funds to make payroll and other critical payments.

31.     FBG's obligations under the First Lien Term Loan Agreement are guaranteed by the ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the First Lien Term Loan Agreement are secured by (i) a **second** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (i) a **first** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

32.     ***Second Lien Facility***.  On February 26, 2019, FBG entered into that certain *Second Lien Term Loan Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Second Lien Term Loan Agreement**") by and among FBG, as borrower, FBGI, as parent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Island Branch), as administrative agent and collateral agent (in such capacities,

the "**Second Lien Agent**") and the lenders from time to time party thereto (the "**Second Lien Lenders**" and, together with the Second Lien Agent and any other "Secured Parties" (as defined in the Second Lien Term Loan Agreement), collectively, the "**Second Lien Secured Parties**"). Under the Second Lien Term Loan Agreement, term loans in an aggregate principal amount $540 million are outstanding.

33.     FBG's obligations under the Second Lien Term Loan Agreement are guaranteed by the other ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the Second Lien Term Loan Agreement are secured by (i) a **third** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (ii) a **second** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

34.     *Side-Car Facility*. On June 16, 2025, FBG entered into that certain *First Lien Term Loan Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Side-Car Term Loan Agreement**") by and among FBG, as borrower, FBGI, as parent, Sagard Holdings Manager (US) LLC, as Sagard administrative agent (in such capacity, the "**Side-Car Sagard Agent**"), GLAS USA LLC, as GLAS administrative agent (in such capacity, the "**Side-Car GLAS Agent**") and collateral agent (in such capacity, the "**Side-Car GLAS Collateral Agent**") and the lenders from time to time party thereto (the "**Side-Car Lenders**" and, together with the Side-Car Sagard Agent, the Side-Car GLAS Agent, the Side-Car Collateral Agent and any other "Secured Parties" (as defined in the Side-Car Term Loan Agreement), collectively, the "**Side-Car Secured Parties**," and together with the First Lien Secured Parties and the Second Lien Secured Parties, the "**Term Loan Lenders**," and the Term Loan Lenders together with the ABL Secured Parties, the "**Senior Secured Parties**").

36

Under the Side-Car Term Loan, term loans in an aggregate principal amount of $250 million were extended to the Company on June 16, 2025.  On September 24, 2025, as a result of the Company's failure to make an interest payment that was due on September 16, 2025, the Side Car Lenders accelerated the Side Car Loan, including a make-whole premium of approximately $24 million. As a result, the total amount outstanding on account of the Side-Car Term Loan as of the Petition Date is approximately $274 million.

35.    FBG's obligations under the Side-Car Term Loan Agreement are guaranteed by the other ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the Side-Car Term Loan Agreement are secured by (i) a **first** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (ii) a **second** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and, in each case, subject to the terms of the ABL/Term Loan Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement.

36.    Additionally, contemporaneously with the execution of the Side-Car Term Loan Agreement, FBGI and the Side Car Secured Parties also entered into that certain *Side Letter* (the "**Side Letter**").  Under the terms of the Side Letter, FBG agreed to certain restrictions and negative covenants, including with respect to FBG's ability to incur new money indebtedness other than as contemplated by the Side Letter, absent the consent of the Side Car Secured Parties.

### 2.    **Off-Balance Sheet Obligations**

37.    The SPV Debtors' Off-Balance Sheet Obligations generally consist of inventory financing programs, pursuant to which a Debtor borrower will agree to purchase or exchange in-kind inventory and/or raw materials from other Debtor subsidiaries.  The borrower may then utilize the purchased or exchanged inventory as borrowing base assets to obtain loans

from the financier and may sell the completed inventory to other Debtor entities or third parties in the ordinary course.

38.   **Aequum Facilities**.   On March 28, 2024, Debtor Broad Street Financial, LLC, as borrower (the "**Aequum Borrower**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**U.S. Aequum Facility**") with, among others, Aequum Capital Financial II, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto (the "**Aequum Lenders**").   Under the Aequum Facility, the Aequum Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million to the Aequum Borrower.

39.   The Aequum Facility allows the Aequum Borrower to purchase inventory directly from FBG and its subsidiaries, including brake parts, electronics, steering components, calipers, pumps, and motors, and utilize that inventory as a borrowing base to obtain credit from the Aequum Lenders.   Subsequently, the Aequum Borrower may sell the inventory back to the Debtors, which must be purchased by Viceroy if not by another Debtor entity.   As of the Petition Date, on information and belief, the Aequum Borrower holds approximately $66 million in inventory as of July 31, 2025.   The Aequum Borrower's obligations under the Aequum Facility are guaranteed by Debtor Broad Street Financial Holdings, LLC and are secured by a lien on all assets of the Aequum Borrower and Broad Street Financial Holdings, LLC.

40.   On December 2, 2024, Debtors Global Assets LLC, as US borrower, Global Assets GmbH, a German limited liability company and an affiliate of the Debtors, as German borrower (together with Global Assets LLC, the "**UMB Borrowers**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise

modified from time to time, the "**Global Assets Facility,**" and together with the Aequum Facility, the "Aequum Facilities") with, among others, UMB Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto from time to time (the "**UMB Lenders**").  Under the Global Assets Facility, the UMB Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million to the UMB Borrowers.

41.     The Global Assets Facility enables the UMB Borrowers to use finished parts, raw materials, and semi-finished products purchased directly from certain of the Debtors as a borrowing base to draw down credit from the UMB Lenders.  The UMB Borrowers may then sell the inventory back to the Debtors, which, similarly to the U.S.-based Aequum facility, must be purchased by Viceroy if not by another Debtor entity.  As of the Petition Date, on information and belief, the UMB Borrowers hold approximately $68 million in inventory as of July 31, 2025. The UMB Borrowers' obligations under the Global Assets Facility are guaranteed by Debtor Carnaby Capital Holdings, LLC and secured by a lien on all assets of the UMB Borrowers and Carnaby Capital Holdings, LLC.

42.     As of the Petition Date, including all outstanding and accrued interest, approximately $91 million of obligations under the Aequum Facilities are outstanding.

43.     *Carval II Facility*.  On May 31, 2022, Debtor Carnaby Inventory II, LLC (the "**CarVal II Borrower**") entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**CarVal II Facility**") with, among others, GLAS Trust Company LLC, as administrative agent, and the lenders party thereto from time to time (the "**CarVal II Lenders**").  Under the CarVal II Facility, the CarVal II Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $60 million to the CarVal II Borrower.  The CarVal II Borrower

may also engage certain subsidiaries of the Debtors to manufacture inventory on its behalf, which have contractual relationships with certain *maquiladora* entities that import materials from domestic Debtor subsidiaries and export finished goods.  Such finished goods may be entitled to United States-Mexico-Canada exemptions for certain tariffs.  The CarVal II Borrower may purchase manufactured inventory such as brake parts or raw materials from the Debtors and may utilize that inventory as a borrowing base to obtain credit from the CarVal II Lenders.  As of the Petition Date, on information and belief, the CarVal II Borrower holds approximately $116 million in inventory as of August 2, 2025.  The CarVal II Borrower's obligations under the CarVal II Facility are guaranteed by Debtors First Brand Group Holdings, LLC and Carnaby Inventory Holdings II, LLC and secured by a lien on all assets of the CarVal II Borrower and Carnaby Inventory Holdings II, LLC.

44.     *Carval III Facility*.  On July 6, 2022, Debtor Carnaby Inventory III, LLC (the "**CarVal III Borrower**") entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**CarVal III Facility,**" and together with the CarVal II Facility, the "**CarVal Facilities**") with, among others, GLAS Trust Company LLC, as administrative agent, and the lenders party thereto from time to time (the "**CarVal III Lenders**").  Under the CarVal III Facility, the CarVal III Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $100 million to the CarVal III Borrower.  Similar to the CarVal II Facility, the CarVal III Borrower may engage certain subsidiaries of the Debtors with manufacturing contracts with certain *maquiladora* entities to manufacture inventory on its behalf.  The CarVal III Borrower may purchase manufactured inventory and raw materials from the Debtors, and may utilize that inventory as a borrowing base to obtain credit from the CarVal II Lenders.  As of the Petition Date, on

information and belief, the CarVal III Borrower holds approximately $133 million in inventory as of August 2, 2025. The CarVal III Borrower's obligations under the CarVal III Facility are guaranteed by Debtors First Brand Group Holdings, LLC and Carnaby Inventory Holdings III, LLC and secured by a lien on all assets of the CarVal III Borrower and Carnaby Inventory Holdings III, LLC.

45. As of the Petition Date, including all outstanding and accrued interest, approximately $188 million of obligations under the CarVal Facilities are outstanding.

46. *Evolution Facilities*. On November 9, 2023, Debtor Patterson Inventory, LLC (the "**Patterson Borrower**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Patterson Facility**") with Evolution Credit Opportunity Master Fund II-B, L.P., as lender ("**Evolution**"). Under the Patterson Facility, Evolution provided an uncommitted asset-based revolving credit facility with maximum aggregate amount of advances of $150 million to the Patterson Borrower. The Patterson Borrower's obligations under the Patterson Facility are (i) guaranteed by Debtor Patterson Inventory Holdings, LLC, (ii) secured by a pledge of 100% equity of the Patterson Borrower that the Patterson Parent owns, and (iii) secured by a lien on all assets of the Patterson Borrower.

47. On March 28, 2024, Starlight Inventory I, LLC (the "**Starlight Borrower**," and together with the Patterson Borrower, the "**Evolution Borrowers**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Starlight Facility**" and, together with the Patterson Facility, collectively, the "**Evolution Facilities,**" and the Evolution Facilities together with the CarVal Facilities and the Aequum Facilities, the "**Inventory Financing**

41

**Facilities**"). Under the Starlight Facility, Evolution provided an uncommitted asset-based revolving credit facility with maximum aggregate amount of advances of $150 million to the Starlight Borrower. The Starlight Borrower's obligations under the Starlight Facility are (i) guaranteed by Starlight Inventory Holdings I, LLC, (ii) secured by a pledge of 100% equity of the Starlight Borrower that the Starlight Parent owns, and (iii) secured by a lien on all assets of the Starlight Borrower.

48. Under each of the Evolution facilities, the applicable Evolution Borrower may purchase eligible inventory pursuant to purchase orders from FBG and its subsidiaries, which they may use as a borrowing base to obtain loans from Evolution. The Evolution Borrowers collectively held approximately $376 million in inventory as of August 2, 2025.

49. As of the Petition Date, including all outstanding all outstanding and accrued interest, approximately $265 million of obligations under the Evolution Facilities are outstanding.

50. ***Onset Obligations***.[13] On June 28, 2022, Carnaby Inventory IV, LLC ("**Carnaby IV**") entered into that certain *Master Lease Agreement No. OFI1445416* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Onset Master Lease IV**") with Onset Financial, Inc. ("**Onset**" and together with Aequum Lenders, UMB Lenders, CarVal II Lenders, CarVal III Lenders, and Evolution, the "**SPV Lenders**"). Specific leases of property under the Onset Master Lease IV are documented under separate schedules that are entered into and delivered by Carnaby IV to Onset from time to time. Obligations of Carnaby IV under the Onset Master Lease IV are guaranteed by each of First Brands

---

[13] Notwithstanding the description of the Onset Master Leases herein, the Debtors believe the Onset Master Leases may not be true leases, and the Debtors reserve all rights and remedies, and waive none, in connection therewith, including their rights to seek to recharacterize the Onset Master Leases as financings.

Group Holdings, LLC, Viceroy Private Capital, LLC, Carnaby Capital Holdings, LLC, Carnaby Capital, LLC and Carnaby Inventory Holdings IV, LLC.

51.     On October 24, 2023, Carnaby FA, LLC ("**Carnaby FA**" and, together with Carnaby IV, the "**Carnaby Lessees**" or the "**Carnaby Debtors**") entered into that certain *Master Lease Agreement No. OFI1545465* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Onset Master Lease FA**" and, together with the Onset Master Lease IV, collectively, the "**Onset Master Leases**") with Onset. Specific leases of property under the Onset Master Lease FA are documented under separate schedules that are entered into and delivered by Carnaby FA to Onset from time to time. Obligations of Carnaby FA under the Onset Master Lease FA are guaranteed by each of Carnaby Capital Holdings, LLC, Viceroy Private Capital, LLC, First Brands Group Holdings, LLC, Carnaby Capital, LLC, Carnaby FA Holdings, LLC, Eagle Casting Holdings, LLC and Eagle Casting, LLC.

52.     Under the Onset Master Leases, Onset will initially lend funds to Carnaby IV to acquire inventory or equipment from FBG on Onset's behalf.  Subsequently, the inventory will be leased back to Carnaby IV and may ultimately be repurchased by FBG.

53.     As set forth in more detail below, the Debtors entered into three forbearances with respect to the Onset Master Leases.

54.     As of the Petition Date, including all outstanding and accrued interest, fees, forbearance fees, approximately $1.9 billion of obligations under the Onset Master Leases and related forbearances are outstanding.

43

**B.** **Immediate Need for DIP Facility and Use of Cash Collateral**

55. As described in the First Day Declaration, the Debtors have incurred significant losses of liquidity in the months leading up to these chapter 11 cases. Historically, the Debtors have funded their operations through third-party capital and cash generated in the ordinary course of business. However, in light of industry uncertainty and headwinds from newly imposed tariffs, the Debtors' operating performance has been unable to support the liquidity required to satisfy their capital needs while meeting funded debt and other obligations. The Debtors continued to incur substantial losses through the Petition Date—ultimately necessitating that the Debtors obtain Bridge financing from the First Lien Lenders—and incremental capital will be required to stabilize the business during the chapter 11 cases. Accordingly, the Debtors require additional financing to meet their liquidity needs and fund the costs of administering these chapter 11 cases.

56. The Debtors have an immediate and critical need to obtain the DIP Facility and the authority to use Cash Collateral throughout the chapter 11 process, which will permit the Debtors to, among other things, (i) stabilize their business operations, including the Debtors' global manufacturing and distribution network, (ii) maintain business relationships with critical suppliers, manufacturers, vendors, and customers, (iii) purchase the materials necessary to timely deliver products to customers, including auto parts retailers, wholesale distributors, dealerships and mass retailers, (iv) make payroll for their approximately 6,000 Debtor employees and 15,000 Mexico-based employees, (v) satisfy other working capital and operational needs in a capital-intensive business, (vi) administer their estates in the ordinary course for the duration of these chapter 11 cases, and (vii) conduct a value-maximizing transaction. The Debtors are entering chapter 11 with *de minimis* cash on hand (approximately $14 million) and their operating cash flow, as currently projected, is not sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases. Moreover, all of the Debtors' cash, wherever located

44

and held, including cash in deposit accounts, that constitutes or will constitute Cash Collateral is subject to prepetition security interests in favor of the Prepetition Secured Parties in accordance with the Prepetition Credit Documents. Accordingly, without access to Cash Collateral and additional capital, the Debtors do not have sufficient cash on hand to cover their operating expenses and the costs of these chapter 11 cases.

57.     Prior to the Petition Date, the Debtors, with the assistance of their advisors, including Alvarez & Marsal North America, LLC ("**A&M**") and Lazard, worked to analyze the Debtors' cash flows and determine whether incremental DIP financing might be reasonably necessary and, if so, the amount and type of DIP financing that would be appropriate to operate their businesses during an in-court restructuring process. This analysis included, among other things, the assessment of (i) the Debtors' near-term financial projections and (ii) the impact of the chapter 11 cases on the Debtors' liquidity. Based on this analysis, the Debtors and their advisors concluded that the Debtors require approximately at least $1.1 billion of new money postpetition financing and access to Cash Collateral to finance their operations and maintain sufficient liquidity during these chapter 11 cases. Further, as shown in the Initial Budget attached to the Interim Order, the Debtors require immediate access to $500 million of funds (*i.e.*, the Initial Draw) to maintain adequate liquidity to operate their business in the ordinary course prior to the Final Hearing.

58.     The proposed DIP Facility, together with access to Cash Collateral, will provide sufficient liquidity to fund the Debtors' operations and the costs of administering these cases. The DIP Credit Agreement provides for an initial borrowing under the DIP Facility in an amount equal to $500 million following entry of the Interim Order. The Debtors' need for liquidity is immediate and critical—without it, the Debtors will not be able to meet payroll and other

obligations.  In addition, the Debtors received prepetition notices of default from several lender groups, which could exercise remedies and further damage the Debtors' liquidity situation.  With the protections of chapter 11 and influx of liquidity, the Debtors can stabilize operations, both domestic and foreign, and move ahead with negotiations with key stakeholders to initiate a value-maximizing transaction, to the benefit of all parties in interest.  Securing a meaningful new money postpetition financing commitment at the outset of these chapter 11 cases will therefore permit the Debtors to stabilize and continue operating in the ordinary course and effectuate a wider strategy.

## C.      Efforts to Obtain Prepetition Financing

59.      In July 2025, the Company launched a refinancing process led by Jefferies Finance LLC seeking to raise approximately $6.2 billion that would be used to comprehensively refinance its capital structure by paying down its existing funded debt obligations (the "**Global Refinancing Process**").  The primary purpose of the Global Refinancing Process was to extend the maturities on the substantial majority of the Company's funded debt, as well as enhance the Company's liquidity through an upsize of the ABL Facility.  Cowan Decl. ¶ 10.  The Company paused the Global Refinancing Process in early August 2025 to enable the Company to engage a third party to complete a "quality of earnings" report, which was expected to take six to eight weeks to complete, and provide answers on the other outstanding diligence questions raised by potential investors.  *Id.*  At that time, Lazard was engaged to initially explore raising bridge financing to provide the Company with sufficient liquidity to fund operations while the Company completed the quality of earnings process and, ultimately, attempted to complete the Global Refinancing Process.  *Id.*

60.      In early August 2025, with the assistance of the Debtors' management team and other advisors, Lazard launched a marketing process to solicit bridge financing proposals.  In connection with this process, Lazard reached out to six (6) parties, four (4) of which agreed to sign

non-disclosure agreements (the "**NDAs**") for the purpose of engaging on the financing opportunity. At the time, the belief was that the Company needed to raise approximately $425 million of incremental liquidity and had flexibility around the financing structure so long as it was permissible under the Company's existing debt documents and related agreements (*e.g.*, incremental term loans, non-loan party debt, supply chain financing). Parties were presented with both a request for proposal ("**RFP**") that provided background on the Company and its situation at that time (based on information provided by the Company), the investment opportunity and proposed financing structure, as well as a more detailed management presentation. Parties were also provided with access to a virtual dataroom that was populated with a variety of financial and legal information, including details on the capital structure and liquidity information, provided by management.   In the subsequent three weeks, Lazard engaged with parties around potential financing structures, facilitated business and legal due diligence and provided access to management, including through management presentations. The Company progressed both non-loan party and inventory financing-based structures with several parties.   Despite the Debtors' efforts, however, this process did not yield any actionable proposals for out-of-court financing. Specifically, the Debtors only received one (1) financing proposal, which was not actionable because the amount of the proposed financing was (i) insufficient to meet the Company's liquidity needs, (ii) subject to significant incremental asset-level and financial diligence, and (iii) structured in a manner that introduced material execution risk.  Cowan Decl. ¶ 11.

61.     As part of the bridge financing process, the Company also engaged Lazard's automotive mergers and acquisitions team to explore a minority, majority or entire sale of the Company. In connection with this process, Lazard contacted five (5) parties, two (2) of which executed NDAs.  Parties were provided access to a separate VDR and meaningful business and

legal diligence facilitated through Lazard and Weil, with the goal of trying to get to an indication of interest ("**IOI**") in a matter of weeks. Despite those efforts, and partly because of publicity related to the Debtors' capital structure challenges, both parties declined to provide an IOI, but confirmed their continued interest in the Company to the extent those challenges were resolved. Cowan Decl. ¶ 12.

62.     As both the bridge financing and M&A processes unfolded in August 2025, the Company's financial position worsened and certain information became available that required further refinement of the Company's liquidity needs, as well as the advisors' view of the timing and viability of out-of-court processes. The new information that became available to Lazard included (i) updated financial information on the available collateral for new financings, (ii) additional detail about the Company's accounts receivable factoring programs and off-balance sheet supply chain and inventory financings, and (iii) updated information that demonstrated a material decline in liquidity throughout August and early September, and therefore resulted in a greater overall financing need than was previously anticipated. Cowan Decl. ¶ 13.

63.     The third-party bridge financing process was ultimately unsuccessful due to, among other things, the Company's complex capital structure, the limited availability of unencumbered assets, and the amount of financing needed and the complexity and need for further review of the company's off-balance sheet financing arrangements and related accounting. Furthermore, the information requests from potential M&A counterparties suggested that the timeline to reach agreement on economic terms and close a transaction would take multiple additional months. These facts made it apparent that third-party bridge financing, the Global Refinancing Process and potential out-of-court M&A transaction(s) no longer represented viable paths forward. Cowan Decl. ¶ 14.

