**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |

**DECLARATION OF TYLER W. COWAN**
**IN SUPPORT OF THE EMERGENCY MOTION OF DEBTORS**
**FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO**
**(A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL,**
**AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES; (III) MODIFYING**
**THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING;**
**AND (V) GRANTING RELATED RELIEF**

I, Tyler W. Cowan, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am Global Head of Restructuring & Liability Management at Lazard Frères & Co. LLC ("**Lazard**"), the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm founded in 1848, which has its principal office at 30 Rockefeller Plaza, New York, New York 10012.  I have been one of the principal personnel working on Lazard's engagement as the proposed investment banker for First Brands Group, LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**" and together with the Debtors' non-Debtor affiliates, the "**Company**") in the above-captioned chapter 11 cases.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2.      I submit this declaration (the "**Declaration**") in support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**").[2]

3.      Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, including the Debtors' books and records, (iii) information provided to me by Lazard employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, the Special Committee of the board of managers of First Brands Group, LLC (the "**Board**"), or the other advisors to the Debtors, including Weil, Gotshal & Manges LLP ("**Weil**") and Alvarez & Marsal North America, LLC ("**A&M**"), and/or (v) my experience as a restructuring professional.  I am not being compensated specifically for this testimony other than through payments to be received by Lazard as a professional proposed to be retained by the Debtors, which payments include a fee for securing debtor-in-possession financing, subject to Court approval.  If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases.  I am authorized to submit this declaration on behalf of the Debtors.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, the interim order attached as Exhibit A thereto (the "**Interim Order**"), or that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") attached as Exhibit 1 to the Interim Order, as applicable.

## Background and Qualifications

4.      I am Global Head of and a Managing Director in the Restructuring & Liability Management Group at Lazard.  Lazard is a global investment bank providing financial advisory services, including with respect to mergers and acquisitions, capital raises, liability management and restructurings.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 175 years.  Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority.  Since 1990, Lazard professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

5.      Lazard and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, in both out-of-court and in-court contexts.  In addition, Lazard's investment banking professionals have extensive experience advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and prospective buyers in chapter 11 proceedings. Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others: *In re Global Clean Energy Holdings, Inc.*, No. 25-90113 (ARP) (Bankr. S.D. Tex. 2025); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. 2024); *In re Steward Health Care System, LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re Enviva Inc.*, No 24-10453 (BFK) (Bankr. S.D. Va. 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex 2023); *In re SiO2 Medical Prod., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D. N.J. 2023); *In re National Cinemedia, LLC*, No. 23-90291 (DRJ) (Bankr. S.D. Tex. 2023); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. 2021); *In re Basic Energy Servs., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. 2021); *In re FTS Int'l, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. 2020);

3

*In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del 2020); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. 2020); *In re J.C. Penney Co.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. 2020); *In re Neiman Marcus Grp. Ltd.*, No. 20-32519 (Bankr. S.D. Tex. 2020); *In re Forever21*, No. 19-12122 (KG) (Bankr. D. Del. 2019); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. 2019); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2018); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. 2017); and *In re LINN Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. 2016).

6.      Since joining Lazard in 2003, I have advised companies and creditors, including in situations involving automotive companies, with respect to in-court and out-of-court restructurings, recapitalizations, and reorganizations.  I have also advised companies regarding capital raises, mergers, acquisitions, and divestitures.  I have been involved in a variety of restructuring engagements including, among others, 24 Hour Fitness, Accuride (advisor to term loan lenders), Air Methods, Alpha Natural Resources (advisor to Rice Energy, the stalking horse bidder for certain gas assets), Altice France, Anthology (advisor to term loan lenders), Atlas Iron, Avison Young (advisor to term loan lenders), Bed Bath & Beyond, Belk, Blackboard, Boart Longyear (advisor to bondholders), Brazos Electric Power Cooperative (advisor to the Unsecured Creditors' Committee), Cengage Learning, Chassix, Claire's Stores, Dex Media (formerly R.H. Donnelley), Dish (advisor to DBS bondholders), Empire Today (advisor to term loan lenders), EmployBridge (advisor to term loan lenders), Energy Future Holdings (advisor to the TCEH Creditors' Committee), First Energy Solutions, Foresight Energy (advisor to secured lenders), Forever 21, Franchise Group (advisor to term loan lenders), The Great Atlantic & Pacific Tea Company, Heubach (advisor to term loan lenders), Hostess (advisor to secured lenders), iFIT

