**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |

**DECLARATION OF CHARLES M. MOORE**
**IN SUPPORT OF DEBTORS' FIRST DAY RELIEF**

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**") and Chief Restructuring Officer of First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,   the "**Debtors**,"   and   together   with   the   Debtors'   non-debtor   affiliates, the "**Company**").

2.      On September 5, 2025, the Debtors retained A&M to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and assist with contingency preparations for a potential chapter 11 filing.  On September 24, 2025, Global Assets LLC and twelve (12) Debtor affiliates each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Commencing on September 28, 2025 (as applicable, the "**Petition Date**"), FBG and the remaining Debtors each commenced with the Court a voluntary case under the Bankruptcy Code.  From the outset of

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

A&M's retention, my team and I have worked with the Debtors' management team and other advisors on numerous activities to support the Debtors' turnaround and restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become generally familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in this declaration (the "**Declaration**"). Except as otherwise indicated herein, the facts in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by my team, employees of the Company, the Company's advisors, or my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I submit this Declaration in support of the motions and applications that the Debtors filed on September 29, 2025, each of which is described in more detail below (collectively, the "**First Day Motions**").

3.    Additional information regarding my background and the Debtors' business and the circumstances leading to these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22).

## **First Day Motions**

4.    On September 29, 2025, the Debtors filed with the Court the First Day Motions[2] seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.

5.    Several of the First Day Motions request authority to pay certain prepetition claims against the Debtors. I understand that Rule 6003 of the Federal Rules of Bankruptcy

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the applicable First Day Motions.

**Debtors' Exhibit No. 4**
**Page 2 of 33**

Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, except to the extent relief is needed to avoid immediate and irreparable harm.  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.

6.      I am familiar with the content and substance of each of the First Day Motions.  I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to implement their chapter 11 strategy successfully with minimal disruption to their business operations.  The following is an overview of each of the First Day Motions.

### A.  Joint Administration Motion

7.      Pursuant to the *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases* (Docket No. 2) (the "**Joint Administration Motion**"), the Debtors request entry of an order directing consolidation and joint administration of these chapter 11 cases for procedural purposes only.  I understand that the Debtors are all affiliates of one another because, among other reasons, Debtor Viceroy Private Capital, LLC directly or indirectly owns or controls twenty percent (20%) or more of the outstanding voting securities of each Debtor.  Accordingly, I believe that joint administration is appropriate and authorized by the Bankruptcy Code and the Bankruptcy Rules.

8.      Moreover, I believe joint administration of the Debtors' chapter 11 cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Further, joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  I believe that the United States Trustee for the Southern District of Texas and

**Debtors' Exhibit No. 4**
**Page 3 of 33**

other parties in interest would similarly benefit from joint administration of these cases because it would spare them the time and effort of reviewing duplicative pleadings and papers.

9.      I believe that joint administration would not adversely affect any creditors rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes and the Debtors do not seek substantive consolidation of their estates.  As such, each creditor will continue to hold its claim against a particular Debtor's estate after joint administration is approved.

10.      Accordingly, based on the foregoing, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**B.  Creditors Matrix Motion**

11.      Pursuant to the *Emergency Motion Of Debtors for Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personally Identifiable Information, (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (Docket No. 5) (the "**Creditors Matrix Motion**"), the Debtors request entry of an order (i) granting authority to (a) file a Consolidated Creditors Matrix and a Consolidated Top 30 Creditors List, and (b) redact certain personally identifiable information of individual employees, directors, managers, interest holders, contractors, creditors, and any other individuals who may be parties in interest in these chapter 11 cases; (ii) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information; and (iii) granting related relief.

12.      I am advised that Bankruptcy Rule 1007 requires each debtor to file a list containing names and addresses of all creditors, including individuals, as well as a separate list of

4

creditors holding the largest unsecured claims against each debtor. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors have requested authority to file one Consolidated Creditors Matrix for all Debtors. Further, because a significant number of creditors may be shared amongst the Debtors, the Debtors have also requested authority to file one Consolidated Top 30 Creditors List for all Debtors. I believe that the Consolidated Creditors Matrix and the Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service.

13.     I also believe that cause exists to authorize the Debtors to redact certain personally identifiable information of individual employees, directors, managers, interest holders, contractors, creditors, and any other individuals who may be parties in interest in these chapter 11 cases, from the Consolidated Creditors Matrix, the Consolidated Top 30 List, and other filings made in these chapter 11 cases because such information could be used, among other things, to perpetrate identity theft, and poses potential safety or other privacy concerns.

14.     Accordingly, based on the foregoing, I believe that the relief requested in the Creditors Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**C.  Schedules and Statements Motion**

15.     Pursuant to the *Emergency Motion of Debtors for Order Extending Time to File (I) Schedules of Assets and Liabilities, (II) Statements of Financial Affairs, and (III) Rule 2015.3 Reports* (Docket No. 6) (the "**Schedules and Statements Motion**"), the Debtors request the authority to extend the deadline by which the Debtors must file their (i) Schedules and Statements and (ii) 2015.3 Reports, in each case through and including November 21, 2025, without prejudice to the Debtors' ability to request additional extensions for cause shown.

**Debtors' Exhibit No. 4**
**Page 5 of 33**

16.     I believe cause exists for granting the extensions requested in the Schedules and Statements Motion because of the voluminous information the Debtors must compile to complete the Schedules and Statements. Collecting the necessary information to file the Schedules and Statements requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to stabilize the Debtors' business operations at the outset of these cases.

