## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**DECLARATION OF CHARLES
M. MOORE IN SUPPORT OF EMERGENCY
MOTION OF DEBTORS FOR INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A)
OBTAIN POSTPETITION FINANCING, (B) USE CASH
COLLATERAL, AND (C) GRANT LIENS AND PROVIDE
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS;
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**") and Chief Restructuring Officer of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together with the Debtors' non-debtor affiliates, "**FBG**" or the "**Company**").

2. I submit this declaration (the "**Declaration**") in support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain*

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

*Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**").[2]

3. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by A&M employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, or the other advisors to the Debtors, including Weil, Gotshal & Manges LLP ("**Weil**") and Lazard Frères & Co. LLC ("**Lazard**"), and/or (v) my experience as a restructuring professional. I will receive no compensation in exchange for my testimony. If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases. I am authorized to submit this declaration on behalf of the Debtors.

<u>**Background and Qualifications**</u>

4. My background and qualifications are set forth in my declaration in support of the Debtors' chapter 11 petitions and first day relief, filed contemporaneously herewith.

5. On September 5, 2025, the Debtors retained A&M to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and assist with contingency preparations for a potential chapter 11 filing. From the outset of A&M's retention, my team and I have worked with the Debtors' management team and other advisors on numerous activities to support the Debtors' turnaround and restructuring efforts. As a result of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, the interim order attached as <u>Exhibit A</u> thereto (the "**Interim Order**"), or that certain Credit Agreement (the "**DIP Credit Agreement**") attached as <u>Exhibit 1</u> to the Interim Order, as applicable.

2

this work, I have become familiar with the Company's day-to-day operations, business and financial affairs and the circumstances leading to the commencement of these chapter 11 cases. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**The Urgent Need for Interim Approval of the Debtors' Proposed DIP Facility**

6. Prior to the Petition Date, A&M examined the Debtors' liquidity, cash flows and need for post-petition financing during these chapter 11 cases. In connection with that examination, A&M prepared an initial budget (the "**Initial DIP Budget**"), which is attached hereto as **Exhibit A**. In preparing the Initial DIP Budget, A&M worked closely with the Debtors' management team to gather and review historical financial data, assess the Company's current liquidity position, and identify anticipated operating needs during these chapter 11 cases. A&M analyzed, among other things, cash receipts and disbursements—including payroll, rent, leases, utilities, insurance, vendor obligations, taxes, duties, and professional fees—to ensure that projected expenditures were necessary to maintain business operations and preserve the value of the estates. We also analyzed the Debtors' accounts payable, accounts receivable, and operating activity to assess the timing and reliability of expected cash inflows and outflows. In my professional judgment, based on my experience with the Debtors, the Initial DIP Budget represents a reasonable projection of the Debtors' capital needs to finance these cases.

7. As reflected in the Initial DIP Budget, the Debtors have an urgent need for liquidity. On the Petition Date, the Debtors will have only *de minimis* cash on hand (approximately $14 million) and their projected operating cash flow is not sufficient to fund ongoing operations and expenses. The Debtors also require an immediate capital infusion to, among other things, (i) stabilize business operations, including the Debtors' global manufacturing and distribution network, (ii) maintain business relationships with critical suppliers, manufacturers, vendors, and customers, (iii) purchase the materials necessary to timely deliver products to customers, including

3

OEMs, auto parts retailers, wholesale distributors, dealerships and mass retailers, (iv) make payroll for approximately 6,000 U.S. employees and 15,000 Mexico-based employees, (v) satisfy other working capital and operational needs in a capital-intensive business, (vi) administer their estates for the duration of these chapter 11 cases, and (vii) achieve a value-maximizing transaction.

8. For example, in the first five weeks of these cases, the Debtors project that they will need approximately $74.9 million to pay wages and benefits for their approximately 6,000 U.S. employees and 15,000 Mexico-based employees, $176.3 million to replenish inventory, $85 million for critical vendors, and approximately $102.3 million to satisfy tariffs, taxes, leases, insurance, and other operating expenses. In addition, the Debtors estimate they will incur approximately $105 million in non-operating expenses during the first five weeks of these cases.

