**<u>Exhibit A</u>**

**DIP Credit Agreement**

WEIL\100774586\2\35253.0003

---

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of [●], 2025

among

FIRST BRANDS GROUP, LLC
(f/k/a Trico Group, LLC),
as Borrower and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,

FIRST BRANDS GROUP INTERMEDIATE, LLC
(f/k/a Trico Group Holdings, LLC),
as Parent and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code,

THE LENDERS PARTY HERETO,

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent

and

OPY CREDIT CORP.,
as Trading Agent

---

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ................................................ 2

    Section 1.01    Defined Terms ............................................................................ 2
    Section 1.02    Other Interpretive Provisions................................................. 44
    Section 1.03    Accounting Terms ................................................................... 45
    Section 1.04    Rounding ................................................................................. 45
    Section 1.05    References to Agreements, Laws, Etc. .................................... 45
    Section 1.06    Times of Day .......................................................................... 46
    Section 1.07    Timing of Payment or Performance ....................................... 46
    Section 1.08    Currency Equivalents Generally............................................. 46
    Section 1.09    [Reserved]............................................................................... 46
    Section 1.10    [Reserved]............................................................................... 46
    Section 1.11    Divisions ................................................................................. 46
    Section 1.12    Interest Rates .......................................................................... 46

**ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS** ............................. 47

    Section 2.01    The Loans ............................................................................... 47
    Section 2.02    Borrowings, Conversions and Continuations of Loans .................... 50
    Section 2.03    Letter of Credit ....................................................................... 52
    Section 2.04    Funding of Borrowings........................................................... 56
    Section 2.05    Prepayments ............................................................................ 57
    Section 2.06    Termination or Reduction of Commitments ........................... 59
    Section 2.07    Repayment of Loans ............................................................... 60
    Section 2.08    Interest .................................................................................... 60
    Section 2.09    Premiums and Fees ................................................................. 61
    Section 2.10    Computation of Interest and Fees........................................... 62
    Section 2.11    Evidence of Indebtedness ....................................................... 62
    Section 2.12    Payments Generally ................................................................ 63
    Section 2.13    Sharing of Payments............................................................... 65
    Section 2.14    Defaulting Lenders ................................................................. 66
    Section 2.15    Syndication ............................................................................. 66
    Section 2.16    [Reserved]............................................................................... 67
    Section 2.17    [Reserved]............................................................................... 67
    Section 2.18    Extension of Term Loans ....................................................... 67
    Section 2.19    Benchmark Replacement Setting............................................ 68

**ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY** ...................... 70

    Section 3.01    Taxes....................................................................................... 70
    Section 3.02    Illegality ................................................................................. 74
    Section 3.03    Inability to Determine Rates .................................................. 74
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on SOFR Loans and EURIBOR Loans ............................. 75
    Section 3.05    Funding Losses ...................................................................... 76
    Section 3.06    Matters Applicable to All Requests for Compensation ..................... 77
    Section 3.07    Replacement of Lenders under Certain Circumstances..................... 78
    Section 3.08    Survival................................................................................... 79

**ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** ..................... 79

    Section 4.01    Conditions of Initial Credit Extension ................................... 79
    Section 4.02    Conditions to Each Credit Extension, Other Than the Initial Credit Extension ................................................................. 83

i

## TABLE OF CONTENTS (Cont.)

Page

Section 4.03        Conditions to Each Withdrawal .................................................................. 84

**ARTICLE V REPRESENTATIONS AND WARRANTIES** ................................................. **86**

Section 5.01        Existence, Qualification and Power; Compliance with Laws .......................... 86
Section 5.02        Authorization; No Contravention ................................................................ 86
Section 5.03        Governmental Authorization; Other Consents ............................................. 86
Section 5.04        Binding Effect ........................................................................................... 87
Section 5.05        No Material Adverse Effect ......................................................................... 87
Section 5.06        Litigation; FCPA ....................................................................................... 87
Section 5.07        Ownership of Property; Liens; Insurance ..................................................... 87
Section 5.08        Creation and Perfection of Security Interests ............................................... 88
Section 5.09        Environmental Compliance ........................................................................ 88
Section 5.10        Taxes........................................................................................................ 89
Section 5.11        Compliance with ERISA ............................................................................ 89
Section 5.12        Labor Matters ........................................................................................... 89
Section 5.13        Subsidiaries; Equity Interests ..................................................................... 89
Section 5.14        Margin Regulations; Investment Company Act; PATRIOT Act..................... 90
Section 5.15        Disclosure; Financial Statements................................................................. 90
Section 5.16        Intellectual Property ................................................................................... 91
Section 5.17        Security Interest in Collateral ..................................................................... 91
Section 5.18        AML Laws; Anti-Corruption Laws and Sanctions........................................ 91
Section 5.19        Use of Proceeds ........................................................................................ 92
Section 5.20        Bankruptcy Matters ................................................................................... 92

**ARTICLE VI AFFIRMATIVE COVENANTS** ................................................................. **92**

Section 6.01        Financial Statements .................................................................................. 92
Section 6.02        Certificates; Reports; Other Information ...................................................... 94
Section 6.03        Notice Requirements; Other Information ...................................................... 94
Section 6.04        Environmental Matters ............................................................................... 95
Section 6.05        Maintenance of Existence ........................................................................... 95
Section 6.06        Maintenance of Properties .......................................................................... 96
Section 6.07        Maintenance of Insurance ........................................................................... 96
Section 6.08        Compliance with Laws ............................................................................... 96
Section 6.09        Books and Records .................................................................................... 96
Section 6.10        Inspection Rights ....................................................................................... 96
Section 6.11        Covenant to Guarantee Obligations and Give Security................................... 97
Section 6.12        Further Assurances .................................................................................... 98
Section 6.13        Taxes........................................................................................................ 98
Section 6.14        Ratings ..................................................................................................... 98
Section 6.15        Use of Proceeds ........................................................................................ 98
Section 6.16        Milestones................................................................................................. 98
Section 6.17        Approved Budget....................................................................................... 99
Section 6.18        Lender Advisors; Professional Services Firm ............................................. 100
Section 6.19        Chief Restructuring Officer ...................................................................... 100
Section 6.20        Bi-Weekly Calls ...................................................................................... 101
Section 6.21        Cash Management .................................................................................... 101
Section 6.22        Additional Bankruptcy Matters ................................................................ 101
Section 6.23        Cash Quarantine ...................................................................................... 101
Section 6.24        Control Agreements ................................................................................. 101
Section 6.25        Participation Elevation ............................................................................. 101
Section 6.26        Loan Party Affirmative Covenants............................................................ 102

**Debtors' Exhibit No. 11**
**Page 4 of 168**

## TABLE OF CONTENTS (Cont.)

Page

Section 6.27     Governance ................................................................... 103

**ARTICLE VII NEGATIVE COVENANTS** ......................................................... **104**

Section 7.01     Liens ............................................................................ 104
Section 7.02     Investments ................................................................. 107
Section 7.03     Indebtedness ............................................................... 109
Section 7.04     Fundamental Changes ................................................. 111
Section 7.05     Dispositions ................................................................ 112
Section 7.06     Restricted Payments ................................................... 113
Section 7.07     Change in Nature of Business ..................................... 113
Section 7.08     Transactions with Affiliates ........................................ 114
Section 7.09     Prepayments and Modifications of Certain Indebtedness ............ 114
Section 7.10     Negative Pledge .......................................................... 115
Section 7.11     Amendments to Organization Documents .................... 116
Section 7.12     Fiscal Year .................................................................. 116
Section 7.13     Sanctions; Anti-Corruption Laws ............................... 116
Section 7.14     Minimum Liquidity ..................................................... 117
Section 7.15     Insolvency Proceeding Claims .................................... 117
Section 7.16     Bankruptcy Actions .................................................... 117
Section 7.17     Orders ......................................................................... 117

**ARTICLE VIII PARENT COVENANT** ............................................................. **117**

**ARTICLE IX EVENTS OF DEFAULT AND REMEDIES** ................................. **118**

Section 9.01     Events of Default ........................................................ 118
Section 9.02     Remedies Upon Event of Default ................................ 125
Section 9.03     Application of Funds ................................................... 125

**ARTICLE X ADMINISTRATIVE AGENT AND OTHER AGENTS** ................... **126**

Section 10.01     Appointment and Authorization of Agents .................. 126
Section 10.02     Delegation of Duties ................................................... 128
Section 10.03     Liability of Agents ...................................................... 129
Section 10.04     Reliance by Agents ..................................................... 129
Section 10.05     Notice of Default ......................................................... 130
Section 10.06     Credit Decision; Disclosure of Information by Agents ................. 130
Section 10.07     Indemnification of Agents ........................................... 131
Section 10.08     Agents in their Individual Capacities .......................... 131
Section 10.09     Successor Agents ......................................................... 131
Section 10.10     Administrative Agent May File Proofs of Claim; Credit Bidding .......... 132
Section 10.11     Other Agents; Arrangers and Managers ...................... 133
Section 10.12     Certain ERISA Matters ............................................... 134

**ARTICLE XI MISCELLANEOUS** ..................................................................... **135**

Section 11.01     Amendments, Etc. ....................................................... 135
Section 11.02     Notices and Other Communications; Facsimile and Electronic Copies ......... 139
Section 11.03     No Waiver; Cumulative Remedies ............................... 143
Section 11.04     Costs and Expenses ..................................................... 143
Section 11.05     Indemnification ........................................................... 144
Section 11.06     Payments Set Aside ..................................................... 145
Section 11.07     Successors and Assigns ............................................... 145
Section 11.08     Confidentiality ............................................................ 150

iii

### TABLE OF CONTENTS (Cont.)

Page

| | | |
|---|---|---|
| Section 11.09 | Setoff | 152 |
| Section 11.10 | Release of Collateral and Guarantee | 152 |
| Section 11.11 | Counterparts | 153 |
| Section 11.12 | Integration | 153 |
| Section 11.13 | Survival of Representations and Warranties | 153 |
| Section 11.14 | Severability | 154 |
| Section 11.15 | GOVERNING LAW | 154 |
| Section 11.16 | WAIVER OF RIGHT TO TRIAL BY JURY | 154 |
| Section 11.17 | Binding Effect | 154 |
| Section 11.18 | [Reserved] | 155 |
| Section 11.19 | PATRIOT Act | 155 |
| Section 11.20 | Interest Rate Limitation | 155 |
| Section 11.21 | [Reserved] | 155 |
| Section 11.22 | [Reserved | 155 |
| Section 11.23 | No Fiduciary Duty | 155 |
| Section 11.24 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 156 |
| Section 11.25 | Acknowledgement Regarding Any Supported QFCs | 156 |

iv

SCHEDULES

Schedule 1.01       -       Subsidiary Guarantors
Schedule 2.01       -       Commitments
Schedule 2.15       -       Syndication Parties
Schedule 5.07(b)    -       Owned Real Property
Schedule 5.13       -       Subsidiaries and Other Equity Investments
Schedule 7.02(e)    -       Investments
Schedule 7.03(v)    -       Indebtedness

EXHIBITS

Exhibit A-1     -       Form of Committed Loan Notice
Exhibit A-2             Form of Letter of Credit Request
Exhibit B       -       Form of Prepayment Notice
Exhibit C       -       Form of Note
Exhibit D       -       [Reserved]
Exhibit E       -       Form of Assignment and Assumption
Exhibit F       -       Form of Guarantee
Exhibit G       -       Form of Perfection Certificate
Exhibit H       -       Form of Withdrawal Notice
Exhibit I       -       [Reserved]
Exhibit J-1     -       Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                        are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-2     -       Form of U.S. Tax Compliance Certificate (For Foreign Participants
                        that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-3     -       Form of U.S. Tax Compliance Certificate (For Foreign Participants
                        that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-4     -       Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                        are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit K       -       [Reserved]
Exhibit L       -       [Reserved]
Exhibit M       -       Initial Approved Budget

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of [●], 2025, among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as Trico Group, LLC) and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as Trico Group Holdings, LLC) and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Parent"), each Restricted Subsidiary that is a Guarantor (as defined below) and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, THE LENDERS FROM TIME TO TIME PARTY HERETO, WILMINGTON SAVINGS FUND SOCIETY, FSB ("WSFS"), as administrative agent (together with its permitted successors in such capacity, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"), and OPY Credit Corp. ("OPY") as Trading Agent.

**PRELIMINARY STATEMENTS**

WHEREAS, on or around [●], 2025 (the "Petition Date"), the Parent, the Borrower and certain Subsidiaries of the Borrower (collectively, the "Debtors" and, each individually, a "Debtor") voluntarily commenced chapter 11 cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and the Debtors have retained possession of their assets and the management of their business pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain of the Lenders (together with the Prepetition First Lien Term Lenders (as defined below)) provided certain secured Indebtedness to the Borrower pursuant to that certain First Lien Term Loan Agreement, dated as of February 2, 2018, among the Parent, the Borrower, Jefferies Finance, LLC, as administrative agent and collateral agent (in such capacity, the "Prepetition First Lien Agents"), and the lenders party thereto from time to time (the "Prepetition First Lien Term Lenders") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition First Lien Credit Agreement");

WHEREAS, prior to the Petition Date, certain of the Lenders provided $24,500,000 million of Incremental Term Loans (under, and as defined in, the Prepetition First Lien Credit Agreement) to the Borrower (the "Prepetition Bridge Facility") pursuant to the Amendment No. 18 to First Lien Term Loan Agreement, dated as of September 25, 2025;

WHEREAS, on the Petition Date, the Prepetition First Lien Term Lenders were owed approximately $[4,637,000,000] in outstanding principal balance of Term Loans (as defined in, and in accordance with, the Prepetition First Lien Credit Agreement) (the "Prepetition First Lien Term Loans") plus interest, fees, costs and expenses and all other Prepetition First Lien Obligations under the Prepetition First Lien Credit Agreement;

WHEREAS, prior to the Petition Date, certain of the Lenders (together with the Prepetition Sidecar Lenders (as defined below)) provided financing to the Borrower pursuant to that certain First Lien Term Loan Agreement, dated as of June 16, 2025, among the Parent, the Borrower, the Prepetition Sidecar Agents, and the lenders party thereto from time to time (the "Prepetition Sidecar Lenders") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Sidecar Credit Agreement");

1

WHEREAS, on the Petition Date, the Prepetition Sidecar Lenders were owed approximately $[●] in outstanding principal balance of Term Loans (as defined in the Prepetition Sidecar Credit Agreement) (the "Prepetition Sidecar Term Loans") plus interest, fees, costs and expenses and all other Prepetition Sidecar Obligations under the Prepetition Sidecar Credit Agreement;

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, the Borrower has requested that the Lenders extend credit to the Borrower in the form of senior secured superpriority debtor-in-possession credit facility (the "DIP Facility") comprised of (i) term loans in an initial aggregate principal amount equal to $[1,100,000,000] (the "New Money Term Loans") available in Dollars, (ii) prepetition term loans in an aggregate principal amount not to exceed, after giving effect to the making of the Interim New Money Term Loans and the Final New Money Term Loans (on a proportional basis), $[3,300,000,000] (such amount, the "Roll-Up Cap", and the "Roll-Up Loans", together with the New Money Term Loans, the "Term Loans"), which Roll-Up Loans will result from the assignment and waiver of certain of the Prepetition First Lien Term Loans and Prepetition Sidecar Term Loans upon funding of the Interim New Money Term Loans and the Final New Money Term Loans, in each case, pursuant to and in accordance with the Syndication (as defined below), and (iii) a letter of credit facility with an aggregate commitment not to exceed $[100,000,000];

WHEREAS, the priority of the DIP Facility with respect to the Collateral granted as security for the payment and performance of the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case, upon entry thereof by the Bankruptcy Court, and in the Collateral Documents;

WHEREAS, all claims and the Liens granted under the Orders and the Credit Documents to the Administrative Agent, the Lenders and the other Secured Parties in respect of the DIP Facility shall be subject to the Carve-Out;

WHEREAS, the Borrower the Parent and the other Guarantors are engaged in related businesses, and the Parent and each other Guarantor will derive substantial direct and indirect benefit from the making of the extensions under this Agreement; and

WHEREAS, the Lenders are willing to make available to the Borrower the credit facilities described herein subject to and on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Bid" means a bid or series of bids (whether individual or related) for all or substantially all of the Debtors' assets, in which the aggregate cash consideration for such bid or bids would be payable to the Lenders in satisfaction of the Term Loans plus interest, fees, costs and expenses, and is not less than the amount necessary to repay all New Money Term Loans and all Roll-Up Loans indefeasibly in cash or is otherwise consented to by Required Lenders.

**Debtors' Exhibit No. 11**
**Page 9 of 168**

"Accounts" has the meaning specified in Article 9 of the UCC.

"Actual Borrower Professional Fees" means with respect to any period, the amount of restructuring and professional fees expended during such period for which the Loan Parties are liable for payment (including as reimbursement to any Secured Party or the Lender Advisors) that correspond to the heading ["Professional Fees"] in the Approved Budget as then in effect.

"Actual Cash Receipts" shall mean with respect to any period, as the context requires, (x) the amount of actual receipts during such period of the Loan Parties (excluding any borrowings under this Agreement or the Prepetition Credit Agreements) under the heading ["Total Operating Receipts"] in the Approved Budget and/or (y) the sum, for such period, of all such receipts for all such line items which comprise ["Total Operating Receipts"] (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect. For the avoidance of doubt, any proceeds received from asset sales shall be excluded (other than the factoring of accounts receivable in the ordinary course of business).

"Actual Disbursement Amounts" shall mean with respect to any period, the sum, for such period, of all such disbursements for all such line items which comprise ["Total Operating Disbursements", "Total Non-Operating Receipts / (Disbursements)", and "Total Restructuring Receipts/ (Disbursements)"] (as set forth in the Approved Budget) on a cumulative basis, as determined by reference to the Approved Budget as then in effect.

"Acquisition" means the purchase or other acquisition of all or substantially all of the property and assets or business of any Person or of assets constituting a business unit, a line of business or division of such Person, or of a majority of the Equity Interests in a Person.

"Ad Hoc Group" means the ad hoc group of Lenders, Prepetition First Lien Term Lenders, Prepetition Sidecar Lenders, and Prepetition Second Lien Term Lenders represented by the Lender Advisors.

"Adequate Protection Claims" shall have the meaning assigned to such term in the DIP Order.

"Adequate Protection Liens" shall have the meaning assigned to such term in the DIP Order.

"Adequate Protection Obligations" shall have the meaning assigned to such term in the DIP Order.

"Adjusted EURIBOR" means, with respect to any Borrowing denominated in Euros for any Interest Period, an interest rate per annum equal to (i) EURIBOR Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means WSFS, in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with Section 10.09.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth in Section 11.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

**Debtors' Exhibit No. 11**
**Page 10 of 168**

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, controls, is Controlled by or is under common Control with the Person specified.

"<u>Agent-Related Persons</u>" mean the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"<u>Agents</u>" means, collectively, the Administrative Agent, the Collateral Agent, the Escrow Agent and, where applicable, the Trading Agent.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Allocation Parties</u>" means the members of the Ad Hoc Group that have agreed to purchase New Money Term Loans from the Fronting Lender.

"<u>Alternate Currencies</u>" means Euros and such additional currencies as may be agreed by the Administrative Agent (acting at the Direction of the Required Lenders).

"<u>Alvarez & Marsal</u>" means Alvarez & Marsal Holdings, LLC as financial advisor to the Borrower.

"<u>AML Laws</u>" means all Laws of any jurisdiction applicable to any Lender, the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to terrorism financing or money laundering, including, without limitation, Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957) and all Laws comprising or implementing these Laws.

"<u>Anchor Premium</u>" has the meaning specified in <u>Section 2.09(b)</u>.

"<u>Anti-Corruption Laws</u>" means all Laws of any jurisdiction applicable to the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to bribery or corruption, including, without limitation, the FCPA.

"<u>Applicable Lending Office</u>" means for any Lender, such Lender's office, branch or affiliate designated for EURIBOR Loans, SOFR Loans or Base Rate Loans, as applicable, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to <u>Section 3.01(e)</u> and <u>Section 3.02</u>, be changed by such Lender upon 10 days' prior written notice to the Administrative Agent and the Borrower.

"<u>Applicable Rate</u>" means, (a) with respect to New Money Term Loans, (x) with respect to SOFR Loans or EURIBOR Loans, 10.00%, of which 1.55% shall be paid in cash and 8.45% shall be Paid in Kind and (y) with respect to Base Rate Loans, 9.00%, of which 1.55% shall be paid in cash and 7.45% shall be Paid in Kind and (b) with respect to Roll-up Loans, (x) with respect to SOFR Loans or EURIBOR Loans, 7.00%, which shall be Paid in Kind and (y) with respect to Base Rate Loans, 6.00%, which shall be Paid in Kind.

4

"<u>Appropriate Lender</u>" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"<u>Approved Business Plan</u>" has the meaning assigned to such term in <u>Section 6.16(b)</u>.

"<u>Approved Budget</u>" means the initial Approved Budget and each Approved Budget delivered pursuant to <u>Section 6.17</u>. The initial Approved Budget is attached hereto as Exhibit M.

"<u>Approved Budget Variance Report</u>" shall mean a report provided by the Borrower to the Administrative Agent, for prompt further delivery to the Lenders, (a) showing, in each case, on a line item by line item and cumulative basis, the Actual Cash Receipts, the Actual Disbursement Amounts, actual U.S. Bank Cash, Liquidity, and Actual Borrower Professional Fees as of the last day of the prior week, and the Variance Testing Period then most recently ended, noting therein (i) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Disbursement Amounts, budgeted U.S. Bank Cash, Budgeted Liquidity and Budgeted Borrower Professional Fees for such period as set forth in the Approved Budget as in effect for such period and (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (iii) certifying compliance or non-compliance with such maximum variances set forth herein, and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intends to take with respect thereto, and (b) which such reports shall be certified by a Responsible Officer of the Borrower and shall be in a form, and shall contain supporting information, satisfactory to the Required Lenders in their sole discretion (it being acknowledged and agreed that the form of the variance report provided by the Borrower to the Lenders prior to the Closing Date shall be deemed satisfactory); <u>provided</u>, that Actual Cash Receipts shall not be required to be reported or tested (notwithstanding anything to the contrary contained herein or in any Loan Document) prior to the date that is six (6) weeks after the Closing Date.

"<u>Approved Fund</u>" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"<u>Assignment and Assumption</u>" means an Assignment and Assumption substantially in the form of <u>Exhibit E</u>.

"<u>Attorney Costs</u>" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of any law firm or other external legal counsel.

"<u>Attributable Indebtedness</u>" means, at any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that appears on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"<u>Audited Financial Statements</u>" has the meaning specified in <u>Section 4.01(g)</u>.

"<u>Auto-Renewal Letter of Credit</u>" has the meaning specified in **Error! Reference source not found.**.

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and

**Debtors' Exhibit No. 11**
**Page 12 of 168**

not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.19(d).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable to the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the greatest of (i) the Prime Rate, (ii) ½ of 1.00% per annum above the Federal Funds Rate; (iii) Adjusted Term SOFR for a one-month tenor in effect on such day plus 1.00%; and (iv) 2.00%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, initially, (x) with respect to any Borrowing denominated in Euros, the EURIBOR Rate and (y) with respect to any Borrowing denominated in Dollars, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the EURIBOR Rate or the Term SOFR Reference Rate, as applicable, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.19(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(x) with respect to any Borrowing denominated in Euros, the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Euro-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment; and

6

(y) with respect to any Borrowing denominated in Dollars, (a) the sum of (i) Daily Simple SOFR and (ii) the Benchmark Replacement Adjustment and (b) the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (x) or (y) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for (x) Dollar-denominated syndicated credit facilities at such time, in the case of SOFR Loans or (y) Euro-denominated syndicated credit facilities at such time, in the case of EURIBOR Loans.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of a Committed Loan Notice or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.05 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been

7

determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof)

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.19 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.19.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

**Debtors' Exhibit No. 11**
**Page 15 of 168**

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (pursuant to ERISA Section 3(42)) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Borrower" has the meaning specified in the introductory paragraph of this Agreement.

"Borrower Maturity Election" has the meaning specified in Section 2.18(a).

"Borrowing" means the incurrence of one Class and Type of Term Loans having, in the case of Term SOFR Loans or EURIBOR Loans, the same Interest Period.

"Budgeted Borrower Professional Fees" shall mean with respect to any period, the amount of restructuring and professional fees for such period that are set forth under the headings ["Professional Fees"] in the Approved Budget, as then in effect.

"Budgeted Cash Receipts" means with respect to any period, as the context requires, (x) the line item under the heading ["Total Operating Receipts"] in the Approved Budget and/or (y) the sum, for such period, of all the amounts for all such line items which comprise ["Total Operating Receipts"] (as set forth in the Approved Budget), on a cumulative basis, in each case, as determined by reference to the Approved Budget as then in effect.

"Budgeted Disbursement Amounts" means with respect to any period, as the context requires, the sum of all such line items under the headings ["Total Operating Disbursements", "Total Non-Operating Receipts/(Disbursements)" and "Total Restructuring Receipts/(Disbursements)"] (as set forth in the Approved Budget), as determined by reference to the Approved Budget as then in effect.

"Budgeted Liquidity" shall mean as of any date of determination, as the context requires, for the Loan Parties, the amount set forth as of such date as Liquidity, in each case as determined by reference to the Approved Budget as then in effect.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of, or are in fact closed in, the province or state where the Administrative Agent's Office is located and in the State of New York, except that, when used in connection with a EURIBOR Loan, "Business Day" shall not include any day on which TARGET is authorized or required by law to close.

"Capital Lease" means, in respect of any Person, any lease of or other arrangement conveying the right to use, property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person; provided that all leases of any Person that are or would have been characterized as operating leases in accordance with GAAP as in effect immediately prior to the Closing Date shall continue to be accounted for as operating leases (and not as Capital Leases) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such leases to be recharacterized as Capital Leases.

"Capital Lease Obligation" means, with respect to any Person, at any time of determination, all obligations of such Person as lessee under Capital Leases, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

**Debtors' Exhibit No. 11**
**Page 16 of 168**

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Equivalents" means any of the following, to the extent owned by Parent or any of its Restricted Subsidiaries, having a maturity of not greater than 365 days from the date of acquisition thereof: (a) Dollars, (b) [reserved], (c) [reserved], (d) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (e) insured certificates of deposit, time deposits, money market deposits, bankers' acceptances and time deposits (or similar instruments), in each case with any commercial bank having capital and surplus of not less than $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person, (f) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities, (g) securities with maturities of 365 days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A-1 by S&P or P-1 by Moody's (or, if at any time neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized statistical rating agency), (h) commercial paper maturing no more than one year from the date of creation thereof and having a rating of at least A-1 by S&P or P-1 by Moody's, (i) securities with maturities of six (6) months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (e) of this definition, (j) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (d) through (i) of this definition and (k) Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of the other Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $1,000,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (d) and (e) of this definition.

"Cash Management Order" means [●].

"Casualty Event" means any casualty, loss, damage, destruction or any condemnation or other taking by a Governmental Authority pursuant to the power of eminent domain or other similar loss with respect to real or personal property or improvements of the Borrower and the other Restricted Subsidiaries resulting in receipt by the Borrower or any other Restricted Subsidiary of payments or proceeds (including cash and Cash Equivalents) under any casualty insurance policy or proceeds of a condemnation award in respect of any such property.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law) (in each case, regardless of whether the same had been proposed as of the date of this Agreement); provided that notwithstanding anything herein the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States

**Debtors' Exhibit No. 11**
**Page 17 of 168**

or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>CFC</u>" means a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"<u>CFC Domestic Person</u>" means any Domestic Subsidiary substantially all the assets of which consist of equity and/or debt of one or more CFCs (or other CFC Domestic Persons) and cash or cash equivalents.

"<u>Change of Control</u>" means the earliest to occur of:

(a)      the Parent ceasing to own directly 100% of the Equity Interests of the Borrower;

(b)      at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Parent in the aggregate;

(c)      at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the lesser of (i) 35% of the then outstanding voting stock of Parent in the aggregate and (ii) the aggregate amount of outstanding voting stock of Parent held, directly or indirectly, by the Permitted Holders; or

(d)      a "Change of Control" under (and as defined in) the Prepetition First Lien Credit Agreement, the Prepetition Sidecar Credit Agreement, the Prepetition Second Lien Credit Agreement or the Prepetition ABL Credit Agreement.

Notwithstanding the foregoing, in no event shall a "Change of Control" be deemed to have occurred herein in connection with any sale of all or substantially all of the assets of the Borrower or its Subsidiaries to the extent such transaction is consummated as part of a Chapter 11 Plan.

"<u>Chapter 11 Cases</u>" has the meaning specified in the recitals to this Agreement.

"<u>Chapter 11 Plan</u>" means any joint plan of reorganization to be filed by the Debtors in the Chapter 11 Cases, which shall be in form and substance acceptable to the Required Lenders.

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"<u>Class</u>" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing are New Money Term Loans or Roll-Up Loans, and, when used in reference to any Commitment, refers to whether such Commitment is a New Money Term Commitment, and when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment of such Class.

"<u>Closing Date</u>" means the date on which all the conditions precedent in <u>Section 4.01</u> were satisfied or waived in accordance with <u>Section 11.01</u> and the initial Credit Extension was made.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

11

"Collateral" means all the "Collateral" as defined in any Collateral Document and shall include the Prepetition Term Priority Collateral, Prepetition ABL Priority Collateral.

"Collateral Agent" means WSFS, in its capacity as collateral agent under the Loan Documents, or any successor collateral agent appointed in accordance with Section 10.09.

"Collateral Documents" means, collectively, the DIP Order, the Guaranty and each of the other agreements, instruments or documents that may be entered into that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties (or any of them), in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Commitment" means, with respect to each Lender (to the extent applicable), such Lender's New Money Term Commitment.

"Committed Loan Notice" means a notice of a Term Borrowing pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A-1.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.).

"Communications" has the meaning specified in Section 11.02(e).

"Company Competitor" means any competitor of the Borrower and/or any of its Subsidiaries.

"Company Customer" means any customer of the Borrower and/or any of its Subsidiaries.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Confirmation Order" means an order of the Bankruptcy Court confirming a Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Total Debt" means, with respect to the Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, an amount equal to the sum of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), (h) (without duplication and only to the extent of Guarantee Obligations of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), and (k) of the definition thereof), and (k) of the definition thereof; provided that "Consolidated Total Debt" shall be calculated (x) net of Unrestricted Cash and (y) excluding any obligation, liability or indebtedness of Parent or any of its Restricted Subsidiaries if, upon or prior to the maturity thereof, there shall have been irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in any computation of Unrestricted Cash.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

12

**Debtors' Exhibit No. 11**
**Page 19 of 168**

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Parties" has the meaning assigned to such term in Section 11.02(f).

"Credit Extension" means a Borrowing or an L/C Credit Extension.

"Credit Facilities" means each facility under this Agreement providing for Term Loans of a different Class.

"Current Assets" means, at any date, all assets of the Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) cash or Cash Equivalents (including cash and Cash Equivalents held on deposit for third parties by the Borrower or any of the other Restricted Subsidiaries), (ii) deferred bank fees and derivative financial instruments related to Indebtedness, and (iii) the current portion of current and deferred income taxes and taxes based on profit or capital).

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtor" or "Debtors" has the meaning specified in the recitals to this Agreement.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, fraudulent transfer, reorganization, or similar debtor relief Laws of the United States or any similar foreign, federal or state law for the relief of debtors from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate for the applicable Class of Base Rate Loans plus (c) 2.00% per annum; provided that with respect to a SOFR Loan or a EURIBOR Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (i) has failed to fund any portion of the Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder

**Debtors' Exhibit No. 11**
**Page 20 of 168**

(provided that any such Lender shall be a Defaulting Lender under this <u>clause (i)</u> solely (x) with respect to each Credit Facility with respect to which it has failed to fund and (y) during the occurrence and continuation of such failure to fund, until any such funding shortfall shall have been funded in full by such Lender), (ii) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other existing agreements under which it has an obligation to extend credit (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent to funding cannot be satisfied), (iii) failed, within three (3) Business Days after request by the Administrative Agent, to provide written confirmation that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (iii)</u> upon receipt by the Administrative Agent and the Borrower of such requested confirmation, (iv) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, (v) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or its parent company has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (which shall not include any Undisclosed Administration) or (vi) has become subject to a Bail-In Action; <u>provided</u> that (x) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to an SPC pursuant to <u>Section 11.07(g)</u> and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"<u>Definitive Documents</u>" means, collectively, all material documents, instruments, deeds, notifications, agreements, and filings related to the documentation, implementation, and consummation of any Chapter 11 Plan, including, without limitation: (a) the Chapter 11 Plan; (b) the Confirmation Order; (c) the Disclosure Statement (and any motions or orders related thereto); (d) the order of the Bankruptcy Court approving the Disclosure Statement; (e) the Solicitation Materials; (f) the First Day Pleadings and all orders sought pursuant thereto; (g) any supplement to the Chapter 11 Plan (including but not limited to any restructuring transactions memorandum and/or schedules to assume, reject or renegotiate executory contracts and unexpired leases); (h)(x) the Loan Documents (including the Approved Budget and each motion filed with the Bankruptcy Court seeking entry of the DIP Orders) and (y) any documents in connection with a debtor-in-possession facility with respect to the Prepetition ABL Loans; (i) the DIP Orders; (j) [reserved]; (k) any material documents and/or filings with the Bankruptcy Court providing for any key employee incentive and/or retention plan(s); (l) any new Organization Documents (including any shareholders' or similar agreements and/or any corporate formational documents necessary or desirable to give effect to the Chapter 11 Plan); (m) any exit facility documents; (n) [reserved]; and (o) all other material pleadings and/or other material documents filed with the Bankruptcy Court; in each case, including any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable). For the avoidance of doubt, all Definitive Documents shall (i) be reasonably satisfactory to the Required Lenders. and (ii) not provide for any treatment or recovery on account of DIP Term Loan Claims, Prepetition First Lien Term Loan Claims, Prepetition Sidecar Claims or Prepetition Second Lien Term Loan Claims that are not consented to by the Required Lenders in their sole discretion.

"<u>Deposit Account</u>" has the meaning set forth in the Uniform Commercial Code.

14

"<u>Deposit Account Control Agreement</u>" means an account control agreement (in form and substance reasonably satisfactory to the Collateral Agent acting at the Direction of the Required Lenders) among any Loan Party, a banking institution holding such Loan Party's funds, and the Collateral Agent with respect to collection and control (within the meaning of the New York UCC) of all deposits and balances held in a Deposit Account maintained by such Loan Party with such banking institution.

"<u>DIP Order</u>" means the Interim Order and the Final Order, as applicable.

"<u>DIP Term Loan Claims</u>" means any Claim that arises under the Loan Documents.

