Execution Version

**PUBLISHED DEAL CUSIP NO. 89609UAA9**
**PUBLISHED TERM FACILITY CUSIP NO. 89609UAB7**

---

$425,000,000
FIRST LIEN TERM LOAN AGREEMENT

Dated as of February 2, 2018

among

TRICO GROUP, LLC,
as Borrower,

TRICO GROUP HOLDINGS, LLC,
as Parent,

THE LENDERS PARTY HERETO

and

GOLDMAN SACHS BANK USA,
as Administrative Agent and Collateral Agent

_____

GOLDMAN SACHS BANK USA AND DEUTSCHE BANK SECURITIES INC.,
as Lead Arrangers

_____

---

#90400391v30

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ................................................................ 1

    Section 1.01    Defined Terms ................................................................................ 1
    Section 1.02    Other Interpretive Provisions ....................................................... 48
    Section 1.03    Accounting Terms ........................................................................ 49
    Section 1.04    Rounding ...................................................................................... 49
    Section 1.05    References to Agreements, Laws, Etc. .......................................... 49
    Section 1.06    Times of Day ................................................................................ 49
    Section 1.07    Timing of Payment or Performance ............................................. 49
    Section 1.08    Currency Equivalents Generally ................................................... 50
    Section 1.09    Cashless Rollovers ....................................................................... 50
    Section 1.10    Certain Calculations and Tests .................................................... 50

**ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS** ........................................... 51

    Section 2.01    The Loans ..................................................................................... 51
    Section 2.02    Borrowings, Conversions and Continuations of Loans ................ 51
    Section 2.03    [Reserved] .................................................................................... 53
    Section 2.04    [Reserved] .................................................................................... 53
    Section 2.05    Prepayments ................................................................................. 53
    Section 2.06    Termination or Reduction of Commitments .................................. 57
    Section 2.07    Repayment of Loans ..................................................................... 58
    Section 2.08    Interest ......................................................................................... 58
    Section 2.09    Fees .............................................................................................. 58
    Section 2.10    Computation of Interest and Fees ................................................. 59
    Section 2.11    Evidence of Indebtedness ............................................................. 59
    Section 2.12    Payments Generally ..................................................................... 59
    Section 2.13    Sharing of Payments .................................................................... 61
    Section 2.14    Defaulting Lenders ....................................................................... 61
    Section 2.15    [Reserved] .................................................................................... 62
    Section 2.16    Incremental Term Loans .............................................................. 62
    Section 2.17    Specified Term Refinancing Debt ................................................ 65
    Section 2.18    Extension of Loans ....................................................................... 67

**ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY** ................... 68

    Section 3.01    Taxes ............................................................................................ 68
    Section 3.02    Illegality ....................................................................................... 72
    Section 3.03    Inability to Determine Rates ......................................................... 73
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans ............................................................... 73
    Section 3.05    Funding Losses ............................................................................ 74
    Section 3.06    Matters Applicable to All Requests for Compensation ................. 74
    Section 3.07    Replacement of Lenders under Certain Circumstances ................. 75
    Section 3.08    Survival ........................................................................................ 76

**ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** .................................. 76

    Section 4.01    Conditions of Initial Credit Extension .......................................... 76
    Section 4.02    Conditions to All Credit Extensions ............................................ 80

**ARTICLE V REPRESENTATIONS AND WARRANTIES** ......................................................... 80

    Section 5.01    Existence, Qualification and Power; Compliance with Laws......... 80
    Section 5.02    Authorization; No Contravention ................................................. 81

i

#90400391v30

## TABLE OF CONTENTS (Cont.)

Page

| | | |
|---|---|---|
| Section 5.03 | Governmental Authorization; Other Consents | 81 |
| Section 5.04 | Binding Effect | 81 |
| Section 5.05 | No Material Adverse Effect | 81 |
| Section 5.06 | Litigation; FCPA | 81 |
| Section 5.07 | Ownership of Property; Liens; Insurance | 82 |
| Section 5.08 | Creation and Perfection of Security Interests | 82 |
| Section 5.09 | Environmental Compliance | 82 |
| Section 5.10 | Taxes | 83 |
| Section 5.11 | Compliance with ERISA | 83 |
| Section 5.12 | Labor Matters | 83 |
| Section 5.13 | Subsidiaries; Equity Interests | 84 |
| Section 5.14 | Margin Regulations; Investment Company Act; PATRIOT Act | 84 |
| Section 5.15 | Disclosure; Financial Statements | 84 |
| Section 5.16 | Intellectual Property | 85 |
| Section 5.17 | Solvency | 85 |
| Section 5.18 | AML Laws; Anti-Corruption Laws and Sanctions | 85 |
| Section 5.19 | Status as Senior Indebtedness | 86 |

**ARTICLE VI AFFIRMATIVE COVENANTS** .................... **86**

| | | |
|---|---|---|
| Section 6.01 | Financial Statements | 86 |
| Section 6.02 | Certificates; Reports; Other Information | 87 |
| Section 6.03 | Notice Requirements; Other Information | 88 |
| Section 6.04 | Environmental Matters | 88 |
| Section 6.05 | Maintenance of Existence | 89 |
| Section 6.06 | Maintenance of Properties | 89 |
| Section 6.07 | Maintenance of Insurance | 89 |
| Section 6.08 | Compliance with Laws | 89 |
| Section 6.09 | Books and Records | 89 |
| Section 6.10 | Inspection Rights | 90 |
| Section 6.11 | Covenant to Guarantee Obligations and Give Security | 90 |
| Section 6.12 | Further Assurances | 92 |
| Section 6.13 | Taxes | 92 |
| Section 6.14 | Ratings | 92 |
| Section 6.15 | Use of Proceeds | 92 |
| Section 6.16 | Lien Enhancements | 93 |
| Section 6.17 | Post-Closing Covenants | 93 |

**ARTICLE VII NEGATIVE COVENANTS** .................... **93**

| | | |
|---|---|---|
| Section 7.01 | Liens | 93 |
| Section 7.02 | Investments | 97 |
| Section 7.03 | Indebtedness | 100 |
| Section 7.04 | Fundamental Changes | 104 |
| Section 7.05 | Dispositions | 106 |
| Section 7.06 | Restricted Payments | 108 |
| Section 7.07 | Change in Nature of Business | 111 |
| Section 7.08 | Transactions with Affiliates | 111 |
| Section 7.09 | Prepayments and Modifications of Certain Indebtedness | 112 |
| Section 7.10 | Negative Pledge | 113 |
| Section 7.11 | Amendments to Organization Documents | 114 |
| Section 7.12 | Fiscal Year | 114 |
| Section 7.13 | Sanctions; Anti-Corruption Laws | 114 |

#90400391v30

Debtors' Exhibit No. 12
Page 3 of 354

## TABLE OF CONTENTS (Cont.)

Page

**ARTICLE VIII PARENT COVENANT** ............................................................................ 115

**ARTICLE IX EVENTS OF DEFAULT AND REMEDIES** ............................................. 116

| | | |
|---|---|---|
| Section 9.01 | Events of Default | 116 |
| Section 9.02 | Remedies Upon Event of Default | 118 |
| Section 9.03 | Application of Funds | 119 |

**ARTICLE X ADMINISTRATIVE AGENT AND OTHER AGENTS** .............................. 120

| | | |
|---|---|---|
| Section 10.01 | Appointment and Authorization of Agents | 120 |
| Section 10.02 | Delegation of Duties | 121 |
| Section 10.03 | Liability of Agents | 121 |
| Section 10.04 | Reliance by Agents | 122 |
| Section 10.05 | Notice of Default | 122 |
| Section 10.06 | Credit Decision; Disclosure of Information by Agents | 122 |
| Section 10.07 | Indemnification of Agents | 123 |
| Section 10.08 | Agents in their Individual Capacities | 123 |
| Section 10.09 | Successor Agents | 123 |
| Section 10.10 | Administrative Agent May File Proofs of Claim; Credit Bidding | 124 |
| Section 10.11 | Other Agents; Arrangers and Managers | 125 |
| Section 10.12 | Certain ERISA Matters | 126 |

**ARTICLE XI MISCELLANEOUS** .................................................................................... 127

| | | |
|---|---|---|
| Section 11.01 | Amendments, Etc. | 127 |
| Section 11.02 | Notices and Other Communications; Facsimile and Electronic Copies | 130 |
| Section 11.03 | No Waiver; Cumulative Remedies | 134 |
| Section 11.04 | Costs and Expenses | 134 |
| Section 11.05 | Indemnification | 135 |
| Section 11.06 | Payments Set Aside | 136 |
| Section 11.07 | Successors and Assigns | 136 |
| Section 11.08 | Confidentiality | 142 |
| Section 11.09 | Setoff | 144 |
| Section 11.10 | Release of Collateral and Guarantee | 144 |
| Section 11.11 | Counterparts | 145 |
| Section 11.12 | Integration | 145 |
| Section 11.13 | Survival of Representations and Warranties | 145 |
| Section 11.14 | Severability | 145 |
| Section 11.15 | GOVERNING LAW | 145 |
| Section 11.16 | WAIVER OF RIGHT TO TRIAL BY JURY | 146 |
| Section 11.17 | Binding Effect | 146 |
| Section 11.18 | [Reserved] | 146 |
| Section 11.19 | PATRIOT Act | 146 |
| Section 11.20 | Interest Rate Limitation | 147 |
| Section 11.21 | Intercreditor Agreements | 147 |
| Section 11.22 | No Fiduciary Duty | 147 |
| Section 11.23 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 148 |

**Debtors' Exhibit No. 12**
**Page 4 of 354**

SCHEDULES

Schedule 1.01(a)      -      Specified Customers
Schedule 1.01(b)      -      Subsidiary Guarantors
Schedule 2.01         -      Commitments
Schedule 5.07(b)      -      Owned Real Property
Schedule 5.13         -      Subsidiaries and Other Equity Investments
Schedule 6.17         -      Post-Closing Covenants
Schedule 7.01(b)      -      Existing Liens
Schedule 7.02(e)      -      Investments
Schedule 7.03         -      Indebtedness

EXHIBITS

Exhibit A      -      Form of Committed Loan Notice
Exhibit B      -      Form of Prepayment Notice
Exhibit C      -      Form of Note
Exhibit D      -      Form of Compliance Certificate
Exhibit E      -      Form of Assignment and Assumption
Exhibit F      -      Form of Guarantee
Exhibit G-1    -      Form of Pledge Agreement
Exhibit G-2    -      Form of Security Agreement
Exhibit H-1    -      Form of Intellectual Property Security Agreement
Exhibit H-2    -      Form of Intellectual Property Security Agreement Supplement
Exhibit I      -      Form of ABL Intercreditor Agreement
Exhibit J-1    -      Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                      are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-2    -      Form of U.S. Tax Compliance Certificate (For Foreign Participants
                      that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-3    -      Form of U.S. Tax Compliance Certificate (For Foreign Participants
                      that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-4    -      Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                      are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit K      -      Form of Solvency Certificate

#90400391v30

## FIRST LIEN TERM LOAN AGREEMENT

This FIRST LIEN TERM LOAN AGREEMENT (this "Agreement") is entered into as of February 2, 2018, among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), THE LENDERS FROM TIME TO TIME PARTY HERETO, and GOLDMAN SACHS BANK USA ("Goldman Sachs"), as administrative agent (together with its permitted successors in such capacity, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent").

### PRELIMINARY STATEMENTS

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, the Lenders have agreed to extend to the Borrower $425,000,000 aggregate principal amount of Term Loans (as such amount may be increased pursuant to Section 2.16, the "Term Loan Facility"), the proceeds of which will be used to repay the Indebtedness outstanding under the Existing Credit Agreements and to consummate the other Transactions and for other permitted purposes as set forth in Section 6.15 hereof;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder; and

WHEREAS, the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a first priority Lien (subject to Liens on the ABL Priority Collateral in favor of the ABL Agent) on substantially all of their respective assets, subject to the terms and conditions set forth in the Collateral Documents.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ABL Agent" means Goldman Sachs Bank USA as administrative agent and collateral agent for the lenders from time to time party to the ABL Credit Agreement.

"ABL Credit Agreement" means the ABL Credit Agreement, dated as of the date hereof (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time not in violation of the ABL Intercreditor Agreement), among, *inter alios*, Parent, the Borrower, the other borrowers from time to time party thereto, Goldman Sachs Bank USA, as administrative agent and collateral agent, and the lenders from time to time party thereto.

"ABL Facility" means the credit facility governed by the ABL Credit Agreement.

"ABL Incremental Commitment Increase" means any "Incremental ABL Commitment Increase" as defined in the ABL Credit Agreement.

"ABL Intercreditor Agreement" means the ABL Intercreditor Agreement, dated as of the date hereof (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), among the Administrative Agent, the ABL Agent and the Loan Parties, substantially in the form of Exhibit I.

"ABL Loan Documents" means the "Loan Documents" as defined in the ABL Credit Agreement.

"ABL Loans" means the loans extended to the "Borrowers" (as defined in the ABL Credit Agreement) pursuant to the ABL Credit Agreement (including pursuant to any ABL Incremental Commitment Increase).

"ABL Obligations" means the "Obligations" as defined in the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Accounts" has the meaning specified in Article 9 of the UCC.

"Acquisition" means the purchase or other acquisition of all or substantially all of the property and assets or business of any Person or of assets constituting a business unit, a line of business or division of such Person, or of a majority of the Equity Interests in a Person.

"Additional Amount Basket" means, at any date of determination, an amount equal to the sum, without duplication and, in the case of clauses (v) through (vii) below, to the extent not otherwise reflected in the Retained Excess Cash Flow Amount, of

(i)     [reserved]

(ii)     the Retained Excess Cash Flow Amount, plus

(iii)     the cash proceeds of Qualified Equity Interests of Parent (other than Specified Equity Contributions made pursuant to this Agreement or Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement) that are contributed to the Borrower as common equity, plus

(iv)     the cash proceeds of capital contributions to Parent and/or any of its Restricted Subsidiaries (other than contributions from Parent and/or any of its Restricted Subsidiaries, or Specified Equity Contributions made pursuant to this Agreement or Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement) that are contributed to the Borrower as common equity, plus

(v)     returns, net profits, distributions and cash principal payments on loans received in cash on Investments made using this Additional Amount Basket (up to the amount of the original Investment), plus

(vi)     the net cash proceeds received by the Borrower or any other Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with the Disposition to any Person (other than

2

Parent or any of its Restricted Subsidiaries) of any Investment made using this Additional Amount Basket (up to the amount of the original Investment), <u>plus</u>

      (vii)    [reserved], <u>plus</u>

      (viii)    the aggregate principal amount of any Indebtedness or Disqualified Equity Interests, in each case, of Parent or any of its Restricted Subsidiaries issued after the Closing Date (other than Indebtedness or such Disqualified Equity Interests issued to Parent or any of its Restricted Subsidiaries), which has been converted into or exchanged for Qualified Equity Interests of the Borrower, any other Restricted Subsidiary or any Parent Company, in each case, during the period from and including the day immediately following the Closing Date through and including such time (other than Specified Equity Contributions made pursuant to this Agreement or Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement), <u>plus</u>

      (ix)    to the extent not otherwise applied to prepay Indebtedness secured by the Collateral on a junior lien basis to the Obligations in accordance with the terms of the definitive documentation governing such Indebtedness, the amount of any Declined Proceeds, <u>minus</u>

      (x)    any amounts expended pursuant to <u>Section 7.02(m)(ii)</u>, <u>Section 7.06(e)</u> and <u>Section 7.09(a)(vi)</u> hereof.

"<u>Administrative Agent</u>" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with <u>Section 10.09</u>.

"<u>Administrative Agent's Office</u>" means, the Administrative Agent's address and, as appropriate, account as set forth in <u>Section 11.02</u>, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, controls, is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Lender</u>" means, at any time, any Affiliate of any Permitted Holder or the Parent (other than any natural person), the Borrower and each other Subsidiary of Parent.

"<u>Agent-Related Persons</u>" mean the Agents and the Lead Arrangers, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"<u>Agents</u>" means, collectively, the Administrative Agent and the Collateral Agent.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph hereto.

"<u>All-In Yield</u>" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate margin, original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity or, if the relevant Indebtedness has a maturity of less than four (4) years, then based on the actual maturity for such Indebtedness), upfront fees, an interest rate

#90400391v30

floor, or otherwise, in each case, incurred or payable to all lenders of such Indebtedness; provided that (a) All-In Yield shall not include customary arrangement, administration, structuring and underwriting fees and commissions and any amendment fees and, in each case, similar fees in respect of the applicable Indebtedness, in each case, that are not generally paid to all lenders providing such Indebtedness and (b) if such Indebtedness includes an interest rate floor, such interest rate floor shall be equated to applicable interest rate margin for purposes of determining the difference between the All-In Yield of two items of Indebtedness.

"AML Laws" means all Laws of any jurisdiction applicable to any Lender, the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to terrorism financing or money laundering, including, without limitation, Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957) and all Laws comprising or implementing these Laws.

"Anti-Corruption Laws" means all Laws of any jurisdiction applicable to the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to bribery or corruption, including, without limitation, the FCPA.

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Eurodollar Rate Loans or Base Rate Loans, as applicable, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to Section 3.01(e) and Section 3.02, be changed by such Lender upon 10 days' prior written notice to the Administrative Agent and the Borrower.

"Applicable Rate" means a percentage per annum equal to, in respect of Loans that are (i) Eurodollar Rate Loans, 6.50%, (ii) Base Rate Loans, 5.50% and (iii) Specified Term Refinancing Debt Loans, Incremental Term Loans, or Extended Term Loans, in each case, as set forth in the applicable Extension Amendment, Joinder Agreement or Refinancing Amendment.

"Appropriate Lender" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit E.

"Attorney Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of any law firm or other external legal counsel.

"Attributable Indebtedness" means, at any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that appears on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" has the meaning specified in Section 4.01(g).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

4

**Debtors' Exhibit No. 12**
**Page 9 of 354**

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"<u>Bankruptcy Plan</u>" has the meaning specified in <u>Section 11.07(i)(ii)</u>.

"<u>Base Rate</u>" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the greatest of (i) the Prime Rate, (ii) ½ of 1.00% per annum above the Federal Funds Rate; (iii) the Eurodollar Rate for an Interest Period of one (1) month plus 1.00%; and (iv) 2.00%.

"<u>Base Rate Loan</u>" means a Loan that bears interest at a rate based on the Base Rate.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (pursuant to ERISA Section 3(42)) the assets of any such "employee benefit plan" or "plan".

"<u>Borrower</u>" has the meaning specified in the introductory paragraph of this Agreement.

"<u>Borrowing</u>" means a Term Borrowing, an Incremental Term Borrowing, and/or a Specified Term Refinancing Debt Borrowing, as the context may require.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of, or are in fact closed in, the province or state where the Administrative Agent's Office is located and in the State of New York; <u>provided</u> that if such day relates to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, Business Day also means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank market.

"<u>Capital Expenditures</u>" means, with respect to the Borrower and the other Restricted Subsidiaries for any period, the aggregate amount, without duplication, of (x) all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that would, in accordance with GAAP, be included as additions to property, plant and equipment and (y) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that are reported in the Borrower's consolidated statement of cash flows for such period; <u>provided</u>, that Capital Expenditures shall not include (i) any expenditures for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with (A) Net Cash Proceeds invested pursuant to <u>Section 2.05(b)(ii)</u> or (B) proceeds from any Disposition for aggregate consideration of less than $2,000,000 with respect to any transaction or series of related transactions and less than $5,000,000 in the aggregate during any Fiscal Year, (ii) expenditures financed with the proceeds of cash capital contributions or the net cash proceeds from the sale or issuance of Equity Interests (other than Disqualified Equity Interests) received or made by Parent (or any other Parent Company) and contributed to the Borrower, (iii) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party and for which none of the Loan Parties and their Subsidiaries have provided or are required to provide or

incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period), (iv) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (v) investments in respect of a Permitted Acquisition solely to the extent amounts paid in connection with such Permitted Acquisition would be treated as a capital expenditure in accordance with GAAP.

"Capital Lease" means, in respect of any Person, any lease of or other arrangement conveying the right to use, property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person; provided that all leases of any Person that are or would have been characterized as operating leases in accordance with GAAP as in effect immediately prior to the Closing Date shall continue to be accounted for as operating leases (and not as Capital Leases) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such leases to be recharacterized as Capital Leases.

"Capital Lease Obligation" means, with respect to any Person, at any time of determination, all obligations of such Person as lessee under Capital Leases, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Cash Equivalents" means any of the following, to the extent owned by Parent or any of its Restricted Subsidiaries, having a maturity of not greater than 365 days from the date of acquisition thereof:   (a) Dollars, (b) [reserved], (c) [reserved], (d) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (e) insured certificates of deposit, time deposits, money market deposits, bankers' acceptances and Eurodollar time deposits (or similar instruments), in each case with any commercial bank having capital and surplus of not less than $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person, (f) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities, (g) securities with maturities of 365 days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A-1 by S&P or P-1 by Moody's (or, if at any time neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized statistical rating agency), (h) commercial paper maturing no more than one year from the date of creation thereof and having a rating of at least A-1 by S&P or P-1 by Moody's, (i) securities with maturities of six (6) months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (e) of this definition, (j) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (d) through (i) of this definition and (k) Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of the other Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $1,000,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (d) and (e) of this definition.

#90400391v30

"Cash Management Agreement" means any agreement entered into by and between the Borrower or any of the other Restricted Subsidiaries and any Cash Management Bank in respect of any Cash Management Obligations and that is not designated in writing by the Borrower and such Cash Management Bank to the Administrative Agent to be included as a Cash Management Agreement under (and as defined in) the ABL Credit Agreement.

"Cash Management Bank" means any Lender, an Agent or a Lead Arranger or any Affiliate of a Lender, an Agent or a Lead Arranger (in each case, determined as of the time the applicable Cash Management Agreement was entered into) providing treasury, depository and/or cash management services (including credit cards, purchase cards and other similar arrangements) to the Borrower or any of the other Restricted Subsidiaries or conducting any automated clearing house transfers of funds.

"Cash Management Obligations" means obligations owed by the Borrower or any of the other Restricted Subsidiaries to any Cash Management Bank in respect of any overdraft and related liabilities arising from treasury, depository or cash management services (including credit cards, purchase cards and other similar arrangements) or any automated clearing house transfers of funds.

"Casualty Event" means any casualty, loss, damage, destruction or any condemnation or other taking by a Governmental Authority pursuant to the power of eminent domain or other similar loss with respect to real or personal property or improvements of the Borrower and the other Restricted Subsidiaries resulting in receipt by the Borrower or any other Restricted Subsidiary of payments or proceeds (including cash and Cash Equivalents) under any casualty insurance policy or proceeds of a condemnation award in respect of any such property.

"CFC" means a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"CFC Domestic Person" means any Domestic Subsidiary substantially all the assets of which consist of equity and/or debt of one or more CFCs and cash or cash equivalents.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law) (in each case, regardless of whether the same had been proposed as of the date of this Agreement); provided that notwithstanding anything herein the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the earliest to occur of:

(a)    the Parent ceasing to own directly 100% of the Equity Interests of the Borrower (or, if applicable, any Successor Borrower);

(b)    at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Parent in the aggregate;

#90400391v30

(c)     at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the lesser of (i) 35% of the then outstanding voting stock of Parent in the aggregate and (ii) the aggregate amount of outstanding voting stock of Parent held by the Permitted Holders; or

(d)     a "Change of Control" under (and as defined in) the ABL Credit Agreement (or any equivalent occurrence under any Refinancing Indebtedness in respect thereof).

"Class" (a) when used with respect to Lenders, refers to whether such Lenders are Term Lenders, Incremental Term Lenders, or Specified Term Refinancing Debt Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Term Commitments, Incremental Term Loan Commitments, or Specified Term Refinancing Debt Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Term Loans, Incremental Term Loans, or Specified Term Refinancing Debt Loans.

"Closing Date" means the date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 11.01 and the making of the initial Credit Extension.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means all the "Collateral" as defined in any Collateral Document and shall include the Term Priority Collateral, ABL Priority Collateral, and the Mortgaged Properties, if any.

"Collateral Agent" means Goldman Sachs Bank USA, in its capacity as collateral agent under the Loan Documents, or any successor collateral agent appointed in accordance with Section 10.09.

"Collateral Documents" means, collectively, the Security Agreement, the Intellectual Property Security Agreement, the Mortgages, the Pledge Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations.

"Commitment" means a Term Commitment, an Incremental Term Loan Commitment, a Specified Term Refinancing Debt Commitment or an Extended Term Loan Commitment, as the context may require.

"Committed Loan Notice" means a notice of (i) a Term Borrowing, (ii) an Incremental Term Borrowing, or (iii) a Specified Term Refinancing Debt Borrowing, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.).

"Communications" has the meaning specified in Section 11.02(e).

"Company Competitor" means any competitor of the Borrower and/or any of its Subsidiaries.

"Company Model" means the financial model delivered to the Lead Arrangers prior to the Closing Date.

#90400391v30

**Debtors' Exhibit No. 12**
**Page 13 of 354**

"<u>Compensation Period</u>" has the meaning specified in <u>Section 2.12(c)(ii)</u>.

"<u>Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit D</u>.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consolidated Adjusted EBITDA</u>" means, with respect to any Person on a consolidated basis for any period, the sum of:

(a)     Consolidated Net Income for such period; plus

(b)     without duplication and to the extent deducted in determining Consolidated Net Income for such period, the sum of:

(i)     Consolidated Interest Expense for such period;

(ii)     federal, state and foreign income tax expense for such period and other taxes based on profits, revenue or capital, including, without limitation, franchise, property, premium and similar taxes based on income, profits, revenue or capital, ACA fees and taxes, and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds), including, in each case with respect to this clause (ii), penalties and interest related to such taxes or arising from any tax examinations (in each case, net of tax refunds received in such period);

(iii)     all amounts attributable to depreciation and amortization expenses or charges for such period;

(iv)     the aggregate amount of all non-cash charges reducing Consolidated Net Income for such period; <u>provided</u> that any cash payments made with respect to any non-cash expenses or charges added back in calculating Consolidated Adjusted EBITDA for any earlier period pursuant to this clause (iv) shall be subtracted in calculating Consolidated Adjusted EBITDA for the period in which such cash payment is made until the entire amount previously added back with respect to such expense or charge has been deducted;

(v)     Transaction Expenses to the extent incurred during such period;

(vi)     non-recurring cash costs and expenses for such period in connection with any Investment (other than an Investment in the Borrower or any of its Subsidiaries existing at the time of such Investment), Permitted Acquisition, Disposition, factoring or other Indebtedness or the issuance of Equity Interests or Indebtedness or the refinancing, modification or amendment thereof and the prepayment of Indebtedness (in each case, solely to the extent permitted hereunder);

(vii)     management fees expensed during such period to the extent permitted under <u>Section 7.06(j)</u>;

(viii)     expenses related to contributions to any Pension Plan;

(ix)     any realized or unrealized losses attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815;

9

(x)      currency conversion translation losses;

(xi)     any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any Disposition of assets permitted under this Agreement, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the applicable carrier that it does not intend to indemnify or reimburse such expenses, charges or losses; provided that such amount is in fact indemnified or reimbursed within one hundred eighty (180) days of the initial claim made under the relevant indemnification provisions;

(xii)    any expenses, charges or losses with respect to liability or casualty events or business interruption that are covered by insurance, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the insurer such amount will not be reimbursed by the insurer; provided that (i) such amount is in fact reimbursed within one hundred eighty (180) days of the initial claim and (ii) upon request of the Administrative Agent, the Borrower shall provide reasonable documentation supporting such expenses, charges or losses for distribution to the Lenders;

(xiii)   (A) non-recurring or unusual charges (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and business optimization costs) or losses, restructuring charges, severance costs and relocation costs, (B) the amount of cost savings that have resulted from actions that have been implemented prior to the end of the relevant period, which, on a Pro Forma Basis, are realized or expected to be realized within the first 12 months following the event giving rise thereto as though such cost savings had been realized on the first day of the relevant period, so long as (1) such cost savings are reasonably identifiable and quantifiable and factually supportable and (2) no cost savings shall be added pursuant to this clause (B) to the extent duplicative of (x) any cost savings that have been included in the determination of Deemed EBITDA (as defined below) or (y) any expenses or charges relating to such cost savings that are included in clause (A) above or clause (C) below, and (C) start-up costs, launch costs and any expenses, charges or losses related to pre-production activity, provided that the aggregate amount that may be added back to Consolidated Adjusted EBITDA pursuant to this clause (b)(xiii) in any Test Period shall not exceed 15% of Consolidated Adjusted EBITDA (calculated prior to giving effect to any adjustment in this clause (b)(xiii));

(xiv)   without duplication of amounts added back to Consolidated Adjusted EBITDA pursuant to clause (b)(i) above or otherwise, the "interest" or financing charge component of Permitted Non-Recourse Factoring Transactions for such period;

(xv)    [reserved];

(xvi)   adjustments identified in the Company Model (including any cost savings identified therein);

(xvii)   expenses, charges, losses or deductions associated with the Equity Interests in an entity held by such Person attributable to the non-controlling interests or minority interests of third parties; and

(xviii)  any aggregate net loss on the Disposition of property and charges related to any asset write-off or write-down (in each case, other than the sale of accounts receivable and inventory in the ordinary course of business); minus

#90400391v30

(c)     without duplication and to the extent included in Consolidated Net Income for such period, the sum of:

(i)     the aggregate amount of all non-cash items of income for such period, other than the accrual of revenue or recording of receivables in the ordinary course of business,

(ii)     any realized or unrealized gains attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815,

(iii)     currency conversion translation gains; and

(iv)     any aggregate net gains on the Disposition of property.

Notwithstanding the foregoing, Consolidated Adjusted EBITDA (a) for the fiscal quarter ended December 31, 2016 shall be deemed to be $33,891,000, (b) for the fiscal quarter ended March 31, 2017 shall be deemed to be $34,249,000, (c) for the fiscal quarter ended June 30, 2017 shall be deemed to be $15,920,000 and (d) for the fiscal quarter ended September 30, 2017 shall be deemed to be $15,940,000 (the "Deemed EBITDA").

Solely for purposes of calculating Consolidated Adjusted EBITDA to determine compliance with the Financial Maintenance Covenant for any Test Period (including any Test Period which would include a fiscal quarter in respect of which a Specified Equity Contribution was made) (and for no other purpose under the Loan Documents), Specified Equity Contributions shall be added to and included in Consolidated Adjusted EBITDA; provided that (a) in each Test Period, there shall be no more than two (2) fiscal quarters (which may be consecutive) in which a Specified Equity Contribution is made, (b) there shall be no more than five (5) Specified Equity Contributions during the term of the Credit Facilities, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in compliance with the Financial Maintenance Covenant as of the first Test Period in respect of which such Specified Equity Contribution is made (without giving effect to any repayment of Indebtedness with the proceeds thereof), (d) all Specified Equity Contributions shall be disregarded for any purpose other than determining compliance with the Financial Maintenance Covenant and shall not be considered in determining any covenant baskets (or compliance, on a Pro Forma Basis, with the Financial Maintenance Covenant for the purposes of compliance with any other covenant), in each case solely during the Test Period in which the relevant Specified Equity Contribution is included in Consolidated Adjusted EBITDA and (e) there shall be no pro forma or other reduction of the amount of Indebtedness by the amount of any Specified Equity Contribution for purposes of determining compliance with the Financial Maintenance Covenant for the compliance date in respect to which such Specified Equity Contribution is made (other than, with respect to any future Test Period that includes the fiscal quarter in which such compliance date occurs, with respect to any portion of such Specified Equity Contribution that is actually applied to repay any Indebtedness and without duplication of any amounts included in the calculation of Consolidated Adjusted EBITDA for such fiscal quarter).

"Consolidated First Lien Debt" means, with respect to the Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a "first priority" Lien on any property of the Borrower or the other Restricted Subsidiaries, including the Loans and the ABL Loans.

"Consolidated Interest Expense" means, with respect to any Person for any Test Period, the sum of (i) consolidated total interest expense of such Person and its Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation (and without duplication),

11

amortization of debt issuance costs and original issue discount, premiums paid to obtain payment, financial assurance or similar bonds, interest capitalized during construction, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capital Leases (regardless of whether accounted for as interest expense under GAAP), all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net obligations under any Swap Contracts constituting interest rate swaps, collars, caps or other arrangements requiring payments contingent upon interest rates of such Person and its Subsidiaries, any fees and/or expenses paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee) and financing fees and costs of surety bonds in connection with Indebtedness) plus (ii) all cash dividends paid or payable on preferred stock during such period other than to such Person or a Loan party plus or less, as applicable, (iii) to the extent they would otherwise be included in interest expense under GAAP, unrealized gains and losses arising from derivative financial instruments issued by such Person for the benefit of such Person or its Subsidiaries, in each case determined on a consolidated basis for such period.

For purposes of this definition, interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of the Borrower and the other Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of the Borrower or is merged into or consolidated with the Loan Parties or any of their respective Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Borrower) in which any other Person (other than the Loan Parties or any of their Restricted Subsidiaries) has a joint ownership interest, except to the extent that any such income is actually received by a Loan Party or such Restricted Subsidiary during such period in the form of dividends or similar distributions, (c) the undistributed earnings of any Restricted Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of its charter or any agreement (other than under any Loan Document), instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (d) any after-tax gains or losses attributable to (i) disposed, abandoned, divested and/or discontinued assets, properties or operations (other than, at the option of the Borrower, assets, properties or operations pending the disposal, abandonment, divestiture and/or termination thereof), (ii) the disposal, abandonment, divestiture and/or discontinuation of assets, properties or operations or (iii) asset Dispositions or returned surplus assets of any Pension Plan, (e) the income (or loss) attributable to the early extinguishment of Indebtedness, and (f) (to the extent not included in clauses (a) through (e) above) any net extraordinary gains or net extraordinary losses.

"Consolidated Total Assets" means, as of any date, the assets and properties of the Borrower and the other Restricted Subsidiaries as of such date, determined on a consolidated basis in accordance with GAAP as set forth on the most recent consolidated balance sheet of the Borrower delivered pursuant to Section 6.01.

"Consolidated Total Debt" means, with respect to the Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, an amount equal to the sum of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), (h) (without duplication and only to the extent of Guarantee Obligations of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), and (k) of the definition thereof), and (k) of the

#90400391v30

definition thereof; provided that "Consolidated Total Debt" shall be calculated (x) net of Unrestricted Cash up to an amount not to exceed $10,000,000 and (y) excluding any obligation, liability or indebtedness of Parent or any of its Restricted Subsidiaries if, upon or prior to the maturity thereof, there shall have been irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in any computation of Unrestricted Cash.

"Consolidated Working Capital" means, as at any date of determination, the excess or deficiency of Current Assets over Current Liabilities.

"Consolidated Working Capital Adjustment" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period. In calculating the Consolidated Working Capital Adjustment there shall be excluded the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any Permitted Acquisition during such period; provided that there shall be included with respect to any Permitted Acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such Permitted Acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period.

"Contract Consideration" has the meaning specified in the definition of "Excess Cash Flow".

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Parties" has the meaning assigned to such term in Section 11.02(f).

"Credit Extension" means a Borrowing.

"Credit Facilities" means the Term Loan Facility, any Incremental Term Facility or any Specified Term Refinancing Debt Facility, as the context may require.

"Current Assets" means, at any date, all assets of the Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) cash or Cash Equivalents (including cash and Cash Equivalents held on deposit for third parties by the Borrower or any of the other Restricted Subsidiaries), (ii) deferred bank fees and derivative financial instruments related to Indebtedness, and (iii) the current portion of current and deferred income taxes and taxes based on profit or capital.

"Current Liabilities" means, at any date, all liabilities of the Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current liabilities, other than (i) current maturities of long term debt, (ii) outstanding ABL Loans (including, without limitation, Swing Line Loans (as defined in the ABL Credit Agreement)) and L/C Exposure (as defined in the ABL Credit Agreement), (iii) accruals of Consolidated Interest Expense (excluding Consolidated Interest Expense that is due and

Debtors' Exhibit No. 12
Page 18 of 354

unpaid), (iv) obligations in respect of derivative financial instruments related to Indebtedness, (v) accruals of current and deferred income taxes and taxes based on profit or capital, (vi) liabilities in respect of unpaid earnouts, (vii) the accruals relating to restructuring reserves, (viii) liabilities in respect of funds of third parties on deposit with the Borrower or any of the other Restricted Subsidiaries, (ix) [reserved] and (x) the current portion of any other long term liability for borrowed money.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, fraudulent transfer, reorganization, or similar debtor relief Laws of the United States or any similar foreign, federal or state law for the relief of debtors from time to time in effect and affecting the rights of creditors generally.

"<u>Declined Proceeds</u>" has the meaning specified in <u>Section 2.05(b)(vii)</u>.

"<u>Deemed EBITDA</u>" has the meaning specified in the definition of "Consolidated Adjusted EBITDA".

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means an interest rate equal to (a) the Base Rate <u>plus</u> (b) the Applicable Rate applicable to Base Rate Loans <u>plus</u> (c) 2.00% per annum; <u>provided</u> that with respect to a Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"<u>Defaulting Lender</u>" means any Lender that (i) has failed to fund any portion of the Term Loans or Incremental Term Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder (provided that any such Lender shall be a Defaulting Lender under this <u>clause (i)</u> solely (x) with respect to each Credit Facility with respect to which it has failed to fund and (y) during the occurrence and continuation of such failure to fund, until any such funding shortfall shall have been funded in full by such Lender), (ii) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other existing agreements under which it has an obligation to extend credit (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent to funding cannot be satisfied), (iii) failed, within three (3) Business Days after request by the Administrative Agent, to provide written confirmation that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (iii)</u> upon receipt by the Administrative Agent and the Borrower of such requested confirmation, (iv) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, (v) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or its parent company has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (which shall not include any Undisclosed Administration) or (vi) has become subject to a Bail-In Action; <u>provided</u> that (x) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to an SPC pursuant to <u>Section 11.07(g)</u> and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such

14

ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrower or any other Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-Cash Consideration.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by a Person (including any sale of Equity Interests, but excluding any issuance by a Person of its own Equity Interests), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a Change of Control, Qualifying IPO or asset sale so long as any rights of the holders thereof upon the occurrence of a Change of Control, Qualifying IPO or asset sale event shall be subject to the occurrence of the Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety one (91) days after the Latest Maturity Date; provided that, (i) if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent or any of its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Parent or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations, (ii) no Equity Interest held by any future, present or former Representative (or its Affiliates or any Immediate Family Member who is a successor-in-interest to the relevant Representative) of the Borrower (or any Parent Company or Subsidiary thereof) shall be considered a Disqualified Equity Interest because such Equity Interest is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time and (iii) any Equity Interests that would not constitute Disqualified Equity Interests but for provisions thereof that give the holders thereof (or the holders of any security into which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of any Change of Control, Qualifying IPO or any asset sale occurring prior to ninety one (91) days after the Latest Maturity Date shall not constitute Disqualified Equity Interests if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the Termination Date.

"Disqualified Institution" means (i) those Persons who have been identified to the Lead Arrangers in writing prior to the date hereof, (ii) Company Competitors who have been identified to the Lead Arrangers in writing prior to the date hereof and (iii) Affiliates of the Persons identified in clauses (i) and (ii) above that are identifiable as Affiliates thereof solely on the basis of such Person's name; provided, that the Borrower may supplement the list of Disqualified Institutions that are Company Competitors and

#90400391v30

Affiliates thereof in writing to the Administrative Agent (it being understood that (A) any such supplement shall not apply retroactively to disqualify a Person that has previously acquired an assignment or participation interest in a Loan and (B) with effect from the date of the Administrative Agent's receipt of a notice from the Borrower designating a Person as no longer being a "Disqualified Institution", references herein and in the other Loan Documents to a "Disqualified Institution" shall not mean, be, include references to such Person) and provided, further, that Disqualified Institutions shall not include any Person which is a bona fide debt fund, investment vehicle, regulated bank entity or unregulated lending entity (other than any Person separately identified as a Disqualified Institution pursuant to clause (i) or (ii) above) that is engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of business so long as any Person identified in clauses (i) through (iii) above does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.

"Disregarded Domestic Person" means any direct or indirect Domestic Subsidiary that is treated as disregarded for U.S. tax purposes and substantially all the assets of which consist of equity of one or more Foreign Subsidiaries and cash or cash equivalents.

"Dollars" means lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"ECF Payment" has the meaning specified in Section 2.05(b).

"ECF Percentage" means 50%, provided, however, (i) if the First Lien Leverage Ratio at the end of the applicable Excess Cash Flow Period is less than or equal to 3.50:1.00 and greater than 3.00:1.00, the ECF Percentage shall mean 25% and (ii) if the First Lien Leverage Ratio at the end of the applicable Excess Cash Flow Period is less than or equal to 3.00:1.00, the ECF Percentage shall mean 0%.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender.  Notwithstanding anything to the contrary herein, (i) (x) a Disqualified Institution or (y) any natural person shall, in each case, not be an "Eligible Assignee" and (ii) except as permitted under Section 11.07(i), neither Parent nor any of its Affiliates may be an "Eligible Assignee".

#90400391v30

"Environmental Action" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written request for information, notice of liability or potential liability, notice of governmental investigation, proceeding, consent order, consent decree or consent agreement relating in any way to any Environmental Law, any Environmental Permit, Hazardous Material or Environmental Liability including, without limitation, (a) by any Person with respect to enforcement (including citizen-suit enforcement pursuant to such provisions of Environmental Laws), Responses or damages, or (b) by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all Laws, decrees or other governmental restrictions of legal effect relating to the protection of the environment, to the Release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, or exposure to, Hazardous Materials.

"Environmental Liability" means any and all legal obligations or liabilities (including obligations to perform Response activities) related to Environmental Laws, Environmental Permits or Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other Governmental Authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that is under common control with the Borrower or any of the other Restricted Subsidiaries and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Borrower or any of the other Restricted Subsidiaries, notification of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to

17

terminate a Pension Plan or the receipt by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA for which the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate may be directly or indirectly liable, (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA or (l) a Foreign Plan Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Reserve Requirements" means for any day as applied to a Eurodollar Rate Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the FRB or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate" means, for any Interest Period, the highest of:

(a)    in respect of the Term Loans only, 1.00% per annum,

(b)    the rate per annum (which in any event shall not be less than zero) equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Reuters Screen (or any successor thereto) that displays an average London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) (such page currently being page number LIBOR01) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

(c)    if the rates referenced in the preceding clause (b) are not available, the rate per annum (which in any event shall not be less than zero) determined by the Administrative Agent to be the offered rate on such other page or other service which displays an average London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period.  Notwithstanding

18

anything contained herein to the contrary, and without limiting the provisions of Section 3.03 (Inability to Determine Rates) in the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) that (i) the rates referenced in the preceding clauses (a) and (b) (the "Eurodollar Screen Rate") are not available, (ii) the supervisor for the administrator of the Eurodollar Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurodollar Screen Rate shall no longer be used for determining interest rates for loans or (iii) there exists, at such time, a broadly accepted market convention for determining a rate of interest for syndicated loans in the United States in lieu of the Eurodollar Screen Rate and the Administrative Agent shall have given notice of such determination to the Borrower and each Lender (it being understood that the Administrative Agent shall have no obligation to make such determination and/or to give such notice), then the Administrative Agent, the Borrower and the Required Lenders shall endeavor to establish an alternate rate of interest to the Eurodollar Base Rate that gives due consideration to the then broadly accepted market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable.

"Eurodollar Rate" means with respect to each day during each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum equal to (x) the Eurodollar Base Rate as of such date divided by (y) (1.00 minus Eurocurrency Reserve Requirements as of such date).

"Eurodollar Rate Loan" means a Loan (other than a Base Rate Loan) that bears interest at a rate based on the Eurodollar Rate.

"Eurodollar Screen Rate" has the meaning specified in the definition of "Eurodollar Base Rate".

"Event of Default" has the meaning specified in Section 9.01.

"Excess Cash Flow" means, with respect to the Borrower and the other Restricted Subsidiaries for any Excess Cash Flow Period, an amount (if positive) equal to (without duplication):

(a)  the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, plus, (ii) to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for non-cash charges reducing Consolidated Net Income, including for depreciation and amortization (excluding any such non-cash charge to the extent that it represents an accrual or reserve for potential cash charge in any future period or amortization of a prepaid cash gain that was paid in a prior period), plus (iii) the Consolidated Working Capital Adjustment (which, for the avoidance of doubt, may be negative), minus

(b)  the sum of, without duplication, (i) the amounts for such period of cash payments (except to the extent financed with long term Indebtedness) actually made of (1) scheduled repayments and required prepayments (to the extent permitted under this Agreement) of Indebtedness for borrowed money (excluding (x) prepayments of loans under the ABL Credit Agreement, (y) mandatory prepayments (other than scheduled amortization) or voluntary prepayments of the Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans and (z) repayments and prepayments (to the extent permitted under this Agreement) of Capital Lease Obligations (excluding any interest expense portion thereof), (2) consolidated Capital Expenditures made in accordance with this Agreement and (3) without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration paid in cash in respect of Permitted Acquisitions made during such period in accordance with Section 7.02(h), plus (ii) the amount of Taxes actually paid in cash in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, plus

19

Debtors' Exhibit No. 12
Page 24 of 354

(iii) to the extent not deducted when determining Consolidated Net Income, management fees paid in cash for such period permitted under Section 7.06(j), plus (iv) Restricted Payments made during such period pursuant to Sections 7.06(c), plus (v) other non-cash gains increasing Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents the reversal of an accrual or reserve for potential cash gain in any prior period), plus (vi) without duplication of amounts deducted from Excess Cash Flow in prior periods, and at the option of the Borrower, the aggregate consideration required to be paid in cash by the Borrower or any of its Subsidiaries pursuant to binding contracts (the "Contract Consideration") entered into during such period relating to Permitted Acquisitions permitted under Section 7.06(j) to be consummated following such period but on or prior to the date that is 120 days following the end of such period (the "Outside Date"), to the extent such payments will actually be made with internally generated cash; provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Permitted Acquisition prior to the Outside Date is less than the Contract Consideration, the amount of the resulting shortfall shall be added to the calculation of Excess Cash Flow in the first full period immediately following the Outside Date, plus (vii) Transaction Expenses paid during such period.

"Excess Cash Flow Period" means each Fiscal Year of the Borrower commencing with the Fiscal Year ending December 31, 2018; provided that, with respect to the Fiscal Year ending December 31, 2018, Excess Cash Flow Period shall mean the period from the Closing Date through December 31, 2018.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Asset" has the meaning specified in the Security Agreement.

"Excluded Subsidiary" means (a) any Subsidiary of Parent that is not a Wholly-owned Subsidiary, (b) any Immaterial Subsidiary, (c) any Subsidiary of Parent that is prohibited by law, regulation or Contractual Obligation (in the case of a Contractual Obligation, not entered into in contemplation of the Transactions) from providing the Guarantee or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee or where the provision of such Guarantee would result in material adverse tax consequences as mutually determined by the Borrower and the Administrative Agent, (d) any Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person, (e) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, CFC Domestic Person or a Disregarded Domestic Person, (f) any not-for-profit Subsidiaries, captive insurance Subsidiaries and special purpose entities used for permitted financings and (g) any Subsidiary to the extent that the Administrative Agent and the Borrower reasonably agree that the burden or cost of providing a Guarantee with respect to such Subsidiary shall be excessive in view of the benefits afforded thereby; provided that the term "Excluded Subsidiary" shall not include the Borrower or any Subsidiary that is an obligor (including pursuant to a Guarantee) under any ABL Facility, any Subordinated Indebtedness or any Refinancing Indebtedness in respect of any of the foregoing or under any Material Indebtedness of a Loan Party, other than such Subsidiaries which constitute "Excluded Subsidiaries" pursuant to clause (d) or (e) above which are not obligors with respect to any obligations of U.S. Persons.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation

20

arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means, (a) with respect to each Agent and each Lender, Taxes imposed on or measured by net income (however denominated), net profits (including any branch profits taxes), franchise Taxes and backup withholding Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, being a resident of, or having its principal office or Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any withholding Tax that is imposed by the United States on amounts payable to a Lender under the law in effect at the time (i) such Lender becomes a party to this Agreement other than pursuant to an assignment made under Section 3.07 or (ii) such Lender changes its lending office; provided that clause (b) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to clause (b)) do not exceed the indemnity payment or additional amounts that the Person making the assignment or transfer to such Lender or the Lender changing its lending office would have been entitled to receive in the absence of such assignment or transfer, other than an assignment made pursuant to Section 3.07(b) or in the absence of such change of lending office, (c) any Tax that is attributable to a Lender's or Agent's failure to comply with Section 3.01(f), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Credit Agreements" means, collectively, and in each case as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time prior to the date hereof: (i) that certain Credit and Guaranty Agreement, dated as of May 26, 2016, among, among others, Crowne Group, LLC, as borrower, Crowne Group Holdings, LLC, as holdings, HPS Investment Partners, LLC, as administrative agent and collateral agent, and the lenders party thereto and (ii) that certain Amended and Restated ABL Credit Agreement, dated as of May 26, 2016, among, among others, Crowne Group Holdings, LLC, as parent, Crowne Group, LLC, as borrower representative, the other borrowers party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A. and J.P. Morgan Europe, as administrative agent and collateral agent.

"Extended Loans" means Extended Term Loans.

"Extended Term Loan" means a Term Loan that has been extended pursuant to an Extension.

"Extended Term Loan Commitment" means a commitment of any Lender, established pursuant to Section 2.18, to make Extended Term Loans to the Borrower.

"Extension" as defined in Section 2.18(a).

"Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent and the Borrower, be in the form of an amendment and restatement of this Agreement) among the Borrower, the applicable extending Lenders, and the Administrative Agent.

"Extension Offer" as defined in Section 2.18(a).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code, and any legislation, regulation or guidance giving effect to such intergovernmental agreements.

21

"<u>FCPA</u>" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; <u>provided</u> that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"<u>Fee Letter</u>" means the First Lien Term Loan Agent Fee Letter dated as of the date hereof among the Administrative Agent and the Borrower.

"<u>Financial Maintenance Covenant</u>" means the covenant set forth in <u>Section 7.14</u>.

"<u>First Lien Leverage Ratio</u>" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt as of the last day of such Test Period to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"<u>Fiscal Year</u>" means the fiscal year of the Borrower and the other Restricted Subsidiaries ending on December 31 of each calendar year.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Plan</u>" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States.

"<u>Foreign Plan Event</u>" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of liability by any Loan Party or any of their respective Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any material transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"<u>Foreign Subsidiary</u>" means any direct or indirect Subsidiary organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

#90400391v30

"<u>Fund</u>" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP, the methodologies thereunder or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and it is agreed that such amendment to effectuate such changes shall not require the payment of any amendment or similar fee to the Administrative Agent or the Lenders.  Without limiting the generality of the foregoing, the Borrower shall neither be deemed to be in compliance with any covenant hereunder nor out of compliance with any covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

"<u>Goldman Sachs</u>" has the meaning set forth in the introductory paragraph hereto.

"<u>Governmental Authority</u>" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, any central bank or supra-national authority and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Governmental Authorization</u>" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"<u>Granting Lender</u>" has the meaning specified in <u>Section 11.07(g)</u>.

"<u>Guarantee</u>" means the Guaranty executed by the Loan Parties substantially in the form of <u>Exhibit F</u>.

"<u>Guarantee Obligations</u>" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such

#90400391v30

Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means Parent and the Subsidiary Guarantors and, solely with respect to obligations under Secured Hedge Agreements (other than any Excluded Swap Obligation) and Cash Management Agreements, the Borrower.

"Guaranty" means the Guarantee, as supplemented by each Guaranty Supplement delivered pursuant to Section 6.11.

"Guaranty Supplement" has the meaning specified in Section 6.11(a)(i).

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise defined under or pursuant to any Environmental Law as "hazardous", "toxic", a "pollutant", a "contaminant", a "deleterious substance", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, urea formaldehyde insulation and chlorofluorocarbons and all other regulated ozone-depleting substances.

"Hedge Bank" means any Person that is a Lender, an Agent, a Lead Arranger or an Affiliate of the foregoing at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto.

"Immaterial Subsidiary" means any direct or indirect Restricted Subsidiary (other than the Borrower) designated as such in writing by the Borrower to the Administrative Agent from time to time; provided that (i) no Immaterial Subsidiary shall have revenues for any fiscal quarter or total assets as of the last day of any fiscal quarter for which financial statements have been furnished in an amount that is equal to or greater than 2.5% of the consolidated total revenues or Consolidated Total Assets, as the case may be, for, or as of the last day of, such fiscal quarter, as the case may be, and (ii) Immaterial Subsidiaries, taken together, shall not have total revenues or total assets as of the last day of any fiscal quarter in an amount that is equal to or greater than 5.0% of the consolidated revenues or Consolidated Total Assets, as applicable, for, or as of the last day of, such fiscal quarter, as the case may be.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, corporation, limited liability company, partnership or other bona fide estate-planning vehicle the only stockholders, members, partners or beneficiaries of which are any of the foregoing individuals or a charity, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increased Amount Date" has the meaning specified in Section 2.16(a).

"Incremental Cap" means:

      (a)    $50,000,000, *plus*

      (b)    [reserved], *plus*

#90400391v30

(c)      (i) the amount of any optional prepayment of any Loan in accordance with Section 2.05(a), and (ii) the amount of any reduction in the outstanding amount of any Term Loans, Incremental Term Loans (other than any Incremental Term Loans incurred pursuant to clause (d) below) and/or Specified Term Refinancing Debt Loans resulting from any assignment of Term Loans to Parent or any of its Restricted Subsidiaries made in accordance with Section 11.07(i) of this Agreement (including in connection with any Dutch auction) based upon the actual amount of cash paid in connection with the relevant assignment (it being understood that the amount of the relevant reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans shall not exceed the actual purchase price of any such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans below par), so long as, in the case of clauses (i) and (ii), such prepayment or reduction was not funded with the proceeds of any long-term Indebtedness and, in each case, only to the extent such prepayment or reduction occurs on or prior to the date of any Incremental Term Facility and/or Incremental Equivalent Debt incurred or issued in reliance on clauses (c)(i) and (c)(ii) of this definition and *less* the aggregate principal amount of all Incremental Term Facilities and Incremental Equivalent Debt incurred or issued in reliance on clauses (c)(i) and (c)(ii) of this definition (the amount calculated pursuant to clauses (a), (b) and (c) of this definition, collectively, "Shared Fixed Incremental Amount"), *plus*

(d)      an unlimited amount (such maximum aggregate principal amount under this clause (d), the "Incurrence-Based Incremental Amount") at any time so long as after giving effect to the incurrence of any such Incremental Term Facility or Incremental Equivalent Debt and the use of proceeds thereof,

(i)      in the case of an Incremental Term Facility or Incremental Equivalent Debt that is secured on a pari passu basis to the Obligations, the First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing clauses (a), (b) and (c) of this definition) shall not exceed 4.00:1.00;

(ii)      in the case of an Incremental Term Facility or Incremental Equivalent Debt that is secured on a junior lien basis to the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing clauses (a), (b) and (c) of this definition) shall not exceed 4.00:1.00; and

(iii)      in the case of an Incremental Term Facility or Incremental Equivalent Debt that is unsecured, the Total Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing clauses (a), (b) and (c) of this definition) shall not exceed 4.00:1.00.

Compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described in clause (d) above shall be calculated at the time of incurrence of the relevant Incremental Term Facility or Incremental Equivalent Debt on a Pro Forma Basis after giving effect thereto (and as if fully drawn) and the application of the proceeds thereof (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable); it being understood that if the proceeds of the relevant Incremental Term Facility or Incremental Equivalent Debt will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests prescribed above shall be determined as of the LCA Test Date in respect of such Limited Condition

25

Debtors' Exhibit No. 12
Page 30 of 354

Acquisition (and determined on the basis of the financial statements for the then-most recently ended Test Period on or prior to such date for which financial statements have been (or are required to have been) delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable).

Incremental Loans may be incurred under both the Shared Fixed Incremental Amount and the Incurrence-Based Incremental Amount, and proceeds from any such incurrence may be utilized in a single transaction by first calculating the incurrence under the Incurrence-Based Incremental Amount and then calculating the incurrence under Shared Fixed Incremental Amount (if any) and, for the avoidance of doubt, the First Lien Leverage Ratio, Total Secured Leverage Ratio or Total Leverage Ratio, as applicable, shall be permitted to exceed the maximum First Lien Leverage Ratio, Total Secured Leverage Ratio or Total Leverage Ratio tests set forth in <u>clause (d)</u> above to the extent of such amounts incurred in reliance on the Shared Fixed Incremental Amount at substantially the same time.  Unless the Borrower otherwise elects in writing to the Administrative Agent, the Borrower shall be deemed to have used amounts, if any, that are available under the Incurrence-Based Incremental Amount prior to the utilization of amounts under the Shared Fixed Incremental Amount.

"<u>Incremental Equivalent Debt</u>" means Indebtedness of any Loan Party in the form of secured or unsecured bonds, notes or other instruments issued or incurred in lieu of loans under the Incremental Term Facilities otherwise permitted to be incurred under <u>Section 2.16(a)</u>; <u>provided</u> that the aggregate amount thereof shall (x) not exceed the Incremental Cap and (y) be subject to the Required Additional Debt Terms.

"<u>Incremental Term Borrowing</u>" means a borrowing consisting of Incremental Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made pursuant to the applicable Incremental Term Facility.

"<u>Incremental Term Facility</u>" has the meaning specified in <u>Section 2.16(a)</u>.

"<u>Incremental Term Lender</u>" has the meaning specified in <u>Section 2.16(c)</u>.

"<u>Incremental Term Loan Commitments</u>" has the meaning specified in <u>Section 2.16(a)</u>.

"<u>Incremental Term Loans</u>" has the meaning specified in <u>Section 2.16(a)</u>.

"<u>Incurrence-Based Incremental Amount</u>" has the meaning set forth in the definition of "Incremental Cap".

"<u>Indebtedness</u>" of any Person means, as to any Person at a particular time, without duplication, all of the following:

(a)     all obligations of such Person for borrowed money;

(b)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, but excluding all obligations of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(c)     all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person;

#90400391v30

**Debtors' Exhibit No. 12**
**Page 31 of 354**

(d)  all obligations, other than intercompany items, of such person to pay the deferred purchase price of property (other than trade accounts payable and accrued expenses arising in the ordinary course of business);

(e)  the Attributable Indebtedness of such Person in respect of Capital Lease Obligations;

(f)  without duplication, all (i) obligations, contingent or otherwise, of such Person to reimburse any bank or other Person in respect of amounts paid or payable under a letter of credit, bankers' acceptance or similar instrument, and (ii) all non-contingent obligations (and, for purposes of Indebtedness permitted under Section 7.03, all contingent obligations) of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(g)  all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on any property or asset of such Person, whether or not such obligation is assumed by such Person, provided that the aggregate amount of such obligations does not exceed the lesser of (i) the aggregate unpaid amount of the relevant obligation and (ii) the fair market value of the assets by which the obligations are secured;

(h)  all guarantees by such Person of other obligations of third parties treated as Indebtedness pursuant to clauses (a)-(g) above or (i)-(l) below;

(i)  all Disqualified Equity Interests of such Person;

(j)  all net obligations arising under or in connection with Swap Contracts to which such Person is party;

(k)  all purchase money obligations of such Person; and

(l)  the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person shall not be liable therefor and only to the extent the relevant Indebtedness is of the type that would be included in the calculation of Consolidated Total Debt;

provided that (A) to the extent not constituting Indebtedness for borrowed money, Indebtedness shall not include (i) deferred compensation arrangements, (ii) earn-out obligations and purchase price adjustments unless and until the same are required by GAAP to be reflected on the balance sheet of such Person or (iii) non-compete or consulting obligations incurred in connection with permitted Acquisitions or permitted Dispositions and (B) notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness hereunder but for the application of clause (B) of this proviso shall not be deemed an incurrence of Indebtedness hereunder.

"Indemnified Liabilities" has the meaning specified in Section 11.05.

27

Debtors' Exhibit No. 12
Page 32 of 354

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnitees</u>" has the meaning specified in <u>Section 11.05</u>.

"<u>Information</u>" has the meaning specified in <u>Section 11.08</u>.

"<u>Initial Term Loans</u>" means the Term Loans made pursuant to <u>Section 2.01</u> on the Closing Date.

"<u>Intellectual Property</u>" has the meaning specified in <u>Section 5.16</u>.

"<u>Intellectual Property Security Agreement</u>" means, collectively, any Intellectual Property Security Agreement executed by one or more Loan Parties substantially in the form of <u>Exhibit H-1</u>, as any such agreement may be supplemented by any Intellectual Property Security Agreement Supplement executed and delivered pursuant to <u>Section 6.11</u>.

"<u>Intellectual Property Security Agreement Supplement</u>" means a supplement to any Intellectual Property Security Agreement substantially in the form of <u>Exhibit H-2</u>.

"<u>Interest Payment Date</u>" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Credit Facility under which such Loan was made; <u>provided</u> that if any Interest Period for a Eurodollar Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Credit Facility under which such Loan was made.

"<u>Interest Period</u>" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan as applicable, and ending on the date one (1), two (2), three (3) or six (6) months (or, if agreed to by all affected Lenders, twelve (12) months) and such other shorter interest period as may be permitted by the Lenders and the Administrative Agent, in each case as set forth by the Borrower in its Committed Loan Notice; <u>provided</u> that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date of the Credit Facility under which such Loan was made.

"<u>Investment</u>" in any Person means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or Indebtedness or the assets comprising a division or business unit or all or substantially all of the business of such Person (including any partnership or joint venture), or any capital contribution to such Person.

28

"Joinder Agreement" has the meaning specified in Section 2.16(b)(vii).

"Latest Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Term Loan, Incremental Term Loan, or Specified Term Refinancing Debt Loan.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local laws, statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"LCA Election" has the meaning specified in Section 1.10.

"LCA Test Date" has the meaning specified in Section 1.10.

"Lead Arranger" means individually and "Lead Arrangers" means collectively, Goldman Sachs Bank USA and Deutsche Bank Securities Inc..

"Lender" means any Term Lender, Incremental Term Lender or Specified Term Refinancing Debt Lender that may be a party to this Agreement from time to time and, in the case of each such Lender, including their respective successors and assigns as permitted hereunder (each of which is referred to herein as a "Lender").

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest or interest in the nature of security whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Limited Condition Acquisition" means an Acquisition or Investment that the Borrower or one or more of the other Restricted Subsidiaries is contractually committed to consummate and whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"Loan" means an extension of credit by a Lender to the Borrower in the form of a Term Loan, an Incremental Term Loan and/or any Specified Term Refinancing Debt Loan.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) Joinder Agreements, (v) Extension Amendments, (vi) Refinancing Amendments, (vii) the ABL Intercreditor Agreement, (viii) the Guaranty and (ix) all other certificates, instruments and documents delivered from time to time by or on behalf of the Borrower or any of the other Restricted Subsidiaries in connection herewith or therewith which have been designated as "Loan Documents".

"Loan Parties" means, collectively, Parent, the Borrower and each Subsidiary Guarantor.

"Management Agreement" means the Management Services Agreement between the Borrower and Larchmont, LLC, dated as of February 2, 2018 (as amended or otherwise modified from time to time in a manner not materially adverse to the Lenders).

"Master Agreement" has the meaning specified in the definition of "Swap Contract".

#90400391v30

**Debtors' Exhibit No. 12**
**Page 34 of 354**

"Material Adverse Effect" means any event or circumstance which has a material adverse effect on (i) the business, properties, assets, financial condition or results of operations, in each case, of the Borrower and the other Restricted Subsidiaries, taken as a whole, (ii) the rights and remedies of any Agent or the Lenders under any Loan Document or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform any of their obligations under the Loan Documents.

"Material Indebtedness" means any Indebtedness incurred or assumed by a Loan Party with an aggregate outstanding principal amount or committed amount in excess of $15,000,000.

"Material Owned Property" means any real property located in the United States and owned by any Loan Party with a fair market value in excess of $1,000,000 at the time of acquisition (such value to be reasonably estimated by the Borrower in good faith).

"Maturity Date" means, with respect to (a) the Term Loan Facility, February 2, 2024, and (b) any other Class of Loans, the maturity dates specified therefor in the applicable Joinder Agreement, Extension Amendment or Refinancing Amendment.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Mortgage" means collectively, the deeds of trust, trust deeds, deeds to secure debt and mortgages creating and evidencing a Lien on a Mortgaged Property made by the Loan Parties in favor of or for the benefit of the Administrative Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered pursuant to Section 6.11.

"Mortgage Policies" has the meaning specified in paragraph (c) of the definition of "Mortgage Requirement".

"Mortgage Requirement" means the Administrative Agent shall have received the Mortgages with respect to each Material Owned Property required to be delivered pursuant to Section 6.11 within the time period prescribed therein (the "Mortgaged Properties"), together with:

(a)     a completed Life of Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any improvements on any Mortgaged Property are located in an area designated as a "special flood hazard area," evidence of such flood insurance as may be required under Section 6.07;

(b)     evidence that counterparts of the Mortgages with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices as the Administrative Agent reasonably deems necessary to create a valid first and subsisting Lien on the property described therein in favor of the Collateral Agent for the benefit of the Secured Parties (subject only to Liens of the nature referred to in Section 5.07(b)) along with evidence reasonably satisfactory to the Administrative Agent that all filing and recording taxes and fees payable with respect to the Mortgages have been paid or received by the issuer of the Mortgage Policies;

(c)     (i) fully paid American Land Title Association Lender's Extended Coverage (or other reasonably satisfactory coverage if such coverage is not available in the applicable jurisdiction) title insurance policies (the "Mortgage Policies") in form and substance reasonably satisfactory to the Administrative Agent, together with such endorsements (other than endorsements relating to creditors'

30

Debtors' Exhibit No. 12
Page 35 of 354

rights) that are reasonably required by the Administrative Agent and which lenders typically receive in the jurisdiction where the Mortgaged Property is located, in an amount reasonably acceptable to the Administrative Agent (but in any event not to exceed the fair market value of the property as reasonably determined by the Borrower in good faith), issued by title insurers reasonably acceptable to the Administrative Agent and insuring the Mortgages to be valid first (or where applicable in accordance with this Agreement, a second) and subsisting Liens on the real property described therein, in a customary form in the jurisdiction where the Mortgaged Property is located free and clear of all Liens (<u>provided</u> that if a survey is not available, such Mortgage Policies may include the standard survey exception and the Administrative Agent shall not require any endorsement that will require delivery of a survey), except Permitted Liens;

(d)     customary opinions of local counsel for the relevant Loan Party (A) in the state in which the relevant Mortgaged Property is located, including, without limitation, with respect to the enforceability of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent and (B) in the state in which the relevant Loan Party is organized or formed, with respect to the valid existence, corporate power and authority of such Loan Party in the granting of the Mortgages, in form and substance reasonably satisfactory to the Administrative Agent;

(e)     such other actions that, in each case, the Administrative Agent may reasonably deem necessary in order to create valid and subsisting Liens on the property described in the Mortgages shall have been delivered or taken, in each case to the extent the same can be obtained or taken with the use of commercially reasonable efforts; it being understood that if the Administrative Agent so agrees, the relevant Loan Party may provide such existing surveys, abstracts, appraisals, legal opinions and/or other documents as may suffice to satisfy the requirements described in <u>clauses (a)</u> through <u>(d)</u> above; and

(f)     reasonably satisfactory evidence of any additional insurance required to be maintained pursuant to <u>Section 6.07</u>.

"<u>Mortgaged Properties</u>" has the meaning specified in the definition of "Mortgage Requirement".

"<u>Multiemployer Plan</u>" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates is making or has an obligation to make contributions or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"<u>Net Cash Proceeds</u>" means:

(a)     with respect to the Disposition of any asset or any Casualty Event the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the other Restricted Subsidiaries) less (ii) the sum of (A) the principal amount of and interest and fees, premiums and other amounts payable in respect of any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is repaid in connection therewith (other than Indebtedness under any Credit Facility, Indebtedness under any ABL Facility, or any Indebtedness that is secured by a Lien that is pari passu or junior to the Lien securing the Obligations), (B) the reasonable and documented out-of-pocket expenses actually incurred and paid by the Borrower or any of the other Restricted Subsidiaries in connection with such Disposition or Casualty Event (including, reasonable attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer

31

taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant, and other customary fees) to third parties (other than the Loan Parties), (C) taxes paid or reasonably estimated to be payable (including pursuant to any tax sharing arrangements) as a result of any gain recognized in connection therewith by such Person or any of the direct or indirect stockholders thereof and attributable to such Disposition or Casualty Event, (D) any reserve actually maintained in respect of (x) the sale price of such asset or assets established in accordance with GAAP, and (y) any liabilities associated with such asset or assets and retained by the Borrower or any of the other Restricted Subsidiaries after such sale or other Disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to any indemnification obligations and/or purchase price adjustments associated with such transaction and (E) the amount of any cash escrow from the sale price for any relevant Disposition (until released from escrow); it being understood that "Net Cash Proceeds" shall include (1) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by such Person in any such Disposition, and (2) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in <u>clause (D)</u> above, the amount of such reserve; and

(b)     with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of the other Restricted Subsidiaries not permitted under <u>Section 7.03</u> (other than Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt), the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance less (ii) the investment banking fees, underwriting discounts, commissions, costs and other reasonable and documented out-of-pocket expenses and other customary expenses and any taxes incurred by such Loan Party in connection with such incurrence or issuance to third parties (other than the Loan Parties).

"Non-Consenting Lender" has the meaning specified in <u>Section 3.07(c)</u>.

"Non-Loan Party Subsidiary" means any Subsidiary of the Borrower that is not a Loan Party.

"Note" means a promissory note of the Borrower payable to any Lender or its assigns, in substantially the form of <u>Exhibit C</u> hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"Obligations" means (a) for purposes of this Agreement, all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed or allowable claims in such proceeding and interest accruing at the Default Rate in accordance with <u>Section 2.08(b)</u> or (b) solely for purposes of the Guarantee and the Collateral Documents, (x) the obligations specified in the foregoing <u>clause (a)</u> and the other Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest (including interest accruing at the Default Rate in accordance with <u>Section 2.08(b)</u>), charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.  Notwithstanding the foregoing, the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Agreement or any Cash Management Agreement shall be secured and guaranteed pursuant to the Collateral Documents and the Guaranty only to the extent that, and for so long as, the other Obligations are so secured and guaranteed.

32

**Debtors' Exhibit No. 12**
**Page 37 of 354**

Notwithstanding the foregoing, Obligations of any Guarantor shall in no event include any Excluded Swap Obligations of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury, or any successor thereto.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Applicable Indebtedness" has the meaning specified in Section 2.05(b)(ii)(D).

"Other Connection Taxes" means, with respect to any Agent or Lender, as the case may be, Taxes imposed as a result of a present or former connection between such Lender or Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means with respect to the Term Loans, Incremental Term Loans and Specified Term Refinancing Debt Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans, Incremental Term Loans, and Specified Term Refinancing Debt Loans, as the case may be, occurring on such date.

"Parent" has the meaning specified in the introductory paragraph of this Agreement.

"Parent Company" means Parent and any other Person of which the Borrower is an indirect Wholly-owned Subsidiary.

"Participant" has the meaning specified in Section 11.07(e).

"Participant Register" has the meaning specified in Section 11.07(e).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates or to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates contributes or

#90400391v30

has an obligation to contribute or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Permitted Acquisition" means any Acquisition by the Borrower or any of the other Restricted Subsidiaries; provided that:

(a)    both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), no Event of Default exists or would result from the consummation of such Acquisition (provided that, solely in connection with a Permitted Acquisition that is a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Event of Default shall exist or would result from the consummation of such Acquisition as of the LCA Test Date for such Limited Condition Acquisition, both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition);

(b)    upon the consummation of such Acquisition, the Borrower and the other Restricted Subsidiaries are in compliance with Section 7.07; and

(c)    the total consideration paid by Loan Parties for (i) the Equity Interests of any Person that does not become a Guarantor and (ii) in the case of an asset Acquisition, assets that are not acquired by the Borrower or any Guarantor, shall not exceed, when taken together with the total consideration for all such Persons and assets so acquired after the Closing Date and investments pursuant to Sections 7.02(c)(iv), the greater of $20,000,000 and 20.0% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable.

"Permitted Holder" means each of (i) Patrick James, and any family members of Patrick James (including his spouse, lineal descendants, spouses of such descendants, the lineal descendants of any such spouse and the spouses of any such spouse's lineal descendants), and trusts for estate planning purposes where any of the foregoing persons or a spouse of any such person is a beneficiary or trustee of any such trust or trusts, including a voting trust or any other business entity, regardless of form, organized solely for the benefit of one or more of the foregoing persons and (ii) Aztec Corporation, an Ohio corporation that is Controlled by Patrick James as of the Closing Date. For purposes of this paragraph, the relationship of any person that is derived by or through legal adoption prior to age 18 shall be considered a natural one. A minor for whom an Equity Interest is held pursuant to a Uniform Transfers to Minors Act or similar law shall be considered a holder of an Equity Interest.

"Permitted Inventory Financing" means the financing, including pursuant to a sale, sale-leaseback, factoring, early-pay or similar arrangement, of inventory that does not constitute Eligible Inventory (as defined in the ABL Credit Agreement).

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Permitted Non-Recourse Factoring Transactions" means non-recourse factoring (or factoring where recourse is limited to customary warranties and indemnities) and early-pay arrangements between the Borrower or any Subsidiary thereof (each such Person, a "Selling Trico Party") and any of (a) a third

#90400391v30

party commercial bank or an Affiliate thereof, or (b) any other Person which customarily acts as a factor under factoring or early pay arrangements in the ordinary course of its business (each such counterparty, a "Factor"), pursuant to which such Selling Trico Party sells Accounts, together with Related Assets, to such Factor; provided that (i) either (A) if the transaction does not involve an implied interest or similar financing component, the maximum discount for Accounts sold thereunder shall not exceed 5.0% of the face value thereof or (B) the implied interest or similar financing component of such Permitted Non-Recourse Factoring Transaction shall not exceed the Eurodollar Rate (or the equivalent term used in the documentation governing such Permitted Non-Recourse Factoring Transaction for the applicable period, in each case without giving effect to any floor) plus 5.00%, (ii) for Permitted Non-Recourse Factoring Transactions existing as of the Closing Date, the Lead Borrower shall have delivered the documentation governing such transaction to the  Administrative Agent prior to the Closing Date, and (B) for any Permitted Non-Recourse Factoring Transaction consummated after the Closing Date, the Lead Borrower shall have delivered the documentation governing such transaction to the Administrative Agent at least two (2) Business Days prior to the consummation thereof, (iii) the risk of credit loss with respect to the Accounts subject thereof is transferred to the Factor thereunder, (iv) to the extent collection accounts are established in connection with such Permitted Non-Recourse Factoring Transaction for the purposes of the collection of Accounts subject to such Permitted Non-Recourse Factoring Transaction, the Loan Parties shall not permit the proceeds of ABL Priority Collateral (which, for the avoidance of doubt does not include proceeds of the Accounts subject to such Permitted Non-Recourse Factoring Transaction) to be deposited or maintained in such collection accounts, (v) other than as set forth in clause (vi) below in the case of each Selling Trico Party to such Permitted Non-Recourse Factoring Transaction, neither Parent nor any of its Subsidiaries shall provide any credit support of any kind other than customary performance undertakings and (vi) other than customary performance undertakings and indemnities, the obligations thereunder shall not involve any recourse to Parent or any of its Subsidiaries other than to each Selling Trico Party party to such Permitted Non-Recourse Factoring Transaction, and such recourse to such Selling Trico Party shall be limited solely to a breach of a customary asset related representation thereunder and disputes.

 "Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained or contributed to by any Loan Party or any of the other Restricted Subsidiaries or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning specified in Section 11.02(e).

"Pledge Agreement" means the Pledge Agreement executed by the Loan Parties substantially in the form of Exhibit G-1, as supplemented by each Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit B.

"Prime Rate" means (a) the rate of interest per annum quoted as the "Prime Rate" in the print edition of the Wall Street Journal, Money Rates section for United States Dollar loans in the United States for such day or (b) if such rate is not quoted, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as

35

reasonably determined by the Administrative Agent).  The Prime Rate is not necessarily the lowest rate that Goldman Sachs is charging any corporate customer.

"Pro Forma Basis" means, with respect to any determination of the First Lien Leverage Ratio, Total Leverage Ratio, Total Secured Leverage Ratio, the Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that each Specified Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made and that:

(a)    (i)    in the case of any Disposition of all or substantially all of the Equity Interests of any Subsidiary of Parent (other than the Borrower) or any division and/or product line of the Borrower and/or any Restricted Subsidiary, income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, shall be excluded as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made, and

(ii)    in the case of any Permitted Acquisition and/or Investment described in the definition of the term "Specified Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction shall be included as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(b)    any retirement or repayment of Indebtedness (other than normal fluctuations in revolving Indebtedness incurred for working capital purposes) shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(c)    any Indebtedness incurred or assumed by the Borrower or any of the other Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a Eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Borrower, and

(d)    the acquisition of any assets included in calculating Consolidated Total Assets, whether pursuant to any Specified Transaction or any Person becoming a Restricted Subsidiary or merging, amalgamating or consolidating with or into the Borrower or any of the other Restricted Subsidiaries, or the Disposition of any assets included in calculating Consolidated Total Assets described in the definition of "Specified Transaction" shall be deemed to have occurred as of the last day of such Test Period with respect to any test or covenant for which such calculation is being made.

In the case of any calculation of the First Lien Leverage Ratio, Total Secured Leverage Ratio, Total Leverage Ratio or Consolidated Total Assets for any event described above that occurs prior to the date

#90400391v30

on which financial statements have been (or are required to be) delivered for the fiscal quarter ending March 31, 2018, any such calculation required to be made on a "Pro Forma Basis" shall use (I) prior to the date on which the financial statements for the fiscal quarter ending March 31, 2018 have been (or are required to have been) delivered pursuant to <u>Section 6.01(b)</u>, the financial statements of the Borrower and the other Restricted Subsidiaries delivered pursuant to <u>Section 4.01(g)</u> and (II) on and after such date referred to in the foregoing <u>clause (I)</u>, the financial statements of the Borrower and the other Restricted Subsidiaries delivered pursuant to <u>Section 6.01</u>.  Notwithstanding the foregoing, the Borrower shall not be required to (but may) make any determination on a Pro Forma Basis if the Specified Transaction does not involve consideration in excess of $500,000.

"<u>Pro Rata Share</u>" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the respective applicable Credit Facility or Credit Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Credit Facility or Credit Facilities at such time; <u>provided</u> that if any Commitment for a Credit Facility has been terminated, then the Pro Rata Share of each Lender as it pertains to such Credit Facility shall be determined based on the outstanding principal amount of the Loans under such Credit Facility held by such Lender divided by the aggregate principal amount of all Outstanding Amounts under such Credit Facility.

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Lender</u>" has the meaning specified in <u>Section 11.02(h)</u>.

"<u>Qualified Equity Interests</u>" means any Equity Interests that are not Disqualified Equity Interests.

"<u>Qualifying IPO</u>" means the issuance by Parent or any other Parent Company or any successor thereof of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

"<u>Ratio Debt Basket</u>" means, at any date of determination, subject to the Required Additional Debt Terms, an unlimited amount at any time so long as after giving effect to the incurrence of any such Indebtedness and the use of proceeds thereof,

(a)    in the case of Indebtedness that is secured on a pari passu basis to the Obligations, the First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant to any other clause of <u>Section 7.03</u>) shall not exceed 4.00:1.00;

(b)    in the case of Indebtedness that is secured by the Collateral on a junior lien basis to the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant any other clause of <u>Section 7.03</u>) shall not exceed 4.00:1.00; and

(c)    in the case of Indebtedness that is unsecured, the Total Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant any other clause of <u>Section 7.03</u>) shall not exceed 4.00:1.00.

#90400391v30

Compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described above shall be calculated at the time of incurrence of the relevant Indebtedness on a Pro Forma Basis after giving effect thereto and the application of the proceeds thereof (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable); it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described above shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable).

"Refinancing Amendment" means an amendment to this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Borrower, the Administrative Agent and the lender or lenders providing the relevant Specified Term Refinancing Debt.

"Refinancing Facility" means one or more series of notes or loans, which may be pari passu or junior in right of payment with the Indebtedness then existing under the Credit Facilities and/or may be secured by a Lien on all or part of the Collateral that is pari passu or junior to the Lien on such Collateral securing the Credit Facilities or be unsecured, in each case issued in respect of a refinancing of a portion of the outstanding Indebtedness of the Borrower under the Credit Facilities; provided that:

(a)     if such Refinancing Facility shall be secured by a security interest in the Collateral, then such Refinancing Facility shall be issued subject to the ABL Intercreditor Agreement or customary intercreditor arrangements that are reasonably satisfactory to the Administrative Agent and the Borrower and, if such security interest is junior to the Liens securing the Obligations, customary intercreditor arrangements that are reasonably satisfactory to the Administrative Agent and the Borrower,

(b)     such Refinancing Facility shall not have a scheduled final maturity earlier than the Maturity Date of the Indebtedness being refinanced; provided that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(c)     the Weighted Average Life to Maturity of such Refinancing Facility shall be equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, provided that any Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date,

(d)     the covenants, events of default, and other terms of such Refinancing Facility (other than interest rate, payment premiums and redemptions or as otherwise provided in the other clauses of this definition) shall be as agreed between the Borrower and the lenders providing such Refinancing Facility; provided, that the other terms of any Refinancing Facility that are not substantially identical to the corresponding terms in the then-existing Term Loan Facility shall (x) reflect current market terms at the time such Refinancing Facility is incurred for such types of Indebtedness (as reasonably determined by the Borrower in good faith) or (y) be not materially more favorable (taken as a whole) to the lenders providing such Indebtedness than such terms in the Loans being refinanced thereby (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Loans not being refinanced thereby or (iii) applicable only after the Latest Maturity Date of the remaining outstanding Loans);

38

Debtors' Exhibit No. 12
Page 43 of 354

(e)      except to the extent otherwise permitted hereunder, the aggregate principal amount of such Refinancing Facility shall not exceed the aggregate principal amount of Indebtedness being refinanced therewith, plus interest, premiums, fees and reasonable expenses;

(f)      (i) if any such Refinancing Facility is guaranteed, it shall not be guaranteed by any Person other than the Guarantors and (ii) if any Refinancing Facility is secured, it shall not be secured by any assets other than the Collateral; and

(g)      any Refinancing Facility that replaces and/or refinances the Term Loan Facility or any Incremental Term Facility and that is pari passu with such Term Loan Facility or Incremental Term Facility in right of payment and pari passu with the Lien on the Collateral securing such Term Loan Facility or Incremental Term Facility shall share ratably in any mandatory prepayment of such Term Loan Facility or Incremental Term Facility unless the Borrower and the lenders in respect of such Refinancing Facility elect lesser payments.

"Refinancing Indebtedness" has the meaning specified in Section 7.03(y).

"Refunding Equity Interests" has the meaning specified in Section 7.06(k).

"Register" has the meaning specified in Section 11.07(d).

"Related Assets" means, (i) with respect to any Accounts sold pursuant to a Permitted Non-Recourse Factoring Transaction, all collateral securing such Accounts, all contracts and contract rights, guarantees or other obligations in respect of such Accounts, all records with respect to such Accounts and any other assets customarily transferred together with Accounts in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed, assigned or otherwise transferred by the Borrower or any other Restricted Subsidiary thereof party to such Permitted Non-Recourse Factoring Transaction to the factor thereunder and (ii) with respect to any inventory sold pursuant to a Permitted Inventory Financing, all collateral securing such inventory, all contracts and contract rights, guarantees or other obligations in respect of such inventory, all records with respect to such inventory and any other assets customarily transferred together with inventory in connection with a comparable inventory financing arrangement and which are sold, conveyed, assigned or otherwise transferred by the Borrower or any other Restricted Subsidiary thereof party to such Permitted Inventory Financing to the counterparty thereto.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leaching or migration of any Hazardous Material in or into the environment, including indoor air.

"Reportable Event" means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

"Representatives" mean, with respect to any Person, the employees, directors, members of management, officers, managers, consultants, partners or independent contractors of such Person.

"Repricing Transaction" means (i) any prepayment or repayment of any Term Loans with the proceeds of, or any conversion of any Term Loans into, any new or replacement tranche of secured term loans with an All-In Yield less than the All-In Yield applicable to the Term Loans (as such comparative rates are determined by the Administrative Agent in consultation with the Borrower), and (ii) any amendment to the Term Loan Facility that, directly or indirectly, reduces the All-In Yield applicable to

the Term Loans (including any mandatory assignment of any Term Loan by a Lender that refuses to consent to such amendment).

"<u>Request for Credit Extension</u>" means, with respect to a Borrowing, conversion or continuation of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans, the delivery of a Committed Loan Notice.

"<u>Required Additional Debt Terms</u>" means, with respect to any Indebtedness:

(a)     no Default or Event of Default shall exist and be continuing or would result from the incurrence of such Indebtedness, <u>provided</u> that, solely in connection with Indebtedness incurred to finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section <u>9.01(a)</u>, <u>(f)</u> or <u>(g)</u> shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition,

(b)     such Indebtedness shall not (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) have a scheduled final maturity earlier than the Latest Maturity Date; <u>provided</u> that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(c)     the Weighted Average Life to Maturity applicable to such Indebtedness shall (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions), be equal to or greater than the Weighted Average Life to Maturity of the existing Term Loan Facility, <u>provided</u> that any Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date,

(d)     any such Indebtedness that is <u>pari</u> <u>passu</u> in right of payment with the Term Loans on the Closing Date and which is secured by a Lien that is <u>pari</u> <u>passu</u> with the Lien securing the Obligations on the Closing Date and is in the form of loans shall be subject to the requirements set forth in <u>Section 2.16(b)(xi)</u> hereof,

(e)     if such Indebtedness is secured, the obligations in respect thereof shall not be secured by a Lien on any asset other than Collateral,

(f)     such Indebtedness shall not be subject to any Guarantee by any Person other than a Guarantor,

(g)     such Indebtedness may rank pari passu or junior in right of payment and pari passu or junior in right of security to the Term Loans or may be unsecured, and (x) if junior in right of payment and/or security or unsecured, shall be established pursuant to separate documentation than the Loan Documents for the Term Loans that are secured by the Collateral on a first priority basis, (y) if secured, shall be subject to the ABL Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower and (z) if secured on a junior basis to the Liens securing the Obligations, shall be subject to customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower;

#90400391v30

(h)      such Indebtedness which is secured on a <u>pari passu</u> basis with the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans; and

(i)      except as otherwise required by this definition, all other terms of such Indebtedness will be as agreed between the Borrower and the lenders providing such Indebtedness; <u>provided</u>, that the other terms of such Indebtedness (other than terms related to pricing, fees and maturity) that are not substantially identical to the corresponding terms in the then existing Term Loan Facility shall not be materially more favorable (taken as a whole) to the lenders providing such Indebtedness than such terms in the then-existing Term Loan Facility (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility or (iii) applicable only after the Latest Maturity Date).

"<u>Required Lenders</u>" means, as of any date of determination, Lenders having more than 50% of the Total Facility Exposure; <u>provided</u> that any unused Term Commitment (if any) and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Response</u>" shall mean any investigations, assessments, studies, cleanup, response, remedial, removal, or corrective actions related to Environmental Laws, Environmental Permits, Environment Actions or Hazardous Materials.

"<u>Responsible Officer</u>" means the chief executive officer, president, chief financial officer, or treasurer, any assistant treasurer, executive vice president, senior vice president or, in each case, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent acceptable to the Administrative Agent in its sole discretion or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party).   Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Amount</u>" has the meaning specified in <u>Section 2.05(b)(vi)</u>.

"<u>Restricted Debt</u>" has the meaning specified in <u>Section 7.09(a)</u>.

"<u>Restricted Debt Payment</u>" has the meaning specified in <u>Section 7.09(a)</u>.

"<u>Restricted Payment</u>" means, with respect to any Person, any dividend or other distribution (whether in cash, securities (other than dividends consisting of Qualified Equity Interests issued by such Person) or other property) with respect to any capital stock or other Equity Interest of such Person, or any payment (whether in cash, securities (other than Qualified Equity Interests) or other property), including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof).

"<u>Restricted Subsidiary</u>" means any Subsidiary of Parent.

41

**Debtors' Exhibit No. 12**
**Page 46 of 354**

"<u>Restricting Information</u>" has the meaning assigned to such term in <u>Section 11.02(i)</u>.

"<u>Retained Excess Cash Flow Amount</u>" means, at any date of determination, an amount, not less than zero, determined on a cumulative basis equal to the amount of Excess Cash Flow for all Excess Cash Flow Periods ending after the Closing Date that is not (and, in the case of any Excess Cash Flow Period where the respective required date of prepayment has not yet occurred pursuant to <u>Section 2.05(b)(i)</u>, will not on such date of required prepayment be) required to be applied in accordance with <u>Section 2.05(b)(i)</u> (other than as a result of <u>clause (B)</u> thereof).

"<u>S&P</u>" means S&P Global Ratings Inc., and its successors.

"<u>Sale Leaseback Transaction</u>" means any arrangement with any Person providing for the leasing by either of the Borrower or any of the other Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person in contemplation of such leasing.

"<u>Sanctioned Country</u>" means, at any time, a country or territory that is the subject or target of any Sanctions broadly restricting or prohibiting dealings with or in such country or territory (including, as of the date hereof, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means any Person: (i) listed in any Sanctions-related list of designated Persons maintained by any Sanctions Authority, (ii)  located, organized or resident in, or any governmental entity or governmental instrumentality of, a Sanctioned Country, (iii) owned or controlled by, or acting for the benefit or on behalf of, directly or indirectly, any Person described in <u>clauses (i)</u> or <u>(ii)</u> hereof or (iv) otherwise the subject or target of any Sanctions.

"<u>Sanctions</u>" means the economic, financial or other sanctions laws, regulations or embargoes administered and enforced from time to time by any Sanctions Authority.

"<u>Sanctions Authority</u>" means (a) the United Nations Security Council, (b) the European Union and each of its member states, (c) the United States of America (including, without limitation, OFAC and the U.S. Department of State), (d)  the United Kingdom (including, without limitation, Her Majesty's Treasury) or (e) any other relevant national or supra-national sanctions authority with jurisdiction over the Borrower.

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Hedge Agreement</u>" means any Swap Contract permitted under <u>Section 7.03(d)</u> that is entered into by and between any Loan Party or any Subsidiary and any Hedge Bank and that is not designated in writing by the Borrower and such Hedge Bank to the Administrative Agent to be included as a Secured Hedge Agreement under (and as defined in) the ABL Credit Agreement.

"<u>Secured Obligations</u>" means all Obligations of each Loan Party now or hereafter existing under the Loan Documents, and any obligation under any Secured Hedge Agreement (other than any Excluded Swap Obligation) and any Cash Management Obligation.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Cash Management Banks and the Hedge Banks.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

#90400391v30

"<u>Security Agreement</u>" means the Security Agreement executed by the Loan Parties substantially in the form of <u>Exhibit G-2</u>, as supplemented by each Security Agreement Supplement executed and delivered pursuant to <u>Section 6.11</u>.

"<u>Security Agreement Supplement</u>" has the meaning specified in <u>Section 6.11(a)(ii)</u>.

"<u>Shared Fixed Incremental Amount</u>" has the meaning specified in the definition of "Incremental Cap."

"<u>Sold Entity or Business</u>" means for any period any Person or any property or assets constituting a line of business or a division of a Person or all or substantially all of the assets of a Person sold, transferred or otherwise disposed of, closed or classified as discontinued operations (in each case, other than as a result of such Person, property, business or asset being held for sale, transfer or other disposition) by the Borrower or any of the other Restricted Subsidiaries.

"<u>Solvency Certificate</u>" means the Solvency Certificate executed by certain Loan Parties substantially in the form of <u>Exhibit K</u>.

"<u>Solvent</u>" and "<u>Solvency</u>" mean, with respect to any Person on any date of determination, that on such date (a) the Fair Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the Liabilities of such Person and its Subsidiaries taken as a whole, (b) the Present Fair Salable Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Subsidiaries taken as a whole do not have Unreasonably Small Capital and (d) such Person and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.  For purposes of this definition: (i) "<u>Fair Value</u>" means the amount at which the assets (both tangible and intangible), in their entirety, of such Person and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act; (ii) "<u>Present Fair Salable Value</u>" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of such Person and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated; (iii) "<u>Liabilities</u>" means the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of such Person and its Subsidiaries taken as a whole, as of any date, determined in accordance with GAAP consistently applied; (iv) "<u>will be able to pay their Liabilities as they mature</u>" shall mean such Person and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by such Person and its Subsidiaries and (v) "<u>do not have Unreasonably Small Capital</u>" means such Person and its Subsidiaries taken as a whole is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern (it being understood that "unreasonably small capital" depends on the nature of the particular business or business conducted or to be conducted, based on the needs and anticipated needs for the capital of the business conducted or anticipated to be conducted by such Person and its Subsidiaries).

"<u>SPC</u>" has the meaning specified in <u>Section 11.07(g)</u>.

"<u>Specified Customers</u>" means each Person listed on <u>Schedule 1.01(a)</u>.

"Specified Equity Contribution" means the cash proceeds of a sale of, or contribution to, equity (which equity shall be common equity, or Qualified Equity Interests or other equity on terms and conditions reasonably acceptable to the Administrative Agent) in or to the Borrower during any fiscal quarter and on or prior to the day that is fifteen (15) Business Days after the day on which financial statements are required to be delivered for such fiscal quarter, which will, at the request of the Borrower, be included in the calculation of Consolidated Adjusted EBITDA for purposes of determining compliance with the Financial Maintenance Covenant at the end of such fiscal quarter and applicable subsequent periods.

"Specified Term Refinancing Debt" has the meaning specified in Section 2.17(a).

"Specified Term Refinancing Debt Borrowing" means a borrowing consisting of Specified Term Refinancing Debt Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made pursuant to the applicable Specified Term Refinancing Debt Facility.

"Specified Term Refinancing Debt Commitment" has the meaning specified in Section 2.17(a).

"Specified Term Refinancing Debt Facility" means a new term loan facility under this Agreement or one or more series of notes or loans, in each case, pursuant to Section 2.17.

"Specified Term Refinancing Debt Lenders" means lenders under any Specified Term Refinancing Debt Facility.

"Specified Term Refinancing Debt Loans" has the meaning specified in Section 2.17(a).

"Specified Transaction" means the Transactions, any Permitted Acquisition or similar Investment, any Disposition of a Sold Entity or Business, any incurrence or repayment of Indebtedness, any Incremental Term Facility or any other transaction, event or action that by the terms of this Agreement requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Subordinated Indebtedness" means any Indebtedness created, incurred or assumed by Parent or any of its Restricted Subsidiaries or in respect of which Parent or any of its Restricted Subsidiaries is liable, which is contractually subordinated in right of payment to the Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" of a Person shall refer to a Subsidiary or Subsidiaries of Parent.

"Subsidiary Guarantors" means (i) on the Closing Date, each Subsidiary listed on Schedule 1.01(b) hereto and (ii) thereafter, each Subsidiary that executes a Guaranty Supplement, in each case, until such time as the relevant Subsidiary is released from its obligations under the Guaranty in accordance with the terms and provisions hereof.

"Successor Borrower" has the meaning specified in Section 7.04(a).

#90400391v30

"Swap Contract" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined by the Hedge Bank in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by the Hedge Bank.

"Tax Distributions" for any period in which each of the Borrower and Parent is a partnership or disregarded entity for U.S. federal income tax purposes, the Borrower and its Subsidiaries may pay dividends or make distributions to Parent and Parent may distribute such amounts to the partners or members to whom the income earned by the Borrower and its Subsidiaries is allocable for such purposes (either directly or indirectly through intermediary entities, as the case may be) in an aggregate amount not greater than the amount necessary for such partners or members, as the case may be, to pay their state and United States federal income tax liabilities, in each case, solely in respect of income earned by the Borrower and its Subsidiaries that is allocable to them (but not, for the avoidance of doubt, any other Affiliate of the Borrower) but not to exceed in any taxable year the state and United States income tax liabilities of such partners or members actually owed by such partners or members for such taxable year (calculated as taxable income, on a quarterly basis, multiplied by the highest combined federal, state and local tax rates taking into account the deductibility of state and local income taxes for federal income tax purposes, but without taking into account any potential effects of Sections 67 and 68 of the Code and reduced by any amounts required to be withheld by Borrower or Parent with respect to such partners or members under Section 1446 of the Code).

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority, including interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means a borrowing consisting of Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Term Lenders pursuant to Section 2.01.

#90400391v30

Debtors' Exhibit No. 12
Page 50 of 354

"Term Commitment" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Term Commitment" or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The initial aggregate amount of the Term Commitments is $425,000,000.

"Term Lender" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"Term Loan" means a Loan made pursuant to Section 2.01, an Incremental Term Loan, a Specified Term Refinancing Debt Loan or an Extended Term Loan.

"Term Loan Facility" has the meaning set forth in the Preliminary Statements.

"Term Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Termination Date" means the date upon which all Commitments have terminated and the Loans, together with all interest, fees and other Obligations (other than contingent indemnification Obligations for which no demand shall have been made), have been paid in full in cash.

"Test Period" means, at any date of determination, the most recently completed four (4) consecutive fiscal quarters of the applicable Person ending on or prior to such date for which financial statements are required to have been delivered pursuant to Section 6.01(a) or (b), as applicable.

"Total Facility Exposure" means the sum of (a) Total Outstandings and (b) aggregate unused Term Commitments (if any), Incremental Term Loan Commitments and Specified Term Refinancing Debt Commitments.

"Total Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Total Secured Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period that is secured by the assets of the Borrower and the other Restricted Subsidiaries to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"Transaction Expenses" means any fees or expenses incurred or paid by the Borrower (or any Parent Company) or any of the other Restricted Subsidiaries in connection with (i) the Transactions, (ii) the internal restructuring commencing on or prior to the Closing Date (including amendments, modifications and the repayment of obligations under any contracts, leases or indebtedness in connection therewith) in an amount not to exceed $5,000,000, and (iii) this Agreement and the other Loan Documents and the transactions contemplated to occur hereunder and thereunder, as applicable.

"Transactions" means, collectively, (a) the funding of the Term Loans on the Closing Date, (b) the repayment of the Indebtedness outstanding under the Existing Credit Agreements, (c) the incurrence of the loans and effectiveness of the commitments pursuant to and under the ABL Credit

#90400391v30

Agreement, (d) the consummation of any other transactions in connection with the foregoing, and (e) the payment of the fees and expenses incurred in connection with any of the foregoing.

"Treasury Equity Interests" has the meaning specified in Section 7.06(k).

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"Unaudited Financial Statements" has the meaning specified in Section 4.01(g).

"Undisclosed Administration" means, in relation to a Lender or its parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such person is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"United States" means the United States of America.

"Unrestricted Cash" means all non-restricted cash and Cash Equivalents of the Loan Parties in deposit or securities accounts in which the Collateral Agent has "control" pursuant to and within the meaning of Section 9-104 and/or 9-106 of the UCC pursuant to the terms and conditions set forth in the Security Agreement or any other Collateral Document.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(B)(3).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years calculated to the nearest one-twelfth that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by the Borrower or any other Restricted Subsidiary or the ERISA Affiliates of the Borrower.

#90400391v30

Debtors' Exhibit No. 12
Page 52 of 354

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

(f)    For purposes of determining compliance with Section 7.01 or 7.03, in the event that a Lien or an item of Indebtedness meets the criteria of more than one of the categories in their respective sections or the defined terms used therein, the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify such Lien or item of Indebtedness (or any portion thereof, as applicable), and will be permitted to include the amount and type of such Lien or item of Indebtedness in one or more of the clauses contained in Section 7.01 or 7.03, as applicable; provided that all Indebtedness outstanding under the Loan Documents and the ABL Loan Documents will be deemed to have been incurred in reliance only on the exception in clauses (a) and (b), as applicable, of Section 7.03.

(g)    For purposes of determining the permissibility of any action, change, transaction or event that by the terms of the Loan Documents requires a calculation of any financial ratio or test (including the First Lien Leverage Ratio, the Total Secured Leverage Ratio, the Total Leverage Ratio and the amount of Consolidated Adjusted EBITDA and/or Consolidated Total Assets), such financial ratio or test shall be calculated at the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after the

48

Debtors' Exhibit No. 12
Page 53 of 354

time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be.

(h)     The determination of whether any Indebtedness that is permitted hereunder matures or requires certain payments prior to the Latest Maturity Date shall be made at the time of the incurrence of the relevant Indebtedness.

Section 1.03    Accounting Terms. (a)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing audited financial statements, except as otherwise specifically prescribed herein.

(b)     Notwithstanding anything to the contrary herein, financial ratios and tests (including the First Lien Leverage Ratio, the Total Leverage Ratio, the Total Secured Leverage Ratio and the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets) contained in this Agreement that are calculated with respect to any Test Period during which any Specified Transaction occurs shall be calculated with respect to such Test Period and such Specified Transaction on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of the other Restricted Subsidiaries since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period.

(c)     Where reference is made to a Person "and its Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any subsidiaries other than Subsidiaries.

Section 1.04    Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day (unless such

49

Debtors' Exhibit No. 12
Page 54 of 354

immediately succeeding Business Day is in the next calendar month, in which case the date of such payment or performance shall be the immediately preceding Business Day) and, in the case of any payment that accrues interest, interest thereon shall be payable for the period of such extension.

Section 1.08    Currency Equivalents Generally.

(a)    For purposes of determining compliance under Sections 7.01, 7.02, 7.03, 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(a) at the time of determination; provided that no Event of Default shall be deemed to have occurred thereafter solely as a result of such changes in rates of exchange thereafter.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

(c)    Notwithstanding anything to the contrary herein, for purposes of any determination of Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the financial statements pursuant to Sections 6.01(a) or (b), as applicable.

Section 1.09    Cashless Rollovers.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with Incremental Term Loans and/or Specified Term Refinancing Debt Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

Section 1.10    Certain Calculations and Tests.  (a)  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, for purposes of (a) determining compliance with any provision of this Agreement which requires calculation of the First Lien Leverage Ratio, Total Leverage Ratio or Total Secured Leverage Ratio, (b) determining compliance with any provision of this Agreement which requires as a condition that no Default or Event of Default has occurred, is continuing or would result from the incurrence of any Indebtedness (including Incremental Term Facilities) or Liens or the making of any Acquisitions or Investments, in each case, in connection with the consummation of a Limited Condition Acquisition or (c) testing availability under baskets set forth in this Agreement (including (i) any baskets based on a percentage of Consolidated Adjusted EBITDA and (ii) the incurrence of any Incremental Term Facility), in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or of whether any Default or Event of Default has occurred, is continuing or would result therefrom or other applicable covenant shall, at the irrevocable option of the Borrower (an "LCA Election"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "LCA Test Date") and if, after such ratios and other provisions are measured on a Pro Forma Basis after giving effect to such Limited Condition Acquisition and any incurrence of Indebtedness (and the use of proceeds thereof) or Liens or the making of any Acquisitions or Investments, in each case, to be consummated in connection therewith, as if they occurred at the beginning of the Test Period being used to calculate such financial ratio ending prior to the LCA Test Date, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratios and provisions, such provisions shall be deemed to have been complied with.  For the

50

avoidance of doubt, if any of such ratios are exceeded as a result of fluctuations in such ratio (including due to fluctuations in Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries or the target of such Limited Condition Acquisition) at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether such Limited Condition Acquisition (and any incurrence of any Indebtedness (including Incremental Term Facilities) or Liens or the making of any Acquisitions or Investments, in each case in connection therewith) is permitted hereunder.  If the Borrower makes an LCA Election, then in connection with any calculation of any ratio, test or basket availability with respect to any Specified Transaction following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, for purposes of determining whether such subsequent Specified Transaction is permitted under the Loan Document, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated.

(b) The calculation of any ratio hereunder shall be made without regard to the netting of any cash proceeds of Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in connection with such transaction (but without limiting the pro forma effect of any prepayment of Indebtedness with such cash proceeds).

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Loans.   Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make to the Borrower a single loan in a principal amount equal to such Term Lender's Term Commitment on the Closing Date.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  Term Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent of such Borrowing, conversion or continuation of Eurodollar Rate Loans, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than (i) 1:00 p.m. three (3) Business Days prior to the requested date of any Borrowing or continuation or conversion of Eurodollar Rate Loans (or any conversion of Base Rate Loans to Eurodollar Rate Loans) and (ii) 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans or any continuation or conversion of Eurodollar Rate Loans to Base Rate Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Except with respect to the initial Credit Extension, each Borrowing of, continuation of or conversion to Base Rate Loans, shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice shall specify, as applicable, (i) whether the Borrower is requesting a Term Borrowing, an Incremental Term Borrowing, a Specified Term Refinancing Debt Borrowing or a conversion or continuation of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans from

51

one Type to the other, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) in the case of Eurodollar Rate Loans, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice with respect to Loans or fails to give a timely request for conversion or continuation pursuant to a Committed Loan Notice, then the applicable Loans shall be made as, continued as or converted to, as applicable, a Eurodollar Rate Loan with an Interest Period of one (1) month.  Any such automatic conversion to a Eurodollar Rate Loan with an Interest Period of one (1) month shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.  For the avoidance of doubt, the Borrower and the Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)      Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Class of Loans (or of the details of the relevant conversion or continuation), and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion described in Section 2.02(a).  In the case of each Borrowing, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than (i) 1:00 p.m., in the case of Eurodollar Rate Loans, and (ii) 2:00 p.m., in the case of Base Rate Loans, in each case on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (A) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (B) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)      Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  During the existence of an Event of Default, upon notice to the Administrative Agent, the Required Lenders may require that no Loans may be converted to or continued as Eurodollar Rate Loans.

(d)      The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)      Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than fifteen (15) Interest Periods in effect at any time for all Borrowings unless otherwise agreed between the Borrower and the Administrative Agent.

(f)      The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the

date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

Section 2.03    [Reserved].

Section 2.04    [Reserved].

Section 2.05    Prepayments.

(a)    Optional Prepayments.  (i)  The Borrower may, upon delivery of a Prepayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans, Incremental Term Loans and Specified Term Refinancing Debt Loans, in whole or in part without premium or penalty (except as set forth in Section 2.05(a)(iii) below); provided that (1) such notice must be received by the Administrative Agent not later than (A) 1:00 p.m. three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) 11:00 a.m. on any date of prepayment of Base Rate Loans (or, in each case, such later date to which the Administrative Agent may agree); (2) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; (3) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of any Class of Loans pursuant to this Section 2.05(a) shall be applied (x) ratably among the Loans of such Class and (y) to the remaining installments thereof as directed by the Borrower (it being understood and agreed that if the Borrower does not so direct at the time of such prepayment, such prepayment shall be applied against the scheduled repayments of Term Loans under Section 2.07 in direct order of maturity) and shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a) if such prepayment would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(iii)    If the Borrower (A) consummates any Repricing Transaction (including any assignment pursuant to Section 3.07 in connection with any Repricing Transaction), (B) makes any voluntary prepayment of the Term Loans or (C) makes any mandatory prepayment of the Term Loans (x) pursuant to Section 2.05(b)(ii) with the Net Cash Proceeds thereof or (y) pursuant to Section 2.05(b)(iii) with the proceeds of Indebtedness (other than Indebtedness otherwise permitted under the Loan Documents (other than Indebtedness incurred pursuant to Specified Term Refinancing Debt, a Refinancing Facility or an Incremental Term Facility)), prior to the relevant anniversary of the Closing Date set forth below, the Borrower shall pay to the Administrative Agent, for the ratable account of each Term Lender, a premium equal to the corresponding percentage set forth below on the aggregate principal amount of the Term Loans so prepaid or refinanced.  In addition, with respect to any Non-Consenting Lender that is replaced pursuant to Section 3.07 in connection with a Repricing Transaction prior to the relevant

53

Debtors' Exhibit No. 12
Page 58 of 354

anniversary of the Closing Date set forth below, the Borrower shall pay to the Administrative Agent, for the ratable account of each such Non-Consenting Lender, a premium equal to the corresponding percentage set forth below on the aggregate principal amount of such Non-Consenting Lender's Term Loans that are assigned to one or more Persons pursuant to such section.

| Anniversary of the Closing Date | Percentage |
|---|---|
| First | 2.00% |
| Second | 1.00% |
| At all times thereafter | 0.00% |

(b)      Mandatory Prepayments.  (i)  No later than five (5) Business Days after the date on which financial statements are required to be delivered pursuant to Section 6.01(a) (commencing with the Fiscal Year ending December 31, 2018), the Borrower shall cause to be prepaid (each such payment, an "ECF Payment") an aggregate principal amount of Term Loans and, if applicable, Incremental Term Loans and Specified Term Refinancing Debt Loans equal to the ECF Percentage of Excess Cash Flow, if any, for the Excess Cash Flow Period covered by the financial statements required to be delivered pursuant to Section 6.01(a) minus (B) the sum of (1) all voluntary prepayments of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans and the amount of any reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans resulting from any assignment to Parent or its Restricted Subsidiaries made in accordance with Section 11.07(i) of this Agreement (including in connection with any Dutch auction) based upon the actual amount of cash paid in connection with the relevant assignment (it being understood that the amount of the relevant reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans shall not exceed the actual purchase price of any such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans below par), in each case during such Excess Cash Flow Period or, at the option of the Borrower, on or prior to the date such ECF Payment is required to be made (without duplication in any succeeding period) and (2) all voluntary prepayments of ABL Loans during such Excess Cash Flow Period or, at the option of the Borrower, on or prior to the date such ECF Payment is required to be made (without duplication in any succeeding period) to the extent the Commitments (as defined in the ABL Credit Agreement) are permanently reduced by the amount of such payments, in each case of the foregoing subclauses (1)-(2), except to the extent financed with long-term Indebtedness; provided that no prepayment under this Section 2.05(b)(i) shall be required to the extent that Excess Cash Flow is less than or equal to $1,000,000.

(ii)      (A)      Subject to Section 2.05(b)(ii)(B), if (x) the Borrower or any of the other Restricted Subsidiaries Disposes of any property pursuant to Section 7.05(h), (k), (n), (o) or (t) outside the ordinary course of business or (y) any Casualty Event occurs, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Term Loans and, if applicable, Incremental Term Loans and Specified Term Refinancing Debt Loans equal to 100% of all such Net Cash Proceeds realized or received in excess of $2,500,000 in any single transaction or series of related transactions (but only the amount in excess of such amount); provided that no such prepayment shall be required pursuant to this Section 2.05(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower has, on or prior to the date specified in Section 2.05(b)(ii)(C) below, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.05(b)(ii)(B).

#90400391v30

(B)     With respect to any Net Cash Proceeds realized or received with respect to any Disposition or any Casualty Event which are required to be applied to prepay the Term Loans under clause (A) above, at the option of the Borrower, the Borrower and/or any other Restricted Subsidiary may reinvest or commit to reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within three hundred sixty five (365) days following receipt of such Net Cash Proceeds (and, in the case of any commitment to reinvest, so reinvest within one hundred eighty (180) days after the end of such three hundred sixty five (365) day period); provided that if any such Net Cash Proceeds are not so reinvested by the deadline specified above, an amount equal to 100% of any such Net Cash Proceeds shall be applied, in accordance with Section 2.05(b)(ii)(C), to the prepayment of the Term Loans as set forth in this Section 2.05.

(C)     On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, as promptly as reasonably practicable, but in any event within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds (or, in the case of prepayments required pursuant to Section 2.05(b)(ii)(B), as promptly as reasonably practicable, but in any event within five (5) Business Days after the deadline specified therein), make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to 100% of such Net Cash Proceeds realized or received and required to be prepaid.

(D)     Notwithstanding the foregoing, if at any time a prepayment obligation arises under this Section 2.05(b)(ii), the Borrower or any other Restricted Subsidiary is required to offer to repay or repurchase any other Indebtedness that is secured on a pari passu basis with the Obligations pursuant to the terms of the documentation governing such Indebtedness with the Net Cash Proceeds giving rise to the prepayment obligation under this Section 2.05(b)(ii) (such Indebtedness required to be offered to be so repaid or repurchased, the "Other Applicable Indebtedness"), then the relevant Person may apply such Net Cash Proceeds on a pro rata basis to the prepayment of the Term Loans and, if applicable, the Incremental Term Loans and Specified Term Refinancing Debt Loans and to the repurchase or repayment of the relevant Other Applicable Indebtedness (determined on the basis of the aggregate outstanding principal amount of the Term Loans, applicable Incremental Term Loans, applicable Specified Term Refinancing Debt Loans and such Other Applicable Indebtedness (or accreted amount, if such Other Applicable Indebtedness is issued with original issue discount) at such time; provided that the portion of such Net Cash Proceeds allocated to the relevant Other Applicable Indebtedness shall not exceed the amount that is required to be allocated to such Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Cash Proceeds shall be allocated to the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing Debt Loans in accordance with the terms hereof), and the amount of the prepayment of the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing Debt Loans that would have otherwise been required pursuant to this Section 2.05(b)(ii) shall be reduced accordingly; provided, further, that to the extent the holders of the relevant Other Applicable Indebtedness decline to have such Indebtedness prepaid or repurchased, the

55

Debtors' Exhibit No. 12
Page 60 of 354

declined amount shall promptly be applied to prepay the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing Debt Loans in accordance with the terms hereof.

(iii)     If the Parent or any of its Restricted Subsidiaries incurs or issues any Indebtedness (including Disqualified Equity Interests) either (A) not permitted to be incurred or issued pursuant to Section 7.03 or, with respect to Parent, Article VIII or (B) constituting Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)     Each prepayment of Term Loans pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied to the Term Loan Facility to the remaining installments thereof as directed by the Borrower (it being understood and agreed that if the Borrower does not so direct at the time of such prepayment, such prepayment shall be applied against the scheduled repayments of Term Loans under Section 2.07 in direct order of maturity).  For the purpose of Section 2.05(b), references to "Term Loans" or "Term Loan Facility" shall also be deemed to be a reference to the Incremental Term Loans and the Specified Term Refinancing Debt Loans (unless a Joinder Agreement or Refinancing Amendment, as applicable, expressly provides otherwise).

(v)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three (3) Business Days (or such shorter period as the Administrative Agent may agree in its sole discretion) prior to the date of such prepayment pursuant to a Prepayment Notice.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's Prepayment Notice and of such Appropriate Lender's Pro Rata Share of the prepayment.

(vi)     Notwithstanding anything in this Section 2.05 to the contrary, (A) the Borrower shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Section 2.05(b)(i) or (ii) above to the extent that the relevant Excess Cash Flow is generated by any Foreign Subsidiary or the relevant Net Cash Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrower of any such amount would be prohibited under any requirement of local law as reasonably determined by the Borrower in good faith (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by applicable requirements of law to permit such repatriation); it being understood that once the repatriation of the relevant affected Excess Cash Flow or Net Cash Proceeds, as the case may be, is permitted under the applicable requirement of law, the relevant Foreign Subsidiary will promptly repatriate the relevant Excess Cash Flow or Net Cash Proceeds, as the case may be, and the repatriated Excess Cash Flow or Net Cash Proceeds, as the case may be, will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05 to the extent required herein (without regard to this clause (vi)) and (B) if the Borrower reasonably determines in good faith that the repatriation to the Borrower of any amounts required to mandatorily prepay the Term Loans pursuant to Section 2.05(b)(i) or (ii) above would result in material and adverse tax consequences (such amount, a "Restricted Amount"), as reasonably determined by the Borrower in good faith, the amount the Borrower shall be required to mandatorily prepay pursuant to such applicable provision of Section 2.05

#90400391v30

above shall be reduced by the Restricted Amount until such time as it may repatriate to the Borrower the Restricted Amount without incurring such material and adverse tax liability; provided that to the extent that the repatriation of any Excess Cash Flow or Net Cash Proceeds from the relevant Foreign Subsidiary would no longer have an adverse tax consequence, an amount equal to such Excess Cash Flow or Net Cash Proceeds, as applicable, not previously applied pursuant to preceding clause (B), shall be promptly applied to the repayment of the Term Loans pursuant to this Section 2.05 as otherwise required above (without regard to this clause (vi)).

(vii)     Any Lender may elect not to accept any mandatory prepayments required to be made pursuant to this Section 2.05(b); provided that in the case of a mandatory prepayment required to be made pursuant to Section 2.05(b)(iii), a Lender may only decline such prepayments solely to the extent they do not represent Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt.  Any prepayment amount so declined by a Lender may be retained by the Borrower (such declined payment, the "Declined Proceeds") subject to prepayment requirements, if any, of any Indebtedness secured by a lien on the Collateral that is junior to the Liens securing the Obligations, and will increase the Additional Amount Basket.

(viii)     Notwithstanding the foregoing, any requirement to prepay or repay the Term Loans pursuant to clauses (b)(ii) of this Section 2.05 with respect to ABL Priority Collateral shall be subject to the terms of the ABL Intercreditor Agreement.

(c)     Interest, Funding Losses.   All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.  If any payment of Eurodollar Rate Loans otherwise required to be prepaid under Section 2.05(b) would be made on a day other than the last day of the applicable Interest Period therefor, the Borrower may direct the Administrative Agent to (and if so directed, the Administrative Agent shall) deposit such payment in a deposit account pledged as Collateral until the last day of the applicable Interest Period at which time the Administrative Agent shall apply the amount of such payment to the prepayment of such Borrowings; provided, however, that such Loans shall continue to bear interest as set forth in Section 2.08 until the last day of the applicable Interest Period thereunder.

Section 2.06     Termination or Reduction of Commitments.

(a)     Optional.   The Borrower may, upon written notice in accordance with Section 11.02 to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof.  Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice to terminate or reduce unused Commitments of any Class under this Section 2.06(a) if such termination or reduction would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(b)     Mandatory.   Upon the making of each Term Lender's Term Loans pursuant to Section 2.01, the Term Commitment of such Term Lender shall be automatically and permanently reduced to $0.  Upon the making by any Incremental Term Lender of any Incremental Term Loans pursuant to Section 2.16, the Incremental Term Loan Commitment of such Incremental Term Lender with

#90400391v30

respect to such Incremental Term Loan shall be automatically and permanently reduced to $0.  Upon the making by any Specified Term Refinancing Debt Lender of any Specified Term Refinancing Debt Loan pursuant to Section 2.17, the Specified Term Refinancing Debt Commitment of such Specified Term Refinancing Debt Lender with respect to such Specified Term Refinancing Debt Loan shall be automatically and permanently reduced to $0.  The Extended Term Loan Commitments shall terminate as provided in the related Extension Amendment.

Section 2.07    Repayment of Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term Lenders (i) on the last Business Day of June 2018, September 2018 and December 2018, an amount equal to 0.625% of the aggregate principal amount of the Term Loans advanced on the Closing Date, (ii) on the last Business Day of each March, June, September and December commencing with the last Business Day of March 2019, an amount equal to 1.25% of the aggregate principal amount of the Term Loans advanced on the Closing Date and (iii) on the Maturity Date, the aggregate principal amount of all Term Loans outstanding on such date; provided that the payments required under clauses (i) and (ii) shall be reduced as a result of the application of prepayments in accordance with Section 2.05 and Section 11.07(i)(viii).  The principal amounts of Incremental Term Loans, Extended Term Loans and Specified Term Refinancing Debt Loans, in each case, shall be repaid in installments, if any, as set forth in the applicable Extension Amendment, Joinder Agreement or Refinancing Amendment.

Section 2.08    Interest.

(a)    Subject to the provisions of Section 2.08(b), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period, as the case may be, plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    Commencing upon the occurrence and during the continuance of any Event of Default under Section 9.01(a) (with respect to any failure to make any payment of principal, interest or fees that is required under the terms of this Agreement), 9.01(f) or 9.01(g), the Borrower shall pay interest on the relevant overdue amounts at a fluctuating interest rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    Fees.

(a)    Term Loan Fee.  The Borrower shall pay to the Administrative Agent for the account of each Term Lender in accordance with its Pro Rata Share of the Term Loan Facility, an upfront fee in respect of the Term Commitments equal to a percentage of the aggregate amount of the Term Commitments as agreed with the Lead Arrangers, which shall be payable in full on the Closing Date.

(b)    Other Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Fee Letter at the times so specified.

58

Section 2.10    Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, in each case in the ordinary course of business.  Without limitation of Section 11.07(d), the accounts or records maintained by each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  It is understood and agreed that any Lender (and/or its applicable assign) in possession of a Note shall be required to return such Note to the Borrower in accordance with Section 11.07(b) and upon the occurrence of the Termination Date (or as promptly as practicable thereafter).

(b)    Entries made in good faith by each Lender in its account or accounts pursuant to Section 2.11(a) shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to such Lender under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents; provided, further, that if such accounts are inconsistent with the Register, the Register shall prevail, absent manifest error.  The Register shall be available for inspection by the Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.12    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 3:00 p.m. (or at such later time as the Administrative Agent may agree) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such

59

Debtors' Exhibit No. 12
Page 64 of 354

payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. All payments received by the Administrative Agent after 3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     [Reserved].

(c)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)     if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, then in the event the Administrative Agent has funded a Loan in advance of receipt of funds from a Defaulting Lender or otherwise made a payment to the Borrower on behalf of such Defaulting Lender, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by a Lender hereunder.

A notice by the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this ARTICLE II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in ARTICLE IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

#90400391v30

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan or purchase its participation.

(f)     Without limiting the obligations of any Lender to make Loans hereunder, nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular manner.

(g)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 9.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13     Sharing of Payments.  If, other than as expressly provided elsewhere herein (including, without limitation, in Section 2.16, Section 2.17 and Section 11.07), any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 11.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14     Defaulting Lenders.  Notwithstanding any other provision in this Agreement to the contrary, if at any time a Lender becomes a Defaulting Lender, then the following provisions shall

61

Debtors' Exhibit No. 12
Page 66 of 354

apply so long as any Lender is a Defaulting Lender:  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 11.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Borrower as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, so long as no Default or Event of Default exists, as the Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent or the Borrower, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan was made or created, as applicable, at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender pursuant to this Section 2.14 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.15    [Reserved].

Section 2.16    Incremental Term Loans.

(a)    On or before the Maturity Date of the Term Loan Facility, the Borrower may by written notice to the Administrative Agent elect to request the establishment of incremental or additional term loan facilities (each, an "Incremental Term Facility", the commitments thereunder, the "Incremental Term Loan Commitments" and the loans thereunder, the "Incremental Term Loans").  Subject to the terms and conditions set forth in this Section 2.16, the Incremental Term Facilities shall be, in the case of any Incremental Term Facility, funded on the relevant Increased Amount Date (as defined below); provided that the aggregate amount of all Incremental Term Facilities shall not exceed the Incremental Cap.  Each such notice shall specify the date (each, an "Increased Amount Date") on which the Borrower proposes that the Incremental Term Loan Commitments shall be effective; provided that any Lender offered or approached to provide all or a portion of any Incremental Term Loan Commitments may elect or decline, in its sole discretion, to provide such Incremental Term Loan Commitments.

(b)    Such Incremental Term Loan Commitments shall become effective as of the Increased Amount Date; provided that

(i)    no Default or Event of Default shall exist and be continuing or would result from the incurrence of such Incremental Term Facility; provided that, solely in connection with Incremental Term Facilities incurred to finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Default or Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of

62

Debtors' Exhibit No. 12
Page 67 of 354

Default pursuant to Section <u>9.01(a)</u>, <u>(f)</u> or <u>(g)</u> shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition;

(ii)    the representations and warranties in <u>ARTICLE V</u> shall be true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respect) on and as of the date of incurrence of such Indebtedness to the same extent as though made on and as of that date, except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; <u>provided</u> that, solely in connection with Incremental Term Facilities incurred to finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, the representations and warranties shall be made as of the LCA Test Date for such Limited Condition Acquisition and such Limited Condition Acquisition may be subject to customary "SunGard" conditionality;

(iii)    such Incremental Term Facility shall not be (x) secured by any Lien on any assets other than the Collateral or (y) guaranteed by any person other than the Guarantors under the then outstanding Credit Facilities;

(iv)    such Incremental Term Facility shall not (except in the case of customary bridge loans, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) have a scheduled final maturity date earlier than the Latest Maturity Date; <u>provided</u> that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(v)    the Weighted Average Life to Maturity applicable to such Incremental Term Facility shall (except in the case of customary bridge loans, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) be equal to or greater than the Weighted Average Life to Maturity of the existing Term Loan Facility, <u>provided</u> that any Incremental Term Loans that are unsecured or secured on a junior lien basis to the Obligations or subordinated in right in right of payment to the Obligations shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date of the Term Loans,

(vi)    except as otherwise required by this Section, all other terms of such Incremental Term Facility will be as agreed between the Borrower and the lenders providing such Incremental Term Facility; <u>provided</u>, that the other terms of any Incremental Term Facility (other than terms related to pricing, fees and maturity) that are not substantially identical to the corresponding terms in the then existing Term Loan Facility shall not be materially more favorable (taken as a whole) to the lenders providing such Incremental Term Facility than such terms in the then existing Term Loan Facility (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility or (iii) applicable only after the Latest Maturity Date);

(vii)    such Incremental Term Loans or Incremental Term Loan Commitments shall be effected pursuant to one or more joinder agreements executed and delivered by the Borrower, and one or more Incremental Term Lenders (and acknowledged by the Administrative

#90400391v30

Agent) and setting forth the terms applicable to such Incremental Term Loans and Incremental Term Loan Commitments (each, a "Joinder Agreement");

(viii)    the Incremental Term Loans shall rank pari passu or junior in right of payment and pari passu or junior in right of security to the Term Loans or may be unsecured, and (x) if junior in right of payment and/or security or unsecured, shall be established pursuant to separate documentation than the Loan Documents for the Term Loans that are secured by the Collateral on a first priority basis, (y) if secured, shall be subject to the ABL Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower and (z) if such security is junior to the Liens securing the Obligations, shall be subject to customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower;

(ix)    the Borrower shall deliver or cause to be delivered any customary legal opinions or other customary documents reasonably requested by the Administrative Agent in connection with any such Incremental Term Facility, including any supplements or amendments to the Collateral Documents providing for such Incremental Term Loans secured thereby and, if applicable, a Committed Loan Notice;

(x)    an Incremental Term Facility which is secured on a pari passu basis with the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans; and

(xi)    if the All-In Yield applicable to any Incremental Term Loans under such Incremental Term Facility that ranks pari passu in right of payment and with respect to security with the Initial Term Loans shall be more than 0.50% higher than the corresponding All-In Yield of the Initial Term Loans, then the All-In Yield applicable to the Initial Term Loans shall be increased to a level that is not less than 0.50% below such Incremental Term Facility; provided that any amendments to the Applicable Rate on the Initial Term Loans that became effective subsequent to the Closing Date but prior to the time of the addition of such Incremental Term Facility shall be included.

(c)    On any Increased Amount Date on which any Incremental Term Loan Commitment becomes effective, subject to the foregoing terms and conditions, each lender with any such Incremental Term Loan Commitment (each, an "Incremental Term Lender"), to the extent not already a Lender, shall become a Lender hereunder with respect to such Incremental Term Loan Commitment; provided that any financial institution that becomes an Incremental Term Lender that is not already a Lender hereunder shall be satisfactory to the Borrower and to the extent the consent of the Administrative Agent would be required under Section 11.07 for an assignment of Term Loans to such financial institution, the Administrative Agent.

(d)    The Lenders hereby irrevocably authorize the Administrative Agent to enter into such amendments to this Agreement and the other Loan Documents with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans or Commitments increased or extended pursuant to this Section 2.16, and each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to effect the provisions of this Section 2.16.

64

(e)      The proceeds of any Incremental Term Facility may be used for working capital and other general corporate purposes, including the financing of Permitted Acquisitions and other Investments and any other use not prohibited by this Agreement.

(f)      This Section 2.16 shall supersede any provision of Section 2.13 and/or Section 11.01 to the contrary.

Section 2.17      Specified Term Refinancing Debt.

(a)      The Borrower may, from time to time, add one or more new term loan facilities to the Credit Facilities or incur one or more additional series of notes or loans (such term loan facilities, notes or loans, "Specified Term Refinancing Debt", the commitments thereunder, "Specified Term Refinancing Debt Commitments" and the notes or loans thereunder, "Specified Term Refinancing Debt Loans") with the consent of the lenders providing such Specified Term Refinancing Debt, to refinance or replace all or any portion of the Term Loans then outstanding under this Agreement (which for purposes of this Section 2.17 will be deemed to include any then outstanding Incremental Term Loans and any previously incurred Specified Term Refinancing Debt Loans); provided that:

(i)      any such Specified Term Refinancing Debt will rank pari passu or junior in right of payment and/or of security with the other Loans and Commitments hereunder (or may be unsecured) and any Specified Term Refinancing Debt that is pari passu or junior with respect to security shall be subject to the ABL Intercreditor Agreement and, if junior, shall be subject to customary intercreditor arrangements reasonably acceptable to the Administrative Agent and the Borrower;

(ii)      (A) no Specified Term Refinancing Debt that is secured on a pari passu basis to the Obligations shall mature prior to the Latest Maturity Date of the Term Loans being refinanced or replaced or have a shorter Weighted Average Life to Maturity than the Term Loans being refinanced or replaced and (B) Specified Term Refinancing Debt that is junior in security or unsecured or subordinated in right in right of payment to the Obligations shall not mature prior to the date that is ninety one (91) days following the Latest Maturity Date of the Term Loans being refinanced or replaced hereunder and shall have no scheduled amortization or scheduled payments of principal prior to the date that is ninety one (91) days following the Latest Maturity Date of the Term Loans being refinanced or replaced hereunder;

(iii)      such Specified Term Refinancing Debt shall have pricing (including interest, fees and premiums), optional prepayment and redemption terms as may be agreed to by the Borrower and the lenders party thereto; provided that no Specified Term Refinancing Debt shall be voluntarily or mandatorily prepaid prior to repayment in full of the then existing Credit Facilities, unless accompanied by at least a ratable payment of the then existing Credit Facilities (or, if junior in right of payment or as to security, on a junior basis with respect to the then existing Credit Facilities);

(iv)      if any such Specified Term Refinancing Debt is secured, it shall not be secured by any assets other than the Collateral;

(v)      if any such Specified Term Refinancing Debt is guaranteed, it shall not be guaranteed by any Person other than the Guarantors;

(vi)      Specified Term Refinancing Debt that is secured on a pari passu basis to the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata

#90400391v30

basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans;

(vii)    the other terms and conditions (excluding those referenced in <u>clauses (i)</u> through <u>(vi)</u> above) of such Specified Term Refinancing Debt that are not substantially identical to the corresponding terms applicable to the then-existing Term Loans shall either (x) reflect market terms at the time of incurrence of such Specified Term Refinancing Debt (as reasonably determined by the Borrower) or (y) not be materially more favorable (taken as a whole) to the lenders providing such Specified Term Refinancing Debt (except for materially more favorable terms (i) reasonably satisfactory to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility (to the extent not refinanced), or (iii) applicable only to periods after the Latest Maturity Date existing at the time of such refinancing or replacement);

(viii)    the aggregate principal amount of any Specified Term Refinancing Debt shall not exceed the aggregate principal amount of indebtedness and commitments being refinanced or replaced therewith, plus interest, premiums, fees and expenses;

(ix)    the proceeds of such Specified Term Refinancing Debt shall be applied, substantially concurrently with the incurrence thereof, to the prepayment of outstanding Term Loans being so refinanced, in each case pursuant to <u>Section 2.05(b)</u>; and

(x)    no Lender shall be obligated to provide all or any portion of any such Specified Term Refinancing Debt and the determination to provide such Specified Term Refinancing Debt shall be within the sole and absolute discretion of such Lender.

(b)    The Borrower shall make any request for Specified Term Refinancing Debt pursuant to a written notice to the Administrative Agent specifying in reasonable detail the proposed terms thereof.  To achieve the full amount of a requested issuance of Specified Term Refinancing Debt, and subject to the approval of the Administrative Agent to the extent the consent of the Administrative Agent would be required under <u>Section 11.07</u> for an assignment of Term Loans to such financial institution, the Borrower may invite additional Eligible Assignees to become Lenders in respect of such Specified Term Refinancing Debt pursuant to a joinder agreement in form and substance satisfactory to the Administrative Agent.  For the avoidance of doubt, any Affiliated Lender that becomes a Lender in respect of any Specified Term Refinancing Debt and the Term Loans, if any, comprising all or a part of such Specified Term Refinancing Debt, provided by such Affiliated Lender shall be subject to the limitations on assignments to Affiliated Lenders set forth in <u>Section 11.07(i)</u>.

(c)    Each class of Specified Term Refinancing Debt incurred under this <u>Section 2.17</u> shall be in an aggregate principal amount that is (x) not less than $5,000,000 (or such lesser amount as the Administrative Agent may agree) and (y) an integral multiple of $1,000,000 (or such lesser amount as the Administrative Agent may agree) in excess thereof.

(d)    The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Specified Term Refinancing Debt incurred pursuant thereto (including the addition of such Specified Term Refinancing Debt as separate "Credit Facilities" hereunder and treated in a manner consistent with (or less favorable than) the Credit Facilities being refinanced, including, without limitation, for purposes of prepayments and voting).  Any Refinancing Amendment may, without the consent of any Person other than the Borrower, the Administrative Agent and the Lenders providing such Specified Term Refinancing Debt, effect such

**Debtors' Exhibit No. 12**
**Page 71 of 354**

amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.17 (including the establishment of new tranches or subtranches of debt hereunder).

(e)     This Section 2.17 shall supersede any provision of Section 2.13 and/or Section 11.01 to the contrary.

Section 2.18     Extension of Loans.

(a)     The Borrower may, by written notice to the Administrative Agent from time to time, request an extension (each, an "Extension") of the maturity date of any Class of Loans and Commitments to the extended maturity date specified in such notice.  Such notice shall (i) set forth the amount of the applicable Class of Term Loans to which the Extension will apply (which shall be in a minimum amount of $10,000,000 and minimum increments of $1,000,000 above such amount), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten Business Days nor more than sixty days after the date of such Extension notice (or such longer or shorter periods as the Administrative Agent shall agree in its sole discretion)) and (iii) identify the relevant Class of Term Loans to which such Extension relates.  Each Lender of the applicable Class shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Borrower.  If the aggregate principal amount of Term Loans in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans subject to the Extension Offer as set forth in the Extension notice, then the Term Loans of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts with respect to which such Lenders have accepted such Extension Offer.  If the aggregate principal amount of Term Loans in respect of which Lenders shall have accepted the relevant Extension Offer is less than the maximum aggregate principal amount of Term Loans subject to the Extension Offer as set forth in the Extension notice, then the Term Loans of Lenders of the applicable Class shall be extended up to the amounts to which the Lenders accepting such Extension Offer shall have committed.

(b)     The following shall be conditions precedent to the effectiveness of any Extension:

(i)     no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension,

(ii)     the representations and warranties set forth in ARTICLE V and in each other Loan Document shall be deemed to be made and shall be true and correct in all material respects on and as of the effective date of such Extension provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date,

(iii)     the terms of such Extended Term Loans shall comply with Section 2.18(c); and

(iv)     no Lender shall be obligated to provide all or any portion of any such Extension and the determination to provide such Extension shall be within the sole and absolute discretion of such Lender.

67

Debtors' Exhibit No. 12
Page 72 of 354

(c)      The terms of each Extension shall be determined by the Borrower and the applicable extending Lenders and set forth in an Extension Amendment; provided:

(i)      the final maturity date of any Extended Term Loan shall be no earlier than the Latest Maturity Date for the Term Loan Facility;

(ii)      the average weighted life to maturity of the Extended Term Loans shall be no shorter than the remaining average weighted life to maturity of the existing Term Loans;

(iii)      the Extended Term Loans will rank pari passu in right of payment and with respect to security with the existing Term Loans and the borrower and guarantors of the Extended Term Loans shall be the same as the Borrower and Guarantors with respect to the existing Term Loans;

(iv)      the interest rate margin, rate floors, fees, original issue discount and premium applicable to any Extended Term Loans shall be determined by the Borrower and the applicable extending Lenders;

(v)      the Extended Term Loans may participate on a pro rata or less than pro rata (but not greater than pro rata) basis in voluntary or mandatory prepayments with the other Term Loans; and

(vi)      the terms of the Extended Term Loans shall be substantially identical to the terms set forth in this Agreement (except as set forth in clauses (i) through (v) above), except for such terms as apply only after the Latest Maturity Date of the Loans which are not extended).

(d)      In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension.  Any Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension, including any amendments necessary to establish Extended Term Loans as a new Class or tranche of Term Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches), in each case on terms consistent with this section.

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)      Except as required by applicable Laws, any and all payments by a Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all Taxes.

If a Loan Party, or its applicable agent, shall be required by any Law to deduct (under applicable Laws, as determined in the good faith discretion of the applicable withholding agent) any Taxes from or

#90400391v30

Debtors' Exhibit No. 12
Page 73 of 354

in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) with respect to Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings on account of Indemnified Taxes that are applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Loan Party (or withholding agent if applicable) shall make such deductions or withholdings, (iii) the applicable Loan Party (or withholding agent if applicable) shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Borrower shall furnish to the Administrative Agent for its account or for the account of any other Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof, or in the event that the same is not available using commercially reasonable business efforts, such other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)     In addition, the Borrower agrees to pay any and all present or future stamp, fee, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07(a)) (all such non-excluded taxes, charges, duties, debits and levies described in this Section 3.01(b) being hereinafter referred to as "Other Taxes").

(c)     The Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any Governmental Authority on amounts payable and paid under this Section 3.01) payable or paid by such Agent and such Lender under any Loan Document or otherwise arising in connection with any Loan and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made in accordance with Section 3.06 hereof.  For the avoidance of doubt, the Borrower shall not be required to indemnify any Lender or Agent under this Section 3.01(c) with respect to any Taxes that have been compensated for by the payment of any additional amounts pursuant to Section 3.01(a) or (b).

(d)     If any Lender or Agent determines, in its reasonable discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall remit such refund as soon as practicable after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund) to the Borrower, net of all reasonable out-of-pocket expenses of the relevant Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority); provided that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential).

69

**Debtors' Exhibit No. 12**
**Page 74 of 354**

Notwithstanding anything to the contrary in this paragraph (d), in no event will any Lender or Agent be required to pay any amount to the Borrower pursuant to this paragraph (d) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid.  Subject to Section 3.01(e) below, nothing herein contained shall oblige any Lender or Agent to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof (or any other information relating to its Taxes that it deems confidential) or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a), 3.01(b) or 3.01(c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan affected by such event; provided that (i) such designation would eliminate or reduce amounts payable pursuant to Section 3.01(a), 3.01(b) or 3.01(c), as the case may be, and (ii) such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no economic, legal or regulatory disadvantage; and provided further that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or 3.01(c).  The Borrower agrees to pay all reasonable out-of-pocket expenses incurred by any Lender or Agent in connection with any such designation in accordance with Section 11.04 hereof.

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f) (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to

70

#90400391v30

time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

> (1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

> (2)      executed copies of Internal Revenue Service Form W-8ECI;

> (3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable; or

> (4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

#90400391v30

Debtors' Exhibit No. 12
Page 76 of 354

(D)      such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for any Taxes imposed on or with respect to any payment made by the Borrower under any Loan Document attributable to such Lender (but only to the extent that the Borrower, Parent or any Subsidiary Guarantor has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower, Parent or any Subsidiary Guarantor to do so). Each Lender shall severally indemnify the Administrative Agent within 10 days after demand therefor, for (i) any taxes, including interest, additions to tax or penalties applicable thereto, attributable to such Lender's failure to comply with the provisions of Section 11.07(e) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes, taxes or Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

Section 3.02      Illegality.    If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority that is a court, statutory board or commission has asserted that it is unlawful, for any Lender or its Applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, in respect of Eurodollar Rate Loans, (A) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist, (B) upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans, (C) upon any such conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05. Each Lender agrees to designate a different Applicable Lending Office if such designation will avoid the need for any such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

#90400391v30

Section 3.03    <u>Inability to Determine Rates</u>.  If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or that the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and the Interest Period of such Eurodollar Rate Loan, such Lenders shall provide a notice to the Administrative Agent to such effect, and, upon receipt of such notices, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans</u>

(a)    If any Lender reasonably determines that as a result of any Change in Law that (x) imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Eurodollar Rate) or (y) imposes on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Rate Loans made by any Lender and with which such Lender is required to comply, in each case, after the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loan (other than a Base Rate Loan), or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this <u>Section 3.04</u> any such increased costs or reduction in amount resulting from Indemnified Taxes, Connection Income Taxes or Excluded Taxes), then, in accordance with <u>Section 3.06</u> hereof, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  At any time when any Eurodollar Rate Loan is affected by the circumstances described in this <u>Section 3.04(a)</u>, the Borrower may either (i) if the affected Eurodollar Rate Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower receives any such demand from such Lender or (ii) if the affected Eurodollar Rate Loan is then outstanding, upon at least three (3) Business Days' notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Rate Loan into a Base Rate Loan, subject to the requirements of <u>Section 3.05</u> to the extent applicable.

(b)    If any Lender determines that any Change in Law regarding liquidity or capital requirements with which such Lender (or its Applicable Lending Office) is required to comply, in each case after the date hereof, would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender to a level below that which such Lender or the corporation controlling such Lender could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of any corporation controlling such Lender with respect to capital adequacy) as a consequence of such Lender's obligations hereunder, in accordance with <u>Section 3.06</u> below, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(c)    Subject to <u>Section 3.06(b)</u>, failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation.

#90400391v30

**Debtors' Exhibit No. 12**
**Page 78 of 354**

(d)      If any Lender requests compensation under this <u>Section 3.04</u>, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; <u>provided</u> that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and <u>provided</u> <u>further</u> that nothing in this <u>Section 3.04(d)</u> shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to <u>Section 3.04(a)</u>, <u>(b)</u> or <u>(c)</u>.

Section 3.05      <u>Funding Losses</u>.  In accordance with <u>Section 3.06</u> hereof, the Borrower shall compensate any Lender for and hold any Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank Eurodollar market or the European interbank market, respectively, for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06      <u>Matters Applicable to All Requests for Compensation</u>.

(a)      Any Agent or Lender claiming compensation under this <u>ARTICLE III</u> shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error (it being understood and agreed that such Agent or such Lender may use any reasonable averaging and attribution methods), and the basis therefor.  The Borrower shall pay the relevant amounts to the relevant Agent or Lender within 30 days following receipt of the certificate described in the immediately preceding sentence.  With respect to any Lender's claim for compensation under <u>Section 3.01</u>, <u>Section 3.02</u>, <u>Section 3.03</u> or <u>Section 3.04</u>, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; <u>provided</u> that if the circumstance giving rise to such claim is retroactive, then such one hundred and eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under <u>Section 3.04</u>, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another, or to convert Base Rate Loans into Eurodollar Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(b)</u> shall be applicable); <u>provided</u> that such suspension shall not affect the right of such Lender to receive the compensation so requested.

#90400391v30

(b)     If the obligation of any Lender to make or continue any Eurodollar Rate Loan from one Interest Period to another, or to convert Base Rate Loans into Eurodollar Rate Loans shall be suspended pursuant to Section 3.06(a) hereof (but excluding Section 3.03), such Lender's Eurodollar Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurodollar Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's Eurodollar Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurodollar Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)     all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurodollar Rate Loans shall remain as Base Rate Loans.

(c)     If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to Eurodollar Rate Loans, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

Section 3.07     Replacement of Lenders under Certain Circumstances.

(a)     If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.04 or requires a Loan Party to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 as a result of any condition described in such Sections or any Lender ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, in its sole discretion and at its sole expense and effort, on prior written notice to the Administrative Agent and such Lender, (A) terminate the Commitments of such Lender and prepay such Lender's outstanding Loans in full at par or (B) replace any such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 11.07(b) (with any assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver or amendment) to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and provided further that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments, (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents and (C) no such assignment shall be made if it conflicts with applicable Laws.  A Lender shall

75

Debtors' Exhibit No. 12
Page 80 of 354

not be required to make any such assignment if, prior thereto, as a result of a waiver by the Required Lenders or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply.

(b)     Any Lender being replaced pursuant to Section 3.07(a) above shall execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement shall be paid in full to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the Borrower shall deliver to the assignee Lender a Note or Notes (or replacement Note or Notes, as the case may be) executed by the Borrower, the assignee Lender shall become a Lender hereunder with respect to the interests assigned, in addition to any other interest it may otherwise hold as a Lender under this Agreement, and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned interest, except with respect to provisions under this Agreement which survive the Termination Date, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Lender being replaced does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within two Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender being replaced, then such Lender being replaced shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender being replaced.

(c)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 11.01 or all the Lenders with respect to a certain Class of the Loans and (iii) the Required Lenders or the Lenders holding a majority in outstanding principal amount of the Loans held by the relevant group of affected Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender". Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior notice to such Lender, to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out this provisions of this Section 3.07.

Section 3.08     Survival. All of the Borrower's obligations under this ARTICLE III shall survive the Termination Date.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01     Conditions of Initial Credit Extension. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the Administrative Agent:

(a)     Loan Documents. The Administrative Agent shall have received of the following Loan Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each executed

#90400391v30

by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

> (i)      this Agreement;

> (ii)     the Collateral Documents;

> (iii)    each Note requested by a Lender, if any;

> (iv)     the Guaranty; and

> (v)      the ABL Intercreditor Agreement.

(b)      <u>Secretary's Certificate and Attachments</u>.  The Administrative Agent shall have received a copy of an originally executed certificate from the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

(i)      <u>Organizational Documents</u>.   Attached thereto is a copy of each Organization Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)     <u>Signature and Incumbency</u>.   Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Loan Documents to which it is a party.

(iii)    <u>Resolutions</u>.   Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and the ABL Loan Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)     <u>Good Standing Certificates</u>.   Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)      <u>Committed Loan Notice; Letter of Direction; Flow of Funds Memorandum</u>.  The Administrative Agent shall have received a fully executed and delivered Committed Loan Notice, no later than (i) 11:00 a.m. on the Closing Date (in the case of Base Rate Loans) or (ii) 1:00 p.m. three (3) Business Days in advance of the Closing Date (in the case of Eurodollar Rate Loans) (or, in each case such shorter period as may be agreed to by the Lead Arrangers), together with a customary direction letter attaching a flow of funds memorandum with respect to the Transactions and any of the other transactions contemplated by the Loan Documents or the ABL Loan Documents to occur as of the Closing Date.

#90400391v30

(d)     <u>Closing Date Certificate and Attachments</u>.  The following shall have occurred (or shall occur concurrently with the making of the Loans on the Closing Date), and the Administrative Agent shall have received an originally executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

(i)     <u>Representations and Warranties</u>. Confirming satisfaction of the condition set forth in <u>Section 4.02(a)</u>.

(ii)     <u>No Default or Event of Default</u>. Confirming satisfaction of the condition set forth in <u>Section 4.02(b)</u>.

(iii)     <u>Material Adverse Effect</u>.  Since December 31, 2016, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iv)     <u>ABL Loan Documents</u>.  The Administrative Agent shall have received copies of each of the material ABL Loan Documents, duly executed by the parties thereto and in form and substance satisfactory to the Lenders, together with all agreements, instruments and other documents delivered in connection therewith as the Administrative Agent shall reasonably request.

(e)     <u>Existing Indebtedness</u>.  On the Closing Date, Parent and its Restricted Subsidiaries shall have:

(i)     <u>Repayment</u>.  Terminated all commitments and repaid in full all of the Indebtedness and other obligations outstanding under the Existing Credit Agreements (other than unasserted contingent obligations).

(ii)     <u>Release of Liens</u>.  (A) Delivered to the Administrative Agent any copies of documents or instruments to be returned, filed or that are otherwise necessary to evidence the release all Liens securing the Indebtedness and other obligations outstanding under the Existing Credit Agreements and (B) taken all other actions necessary or reasonably required by the Collateral Agent to establish the Collateral Agent will have a perfected first priority security interest in the Collateral (subject to Liens permitted under Section 7.01 which by operation of law or contract would have priority over the Liens securing the Obligations).

(iii)     <u>Existing Letters of Credit</u>.  Made arrangements satisfactory to the Administrative Agent with respect to the cancellation of letters of credit outstanding issued under the Existing Credit Agreement or the issuances of Letters of Credit under (and as defined in) the ABL Credit Agreement to support the obligations of Parent and its Restricted Subsidiaries with respect to any letters of credit outstanding issued under the Existing Credit Agreement.

(iv)     <u>Payoff Letters</u>.  Delivered customary payoff letters in respect of each Existing Credit Agreement duly executed by the applicable agents and borrower under, and other applicable parties to, each Existing Credit Agreement.

(f)     <u>Collateral</u>.  The Collateral Agent shall have received:

(i)     <u>Lien Searches</u>.  The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent, of all effective UCC financing statements (or equivalent

78

**Debtors' Exhibit No. 12**
**Page 83 of 354**

filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(ii)     [Reserved].

(iii)     UCC Financing Statements.  Copies of proper financing statements, filed or duly prepared for filing under the UCC in all United States jurisdictions that the Administrative Agent may deem reasonably necessary in order to perfect and protect the Liens created under the Collateral Documents on assets of Parent, the Borrower and each Subsidiary Guarantor that is party to the Collateral Documents, covering the Collateral described therein.

(iv)     Securities.     Certificates, if any, representing the pledged equity accompanied by undated stock or membership interest powers executed in blank and instruments evidencing the pledged debt, as required pursuant to the Pledge Agreement, indorsed in blank (or confirmation in lieu thereof reasonably satisfactory to the Administrative Agent or its counsel that such certificates, powers and instruments have been sent for prompt delivery to the Collateral Agent or its counsel).

(v)     Perfection Certificate.  A completed perfection certificate, executed and delivered by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(g)     Financial Statements.  The Administrative Agent and the Lead Arrangers shall have received (i) an audited consolidated balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries as of and for each of the Fiscal Year ended December 31, 2016 (the "Audited Financial Statements") and (ii) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 (the "Unaudited Financial Statements"); provided that the financial statements described in this clause (g) shall have been prepared in accordance with GAAP consistently applied.

(h)     Opinions of Counsel to Loan Parties.  The Administrative Agent and its counsel shall have received an opinion of Jones Day®, special counsel to the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date.

(i)     [Reserved].

(j)     Fees.  The Borrower shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Lead Arrangers, the Administrative Agent, the Collateral Agent, the Lenders and third party service providers such fees payable to each such Person on the Closing Date to the extent due and invoiced at least two (2) Business Days prior to the Closing Date.

(k)     Solvency.  The Administrative Agent shall have received a copy of the executed Solvency Certificate.

(l)     "Know-Your-Customer", Etc.  The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under any "know-your-customer" Laws or AML Laws in order to allow the Lenders to comply therewith.

#90400391v30

Each Lender and each Agent, by delivering its signature page to this Agreement and, if applicable, funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document, agreement, instrument, certificate or opinion required to be approved by such Lender or such Agent, as the case may be, on the Closing Date.

Section 4.02    Conditions to All Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.17 hereof) is subject to the following conditions precedent:

(a)    the representations and warranties of the Borrower and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension (immediately before and after giving effect to such Credit Extension); provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)    no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom; and

(c)    the Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion or continuation of Loans to the other Type or a continuation of Eurodollar Rate Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.17 hereof) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(a) and Section 4.02(b) have been satisfied on and as of the date of the applicable Credit Extension; provided that, notwithstanding anything in this Section 4.02 to the contrary, any Request for Credit Extension in connection with any Indebtedness incurred under Section 2.16 may be subject to the more limited conditions set forth in paragraphs (b)(i) and (ii) thereof.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each of Parent and the Borrower represents and warrants to the Agents and the Lenders on the Closing Date and on the date of each Credit Extension that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.  Each of the Borrower, the Guarantors and each of the other Restricted Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction) (solely in the case of any such Person other than the Borrower, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (b) has all requisite power and authority to (i) own or lease its assets and carry on its business (except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to the extent such Person is a Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified

#90400391v30

and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (except where such failure could not reasonably be expected to have a Material Adverse Effect), (d) is in compliance with all Laws, orders, writs, injunctions and orders (except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect) and (e) has all requisite governmental licenses, authorizations, consents and approvals, if any, to operate its business as currently conducted (except where the failure to have such licenses, authorizations, consents and approvals could not reasonably be expected to have a Material Adverse Effect).

Section 5.02    Authorization; No Contravention.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) are within such Loan Party's corporate or other organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject (in each case in this clause (ii), except to the extent such conflict, breach, contravention or creation of a Lien could not reasonably be expected to have a Material Adverse Effect), or (iii) violate any applicable Law (except to the extent such violation could not reasonably be expected to have a Material Adverse Effect).

Section 5.03    Governmental Authorization; Other Consents.  Except to the extent that any such failure could not reasonably be expected to result in a Material Adverse Effect, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, any other Loan Document or any ABL Loan Document or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05    No Material Adverse Effect.  Since December 31, 2016, no event, effect, occurrence, fact, condition, change or development has occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.06    Litigation; FCPA.  There is no action, suit, investigation, litigation, proceeding or disputes affecting the Parent or any of its Restricted Subsidiaries or any of their properties, pending or threatened in writing before any Governmental Authority or arbitrator that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

81

Section 5.07     Ownership of Property; Liens; Insurance.

(a)     Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for the Liens and security interest created or permitted under the Loan Documents including, any Liens permitted under Section 7.01.

(b)     The Borrower and each of the other Restricted Subsidiaries has (i) good and legal (or to the extent such real property is located in Texas, indefeasible) title in fee simple to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real property), or (iii) easements or other limited property interests in, all real property used in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Set forth as Schedule 5.07(b) hereto is a complete and accurate list of all real property owned in fee by the Borrower or any of the other Restricted Subsidiaries as of the Closing Date, showing the street address (if applicable), county, state and any other relevant jurisdiction and record owner.

(c)     The Borrower and each of the other Restricted Subsidiaries maintains the insurance required by Section 6.07.

Section 5.08     Creation and Perfection of Security Interests.

(a)     The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a valid, enforceable and, upon the making of the filings and the taking of the actions required under the terms of the Loan Documents, perfected security interest in the Collateral, securing the payment of the Secured Obligations, and having priority over all other Liens on the Collateral except Liens permitted under Section 7.01.

(b)     When the Intellectual Property Security Agreements are properly filed in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, to the extent such filings may perfect such interests, the Liens created by the Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents and Trademarks (each as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Liens permitted under Section 7.01 (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect the Collateral Agent's Lien on registered Patents, Trademarks and Copyrights acquired by the grantors thereof after the Closing Date).

Section 5.09     Environmental Compliance.  Except as could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(a)     The operations and properties of the Parent, the Borrower and each of their respective Subsidiaries comply in all respects with all, and have not violated any, applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all applicable Environmental Permits. The Parent, the Borrower and each of their respective Subsidiaries have no reasonable basis to believe that any such Environmental Permits will be revoked or adversely modified, or will not be timely renewed and complied with, in the ordinary course of business;

#90400391v30

(b)      (i) There are no Environmental Liabilities of the Parent, the Borrower or any of their respective Subsidiaries, and (ii) there are no facts, circumstances or conditions arising out of or relating to the Parent, the Borrower or any of their respective Subsidiaries, their respective operations or their respective currently or formerly owned, leased or operated facilities that would be reasonably likely to give rise to Environmental Liabilities or Environmental Actions against the Parent, the Borrower or any of their respective Subsidiaries or be reasonably likely to require a net increase in the Parent's, Borrower's or their respective Subsidiaries' costs to maintain compliance with applicable Environmental Laws;

(c)      Neither the Parent, the Borrower nor any of their respective Subsidiaries has received any written notice of, nor have they been subject to, any Environmental Action, nor is any Environmental Action pending or, to the knowledge of the Parent or the Borrower, threatened as to the Parent, the Borrower or any of their respective Subsidiaries; and

(d)      There has been no release at, on, to, from or in any property or facility currently or formerly owned, leased, or operated by the Parent, the Borrower or any of their respective Subsidiaries.

Section 5.10    Taxes.  The Parent, the Borrower and each of their Restricted Subsidiaries have (a) timely filed all tax returns and reports required to be filed (taking into account extensions of time to file), and (b) timely paid all Taxes, shown on such returns and all other amounts of federal, provincial, state, municipal, foreign and other Taxes imposed upon them or their properties, income or assets otherwise due and payable, in each case except (i) with respect to amounts which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, if applicable, or (ii) where the failure to file or pay could not reasonably be expected to have a Material Adverse Effect. No material written claim has been asserted with respect to any Taxes, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11    Compliance with ERISA.

(a)      Each Plan is in material compliance with the applicable provisions of ERISA, the Code and other federal or state Laws; and

(b)      (i) no ERISA Event has occurred prior to the date on which this representation is made that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect and (ii) none of the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.12    Labor Matters.  There are no strikes pending or threatened against the Borrower or any of the other Restricted Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Except as could not reasonably be expected to have a Material Adverse Effect, (i) the hours worked and payments made to employees of the Borrower or any of the other Restricted Subsidiaries have not been in violation in any respect of the Fair Labor Standards Act or any other applicable law dealing with such matters and (ii) all payments due from the Borrower or any of the other Restricted Subsidiaries or for which any claim may be made against the Borrower or any of the other Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Restricted Subsidiary to the extent required by GAAP.

#90400391v30

Section 5.13    Subsidiaries; Equity Interests.  As of the Closing Date, none of Parent or any of its Restricted Subsidiaries has any Subsidiaries other than those specifically disclosed on Schedule 5.13, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, and, if applicable, are fully paid and non-assessable and are owned by the Parent or a Restricted Subsidiary (as applicable) free and clear of all Liens except those permitted under Section 7.01.  As of the Closing Date, Schedule 5.13 (a) sets forth the name and jurisdiction of organization of each Subsidiary of Parent and each of their respective Subsidiaries and (b) sets forth the ownership interest of Parent and its Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership.

Section 5.14    Margin Regulations; Investment Company Act; PATRIOT Act.

(a)    None of Parent or any of its Restricted Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U issued by the FRB.

(b)    None of Parent or any of its Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)    None of Parent or any of its Restricted Subsidiaries is in violation in any material respect of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the PATRIOT Act and the use of proceeds of the Loans will not violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

Section 5.15    Disclosure; Financial Statements.

(a)    As of the Closing Date, (i) no report, financial statement, certificate or other written information furnished by or on behalf of Parent or any of its Restricted Subsidiaries to any Lead Arranger, Agent or Lender (other than projections and other forward looking information and information of a general economic or general industry nature) in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when furnished, and when taken as a whole (including all supplements thereto), contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates thereto from time to time) and (ii) the projected financial information delivered by or on behalf of the Borrower or any of the other Restricted Subsidiaries to any Lead Arranger, Agent or Lender prior to the Closing Date was prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time such projected financial information were so delivered, it being understood that such financial projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and the other Restricted Subsidiaries, that no assurance can be given that any particular financial projection or the financial projections taken as a whole will be realized and that actual results during the period or periods covered by any such financial projections may differ significantly from the projected results and such differences may be material.

84

(b)     The Audited Financial Statements and the Unaudited Financial Statements were prepared in conformity with GAAP (except as may be indicated in the notes thereto) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of the Unaudited Financial Statements, to changes resulting from audit and normal year-end adjustments.

Section 5.16     Intellectual Property.  Each Loan Party and each of the Restricted Subsidiaries owns or has a valid and enforceable right to use, any and all intellectual property and similar proprietary rights throughout the world, including any and all trademarks (including the associated goodwill), service marks (including the associated goodwill), trade names, domain names, copyrights, patents, licenses, know-how (including trade secrets and other patented and/or unpatentable proprietary or confidential information, systems or procedures), software, design rights, technology and all registrations and applications for registration of any of the foregoing and all goodwill associated with any of the foregoing (collectively, "Intellectual Property") that are used or held for use in, or otherwise necessary for, the operation of their respective business as currently conducted and, to the knowledge of Parent and the Borrower, the use of such Intellectual Property by such Loan Party or Restricted Subsidiary does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, any Intellectual Property held by any other Person, except, in each case, for such infringement, misappropriation or other violations, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Parent and the Borrower, the respective business of any Loan Party or any of its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property held by any Person except for such infringement, misappropriation or other violations, which either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any Intellectual Property is filed and presently pending or, to the knowledge of the Parent or the Borrower, presently threatened in writing against any Loan Party or any of its Subsidiaries, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.17     Solvency.  As of the Closing Date, after giving effect to the consummation of the Transactions, Parent and its Restricted Subsidiaries are, on a consolidated basis, Solvent.

Section 5.18     AML Laws; Anti-Corruption Laws and Sanctions.

(a)     None of the Borrower, any Guarantor, any Subsidiary or any of their respective directors, officers or, to the Borrower's knowledge, employees, agents or Affiliates is: (i) a Sanctioned Person, (ii) has engaged in the past five (5) years or intends to engage in the future in any dealings or transactions with, involving or for the benefit of, any Sanctioned Person, (iii) has taken or will take any action that would constitute or give rise to a violation of any AML Laws, Anti-Corruption Laws, or Sanctions or (iv) will directly or indirectly use any part of any proceeds of the Loans or lend, contribute, or otherwise make available such proceeds (A) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law or (B) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

#90400391v30

(b)     The Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Borrower and its Subsidiaries, are in compliance with applicable Anti-Corruption Laws, AML Laws, and Sanctions in all material respects.

Section 5.19     Status as Senior Indebtedness.   The Obligations constitute (i) "First Lien Obligations" under and as defined in the ABL Intercreditor Agreement and (ii) "senior indebtedness" under and as defined in any documentation governing any Subordinated Indebtedness.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Until the Termination Date, each of Parent and the Borrower shall, and shall cause each other Restricted Subsidiary to:

Section 6.01     Financial Statements.   Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)     As soon as available, but in any event within (i) for the Fiscal Year of the Borrower ended December 31, 2017, one-hundred-fifty (150) days after the end of such Fiscal Year and (ii) for each Fiscal Year of the Borrower ended thereafter, ninety (90) days after the end of such Fiscal Year, a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP and audited and accompanied by a (A) report and opinion of Cohen & Co. or any independent registered public accounting firm of nationally recognized standing (including, but not limited to, any of the "big 4" national firms) (or another accounting firm reasonably satisfactory to the Administrative Agent), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, (other than with regard to the occurrence of the Maturity Date in respect of any Credit Facility or the ABL Facility in the 12 month period following the date of the relevant auditor's report) and (B) (i) a comparison against the figures for the previous Fiscal Year and (ii) commencing after the delivery of the first forecast under Section 6.01(b) below, a comparison of actual figures against the forecast for such Fiscal Year, all in reasonable detail.

(b)     As soon as available, but in any event, within, (i) for the fiscal quarters ending March 31, 2018, sixty (60) days after the end of each such fiscal quarter and (ii) for each applicable fiscal quarter ending thereafter, forty-five (45) days after the end of each of the first three (3) fiscal quarters of each Fiscal Year of the Borrower, a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such fiscal quarter, and the related (A) consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and (B) consolidated statements of cash flows for the portion of the Fiscal Year then ended and, in the case of each of clauses (A) and (B) setting forth in each case (x) in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year and (y) "segment"-level information with respect to revenues and gross margins.

(c)     Annual Forecasts and Budget; "Flash Reports".   As soon as available and in any event within (x) ninety (90) days after the end of each Fiscal Year, an annual budget prepared by management of Parent, consisting of condensed income statements on an annual basis for the Fiscal Year following the most recently ended Fiscal Year and showing financial projections for each fiscal quarter in the Fiscal Year covered thereby and (y) forty-five (45) days after the end of each Fiscal Year, "flash

#90400391v30

reports" relating to revenue, Consolidated Adjusted EBITDA and liquidity of the Borrower and the other Restricted Subsidiaries with respect to the fourth fiscal quarter of such Fiscal Year.

(d)   Telephonic Meetings.  The Borrower shall, following the delivery of the financial statements referred to in Section 6.01(a) and (b), as applicable, at such date and time as reasonably agreed by the Borrower and the Administrative Agent, schedule one telephonic conference call per applicable period specified in Section 6.01(a) and Section 6.01(b) (but in no event more frequently than once per fiscal quarter) with directors and officers of the Borrower reasonably requested by the Administrative Agent to attend (which may include the chief executive officer, the chief financial officer and the president of the Borrower) to discuss the contents of the relevant reports.

Section 6.02   Certificates; Reports; Other Information.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)   upon delivery of the financial statements referred to in Section 6.01(a) and (b) a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower which Compliance Certificate shall, among other things, set forth in reasonable detail satisfactory to the Administrative Agent calculations (including a reasonably detailed calculation of Consolidated Adjusted EBITDA) demonstrating compliance with the Financial Maintenance Covenant and, together with each Compliance Certificate delivered in connection with the financial statements referred to in Section 6.01(a) and (b), a customary management discussion and analysis with respect to the financial statements accompanying such Compliance Certificate;

(b)   promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)   prompt written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's type of organization, (iii) in any Loan Party's jurisdiction of organization and (iv) to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, in any Loan Party's organizational identification number; and

(d)   promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents or other information, or provides a link thereto at the website address listed in Section 11.02, (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (iii) on which such documents are available on the website of the SEC at http:/www.sec.gov; provided that the Borrower shall notify (which notice may be delivered by facsimile or electronic mail as provided in Section 11.02) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft

#90400391v30

copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Section 6.03   <u>Notice Requirements; Other Information</u>. Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of each of the following events or circumstances:

(a)   the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)   to the extent permissible by applicable requirements of Law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (i) against any Loan Party, that would reasonably be expected to result in a Material Adverse Effect and (ii) with respect to any Loan Document, in each case, together with the details thereof and any action taken or proposed to be taken with respect thereto;

(c)   the occurrence of any ERISA Event or ERISA Events that has had or could reasonably be expected to have a Material Adverse Effect;

(d)   the occurrence of any other matter that has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(e)   damage to, or condemnation of, a material portion of the Collateral, which notice shall specify the nature of such condition, event or change and what action, if any, Parent or the Borrower has taken, is taking or proposes to take with respect thereto.

Section 6.04   <u>Environmental Matters</u>.   Except to the extent that failure to take the actions described in this <u>Section 6.04</u> could not reasonably be expected to have a Material Adverse Effect:

(a)   comply and cause each of the Subsidiaries to comply, and take commercially reasonable efforts to cause all of their lessees to comply, with all applicable Environmental Laws and Environmental Permits, which compliance includes obtaining and renewing, and causing each of the Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for their operations and properties;

(b)   conduct, cause each of the Subsidiaries to conduct, and take commercially reasonable efforts to cause any other Persons occupying or leasing their facilities or properties to conduct, any Response required by Environmental Law related to their facilities or properties, or at any location which the Parent, the Borrower or any of their respective Subsidiaries conduct operations or business by contract or otherwise; <u>provided</u>, <u>however</u>, that neither the Parent, the Borrower nor any of their respective Subsidiaries shall be required to undertake any such Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances; and

(c)   promptly, and in any event within ten (10) Business Days of, either (i) receipt by the Parent, the Borrower or any of their respective Subsidiaries of any notice of an Environmental Action related to such Persons, or (ii) the occurrence of any Release that would reasonably be likely to result in the Parent, the Borrower or any of their respective Subsidiaries incurring Environmental Liability or being required to conduct a Response, provide written notice of such receipt or Release to the

88

Debtors' Exhibit No. 12
Page 93 of 354

Administrative Agent, along with a description of actions proposed to be taken by the Parent, the Borrower or any of their respective Subsidiaries to address the Environmental Action or Release.

Section 6.05   <u>Maintenance of Existence</u>.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in each case, (i) other than with respect to any Person (other than the Borrower), to the extent the board of directors (or equivalent governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and the other Restricted Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to the Borrower, any of the other Restricted Subsidiaries or the Lenders in any material respect, (ii) pursuant to a transaction permitted by <u>Section 7.04</u> or <u>Section 7.05</u> or (iii) with respect to any such Person (other than the Borrower), except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect.

Section 6.06   <u>Maintenance of Properties</u>.  Maintain, preserve and protect all of its material tangible and intangible properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof, in each case except where failure to do so could not reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

Section 6.07   <u>Maintenance of Insurance</u>.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the other Restricted Subsidiaries) as are customarily carried by Persons engaged in similar businesses and owning or leasing similar properties in the same general areas in which the Borrower or such Restricted Subsidiary operates.  Each policy of property or general liability insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii)  in the case of each casualty insurance policy (excluding any business interruption or personal injury insurance policy), contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and, provide for prior written notice to the Collateral Agent of any modification or cancellation of such policy or the failure to pay any premiums thereunder.  In addition to the foregoing, if any improvements located upon any Mortgaged Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), then the applicable Loan Party shall maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to such Act.

Section 6.08   <u>Compliance with Laws</u>.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09   <u>Books and Records</u>.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and permit the preparation of financial statements in conformity in all material respects with GAAP shall be made of all material financial

#90400391v30

transactions and matters involving the assets and business of the Borrower or any of the other Restricted Subsidiaries, as the case may be.

Section 6.10    Inspection Rights.  Permit representatives and independent contractors, in each case designated by the Administrative Agent or any applicable Lender, to visit and inspect any properties of the Borrower and the other Restricted Subsidiaries and in connection with such visit, to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, in each case, at such reasonable times during normal business hours and as often as may be reasonably requested, upon reasonable advance notice to the Borrower; provided, however, that excluding any such visits and inspections during the continuance of an Event of Default, (i) such visits and inspections shall be coordinated through and by the Administrative Agent and (ii) the Administrative Agent and Lenders, taken as a whole, shall not exercise such rights more than one (1) time during any calendar year (it being understood that such annual visit or inspection shall be at the Borrower's expense); provided further that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower a reasonable opportunity to participate in any discussions with the Borrower's independent public accountants.  None of the Borrower nor any of the other Restricted Subsidiaries shall be required to disclose to the Administrative Agent or any Lender (or any authorized representative or independent contractor of any of them) any information (w) that is prohibited by Law to be disclosed, (x) that is subject to attorney-client or similar privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure or similar agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10 or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers; provided that, in the event the Borrower or any Restricted Subsidiary thereof withholds information from the Administrative Agent or the Lenders in reliance on this sentence, the Borrower shall provide (to the extent possible without violation of such Law, attorney-client or similar privilege, attorney work product privilege or non-disclosure or similar agreement) to provide notice to the Administrative Agent or such applicable Lender that such information is being withheld and shall use commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable Law or non-disclosure or similar agreement or risk waiver of such attorney-client or similar privilege or attorney work product privilege.

Section 6.11    Covenant to Guarantee Obligations and Give Security.

(a)    Upon (x) the formation or Acquisition by any Loan Party of any new direct or indirect Wholly-owned Domestic Subsidiary which is not an Excluded Subsidiary, including pursuant to a Permitted Acquisition or (y) any Excluded Subsidiary ceasing to constitute an Excluded Subsidiary, then the Borrower shall, within sixty (60) days of the date of such formation, Acquisition or cessation (or such later date as may be agreed by the Administrative Agent):

(i)    cause such Domestic Subsidiary to duly execute and deliver to the Administrative Agent a supplement to the Guarantee in substantially the form attached as Exhibit A thereto (a "Guaranty Supplement"),

(ii)    cause such Domestic Subsidiary to (i) duly execute and deliver to the Administrative Agent (A) a supplement (x) to the Security Agreement in substantially the form attached as Annex I to the Security Agreement (a "Security Agreement Supplement"), (y) to the Pledge Agreement and (z) to the ABL Intercreditor Agreement in substantially the form attached as Exhibit C to the ABL Intercreditor Agreement and (B) if such Domestic Subsidiary owns

#90400391v30

Debtors' Exhibit No. 12
Page 95 of 354

registrations of or applications for U.S. Patents, Trademarks and/or Copyrights (each as defined in the Security Agreement) that constitute Collateral, an Intellectual Property Security Agreement, and (ii) deliver completed Uniform Commercial Code financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request; it being understood and agreed that with respect to any Collateral owned by any Restricted Subsidiary that becomes a Loan Party in accordance with this <u>Section 6.11</u>, for purposes of the requirements set forth in the Pledge Agreement and the Security Agreement, such Collateral shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Loan Party under this <u>Section 6.11</u>,

(iii)    cause such Domestic Subsidiary to deliver to the Administrative Agent, upon the reasonable request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion in customary form, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to the matters contained in <u>clauses (i)</u> and <u>(ii)</u> above and such other matters as the Administrative Agent may reasonably request,

(iv)    cause such Domestic Subsidiary to deliver to the Administrative Agent the secretary's certificates and attachments which would have been required to be delivered to the Administrative Agent pursuant to Section 4.01(b) if such Domestic Subsidiary had been a Guarantor on the Closing Date, and

(v)    cause such Domestic Subsidiary (and the parent of each such Domestic Subsidiary that is a Loan Party) to deliver any and all certificates representing Equity Interests (to the extent certificated) and promissory notes that are required to be pledged pursuant to the Collateral Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank.

(b)    After the Closing Date, promptly within ninety (90) days (or such later date as may be agreed by the Administrative Agent) after the acquisition of any Material Owned Property by any Loan Party, satisfy the Mortgage Requirement; it being understood and agreed that, with respect to any Material Owned Property owned by any Domestic Subsidiary at the time such Domestic Subsidiary is required to become a Loan Party under this <u>Section 6.11</u>, such Material Owned Property shall be deemed to have been acquired by such Domestic Subsidiary on the first day of the time period within which such Domestic Subsidiary is required to become a Loan Party under this <u>Section 6.11</u>.

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)    the Loan Documents shall not require the creation or perfection of pledges of or security interests in, or the delivery of particular documents with respect to, particular assets if and for so long as the Administrative Agent and the Borrower determine in their reasonable discretion that the burden or cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance in respect of such assets shall excessive in view of the benefit of the security afforded thereby;

(ii)    [reserved];

(iii)    notwithstanding anything to the contrary contained herein, the Loan Parties shall not be required to (a) grant a security interest in any asset or perfect a security interest in any asset to the extent (and for the duration) that the relevant assets constitute

91

Debtors' Exhibit No. 12
Page 96 of 354

Excluded Assets, (b) other than to the extent required pursuant to any ABL Loan Document, seek any landlord waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (c) perfect a security interest in vehicles and any other assets subject to a certificate of title and letter of credit rights to the extent not perfected by the filing of a UCC-1 financing statement and (d) no action shall be required in order to create or perfect a security interest in any asset located outside of the United States; it being understood and agreed that no foreign law pledge and/or security agreements shall be required; and

(iv)    the Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the time as set forth therein for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in its discretion, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Section 6.12    <u>Further Assurances</u>.  Promptly upon request by the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, Mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent, may reasonably require from time to time in order to (x) to the fullest extent permitted by applicable Law, subject any Loan Party's properties, assets, rights or interests that constitute Collateral to the Liens now or hereafter intended to be covered by any of the Collateral Documents and (y) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder (subject to Liens permitted by <u>Section 7.01</u>) and cause each of its Restricted Subsidiaries to do so, but in each case, subject to the limitations set forth herein and in the other Loan Documents.

Section 6.13    <u>Taxes</u>.  Pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a tax Lien upon any properties of Parent or any of its Restricted Subsidiaries not otherwise permitted under this Agreement; <u>provided</u> that none of Parent or any of its Restricted Subsidiaries shall be required to pay any such Tax,  with respect to amounts which are being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

Section 6.14    <u>Ratings</u>.  Use commercially reasonable efforts to maintain at all times (a) public corporate family ratings with respect to the Borrower from Moody's and public corporate credit ratings with respect to the Borrower from S&P and (b) public facility ratings with respect to the Credit Facilities from each of S&P and Moody's (but, in each case, not any specific ratings).

Section 6.15    <u>Use of Proceeds</u>.  The proceeds of the Term Loans shall be applied by the Borrower on the Closing Date, first, to repay and discharge in full the Indebtedness under the Existing Credit Agreements and certain other existing Indebtedness and, second, to consummate the other Transactions and to pay fees and expenses relating thereto including, without limitation, the Transaction Expenses.  Following the Closing Date, the proceeds of the Term Loans in excess of the amount necessary to prepay in full the Existing Credit Agreements may be applied by the Borrower to other permitted transactions, to finance the working capital needs of Parent and its Subsidiaries and for general corporate purposes.  The proceeds of the Incremental Term Loans shall be applied by the Borrower for

#90400391v30

use as agreed by the Borrower and the lenders providing such Incremental Term Loans to the extent not otherwise prohibited under the Loan Documents.

Section 6.16    Lien Enhancements.  If any holder of the ABL Loans or any agent thereof receives any guaranty from any Person, or is granted additional collateral to secure such ABL Loans after the Closing Date, the Loan Parties shall cause the same to be granted to the Collateral Agent for the benefit of the Secured Parties, to the extent required by the ABL Intercreditor Agreement.

Section 6.17    Post-Closing Covenants.  Except as otherwise agreed by the Administrative Agent in its sole discretion, the Borrower shall, and shall cause each of the other Loan Parties to, deliver each of the documents, instruments and agreements and take each of the actions set forth on Schedule 6.17 within the time periods set forth therein (or such longer time periods as determined by the Administrative Agent in its discretion).

## ARTICLE VII

## NEGATIVE COVENANTS

(i) Until the Termination Date, in the case of each provision of this ARTICLE VII, the Borrower shall not, nor shall it permit any of the other Restricted Subsidiaries to, directly or indirectly:

Section 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens pursuant to any Loan Document;

(b)     Liens existing on the date hereof and listed on Schedule 7.01(b);

(c)     Liens for Taxes (i) not yet due and payable or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts (i) which are not yet overdue, (ii) which are overdue and which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (iii) the failure to make payment of which could not reasonably be expected to have a Material Adverse Effect;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation (including obligations in respect of letters of credit or bank guarantees in respect thereof), (ii) pledges and deposits in the ordinary course of business securing (A) liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of the other Restricted Subsidiaries or (B) leases or licenses of property otherwise permitted by this Agreement (and, in each case, obligations in respect of letters of credit or bank guarantees in respect thereof) and (iii) pledges and deposits securing any settlement of litigation;

(f)     Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and

93

Debtors' Exhibit No. 12
Page 98 of 354

appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business (and, in each case, obligations in respect of indemnities, letters of credit or bank guarantees in respect thereof);

(g)      easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects, protrusions and other similar encumbrances and minor title defects, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions and declarations affecting real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness, and which do not in any case or in the aggregate materially and adversely interfere with the ordinary conduct of business of the applicable Person on the affected real property;

(h)      Liens securing Indebtedness permitted under Section 7.03(c); provided that (i) such Liens attach concurrently with or within one hundred and eighty (180) days after the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (iii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition plus the amount of any related interest, premiums, fees and/or expenses and/or other customary amounts; it being understood and agreed that individual financings by any lender may be cross-collateralized to other financings provided by such lender or its affiliates;

(i)      Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the date hereof and pursuant to an Acquisition permitted hereby; provided that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder), and (iii) the Indebtedness secured thereby is permitted under Section 7.03;

(j)      (i) Liens securing obligations of the type described in Section 7.03(i) and (ii) bankers' Liens and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower and/or any other Restricted Subsidiary granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank or banks in respect of cash management and/or operating account arrangements, including those involving pooled and netting arrangements;

(k)      Liens arising from precautionary Uniform Commercial Code financing statement filings;

(l)      Liens securing Indebtedness incurred in reliance on Section 7.03(n), subject to the Required Additional Debt Terms;

(m)      the modification, replacement, renewal or extension of any Lien permitted by clause (b)  or (h) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (C) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations

#90400391v30

secured or benefited by such Liens, if such obligations are Indebtedness, is permitted pursuant to Section 7.03;

(n)      (i) leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to other Persons in the ordinary course of business which do not (x) interfere in any material respect with the business of the Borrower or any of the other Restricted Subsidiaries (taken as a whole) or (y) secure any Indebtedness and (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of their respective Restricted Subsidiaries or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(o)      Liens securing Indebtedness permitted to be assumed or incurred, as applicable, pursuant to Section 7.03(m) and (s) so long as the applicable conditions described in the definition of "Incremental Equivalent Debt" or Section 7.03(s), as the case may be, have been satisfied;

(p)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(q)      Liens on (i) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies, (ii) on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto and (iii) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case securing Indebtedness permitted to be incurred pursuant to Section 7.03;

(r)      [reserved];

(s)      Liens securing judgments and awards for the payment of money not constituting an Event of Default under Section 9.01(h);

(t)      Liens securing any Specified Term Refinancing Debt or Refinancing Facility permitted hereunder;

(u)      Liens not otherwise permitted by this Section 7.01 so long as the aggregate outstanding principal amount of the obligations secured thereby (together with the then outstanding principal amount of obligations secured by all other Liens incurred pursuant to this clause (u)) does not exceed $10,000,000 in the aggregate at any time; provided that any such Liens securing Indebtedness for borrowed money on assets constituting Collateral shall be secured on a junior basis to the Liens securing the Credit Facilities on the Closing Date and shall be subject to an intercreditor agreement reasonably acceptable to the Administrative Agent;

(v)      Liens consisting of any (i) interest or title of a lessor or sub-lessor (or such lessor or sub-lessor's mortgagee or lender) under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject, (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii) or (v) deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any other Restricted Subsidiary in the ordinary course of business of the Borrower or such Restricted Subsidiary to secure the performance of the Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

95

(w)     Liens solely on any cash earnest money deposits made by the Borrower and/or any of the other Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder;

(x)     Liens securing Indebtedness permitted pursuant to Section 7.03(y); provided that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is refinanced other than (A) after acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (C) proceeds and products thereof and (ii) if the Indebtedness being refinanced was subject to intercreditor arrangements, then any Refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements not materially less favorable, taken as a whole, than the intercreditor arrangements governing the Indebtedness that is refinanced or the intercreditor arrangements governing the relevant Refinancing Indebtedness shall be otherwise reasonably acceptable to the Administrative Agent;

(y)     Liens arising out of Sale Leaseback Transactions permitted pursuant to Section 7.05(n);

(z)     Subject to the terms of the ABL Intercreditor Agreement, Liens securing the ABL Loans and other ABL Obligations;

(aa)    Liens disclosed in any Mortgage Policy delivered pursuant to the terms hereof with respect to any Material Owned Property and any replacement, extension or renewal of any such Lien; provided that no such replacement, extension or renewal Lien shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof);

(bb)    Liens on securities that are the subject of repurchase agreements constituting Investments permitted under Section 7.02 arising out of the relevant repurchase transaction;

(cc)    Liens securing obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Section 7.03;

(dd)    Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(ee)    Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of each of clauses (i) and (ii), securing intercompany Indebtedness permitted under Section 7.03;

(ff)    Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(gg)    Liens securing obligations under Swap Contracts in connection with any derivative transaction of the type permitted under Section 7.03(d);

96

**Debtors' Exhibit No. 12**
**Page 101 of 354**

(hh)    (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly- owned Subsidiaries;

(ii)    Liens on cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(jj)    Liens that are customary rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any other Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any other Restricted Subsidiary in the ordinary course of business or (iv) relating to credit card processing arrangements entered into in the ordinary course of business;

(kk)    Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(ll)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to dispose of any property in a Disposition permitted under Section 7.04, in each case, solely to the extent such Investment or Disposition, as applicable, would have been permitted on the date of the creation of such Lien;

(mm)    Liens arising as a result of any Permitted Non-Recourse Factoring Transaction; provided that such Liens encumber solely the Accounts and the Related Assets sold in connection with such Permitted Non-Recourse Factoring Transaction; and

(nn)    Liens arising as a result of any Permitted Inventory Financing; provided that such Liens encumber solely the inventory and the Related Assets sold in connection with such Permitted Inventory Financing.

Section 7.02    Investments.  Make any Investments (directly or indirectly), except:

(a)    Investments by the Borrower or any of the other Restricted Subsidiaries in cash or Cash Equivalents at the time of the relevant Investment;

(b)    loans and advances to Representatives in the ordinary course of the business of Parent or any of its Restricted Subsidiaries (i) in an aggregate principal amount, together with the then-outstanding principal amount of all other loans and advances made pursuant to this clause (b)(i), not to exceed the greater of $2,000,000 and 2.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), or (ii) in connection with the relevant Person's purchase of Equity Interests of Parent or any other Parent Company so long as the proceeds of such loans and/or advances are substantially contemporaneously contributed to the Borrower as consideration for the purchase of such Equity Interests;

97

**Debtors' Exhibit No. 12**
**Page 102 of 354**

(c)        Investments (i) by any Loan Party in any other Loan Party, (ii) by any Restricted Subsidiary that is not a Loan Party in any Loan Party, (iii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party and (iv) by any Loan Party in any Restricted Subsidiary that is not a Loan Party in an aggregate outstanding amount, together with all Investments pursuant to this clause (c)(iv), and the total consideration for all Permitted Acquisitions pursuant to clause (c)(A) of the definition thereof, not to exceed the greater of $20,000,000 and 20.0% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(d)        Investments consisting of (or resulting from) Liens, Indebtedness, fundamental changes, Dispositions, Restricted Payments and/or Restricted Debt Payments permitted or not restricted under Section 7.01 (other than Section 7.01(bb)), Section 7.03 (other than Section 7.03(l) and (u)), Section 7.04 (other than Sections 7.04(a)(ii)(B), (c) and (d)), Section 7.05 (other than Section 7.05(d) and (e)), Section 7.06 (other than Section 7.06(a) and (c)(ix)) and Section 7.09 respectively;

(e)        Investments existing on the date hereof and listed on Schedule 7.02(e) or consisting of any modification, replacement, renewal, reinvestment or extension of any Investment existing on the date hereof; provided that the amount of any Investment permitted pursuant to this Section 7.02(e) shall not be increased from the amount of such Investment on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by this Section 7.02;

(f)        Investments in Swap Contracts permitted under Section 7.03;

(g)        promissory notes and other non-cash consideration (including, without limitation, net exercise and net withholding of equity and equity-based awards) received in connection with Dispositions permitted by Section 7.05;

(h)        Permitted Acquisitions;

(i)        loans and advances of payroll payments or other compensation to present or former Representatives of any Parent Company (to the extent such payments or other compensation relate to services actually provided to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, attributable to the ownership or operations of any Subsidiary of any Parent Company other than the Borrower and/or its Subsidiaries)), the Borrower and/or any Subsidiary, in each case in the ordinary course of business;

(j)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(k)        Investments (i) received (A) in satisfaction or partial satisfaction thereof from financially troubled suppliers and/or account debtors to the extent reasonably necessary in order to prevent or limit loss, (B) in connection with the bankruptcy or reorganization of any Person, (C) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and (D) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes, (ii) in the form of advances made to distributors, suppliers, licensors and licensees in the ordinary course of business or to the extent necessary to maintain the ordinary course of supplies to the Borrower and/or any Restricted Subsidiary, (iii) made in the ordinary course of business consisting of

98

Debtors' Exhibit No. 12
Page 103 of 354

endorsements for collection or deposit and (iv) consisting of customary trade arrangements with customers in the ordinary course of business;

(l)     Investments consisting of the acquisition and/or retention by the Borrower of obligations of one or more current or former Representatives of the Borrower or any of the other Restricted Subsidiaries or any Parent Company in connection with any such Representative's acquisition of Equity Interests of the Borrower or any Parent Company, so long as no cash is paid by the Borrower or any of the other Restricted Subsidiaries to such officers or employees in connection with the acquisition of any such obligations; and

(m)     other Investments in an amount not to exceed (i) $15,000,000 plus (ii) the portion of the Additional Amount Basket on the relevant date of determination that the Borrower elects to apply pursuant to this Section 7.02(m) so long as no Event of Default exists on such date or would result therefrom; provided that any such Investments made pursuant to this clause (m)(ii) funded with all or any portion of the Additional Amount Basket may only be made if at the time of the making of any such Investment, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Payment, does not exceed 3.25:1.00

(n)     Investments to the extent that payment therefor is made solely with Qualified Equity Interests of any Parent Company, in each case, to the extent not resulting in a Change of Control;

(o)     (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Borrower or any other Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 7.02 to the extent that such Investments were not made in contemplation of or in connection with the relevant Acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant Acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement, renewal or extension of any Investment permitted under clause (i) of this Section 7.02(o) so long as no such modification, replacement, renewal or extension thereof increases the amount of such Investment except as otherwise permitted by this Section 7.02;

(p)     (i) Guarantee Obligations in respect of leases (other than Capital Leases) or of other obligations not constituting Indebtedness, in each case, in the ordinary course of business and (ii) Guarantee Obligations constituting Indebtedness to the extent permitted by Section 7.03;

(q)     Investments in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under Section 7.06; provided that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable provision of Section 7.06;

(r)     Investments consisting of advances made to Trico Componentes, S.A. de C.V. in the ordinary course of business for payroll and other ordinary course expenses not to exceed $3,000,000 in any Fiscal Year, when taken together with the principal amount of all other Investments made pursuant to this clause (r) in such Fiscal Year;

(s)     Investments received in connection with the Disposition of assets permitted by Section 7.05;

#90400391v30

(t)        Investments in the Borrower, any Subsidiary and/or any joint venture in connection with intercompany cash management arrangements and related activities consistent with past practice and in the ordinary course of business;

(u)        Investments consisting of the grant of non-exclusive licenses or sublicenses of Intellectual Property pursuant to joint marketing arrangements with other Persons in the ordinary course of business; and

(v)        Investments in an unlimited amount so long as, (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Investments, the Total Leverage Ratio shall not exceed 2.75:1.00 and (ii) no Event of Default shall have occurred or be continuing.

Section 7.03    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

(a)        Indebtedness of the Borrower and the other Loan Parties under (i) the Loan Documents, (ii) any Incremental Term Facilities, (iii) any Specified Term Refinancing Debt and/or (iv) Refinancing Facilities;

(b)        Indebtedness of the Borrower or any Subsidiary Guarantor incurred in respect of any ABL Facility or any, in each case in an aggregate principal amount that does not exceed the "ABL Priority Cap" (as defined in the ABL Intercreditor Agreement); provided that such Indebtedness is secured only by Liens permitted under Section 7.01(z);

(c)        Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (c), the greater of (x) $10,000,000 and (y) 15.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(d)        Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks and not entered into for speculative purposes;

(e)        Indebtedness (but not for borrowed money) in respect of Permitted Non-Recourse Factoring Transactions (i) with respect to Accounts owing from Persons that are not Specified Customers, in an aggregate outstanding amount not to exceed $50,000,000 and (ii) with respect to Accounts owing from Persons that are Specified Customers;

(f)        Indebtedness incurred by any Loan Party or any Restricted Subsidiary of any Loan Party in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits, salary, wages or other compensation or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 Business Days following the incurrence thereof;

100

#90400391v30

(g)      (A) contingent liabilities in respect of any indemnification, adjustment of purchase price, earn-out, non-compete, consulting, deferred compensation and similar obligations of one or more of the Borrower or the other Restricted Subsidiaries incurred in the ordinary course of business or in connection with Acquisitions and Dispositions permitted hereby and (B) letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments issued in support of such liabilities;

(h)      reimbursement, indemnification or similar obligations (including any arising by right of subrogation) of one or more of the Borrower or the other Restricted Subsidiaries in respect of performance, payment, surety, customs, stay, return of money or appeal bonds, performance and completion guaranties or similar instruments, in each case incurred in the ordinary course of business, for the benefit of one or more of the Borrower or the other Restricted Subsidiaries;

(i)      Indebtedness in the ordinary course of business (i) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds and/or (ii) in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts, including Cash Management Obligations and supplier finance or similar programs;

(j)      Indebtedness owed to any Person incurred to finance the premiums with respect to any insurance policy of any Parent Company, or Parent or its Restricted Subsidiaries in the ordinary course of business;

(k)      Indebtedness (but not for borrowed money) in respect of Permitted Inventory Financing in an aggregate outstanding amount not to exceed $50,000,000;

(l)      Indebtedness of (i) any Loan Party to any other Loan Party, (ii) any Non-Loan Party Subsidiary to any Non-Loan Party Subsidiary, (iii) any Loan Party to any Non-Loan Party Subsidiary; provided that any such Indebtedness pursuant to this clause (l)(iii) shall be unsecured and expressly subordinated in right of payment to the Obligations and the ABL Obligations, in each case, on terms reasonably satisfactory to the Administrative Agent or (iv) any Non-Loan Party Subsidiary to any Loan Party; provided that any such Indebtedness pursuant to this clause (l)(iv) shall (x) not exceed the amount of Investments otherwise permitted under Section 7.02 and (y) be evidenced by a promissory note in form and substance reasonably satisfactory to the Administrative Agent which shall have been pledged to the extent required by the Security Agreement;

(m)      Incremental Equivalent Debt;

(n)      additional Indebtedness of any Loan Party in an amount not to exceed the aggregate principal amount of the Ratio Debt Basket at such time, subject to the Required Additional Debt Terms;

(o)      Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties in an aggregate outstanding principal amount not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (o), the greater of (i) $10,000,000 and (ii) 10.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at

#90400391v30

or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(p)     additional Indebtedness in an aggregate outstanding principal amount not to exceed $30,000,000;

(q)     Indebtedness consisting of promissory notes issued by the Borrower and the other Restricted Subsidiaries to current or former Representatives of any Parent Company or Parent or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative) to finance the purchase or redemption of Equity Interests permitted by Section 7.06;

(r)     [reserved];

(s)     Indebtedness of any Loan Party incurred to finance, or assumed in connection with, any Acquisition permitted hereunder after the Closing Date that is secured by a Lien on the Collateral that is pari passu or junior to the Lien securing the Credit Facilities on the Closing Date or is unsecured; provided that after giving effect to such Acquisition as of the last day of the most recently ended Test Period for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable, prior to the date of incurrence thereof, the Borrower could incur $1.00 of additional pari passu, junior or unsecured Indebtedness (as applicable) permitted by clause (n) of this Section (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, availability under clause (n) of this Section shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for then-most recently ended Test Period on or prior to such LCA Test Date for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable)), and provided further, that (i) other than with respect to any Indebtedness assumed by any Loan Party in connection with such Acquisition, the Required Additional Debt Terms shall have been satisfied and (ii) with respect to any assumed Indebtedness, (x) such Indebtedness (A) was not incurred in contemplation of such Acquisition, (B) is secured only by the assets acquired in the applicable Acquisition (including any acquired Equity Interests) and products and proceeds thereof, accessions or additions thereto and improvements thereon and (C) the only obligors with respect to any such assumed Indebtedness shall be those Persons who were obligors of such Indebtedness prior to such Acquisition and (y) both immediately prior and after giving effect to the incurrence of such Indebtedness, no Event of Default shall exist or result therefrom (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, (i) no Event of Default shall exist or would result therefrom as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition);

(t)     Indebtedness of the Borrower and/or any other Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(u)     Guarantee Obligations by the Borrower and/or any other Restricted Subsidiary of Indebtedness or other payment obligations of the Borrower and/or any other Restricted Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.03 or other payment obligations not prohibited by this Agreement; provided that in the case of any Guarantee Obligation by any Loan Party of the payment obligations of any non-Loan Party, the related Investment is permitted under Section 7.02 (other than Section 7.02(d));

102

(v)     Indebtedness of the Borrower and/or any other Restricted Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on <u>Schedule 7.03</u>;

(w)     [reserved];

(x)     Indebtedness of the Borrower and/or any other Restricted Subsidiary consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(y)     the Borrower and the other Restricted Subsidiaries may become and remain liable for any Indebtedness refinancing, refunding or replacing any Indebtedness permitted under <u>clauses (a)(iv)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(m)</u>, <u>(n)</u>, <u>(p)</u>, <u>(s)</u>, <u>(v)</u> and <u>(z)</u> of this <u>Section 7.03</u> ("<u>Refinancing Indebtedness</u>") and any subsequent Refinancing Indebtedness in respect thereof; <u>provided</u> that

(i)     the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this <u>Section 7.03</u> (<u>provided</u> that (1) such additional Indebtedness satisfies the other applicable requirements of this <u>Section 7.03</u> (with additional amounts incurred in reliance on this <u>clause (C)</u> constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of <u>Section 7.01</u>);

(ii)     other than in the case of Refinancing Indebtedness with respect to <u>clauses (c)</u> and <u>(z)</u> of this <u>Section 7.03</u>, (A) such Indebtedness has a final scheduled maturity on or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced;

(iii)     the covenants, events of default, and other terms of such Indebtedness (other than interest rate, payment premiums and redemptions or as otherwise provided in the other clauses of this <u>clause (y)</u>) shall be not materially more favorable (taken as a whole) to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than any covenants or any other provisions applicable only to periods after the Latest Maturity Date);

(iv)     in the case of Refinancing Indebtedness with respect to Indebtedness permitted or originally incurred under <u>clauses (a)(iv)</u>, <u>(b)</u>, <u>(c)</u>, <u>(e)</u>, <u>(m)</u>, <u>(n)</u>, <u>(o)</u>, <u>(p)</u> and <u>(z)</u> of this <u>Section 7.03</u>, the incurrence thereof shall be deemed to be incurred in reliance on the relevant clause noted above and not under this <u>clause (iv)</u>;

(v)     (A) to the extent secured, such Indebtedness (i) is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood

that secured Indebtedness may be refinanced with unsecured Indebtedness) and (ii) is not secured by any Lien which extends to any asset not covered by the Lien securing the Indebtedness that is refinanced, refunded or replaced, and (B) if the Indebtedness being refinanced, refunded or replaced was originally contractually subordinated to the Obligations in right of payment (or the Liens securing such Indebtedness were originally contractually subordinated to the Liens on the Collateral securing the Secured Obligations), such Indebtedness is contractually subordinated to the Obligations in right of payment (or the Liens securing such Indebtedness are subordinated to the Liens on the Collateral securing the Secured Obligations) on terms not materially less favorable (as reasonably determined by the Borrower), taken as a whole;

(vi)      such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to Section 7.03;

(vii)      at the time such Indebtedness is incurred, no Default or Event of Default shall have occurred and be continuing; and

(viii)      any Refinancing Indebtedness that replaces and/or refinances Indebtedness that is pari passu with the Term Loan Facility in right of payment and pari passu with the Lien on the Collateral securing the Term Loan Facility shall share ratably (but not on a greater than pro rata basis) in any mandatory prepayment of the Term Loan Facility unless the Borrower and the lenders in respect of such Refinancing Indebtedness elect lesser payments.

(z)      Indebtedness of the Borrower and/or any other Restricted Subsidiary incurred in connection with Sale Leaseback Transactions permitted pursuant to Section 7.05(n)(ii);

(aa)      [reserved];

(bb)      Indebtedness of the Borrower and/or any other Restricted Subsidiary supported by any Letter of Credit (as defined in the ABL Credit Agreement) the face amount of which is at least equal to the principal (or equivalent) amount of such Indebtedness;

(cc)      without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrower and/or any other Restricted Subsidiary hereunder.

Section 7.04      Fundamental Changes.      Merge, dissolve, liquidate, consolidate or amalgamate with or into another Person, except that:

(a)      any Restricted Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with (i) the Borrower; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not the Borrower (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the law of the United States, any state thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume the Obligations of the Borrower in a manner and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security

104

interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrower shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents, or (ii) any one or more other Restricted Subsidiaries; provided that when any Restricted Subsidiary that is a Loan Party is merging with another Restricted Subsidiary, (A) a Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the Guarantee Obligations of the relevant Loan Party in a manner reasonably satisfactory to the Administrative Agent or (B) the relevant transaction shall be treated as an Investment and comply with Section 7.02;

(b)     any Restricted Subsidiary that is not a Loan Party may merge, consolidate or amalgamate with or dissolve or liquidate into any other Restricted Subsidiary that is not a Loan Party;

(c)     any Restricted Subsidiary may dissolve or liquidate; provided that if in connection with any such dissolution or liquidation, the dissolving entity transfers its assets to another Person and the transferor in such a transaction is a Loan Party, then (i) the transferee must be or become a Loan Party or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in each applicable Restricted Subsidiary in accordance with Section 7.02 (other than Section 7.02(d));

(d)     the Borrower may merge, amalgamate or consolidate with or dissolve or liquidate into any other Person; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is a Successor Borrower, (1) the Successor Borrower shall be an entity organized or existing under the law of the United States, any state thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume the Obligations of the Borrower in a manner and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrower shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the

#90400391v30

relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents; and

(e) so long as no Default or Event of Default exists or would result therefrom, a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)), may be effected.

Notwithstanding the foregoing, nothing in this Section 7.04 shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrower and their Restricted Subsidiaries (taken as a whole).

Section 7.05    Dispositions.  Make any Disposition (directly or indirectly), except:

(a) (i) Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, (ii) Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the other Restricted Subsidiaries and (iii) Dispositions of property that is economically impracticable to maintain;

(b) Dispositions of inventory, immaterial assets and immaterial Intellectual Property, in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial Intellectual Property to lapse or be abandoned in the ordinary course of business) and non-exclusive licensing of Intellectual Property in the ordinary course of business;

(c) Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d) Dispositions of property to the Borrower or any of the other Restricted Subsidiaries; provided that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) if the relevant transaction constitutes an Investment, it is permitted under Section 7.02 and the transferee must pay fair market value (as reasonably determined by such Person);

(e) Dispositions consisting of (or resulting from) Liens, Investments, fundamental changes, Restricted Payments and Restricted Debt Payments permitted (or not restricted) by Section 7.01 (other than Section 7.01(y)), Section 7.02 (other than Section 7.02(d)), Section 7.04 (other than Section 7.04(e)), Section 7.06 (other than Section 7.06(a)) and Section 7.09, respectively;

(f) Dispositions of cash and Cash Equivalents;

(g) Dispositions in connection with the unwinding of any Swap Contract pursuant to its terms;

(h) Dispositions of assets; provided that

(i) the purchase price paid to the Borrower or other Restricted Subsidiary for such asset shall be no less than the fair market value of such asset at the time of such sale,

106

**Debtors' Exhibit No. 12**
**Page 111 of 354**

(ii)     with respect to any Disposition having a fair market value in excess of $2,500,000, not less than 75% of the consideration for such disposition shall be paid in cash or Cash Equivalents; provided that for purposes of such 75% cash consideration requirement:

(A)     the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Borrower or any other Restricted Subsidiary) of the Borrower or any other Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto)) that are assumed by the transferee of any such assets and for which the Borrower and/or the applicable other Restricted Subsidiary have been validly released by all relevant creditors in writing,

(B)     any securities received by the Borrower or any other Restricted Subsidiary from such transferee that are converted by such Person into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within one hundred and eighty (180) days following the closing of the applicable Disposition, and

(C)     any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (h) that is at that time outstanding, not in excess of $2,500,000 shall be deemed to be cash,

(iii)     no Default or Event of Default has occurred and is continuing at the time of the execution of the definitive agreement with respect to such Disposition or would result therefrom, and

(iv)     such Disposition is subject to the provisions of Section 2.05(b)(ii);

(i)     Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business (including sales to factors or other third parties);

(j)     leases, subleases, non-exclusive licenses or non-exclusive sublicenses of property in the ordinary course of business and which do not materially interfere with the business of the Borrower or any of the other Restricted Subsidiaries;

(k)     transfers of property subject to foreclosure, eminent domain, casualty or condemnation proceedings (including in lieu thereof) or any similar proceedings;

(l)     any surrender, waiver, settlement, compromise, modification or release of contractual rights in the ordinary course of business, or the settlement, release or surrender of tort or other claims of any kind;

(m)     Dispositions of (i) Accounts and Related Assets pursuant to any Permitted Non-Recourse Factoring Transaction and (ii) inventory and Related Assets pursuant to any Permitted Inventory Financing;

(n)     Sale Leaseback Transactions so long as (i) any resulting Capital Lease is permitted under Section 7.03 or (ii) in an aggregate amount not to exceed $20,000,000;

#90400391v30

(o)     Dispositions not otherwise permitted by this <u>Section 7.05</u> in an aggregate amount not to exceed $2,500,000 in any Fiscal Year;

(p)     Dispositions made pursuant to deferred compensation arrangements in the ordinary course of business;

(q)     Dispositions of Equity Interests made in connection with the exercise or settlement of equity-based awards outstanding as of the date hereof or hereafter granted under the terms of any equity or equity-based compensation plans, programs, agreements or arrangements of any Parent Company or Parent or any of its Restricted Subsidiaries;

(r)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(s)     (i) Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), which (A) do not materially interfere with the business of the Borrower and the other Restricted Subsidiaries or (B) relate to closed facilities or the discontinuation of any product line and (ii) expirations of options agreements in respect of real or personal property;

(t)     Dispositions of non-core assets acquired in connection with any Acquisition permitted hereunder, within ninety (90) days of the date of such Acquisition, are designated in writing to the Administrative Agent by the Borrower as being held for sale and not for the continued operation of the Borrower or any of the other Restricted Subsidiaries or any of their respective businesses; <u>provided</u> that no Default or Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed; and

(u)     exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of property or assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Borrower) for like property or assets; <u>provided</u> that upon the consummation of any such exchange or swap by any Loan Party, to the extent the property received does not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the property so exchanged or swapped.

To the extent that any Collateral is disposed of as expressly permitted by this <u>Section 7.05</u> to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take (and shall take) any actions deemed appropriate in order to effect the foregoing.

Notwithstanding the foregoing, nothing in this <u>Section 7.05</u> shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrower and their Restricted Subsidiaries (taken as a whole).

Section 7.06     <u>Restricted Payments</u>.  Make, directly or indirectly, any Restricted Payment, except:

(a)     to the extent constituting Restricted Payments, the Borrower and each of the other Restricted Subsidiaries may enter into and consummate transactions permitted or not restricted by any provision of <u>Section 7.02</u> (other than <u>Section 7.02(d)</u> and <u>(q)</u>), <u>Section 7.04</u>, <u>Section 7.05</u> (other than <u>Section 7.05(e)</u>) and/or <u>Section 7.08</u> (other than <u>Section 7.08(b)</u> and <u>(c)</u>);

108

**Debtors' Exhibit No. 12**
**Page 113 of 354**

(b)     any Restricted Subsidiary may make Restricted Payments to the direct holders of its Equity Interests on a pro rata basis;

(c)     the payment of dividends or the payment of other distributions by Parent or any of its Restricted Subsidiaries to any Parent Company not to exceed amounts required for Parent or any other Parent Company to pay, in each case without duplication:

(i)     franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(ii)     Tax Distributions; provided that upon the request of the Administrative Agent, the Borrower shall provide reasonable documentation supporting the basis of such Tax Distribution for distribution to the Lenders;

(iii)     (A) expenses relating to any Qualifying IPO, debt offering or Acquisition (whether or not successful) and (B) after the consummation of a Qualifying IPO, listing fees and other costs and expenses attributable to being a publicly traded company which are reasonable and customary;

(iv)     general corporate operating, overhead, administrative and legal costs and expenses incurred in the ordinary course of business;

(v)     reasonable    and    customary    indemnification    claims    made    by Representatives;

(vi)     audit, accounting and reporting expenses;

(vii)     insurance premiums;

(viii)     customary salary, bonus, severance and other benefits payable to current or former Representatives of any Parent Company consistent with past practice; and

(ix)     consideration for any Investment permitted under Section 7.02 (other than Section 7.02(d)); provided that (A) any Restricted Payment under this clause (c)(ix) shall be made substantially concurrently with the consummation of the relevant Investment and (B) the relevant Parent Company shall, promptly following the consummation of such Investment, cause (x) all property acquired to be contributed to the Borrower or one or more of the other Restricted Subsidiaries or (y) the merger, consolidation or amalgamation of the Person formed or acquired into the Borrower or one or more of the other Restricted Subsidiaries, in either case, in order to consummate such Investment in compliance with the applicable requirements of Section 7.02 as if undertaken as a direct Investment by the Borrower or such other Restricted Subsidiary;

provided that any amount giving rise to a Restricted Payment made in reliance on Section 7.06(c)(i) through (viii) above shall be attributable to the relevant Parent Company's ownership of Parent and/or its Subsidiaries (and/or any of them);

(d)     (i) cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower or any Parent Company, (ii) payments made or expected to be made in respect of withholding or similar taxes payable by any future, present or former Representatives of any Parent Company, Parent or any of its Restricted Subsidiaries (or any Immediate Family Member who is a

109

Debtors' Exhibit No. 12
Page 114 of 354

successor-in-interest to the relevant Representative) and/or (iii) repurchases of Equity Interests in consideration of the payments described in <u>clause (ii)</u> above, including demand repurchases in connection with the exercise of stock options;

(e)     Restricted Payments in an amount not to exceed the Additional Amount Basket then in effect so long as no Event of Default is then continuing or would result therefrom; <u>provided</u> that such Restricted Payments pursuant to this <u>clause (e)</u> may only be made if at the time of the declaration of any such Restricted Payment funded with all or any portion of the Additional Amount Basket, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable) after giving effect to such Restricted Payment, does not exceed 3.25:1.00;

(f)     payments (including under any promissory note) to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) the repurchase, redemption, retirement or other acquisition of Qualified Equity Interests held by current or former Representatives of such Person (including any Parent Company) or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative); <u>provided</u> (i) that the aggregate cash consideration paid for all such redemptions and payments shall not exceed, in any Fiscal Year, (x) $2,500,000, <u>plus</u> (y) the net cash proceeds of any "key man" life insurance policies contributed to the Borrower, with any unused amounts in any Fiscal Year being carried over to the next two (2) succeeding (but no other) Fiscal Years and (ii) no Default or Event of Default is then continuing;

(g)     repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other securities if such Equity Interests represent a portion of the exercise price or tax withholding obligation of such options, warrants or other securities;

(h)     the declaration and payment of dividends on the Person's Equity Interests (or a Restricted Payment to any Parent Company to fund a payment of dividends on such entity's Equity Interests), following the first Qualifying IPO of such common stock after the Closing Date, of up to 6% per annum of the net cash proceeds received by (or, in the case of a Restricted Payment to a Parent Company, contributed to the capital of) the Borrower in or from any such Qualifying IPO; <u>provided</u> no Default or Event of Default is then continuing;

(i)     [reserved];

(j)     Restricted Payments to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) paying management fees in cash under the Management Agreement in an aggregate amount not to exceed $5,000,000 in any Fiscal Year; <u>provided</u> that no Default or Event of Default is then continuing;

(k)     Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Equity Interests ("<u>Treasury Equity Interests</u>") of the Borrower and/or any other Restricted Subsidiary or (B) Equity Interests of any Parent Company, in the case of each of <u>clauses (A)</u> and <u>(B)</u>, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Borrower and/or any other Restricted Subsidiary) of, Qualified Equity Interests of the Borrower or any Parent Company to the extent any such proceeds are contributed to the capital of the Borrower and/or any other Restricted Subsidiary in respect of Qualified Equity Interests ("<u>Refunding Equity Interests</u>") and (ii) declare and pay dividends on any Treasury Equity Interests out of the proceeds of the substantially concurrent sale (other than to the Borrower or any other Restricted Subsidiary) of any Refunding Equity Interests;

#90400391v30

(l)      additional Restricted Payments in an aggregate amount not to exceed $5,000,000; and

(m)      Restricted Payments in an unlimited amount so long as (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Payments, the Total Leverage Ratio shall not exceed 2.25:1.00 and (ii) no Event of Default shall have occurred or be continuing.

Section 7.07      <u>Change in Nature of Business</u>.  Engage, directly or indirectly, in any line of business other than (i) those lines of business conducted by the Borrower and the Restricted Subsidiaries on the date hereof or (ii) any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof or as otherwise consented to by the Administrative Agent.

Section 7.08      <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)      transactions on terms, taken as a whole, substantially as favorable (or more favorable) to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(b)      loans and other transactions by and among Parent and/or one or more of its Restricted Subsidiaries to the extent expressly permitted or not restricted under this <u>ARTICLE VII</u>;

(c)      (i) Restricted Payments expressly permitted under <u>Section 7.06</u> (other than Section 7.06(a)) and (ii) Investments expressly permitted by <u>Section 7.02(b)</u>, <u>(i)</u>, <u>(l)</u>, <u>(o)</u>, <u>(q)</u> and <u>(s)</u>;

(d)      [reserved];

(e)      issuances of Equity Interests (other than Disqualified Equity Interests);

(f)      (i) expense reimbursement and employment, severance and compensation arrangements entered into by Parent or any of its Restricted Subsidiaries with their respective Representatives in the ordinary course of business, (ii) transactions pursuant to any employee compensation, benefit plan, equity-based incentive plan or arrangement, any health, disability or similar insurance plan which covers current or former Representatives or any employment or consulting contract or arrangement and (iii) the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(g)      the payment of reasonable and customary fees to, and indemnities provided on behalf of, Representatives of the Borrower, any direct or indirect parent companies of Parent or any of its Restricted Subsidiaries (including any Parent Company) in the ordinary course of business;

(h)      [reserved];

(i)      Guarantees to the extent expressly permitted by <u>Section 7.02</u> or <u>Section 7.03</u>;

(j)      transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair from a financial perspective (taken as a whole) to the Borrower and/or the

#90400391v30

other applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained in a comparable arm's-length transaction with a Person other than an Affiliate; and

(k)    any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to the Borrower or the other applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person who is not an Affiliate.

Section 7.09    Prepayments and Modifications of Certain Indebtedness.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner or make any cash payment, in each case, of any unsecured Indebtedness, any Subordinated Indebtedness or any Indebtedness secured on a junior lien basis to the Liens securing the Obligations (for the avoidance of doubt, excluding the ABL Loans) (any such debt, "Restricted Debt"), or in violation of any subordination terms of any such Subordinated Indebtedness (any such payment, a "Restricted Debt Payment"), other than:

(i)    regularly scheduled interest payments and payments of fees, expenses and indemnification obligations in respect of Restricted Debt, in each case when due and in amounts not to exceed the amounts required to be paid with respect thereto as of the date hereof,

(ii)    refinancings, replacements or exchanges of such Indebtedness for Refinancing Indebtedness permitted by Section 7.03(y),

(iii)    payments with, or conversions to, Equity Interests (other than Disqualified Equity Interests),

(iv)    payments made such that a loan will not be classified, at the issue date or thereafter, as an applicable high yield discount obligation for purposes of Code Section 163(i),

(v)    other Restricted Debt Payments in an unlimited amount so long as (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Debt Payments, the Total Leverage Ratio shall not exceed 2.25:1.00 and (ii) no Event of Default shall have occurred or be continuing,

(vi)    Restricted Debt Payments in an amount not to exceed the Additional Amount Basket then in effect so long as no Event of Default is then continuing or would result therefrom; provided that such Restricted Debt Payments pursuant to this clause (vi) may only be made if at the time of the declaration of any such Restricted Debt Payment funded with all or any portion of the Additional Amount Basket, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Debt Payment, does not exceed 3.25:1.00,

#90400391v30

(vii)     [reserved]; and

(viii)    mandatory prepayments of any junior secured Indebtedness made with Declined Proceeds (it being understood that any Declined Proceeds applied to make Restricted Debt Payments in reliance on this Section 7.09(a) shall not increase the amount available under clause (a)(ix) of the definition of "Additional Amount Basket" to the extent so applied).

(b)      Amend or otherwise modify the terms of the documentation governing any Restricted Debt in a manner materially adverse to the Lenders; provided that the foregoing limitation shall not otherwise prohibit debt refinancing or replacing or an exchange of Restricted Debt.

Section 7.10    Negative Pledge.  Enter into or suffer to exist, incur or permit any of the Restricted Subsidiaries to enter into or suffer to exist any agreement or other arrangement that prohibits:

(a)      the ability of Parent, the Borrower or any of the other Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations;

(b)      the ability of any Restricted Subsidiary to make any Restricted Payments with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any of the other Loan Parties; or

(c)      the ability of any Restricted Subsidiary to make loans or cash advances to the Borrower or any of the other Loan Parties;

provided, that the foregoing shall not apply to:

(i)      any restriction or encumbrance with respect to any asset of and/or Equity Interest in any Restricted Subsidiary imposed pursuant to an agreement which has been entered into for the sale or disposition of such assets or all or a portion of the Equity Interests or assets of such Restricted Subsidiary, so long as such sale or disposition is permitted under this Agreement;

(ii)      Contractual Obligations binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary;

(iii)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures expressly permitted hereunder and applicable solely to the assets of and Equity Interests of and in such joint venture entered into in the ordinary course of business;

(iv)      restrictions imposed by any agreement relating to secured Indebtedness expressly permitted by this Agreement if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries or the property or assets intended to secure such Indebtedness;

(v)      any negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of or securing such Indebtedness or expressly permits Liens for the benefit of the Secured Parties with respect to the Credit Facilities established

Debtors' Exhibit No. 12
Page 118 of 354

hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably;

(vi)    restrictions on cash, other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(vii)    customary non-assignment provisions with respect to leases or licensing agreements or other agreements entered into by the Borrower or any of the other Restricted Subsidiaries, in each case entered into in the ordinary course of business;

(viii)    restrictions imposed by any agreement relating to Indebtedness permitted by Section 2.16, 2.17, and 7.03(a), (b), (m), (n), (o), (p), (s) and (x) (with respect to the foregoing types of Indebtedness) if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries;

(ix)    restrictions set forth in any Loan Document, any Swap Contract and/or any agreement relating to any Cash Management Obligations;

(x)    [reserved];

(xi)    restrictions arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xii)    other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in the foregoing clauses of this Section 7.10; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 7.11    Amendments to Organization Documents.    Without the consent of the Administrative Agent, amend, or permit any of the Restricted Subsidiaries that are Loan Parties to amend, its certificate of incorporation or bylaws or other Organization Documents in any manner materially adverse to the interests of the Lenders (as reasonably determined by the Borrower in good faith).

Section 7.12    Fiscal Year.    Make any change in the Fiscal Year of the Parent or any of its Restricted Subsidiaries; provided, that, Parent or the Borrower may, upon written notice to the Administrative Agent, change their Fiscal Year to another date, in which case the Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 7.13    Sanctions; Anti-Corruption Laws.    Use any part of any proceeds of the Loans or lend, contribute or other make available such proceeds: (i) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-

#90400391v30

Corruption Law; or (ii) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

Section 7.14     <u>Financial Maintenance Covenant</u>.  Permit the Total Leverage Ratio as of the last day of each fiscal quarter of the Borrower ending during any period set forth below, to be greater than the ratio set forth opposite such period below:

| Period | Ratio |
|---|---|
| March 31, 2018 and June 30, 2018 | 5.75 to 1.00 |
| September 30, 2018 and December 31, 2018 | 5.50 to 1.00 |
| March 31, 2019 and June 30, 2019 | 5.25 to 1.00 |
| September 30, 2019 and December 31, 2019 | 5.00 to 1.00 |
| March 31, 2020, June 30, 2020 and September 30, 2020 | 4.75 to 1.00 |
| December 31, 2020 | 4.25 to 1.00 |
| March 31, 2021 and thereafter | 4.00 to 1.00 |

## ARTICLE VIII

## PARENT COVENANT

Until the Termination Date, Parent shall not engage in any business or activity other than:

(a)     the ownership of all outstanding Equity Interests in the Borrower and, indirectly, its Subsidiaries and joint ventures; <u>provided</u> that Parent shall not own directly any Equity Interests other than those of Borrower,

(b)     maintaining its corporate existence,

(c)     participating in tax, accounting and other administrative activities of the consolidated group of companies, including the Loan Parties, including (i) filing tax reports and paying Taxes, including interest, additions to tax or penalties applicable thereto, and other customary obligations in the ordinary course (and contesting any Taxes), (ii) preparing reports to Governmental Authorities and to its shareholders and (iii) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable requirements of law,

(d)     (i) the performance of obligations under the Loan Documents, the ABL Loan Documents, the documents governing Incremental Term Loans, Extended Loans, Specified Term Refinancing Debt and Refinancing Facilities and Guarantees of Indebtedness permitted under <u>Section 7.03</u> and/or obligations that do not constitute Indebtedness (including, for the avoidance of doubt, guaranties of any lease obligations of any Loan Party or Subsidiary) and (ii) the creation of (A) Liens to secure Guarantees permitted under this <u>clause (d)</u> so long as the underlying Indebtedness is permitted to be secured on the same basis under <u>Section 7.01</u> and (B) Liens of the types permitted under <u>Section 7.01</u> (other than to secure debt for borrowed money),

(e)     the Transactions,

115

(f)        issuing its own Equity Interests (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Equity Interests),

(g)        holding, distributing and/or lending (A) cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or permitted Dispositions made by, any of its Subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Equity Interests of, Parent pending the application thereof and (B) the proceeds of Indebtedness permitted by Section 7.03,

(h)        making payments of the type permitted under Section 7.06 and the performance of its obligations under any document, agreement and/or Investment contemplated by the Transactions or otherwise not prohibited under this Agreement,

(i)        complying with applicable requirements of law, and

(j)        activities incidental to the businesses or activities described in the foregoing clauses (a) through (i).

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default.  Any of the following events referred to in any of clauses (a) through (m) inclusive of this Section 9.01 shall constitute an "Event of Default":

(a)        Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)        Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a), Section 6.05(a) (with respect to the existence of the Parent and the Borrower), Section 6.15, ARTICLE VII or VIII, as applicable, or (ii) Parent fails to perform or observe any term, covenant or agreement contained in ARTICLE VIII; or

(c)        Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) Borrower's knowledge of such default and (ii) receipt by the Borrower of written notice thereof by the Administrative Agent; or

(d)        Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any certificate required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be incorrect or misleading (after giving effect to any qualification therein) in all respects when made or deemed made or

116

**Debtors' Exhibit No. 12**
**Page 121 of 354**

(e)  Cross-Default.  (i) Parent, the Borrower or any of the other Restricted Subsidiaries (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount in excess of $15,000,000, or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness with an aggregate outstanding principal amount in excess of $15,000,000 (other than, for the avoidance of doubt, with respect to Indebtedness consisting of obligations under Swap Contracts, termination events or equivalent events pursuant to the terms of the relevant Swap Contract which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, the effect of which failure is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (B) of this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; provided, further, that a breach of the Financial Covenant (as defined in the ABL Credit Agreement) shall not be an Event of Default until such time as the holders of the ABL Loans have actually caused the ABL Loans to become due or to be repurchased, prepaid, defeased or redeemed as a result of such breach; or

(f)  Insolvency Proceedings, Etc.  Parent, the Borrower or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or

(g)  Inability to Pay Debts; Attachment.  (i) Parent, the Borrower or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process in respect of a claim in excess of $15,000,000 is issued or levied against all or any material part of the property of the Loan Parties, taken as a whole, and is not released, vacated, stayed or fully bonded within sixty (60) days after its issue or levy; or

(h)  Judgments.  There is entered against Parent, the Borrower or any of the other Restricted Subsidiaries a final judgment or order for the payment of money in an aggregate amount in excess of $15,000,000 (to the extent not effectively covered by insurance) and such judgment or order shall not have been paid, satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)  ERISA.  (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect or (ii) Parent, the Borrower, any of the other Restricted Subsidiaries or ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

117

**Debtors' Exhibit No. 12**
**Page 122 of 354**

(j)     Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of the occurrence of the Termination Date or as a result of the release of any Loan Party therefrom in accordance with its terms or the terms hereof), purports to revoke or rescind any Loan Document or asserts in writing that any Guarantee, Collateral Document or subordination provision in respect of any Indebtedness in excess (in the aggregate) of $15,000,000 is invalid or unenforceable; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Liens.  Any Lien on Collateral created under any Collateral Document ceases to be perfected with the priority required by the Collateral Documents and the ABL Intercreditor Agreement with respect to a material portion of the Collateral (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof); or

(m)     Indebtedness.  The Obligations shall cease to constitute first priority Indebtedness under the ABL Intercreditor Agreement or, in any case, such intercreditor provisions shall be invalidated or otherwise cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof).

Section 9.02   Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)     declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligations shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default under Section 9.01(f), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of any Agent or any Lender; provided further that, in the case of the breach of any Financial Maintenance Covenant, so long as, at such time, (x) the Borrower shall have a right to receive a Specified

Equity Contribution hereunder, (y) the Administrative Agent shall have received a written notice from the Borrower that the Borrower expects to receive such Specified Equity Contribution within fifteen (15) Business Days following the date on which the Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02, and (z) the exercise of any such permitted Specified Equity Contribution shall cure such breach, upon receipt of the notice specified in clause (y) above within fifteen (15) Business Days following the date on which the Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02, each of the Administrative Agent and each Lender agrees that it shall not exercise its rights and remedies arising from such Financial Maintenance Covenant breach until the expiration of the fifteenth (15th) Business Day subsequent to the date on which the Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02 (provided, however, for the avoidance of doubt, that the foregoing shall not limit any right of the Administrative Agent and the Lenders hereunder to exercise any of their respective rights and remedies arising from any other breach of this Agreement; provided further that no Lender holding Commitments shall be required to fund any Term Loans or advances during the period of time between the breach of the Financial Maintenance Covenant and fifteen (15) Business Days following the day on which financial statements are required to be delivered for such fiscal quarter).  For the avoidance of doubt, if the Borrower exercises its right to receive a Specified Equity Contribution which cures a Financial Maintenance Covenant breach, then the requirements of the Financial Maintenance Covenant shall be deemed satisfied as of the end of the relevant quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach of the Financial Maintenance Covenant that had occurred shall be deemed cured for the purposes of this Agreement.

Section 9.03   Application of Funds.  If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III) payable to each Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of Loans or face amounts of the Loans and Swap Termination Value under Secured Hedge Agreements and Cash Management Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

#90400391v30

Last, the balance, if any, after all of the Obligations have been paid in full in cash, to the Borrower or as otherwise required by Law.

## ARTICLE X

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 10.01    Appointment and Authorization of Agents.

(a)    Each Lender hereby irrevocably appoints and designates Goldman Sachs to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents, and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to each such Agent by the terms of this Agreement or any other Loan Document, together with such actions or powers as are reasonably incidental thereto.  The provisions of this ARTICLE X are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in an Agent's reasonable discretion or approval of any action or matter in an Agent's reasonable satisfaction, such Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law.  No Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as such Agent or any other Agent-Related Person in any capacity.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

120

Debtors' Exhibit No. 12
Page 125 of 354

(b)      Goldman Sachs shall also act as the Collateral Agent under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes Goldman Sachs to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to <u>Section 10.02</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this <u>ARTICLE X</u> (including <u>Section 10.07</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(c)      Each Lender and each other Secured Party (by acceptance of the benefits of the Collateral Documents) hereby   acknowledges that it has received a copy of the ABL Intercreditor Agreement, agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement to the extent then in effect, and authorizes and instructs the Collateral Agent to enter into the ABL Intercreditor Agreement as Collateral Agent and on behalf of such Lender or Secured Party.

Section 10.02   <u>Delegation of Duties</u>.  Each Agent may execute any and all of its duties and exercise its rights and powers under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates and Representatives as shall be deemed necessary by such Agent or sub-agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. The exculpatory provisions of this <u>ARTICLE X</u> shall apply to any such sub-agent and to the Affiliates and Representatives of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Loan Facility as well as activities as Administrative Agent and Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such agent, sub-agent or attorney-in-fact.

Section 10.03   <u>Liability of Agents</u>.  No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final and nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, the existence, value or collectability of the Collateral, any failure to monitor or maintain any part of the Collateral, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder or (c) be responsible for or have any duty to ascertain or

121

#90400391v30

inquire into the satisfaction of any condition set forth in <u>ARTICLE IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 10.04   <u>Reliance by Agents</u>.

(a)   Each Agent shall be entitled to rely, shall be fully protected in relying and shall not incur any liability for relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, made or otherwise authenticated by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)   For purposes of determining compliance with the conditions specified in <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 10.05   <u>Notice of Default</u>. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless such Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default". Each Agent will promptly notify the Lenders of its receipt of any such notice. Each Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with <u>ARTICLE IX</u>; <u>provided</u> that unless and until an Agent has received any such direction, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 10.06   <u>Credit Decision; Disclosure of Information by Agents</u>. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the

122

Loan Parties and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 10.07    Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 10.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The undertakings in this Section 10.07 shall survive the Termination Date.

Section 10.08    Agents in their Individual Capacities.  Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, each Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.  With respect to its Loans, each Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include each such Agent in its individual capacity.

Section 10.09    Successor Agents.  Each Agent may resign as an Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If an Agent resigns under this Agreement or any other Loan

#90400391v30

Document, the Required Lenders shall appoint a commercial bank or trust company with offices in the United States having combined capital and surplus in excess of $1,000,000,000 as successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of such Agent, such Agent may appoint, after consulting with the Lenders and, if no Event of Default has occurred and is continuing, procuring the consent of the Borrower (which consent of the Borrower shall not be unreasonably withheld or delayed), a successor agent satisfying the requirements set forth above from among the Lenders; provided that (i) nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of such Agent or any of the obligations thereof to assume such role or obligations and (ii) such appointment shall not be a condition to the effectiveness of such Agent's resignation. If an Agent becomes a Defaulting Lender or is or becomes an Affiliate of a Defaulting Lender, the Required Lenders or the Borrower may at their option appoint a successor agent satisfying the requirements set forth above to replace such Agent, and such successor agent shall be appointed from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent, as the case may be, and the retiring Agent's appointment, powers and duties as the Agent shall be terminated. After the retiring Agent's resignation hereunder as an Agent, the provisions of this ARTICLE X and Section 11.04 and Section 11.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement. If no successor agent has accepted appointment by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Lenders assuming the role of an Agent as specified in the immediately preceding sentence shall assume the rights and obligations of such Agent (including the indemnification provisions set forth in Section 10.07) as if each such Lender were such Agent; provided that nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of an Agent or any of the obligations thereof to assume such role or obligations. Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor and, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents), the successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents. Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate of any Disqualified Institution) may be appointed as a successor Agent.

Section 10.10   Administrative Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the

Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 2.04(e)</u> and <u>(f)</u>, <u>Section 2.09</u> and <u>Section 11.04</u> or otherwise hereunder) allowed in such judicial proceeding; and

          (b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

          (c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under <u>Section 2.09</u> and <u>Section 11.04</u> or otherwise hereunder.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 thereof, or any Debtor Relief Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable laws.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt interests of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid, (I) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (II) to adopt documents providing that the governance of the acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in <u>Section 11.01</u>, and (III) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders <u>pro</u> <u>rata</u> and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

      Section 10.11   <u>Other Agents; Arrangers and Managers</u>.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent", Lead

Arranger "lead arranger" or "sole bookrunner" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, to the extent such Person is a Lender, those applicable to all Lenders in such capacity.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender, or any trust or agency relationship with any Loan Party.  Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking any action hereunder.

Section 10.12    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not, for the avoidance of doubt, to or for the benefit of the Borrower and or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

126

(i)      no Agent-Related Person is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 C.F.R. § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 C.F.R. § 2510.3-21(c)(1)(i)(A)-(E),

(iii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations,

(iv)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to any Agent-Related Person for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)      The Agents and each Lead Arranger hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE XI

## MISCELLANEOUS

Section 11.01   <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, or by the Administrative agent with the consent of the Required Lenders, and the Borrower, and then such waiver

127

or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)     no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)     change the number of Lenders or reduce the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders (or any of them) to take any action hereunder;

(ii)     except as otherwise permitted herein or in any other Loan Document, release Parent or any Subsidiary Guarantor (or otherwise limit Parent or such Subsidiary Guarantor's liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranty) if such release or limitation is in respect of all or substantially all of the value of the Guaranty;

(iii)     except as otherwise permitted herein or in any other Loan Document, release all or substantially all of the Collateral in any transaction or series of related transactions;

(iv)     amend, modify, terminate or waive any provision of the definition of "Required Lenders", "Pro Rata Share", Sections 2.12, 2.13 or 9.03 or any other term or condition of this Agreement or any other Loan Document that would deprive a Lender of its Pro Rata Share of any payments to which it is entitled; provided, additional extensions of credit pursuant hereto may be included in the determination of "Required Lenders" or "Pro Rata Share" on substantially the same basis as the Term Commitments and the Term Loans are included on the Closing Date;

(v)     amend, modify, terminate or waive any term of condition of Section 11.01; and

(vi)     consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document;

(b)     no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent, but without the consent of the Required Lenders or any other Lender:

(i)     increase the Commitments of a Lender without the consent of such Lender (it being understood that waivers or modifications of any condition precedent pursuant to Section 4.01 and 4.02 (other than with respect to Credit Extensions on the Closing Date), any Default or Event of Default pursuant to Section 9.01, any representation or warranty set forth in ARTICLE V, any covenant set forth in ARTICLE VI, ARTICLE VII and/or ARTICLE VIII, any mandatory prepayment required pursuant to Section 2.05(b) and/or any mandatory Commitment reduction pursuant to Section 2.06(a) shall not constitute an increase of the Commitments of any Lender for the purpose of this clause (i));

(ii)     waive or reduce the principal of, or stated rate of interest on, or stated premium payable on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender (it being understood that any change in the definition of any ratio used in the calculation of such rate of interest or fees (or the component definitions thereof) shall not constitute a reduction in any rate of interest of fees and it being further understood that a waiver

128

Debtors' Exhibit No. 12
Page 133 of 354

or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute a reduction or forgiveness of principal for the purpose of this <u>clause (ii)</u>); <u>provided</u> if the Required Lenders agree to waive any relevant Event of Default and such waiver is effective in accordance with this <u>Section 11.01</u>, then only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate in connection with such waived Event of Default;

    (iii)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to <u>Section 2.05(b)(iii)</u>, <u>Section 2.07</u> or <u>Section 2.08</u>, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender (other than, in each case, an extension for administrative reasons agreed by the Administrative Agent) (it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute an extension of the maturity date for purposes of this <u>clause (iii)</u>);

    (iv)    alter the required application of any repayments or prepayments as between Classes of Loans pursuant to <u>Section 2.13</u> or <u>Section 9.03</u> without the consent of Lenders holding more than 50% of the Total Facility Exposure of all Lenders of each Class of Loans which is being allocated a lesser repayment or prepayment as a result thereof; <u>provided</u>, Required Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered; or

    (v)    extend the expiry date of Lender's Commitment (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default, representation, warranty, covenant mandatory prepayment or mandatory Commitment reduction shall not constitute an extension of a Commitment of any Lender);

<u>provided</u> <u>further</u> that (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent or Lead Arranger, as applicable, in addition to the Lenders required above to take such action, affect the rights or duties of such Agent or Lead Arranger, as applicable, under this Agreement or the other Loan Documents (it being understood that only the consent of the Required Lenders (and no other Person other than (as applicable) the Borrower) is necessary to effectuate any forbearance agreement in respect of any Default or Event of Default), (B) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may only be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time, (C) the scheduled maturity dates of part or all of any Term Loans or Commitments of any Lender may be extended solely with the consent of such Lender, (D) the scheduled amortization payment of any Term Loan of any Lender may be reduced solely with the consent of such Lender, (E) any tranche of Term Loans may be refinanced with a replacement tranche of Term Loans, or modified with a lower rate of interest with the consent of each Lender holding the Term Loans subject thereto, (F) any mandatory prepayment required pursuant to <u>Section 2.05(b)</u> may be waived with the consent of the Required Lenders and (G) no amendment, waiver or consent to this Agreement or any Collateral Document shall amend, modify or waive this Agreement or any Collateral Document so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Hedge Agreements or the definition of "Hedge Bank," "Hedge Agreement," "Secured Hedge Agreement," "Swap Contract," "Obligations," or "Secured Obligations" (as defined in this Agreement or in any applicable Collateral

129

Document) in each case in a manner adverse to any Hedge Bank with Obligations then outstanding without the written consent of any such Hedge Bank.

Notwithstanding anything to the contrary contained in this Section 11.01, (a) any guarantees, collateral security documents and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent acting on the advice of counsel and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent acting on the advice of counsel at the request of the Borrower without the need to obtain the input or consent of any other Lender if such amendment, supplement or waiver is delivered in order to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents and/or comply with relevant requirements of law or the advice of local counsel and (b) any intercreditor agreement entered into with respect to this Agreement may be amended, supplemented and/or waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender to give effect thereto and/or to carry out the purposes thereof and/or to reflect amendments, supplements, waivers and/or other modifications with respect to the treatment of any Equity Interests or Indebtedness to address the methodology (or any change therein) applied by any ratings agency in providing a rating of Parent or any other Parent Company, the Borrower and/or any other Restricted Subsidiary so long as such amendment, supplement, waiver or modification is not materially adverse to the Lenders; it being understood that any amendment, supplement or waiver effecting a change to permit any transaction permitted under Sections 7.02, 7.06 and 7.09 hereof is not materially adverse to the Lenders.

Notwithstanding the foregoing, the Administrative Agent and the Borrower may amend, modify or supplement this Agreement or any other Loan Document to cure any ambiguity, error, omission, defect or inconsistency or any necessary or desirable technical change without any further action or consent of any other party to any Loan Document, so long as such amendment, modification or supplement does not materially and adversely affect the rights of any Lender.

Notwithstanding the foregoing, in addition to any credit extensions and related Refinancing Amendments effectuated without the consent of Lenders in accordance with Section 2.16 or Section 2.17, as applicable, this Agreement (including this Section 11.01 and Section 2.13) may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new credit facilities; provided that, for the purpose of clarity, (x) no such facility shall rank senior in right of payment or security to the original Credit Facilities and (y) no Incremental Term Facility shall rank senior in right of payment or security to the original Credit Facilities.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the lenders providing the relevant Incremental Term Facility and/or the relevant Specified Term Refinancing Debt (but without the consent of any other Lender) to effectuate the provisions of Section 2.16 and/or Section 2.17.

Section 11.02    Notices and Other Communications; Facsimile and Electronic Copies.

(a)    General.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile or other electronic transmission) (and, as to service of process, only in writing and in

accordance with applicable law) and, to the extent set forth in <u>Section 11.02(e)</u>, in an electronic medium and delivered as set forth in <u>Section 11.02(e)</u>.  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Borrower, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

TRICO GROUP, LLC



Attention:   Patrick James, Chairman

With a copy (which shall not constitute notice) to:

Jones Day®



Attention: Brett P. Barragate

(ii)      if to the Administrative Agent or the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

Goldman Sachs Bank USA



Attention:  SBD Operations

(iii)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid (properly addressed); (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of <u>Section 11.02(b)</u>) upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as

**Debtors' Exhibit No. 12**
**Page 136 of 354**

available, return e-mail or other written acknowledgement), when delivered; provided that notices and other communications to the Borrower and Administrative Agent pursuant to ARTICLE II shall not be effective until actually received by such Person during the Person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)     Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or signed by facsimile or electronic transmission of a .pdf copy; provided that, if requested, original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission).

(c)     Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Agent or Lender on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and nonappealable judgment by a court of competent jurisdiction.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(d)     Notice to other Loan Parties.  The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 11.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders or actual or prospective assignees or participants by posting the Communications on Debt Domain, SyndTrak, IntraLinks or another relevant website or other information platform (the "Platform").

(f)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT-RELATED PERSONS IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "COVERED PARTIES") HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT

132

LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT (I) TO THE EXTENT THE LIABILITY OF ANY COVERED PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH COVERED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR A MATERIAL BREACH OF THIS AGREEMENT OR (II) IN THE CASE OF A CLAIM BY ANY THIRD PARTY AGAINST ANY INDEMNITEE, TO THE EXTENT SUCH DAMAGES WOULD OTHERWISE BE SUBJECT TO INDEMNIFICATION PURSUANT TO THE TERMS OF SECTION 11.05.

(g)    The Administrative Agent agrees that the receipt in accordance with this Section 11.02 of the Communications by the Administrative Agent at its e-mail address set forth in this Section 11.02 shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(h)    Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender"). Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Borrower and the Administrative Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as either publicly available information or not material information for purposes of United States federal, state and other applicable securities laws (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 11.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be required to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(i)    EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT ANY PERSON FROM PURCHASING OR SELLING SECURITIES OF SUCH PERSON OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON. EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION. Each Lender that is not a Public Lender confirms to the Administrative Agent that such Lender has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective Contractual Obligations with respect to confidential and material non-public information. A Public

#90400391v30

Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "<u>Restricting Information</u>"), in which case it will identify itself to the Administrative Agent as a Public Lender.  Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent-Related Persons, any Lender or any Loan Party concerning the Credit Facilities in which Restricting Information may be discussed.  No Agent-Related Person, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information.  In particular, no Agent-Related Person shall have, and the Administrative Agent, on behalf of all Agent-Related Persons, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material non-public information or such Lender's compliance with applicable laws related thereto.  Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that might contain Restricting Information.  Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information).  Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent.  Each Public Lender confirms to the Administrative Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lenders may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information.  Nothing in this <u>Section 11.02(i)</u> shall modify or limit a Lender's (including any Public Lender) obligations under <u>Section 11.08</u> with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information.  Each Public Lender hereby waives any claim or cause of action it may have or acquire against Parent and/or any of its Restricted Subsidiaries by virtue of its election to not receive any Restricting Information.

Section 11.03   <u>No Waiver; Cumulative Remedies</u>.   No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 11.04   <u>Costs and Expenses</u>.  The Borrower agrees (a) to pay or reimburse the Lead Arranger and each Agent in its capacity as such for all reasonable and documented out of pocket costs and expenses incurred before (to the extent not reimbursed on the Closing Date), on or after the Closing Date in connection with the preparation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Borrower or negotiated in consultation with the Borrower (in each case, whether or not the transactions contemplated thereby are consummated), but limited, in the case of Attorney Costs, to the Attorney Costs of Davis Polk & Wardwell LLP, counsel for the Agents, taken as a whole, and, to the extent reasonably necessary, one local counsel in any relevant jurisdiction, and (b) to pay or reimburse the Lead Arrangers, each Agent and each Lender for all reasonable and

#90400391v30

**Debtors' Exhibit No. 12**
**Page 139 of 354**

documented out of pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), but limited, in the case of Attorney Costs, to the reasonable and documented costs and expenses of one counsel to the Administrative Agent and the Lenders, taken as a whole and, to the extent reasonably necessary, one local counsel to such Persons taken as a whole in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, one additional counsel to each group of affected persons similarly situated, taken as a whole).   The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out of pocket expenses (other than Attorney Costs) incurred by the Administrative Agent.   The agreements in this Section 11.04 shall survive the Termination Date.   All amounts due under this Section 11.04 shall be paid within thirty (30) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.   If the Borrower fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

For the avoidance of doubt, this Section 11.04 shall not apply to Taxes arising with respect to payments to the Lenders under the Loan Documents, which shall be governed exclusively by Section 3.01.

Section 11.05   Indemnification.  The Borrower shall indemnify and hold harmless each Agent-Related Person, the Lead Arranger, each Lender and their respective Affiliates, and their respective directors, officers, employees, partners, counsel, agents, trustees, investment advisors and attorneys in fact (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, Taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (but limited, in the case of Attorney Costs, to the reasonable and documented out-of-pocket fees and expenses of one counsel to all the Indemnitees, taken as a whole, and to the extent reasonably necessary, the reasonable and documented out-of-pocket fees and expenses of one local counsel to such Persons in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, the reasonable and documented out-of-pocket fees and expenses of one additional counsel to the affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by the Parent, the Borrower, or any of their respective Subsidiaries (or at which the Parent, the Borrower or any of their respective Subsidiaries has arranged for or caused any Release or disposal of Hazardous Materials), or any Environmental Action or Environmental Liability related to the Parent, the Borrower or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as

135

to any Indemnitees, be available to the extent that (x) such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of this Agreement or any of the other Loan Documents by, such Indemnitee or of any controlled Affiliate, director, officer, employee, counsel, agent or attorney in fact of such Indemnitee as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) if such indemnity relates to any dispute solely among the Indemnitees that does not involve an act or omission of Borrower or any of its Affiliates (other than indemnity for claims against the Agents or the Lead Arrangers in their respective capacities as such), and the Borrower shall be entitled to a refund and a return of any and all amounts paid to any Indemnitee for fees and expenses to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.  No Indemnitee nor any Loan Party nor any of their respective officers, directors, employees, agents, advisors or representatives shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document (other than in respect of any such damages incurred or paid by an Indemnitee to a third party unaffiliated with such Indemnitee).  All amounts due under this Section 11.05 shall be paid within thirty (30) days after written demand therefor, which demand shall set forth in reasonable detail the amount and nature of reimbursement claimed.  The agreements in this Section 11.05 shall survive the resignation of any Agent, the replacement of any Lender and the Termination Date.

Section 11.06   Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 11.07   Successors and Assigns.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby and, except as otherwise provided herein (including without limitation as permitted under Section 7.04), none of Parent, the Borrower or any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under the other Loan Documents without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the requirements of Section 11.07(b), (ii) by way of participation in accordance with the provisions of Section 11.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.07(f) or (iv) to an SPC in accordance with the provisions of Section 11.07(g) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   (i)   Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this

#90400391v30

Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent in each case not to be unreasonably withheld or delayed) of:

> (A)     the Borrower; provided that no consent of the Borrower shall be required for an assignment to (1) a Lender, an Affiliate of a Lender, a Lead Arranger or an Approved Fund relating thereto, (2) if an Event of Default pursuant to Section 9.01(a), (f) or (g) has occurred and is continuing, any Eligible Assignee or (3) any Eligible Assignee that occurs at any time prior to the date that the Administrative Agent shall notify the Borrower that the primary syndication of the Loans has been completed; and

> (B)     the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund relating thereto.

> (ii)     Assignments shall be subject to the following additional conditions:

> (A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent; provided that (1) no such consent of the Borrower to such lesser amount shall be required if any Event of Default of the type described in Section 9.01(a), (f) or (g) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

> (B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and any applicable tax forms required by Section 3.01(f), if applicable; and

> (C)     the relevant Eligible Assignee, if it is not then a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f).

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credit Facilities on a non-pro rata basis.

Notwithstanding anything in this Section 11.07 to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Term Loans within ten (10) Business Days after receipt of written notice of such assignment, the Borrower shall be deemed to have consented to such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 11.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent; provided, that all Affiliates of the Administrative Agent shall be exempt from paying such processing and recordation fee in connection with Term Loan assignments), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall

be party to this Agreement as a Lender with respect to the interest assigned and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement in addition to any rights and obligations otherwise held by such assignee as a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 (or any other increased costs protection provision), 11.04 and 11.05 and shall continue to be subject to the provisions of Section 11.08).  Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.

(c)      The Administrative Agent may provide the list of Disqualified Institutions to any potential Lender and shall provide the list of Disqualified Institutions upon the request of any Lender, in each case subject to the provisions in Section 11.08   If any assignment or participation under this Section 11.07 is made to any Disqualified Institution without the Borrower's prior written consent, then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate such Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution, (B) in the case of any outstanding Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans held by such Disqualified Institution, purchase such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans, in the cases of clauses (x) and (y), plus accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 11.07), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the applicable Disqualified Institution has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Institution paid for the applicable Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the Borrower, (II) in the case of clauses (A) and (B), the Borrower shall be liable to the relevant Disqualified Institution under Section 3.05 if any Eurodollar Rate Loan owing to such Disqualified Institution is repaid or purchased other than on the last day of the Interest Period relating thereto and (III) in the case of clause (C), the relevant assignment shall otherwise comply with this Section 11.07 (except that no registration and processing fee required under this Section 11.07 shall be required with any assignment pursuant to this paragraph).  Nothing in this Section 11.07(c) shall be deemed to prejudice any right or remedy that the Borrower may otherwise have at law or equity.  Each Lender acknowledges and agrees that Parent and its Subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this Section 11.07 insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Borrower's prior written consent.  Additionally, each Lender agrees that the Borrower may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 11.07(c) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.  The Parent, the Borrower and each Lender agree that (i) the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and (ii) the Administrative Agent shall not have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

(d)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders,

#90400391v30

Debtors' Exhibit No. 12
Page 143 of 354

and the Commitments of, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice (but no Lender shall be entitled to view any information in the Register except such information contained therein with respect to the Class and amount of Obligations owing to such Lender). No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (d). The Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(e)      Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than any Disqualified Institution or any natural person) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a), or Section 11.01(b) that directly affects any participation of such Participant and with respect to which the participating Lender would have been entitled to vote. The Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements of Section 3.01, including Section 3.01(e) and Section 3.01(f) (it being understood that the documentation required under Section 3.01(f) shall be delivered to the participating Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.07(b); provided that such Participant agrees to be subject to the provisions of Sections 3.01(e), 3.04(d) and 3.07 as if it were an assignee under Section 11.07(b). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 11.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower,  maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participant Register is intended to cause the Loan or any other Loan Document to be in registered form

139

**Debtors' Exhibit No. 12**
**Page 144 of 354**

within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

Notwithstanding anything to the contrary contained in this Agreement, a Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after such Participant acquired the applicable participation.

(f)       Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no pledge may be made to a Disqualified Institution and; provided further that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)       Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (other than a Disqualified Institution) identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(h)       Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it in favor of any Person (other than a Disqualified Institution) and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee (other than a Disqualified Institution) for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 11.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

140

**Debtors' Exhibit No. 12**
**Page 145 of 354**

(i)      Notwithstanding any consent requirements otherwise set forth in this Section 11.07, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis through (x) Dutch auctions open to all Lenders on a pro rata basis or (y) open market purchases, subject to the following limitations:

(i)      in connection with an assignment to an Affiliate of Parent, (A) the Affiliate shall have identified itself in writing as an Affiliated Lender to the assigning Term Loan Lender and the Administrative Agent prior to the execution of such assignment and (B) the Affiliate shall be deemed to have represented and warranted to the assigning Term Loan Lender and the Administrative Agent that the requirements set forth in this clause (i) and clause (iii) below, shall have been satisfied upon consummation of the applicable assignment;

(ii)      (A) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under, this Agreement or any other Loan Document, each Affiliate of Parent will be deemed to have consented in the same proportion as the Term Lenders that are not Affiliates of Parent consented to such matter, unless such matter requires the consent of all or all affected Lenders and adversely affects such Affiliate of Parent more than other Term Lenders in any material respect, (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws (a "Bankruptcy Plan"), each Affiliate hereby agrees (x) not to vote on such Bankruptcy Plan, (y) if such Affiliate does vote on such Bankruptcy Plan notwithstanding the restriction in the foregoing clause (x), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Bankruptcy Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (z) not to contest any request by any party for a determination by a U.S. Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (y), in each case under this clause (iii)(B) unless such Bankruptcy Plan adversely affects such Affiliate more than other Term Lenders in any material respect, and (C) each Affiliate of Parent hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Affiliate's attorney-in-fact, with full authority in the place and stead of such Affiliate and in the name of such Affiliate (solely in respect of Term Loans therein and not in respect of any other claim or status such Affiliate may otherwise have), from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary or appropriate to carry out the provisions of this clause (ii), including to ensure that any vote of such Affiliate on any Bankruptcy Plan is withdrawn or otherwise not counted;

(iii)      the aggregate principal amount of Term Loans held at any one time by Affiliated Lenders shall not exceed 10% of the aggregate principal amount of all Term Loans (including any Incremental Term Loans and any Specified Term Refinancing Debt Loans) outstanding at such time under this Agreement, after giving effect to any substantially simultaneous cancellations thereof;

(iv)      Affiliated Lenders in their respective capacities as such will not be entitled to receive information provided solely to Lenders by the Administrative Agent (except to the extent such information or materials have been made available to any Loan Party or constitute administrative notices in respect of such Affiliated Lender's Term Loans) or any Lender and will

141

Debtors' Exhibit No. 12
Page 146 of 354

not be permitted to attend or participate in meetings or conference calls attended solely by the Lenders and the Administrative Agent;

(v)       in the case of any Dutch auction or open market purchases conducted by Parent or any of its Subsidiaries, no Default or Event of Default shall have occurred and be continuing at the time of acceptance of bids for the Dutch auction or consummation of such open market purchase, as the case may be;

(vi)       no Affiliated Lender will be entitled to bring actions against the Administrative Agent, in its role as such, or receive advice of counsel or other advisors to the Administrative Agent or any other Lenders or challenge the attorney client privilege of their respective counsel;

(vii)       [reserved];

(viii)       any Term Loans acquired by Parent or any of its Subsidiaries shall be promptly cancelled to the extent permitted by applicable law and the full par value of the aggregate principal amount of such Term Loans shall be applied to Term Loan Facility pursuant to Section 2.07; and

(ix)       the proceeds of the ABL Loans shall not be used to acquire such Term Loans.

It is understood and agreed that no Affiliated Lender shall be required to make a representation that, as of the date of any open market purchase or assignment of Loans hereunder or at any other time, it is not in possession of material nonpublic information within the meaning of the United States federal securities laws within respect to Parent and its Subsidiaries or any of their respective securities.

Notwithstanding the foregoing, (a) any Affiliated Lender (other than Parent or any of its Subsidiaries) shall be permitted (but not required) to contribute any such Term Loans assigned to it to Parent or any of its Subsidiaries for purposes of cancellation of such debt and the aggregate principal amount of such Term Loans shall be reduced in accordance with Section 11.07(i)(v) which contribution may be made (including, with the Borrower's consent, to the Borrower, whether through Parent or otherwise), in exchange for Qualified Equity Interests of Parent, or the Borrower or Subordinated Indebtedness of the Borrower to the extent such Subordinated Indebtedness is permitted to be incurred (including, if applicable, as a permitted Refinancing Facility) pursuant to Section 7.03 at such time, (b) each Affiliated Lender shall have the right to vote on any amendment, modification, waiver or consent that would require the vote of all Lenders or the vote of all Lenders directly and adversely affected thereby and (c) no amendment, modification, waiver or consent shall affect any Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender of the same Class or that would deprive such Affiliated Lender of its Pro Rata Share of any payments to which it is entitled.

Section 11.08   Confidentiality.  Each of the Agents, the Lead Arranger and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed:

(a)       to its Affiliates and its and its Affiliates' Representatives, partners, trustees, investment advisors and agents, including accountants and independent auditors, legal counsel and other experts, agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the transactions contemplated or permitted hereby; provided that the

#90400391v30

relevant Agent, Lead Arranger or Lender shall be responsible for its controlled Affiliates' and their respective directors', officers', employees' and agents' compliance with the terms of this Section 11.08,

(b)      to the extent requested or required by any Governmental Authority or examiner regulating any Lender (provided that such Lender that discloses any Information or any Loan Document pursuant to this clause (b) shall provide the Borrower with prompt advance written notice of such disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority, self-regulatory authority, state insurance commissioners or the National Association of Insurance Commissioners exercising its examination or regulatory authority) to the extent practical and permitted by applicable Law);

(c)      to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (provided, that such Agent, Lead Arranger or such Lender that discloses any Information or any Loan Document pursuant to this clause (c) shall provide the Borrower with prompt written advance notice of such disclosure to the extent practical and permitted by applicable law);

(d)      to any other party to this Agreement;

(e)      subject to a written acknowledgment from the relevant recipient that the Information and/or Loan Document so disclosed is being disseminated on a confidential basis (on substantially the same, or at least as restrictive taken as a whole, as the terms set forth in this Section 11.08 or on such other terms to which the Borrower provides written consent, to any pledgee referred to in Section 11.07(f) or Section 11.07(h), direct or indirect counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement;

(f)      with the written consent of the Borrower;

(g)      to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.08 by the disclosing party;

(h)      to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the disclosing Person);

(i)      in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or in connection with the administration by the Agents of the Term Loan Facility;

(j)      to the extent that such Information (i) is received by such Person from a third party that is not, to such Person's knowledge, after reasonable investigation, subject to confidentiality, fiduciary or other legal obligations owing to the Parent or its Restricted Subsidiaries or Affiliates or (ii) was already in such Person's possession (except to the extent received in a manner that would be restricted by the immediately-preceding subclause (i)) or is independently developed by such Person based exclusively on information the disclosure of which would not be restricted by this Section 11.08; or

(k)      for purposes of establishing a "due diligence" defense.

In addition, the Agents, the Lead Arrangers and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to

#90400391v30

the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions.  For the purposes of this Section 11.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to Parent or any of its Restricted Subsidiaries or their business, other than any such information that is publicly available prior to disclosure by any Loan Party other than as a result of a breach of this Section 11.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.  Notwithstanding anything to the contrary in this Agreement, this Section 11.08 shall survive the Termination Date for a period of one (1) year.

Section 11.09    Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and the Restricted Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and the Restricted Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; provided that such Lender and its Affiliates shall not exercise any right of setoff given this Section 11.09 without obtaining the prior written consent of the Administrative Agent.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent, each Lender under this Section 11.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender may have.

Section 11.10    Release of Collateral and Guarantee.  (a) (i) Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party to any Person that is not a Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents or, subject to Section 11.01, if otherwise approved, authorized or ratified in writing by the Required Lenders, (ii) upon the Termination Date (and, concurrently therewith, to release all the Loan Parties from their obligations under the Loan Documents (other than those that specifically survive the Termination Date)), (iii) upon release of a Subsidiary Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (iv) upon any asset ceasing to constitute Collateral, the Lenders irrevocably authorize the Agents, and the Agents agree, at the Borrower's expense, to execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

(b)     The Lenders irrevocably authorize the Agents, and the Agents agree, at the request of the Borrower, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01.

(c)     The Lenders irrevocably authorize the Agents, and the Agents agree, to release any Subsidiary Guarantor from its obligations under any Loan Document to which it is a party if such

Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

(d)     The Lenders irrevocably authorize the Agents, and the Agents agree, to enter into subordination or intercreditor agreements or arrangements with respect to Indebtedness (or Liens securing such Indebtedness) that is required or permitted to be <u>pari passu</u> with or subordinated to the Obligations or Secured Obligations hereunder.

Section 11.11   <u>Counterparts</u>.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile transmission or electronic transmission of a .pdf copy of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document; <u>provided</u> that original signatures shall be promptly delivered thereafter, it being understood that that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

Section 11.12   <u>Integration</u>.   This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document (but excluding the ABL Intercreditor Agreement), the provisions of this Agreement shall control; <u>provided</u> that in the case of any conflict or inconsistency between the ABL Intercreditor Agreement and any other Loan Document, the terms of the ABL Intercreditor Agreement shall govern and control; <u>provided</u> further that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 11.13   <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

Section 11.14   <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.15   <u>GOVERNING LAW</u>.

(a)     THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

145

(b)  ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, PARENT, THE BORROWER, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND THE PARENT AND THE BORROWER HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT. PARENT, THE BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

Section 11.16  WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.16 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.17  Binding Effect.  This Agreement shall become effective when it shall have been executed by Parent, the Borrower, the Administrative Agent, and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of Parent, the Borrower, each such Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 11.18  [Reserved].

Section 11.19  PATRIOT Act.  Each Lender and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender and the Administrative Agent to identify the Borrower in accordance with the PATRIOT Act.  The Borrower agrees to provide, and to cause each other Loan Party to provide, such information promptly upon request.

146

#90400391v30

Section 11.20   <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "<u>Maximum Rate</u>").   If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 11.21   <u>ABL Intercreditor Agreement</u>.   REFERENCE IS MADE TO THE ABL INTERCREDITOR AGREEMENT.  EACH LENDER HEREUNDER (a) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT AND (b) AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE ABL INTERCREDITOR AGREEMENT AS "FIRST LIEN AGENT" AND ON BEHALF OF SUCH LENDER.  THE PROVISIONS OF THIS <u>SECTION 11.21</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT.   REFERENCE MUST BE MADE TO THE ABL INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.   EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE ABL INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE ABL INTERCREDITOR AGREEMENT.  THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER ANY ABL FACILITY TO EXTEND CREDIT AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT.

Section 11.22   <u>No Fiduciary Duty</u>.  Each Agent, each Lender and their Affiliates (collectively, the "<u>Lender Affiliated Parties</u>"), may have economic interests that conflict with those of the Loan Parties, and each Loan Party acknowledges and agrees that (a) nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Loan Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Loan Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Loan Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Loan Party on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents; (e) each Loan Party has its own legal and financial advisors to the extent it deemed appropriate; (f) each Loan Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Loan Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

147

Section 11.23    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Remainder of Page Intentionally Blank]

148

**Debtors' Exhibit No. 12**
**Page 153 of 354**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

Trico Group, LLC,
as Borrower

By: _____
Name:  Stephen Graham
Title:   Chief Financial Officer, Treasurer and
         Secretary

Trico Group Holdings, LLC,
as Parent

By: _____
Name:  Stephen Graham
Title:   Chief Financial Officer, Treasurer and
         Secretary

[Signature Page to First Lien Term Loan Agreement]

**GOLDMAN SACHS BANK USA,**
as Administrative Agent, Collateral Agent and a Lender

By: _____
Authorized Signatory

Charles D. Johnston
Authorized Signatory

[Signature Page to First Lien Term Loan Agreement]

Schedule 1.01(a)
Specified Customers

1.  Advance Auto
2.  Alliance Automotive Group
3.  Autozone
4.  Canadian Tire
5.  Carquest
6.  Fisher Auto Parts
7.  NAPA
8.  O'Reilly/Ozark
9.  Pep Boys
10. Prime Automotive Parts
11. Trelleborg
12. Walmart
13. Costco
14. Balkamp
15. CAT/Perkins
16. WORLDPAC

Schedule 1.01(b)
Subsidiary Guarantors

1. AVM Export, Inc., a Delaware corporation
2. Carter Fuel Export, Inc., a Delaware corporation
3. Carter Fuel Systems, LLC, a Delaware limited liability company
4. Heatherton Holdings, LLC, a Delaware limited liability company
5. KTRI Holdings, Inc., a Delaware corporation
6. KTRI Offshore Holdings, LLC, a Delaware limited liability company
7. Premier Marketing Group, LLC, an Ohio limited liability company
8. Strongarm, LLC, an Ohio limited liability company
9. Trico Holding Corporation, a Delaware corporation
10. Trico Products Corporation, a New York corporation
11. Trico Technologies Corporation, a Delaware corporation

Schedule 2.01
Commitments

| Lender | Commitment |
|---|---|
| Goldman Sachs Bank USA | $425,000,000 |
| **Total** | $425,000,000 |

#90528640v6

Schedule 5.07(b)
Owned Real Property

None.

#90528640v6

Schedule 5.13
Subsidiaries and Other Equity Investments

| Equity Holder | Subsidiary (Jurisdiction) | Ownership Interest |
|---|---|---|
| Carter Fuel Systems, LLC (DE) | Carter Fuel Export, Inc. (DE) | 100% |
| KTRI Holdings, Inc. (DE) | Trico Products Corporation (NY) | 100% |
| | KTRI Offshore Holdings, LLC (DE) | 100% |
| | Trico Distribuidora, S.A. de C.V. (Mexico) | >99%[1] |
| | Trico Componentes, S.A. de C.V. (Mexico) | >99%[2] |
| | Trico Latinamericano do Brasil, Ltda. (Brazil) | 90%[3] |
| | Trico Products Pty. Ltd (Australia) | 100% |
| | Trico Latinamericano S.A. (Argentina) | 90%[4] |
| | Trico Suzhou Investments, Ltd. (UK) | 100% |
| Strongarm, LLC (OH) | Premier Marketing Group, LLC (OH) | 100% |
| | AVM Export, Inc. (DE) | 100% |
| Trico Group, LLC (DE) | Strongarm, LLC (OH) | 100% |
| | Carter Fuel Systems, LLC (DE) | 100% |
| | KTRI Holdings, Inc. (DE) | 100% |
| | Heatherton Holdings, LLC (DE) | 100% |
| Trico Group Holdings, LLC (DE) | Trico Group, LLC (DE) | 100% |
| Trico Holding Corporation (DE) | Trico Technologies Corporation (DE) | 100% |
| Trico Investments Corporation (DE) | Trico Limited (UK) | 100% |
| | Trico Italy S.r.l. (Italy) | 100% |
| Trico Products Corporation (NY) | Trico Investments Corporation (DE) | 100% |
| | Trico Holding Corporation (DE) | 100% |

---

[1] KTRI Offshore Holdings, LLC holds a .002% interest in Trico Distribuidora, S.A. de C.V.

[2] KTRI Offshore Holdings, LLC holds a .04% interest in Trico Componentes, S.A. de C.V.

[3] KTRI Offshore Holdings, LLC holds a 10% interest in Trico Latinamericano do Brasil, Ltda.

[4] Nominee shareholder holds 10% of Trico Latinamericano S.A.

| Equity Holder | Subsidiary (Jurisdiction) | Ownership Interest |
|---|---|---|
| Trico Suzhou Investments, Ltd. (UK) | Trico Automotive Systems (Suzhou), Ltd. (People's Republic of China) | 100% |

#90528640v6

Schedule 6.17
Post-Closing Covenants

| Post-Closing Deliverable | Time Period Following Closing Date |
|---|---|
| Delivery of insurance certificates to the Administrative Agent evidencing coverage under liability and property insurance policies, together with endorsements, in each case to the extent required pursuant to Section 6.07 of the Credit Agreement. | 60 days (or such later date agreed by the Administrative Agent in its Permitted Discretion) |
| Delivery of an executed control agreement to the Collateral Agent with respect to each Deposit Account and Securities Account other than to the extent constituting an Excluded Account (each as defined in the Security Agreement) of any Loan Party, which control agreements shall be in form and substance reasonably satisfactory to the Collateral Agent and shall be subject to the ABL Intercreditor Agreement. | 90 days (or such later date agreed by the Collateral Agent in its Permitted Discretion) |

Schedule 7.01(b)
Existing Liens

1.    Liens with respect to that certain Master Lease Agreement, dated as of April 30,
      2015, among CIT Bank, N.A., the Loan Parties party thereto and the other parties
      thereto (the "CIT Lease") as of the Closing Date; provided that the Capital Lease
      Obligations secured by such Liens do not exceed $3,500,000 as of the Closing
      Date.

2.    Liens (i) on assets of Trico Componentes, S.A. de C.V. and the Borrower securing
      obligations under the Trico Mexico Facility (as defined on Schedule 7.03 hereto),
      (ii) on assets of Trico Latinamericano do Brasil, Ltda. securing obligations under
      the Trico Brazil Facility (as defined on Schedule 7.03 hereto) and (iii) on assets of
      Trico Products Pty. Ltd. securing obligations under the Trico Australia Facility
      (as defined on Schedule 7.03 hereto).

3.    The following Liens:

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| CARTER FUEL SYSTEMS, LLC | JPMORGAN CHASE BANK, N.A. | DE – Secretary of State UCC Debtor | 9/25/2013 | 2013 4005964 | Accounts and Related Assets |
| CARTER FUEL SYSTEMS, LLC | JPMORGAN CHASE BANK, N.A. | DE - SECRETARY OF STATE | 5/27/2015 | 20152499654 | Accounts and Related Assets |
| CARTER FUEL SYSTEMS, LLC | HITACHI CAPITAL AMERICA CORP. | DE - SECRETARY OF STATE | 8/28/2015 | 20153792230 | Accounts and Related Assets |
| CARTER FUEL SYSTEMS, LLC | HITACHI CAPITAL AMERICA CORP. | DE - SECRETARY OF STATE | 6/23/2016 | 20163782636 | Accounts and Related Assets |
| CARTER FUEL SYSTEMS, LLC | LIQUIDX, INC., AS COLLATERAL AGENT FOR BUYERS OF FINANCIAL ASSETS | DE- SECRETARY OF STATE | 8/9/2017 | 20175286536 | Accounts, Related Assets and other Financial Assets (as defined therein) |
| CARTER FUEL SYSTEMS, LLC | LIQUIDX, INC., AS COLLATERAL AGENT FOR BUYERS OF FINANCIAL ASSETS | DE- SECRETARY OF STATE | 9/5/2017 | 20175881039 | Accounts, Related Assets and other Financial Assets (as defined therein) |
| STRONGARM, LLC (FILED UNDER AVM INDUSTRIES, LLC) | SUNTRUST BANK | OH – Secretary of State UCC Debtor | 11/27/2006 | OH00109230613 | Accounts and Related Assets |

#90528640v6

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| STRONGARM, LLC (FILED UNDER AVM INDUSTRIES, LLC) | SUNTRUST BANK | OH – Secretary of State UCC Debtor | 7/21/2010 | OH00143776752 | Accounts and Related Assets |
| STRONGARM, LLC (FILED UNDER AVM INDUSTRIES, LLC) | BRANCH BANKING AND TRUST COMPANY | OH – Secretary of State UCC Debtor | 11/16/2012 | OH00162741782 | Accounts and Related Assets |
| STRONGARM, LLC (FILED UNDER AVM INDUSTRIES, LLC) | HITACHI CAPITAL AMERICA CORP. | OH – Secretary of State UCC Debtor | 6/24/2016 | OH00202090922 | Accounts and Related Assets |
| TRICO PRODUCTS CORPORATION (AMONG OTHER DEBTORS) | CIT BANK, N.A. | OH - SECRETARY OF STATE | 5/4/2015 | OH00185249210 | Equipment under lease |
| TRICO PRODUCTS CORPORATION (AMONG OTHER DEBTORS) | CIT BANK, N.A. | OH - SECRETARY OF STATE | 5/4/2015 | OH00185249210 | Equipment under lease |
| TRICO PRODUCTS CORPORATION (AMONG OTHER DEBTORS) | WINTRUST COMMERCIAL FINANCE, A DIVISION OF BEVERLY BANK & TRUST COMPANY, N.A. | MI - DEPARTMENT OF STATE | 5/4/2015 | 2015061551-3 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | WELLS FARGO BANK, NATIONAL ASSOCIATION | NY - DEPARTMENT OF STATE | 6/7/2011 | 201106075618396 | Accounts and Related Assets |
| TRICO PRODUCTS CORPORATION | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | NY - DEPARTMENT OF STATE | 2/17/2012 | 201202175201158 | Accounts and Related Assets |
| TRICO PRODUCTS CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | NY - DEPARTMENT OF STATE | 2/8/2013 | 201302085157322 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | NY - DEPARTMENT OF STATE | 8/21/2013 | 201308215899362 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CISCO SYSTEMS CAPITAL CORPORATION | NY - DEPARTMENT OF STATE | 10/30/2013 | 201310306151313 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 12/3/2013 | 201312036265943 | Equipment under lease |

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 12/5/2013 | 201312050677437 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 3/21/2014 | 201403215284791 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CISCO SYSTEMS CAPITAL CORPORATION | NY - DEPARTMENT OF STATE | 3/29/2014 | 201403295314487 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 4/11/2014 | 201404115369906 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 8/5/2014 | 201408055830443 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 9/4/2014 | 201409040498391 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 12/1/2014 | 201412016261842 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 12/17/2014 | 201412170704635 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 12/17/2014 | 201412170704659 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 2/5/2015 | 201502050056826 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 3/17/2015 | 201503175267572 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 4/6/2015 | 201504065354603 | Equipment under lease |
| TRICO PRODUCTS CORPORATION (AMONG OTHER DEBTORS) | WINTRUST COMMERCIAL FINANCE, A DIVISION OF BEVERLY BANK & TRUST COMPANY, N.A. | NY - DEPARTMENT OF STATE | 5/4/2015 | 201505040217985 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CIT FINANCE LLC | NY - DEPARTMENT OF STATE | 5/4/2015 | 201505040218103 | Equipment under lease |

#90528640v6

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| TRICO PRODUCTS CORPORATION | HITACHI CAPITAL AMERICA CORP. | NY - DEPARTMENT OF STATE | 5/26/2015 | 201505260258797 | Accounts and Related Assets |
| TRICO PRODUCTS CORPORATION | SG EQUIPMENT FINANCE USA CORP. | NY - DEPARTMENT OF STATE | 6/19/2015 | 201506195677444 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | IBM CREDIT LLC | NY - DEPARTMENT OF STATE | 7/1/2015 | 201507015723880 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | SG EQUIPMENT FINANCE USA CORP. | NY - DEPARTMENT OF STATE | 9/22/2015 | 201509226059272 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 10/5/2015 | 201510056114354 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 10/5/2015 | 201510056114366 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 10/7/2015 | 201510070514615 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | SG EQUIPMENT FINANCE USA CORP. | NY - DEPARTMENT OF STATE | 2/26/2016 | 201602265230839 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 3/29/2016 | 201603295360224 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 3/29/2016 | 201603295360248 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 4/4/2016 | 201604040156543 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | WAELZHOLZ NORTH AMERICA, LLC | NY - DEPARTMENT OF STATE | 4/4/2016 | 201604140173944 | Inventory on consignment |
| TRICO PRODUCTS CORPORATION | DIE-TECH AND ENGINEERING, INC. | NY - DEPARTMENT OF STATE | 6/3/2016 | 201606038222594 | Special Tools |
| TRICO PRODUCTS CORPORATION | HITACHI CAPITAL AMERICA CORP. | NY - DEPARTMENT OF STATE | 6/23/2016 | 201606230300708 | Accounts and Related Assets |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 6/28/2016 | 201607280362407 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | SG EQUIPMENT FINANCE USA CORP. | NY - DEPARTMENT OF STATE | 9/2/2016 | 201609026054549 | Equipment under lease |

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 9/21/2016 | 201609210452713 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | DIE-TECH AND ENGINEERING, INC. | NY - DEPARTMENT OF STATE | 11/25/2016 | 201611258464074 | Special Tools |
| TRICO PRODUCTS CORPORATION | SG EQUIPMENT FINANCE USA CORP. | NY - DEPARTMENT OF STATE | 2/24/2017 | 201702245230178 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | TICONA POLYMERS, INC. | NY - DEPARTMENT OF STATE | 4/3/2017 | 201704035390417 | Inventory on consignment |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 5/4/2017 | 201705040217991 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | CSI LEASING, INC. | NY - DEPARTMENT OF STATE | 6/14/2017 | 201706145709166 | Equipment under lease |
| TRICO PRODUCTS CORPORATION | KENTWATER TOOL & MFG. CO. | NY - DEPARTMENT OF STATE | 8/7/2017 | 201708078340168 | Special Tools |
| TRICO PRODUCTS CORPORATION | LIQUIDX, INC., AS COLLATERAL AGENT FOR BUYERS OF FINANCIAL ASSETS | NY - DEPARTMENT OF STATE | 8/11/2017 | 201708110396798 | Accounts, Related Assets and other Financial Assets (as defined therein) |
| TRICO PRODUCTS CORPORATION | CT CORPORATION SYSTEM, AS REPRESENTATIVE | NY - DEPARTMENT OF STATE | 12/4/2017 | 201712046468145 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 3/21/2012 | 2012 1080029 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | WELLS FARGO BANK, N.A. | DE – Secretary of State UCC Debtor | 12/05/2012 | 2012 4705473 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | DE – Secretary of State UCC Debtor | 3/07/2014 | 2014 0903682 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 7/28/2016 | 20164584890 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 8/19/2016 | 20165056906 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 8/25/2016 | 20165188725 | Equipment under lease |

| Loan Party/Debtor | Secured Party | Jurisdiction | Original File Date | Original File No. | Collateral Description |
|---|---|---|---|---|---|
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 9/15/2016 | 20165650708 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | DE – Secretary of State UCC Debtor | 9/28/2016 | 20165962178 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 11/11/2016 | 20166994139 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 1/9/2017 | 20170190311 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 1/10/2017 | 20170219235 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 1/10/2017 | 20170219276 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 3/2/2017 | 20171393112 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 5/18/2017 | 2017 3271845 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 7/20/2017 | 2017 4791841 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | NISSAN MOTOR ACCEPTANCE CORPORATION | DE – Secretary of State UCC Debtor | 8/30/2017 | 20175777492 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | DE - SECRETARY OF STATE | 3/7/2014 | 20140903682 | Equipment under lease |
| TRICO TECHNOLOGIES CORPORATION | DE LAGE LANDEN FINANCIAL SERVICES, INC. | DE - SECRETARY OF STATE | 9/28/2016 | 20165962178 | Equipment under lease |
| TRICO LIMITED | Marden (Norwich) Limited | England – Companies House | 8/30/1991 | N/A | £3,000 held in a deposit account |
| TRICO LIMITED | Marden (Norwich) Limited | England – Companies House | 8/30/1991 | N/A | £3,000 held in a deposit account |
| TRICO LIMITED | Marden (Norwich) Limited | England – Companies House | 8/30/1991 | N/A | £3,000 held in a deposit account |

#90528640v6

Schedule 7.02(e)
Investments

1. Investments in Subsidiaries as of the Closing Date as set forth on Schedule 5.13 hereto.

2. Joint and several obligations pursuant to the CIT Lease; provided that Investments in respect of obligations constituting Capital Lease Obligations do not exceed $3,500,000 as of the Closing Date.

3. Guarantee Obligations of the Borrower in respect of the Trico Mexico Facility (as defined on Schedule 7.03 hereto).

4. Joint and several obligations pursuant to that certain Master Lease Agreement, dated as of August 28, 2017, among Varilease Finance, Inc., a Michigan corporation, the Loan Parties party thereto and the Affiliates of the Loan Parties party thereto, together with all schedules thereto.

Schedule 7.03
Indebtedness

1. Capital Lease Obligations under the CIT Lease in an aggregate amount of $3,500,000 as of the Closing Date, and Guarantee Obligations in respect thereof.

2. Credit Agreement dated as of November 4, 2015, between GE Capital CEF México, S. de R.L. de C.V., as lender, and Trico Componentes, S.A. de C.V., as borrower, and the guarantors party thereto providing for credit facilities of up to $5,000,000 (the "Trico Mexico Facility").

3. Bank Credit Note, dated January 11, 2018, whereby Banco Santander makes available to Trico Latinoamericana do Brasil Ltda., as issuer, a line of financing for working capital of up to BRL 180,000 (the "Trico Brazil Facility").

4. Credit facility between Trico Products Pty. Ltd. and National Australia Bank providing for credit facilities of up to AUD 500,000 (the "Trico Australia Facility").

#90528640v6

**EXHIBIT A**

**FORM OF COMMITTED LOAN NOTICE (LOAN)**

To:     Goldman Sachs Bank USA, as Administrative Agent

███████████████████████████████

Attention:  SBD Operations

███████████████████████████████████████████████

███████████████████

Ladies and Gentlemen:

Reference is made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement") among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as administrative agent and as collateral agent.  All capitalized terms used and not defined herein have the meanings ascribed thereto in the Credit Agreement.

Pursuant to Section 2.02 of the Credit Agreement, the Borrower hereby gives you notice that it requests a Borrowing under the Credit Agreement, and in connection therewith, set forth below are the terms on which such Borrowing is requested to be made:

| | | |
|---|---|---|
| (A) | Class of Borrowing | [Term Loan] [Incremental Term Loan] [Specified Term Refinancing Debt Loans] [conversion or continuation of [●][1] |
| (B) | Date of Borrowing, conversion or continuation (which is a Business Day) | [●] |
| (C) | Principal amount of Borrowing, conversion or continuation[2] | [●] |
| (D) | Type of Borrowing[3] or conversion | [Base Rate] [Eurodollar Rate] |
| (E) | [Interest Period][4] | [●] |
| (F) | [Funds are requested to be disbursed to | [●] |

---

[1] Insert applicable Class of Loan.

[2] Each Borrowing, conversion or continuation shall be in a minimum aggregate principal amount of (i) in the case of a Eurodollar Rate Loan, $500,000 or a whole multiple of $100,000 in excess thereof or (ii) in the case of a Base Rate Loan, $500,000 or a whole multiple of $100,000 in excess thereof.

[3] The Loans may from time to time be (i) Eurodollar Rate Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 2.02 of the Credit Agreement.

[4] If a Borrowing is to be of Eurodollar Rate Loans, then it shall be subject to the definition of "Interest Period" in the Credit Agreement.

A-1

**Debtors' Exhibit No. 12**
**Page 171 of 354**

the following account(s) of the Borrower][5]

Upon acceptance of any or all of the Loans offered by the Lenders in response to this request, the Borrower shall be deemed to have represented and warranted that the conditions to lending specified in Section 4.02 of the Credit Agreement have been satisfied; it being understood and agreed that the conditions to lending specified in Section 4.02 of the Credit Agreement shall not apply to (a) any Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans or (b) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.17 of the Credit Agreement[6].

THIS COMMITTED LOAN NOTICE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[In consideration for permitting the Borrower to request the Loan(s) herein set forth as Eurodollar Rate Loans pursuant to the Credit Agreement prior to the effectiveness thereof, the Borrower hereby agrees that, in the event the Borrower fails to borrow such Loan(s) on the requested date of Borrowing above for any reason (including the failure of the Credit Agreement to become effective), the Borrower shall reimburse each applicable Lender in respect of its Loan(s) upon demand as set forth in Section 3.05 of the Credit Agreement as if the Credit Agreement were in effect with respect to the requested Loans(s).][7]

Delivery of an executed copy of this Committed Loan Notice by telecopier or other electronic means shall be effective as delivery of an original executed counterpart of this Committed Loan Notice.

[signature page follows]

---

[5] Specify the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of the Credit Agreement.

[6] Any Committed Loan Notice requesting a Borrowing of an Incremental Term Facility to finance a Limited Condition Acquisition may be subject to the more limited conditions in Section 2.16(b)(i) and (ii).

[7] Select for initial borrowing on the Closing Date if such borrowings are for Eurodollar Rate Loans.

A-2

TRICO GROUP, LLC,
as Borrower

By: _____
Name:
Title:

**Debtors' Exhibit No. 12**
**Page 173 of 354**

**EXHIBIT B**

**FORM OF PREPAYMENT NOTICE**

[Insert Date]

Goldman Sachs Bank USA, as Administrative Agent

██████████████████████

Attention:  SBD Operations

████████████████████████████████████████████████

Ladies and Gentlemen:

Reference is made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement") among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as administrative agent and as collateral agent.  All capitalized terms used and not defined herein have the meanings ascribed thereto in the Credit Agreement.

Pursuant to Section 2.05(a) of the Credit Agreement, the Borrower hereby gives you notice that it shall prepay certain of the Loans under the Credit Agreement, and such notice may only be rescinded in accordance with Section 2.05(a)(ii) of the Credit Agreement.

1.      Date of prepayment:     [●].

2.      Aggregate principal amount[8] of prepayment of $[●] [Base Rate][Eurodollar] Loans.

3.      Class of Loan to be prepaid: [Term Loan] [Incremental Term Loan] [Specified Term Refinancing Debt Loans].

4.      THIS PREPAYMENT NOTICE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

5.      Delivery of an executed copy of this Prepayment Notice by telecopier or other electronic means shall be effective as delivery of an original executed counterpart of this Prepayment Notice.

[signature page follows]

---

[8] Each prepayment shall be in a principal amount of (i) in the case of a Eurodollar Rate Loan, $500,000 or a whole multiple of $100,000 in excess thereof or (ii) in the case of a Base Rate Loan, $500,000 or a whole multiple of $100,000 in excess thereof.

**Debtors' Exhibit No. 12**
**Page 174 of 354**

TRICO GROUP, LLC,
as Borrower

By: _____
Name:
Title:

B-2

**EXHIBIT C**

**FORM OF NOTE**

$[●]     [Insert date]

FOR VALUE RECEIVED, the undersigned, TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), hereby unconditionally promises to pay [Lender] (the "Lender"), at the office of Lender at [Address], on each date set forth under the Credit Agreement (as defined below) and on the Maturity Date of the Term Loan Facility (capitalized terms used without definition shall have the meanings assigned to such terms in that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as administrative agent and as collateral agent) the aggregate unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to Section 2.01 of the Credit Agreement, such payment or payments to be in immediately available funds.  The Borrower further agrees to pay interest on such principal amount from time to time outstanding, at said office, at a rate or rates per annum and payable on such dates as are determined pursuant to the Credit Agreement.

The Borrower promises to pay interest on any overdue principal of and, to the extent permitted by law, overdue interest on the Term Loans in accordance with Section 2.08(b) of the Credit Agreement from their due dates at the times specified and at a rate or rates determined as set forth in the Credit Agreement and subject to the limitations set forth in the Credit Agreement.

The Borrower hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever, except as expressly required by the Credit Agreement.  The nonexercise by the holder of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

The Term Loans evidenced by this Note (this "Note") and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof, or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that any failure of the holder hereof to make such a notation or any error in such notation shall not in any manner affect the obligation of the Borrower to make payments of principal and interest in accordance with the terms of this Note and the Credit Agreement.

This Note evidences Loans referred to in the Credit Agreement which, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof under certain circumstances prior to the maturity hereof and for the amendment or waiver of certain provisions of the Credit Agreement, all upon the terms and conditions therein specified.  This Note is entitled to the benefit of the Credit Agreement, including the Guarantees thereunder, and the Collateral Documents.  THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

In the event of a conflict between this Note and the Credit Agreement, the provisions of the Credit Agreement will govern.

[signature page follows]

C-1

TRICO GROUP, LLC,
as Borrower

By: _____
Name:
Title:

C-2

LOANS, CONVERSIONS AND REPAYMENTS OF BASE RATE LOANS

| Date | Amount of Base Rate Loans | Amount Converted to Base Rate Loans | Amount of Principal of Base Rate Loans Repaid | Amount of Base Rate Loans Converted to Eurodollar Loans | Unpaid Principal Balance of Base Rate Loans | Notation Made By |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

C-3

LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF EURODOLLAR LOANS

| Date | Amount of Eurodollar Loans | Amount Converted to Eurodollar Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Principal of Eurodollar Loans Repaid | Amount of Eurodollar Loans Converted to Base Rate Loans | Unpaid Principal Balance of Eurodollar Loans | Notation Made By |
|------|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

C-4

**EXHIBIT D**

**FORM OF COMPLIANCE CERTIFICATE**

[Insert date]

To:    Goldman Sachs Bank USA, as Administrative Agent



Attention: SBD Operations

Ladies and Gentlemen:

This Compliance Certificate is being delivered pursuant to Section 6.02(a) of that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement") among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as Administrative Agent, in respect of the fiscal quarter ended on or about [●] (the "Test Date"). All capitalized terms used and not defined herein have the meanings ascribed thereto in the Credit Agreement.

(a)    [Attached hereto as Schedule 1 are the consolidated balance sheet and related consolidated statements of income or operations, shareholders' equity and cash flows for the Fiscal Year ended December 31, 20[●], prepared in accordance with GAAP and audited by Cohen & Co. or other independent registered public accounting firm of nationally recognized standing and accompanied by a report and opinion of such accountants (which opinion is without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than with regard to the occurrence of the Maturity Date of any Credit Facility or the ABL Facility in the 12 month period following the date of such opinion)), together with comparative figures for the previous Fiscal Year and, commencing after the delivery of the first forecast under Section 6.01(b) of the Credit Agreement, a comparison of actual figures against the forecast for such Fiscal Year, all in reasonable detail, in each case as required by Section 6.01(a) of the Credit Agreement.][1] [Attached hereto as Schedule 1 are the consolidated balance sheet for the fiscal quarter ended [●], 20[●] and related consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and consolidated statements of cash flows for the portion of the Fiscal Year then ended, together with comparative figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year as required by Section 6.01(b) of the Credit Agreement.][2]

(b)    Parent hereby certifies, represents and warrants that, as of the date hereof, no Event of Default has occurred and is continuing [other than as follows:].

---

[1] Include in the case of annual financial statements.

[2] Include in the case of quarterly financial statements.

D-1

(c)     The following represent true and accurate calculations, as of the last day of the Test Period, to be used to determine whether the Borrower and the other Restricted Subsidiaries are in compliance with the covenant set forth in <u>Section [●]</u> of the Credit Agreement:

Total Leverage Ratio.

| | |
|---|---|
| Consolidated Total Debt= | [●] |
| Unrestricted Cash= | [●] |
| Consolidated Adjusted EBITDA= | [●] |
| Actual Ratio= | [●] to 1.00 |
| Required Ratio= | [●] to 1.00 |

Supporting detail showing the calculation of Consolidated Total Debt is attached hereto as <u>Schedule 2</u>. Supporting detail showing the calculation of Unrestricted Cash is attached hereto as <u>Schedule 3</u>. Supporting detail showing the calculation of Consolidated Adjusted EBITDA is attached hereto as <u>Schedule 4</u>.

(d)     Attached hereto as <u>Annex I</u> is a supplement to Schedule 5.13 of the Credit Agreement, updating the information set forth in Schedule 5.13 to the Credit Agreement as of the date hereof.  The Borrower hereby certifies, represents and warrants that there has been no change in the information set forth in Schedule 5.13 of the Credit Agreement since the Closing Date or the latest supplement to Schedule 5.13 of the Credit Agreement delivered to the Administrative Agent.

(e)     THIS COMPLIANCE CERTIFICATE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[signature page follows]

IN WITNESS WHEREOF, the undersigned has caused this Compliance Certificate to be executed and delivered by its respective duly authorized [Chief Financial Officer] as of the date first written above.[3]

TRICO GROUP, LLC, as Borrower

By: _____
Name:
Title:

---

[3] Please note that the deadlines for satisfaction of the following requirements correspond with the delivery of each Compliance Certificate (unless otherwise indicated):

1. The delivery of a customary management discussion and analysis with respect to the financial statements accompanying such Compliance Certificate.

2. The delivery of documents and deliverables required under Section 5.07(c) of the Security Agreement relating to any United States Registered Patent, Trademark or Copyright (or application therefor) that is filed or acquired, as the case may be, during the fiscal quarter covered by the attached financial statements.

D-3

**SCHEDULE 1**

**Financial Statements**

D-4

## SCHEDULE 2

**Consolidated Total Debt**

**Debtors' Exhibit No. 12**
**Page 184 of 354**

**SCHEDULE 3**

**Unrestricted Cash**

D-6

**SCHEDULE 4**

**Consolidated Adjusted EBITDA**

D-7

**EXHIBIT E**

**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption Agreement (the "<u>Assignment</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by Administrative Agent as contemplated below, (i) the interest in and to all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, without limitation, any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1.    Assignor:                 _____

2.    Assignee:                 _____ [and is an Affiliate/Approved Fund[1]]

3.    Borrower(s):             TRICO GROUP, LLC

4.    Administrative Agent:    Goldman Sachs Bank USA, as administrative agent under the Credit Agreement

5.    Credit Agreement        First Lien Term Loan Agreement dated as of February 2, 2018, among Trico Group, LLC, Trico Group Holdings, LLC, the Lenders from time to time party thereto and Goldman Sachs Bank USA, as administrative agent and as collateral agent.

---

[1]    Select as applicable.

E-1

6.      Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[2] |
|---|---|---|---|
| Term Loan | $_____ | $_____ | _____% |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By: _____
        Name:
        Title:


By: _____
        Name
        Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By: _____
        Name:
        Title:


By: _____
        Name:
        Title:

---

[2]   Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

E-2

[Consented to and]³  Accepted:

GOLDMAN SACHS BANK USA,
as Administrative Agent


By: _____
    Authorized Signatory




[Consented to:]⁴

TRICO GROUP, LLC


By: _____
    Name:
    Title:

---

³  To be added only if the consent of Administrative Agent is required by the terms of the Credit Agreement.

⁴  To be added only if the consent of the Borrower and/or other parties is required by the terms of the Credit Agreement.

E-3

ANNEX 1

TRICO GROUP, LLC
FIRST LIEN TERM LOAN AGREEMENT
DATED AS OF FEBRUARY 2, 2018
STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to <u>Section 6.01</u> thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, (vii) it is not a natural person or an investment vehicle established primarily for the benefit of a natural person, (viii) it is not a Disqualified Institution, and (ix) if it is a Foreign Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

E-4

3.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  THIS ASSIGNMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

**EXHIBIT F**

**FORM OF FIRST LIEN GUARANTEE**

[See Attached]

F-1

<u>FIRST LIEN GUARANTY</u>

By

TRICO GROUP HOLDINGS, LLC,

TRICO GROUP, LLC,

and

THE SUBSIDIARY GUARANTORS REFERRED TO HEREIN,

as Guarantors

and

GOLDMAN SACHS BANK USA,
as Administrative Agent and Collateral Agent

_____

Dated as of February 2, 2018

#90430106v10

## TABLE OF CONTENTS

**Section**                                                                                      **Page**

Section 1.      Guaranty; Limitation of Liability ................................................................. 1

Section 2.      Guaranty Absolute ............................................................................................ 2

Section 3.      Waivers and Acknowledgments ....................................................................... 3

Section 4.      Subrogation; Subordination ............................................................................. 4

Section 5.      Payments Free and Clear of Taxes, Etc .......................................................... 5

Section 6.      Representations and Warranties ....................................................................... 5

Section 7.      Covenants ......................................................................................................... 5

Section 8.      Amendments, Guaranty Supplements, Etc ...................................................... 5

Section 9.      Notices, Etc ...................................................................................................... 6

Section 10.     No Waiver; Remedies; Severability ................................................................ 6

Section 11.     Right of Setoff .................................................................................................. 6

Section 12.     Indemnification ................................................................................................ 6

Section 13.     Continuing Guaranty; Assignments under the Credit Agreement .................... 6

Section 14.     Execution in Counterparts ............................................................................... 6

Section 15.     Governing Law; Jurisdiction; Waiver of Jury Trial, Etc .................................. 7

Section 16.     Termination; Survival ....................................................................................... 7


Exhibit A -     Guaranty Supplement

#90430106v10

**Debtors' Exhibit No. 12**
**Page 194 of 354**

**FIRST LIEN GUARANTY**

FIRST LIEN GUARANTY (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Guaranty") dated as of February 2, 2018, among Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), Trico Group, LLC, a Delaware limited liability company (the "Borrower"), each of the other Restricted Subsidiaries of Parent that is a party hereto or may become party hereto pursuant to Section 8 below (such Restricted Subsidiaries, collectively, the "Subsidiary Guarantors" and together with Parent and the Borrower, the "Guarantors") and Goldman Sachs Bank USA, as administrative agent and collateral agent (in such capacities, the "Administrative Agent") for the Secured Parties (as defined in the Credit Agreement referred to below).

Reference is made to the First Lien Term Loan Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, Parent, the Lenders and agents party thereto from time to time and Goldman Sachs Bank USA, as Administrative Agent and Collateral Agent. Terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

The Lenders have agreed to make Loans to the Borrower pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement. Each of the Guarantors acknowledges that it will derive substantial benefit from the making of the Loans by the Lenders. The obligations of the Lenders to make Loans are conditioned on, among other things, the execution and delivery by the Guarantors of a Guaranty in the form hereof. As consideration therefor and in order to induce the Lenders to make Loans, the Guarantors are willing to execute this Guaranty.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lenders to make Loans under the Credit Agreement, the Hedge Banks to enter into Secured Hedge Agreements from time to time and the Cash Management Banks to enter into Cash Management Agreements from time to time, each Guarantor, jointly and severally with each other Guarantor, hereby agrees as follows:

Section 1.    Guaranty; Limitation of Liability. (a)  Each Guarantor hereby absolutely, unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the punctual payment and performance when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Secured Obligations (including Cash Management Obligations and obligations under Secured Hedge Agreements, but excluding (i) Excluded Swap Obligations and (ii) in the case of each Guarantor, its own Secured Obligations) now or hereafter existing (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Secured Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such obligations being the "Guaranteed Obligations"), and agrees to pay all costs and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Secured Party in enforcing any rights under this Guaranty, subject to the limitations of Section 11.04 of the Credit Agreement. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)     Each Subsidiary Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Guaranteed Obligations of each Subsidiary Guarantor hereunder not constitute a

#90430106v10

fraudulent transfer or conveyance for purposes of Debtor Relief Laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of each Subsidiary Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the Subsidiary Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Subsidiary Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Subsidiary Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Secured Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Secured Parties under or in respect of the Loan Documents.

(d)     Each Guarantor hereby further agrees that the Guaranteed Obligations may be extended, increased or renewed, amended or modified, in whole or in part, without notice to, or further assent from, such Guarantor, and that such Guarantor will remain bound upon its guarantee hereunder notwithstanding any such extension, increase, renewal, amendment or modification of any Guaranteed Obligation.

(e)     Each Qualified ECP Guarantor (as hereinafter defined) hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor that is not a Qualified ECP Guarantor to honor all of its obligations under this Guaranty in respect of Swap Obligations that but for such funds or other support would be Excluded Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 1(e) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 1(e), or otherwise under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Each Qualified ECP Guarantor intends that this Section 1(e) constitute, and this Section 1(e) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act. "Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 2.     Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto.  The obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party are joined in any such action or actions.  This Guaranty is a guaranty of payment when due (whether or not any proceeding under any Debtor Relief Law shall have stayed the accrual of collection of the Guaranteed Obligations or operated as a discharge thereof), and not merely of collection (and each Guarantor hereby waives any right to require that resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of any of the Guaranteed Obligations).  Until the Termination Date, (i) the liability

2

of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and (ii) each Guarantor hereby irrevocably waives (to the extent permitted by applicable Laws) any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Secured Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Secured Party (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information);

(g)     the failure of any other Person to execute or deliver this Guaranty, any Guaranty Supplement (as hereinafter defined) or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Secured Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety (other than payment or performance in full in cash of the Guaranteed Obligations),

in each case, other than in connection with the termination of any Guarantor's obligations in accordance with the terms of the Credit Agreement or as otherwise expressly provided herein.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Secured Party in accordance with <u>Section 11.06</u> of the Credit Agreement all as though such payment had not been made.

Section 3.     <u>Waivers and Acknowledgments</u>. (a) Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws and except as otherwise expressly provided in any Loan Document, promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice

3

with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Secured Party exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)     Until the Termination Date, each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Secured Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of setoff or counterclaim against or in respect of the Guaranteed Obligations of such Guarantor hereunder.

(d)     Each Guarantor acknowledges that the Administrative Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale (to the extent such sale is permitted by applicable Laws), and each Guarantor hereby waives, to the extent permitted by applicable Laws, any defense to the recovery by the Administrative Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable Laws.

(e)     Each Guarantor hereby unconditionally and irrevocably waives, to the extent permitted by applicable Laws, any duty on the part of any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Secured Party.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 2 and this Section 3 are knowingly made in contemplation of such benefits.

Section 4.     Subrogation; Subordination.   (a) Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against the Borrower, any other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right, until the occurrence of the Termination Date.   If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the Termination Date, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed

4

Obligations and all other amounts payable under this Guaranty, if any, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty, if any, thereafter arising.  If any Guarantor shall make payment to any Secured Party of all or any part of the Guaranteed Obligations and the Termination Date has occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

(b)      Notwithstanding any provision of this Agreement to the contrary, but subject to Section 1(b), all rights of the Guarantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all of the Guaranteed Obligations.  No failure on the part of any Guarantor to make the payments required by Section 1(c) (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

Section 5.      Payments Free and Clear of Taxes, Etc.  Any and all payments by or on account of any obligation of any Guarantor hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes or Other Taxes on the same terms and to the same extent that payments by the Borrower are required to be made free and clear of Taxes and Other Taxes pursuant to Section 3.01 of the Credit Agreement.

Section 6.      Representations and Warranties.   Each Guarantor hereby makes each representation and warranty made in the Credit Agreement by the Borrower with respect to such Guarantor and each Guarantor hereby further represents and warrants as follows:

(a)      There are no conditions precedent to the effectiveness of this Guaranty that have not been satisfied or waived.

(b)      Such Guarantor has, independently and without reliance upon any Secured Party and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty and each other Loan Document to which it is or is to be a party.

Section 7.      Covenants.  Each Guarantor covenants and agrees that, until the Termination Date has occurred, such Guarantor will perform and observe, and cause each of its Restricted Subsidiaries to perform and observe, all of the terms, covenants and agreements set forth in the Loan Documents on its or their part to be performed or observed or that the Borrower has agreed to cause such Guarantor or such Restricted Subsidiaries to perform or observe.

Section 8.      Amendments, Guaranty Supplements, Etc.  (a)  No amendment or waiver of any provision of this Guaranty and no consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by the Administrative Agent and shall otherwise be in accordance with Section 11.01 of the Credit Agreement.  Pursuant to Section 6.11(a) of the Credit Agreement, Wholly-owned Domestic Subsidiaries of any Loan Party, which are not Excluded Subsidiaries, may be required, after the date hereof, to enter into this Guaranty as a Guarantor.  Upon the execution and delivery by any Person of a guaranty supplement in substantially the form of Exhibit A hereto (each, a "Guaranty Supplement"), (i) such Person shall be referred to as an "Additional Guarantor" and shall become and be a Guarantor hereunder, and each reference in this Guaranty and in any other Loan Document to a "Guarantor", a "Subsidiary Guarantor" or a "Loan Party" shall also mean and be a

5

#90430106v10

reference to such Additional Guarantor, and (ii) each reference herein to "this Guaranty", "hereunder", "hereof" or words of like import referring to this Guaranty, and each reference in any other Loan Document to the "Guaranty", "thereunder", "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty as supplemented by such Guaranty Supplement.

Section 9.     Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and in accordance with Section 11.02 of the Credit Agreement (and shall be effective as set forth in Section 11.02 of the Credit Agreement).

Section 10.     No Waiver; Remedies; Severability.   (a) No failure on the part of the Administrative Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(b)     In the event any one or more of the provisions contained in this Guaranty should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 11.     Right of Setoff.  Each Agent, each Lender and each of their respective Affiliates shall have, in respect of each Guarantor and any and all of the Obligations of such Guarantor, rights of setoff as described in Section 11.09 of the Credit Agreement.  The rights of the Administrative Agent and each Lender and their respective Affiliates under this Section 11 are in addition to other rights and remedies (including other rights of setoff) that any such Agent, Lender or Affiliate may have.  Section 11.09 of the Credit Agreement shall be incorporated herein by reference in respect of the Guarantors and any and all of the Guaranteed Obligations of the Guarantors.

Section 12.     Indemnification.  Each Guarantor agrees that the provisions of Section 11.05 of the Credit Agreement shall be incorporated herein, *mutatis mutandis*, and apply to such Guarantor as if it were the Borrower under the Credit Agreement.

Section 13.     Continuing Guaranty; Assignments under the Credit Agreement.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the Termination Date, upon which it shall automatically terminate, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, transferees and permitted assigns.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders (except as otherwise contemplated by the Credit Agreement).

Section 14.     Execution in Counterparts.  This Guaranty or any Guaranty Supplement and each amendment, waiver and consent with respect hereto may be executed in any number of counterparts and by different parties thereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Guaranty or any Guaranty Supplement by facsimile or an electronic transmission of a .pdf copy thereof shall be effective as delivery of an original executed counterpart of this Guaranty or any Guaranty Supplement.

6

Section 15.     Governing Law; Jurisdiction; Waiver of Jury Trial, Etc.   (a)   THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES OR THE AGENTS OR ANY OF THEM WITH RESPECT TO THIS GUARANTY, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS GUARANTY, EACH OF THE UNDERSIGNED CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.   EACH OF THE UNDERSIGNED IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS GUARANTY.

(c)     EACH PARTY TO THIS GUARANTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES, THE AGENTS OR ANY OF THEM WITH RESPECT TO THIS GUARANTY, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH OF THE UNDERSIGNED HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY OF THE UNDERSIGNED MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 15(c) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE UNDERSIGNED TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 16.     Termination; Survival.  The agreements and obligations of each Guarantor under this Guaranty shall automatically terminate on the Termination Date except that a Guarantor shall be released from its obligations under this Guaranty at the time or times and in the manner set forth in Section 11.10 of the Credit Agreement; provided, however, that the agreements and obligations of each Guarantor under Section 1(a) (with respect to enforcement expenses), Section 2 (with respect to the last sentence thereof), Section 5 (to the extent the Borrower's obligations with respect to Section 3.01 of the Credit Agreement survive the Termination Date) and Section 12 shall survive the Termination Date.

[Signature pages follow.]

7

#90430106v10

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

TRICO GROUP HOLDINGS, LLC
TRICO GROUP, LLC
AVM EXPORT, INC.
CARTER FUEL EXPORT, INC.
CARTER FUEL SYSTEMS, LLC
HEATHERTON HOLDINGS, LLC
KTRI HOLDINGS, INC.
KTRI OFFSHORE HOLDINGS, LLC
PREMIER MARKETING GROUP, LLC
STRONGARM, LLC
TRICO HOLDING CORPORATION
TRICO PRODUCTS CORPORATION
TRICO TECHNOLOGIES CORPORATION, as Guarantors

By:_____

     Name:
     Title:

[Signature Page to Guaranty]

GOLDMAN SACHS BANK USA, as Administrative
Agent

By:_____

     Name:

     Title:

[Signature Page to Guaranty]

#90430106v10

**Exhibit A**
**to the**
**Guaranty**

SUPPLEMENT NO. [●] (this "Guaranty Supplement") dated as of [●], 20[●], between the undersigned (the "New Guarantor") and Goldman Sachs Bank USA ("Goldman Sachs"), as administrative agent and collateral agent (in such capacities, the "Administrative Agent") supplements that certain First Lien Guaranty dated as of February 2, 2018 (as the same has been amended, restated, amended and restated, supplemented or otherwise modified as of the date hereof, the "Guaranty"), among Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), each of the Restricted Subsidiaries of Parent that is a party thereto or may become party thereto pursuant to Section 8 thereof (such Restricted Subsidiaries, collectively, the "Subsidiary Guarantors" and together with Parent and the Borrower, the "Guarantors") and the Administrative Agent.

Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Guaranty.

A.      Reference is made to that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Parent, the Borrower, the lenders party thereto (the "Lenders") and Goldman Sachs, in its capacity as Administrative Agent and Collateral Agent.

B.      Parent and the Guarantors have entered into the Guaranty in order to induce the Lenders to make Loans.  Each undersigned Restricted Subsidiary is executing this Guaranty Supplement in accordance with the requirements of the Credit Agreement and the Guaranty to become a Guarantor under the Guaranty in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Administrative Agent and the New Guarantor agree as follows:

Section 1.      Guaranty; Limitation of Liability.   (a) The undersigned hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on the date of any required prepayment or by acceleration, demand or otherwise, of all Secured Obligations (including Cash Management Obligations and obligations under Secured Hedge Agreements, but excluding Excluded Swap Obligations) of each other Loan Party now or hereafter existing, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such obligations being the "Guaranteed Obligations"), and agrees to pay all costs and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by the Administrative Agent or any other Secured Party in enforcing any rights under the Guaranty, subject to the limitations of Section 11.04 of the Credit Agreement.  Without limiting the generality of the foregoing, the undersigned's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)      The undersigned, and by its acceptance of this Guaranty Supplement, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty Supplement, the Guaranty and the Guaranteed Obligations of the undersigned hereunder and thereunder not constitute a fraudulent transfer or conveyance for purposes of Debtor Relief Laws, the

A-1

Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty Supplement, the Guaranty and the Guaranteed Obligations of the undersigned hereunder and thereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the undersigned hereby irrevocably agree that the Guaranteed Obligations of the undersigned under this Guaranty Supplement and the Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of the undersigned under this Guaranty Supplement and the Guaranty not constituting a fraudulent transfer or conveyance.

(c)     The undersigned hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Secured Party under this Guaranty Supplement, the Guaranty or any other guaranty, the undersigned will contribute, to the maximum extent permitted by applicable law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Secured Parties under or in respect of the Loan Documents.

Section 2.     <u>Obligations Under the Guaranty</u>.  The undersigned hereby agrees, as of the date first above written, to be bound as a Guarantor by all of the terms and conditions of the Guaranty to the same extent as each of the other Guarantors thereunder.  The undersigned further agrees, as of the date first above written, that each reference in the Guaranty to an "<u>Additional Guarantor</u>" or a "<u>Guarantor</u>" shall also mean and be a reference to the undersigned, and each reference in any other Loan Document to a "<u>Guarantor</u>", a "<u>Subsidiary Guarantor</u>" or a "<u>Loan Party</u>" shall also mean and be a reference to the undersigned.

Section 3.     <u>Representations and Warranties</u>.   The undersigned hereby makes each representation and warranty set forth in <u>Section 6</u> of the Guaranty to the same extent as each other Guarantor; it being understood and agreed that (i) any such representation or warranty applicable to the undersigned that expressly refers to an earlier date shall be deemed to refer to the date hereof and (ii) the undersigned shall be permitted to attach any schedule that is necessary to ensure that any such representation or warranty that is applicable to the undersigned is correct to the extent required by the terms of the Loan Documents.

Section 4.     <u>Delivery by Facsimile; Electronic Transmission</u>.   Delivery of an executed counterpart of a signature page to this Guaranty Supplement by facsimile or electronic transmission of a .pdf copy shall be effective as delivery of an original executed counterpart of this Guaranty Supplement.

Section 5.     <u>Governing Law</u>.  (a) THIS GUARANTY SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS GUARANTY SUPPLEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES OR THE AGENT OR ANY OF THEM WITH RESPECT TO THIS GUARANTY SUPPLEMENT OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS GUARANTY SUPPLEMENT, EACH OF THE UNDERSIGNED CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.     EACH OF THE UNDERSIGNED IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH

A-2

JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

(c)     WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS GUARANTY SUPPLEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY SUPPLEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE UNDERSIGNED, THE SECURED PARTIES, THE AGENTS OR ANY OF THEM WITH RESPECT TO THIS GUARANTY SUPPLEMENT, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND THE UNDERSIGNED HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY OF THE UNDERSIGNED MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 5(c) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE UNDERSIGNED TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

[Signature page follows]

A-3

#90430106v10

IN WITNESS WHEREOF, the part**[y][ies]** hereto **[has] [have]** caused this Guaranty Supplement to be duly executed as of the date first above written.

**[NAME OF ADDITIONAL GUARANTOR]**

By:_____
     Name:
     Title:

#90430106v10

GOLDMAN SACHS BANK USA, as Administrative Agent

By: _____

       Name:

       Title:

**EXHIBIT G-1**

**FORM OF FIRST LIEN PLEDGE AGREEMENT**

[See Attached]

FIRST LIEN PLEDGE AGREEMENT

By

TRICO GROUP, LLC,

TRICO GROUP HOLDINGS, LLC,

and

THE RESTRICTED SUBSIDIARIES OF PARENT PARTY HERETO,
as Pledgors,

and

GOLDMAN SACHS BANK USA,
as Collateral Agent

_____

Dated as of February 2, 2018

#90430109v10

# TABLE OF CONTENTS

**Page**

SECTION 1.    Pledge ........................................................................................................................... 1

SECTION 2.    Delivery of the Securities Collateral ......................................................................... 2

SECTION 3.    Representations, Warranties and Covenants ............................................................ 2

SECTION 4.    Registration in Nominee Name; Denominations ...................................................... 4

SECTION 5.    Voting Rights; Dividends and Interest, etc .............................................................. 4

SECTION 6.    Remedies upon Default ............................................................................................... 5

SECTION 7.    Application of Proceeds of Sale ................................................................................. 6

SECTION 8.    Collateral Agent Appointed Attorney-in-Fact ......................................................... 6

SECTION 9.    Waivers; Amendment ................................................................................................. 7

SECTION 10.   Securities Act, etc ....................................................................................................... 7

SECTION 11.   Termination or Release ............................................................................................. 8

SECTION 12.   Notices ......................................................................................................................... 8

SECTION 13.   Further Assurances ..................................................................................................... 8

SECTION 14.   Binding Effect; Several Agreement; Assignment ..................................................... 8

SECTION 15.   Survival of Agreement; Severability .......................................................................... 9

SECTION 16.   **GOVERNING LAW** ................................................................................................. 9

SECTION 17.   Counterparts ............................................................................................................... 9

SECTION 18.   Rules of Construction ................................................................................................. 9

SECTION 19.   Jurisdiction; Consent to Service of Process .............................................................. 9

SECTION 20.   WAIVER OF JURY TRIAL ...................................................................................... 10

SECTION 21.   Additional Pledgors ................................................................................................... 10

SECTION 22.   Filing of Financing Statements ................................................................................. 10

SECTION 23.   [Reserved] ................................................................................................................... 10

SECTION 24.   Intercreditor Agreement ........................................................................................... 10

i

#90430109v10

## SCHEDULES

Schedule I        Pledged Securities

#90430109v10

## FIRST LIEN PLEDGE AGREEMENT

FIRST LIEN PLEDGE AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") dated as of February 2, 2018, among Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), each Restricted Subsidiary of Parent that is a party hereto or may become a party hereto pursuant to SECTION 21 of this Agreement (the "Subsidiary Guarantors" and, together with Parent and the Borrower, the "Pledgors") and Goldman Sachs Bank USA, as administrative agent and as collateral agent (in such capacity, and together with any successors in such capacity, the "Collateral Agent") for the Secured Parties.

R E C I T A L S

A.      Parent, the Borrower, the lenders and agents party thereto from time to time and Goldman Sachs Bank USA, in its capacity as Administrative Agent and Collateral Agent, in connection with the execution and delivery of this Agreement, entered into that certain First Lien Term Loan Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), providing for the making of Loans to the Borrower pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement.

B.      Parent, the Borrower and each of the Subsidiary Guarantors has, pursuant to the First Lien Guaranty, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty") among other things, unconditionally guaranteed the obligations of the Loan Parties under the Loan Documents.

C.      The Borrower, Parent and each Subsidiary Guarantor will receive substantial benefits from the execution, delivery and performance of the Obligations under the Loan Documents and are, therefore, willing to enter into this Agreement.

D.      Contemporaneously with the execution and delivery of this Agreement, the Borrower, the Parent and the Subsidiary Guarantors have executed and delivered to the Collateral Agent a First Lien Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement").

E.      This Agreement is given by each Pledgor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of the Secured Obligations (whether or not constituting future advances, obligatory or otherwise) of the Borrower, Parent and any and all of the Subsidiary Guarantors from time to time arising under or in respect of this Agreement, the Credit Agreement, the Guaranty and the other Loan Documents and the other Secured Obligations.

Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement and/or the Security Agreement, as the context may require.

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each of the parties hereto hereby agree as follows:

SECTION 1.      Pledge.  As security for the timely payment in full in cash and the timely performance, as the case may be, of the Secured Obligations, each Pledgor hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in all of such Pledgor's right, title and interest in, to and under (a) all the Equity Interests owned by it (including the property listed on

**Debtors' Exhibit No. 12**
**Page 213 of 354**

Schedule I hereto) and other Equity Interests obtained in the future by such Pledgor and the certificates, if any, representing all such shares or interests (collectively, the "Pledged Stock"); (b)(i) all debt securities owned by it, (ii) all debt securities in the future issued to the Pledgor and (iii) all promissory notes and other instruments evidencing such debt securities (the "Pledged Debt Securities" and together with the Pledged Stock, the "Pledged Securities"); (c) subject to SECTION 5, all payments of dividends, cash, instruments, warrants, rights and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of the securities referred to in clause (a) and (b) above; (d) subject to SECTION 5, all rights and privileges of the Pledgor with respect to the securities and other property referred to in clauses (a), (b) and (c) above; and (e) all Proceeds of, and books and records relating to, any and all of the foregoing (all the foregoing, collectively, the "Securities Collateral"); provided, however, that the Securities Collateral and all components thereof shall exclude any Excluded Assets; provided, further, however, that no Pledgor shall be required to take any Excluded Perfection Action with respect to the Securities Collateral.

Upon delivery to the Collateral Agent, (a) any certificated Pledged Securities now or hereafter included in the Securities Collateral shall be accompanied by stock or note powers or allonges duly executed in blank or other instruments of transfer reasonably satisfactory to the Collateral Agent and (b) all other property comprising part of the Securities Collateral shall be accompanied by proper instruments of assignment duly executed by the applicable Pledgor and such other instruments or documents as the Collateral Agent may reasonably request.  Each subsequent delivery of Pledged Securities shall be accompanied by a schedule describing the securities then being pledged hereunder, which schedule shall be attached hereto as a supplement to Schedule I and made a part hereof.  Each schedule so delivered shall supplement any prior schedules so delivered.

SECTION 2.    Delivery of the Securities Collateral.  (a)  Each Pledgor agrees to promptly (and in any event on or before, (x) in the case of any delivery required by Section 6.11 of the Credit Agreement, the applicable time period set forth in Section 6.11 of the Credit Agreement (or such longer period as the Collateral Agent may agree) and (y) in all other cases, the date on which financial statements under Section 6.01(b) of the Credit Agreement are required to be delivered for the fiscal quarter in which the same were acquired (or, solely in the case of any such acquisition during the fourth fiscal quarter of the Borrower in any Fiscal Year, within 45 days of the beginning of the next succeeding Fiscal Year (or such longer period as Collateral Agent may agree)) deliver or cause to be delivered to the Collateral Agent any and all certificates or other instruments representing (together with stock powers or other instruments of transfer required to be delivered pursuant to Section 1) (i) the Pledged Stock and (ii) the Pledged Debt Securities, solely in the case of this clause (ii), in an individual principal amount greater than $500,000, in each case, required to be pledged to the Collateral Agent pursuant to the Loan Documents.

(b)    Each Domestic Restricted Subsidiary that is an issuer of Pledged Stock that is a limited liability company or a partnership shall not issue certificates to evidence its Equity Interests unless it shall have opted in to Article 8 under Section 8-103(c) of the UCC; it being understood and agreed that, if it has so opted in, it shall deliver (or cause the applicable Pledgor to deliver) such certificates together with stock powers or other instruments of transfer as required pursuant to Section 2(a) hereof.

SECTION 3.    Representations, Warranties and Covenants.  Upon becoming a Pledgor hereunder and on the Closing Date and on each date on which the representations and warranties in the Credit Agreement are made or are required to be made, each Pledgor hereby represents, warrants and each Pledgor covenants, as to itself and the Securities Collateral pledged by it hereunder, to and, in the case of covenants, with the Collateral Agent that:

2

Debtors' Exhibit No. 12
Page 214 of 354

(a)        Schedule I correctly represents as of the date hereof (i) the issuer, the issuer's jurisdiction of formation, the certificate number, if any, the Pledgor and the record owner, the number and class and the percentage of the issued and outstanding Equity Interests of such class of all Pledged Stock, in each case with respect to the Pledged Stock pledged or assigned by such Pledgor and (ii) the issuer, the issuer's jurisdiction, the initial principal amount, the Pledgor and holder, date of issuance and maturity date of all Pledged Debt Securities, in each case pledged or assigned by such Pledgor;

(b)        the Pledged Securities set forth on Schedule I constitute all Equity Interests, debt securities and promissory notes owned by such Pledgor as of the date hereof that are not included in the definition of "Collateral" under the Security Agreement (other than Excluded Assets);

(c)        such Pledgor will defend its title or interest to or in the Pledged Stock and all material Pledged Debt Securities against any and all Liens (other than Permitted Liens), however arising, of all Persons whomsoever;

(d)        (i) all of the Pledged Debt Securities issued by any Pledgor have been duly authorized, executed and delivered and are the enforceable obligations of such Pledgor, except in the case of enforceability as the same may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing and (ii) all of the Pledged Stock issued by any Pledgor have been duly authorized and validly issued and, in the case of Pledged Stock issued by a corporation, are fully paid and non-assessable;

(e)        all information set forth on Schedule I relating to the Pledged Securities is accurate and complete in all material respects as of the date hereof;

(f)        each Pledgor has good and valid rights in and title to the Securities Collateral with respect to which it has purported to grant a security interest hereunder, has full power and authority to grant to the Collateral Agent, for the benefit of the Secured Parties, the security interest in such Securities Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained and except to the extent that failure to obtain or make such consent or approval, as the case may be, individually or in aggregate, would not reasonably be expected to have a Material Adverse Effect;

(g)        except for restrictions and limitations imposed or permitted by the Loan Documents or imposed by securities laws, the Securities Collateral pledged, transferred or assigned by such Pledgor hereunder is freely transferable and assignable, and none of such Securities Collateral is subject to any option, right of first refusal, shareholders agreement, charter or bylaw provisions or contractual restriction of any nature that would prohibit, impair, delay or otherwise affect the pledge of such Securities Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(h)        the security interest granted hereunder constitutes (i) a legal and valid security interest in all the Securities Collateral securing the payment and performance of the Secured Obligations (it being understood that no representation or warranty is made as to the legality or validity of the security interest in the Securities Collateral constituting Pledged Stock in any Foreign Subsidiary under the laws of such Foreign Subsidiary's jurisdiction of organization) and (ii) subject to the delivery requirements described in Section 1 and the filings described in Section 22, a perfected security interest in all Securities Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any state thereof or the District of Columbia) pursuant to the UCC; and

3

(i)        the security interest granted hereunder in the Pledged Securities is and shall be prior to any other Lien on the Pledged Securities.  None of the Pledgors has filed or consented to the filing of (i) any financing statement or analogous document under the UCC or any other applicable laws covering any Securities Collateral (other than any financing statement or document pursuant to the ABL Loan Documents) or (ii) any assignment in which any Pledgor assigns any Securities Collateral or any security agreement or similar instrument covering any Securities Collateral, in each case, with any governmental or municipal office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect.

SECTION 4.    Registration in Nominee Name; Denominations.  The Collateral Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the Pledgors, endorsed or assigned in blank or in favor of the Collateral Agent; provided that the Collateral Agent shall not exercise any such right unless an Event of Default is continuing and the Collateral Agent has provided prior written notice thereof to the Borrower (except in the case of an Event of Default under Sections 9.01(f) or (g) of the Credit Agreement, in which case no such prior written notice will be required, subject to any applicable requirements of law).  During the continuance of any Event of Default, the Collateral Agent shall at all times have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

SECTION 5.    Voting Rights; Dividends and Interest, etc.  (a)  Unless and until an Event of Default shall have occurred and be continuing and subject to clauses (b) and (c) below:

(i)        Each Pledgor shall have the right to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose not inconsistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents;

(ii)        The Collateral Agent shall execute and deliver to each Pledgor, or cause to be executed and delivered to each Pledgor, all such proxies, powers of attorney and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above and to receive the cash dividends, interest, principal and other amounts it is entitled to receive pursuant to subparagraph (iii) below; and

(iii)        Each Pledgor shall be entitled to receive and retain any and all cash dividends, interest, principal and other amounts paid on the Pledged Securities to the extent and only to the extent that such cash dividends, interest, principal and other amounts are permitted by, and otherwise paid in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable laws.  All dividends, interest, principal and other amounts paid or payable to a Pledgor in respect of the Pledged Securities shall be and become part of the Securities Collateral unless the same constitutes Excluded Assets.

(b)        Upon the occurrence and during the continuance of an Event of Default, following prior written notice from the Collateral Agent of its intent to exercise its rights under this Section 5(b) (except in the case of an Event of Default under Sections 9.01(f) or (g) of the Credit Agreement, in which case no such prior written notice will be required, subject to any applicable requirements of law), all rights of any Pledgor to dividends, interest, principal or other amounts that such Pledgor is authorized to receive pursuant to paragraph (a)(iii) above shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such

4

dividends, interest, principal or other amounts. All dividends, interest, principal or other amounts received by the Pledgor contrary to the provisions of this Section 5 shall be held in trust for the benefit of the Collateral Agent and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsement). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in a collateral account and shall be applied in accordance with the provisions of Section 7. After all such Events of Default have been cured or waived, the Collateral Agent shall return to each Pledgor all cash dividends, interest, principal and other amounts (including interest earned thereon) that such Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) above and which remain in such account; provided, however, the Collateral Agent shall be under no obligation with respect to the investment of such cash dividends, interest, principal or other amounts, including, for the avoidance of doubt, any requirement to invest such cash dividends, interest, principal or other amounts in any class of investment, interest-bearing or otherwise.

(c)    Upon the occurrence and during the continuance of an Event of Default, following prior written notice from the Collateral Agent of its intent to exercise its rights under this Section 5(c) (except in the case of an Event of Default under Sections 9.01(f) or (g) of the Credit Agreement, in which case no such prior written notice will be required, subject to any applicable requirements of law), all rights of any Pledgor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this SECTION 5, and the obligations of the Collateral Agent under paragraph (a)(ii) of this SECTION 5, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers upon prior written notice to Pledgors. After all Events of Default have been cured or waived, such Pledgor will immediately have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) above and Collateral Agent shall have the obligations under paragraph (a)(ii) above.

SECTION 6.    Remedies upon Default. (a) After the occurrence and during the continuance of an Event of Default, subject to applicable regulatory and legal requirements, the Collateral Agent may sell or otherwise dispose of the Securities Collateral, or any part thereof, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate. Each Pledgor acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Pledgor, and, to the extent permitted by applicable law, the Pledgors hereby waive all rights of redemption, stay, valuation and appraisal any Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(b)    To the extent prior notice is required by applicable law, the Collateral Agent shall give a Pledgor ten (10) days' prior written notice (which each Pledgor agrees is reasonable notice within the meaning of Section 9-611 of the UCC) of the Collateral Agent's intention to make any sale or other disposition of such Pledgor's Securities Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Securities Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale. At any such sale, the Securities Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent shall not be obligated to

5

**Debtors' Exhibit No. 12**
**Page 217 of 354**

make any sale of any Securities Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Securities Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Securities Collateral is made on credit or for future delivery, the Securities Collateral so sold may be retained by the Collateral Agent until the sale price is paid in full by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Securities Collateral so sold and, in case of any such failure, such Securities Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by applicable law, private) sale made pursuant to this SECTION 6, any Secured Party may bid for or purchase, free from any right of redemption, stay, valuation or appraisal on the part of any Pledgor (all said rights being also hereby waived and released), the Securities Collateral or any part thereof offered for sale and may make payment on account thereof by using any Secured Obligation then due and payable to such Secured Party from any Pledgor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Pledgor therefor.  For purposes hereof, (a) a written agreement to purchase the Securities Collateral or any portion thereof shall be treated as a sale thereof, (b) the Collateral Agent shall be free to carry out such sale pursuant to such agreement and (c) no Pledgor shall be entitled to the return of the Securities Collateral or any portion thereof subject thereto, notwithstanding any cure of any Event of Default or any repayment of the Obligations following the entry into such an agreement.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose upon the Securities Collateral and to sell the Securities Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, the Pledgors shall remain liable for the deficiency.

SECTION 7.   Application of Proceeds of Sale.   The proceeds of any sale of Securities Collateral pursuant to SECTION 6, as well as any Securities Collateral consisting of cash pursuant to Section 5(b), shall be applied by the Collateral Agent in accordance with Section 9.03 of the Credit Agreement.

SECTION 8.   Collateral Agent Appointed Attorney-in-Fact.  Each Pledgor hereby appoints the Collateral Agent the attorney-in-fact of such Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem reasonably necessary to accomplish the purposes hereof, which appointment is irrevocable until the occurrence of the Termination Date and is coupled with an interest; provided that the Collateral Agent shall only take any action pursuant to such appointment after the occurrence and during the continuation of an Event of Default.  Without limiting the generality of the foregoing, the Collateral Agent shall have the right, after the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Collateral Agent's name or in the name of such Pledgor, to ask for, demand, sue for, collect, receive and give acquittance for any and all monies due or to become due under and by virtue of any Securities Collateral, to endorse checks, drafts, orders and other instruments for the payment of money payable to the Pledgor representing any interest or dividend or other distribution payable in respect of the Securities Collateral or any part thereof or on account thereof and to give full discharge for the same, to settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto, and to sell, assign, endorse, pledge, transfer and to make any agreement respecting, or otherwise deal with, the same; provided, however, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or

6

to take any action with respect to the Securities Collateral or any part thereof or the monies due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Pledgor for any act or failure to act hereunder, except for their own gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

SECTION 9.   Waivers; Amendment.  (a)  No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provisions of this Agreement or consent to any departure by any Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Pledgor in any case shall entitle such Pledgor or any other Pledgor to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into among Borrower, the Collateral Agent and the Pledgors with respect to which such waiver, amendment or modification is to apply subject to any consents required in accordance with Section 11.01 of the Credit Agreement.

SECTION 10.   Securities Act, etc.  In view of the position of the Pledgors in relation to the Pledged Securities, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Securities permitted hereunder.  Each Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Pledged Securities, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Securities could dispose of the same.  Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Pledged Securities under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect.  Each Pledgor recognizes that in light of such restrictions and limitations the Collateral Agent may in its reasonable discretion, with respect to any sale of the Pledged Securities, limit the purchasers to those who will represent and agree, among other things, to acquire such Pledged Securities for their own account for investment, and not with a view to the distribution or resale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Pledged Securities so sold.  Each Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Collateral Agent, in its reasonable discretion (but subject to the other provisions of this Agreement), (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Securities or part thereof shall have been filed under the Federal Securities Laws and (b) may approach and negotiate with a single potential purchaser to effect such sale.  Each Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions.  In the event of any such sale, the Collateral Agent shall incur no responsibility or liability for selling all or any part of the Pledged Securities at a price that the Collateral Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the

7

possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached.  The provisions of this SECTION 10 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Collateral Agent sells.

SECTION 11.   Termination or Release.  (a)  This Agreement and the security interests granted hereby (i) shall automatically terminate upon the Termination Date and (ii) shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment in respect of any Obligation is rescinded or must otherwise be restored by any Secured Party upon any bankruptcy or reorganization of any Pledgor or otherwise.  Any execution and delivery of termination statements or documents pursuant to this Section 11(a) shall be without recourse to or warranty by the Collateral Agent.

(b)     Under the circumstances described in Section 11.10 of the Credit Agreement, the security interest in the Securities Collateral described therein shall be automatically discharged and released without any further action by the Collateral Agent or any other Person effective as of the time of such sale, transfer or disposition.

(c)     In connection with any termination or release pursuant to paragraph (a) or (b), the Collateral Agent shall execute and deliver to any Pledgor, at such Pledgor's expense, all documents that such Pledgor shall reasonably request, in writing, to evidence such termination or release and shall deliver to such Pledgor any Securities Collateral of such Pledgor held by the Collateral Agent.  Any execution and delivery of documents pursuant to this SECTION 11 shall be without recourse to or warranty by the Collateral Agent.

SECTION 12.   Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 11.02 of the Credit Agreement.  All communications and notices hereunder to each Pledgor shall be given to it in care of the Borrower at the Borrower's address set forth on Schedule 11.02 of the Credit Agreement.

SECTION 13.   Further Assurances.  Each Pledgor agrees to do such further acts and things, and to execute and deliver such additional conveyances, assignments, agreements, instruments and documents, in each case as the Collateral Agent may at any time reasonably request in connection with the administration and enforcement of this Agreement or with respect to the Securities Collateral or any part thereof or in order better to assure and confirm unto the Collateral Agent its rights and remedies hereunder.

SECTION 14.   Binding Effect; Several Agreement; Assignment.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Pledgor that are contained in this Agreement shall bind and inure to the benefit of its successors and assigns.  This Agreement shall become effective as to any Pledgor when a counterpart hereof executed on behalf of such Pledgor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Pledgor and the Collateral Agent and their respective successors and assigns, and shall inure to the benefit of such Pledgor, the Collateral Agent and the other Secured Parties, and their respective successors and permitted assigns, except that no Pledgor shall have the right to assign its rights hereunder or any interest herein (and any such attempted assignment shall be void), except as contemplated by this Agreement or the other Loan Documents.  This Agreement shall be construed as a separate agreement with respect to each Pledgor and may be amended, modified, supplemented, waived or released with respect to any Pledgor without the approval of any other Pledgor and without affecting the obligations of any other Pledgor hereunder.

8

SECTION 15.   Survival of Agreement; Severability.   (a)   All covenants, agreements, representations and warranties made by any Pledgor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Collateral Agent and the other Secured Parties and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Secured Parties or on their behalf, and shall continue in full force and effect until this Agreement shall terminate.

(b)   In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.   It is understood and agreed that this Agreement shall create separate security interests in the Securities Collateral securing the Secured Obligations, as provided in SECTION 1, and that any determination by any court with jurisdiction that the security interest securing any Secured Obligation or class of Secured Obligations is invalid for any reason shall not in and of itself invalidate the security interest securing any other Secured Obligations hereunder.

SECTION 16.   **GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 17.   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or electronic transmission of a .pdf copy or an executed counterpart of this Agreement shall be effective as delivery of an original executed counterpart hereof; provided that original signatures shall be promptly delivered thereafter, it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

SECTION 18.   Rules of Construction.   The rules of construction specified in Sections 1.02 through 1.08 of the Credit Agreement shall be applicable to this Agreement.   Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 19.   Jurisdiction; Consent to Service of Process.   (a)   ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT  THE COLLATERAL AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY PLEDGOR IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS HEREUNDER OR AGAINST ANY SECURITIES COLLATERAL OR THE

9

ENFORCEMENT OF ANY JUDGMENT, AND EACH PLEDGOR HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR THERETO.

(b)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>SECTION 12</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 20.   <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 20</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 21.   <u>Additional Pledgors</u>.   Pursuant to <u>Section 6.11</u> of the Credit Agreement, certain Restricted Subsidiaries of Parent may be required, after the date hereof, to enter into this Agreement as a Pledgor.  Upon execution and delivery by such Restricted Subsidiary of an instrument in the form of Annex 1 attached to the Security Agreement, such Restricted Subsidiary shall become a Pledgor hereunder with the same force and effect as if originally named as a Pledgor herein.  The execution and delivery of such instrument shall not require the consent of any Pledgor hereunder.  The rights and obligations of each Pledgor hereunder shall remain in full force and effect notwithstanding the addition of any new Pledgor as a party to this Agreement.

SECTION 22.   <u>Filing of Financing Statements</u>.   Pursuant to Section 9-509 of the UCC, each Pledgor authorizes the Collateral Agent to file financing statements and continuation statements with respect to the Securities Collateral owned by it without the signature of such Pledgor in such form and in such filing offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent under this Agreement (including financing statements that describe the Collateral as "all assets" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC).  A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement for filing in any jurisdiction.

SECTION 23.   [Reserved].

SECTION 24.   <u>Intercreditor Agreements</u>.   Notwithstanding anything herein to the contrary, the Liens and security interests granted to Goldman Sachs Bank USA, as Collateral Agent, pursuant to this Agreement in any Securities Collateral and the exercise of any right or remedy by Goldman Sachs Bank USA, as Collateral Agent, with respect to any Securities Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement with the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control.

10

[Signature pages follow.]

11

**Debtors' Exhibit No. 12**
**Page 223 of 354**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

TRICO GROUP HOLDINGS, LLC
TRICO GROUP, LLC
AVM EXPORT, INC.
CARTER FUEL EXPORT, INC.
CARTER FUEL SYSTEMS, LLC
HEATHERTON HOLDINGS, LLC
KTRI HOLDINGS, INC.
KTRI OFFSHORE HOLDINGS, LLC
PREMIER MARKETING GROUP, LLC
STRONGARM, LLC
TRICO HOLDING CORPORATION
TRICO PRODUCTS CORPORATION
TRICO TECHNOLOGIES CORPORATION, as
Pledgors

By:_____
    Name:
    Title:

[Pledge Agreement Signature Page]

#90430109v10

GOLDMAN SACHS BANK USA, as Collateral Agent


By:_____
      Name:
      Title:  Authorized Signatory

[Pledge Agreement Signature Page]

#90430109v10

Schedule I to the
Pledge Agreement

PLEDGED SECURITIES

#90430109v10

**EXHIBIT G-2**

**FORM OF FIRST LIEN SECURITY AGREEMENT**

[See Attached]

FIRST LIEN SECURITY AGREEMENT

By

TRICO GROUP HOLDINGS, LLC,

as Parent,

TRICO GROUP, LLC,

as Borrower,

THE RESTRICTED SUBSIDIARIES OF THE BORROWER PARTY HERETO,

as Grantors,

GOLDMAN SACHS BANK USA,

as Collateral Agent

_____

Dated as of February 2, 2018

#90429545v10

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................................ 2

    SECTION 1.01.    Uniform Commercial Code Defined Terms ........................................ 2

    SECTION 1.02.    Credit Agreement Defined Terms....................................................... 2

    SECTION 1.03.    Definition of Certain Terms Used Herein ......................................... 2

    SECTION 1.04.    Rules of Construction ........................................................................ 8

ARTICLE II AUTHORITY OF COLLATERAL AGENT ...................................................... 8

    SECTION 2.01.    General Authority of the Collateral Agent over the Collateral ........... 8

    SECTION 2.02.    Exercise of Powers............................................................................ 8

    SECTION 2.03.    Remedies Not Exclusive .................................................................... 8

    SECTION 2.04.    Waiver and Estoppel ......................................................................... 9

    SECTION 2.05.    Limitation on Collateral Agent's Duty in Respect of Collateral .......... 9

    SECTION 2.06.    Limitation by Law ........................................................................... 10

ARTICLE III SECURITY INTEREST ................................................................................. 10

    SECTION 3.01.    Security Interest ............................................................................... 10

    SECTION 3.02.    No Assumption of Liability .............................................................. 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES................................................ 10

    SECTION 4.01.    Intellectual Property......................................................................... 11

    SECTION 4.02.    Names, Type and Jurisdiction of Organization, Organizational
                     Identification Numbers .................................................................... 11

    SECTION 4.03.    Enforceability and Perfection ......................................................... 12

ARTICLE V COVENANTS.................................................................................................... 12

    SECTION 5.01.    Protection of Security ...................................................................... 12

    SECTION 5.02.    Further Assurances .......................................................................... 12

    SECTION 5.03.    Taxes; Encumbrances ...................................................................... 12

    SECTION 5.04.    Continuing Obligations of the Grantors........................................... 12

    SECTION 5.05.    Liens on Collateral.......................................................................... 12

    SECTION 5.06.    Insurance ......................................................................................... 13

    SECTION 5.07.    Certain Covenants Regarding Intellectual Property........................... 13

    SECTION 5.08.    No Conflicts, Consents, etc.............................................................. 14

    SECTION 5.09.    Letter-of-Credit Rights .................................................................... 14

    SECTION 5.10.    Commercial Tort Claims. ................................................................ 14

i

ARTICLE VI REMEDIES .................................................................................................. 14

    SECTION 6.01.    Remedies upon Default.................................................................. 14

    SECTION 6.02.    Application of Proceeds ................................................................ 16

    SECTION 6.03.    Grant of License to Use Intellectual Property .............................. 16

ARTICLE VII MISCELLANEOUS ................................................................................... 16

    SECTION 7.01.    Notices ......................................................................................... 16

    SECTION 7.02.    Survival of Agreement ................................................................. 16

    SECTION 7.03.    Binding Effect .............................................................................. 17

    SECTION 7.04.    Successors and Assigns ................................................................ 17

    SECTION 7.05.    GOVERNING LAW ..................................................................... 17

    SECTION 7.06.    Waivers; Amendment; Several Agreement; Confidentiality ............... 17

    SECTION 7.07.    WAIVER OF JURY TRIAL ........................................................ 17

    SECTION 7.08.    Severability ................................................................................. 18

    SECTION 7.09.    Counterparts ................................................................................. 18

    SECTION 7.10.    Headings ...................................................................................... 18

    SECTION 7.11.    Jurisdiction; Consent to Service of Process ................................. 18

    SECTION 7.12.    Termination .................................................................................. 19

    SECTION 7.13.    Additional Grantors ..................................................................... 19

    SECTION 7.14.    [Reserved] .................................................................................... 19

    SECTION 7.15.    Collateral Agent Appointed Attorney-in-Fact ............................. 19

    SECTION 7.16.    Intercreditor Agreements ............................................................. 20

**ANNEXES**

Annex I                Form of Supplement

**SCHEDULES**

Schedule I          Intellectual Property

Schedule II         Chief Executive Office, Type of Organization, Jurisdiction of Organization and Organizational Identification Number

Schedule III       Commercial Tort Claims

#90429545v10

## FIRST LIEN SECURITY AGREEMENT

FIRST LIEN SECURITY AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of February 2, 2018 among Trico Group, LLC, a Delaware limited liability company ("Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), each Subsidiary Guarantor that is a party hereto or may become a party hereto pursuant to Section 7.13 of this Agreement (together with the Borrower and Parent, the "Grantors") and Goldman Sachs Bank USA ("Goldman Sachs"), as collateral agent (in such capacity, and together with any successors in such capacity, the "Collateral Agent") for the Secured Parties (as defined in the Credit Agreement).

### R E C I T A L S

A.      Pursuant to that certain First Lien Term Loan Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, Parent, the lenders party thereto from time to time (the "Lenders"), Goldman Sachs, in its capacity as Administrative Agent and Collateral Agent, the Grantors are required to enter into this Agreement.

B.      Each Grantor has, pursuant to that certain First Lien Guaranty, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty"), among Parent, the Borrower and each other guarantor party thereto and the Administrative Agent, among other things, unconditionally guaranteed the Obligations of the Borrower and the Loan Parties.

C.      The Borrower and each other Grantor will receive substantial benefits from the execution and delivery of the Credit Agreement and performance of the obligations thereunder and is, therefore, willing to enter into this Agreement.

D.      It is contemplated that, to the extent permitted by the Credit Agreement, one or more of the Grantors and/or their Restricted Subsidiaries may enter into one or more Secured Hedge Agreements with one or more Hedge Banks.

E.      It is contemplated that, to the extent permitted by the Credit Agreement, one or more of the Grantors and/or their Restricted Subsidiaries may enter into one or more Cash Management Agreements with one or more Cash Management Banks.

F.      Contemporaneously with the execution and delivery of this Agreement, the Borrower, and the other Grantors have executed and delivered to the Collateral Agent a First Lien Pledge Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Pledge Agreement").

G.      This Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties (as defined in the Credit Agreement) to secure the payment and performance of all of the Secured Obligations (as defined in the Credit Agreement).

NOW THEREFORE, in consideration of the foregoing and other benefits accruing each Grantor, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby makes the following grant, agreements and representations and warranties to the Collateral Agent for the benefit of the Secured Parties (and each of their respective successors and permitted assigns), as follows:

#90429545v10

# ARTICLE I

# DEFINITIONS

SECTION 1.01.   <u>Uniform Commercial Code Defined Terms</u>.  Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC, including the following which are capitalized herein:

"<u>Accounts</u>"; "<u>Certificate of Title</u>"; "<u>Chattel Paper</u>"; "<u>Commercial Tort Claim</u>"; "<u>Commodity Account</u>"; "<u>Commodity Contract</u>"; "<u>Deposit Accounts</u>"; "<u>Documents</u>"; "<u>Electronic Chattel Paper</u>"; "<u>Equipment</u>"; "<u>Fixtures</u>"; "<u>Goods</u>"; "<u>Instruments</u>" (as defined in Article 9 rather than Article 3 of the UCC); "<u>Inventory</u>"; "<u>Investment Property</u>"; "<u>Letter-of-Credit Rights</u>"; "<u>Letters of Credit</u>"; "<u>Securities</u>"; "<u>Securities Account</u>"; "<u>Securities Intermediary</u>"; "<u>Security Entitlement</u>"; "<u>Supporting Obligations</u>"; and "<u>Tangible Chattel Paper</u>".

SECTION 1.02.   <u>Credit Agreement Defined Terms</u>.  Capitalized terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

SECTION 1.03.   <u>Definition of Certain Terms Used Herein</u>.  As used herein, the following terms shall have the following meanings:

"<u>Account Debtor</u>" shall mean any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"<u>Accounts Receivable</u>" shall mean all Accounts and all right, title and interest in any returned goods, together with all rights, titles, securities and guarantees with respect thereto, including any rights to stoppage in transit, replevin, reclamation and resales, and all related security interests, liens, pledges and other related contracts, whether voluntary or involuntary, in each case whether now existing or owned or hereafter arising or acquired.

"<u>Agreement</u>" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"<u>Books and Records</u>" shall mean all instruments, files, records, ledger sheets and documents (including, without limitation, customer lists, credit files, printouts and other computer output materials) evidencing, covering or relating to any of the Collateral.

"<u>Borrower</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Collateral</u>" shall mean with respect to each of the Grantors all of the following, in each case, whether now owned or hereafter acquired, wherever located and whether now or hereafter existing or arising:

(a)      Accounts Receivable;

(b)      Books and Records;

(c)      cash, Money and Cash Equivalents

2

**Debtors' Exhibit No. 12**
**Page 232 of 354**

(d)      Chattel Paper;

(e)      Commercial Tort Claims specifically described on Schedule III, as such schedule may be supplemented from time to time pursuant to <u>Section 5.10</u>;

(f)      Documents;

(g)      Equipment;

(h)      Fixtures;

(i)      General Intangibles;

(j)      Goods;

(k)      Instruments;

(l)      Inventory;

(m)      Investment Property (including Securities Accounts and Commodity Accounts);

(n)      Letter-of-Credit Rights;

(o)      Supporting Obligations;

(p)      Deposit Accounts;

(q)      all Security Entitlements in any or all of the foregoing;

(r)      Intellectual Property

(s)      to the extent not covered by <u>clauses (a)</u> through <u>(r)</u> of this definition, all other personal property, whether tangible or intangible; and

(t)      Proceeds of any and all of the foregoing;

<u>provided</u> that, notwithstanding the foregoing, "<u>Collateral</u>" (and any of the component terms thereof) shall not include any (i) Securities Collateral (as defined in the Pledge Agreement) or other collateral for the Secured Obligations pledged under the Pledge Agreement, in each case to the extent an effective security interest has been granted in favor of the Collateral Agent in such property pursuant to the Pledge Agreement or (ii) Excluded Assets.

"<u>Collateral Estate</u>" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"<u>Computer Software</u>" shall mean all computer software, programs and databases in any form (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing.

3

**Debtors' Exhibit No. 12**
**Page 233 of 354**

"Copyright License" shall mean each written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party under any Copyright, including Computer Software (to the extent protected by copyright), now or hereafter owned by any Grantor or which such Grantor otherwise has the right to license, or granting any right to such Grantor under any Copyright now or hereafter owned by any third party, and all rights of such Grantor under any such agreement.

"Copyrights" shall mean any and all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all copyrights (whether statutory or common law, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Grantor, in each case, whether now owned or hereafter created or acquired by or assigned to such Grantor, including, without limitation, to the extent the same constitute Collateral, the copyrights, registrations and applications listed in Schedule I hereto, (b) all rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (c) all reissues, renewals, continuations and extensions thereof, (d) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (e) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"Credit Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Excluded Account" shall mean, (a) any Deposit Account that is used exclusively for payroll or payroll taxes, withholding tax or any other tax required to be collected, remitted or withheld, benefits, escrow, trust, cash collateral, customs or any other fiduciary account, (b) petty cash accounts, zero balance accounts and other accounts with amounts on deposit which do not exceed $250,000 per such account and $500,000 in the aggregate for all such accounts at any one time; provided that the aggregate amount on deposit for all such accounts may exceed $500,000 so long as (i) such aggregate amount does not exceed $500,000 for more than five (5) consecutive Business Days and (ii) such aggregate amount does not at any time exceed $1,000,000 and (c) for the avoidance of doubt, Deposit Accounts permitted to be pledged to or maintained with a factoring counterparty in respect of a Permitted Non-Recourse Factoring Transaction.

"Excluded Assets" shall mean, collectively (a) leased real property (including requirements to deliver landlord lien waivers, estoppels, consents and collateral access letters), (b) fee-owned real property other than Material Owned Property, (c) all foreign Intellectual Property except to the extent perfection can be obtained by filing a UCC-1 financing statement and any intent to use Trademark application filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b), prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act, 15 U.S.C. § 1051(d) or "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act, 15 U.S.C. § 1051(c), with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent to use Trademark application under applicable Law, (d) assets of and interests in partnerships, joint ventures and non-wholly-owned subsidiaries which cannot be pledged without the consent of one or more third parties (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), unless such consent has been obtained, or to the extent not permitted by the terms of such Person's organizational or joint venture document, (e) Excluded Equity, (f) any property as to which (and only for so long as) the Borrower and the Collateral Agent determine in their reasonable discretion that the burden or cost of creating or perfecting a security interest therein is excessive in view of the benefit of the security to be afforded thereby, (g) any property and assets the pledge of, or perfection of a security interest in, which would require governmental consent, approval, license or authorization (after giving effect to the applicable anti-

4

assignment provisions of the UCC or other applicable law) or the consent, approval, license or authorization of any third party to such pledge or security interest (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), unless such consent has been obtained (other than proceeds of such assets, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition), (h) all leases, contracts, agreements, licenses, franchises, charters, authorizations and permits to the extent the grant of a security interest therein is prohibited or is restricted by applicable law or by the terms thereof or that would require the consent of any Governmental Authority or third party to such pledge or security interest, unless such consent has been obtained, in each case except to the extent such prohibition or restriction is ineffective under the UCC (other than Proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) and so long as no such third party consent requirement was created in contemplation hereof, (i) any assets to the extent the grant or pledge of, or perfection of a security interest in to the extent the same would result in material adverse tax consequences (including, without limitation, as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) as mutually determined by the Borrower and the Collateral Agent, (j) Commercial Tort Claims with a value of less than $500,000 except to the extent perfection can be obtained by filing a UCC-1 financing statement, (k) vehicles and any other assets subject to a certificate of title, (l) Letter of Credit Rights, with a value of less than $500,000 except to the extent perfection can be obtained by filing a UCC-1 financing statement, (m) any Excluded Accounts, (n) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time), (o) any assets of any Excluded Subsidiary, (p) other than with respect to the pledge of equity interests by a Grantor, any assets located outside of the United States; provided that no Grantor shall be required to take any action to perfect the pledge of equity interests by such Grantor in any jurisdiction other than the United States, (q) any Accounts disposed of pursuant to a Permitted Non-Recourse Factoring Transaction and any Related Assets in respect thereof, (r) any inventory disposed of pursuant to a Permitted Inventory Financing and any Related Assets in respect thereof and (s) any Proceeds, substitutions or replacements of any of the foregoing, but only to the extent such Proceeds, substitutions or replacements would otherwise constitute Excluded Assets.

"Excluded Equity" shall mean (a) any Voting Stock in excess of 65% of the issued and outstanding Voting Stock of each Wholly-owned Subsidiary that is a Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person (and Equity Interests in any Subsidiary of any such Person), (b) Equity Interests in any Immaterial Subsidiary, (c) Equity Interests in any captive insurance Subsidiary, (d) Equity Interests in not-for-profit Subsidiaries, (e) Equity Interests in special purpose entities used for securitization facilities, and (f) Equity Interests in any broker-dealer Subsidiary.

"Excluded Perfection Action" shall mean, with respect to any Collateral, any action (a) in any foreign jurisdiction in order to create or perfect any security interests in assets located outside of the United States and (b) other than the filing of a UCC-1 financing statement, to perfect the Security Interest of the Collateral Agent in any Chattel Paper with a value of less than $500,000.

"General Intangibles" shall mean, collectively, all general intangibles (as such term is defined in the UCC), and in any event shall include, without limitation, all choses in action and causes of action and all other intangible personal property of any Grantor of every kind and nature now owned or hereafter acquired by any Grantor, including all rights and interests in partnerships, limited partnerships, limited liability companies and other unincorporated entities, corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Secured Hedge Agreements and other agreements), Intellectual Property, goodwill, registrations, franchises and tax refund claims.

"Grantors" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

5

"<u>Intellectual Property</u>" shall mean any and all intellectual property and similar proprietary rights of every kind and nature in any jurisdiction throughout the world now owned or hereafter acquired by any Grantor, including, without limitation, any and all (a) Patents, Copyrights, intellectual property rights in Computer Software, Licenses, Trademarks and Trade Secrets, (b) goodwill associated with any of the foregoing, (c) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (d) rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"<u>Lenders</u>" shall have the meaning assigned to such term in the recitals of this Agreement.

"<u>License</u>" shall mean any Patent License, Trademark License or Copyright License including, without limitation, those listed on <u>Schedule I</u> hereto.

"<u>Parent</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Patent License</u>" shall mean any written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party to make, have made, use, import, offer to sell, or sell any invention on which a Patent, now or hereafter owned by any Grantor or which any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any right to make, have made, use, import, offer to sell or sell any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"<u>Patents</u>" shall mean any and all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all industrial designs, mask works, letters patent, all registrations and recordings thereof, and all applications for letters patent, including registrations, recordings and pending applications in the United States Patent and Trademark Office, including, to the extent the same constitute Collateral, those listed on <u>Schedule I</u> hereto and (b) all reissues, continuations, divisions, continuations in part, renewals or extensions thereof, and the inventions disclosed or claimed therein and patentable improvements thereto, including the right to make, use and/or sell the inventions disclosed or claimed therein and all improvements thereto, (c) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (d) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"<u>Permitted Liens</u>" means any Liens permitted under <u>Section 7.01</u> of the Credit Agreement.

"<u>Pledge Agreement</u>" shall have the meaning assigned to such term in the recitals of this Agreement.

"<u>Pledged Securities</u>" shall have the meaning assigned to such term in the Pledge Agreement.

"<u>Pledgor</u>" has the meaning specified in the Pledge Agreement.

"<u>Proceeds</u>" shall mean, collectively, all "<u>proceeds</u>," as such term is defined in the UCC, and in any event shall include, without limitation, any consideration received from the sale, exchange, license, lease or other disposition of any asset or property that constitutes Collateral, any value received as a consequence of the possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of

6

**Debtors' Exhibit No. 12**
**Page 236 of 354**

whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for (and the right to sue and recover for and the rights to damages or profits due or accrued arising out of or in connection with) (i) past, present or future infringement, misappropriation or other violations of any Patent now or hereafter owned by any Grantor, or licensed under a Patent License, (ii) past, present or future infringement, dilution, misappropriation or other violations of any Trademark now or hereafter owned by any Grantor or licensed under a Trademark License or injury to the goodwill associated with or symbolized by any Trademark now or hereafter owned by any Grantor, (iii) past, present or future breach of any License, (iv) past, present or future infringement, misappropriation or other violations of any Copyright now or hereafter owned by any Grantor and (v) past, present or future infringement, misappropriation or other violations of any other Intellectual Property now or hereafter owned by any Grantor or licensed under a Copyright License and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Security Interest" shall have the meaning assigned to such term in Section 3.01(a).

"Trademark License" shall mean any written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party to use any Trademark now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any Trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

"Trademarks" shall mean all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all trademarks, service marks, domain names, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, slogans, social media identifiers or accounts and other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any State of the United States, and all extensions or renewals thereof, including, to the extent the same constitute Collateral, those listed on Schedule I hereto, (b) all goodwill associated therewith or symbolized thereby, (c) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, dilution, misappropriation or other violations thereof and (d) all rights to sue for past, present or future infringement, dilution, misappropriation or other violations thereof.

"Trade Secrets" shall mean all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all confidential and proprietary information of each Grantor, including, without limitation, know-how, show-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, and databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, information., (b) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (c) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided, however, that if by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a

7

jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions relating to such provisions.

"Voting Stock" means, as to any issuer, the issued and outstanding shares of each class of capital stock or other ownership interests of such issuer entitled to vote (within the meaning of Treasury Regulation § 1.956-2(c)(2)).

SECTION 1.04.   Rules of Construction.   The provisions of Sections 1.02 through 1.08 of the Credit Agreement shall apply to this Agreement, *mutatis mutandis*.   In addition, where the context requires, provisions relating to any Collateral, when used in relation to a Grantor, shall refer to such Grantor's Collateral or any relevant part thereof.

## ARTICLE II

## AUTHORITY OF COLLATERAL AGENT

SECTION 2.01.   General Authority of the Collateral Agent over the Collateral.   By acceptance of the benefits of this Agreement and the other Collateral Documents, each Secured Party shall be deemed irrevocably (i) to consent to the appointment of the Collateral Agent as its agent hereunder and under the other Collateral Documents, (ii) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for enforcement of any provisions of this Agreement and the other Collateral Documents directly against any Grantor or the exercise of remedies hereunder or thereunder, (iii) to agree that such Secured Party shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor or to exercise any remedy hereunder or thereunder other than any rights of set-off it may have and (iv) to agree to be bound by the terms of this Agreement and the Collateral Documents.

The Collateral Agent hereby agrees that it holds and will hold all of its right, title and interest in, to and under the Collateral Documents and the Collateral granted to the Collateral Agent thereunder whether now existing or hereafter arising (all such right, title and interest being hereinafter referred to as the "Collateral Estate") under and subject to the conditions set forth in this Agreement and the other Loan Documents; and the Collateral Agent further agrees that it will hold such Collateral Estate for the benefit of the Secured Parties, as security for the enforcement of the payment of all Secured Obligations (subject to the limitations and priorities set forth herein and in the respective Collateral Documents and/or other Loan Documents) and as security for the performance of and compliance with the covenants and conditions of this Agreement and the Loan Documents.

SECTION 2.02.   Exercise of Powers.   All of the powers, remedies and rights of the Collateral Agent as set forth in this Agreement may be exercised by the Collateral Agent in respect of any Collateral Document as though set forth in full therein and all of the powers, remedies and rights of the Collateral Agent as set forth in any Collateral Document may be exercised from time to time as herein and therein provided.

SECTION 2.03.   Remedies Not Exclusive.

(a)      No remedy conferred upon or reserved to the Collateral Agent herein or in the Collateral Documents is intended to be exclusive of any other remedy or remedies, but every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or in any Collateral Document or now or hereafter existing at law or in equity or by statute.

8

Debtors' Exhibit No. 12
Page 238 of 354

(b)     No delay or omission by the Collateral Agent to exercise any right, remedy or power hereunder or under any Collateral Document shall impair any such right, remedy or power or shall be construed to be a waiver thereof, and every right, power and remedy given by this Agreement or any other Collateral Document to the Collateral Agent may be exercised from time to time by the Collateral Agent in accordance with and subject to the limitations set forth in the Loan Documents.

(c)     If the Collateral Agent shall have proceeded to enforce any right, remedy or power under this Agreement or any other Collateral Document and the proceeding for the enforcement thereof shall have been discontinued or abandoned for any reason, then the Grantors, the Collateral Agent and the other Secured Parties shall, subject to any determination in such proceeding, severally and respectively be restored to their former positions and rights hereunder or thereunder with respect to the Collateral Estate and in all other respects, and thereafter all rights, remedies and powers of the Collateral Agent shall continue as though no such proceeding had been taken.

SECTION 2.04.   Waiver and Estoppel.

(a)     Subject to the terms of the Collateral Documents and the other Loan Documents, each Grantor agrees, to the extent it may lawfully do so, that it will not claim, or take the benefit or advantage of, any appraisement, valuation, stay, extension, moratorium, turnover or redemption law, or any law permitting it to direct the order in which the Collateral shall be sold, now or at any time hereafter in force, with the knowledge that such action is reasonably likely to hinder, delay or impede the performance or enforcement of this Agreement or any other Collateral Document and hereby waives all benefit or advantage of all such laws and covenants that it will not hinder, delay or impede the execution of any power granted to the Collateral Agent in this Agreement or any other Collateral Document, but will suffer and permit the execution of every such power as though no such law were in force; provided that nothing contained in this Section 2.04(a) shall be construed as a waiver of any rights of the Grantors under any applicable federal bankruptcy law or state insolvency law.

(b)     Each Grantor, to the extent it may lawfully do so, on behalf of itself and all Persons under its control who may claim through or under it, including without limitation any and all such Persons which are subsequent creditors, vendees, assignees and licensors, waives and releases all rights to demand or to have any marshaling of the Collateral upon any sale, whether made under any power of sale granted herein or in any Loan Document or pursuant to judicial proceedings or upon any foreclosure or any enforcement of this Agreement or any other Loan Document and consents and agrees that all the Collateral may at any such sale be offered and sold as an entirety.

(c)     Each Grantor waives, to the extent permitted by applicable law, presentment, demand, protest and any notice of any kind (except notices explicitly required hereunder or under any other Loan Document) in connection with this Agreement and the other Collateral Documents and any action taken by the Collateral Agent with respect to any Collateral.

SECTION 2.05.   Limitation on Collateral Agent's Duty in Respect of Collateral.   The Collateral Agent shall use reasonable care with respect to the Collateral in its possession; provided that the Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to which it accords its own property.  Beyond such duty and any other duties as to the custody thereof expressly provided herein or in any other Collateral Document and to account to the Secured Parties and the Grantors for monies and other property received by it hereunder or under any other Collateral Document and any other express duties specified in the Collateral Documents, the Collateral Agent shall not have any duty to the Grantors or to the Secured Parties as to any Collateral in its possession or control or in the

9

Debtors' Exhibit No. 12
Page 239 of 354

possession or control of any of its agents or nominees, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except to the extent required by law.

SECTION 2.06.   Limitation by Law.   All rights, remedies and powers provided in this Agreement or any other Collateral Document may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions hereof are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement invalid, unenforceable in whole or in part or not entitled to be recorded, registered or filed under the provisions of any applicable law.

The provisions of this Article II are without limitation to the provisions under Article X of the Credit Agreement relating to the Collateral Agent.

## ARTICLE III

## SECURITY INTEREST

SECTION 3.01.   Security Interest.

(a)     As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Collateral Agent and its successors and permitted assigns, for the ratable benefit of the Secured Parties, a security interest in, all of such Grantor's right, title and interest in, to and under the Collateral of such Grantor, in each case, whether now existing or owned or hereafter arising or acquired, and wherever located.  The Liens granted hereunder to secure the Secured Obligations are referred to herein as the "Security Interest."

(b)     Without limiting the foregoing, the Collateral Agent is hereby authorized at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings and financing statements that describe the Collateral as "all assets" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC), continuation statements, filings with the United States Patent and Trademark Office, United States Copyright Office or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor, or the first priority thereof (other than with respect to any ABL Priority Collateral) without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Collateral Agent as secured party.

(c)     Notwithstanding anything in this Agreement to the contrary, in no event shall any Grantor be required to take any Excluded Perfection Action with respect to any Collateral.

SECTION 3.02.   No Assumption of Liability.   The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Grantors jointly and severally represent and warrant to the Collateral Agent and the Secured Parties on the Closing Date and on each date on which the representations and warranties contained in the Credit Agreement are made or required to be made:

10

SECTION 4.01.    Intellectual Property.

(a)    Except as would not reasonably be expected to result in a Material Adverse Effect, each Grantor owns all right, title and interest in or otherwise has a valid and enforceable right or license to use any and all Intellectual Property that is used or held for use in, or otherwise necessary for, the operation of such Grantor's business as currently conducted.  As of the date hereof, each Grantor represents and warrants that the Copyrights, Patents and Trademarks listed on Schedule I hereto include all active United States federal registrations of and active pending applications for United States federal registration of, Copyrights, Patents and Trademarks that constitute Collateral that such Grantor owns as of the date hereof and all material Copyright Licenses pursuant to which any Grantor is granted an exclusive license to one or more registered United States Copyrights that are specifically identified in such Copyright License.  To the knowledge of each of the Grantors, there are no proceedings pending against such Grantor with respect to the use by such Grantor of any Intellectual Property or challenging or questioning the validity or enforceability of any Intellectual Property, in each case, except where such use, invalidity or unenforceability would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, no Person is engaging in any activity that infringes, misappropriates or otherwise violates or conflicts with any Intellectual Property owned by such Grantor in a manner that would reasonably be expected to have a Material Adverse Effect.  Each Grantor has taken commercially reasonable efforts to maintain the confidentiality and value of all Trade Secrets necessary for the operation of the business of such Grantor except as would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, no Trade Secrets necessary for the operation of the business of any Grantor have been disclosed by such Grantor except pursuant to non-disclosure agreements and/or license agreements that contain non-disclosure restrictions, in each case, that have not been breached except as would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, the operation of such Grantor's business as currently conducted and the use of the Intellectual Property in connection therewith do not infringe or misappropriate the intellectual property rights of any third party in a manner that would reasonably be expected to have a Material Adverse Effect.

(b)    Each Grantor represents and warrants that a fully executed Intellectual Property Security Agreement containing a description of the Collateral consisting of United States registered Patents, United States registered Trademarks and United States registered Copyrights (and applications for any of the foregoing), including such Patents, Trademarks and Copyrights set forth on Schedule I, as applicable, and executed by each Grantor owning any such Collateral, have been delivered to the Collateral Agent for recording with the United States Patent and Trademark Office or the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in respect of all Collateral consisting of Patents, Trademarks and Copyrights in which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Collateral consisting of registered or applied for Patents, Trademarks and Copyrights acquired or developed by a Grantor after the date hereof).

SECTION 4.02.    Names, Type and Jurisdiction of Organization, Organizational Identification Numbers.  As of the date hereof, each Grantor hereby represents and warrants that Schedule II hereto sets forth (i) its exact legal name, (ii) its type of organization, (iii) its jurisdiction of organization, (iv) its tax identification number, (v) its organizational identification number and (vi) the address of its chief executive office.

11

SECTION 4.03.   Enforceability and Perfection.  The Security Interest constitutes (i) a legal and valid security interest in all the Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings of UCC-1 financing statements with respect to each Grantor and the filings described in Section 4.01(b), a perfected security interest in all Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any state thereof or the District of Columbia) pursuant to the UCC and (iii) subject to the filings described in Section 4.01(b), a security interest that shall be perfected in all Collateral in which a security interest may be perfected upon the receipt and recording of an Intellectual Property Security Agreement with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three-month period after the date hereof pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one-month period after the date hereof pursuant to 17 U.S.C. § 205

## ARTICLE V

## COVENANTS

SECTION 5.01.   Protection of Security.  Each Grantor shall, at its own cost and expense, take any and all actions reasonably necessary to defend its right, interest and title in and to the Collateral against all Persons and to defend the Security Interest of the Collateral Agent in the Collateral and the first priority thereof (other than any ABL Priority Collateral) against any Lien other than Permitted Liens, except where failure to do so is otherwise permitted (or not prohibited) under the Credit Agreement.

SECTION 5.02.   Further Assurances.  Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments, agreements and documents and take all such actions, in each case as the Collateral Agent may from time to time reasonably request to assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby and by the other Loan Documents, subject in all respects to the limitations set forth in the Credit Agreement and the other Loan Documents.

SECTION 5.03.   Taxes; Encumbrances.  During the continuance of an Event of Default, the Collateral Agent at its option may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Collateral except to the extent the same constitute Permitted Liens, and may pay for the maintenance and preservation of the Collateral to the extent any Grantor fails to do so as required by this Agreement, and each Grantor jointly and severally agrees to reimburse the Collateral Agent for any payment made or any expense incurred by the Collateral Agent pursuant to the foregoing authorization in accordance with Sections 11.04 and 11.05 of the Credit Agreement; provided, however, that nothing in this Section 5.03 shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, liens, security interests or other encumbrances or maintenance or preservation as set forth herein or in the other Loan Documents.

SECTION 5.04.   Continuing Obligations of the Grantors.  As between the Grantors and the Collateral Agent, each Grantor shall remain liable to observe and perform in all material respects all the conditions and obligations to be observed and performed by it under each material contract, agreement or instrument relating to the Collateral.

SECTION 5.05.   Liens on Collateral.  Except as permitted under the Credit Agreement, none of the Grantors shall grant any Lien in respect of the Collateral other than Liens securing the Secured Obligations and Permitted Liens.

12

SECTION 5.06.   <u>Insurance</u>.   Each Grantor irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent), until the occurrence of the Termination Date, as such Grantor's true and lawful agent (and attorney in fact) for the purpose, during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.   So long as no Event of Default has occurred and is continuing, all actions to be taken with respect to the making, settling and adjusting of claims under insurance policies may be taken by the Grantors without any requirement of participation or consent from the Collateral Agent.

SECTION 5.07.   <u>Certain Covenants Regarding Intellectual Property</u>.

(a)   Except to the extent otherwise permitted under the Credit Agreement, with respect to each item of its Intellectual Property, (i) each Grantor shall take, at its expense, all commercially reasonable steps, including, without limitation, with respect to Intellectual Property owned by such Grantor that is registered or for which an application for registration is pending, in the U.S. Patent and Trademark Office and the U.S. Copyright Office, to maintain the validity and enforceability of such Intellectual Property and (ii) unless using Grantor's commercially reasonable judgment it is prudent to do so, no Grantor shall discontinue use of or otherwise abandon any of its Intellectual Property, or abandon any right to file an application for any Patent, Trademark, or Copyright.

(b)   Except to the extent otherwise permitted under the Credit Agreement, and unless using Grantor's commercially reasonable judgment it is prudent to do so, each Grantor shall use proper statutory notice as required by law in connection with its use of its Intellectual Property and no Grantor shall do or knowingly omit to do any act whereby any of its Intellectual Property is likely to lapse or become invalid or unenforceable or placed in the public domain.

(c)   In the event that any Grantor, either itself or through any agent, employee, licensee or designee acting on behalf of such Grantor, files an application for or, following the Closing Date (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), becomes the registered owner of any United States Registered Patent, Trademark or Copyright or becomes the exclusive licensee of a United States Registered Copyright pursuant to a Copyright License, such Grantor shall notify the Collateral Agent on or before the date on which financial statements are required to be delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable, of the Credit Agreement for the fiscal quarter in which the relevant event occurred (or such longer period as the Collateral Agent may reasonably agree), and execute and deliver to the Collateral Agent, at such Grantor's expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, as the Collateral Agent may reasonably request and require to evidence the Collateral Agent's security interest in such registered Patent, Trademark, Copyright (or application therefor) or Copyright License.   Each Grantor hereby appoints the Collateral Agent as its attorney in fact to execute and file such writings solely for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; such power, being coupled with an interest, is irrevocable until the Termination Date.

(d)   Upon and during the continuance of an Event of Default, each Grantor shall upon the written request of the Collateral Agent use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor of each Copyright License, Patent License or Trademark License to effect the assignment (during the continuance of such Event of Default) of all of such Grantor's right, title and interest thereunder to the Collateral Agent or its designee.

13

Debtors' Exhibit No. 12
Page 243 of 354

SECTION 5.08.    No Conflicts, Consents, etc.  In the event that an Event of Default has occurred and is continuing and the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney in fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Collateral Agent, such Grantor agrees to use commercially reasonable efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 5.09.   Letter-of-Credit Rights.  If any Grantor is at any time a beneficiary under a letter of credit with an aggregate face amount in excess of $500,000 now or hereafter issued in favor of such Grantor that is not a Supporting Obligation with respect to any of the Collateral, such Grantor shall promptly notify the Collateral Agent thereof and, at the written request and option of the Collateral Agent, such Grantor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, use commercially reasonable efforts to arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under such letter of credit, with the Collateral Agent agreeing that the proceeds of any drawing under such letter of credit are to be paid to the applicable Grantor unless an Event of Default has occurred and is continuing.

SECTION 5.10.   Commercial Tort Claims.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim in an amount reasonably estimated to exceed $500,000, such Grantor shall promptly notify the Collateral Agent thereof in a writing signed by such Grantor, including a summary description of such claim, and Schedule III shall be deemed to be supplemented to include such description of such commercial tort claim as set forth in such writing.

## ARTICLE VI

## REMEDIES

SECTION 6.01.    Remedies upon Default.  After the occurrence and during the continuance of an Event of Default, it is agreed that the Collateral Agent shall have the right to take any of or all the following actions at the same or different times: (a) with respect to any Collateral consisting of Intellectual Property, to exercise the rights expressly granted to it pursuant to Section 6.03(a) hereof, subject to Section 6.03(b) hereof, and (b) with or without legal process and with or without prior demand for performance, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral and, generally, to exercise any and all rights afforded to a secured party under the UCC or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Collateral Agent shall have the right, subject to the mandatory requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate.  The Collateral Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

14

To the extent prior notice is required by applicable law, the Collateral Agent shall give the applicable Grantor ten (10) days' prior written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the UCC) of the Collateral Agent's intention to make any sale or other disposition of such Grantor's Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine.  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall reasonably determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by law, private) sale made pursuant to this Section 6.01, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any Secured Obligation then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.  For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof, the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding any cure of any Event of Default or any repayment of the Obligations following the entry into such an agreement.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver.  Each Grantor acknowledges that any sale pursuant to the provisions of this Section 6.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-611 of the UCC.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, the Grantors shall remain liable for the deficiency.

At any time upon the occurrence and during the continuance of an Event of Default, the Collateral Agent may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person, except to the extent expressly provided in the Credit Agreement or any other Loan Document (which notice is hereby expressly waived to the maximum extent permitted by the UCC or any other applicable law), (i) with respect to any Grantor's Deposit Accounts in which the Collateral Agent's security interest is perfected by control under Section 9-104 of the UCC, instruct the bank maintaining such Deposit Account for the applicable Grantor to pay the balance of such Deposit Account to or for the benefit of the Collateral Agent, and (ii) with respect to any Grantor's Securities Accounts in which the Collateral Agent's security interest is perfected by control under Section 9-106 of the UCC, instruct the securities intermediary maintaining such Securities Account for the applicable Grantor to (A) transfer any cash in such Securities Account to or for the benefit of the Collateral Agent, or

15

**Debtors' Exhibit No. 12**
**Page 245 of 354**

(B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of the Collateral Agent.

SECTION 6.02.    Application of Proceeds.  The proceeds of any sale of Collateral pursuant to Section 6.01, as well as any Collateral consisting of cash required to be applied by the terms of this Agreement, shall be applied by the Collateral Agent in accordance with Section 9.03 of the Credit Agreement.

SECTION 6.03.    Grant of License to Use Intellectual Property.

(a)    Subject to clause (b) below, solely for the purposes of the exercise by the Collateral Agent of its rights and remedies under this Article at and during such time as the Collateral Agent shall be lawfully or contractually entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent an irrevocable, royalty-free, nonexclusive license to make, have made, use, sell, copy, distribute, perform, reproduce, publicly display, make derivative works and otherwise exploit any of the Collateral consisting of Intellectual Property now owned or hereafter acquired by such Grantor, solely to the extent permissible under the Licenses and applicable Laws relevant to such Collateral (a "Permitted Purpose"), and such license shall include reasonable access to all media in which any of the licensed items may be recorded or stored and to all Computer Software used for the compilation or printout thereof.  The Collateral Agent shall comply with the terms of all Licenses and applicable Laws in connection with its exercise of this license and shall obtain all necessary consents and pay all royalties and other compensation due pursuant to such Licenses to the extent arising from its exercise of this license.

(b)    The use of such license by the Collateral Agent may be exercised, at the option of the Collateral Agent, solely after the occurrence and during the continuation of an Event of Default, and only for a Permitted Purpose.  Such license shall be irrevocable until the Termination Date.  Nothing in this Section grants, or shall require a Grantor to grant, with respect to its property any license that is prohibited by applicable Laws or would constitute a breach by a Grantor of any third party contract, license, agreement, instrument or other document concerning such property.  Notwithstanding the existence of any Event of Default, any license rights granted under the Collateral under this Section are subject to all other earlier license rights granted by any Grantor to any third party that are not otherwise prohibited by this Agreement.  In the event the license set forth in this Section is exercised with regard to any Trademarks, then the following shall apply: (i) all goodwill arising from any licensed or sublicensed use of any Trademark shall inure to the benefit of the owners of such Trademarks; and (ii) the licensed or sublicensed Trademarks shall only be used by the Collateral Agent and its sublicensees in association with goods or services of a quality and nature consistent with the quality and reputation with which such Trademarks were associated when used by the applicable Grantor prior to the exercise of the license rights set forth herein.

**ARTICLE VII**

**MISCELLANEOUS**

SECTION 7.01.   Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 11.02 of the Credit Agreement. All communications and notices hereunder to each Grantor shall be given to it in care of the Borrower at the Borrower's address set forth in Section 11.02 of the Credit Agreement.

SECTION 7.02.   Survival of Agreement.  All covenants, agreements, representations and warranties made by any Grantor herein and in the certificates or other instruments prepared or delivered

16

in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Collateral Agent and the other Secured Parties and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Secured Parties or on their behalf, and shall continue in full force and effect until the Termination Date.

SECTION 7.03.   Binding Effect.   This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective successors and permitted assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective successors and permitted assigns, except that no Grantor shall have the right to assign its rights or obligations hereunder or any interest herein (and any such assignment shall be void) except as permitted by any of the other Loan Documents.

SECTION 7.04.   Successors and Assigns.   Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

SECTION 7.05.   GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 7.06.   Waivers; Amendment; Several Agreement; Confidentiality.

(a)      No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provisions of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Grantor in any case shall entitle such Grantor or any other Grantor to any other or further notice or demand in similar or other circumstances

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into among the Borrower, the Collateral Agent and the Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consents required in accordance with Section 11.01 of the Credit Agreement.

(c)      This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

(d)      The Collateral Agent agrees to maintain the confidentiality of Loan Party Information as provided in Section 11.08 of the Credit Agreement.

SECTION 7.07.   WAIVER OF JURY TRIAL.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY

17

CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 7.07</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 7.08.   <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.  It is understood and agreed among the parties that this Agreement shall create separate security interests in the Collateral securing the Secured Obligations as provided in <u>Section 3.01</u>, and that any determination by any court with jurisdiction that the security interest securing any Secured Obligation or class of Secured Obligations is invalid for any reason shall not in and of itself invalidate the Security Interest securing any other Secured Obligations hereunder.

SECTION 7.09.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or electronic transmission of a .pdf copy or an executed counterpart of this Agreement shall be effective as delivery of an original executed counterpart hereof; <u>provided</u> that original signatures shall be promptly delivered thereafter, it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

SECTION 7.10.   <u>Headings</u>.  Article and section headings used herein are for the purpose of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 7.11.   <u>Jurisdiction; Consent to Service of Process</u>.

(a)      ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT THE COLLATERAL AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN

18

CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER THIS AGREEMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND PARENT, THE BORROWER AND EACH OTHER GRANTOR HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT.

(b)     Each party to this Agreement irrevocably consents to service of process in the manner provided for in Section 11.02 of the Credit Agreement.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 7.12.   Termination.

(a)     This Agreement and the Security Interest (i) shall automatically terminate on the Termination Date, and (ii) shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment in respect of any Secured Obligation is rescinded or must otherwise be restored by any Secured Party upon any bankruptcy or reorganization of any Grantor or otherwise.  Any execution and delivery of termination statements or documents pursuant to this Section 7.12(a) shall be without recourse to or warranty by the Collateral Agent.

(b)     Under the circumstances described in Section 11.10 of the Credit Agreement, the security interest in the Collateral described therein shall be automatically terminated and released without any further action and the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and other documents that such Grantor shall reasonably request to evidence such termination or release and shall return to such Grantor any Collateral owned by such Grantor that is in the Collateral Agent's possession.  Any execution and delivery of UCC termination statements and similar documents pursuant to this Section 7.12(b) shall be without recourse to or warranty by the Collateral Agent.

SECTION 7.13.   Additional Grantors.  To the extent any Restricted Subsidiary shall be required to become a Grantor pursuant to any Loan Document, upon execution and delivery by such Restricted Subsidiary of an instrument in the form of Annex I hereto, such Restricted Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor thereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 7.14.   [Reserved].

SECTION 7.15.   Collateral Agent Appointed Attorney-in-Fact.  Each Grantor hereby appoints the Collateral Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable until the Termination Date and is coupled with an interest; provided that the Collateral Agent shall only take any action pursuant to such appointment after the occurrence and during the continuation of an Event of Default.  Without limiting the generality of the foregoing, the Collateral Agent shall have the right, after the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor, (a) to receive, endorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the

19

Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all monies due or to become due under and by virtue of any Collateral; (d) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (e) to send verifications of Accounts constituting Collateral to any Account Debtor; (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (h) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent with respect to Accounts constituting Collateral; and (i) to use, sell, assign, transfer, license, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the monies due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

SECTION 7.16.   Intercreditor Agreements.  Notwithstanding anything herein to the contrary, the Liens and security interests granted to Goldman Sachs Bank USA, as Collateral Agent, pursuant to this Agreement in any Collateral and the exercise of any right or remedy by Goldman Sachs Bank USA, as Collateral Agent, with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement with the terms of this Agreement, the terms of the ABL Intercreditor Agreement, as applicable, shall govern and control.

[Signature Pages Follow]

20

#90429545v10

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

TRICO GROUP HOLDINGS, LLC
TRICO GROUP, LLC
AVM EXPORT, INC.
CARTER FUEL EXPORT, INC.
CARTER FUEL SYSTEMS, LLC
HEATHERTON HOLDINGS, LLC
KTRI HOLDINGS, INC.
KTRI OFFSHORE HOLDINGS, LLC
PREMIER MARKETING GROUP, LLC
STRONGARM, LLC
TRICO HOLDING CORPORATION
TRICO PRODUCTS CORPORATION
TRICO TECHNOLOGIES CORPORATION, as Grantors

By:_____

    Name:
    Title:

21

GOLDMAN SACHS BANK USA, as Collateral Agent

By:_____
        Name:
        Title:  Authorized Signatory

22

**Annex I to the**
**First Lien Security Agreement**

<u>Form of Supplement to Security Agreement</u>

SUPPLEMENT NO. ___ (this "<u>Supplement</u>") dated as of [_____], to the First Lien Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>") dated as of February 2, 2018 among Trico Group, LLC, a Delaware limited liability company ("<u>Borrower</u>"), Trico Group Holdings, LLC, a Delaware limited liability company ("<u>Parent</u>"), each Subsidiary Guarantor that is a party thereto or may become a party thereto pursuant to <u>Section 7.13</u> of the Security Agreement (together with the Borrower and Parent, the "<u>Grantors</u>") and Goldman Sachs Bank USA ("<u>Goldman Sachs</u>"), as collateral agent (in such capacity, and together with any successors in such capacity, the "<u>Collateral Agent</u>") for the Secured Parties (as defined in the Credit Agreement referred to below).

A.      Reference is made to (a) the First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Parent, the Borrower, the Lenders party thereto and Goldman Sachs, in its capacity as Administrative Agent and Collateral Agent and (b) the First Lien Pledge Agreement, dated as of February 2, 2018, among certain Pledgors and the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Pledge Agreement</u>", and together with the Security Agreement, the "<u>Collateral Documents</u>").

B.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement.

C.      Pursuant to <u>Section 6.11</u> of the Credit Agreement (and subject to certain limitations specified therein), certain Wholly-owned Domestic Subsidiaries (each as defined in the Credit Agreement) of the Loan Parties are required to enter into the Collateral Documents upon the occurrence of certain events and circumstances specified therein. The undersigned Subsidiary (the "<u>New Grantor</u>") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a party to the Collateral Documents.

Accordingly, the Collateral Agent and the New Grantor agree as follows:

SECTION 1.      In accordance with <u>Section 6.11</u> of the Credit Agreement, <u>Section 7.13</u> of the Security Agreement and <u>Section 21</u> of the Pledge Agreement, the New Grantor by its signature below becomes a Grantor and Pledgor under each of the Security Agreement and the Pledge Agreement, as applicable, with the same force and effect as if originally named therein as a party thereto and hereby (a) agrees to all terms and provisions of the Security Agreement and the Pledge Agreement applicable to it as a Grantor and Pledgor, as applicable, thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor and Pledgor, as applicable, thereunder are true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualification therein) on and as of the date hereof (after giving effect to this Supplement); it being understood and agreed that any such representation or warranty that expressly refers to an earlier date shall be deemed to refer to the date hereof. In furtherance of the foregoing, the New Grantor, as security for the payment or performance, as the case may be, in full of the Secured Obligations, does hereby grant to the Collateral Agent (and its successors and permitted assigns), for the benefit of the Secured Parties (and their respective successors and permitted assigns), a security interest in all of the New Grantor's right, title and interest in and to the Collateral (as defined in the Security Agreement) of the New Grantor

Annex I-1

**Debtors' Exhibit No. 12**
**Page 253 of 354**

and the Securities Collateral (as defined in the Pledge Agreement) of the New Grantor.  Each of the Collateral Documents is hereby incorporated herein in its entirety by reference.

SECTION 2.    The New Grantor represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally any by general equitable principles.

SECTION 3.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Collateral Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Grantor.   Delivery of an executed signature page to this Supplement by facsimile transmission or electronic transmission of a .pdf copy or an executed counterpart of this Agreement shall be effective as delivery of a manually executed counterpart of this Supplement.

SECTION 4.    Except as expressly supplemented thereby, each of the Collateral Documents shall remain in full force and effect.

SECTION 5.    THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.    In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Collateral Documents shall not in any way be affected or impaired thereby (it being understood that the invalidity a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties hereto shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 7.01 of the Security Agreement.  All communications and notices hereunder of the New Grantor shall be given to it in care of the Borrower at the Borrower's address as provided in Section 11.02 of the Credit Agreement.

SECTION 8.    The New Grantor agrees to reimburse the Collateral Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement, including, subject to the limitations set forth in Section 11.04 of the Credit Agreement, the reasonable fees, other charges and disbursements of external counsel for the Collateral Agent.

Annex I-2

IN WITNESS WHEREOF, the New Grantor has duly executed this Supplement as of the day and year first above written.

[Name of New Grantor]

By: _____

Name:
Title:

Annex I-3

#90429545v10

**EXHIBIT H-1**

**FORM OF FIRST LIEN INTELLECTUAL PROPERTY SECURITY AGREEMENT**

[See Attached]

**FIRST LIEN INTELLECTUAL PROPERTY SECURITY AGREEMENT**

This FIRST LIEN INTELLECTUAL PROPERTY SECURITY AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement") dated as of February 2, 2018, is made by the Persons listed on the signature pages hereof (each, a "Grantor") in favor of GOLDMAN SACHS BANK USA, as collateral agent (the "Collateral Agent") for the Secured Parties (as defined in the Credit Agreement referred to below).

WHEREAS, TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company, and TRICO GROUP, LLC, a Delaware limited liability company, have entered into that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with GOLDMAN SACHS BANK USA, as Administrative Agent and Collateral Agent, and each other Lender from time to time party thereto. Capitalized terms defined in the Credit Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement.

WHEREAS, as a condition precedent to the making of Loans by the Lenders under the Credit Agreement, the entry into Secured Hedge Agreements by the Hedge Banks and the entry into Cash Management Agreements by the Cash Management Banks from time to time, each Grantor has executed and delivered that certain First Lien Security Agreement dated as of February 2, 2018 made by the Loan Parties to the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement").

WHEREAS, under the terms of the Security Agreement, each Grantor has granted to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in, among other property, certain intellectual property of such Grantor, and have agreed as a condition thereof to execute this IP Security Agreement for recording with the United States Patent and Trademark Office and/or the United States Copyright Office, as applicable.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

Section 1.01.   Grant of Security.   As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Collateral Agent and its successors and assigns, for the ratable benefit of the Secured Parties, a security interest in all of such Grantor's right, title, and interest in and to the following (the "Collateral"):

(a)   all Patents (as defined in the Security Agreement) including, without limitation, each Patent set forth in Schedule A hereto;

(b)   all Patent Licenses (as defined in the Security Agreement);

(c)   all Trademarks (as defined in the Security Agreement) including, without limitation, each Trademark set forth in Schedule B hereto (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications or the marks that are the subject thereof under applicable federal law);

(d)   all Trademark Licenses (as defined in the Security Agreement);

#90478953v8

(e)      all Copyrights (as defined in the Security Agreement), including, without limitation, the Copyrights listed in Schedule C hereto;

(f)      all Copyright Licenses (as defined in the Security Agreement); and

(g)      all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto.

Section 1.02.   Excluded Assets.   Notwithstanding anything herein alluding to the contrary, none of the Excluded Assets shall constitute Collateral.

Section 1.03.   Security for Obligations.   The grant of a security interest in the Collateral by each Grantor under this IP Security Agreement secures the payment of all Secured Obligations of such Grantor now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise, including, without limitation, obligations of such Grantor under the Guaranty.

Section 1.04.   Recordation.   Each Grantor authorizes and requests that the Register of Copyrights, the Commissioner for Patents and the Commissioner for Trademarks and any other government officer, as applicable, record this IP Security Agreement.

Section 1.05.   Execution in Counterparts.   This IP Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   Delivery of an executed counterpart of a signature page to this IP Security Agreement by facsimile or an electronic transmission of a .pdf copy thereof shall be effective as delivery of an original executed counterpart of this IP Security Agreement.

Section 1.06.   Grants, Rights and Remedies.   This IP Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.   Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Collateral Agent with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.   In the event of any conflict between the terms of this IP Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

Section 1.07.   Governing Law.   THIS IP SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 1.08.   Intercreditor Agreement.   Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this IP Security Agreement in any Collateral and the exercise of any right or remedy by the Collateral Agent, with respect to any Collateral hereunder, are subject to the provisions of the ABL Intercreditor Agreement.   In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this IP Security Agreement, the terms of the ABL Intercreditor Agreement shall govern and control.

[Signature Pages Follow]

2

**Debtors' Exhibit No. 12**
**Page 258 of 354**

IN WITNESS WHEREOF, each Grantor has caused this IP Security Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

CARTER FUEL SYSTEMS
STRONGARM, LLC
TRICO PRODUCTS CORPORATION


By _____
Name:
Title:


Address for Notices:

c/o Trico Group, LLC

#90478953v8

GOLDMAN SACHS BANK USA, as Collateral Agent

By _____
Authorized Signatory

Address for Notices:

Attention:  SBD Operations

**Schedule A**

**UNITED STATES PATENTS**

**United States Patents**

| Registered Owner | Type | Registration Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**United States Patent Applications**

| Registered Owner | Type | Application Number | Date Filed |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

5

**Schedule B**

**UNITED STATES TRADEMARKS**

**United States Trademarks**

| Registered Owner | Mark | Registration Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**United States Trademark Applications**

| Registered Owner | Mark | Application Number | Date Filed |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

6

**Schedule C**

**UNITED STATES COPYRIGHTS**

**United States Copyrights**

| Registered Owner | Title | Registration Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**United States Copyright Applications**

| Registered Owner | Title | Application Number | Date Filed |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

7

**EXHIBIT H-2**

**FORM OF FIRST LIEN INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT**

This FIRST LIEN INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement Supplement") dated [●] [●], 20[●], is made by the Person listed on the signature page hereof (the "Grantor") in favor of GOLDMAN SACHS BANK USA, as collateral agent (the "Collateral Agent") for the Secured Parties (as defined in the Credit Agreement referred to below).

WHEREAS, TRICO GROUP, LLC, a Delaware limited liability company, and TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company, have entered into that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with GOLDMAN SACHS BANK USA, as Administrative Agent and Collateral Agent, and each other Lender from time to time party thereto.  Capitalized terms defined in the Credit Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement.

WHEREAS, pursuant to the Credit Agreement, the Grantor and certain other Persons have executed and delivered that certain First Lien Security Agreement dated as of February 2, 2018 made by the Grantor and such other Persons in favor of the Collateral Agent for the benefit of the Secured Parties (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement") and that certain First Lien Intellectual Property Security Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement").

WHEREAS, under the terms of the Security Agreement, the Grantor has granted to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Additional Collateral (as defined in Section 1 below) of the Grantor and has agreed in connection therewith to execute this IP Security Agreement Supplement for recording with the United States Patent and Trademark Office, the United States Copyright Office and/or other governmental authorities, as applicable.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor agrees as follows:

Section 1.01.   Grant of Security.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Grantor hereby grants to the Collateral Agent and its successors and assigns, for the ratable benefit of the Secured Parties, a security interest in all of the Grantor's right, title and interest in and to the following (the "Additional Collateral"):

(a)     all Patents (as defined in the Security Agreement) including, without limitation, each Patent set forth in Schedule A hereto;

(b)     all Patent Licenses (as defined in the Security Agreement);

(c)     all Trademarks (as defined in the Security Agreement) including, without limitation, each Trademark set forth in Schedule B hereto (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest

H-2-1

therein would impair the validity or enforceability of such intent-to-use trademark applications or the marks that are the subject thereof under applicable federal law);

(d)      all Trademark Licenses (as defined in the Security Agreement);

(e)      all Copyrights (as defined in the Security Agreement) including, without limitation, the Copyrights listed in <u>Schedule C</u> hereto;

(f)      all Copyright Licenses (as defined in the Security Agreement); and

(g)      all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto.

Section 1.02.   <u>Excluded Assets</u>.   Notwithstanding anything herein alluding to the contrary, none of the Excluded Assets shall constitute Additional Collateral.

Section 1.03.   <u>Security for Obligations</u>.   The grant of a security interest in the Additional Collateral by the Grantor under this IP Security Agreement Supplement secures the payment of all Secured Obligations of the Grantor now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise, including, without limitation, obligations of the Grantor under the Guaranty.

Section 1.04.   <u>Recordation</u>.   The Grantor authorizes the Register of Copyrights, the Commissioner for Patents and the Commissioner for Trademarks, as applicable, to record this IP Security Agreement Supplement.

Section 1.05.   <u>Execution in Counterparts</u>.   This IP Security Agreement Supplement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   Delivery of an executed counterpart of a signature page to this IP Security Agreement Supplement by facsimile or an electronic transmission of a .pdf copy thereof shall be effective as delivery of an original executed counterpart of this IP Security Agreement Supplement.

Section 1.06.   <u>Grants, Rights and Remedies</u>.   This IP Security Agreement Supplement has been entered into in conjunction with the provisions of the Security Agreement.   The Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Collateral Agent with respect to the Additional Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.   In the event of any conflict between the terms of this IP Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

Section 1.07.   <u>Governing Law.</u>   THIS IP SECURITY AGREEMENT SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 1.08.   <u>Intercreditor Agreement</u>.   Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent, pursuant to this IP Security Agreement Supplement in any Additional Collateral and the exercise of any right or remedy by the

**Debtors' Exhibit No. 12**
**Page 265 of 354**

Collateral Agent, with respect to any Additional Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this IP Security Agreement Supplement, the terms of the ABL Intercreditor Agreement shall govern and control.

[Signature page follows]

H-2-3

IN WITNESS WHEREOF, the Grantor has caused this IP Security Agreement Supplement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

[NAME OF GRANTOR]

By _____
Name:
Title:

Address for Notices:
_____
_____
_____

GOLDMAN SACHS BANK USA, as Collateral Agent

By _____
Authorized Signatory

Address for Notices:

███████████████████████████

Attention: SBD Operations

███████████████████████████

H-2-4

**Schedule A**

**UNITED STATES PATENTS**

**United States Patents**

| Registered Owner | Type | Registration Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**United States Patent Applications**

| Registered Owner | Type | Application Number | Date Filed |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

H-2-5

**Schedule B**

**UNITED STATES TRADEMARKS**

**United States Trademarks**

| Registered Owner | Mark | Registration Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**United States Trademark Applications**

| Registered Owner | Mark | Application Number | Date Filed |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

H-2-6

**Schedule C**

**UNITED STATES COPYRIGHTS**

**United States Copyrights**

| Registered Owner | Title | Registration Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**United States Copyright Applications**

| Registered Owner | Title | Application Number | Date Filed |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

H-2-7

**EXHIBIT I**

**FORM OF ABL INTERCREDITOR AGREEMENT**

[See Attached]

I-1

INTERCREDITOR AGREEMENT

dated as of

February 2, 2018,

among

GOLDMAN SACHS BANK USA,
as ABL Collateral Agent,

GOLDMAN SACHS BANK USA,
as First Lien Collateral Agent,

and

EACH ADDITIONAL PARI PASSU OBLIGATIONS AGENT

#90439847v6

## Table of Contents

Page

SECTION 1. DEFINITIONS ................................................................................................ 2
    1.1.    Defined Terms ................................................................................................ 2
    1.2.    Construction .................................................................................................. 15
    1.3.    Terms Defined in UCC .................................................................................. 16

SECTION 2. LIEN PRIORITIES ....................................................................................... 16
    2.1.    Relative Priorities .......................................................................................... 16
    2.2.    Prohibition on Contesting Liens or Obligations ........................................... 18
    2.3.    No New Liens ................................................................................................ 18
    2.4.    Cooperation in Designating Collateral ......................................................... 19
    2.5.    Revolving Nature of ABL Obligations ......................................................... 20
    2.6.    No Subordination of the Relative Priority of Claims .................................... 20

SECTION 3. EXERCISE OF REMEDIES ......................................................................... 20
    3.1.    Exercise of Remedies by First Lien Collateral Agent ................................. 20
    3.2.    Exercise of Remedies by ABL Collateral Agent .......................................... 21
    3.3.    Exclusive Enforcement Rights ..................................................................... 22
    3.4.    Claimholders Permitted Actions ................................................................... 23
    3.5.    Retention of Proceeds ................................................................................... 25
    3.6.    Non-Interference ........................................................................................... 25
    3.7.    Inspection and Access Rights ....................................................................... 26
    3.8.    Sharing of Information and Access ............................................................... 28
    3.9.    Tracing of and Priorities in Proceeds ........................................................... 28
    3.10.    Permits and Licenses .................................................................................... 29

SECTION 4. PROCEEDS ................................................................................................... 30
    4.1.    Application of Proceeds ................................................................................ 30
    4.2.    Turnover ........................................................................................................ 31

SECTION 5. RELEASES; DISPOSITIONS; OTHER AGREEMENTS ............................. 32
    5.1.    Releases ......................................................................................................... 32
    5.2.    Insurance ....................................................................................................... 33
    5.3.    Amendments; Refinancings .......................................................................... 34
    5.4.    Bailee for Perfection ..................................................................................... 36
    5.5.    When Discharge of Obligations Deemed to Not Have Occurred ................. 38
    5.6.    Injunctive Relief ........................................................................................... 39
    5.7.    Obligations Purchase Right ........................................................................... 39

SECTION 6. INSOLVENCY PROCEEDINGS ................................................................. 40
    6.1.    Financing ....................................................................................................... 40
    6.2.    Sales .............................................................................................................. 42
    6.3.    Relief from the Automatic Stay .................................................................... 43
    6.4.    Adequate Protection ...................................................................................... 43
    6.5.    Section 1111(b) of the Bankruptcy Code ..................................................... 45
    6.6.    Avoidance Issues .......................................................................................... 45
    6.7.    Plan of Reorganization .................................................................................. 45
    6.8.    Separate Grants of Security and Separate Classification .............................. 46

(i)

**Debtors' Exhibit No. 12**
**Page 273 of 354**

6.9.    Post-Petition Interest ................................................................................................ 46

SECTION 7. RELIANCE; WAIVERS; ETC. ........................................................................ 47

7.1.    Reliance ...................................................................................................................... 47
7.2.    No Warranties or Liability ......................................................................................... 47
7.3.    No Waiver of Lien Priorities ..................................................................................... 48
7.4.    Obligations Unconditional ........................................................................................ 51

SECTION 8. REPRESENTATIONS AND WARRANTIES .................................................. 52

8.1.    Representations and Warranties of Each Collateral Agent ....................................... 52

SECTION 9. MISCELLANEOUS ......................................................................................... 52

9.1.    Conflicts .................................................................................................................... 52
9.2.    Continuing Nature of this Agreement; Severability ................................................. 52
9.3.    Amendments; Waivers .............................................................................................. 52
9.4.    Additional Obligations .............................................................................................. 53
9.5.    Information Concerning Financial Condition of Certain Entities ............................. 54
9.6.    Subrogation ............................................................................................................... 54
9.7.    Governing Law .......................................................................................................... 55
9.8.    Submission to Jurisdiction ........................................................................................ 55
9.9.    Notices ....................................................................................................................... 56
9.10.   Successors and Assigns ............................................................................................. 57
9.11.   Headings .................................................................................................................... 57
9.12.   Severability ............................................................................................................... 57
9.13.   Counterparts; Integration; Effectiveness .................................................................. 57
9.14.   WAIVER OF JURY TRIAL ..................................................................................... 57
9.15.   Additional Loan Parties ............................................................................................ 57
9.16.   No Third Party Beneficiaries .................................................................................... 57
9.17.   Provisions Solely to Define Relative Rights ............................................................ 57
9.18.   Specific Performance ................................................................................................. 58
9.19.   Further Assurances .................................................................................................... 58
9.20.   Intercreditor Agreement Acknowledgement ............................................................. 58
9.21.   Intercreditor Agreements ........................................................................................... 58

**Debtors' Exhibit No. 12**
**Page 274 of 354**

This **INTERCREDITOR AGREEMENT** is dated as of February 2, 2018, and entered into by and among **GOLDMAN SACHS BANK USA**, in its capacity as administrative and collateral agent under the ABL Loan Documents (as defined below), including its successors and assigns in such capacity from time to time (the "ABL Collateral Agent"), on behalf of itself and the other ABL Claimholders (as defined below), **GOLDMAN SACHS BANK USA**, in its capacity as collateral agent under the First Lien Loan Documents (as defined below), including its successors and assigns in such capacity from time to time (the "First Lien Collateral Agent"), on behalf of itself and the other First Lien Claimholders (as defined below), and each **ADDITIONAL PARI PASSU OBLIGATIONS AGENT** that, in each case, shall have become a party hereto pursuant to Section 9.4.

## RECITALS

Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), certain of the Borrower's Subsidiaries from time to time party thereto as co-borrowers (such Subsidiaries, collectively, the "ABL Co-Borrowers"; together with the Borrower, collectively, the "ABL Borrowers"), the lenders from time to time party thereto, Goldman Sachs Bank USA, as administrative agent, and the ABL Collateral Agent, have entered into that certain ABL Credit Agreement, dated as of the date hereof (the "ABL Credit Agreement").

Parent, certain of Parent's Subsidiaries from time to time party thereto as guarantors (Parent and such Subsidiaries, collectively, the "ABL Guarantors") and the ABL Collateral Agent have entered into that certain ABL Guaranty, dated as of the date hereof (the "ABL Guarantee Agreement").

The Borrower, Parent, the lenders from time to time party thereto and Goldman Sachs Bank USA, as administrative agent (the "First Lien Administrative Agent") and as First Lien Collateral Agent, have entered into that certain First Lien Term Loan Agreement, dated as of the date hereof (the "First Lien Credit Agreement").

Parent, certain of Parent's Subsidiaries from time to time party thereto as guarantors (Parent and such Subsidiaries, collectively, the "First Lien Guarantors"), the First Lien Administrative Agent and the First Lien Collateral Agent have entered into that certain First Lien Guaranty, dated as of the date hereof (the "First Lien Guarantee Agreement").

The obligations of the ABL Borrowers that are U.S. Loan Parties and the ABL Guarantors that are U.S. Loan Parties under the ABL Credit Agreement and the U.S. ABL Guarantee Agreement are to be secured (a) on a first priority basis, by Liens on the ABL Priority Collateral of such ABL Borrowers and such ABL Guarantors and (b) on a second priority basis, by Liens on the Term Priority Collateral of such ABL Borrowers and such ABL Guarantors.

The obligations of the Borrower and the First Lien Guarantors under the First Lien Credit Agreement and the First Lien Guarantee Agreement are to be secured (a) on a first priority basis, by Liens on the Term Priority Collateral of the Borrower and the First Lien Guarantors and (b) on a second priority basis, by Liens on the ABL Priority Collateral of the Borrower and the First Lien Guarantors.

The ABL Loan Documents and the First Lien Loan Documents provide, among other things, that the ABL Claimholders and the First Lien Claimholders shall set forth in this Agreement their respective rights and remedies with respect to the Collateral and certain other matters.

The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders have agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.  Definitions**.

1.1.    Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"ABL Borrowers" has the meaning set forth in the recitals to this Agreement.

"ABL Cash Management Agreement" means "Cash Management Agreement" as such term is defined in the ABL Credit Agreement.

"ABL Cash Management Obligations" means "Cash Management Obligations" as such term is defined in the ABL Credit Agreement.

"ABL Cash Management Bank" means "Cash Management Bank" as such term is defined in the ABL Credit Agreement.

"ABL Claimholders" means the ABL Collateral Agent, the ABL Lenders, the ABL Issuing Banks, the ABL Swing Line Lender, and the other holders of ABL Obligations (including any such holders that are ABL Cash Management Banks or ABL Hedge Banks).

"ABL Collateral" means any and all assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, subject, or purported under the terms of any ABL Collateral Document to be subject, to any Lien securing any ABL Obligations.

"ABL Collateral Agent" has the meaning set forth in the preamble to this Agreement.

"ABL Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any ABL Loan Document and any documents that are designated under any ABL Loan Document as "ABL Collateral Documents" for purposes of this Agreement.

"ABL Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"ABL Default" means any "Event of Default" as such term is defined in the ABL Credit Agreement.

"ABL Guarantee Agreement" has the meaning set forth in the recitals to this Agreement.

"ABL Guarantors" has the meaning set forth in the recitals to this Agreement.

"ABL Hedge Bank" means any counterparty to an ABL Secured Hedge Agreement entered into with any ABL Borrower or ABL Guarantor that is an Agent, Arranger or Lender or any of

2

their respective Affiliates as of the Closing Date or at the time such Person has entered into an ABL Secured Hedge Agreement.

"ABL Issuing Banks" means the "L/C Issuers" as such term is defined in the ABL Credit Agreement.

"ABL Lenders" means the "Lenders" as such term is defined in the ABL Credit Agreement.

"ABL Lenders Lien" means all Liens on the Collateral securing the ABL Obligations, whether created under the ABL Collateral Documents or acquired by possession, statute (including any judgment lien), operation of law, subrogation or otherwise and whether or not created following the commencement of any Insolvency Proceeding, now or hereafter held by or on behalf of the ABL Collateral Agent or any other ABL Claimholders, or any agent or trustee therefor.

"ABL Loan Documents" means the ABL Credit Agreement, the ABL Guarantee Agreement, the ABL Collateral Documents and each of the other "Loan Documents" (as defined in the ABL Credit Agreement), and any other document or instrument (including any ABL Cash Management Agreement or any ABL Secured Hedge Agreement) executed or delivered at any time in connection with any ABL Obligations.

"ABL Obligations" means the "Secured Obligations" as such term is defined in the ABL Credit Agreement (or any equivalent term in any Refinancing thereof), including (a) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to the ABL Credit Agreement, (b) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the ABL Credit Agreement, (c) all ABL Cash Management Obligations and ABL Secured Hedging Obligations, and (d) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the ABL Loan Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Lien Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Claimholders and the First Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

"ABL Priority Cap" means, as of any date of determination, the sum of:

(a)     an aggregate principal amount not to exceed $115,000,000; plus

(b)     Permitted Overadvances (as defined in the ABL Credit Agreement as in effect on the date hereof, without giving effect to any amendments thereto) in an aggregate principal amount not to exceed the amount equal to ten percent (10%) of the aggregate ABL Commitments in effect at such time; plus

(c)     all ABL Cash Management Obligations and ABL Secured Hedging Obligations to the extent constituting ABL Obligations; plus

(d)     all other ABL Obligations but only in respect of or attributable to subsections (a), (b) and (c) above (including ABL Obligations constituting accrued and unpaid interest (including interest

3

accruing at the default interest rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"ABL Priority Collateral" means all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency Proceeding) and wherever located (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any provision of any other Bankruptcy Law), would constitute ABL Collateral):

(a)      all Accounts (other than Accounts arising under agreements for the sale of Term Priority Collateral described in clauses (a) through (f) of the definition of such term to the extent constituting identifiable Proceeds of such Term Priority Collateral);

(b)      Inventory;

(c)      all Payment Intangibles, including all corporate and other tax refunds and including all rights to payment arising therefrom in a credit-card, debit-card, prepaid-card or other payment-card transaction (other than any Payment Intangibles arising under agreements for the sale of Term Priority Collateral described in clauses (a) through (f) of the definition of such term to the extent constituting identifiable Proceeds of such Term Priority Collateral);

(d)      all Deposit Accounts, Securities Accounts and Commodity Accounts (in each case, subject to Section 3.9, other than the Term Priority Accounts) and all Money, Financial Assets, cash equivalents and other assets contained in, or credited to, all Securities Entitlements arising from, any such Deposit Accounts, Securities Accounts or Commodity Accounts (in each case, subject to Section 3.9, except (i) to the extent constituting identifiable Proceeds of Term Priority Collateral and (ii) Equity Interests or Instruments evidencing indebtedness to the extent such indebtedness is not relating to, evidencing or owing in respect of, ABL Priority Collateral) (for the avoidance of doubt all Deposit Accounts and Securities Accounts containing "Qualified Cash" (as defined in the ABL Credit Agreement) constitute ABL Priority Collateral);

(e)      (i) 50% of any business interruption insurance and (ii) all rights to credit insurance with respect to any Accounts (in each case, regardless of whether the ABL Collateral Agent is the loss payee thereof);

(f)      to the extent evidencing, governing, securing or otherwise relating to any of the items constituting ABL Priority Collateral under clauses (a) through (e) above, all (i) General Intangibles, including all purchase agreements, contractual arrangements, and purchase orders with foreign vendors and foreign purchasers (excluding Intellectual Property (but subject to the rights of the ABL Collateral Agent under Section 3.10), Indebtedness (or any evidence thereof) owing to any Loan Party by Parent or any of the Restricted Subsidiaries, and any Equity Interests and including any and all contracts, contract rights and other General Intangibles providing for or relating to the sale or other Disposition of Inventory), (ii) Instruments (including Promissory Notes), (iii) Documents (including each warehouse receipt or bill of lading covering any Inventory), (iv) insurance policies (regardless of whether the ABL Collateral Agent is the loss payee thereof), (v) export or other licenses from any Governmental Authority to sell or to manufacture Inventory, and (vi) Chattel Paper (including all Electronic Chattel Paper and all Tangible Chattel Paper);

**Debtors' Exhibit No. 12**
**Page 278 of 354**

(g)    all collateral and guarantees given by any other Person with respect to any of the foregoing, and all other Supporting Obligations (including Letter-of-Credit Rights) with respect to any of the foregoing;

(h)    all books and Records to the extent relating to any of the foregoing (including customer lists, files, correspondence, tapes, computer programs, printouts and computer records); and

(i)    all Products and Proceeds of the foregoing.

Notwithstanding the foregoing, the term "ABL Priority Collateral" shall not include any assets referred to in clauses (a), (b) and (c) of the definition of the term "Term Priority Collateral".  Proceeds of Excluded Assets that would otherwise constitute ABL Priority Collateral shall be deemed to be ABL Priority Collateral.

"<u>ABL Secured Hedge Agreement</u>" means "Secured Hedge Agreement" as such term is defined in the ABL Credit Agreement.

"<u>ABL Secured Hedging Obligations</u>" means any "Secured Obligations" (as defined in the ABL Credit Agreement) in respect of any ABL Secured Hedge Agreement.

"<u>ABL Standstill Period</u>" has the meaning set forth in Section 3.2(a).

"<u>ABL Swing Line Lender</u>" means the "Swing Line Lender" as such term is defined in the ABL Credit Agreement.

"<u>Additional Agent</u>" means any Additional Pari Passu Obligations Agent.

"<u>Additional Pari Passu Obligations</u>" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including any "Incremental Term Facility", "Incremental Equivalent Debt", "Refinancing Facility" and "Specified Term Refinancing Debt" (in each case, as such terms are defined in the First Lien Credit Agreement) (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Pari Passu Obligations Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional Pari Passu Obligations Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the ABL Credit Agreement, the First Lien Credit Agreement and each other Additional Pari Passu Obligations Agreement then in effect to be secured by Liens on the Collateral ranking pari passu in priority with the Liens on the Collateral securing the First Lien Obligations (without regard to the control of remedies) and, with respect to any Collateral constituting ABL Priority Collateral, ranking junior in priority to the ABL Lenders' Liens and (b) the Loan Parties have granted Liens on the Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"<u>Additional Pari Passu Obligations Agent</u>" means any Person appointed to act as trustee, collateral agent or a similar representative for the holders of Additional Pari Passu Obligations pursuant to any Additional Pari Passu Obligations Agreement.

"<u>Additional Pari Passu Obligations Agreement</u>" means the indenture, credit agreement or other definitive agreement under which any Additional Pari Passu Obligations are incurred.

5

**Debtors' Exhibit No. 12**
**Page 279 of 354**

"<u>Administrative Agent</u>" means the ABL Administrative Agent or the First Lien Administrative Agent, as the context may require.

"<u>Agreement</u>" means this Intercreditor Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*).

"<u>Borrower</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"<u>Cash Collateral</u>" has the meaning set forth in Section 6.1.

"<u>Claimholders</u>" means the ABL Claimholders and the First Lien Claimholders, or any of them, as the context may require.  Any references herein to "related" Claimholders of any Collateral Agent shall mean, with respect to the ABL Collateral Agent, the ABL Claimholders and, with respect to the First Lien Collateral Agent, the First Lien Claimholders.

"<u>Class</u>" refers to either (a) the ABL Collateral Agent, the ABL Claimholders, the ABL Obligations, the ABL Priority Collateral, the ABL Credit Agreement, the ABL Collateral Documents and the ABL Loan Documents, on the one hand, as opposed to (b) the First Lien Collateral Agent, the First Lien Claimholders, the First Lien Obligations, the Term Priority Collateral, the First Lien Credit Agreement, the First Lien Collateral Documents and the First Lien Loan Documents, on the other hand.

"<u>Collateral</u>" means all of the assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, that constitute ABL Collateral or First Lien Collateral.

"<u>Collateral Agent</u>" means the ABL Collateral Agent or the First Lien Collateral Agent, as the context may require.

"<u>Collateral Documents</u>" means the ABL Collateral Documents and the First Lien Collateral Documents, or any of them, as the context may require.

"<u>Controlling Collateral Agent</u>" means the ABL Collateral Agent and the First Lien Collateral Agent.

"<u>Credit Documents</u>" means the ABL Loan Documents and the First Lien Loan Documents, or any of them, as the context may require.

"<u>DIP Financing</u>" has the meaning set forth in Section 6.1(a).

"<u>Discharge</u>" means Discharge of ABL Obligations or Discharge of First Lien Obligations, as the context requires.

"<u>Discharge of ABL Obligations</u>" means, except to the extent otherwise expressly provided in Sections 5.5 and 6.6, (a) the ABL Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in full (or cash collateralized or defeased in accordance with the terms of the ABL Loan Documents), (b) all commitments to extend credit under the ABL Loan Documents have been terminated and (c) there are no outstanding letters of credit or similar instruments

6

issued under the ABL Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the ABL Loan Documents).  Upon the written request by any First Lien Collateral Agent or the Borrower, the ABL Administrative Agent shall promptly deliver a written notice to each First Lien Collateral Agent and the Borrower stating that (to the extent such events have occurred) the events described in clauses (a), (b) and (c) have occurred.

"Discharge of ABL Priority Obligations" means the Discharge of ABL Obligations other than the principal amounts under the ABL Loan Documents that exceed the ABL Priority Cap.

"Discharge of First Lien Obligations" means, except to the extent otherwise expressly provided in Sections 5.5 and 6.6, (a) the First Lien Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in full (or cash collateralized or defeased in accordance with the terms of the First Lien Loan Documents), (b) all commitments to extend credit under the First Lien Loan Documents have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the First Lien Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Lien Loan Documents).  Upon the written request by ABL Agent or the Borrower, the First Lien Collateral Agent shall promptly deliver a written notice to ABL Agent and the Borrower stating that (to the extent such events have occurred) the events described in clauses (a), (b) and (c) have occurred.

"Discharge of First Lien Priority Obligations" means the Discharge of First Lien Obligations other than the principal amounts under the First Lien Loan Documents that exceed the First Lien Priority Cap.

"Disposition" or "Dispose" means the sale, assignment, transfer, license, lease (as lessor), exchange or other disposition (including any sale and leaseback transaction) of any Collateral.

"Enforcement Notice" means a written notice delivered by any Collateral Agent to the other Collateral Agents stating that an ABL Default or a First Lien Default, as applicable, has occurred and is continuing and that an Exercise of Secured Creditor Remedies has commenced or is about to be commenced with respect to the ABL Priority Collateral or the Term Priority Collateral, as applicable.

"Enforcement Period" means the period of time following the receipt by any Collateral Agent of an Enforcement Notice from another Collateral Agent and continuing until the earliest of (a) (i) in case of an Enforcement Period commenced by the First Lien Collateral Agent, the Discharge of First Lien Priority Obligations and (ii) in the case of an Enforcement Period commenced by the ABL Collateral Agent, the Discharge of ABL Priority Obligations, (b) the ABL Collateral Agent or the First Lien Collateral Agent, as applicable, agreeing in writing to terminate the Enforcement Period initiated by such Collateral Agent and (c) the date on which the ABL Default or the First Lien Default, as applicable, that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Collateral Agent or the First Lien Collateral Agent, as applicable, or waived in writing in accordance with the requirements of the applicable Credit Documents.

"Equity Interests" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

7

**Debtors' Exhibit No. 12**
**Page 281 of 354**

"<u>Excluded Assets</u>" shall mean (a) with respect to any Term Priority Collateral, any "Excluded Assets" as such term is defined in the First Lien Loan Documents as in effect on the date hereof or (b) with respect to any ABL Priority Collateral, any "Excluded Assets" as such term is defined in the U.S. ABL Loan Documents as in effect on the date hereof.

"<u>Exercise any Secured Creditor Remedies</u>" or "<u>Exercise of Secured Creditor Remedies</u>" means (a) the taking of any action (or joining with any other Person (other than the other Collateral Agents to the extent provided in Section 3.4(i)) in taking any action) to enforce any Lien in respect of the Collateral, including the institution of any foreclosure proceedings, the giving of notice of any public or private sale or other Disposition pursuant to Article 8 or Article 9 of the UCC or other applicable law or any action to vacate, obtain relief from or modify a stay or other injunction restricting any such enforcement or any other exercise of rights or remedies with respect to any Collateral described in this definition, (b) after the occurrence of a First Lien Default or an ABL Default, as applicable, the exercise of (or joining with any other Person (other than the other Controlling Collateral Agent to the extent provided in Section 3.4(i)) in exercising) any right or remedy provided to a secured creditor under the ABL Loan Documents or the First Lien Loan Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Loan Party or the taking of any action or the exercise of any right or remedy in respect of the set off or recoupment against any Collateral or proceeds of any Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including credit bidding or otherwise accepting any Collateral in full or partial satisfaction of a Lien, (c) after the occurrence of a First Lien Default or an ABL Default, as applicable, the Disposition of all or any material portion of the Collateral, by private or public sale or any other means, (d) after the occurrence of a First Lien Default or an ABL Default, as applicable, the solicitation of bids by a Controlling Collateral Agent from third parties to conduct the liquidation of any Collateral, (e) after the occurrence of a First Lien Default or an ABL Default, as applicable, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties by a Controlling Collateral Agent for the purposes of valuing, marketing, or Disposing of, any Collateral, or (f) the exercise of any other enforcement right relating to any Collateral (including the exercise of any voting rights relating to any Equity Interests constituting Collateral) whether under the ABL Loan Documents, the First Lien Loan Documents, under applicable law, in equity, in an Insolvency Proceeding, or otherwise; it being acknowledged and agreed that none of the following will constitute an Exercise of Secured Creditor Remedies for purposes of this Agreement:  (i) the exercise of cash dominion by the ABL Collateral Agent over the Deposit Accounts of any Loan Party that constitute ABL Priority Collateral and application of funds in connection therewith against the ABL Obligations pursuant to the ABL Credit Agreement, (ii) the imposition of a default interest rate or late fee, (iii) the collection and application of monies deposited from time to time in any Term Priority Account, to the extent constituting Term Priority Collateral, against the First Lien Obligations pursuant to the provisions of the First Lien Loan Documents prior to the occurrence of a First Lien Default, (iv) the filing of a proof of claim or a statement of interest in any Insolvency Proceeding, (v) the consent by the ABL Collateral Agent to the Disposition by any Loan Party of any of the ABL Priority Collateral prior to the occurrence of an ABL Default, (vi) the consent of the First Lien Collateral Agent to the Disposition by any Loan Party of any Term Priority Collateral and (vii) the acceleration of the First Lien Obligations or the ABL Obligations.

"<u>First Lien Administrative Agent</u>" has the meaning set forth in the recitals to this Agreement.

"<u>First Lien Claimholders</u>" means the First Lien Administrative Agent, the First Lien Collateral Agent, the First Lien Lenders and the other holders of First Lien Obligations (including any such holders that are Term Cash Management Banks or Term Hedge Counterparties).

"First Lien Collateral" means any and all assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, subject, or purported under the terms of any First Lien Collateral Document to be subject, to any Lien securing any First Lien Obligations.

"First Lien Collateral Agent" has the meaning set forth in the preamble to this Agreement.

"First Lien Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any First Lien Loan Document and any documents that are designated under any First Lien Loan Document as "First Lien Collateral Documents" for purposes of this Agreement.

"First Lien Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"First Lien Default" means any "Event of Default" as such term is defined in the First Lien Credit Agreement.

"First Lien Guarantee Agreement" has the meaning set forth in the recitals to this Agreement.

"First Lien Guarantors" has the meaning set forth in the recitals to this Agreement.

"First Lien Lenders" means the "Lenders" as such term is defined in the First Lien Credit Agreement.

"First Lien Lenders Lien" means all Liens on the Collateral securing the First Lien Obligations, whether created under the First Lien Collateral Documents or acquired by possession, statute (including any judgment lien), operation of law, subrogation or otherwise and whether or not created following the commencement of any Insolvency Proceeding, now or hereafter held by or on behalf of the First Lien Collateral Agent or any other First Lien Claimholders, or any agent or trustee therefor.

"First Lien Loan Documents" means the First Lien Credit Agreement, the First Lien Guarantee, the First Lien Collateral Documents, and each of the other "Loan Documents" (as defined in the First Lien Credit Agreement), and any other document or instrument (including any Term Cash Management Agreement or any Term Secured Hedge Agreement) executed or delivered at any time in connection with any First Lien Obligations.

"First Lien Obligations" means the "Obligations" of each Loan Party as defined in the First Lien Credit Agreement (or any equivalent term in any Refinancing thereof), including any Additional Pari Passu Obligations, including (a) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to the First Lien Credit Agreement or the applicable Additional Pari Passu Obligations Agreement, (b) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Lien Credit Agreement or the applicable Additional Pari Passu Obligations Agreement, (c) all Term Cash Management Obligations and Term Secured Hedging Obligations, and (d) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the First Lien Loan Documents or the applicable Additional Pari Passu Obligations Agreement, in each case whether or not allowed or allowable in an Insolvency Proceeding; *provided* that to the extent any Indebtedness thereunder is expressly provided thereunder to be secured on a junior basis to the Liens securing the First Lien Obligations in existence on the date hereof, such Indebtedness shall not constitute First Lien Obligations.  To the extent any payment with

**Debtors' Exhibit No. 12**
**Page 283 of 354**

respect to any First Lien Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Lien Claimholders and the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

"First Lien Priority Cap" means, as of any date of determination, the sum of:

(a)     an amount, not to exceed the sum of (i) $604,000,000 plus (ii) the aggregate principal amount of (1) Incremental Loans made and outstanding under the Incurrence-Based Incremental Amount (each as defined in the First Lien Credit Agreement (as in effect on the date hereof, without giving effect to any amendments thereto)) pursuant to Section 2.16 of the First Lien Credit Agreement (as in effect on the date hereof, without giving effect to any amendments thereto) and (2) the loans and commitments made and outstanding by the First Lien Claimholders after the date of this Agreement pursuant to Sections 7.03(m), 7.03(n) and 7.03(s) of the First Lien Credit Agreement (as in effect on the date hereof, without giving effect to any amendments thereto); plus

(b)     all Term Cash Management Obligations and Term Secured Hedging Obligations to the extent constituting First Lien Obligations; plus

(c)     all other First Lien Obligations but only in respect of or attributable to subsections (a) and (b) above (including First Lien Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the U.S., the U.S., or a foreign government or any other political subdivision thereof, including central banks and supra national bodies.

"Indebtedness" means all obligations that constitute "Indebtedness" within the meaning of the ABL Credit Agreement or the First Lien Credit Agreement, as applicable.

"Insolvency Proceeding" means any voluntary or involuntary case or proceeding of which any Loan Party is the subject and in respect of bankruptcy, insolvency, winding up, receivership, dissolution, liquidation, reorganization or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

"Intellectual Property" means "Intellectual Property" as such term is defined in the ABL Credit Agreement and the First Lien Credit Agreement.

10

"<u>Junior Claimholders</u>" means, as to any Collateral, the Claimholders whose Liens on such Collateral are junior and subordinate to the Liens of the other Claimholders on such Collateral as set forth in Section 2.1.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any capital lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided</u> that in no event shall an operating lease in and of itself be deemed to constitute a Lien on any asset.

"<u>Loan Parties</u>" means Parent, the Borrower, the ABL Co-Borrowers, the ABL Guarantors, the First Lien Guarantors and each other Subsidiary Guarantor (as such term is defined in the ABL Credit Agreement and the First Lien Credit Agreement) other than, in the case of the ABL Credit Agreement, any such Loan Party that is not a U.S. Loan Party. All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"<u>Mortgage</u>" has the meaning set forth in the ABL Credit Agreement and/or the First Lien Credit Agreement, as the context requires.

"<u>Non-Conforming Plan of Reorganization</u>" means any Plan of Reorganization the provisions of which are inconsistent with, or are in contravention of, the relative Lien priorities or the other provisions of this Agreement, including any Plan of Reorganization that purports to re-order (whether by subordination, invalidation or otherwise) or otherwise disregard, in whole or part, the provisions of Section 2 (including the relative Lien priorities of Section 2.1), 4 or 6.

"<u>Notification of Proceeds</u>" has the meaning set forth in Section 3.9(b).

"<u>Obligations</u>" means the ABL Obligations and the First Lien Obligations, or any of them, as the context requires.

"<u>Parent</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"<u>Plan of Reorganization</u>" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of dispositive plan of arrangement proposed in or in connection with any Insolvency Proceeding.

"<u>Pledged Collateral</u>" has the meaning set forth in Section 5.4(a).

"<u>Post-Petition Interest</u>" means interest (including interest accruing at the default rate specified in the applicable Credit Documents), fees, expenses and other charges that pursuant to the ABL Collateral Documents or the First Lien Collateral Documents, as the case may be, continue to accrue after the commencement of any Insolvency Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, or in any such Insolvency Proceeding.

**Debtors' Exhibit No. 12**
**Page 285 of 354**

"Purchase Event" means, with respect to the Obligations of any Class, the occurrence of any of the following: (a) the occurrence of an event of default under any Credit Documents in respect of any Class arising from the failure of any Loan Party to pay any principal, interest or fees when due and payable thereunder, (b) any Exercise of Secured Creditor Remedies by the Collateral Agent of such Class or the institution of any Insolvency Proceeding or (c) an acceleration of the Obligations of such Class in accordance with the terms of the Credit Documents of such Class.

"Recovery" has the meaning set forth in Section 6.6.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Refinancing Indebtedness" means the Indebtedness or other Obligations resulting from the Refinancing of any other Indebtedness or other Obligations.

"Senior Claimholders" means, as to any Collateral, the Claimholders whose Liens on such Collateral are senior to the Liens of the Claimholders of the other Class on such Collateral pursuant to the terms of this Agreement. The parties hereto acknowledge that the ABL Claimholders are the Senior Claimholders with respect to the ABL Priority Collateral and the First Lien Claimholders are the Senior Claimholders with respect to the Term Priority Collateral, and that, accordingly, any reference herein to the "Senior Claimholders" shall be construed as a reference to the ABL Claimholders insofar as the ABL Priority Collateral is concerned and to the First Lien Claimholders insofar as the Term Priority Collateral is concerned.

"Senior Collateral Agent" means, as to any Collateral, the Collateral Agent whose Liens on such Collateral, held by it for its benefit and the benefit of its related Claimholders, are senior to the Liens on such Collateral held by the Collateral Agent of the other Class, for its benefit and the benefit of its related Claimholders. The parties hereto acknowledge that the ABL Collateral Agent is the Senior Collateral Agent with respect to the ABL Priority Collateral and the First Lien Collateral Agent is the Senior Collateral Agent with respect to the Term Priority Collateral, and that, accordingly, any reference herein to the "Senior Collateral Agent" shall be construed as a reference to the ABL Collateral Agent insofar as the ABL Priority Collateral is concerned and to the First Lien Collateral Agent insofar as the Term Priority Collateral is concerned.

"Senior Liens" means (a) with respect to the ABL Priority Collateral or the First Lien Lenders Liens on the ABL Priority Collateral, the ABL Lenders Liens on such Collateral, and (b) with respect to the Term Priority Collateral or the ABL Lenders Liens on the Term Priority Collateral, the First Lien Lenders Liens on such Collateral, and, in each case, any Liens incurred in connection with any Refinancing of Senior Obligations that are deemed to be Senior Liens under Section 5.5.

"Senior Obligations" means, with respect to any Collateral or any Liens thereon, any Obligations that are secured by Senior Liens on such Collateral.

"Senior Priority Collateral" means (a) with respect to the ABL Collateral Agent and any other ABL Claimholders, all ABL Priority Collateral and (b) with respect to the First Lien Collateral Agent and any other First Lien Claimholders, Term Priority Collateral.

12

"<u>Subject Obligations</u>" has the meaning set forth in Section 5.7(a).

"<u>Subject Secured Parties</u>" has the meaning set forth in Section 5.7(a).

"<u>Subsidiary</u>" shall have the meaning set forth in the ABL Credit Agreement and First Lien Credit Agreement in effect on the date hereof and shall exclude any Subsidiary that is not a U.S. Subsidiary.  Unless otherwise specified, all references herein to Subsidiaries shall be deemed to refer to Subsidiaries of the Borrower.

"<u>Term Cash Management Agreement</u>" means "Cash Management Agreement" as such term is defined in the First Lien Credit Agreement.

"<u>Term Cash Management Obligations</u>" means "Cash Management Obligations" as such term is defined in the First Lien Credit Agreement.

"<u>Term Cash Management Bank</u>" means "Cash Management Bank" as such term is defined in the First Lien Credit Agreement.

"<u>Term DIP Financing</u>" has the meaning set forth in Section 6.1(b).

"<u>Term Priority Accounts</u>" means any Deposit Accounts or Securities Accounts that are required to be established pursuant to the First Lien Loan Documents for purposes of exclusively holding identifiable Proceeds of the First Lien Priority Collateral (it being understood that any property in such Deposit Accounts or Securities Accounts which is not identifiable proceeds of First Lien Priority Collateral shall not be First Lien Priority Collateral solely by virtue of being on deposit in or credited to any such Deposit Account or Securities Account).

"<u>Term Priority Collateral</u>" means all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency Proceeding) and wherever located (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any provision of any other Bankruptcy Law), would constitute First Lien Collateral):

(a)     all Equipment and all real property and interests therein (including both fee and leasehold interests) and all Fixtures;

(b)     all Intellectual Property (other than any computer programs and any support and information relating thereto that constitute Inventory pursuant to Section 1.3 and subject to the rights of the ABL Collateral Agent under Section 3.10);

(c)     all Equity Interests and other Investment Property (other than Investment Property constituting ABL Priority Collateral under clause (c) of the definition of such term);

(d)     except to the extent constituting ABL Priority Collateral under clause (f) of the definition of such term, all Instruments, Documents and General Intangibles (including all Indebtedness between or among Parent and any of its Subsidiaries);

(e)     all Term Priority Accounts and all Money, Financial Assets, Securities Entitlements or other assets contained in, or credited to, or arising from any such Term Priority Account (in each case, except to the extent constituting identifiable Proceeds of ABL Priority Collateral);

13

(f)      all insurance policies relating to Term Priority Collateral (regardless of whether the First Lien Collateral Agent is the loss payee thereof), but, for the avoidance of doubt, excluding 50% of any business interruption insurance and all credit insurance with respect to any Accounts, each of which constitutes ABL Priority Collateral;

(g)      all Commercial Tort Claims;

(h)      all other Collateral not constituting ABL Priority Collateral;

(i)      all collateral and guarantees given by any other Person with respect to any of the foregoing, and all Supporting Obligations (including Letter-of-Credit Rights) with respect to any of the foregoing;

(j)      all books and Records to the extent relating to any of the foregoing (including files, correspondence, tapes, computer programs, printouts and computer records); and

(k)      all Products and Proceeds of the foregoing.

Notwithstanding the foregoing, the term "Term Priority Collateral" shall not include any assets referred to in clauses (a), (b), (c), (d) and (e) of the term "ABL Priority Collateral". Proceeds of Excluded Assets that would otherwise constitute Term Priority Collateral shall be deemed to be Term Priority Collateral.

"Term Secured Hedge Agreement" means "Secured Hedge Agreement" as such term is defined in the First Lien Credit Agreement.

"Term Hedge Counterparty" means any counterparty to a Term Secured Hedge Agreement entered into with a Loan Party the obligations under which constitute Term Secured Hedging Obligations.

"Term Secured Hedging Obligations" means any "Secured Obligations" (as defined in the First Lien Credit Agreement) in respect of any Term Secured Hedge Agreement.

"Term Standstill Period" has the meaning set forth in Section 3.1(a).

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"Unasserted Contingent Obligations" means, at any time, ABL Obligations and First Lien Obligations (as applicable) for indemnification in respect of which no demand has been made at such time (it being understood that, in respect of ABL Obligations, contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit shall not constitute Unasserted Contingent Obligations).

"Use Period" means, with respect to any Term Priority Collateral, the period (a) commencing on the later of (i) the date on which the ABL Collateral Agent (or any ABL Claimholder acting with the consent of the ABL Collateral Agent) commences an Enforcement Period in connection with any ABL Priority Collateral and (ii) the date on which the ABL Collateral Agent delivers, in accordance with Section 3.7, a written notice to the First Lien Collateral Agent electing to exercise its access rights pursuant to Section 3.7 with respect to such Term Priority Collateral, and (b) ending, with respect to any Term Priority Collateral, on the earliest to occur of (i) the 180th day after the date (the

14

"Initial Access Date") on which the ABL Collateral Agent, or its designee, initially obtains the ability to take physical possession of, remove, or otherwise control physical access to, or actually uses, the ABL Priority Collateral located on such Term Priority Collateral, (ii) the date on which all or substantially all of the ABL Priority Collateral located on such Term Priority Collateral is removed, sold, collected or liquidated and (iii) the termination of such Enforcement Period. If any stay or other order that prohibits any of the ABL Collateral Agent or the other ABL Claimholders from commencing and continuing to Exercise any Secured Creditor Remedies or from liquidating or selling the ABL Priority Collateral has occurred by the operation of law or has been entered by a court of competent jurisdiction after the Initial Access Date, the 180-day period referred to in clause (i) above shall be tolled during the pendency of any such stay or other order and the Use Period, to the extent the expiration thereof is to be determined by reference to clause (i) above, shall be extended by a corresponding number of days, provided that if, after the lifting of such stay or other order, fewer than 90 days shall remain in the Use Period, then the Use Period shall be extended so that the ABL Collateral Agent and the other ABL Claimholders have 90 days remaining in the Use Period upon lifting of the stay or other order.

"U.S. ABL Collateral Documents" means any ABL Collateral Document executed by a U.S. Loan Party.

"U.S. ABL Guarantee Agreement" means "U.S. Guarantee" as such term is defined in the ABL Credit Agreement.

"U.S. ABL Loan Documents" means any ABL Loan Document executed by a U.S. Loan Party.

"U.S. Loan Party" means any Loan Party organized under the laws of any state within the United States or the District of Columbia.

"U.S. Subsidiary" means any Subsidiary of the Parent that is organized under the laws of the United States, any state thereof or the District of Columbia.

1.2.    Construction. The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The term "or" shall be construed to have, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." Unless the context requires otherwise:

(a)    except as otherwise provided herein, any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified;

(b)    any reference herein to any Person shall be construed to include such Person's successors and assigns;

(c)    the words "herein", "hereof", and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections and Annexes shall be construed to refer to Sections and Annexes of this Agreement;

15

(e)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, real, personal or mixed, including cash, securities, accounts, and contract rights;

(f)     any references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs; and

(g)     any references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

1.3.     <u>Terms Defined in UCC</u>.  Terms defined in the UCC that are not otherwise defined in this Agreement are used herein as defined in Articles 8 or 9 of the UCC in effect in the State of New York from time to time, as the context may require (including, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms:  "Accounts", "Chattel Paper", "Commodity Account", "Commercial Tort Claims", "Deposit Account", "Document", "Electronic Chattel Paper", "Equipment", "Financial Asset", "Fixtures", "General Intangible" (except that such term shall include all interest rate or currency protection or hedging arrangements, all licenses, permits, concessions and authorizations and all Intellectual Property (in each case, regardless of whether characterized as General Intangibles under the UCC)), "Goods" (except that such term shall include all Equipment and Inventory (in each case, regardless of whether characterized as Goods under the UCC)), "Instrument", "Inventory" (except that such term shall include all computer programs embedded in any Inventory and all supporting information relating to such programs, in each case that are included in the definition of Goods under the UCC (in each case, regardless of whether characterized as Inventory under the UCC), but not, for the avoidance of doubt, any other Intellectual Property), "Investment Property", "Letter-of-Credit Right", "Money", "Payment Intangibles", "Promissory Notes", "Records", "Securities Accounts", "Securities Entitlement", "Supporting Obligation", "Tangible Chattel Paper" and "Uncertificated Securities").

**SECTION 2.  <u>Lien Priorities</u>**.

2.1.     <u>Relative Priorities</u>.  (a) Notwithstanding (i) the date, time, method, manner, or order of grant, attachment, or perfection of any ABL Lenders Lien or any First Lien Lenders Lien on any Collateral (including, in each case, irrespective of whether any such ABL Lenders Lien or First Lien Lenders Lien is granted (or secures Obligations relating to the period) before or after the commencement of any Insolvency Proceeding), (ii) any contrary provision of the UCC or any other applicable law or of the ABL Loan Documents or the First Lien Loan Documents, as applicable, (iii) any defect or deficiencies in, or failure to attach or perfect, any ABL Lenders Lien or any First Lien Lenders Lien or (iv) any other circumstance whatsoever:

(A)     First Lien Collateral Agent, for themselves and on behalf of the other First Lien Claimholders, hereby agree that:

(1)     any Lien on the ABL Priority Collateral securing the ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap) now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the ABL Priority Collateral securing the First Lien Obligations now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor;

16

(2)      any Lien on the ABL Priority Collateral securing any of the First Lien Obligations now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap);

(3)      any Lien on the Term Priority Collateral securing the ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap) now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing First Lien Obligations in excess of the First Lien Priority Cap now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing any First Lien Obligations in excess of the First Lien Priority Cap now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing any ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap).

(B)      ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby agrees that:

(1)      any Lien on the Term Priority Collateral securing the First Lien Obligations (other than the principal amount of such First Lien Obligations in excess of the First Lien Priority Cap) now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing the ABL Obligations now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing any of the ABL Obligations now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing any First Lien Obligations (other than the principal amount of such First Lien Obligations in excess of the First Lien Priority Cap);

(2)      any Lien on the First Lien Priority Collateral securing First Lien Obligations in excess of the First Lien Priority Cap now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL

17

Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing First Lien Obligations in excess of the First Lien Priority Cap; and

(3)     any Lien on the ABL Priority Collateral securing the First Lien Obligations (other than the principal amount of such First Lien Obligations in excess of the First Lien Priority Cap) now or hereafter held by or for the benefit or on behalf of any First Lien Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any First Lien Obligations (other than the principal amount of such First Lien Obligations in excess of the First Lien Priority Cap).

(b)     The priority and subordination of Liens provided for in this Agreement (i) shall continue to be effective with respect to any part of the Collateral from and after the date hereof whether such Liens are declared, or ruled to be, invalid, unenforceable, void or not allowed by a court of competent jurisdiction or otherwise, and whether as a result of any action taken by the First Lien Collateral Agent or the ABL Collateral Agent, as applicable, or any failure by any such Person to take any action with respect to any financing statement (including any amendment to or continuation thereof), mortgage or other perfection document, or otherwise and (ii) are intended to be effective whether or not such Liens are subordinated to any Lien securing any other obligation of the Borrower, any other Loan Party or any other Person (but only to the extent that such subordination is permitted pursuant to the terms of the ABL Credit Agreement, the First Lien Credit Agreement and each Additional Pari Passu Obligations Agreement then in effect or as contemplated in Section 6.1).

2.2.     <u>Prohibition on Contesting Liens or Obligations</u>.  Each of the First Lien Collateral Agent, for itself and on behalf of each other First Lien Claimholder, and the ABL Collateral Agent, for itself and on behalf of each other ABL Claimholder, agrees that it and its related Claimholders will not (and hereby waive any right to), directly or indirectly, contest or question the validity or enforceability of, or support any other Person in contesting or questioning the validity or enforceability of, in any proceeding (including any Insolvency Proceeding) (a) the existence, priority, validity, extent, perfection or enforceability of any ABL Lenders Lien or any First Lien Lenders Lien, (b) the priority, validity, extent or enforceability of any Obligations, including the allowability or priority of any Obligations in any Insolvency Proceeding or (c) the relative rights and duties of the Claimholders granted and/or established in this Agreement; <u>provided</u>, <u>however</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the ABL Collateral Agent, any other ABL Claimholder, the First Lien Collateral Agent or any other First Lien Claimholder to enforce the terms of this Agreement, including the provisions of this Agreement relating to the priority and subordination of the Liens securing the ABL Obligations and the First Lien Obligations, as applicable.

2.3.     <u>No New Liens</u>.  (a) Whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the parties hereto agree, subject to Section 6, that:

18

(i)      no Loan Party shall grant, and the First Lien Collateral Agent shall not accept from any Loan Party, any additional Liens under any First Lien Collateral Document on any asset to secure any First Lien Obligation unless such Loan Party also grants a Lien on such asset to secure the ABL Obligations concurrently with the grant of a Lien thereon in favor of the First Lien Collateral Agent in accordance with the relative Lien priorities set forth in this Agreement; and

(ii)      no Loan Party shall grant, and the ABL Collateral Agent shall not accept from any Loan Party, any additional Liens under any ABL Collateral Documents on any asset to secure any ABL Obligations unless such Loan Party grants a Lien on such asset to secure the First Lien Obligations concurrently with the grant of a Lien thereon in favor of the ABL Collateral Agent in accordance with the relative Lien priorities set forth in this Agreement;

provided that the foregoing shall not apply to (i) Liens on any asset of any Loan Party granted to secure Obligations of any Class if such asset is expressly excluded from the grant of a security interest by such Loan Party pursuant to the Collateral Documents of the other Class, (ii) additional Liens on any asset of any Loan Party granted to secure Obligations of any Class if, prior to such grant, such Loan Party has offered in writing to grant a Lien on such asset to secure Obligations of the other Class and the Collateral Agent of such other Class has affirmatively declined in writing to accept such Lien; and provided further that the attachment of any previously granted Lien to any after-acquired property of the type covered by such Lien immediately prior thereto shall not be deemed to be an acceptance of an additional Lien for the purposes of this Section 2.3, and (iii) Material Owned Property (as such term is defined in the First Lien Credit Agreement), as to which ABL Claimholders do not, pursuant to the terms of the Loan Documents require a Lien.

(b)      To the extent that the provisions of Section 2.3(a) are not complied with for any reason, (i) without limiting any other rights and remedies available to the ABL Collateral Agent or the other ABL Claimholders, the First Lien Collateral Agent, on behalf of the First Lien Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted and accepted in contravention of Section 2.3(a) shall be subject to Section 4.2 and the First Lien Collateral Agent also shall hold and be deemed to have held such Liens for the benefit of the ABL Collateral Agent and the other ABL Claimholders subject to the provisions set forth herein, and (ii) without limiting any other rights and remedies available to the First Lien Collateral Agent or the other First Lien Claimholders, the ABL Collateral Agent, on behalf of the ABL Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted and accepted in contravention of Section 2.3(a) shall be subject to Section 4.2 and the ABL Collateral Agent also shall hold and be deemed to have held such Liens for the benefit of the First Lien Collateral Agent and the other First Lien Claimholders subject to the provisions set forth herein.

2.4.      Cooperation in Designating Collateral.  In furtherance of Section 9.9, each of the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that it and its related Claimholders will, subject to the other provisions of this Agreement, upon request by the ABL Collateral Agent or the First Lien Collateral Agent, cooperate in good faith (and will direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Priority Collateral and the Term Priority Collateral, as the case may be, and the steps taken to perfect the ABL Lenders Liens or the First Lien Lenders Liens, as the case may be, and the identity of the respective parties obligated under the ABL Loan Documents and the First Lien Loan Documents, as the case may be.  In addition, each of the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for themselves and on behalf of the other First Lien Claimholders, agrees that, in the event that (a) the ABL Collateral Agent receives any business

19

interruption insurance proceeds, the ABL Collateral Agent shall deliver to the Term Controlling Agent 50% of such proceeds and (b) any First Lien Collateral Agent receives any business interruption insurance proceeds, such First Lien Collateral Agent shall deliver to the ABL Collateral Agent 50% of such proceeds.

2.5.    <u>Revolving Nature of ABL Obligations</u>.  The First Lien Administrative Agent, for itself and on behalf of the other First Lien Claimholders, expressly acknowledges and agrees that (a) the ABL Credit Agreement includes a revolving commitment and that in the ordinary course of business the ABL Administrative Agent and the ABL Lenders will apply payments and make advances thereunder, (b) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, subject to the ABL Priority Cap, (c) all cash collateral received by the ABL Administrative Agent or the ABL Collateral Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time and from time to time and (d) the advance rates under the ABL Credit Agreement may be reduced, the eligibility criteria for purposes of the Borrowing Base (as defined in the ABL Credit Agreement) may be modified and Reserves (as defined in the ABL Credit Agreement) may be imposed, under the terms of the ABL Credit Agreement, in each case without altering or otherwise affecting the relative Lien priorities set forth in this Agreement.

2.6.    <u>No Subordination of the Relative Priority of Claims</u>.  Notwithstanding anything to the contrary contained herein, the subordination of the First Lien Lenders Liens to the ABL Lenders Liens and of the ABL Lenders Liens to the First Lien Lenders Liens as set forth herein is with respect to the relative priority of the respective Liens held by or on behalf of the First Lien Claimholders or the ABL Claimholders only and shall not constitute a subordination of the First Lien Obligations to the ABL Obligations or the ABL Obligations to the First Lien Obligations.

**SECTION 3.  Exercise of Remedies**.

3.1.    <u>Exercise of Remedies by</u> First Lien Collateral Agent.  Until the Discharge of ABL Priority Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, each First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that the First Lien Claimholders:

(a)    will not exercise or seek to exercise any rights or remedies with respect to any ABL Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral); <u>provided</u>, <u>however</u>, that the First Lien Collateral Agent may exercise any or all such rights or remedies (including any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral) after the passage of a period of at least 180 days after the date on which the ABL Collateral Agent received written notice from either First Lien Collateral Agent that the maturity of the First Lien Obligations has been accelerated; <u>provided</u>, <u>further</u>, <u>however</u>, that notwithstanding anything to the contrary contained herein, in no event will the First Lien Collateral Agent or any other First Lien Claimholder exercise any rights or remedies with respect to the ABL Priority Collateral if, notwithstanding the expiration of such 180 day period, the ABL Collateral Agent or any other ABL Claimholder (x) shall have commenced and is diligently pursuing the exercise of its rights or remedies with respect to all or a material portion of the ABL Priority Collateral (prompt written notice of such exercise to be given to the First Lien Collateral Agent by the ABL Collateral Agent, <u>provided</u> that the failure to give such notice shall not affect the ABL Collateral Agent's or any other ABL Claimholders' rights hereunder) or (y) shall have been stayed by operation of law or any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the First Lien Collateral Agent and the other First Lien Claimholders may not pursuant to this Section 3.1(a) exercise any rights or remedies with respect to the ABL Priority Collateral, the "<u>Term</u>

20

Standstill Period"); provided that in the event that at any time after the First Lien Collateral Agent has sent a notice to the ABL Collateral Agent to commence the Term Standstill Period, the First Lien Default that was the basis for such notice is cured or waived or otherwise ceases to exist, and any notice of acceleration has been rescinded by the First Lien Collateral Agent, then the notice to commence the Term Standstill Period shall automatically and without further action of the parties be deemed rescinded and no Term Standstill Period shall have been deemed to have commenced;

(b)     will not directly or indirectly contest, protest or object to or hinder any Exercise of Secured Creditor Remedies by the ABL Collateral Agent or any other ABL Claimholder with respect to any ABL Priority Collateral;

(c)     will have no right to direct the ABL Collateral Agent to Exercise any Secured Creditor Remedies with respect to any ABL Priority Collateral or to take any other action under the ABL Loan Documents with respect to any ABL Priority Collateral; and

(d)     will not object to (and hereby waive any and all claims with respect to) the forbearance by the ABL Collateral Agent or the other ABL Claimholders from Exercising any Secured Creditor Remedies with respect to any ABL Priority Collateral;

provided, however, that, in each case under this Section 3.1, the First Lien Lenders Liens shall remain on any Proceeds (other than those Proceeds properly applied to the ABL Obligations in accordance with Section 4.1(a)) resulting from actions taken by the ABL Collateral Agent or any other ABL Claimholder with respect to the ABL Priority Collateral (subject to the relative Lien priorities described in Section 2).

3.2.     Exercise of Remedies by ABL Collateral Agent.  Until the Discharge of First Lien Priority Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the ABL Claimholders:

(a)     will not exercise or seek to exercise any rights or remedies with respect to any Term Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral); provided, however, that the ABL Collateral Agent may exercise any or all such rights or remedies (including any Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral) after the passage of a period of at least 180 days after the date on which the First Lien Collateral Agent received written notice from the ABL Collateral Agent that the maturity of the ABL Obligations has been accelerated; provided further, however, that notwithstanding anything to the contrary contained herein, in no event will the ABL Collateral Agent or any other ABL Claimholder exercise any rights or remedies with respect to the Term Priority Collateral if, notwithstanding the expiration of such 180-day period, any First Lien Collateral Agent or any First Lien Claimholder (x) shall have commenced and is diligently pursuing the exercise of its rights or remedies with respect to all or a material portion of the Term Priority Collateral (prompt written notice of such exercise to be given to the ABL Collateral Agent by the First Lien Collateral Agent, provided that the failure to give such notice shall not affect the First Lien Collateral Agent' or any other First Lien Claimholders' rights hereunder) or (y) shall have been stayed by operation of law or any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the ABL Collateral Agent and the other ABL Claimholders may not pursuant to this Section 3.2(a) exercise any rights or remedies with respect to the Term Priority Collateral, the "ABL Standstill Period"); provided that in the event that at any time after the ABL Collateral Agent has sent a notice to First Lien Collateral Agent to commence the ABL Standstill Period, the ABL Default that was the basis for such notice is cured or waived or otherwise ceases to exist, and any notice of acceleration has been rescinded by the ABL Collateral Agent, then the notice to commence the ABL Standstill Period shall automatically and

**Debtors' Exhibit No. 12**
**Page 295 of 354**

without further action of the parties be deemed rescinded and no ABL Standstill Period shall have been deemed to have commenced;

      (b)    will not directly or indirectly contest, protest or object to or hinder any Exercise of Secured Creditor Remedies by the First Lien Collateral Agent or any other First Lien Claimholder with respect to any Term Priority Collateral;

      (c)    will have no right to direct the First Lien Collateral Agent to Exercise any Secured Creditor Remedies with respect to any Term Priority Collateral or to take any other action under the First Lien Loan Documents with respect to any Term Priority Collateral; and

      (d)    will not object to (and hereby waives any and all claims with respect to) the forbearance by the First Lien Collateral Agent or any other First Lien Claimholder from the Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral

provided, however, that, in each case under this Section 3.2, the ABL Lenders Liens shall remain on any Proceeds (other than those Proceeds properly applied to the First Lien Obligations in accordance with Section 4.1(b)) resulting from actions taken by the First Lien Collateral Agent or any other First Lien Claimholder with respect to the Term Priority Collateral (subject to the relative Lien priorities described in Section 2).

      3.3.    Exclusive Enforcement Rights.  (a) Until the Discharge of ABL Priority Obligations has occurred and except as provided in Sections 3.1(a) and 3.4, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the ABL Collateral Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to the ABL Priority Collateral (including the exercise of any right under any lockbox agreement, control agreement, landlord waiver, bailee's letter, consignee agreement or any similar agreement or arrangement with respect to the ABL Priority Collateral) without any consultation with or the consent of the First Lien Collateral Agent or any other First Lien Claimholder; provided, however, that the First Lien Lenders Liens shall remain on any Proceeds (other than those properly applied to the ABL Obligations in accordance with Section 4.1(a)) resulting from actions taken by the ABL Collateral Agent or any other ABL Claimholder with respect to the ABL Priority Collateral (subject to the relative Lien priorities described in Section 2).

      (b)    Until the Discharge of First Lien Priority Obligations has occurred and except as provided in Sections 3.2(a), 3.4 and 3.7, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the First Lien Collateral Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to the Term Priority Collateral (including the exercise of any right under any lockbox agreement, control agreement, landlord waiver, bailee's letter, consignee agreement or any similar agreement or arrangement with respect to the Term Priority Collateral) without any consultation with or the consent of the ABL Collateral Agent or any other ABL Claimholder; provided, however, that the ABL Lenders Liens shall remain on any Proceeds (other than those properly applied to the First Lien Obligations in accordance with Section 4.1(b)) resulting from actions taken by the First Lien Collateral Agent or any other First Lien Claimholder with respect to the Term Priority Collateral (subject to the relative Lien priorities described in Section 2).

      (c)    In connection with any Exercise of Secured Creditor Remedies with respect to any of its Senior Priority Collateral, each of the First Lien Collateral Agent, the other First Lien Claimholders, the ABL Collateral Agent and the other ABL Claimholders may enforce the provisions of the First Lien Collateral Documents or ABL Collateral Documents, as applicable, and exercise rights, powers and remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by any

Debtors' Exhibit No. 12
Page 296 of 354

Senior Claimholder to Dispose of its Senior Priority Collateral upon foreclosure, to incur expenses in connection with such Disposition, and to exercise with respect to its Senior Priority Collateral all the rights and remedies of a secured creditor under applicable law.

3.4.    <u>Claimholders Permitted Actions</u>.    Anything to the contrary in Sections 3.1 and 3.2 notwithstanding, each of the First Lien Collateral Agent, the other First Lien Claimholders, the ABL Collateral Agent and the other ABL Claimholders may, but shall not be obligated to:

(a)    if an Insolvency Proceeding has been commenced by or against the Borrower or any other Loan Party, file a proof of claim or statement of interest with respect to the First Lien Collateral or the ABL Collateral, as the case may be, or otherwise with respect to the First Lien Obligations or the ABL Obligations, as the case may be;

(b)    take any action (not adverse to the priority status of the Liens on the Senior Priority Collateral of the Collateral Agent and other Claimholders of the other Class, or the rights of the Collateral Agent or any other Claimholders of the other Class to Exercise any Secured Creditor Remedies) in order to create, perfect, preserve, protect or prove (but, subject to Section 3.1(a) or 3.2(a), as the case may be, not enforce) its Lien on its First Lien Collateral or ABL Collateral, as the case may be, in each case, to the extent not inconsistent with the terms of this Agreement;

(c)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any Person objecting to or otherwise seeking the disallowance of its claims or any claims of the other Claimholders of its Class or the avoidance of any Liens on any Collateral securing any Obligations of its Class, in each case, to the extent not inconsistent with the terms of this Agreement;

(d)    file any pleadings, objections, motions or agreements that assert rights or interests available to unsecured creditors of the Loan Parties arising under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case not inconsistent with the terms of this Agreement; <u>provided</u> that any judgment Lien obtained in connection therewith shall be subject to the relative Lien priorities set forth in this Agreement;

(e)    vote on any Plan of Reorganization, file any proof of claim and make other filings and make any arguments and motions, in each case to the extent not inconsistent with the terms of this Agreement;

(f)    exercise any of its other rights or remedies referred to in Section 3.1(a) or 3.2(a), as the case may be, after the expiration of the Term Standstill Period or ABL Standstill Period, as applicable, or in Section 3.7 or 3.8 to the extent permitted thereby;

(g)    make a cash bid on all or any portion of the First Lien Collateral or the ABL Collateral, as applicable, in any foreclosure proceeding or action;

(h)    make a credit bid on all or any portion of the First Lien Collateral or the ABL Collateral, as applicable, <u>provided</u> that there is a Discharge of any Senior Obligations secured by Senior Liens on such Collateral in cash in full prior to or upon consummation of any such credit bid;

(i)    join in (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Senior Priority Collateral of the other Class initiated by any Claimholder of the other Class to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or

23

otherwise interfere with the Exercise of Secured Creditor Remedies by the Claimholders of other Class (it being understood that (i) with respect to ABL Priority Collateral, neither the First Lien Collateral Agent nor any other First Lien Claimholder shall be entitled to receive any Proceeds thereof unless otherwise expressly permitted herein and (ii) with respect to the Term Priority Collateral, neither the ABL Collateral Agent nor any other ABL Claimholder shall be entitled to receive any Proceeds thereof unless otherwise expressly permitted herein);

        (j)      engage or retain consultants, valuation firms, appraisers, investment bankers and accountants, and perform or engage third parties to perform audits, examinations and appraisals of any Collateral, for the sole purpose of valuing such Collateral and not for the purpose of marketing or conducting a Disposition of such Collateral; provided, however, that the Junior Claimholders with respect to any Collateral shall not take any of the foregoing actions if such actions would interfere in any material respect with the enforcement by the Senior Claimholders with respect to such Collateral of their Senior Liens; and

        (k)      commence, or join in filing of a petition for the commencement of, any involuntary Insolvency Proceeding of the type described in clause (a), (b) or (d) of the definition of such term or exercise any of its rights during any Insolvency Proceeding to the extent expressly permitted by Section 6.

        Except as expressly set forth in this Agreement (including Sections 3.1(a), 3.2(a), 3.4 and 6), each First Lien Claimholder and each ABL Claimholder shall have any and all rights and remedies it may have as a creditor (including as an unsecured creditor) under any applicable law, including the right to the Exercise of Secured Creditor Remedies; provided, however, that (a) the Exercise of Secured Creditor Remedies with respect to the Collateral (and any judgment Lien obtained in connection therewith or otherwise) shall be subject to the Lien priorities set forth herein and to the provisions of this Agreement, and (b) the exercise of any rights or remedies as unsecured creditors of the Loan Parties shall not be inconsistent with the terms of this Agreement. The ABL Collateral Agent and the other ABL Claimholders may enforce the provisions of the ABL Loan Documents, the First Lien Collateral Agent and the other First Lien Claimholders may enforce the provisions of the First Lien Loan Documents, and the Collateral Agents and the other Claimholders may Exercise any Secured Creditor Remedies, all in such order and in such manner as they may determine in the exercise of their sole discretion, consistent with the terms of this Agreement (including Sections 2, 3 and 6) and mandatory provisions of applicable law; provided, however, that each of the ABL Collateral Agent and the First Lien Collateral Agent agrees to provide to the other (x) an Enforcement Notice prior to its Exercise of Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to the Borrower or any other Loan Party; provided further, however, that the ABL Collateral Agent's failure to provide copies of any such notices to the First Lien Collateral Agent shall not impair any of the ABL Collateral Agent's or other ABL Claimholders' rights hereunder or under any of the ABL Loan Documents, and the First Lien Collateral Agent' failure to provide copies of any such notices to the ABL Collateral Agent shall not impair any of the First Lien Collateral Agent' or any other First Lien Claimholders' rights hereunder or under any of the First Lien Loan Documents. Each of the First Lien Collateral Agent, for itself and on behalf of each other First Lien Claimholder, and the ABL Collateral Agent, for itself and on behalf of each other ABL Claimholder, agrees that it and its related Claimholders will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the First Lien Collateral Agent and each other First Lien Claimholder, against either the ABL Collateral Agent or any other ABL Claimholder, and in the case of the ABL Collateral Agent and each other ABL Claimholder, against either the First Lien Collateral Agent or any other First Lien Claimholder, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such Person with respect to the Collateral which is consistent

**Debtors' Exhibit No. 12**
**Page 298 of 354**

with the terms of this Agreement, and none of such Persons shall be liable for any such action taken or omitted to be taken.

      3.5.   <u>Retention of Proceeds</u>.

      (a)    The First Lien Claimholders shall not be permitted to retain any proceeds of ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies in any circumstance unless and until the Discharge of ABL Priority Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to Section 4.2.

      (b)    The ABL Claimholders shall not be permitted to retain any proceeds of Term Priority Collateral in connection with any Exercise of Secured Creditor Remedies in any circumstance unless and until the Discharge of First Lien Priority Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to Section 4.2.

      (c)    Notwithstanding anything contained in this Agreement to the contrary, in the event of any Disposition or series of related Dispositions that includes ABL Priority Collateral and Term Priority Collateral where the aggregate sales price is not allocated between the ABL Priority Collateral and the Term Priority Collateral being Disposed (including in connection with or as a result of the sale of the Equity Interests of a Loan Party), solely for purposes of this Agreement, the portion of the aggregate sales price determined to be Proceeds of the ABL Priority Collateral on the one hand and Proceeds of the Term Priority Collateral on the other hand shall be allocated first to the ABL Priority Collateral in an amount equal to the lesser of (x) the total proceeds of such Disposition and (y) the book value of such sold ABL Priority Collateral recorded on the applicable Loan Party's books in accordance with GAAP on the date of such Disposition, with the balance, if any, allocated to the Term Priority Collateral.

      3.6.   <u>Non-Interference</u>.  Subject to Sections 3.1, 3.2, 3.3, 3.4, and 6.4(b), each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby:

      (a)    agrees that it and its related Claimholders will not, directly or indirectly, knowingly take any action that would restrain, hinder, limit, delay, or otherwise interfere with any Exercise of Secured Creditor Remedies by the Claimholders of the other Class with respect to any Senior Priority Collateral of such other Class, or that is otherwise prohibited hereunder, including any Disposition of any Senior Priority Collateral of such other Class, whether by foreclosure or otherwise;

      (b)    waives any and all rights it or its related Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the Claimholders of the other Class seek to enforce or collect any Obligations of such other Class (subject to the terms of this Agreement insofar as any such enforcement or collection relates to the Collateral constituting junior priority Collateral of such other Class) or to enforce or realize their Senior Liens on any Senior Priority Collateral of such other Class, regardless of whether any action or failure to act by or on behalf of any Claimholders of such other Class is adverse to the interest of it or its related Claimholders; and

      (c)    agrees that it and its related Claimholders will not knowingly take or cause to be taken any action the purpose or effect of which is to make any junior lien that it or any of its related Claimholders has on any Collateral equal with, or to give it or its related Claimholders any preference or priority relative to, any Senior Lien on such Collateral;

25

(d)     agrees it will not seek, and will waive any right, to have any Senior Priority Collateral or any part thereof of the other Class marshaled upon any foreclosure or other Disposition of such Senior Priority Collateral; and

(e)     will not attempt, directly or indirectly, whether by judicial proceedings (including in any Insolvency Proceeding) or otherwise, to challenge the enforceability of any provision of this Agreement.

3.7.    <u>Inspection and Access Rights</u>.

(a)     If the First Lien Collateral Agent, or any agent or representative of the First Lien Collateral Agent, shall, after any First Lien Default, obtain possession or physical control of any of the Term Priority Collateral, such First Lien Collateral Agent shall promptly notify the ABL Collateral Agent in writing of that fact, and the ABL Collateral Agent shall, within 30 calendar days thereafter, notify the First Lien Collateral Agent in writing as to whether the ABL Collateral Agent desires to exercise its access rights under this Section 3.7 with respect to such Term Priority Collateral.  Upon delivery of such notice by the ABL Collateral Agent to the First Lien Collateral Agent, the parties shall confer in good faith to coordinate with respect to the ABL Collateral Agent's exercise of such access rights.  Consistent with the definition of "Use Period," access rights may apply to differing parcels of real properties at differing times, in which case, a differing Use Period will apply to each such property.

(b)     Without limiting any rights the ABL Collateral Agent or any other ABL Claimholder may otherwise have under applicable law or by agreement and whether or not the First Lien Collateral Agent or any other First Lien Claimholder has commenced and is continuing to Exercise any Secured Creditor Remedies of the First Lien Claimholders, in the event any First Lien Collateral Agent, or any agent or representative of the First Lien Collateral Agent, shall have obtained possession or physical control of any Term Priority Collateral and the ABL Collateral Agent shall have delivered the written notice of its intent to exercise its access rights under this Section 3.7 as provided in Section 3.7(a), then the ABL Collateral Agent or any other Person (including any ABL Claimholder) acting with the consent, or on behalf, of the ABL Collateral Agent shall have the right, and the First Lien Collateral Agent and the other First Lien Claimholders will reasonably cooperate in connection therewith, at the sole cost and expense of the ABL Collateral Agent and the other ABL Claimholders and upon reasonable advance written notice to the First Lien Collateral Agent, during the Use Period (i) during normal business hours on any Business Day, to access ABL Priority Collateral that (A) is stored or located in or on, (B) has become an accession with respect to (within the meaning of Section 9-335 of the UCC), or (C) has been commingled with (within the meaning of Section 9-336 of the UCC) any such Term Priority Collateral, and (ii) access, on a non-exclusive basis, any such Term Priority Collateral (including Equipment (including any processors, computers and other machinery related to the storage or processing of records, documents or files), Fixtures, Intellectual Property, General Intangibles and real property), for purposes of (A) assembling and storing the ABL Priority Collateral and completing the processing of and turning into finished goods of any ABL Priority Collateral consisting of work-in process, semi-finished goods or raw materials, (B) selling any or all of the ABL Priority Collateral located on such Term Priority Collateral, whether in bulk, in lots or to customers in the ordinary course of business or otherwise, (C) removing any or all of the ABL Priority Collateral located on such Term Priority Collateral, or (D) taking reasonable actions to protect, secure and otherwise enforce the rights of the ABL Collateral Agent and the other ABL Claimholders in and to the ABL Priority Collateral, <u>provided</u> that if the ABL Collateral Agent conducts a public auction or private sale of the ABL Priority Collateral at any of the real properties subject to a Mortgage that constitutes Term Priority Collateral, the ABL Collateral Agent shall provide the First Lien Collateral Agent with two Business Days' advance written notice and use reasonable efforts to hold such auction or sale in a manner which would not unduly disrupt the First Lien Collateral Agent' or any other First Lien Claimholder's use of such real properties.  The First Lien

26

Collateral Agent and the other First Lien Claimholders may not sell, assign or otherwise transfer the Term Priority Collateral prior to the expiration of the Use Period unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.7.

(c)     During the period of actual occupation, use and/or control by the ABL Collateral Agent or any other ABL Claimholder (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral pursuant to Section 3.7(b), the ABL Collateral Agent and the other ABL Claimholders shall be obligated to promptly repair at their expense any actual physical damage (but not any diminution in value) to such Term Priority Collateral or other assets or property on which such Term Priority Collateral is located resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear).  In the event, and only in the event, that in connection with its use of some or all of the premises constituting Term Priority Collateral, the ABL Collateral Agent requires the services of any employees of any Loan Party, the ABL Claimholders shall pay directly to any such employees the appropriate, allocated wages of such employees, if any, during the time periods that the ABL Collateral Agent requires their services to the extent not paid for by the Loan Parties.  Notwithstanding the foregoing, in no event shall the ABL Collateral Agent or the other ABL Claimholders have any liability to the First Lien Collateral Agent or the other First Lien Claimholders pursuant to this Section 3.7 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral or other assets or property on which such Term Priority Collateral is located existing prior to the date of the exercise by the ABL Collateral Agent or the other ABL Claimholders of their rights under this Section 3.7 and the ABL Collateral Agent and the other ABL Claimholders shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Collateral Agent or any other ABL Claimholders, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Priority Collateral by the ABL Collateral Agent or any other ABL Claimholders in the manner and for the time periods specified under this Section 3.7 (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear.  Without limiting the rights granted in this Section 3.7, the ABL Collateral Agent and the ABL Claimholders shall reasonably cooperate with the First Lien Collateral Agent and the other First Lien Claimholders in connection with any efforts made by the First Lien Collateral Agent and the other First Lien Claimholders to sell the Term Priority Collateral.

(d)     The ABL Collateral Agent and the other ABL Claimholders shall not be obligated to pay any amounts to the First Lien Collateral Agent or the other First Lien Claimholders (or any Person claiming by, through or under the First Lien Claimholders, including any purchaser of the Term Priority Collateral) or to the Loan Parties for or in respect of the use by the ABL Collateral Agent and the other ABL Claimholders of the Term Priority Collateral pursuant to this Section 3.7; provided that the ABL Claimholders shall be obligated to reimburse the First Lien Collateral Agent and the other First Lien Claimholders for their reasonable out-of-pocket costs and expenses incurred as a result of the First Lien Collateral Agent and the other First Lien Claimholders providing access and use of the Term Priority Collateral to the ABL Collateral Agent or any other ABL Claimholder (or any other Person acting with the consent, or on behalf, of any of the foregoing) at the written request of the ABL Collateral Agent as contemplated by Section 3.7(b).

(e)     The ABL Claimholders shall (i) use the Term Priority Collateral in accordance with applicable law, (ii) insure for damage to property and liability to Persons, including property and liability insurance for the benefit of the First Lien Claimholders, and (iii) pay, indemnify and hold the First Lien Collateral Agent, the other First Lien Claimholders and each of their respective officers, agents,

27

directors and employees harmless from and against any third party liability resulting solely and directly from the ABL Collateral Agent's or any other ABL Claimholders' or any of their respective agents, representatives or invitees', occupancy, use or control of the Term Priority Collateral as set forth in this Section 3.7 (ordinary wear and tear excepted (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear)).

(f)     The First Lien Collateral Agent and the other First Lien Claimholders shall use commercially reasonable efforts to not hinder or obstruct the ABL Collateral Agent and the other ABL Claimholders from exercising the rights described in Section 3.7(b).

(g)     Subject to the terms hereof, the First Lien Collateral Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral, without the involvement of or interference by any ABL Claimholder or liability to any ABL Claimholder, as long as, in the case of an actual sale, the respective purchaser assumes and agrees to the obligations of the First Lien Collateral Agent and the other First Lien Claimholders under this Section 3.7.

3.8.     <u>Sharing of Information and Access</u>.  Subject to the confidentiality limitations imposed by law or agreement (other than any agreement to the extent the confidentiality provisions of such agreement are for the benefit of any Loan Party), in the event that the ABL Collateral Agent shall, in the exercise of its rights under the ABL Collateral Documents or otherwise, receive possession or control of any books and records (whether in the form of a writing or stored in any data equipment or data record in the physical possession of the ABL Collateral Agent) of any Loan Party which contain information identifying or pertaining to the Term Priority Collateral, the ABL Collateral Agent shall, upon written request from either First Lien Collateral Agent and as promptly as practicable thereafter, either make available to the First Lien Collateral Agent such books and records for inspection and duplication or provide to the First Lien Collateral Agent copies thereof. Subject to the confidentiality limitations imposed by law or agreement (other than any agreement to the extent the confidentiality provisions of such agreement are for the benefit of any Loan Party), in the event that either First Lien Collateral Agent shall, in the exercise of its rights under the First Lien Collateral Documents or otherwise, receive possession or control of any books and records (whether in the form of a writing or stored in any data equipment or data record in the physical possession of either First Lien Collateral Agent) of any Loan Party which contain information identifying or pertaining to any of the ABL Priority Collateral, such First Lien Collateral Agent shall, upon written request from the ABL Collateral Agent and as promptly as practicable thereafter, either make available to the ABL Collateral Agent such books and records for inspection and duplication or provide the ABL Collateral Agent copies thereof.

3.9.     <u>Tracing of and Priorities in Proceeds</u>.  (a) The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, further agree that until the earlier of an issuance of any Enforcement Notice by such Claimholder or a bankruptcy or insolvency constituting a First Lien Default or a bankruptcy or insolvency constituting an ABL Default, as applicable, then exists, any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Loan Party to acquire other property which is Collateral shall not (solely as between the Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative Lien priorities in the Collateral which was so acquired.

(b)     Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, acknowledges that, under the terms of the ABL Loan Documents, the Loan Parties are or may be required to ensure that all payments on Accounts constituting ABL Priority Collateral, or on other ABL Priority Collateral, are made to Deposit Accounts or lockboxes related thereto that constitute ABL Priority Collateral, and agrees that, notwithstanding anything to the contrary set forth herein, no

28

ABL Claimholder shall have any duty, responsibility or obligation to any First Lien Claimholder with respect to such Deposit Accounts or lockboxes, including no obligation to pay over to any First Lien Claimholder any payments received into any such Deposit Account or lockbox at any time.  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that, notwithstanding anything to the contrary set forth herein (including Section 4.2) to the extent that Proceeds of any Term Priority Collateral are deposited into any Deposit Accounts or lockboxes and are subsequently applied to repay or prepay the ABL Obligations, in the absence of the ABL Administrative Agent's willful misconduct or gross negligence (such absence to be presumed unless otherwise determined by a final, non-appealable judgment of a court of competent jurisdiction), the sole remedy of the First Lien Claimholders with regard to such Proceeds shall be to proceed directly against the Loan Parties unless, prior to the time such proceeds are applied to repay or prepay the ABL Obligations, the ABL Administrative Agent has actually received a Notification of Proceeds.  For purposes of the foregoing, a "Notification of Proceeds" means a notice in writing from either First Lien Collateral Agent or any Loan Party to the ABL Administrative Agent containing the following information:  (a) the Term Priority Collateral being sold or otherwise Disposed, (b) the proposed date of the sale or other Disposition, (c) the approximate amount of Proceeds therefrom and (d) the name and contact information of the buyer or transferee of such Term Priority Collateral or, in the case of an auction, of the auctioneer.

      3.10.  <u>Permits and Licenses</u>.  (a) Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, (i) consents to the grant by the Borrower or any other Loan Party to the ABL Collateral Agent of a non-exclusive royalty-free license to use any Intellectual Property of such Loan Party that is subject to a Lien held by the First Lien Collateral Agent and (ii) grants, in its capacity as a Claimholder and to the extent of its rights and interests therein, to the ABL Collateral Agent a non-exclusive royalty-free license to use any Intellectual Property constituting Term Priority Collateral that is subject to a Senior Lien held by the First Lien Collateral Agent (and, as applicable, to Dispose of any such Intellectual Property that is embedded in or otherwise integral to any Inventory, to the extent the Loan Party owning such Inventory would Dispose of such Intellectual Property in connection with the Disposition of such Inventory), in each case in connection with the Exercise of Secured Creditor Remedies of any Lien held by the ABL Collateral Agent upon any Inventory or other ABL Priority Collateral of any Loan Party and to the extent the use of such Intellectual Property is necessary or appropriate, in the good faith opinion of the ABL Collateral Agent, to process, ship, produce, store, complete, supply, lease, sell or otherwise Dispose of any such Inventory or other ABL Priority Collateral in any lawful manner in connection with such Exercise of Secured Creditor Remedies.

      (b)  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that if the ABL Collateral Agent shall require rights available under any permit or license controlled by the First Lien Collateral Agent or any other First Lien Claimholder in connection with the Exercise of Secured Creditor Remedies, the First Lien Collateral Agent or such other First Lien Claimholder shall take all such actions as shall be reasonably available to it (at the sole cost and expense of the Loan Parties), consistent with applicable law, and as shall be reasonably requested by the ABL Collateral Agent to make such rights available to the ABL Collateral Agent, subject to the First Lien Lenders Liens.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that if the First Lien Collateral Agent shall require rights available under any permit or license controlled by the ABL Collateral Agent or any other ABL Claimholder in connection with the Exercise of Secured Creditor Remedies, the ABL Collateral Agent or such other ABL Claimholder shall take all such actions as shall be reasonably available to it (at the sole cost and expense of the Loan Parties), consistent with applicable law, and as shall be reasonably requested by the First Lien Collateral Agent to make such rights available to the First Lien Collateral Agent, subject to the ABL Lenders Liens.

**Debtors' Exhibit No. 12**
**Page 303 of 354**

(c)     The First Lien Collateral Agent and the other First Lien Claimholders may not sell, assign or otherwise transfer the Term Priority Collateral unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.10.

**SECTION 4.  Proceeds**.

4.1.     Application of Proceeds.

(a)     Prior to the Discharge of ABL Obligations, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, any ABL Priority Collateral received in connection with any Exercise of Secured Creditor Remedies (including as a result of any collection, sale, foreclosure or other realization or distribution of or in respect of any ABL Priority Collateral (whether or not expressly characterized as such) or in any Insolvency Proceeding) shall be applied in the following order of priority:

(i)     first, to the ABL Obligations (other than the principal amount thereof in excess of the ABL Priority Cap) and for cash collateral as required under the ABL Loan Documents, and in such order as specified in the applicable ABL Loan Documents until the Discharge of ABL Priority Obligations has occurred;

(ii)     second, to the First Lien Obligations (other than the principal amount thereof in excess of the First Lien Priority Cap) in such order as specified in the applicable First Lien Loan Documents until the Discharge of First Lien Priority Obligations has occurred;

(iii)     third, to the principal amount of the ABL Obligations in excess of the ABL Priority Cap until the Discharge of ABL Obligations has occurred; and

(iv)     fourth, to the principal amount of the First Lien Obligations in excess of the First Lien Priority Cap.

(b)     Prior to the Discharge of First Lien Obligations, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, any Term Priority Collateral received in connection with any Exercise of Secured Creditor Remedies (including as a result of any collection, sale, foreclosure or other realization or distribution of or in respect of any Term Priority Collateral (whether or not expressly characterized as such) or in any Insolvency Proceeding) shall be applied in the following order of priority

(i)     first, to the First Lien Obligations (other than the principal amount thereof in excess of the First Lien Priority Cap) and for cash collateral as required under the First Lien Loan Documents, and in such order as specified in the applicable First Lien Loan Documents until the Discharge of First Lien Priority Obligations has occurred;

(ii)     second, to the ABL Obligations (other than the principal amount thereof in excess of the ABL Priority Cap) in such order as specified in the applicable ABL Loan Documents until the Discharge of ABL Priority Obligations has occurred;

(iii)     third, to the principal amount of the First Lien Obligations in excess of the First Lien Priority Cap until the Discharge of First Lien Obligations has occurred; and

(iv)     fourth, to the principal amount of the ABL Obligations in excess of the ABL Priority Cap.

**Debtors' Exhibit No. 12**
**Page 304 of 354**

(c)     If any Exercise of Secured Creditor Remedies with respect to the Collateral produces non-cash proceeds, then such non-cash proceeds shall, subject to Section 4.2, be held by the Collateral Agent that conducted such Exercise of Secured Creditor Remedies and/or sold for cash prior to the application of the proceeds thereof as additional Collateral and, at such time as such non-cash proceeds are monetized, shall be applied as set forth above.

4.2.     <u>Turnover</u>.  So long as the Discharge of Senior Obligations with respect to any Collateral has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, if (a) any Junior Claimholder of any Class receives any Collateral that is subject to any Senior Lien or any Proceeds of any such Collateral, or any other payment in connection with or on account of such Collateral, (i) in connection with the enforcement or exercise of any right or remedy (including any right of set-off) relating to such Collateral, the transfer of such Collateral or Proceeds to any Junior Claimholder by any Person holding a Lien on such Collateral that is subordinate to the junior Lien on such Collateral, or proceeds of any insurance policy claim or of any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of such Collateral or (ii) as a distribution or recovery in any Insolvency Proceeding, (b) any Junior Claimholder receives, in contravention of Section 2.3, any Collateral of the type that would not constitute Senior Priority Collateral of such Junior Claimholder, or any Proceeds of any such Collateral, or any other payment in connection with or on account of such Collateral, or (c) any Junior Claimholder receives any additional Collateral referred to in Section 6.4 that pursuant to such Section is subject to the provisions of this Section 4.2, or any Proceeds of such additional Collateral, or any other payment in connection with or on account of such additional Collateral, then, in each case, such Collateral or Proceeds thereof, or such other payment, shall be segregated and held in trust and forthwith, to the extent not prohibited by applicable law, shall be transferred or paid over to the Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements, for application in accordance with Section 4.1 (to the extent required), or as a court of competent jurisdiction may otherwise direct; <u>provided</u>, <u>however</u>, (A) in the case of any Proceeds of Term Priority Collateral received by the ABL Collateral Agent or any other ABL Claimholder in connection with a Disposition of Term Priority Collateral by any Loan Party, unless a Notification of Proceeds has been received by the ABL Collateral Agent (and in each case subject to Section 3.9(b)), neither the ABL Collateral Agent nor any other ABL Claimholder shall have any obligation to transfer or pay over any Proceeds of such Disposition to the First Lien Collateral Agent, and (B) any payments made by the Loan Parties in respect of the First Lien Obligations with proceeds of loans or advances under the ABL Loan Documents shall not constitute a breach of this Section 4.2 and shall not be subject to any turnover as provided for in this Section 4.2.  Until the Discharge of ABL Priority Obligations occurs, each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, hereby irrevocably constitutes and appoints the ABL Collateral Agent and any officer or agent of the ABL Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the First Lien Collateral Agent or the other First Lien Claimholders, as the case may be, or in the ABL Collateral Agent's own name, from time to time in the ABL Collateral Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 4.2 with respect to ABL Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2 with respect to ABL Priority Collateral.  Until the Discharge of First Lien Priority Obligations occurs, ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the ABL Collateral Agent or the other ABL Claimholders, as the case may be, or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 4.2 with respect to Term Priority Collateral, to take any and all appropriate

31

action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2 with respect to Term Priority Collateral.

      **SECTION 5.**  **Releases; Dispositions; Other Agreements**.

      5.1.  <u>Releases</u>.

      (a)  If, in connection with the Exercise of Secured Creditor Remedies by the ABL Collateral Agent with respect to ABL Priority Collateral as provided for in Section 3 (including any Disposition of any ABL Priority Collateral by any Loan Party with the consent of the ABL Collateral Agent acting in accordance with the terms of the ABL Loan Documents), the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, releases any of its ABL Lenders Liens on any part of the ABL Priority Collateral, then the First Lien Lenders Liens of the First Lien Collateral Agent on such ABL Priority Collateral shall be automatically, unconditionally, and simultaneously released; <u>provided</u>, <u>however</u>, that, to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations in accordance with Section 4.1(a), the First Lien Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  Each of the First Lien Collateral Agent, for itself or on behalf of the other First Lien Claimholders, promptly shall execute and deliver to the ABL Collateral Agent such termination or amendment statements, releases, and other documents as the ABL Collateral Agent may reasonably request in writing to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other First Lien Claimholders.

      (b)  If, in connection with the Exercise of Secured Creditor Remedies by the First Lien Collateral Agent with respect to Term Priority Collateral as provided for in Section 3 (including any Disposition of any Term Priority Collateral by any Loan Party with the consent of the First Lien Collateral Agent acting in accordance with the terms of the First Lien Loan Documents), the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, releases any of its First Lien Lenders Liens on any part of the Term Priority Collateral, then the ABL Lenders Liens of the ABL Collateral Agent on such Term Priority Collateral shall be automatically, unconditionally, and simultaneously released; <u>provided</u>, <u>however</u>, that, to the extent the Proceeds of such Term Priority Collateral are not applied to reduce First Lien Obligations in accordance with Section 4.1(b), the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement. The ABL Collateral Agent, for itself or on behalf of the other ABL Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent such termination or amendment statements, releases, and other documents as the First Lien Collateral Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other ABL Claimholders.

      (c)  If, in connection with any Disposition of any ABL Priority Collateral permitted under the terms of the ABL Loan Documents and the terms of the First Lien Loan Documents, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, releases any of its ABL Lenders Liens on the portion of the ABL Priority Collateral that is the subject of such Disposition, then the First Lien Lenders Liens of the First Lien Collateral Agent on such Collateral shall be automatically, unconditionally, and simultaneously released; <u>provided</u>, that to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations in accordance with Section 4.1(a), the First Lien Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  Each of the First Lien Collateral Agent, for itself or on behalf of the other First Lien Claimholders, promptly shall execute and deliver to the ABL Collateral Agent such termination or amendment statements, releases, and other documents as the ABL Collateral Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other First Lien Claimholders.

32

(d)       If, in connection with any Disposition of any Term Priority Collateral permitted under the terms of the First Lien Loan Documents and the terms of the ABL Loan Documents, the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, releases any of its First Lien Lenders Liens on the portion of the Term Priority Collateral that is the subject of such Disposition, then the ABL Lenders Liens of the ABL Collateral Agent on such Collateral shall be automatically, unconditionally, and simultaneously released; provided that to the extent the Proceeds of such Term Priority Collateral are not applied to reduce First Lien Obligations in accordance with Section 4.1(b), the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.   The ABL Collateral Agent, for itself or on behalf of the other ABL Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent such termination or amendment statements, releases, and other documents as the First Lien Collateral Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other ABL Claimholders.

(e)       Until the Discharge of ABL Obligations occurs, each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, hereby irrevocably constitutes and appoints the ABL Collateral Agent and any officer or agent of the ABL Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the First Lien Collateral Agent or the other First Lien Claimholders, as the case may be, or in the ABL Collateral Agent's own name, from time to time as elected by the ABL Collateral Agent in good faith, for the purpose of carrying out the terms of this Section 5.1 with respect to ABL Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to ABL Priority Collateral, including any endorsements or other instruments of transfer or release.

(f)       Until the Discharge of ABL Obligations occurs, to the extent that the ABL Claimholders (i) have released any Lien on ABL Priority Collateral and any such Lien is later reinstated or (ii) obtain any new Lien on assets constituting ABL Priority Collateral from Loan Parties, then, subject to the proviso contained in Section 2.3, the First Lien Claimholders shall be granted a Lien on any such ABL Priority Collateral, subject to the relative Lien priorities set forth in Section 2.1.

(g)       Until the Discharge of First Lien Obligations occurs, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the ABL Collateral Agent or the other ABL Claimholders, as the case may be, or in the First Lien Collateral Agent's own name, from time to time as elected by the First Lien Collateral Agent in good faith, for the purpose of carrying out the terms of this Section 5.1 with respect to Term Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to Term Priority Collateral, including any endorsements or other instruments of transfer or release.

(h)       Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Claimholders (i) have released any Lien on Term Priority Collateral and any such Lien is later reinstated or (ii) obtain any new Liens on assets constituting Term Priority Collateral from Loan Parties, then, subject to the proviso contained in Section 2.3, the ABL Claimholders shall be granted a Lien on any such Term Priority Collateral, subject to the relative Lien priorities set forth in Section 2.1.

5.2.    Insurance.

33

(a)      Unless and until the Discharge of ABL Obligations has occurred:  (i) the ABL Collateral Agent and the other ABL Claimholders shall have the sole and exclusive right, subject to the rights of the Loan Parties under the ABL Loan Documents, to adjust and settle any claim under any insurance policy to the extent solely in respect of ABL Priority Collateral (including any claim in respect of any business interruption insurance or credit insurance with respect to any Accounts) and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) to the extent solely in respect of the ABL Priority Collateral; and (ii) all proceeds of any such insurance claim and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of ABL Priority Collateral, shall be paid, subject to the rights of the Loan Parties under the ABL Loan Documents, in accordance with Section 4.1(a).

(b)      Unless and until the Discharge of First Lien Obligations has occurred:  (i) the First Lien Collateral Agent and the other First Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Loan Parties under the First Lien Loan Documents, to adjust and settle any claim under any insurance policy to the extent solely in respect of Term Priority Collateral and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) to the extent solely in respect of Term Priority Collateral; and (ii) all proceeds of any such insurance claim and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of Term Priority Collateral, shall be paid, subject to the rights of Loan Parties under the First Lien Loan Documents, in accordance with Section 4.1(b).

Notwithstanding anything contained in this Agreement to the contrary, in the event that any proceeds are derived from any claim under any insurance policy in respect of both ABL Priority Collateral and Term Priority Collateral where the allocation of proceeds is not stipulated between ABL Priority Collateral and Term Priority Collateral, then solely for purposes of this Agreement, the portion of the aggregate proceeds deemed to be proceeds of the ABL Priority Collateral on the one hand and Term Priority Collateral on the other hand shall be determined by first allocating to the ABL Priority Collateral an amount equal to the lesser of (x) the total proceeds of such insurance policy and (y) the book value of such ABL Priority Collateral subject to such insurance event recorded on the applicable Loan Party's books in accordance with GAAP on the date of the loss associated with the insurance proceeds, with the balance, if any, allocated to the Term Priority Collateral.  If any insurance claim includes both ABL Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to ABL Priority Collateral and Term Priority Collateral, and if the ABL Collateral Agent and the First Lien Collateral Agent are unable after negotiating in good faith to agree on the settlement for such claim, each Controlling Collateral Agent may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the parties.  If a Collateral Agent or any other Claimholder of any Class shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Section 5.2, it shall pay such proceeds over to the Controlling Collateral Agent of the other Class in accordance with the terms of Section 4.2.

5.3.    Amendments; Refinancings.

(a)      The U.S. ABL Loan Documents and the ABL Obligations may be amended, restated, Refinanced, supplemented or otherwise modified in accordance with their terms without the consent of any First Lien Collateral Agent or any First Lien Claimholder, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the First Lien Collateral Agent, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement; provided, further, that, the applicable agent for the holders of

Debtors' Exhibit No. 12
Page 308 of 354

obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

(b)    The First Lien Loan Documents and the First Lien Obligations may be amended, restated, Refinanced (as permitted pursuant to the terms of the ABL Loan Documents), supplemented or otherwise modified in accordance with their terms without the consent of ABL Administrative Agent or any ABL Claimholder, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the ABL Administrative Agent, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement; provided, further, that, the applicable agent for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

(c)    [Reserved.]

(d)    In connection with any Refinancing, the ABL Collateral Agent and the First Lien Collateral Agent shall enter (and are hereby authorized to enter without the consent of any other Claimholder), at the written request and expense of the Loan Parties, into such amendments or other modifications of this Agreement as are reasonably necessary to add the new collateral agent (or similar representative) in respect of such Refinancing Indebtedness as a party hereto and to provide such new collateral agent (or similar representative), and the other holders of such Refinancing Indebtedness, the rights and obligations hereunder of the Collateral Agent in respect of, or the holders of, the Indebtedness or other Obligations being Refinanced and to otherwise reflect such Refinancing (and in connection therewith to provide for technical modifications to this Agreement to facilitate the foregoing), it being the intent that such amendments or other modifications (x) establish that the Liens on any Collateral securing any Refinancing Indebtedness will have the same priorities relative to the Liens on such Collateral securing Obligations of the other Class as the Liens that secured the Indebtedness being Refinanced had immediately prior to such Refinancing and (y) provide to the parties benefited by the Liens on any Collateral securing such Refinancing Indebtedness the same rights and obligations relative to the parties holding Liens on such Collateral securing Obligations of the other Class as the parties that were benefited by the Liens that secured such Indebtedness or other Obligations being Refinanced had immediately prior to such Refinancing.

(e)    Notwithstanding the terms of Section 5.3(d):

(i)    In the event that the First Lien Collateral Agent have not commenced the actions contemplated by Section 5.3(d) in connection with any permitted Refinancing of the ABL Obligations within 10 Business Days after the delivery by the Borrower to the First Lien Collateral Agent of a written request to do so, then, unless the First Lien Collateral Agent have provided written notice to the Borrower and the ABL Collateral Agent within such 10 Business Days' period setting forth in reasonable detail the basis for its determination that it is not required to take such action in accordance with Section 5.3(d), the ABL Collateral Agent, without the consent of the First Lien Collateral Agent, is authorized to amend or otherwise modify this Agreement in the manner set forth in Section 5.3(d); provided that such Refinancing (and any Liens relating thereto), are permitted under the First Lien Loan Documents then extant.

(ii)    Notwithstanding the terms of Section 5.3(d), in the event that the ABL Collateral Agent does not take the actions contemplated by Section 5.3(d) in connection with any permitted Refinancing of the First Lien Obligations within 10 Business Days after the delivery by the Borrower to the ABL Collateral Agent of a written request to do so, then, unless the ABL

35

Collateral Agent has provided written notice to the Borrower and the First Lien Collateral Agent within such 10 Business Days' period setting forth in reasonable detail the basis for its determination that it is not required to take such action in accordance with Section 5.3(d), the First Lien Collateral Agent, without the consent of the ABL Collateral Agent, is authorized to amend or otherwise modify this Agreement in the manner set forth in Section 5.3(d); provided that such Refinancing (and any Liens relating thereto), are permitted under the ABL Loan Documents then extant.

(f)     So long as the Discharge of ABL Obligations has not occurred, each First Lien Collateral Document shall include the following language (or similar language acceptable to the ABL Collateral Agent):  "Notwithstanding anything herein to the contrary, the Liens and security interests granted to Goldman Sachs Bank USA, as Collateral Agent, pursuant to this Agreement in any Collateral and the exercise of any right or remedy by Goldman Sachs Bank USA, as Collateral Agent, with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

(g)     So long as the Discharge of First Lien Obligations has not occurred, each U.S. ABL Collateral Document shall include the following language (or similar language acceptable to the First Lien Collateral Agent):  "Notwithstanding anything herein to the contrary, the Liens and security interests granted to Goldman Sachs Bank USA, as Collateral Agent, pursuant to this Agreement in any Collateral and the exercise of any right or remedy by Goldman Sachs Bank USA, as ABL Collateral Agent, with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

5.4.    <u>Bailee for Perfection</u>.

(a)     The ABL Collateral Agent and the First Lien Collateral Agent each agree to hold or control that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) (such Collateral, which shall include Collateral subject to deposit account control agreements or security account control agreements, being referred to as the "<u>Pledged Collateral</u>"), as gratuitous bailee and as a non-fiduciary agent for the First Lien Collateral Agent or the ABL Collateral Agent, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC), solely for the purpose of perfecting the security interest granted under the First Lien Loan Documents or the U.S. ABL Loan Documents, as applicable, subject to the terms and conditions of this Section 5.4.  The First Lien Collateral Agent and the other First Lien Claimholders hereby appoint the ABL Collateral Agent as their gratuitous bailee for the purposes of perfecting their security interest in all Pledged Collateral in which the ABL Collateral Agent has a perfected security interest under the UCC.  The ABL Collateral Agent and the other ABL Claimholders hereby appoint the First Lien Collateral Agent as their gratuitous bailee for the purposes of perfecting their security interest in all Pledged Collateral in which the First Lien Collateral Agent has a perfected security interest under the UCC.  Each of the ABL Collateral Agent and the First Lien Collateral Agent hereby accept such appointments pursuant to this Section 5.4(a) and acknowledges and agrees that it shall act for the benefit of the Claimholders of the other Class with respect to any Pledged Collateral and that any proceeds received by the ABL Collateral Agent or the First Lien Collateral Agent, as the case may be, under any Pledged Collateral shall be applied in accordance with Section 4.  Unless and until the Discharge of ABL Obligations has occurred, the First Lien Collateral Agent agrees to promptly notify the ABL Collateral Agent of any Pledged Collateral constituting ABL Priority Collateral held or controlled by it (or its agents or bailees, other than the ABL Collateral Agent) or actually known by it to be held or controlled by any other First Lien Claimholders, and at any time

36

prior to the Discharge of ABL Obligations, the First Lien Collateral Agent and each other First Lien Claimholder agrees to deliver to the ABL Collateral Agent any such Pledged Collateral held by it, together with any necessary endorsements (or otherwise allow the ABL Collateral Agent to obtain control of such Pledged Collateral). Subject to Section 3.9(b) and except as otherwise provided in Section 4.2 in respect of Proceeds of Term Priority Collateral, unless and until the Discharge of First Lien Obligations has occurred, the ABL Collateral Agent agrees to promptly notify the First Lien Collateral Agent in writing of any Pledged Collateral constituting Term Priority Collateral held or controlled by it (or its agents or bailees, other than the First Lien Collateral Agent) or actually known by it to be held by any other ABL Claimholders, and at any time prior to the Discharge of First Lien Obligations, the ABL Collateral Agent and each other ABL Claimholder agrees to deliver to the First Lien Collateral Agent any such Pledged Collateral held by it, together with any necessary endorsements (or otherwise allow the First Lien Collateral Agent to obtain control of such Pledged Collateral).

(b)     Subject to the terms of this Agreement, until the Discharge of ABL Priority Obligations has occurred, the ABL Collateral Agent shall be entitled to deal with the ABL Priority Collateral in accordance with the terms of the ABL Loan Documents as if the Liens of the First Lien Collateral Agent under the First Lien Loan Documents did not exist. The rights of the First Lien Collateral Agent in respect of any ABL Priority Collateral shall at all times be subject to the terms of this Agreement.

(c)     Subject to the terms of this Agreement, until the Discharge of First Lien Priority Obligations has occurred, the First Lien Collateral Agent shall be entitled to deal with the Term Priority Collateral in accordance with the terms of the First Lien Loan Documents as if the Liens of the ABL Collateral Agent under the ABL Loan Documents did not exist. The rights of the ABL Collateral Agent in respect of any Term Priority Collateral shall at all times be subject to the terms of this Agreement.

(d)     The ABL Collateral Agent shall have no obligation whatsoever to the First Lien Collateral Agent or any other First Lien Claimholder to ensure that the Pledged Collateral is genuine or owned by any of Loan Parties or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The First Lien Collateral Agent shall have no obligation whatsoever to the ABL Collateral Agent or any other ABL Claimholder to ensure that the Pledged Collateral is genuine or owned by any of Loan Parties or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the ABL Collateral Agent under this Section 5.4 shall be limited solely to holding or controlling the Pledged Collateral as bailee and agent in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of ABL Priority Obligations as provided in paragraph (f) of this Section 5.4. The duties or responsibilities of the First Lien Collateral Agent under this Section 5.4 shall be limited solely to holding or controlling the Pledged Collateral as bailee and agent in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of First Lien Priority Obligations as provided in paragraph (g) of this Section 5.4.

(e)     The ABL Collateral Agent acting pursuant to this Section 5.4 shall not have by reason of the ABL Collateral Documents, the First Lien Collateral Documents, this Agreement, or any other document a fiduciary relationship in respect of the First Lien Collateral Agent or any other First Lien Claimholder. The First Lien Collateral Agent acting pursuant to this Section 5.4 shall not have by reason of the ABL Collateral Documents, the First Lien Collateral Documents, this Agreement, or any other document a fiduciary relationship in respect of the ABL Collateral Agent or any other ABL Claimholder.

(f)     Upon the Discharge of ABL Priority Obligations, the ABL Collateral Agent (i) shall deliver or cause to be delivered the remaining Pledged Collateral (if any) in its possession or in the possession of its agents or bailees (other than the First Lien Collateral Agent), together with any

37

necessary endorsements, <u>first</u>, to the First Lien Collateral Agent to the extent First Lien Obligations remain outstanding as confirmed in writing by any First Lien Collateral Agent, and, to the extent that both First Lien Collateral Agent confirm no First Lien Obligations are outstanding, <u>second</u>, to the applicable Loan Party to the extent no ABL Obligations or First Lien Obligations that are secured by such Pledged Collateral remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction may otherwise direct and (ii) will cooperate with the First Lien Collateral Agent and such Loan Party, as the case may be, in assigning (without recourse to or warranty by the ABL Collateral Agent or any other ABL Claimholder or agent or bailee thereof) control over any other ABL Priority Collateral under its control.  At such time, the ABL Collateral Agent further agrees to take, at the sole cost and expense of the Loan Parties, all other action reasonably requested in writing by the First Lien Collateral Agent (including amending any outstanding control agreements) to enable the First Lien Collateral Agent to obtain a first priority security interest in the Collateral.

(g)     Upon the Discharge of First Lien Priority Obligations, the First Lien Collateral Agent (i) shall deliver the remaining Pledged Collateral (if any) in its possession or in the possession of its agents or bailees (other than the ABL Collateral Agent) together with any necessary endorsements, <u>first</u>, to the ABL Collateral Agent to the extent the ABL Obligations remain outstanding as confirmed in writing by the ABL Collateral Agent, and, to the extent that the ABL Collateral Agent confirms no ABL Obligations are outstanding, <u>second</u>, to the applicable Loan Party to the extent no ABL Obligations or First Lien Obligations that are secured by such Pledged Collateral remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction might otherwise direct and (ii) will cooperate with the ABL Collateral Agent and such Loan Party, as the case may be, in assigning (without recourse to or warranty by the First Lien Collateral Agent or any other First Lien Claimholder or agent or bailee thereof) control over any other Term Priority Collateral under its control.  At such time, the First Lien Collateral Agent further agree to take, at the sole cost and expense of the Loan Parties, all other action reasonably requested in writing by the ABL Collateral Agent (including amending any outstanding control agreements) to enable the ABL Collateral Agent to obtain a first priority security interest in the Collateral.

5.5.    <u>When Discharge of Obligations Deemed to Not Have Occurred</u>.

(a)     If the Loan Parties enter into any Refinancing of the ABL Obligations with Indebtedness permitted under the First Lien Loan Documents that is intended to be (and under the First Lien Loan Documents is permitted to be) secured by the ABL Priority Collateral on a basis that is senior to the First Lien Lenders Liens thereon and by the Term Priority Collateral on a basis that is junior to the First Lien Lenders Liens thereon, then a Discharge of ABL Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the Refinancing Indebtedness in respect of such ABL Obligations shall be treated as ABL Obligations for all purposes of this Agreement, including for purposes of the relative Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent (or similar representative) in respect of the obligations under such Refinancing shall be the ABL Collateral Agent for all purposes of this Agreement; <u>provided</u>, <u>however</u>, that the holders of such Refinancing Indebtedness, and the collateral agent (or similar representative) of such holders, bind themselves to the terms of this Agreement pursuant to an amendment or joinder effected in accordance with Section 5.3(d) or Section 9.4, as applicable.

(b)     If the Loan Parties enter into any Refinancing of the First Lien Obligations with Indebtedness permitted under the ABL Loan Documents that is intended to be (and under the ABL Loan Documents is permitted to be) secured by the Term Priority Collateral on a basis that is senior to the ABL Lenders Liens thereon and by the ABL Priority Collateral on a basis that is junior to the ABL Lenders Liens thereon, then a Discharge of First Lien Obligations shall be deemed not to have occurred for all

38

purposes of this Agreement, and the Refinancing Indebtedness in respect of such First Lien Obligations shall be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the relative Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent (or similar representative) in respect of the obligations under such Refinancing shall be the First Lien Collateral Agent for all purposes of this Agreement; provided, however, that the holders of such Refinancing Indebtedness, and the collateral agent (or similar representative) of such holders, bind themselves to the terms of this Agreement pursuant to an amendment or joinder effected in accordance with Section 5.3(d) or Section 9.4, as applicable.

(c)     [Reserved]

5.6.     Injunctive Relief.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agree that should any Claimholder in any way take, attempt to, or threaten to take any action contrary to terms of this Agreement with respect to the Collateral, or fail to take any action required by this Agreement, the First Lien Collateral Agent, the ABL Collateral Agent or any other Claimholder, as the case may be, may obtain relief against such Claimholder by injunction, specific performance, or other appropriate equitable relief, it being understood and agreed that non-breaching Claimholders' damages from such actions may at that time be difficult to ascertain and may be irreparable, and (b) each Claimholder waives any defense that other Claimholders can demonstrate damage and/or be made whole by the awarding of damages.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the ABL Collateral Agent or the other ABL Claimholders or the First Lien Collateral Agent or the other First Lien Claimholders, as the case may be.

5.7.     Obligations Purchase Right.

(a)     Without prejudice to the enforcement of any remedies of any Claimholder, whether under the Credit Documents or otherwise, the Collateral Agents of each Class, on behalf of its related Claimholders, agrees that, in the event a Purchase Event of the type described in clause (c) of the definition of such term shall have occurred, or any other Purchase Event shall have occurred with respect to Obligations of such Class (the "Subject Obligations"), the Claimholders of the other Class (or any of them) may, at their sole expense and effort, upon notice to the ABL Collateral Agent if the ABL Obligations are such first Class or the First Lien Collateral Agent if the First Lien Obligations are such first class (which notice shall be irrevocable and shall specify the date of closing (which shall be not less than five (5) nor more than thirty (30) Business Days after the receipt by the applicable Collateral Agents of such first Class of the irrevocable notice from the Controlling Collateral Agent of the other Class' election to exercise the purchase option as provided for in this Section 5.7), require the Claimholders holding the Subject Obligations (the "Subject Secured Parties") to assign and delegate to the Claimholders of such other Class, without warranty or representation or recourse, all (but not less than all) of the Subject Obligations (including all, but not less than all, unfunded commitments under the applicable Credit Documents, if any, that are in effect); provided that (i) such assignment and delegation shall not conflict with any applicable law and (ii) the Claimholders of such other Class shall have paid to the applicable Collateral Agent or Collateral Agents of such first Class, for the account of the Subject Claimholders, in immediately available funds, an amount equal to 100% of the principal of all Indebtedness included in such Subject Obligations plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (including prepayment fees) and all premiums applicable thereto and all the other Subject Obligations then outstanding (which shall include, with respect to (A) the aggregate face amount of the letters of credit, cash collateral in an amount equal to 102% thereof, (B) any ABL Secured Hedging

39

Obligations, 100% of the aggregate amount of such ABL Secured Hedging Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the relevant ABL Secured Hedge Agreements giving rise to such ABL Secured Hedging Obligations were terminated at such time, (C) any ABL Cash Management Obligations, 100% of the aggregate amount of such ABL Cash Management Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the ABL Cash Management Agreement giving rise to such ABL Cash Management Obligations were terminated at such time (or, if not then terminable, if such ABL Cash Management Agreement were terminated on the first date on which the party providing such services would be entitled to terminate it (assuming that such party promptly takes all actions (including the giving of any notice of termination) that under the terms of such ABL Cash Management Agreement are required to be taken in order to effect such termination)), (D) any Term Secured Hedging Obligations, 100% of the aggregate amount of such Term Secured Hedging Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the relevant Term Secured Hedge Agreements giving rise to such Term Secured Hedging Obligations were terminated at such time, and (E) any Term Cash Management Obligations, 100% of the aggregate amount of such Term Cash Management Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the Term Cash Management Agreement giving rise to such Term Cash Management Obligations were terminated at such time (or, if not then terminable, if such Term Cash Management Agreement were terminated on the first date on which the party providing such services would be entitled to terminate it (assuming that such party promptly takes all actions (including the giving of any notice of termination) that under the terms of such Term Cash Management Agreement are required to be taken in order to effect such termination)).  In order to effectuate the foregoing, the applicable Collateral Agent or Collateral Agents of such first Class shall calculate, upon the written request of the Collateral Agent of such other Class from time to time, the amount in cash (and, with respect to clause (A) above, cash collateral) that would be necessary so to purchase the Subject Obligations.  Notwithstanding anything herein to the contrary, so long as the First Lien Agent is the First Lien Collateral Agent, only the First Lien Agent and the First Lien Claimholders may exercise the purchase right specified in this Section 5.7.

(b)     Following exercise of any such purchase right by the Claimholders of any Class in accordance with the terms of this Section 5.7, the Claimholders shall cooperate in consummating promptly thereafter such assignment and delegation using the applicable assignment forms provided in the Credit Documents of the applicable Class or, if no such assignment forms are provided, using the assignment and assumption forms customary for the type of Obligations being assigned.  In addition, contemporaneously with the consummation of the purchase by the Claimholders of any Class of the Subject Obligations of the other Class, the Collateral Agent and Administrative Agent of such purchased Class shall resign as the "Collateral Agent" and "Administrative Agent" under the applicable Credit Documents (and shall execute and deliver all such documents and instruments reasonably requested by the Collateral Agent of the purchasing Class to assign and transfer any Collateral, together with any and all rights under third-party agreements related to Collateral and/or access thereto, to the Collateral Agent of the purchasing Class and to maintain the validity, perfection and priority of the Liens on the Collateral in favor of the Collateral Agent of the purchasing Class) and the Collateral Agent of the purchasing Class shall be designated as the successor "Collateral Agent" under the Credit Documents of the purchased Class and the Administrative Agent of the purchasing Class shall be designated as the successor "Administrative Agent" under the Credit Documents of the purchased Class.

**SECTION 6.  Insolvency Proceedings**.

6.1.    Financing.

40

(a)      Until the Discharge of ABL Obligations, if any Loan Party shall be subject to any Insolvency Proceeding and the ABL Collateral Agent consents to the use of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code; herein, "Cash Collateral") constituting ABL Priority Collateral or consents to permit any Loan Party to obtain financing provided by any one or more ABL Claimholders or any other Person under Section 364 of the Bankruptcy Code or under any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, secured by a Lien on such ABL Priority Collateral that is (i) senior to or pari passu with the ABL Lenders Liens on the ABL Priority Collateral and (ii) junior to the First Lien Lenders Liens on the Term Priority Collateral (such financing, which may include a "roll-up" or "roll-over" of all or any of the ABL Obligations, is referred to herein as a "DIP Financing"), and if the Loan Parties desire to obtain authorization from the applicable Bankruptcy Court to use such Cash Collateral or to obtain such DIP Financing, then each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that, so long as the maximum principal amount of such DIP Financing (and any unfunded commitments under such DIP Financing and the face amount of any letters of credit or other financial accommodations issued and outstanding under such DIP Financing), does not exceed 115% of the principal balance of the ABL Obligations as of the date of the commencement of such Insolvency Proceeding, the First Lien Claimholders will consent (and hereby are deemed to have consented to), and will not object to or oppose, or support any other Person objecting to or opposing, such use of such Cash Collateral or such DIP Financing and, to the extent the ABL Lenders Liens on the ABL Priority Collateral are subordinated to or pari passu with any new Liens securing such DIP Financing, each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, will subordinate (and hereby subordinates) the First Lien Lenders Liens on the ABL Priority Collateral (x) to the Liens securing such DIP Financing (the extent consistent with the other provisions of this Agreement) and (y) to any professional fee or U.S. trustee fee "carve-out"; provided that (A) the First Lien Collateral Agent and the other First Lien Claimholders shall retain the First Lien Lenders Liens on the Collateral and, as to the Term Priority Collateral only, the First Lien Lenders Liens shall have the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on the Term Priority Collateral securing such DIP Financing shall be junior and subordinate to the First Lien Lenders Liens on the Term Priority Collateral, (B) all Liens on ABL Priority Collateral securing any such DIP Financing shall be senior to or pari passu with the ABL Lenders Liens on the ABL Priority Collateral and (C) the terms of such DIP Financing or Cash Collateral order do not require any First Lien Claimholders to extend additional credit pursuant to such DIP Financing or Cash Collateral order.  The foregoing provisions of this Section 6.1(a) shall not restrict the First Lien Collateral Agent or any other First Lien Claimholders from objecting to or opposing any provision in any Cash Collateral order or DIP Financing documentation relating to any provision or content of a Plan of Reorganization other than a condition in the DIP Financing that provides that all Obligations in respect of such DIP Financing must be paid in full upon the confirmation of any Plan of Reorganization; provided that the inability of the First Lien Claimholders to receive a Lien on actions under Chapter 5 of the Bankruptcy Code or proceeds thereof shall not affect the agreements and waivers set forth in this section.

(b)      Until the Discharge of First Lien Obligations, if any Loan Party shall be subject to any Insolvency Proceeding and the First Lien Collateral Agent consents to the use of Cash Collateral constituting Term Priority Collateral or consents to permit any Loan Party to obtain financing provided by any one or more First Lien Claimholders or any other Person under Section 364 of the Bankruptcy Code or under any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, secured by a Lien on such Term Priority Collateral that is (i) senior to or pari passu with the First Lien Lenders Liens on the Term Priority Collateral and (ii) junior to the ABL Lenders Liens on the ABL Priority Collateral (such financing, which may include a "roll-up" or "roll-over" of all or any of the First Lien Obligations, is referred to herein as a "Term DIP Financing"), and if the Loan Parties desire to obtain authorization from the applicable Bankruptcy Court to use such Cash Collateral or to obtain such Term DIP Financing, then the ABL Collateral Agent, for itself and on behalf of the other ABL

41

Claimholders, agrees that, so long as the principal amount of such Term DIP Financing, does not exceed 115% of the principal balance of the First Lien Obligations as of the date of the commencement or such Insolvency Proceeding, the ABL Claimholders will consent (and hereby are deemed to have consented to), and will not object to or oppose, or support any other Person objecting to or opposing, such use of such Cash Collateral or such Term DIP Financing and, to the extent the First Lien Lenders Liens on the Term Priority Collateral are subordinated to or pari passu with any new Liens securing such Term DIP Financing, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, will subordinate (and hereby subordinates) the ABL Lenders Liens on the Term Priority Collateral (x) to the Liens securing such Term DIP Financing (to the extent consistent with the other provisions of this Agreement) and (y) to any professional fee or U.S. trustee fee "carve-out"; provided that (A) the ABL Collateral Agent and the other ABL Claimholders shall retain the ABL Lenders Liens on the Collateral and, as to the ABL Priority Collateral only, the ABL Lenders Liens shall have the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on the ABL Priority Collateral securing such Term DIP Financing shall be junior and subordinate to the ABL Lenders Liens on the ABL Priority Collateral, (B) all Liens on Term Priority Collateral securing any such Term DIP Financing shall be senior to or pari passu with the First Lien Lenders Liens on the Term Priority Collateral and (C) the terms of such Term DIP Financing or Cash Collateral order do not require any ABL Claimholders to extend additional credit pursuant to such Term DIP Financing or Cash Collateral order. The foregoing provisions of this Section 6.1(b) shall not restrict the ABL Collateral Agent or any other ABL Claimholder from objecting to or opposing any provision in any Cash Collateral order or Term DIP Financing documentation relating to any provision or content of a Plan of Reorganization other than a condition in the Term DIP Financing that provides that all Obligations in respect of such Term DIP Financing must be paid in full upon the confirmation of any Plan of Reorganization; provided that the inability of the ABL Claimholders to receive a Lien on actions under Chapter 5 of the Bankruptcy Code or proceeds thereof shall not affect the agreements and waivers set forth in this section.

(c)     Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that, with respect to any Cash Collateral use or DIP Financing that meets the requirements of Section 6.1(a), no First Lien Claimholder will request adequate protection in connection with its rights as a holder of Liens on the ABL Priority Collateral, except as expressly agreed by the ABL Collateral Agent or as permitted by Section 6.4(b)(ii).  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that, with respect to any Cash Collateral use or Term DIP Financing that meets the requirements of Section 6.1(b), no ABL Claimholder will request adequate protection in connection with its rights as a holder of Liens on the Term Priority Collateral, except as expressly agreed by the First Lien Collateral Agent or as permitted by Section 6.4(b)(ii).

(d)     All ABL Lenders Liens granted to the ABL Collateral Agent or any other ABL Claimholder, and all First Lien Lenders Liens granted to the First Lien Collateral Agent or any other First Lien Claimholders, in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the parties to be and shall be deemed to be subject to the Lien priorities set forth in Section 2.1 and the other terms and conditions of this Agreement.

6.2.     Sales.  Subject to Section 3.7, each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the First Lien Claimholders or the ABL Claimholders, as the case may be, will consent to (and hereby are deemed to have consented to), and will not object or oppose (or support any Person in objecting to or opposing), a motion to Dispose any Senior Priority Collateral of the other Class free and clear of any Liens under Section 363 of the Bankruptcy Code (or any comparable provision of any other similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law), including any motion for approval of bidding procedures in connection therewith or any other related or ancillary matters, if the requisite ABL Claimholders under the ABL

42

Credit Agreement or the requisite First Lien Claimholders under the First Lien Credit Agreement, as the case may be, have consented to such Disposition of such assets, so long as the Liens of the First Lien Claimholders or the ABL Claimholders, as the case may be, on such assets attach to the proceeds thereof subject to the relative Lien priorities set forth in this Agreement and such motion does not impair the rights of the First Lien Claimholders or the ABL Claimholders, as the case may be, under Section 363(k) of the Bankruptcy Code (so long as the right of the First Lien Claimholders to offset their First Lien Obligations against the purchase price for any ABL Priority Collateral exists only after the Discharge of ABL Obligations and the right of the ABL Claimholders to offset their ABL Obligations against the purchase price for any Term Priority Collateral exists only after the Discharge of First Lien Obligations).

6.3.  Relief from the Automatic Stay.

(a)  Until the Discharge of ABL Obligations has occurred, the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, agrees that the First Lien Claimholders will not seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of the ABL Priority Collateral without the prior written consent of the ABL Collateral Agent.

(b)  Until the Discharge of First Lien Obligations has occurred, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, agrees that the ABL Claimholders will not seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of the Term Priority Collateral without the prior written consent of the First Lien Collateral Agent.

6.4.  Adequate Protection.

(a)  In any Insolvency Proceeding, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agree that the ABL Claimholders or the First Lien Claimholders, as the case may be, will not object to or oppose (or support any other Person objecting to or opposing) (i) any motion or other request for adequate protection by (x) the First Lien Collateral Agent or any other First Lien Claimholder, with respect to the Term Priority Collateral, prior to the Discharge of First Lien Obligations or (y) the ABL Collateral Agent or any other ABL Claimholder, with respect to the ABL Priority Collateral, prior to the Discharge of ABL Obligations, as the case may be, or (ii) any objection claiming a lack of adequate protection by (x) the First Lien Collateral Agent or any other First Lien Claimholder, with respect to the Term Priority Collateral, prior to the Discharge of First Lien Obligations, or (y) the ABL Collateral Agent or any other ABL Claimholder, with respect to the ABL Priority Collateral, prior to the Discharge of ABL Obligations, as the case may be.

(b)  In any Insolvency Proceeding:

(i)  The First Lien Collateral Agent and the other First Lien Claimholders may seek adequate protection with respect to their rights in the Term Priority Collateral, and the ABL Collateral Agent and the other ABL Claimholders may seek adequate protection with respect to their rights in the ABL Priority Collateral. Notwithstanding the foregoing, however, (1) the First Lien Claimholders shall not be permitted to receive Post-Petition Interest payments or adequate protection payments from the proceeds of ABL Priority Collateral or any DIP Financing permitted under Section 6 before the Discharge of ABL Obligations, other than with the prior consent of the ABL Claimholders, and (2) the ABL Claimholders shall not be permitted to receive Post-Petition Interest and adequate protection payments from the proceeds of Term

43

Priority Collateral or any Term DIP Financing permitted under Section 6 before the Discharge of First Lien Obligations other than with the prior consent of the First Lien Claimholders.

(ii)     Notwithstanding anything in this Section 6 to the contrary, (A) to the extent that the First Lien Collateral Agent or any other First Lien Claimholders are granted adequate protection in the form of an additional or replacement Lien on assets of the same type as the Term Priority Collateral, the ABL Claimholders shall be permitted to seek a Lien on such Collateral subject to the relative Lien priority set forth in Section 2.1 (and neither the First Lien Collateral Agent nor any other First Lien Claimholder shall object to or oppose (or support any other Person objecting to or opposing) any motion by any ABL Claimholder to receive such a Lien), and (B) to the extent that the ABL Collateral Agent or any other ABL Claimholders are granted adequate protection in the form of an additional or replacement Lien on assets of the same type as the ABL Priority Collateral, the First Lien Claimholders shall be permitted to seek a Lien on such Collateral subject to the relative Lien priority set forth in Section 2.1 (and neither the ABL Collateral Agent nor any other ABL Claimholder shall object to or oppose (or support any other Person objecting to or opposing) any motion by any First Lien Claimholder to receive such a Lien).

(iii)     If any ABL Claimholder seeks or requires (or is otherwise granted) adequate protection of its ABL Lenders Liens on the Term Priority Collateral in the form of additional or replacement Lien on assets of the same type as the Term Priority Collateral, then the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, agrees that the First Lien Collateral Agent shall be entitled to be granted an additional or replacement Lien on such assets as adequate protection of its senior interest in the Term Priority Collateral and that the additional or replacement Lien thereon of the ABL Collateral Agent or any other ABL Claimholder shall be subordinated and junior to the additional or replacement Lien thereon of the First Lien Collateral Agent on the same basis as the ABL Lenders Liens are subordinated to the First Lien Lenders Liens with respect to the Term Priority Collateral under Section 2.1; provided that, to the extent the First Lien Collateral Agent is not granted such adequate protection in the applicable form, any such additional or replacement Lien and any amounts recovered by or distributed to the ABL Collateral Agent or any other ABL Claimholder pursuant to or as a result of such Lien shall be subject to Section 4.2 to the extent not inconsistent with an order of a court of competent jurisdiction.

(iv)     If any First Lien Claimholder seeks or requires (or is otherwise granted) adequate protection of its First Lien Lenders Liens on the ABL Priority Collateral in the form of additional or replacement Lien on assets of the same type as the ABL Priority Collateral, then each of the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, agrees that the ABL Collateral Agent shall be entitled to be granted an additional or replacement Lien on such assets as adequate protection of its senior interest in the ABL Priority Collateral and that the additional or replacement Lien thereon of the First Lien Collateral Agent or any other First Lien Claimholder shall be subordinated and junior to the additional or replacement Lien thereon of the ABL Collateral Agent on the same basis as the First Lien Lenders Liens are subordinated to the ABL Lenders Liens with respect to the ABL Priority Collateral under Section 2.1; provided that, to the extent the ABL Collateral Agent is not granted such adequate protection in the applicable form, any such additional or replacement Lien and any amounts recovered by or distributed to the First Lien Collateral Agent or any other First Lien Claimholder pursuant to or as a result of such Lien shall be subject to Section 4.2 to the extent not inconsistent with an order of a court of competent jurisdiction.

44

(v)      Except as expressly set forth in Sections 6.1, 6.2 and 6.3 and this Section 6.4, nothing herein shall limit the rights of the First Lien Collateral Agent or any other First Lien Claimholder, or the rights of the ABL Collateral Agent or any other ABL Claimholder, to seek adequate protection with respect to their rights in the Collateral in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

6.5.    <u>Section 1111(b) of the Bankruptcy Code</u>.  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that neither it nor its related Claimholders shall object to or oppose (or support any other Person objecting to or opposing), or take any other action to impede, in any Insolvency Proceeding, the right of any Claimholder of the other Class to make an election under Section 1111(b)(2) of the Bankruptcy Code with respect to the Senior Priority Collateral of such Claimholder of the other Class.  Each of the First Lien Collateral Agent, for itself and the other First Lien Claimholders, and the ABL Collateral Agent, for itself and the other ABL Claimholders, waives any claim it or its related Claimholders may hereafter have against any Claimholder of the other Class arising out of (a) the election by such Claimholder of the other Class of the application of Section 1111(b)(2) of the Bankruptcy Code or (b) any cash collateral or financing arrangement, and any related grant of a security interest in the Senior Priority Collateral of such Claimholder of the other Class, made in accordance with Section 6.1 in any Insolvency Proceeding.

6.6.    <u>Avoidance Issues</u>.  If any Claimholder is required in any Insolvency Proceeding or otherwise to turn over, disgorge or otherwise pay to the estate of any Loan Party any amount paid in respect of the ABL Obligations or the First Lien Obligations, as the case may be (a "<u>Recovery</u>"), then such Claimholder shall be entitled to a reinstatement of the ABL Obligations or the First Lien Obligations, as the case may be, with respect to all such recovered amounts, and all rights, interests, priorities and privileges recognized in this Agreement shall apply with respect to any such reinstated ABL Obligations or First Lien Obligations, as the case may be.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement.  This Section 6.6 shall survive the termination of this Agreement.

6.7.    <u>Plan of Reorganization</u>.

(a)      If, in any Insolvency Proceeding, debt obligations of any reorganized Loan Party secured by Liens upon any property of the reorganized Loan Party are distributed or reinstated (in whole or in part) pursuant to a Plan of Reorganization, both on account of the ABL Obligations and on account of the First Lien Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the First Lien Obligations are secured by Liens upon the same property, the relative Lien priorities and other provisions of this Agreement will survive the distribution of such debt obligations pursuant to such Plan of Reorganization and will apply with like effect to the Liens securing such debt obligations.

(b)      The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that neither it nor its related Claimholders shall (i) take or support any other Person in taking any action that is inconsistent with the relative Lien priorities or other provisions of this Agreement or (ii) propose, vote for, or otherwise support directly or indirectly any Non-Conforming Plan of Reorganization (and, in the event of any such proposal, vote or other support of a Non-Conforming Plan of Reorganization by a Claimholder of any Class, the Collateral Agent of the other Class shall be entitled to have any such proposal, vote or support changed or withdrawn).

45

6.8.    Separate Grants of Security and Separate Classification.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, acknowledges and agrees that (a) the respective grants of Liens pursuant to the ABL Collateral Documents and the First Lien Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Collateral, (i) the First Lien Obligations are fundamentally different from the ABL Obligations and (ii) the ABL Obligations are fundamentally different from the First Lien Obligations and, in each case, must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Claimholders and the First Lien Claimholders in respect of the Collateral constitute claims of the same class (rather than at least two separate classes of secured claims with the relative Lien priorities described in Section 2.1), then the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, hereby acknowledge and agree that all distributions from the Collateral shall be made as if such claims were of two separate classes of junior and senior claims (with the effect being that, to the extent that (x) if the aggregate value of the ABL Priority Collateral is sufficient (for this purpose ignoring all claims held by the First Lien Claimholders thereon), the ABL Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other ABL Obligations, all amounts owing in respect of Post-Petition Interest that is available from the ABL Priority Collateral, before any distribution is made in respect of the First Lien Obligations with respect to the ABL Priority Collateral, with each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agreeing to turn over to the ABL Collateral Agent amounts otherwise received or receivable by any of them with respect to the ABL Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries on the First Lien Obligations, and (y) if the aggregate value of the Term Priority Collateral is sufficient (for this purpose ignoring all claims held by the ABL Claimholders thereon), the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other First Lien Obligations, all amounts owing in respect of Post-Petition Interest that is available from the Term Priority Collateral, before any distribution is made in respect of the ABL Obligations with respect to the Term Priority Collateral, with the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agreeing to turn over to the First Lien Collateral Agent amounts otherwise received or receivable with respect to such Term Priority Collateral by any of them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries on the ABL Obligations).  This Section 6.8 is intended to govern the relationship between the classes of claims held by the ABL Claimholders, on the one hand, and a collective class of claims comprised of each series of claims of the First Lien Claimholders (as opposed to separate classes of each such series of claims), on the other hand.

6.9.    Post-Petition Interest.

(a)    The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that none of them shall object to or oppose (or support any other Person objecting to or opposing) any claim by the First Lien Collateral Agent or any other First Lien Claimholder for allowance in any Insolvency Proceeding of First Lien Obligations consisting or alleged to consist of Post-Petition Interest to the extent of the value of the First Lien Lenders Liens on the Term Priority Collateral (without regard to the existence of the ABL Lenders Liens thereon) or on the ABL Priority Collateral (after taking into account the ABL Lenders Liens thereon); provided, that, First Lien Claimholders shall not be permitted to receive Post-Petition Interest payments from the proceeds of ABL Priority Collateral or any  DIP Financing permitted under Section 6.1(a) prior to the Discharge of ABL Obligations, other than with the prior consent of the ABL Claimholders.

46

(b)      Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that none of them shall object to or oppose (or support any other Person objecting to or opposing) any claim by the ABL Collateral Agent or any other ABL Claimholder for allowance in any Insolvency Proceeding of ABL Obligations consisting or alleged to consist of Post-Petition Interest to the extent of the value of the ABL Lenders Liens on the ABL Priority Collateral (without regard to the existence of the First Lien Lenders Liens thereon) or on the Term Priority Collateral (after taking into account the First Lien Lenders Liens thereon); provided, that, ABL Claimholders shall not be permitted to receive Post-Petition Interest payments from the proceeds of Term Priority Collateral or any Term DIP Financing permitted under Section 6.1(b) prior to the Discharge of First Lien Obligations, other than with the prior consent of the First Lien Claimholders.

### SECTION 7.  Reliance; Waivers; Etc.

7.1.    Reliance.  Other than any reliance on the terms of this Agreement, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges that they have, independently and without reliance on the First Lien Collateral Agent or any other First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the ABL Loan Documents and be bound by the terms of this Agreement, and that they will continue to make their own credit decision in taking or not taking any action under the ABL Loan Documents or this Agreement.  Other than any reliance on the terms of this Agreement, the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, acknowledges that they have, independently and without reliance on the ABL Collateral Agent or any other ABL Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the First Lien Loan Documents and be bound by the terms of this Agreement, and that they will continue to make their own credit decision in taking or not taking any action under the First Lien Loan Documents or this Agreement.

7.2.    No Warranties or Liability.  The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges and agrees that, except as set forth in Section 8, neither the First Lien Collateral Agent nor any other First Lien Claimholder has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral, or the perfection or priority of any Liens thereon.  Except as otherwise expressly provided herein, the First Lien Collateral Agent and the other First Lien Claimholders will be entitled to manage and supervise the First Lien Loan Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  The First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, acknowledges and agrees that, except as set forth in Section 8, neither the ABL Collateral Agent nor any other ABL Claimholder has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the ABL Loan Documents, the ownership of any Collateral, or the perfection or priority of any Liens thereon. Except as otherwise expressly provided herein, the ABL Claimholders will be entitled to manage and supervise the ABL Loan Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  Except as expressly provided herein, the First Lien Collateral Agent and the other First Lien Claimholders shall have no duty to the ABL Collateral Agent or any other ABL Claimholders, and the ABL Collateral Agent and the other ABL Claimholders shall have no duty to the First Lien Collateral Agent and the other First Lien Claimholders, to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of a default or an event of default under any agreements with any Loan Party (including the ABL Loan Documents and the First Lien Loan Documents), regardless of any knowledge thereof which they may have or be charged with.  The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges and agrees that the First Lien Collateral Agent may, but shall have no obligation to, take all actions it determines necessary

47

or advisable to perfect or continue the perfection of the First Lien Lenders Liens on any Collateral, and the First Lien Collateral Agent shall not be liable for any lapse of perfection or for maintaining perfection. The First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, acknowledges and agrees that the ABL Collateral Agent may, but shall have no obligation to, take all actions it determines necessary or advisable to perfect or continue the perfection of the ABL Lenders Liens on any Collateral, and the ABL Collateral Agent shall not be liable for any lapse of perfection or for maintaining perfection.

7.3. <u>No Waiver of Lien Priorities</u>.

(a) No right of the ABL Collateral Agent or any other ABL Claimholder to enforce any provision of this Agreement or any U.S. ABL Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Loan Party or by any act or failure to act by the ABL Collateral Agent or any other ABL Claimholder or by any noncompliance by any Person with the terms, provisions, and covenants of this Agreement, any of the ABL Loan Documents or any of the First Lien Loan Documents, regardless of any knowledge thereof which the ABL Collateral Agent or any other ABL Claimholder may have or be otherwise charged with. No right of the First Lien Collateral Agent or any other First Lien Claimholder to enforce any provision of this Agreement or any First Lien Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Loan Party or by any act or failure to act by the First Lien Collateral Agent or any other First Lien Claimholder or by any noncompliance by any Person with the terms, provisions, and covenants of this Agreement, any of the First Lien Loan Documents or any of the ABL Loan Documents, regardless of any knowledge thereof which the First Lien Collateral Agent or any other First Lien Claimholder may have or be otherwise charged with.

(b) Without in any way limiting the generality of Section 7.3(a), but subject to any rights of the Loan Parties under the ABL Loan Documents and the First Lien Loan Documents and subject to the provisions of Section 5.3(a), the ABL Collateral Agent and any other ABL Claimholder may, at any time and from time to time in accordance with the ABL Loan Documents and/or applicable law, without the consent of, or notice to, the First Lien Collateral Agent or any other First Lien Claimholder, without incurring any liabilities to the First Lien Collateral Agent or any other First Lien Claimholder and without impairing or releasing the relative Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the First Lien Collateral Agent or the other First Lien Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following:

(i) make loans and advances to an ABL Borrower or any other Loan Party, issue, guaranty or obtain letters of credit for account of an ABL Borrower or any other Loan Party or otherwise extend credit to an ABL Borrower or any other Loan Party, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(ii) change the manner, place, or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase, or alter the terms of, any of the ABL Obligations or any guarantee thereof or any other liability of any Loan Party, or any liability incurred directly or indirectly in respect thereof (including any increase in (so long as such increase does not cause the maximum principal amount drawable or outstanding principal balance under the ABL Credit Agreement to exceed the ABL Priority Cap) or extension of the ABL Obligations, without any restriction as to the amount, tenor, or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any ABL Lenders Liens, the ABL Obligations, or any of the ABL Loan Documents;

48

(iii)     sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the ABL Priority Collateral or any liability of any Loan Party to the ABL Claimholders or any liability incurred directly or indirectly in respect thereof;

(iv)     settle or compromise any ABL Obligation or any other liability of any Loan Party or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the ABL Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

(v)     exercise or delay in or refrain from exercising any right or remedy against any Loan Party or any other Person, elect any remedy and otherwise deal freely with any Loan Party or any ABL Priority Collateral and any security and any guarantor or any liability of any Loan Party to any ABL Claimholders or any liability incurred directly or indirectly in respect thereof;

provided that the foregoing shall not (x) limit or otherwise affect in any way any Loan Party's obligations or liabilities under the First Lien Loan Documents to the extent any of the foregoing constitutes a violation of any of the First Lien Loan Documents or (y) limit the restrictions set forth in Section 5.3(a) or be deemed to be a waiver by the First Lien Collateral Agent or any other First Lien Claimholder of any liability of, or any claim against, the ABL Collateral Agent or any other ABL Claimholder arising on account of any such violation.

(c)     Except as otherwise provided herein, each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that the ABL Collateral Agent and the other ABL Claimholders shall have no liability to the First Lien Collateral Agent and the other First Lien Claimholders, and the First Lien Collateral Agent and the other First Lien Claimholders hereby waive any claim against the ABL Collateral Agent or any other ABL Claimholder, arising out of any and all actions which the ABL Collateral Agent or any other ABL Claimholder may, pursuant to the terms hereof, take, permit or omit to take with respect to:

(i)     the ABL Loan Documents (other than this Agreement);

(ii)     the collection of the ABL Obligations; or

(iii)     the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any ABL Priority Collateral.

Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Claimholders, agrees that the ABL Collateral Agent and the other ABL Claimholders have no duty to them in respect of the maintenance or preservation of the ABL Priority Collateral, the ABL Obligations, or otherwise (other than the obligations of the ABL Claimholders under this Agreement).

(d)     Without in any way limiting the generality of Section 7.3(a), but subject to any rights of the Loan Parties under the ABL Loan Documents and the First Lien Loan Documents and subject to the provisions of Section 5.3(b) and/or Section 5.3(c), as applicable, the First Lien Collateral Agent and any other First Lien Claimholder may, at any time and from time to time in accordance with the First Lien Loan Documents and/or applicable law, without the consent of, or notice to, the ABL Collateral Agent or any other ABL Claimholder, without incurring any liabilities to the ABL Collateral Agent or any other ABL Claimholder and without impairing or releasing the relative Lien priorities and

49

other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the ABL Collateral Agent or the other ABL Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following:

          (i)      make loans and advances to the Borrower or any other Loan Party, issue, guaranty or obtain letters of credit for account of the Borrower or any other Loan Party or otherwise extend credit to the Borrower or any other Loan Party, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

          (ii)      change the manner, place, or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase, or alter, the terms of any of the First Lien Obligations or any guarantee thereof or any other liability of any Loan Party, or any liability incurred directly or indirectly in respect thereof (including any increase in (so long as such increase does not cause the outstanding principal balance under the First Lien Credit Agreement to exceed the applicable First Lien Priority Cap) or extension of the First Lien Obligations, without any restriction as to the amount, tenor, or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any First Lien Lenders Liens, the First Lien Obligations, or any of the First Lien Loan Documents;

          (iii)     sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the Term Priority Collateral or any liability of any Loan Party to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

          (iv)      settle or compromise any First Lien Obligation or any other liability of any Loan Party or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

          (v)      exercise or delay in or refrain from exercising any right or remedy against any Loan Party or any other Person, elect any remedy and otherwise deal freely with any Loan Party or any Term Priority Collateral and any security and any guarantor or any liability of any Loan Party to any First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

provided that the foregoing shall not (x) limit or otherwise affect in any way any Loan Party's liability under the ABL Loan Documents to the extent any of the foregoing constitutes a violation of any of the ABL Loan Documents or (y) limit the restrictions set forth in Section 5.3(b) and/or Section 5.3(c), as applicable, or be deemed to be a waiver by the ABL Collateral Agent or any other ABL Claimholder of any liability of, or any claim against, the First Lien Collateral Agent or any other First Lien Claimholder arising on account of any such violation.

          (e)      Except as otherwise provided herein, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the First Lien Collateral Agent and the other First Lien Claimholders shall have no liability to the ABL Collateral Agent and the other ABL Claimholders, and the ABL Collateral Agent and the other ABL Claimholders hereby waive any claim against the First Lien Collateral Agent or any other First Lien Claimholder, arising out of any and all actions which the First

**Debtors' Exhibit No. 12**
**Page 324 of 354**

Lien Collateral Agent or any other First Lien Claimholder may, pursuant to the terms hereof, take, permit or omit to take with respect to:

> (i)     the First Lien Loan Documents (other than this Agreement);

> (ii)    the collection of the First Lien Obligations; or

> (iii)   the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any Term Priority Collateral.

The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the First Lien Collateral Agent and the other First Lien Claimholders have no duty to them in respect of the maintenance or preservation of the Term Priority Collateral, the First Lien Obligations, or otherwise (other than the obligations of the First Lien Claimholders under this Agreement).

       (f)    Until the Discharge of First Lien Obligations or the Discharge of ABL Obligations, as the case may be, has occurred, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, agrees that neither it nor its related Claimholders shall assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead, or otherwise assert, or otherwise claim the benefit of, any marshaling, appraisal, valuation, or other similar right that may otherwise be available under applicable law with respect to the Senior Priority Collateral of the other Class or any other similar rights a junior secured creditor may have under applicable law.

       7.4.    <u>Obligations Unconditional</u>.  All rights, interests, agreements and obligations of the ABL Collateral Agent and the other ABL Claimholders and the First Lien Collateral Agent and the other First Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

       (a)    any lack of validity or enforceability of any ABL Loan Documents or any First Lien Loan Documents;

       (b)    except as otherwise expressly set forth in this Agreement, any change in the time, manner, or place of payment of, or in any other terms of, all or any of the ABL Obligations or First Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Loan Document or any First Lien Loan Document;

       (c)    except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or First Lien Obligations or any guarantee thereof;

       (d)    the commencement of any Insolvency Proceeding; or

       (e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the ABL Collateral Agent, any other ABL Claimholder or any ABL Obligations or the First Lien Collateral Agent, any other First Lien Claimholder or any First Lien Obligations in respect of this Agreement.

**Debtors' Exhibit No. 12**
**Page 325 of 354**

**SECTION 8.  Representations and Warranties**.

8.1.    Representations and Warranties of Each Collateral Agent.  The ABL Collateral Agent and the First Lien Collateral Agent each represents and warrants to the other that it has been authorized by the ABL Lenders or the First Lenders, as applicable, under the ABL Credit Agreement or the First Lien Credit Agreement, as applicable, to enter into this Agreement and that this Agreement has been duly executed and delivered by it.

**SECTION 9.  Miscellaneous**.

9.1.    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Loan Document or any First Lien Loan Document, the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Claimholders, negate, impair, waive or cancel any rights granted to, or create any liability or obligation of, any Loan Party in the ABL Loan Documents and the First Lien Loan Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).

9.2.    Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the ABL Collateral Agent and the First Lien Collateral Agent.  This is a continuing agreement of Lien subordination (as opposed to debt or claim subordination), and the Claimholders of any Class may continue, at any time and without notice to the Collateral Agent or the other Claimholders of the other Class, to extend credit and other financial accommodations to or for the benefit of any Loan Party constituting ABL Obligations or First Lien Obligations, as the case may be, in reliance hereon.  The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, hereby waive any right any of them may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.  Consistent with, but not in limitation of, the preceding sentence, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, irrevocably acknowledge that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable law other than under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.  Any provision of this Agreement that is prohibited or unenforceable shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Loan Party shall include such Loan Party as debtor and debtor in possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.  Except as set forth in Section 6.6, this Agreement shall automatically terminate and be of no further force and effect (a) with respect to the ABL Collateral Agent, the other ABL Claimholders, and the ABL Obligations, on the date that the Discharge of ABL Obligations has occurred, and (b) with respect to the First Lien Collateral Agent, the other First Lien Claimholders and the First Lien Obligations on the date that the Discharge of First Lien Obligations has occurred.

9.3.    Amendments; Waivers.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies

52

of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by Section 9.3(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)     No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by (a) ABL Collateral Agent (in accordance with the ABL Credit Agreement) and each First Lien Collateral Agent (in accordance with the First Lien Credit Agreement) with respect to any amendment or modification, and (b) the Loan Parties, solely with respect to any amendments or modifications that (A) adversely affect any obligation or right of the Loan Parties hereunder or under the ABL Loan Documents or the First Lien Loan Documents or impose any additional obligations on the Loan Parties, (B) change the rights of the Loan Parties to refinance the ABL Obligations or the First Lien Obligations or (C) modify the definitions of "ABL Priority Cap" or "First Lien Priority Cap".  In addition, each waiver, if any, with respect to any aspect of this Agreement shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  The ABL Collateral Agent and the First Lien Collateral Agent shall provide the Loan Parties with written notice (together with a true and correct copy) of each proposed amendment or other modification to this Agreement prior to the effectiveness thereof.

9.4.     <u>Additional Obligations</u>.

(a)     To the extent, but only to the extent, permitted by the provisions of each then extant ABL Credit Agreement and First Lien Credit Agreement (including, in each case, pursuant to any consent or waiver thereto or thereunder), the Borrower may incur or issue and sell one or more series or classes of Additional Pari Passu Obligations.

Any such series or class of Additional Pari Passu Obligations may be secured by a first-priority, senior Lien on the Term Priority Collateral and a junior-priority, subordinated Lien on the ABL Priority Collateral, in each case under and pursuant to the First Lien Collateral Documents for such Series of Additional Pari Passu Obligations, if and subject to the condition that, unless such Indebtedness is part of an existing Series of Additional Pari Passu Obligations represented by an Additional Pari Passu Obligations Agent already party to this Agreement, the Additional Pari Passu Obligations Agent with respect to any such Additional Pari Passu Obligations becomes a party to this Agreement by satisfying the conditions set forth in this Section 9.4.  Upon any Additional Pari Passu Obligations Agent so becoming a party hereto in accordance with the terms thereof, all Additional Pari Passu Obligations of such Series shall also be entitled to be so secured by a senior Lien on the Term Priority Collateral and by a subordinated Lien on the ABL Priority Collateral in accordance with the terms hereof and thereof.

(b)     In order for an Additional Agent to become a party to this Agreement:

(i)     such Additional Agent shall have executed and delivered to each other then-existing Additional Agent, ABL Collateral Agent and First Lien Collateral Agent a Joinder Agreement substantially in the form of Exhibit A hereto (with such changes as may be reasonably approved by the ABL Collateral Agent and First Lien Collateral Agent and such Additional Agent) pursuant to which such Additional Agent becomes an Additional Pari Passu Obligations Agent hereunder and the related ABL Claimholders or First Lien Claimholders, as applicable, become subject hereto and bound hereby;

53

(ii)     the Borrower shall have delivered a designation to each other then-existing Additional Agent, ABL Collateral Agent and First Lien Collateral Agent substantially in the form of Exhibit B hereto, pursuant to which an officer of the Borrower shall (A) identify the Indebtedness to be designated as Additional Pari Passu Obligations and the initial aggregate principal amount of such Indebtedness, (B) identify the Additional Pari Passu Obligations Agreement, (C) specify the name and address of the applicable Additional Agent, (D) certify that such Indebtedness, is permitted to be incurred, secured and guaranteed by each then extant ABL Credit Agreement and First Lien Credit Agreement and (E) attach to such designation true and complete copies of each of the Additional Pari Passu Obligations Agreement relating to such Additional Pari Passu Obligations.

(iii)     Upon the execution and delivery of a Joinder Agreement by an Additional Pari Passu Obligations Agent in accordance with this Section 9.4, each other Additional Agent, ABL Collateral Agent and First Lien Collateral Agent shall acknowledge receipt thereof by countersigning a copy thereof and returning the same to such Additional Agent; provided that the failure of any other Additional Agent, ABL Collateral Agent and First Lien Collateral Agent to so acknowledge or return the same shall not affect the status of such additional Indebtedness as Additional Pari Passu Obligations, if the other requirements of this Section 9.4 are complied with.

(c)     With respect to any incurrence, issuance or sale of Indebtedness after the date hereof under any Additional Pari Passu Obligations Agreement of Additional Pari Passu Obligations whose Additional Agent is already a party to each of this Agreement, the requirements of Section 9.4 shall not be applicable and such Indebtedness shall automatically constitute Additional Pari Passu Obligations so long as such Indebtedness is permitted to be incurred, secured and guaranteed by each Additional Pari Passu Obligations Agreement, ABL Credit Agreement and First Lien Credit Agreement.

9.5.     Information Concerning Financial Condition of Certain Entities.  Neither any First Lien Collateral Agent nor ABL Collateral Agent hereby assumes responsibility for keeping each other informed of the financial condition of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the First Lien Obligations.  Each First Lien Collateral Agent and ABL Collateral Agent hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event any First Lien Collateral Agent or ABL Collateral Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide or update any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.  Neither ABL Collateral Agent nor any First Lien Collateral Agent shall have any responsibility to monitor or verify the financial condition of the Loan Parties.

9.6.     Subrogation.  (a) With respect to any payments or distributions in cash, property, or other assets that the First Lien Collateral Agent or any other First Lien Claimholders pay over to the ABL Collateral Agent or any other ABL Claimholders under the terms of this Agreement, the First Lien Collateral Agent and the other First Lien Claimholders shall be subrogated to the rights of the ABL Collateral Agent and the other ABL Claimholders and (b) with respect to any payments or distributions in cash, property, or other assets that the ABL Collateral Agent or any other ABL Claimholders pay over to the First Lien Collateral Agent or the other First Lien Claimholders under the terms of this Agreement, the ABL Collateral Agent and the other ABL Claimholders shall be subrogated to the rights of the First Lien Collateral Agent and the other First Lien Claimholders; provided, however, that each of the ABL Collateral Agent, for itself and the other ABL Claimholders, and each of the First Lien Collateral Agent, for itself and the other First Lien Claimholders, agrees not to assert or enforce any such rights of

54

subrogation it or they may acquire as a result of any payment hereunder until the Discharge of ABL Obligations or Discharge of First Lien Obligations, as applicable, has occurred.  Any payments or distributions in cash, property or other assets received by the ABL Collateral Agent or any other ABL Claimholders that are paid over to the First Lien Collateral Agent or any other First Lien Claimholders pursuant to this Agreement shall not reduce any of the ABL Obligations.  Any payments or distributions in cash, property or other assets received by the First Lien Collateral Agent or any other First Lien Claimholders that are paid over to the ABL Collateral Agent or any other ABL Claimholders pursuant to this Agreement shall not reduce any of the First Lien Obligations.  Notwithstanding the foregoing provisions of this Section 9.6, none of the ABL Claimholders shall have any claim against any of the First Lien Claimholders for any impairment of any subrogation rights herein granted to the ABL Claimholders, and none of the First Lien Claimholders shall have any claim against any of the ABL Claimholders for any impairment of any subrogation rights herein granted to the First Lien Claimholders.

9.7.  <u>Governing Law</u>.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.8.  <u>Submission to Jurisdiction</u>.

(a)  Each ABL Collateral Agent, on behalf of itself and the other ABL Loan Claimholders represented by it, and each First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders represented by it, and the Loan Parties hereby agree that each ABL Loan Claimholder, each First Lien Claimholder and each Loan Party shall irrevocably and unconditionally submit, for itself and its property, to the exclusive general jurisdiction of the Supreme Court of the State of New York and of the United States District Court of the Southern District of New York, sitting in the Borough of Manhattan in the City of New York, and any appellate court from any thereof (except that, (x) in the case of any Mortgage or other Security Document, proceedings may also be brought by the applicable ABL Collateral Agent or First Lien Collateral Agent in the state in which the respective mortgaged property or Collateral is located or any other relevant jurisdiction and (y) in the case of any Insolvency Proceedings with respect to any Loan Party, actions or proceedings related to this Agreement and the other ABL Loan Documents or First Lien Loan Documents may be brought in such court holding such Insolvency Proceedings), in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment with respect to this Agreement, and each ABL Collateral Agent, on behalf of itself and the other ABL Loan Claimholders represented by it, and each First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders represented by it, and the Loan Parties hereby irrevocably and unconditionally agree that all of their respective claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court.  Each ABL Collateral Agent, on behalf of itself and the other ABL Loan Claimholders represented by it, and each First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders represented by it, and the Loan Parties hereby further agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)  Each ABL Collateral Agent, on behalf of itself and the other ABL Loan Claimholders represented by it, each First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders represented by it, and the Loan Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any

**Debtors' Exhibit No. 12**
**Page 329 of 354**

court referred to in the first sentence of paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each ABL Collateral Agent, on behalf of itself and the other ABL Loan Claimholders represented by it, each First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders represented by it, and the Loan Parties hereby irrevocably consents to service of process in the manner provided for notices (other than facsimile or email) in Section 9.9.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

9.9.     <u>Notices</u>.

(a)     Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email.

(b)     All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.9 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.9 or (ii) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; <u>provided</u> that received notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in clause (c) below shall be effective as provided in such clause (c).

(c)     Notices and other communications hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the parties hereto.  Each party hereto may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth on <u>Annex I</u> hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

56

9.10.   <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the ABL Claimholders and First Lien Claimholders and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

9.11.   <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.12.   <u>Severability</u>.  To the extent permitted by law, any provision of this Agreement that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.13.   <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  This Agreement shall become effective when it shall have been executed by each party hereto.

9.14.   <u>WAIVER OF JURY TRIAL</u>.  ABL COLLATERAL AGENT, ON BEHALF OF ITSELF AND THE OTHER ABL CLAIMHOLDERS REPRESENTED BY IT, EACH TERM COLLATERAL AGENT, ON BEHALF OF ITSELF AND THE OTHER TERM CLAIMHOLDERS REPRESENTED BY IT, THE LOAN PARTIES, AND EACH OTHER PARTY HERETO, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.14.

9.15.   <u>Additional Loan Parties</u>.  Each Person that becomes a Loan Party after the date hereof shall become a party to this Agreement upon execution and delivery by such Person of an Assumption Agreement in substantially the form of <u>Exhibit C</u> hereto.

9.16.   <u>No Third Party Beneficiaries</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of and bind each of the ABL Claimholders and the First Lien Claimholders.  Other than with respect to Sections 5.3 and 9.4, which shall also inure to the benefit of the Borrower, in no event shall any Loan Party be a third party beneficiary of this Agreement.

9.17.   <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Collateral Agent and the other ABL Claimholders, on the one hand, and the First Lien Collateral Agent and the other First Lien

Claimholders, on the other hand (other than Sections 5.3 and 9.4, under which the Borrower shall be a third party beneficiary). Other than Sections 5.3 and 9.4, which shall also inure to the benefit of the Borrower, no Loan Party or any other creditor thereof shall have any rights hereunder and no Loan Party may rely on the terms hereof. Nothing in this Agreement shall impair, as between the Loan Parties and the ABL Collateral Agent and the other ABL Claimholders, or as between the Loan Parties and the First Lien Collateral Agent and the other First Lien Claimholders, the obligations of the Loan Parties to pay principal, interest, fees and other amounts as provided in the ABL Loan Documents and the First Lien Loan Documents, respectively.

9.18.   Specific Performance.   Each of the ABL Collateral Agent and the First Lien Collateral Agent may demand specific performance of this Agreement. Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in any Insolvency Proceeding, the ABL Collateral Agent or the First Lien Collateral Agent may seek such or any other relief as if it were the "holder" of the claims of the Claimholders of the other Class under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by the Claimholders of the other Class.

9.19.   Further Assurances.   Each of the ABL Collateral Agent and the First Lien Collateral Agent agrees to take such further action and shall execute (without recourse or warranty) and deliver such additional documents and instruments (in recordable form, if requested in writing) as the ABL Collateral Agent or the First Lien Collateral Agent, as the case may be, may request to effectuate the terms of and the relative Lien priorities contemplated by this Agreement, all at the expense of the Loan Parties.

9.20.   Intercreditor Agreement Acknowledgement.   Reference is made to the Intercreditor Agreement Acknowledgement executed and delivered in respect of this Agreement (a) on the date hereof by the Borrower and each other Loan Party that is a Loan Party on the date hereof and (b) after the date hereof, pursuant to the terms of the Collateral Documents, by each Subsidiary of Parent that becomes a Loan Party after the date hereof.

9.21.   Intercreditor Agreements.   This Agreement is the "ABL Intercreditor Agreement" referred to in the ABL Credit Agreement and this Agreement is the "ABL Intercreditor Agreement" referred to in the First Lien Credit Agreement.

[Signature Page Follows]

58

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**GOLDMAN SACHS BANK USA**,
as ABL Collateral Agent


By: _____
       Authorized Signatory


**GOLDMAN SACHS BANK USA**,
as First Lien Collateral Agent


By: _____
       Authorized Signatory

#4814-6502-9968
#90439847v6

**ANNEX I**

Notice Addresses

(a)    if to the First Lien Collateral Agent, at:
Goldman Sachs Bank USA

███████████

Attention:  SBD Operations

███████████████████████████████████████

(b)    if to the ABL Collateral Agent, at:
Goldman Sachs Bank USA
c/o Goldman, Sachs & Co.

███████████

Attention:  Loan Ops
Attention:  Beverly Galbreath

███████████████████

#90439847v6

**ABL INTERCREDITOR AGREEMENT ACKNOWLEDGMENT**

1.    Acknowledgement.   Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent") and each of the undersigned U.S. subsidiaries of Parent (together with Parent and the Borrower, collectively, the "Loan Parties") acknowledges that it has received a copy of the Intercreditor Agreement dated as of February 2, 2018, among Goldman Sachs Bank USA, as ABL Collateral Agent, Goldman Sachs Bank USA, as First Lien Collateral Agent, Goldman Sachs Bank USA, as First Lien Collateral Agent and each Additional Pari Passu Obligations Agent (the "ABL Intercreditor Agreement") as in effect on the date hereof, and consents thereto, agrees to recognize all rights granted thereby to the ABL Collateral Agent, the other ABL Claimholders, the First Lien Collateral Agent and the other First Lien Claimholders, and agrees that it shall not do any act or perform any obligation which is not in accordance with the agreements set forth in the ABL Intercreditor Agreement as in effect on the date hereof (and, to the extent such Loan Party has been notified of the terms of any amendment, as amended or otherwise modified pursuant thereto).  Each of the Loan Parties further acknowledges and agrees that (a) other than with respect to Section 9.3(b) of the ABL Intercreditor Agreement, under which the Borrower is a third party beneficiary, no Loan Party is a beneficiary or third party beneficiary of the ABL Intercreditor Agreement, (b) no Loan Party has any rights under the ABL Intercreditor Agreement, and no Loan Party may rely on the terms of the Intercreditor Agreement, in each case other than Section 9.3(b) of the ABL Intercreditor Agreement, which also inure to the benefit of the Borrower, and (c) nothing in the ABL Intercreditor Agreement shall impair, as between the Loan Parties and the ABL Collateral Agent and the other ABL Claimholders, or as between the Loan Parties and the First Lien Collateral Agent and the other First Lien Claimholders, the obligations of the Loan Parties to pay principal, interest, fees and other amounts as provided in the ABL Loan Documents or the First Lien Loan Documents, respectively.

2.    Notices.   The address of the Loan Parties for purposes of all notices and other communications hereunder and under the ABL Intercreditor Agreement is:

Trico Group, LLC



Attention:  Patrick James, Chairman

With a copy (which shall not constitute notice) to:

Jones Day®



Attention: Brett P. Barragate

Any notice or other communication hereunder or under the ABL Intercreditor Agreement shall be in writing and may be personally served or sent by facsimile or United States mail or courier service or electronic mail and shall be deemed to have been given when delivered in person or by courier service or signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.

3.    Counterparts.   This Acknowledgement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute one

#90439847v6

document.  Delivery of an executed signature page to this Acknowledgement by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be as effective as delivery of a manually signed counterpart of this Acknowledgement.

4.      <u>Governing Law</u>.    THIS ACKNOWLEDGEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

5.      <u>Credit Document</u>.  This Acknowledgement shall constitute an ABL Loan Document and a First Lien Loan Document.

6.      <u>Miscellaneous</u>.    The provisions of Sections 9.6 and 9.7 of the ABL Intercreditor Agreement will apply with like effect to this Acknowledgement, *mutatis mutandis* as though the references therein to the ABL Collateral Agent or the First Lien Collateral Agent refer instead to each Loan Party.  The ABL Collateral Agent, the other ABL Claimholders, the First Lien Collateral Agent and the other First Lien Claimholders are the intended beneficiaries of this Acknowledgement.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the ABL Intercreditor Agreement.

[Signature Page Follows]

2

**ACKNOWLEDGED AS OF THE DATE FIRST WRITTEN ABOVE:**

TRICO GROUP HOLDINGS, LLC,
as Parent

By: _____
    Name:
    Title:

TRICO GROUP, LLC,
as the Borrower

By: _____
    Name:
    Title:

CARTER FUEL SYSTEMS, LLC

as Loan Party,

By: _____
    Name:
    Title:

STRONGARM, LLC

as Loan Party,

By: _____
    Name:
    Title:

KTRI HOLDINGS, INC.

as Loan Party,

By: _____
    Name:
    Title:

[Signature Page to Intercreditor Agreement Acknowledgment]

#90439847v6

HEATHERTON HOLDINGS, LLC

as Loan Party,

By: _____
    Name:
    Title:

CARTER FUEL EXPORT, INC.

as Loan Party,

By: _____
    Name:
    Title:

PREMIER MARKETING GROUP, LLC

as Loan Party,

By: _____
    Name:
    Title:

AVM EXPORT, INC.

as Loan Party,

By: _____
    Name:
    Title:

TRICO PRODUCTS CORPORATION

as Loan Party,

By: _____
    Name:
    Title:

[Signature Page to Intercreditor Agreement Acknowledgment]

#90439847v6

KTRI OFFSHORE HOLDINGS, LLC

as Loan Party,

By: _____
    Name:
    Title:


TRICO HOLDING CORPORATION

as Loan Party,

By: _____
    Name:
    Title:


TRICO TECHNOLOGIES CORPORATION

as Loan Party,

By: _____
    Name:
Title:

Exhibit A to Intercreditor Agreement

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [   ], 20[ ] to the INTERCREDITOR AGREEMENT dated as of February 2, 2018 (the "Intercreditor Agreement"), among Goldman Sachs Bank USA, as ABL Collateral Agent, Goldman Sachs Bank USA, as First Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC ("Parent"), Trico Group, LLC (the "Borrower") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

As a condition to the ability of the Borrower to incur Additional Pari Passu Obligations after the date of the Intercreditor Agreement and to secure such Additional Pari Passu Obligations with a lien on the Collateral and to have such Additional Pari Passu Obligations guaranteed by the Loan Parties, in each case under and pursuant to the applicable Loan Documents, each of the Additional Pari Passu Obligations Agent in respect of such Additional Pari Passu Obligations is required to become an Additional Pari Passu Obligations Agent under, and the related Claimholders in respect thereof are required to become subject to and bound by, the Intercreditor Agreement.  Section 9.4 of the Intercreditor Agreement provides that such Additional Pari Passu Obligations Agent may become an Additional Pari Passu Obligations Agent under, and the related Claimholders may become subject to and bound by, the Intercreditor Agreement pursuant to the execution and delivery by the Additional Pari Passu Obligations Agent of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 9.4 of the Intercreditor Agreement.  The undersigned Additional Pari Passu Obligations Agent (the "New Representative") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

Accordingly, the New Representative agrees as follows:

In accordance with Section 9.4 of the Intercreditor Agreement, the Additional Agent by its signatures below become a Additional Pari Passu Obligations Agent under, and the related [Claimholders] represented by it become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the Additional Agent had originally been named therein as a Additional Pari Passu Obligations Agent and each of the Additional Agent, on behalf of itself and each other [Claimholder] represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement applicable to it as a Additional Pari Passu Obligations Agent and to the Claimholders represented by it as First Lien Claimholders.  Each reference to a "Additional Pari Passu Obligations Agent" in the Intercreditor Agreement shall be deemed to include the Additional Agent and each reference to "First Lien Claimholders" shall include the additional First Lien Claimholders represented by such Additional Agent. The Intercreditor Agreement is hereby incorporated herein by reference.

Each of the Additional Agent represents and warrants to the other Additional Agents, the ABL Collateral Agent, the First Lien Agent and the other Claimholders that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the Additional Pari Passu Obligations Agreement and related loan documents relating to such Additional Pari Passu Obligations provides that, upon the New Representative's entry into this Agreement, the additional First Lien Claimholders in respect of such Additional Pari Passu Obligations will be subject to and bound by the provisions of the Intercreditor Agreement as First Lien Claimholders.

Exhibit A – Page 1

This Joinder Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.    Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

**THIS JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Any provision of this Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.  All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the Additional Agent has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL AGENT],
as [      ] for the holders of [               ]
By: _____

      Name:
      Title:


Address for notices:

_____
_____
attention of:_____
Telecopy:_____


Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE PARI PASSU
OBLIGATIONS AGENT],
as [Insert title of Agent]


By: _____

      Name:
      Title:

Exhibit B to Intercreditor Agreement


[FORM OF] DEBT DESIGNATION NO. [ ] (this "<u>Designation</u>") dated as of [      ], 20[ ] with respect to the INTERCREDITOR AGREEMENT dated as of February 2, 2018 (the "<u>Intercreditor Agreement</u>"), among Goldman Sachs Bank USA, as ABL Collateral Agent, Goldman Sachs Bank USA, as First Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC ("<u>Parent</u>"), Trico Group, LLC (the "<u>Borrower</u>") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Designation is being executed and delivered in order to designate additional secured Obligations of the Borrower and the Loan Parties as Additional Pari Passu Obligations entitled to the benefit of and subject to the terms of the Intercreditor Agreement.

The undersigned, the duly appointed [*specify title of Responsible Officer*] of the Borrower hereby certifies on behalf of the Borrower that:

1.  Borrower intends to incur Indebtedness (the "<u>Designated Obligations</u>") in the initial aggregate principal amount of [        ] pursuant to the following agreement:  [*describe credit/loan agreement indenture or other agreement giving rise to Additional Pari Passu Obligations*] (the "<u>Designated Agreement</u>") which will be Additional Pari Passu Obligations.

2.  The incurrence of the Designated Obligations is permitted to be incurred, secured and guaranteed by each extant Loan Document.

3.  The name and address of the Additional Agent for such Designated Obligations is:

    [Insert name and all capacities; Address]

    Telephone:        _____

    Fax:        _____

    Email        _____

4.  Attached hereto are true and complete copies of each of the Additional Pari Passu Agreement relating to such Additional Pari Passu Obligations.


[Remainder of this page intentionally left blank]


Exhibit B – Page 1

IN WITNESS WHEREOF, the Borrower has caused this Designation to be duly executed by the undersigned Responsible Officer as of the day and year first above written.

TRICO GROUP, LLC

By: _____
       Name:
       Title:

Exhibit C to Intercreditor Agreement

[FORM OF] LOAN PARTY JOINDER AGREEMENT NO. [ ] dated as of [     ], 20[ ] (the "Loan Party Joinder Agreement") to the INTERCREDITOR AGREEMENT dated as of February 2, 2018 (the "Intercreditor Agreement"), among Goldman Sachs Bank USA, as ABL Collateral Agent, Goldman Sachs Bank USA, as First Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC ("Parent"), Trico Group, LLC (the "Borrower") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

The undersigned, [                    ], a [                    ], (the "New Loan Party") wishes to acknowledge and agree to the Intercreditor Agreement and become a party thereto and to acquire and undertake the rights and obligations of a Loan Party thereunder.

Accordingly, the New Loan Party agrees as follows for the benefit of the ABL Collateral Agent, First Lien Collateral Agent, Additional Agents and the other Claimholders:

The New Loan Party (a) acknowledges and agrees to, and becomes a party to the Intercreditor Agreement as a Loan Party, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of a Loan Party under the Intercreditor Agreement. This Loan Party Joinder Agreement supplements the Intercreditor Agreement and is being executed and delivered by the New Loan Party pursuant to Section 9.15 of the Intercreditor Agreement.

The New Loan Party represents and warrants to the ABL Collateral Agent, First Lien Collateral Agent, Additional Agents and the other Claimholders that (a) it has full power and authority to enter into this Loan Party Joinder Agreement, in its capacity as a Loan Party and (b) this Loan Party Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Loan Party Joinder Agreement.

This Loan Party Joinder Agreement may be executed by one or more of the parties to this Loan Party Joinder Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Loan Party Joinder Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

THIS LOAN PARTY JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS LOAN PARTY JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Any provision of this Loan Party Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

Exhibit C – Page 1

unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.

Exhibit C – Page 2

IN WITNESS WHEREOF, the New Loan Party has duly executed this Loan Party Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[_____]


By:      _____
Name:
Title:

Exhibit C – Page 3

**Debtors' Exhibit No. 12**
**Page 347 of 354**

**EXHIBIT J-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as Administrative Agent. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten-percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its Foreign Lender status on Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____

    Name:
    Title:

Date: _____ __, 20[  ]

**EXHIBIT J-2**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as Administrative Agent. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its Foreign Lender status on Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____

     Name:

     Title:

Date: _____ __, 20[  ]

J-2-1

**EXHIBIT J-3**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as Administrative Agent. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____

    Name:

    Title:

Date: _____ __, 20[  ]

**Debtors' Exhibit No. 12**
**Page 350 of 354**

**EXHIBIT J-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), the Lenders from time to time party thereto, and GOLDMAN SACHS BANK USA, as Administrative Agent. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
      Name:
      Title:

Date: _____ __, 20[  ]

**EXHIBIT K**

**FORM OF SOLVENCY CERTIFICATE**

I, the undersigned [chief financial officer][other senior officer with similar title] of TRICO GROUP HOLDINGS, LLC, a Delaware limited liability company ("Parent"), in that capacity only and not in my individual capacity (and without personal liability), do hereby certify as of the date hereof, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such facts and circumstances after the date hereof), that:

1.    This certificate is furnished (i) pursuant to Section 4.01(k) of the First Lien Term Loan Agreement, dated as of February 2, 2018 (the "First Lien Credit Agreement") among TRICO GROUP, LLC, a Delaware limited liability company (the "Borrower"), Parent, the lenders from time to time party thereto (the "First Lien Lenders") and Goldman Sachs Bank USA, as administrative agent and collateral agent (the "First Lien Agent") to the First Lien Lenders and (ii) pursuant to Section 4.01(k) of the ABL Credit Agreement, dated as of February 2, 2018 (the "ABL Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements" and each, a "Credit Agreement") among the Borrower, Parent, TRICO LIMITED, a limited company organized under the laws of England and Wales, the lenders from time to time party thereto (the "ABL Lenders") and Goldman Sachs Bank USA, as administrative agent and collateral agent (the "ABL Agent") to the ABL Lenders.  Unless otherwise defined herein, capitalized terms used in this certificate shall have the meanings set forth in the applicable Credit Agreement, as context may suggest.

2.    For purposes of this certificate, the terms below shall have the following definitions:

(a)    "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of Parent and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(b)    "Present Fair Salable Value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of Parent and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

(c)    "Liabilities"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of Parent and its Subsidiaries taken as a whole, as of the date hereof after giving effect to the consummation of the Transactions, determined in accordance with GAAP consistently applied.

(d)    "Will be able to pay their Liabilities as they mature"

Parent and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by Parent and its Subsidiaries taken as a whole.

(e)     "Do not have Unreasonably Small Capital"

Parent and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern. I understand that "unreasonably small capital" depends upon the nature of the particular business or businesses conducted or to be conducted, and I have reached my conclusion based on the needs and anticipated needs for capital of the business conducted or anticipated to be conducted by Parent and its Subsidiaries taken as a whole.

3.     For purposes of this certificate, I, or officers of Parent under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

(a)     I have reviewed the financial statements referred to in Section 4.01(g) of the Credit Agreement.

(b)     I have knowledge of and have reviewed to my satisfaction the Credit Agreement.

(c)     As [chief financial officer] [other senior officer with similar title] of Parent, I am familiar with the financial condition of Parent and its Subsidiaries.

4.     Based on and subject to the foregoing, I hereby certify on behalf of Parent that after giving effect to the consummation of the Transactions, it is my opinion that (i) the Fair Value of the assets of Parent and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of Parent and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) Parent and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (iv) Parent and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

[*Signature Page Follows*]

K-2

IN WITNESS WHEREOF, Parent has caused this certificate to be executed on its behalf by [chief financial officer] [other senior officer with similar title] as of the date first written above.

TRICO GROUP HOLDINGS, LLC


By:_____
Name:
Title:

K-3