*Execution Version*

## TERM INTERCREDITOR AGREEMENT

Term Intercreditor Agreement (this "Agreement"), dated as of March 30, 2021, (a) by and among (i) Jefferies Finance LLC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, and as more specifically defined below, the "Initial First Priority Representative") for the Initial First Priority Secured Creditors (as defined below) secured pursuant to the Initial First Priority Agreement (as defined below), (ii) Jefferies Finance LLC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, and as more specifically defined below, the "Initial Second Priority Representative") for the Initial Second Priority Secured Creditors (as defined below) secured pursuant to the Initial Second Priority Agreement (as defined below), and (iii) each other First Priority Representative and Second Priority Representative (each, as defined below) that from time to time becomes a party hereto pursuant to the terms hereof, and (b) acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company ("Parent"), First Brands Group, LLC, a Delaware limited liability company (the "Borrower"), and each of the other Loan Parties (as defined below).

WHEREAS, on February 26, 2019, Parent, the Borrower and the other Loan Parties party thereto entered into the Term Intercreditor Agreement (the "Original Intercreditor Agreement") with Credit Suisse AG, Cayman Islands Branch, as the administrative agent and collateral agent under the Existing Initial First Priority Agreement (as defined below), and Credit Suisse AG, Cayman Islands Branch, as the administrative agent and collateral agent under the Existing Initial Second Priority Agreement (as defined below);

WHEREAS, Parent, the Borrower, the Initial First Priority Representative and certain financial institutions and other entities are parties to the first lien senior secured First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated as of October 23. 2018, as further amended by that certain Amendment No. 2 to First Lien Term Loan Agreement, dated as of January 24, 2019, as further amended by that certain Amendment No. 3 to First Lien Term Loan Agreement, dated as of February 26, 2019, as further amended by that certain Amendment No. 4 to First Lien Term Loan Agreement, dated as of May 21, 2020, as further amended by that certain Amendment No. 5 to First Lien Term Loan Agreement, dated as of July 31, 2020, as further amended by that certain Amendment No. 6 to First Lien Term Loan Agreement, dated as of November 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified immediately prior to the date hereof, the "Existing Initial First Priority Agreement"), pursuant to which such financial institutions and other entities have agreed to make loans to the Borrower; and

WHEREAS, Parent, the Borrower, the Initial Second Priority Representative and certain financial institutions and other entities are parties to the second lien senior secured Second Lien Term Loan Agreement, dated as of February 26, 2019 (as amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated as of July 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise immediately prior to the date hereof, the "Existing Initial Second Priority Agreement"), pursuant to which such financial institutions and other entities have agreed to make loans to the Borrower;

WHEREAS, the Borrowers intends to refinance (the "2021 Refinancing") the entire amount of the term loans outstanding immediately prior to the date hereof under (i) the Existing Initial First Priority Agreement, with new term loans incurred pursuant to that certain Refinancing Agreement (First Lien), dated as of the date hereof (the "First Priority Refinancing Agreement"), by and among Parent, the Borrower, the lender party thereto and the Initial First Priority Representative, and (ii) the Existing Initial Second Priority Agreement, with new term loans incurred pursuant to that certain Refinancing Agreement (Second Lien), dated as of the date hereof (the "Second Priority Refinancing Agreement"), by and among Parent, the Borrower, the lender party thereto and the Initial Second Priority Representative;

WHEREAS, the parties hereto desire to amend and restate the Original Intercreditor Agreement to, among other things, reflect the 2021 Refinancing;

WHEREAS, the Borrower and the other Loan Parties have granted to the Initial First Priority Representative senior security interests in the Common Collateral (as defined below) as security for payment and performance of the First Priority Obligations;

WHEREAS, the Borrower and the other Loan Parties have granted to the Initial Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, from time to time, the Borrower may, subject to the terms and conditions hereof, designate additional Indebtedness as First Priority Obligations or Second Priority Obligations.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the Initial First Priority Representative (for itself and on behalf of the Initial First Priority Secured Creditors), the Initial Second Priority Representative (for itself and on behalf of the Initial Second Priority Secured Creditors), each Additional First Priority Representative (for itself and on behalf of the Additional First Priority Secured Creditors for which it is Additional First Priority Representative) and each Additional Second Priority Representative (for itself and on behalf of the Additional Second Priority Secured Creditors for which it is Additional Second Priority Representative) agree to amend and restate the Original Intercreditor Agreement in its entirety as follows:

SECTION 1.    Definitions.

1.1.    Defined Terms. The following terms, as used herein, have the following meanings:

"2021 Refinancing" has the meaning set forth in the recitals of this Agreement.

"ABL Intercreditor Agreement" means the Amended and Restated ABL Intercreditor Agreement, dated as of February 26, 2019, by and among Bank of America, N.A., as administrative agent and collateral agent for the ABL Secured Parties (as defined therein), the Initial First Priority Representative for the Initial First Priority Secured Creditors and the Initial Second Priority Representative for the Initial Second Priority Secured Creditors, as amended by

2

that certain Amendment No. 1 to Amended and Restated Intercreditor Agreement, dated as of July 31, 2020, and as further amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"<u>Additional Debt</u>" means Additional First Priority Debt and Additional Second Priority Debt.

"<u>Additional First Priority Agreement</u>" means any agreement evidencing Additional First Priority Debt designated as such in writing by the Borrower to the extent permitted to be so designated under each then extant First Priority Agreement and Second Priority Agreement.

"<u>Additional First Priority Debt</u>" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including, without limitation, any "<u>Incremental Facility</u>", "<u>Incremental Equivalent Debt</u>" and "<u>Specified Refinancing Debt</u>" (in each case, as such terms are defined in the Initial First Priority Agreement) (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional First Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional First Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the Initial First Priority Agreement, the Initial Second Priority Agreement, each other Additional First Priority Agreement then in effect and each Additional Second Priority Agreement then in effect to be secured by Liens on the Common Collateral ranking pari passu in priority with the applicable First Priority Liens and the Liens on the Common Collateral securing other Additional First Priority Debt (without regard to the control of remedies) and ranking senior to the Second Priority Liens and (b) the Loan Parties have granted Liens on the Common Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"<u>Additional First Priority Representative</u>" has the meaning set forth in the definition of First Priority Representative.

"<u>Additional First Priority Secured Parties</u>" means, with respect to any Series of Additional First Priority Debt, the First Priority Secured Parties in respect thereof.

"<u>Additional Representative</u>" means, as the case may be, an Additional First Priority Representative and/or an Additional Second Priority Representative.

"<u>Additional Second Priority Agreement</u>" means any agreement evidencing Additional Second Priority Debt designated as such in writing by the Borrower to the extent permitted to be so designated under each then extant First Priority Agreement and Second Priority Agreement.

"<u>Additional Second Priority Debt</u>" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including, without limitation, any "<u>Incremental Term Facility</u>", "<u>Incremental Equivalent Debt</u>" and "<u>Specified Term Refinancing Debt</u>" (in each case, as such terms are defined in the Initial Second Priority Agreement) (together with all obligations

3

in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Second Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional Second Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the First Priority Agreement, the Second Priority Agreement, each Additional First Priority Agreement then in effect and each other Additional Second Priority Agreement then in effect to be secured by Liens on the Common Collateral ranking pari passu in priority with the applicable Second Priority Liens and the Liens on the Common Collateral securing other Additional Second Priority Debt (without regard to the control of remedies) and ranking junior in priority to the First Priority Liens and (b) the Loan Parties have granted Liens on the Common Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"<u>Additional Second Priority Representative</u>" has the meaning set forth in the definition of Second Priority Representative.

"<u>Additional Second Priority Secured Parties</u>" means, with respect to any Series of Additional Second Priority Debt, the Second Priority Secured Parties in respect thereof.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"<u>Business Day</u>" has the meaning set forth in the Initial First Priority Agreement.

"<u>Borrower</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Cash Management Agreement</u>" has the meaning set forth in the Initial First Priority Agreement.

"<u>Cash Management Bank</u>" has the meaning set forth in the Initial First Priority Agreement.

"<u>Cash Management Obligations</u>" has the meaning set forth in the Initial First Priority Agreement.

"<u>Common Collateral</u>" means all assets that are both First Priority Collateral and Second Priority Collateral.

"<u>Default Rate</u>" has the meaning set forth in <u>Section 6(d)(i)</u>.

"<u>Designated First Priority Representative</u>" means (i) if at any time there is only one Series of First Priority Obligations then extant, the First Priority Representative for the First Priority Secured Parties in such Series and (ii) at any time when clause (i) of this definition does

**Debtors' Exhibit No. 13**
**Page 4 of 56**

not apply, either (a) if the First Priority Obligations Series Payment Date with respect to the First Priority Obligations in respect of the Initial First Priority Agreement has not occurred, the Initial First Priority Representative and (b) if the First Priority Obligations Series Payment Date with respect to the First Priority Obligations in respect of the Initial First Priority Agreement has occurred, the First Priority Representative for the First Priority Secured Parties in respect of the Series of First Priority Obligations representing a majority in aggregate principal amount of all extant First Priority Obligations at such time.

"Designated Second Priority Representative" means (i) if at any time there is only one Series of Second Priority Obligations then extant, the Second Priority Representative for the Second Priority Secured Parties in such Series and (ii) at any time when clause (i) of this definition does not apply, either (a) if the Initial Second Priority Agreement is then in effect, the Initial Second Priority Representative and (b) if the Initial Second Priority Agreement is no longer in effect, the Second Priority Representative for the Second Priority Secured Parties in respect of the Series of Second Priority Obligations representing a majority in aggregate principal amount of all extant Second Priority Obligations at such time.

"DIP Financing" has the meaning set forth in Section 5.2.

