**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**EMERGENCY MOTION OF THE RAISTONE PARTIES
FOR THE APPOINTMENT OF AN EXAMINER
PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE**

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on October 29, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Raistone Capital LLC ("Raistone Capital") and Raistone Purchasing LLC – Series XXXII ("Raistone XXXII" and when taken together with Raistone Capital "Raistone" or the "Raistone Parties") as and for this motion (the "Motion") pursuant to section 1104(c) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order substantially in the form of the order attached hereto as **Exhibit 1** (the "Proposed Order") for the appointment of an independent examiner in the Chapter 11 Cases of the above-captioned debtors and debtors in possession (the "Debtors") respectfully states as follows:

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these Chapter 11 Cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**PRELIMINARY STATEMENT**[2]

1.      According to the sworn declarations of the Debtors' representatives and the representations of counsel, as much as $2.3 billion attributable to Third-Party Factoring arrangements has simply vanished.  Notwithstanding the enormity of this potential defalcation, the Debtors euphemistically characterize the missing amounts as the result of mere "Third-Party Factoring irregularities."  No one has apparently been held accountable to date.  The Debtors' Chief Executive Officer and Chief Financial Officer remain in place in both their executive and board positions -- albeit now supported by two "independent" directors who were engaged only shortly before the Petition Date.  While those independent directors constitute a "Special Committee" authorized to investigate what happened to the accounts receivable and the missing funds, they will also be responsible for all potential material transactions in these Chapter 11 Cases. Not only have the Debtors appointed the Special Committee members responsible for investigating the Debtors own wrongdoing, but, based on the Debtors' representations, the Special Committee has not even retained separate, independent counsel to assist them in the proposed Investigation. Simply put, it is highly questionable whether this purportedly independent Special Committee will conduct the thorough and robust investigation called for in light of the deeply concerning circumstances.

2.      The Debtors bore responsibility pre-petition for collecting the accounts receivables purchased by Raistone (and others).  Yet, Debtors' counsel would only state in passing at the First Day Hearing that "[t]he collection of approximately [$]1.9 billion of those factored receivables had come into the company that had not been turned over to the factors." *See* **Exhibit 2** (Transcript

---

[2] Capitalized term(s) not otherwise defined in this section shall have the same meaning(s) as set forth elsewhere in this motion.

of First-Day Motions Hearing, October 1, 2025 ("<u>First Day Hr'g Tr.</u>")), at 24:11-13.  When asked subsequent to the hearing for a call to address the question as to "whether FBG actually received $1.9 billion (no matter what happened to it)," Debtors' counsel replied, "We don't know."  *See* **Exhibit 3**.  The Debtors' presentation and the supporting remarks of counsel to the first lien lenders at the first day hearing made clear that it is their collective priority to focus on the reorganization or sale of the existing business—not figuring out what happened to billions of dollars that belong to Raistone and other third parties.

3.      Under these circumstances—with up to $2.3 billion in assets is unaccounted for—the appointment of an examiner to conduct an independent investigation is both mandatory and is critical to maximizing recovery for creditors.  Indeed, section 1104(c) of the Bankruptcy Code provides for the investigation of a debtor including with respect to "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor[.]"  11 U.S.C. § 1104(c).  The Debtors have already at a minimum admitted to accounting irregularities in this instance, but an investigation by the Debtors into their own potential wrongdoing is woefully insufficient given the magnitude of potential misconduct at issue.

4.      The facts here unequivocally warrant the appointment of an examiner under both section 1104(c)(1) and (2).  As a threshold matter, with respect to section 1104(c)(2), the appointment of an examiner is *mandatory* because a party in interest (here, a creditor) has requested one and the Debtors' total fixed, liquidated, and unsecured debt far exceeds the $5 million statutory threshold (at least $800 million in unsecured debt).  But even if the appointment of an examiner were not required (it is), such an appointment is in the best interests of creditors under section 1104(c)(1) because it allows for a thorough and independent assessment into how more than $2 billion of collections disappeared.  Moreover, based on the Debtors' admissions

regarding accounting "irregularities", the Debtors cannot credibly dispute the need for an examiner and a truly <u>independent</u> investigation.

