# EXHIBIT 4

## SIXTH AMENDED AND RESTATED RECEIVABLES PURCHASE AGREEMENT

**SIXTH AMENDED AND RESTATED RECEIVABLES PURCHASE AGREEMENT** (as it may be amended, modified or supplemented from time to time, this "Agreement") is made as of May 14 2024 between First Brands Group, LLC, formerly known as Trico Group LLC, ("Parent"), Trico Products Corporation ("Trico Products"), Strongarm, LLC ("Strongarm"), Carter Fuel Systems, LLC ("Carter"), ASC Industries, Inc. ("ASC Industries"), FRAM Group Operations LLC ("FRAM Group"), Brake Parts Inc LLC ("Brake Parts"), Champion Laboratories, Inc ("Champion Labs")., CWD, LLC ("CWD"), Qualis Enterprises, Inc. ("QEI"), Qualis Automotive, L.L.C. ("QALLC"), FRAM Group Holdings Mexico S.A. de C.V. ("FRAM Holdings"), FRAM Group Services Mexico S.A. de C.V. ("FRAM Group Services"), FRAM Group Operations Mexico City S.A. de C.V. ("FRAM Group Operations"), FRAM Group Operations Mexicali S.A. de C.V. ("FRAM Mexicali"), FRAM Filtration Operations Mexico S.A. de C.V. ("FRAM Filtration"), Autoelectricos de Mexico S.A. de C.V. ("Autoelectricos"), BPI Brake Manufacturing Juarez S.A. de C.V. ("BPI Brake"), BPI Distribution Mexico S.A. de C.V. ("BPI Distribution"), BPI Braking Systems Mexico S.A. de C.V. ("BPI Braking Systems"), Horizon Global Corporation ("Horizon Corp."), Horizon Global Company LLC ("Horizon Co.") , Horizon Global Americas Inc. ("Horizon Americas") , Horizon International Holdings LLC ("Horizon International"), Horizon Euro Finance LLC ("Horizon Euro"), and Hopkins Manufacturing Corporation ("Hopkins"), Walbro Midco LLC ("WMidco"), WEM US Co. ("Wem"), Walbro LLC ("Walbro"), and Carter Carburetor Holdings, LLC ("Carter CH") and Carter Carburetor, LLC ("Carter", along with Parent, Trico Products, Strongarm, Carter, ASC Industries,  FRAM Group, Brake Parts, Champion Labs, CWD, QEI, QALLC, FRAM Holdings, FRAM Group Services,  FRAM Group Operations, FRAM Mexicali, FRAM Filtration, Autoelectricos, BPI Brake, BPI Distribution, BPI Braking Systems, Horizon Corp., Horizon Co., Horizon Americas, Horizon International, Horizon Euro, Hopkins, WMidco, Wem, Walbro, and Carter CH, collectively "Seller" and individually as the context requires, each a "Seller") and Raistone Purchasing LLC-Series XXXII ( "Purchaser").

### RECITALS

WHEREAS, Parent, Trico Products Corporation, Strongman, Carter, ASC Industries, FRAM Group, Brake Parts Inc., Champion Labs, CWD, QEI, QALLC, FRAM Holdings, FRAM Group Services,  FRAM Group Operations, FRAM Mexicali, FRAM Filtration, Autoelectricos, BPI Brake, BPI Distribution, BPI Braking Systems, Horizon Corp., Horizon Co., Horizon Americas, Horizon International, Horizon Euro, Hopkins, WMidco, Wem, Walbro,,Carter CH and Carter and Purchaser are parties to a Fifth Amended and Restated Receivables Purchase Agreement dated as of February 7, 2024 (the "A&R RPA");

WHEREAS, Parent has requested that Purchaser amend and restate the A&R RPA in its entirety to substitute the name Brake Parts Inc. for the name Brake Parts Inc LLC;

WHEREAS, Brake Parts Inc., by an amendment to its certificate of incorporation, March 16, 2012, has changed its corporate name to Brake Parts Inc LLC;

WHEREAS, Brake Parts will continue to fully perform and abide by all terms and conditions specified in this Agreement under the name Brake Parts Inc. LLC, and all rights and obligations of Brake Parts and each Seller under the Agreement are unaffected by this change; and

WHEREAS, Seller desires to sell certain of its Receivables from time to time, and Purchaser may, in its sole discretion, purchase from Seller such Receivables on the terms set forth herein. Terms not otherwise defined herein shall have the meanings set forth on Exhibit A hereto.

### AMENDMENT AND RESTATEMENT

As of the date first written above, the A&R RPA shall be amended and restated in its entirety by this Agreement shall thereafter be of no further force and effect, except to evidence (i) the purchase of any Purchased Receivables thereunder, (ii) the incurrence of any obligations (contingent or otherwise) of Parent, Trico Products thereunder, Strongman, Carter, ASC Industries, FRAM Group, Brake Parts, Champion Labs, CWD, QEI, QALLC, FRAM Holdings, FRAM Group Services,  FRAM Group Operations, FRAM Mexicali, FRAM Filtration, Autoelectricos, BPI Brake, BPI Distribution and BPI Braking Systems, Horizon Corp., Horizon Co., Horizon Americas, Horizon International, Horizon Euro, Hopkins, WMidco, Wem, Walbro,,Carter CH and Carter (iii) the representations and warranties thereunder made by Parent and Trico Products, Strongman, Carter, ASC Industries, FRAM Group, Brake Parts, Champion Labs, CWD, QEI, QALLC, FRAM Holdings, FRAM Group Services,  FRAM Group Operations, FRAM Mexicali, FRAM Filtration, Autoelectricos, BPI Brake, BPI Distribution and BPI Braking Systems, Horizon Corp., Horizon Co., Horizon Americas, Horizon International, Horizon Euro, Hopkins, WMidco, Wem, Walbro,,Carter CH and Carter prior to the date hereof, (iv) any actions performed or omissions required to be performed by Parent and Trico Products, Strongman, Carter, ASC Industries, FRAM Group, Brake Parts, Champion Labs, CWD, QEI, QALLC, FRAM Holdings, FRAM Group Services,  FRAM Group Operations, FRAM Mexicali, FRAM Filtration, Autoelectricos, BPI Brake, BPI Distribution and BPI Braking Systems, Horizon Corp., Horizon Co., Horizon Americas, Horizon International, Horizon Euro, Hopkins, WMidco, Wem, Walbro,,Carter CH and Carter prior to the date hereof to comply with the covenants contained therein.  This amendment and restatement shall not serve as a cure of any breach of, or Event of Repurchase under, the A&R RPA or any other document or agreement related thereto.  This Agreement is not intended to (i) constitute a novation of the obligations or liabilities existing under the A&R RPA or (ii) impair any true sale (or back up security interest) of or in any Purchased Receivable purchased thereunder or Related Security.

### AGREEMENT

Accordingly, the parties hereto agree as follows:

1.    **SALE AND PURCHASE**

a.        From time to time during the period commencing on the date hereof and terminating on the Purchase Termination Date, Purchaser may receive from Seller a request to purchase from Seller certain Eligible Receivables set out in such request (each, a "**Request**"). The Request shall be submitted via the Platform or in such other manner as Purchaser shall agree, and it shall be accompanied by such additional supporting documentation as Purchaser reasonably requires. Purchaser, in its sole discretion, may choose to accept or reject a Request. If Purchaser chooses to accept a Request, then Purchaser shall and hereby does purchase, and Seller shall and hereby does sell, all of Seller's right, title and interest (but none of Seller's underlying obligations to the applicable Account Debtor) with respect to the Receivables identified in such Request as of the Purchase Date (all such Receivables, once sold and purchased hereunder, collectively the "**Purchased Receivables**") together with all Related Security, Collections and proceeds with respect thereto. Under no circumstances shall Seller sell Receivables to the extent that the purchase would result in (i) the Outstanding Purchase Price exceeding the Purchase Limit, or (ii) the Outstanding Purchase Price with respect to any Account Debtor exceeding its Purchase Sublimit. Seller shall at all times maintain an accurate schedule of all Purchased Receivables sold to Purchaser hereunder and shall deliver the most recently updated version thereof to Purchaser on each date it delivers to Purchaser the reports described in Section 3(f)(vi) below, or as otherwise requested by Purchaser.  Purchaser shall be entitled to rely on any Request or other communication sent or purportedly sent by Seller via the Platform, or otherwise in accordance with this Agreement, and shall not be liable for any action or omission in connection therewith.

