## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

## MOTION OF DEBTORS FOR ORDER
## (I) ESTABLISHING THIRD-PARTY FACTORING PROCEDURES
## FOR (A) THE REVIEW AND RECONCILIATION OF THE DEBTORS'
## RECEIPTS, AND (B) THE RELEASE OF FUNDS TO THE DEBTORS' ESTATES
## AND THE THIRD-PARTY FACTORS; (II) AUTHORIZING CUSTOMERS TO REMIT
## RECEIVABLES WITHOUT LIABILITY; AND (III) GRANTING RELATED RELIEF

> IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED.  IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with the Debtors' non-Debtor affiliates, the "**Company**"), respectfully represent as follows:[2]

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration, as defined herein.

**Preliminary Statement[3]**

1.        Prior to the Petition Date, the Company commonly utilized various factoring arrangements to support liquidity.  The Company historically entered into two types of factoring arrangements: (i) factoring arrangements with customers and their financial institution partners ("**Customer Factoring**") and (ii) factoring arrangements with unaffiliated third parties ("**Third-Party Factoring**").[4]  Under the Third-Party Factoring arrangements (each, a "**Factoring Facility**"), the Company would sell inventory to a customer (each, a "**Customer**") and subsequently sell the associated receivable of that inventory sale to an unaffiliated third-party factor (each, a "**Third-Party Factor**").[5]  The Third-Party Factor would purchase the Company's receivable, at a discount to face value based on a preset or contractual formula, and remit cash to the Company.  The Third-Party Factoring arrangements allowed the Company to receive cash sooner than it would have under the Customers' payment terms.  Under the structure of the Factoring Facilities, even though the Company had technically sold the receivable to a Third-Party Factor, the Company continued to service the Factored Receivable (i.e., the Customer would remit payment to the Company once the receivable became due and the Company would then transfer the amount owed to the Third-Party Factor related to that particular receivable).[6]

---

[3]    For the avoidance of doubt, the summary descriptions of Factoring Facilities and the Company's prepetition Third-Party Factoring practices set forth herein are provided for convenience only.  Any and all rights of the Debtors and the Third-Party Factors as to the Factoring Facilities are expressly reserved.

[4]    For the avoidance of doubt, Customer Factoring is not the subject of this Motion or of the relief sought herein.

[5]    In some instances, a Factored Receivable was subsequently sold again by a Third-Party Factor to an additional unaffiliated third-party.

[6]    "**Third-Party Factors**" refers to, collectively, Raistone Purchasing Series LLC-Series XXXII, Raistone Purchasing LLC-Series XXVIII, Leucadia Asset Management LLC, LAM Trade Finance Group LLC, LAM Trade Finance Group, Katsumi Servicing, LLC, Evolution Credit Partners Trade Finance Master L.P., ING Belgium S.A./N.V., Arab Banking Corporation B.S.C., and each of the foregoing's affiliates and transferees, as the case may be.

2.　　Shortly after learning of irregularities in the Company's Third-Party Factoring practices, on or about September 12, 2025, the Debtors discontinued all of its Third-Party Factoring and have not sold any receivables to a Third-Party Factor after that date.  Since the Petition Date, A&M has undertaken significant efforts to investigate and understand the Company's historical Third-Party Factoring practices and liabilities, which confirmed instances where the invoices provided by the Company to the Third-Party Factors were (i) fabricated (i.e., invoice information (invoice number, customer, supplier) provided by the Company to the Third-Party Factor did not match the Company's system generated invoice records), (ii) inflated (i.e., the invoice amount provided by the Company to the Third-Party Factors was significantly inflated from the invoice values in the Company's system generated records), or (iii) provided to more than one Third-Party Factor, creating the potential for more than one Third-Party Factor to assert a claim to the same invoice(s).

3.　　Specifically, A&M's latest analysis of the Debtors' records and the records provided by Third-Party Factors indicates that approximately $3.0 billion of invoices (at face value) were sold to Third-Party Factors, with such invoices carrying a current loan value liability of approximately $2.3 billion. A&M's forensic analysis to date has not been able to match approximately $2.5 billion of those invoices to actual invoices for inventory sold to Customers – either because there is no record of a particular invoice or the actual matched invoice number has amounts that have been substantially altered.  A&M's reconciliation has also uncovered widespread instances of the same invoices being sold to more than one Third-Party Factor, as well as some instances where the same invoice may have been factored multiple times by the same Third-Party Factor.

4.      In addition to the issues uncovered by the initial stages of A&M's investigation, it has come to the Debtors' attention that many of the Third-Party Factors sent prepetition notices to the Customers directing payment of their purchased receivables to accounts controlled by such Third-Party Factor, rather than to the Company-account that payments were historically made.  This has created significant confusion among the Customers as to which receivables have been factored (and with which Third-Party Factor) and which receivables have not been factored, resulting in some Customers withholding **all** payments owed to the Debtors.  A&M estimates a significant amount of money (approximately $150 million) is being withheld from the Debtors by Customers on account of outstanding accounts receivable related to invoices that have no evidence of ever being factored.  These funds are property of the Debtors' estates (and constitute Collateral (as defined in the Final DIP Order[7])) and are desperately needed to maintain operations, finance new inventory purchases, and otherwise alleviate the strain on the Debtors' already-tenuous Customer and vendor relationships.

5.      To allow for a reconciliation process, and in accordance with the Final Cash Management Order,[8] the Debtors segregated and held all collections received from Customers since the Petition Date (the "**Collected Receipts**"), other than funds received on account of any postpetition sales or related invoices, including receipts of accounts receivables of any Factoring Facility (the "**Factored Receivables**") and receipts of non-factored accounts receivables

---

[7]  "**Final DIP Order**" shall mean the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

[8]  "**Final Cash Management Order**" shall mean the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (V) Granting Related Relief* (Docket No. 604).

(the "**Non-Factored Receivables**").  Pursuant to the Final Cash Management Order, the Debtors have also established a new bank account (the "**Factored Receivables Account**") to segregate and hold the Collected Receipts, which cannot be accessed or disbursed without further order from the Court.[9]  However, holding all Collected Receipts forces the Debtors' business into an extremely fragile predicament, where the Debtors must expend resources to operate the business to generate postpetition sales for the estate, without being able to access the funds generated from Collected Receipts.  This practice has put a significant strain on the Debtors' operations and liquidity forecast, which assumed the Debtors would have access to such funds to operate.

6.      In order to restart the flow of funds in a fully transparent manner, A&M deployed a team to conduct a forensic audit and investigate the Third-Party Factoring transactions. A&M developed a rigorous reconciliation process to determine if Collected Receipts were on account of invoices claimed to have been purchased by any of the Third-Party Factors.  As part of this process, A&M worked collaboratively with the Third-Party Factors to obtain their internal data regarding purchased invoices, which was then compared to the Company's books and records, as verified by A&M.  Additionally, the Debtors' advisors have maintained close coordination and met regularly with the Third-Party Factors to discuss the status of A&M's reconciliation efforts.

7.      The Debtors are now in a position to report which of the Collected Receipts were factored (i.e., matched the Third-Party Factors' purchased invoice records), which, due to the significant issues in the prepetition Third-Party Factoring practices discussed herein, is only a small portion of the Collected Receipts.  A&M has recorded and confirmed a total of $105.9 million in Collected Receipts since the Petition Date through November 21, 2025.  A&M, with

---

[9]     The Final Cash Management Order also provides that no bank, creditor, or any other party or entity may set off or recoup, or exercise any other rights, defenses or remedies against any funds held in the Factored Receivables Account.  Final Cash Management Order ¶ 6.

support from the Debtors' accounts receivable team, has completed their reconciliation on the $105.9 million of Collected Receipts and determined that $4.4 million match to invoices purchased by Third-Party Factors and $101.6 million are Non-Factored Receivables that are property of the Debtors' estate. Additionally, A&M has received and recorded $10.2 million of receipts that remains subject to A&M's ongoing reconciliation.

8. The quantum of frozen cash that is part of the Debtors' estates that is either trapped with Customers or segregated pursuant to the Final Cash Management Order totals approximately $250 million, all of which constitutes Collateral (as defined in the Final DIP Order). Without near term access to these Non-Factored Receivables, the Debtors will face tremendous liquidity pressure. The Debtors' DIP Budget specifically assumes that the Debtors would have unrestricted access to, and ordinary course use of, the Non-Factored Receivables.

9. The Debtors have worked to design a transparent process, supported by the DIP Lenders, for funds to be properly collected, segregated, reconciled, and distributed, all under the purview of the Court and with the opportunity for Third-Party Factors to review the Debtors' work and raise any issues before funds are released. The Debtors shared the proposed Third-Party Factoring Procedures with the Creditors' Committee and the Third-Party Factors to solicit input and provide an opportunity for any concerns to be addressed. A&M also presented its reconciliation process and preliminary findings to the Third-Party Factors, the Third-Party Factors' advisors, and the financial advisor to the Creditors' Committee, M3 Advisory Partners, LP ("**M3**"), to allow the Third-Party Factors to ask any questions, offer input, and better understand A&M's analysis. Following the presentation to the Third-Party Factors, A&M continued to refine its analysis, including based on feedback and input from the Third-Party Factors, through multiple tests of the data using different assumptions and iterations, which resulted in no meaningful change

6

in the reconciliation or findings discussed herein. Finally, the Debtors have provided Brown Rudnick LLP and M3, advisors to the Creditors' Committee (the "**Committee Advisors**"), and the Third-Party Factors' advisors the Company's records used in A&M's reconciliation, so that the applicable advisors can replicate and verify A&M's analysis for themselves. The Creditors' Committee recognizes the importance of resolving the issues discussed herein in an expeditious and fair manner.

## Relief Requested

10.     By this motion (the "**Motion**"), pursuant to sections 105(a), 362(a), 1107, and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1 and 4001-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors respectfully request that the Court: (i) establish procedures for the Debtors to complete an orderly, efficient, and fair reconciliation of all Collected Receipts, (ii) authorize and provide comfort to Customers to remit receivables to the Debtors without risk of double payment liability, (iii) authorize the Debtors to use Collected Receipts that were not factored following notice to and an opportunity to be heard by the Third-Party Factors, and (iv) granting related relief, all as further described herein.

11.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

## Background

12.     On September 24, 2025 (the "**Petition Date**"), Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code. Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter

11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

13. On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (Docket No. 313) (the "**Creditors' Committee**").

14. The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

15. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**"), filed on September 29, 2025. Additional information regarding the Debtors' Third-Party Factoring is set forth in the *Supplemental Declaration of Charles M. Moore in Support of DIP Motion* (Docket No. 527), filed on November 4, 2025, and each incorporated herein by reference.

16. In support of the Third-Party Factoring Procedures and this Motion, the Debtors submit the *Declaration of Daniel Jerneycic in Support of Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* (the "**Jerneycic Declaration**"), which has been filed with the Court contemporaneously herewith and incorporated by reference.

**Jurisdiction and Venue**

17.     The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Postpetition Reconciliation and Preliminary Investigation Findings**

18.     As set forth in more detail in the Jerneycic Declaration, A&M deployed a team to conduct a forensic audit and investigate transactions related to the Debtors' Third-Party Factoring liabilities.  A&M developed a rigorous reconciliation process to determine if Collected Receipts were on account of invoices claimed to have been purchased by any of the Third-Party Factors.  First, in accordance with comprehensive and detailed procedures for each business unit (the "**Cash Application Procedures**"), the Debtors' accounts receivable team performed a receipts reconciliation process to match Collected Receipts to authentic invoices (each a "**Mapped Invoice**" and, collectively, the "**Mapped Invoices**").

19.     A&M then compared the Mapped Invoices to (i) the data from the Debtors' system generated invoices and (ii) records received from each of the Third-Party Factors.  This data comparison allowed A&M to match the Collected Receipts to determine the Debtors' view regarding (a) whether the funds are property of a Third-Party Factor or the Debtors' estates (i.e., not factored), and (b) which Third-Party Factor(s) may have a claim to a particular Collected Receipt associated with a particular Mapped Invoice.

20.     A&M's investigation and reconciliation process led to the discovery of significant issues with the Debtors' historical Third-Party Factoring practices, including instances where the invoices provided by the Company to the Third-Party Factors were (i) fabricated (i.e., invoice information (invoice number, customer, supplier) provided by the Company to the Third-Party Factor did not match the Company's system generated invoice records), (ii) inflated (i.e., the

9

invoice amount provided by the Company to the Third-Party Factors was significantly inflated from the invoice values in the Company's system generated records), or (iii) provided to more than one Third-Party Factor, creating the potential for more than one party to assert a claim to the same invoice(s).

### Postpetition Segregation and Collection

21.     In accordance with the Final Cash Management Order, the Debtors agreed to hold and segregate all Collected Receipts pending further order of this Court.  As part of that process, the Debtors established the Factored Receivables Account and have transferred approximately $94.5 million of Collected Receipts into the Factored Receivables Account since the Petition Date through December 1, 2025.[10]  A&M, with support from the Debtors' accounts receivable team, has completed their reconciliation on the $105.9 million of Collected Receipts and determined that $4.4 million match to invoices purchased by Third-Party Factors and $101.6 million are Non-Factored Receivables that are property of the Debtors' estates and constitute Collateral (as defined in the Final DIP Order).  The balance, as well as all additional receipts that will be collected, will be reconciled by A&M on an ongoing basis.  As noted above, the Debtors believe a significant portion of the Collected Receipts were not factored, are property of the Debtors' estates, and constitute Collateral (as defined in the Final DIP Order).  The Debtors need authorization to release the Non-Factored Receivables so they can be used to operate their business and help administer these cases.

---

[10]     The balance of the Collected Receipts are in the process of being transferred to the Factored Receivables Account and additional receipts that will be collected will be transferred to the Factored Receivables Account in accordance with the Final Cash Management Order on an ongoing basis.

**Trapped Customer Cash**

22.     In addition to the Collected Receipts that are segregated, a substantial portion of accounts receivable owed to the Debtors are being held by the Debtors' Customers.  A number of Customers received prepetition correspondence from the Debtors' Third-Party Factors indicating that the Debtors had been terminated as servicer with respect to certain factored accounts receivables and providing direction to remit funds related to those accounts receivables directly to bank accounts controlled by such Third-Party Factor, rather than to the Debtors' bank account where such payments were historically sent (the "**Assignment Notices**").

23.     The Assignment Notices have created confusion among the Debtors' Customers making it unclear where Customers should remit payments.  As a result of the issues uncovered by the Debtors' advisors, many of the invoice lists in the Assignment Notices do not match the Customer's records and have significant discrepancies.  Many Customers are unable to verify the accuracy of purchased invoices – likely because some, if not all, have been fabricated or inflated – and are now holding receipts in fear that if they remit to the wrong account they will expose themselves to liability for double payment.[11]  Consequentially, some Customers have frozen *all* payments to the Debtors, including payments related to Non-Factored Receivables (the "**Trapped Customer Cash**").  The Trapped Customer Cash is locking up funds that are property of the Debtors' estate, which is severely impacting the Debtors' liquidity and ability to continue operations.  Additionally, the Assignment Notices also run the risk of misdirecting a Factored Receivable to one Third-Party Factor to the detriment of another Third-Party Factor that may have a competing claim to ownership of the same Factored Receivable.  As noted in the Jerneycic

---

[11]     *See* Uniform Commercial Code § 9-404.

Declaration, there is significant evidence of Factored Receivables being sold to more than one Third-Party Factor.

24.     In an effort to resolve the Trapped Customer Cash issue, the Debtors sent correspondence to Third-Party Factors as well as Customers, notifying the parties of the Factored Receivables Account required by the Cash Management Orders and the Debtors' ongoing reconciliation efforts.  Despite these efforts, many Customers are understandably unwilling to risk releasing payments related to amounts owed to the Debtors after receiving the Assignment Notices absent an order from this Court.  As such, it is imperative that the Court authorize all Customers to remit payments to the Debtors for amounts owed related to the Debtors accounts receivable and provide comfort they will not be held liable for double payment.

25.     Moreover, the Debtors' DIP Budget was formulated on the basis that the Debtors would have unrestricted use of the vast majority of the Non-Factored Receivables.  Thus, to maintain normal operations, the Debtors need to ensure that their Customers are comfortable with and will not be subject to double payment claims by remitting payments to the Debtors for reconciliation in accordance with the Third-Party Factoring Procedures set forth below.  Without unlocking the Trapped Customer Cash, the Debtors would be forced to seek additional funding or face a liquidity shortfall.  As set forth herein, in the Jerneycic Declaration, and as indicated by the reconciliation already performed, the Debtors believe that a significant portion of the Trapped Customer Cash is not factored, is property of the Debtors' estates, and constitutes Collateral (as defined in the Final DIP Order).

26.     Approval of the Third-Party Factoring Procedures will serve two primary and important purposes: (i) allow the Debtors to reconcile, determine the ownership of, and disburse the Collected Receipts for the benefit of all stakeholders and (ii) provide comfort to

Customers that their remittance of Trapped Customer Cash will not result in any claims or double payment liability.

**Third-Party Factoring Procedures**

27. The Debtors seek the establishment of the following procedures (the "**Third-Party Factoring Procedures**") to ensure the continued access to cash flow and the proper remittance of payments related to accounts receivable of the Debtors and operation of the Debtors' business for the benefit of the Debtors' estates:

    i.    In accordance with the Final Cash Management Order, all Collected Receipts shall be transferred by the Debtors to the Factored Receivables Account and shall remain in the Factored Receivables Account until released in accordance with these Third-Party Factoring Procedures.

    ii.    Notwithstanding the receipt of an Assignment Notice from one or more of the Third-Party Factors, the Debtors' Customers shall remit all prepetition amounts owed to the Debtors currently being held, (the "**Prepetition Customer Receipts**" and, together with the Collected Receipts, the "**Segregated Funds**") to the Debtors and, upon receipt, the Debtors shall transfer such funds to the Factored Receivables Account.  Customers who remit Prepetition Customer Receipts to the Debtors in accordance with these procedures will not be liable for any claim from a Third-Party Factor as a result of such remittance and the Third-Party Factors will be prohibited from collecting or seeking to collect any amounts from the Customers on account of such Prepetition Customer Receipts.

    iii.    The Customers shall remit all amounts owed on account of receivables sold by the Debtors postpetition in the ordinary course (the "**Postpetition Customer Receipts**"), whether directly to the Debtors or in accordance with any Customer Factoring Program, and the Debtors shall provide reporting of the Postpetition Customer Receipts to Third-Party Factors upon reasonable request.  For the avoidance of doubt, the Debtors shall not be required to segregate any Postpetition Customer Receipts.

    iv.    The Debtors' advisors shall process all Segregated Funds as follows (the "**Reconciliation and Mapping Process**"):

        a)  *First*, the Debtors' advisors shall utilize the Cash Application Procedures to match the Segregated Funds to a specific invoice number to determine each Mapped Invoice;

13

b) *Second*, the Debtors' advisors shall then compare the invoice number of each Mapped Invoice to the purchase records received from each of the Third-Party Factors;

c) *Third*, the Debtors' advisors shall compare each Mapped Invoice to the Debtors' system generated invoice records to produce comparison data (invoice number, supplier name, customer name);

d) *Fourth*, any Segregated Funds that the Debtors' advisors confirm matches both (a) the purchase records of the Third-Party Factors and (b) the comparison data of the Debtors' system generated invoice records shall be determined to be Factored Receivables, and conversely, any Segregated Funds that the Debtors confirm do not match both (a) the purchase records of the Third-Party Factors and (b) the comparison data of the Debtors' system generated invoice records shall be determined to be Non-Factored Receivables;[12] and

e) *Fifth,* the Debtors' advisors shall determine whether any Factored Receivables were (a) purchased by one Third-Party Factor (the "**Single Claim Factored Receivables**"), or (b) purchased by more than one Third-Party Factor (the "**Multiple Claim Factored Receivables**").

v. Following the Reconciliation and Mapping Process, the Debtors shall serve a bi-weekly report setting forth the (i) invoice number, supplier name, customer name, and invoice amount of the Non-Factored Receivables, (ii) invoice number, supplier name, customer name, invoice amount of the Single Claim Factored Receivables, and the Third-Party Factor that purchased each Single Claim Factored Receivable, and (iii) invoice number, supplier name, customer name, invoice amount of the Multiple Claim Factored Receivables, and Third-Party Factors that have alleged competing claims to the Multiple Claim Factored Receivables (the "**Reconciliation Reports**"), on the following entities on a confidential basis (or their respective counsel, if known): (i) the Office of the U.S. Trustee; (ii) counsel to the Creditors' Committee, (iii) counsel to the DIP Secured Parties, (iv) counsel to each of the Third-Party Factors, and (v) Customers whose invoices are included in the Reconciliation Reports, *provided that* such Customers shall only receive information associated with their respective invoices (collectively, the "**Notice Parties**").

vi. Three (3) days prior to serving a Reconciliation Report on the Notice Parties, the Debtors shall provide a draft Reconciliation Report to the Committee Advisors and the Ad Hoc Group Advisors (as defined in the Final DIP Order), on a confidential and professional eyes' only basis, and reasonably consult with the Committee

---

[12] For the avoidance of doubt, a Mapped Invoice shall be considered a Factored Receivable even if the only alteration to the invoice is the amount.

14

Advisors and the Ad Hoc Group Advisors with respect to the draft Reconciliation Report.

vii. During each Notice Period (as defined herein), (a) the Debtors and the Third-Party Factors (and their respective advisors) shall reasonably consult and cooperate with each other regarding the applicable Reconciliation Report, and (b) upon reasonable request, the Debtors shall promptly provide to the Third-Party Factors information and documents relating to the applicable Reconciliation Report.

viii. Each Notice Party shall have ten (10) days from the receipt of the applicable Reconciliation Report (the "**Notice Period**"), unless extended by agreement between the Debtors and the requesting Notice Party, to serve an objection on the Debtors (email to the Debtors' counsel being sufficient) to any particular receivable included in the Reconciliation Report (each an "**Objection**" and each party filing an Objection, an "**Objecting Party**").

ix. Each Objection must (a) be in writing, (b) state with specificity the legal and factual grounds for such objection, and (c) provide documentation supporting the Objecting Party's legal interest in each such receivable contained in the Reconciliation Report that is subject to the Objection.

x. If an Objection is timely and properly served, the Debtors and the Objecting Party shall meet and confer within seven (7) days of service of such Objection (the "**Meet and Confer Period**").

xi. If an Objection is timely and properly served and not withdrawn or resolved prior to expiration of the Meet and Confer Period (an "**Unresolved Objection**"), the Debtors may file a notice scheduling a hearing for the Court to consider the Unresolved Objection on no less than ten (10) days' notice, subject to the Court's availability.  The Debtors and the Objecting Party may resolve the Unresolved Objection without further notice or Court approval in advance of the hearing.

xii. If no Objection is timely and properly served within the Notice Period with respect to any particular receivable included in the Reconciliation Report (each an "**Undisputed Fund**"), the Debtors will be authorized, without further order of the Court, to release the Undisputed Fund from the Factored Receivables Account to the applicable Third-Party Factor or into the Debtors' operating accounts, as applicable.

xiii. To the extent any particular Non-Factored Receivable listed on a Reconciliation Report remains subject to an Unresolved Objection, such receipts shall remain in the Factored Receivables Account pending further order of the Court or agreement amongst the Debtors and the Objecting Party.

xiv. To the extent any particular Single Claim Factored Receivable listed on a Reconciliation Report remains subject to an Unresolved Objection, such receipts

15

shall remain in the Factored Receivables Account pending further order of the Court or agreement amongst the Debtors, the Objecting Party, and the Third-Party Factor that was listed on the Reconciliation Report as the purchaser of the Single Claim Factored Receivable.

xv. Any Segregated Funds that are determined to be Multiple Claim Factored Receivables shall remain in the Factored Receivables Account pending further order of the Court or agreement amongst the Debtors and the applicable Third-Party Factors that purchased the Multiple Claim Factored Receivable.

xvi. The Debtors shall publish by filing on the docket and serve on the Notice Parties and all entities that have requested notice of the proceedings in these chapter 11 cases pursuant to Bankruptcy Rule 2002, a monthly notice setting forth the amount of Segregated Funds held, reconciled, and disbursed in the previous month.

**Relief Requested Should Be Granted**

## I. Trapped Customer Cash that is Property of the Estate is Required to Be Remitted to the Debtors

28. The Court may grant the relief requested herein pursuant to section 362(a) of the Bankruptcy Code, which prohibits all entities from, among other things, taking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). "[P]roperty of the estate," in turn, is defined as "all legal or equitable interests of the debtor in property as of the—commencement of the case," and is comprised of such property "wherever located and by whomever held." *Id.* § 541(a). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1146 (5th Cir. 1987). It is intended to "give[] the debtor a breathing spell from his creditors." *Id.* (the automatic stay "prohibits the proliferation of numerous claims in different forums against the debtor."). The automatic stay is "particularly important in maintaining the status quo and permitting the debtor in possession or trustee to attempt to formulate a plan of reorganization." 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2019) ("[W]ithout the stay, the debtor's assets might

well be dismembered, and its business destroyed, before the debtor has an opportunity to put forward a plan for future operations.").

29.     As such, "[t]he scope of protection afforded by the automatic stay provision is broad . . . , and it bars any action which 'would inevitably have an adverse impact on the property of the bankruptcy estate.'" *In re Prudential Lines, Inc.*, 119 B.R. 430, 432 (S.D.N.Y 1990), *aff'd*, 928 F.2d 565 (2d Cir. 1991) (quoting *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987)) (citations omitted).   More specifically, section 362 of the Bankruptcy Code prohibits creditors from engaging in "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3), (6).

30.     Section 362(a)(3) should be read together with sections 542 and 543 of the Bankruptcy Code, which empower a debtor in possession to take control of all property of the estate in order to maintain going concern value and to ensure an equitable distribution of property among creditors.   Section 542(a) provides that entities, other than a custodian, having possession, custody, or control of property that belongs to the debtor must turn over such property.   Moreover, section 542(a) "grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings."  *United States v. Whiting Pools, Inc.*, 103 S. Ct. 2309, 2314 (1983).

31.     To ensure that a debtor in possession may control all the property of the estate, section 362(a)(3) "unambiguously and unequivocally prohibits attempts to exercise control over property of the estate."  *In re Adelphia Communication Corp.*, 345 B.R. 69, 79 (Bankr. S.D.N.Y. 2006).  Section 362(a)(3) applies the automatic stay to attempts to exercise control over any property of the estate, whether tangible or intangible.  *In re M.J. & K. Co.*, 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993) (any right of a debtor is protected by the automatic stay, although the

nature and extent of those rights are fixed by state law). Thus, any entity that attempts to take control over or refuses to turn over possession of estate property is in violation of the automatic stay.

32. The purpose of the automatic stay is to channel competing claims for a debtor's assets into a single forum to provide a platform for the debtor's reorganization. *Browning v. Navarro*, 743 F.2d 1069, 1083 (5th Cir. 1984); *see also In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1409 (5th Cir. 1986), *on reh'g*, 808 F.2d 363 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs, Ltd.*, 484 U.S. 365 (1988). The Debtors are seeking to channel competing claims to the receivables into a single forum (this Court), and for the Customers to be protected from claims from the Third-Party Factors once they comply with the Bankruptcy Code and remit receivables to the Debtors.

33. The Third-Party Factors and Customers waive no rights by the Debtors collecting the receivables. The Debtors are duty-bound by the Final Cash Management Order to collect and segregate all collections on account of any Factoring Facility, regardless if received prepetition or postpetition. Once segregated, the Debtors cannot release the Segregated Funds absent an order from the Court, except as provided by the Third-Party Factoring Procedures. It is of utmost importance that appropriate protocols are in place to ensure the orderly collection, reconciliation, and ultimately, distribution of Segregated Funds. The Debtors and their advisors are working tirelessly and transparently to trace and determine the legal claims of all Segregated Funds, but cannot complete the reconciliation without the relief requested herein.

34. Without providing express authorization and comfort to the Customers to release the Trapped Customer Cash, the Customers are left with the precarious decisions to (i) violate the automatic stay by exercising control over property of the estate, or (ii) be subject to

claims by the Third-Party Factors.  The automatic stay is specifically designed to address situations like this.

## II. The Third-Party Factoring Procedures Are Necessary Relief to Carry Out the Debtors' Duties

35.     Even to the extent portions of the Trapped Customer Cash are not property of the Debtors' estate, an order compelling the submission of all receivables is appropriate pursuant to section 105(a).  The Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

36.     As set forth herein, it is imperative that the Customers remit all receivables to the Debtors so that A&M, with support from the Debtors' accounts receivables team, can reconcile and ultimately distribute the funds whether to the Debtors or the Third-Party Factors, and so that the Debtors can continue to operate their business with sufficient liquidity.  Absent this streamlined process and appropriate protections from the Court, the Customers will not have comfort that they are properly remitting the Trapped Customer Cash and have serious concerns over being subject to claims against them by Third-Party Factors.  Accordingly, the Bankruptcy Code authorizes the Debtors' requested relief where, as here, such receivables are critical for operating the Debtors' business and preserving the going-concern value of the Debtor's estate.

19

### III. Third-Party Factoring Procedures are Reasonable and Appropriate

37.     The scope and breadth of the irregularities uncovered by A&M in the Company's Third-Party Factoring practices necessitate streamlined court-approved procedures to ensure that a transparent process is in place for receivables to be reconciled and allocated properly, while providing adequate notice to parties to review. The proposed procedures are especially necessary in light of the likelihood that many of the invoices associated with the Trapped Customer Cash may have been fabricated, altered, and/or double-factored and for those that are not, the proceeds can be distributed to their proper owners. A&M has made significant progress in its investigation and reconciliation efforts, and is in the best position to complete the Reconciliation and Mapping Process given their ability to serve as a central hub for collecting data from the Company, Customers, and Third-Party Factors. In the absence of the Third-Party Factoring Procedures, a substantial amount of cash would continue to be inaccessible and unusable by the Debtors and Third-Party Factors, hindering advancement in these cases and preventing the Debtors from optimally operating their business to provide recoveries to the estate. The Debtors submit that they have shown good cause for implementing the Third-Party Factoring Procedures.

38.     Moreover, the Third-Party Factoring Procedures set forth a clear and open process that provide ample notice and opportunity for interested parties to be heard. The Debtors are proposing fair and equitable procedures, with the support of the DIP Lenders, to address a complicated situation with full transparency, including by sharing in advance all draft Reconciliation Reports with the Committee Advisors and the Ad Hoc Group Advisors, and consulting with them regarding same. The Debtors shared the proposed Third-Party Factoring Procedures with the Creditors' Committee and the Third-Party Factors and received feedback and input from the Creditors' Committee and certain Third-Party Factors. Additionally, the Debtors have provided the Creditors' Committee and the Third-Party Factors all the data necessary for

replicating and verifying A&M's analysis.  The Debtors submit that the relief requested herein provides for clear notice consistent with the underlying policies of the Bankruptcy Code.

39.     Accordingly, for the foregoing reasons, the Debtors submit that the relief requested herein, including the establishment of the Third-Party Factoring Procedures, is warranted and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases, and the form and manner of providing notice thereof are reasonable and appropriate in light of the circumstances.

## Reservation of Rights

40.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.  The Debtors expressly reserve all rights with respect to the foregoing matters.

## Notice

41.     Notice of this Motion will be served on all known Customers, any party entitled to notice pursuant to Bankruptcy Rule 2002, and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Previous Request**

42.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 1, 2025
       Houston, Texas

                                           /s/  Clifford W. Carlson
                                    WEIL, GOTSHAL & MANGES LLP
                                    Gabriel A. Morgan (24125891)
                                    Clifford W. Carlson (24090024)
                                    700 Louisiana Street, Suite 3700
                                    Houston, Texas 77002
                                    Telephone:  (713) 546-5000
                                    Facsimile:  (713) 224-9511
                                    Email:   gabriel.morgan@weil.com
                                               clifford.carlson@weil.com

                                    -and-

                                    WEIL, GOTSHAL & MANGES LLP
                                    Matthew S. Barr (admitted *pro hac vice*)
                                    Sunny Singh (admitted *pro hac vice*)
                                    Andriana Georgallas (admitted *pro hac vice*)
                                    Kevin Bostel (admitted *pro hac vice*)
                                    Jason H. George (admitted *pro hac vice*)
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Email:  matt.barr@weil.com
                                               sunny.singh@weil.com
                                               andriana.georgallas@weil.com
                                               kevin.bostel@weil.com
                                               jason.george@weil.com

                                    *Proposed Attorneys for Debtors*
                                    *and Debtors in Possession*

## Certificate of Service

I hereby certify that on December 1, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


          */s/ Clifford W. Carlson*
          Clifford W. Carlson