**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE (I) APPROVING AND AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE CONSULTING AGREEMENT; (II) AUTHORIZING THE SALE OF WIND DOWN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN APRIL 2, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**THE DEBTORS HAVE REQUESTED THAT A HEARING BE CONDUCTED ON THIS MATTER ON APRIL 2, 2026 IN COURTROOM 402, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ."**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1. While the Debtors have completed a going-concern sale of the Walbro[2] business unit, and are also pursuing going-concern sales for certain of their other business units, the Debtors' liquidity challenges have forced them to commence a wind down of certain of their remaining North American businesses and to cease operations at the facilities associated with such business units, including, among others, all facilities of Brakes,[3] Autolite Operations LLC ("**Autolite**"), and Hopkins Manufacturing Corporation ("**Hopkins**"). In connection with such wind-down process, the Debtors are now seeking to expeditiously liquidate their remaining assets to maximize value for their stakeholders.

2. Accordingly, the Debtors have engaged Hilco (as defined below) to market certain inventory and accounts receivable that will not be transferred as part of any going-concern sales,

---

[2] "**Walbro**" means the business operated by the Debtors consisting of the development, design, manufacture, sourcing, marketing, distribution and sale of products and services under or primarily associated with (a) small engine fuel systems, carburetors, fuel pumps, ignition systems, electronic fuel injection, plastic injection molding, and related components across power equipment, powersports, marine, and specialty engines and (b) operations under brand names associated with Walbro or Carter Carburetor, in each case, at, from, or through certain facilities operated by the Debtors.

[3] "**Brakes**" collectively refers to the businesses of Brake Parts Inc LLC, CWD, LLC, International Brake Industries, Inc., Foundry (including Dalton Corporation, Eagle Casting, LLC, and Eagle Machining, LLC), and Cardone Industries, Inc.

and seek to establish an efficient process to execute on sales without having to incur the cost and delay of filing a motion for each proposed transaction while preserving the rights of parties in interest. As set forth herein, to the extent any proposed transaction involves the sale of any disputed collateral of any creditors of the SPV Debtors[4] or assets subject to disputed ownership interests, the Debtors will segregate the proceeds of such sales, less Hilco's Fees and Expenses (as defined in the Consulting Agreement), pending further Court order.

3. The Debtors are seeking emergency relief so they can proceed with executing on sale transactions as efficiently as possible and to take advantage of any actionable bids that may otherwise be lost with the passage of time. Obtaining such relief on an emergency basis will also allow the Debtors to (i) avoid or minimize further rent obligations associated with the applicable facilities storing inventory, (ii) benefit from the institutional knowledge and operational assistance of the Debtors' current workforce, and (iii) minimize depreciation of the Debtors' assets.

4. Pursuant to the Consulting Agreement (as defined below), the Debtors seek authority to retain Hilco to monetize inventory, collect outstanding accounts receivable, and perform advisory services related to the Debtors' disposition strategy. In exchange for such services, Hilco will be paid (i) a commission equal to 5% of the Net Proceeds generated from the sale of Inventory; (ii) a commission equal to 3% of the Gross Proceeds generated from the collection of Receivables; (iii) a monthly fee of $200,000 for the Advisory Services; and (iv) reimbursement of Expenses.

5. Accordingly, for the reasons set forth herein, the Debtors respectfully request that this Motion be granted on an emergency basis.

---

[4] The "**SPV Debtors**" mean, collectively, Carnaby Capital Holdings, LLC and each of its Debtor subsidiaries.

## Relief Requested

6. By this Motion, pursuant to sections 105(a), 363, and 554 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"):

a. approving, and authorizing the Debtors to enter into and perform under that certain Amended and Restated Consulting and Marketing Services Agreement, by and between Hilco Merchant Resources, LLC, Hilco Receivables, LLC, and Hilco Global Professional Services, LLC (collectively, "**Hilco**" or the "**Consultant**") and First Brands Group, LLC, dated as of March 13, 2026, attached as Exhibit 1 to the Proposed Order (together with any amendments and supplements thereto, the "**Consulting Agreement**"), pursuant to which, among other things, Hilco will serve as the Debtors' exclusive agent with respect to the Inventory Services, the Receivables Services, and the Advisory Services (each as defined herein);

b. approving the sale and/or abandonment of certain Wind Down Assets (as defined below) and waiving any otherwise applicable Liquidation Sale Laws (as defined below);

c. authorizing the sale or disposition of the Wind Down Assets free and clear of all liens, claims, and encumbrances; and

d. granting related relief.

7. In support of the Motion, the Debtors submit the declaration of Charles M. Moore, Interim Chief Executive Officer of First Brands Group, LLC, and Managing Director at Alvarez & Marsal North America, LLC, the financial advisors to the Debtors, filed contemporaneously herewith and incorporated by reference herein.

## Jurisdiction and Venue

8. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

10. On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code. Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.

11. On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") [Docket No. 313].

12. The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

## The Wind Down of Certain North American Business Operations

### I. Overview

13. As more fully described in the First Day Declaration,[5] the Debtors commenced these chapter 11 cases under extremely challenging circumstances to, among other things, stabilize the business and pursue one or more value-maximizing transactions for the benefit of the Debtors' stakeholders. Since then, the Debtors and their advisors have taken extraordinary measures to stabilize the business, negotiate with key creditors and stakeholders, litigate numerous contested matters before the Court, and forge a path forward.

[5] "**First Day Declaration**" means the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [Docket No. 22].

14. Although the Debtors have made significant strides toward their goals, certain obstacles driven by the nature of these cases have strained liquidity—the lack of accurate financials, the conduct of prior management in connection with, among other things, the third-party factoring program and off-balance sheet financing arrangements, and the litigation costs attendant thereto.

15. Against this backdrop, the Debtors determined that an orderly and expeditious marketing and sale process for the Debtors' assets was the value-maximizing path forward. To that end, the Debtors, working with their advisors, developed the postpetition marketing, bidding, and auction procedures for which they sought approval through the Bidding Procedures Motion.[6]

16. In connection with filing the Bidding Procedures Motion, the Debtors, through their investment banker, Lazard Frères & Co. LLC, commenced outreach to numerous financial and strategic bidders. Although the Debtors are continuing discussions with potential bidders with respect to certain business units, the Debtors and their advisors have determined that there is no viable path forward, either by sale or additional funding, to maintain the operations of certain North American business units, including, among others, the Brakes and Autolite brands. On January 26 and February 3, 2026, in response to (among other things) certain bidders suddenly and unexpectedly exiting the sales process, the Debtors announced that they had commenced the wind down of these business units, which announcement was followed by the determination to wind down certain of their other remaining business units, such as, among others, Hopkins, due to (among other things) certain lenders unexpectedly withdrawing funding for ongoing operations

[6] *See Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* [Docket No. 1253] (the "**Bidding Procedures Motion**"). The hearing on the Bidding Procedures motion has been adjourned indefinitely.

and/or potential buyers suddenly withdrawing their bids, on February 23, 2026 and February 27, 2026 (the "**Wind Down**" and such business units, collectively, the "**Wind Down Brands**").

## II. Selection of Consultant and Consulting Agreement

17. In order to maximize the value of the Wind Down Brands and other such business units and/or asset classes (collectively, the "**Wind Down Assets**"), the Debtors have determined in their business judgment that the Consultant's services are necessary (i) to efficiently monetize the inventory (the "**Inventory**" and such services, the "**Inventory Services**") located at certain of the Debtors' owned and/or leased facilities, warehouses, distribution centers, and/or fulfillment centers, listed on Exhibit A to the Consulting Agreement (collectively, the "**Locations**");[7] (ii) to collect, service, settle, and otherwise resolve outstanding trade accounts receivables for certain Wind Down Brands and for which the Debtors have the exclusive right to collect (the "**Receivables**" and such services, the "**Receivables Services**");[8] and (iii) to perform advisory services related to the Debtors' disposition strategy, including to peer-review any liquidation analyses prepared by the Debtors and/or their advisors and to prepare liquidation models for certain underlying assets to help inform the Debtors' disposition strategy (the "**Advisory Services**" and, together with the Inventory Services and Receivables Services, the "**Services**"). As set forth in further detail below, the Debtors and their advisors have determined that it is in the best interests

---

[7] For the avoidance of doubt, if Hilco has not provided any Inventory Services in respect of Inventory being separately sold by the Debtors at the Fram Hebron and CDMX DC (FRAM) facilities, then Hilco shall not be entitled to receive an Inventory Fee (as defined below) with respect thereto.

[8] For the avoidance of doubt, accounts receivable from OEMs that are settled as part of the Debtors' going concern sales are not included in the meaning of "Receivables" and, in turn, fall outside the scope of Hilco's Receivables Services.

of the Debtors' estates to, with the Consultant's assistance, immediately begin monetizing the Wind Down Assets and, thus, have sought emergency consideration of this Motion.

18. The Consultant is a nationally recognized advisory firm with expertise in, among other things, asset disposition, collection, and monetization. The Consultant is already retained as the Debtors' appraiser and thus has developed a familiarity with the Debtors' assets and operations, such that the Consultant is well-qualified and capable of performing the tasks contemplated under the Consulting Agreement in a manner that is value-maximizing for the Debtors' estates.[9]

19. Pursuant to the Consulting Agreement, the Consultant will serve as an independent consultant to the Debtors performing the Services in connection with the Wind Down of the Wind Down Brands. The Debtors have determined, in their reasonable business judgment, that: (a) the Services of the Consultant are necessary to maximize the value of the Wind Down Assets, while allowing the Debtors to retain control over the Wind Down of the Wind Down Brands and maximize benefit to their estates; (b) the economic terms—including the Fees and Expenses—set forth in the Consulting Agreement are fair and reasonable under the circumstances and are consistent with "market" comparables; (c) the Consulting Agreement will allow the Debtors to utilize the capabilities, experience, and resources of the Consultant in performing the Services; and (d) the Consultant is capable of performing the Services on favorable terms.

20. A summary of the key terms of the Consulting Agreement is set forth below.[10] A copy of the Consulting Agreement is attached to the Proposed Order as Exhibit 1.

---

[9] On December 8, 2025, the Court entered the *Order Authorizing Retention and Employment of Hilco Global as Appraisers for Debtors Effective as of October 7, 2025* [Docket No. 898], authorizing the Debtors to retain and employ certain affiliates of the Consultant as appraiser. The work performed in connection with the Consulting Agreement is separate and distinct from the appraisal work performed for the Debtors.

[10] The following summary chart is for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects. Capitalized terms used but not defined in the summary chart have the meaning ascribed to them in the Consulting Agreement.

<table>
<tr><th>Term</th><th>Consulting Agreement</th></tr>
<tr><td>Services Provided by Consultant</td><td>
During the Term, Hilco will perform the following services:
Inventory Services
<ul>
<li>mutually agree with the Debtors with respect to a strategic plan to maximize the value of the Inventory (the “Strategy”);</li>
<li>market the Inventory for sale on the Debtors’ behalf in accordance with the Strategy, negotiate the terms of sales of the Inventory in whole or in part and implement any such agreements reached with purchasers;</li>
<li>to the extent reasonably practicable and upon mutual written agreement of the Parties, provide supervisors (“Supervisors”) and/or source additional labor personnel to assist with the marketing and sale of the Inventory;</li>
<li>the Debtors and Hilco shall jointly establish pricing parameters for the sale of the Inventory within which Hilco shall be authorized to sell Inventory without the Debtors’ consent;</li>
<li>provide such other services as the Debtors and Hilco may agree in writing to carry out the Inventory Services; and</li>
<li>collect all gross proceeds generated from the sale of Inventory on behalf of the Debtors and remit such proceeds to the Debtors (less any amounts due to Hilco under the Consulting Agreement on account of the Inventory Services).</li>
</ul>
Receivables Services
<ul>
<li>in consultation with the Debtors, collect, service, settle, and otherwise resolve outstanding Receivables on the Debtors’ behalf for certain Wind Down Brands and otherwise in compliance with applicable law;</li>
<li>in consultation with the Debtors, direct the obligors on the Receivables to make payment to Hilco or through a lock box arrangement mutually agreed by the Debtors and Hilco;</li>
<li>(a) receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Hilco, as the agent for the Debtors; and</li>
</ul>
</td></tr>
</table>

| Term | Consulting Agreement |
|---|---|
| | • if the Debtors request, identify and oversee third-party collection attorneys to collect those Receivables Hilco is otherwise unable to collect.<br><br>***Advisory Services***<br><br>• peer-review any liquidation analyses prepared by the Debtors and/or their advisors;<br><br>• prepare liquidation models for certain underlying assets to help inform the Debtors' disposition strategy; and<br><br>• provide guidance on personnel that may be necessary to execute the Debtors' disposition strategy. |
| **Term** | Hilco shall commence providing the Services on the Effective Date of the Consulting Agreement and shall continue for a period of six (6) months therefrom unless terminated in accordance with the Agreement (the "**Term**"); unless further extended by mutual written agreement of the Parties.<br><br>Either Party shall have the right to terminate the Consulting Agreement for cause upon written notice to the other Party. Termination for cause shall mean any termination as a result of a Party's fraud, misrepresentation, gross negligence, willful misconduct, or material breach of any of the terms of the Consulting Agreement. In addition, the Debtors may terminate the Consulting Agreement upon forty-five (45) days' prior written notice, subject to payment of all fees and Expenses accrued through the effective date of termination. |
| **Compensation** | In connection with the Services, Hilco shall be entitled to the following fees:<br><br>• ***Inventory Services***. As a fee for the Inventory Services, Hilco shall be paid a commission equal to 5% of the Net Proceeds generated from the sale of Inventory (the "**Inventory Fee**"). For purposes of the Consulting Agreement, "Net Proceeds" shall mean the total cash or non-cash consideration paid or received from the sale of Inventory under the Consulting Agreement, less any applicable (a) tariffs and duties (not to exceed $20 million), sales tax, and outbound freight paid by the Debtors for the sale of Inventory under the Consulting Agreement and (b) amounts required to be paid by the Debtors to secure the release of Inventory to be sold under the Consulting Agreement from freight providers, not to exceed $15 million in the aggregate, and in the case of both (a) and (b), to the extent supported by reasonable documentation |

| Term | Consulting Agreement |
| --- | --- |
| | provided by the Debtors. For the avoidance of doubt, any in-bound freight charges paid by the Debtors to acquire and receive the Inventory shall not be factored into the calculation of Net Proceeds under the Consulting Agreement.<br><br>• ***Receivables Services***. As a fee for the Receivables Services, Hilco shall be paid a commission equal to 3% of the Gross Proceeds generated from the collection of Receivables (the "**Receivables Fee**"). "**Gross Proceeds**" shall mean the total cash or non-cash consideration paid or received from the collection of the Receivables.<br><br>• ***Advisory Services***. As a fee for the Advisory Services, the Debtors shall pay Hilco a monthly fee of $200,000 (the "**Monthly Fee**" and, together with the Inventory Fee and Receivables Fee, the "**Fees**"). Each Monthly Fee shall be due and payable in advance upon the first business day of each calendar month, except with respect to the first Monthly Fee, which shall be due and payable upon execution of the Consulting Agreement. Each Monthly Fee shall be earned in full when due and nonrefundable; *provided*, that each Monthly Fee paid to Hilco under the Consulting Agreement shall be credited against and subtracted from any Inventory Fee or Receivables Fee that becomes payable pursuant to the Consulting Agreement (but such subtraction shall in no event result in a fee of less than zero and each Monthly Fee shall be credited no more than once).<br><br>• ***Expenses***. The Debtors shall be responsible for all expenses incurred by Hilco in connection with the Services, including (without limitation) advertising, promotion and sales costs, travel expenses, reasonable attorneys' fees and costs, and other miscellaneous costs and expenses, including costs and expenses related to the costs of supervision (including (without limitation) Supervisors' reasonable and documented wages, deferred compensation, travel, and bonus payments, if any) and advertising costs (including signage and the shipping, freight, and sales tax related thereto where applicable) (collectively, the "**Expenses**"); *provided*, that Hilco's Expenses shall not exceed the aggregate budget established and mutually agreed by the Debtors and Hilco.<br><br>Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors agree that Hilco may withhold all fees and expenses due to Hilco under the Consulting Agreement from proceeds collected by Hilco from the sale of Inventory and/or collection of Receivables.<br><br>All fees payable to Hilco under the Consulting Agreement shall be free and clear of any liens, claims and encumbrances, including the liens of any secured parties. |

<table>
<tr><th>Term</th><th>Consulting Agreement</th></tr>
<tr><td>Indemnification by Consultant</td><td>Hilco shall indemnify, defend, and hold the Debtors and their affiliates, and their respective officers, directors, principals, shareholders, affiliates, members, consultants, advisors, agents, and employees harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to:<br><br>• the gross negligence (including omissions), willful misconduct, or fraud of Hilco, its affiliates, directors, officers, employees, agents, contractors, consultants, or representatives; and<br><br>• the material breach of any provision of, or the failure to perform any obligation under the Consulting Agreement by Hilco, including any representation, warranty, or covenant.</td></tr>
<tr><td>Indemnification by the Debtors</td><td>The Debtors shall indemnify, defend, and hold Hilco and its officers, directors, principals, shareholders, affiliates, members, consultants, advisors, and employees (collectively, the "Hilco Indemnified Parties") harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to:<br><br>• the negligence, intentional or unlawful acts or omissions of the Debtors or their consultants, advisors, employees, representatives and principals (other than Hilco Indemnified Parties);<br><br>• the material breach of any provision of, or the failure to perform any obligation under the Consulting Agreement by the Debtors;<br><br>• the failure by the Debtors to promptly pay any taxes to the proper taxing authorities in connection with the Services and/or sale of any Inventory and/or the failure by the Debtors to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities;<br><br>• any liability or other claims asserted by the Debtors' previous brokers, consultants, advisors, employees, representatives, and principals;<br><br>• any claims, violation notices, recalls, damages, fines, penalties and other expenses relating to hazardous or toxic component materials (including, without limitation, those relating to any violation or alleged violation of the State of California, USA's Safe Drinking</td></tr>
</table>

| Term | Consulting Agreement |
|---|---|
| | Water and Toxic Enforcement Act of 1986/Proposition 65 laws or any other laws, rules or regulations); and<br><br>• improper or incomplete labeling or warnings with respect to any of the Inventory.<br><br>As set forth in the Proposed Order, any indemnification payment from the Debtors' estates during the pendency of these chapter 11 cases shall require prior Court approval after notice and a hearing. |

## III. Abandonment of Burdensome Property

21. In effectuating the Inventory Services, the Debtors intend to sell or otherwise monetize the Inventory and other Wind Down Assets at the Locations. The Debtors may determine, however, in their business judgment, that certain Wind Down Assets (the "**Burdensome Property**") will be difficult or expensive to remove, ship, or store, such that the economic benefits of removing, selling, shipping, or storing some or all of the Burdensome Property will be exceeded by the attendant costs thereof. Accordingly, the Debtors respectfully submit that, under such circumstances, the abandonment or discard of such property would be in the best interests of their estates and, as such, the Debtors request the Court's approval to abandon any Burdensome Property for the benefit of their estates and creditors.

## IV. Wind Down of Additional Wind Down Assets

22. The Debtors continue to evaluate their business portfolio and may, in the future, determine that it would be in the best interests of their estates to wind down additional brands, business units, and/or asset classes, including, without limitation, intellectual property, machinery and equipment, and real estate, pursuant to the terms set forth in this Motion and the Consulting Agreement. Therefore, the Debtors request the authority to amend or supplement the list of Wind Down Assets by either (i) amending Exhibits A and B of the Consulting Agreement or (ii) entering into additional agreements consistent with, and subject to, the Proposed Order, in each case,

pursuant to which each of the Amendment Notice Parties[11] shall have two (2) business days to object to such proposed amendment to the Consulting Agreement or additional agreement, but without the need of further Court order if the Debtors determine in their business judgment that such additional Wind Downs would be in the best interests of their estates; *provided*, that any such proposed amendment or additional agreement which seeks to add any Inventory subject to any Asserted SPV Interests by the Aequum Secured Parties,[12] the Carnaby II and III Secured Parties,[13] Evolution,[14] or the UMB Lenders[15] will require the consent of such affected party, as applicable, or further Court order.

## V. Segregation of Proceeds with Respect to Disputed Collateral

23. As the Court knows, certain of the Debtors' inventory is subject to disputes by multiple lenders asserting competing interests in such inventory. Specifically, certain of the Debtors' lender groups—the ABL Lenders,[16] the DIP Secured Parties, and certain of the Debtors' inventory financing counterparties (the "**SPV Lenders**")[17]—have asserted liens and/or ownership

---

[11] The "**Amendment Notice Parties**" consist of (i) the U.S. Trustee, (ii) the Creditors' Committee, (iii) the Ad Hoc Group, (iv) the ABL Lenders, (v) Benjamin Duster in his capacity as independent manager of Viceroy Private Capital, LLC, (vi) Onset Financial, Inc. ("**Onset**"), (vii) Aequum, (viii) UMB, (ix) Carval, and (x) Evolution.

[12] "**Aequum Secured Parties**" has the meaning ascribed to such term in the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Aequum Secured Parties* [Docket No. 1018] (the "**Aequum Stipulation**").

[13] "**Carnaby II and III Secured Parties**" has the meaning ascribed to such term in the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* [Docket No. 1363] (the "**Carval Stipulation**").

[14] "**Evolution**" has the meaning ascribed to such term in the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 609] (the "**Evolution Stipulation**").

[15] "**UMB Lenders**" has the meaning ascribed to such term in the *Stipulation and Agreed Order Regarding Adequate Protection of UMB Bank, N.A. and the UMB Lenders* [Docket No. 213] (the "**UMB Stipulation**").

[16] Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to them in the First Day Declaration or the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "**Final DIP Order**").

[17] For the avoidance of doubt, Onset shall be deemed an SPV Lender for all purposes hereunder.

interests in such inventory.[18] Nevertheless, the Debtors believe, in their reasonable business judgment, that it is imperative to begin liquidating certain assets for the benefit of the lender(s) that are ultimately determined to hold an interest in such inventory. As detailed below, such assets can be monetized and held in escrow pending further order of the Court.

24. With respect to any Wind Down Assets sold pursuant to the Proposed Order that are subject to an actual or purported lien, claim, encumbrance, ownership, or other interest by an SPV Lender (the "**Asserted SPV Interests**") and that are subject to an actual or purported lien, claim, or encumbrance by the ABL Lenders (the "**Asserted ABL Priority Collateral Interests**"), the Debtors request authority to deposit the proceeds of the sale of such assets, net of (i) Fees and Expenses and (ii) any obligations owed to the Debtors, including on account of surcharges pursuant to section 506(c) of the Bankruptcy Code as determined by further order of the Court, into a segregated account (the "**SPV-ABL Wind Down Account**"). The Asserted SPV Interests and Asserted ABL Priority Collateral Interests of any holder will attach to the funds in the SPV-ABL Wind Down Account to the same extent and with the same priority as the holders now have against such Wind Down Assets. All parties' rights to object to the priority, validity, amount, and extent of the Asserted SPV Interests and Asserted ABL Priority Collateral Interests asserted by any holder will be fully preserved. Funds in the SPV-ABL Wind Down Account will not be distributed without further Court order.

[18] In relevant part, among other things, (i) the ABL Lenders hold first priority liens over inventory as ABL Priority Collateral, in which the DIP Secured Parties and the Term Loan Secured Parties assert junior liens, (ii) the DIP Secured Parties hold first-priority DIP Liens over certain real property, intellectual property rights, and PP&E as Term Priority Collateral, in which the Term Loan Secured Parties and the ABL Lenders assert junior liens, and (iii) Onset asserts ownership interests and/or liens in certain inventory and PP&E (collectively, the "**Onset Interests**"). The Debtors dispute and have challenged the Onset Interests. *See* Adv. Pro. No. 26-03005 [Docket No. 1].

25. Similarly, with respect to any Wind Down Assets sold pursuant to the Proposed Order that are subject to any Asserted SPV Interests and are DIP Collateral other than ABL Priority Collateral and subject to an actual or purported lien, claim, or encumbrance (the "**Asserted DIP Collateral Interests**" and, together with the Asserted SPV Interests and the Asserted ABL Priority Collateral Interests, the "**Asserted Interests**"), the Debtors request authority to deposit the proceeds of the sale of such assets, net of (i) Fees and Expenses and (ii) any obligations owed to the Debtors, including on account of surcharges pursuant to section 506(c) of the Bankruptcy Code as determined by further order of the Court, into a segregated account (the "**SPV-DIP Wind Down Account**" and, together with the SPV-ABL Wind Down Account, the "**Wind Down Accounts**"). The Asserted SPV Interests and Asserted DIP Collateral Interests of any holder will attach to the funds in the SPV-DIP Wind Down Account to the same extent and with the same priority as the holders now have against such Wind Down Assets. All parties' rights to object to the priority, validity, amount, and extent of the Asserted SPV Interests and Asserted DIP Collateral Interests asserted by any holder will be fully preserved. Funds in the SPV-DIP Wind Down Account will not be distributed without further Court order.

26. Additionally, with respect to any Wind Down Assets sold pursuant to the Proposed Order that are undisputed DIP Collateral (other than ABL Priority Collateral), the Debtors request authority to deposit the proceeds of the sale of such assets, net of Fees and Expenses, into the Escrow Account. The interests of the DIP Secured Parties will attach to the funds in the Escrow Account to the same extent and with the same priority as the DIP Secured Parties now have against such Wind Down Assets. Other than in connection with payment of Fees and Expenses pursuant

to the terms of the Proposed Order, funds in the Escrow Account will not be distributed without the prior written consent of the Ad Hoc Group (email being sufficient) or further Court order.[19]

27. Furthermore, in the course of the Wind Down, it is possible to envision scenarios in which conflicts may emerge as to collateral held by different parties. For example, Hilco may have an opportunity to monetize Inventory with a third-party buyer in which one creditor holds an interest as well as collect Receivables from that same third-party in which a different creditor holds an interest (an "**Overlapping Collateral Sale**"). In an Overlapping Collateral Sale, such third-party buyer could theoretically offer to pay a premium for the Inventory if the Debtors agreed to a haircut as to the Receivables. Such a result could be value-maximizing from the perspective of the estate as a whole, but would be preferential for one creditor owning, purporting to own, or asserting an actual or purported lien, claim, or encumbrance in the Inventory or Receivables, as applicable (an "**Overlapping Collateral Interest**"), at the expense of another creditor with an Overlapping Collateral Interest.

28. To the extent that any Overlapping Collateral Sales arise, the Debtors would only seek to proceed with the proposed transaction if both the creditor with an Overlapping Collateral Interest in the Inventory and the creditor with an Overlapping Collateral Interest in the Receivables each consented to the proposed Overlapping Collateral Sale or by further order of this Court. Ensuring no creditors are prejudiced as a result of any potential transactions, including with respect to Overlapping Collateral Sales, is of paramount importance in the Wind Down. For the avoidance of doubt, any party asserting an Overlapping Collateral Interest will receive a Wind Down Sale Notice (as defined below) as it pertains to such party's Overlapping Collateral Interest and will

[19] To the extent Hilco's Fees and Expenses are not already paid or are inadvertently deposited into any of the Wind Down Accounts, the Debtors shall seek the release of the Fees and Expenses to the Consultant and, until such time, the Consultant shall be granted a first-priority security interest and lien subject to the terms of the Proposed Order.

have the benefit of the Notice Period (as defined below) prior to being asked to consent to such proposed Overlapping Collateral Sale.

29. The Debtors submit that escrowing such funds in any of the Wind Down Accounts, as applicable, and obtaining consents from the relevant creditors in Overlapping Collateral Sales or a further order of this Court with respect thereto, in each case, will protect the interests of the relevant stakeholders while also enabling the Debtors and their parties in interest to benefit from efficiently liquidating such collateral.

## Basis for Relief

### VI. The Court Should Authorize Entry into and Performance under the Consulting Agreement

30. Entry into and performance under the Consulting Agreement represents a sound exercise of the Debtors' business judgment and is permissible under sections 363(b) and 105(a) of the Bankruptcy Code.

31. Pursuant to section 363(b) of the Bankruptcy Code, a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Court of Appeals for the Fifth Circuit has held that debtors must articulate a "business justification" for using, selling, or leasing property outside of the ordinary course of business. *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (outside of the ordinary course of business, "for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property") (internal quotation marks omitted). The "business judgment standard is flexible and encourages discretion." *ASARCO*, 650 F.3d at 601. "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken

was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to impartially control a case. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

32. Section 105 of the Bankruptcy Code provides further support for entry of an order approving the Debtors' entry into the Consulting Agreement. Section 105 empowers the Court "to issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105 (a). Section 105(a) operates "to facilitate the implementation of other Bankruptcy Code provisions," and in so doing it provides a "bankruptcy court with broad authority to exercise its equitable powers." *Ameriquest Mortgage Co. v. Nosek (In re Nosek)*, 544 F.3d 34, 43 (1st Cir. 2008) (internal citations omitted). In this circuit, section 105(a) is interpreted "liberally" provided that the relief sought is "consistent with the rest of the Bankruptcy Code." *Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) (revised for clarity). These equitable powers are granted to effectuate the policies and goals of chapter 11 reorganization, which are to rehabilitate the debtor. *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176–77 (Bankr. S.D.N.Y. 1989), and to "create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987).

33. The entry into and performance under the Consulting Agreement represents a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the

Debtors determined that conducting the Wind Down pursuant to the Consulting Agreement, including the related sale of the Wind Down Assets, was in the best interests of the Debtors and their estates and, specifically, (a) the Inventory should be liquidated or otherwise monetized and the Debtors' Receivables should be collected or otherwise resolved, in each case for the benefit the Debtors' estates and their creditors; and (b) the Advisory Services would provide additional benefits to the Debtors' estates and their creditors by helping inform the Debtors' disposition strategy. Further, after arm's-length negotiations with the Consultant, the Debtors believe that the Consulting Agreement contains the most favorable terms available under the circumstances.

34. The Consultant has extensive expertise in, among other things, asset disposition, collection, and monetization and can oversee, and assist in the management and implementation of, the Wind Down in an efficient and cost-effective manner. Further, because the Consultant has already been retained as the Debtors' appraiser, it has developed institutional knowledge regarding the Debtors and their asset portfolio. In turn, the Debtors have determined that the Consultant will be a more economical alternative to any other consultant. Entry into the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to efficiently conduct the Wind Down for the benefit of all stakeholders.

35. For the reasons set forth herein, the Debtors submit that they have exercised their reasonable business judgment in seeking to enter into the Consulting Agreement, thereby engaging and enabling the Consultant to proceed with the Wind Down, and respectfully request that the Proposed Order approving entry into the Consulting Agreement be granted.

## VII. Conducting the Wind Down Is Authorized Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code

36. The Court may authorize the Debtors to consummate the Wind Down pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. As described above, section 105(a) codifies

the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize actions that are essential to the continued operation of a debtor's business. The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction.

*Davis v. Davis* (*In re Davis*), 170 F.3d 475, 492 (5th Cir. 1999) (internal citation and quotation marks omitted).

37. Section 363(b)(1) of the Bankruptcy Code, as described above, governs asset sales outside of a debtor's ordinary course of business, providing that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors need only show a legitimate business justification for the proposed action as "[s]ection 363 impliedly requires the Court to find that it is good business judgment for the Debtor to enter into the transaction." *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (agreeing with *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)) (internal quotations omitted). Parties challenging a debtor's business decision must make a showing of "self-dealing, bad faith and gross negligence." *See In re Think3, Inc.*, 529 B.R. 147, 173 (Bankr. W.D. Tex. 2015) (overcoming the presumption of business judgment requires conduct "committed with gross negligence or beyond the 'bounds of reason'"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

38. Here, sufficient business justification exists for the Debtors to conduct the Wind Down. Prior to and since the commencement of these chapter 11 cases, the Debtors and their

advisors executed an extensive brand-by-brand analysis of the Debtors' existing asset portfolio. The Debtors determined, in their business judgment and with the assistance of their advisors, that there is no viable path forward, either by sale or additional funding, to maintain the Wind Down Brands and, therefore, it is in the best interests of the Debtors' estates, creditors, and other stakeholders to wind down the Wind Down Brands. As such, conducting the Wind Down of the Wind Down Brands, with the help of the Consultant, will facilitate the Debtors' code-based prerogative to monetize estate property for the benefit of all stakeholders. Absent the relief requested herein, the Debtors would be severely hampered in conducting the Wind Down.

## VIII. The Court Should Waive the Debtors' Obligations to Comply with Applicable Liquidation Sale Laws

39. Certain states in which the Debtors operate may have licensing or other requirements (including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances) related to liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations, or fast pay laws (collectively, the "**Liquidation Sale Laws**"). Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures in connection with liquidation sales. With respect to any aspect of the Consulting Agreement that is inconsistent with the Liquidation Sale Laws, the Debtors submit that a waiver of the Debtors' obligation to comply with such laws is warranted and should be approved.

40. Although certain state or local laws expressly except bankruptcy sales from their ambit, even when they do not, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, they are preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have

consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See, e.g.*, *Aloe v. Shenango Inc. (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). Preemption of state law is appropriate when, as here, the state laws involved solely concern economic regulation. *Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

41. Further, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because the Liquidation Sale Laws constrain the Debtors' ability to marshal and maximize the recoverable value of the Wind Down Assets for the benefit of the Debtors' stakeholders. Moreover, given the supervision of the Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Wind Down. The Debtors only request that the Court authorize the Debtors to conduct the Wind Down without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to conducting the Wind Down as similar asset dispositions and sales. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety and consumer protection laws. Moreover, pursuant to section

105 of the Bankruptcy Code, the Court has the authority to permit the Wind Down to proceed notwithstanding contrary Liquidation Sale Laws. *See* 11 U.S.C. § 105(a).

42. For each of these reasons, the Debtors seek a waiver of compliance with the Liquidation Sale Laws to the extent of any conflict with the Consulting Agreement or the objectives of these chapter 11 cases.

43. Except as described herein, the Debtors request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Wind Down, or the advertising and promotion (including through the posting of signs) of the Wind Down, in the manner set forth in the Proposed Order and the Consulting Agreement.

## IX. The Sale of Wind Down Assets Free and Clear of all Liens, Encumbrances, and Other Interests Is Warranted under Section 363(f) of the Bankruptcy Code

44. The Debtors request approval to sell the Wind Down Assets on a final "as is" basis, free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (holding that under section 363(f), a sale free and clear of interests can occur if any one of five conditions

has been satisfied); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

45. The Debtors anticipate that, to the extent there are liens on the Wind Down Assets, all holders of such liens will consent to the sales because the Wind Down provides the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties, thereby satisfying section 363(f)(2) of the Bankruptcy Code. Moreover, any and all liens on the Wind Down Assets sold during the Wind Down would attach to the Debtors' share of proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto.

46. Moreover, all identified parties with Asserted Interests will receive notice and will be given sufficient opportunity to object to the relief requested in this Motion. Any such entity that does not object to the Motion should be deemed to have consented. *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[i]t is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims, and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

47. Further, all identified parties with Asserted Interests will receive notice of the potential sales contemplated herein. As detailed in the Proposed Order, the Debtors will, at least two (2) days prior to the sale of any Wind Down Assets (the "**Notice Period**" and, such sale, a "**Wind Down Sale**"), serve by email a written notice of such Wind Down Sale (such notice, a "**Wind Down Sale Notice**") on (i) the U.S. Trustee (Jayson.B.Ruff@usdoj.gov); (ii) counsel to the Ad Hoc Group, Gibson, Dunn & Crutcher LLP: Scott J. Greenberg (sgreenberg@gibsondunn.com), Stephen D. Silverman (ssilverman@gibsondunn.com), AnnElyse Scarlett Gains (agains@gibsondunn.com), and Christina M. Brown (christina.brown@gibsondunn.com); (iii) counsel to the Creditors' Committee: Robert J. Stark (rstark@brownrudnick.com), Bennett S. Silverberg (bsilverberg@brownrudnick.com), and Kenneth J. Aulet (kaulet@brownrudnick.com); and (iv) counsel to the known creditors with an Asserted Interest (collectively, the "**Wind Down Sale Notice Parties**"). For the avoidance of doubt, no Inventory that is Aequum Collateral,[20] Carnaby II and III Collateral,[21] Holdings Collateral,[22] Evolution Collateral,[23] or Global Assets Collateral[24] will be sold without the consent of such affected party, as applicable, or further Court order.

48. The Wind Down Sale Notice will be delivered to the Wind Down Sale Notice Parties and will (i) identify the Wind Down Assets being sold, transferred, or otherwise disposed of (including the business unit and legal entity with which the Wind Down Assets are associated), (ii) identify the purchaser of the assets, (iii) state the purchase price, (iv) indicate whether the Wind

---

[20] "**Aequum Collateral**" has the meaning ascribed to such term in the Aequum Stipulation

[21] "**Carnaby II and III Collateral**" has the meaning ascribed to such term in the Carval Stipulation.

[22] "**Holdings Collateral**" has the meaning ascribed to such term in the Carval Stipulation.

[23] "**Evolution Collateral**" has the meaning ascribed to such term in the Evolution Stipulation.

[24] "**Global Assets Collateral**" has the meaning ascribed to such term in the UMB Stipulation.

Down Assets being sold constitute Overlapping Collateral, and (v) include any other significant terms of the proposed Wind Down Sale. If any Wind Down Sale Notice Party objects to the proposed Wind Down Sale before the end of the Notice Period, then such Wind Down Sale will not proceed until any issues raised by the Wind Down Sale Notice Parties have been consensually addressed or have been addressed by further order of this Court.

49. Accordingly, the Debtors submit that the sale of the Wind Down Assets satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should be free and clear of any liens, claims, encumbrances, and other interests.

**X. Sales of Wind Down Assets Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

50. Because the purchasers of the Wind Down Assets act in good faith, they are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sales related to the Wind Down. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. Purchasers are provided this protection so long as they leased or purchased the assets in "good faith." *Id.* Although the Bankruptcy Code does not define "good faith purchaser," "the test for good faith 'is twofold: a good faith purchaser is one who buys in good faith and for value.'" *In re 23andMe Holding Co.*,

674 B.R. 487, 522 (Bankr. E.D. Mo. 2026) (quoting *In re Burgess*, 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000)); *see also In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986); 3 Collier on Bankruptcy ¶ 363.11 (Richard Levin & Henry J. Sommer eds., 16th ed.). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed. *In re Abbotts Dairies*, 788 F.2d at 149–50. "[C]ourts properly look to the transparency of the process as indicative of one's intent," and courts often look to whether "each of the salient facts" were disclosed. *Matter of RE Palm Springs II, L.L.C.*, 65 F.4th 752, 764–65 (5th Cir. 2023). To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Vetter Corp.*, 724 F.2d 52, 56 (7th Cir. 1983) (emphasis omitted) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m))); *see* 3 Collier on Bankruptcy ¶ 363.11 (Richard Levin & Henry J. Sommer eds., 16th ed.).

51. Here, Wind Down Assets are being marketed to unaffiliated third parties acting for bona fide personal purposes, and Wind Down Sales to insiders (as defined in the Bankruptcy Code) are expressly prohibited. Each sale of a Wind Down Asset will be mutually beneficial to both parties and the terms thereof will be fully disclosed to each purchaser and to the Wind Down Sale Notice Parties. A fair and transparent process ensures the sales are at arm's-length, without collusion or fraud, and entered into in good faith. Accordingly, the Debtors request that the Court determine that the purchasers of the Wind Down Assets acted at all times in good faith and, as a result, are entitled to the full protections of good faith purchasers under section 363(m) of the Bankruptcy Code.

## XI. The Court Should Approve the Abandonment of Certain Property in Connection with the Wind Down

52. After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim or administering the property"). The Debtors are seeking to sell the Wind Down Assets at the Locations. However, the Debtors may determine that the costs associated with holding or selling certain property exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estates and may be burdensome to retain.

53. To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining Inventory or other Wind Down Assets located at any of the Locations without incurring liability to any person or entity. The Debtors further request that the landlord of each leased Location with any abandoned Inventory or other Wind Down Assets be authorized to dispose of such property without liability to any third parties.

54. Notwithstanding the foregoing, the Debtors and/or the Consultant will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (referring to information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) of any customers or employees in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

**Emergency Consideration**

55. The Debtors respectfully request emergency consideration of this Motion in order to commence the Wind Down on an expedited basis. The Debtors believe that immediate relief is necessary to maximize the value of their estates and avoid forced wind downs of their business units as well as irreparable harm to the Debtors and their estates. If the Debtors are not authorized to enter into the Consulting Agreement, there could be substantial harm to all stakeholders including because (i) the estates could be forced to incur rent obligations at certain Locations beyond the Term to facilitate the Wind Down; (ii) delay in commencement of the Wind Down risks losing the institutional knowledge and operational assistance of certain of the Debtors' employees, who are critical to facilitating the Wind Down; and (iii) the value of the Wind Down Assets will continue to depreciate over time. To that end, the proposed timeline for the Wind Down of the Wind Down Brands is predicated on the Wind Down starting immediately. Accordingly, the Debtors request the Court approve the relief requested herein on an emergency basis.

**Debtors' Compliance with Bankruptcy Rules 6004(a) and 6004(h)**

56. To implement the foregoing successfully, the Debtors request that the Court waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above, the relief requested herein will allow the Debtors to consummate value-maximizing transactions as efficiently as possible and to take advantage of actionable bids for the sale of their assets. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

57. Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action that may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any executory contract or unexpired lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve all of their rights with respect to the foregoing matters. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**Notice**

58. Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Previous Request**

59. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: March 23, 2026
Houston, Texas

*/s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: gabriel.morgan@weil.com
clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: matt.barr@weil.com
sunny.singh@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
jason.george@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on March 23, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson