**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FIRST BRANDS GROUP, LLC, *et al.,* | ) Case No. 25-90399 (CML) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |
| | ) **Re: Docket No. 2546** |
| | ) |

**EVOLUTION'S OBJECTION TO DISCLOSURE STATEMENT
FOR CHAPTER 11 PLAN OF PREMIER MARKETING GROUP, LLC**

Evolution[2] hereby submits this objection (this "Objection") to the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Plan; (V) Establishing Global Settlement Election Procedures; and (VI) Granting Related Relief* [Docket No. 2546] (the "Disclosure Statement Approval Motion"), seeking conditional approval of the *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Docket No. 2545] (the "Disclosure Statement").[3]  In support of this Objection, Evolution respectfully states as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] "Evolution" shall mean, individually and collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[3] Capitalized terms used herein but not defined shall be given the meaning ascribed them in the Disclosure Statement or the Disclosure Statement Approval Motion, as applicable.

4938-0063-7610

## PRELIMINARY STATEMENT[4]

1.      These chapter 11 cases have been circling the drain since shortly after the Petition Date, as the Debtors have only further destroyed value post-petition, failed in their efforts to sell their assets as a going concern, and accrued astronomical administrative expenses.  These cases are in desperate need of a prompt resolution, whether through conversion and liquidation, or through an orderly chapter 11 plan involving the input of all of the Debtors' impaired creditors. The Plan does neither.

2.      Instead, under the guise of a chapter 11 plan for a single debtor entity, the FBG Debtors and certain favored lenders (and, possibly, the Creditors Committee)[5] devised a scheme to (a) isolate for themselves all of the other FBG Debtors' assets before any determinations can be made with respect to competing rights to those assets, (b) obtain for themselves valuable releases from third parties without investigation or valuation of the rights being released, and (c) prioritize and enhance their recoveries through fees and other benefits, binding all of the FBG Debtors and their creditors to the bargain.[6]  Meanwhile, creditors of all of the other FBG Debtors will have no say and no recourse.  Even opting out of (or declining to opt in to) the Global Settlement and declining to provide releases does not stand in the way of the Plan Transactions extracting all value

---

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Objection or the Disclosure Statement, as applicable.

[5] As of the filing of this Objection, it remains unclear whether the Creditors' Committee remains supportive.

[6] The Debtors and the other parties to the "Global Settlement" were initially proposing to provide creditors with only 9 days between the hearing to conditionally approve the Disclosure Statement Approval Motion and the deadline to opt out of the Global Settlement.  As set forth in the recently-filed *Declaration of Charles M. Moore in Support of Proposed Confirmation Schedule* [Docket No. 2621], the Debtors' proposed schedule now includes a "Release Opt-In Deadline" of 21 days and a "Global Settlement Election Deadline" of greater than 45 days from the hearing.  *Id.* at 4.  It is unclear what the revised terms of the release structure will provide, but in either case the substance of this Objection and the impact of the proposed Global Settlement on the FBG Debtors' other creditors must be addressed.

4938-0063-7610

from the FBG Debtors.  Objections to Plan confirmation on these grounds, among others, will almost certainly be filed at the appropriate time.

3.      At this juncture, however, the Court should decline to approve the Disclosure Statement because it fails to provide any "hypothetical reasonable investor" the necessary information in accordance with Bankruptcy Code Section 1125 to make an informed decision on whether to support or oppose the Plan by failing to adequately describe the Plan's impact on the rights and interests of the other FBG Debtors' and SPV Debtors' creditors.

4.      The Plan is premised on three Plan Transactions to be executed between the Debtors and the DIP Secured Parties or the ABL Lenders, as applicable.  But the only aspect of the Plan Transactions that is made clear in the Disclosure Statement is the beneficiaries.  The Disclosure Statement includes no valuation of any of the assets being purchased or foreclosed upon.  Likewise, it includes only a nine-day marketing process between the hearing on the Disclosure Statement Approval Motion and the bid deadline for the Estate Claims, which are the only assets being subjected to a market test, to determine if the DIP Secured Parties' credit bid of an unknown and undisclosed amount is the highest and best offer.  It fails to describe how, if at all, the DIP Secured Parties will marshal their recoveries between the Litigation Trust and the DIP Collateral Trust. And, of particular import to Evolution, the Disclosure Statement provides no information regarding how the Debtors can execute the Plan Transactions while the significant disputes regarding asset ownership and lien priority among the FBG Debtors, the SPV Debtors, and their respective secured lenders remain pending.

5.      For these reasons, and as set forth in more detail herein, the Court should decline to approve the Disclosure Statement unless the Debtors supplement it with additional information to address the issues set forth below.

4938-0063-7610

**RELEVANT BACKGROUND**

A.      **Commencement of the Chapter 11 Cases**

6.      On September 24, 2025 (the "SPV Petition Date"), the SPV Debtors (as defined below), together with certain of their affiliates, each filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.  On September 28, 2025 (the "FBG Petition Date" and collectively with the SPV Petition Date, the "Petition Dates"), First Brands Group, LLC and the remainder of the Debtors (*i.e.*, the non-SPV Debtors, (the "FBG Debtors")) followed suit, each filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      As described in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions*, [Docket No. 22] (the "Moore Declaration"), the Debtors entered chapter 11 having admitted to fraudulently duplicating and fabricating invoices under their third-party factoring program and defrauding creditors of up to $2.3 billion.  Moore Decl., ¶¶ 72, 94–95.  On December 16, 2025, an examiner was appointed by the United States Trustee to investigate these claims, among other things.  [Docket No. 1260].

B.      **The Evolution SPV Debtors and the Evolution Facilities**

8.      As described in greater detail in the Disclosure Statement (*see* Disclosure Statement at 41-42), certain of the SPV Debtors entered into asset-based revolving credit facilities (the "Evolution Facilities") with Evolution secured by the assets and equity of the SPV Debtor borrowers and guaranteed by their SPV Debtor parent entities.

9.      Under each of the Evolution Facilities, the SPV Borrowers are entitled to purchase inventory from the FBG Debtors, creating a borrowing base to obtain loans from Evolution Inventory Lender.  *See id.* ¶ 61.  As of the FBG Petition Date, approximately $230 million in principal obligations under the Evolution Facilities were outstanding.  *Id.* ¶ 62.

4

4938-0063-7610

10.     The Evolution SPV Debtors had no operations, no employees, and no creditors other than Evolution.  They were intended solely to be "bankruptcy-remote" special-purpose vehicles with assets isolated from the FBG Debtors, created for the purpose of effectuating the financing ultimately obtained from Evolution.  For that same reason, the Debtors' post-petition DIP financing does not grant liens on the assets of any of the SPV Debtors, including the Evolution SPV Debtors.  *See* Docket No. 608 at 63 ("For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the DIP Documents, none of the SPV Debtors are DIP Guarantors.  Nothing in this Final Order or any of the DIP Documents shall grant any liens or claims against any of the SPV Debtors or any assets of SPV Debtors or the proceeds thereof . . . . Notwithstanding anything herein to the contrary, no carve-out (including, without limitation, the Carve-Out . . .), shall apply to or be granted against, and no administrative claims in connection with the DIP Facility shall be granted against any of the [SPV Debtors].").

11.     Separately, Evolution provided additional financing to the Debtors in the form of a factoring facility.  On March 28, 2023, Evolution entered into a factoring agreement with eight Debtors, pursuant to which Evolution purchased what the Debtors held out to be real receivables. *See* Docket Nos. 1032-1, 1032-2.  In exchange, those Debtors made express representations, warranties, and covenants regarding the authenticity of the receivables it sold to Evolution and the underlying invoices.  Docket No. 1032-1 § 2, Exhibit B-1.  If any of those representations and warranties were not met, or covenants were breached, then the Debtors were obligated to indemnify Evolution or repurchase the receivables at face value, and provide for attorneys' fees and expenses.  *Id*. §§ 5(b)(i)–(iii), 5(c), 5(g).  These obligations are secured by "a lien on and security interest in" "all of the Receivables now or hereafter owned or held by such Seller [Debtor] to the extent not sold and purchased" by Evolution—in other words, Evolution was protected from

5

the Debtors' breaches of the Factoring Agreement by the grant of a security interest in those eight Debtors' prepetition receivables not sold to Evolution.  *Id*. § 5(g).

12. Evolution filed UCC-1 financing statements on March 31, 2023, and April 3, 2023, perfecting Evolution's security interest in "[a]ny and all present and future Receivables transferred or purported to be transferred to the Secured Party pursuant to that certain Master Receivables Purchase Agreement [the Factoring Agreement] . . . dated as March 28, 2023" for each of the eight Debtors who were party to the factoring agreement.  Docket No. 1032-3.  As of the Petition Date, the Receivable Sellers owed Evolution approximately $60.5 million on so-called receivables Evolution had purchased pursuant to the Factoring Agreement.  Shortly after filing for bankruptcy, the Debtors informed Evolution that *all* of the receivables Evolution purchased were fabricated.

### C.   Postpetition Disputes and Conversion.

13. <u>Failure to Provide Adequate Protection of Evolution's Interests in Inventory</u>. Evolution was one of many of the Debtors' secured lenders to enter into postpetition adequate protection stipulations related to the Debtors' inventory.  After arm's length and good faith negotiations, the parties reached an interim agreement and the Court ultimately approved the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 609] (as may be amended, modified, or supplemented, the "<u>Stipulation and Order</u>") governing the Debtors' consensual use of Evolution's inventory collateral.  The Stipulation and Order, like those entered into with multiple other secured lenders,[7]

---

[7] *See, e.g.*, *Aequum Capital Financial II LLC's (1) Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection of Aequum Capital Financial II LLC and the Aequum Lenders and (2) Second Objection and Reservation of Rights to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 485]; *see also* [Docket No. 486]; *Emergency Motion to Recognize Interests Under and to Enforce Stipulation and Order, and/or to Compel Performance Under Equipment Lease, and/or For Adequate Protection, and For Relief From Automatic Stay* [Docket No. 1702]; and *Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* [Docket No. 2011].

4938-0063-7610

was quickly violated by the Debtors and this Court found the Debtors in breach of the Stipulation and Order, prohibiting the Debtors "from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court." Hr'g Tr. January 20, 2026 at 45:15-46:7.

14. Factored Receivables Dispute. Needing additional liquidity to finance these chapter 11 cases in the months following the Petition Date, the Debtors filed the *Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability, and (III) Granting Related Relief* [Docket No. 807], seeking, among other things, entry of an order establishing procedures for the reconciliation of receivables collected and authorizing the release of tens of millions of dollars of collected prepetition receivables. Evolution and multiple other Third-Party Factors initially objected to the relief sought.

15. Evolution promptly appealed the Court's order granting the requested relief and, on January 31, 2026, the United States District Court for the Southern District of Texas remanded the matter for further proceedings to determine whether Evolution's interests were adequately protected. Docket No. 1845. On remand, the Court ultimately ordered the Debtors to return $25.7 million of previously released receivables to the segregated Factoring Receivables Account to adequately protect Evolution's interests in prepetition receivables of the relevant FBG Debtors. Docket No. 2127.

16. Lien Priority Actions. In addition to entering into the Stipulation and Order to safeguard its inventory collateral and obtaining adequate protection for its claim to certain prepetition accounts receivable, Evolution commenced two adversary proceedings (Adv. Proc. Nos. 25-03800 and 26-03006, (together, the "Lien Priority Actions")) against, as applicable, (a) the Evolution SPV Debtors, (b) certain of the FBG Debtors, (c) the ABL Lenders, (d) the Term Loan

4938-0063-7610

Lenders, and (e) the DIP Lenders, seeking declaratory judgments as to the priority of each party's respective liens and rights to certain of the Debtors' inventory, prepetition accounts receivable, and other assets.

17.     As described in greater detail in the operative complaints in the Lien Priority Actions, Evolution asserts perfected, first-priority liens and security interests in (a) all assets of the Evolution SPV Borrowers, including inventory, accounts, deposit accounts, and proceeds of each, including, without limitation, accounts receivable from the sale of inventory prepetition, and (b) as against the ABL Lenders, Term Loan Lenders, and DIP Lenders, prepetition receivables owned by FBG Debtors (1) Strongarm, LLC, (2) Carter Fuel Systems, LLC, (3) Trico Products Corporation, (4) ASC Industries, Inc., (5) Fram Group Operations, LLC, (6) Brake Parts, Inc., (7) First Brands Group, LLC, and (8) Champion Laboratories, Inc. (collectively, the "Receivables Sellers")  Both Lien Priority Actions remain pending.

18.     Conversion to Chapter 7.  Following the Debtors' violation of the Stipulation and Order, and the failure of the Debtors' sale process for their brake parts division, including the assets of the Evolution SPV Debtors, Evolution filed *Evolution's Emergency Motion for Entry of an Order Converting Chapter 11 Cases of Certain SPV Debtors to Chapter 7* [Docket No. 2110], seeking the conversion of the Evolution SPV Debtors' cases to chapter 7.

19.     On April 9, 2026, with the consent of the Debtors, the Court entered its *Order (I) Converting Chapter 11 Cases of Evolution SPV Debtors to Cases Under Chapter 7; and (II) Granting Related Relief* [Docket No. 2396].

4938-0063-7610

### D.        The Plan and Disclosure Statement

20.        On April 29, 2026, "the Debtors, the Ad Hoc Group, and the Creditors' Committee[8] reached an agreement in principle on the terms of a chapter 11 plan" and announced a "Global Settlement" that would be implemented through a plan.  Disclosure Statement Approval Motion, ¶ 10.  That same day, the Debtors filed the Disclosure Statement and the Plan.  Docket Nos. 2544 and 2545.

21.        While the Plan purports to classify and treat—and thus impact—only Premier Marketing Group, LLC (the "Plan Debtor") and the claims and interests asserted against the Plan Debtor, in reality it sets forth a mechanism to distribute value among all of the Debtors' creditors (or, more accurately, divvy it up among those who were invited to participate in the mediation process).  As set forth in the Disclosure Statement, despite intending to solicit only the Plan Debtor's creditors, "the Global Settlement provides for a structure to (i) monetize *all of the FBG Debtors' remaining assets* and (ii) allocate recoveries on Estate Claims among creditors in accordance with an agreed waterfall without litigation."  Disclosure Statement at 2 (emphasis added).  The litigation of Estate Claims will be funded with $25 million cash from the FBG Debtors' balance sheet and an additional $50 million of new money financing provided by certain of the DIP Secured Parties.  *Id*.

22.        The FBG Debtors' assets will be monetized by the FBG Debtors' other secured lenders via three proposed transactions (the "Plan Transactions"):

- The DIP Secured Parties will credit bid an unknown and undisclosed amount of DIP Claims "for the transfer of all Estate Claims of the FBG Debtors to the Plan Debtor and subsequent transfer of such Estate Claims to a [Litigation Trust] that

---

[8] At the May 8, 2026, status conference, counsel for the Creditors' Committee stated the agreement announced in the Disclosure Statement Approval Motion was premature, and that it understands the Debtors intend to proceed with the support of the Ad Hoc Group and not the Creditors' Committee.  Evolution reserves all rights to supplement this Objection to the extent necessary to address modifications to the Disclosure Statement and Plan that may be filed.

9

4938-0063-7610

will prosecute and monetize such Estate Claims for the benefit of creditors of the FBG Debtors";

- The DIP Secured Parties will also credit bid an unknown and undisclosed amount of DIP Claims "for the transfer of other DIP Collateral to be set forth in a schedule to be filed as part of the Plan Supplement to the Plan Debtor and subsequent transfer of such DIP Collateral Trust Assets to a trust for the benefit of the DIP Secured Parties"; and

- The ABL Secured Parties will consensually foreclose on the ABL Priority Collateral, which will be listed in a schedule to be filed as part of the Plan Supplement, and transfer "such ABL Collateral Trust Assets to a trust for the benefit of the ABL Secured Parties."

*Id.*

23.    In addition to the Plan Transactions, "pursuant to the Global Settlement, certain creditors[9] of the FBG Debtors (including administrative, priority, and general unsecured creditors) will be offered the opportunity to elect to participate in distributions from a Litigation Trust established under the Plan in accordance with an agreed Litigation Trust Waterfall."  Disclosure Statement Approval Motion, ¶ 11.  Eligible Creditors who do not opt out of the Global Settlement, and thus become Electing Creditors, "will be deemed to (i) have waived any objections to the Plan, Confirmation Order, and any related settlements and relief sought in furtherance thereof, including the Global Settlement, (ii) grant the [third-party] releases contained in Section 14.5(b) of the Plan, and (iii) have their Claims against the FBG Debtors consolidated . . . regardless of any joint and several liability among the FBG Debtors."  Disclosure Statement at 3.

24.    Accordingly, the Plan for the Plan Debtor seeks to bind and impair the interests of all creditors of the FBG Debtors.  But only the Plan Debtor's creditors will be entitled to vote on

---

[9] Pursuant to the Global Settlement, "holders of Administrative Expense Claims, Other Secured Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Creditors against the FBG Debtors (other than the Plan Debtor), excluding Ineligible Creditors (collectively, "Eligible Creditors")" **who do not opt out of the Global Settlement will be deemed "'Electing Creditors'."**  *Id.*, ¶¶ 14-15 (emphasis added).  Evolution and the other creditors of the SPV Debtors are explicitly deemed Ineligible Creditors under the Plan, and thus are also ineligible to be Electing Creditors.

4938-0063-7610

the Plan, which are limited to only (a) the DIP Secured Parties, (b) the Term Loan Secured Parties, (c) the ABL Secured Parties, and (d) a single, contingent and unliquidated unsecured claim by the Pension Benefit Guaranty Corporation.

## OBJECTION

25.     The Disclosure Statement lacks adequate information as required by the Bankruptcy Code to allow creditors, including the Electing Creditors of the other FBG Debtors, to make an informed decision regarding (a) whether to support or oppose the Plan, (b) whether to vote to approve the Plan (if permitted to vote), and (c) whether or not to opt out of the Global Settlement being implemented with respect to all of the FBG Debtors' estates.  The Disclosure Statement fails to provide creditors with sufficient information regarding, among other things, the proposed recoveries under the Plan, the valuation of any of the assets subject to the Plan Transactions, and the legal justification for the Plan Transactions.  More specifically, as relevant to Evolution—which, despite being neither a creditor of the Plan Debtor nor an Eligible Creditor, is nonetheless harmed and impaired by the Plan and the Plan Transactions—the Disclosure Statement fails to provide any information regarding the Plan Transactions' seeming evisceration of Evolution's rights currently being litigated in the Lien Priority Actions.  Absent at least these essential disclosures in a sufficient amount of time ahead of the voting deadline in accordance with the Federal Rules of Bankruptcy Procedure, creditors cannot possibly make an informed decision regarding whether to accept or reject the Plan.

## I.     Legal Standard

26.     It is essential that any proposed disclosure statement provide "information of a kind and in sufficient detail" to adequately inform "a hypothetical investor" to "make an informed judgment about a plan," because such adequate disclosure is crucial to the bankruptcy process. *See, e.g.*, *Westland Oil Dev. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex.

11

4938-0063-7610

1993) (noting disclosure is the "pivotal" concept in reorganization cases) (citing 5 Collier on Bankruptcy, ¶ 1125.03 (15th ed. 1992)).  Adequacy is viewed as what is "relative both to the entity (*e.g.* complexity/amount of assets being reorganized or liquidated) and to the sophistication of the creditors." *See In re Rodriguez Gas & Oil Services Inc.*, 2008 WL 4533687 at \*1 (Bankr. S.D. Tex. 2008). The Fifth Circuit has articulated "adequacy" as "enabl[ing] a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." *See Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

27.     In proposing the Disclosure Statement, the Debtors bear the burden of establishing the Disclosure Statement contains adequate information in accordance with the statutory requirements set forth in the Bankruptcy Code.  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  To obtain approval, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991). The Disclosure Statement must "provide the information in a reasonable way calculated to be understandable and to be absorbed by the typical creditor." *See In re Rodriguez Gas & Oil Services Inc.*, 2008 WL 4533687 at \*2.  The inquiry into whether a disclosure statement satisfies section 1125 of the Bankruptcy Code lies within the discretion of the Court and is determined on a case-by-case basis. *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998).

## II.    **The Disclosure Statement Does Not Provide Adequate Information Regarding Evolution's Rights and the Lien Priority Actions.**

28.     As set forth above, Evolution commenced each of the Lien Priority Actions to assert its perfected, first-priority liens and security interests in (a) all assets of the Evolution SPV Borrowers, including inventory, accounts, deposit accounts, and their proceeds , including, without limitation, accounts receivable from the sale of inventory prepetition, and (b) as against the ABL

12

Lenders, Term Loan Lenders, and DIP Lenders, prepetition receivables owned by the Receivables Sellers. While the Disclosure Statement provides general information regarding the status of each of the Lien Priority Actions, which remain pending, the Disclosure Statement fails to provide any information regarding how the implementation of the Plan Transactions are to be reconciled with any judicial determinations to be made in the Lien Priority Actions.

29.     Pursuant to the Plan, the ABL Secured Parties will consensually foreclose on the ABL Priority Collateral, which is largely comprised of inventory and accounts receivable, and assign those assets to an ABL Collateral Trust to liquidate them for the benefit of the ABL Secured Parties. Specifically, the Plan defines the ABL Collateral Trust Assets to include "any ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (i) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected Lien on such collateral, senior in lien priority to liens securing the DIP Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected, first-priority Lien on such collateral." Plan at 1.

30.     Similarly, the DIP Secured Parties will submit a credit bid of an unknown amount on the DIP Collateral, and assign (a) the Estate Claims to the Litigation Trust, and (b) all other DIP Collateral to the DIP Collateral Trust. Accordingly, the Plan defines the DIP Collateral Trust Assets as including "all DIP Collateral, other than the Litigation Trust Assets and the ABL Collateral Trust Assets, for which, on the date the DIP Collateral Trust is established, (i) no bona fide dispute exists as to whether the DIP Secured Parties have a validly perfected Lien on such collateral, senior in lien priority to liens securing the ABL Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order

13

or settlement that the DIP Secured Parties have a validly perfected, first-priority Lien on such collateral." *Id.* at 7.

31.     The Plan and Disclosure Statement fail to acknowledge or even consider the rights of any other lenders asserting priority liens to the disputed assets, such as the first-priority liens and security interests asserted by Evolution through the Lien Priority Actions on certain of the FBG Debtors' prepetition receivables (whether factored or not) and certain other inventory and accounts receivable generated through the sale of other Evolution inventory collateral pre-petition.

32.     Moreover, the Disclosure Statement fails to provide any information regarding how the Debtors intend to determine what inventory products and values, and the accounts receivable generated from past inventory, are owned by which Debtors, instead treating all assets as ABL Priority Collateral without further analysis.  Absent detailed clarification, it is unclear whether the Debtors and favored lenders are purporting to delegate to themselves the unilateral right to decide Evolution's rights and claims, as asserted in the Lien Priority Actions, including Evolution's rights as to prepetition receivables held by the Receivables Sellers which sold falsified receivables to Evolution.  As written, the Disclosure Statement fails to acknowledge these disputes and could be read to eviscerate Evolution's asserted rights, as the ABL Secured Parties and DIP Secured Parties purchase or foreclose upon, as applicable, all of the FBG Debtors' assets, with the only exception being for bona fide disputes among themselves, but *not* other lenders.  The Disclosure Statement cannot be approved without addressing in detail how the Debtors propose to resolve and address disputes between the DIP Secured Parties or ABL Secured Parties, on the one hand, and other secured lenders and Third-Party Factors such as Evolution, on the other.

4938-0063-7610

Case 25-90399   Document 2629   Filed in TXSB on 05/12/26   Page 15 of 20

**III.     The Disclosure Statement Fails to Provide Adequate Information Regarding Litigation Funding Sources.**

33.     The Plan provides for the establishment of a Litigation Trust that will be vested with the FBG Debtors' Estate Claims and will be used to distribute recoveries pursuant to the Litigation Trust Waterfall.  This litigation will be funded using (i) $25 million from the Debtors' balance sheet, and (ii) $50 million of new financing.  *See* Disclosure Statement at 2.  But the Disclosure Statement provides no further details regarding the disputed interests of various parties as to the Debtors' cash.

34.     Since the Petition Date, the Debtors' chapter 11 cases have been financed through postpetition DIP financing and also the collections of hundreds of millions of dollars of accounts receivable.[10]  Evolution and other Third-Party Factors have asserted perfected liens on certain of the FBG Debtors' prepetition receivables.  The FBG Debtors are funding a third of the Litigation Trust from the cash on their balance sheet, but the Disclosure Statement contains no information regarding the sources of this cash and what amount, if any, may be subject to asserted liens (or asserted to be owned directly) by third parties such as Evolution, and instead is being used to fund other creditors' recoveries.

35.     The Disclosure Statement should not be approved absent supplemental information regarding the amount of prepetition receivables collected post-petition and the tracing of those amounts to confirm the existence of $25 million of truly unencumbered cash.

---

[10] *See, e.g.*, *Second Supplemental Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* [Docket No. 1314] at 7 (reconciling approximately $118 million of collected pre-petition receivables).

15

4938-0063-7610

**IV.**     **The Disclosure Statement Fails to Provide Adequate Information Regarding Shared Assets and Litigation Rights.**

36.     The FBG Debtors and Evolution SPV Debtors share certain assets, rights, and claims, the utilization of which by one estate may impair another.  For example, the FBG Debtors and Evolution SPV Debtors are each insured parties under certain insurance agreements covering claims against both sets of entities.

37.     The Plan and Disclosure Statement provide that the rights to coverage, to the extent applicable, of Debtors' insurance policies will be assigned to the Litigation Trustee and "all net proceeds of insurance policies received by the Litigation Trustee shall be treated as proceeds of such Causes of Action for all purposes under the Plan."  But the Estate Claims are not the only claims and causes of action covered by the insurance policies and there is no provision or description for how the Litigation Trustee and other parties intend to coordinate and allocate Litigation Trust proceeds as a result.

38.     With respect to the Evolution SPV Debtors, for example, the chapter 7 Debtors intend to investigate, pursue, and prosecute claims and causes of action against some of their FBG Debtor affiliates, officers and directors, and other third parties involved in fraud and other tortious conduct directed at Evolution and the Evolution SPV Debtors in their formation, financing, and suspected fraudulent transfers out of the SPV structure.  Though similar in kind, these claims are separate and distinct from the Estate Claims being prosecuted by the Litigation Trustee.  Indeed, they must be, as the Estate Claims are being purchased via credit bid of the DIP Secured Parties who do not have a lien on the Evolution SPV Debtors' claims and causes of action.  *See* Final DIP Order, ¶ 22(p) ("For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the DIP Documents, none of the SPV Debtors are DIP Guarantors.  Nothing in this Final Order or any of the DIP Documents shall grant any liens or claims against any of the SPV Debtors

16

4938-0063-7610

or any assets of SPV Debtors or the proceeds thereof . . . .").  Accordingly, the DIP Secured Parties cannot credit bid on any of the Evolution SPV Debtors' assets, including their rights to insurance coverage under the Debtors' various insurance programs, and the Disclosure Statement provides no guidance as to how to reconcile the rights of the FBG Debtors and Evolution SPV Debtors to insurance coverage as recovery support.

39.     The Disclosure Statement cannot be approved without additional information clarifying and confirming that nothing in the Plan or Confirmation Order shall (a) diminish or impair the rights of non-Debtors to enforce the insurance policies and related agreements that may cover causes of action against the Debtors or third parties, and (b) impede, interfere with, diminish or impair the rights of the Evolution SPV Debtors under any insurance policies, including D&O policies.

40.     The Plan also provides for the transfer of any and all attorney-client or other privileges or protections held by any of the Debtors, their predecessors, and any pre- or post-petition committee or subcommittee of their respective board of directors to the Litigation Trust and its authorized representatives.  Evolution does not object to this provision in concept, but the Evolution SPV Debtors maintain their own independent attorney-client privileges that must be respected (and which now reside with the chapter 7 trustee of their respective estates).  The Disclosure Statement must be supplemented to clarify that no transfer of privileges to the Litigation Trust will apply to the Evolution SPV Debtors' rights as to any attorney-client or other privileged information relevant to prosecuting its claims and interests on behalf of its creditors.

4938-0063-7610

18

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Evolution respectfully requests the Court enter an order denying the Disclosure Statement Approval Motion or, in the alternative, requiring that the Disclosure Statement be supplemented to address the matters set forth above prior to approval and solicitation, and granting such other and further relief as the Court deems appropriate.

[*Remainder of page intentionally left blank.*]

4938-0063-7610

Respectfully submitted this 12th day of May 2026.

**GRAY REED**

By: */s/Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    Vincent Indelicato (admitted *pro hac vice*)
    Matthew R. Koch (admitted *pro hac vice*)
    Elliot R. Stevens (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:      vindelicato@proskauer.com
            mkoch@proskauer.com
            estevens@proskauer.com

- and -

    Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Email:      cdale@proskauer.com

- and -

    Jordan E. Sazant (admitted *pro hac vice*)
70 W Madison St., Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3500
Email:      jsazant@proskauer.com

*Counsel to Evolution*

4938-0063-7610

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of May 2026, he caused a true and correct copy of the foregoing document by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

4938-0063-7610