**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| FIRST BRANDS GROUP, LLC *et al.*,[1] | Case No. 25-90399 (CML) |
| Debtors. | (Jointly Administered) |

**ONSET FINANCIAL, INC.'S LIMITED OBJECTION TO
UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS
PURSUANT TO 11 U.S.C. § 1112(b)**

Onset Financial, Inc. ("Onset") submits this limited objection (the "Objection") to the *United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* [Dkt. No. 2670] (the "UST Motion" or the "Motion"), filed by the United States Trustee (the "UST") with respect to the Motion's requested relief to convert or dismiss the Carnaby Debtors' (defined herein) Chapter 11 Cases.  In support of the Objection, Onset respectfully states as follows:[2]

**PRELIMINARY STATEMENT**

1.      The UST Motion raises certain valid and understandable concerns; Onset shares the UST's frustration with the way these cases have unfolded.  But the UST Motion paints with too broad a brush.  It ignores that certain Debtors—namely, the Carnaby Debtors (defined herein)— may indeed have viable paths forward in chapter 11 once the Debtors' exclusive control over the plan process is terminated and other parties in interest are permitted to propose a plan.  Section 1112(b)(4)(A) demands a case-specific inquiry into each debtor's circumstances, but the UST

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms not defined herein shall have the meaning assigned to them in the *Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 2522] (the "Second Exclusivity Motion").

offers no individualized analysis of the Carnaby Debtors' financial condition and identifies no continuing loss attributable to these entities.  Still, it asks this Court to take, now, the "drastic measure" of conversion for *all* Debtors—lumping special purpose vehicles ("SPVs") with a relatively negligible burn rate and no operational costs into the same basket as the administratively insolvent FBG Debtors, as though all 112 jointly administered cases were the same case.  They are not.  For this reason, the UST Motion should be denied with respect to the Carnaby Debtors.

2.     The Carnaby Debtors are fundamentally different from the FBG Debtors:  they are non-operating SPVs with minimal administrative costs and simple capital structures, and their administrative expenses are not mounting unsustainably in chapter 11.  Nor are certain of the Carnaby Debtors' most valuable assets—litigation claims—at risk if the cases are not converted. The Carnaby Debtors are co-plaintiffs in adversary proceedings seeking to recover billions arising from a massive criminal fraud scheme orchestrated by Patrick James and Ed James.  Federal criminal investigations into this same scheme have already resulted in indictments and guilty pleas from senior executives; the Examiner in this case has made preliminary findings that accord.  These litigation assets are not speculative claims that require conversion to protect them; to the contrary, a properly funded chapter 11 litigation trust formed for the benefit of the Carnaby Debtors, particularly one that brings with it institutional knowledge of these cases to date, is an option that may be best positioned to maximize the value of these claims for creditors.

3.     At bottom, converting the Carnaby Debtors to chapter 7 now is premature. Conversion may not be in the best interest of their creditors, and at this point in these bankruptcy proceedings would serve no legitimate purpose.  The Carnaby Debtors are entitled to explore whether they have other viable alternatives in chapter 11; Onset has argued against the extension of the Debtors' exclusive periods so that these estates may be allowed to do just that.  A standalone

chapter 11 plan establishing a funded litigation trust for the Carnaby Debtors may be better suited to serve creditors of the Carnaby Debtors given the ability to lever existing institutional knowledge and work product and move quickly to protect the valuable assets of those estates.  Conversion at this juncture would, in fact, harm creditors of these entities given that a chapter 11 path may be possible and that Onset—the Carnaby Debtors' overwhelmingly largest creditor—would be prepared to support it.  For these reasons, the Court should deny the UST Motion as to the Carnaby Debtors at this time, and permit the chapter 11 process to be explored for the benefit of stakeholders of those estates.

## BACKGROUND

### I.      Onset's Relationship with the Carnaby Debtors

4.      Since 2018, Onset has provided the Debtors with significant liquidity.  Over the course of nearly a decade, Onset funded roughly $3 billion to several of the Debtors on account of inventory and equipment.  Accordingly, Onset has claims against certain of the FBG Debtors and certain of the SPV Debtors (defined herein).[3]

5.      Beginning in January 2022, Onset entered into a series of sale-and-leaseback transactions (the "Carnaby Transactions") with certain Debtors that had been formed to facilitate the Carnaby Transactions (the "SPV Debtors").  The terms of the Carnaby Transactions are governed by certain master lease agreements among Onset, the relevant SPV Debtors, and certain affiliates of such SPV Debtors.  *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2786] (the "Disclosure Statement") at 60.  In particular:

---

[3]     The full extent of Onset's lending to the Debtors is summarized in *Onset Financial, Inc.'s Opposition to Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 2714] ("Exclusivity Opposition"), ¶¶ 11–14.  The structure of the transactions between Onset and the various Debtors is detailed in *Onset Financial, Inc.'s Answer and Counterclaim, Cross-Claim, and Third-Party Complaint*, *First Brands Group, LLC v. Onset Financial, Inc.*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) [Dkt. No. 16] ("Onset Counterclaim"), ¶ 123.

3

- On June 28, 2022, Onset and Carnaby Inventory IV, LLC ("Carnaby IV") entered into *Master Lease Agreement No. OFI1445416* (the "Carnaby IV MLA"). *Id.* The obligations of Carnaby IV under this agreement were guaranteed by Carnaby Inventory Holdings IV, LLC—Carnaby IV's direct parent—and also by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; First Brands Group Holdings, LLC ("FBG Holdings"); and Viceroy Private Capital, LLC ("Viceroy"). *Id.*

- On October 24, 2023, Onset and Carnaby FA, LLC ("Carnaby FA") entered into *Master Lease Agreement No. OFI1545465* (the "Carnaby FA MLA" and, together with the Carnaby IV MLA, the "Carnaby MLAs"). *Id.* The obligations of Carnaby FA under this agreement were guaranteed by Carnaby FA Holdings, LLC—Carnaby FA's direct parent—and by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC; FBG Holdings; and Viceroy. *Id.*

Accordingly, pursuant to the Carnaby MLAs, the following SPV Debtors owe obligations to Onset: Carnaby IV; Carnaby Inventory Holdings IV, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby FA; Carnaby FA Holdings, LLC, and Eagle Casting Holdings, LLC (collectively, the "Carnaby Debtors"). *Id.* The following FBG Debtors also owe obligations to Onset pursuant to the Carnaby MLAs: FBG Holdings; Eagle Casting, LLC; and Viceroy. *Id.*

6. As of the Petition Date, the value of the Debtors' outstanding obligations under the Carnaby MLAs (and the lease and forbearance agreements arising under the master lease agreements) totaled approximately $1.88 billion, consisting of approximately $1.35 billion on account of inventory and $528 million on account of equipment. Onset Counterclaim ¶ 147.

7. Onset's claims dwarf those of any other creditor of the Carnaby Debtors. No other party has a greater stake in the outcome of these proceedings as they relate to the Carnaby Debtors, and no other party will be more prejudiced by a premature conversion of the Carnaby Debtors' cases to chapter 7.

## II.   The Carnaby Debtors Hold Valuable Claims

8. On November 3, 2025, the Debtors—including the Carnaby Debtors—commenced an adversary proceeding (the "Patrick James Adversary Proceeding") against Patrick James, the

4

Debtors' founder and former Chief Executive Officer.  *See First Brands Group LLC v. James*, Adv. Pro. No. 25-03803 (CML) (Bankr. S.D. Tex. 2025).

9.      On January 9, 2026, the Debtors—including the Carnaby Debtors—commenced an adversary proceeding (the "Edward James Adversary Proceeding") against Onset and Edward James (Patrick James's brother and former executive vice president, board member, and officer of the Debtors), and certain related entities.  *See First Brands Group LLC v. Onset Financial, Inc.*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. 2026).

10.      The Debtors' claims in those actions are immensely valuable:  in the Patrick James Adversary, the Debtors are seeking to recover alleged transfers of more than $700 million,[4] and are seeking to recover billions of dollars from Edward James.

11.      The claims against the Jameses and co-conspirators at First Brands are not speculative—they arise from an established fraud scheme by First Brands and its culpable officers that has resulted in criminal indictments and guilty pleas.  Patrick James and Edward James were indicted on January 29, 2026, and charged with conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and multiple counts of wire fraud and bank fraud.  *Sealed Indictment*, *United States v. Patrick James and Edward James*, No. 26-cr-00029 (AT) (S.D.N.Y. Jan. 27, 2026) [Dkt. No. 2] (the "James Brothers Indictment").  A criminal trial is scheduled for February 2027.  *Order*, No. 1:26-cr-00029 (S.D.N.Y. May 8, 2026) [Dkt. No. 59].  Meanwhile, Peter Brumbergs and Stephen Graham—both former First Brands senior executives—have each pleaded guilty in connection with their roles in the alleged scheme and are cooperating with the

---

4      *See Amended Complaint*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-03803 (CML) (Bankr. S.D. Tex. Jan. 19, 2026) (the "Patrick James Complaint") [Dkt. No. 141] Exhibit A.

government.  *Minute Entry*, *United States v. Brumbergs*, No. 26-cr-00025 (S.D.N.Y. Jan. 29, 2026).

12.     These causes of action, along with inventory and equipment, are the Carnaby Debtors' primary assets.  Their substantial value is well-defined and supported by extensive investigation, including the Examiner's findings.  *See, e.g.*, *Report of E. Martin de Luca, Examiner* [Dkt. No. 2479] at 4 (finding that "more than $700 million in transfers to Patrick James" and his affiliates siphoned value from the Carnaby Debtors).

### III.     The Debtors' Plan Abandons the Carnaby Debtors[5]

13.     The most recent version of the Debtors' Plan does not classify, treat, or provide any recovery mechanism for Claims against the Carnaby Debtors.  *See generally Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2784] ("Plan"); *see also* Disclosure Statement at 17 (stating that "[t]he Plan *only* treats Claims against and Interests in the Plan Debtor" and "does not treat any Claims against or Interests in Debtors other than the Plan Debtor").

14.     Under the Plan, the Litigation Trust—which excludes the Carnaby Debtors' creditors from sharing in its recoveries[6]—would receive $75 million in initial funding ($25 million from the FBG Debtors' balance sheet plus $50 million in DIP Lender commitments), with authority to raise up to $37.5 million more.  Disclosure Statement at 2.  It would also receive all books, records, investigative and discovery findings of the FBG Debtors, the Examiner's work

---

[5]     Although this Court has denied conditional approval of Debtors' Disclosure Statement, *Order Denying Conditional Approval* [Dkt. No. 2814], the Plan discussed therein nonetheless serves as the clearest indication of the Debtors' intentions for reorganization.  Onset, therefore, continues to refer to the Plan and Disclosure Statement herein.

[6]     Under the Plan, the Litigation Trust will be vested with "all Estate Claims" of the FBG Debtors, defined to encompass all claims held by the FBG Debtors—not the Carnaby Debtors.  Disclosure Statement at 6 n.4. Participation in Litigation Trust distributions is premised on holding claims against the FBG Debtors (*i.e.*, being an "Eligible Creditor" of an FBG Debtor), not on holding claims against the Carnaby Debtors.  Plan at 13–14, 40–41.  Thus, even though the Carnaby Debtors are co-plaintiffs in the adversary proceedings, the Plan provides no mechanism for the Carnaby Debtors' creditors to share in recoveries from those proceedings.

product, and all attorney-client privileges, work product protections, and other privileges held by "any one or more of the FBG Debtors" will be "deemed transferred and assigned to, and vested in, the Litigation Trust." Plan at 20; *id.* Art. 6.2(d).

15. By contrast, the Debtors have disclaimed any interest in seeking a path forward for the Carnaby Debtors under chapter 11. *See* Disclosure Statement at 74 ("The Debtors will seek conversion of the SPV Debtors by separate motion and will seek conversion of such Debtors effective upon the Plan Effective Date"); *see generally* Exclusivity Opposition. If the Carnaby Debtors are converted to chapter 7, as the Debtors apparently intend to do, their trustee(s) may be left with no funding, no institutional knowledge, no investigative work product, and no access to the privileges developed at the cost of all Debtors—including the Carnaby Debtors.[7]

## ARGUMENT

16. Section 1112(b)(1) provides that—when "cause" exists—the court "shall" convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). The movant bears the burden of establishing cause by a preponderance of the evidence. *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 855 (Bankr. S.D. Tex. 2023); *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 138 (Bankr. S.D. Tex. 2024). Conversion is a "drastic measure" and its "harshness . . . mandates that it result only upon a strong evidentiary showing." *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995). "[A]ll doubts are to be resolved in favor of the debtor." *In re Austin Ocala Ltd.*, 150 B.R. 279, 282 (Bankr. M.D. Fla. 1993).

---

[7] The Debtors' abandonment of the Carnaby Debtors underscores why terminating the Debtors' exclusive control over the plan process is also essential: the Debtors have weaponized exclusivity to block other parties in interest from proposing a chapter 11 plan for the Carnaby Debtors while simultaneously disclaiming any intent to propose one themselves. Both this Motion and the Debtors' Second Exclusivity Motion should be denied as to the Carnaby Debtors to ensure the Carnaby Debtors are not left in limbo and are able to explore a meaningful path forward.

17. Section 1112(b)(4) includes 16 examples of "cause." The UST relies solely on Section 1112(b)(4)(A), which requires showing both (i) a "substantial or continuing loss to or diminution of the estate" and (ii) "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The UST must prove both elements to meet this conjunctive standard. *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015). If the UST fails to satisfy either prong, its Motion must be denied. *In re Express Grain Terminals, LLC*, No. 21-11832, 2022 WL 1051097, at *9 (Bankr. N.D. Miss. Apr. 7, 2022).

18. Even if cause is shown, Section 1112(b)(2) provides an override: the Court "may not" convert or dismiss if it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and a party in interest establishes (A) a reasonable likelihood that a plan will be confirmed within a reasonable period of time, and (B) the grounds for converting include an act or omission for which there exists reasonable justification and which will be cured. 11 U.S.C. § 1112(b)(2). The phrase "unusual circumstances" contemplates "facts that are not common to chapter 11 cases generally." *In re Ford Steel, LLC*, 629 B.R. 871, 883 (Bankr. S.D. Tex. 2021). Determining whether unusual circumstances exist is a fact-intensive inquiry, and bankruptcy courts have significant discretion in making that determination. *Id.*

I. **The UST has not established "cause" as to the Carnaby Debtors.**

19. As a threshold matter, the "inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 371–72 (5th Cir. 1987). Because these cases are jointly administered—not substantively consolidated—the UST must establish cause as to each individual Debtor for which conversion is sought. *In re Exigent Landscaping, LLC*, 656 B.R. 757, 764 (Bankr. E.D. Mich. 2024) ("In determining whether cause exists to dismiss [or convert] a case under § 1112(b), a court must

8

engage in a 'case-specific' factual inquiry which 'focus[es] on the circumstances of each debtor.'") (alterations in original). The UST does not present any individualized analysis of the Carnaby Debtors, and its Motion must be denied as to those entities.

### A. There is no substantial or continuing loss to or diminution of the Carnaby Debtors' estates.

20. "[U]nder its plain meaning, a 'continuing loss' must mean a loss that will persist in the future." *In re Neosho Concrete Prods. Co.*, No. 20-30314, 2021 WL 1821444, at \*4 (Bankr. W.D. Mo. May 6, 2021). The simple act of incurring fees and costs is, without more, insufficient to constitute a "continuing loss." *Compare id.* at \*4 (finding attorney's fees and costs incurred in filing adversary proceeding, and corresponding decrease in bank account balance, did not constitute continuing losses), *with In re Fall*, 405 B.R. 863, 867 (Bankr. N.D. Oh. 2009), *aff'd sub nom. Fall v. Farmers & Merchants State Bank*, No. 3:08CV3012, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009) (explaining that "continuing loss to or diminution of the estate" may be established by showing that the debtor is continuing to "incur losses or maintains a negative cash-flow position after entry of the order for relief").

21. The UST argues that this first prong is satisfied because "there is a continuing loss and diminution of the Debtors' estates because administrative expenses continue to accrue, and the Debtors admit in the Disclosure Statement that they cannot pay administrative claims in full." UST Motion ¶ 16. The UST points to the $223 million in estimated administrative claims across *all* Debtors, but acknowledges that the Debtors "do[] not disclose which Debtors owe those amounts or when they were incurred." UST Motion ¶ 11.

22. However, it is likely that these administrative costs largely relate to operating expenses—for which the Carnaby Debtors bear no liability. The Carnaby Debtors are SPVs that are not operating entities. They have simple capital structures, very few parties in interest, and no

9

ongoing business operations generating expenses.  Their primary assets are inventory and equipment (being appraised, marketed, and liquidated by Hilco Valuation Services, LLC) and estate causes of action.  Accordingly, unlike the FBG Debtors—which incur significant operational costs and professional fees that stem from managing operations (vendor payments, wind-down expenses, etc.)—the Carnaby Debtors are not accruing the substantial ongoing professional fees or operational costs that drive the administrative insolvency of the FBG Debtors.  The Carnaby Debtors likely owe minimal administrative expense claims, making the UST's administrative insolvency argument inapposite as to them.  Without a cash hemorrhage that needs stanching, the UST has no factual predicate for the first prong of its cause argument as to the Carnaby Debtors.

23.  Where a movant fails to demonstrate actual degradation of the specific estate at issue—as opposed to the mere accrual of fees—a motion to convert must be denied.  *See In re Creech*, 538 B.R. 245, 250 (Bankr. E.D.N.C. 2015) (denying conversion because "[t]his is clearly not a case where the operating account has been depleted and there is no income to fund ongoing expenses"); *In re TMT Procurement Corp.*, 534 B.R. at 920 (finding no "continuing loss" where debtors had terminated operations and only significant out-of-pocket expenses were professional fees necessary to pursue pending estate claims).  The UST's general reliance on accrual of collective fees cannot replace specific evidence of loss attributable to the Carnaby Debtors, and the UST has not identified a single dollar of continuing loss attributable to the Carnaby Debtors.  Thus, the UST has failed to meet the first prong of Section 1112(b)(4)(A) as to the Carnaby Debtors, and the UST Motion should be denied for such Debtors.

**B.   There is a reasonable likelihood of rehabilitation for the Carnaby Debtors.**

24.  Even if the UST could satisfy the first prong (it cannot), the UST must also prove the "absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  It cannot meet this burden as to the Carnaby Debtors.

25.     The UST argues that "[t]he Court should convert or dismiss these cases because the Debtors have no realistic prospect for reorganization," and because the Debtors will have no operations to preserve after all marketable businesses are sold and the Estate Claims (as defined in the Plan) are liquidated.  UST Motion ¶ 18.  But the UST's narrow definition of "rehabilitation" ignores well-settled caselaw that the term is interpreted broadly.  *In re Honx, Inc.*, No. 22-90035, 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) (noting rehabilitation "is better read as encompassing a debtor's intention to use the bankruptcy process to prevent a complete and total loss of value").

26.     Additionally, this Court has held that "rehabilitation" includes liquidating plans because the term encompasses "a debtor's intention to use the bankruptcy process to prevent a complete and total loss of value."  *Honx*, 2022 WL 17984313, at *3 (finding rehabilitation for liquidating debtor where parent entity provided funding); *In re BMI Oldco Inc.*, 671 B.R. 215, 224 (Bankr. S.D. Tex. 2025) (finding rehabilitation for a debtor with no business prospects); *see also In re R & S St. Rose Lenders, LLC*, No. 11-14973-MKN, 2016 WL 3536533, at *6 n.11 (Bankr. D. Nev. May 18, 2016) (noting that courts have found a liquidating plan constitutes "rehabilitation" under Section 1112(b)(4)(A)); *In re Smith*, 77 B.R. 496, 502 (Bankr. E.D. Pa. 1987) ("[A] liquidation is a form of rehabilitation[.]").  Such a plan for the Carnaby Debtors is indeed a realistic possibility.

27.     As explained in the Exclusivity Opposition, if the Debtors' Second Exclusivity Motion is denied entirely or limited as to the Carnaby Debtors, Onset is considering developing and proposing a simple, viable chapter 11 plan for the Carnaby Debtors that would ensure funding for the prosecution of the Carnaby Debtors' claims.  Exclusivity Opposition at ¶ 8.  A chapter 11 plan for the Carnaby Debtors that establishes a properly funded, standalone litigation trust to

11

pursue these causes of action would provide creditors with meaningful recoveries.  Caselaw is clear that rehabilitation exists in such circumstances.  *See Honx*, 2022 WL 17984313, at *3 (finding likelihood of rehabilitation for liquidating debtor where funding was available); *In re TMT Procurement Corp.*, 534 B.R. at 921–22 (declining to convert where there was no risk that debtors would gamble its enterprise to the detriment of creditors and value remained in estate claims).  Moreover, the Carnaby Debtors' claims are valuable:  they arise from an established fraud involving transfers of hundreds of millions of dollars, supported by months of investigation, the Examiner's findings, guilty pleas, and the ongoing criminal proceedings against Patrick and Edward James.  Disclosure Statement at 6–7; *see also supra* ¶¶ 8–12.  Indeed, the Carnaby Debtors' claims may be uniquely valuable because the Patrick James Complaint and the James Brothers Indictment make clear that proceeds funded to the Carnaby Debtors were directly transferred by the Carnaby Debtors to Patrick James and his affiliates.  *See* Patrick James Complaint ¶¶ 75–83 (describing how funds were transferred from certain Carnaby Debtors to a trust held by Patrick James); James Brothers Indictment ¶ 28 (describing how Patrick James siphoned millions of dollars from the Carnaby Debtors into his personal accounts).  The existence of these defined, substantial claims constitutes far more than "unsubstantiated hopes for a successful reorganization."  *Matter of Canal Place Ltd. P'ship*, 921 F.2d 569, 577 (5th Cir. 1991).

28.     Rehabilitation in this form—an orderly, well-funded prosecution of claims and distributions to creditors—is a far superior outcome to the possibly unfunded, disorganized chapter 7 alternative.[8]  *See BMI Oldco*, 671 B.R. at 224 (finding rehabilitation because the bankruptcy case

---

[8]     The UST argues that the Debtors have no realistic prospect for reorganization, contending that the Debtors "have sold, or will soon sell, all marketable businesses before confirmation."  UST Motion ¶ 18.  But this argument conflates the FBG Debtors' situation with that of the Carnaby Debtors.  While true for the FBG Debtors, the Carnaby Debtors never had operations, never had employees, and never had marketable businesses.  A chapter 11 plan for the Carnaby Debtors that establishes a litigation trust dedicated to pursuing

gave "the Debtors time to properly prosecute its causes of action"). That path is certainly possible for the Carnaby Debtors here. Conversion for these Debtors is thus premature; it is not currently in the best interest of the Carnaby Debtors' creditors while their key stakeholders evaluate whether there is a chapter 11 alternative upon the termination of the Debtors' exclusive control over the plan process. The Motion should be denied with respect to the Carnaby Debtors.

II.    **Even if the UST could show cause (it cannot), unusual circumstances establish that conversion is not in the best interests of the Carnaby Debtors' creditors.**

29.    Section 1112(b)(2) provides an independent and sufficient basis to deny the UST Motion as to the Carnaby Debtors. Even where "cause" under Section 1112(b)(4) is established, the Court "may not" convert or dismiss if there are "unusual circumstances" demonstrating that conversion is not in the best interests of creditors, there is a reasonable likelihood that a plan will be confirmed, and the asserted grounds for conversion include an act or omission of the debtor for which there exists a reasonable justification and which can be cured within a reasonable period of time. 11 U.S.C. § 1112(b)(2). While there is not "cause" to convert for the reasons discussed *supra*, even had cause been demonstrated, conversion would still be inappropriate.

A.    **The Carnaby Debtors present unusual circumstances.**

30.    The unusual circumstances here are manifest and extraordinary. The Carnaby Debtors hold valuable estate claims that the Plan functionally abandons—providing no path forward for the Carnaby Debtors and instead transferring all resources, privilege, and institutional knowledge to a Litigation Trust that will prosecute overlapping claims against the same defendants on behalf of FBG Debtors' creditors only. The Carnaby Debtors' situation is unlike the typical chapter 11 case; they are co-plaintiffs in multi-billion-dollar adversary proceedings whose interests

---

these causes of action may better provide creditors with meaningful recoveries—the very essence of rehabilitation.

are being structurally subordinated by a Plan designed to benefit other, competing creditors.  The Debtors—thus far—have used their exclusive control over the plan process to benefit only a portion of the creditors to whom they owe fiduciary duties.  With exclusivity thus weaponized, the disfavored parties in interest (including Onset) have not had the opportunity to develop and present a feasible chapter 11 plan for the Carnaby Debtors.[9]  The Debtors' failings should not justify compounding the harm to the very creditors they failed.

31.    This is precisely the type of uncommon circumstance that Section 1112(b)(2) was designed to address.  *See In re Ford Steel, LLC,* 629 B.R. at 883 (finding unusual circumstances are "facts that are not common to Chapter 11 cases generally"); *In re New Towne Dev., LLC*, 404 B.R. 140, 147 (Bankr. M.D. La. 2009) (finding unusual circumstances where insufficient time for parties in interest to develop alternative plans of reorganization and evidence did not show that chapter 11 plan was not feasible).

**B.    Conversion or dismissal is not in the best interests of the Carnaby Debtors' creditors.**

32.    Onset does not oppose conversion of the FBG Debtors.  Indeed, Onset recognizes that the FBG Debtors' administrative insolvency and the Plan's Global Settlement structure may require conversion for those entities.  But conversion of the Carnaby Debtors is not in the best interest of the Carnaby Debtors' creditors at this time.

33.    A newly appointed chapter 7 trustee(s) for the Carnaby Debtors may not be supported by funding (absent a funding arrangement) and would lack institutional knowledge to pursue complex multi-billion-dollar fraud claims requiring substantial resources.  This Court has

---

[9]    For this very reason, Onset opposed further extension of the Debtors' exclusivity period.  *See* Exclusivity Opposition ¶ 40 ("[D]enying the Second Exclusivity Motion with respect to the Carnaby Debtors would yield meaningful benefits at no cost to any estate. It would give Onset—the most significant party in interest . . . the ability to evaluate and propose an alternative plan, which would apply only to the Carnaby Debtors, [and] would cost the Debtors nothing . . ..").

recognized precisely this concern under similar circumstances: "converting the case to chapter 7 necessitates the appointment of a trustee, who would be forced to expend a significant amount of time and money to become familiar with a complex case . . . ." *In re TMT Procurement Corp.*, 534 B.R. at 921; *see also In re Deer Park*, 136 B.R. 815, 818 (B.A.P. 9th Cir. 1992) ("A liquidation under Chapter 11 allows . . . one who is presumably more familiar with the assets of the debtor's organization and its respective values, the ability to plan for an orderly divestiture of the assets . . .."); *In re Alves Photo Serv., Inc.*, 6 B.R. 690, 694 (Bankr. D. Mass. 1980) (noting the considerable costs of conversion, including "[t]he attendant cost of new counsel for the trustee, the disruption of the present investigation and the resulting delay and expense necessary to educate replacement fiduciaries, along with the possibility of duplication of discovery efforts which have been completed").

34. Such resource and institutional knowledge gaps are not a theoretical harm—they are an inevitable structural consequence of hasty conversion. Conversion of the Carnaby Debtors is premature at this stage and would impose significant transition costs while offering no discernible benefit to any party. By contrast, allowing the Carnaby Debtors to remain in chapter 11 for the time being costs nothing for any other estate. Onset is considering proposing a standalone chapter 11 plan for the Carnaby Debtors upon termination of the Debtors' exclusive control over the plan process. Such a plan would apply only to those entities, would not interfere with the Debtors' current Plan or the UST's efforts with respect to converting the other Debtors, and would preserve the Carnaby Debtors' creditors' ability to recover meaningful value as all options are being considered. *See All Am. of Ashburn, Inc.*, 40 B.R. 104, 109 (Bankr. N.D. Ga. 1984) (noting conversion would "discard the knowledge of counsel" and "could only result in a multiplication of administrative expenses, because the Trustee's counsel would have difficulty

gaining comparable familiarity with the case"); *Alves Photo Serv.*, 6 B.R. at 694 (finding it "most probable" that the "purported savings derived from a conversion would not offset the additional replacement costs").

35.     Thus, the UST's conclusory assertion that "[a] chapter 7 trustee can effectively liquidate assets and pursue these litigation claims at a fraction of the existing costs" (UST Mot. ¶ 18) is, as applied to the Carnaby Debtors, premature and unsupported by any evidence:  the UST identifies no immediate funding source for a chapter 7 trustee to prosecute multi-billion-dollar fraud claims; it identifies no mechanism for the trustee to gain access to the institutional knowledge and work product that has been accumulated; and it identifies no ability to protect the Carnaby Debtors' interest in shared insurance proceeds.  In sum, the UST cannot now satisfy the "strong evidentiary showing" required for the "drastic measure" of conversion as to the Carnaby Debtors. *See In re Dark Horse Tavern*, 189 B.R. at 580.

      **C.     A plan can be confirmed for the Carnaby Debtors within a reasonable period of time.**

36.     Section 1112(b)(2)(A) is satisfied because the Carnaby Debtors' cases are neither large nor complex—as SPVs, they have simple capital structures and few parties in interest.  A standalone chapter 11 plan for the Carnaby Debtors would establish a separate litigation trust to pursue the Carnaby Debtors' claims.  Onset is considering developing such a plan, which could be confirmed expeditiously because: (i) the Carnaby Debtors' creditor body is small and concentrated, with Onset holding the overwhelming majority of claims; (ii) the structure of a litigation trust plan would be straightforward, as it does not require complex operational reorganization; (iii) the causes of action are already well-defined in existing adversary proceedings; and (iv) Onset, as the primary creditor, would be prepared to support such a plan.

**D.     The grounds for converting include an act or omission that will be cured.**

37.     Finally, Section 1112(b)(2)(B) requires showing that the grounds for conversion or dismissal include an act or omission of the debtor for which there exists a reasonable justification and which will be cured within a reasonable period of time fixed by the court.  That element is satisfied here.

38.     An obvious omission underlying the UST's cause argument as to the Carnaby Debtor is the absence of a confirmable chapter 11 plan for those entities.  But that absence is not attributable to any act or omission of the Carnaby Debtors themselves—it is the direct and inevitable result of the Debtors' exclusive control over the plan process.  The Debtors have weaponized their exclusivity period to develop a Plan that makes no provision whatsoever for the Carnaby Debtors, while simultaneously blocking other parties in interest from developing an alternative.  But this omission is readily curable.  If the Court terminates the Debtors' exclusivity as to the Carnaby Debtors, Onset and other parties in interest would have the opportunity to evaluate and file a chapter 11 plan for the Carnaby Debtors—a plan that, as discussed above, could be developed and confirmed expeditiously given the Carnaby Debtors' simple capital structure and concentrated creditor base.  The reasonable justification for this omission is self-evident:  the Carnaby Debtors have been denied the opportunity to have a plan proposed on their behalf because of the Debtors' exercise of exclusivity.  And the cure is equally straightforward:  termination of that exclusivity as to the Carnaby Debtors.

## CONCLUSION

39.     For the foregoing reasons, Onset respectfully requests that the Court deny the UST Motion to the extent it seeks to convert or dismiss the Carnaby Debtors' Chapter 11 Cases, and grant such other and further relief as the Court deems just and proper.

17

Dated: June 3, 2026
      Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
Carrie H. Cohen (admitted *pro hac vice*)
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed on this 3rd day of June 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry