**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Docket No. 2670** |

**DEBTORS' OBJECTION TO UNITED STATES TRUSTEE'S**
**MOTION TO CONVERT OR DISMISS PURSUANT TO 11 U.S.C. § 1112(b)**

First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), file this objection ("**Objection**") to the *United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2670) (the "**Motion**") filed by Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"). The Debtors respectfully represent as follows:[2]

**Preliminary Statement**

1.      The Motion should be denied as the U.S. Trustee has failed to satisfy its steep burden to show that cause exists to convert or dismiss these chapter 11 cases. The Motion was filed directly in response to a prior chapter 11 plan that the U.S. Trustee argued did not comply with the requirement under section 1129(a)(9) that all administrative expenses be paid in full on

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the (i) *Declaration of Charles M. Moore in Support of (I) The Proposed Confirmation Schedule and (II) The Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (the "**Moore Declaration**"), (ii) the Joint Plan (as defined herein) (as may be further amended, supplemented, or modified from time to time), and (iii) the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (as may be further amended, supplemented, or modified from time to time, the "**Disclosure Statement**"), each filed contemporaneously herewith.

or before the Effective Date.  *See* Motion ¶1.  That plan is no longer being prosecuted.  Rather, the Debtors have filed a revised joint chapter 11 plan of liquidation proposed by all 92 of the FBG Debtors (the "**Joint Plan**") contemporaneously herewith.  The Joint Plan provides for the treatment of claims against all FBG Debtors and provides for payment in full of all administrative expense and priority claims of the FBG Debtors (in accordance with a revised Litigation Waterfall that repays administrative and priority creditors in full in cash *ahead* of $3.5 billion in DIP Roll-Up Claims, prepetition secured claims and unsecured claims) on or before the Effective Date.  The Joint Plan also incorporates various other changes to address the concerns and issues raised by the Court and the U.S. Trustee.  The Joint Plan maximizes value for all creditors of the FBG Debtors by funding and monetizing estate claims and causes of action for the benefit of the DIP Lenders and administrative, priority and unsecured creditors.  As set forth in the Moore Declaration filed contemporaneously herewith, any alternative, including conversion, is likely much worse for junior creditors (including administrative creditors).  Accordingly, the Joint Plan provides a much better outcome than conversion for all stakeholders.

2.　　The U.S. Trustee does not (and cannot) satisfy its burden to show that cause exists for conversion or dismissal.  The U.S. Trustee moves for conversion under section 1112(b)(4)(A), which requires the U.S. Trustee to demonstrate that (i) there is a "substantial or continuing loss" to the Debtors' estates *and* (ii) the absence of a likelihood of rehabilitation.  The U.S. Trustee cannot meet either prong.

3.　　*First*, the U.S. Trustee cannot demonstrate a "substantial or continuing loss" to the Debtors' estates.  The U.S. Trustee's sole argument in respect of this element of § 1112(b)(4)(A) is that there are outstanding administrative expenses of $222 million.  However, as this Court and numerous others have held, the existence of asserted administrative expense

2

claims alone does not support conversion.  Indeed, courts holistically evaluate this element based on the present condition of the debtor's estate and by looking at the debtor's circumstances prospectively.[3]  Here, there is no substantial loss as the Debtors have proposed a Joint Plan that proposes to repay those administrative expense claims (and priority claims) in full.

4.     Moreover, the Debtors have prepared a budget, attached to the Moore Declaration as Exhibit A (the "**Confirmation Budget**"), which identifies three discrete funding sources—(i) continued OEM funding for operating expenses through the wind-down period for certain business units, (ii) proposed funding from the ABL Secured Parties, and (iii) freed cash reserves—which in the aggregate, provides the Debtors with sufficient liquidity to pay administrative expense claims to be incurred during the proposed period required to solicit and confirm the Joint Plan.  *Id*. ¶ 11.  While the Ad Hoc Group SteerCo and the Creditors' Committee have confirmed their support of the Confirmation Budget and corresponding timeline for solicitation and confirmation of the Joint Plan, the Debtors are in ongoing discussions with the ABL Secured Parties to secure their consent of the Confirmation Budget in advance of the June 12 hearing.  *Id*. ¶ 12.

5.     The Debtors' estates are not suffering a continuing or substantial loss.  Indeed, despite extraordinary hurdles in these cases, the Debtors have achieved hard-fought results, including obtaining $1.1 billion of new money DIP financing and consummating four sale transactions that generated approximately $221 million in aggregate sale proceeds (plus future royalites) to pay down secured claims and saved more than 2,000 jobs, and achieved consensus around the Joint Plan which the Debtors now seek to solicit and confirm which provides a far better

---

[3]     *See* 11 U.S.C. § 1112(b)(4)(A); Tr. of July 16, 2025 Hr'g at 57:15–19, *In re Steward Health Care System LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) (CML) (Docket No. 5724) ("You don't just take a snapshot in time and say, at this point, I filed my motion, here's what happened . . . in the past. ***It must continue***.") (emphasis added).

outcome than chapter 7 for all creditors of the FBG Debtors. *Id*. ¶ 8.  Moreover, since the Petition Date, the Debtors have paid more than $1.8 billion in satisfaction of administrative expense claims, representing more than 91% of those that came due and payable.  *See* Moore Decl. ¶ 10.

6.     ***Second***, the U.S. Trustee fails to demonstrate an absence of likelihood of rehabilitation.  The U.S. Trustee's primary argument on this element is that the Debtors lack any "operations to preserve" because they have sold, or will soon sell, all marketable businesses before confirmation.  Motion ¶ 18.  The U.S. Trustee conflates rehabilitation with the continuation of business operations and concludes that, because the Debtors have sold or will sell their marketable businesses, there is nothing left to rehabilitate.  As this Court and others have held, there is not an absence of a likelihood of rehabilitation merely because a debtor is proposing a plan of liquidation rather than a plan of reorganization.[4]  Here, the Joint Plan will effectuate a rehabilitation by stopping the accrual of ongoing administrative expenses, maximizing recoveries for all creditors, and providing the best and only path to repay administrative expense and other priority claims in full.  Therefore, because the U.S. Trustee has failed to establish either element of cause under § 1112(b)(4)(A), the Motion should be denied.

---

[4]     *See, e.g.*, Transcript of July 16 Hr'g at 54:22-24, *In re Steward Health Care System LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) ("to require conversion in all cases in which a Chapter 11 has liquidated most of its assets and is proposing a plan, in my opinion, renders 1129(a) basically meaningless"); *see also In re Honx, Inc.*, No. 22-90035 (MI), 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) (finding likelihood of rehabilitation existed for a liquidating debtor where the debtor's parent entity would provide funding); Findings of Fact and Conclusions of Law at 14, *In re BMI Oldco Inc.*, No. 23-90794, (MI) (Bankr. S.D. Tex. May 20, 2025), ECF No. 1506 (holding that rehabilitation does not impose an ongoing business requirement); *In re MSR Hotels & Resorts, Inc.*, No. 12-11512 (SHL), 2013 WL 5716897, at *13 (Bankr. S.D.N.Y. Oct. 1, 2013) (dismissing arguments that the debtor must convert under the substantial and continuing loss prong because it no longer had operations or employees and explaining that liquidation in chapter 11 is a valid reorganizational purpose); *In re Cash Cloud., Inc*., 2023 Bankr. LEXIS 2562, *10 fn. 6 (Bankr. D. Nev. 2023) ("Because Chapter 11 expressly permits a debtor to liquidate through a confirmed plan rather than to reorganize, the Amended Plan is consistent with the rehabilitation process contemplated by the Bankruptcy Code.").

7.      Creditors will be substantially worse off if the Debtors' cases convert to chapter 7 or are dismissed.  *See* Moore Decl. ¶ 25.  In a chapter 7 scenario, a trustee would have no unencumbered assets with which to provide adequate protection, and the DIP Lenders would likely exercise remedies to foreclose on and/or otherwise control their collateral or would contest any attempt by a chapter 7 trustees to control estate claims or causes of action without their consent.  *Id*. ¶ 25.  Even assuming the chapter 7 debtors somehow maintained ownership and control over the Estate Claims, administrative creditors would still not be entitled to any recovery until after the DIP A Claims, any litigation financing claims, and chapter 7 administrative expenses were repaid in full. *Id*.  ¶ 26.  Therefore, at a minimum, the first $1.3 billion in DIP A claims must be paid in full before any administrative expense creditor can receive any recovery.  *Id*.  In contrast, under the Litigation Trust Waterfall, administrative and priority claims will be paid in full on or before the Effective Date and before any litigation recoveries are provided to holders of the $3.5 billion in Roll-Up Claims, prepetition secured claims, and general unsecured claims.  *Id*. ¶ 23.  Moreover, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Trust obtains approximately $1.9 billion in proceeds, even assuming no participation in the Administrative Expense Claim Consent Program.  *Id*.  Granting the Motion would therefore guarantee the very outcome the U.S. Trustee seeks to prevent: a loss of value for administrative, priority, and unsecured creditors.

8.      By contrast, the Joint Plan will provide numerous benefits for the Debtors' estates, including (among others) (i) $75 million of litigation funding that will allow the estate to maximize the value of the Estate Claims for the benefit of all creditors, (ii) a Litigation Trust Waterfall that allows junior creditors to participate in recoveries in accordance with their relative

priorities set forth in section 507 of the Bankruptcy Code and the waterfall in the DIP Order, but well before the senior DIP A Claims are repaid in full, and (iii) governance rights and representation for junior creditors in the Litigation Trust.

9.      Accordingly, for the reasons set forth herein, the Court should deny the Motion and afford the Debtors the opportunity to solicit and seek confirmation of the Joint Plan.

**Objection**

10.      Under section 1112(b)(1) of the Bankruptcy Code, the Court may only convert a case to chapter 7 if the movant establishes "cause" for conversion.  To establish cause under section 1112(b)(4)(A) of the Bankruptcy Code, the U.S. Trustee must prove there is both (i) a substantial or continuing loss or diminution of the estate **_and_** (ii) the absence of a reasonable likelihood of rehabilitation.  11 U.S.C. § 1112(b)(4)(A); *see In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015).  Converting a chapter 11 case "is a drastic measure," and its "harshness . . . mandates that it result only upon a strong evidentiary showing." *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).  The U.S. Trustee has the burden to establish "cause" by a preponderance of the evidence. *In re The Reserves Resort, Spa & Country Club LLC*, 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013).  "[A]ll doubts are to be resolved in favor of the debtor." *In re Austin Ocala Ltd.*, 150 B.R. 279, 282 (Bankr. M.D. Fla. 1993).  And, the "inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor." *In re Timbers of Inwood Forest Associates, Ltd*., 808 F.2d 363, 371–72 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).  Because the U.S. Trustee has the burden to show each prong is met, "[t]he Court must deny the motion to convert or dismiss if the movant fails to

satisfy either prong of § 1112(b)(4)(A).” *See In re Express Grain Terminals, LLC*, No. 21-11832, 2022 WL 1051097, at *9 (Bankr. N.D. Miss. Apr. 7, 2022).

11.     The U.S. Trustee has failed to meet its burden on either element of § 1112(b)(4)(A).

**I.     U.S. Trustee Has Not Demonstrated Substantial or Continuing Loss**

12.     The U.S. Trustee has failed to satisfy its burden to show by a preponderance of the evidence that the Debtors’ estates are suffering substantial or continuing loss.  In analyzing the “continuing or substantial loss” prong of section 1112(b)(4)(A) of the Bankruptcy Code, “courts must look beyond a debtor’s financial statements and make a full evaluation of the present condition of the estate.” *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 856 (Bankr. S.D. Tex. 2023) (citing *In re Ozcelebi*, 639 B.R. 365, 384 (Bankr. S.D. Tex. 2022)); *In re Zamora-Quezada*, 622 B.R. 865, 881 (Bankr. S.D. Tex. 2017).  “If the loss is sufficiently large under the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors,” the loss is substantial.  7 Collier on Bankruptcy ¶ 1112.04[6][a][i] (16th ed. 2022).  A finding of continuing loss must be based on a prospective analysis of a debtor’s estate, rather than relying on events occurring over the course of the case.  *See* Tr. of July 16 Hr’g at 57:15–19, *In re Steward Health Care System LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724) (“You don’t just take a snapshot in time and say, at this point, I filed my motion, here’s what happened . . . in the past.  ***It must continue***.”); *In re Zamora-Quezada*, 622 B.R. 865, 881 (Bankr. S.D. Tex. 2017) (“When examining the movant’s evidence for loss or diminution, ‘courts must look beyond a debtor’s financial statements and make a full evaluation of the present condition of the estate.’” (citations omitted)).

13.     To support this prong, the U.S. Trustee relies exclusively on the Debtors’ statement in their Disclosure Statement that there are approximately $223 million of unpaid

administrative expenses. *See* Motion ¶ 16. The U.S. Trustee fails to acknowledge, however, that the Debtors have paid more than $1.8 billion in satisfaction of administrative expense claims since the Petition Date, representing more than 91% of those that came due and payable. *See* Moore Decl. ¶ 10. Additionally, approximately $39 million of the Debtors' approximately $222 million accrued but unpaid administrative expense claims represent 503(b)(9) claims. *Id*. Further, of the remaining due and payable administrative expense claims that have not been paid, the vast majority of such claims date back to before February 1, 2026 before the Debtors obtained funding from the OEM customers. *Id*. Most importantly, the Debtors have proposed a viable chapter 11 plan that will pay these administrative expense claims in full and avert any substantial loss.

14. The fact that administrative claims have accumulated over the course of these cases does not, standing alone, demonstrate a substantial or continuing loss to the estate. The word "continuing" necessarily connotes an ongoing, prospective condition.[5] The U.S. Trustee must therefore demonstrate that the estates are presently suffering a diminution in value, meaning that assets are declining or liabilities are mounting without any means of stabilization or repayment on a go-forward basis. The U.S. Trustee has not and cannot make any such showing.

15. To the contrary, the Confirmation Budget will provide the estates with the liquidity necessary to maintain operations and preserve value for the benefit of all stakeholders. *See* Moore Decl. ¶ 11. The Confirmation Budget reflects the Debtors' ability to fund these cases through the anticipated Confirmation Date from three discrete funding sources—(i) continued OEM funding for operating expenses through the wind-down period for certain business units, (ii) proposed funding from the ABL Secured Parties, and (iii) freed cash reserves—which in the

---

[5] *See* Tr. of July 16 Hr'g at 57:15–16, *In re Steward Health Care System LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724) ("And I would note that the word 'continuing' indicates that it is prospective.")

aggregate, provides the Debtors with sufficient liquidity to pay administrative expense claims to be incurred during the period required to solicit, confirm and consummate the Joint Plan. *Id*. While the Ad Hoc Group SteerCo and the Creditors' Committee have confirmed their support of the Confirmation Budget and corresponding timeline for solicitation and confirmation of the Joint Plan, the Debtors are in ongoing discussions with the ABL Secured Parties to secure their consent of the Confirmation Budget in advance of the June 12 hearing. *Id*. ¶ 12. Upon securing the requisite lender consents, the Debtors will have the necessary cash to pay all costs as they become due in order to preserve and maximize the estate assets and fund these cases through the anticipated Confirmation Date of the Joint Plan. *Id*.

16. The mere existence of administrative expenses does not establish cause for conversion where the debtor has a viable path forward. *See In re Creech*, 538 B.R. 245, 250 (Bankr. E.D.N.C. 2015) (denying motion to convert because "[t]his is clearly not a case where the operating account has been depleted and there is no income to fund ongoing expenses," and "[t]he court is simply unable to find the existence of loss or diminution, let alone loss or diminution that is substantial or continuing"). Here, the Debtors have proposed a plan of liquidation that avoids loss to the estate by preserving and maximizing estate value for the benefit of all creditors.

17. Accordingly, because the U.S. Trustee cannot satisfy its burden to show that the Debtors' estates are suffering a substantial or continuing loss, the Motion should be denied.

**II.     U.S. Trustee Has Not Demonstrated an Absence of a Reasonable Likelihood of Rehabilitation**

18. Nor can the U.S. Trustee meet its burden of demonstrating "the absence of a reasonable likelihood of rehabilitation." The U.S. Trustee's main argument on this prong is that the Debtors lack any "operations to preserve" because they have sold, or will soon sell, all marketable businesses before confirmation. Motion ¶ 18. Courts, however, have squarely

rejected this argument on multiple occasions. *See, e.g.*, *Toibb v. Radloff*, 501 U.S. 157 (1991) ("the [Bankruptcy] Code contains no 'ongoing business' requirement for chapter 11 reorganization, and we find no basis for imposing one"); *In re Honx, Inc.*, No. 22-90035 (MI), 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) ("The Committee's contention that [the debtor] has no ongoing business and therefore cannot be said to have a goal of 'rehabilitation' misses the point.  There is no ongoing business requirement in the Code."); *In re BMI Oldco Inc.*, No. 23-90794 (MI) (Bankr. S.D. Tex. May 20, 2025), ECF No. 1506 (denying the United States Trustee's motion to dismiss and holding that rehabilitation does not impose an ongoing business requirement); *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 64 (Bankr. D.N.J. 2003) ("even if the Debtor had no ongoing business, the lack of an ongoing business is irrelevant for purposes of evaluating eligibility for Chapter 11 relief"); *In re MSR Hotels & Resorts, Inc.*, No. 12-11512 (SHL), 2013 WL 5716897, at *13 (Bankr. S.D.N.Y. Oct. 1, 2013) (dismissing arguments that the debtor must convert under the substantial and continuing loss prong because it no longer had operations or employees and explaining that liquidation in chapter 11 is a valid reorganizational purpose).  Because liquidating plans are expressly contemplated by section 1129(a) of the Bankruptcy Code, debtors are not required to have ongoing businesses to demonstrate a reasonable likelihood of rehabilitation.  *See In re Steward Health Care System LLC*, Tr. July 16 Hr'g at 54:22-24, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724) ("to require conversion in all cases in which a Chapter 11 has liquidated most of its assets and is proposing a plan, in my opinion, renders 1129(a) basically meaningless"); *In re Cash Cloud., Inc.*, 2023 Bankr. LEXIS 2562, *10 fn. 6 (Bankr. D. Nev. 2023) ("Because Chapter 11 expressly permits a debtor to liquidate through a confirmed plan rather than to reorganize, the Amended Plan is consistent with the rehabilitation process contemplated by the Bankruptcy Code."); *In re Weiss Multi-Strategy*

10

*Advisers LLC*, No. 24-10743 (MG) 2024 Bankr. LEXIS 1256, \*45 (Bankr. S.D.N.Y. 2024) (explaining that because it is permissible to confirm a chapter 11 plan of liquidation, having an intention to liquidate does not automatically foreclose satisfaction of the rehabilitation prong of § 1112(b)(4)(A))

19. As the Court has held, "'Rehabilitation,' as it is used in § 1112, ***is better read as encompassing a debtor's intention to use the bankruptcy process to prevent a complete and total loss of value***." *In re Honx, Inc.*, 2022 WL 17984313, at \*3 (emphasis added). That is exactly what the Joint Plan provides. If these cases are dismissed or converted to chapter 7, administrative, priority, and general unsecured creditors will be worse off than under the Joint Plan. *See* Moore Decl. ¶ 24. Indeed, the substantial benefits of the Joint Plan, including the Litigation Trust Waterfall which provides for the payment of administrative expenses beginning after the first $350 million attachment point, would be lost in a chapter 7. *Id.* ¶ 25. A liquidating plan that prevents such total loss of value is, by definition, rehabilitative under section 1112, and the U.S. Trustee offers no credible argument to the contrary.

20. The U.S. Trustee's reliance on *Irasel Sand* does not alter this conclusion. In that case, the court found a lack of rehabilitation where uncontroverted evidence showed the debtor's operations would fail without postpetition financing that it did not have. *See In re Irasel Sand, LLC*, 569 B.R. 433, 442 (Bankr. S.D. Tex. 2017). The circumstances here are very different. The Debtors' Confirmation Budget demonstrates that the Debtors can secure the funding necessary to confirm the Joint Plan.

21. Moreover, the U.S. Trustee's bare assertion that "a chapter 7 trustee can effectively liquidate assets and pursue these litigation claims at a fraction of the existing costs" is unsupported. Motion ¶ 18. A chapter 7 trustee would need to incur substantial additional

11

administrative expenses not required under the Confirmation Budget, including the costs of retaining and educating new professionals, re-negotiating agreements with lenders, and potentially litigating with secured parties, all without a clear timeline, funding source, or ending point. *See* Moore Decl. ¶ 14. By contrast, the Confirmation Budget benefits from minimized expenses, committed funding, and a defined conclusion: upon confirmation of the Joint Plan, the funding mechanisms contemplated thereunder would replace the Confirmation Budget's interim litigation funding sources, preserving value of estate assets and monetizing claims. *Id*. The Confirmation Budget and the Joint Plan together offer a path to resolving these cases and maximizing the value of estate assets that a conversion or dismissal cannot. *Id*.

### III.     The Debtors Must be Given the Opportunity to Prosecute the Joint Plan

22.     The Debtors have worked tirelessly with the Ad Hoc Group and the Creditors' Committee, including through extensive mediation with the Honorable Judge Marvin Isgur, to negotiate a chapter 11 plan that will monetize the estates' remaining assets in a manner that maximize value for creditors, including for administrative expense, priority, and general unsecured creditors. The Debtors have also worked to negotiate a revised Joint Plan that addresses the concerns the Court and objecting parties raised with respect to the prior plan. Indeed, the revised plan is a joint plan of all 92 FBG Debtors that provides recoveries to junior creditors in accordance with the priorities of section 507 of the Bankruptcy Code before even the new money DIP Claims are repaid in full. The Joint Plan demonstrates the Debtors' intention to "use the bankruptcy process to prevent a complete and total loss of value." *In re Honx, Inc.*, 2022 WL 17984313, at *3.

23.     In contrast, as explained in the Moore Declaration, creditors would be significantly worse off if these cases converted to chapter 7. *See* Moore Decl. ¶ 25. As a threshold matter, all or substantially all of the Debtors' remaining assets, including most notably the claims

and causes of action (or proceeds thereof) are encumbered by billions of dollars in secured claims. *Id.* Most assets are encumbered by as much as $7.9 billion in secured claims (approximately $4.9 billion in DIP claims, $2.6 billion in term loan claims, and $400 million of ABL Claims). *Id.* With respect to a fraction of estates' claims and causes of action that were unencumbered on the Petition Date (including claims arising under chapter 5 of the Bankruptcy Code), the proceeds of such claims and causes of action are encumbered by at least $1.3 billion of DIP A claims, and, with the possible exception of $200 million in administrative expense claims, the approximately $2.4 billion of DIP Claim reflected in the DIP Hurdle. *Id.* Under the Joint Plan, however, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Trust obtains approximately $1.9 billion in proceeds. *Id.* ¶ 7.

24. A chapter 11 plan of liquidation that garners requisite creditor support is achievable, and clearly a more efficient and cost-effective means for resolving these cases than conversion to chapter 7. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363 (5th Cir. 1987) ("The charge to the bankruptcy judge under § 1112, then, is to evaluate each debtor's viability and rate of progress in light of 'the best interest of creditors and the estate.'"); *In re Honx*, 2022 WL 17984313, at *3 ("Yet, sometimes, a plan of liquidation is better for all parties than attempting to salvage the business as an ongoing matter or allowing the provisions of chapter 7 or a race to the courthouse to dictate the liquidation process. Likewise, here, though the debtor does not purport to revamp its long-dormant business operations, it is using the bankruptcy process to preserve value for the future.").

25. Further, when faced with conversion motions based on administrative fees, courts have consistently recognized and heeded concerns surrounding the relative costs of

chapter 7 and refused to convert cases accordingly. *See, e.g.*, *In re W. Pac. Airlines, Inc.*, 218 B.R. 590 (Bankr. D. Colo. 1998). The court in *Western Pacific Airlines* concluded that:

> [L]iquidation has and will proceed more expeditiously, more orderly and less expensively under the control of the Debtor [in chapter 11], its existing management and senior staff, and funded by its DIP Lenders. If the case was converted, there would be (1) additional expenses associated with appointing a trustee and his/her attorneys; (2) disruption resulting from delay and change in personnel; (3) time and resources needed, but not available, to train or familiarize replacement management/employees; and (4) turmoil in the enormous and complex record keeping and information disbursal tasks required by the business . . . .

*Id.* at 595. Numerous other courts agree with this rationale. *See, e.g.*, *In re All Am. of Ashburn, Inc.*, 40 B.R. 104, 109 (Bankr. N.D. Ga. 1984) (stating that conversion following a sale of all assets but before plan confirmation would "discard the knowledge of counsel for the Creditors' Committee [and debtors]," which "could only result in a multiplication of administrative expenses, because the Trustee's counsel would have difficulty gaining comparable familiarity with the case during the remainder of the bankruptcy proceedings."); *In re Alves Photo Serv., Inc.*, 6 B.R. 690, 694 (Bankr. D. Mass. 1980) ("This court finds that it is most probable, according to the facts of this particular case, that the purported savings derived from a conversion would not offset the additional replacement costs, and therefore, that a proposed plan would meet confirmation standards.").

26.    For the foregoing reasons, U.S. Trustee cannot meet its high burden of demonstrating either prong under section 1112(b)(4)(a) because the Debtors (i) are not experiencing "substantial or continuing losses" and (ii) will effectuate a rehabilitation through confirmation of the revised Joint Plan which will maximize recoveries for creditors and avoid the significant value destruction that would result from a non-consensual conversion to chapter 7.

27.    Accordingly, the Motion should be denied.

14

**Reservation of Rights**

28.     The Debtors reserve all rights to supplement or add to the legal and factual arguments raised in this Objection, including by filing declarations in support of this Objection, on any basis whatsoever, at a future date.  Nothing herein shall be interpreted as an admission that any claim described herein is valid, and the Debtors reserve all rights with respect thereto.

**Conclusion**

29.     For the reasons set forth herein, the Debtors request that the Court deny the relief requested in the Motion.

For the foregoing reasons the Debtors respectfully request that the Court deny the relief requested in the Motion.

Dated:  June 5, 2026
      Houston, Texas

                                   */s/  Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   gabriel.morgan@weil.com
          clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   matt.barr@weil.com
          sunny.singh@weil.com
          andriana.georgallas@weil.com
          kevin.bostel@weil.com
          jason.george@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on June 5, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson