**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, LLC, et al.,[1] | Case No. 25-90399 (CML) |
| Debtors. | |

**OBJECTION OF TOTAL QUALITY LOGISTICS, LLC TO DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS DATED JUNE 5, 2026**

Total Quality Logistics, LLC ("TQL") hereby objects to the Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors ("FBG Debtors") dated June 5, 2026 [Doc. 2912] ("Disclosure Statement"), and, in support thereof, states as follows:

**PRELIMINARY STATEMENT**

The Disclosure Statement should not be conditionally approved for two primary reasons.

First, the Disclosure Statement is a voluminous document describing an equally, if not more, complex plan than that described in the prior rejected Disclosure Statement to Chapter 11 Plan of Premier Marketing Group, LLC ("PMG Disclosure Statement") [Doc. 2545], and was still filed on a compressed timeline. TQL, a holder of administrative expense claims against the FBG Debtors, has not had sufficient time to fully review and analyze the new Disclosure Statement given its length, complexity, and the compressed seven-day timeline. This alone is a basis to deny conditional approval.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

1

Second, and more fundamentally, the core deficiencies identified in TQL's prior objection with respect to the PMG Disclosure Statement [Doc. 2647] ("TQL's Prior Objection") – namely that the Disclosure Statement lacks adequate information as required under Section 1125(b) of the Bankruptcy Code to enable TQL and other creditors to make an informed judgment about the proposed plan – appear to still remain unresolved in this new Disclosure Statement. Moreover, on initial review, the new Disclosure Statement also raises additional concerns that TQL has not had sufficient time to fully analyze (but a few of particular concern it points out below). TQL reserves all rights to supplement this Objection.

## BACKGROUND

1.      On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Commencing on September 28, 2025, First Brands Group, LLC and ninety-eight (98) debtor affiliates each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

2.      On November 9, 2025, this Court entered the final order authorizing the Debtors to obtain post-petition financing [Doc. 608] ("Final DIP Order"). Paragraph 8(b) of the Final DIP Order provides certain protections to unpaid and undisputed administrative expense claims of the Debtors, including, without limitation, establishing an Administrative Expense Claims Basket (as defined in the Final DIP Order) of $200 million for the holders of administrative expense claims and specifying that "remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket",

as long as the New Money DIP Loans (as defined in the Final DIP Order) are paid in full. (Final DIP Order ¶ 8(b).)

3.      In his Declaration in Support of the Final DIP Order, the Debtors' Interim Chief Executive Officer, Charles M. Moore declared, in pertinent part:

**<u>Administrative Expense Claims Basket</u>**

> 50.      The DIP Lenders have agreed to subordinate all $3.3 billion in Roll-Up Obligations to certain categories of administrative expense claims (including payroll, trade claims, section 503(b)(9) claims) up to an aggregate cap of $200 million (the "Aggregate Administrative Expense Claims Basket") in the event the Debtors' estates are administratively insolvent. Under my supervision, the A&M team sized the Administrative Expense Claims Basket based on a variety of factors, including, but not limited to, the Debtors' average run rate over a two-week period, the amount of two weeks of accrued and unpaid payroll for U.S. salaried and hourly employees, and approximately one and a half weeks of total vendor spend, among other things.

> 51.      I believe the sizing of the Aggregate Administrative Expense Claims Basket and underlying assumptions are reasonable given the Debtors' average historical spend since commencing these cases and will materially reduce and potentially eliminate the risk to parties providing postpetition goods and services to the Debtors.

[Doc. 527, p. 21.]

4.      On April 29, 2026, Debtor Premier Marketing Group, LLC filed the PMG Disclosure Statement [Doc. 2545].

5.      On May 12, 2026, TQL filed TQL's Prior Objection [Doc. 2647].

6.      On May 27, 2026, this Court entered an order denying conditional approval of the PMG Disclosure Statement for reasons stated on the record at the May 26, 2026 hearing [Doc. 2814].

7.      On June 5, 2026, the FBG Debtors filed the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors [Doc. 2907] (the "Plan"). On that same day, FBG Debtors filed the related Disclosure Statement [Doc. 2912].

8.     The notice with respect to the June 5, 2026 Disclosure Statement [Doc. 2933] advised that those who object must appear at the Disclosure Statement hearing or file a written response prior to June 12, 2026, making this Objection timely.

9.     TQL is a logistics services provider with administrative expense claims against the FBG Debtors for services provided over the course of approximately five months following the Petition Date, generating 114 documented unpaid invoices totaling $268,499.20. On May 12, 2026, TQL filed its Emergency Motion to Allow Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and Compel Payment [Doc. 2644], which motion remains pending before this Court.

**OBJECTIONS**

**I.     Issues From TQL's Prior Objection That Remain Unresolved**

10.     Several core deficiencies identified in TQL's Prior Objection with respect to the PMG Disclosure Statement remain present with respect to the Disclosure Statement, with notable ones set forth below.

**a.     The Disclosure Statement Fails to Explain Disregard of Final DIP Order's Protections to Holders of Administrative Expense Claims**

11.     The Disclosure Statement fails to sufficiently explain how the Plan (and its establishment of the multiple trusts and waterfalls) satisfies the protections afforded to the Specified Administrative Expense Claims as defined and established in the Final DIP Order (Final DIP Order ¶ 8(b), pp. 42-43.) Particularly, the Disclosure Statement fails to describe why distributions of proceeds under the various trusts established in the Plan to the holders of the New Money DIP Loans (defined in the Final DIP Order) would not trigger the payment of Specified Administrative Expense Claims from the $200 million Administrative Expense Claims Basket established in ¶ 8(b) of the Final DIP Order.

12. The Debtors' own CEO Mr. Moore declared this basket would "materially reduce and potentially eliminate the risk to parties providing postpetition goods and services." [Doc. 527, p. 21.] However, as described in the Disclosure Statement, the new Plan still appears to be paying claims of other prepetition lenders, which under the Final DIP Order should have been subordinated to the Administrative Expense Claims Basket, prior to administrative expense claims (*See* ¶ 8(b) of the Final DIP Order providing "the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket", as long as the New Money DIP Loans are paid in full.)

13. The Disclosure Statement fails to provide sufficient explanation why the FBG Debtors believe the Plan provides holders of administrative expense claims a better opportunity for recovery on their administrative expense claims than would otherwise be provided to them if the protections given to them in ¶ 8(b) of the Final DIP Order were not disregarded. [Doc. 2912, pp. 2-5, 20-21, 82-83, 84-87.]

**b. <u>Critical Financial and Other Information Is Still Missing – Disclosure Statement Lacks Adequate Information Under § 1125</u>**

14. The Disclosure Statement fails to provide the basic financial and other information creditors need to be able to evaluate their recovery under § 1125(b) of the Bankruptcy Code.  For example, the credit bid amounts are not currently disclosed and are to be provided in the Plan Supplement due June 22, 2026, after the hearing on the Disclosure Statement. (Disclosure Statement p. 17.)

15. The Disclosure Statement also does not provide asset valuations. There is no valuation in the Disclosure Statement of DIP Collateral Trust Assets, ABL Collateral Trust Assets or Litigation Trust Assets (each as defined in the Plan). (*See* Disclosure Statement generally.) Without these, holders of administrative expense claims and other creditors cannot evaluate

expected distributions and key issues such as whether the DIP A Claims (defined in the Plan) could be substantially satisfied from proceeds from the DIP Collateral Trust alone and if the complex multiple trust structure and waterfall mechanisms are necessary or warranted.

16. The Disclosure Statement also does not provide a Liquidation Analysis or recovery estimate to allow holders of administrative expense claims and other creditors to properly evaluate whether the Plan provides greater recovery than they would otherwise receive in a chapter 7 and if the Administrative Expense Claims Basket and other protections set forth in ¶ 8(b) of the Final DIP Order were otherwise honored and followed.  To the extent the FBG Debtors intend to rely on the Declaration of Charles M. Moore [Doc. 2911] ("Moore Declaration") as satisfying this requirement, such reliance is insufficient, as the Moore Declaration appears to simply provide generalizations and illustrative recovery scenarios without the actual valuations or probability-weighted estimates necessary for creditors to make meaningful informed judgments. Further, the Moore Declaration does not appear to be based upon proper application of the subordination provisions of ¶ 8(b) of the Final DIP Order or otherwise explain or address certain of the other concerns with the proposed structure and mechanisms of the Plan, as discussed in this Objection.

17. It should also be noted that the Moore Declaration suggests that the accrual of unpaid administrative expense claims was the result of unforeseeable extraordinary circumstances (Moore Declaration ¶ 9), which is difficult to reconcile with the fact that, under his own supervision, the Debtors and their financial advisors sized the $200 million Aggregate Administrative Expense Claims Basket established in ¶ 8(b) of the Final DIP Order, with the specific purpose of protecting holders of administrative expense claims against the risk of nonpayment [Doc. 527, p. 21]. The existence of that $200 million Administrative Expense Claims Basket reflects that the risk of unpaid administrative expense claims was anticipated and protections therefrom bargained for — which makes the Disclosure Statement's failure to explain

6

why the Plan does not honor those protections and further failure to provide concrete information to allow  administrative expense creditors to evaluate the disparity in recovery that they will face if the Plan is confirmed without honoring those protections, all the more significant.

18. In addition, bar dates, including for administrative expense claims, have not yet been established in these chapter 11 cases in order to know the universe of claims asserted against the FBG Debtors. Claims, including administrative expense claims, are estimated based solely on the FBG Debtors' books and records. (Disclosure Statement p. 77.)

19. Ultimately, the Disclosure Statement does not provide sufficient explanation with respect to the extremely complex mechanisms set forth in the Plan, nor does it provide sufficient information to enable holders of administrative expense claims and other creditors to make informed judgments about the Plan.

## II. Additional Concerns Identified

20. Given the complexity of the new Disclosure Statement and the compressed timeline, TQL has not had sufficient time to fully analyze the Disclosure Statement. However, TQL wants to point out the following additional items (some of which may be new to this Disclosure Statement or relate to similar concepts that carry over from the PMG Disclosure Statement) which raise concerns.

### a. ABL Collateral Trust Assets Paid Directly to ABL Lenders

21. The Final DIP Order's subordination language applies to the asset pools transferred to the proposed trusts under this new Disclosure Statement. The Final DIP Order states, in pertinent part:

> "up to an aggregate amount of **$200 million** shall be paid (the 'Administrative Expense Claims Basket'), and... **the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims** from the Administrative Expense Claims Basket."

(Final DIP Order ¶ 8(b) (emphasis added).)

22.     Pursuant to the Plan, as described by the Disclosure Statement (with capitalized terms as defined therein), it appears that ABL Priority Collateral will be transferred directly to the ABL Secured Parties via a consensual foreclosure, with any surplus going to the DIP Collateral Trust. (Disclosure Statement pp. 2, 16-17.) The Final DIP Order ¶ 8(b) subordinates "Prepetition Liens" (which is expressly defined in ¶ G(xviii) on p. 19 of the DIP Order to include ABL Liens) to the payment of the $200 million administrative expense claims basket once the New Money DIP Loans (defined in the Final DIP Order) are satisfied. The Plan's structure appears to bypass this entirely and the Disclosure Statement does not appear to provide sufficient discussion regarding how and why the Plan may diverge from the provisions in ¶ 8(b) of the Final DIP Order regarding the Administrative Expense Claims Basket and payment priority of Specified Administrative Expense Claims (each as defined in ¶ 8(b) of the Final DIP Order).

23.     This is particularly of concern as TQL, and potentially other post-petition creditors, relied on the subordination provisions in the Final DIP Order when determining whether to extend such post-petition credit and services to the FBG Debtors.

> b. **Administrative Expense Claims Consent Program – Insufficient Disclosure**

24.     Under the Administrative Expense Claims Consent Program (defined in the Plan), holders of administrative expense claims may elect to reduce their administrative expense claim to 50% in order to receive payment of such reduced amounts before holders of other administrative expense claims that do not opt in to the Administrative Expense Claims Consent Program (but following the first $350 million in distributable proceeds from the Litigation Trust Waterfall (defined in the Plan)). (Disclosure Statement pp. 22-25.) The FBG Debtors have provided illustrative charts in the Disclosure Statement (Disclosure Statement p. 24), however, given the lack of information regarding valuation of the FBG Debtor's assets (including the Litigation Trust

assets), holders of administrative expense claims are unable to evaluate whether there will be sufficient recovery to pay the administrative expense claims settled at 50%, let alone to satisfy the administrative expense claims for those that do not opt in to the Administrative Expense Claims Consent Program (who get paid after all settled administrative expense claims for those holders that opt in to the Administrative Expense Claims Consent Program). (Disclosure Statement pp. 22-25.) The FBG Debtors instead state in the Disclosure Statement that "the timing of the Effective Date and distributions to holders of Allowed Administrative Expense Claims who do not opt in are indeterminate, are not required to be reserved for, and will depend in part on the level of participation in the Administrative Expense Claims Consent Program." (Disclosure Statement p. 24.)

25.     Without the requite disclosures with respect to valuations, creditors cannot determine whether this Administrative Expense Claims Consent Program mechanism is beneficial or detrimental to those holding administrative expense claims and who do not opt-in.

### c.   Effective Date Unsupported

26.     The FBG Debtors estimate in the Disclosure Statement that "the Effective Date is reasonably likely to occur in the second half of 2028, although the Effective Date may reasonably or in fact occur earlier or later than the second half of 2028." (Disclosure Statement p. 25.) The FBG Debtors do not appear to provide further support or explanation in the Disclosure Statement as to how they determined this estimated Effective Date nor how any current or future potential stays of litigation (due to any potential criminal or bankruptcy proceedings of the defendants or otherwise) could affect the Effective Date.

27.     As such, there is insufficient information for creditors to determine whether the proposed Plan will *ever* go effective.

d.   **Administrative Expense Claims Estimate – Insufficient Disclosure**

28.     The FBG Debtors estimate in the Disclosure Statement that there are a total of $222 million in administrative expense claims against the FBG Debtors, which includes a 20% contingency for expenses that have not yet been invoiced. (Disclosure Statement p. 77.)  The Disclosure Statement does not appear to provide further explanation as to how the 20% contingency for expenses that were not invoiced was determined (and if it takes into account any reductions in potential additional invoices as the cases progress and the FBG Debtors no longer operate) and if there would be a material effect on the payment of administrative expense claims if the administrative expense claims were less than the amount of the $200 million Administrative Expense Claim Basket set forth in the Final DIP Order. (Final DIP Order ¶ 8(b).)

e.   **Lack of Litigation Trust Interests for Administrative Expense Creditors Not Explained**

29.     The FBG Debtors do not appear to provide an explanation in the Disclosure Statement that holders of administrative expense claims are not holders of any Litigation Trust Interests (defined in the Plan) although other creditors (such as holders of Roll-Up Claims (defined in the Plan) and general unsecured creditors) are holders of Litigation Trust Interests and how the rights of holders of administrative expense claims may differ, if at all, from receiving cash distributions rather than Litigation Trust Interests. (Disclosure Statement pp. 9-14, 20.)

f.   **Insufficient Information Regarding Potential Excess Recovery of DIP A Claims Under Litigation Trust Waterfall**

30.     The Disclosure Statement lacks sufficient explanation as to why under the Litigation Trust Waterfall, the return thresholds do not appear to take into account aggregate distributions received under both the DIP Collateral Trust and Litigation Trust to determine if distributions equal to the amount of the DIP A Claims as of the Confirmation Date have been received by the holders of Allowed DIP A Claims in order to allow payment of 100% of Litigation

10

Trust proceeds to thereafter be paid to holders of administrative expense claims until paid in full.

(Disclosure Statement pp. 9-12.) The Disclosure Statement describes the DIP Collateral Trust

Waterfall (defined in the Plan) on the other hand as including such mechanism, stating with respect

to distributions from the DIP Collateral Trust:

> "*Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Allowed Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full."

(Disclosure Statement p. 15 (italics in original).)

### g.  **Apparent Conflict in DIP Collateral Trust Waterfall**

31.     There appears to be a conflict between how the Disclosure Statement describes the

DIP Collateral Trust Waterfall and what happens when aggregate distributions equal the amount

of Allowed DIP A Claims.  In the fourth step of the DIP Collateral Trust Waterfall, as noted, the

Disclosure Statement provides: "*Fourth*, to the extent that at any time (a) aggregate distributions

to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the

amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance

of doubt , any reduction for Credit Bid Claims) and (b) all Allowed Administrative Expense Claims

(including Allowed Settled Administrative Expense Claims) have not been repaid in full from the

proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims

until such Allowed Claims are paid in full." (Disclosure Statement p. 15 (italics in original).)

However, immediately following the fourth step, the Disclosure Statement provides: "Following

aggregate distributions equal to the amount of Allowed DIP A Claims as of the Confirmation Date,

any residual value will be paid as directed by the DIP Collateral Trust Oversight Committee,

subject to Bankruptcy Court approval." (*Id.*)  It is also not clear whether upon the occurrence of

the fourth step of the DIP Collateral Trust Waterfall if Settled Administrative Expense Claims (defined in the Plan, where holders agreed to 50%) would be paid before other administrative expense claims or if that is being limited to proceeds from the Litigation Trust.

## RESERVATION OF RIGHTS

TQL reserves all of its rights, claims, interests and remedies, including, without limitation: (a) the right to supplement this Objection; (b) the right to file and to prosecute an objection to confirmation of any plan of reorganization or liquidation on any grounds; (c) the right to conduct discovery and present evidence relating to any of the foregoing; and (d) all other of its rights and claims available to TQL.

## CONCLUSION

As identified above, it appears that many of the core deficiencies in the PMG Disclosure Statement continue to exist in this new Disclosure Statement. The FBG Debtors have not provided adequate information in the Disclosure Statement that would be necessary for holders of administrative expense claims and other creditors to make an informed judgment about the Plan. Ultimately, TQL wants to ensure that it receives sufficient information and sufficient time to review such information so that it may make an informed judgment about the Plan to ensure the Plan properly provides for full and timely payment of its administrative expense claims, pursuant to the Bankruptcy Code and orders of this Court, because TQL has not agreed to a different treatment.

WHEREFORE, for the reasons set forth herein, TQL respectfully requests that the Court sustain this Objection, deny approval of the Disclosure Statement, and grant TQL such further and additional relief as the Court may deem just and proper.

Dated:  June 11, 2026

By: /s/ Yosina M. Lissebeck
    Yosina M. Lissebeck
yosina.lissebeck@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-0500
Attorneys for Total Quality Logistics, LLC

13

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, LLC, et al. [1] | Case No. 25-90399 (CML) |
| | (Jointly Administered) |
| Debtors. | |

**ORDER SUSTAINING OBJECTION OF TOTAL QUALITY LOGISTICS, LLC TO DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS DATED JUNE 5, 2026**

The Court, having considered the Objection of Total Quality Logistics, LLC to Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors Dated June 5, 2026 ("Objection")[2] and the Disclosure Statement, HEREBY ORDERS THAT:

1.      The Objection is sustained.

2.      The Disclosure Statement is not approved.

3.      This Order is effective immediately upon entry.

4.      This Court shall retain jurisdiction over the matters arising from or related to the interpretation, implementation, or enforcement of this Order.

Dated: _____, 2026
Houston, Texas

_____
CHRISTOPHER M. LOPEZ
 UNITED STATES BANKRUPTCY JUDGE

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.
[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

## **CERTIFICATE OF SERVICE**

I certify that on June 11, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Bankruptcy Court for the Southern District of Texas, using the CM/ECF system. The ECF system will send a "Notice of Electronic Filing" to all counsel of record who have consented in writing to accept service of this document by electronic means.

/s/ Yosina Lissebeck
Yosina Lissebeck