48

**D.      Efforts to Obtain DIP Financing**

64.      With no third-party source of additional funding available on an out-of-court basis, the Debtors' only apparent viable option for raising the financing necessary to stabilize the business and pursue a value-maximizing restructuring process was to file for chapter 11 protection and secure debtor-in-possession financing.  A chapter 11 filing would also allow the Debtors to review and diligence the Company's operations, accounting, financing and contractual arrangements, among others, and to be protected by an automatic stay, preventing creditors from seizing Company assets.  Cowan Decl. ¶ 16.

65.      Substantially all of the Debtors' domestic assets are subject to the liens of the Prepetition Secured Parties, each of which expressed that they would not consent to any third-party providing DIP financing on a priming basis.  Moreover, as evidenced by the Debtors' efforts to raise financing prior to the Petition Date, the Debtors do not have sufficient unencumbered property to pledge as collateral to support an adequately sized DIP facility.  Therefore, any third-party DIP financing would either have to be provided on a junior basis or otherwise be subject to a priming contest or valuation dispute with the Debtors' prepetition secured lenders at the outset of these chapter 11 cases.  Accordingly, the Debtors and their advisors focused their primary efforts during their remaining liquidity runway towards developing and negotiating an actionable DIP financing proposal with their existing prepetition lenders.

66.      In early September, the Ad Hoc Group retained counsel, Gibson, Dunn & Crutcher LLP, and a banker, Evercore Inc.  In the aggregate, the Ad Hoc Group holds approximately (i) 86% of the principal outstanding First Lien Term Loans, (ii) 100% of the principal outstanding Side-Car Loans, and (iii) 78% of the principal outstanding Second Lien Term Loans.  By mid-September, members of the Ad Hoc Group and their advisors executed non-disclosure agreements and were provided with diligence information, including access to a virtual

dataroom, marketing materials and diligence sessions. In a matter of days, Lazard and the Debtors' other advisors were in frequent discussions with the Ad Hoc Group and their advisors regarding the consensual use of their cash collateral and the terms of a potential DIP financing. On September 17, 2025, the Debtors delivered an initial debtor-in-possession financing proposal to the Ad Hoc Group as part of such discussions. Cowan Decl. ¶ 18.

67. Simultaneously, the Debtors, with the assistance of Lazard and their other advisors, negotiated with their ABL Lenders regarding the terms of consensual use of cash collateral and adequate protection, and sought a DIP proposal from such lenders. The parties exchanged multiple proposals outlining the potential terms of adequate protection and consensual use of cash collateral in the week leading up to the Petition Date. The DIP proposal ultimately received from the ABL Lenders was not actionable, as it did not include any new money, and would not have been sufficient to meet the Debtors' needs, among other deficiencies. Cowan Decl. ¶ 19.

68. In the week leading up to the Petition Date, the Debtors also received one DIP financing proposal from an inventory financing counterparty. However, the proposal was not actionable given the limited quantum of new money made available, and the request for a roll-up of the existing exposure despite uncertainty over the nature of the claims. Cowan Decl. ¶ 20.

69. During the approximately ten days leading up to the Petition Date, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, including the size of the facility, the roll-up of the DIP Lenders' First Lien Term Loans, the conditions for drawing on the DIP tranches, the associated fees, milestones, and definitive documentation for the financing. Throughout the negotiation process, the Debtors' advisors held numerous calls and briefings with the Debtors' management team, Special Committee, and the

Board, each of which provided feedback and direction with respect to the proposed term of the DIP Facility.  Cowan Decl. ¶ 21.

70.     The Debtors' primary strategic consideration with respect to the financing was to adequately size the facility to stabilize the Debtors' business and provide sufficient runway for the Debtors to reorganize.

### Terms of DIP Facility Are Reasonable Under the Circumstances

71.     As discussed in the First Day Declaration, the DIP Declarations, and herein, the obligations, interest rate, fees, and milestones under the DIP Facility are reasonable under the circumstances.  For the reasons set forth herein and in the First Day Declaration and DIP Declarations, the DIP Facility provides the best (and only) financing option available to the Debtors under the circumstances.  The DIP Lenders have acted in good faith and have agreed to provide the DIP Facility to the Debtors on terms that are reasonable under the circumstances.

### DIP Facility Should Be Approved

72.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the DIP Declarations, the Debtors were unable to procure sufficient financing in the form of unsecured or other junior credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)–(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders to secure the DIP Facility on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

A.     **Obtaining DIP Financing Is a Sound Exercise of Business Judgment and Is Necessary to Preserve the Debtors' Assets**

73.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re Estrada*, Case No. 16-80003 (LZP), 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Age Ref., Inc.*, No. 10-50501 (LMC)), 2010 WL 4780670, at *6 (Bankr. W.D. Tex. Mar. 3, 2010) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (JB) (Bankr. S.D. Tex. July 11, 2008), ECF No. 21 (same); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

74.     The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the debtor and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *see also Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986). Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the

action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

75. The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment for several reasons.  The Debtors require immediate access to postpetition financing to support their working capital needs, satisfy near-term payment obligations, including to employees, vendors, and taxing authorities, and transition smoothly into chapter 11.

76. *First*, the proposed DIP Facility is the only viable financing option available to the Debtors.  As set forth in the DIP Declarations, the Debtors, through Lazard, sought financing proposals from existing and third party lenders, and there was no alternative financing available on more favorable economic terms or on the expedited timeline the Debtors required. The Debtors, in a reasonable exercise of their business judgment, determined that the DIP Facility provides certainty with respect to the capital necessary to stabilize operations and fund the administration of these chapter 11 cases.

77. *Second*, the proposed terms, including the principal economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, premia, interest rate, and default rate, are consistent with other debtor-in-possession financings of this magnitude, in

complex cases with similar risk profiles and unique circumstances.  Here, the warp speed with which the Debtors had to secure a massive amount of DIP Financing did not provide the Ad Hoc Group with an adequate opportunity for legal and factual diligence.  Combined with the allegations around the Debtors' undisclosed liabilities, the Ad Hoc Group insisted on economics that compensated them for the potential risk in this circumstance.

78. The Debtors negotiated the DIP Credit Agreement with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases on fair and reasonable terms under the circumstances.  For the foregoing reasons, the DIP Facility is in the best interests of the Debtors' estates and is a sound exercise of the Debtors' business judgment.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

79. The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens to the applicable DIP Lenders pursuant to section 364(d) of the Bankruptcy Code.  The Debtors propose to provide the DIP Lenders (i) first priority liens on, and security interests in, substantially all unencumbered property of the Debtors, subject and subordinate to the Carve-Out, and (ii) first priority, senior priming liens on, and security interests in, the DIP Collateral, subject and subordinate to the Carve-Out and the ABL Liens on the ABL Priority Collateral.

80. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice

and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

81.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and (b) of the Bankruptcy Code; (b) the credit transaction benefits the debtor as necessary to preserve estate assets; and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, Case No. 16-10429 (SHL), 2016 WL 2616717, at \*11 (Bankr. S.D.N.Y. May 4, 2016); *Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *Ames Dep't Stores*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

82.     The proposed DIP Facility satisfies all three prongs.  First, the Debtors do not believe alternative financing is presently available on an unsecured or administrative priority basis only.  Nor would it be customary for chapter 11 debtors of similar size and scale to be able to incur such financing.  Moreover, the Debtors' experience advisors, including Lazard, do not believe such financing will be available on terms comparable to those provided pursuant to the Debtors' proposed DIP Financing.  *See* Cowan Decl. ¶ 29.

55

83.     Second, the proposed DIP Facility is necessary to preserve the Debtors' estates.  As set forth in the Moore Declaration and DIP Declarations, the Debtors urgently require access to the DIP Facility to ensure they have sufficient liquidity to, among other things, pay their employees, taxing authorities, and critical vendors, and operate their businesses and administer their estates in the ordinary course for the pendency of these cases.  *See* Moore Decl. ¶¶ 7–10; *see also* Cowan Decl. ¶¶ 23–24.  As reflected in the Initial DIP Budget, the Debtors' operating cash flow will not be sufficient to fund ongoing operations and expenses for the projected duration of these chapter 11 cases.  Without the funds provided by the DIP Facility, the Debtors risk rapid diminishing value of their assets and potential operational shutdown, which would irreparably harm the Debtors.

84.     Third, the terms of the proposed DIP Facility are fair, reasonable, and adequate under the circumstances.  As stated in the DIP Declarations, First Day Declaration, and this Motion, the proposed DIP Facility represents the most favorable—indeed, the only—source of financing available to the Debtors that would meet their long-term liquidity need and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases.

85.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1). "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'" *Republic Airways Holdings*, 2016 WL 2616717, at *11 (quoting *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992)). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). The Debtors may incur "priming" liens under the DIP Facility if either (a) the Term Loan Lenders have consented or (b) the Term Loan Lenders' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

86. Here, the Ad Hoc Group members have affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. The members of the Ad Hoc Group hold in the aggregate approximately 86% of the First Lien Term Loan Claims, 100% of the Side Car Claims, and 78% of the Second Lien Term Loan Claims, the holdings of each are sufficient to establish consent. In addition, through their intercreditor agreement, the ABL Lenders have consented to their third lien on Term Loan Collateral being primed.

87. As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

1. **Alternative Sources of Financing Are Not Available to Debtors**

88.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

89.     The Debtors do not believe that alternative financing on an unsecured or junior secured basis is presently available. As set forth in the DIP Declarations, in addition to the Ad Hoc Group, the Debtors, with the assistance of Lazard, were in contact with the ABL Lenders to seek a proposal for postpetition financing. None of the proposals form the ABL Lenders were actionable, as they did not include any new money, which is insufficient to meet the Company's dire liquidity needs. The Debtors also received DIP financing proposals from various other parties, but none of those were actionable either.

58

90.     Moreover, the terms of the DIP Facility are fair, reasonable, and adequate. The DIP Facility represents the best—and only—postpetition financing available to the Debtors under the circumstances and is designed to provide the Debtors with sufficient liquidity to operate while negotiating for more fulsome DIP financing that would fund the Debtors during the pendency of these chapter 11 cases.

91.     The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code.

**2.      Senior Secured Parties Have Consented to DIP Liens and DIP Superpriority Claims**

92.     The Term Loan Lenders and ABL Secured Parties have each consented to the Debtors' entry into the DIP Facility and the granting of the DIP Liens and the DIP Superpriority Claims, in each case, upon the terms set forth in the Interim Order and the DIP Documents.

*a.      Consent of First Lien, Side-Car, and Second Lien Secured Parties*

93.     Under the relevant term loan agreements, each of the First Lien Lenders, Side-Car Lenders, and Second Lien Lenders may direct the respective agents with a simple majority of outstanding holdings, unless written consent of all such holders is expressly required for express "sacred rights."  *See* First Lien Term Loan Agreement § 2.01; Side-Car Term Loan Agreement § 2.01; Second Lien Term Loan Agreement § 2.01.  Each term loan agreement further provides that subordination of the liens securing each tranche of term loans in connection with debtor-in-possession financing, as is contemplated here with the DIP Facility, is not a sacred right that would require consent of every First Lien Lender, Side-Car Lender, or Second Lien Lender, as applicable.  *See* First Lien Term Loan Agreement § 11.01(a)(vii); Side-Car Term Loan Agreement § 11.01(a)(vii); Second Lien Term Loan Agreement § 11.01(a)(vii).

94.     In the aggregate, as of the Petition Date, the Ad Hoc Group holds approximately (i) 86% of the principal outstanding First Lien Term Loans, (ii) 100% of the principal outstanding Side-Car Term Loans, and (iii) 78% of the principal outstanding Second Lien Term Loans.   Having approved the DIP Facility and consented to the DIP Liens and DIP Superpriority Claims, and having directed their respective agents to effectuate the same, the Ad Hoc Group have bound all other First Lien Lenders, Side-Car Lenders, and Second Lien Lenders. Any minority groups of each tranche has no basis to object to the DIP Liens or DIP Superpriority Claims, or their effects on the prepetition liens, because those liens belong to the First Lien Agent, Side-Car Agent, and Second Lien Agent, respectively, which have each consented at the direction of the majority of each group (pursuant to the governing credit documents).   *See In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex.) (May 20, 2020 Hr'g Tr. at 107:15–109:7) (overruling a minority lender's objection and holding that standing is moot because the prepetition agent had the authority to act on behalf of the requisite consenting lenders' instructions"); *In re Tops Holding II Corp.*, No. 18-22279 (RDD) (Bankr. S.D.N.Y.) (Feb. 22, 2018 Hr'g Tr. at 41:9– 46:3), ECF No. 167; *In re Chrysler LLC*, 405 B.R. 84, 103 (Bankr. S.D.N.Y.), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *cert. granted*, *judgment vacated sub nom*. *Indiana State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009), *and vacated sub nom*. *In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (stating that an administrative agent and collateral trustee could consent to the sale of collateral free and clear of liens on behalf of all lenders, based on a majority vote in accordance with the applicable credit and intercreditor documents, binding the minority dissenting lenders).

        b.     *Consent of ABL Secured Parties*

95.     Under the ABL/Term Loan Intercreditor Agreement, the ABL Secured Parties consented to debtor-in-possession financing following the structure of the DIP Facility

(with the DIP Liens being senior or pari passu to the Term Loan Lenders' liens on their collateral, and junior to the ABL Liens on the on the ABL Collateral) within a threshold of "115% of the principal balance of the First Lien Obligations as of the date of the commencement of such Insolvency Proceeding." ABL/Term Loan Intercreditor Agreement § 6.1(b). Here, 115% of the "First Lien Obligations" (defined as all obligations arising under the First Lien Term Loan Agreement and additional pari passu obligations), is well in excess of the proposed DIP Facility. Accordingly, the ABL Secured Parties have consented to the incurrence of the a debtor-in-possession loan of that magnitude. The interim relief sought by the Debtors is within that threshold.

### 3. Prepetition Secured Parties Are Adequately Protected

96. Regardless of whether any of the Secured Parties have consented to the DIP Liens, DIP Superpriority Claims, and use of Cash Collateral, they are adequately protected as contemplated by section 364(d) of the Bankruptcy Code. Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens or administrative claims, or enhancement or preservation of collateral value. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.") (quoting 3 *Collier on Bankruptcy* ¶ 363.05 (15th ed. rev. 2005)); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate

that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis.").

     a. *First Lien, Side-Car, and Second Lien Secured Parties Are Adequately Protected*

    97. In exchange for the use of Cash Collateral, pursuant to the Interim Order and Final Order, each of the First Lien Secured Parties, Second Lien Secured Parties, and Side-Car Secured Parties is receiving adequate protection, negotiated in good faith and at arm's length, in the form of (i) valid, perfected replacement security interests in and liens upon all of the Collateral to the extent of any Diminution of Value, (ii) current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of their respective advisors and agents, (iii) payment-in-kind of accrued interest on outstanding obligations under the applicable loan documents, and (iv) information rights equal to the DIP Lenders and the DIP Agent under the DIP Documents, each as provided by the DIP Documents or Interim Order, as applicable. The Debtors submit that the proposed adequate protection package will reasonably protect the First Lien Secured Parties, Second Lien Secured Parties, and Side-Car Secured Parties from any diminution of value in the Prepetition Collateral in which they have a prepetition security interest during the pendency of these chapter 11 cases. The proposed adequate protection package is appropriate under the circumstances of these chapter 11 cases and is necessary to ensure that the Debtors can continue to use Cash Collateral on a consensual basis for the benefit of all parties in interest and the Debtors' estates. The Debtors further submit that the provision of adequate protection to the First Lien Secured Parties, Second Lien Secured Parties, and Side-Car Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

b.    *ABL Secured Parties Are Adequately Protected*

98.    Separately, although the Debtors are in the midst of negotiating an adequate protection package with the ABL Secured Parties for the use of the ABL Priority Collateral on a consensual basis, the ABL Secured Parties are already more than adequately protected.

99.    First, the DIP Facility enhances, rather than diminishes, the value of the first priority liens held by the ABL Secured Parties in inventory and receivables.  The Initial DIP Budget contemplates using the DIP proceeds to, among other things, (i) replenish inventory, (ii) sell existing inventory in exchange for new accounts receivable, and (iii) collect existing accounts receivable for cash.  The Debtors' continued operations, financed by the DIP Facility, are forecast to increase the total ABL Priority Collateral inventory and accounts receivable from an estimated $1.388 billion as of the Petition Date, to an estimated $1.600 billion by the end of October and $1.638 billion by the end of December.  *See* Moore Decl. ¶ 17.  As the first lien holders, the ABL Secured Parties are the direct beneficiaries of this value increase.  In many cases, the preservation or enhancement of collateral constitutes sufficient adequate protection. *See In re True Religion Apparel, Inc.*, No. 20-10941 (CTG) (Bankr. D. Del. May 6, 2020), ECF No. 210 (finding an increase in value is by itself adequate protection); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 3, 2015), ECF No. 245 at 131:25 ("I think in this case that the preservation of the going concern adequately protects the [] lender' interests."); *Prospect Med. Holdings, Inc.*, No. 25-80002 (SGJ) (Bankr. N.D. Tex. Jan. 14, 2025), ECF No. 164 at 133:20–23 (finding "the going concern value that is absolutely I think being preserved here . . . is adequate protection."). Such is the case here.

100.    Additionally, the ABL Secured Parties benefit from a significant equity cushion.  Generally, a sufficient "cushion" of collateral value in excess of the debt can itself constitute adequate protection. *Mendoza v. Temple-Inland Mortgage Corp. (Matter of Mendoza)*,

111 F.3d 1264, 1272 (5th Cir.1997) (stating "most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor"). Although the presence of an equity cushion is not required for a creditor's interest to be adequately protected, it is generally considered *prima facie* evidence of adequate protection. *In re Triplett*, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988) (stating that although the presence of an equity cushion is sufficient to provide adequate protection, it is not required in connection with a debtor's request to use cash collateral); *Wilmington Tr. Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection.").

101.    The amount of equity cushion sufficient to adequately protect a creditor's interest is determined on a case-by-case basis and is within the discretion of the court. *The Resolution Tr. Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994). However, courts have "almost uniformly held that an equity cushion of 20% or more constitutes adequate protection . . . [and have] almost as uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection." *Equitable Life Assurance Soc'y of the U.S. v. James River Assoc. (In re James River Assoc.)*, 148 B.R. 790, 796 (E.D. Va. 1992) (internal quotation marks and citation omitted). Moreover, courts have found creditors with equity cushions between 11% to 20% to be adequately protected. *See, e.g.*, *Fed. Land Bank v. Carson (In re Carson)*, 34 B.R. 502, 505 (D. Kan. 1983) (finding an 11% equity cushion constituted adequate protection); *Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679, 680 (Bankr. E.D. Va.1980) (holding that an equity cushion of 15% to 20% constituted adequate protection for a creditor).

64

102. Importantly, the method of valuing collateral for purposes of adequate protection requires consideration of the Debtors' intended use of such collateral. *ESL Inv., Inc. v. Sears Holding Corp. (In re Sears Holdings Corp.)*, 621 B.R. 563, 573 (S.D.N.Y. 2020), *aff'd*, 51 F.4th 53 (2d Cir. 2022) ("[T]he court should look to the purpose of the proposed use of the value, and if it is to be a reorganization, that use would be in the hands of the Debtor and would normally call for replacement value.") (citing *Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 963–65 (1997)), *aff'd*, 51 F.4th (2d Cir. 2022). Here, the ABL Collateral consists primarily of inventory and accounts receivable. In the ordinary course of business, as evidenced by the Approved DIP Budget, the Debtors intend and fully expect to sell inventory and collect accounts receivable in a going concern capacity. Accordingly, using the going concern value of the ABL Collateral is appropriate.

103. As of the Petition Date approximately $596.4 million of obligations under the ABL Facility are outstanding, consisting of $227 million in obligations under the ABL Loans and $369.4[14] million of ABL Supply Chain Financing. Accordingly, for there to be a 20% equity cushion with respect to the ABL Lenders, the value of the collateral must exceed approximately $715.7 million. Based on the Debtors books and records, non-factored accounts receivable as of the Petition Date were estimated at $178 million, and the book value of the Debtors' inventory securing the ABL Facility exceeds $1.2 billion. *See* Moore Decl. ¶¶ 18–19. Even excluding the inventory that may have been comingled with that of the Evolution Borrower, the value of the ABL Secured Parties' collateral offers an equity cushion in excess of a 20%. Thus, the ABL

---

[14] The ABL Secured Parties are only entitled to a secured claim on the ABL Supply Chain Financing if certain requirements under the credit agreements are satisfied. Debtors reserve all rights, including in respect to the existence, validity, priority and value of liens asserted by the ABL Secured Parties.

Secured Parties benefit from a significant equity cushion that is more than sufficient to provide adequate protection.

### c.   SPV Secured Parties Are Adequately Protected

104.     Similarly, the Debtors are actively discussing with each of the SPV Secured Parties an adequate protection package that would permit the Debtors to consensually use and sell the SPV Secured Parties' collateral at each entity, in the ordinary course of business.  Notably, the SPV Secured Parties' liens are not primed or otherwise impacted by the DIP Facility.  The only adequate protection that must be provided is to prevent the SPV Secured Parties' interests from diminishing in value through the Debtors' use of the collateral securing their loans (almost entirely inventory) and the proceeds thereof.  Like with the ABL Lenders, approval of the DIP Financing will enhance the value of all collateral.

105.     The Debtors have proposed to provide additional forms of adequate protection to the SPV Secured Parties, depending upon the facts and circumstances of each party, including: (1) in the event an SPV Secured Party's collateral is sold from an SPV Debtor entity to another Debtor entity, the SPV entity receives an administrative expense claim equal to the "gross book value" of the collateral transferred; (2) continuation of the SPV Secured Party's liens in the event their collateral is sold to the proceeds generated therefrom; (3) ultimate repayment (reducing the principal balance of the SPV Secured Parties' claim) or segregation of funds if the collateral is sold to a third party; (4) to the extent oversecured, payment in-kind of non-default rate interest; and/or (5) certain reporting requirements on the Debtors regarding the collateral.

106.     The Debtors submit that the improved position of the SPV Secured Parties' collateral positions, in addition to the protections the Debtors have offered, is more than sufficient to adequately protect such parties from any diminution in value.  The Debtors' sale and use of the property is reasonable, appropriate, and permissible under the Bankruptcy Code, and the

requirement of section 364(d) of the Bankruptcy Code—that all Prepetition Secured Parties consent or are adequately protected—is satisfied.

**C.      Debtors Should Be Authorized to Use Cash Collateral**

107.     For the reasons set forth herein, the Debtors require use of Cash Collateral (as well as the DIP Facility) for the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section 363.

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

108.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral because the Term Loan Lenders have consented to such use and are, moreover, adequately protected as described above, as are the ABL Secured Parties and the SPV Secured Parties.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

**D.      Debtors Should Be Authorized to Pay Fees, Including the Roll-Up, Required by DIP Documents**

109.     In consideration for the DIP Lenders' commitments in connection with the DIP Facility, the Debtors have agreed, subject to Court approval, to, among other things, (i) pay certain fees, premiums, and expenses summarized below (the "**DIP Fees**") to the DIP Lenders and

the DIP Agent, in exchange for their committing to the DIP Facility, (ii) pay the reasonable and documented out-of-pocket fees and expenses of the legal and financial advisors of each of the DIP Lenders and the DIP Agent, (iii) pay interest on the DIP Facility, payable in kind (the "**Interest**"), and (iv) indemnify the DIP Lenders in accordance with the DIP Credit Agreement (collectively, the "**DIP Fees and Expenses**").

110.    Specifically, the DIP Fees and Interest consist of the following:

- Anchoring Premium.  10.0% payable-in-kind.

- Upfront Premium:  5.0% payable in kind, which shall be earned and payable to all Participating Lenders *pro rata* upon entry of the Interim Order and/or Final Order, as applicable.

- Exit Premium:  5.0% cash, which shall be earned upon entry of the Interim Order and/or Final Order, as applicable, and payable to all Participating Lenders *pro rata* upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

- Extension Premium. As a condition precedent to any 45-day extension, the Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee of 0.75% on the then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments, payable to each DIP Lender in cash ratably based on each DIP Lender's proportion to its share of the then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments.

- Interest Rates:  (i) the New Money DIP Loans will accrue interest at a per annum rate of SOFR cash *plus* 1.55%, payable monthly in cash *plus* 8.45% per annum, payable monthly in-kind, and (ii) the Roll-Up Loans will accrue interest at a per annum rate of SOFR *plus* 7.0%, payable monthly in-kind. The interest rate on the Roll-Up Loans is the default rate under the First Lien Credit Agreement.

111.    As set forth in the Cowan Declaration, the terms of the DIP Documents, including the economic terms embodied by the DIP Fees and Interest imposed thereunder, are reasonable under these circumstances and were negotiated at arm's length.  The Debtors believe that such terms are the best available option to maintain their ongoing business operations and fund their chapter 11 cases.

68

112.     The Debtors considered the DIP Fees and Interest when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.  The principal economic terms proposed under the proposed DIP Facility, such as the contemplated pricing, fees, interest rate, and default rate, are customary and usual for debtor-in-possession financings of this type.  Such economic terms were negotiated at arm's-length and are reasonable under the current circumstances and market conditions of debtor-in-possession financings in comparable circumstances.

113.     As noted above, the DIP Facility provides for a roll-up of up to $3.3 billion in the aggregate of the First Lien Term Loans held by the DIP Lenders.  The Debtors submit that the Roll-Up is appropriate under the circumstances of these chapter 11 cases.  Importantly, the Roll-Up of the First Lien Term Loans is a "creeping" roll-up that is subject to, and only occurs upon, the Debtors drawing the new-money financing (*i.e.*, $1.5 billion in First Lien Term Loans would be rolled up, subject to, and effective upon, entry of the Interim Order and funding of the Initial Draw and $1.8 billion would be rolled up, subject to, and effective upon, entry of the Final Order and funding of the Final Draw).

114.     Roll-ups of prepetition debt are a common feature in debtor-in-possession financing where, as here, they are necessary to induce prospective postpetition lenders to advance debtor-in-possession financing.  The importance of roll-ups and refinancings in DIP facilities has been repeatedly recognized by courts in this district which have authorized the roll-up of prepetition obligations in interim orders.  *See, e.g.*, *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. Apr. 23, 2020), ECF No. 49 (interim order authorizing the debtors to incur $90 million of new money loans and $180 roll up prepetition indebtedness); *In re Genesis Care Pty*

*Ltd*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 2, 2023), ECF No. 89 (interim order authorizing the debtors to incur $90 million of new money loans and a roll-up of $270 million of prepetition indebtedness); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023), ECF No. 98 (interim order authorizing the roll-up of $190 million of prepetition indebtedness and $100 million of new money loans); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. May 16, 2023), ECF No. 116 (interim order authorizing an over $220 million refinancing facility and $75 million new money loans); *In re Oasis Petroleum Inc.*, No. 20-34771 (MI) (Bankr. S.D. Tex. Sept. 30, 2023), ECF No. 73 (interim order authorizing the roll-up of $240 million of prepetition indebtedness and $120 million of new money loans); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019), ECF No. 255 (interim order authorizing the roll-up of $87.5 million of prepetition indebtedness and $35 million of new money loans).

115.    Furthermore, the amount of the Roll-Up relative to the new money to be provided under the DIP Facility (a ratio of 3:1) is comparable to ratios that have been approved in other cases, including those in this district.  *See, e.g.*, *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023), ECF No. 130 (approving a roll-up with a 5.8:1 ratio); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023), ECF No. 323 (approving a roll-up with a 3:1 ratio); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023), ECF  No. 434 (approving a roll-up with a 4.3:1 ratio); *In re Mountain Express Oil Co.*, No. 23-90147 (DRJ) (Bankr. S.D. Tex. Apr. 25, 2023), ECF  No. 332 (approving a roll-up with a 4.5:1 ratio); *In re Amerimark Interactive, LLC*, No. 23-10438 (TMH) (Bankr. D. Del. Apr. 13, 2023), ECF No. 52 (approving a roll-up with a 3:1 ratio); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022), ECF No. 73 (same).

116. Here, the Roll-Up is reasonable and justified under the circumstances. The Roll-Up provision was a material component of the structure of the DIP Facility and required by the DIP Lenders as a condition to provide the DIP Facility, and the only impacted parties, the Prepetition Secured Parties, consent to the Roll-Up and are adequately protected.

117. The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder, without approval of the approval of the Roll-Up upon entry of the Interim Order. The Roll-Up Obligations are a fee in exchange for, and solely on account of, the agreement of the Prepetition Secured Parties to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any Term Loan Obligations. The Roll-Up Obligations are a fee and a necessary inducement, for the DIP Secured Parties to consent to the use of Cash Collateral and the subordination of the Roll-Up Obligations to the Carve-Out to the extent set forth in the Interim Order.

E.    Carve-Out Is Appropriate

118. The DIP Facility subjects and subordinates the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve-Out. Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted. *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."). Additionally, the Carve-Out protects against administrative insolvency during the pendency of these chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and the professional fees of

71

the Debtors and any official committee of unsecured creditors in the event that the DIP Facility is terminated. Accordingly, the Debtors submit that the Carve-Out is appropriate.

**F.      DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

119.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

120.    As explained herein and in the First Day Declaration, negotiations of the DIP Facility were conducted in good faith and at arm's length. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

**G.      Modification of Automatic Stay Is Warranted**

121.    The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent, DIP Lenders, and the DIP Secured Parties to exercise rights and remedies under certain circumstances. These provisions

were part of the *quid pro quo* for the Debtors' ability to obtain the DIP Facility and use Cash Collateral as provided therein and in the Interim Order. Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to seven business days' notice to allow the Debtors to contest whether a default has occurred and is occurring. Moreover, following the delivery of such notice, but prior to exercising certain remedies, the DIP Secured Parties must file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral to fund operations in accordance with the terms of the Interim Order. Under these circumstances, the modifications to the automatic stay under the Interim Order are reasonable and should be approved.

122. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr S.D. Tex. Nov. 14, 2023), ECF No. 225 (modifying automatic stay as necessary to effectuate the terms of the order); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr S.D. Tex. Mar. 3, 2023), ECF No. 406 (same); *In re Core Scientific, Inc.*, No. 22-90341 (CML) (Bankr S.D. Tex. Mar. 1, 2023) (Docket No. 608) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 17, 2022), ECF No. 588 (same); *In re Sheridan Holding Co. II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019), ECF No. 178 (same).

**H.     Debtors Require Immediate Access to Cash Collateral and DIP Facility**

123. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid

immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

124. The Debtors have an immediate and critical need to obtain the DIP Facility and the authority to use Cash Collateral throughout the chapter 11 process to permit the Debtors to, among other things, (i) stabilize their business operations, including the Company's global manufacturing and distribution network, (ii) maintain business relationships with critical suppliers, manufacturers, vendors, and customers, (iii) purchase the materials necessary to timely deliver products to customers, including auto parts retailers, wholesale distributors, dealerships and mass retailers, (iv) make payroll for their approximately 26,000 employees, (v) satisfy other working capital and operational needs in a capital-intensive business, (vi) administer their estates in the ordinary course for the duration of these chapter 11 cases, and (vii) conduct a value-maximizing reorganization. The Debtors are entering chapter 11 with approximately $14 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases. Moreover, all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute Cash Collateral is subject to prepetition security interests in favor of the Prepetition Secured Parties in accordance with the Prepetition Credit Documents. Accordingly, without access to Cash Collateral and additional capital, the Debtors do not have sufficient cash on hand to cover their operating expenses and the costs of these chapter 11 cases.

125. Such a disruption to the use of Cash Collateral would destroy value from the Debtors' estates by preventing them from making disbursements necessary to operate in the

ordinary course. Similarly, access to the DIP Facility would provide assurances to employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of these chapter 11 cases. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## I.      Request for Final Hearing

126.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order. The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Debtors Have Satisfied Bankruptcy Rule 6003(a)

127.    Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003. Bankruptcy Rule 6003(a) provides that, to the extent relief is needed to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting a motion to "use, sell, or lease property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" or a motion to "incur any other obligation regarding the property of the estate" prior to 21 days after the Petition Date. Fed. R. Bankr. P. 6003(a). As explained above and in the First Day Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is needed to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied

**Debtors Have Satisfied Bankruptcy Rules**
**6004(a) and 6004(h)**

128.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

129.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.  The Debtors expressly reserve all rights with respect to the foregoing matters.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

76

## Notice

130.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

131.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 30, 2025
      Houston, Texas

           Respectfully submitted,

           */s/  Clifford W. Carlson*
           WEIL, GOTSHAL & MANGES LLP
           Gabriel A. Morgan (24125891)
           Clifford W. Carlson (24090024)
           700 Louisiana Street, Suite 3700
           Houston, Texas 77002
           Telephone:  (713) 546-5000
           Facsimile:  (713) 224-9511
           Email:   gabriel.morgan@weil.com
                 clifford.carlson@weil.com

           -and-

           WEIL, GOTSHAL & MANGES LLP
           Matthew S. Barr (*pro hac vice* pending)
           Sunny Singh (*pro hac vice* pending)
           Andriana Georgallas (*pro hac vice* pending)
           Kevin Bostel (*pro hac vice* pending)
           Jason H. George (*pro hac vice* pending)
           767 Fifth Avenue
           New York, New York 10153
           Telephone:  (212) 310-8000
           Facsimile:  (212) 310-8007
           Email:   matt.barr@weil.com
                 sunny.singh@weil.com
                 andriana.georgallas@weil.com
                 kevin.bostel@weil.com
                 jason.george@weil.com

           *Proposed Attorneys for Debtors*
           *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on September 30, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Clifford W. Carlson_
Clifford W. Carlson

**Exhibit A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| | § | |
| **Debtors.**[1] | § | |

**INTERIM ORDER (I) AUTHORIZING**
**THE DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT**
**LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC**
**STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of First Brands Group, LLC and each of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (together, the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**" and, together with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this interim order (this "**Interim Order**") and the Final Order (as defined herein) as applicable, among other things:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Credit Agreement (as defined herein) or the DIP Motion, as applicable.

(i)    authorizing First Brands Group, LLC, a Delaware limited liability company (the "**Borrower**" or the "**Company**") to obtain postpetition financing ("**DIP Financing**")[3] pursuant to a senior secured, superpriority and priming debtor-in-possession term loan credit facility (the "**DIP Facility**") subject to the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached hereto in substantially final form as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), in an aggregate principal amount of $4.4 billion (inclusive of the New Money DIP Loans (as defined herein) and the Roll-Up Obligations (as defined herein)) (the commitments in respect thereof, the "**DIP Commitments**," and such loans, the "**DIP Loans**")[4] from the DIP Lenders (as defined herein) by and among the Borrower, First Brands Group Intermediate, LLC, a Delaware limited liability company (the "**Parent**"), the several financial institutions or other entities from time to time party thereto as "Lenders" (the "**DIP Lenders**"), Wilmington Savings Fund Society, FSB, as administrative agent, escrow agent, and collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Agent**" and, collectively, with the DIP Lenders, the "**DIP Secured Parties**"), consisting of:

    a.    $1.1 billion new money term loans (the "**New Money DIP Loans**") of which (i) $175 million will be available immediately upon entry of this Interim Order, (ii) $325 million will be funded into the Escrow Account (defined below) upon entry of this Interim Order (the "**Intermediate Amount**" and together with clause (i), the "**Initial Draw**"), and (iii) $600 million will be funded into the Escrow Account subject to and upon the date of entry of the Final Order (the "**Final Draw**"); *provided*, that the Intermediate Amount shall accrue interest and fees pursuant to the DIP Credit Agreement commencing with the funding into the Escrow Account; and

    b.    $3.3 billion of Roll-Up Obligations (as defined herein), in each case, calculated in accordance with the DIP Documents and the Syndication Procedures, with:

        i.    <u>Interim Roll-Up Obligations</u>:  $1.5 billion rolling up subject to, and effective upon, entry of this Interim Order and funding of the Initial Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of this Interim Order; and

        ii.    <u>Final Roll-Up Obligations</u>:  $1.8 billion rolling up subject to, and effective upon the date of entry of the Final Order and funding of the Final Draw, accruing interest pursuant to the DIP Credit Agreement commencing with entry of the Final Order;

---

[3]    Any consent, agreement, amendment, approval, waiver, or instruction of the DIP Borrowers, DIP Guarantors, Parent Guarantors, DIP Agents, or DIP Secured Parties to be delivered hereunder may be delivered by any written instrument, including by way of electronic mail, by the DIP Borrowers, DIP Guarantors, Parent Guarantors, DIP Agents, DIP Secured Parties, or their respective counsel on their behalf.

[4]    Certain of the DIP Loans will be issued and denominated in Euros based on the prevailing market exchange rate as of the Petition Date.

(ii)     authorizing each of the relevant Debtors and, to the extent required by the DIP Documents,[5] any additional Debtors and/or non-Debtors party thereto from time to time as guarantors, to jointly and severally guarantee the DIP Loans and the other DIP Obligations (such Debtors, other than the Borrower, the "**DIP Guarantors**," and together with the Borrower, the "**DIP Loan Parties**"); *provided*, that in the case of Viceroy Private Capital, LLC and First Brands Group Holdings, LLC (collectively, the "**Parent Guarantors**") such entities will only execute a separate parent guarantee (the "**Parent Guarantee**") attached hereto in substantially final form as **Exhibit 2** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time);

(iii)    authorizing the DIP Loan Parties and the Parent Guarantors, as applicable, to execute, deliver and perform under the DIP Credit Agreement and Parent Guarantee, as applicable, and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the Fee Letter, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the Parent Guarantee, and any other Loan Documents, including the Initial DIP Budget and each Approved Budget (each as defined herein), the "**DIP Documents**");

(iv)     authorizing the DIP Loan Parties and the Parent Guarantors to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, the Upfront Premium, Exit Premium, Anchor Premium, Extension Premium (each as defined in the DIP Credit Agreement), administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)      upon entry of this Interim Order, authorizing the Debtors to indefeasibly repay in full the Bridge Loans and pay any reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the Bridge Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the Bridge Documents (each as defined herein);

(vi)     subject and subordinate only to the Carve-Out (as defined herein), authorizing the Adequate Protection Claims (as defined herein) with respect to the Prepetition Collateral (as defined herein) and such other claims as and solely to the extent set forth herein;

---

[5]   On the Closing Date (as defined herein), the DIP Guarantors shall include only (a) the Prepetition 1L Term Loan Guarantors and (b) the parties to the Parent Guarantee.

3

(vii)     subject and subordinate only to the Carve-Out, granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties;

(viii)    granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral and any Avoidance Proceeds (each as defined herein) subject to entry of the Final Order, on the terms described herein, in each case subject and subordinate to the Carve-Out, the ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as, and solely to the extent, set forth herein;

(ix)      authorizing the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(x)       upon entry of the Interim Order, waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) (excluding ABL Collateral) and the DIP Collateral (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code, except with respect to the ABL Secured Parties; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order;

(xi)      upon entry of the Interim Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral), excluding ABL Collateral, for the benefit of any party other than the Prepetition Secured Parties (as defined herein), except with respect to the ABL Secured Parties; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order;

(xii)     authorizing the DIP Loan Parties to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with this Interim Order and the other DIP Documents, including the Final Order;

(xiii)    authorizing the DIP Loan Parties, upon entry of the Interim Order and as set forth herein, to satisfy the Bridge Obligations (as defined herein) indefeasibly in full in cash (the "**Bridge Repayment**");

(xiv)     authorizing the Borrower to incur, and the DIP Guarantors and Parent Guarantors to guarantee, on an unconditional joint and several basis, the principal, all unpaid and accrued interest, fees, premiums, reimbursements, interest on interest, costs, expenses, obligations (whether contingent, unmatured, or otherwise due), and all other amounts and obligations owing under and/or secured by and/or payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

4

(xv)    subject to the terms and restrictions set forth in the DIP Documents and this Interim Order, authorizing the DIP Loan Parties to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Credit Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties to the extent of any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xvi)   vacating and modifying the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

(xvii)  on the terms and conditions set forth in the syndication procedures (the "**Syndication Procedures**") attached to this Interim Order as **Exhibit 3**, upon the entry of this Interim Order, each First Lien Lender shall be offered the right to purchase their specified allocation of the DIP Loans and DIP Commitments (with such allocation backstopped by the certain members of the Ad Hoc Group (as defined in the DIP Motion) (the "**Allocation Parties**"));

(xviii) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(xix)   scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order[6] (the "**Final Order**," and together with this Interim Order, the "**DIP Orders**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Tyler W. Cowan in Support of the Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Cowan Declaration**"), *Declaration of Charles M. Moore in Support of the Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide*

---

[6]    A proposed Final Order will be posted to the docket prior to the Final Hearing.

5

*Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Moore Declaration**" and, together with the Cowan Declaration, the "**DIP Declarations**")*,* and the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**" and collectively with the DIP Declarations, the "**Declarations**"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on October 1, 2025 (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the DIP Loan Parties' entry into the relevant DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[7]

A.      *Petition Date*.  On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned Chapter 11 Cases each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as

---

[7]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

B.      *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b).  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.      *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S**. **Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.      *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice was required under the circumstances to enter this Interim Order.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.      *Cash Collateral*.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G. *Debtors' Stipulations*. Upon entry of this Interim Order, and after consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest set forth in paragraph 27 and paragraph G(xxii), the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree, as follows (collectively, the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph G, the "**Debtors' Stipulations**"):

(i) *ABL Facility*. Pursuant to that certain ABL Credit Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**ABL Credit Agreement**," and collectively with the other Loan Documents (as defined in the ABL Credit Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**ABL Credit Documents**" and the credit facilities evidenced thereby, collectively, the "**ABL Facility**"), among (a) the Company, (b) the Parent, (c) the other borrowers from time to time party thereto (together with the Company, the "**ABL Borrowers**"), (d) Bank of America, N.A. ("**BofA**"), as administrative agent and collateral agent (solely in such capacity, the "**ABL Agent**"), and (f) the lenders from time to time party thereto (collectively, the "**ABL Lenders**," and together with the ABL Agent, any holders of ABL Debt (as defined below) and any holder of other Secured Obligations (as defined in the ABL Credit Agreement), the "**ABL Secured Parties**"), the ABL Lenders provided revolving credit and other financial accommodations to the ABL Borrowers pursuant to the ABL Credit Documents, and Parent and certain of its subsidiaries (the "**ABL Guarantors**") guaranteed the "Obligations" (as defined in the ABL Credit Agreement, the "**ABL Obligations**") pursuant to that certain ABL Guaranty, dated as of February 2, 2018 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the ABL Guarantors and the ABL Agent;

(ii) *Sidecar Term Loan*. Pursuant to that certain First Lien Term Loan Agreement dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Sidecar Term Loan Agreement**" and collectively with the other Loan Documents (as defined in the Sidecar Term Loan Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Sidecar Term Loan Documents**", and the term loans evidenced thereby, collectively, the "**Sidecar Term Loans**"),

among (a) the Company, (b) the Parent, (c) Sagard Holdings Manager (US) LLC ("**Sagard**") and GLAS USA LLC ("**GLAS**"), together as administrative agent and collateral agent (solely in such capacity, the "**Sidecar Term Loan Agents**"), and (d) the lenders from time to time party thereto (collectively, the "**Sidecar Term Loan Lenders**", and collectively with the Sidecar Term Loan Agent, and all other holders of Sidecar Term Loan Debt (as defined below), the "**Sidecar Term Loan Secured Parties**"), the Sidecar Term Loan Lenders provided term loans to the Company pursuant to the Sidecar Term Loan Credit Agreement, and the First Lien Term Loan Guarantors (as defined below) guaranteed on a joint and several basis the "Obligations" (as defined in the Sidecar Term Loan Agreement, the "**Sidecar Term Loan Obligations**") pursuant to that certain First Lien Guaranty, dated as of June 16, 2025 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the First Lien Term Loan Guarantors and the Sidecar Term Loan Agents;

(iii)    *First Lien Term Loans*.  Pursuant to that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**First Lien Term Loan Agreement**," and together with the Sidecar Term Loan Agreement, the "**First Lien Agreements**", and the First Lien Term Loan Agreement, collectively with the other Loan Documents (as defined in the First Lien Term Loan Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**First Lien Term Loan Documents**" and together with the Sidecar Term Loan Documents, the "**First Lien Documents**", and the term loans evidenced thereby by, the "**First Lien Term Loans**", and together with the Letters of Credit and L/C Obligations (each as defined in the First Lien Term Loan Agreement) and the Sidecar Term Loans, the "**First Lien Loans**"), among (a) the Company, (b) the Parent, (c) Jefferies Finance LLC ("**Jefferies**"), as administrative agent and collateral agent (solely in such capacity, the "**First Lien Term Loan Agent**" and together with the Sidecar Term Loan Agents, the "**First Lien Agent**"), and (d) the lenders and letter of credit issuers from time to time party thereto (collectively, the "**First Lien Term Loan Lenders**" and together with the Sidecar Term Loan Lenders, the "**First Lien Lenders**"), and the First Lien Term Loan Lenders, collectively with the First Lien Term Loan Agent, and all other holders of First Lien Term Loan Debt (as defined below), the "**First Lien Term Loan Secured**

9

**Parties**" and together with the Sidecar Term Secured Parties, the "**First Lien Secured Parties**"),  the First Lien Term Loan Lenders provided term loans to the Company pursuant to the First Lien Term Loan Documents, and Parent and certain of its Subsidiaries (the "**First Lien Term Loan Guarantors**") guaranteed on a joint and several basis the "Obligations" (as defined in the First Lien Term Loan Agreement, the "**First Lien Term Loan Obligations**" and together with the Sidecar Term Loan Obligations, the "**First Lien Obligations**") pursuant to that certain First Lien Guaranty, dated February 2, 2018 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**First Lien Guaranty**"), by and among the First Lien Term Loan Guarantors and the First Lien Term Loan Agent;

(iv)     *Bridge Loans*.  Pursuant to that certain Amendment No. 18 to First Lien Term Loan Agreement dated as of September 25, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Bridge Amendment**," and collectively with the other Loan Documents (as defined in the Bridge Amendment by reference to the First Lien Term Loan Agreement) solely executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Bridge Documents**" and the term loans evidenced thereby, the "**Bridge Loans**," which are "Incremental Term Loans" (as defined  in the First Lien Term Loan Agreement) and a separate "Class" (as defined in the First Lien Term Loan Agreement) from the other First Lien Term Loans under the First Lien Term Loan Agreement), among (a) the Company, (b) the Parent, (c) the First Lien Term Loan Agent, and (d) the lenders from time to time party thereto with respect to the 2025 Incremental Term Loans (as defined in the Bridge Amendment) and any other Obligations (as defined in the First Lien Term Loan Agreement) in connection therewith (the "**Bridge Obligations**") (collectively, the "**Bridge Lenders**", and collectively with the First Lien Term Loan Agent, and all other holders of Bridge Debt (as defined below), the "**Bridge Secured Parties**"), the Bridge Lenders provided term loans to the Company pursuant to the Bridge Documents, and the First Lien Term Loan Guarantors guaranteed on a joint and several basis the Bridge Obligations pursuant to the First Lien Guaranty;

(v)     *Second Lien Term Loan*.  Pursuant to that certain Second Lien Term Loan Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or

otherwise modified prior to the Petition Date, the "**Second Lien Term Loan Agreement**," and collectively with the other Loan Documents (as defined in the Second Lien Term Loan Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Second Lien Term Loan Documents**" and the term loans evidenced thereby (collectively, the "**Second Lien Term Loan**"), among (a) the Company, (b) the Parent, (c) Jefferies, as administrative agent and collateral agent (solely in such capacity, the "**Second Lien Term Loan Agent**" and, together with the ABL Agent and the First Lien Agent, the "**Prepetition Agents**"), and (d) the lenders from time to time party thereto (collectively, the "**Second Lien Term Loan Lenders**," and collectively with the Second Lien Term Loan Agent, and all other holders of Second Lien Term Loan Debt (as defined below), the "**Second Lien Term Loan Secured Parties**" and, together with the ABL Secured Parties, the First Lien Secured Parties and the Bridge Secured Parties, the "**Prepetition Secured Parties**"), the Second Lien Term Loan Lenders provided term loans to the Company pursuant to the Second Lien Term Loan Documents, and Parent and certain of its Subsidiaries (the "**Second Lien Term Loan Guarantors**" and, together with the First Lien Term Loan Guarantors, the "**Term Loan Guarantors**") guaranteed on a joint and several basis the "Obligations" (as defined in the Second Lien Term Loan Agreement, the "**Second Lien Term Loan Obligations**," and together with the First Lien Obligations and the Bridge Obligations, the "**Term Loan Obligations**") pursuant to that certain Second Lien Guaranty, dated as of February 26, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the Second Lien Term Loan Guarantors and the Second Lien Term Loan Agent;

(vi)    *ABL Intercreditor Agreement*.  Pursuant to, and to the extent set forth in, that certain Amended and Restated Intercreditor Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, including by that certain Joinder to Amended and Restated Intercreditor Agreement, dated as of June 16, 2025, the "**ABL Intercreditor Agreement**"), by and among (a) the ABL Agent, (b) the First Lien Term Loan Agent, (c) and the Second Lien Term Loan Agent, (d) the Sidecar Term Loan Agent (e) the Company and (f) the other Loan Parties (as defined in the ABL Intercreditor Agreement) party thereto, the parties thereto agreed, among other things:  (i) that the ABL Liens (as defined herein) on the ABL Priority Collateral (as

11

defined herein) are senior to the First Lien Term Loan Liens on such collateral, which are in turn senior to the Second Lien Term Loan Liens (as defined herein) on such collateral and (ii) that the First Lien Term Loan Liens on Term Priority Collateral (as defined in the ABL Intercreditor Agreement, the "**Prepetition Term Priority Collateral**") are senior to the Second Lien Term Loan Liens (as defined herein) on such collateral, which are in turn senior to the ABL Liens (as defined herein) on such collateral;

(vii)    *Term Intercreditor Agreement*.   Pursuant to, and to the extent set forth in, that certain Term Intercreditor Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, including by that certain Joinder to the Term Intercreditor Agreement, dated as of June 16, 2025, the "**Term Intercreditor Agreement**," and together with the ABL Credit Documents, the First Lien Term Loan Documents, the Bridge Documents, the Second Lien Term Loan Documents and the ABL Intercreditor Agreement, the "**Prepetition Credit Documents**") by and among (a) the First Lien Term Loan Agent, (b) the Second Lien Term Loan Agent, (c) the Sidecar Term Loan Agent, (d) the Company and (e) the other Loan Parties (as defined in the Term Intercreditor Agreement) party thereto, the parties thereto agreed, among other things, that the Second Lien Term Loan Liens (as defined herein) are subordinated to any Lien (as defined in the Term Intercreditor Agreement) on the same assets of any Loan Party securing the First Priority Obligations (as defined in the Term Intercreditor Agreement) of such Loan Party;

(viii)    *ABL Debt*.   The ABL Borrowers and the other ABL Guarantors were justly and lawfully indebted and liable to the ABL Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $133,479,006.83 in outstanding principal amount of ABL Loans (as defined in the ABL Credit Agreement) plus interest and fees thereon (the "**ABL Revolving Debt**"), plus $93,409,474.32 of the aggregate stated principal amount available for drawing under all outstanding letters of credit and all unpaid reimbursement obligations with respect to drawn letters of credit (the "**Letters of Credit**"), which loans and outstanding letters of credit were made or issued by the ABL Lenders pursuant to, and in accordance with the terms of, the ABL Credit Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or

12

reimbursable under the ABL Credit Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the ABL Credit Documents (collectively, the "**ABL Debt**"), which ABL Debt has been guaranteed by each of the ABL Guarantors.   Pursuant to the ABL Credit Documents, in addition to the ABL Debt, certain Cash Management Obligations (as defined in the ABL Credit Agreement and including, among other liability, supply chain financing) of certain Debtors are owing solely to the extent the underlying agreement of such Cash Management Obligation has been designated in writing by the ABL Borrowers and such counterparty to the ABL Agent as a "Cash Management Agreement" under the ABL Facility.

(ix)     *First Lien Term Loan Debt*.   The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the First Lien Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $4,625,413,695.97 in outstanding principal amount of First Lien Term Loans (which includes (i) $1,999,060,490.56 in outstanding principal amount of the First Lien Term Loan, (ii) $1,863,348,510.82 in outstanding principal amount of the Non-Fungible Incremental First Lien Term Loan, and (iii) $763,004,694.59[8] in outstanding principal amount of the Euro First Lien Term Loan), which loans were made or issued by the First Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the First Lien Term Loan Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the First Lien Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the First Lien Term Loan Documents (collectively, the "**First Lien Term Loan Debt**"), which First Lien Term Loan Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors;

(x)     *Sidecar Term Loan Debt*.   The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Sidecar Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than

---

[8] Assumes U.S. Dollar to Euro conversion rate of 1.19:1.00.

13

(a) $250,000,000.00 in outstanding principal amount of Sidecar Term Loans, which loans were made or issued by the Sidecar Term Loan Lenders pursuant to, and in accordance with the terms of, the Sidecar Term Loan Credit Agreement, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Sidecar Term Loan Credit Agreement), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Sidecar Term Loan Credit Agreement (collectively, the "**Sidecar Term Loan Debt**"), which Sidecar Term Loan Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors;

(xi)    *Bridge Debt*.  The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Bridge Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $24,500,000.00 in outstanding principal amount of Bridge Loans, which loans were made or issued by the Bridge Lenders pursuant to, and in accordance with the terms of, the Bridge Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Bridge Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Bridge Documents (collectively, the "**Bridge Debt**"), which Bridge Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors;

(xii)    *Second Lien Term Loan Debt*.  The Company, the Parent, and the other Second Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Second Lien Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $540,000,000.00 in outstanding principal amount of the Second Lien Term Loan, which loan was made or issued by the Second Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the Second Lien Term Loan Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial

14

advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Second Lien Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Second Lien Term Loan Documents (collectively, the "**Second Lien Term Loan Debt**," and collectively with the ABL Debt, the First Lien Term Loan Debt, the Bridge Debt, and the Sidecar Term Loan Debt, the "**Prepetition Secured Debt**"), which Second Lien Term Loan Debt has been guaranteed on a joint and several basis by each of the Second Lien Term Loan Guarantors;

(xiii)   *Validity of Prepetition Secured Debt*.   The Prepetition Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Company, the Parent, the other ABL Borrowers, the ABL Guarantors, the First Lien Term Loan Guarantors, and the Second Lien Term Loan Guarantors, as applicable, enforceable in accordance with their respective terms and no portion of the Prepetition Secured Debt or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Credit Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is used in the Bankruptcy Code), cause of action (including any claims or avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that the foregoing is subject to confirmation as to the quantum of the Cash Management Obligations (as defined in the ABL Credit Agreement) that have been validly secured by the ABL Liens pursuant to, and in accordance with, the notice and other requirements of, the ABL Credit Documents;

(xiv)   *Validity, Perfection and Priority of ABL Liens*.   As of the Petition Date, pursuant to and in connection with the ABL Credit Documents, the ABL Borrowers and the ABL Guarantors granted to the ABL Agent, for the benefit of itself and the other ABL Secured Parties, a security interest in and continuing lien on (the "**ABL Liens**") substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each

15

case whether then owned or existing or thereafter acquired or arising (collectively, the "**ABL Priority Collateral**," and together with the Prepetition Term Priority Collateral, the "**Prepetition Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the Prepetition Term Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**ABL Junior Collateral**" and, together with the ABL Priority Collateral, the "**ABL Collateral**"), which ABL Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code, any relevant debtor in relief laws outside of the United States or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the ABL Credit Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the ABL Liens as of the Petition Date (the "**ABL Permitted Senior Liens**");

(xv)    *Validity, Perfection and Priority of First Lien Term Loan Liens.*  As of the Petition Date, pursuant to and in connection with the First Lien Term Loan Documents, the Company, the Parent, and the First Lien Term Loan Guarantors granted to the First Lien Term Loan Agent, for the benefit of itself and the other First Lien Term Loan Secured Parties, a security interest in and continuing lien on (the "**First Lien Term Loan Liens**," which liens, for the avoidance of doubt rank *pari passu* with the Sidecar Term Loan Liens and the Bridge Liens) substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**First Lien Term Loan Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter

16

acquired or arising (the "**First Lien Term Loan Junior Collateral**" and, together with the First Lien Term Loan Senior Collateral, the "**First Lien Term Loan Collateral**"), which First Lien Term Loan Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the First Lien Term Loan Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the First Lien Term Loan Liens as of the Petition Date (the "**First Lien Term Loan Permitted Senior Liens**");

(xvi) *Validity, Perfection and Priority of Sidecar Term Loan Liens*. As of the Petition Date, pursuant to and in connection with the Sidecar Term Loan Documents, the Company, the Parent, and the First Lien Term Loan Guarantors granted to the Sidecar Term Loan Agent, for the benefit of itself and the other Sidecar Term Loan Secured Parties, a security interest in and continuing lien on (the "**Sidecar Term Loan Liens**," which liens, for the avoidance of doubt rank *pari passu* with the First Lien Term Loan Liens and Bridge Liens) substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Sidecar Term Loan Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Sidecar Term Loan Junior Collateral**" and, together with the Prepetition Sidecar Term Loan Senior Collateral, the "**Sidecar Term Loan Collateral**"), which Sidecar Term Loan Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and

17

subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the Sidecar Term Loan Credit Agreement, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Sidecar Term Loan Liens as of the Petition Date (the "**Sidecar Term Loan Permitted Senior Liens**");

(xvii)   *Validity, Perfection and Priority of Bridge Liens*.  As of the Petition Date, pursuant to and in connection with the Bridge Documents and the First Lien Term Loan Documents, the Company, the Parent, and the First Lien Term Loan Guarantors granted to the First Lien Term Loan Agent, for the benefit of itself and the other Bridge Secured Parties, a security interest in and continuing lien on (the "**Bridge Liens**" which liens, for the avoidance of doubt rank *pari passu* with the First Lien Term Loan Liens and the Sidecar Term Loan Liens) substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Bridge Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Bridge Junior Collateral**" and, together with the Bridge Senior Collateral, the "**Bridge Collateral**"), which Bridge Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the Bridge Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Bridge Liens as of the Petition Date (the "**Bridge Permitted Senior Liens**");

(xviii)   *Validity, Perfection and Priority of Second Lien Term Loan Liens*.  As of the Petition Date, pursuant to and in connection with the Second Lien Term Loan  Documents, the Company,

18

the Parent, and the Second Lien Term Loan Guarantors granted to the Second Lien Term Loan Agent, for the benefit of itself and the other Second Lien Term Loan Secured Parties, a security interest in and continuing lien on (the "**Second Lien Term Loan Liens**," and, together with the ABL Liens, the First Lien Term Loan Liens, the Bridge Liens, the Sidecar Term Loan Liens, and the Second Lien Term Loan Liens, the "**Prepetition Liens**") substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Second Lien Term Loan Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Second Lien Term Loan Junior Collateral**" and, together with the Second Lien Term Loan Senior Collateral, the "**Second Lien Term Loan Collateral**"), which Second Lien Term Loan Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the Second Lien Term Loan Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Second Lien Term Loan Liens as of the Petition Date (the "**Second Lien Term Loan Permitted Senior Liens**" and, together with the ABL Permitted Senior Liens, the First Lien Term Loan Permitted Senior Liens, the Bridge Permitted Senior Liens, and the Sidecar Term Loan Permitted Senior Liens, the "**Prepetition Permitted Senior Liens**");

(xix) *No Control.* None of the Prepetition Secured Parties or DIP Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of

19

the Debtors by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Documents or DIP Documents;

(xx)  *No Claims or Causes of Action*.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the DIP Secured Parties or Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any DIP Secured Party or Prepetition Secured Party that is in existence as of the Petition Date; and

(xxi)  *Release*.  Effective upon entry of this Interim Order, each of the Debtors and (subject only to the Challenge Period) the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Participating Lenders (in their capacity as DIP Lenders and Prepetition Secured Parties), the DIP Secured Parties and each of their respective Representatives (as defined herein) in such capacity (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action[9] arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or

---

[9]  As used in this Interim Order, "causes of action" means any action, claim, cause of action, controversy demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined in the DIP Credit Agreement), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "cause of action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non- U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer or fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "**Released Claims**"), in each case arising out of or related to (as applicable) the Prepetition Credit Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents and the DIP Secured Parties and the Debtors reserve all rights in respect of any breaches of the DIP Documents by any DIP Secured Parties or the Debtors, as applicable.

(xxii)   For the avoidance of doubt, the Debtors do not stipulate to the fact that any supply chain financing liability is a "Cash Management Obligation" and none of the foregoing Debtor Stipulations shall effect or apply to the supply chain obligations.

H.       *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)       Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the DIP Loan Parties and Parent Guarantors, immediately upon entry of this Interim Order, to obtain and guarantee financing pursuant to the DIP Documents, commence the Bridge Repayment, exchange the Roll-Up Obligations, and to use Cash Collateral as set forth herein.

(ii)      The DIP Loan Parties have an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and other financial

21

accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case as provided for herein subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Credit Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Credit Documents, as applicable.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date or hereafter created or arising, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)    Effective upon (a) the entry of this Interim Order and the funding of the Initial Draw, and without any further action by the Debtors or any other party, (i) the Debtors are authorized and directed to utilize the DIP Loans to effectuate the Bridge Repayment, and (ii) subject only to a successful Challenge, $1,500,000,000.00 of First Lien Obligations held by DIP Lenders that fund the Interim Draw of the New Money DIP Loans (including the Allocation Parties) (the "**Interim Roll-Up**" and "**Interim Roll-Up Obligations**"), shall be automatically deemed exchanged via assignment on a cashless basis into and

22

shall be deemed to constitute DIP Obligations and (b) the entry of the Final Order and the funding of the Final Draw, and subject only to a successful Challenge, without any further action by the Debtors or any other party, $1,800,000,000.00 First Lien Obligations held by First Lien Lenders (including Allocation Parties) that fund the Final Draw of the New Money DIP Loans (including the Allocation Parties) shall be automatically deemed exchanged via assignment on a cashless basis into and deemed to constitute DIP Obligations (the "**Final Roll-Up**" and "**Final Roll-Up Obligations**", and collectively with the Interim Roll-Up and Interim Roll-Up Obligations, the "**Roll-Up**" and "**Roll-Up Obligations**"),[10] pursuant to the terms of this Interim Order, the Prepetition Credit Documents (as expressly modified herein), any other Loan Documents (as defined in the Prepetition Credit Documents) (as expressly modified herein), the DIP Documents, and any other documents evidencing the Roll-Up Obligations.  The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties and Parent Guarantors thereunder, without approval of the Bridge Repayment and approval of the Roll-Up upon entry of this Interim Order.  The Roll-Up Obligations shall be authorized as and deemed for all purposes to be a fee in exchange for, and solely on account of, the agreement of the Prepetition Secured Parties to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any Term Loan Obligations.  Because the Roll-Up Obligations are subject to the reservation of rights in paragraph 27 hereof, they will not prejudice the rights of any other party-in-interest.

(vii)    The Bridge Repayment and incurrence of fees under the DIP Facility, including the Roll-Up Obligations, shall be authorized as a fee and as a necessary inducement, for the DIP Secured Parties to consent to the use of Cash Collateral and the subordination of the Roll-Up Obligations to the Carve-Out to the extent set forth herein.

---

[10]   Solely with respect to any holders of a Prepetition Letter of Credit (as defined in the DIP Credit Agreement), such holder shall be automatically deemed to have converted and exchanged, on a cashless basis, such holder's portion of the related L/C Borrowing in respect of such Prepetition Letter of Credit into Roll-Up Loans in accordance with the DIP Credit Agreement on the date that (x) such Prepetition Letter of Credit is drawn in accordance with the terms of the Prepetition 1L Credit Agreement and (y) the amount of any unreimbursed amounts in respect of such drawn Prepetition Letter of Credit is converted into a Prepetition L/C Borrowing (as defined in the DIP Credit Agreement) in accordance with the Prepetition 1L Credit Agreement.

(viii)   Pursuant to the Intercreditor Agreements, Prepetition Secured Parties are deemed to consent to the DIP Facility (including the Roll-Up) and the use of the Cash Collateral on the terms and conditions set forth in this Interim Order.

(ix)   Based on the DIP Motion, the Declarations, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraphs 23(a) – 23(r) of this Interim Order (the "**Adequate Protection**"), and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(x)   The DIP Financing (including the Roll-Up), the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Loan Parties, the Parent Guarantors, the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties, and all of the DIP Loan Parties' and Parent Guarantors obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties and Parent Guarantors pursuant to the DIP Documents (including the Roll-Up) and any other DIP Obligations shall be deemed to have been extended by the DIP Agent, the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties, and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent, the Allocation Parties, the Prepetition Secured Parties, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(xi)   The DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties have acted in good faith regarding the DIP Financing, the Roll-Up, and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the

24

Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, or any DIP Secured Party, Prepetition Secured Party, or Backstop Party is subject to any claim or cause of action in any forum. The DIP Facility is not in violation of the Prepetition Credit Documents and, in all respects, the DIP Documents and DIP Obligations (including the Roll-Up) comply with the Prepetition Credit Documents.

(xii)    The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion, the Declarations, and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and, to the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, on the terms set forth in this Interim Order, and the priming of the Prepetition Liens by the DIP Liens pursuant to the terms set forth in this Interim Order and the DIP Documents; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert any rights of any of the Prepetition Secured Parties,

25

and the rights of any other party in interest, including the DIP Loan Parties, to object to such relief are hereby preserved.

(xiii)    The Debtors have prepared and delivered to the advisors to the DIP Secured Parties the Initial DIP Budget (as defined below).  The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement, and once approved by the Required Lenders (in their sole discretion), shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each budget subsequently approved by the Required Lenders in their sole discretion shall constitute, without duplication, an "**Approved Budget**").  The Debtors believe that the Initial DIP Budget is reasonable under the circumstances.  The DIP Secured Parties are relying, in part, upon the DIP Loan Parties' and Parent Guarantors' agreement to comply with the Approved Budget (subject to permitted variances), the other DIP Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xiv)    Each of the Prepetition Secured Parties (except the ABL Secured Parties) and DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties (excluding the ABL Secured Parties) and DIP Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral or DIP Collateral; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order.

(xv)    The Syndication Procedures attached to this Interim Order as **Exhibit C** are reasonable and proper, and have been formulated in good faith by the Debtors, the Prepetition Secured Parties, the Allocation Parties, the DIP Agent, and the DIP Lenders in order to reasonably identify the opportunity to participate in the DIP Facility.

I.      *Immediate Entry*.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the permitted use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

J.      *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien and/or security interests.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Senior Lien, as used herein, and is expressly subject to the DIP Liens (as defined herein) and the Prepetition Liens.  The Prepetition Liens and the DIP Liens are continuing liens and the Collateral is and will continue to be encumbered by such liens.

K.      *Intercreditor Agreements.*  Pursuant to Section 510 of the Bankruptcy Code, the ABL Intercreditor Agreement and the Term Intercreditor Agreement (the "**Intercreditor Agreements**") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the Debtors under this Interim Order or otherwise) and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

L.      *Certain Agreed Contractual Rights between the DIP Lenders.*

(i)      Pursuant to Section 2.07(a) of the DIP Credit Agreement, the DIP Lenders have agreed that the DIP Obligations may be satisfied in accordance with a Chapter 11 Plan (as defined in the DIP Credit Agreement) supported by Required Supermajority Lenders (as defined in the DIP Credit Agreement).  Notwithstanding anything to the contrary, if the Chapter 11 Plan supported by Required Supermajority Lenders provides for the DIP Lenders to receive non-Cash distributions on account of the DIP Obligations and related DIP Loans on account thereof, each DIP Lender shall be deemed to have consented to have its DIP Loans paid on the effective date of such Chapter 11 Plan with the non-cash option provided in the Chapter 11 Plan.

Based upon the foregoing findings and conclusions, the Declarations, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted.*  The interim relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The DIP Facility is hereby approved as set forth herein.  The DIP Loan Parties and Parent Guarantors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the relevant DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow money pursuant to the DIP Credit Agreement and the Debtors who are DIP Guarantors or Parent Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Obligations, subject to any limitations on borrowing under the DIP Documents, which borrowings shall be used for all purposes permitted under the DIP Documents and this Interim Order (and subject to and in accordance with the

28

Approved Budget) (subject to any permitted variances) up to the aggregate amount of the Initial Draw (including for the avoidance of doubt, the Bridge Repayment and the Interim Roll-Up).

(b)      The Debtors are authorized and directed to pay, in accordance with this Interim Order, all principal, unpaid and accrued interest, premiums, fees, interest on interest, payments, costs, expenses, the Upfront Premium, Exit Premium, Anchor Premium, Extension Premium, and other amounts (including any payoff, arrangement, backstop, commitment, exit, and/or administrative fees, including in any separate letter agreement or in any other DIP Document) described in the DIP Documents as such amounts become due and payable, without the need to obtain further Court approval, whether or not such fees arose before, on, or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in the DIP Orders or the DIP Documents; *provided* that the payment of legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the closing of the DIP Facility) shall be subject to the requirements of paragraph 27 hereof.  The Debtors shall pay, in accordance with this Interim Order, the reasonable and documented fees and disbursements of the DIP Secured Parties, in each case whether or not such fees or other amounts arose before, on, and after the Petition Date, in accordance with the DIP Orders or the DIP Documents.

(c)      In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party and the Parent Guarantors are authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' and Parent Guarantors' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

29

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement) may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses, including attorneys', accountants', appraisers' and financial advisors' fees, amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder, increase the aggregate commitments, increase the rate of interest payable or fees that are payable calculated on commitments thereunder. Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court;

(iii)     the non-refundable payment to and authorization for the DIP Agent and the DIP Secured Parties, as the case may be, all premia, fees and rights received as consideration under, or in connection with, the DIP Facility, including the Roll-Up, Upfront Premium, Exit Premium, Anchor Premium, Extension Premium, and any amendment fees, prepayment premiums, early termination fees, rights of repayment (which, for the avoidance of doubt, shall be fully earned as of the Closing Date (or such other date as prescribed by the DIP Documents) and shall be due and payable on the earlier to occur of the Termination Date and the effective date of a chapter 11 plan supported by the Required Lenders), servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, fronting fees, escrow fees, upfront fees, closing fees, commitment fees, exit fees, closing date fees, backstop fees, prepayment fees or agency fees, rights under the DIP Documents, indemnities and professional fees (the payment of which fees shall be irrevocable), and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-

30

bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents, and the costs and expenses as may be due from time to time in accordance with the DIP Documents, including, without limitation, the reasonable and documented fees and expenses of the professionals retained by, or on behalf of, the Ad Hoc Group (including, without limitation, those of Gibson, Dunn & Crutcher LLP, Evercore Group L.L.C., Howley Law PLLC, and any other foreign counsel, legal counsel, and any other advisors or consultants as permitted under the DIP Documents, the "**Ad Hoc Group Advisors**") and the DIP Agent (including ArentFox Schiff LLP), in each case, as provided for in the DIP Documents, (collectively, the "**DIP Fees and Expenses**"), without the need to file retention motions or fee applications; and

(iv)  the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

(v)  The Debtors are authorized and directed to implement, and the DIP Agent and DIP Lenders are authorized to comply with, the Syndication Procedures. The Syndication Procedures and the allocations with respect thereto (as confirmed by the DIP Lenders in writing (email being sufficient)) are hereby approved in their entirety, are incorporated into this Interim Order by reference as if set forth fully herein, and shall govern the syndication, allocation, and participation of the DIP Facility. The Debtors, the DIP Agent, and the DIP Lenders are authorized to take all actions necessary or appropriate to effectuate the Syndication Procedures without further notice, hearing, or order of the Court. For the avoidance of doubt, any actions taken in accordance with the Syndication Procedures shall be deemed to comply with the terms of this Interim Order and shall not constitute a transfer subject to avoidance, recharacterization, or subordination under the Bankruptcy Code or applicable law.

(d)  The entry of this Interim Order shall constitute final approval of the DIP Fees and Expenses, including without limitation, the Roll-Up and Roll-Up Obligations, Upfront Premium, Exit

31

Premium, Anchor Premium (payable to the Allocation Parties), and Extension Premium.  Furthermore, upon the entry of this Interim Order, the terms and conditions of the Anchor Premium shall have been fully satisfied by the DIP Lenders and the Allocation Parties, and the Anchor Premium and Roll-Up apportioned to the Allocation Parties shall have been fully and finally earned as a bargained for and integral part of the DIP Facility contemplated in these Chapter 11 Cases.

(e)     From the entry of this Interim Order, the DIP Guarantors and Parent Guarantors are hereby authorized and directed on a final basis to jointly, severally, and unconditionally guarantee, and shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrowers.  Upon the effectiveness of the DIP Credit Agreements in accordance with their terms, (i) all holders of the DIP Loans shall be deemed to be a party to, and bound by, the DIP Credit Agreement and DIP Documents, regardless of whether such holder has executed a signature page thereto (solely with respect to the DIP Credit Agreement) and (ii) DIP Lender participation in the DIP Facility shall operate as a deemed consent to the DIP Documents and DIP Facility (including Roll-Up) and DIP Fees and Expenses.

3.     *Repayment of Bridge Loan Obligations*.

(a)     Upon the entry of this Interim Order, the Debtors and the First Lien Term Loan Agent shall be authorized and directed to effectuate the Bridge Repayment.  Pursuant to the Bridge Repayment, the Bridge Loans shall be indefeasibly paid in full and the Debtors shall pay any reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, and any other fees payable pursuant to the Bridge Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the Bridge Documents.

4.     *Roll-Up of First Lien Obligations*.  Upon the entry of this Interim Order, and subject only to a successful Challenge pursuant to paragraph 27, the Roll-Up is approved on a final basis.  Specifically, the authorization of the Roll-Up Obligations shall be subject only to the reservation of rights set forth in paragraph 27 hereof and, in the event of a successful Challenge (as defined below), the Court may fashion any appropriate remedy.

5.    *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations (including, for the avoidance of doubt, the Roll-Up and the Bridge Repayment) of the DIP Loan Parties and Parent Guarantors, enforceable against each relevant DIP Loan Party and Parent Guarantor and their estates in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties or Parent Guarantors to any of the DIP Agent or DIP Secured Parties, in such capacities, in each case, under, or secured by, the DIP Documents (including this Interim Order), including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Interim Order).  The DIP Loan Parties and Parent Guarantors shall be jointly and severally liable for the DIP Obligations.  Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.    *No Obligation to Extend Credit*.  The DIP Lenders shall have no obligations to make any loans under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and/or the DIP Orders, as applicable, have been satisfied in full or waived

by the DIP Agent (at the direction of the Required Lenders) or as otherwise contemplated by the DIP Documents.

       7.    *Carve-Out*.

       (a)    <u>Priority Carve-Out</u>. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Claims, and any other liens, claims, or interests that any creditor, the Prepetition Secured Parties, the DIP Secured Parties, or any of their respective affiliates hold, own or control in relation to the Debtors or their affiliates, shall be subject and subordinate to payment of the Carve-Out (as defined herein).  The Carve-Out shall be senior to all claims and liens, including DIP Superpriority Claims and DIP Liens, over any assets of the Debtors, including any DIP Collateral and Prepetition Collateral, as set forth in this Interim Order.  For the avoidance of doubt, after delivery of a Termination Notice or the date upon which the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the New Money Loan Commitments have been terminated, the Carve-Out shall remain in effect as to all claims and obligations, including the Prepetition Secured Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Interim Order.

       (b)    <u>Carve-Out</u>. As used in this Interim Order, "Carve-Out" means the sum of:  (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717; (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $125,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) subject, in each case, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued but unpaid claims for fees and expenses (including any restructuring, sale, success or other transaction fees that have been fully earned, and accrued, and are due and payable in accordance with the applicable engagement letter, but excluding any fee payable under any "tail" obligation or any other fees that have not been earned and accrued in accordance with the applicable engagement letter) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the

34

Bankruptcy Code (the "**Professional Persons**") pursuant to sections 328 or 1103 of the Bankruptcy Code, at any time before the date of delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after the Carve-Out Trigger Notice Date (as defined below) and without regard to whether such fees and expenses are provided for in the Approved DIP Budget (the amounts set forth in the foregoing clauses (i)–(iii), the "**Pre-Carve-Out Notice Amount**"); (iv) Allowed Professional Fees of Professional Persons incurred on or after the date of delivery by the DIP Agent of a Carve-Out Trigger Notice in an aggregate amount not to exceed $25,000,000 (the amount set forth in this clause (iv) being the "**Post-Carve-Out Notice Amount**" and, together with the Pre-Carve-Out Notice Amount, the "**Carve-Out Amount**").  The "**Carve-Out Notice**" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the Required Lenders) to Weil, Gotshal & Manges LLP ("**Weil**"), as lead restructuring counsel to the Debtors, the U.S. Trustee, and the lead counsel to the Creditors' Committee (if appointed) and any other official committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Carve-Out has been invoked.

(c)      Professional Fees Escrow Account.  The Debtors are authorized and directed to open a new bank account or designate an existing bank account that shall function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons (the "**Professional Fees Escrow Account**").  As soon as reasonably practicable following entry of this Interim Order, the Debtors shall transfer cash, including proceeds from DIP Loans, in an amount equal to the total budgeted (or actual, if available) weekly fees and expenses incurred or to be incurred by Professional Persons between the Petition Date and the first weekly period set forth in the Approved Budget into the Professional Fee Escrow Account.  The Professional Fees Escrow Account shall not be subject to the control of the DIP Agent, any DIP Lender, or any of the Prepetition Secured Lenders and all of the funds transferred to the Professional Fees Escrow Account shall not (i) be property of the estate of any of the Debtors, under section 541 of the Bankruptcy Code, (ii) be subject to the DIP Liens or Adequate Protection Liens, or (iii) constitute DIP Collateral.

35

(d)     Pre-Carve-Out Notice.  Prior to the delivery of a Carve-Out Notice, on the third Business Day of each week starting with the first full calendar week following the date of this Interim Order, each Professional Person shall deliver to the Debtors, the DIP Agent, and their respective advisors a weekly statement (each, a "**Weekly Statement**") setting forth a reasonable good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "**Weekly Estimated Fees and Expenses**"), and the Debtors shall, on a weekly basis, transfer cash proceeds from cash on hand and, if necessary to cover any shortfall from cash on hand, from DIP Loans in the Proceeds Account and Escrow Account into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account).  If, at any time, the amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by a Professional Person exceeds the actual amount accrued by such Professional Person during such applicable weekly period, such excess amount shall be credited against the subsequent Weekly Estimated Fees and Expenses.  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, in accordance with any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.

(e)     Post-Carve-Out Notice.  On the date on which a Carve-Out Notice is delivered in accordance with this paragraph 7(e) of this Interim Order (the "**Carve-Out Trigger Date**"), the Carve-Out Notice shall constitute a demand to the Debtors to (a) utilize all cash on hand and any available cash thereafter held by any Debtor and (b) solely to the extent of any shortfall and subject to the terms of this Interim Order, cash held in the Escrow Account; provided that such demand by the Debtors shall be strictly limited to the amount of any shortfall needed to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount ((i) and (ii), each

36

to the extent not previously funded to the Professional Fees Escrow Account).  Not later than two (2) Business Days after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Agent, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement through and including the Carve-Out Trigger Date, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account.  Notwithstanding anything to the contrary in this Interim Order, the Post-Carve-Out Notice Amount shall promptly be funded into the Professional Fees Escrow Account on the Carve-Out Trigger Date; *provided, however,* that any unused amounts shall be returned to the DIP Lenders.  Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Loan Documents, after delivery of a Carve-Out Notice, if the Professional Fees Escrow Account has not been funded with the full Carve-Out Amount within three (3) business days of delivery of such Carve-Out Notice (to run concurrently with the delivery of the last Weekly Statement), any shortfall shall be funded first, from cash on hand, then from the Proceeds Account, and solely if necessary, from the Escrow Account.

(f)     Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Loan Documents, following delivery of a Carve-Out Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets and any cash in the Escrow Account or Proceeds Account, solely to the extent necessary to fund any shortfall as set forth in paragraph 7(e)) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein.  If, after paying all amounts set forth in the definition of Carve-Out, the Professional Fees Escrow Account has not been reduced to zero, all remaining funds in the Professional Fees Escrow Account shall be distributed to the DIP Agent for application to the DIP Obligations until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the New Money Loan Commitments have been terminated, or, in the event the DIP Obligations have been indefeasibly paid in full in cash, to the Debtors or their estates.

(g)      Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Loan Documents, (i) funds transferred to the Professional Fees Escrow Account shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to the obligations arising out of the Carve-Out, (ii) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Documents or the Prepetition Loan Documents or otherwise increase or reduce the DIP Obligations or the Senior Secured Obligations, (iii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, (iv) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons, and (v) the Carve-Out and the entitlement of the Professional Persons to the Carve-Out and the Professional Fee Escrow Account proceeds shall be senior to all liens and claims against the assets of the Debtors, including those securing the DIP Facility, the Adequate Protections Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing any claims and liens against the Debtors' assets, including the DIP Obligations, the Senior Secured Obligations.

(h)      <u>Payment of Carve-Out on or After the Carve-Out Trigger Date</u>.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.  Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and any applicable Court orders.

(i)      <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be directly responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; provided that

nothing herein shall limit the requirement that any shortfall shall be funded from the Escrow Account or Proceeds Account as contemplated in paragraph 7(e) above.  Nothing in this Interim Order shall be construed as a waiver of any right of the DIP Secured Parties or the Prepetition Secured Parties with respect to any retention application, fee statement, interim application, or monthly application issued or filed by the Professional Persons.

(j)    The DIP Secured Parties and Prepetition Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget.  None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees, disbursements or expenses of the U.S. Trustee, Clerk of the Court or any Professional Person incurred in connection with the Chapter 11 Cases or any successor case(s) under any chapter of the Bankruptcy Code (a "**Successor Case**") under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court.  Nothing in this Interim order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to pay compensation to or reimburse expenses of any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement.

8.    *DIP Superpriority Claims*.  Pursuant to section 364©(1) of the Bankruptcy Code, subject and subordinate to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties and Parent Guarantors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties and Parent Guarantors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be

39

considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and Parent Guarantors, and all proceeds thereof, (excluding the Carve-Out), excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but including (subject to entry of the Final Order) any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**") and (y) the proceeds of property recovered, whether by judgment, settlement, or otherwise from all claims and causes of action under section 549 of the Bankruptcy Code (and section 550 of the Bankruptcy Code solely as to claims and causes of action under section 549) to recover any postpetition transfer of Collateral (such actions, "**Transfer Actions Proceeds**"), and (z) all amounts recovered by the Debtors' estates under section 506(c) of the Bankruptcy Code (subject to entry of the Final Order) ((x) through (z), the "**Recovery Actions**," and the proceeds of property recovered, whether by judgment, settlement, or otherwise from Recovery Actions ("**Recovery Action Proceeds**")) (the foregoing actions in clauses (i)(x), (y), and (z), to the extent not already encumbered, the "**Previously Unencumbered Property**")) and (ii) all Prepetition Collateral (collectively, the "**DIP Collateral**"), in accordance with the DIP Documents and this Interim Order, subject and subordinate only to the Carve-Out; *provided*, for the avoidance of doubt, that the DIP Collateral shall not include any Excluded Assets (as defined in the DIP Documents) but shall include any and all proceeds and products of the Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets; *provided*, *further*, that any such Previously Unencumbered Property that is Recovery Action Proceeds shall constitute DIP Term Priority Collateral for purposes of lien and claim priority.

9.     The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

10.     Pursuant to section 503(b)(1) of the Bankruptcy Code, all postpetition payments on account of any Intercompany Transaction (as defined in the *Emergency Motion of Debtors for Interim and Final*

*Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply With Requirements of 11 U.S.C. § 345(B), and (IV) Granting Related Relief* (Docket No. 17) (the "**Cash Management Motion**"), including any interest and fees related thereto, made by a Debtor to another Debtor, shall be accorded administrative expense status; *provided* that any such administrative expense status shall be junior to the Carve Out and any approved superpriority administrative expense claims under this Interim Order.

11.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the DIP Loan Parties, Parent Guarantors, or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Agent, the DIP Secured Parties, and the Debtors, including the DIP Loan Parties and Parent Guarantors, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**") are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below being collectively included in the definition of DIP Collateral):

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtors, including, the DIP Loan Parties and Parent Guarantors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or

41

(ii) a valid and non- avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, (x) the Previously Unencumbered Property and (y) without duplication, any and all unencumbered cash of the Debtors, including the DIP Loan Parties and the Parent Guarantors (whether maintained with any of the DIP Secured Parties or otherwise and whether existing and/or acquired on or after the Petition Date) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**Additional Unencumbered Property**"), in each case other than the Avoidance Actions and any Excluded Assets (but shall include any and all proceeds and products of the Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets) and amounts under the Carve-Out (but, for the avoidance of doubt, subject to entry of the Final Order, "Additional Unencumbered Property" shall include Avoidance Actions and Avoidance Proceeds).   Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, in no event shall DIP Collateral (and the DIP Liens and Adequate Protection Liens thereon) include:  (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases and (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtors' revisionary interests therein), in each case, unless such lien is expressly permitted under such lease.

(b)      *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully- perfected first priority senior priming security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtors, including the DIP Loan Parties and Parent Guarantors, of the same nature, scope, and type as the Prepetition Term Priority Collateral (the "**DIP Term Priority Collateral**"), regardless of where located (the "**DIP Priming Liens**"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) senior in all respects to the other Prepetition Liens on DIP Term Priority Collateral, (ii) senior to any Adequate Protection Liens on DIP Term Priority Collateral and (iii) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Term Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)      *Liens Junior to Certain Other Liens*.  Pursuant to section 364©(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, including the DIP Loan Parties and Parent Guarantors that, on or as of the Petition Date, is subject to either (i) valid, perfected and non-avoidable Prepetition Permitted Senior Liens, or (ii) valid and non-avoidable Prepetition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be (x) immediately junior and subordinate to any such Prepetition Permitted Senior Liens and (y) junior to the Adequate Protection Liens and the Prepetition Liens.

(d)      *Liens Senior to Certain Other Liens*.  The DIP Liens shall not be subject or subordinate to or made *pari passu* with:  (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court

for any liability of the Debtors, including the DIP Loan Parties or Parent Guarantors, or (iii) any intercompany or affiliate liens of the Debtors, including DIP Loan Parties or Parent Guarantors or security interests of the Debtors, including the DIP Loan Parties or Parent Guarantors; or (iv) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.

(e)　　*FBG Debtors' Intercompany Claim*.　Notwithstanding anything to the contrary herein, the FBG Debtors[11] shall receive (a) allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code and (b) valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code, for (a) any allocable costs incurred for administering the chapter 11 cases of the SPV Debtors (including, but not limited to, their share of "carve-out" estate professional fees and U.S. Trustee fees) and (b) any other intercompany transaction made to or for the benefit of the SPV Debtors; provided however that the Debtors, the SPV Lenders, and all other parties in interest reserve their rights with respect to the amount of such allocation costs.

12.　　*Protection of DIP Lenders' and Prepetition Secured Parties' Rights*.

(a)　　So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments under the DIP Documents, the Prepetition Secured Parties, shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than, (x) solely as to this clause (iii), the Prepetition Secured Parties filing financing statements or other documents to perfect

---

[11]　"**FBG Debtors**" means First Brands Groups Holdings, LLC and its subsidiary Debtors.

the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' or Parent Guarantors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by the DIP Documents and this Interim Order.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Secured Parties, and such Prepetition Secured Party, as applicable, shall comply with the instructions of the DIP Agent, acting at the direction of the Required Lenders, with respect to such notation or the exercise of such control or possession.

(c)     Any proceeds of Prepetition Collateral received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by a Prepetition Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for the ABL Agent and any such Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

(d)     Immediately upon the occurrence of and during the continuation of an Event of Default that has not been waived by the Required Lenders and following delivery of written notice (a "**Termination Notice**") (including by e-mail) on not less than five (5) business days' notice (such three (3) business day period, the "**Remedies Notice Period**") to lead restructuring counsel to the Debtors, lead

45

restructuring counsel to the ABL Agent, lead restructuring counsel to the First Lien Term Loan Agent, lead restructuring counsel to the Second Lien Term Loan Agent, lead counsel to the Creditors' Committee, and the U.S. Trustee, (the "**Remedies Notice Parties**"), the (i) DIP Agent may, acting at the direction of the Required Lenders, and (ii) solely with respect to the immediately following clause (a) in this paragraph 12(d), Prepetition Secured Parties (acting under the direction of the applicable required lenders), subject to the DIP Obligations, the DIP Superpriority Claims, the Permitted Liens (if any), and consistent with the Prepetition Credit Documents, including the Intercreditor Agreements, and the relative rights and priorities, without further notice to, hearing of, or order from this Court, may, unless the Court orders otherwise: (a) immediately terminate and/or revoke the DIP Loan Parties' and Parent Guarantors' rights under this Interim Order and any other DIP Documents or Prepetition Secured Documents, as applicable, to use any Cash Collateral (subject only to the Carve-Out, including the provisions set forth in paragraph 7 of this Interim Order) except as solely necessary to fund expenses critically necessary to preserve the value of the DIP Loan Parties' business and the DIP Collateral, which expenses are in accordance with the Approved Budget; (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) invoke the right to charge interest at the default rate under the DIP Documents; and (e) terminate, reduce, or restrict any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility. The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically modified with respect to the DIP Secured Parties and the Prepetition Secured Parties, as applicable, at the end of the Remedies Notice Period, without further notice or order of the Court, unless (A) the DIP Agent (at the direction of the Required Lenders) and the Prepetition Agents (at the direction of the applicable requisite lenders), as applicable, elect otherwise in a written notice to the Debtors, and/or (B) the Court has determined that an Event of Default has not occurred and/or is not continuing and/or (C) the Court orders otherwise.

(e)     Upon delivery of such Termination Notice by the DIP Agent and subject to the Carve-Out and related provisions set forth in paragraph 7, without further notice or order of the Court, the

DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations; *provided* that, during the Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Agent consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral; *provided* further that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.

(f)     Following an Event of Default and the delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 12(e)), the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) days' notice to the Remedies Notice Parties for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties and Prepetition Secured Parties to, subject to the ABL Intercreditor Agreement, the Term Intercreditor Agreement, the Carve-Out and related provisions:  (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Secured Parties against the DIP Obligations; (c) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; (d) the Prepetition Secured Parties may exercise any rights and remedies to satisfy the Prepetition Secured Obligations and Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Permitted Liens (if any), and consistent with the Prepetition Credit Documents, including the Intercreditor Agreements, including, without limitation, to charge interest at the default rate; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable

law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to extent drawn prior to the occurrence of an Event of Default or Cash Collateral solely necessary to fund expenses critically necessary to preserve the value of the DIP Loan Parties' business and the DIP Collateral and any unfunded Carve-Out Amounts to the Escrow Account.  For the avoidance of doubt, following an Event of Default and delivery of a Termination Notice, no further draws from the Escrow Account may be made absent the consent of the Required Lenders.  The DIP Lenders shall promptly cause a copy of any Stay Relief Motion to be served on any party that has filed a request for notices with this Court.

(g)     Notwithstanding the foregoing, and irrespective of the Remedies Notice Period, but except solely as otherwise expressly provided with respect to the Carve-Out, the DIP Lenders shall not be obligated to provide any DIP Loans, withdrawals from the DIP Account, or advances at any time a Default (as defined in the applicable DIP Credit Agreement) or Event of Default has occurred and is continuing after a DIP Termination Event.

(h)     Notwithstanding anything in the Interim Order or the DIP Documents to the contrary, none of the Prepetition Secured Parties shall be permitted to exercise any rights or remedies with respect to any Prepetition Collateral or DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full.

(i)     No rights, protections or remedies of the DIP Agent or the DIP Secured Parties or the Prepetition Secured Parties granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by:  (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order

or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

13.     *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral (excluding the ABL Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the ABL Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, and/or the Second Lien Term Loan Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, the ABL Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Secured Parties, the ABL Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

14.     *No Marshaling*.  In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Debt, or the Prepetition Collateral.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Collateral; subject to entry of the Final Order.

15.     *Payments and Exchanges Free and Clear*.  Any and all payments, fees, premiums, or proceeds remitted, reimbursed, or exchanged to the DIP Agent by, through or on behalf of the DIP Secured Parties or by, through or on behalf of the Prepetition Secured Parties (on behalf of themselves or any other Prepetition Secured Party) pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment

or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506© or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

16.     *Use of Cash Collateral*.  The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with the DIP Documents and Approved Budget (subject to permitted variances); *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the DIP Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

17.     *Disposition of DIP Collateral*.  The DIP Loan Parties and Parent Guarantors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or an order of the Court.

18.     *Use of DIP Facility Proceeds*

(a)     Subject to satisfaction (or waiver) of all applicable conditions precedent under the DIP Documents, the DIP Loans shall have been or shall be made available to the DIP Loan Parties:  (i) on the Closing Date, to pay the Bridge Repayment (which may be on a cashless basis), and the fees, premia, costs, and expenses incurred in connection with the transactions contemplated hereby, and (ii) on and/or after the Closing Date:  (A) for the DIP Loan Parties (and non-DIP Loan Parties, solely as permitted under the DIP Documents) working capital requirements and for general corporate purposes (including, to fund the costs, fees, and expenses in connection with administration of the Chapter 11 Cases) in accordance with the Approved Budget, (B) for the payment of all reasonable and documented out-of-pocket costs, fees, and expenses required by the DIP Documents, and (C) to fund the Carve-Out as provided in the DIP Orders, in the case of each of (i) and (ii) above, in accordance with the terms of the DIP Orders and the DIP Documents.

(b)     Unless expressly consented to by the Required Lenders (in their sole discretion), no proceeds of the DIP Loans (including payments from Collateral, the Proceeds Account, or the Escrow Account) shall be used (i) to make any payment in settlement or satisfaction of any prepetition claim or

administrative claim (other than the DIP Obligations as provided in the DIP Orders and the DIP Credit Agreement); (ii) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreements and the Approved Budget; (iii) except as expressly provided or permitted hereunder or under the DIP Credit Agreement (in accordance with the Approved Budget), or as otherwise approved in advance in writing by Required Lenders (and approved by the Court, if necessary), to make any payment or distribution, directly or indirectly (including through an intercompany set-off), to, or on behalf of, any SPV Debtor and any other non-DIP Loan Party; *provided that*, notwithstanding anything else in this Interim Order or any First Day Pleadings (as defined in the DIP Credit Agreement), any consent of the Required Lenders to payments, set offs, or distributions to non-DIP Loan Parties shall not be deemed, inferred, or assumed absent express line-item approval of such payment, set off, or distribution in the Approved Budget; (iv) except as expressly provided or permitted hereunder, under the DIP Credit Agreement or in the Approved Budget, or as otherwise approved in advance in writing (and approved by the Court, if necessary), to make any payment or distribution to, or on behalf of, any insider of the Debtors (whether ordinary course or non-ordinary course), and in no event shall any management, advisory, consulting, or similar fees be paid to or for the benefit of any non-Debtor affiliate (whether ordinary or non-ordinary course); (v) to make any payment otherwise prohibited by this Interim Order; (vi) to make any intercompany loans and investments (including to and in foreign subsidiaries) unless expressly permitted by this Interim Order or the other DIP Documents and the Approved Budget or consented to by the Required Lenders; or (vii) for any purpose not authorized by any Approved Budget.

(c)     Subject to the terms and conditions of this Interim Order and the other DIP Documents, the DIP Loan Parties, Parent Guarantors, and, if applicable, any non-DIP Loan Party authorized to receive proceeds of DIP Collateral in accordance with the DIP Documents, are only authorized to use proceeds of the DIP Collateral in the amounts and for the stated purpose set forth in the Approved Budget (subject to permitted variances).

(d)     For the avoidance of doubt, except as otherwise set forth in the Approved Budget or otherwise consented to by the Required Lenders, proceeds of the DIP Loans may not be used (i) by any

51

non-Debtor entity or any foreign subsidiary or affiliate of the Debtors or (ii) to pay any fees, costs, expenses, and/or any other amounts of any non-Debtor or foreign entity.

19.     *Budget Maintenance*.

(a)     The DIP Secured Parties shall, as soon as reasonably practicable upon authorization to advance DIP Loans under the DIP Facility pursuant to this Interim Order and/or the Final Order, deposit such amounts into a segregated escrow account (the "**Escrow Account**") maintained by the DIP Agent, which amounts may only be disbursed with the consent of the Required Lenders in accordance with the Escrow Agreement (as defined in the DIP Credit Agreement) and the Approved Budget, the terms and conditions of the DIP Orders, and the DIP Credit Agreement, and with all funds held in the Escrow Account deemed to be DIP Collateral (provided that the Escrow Account shall not be subject to any liens of the ABL Agent or the other ABL Secured Parties).  Funds in the Escrow Account will become available to be drawn by and/or shall be disbursed to the DIP Loan Parties in accordance with the Approved Budget, the DIP Orders, and the DIP Credit Agreement.  The DIP Agent shall be deemed to have "control" over the Escrow Account for all purposes of perfection under the Uniform Commercial Code pursuant to the DIP Orders.  Once disbursed from the Escrow Account, the DIP Loans shall be placed into an account maintained with the DIP Agent (the "**Proceeds Account**") and shall continue to be DIP Term Priority Collateral until such funds are first used by the Debtors, and at all times the Debtors shall, notwithstanding any potential commingling, establish strict internal cash management procedures acceptable to the Required Lenders to allow for the continued tracing of such funds, including oversight by the Debtors' chief restructuring officer and the Proceeds Account shall not be subject to any liens of the ABL Agent or the other ABL Secured Parties.  The DIP Agent shall be deemed to have "control" over the Proceeds Account for all purposes of perfection under the Uniform Commercial Code pursuant to the DIP Orders and pursuant to a control agreement acceptable to the Required Lenders.

(b)     All cash withdrawals from the Escrow Account or the Proceeds Account or otherwise on account of DIP Term Priority Collateral shall be, and in any event shall be deemed to be, pursuant to this Interim DIP Order and notwithstanding anything to the contrary in any Intercreditor

52

Agreement, DIP Term Priority Collateral for the benefit of the DIP Agent (for the benefit of the DIP Secured Parties).

(c)     Except as permitted by this Interim Order or any DIP Document, the Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest, or other amount payable in respect of any secured funded indebtedness prior to its scheduled maturity, other than the obligations expressly authorized by an order of the Court.

(d)     The DIP Loan Parties shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the Approved Budget (subject to permitted variances), provided that the Approved Budget will not operate as a cap on professional fees.  The Approved Budget annexed to this Interim Order as **Exhibit 4** shall constitute the initial Approved Budget upon the entry of this Interim Order (the "**Initial DIP Budget**").

20.     *DIP Information Rights.*

(a)     The Debtors will (i) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Ad Hoc Group Advisors (with copies to the Prepetition Agents), respectively, all such information and documents that any or all of the Debtors are obligated (upon their reasonable request) to provide under the DIP Documents, or the provision of the DIP Orders, excluding any information subject to attorney-client, work product, or similar privilege, (ii) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of the DIP Secured Parties to discuss, and provide advice with respect to, the Debtors' respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel), and (iii) permit the DIP Secured Parties and their respective consultants, advisors, and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Secured Parties, the Prepetition Agents, or any of their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

21.     *Proceeds of Subsequent Financing.* If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), and 364(d) of the Bankruptcy Code in violation of the DIP Documents or the DIP Orders at any time, including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied in accordance with this Interim DIP Order, the Intercreditor Agreements, and the DIP Documents.

22.     *Adequate Protection of Prepetition Secured Parties.*  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) to the extent any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for under the Bankruptcy Code ("**Diminution of Value**"), including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents and this Interim Order, the payment of any amounts under the Carve-Out or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "**Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition Agents, as applicable, and for the benefit of the applicable Prepetition Secured Parties, are hereby granted the following as Adequate Protection on account of their Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)     *Section 507(b) Claims.* Solely to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, under this Interim Order, each Prepetition Agent, for the benefit of the applicable Prepetition Secured Parties, is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (each, an "**Adequate Protection Claim**") against the Debtors and their estates on a joint and several basis, which Adequate Protection Claims shall

54

have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726(b), 1113, and 1114 of the Bankruptcy Code, in each case subject only to the Carve-Out and the DIP Superpriority Claims and shall otherwise have the relative rank and priority set forth in the Intercreditor Agreements.

(b)     *ABL Adequate Protection Liens*.  The ABL Agent, for itself and for the benefit of the ABL Lenders is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**ABL Adequate Protection Liens**"), in the case of the Prepetition ABL Priority Collateral, subject to and subordinate only to the Carve-Out, but in the case of the Prepetition Term Priority Collateral, subject and subordinate to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the First Lien Term Loans Adequate Protection Liens and (v) the Second Lien Term Loans Adequate Protection Liens.

(c)     *First Lien Term Loans Adequate Protection Liens*.  The First Lien Agent, for itself and for the benefit of the First Lien Term Loan Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**First Lien Term Loans Adequate Protection Liens**"), in the in the case of  Prepetition Term Priority Collateral, subordinate only to the (A) Carve-Out, (B) the DIP Liens, and (C) Prepetition Permitted Senior Liens, and in the case of  Prepetition ABL Priority Collateral, subject and subordinate only to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, and (iii) the DIP Liens, and (iv) the ABL Adequate Protection Liens.

(d)     *Second Lien Term Loan Adequate Protection Liens*.  The Second Lien Term Loan Agent, for itself and for the benefit of the Second Lien Term Loan Lenders is hereby granted (effective and

55

perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**Second Lien Term Loan Adequate Protection Liens**" and, together with the ABL Adequate Protection Liens, and the First Lien Term Loans Adequate Protection Liens, the "**Adequate Protection Liens**"), in the in the case of  Prepetition Term Priority Collateral, subordinate only to the (A) Carve-Out, (B) the DIP Liens, (C) Prepetition Permitted Senior Liens, and (D) First Lien Term Loans Adequate Protection Liens, and in the case of  Prepetition ABL Priority Collateral, subject and subordinate only to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the ABL Adequate Protection Liens, and (v) the First Lien Term Loans Adequate Protection Liens.

(e)     *ABL Secured Parties' Adequate Protection Fees and Expenses*.   As further adequate protection, the DIP Loan Parties shall provide the ABL Agent, for the benefit of the ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the ABL Agent under the ABL Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Winston & Strawn LLP (solely in its capacity as counsel to the ABL Agent), and one local counsel to the ABL Agent (the "**ABL Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 26 of this Interim Order.

(f)     *First Lien Term Loan Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the First Lien Term Loan Agent, for the benefit of the First Lien Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Ad Hoc Group Advisors and the First Lien Term Loan Agent under the First Lien Term Loan Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Herbert Smith Freehills Kramer LLP (solely in its capacity as counsel to the First Lien Term Loan Agent), and one local counsel to the First Lien Term Loan Agent (the "**First Lien Term Loans Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 26 of this Interim Order.

(g)      *Second Lien Term Loan Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the Second Lien Term Loan Agent, for the benefit of the Second Lien Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Second Lien Term Loan Agent under the Second Lien Term Loan Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of counsel to the Second Lien Term Loan Agent, and one local counsel to the Second Lien Term Loan Agent (the "**Second Lien Term Loan Adequate Protection Fees and Expenses**" and, together with the ABL Adequate Protection Fees and Expenses, and the First Lien Term Loans Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 26 of this Interim Order.

(h)      *ABL Postpetition Interest Payments*.  From and after entry of this Interim Order, the ABL Agent, on behalf of itself and the ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest on the ABL Obligations under the ABL Credit Agreement (except with respect to any supply chain obligations) as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the ABL Credit Agreement.  The first such interest payment date shall be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek a determination (i) that adequate protection payments (as set forth in this paragraph 23(h)) should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the ABL Debt as of the Petition Date and (ii) with respect to the accrual and amount of default interest.  To the extent the supply chain obligations are valid "Cash Management Obligations" interest on such amounts shall accrue and be paid in kind, subject to the satisfaction of section 506(b) of the Bankruptcy Code.

(i)      *First Lien Term Loans Postpetition Interest Payments*.  From and after entry of this Interim Order, the First Lien Term Loan Agent, on behalf of itself and the First Lien Term Loan Lenders, shall receive current payment-in-kind during the Chapter 11 Cases of all accrued interest on the First Lien Term Loan Obligations under the First Lien Term Loan Agreement as such interest becomes due

57

and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder and in the amounts specified in the First Lien Term Loan Agreement.  The first such interest payment date shall be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek a determination (i) that adequate protection payments (as set forth in this paragraph 23(j)) should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the First Lien Term Loan Debt as of the Petition Date and (ii) with respect to the accrual and amount of default interest.

(j)      *Second Lien Term Loan Postpetition Interest Payments*.  From and after entry of this Interim Order, the Second Lien Term Loan Lenders, shall receive current payment-in-kind during the Chapter 11 Cases of all accrued interest on the Second Lien Term Loan Obligations under the Second Lien Term Loan Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder and in the amounts specified in the Second Lien Term Loan Agreement.  The first such interest payment date shall be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek a determination (i) that adequate protection payments (as set forth in this paragraph 23(j)) should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the Second Lien Term Loan Debt as of the Petition Date and (ii) with respect to the accrual and amount of default interest.

(k)      *Adequate Protection Information Rights*.  The Debtors shall provide to the Prepetition Agents, at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent, all written reporting required to be provided to the DIP Lenders or DIP Agent under the DIP Documents. The Debtors shall provide the Prepetition Agents with all other written reporting required under the DIP Credit Agreement, as applicable, when due in accordance with its terms (without, for the avoidance of doubt, any approval rights with respect thereto).

(l)      *Disposition of DIP Collateral*.  Except as otherwise provided for in the DIP Documents or the Approved Budget, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition Collateral (or enter into any binding

agreement to do so) without the prior written consent of the DIP Agent (at the direction of the Required Lenders), or solely in the case of any ABL Priority Collateral, the ABL Agent (at the direction of the ABL Required Lenders), or solely in the case of any DIP Term Priority Collateral, the DIP Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Secured Parties, respectively, or any order of this Court, until the DIP Obligations are paid in full in cash (or with respect to any letters of credit, cash collateralized) and, thereafter, subject to the Intercreditor Agreements, without the prior written consent of the applicable Prepetition Agents (acting at the direction of the applicable required Prepetition Secured Parties) (and no consent shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured Party or any order of this Court) until the Prepetition Secured Obligations are paid in full in cash.

(m)     From the Petition Date until the DIP Obligations have been paid in full in cash (or with respect to any letters of credit, cash collateralized) or such other treatment with respect to the DIP Obligations solely to the extent expressly consented to in a writing prior thereto by the Required Lenders, as applicable, all cash receipts, Cash Collateral, and all proceeds from the sale, lease, transfer, encumbrance, or other disposition of, or other revenue of any kind attributable to, any DIP Collateral or Prepetition Collateral that is now in, or shall hereafter come into, the possession or control of any of the Debtors, or to which any of the Debtors is now or shall hereafter become entitled shall, to the extent provided in the DIP Orders, be subject to the DIP Liens and Adequate Protection Liens, respectively (and shall be treated in accordance with the DIP Orders, the DIP Documents, and the Intercreditor Agreements). Thereafter, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any DIP Collateral shall be remitted in accordance with the Intercreditor Agreements.

(n)     *Maintenance of Collateral*.  The Debtors shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Documents.  Unless (a) the Debtors have the consent of the DIP Agent (at the direction of the Required Lenders) or (b) the DIP Secured Parties' obligations to extend credit under the DIP Documents as provided therein has been terminated, the Debtors shall (i) insure the Prepetition Collateral and the DIP Collateral as required under DIP Documents and the Prepetition Credit

59

Documents, and (ii) maintain the cash management system in effect following entry of the Cash Management Order, as modified by the DIP Orders, or as otherwise agreed to by the DIP Agent (at the direction of the Required Lenders). The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Secured Parties, and any such accounts shall be subject to the lien priorities and other provisions set forth in the DIP Orders. To the extent that any of the Prepetition Secured Parties are listed as additional insured and/or loss payee under the DIP Secured Parties' insurance policies, upon the entry of the Interim Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that covers the DIP Collateral, and the DIP Agents shall distribute any proceeds recovered or received in respect of any such insurance policies, subject to the Carve-Out, in accordance with the terms DIP Documents and the DIP Orders, and subject to the terms and conditions of the Intercreditor Agreements.

(o)     *SPV Lenders*.  For the avoidance of doubt, none of the SPV Debtors are DIP Guarantors. Except as set forth in paragraph 11(e), nothing in this Interim Order or any of the DIP Documents shall grant any liens or claims against any assets of SPV Debtors.  The rights and obligations of the SPV Lenders and SPV Debtors shall be set forth in separate stipulations to be filed with the Court or as further determined by the Court.

23.     *Reservation of Rights*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 507(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties (subject to any applicable contractual limitations on such rights) may request further or different adequate protection and the DIP Loan Parties or any other party in interest may contest any such request. Subject only to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition

Secured Parties that the adequate protection granted in the DIP Orders does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

24.    *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    Without in any way limiting the automatically valid effective perfection of the DIP Liens granted pursuant to this Interim DIP Order and the Adequate Protection Liens granted pursuant to this Interim DIP Order, the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, Parent Guarantors, and the Prepetition Secured parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("**Perfection Actions**").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, the Prepetition Agents, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, and at the sole cost of the Debtors as set forth herein, is authorized (in the case of the DIP Loan Parties and Parent Guarantors) and directed (in the case of the Prepetition Secured Parties), and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Prepetition Credit Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent; *provided*, *however*, that no action need

be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent and the Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit the DIP Agent and Prepetition Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)     No later than thirty (30) days following the entry of this Interim Order, each Foreign Subsidiary (each as defined in the DIP Credit Agreement) that the Required Lenders request, in their commercially reasonable discretion, shall become a Subsidiary Guarantor. In addition, the Debtors, as a condition precedent to the transfer of any cash from a DIP Loan Party to a non-DIP Loan Party (other than the Parent Guarantors), shall obtain secured guarantees from such non-DIP Loan Party to secure any DIP Obligations that are incurred as a result of any Debtor transferring any cash and shall deliver such documents and take such actions reasonably requested by the Required Lenders in connection with such.

(d)     Upon the request of the DIP Agent (at the direction of the Required Lenders), each applicable Debtor shall use commercially reasonable efforts to execute, acknowledge, and deliver, or shall cause to be executed, acknowledged, and delivered, all such further agreements, instruments, certificates or documents, that the DIP Agent (at the direction of the Required Lenders) shall require in order to ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Agent and the DIP Lenders with respect to the DIP Collateral, including any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States.  Further, the DIP Agent (at the direction of the Required Lenders) may, subject to the terms of the DIP Documents, require certain of the Debtors to enter into non-U.S. security documentation with respect to collateral owned by non-U.S. Debtors or located in non-U.S. jurisdictions and each Debtor and its respective officers or agents are authorized to execute, file and record any documents or instruments as the

62

DIP Agent (at the direction of the Required Lenders) shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

(e)     The Debtors further agree in this Interim Order to use commercially reasonably efforts in advance of entry of the Final Order, to identify any additional unencumbered property of the Debtors and, if practicable, cause non-Debtor subsidiaries to pledge any applicable assets to secure the DIP Obligations, or such other actions as may be reasonably requested by the Required Lenders.

25.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Other than (i) the Carve-Out, (ii) and other claims and liens expressly granted or permitted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Secured Parties or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be:  (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)     The occurrence and continuance of any Event of Default (as defined in the DIP Credit Agreement) shall, after notice by the DIP Agent (acting at the direction of Required Lenders in accordance with the terms of this Interim Order) in writing to the Borrower, counsel to the Borrower, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any) constitute an event of default under this Interim Order (each an "**Event of Default**").  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these Chapter 11 Cases to cases under chapter 7:  (A) the DIP Superpriority Claims, the Prepetition Adequate Protection

Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect:  (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens, or the Carve-Out. Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Loan Parties and granted to the DIP Agent, the DIP Secured Parties, the Prepetition Agents, or the other Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Secured Parties, the Prepetition Agents, and the other Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Claims and all other rights and remedies of the DIP Agent, the DIP

Secured Parties, the Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents and the Carve-Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, the Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Claims are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of the Prepetition Agent, and the other Prepetition Secured Parties, shall remain in full force and effect thereafter, subject to the terms of this Interim Order), and the Carve-Out shall continue in full force and effect.

26.     *Payment of Fees and Expenses*. The DIP Loan Parties are authorized to and shall pay the Adequate Protection Fees and Expenses. Subject to the review procedures set forth in this paragraph 26, payment of all Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Secured Parties, the Ad Hoc Group, and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices including aggregate amounts of fees

and expenses and total amount of time on a per-professional basis (which shall not be required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, or any information constituting attorney work product, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) to the DIP Loan Parties, counsel to the Ad Hoc Group, counsel to any 66tatutoryy committee, and the U.S. Trustee (together, the "**Review Parties**"); *provided, however*, that the U.S. Trustee and any statutory committee reserve their rights to request additional details regarding the services rendered and expenses incurred by such professionals (an "**Information Request**").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt by the Review Parties (the "**Review Period**"), which shall not be extended by the delivery of an Information Request or the timing of any reply thereto.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the DIP Loan Parties shall pay such invoices within three (3) business days.  If an objection to a professional's invoice is received within the Review Period, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date any DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors).  No attorney or advisor to any DIP Secured Party, the Ad Hoc Group, or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the debtors to (i) the DIP Secured Parties in connection with or with respect to the DIP facility and (ii) Prepetition Secured Parties in connection with or with respect to these Chapter 11

66

Cases, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

27.    *Effect of Stipulations on Third Parties*.  The Debtors' Stipulations, including any other admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' Stipulations and any other admissions, agreements, releases and the Roll-Up Obligations contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless:  (a) such committee or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the deadline to assert a Challenge and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) as to the Creditors' Committee only, 60 calendar days after the appointment of the Creditors' Committee, (ii) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, then the Challenge Period for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee and chapter 11 trustee) to the date that is the later of (1) 60 calendar days after entry of this Interim Order, or (2) the date that is 30 calendar days after its appointment, and (iii) as for all other parties in interest, 60 calendar days after entry of this Interim Order; and any such later date as (a) has been agreed to by the ABL Agent with respect to the ABL Debt or the ABL Liens, (b) has been agreed to by the First Lien Term Loan Agent with respect to the First Lien Term Loan Obligations or the First Lien Term Loan Liens, (c) has been agreed to by the Second Lien Term Loan Agent with respect to the Second Lien Term Loan Obligations or the Second Lien Term Loan Liens, (d) has been agreed to by the DIP Agent with respect to the Roll-Up, or (e) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(iii), the "**Challenge**

**Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens, the Prepetition Collateral, and the Roll-Up Obligations; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then:  (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral (including the Roll-Up Obligations) shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim,

68

cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral (including with respect to the Roll-Up Obligations) shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each other statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens, or the Roll-Up Obligations, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any chapter 11 plan.

28.      *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-DIP Loan Party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Agents', the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under this Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Secured Parties

70

under this Interim Order, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and the Adequate Protection Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court and expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, Prepetition Agents, and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties.  For the avoidance of doubt, this paragraph 28 shall not limit the Debtors' right to use DIP Collateral and Cash Collateral to contest that an Event of Default has occurred hereunder pursuant to and consistent with paragraph 12 of this Interim Order.

29.     *Indemnification*.  The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility (including the Roll-Up) or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Allocation Parties, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) from and against all costs, expenses and liabilities arising out of or relating to the transactions, procedures, and/or relief approved by this Interim Order, including, without limitation, pursuant to the DIP Credit Agreement.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth,

71

as the case may be, in this paragraph 31 or in the DIP Documents, or in the Prepetition Credit Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, Backstop Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

30.     *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or the Prepetition Credit Documents, the provisions of this Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget (subject to permitted variances).

31.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be, subject only to the challenge rights in paragraph 26, binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Secured Parties, the Prepetition Agents, the other Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Secured Parties, the Prepetition Agents, the other Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Secured Parties, the Prepetition Agents, and the other Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

32.     *Limitation of Liability*.  Nothing in this Interim Order, the DIP Documents, the Prepetition Credit Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition

72

Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, (a) be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person or (b) bear any risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Credit Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, DIP Secured Parties, the Prepetition Agents, or other Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

33.     *Master Proofs of Claim*.  The Prepetition Secured Parties and the DIP Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or any other party for payment of the any claim arising under the DIP Orders or any Prepetition Secured Debt arising under the Prepetition Credit Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Credit Documents.  The statements of claim in respect of such indebtedness set forth in this Interim Order is

deemed sufficient to and does constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, the DIP Agent and the Prepetition Agents are each authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re First Brands Group, LLC*, Case No. 25-90399 (CML), a master proof of claim on behalf of its respective DIP Secured Parties or Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by the DIP Agent, ABL Agent, the Prepetition Agents, as applicable, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable DIP Documents or Prepetition Credit Documents, and the claim of each applicable DIP Secured Party and Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any DIP Secured Party or Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 33 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each DIP Secured Party or Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable DIP Secured Parties and Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the DIP Agent and the Prepetition Agents, as applicable.  The DIP Agent and the DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the Declarations, the evidence presented with the DIP Motion, the record established at the Interim Hearing, and this Interim Order are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

34.     *Insurance*.  To the extent that the Prepetition Agents are listed as loss payee under the Borrower's, DIP Guarantors' or Parent Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies, (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein) and, except with respect to the ABL Priority Collateral prior to the indefeasible payment in full of the ABL Obligations, shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and thereafter to the payment of the applicable Prepetition Secured Debt; *provided* that the rights of a lessor under any non-residential real property lease to any such insurance proceeds are hereby expressly reserved pending entry of a Final Order.

35.     *Credit Bidding*.  In accordance with the DIP Documents, the DIP Agent shall have the right to credit bid up to the full amount of the DIP Obligations (including any Roll-Up Obligations) in any sale of the DIP Collateral and (b) the Prepetition Agents, shall each have the right, consistent with the provisions of the Prepetition Credit Documents, as applicable (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid up to the full amount of the applicable Prepetition Secured Debt in the sale of the Prepetition Collateral, as applicable, in each case, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  For credit bidding purposes, DIP Lenders holding a majority of the then-outstanding New Money DIP Loans may credit bid up to the full amount of the then-outstanding New Money DIP Loans and DIP Lenders holding a majority of the then-outstanding Roll-Up Obligations may credit bid up to the full amount of the then-outstanding Roll-Up Obligations; *provided however*, that no Roll-Up Obligations may be credit bid unless the proposed transaction (y) indefeasibly repays in full the New Money

75

DIP Loans or (z) DIP Lenders holding a majority of the then-outstanding New Money DIP Loans otherwise consent.

36.     *Preservation of Rights Granted Under this Interim Order*.   Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Secured Parties' and the Prepetition Secured Parties', as applicable, right to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Term Loan Lenders to seek the payment by the Debtors of postpetition interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Secured Parties and the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral, (v) object to any sale of assets, or (vi) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; *provided that* the rights of the DIP Secured Parties and the Prepetition Secured Parties, respectively, with respect to the foregoing clauses (a) through (c) of this paragraph 36 shall be subject to the Intercreditor Agreements and the Prepetition Credit Documents, as applicable; *provided, further that*, the rights and defenses of the Debtors with respect to the foregoing clauses (a) through (c) of this paragraph 36 are expressly preserved. Other than as expressly set forth in the DIP Orders, any other rights, claims or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties are preserved.

37.     Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all DIP Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or the DIP Orders, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 12 hereof.

38.     Subject to the Carve-Out and the Permitted Liens, unless the DIP Secured Parties and the DIP Agents have provided their prior written consent, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, other than the Carve-Out, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Fees and Expenses provided to the DIP Secured Parties; (ii) the use of Cash Collateral for any purpose that is not permitted in the DIP Orders and the DIP Documents, or (iii) any modification of any of the DIP Secured Parties' rights under the DIP Orders and the DIP Documents with respect to any DIP Obligations.

39.     Notwithstanding any order dismissing any of the Chapter 11 Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and the other administrative claims granted pursuant to the DIP Orders shall continue in full force and effect and shall maintain their priorities as provided in the DIP Orders until all DIP Obligations and Adequate Protection Obligations are paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations, and the other administrative claims granted pursuant to the DIP Orders, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in the foregoing clause (x).

40.     Except as expressly provided in the DIP Orders or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of the DIP Orders and the DIP Documents shall survive, and shall not be modified,

77

impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases, or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of the DIP Orders and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of the DIP Orders shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders). To the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding a dismissal of these Chapter 11 Cases, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph 40.

41.     *Grammer*.   Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, to the extent that any funds received or held by the Debtors are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors and Grammer, Inc. and Grammer Americas, LLC (collectively, "**Grammer**"), to be the property of or held in trust for Grammer (the "**Disputed Funds**"), neither this Interim Order nor the DIP Documents shall be deemed to grant liens, claims, or encumbrances in favor of any current or future lienholder, including the DIP Liens or the Adequate Protection Liens on such Disputed Funds.  The Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and Grammer reserve all of their rights and remedies with respect to the Disputed Funds under the Bankruptcy Code, Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

42.     *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

43.     *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

44.     *No Waiver by Failure to Seek Relief*. The failure or delay on the part of any of the DIP Agent, DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the DIP Orders, the DIP Documents, the Prepetition Secured Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under the DIP Orders shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under the DIP Orders shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder by any of the DIP Secured Parties or Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

45.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

46.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds

of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments or, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Secured Parties and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

47.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

48.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

49.     *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

50.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

51.     *Final Hearing*.  A final hearing to consider the relief requested in the DIP Motion shall be held on [●], 2025 at [●] [a.m./p.m.] (Prevailing Central Time) and any objections or responses to the DIP Motion shall be filed on or prior to [●], 2025 at [●] [a.m./p.m.] (Prevailing Central Time).

52.     *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtors, and counsel thereto, Weil, Gotshal & Manges LLC, 767 5th Ave, New York, New York 10153, Attn: Matt Bar (Matt.Barr@weil.com) and Sunny Singh (Sunny.Singh@weil.com); (b) the Office of the

80

United States Trustee for the Southern District of Texas; (c) if appointed, the Creditors' Committee; (d) Bank of America, N.A., as ABL Agent, and counsel thereto, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166; (e) Jefferies Finance LLC, as First Lien Term Loan Agent and Second Lien Term Loan Agent, and counsel thereto, Herbert Smith Freehills Kramer LLP, 1177 6th Ave, New York, NY 10036; (f) Sagard Holdings Manager (US) LLC and GLAS USA LLC, as Sidecar Term Loan Agent, and counsel thereto; (g) counsel to the Ad Hoc Group, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166; (h) Wilmington Savings Fund Society, FSB, as DIP Agent, and counsel thereto, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019.

53.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.

Signed:  [●]

_____

CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**DIP Credit Agreement (To Come)**

**Exhibit 2**

**Parent Guaranty**

DEBTOR IN POSSESSION
PARENT GUARANTY

By

VICEROY PRIVATE CAPITAL, LLC
as a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,

FIRST BRANDS GROUP HOLDINGS, LLC
as a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,

as Guarantors

and

WILMINGTON SAVINGS FUND
SOCIETY, FSB,
as Administrative Agent and Collateral Agent

_____

Dated as of October [1], 2025

**TABLE OF CONTENTS**

**Section**                                                                                                      **Page**

Section 1.      Guaranty; Limitation of Liability ..................................................................................... 1

Section 2.      Guaranty Absolute ............................................................................................................ 2

Section 3.      Waivers and Acknowledgments ....................................................................................... 2

Section 4.      Subrogation; Subordination .............................................................................................. 4

Section 5.      Payments Free and Clear of Taxes, Etc ........................................................................... 5

Section 6.      Representations and Warranties ........................................................................................ 5

Section 7.      Covenants .......................................................................................................................... 5

Section 8.      Amendments ...................................................................................................................... 5

Section 9.      Notices, Etc ....................................................................................................................... 5

Section 10.     No Waiver; Remedies; Severability ................................................................................. 5

Section 11.     Right of Setoff .................................................................................................................. 6

Section 12.     Indemnification ................................................................................................................. 6

Section 13.     Continuing Guaranty; Assignments under the Credit Agreement ..................................... 6

Section 14.     Execution in Counterparts ................................................................................................ 6

Section 15.     Governing Law; Jurisdiction; Waiver of Jury Trial, Etc .................................................. 7

Section 16.     Termination; Survival ....................................................................................................... 7

**DEBTOR IN POSSESSION PARENT**
**GUARANTY**

DEBTOR IN POSSESSION PARENT GUARANTY dated as of September [●], 2025  (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Parent Guaranty") among VICEROY PRIVATE CAPITAL, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("Viceroy"), FIRST BRANDS GROUP HOLDINGS, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (together with Viceroy, each, a "Guarantor" and collectively, the "Guarantors") and WILMINGTON SAVINGS FUND SOCIETY, FSB ("WSFS"), as administrative agent (together with its permitted successors in such capacity, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent").

Reference is made to the SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT entered into as of October [1], 2025, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among the First Brands Group, LLC, as Borrower, First Brands Group Intermediate, LLC, the Lenders and agents party thereto from time to time and the Administrative Agent and the Collateral Agent.  Unless otherwise defined herein, capitalized terms used in this Parent Guaranty shall have the meanings assigned to such terms in the Credit Agreement.

Each Guarantor has agreed to guaranty the Obligations of the Borrower, and each Guarantor has agreed to secure such Guarantor's Obligations under the Loan Documents pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, in each case, subject to the terms of the DIP Orders (as defined in the Credit Agreement).

The Lenders have agreed to make Loans to the Borrower pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement.  Each of the Guarantors acknowledges that it will derive substantial benefit from the making of the Loans by the Lenders.  The obligations of the Lenders to make Loans are conditioned on, among other things, the execution and delivery by the Guarantors of a Guaranty in the form hereof.  As consideration therefor and in order to induce the Lenders to make Loans, the Guarantors are willing to execute this Parent Guaranty.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lenders to make Loans under the Credit Agreement, each Guarantor, jointly and severally with each other Guarantor, hereby agrees as follows:

Section 1.    Guaranty; Limitation of Liability. (a) Each Guarantor hereby absolutely, unconditionally and irrevocably guarantees, jointly with the other Guarantor and severally, as a primary obligor and not merely as a surety, the punctual payment and performance when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Secured Obligations, subject to, and in accordance with the terms of the DIP Orders, now or hereafter existing (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Secured Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such obligations being the "Guaranteed Obligations"), and agrees to pay all costs and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Secured  Party in enforcing any rights under this Parent Guaranty, subject to the limitations of Section 11.04 of the Credit Agreement. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any Loan Party to any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such Loan Party.

(b)      Each Guarantor, and by its acceptance of this Parent Guaranty, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Parent Guaranty and the Guaranteed Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Debtor Relief Laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Parent Guaranty and the Guaranteed Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Guarantor under this Parent Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Guarantor under this Parent Guaranty not constituting a fraudulent transfer or conveyance.

(c)      Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Secured Party under this Parent Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Secured Parties under or in respect of the Loan Documents.

(d)      Each Guarantor hereby further agrees that the Guaranteed Obligations may be extended, increased or renewed, amended or modified, in whole or in part, without notice to, or further assent from, such Guarantor, and that such Guarantor will remain bound upon its guarantee hereunder notwithstanding any such extension, increase, renewal, amendment or modification of any Guaranteed Obligation.

Section 2.      Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto.  The obligations of each Guarantor under or in respect of this Parent Guaranty are independent of the Guaranteed Obligations or any other obligations of any Loan Party or any other Guarantor under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Parent Guaranty, irrespective of whether any action is brought against the Borrower or any Loan Party or any other Guarantor or whether the Borrower or any Loan Party or any other Guarantor are joined in any such action or actions.   This Parent Guaranty is a guaranty of payment when due and not merely of collection (and each Guarantor hereby waives any right to require that resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of any of the Guaranteed Obligations).  Until the Termination Date, (i) the liability of each Guarantor under this Parent Guaranty shall be irrevocable, absolute and unconditional irrespective of,  and (ii) each Guarantor hereby irrevocably waives (to the extent permitted by applicable Laws) any defenses it may now have or hereafter acquire in any way relating to, subject to the DIP Orders, any or all of the following:

(a)      any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other obligations of any Loan Party or any other Guarantor under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party, any other Guarantor or any of their respective Subsidiaries or otherwise;

(c)      any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)      any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party, any other Guarantor or any of their respective Subsidiaries;

(e)      any change, restructuring or termination of the corporate structure or existence of any Loan Party, any other Guarantor or any of their respective Subsidiaries;

(f)      any failure of any Secured Party to disclose to any Loan Party or any other Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any other Guarantor now or hereafter known to such Secured Party (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information);

(g)      the failure of any other Person to execute or deliver this Parent Guaranty or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)      any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Secured Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety (other than payment or performance in full in cash of the Guaranteed Obligations), in each case, other than in connection with the termination of any Guarantor's obligations in accordance with the terms of the Credit Agreement, the DIP Orders or as otherwise expressly provided herein.

This Parent Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Secured Party in accordance with Section 11.06 of the Credit Agreement all as though such payment had not been made.

Section 3.      Waivers and Acknowledgments. (a) Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws and except as otherwise expressly provided in any Loan Document, promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Parent Guaranty and any requirement that any Secured Party exhaust any right or take any action against any Loan Party, any other Guarantor or any other Person or any Collateral.

(b)      Until the Termination Date, each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, any right to revoke this Parent Guaranty and acknowledges that this Parent Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)      Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Secured Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of setoff or counterclaim against or in respect of the Guaranteed Obligations of such Guarantor hereunder.

(d)      Each Guarantor acknowledges that the Administrative Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Parent Guaranty, foreclose under any mortgage by nonjudicial sale (to the extent such sale is permitted by

applicable Laws), and each Guarantor hereby waives, to the extent permitted by applicable Laws, any defense to the recovery by the Administrative Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable Laws.

(e)     Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, any duty on the part of any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party, any other Guarantor or any of their respective Subsidiaries now or hereafter known by such Secured Party.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 2 and this Section 3 are knowingly made in contemplation of such benefits.

Section 4.     Subrogation; Subordination.  (a) Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party, any other Guarantor or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Parent Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against the Borrower, any other Loan Party, any other Guarantor or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party, any other Guarantor or any other insider guarantor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right, until the occurrence of the Termination Date.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the Termination Date, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Parent Guaranty, if any, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Parent Guaranty, if any, thereafter arising. If any Guarantor shall make payment to any Secured Party of all or any part of the Guaranteed Obligations and the Termination Date has occurred, the Secured Parties will, at such Guarantor's request and expense,  execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Parent Guaranty.

(b)     Notwithstanding any provision of this Agreement to the contrary, but subject to Section 1(b), all rights of the Guarantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all of the Guaranteed Obligations. No failure on the part of any Guarantor to make the payments required by Section 1(c) (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

Section 5.     Payments Free and Clear of Taxes, Etc.  Any and all payments by or on account of any obligation of any Guarantor hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes or Other Taxes on the same terms and to the same extent that payments by the Borrower are required to be made free and clear of Taxes and Other Taxes

pursuant to Section 3.01 of the Credit Agreement.

Section 6.   Representations and Warranties.   Each Guarantor hereby represents and warrants as follows:

(a)   Each Guarantor (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect, (b) subject to any restrictions arising on account of such Guarantor's status as a "debtor" under the Bankruptcy Code, has all requisite power and authority to (i) own or lease its assets and carry on its business (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to execute, deliver and perform its obligations under this Parent Guaranty, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (d) is in compliance with all Laws, orders, writs, injunctions and orders (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (e) has all requisite governmental licenses, authorizations, consents and approvals, if any, to operate its business as currently conducted (except where the failure to have such licenses, authorizations, consents and approvals could not reasonably be expected to have a Material Adverse Effect).

(b)   Subject to entry of the DIP Order, the execution, delivery and performance by each Guarantor of this Parent Guaranty, (a) are within such Guarantor's corporate or other organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Guarantor's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (x) any Contractual Obligation to which such Guarantor is a party or affecting such Guarantor or its properties or (y) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Guarantor or its property is subject, or (iii) violate any applicable Law (in each case, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect).

(c)   Subject to entry of the DIP Order, and except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Guarantor of this Parent Guaranty, (ii) the grant by any Guarantor of the Liens granted by it pursuant to the DIP Order and any other applicable Collateral Documents, (iii) the perfection or maintenance of the Liens created under the DIP Order or any other applicable Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the DIP order or any other applicable Collateral Documents.

(d)   This Parent Guaranty has been duly executed and delivered by each Guarantor that is party hereto. This Parent Guaranty constitutes a legal, valid and binding obligation of such Guarantor, enforceable against each Guarantor that is a party hereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

(e)   Subject to the entry thereof, the DIP Order creates in favor of the Collateral Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest in (and valid and perfected as of the Closing Date by entry of the DIP order) the Collateral owned by each Guarantor, and such security interest shall constitute a continuing security interest and Lien on such Collateral having priority over all other security interests and Liens on such Collateral and securing all the Obligations, other

than as set forth in the DIP Order. The Collateral Agent and Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the DIP Order.

(f)      Pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, the Obligations of the Guarantors shall at all times constitute allowed senior administrative expenses against each of the Guarantors in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Guarantors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the U.S. Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the U.S. Bankruptcy Code and which shall be payable from and have recourse to all pre- and post-petition property of the Guarantors and their estates and all proceeds thereof other than as set forth in the DIP Order.

(g)      There are no conditions precedent to the effectiveness of this Parent Guaranty that have not been satisfied or waived.

(h)      Such Guarantor has, independently and without reliance upon any Secured Party and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Parent Guaranty.

Section 7.      Covenants. Each Guarantor covenants and agrees that, until the Termination Date has occurred, such Guarantor will perform and observe all of the terms, covenants and agreements set forth in this Parent Guaranty. Each Guarantor covenants and agrees that, until the Termination Date has occurred, such Guarantor will perform and observe the terms, covenants and agreements set forth in Sections 6.05 (*Maintenance of Existence*), 6.06 (*Maintenance of Properties*), 6.07 (*Maintenance of Insurance*), 6.08 (*Compliance with Laws*), 6.09 (*Books and Records*), 6.10 (*Inspection Rights*), 6.13 (*Taxes*), 6.15 (*Use of Proceeds*), 6.21 (*Cash Management*), 6.23 (*Cash Quarantine*), 6.24 (*Control Agreements*) and Article VII (*Negative Covenants*) (other than Section 7.14 (*Minimum Liquidity*) of Article VIII) of the Credit Agreement, as if such Guarantor were subject to such provisions as a Restricted Subsidiary or Loan Party under the Credit Agreement. This Parent Guaranty is a Loan Document under the Credit Agreement.

Section 8.      Amendments. (a) No amendment or waiver of any provision of this Parent Guaranty and no consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by the Administrative Agent and shall otherwise be in accordance with Section 11.01 of the Credit Agreement.

Section 9.      Notices, Etc. All notices and other communications provided for hereunder shall be in writing and in accordance with Section 11.02 of the Credit Agreement (and shall be effective as set forth in Section 11.02 of the Credit Agreement); *provided*, that any notices to the Guarantors shall be to the to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time.

VICEROY PRIVATE CAPITAL, LLC
c/o FIRST BRANDS GROUP, LLC
127 Public Square, Suite 5110
Cleveland, Ohio 44114
Facsimile: (216) 274-9027
Attention: Chuck Moore
Email: cmoore@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Justin D. Lee and Thomas Mastoras
Email: justin.d.lee@weil.com; Thomas.Mastoras@weil.com

Section 10.    No Waiver; Remedies; Severability.  (a) No failure on the part of the Administrative Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(b)    In the event any one or more of the provisions contained in this Parent Guaranty should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 11.    Right of Setoff.  Each Agent, each Lender and each of their respective Affiliates shall have, in respect of each Guarantor and any and all of the Obligations of such Guarantor, rights of setoff as described in Section 11.09 of the Credit Agreement.  The rights of the Administrative Agent and each Lender and their respective Affiliates under this Section 11 are in addition to other rights and remedies (including other rights of setoff) that any such Agent, Lender or Affiliate may have.  Section 11.09 of the Credit Agreement shall be incorporated herein by reference in respect of the Guarantors and any and all of the Guaranteed Obligations of the Guarantors.

Section 12.    Indemnification.  Each Guarantor agrees that the provisions of Section 11.05 of the Credit Agreement shall be incorporated herein, *mutatis mutandis*, and apply to such Guarantor as if it were the Borrower under the Credit Agreement.

Section 13.    Continuing Guaranty; Assignments under the Credit Agreement.  This Parent Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the Termination Date, upon which it shall automatically terminate, (b) be binding upon each Guarantor, its successors and assigns and inure to the benefit of and be enforceable by the Secured Parties and their successors, transferees and permitted assigns. No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders (except as otherwise contemplated by the Credit Agreement).

Section 14.    Execution in Counterparts. This Parent Guaranty and each amendment, waiver and consent with respect hereto may be executed in any number of counterparts and by different parties thereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which

taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Parent Guaranty by facsimile or an electronic transmission of a .pdf copy thereof shall be effective as delivery of an original executed counterpart of this Parent Guaranty.

Section 15.    Governing Law; Jurisdiction; Waiver of Jury Trial, Etc.  (a) THIS PARENT GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS AS SET FORTH IN SECTION 11.15 (GOVERNING LAW) OF THE CREDIT AGREEMENT, WHICH IS INCORPORATED INTO THIS PARENT GUARANTY *MUTATIS MUTANDIS*.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS PARENT GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES OR THE AGENTS OR ANY OF THEM WITH  RESPECT TO THIS PARENT GUARANTY, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE BANKRUPTCY COURT AND TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED  STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS PARENT GUARANTY, EACH OF THE UNDERSIGNED CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF THE UNDERSIGNED IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS PARENT GUARANTY.

(c)    EACH PARTY TO THIS PARENT GUARANTY HEREBY EXPRESSLY WAIVES ANY  RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS PARENT GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES, THE AGENTS OR ANY OF THEM WITH RESPECT TO THIS PARENT GUARANTY, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH OF THE UNDERSIGNED HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY OF THE UNDERSIGNED MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 15(C) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE UNDERSIGNED TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 16.    Termination; Survival.  The agreements and obligations of each Guarantor under this Parent Guaranty shall automatically terminate on the Termination Date; provided, however, that the agreements and obligations of each Guarantor under Section 1(a) (with respect to enforcement expenses), Section 2 (with respect to the last sentence thereof), Section 5 (to the extent the Borrower's obligations with respect to Section 3.01 of the Credit Agreement survive the Termination Date) and Section 12 shall survive the Termination Date.

[Signature pages follow.]

IN WITNESS WHEREOF, each Guarantor has caused this Parent Guaranty to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

VICEROY PRIVATE CAPITAL, LLC
as a Guarantor

By:_____
Name: Shekhar Kumar
Title:   Senior Vice President – M&A


FIRST BRANDS GROUP HOLDINGS, LLC
 as a Guarantor



By:_____
Name: Shekhar Kumar
Title:   Senior Vice President – M&A

[Signature Page to Debtor in Possession Parent Guaranty]

WILMINGTON SAVINGS FUND SOCIETY,
as Administrative Agent and as Collateral Agent

By:
Name:

[Signature Page to Debtor in Possession Parent Guaranty]

**Exhibit 3**

**Syndication Procedures (To Come)**

**Exhibit 4**

**Interim DIP Budget**

**Project Overdrive - North America**

DIP Cash Flow Forecast

*$ in millions USD*

| Week Ending | Wk 1 10/3/25 | Wk 2 10/10/25 | Wk 3 10/17/25 | Wk 4 10/24/25 | Wk 5 10/31/25 | Wk 6 11/7/25 | Wk 7 11/14/25 | Wk 8 11/21/25 | Wk 9 11/28/25 | Wk 10 12/5/25 | Wk 11 12/12/25 | Wk 12 12/19/25 | Wk 13 12/26/25 | Total 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total receipts** | **$13.1** | **$11.9** | **$12.0** | **$7.6** | **$14.8** | **$30.3** | **$28.0** | **$26.3** | **$28.9** | **$45.7** | **$49.0** | **$47.1** | **$47.0** | **$361.5** |
| **Operating disbursements:** | | | | | | | | | | | | | | |
| Vendor Payments | ($41.3) | ($56.3) | ($56.3) | ($56.3) | ($51.3) | ($51.3) | ($46.3) | ($31.3) | ($23.8) | ($23.8) | ($23.8) | ($23.8) | ($23.8) | ($508.8) |
| Payroll - Wages & Benefits | (11.1) | (11.1) | (24.3) | (11.1) | (17.3) | (11.4) | (27.5) | (18.4) | (17.5) | (13.6) | (17.3) | (20.6) | (11.5) | (212.8) |
| Tariffs | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (3.5) | (45.5) |
| Leases & Rent | (12.0) | (2.8) | (2.8) | (2.8) | — | (12.0) | (2.8) | (2.8) | (2.8) | (12.0) | (2.8) | (2.8) | (2.8) | (61.2) |
| Insurance | — | — | — | — | (15.2) | — | — | — | — | — | — | — | — | (15.2) |
| Taxes | — | (14.0) | (8.2) | — | (1.9) | — | — | — | (2.0) | — | — | — | (85.8) | (111.9) |
| Other | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (65.0) |
| **Total operating disbursements** | **($72.9)** | **($92.7)** | **($100.0)** | **($78.7)** | **($94.1)** | **($83.2)** | **($85.1)** | **($60.9)** | **($54.5)** | **($57.9)** | **($52.3)** | **($55.7)** | **($132.4)** | **($1,020.4)** |
| **Net operating cash flow** | **($59.8)** | **($80.8)** | **($88.0)** | **($71.1)** | **($79.4)** | **($52.9)** | **($57.1)** | **($34.7)** | **($25.6)** | **($12.2)** | **($3.3)** | **($8.6)** | **($85.5)** | **($658.9)** |
| **Non-operating items:** | | | | | | | | | | | | | | |
| ABL Interest | ($1.6) | — | — | — | — | ($1.6) | — | — | — | ($1.6) | — | — | — | ($4.8) |
| DIP Interest | — | — | — | — | — | (2.8) | — | — | — | (4.9) | — | — | — | (7.7) |
| Rx costs | (25.6) | (6.8) | (8.6) | (8.8) | (8.7) | (12.9) | (8.7) | (8.9) | (8.6) | (12.3) | (8.1) | (8.3) | (8.1) | (134.3) |
| Utilities Deposit | — | (2.0) | — | — | — | — | — | — | — | — | — | — | — | (2.0) |
| Other non-operating | (9.9) | (7.7) | (7.7) | (7.7) | (9.9) | (7.7) | (7.7) | (7.7) | (9.9) | (7.7) | (7.7) | (7.7) | (7.7) | (106.6) |
| **Total non-operating items** | **($37.1)** | **($16.5)** | **($16.3)** | **($16.5)** | **($18.6)** | **($25.0)** | **($16.4)** | **($16.6)** | **($18.5)** | **($26.5)** | **($15.8)** | **($16.0)** | **($15.8)** | **($255.4)** |
| **Net cash flow** | **($96.9)** | **($97.3)** | **($104.3)** | **($87.6)** | **($97.9)** | **($77.9)** | **($73.4)** | **($51.2)** | **($44.1)** | **($38.7)** | **($19.1)** | **($24.6)** | **($101.2)** | **($914.4)** |
| Bank cash balance, beg. | $14.2 | $392.8 | $295.5 | $191.2 | $103.6 | $605.7 | $527.8 | $454.4 | $403.1 | $359.0 | $320.3 | $301.2 | $276.6 | $14.2 |
| Net cash flow | (96.9) | (97.3) | (104.3) | (87.6) | (97.9) | (77.9) | (73.4) | (51.2) | (44.1) | (38.7) | (19.1) | (24.6) | (101.2) | (914.4) |
| DIP Funding | 500.0 | — | — | — | 600.0 | — | — | — | — | — | — | — | — | 1,100.0 |
| Bridge repayment | (24.5) | — | — | — | — | — | — | — | — | — | — | — | — | (24.5) |
| **Bank cash balance, end.** | **$392.8** | **$295.5** | **$191.2** | **$103.6** | **$605.7** | **$527.8** | **$454.4** | **$403.1** | **$359.0** | **$320.3** | **$301.2** | **$276.6** | **$175.4** | **$175.4** |
| (-) Minimum cash need | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) |
| **Cash surplus (shortfall)** | **$342.8** | **$245.5** | **$141.2** | **$53.6** | **$555.7** | **$477.8** | **$404.4** | **$353.1** | **$309.0** | **$270.3** | **$251.2** | **$226.6** | **$125.4** | **$125.4** |