Health & Fitness, Illinois Power Holdings (advisor to Dynegy), Intelsat (advisor to convertible noteholders), JCPenney, J.Crew, JOANN (advisor to term loan lenders), Local Insight Media, Longview Power/Mepco, Macy's, Neiman Marcus, Party City (advisor to secured noteholders), Patriot Coal (advisor to Peabody Energy), Peabody Energy, Petmate (advisor to second lien lenders), Remington Outdoor, Revlon (advisor to Citi), Rite Aid (advisor to Unsecured Creditors' Committee), Saks (advisor to secured bondholders), SI Group (advisor to term loan lenders), SiO2, Sirva (advisor to crossholder group), Solo Brands, Steward Health Care System, Superior Industries, Tops Markets (advisor to secured noteholders), United States Enrichment Corp., Venator (advisor to secured lenders), Walter Energy (advisor to first lien lenders), Wellness Pet (advisor to term loan lenders), Westgate Resorts, and Westmoreland Resource Partners.

    7.  Pursuant to these engagements, among others, I have worked on a variety of financings for troubled companies, including a number of DIP financings and marketing processes.  Additionally, I have provided testimony in the following bankruptcy cases: *In re Steward Health Care System LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re SiO2 Medical Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. 2023); *In re Intelsat S.A.*, Case No. 20-32299 (KLP) (Bankr. E.D. Va. 2021); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. 2021); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del 2020); *In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. 2020); *In re Neiman Marcus Grp. Ltd.*, Case No. 20-32519 (Bankr. S.D. Tex. 2020); *In re Forever21,* No. 19-12122 (KG) (Bankr. D. Del. 2019); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. 2019) (advisor to Westmoreland Resource Partners, LP); *In re FirstEnergy Sols. Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio 2018); *In re Claire's Stores, Inc.,* No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Peabody Energy Corp.*, No. 16-42529-399 (Bankr. E.D. Mo. 2016);

*In re Walter Energy, Inc.*, No. 15-02741 (TOM) (Bankr N.D. Ala. 2015), *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Mar. 12, 2015); *In re Longview Power, LLC,* No. 13-12211 (BLS) (Bankr. D. Del. 2013); and *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. 2011).  Prior to joining Lazard in 2003, I attended Northwestern University where I graduated with a Bachelor of Science in Engineering.

### Lazard's Retention

8.     Lazard was engaged as investment banker to the Debtors in August 2025 to advise the Debtors on potential out-of-court financing and capital structure alternatives, as well as potential M&A alternatives.  Specifically, pursuant to an engagement letter dated as of August 3, 2025 (as amended by letters dated as of September 2, 2025 and as of September 24, 2025), Lazard has rendered investment banking services to the Debtors in connection with the evaluation of potential strategic and financial alternatives to improve their capital structure, liquidity, and overall financial position, including with respect to reviewing and negotiating the terms and conditions of their proposed DIP Facility.

9.     Since Lazard's retention, members of my team and I have worked closely with the Debtors' management, the Special Committee, A&M, and Weil analyzing the Debtors' business affairs, assets, financial position, contractual arrangements, and various proposed strategic and financing transactions.  Pursuant to this work, I, and other members of the Lazard team, have become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.  Members of my team and I have also assisted the Debtors in reviewing and negotiating the terms, conditions, and potential impact of the proposed DIP Facility and various strategic alternatives.

### Debtors' Exploration of Strategic Alternatives

10.     In July 2025, the Company launched a refinancing process led by Jefferies Finance LLC, seeking to raise approximately $6.2 billion of financing that would be used to comprehensively refinance its capital structure by paying down its existing funded debt obligations (the "**Global Refinancing Process**").  The primary purpose of the Global Refinancing Process was to extend the maturities on the substantial majority of the Company's funded debt, as well as enhance the Company's liquidity through an upsize of the ABL Facility. I have been advised by the Company that, given the Company's historical acquisitions and complex off-balance sheet financing arrangements, potential investors were focused on undertaking additional diligence around the size and terms of the Company's factoring, supply chain and inventory SPV financing programs, segment-level profitability, organic growth trends and synergy realization over time, among other areas.  The Company paused the Global Refinancing Process in early August 2025 to enable the Company to engage a third party to complete a "quality of earnings" report, which was expected to take six to eight weeks to complete, and provide answers on the other outstanding diligence questions raised by potential investors.  At that time, Lazard was engaged to initially explore raising bridge financing to provide the Company with sufficient liquidity to fund operations while the Company completed the quality of earnings process and, ultimately, attempted to complete the Global Refinancing Process.

11.     On or around August 11, 2025, with the assistance of the Debtors' management team and other advisors, Lazard launched a marketing process to solicit bridge financing proposals.  Lazard reached out to six (6) parties, four (4) of which agreed to sign non-disclosure agreements (the "**NDAs**") for the purpose of engaging on the financing opportunity.  At the time, the belief was that the Company needed to raise approximately $425 million of

incremental liquidity and had flexibility around the financing structure so long as it was permissible under the Company's existing debt documents and related agreements (*e.g.*, incremental term loans, non-loan party debt, supply chain financing). Parties were presented with both a request for proposal ("**RFP**") that provided background on the Company and its situation at that time (based on information provided by the Company), the investment opportunity and proposed financing structure, as well as a more detailed management presentation. Parties were also provided with access to a virtual dataroom that was populated with a variety of financial and legal information, including details on the capital structure and liquidity information, provided by management.   In the subsequent three weeks, Lazard engaged with parties around potential financing structures, facilitated business and legal due diligence and provided access to management, including through management presentations. The Company progressed both non-loan party and inventory financing-based structures with several parties.   Despite the Debtors' efforts, however, this process did not yield any actionable proposals for out-of-court financing. Specifically, the Debtors only received one (1) financing proposal, which was not actionable because the amount of the proposed financing was (i) insufficient to meet the Company's liquidity needs, (ii) subject to significant incremental asset-level and financial diligence, and (iii) structured in a manner that introduced material execution risk.

12.     As part of the bridge financing process, the Company also engaged Lazard's automotive mergers and acquisitions team to explore a minority, majority or entire sale of the Company. In connection with this process, Lazard contacted five (5) parties, two (2) of which executed NDAs.  Parties were provided access to a separate VDR and meaningful business and legal diligence facilitated through Lazard and Weil, with the goal of trying to get to an indication of interest ("**IOI**") in a matter of weeks.  Despite those efforts, and partly because of publicity

related to the Debtors' capital structure challenges, both parties declined to provide an IOI, but confirmed their continued interest in the Company to the extent those challenges were resolved.

13.     As both the bridge financing and M&A processes unfolded in August 2025, the Company's financial position worsened and certain information became available that required further refinement of the Company's liquidity needs, as well as the advisors' view of the timing and viability of out-of-court processes.  The new information that become available to Lazard included (i) updated financial information on the available collateral for new financings, (ii) additional detail about the Company's accounts receivable factoring programs and off-balance sheet supply chain and inventory financings, and (iii) updated information that demonstrated a material decline in liquidity throughout August and early September, and therefore resulted in a greater overall financing need than was previously anticipated.

14.     The third-party bridge financing process was ultimately unsuccessful due to, among other things, the Company's complex capital structure, the limited availability of unencumbered assets, and the amount of financing needed and the complexity and need for further review of the company's off-balance sheet financing arrangements and related accounting. Furthermore, the information requests from potential M&A counterparties suggested that the timeline to reach agreement on economic terms and close a transaction would take multiple additional months.  These facts made it apparent that third-party bridge financing, the Global Refinancing Process and potential out-of-court M&A transaction(s) no longer represented viable paths forward.  As such, in or around the second week of September, the Company pivoted its strategy and began conversations around both out-of-court and in-court financing alternatives with advisors of certain of the Debtors' prepetition secured lenders who had formed an ad hoc group

(the "**Ad Hoc Group**") and retained counsel, Gibson, Dunn & Crutcher LLP, and a banker, Evercore Inc.

15. The Company thereafter decided that it had no choice but to seek chapter 11 protection and stabilize the business through DIP financing.

<u>**Debtors' Efforts to Obtain DIP Financing**</u>

16. With no third-party source of additional funding available on an out-of-court basis, the Debtors' only apparent viable option for raising the financing necessary to stabilize the business and pursue a value-maximizing restructuring process was to file for chapter 11 protection and secure debtor-in-possession financing. A chapter 11 filing would also allow the Debtors to review and diligence the Company's operations, accounting, financing and contractual arrangements, among others, and to be protected by an automatic stay, preventing creditors from seizing Company assets.

17. I understand that substantially all of the Debtors' domestic assets are subject to the Prepetition Secured Lenders' and/or the ABL Lenders' liens and the Prepetition Secured Lenders and ABL Lenders have communicated that they would not consent to any third-party providing DIP financing on a priming basis. Moreover, as evidenced by the Debtors' efforts to raise financing prior to the Petition Date, the Debtors do not have sufficient unencumbered property to pledge as collateral to support an adequately sized DIP facility. Therefore, any third-party DIP financing would either have to be provided on a junior basis or otherwise be subject to a priming contest or valuation dispute with the Debtors' prepetition secured lenders at the outset of these chapter 11 cases, neither of which, in my view, is in the Company's interests. Accordingly, the Debtors and their advisors focused their primary efforts during their remaining liquidity runway towards developing and negotiating an actionable DIP financing proposal with their existing prepetition lenders.

18.     In the aggregate, as of the Petition Date, the Ad Hoc Group holds approximately (i) 86% of the principal outstanding First Lien Term Loans, (ii) 100% of the principal outstanding Side-Car Term Loans, and (iii) 78% of the principal outstanding Second Lien Term Loans.  By mid-September, members of the Ad Hoc Group and their advisors executed non-disclosure agreements and were provided with diligence information, including access to a virtual dataroom, marketing materials and diligence sessions.  In a matter of days, Lazard and the Debtors' other advisors were in frequent discussions with the Ad Hoc Group and their advisors regarding the consensual use of their cash collateral and the terms of a potential DIP financing.   On September 17, 2025, the Debtors delivered an initial debtor-in-possession financing proposal to the Ad Hoc Group as part of such discussions.

19.     Simultaneously, the Debtors, with the assistance of Lazard and their other advisors, negotiated with their ABL Lenders regarding the terms of consensual use of cash collateral and adequate protection, and sought a DIP proposal from such lenders.  The parties exchanged multiple proposals outlining the potential terms of adequate protection and consensual use of cash collateral in the week leading up to the Petition Date.  The DIP proposal ultimately received from the ABL Lenders was not actionable, as it did not include any new money, and would not have been sufficient to meet the Debtors' needs, among other deficiencies.

20.     In the week leading up to the Petition Date, the Debtors also received one DIP financing proposal from an inventory financing counterparty. However, the proposal was not actionable given the limited quantum of new money made available, request for a roll-up of the existing exposure despite uncertainty over the nature of the claims and the need for support from multiple key stakeholders, including the Ad Hoc Group, who were not supportive.

21.     During the approximately ten days leading up to the Petition Date, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, including the size of the facility, the amount and timing of the roll-up of the DIP Lenders' First Lien Term Loans, the conditions for drawing on the DIP tranches, the associated economics and fees, milestones, and definitive documentation for the financing.  Throughout the negotiation process, the Debtors' advisors held several calls and briefings with the Debtors' management team, Special Committee, and the Board, each of which provided feedback with respect to the proposed terms of the DIP Facility.

22.     On September 23, 2025, in the lead up to the Petition Date, the Debtors' available cash was swept by one of their banks, which also had exposure on the supply chain financing.  As a result, the Debtors were left with virtually no cash.  In conjunction with these negotiations, with the advice of the Lazard team and the Debtors' other advisors, the Debtors and the Ad Hoc Group negotiated the terms of an out-of-court bridge financing on an emergency basis in the amount of $24.5 million (the "**Bridge Financing**"), which closed and funded on September 25, 2025, to provide the Debtors with (i) four (4) critical days to further prepare for a more orderly chapter 11 filing, (ii) the funds necessary to pay employees and other critical expenses during this time, and (iii) additional time to negotiate comprehensive DIP financing and consensual use of cash collateral.  As set forth in the DIP Motion, and as a condition to the Ad Hoc Group providing the Bridge Financing, the Debtors are seeking approval to repay the Bridge Financing with DIP Financing proceeds.

## Debtors' Immediate Need for Liquidity

23.     The Debtors require an immediate capital infusion, as well as continued use of Cash Collateral, to continue to operate their business postpetition, including paying their employees and vendors, and administer these chapter 11 cases.

12

24.     I believe that the DIP Facility is critical to these chapter 11 cases because it provides the Debtors with the urgent liquidity needed to (i) stabilize the Debtors' global operations and avoid immediate and irreparable harm, (ii) pay certain outstanding prepetition amounts owed to employees, critical vendors, taxing authorities, and other critical stakeholders consistent with the DIP Budget, as requested by the Debtors in their first day motions, (iii) pay ordinary course operating expenses necessary to support their operations, and (iv) provide runway to allow the Debtors to maximize the value of their assets during these chapter 11 cases.

## DIP Facility Was Negotiated in Good Faith and at Arm's Length

25.     I believe the Debtors, with the oversight of the independent Special Committee and assistance from the Debtors' advisors, engaged in arm's-length, good-faith negotiations with the DIP Lenders regarding the terms of the DIP Facility.  Prior to the Petition Date, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, including, among other things, the sizing of the facility, the Roll-Up, the applicable interest rate, and the associated fees.  Through these efforts, the Debtors, with the oversight of the independent Special Committee and assistance of the Debtors' advisors, negotiated DIP financing that provides the Debtors with the financing projected to stabilize their business and prepare for and undertake a value-maximizing restructuring process.

## Terms of the DIP Facility

26.     The following summarizes certain key terms of the DIP Facility:

- *Amount/ Structure*:

  - A $1.1 billion multi-draw term loan facility comprised of (i) $1.1 billion in new money (the "**New Money DIP Loans**"), $500 million of New Money DIP Loans available upon entry of the Interim Order ($325 million of which will be funded into escrow) and $600 million of New Money DIP Loans to be funded into escrow upon entry of the Final Order and (ii) $1.5 billion of First Lien Obligations held by DIP Lenders that fund the Interim Draw of the New Money DIP Loans (the "**Interim Roll-Up**"), and (iii) $1.8 billion

13

First Lien Obligations held by DIP Lenders that fund the Final Draw of the New Money DIP Loans shall automatically be deemed exchanged and converted pro rata on a cashless basis into and constitute DIP Obligations (the "**Final Roll-Up**").

- *Collateral*:

  - Superpriority priming first liens on First Lien Term Loan Collateral.

  - Priming second liens on ABL Priority Collateral, which are senior to First Lien Term Loan Obligations.

  - First liens on substantially all unencumbered assets, including avoidance actions and any proceeds thereof and commercial tort claims (each subject to entry of the Final Order) and pledges of equity in certain foreign subsidiaries of the Debtors.

- *Maturity*:

  - 270 days with two (2) 45-day extensions at the Debtors' discretion and three (3) additional 45-day extensions with the consent of the Debtors and DIP Lenders holding at least 50.1% of the DIP Facility, each extension subject to a 0.75% extension fee.

- *Interest Rate*:
  - New Money DIP Loans: SOFR cash *plus* 1.55% cash *plus* 8.45%, payable monthly in kind.
  - Roll-Up Loans: SOFR *plus* 7.0%, payable monthly in kind (the default rate under the Prepetition 1L Credit Agreement).

- *Fees*:

  - Anchor Premium: 10.0% of the New Money Term Commitment (as defined in the DIP Credit Agreement) payable in kind, which shall be earned and payable upon entry of the Interim Order.

  - Upfront Premium: 5.0% payable in kind, which shall be earned and payable to all Participating Lenders *pro rata* upon entry of the Interim Order and/or Final Order, as applicable.

  - Exit Premium: 5.0% cash, which shall be earned upon entry of the Interim Order and/or Final Order, as applicable, and payable to all Participating Lenders *pro rata* upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

- *Extension Premium*: 0.75% per each 45-day extension.

- ***Roll-Up***: All Participating Lenders are offered a "roll-up" of all obligations under the First Lien Term Loans at a 3:1 ratio.  Roll-up will occur proportionally with each funding pursuant to the Interim Order and Final Order.

## A.     Roll-Up of the Prepetition Obligations is Reasonable

27.     As a condition for providing $1.1 billion of New Money DIP Loans, the DIP Lenders required a "creeping" roll up of their Prepetition 1L Loans on a 3:1 basis, effective only upon the DIP Lenders funding amounts under the DIP Facility.  I believe the Roll-Up is appropriate under the circumstances of these chapter 11 cases.  The Roll-Up is a material component of the structure of the DIP Facility required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral.  Importantly, each First Lien Lender has been or will be offered the opportunity to participate in the DIP Facility and have their prepetition claims rolled-up.  It is my understanding that approximately 86% of the First Lien Lenders have agreed to an allocation of the DIP.  The Ad Hoc Group intends to negotiate with the remaining holders of the approximately 14% of the First Lien Lenders.

28.     The Debtors and the DIP Lenders engaged in arm's length negotiations and ultimately agreed to the Roll-Up as consideration for, among other things, the Debtors' continued use of Cash Collateral and the extension of additional funding through the DIP Facility (including $1.1 billion of commitments, $500 million of which is available immediately upon entry of the Interim Order).  Without the additional protections and compensation offered by the Roll-Up, which does not increase the total secured indebtedness of the Debtors (beyond the new money provided by the DIP), I do not believe the DIP Lenders would have provided the DIP Facility.

**B.      Terms of the DIP Facility are Reasonable under the Circumstances**

29.     Based on my experience as a restructuring professional and my understanding of the Debtors' capital structure and immediate need for postpetition financing, I believe that the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best (and only) currently available option.  I believe that the obligations, interest rate, fees, milestones, and other material terms under the DIP Facility are reasonable under the circumstances, considering, among other things, the (i) lack of other alternatives, (ii) additional diligence required regarding the Debtors' acquisition history, accounting practices and off-balance sheet factoring and financing arrangements, (iii) rates and fees of the Debtors' Prepetition Secured Obligations (including those secured by junior liens), (iv) the nature and extent of the collateral securing the DIP Facility, (v) the risks for the DIP Lenders associated with lending against collateral that multiple parties assert is theirs, (vi) market terms for companies facing similar situations, and (vii) negative sentiments in the market regarding the Company's operations.

30.     The DIP Lenders have committed $1.1 billion of capital to allow the Debtors time to stabilize their business over the next few months and to run a value-maximizing restructuring process for the benefit of the Debtors and their stakeholders.  In view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having substantial committed postpetition financing, I believe that the consideration being provided to the DIP Lenders for such commitments are reasonable in amount, appropriately compensate those parties for their costs and the assurances they are providing to the process, and are necessary for the Debtors to continue operating their businesses in the ordinary course and maximize the value of their estates.

31.     In exchange for participating in the New Money DIP Loans, the Participating Lenders are entitled to receive their pro rata share of (i) an upfront fee equal to 5.0%

of the New Money DIP Loans, earned and payable upon entry of the Interim Order and/or Final Order, as applicable, and (ii) an exit fee equal to 5.0% of the New Money DIP Loans, which are earned upon entry of the Interim Order and/or Final Order, as applicable and payable upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

32.     Additionally, in exchange for their work negotiating, structuring, and obtaining the support of the other first and second lien term loan lenders, certain members of the Ad Hoc Group will receive a fee equal to 10.0% of the aggregate $1.1 billion commitment amount under the DIP Facility payable in kind and (the "**Structuring Fees**").  I believe that the Structuring Fees are reasonable under the circumstances given that certain members of the Ad Hoc Group have expended significant effort and resources structuring the DIP Financing in a compressed timeline and obtaining consents from the vast majority of the Debtors' prepetition term loan lenders.

33.     Based on my familiarity with the Debtors' capital structure, financial situation and experience as a restructuring professional, I believe the pricing and fees are reasonable under the circumstances and generally consistent with comparable DIP Financings in complex cases where there is substantial uncertainty such as these, given (i) the magnitude of the financing need, (ii) the lack of comprehensive accounting and financial diligence when investors have substantial concerns related thereto (as evidenced by the failed Global Refinancing Process), and (iii) the accelerated timeframe.  Therefore, I do not believe that a financing commitment with terms similar to those in the DIP Financing is available to the Debtors for lower fees or without the Roll-Up.  Accordingly, I believe that paying these fees and allowing for a roll up is reasonable and necessary under the circumstances of these chapter 11 cases.

C.       **Debtors' Proposed Adequate Protection**

           34.       As part of the proposed DIP Facility, the Debtors propose to provide the

following as adequate protection:[3]

      a.   **First Lien Lenders**: In exchange for the use of cash collateral, the First Lien Term Loan Lenders will receive (i) first priority adequate protection liens on substantially all unencumbered assets (excluding avoidance actions and commercial tort claims, subject to entry of the Final Order) of the Debtors, (ii) payment in kind of the interest on the First Lien Term Loan Claims at the default rate, and (iii) superpriority claims and cash payment of reasonable and documented fees and expenses of the Ad Hoc Group's professionals.

      b.   **Second Lien Lenders**: In exchange for the use of cash collateral, the Second Lien Lenders will receive (i) second priority adequate protection liens on substantially all unencumbered assets (excluding avoidance actions and commercial tort claims, subject to entry of the Final Order) of the Debtors, and (ii) payment in kind of the interest on the Second Lien Term Loan Claims at the default rate.

      c.   **SPV Lenders**:

          i.   The Debtors have proposed to provide certain of the SPV Lenders with one or more of the following rights and protections to maintain the status quo and not prejudice the SPV Debtors or the SPV Lenders during the interim period, depending upon the facts and circumstances for each SPV Lender:

              1.   continuation of the SPV Lenders' liens on their inventory collateral and all proceeds generated therefrom (including accounts receivables generated from the sale of such inventory by the FBG Debtors);

              2.   if any of the applicable SPV Lender's asserted collateral is sold to a third party, repayment in cash or segregation of any proceeds;

              3.   to the extent oversecured, payment of interest from their respective SPV Debtor obligor; and

              4.   various information and reporting requirements.

          ii.   In addition, the Interim Order will provide that the DIP Liens and Adequate Protection Liens will not extend to the SPV Debtors.  However, the SPV Debtors must bear their fair share of costs fairly allocable to the SPV Debtors (e.g., professional fees and other costs to monetize their assets). Therefore, the FBG Debtor will be entitled to a superpriority administrative

---

[3] The below reflects a summary of the proposed adequate protection for the Debtors' prepetition lenders. Refer to the Interim Order for the comprehensive adequate protection package.

expense claim and senior lien against the SPV Debtor in the amount of such costs allocable to the SPV Debtor.  The Debtors, the SPV Lenders, and all other parties in interest will reserve their rights regarding the amount of such allocable costs, and all rights will be reserved regarding the validity, amount, secured status and/or priority of any claims asserted by the SPV Lenders and any of the Debtors.

## **Conclusion**

35.    Based on my experience and involvement in the third-party prepetition financing process, as well as the good faith, arm's length negotiations with the DIP Lenders, I believe that the terms of the DIP Facility are reasonable under the circumstances.  The DIP Facility is a critical component to the overall restructuring and provides the projected necessary liquidity for the Debtors to maintain operations in the normal course during the first phase of these chapter 11 cases.  Finally, the DIP Facility is the best (and only actionable) postpetition financing option currently available to the Debtors.  Accordingly, I believe that it would be appropriate for the Court to approve the DIP Facility as contemplated by the DIP Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

September 30, 2025                                  */s/ Tyler W. Cowan*
New York, New York                             Tyler W. Cowan
                                                              Global Head of Restructuring & Liability
                                                              Management
                                                              Lazard Frères & Co. LLC