17.     Additionally. the Debtors consist of 112 separate entities, many of which hold a substantial or controlling interest in another entity within the meaning of Bankruptcy Rule 2015.3. These entities include complex and sizeable businesses, some of which operate overseas. Thus, I believe cause exists to extend the deadline for filing the Rule 2015.3 Reports based on (i) the size and complexity of the Debtors' business; and (ii) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.  Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

18.     Accordingly, based on the foregoing, I believe that the relief requested in the Schedules and Statements Motion is in the best interest of the Debtors, their estates, and all other parties in interest and should be approved.

**D.  Utilities Motion**

19.     Pursuant to the *Emergency Motion of the Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related*

6

*Relief* (Docket No. 7) (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) granting related relief.

20.    As more fully set forth in the Utilities Motion, in the ordinary course of business, the Debtors incur utility expenses, including on account of electricity, gas, waste and recycling, telecommunications, water and other utility services from a number of utility companies. I understand that the Debtors rely on the Utility Companies to provide necessary support to their employees, vendors, and customers.   Preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' business.

21.    Based on a monthly average for the twelve (12) months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for the thirty (30) days following the Petition Date will be approximately $3,480,000.  To provide the Utility Companies with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to approximately two weeks' cost of the Utility Services (less any amounts guaranteed pursuant to a letter of credit issued in favor of, or deposit held by, any such Utility Company that have not been applied to outstanding prepetition amounts), calculated using the historical average for such payments during the twelve (12) months prior to the Petition Date into the Utility Deposit Account (as defined in the Utilities Motion).  The Debtors

7

estimate that the total amount of the Adequate Assurance Deposit will be $1,705,219.  Such Adequate Assurance Deposit will further assure the Utility Companies of payment for postpetition services.

22.    Any Utility Company that is not satisfied with the Proposed Adequate Assurance may request additional or different adequate assurance of future payment pursuant to Adequate Assurance Procedures.  I believe the proposed Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.

23.    Accordingly, based on the foregoing, I believe that the Proposed Adequate Assurance and the Adequate Assurance Procedures set forth in the Utilities Motion are necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**E.  Taxes Motion**

24.    Pursuant to the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (Docket No. 8) (the "**Taxes Motion**"), the Debtors request entry of any order (i) authorizing the Debtors to satisfy all Taxes and Fees due and owing to the applicable Taxing Authorities that arose prior to the Petition Date, including Taxes and Fees determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) granting related relief.

25.    I understand that the taxes and regulatory fees the Debtors incur generally fall into the following categories:  (i) Property Taxes, (ii) Income Taxes, (iii) Sales and Use Taxes, (iv) Custom and Import Duties, (v) Franchise, Business and Other Related Taxes, and

(vi) Government Fees and Other Taxes.  Pursuant to the Taxes Motion, the Debtors seek the authority to pay approximately $22,290,000 in prepetition Taxes and Fees.

26.     As more fully described in the Taxes Motion, the prompt payment of the Taxes and Fees may avoid the potential imposition of liens, prevent the accrual of interest charges and unnecessary fees and penalties on such claims, and eliminate claims for interest at potentially above-market rates for any resulting secured claims, all thereby preserving the value of the Debtors' estates and maximizing the distribution available for other creditors.  Additionally, certain of the amounts related to the Taxes and Fees that the Debtors have collected or are holding may not be property of their estates, and therefore, I believe the Debtors should be allowed to pay those funds to the applicable Tax Authorities.  Finally, I am advised certain of the Taxes and Fees are afforded priority treatment under the Bankruptcy Code, and therefore, the relief requested in the Taxes Motion will not prejudice the rights of general unsecured creditors.

27.     Accordingly, based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**F.  Insurance Motion**

28.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Policies, Surety Bonds, and Letters of Credit and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (Docket No. 10) (the "**Insurance Motion**"), the Debtors request entry of interim and final orders (i) authorizing the Debtors to (a) continue the Insurance Programs, Surety Bonds, and Letters of Credit in accordance with the applicable insurance programs and in the ordinary course of business, and (b) pay prepetition and postpetition obligations arising under the Insurance Programs, Surety Bonds, and Letters of Credit, and (ii) modifying the automatic stay imposed by

9

section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program, and (iii) granting related relief.

29.     In the ordinary course of business, the Debtors maintain 137 Insurance Policies that are underwritten by approximately 95 Insurance Carriers.  These policies provide coverage for both general and commercial business risks, including, but not limited to, coverage for the Debtors' property, general liability, employment practices liability, aviation, business travel accident, automobile liability, cyber, pollution, marine cargo, product recall, environmental, and workers' compensation.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit C.

30.     The Debtors' obligations with respect to the Insurance Policies include costs associated with Insurance Premiums, Insurance Financing Agreements, the Workers' Compensation Program, the Captive Insurance Program, and Brokerage Fees.

31.     The Debtors are required by certain statutes, rules, and regulations to provide surety bonds for the benefit of certain third parties, often governmental units or other public agencies, to secure certain of the Debtors' payment or performance obligations.  These obligations relate to, among other things: utility deposits and U.S. and Canadian customs obligations.  A detailed list of the Surety Bonds currently maintained by the Debtors is attached to the Insurance Motion as Exhibit D.

32.     In addition, in the ordinary course of business, the Debtors obtain various letters of credit for the benefit of third parties to support their obligations related to, among other things, the Workers' Compensation Program, property leases, custom bonds, gas suppliers, etc.

**Debtors' Exhibit No. 4**
**Page 10 of 33**

A detailed list of the Letters of Credit currently maintained by the Debtors is attached to the Insurance Motion as <u>Exhibit E</u>.

33.     I believe that continuation and renewal of the Insurance Policies and entry into new Insurance Policies are essential to preserving the value of the Debtors' businesses, properties and assets. I understand that, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Bankruptcy Code and the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees published by the U.S. Trustee.

34.     I believe that maintaining the Captive Insurance Program is critical in these chapter 11 cases because without the coverage Securus provides, the Debtors would be left uninsured against various risks.  Thus, if the Captive Insurance Program were to terminate, the Debtors would be forced to seek coverage elsewhere, potentially at much higher costs.

35.     Moreover, I believe the Debtors could be exposed to significant liability if the Insurance Policies were allowed to lapse or terminate as they would not have insurance coverage to protect against certain risks and liabilities.  I believe such exposure could detrimentally impact the success of these chapter 11 cases—in particular, if an uninsured loss were to occur.  In addition, I understand that failure to timely pay the outstanding Insurance Premiums could expose the Debtors to potential penalties or termination of their Insurance Policies.  Further, if the Debtors fail to pay their Insurance Premium, it may result in carriers refusing to renew Insurance Policies or seeking to charge higher rates for policy renewals.

36.     Further, it is my understanding that in many of the jurisdictions in which the Debtors operate their business, the Debtors are required to maintain workers' compensation coverage in accordance with applicable law. If the Debtors fail to maintain the workers'

Debtors' Exhibit No. 4
Page 11 of 33

compensation coverage for certain states, they may be prohibited from operating in those states. Also, if eligible workers' compensation claimants do not receive timely payments for prepetition employment-related injuries, I believe it would negatively impact the financial well-being and morale of those claimants and, in turn, the Debtors' entire employee base, potentially resulting in employee departures. Accordingly, I believe that maintaining the Workers' Compensation Program and satisfying all workers' compensation claims in connection therewith are crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

37.     Similarly, I understand that, to continue their business operations during the chapter 11 cases, the Debtors must be able to provide financial assurances to their contract counterparties and the regulatory agencies that oversee certain aspects of the Debtors' operations. This requires the Debtors to maintain their existing Surety Bonds and Letters of Credit in the ordinary course of business, including the payment of premiums and fees as and when they come due, providing the sureties and issuers with collateral, renewing or potentially acquiring additional bonding capacity or letters of credit, as needed, and executing other agreements, as needed, in connection with the Surety Bonds and Letters of Credit.

38.     Accordingly, based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**G. Critical Vendor Motion**

39.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Non-U.S. Vendor Claims, (C) Lien Claims, and (D) 503(B)(9) Claims, (II) Confirming Administrative Expense Priority Of Undisputed Outstanding Prepetition Orders, and (III) Granting Related Relief* (Docket No. 13) (the "**Critical Vendor Motion**"), the Debtors request entry of an order (i) authorizing the Debtors

**Debtors' Exhibit No. 4**
**Page 12 of 33**

to pay prepetition claims held by (a) vendors whose goods and services are essential to the Debtors' operations, (b) vendors, suppliers, service providers, independent contractors, and other entities located outside of the United States, (c) service providers that may be entitled to assert statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered, and (d) vendors that have delivered goods to the Debtors in the ordinary course of business within the twenty (20) days prior to the Petition Date.

40.     In the ordinary course of business, the Debtors rely on a network of Trade Claimants to provide goods and services essential to maintaining their global supply chain, including raw material and finished goods suppliers, maintenance, equipment, and repair providers, and shipping, freight, and other transportation services, among others.  I believe that any interruption to the Debtors' global supply chain could have disastrous and value-destructive consequences on the Debtors' operations to the detriment of all stakeholders.

41.     The Debtors' ability to maintain their global supply chain and their operations depends, in part, on the Debtors' relationships with their Trade Claimants.  I believe that certain Trade Claimants would likely refuse to continue doing business with the Debtors if such Trade Claimants are not paid for outstanding prepetition amounts, potentially causing a destabilizing effect on the Debtors' commercial relationships and operations.

42.     As further described in the Critical Vendor Motion, the Debtors rely on a network of raw material and finished goods providers, manufacturers, shipping, freight, and other transportation services, and business and administrative vendors to provide the goods and services necessary to facilitate their day-to-day operations.  I believe that many of the goods and services these vendors provide are critical to the Debtors' operations, and certain vendors are (i) sole- or limited-source suppliers of goods and services that support the Debtors' daily operations and/or

(ii) cannot easily be replaced without significant cost and disruption to the Debtors' business. Although the Debtors contract for goods and services from certain vendors pursuant to discrete agreements, in some cases the terms of those agreements do not ensure ongoing provision of goods and services for any meaningful period of time. And in other cases, where vendors are required by contract to continue providing goods or services, even a slight delay resulting from the time it would take the Debtors to initiate enforcement proceedings could cause significant disruption to the Debtors' business.

43.     In identifying the relief needed pursuant to the Critical Vendor Motion, the Debtors first identified all vendors that supply goods and services used in the Debtors' operations. The Debtors then analyzed whether the failure to pay the prepetition claims of such vendors would, in the Debtors' business judgment, result in a substantial risk that such vendors may refuse to provide goods or services to the Debtors postpetition. The Debtors then identified which of the vendors:

(a) are sole-source or limited-source suppliers of goods and services necessary for operations to continue undisrupted;

(b) provide essential goods and services for which it would be impossible or prohibitively costly, impractical, disruptive, or imprudent to find timely alternative sources of supply that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

(c) have prepetition claims that would be exceeded by the costs to the Debtors to replace such vendor (including, but not limited to, transition expenses, professional fees, and lost sales or future revenue);

(d) provide goods or services required to maintain safety standards, or that are strongly preferred or required by a particular customer;

(e) if not paid, would present an unacceptable risk to the Debtors' remaining operations;

(f) are currently refusing or are able or likely to refuse to supply the Debtors with goods or services without payment up front; or

14

(g) cannot be compelled by an agreement with the Debtors to continue performing on prepetition terms.

44.     As a result of this analysis, the Debtors identified the type and categories of vendors whose support is essential to preserving and enhancing value through the seamless transition of their operations into chapter 11 and maximize the value of their estates:

- Materials Suppliers provide specialty materials and parts necessary for the production process and packaging of goods, including chemical compounds, metals, plastics, electronic components, and more.  Many of the Material Suppliers would be prohibitively costly or impracticable to replace, and the Debtors are often directed by OEMs to utilize goods provided by a particular Material Supplier in the manufacturing of component parts.  Certain Material Suppliers provide specific quantities of products that would be difficult to acquire from an alternative vendor in a timely manner.  Should the Debtors be required to seek out alternative suppliers to replace certain Materials Suppliers, I believe that they may incur an increase in operating costs and would be subject to product availability risks that could, in each case, detrimentally affect the Debtors' operations.

- The MRO Providers provide the Debtors with equipment maintenance, repair services, industrial supplies, and related goods and services.  Demand for these services is high and the availability of qualified personnel is often limited.  If the Debtors were required to suddenly change service providers, it would likely require a significant amount of time, capital, and other resources to locate qualified replacements, to the extent such replacements exist.

- The Logistics Providers provide for the transportation and delivery of goods to and from the Debtors' facilities through freighting, ocean transportation, and parcel services, among other things. Although the Debtors may contract directly with such vendors, the Debtors also rely on third-party contract logistics services from certain Logistics Providers, whereby the Debtors will make consolidated payments to a single Logistics Provider that will, in turn, remit payment to other transportation carriers. The Logistics Providers are highly integrated into the Debtors' business, manufacturing process, and delivery schedules, and the uninterrupted provision of transportation and logistics services is critical to the efficient management of the Debtors' supply chain.

- The Debtors also rely on the services of Other Vendors including business administration services, IT systems and computer hardware, marketing and product certification services, and other vendors necessary for maintaining safety standards, facilities, customer relations, and the Debtors' product distribution processes.  These vendors are also highly integrated into the Debtors' operations, and in some cases, provide services (such as product certification services) that are required to do business with certain customers.  I

**Debtors' Exhibit No. 4**
**Page 15 of 33**

believe vendors would likely take significant time or capital to replace on short notice.

45.     The Debtors also rely on Non-U.S. Vendors to provide essential services and products for maintaining their enterprise.  The goods and services provided by the Non-U.S. Vendors generally fall into the same categories as the Critical Vendors detailed above.  As with the Critical Vendors, I believe many of these suppliers are also either the sole supply source of such goods or would be prohibitively expensive or untimely to replace.  I understand that the Debtors may not be able to enforce the automatic stay against parties with minimal or no presence in the United States.  As a result, Non-U.S. Vendors may pursue remedies and seek to collect prepetition amounts owed to them in foreign jurisdictions.  In light of this risk, I believe that payment of certain Non-U.S. Vendor Claims is essential to avoid costly disruptions to the Debtors' operation.

46.     The Debtors also do business with Lien Claimants that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors if the Debtors fail to pay such Lien Claims for certain goods delivered or services rendered, including equipment and maintenance, engineering services, storage, warehousing, and freighting, all of which are necessary for the Debtors' business.  I believe that the Lien Claimants' possession and retention of the Debtors' goods and supplies, or enforcement of a mechanic's lien, would likely disrupt the Debtors' operations and the Debtors' ability to administer these chapter 11 cases efficiently.

47.     The Debtors may have received certain inventory, goods, and/or materials from the 503(b)(9) Claimants within the twenty (20) days immediately preceding the Petition Date, which I understand, upon information and belief, may give rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code and must be paid in full upon the effective date of a chapter 11 plan.  Many of the Debtors' relationships with the 503(b)(9)

Debtors' Exhibit No. 4
Page 16 of 33

Claimants are not governed by long-term contracts.  Instead, the Debtors obtain much of their goods and equipment from such claimants on an order-by-order or as-needed basis.  Therefore, I believe the Debtors payment of 503(b)(9) claims is essential to avoid disruptions to the Debtors' operations.

48.     Additionally, many of the Debtors' vendors may hold Outstanding Prepetition Orders.  Because the Debtors' obligations under the Outstanding Prepetition Orders arose prior to the Petition Date, upon information and belief, I understand such obligations could be treated as general unsecured claims in these chapter 11 cases.  Accordingly, certain vendors may refuse to provide such goods or services to the Debtors (or may recall shipments) purchased unless the Debtors have the authority to pay such orders in the ordinary course or confirm the administrative expense priority status of such claims.

49.     Accordingly, based upon the foregoing, I believe that the relief requested in the Vendor Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**H.  Automatic Stay Motion**

50.     Pursuant to the *Emergency Motion of Debtors for Entry of Order Enforcing Protections of 11 U.S.C. §§ 362, 365, 525, and 541* (Docket No. 14) (the "**Automatic Stay Motion**"), the Debtors request entry of an order enforcing the protections of sections 362, 365, 525, and 541 of the Bankruptcy Code to aid in the administration of these chapter 11 cases and to help ensure that the Debtors' global business operations are not disrupted.

51.     The Company includes more than 260 separate entities (112 of which are Debtors in these chapter 11 cases) and operates in over 15 countries.  The Debtors engage with numerous foreign customers, suppliers, and other vendors, as well as foreign regulators and other governmental units.  Certain of the Debtors' affiliates are also incorporated under the laws of other

17

countries and jurisdictions across North America, South America, Europe, Africa, Asia, and Australia.  Based on my experience, foreign parties may not be familiar with the United States Bankruptcy Code and may take actions in violation of the automatic stay in foreign jurisdictions.

52.     I believe that the relief requested by the Automatic Stay will give effect to the protections under sections 362, 365, 525, and 541 of the Bankruptcy Code by proactively confirming the applicability and effect of these provisions in the form of an order that bears the authority of a federal court and may be transmitted to third parties as necessary.

53.     Accordingly, based on the foregoing, I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**I.   Customer Programs Motion**

54.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (Docket No. 15) (the "**Customer Programs Motion**"), the Debtors request entry of an order (i) authorizing the Debtors to maintain and administer, in the ordinary course of business and consistent with past practice, customer-related programs, promotions, and practices, including certain customer factoring arrangements, and pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business judgment, and (ii) granting related relief.

55.     The Debtors' business depends upon the support of their customers, as well as their ability to attract new customers.  Historically, the Debtors have offered or participated in discounts, warranties, rebates, and other programs, including certain factoring arrangements, in the ordinary course of business to maximize value to customers, maintain brand confidence,

**Debtors' Exhibit No. 4**
**Page 18 of 33**

manage cash flows, and ensure customer satisfaction. Without the ability to continue the Customer Programs, and to satisfy prepetition obligations in connection therewith, I believe the Debtors risk losing the support of their key customers and decreasing the value of their businesses.

56.     The Debtors provide a variety of Discounts to their customers in the ordinary course of business. Once a customer earns a Discount, the customer typically will receive the Discount as a credit off of a current or a future invoice, or payments on a monthly, quarterly, semi-annual, or annual basis. Without the ability to continue their Discounts and satisfy certain prepetition liabilities related thereto, I believe the Debtors risk losing customers and, in turn, losing revenue, to the detriment of the Debtors' estates and their stakeholders.

57.     The types of Discounts offered by the Debtors include:

- ***Invoice Discounts***, in which the Debtors may apply a direct reduction to the amount owed on a particular invoice. Invoice Discounts are offered for a variety of reasons, including to incentivize purchases and respond to price fluctuations.

- ***Volume Discounts***, in which the Debtors reward customers for reaching certain sale volume thresholds. Volume Discounts play a vital role in incentivizing customers to purchase products from the Debtors on an ongoing basis by providing incremental benefits for purchasing greater volume.

- ***Price Discounts***, in which the Debtors may offer certain price discounts off ordinary prices to a customer. Price Discounts are typically offered in unique circumstances, such as in connection with the signing of a new contract or specialized order. Generally, a Price Discount is amortized over the course of a contract between the Debtors and the applicable customer.

58.     The Debtors also offer ordinary course Return Programs that allow the Debtors' customers to return products, or obtain replacement products, under certain circumstances. The Debtors' customers have come to rely on, and expect to benefit from, the Return Programs, and I believe that failure to honor the Return Programs in the ordinary course may jeopardize the Debtors' relationships with their customers.

59.     The types of Return Programs offered by the Debtors include:

**Debtors' Exhibit No. 4**
**Page 19 of 33**

- **_Obsolescence Protection_**.  In some instances, the Debtors' customers may not sell their entire stock of a particular product to end customers before the Debtors produce an improved version of that product.  The Debtors offer certain customers Obsolescence Protection such that, on an annual basis, such customers can return unsold products to the Debtors in exchange for a percentage of the products' purchase price.

- **_Core Returns_**.  Certain of the Debtors' products including certain calipers, power steering pumps, power brake boosters, and electronic control modules, may be returned by a customer to be refurbished and resold by the Debtors in the ordinary course.  Upon purchasing one of these "cores," the applicable customer pays the Debtors a fee that is credited back to the customer once the core is returned.

- **_Warranties_**.  The Debtors, in the ordinary course of business and consistent with standard practice, provide general product Warranties that insure customers in the event of latent product defects.  Generally, the Warranties have a term of one to five years and may be express in a customer's contract, purchase order, or a product manual, or implied under law.

60.     The Debtors offer other Customer Programs in the ordinary course as well. Certain of the Debtors' customers require that the Debtors agree in advance to fulfill a certain number of orders over an applicable time period.  If the Debtors do not satisfy the requisite number of orders, the Debtors may incur penalties following a dispute and reconciliation process.  Because these arrangements are standard in the Debtors' industry, I believe it is critical that the Debtors are able to maintain their Customer Compliance Programs in the ordinary course to remain competitive and prevent customers from seeking business from the Debtors' competitors.

61.     Additionally, in the ordinary course of business, the Debtors enter into arrangements with select customers that allow them to receive certain goods directly from the manufacturer as opposed to the Debtors' warehouses.  Under this Direct Ship Program, the Debtors transfer a customer's purchase order to a manufacturer, who ships the purchased product directly to the customer.  Subsequently, the Debtors offer a credit to the customer under certain circumstances.  The Direct Ship Program allows the Debtors to reduce shipping time for the benefit

**Debtors' Exhibit No. 4**
**Page 20 of 33**

of their customers and the need for additional inventory on-hand, and therefore, I believe continuation of the Direct Ship Program is in the best interests of the estates.

62.     Moreover, he Debtors further employ certain Customer Factoring arrangements in the ordinary course to optimize cash flows and ensure access to near-term liquidity.  Under these arrangements, consistent with industry practice, the Debtors will sell Receivables to financial institutions that have partnered with the Debtors' customers in exchange for near-term payment.  Because many of the Debtors' customers typically have lengthy credit terms, ranging up to 365 days in some cases, I believe the Customer Factoring arrangements are crucial to preserving operational flexibility and ensuring quicker access to steady liquidity.

63.     Certain of the Debtors' customers have direct relationships with a Customer Factor and are extended credit by that Customer Factor to fast-track payment to the Debtors on invoices.  In this AR Customer Factoring arrangement, the Debtors will invoice the applicable customer on anywhere from 180- to 360-day terms.  After the customer reviews and approves the invoice, the customer will notify their Customer Factor to remit payment to the Debtors, usually within thirty-five (35) to forty-five (45) days.  The amount paid to the Debtors is net of any fees, discounts, or other credits owed to the customer or the Customer Factor.  The Debtors sell their interest in the applicable Receivable to the Customer Factor and the Customer Factor receives payment directly from the Customer at the time the invoice is due.

64.     The Debtors also participate in a slightly different program for certain mass retail customers where the Debtors send the invoices directly to the customer factor.  Under Mass Retail Customer Factoring, upon the sale of their interest in the Receivable to the Customer Factor, the Debtors will receive payment from the Customer Factor, less a predetermined discount, within

Debtors' Exhibit No. 4
Page 21 of 33

fifteen (15) to thirty (30) days. Similar to the AR Customer Factoring, the retail customer will pay the Customer Factor directly once the invoice comes due, generally within 60-180 days.

65. I believe the Customer Factoring arrangements provide the Debtors with the ability to "bring forward" Receivables and manage their short-term liquidity position. I believe that, absent the ability to continue such arrangements in the ordinary course, would lose access to near-term cash flow and much needed liquidity, among other things.

66. Accordingly, based upon the foregoing, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

### J.  Wages Motion

67. Pursuant to the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Obligations and (B) Continue Compensation and Benefits Programs in the Ordinary Course, and (II) Granting Related Relief*, filed at Docket No. 16 (the "**Wages Motion**"), the Debtors request entry of an order (i) authorizing the Debtors to (a) pay Workforce Compensation Obligations and Employee Benefit Obligations and related expenses, fees, and costs attendant to the foregoing, and (b) maintain, and continue to honor and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented in the ordinary course of business; and (ii) granting related relief.

68. As described more fully in the Wages Motion, the Debtors collectively employ approximately 6,000 Employees, approximately 5,970 of which are Full-Time Employees and approximately 30 of which are Part-Time Employees. All of the Debtors' Employees are located in the United States. Approximately 1,200 of the Debtors' Employees are salaried, and approximately 4,800 are paid on an hourly basis. In addition to the Employees, the Debtors rely

on services from a supplemental workforce that fluctuates from time to time but is currently comprised of approximately twelve (12) Temporary Employees sourced by third-party staffing agencies, and approximately twelve (12) Independent Contractors who the Debtors pay directly.

69.     The Debtors' ability to maintain business operations is entirely dependent on the support of their expansive and dedicated Workforce.  These individuals, with their specialized skills and experience, are essential to the Debtors' ability to maintain continuity of operations.  I believe that any delay in paying, or failure to pay, the Workforce Obligations could irreparably impair the morale of the Debtors' Workforce at a time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Workforce Obligations could also inflict a significant financial hardship on the families of the Workforce.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put the Workforce at risk of such hardship.  Without the relief requested in the Wages Motion, otherwise-loyal Employees and members of the Supplemental Workforce may seek other work opportunities, thereby putting at risk the Debtors' continued operations.

70.     In the ordinary course of business, the Debtors incur and pay obligations relating to salaries, wages and other compensation owed to the Workforce.  Additionally, Employees are entitled to reimbursement of certain reasonable and necessary expenses incurred while performing their employment duties, including job related travel and other business related expenses.  I believe that payment of prepetition Expense Reimbursements is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce.  Employees who have incurred Expense Reimbursements should not be forced personally to bear the cost of the Expense Reimbursements, especially because those Employees

incurred such Expense Reimbursements for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

71.     In the ordinary course of business, the Debtors are required by law to make certain deductions from Employees' gross pay as discussed in the Wages Motion. Further, as required by certain laws, the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority, which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance. I believe that disbursement of all these payments would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

72.     In the ordinary course of business, the Debtors also maintain a Bonus Program designed to motivate and reward their salaried Employees at both the corporate and site levels. The Bonus Program is maintained entirely in the discretion of the Debtors' management. As part of the Bonus Program, all of the Debtors' salaried Employees are eligible to receive annual performance-based cash bonuses, commonly a predetermined percentage of base salary as set forth in the employee's offer letter and tied to the annual performance of the Debtors and the individual. In August 2025, the Debtors informed 321 non-executive salaried Employees that they were deferring payment of Discretionary Bonuses earned by such Employees in 2024 to November 2025 (the "**2024 Deferred Bonuses**"). I believe that payment of the 2024 Deferred Bonuses is necessary because such bonuses are an integral component of these employees' overall compensation, and they have relied on receiving them in connection with their continued employment. I believe that

**Debtors' Exhibit No. 4**
**Page 24 of 33**

failure to pay the 2024 Deferred Bonuses would risk significant harm to morale and retention, which in turn could adversely impact the Debtors' operations.  For the avoidance of doubt, the Debtors do not seek authority to make payment on account of the 2024 Deferred Bonuses to any Insiders (as defined by section 101(31) of the Bankruptcy Code) or executives.

73.     Under the terms of certain CBAs, the Debtors are obligated to pay severance, in certain circumstances, to certain eligible Union Employees.  From time to time, the Debtors are also obligated to pay severance, in certain circumstances, pursuant to the terms of certain employment contracts.  Additionally, the Debtors maintain an informal practice of paying severance to certain salaried Employees as determined in the Debtors' sole discretion.  This practice is fully discretionary and typically provides eight and a half (8.5) weeks' pay to hourly Employees upon a reduction in force of more than fifty (50) such Employees within a six (6) month period.  The Severance Obligations are necessary for maintaining positive Employee morale and loyalty, and failure to honor these obligations could cause severe hardship to the Workforce in a critical time; payment of the Severance Obligations are integral and necessary for maintaining a stable workforce and the ultimate successful operation of the Debtors' business.  The Debtors are not seeking authority to pay or honor any prepetition obligations on account of any severance payments to Insiders.

74.     In the ordinary course of business, the Debtors make various benefit plans and programs available to their Employees.  These benefit plans, programs, and practices fall within the following categories: (i) obligations relating to unpaid and paid leave benefits for Employees; (ii) medical, prescription drug, dental, and vision benefits, including health savings accounts and flexible spending accounts, life insurance, accidental death and dismemberment insurance, short-term and long-term disability insurance, voluntary supplemental insurance

25

programs, and certain other benefits; (iii) a 401(k) retirement savings plan, a 401(h) retirement healthcare plan, pension plans, non-qualified plans, and Other Post-Employment Benefit (OPEB) plans; and (iv) discretionary non-Insider severance.  I believe that maintaining the Employee Benefits is critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

75.     As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of the Workforce Compensation Obligations and Employee Benefits. Third-party administrators assist the Debtors with, among other things, administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with the Workforce Obligations.  I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

76.     Accordingly, based upon the foregoing, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

### K.  Cash Management Motion

77.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtors request entry of an order (i) authorizing the Debtors to (a) continue using their existing

Cash Management System, including through the continued use of their existing Bank Accounts and existing Business Forms, (b) continue to perform and honor the Intercompany Transactions between and among the Debtors and Non-Debtor Affiliates in the ordinary course of business, in their business judgment, (c) implement changes to their Cash Management System in the ordinary course of business, including opening new or closing existing Bank Accounts, and (d) honor certain prepetition obligations related to the Cash Management System; (ii) granting administrative expense priority for Intercompany Claims; (iii) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts; and (iv) granting related relief.

78.    The Debtors further request that the Court authorize the Banks to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for:  (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

79.    In the ordinary course of business, the Debtors utilize an integrated Cash Management System in North America to collect, transfer, and disburse funds generated by their operations and the operations of their Non-Debtor Affiliates.  The Cash Management System

27

operates as a cash pool among the Debtor entities and is tailored to meet the Debtors' operating needs as a leading global supplier of aftermarket automotive parts. The Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, produce financial forecasts and reports, streamline use of their cash and invested funds, reduce administrative expenses, facilitate tracking between certain entities and business units, and obtain accurate account balances and other financial data.

### 1.    Bank Accounts

80.    In connection with the Cash Management System and its cash pooling, the Debtors maintain the Bank Accounts with multiple Banks. As of the Petition Date, the Debtors maintained 160 Bank Accounts across 11 Banks for various purposes. The Debtors' primary Bank is BOFA, where the Debtors maintain ninety-two (92) Bank Accounts. As of the Petition Date, the Debtors have an aggregate amount of approximately $12 million in the Bank Accounts.

81.    I understand the Bank Accounts that comprise the Cash Management System generally function as follows:

(i)     a single centralized Main Concentration Account held by FBG and maintained at BOFA is funded by periodic automatic sweeps of the Subsidiary Concentration Accounts or directly through automatic and manual sweeps of the Collection Accounts;

(ii)    non-BOFA Subsidiary Concentration Accounts maintained by certain Debtor subsidiaries of FBG are generally maintained at low balances, with amounts in excess of the target balances swept periodically to the Main Concentration Account;

(iii)   Collection Accounts are funded with customer, factored, and non-factored receipts, and are generally zero-balance accounts, with funds swept on a daily basis into the Main Concentration Account directly or first through a Subsidiary Concentration Account—with the exception of certain accounts that maintain a balance and are manually swept;

28

(iv)     Disbursement Accounts fund general corporate and operational disbursements with amounts transferred via both automatic and manual transfers from the Main Concentration Account; and

(v)      Investment Accounts are maintained, although they currently carry de minimis balances.

82.     In addition, I understand that, in connection with these chapter 11 cases, the Debtors also will establish or designate (i) a Utility Deposit Account to provide for adequate assurance of payment to utility companies, (ii) a DIP Financing Account funded pursuant to the DIP Orders, and (iii) a Professional Fees Account that the Debtors propose will hold the professional fees escrow amounts that will accrue during the pendency of the chapter 11 cases.

83.     Finally, I understand the ROW Entities utilize a separate ROW Cash Management System that operates on a regional basis.[3] The ROW Cash Management System and the non-Debtor businesses that it serves are generally cash flow positive and self-sustaining, subject to the continuation of certain Intercompany Transactions on a postpetition basis. Although the ROW Entities do not participate in external cash pooling with the Debtors and the two cash management systems largely operate independently, the ROW Entities do participate in Intercompany Transactions with the Debtors, as discussed in more detail below.

**2.     Bank Fees**

84.     In the ordinary course of business, the Debtors incur and pay, as well as honor and/or allow to be deducted, certain Bank Fees in connection with the maintenance of the Cash Management System. The Bank Fees average approximately $150,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $150,000 in unpaid Bank Fees, all of which will come due within thirty (30) days of the Petition Date.

---

[3]   As of the Petition Date, the ROW Cash Management System consisted of 328 bank accounts maintained across 70 banks, all of which, except one, are owned and controlled by Non-Debtor Affiliates.

**Debtors' Exhibit No. 4**
**Page 29 of 33**

3.     **Intercompany Transactions**

85.     In the ordinary course of their business, the Debtors maintain relationships with each other and certain of their Non-Debtor Affiliates, including certain ROW Entities.  In turn, the Debtors engage in Intercompany Transactions with each other and with Non-Debtor Affiliates, including the ROW Entities.  The Debtors and the applicable Non-Debtor Affiliates regularly engage in cash settlements of amounts owed on account of Intercompany Claims on an as-needed basis, with the exception of Non-Debtor Affiliates in Mexico, with whom the Debtors engage in such settlements on a weekly basis.  The Intercompany Transactions typically arise from Operational Intercompany Transactions and cash pooling arrangements.

86.     Although general cash transfers between the Debtors and their Non-Debtor Affiliates are infrequent, in connection with the Operational Intercompany Transactions, the Debtors pay certain of their Non-Debtor Affiliates for invoiced goods and services provided and purchased for the benefit of the Debtors' enterprise.  Such goods and services include manufacturing, administrative functions, inventory, accounting, and treasury.  The Non-Debtor Affiliates—whose locations include, but are not limited to, Mexico, China, India, and Romania—invoice Operational Intercompany Transactions on an arm's length basis, and the Debtors record these invoices on their books as Intercompany Claims, which are settled in the ordinary course.  I understand such services include, but are not limited to, back-office services and inventory in Mexico; the manufacturing of brakes, rotors, and pumps in China; and treasury and service centers in India and Romania.  These services resulting from these Operational Intercompany Transactions enable the Debtors to run their global business and service customers around the world.  I believe the benefits of the Intercompany Transactions ultimately inure to the Debtors' estates, and failing to honor prepetition Intercompany Claims among the Debtors and between Debtors and Non-

**Debtors' Exhibit No. 4**
**Page 30 of 33**

Debtor Affiliates, or ceasing Intercompany Transactions in the ordinary course postpetition, would negatively impact the Debtors' ability to operate in chapter 11.

87.     As of the Petition Date, the Debtors estimate they pay, on average, between $30 million and $40 million on a monthly basis on account of the Operational Intercompany Transactions.

88.     I anticipate that the quantum of postpetition Intercompany Transactions with Non-Debtor Affiliates will continue at prepetition levels.  This will ensure the Debtors have access to critical goods and services without interruption.  The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis and will implement such other internal mechanisms as needed to permit them, with the assistance of their advisors, to accurately track the balance of, and account for, all prepetition and postpetition Intercompany Transactions.

### 4.     Credit Card Program

89.     In the ordinary course of business, the Debtors utilize Credit Cards issued by BOFA, American Express, and HSBC, which employees use to make authorized business purchases on behalf of the Debtors or in connection with their employment duties, such as travel expenses and minor vendor expenses for marketing purposes that these employees incur in the course and scope of their employment with the Debtors.  The Debtors pay for expenses charged to such cards directly.

90.     As of the Petition Date, there are approximately 200 issued and active Credit Cards, for which the Debtors owe approximately $250,000 on account thereof.  Based on historical figures, the Debtors estimate that they incur total liabilities of approximately $500,000 per month on account of the Credit Cards.

**Debtors' Exhibit No. 4**
**Page 31 of 33**

91.     I believe efficient and economical operation of the Debtors' business requires that the Cash Management System continue during the pendency of these chapter 11 cases.  As a practical matter, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash management systems would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations.  Any such disruption would have a severe and adverse impact upon the success of these chapter 11 cases.

92.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors and provides significant benefits to the Debtors, including the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account information.  Therefore, I believe the Debtors' ability to continue operating under the existing Cash Management System is necessary to avoid severe disruptions to the Debtors' operations, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates.

93.     Accordingly, based on the foregoing, I believe the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

**Debtors' Exhibit No. 4**
**Page 32 of 33**

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 30th day of September 2025.

Respectfully submitted,

By:     /s/ *Charles M. Moore*
        Charles M. Moore, Managing Director
        Alvarez & Marsal

**Debtors' Exhibit No. 4**
**Page 33 of 33**