9. Moreover, demonstrating that the Debtors have access to financing will allow them to maintain favorable trade terms with vendors and will improve confidence in the Debtors' business among the Debtors' other stakeholders, including customers and employees. In contrast, without that funding, the Debtors' access to cash needed to operate the business would evaporate and trade creditors would likely cease extending credit.

10. For these reasons, the Debtors require immediate access to the DIP Facility to meet their near-term working capital needs, stabilize their operations, and fund the costs of administering these cases.

**The Amount of the Proposed DIP Financing Is Reasonable and Necessary**

11. The proposed DIP Facility is a multi-draw senior secured super-priority debtor-in-possession term loan facility in the aggregate principal amount of at least $1.1 billion in new money financing, including a $500 million initial draw to be funded upon entry of the Interim Order and another $600 million draw to be funded upon entry of the Final Order.

12. The Debtors require, and the Initial DIP Budget contemplates, an initial draw in an aggregate principal amount equal to $500 million upon entry of the Interim Order. As discussed above, this initial draw is necessary to satisfy immediate expenses for the period between the Petition Date and entry of a Final Order (the "**Interim Period**"). The Debtors are expected to incur a net cash outflow of $484.1 million in the first five weeks of these chapter 11 cases, including a net operating outflow of $379.1 million. Accordingly the proposed initial draw of $500 million is appropriately sized and necessary to satisfy the Debtors' immediate liquidity needs, while offering a reasonable cushion should it be required to satisfy additional, unforeseen expenses. Based on my experience and work with the Debtors' management team and other advisors, I believe that these expenses are necessary for the Debtors to continue ordinary course operations.

13. Following the Interim Period, the Debtors will need continued access to the remaining amounts available under the DIP Facility to ensure minimum liquidity levels because, as reflected in the Initial DIP Budget, the Debtors do not expect to achieve a positive net cash flow during the forecast period. As summarized in the Initial DIP Budget, the Debtors anticipate a net cash outflow of $914.4 million dollars between the Petition Date and December 26, 2025. The second draw of $600 million is therefore appropriately sized and necessary to stabilize the Debtors and bridge the gap to a self-sustaining net positive cash flow. Access to the DIP Facility is therefore essential to the Debtors' ability to continue operating their business in the ordinary course, preserve going-concern value, and provide stability for employees, customers, and vendors, while ensuring that the Debtors have sufficient liquidity to successfully reorganize.

14. Based on my analysis, consistent with the Initial DIP Budget, I believe the DIP Facility and each of the proposed draws thereunder are appropriately sized to satisfy the Debtors' liquidity needs during the forecasted period.

### Adequate Protection For The ABL Secured Parties

15. I understand that the ABL Secured Parties may contend that the Debtors have failed to provide sufficient adequate protection of their interest in collateral. The ABL Secured Parties hold first liens on the ABL Priority Collateral which consists primarily of certain inventory and accounts receivable held by the U.S. Debtors, as well as the proceeds thereof (i.e., cash). In my opinion, approval of the DIP Facility enhances, rather than diminishes, the value of the first priority liens held by the ABL Secured Parties in inventory and receivables.

**A.   The DIP Proceeds Enhance The ABL Priority Collateral**

16. The DIP Facility will not impose priming liens on the ABL Secured Parties' liens on inventory, accounts receivables, or cash collateral, i.e. the ABL Priority Collateral. As a result, the ABL Secured Parties' collateral position will be enhanced by the DIP Facility loan proceeds because, as explained above, the Debtors will be purchasing parts and paying employees to create new inventory, and will be converting existing (and future) inventory into higher value receivables.

17. Specifically, the Initial DIP Budget contemplates using the DIP proceeds to, among other things, (i) replenish inventory, (ii) sell existing inventory in exchange for new accounts receivable, and (iii) collect existing accounts receivable for cash. As reflected below, over the course of these cases, the Debtors' continued operations, financed by the DIP Facility, are forecast to increase the total ABL Priority Collateral inventory and accounts receivable from an estimated $1.388 billion as of the Petition Date, to an estimated $1.6 billion by the end of October and $1.638 billion by the end of December.

6



18. Inventory is forecasted to increase from a book value of $1.21 billion to a book value of $1.27 billion during the Interim Period. Accounts receivable are forecasted to increase from a book value of $178 million to a book value of $330 million in that same period. In total, inventory, and accounts receivable are expected to increase by more than $212 million during the first five weeks of these chapter 11 cases as a result of the DIP Facility. With respect to cash proceeds subject to the ABL Secured Parties' liens, starting cash is approximately only $14 million. Given that inventory and accounts receivable subject to the ABL Secured Parties' liens will increase during the forecast period, cash subject to the ABL Secured Parties' liens will increase, not decrease. Accordingly, the value of ABL Priority Collateral should *increase* as a result of approval of the DIP Facility, including during the Interim Period. As the first lien holders, the ABL Secured Parties are the direct beneficiaries of this value increase.

B. The ABL Secured Parties' Equity Cushion

19. As of the Petition Date approximately $596.3 million of obligations under the ABL Facility are outstanding, consisting of $226.9 million in obligations under the ABL Loans and $369.4[3] million of ABL Supply Chain Financing. These obligations are secured by, in addition to liens in certain inventory and accounts receivable, third-priority liens on the Term

---

[3] The ABL Secured Parties are only entitled to a secured claim on the ABL Supply Chain Financing if certain requirements under the credit agreements are satisfied. Debtors reserve all rights, including in respect to the existence, validity, priority and value of liens asserted by the ABL Secured Parties.

Priority Collateral consisting of, among other things, equipment, real property, intellectual property, investment property, and other collateral.

20. I understand that, under the ABL/Term Loan Intercreditor Agreement, the ABL Secured Parties are deemed to consent to the proposed DIP Facility.

21. In addition, according to the relevant collateral packages, the ABL Secured Parties would benefit from an equity cushion far in excess of 20% of the total amounts purportedly owed by the Debtors.

22. In making that assessment, I determined that the book value of the Debtors' accounts receivable and inventory is the most appropriate and relevant valuation to utilize because the Debtors intend to operate their business in the ordinary course (including the sale of inventory to customers and the creation of new inventory), and certainly will do so during the Interim Period. Alternative valuation methods, including Net Orderly Liquidation Value, would be inappropriate for valuing the Debtors' accounts receivables and inventory which will be sold and replenished as a going concern.

C. **Accounts Receivable**

23. Based on the Debtors' most recent receivable report, a copy of which is attached hereto as **Exhibit B**, the book value of non-factored accounts receivable as of September 12, 2025 was $148 million. The non-factored accounts receivable as of the Petition Date were estimated at $178 million.

D. **Inventory**

24. Based on the Debtors' latest ABL compliance certificate (the "**Compliance Certificate**"), attached hereto as **Exhibit C**, the book value of the Debtors' inventory securing the ABL Facility was more than $1 billion as of August 30, 2025. In addition, approximately $200.7

8

million of additional collateral stored at different locations was not included in the Compliance Certificate, yet constitutes ABL Priority Collateral.

25. As set forth in the First Day Declaration, the Evolution Borrowers collectively held approximately $376.1 million in inventory as of August 2, 2025. Recently, the Company Advisors became aware that Evolution inventory may have been commingled with the inventory of the FBG Debtors prior to the Petition Date. Although this inventory is on FBG Debtors' books, because the Evolution Borrowers are likely to contend this inventory was improperly comingled, it can be excluded for purposes of calculating an equity cushion without altering the conclusion that there appears to be far more than a 20% equity cushion protecting the ABL Secured Parties.

26. Based on the Debtors' books and records, my team and I prepared an overview of the ABL inventory collateral (the "**ABL Inventory Collateral Overview**"), attached hereto as **Exhibit D**. According to those records, as shown in the ABL Inventory Collateral Overview, there remains in excess of $833.9 million of value associated with liens held by the ABL Secured Parties even after excluding the inventory transferred from the Evolution facilities.

## Conclusion

27. Based on my experience as a restructuring professional, my familiarity with the Debtors, and my extensive discussions with the Debtors' management team and advisors, I believe the Debtors will materially benefit from immediate access to the DIP Facility. For these reasons and those set forth above, I believe that the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment, and it would be appropriate for the Court to approve the DIP Facility as contemplated by the DIP Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

September 30, 2025  
New York, New York

*/s/ Charles M. Moore*  
Charles M. Moore, Managing Director  
Alvarez & Marsal