"<u>Direction of the Required Lenders</u>" means a written direction or instruction from the Lenders constituting the Required Lenders which may be in the form of email or other form of written communication from the Lender Advisors. Any such email or other form of written communication from Lenders Advisors shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders and Lenders Advisors shall be conclusively presumed to have acted on behalf of and at the written direction or instruction from the Required Lenders (and the Administrative Agent shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders, such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Lenders, such consent, approval or determination may be communicated by a Direction of the Required Lenders as contemplated above and any reference to the Administrative Agent taking an action or omitting to take an action with the "consent" or at the "direction" or "instruction" of the Required Lenders (or any expressions of similar import) shall be interpreted to include a Direction of the Required Lenders. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any written direction or instruction that is purported to be a Direction of the Required Lenders, and the Administrative Agent shall not have any responsibility to independently determine whether such direction or instruction has in fact been authorized by the Required Lenders.

"<u>Disclosure Statement</u>" means a disclosure statement disclosing the terms and conditions of the Chapter 11 Plan, as may be amended, supplemented, or otherwise modified from time-to-time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition of any asset or property by a Person (including any sale of Equity Interests, but excluding any issuance by a Person of its own Equity Interests), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Disqualified Equity Interests</u>" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a Change of Control, Qualifying IPO or asset sale so long as any rights of the holders thereof upon the occurrence of a Change of Control, Qualifying IPO or asset sale event shall be subject to the occurrence of the Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case,

**Debtors' Exhibit No. 11**
**Page 22 of 168**

prior to the date that is ninety one (91) days after the Latest Maturity Date; provided that, (i) if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent or any of its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Parent or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations, (ii) no Equity Interest held by any future, present or former Representative (or its Affiliates or any Immediate Family Member who is a successor-in-interest to the relevant Representative) of the Borrower (or any Parent Company or Subsidiary thereof) shall be considered a Disqualified Equity Interest because such Equity Interest is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time and (iii) any Equity Interests that would not constitute Disqualified Equity Interests but for provisions thereof that give the holders thereof (or the holders of any security into which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of any Change of Control, Qualifying IPO or any asset sale occurring prior to ninety one (91) days after the Latest Maturity Date shall not constitute Disqualified Equity Interests if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the Termination Date.

"Disqualified Institution" means (i) any Person designated by the Borrower in writing by name to the Administrative Agent prior to the Closing Date (and any Affiliate of such Person that is reasonably identifiable by name), (ii) Company Competitors and Company Customers who have been identified to the Administrative Agent and Lender Advisors in writing on or prior to the Closing Date, (iii) Objecting Lenders and (iv) Affiliates of the Persons identified in clauses (ii) and (iii) above that are identifiable as Affiliates thereof solely on the basis of such Person's name; provided, that the Borrower may supplement the list of Disqualified Institutions that are Company Competitors and Company Customers and Affiliates thereof in writing to the Administrative Agent (it being understood that (A) any such supplement shall not apply retroactively to disqualify a Person that has previously acquired an assignment or participation interest in a Loan and (B) with effect from the date of the Administrative Agent's receipt of a notice from the Borrower designating a Person as no longer being a "Disqualified Institution", references herein and in the other Loan Documents to a "Disqualified Institution" shall not include references to such Person) and provided, further, that Disqualified Institutions shall not include any Person which is a bona fide debt fund, investment vehicle, regulated bank entity or unregulated lending entity (other than any Person separately identified as a Disqualified Institution pursuant to clause (ii) above or included as a Disqualified Institution pursuant to clause (iii) above) that is engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of business so long as any Person identified in clauses (i) through (iv) above does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no member of the Ad Hoc Group on the date hereof may be designated or deemed to be a Disqualified Institution at any time.

"Disregarded Domestic Person" means any direct or indirect Domestic Subsidiary that is treated as a disregarded entity for U.S. federal income tax purposes and which holds equity of one or more Foreign Subsidiaries.

"Dollar Equivalent Amount" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in an Alternate Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent, at such time on the basis of the Spot Rate (determined as of the date of determination or such other date determined by the Administrative Agent) for the purchase of Dollars with such applicable Alternate Currency, as the case may be.

**Debtors' Exhibit No. 11**
**Page 23 of 168**

"<u>Dollars</u>" means lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender. Notwithstanding anything to the contrary herein, (i) (x) a Disqualified Institution or (y) any natural person shall, in each case, not be an "Eligible Assignee" and (ii) except as permitted under <u>Section 11.07(i)</u>, neither Parent nor any of its Affiliates may be an "Eligible Assignee".

"<u>Eligible Prepetition 1L Claims</u>" means, collectively, Prepetition First Lien Term Loans, Prepetition Sidecar Term Loans and any contingent or existing Prepetition L/C Borrowing in respect of a Prepetition Letter of Credit. For the avoidance of doubt any Prepetition Letter of Credit Commitment shall be an Eligible Prepetition 1L Claim.

"<u>Eligible Prepetition Lenders</u>" has the meaning specified in the Syndication Procedures.

"<u>Environmental Action</u>" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written request for information, notice of liability or potential liability, notice of governmental investigation, proceeding, consent order, consent decree or consent agreement relating in any way to any Environmental Law, any Environmental Permit, Hazardous Material or Environmental Liability including, without limitation, (a) by any Person with respect to enforcement (including citizen-suit enforcement pursuant to such provisions of Environmental Laws), Responses or damages, or (b) by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"<u>Environmental Laws</u>" means any and all Laws, decrees or other governmental restrictions of legal effect relating to the protection of the environment, to the Release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, or exposure to, Hazardous Materials.

"<u>Environmental Liability</u>" means any and all legal obligations or liabilities (including obligations to perform Response activities) related to Environmental Laws, Environmental Permits or Hazardous Materials.

**Debtors' Exhibit No. 11**
**Page 24 of 168**

"Environmental Permit" means any permit, approval, identification number, license or other Governmental Authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that is under common control with the Borrower or any of the other Restricted Subsidiaries and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Borrower or any of the other Restricted Subsidiaries, notification of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA for which the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate may be directly or indirectly liable, (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA or (l) a Foreign Plan Event.

**Debtors' Exhibit No. 11**
**Page 25 of 168**

"Erroneous Payment" has the meaning specified in Section 10.01(d)(i).

"Erroneous Payment Notice" has the meaning specified in Section 10.01(d)(ii).

"Escrow Agent" means the Escrow Agent under the Escrow Agreement, which shall initially be WSFS.

"Escrow Agreement" means an Escrow Agreement, dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time), among the Borrowers, the Escrow Agent and the Administrative Agent for and on behalf of the Lenders relating to the Loan Proceeds Account.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"EURIBOR Borrowing" means, as to any Borrowing, the EURIBOR Loans comprising such Borrowing.

"EURIBOR Interpolated Rate" means, at any time, with respect to any Borrowing denominated in Euros and for any Interest Period, the rate per annum (rounded to the same number of decimal places as the EURIBOR Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the EURIBOR Screen Rate for the longest period (for which the EURIBOR Screen Rate is available for Euros) that is shorter than the Impacted EURIBOR Rate Interest Period; and (b) the EURIBOR Screen Rate for the shortest period (for which the EURIBOR Screen Rate is available for Euros) that exceeds the Impacted EURIBOR Rate Interest Period, in each case, at such time. If the EURIBOR Interpolated Rate shall be less than zero, the EURIBOR Interpolated Rate shall be deemed to be the Floor.

"EURIBOR Loan" means a Loan that bears interest at a rate based on Adjusted EURIBOR.

"EURIBOR Rate" means, with respect to any Borrowing denominated in Euros and for any applicable Interest Period, the EURIBOR Screen Rate as of approximately 11:00 a.m. Brussels time two Business Days prior to the commencement of such Interest Period; provided that, if the EURIBOR Screen Rate shall not be available at such time for such Interest Period (an "Impacted EURIBOR Rate Interest Period") then the EURIBOR Rate for such Interest Period shall be the EURIBOR Interpolated Rate. If the EURIBOR Rate shall be less than zero, the EURIBOR Rate shall be deemed to be the Floor.

"EURIBOR Screen Rate" means the euro interbank offered rate administered by the European Money Markets Institute (or any other Person which takes over the administration of that rate) for the relevant period displayed (before any correction, recalculation or republication by the administrator) on page EURIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters as of 11:00 a.m. Brussels time two Business Days prior to the commencement of such Interest Period. If such page or service ceases to be available, the Administrative Agent may specify another page or service displaying the relevant rate after consultation with Borrower. If the EURIBOR Screen Rate shall be less than zero, the EURIBOR Screen Rate shall be deemed to be the Floor.

"Euro" means the single currency of the participating member states of the European Union.

"Euro Equivalent Amount" means, on any date of determination, (a) with respect to any amount denominated in Euros, such amount, and (b) with respect to any amount denominated in Dollars or an

19

Alternate Currency (other than Euros), the equivalent amount thereof in Euros as determined by the Administrative Agent, at such time on the basis of the Spot Rate (determined as of the date of determination or such other date determined by the Administrative Agent) for the purchase of Euros with Dollars or such applicable Alternate Currency (other than Euros), as the case may be.

"Event of Default" has the meaning specified in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Account" means any of the following:

(a)     accounts that are zero balance accounts; provided, that the available balance of each such zero balance account is automatically swept on each Business Day into another account that is subject to a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, for the benefit of the Collateral Agent and such Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, does not provide that such sweep is discontinued or terminated upon delivery of a notice of exclusive control (or other similar term, as defined in such Deposit Account Control Agreement or Security Account Control Agreement, as applicable);

(b)     any deposit account used exclusively for trust and fiduciary accounts, escrow accounts, accounts containing customer funds and other accounts established by any Grantor exclusively for the benefit of third parties (that are not Grantors);

(c)     any deposit account used exclusively for payroll account, payroll tax account, benefit account, other employee wage and benefit account;

(d)     any account with an aggregate balance not exceeding $5,000,000 at any one time that is established to support liquidity needs of any of the Borrower or its Subsidiaries in Mexico; and

(e)     accounts holding solely taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)).

"Excluded Asset" means (i) the stock or securities of (x) any Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person (other than any such subsidiaries that are "first-tier" subsidiaries that are directly owned by a Loan Party) and (y) any Domestic Subsidiary that is a direct or indirect Subsidiary of any entity described in the preceding clause (x); provided that, the stock or securities of such Subsidiaries listed in the preceding clauses (x) and (y) shall cease to be Excluded Assets following a period of 45 days from the Closing Date, unless the Borrower reasonably demonstrates to the Administrative Agent (acting at the Direction of the Required Lenders) that the burden or cost (including tax consequences) of pledging such stock or securities described in the preceding clauses (x) and (y) would be excessive in view of the benefits afforded thereby, (ii) any property or assets to the extent that the Collateral Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date, or (iii) any property or assets the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (ii) and (iii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation; provided, however, that Excluded Assets shall not include any proceeds,

20

**Debtors' Exhibit No. 11**
**Page 27 of 168**

substitutions, replacements, economic interest and economic value unless such proceeds, substitutions, replacements economic interest and economic value constitute Excluded Assets in accordance with clause (ii) or (iii) above.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means, (a) with respect to each Agent, the L/C Issuer and each Lender, Taxes imposed on or measured by net income (however denominated), net profits (including any branch profits taxes), franchise Taxes and backup withholding Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, being a resident of, or having its principal office or Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any withholding Tax that is imposed by the United States on amounts payable to a Lender under the law in effect at the time (i) such Lender becomes a party to this Agreement other than pursuant to an assignment made under Section 3.07 or (ii) such Lender changes its lending office; provided that clause (b) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to clause (b)) do not exceed the indemnity payment or additional amounts that the Person making the assignment or transfer to such Lender or the Lender changing its lending office would have been entitled to receive in the absence of such assignment or transfer, other than an assignment made pursuant to Section 3.07(b) or in the absence of such change of lending office, (c) any Tax that is attributable to a Lender's or Agent's failure to comply with Section 3.01(f), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code, and any legislation, regulation or guidance giving effect to such intergovernmental agreements.

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

Debtors' Exhibit No. 11
Page 28 of 168

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"<u>Fee Letter</u>" means the Fee Letter dated as of [●], 2025 among the Administrative Agent, the Fronting Lender and the Borrower.

"<u>Final Draw Syndication Closing Date</u>" has the meaning set forth in the Syndication Procedures.

"<u>Final New Money Term Loans</u>" has the meaning set forth in Section 2.01(a).

"<u>Final Order</u>" means the order entered by the Bankruptcy Court approving the Term Loans on a final basis, in form and substance satisfactory to the Required Lenders, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders.

"<u>First Day Pleadings</u>" means the first-day motions and related pleadings that the Debtors determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"<u>Fiscal Year</u>" means the fiscal year of the Borrower and the other Restricted Subsidiaries ending on December 31 of each calendar year.

"<u>Floor</u>" means 1.00%.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Plan</u>" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States.

"<u>Foreign Plan Event</u>" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of liability by any Loan Party or any of their respective Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any material transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"<u>Foreign Subsidiary</u>" means any direct or indirect Subsidiary organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

**Debtors' Exhibit No. 11**
**Page 29 of 168**

"<u>Fronting Lender</u>" means Morgan Stanley Senior Funding, Inc., solely in its capacity as the initial Lender as of the Closing Date.

"<u>Fund</u>" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP, the methodologies thereunder or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and it is agreed that such amendment to effectuate such changes shall not require the payment of any amendment or similar fee to the Administrative Agent or the Lenders. Without limiting the generality of the foregoing, the Borrower shall neither be deemed to be in compliance with any covenant hereunder nor out of compliance with any covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

"<u>Governmental Authority</u>" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, any central bank or supra-national authority and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Governmental Authorization</u>" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"<u>Granting Lender</u>" has the meaning specified in <u>Section 11.07(g)</u>.

"<u>Guarantee</u>" means the Guaranty executed by the Loan Parties substantially in the form of <u>Exhibit F</u>.

"<u>Guarantee Obligations</u>" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or

23

determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means Parent and the Subsidiary Guarantors.

"Guaranty" means the Guarantee, as supplemented by each Guaranty Supplement delivered pursuant to Section 6.11.

"Guaranty Supplement" means a supplement to the Guarantee in substantially the form attached as Exhibit A thereto.

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise defined under or pursuant to any Environmental Law as "hazardous", "toxic", a "pollutant", a "contaminant", a "deleterious substance", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, urea formaldehyde insulation and chlorofluorocarbons and all other regulated ozone-depleting substances.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, corporation, limited liability company, partnership or other bona fide estate-planning vehicle the only stockholders, members, partners or beneficiaries of which are any of the foregoing individuals or a charity, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Indebtedness" of any Person means, as to any Person at a particular time, without duplication, all of the following:

(a)    all obligations of such Person for borrowed money;

(b)    all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, but excluding all obligations of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(c)    all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person;

(d)    all obligations, other than intercompany items, of such person to pay the deferred purchase price of property (other than trade accounts payable and accrued expenses arising in the ordinary course of business);

(e)    the Attributable Indebtedness of such Person in respect of Capital Lease Obligations;

(f)    without duplication, (i) all obligations, contingent or otherwise, of such Person to reimburse any bank or other Person in respect of amounts paid or payable under a letter of credit, bankers'

24

acceptance or similar instrument, and (ii) all non-contingent obligations (and, for purposes of Indebtedness permitted under Section 7.03, all contingent obligations) of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(g)     all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on any property or asset of such Person, whether or not such obligation is assumed by such Person, _provided_ that the aggregate amount of such obligations does not exceed the lesser of (i) the aggregate unpaid amount of the relevant obligation and (ii) the fair market value of the assets by which the obligations are secured;

(h)     all guarantees by such Person of other obligations of third parties treated as Indebtedness pursuant to clauses (a)-(g) above or (i)-(l) below;

(i)     all Disqualified Equity Interests of such Person;

(j)     all net obligations arising under or in connection with Swap Contracts to which such Person is party;

(k)     all purchase money obligations of such Person; and

(l)     the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person shall not be liable therefor and only to the extent the relevant Indebtedness is of the type that would be included in the calculation of Consolidated Total Debt;

_provided_ that (A) to the extent not constituting Indebtedness for borrowed money, Indebtedness shall not include (i) deferred compensation arrangements, (ii) earn-out obligations and purchase price adjustments unless and until the same are required by GAAP to be reflected on the balance sheet of such Person or (iii) non-compete or consulting obligations incurred in connection with permitted Acquisitions or permitted Dispositions and (B) notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness hereunder but for the application of clause (B) of this proviso shall not be deemed an incurrence of Indebtedness hereunder.

"Indemnified Liabilities" has the meaning specified in Section 11.05.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.05.

"Information" has the meaning specified in Section 11.08(l).

"Initial Draw Syndication Closing Date" has the meaning set forth in the Syndication Procedures.

**Debtors' Exhibit No. 11**
**Page 32 of 168**

"Intellectual Property" has the meaning specified in Section 5.16.

"Interest Payment Date" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided that if any Interest Period for a SOFR Loan or a EURIBOR Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each SOFR Loan and each EURIBOR Loan, (i) initially, the period commencing on the date such SOFR Loan or EURIBOR Loan is disbursed or converted to or continued as a SOFR Loan or EURIBOR Loan as applicable, and ending on the date that is six (6) months after such disbursement, conversion or continuation, as applicable, and (ii) thereafter, the period commencing on the first date immediately following the prior Interest Period and ending on the date that is three (3) months after such date; provided that:

(a)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)        any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)        no Interest Period shall extend beyond the Maturity Date.

"Interim New Money Term Loans" has the meaning set forth in Section 2.01(a).

"Interim Order" means the order entered by the Bankruptcy Court approving the Term Loans on an interim basis, in form and substance satisfactory to the Required Lenders, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders.

"Investigation" has the meaning set forth in Section 6.20.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or Indebtedness or the assets comprising a division or business unit or all or substantially all of the business of such Person (including any partnership or joint venture), or any capital contribution to such Person.

"Latest Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Loan.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local laws, statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

26

"<u>L/C Borrowing</u>" means a Borrowing deemed to occur in accordance with **Error! Reference source not found.** upon the automatic conversion of any Unreimbursed Amount at the Conversion Time in respect thereof.

"<u>L/C Credit Extension</u>" means, with respect to the Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"<u>L/C Documents</u>" means, as to the Letter of Credit, each Letter of Credit Application, each Letter of Credit Request and any other document, agreement and instrument entered into by the Borrower or a Subsidiary with or in favor of the L/C Issuer and in each case relating to the Letter of Credit.

"<u>L/C Issuer</u>" means any Lender that becomes an L/C Issuer in accordance with <u>Section 11.07(j)</u> in its capacity as an issuer of the Letter of Credit hereunder, or any successor issuer of the Letter of Credit hereunder.

"<u>L/C Obligation</u>" means, as at any date of determination, without duplication, (i) the aggregate maximum amount available to be drawn under the outstanding Letter of Credit during the remaining life thereof, or (ii) if the Letter of Credit is drawn, the aggregate of all Unreimbursed Amounts in respect of the Letter of Credit, or (iii) if the Conversion Time has occurred, the aggregate principal amount of all L/C Borrowings.

"<u>Lender</u>" means (a) the Fronting Lender, (b) the Persons listed on Schedule 2.01, (c) any other Person that shall become a party hereto as a "lender" pursuant to <u>Section 10.04</u>, including, without limitation, any other Person that shall become a Lender hereto as a result of purchasing New Money Term Loans in accordance with the Syndication pursuant to <u>Section 2.01</u>, (d) any Roll-Up Lender and (e) each Person that becomes a party hereto as a "lender" pursuant to the terms of <u>Section 2.15</u>.

"<u>Lender Advisor</u>" shall mean (x) Gibson, Dunn & Crutcher LLP, as legal counsel, (y) Evercore Group L.L.C., as financial advisor, and (z) any other advisor or consultant hired by the Ad Hoc Group in consultation with the Borrower.

"<u>Letter of Credit</u>" means a standby letter of credit issued by the L/C Issuer for the account of the Borrower.

"<u>Letter of Credit Application</u>" means an application and agreement for the issuance or amendment of the Letter of Credit in the form from time to time in use by and reasonably satisfactory to the L/C Issuer.

"<u>Letter of Credit Commitment</u>" means, with respect to an L/C Issuer, an amount that such L/C Issuer and the Borrower may agree to, with the consent of the Required Lenders, or, if the L/C Issuer has entered into an Assignment and Assumption, the amount set forth for the L/C Issuer in the Register maintained by the Administrative Agent pursuant to <u>Section 11.07(c)</u> as the L/C Issuer's "Letter of Credit Commitment." The total amount of the Letter of Credit Commitment on the Closing Date is $0, and the aggregate Letter of Credit Commitments shall not exceed $0 at any time. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Revolving Lender, other than the L/C Issuer, shall at any time have a Letter of Credit Commitment at any time that the Letter of Credit Facility exists.

"<u>Letter of Credit Facility</u>" means a letter of credit facility made available by the L/C Issuer pursuant to **Error! Reference source not found.**.

"<u>Letter of Credit Facility Expiration Date</u>" means the day that is thirty (30) days prior to the scheduled Maturity Date then in effect for the Letter of Credit Facility.

**Debtors' Exhibit No. 11**
**Page 34 of 168**

"Letter of Credit Request" means (i) a request for the issuance of the Letter of Credit pursuant to **Error! Reference source not found.**, which shall be substantially in the form of Exhibit A-2 and (ii) a Letter of Credit Application.

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest or interest in the nature of security whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Liquidity" means, as of any date, the sum, without duplication of (i) the aggregate Dollar equivalent of all cash and Cash Equivalents held by the Parent and its Subsidiaries that are Debtors at such time in an account subject to a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable (it being agreed that Liquidity shall exclude any cash maintained in (x) any account used for payroll in the ordinary course of business and (y) the Loan Proceeds Account), plus (ii) Excess Availability (as defined in the Prepetition ABL Credit Agreement) to the extent such amount is available to be borrowed by the Debtors at such time. As used herein, the term "unrestricted" as it relates to such cash or Cash Equivalents excludes any such amounts representing deposits, escrows, sinking fund payments or other amounts that are otherwise encumbered (other than pursuant to the Loan Documents), held in trust, or dedicated for a particular use and/or which would not be characterized as "unrestricted cash" on the financial statements of such entities in accordance with GAAP.

"Loan" means an extension of credit by a Lender to the Borrower in the form of a Term Loan and/or a Revolving Loan, including an L/C Borrowing.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Fee Letter, (v) the DIP Order, (vi) the Guaranty, (vii) the Escrow Agreement, (viii) any other fee letter or document evidencing any similar arrangement, (ix) each L/C Document and (x) all other certificates, instruments and documents delivered from time to time on and after the Closing Date by or on behalf of the Borrower or any of the other Restricted Subsidiaries in connection herewith or therewith which have been designated as "Loan Documents".

"Loan Proceeds Account" means one or more escrow accounts with the Escrow Agent into which the proceeds of the New Money Term Loans shall be deposited and retained subject to withdrawal thereof by the Borrower pursuant to a Withdrawal Notice in accordance with Section 4.03 and the Escrow Agreement

"Loan Parties" means, collectively, Parent, the Borrower and each Subsidiary Guarantor.

"Master Agreement" has the meaning specified in the definition of "Swap Contract".

"Material Adverse Effect" means any event or circumstance which has a material adverse effect on (i) the business, properties, assets, financial condition or results of operations, in each case, of the Borrower and the other Restricted Subsidiaries, taken as a whole, (ii) the rights and remedies of any Agent or the Lenders under any Loan Document or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform any of their obligations under the Loan Documents (excluding the filing of the Chapter 11 Cases, the events and conditions related and/or leading up thereto as disclosed to the Lenders prior to the Closing Date or resulting therefrom and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Orders or pursuant to any action required to be taken by the Bankruptcy Court; provided that, for the avoidance of doubt, any findings and discoveries resulting from the Investigations shall not be excluded pursuant to this parenthetical).

28

**Debtors' Exhibit No. 11**
**Page 35 of 168**

"Material Indebtedness" means any Indebtedness incurred or assumed by a Loan Party with an aggregate outstanding principal amount or committed amount in excess of $1,000,000.

"Material Property" means assets, including intellectual property, owned by the Borrower or their Subsidiaries that is material to the business, operations, assets, financial condition or prospects of the Borrower and their Subsidiaries, taken as a whole.

"Maturity Date" means, the earliest to occur of (i) [_____], 2026, or if extended pursuant to Section 2.18, the date set forth in Section 2.18; (ii) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties; (iii) the Plan Consummation Date; (iv) the first Business Day after the date on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and becomes effective prior thereto; and (v) the date that the Final Order is vacated, terminated, rescinded, revoked, declared null and void (as finally determined in a non-appealable decision by a court of competent jurisdiction) or otherwise ceases to be in full force and effect (unless, in each case, as otherwise consented to by the Required Lenders).

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates is making or has an obligation to make contributions or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Mutual Maturity Election" has the meaning specified in Section 2.18(b).

"Net Cash Proceeds" means:

(a)  with respect to the Disposition of any asset or any Casualty Event the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the other Restricted Subsidiaries) less (ii) the sum of (A) the principal amount of and interest and fees, premiums and other amounts payable in respect of any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is repaid in connection therewith (other than Indebtedness under this Agreement, Indebtedness under any Prepetition Credit Agreement, or any Indebtedness that is secured by a Lien that is pari passu or junior to the Lien securing the Obligations), (B) the reasonable and documented out-of-pocket expenses actually incurred and paid by the Borrower or any of the other Restricted Subsidiaries in connection with such Disposition or Casualty Event (including, reasonable attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant, and other customary fees) to third parties (other than the Loan Parties), (C) taxes paid or reasonably estimated to be payable (including pursuant to any tax sharing arrangements) as a result of any gain recognized in connection therewith by such Person or any of the direct or indirect stockholders thereof and attributable to such Disposition or Casualty Event, (D) any reserve actually maintained in respect of (x) the sale price of such asset or assets established in accordance with GAAP, and (y) any liabilities associated with such asset or assets and retained by the Borrower or any of the other Restricted Subsidiaries after such sale or other Disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to any indemnification obligations and/or purchase price adjustments associated with such transaction and (E) the

29

amount of any cash escrow from the sale price for any relevant Disposition (until released from escrow); it being understood that "Net Cash Proceeds" shall include (1) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by such Person in any such Disposition, and (2) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (D) above, the amount of such reserve; and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of the other Restricted Subsidiaries not permitted under Section 7.03, the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance less (ii) the investment banking fees, underwriting discounts, commissions, costs and other reasonable and documented out-of-pocket expenses and other customary expenses and any taxes incurred by such Loan Party in connection with such incurrence or issuance to third parties (other than the Loan Parties).

"New Money Term Commitment" means, as to each Lender, its obligation to make a New Money Term Loan to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "New Money Term Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"New Money Term Lender" means, at any time, any Lender that has a New Money Term Commitment or a New Money Term Loan at such time.

"New Money Term Loan" has the meaning specified in the recitals to this Agreement.

"Non-Consenting Lender" has the meaning specified in Section 3.07(c).

"Non-Loan Party Subsidiary" means any Subsidiary of the Borrower that is not a Loan Party.

"Note" means a promissory note of the Borrower payable to any Lender or its assigns, in substantially the form of Exhibit C hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"Objecting Lender" means any Person, including any Prepetition Lender (together with its affiliates) that objects to the Interim Order, the Final Order or any other part of the Transactions.

"Obligations" means (a) for purposes of this Agreement, all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan and any Unreimbursed Amount, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed or allowable claims in such proceeding and interest accruing at the Default Rate in accordance with Section 2.08(b) or (b) solely for purposes of the Guarantee and the Collateral Documents, (x) the obligations specified in the foregoing clause (a) and the other Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest (including interest accruing at the Default Rate in accordance with Section 2.08(b)), charges, expenses, fees, reimbursement amounts (including any Unreimbursed Amount), Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.

30

Notwithstanding the foregoing, Obligations of any Guarantor shall in no event include any Excluded Swap Obligations of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury, or any successor thereto.

"Offered New Money DIP Term Loans" has the meaning set forth in the Syndication Procedures.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Agent, L/C Issuer or Lender, as the case may be, Taxes imposed as a result of a present or former connection between such Lender, L/C Issuer or Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender, L/C Issuer or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means (a) with respect to the Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans (including any conversion of outstanding Unreimbursed Amounts in respect of the Letter of Credit into L/C Borrowings) occurring on such date and (b) with respect to any L/C Obligations on any date, the outstanding amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date (including (i) as a result of any reimbursement of amounts drawn under the Letter of Credit and (ii) any conversion of outstanding Unreimbursed Amounts in respect of the Letter of Credit into L/C Borrowings) or any reductions in the maximum amount available for drawing under the Letter of Credit taking effect on such date.

"Paid in Kind" as used with respect to payment of any accrued interest on any Term Loan, or the payment of any fee or any other amount hereunder that is expressly specified as being required to or permitted to be Paid in Kind (or payable in kind, capitalized or similar) (the applicable interest, fee or other amount, the "Reference Obligation"), means that such Reference Obligation shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment), be deemed paid at 12:01 a.m. (New York City time) on the due date therefor, by deeming the equivalent Dollar amount of such Reference Obligation (calculated in accordance with Section 2.08, as applicable, and as otherwise provided in this Agreement) to be automatically capitalized as an equivalent principal amount of the Term Loans due in respect of (as determined in accordance with this Agreement), and, accordingly, such amount shall be compounded onto, and added to the aggregate principal amount of the Term Loans outstanding immediately prior to such payment, such that, immediately after giving effect to the payment of the applicable Reference Obligation as described herein, the aggregate outstanding principal amount of the Term Loans shall include the amount of such Reference Obligation. For the avoidance of doubt, without limiting the foregoing, (i) with respect to any Reference Obligation owing with respect to any Term Loans, once such Reference Obligation has

31

been Paid in Kind in accordance with the foregoing, the amount of such Reference Obligation shall constitute, for all purposes hereunder, Term Loans incurred as of such time, which shall thereupon accrue interest in accordance with Section 2.08 and (ii) the aggregate principal amount of Term Loans outstanding as of any time shall be calculated to include (without duplication) (x) the original principal amount thereof, (y) the aggregate amount of PIK Interest through the time of determination, and (z) any other amounts previously Paid in Kind hereunder.

"Parent" has the meaning specified in the introductory paragraph of this Agreement.

"Parent Company" means Parent and any other Person of which the Borrower is an indirect Wholly-owned Subsidiary.

"Participant" has the meaning specified in Section 11.07(e).

"Participating Final DIP Term Lender" has the meaning set forth in the Syndication Procedures.

"Participant Register" has the meaning specified in Section 11.07(e).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates or to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates contributes or has an obligation to contribute or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Variances" has the meaning specified in Section 6.17(c).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals to this Agreement.

"PIK Interest" means that the portion of the interest with respect to any Term Loans that is Paid in Kind by capitalizing and adding such amount of accrued interest to the principal balance of such Term Loans on the applicable Interest Payment Date.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained or contributed to by any Loan Party or any of the other Restricted Subsidiaries or,

**Debtors' Exhibit No. 11**
**Page 39 of 168**

with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Plan Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the US Bankruptcy Code) of a Chapter 11 Plan, which, for purposes of this Agreement, shall be no later than the effective date of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"Platform" has the meaning specified in Section 11.02(e).

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit B.

"Prepetition ABL Agent" means Bank of America, N.A. as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA) for the lenders from time to time party to the Prepetition ABL Credit Agreement.

"Prepetition ABL Credit Agreement" means the ABL Credit Agreement, dated as of the February 2, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time not in violation of the Prepetition ABL Intercreditor Agreement), among, *inter alios*, Parent, the Borrower, the other borrowers from time to time party thereto, Bank of America, N.A., as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA), and the lenders from time to time party thereto.

"Prepetition ABL Facility" means the credit facility governed by the Prepetition ABL Credit Agreement.

"Prepetition ABL Facility Documentation" means the Prepetition ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"Prepetition ABL Incremental Commitment Increase" means any "Incremental ABL Commitment Increase" as defined in the Prepetition ABL Credit Agreement.

"Prepetition ABL Intercreditor Agreement" means the Amended and Restated ABL Intercreditor Agreement, dated as of the 2019 Incremental Facility Closing Date (as defined in the Prepetition First Lien Credit Agreement and as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), among the Prepetition First Lien Collateral Agent, the Prepetition ABL Agent, the Prepetition Second Lien Administrative Agent and the Loan Parties.

"Prepetition ABL Loans" means the loans extended to the "Borrowers" (as defined in the Prepetition ABL Credit Agreement) pursuant to the Prepetition ABL Credit Agreement (including pursuant to any Prepetition ABL Incremental Commitment Increase).

"Prepetition ABL Obligations" means the "Obligations" as defined in the Prepetition ABL Credit Agreement.

"Prepetition ABL Priority Collateral" has the meaning specified in the Prepetition ABL Intercreditor Agreement.

33

"Prepetition Agents" means the Prepetition First Lien Collateral Agent, Prepetition First Lien Administrative Agent, Prepetition ABL Agent, Prepetition Second Lien Administrative Agent, Prepetition Sidecar Agents.

"Prepetition Bridge Facility" shall have the meaning set forth in the recitals to this Agreement.

"Prepetition Credit Agreements" means the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, the Prepetition Sidecar Credit Agreement and Prepetition ABL Credit Agreement.

"Prepetition First Lien Administrative Agent" means Jefferies Finance LLC, in its capacity as administrative agent under the Prepetition First Lien Facility Documentation, or any successor administrative agent appointed in accordance with the Prepetition First Lien Facility Documentation.

"Prepetition First Lien Agents" has the meaning assigned to such term in the recitals to this Agreement.

"Prepetition First Lien Collateral Agent" means Jefferies Finance LLC, in its capacity as collateral agent under the Prepetition First Lien Facility Documentation, or any successor collateral agent appointed in accordance with the Prepetition First Lien Facility Documentation.

"Prepetition First Lien Credit Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Prepetition First Lien Facility" means the credit facility governed by the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Facility Documentation" means the Prepetition First Lien Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"Prepetition First Lien Obligations" has the meaning assigned to the term "Obligations" in the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Term Loan Claims" means any Claim that arises under the Prepetition First Lien Facility Documents.

"Prepetition First Lien Term Lenders" has the meaning assigned to such term in the recitals to this Agreement.

"Prepetition First Lien Term Loans" has the meaning assigned to such term in the recitals to this Agreement.

"Prepetition First Lien/Second Lien Intercreditor Agreement" means the Term Intercreditor Agreement, dated as of March 30, 2021, among Parent, the Borrower, the Prepetition First Lien Administrative Agent, the Prepetition First Lien Collateral Agent and the Prepetition Second Lien Administrative Agent, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"Prepetition Indebtedness" means all Indebtedness of the Loan Parties outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases.

"<u>Prepetition L/C Borrowing</u>" means any "L/C Borrowing" under the Prepetition First Lien Credit Agreement.

"<u>Prepetition Lenders</u>" means the "Lenders" under the Prepetition First Lien Credit Agreement, Prepetition Second Lien Credit Agreement, Prepetition ABL Credit Agreement and Prepetition Sidecar Credit Agreement.

"<u>Prepetition Letter of Credit</u>" means the "Letter of Credit" under the Prepetition First Lien Credit Agreement.

"<u>Prepetition Letter of Credit Commitment</u>" means the "Letter of Credit Commitment" under the Prepetition First Lien Credit Agreement.

"<u>Prepetition Second Lien Administrative Agent</u>" means Jefferies Finance LLC, in its capacity as administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement, or any successor administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement.

"<u>Prepetition Second Lien Credit Agreement</u>" means that certain second lien credit agreement, dated as of February 26, 2019, among the Parent, the Borrower, the lenders party thereto and the Prepetition Second Lien Administrative Agent, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, in each case, as and to the extent permitted by this Agreement, the Prepetition First Lien Credit Agreement, the Prepetition ABL Intercreditor Agreement and the Prepetition First Lien/Second Lien Intercreditor Agreement.

"<u>Prepetition Second Lien Facility</u>" means the term credit facility under the Prepetition Second Lien Credit Agreement.

"<u>Prepetition Second Lien Facility Documentation</u>" means the Prepetition Second Lien Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"<u>Prepetition Second Lien Term Lenders</u>" has the meaning assigned to the term "Lenders" in the Prepetition Second Lien Credit Agreement.

"<u>Prepetition Sidecar Agents</u>" means (i) Sagard Holdings Manager (US) LLC in its capacity as administrative agent under the Prepetition Sidecar Credit Agreement, or any successor administrative agent under the Prepetition Sidecar Credit Agreement and (ii) GLAS USA LLC in its capacity as administrative agent and collateral agent under the Prepetition Sidecar Credit Agreement, or any successor administrative agent and collateral agent under the Prepetition Sidecar Credit Agreement.

"<u>Prepetition Sidecar Claims</u>" means any Claim that arises under the Prepetition Sidecar Facility Documents.

"<u>Prepetition Sidecar Credit Agreement</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Prepetition Sidecar Facility</u>" means the term credit facility under the Prepetition Sidecar Credit Agreement.

**Debtors' Exhibit No. 11**
**Page 42 of 168**

"<u>Prepetition Sidecar Facility Documentation</u>" means the Prepetition Sidecar Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"<u>Prepetition Sidecar Obligations</u>" has the meaning assigned to the term "Obligations" in the Prepetition Sidecar Credit Agreement.

"<u>Prepetition Sidecar Term Loans</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Prepetition Term Priority Collateral</u>" has the meaning specified in the Prepetition ABL Intercreditor Agreement.

"<u>Prime Rate</u>" means, for any day, the prime rate published in the Wall Street Journal for such day; <u>provided</u> that if the Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" means the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Prime Rate shall be effective on the date such change is effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"<u>Pro Rata Share</u>" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the respective applicable Class or Classes at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Class or Classes at such time; <u>provided</u> that if any Commitment for a Class has been terminated, then the Pro Rata Share of each Lender as it pertains to such Class shall be determined based on the outstanding principal amount of the Loans and L/C Obligations under such Class held by such Lender divided by the aggregate principal amount of all Outstanding Amounts under such Class.

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Lender</u>" has the meaning specified in <u>Section 11.02(h)</u>.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>Qualified Equity Interests</u>" means any Equity Interests that are not Disqualified Equity Interests.

"<u>Qualifying IPO</u>" means the issuance by Parent or any other Parent Company or any successor thereof of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

"<u>Register</u>" has the meaning specified in <u>Section 11.07(d)</u>.

36

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leaching or migration of any Hazardous Material in or into the environment, including indoor air.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Event" means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

"Representatives" mean, with respect to any Person, the employees, directors, members of management, officers, managers, consultants, partners or independent contractors of such Person.

"Request for Credit Extension" means (a) with respect to a Borrowing (other than an L/C Borrowing), conversion or continuation of Loans, the delivery of a Committed Loan Notice, or (b) with respect to the Letter of Credit, the delivery of a Letter of Credit Request.

"Required Lenders" means, as of any date of determination, Lenders having more than 50% of the Total Facility Exposure; provided that any unused Commitment (if any) and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders; provided, further, that at any time that there are three (3) or more Lenders that are not Affiliates that hold Loans or unfunded Commitments, Required Lender must include at least three (3) Lenders that are not Affiliates.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, for the period commencing on the date hereof and ending on the date that the Fronting Lender has assigned all of the New Money Term Loans pursuant to the Syndication Procedures and Section 2.01 of this Agreement, the Fronting Lender shall not have any voting rights under this Agreement or any other Loan Document in respect of the New Money Term Loans and/or the New Money Term Commitments held by it, and the New Money Term Loans held by the Fronting Lender shall be disregarded for the purposes of calculating "Required Lenders."

"Required Supermajority Lenders" means, as of any date of determination, Lenders having more than 66.67% of the Total Facility Exposure; provided that any unused Commitment (if any) and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Supermajority Lenders; provided, further, that at any time that there are three (3) or more Lenders that are not Affiliates that hold Loans or unfunded Commitments, Required Supermajority Lenders must include at least three (3) Lenders that are not Affiliates.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, for the period commencing on the date hereof and ending on the date that the Fronting Lender has assigned all of the New Money Term Loans pursuant to the Syndication Procedures and Section 2.01 of this Agreement, the Fronting Lender shall not have any voting rights under this Agreement or any other Loan Document in respect of the New Money Term Loans and/or the New Money Term Commitments held by it, and the New Money Term Loans held by the Fronting Lender shall be disregarded for the purposes of calculating "Required Supermajority Lenders."

"Required Supermajority New Money Lenders" means, as of any date of determination, Lenders having more than 66.67% of the Total New Money Exposure; provided that any unused Commitment (if any) and the portion of the Total New Money Exposure held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Supermajority New Money Lenders; provided, further, that at any time that there are three (3) or more Lenders that are not Affiliates that hold

**Debtors' Exhibit No. 11**
**Page 44 of 168**

New Money Term Loans or unfunded New Money Term Commitments, Required Supermajority New Money Lenders must include at least three (3) Lenders that are not Affiliates. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, for the period commencing on the date hereof and ending on the date that the Fronting Lender has assigned all of the New Money Term Loans pursuant to the Syndication Procedures and Section 2.01 of this Agreement, the Fronting Lender shall not have any voting rights under this Agreement or any other Loan Document in respect of the New Money Term Loans and/or the New Money Term Commitments held by it, and the New Money Term Loans held by the Fronting Lender shall be disregarded for the purposes of calculating "Required Supermajority New Money Lenders."

"Required Supermajority Roll-Up Lenders" means, as of any date of determination, Lenders having more than 66.67% of the Roll-Up Loans; provided, that at any time that there are three (3) or more Lenders that are not Affiliates that hold Roll-Up Loans, Required Supermajority Lenders must include at least three (3) Lenders that are not Affiliates. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, for the period commencing on the date hereof and ending on the date that the Administrative Agent has assigned all of the Roll-Up Loans pursuant to the Syndication Procedures and Section 2.01 of this Agreement, the Administrative Agent shall not have any voting rights under this Agreement or any other Loan Document in respect of the Roll-Up Loans held by it, and the Roll-Up Loans held by the Administrative Agent shall be disregarded for the purposes of calculating "Required Supermajority Roll-Up Lenders."

"Resolution Authority" means an EEA Resolution Authority or, with respect tony UK Financial Institution, a UK Resolution Authority.

"Response" shall mean any investigations, assessments, studies, cleanup, response, remedial, removal, or corrective actions related to Environmental Laws, Environmental Permits, Environmental Actions or Hazardous Materials.

"Responsible Officer" means the chief executive officer, president, chief financial officer, or treasurer, any assistant treasurer, executive vice president, senior vice president or, in each case, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent reasonably acceptable to the Required Lenders in or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party). Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Amount" has the meaning specified in Section 2.05(b)(vi).

"Restricted Debt" has the meaning specified in Section 7.09(a).

"Restricted Debt Payment" has the meaning specified in Section 7.09(a).

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof).

**Debtors' Exhibit No. 11**
**Page 45 of 168**

"Restricted Subsidiary" means any Subsidiary of Parent.

"Restricting Information" has the meaning assigned to such term in Section 11.02(i).

"Revolving Commitment" means, at any time that the Letter of Credit Facility exists, as to the L/C Issuer, its Letter of Credit Commitment.

"Revolving Lender" means any Lender that has a Letter of Credit Commitment or a Revolving Commitment, and/or that holds any outstanding L/C Borrowing, L/C Obligation or Revolving Loan at such time. Unless the context otherwise requires, the term "Revolving Lender" includes the L/C Issuer.

"Revolving Loan" means at any time that the Letter of Credit Facility exists, an L/C Borrowing.

"Roll-Up Cap" shall have the meaning set forth in the recitals to this Agreement.

"Roll-Up Lender" means any Person that owns Roll-Up Loans and becomes a "lender" hereunder pursuant to Section 2.01(b).

"Roll-Up Loans" shall have the meaning set forth in the recitals to this Agreement.

"S&P" means S&P Global Ratings Inc., and its successors.

"Sanctioned Country" means, at any time, a country or territory that is the subject or target of any Sanctions broadly restricting or prohibiting dealings with or in such country or territory (including, as of the date hereof, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means any Person: (i) listed in any Sanctions-related list of designated Persons maintained by any Sanctions Authority, (ii) located, organized or resident in, or any governmental entity or governmental instrumentality of, a Sanctioned Country, (iii) owned or controlled by, or acting for the benefit or on behalf of, directly or indirectly, any Person described in clauses (i) or (ii) hereof or (iv) otherwise the subject or target of any Sanctions.

"Sanctions" means the economic, financial or other sanctions laws, regulations or embargoes administered and enforced from time to time by any Sanctions Authority.

"Sanctions Authority" means (a) the United Nations Security Council, (b) the European Union and each of its member states, (c) the United States of America (including, without limitation, OFAC and the U.S. Department of State), (d) the United Kingdom (including, without limitation, Her Majesty's Treasury) or (e) any other relevant national or supra-national sanctions authority with jurisdiction over the Borrower.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" means all Obligations of each Loan Party now or hereafter existing under the Loan Documents.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders and the L/C Issuer.

"Securities Account" has the meaning set forth in the Uniform Commercial Code.

**Debtors' Exhibit No. 11**
**Page 46 of 168**

"<u>Securities Account Control Agreement</u>" means a springing account control agreement (in form and substance reasonably satisfactory to the Collateral Agent) among any Loan Party, a securities intermediary holding securities owned by such Loan Party or on such Loan Party's behalf, and the Collateral Agent with respect to control (within the meaning of the New York UCC) of all securities, cash and Cash Equivalents held in a Securities Account maintained by such Loan Party with such securities intermediary.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>SOFR</u>" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"<u>SOFR Borrowing</u>" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"<u>SOFR Loan</u>" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (iii) of the definition of "Base Rate".

"<u>Solicitation Materials</u>" means, collectively, all documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on a Chapter 11 Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, but not limited to, the Disclosure Statement.

"<u>SPC</u>" has the meaning specified in <u>Section 11.07(g)</u>.

"<u>Specified Exchange Rate</u>" means an exchange rate of $1.17 for every €1.00.

"<u>Spot Rate</u>" means, on any date of determination, the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in the Administrative Agent's (or one of its Affiliate's) principal foreign exchange trading office for the first currency.

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one <u>minus</u> the aggregate of the maximum reserve, liquid asset or similar percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority of the United States. Such reserve, liquid asset or similar percentages shall include those imposed pursuant to Regulation D of the FRB. EURIBOR Loans shall be deemed to be subject to such reserve, liquid asset or similar requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D of the FRB or any other requirements of Law. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subordinated Indebtedness</u>" means any Indebtedness created, incurred or assumed by Parent or any of its Restricted Subsidiaries or in respect of which Parent or any of its Restricted Subsidiaries is liable, which is contractually subordinated in right of payment to the Obligations, secured by a Lien on a junior priority basis to the Obligations or is unsecured.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having

40

such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" of a Person shall refer to a Subsidiary or Subsidiaries of Parent.

"<u>Subsidiary Guarantors</u>" means (i) on the Closing Date, each Subsidiary domiciled in the United States listed on Schedule 1.01(b) hereto and (ii) thereafter, each Subsidiary that executes a Guaranty Supplement, in each case, until such time as the relevant Subsidiary is released from its obligations under the Guaranty in accordance with the terms and provisions hereof.

"<u>Swap Contract</u>" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"<u>Swap Obligation</u>" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Syndication</u>" has the meaning set forth in <u>Section 2.15</u>.

"<u>Syndication Closing Date</u>" has the meaning set forth in the Syndication Procedures

"<u>Syndication Procedures</u>" has the <u>meaning set forth in the DIP Order.</u>

"<u>TARGET</u>" means the Trans-European Automated Real-time Gross settlement Express Transfer system.

"<u>Taxes</u>" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority, including interest, additions to tax or penalties applicable thereto.

"<u>Term Borrowing</u>" means a borrowing consisting of Term Loans of the same Type and, in the case of SOFR Loans or EURIBOR Loans, having the same Interest Period made by each of the Term Lenders pursuant to <u>Section 2.01</u>.

"<u>Term Lender</u>" means, at any time, any Lender that has a Commitment or a Term Loan at such time.

"<u>Term Loan</u>" has the meaning specified in the recitals to this Agreement.

"<u>Term SOFR</u>" means,

41

(a)       for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)       for any calculation with respect to an Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent at the Direction of the Required Lenders).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the date upon which all Commitments have terminated and the Loans, together with all interest, fees and other Obligations (other than contingent indemnification Obligations for which no demand shall have been made), have been paid in full in cash.

"Total Facility Exposure" means the sum of (a) Total Outstandings and (b) aggregate unused Commitments (if any).

"Total New Money Exposure" means the sum of (a) the aggregate Outstanding Amount of all New Money Term Loans and (b) the aggregate unused New Money Term Commitments (if any).

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and the Letter of Credit (including Unreimbursed Amounts).

"Trading Agent" means OPY (and its Affiliates) as that certain party available solely to facilitate trades of the Borrower's Loans, securities or other debt instruments currently outstanding or to be issued by the Borrower under the Loan Documents. The Trading Agent shall be entitled to the same rights, protections and benefits provided to any of the Agents under Sections 10.03, 10.06, 10.07, 11.04, 11.05, 11.07(c), 11.08, 11.11, 11.12, 11.13, 11.15, 11.16, 11.17, and 11.23 of this Agreement. For the avoidance of doubt, the Trading Agent shall not have any duties, responsibilities or obligations under this Agreement (other than pursuant to Section 11.08 (Confidentiality)).

42

"Transaction Expenses" means any fees, expenses, premiums and other transaction costs (including original issue discount or upfront premiums) incurred or paid by the Borrower (or any Parent Company) or any of the other Restricted Subsidiaries in connection with any of the following (but calculated without duplication of any amounts): (i) the Transactions and (ii) this Agreement and the other Loan Documents and the transactions contemplated to occur hereunder and thereunder, as applicable.

"Transactions" means, collectively, the transactions to occur pursuant to the Loan Documents on or following the Closing Date, including (a) the Chapter 11 Cases, (b) the execution, delivery and performance of the Loan Documents, the creation of the Liens pursuant to the Loan Documents, and the borrowings hereunder, (c) the assignment and waiver of Eligible Prepetition 1L Claims in exchange for Roll-Up Loans in accordance with the Syndication Procedures and the terms of this Agreement, (d) the repayment in full in cash of the Prepetition Bridge Facility and (e) the payment of the Transaction Expenses.

"Treasury Equity Interests" has the meaning specified in Section 7.06(k).

"Type" means, with respect to a Loan, its character as a Base Rate Loan, a SOFR Loan or a EURIBOR Loan.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unaudited Financial Statements" has the meaning specified in Section 4.01(g).

"Undisclosed Administration" means, in relation to a Lender or its parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such person is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"United States" means the United States of America.

"Unreimbursed Amount" has the meaning specified in **Error! Reference source not found.**.

"Unrestricted Cash" means all non-restricted cash and Cash Equivalents of the Loan Parties in deposit or securities accounts in which the Collateral Agent has "control" pursuant to and within the meaning of Section 9-104 and/or 9-106 of the UCC.

43

"U.S. Bank Cash" means cash and Cash Equivalents of the Borrower and Guarantors deposited in commercial banks located in the United States as currently reported in the Approved Budget and in a manner consistent with past practices (excluding amounts held for customers pursuant to the terms of the agreements with such customers and which are excluded from the Approved Budget and related reporting).

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(B)(3).

"Variance Testing Period" has the meaning specified in Section 6.17(c).

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal" means a withdrawal from the Loan Proceeds Account made in accordance with Section 4.03.

"Withdrawal Date" means the date of the making of any Withdrawal.

"Withdrawal Liability" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by the Borrower or any other Restricted Subsidiary or the ERISA Affiliates of the Borrower.

"Withdrawal Notice" means a notice substantially in the form attached hereto as Exhibit H to be delivered by the Borrowers to the Escrow Agent and the Administrative Agent from time to time to request a Withdrawal from the Loan Proceeds Account.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or a part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related or ancillary to any of those powers.

"WSFS" has the meaning set forth in the introductory paragraph hereto.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      (i)      The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)      Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)      The term "including" is by way of example and not limitation.

(iv)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(d)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)      Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

(f)      [Reserved].

(g)      [Reserved].

(h)      The determination of whether any Indebtedness that is permitted hereunder matures or requires certain payments prior to the Latest Maturity Date shall be made at the time of the incurrence of the relevant Indebtedness.

Section 1.03      Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing audited financial statements, except as otherwise specifically prescribed herein.

Section 1.04      Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05      References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only

45

to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall be the immediately preceding Business Day and, in the case of any payment that accrues interest, interest thereon shall be payable for the period of such extension.

Section 1.08    Currency Equivalents Generally.

(a)    For purposes of determining compliance under Sections 7.01, 7.02, 7.03, 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars shall be translated into Dollars at the Spot Rate then in effect on the date of such determination; provided that no Event of Default shall be deemed to have occurred thereafter solely as a result of such changes in rates of exchange thereafter.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (acting at the Direction of the Required Lenders) may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.09    [Reserved].

Section 1.10    [Reserved].

Section 1.11    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.12    Interest Rates. The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the EURIBOR Rate, Adjusted EURIBOR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the EURIBOR Rate, Adjusted EURIBOR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Benchmark Replacement Conforming Changes. The

46

Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the EURIBOR Rate, Adjusted EURIBOR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the EURIBOR Rate, Adjusted EURIBOR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    <u>The Loans</u>.

(a)    <u>New Money Term Loans</u>.

(i)    Subject to the terms and conditions set forth in <u>Section 4.01</u> and <u>4.02</u>, the Fronting Lender severally agrees to make to the Borrower New Money Term Loans denominated in Dollars in a principal amount equal to the Fronting Lender's New Money Term Commitment in up to two (2) drawings, (i) the first such drawing shall be in an initial principal amount (prior to giving effect to any amounts Paid in Kind upon the making of such Term Loans) not to exceed $[500,000,000] (the "<u>Interim New Money Term Loans</u>") and (ii) the second such drawing shall be in an initial principal amount (prior to giving effect to any amounts Paid in Kind upon the making of such Term Loans) not to exceed $[600,000,000] (the "<u>Final New Money Term Loans</u>"); provided that no New Money Term Loans may exceed the amount of unused New Money Term Commitments. Upon each funding by the Fronting Lender, such Fronting Lender's New Money Term Commitment shall be permanently reduced by the amount of such funding and, upon drawing in full of the New Money Term Commitments, the Fronting Lender's New Money Term Commitment shall terminate. The New Money Term Loans shall be made by the Fronting Lender on the date of each applicable Borrowing. For the avoidance of doubt, (x) the funding of the Interim New Money Term Loans shall be subject to the entry of the Interim Order by the Bankruptcy Court and the satisfaction or waiver of all other conditions precedent required under <u>Section 4.01</u> and (y) the funding of the Final New Money Term Loans shall be subject to the entry of the Final Order by the Bankruptcy Court and the satisfaction or waiver of all other conditions precedent required under <u>Section 4.02</u>.

(ii)    On a date following the occurrence of the Initial Draw Syndication Closing Date as mutually agreed between the Fronting Lender, the Administrative Agent, the Borrower and the Lender Advisors, the Fronting Lender shall assign to (i) each Participating Interim DIP Term Lender (as defined in the Syndication Procedures) its pro rata share of the Offered New Money Term Loans that such Participating Interim DIP Term Lender elected to purchase in accordance with the Syndication Procedures and (ii) to each Allocation Party, its applicable share of the Interim New Money Term Loans (the syndication of New Money Term Loans pursuant to foregoing clauses (i) and (ii), the

47

"Interim New Money Term Loan Syndication" and the New Money Term Loans assigned by the Fronting Lender in connection therewith, the "Syndicated Interim New Money Term Loans").

(iii)    On a date following the occurrence of the Final Draw Syndication Closing Date as mutually agreed between the Fronting Lender, the Administrative Agent, the Borrower and the Lender Advisors, the Fronting Lender shall assign to (i) each Participating Final DIP Term Lender (as defined in the Syndication Procedures) its pro rata share of the Offered New Money Term Loans that such Participating Final DIP Term Lender elected to purchase in accordance with the Syndication Procedures and (ii) to each Allocation Party, its applicable share of the Final New Money Term Loans (the syndication of New Money Term Loans pursuant to foregoing clauses (i) and (ii), the "Final New Money Term Loan Syndication" and the New Money Term Loans assigned by the Fronting Lender in connection therewith, the "Syndicated Final New Money Term Loans" and together with the Syndicated Interim New Money Term Loans, the "Syndicated New Money Term Loans").

(iv)    All Syndicated New Money Term Loans will be SOFR Loans denominated in Dollars at the time such Syndicated New Money Term Loans are assigned by the Fronting Lender in accordance with this Section 2.01; *provided* that any Syndicated New Money Term Loans that are required to be assigned to Required Euro Holders in accordance with Section 2.02 of this Agreement will, at the time of such assignment, be deemed to have been converted to EURIBOR Loans denominated in Euros at the Specified Exchange Rate in a principal amount equal to the applicable Required Euro Amount for each such Required Euro Holder. Any Syndicated New Money Term Loans that are assigned to Required Euro Holders as EURIBOR Loans in accordance with this Agreement shall be deemed to have been funded as EURIBOR Loans as of the date that the Fronting Lender funded the Interim New Money Term Loans and the Final New Money Term Loans, as applicable.

The Borrower and each other Loan Party hereby irrevocably consents to all assignments of Syndicated New Money Term Loans by the Fronting Lender necessary and desirable to effectuate the Interim New Money Term Loan Syndication and the Final New Money Term Loan Syndication. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed. New Money Term Loans may be Base Rate Loans, SOFR Loans or EURIBOR Loans, as further provided herein.

(b)    Roll-Up Loans.

(i)    Subject to the occurrence of the Interim New Money Term Loan Syndication, as consideration for purchasing Syndicated Interim New Money Term Loans, each beneficial holder of Syndicated Interim New Money Term Loans shall be deemed to have (x) assigned $3.00 of principal of its Eligible Prepetition 1L Claims to the Administrative Agent in exchange for $3.00 of principal of Roll-Up Loans for every $1.00 of principal of Syndicated Interim New Money Term Loans purchased by such beneficial holder from the Fronting Lender pursuant to Section 2.01(a) of this Agreement (the foregoing assignment and exchange, the "Interim Roll-Up Loan Syndication") on the (a) date that the Fronting Lender funded the Interim New Money Term Loans or (b) a date as otherwise agreed between such beneficial holder and the Company and the Lender Advisors and (y) directed the Administrative Agent, which such direction will be deemed to have been given by such beneficial holder immediately after purchasing its Syndicated Interim New Money Term Loans, to irrevocably cancel, extinguish and waive the full

48

principal amount of any claims in respect of any Eligible Prepetition 1L Claims (such claims, "Purchased Eligible Prepetition 1L Claims) received by the Administrative Agent in connection with the Interim Roll-Up Loan Syndication.  Upon the consummation of any Interim Roll-Up Loan Syndication, the Administrative Agent shall be deemed to have, at the direction of the Required Lenders, irrevocably cancelled, extinguished and waived all Purchased Eligible Prepetition 1L Claims received by the Administrative Agent in connection with the Interim Roll-Up Loan Syndication; *provided* solely with respect to any holders of Syndicated Interim New Money Term Loans that own Eligible Prepetition 1L Claims in respect of a Prepetition Letter of Credit, such holder shall be automatically deemed to have assigned $3.00 of principal of its Eligible Prepetition 1L Claim to the Administrative Agent in exchange for $3.00 of principal of Roll-Up Loans for every $1.00 of principal of Syndicated Interim New Money Term Loan on the date that such Prepetition Letter of Credit is drawn in accordance with the terms of the Prepetition First Lien Credit Agreement.  Any Roll-Up Loans incurred by the Borrower pursuant to this Section 2.01(d)(i) shall be deemed incurred on the date that the Interim New Money Term Loans were funded by the Fronting Lender.

(ii)     Subject to the occurrence of the Final New Money Term Loan Syndication, as consideration for purchasing Syndicated Final New Money Term Loans, each beneficial holder of Syndicated Final New Money Term Loans shall be deemed to have (x) assigned $3.00 of principal of its Eligible Prepetition 1L Claims to the Administrative Agent in exchange for $3.00 of principal of Roll-Up Loans for every $1.00 of principal of Syndicated Final New Money Term Loans purchased by such beneficial holder from the Fronting Lender pursuant to Section 2.01(a) of this Agreement (the foregoing assignment and exchange, the "Final Roll-Up Loan Syndication" and together with the Interim Roll-Up Syndications, the "Roll-Up Syndication") on (a) the date that the Fronting Lender funded the Final New Money Term Loans or (b) a date as otherwise agreed between such beneficial holder and the Company and the Lender Advisors and (y) directed the Administrative Agent, which such direction will be deemed to have been given by such beneficial holder immediately after purchasing its Syndicated Final New Money Term Loans, to irrevocably cancel, extinguish and waive the full principal amount of any claims in respect of any Purchased Eligible Prepetition 1L Claims received by the Administrative Agent in connection with the Final Roll-Up Loan Syndication.  Upon the consummation of any Final Roll-Up Loan Syndication, the Administrative Agent shall be deemed to have, at the direction of the Required Lenders, irrevocably cancelled, extinguished and waived all Purchased Eligible Prepetition 1L Claims received by the Administrative Agent in connection with the Final Roll-Up Loan Syndication; *provided* solely with respect to any holders of Syndicated Final New Money Term Loans that own Eligible Prepetition 1L Claims in respect of a Prepetition Letter of Credit, such holder shall be automatically deemed to have assigned $3.00 of principal of its Eligible Prepetition 1L Claim to the Administrative Agent in exchange for $3.00 of principal of Roll-Up Loans for every $1.00 of principal of Syndicated Final New Money Term Loan on the date that such Prepetition Letter of Credit is drawn in accordance with the terms of the Prepetition First Lien Credit Agreement.  Any Roll-Up Loans incurred by the Borrower pursuant to this Section 2.01(d)(ii) shall be deemed incurred on the date that the Final New Money Term Loans were funded by the Fronting Lender.

(iii)     In exchange for the Administrative Agent agreeing to take assignment of and subsequently cancel, extinguish and waive the Purchased Eligible Prepetition 1L Claims in connection with the Roll-Up Loan Syndication, the Borrower will be deemed to have issued, immediately after the funding of the Interim New Money Term

49

Loans and Final New Money Term Loans, as applicable, Roll-Up Loans to the Administrative Agent in the same amount of the Purchased Eligible Prepetition 1L Claims. As set forth in Section 2.01(d)(i) and 2.01(d)(ii), the Administrative Agent shall use such Roll-Up Loans as consideration to take assignment of the Purchased Eligible Prepetition 1L Claims in connection with the Roll-Up Loan Syndication; *provided* that the total principal amount of Roll-Up Loans shall not exceed the Roll-Up Cap at any time.

(iv)     All Roll-Up Loans incurred by the Borrower pursuant to this Section 2.01(b) shall be funded as SOFR Loans denominated in Dollars except, solely in the case of any Roll-Up Loans assigned to Required Euro Holders, such Roll-Up Loans shall be converted and exchanged into Roll-Up Loans as EURIBOR Loans at the Specified Exchange Rate in a principal amount equal to the Required Euro Amount for each Required Euro Holder.

(v)     The Roll-Up Loans deemed assigned pursuant to this Section 2.01(b) shall be deemed to be made by each Roll-Up Lender (or an investment advisor, manager or beneficial owner for the account of a Roll-Up Lender, or an affiliated fund or trade counterparty designated by such Roll-Up Lender).

(vi)     For U.S. federal and applicable state and local income tax purposes, the Parties shall treat the purchase and funding of the Interim New Money Term Loans or Final New Money Term Loans (as applicable) and the deemed assignment of the Roll-Up Loans as an integrated acquisition of an investment unit consisting of the Interim New Money Term Loans or Final New Money Term Loans (as applicable) and Roll-Up Loans for a package of consideration consisting of cash, Eligible Prepetition 1L Claims, except as otherwise required by a change in law after the date hereof or upon a contrary final "determination" within the meaning of Section 1313(a) of the Code (and any analogous or similar determination under state or local law).]

(c)     For the avoidance of doubt, amounts repaid or prepaid in respect of the New Money Term Loans or Roll-Up Loans may not be reborrowed.

Section 2.02     Borrowings, Conversions and Continuations of Loans.

(a)     Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of SOFR Loans or EURIBOR Loans, as applicable, shall be made upon the Borrower's irrevocable notice to the Administrative Agent of such Borrowing, conversion or continuation of SOFR Loans or EURIBOR Loans, as applicable, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than (i) 1:00 p.m. three (3) U.S. Government Securities Business Days prior to the requested date of any Borrowing or continuation or conversion of SOFR Loans (or any conversion of Base Rate Loans to SOFR Loans), (ii) 1:00 p.m. three (3) Business Days prior to the requested date of any Borrowing or continuation of EURIBOR Loans and (iii) 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans or any continuation or conversion of SOFR Loans to Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing of, conversion to or continuation of SOFR Loans or EURIBOR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Except with respect to the initial Credit Extension, each Borrowing of, continuation of or conversion to Base Rate Loans, shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify, as applicable, (i) whether the Borrower is requesting a Term Borrowing or a conversion or continuation of Term Loans from

50

one Type to the other, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day or a U.S. Government Securities Business Day, as applicable), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, (v) in the case of SOFR Loans or EURIBOR Loans, the duration of the Interest Period with respect thereto and (vi) [reserved]. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice with respect to Loans denominated in Dollars or fails to give a timely request for conversion or continuation of Loans denominated in Dollars pursuant to a Committed Loan Notice, then the applicable Loans shall be made as, continued as or converted to, as applicable, a Base Rate Loan. Any such automatic conversion to a Base Rate Loan shall be effective as of the last day of the Interest Period then in effect with respect to the applicable SOFR Loans. If the Borrower requests a Borrowing or continuation of SOFR Loans or EURIBOR Loans or a conversion to SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. The Borrower and the Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Class of Loans (or of the details of the relevant conversion or continuation), and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion described in Section 2.02(a). In the case of each Borrowing after the Closing Date, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than (i) 1:00 p.m., in the case of SOFR Loans or EURIBOR Loans, and (ii) 2:00 p.m., in the case of Base Rate Loans, in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (A) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (B) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a SOFR Loan or a EURIBOR Loan may be continued, and a SOFR Loan may be converted, only on the last day of an Interest Period for such SOFR Loan or EURIBOR Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. During the existence of an Event of Default, upon notice to the Administrative Agent, the Required Lenders may require that no Loans may be converted to or continued as SOFR Loans. Notwithstanding anything herein or in any other Loan Document to the contrary, L/C Borrowings shall bear interest solely at the Default Rate applicable to Base Rate Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans or EURIBOR Loans, as applicable, upon determination of such interest rate (in any event, no less than one Business Day before the effective date of such interest rate). The determination of Adjusted Term SOFR or Adjusted EURIBOR, as applicable, by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than fifteen (15) Interest Periods in effect at any time for all Borrowings unless otherwise agreed between the Borrower and the Administrative Agent.

51

(f)       The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)       Notwithstanding anything to the contrary in this Agreement or any other Loan Document, each of the Borrower and the other Loan Parties, the Administrative Agent, the Collateral Agent, and the Lenders hereby acknowledge and agree that certain holders of Eligible Prepetition 1L Claims (the "Required Euro Holders") may require that a certain principal amount of Syndicated New Money Term Loans and/or Roll-Up Loans to be denominated in Euros (such required amount for any such holder, the "Required Euro Amount") in order to consummate the Syndication and the transactions contemplated in Section 2.01. Prior to the occurrence of any Syndication Closing Date, the Lender Advisors shall deliver a written notice to the Administrative Agent (such notice, a "Pre-Syndication Conversion Notice"), which such notice shall be delivered via e-mail with copy to Weil Gotshal & Manges LLP and Lazard Freres & Co. as advisors to the Borrower, that (i) identifies each Required Euro Holder and (ii) specifies the Required Euro Amount allocable to each Required Euro Holder (including whether such allocation is in respect of Syndicated New Money Term Loans and/or Roll-Up Loans).

Section 2.03       Letter of Credit.

(a)       Letter of Credit Commitments.

(i)       Subject to the terms and conditions set forth herein, an L/C Issuer may agree, (x) from time to time on any Business Day during the period on and from the Closing Date until December 31, 2026, to issue a Letter of Credit denominated in Dollars for the account of the Borrower (and, in its sole discretion, to amend the Letter of Credit previously issued by it) in accordance with Section 2.03(b), and (y) to honor drawings under the Letter of Credit; provided that the L/C Issuer shall not be obligated to make any L/C Credit Extension with respect to the Letter of Credit, if after giving effect to such L/C Credit Extension, the Outstanding Amount of the L/C Obligations would exceed the aggregate Letter of Credit Commitment; provided further that the L/C Issuer shall not be obligated to make any L/C Credit Extension with respect to the Letter of Credit if after giving effect to such L/C Credit Extension the Outstanding Amount of the L/C Obligations of the L/C Issuer would exceed the L/C Issuer's Letter of Credit Commitment.

(ii)       The L/C Issuer shall be under no obligation to issue the Letter of Credit if:

(A)       The Letter of Credit is not consistent with the form Letter of Credit approved by the L/C Issuer pursuant thereto;

(B)       any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing the Letter of Credit, or any Law applicable to the L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or direct that the L/C Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular;

(C)       subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance;

(D)       the expiry date of such requested Letter of Credit would occur after the Letter of Credit Facility Expiration Date;

**Debtors' Exhibit No. 11**
**Page 59 of 168**

(E)     the issuance of the Letter of Credit would violate any Laws binding upon the L/C Issuer;

(F)     the Letter of Credit is to be denominated in a currency other than Dollars; or

(G)     the issuance of the Letter of Credit would violate one or more applicable policies of the L/C Issuer in place at the time of such issuance.

(iii)     The L/C Issuer shall be under no obligation to amend the Letter of Credit if (x) the L/C Issuer would have no obligation at such time to issue the Letter of Credit in its amended form under the terms hereof, or (y) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letter of Credit.  Notwithstanding the foregoing, Royal Bank of Canada, in its capacity as the L/C Issuer, shall not be under any obligation to issue a commercial Letter of Credit or letters of guarantee.

(b)     <u>Procedures for Issuance and Amendment of the Letter of Credit; Auto Renewal Letter of Credit.</u>

(i)     The Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application together with a Letter of Credit Request in respect of such L/C Credit Extension, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 12:00 noon at least three (3) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such earlier or later date and time as the L/C Issuer may agree in a particular instance in its sole discretion.  In the case of a request for the issuance of the Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day that is not later than December 31, 2026); (B) the amount thereof; (C) the expiry date thereof (which shall be no later than the earlier of the dates contemplated above in clauses (a)(ii)(B) and (D) above); (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) specifying that the Letter of Credit is to be issued for its own account; and (H) such other matters as the L/C Issuer may reasonably request.  In the case of a request for an amendment of any outstanding Letter of Credit, such request shall specify in form and detail reasonably satisfactory to the L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day that is not later than December 31, 2026); (3) the nature of the proposed amendment; and (4) such other matters as the L/C Issuer may reasonably request. Any request for the issuance of the Letter of Credit or amendment thereto, once made shall be irrevocable.

(ii)     Promptly after receipt of any Letter of Credit Application or request for amendment, the L/C Issuer will confirm with the Administrative Agent (in writing) that (i) the Administrative Agent has received a copy of such Letter of Credit Application or request for amendment from the Borrower, and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof and (ii) that the Borrower is permitted to request the issuance of the Letter of Credit on the proposed terms.  Upon receipt by the L/C Issuer of confirmation from the Administrative Agent that the requested issuance is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue

53

the Letter of Credit for the account of the Borrower or any Subsidiary, as the case may be, or enter into the applicable amendment, as the case may be.

(iii)    If the Borrower so requests in the applicable Letter of Credit Application, the L/C Issuer shall agree to issue the Letter of Credit in a form providing for automatic extension provisions (such Letter of Credit, the "Auto Extension Letter of Credit"); provided that the Auto Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve (12) month period (commencing with the date of issuance of the Letter of Credit) by giving notice to the beneficiary thereof and the Borrower not later than the date that is thirty (30) days prior to the then scheduled expiration date for the Letter of Credit (the "Non-Extension Notice Date") in each such twelve (12) month period; provided that in no event shall any such extension extend the expiry date for the Letter of Credit to a date following the Letter of Credit Facility Expiration Date.  Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer for any such extension.  The L/C Issuer shall have no obligation to permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue the Letter of Credit in its extended form under the terms hereof (by reason of the provisions of Section 2.03(a)(iii) or otherwise), or (B) it has received notice (which may be by telephone, followed promptly in writing, or in writing) on or before the day that is thirty (30) Business Days before the Non-Extension Notice Date from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied.

(iv)    Promptly after its delivery of the Letter of Credit or any amendment to the Letter of Credit to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Conversion to L/C Borrowings. Upon receipt from the beneficiary of the Letter of Credit of a compliant drawing under the Letter of Credit, the L/C Issuer shall promptly notify the Administrative Agent and the Borrower thereof.  On the Business Day after the date on which the Borrower shall have received notice of any payment by the L/C Issuer under the Letter of Credit (each such date, an "Honor Date"), the Borrower shall reimburse the L/C Issuer in an amount equal to the amount of such drawing.  If the Borrower fails to so reimburse the L/C Issuer on the applicable Honor Date, the amount of the unreimbursed drawing in respect of such drawn Letter of Credit (any such amount outstanding at any time prior to the Conversion Time, an "Unreimbursed Amount") shall, at noon Eastern time on the Business Day immediately following the Honor Date (such time, the "Conversion Time") in respect of the applicable Unreimbursed Amount, automatically (and without any further action by any person) convert into, and the Borrower shall be deemed to have incurred from the L/C Issuer, an L/C Borrowing, in a principal amount equal to such then outstanding Unreimbursed Amount. Each L/C Borrowing shall be due and payable at the Conversion Time, shall bear interest at the Default Rate applicable to Base Rate Loans, and a Default shall be deemed continuing. If any L/C Borrowing has not been repaid in full, together with accrued and unpaid interest thereon, by the date that is three (3) Business Days after the day on which the Conversion Time in respect of such L/C Borrowing occurred, then an Event of Default shall exist.  Any notice given by the L/C Issuer pursuant to this **Error! Reference source not found.** may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(d)    Obligations Absolute.  The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

54

(i)     any lack of validity or enforceability of the Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of the Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by the Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under the Letter of Credit;

(iv)     any payment by the L/C Issuer under the Letter of Credit against presentation of documents that do not strictly comply with the terms of the Letter of Credit; or any payment made by the L/C Issuer under the Letter of Credit to any the purporting to be a trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of the Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)     any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of the Letter of Credit; or

(vi)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

provided that the foregoing shall not excuse the L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to consequential, punitive or special damages, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower to the extent such damages are determined by a final non appealable judgment of a court of competent jurisdiction to have been caused by the L/C Issuer's gross negligence, bad faith or willful misconduct or material breach of this Agreement when determining whether drafts and other documents presented under the Letter of Credit comply with the terms thereof.

(e)     <u>Role of the L/C Issuer</u>.  Each Lender and the Borrower agrees that, in paying any drawing under the Letter of Credit, the L/C Issuer (or any fronting, advising or confirming banks) shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, any Agent Related Person or any of the respective fronting, advising or confirming banks, or any permitted assignees of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct (with such absence to be presumed unless otherwise determined by a court of a competent jurisdiction in a final and non-appealable judgment); or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to the Letter of Credit or Letter of Credit Application. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect

55

to its use of the Letter of Credit, and none of the L/C Issuer, any Agent Related Person or any of the respective fronting, advising or confirming banks, or any permitted assignees of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this **Error! Reference source not found.**; provided that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower caused by the L/C Issuer's willful misconduct, bad faith, gross negligence or material breach of this Agreement or the L/C Issuer's willful misconduct or grossly negligent or bad faith failure to pay under the Letter of Credit after the presentation to it by the beneficiary of documents strictly complying with the terms and conditions of the Letter of Credit, in each case as determined by a final non appealable judgment of a court of competent jurisdiction.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in substantial compliance with the terms of the Letter of Credit, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or purporting to transfer the Letter of Credit or assign the proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(f)      Letter of Credit Fees.  The Borrower shall pay to the L/C Issuer a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the product of (i) the rate set forth in clause (d) of the definition of "Applicable Rate" and (ii) the daily maximum amount then available to be drawn under the Letter of Credit (excluding any portion thereof attributable to Unreimbursed Amounts). Such Letter of Credit fee shall be computed on a quarterly basis in arrears and shall be payable on the first calendar day of each April, July, October and January and on the Maturity Date, commencing with the first such date to occur after the issuance of the Letter of Credit, on the Letter of Credit Facility Expiration Date and thereafter on demand.

(g)      [Reserved].

(h)      Conflict with Letter of Credit Application.  Notwithstanding anything else to the contrary in any Letter of Credit Application, in the event of any conflict or inconsistency between the terms of any Loan Document and the terms of any Letter of Credit Application, the terms of the applicable Loan Documents shall control.

Section 2.04      Funding of Borrowings.

(a)      The Administrative Agent, following receipt of a Committed Loan Notice, shall promptly notify each Lender of the applicable amount of New Money Term Loans to be funded. Whereupon, each Lender shall remit to the Administrative Agent its share of such New Money Term Loans, in same day funds not later than 12:00 noon on the Business Day specified in the Committed Loan Notice to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds with respect to the New Money Term Loans, the Administrative Agent will promptly (i) remit to Lender Advisors all fees and expenses payable on the date of the funding of the New Money Term Loan, (ii) deduct and apply all fees payable to the Administrative Agent on the date of the funding of the New Money Term Loan to the extent properly invoiced for its own account and for the account of the Escrow Agent and the Lenders and (iii) in the case of New Money Term Loans made on the Closing Date, remit an amount of $[●] less the amounts in clauses (i) and (ii) to the Loan Proceeds Account, and in the case of New Money Term Loans made after the Closing Date, remit an amount of $[●] less the amounts in clauses (i) and (ii) to the Loan Proceeds Account.  For the avoidance of doubt, all parties agree that all Loans shall be funded and accrue interest starting on the Closing Date, including any Loans the proceeds of which have not been directly remitted to the Borrower.  For the avoidance of doubt, and notwithstanding

**Debtors' Exhibit No. 11**
**Page 63 of 168**

anything to the contrary in any Loan Document, the Prepetition Credit Agreement, any additional document, instrument, certificate and/or agreement related to any of the foregoing, in no event shall any property, proceeds, cash, cash equivalents, or otherwise placed or held in the Loan Proceeds Account established pursuant to the Escrow Agreement at any time be, or be deemed to be, property of any of the Debtors or their affiliates or subsidiaries or any of the Debtors' estates and the parties to the Escrow Agreement have acknowledged and agreed to the foregoing, and the amounts on deposit in the Loan Proceeds Account shall only be made available to the Borrowers to the extent set forth in <u>Section 4.03</u> hereof.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with clause (a) of this Section 2.03 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of (A) the Federal Funds Effective Rate and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans at such time.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.05      <u>Prepayments</u>.

(a)      <u>Optional Prepayments</u>. (i) The Borrower may, upon delivery of a Prepayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans, in whole or in part without premium or penalty other than the Exit Premium; <u>provided</u> that (1) such notice must be received by the Administrative Agent not later than (A) 1:00 p.m. three (3) U.S. Government Securities Business Days prior to any date of prepayment of SOFR Loans, (B) 1:00 p.m. three (3) Business Days prior to any date of prepayment of EURIBOR Loans and (C) 11:00 a.m. on any date of prepayment of Base Rate Loans (or, in each case, such later date to which the Administrative Agent may agree); (2) any prepayment of SOFR Loans or EURIBOR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; (3) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and, subject to the limitations in the final sentence of this <u>Section 2.05(a)(i)</u>, the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a SOFR Loan or a EURIBOR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to <u>Section 3.05</u>. Each prepayment of any Loans pursuant to this <u>Section 2.05(a)</u> shall be applied, first, ratably to the New Money Term Loans, until all the New Money

**Debtors' Exhibit No. 11**
**Page 64 of 168**

Term Loans are repaid in full, and, second, ratably to the Roll-Up Loans and Revolving Loans, until all Roll-Up Loans and Revolving Loans are repaid in full.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a) if such prepayment would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(b)    <u>Mandatory Prepayments</u>. (i) [Reserved].

(ii)    (A)    If (x) the Borrower or any of the other Restricted Subsidiaries Disposes of any property pursuant to Section 7.05(h), (k) or (y) any Casualty Event occurs, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Term Loans equal to 100% of all such Net Cash Proceeds realized or received.

(B)    [Reserved].

(C)    On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, as promptly as reasonably practicable, but in any event within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to 100% of such Net Cash Proceeds realized or received and required to be prepaid.

(D)    [Reserved].

(iii)    If the Parent or any of its Restricted Subsidiaries incurs or issues any Indebtedness (including Disqualified Equity Interests) either (A) not permitted to be incurred or issued pursuant to Section 7.03 or, with respect to Parent, Article VIII or (B) [reserved], the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)    Each prepayment of Loans pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied first, ratably to the New Money Term Loans, until all the New Money Term Loans are repaid in full, and, second, ratably to the Roll-Up Loans, until all Roll-Up Loans are repaid in full.

(v)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three (3) Business Days (or such shorter period as the Administrative Agent may agree in its sole discretion) prior to the date of such prepayment pursuant to a Prepayment Notice. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's Prepayment Notice and of such Appropriate Lender's Pro Rata Share of the prepayment.

Debtors' Exhibit No. 11
Page 65 of 168

(vi)    Notwithstanding anything in this Section 2.05 to the contrary, (A) the Borrower shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Section 2.05(b)(ii) above to the extent that the relevant Net Cash Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrower of any such amount would be prohibited under any requirement of local law as reasonably determined by the Borrower in good faith (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by applicable requirements of law to permit such repatriation); it being understood that once the repatriation of the relevant affected Net Cash Proceeds, as the case may be, is permitted under the applicable requirement of law, the relevant Foreign Subsidiary will promptly repatriate the relevant Net Cash Proceeds, and promptly apply such Net Cash Proceeds (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05 to the extent required herein (without regard to this clause (vi)) and (B) if the Borrower reasonably determines in good faith that the repatriation to the Borrower of any amounts required to mandatorily prepay the Term Loans pursuant to Section 2.05(b)(ii) above would result in material and adverse tax consequences (such amount, a "Restricted Amount"), as reasonably determined by the Borrower in good faith, the amount the Borrower shall be required to mandatorily prepay pursuant to such applicable provision of Section 2.05 above shall be reduced by the Restricted Amount until such time as it may repatriate to the Borrower the Restricted Amount without incurring such material and adverse tax liability; provided that to the extent that the repatriation of any Net Cash Proceeds from the relevant Foreign Subsidiary would no longer have an adverse tax consequence, an amount equal to such Net Cash Proceeds not previously applied pursuant to preceding clause (B), shall be promptly applied to the repayment of the Term Loans pursuant to this Section 2.05 as otherwise required above (without regard to this clause (vi)).

(c)    Interest, Funding Losses. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon and any applicable Exit Premium pursuant to Section 2.09(c), together with, in the case of any such prepayment of a SOFR Loan or a EURIBOR Loan, as applicable, on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such SOFR Loan or EURIBOR Loan pursuant to Section 3.05. If any payment of SOFR Loans or EURIBOR Loans otherwise required to be prepaid under Section 2.05(b) would be made on a day other than the last day of the applicable Interest Period therefor, the Borrower may direct the Administrative Agent to (and if so directed, the Administrative Agent shall) deposit such payment in a deposit account pledged as Collateral until the last day of the applicable Interest Period at which time the Administrative Agent shall apply the amount of such payment to the prepayment of such Borrowings; provided, however, that such Loans shall continue to bear interest as set forth in Section 2.08 until the last day of the applicable Interest Period thereunder.

(d)    Application of Commitment Reductions. For the avoidance of doubt, each repayment of Term Loans shall be applied, first, ratably to the New Money Term Loans, until all New Money Term Loans are repaid in full, and, second, ratably to the Roll-Up Loans, until all Roll-Up Loans are repaid in full.

Section 2.06    Termination or Reduction of Commitments.

(a)    Optional. The Borrower may, upon written notice in accordance with Section 11.02 to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction,

59

and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice to terminate or reduce unused Commitments of any Class under this <u>Section 2.06(a)</u> if such termination or reduction would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(b)     <u>Mandatory</u>. Upon the making of each New Money Term Lender's New Money Term Loans pursuant to <u>Section 2.01(a)(i)</u> and <u>(ii)</u>, the New Money Term Commitment of such New Money Term Lender shall be automatically and permanently reduced to $0.

(c)     Commitments in connection with any Roll-Up Loans may only be reduced or terminated as long as (i) all Commitments in connection with the New Money Term Loans have been reduced or terminated in full and (ii) all Obligations in connection with the New Money Term Loans have been repaid in full.

Section 2.07     <u>Repayment of Loans</u>.

(a)     The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date, the aggregate principal amount of all Term Loans outstanding on such date, together with accrued and unpaid interest.  Notwithstanding anything herein or the other Loan Documents to the contrary, if the Required Supermajority Lenders support a Chapter 11 Plan that provides for the Lenders to receive non-cash distributions on account of the Obligations and related DIP Term Loan Claims on account thereof, then each Lender shall be deemed to have consented to have its DIP Term Loan Claims paid on the effective date of such Chapter 11 Plan with the non-cash option provided in such Chapter 11 Plan.

(b)     Each repayment of Loans shall be applied, first, ratably to the New Money Term Loans until all New Money Term Loans are repaid in full, and, second, ratably to the Roll-Up Loans until all Roll-Up Loans are repaid in full.

(c)     For the avoidance of doubt, no payment or repayment may be made with respect to the Roll-Up Loans until (i) all Commitments with respect to New Money Term Loans have terminated or have otherwise been reduced to $0 and (ii) all Obligations with respect to New Money Term Loans are repaid in full.

(d)     The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Lenders the then unpaid principal amount of each Revolving Loan of such Revolving Lender on the applicable Maturity Date; provided that L/C Borrowings shall be due and payable as provided in <u>Section 2.03(c)</u>.

Section 2.08     <u>Interest</u>.

(a)     Subject to the provisions of <u>Section 2.08(b)</u>, (i) each SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Adjusted Term SOFR for such Interest Period, as the case may be, plus the Applicable Rate; (ii) each EURIBOR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Adjusted EURIBOR for such Interest Period, as the case may be, plus the Applicable Rate; and (iii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate. Any Unreimbursed Amounts in respect of the Letter of Credit that are not converted to L/C Borrowings shall

60

bear interest at a rate equal to the Applicable Rate for Base Rate Loans plus the Default Rate. All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination.

(b)     Commencing upon the occurrence and during the continuance of any Event of Default under Section 9.01(a) (with respect to any failure to make any payment of principal, interest or fees that is required under the terms of this Agreement), 9.01(f) or 9.01(g), the Borrower shall pay interest on the relevant overdue amounts at a fluctuating interest rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided, for the avoidance of doubt, that all such interest shall be payable in cash, other than PIK Interest due and payable on each Interest Payment Date (excluding any such accrued and unpaid PIK Interest on the Maturity Date, which shall be payable in cash). Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)     In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use or administration of Term SOFR.

(e)     Interest shall begin to accrue on the Roll-Up Loans from (and including) the date such Roll-Up Loans are deemed assigned in accordance with Section 2.01(b). Notwithstanding anything to the contrary in this Agreement, New Money Term Loans held in the Loan Proceeds Account shall be deemed to be made and funded hereunder on the Closing Date and shall accrue interest in accordance with this Section 2.08(e) even if such New Money Term Loans are not yet withdrawn and disbursed to the Borrower.

Section 2.09     Premiums and Fees.

(a)     Upfront Premium. The Borrower agrees to pay to the Administrative Agent for the ratable account of the Lenders ratably based on their New Money Term Loans, an upfront premium in an amount equal to 5.00% of the New Money Term Commitments (the "Upfront Premium"), which, as to New Money Term Loans made on the Closing Date, shall be fully earned and Paid in Kind as of the Closing Date, and as to New Money Term Loans made after the Closing Date, shall be fully earned and Paid in Kind as of the date of the entry into the Final DIP Order, in each case which shall be taken into account by the Borrower and the Lenders in determining original issue discount for U.S. federal, state, and local income tax purposes.

(b)     Anchor Premium. The Borrower agrees to pay to the Administrative Agent for the benefit of certain Allocation Parties, an anchor premium equal to 10.00% of the New Money Term Commitments in effective immediately prior to the funding of any New Money Term Loans on the Closing Date) (the "Anchor Premium"), which shall be fully earned on the Closing Date and Paid in Kind on the date that each of the Interim New Money Term Loans and Final New Money Term Loans, respectively and

61

on a proportional basis, are funded pursuant to Section 2.1(a). The Anchor Premium shall be treated (and reported) by the Borrower and the Allocation Parties as put option premium for U.S. federal, state and local income tax purposes.

(c)     Exit Premium. The Borrower agrees to pay to the Administrative Agent for the ratable account of the Lenders ratably based on their Term Loans, an exit premium in an amount equal 5.00% of the then-outstanding Term Loans (the "Exit Premium"), which, as to New Money Term Loans made on the Closing Date (and related Roll-Up Loans), shall be fully earned as of the Closing Date, and as to New Money Term Loans made after the Closing Date (and related Roll-Up Loans), shall be fully earned as of the entry into the Final DIP Order, and in each case shall be payable in cash upon the earlier to occur of (i) any voluntary prepayment of any Term Loans, which has been made pursuant to Section 2.05(a) herein or any mandatory prepayment of the Term Loans, or any voluntary termination of Commitments and (ii) the Maturity Date and which shall be taken into account by the Borrower and the Lenders in determining original issue discount for U.S. federal, state, and local income tax purposes.

(d)     Extension Premium. The Borrower agrees to pay to the Administrative Agent for the ratable account of the Lenders ratably based on their Term Loans, (i) an extension premium in an amount equal to 0.75% of the then-outstanding Term Loans (the "Extension Premium Amount"), which shall be fully earned and paid in cash on the date the Borrower makes a Borrower Maturity Election, and (ii) an extension premium in an amount equal to the Extension Premium Amount, which shall be fully earned and Paid in Kind on the date the Borrower makes a Mutual Maturity Election, in each case which shall be taken into account by the Borrower and the Lenders in determining original issue discount for U.S. federal, state, and local income tax purposes.

Section 2.10     Computation of Interest and Fees. All computations of interest for Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed. Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent (acting at the Direction of the Required Lenders) of an interest rate or premium hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11     Evidence of Indebtedness.

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, in each case in the ordinary course of business. Without limitation of Section 11.07(d), the accounts or records maintained by each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if

62

applicable), amount and maturity of its Loans and payments with respect thereto. It is understood and agreed that any Lender (and/or its applicable assign) in possession of a Note shall be required to return such Note to the Borrower in accordance with Section 11.07(b) and upon the occurrence of the Termination Date (or as promptly as practicable thereafter).

(b)      Entries made in good faith by each Lender in its account or accounts pursuant to Section 2.11(a) shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to such Lender under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents; provided, further, that if such accounts are inconsistent with the Register, the Register shall prevail, absent manifest error. The Register shall be available for inspection by the Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.12      Payments Generally.

(a)      All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 3:00 p.m. (or at such later time as the Administrative Agent may agree) on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. All payments received by the Administrative Agent after 3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      [Reserved].

(c)      Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount

63

is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, then in the event the Administrative Agent has funded a Loan in advance of receipt of funds from a Defaulting Lender or otherwise made a payment to the Borrower on behalf of such Defaulting Lender, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by a Lender hereunder.

A notice by the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this ARTICLE II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in ARTICLE IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan or purchase its participation.

(f)     Without limiting the obligations of any Lender to make Loans hereunder, nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular manner.

(g)     Subject to Section 9.03, if at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards payment of interests and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (ii) second, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled hereto in accordance with the amounts of principal then due to such parties.

(h)     After the occurrence and during the continuation of an Event of Default, monies to be applied to the Obligations, whether arising from payments by the Loan Parties, realization on Collateral, set-off or otherwise, shall be allocated as follows (subject, in all respects, to the Carve-Out):

(i)     First, to payment of the that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but

**Debtors' Exhibit No. 11**
**Page 71 of 168**

including attorney costs and fees and expenses) payable to the Agents in their capacity as such, until paid in full;

(ii)      Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest but including attorney costs and fees and expenses) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them, until paid in full;

(iii)      Third, to pay interest, principal and any other Obligations due in respect of New Money Term Loans, until paid in full;

(iv)      Fourth, to pay interest, principal and any other Obligations in respect of the Roll-Up Loans, until paid in full; and

(v)      Fifth, to pay all other Obligations that are due and payable, until paid in full.

Amounts shall be applied to each category of Obligations set forth above until paid in full and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied pro rata among the Obligations in the category. The allocations set forth in this Section 2.12(h) are solely to determine the rights and priorities of the Agents and Lenders as among themselves and may be changed by agreement among the Agents and all of the Lenders without the consent of any Loan Party. This Section 2.12(h) is not for the benefit of, or enforceable by, any Loan Party.

Section 2.13      Sharing of Payments. If, other than as expressly provided elsewhere herein (including Section 11.07), any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise; provided that any conversion or exchange of the Loans into other Indebtedness shall not be a payment for purposes of this Section 2.13) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 11.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to

65

the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    Defaulting Lenders. Notwithstanding any other provision in this Agreement to the contrary, if at any time a Lender becomes a Defaulting Lender, then the following provisions shall apply so long as any Lender is a Defaulting Lender: Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 11.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Borrower as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, so long as no Default or Event of Default exists, as the Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent or the Borrower, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan was made or created, as applicable, at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender. Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender pursuant to this Section 2.14 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.15    Syndication. Following the Closing Date, the Borrower shall use best efforts to assist the Lenders in connection with a syndication process in accordance with the Syndication Procedures (the "Syndication") for the assignment of a proportionate share of the Offered New Money DIP Term Loans. Upon completion of the Syndication, a Schedule 2.15, which shall be prepared by the Lender Advisors and satisfactory to the Ad Hoc Group, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate principal amount of New Money Term Loans and proposed Roll-Up Loans held, or to be held, by each Lender upon the occurrence of each Syndication Closing Date. Subject to the Roll-Up Cap, the Roll-Up shall be effective, and the deemed assignment of the Roll-Up

66

Loans and cancellation, extinguishment and waiver of the Eligible Prepetition 1L Claims shall occur as set forth in Section 2.01(b).

Section 2.16    [Reserved].

Section 2.17    [Reserved].

Section 2.18    Extension of Term Loans.

(a)    Following the Closing Date, the Borrower may extend the date set forth in clause (iii) of the definition of Maturity Date at its sole election (each, a "Borrower Maturity Election"), provided that the following conditions are satisfied (or waived by the Required Lenders):

(i)    The Borrower shall provide 5 calendar days prior written notice to the Administrative Agent of each such Borrower Maturity Election;

(ii)    the representations and warranties of the Borrower and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Borrower Maturity Election; provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(iii)    no Default or Event of Default shall exist, or would result from such proposed Borrower Maturity Election;

(iv)    the Borrower shall have paid the Extension Premium and all other fees or premiums payable hereunder or under any Loan Documents and, to the extent invoiced at least one Business Day prior to the date of the Borrower Maturity Election, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including the reasonable and documented fees, charges, disbursements and expenses of the Lender Advisors);

(v)    the Borrower may only make two (2) Borrower Maturity Elections during the term of this Agreement;

(vi)    each Borrower Maturity Election shall extend the then applicable date set forth in clause (iii) of the definition of "Maturity Date" by 45 days; and

(vii)    the Borrower shall have paid to the Administrative Agent for the ratable account of the Lenders ratably based on their Term Loans an Extension Premium for each Borrower Maturity Election.

(b)    Following the Closing Date and after all Borrower Maturity Elections have been utilized, the Borrower, with the consent of Required Lenders may extend the date set forth in clause (iii) of the definition of Maturity Date at their mutual election (each, a "Mutual Maturity Election"), provided that the following conditions are satisfied (or waived by the Required Lenders):

67

(i)     The Borrower shall provide 5 calendar days prior written notice to the Administrative Agent of each such Mutual Maturity Election request;

(ii)     Required Lenders shall consent or withhold consent within 5 days of receiving the request described in clause (i) above;

(iii)     the representations and warranties of the Borrower and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Borrower Maturity Election; provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(iv)     no Default or Event of Default shall exist, or would result from such proposed Mutual Maturity Election;

(v)     the Borrower shall have paid the Extension Premium and all other fees or premiums payable hereunder or under any Loan Documents and, to the extent invoiced at least one Business Day prior to the date of the Mutual Maturity Election, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including the reasonable and documented fees, charges, disbursements and expenses of the Lender Advisors); and

(vi)     the Borrower and the Required Lenders may only make four (4) Mutual Maturity Elections during the term of this Agreement;

(vii)     each Mutual Maturity Election shall extend the then applicable date set forth in clause (iii) of the definition of "Maturity Date" by 30 days; and

(viii)     the Borrower shall have paid to the Administrative Agent for the ratable account of the Lenders ratably based on their Term Loans an Extension Premium for each Mutual Maturity Election.

Section 2.19     Benchmark Replacement Setting.

(a)     Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long

68

as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b)     Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.19(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.19, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.19.

(d)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate or the EURIBOR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent (acting at the Direction of the Required Lenders) in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued, or a EURIBOR Borrowing of or continuation of EURIBOR Loans to be made continued, during any Benchmark Unavailability Period and, failing that, (x) the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans, in the case of Loans denominated in Dollars or (y) any request for a Loan denominated in Euros shall be ineffective. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate. Furthermore, if any Loan denominated in Euros is outstanding on the date of the Borrower's receipt of notice of the

69

commencement of a Benchmark Unavailability Period with respect to the EURIBOR Rate, then such Loan shall, on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), at the Borrower's election prior to such day: (A) be prepaid by the Borrower on such day or (B) be converted by the Administrative Agent to, and (subject to the remainder of this subclause (B)) shall constitute, a Base Rate Loan denominated in Dollars (in an amount equal to the Dollar Equivalent Amount of Euros so converted) on such day (it being understood and agreed that if the Borrower does not so prepay such Loan on such day by 12:00 noon, local time, the Administrative Agent is authorized to effect such conversion of such EURIBOR Loan into a Base Rate Loan denominated in Dollars), and, in the case of such subclause (B), upon any subsequent implementation of a Benchmark Replacement in respect of Euros pursuant to this clause (e), such Base Rate Loan denominated in Dollars shall then be converted by the Administrative Agent to, and shall constitute, a EURIBOR Loan denominated in Euros (in an amount equal to the Euro Equivalent Amount of Dollars so converted) on the day of such implementation, giving effect to such Benchmark Replacement in respect of Euros.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01      Taxes.

(a)      Except as required by applicable Laws, any and all payments by a Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all Taxes.

If a Loan Party, or its applicable agent, shall be required by any Law to deduct (under applicable Laws, as determined in the good faith discretion of the applicable withholding agent) any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) with respect to Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings on account of Indemnified Taxes that are applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Loan Party (or withholding agent if applicable) shall make such deductions or withholdings, (iii) the applicable Loan Party (or withholding agent if applicable) shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Borrower shall furnish to the Administrative Agent for its account or for the account of any other Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof, or in the event that the same is not available using commercially reasonable business efforts, such other written proof of payment thereof that is reasonably satisfactory to the applicable Agent or Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, fee, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07(a)) (all such non-excluded taxes, charges, duties, debits and levies described in this Section 3.01(b) being hereinafter referred to as "Other Taxes").

(c)      The Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any Governmental Authority on amounts payable and paid under this Section 3.01) payable or paid by such Agent and such

70

Lender under any Loan Document or otherwise arising in connection with any Loan and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Payment under this <u>Section 3.01(c)</u> shall be made in accordance with <u>Section 3.06</u> hereof. The Borrower shall not be required to indemnify any Lender or Agent under this <u>Section 3.01(c)</u> with respect to any Taxes that have been compensated for by the payment of any additional amounts pursuant to <u>Section 3.01(a)</u> or <u>(b)</u>.

(d)     If any Lender or Agent determines, in its reasonable discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it pursuant to this <u>Section 3.01</u> (including by the payment of additional amounts pursuant to this <u>Section 3.01</u>), it shall remit such refund as soon as practicable after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, under this <u>Section 3.01</u> with respect to the Indemnified Taxes giving rise to such refund) to the Borrower, net of all reasonable out-of-pocket expenses of the relevant Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority); <u>provided</u> that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (<u>provided</u> that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (d), in no event will any Lender or Agent be required to pay any amount to the Borrower pursuant to this paragraph (d) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid. Subject to <u>Section 3.01(e)</u> below, nothing herein contained shall oblige any Lender or Agent to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof (or any other information relating to its Taxes that it deems confidential) or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of <u>Section 3.01(a)</u>, <u>3.01(b)</u> or <u>3.01(c)</u> with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan affected by such event; <u>provided</u> that (i) such designation would eliminate or reduce amounts payable pursuant to <u>Section 3.01(a)</u>, <u>3.01(b)</u> or <u>3.01(c)</u>, as the case may be, and (ii) such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no economic, legal or regulatory disadvantage; and <u>provided</u> <u>further</u> that nothing in this <u>Section 3.01(e)</u> shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to <u>Section 3.01(a)</u> or <u>3.01(c)</u>. The Borrower agrees to pay all reasonable out-of-pocket expenses incurred by any Lender or Agent in connection with any such designation in accordance with <u>Section 11.04</u> hereof.

(f)     (i) Any Lender (which term "Lender" shall include the L/C Issuer for purposes of this <u>Section 3.01(f)</u>) that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at

**Debtors' Exhibit No. 11**

**Page 78 of 168**

the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f) (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of Internal Revenue Service Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax

72

Compliance Certificate") and (y) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for any Taxes imposed on or with respect to any payment made by the Borrower under any Loan Document attributable to such Lender (but only to the extent that the Borrower, Parent or any Subsidiary Guarantor has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower, Parent or any Subsidiary Guarantor to do so). Each Lender shall severally indemnify the Administrative Agent within 10 days after demand therefor, for (i) any taxes, including interest, additions to tax or penalties applicable thereto, attributable to such Lender's failure to comply with the provisions of Section 11.07(e) relating to the maintenance of a Participant Register and

73

(ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes, taxes or Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

Section 3.02    Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the EURIBOR Rate, the EURIBOR Screen Rate, the EURIBOR Interpolated Rate, Adjusted EURIBOR, SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest based upon the EURIBOR Rate, the EURIBOR Screen Rate, the EURIBOR Interpolated Rate, Adjusted EURIBOR, SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of the Lenders to make SOFR Loans or EURIBOR Loans, as applicable, and any right of the Borrower to continue SOFR Loans or EURIBOR Loans, as applicable, or to convert Base Rate Loans to SOFR Loans, shall be suspended and the Borrower shall make such appropriate accommodations regarding any affected Letter of Credit as the Administrative Agent or the L/C Issuer may reasonably request, as applicable, and (b) the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate", in each case until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans or EURIBOR Loans (in the case of EURIBOR Loans, in an amount equal to the Dollar Equivalent Amount of Euros so converted), as applicable, to Base Rate Loans (the interest rate on which Base Rate Loans that are denominated in Dollars shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans or EURIBOR Loans, as applicable, to such day, or promptly, if such Lender may not lawfully continue to maintain such SOFR Loans or EURIBOR Loans, as applicable, to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the EURIBOR Rate, Adjusted EURIBOR, SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR (at which time, with respect to Base Rate Loans that were converted from EURIBOR Loans, such Base Rate Loans shall be converted to EURIBOR Loans (in an amount equal to the Euro Equivalent Amount of Dollars subject so converted) with an Interest Period of one month. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05.

Section 3.03    Inability to Determine Rates. Subject to Section 2.19, if, on or prior to the first day of any Interest Period for any SOFR Loan or EURIBOR Loan:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" or "Adjusted EURIBOR", as applicable, cannot be determined pursuant to the definition thereof, or

Debtors' Exhibit No. 11
Page 81 of 168

(b)      the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a EURIBOR Loan, as applicable, or a conversion thereto or a continuation thereof that Adjusted Term SOFR or Adjusted EURIBOR, as applicable, for any requested Interest Period with respect to a proposed SOFR Loan or EURIBOR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans or EURIBOR Loans, as applicable, and any right of the Borrower to continue SOFR Loans or EURIBOR Loans, as applicable, or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or EURIBOR Loans, as applicable, or affected Interest Periods) until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing or continuation of SOFR Loans or EURIBOR Loans or a conversion to SOFR Loans, as applicable (to the extent of the affected SOFR Loans or EURIBOR Loans, as applicable, or affected Interest Periods), or, failing that, (a) in the case of SOFR Loans, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (b) in the case of EURIBOR Loans, such request shall be ineffective, and (ii)(A) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period and (B) any outstanding affected EURIBOR Loans shall, at the Borrower's election on the date of receipt of such notice: (A) be prepaid by the Borrower on such date or (B) be converted by the Administrative Agent to, and (subject to the remainder of this subclause (B)) shall constitute, a Base Rate Loan denominated in Dollars (in an amount equal to the Dollar Equivalent Amount of Euros so converted) on such day (it being understood and agreed that if the Borrower does not so prepay such Loan on such day by 12:00 noon, local time, the Administrative Agent is authorized to effect such conversion of such EURIBOR Loan into a Base Rate Loan denominated in Dollars), and, in the case of such subclause (B), upon receipt of any notice from the Administrative Agent that the foregoing provisions of this Section 3.03 no longer apply with any affected EURIBOR Loans, such Base Rate Loan denominated in Dollars shall then be converted by the Administrative Agent to, and shall constitute, a EURIBOR Loan denominated in Euros (in an amount equal to the Euro Equivalent Amount of Dollars so converted) on the day of such implementation. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.19, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Administrative Agent without reference to clause (iii) of the definition of "Base Rate" until the Administrative Agent revokes such determination.

Section 3.04     Increased  Cost  and  Reduced  Return;  Capital  Adequacy;  Reserves  on SOFR Loans and EURIBOR Loans.

(a)      If any Lender reasonably determines that as a result of any Change in Law that (x) imposes, modifies or deems applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or the L/C Issuer or (y) imposes on any Lender or the L/C Issuer any other condition affecting this Agreement or SOFR Loans or EURIBOR Loans or the Letter of Credit, as applicable, made or issued by any Lender or the L/C Issuer, as applicable, and with which such Lender or the L/C Issuer, as applicable, is required to comply, in each case, after the date hereof, there shall be any increase in the cost to such Lender or the L/C Issuer of agreeing to make or making, funding or maintaining any Loan (other than a Base Rate Loan),

**Debtors' Exhibit No. 11**
**Page 82 of 168**

issuing or maintaining the Letter of Credit or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04 any such increased costs or reduction in amount resulting from Indemnified Taxes, Connection Income Taxes or Excluded Taxes), then, in accordance with Section 3.06 hereof, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. At any time when any SOFR Loan or EURIBOR Loan or the Letter of Credit, as applicable, is affected by the circumstances described in this Section 3.04(a), the Borrower may either (i) if the affected SOFR Loan or EURIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower receives any such demand from such Lender or (ii) if the affected SOFR Loan or EURIBOR Loan is then outstanding, upon at least three (3) Business Days' notice to the Administrative Agent, require the affected Lender to convert such SOFR Loan or EURIBOR Loan, as applicable, into a Base Rate Loan (in the case of EURIBOR Loans, in an amount equal to the Dollar Equivalent Amount of Euros so converted), subject to the requirements of Section 3.05 to the extent applicable.

(b)      If any Lender determines that any Change in Law regarding liquidity or capital requirements with which such Lender (or its Applicable Lending Office) is required to comply, in each case after the date hereof, would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender to a level below that which such Lender or the corporation controlling such Lender could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of any corporation controlling such Lender with respect to capital adequacy) as a consequence of such Lender's obligations hereunder, in accordance with Section 3.06 below, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(c)      Subject to Section 3.06(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(d)      If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; provided that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and provided further that nothing in this Section 3.04(d) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b) or (c).

Section 3.05      Funding Losses. In accordance with Section 3.06 hereof, the Borrower shall compensate any Lender for and hold any Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any SOFR Loan or EURIBOR Loan, as applicable, on a day other than the last day of the Interest Period for such Loan; or

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

Debtors' Exhibit No. 11
Page 83 of 168

Section 3.06      Matters Applicable to All Requests for Compensation.

(a)      Any Agent or Lender claiming compensation under this ARTICLE III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error (it being understood and agreed that such Agent or such Lender may use any reasonable averaging and attribution methods), and the basis therefor. The Borrower shall pay the relevant amounts to the relevant Agent or Lender within 30 days following receipt of the certificate described in the immediately preceding sentence. With respect to any Lender's claim for compensation under Section 3.01, Section 3.02, Section 3.03 or Section 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that if the circumstance giving rise to such claim is retroactive, then such one hundred and eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrower under Section 3.04 with respect to SOFR Loans or EURIBOR Loans, as applicable, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue SOFR Loans or EURIBOR Loans, as applicable, subject to such request from one Interest Period to another, or to convert Base Rate Loans into SOFR Loans or EURIBOR Loans, as applicable, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(b) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(b)      If the obligation of any Lender to make or continue any SOFR Loan or EURIBOR Loan from one Interest Period to another, or to convert Base Rate Loans into SOFR Loans or EURIBOR Loans shall be suspended pursuant to Section 3.06(a) hereof (but excluding Section 3.03), such Lender's SOFR Loans or EURIBOR Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such SOFR Loans or EURIBOR Loans as applicable (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's SOFR Loans or EURIBOR Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's SOFR Loans or EURIBOR Loans, as applicable, shall be applied instead to its Base Rate Loans; and

(ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as SOFR Loans or EURIBOR Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into SOFR Loans or EURIBOR Loans, as applicable, shall remain as Base Rate Loans.

(c)      If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise to the conversion of such Lender's SOFR Loans or EURIBOR Loans, as applicable, pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when SOFR Loans or EURIBOR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to SOFR Loans or EURIBOR Loans, as applicable, on the first day(s) of the next succeeding Interest Period(s) for such outstanding SOFR Loans or EURIBOR Loans, to the extent necessary so that, after giving effect thereto, as applicable, all Loans held by the Lenders holding SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments and all Loans held by the Lenders

77

holding EURIBOR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

Section 3.07    Replacement of Lenders under Certain Circumstances.

(a)    If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.04 or requires a Loan Party to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 as a result of any condition described in such Sections or any Lender ceases to make SOFR Loans or EURIBOR Loans, as applicable, as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, in its sole discretion and at its sole expense and effort, on prior written notice to the Administrative Agent and such Lender, (A) terminate the Commitments of such Lender and prepay such Lender's outstanding Loans in full at par or (B) replace any such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 11.07(b) (with any assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver or amendment) to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and provided further that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments, (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents and (C) no such assignment shall be made if it conflicts with applicable Laws. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by the Required Lenders or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement shall be paid in full to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the Borrower shall deliver to the assignee Lender a Note or Notes (or replacement Note or Notes, as the case may be) executed by the Borrower, the assignee Lender shall become a Lender hereunder with respect to the interests assigned, in addition to any other interest it may otherwise hold as a Lender under this Agreement, and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned interest, except with respect to provisions under this Agreement which survive the Termination Date, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Lender being replaced does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within two Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender being replaced, then such Lender being replaced shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender being replaced.

(c)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected

78

Lenders in accordance with the terms of <u>Section 11.01</u> or all the Lenders with respect to a certain Class of the Loans and (iii) the Required Lenders or the Lenders holding a majority in outstanding principal amount of the Loans held by the relevant group of affected Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "<u>Non-Consenting Lender</u>". Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior notice to such Lender, to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out this provisions of this <u>Section 3.07;</u> and provided, further, that if a Non-Consenting Lender is forced to assign its Commitment under this Agreement, such Non-Consenting Lender shall be entitled to payment of the Exit Premium with respect to such New Money Term Loan, accrued through such date of assignment.

Section 3.08   <u>Survival</u>. All of the Borrower's obligations under this <u>ARTICLE III</u> shall survive the Termination Date.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01   <u>Conditions of Initial Credit Extension</u>. The obligation of each Lender on the Closing Date to make its initial Credit Extension hereunder is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent except as otherwise agreed between the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders):

(a)   <u>Loan Documents</u>. The Administrative Agent and the Lender Advisors shall have received the following Loan Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)   this Agreement;

(ii)   each Note requested by a Lender, if any;

(iii)   the Guaranty;

(iv)   the Debtor in Possession Parent Guaranty executed by Viceroy Private Capital, LLC and First Brands Group Holdings, LLC in favor of the Administrative Agent;

(v)   the Escrow Agreement; and

(vi)   the Fee Letter.

(b)   <u>Secretary's Certificate and Attachments</u>. The Administrative Agent and the Lender Advisors shall have received a copy of an originally executed certificate from the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

**Debtors' Exhibit No. 11**
**Page 86 of 168**

(i)    <u>Organizational Documents</u>. Attached thereto is a copy of each Organization Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)    <u>Signature and Incumbency</u>. Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Loan Documents to which it is a party.

(iii)    <u>Resolutions</u>. Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)    <u>Good Standing Certificates</u>. Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)    <u>Committed Loan Notice; Letter of Direction; Flow of Funds Memorandum</u>. The Administrative Agent and the Lender Advisors shall have received a fully executed and delivered Committed Loan Notice, no later than (i) 11:00 a.m. on the Closing Date (in the case of Base Rate Loans) or (ii) 1:00 p.m. one (1) Business Day in advance of the Closing Date (in the case of SOFR Loans), together with a customary direction letter (including such direction built into any such Committed Loan Notice) attaching a flow of funds memorandum with respect to the Transactions and any of the other transactions contemplated by the Loan Documents to occur as of the Closing Date.

(d)    <u>Closing Date Certificate and Attachments</u>. The following shall have occurred (or shall occur concurrently with the making of the Loans on the Closing Date), and the Administrative Agent and the Lender Advisors shall have received an originally executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

(i)    <u>Representations and Warranties</u>. Confirming satisfaction of the condition set forth in Section 4.02(a).

(ii)    <u>No Default or Event of Default</u>. Confirming satisfaction of the condition set forth in Section 4.02(b).

(iii)    <u>Material Adverse Effect</u>. Except for the Chapter 11 Cases, since the Petition Date, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)    <u>Adequate Protection</u>. The Prepetition Agents and the Prepetition Lenders shall have each consented or are deemed to consent to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

80

(f)      Collateral. The Collateral Agent shall have received:

(i)      Lien Searches. The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search (it being understood and agreed that as of the date hereof, the Administrative Agent has received such results and such results are reasonably satisfactory).

(ii)      [Reserved].

(iii)      [Reserved].

(iv)      [Reserved].

(v)      Perfection Certificate. A completed perfection certificate, executed and delivered by a Responsible Officer of each Loan Party on the Closing Date, together with all attachments contemplated thereby.

(vi)      Financial Statements. The Administrative Agent and the Lender Advisors shall have received (i) an audited consolidated balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries as of and for each of the Fiscal Years ended December 31, 2022, December 31, 2023 and December 31, 2024 (the "Audited Financial Statements") and (ii) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Quarters ended March 31, 2025, June 30, 2025 and September 30, 2025 (the "Unaudited Financial Statements"); provided that the financial statements described in this clause (g) shall have been prepared in accordance with GAAP consistently applied.

(g)      [Reserved].

(h)      [Reserved].

(i)      DIP Order. (i) The Bankruptcy Court shall have entered the Interim Order, no later than five (5) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (which consent may be communicated via an email from each of the Lender Advisors, as applicable) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) the Lenders shall have received drafts of the First Day Pleadings, in each case, in form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors), not later than a reasonable time in advance of the Petition Date for the Lender Advisors to review and analyze the same; (iii) all motions, orders (including the "first day" orders), and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably acceptable to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors); and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise agreed by the Required Lenders (which agreement may be communicated via an email from each of the Lender Advisors).

81

(j)      Fees. The Borrower shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Administrative Agent, the Collateral Agent, the Lenders and third party service providers such fees payable to each such Person on the Closing Date. The Administrative Agent shall have received all fees and other amounts previously agreed by the Borrower to be due and payable, including the fees of the Lender Advisors and the reimbursement of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel, including the fees of Gibson, Dunn & Crutcher LLP and Evercore Group L.L.C.).

(k)      Approved Budget. The Administrative Agent and Lender Advisors shall have received the Approved Budget in form and substance satisfactory to the Required Lenders.

(l)      "Know-Your-Customer", Etc. The Administrative Agent shall have received not less than one (1) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under any "know-your-customer" Laws or AML Laws in order to allow the Lenders to comply therewith.

(m)      Consents and Approvals. All necessary governmental and third party consents and approvals necessary in connection with the Term Loans and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Lenders (which may be communicated via a Direction of the Required Lenders)) and shall remain in effect and shall not have been vacated, reversed, amended, modified, repealed or stayed in any respect without the Required Lenders' consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lenders); and the making of the Term Loans shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

(n)      Chapter 11 Cases. The Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor in possession. The Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code. No trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases.

(o)      Other Restraints. Other than (and subject to the entry of) the Interim Order, there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that prohibits, restricts, or imposes an adverse condition on the Term Loans or the exercise by the Administrative Agent of its rights as a secured party on a material portion of the Collateral.

(p)      Event of Default.  As of the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(q)      Prepetition Agent and Prepetition Lenders.  The Prepetition First Lien Agents, the Prepetition First Lien Term Lenders, the Prepetition Sidecar Agents, and the Prepetition Sidecar Lenders shall have each consented or are deemed to consent to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

(r)      Prepetition Commitments. (i) Either (x) the commitments under the Prepetition ABL Credit Agreement or under a debtor-in-possession facility in connection with the Prepetition ABL Credit Agreement shall be at least $250,000,000 or (y) the Bankruptcy Court has approved the Interim DIP Order that provides for the use of cash collateral in respect of the Prepetition ABL Facility in a manner in form and substance acceptable to the Required Lenders and (ii) the Borrower shall maintain the "big 7" factoring programs on a best efforts basis.

**Debtors' Exhibit No. 11**
**Page 89 of 168**

(s)      <u>Fraudulent Activities</u>.  After due inquiry, each Loan Party is unaware of any fraudulent activities occurring after the Petition Date in connection with its business.

Each Lender and each Agent, by delivering its signature page to this Agreement and, if applicable, funding a Loan on or following the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document, agreement, instrument, certificate or opinion required to be approved by such Lender or such Agent, as the case may be, on the Closing Date.

Section 4.02      <u>Conditions to Each Credit Extension, Other Than the Initial Credit Extension</u>.  Each Credit Extension, other than the Initial Credit Extension, is subject to the satisfaction (or waiver by the Required Lender)s of the following conditions precedent:

(a)      the representations and warranties of the Borrower and each other Loan Party contained in <u>ARTICLE V</u> or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension (immediately before and after giving effect to such Credit Extension, as applicable), as applicable; <u>provided</u> that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided further</u> that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)      no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom;

(c)      in the case of an L/C Credit Extension, (x) the Administrative Agent shall have received a fully executed and delivered Letter of Credit Application and Letter of Credit Request, subject to <u>Section 2.03(b)</u>, no later than 12:00 p.m. three (3) Business Days in advance of the requested date of issuance of the Letter of Credit and (y) after giving effect to the requested L/C Credit Extension, the outstanding amounts under the Letter of Credit shall not exceed the Letter of Credit Commitment;

(d)      the Bankruptcy Court shall have entered the Final Order, it shall be in full force and effect and it shall not have been vacated, stayed, reversed, modified or amended, in whole or in any part, without the Required Lenders' written consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lender). All other "second day" orders shall have been entered in form and substance reasonably acceptable to the Required Lenders;

(e)      no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent (acting at the Direction of the Required Lenders) and the Required Lenders;

(f)      the Loan Parties shall be in compliance in all respects with the Milestones;

(g)      the Loan Parties shall be in compliance with the Approved Budget in all respects and the proceeds of the New Money Term Loans shall be used as set forth in the Approved Budget (in each case, subject to the Permitted Variance);

(h)      the Agents and the Lender Advisors, as applicable, shall have received all fees and other amounts previously agreed in writing by Holdings to be due and payable on such date, including, for the avoidance of doubt, the fees of the Lender Advisors, to the extent invoiced prior to such Withdrawal or L/C Credit Extension, as applicable (except as otherwise reasonably agreed by the Borrowers),

**Debtors' Exhibit No. 11**
**Page 90 of 168**

reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party under any Loan Document;

(i)       each Credit Extension must be approved by the CRO;

(j)       after due inquiry, each Loan Party is unaware of any fraudulent activities occurring after the Petition Date in connection with its business; and

(k)       (i) Either (x) the commitments under the Prepetition ABL Credit Agreement or under a debtor-in-possession facility in connection with the Prepetition ABL Credit Agreement shall be at least $250,000,000 or (y) the Bankruptcy Court has approved the DIP Orders that provide for the use of cash collateral in respect of the Prepetition ABL Facility in a manner in form and substance acceptable to the Required Lenders and (ii) the Borrower shall maintain the "big 7" factoring programs on a best efforts basis.

Section 4.03    Conditions to Each Withdrawal.  Any Withdrawal after the Closing Date is subject to the satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)       the representations and warranties of the Borrower and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Withdrawal (immediately before and after giving effect to such Withdrawal), as applicable; provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)       no Default or Event of Default shall exist, or would result from such proposed Withdrawal or from the application of the proceeds therefrom;

(c)       the Administrative Agent and the Lender Advisors shall have received a Withdrawal Notice executed by the Borrower requesting the proposed Withdrawal thereunder by no later than 2:00 p.m. two (2) Business Days prior to the proposed Withdrawal Date, which shall include a reasonably detailed description (in form and substance reasonably satisfactory to the Lender Advisors) of the contemplated use of proceeds for the proposed Withdrawal, and the requested Withdrawal amount shall not exceed $100,000,000 for any single Withdrawal Notice; provided, that no Withdrawal shall be permitted unless the Withdrawal Notice and the contemplated use of proceeds of the proposed Withdrawal is satisfactory to the Lender Advisors;

(d)       other than in connection with any Withdrawal consisting solely of Interim New Money Term Loans, the Bankruptcy Court shall have entered the Final Order, it shall be in full force and effect and it shall not have been vacated, stayed, reversed, modified or amended, in whole or in any part, without the Required Lenders' written consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lender). All other "second day" orders shall have been entered in form and substance reasonably acceptable to the Required Lenders;

(e)       no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent (acting at the Direction of the Required Lenders);

**Debtors' Exhibit No. 11**
**Page 91 of 168**

(f)     the Loan Parties shall be in compliance in all respects with the Milestones;

(g)     the Loan Parties shall be in compliance with the Approved Budget in all respects and the proceeds of the New Money Term Loans shall be used as set forth in the Approved Budget (in each case, subject to the Permitted Variance);

(h)     the Agents and the Lender Advisors, as applicable, shall have received all fees and other amounts previously agreed in writing by Parent to be due and payable on such date, including, for the avoidance of doubt, the fees of the Lender Advisors, to the extent invoiced prior to such Withdrawal (except as otherwise reasonably agreed by the Borrowers), reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party under any Loan Document;

(i)     each Withdrawal must be approved by the CRO;

(j)     after due inquiry, each Loan Party is unaware of any fraudulent activities occurring after the Petition Date in connection with its business;

(k)     (i) Either (x) the commitments under the Prepetition ABL Credit Agreement or under a debtor-in-possession facility in connection with the Prepetition ABL Credit Agreement shall be at least $250,000,000 or (y) the Bankruptcy Court has approved the Interim DIP Order or Final DIP Order, as applicable, that provides for the use of cash collateral in respect of the Prepetition ABL Facility in a manner in form and substance acceptable to the Required Lenders and (ii) the Borrower shall maintain the "big 7" factoring programs on a best efforts basis; and

(l)     Liquidity shall be no greater than $100,000,000 after giving effect to such Withdrawal and the permitted use of proceeds thereof.

Upon receipt of the Withdrawal Notice and satisfaction of the conditions set forth in Article IV, the Administrative Agent shall promptly direct the Escrow Agent to disburse funds by 2:00 p.m. on the applicable Withdrawal Date; provided that, if the Lender Advisors or the Required Lenders determine (which determination may be communicated via an email from each of the Lender Advisors) that the Borrower has failed to satisfy the conditions precedent set forth in this Section 4.03 for a Withdrawal Notice and so advise the Administrative Agent in writing (directly or through the Lender Advisors) prior to the Escrow Agent disbursing the Withdrawal, the Administrative Agent shall decline to authorize such Withdrawal and shall communicate the same to the Escrow Agent.

On any date on which the Loans shall have been accelerated, any amounts remaining in the Loan Proceeds Account, as the case may be, may be applied by the Administrative Agent (acting at the Direction of the Required Lenders) to reduce the Loans then outstanding, in accordance with Section 2.12. None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the Loan Proceeds Account upon the occurrence and during the continuance of any Default or Event of Default. It is understood and agreed that the Administrative Agent may not deliver a "Termination Notice" (as defined and under the Escrow Agreement) unless and until an Event of Default has occurred and is continuing or otherwise (and at the Direction of the Required Lenders).

The acceptance by the Borrower of the Loans or proceeds of a Withdrawal shall conclusively be deemed to constitute a representation by the Borrower that each of the conditions precedent set forth in Section 4.01, Section 4.02 and Section 4.03 shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, however, that the making

85

of any such Loan or Withdrawal (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Agents, any Lender or other Secured Party of the provisions of this Article IV on such occasion or on any future occasion or operate as a waiver of (i) the right of the Administrative Agent and the Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of any Agent or any Lender as a result of any such failure of the Loan Parties to comply.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each of Parent and the Borrower represents and warrants to the Agents and the Lenders on the Closing Date and on the date of each Credit Extension that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws. Each of the Parent, Borrower, the Guarantors and each of the other Restricted Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction) (solely in the case of any such Person other than the Borrower, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (b) subject to any restrictions arising on account of the Borrower's or any Person's status as a "debtor" under the Bankruptcy Code, has all requisite power and authority to (i) own or lease its assets and carry on its business (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to the extent such Person is a Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (d) is in compliance with all Laws, orders, writs, injunctions and orders (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (e) has all requisite governmental licenses, authorizations, consents and approvals, if any, to operate its business as currently conducted (except where the failure to have such licenses, authorizations, consents and approvals could not reasonably be expected to have a Material Adverse Effect).

Section 5.02    Authorization; No Contravention. Subject to entry of the DIP Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) are within such Loan Party's corporate or other organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (iii) violate any applicable Law (in each case, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect).

Section 5.03    Governmental Authorization; Other Consents. Subject to entry of the DIP Order and other than the entry of the Final Order, and except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect. no approval, consent, exemption,

Debtors' Exhibit No. 11
Page 93 of 168

authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, any other Loan Document or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04    Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto. This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05    No Material Adverse Effect. Since the Closing Date, no event, effect, occurrence, fact, condition, change or development has occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.06    Litigation; FCPA. Except for the Chapter 11 Cases and any dispute, claim, investigation or litigation arising in connection therewith or related thereto, there is no action, suit, investigation, litigation, proceeding or disputes affecting the Parent or any of its Restricted Subsidiaries or any of their properties, pending or threatened in writing before any Governmental Authority or arbitrator that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07    Ownership of Property; Liens; Insurance.

(a)    Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for the Liens and security interest created or permitted under the Loan Documents including, any Liens permitted under Section 7.01.

(b)    The Borrower and each of the other Restricted Subsidiaries has (i) good and legal (or to the extent such real property is located in Texas, indefeasible) title in fee simple to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real property), or (iii) easements or other limited property interests in, all real property used in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Set forth as Schedule 5.07(b) hereto is a complete and accurate list of all real property owned in fee by the Borrower or any of the other Restricted Subsidiaries as of the Closing Date, showing the street address (if applicable), county, state and any other relevant jurisdiction and record owner.

(c)    The Borrower and each of the other Restricted Subsidiaries maintains the insurance required by Section 6.07.

**Debtors' Exhibit No. 11**
**Page 94 of 168**

Section 5.08    Creation and Perfection of Security Interests.

(a)    Subject to the entry thereof, the DIP Order creates in favor of the Collateral Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest in and valid and perfected as of the Closing Date by entry of the DIP Order with respect to each Loan Party and which shall constitute a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing all the Obligations, other than as set forth in the DIP Order. The Collateral Agent and Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the DIP Order.

(b)    Pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the U.S. Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the U.S. Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof other than as set forth in the DIP Order.

Section 5.09    Environmental Compliance. Except as could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(a)    the operations and properties of the Parent, the Borrower and each of their respective Subsidiaries comply in all respects with all, and have not violated any, applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all applicable Environmental Permits. The Parent, the Borrower and each of their respective Subsidiaries have no reasonable basis to believe that any such Environmental Permits will be revoked or adversely modified, or will not be timely renewed and complied with, in the ordinary course of business;

(b)    (i) there are no Environmental Liabilities of the Parent, the Borrower or any of their respective Subsidiaries, and (ii) there are no facts, circumstances or conditions arising out of or relating to the Parent, the Borrower or any of their respective Subsidiaries, their respective operations or their respective currently or formerly owned, leased or operated facilities that would be reasonably likely to give rise to Environmental Liabilities or Environmental Actions against the Parent, the Borrower or any of their respective Subsidiaries or be reasonably likely to require a net increase in the Parent's, Borrower's or their respective Subsidiaries' costs to maintain compliance with applicable Environmental Laws;

(c)    neither the Parent, the Borrower nor any of their respective Subsidiaries has received any written notice of, nor have they been subject to, any Environmental Action, nor is any Environmental Action pending or, to the knowledge of the Parent or the Borrower, threatened as to the Parent, the Borrower or any of their respective Subsidiaries; and

88

(d)    there has been no release at, on, to, from or in any property or facility currently or formerly owned, leased, or operated by the Parent, the Borrower or any of their respective Subsidiaries.

Section 5.10    Taxes. Subject to the Bankruptcy Code, the DIP Orders and any required approval by the Bankruptcy Court, the Parent, the Borrower and each of their Restricted Subsidiaries have (a) timely filed all material tax returns and reports required to be filed (taking into account extensions of time to file), and (b) timely paid all material Taxes, shown on such returns and all other amounts of federal, provincial, state, municipal, foreign and other Taxes imposed upon them or their properties, income or assets otherwise due and payable, in each case except (x) with respect to amounts which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, if applicable or (y) the payment of which is authorized but not required by an order of the Bankruptcy Court. No material written claim has been asserted with respect to any Taxes, except (A) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (B) for which proofs of claims for Taxes have been filed with the Bankruptcy Court.

Section 5.11    Compliance with ERISA.

(a)    Each Plan is in material compliance with the applicable provisions of ERISA, the Code and other federal or state Laws; and

(b)    (i) no ERISA Event has occurred prior to the date on which this representation is made that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect and (ii) none of the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect..

Section 5.12    Labor Matters. There are no strikes pending or threatened against the Borrower or any of the other Restricted Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Except as could not reasonably be expected to have a Material Adverse Effect, (i) the hours worked and payments made to employees of the Borrower or any of the other Restricted Subsidiaries have not been in violation in any respect of the Fair Labor Standards Act or any other applicable law dealing with such matters and (ii) all payments due from the Borrower or any of the other Restricted Subsidiaries or for which any claim may be made against the Borrower or any of the other Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Restricted Subsidiary to the extent required by GAAP.

Section 5.13    Subsidiaries; Equity Interests. As of the Closing Date, none of Parent or any of its Restricted Subsidiaries has any Subsidiaries other than those specifically disclosed on Schedule 5.13, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, and, if applicable, are fully paid and non-assessable and are owned by the Parent or a Restricted Subsidiary (as applicable) free and clear of all Liens except those permitted under Section 7.01. As of the Closing Date, Schedule 5.13 (a) sets forth the name and jurisdiction of organization of each Subsidiary of Parent and each of their respective Subsidiaries and (b) sets forth the ownership interest of Parent and its Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership.

89

Section 5.14    Margin Regulations; Investment Company Act; PATRIOT Act.

(a)    None of Parent or any of its Restricted Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U issued by the FRB.

(b)    None of Parent or any of its Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)    None of Parent or any of its Restricted Subsidiaries is in violation in any material respect of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the PATRIOT Act and the use of proceeds of the Loans will not violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

Section 5.15    Disclosure; Financial Statements.

(a)    As of the Closing Date and on the date of any Withdrawal, (i) no report, financial statement, certificate or other written information furnished by or on behalf of Parent or any of its Restricted Subsidiaries to Lender Advisor, Agent or Lender (other than projections and other forward looking information and information of a general economic or general industry nature) in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when furnished, and when taken as a whole (including all supplements thereto), contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates thereto from time to time) and (ii) the projected financial information delivered by or on behalf of the Borrower or any of the other Restricted Subsidiaries to any Lender Advisor, Agent or Lender prior to the Closing Date was prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time such projected financial information were so delivered, it being understood that such financial projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and the other Restricted Subsidiaries, that no assurance can be given that any particular financial projection or the financial projections taken as a whole will be realized and that actual results during the period or periods covered by any such financial projections may differ significantly from the projected results and such differences may be material.

(b)    The Audited Financial Statements and the Unaudited Financial Statements were prepared in conformity with GAAP (except as may be indicated in the notes thereto) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of the Unaudited Financial Statements, to changes resulting from audit and normal year-end adjustments.

(c)    As of the Closing Date and on the date of any Withdrawal, the information included in the Beneficial Ownership Certification is true and correct in all respects.

90

**Debtors' Exhibit No. 11**
**Page 97 of 168**

(d)     After due inquiry, each Loan Party is unaware of any fraudulent activities occurring after the Petition Date in connection with their businesses.

Section 5.16     Intellectual Property. Each Loan Party and each of the Restricted Subsidiaries owns or has a valid and enforceable right to use, any and all intellectual property and similar proprietary rights throughout the world, including any and all trademarks (including the associated goodwill), service marks (including the associated goodwill), trade names, domain names, copyrights, patents, licenses, know how (including trade secrets and other patented and/or unpatentable proprietary or confidential information, systems or procedures), software, design rights, technology and all registrations and applications for registration of any of the foregoing and all goodwill associated with any of the foregoing (collectively, "Intellectual Property") that are used or held for use in, or otherwise necessary for, the operation of their respective business as currently conducted and, to the knowledge of Parent and the Borrower, the use of such Intellectual Property by such Loan Party or Restricted Subsidiary does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, any Intellectual Property held by any other Person, except, in each case, for such infringement, misappropriation or other violations, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Parent and the Borrower, the respective business of any Loan Party or any of its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property held by any Person except for such infringement, misappropriation or other violations, which either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any Intellectual Property is filed and presently pending or, to the knowledge of the Parent or the Borrower, presently threatened in writing against any Loan Party or any of its Subsidiaries, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.17     Security Interest in Collateral. Upon execution and delivery thereof by the parties thereto and upon the entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, the Collateral Documents are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) or, if so contemplated by the respective Collateral Document, the Administrative Agent and the other Secured Parties, in each case, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. Upon the entry by the Bankruptcy Court of the Interim Order or the Final Order, as applicable, and in accordance therewith, the security interests and liens granted to the Administrative Agent (for the benefit of the Secured Parties) to secure the Secured Obligations pursuant to the Interim Order or the Final Order, as applicable, and the Collateral Documents shall automatically, and without further action, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (subject to the Carve-Out).

Section 5.18     AML Laws; Anti-Corruption Laws and Sanctions.

(a)     None of the Borrower, any Guarantor, any Subsidiary or any of their respective directors, officers, to the Borrower's knowledge, or employees, agents or Affiliates is: (i) a Sanctioned Person, (ii) has engaged in the past five (5) years or intends to engage in the future in any dealings or transactions with, involving or for the benefit of, any Sanctioned Person, (iii) has taken or will take any action that would constitute or give rise to a violation of any AML Laws, Anti-Corruption Laws, or Sanctions or (iv) will directly or indirectly use any part of any proceeds of the Loans or the Letter of Credit or lend, contribute, or otherwise make available such proceeds (A) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in

91

violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law or (B) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

(b)     The Borrower, its Subsidiaries and their respective directors, officers and, to the knowledge of the Borrower, employees and the agents of the Borrower and its Subsidiaries, are in compliance with applicable Anti-Corruption Laws, AML Laws, and Sanctions in all material respects.

Section 5.19     <u>Use of Proceeds</u>. The proceeds of the Term Loans shall be subject to and used in accordance with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions of this Agreement, the "first day" orders (solely to the extent permitted under the Approved Budget (subject to Permitted Variances)) and the DIP Order to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and sales under Section 363 of the Bankruptcy Code, (iii) make any other payments consistent with the Approved Budget, in each case, subject to Permitted Variances, (iv) repay in full in cash the Prepetition Bridge Facility and (v) in accordance with any wind-down budget in any restructuring or transaction support agreement, as applicable.

Section 5.20     <u>Bankruptcy Matters</u>

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given. Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 7.01 and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out, the Prepetition ABL Priority Collateral with respect to liens securing the ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) and the Prior Senior Liens (as defined in the DIP Order) and subject to the priorities set forth in the Interim Order or the Final Order, as applicable.

(c)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Required Lenders' consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lenders).

## ARTICLE VI

## AFFIRMATIVE COVENANTS

On and after the Closing Date until the Termination Date, each of Parent and the Borrower shall, and shall cause each other Restricted Subsidiary to:

Section 6.01     <u>Financial Statements</u>. Deliver to the Administrative Agent for prompt further distribution to each Lender:

**Debtors' Exhibit No. 11**
**Page 99 of 168**

(a)     As soon as available, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ending December 31, 2025), a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP and (A) audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing (including, but not limited to, any of the "big 4" national firms) that is reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders)) and (B) accompanied by a comparison against the figures for the previous Fiscal Year; provided, that the requirement in the foregoing subclause (A) for the fiscal year ending December 31, 2025 shall not be required to be delivered until the date that is 150 days after the end of such fiscal year.

(b)     As soon as available, but in any event, within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each Fiscal Year of the Borrower, a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such fiscal quarter, and the related (A) consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and (B) consolidated statements of cash flows for the portion of the Fiscal Year then ended and, in the case of each of clauses (A) and (B) setting forth in each case (x) in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year and (y) "segment"-level information with respect to revenues and gross margins.

(c)     The Borrower shall furnish to the Administrative Agent for further distribution to the Lenders, in each case, in a form satisfactory to the Required Lenders:

(i)     on each Thursday of each calendar week, a summary of liquidity by jurisdiction or region, as applicable;

(ii)     on a bi-weekly basis, on the applicable Friday, beginning with the Friday occurring during the second week following the week during which the Petition Date occurs, a summary of North American accounts payable and accounts receivables balances for the two-week period ending on the Friday immediately preceding the applicable Friday on which such summary is required to be delivered;

(iii)     on the last Business Day of each calendar month, an internal business review package for the immediately preceding calendar month; and

(iv)     on the tenth Business Day of each calendar month (commencing with November 18, 2025), North American accounts receivable aging summary by customer, accounts payable aging summary by vendor and an inventory summary by location for the immediately preceding calendar month.

(d)     Telephonic Meetings. The Borrower shall, following the delivery of the financial statements referred to in Section 6.01(a) and (b), as applicable, at such date and time as reasonably agreed by the Borrower and the Administrative Agent, schedule one telephonic conference call per applicable period specified in Section 6.01(a) and Section 6.01(b) (but in no event more frequently than once per fiscal quarter) with directors and officers of the Borrower reasonably requested by the Administrative Agent to attend to discuss the contents of the relevant reports.

93

Section 6.02    Certificates; Reports; Other Information. Deliver to the Administrative Agent for further distribution to each Lender:

(a)    promptly, any reports, documents, certificate or other information provided to the Prepetition ABL Agent or the lenders under the Prepetition ABL Facility pursuant to the Prepetition ABL Facility or any order entered pursuant to the Chapter 11 Cases;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)    prompt written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's type of organization, (iii) in any Loan Party's jurisdiction of organization and (iv) to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, in any Loan Party's organizational identification number; and

(d)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent, any Lender or the Lender Advisors may from time to time reasonably request, including anonymized updates on any marketing process as reasonably requested by the Allocation Parties and detail on outstanding amounts under financing facilities (including off balance sheet facilities), and the Loan Parties and its Subsidiaries shall execute any documentation to provide for the release to Lenders or the Lender Advisors of reasonably requested third-party information and reports (subject to reasonable and customary confidentiality arrangements).

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents or other information, or provides a link thereto at the website address listed in Section 11.02, (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (iii) on which such documents are available on the website of the SEC at http://www.sec.gov; provided that the Borrower shall notify (which notice may be delivered by facsimile or electronic mail as provided in Section 11.02) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Section 6.03    Notice Requirements; Other Information. Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of each of the following events or circumstances:

(a)    the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)    to the extent permissible by applicable requirements of Law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (i)

94

against any Loan Party, that would reasonably be expected to result in a Material Adverse Effect and (ii) with respect to any Loan Document, in each case, together with the details thereof and any action taken or proposed to be taken with respect thereto;

        (c)    the occurrence of any ERISA Event or ERISA Events that has had or could reasonably be expected to have a Material Adverse Effect;

        (d)    the occurrence of any other matter that has resulted or would reasonably be expected to result in a Material Adverse Effect;

        (e)    damage to, or condemnation of, a material portion of the Collateral, which notice shall specify the nature of such condition, event or change and what action, if any, Parent or the Borrower has taken, is taking or proposes to take with respect thereto; and

        (f)    any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

        Section 6.04    Environmental Matters. Except to the extent that failure to take the actions described in this Section 6.04 could not reasonably be expected to have a Material Adverse Effect:

        (a)    comply and cause each of the Subsidiaries to comply, and take commercially reasonable efforts to cause all of their lessees to comply, with all applicable Environmental Laws and Environmental Permits, which compliance includes obtaining and renewing, and causing each of the Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for their operations and properties;

        (b)    conduct, cause each of the Subsidiaries to conduct, and take commercially reasonable efforts to cause any other Persons occupying or leasing their facilities or properties to conduct, any Response required by Environmental Law related to their facilities or properties, or at any location which the Parent, the Borrower or any of their respective Subsidiaries conduct operations or business by contract or otherwise; provided, however, that neither the Parent, the Borrower nor any of their respective Subsidiaries shall be required to undertake any such Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances; and

        (c)    promptly, and in any event within ten (10) Business Days of, either (i) receipt by the Parent, the Borrower or any of their respective Subsidiaries of any notice of an Environmental Action related to such Persons, or (ii) the occurrence of any Release that would reasonably be likely to result in the Parent, the Borrower or any of their respective Subsidiaries incurring Environmental Liability or being required to conduct a Response, provide written notice of such receipt or Release to the Administrative Agent, along with a description of actions proposed to be taken by the Parent, the Borrower or any of their respective Subsidiaries to address the Environmental Action or Release.

        Section 6.05    Maintenance of Existence. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in each case, (i) other than with respect to any Person (other than the Borrower), to the extent the board of directors (or equivalent governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and the other Restricted Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to the Borrower,

Debtors' Exhibit No. 11
Page 102 of 168

any of the other Restricted Subsidiaries or the Lenders in any material respect, (ii) [reserved] or (iii) with respect to any such Person (other than the Borrower), except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect.

Section 6.06    <u>Maintenance of Properties</u>. Maintain, preserve and protect all of its material tangible and intangible properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof, in each case except where failure to do so could not reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

Section 6.07    <u>Maintenance of Insurance</u>. Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the other Restricted Subsidiaries) as are customarily carried by Persons engaged in similar businesses and owning or leasing similar properties in the same general areas in which the Borrower or such Restricted Subsidiary operates. Within 60 days of the Petition Date, each policy of property or general liability insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy (excluding any business interruption or personal injury insurance policy), contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and, provide for prior written notice to the Collateral Agent of any modification or cancellation of such policy or the failure to pay any premiums thereunder.

Section 6.08    <u>Compliance with Laws</u>. Comply with the requirements of all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property (including any order of the Bankruptcy Court), except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09    <u>Books and Records</u>. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and permit the preparation of financial statements in conformity in all material respects with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrower or any of the other Restricted Subsidiaries, as the case may be.

Section 6.10    <u>Inspection Rights</u>. Permit representatives and independent contractors, in each case designated by the Administrative Agent or any applicable Lender, to visit and inspect any properties of the Borrower and the other Restricted Subsidiaries and in connection with such visit, to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, in each case, at such reasonable times during normal business hours and as often as may be reasonably requested, upon reasonable advance notice to the Borrower; provided, however, that excluding any such visits and inspections during the continuance of an Event of Default, (i) such visits and inspections shall be coordinated through and by the Administrative Agent and (ii) the Administrative Agent and Lenders, taken as a whole, shall not exercise such rights more than one (1) time during any calendar year (it being understood that such annual visit or inspection shall be at the Borrower's expense); provided further that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the

96

Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower a reasonable opportunity to participate in any discussions with the Borrower's independent public accountants. None of the Borrower nor any of the other Restricted Subsidiaries shall be required to disclose to the Administrative Agent or any Lender (or any authorized representative or independent contractor of any of them) any information (w) that is prohibited by Law to be disclosed, (x) that is subject to attorney-client or similar privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure or similar agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10 or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers; provided that, in the event the Borrower or any Restricted Subsidiary thereof withholds information from the Administrative Agent or the Lenders in reliance on this sentence, the Borrower shall provide (to the extent possible without violation of such Law, attorney-client or similar privilege, attorney work product privilege or non-disclosure or similar agreement) to provide notice to the Administrative Agent or such applicable Lender that such information is being withheld and shall use commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable Law or non-disclosure or similar agreement or risk waiver of such attorney-client or similar privilege or attorney work product privilege.

Section 6.11    Covenant to Guarantee Obligations and Give Security.

(a)    After the Closing Date, if any direct or indirect Subsidiary of the Parent that is domiciled in the United States becomes a Debtor under the Chapter 11 Cases, within ten (10) Business Days after the date such Subsidiary becomes a Debtor under the Chapter 11 Cases (or such longer period as the Administrative Agent (at the Direction of the Required Lenders) may agree in its reasonable discretion), notify the Collateral Agent thereof and cause such Subsidiary to become a Loan Party and to guaranty the Obligations and grant a valid and perfected lien on the assets of such Subsidiaries, in each case, pursuant to documentation reasonably acceptable to the Required Lenders and subject to exclusions reasonably agreed by the Borrower and the Required Lenders; provided, that no such Person shall be required to become a Subsidiary Guarantor hereunder if (x) it is prohibited from doing so under any contractual obligation existing prior to the Petition Date or created in the ordinary course of business after the Petition Date (and not in contemplation of this provision), in each case, to the extent such prohibition is not rendered ineffective by the Bankruptcy Code or other applicable Law, (y) the provision of such guarantee would result in adverse tax consequences  or would be prohibited or restricted by applicable law, rule or regulation or (z) the provision of such guarantee would be prohibited or restricted by local law or similar "corporate benefit" or "financial assistance" limitations in any relevant jurisdiction), in each case for clauses (x), (y) and (z), as determined by the Borrower and the Required Lenders.

(b)    Within 45 calendar days of (i) the Closing Date with respect to Subsidiaries in existence on the Closing Date and (ii) the date of formation or acquisition with respect to any other Subsidiaries (in each case other than Subsidiaries that are the subject of clause (a) above), the Parent shall use commercially reasonable efforts to cause any such Subsidiaries that is not a Guarantor to guarantee the Obligations and grant a valid and perfected lien on the assets of such Subsidiaries, in each case, pursuant to documentation reasonably acceptable to the Required Lenders and subject to exclusions reasonably agreed by the Borrower and the Required Lenders; provided, that no such Person shall be required to become a Subsidiary Guarantor hereunder if (x) it is prohibited from doing so under any contractual obligation existing prior to the Petition Date or created in the ordinary course of business after the Petition Date (and not in contemplation of this provision), in each case, to the extent such prohibition is not rendered ineffective by the Bankruptcy Code or other applicable Law, (y) the provision of such guarantee would result in adverse tax consequences or would be prohibited or restricted by applicable law, rule or regulation

97

or (z) the provision of such guarantee would be prohibited or restricted by local law or similar "corporate benefit" or "financial assistance" limitations in any relevant jurisdiction, in each case for clauses (x), (y) and (z), as determined by the Borrower and the Required Lenders.

Section 6.12    Further Assurances. Promptly upon request by the Administrative Agent or the Required Lenders, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent or Required Lenders, may reasonably require from time to time in order to (x) to the fullest extent permitted by applicable Law, subject any Loan Party's properties, assets, rights or interests that constitute Collateral to the Liens now or hereafter intended to be covered by any of the Collateral Documents and (y) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder (subject to Liens permitted by Section 7.01) and cause each of its Restricted Subsidiaries to do so, but in each case, subject to the limitations set forth herein and in the other Loan Documents.

Section 6.13    Taxes. Subject to the Bankruptcy Code, the terms of the DIP Orders and any required approval or order by the Bankruptcy Court, pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all material Taxes, imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a tax Lien upon any properties of Parent or any of its Restricted Subsidiaries not otherwise permitted under this Agreement; provided that none of Parent or any of its Restricted Subsidiaries shall be required to pay any such Tax, (a) with respect to amounts which are being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or (b) the payment of which is authorized but not required by an order of the Bankruptcy Court.

Section 6.14    Ratings. Use commercially reasonable efforts to obtain, within 60 days of the Closing Date, and, to the extent so obtained, at all times thereafter, maintain (a) public corporate family ratings with respect to the Borrower from Moody's and public corporate credit ratings with respect to the Borrower from S&P and Fitch Ratings and (b) public facility ratings with respect to the Credit Facilities for each of the New Money Term Loans and Roll-Up Loans from each of S&P and Moody's and Fitch Ratings (but, in each case, not any specific ratings).

Section 6.15    Use of Proceeds. The proceeds of the Term Loans shall be subject to and used in accordance with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions of this Agreement, the "first day" orders (solely to the extent permitted under the Approved Budget (subject to Permitted Variances)) and the DIP Order to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and sales under Section 363 of the Bankruptcy Code, (iii) make any other payments consistent with the Approved Budget, in each case, subject to Permitted Variances and (iv) repay in full in cash the Prepetition Bridge Facility.

Section 6.16    Milestones. By the times and dates set forth below (as any such time and date may be extended with the consent of the Required Lenders) cause the following to occur (each, a "Milestone" and collectively, the "Milestones"):

(a)    by the date that is no later than 5 Business Days after the Petition Date, the Debtors shall obtain entry of the Interim Order;

98

(b)      by the date that is no later than 30 days after the Petition Date, the Debtors shall have provided a go-forward business plan for the Debtor and non-Debtor affiliates (the "Approved Business Plan") and entered into a restructuring support agreement in form and substance satisfactory to the Required Lenders;

(c)      by the date that is no later than 45 days after the Petition Date, the Debtors shall obtain entry of the Final Order; and

(d)      by the date that is 75 days after the Petition Date, the Debtors shall deliver a final quality of earnings report to the Lenders prepared by Alvarez & Marsal (or such other institution appointed by the Borrower that is acceptable to the Required Lenders (which may be communicated by a Direction of the Required Lenders)).

Section 6.17      Approved Budget.

(a)      The use of Loans by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to Permitted Variances). The initial Approved Budget shall set forth, on a weekly basis, the Budgeted Cash Receipts, Budgeted Disbursement Amounts, Budgeted Liquidity and Budgeted Borrower Professional Fees for the 13 week period commencing with the week that includes the Closing Date and shall be approved by, and be in form and substance satisfactory to, the Required Lenders in their sole discretion (it being acknowledged and agreed that the form of Approved Budget set forth as Exhibit M hereto is approved by and satisfactory to the Required Lenders and is and shall be the Approved Budget unless and until replaced in accordance with the terms of this Section 6.17). The Approved Budget shall be made available to all Lenders via a public lender data site.

(b)      On the first Thursday of each calendar month, beginning with the first Thursday occurring in November 2025, the Debtors will deliver to the Lenders an updated budget covering the 13 week period starting with the following calendar week, which shall be in form and substance satisfactory to the Required Lenders in their sole discretion, and upon such approval, such updated budget shall be the Approved Budget; provided, that in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, the then current Approved Budget shall remain in effect unless and until a new Approved Budget is approved by the Required Lenders in their sole discretion. Each Approved Budget delivered shall be accompanied by such supporting documentation as requested by the Required Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time of preparation thereof.

(c)      The Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts (each calculated weekly on a cumulative basis (against the then-existing Approved Budget) as opposed to on a line by line basis), in each case, for the cumulative period beginning with the first week covered by the then Approved Budget through the end of the week immediately prior to the date on which the Approved Budget Variance Report is required to be delivered pursuant to clause (d) below (each such period, a "Variance Testing Period") by more than 20% for any such Variance Testing Period ending on or prior to November 7, 2025 and 15% for each Variance Testing Period thereafter; provided that notwithstanding anything to the contrary contained herein, Actual Cash Receipts shall not be tested until the end of the sixth week following the Petition Date; and (y) "Total Operating Disbursements" to exceed the Budgeted Disbursement Amounts (for the avoidance of doubt, excluding Budgeted Borrower Professional Fees) (each calculated weekly on a cumulative basis (against the then-existing Approved Budget) as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than 20% for any Variance Testing Period ending on or prior to November 7, 2025 and 15% for each Variance Testing Period thereafter (the "Permitted Variances"). For the avoidance of doubt, upon the delivery and

99

approval of a revised Approved Budget pursuant to clause (b) above, the Variance Testing Periods shall reset to start beginning with the first week included in such revised Approved Budget.

(d)     The Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. New York City time on Thursday of each week commencing on Thursday, October 9th, 2025, an Approved Budget Variance Report.

(e)     The Borrower shall deliver to the Administrative Agent and the Lenders concurrently with the delivery of the Approved Budget Variance Report pursuant to clause (d) above, a certificate which shall include such detail satisfactory to the Required Lenders, signed by a Responsible Officer of the Borrower (1) certifying that (i) the Loan Parties are in compliance with the covenants contained in Section 6.17, (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) the Loan Parties are in compliance with the Liquidity covenant set forth in <u>Section 7.14</u> at all times during the Variance Testing Period then most recently ended, and (2) attaching an Approved Budget Variance Report, which shall be prepared by the Borrower as of the last day of the respective Variance Testing Period then most recently ended.

(f)     The Lenders (i) may assume that the Loan Parties will comply with the Approved Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

Section 6.18     <u>Lender Advisors; Professional Services Firm</u>  The Lenders (taken as a whole) shall be entitled to retain or continue to retain (either directly or through counsel) any Lender Advisor as the Required Lenders may deem necessary to provide advice, analysis and reporting for the benefit of the Lenders.  The Loan Parties shall pay all reasonable and documented out of pocket fees, charges and disbursements of each Lender Advisor and all such fees and expenses shall constitute Obligations and be secured by the Collateral. The Loan Parties (whether directly or, as appropriate, through their relevant advisors) shall use commercially reasonable efforts to cooperate with the Lender Advisors in connection with the services the Lender Advisors provide to the Lenders, including to promptly furnish to the Lender Advisors the ordinary course monthly financial materials provided to the Board of Directors of Parent or the Borrower (excluding, for the avoidance of doubt, any such materials that would adversely affect any legal privilege or that relate to the Lenders, the Loan Documents or other material debt financing arrangements; provided that the Borrower will use reasonable efforts to deliver such information in a manner that would not adversely affect such legal privilege) (it being understood that none of the foregoing shall be construed to override any existing confidentiality and/or other obligations owed by the Loan Parties to such of its advisors or any other Person, including with respect to the sharing of any such information with third parties).

Section 6.19     <u>Chief Restructuring Officer</u>. Prior to or concurrently with the execution of this Agreement, the Borrower shall appoint a Chief Restructuring Officer (a "<u>CRO</u>") acceptable to the Required Lenders (which may be communicated by a Direction of the Required Lenders), at the Borrower's sole cost and expense; provided that, for the avoidance of doubt, the Required Lenders hereby consent to the appointment of Charles Moore of Alvarez & Marsal as the CRO.

**Debtors' Exhibit No. 11**
**Page 107 of 168**

The terms, including the scope of the CRO's engagement shall be reasonably acceptable to the Required Lenders (which may be communicated by a Direction of the Required Lenders). In the event of any vacancy of the CRO position, the Borrower shall use commercially reasonable efforts to promptly appoint a successor CRO acceptable to the Required Lenders.

Section 6.20    Bi-Weekly Calls.  Commencing the week following the week during which the Petition Date occurs, the Borrower, Alvarez & Marsal, Lazard and the Borrower's legal advisors shall hold biweekly calls with the Lender Advisors to discuss the investigation of the existence of any potential claims and causes of action against insiders and affiliate transactions and provide any updates with respect thereto (the "Investigation"). Commencing with the week following the week during which the Petition Date occurs, the Borrower and members of its senior management team shall hold biweekly calls with the Lenders to discuss the Debtors business, financial performance and other matters requested by the Lenders. The date and time of such calls shall be agreed among the Required Lenders and/or the Lender Advisors and the Borrower.

Section 6.21    Cash Management. Maintain cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

Section 6.22    Additional Bankruptcy Matters. Promptly provide the Administrative Agent, the Lenders and the Lender Advisors with updates of any material developments in the Chapter 11 Cases, whether in connection with the sale of all or substantially all of the Borrower's and its Subsidiaries' consolidated assets, the marketing of any Loan Parties' assets, the formulation of bidding procedures, an auction plan, and documents related thereto. The Debtors shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the rules promulgated thereunder, the DIP Order and any other order of the Bankruptcy Court.

Section 6.23    Cash Quarantine. All cash or Cash Equivalents received by the Debtors (including any full or partial state or federal tax refunds) shall be transferred and held in an account subject to perfected Liens and a Deposit Account Control Agreement in favor of the Collateral Agent.

Section 6.24    Control Agreements. Enter into a Deposit Account Control Agreement or a Securities Account Control Agreement, as applicable, with respect to all Deposit Accounts and Securities Accounts (in each case, that are not Excluded Accounts) that are held by the Loan Parties (x) with respect to Deposit Accounts and Securities Account that are in existence on the Closing Date, within 45 days thereafter (or such later date so long as the Borrower is using commercially reasonable efforts to comply with this Section 6.24) and (y) with respect to any such Deposit Account and Securities Account that are established after the Closing Date, within 30 days of such Deposit Account or Securities Account being established (or such later date so long as the Borrower is using commercially reasonable efforts to comply with this Section 6.24); provided that no amounts shall be funded or deposited in any such Deposit Account or Securities Account established after the Closing Date until such Deposit Account Control Agreement or Securities Account Control Agreement, respectively, has been entered into.

Section 6.25    Participation Elevation. Upon the written request therefor, use commercially reasonable best efforts to cooperate with any efforts to elevate participations and sub-participations with respect to the Prepetition First Lien Credit Agreement and the Prepetition Sidecar Credit Agreement held by any Lender to assignments within thirty (30) days of receipt of such request.

101

Section 6.26     Loan Party Affirmative Covenants.

(a)     [Reserved].

(b)     To the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of any Chapter 11 Plan, take all steps reasonably necessary and desirable to address any such impediment.

(c)     Use commercially reasonable efforts to obtain any and all required regulatory and/or third party approvals necessary to implement and/or consummate any Chapter 11 Plan.

(d)     Negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Chapter 11 Plan.

(e)     Use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Loan Party's or Subsidiary's good standing arises solely from the filing of the Chapter 11 Cases; provided that in the event that any of the Loan Parties or their Subsidiaries are unable to maintain good standing, the Loan Parties shall consult with the Required Lenders promptly and take commercially reasonable steps to reinstate their good standing.

(f)     Cause any and all of its subsidiaries to comply with the terms of this Agreement, the Approved Business Plan, and the other Definitive Documents as if they were a party hereto and had the obligations of the Loan Parties hereunder and, at the request of Required Lenders, use commercially reasonable efforts to cause such subsidiaries to sign reasonable documentation as may be required to effect the foregoing.

(g)     Use commercially reasonable efforts to provide the Lender Advisors with a reasonable opportunity to review draft copies of all Definitive Documents, including but not limited to, all material motions or pleadings, and any drafts or proposed amended version of the First Day Pleadings that the Debtors intend to file with the Bankruptcy Court, at least two (2) Business Days before the date of filing any such pleading or other document (or such shorter period as is necessary or appropriate under the circumstances), (ii) without limiting any approval or consent rights set forth in this Agreement, consult in good faith with the Lender Advisors regarding the form and substance of any such proposed filing, and (iii) provide draft copies of any motion or pleading that materially affects any Prepetition First Lien Term Lender, Prepetition Sidecar Lender or Lender, in each case, to the Lender Advisors in no event less than two (2) Business Days prior to the date when the Debtors intend to file such motion or pleading with the Bankruptcy Court; provided that in the event that such notice periods are impossible or impracticable under the circumstances, the Loan Parties and their Subsidiaries shall provide such draft copies to the applicable counsels as soon as otherwise practicable before the date when the Debtors intend to file any such motion or other pleading; provided, further, that the rights set forth in this provision shall not apply to monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto.

(h)     Provide the Lender Advisors with (i) reasonable access to, during regular business hours, the non-privileged, non-confidential books, work papers, records, and materials of any Loan Party and each of their Subsidiaries that are materially related to any Chapter 11 Plan, (ii) reasonable access to, during regular business hours, the Chief Restructuring Officer to, and advisors of, any Loan Party, and (iii) reasonably timely responses to all reasonable diligence requests sent to the Loan Parties by and through the Lender Advisors on a continuing and rolling basis following the Closing Date.

102

(i)      Use commercially reasonable efforts to avoid and/or cure any breach or default under any material contractual obligations (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases).

(j)      Timely file a formal objection to any motion filed with the Bankruptcy Court by a third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, disallowance, or subordination of, any portion of the DIP Term Loan Claims, the Prepetition First Lien Term Loan Claims or the Prepetition Sidecar Claims, or the liens securing such claims (as applicable).

(k)      Except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to operate their businesses and operations in the ordinary course in a manner that is consistent with past practices and in a manner that is materially consistent with the Approved Business Plan, and use commercially reasonable efforts to preserve intact the Loan Parties' business organization and material relationships with third parties (including, without limitation, suppliers, distributors, customers, and governmental and regulatory authorities and key employees) and maintain in effect all of their material foreign, federal, state, and local licenses, permits, consents, franchises, approvals, and authorizations that are required to operate their business, in each case to the extent reasonably practicable and permitted by applicable law, provide updates to the Lender Advisors with respect to any material development in connection with any Loan Party, including businesses, operations (including material changes to the cash management system, employee benefit programs, and insurance programs), material expenditures (to the extent not provided for in the Approved Budget), and relationships with material third parties (including, without limitation, vendors, and customers).

(l)      At all times prior to any Chapter 11 Plan effective date, take all commercially reasonable actions to preserve the Loan Parties' ability to implement any strategic transactions set forth in the Approved Business Plan.

Section 6.27      Governance. Within the time periods specified in this Section 6.27 (as any such time and date may be extended with the consent of the Required Lenders):

(a)      Parent shall appoint one (1) new independent director (the "New Independent Director") to the Parent's board of managers, it being understood and agreed that the Parent shall select such New Independent Director from a slate of two (2) nominees provided by the Ad Hoc Group, within five (5) Business Days of receiving such slate of nominees;

(b)      Within five (5) Business Days of receiving the slate of nominees contemplated in Section 6.27(a) above, Parent shall supplement or reconstitute the restructuring committee of the board, which shall (i) be comprised of the New Independent Director and two (2) existing independent directors, and (ii) operate by majority consent of all of its members;

(c)      Within five (5) Business Days of the Closing Date, Parent shall delegate exclusive authority to the restructuring committee to (i) oversee and implement the Chapter 11 Cases and the Borrower's restructuring efforts, which shall include any sale process, and (ii) investigate the existence of any and all potential claims and causes of action against insiders, as well as any affiliate transactions; and

(d)      Within five (5) Business Days of the Closing Date, Parent shall provide its restructuring committee with exclusive authority to approve any sale of all or substantially all of the Borrower's assets or Equity Interests.

Debtors' Exhibit No. 11
Page 110 of 168

## ARTICLE VII

## NEGATIVE COVENANTS

Until the Termination Date, in the case of each provision of this <u>ARTICLE VII</u>, the Borrower shall not, nor shall it permit any of the other Restricted Subsidiaries to, directly or indirectly:

Section 7.01     <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens securing Indebtedness permitted pursuant to <u>Section 7.03(a)</u>;

(b)     [reserved];

(c)     Liens for Taxes (i) not yet due and payable or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business and consistent with past practice which secure amounts (i) which are not yet overdue, (ii) which are overdue and which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (iii) the failure to make payment of which could not reasonably be expected to have a Material Adverse Effect;

(e)     (i) pledges or deposits in the ordinary course of business and consistent with past practice in connection with workers' compensation, unemployment insurance and other social security legislation (including obligations in respect of letters of credit or bank guarantees in respect thereof), (ii) pledges and deposits in the ordinary course of business and consistent with past practice securing (A) liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of the other Restricted Subsidiaries or (B) leases or licenses of property otherwise permitted by this Agreement (and, in each case, obligations in respect of letters of credit or bank guarantees in respect thereof) and (iii) pledges and deposits securing any settlement of litigation;

(f)     Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business and consistent with past practice (and, in each case, obligations in respect of indemnities, letters of credit or bank guarantees in respect thereof);

(g)     easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects, protrusions and other similar encumbrances and minor title defects, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions and declarations affecting real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness, and which do not in any case or in the aggregate materially and adversely interfere with the ordinary conduct of business of the applicable Person on the affected real property;

**Debtors' Exhibit No. 11**
**Page 111 of 168**

(h)     Adequate Protection Liens;

(i)     [reserved];

(j)     (i) Liens securing obligations of the type described in Section 7.03(i) and (ii) bankers' Liens and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower and/or any other Restricted Subsidiary granted in the ordinary course of business and consistent with past practice in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank or banks in respect of cash management and/or operating account arrangements, including those involving pooled and netting arrangements;

(k)     Liens arising from precautionary Uniform Commercial Code financing statement filings;

(l)     [reserved];

(m)     the modification, replacement, renewal or extension of any Lien permitted by clause (b) or (h) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (C) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens, if such obligations are Indebtedness, is permitted pursuant to Section 7.03;

(n)     (i) leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to other Persons in the ordinary course of business and consistent with past practice which do not (x) interfere in any material respect with the business of the Borrower or any of the other Restricted Subsidiaries (taken as a whole) or (y) secure any Indebtedness and (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of their respective Restricted Subsidiaries or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(o)     [reserved];

(p)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and consistent with past practice;

(q)     Liens on (i) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies, (ii) on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto and (iii) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case securing Indebtedness permitted to be incurred pursuant to Section 7.03;

(r)     Liens securing Indebtedness permitted under Section 7.03(r), as long as such Liens are subordinated to the Liens securing the Obligations pursuant to the DIP Order;

(s)     Liens securing judgments and awards for the payment of money not constituting an Event of Default under Section 9.01(h);

(t)     [reserved];

Debtors' Exhibit No. 11
Page 112 of 168

(u)     [reserved];

(v)     Liens consisting of any (i) interest or title of a lessor or sub-lessor (or such lessor or sub-lessor's mortgage or lender) under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject, (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii) or (v) deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any other Restricted Subsidiary in the ordinary course of business and consistent with past practice of the Borrower or such Restricted Subsidiary to secure the performance of the Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

(w)     [reserved];

(x)     [reserved];

(y)     [reserved];

(z)     Subject to the terms of the Prepetition ABL Intercreditor Agreement and the DIP Order, Liens securing the Prepetition ABL Loans and other Prepetition ABL Obligations;

(aa)    [reserved];

(bb)    [reserved];

(cc)    Liens securing obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Section 7.03;

(dd)    Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business and consistent with past practice and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(ee)    [reserved];

(ff)    Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods, in each case, in the ordinary course of business and consistent with past practice, and, to the extent such Liens secure Indebtedness, such Indebtedness is permitted under Section 7.03;

(gg)    Liens securing obligations under Swap Contracts in connection with any derivative transaction of the type permitted under Section 7.03(d), incurred in the ordinary course of business and consistent with past practice;

(hh)    [reserved];

(ii)    [reserved];

(jj)    Liens that are customary rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of

106

business and consistent with past practice and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any other Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and consistent with past practice, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any other Restricted Subsidiary in the ordinary course of business and consistent with past practice or (iv) relating to credit card processing arrangements entered into in the ordinary course of business and consistent with past practice;

(kk)     Liens of a collecting bank arising in the ordinary course of business and consistent with past practice under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon; and

(ll)     Liens in existence on the Petition Date.

Section 7.02     <u>Investments</u>. Make any Investments (directly or indirectly), except:

(a)     Investments by the Borrower or any of the other Restricted Subsidiaries in cash or Cash Equivalents at the time of the relevant Investment;

(b)     [reserved];

(c)     Investments (i) by any Loan Party that is a Debtor in any other Loan Party that is a Debtor, (ii) by any Subsidiary that is not a Loan Party in any Loan Party, (iii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is also not a Loan Party and (iv) by any Loan Party that is a Debtor (a "<u>Debtor Loan Party</u>") in any other Subsidiary that is not a Debtor Loan Party or any other Debtor that is an Affiliate of the Borrower but not a Subsidiary of the Borrower (such an Affiliate, an "<u>Affiliate Debtor</u>"); provided that, notwithstanding anything herein to the contrary, no cash or Cash Equivalents may be transferred pursuant to this clause (c) or pursuant to any other provision of this Agreement by a Debtor Loan Party to any Subsidiary that is not a Debtor Loan Party, to an Affiliate Debtor, or to any other Affiliate of the Debtors unless such amounts to be transferred (including proposed use by the recipient) are expressly set forth as a line item in the Approved Budget and the recipient of such amounts utilize the proceeds solely for such proposed purpose (it being agreed that to the extent that the recipient does not use the proceeds for the intended purpose, the transfer of such amounts will be deemed an Investment that is not permitted pursuant to this Agreement, and will result in an Event of Default hereunder) or are otherwise consented to by the Required Lenders;

(d)     [reserved];

(e)     Investments existing on the Petition Date;

(f)     Investments in Swap Contracts permitted under <u>Section 7.03</u>;

(g)     [reserved];

(h)     [reserved];

(i)     loans and advances of payroll payments or other compensation to present or former Representatives of any Parent Company (to the extent such payments or other compensation relate to services actually provided to such Parent Company (but excluding the portion of any such amount, if any, attributable to the ownership or operations of any Subsidiary of any Parent Company other than the

107

Borrower and/or its Subsidiaries)), the Borrower and/or any Subsidiary, in each case in the ordinary course of business and consistent with past practice;

(j)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(k)  Investments (i) received (A) in satisfaction or partial satisfaction thereof from financially troubled suppliers and/or account debtors to the extent reasonably necessary in order to prevent or limit loss, (B) in connection with the bankruptcy or reorganization of any Person, (C) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and (D) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes, (ii) in the form of advances made to distributors, suppliers, licensors and licensees in the ordinary course of business and consistent with past practice or to the extent necessary to maintain the ordinary course of supplies to the Borrower and/or any Restricted Subsidiary, (iii) made in the ordinary course of business and consistent with past practice consisting of endorsements for collection or deposit and (iv) consisting of customary trade arrangements with customers in the ordinary course of business and consistent with past practice;

(l)  [reserved];

(m)  [reserved];

(n)  [reserved];

(o)  [reserved];

(p)  (i) Guarantee Obligations in respect of leases (other than Capital Leases) or of other obligations not constituting Indebtedness, in each case, in the ordinary course of business and consistent with past practice and (ii) Guarantee Obligations constituting Indebtedness to the extent permitted by Section 7.03;

(q)  [reserved];

(r)  [reserved];

(s)  [reserved];

(t)  Investments in the Borrower, any Subsidiary and/or any joint venture in connection with intercompany cash management arrangements and related activities consistent with past practice and in the ordinary course of business and consistent with past practice; and

(u)  Investments consisting of the grant of non-exclusive licenses or sublicenses of Intellectual Property pursuant to joint marketing arrangements with other Persons in the ordinary course of business and consistent with past practice.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrowers or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, Restricted Payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrowers or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business, consistent with

108

past practice and for a bona fide business purpose and (b) any Restricted Subsidiary that is not a Loan Party own or hold an exclusive license to any Material Property.

Section 7.03   Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

(a)      Indebtedness of the Borrower and the other Loan Parties under the Loan Documents;

(b)      Indebtedness of the Borrower or any Subsidiary Guarantor incurred in respect of any Prepetition ABL Facility in an aggregate principal amount not to exceed the aggregate principal amount outstanding plus unused commitments outstanding, in each case, as of the Closing Date; provided that such Indebtedness is secured only by Liens permitted under Section 7.01(z);

(c)      [reserved];

(d)      Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks and not entered into for speculative purposes, incurred in the ordinary course of business and consistent with past practice;

(e)      [reserved];

(f)      Indebtedness incurred by any Loan Party or any Restricted Subsidiary of any Loan Party in respect of bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business and consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits, salary, wages or other compensation or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 Business Days following the incurrence thereof;

(g)      (A) contingent liabilities in respect of any indemnification, adjustment of purchase price, earn-out, non-compete, consulting, deferred compensation and similar obligations of one or more of the Borrower or the other Restricted Subsidiaries incurred in the ordinary course of business and consistent with past practice or in connection with Acquisitions and Dispositions permitted hereby and (B) letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments issued in support of such liabilities, in each case pursuant to this clause (g), not to exceed amounts outstanding on the Closing Date;

(h)      reimbursement, indemnification or similar obligations (including any arising by right of subrogation) of one or more of the Borrower or the other Restricted Subsidiaries in respect of performance, payment, surety, customs, stay, return of money or appeal bonds, performance and completion guaranties or similar instruments, in each case incurred in the ordinary course of business and consistent with past practice, for the benefit of one or more of the Borrower or the other Loan Parties;

(i)      Indebtedness in the ordinary course of business and consistent with past practice (i) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds and/or (ii) in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in

109

connection with cash management and deposit accounts; provided, that for the avoidance of doubt, no factoring or receivables financing, sale-leasebacks or other similar financing or other inventory programs intended to provide liquidity shall be permitted pursuant to this clause (i) and shall solely be permitted pursuant to clause (v) below;

(j)        Indebtedness owed to any Person incurred to finance the premiums with respect to any insurance policy of any Parent Company, or Parent or its Restricted Subsidiaries in the ordinary course of business and consistent with past practice;

(k)        [Reserved];

(l)        Indebtedness of (i) any Loan Party to any other Loan Party, (ii) any Non-Loan Party Subsidiary to any Non-Loan Party Subsidiary or (iii) any Loan Party to any Non-Loan Party Subsidiary; provided that any such Indebtedness pursuant to this clause (l)(iii) shall be unsecured and expressly subordinated in right of payment to the Obligations on terms satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(m)        [reserved];

(n)        [reserved];

(o)        [reserved];

(p)        [reserved];

(q)        [reserved];

(r)        Indebtedness incurred pursuant to the (i) Prepetition First Lien Credit Agreement, (ii) the Prepetition Second Lien Credit Agreement and (iii) the Prepetition Sidecar Credit Agreement, in each case in an amount not to exceed the amount outstanding as of the Closing Date;

(s)        [reserved].

(t)        Indebtedness of the Borrower and/or any other Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts or other similar obligations incurred in the ordinary course of business and consistent with past practice and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items, in each case consistent with past practice and in the ordinary course of business and consistent with past practice;

(u)        Guarantee Obligations by the Borrower and/or any other Restricted Subsidiary of Indebtedness or other payment obligations of the Borrower and/or any other Restricted Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.03 or other payment obligations not prohibited by this Agreement; provided that no Guarantee Obligations by the Borrower or any other Loan Party of any joint venture or Subsidiary that is not a Loan Party shall be permitted pursuant to this clause (u);

(v)        Indebtedness of the Borrower and/or any other Restricted Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on Schedule 7.03(v);

(w)        [reserved];

**Debtors' Exhibit No. 11**
**Page 117 of 168**

(x)    Indebtedness of the Borrower and/or any other Restricted Subsidiary consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary course of business and consistent with past practice from customers for goods and services purchased in the ordinary course of business and consistent with past practice, in each case excluding factoring or receivables financing, sale-leasebacks or other similar financing or other inventory programs intended to provide liquidity which shall solely be permitted pursuant to clause (v) above;

(y)    [reserved];

(z)    [reserved];

(aa)    Indebtedness of the Borrower and/or any other Restricted Subsidiary supported by any Letter of Credit (as defined in the Prepetition ABL Credit Agreement), outstanding as of the Closing Date, the face amount of which is at least equal to the principal (or equivalent) amount of such Indebtedness; and

(bb)    without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrower and/or any other Restricted Subsidiary hereunder.

Section 7.04    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate or amalgamate with or into another Person, except that:

(a)    any Restricted Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with (i) the Borrower; <u>provided</u> that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Restricted Subsidiaries; <u>provided</u> that when any Restricted Subsidiary that is a Loan Party is merging with another Restricted Subsidiary, a Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the Guarantee Obligations of the relevant Loan Party in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(b)    any Restricted Subsidiary that is not a Loan Party may merge, consolidate or amalgamate with or dissolve or liquidate into any other Restricted Subsidiary that is not a Loan Party;

(c)    any Restricted Subsidiary may dissolve or liquidate; <u>provided</u> that if in connection with any such dissolution or liquidation, the dissolving entity transfers its assets to another Person and the transferor in such a transaction is a Loan Party, then the transferee must be or become a Loan Party;

(d)    the Borrower may merge, amalgamate or consolidate with or dissolve or liquidate into any other Person; <u>provided</u> that the Borrower shall be the continuing or surviving Person; and

(e)    so long as no Default or Event of Default exists or would result therefrom, a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to <u>Section 7.05</u> (other than <u>Section 7.05(e)</u>), may be effected.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrower or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, Restricted Payment, dividend or otherwise or relating to the exclusive

**Debtors' Exhibit No. 11**
**Page 118 of 168**

rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrowers or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business, consistent with past practice and for a bona fide business purpose and (b) any Restricted Subsidiary that is not a Loan Party own or hold an exclusive license to any Material Property.

Section 7.05    Dispositions. Make any Disposition (directly or indirectly), except:

(a)    (i) Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, (ii) Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the other Restricted Subsidiaries and (iii) Dispositions of property that is economically impracticable to maintain, in the ordinary course of business and consistent with past practice;

(b)    Dispositions of inventory, immaterial assets and immaterial Intellectual Property, in the ordinary course of business and consistent with past practice (including allowing any registrations or any applications for registration of any immaterial Intellectual Property to lapse or be abandoned in the ordinary course of business and consistent with past practice) and non-exclusive licensing of Intellectual Property in the ordinary course of business and, in each case, consistent with past practice;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrower or any of the other Restricted Subsidiaries; provided that if the transferor of such property is a Loan Party the transferee thereof must be a Loan Party;

(e)    [reserved];

(f)    Dispositions of cash and Cash Equivalents;

(g)    Dispositions in connection with the unwinding of any Swap Contract pursuant to its terms;

(h)    Dispositions for fair market value to the extent expressly set forth in the Approved Budget; provided that 100% of the consideration for such Disposition shall consist of cash or Cash Equivalents ; provided that (i) no Default or Event of Default has occurred and is continuing at the time of the execution of the definitive agreement with respect to such Disposition or would result therefrom, and (ii) such Disposition is subject to the provisions of Section 2.05(b)(ii);

(i)    Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business and consistent with past practice; provided that sales to factors or other third parties are subject to the consent of Required Lenders;

(j)    leases, subleases, non-exclusive licenses or non-exclusive sublicenses of property in the ordinary course of business and consistent with past practice and which do not materially interfere with the business of the Borrower or any of the other Restricted Subsidiaries;

(k)    transfers of property subject to foreclosure, eminent domain, casualty or condemnation proceedings (including in lieu thereof) or any similar proceedings;

Debtors' Exhibit No. 11
Page 119 of 168

(l)      any surrender, waiver, settlement, compromise, modification or release of contractual rights in the ordinary course of business and consistent with past practice, or the settlement, release or surrender of tort or other claims of any kind;

(m)      [reserved];

(n)      [reserved];

(o)      [reserved];

(p)      Dispositions made pursuant to deferred compensation arrangements in the ordinary course of business and consistent with past practice;

(q)      [reserved];

(r)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements, to the extent made in the ordinary course of business and consistent with past practice; and

(s)      (i) Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), which (A) do not materially interfere with the business of the Borrower and the other Restricted Subsidiaries or (B) relate to closed facilities or the discontinuation of any product line and (ii) expirations of options agreements in respect of real or personal property, in each case to the extent consistent with past practice and in done in the ordinary course of business and consistent with past practice.

To the extent that any Collateral is disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized (at the Direction of the Required Lenders) to take (and shall take) any actions deemed appropriate in order to effect the foregoing.

Notwithstanding anything to the contrary contained in this Agreement, in no event shall (a) the Borrowers or any Loan Party sell, transfer or otherwise dispose of any Material Property (whether pursuant to a sale, lease, license, transfer, Investment, Restricted Payment, dividend or otherwise or relating to the exclusive rights thereto) to any Subsidiary that is not a Loan Party; provided that in no event shall this sentence prohibit the Borrowers or its Subsidiaries from entering into non-exclusive licensing arrangements of Intellectual Property to a Subsidiary in the ordinary course of business, consistent with past practice and for a bona fide business purpose, (b) any Restricted Subsidiary that is not a Loan Party own or hold an exclusive license to any Material Property and (c) this Section 7.05 or any other provision of this Agreement permit Dispositions of inventory or receivables not in the ordinary course of business without the prior written consent of the Required Lenders.

Section 7.06      Restricted Payments. Make, directly or indirectly, any Restricted Payment, except any Restricted Subsidiary other than the Borrower may make Restricted Payments to the direct holders of its Equity Interests on a pro rata basis; provided that any Loan Party may only make Restricted Payments to other Loan Parties.

Section 7.07      Change in Nature of Business. Engage, directly or indirectly, in any line of business other than (i) those lines of business conducted by the Borrower and the Restricted Subsidiaries on the date hereof or (ii) any business substantially related, similar, ancillary or

113

complementary thereto or a reasonable extension thereof or as otherwise consented to by the Administrative Agent (acting at the Direction of the Required Lenders).

Section 7.08    Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)    transactions on terms, taken as a whole, substantially as favorable (or more favorable) to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate; provided that, such transaction are undertaken in the ordinary course of business, consistent with past practice and for a bona fide business purpose;

(b)    [reserved];

(c)    (i) Restricted Payments expressly permitted under Section 7.06 and (ii) Investments expressly permitted by Section 7.02(i);

(d)    the Transactions;

(e)    issuances of Equity Interests (other than Disqualified Equity Interests);

(f)    (i) expense reimbursement and employment, severance and compensation arrangements entered into by Parent or any of its Restricted Subsidiaries with their respective Representatives in the ordinary course of business and consistent with past practice and (ii) transactions pursuant to any employee compensation, benefit plan, equity-based incentive plan or arrangement, any health, disability or similar insurance plan which covers current or former Representatives or any employment or consulting contract or arrangement;

(g)    the payment of reasonable and customary fees to, and indemnities provided on behalf of, Representatives of the Borrower, any direct or indirect parent companies of Parent or any of its Restricted Subsidiaries (including any Parent Company) in the ordinary course of business and consistent with past practice;

(h)    [reserved];

(i)    Guarantees to the extent expressly permitted by Section 7.02 or Section 7.03; and

(j)    transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business and consistent with past practice, which are (i) fair from a financial perspective (taken as a whole) to the Borrower and/or the other applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained in a comparable arm's-length transaction with a Person other than an Affiliate.

Section 7.09    Prepayments and Modifications of Certain Indebtedness.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner or make any payment, in each case, of any Subordinated Indebtedness or any Indebtedness secured on a junior lien basis to the Liens securing the Obligations or any Prepetition

114

Indebtedness (any such debt, "<u>Restricted Debt</u>"), or in violation of any subordination terms of any such Subordinated Indebtedness (any such payment, a "<u>Restricted Debt Payment</u>"), other than:

> (i)      The Transactions, including the payment of Transaction Expenses;

> (ii)      The payment of the Prepetition Bridge Facility and all costs, fees, premia, and expenses thereon or required in connection therewith; and

> (iii)      payments with, or conversions to, Equity Interests (other than Disqualified Equity Interests).

(b)      Amend or otherwise modify the terms of the documentation governing any Restricted Debt in a manner materially adverse to the Lenders.

Section 7.10      <u>Negative Pledge</u>. Enter into or suffer to exist, incur or permit any of the Restricted Subsidiaries to enter into or suffer to exist any agreement or other arrangement that prohibits:

(a)      the ability of Parent, the Borrower or any of the other Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations;

(b)      the ability of any Restricted Subsidiary to make any Restricted Payments with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any of the other Loan Parties; or

(c)      the ability of any Restricted Subsidiary to make loans or cash advances to the Borrower or any of the other Loan Parties;

<u>provided</u>, that the foregoing shall not apply to:

> (i)      Contractual Obligations in effect on the Petition Date;

> (ii)      [reserved];

> (iii)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures expressly permitted hereunder and applicable solely to the assets of and Equity Interests of and in such joint venture entered into in the ordinary course of business and consistent with past practice;

> (iv)      restrictions imposed by any agreement relating to secured Indebtedness expressly permitted by this Agreement if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries or the property or assets intended to secure such Indebtedness;

> (v)      any negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under <u>Section 7.03</u> but solely to the extent any negative pledge relates to the property financed by or the subject of or securing such Indebtedness or expressly permits Liens for the benefit of the Secured Parties with respect to the Credit Facilities established hereunder and the Obligations under the Loan Documents on a senior

115

basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably;

(vi)    restrictions on cash, other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business and consistent with past practice;

(vii)    customary non-assignment provisions with respect to leases or licensing agreements or other agreements entered into by the Borrower or any of the other Restricted Subsidiaries, in each case entered into in the ordinary course of business and consistent with past practice;

(viii)    restrictions imposed by any agreement relating to Indebtedness permitted by Section 7.03(a), (b), (r) and (x) (with respect to the foregoing types of Indebtedness) if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries;

(ix)    restrictions set forth in any Loan Document, to the extent entered into in the ordinary course of business and consistent with past practice;

(x)    [reserved];

(xi)    restrictions arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xii)    other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in the foregoing clauses of this Section 7.10; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 7.11    Amendments to Organization Documents. Amend, or permit any of the Restricted Subsidiaries that are Loan Parties to amend, its certificate of incorporation or bylaws or other Organization Documents in any manner without the consent of the Required Lenders (which may be delivered via email by the Lender Advisors).

Section 7.12    Fiscal Year. Make any change in the Fiscal Year of the Parent or any of its Restricted Subsidiaries.

Section 7.13    Sanctions; Anti-Corruption Laws. Use any part of any proceeds of the Loans or lend, contribute or other make available such proceeds: (i) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law; or (ii) to fund or

116

facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

Section 7.14    <u>Minimum Liquidity</u>. Permit Liquidity at any time to be less than $50,000,000.

Section 7.15    <u>Insolvency Proceeding Claims</u>. Incur, create, assume, suffer to exist or permit any other super priority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the DIP Order or the Cash Management Order.

Section 7.16    <u>Bankruptcy Actions</u>. Absent Direction of the Required Lenders, file a motion seeking, or consent to the entry of, any order of the Bankruptcy Court granting authority to (x) take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Loan Documents or (y) refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Document.

Section 7.17    <u>Orders</u>. Notwithstanding anything to the contrary herein, use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the DIP Order.

## ARTICLE VIII

## PARENT COVENANT

Until the Termination Date, Parent shall not engage in any business or activity other than:

(a)    the ownership of all outstanding Equity Interests in the Borrower and, indirectly, its Subsidiaries and joint ventures; <u>provided</u> that Parent shall not own directly any Equity Interests other than those of Borrower,

(b)    maintaining its corporate existence,

(c)    participating in tax, accounting and other administrative activities of the consolidated group of companies, including the Loan Parties, including (i) filing tax reports and paying Taxes, including interest, additions to tax or penalties applicable thereto, and other customary obligations in the ordinary course (and contesting any Taxes), (ii) preparing reports to Governmental Authorities and to its shareholders and (iii) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable requirements of law,

(d)    (i) the performance of obligations under the Loan Documents, the Prepetition ABL Facility Documentation, the Prepetition First Lien Facility Documentation, the Prepetition Sidecar Facility Documentation, the Prepetition Second Lien Facility Documentation, the documents governing Guarantees of Indebtedness permitted under <u>Section 7.03</u> and/or obligations that do not constitute Indebtedness (including guaranties of any lease obligations of any Loan Party or Subsidiary) and (ii) the creation of (A) Liens to secure Guarantees permitted under this <u>clause (d)</u> so long as the underlying Indebtedness is permitted to be secured on the same basis under <u>Section 7.01</u> and (B) Liens of the types permitted under <u>Section 7.01</u> (other than to secure debt for borrowed money),

117

(e)    the Transactions,

(f)    issuing its own Equity Interests (including the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Equity Interests),

(g)    holding, distributing and/or lending (A) cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or permitted Dispositions made by, any of its Subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Equity Interests of, Parent pending the application thereof and (B) the proceeds of Indebtedness permitted by Section 7.03,

(h)    making payments of the type permitted under Section 7.06 and the performance of its obligations under any document, agreement and/or Investment contemplated by the Transactions or otherwise not prohibited under this Agreement,

(i)    complying with applicable requirements of law, and

(j)    activities incidental to the businesses or activities described in the foregoing clauses (a) through (i).

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default. Any of the following events referred to in any of clauses (a) through (m) inclusive of this Section 9.01 shall constitute an "Event of Default":

(a)    Non-Payment. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan (other than an L/C Borrowing), (ii) within one (1) Business Days after the same becomes due, any interest on any Loan (other than an L/C Borrowing) or any other amount payable hereunder (other than in respect of the Letter of Credit Facility) or with respect to any other Loan Document, or (iii) within three (3) Business Days after the same becomes due, any amount of principal of, and any accrued and unpaid interest on, any L/C Borrowing; or

(b)    Specific Covenants. (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01(c), Section 6.01(d), Section 6.03(a), Section 6.05(a) (with respect to the existence of the Parent and the Borrower), Section 6.15, Section 6.16, Section 6.17, Section 6.18, Section 6.19, Section 6.20, Section 6.21, Section 6.22, Section 6.23, Section 6.24, Section 6.25, Section 6.26, Section 6.27, ARTICLE VII or VIII, as applicable, or (ii) Parent fails to perform or observe any term, covenant or agreement contained in ARTICLE VIII; or

(c)    Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for five (5) days after the earlier of (i) Borrower's knowledge of such default and (ii) receipt by the Borrower of written notice thereof by the Administrative Agent; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any certificate or other document required to be delivered in connection herewith or

**Debtors' Exhibit No. 11**
**Page 125 of 168**

therewith shall be incorrect or misleading in any material respect as of the date made or deemed made; <u>provided</u> further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be incorrect or misleading (after giving effect to any qualification therein) in all respects when made or deemed made; or

(e)     <u>Cross-Default</u>. (i) Parent, the Borrower or any of the other Restricted Subsidiaries (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness having an aggregate outstanding principal amount in excess of 1,000,000, or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness with an aggregate outstanding principal amount in excess of $1,000,000 (other than with respect to Indebtedness consisting of obligations under Swap Contracts, termination events or equivalent events pursuant to the terms of the relevant Swap Contract which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, the effect of which failure is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (B) of this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; provided further that this paragraph (e) shall not apply to  Prepetition Indebtedness as long as enforcement of remedies thereunder is subject to the automatic stay of Section 362 of the Bankruptcy Code; or

(f)     <u>Insolvency Proceedings, Etc.</u> Other than the Chapter 11 Cases, Parent, the Borrower or any of the other Restricted Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for fifteen (15) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for fifteen (15) calendar days; provided that the events described in this clause (f) shall not constitute an Event of Default if, within five (5) Business Days following the occurrence of such event, the Lender Advisors have consented to the occurrence of such event; or

(g)     [Reserved]; or

(h)     <u>Judgments.</u> There is entered against Parent, the Borrower or any of the other Restricted Subsidiaries a final post-petition judgment or order for the payment of money in an aggregate amount in excess of $500,000 (to the extent not effectively covered by insurance) and such post-petition judgment or order shall not have been paid, satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of fifteen (15) consecutive days; or

(i)     <u>ERISA</u>. (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect or (ii) Parent, the Borrower, any of the other Restricted Subsidiaries or ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its

**Debtors' Exhibit No. 11**
**Page 126 of 168**

Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents. Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of the occurrence of the Termination Date or as a result of the release of any Loan Party therefrom in accordance with its terms or the terms hereof), purports to revoke or rescind any Loan Document or asserts in writing that any Guarantee, Collateral Document or subordination provision in respect of any Indebtedness in excess (in the aggregate) of $500,000 is invalid or unenforceable; or

(k)     Change of Control. Any Change of Control transaction is consummated; or

(l)     Liens. Subject in all respects to the Carve-Out, any Lien on Collateral created under any Collateral Document ceases to be perfected with the priority required by the Collateral Documents with respect to a material portion of the Collateral (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof); or

(m)     Bankruptcy Related Events of Default.

(i)     other than the Carve-Out, the failure by the Debtors to timely object to any disputed administrative claim filed in the Chapter 11 Cases over $250,000, or the settlement by the Debtors of any disputed claim in any amount over $250,000, without the prior written consent of the Required Lenders (which approval may be communicated via email from any of the Lender Advisors) (which consent shall constitute authorization under this Agreement);

(ii)     the entry of an order by the Bankruptcy Court appointing, the filing of an application by any Debtor or any Debtor consenting to or supporting an application by any other Person, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under Section 1104 of the U.S. Bankruptcy Code in any Chapter 11 Case in each case with expanded powers (beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) of the U.S. Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(iii)     other than circumstances whereby the Lenders are paid the Obligations in full in cash, the consummation of a sale of all or substantially all of the Debtors' assets pursuant to a sale under Section 363 of the U.S. Bankruptcy Code, a confirmed plan in the Chapter 11 Cases or otherwise or any Loan Party shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking any of the foregoing, in each case, without the prior written consent of the Required Lenders;

120

(iv)    subject to the Carve-Out, the creation or incurrence by the Debtors of any claim that is senior to or pari passu with the Adequate Protection Claims or any Lien that is senior to or pari passu with the Adequate Protection Liens without the prior written consent of the Required Lenders;

(v)    the conversion of any Chapter 11 Case of a Debtor from one under chapter 11 to one under chapter 7 of the U.S. Bankruptcy Code or any Debtor shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking the conversion of any Chapter 11 Case of a Debtor under Section 1112 of the U.S. Bankruptcy Code or otherwise;

(vi)    subject to the Carve-Out, the payment of or granting adequate protection (except for Adequate Protection Obligations) that rank senior to or pari passu with the Adequate Protection Obligations with respect to any Prepetition First Lien Term Loans, Prepetition Second Lien Term Loans or Prepetition Sidecar Term Loans (other than as set forth in the DIP Order or any Approved Budget);

(vii)    (i) the entry by the Bankruptcy Court of any order terminating the Debtors' exclusive periods to file a Chapter 11 Plan of reorganization or liquidation and solicit acceptances thereon under Section 1121 of the U.S. Bankruptcy Code or (ii) the expiration of any Loan Party's exclusive right to file a Chapter 11 Plan of reorganization or liquidation;

(viii)    the dismissal of any Chapter 11 Case which does not contain a provision for the payment in full in cash of the Obligations, or if any Debtor shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case which does not contain a provision for the payment in full in cash of the Obligations under this Agreement;

(ix)    the entry by the Bankruptcy Court of an order granting relief from or modifying the automatic stay of Section 362 of the U.S. Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral which has a value in excess of $500,000, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority which has a value in excess of $500,000;

(x)    the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case, or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the U.S. Bankruptcy Code not otherwise permitted pursuant to this Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence thereof or (ii) except as provided in the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the U.S. Bankruptcy Code or any equivalent provision of relevant applicable law without the prior written consent of the Required Lenders;

(xi)    the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is pari passu or senior to the Liens on the Collateral securing the Obligations,

**Debtors' Exhibit No. 11**
**Page 128 of 168**

other than Liens expressly permitted under this Agreement or the DIP Order (including the Carve-Out);

(xii)     other than the Carve-Out, the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order, or the Cash Management Order, in each case, in a manner that is adverse to the Lenders, in their capacities as such, without the prior written consent of the Required Lenders;

(xiii)     subject to the Carve-Out and except as otherwise provided herein, the filing of a motion or taking of any action by the Debtors in any Chapter 11 Case seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiv)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding the Administrative Agent, the Prepetition First Lien Collateral Agent, Prepetition First Lien Administrative Agent, Prepetition Second Lien Administrative Agent and Prepetition Sidecar Agents to have the right to or be permitted to "credit bid";

(xv)     any attempt by any Loan Party to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Indebtedness;

(xvi)     the filing by any Loan Party of any Chapter 11 Plan or disclosure statement attendant thereto, or any amendment to such plan or disclosure statement, that (a) does not provide for the payment in full in cash of the Obligations and (b) is not otherwise acceptable to the Required Lenders (which approval may be communicated via email from any of the Lender Advisors);

(xvii)    (i) the filing by any of the Debtors of any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Obligations (as defined in the Prepetition First Lien Credit Agreement, the Prepetition Sidecar Credit Agreement and the Prepetition Second Lien Credit Agreement), and/or the liens securing the Obligations (as defined in the Prepetition First Lien Credit Agreement, the Prepetition Sidecar Credit Agreement and the Prepetition Second Lien Credit Agreement) or the Obligations, or asserting any other claim or cause of action against and/or with respect to the Obligations (as defined in the Prepetition First Lien Credit Agreement, the Prepetition Sidecar Credit Agreement and the Prepetition Second Lien Credit Agreement) or (ii) the entry of an order by the Bankruptcy Court providing relief that materially and adversely impact the interests of any Prepetition First Lien Term Lender, Prepetition Second Lien Term Lender and Prepetition Sidecar Lenders, the Prepetition First Lien Agent, the Prepetition Second Lien Administrative Agent, the Prepetition Sidecar Agent or the Administrative Agent with respect to any of the foregoing claims, causes of action or proceedings, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding;

122

(xviii)    subject to the entry of the Final Order and to the extent set forth therein, an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the U.S. Bankruptcy Code against the Administrative Agent and the Secured Parties or (ii) limiting the extension under Section 552(b) of the U.S. Bankruptcy Code of the Liens of the Prepetition First Lien Agent, the Prepetition Second Lien Administrative Agent and the Prepetition Sidecar Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date (or granting any other relief under section 552(b) of the U.S. Bankruptcy Code);

(xix)    the acceptance by any Loan Party of any bid that is not an Acceptable Bid without the prior written consent of the Required Lenders;

(xx)    a default by any Loan Party under any restructuring or transaction support agreement, as applicable, that may be entered into between the Loan Parties and the Lenders;

(xxi)    in the event the Loan Parties enter into any restructuring or transaction support agreement, as applicable, such restructuring or transaction support agreement is terminated for any reason;

(xxii)    the Debtors' filing of a Definitive Document that is not reasonably acceptable to the Required Lenders or the filing of a Chapter 11 Plan that provides for any treatment or recovery on account of DIP Term Loan Claims, Prepetition First Lien Term Loan Claims or Prepetition Sidecar Claims that are not consented to by the Required Lenders in their sole discretion;

(xxiii)    the DIP Orders shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal (other than through the entry of the Final Order), in each case so as to cause the DIP Orders to cease to create a valid and perfected Lien on the Collateral (without further action other than the entry and terms of the DIP Orders) to the extent the DIP Orders do so on the Closing Date;

(xxiv)    (A) any Loan Party or any Subsidiary thereof takes any action in support of any matter prohibited by this Section 9.01(m) or (B) any other Person files a motion before the Bankruptcy Court seeking the entry of order in violation of this Section 9.01(m) and such motion is not contested in good faith by the Loan Parties;

(xxv)    any Debtor denies in writing that such Debtor has liability or obligation under this Agreement for the Obligations or seek to recover any monetary damages from any Secured Party or any secured party under the Prepetition First Lien Facility Documents, the Prepetition Sidecar Facility Documents or the Prepetition Second Lien Facility Documents, in each case in their capacity as such;

(xxvi)    any Loan Parties (i) authorize, create, issue, sell, or grant any additional Equity Interests, (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests, or (iii) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Loan Parties, taken as a whole, without the consent of the Required

123

Lenders (not to be unreasonably withheld), other than in connection with a Chapter 11 Plan;

(xxvii) any Loan Parties pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Equity Interests in the Loan Parties, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale, or other transfer will impair any of the Loan Parties' tax attributes and is reasonably expected to result in material adverse tax consequences to the Loan Parties;

(xxviii) any Loan Parties take any action (except to the extent expressly contemplated by this Agreement or the DIP Order) if such action would result in a change in the tax status of any Loan Party or (ii) make any election outside the ordinary course of business, or settle any tax audit or contest, in each case, if such election or action pursuant to clause (i) or (ii) is reasonably expected to result, individually or in the aggregate, in material adverse tax consequences to any of the Loan Parties;

(xxix) other than as contemplated in the Chapter 11 Plan, the DIP Orders, or the First Day Pleadings, or any other orders of the Bankruptcy Court, any Loan Parties incur any indebtedness, guarantee any indebtedness of another entity, and/or guarantee any liabilities, in each case in excess of $250,000, relating to the Loan Parties' material contracts and facilities (including, for the avoidance of doubt, with respect to any of the Loan Parties' non-Debtor Affiliates) without the prior written consent of the Required Lenders (not to be unreasonably withheld); provided that, for the avoidance of doubt, any indebtedness incurred pursuant to the this Agreement or a debtor-in-possession facility or agreement regarding the use of cash collateral in connection with the Prepetition ABL Credit Agreement shall not be subject to this clause (xxxviii);

(xxx) other than in the ordinary course of business, any Loan Parties (i) enter into any material agreement with a contract value in excess of $1,000,000, (ii) amend, supplement, modify, or terminate any material agreement, or (iii) allow any material permit, license, or regulatory approval to be terminated, revoked, suspended, or modified, in each case without the prior written consent of the Required Lenders;

(xxxi) any Loan Parties grant, agree to grant, or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any management or executive level employee or director qualifying as an insider under the Bankruptcy Code without the prior written consent of the Required Lenders;

(xxxii) other than as contemplated by this Agreement and any other Loan Document, any Loan Parties amend any of their existing corporate governance or organizational documents without the prior written consent of the Required Lenders; other than in the ordinary course of business and consistent with past practice, any Loan Parties (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (A) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any

124

employee, or (B) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Loan Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), in each case without the prior written consent of the Required Lenders (such consent not be unreasonably withheld, conditioned, or delayed with respect to any action set forth in this paragraph taken with respect to non-insider employees of the Loan Parties);

(xxxiii) the Debtors sell, or file any motion or application seeking to sell, any material assets outside of the ordinary course of business without the prior written consent of the Required Lenders (not to be unreasonably withheld); and

(xxxiv) any Loan Parties encourage or facilitate any Person (including, for the avoidance of doubt, any non-Debtor Affiliate) to do any of the foregoing actions described in this Section 9.01(m) that if taken by any Debtor or Loan Party, as applicable, would result in an Event of Default.

Section 9.02    Remedies Upon Event of Default. Subject to the terms and conditions of the DIP Order and the Carve-Out, if any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligations shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, which amount shall include the Exit Premium and all other fees and premiums in effect on the date of such acceleration, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default under Section 9.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case, without further act of any Agent or any Lender.

Section 9.03    Application of Funds. Subject to the Carve-Out, any amount received by the Administrative Agent or the Collateral Agent from the Loan Parties or on account of the Obligations (or from proceeds of any Collateral) following an Event of Default under this Agreement, shall be applied as set forth in Section 2.12(h).

**Debtors' Exhibit No. 11**
**Page 132 of 168**

## ARTICLE X

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 10.01    <u>Appointment and Authorization of Agents</u>.

(a)        Each Lender hereby irrevocably appoints and designates WSFS to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents, and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to each such Agent by the terms of this Agreement or any other Loan Document, together with such actions or powers as are reasonably incidental thereto. The provisions of this <u>ARTICLE X</u> are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in an Agent's reasonable discretion or approval of any action or matter in an Agent's reasonable satisfaction, such Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law. No Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as such Agent or any other Agent-Related Person in any capacity.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value, collectability or the sufficiency of any Collateral, the existence, priority or (vi) the satisfaction of any condition set forth in <u>ARTICLE IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)        WSFS shall also act as the Collateral Agent under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes WSFS to act as the

126

agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to <u>Section 10.02</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this <u>ARTICLE X</u> (including <u>Section 10.07</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents), and any reference to the Administrative Agent shall be interpreted accordingly to include references to the Collateral Agent, as if set forth in full herein with respect thereto.

(c)     [Reserved].

(d)

(i)     Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from or on behalf of the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this Section 10.01(d) shall be conclusive, absent manifest error.

(ii)     Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from or on behalf of the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "<u>Erroneous Payment Notice</u>"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with

127

respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)    Each Lender hereby agrees that, to the extent it fails to return any Erroneous Payment to the Administrative Agent pursuant to, and within the time periods required by, clauses (i) or (ii) above, the Administrative Agent (or its Affiliates) is authorized at any time and from time to time thereafter, to the fullest extent permitted by law, to set off and apply any and all deposits of such Lender (general or special, time or demand, provisional or final) at any time held by or on behalf of the Administrative Agent (or its Affiliate, including by branches and agencies of the Administrative Agent, wherever located) for the account of such Lender against any such amounts.

(iv)    The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(v)    Each party's obligations under this Section 10.01(d) shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all (or any portion thereof) under any Loan Document.

Section 10.02    Delegation of Duties. Each Agent may execute any and all of its duties and exercise its rights and powers under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates and Representatives as shall be deemed necessary by such Agent or sub-agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. The exculpatory provisions of this ARTICLE X shall apply to any such sub-agent and to the Affiliates and Representatives of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent and Collateral Agent. No Agent shall be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent

128

acted with gross negligence or willful misconduct in the selection of such agent, sub-agent or attorney-in-fact.

Section 10.03    Liability of Agents. No Agent Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final and nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein, provided however that any such action taken or omitted to be taken with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent-Related Person shall believe in good faith to be necessary) shall not constitute gross negligence or willful misconduct), (b) be responsible in any manner for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, the existence, sufficiency, value or collectability of the Collateral, any failure to monitor or maintain any part of the Collateral, the payment of taxes with respect to the Collateral, providing, maintaining or preserving insurance on (including any flood insurance or for determining whether any flood insurance is or should be obtained with respect to the Collateral), or the existence, perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder or (c) be responsible for or have any duty to ascertain or inquire into the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. No Agent Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to Administrative Agent hereunder (including without limitation this ARTICLE X), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import that authorize and permit either the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 10.04    Reliance by Agents.

(a)      Each Agent shall be entitled to rely, shall be fully protected in relying and shall not incur any liability for relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, made or otherwise authenticated by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders

Debtors' Exhibit No. 11
Page 136 of 168

as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)        For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 10.05   Notice of Default. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless such Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default" and clearly labeled as such. Each Agent will promptly notify the Lenders of its receipt of any such notice. Each Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with ARTICLE IX; provided that unless and until an Agent has received any such direction, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 10.06   Credit Decision; Disclosure of Information by Agents. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

**Debtors' Exhibit No. 11**
**Page 137 of 168**

Section 10.07   <u>Indemnification of Agents</u>. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; <u>provided</u> that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; <u>provided</u> that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 10.07</u>. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 10.07</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; <u>provided</u> that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any. The undertakings in this <u>Section 10.07</u> shall survive the Termination Date and the resignation of the Administrative Agent.

Section 10.08   <u>Agents in their Individual Capacities</u>. Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, each Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them. With respect to its Loans, each Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include each such Agent in its individual capacity.

Section 10.09   <u>Successor Agents</u>.

(a)      Each Agent may resign as an Agent upon thirty (30) days' notice to the Lenders and the Borrower. If an Agent resigns under this Agreement or any other Loan Document, the Required Lenders shall appoint a commercial bank or trust company with offices in the United States having combined capital and surplus in excess of $1,000,000,000 as successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of such Agent, such Agent may appoint, after consulting with the Lenders, a successor agent satisfying the requirements set forth above from among the Lenders; <u>provided</u> that (i) nothing in this <u>Section 10.09</u> shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of such Agent or any of the obligations thereof to assume such role or obligations and (ii) such appointment shall not be a condition to the effectiveness of such Agent's resignation. If an Agent becomes a Defaulting Lender or is or becomes an Affiliate of a Defaulting Lender, the Required Lenders or the Borrower may at their option appoint a

131

successor agent satisfying the requirements set forth above to replace such Agent, and such successor agent shall be appointed from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent, as the case may be, and the retiring Agent's appointment, powers and duties as the Agent shall be terminated. After the retiring Agent's resignation hereunder as an Agent, the provisions of this ARTICLE X and Section 11.04 and Section 11.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement. If no successor agent has accepted appointment by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Lenders assuming the role of an Agent as specified in the immediately preceding sentence shall assume the rights and obligations of such Agent (including the indemnification provisions set forth in Section 10.07) as if each such Lender were such Agent; provided that nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of an Agent or any of the obligations thereof to assume such role or obligations. Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor and, upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents. Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate of any Disqualified Institution) may be appointed as a successor Agent.

(b)      Notwithstanding anything in the foregoing to the contrary, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Administrative Agent remove such Person as Administrative Agent and appoint a successor.

Section 10.10    Administrative Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.04(e) and (f), Section 2.09 and Section 11.04 or otherwise hereunder) allowed in such judicial proceeding; and to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(b)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel,

Debtors' Exhibit No. 11
Page 139 of 168

and any other amounts due to the Administrative Agent under Section 2.09 and Section 11.04 or otherwise hereunder;

(c)     Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding; and

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Lenders specified below in this paragraph, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 thereof, or any Debtor Relief Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable laws. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis within the applicable Class of Loans hereunder (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt interests of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid, (I) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (II) to adopt documents providing that the governance of the acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders (or the requisite Lenders specified in the last sentence of this paragraph, if applicable), irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01, and (III) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding the foregoing or anything in the Loan Documents to the contrary, (i) Lenders holding a majority of the aggregate amount of all New Money Term Loans then outstanding may direct the credit bid of any Obligations with respect to the New Money Term Loans and (ii) Lenders holding a majority of the aggregate amount of all Roll-Up Loans then outstanding may direct the credit bid of any Obligations with respect to the Roll-Up Loans; provided that, notwithstanding the foregoing, the Roll-Up Lenders shall not be permitted to credit bid Obligations with respect to the Roll-Up Loans unless the proposed transaction would pay in full all Obligations with respect to the New Money Term Loans in cash, or Lenders holding a majority of the aggregate amount of all New Money Term Loans shall have consented to such a transaction.

Section 10.11   Other Agents; Arrangers and Managers. None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent", "lead arranger" or "sole bookrunner" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, to the extent such Person is a Lender, those applicable to all Lenders in such capacity. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any

133

Lender, or any trust or agency relationship with any Loan Party. Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking any action hereunder.

Section 10.12    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not to or for the benefit of the Borrower and or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Letter of Credit,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments, the Letter of Credit and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not to or for the benefit of the Borrower or any other Loan Party, that:

(i)    no Agent-Related Person is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by

134

the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

   (ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement is independent (within the meaning of 29 C.F.R. § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 C.F.R. § 2510.3-21(c)(1)(i)(A)-(E),

   (iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

   (iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments, the Letter of Credit and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments, the Letter of Credit and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

   (v) no fee or other compensation is being paid directly to any Agent-Related Person for investment advice (as opposed to other services) in connection with the Loans, the Commitments, the Letter of Credit or this Agreement.

  (c) The Agents hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments, the Letter of Credit and this Agreement, (ii) may recognize a gain if it extended the Loans, the Commitments or the Letter of Credit for an amount less than the amount being paid for an interest in the Loans, the Commitments or the Letter of Credit by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE XI

## MISCELLANEOUS

  Section 11.01 <u>Amendments, Etc.</u> No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, or by the Administrative Agent with the consent of the Required Lenders, and the

135

Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)   no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)   change the number of Lenders or reduce the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders (or any of them) to take any action hereunder;

(ii)   other than in a transaction permitted under Section 7.04 or Section 7.05 or in connection with a Chapter 11 Plan, release Parent or any Subsidiary Guarantor (or otherwise limit Parent or such Subsidiary Guarantor's liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranty) if such release or limitation is in respect of all or substantially all of the value of the Guaranty;

(iii)   other than in a transaction permitted under Section 7.04 or Section 7.05 or in connection with a Chapter 11 Plan, release all or substantially all of the Collateral in any transaction or series of related transactions;

(iv)   amend, modify, terminate or waive any provision of the definition of "Required Lenders", "Pro Rata Share", Sections 2.12, 2.13 or 9.03 or any other term or condition of this Agreement or any other Loan Document that would, either directly or indirectly, deprive, or have the effect of depriving, a Lender of its Pro Rata Share of any payments to which it is entitled; provided, (x) additional extensions of credit pursuant hereto may be included in the determination of "Required Lenders" or "Pro Rata Share" on substantially the same basis as the Commitments and the Term Loans are included on the Closing Date and (y) this clause (iv) shall not apply with respect to any incurrence of Indebtedness approved pursuant to clause (vii) below;

(v)   amend, modify, terminate or waive any term of condition of Section 11.01;

(vi)   consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document;

(vii)   (A) subordinate the priority of payment of the Obligations to the payment of other Indebtedness, (B) subordinate the Liens granted in favor of the Collateral Agent on the Collateral to Liens securing other Indebtedness or (C) incur additional Indebtedness that is pari passu in Lien and/or payment priority with the New Money Term Loans and/or Roll-Up Loans (including pursuant to any waterfall provisions set forth herein), except, to the extent that the Required Supermajority New Money Lenders and Required Supermajority Roll-Up Lenders have consented to any such transaction;

(viii)   amend, waive or modify the definition of "Material Property" or any provision of the Loan Documents in a manner that would permit the transfer of Material Property (whether pursuant to a sale, lease, license, transfer, Investment, Restricted Payment, dividend or otherwise or relating to the exclusive rights thereto) to any Person that is not a Guarantor;

(ix)   [reserved];

136

(x)  authorizes additional Indebtedness that would be issued under the Loan Documents for purposes of influencing voting;

(xi)  amend, modify or waive any provision of the Loan Documents in a manner that would permit any Subsidiary to be designated as an "Unrestricted Subsidiary" or permit the transfer of any assets (including by Disposition, Investment, Restricted Payment or designation of a Subsidiary as an "Unrestricted Subsidiary") to "Unrestricted Subsidiaries" or other permit the creation or existence of, or transfer of, any assets (including by Disposition, Investment, Restricted Payment or designation of a Subsidiary as an "Unrestricted Subsidiary") to, a subsidiary, joint venture or other Affiliate otherwise not subject to the provisions of the Loan Documents (it being acknowledged that no Subsidiary is an "Unrestricted Subsidiary" as of the Closing Date);

(xii)  amend or modify this Agreement or the other Loan Documents in a manner that disproportionately and adversely affects one or more Classes of Loans or Commitments relative to any other Class or Classes of Loans or Commitments without the consent of Lenders holding a majority of the aggregate outstanding Loans and Commitments of such disproportionately and adversely affected Class; or

(xiii)  amend, modify or waive any provision of the Loan Documents to allow for purchases of any Loans (by open market purchase or through other assignments) by the Borrower or any of its Subsidiaries or other Affiliates, in each case using consideration other than cash without the written consent of all adversely affected Lenders, unless all adversely affected Lenders are offered the ability to participate in such transaction on a pro rata basis, on the same terms.

(b)  no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent, but without the consent of the Required Lenders or any other Lender:

(i)  increase the Commitments of a Lender without the consent of such Lender (it being understood that waivers or modifications of any condition precedent pursuant to Section 4.01 and 4.02 (other than with respect to Credit Extensions on the Closing Date), any Default or Event of Default pursuant to Section 9.01, any representation or warranty set forth in ARTICLE V, any covenant set forth in ARTICLE VI, ARTICLE VII and/or ARTICLE VIII, any mandatory prepayment required pursuant to Section 2.05(b) and/or any mandatory Commitment reduction pursuant to Section 2.06(a) shall not constitute an increase of the Commitments of any Lender for the purpose of this clause (i));

(ii)  waive or reduce the principal of, or stated rate of interest on, or currency in which interest is to be paid, or stated premium payable on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender (it being understood that any change in the definition of any ratio used in the calculation of such rate of interest or fees (or the component definitions thereof) shall not constitute a reduction in any rate of interest of fees and it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute a reduction or forgiveness of principal for the purpose of this clause (ii)); provided if the Required Lenders agree to waive any relevant Event of Default and such waiver is effective in accordance with this Section 11.01, then only the consent of the Required Lenders shall be necessary to waive any obligation of the

137

Borrower to pay interest at the Default Rate in connection with such waived Event of Default;

(iii)       except as set forth in <u>Section 2.18</u>, postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to <u>Section 2.05(b)(ii)</u> and <u>(iii)</u>, <u>Section 2.07</u> or <u>Section 2.08</u>, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender (other than, in each case, an extension for administrative reasons agreed by the Administrative Agent (acting at the Direction of the Required Lenders) (it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute an extension of the maturity date for purposes of this <u>clause (iii)</u>));

(iv)       alter the required application of any repayments or prepayments as between Classes of Loans pursuant to <u>Section 2.05</u>, <u>Section 2.07</u>, <u>Section 2.12</u>, <u>Section 2.13</u> or <u>Section 9.03</u> without the consent of Lenders holding more than 50% of the Total Facility Exposure of all Lenders of each Class of Loans which is being allocated a lesser repayment or prepayment as a result thereof; <u>provided</u>, Required Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered; or

(v)       extend the expiry date of Lender's Commitment (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default, representation, warranty, covenant mandatory prepayment or mandatory Commitment reduction shall not constitute an extension of a Commitment of any Lender);

<u>provided further</u> that (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent, in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents (it being understood that only the consent of the Required Lenders (and no other Person other than (as applicable) the Borrower) is necessary to effectuate any forbearance agreement in respect of any Default or Event of Default), (B) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may only be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time, (C) the scheduled maturity dates of part or all of any Term Loans or Commitments of any Lender may be extended solely with the consent of such Lender, (D) [reserved], (E) [reserved], (F) any mandatory prepayment required pursuant to <u>Section 2.05(b)</u> may be waived with the consent of the Required Lenders, (G) [reserved], (H) the Letter of Credit Commitment of the L/C Issuer (but not the aggregate Letter of Credit Commitment) may be reduced or increased solely with the consent of such L/C Issuer and (I) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above to take such action, affect the rights or obligations of the L/C Issuer under this Agreement.

Notwithstanding anything to the contrary contained in this <u>Section 11.01</u>, (a) any guarantees, collateral security documents and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent acting on the advice of counsel and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent acting on the advice of counsel at the request of the Borrower without the need to obtain the input or consent of any other Lender if such amendment, supplement or waiver is delivered in

138

order to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents and/or comply with relevant requirements of law or the advice of local counsel and (b) [reserved].

Notwithstanding the foregoing, the Administrative Agent (at the Direction of the Required Lenders) and the Borrower may amend, modify or supplement this Agreement or any other Loan Document to cure any ambiguity, error, omission, defect or inconsistency or any necessary or desirable technical change without any further action or consent of any other party to any Loan Document, so long as such amendment, modification or supplement does not materially and adversely affect the rights of any Lender.

Section 11.02   Notices and Other Communications; Facsimile and Electronic Copies.

(a)      General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile, electronic mail address or other electronic transmission) (and, as to service of process, only in writing and in accordance with applicable law) and, to the extent set forth in Section 11.02(e), in an electronic medium and delivered as set forth in Section 11.02(e). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Borrower, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

FIRST BRANDS GROUP, LLC
127 Public Square, Suite 5110
Cleveland, Ohio 44114
Facsimile: (216) 274-9027
Attention: Chuck Moore
Email: cmoore@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Justin D. Lee and Thomas Mastoras
Email: justin.d.lee@weil.com; Thomas.Mastoras@weil.com

(ii)      if to the Administrative Agent or the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Patrick Healy, Raye Goldsborough

139

Email: phealy@wsfsbank.com; rgoldsborough@wsfsbank.com

With a copy (which shall not constitute notice) to:

ArentFox Schiff LLP
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Attention: Jeffrey R. Gleit
Email: jeffrey.gleit@afslaw.com

With a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Frederick T. Lee; Eugene Y. Park
Email: flee@gibsondunn.com; eypark@gibsondunn.com

(iii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid (properly addressed); (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 11.02(b)) upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), when delivered; provided that notices and other communications to the Borrower and Administrative Agent pursuant to ARTICLE II shall not be effective until actually received by such Person during the Person's normal business hours. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)    Effectiveness of Facsimile Documents and Signatures. Loan Documents may be transmitted and/or signed by facsimile or electronic transmission of a .pdf copy; provided that, if requested, original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission).

(c)    Reliance by Agents and Lenders. The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Agent or Lender on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and nonappealable judgment by a court of competent jurisdiction. All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

140

(d)      <u>Notice to other Loan Parties</u>. The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this <u>Section 11.02</u> with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)      The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as the "<u>Communications</u>"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders or actual or prospective assignees or participants by posting the Communications on Debt Domain, SyndTrak, IntraLinks or another relevant website or other information platform (the "<u>Platform</u>").

(f)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT-RELATED PERSONS IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "<u>COVERED PARTIES</u>") HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT (I) TO THE EXTENT THE LIABILITY OF ANY COVERED PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH COVERED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR A MATERIAL BREACH OF THIS AGREEMENT OR (II) IN THE CASE OF A CLAIM BY ANY THIRD PARTY AGAINST ANY INDEMNITEE, TO THE EXTENT SUCH DAMAGES WOULD OTHERWISE BE SUBJECT TO INDEMNIFICATION PURSUANT TO THE TERMS OF <u>SECTION 11.05</u>.

(g)      The Administrative Agent agrees that the receipt in accordance with this <u>Section 11.02</u> of the Communications by the Administrative Agent at its e-mail address set forth in this <u>Section 11.02</u> shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

141

(h)      Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender"). Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Borrower and the Administrative Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as either publicly available information or not material information for purposes of United States federal, state and other applicable securities laws (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 11.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be required to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(i)      EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT ANY PERSON FROM PURCHASING OR SELLING SECURITIES OF SUCH PERSON OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON. EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION. Each Lender that is not a Public Lender confirms to the Administrative Agent that such Lender has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective Contractual Obligations with respect to confidential and material non-public information. A Public Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "Restricting Information"), in which case it will identify itself to the Administrative Agent as a Public Lender. Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent-Related Persons, any Lender or any Loan Party concerning the Credit Facilities in which Restricting Information may be discussed. No Agent-Related Person, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information. In particular, no Agent-Related Person shall have, and the Administrative Agent, on behalf of all Agent-Related Persons, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material non-public information or such Lender's compliance with applicable laws related thereto. Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that might contain Restricting Information. Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information). Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent. Each Public Lender confirms to the Administrative Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lenders may have access to Restricting Information

142

that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information. Nothing in this Section 11.02(i) shall modify or limit a Lender's (including any Public Lender) obligations under Section 11.08 with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information. Each Public Lender hereby waives any claim or cause of action it may have or acquire against Parent and/or any of its Restricted Subsidiaries by virtue of its election to not receive any Restricting Information.

Section 11.03   No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 11.04   Costs and Expenses. The Borrower agrees (a) to pay or reimburse each Agent in its capacity as such for all reasonable and documented out of pocket costs and expenses incurred before (to the extent not reimbursed on the Closing Date), on or after the Closing Date in connection with the preparation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Borrower or negotiated in consultation with the Borrower (in each case, whether or not the transactions contemplated thereby are consummated), but limited, in the case of Attorney Costs, to the Attorney Costs of ArentFox Schiff LLP, counsel for the Agents, taken as a whole, and, to the extent reasonably necessary, one local counsel in any relevant jurisdiction, (b) to pay or reimburse each Agent for all reasonable and documented out of pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), but limited, in the case of Attorney Costs, to the reasonable and documented costs and expenses of one counsel to the Administrative Agent and the Lenders, taken as a whole and, to the extent reasonably necessary to such Persons taken as a whole in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, one additional counsel to each group of affected persons similarly situated, taken as a whole) and (c) to pay or reimburse the Lenders for all their reasonable and documented out of pocket costs and expenses (without duplication) incurred in connection with the development, preparation, execution and delivery of, and any amendment, supplement, modification to, waiver, enforcement and preservation of rights under this Agreement and the other Loan Documents and any other documents in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees, disbursements and other charges of one firm of counsel to the Lenders taken as a whole (it being understood such counsel shall be Gibson, Dunn & Crutcher LLP), and, to the extent required one firm of local counsel in each relevant local jurisdiction (which may include a single special counsel acting in multiple jurisdictions)). The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out of pocket expenses (other than Attorney Costs) incurred by the Administrative Agent and the Lenders (including by the Lenders' Counsel). The agreements in this Section 11.04 shall survive

143

the Termination Date. All amounts due under this Section 11.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If the Borrower fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

This Section 11.04 shall not apply to Taxes arising with respect to payments to the Lenders under the Loan Documents, which shall be governed exclusively by Section 3.01.

Section 11.05   Indemnification. The Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates, each Allocation Party (whether or not such Allocation Party is a Lender as such time) the L/C Issuer and any fronting, advising or correspond banks with respect to the Letter of Credit and their respective directors, officers, employees, partners, counsel, agents, trustees, investment advisors and attorneys in fact (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, Taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (but limited, in the case of Attorney Costs, to (x) the reasonable and documented out-of-pocket fees and expenses of one counsel to each Agent and its respective Affiliates, directors, officers, employees, agents, advisors and other representatives ("Agent's Counsel"), (y) reasonable Attorney Costs of one firm of counsel for the Lenders and their respective Affiliates, directors, officers, employees, agents, advisors, and other representatives (the "Lenders' Counsel"), and (z), to the extent reasonably necessary, the reasonable and documented out-of-pocket fees and expenses of one local counsel to such Persons in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, the reasonable and documented out-of-pocket fees and expenses of one additional counsel to the affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby (including, for the avoidance of doubt and without limitation, any Roll-Up Loan Syndication) or the consummation of the transactions contemplated thereby, (ii) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by the Parent, the Borrower, or any of their respective Subsidiaries (or at which the Parent, the Borrower or any of their respective Subsidiaries has arranged for or caused any Release or disposal of Hazardous Materials), or any Environmental Action or Environmental Liability related to the Parent, the Borrower or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as to any Indemnitees, be available to the extent that (x) such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of this Agreement or any of the other Loan Documents by, such Indemnitee or of any controlled Affiliate, director, officer, employee, counsel, agent or attorney in fact of such Indemnitee as determined by a final non-

144

appealable judgment of a court of competent jurisdiction or (y) if such indemnity relates to any dispute solely among the Indemnitees that does not involve an act or omission of Borrower or any of its Affiliates (other than indemnity for claims against the Agents in their respective capacities as such or disputes among the L/C Issuer), and the Borrower shall be entitled to a refund and a return of any and all amounts paid to any Indemnitee for fees and expenses to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof. No Indemnitee nor any Loan Party nor any of their respective officers, directors, employees, agents, advisors or representatives shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document (other than in respect of any such damages incurred or paid by an Indemnitee to a third party unaffiliated with such Indemnitee). All amounts due under this Section 11.05 shall be paid within thirty (30) days after written demand therefor, which demand shall set forth in reasonable detail the amount and nature of reimbursement claimed. The agreements in this Section 11.05 shall survive the resignation of any Agent, the replacement of any Lender and the Termination Date.

Section 11.06   Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 11.07   Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby and, except as otherwise provided herein (including without limitation as permitted under Section 7.04), none of Parent, the Borrower or any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under the other Loan Documents without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the requirements of Section 11.07(b), (ii) by way of participation in accordance with the provisions of Section 11.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.07(f) or (iv) to an SPC in accordance with the provisions of Section 11.07(g) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including L/C Borrowings) at the time owing to it) with the prior written consent (such consent in each case not to be unreasonably withheld or delayed) of:

145

       (A)     [reserved];

       (B)     the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for (1) an assignment to a Lender, an Affiliate of a Lender or an Approved Fund relating thereto, (2) an assignment of an L/C Borrowing or an L/C Obligation, provided that the Administrative Agent shall receive written notice of any such assignment of an L/C Borrowing or an L/C Obligation substantially contemporaneously therewith or (3) at any time when an Event of Default has occurred and is continuing; and

       (C)     in the case of an assignment with respect to the Letter of Credit Facility, the L/C Issuer.

       (ii)     Assignments shall be subject to the following additional conditions:

       (A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents; provided that (1) [reserved] and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

       (B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and any applicable tax forms required by Section 3.01(f), if applicable; and

       (C)     the relevant Eligible Assignee, if it is not then a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f).

Notwithstanding anything herein to the contrary, the consent of the Administrative Agent shall not be required to effectuate the Syndication or any initial assignments by the Lender and no assignment fees (or other equivalent fees) shall be due or payable in connection with such Syndication or assignments.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credit Facilities on a non-pro rata basis including, for the avoidance of doubt, in connection with the Syndication, Fronting Lender assigning portions of its funded Loans without assigning corresponding portions of its Commitment.

Notwithstanding anything in this Section 11.07 to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Term Loans within ten (10) Business Days after receipt of written notice of such assignment, the Borrower shall be deemed to have consented to such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 11.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative

Agent; provided, that all Affiliates of the Administrative Agent shall be exempt from paying such processing and recordation fee in connection with Term Loan assignments and such fee shall not apply to the Syndication or any initial assignments by the Lender), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be party to this Agreement as a Lender with respect to the interest assigned and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement in addition to any rights and obligations otherwise held by such assignee as a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 (or any other increased costs protection provision), 11.04 and 11.05 and shall continue to be subject to the provisions of Section 11.08). Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.

(c)     The Administrative Agent may provide the list of Disqualified Institutions to any potential Lender and shall provide the list of Disqualified Institutions upon the request of any Lender, in each case subject to the provisions in Section 11.08. If any assignment or participation under this Section 11.07 is made to any Disqualified Institution without the Borrower's prior written consent, then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution, (B) in the case of any outstanding Loans held by such Disqualified Institution, purchase such Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Institution paid to acquire such Loans, in the cases of clauses (x) and (y), plus accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 11.07), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the applicable Disqualified Institution has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Institution paid for the applicable Loans and participations in L/C Borrowings, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the Borrower, (II) in the case of clauses (A) and (B), the Borrower shall be liable to the relevant Disqualified Institution under Section 3.05 if any SOFR Loan or EURIBOR Loan owing to such Disqualified Institution is repaid or prepaid other than on the last day of the Interest Period relating thereto and (III) in the case of clause (C), the relevant assignment shall otherwise comply with this Section 11.07 (except that no registration and processing fee required under this Section 11.07 shall be required with any assignment pursuant to this paragraph). Nothing in this Section 11.07(c) shall be deemed to prejudice any right or remedy that the Borrower may otherwise have at law or equity. Each Lender acknowledges and agrees that Parent and its Subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this Section 11.07 insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Borrower's prior written consent. Additionally, each Lender agrees that the Borrower may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 11.07(c) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm. The Parent, the Borrower and each Lender agree that (i) the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and (ii) the Administrative Agent shall not have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

(d)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and

147

the Commitments of, and principal amounts (and related interest amounts) of the Loans, L/C Obligations (specifying the Unreimbursed Amounts) and L/C Borrowings owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice (but no Lender shall be entitled to view any information in the Register except such information contained therein with respect to the Class and amount of Obligations owing to such Lender). No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (d). The Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(e)        Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than any Disqualified Institution or any natural person) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a), or Section 11.01(b) that directly affects any participation of such Participant and with respect to which the participating Lender would have been entitled to vote. The Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements of Section 3.01, including Section 3.01(e) and Section 3.01(f) (it being understood that the documentation required under Section 3.01(f) shall be delivered to the participating Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.07(b); provided that such Participant agrees to be subject to the provisions of Sections 3.01(e), 3.04(d) and 3.07 as if it were an assignee under Section 11.07(b). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 11.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in its commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participant Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and

Debtors' Exhibit No. 11
Page 155 of 168

1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

Notwithstanding anything to the contrary contained in this Agreement, a Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such Participant acquired the applicable participation.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no pledge may be made to a Disqualified Institution and; provided further that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (other than a Disqualified Institution) identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(h)     Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it in favor of any Person (other than a Disqualified Institution) and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee (other than a Disqualified Institution) for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 11.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

149

(i)     Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it in favor of any Person (other than a Disqualified Institution) and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee (other than a Disqualified Institution) for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 11.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)     Notwithstanding anything to the contrary contained herein, (x) any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to Parent, the Borrower or any Subsidiary and (y) Parent, the Borrower and any Subsidiary may, from time to time, purchase or prepay Term Loans, in each case, on a non-pro rata basis, solely for cash consideration, through Dutch auction procedures open to all applicable Lenders on a pro rata basis in accordance with customary procedures to be agreed between the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders); provided that, any Loans or Commitments acquired by Parent, the Borrower or any other Subsidiary shall be retired and cancelled promptly upon the acquisition thereof; provided further, Holdings, the Borrowers, their Subsidiaries and their respective Affiliates may not purchase or acquire any Term Loans or Commitments hereunder other than as specified in this clause (j)

(k)     Notwithstanding anything to the contrary contained herein, the L/C Issuer may, upon thirty (30) days' notice to the Borrower and the Revolving Lenders under the Letter of Credit Facility, resign as the L/C Issuer.  In the event of any such resignation of the L/C Issuer, the Borrower shall be entitled to appoint a Revolving Lender under the Letter of Credit Facility which is willing to accept such appointment as a successor L/C Issuer hereunder; provided that no failure by the Borrower to appoint any such successor shall affect the resignation of the L/C Issuer; provided, further, that if any L/C Borrowings are outstanding at the time of the L/C Issuer's resignation, then the appointment of any successor L/C Issuer shall be subject to the prior written consent of the Revolving Lenders under the L/C Facility (but such consent shall not be required to give effect to the L/C Issuer's resignation).  If the L/C Issuer resigns as the L/C Issuer, it shall retain all the rights and obligations of the L/C Issuer hereunder with respect to the Letter of Credit outstanding as of the effective date of its resignation as the L/C Issuer and all L/C Obligations with respect thereto.

(l)     Each Lender and any Person that becomes a Lender by way of an assignment acknowledge and agree that each such Lender or Person, as applicable, are bound by the DIP Order and any intra-creditor settlement entered into by and between any such Lenders.

Section 11.08   Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed:

(a)     to its Affiliates and its and its Affiliates' Representatives, partners, trustees, investment advisors and agents, including accountants and independent auditors, legal counsel and other experts, agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the transactions contemplated or permitted hereby; provided that the

150

relevant Agent or Lender shall be responsible for its controlled Affiliates' and their respective directors', officers', employees' and agents' compliance with the terms of this Section 11.08,

(b)      to the extent requested or required by any Governmental Authority or examiner regulating any Lender (provided that such Lender that discloses any Information or any Loan Document pursuant to this clause (b) shall provide the Borrower with prompt advance written notice of such disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority, self-regulatory authority, state insurance commissioners or the National Association of Insurance Commissioners exercising its examination or regulatory authority) to the extent practical and permitted by applicable Law);

(c)      to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (provided, that such Agent or such Lender that discloses any Information or any Loan Document pursuant to this clause (c) shall provide the Borrower with prompt written advance notice of such disclosure to the extent practical and permitted by applicable law);

(d)      to any other party to this Agreement;

(e)      subject to a written acknowledgment from the relevant recipient that the Information and/or Loan Document so disclosed is being disseminated on a confidential basis (on substantially the same, or at least as restrictive taken as a whole, as the terms set forth in this Section 11.08 or on such other terms to which the Borrower provides written consent, to any pledgee referred to in Section 11.07(f) or Section 11.07(h)), direct or indirect counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement;

(f)      with the written consent of the Borrower;

(g)      to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.08 by the disclosing party;

(h)      to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the disclosing Person);

(i)      in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or in connection with the administration by the Agents of the Credit Facilities;

(j)      to the extent that such Information (i) is received by such Person from a third party that is not, to such Person's knowledge, after reasonable investigation, subject to confidentiality, fiduciary or other legal obligations owing to the Parent or its Restricted Subsidiaries or Affiliates or (ii) was already in such Person's possession (except to the extent received in a manner that would be restricted by the immediately-preceding subclause (i)) or is independently developed by such Person based exclusively on information the disclosure of which would not be restricted by this Section 11.08;

(k)      for purposes of establishing a "due diligence" defense; or

**Debtors' Exhibit No. 11**
**Page 158 of 168**

(l)      to the CUSIP Service Bureau or any similar agency in connection with the application, issuance, publishing and monitoring of CUSIP numbers or other identifiers with respect to the credit facilities hereunder.

In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions. For the purposes of this Section 11.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to Parent or any of its Restricted Subsidiaries or their business, other than any such information that is publicly available prior to disclosure by any Loan Party other than as a result of a breach of this Section 11.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof. Notwithstanding anything to the contrary in this Agreement, this Section 11.08 shall survive the Termination Date for a period of one (1) year.

Section 11.09    Setoff. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and the Restricted Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and the Restricted Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; provided that such Lender and its Affiliates shall not exercise any right of setoff given this Section 11.09 without obtaining the prior written consent of the Administrative Agent. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, each Lender under this Section 11.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender may have.

Section 11.10    Release of Collateral and Guarantee. (a) (i) Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party to any Person that is not a Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents or, subject to Section 11.01, if otherwise approved, authorized or ratified in writing by the Required Lenders or any other requisite Lenders, (ii) upon the Termination Date (and, concurrently therewith, to release all the Loan Parties from their obligations under the Loan Documents (other than those that specifically survive the Termination Date)), (iii) upon release of a Subsidiary Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (iv) upon any asset ceasing to constitute Collateral, the Lenders irrevocably authorize the Agents, and the Agents agree, at the Borrower's expense, to execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

152

(b)    [Reserved].

(c)    The Lenders irrevocably authorize the Agents, and the Agents agree, to release any Subsidiary Guarantor from its obligations under any Loan Document to which it is a party if such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder; provided that, no Guarantor will be released from its guarantee solely as a result of ceasing to be wholly-owned unless (i) at the time such Guarantor ceases to be wholly-owned, the primary purpose of such transaction was not to evade the guarantee requirements, (ii) the transaction by which such Guarantor ceases to be wholly-owned was consummated on an arms' length basis with an unaffiliated third party and (iii) such transaction otherwise complies with the terms of Section 7.02 (with the Borrower being deemed to have made an Investment in such resulting non-Guarantor Subsidiary, and such transaction constitutes an Investment permitted pursuant to Section 7.02).

(d)    The Lenders irrevocably authorize the Agents, and the Agents agree, to enter into subordination or intercreditor agreements or arrangements with respect to Indebtedness (or Liens securing such Indebtedness) that is required or permitted to be pari passu with or subordinated to the Obligations or Secured Obligations hereunder.

Section 11.11   Counterparts. This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile transmission or electronic transmission of a .pdf copy of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The foregoing also applies to any amendment, extension or renewal of this Agreement.

Section 11.12   Integration. This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 11.13   Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

153

Section 11.14   <u>Severability</u>. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.15   <u>GOVERNING LAW</u>.

(a)     THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN) AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)     THE BORROWER, PARENT, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT THERETO.

Section 11.16   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 11.16</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.17   <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by Parent, the Borrower, the Administrative Agent, and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of Parent, the Borrower, each such Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to

154

**Debtors' Exhibit No. 11**
**Page 161 of 168**

assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 11.18    [Reserved].

Section 11.19    PATRIOT Act. Each Lender and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender and the Administrative Agent to identify the Borrower in accordance with the PATRIOT Act. The Borrower agrees to provide, and to cause each other Loan Party to provide, such information promptly upon request.

Section 11.20    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 11.21    [Reserved].

Section 11.22    [Reserved].

Section 11.23    No Fiduciary Duty. Each Agent, each Lender and their Affiliates (collectively, the "Lender Affiliated Parties"), may have economic interests that conflict with those of the Loan Parties, and each Loan Party acknowledges and agrees that (a) nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Loan Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Loan Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Loan Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Loan Party on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents; (e) each Loan Party has its own legal and financial advisors to the extent it deemed appropriate; (f) each Loan Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Loan Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

Debtors' Exhibit No. 11
Page 162 of 168

Section 11.24    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 11.25    <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States), in the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

156

[Remainder of Page Intentionally Blank]

157

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FIRST BRANDS GROUP INTERMEDIATE, LLC,
as Parent


By: _____
    Name:
    Title:


FIRST BRANDS GROUP, LLC,
as the Borrower


By: _____
    Name:
    Title:

(Signature Page to Senior Secured Superpriority Debtor-In-Possession Credit Agreement)

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as the Administrative Agent and Collateral Agent


By: _____
     Name:
     Title:

(Signature Page to Senior Secured Superpriority Debtor-In-Possession Credit Agreement)

OPY CREDIT CORP., solely in its capacity as Trading Agent and solely with respect to <u>Sections 10.03</u>, <u>10.06</u>, <u>10.07</u>, <u>11.04</u>, <u>11.05</u>, <u>11.07(c)</u>, <u>11.08</u>, <u>11.11</u>, <u>11.12</u>, <u>11.13</u>, <u>11.15</u>, <u>11.16</u>, <u>11.17</u>, and <u>11.23</u> herein

By: _____
    Name:
    Title:

(Signature Page to Senior Secured Superpriority Debtor-In-Possession Credit Agreement)

MORGAN STANLEY SENIOR FUNDING, INC.,
as the Fronting Lender


By: _____
    Name:
    Title:

(Signature Page to Senior Secured Superpriority Debtor-In-Possession Credit Agreement)

**Debtors' Exhibit No. 11**