"Enforcement Action" means (a) the taking of any action (or joining with any other Person (other than the First Priority Representative to the extent provided in Section 3.2) in taking any action) to enforce any Lien in respect of the Common Collateral, including the institution of any foreclosure proceedings, the giving of notice of any public or private sale or other disposition pursuant to Article 8 or Article 9 of the UCC or other applicable law or any action to vacate, obtain relief from or modify a stay or other injunction restricting any such enforcement or any other exercise of rights or remedies with respect to any Common Collateral, (b) the exercise of (or joining with any other Person (other than the First Priority Representative to the extent provided in Section 3.2) in exercising) any right or remedy provided to a secured creditor under the First Priority Documents or Second Priority Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Loan Party or the taking of any action or the exercise of any right or remedy in respect of the set off or recoupment against any Common Collateral or proceeds of any Common Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including credit bidding or otherwise accepting any Common Collateral in full or partial satisfaction of a Lien, (c) the disposition of all or any material portion of the Common Collateral, by private or public sale or any other means, (d) the solicitation of third parties to conduct the liquidation of any Common Collateral, (e) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties for the purposes of valuing, marketing, or the disposition of, any Common Collateral, or (f) the exercise of any other enforcement right relating to any Common Collateral (including the exercise of any voting rights relating to any equity interests constituting Common Collateral) whether under the First Priority Documents, Second Priority Documents, under applicable law, in equity, in an Insolvency Proceeding, or otherwise; it being acknowledged and agreed that none of the following will constitute an Enforcement Action for purposes of this Agreement: (i) the imposition of a default rate or late fee, (ii) the filing of a proof of claim or a statement of interest in any Insolvency Proceeding and (iii) the acceleration of the First Priority Obligations or the Second Priority Obligations.

**Debtors' Exhibit No. 13**
**Page 5 of 56**

"Existing Initial First Priority Agreement" has the meaning set forth in the recitals of this Agreement.

"Existing Initial Second Priority Agreement" has the meaning set forth in the recitals of this Agreement.

"Extended Period" has the meaning set forth in Section 3.2.

"First Priority Agreement" means the collective reference to (a) the Initial First Priority Agreement, (b) each Additional First Priority Agreement and (c) any secured credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement that Refinances any other then extant First Priority Agreement pursuant to Section 9.6 hereof. Unless the context otherwise requires, any reference to the First Priority Agreement hereunder shall be deemed a reference to each First Priority Agreement then extant.

"First Priority Collateral" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"First Priority Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any First Priority Agreement, and any other documents that are designated under any First Priority Agreement as "First Priority Collateral Documents" for purposes of this Agreement.

"First Priority Debt" means (a) Indebtedness of the Loan Parties incurred pursuant to the Initial First Priority Agreement (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by the Initial First Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the Initial First Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) and (b) all Additional First Priority Debt.

"First Priority Documents" means each First Priority Agreement, each First Priority Collateral Document and each First Priority Guarantee.

"First Priority Guarantee" means any guarantee by any Loan Party of any or all of the First Priority Obligations.

"First Priority Lien" means any Lien created by any First Priority Collateral Documents.

"First Priority Obligations" means (a) with respect to the Initial First Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the Initial First Priority Agreement (or any equivalent term in any Refinancing thereof), including any Additional First Priority Debt, provided, that any Cash Management Obligations and Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder and (b) with respect to each other First

6

Priority Agreement, (i) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to such First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to such First Priority Agreement, (iii) all Secured Hedging Obligations; provided, that any Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder, (iv) all Cash Management Obligations; provided, that any Cash Management Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder and (v) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the applicable First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"First Priority Obligations Payment Date" means the date on which the First Priority Obligations Series Payment Date has occurred for each Series of First Priority Obligations.

"First Priority Obligations Series Payment Date" means, with respect to each Series of First Priority Obligations, the date on which (a) the First Priority Obligations of that Series (other than those that constitute Unasserted Contingent Obligations) have been paid in full in cash (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents for that Series have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents for that Series (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents). The First Priority Obligations Series Payment Date with respect to any Series of First Priority Obligations shall not be deemed to have occurred unless all of the foregoing claims have actually been paid in full in cash, whether or not such amounts are allowed or disallowed vis-a-vis the Borrower, and notwithstanding any discharge of any or all such claims pursuant to section 1141(d) of the Bankruptcy Code or otherwise. Upon the written request by any Second Priority Representative or the Borrower, the applicable First Priority Representative for that Series shall promptly deliver a written notice to each Second Priority Representative and the Borrower stating that (to the extent such events have occurred) the events described in the foregoing clauses (a), (b) and (c) have occurred.

"First Priority Refinancing Agreement" has the meaning set forth in the recitals of this Agreement.

"First Priority Representative" means (i) in the case of the First Priority Obligations or First Priority Secured Parties secured pursuant to the Initial First Priority Agreement, the Initial First Priority Representative, and (ii) in the case of any Additional First Priority Debt or any

Additional First Priority Secured Parties of any Series, the trustee, administrative agent, collateral or similar agent named as the First Priority Representative for such Series in the applicable Joinder Agreement (each, in the case of this clause (ii), together with its successors and assigns in such capacity, an "Additional First Priority Representative").

"First Priority Secured Parties" means each First Priority Representative, each Secured Party (or equivalent term) as defined in any First Priority Collateral Documents or any First Priority Agreement, and any other holders of the First Priority Obligations.

"Indebtedness" means (i) debt for borrowed money, including obligations evidenced by bonds, debentures, notes or other similar instruments (other than any obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees and similar obligations), (ii) Cash Management Obligations, (iii) Secured Hedging Obligations and (iv) any other "Indebtedness" within the meaning of the Initial First Priority Agreement or the Initial Second Priority Agreement.

"Initial First Priority Agreement" means the Existing Initial First Priority Agreement, as amended by the First Priority Refinancing Agreement.

"Initial First Priority Representative" has the meaning set forth in the introductory paragraph hereof.

"Initial First Priority Secured Creditors" means the "Secured Parties" as defined in the Initial First Priority Agreement (or any equivalent term in any Refinancing thereof).

"Initial Second Priority Agreement" means the Existing Initial Second Priority Agreement, as amended by the Second Priority Refinancing Agreement.

"Initial Second Priority Representative" has the meaning set forth in the introductory paragraph hereof.

"Initial Second Priority Secured Creditors" means the "Secured Parties" as defined in the Initial Second Priority Agreement (or any equivalent term in any Refinancing thereof).

"Insolvency Proceeding" means any voluntary or involuntary case or proceeding of which any Loan Party is the subject and in respect of bankruptcy, insolvency, winding up, receivership, dissolution, liquidation, reorganization or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

"Joinder Agreement" means a supplement to this Agreement in the form of Exhibit A hereto, required to be delivered by an Additional Representative to each other then-existing First Priority Representative and Second Priority Representative pursuant to Section 9.4 hereof.

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases (as defined in the Initial First Priority Agreement) but excluding operating leases) or any other security interest or interest in the nature of security

**Debtors' Exhibit No. 13**
**Page 8 of 56**

whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Loan Party" means Parent, the Borrower and each of the Guarantors (as such term is defined in the Initial First Priority Agreement). All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"Maximum First Priority Obligations Amount" means, as of any date of determination:

(a)     an aggregate principal amount, not to exceed the sum of (i) $1,735,110,000, plus (ii) 100% of the aggregate principal amount of the Term Loans (as defined in the Initial First Priority Agreement as in effect on the date hereof) incurred after the date of this Agreement pursuant to Sections 2.16, 7.03(m), 7.03(n) and 7.03(s) of the Initial First Priority Agreement (without giving effect to any amendments thereto), plus (iii) the aggregate principal amount of any Revolving Commitments (as defined in the Initial First Priority Agreement as in effect on the date hereof) provided after the date of this Agreement pursuant to Section 2.16 of the Initial First Priority Agreement (without giving effect to any amendments thereto) minus (x) the aggregate principal amount of any repayments of Term Loans (as defined in the Initial First Priority Agreement as in effect on the date hereof) under the Initial First Priority Agreement after the date of this Agreement; minus (x) the aggregate principal amount of any reduction of the Revolving Commitments (as defined in the Initial First Priority Agreement as in effect on the date hereof) under the Initial First Priority Agreement after the date of this Agreement, plus

(b)     First Priority Obligations constituting Secured Hedging Obligation and Cash Management Obligations; provided, that any Cash Management Obligations and Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder, plus

(c)     all other First Priority Obligations but only in respect of or attributable to subsections (a) and (b) above (including First Priority Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"Maximum First Priority Obligations Payment Date" means the date on which the First Priority Obligations Series Payment Date has occurred for each Series of First Priority Obligations in an amount up to the Maximum First Priority Obligations Amount.

"Maximum Second Priority Obligations Amount" means, as of any date of determination:

(a)     the sum of (i) $540,000,000 plus (ii) 100% of the loans made after the date of this Agreement pursuant to Sections 2.16, 7.03(m), 7.03(n) and 7.03(s) of the Initial

9

Second Priority Agreement (without giving effect to any amendments thereto); <u>minus</u> the aggregate principal amount of any repayments of Term Loans (as defined in the Initial Second Priority Agreement as in effect on the date hereof) under the Initial Second Priority Agreement after the date of this Agreement, <u>plus</u>

(b)      all other Second Priority Obligations but only in respect of or attributable to subsection (a) above (including Second Priority Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"<u>Original Intercreditor Agreement</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Parent</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"<u>Post-Petition Interest</u>" means interest (including interest accruing at the default rate specified in the applicable First Priority Agreement and/or Second Priority Agreement), fees, expenses and other charges that pursuant to the First Priority Documents or the Second Priority Documents, as the case may be, continue to accrue after the commencement of any Insolvency Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, or in any such Insolvency Proceeding.

"<u>Purchase</u>" has the meaning set forth in <u>Section 3.7(b)</u>.

"<u>Purchase Notice</u>" has the meaning set forth in <u>Section 3.7(a)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.7(c)</u>.

"<u>Purchasing Parties</u>" has the meaning set forth in <u>Section 3.7(b)</u>.

"<u>Recovery</u>" has the meaning set forth in <u>Section 5.5</u>.

"<u>Refinance</u>" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "<u>Refinanced</u>" and "<u>Refinancing</u>" have correlative meanings.

10

"<u>Second Priority Agreement</u>" means the collective reference to (a) the Initial Second Priority Agreement, (b) each Additional Second Priority Agreement and (c) any secured credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement that Refinances any other then extant Second Priority Agreement pursuant to <u>Section 9.6</u> hereof. Unless the context otherwise requires, any reference to the Second Priority Agreement hereunder shall be deemed a reference to each Second Priority Agreement then extant.

"<u>Second Priority Collateral</u>" means all assets, whether now owned or hereafter acquired by the Borrower or any Loan Party, in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"<u>Second Priority Collateral Documents</u>" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any Second Priority Agreement and any documents that are designated under any Second Priority Agreement as "Second Priority Collateral Documents" for purposes of this Agreement.

"<u>Second Priority Creditors</u>" means the "Secured Parties" (or equivalent term) as defined in any Second Priority Collateral Documents or any Second Priority Agreement, the Second Priority Representatives and any other Persons to whom Second Priority Obligations are owing.

"<u>Second Priority Debt</u>" means (a) Indebtedness of the Loan Parties incurred pursuant to the Initial Second Priority Agreement (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by the Initial Second Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the Initial Second Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) and (b) all Additional Second Priority Debt.

"<u>Second Priority Documents</u>" means each Second Priority Agreement, each Second Priority Collateral Document and each Second Priority Guarantee.

"<u>Second Priority Guarantee</u>" means any guarantee by any Loan Party of any or all of the Second Priority Obligations.

"<u>Second Priority Lien</u>" means any Lien created by any Second Priority Collateral Documents.

"<u>Second Priority Obligations</u>" means (a) with respect to the Initial Second Priority Agreement, all "<u>Secured Obligations</u>" of each Loan Party as defined in the Initial Second Priority Agreement (or any equivalent term in any Refinancing thereof), including any Additional Second Priority Debt, and (b) with respect to each other Second Priority Agreement, (i) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to such Second Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to such Second Priority

11

Agreement and (iii) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the applicable Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties hereunder, be deemed to be reinstated and outstanding as if such payment had not occurred.

"Second Priority Refinancing Agreement" has the meaning set forth in the recitals of this Agreement.

"Second Priority Representative" means (i) in the case of the Second Priority Obligations or the Second Priority Secured Parties secured pursuant to the Initial Second Priority Agreement, the Initial Second Priority Representative, and (ii) in the case of any Additional Second Priority Debt or any Additional Second Priority Secured Parties of any Series, the trustee, administrative agent, collateral or similar agent named as the Second Priority Representative for such Series in the applicable Joinder Agreement (each, in the case of this clause (ii), together with its successors and assigns in such capacity, an "Additional Second Priority Representative").

"Second Priority Secured Parties" means each Second Priority Representative, each Second Priority Creditor and any other holders of the Second Priority Obligations.

"Secured Hedge Agreement" has the meaning set forth in the Initial First Priority Agreement.

"Secured Hedging Obligations" means any "Secured Obligations" (as defined in the Initial First Priority Agreement) in respect of any Secured Hedge Agreement.

"Secured Parties" means the First Priority Secured Parties and the Second Priority Secured Parties.

"Series" means, (i) with respect to First Priority Debt or Second Priority Debt, all First Priority Debt or Second Priority Debt, as applicable, represented by the same First Priority Representative or Second Priority Representative acting in the same capacity and (ii) with respect to First Priority Obligations or Second Priority Obligations, all such obligations secured by the same First Priority Collateral Documents or same Second Priority Collateral Documents, as the case may be.

"Standstill Period" has the meaning set forth in Section 3.2.

"Surviving Obligations" has the meaning set forth in Section 3.7(b).

"Unasserted Contingent Obligations" means, at any time, First Priority Obligations for indemnification in respect of which no demand has been made at such time.

12

"<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Common Collateral..

1.2.   <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified; <u>provided</u>, that except in connection with any amendments, restatements, supplements or other modifications permitted pursuant to Section 6 hereof, (x) any term defined by reference to the Initial First Priority Agreement shall have the meaning ascribed to such term in the Initial First Priority Agreement as in effect on the date hereof and (y) any term defined by reference to the Initial Second Priority Agreement shall have the meaning ascribed to such term in the Initial Second Priority Agreement as in effect on the date hereof, (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 2. <u>Lien Priorities</u>.

2.1.   <u>Subordination of Liens</u>. (a) Subject to the order of application of proceeds set forth in <u>Section 4.1</u>, any and all Liens now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how or when acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on the Common Collateral now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations (other than any First Priority Obligations in excess of the Maximum First Priority Obligations Amount (such excess, the "<u>Excess First Priority Obligations</u>")), notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other Liens, or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

**Debtors' Exhibit No. 13**
**Page 13 of 56**

(b)     No First Priority Secured Party or Second Priority Secured Party shall object to or contest, or support any other Person in contesting or objecting to, in any proceeding (including any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of any security interest in the Common Collateral granted to the other. Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties (but subject to the order of application of proceeds set forth in Section 4.1), the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

2.2.     Nature of First Priority Obligations. Each Second Priority Representative on behalf of itself and the other Second Priority Secured Parties represented by it acknowledges that, subject to Section 4.1 and 6, the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof, but only so long as, except in the case of any DIP Financing, any such obligations are permitted to be incurred pursuant to the Second Priority Documents. The lien priorities provided in Section 2.1 and the provisions of Section 4.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3.     Agreements Regarding Actions to Perfect Liens. (a) [Reserved].

(b)     Each Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties represented by it that each Second Priority Collateral Document (excluding any Uniform Commercial Code financing statement or similar instrument) securing Common Collateral in favor of or for the benefit of such Second Priority Representative and the other Second Priority Secured Parties represented by it shall, unless otherwise agreed to by the Designated First Priority Representative, contain the following notation (or language to similar effect approved by the Designated First Priority Representative): "Notwithstanding anything herein to the contrary, the lien and security interest created by this agreement on the property described herein and the exercise of any right or remedy by the collateral agent hereunder is subject to the provisions of the Term Intercreditor Agreement, dated as of March 30, 2021 (the "Intercreditor Agreement"), among Jefferies Finance LLC, as administrative agent and collateral agent for the Initial First Priority Secured Creditors, Jefferies Finance LLC, as administrative agent and collateral agent for the Initial Second Priority Secured Creditors, and each other First Priority Representative and Second Priority Representative from time to time party thereto, and acknowledged and agreed to by certain other persons party or that may become party thereto from time to time, as amended, restated, amended and restated, modified or supplemented from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this

14

Agreement (other than Section [●][1]), the terms of the Intercreditor Agreement shall govern and control."

(c)     Each First Priority Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Collateral Documents, such possession or control is also for the benefit of and on behalf of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code). Nothing in the preceding sentence shall be construed to impose any duty on any First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement; provided that subsequent to the occurrence of the Maximum First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver to the Second Priority Representative, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the Second Priority Documents (and to the extent not so required, such delivery shall be made to the Borrower) or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties on the one hand and the Second Priority Secured Parties on the other hand and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

2.4.     No New Liens; Release of Liens.

(a)     So long as the First Priority Obligations Payment Date has not occurred, the parties hereto agree that (i) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, one or more Liens securing each of the First Priority Obligations (including as a result of the release of any Lien securing the First Priority Obligations) and (ii) if any Second Priority Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any Second Priority Obligation which assets are not also subject to the First Priority Lien of each First Priority Representative under the respective First Priority Documents (including as a result of the release of any Lien securing the First Priority Obligations), then such Second Priority Representative, upon demand by any First Priority Representative, will without the need for any further consent of any other Second Priority Secured Party, notwithstanding anything to the contrary in any other Second Priority Document either (x) release such Lien or (y) assign it to such First Priority Representative as security for the applicable

---

[1] Insert reference to applicable security interest granting clause.

Debtors' Exhibit No. 13
Page 15 of 56

First Priority Obligations (in which case the Second Priority Representative may retain a junior Lien on such assets subject to the terms hereof). To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this <u>Section 2.4</u> shall be subject to <u>Section 4.1</u>.

(b)     So long as there are any outstanding Second Priority Obligations (other than those that constitute indemnification obligations in respect of which no claim has been made at such time), the parties hereto agree that (i) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, one or more Liens securing each of the Second Priority Obligations (including as a result of the release of any Lien securing the Second Priority Obligations) and (ii) if any First Priority Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any First Priority Obligation which assets are not also subject to the Second Priority Lien of each Second Priority Representative under the respective Second Priority Documents (including as a result of the release of any Lien securing the Second Priority Obligations), then such First Priority Representative, upon demand by any Second Priority Representative, will without the need for any further consent of any other First Priority Secured Party, notwithstanding anything to the contrary in any other First Priority Document either (x) release such Lien or (y) assign it to such Second Priority Representative as security for the applicable Second Priority Obligations (in which case the First Priority Representative may retain a senior Lien on such assets subject to the terms hereof). To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the Second Priority Secured Parties, the First Priority Representative and the other First Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this <u>Section 2.4</u> shall be subject to <u>Section 4.1</u>.

SECTION 3.<u>Enforcement Rights</u>.

3.1.     <u>Exclusive Enforcement</u>. Until the Maximum First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in <u>Sections 3.2</u> and <u>5.1</u>. Upon the occurrence and during the continuance of an "Event of Default" under and as defined in the First Priority Documents, the Designated First Priority Representative on behalf of the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the Common Collateral permitted under the First Priority Documents in such order and manner as it may determine in its sole discretion.

3.2.     <u>Standstill and Waivers</u>. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that, until the Maximum First Priority Obligations Payment Date has occurred, subject to the proviso set forth in <u>Section 5.1</u>:

**Debtors' Exhibit No. 13**
**Page 16 of 56**

(a)     they will not take or cause to be taken any Enforcement Action with respect to the Common Collateral and they will not take or receive any distribution (whether or not constituting First Priority Collateral or the proceeds thereof) from the Borrower, any other Loan Party or any of their respective bankruptcy estates on account of or in exchange for such party's interest in the Common Collateral or other rights as a secured creditor in respect of the Common Collateral;

(b)     they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties;

(c)     they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including the filing or commencement of, or the joining in the filing or commencement of, an Insolvency Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party with respect to the Common Collateral; provided, that the Liens of the Second Priority Secured Parties attach to the proceeds (if any) of any such foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral with the same priority and validity as the Liens held by the Second Priority Secured Parties and such Liens remain subject to the terms of this Agreement;

(d)     they have no right to (i) direct either any First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or (ii) consent or object to the exercise by any First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or to the timing or manner in which any such right is exercised or not exercised;

(e)     [reserved]; and

(f)     they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon, or in connection with, any foreclosure or other disposition of the Common Collateral;

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of the Common Collateral, including taking any Enforcement Actions, under, and to the extent provided for in, the Second Priority Collateral Documents or applicable law after the passage of a period of 210 days (the "Standstill Period") from the date of delivery of a notice in writing by the applicable Second Priority Representative to each First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of an "Event of Default" under and as defined in the applicable Second Priority Agreement and the applicable Second Priority Representative has demanded repayment of all the principal amount of any Second Priority Obligations thereunder; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) any First Priority Secured

17

Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced (the period during which any event described in the preceding clause (i) or (ii) is continuing, the "Extended Period"); and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, each Second Priority Representative and the other Second Priority Secured Parties may take any action not prohibited by or inconsistent with this Agreement.

Notwithstanding the foregoing, the Second Priority Representative and the Second Priority Secured Parties may:

(1)    file a claim or statement of interest with respect to the Second Priority Obligations; provided that an Insolvency Proceeding has been commenced by or against the Loan Parties;

(2)    take any action (not adverse to the priority status of the Liens on the First Priority Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce or receive any value on account of) its rights in, and perfection and priority of its Lien on, the Common Collateral;

(3)    file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)    file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(5)    vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(6)    exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Agreement, including Section 3.2;

(7)    present a cash or credit bid (in each case, so long as such bid provides for payment in full in cash of the Maximum First Priority Obligations Amount) at any Section hearing or with respect to any other Common Collateral disposition;

18

(8)   bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative and the First Priority Secured Parties, so long as the cash proceeds of such bid are sufficient to cause the Maximum First Priority Obligations Payment Date to occur;

(9)   join in (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the First Priority Collateral initiated by any First Priority Secured Party to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with the any Enforcement Action by the First Priority Secured Parties;

(10)  engage or retain consultants, valuation firms, appraisers, investment bankers and accountants, and perform or engage third parties to perform audits, examinations and appraisals of any Common Collateral, for the sole purpose of valuing such Common Collateral and not for the purpose of marketing or conducting a disposition of such Common Collateral; provided, however, that the Second Priority Secured Parties with respect to any Common Collateral shall not take any of the foregoing actions if such actions would interfere in any material respect with the enforcement by the First Priority Secured Parties with respect to such Common Collateral of their First Priority Liens; and

(11)  commence, or join in filing of a petition for the commencement of, any involuntary Insolvency Proceeding or exercise any of its rights during any Insolvency Proceeding to the extent expressly permitted by Section 5.

3.3.   Judgment Creditors. In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, any such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4.   Cooperation. (a) Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that each of them shall take such actions as any First Priority Representative shall reasonably request in writing in connection with the exercise by the First Priority Secured Parties of their rights set forth herein.

(b)   Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, agrees that, commencing upon the later of the expiration of the Standstill Period and the expiration of the Extended Period, each of them shall take such actions as any Second Priority Representative shall reasonably request in writing in connection with the exercise by the Second Priority Secured Parties of their secured creditor rights expressly set forth herein.

3.5.    No Additional Rights For the Loan Parties Hereunder. If any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.6.    Actions Upon Breach. (a)Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement in a manner contrary to this Agreement), or fail to take any action expressly required by this Agreement to be taken by such Second Priority Secured Party, any First Priority Secured Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby waives (to the extent it may lawfully do so) any defense any Second Priority Secured Party may have that the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

(b)     Should any First Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement in a manner contrary to this Agreement), or fail to take any action expressly required by this Agreement to be taken by such First Priority Secured Party, any Second Priority Secured Party may obtain relief against such First Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the First Priority Representative on behalf of each First Priority Secured Party that (i) the Second Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, hereby waives (to the extent it may lawfully do so) any defense any First Priority Secured Party may have that the Second Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.7.    Option to Purchase. (a) Each First Priority Representative agrees that it will give each Second Priority Representative written notice within ten Business Days of: (i) the occurrence of an event of default under any First Priority Agreement arising from the failure of any Loan Party to pay principal, interest or fees when due and payable thereunder that is not cured, or waived by the applicable First Lien Creditors, within 60 days of its occurrence, (ii) the commencement of an Enforcement Action or the institution of any Insolvency Proceeding or (iii) the acceleration of the First Priority Obligations. Upon receipt of such notice by each Second Priority Representative, any Second Priority Secured Party shall have the option, but in no event the obligation, by irrevocable written notice (the "Purchase Notice") delivered by such Second Priority Representative to each First Priority Representative no later than ten Business Days after receipt by such Second Priority Representative of such notice, to purchase all (but not less than all) of the First Priority Obligations from the First Priority Secured Parties. If more than one

20

Second Priority Representative exercises its purchase option, the purchase shall be allocated among such purchasing Second Priority Representatives pro rata by principal amount of Second Priority Obligations.

(b)     On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a Business Day not less than five Business Days, nor more than ten Business Days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to <u>Section 3.7(a)</u> (the "<u>Purchasing Parties</u>"), and the Purchasing Parties shall purchase in cash (the "<u>Purchase</u>") from the First Priority Secured Parties, the First Priority Obligations; <u>provided</u>, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "<u>Surviving Obligations</u>").

(c)     Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "<u>Purchase Price</u>") therefor the full amount of all First Priority Obligations then outstanding and unpaid at par (including principal, accrued and unpaid interest at the contract rate, fees, breakage costs, attorneys' fees and expenses, and, in the case of any Secured Hedge Agreements, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Secured Hedge Agreements on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be reasonably necessary to collateralize its credit risk arising out of such Secured Hedge Agreements), (ii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations or as to which the First Priority Secured Parties have not yet received final payment and (iii) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, <u>provided</u> that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral actually received by the Purchasing Parties.

(d)     The Purchase Price shall be remitted by wire transfer in immediately available funds to such account(s) of each applicable First Priority Representative as it shall designate to the Purchasing Parties. Each First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties represented by it in accordance with the respective First Priority Agreements. Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to

21

the account designated by the First Priority Representative are received in such account later than 12:00 noon, New York City time.

(e)     The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that the First Priority Secured Parties shall represent and warrant: (i) the amount of the First Priority Obligations being purchased, (ii) that the First Priority Secured Parties own the First Priority Obligations being purchased free and clear of any Liens and (iii) that the First Priority Secured Parties have the right to assign the First Priority Obligations being assigned and the assignment is duly authorized.

(f)     The parties hereto hereby acknowledge and agree that in no event shall the Second Priority Representative (i) be deemed to be a Purchasing Party for purposes of this <u>Section 3.7</u>, (ii) be subject to or liable for any obligations of a Purchasing Party pursuant to this <u>Section 3.7</u> or (iii) incur any liability to any First Priority Secured Party or any other Person in connection with any Purchase pursuant to this <u>Section 3.7</u>.

(g)     To the extent that any First Priority Secured Party is in breach of the provisions of this <u>Section 3.7</u>, a Purchasing Party may, but shall not be obligated to, extend the date of the proposed Purchase on a day for day basis during the period of any breach by such First Priority Secured Party.

3.8.     <u>Rights as Unsecured Creditors</u>. The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties, in each case not inconsistent with the terms of this Agreement; provided that in the event that any Second Priority Secured Party becomes a judgment Lien creditor in respect of the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens securing the Second Priority Obligations are subject to this Agreement.

3.9.     <u>Second Lien Interest, Principal, Etc.</u>. Except as otherwise provided in <u>Section 3.2</u> hereof with respect to recoupment or set-off against Common Collateral or proceeds thereof, nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of the required payments of interest, principal and other amounts owed in respect of the Second Priority Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies as a secured creditor (including set off) or enforcement in contravention of this Agreement of any Lien held by any of them.

SECTION 4. <u>Application of Proceeds of Common Collateral; Dispositions and Releases of Common Collateral; Inspection and Insurance</u>.

4.1.     <u>Application of Proceeds; Turnover Provisions</u>. Until the First Priority Obligations Payment Date has occurred, all First Priority Collateral and proceeds thereof (including any interest earned thereon) received in connection with an Enforcement Action,

22

whether or not pursuant to an Insolvency Proceeding, and any distribution (whether or not constituting First Priority Collateral or the proceeds thereof) from the Borrower, any other Loan Party or any of their respective bankruptcy estates on account of or in exchange for such party's interest in the First Priority Collateral or other rights as a secured creditor in respect of the First Priority Collateral, shall be distributed as follows: <u>first</u> to the respective First Priority Representatives for application to the respective First Priority Obligations in accordance with the terms of the respective First Priority Documents; <u>provided</u> that the amount of First Priority Obligations eligible for application under this clause "first" shall not exceed the Maximum First Priority Obligations Amount, <u>second</u>, to the respective Second Priority Representatives for application to the respective Second Priority Obligations in accordance with the terms of the respective Second Priority Documents; <u>provided</u> that the amount of Second Priority Obligations eligible for application under this clause "second" shall not exceed the Maximum Second Priority Obligations Amount, <u>third</u> to the respective First Priority Representatives for application to all remaining respective First Priority Obligations (including any Excess First Priority Obligations) in accordance with the terms of the respective First Priority Documents, until the First Priority Obligations Payment Date has occurred and <u>fourth</u>, to the extent constituting Common Collateral, to the respective Second Priority Representatives for application to all remaining respective Second Priority Obligations in accordance with the terms of the respective Second Priority Documents. Until the occurrence of the First Priority Obligations Payment Date, any First Priority Collateral, including any such First Priority Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Designated First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the Designated First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable). For so long as any Second Priority Obligations are outstanding, any Second Priority Collateral, including any such Second Priority Collateral constituting proceeds, that may be received by any First Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Designated Second Priority Representative, for the benefit of the Second Priority Secured Parties, in the same form as received, with any necessary endorsements, and each First Priority Secured Party hereby authorizes the Designated Second Priority Representative to make any such endorsements as agent for the First Priority Representative (which authorization, being coupled with an interest, is irrevocable)

       4.2.   <u>Releases of Second Priority Lien</u>. (a) Upon any release, sale or disposition of Common Collateral permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is expressly prohibited by the Second Priority Agreement as in effect on the date hereof unless such sale or disposition is consummated (x) in connection with an Enforcement Action after the occurrence and during the continuance of an "Event of Default" under and as defined in the First Priority Documents or (y) after the institution of any Insolvency Proceeding, (i) the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds of such Common Collateral remaining after the Maximum First Priority Obligations Payment Date occurs), (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, such Loan Party's liability in respect of the Second Priority

23

Obligations) shall be automatically and unconditionally released to the same extent as so released by the First Priority Secured Parties with no further consent or action of any Person, and (ii) the Second Priority Creditors shall be deemed to have consented under the Second Priority Documents to such release, sale or disposition of such Common Collateral (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, the release of such Loan Party's liability in respect of the Second Priority Obligations), and to have waived the provisions of the Second Priority Documents to the extent necessary to permit such release, sale or disposition (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, the release of such Loan Party's liability in respect of the Second Priority Obligations); provided, that no such release, consent, waiver or other action described in clauses (i) and (ii) above shall occur without the consent of the Second Priority Representative unless (x) the net proceeds of the disposition of any such Common Collateral are applied to repay (and, to the extent applicable, permanently reduce commitments with respect to) the First Priority Obligations, (y) in the case of a sale of any ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), the net proceeds of the disposition of any such Common Collateral are applied to repay (and, to the extent applicable, permanently reduce commitments with respect to) the ABL Obligations (as defined in the ABL Intercreditor Agreement) or (z) the Liens of the Second Priority Secured Parties attach to the proceeds of the disposition of any such Common Collateral with the same priority and validity as the Liens held by Second Priority Secured Parties on such Common Collateral.

(b)    Upon delivery to each Second Priority Representative of a notice from the applicable First Priority Representative or the Borrower, which notice states that any release of Liens securing or supporting any First Priority Obligations has become effective (or shall become effective upon the satisfaction of any condition or occurrence of any event, including the release by each Second Priority Representative), each Second Priority Representative shall, at the sole cost of the Borrower, promptly execute and deliver such release documents and instruments and shall take such further actions as any First Priority Representative shall reasonably request in writing to evidence any release of the Second Priority Lien or any release of the applicable Loan Party guarantor of the Second Priority Obligations (which shall be subject to identical conditions or contingencies, if applicable), in each case as provided in paragraph (a) of this Section 4.2. Each Second Priority Representative hereby appoints each First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in such First Priority Representative's own name, from time to time, in such First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3.    Inspection Rights and Insurance. (a) Until the Maximum First Priority Obligations Payment Date has occurred, any First Priority Secured Party and its representatives

Debtors' Exhibit No. 13
Page 24 of 56

may at any time inspect, repossess, remove and otherwise deal with the Common Collateral to the extent permitted in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party, but with a prior written notice to the Designated Second Priority Representative.

(b)     Proceeds of Common Collateral include insurance proceeds in respect of such Common Collateral and therefore the lien priorities provided in Section 2.1 shall govern the ultimate disposition of casualty insurance proceeds. Until the Maximum First Priority Obligations Payment Date has occurred, the Designated First Priority Representative shall have the sole and exclusive right, subject to the rights of the Loan Parties under the First Priority Documents, to adjust or settle any insurance claims in the event of any covered loss, theft or destruction of Common Collateral to the extent provided for, and in accordance with, the First Priority Agreements. To the extent provided in the applicable First Priority Documents or Second Priority Documents, as the case may be, all proceeds of such insurance shall be remitted to the Designated First Priority Representative or the Designated Second Priority Representative, as the case may be, and each of the Second Priority Representatives and First Priority Representatives shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1.

SECTION 5.Insolvency Proceedings.

5.1.     Filing of Motions. Until the Maximum First Priority Obligations Payment Date has occurred, each Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties represented by it that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Secured Parties, in whole or in part, as a result of their interest in the Common Collateral (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by any First Priority Representative or any other First Priority Secured Party with respect to the Common Collateral, or the extent to which the First Priority Obligations constitute secured claims or the value thereof under Section 506(a) of the Bankruptcy Code or otherwise; provided that the Second Priority Representative may (i) file a proof of claim in an Insolvency Proceeding and (ii) file any necessary responsive or defensive pleadings in opposition to any motion or other pleadings made by any Person objecting to or otherwise seeking the disallowance of any claims of the Second Priority Secured Parties on the Common Collateral, subject to the limitations contained in this Agreement and only if consistent with the terms and the limitations on the Second Priority Representative imposed hereby. Each First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties represented by it that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by any Second Priority Representative or any other Second Priority Secured

25

**Debtors' Exhibit No. 13**
**Page 25 of 56**

Party, or the extent to which the Second Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise.

5.2.    <u>Financing Matters</u>. If any Loan Party becomes subject to any Insolvency Proceeding at any time prior to the Maximum First Priority Obligations Payment Date, and if any First Priority Representative or the other First Priority Secured Parties desire to consent (or not object) to the use of cash collateral under the Bankruptcy Code or to provide financing to any Loan Party under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Loan Party by any third party (any such financing, "<u>DIP Financing</u>"), then each Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties represented by it, that each Second Priority Secured Party (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in <u>Section 5.4</u> below or with the written consent of the First Priority Representative, (c) will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties, and (d) agrees that notice received two calendar days prior to the entry of an order approving such usage of cash collateral or approving such financing shall be adequate notice; <u>provided</u> that (i) the Second Priority Representative retains the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the DIP Financing, (ii) (A) the DIP Financing or cash collateral order does not compel the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document or (B) the DIP Financing documentation or cash collateral order does not expressly require the sale or other liquidation of a material portion of the Common Collateral prior to a default under the DIP Financing documentation or cash collateral order and (iii) the aggregate principal amount of Indebtedness for borrowed money under the DIP Financing <u>plus</u> the aggregate outstanding principal amount of Indebtedness for borrowed money under the First Priority Documents outstanding immediately prior to the commencement of such Insolvency Proceeding (which excludes any obligations with respect to Secured Hedge Agreements and Cash Management Agreements that constitute First Priority Obligations) does not exceed 120% of the aggregate principal amount of Indebtedness for borrowed money under the First Priority Documents outstanding immediately prior to the commencement of such Insolvency Proceeding.

No Second Priority Creditor may propose or provide any DIP Financing which (i) rolls-up or otherwise includes or refinances all or any portion of any pre-petition Second Priority Obligations, (ii) is secured by Liens on the Common Collateral ranking senior or pari passu in priority with the First Priority Liens and the Liens on the Common Collateral securing any Additional First Priority Debt, (iii) compels the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document, (iv) expressly requires the sale or other liquidation of a material portion of the Common Collateral prior to a default under such DIP Financing documentation or (v) is otherwise inconsistent with any provision of this Agreement.

**Debtors' Exhibit No. 13**
**Page 26 of 56**

Nothing in this Agreement limits or impairs the right of a Second Priority Secured Party to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more First Priority Secured Parties) or cash collateral to the extent the DIP Financing does not meet the requirements of this Agreement.

5.3.   Relief From the Automatic Stay. Each Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties represented by it, that none of them will seek, or support any person in seeking, relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of each First Priority Representative.

5.4.   Adequate Protection. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that, prior to the Maximum First Priority Obligations Payment Date, none of them shall object, contest, or support any other Person objecting to or contesting, (a) any request by any First Priority Representative or the other First Priority Secured Parties for adequate protection of its interest in the Common Collateral or any adequate protection provided to such First Priority Representative or the other First Priority Secured Parties, (b) any objection by any First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection in the Common Collateral or (c) the payment of interest, fees, expenses or other amounts to any First Priority Representative or any other First Priority Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, further agrees that, prior to the Maximum First Priority Obligations Payment Date, none of them shall assert or enforce any claim under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise that is senior to or on a parity with the First Priority Liens for costs or expenses of preserving or disposing of any Common Collateral. Notwithstanding anything to the contrary set forth in this Section and in Section 5.2(c)(ii), but subject to all other provisions of this Agreement (including Section 5.2(c)(i) and Section 5.3), in any Insolvency Proceeding, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement Liens on such additional collateral) and/or superpriority claims in connection with any DIP Financing or use of cash collateral with respect to the Common Collateral, and the Second Priority Secured Parties do not object to the adequate protection being provided to the First Priority Secured Parties, then in connection with any such DIP Financing or use of cash collateral each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties, may, as adequate protection of their interests in the Common Collateral, seek or accept (and the First Priority Representative and the First Priority Secured Parties shall consent to and not object to, contest or support any other Person objecting to or contesting) adequate protection consisting solely of (x) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Second Priority Liens on the Common Collateral are so subordinated to the First Priority Obligations under this Agreement and/or (y) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties; provided, however, that the inability of the Second Priority Secured Parties to receive any such junior replacement Lien or junior superpriority claims shall not affect the agreements and waivers set forth in this Section 5.4; provided, further, that each Second Priority Representative shall have

27

irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties represented by it, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims; (ii) if the First Priority Secured Parties are granted, as adequate protection or otherwise, post-petition interest (in an amount that is equal to or exceeds the pre-default rate) and reasonable fees and expenses of counsel and financial advisors and consultants of any First Priority Representative, then each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties represented by it, may seek or accept, whether as adequate protection or otherwise (x) the payment of post-petition interest (in an amount that is equal to or exceeds the pre-default rate) and (y) the reasonable fees and expenses of counsel and financial advisors and consultants for the Second Priority Representative; (iii) if the First Priority Secured Parties (or any subset thereof) are granted any other adequate protection not described in clauses (i) or (ii) above, then each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties represented by it, may seek or accept, and the First Priority Secured Parties shall consent to and not object, contest or support any other Person objecting to or contesting, the same adequate protection (which, if applicable, shall be junior in all respects to such adequate protection granted to the First Priority Secured Parties); provided, however, in the event any Second Priority Representative, on behalf of itself and the Second Priority Secured Parties represented by it, seeks or accepts adequate protection in accordance with clause (i) above and such adequate protection is granted in the form of additional collateral, then such Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties represented by it, agrees that each First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the applicable First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection with respect to their interests in the Common Collateral or any payments of post-petition interest, expenses or other amounts in respect of the Second Priority Obligations, in each case, without the prior written consent of the Designated First Priority Representative. None of the Second Priority Representatives or Second Priority Secured Parties shall oppose or seek to challenge any claim by any First Priority Representative or any other First Priority Secured Party for allowance in any Insolvency Proceeding of First Priority Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the First Priority Representatives on behalf of the First Priority Secured Parties on the Common Collateral or any other First Priority Secured Party's Lien on the Common Collateral, without regard to the existence of the Liens of the Second Priority Representatives or the other Second Priority Secured Parties on the Common Collateral. None of the First Priority Representatives or First Priority Secured Parties shall oppose or seek to challenge any claim by any Second Priority Representative or any other Second Priority Secured Party for allowance in any Insolvency Proceeding of Second Priority Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the Second

28

Priority Representatives on behalf of the Second Priority Secured Parties on the Common Collateral or any other Second Priority Secured Party's Lien on the Common Collateral, after taking into account the First Priority Obligations.

5.5.    Avoidance Issues. If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, because such amount was avoided or ordered to be paid or disgorged for any reason, including because it was found to be a fraudulent or preferential transfer, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Second Priority Representative, on behalf of itself and each of the other Second Priority Secured Parties represented by it, agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6.    Asset Dispositions in an Insolvency Proceeding. In an Insolvency Proceeding, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party constituting Common Collateral that is supported by any First Priority Representative and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale or disposition supported by the First Priority Secured Parties and to have released their Liens on such assets constituting Common Collateral; provided that pursuant to court order, the Liens of the Second Priority Secured Parties attach to the proceeds of the disposition with the same priority and validity as the Liens held by Second Priority Secured Parties on such Common Collateral and the Liens remain subject to the terms of this Agreement.

5.7.    Separate Grants of Security and Separate Classification. Each Secured Party acknowledges and agrees that (a) the grants of Liens pursuant to the First Priority Collateral Documents and the Second Priority Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the

29

Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby acknowledges and agrees to turn over to the Designated First Priority Representative amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8.     No Waivers of Rights of First Priority Secured Parties. Subject to the terms of this Agreement, any First Priority Representative or any other First Priority Secured Party may object in any Insolvency Proceeding or otherwise to any action taken by any Second Priority Secured Party not expressly permitted hereunder, including the seeking by any Second Priority Secured Party of adequate protection (except as provided in Section 5.4).

5.9.     Other Matters. So long as the Maximum First Priority Obligations Payment Date has not occurred each Second Priority Representative, on behalf of itself and each applicable Second Priority Secured Party, agrees that it will not file, propose, support or vote in favor of any plan of reorganization that is inconsistent in any manner with the terms of this Agreement.

5.10.     Effectiveness in Insolvency Proceedings. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding. The relative rights of the Secured Parties as to the Common Collateral and proceeds thereof shall continue after the commencement of any Insolvency Proceeding on the same basis as prior to the date of the petition therefor, subject to any court order approving the financing of, or use of cash collateral by, any Loan Party. All references herein to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party.

5.11.     Reorganization Securities. If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Priority Obligations and on account of Second Priority Obligations, then, to the extent the debt obligations distributed on account of the First Priority Obligations and on account of the Second Priority Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations, provided that this provision shall not affect the relative rankings of the First Priority Obligations and the Second Priority Obligations in such Insolvency Proceeding.

SECTION 6. Amendments to Loan Documents.

(a)     Other than as set forth in Section 6(d) below, the Second Priority Documents may be amended, restated, Refinanced, supplemented or otherwise modified in

30

accordance with their terms without the consent of any First Priority Representative or any First Priority Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the First Priority Representative, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement.

(b)     Other than as set forth in Section 6(c) below, the First Priority Documents may be amended, restated, Refinanced, supplemented or otherwise modified in accordance with their terms without the consent of any Second Priority Representative or any Second Priority Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the Second Priority Representative, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement.

(c)     Notwithstanding Section 6(b) above, the First Priority Documents may not be amended, restated, Refinanced, supplemented or otherwise modified without the written consent of the applicable Second Priority Representative if such amendment, restatement, Refinancing, supplement or other modification:

(i)     increases (A) the interest rate, including by increasing the "applicable margin" or similar component of the interest rate (including original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity)) or by modifying the method of computing interest (including increases to any interest rate "floor" (but solely to the extent that, at the time of such amendment, restatement, Refinancing, supplement or other modification, such increase in "floor" would result in a higher interest rate)), so that the interest rate is increased by more than 5.00% per annum in the aggregate or (B) a letter of credit, commitment, facility, utilization or similar ongoing fee (but excluding any arrangement, structuring and underwriting fees and commissions and any amendment fees); provided, that (I) increases in an underlying reference rate resulting from LIBOR not being available or a replacement of LIBOR as the applicable reference rate (as provided by the Initial First Priority Agreement as in effect as of the date hereof or as otherwise implemented by then-existing market practice), (II) accrual of interest at the "Default Rate" as defined in the Initial First Priority Agreement in effect as of the date hereof or, for any rate in any such amendment, restatement, Refinancing, supplement or other modification, a rate that corresponds to such "Default Rate" or (III) any such amendment, restatement, Refinancing, supplement or other modification in connection with the exercise of any "most favored nations" clause in the Initial First Priority Agreement as in effect on the date hereof, in each case, will not be included in determining whether an increase under clauses (A) and (B) above has occurred; or

(ii)     changes or adds, or has the effect of changing or adding, as applicable, any provision that restricts one or more Loan Parties from

making payments of the Second Priority Obligations that would otherwise be permitted under the Initial Second Priority Agreement as in effect on the date hereof.

(d)     Notwithstanding Section 6(a) above, the Second Priority Documents may not be amended, restated, Refinanced, supplemented or otherwise modified without the written consent of the applicable First Priority Representative if such amendment, restatement, Refinancing, supplement or other modification:

(i)     increases (A) the interest rate, including by increasing the "applicable margin" or similar component of the interest rate (including original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity)) or by modifying the method of computing interest (including increases to any interest rate "floor" (but solely to the extent that, at the time of such amendment, restatement, Refinancing, supplement or other modification, such increase in "floor" would result in a higher interest rate)), so that the interest rate is increased by more than 2.00% per annum in the aggregate or (B) a letter of credit, commitment, facility, utilization or similar ongoing fee (but excluding any arrangement, structuring and underwriting fees and commissions and any amendment fees); provided, that (I) increases in an underlying reference rate resulting from LIBOR not being available or a replacement of LIBOR as the applicable reference rate (as provided by the Initial Second Priority Agreement as in effect as of the date hereof or as otherwise implemented by then-existing market practice), (II) accrual of interest at the "Default Rate" as defined in the Initial Second Priority Agreement in effect as of the date hereof or, for any rate in any such amendment, restatement, Refinancing, supplement or other modification, a rate that corresponds to such "Default Rate", (III) any such amendment, restatement, Refinancing, supplement or other modification in connection with the exercise of any "most favored nations" clause in the Initial Second Priority Agreement as in effect on the date hereof and (IV) any changes to the cash or pay-in-kind interest rate or fees in connection with Section 2.08(e) of the Initial Second Priority Agreement as in effect on the date hereof, in each case, will not be included in determining whether an increase under clauses (A) and (B) above has occurred;

(ii)     shortens the maturity date of the Second Priority Debt to a date that is earlier than the date set forth in clause (a) of the definition of "Maturity Date" in the Initial Second Priority Agreement as in effect on the date hereof;

(iii)     changes or adds, or has the effect of changing or adding, as applicable, any provision that restricts one or more Loan Parties from making payments of the First Priority Obligations that would otherwise be permitted under the Initial First Priority Agreement as in effect on the date hereof; or

32

(iv) changes or adds, or has the effect of changing or adding, as applicable, any covenants or events of default thereunder to make them more restrictive as to any Loan Party, unless comparable modifications are also offered to any applicable First Priority Representative and First Priority Secured Party for inclusion in any applicable First Priority Documents that maintain, to the extent applicable, the covenant cushion levels between the covenants in the Initial First Priority Agreement as in effect on the date hereof and the covenants in the Initial Second Priority Agreement as in effect on the date hereof.

SECTION 7.Reliance; Waivers; etc.

7.1.   Reliance. The First Priority Documents are deemed to have been executed and delivered and all extensions of credit thereunder prior to, on or after the date hereof are deemed to have been made or incurred, in reliance upon this Agreement. Each Second Priority Representative, on behalf of itself and the Second Priority Secured Parties represented by it, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties. The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit thereunder on or after the date hereof are deemed to have been made or incurred, in reliance upon this Agreement. Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, expressly waives all notices of the acceptance of and reliance on this Agreement by the Second Priority Representative and the other Second Priority Secured Parties.

7.2.   No Warranties or Liability. Each Second Priority Representative and each First Priority Representative acknowledges and agrees that it has not made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any First Priority Document or any Second Priority Document. Except as otherwise provided in this Agreement, each Second Priority Representative and each First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3.   No Waivers. No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

SECTION 8.Obligations Unconditional.

8.1.   First Priority Obligations Unconditional. All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)   any lack of validity or enforceability of any First Priority Document;

(b)   any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other

33

modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)     prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of any of the Second Priority Representative or any other Second Priority Secured Party, or any Loan Party, to the extent applicable, in respect of this Agreement (other than the occurrence of the First Priority Obligations Payment Date).

8.2.     <u>Second Priority Obligations Unconditional</u>. All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any Second Priority Document;

(b)     any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)     any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second Priority Obligations or any First Priority Secured Party in respect of this Agreement, or any Loan Party, to the extent applicable, other than payment in full in cash of the Second Priority Obligations.

SECTION 9. <u>Miscellaneous</u>.

9.1.     <u>Conflicts</u>. In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, impair, waive or cancel any rights granted to, or create any liability or obligation of, any Loan Party in the First Priority Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as

34

expressly set forth herein). Notwithstanding the foregoing, solely in respect of the relative rights between the ABL Secured Parties (as defined in the ABL Intercreditor Agreement) on the one hand and the First Priority Secured Parties and Second Priority Secured Parties, collectively, on the other hand, and not to any rights or obligations between the First Priority Secured Parties and the Second Priority Secured Parties, in the event of any conflict between this Agreement and the ABL Intercreditor Agreement, the provisions of the ABL Intercreditor Agreement shall govern.

9.2.   <u>Continuing Nature of Provisions</u>. This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred subject to the reinstatement as expressly set forth herein. This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3.   <u>Amendments; Waivers</u>. Except as set forth in Section 9.15, no amendment, waiver or other modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by (i) each First Priority Representative (in accordance with the applicable First Priority Agreement) and each Second Priority Representative (in accordance with the applicable Second Priority Agreement) with respect to any amendment, waiver or other modification, and (ii) the Loan Parties, solely with respect to any amendments, waivers or other modifications that (I) materially adversely affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or impose any additional obligations on the Loan Parties, (II) adversely affect the rights of the Loan Parties to refinance the First Priority Obligations or the Second Priority Obligations or (III) modify the definitions of "Maximum First Priority Obligations Amount" or "Maximum Second Priority Obligations Amount". In addition, each waiver, if any, with respect to any aspect of this Agreement shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. The First Priority Representative and the Second Priority Representative shall provide the Loan Parties with written notice (together with a true and correct copy) of each proposed amendment or other modification to this Agreement prior to the effectiveness thereof. Notwithstanding the provisions of any other First Priority Document or Second Priority Document, each First Priority Representative (in accordance with the applicable First Priority Agreement) and each Second Priority Representative (in accordance with the applicable Second Priority Agreement) may, with the consent of the Loan Parties for any amendments, restatements, amendment and restatements, supplements or other modifications that directly and materially adversely affect any Loan Party, make any amendments, restatements, amendment and restatements, supplements or other modifications to this Agreement to correct any ambiguity, defect or inconsistency contained herein without the consent of any other Person.

9.4.   <u>Additional Debt Facilities</u>.

(a)   To the extent, but only to the extent, permitted by the provisions of each then extant First Priority Agreement and Second Priority Agreement (including, in each case, pursuant to any consent or waiver thereto or thereunder), the Borrower may incur or issue and sell

Debtors' Exhibit No. 13
Page 35 of 56

one or more series or classes of Additional First Priority Debt and/or one or more series or classes of Additional Second Priority Debt.

Any such series or class of Additional First Priority Debt may be secured by a first-priority, senior Lien on the Common Collateral, in each case under and pursuant to the First Priority Collateral Documents for such Series of Additional First Priority Debt, if and subject to the condition that, unless such Indebtedness is part of an existing Series of Additional First Priority Debt represented by a First Priority Representative already party to this Agreement, the Additional First Priority Representative with respect to any such Additional First Priority Debt becomes a party to this Agreement by satisfying the conditions set forth in this <u>Section 9.4</u>. Upon any Additional First Priority Representative so becoming a party hereto, all First Priority Obligations of such Series shall also be entitled to be so secured by a senior Lien on the Common Collateral in accordance with the terms hereof and thereof.

Any such series or class of Additional Second Priority Debt may be secured by a junior-priority, subordinated Lien on the Common Collateral, in each case under and pursuant to the relevant Second Priority Collateral Documents for such Series of Additional Second Priority Debt, if and subject to the condition, unless such Indebtedness is part of an existing Series of Additional Second Priority Debt represented by a Second Priority Representative already party to this Agreement, the Additional Second Priority Representative with respect to any such Additional Second Priority Debt becomes a party to this Agreement by satisfying the conditions set forth in this <u>Section 9.4</u>. Upon any Additional Second Priority Representative so becoming a party hereto, all Second Priority Obligations of such Series shall also be entitled to be so secured by a subordinated Lien on the Common Collateral in accordance with the terms hereof and thereof.

(b)     In order for an Additional Representative to become a party to this Agreement:

(i)   such Additional Representative shall have executed and delivered to each other then-existing First Priority Representative and Second Priority Representative a Joinder Agreement substantially in the form of <u>Exhibit A</u> hereto (with such changes as may be reasonably approved by the Designated First Priority Representative and such Additional Representative) pursuant to which such Additional Representative becomes an Additional First Priority Representative or Additional Second Priority Representative hereunder and the related First Priority Secured Parties or Second Priority Secured Parties, as applicable, become subject hereto and bound hereby;

(ii)   the Borrower shall have delivered a designation to each other then-existing First Priority Representative and Second Priority Representative substantially in the form of <u>Exhibit B</u> hereto, pursuant to which an officer of the Borrower shall (A) identify the Indebtedness to be designated as Additional First Priority Debt or Additional Second Priority Debt, as applicable, and the initial aggregate principal amount of such Indebtedness, (B) identify the Additional First Priority Agreement or Additional Second Priority Agreement as applicable, (C) specify the name and address of the applicable Additional Representative, (D) certify that such Additional Debt, is permitted to be incurred, secured and

36

guaranteed by each then extant First Priority Agreement and Second Priority Agreement and (D) attach to such designation true and complete copies of each of the First Priority Agreement or Second Priority Agreement, as applicable, relating to such Additional First Priority Debt or Additional Second Priority Debt, as applicable.

(iii)   Upon the execution and delivery of a Joinder Agreement by an Additional First Priority Representative or an Additional Second Priority Representative, as the case may be, in each case in accordance with this Section 9.4, each other First Priority Representative and Second Priority Representative shall acknowledge receipt thereof by countersigning a copy thereof and returning the same to such Additional Representative; provided that the failure of any First Priority Representative or Second Priority Representative to so acknowledge or return the same shall not affect the status of such Additional Debt as Additional First Priority Debt or Additional Second Priority Debt, as the case may be, if the other requirements of this Section 9.4 are complied with.

(c)   With respect to any incurrence, issuance or sale of Indebtedness after the date hereof under any Additional First Priority Agreement or Additional Second Priority Agreement, in each case, of a Series of Additional First Priority Debt or Series of Additional Second Priority Debt whose Additional First Priority Representative or Additional Second Priority Representative, as applicable, is already a party to each of this Agreement, the requirements of this Section 9.4 shall not be applicable and such Indebtedness shall automatically constitute Additional First Priority Debt or Additional Second Priority Debt so long as such Indebtedness is permitted to be incurred, secured and guaranteed by each First Priority Agreement and Second Priority Agreement.

9.5.   Information Concerning Financial Condition of the Borrower and the Loan Parties. Neither any Second Priority Representative nor any First Priority Representative hereby assumes responsibility for keeping each other informed of the financial condition of the Borrower and of any of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations. Each Second Priority Representative and each First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances. In the event any Second Priority Representative or any First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide or update any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information. Neither any First Priority Representative nor any Second Priority Representative shall have any responsibility to monitor or verify the financial condition of the Borrower or of any of the Loan Parties.

9.6.   Refinancings. The First Priority Obligations and the Second Priority Obligations may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any First Priority Agreement or any Second Priority Agreement) of, any First Priority

Debtors' Exhibit No. 13
Page 37 of 56

Representative or Second Priority Representative or any Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, that (i) such Refinancing is permitted pursuant to the terms of each then extant First Priority Agreement and Second Priority Agreement and (ii) the Representative for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

   9.7. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

   9.8. Submission to Jurisdiction. (a) Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby agree that each First Priority Secured Party, each Second Priority Secured Party and each Loan Party shall irrevocably and unconditionally submit, for itself and its property, to the exclusive general jurisdiction of the courts of the State of New York sitting in New York County or of the United States for the Southern District of such State, and any appellate court from any thereof (except that, (x) in the case of any Mortgage (as defined in the Initial First Priority Agreement) or other First Priority Collateral Document or Second Priority Collateral Document, proceedings may also be brought by the applicable First Priority Representative or Second Priority Representative in the state in which the respective mortgaged property or Common Collateral is located or any other relevant jurisdiction and (y) in the case of any Insolvency Proceedings with respect to any Loan Party, actions or proceedings related to this Agreement and the other First Priority Documents or Second Priority Documents may be brought in such court holding such Insolvency Proceedings), in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment with respect to this Agreement, and each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably and unconditionally agree that all of their respective claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court. Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby further agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

   (b) Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in the first sentence of paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Debtors' Exhibit No. 13
Page 38 of 56

(c)     Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably consents to service of process in the manner provided for notices (other than facsimile or email) in Section 9.9. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

9.9.    Notices.

(a)     Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email.

(b)     All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.9 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.9 or (ii) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that received notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in clause (c) below shall be effective as provided in such clause (c).

(c)     Notices and other communications hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the parties hereto. Each party hereto may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth on Exhibit D

**Debtors' Exhibit No. 13**
**Page 39 of 56**

hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.10. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.11. <u>Headings</u>. Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.12. <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreements shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.13. <u>Counterparts; Integration; Effectiveness</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile transmission or electronic transmission of a .pdf copy of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement; provided that original signatures shall be promptly delivered thereafter, it being understood that that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission. The words "execution," "signed," "signature," and words of like import in the Agreement, or any notice, certificate or other instrument delivered in connection herewith shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.14. <u>WAIVER OF JURY TRIAL</u>. EACH FIRST PRIORITY REPRESENTATIVE, ON BEHALF OF ITSELF AND THE OTHER FIRST PRIORITY SECURED PARTIES REPRESENTED BY IT, EACH SECOND PRIORITY REPRESENTATIVE, ON BEHALF OF ITSELF AND THE OTHER SECOND PRIORITY SECURED PARTIES REPRESENTED BY IT, THE LOAN PARTIES, AND EACH OTHER PARTY HERETO, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE,**

**Debtors' Exhibit No. 13**
**Page 40 of 56**

**THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.14</u>.**

        9.15.   <u>Additional Loan Parties</u>. Parent and Borrower agree that, if any Person shall become a Loan Party after the date hereof, it will promptly cause such Person to become a party to this Agreement upon execution and delivery by such Person of a Loan Party Joinder Agreement in the form of <u>Exhibit C</u> hereto. Upon such execution and delivery, such Person will become a Loan Party hereunder with the same force and effect as if originally named as a Loan Party herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder. The rights and obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding the addition of any new Loan Party as a party to this Agreement.

        9.16.   <u>Amendment and Restatement</u>. From and after the date hereof, the Original Intercreditor Agreement shall be amended and restated in its entirety by this Agreement, and the Original Intercreditor Agreement shall thereafter be of no further force and effect. This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Original Intercreditor Agreement. On and after the date hereof, (i) all references to the Original Intercreditor Agreement (or to any amendment or any amendment and restatement thereof) in the Second Priority Documents shall be deemed to refer to the Original Intercreditor Agreement as amended and restated hereby (as it may be further amended, restated, amended and restated or otherwise modified) and (ii) all references to any section (or subsection) of the Original Intercreditor Agreement shall be amended to become, *mutatis mutandis*, references to the corresponding provisions of this Agreement.

[Remainder of page intentionally left blank]

41

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**JEFFERIES FINANCE LLC**,
as First Lien Collateral Agent

By: _____

Name:   Jason Kennedy
Title:   Managing Director

**JEFFERIES FINANCE LLC**,
as Second Lien Collateral Agent

By: _____

Name:   Jason Kennedy
Title:   Managing Director

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**PARENT**

FIRST BRANDS GROUP
INTERMEDIATE, LLC

By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**Borrower**

FIRST BRANDS GROUP, LLC


By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

## SUBSIDIARY GUARANTORS

AUTOLITE OPERATIONS LLC
CARTER FUEL SYSTEMS, LLC
STRONGARM, LLC
KTRI HOLDINGS, INC.
HEATHERTON HOLDINGS, LLC
CARTER FUEL EXPORT, INC.
PREMIER MARKETING GROUP, LLC
AVM EXPORT, INC.
TRICO PRODUCTS CORPORATION
KTRI OFFSHORE HOLDINGS, LLC
TRICO HOLDING CORPORATION
TRICO TECHNOLOGIES CORPORATION
ASC INDUSTRIES, INC.
SPECIALTY PUMPS GROUP, INC.
AIRTEX INDUSTRIES, LLC
AIRTEX PRODUCTS, LP
CHAMPION LABORATORIES, INC.
FUEL FILTER TECHNOLOGIES, INC.
UCI ACQUISITION HOLDINGS (NO. 4) LLC
UCI INTERNATIONAL HOLDINGS, INC.
UCI INTERNATIONAL HOLDINGS PARENT, INC.
UCI INTERNATIONAL, LLC
UCI PENNSYLVANIA, INC.
UCI-AIRTEX HOLDINGS, INC.
UNITED COMPONENTS, LLC
UNIVERSAL AUTO FILTER LLC
BPI ACQUISITION COMPANY, INC.
BPI HOLDINGS INTERNATIONAL, INC.
BRAKE PARTS HOLDINGS, INC.
BRAKE PARTS INC LLC
BRAKE PARTS INC INDIA LLC
BPI EC, LLC
BRAKE PARTS INC CHINA LLC
APC Parent, Inc.
APC Intermediate Holdings, Inc.
CWD Intermediate Holdings, Inc.
CWD Holding Corp.
CWD Intermediate Holding Corp.
CWD, LLC
Qualis Enterprises, Inc.
Qualis Automotive, L.L.C.

By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**<u>SUBSIDIARY GUARANTORS</u>**

FRAM GROUP IP LLC
FRAM GROUP OPERATIONS LLC
FRAMAUTO HOLDINGS LLC


By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary


[Signature Page to First Lien-Second Lien Intercreditor Agreement]

<div align="right">

**Exhibit A to the**
**Term Intercreditor Agreement**

</div>

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "<u>Intercreditor Agreement</u>"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("<u>Parent</u>"), First Brands Group, LLC, a Delaware limited liability company (the "<u>Borrower</u>") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

As a condition to the ability of the Borrower to incur [Additional First Priority Debt] [Additional Second Priority Debt] after the date of the Intercreditor Agreement and to secure such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] with a lien on the Common Collateral and to have such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] guaranteed by the Loan Parties, in each case under and pursuant to the applicable [First Priority Documents] [Second Priority Documents], each of the [Additional First Priority Representative] [Additional Second Priority Representative] in respect of such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] is required to become an [Additional First Priority Representative] [Additional Second Priority Representative], under, and the related [First Priority Secured Parties] [Second Priority Secured Parties] in respect thereof are required to become subject to and bound by, the Intercreditor Agreement. Section 9.4 of the Intercreditor Agreement provides that such [Additional First Priority Representative] [Additional Second Priority Representative] may become an [Additional First Priority Representative] [Additional Second Priority Representative] under, and the related [First Priority Secured Parties] [Second Priority Secured Parties] may become subject to and bound by, the Intercreditor Agreement pursuant to the execution and delivery by the [Additional First Priority Representative] [Additional Second Priority Representative] of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 9.4 of the Intercreditor Agreement. The undersigned [Additional First Priority Representative] [Additional Second Priority Representative] (the "<u>New Representative</u>") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

Accordingly, the New Representative agrees as follows:

In accordance with Section 9.4 of the Intercreditor Agreement, the New Representative by its signatures below become a [First Priority Representative] [Second Priority Representative] under, and the related [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by it become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Representative had originally

<div align="center">

Exhibit A – Page 1

</div>

been named therein as a [First Priority Representative] [Second Priority Representative] and each of the New Representative, on behalf of itself and each other [Additional First Priority Secured Party] [Additional Second Priority Secured Party] represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement applicable to it as a [First Priority Representative] [Second Priority Representative] and to the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by it as [First Priority Secured Parties] [Second Priority Secured Parties]. Each reference to a ["First Priority Representative"] ["Second Priority Representative"] in the Intercreditor Agreement shall be deemed to include the New Representative and each reference to ["First Priority Secured Parties"] ["Second Priority Secured Parties"] shall include the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by such New Representative. The Intercreditor Agreement is hereby incorporated herein by reference.

Each of the New Representative represents and warrants to the other First Priority Representatives and Second Priority Representatives and the other Secured Parties that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [First Priority Documents] [Second Priority Documents] relating to such [Additional First Priority Debt] [Additional Second Priority Debt] provides that, upon the New Representative's entry into this Agreement, the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] in respect of such [Additional First Priority Debt] [Additional Second Priority Debt] will be subject to and bound by the provisions of the Intercreditor Agreement as [First Priority Secured Parties] [Second Priority Secured Parties].

This Joinder Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

**THIS JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Any provision of this Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Exhibit A – Page 2

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

[Remainder of this page intentionally left blank]

Exhibit A – Page 3

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

<div style="margin-left:40%">

[NAME OF NEW REPRESENTATIVE],
as [  ] for the holders of [                    ]


By: _____
    Name:
    Title:


Address for notices:


_____
_____
attention of: _____
Telecopy: _____


Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE FIRST
PRIORITY REPRESENTATIVE],
as [Insert title of Representative]


By: _____
    Name:
    Title:


Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE SECOND
PRIORITY REPRESENTATIVE],
as [Insert title of Representative]


By: _____
    Name:
    Title:

</div>

<div style="text-align:center">

Exhibit A – Page 4

</div>

<div align="right">

**Exhibit B to the**
**Term Intercreditor Agreement**

</div>

[FORM OF] DEBT DESIGNATION NO. [ ] (this "Designation") dated as of [ ], 20[ ] with respect to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "Intercreditor Agreement"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("Parent"), First Brands Group, LLC, a Delaware limited liability company (the "Borrower") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Designation is being executed and delivered in order to designate additional secured Obligations of the Borrower and the Loan Parties as [Additional First Priority Debt][Additional Second Priority Debt] entitled to the benefit of and subject to the terms of the Intercreditor Agreement.

The undersigned, the duly appointed [*specify title of Responsible Officer*] of the Borrower hereby certifies on behalf of the Borrower that:

1. Borrower intends to incur Indebtedness (the "Designated Obligations") in the initial aggregate principal amount of [   ] pursuant to the following agreement: [*describe credit/loan agreement indenture or other agreement giving rise to Additional First Priority Debt or Additional Second Priority Debt, as the case may be*] (the "Designated Agreement") which will be [Additional First Priority Debt][Additional Second Priority Debt].

2. The incurrence of the Designated Obligations is permitted to be incurred, secured and guaranteed by each extant First Priority Document and Second Priority Document.

3. The name and address of the Additional Representative for such Designated Obligations is:

   [Insert name and all capacities; Address]
   Telephone: _____
   Fax: _____
   Email _____

4. Attached hereto are true and complete copies of each of the [First/Second] Priority Agreement relating to such Additional [First/Second] Priority Debt.

[Remainder of this page intentionally left blank]

<div align="center">

Exhibit B – Page 1

</div>

IN WITNESS WHEREOF, the Borrower has caused this Designation to be duly executed by the undersigned Responsible Officer as of the day and year first above written.

FIRST BRANDS GROUP, LLC

By: _____
     Name:
     Title:

Exhibit B – Page 2

<div align="right">

**Exhibit C to the**
**Term Intercreditor Agreement**

</div>

[FORM OF] LOAN PARTY JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] (the "<u>Loan Party Joinder Agreement</u>") to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "<u>Intercreditor Agreement</u>"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("<u>Parent</u>"), First Brands Group, LLC, a Delaware limited liability company (the "<u>Borrower</u>") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "<u>New Loan Party</u>") wishes to acknowledge and agree to the Intercreditor Agreement and become a party thereto and to acquire and undertake the rights and obligations of a Loan Party thereunder.

Accordingly, the New Loan Party agrees as follows for the benefit of the First Priority Representatives, Second Priority Representatives and the other Secured Parties:

The New Loan Party (a) acknowledges and agrees to, and becomes a party to the Intercreditor Agreement as a Loan Party, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of a Loan Party under the Intercreditor Agreement. This Loan Party Joinder Agreement supplements the Intercreditor Agreement and is being executed and delivered by the New Loan Party pursuant to Section 9.15 of the Intercreditor Agreement.

The New Loan Party represents and warrants to each First Priority Representative, each Second Priority Representative and to the other Secured Parties that (a) it has full power and authority to enter into this Loan Party Joinder Agreement, in its capacity as a Loan Party and (b) this Loan Party Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Loan Party Joinder Agreement.

This Loan Party Joinder Agreement may be executed by one or more of the parties to this Loan Party Joinder Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Loan Party Joinder Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

<div align="center">

Exhibit C – Page 1

</div>

THIS LOAN PARTY JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS LOAN PARTY JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Any provision of this Loan Party Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.

[Remainder of page intentionally left blank]

Exhibit C – Page 2

IN WITNESS WHEREOF, the New Loan Party has duly executed this Loan Party Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[_____]


By: _____
    Name:
    Title:

Exhibit C – Page 3

**Exhibit D to the**
**Term Intercreditor Agreement**

### ADDRESSES FOR NOTICES

Address for Notices of all Loan Parties:

FIRST BRANDS GROUP, LLC

████████████████████████████
███████████████████

Attention: Patrick James, Chairman

███████████████████████████
████████████████████████████████████

With a copy (which shall not constitute notice) to:

Paul Hastings LLP

██████████████████
████████████████████

Attention: Michael Baker

███████████████████████

Address for Notices of Initial First Priority Representative:

Jefferies Finance LLC

█████████████████
████████████████████

Attention: Account Officer – Trico Group

█████████████████████████
██████████████████████████████████

Address for Notices of Initial Second Priority Representative:

Jefferies Finance LLC

█████████████████
████████████████████

Attention: Account Officer – Trico Group

████████████████████████
██████████████████████████████████

Exhibit D – Page 1