5.      For the foregoing reasons and those set forth below, Raistone respectfully requests this Court order the appointment of an examiner to investigate the issues, facts and circumstances surrounding the factored accounts receivable.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and 11 U.S.C. §§ 1104(c) and 1106.

7.      The statutory bases for the relief requested herein are 11 U.S.C. §§ 1104(c) and 1106.

## RELIEF REQUESTED

8.      Raistone seeks entry of an order, substantially in the form of the Proposed Order, (i) appointing an examiner in these Chapter 11 Cases pursuant to sections 1104(c) and 1106 of the Bankruptcy Code and (ii) establishing the appropriate scope and timing of the examiner's investigation.

## RELEVANT BACKGROUND[3]

### A.  The Chapter 11 Cases.

9.      On September 24 and 28, 2025 (as applicable, the "<u>Petition Date</u>"), each of the Debtors commenced a case (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of

---

[3] Capitalized terms not otherwise defined herein shall have the same meaning(s) as in the First Day Declaration (defined below), Motion or Receivables Purchase Agreement, as applicable.

the United States Code (the "<u>Bankruptcy Code</u>") in this Court.  The Debtors continue to operate

as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

**B.   The Debtors Sell, Assign and Convey Accounts Receivable to Raistone and Serve as Collection Agent and Servicer for Raistone.**

10.     On May 14, 2024, Raistone XXXII, on the one hand, and several of the Debtors

(the "<u>Debtor Sellers</u>") and certain non-debtor affiliates of the Debtors, on the other hand, entered

into the Sixth Amended and Restated Receivables Purchase Agreement (as amended, modified or

supplemented from time to time, the "<u>Receivables Purchase Agreement</u>").   (A copy of the

Receivables Purchase Agreement is attached hereto as **<u>Exhibit 4</u>**.)  Pursuant to the terms of the

Receivables Purchase Agreement, Raistone XXXII purchased accounts receivable from the Debtor

Sellers (the "<u>Purchased Receivables</u>") in connection with goods and services that the Debtor

Sellers provided to non-debtor third parties (each third party, an "<u>Account Debtor</u>").  Pursuant to

Section 1(e) of the Receivables Purchase Agreement, the transactions covered in the agreement

constitute "true sales" of the Purchased Receivables.  Specifically, Section 1(e) of the Receivables

Purchase Agreement states that

> Purchaser and Seller have structured the transactions contemplated
> by this Agreement as a true sale, and Purchaser and Seller each agree
> to treat each such transactions as a "*true sale*" for all purposes under
> applicable law and accounting principles, including, without
> limitation, in their respective books, records, computer files, tax
> returns (federal state and local), and regulatory and governmental
> filings (and shall reflect such sale in their respective financial
> statements). Seller will advise all persons inquiring about the
> ownership of the Receivables that all Purchased Receivables have
> been sold to Purchaser. Purchaser shall have free and unrestricted
> use of all Purchased Receivables, and the Related Security and
> Collections with respect thereto, and nothing in this Agreement shall
> preclude Purchaser from selling, assigning, transferring or otherwise
> conveying any or all of the Purchased Receivables, and the Related
> Security and Collections with respect thereto, assigning
> participation interests in respect of any or all of the Purchased
> Receivables and the Related Security and Collections with respect

> thereto, or otherwise pledging the Purchased Receivables and the Related Security and Collections with respect thereto. On and after the applicable Purchase Date, Purchaser will be the sole owner of the Purchased Receivables, and the Related Security and Collections with respect thereto, for all legal purposes.

Receivables Purchase Agreement § 1(e) (emphasis in original).  As a result, the Purchased

Receivables are the property of Raistone and not the estates.[4]

11.     Under Section 4(a) of the Receivables Purchase Agreement, the Debtor Sellers had

been appointed as servicer and agent for the administration and servicing of all Purchased

Receivables.  *See* Receivables Purchase Agreement § 4(a).  In this capacity, each of the Debtor

Sellers was responsible for commercial collection activities and to arrange for the timely payment

of amounts due and owing under the Purchased Receivables by the applicable Account Debtor.

*Id.*  The Receivables Purchase Agreement granted Raistone the right to terminate the Debtor

Sellers' role as servicer at any time by written notice.  *Id.*

12.     The Receivables Purchase Agreement requires that Collections of the proceeds of

Purchased Receivables be deposited into a designated Collection Account controlled by Raistone

or, if Raistone consents, the Debtor Sellers.  *Id.* § 4(c).  If the Debtor Sellers receive any

Collections, they must promptly remit them to Raistone's designated Collection Account.  *Id.*

Until remitted, the Receivables Purchase Agreement required the Debtor Sellers to hold such funds

in trust, segregated from the Debtor Sellers' other property, and safeguarded as Raistone's

exclusive property.  *Id.*

---

[4] *See, e.g., Dryden Advisory Grp., LLC v. Beneficial Mut. Sav. Bank (In re Dryden Advisory Grp., LLC)*, 534 B.R. 612, 626-27 (Bankr. M.D. Pa. 2015) (accounts receivable sold pre-petition do not constitute estate property); *Drs. Hosp. of Hyde Park, Inc. v. LaSalle Bank Nat'l Ass'n (In re Drs. Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 707-08 (Bankr. N.D. Ill. 2013) (describing "true sale" determination as a question of state law and observing that if transfer is a true sale, the assets should not be considered assets of the bankruptcy estate).

13.     On September 25, 2025, pursuant to and as permitted by Section 4(a) of the Receivables Purchase Agreement, Raistone notified the Debtor Sellers by letter (the "Replacement Notice") that, among other things, the Debtor Sellers' role as servicer had terminated effective immediately, and Raistone had been appointed as the Servicer under the Receivables Purchase Agreement.  Further, as permitted by Sections 3(c) and 4(c) of the Receivables Purchase Agreement, in the Replacement Notice, Raistone directed the Debtor Sellers to notify all Account Debtors that future payments with respect to the Purchased Receivables must be made to the account listed on Annex I of the Replacement Notice, a new Collection Account designated by Raistone.

14.     On September 29, 2025, the Receivables Purchase Agreement terminated as a result of the commencement of the Chapter 11 Cases.  *See* Receivables Purchase Agreement § 10(c).

15.     As of the Petition Date, Raistone is entitled to no less than $172 million in connection with Purchased Receivables to which it acquired title under the Receivables Purchase Agreement.

### C. The Debtors Pause their Global Refinancing Due in Part to the Need for a Quality of Earnings Report and Admit to "Third-Party Factoring Irregularities".

16.     In the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [Docket No. 22] (the "First Day Declaration"), the Debtors state that they suspended their global refinancing process in July 2025 because "potential lenders would require further diligence, including a quality of earnings report."  *See* First Day Declaration ¶ 13.

17.     Further, the Debtors' prepetition liquidity crisis deepened when the Company Advisors discovered what they characterized as "Third-Party Factoring Irregularities." *See* First Day Declaration ¶ 79.  More specifically:

> Following diligence performed by the Company's Advisors, the Debtors believe that ***an unpaid prepetition balance of approximately $2.3 billion has accrued with respect to the Third-Party Factoring arrangements as of the Petition Date***.

First Day Declaration ¶ 72 (emphasis added).  At the First Day Hearing, Debtors' counsel reiterated the scope of the crisis:

> [Mr. Barr] As I mentioned, in September, the special committee was appointed to do, among other things, to do [sic] an investigation into any potential causes of actions or claims that the Company may have.  During this process among other things, it became clear that the company and the special committee needed to look into certain issues surrounding third party factoring, factoring practices that led to approximately $2.3 billion of factoring.  ***The collection of approximately [$]1.9 billion of those factored receivables had come into the company that had not turned over to the factors.***

*See* First Day Hr'g. Tr. at 24:3-13 (emphasis added).  After acknowledging that they had collected and not remitted $1.9 billion to the proper owners of these funds, the Debtors later admitted that they do not have any of such amounts in their possession.  Specifically, Debtors' counsel stated:

> [Mr. Singh] And Mr. Grillo wanted to know, well, where is the $2 billion of factoring cash, et cetera?  ***It's not here.  We don't have it.  Zero dollars***.  There's $12 million in the bank account today.  That's it.  There is nothing else.

First Day Hr'g. Tr. at 100:20-23 (emphasis added).[5]

---

[5] On October 2, 2025, Raistone's counsel requested further clarifications on the comments made at the First Day Hearing and asked in the email, attached as **Exhibit 3**, two follow up questions:
> "First, do we know whether FBG actually received $1.9 billion (no matter what happened to it)?  Second, would you tell us how much is in the segregated accounts in respect of the factored receivables as of today?"
In response the Debtors' counsel responded by stating only as follows:
> "# 1 — We don't know
> # 2 - $0"
*See* **Exhibit 3**.

### D. The Debtors Appoint a Purportedly Independent Special Committee to Address Prepetition Crises and Conduct an Investigation.

18.     To address all of the crises the Debtors faced before the Petition Date, a Special Committee of independent managers was appointed in September 2025.  *See* First Day Declaration ¶ 32.  That Special Committee purportedly has a whole series of responsibilities in these Chapter 11 Cases including, among other things, to:

> (i)     consider and evaluate all potential transactions, including any proposal made in respect thereof;
>
> (ii)    approve and authorize (or reject) the Company's entry into and consummation of any agreement, contract, or other arrangement with respect to a potential transaction and cause and direct the Company's subsidiaries to approve, authorize, execute, and consummate a Potential Transaction;
>
> (iii)   oversee the implementation and execution of a potential transaction; and
>
> (iv)    conduct and oversee an investigation into potential claims and causes of action that may exist in favor of one or more of the Debtors, including with respect to current and former members of the governing bodies of the Debtors as well as current and former members of the governing bodies of the Debtors as well as current and former affiliates, equity holders, officers, and other insiders of the Debtors (the "Investigation").

*Id.*  The Debtors also disclosed that the Special Committee would not have separate advisors from the Debtors and stated that "[t]he Special Committee, working with Weil, as counsel, and A&M, launched the independent Investigation of potential claims held by the Company, among other things, before the Petition Date, and the Investigation is ongoing."  *Id.*  The Debtors have offered no proposed timeline within which they intend to complete the Investigation.  Nor have they offered to file or share any report identifying and describing the methodology employed, the specific actions undertaken, or the results of the Investigation.  Finally, they have provided no assurances that the members of the Special Committee have sufficient time to undertake the Investigation as well as their other concurrent responsibilities.

19. The Investigation will purportedly proceed while the Debtors' prepetition management apparently remains in place, s*ee id.* ¶ 33, and the Debtors' management has already denied all allegations.  In fact, as counsel for the management team noted at the First Day Hearing, they will present a counter narrative to the one raised by the Debtors and other parties in interest. Specifically, management's separate counsel stated at the First Day Hearing that "[w]e've also heard, and I believe we'll continue to hear, allegations this morning about the company and its management.  And on behalf of our clients, we want to be on the record categorically refuting those allegations."  *See* First Day Hr'g. Tr. at 55:20-4.

## **ARGUMENT**

20. Section 1104(c) of the Bankruptcy Code provides for the appointment of an independent examiner as follows:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –
>
> 1. such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> 2. the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).  For the reasons set forth below, the appointment of an examiner is required and is in the best interest of the Debtors' creditors and other stakeholders.

I.   **The Debtors' Unsecured Debt Exceeds the Statutory Threshold Requiring the Appointment of an Examiner under Section 1104(c)(2) to Investigate the $2 Billion of "Irregularities."**

21.     The appointment of an examiner under section 1104(c)(2) to conduct an investigation of the debtor—including with respect to allegations of, among other things, fraud, dishonesty, incompetence, mismanagement or irregularity—"is mandatory" where it is sought by a party in interest for a debtor with the threshold amount of qualifying debt.  *See In re Schepps Food Stores, Inc.*, 148 B.R. 27, 31 (S.D. Tex. 1992) (holding that "[t]he section on appointment of an examiner at the request of a party in interest is mandatory").  As the Third Circuit recently highlighted in *In re FTX Trading Ltd.*: "The issue before us is one of statutory interpretation: whether the plain text of Section 1104(c)(2) requires a bankruptcy court to appoint an examiner, if requested by the U.S. Trustee or a party in interest, and if 'the debtor's total fixed, liquidated, unsecured debt' exceeds $5 million. We hold that it does."  91 F.4th 148, 153 (3d Cir. 2024) (citation omitted); *see also Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*., 898 F.2d 498, 500-01 (6th Cir. 1990); *In re Erickson Retirement Cmtys., LLC*, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 83-4 (N.D. Ga. 2008); *In re Loral Space & Commc'ns, Ltd.*, No. 04 C.V. 8645 (RPP), 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004); *In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 32150478, at *4 (Bankr. S.D.N.Y. Feb. 13, 2002).

22.     Here, there is no dispute that the Debtors' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.  Indeed, the First Day Declaration admits, for example, that the Debtors have "$800 million in unsecured supply chain financing liabilities."  First Day Declaration ¶ 34; *see also Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition*

*Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 49] ¶ 23.

23.     Similarly, there is no question that Raistone, whose claims related to its facility are listed multiple times on the *Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* filed with the petitions, is a party in interest with standing to bring this motion. *See Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Docket No. 1], at 33-36.   In addition, Raistone also has potential tort claims against the Debtors because the unaccounted for $2.3 billion likely included payments made to the Debtors on account of Purchased Receivables, which are Raistone's property.[6]   Under section 1109(b) of the Bankruptcy Code, a party in interest, includes, but is not limited to "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee."   *See* 11 U.S.C. § 1109(b).   Accordingly, the appointment of an examiner is **required** under section 1104(c)(2) of the Bankruptcy Code in these Chapter 11 Cases.

## II.     The Best Interests of Creditors Warrant the Appointment of an Examiner under Section 1104(c)(1) of the Bankruptcy Code.

24.     Even if it were not mandatory to appoint an examiner under section 1104(c)(2) of the Bankruptcy Code, which it is, this Court should appoint an examiner because it is in the best interest of creditors under section 1104(c)(1).   Appointment of an examiner has been found to be

---

[6] Under Section 5 of the Receivables Purchase Agreement, Raistone has certain repurchase rights and indemnity rights against the Debtors, which also gives raise to claims against the Debtors. In addition, Section 8 of the Receivables Purchase Agreement provides that the Debtors will reimburse Raistone for, among other things, fees and costs in connection with enforcement of the Receivables Purchase Agreement by the Debtors.

in the best interests of the estates where "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations." *See In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010); *In re Schepps Food Stores, Inc.*, 160 B.R. at 799 (noting that a party in interest can seek appointment of an examiner "in the event of director malfeasance").

25.     In this instance, the Debtors have already admitted that an investigation into potential causes of action that the Debtors may have against insiders and accounting irregularities is warranted.  *See* First Day Declaration ¶¶ 32, 72.  However, the First Day Declaration attempts to lessen the gravity of the potential malfeasance that may have occurred as well as the inability to account for $2.3 billion.  As noted above, the Third-Party Factoring arrangements are typically structured to be "true sales," so the factored accounts receivable and the amounts collected by the Debtors on account of such receivables are not property of the estates.  The Debtors at best have had significant internal control issues and, at worst, have allowed or caused a misappropriation of billions of dollars of non-estate property.

26.     The existence of a nominally independent investigation in the appointment of the Special Committee is of no comfort.  In *FTX Trading*, the Third Circuit Court of Appeals identified the benefits of the appointment of an examiner over a purportedly independent person acting on behalf of the Debtors: unlike the case where a debtor's representatives conduct an investigation, an examiner must be disinterested and must make his or her findings public, "an obligation neither a creditor committee nor a debtor in possession shares."  *See In re FTX Trading Ltd.*, 91 F.4th at 156-57.

27.     Here, the Debtors' management remains in place, has denied wrongdoing, and shares the same advisors with the Special Committee.  No matter how impartial any members of

the Special Committee may appear, the Debtors should not be permitted to appoint the very parties that will investigate their own potential misconduct.  "No matter how thoroughly or fairly [they] conducted the investigation, the question will always linger whether [they] held back, or failed to bite the hand that feeds [them] quite as hard as the circumstances warranted."  *In re Granite Partners, L.P.*, 219 B.R. 22, 38 (Bankr. S.D.N.Y. 1998); *see also, Midwest Generation EME, LLC v. Continuum Chem. Corp.*, 768 F. Supp. 2d 939, 943 (N.D. Ill. 2010) ("Under a realistic appraisal of psychological tendencies and human weakness, . . . where [a] relationship involves a system of referrals, bias is inherent and inescapable, for getting and keeping customers, is, of course, the life blood of any business." (internal quotation marks and citations omitted)).  An examiner that can retain his or her own professionals, conversely, is statutorily required to conduct an investigation and would not be burdened by any questions about allegiance to any party.  The involvement of the United States Trustee in the selection of an examiner ensures that interests beyond those of the Debtors are being addressed and protected.  *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) ("If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary.").

28.      Raistone submits that the appointment of an examiner is not only in the best interest of creditors, but will instill confidence in the parties in interests, such as Raistone, that an impartial investigation has been conducted.  Ultimately, the investigation will not only result in the potential recovery of assets, but will promote transparency that will ultimately reduce conflict and should maximize recovery for creditors.

### III.     The Proposed Scope of the Examiner's Investigation is Appropriate.

29.     Under section 1106(b) of the Bankruptcy Code, a court-appointed examiner performs the duties set forth in sections 1106(a)(3) and 1106(a)(4), which provide that an examiner shall:

> 3.   except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>
> 4.   as soon as practicable—
>
> > A.  file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
> >
> > B.  transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates[.]

11 U.S.C. § 1106(a)(3)-(4).

30.     Raistone proposes the following scope for the examiner's investigation:

> a.   conduct and oversee an investigation into potential claims and causes of action that may exist in favor of one or more of the Debtors, including with respect to current and former members of the governing bodies of the Debtors as well as current and former affiliates, equity holders, officers, and other insiders of the Debtors;
>
> b.   conduct and oversee an investigation into matters relating to the Debtors' prepetition factoring and other off-balance sheet financing processes;
>
> c.   conduct and oversee an investigation into the $2.3 billion that has accrued with respect to Third-Party Factoring arrangements as of the Petition Date and to trace and provide an accounting of the disposition of such amounts and potential recovery; and
>
> d.   conduct and oversee an accounting of Third-Party Factoring arrangements as of the Petition Date to determine the factor that owns such account factored receivables

that (i) may have been paid to the Debtors prior to the Petition Date, but are unaccounted for and (ii) are received by the Debtors after the Petition Date. The broad mandate of section 1106 plainly includes the scope of the investigation. *See* 11 U.S.C. § 1106 (a)(3) (an examiner shall "investigate . . . any other matter relevant to the case or to the formulation of a plan"); *see also Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003) ("An examiner's duties include investigation of the debtor, the debtor's business, and 'any other matter relevant to the case or to the formation of a plan.'") (citation omitted); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993) ("The purpose of an examiner's investigation in bankruptcy is to discover whatever assets may exist for the estate of the bankrupt, just as one purpose for the appointment of a trustee is so that a trustee may use statutory powers conferred by the Bankruptcy Code to collect all property belonging to the debtor for the benefit of the debtor's creditors.").

31.     Accordingly, for the reasons set forth herein, Raistone submits that the Court should appoint an Examiner.

## RESERVATION OF RIGHTS

32.     Raistone expressly reserves all rights with respect to the characterization, priority, validity, extent, and enforceability of any claims, rights, or interests it may have, and to supplement or amend this reservation of rights as necessary.  Nothing herein shall be deemed a waiver of any such rights or remedies.  Raistone reserves all rights to supplement or add to the legal and factual arguments raised in this Motion on any bases whatsoever at a future date, to seek discovery, and to raise additional statements and arguments at the hearing on this Motion.

## EMERGENCY RELIEF REQUESTED

33.     Raistone respectfully requests emergency consideration of this Motion in accordance with Local Bankruptcy Rule 9013-1(i), so that this Motion can be heard at the Debtors' "second day" hearing.  The Debtors have not provided any timeline for the Investigation or

indicated what, if any, efforts will be made to recover the $2.3 billion for which they are unable to account.  This may result in multiple creditor groups taking independent action or pursuing discovery.  Appointing an examiner at the earliest instance possible will provide comfort to creditors, while at the same time reduce administrative costs to these estates which will benefit all parties in interest.

## <u>NOTICE</u>

34.     Notice of this Motion will be served on: (a) the Debtors; (b) counsel to the Debtors; (c) the Office of the United States Trustee for the Southern District of Texas; (d) the parties on the Master Service List; and (e) any party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Bankruptcy Rule 9013-1(d).  Raistone submits that no other or further notice is required to be given.

*[The Remainder of this Page is Intentionally Blank.]*

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Raistone respectfully requests that the Court enter an order, substantially in the form of the Proposed Order: (i) appointing an examiner in these Chapter 11 Cases; (ii) authorizing the examiner to conduct an investigation on the terms and conditions set by the Court;  and (iii) granting such other relief as the Court deems just and proper.

Dated: October 8, 2025                          **ORRICK, HERRINGTON & SUTCLIFFE LLP**

By: */s/ Jacob R. Herz*
     Richard Jacobsen (admitted *pro hac vice*)
     Laura Metzger (admitted *pro hac vice*)
     Emanuel Grillo (admitted *pro hac vice*)
     Nicholas Poli (admitted *pro hac vice*)
     Ariel Roytenberg (admitted *pro hac vice*)
     Jacob R. Herz (SDTX Federal Bar No. 3759822)
     51 West 52nd Street
     New York, NY 10019-6142
     Telephone: (212) 506-5000
     Facsimile: (212) 506-5151
     Email: rjacobsen@orrick.com
          lmetzger@orrick.com
          egrillo@orrick.com
          npoli@orrick.com
          aroytenberg@orrick.com
          jherz@orrick.com

     -and-

     Nicholas Sabatino (admitted *pro hac vice*)
     400 Capitol Mall, Suite 3000
     Sacramento, California 95814-4497
     Telephone: (916) 329-7962
     Facsimile: (916) 329-4900
     Email: nsabatino@orrick.com

     ***Counsel to the Raistone Parties***

## <u>CERTIFICATE OF ACCURACY</u>

This will certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Bankruptcy Rule 9013-1(i).

*/s/ Jacob R. Herz*
Jacob R. Herz

## <u>CERTIFICATE OF SERVICE BY ECF</u>

I hereby certify that on October 8, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jacob R. Herz*
Jacob R. Herz