b.        The purchase price for Purchased Receivables purchased on any Purchase Date (the "**Purchase Price**") shall be calculated on the Platform and shall equal (i) the Net Amount of such Purchased Receivable minus (ii) a reserve for Dilution (and other potential reductions in the Net Amount) based on the Advance Rate (the difference of (i) and (ii) being the "**Advance Amount**"), minus (iii) the Discount, or such other price with respect thereto as may be agreed to at such time between Purchaser and Seller.  If Purchaser elects to purchase the Receivables set out in a Request, Purchaser shall pay the Purchase Price within three (3) Business Days after the applicable Purchase Date, denominated in the Relevant Currency, into such bank account of Seller as it directs in writing from time to time.  With respect to the reserve for Dilution (reflected in the Advance Rate for a Purchased Receivable being less than 100% of the related face value of such Purchased Receivable), Purchaser may set off the unutilized amount of such reserve against any amount payable by Seller to Purchaser hereunder (including without limitation pursuant to Section 5 hereof). It is anticipated that the balance (following any such set off) of the unutilized amount of such reserve in respect of a Purchased Receivable will be applied by Purchaser to the Purchase Price of one or more Receivables subsequently purchased hereunder or otherwise returned to Seller, subject to any Purchaser claims for indemnification or expenses under Section 5(b) or Section 8, all as set forth on the Platform.

c.        Except as otherwise provided in this Agreement, each purchase of the Purchased Receivables is made without recourse to Seller. Purchaser agrees that it shall be responsible for the non-payment of any Purchased Receivable to the extent it is the result of an Insolvency Event, such assumption of credit risk (with respect to the Outstanding Purchase Price relating thereto only) being effective as of the Purchase Date for such Purchased Receivables.

d.        It is the intention of the parties hereto that the sales, transfers and conveyances contemplated by this Agreement shall constitute an absolute sale of the Purchased Receivables, and the Related Security and Collections with respect thereto, from Seller to Purchaser and that the Purchased Receivables, and the Related Security and Collections with respect thereto, shall not be part of Seller's estate or otherwise be considered property of Seller in the event of the bankruptcy, receivership, insolvency, liquidation, conservatorship or similar proceeding relating to Seller or any of its property. It is not intended that any amounts available for reimbursement of any Purchased Receivables be deemed to have been pledged by Seller to Purchaser to secure a debt or other obligation of Seller.

e.        Purchaser and Seller have structured the transactions contemplated by this Agreement as a true sale, and Purchaser and Seller each agree to treat each such transactions as a "*true sale*" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal state and local), and regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise all persons inquiring about the ownership of the Receivables that all Purchased Receivables have been sold to Purchaser. Purchaser shall have free and unrestricted use of all Purchased Receivables, and the Related Security and Collections with respect thereto, and nothing in this Agreement shall preclude Purchaser from selling, assigning, transferring or otherwise conveying any or all of the Purchased Receivables, and the Related Security and Collections with respect thereto, assigning participation interests in respect of any or all of the Purchased Receivables and the Related Security and Collections with respect thereto, or otherwise pledging the Purchased Receivables and the Related Security and Collections with respect thereto. On and after the applicable Purchase Date, Purchaser will be the sole owner of the Purchased Receivables, and the Related Security and Collections with respect thereto, for all legal purposes.

f.        In the event that, contrary to the mutual intent of the parties, any purchase of Purchased Receivables is not characterized as a sale, Seller shall, effective as of the date hereof, be deemed to have granted to Purchaser (and Seller hereby does grant to Purchaser) a first priority security interest in and to any and all present and future Purchased Receivables, all Related Security and all Collections and proceeds thereof, to secure the repayment on demand of all amounts paid to Seller hereunder with accrued interest thereon at the Discount Rate, and this Agreement shall be deemed to be a security agreement. With respect to such grant of a security interest, Purchaser may at its option exercise from time to time any and all rights and remedies available to it hereunder, under the UCC or otherwise. Seller agrees that five (5) Business Days shall be reasonable prior notice to Seller

of the date of any public or private sale or other disposition of all or any of the Purchased Receivables and/or any Related Security and Collections with respect thereto. Seller hereby authorizes Purchaser to file one or more appropriate UCC financing statements or equivalent financing and/or security statements, filings or registrations in all applicable jurisdictions in connection with the security interest described herein as well as in connection with the purchases referred to herein. Seller hereby waives its right to receive a copy of any financing statement referred to herein, of any financing change statement or of any related verification statement.

2.      **SELLER REPRESENTATIONS AND WARRANTIES**

Seller represents and warrants to Purchaser:

a.          As of the date hereof and the initial Purchase Date, all conditions precedent set forth in Exhibit B hereto have been fulfilled or waived in writing by Purchaser; and

b.          On the date hereof and on each Purchase Date, the representations and warranties set forth below are true and correct (it being understood that with respect to each Purchased Receivable, the representations and warranties with respect to such Purchased Receivable below are, for purposes of the repurchase obligations set forth in Section 5 herein, made solely as of the related Purchase Date therefor):

i.          Each of the Purchased Receivables is an Eligible Receivable and is in full force and effect and is the valid and binding obligation of the related Account Debtor, enforceable in accordance with its terms, and constitutes such Account Debtor's legal, valid and binding obligation to pay to Seller and its assigns in the future the full amount of such Purchased Receivable. Neither Seller nor the related Account Debtor is in default in the performance of any of the provisions of the documentation applicable to the Underlying Transactions in respect of such Purchased Receivable. All Purchased Receivables constitute accounts or payment intangibles for purposes of the UCC.

ii.          Each Purchased Receivable is a bona fide payment obligation of an Account Debtor due in the Net Amount thereof on the Due Date for such Purchased Receivable.  Each Purchased Receivable is freely assignable without any notice requirements, approvals or other restrictions between the Account Debtor and Seller or any other Person (whether arising under the terms of any contract, applicable law or otherwise). Seller has taken all necessary action including, without limitation (i) sending a notice of assignment to each Account Debtor and (ii) if required by Purchaser, received a countersigned notice of assignment from each Account Debtor acknowledging such assignment  in order to properly perfect (or otherwise give first rights to) each Purchased Receivable in favor of Purchaser.  No actual or pending Dispute or event of default with respect to any Purchased Receivable exists. The amount owed under each Purchased Receivable is free of allowances, set-offs, counterclaims, or side agreements, and no credits are available that may be applied by the applicable Account Debtor to such Purchased Receivable.

iii.          The Purchase Price for each Purchased Receivable represents the fair value therefor.

iv.          Seller is the legal and beneficial owner of each Purchased Receivable and of all Collections and Related Security with respect thereto free and clear of any lien, encumbrance or security interest and, upon each purchase of a Purchased Receivable, Purchaser shall acquire valid ownership of each Purchased Receivable and the Collections and Related Security with respect thereto prior to all other Persons.

v.          Each Seller is a corporation or limited liability company (as applicable) duly organized, validly existing and in good standing under the laws of its relevant jurisdiction, and is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified.

vi.          The execution, delivery and performance by Seller of this Agreement and the other documents to be delivered by Seller hereunder, (i) are within Seller's corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) do not contravene (1) Seller's Articles of Organization, Operating Agreement or other organizational documents (2) any law, rule or regulation applicable to Seller, (3) any contractual restriction binding on or affecting Seller or its property, or (4) any order, writ, judgment, award, injunction or decree binding on or affecting Seller or its property and (iv) do not create or cause to exist or arise any lien, security interest or encumbrance under the terms of any agreement applicable to Seller (other than this Agreement). The Agreement has been duly executed and delivered by Seller. Seller has furnished to Purchaser a true, correct and complete copy of its Articles of Organization, Operating Agreement or other applicable organizational documents, including all amendments thereto.

vii.          No authorization or approval or other action by, and no notice to or filing with, any governmental entity is required for the due execution, delivery and performance by Seller of this Agreement or any other document to be delivered hereunder except for the filings or notices as may be necessary under the UCC to perfect the ownership and security interests granted to Purchaser pursuant to this Agreement.

viii.          This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws relating to the enforcement of creditors' rights generally and general principles of equity (regardless of whether enforcement is sought at equity or law).

ix.      There is no pending or, to its knowledge, threatened action, proceeding, investigation or injunction, writ or restraining order affecting Seller or any of its affiliates, or affecting the Account Debtor under a Purchased Receivable or any of its affiliates, before any court, governmental entity or arbitrator which could reasonably be expected to result in a Material Adverse Change or otherwise affect the Purchased Receivables or the Collections or Related Security with respect thereto or Seller's or such Account Debtor's ability to perform its obligations hereunder or under a Purchased Receivable, and Seller and such Account Debtors are solvent and are not currently the subject of, and have no present intention of commencing, an insolvency proceeding or petition in bankruptcy.  Neither Seller nor, any of its subsidiaries is or has ever been the subject of any Insolvency Event.

x.      Seller is in compliance in all material respects with the agreements and sale terms relating to the Purchased Receivables, and the Purchased Receivables, and the agreements and sale terms related thereto, are not subject to any defense or Dispute or any offset, counterclaim or other defense, whether arising out of the transactions contemplated by this Agreement or independently thereof. Except as addressed by lien releases, by existing creditors or purchasers, acceptable to Purchaser, no effective financing statement or other instrument similar in effect covering any Purchased Receivable or the Collections or Related Security with respect thereto is on file in any recording office, except those filed in favor of Purchaser relating to this Agreement, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement remains in effect with respect to any Account Debtor.

xi.      Each Purchased Receivable is denominated and payable only in the Relevant Currency by an Account Debtor domiciled in the Relevant Country.

xii.      There exists no event which has or is reasonably likely to cause a Material Adverse Change, other than as previously communicated in writing to Purchaser.

xiii.      If applicable, Seller is not in default of its obligation to remit or otherwise pay any amount to the Canada Revenue Agency or any provincial taxing authority.

xiv.      Seller does not maintain, sponsor or administer any pension plan and is not obligated to contribute to any such plan.

xv.      Seller shall treat each sale of Purchased Receivables hereunder as a sale for  income tax, reporting and accounting purposes (except solely to the extent that Seller's tax or accounting advisors have determined Seller is required under applicable tax or accounting rules to treat or report such transfers in an alternate or parallel manner, in which case Seller shall provide Purchaser with prompt written notice thereof).

xvi.      No Account Debtor in respect of a Purchased Receivable shall be an affiliate or subsidiary of Seller or any Person controlled by, or under common control with Seller, without the prior written authorization of Purchaser.

xvii.      Seller is not an investment company or a company controlled by an investment company, within the meaning of the U.S. Investment Company Act of 1940, as amended.

xviii.      No information at any time furnished in writing (including in electronic form) by Seller or the Servicer to Purchaser for purposes of or in connection with this Agreement or any transaction contemplated hereby (including without limitation any information set out in a Request) (i) is, or will be, inaccurate in any material respect as of the date it was furnished or (except as otherwise disclosed to Purchaser in writing at or prior to such time) as of the date as of which such information is dated or certified, or (ii) contained or will contain any material misstatement of fact or omitted or will omit to state any material fact necessary to make such information not materially misleading.

xix.      Seller and its subsidiaries are conducting and will continue to conduct their business in compliance with all Sanctions requirements, Anti-Corruption Laws and Anti-Money Laundering Laws.  There is no action, suit or proceeding by or before any court or governmental agency, authority or body involving Seller or any of its subsidiaries with respect to Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws or is pending or, to the knowledge of Seller, threatened.

3.      **SELLER COVENANTS**

Until the later of the termination of this Agreement and the Final Collection Date:

a.      Seller will comply in all material respects with all applicable laws, rules, regulations and orders and preserve and maintain its corporate existence, rights, franchises, qualifications, and privileges.  No Seller will change its jurisdiction of organization without providing Purchaser with at least 30 days prior written notice.. Parent will keep its principal place of business and chief executive office and the office where it keeps its records concerning the Receivables at the address set forth in Section 6 hereto or, upon thirty (30) days' prior written notice to Purchaser, at any other locations in jurisdictions where all actions reasonably requested by Purchaser or otherwise necessary to protect, perfect and maintain Purchaser's interest in the Receivables have been taken and completed by Seller at Seller's expense.

b.          Seller shall make a notation on its books and records, including any computer files, to indicate which Receivables have been sold to Purchaser. Seller shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Receivables and related contracts in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Receivables (including, without limitation, records adequate to permit the daily identification of each Receivable and all collections of and adjustments to each existing Purchased Receivable).

c.          Seller will not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any restriction on assignment, lien, encumbrance or security interest upon or with respect to, the Purchased Receivables or the Collections or Related Security with respect thereto or upon or with respect to any bank or other account to which any Collections of any Purchased Receivable are sent, or assign any right to receive income in respect thereof except the ownership and security interests in favor of Purchaser. Seller will obtain signed releases of any lien, encumbrance or security interest, ownership or other rights over or in respect of any Receivables, prior to their sale hereunder and provide the same to Purchaser.  Seller will provide (or assist Purchaser in providing) any notice of assignment, receipt of acknowledgment of assignment or any other document to or from Account Debtor or any third party in order to perfect, protect or give Purchaser first rights to the Purchased Receivables.

d.          Seller will not amend or extend the payment terms under any Purchased Receivable or its Credit and Collection Policy, unless approved in advance in writing by Purchaser, and shall not otherwise amend or waive, or permit or agree to any deviation from the terms or conditions of, any Purchased Receivable except in accordance with prior and prudent business practices and its Credit and Collection Policy and then only to the extent that any such amendment, waiver or deviation has been approved in advance in writing by Purchaser and will not have any adverse effect on the ability to collect the Net Amount of such Purchased Receivable. Without limiting the effect of the preceding sentence, Seller shall provide five (5) Business Days advance written notice of any extension of the payment terms relating to a Purchased Receivable agreed with an Account Debtor.

e.          Seller will, at any time and from time to time, during regular business hours as requested by Purchaser, permit Purchaser or its auditors or other representatives, at Seller's expense, upon reasonable notice, (i) to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in its possession or under its control relating to Purchased Receivables and Related Security including, without limitation, the related contracts, and (ii) to visit its offices and properties for  the purpose of examining and auditing such materials described in clause (i) above, and to discuss matters relating to Purchased Receivables or its performance hereunder or under the related contracts with any of its officers or employees having knowledge of such matters. Seller shall pay such expenses upon presentation by Purchaser of a statement of account therefor.

f.          Seller will provide to Purchaser the following (unless the same has been delivered to Purchaser pursuant to Section 3(f)(vi) hereof):

i.          as soon as available and in any event within forty-five (45) days after the end of each of the first three quarters of each fiscal year of Seller, consolidated balance sheets of Seller and its subsidiaries as of the end of such quarter and consolidated statements of income, cash flows and retained earnings of Seller and its subsidiaries for the period commencing at the beginning of the current fiscal year and ending with the end of such quarter, and accounts receivable, accounts payable, contract milestones and invoice history payment reports (for existing and new projects in the pipeline), certified by the chief financial officer of Seller;

ii.          as soon as available and in any event within ninety (90) days after the end of each fiscal year of Seller, consolidated balance sheets of Seller and its subsidiaries as of the end of such fiscal year and consolidated statements of income, cash flows and retained earnings of Seller and its subsidiaries for such year, certified by the chief financial officer of Seller;

iii.          as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of Seller, a copy of the audited consolidated financial statements (together with explanatory notes thereon) and auditor's report letter for such year for Seller and its subsidiaries containing financial statements for such year audited by independent public accountants of recognized standing acceptable to Purchaser;

iv.          at least thirty (30) days prior to any change in Seller's name, a notice setting forth the new name and the proposed effective date thereof;

v.          immediately (and in no event later than one (1) Business Day following actual knowledge or notice thereof), written notice in reasonable detail, of any lien, encumbrance or security interest or Dispute asserted or claim made against a Purchased Receivable or any Related Security or Collections with respect thereto, or any credit memoranda issue relating to any Purchased Receivable (including, without limitation, any notice or filing by the Internal Revenue Service, the Pension Benefit Guaranty Corporation or any other government agency or any official body asserting any claim or potential claim (including without limitation any trust claim) on any assets of Seller and/or its Receivables);

vi.          such data, documents, reports and information relating to the Purchased Receivables, including without limitation Seller's Credit and Collection Policy, requested by Purchaser from time to time; and as soon as possible and in any event within five (5) Business Days after becoming aware of the occurrence thereof, written notice of any matter that has resulted in or could reasonably be expected to result in a Material Adverse Change or Insolvency Event with respect to Seller, any Purchased Receivable or the related Account Debtor;

vii.      (x) immediately (and in no event later than one Business Day following actual knowledge or receipt of notice thereof), written notice in reasonable detail, if any Purchased Receivable was not an Eligible Receivable on the related Purchase Date therefor; and (y) immediately (and in no event later than five Business Days following actual knowledge or receipt of notice thereof) written notice in reasonable detail, if any Purchased Receivable which is then outstanding ceases, on any date following its related Purchase Date, to satisfy any of the representations or warranties (without limiting the effect of paragraph (i) below as it relates to material breaches and defaults) with respect thereto set forth in Section 2(b) herein (as if such representations and warranties were made continuously on each day during the term of this Agreement, rather than solely on such related Purchase Date).

g.      Seller will, at its expense, promptly execute and deliver all further instruments and documents, and take all further action that Purchaser may reasonably request, from time to time, in order to perfect, protect or more fully evidence the full and complete ownership and security interest in the Purchased Receivables and the Related Security and Collections with respect thereto, or to enable Purchaser to exercise or enforce the rights of Purchaser hereunder or under the Purchased Receivables and the Related Security and Collections with respect thereto. .

h.      Without limiting the effect of Section 5(c) hereto, Seller will pay any and all taxes relating to the transactions contemplated under this Agreement, including but not limited to the sale, transfer and assignment of each Purchased Receivable; except for those taxes that Seller is contesting in good faith and for which adequate reserves  have been taken.

i.      Seller will duly perform and comply with all terms under each contract relating to Underlying Transactions associated with the Purchased Receivables where the failure to perform or comply could reasonably be expected to cause a Material Adverse Change, and promptly (and in any event within five (5) Business Days following actual knowledge or receipt of notice thereof) inform Purchaser of any material breach or default by Seller or any Account Debtor of any of the terms thereof which has not been cured.

j.      Seller will refrain from any act or omission which might in any way prejudice or limit Purchaser's rights under any of the Purchased Receivables, the Collections or Related Security with respect thereto or this Agreement.

k.      If required by applicable rules and regulations, Seller will promptly disclose to the public such information as required pursuant to and in accordance with rules and regulations promulgated under any applicable securities laws, including, without limitation, (i) the net effect of this Receivables sale transaction on its financial condition, (ii) the nature, amount and term of the material financial obligations incurred hereunder, and (iii) a description of events that may cause such an obligation to arise, increase or become accelerated.

l.      Seller will maintain such insurance on all insurable property owned, leased or otherwise used in Seller's business, including without limitation business interruption and worker's compensation insurance, as is customarily maintained by similar businesses and properties in similar markets and geographic areas; all such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion; Seller shall provide such information concerning its insurance coverage as Purchaser may request from time to time; Seller shall obtain loss payee endorsements in favor of Purchaser with respect to any credit insurance maintained on the Receivables; all policies of insurance shall provide for not less than 30 days prior written notice of cancellation to Purchaser.

m.      None of Seller or any of its parents or subsidiaries, or any of their respective directors, officers or employees, or to the knowledge of Seller, the affiliates or agents of Seller or any of its subsidiaries, will, directly or indirectly, use any part of the proceeds of any sale of Receivables hereunder or lend, contribute or otherwise make available such proceeds (i) to fund or facilitate any activities or business of or with any Person that, at the time of such funding or facilitation, is a Person subject to Sanctions, (ii) to fund or facilitate any activities or business of or in any jurisdiction subject to Sanctions, (iii) in any manner that would result in a violation by any Person of Sanctions, or (iv) in violation of applicable law, including without limitation, Anti-Corruption Laws or Anti-Money Laundering Laws.

n.      Seller will not maintain, sponsor or administer, nor will it be obligated to contribute to, any pension plan.

4.    **COLLECTIONS**

a.      Purchaser appoints Seller as its servicer and agent (in such capacity, the "**Servicer**") for the administration and servicing of all Purchased Receivables, and Seller hereby accepts such appointment and agrees to assume the duties and the administration and servicing obligations as Servicer, and perform all necessary and appropriate commercial collection activities in arranging the timely payment of amounts due and owing under a Purchased Receivable by any Account Debtor, all in accordance with its Credit and Collection Policy and all applicable laws, rules and regulations (including, without limitation, all consumer protection laws), with reasonable care and diligence, including, without limitation, diligently and faithfully performing all servicing and collection actions (including, if necessary, acting as party of record in foreign jurisdictions); provided, however, that such appointment as Servicer shall not release Seller from any of its duties, responsibilities, liabilities and obligations resulting from or arising hereunder. Purchaser may replace the Servicer in its absolute discretion upon written notice to the Servicer. In connection with its servicing obligations, Servicer will, subject to the provisions of Sections 3(d) and 4(g) hereof, perform its obligations and exercise its rights under contracts related to the Purchased Receivables with the same care and applying the same policies as it applies to its own Receivables generally and that it would exercise

and apply if it owned the Purchased Receivables and shall act in a commercially reasonable manner in the best interest of Purchaser to maximize Collections.

b.          All Disputes must be settled directly between Seller and the relevant Account Debtor. Seller shall promptly provide Purchaser written notice of the occurrence of any Disputes together with such information as Purchaser reasonably requests from time to time with respect thereto.

c.          Purchaser (or Seller with Purchasers prior consent) has established the Collection Account to receive amounts owing under the Purchased Receivables. Seller and Servicer covenant and agree (i) prior to the initial Purchase Date, to promptly instruct each Approved Account Debtor in writing and implement an appropriate change, if necessary, to the payment instructions in its payment systems with each Approved Account Debtor, in each case to the extent applicable, to ensure all amounts owing under the Purchased Receivables are paid directly by such Approved Account Debtor into the Collection Account (and at Purchaser's request allow Purchaser access to such payment systems to also perform such change where it requires to do so), (ii) not to change or allow the Account Debtor to change such payment instructions while any Purchased Receivable remains outstanding and (iii) to take any and all other actions, including actions requested by Purchaser, to ensure that all amounts owing under the Purchased Receivables will be deposited exclusively to the Collection Account.

          In the event that any Collections are received by Seller or Servicer, Seller and Servicer covenant and agree to pay to Purchaser, to the Collection Account or such other account as Purchaser shall designate, all amounts received as Collections on the Purchased Receivables within three (3) Business Days of receipt thereof.  Seller and Servicer covenant and agree to take such actions as Purchaser shall direct, in the event Purchaser elects to instruct any Account Debtor to pay Purchaser directly.  Until remitted, Seller or Servicer will hold such funds in trust, and segregated from Seller's and Servicer's other property, as Purchaser's exclusive property and safeguard such funds for the benefit of Purchaser.

d.          Servicer hereby agrees to indemnify Purchaser and its officers, directors, agents, representatives, shareholders, counsel and employees  (each, a "**Servicer Indemnified Person**"), and hold them harmless, from and against any and all claims, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (all of the foregoing being collectively referred to as "**Servicer Indemnified Amounts**") arising out of or resulting from any failure by Servicer to perform its duties or obligations as Servicer hereunder in accordance with this Agreement or any claim brought by any Person other than a Servicer Indemnified Person arising from Servicer's collection or servicing activities with respect to the Purchased Receivables; *provided*, *however*, that in all events there shall be excluded from the foregoing indemnification, Servicer Indemnified Amounts payable to a Servicer Indemnified Person to the extent resulting solely from the gross negligence or willful misconduct of such Servicer Indemnified Person as determined in a final non-appealable judgment by a court of competent jurisdiction. Amounts due hereunder shall accrue interest until paid, at the Discount Rate.

e.          Seller hereby appoints Purchaser as its true and lawful attorney-in-fact, with full power of substitution, coupled with an interest, and hereby authorizes and empowers Purchaser in the name and on behalf of Seller or Purchaser, to take such actions, and execute and deliver such documents (including, without limitation, endorsing Seller's name on checks and other instruments representing Collections), as Purchaser deems necessary or advisable in connection with any Purchased Receivable and/or the Related Security and Collections with respect thereto (i) to obtain full benefits of this Agreement, the Purchased Receivables and the Related Security and Collections with respect thereto, (ii) to perfect the purchase and sale of the Purchased Receivables and the Related Security and Collections with respect thereto, including, without limitation, to send a notice of such purchase and sale to the Account Debtors of the transfers contemplated hereby and the sale of the Purchased Receivables and the Related Security and Collections with respect thereto (it being understood that, as owner of the Purchased Receivables and the Related Security and Collections with respect thereto, Purchaser shall have the right to notify Account Debtors and other Persons of its ownership interest in the Purchased Receivables and the Related Security and Collections with respect thereto, whether or not the Servicer has been or is being replaced hereunder), or (iii) to make collection of and otherwise enforce any Purchased Receivable and/or Related Security.

5.     **REPURCHASE EVENTS; INDEMNITIES AND SET-OFF**

a.          If any of the following events ("**Events of Repurchase**") occurs and is continuing:

i.          any representation or warranty by Seller hereunder with respect to any of the Purchased Receivables is incorrect when made; or

ii.          a Dilution or Dispute occurs with respect to any Purchased Receivable,

then:

(x)          subject to clause (y) below, Seller shall, at the time, in the manner and otherwise as hereinafter set forth, repurchase, on Purchaser's demand, any or all of such Purchased Receivables then outstanding affected by such Event of Repurchase. The Repurchase Price for a Purchased Receivable shall be paid by Seller to Purchaser in immediately available funds promptly and in any event within two Business Days of receipt of notice of such Event of Repurchase from Purchaser. Upon the payment in full of the Repurchase Price with respect to a Purchased Receivable, such Purchased Receivable shall hereby be, and be deemed to be, repurchased by Seller from Purchaser without recourse to or warranty by Purchaser, and shall thereafter cease to be a Purchased

Receivable. Seller agrees that Purchaser may set off against any unpaid obligation of Seller under this Section 5(a)(x). Amounts due hereunder shall accrue interest until repaid in full, which interest shall be payable on demand, at a rate equal to the Discount Rate; and

(y) in the case of any Dispute or Dilution relating to a Purchased Receivable which occurs during an Insolvency Event (and while any proceedings instituted in connection with and as part of such Insolvency Event remain pending), with respect to the related Account Debtor and where such Dispute or Dilution is for or based on the non-payment of a dollar amount which is less than the entire unpaid balance of such Purchased Receivable (such amount in connection with any applicable Purchased Receivable, together with any accrued and unpaid interest thereon, the "**Disputed Portion**"), then Seller shall, upon Purchaser's demand, pay to Purchaser, the dollar amount of such Disputed Portion in immediately available funds within two (2) Business Days of receipt of notice of such demand by Purchaser.  Seller agrees that Purchaser may set off against any unpaid obligation of Seller under this Section 5(a)(y).  Amounts due hereunder shall accrue interest until paid in full, which interest shall be payable on demand at a rate equal to the Discount Rate.

b. Seller hereby agrees to indemnify Purchaser (together with its officers, directors, representatives, shareholders, counsel and employees , each, an "**Indemnified Party**") and hold them harmless, from and against any and all claims, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (all of the foregoing being collectively referred to as "**Indemnified Amounts**") arising out of or resulting from the transactions contemplated by this Agreement and any documents related hereto, including, without limitation, any of the following: (i) the sale to Purchaser of any Receivable which purports to be a Purchased Receivable as to which the representations and warranties made herein are not true and correct on the Purchase Date therefor; (ii) any representation or warranty made or deemed made by Seller (or any of its officers) under or in connection with this Agreement which shall have been incorrect in any material respect when made; (iii) the failure by Seller or any Purchased Receivable to comply with any applicable law, rule or regulation, or any covenant or other obligation contained herein; (iv) the failure to vest in Purchaser a perfected ownership and security interest in each Purchased Receivable, all Related Security and the proceeds and Collections in respect thereof, free and clear of any liens, security interests or encumbrances of any kind or nature whatsoever; (v) any Dilution, Dispute or any claim resulting from the goods or services related to any Purchased Receivable or the furnishing or failure to furnish such goods or services or relating to collection activities; (vi) any loss, claim or liability resulting from foreign exchange risk in connection with the transactions contemplated hereunder, or (vii) any suit, demand, claim or dispute arising in whole or in part out of Seller's use of the Platform in a manner not expressly contemplated hereunder; by or on behalf of Seller in its capacity as Servicer or otherwise, *provided*, *however*, that in all events there shall be excluded from the foregoing indemnification any claims, losses or liabilities resulting solely from (x) the gross negligence or willful misconduct of such Indemnified Party as determined in a final non-appealable judgment by a court of competent jurisdiction or as the result of an Insolvency Event and (y) losses as a result of a failure to collect on a Purchased Receivable during an Insolvency Event (and while any proceedings instituted in connection with and as part of such Insolvency Event remain pending) with respect to the related Account Debtor to the extent such failure to collect would not already result in an Event of Repurchase pursuant to the terms of Section 5(a) above.  Amounts due hereunder shall accrue interest until paid at the Discount Rate.  In the event that such Indemnified Amounts are the result of a claim by or on behalf of an Account Debtor made against an Indemnified Party, Purchaser hereby agrees that so long as Seller is in material compliance with all of its obligations hereunder at such time (in the event Purchaser believes that there is not such material compliance, Purchaser shall have so notified Seller and Seller shall not have cured such non-compliance to the reasonable satisfaction of Purchaser), and to the extent permitted by applicable law, Purchaser shall provide notice of such claim to Seller and shall reasonably communicate and discuss with Seller (at Seller's expense and during reasonable business hours) the nature of such claim and any reasonable steps which Seller may be obligated, permitted or entitled to take (in accordance with all applicable laws) to mitigate any further or additional Indemnified Amounts; it being understood and agreed that any failure by Purchaser to provide such notice shall not in any way reduce, limit or otherwise delay the obligation of Seller to pay such Indemnified Amounts hereunder.

c. Any and all payments (of whatever nature and including taxes) made to Purchaser pursuant to this Agreement (including, but not limited to, the payments on the Purchased Receivables from the Account Debtors) shall be made free and clear of and without deduction or withholding for or on account of any taxes (including any sales, occupational, excise, gross receipts, personal property, privilege or license taxes, or withholdings or other deductions, but not including net income taxes imposed upon Purchaser by the jurisdiction under the laws of which Purchaser is organized), withholdings or other deductions. If any taxes are required to be withheld or paid notwithstanding the provisions of this Section 5(c), then Seller shall pay such taxes to the applicable taxing authority and Seller shall send the original or a certified copy of the receipt evidencing such tax payment, within 30 days of the payment date, to Purchaser. Seller shall pay and indemnify and hold Purchaser harmless from and against, any taxes that may at any time be asserted in respect of the transactions contemplated hereunder (including any sales, occupational, excise, gross receipts, personal property, privilege or license taxes, or withholdings or other deductions, but not including net income taxes imposed upon Purchaser by the jurisdiction under the laws of which Purchaser is organized), and all reasonable costs, expenses and counsel fees in defending against the same, without duplication for any taxes that Seller has paid pursuant to this Section 5(c). All indemnifications required to be made under this Section 5(c) shall be made within ten (10) days from the date Purchaser makes written demand therefor.

d. Seller further agrees that in addition to its obligations under this Section 5, Seller hereby irrevocably instructs and authorizes Purchaser to set-off any amounts owing to Purchaser against any amounts owing to Seller by Purchaser including against the Purchase Price of any Purchased Receivables to be purchased on or after such date . No notification, act or consent of any nature whatsoever is required prior to the right of Purchaser to exercise such right of set-off.

e.        The rights granted to Purchaser under this Agreement are in addition to all other rights and remedies afforded to Purchaser as a secured party under the UCC or otherwise under applicable law or in equity.

6.    **NOTICES**

Unless otherwise provided herein, all communications by Seller or Purchaser or any other agreement entered into in connection herewith shall be in writing and sent via the Platform (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid, or by email). Legal notices shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, to Seller or Purchaser, as the case may be, at its address set forth below:

If to Seller:        First Brands Group LLC
                     127 Public Square Ste 5110
                     Cleveland, OH 44114
                     Attention: Edward James

If to Purchaser:     Raistone Purchasing LLC-Series XXXII
                     c/o its servicer Raistone Capital LLC
                     360 Madison Ave., 22nd Floor
                     New York, NY 10017
                     notices@raistone.com

A party hereto may change the address at which it is to receive notices hereunder by written notice in the foregoing manner given to the other.

7.    **SURVIVAL**

The obligations set out in Sections 4, 5, 8, and 10, and all covenants, representations and warranties made herein, shall continue in full force and effect and survive termination of this Agreement until all Purchased Receivables, and all of Seller's monetary obligations under this Agreement, have been irrevocably and finally paid in full in cash. Each of Seller's and Servicer's obligations hereunder to indemnify Purchaser, any other Indemnified Party or any Servicer Indemnified Person with respect to claims, expenses, damages, losses, costs and liabilities and otherwise shall survive any termination of this Agreement.

8.    **EXPENSES AND FEES**

Seller shall reimburse Purchaser for all reasonable costs (including fees and expenses of counsel) Purchaser incurs in connection with the preparation, negotiation, execution and on-going administration and syndication of this Agreement. In addition, Seller shall reimburse Purchaser for all reasonable costs (including fees and expenses of counsel) in connection with any enforcement of this Agreement as a result of any breach or default by Seller or Servicer of its obligations hereunder, and to the extent requested by Seller from time to time (and if agreed to by Purchaser) any amendment, waiver or modification of any terms or provisions set forth herein. Seller will reimburse such costs upon presentation of a statement of account for the aforesaid costs. In addition, Seller shall pay Purchaser all fees as set forth on the Platform, including the amount set forth in clause (ii) of the definition of Facility Fee (at such times as described therein).  Seller shall pay Purchaser an early termination fee equal to 0% of the Purchase Limit, in the event Seller ceases to offer to sell Receivables to Purchaser within the first 12 months following the closing date.

9.    **GOVERNING LAW**

This Agreement shall be governed by the laws of the State of New York without regard to any conflicting choice of law rules.   Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of any New York State or U.S. federal court sitting in New York County, NY, waives any objection to such venue (including inconvenient forum) and agrees that any such court shall be a proper venue for any action or proceeding brought in connection with this Agreement.  A final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  The Seller irrevocably consents to the service of any and all process in any action or proceeding by the mailing of such process to the address of Seller contained in this Agreement.  Without prejudice to any other method of service allowed hereunder or under relevant law, upon Purchaser's request the Seller shall immediately (and in any event within 5 days) appoint an agent for service of process in New York (on terms acceptable to Purchaser) in connection with this Agreement.  If the Seller fails to appoint an agent, Purchaser is authorized to appoint such agent for this purpose in its sole discretion.  Purchaser shall notify Seller of any appointment it makes pursuant to this Agreement.  In the event that Purchaser makes such appointment, the Seller may replace such process agent with the prior written consent of Purchaser; provided that any service of process that occurs before such notice of replacement shall be effective when served to the process agent appointed by Purchaser.  The Seller agrees that nothing in this Agreement shall affect Purchaser's right to serve process in any other manner permitted by law (including pursuant to the rules for foreign service of process authorized by the Hague Convention) or to commence proceedings in any other jurisdiction, and the failure of the process agent to notify Seller of the process will not invalidate the proceedings concerned.

Each of the Seller and Purchaser hereby intentionally and irrevocably waives any right to trial by jury in connection with any dispute involving this Agreement or any transaction to which it relates.

10.     **GENERAL PROVISIONS**

a.         This Agreement represents the final agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous understandings and agreements with respect to such subject matter. No provision of this Agreement may be amended or waived except by a writing signed by the parties hereto. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; *provided, however*, that Seller may not assign any of its rights hereunder without Purchaser's prior written consent, given or withheld in Purchaser's sole discretion. Purchaser shall have the right without the consent of or notice to Seller to sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in, Purchaser's obligations, rights and benefits hereunder and under any document or agreement related hereto, including without limitation, in respect of any of the Purchased Receivables.

b.         Each provision of this Agreement shall be severable from every other provision hereof for the purpose of determining the legal enforceability of any specific provision. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail attachment in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.

c.         This Agreement shall terminate on the earliest of (i) the Purchase Termination Date (as such date may be extended from time to time pursuant to the definition thereof), (ii) upon notice thereof by Purchaser (in its sole discretion), the date of the occurrence of any Material Adverse Change in Seller or the failure by Seller to perform its obligations hereunder which failure is not cured within five (5) Business Days of notice of such failure,  (iii) any Insolvency Event with respect to Seller, or (iv) upon 30 days' notice by either party to the other (subject to payment by Seller of any obligations owing hereunder); *provided however*, that any provisions hereunder or under any documents related hereto which expressly by their terms survive the termination hereof, shall remain in effect following the dates of termination described in this paragraph.

d.         **For the avoidance of doubt, any purchase of Receivables hereunder shall be at Purchaser's sole discretion, notwithstanding the term of this Agreement contemplated in the immediately preceding paragraph**.

e.         All interest amounts calculated on a per annum basis hereunder are calculated on the basis of a year of three hundred sixty (360) days.

f.         PURCHASER AND SELLER IRREVOCABLY WAIVE ANY RIGHT THAT EITHER MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.

g.         Seller acknowledges that, to help fight the funding of terrorism and money laundering activities, United States Federal law requires all financial institutions to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship. Seller represents to and agrees with Purchaser that (i) none of the requested payments or other transactions hereunder will violate the Trading With the Enemy Act (50 USC §1 et seq., as amended) or any of the foreign assets control regulations of the United States Treasury Department or any enabling legislation or executive order relating thereto and (ii) neither Seller nor any of its subsidiaries or other affiliates is or will become a "blocked person" as described in the Trading with the Enemy Act, any foreign asset control regulations or executive order or engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".

h.         Seller will make payment relative to each amount owing under this Agreement in the currency (the "Original Currency") in which Seller is required to pay such amount. If Seller makes payment relative to any such amount to Purchaser in a currency (the "Other Currency") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of Seller under this Agreement in respect of such amount only to the extent of the amount of the Original Currency which Purchaser is able to purchase in accordance with its usual practice at its office in New York, New York with the amount of the Other Currency it receives on the date of receipt. If the amount of the Original Currency which Purchaser is able to purchase is less than the amount of such currency originally due to it in respect of the relevant amounts, Seller will indemnify and save Purchaser harmless from and against any loss or damage arising as a result of such deficiency. This indemnity will constitute an obligation separate and independent from the other obligations contained in this Agreement, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by Purchaser and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due under this Agreement or under any judgment or order.

10

i.             If two or more entities have executed this Agreement as "Seller", each such entity shall be jointly and severally liable for all obligations of Seller hereunder.  Until termination of this Agreement, each Seller agrees to subordinate to the rights of Purchaser any claim, right or remedy that each Seller may have against another Seller that may arise hereunder.

j.             For the purposes hereof, the closing of this Agreement shall be deemed to take place on the date that each of the parties hereto has received a fully executed copy of this Agreement.

k.             Unless otherwise provided in this Agreement, amounts payable by Seller hereunder shall, until paid, accrue interest payable on demand (before and after judgment) at the Discount Rate.

l.             At any time during the term of this Agreement, with the consent of Purchaser (in Purchaser's sole discretion), one or more additional subsidiaries or affiliates of Parent may be added to this Agreement and shall be a "Seller" hereunder by executing a Joinder Agreement and any other documents, certificates or resolutions Purchaser may reasonably request. Until termination of this Agreement, each Seller agrees to subordinate any claim, right or remedy that each Seller may have against another Seller that may arise hereunder.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**First Brands Group, LLC,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Trico Products Corporation,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Strongarm, LLC,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Carter Fuel Systems, LLC,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**ASC Industries, Inc.,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**FRAM Group Operations LLC,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Brake Parts Inc LLC,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

[Signature Page to Sixth Amended and Restated Receivables Purchase Agreement]

B-1

**Champion Laboratories, Inc.,** as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**CWD, LLC**, as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Qualis Enterprises, Inc**., as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Qualis Automotive L.L.C**., as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**FRAM Group Holdings Mexico S.A. de C.V.,** as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**FRAM Group Services Mexico S.A. de C.V**., as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**FRAM Group Operations Mexico City S.A. de C.V.,** as Seller

By: _____
Name: Shekhar Kumar
Title: Director

[Signature Page to Sixth Amended and Restated Receivables Purchase Agreement]

**FRAM Group Operations Mexicali S.A. de C.V.,** as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**FRAM Filtration Operations Mexico S.A. de C.V.**, as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**Autoelectricos de Mexico S.A. de C.V.,** as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**BPI Brake Manufacturing Juarez S.A. de C.V**., as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**BPI Distribution Mexico S.A. de C.V**., as Seller

By: _____
Name: Shekhar Kumar
Title: Director

**BPI Braking Systems Mexico S.A. de C.V.,** as Seller

By: _____
Name: Shekhar Kumar
Title: Director

[Signature Page to Sixth Amended and Restated Receivables Purchase Agreement]

14

**Horizon Global Corporation,** as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Horizon Global Company LLC,** as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Horizon Global Americas Inc.,** as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Horizon International Holdings LLC,** as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Horizon Euro Finance LLC,** as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Hopkins Manufacturing Corporation**, as Seller


By: _____
Name: Edward James
Title: Executive Vice President

**Walbro Midco LLC**, as Seller


By: _____
Name: Edward James
Title: Executive Vice President

[Signature Page to Sixth Amended and Restated Receivables Purchase Agreement]

**WEM US Co.**, as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Walbro LLC**, as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Carter Carburetor Holdings, LLC**, as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Carter Carburetor, LLC**, as Seller

By: _____
Name: Edward James
Title: Executive Vice President

**Raistone Purchasing LLC-Series XXXII**, as Purchaser

By: _____
Name: Matthew McAlpine
Title: General Counsel

[Signature Page to Sixth Amended and Restated Receivables Purchase Agreement]

**Exhibit A**
**Defined Terms**

As used herein, the following terms shall have the following meanings:

"**Account Debtor**": Any person obligated or who becomes obligated in respect of a Receivable.

"**Advance Amount**": The meaning set forth in Section 1(b) hereto.

"**Advance Rate**": A rate applied against the Net Amount of each Eligible Receivable, as determined by the Purchaser, based on the level of acceptance of, and commitment to pay, the Receivable by the Account Debtor, or a standby letter of credit in favor of the Purchaser (satisfactory to Purchaser in its sole discretion), and taking into account a reserve for Dilution or other potential deduction in or from the Net Amount Due.

"**Agreement**": This Receivables Purchase Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Anti-Corruption Laws**": All laws, rules and regulations concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977.

"**Anti-Money Laundering Laws**": All laws, rules and regulations concerning or relating to money laundering statutes, financial recordkeeping and reporting requirements of all jurisdictions where Seller or any of its subsidiaries conduct business and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental or regulatory agency.

"**Approved Account Debtor**": Account Debtors agreed by Seller and Purchaser (in its sole discretion) and listed on the Platform from time to time. Purchaser may require that each Approved Account Debtor execute an irrevocable acknowledgement and agreement, in a form approved by Purchaser, to make all payments with respect to Purchased Receivables directly into a collection account owned by Purchaser.

"**Business Day**": Any day that is not a Saturday, Sunday or other day on which banks in (i) New York City or (ii) the jurisdiction that is the primary money center for any Relevant Currency are required or permitted to close.

"**Buffer Period**": The number of days (if any) for each Account Debtor as reflected in the Expected Due Date for a Receivable payable by such Account Debtor as set out in the related Request. The Buffer Period with respect to any Account Debtor may be adjusted from time to time prospectively to such number of days as shall be agreed upon in good faith by Seller and Purchaser based on the payment history of such Account Debtor.

"**Collection Account**": Purchaser's (or Seller's with Purchasers prior consent) bank account with respect to Collections specified in writing from time to time by Purchaser.

"**Collections**": With respect to any Purchased Receivable, all cash collections, wire transfers, electronic funds transfers and other funds or amounts of or relating to such Purchased Receivable, including, without limitation, all proceeds thereof.

"**Credit and Collection Policy**": The credit and collection policies and standards of Seller with respect to its Receivables origination and servicing and which may be reviewed and approved by Purchaser from time to time.

"**Dilution**": Non-payment to Purchaser of any amount owing with respect to a Purchased Receivable due to discounts, credit memos, service credits, short payments, and any other off-sets arising from actions of seller in connection with the Underlying Transactions.

"**Discount**": With respect to any Receivable of an Account Debtor purchased or proposed to be purchased by Purchaser, the discount cost applied by Purchaser to such Purchased Receivable purchased on a Purchase Date, equal to the product of (i) the Discount Rate, and (ii) the Advance Amount of such Purchased Receivable, calculated for the number of days between the Purchase Date and Expected Due Date of such Purchased Receivable.

"**Discount Rate**": Such rate set forth on the Platform from time to time for calculating the Purchase Price.

"**Dispute**": Any dispute, discount, deduction, claim, offset, defense or counterclaim of any kind relating to the Purchased Receivables (other than a discount or adjustment granted with Purchaser's written approval), regardless of whether the same (i) is in an amount greater than, equal to or less than the Purchased Receivables concerned, (ii) is bona fide or not, or (iii) arises by reason of an act of God, civil strife, war, currency restrictions, foreign political restrictions or regulations or any other circumstance beyond the control of Seller or related Account Debtor. In the absence of an Insolvency Event with respect to the related Account Debtor, any Purchased Receivables 30 days or more past their Due Date are deemed to have a Dispute and to be subject to Section 5 hereto; *provided* that the failure to make payment of a Purchased Receivable solely as a result of an Insolvency Event with respect to the related Account Debtor shall not be deemed a "Dispute" hereunder.

"**Due Date**": With respect to any Purchased Receivable, the date for timely payment in full of amounts owing thereunder.

"**Eligible Receivable**": A Receivable generated by Seller in the ordinary course of its business in respect of an Underlying Transaction, payable by an Approved Account Debtor in the Relevant Currency and identified in a Request by Seller, which satisfies each of the relevant representations and warranties set forth in Section 2 herein, and

(i)      Is a valid, current and freely assignable "account" or "general intangible" within the meaning of Section 9-102 of the UCC as of the Purchase Date relating thereto, and is not evidenced by any instrument or chattel paper;

(ii)     Is payable in an amount not less than its Net Amount by the Account Debtor identified in the applicable Request;

(iii)    Is based on an actual and bona fide rendering of services or sale of goods by Seller in the ordinary course of its business that have been fully rendered or delivered as of the Purchase Date relating thereto; payments thereon are not contingent upon Seller's fulfillment of any further obligation; and if arising out of the sale of services, such services have been accepted;

(iv)    Is payable in full on the Due Date with respect thereto and is not an installment receivable; the Due Date is less than or equal to 180 days from the date of issuance;

(v)     Is net of and not subject to any contractual allowances, set-offs, counterclaims, side agreements, credits, deductible limitations, commissions, fees, or other discounts other than those offsets reflected in the calculation of the Net Amount and the Purchase Price as of the Purchase Date relating thereto;

(vi)    Is not the subject of any Dispute, action, suit, proceeding or dispute (whether actual, pending or threatened), setoff, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination by the Account Debtor thereof;

(vii)   Is sold hereunder in good faith and without actual intent to hinder, delay or defraud present or future creditors of Purchaser or Seller;

(viii)  Is not subject to a consent requirement by any third party to the sale or other transfer of such Receivable or the grant of a security interest or other lien in such Receivable other than consents previously obtained in writing by Seller;

(ix)    is not payable by any shareholder, director, partner or agent of Seller, or any Person controlling, controlled by or under common control with, Seller;

(x)     Is not subject to any lien, security interest or other encumbrance (except those granted in favor of Purchaser under this Agreement); no effective financing statement or other instrument similar in effect covering such Receivable is on file in any recording office (except those filed in favor of Purchaser in connection with this Agreement), and no competing notice or notice inconsistent with the transactions contemplated by this Agreement remains in effect with respect to the applicable Account Debtor; and

(xi)    Is in full force and effect and constitutes the valid and binding obligation of the related Account Debtor, enforceable in accordance with its terms.

"**Events of Repurchase**": The meaning set forth in Section 5(a) hereto.

"**Expected Due Date**": With respect to any Purchased Receivable, the date arrived at by adding the Buffer Period to the Due Date.

"**Facility Fee"**:  A fee set forth on the Platform.

"**Final Collection Date**": The date following the Purchase Termination Date on which Purchaser has received (i) all Collections owing on the Purchased Receivables (other than Collections that have not been paid as a result of an Insolvency Event with respect to the related Account Debtor) and (ii) all payments, if any, required to be paid by Seller and Servicer hereunder, including without limitation with respect to Events of Repurchase, Indemnified Amounts and Servicer Indemnified Amounts.

 "**Indemnified Amounts**": The meaning set forth in Section 5(b) hereto.

"**Indemnified Party**": The meaning set forth in Section 5(b) hereto.

"**Insolvency Event**": With respect to any Person, such Person generally does not pay its debts as they fall due in the ordinary course of business, or admits in writing or otherwise takes any affirmative action that evidences its inability to pay its debts generally, or makes a general assignment for the benefit of creditors, or any proceedings are instituted by or against such Person seeking to adjudicate it bankrupt or insolvent, or seeking liquidation,

A-2

reorganization, protection or relief of it or its debts under any insolvency or related laws or seeking the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property.

"**Joinder Agreement**": Any joinder agreement in substantially similar form attached hereto as Exhibit C which joins any subsidiary or affiliate of Parent to this Agreement as it if were an original signatory to this Agreement.

"**Material Adverse Change**": An event that results or could likely result in (a) a material adverse change or effect in or on (i) the business, condition (financial or otherwise), operations, performance, properties or prospects of Seller or the Account Debtor in respect of a Purchased Receivable, or (ii) the ability of Seller, as servicer or otherwise, or of the Account Debtor in respect of a Purchased Receivable, to fulfill its obligations hereunder or under such Receivable, or (b) the impairment of the validity or enforceability of, or the rights, remedies or benefits available to Purchaser under, this Agreement or any Purchased Receivable.

"**Net Amount**": The amount of the applicable Purchased Receivable, which represents the total amount payable by the related Account Debtor (net of any discounts, credits or other allowances which may be applied).

"**Outstanding Purchase Price**": (x) The aggregate amount of all Purchase Prices paid by Purchaser with respect to the Purchased Receivables, minus (y) the aggregate amount of all Collections with respect to the Purchased Receivables deposited into the Collection Account.

"**Person**": An individual, partnership, corporation (including a business trust), limited liability company, limited partnership, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Platform**": A web-based software platform provided by Purchaser to Seller for viewing and selecting Receivables to offer for sale to Purchaser.

"**Purchase Date**": Each date on which Purchaser purchases Receivables hereunder.

"**Purchase Limit**": The maximum aggregate Outstanding Purchase Price under the Agreement as as set forth on the Platform. In the event that any Purchased Receivable is denominated in a currency other than USD, then, for the purpose of Section 1(a) hereof, the Outstanding Purchase Price on any day of such Receivable will be converted to USD using the currency conversion rate published in the Wall Street Journal at the close of the prior Business Day.

"**Purchase Price**": The meaning set forth in Section 1(b) hereto. The Purchase Price will be calculated on the Platform, will be non-compounding and will be subject to a minimum 10-day discount period, irrespective of when the Purchased Receivable is paid.

"**Purchase Sublimit**": The amount set forth on the Platform from time to time at Purchaser's discretion as the maximum aggregate Outstanding Purchase Price with respect to the applicable Account Debtor. In the event that any Purchased Receivable is denominated in a currency other than USD, then, for the purpose of Section 1(a) hereof, the Outstanding Purchase Price on any day of such Receivable will be converted to USD using the currency conversion rate published in the Wall Street Journal at the close of the prior Business Day.

"**Purchase Termination Date**": The date falling three (3) years after the date of this Agreement, provided that such date shall be automatically extended for annual successive terms unless Seller or Purchaser provides written notice to the other Person not less than 90 days prior to the expiration of the then current term, that such Person does not intend to extend the term of this Agreement.

"**Purchased Receivables**": The meaning set forth in Section 1(a) hereto.

"**Purchaser**": The meaning set forth in the preamble hereto.

"**Receivables**": Means all indebtedness and other payment obligations owing to Seller by an Account Debtor relating to or arising under a particular Underlying Transaction, whether or not earned by performance, including, without limitation, any indebtedness, or other payment obligation, whether constituting an account, chattel paper, instrument or general intangible, whether now existing or hereafter created, together with the Related Security with respect thereto, and with respect to each of the foregoing, all Collections and proceeds thereof. Receivables may be referred to as "Accounts" or "Invoices" on the Platform.

"**Related Security**": With respect to any Receivable:

(i)     all security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to a contract related to such Receivable or otherwise, together with all financing statements describing any collateral securing such Receivable;

(ii)    all proceeds of insurance with respect thereto;

A-3

(iii)    all guaranties, insurance and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the contract related to such Receivable or otherwise; and

(iv)    all books, records and other information (including, without limitation, computer programs, tapes, discs, punch cards, data processing software and related property and rights) relating to such Receivable and the related Account Debtor.

**"Relevant Country"**: The country of domicile of the relevant Account Debtor, as identified on the Platform.

**"Relevant Currency"**: The currency approved by Purchaser in its sole discretion and set forth on the Platform with respect to a particular Account Debtor.

**"Repurchase Price"**: In respect of a Purchased Receivable which is to be repurchased pursuant to Section 5 (a) hereto, the amount equal to the Net Amount relating to such Purchased Receivable less any Collections with respect to that Purchased Receivable previously deposited into the Collection Account.

**"Request"**: The meaning set forth in Section 1(a) hereto.

**"Sanctions"**:  All economic, trade or financial sanctions, requirements or embargoes imposed, administered or enforced from time to time by any sanctions authority, including but not limited to the United States (including the Office of Foreign Assets Control), the United Kingdom, the European Union or any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

"**Seller**": The meaning set forth in the preamble.

"**Servicer**": The meaning set forth in Section 4(a) hereto.

**"Servicer Indemnified Amounts"**: The meaning set forth in Section 4(e) hereto.

**"Servicer Indemnified Person"**: The meaning set forth in Section 4(e) hereto.

"**UCC**": The Uniform Commercial Code in effect in the State of New York from time to time.

**"Underlying Transactions"**: The provision of goods or services by Seller to Account Debtors, which shall be governed by sales or other agreements in form and substance acceptable to Purchaser.

**Exhibit B**
**Conditions Precedent for Initial Purchase Date**

The purchase of Purchased Receivables under this Agreement on the initial Purchase Date is subject to the conditions precedent that Purchaser shall have received on or before such date the following, each (unless otherwise indicated) dated such date, in form and substance satisfactory to Purchaser:

a.      Certified copies of Seller's Articles of Incorporation, Operating Agreement or other applicable organizational documents and certified copies of all documents evidencing necessary company action and governmental approvals, if any, with respect to this Agreement.

b.      A certificate of the Secretary, Assistant Secretary or equivalent officer of Seller certifying the names and true signatures of the incumbent officers of such entity authorized to sign this Agreement, each Request and any other documents to be delivered by it hereunder.

c.      Completed requests for information (including UCC search results or similar search results) dated within 20 days of the initial Purchase Date, and a schedule thereof listing all effective financing statements that name Seller as debtor, together with copies of all other financing statements or similar instruments filed against Seller and releases of, and acknowledgment copies of proper termination statements (Form UCC-3 or similar) necessary to evidence the release of all security interests, ownership and other rights of any Person previously granted by Seller in the Purchased Receivables.

d.      Acknowledgment or time-stamped receipt copies of proper financing statements (showing Seller as "debtor" and Purchaser as "secured party") duly filed on or before the initial Purchase Date under the UCC or similar instruments as required under applicable law.

e.      Evidence that a notice of assignment has been provided to each Account Debtor (and any acknowledgment thereof by Account Debtor as applicable).

f.      The amount referred to in clause (i) of the definition of Facility Fee at closing.

g.      Any other diligence, documents, agreements, certifications, instruments, filings, acknowledgements or other items required by Purchaser it is commercially reasonable discretion.

Exhibit C

JOINDER AGREEMENT

**THIS JOINDER AGREEMENT** dated as of [ ] (this "Agreement"), is by and among **[ ]**, a [ ]  ("New Seller"), **First Brands Group, LLC**, successor in interest to Trico Group LLC ("Parent"), **Raistone Purchasing LLC - Series XXXII** ("Purchaser").  Capitalized terms used and not defined herein have the meanings given to them in the RPA (as defined below).

**WHEREAS**, Parent, the other Sellers and Purchaser are parties to that certain Sixth Amended and Restated Receivables Purchase Agreement dated April __, 2024 (as amended, supplemented or otherwise modified from time to time, the "RPA"); and

**WHEREAS**, the Parent has requested and the New Seller desires to be joined as a Seller under the RPA;

**NOW, THEREFORE**, for value received or to be received, New Seller and Parent hereby agree as follows:

1.  New Seller is a "Seller" under the RPA effective upon the date hereof.  All references in the RPA to the term "Seller" or "Sellers"," shall be deemed to include New Seller in those respective capacities.  New Seller shall be jointly and severally liable for all obligations of "Seller" under the RPA.  Without limiting the generality of the foregoing, the New Seller and Parent hereby repeat and reaffirm all covenants, agreements, representations and warranties made or given by Seller in the RPA.

2.  THIS AGREEMENT, INCLUDING THE RIGHTS AND DUTIES OF THE PARTIES HERETO, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY OTHER CONFLICTS OF LAW PROVISIONS THEREOF.

3.  This Agreement may be executed in one or more counterparts and each signature delivered by email (in pdf format or otherwise) shall be considered an original signature hereto.

[Remainder of Page Intentionally Left Blank]

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

[  ], as a Seller

By: _____
Name: Ed James
Title: EVP

FIRST BRANDS GROUP, LLC, as Parent and a Seller

By: _____
Name: Ed James
Title: EVP

RAISTONE PURCHASING LLC - SERIES XXXII

By:_____
Name:
Title: