**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION FOR ORDER (A) AUTHORIZING**
**THE SALE OF ASSETS OF THE JASPER RUBBER BUSINESS TO JASPER**
**ACQUISITION CO., LLC, AND (B) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN JULY 2, 2026.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING HAS BEEN REQUESTED ON THIS MATTER ON JULY 2, 2026 IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**
>
> **YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

## Preliminary Statement[2]

1. The Debtors are pleased to be before the Court seeking approval of the sale of assets comprising the "Jasper Rubber" business (collectively, and as defined and further described in the Purchase Agreement, the "**Transferred Assets**"). The Sale Transaction will be consummated pursuant to that certain *Asset Purchase Agreement* (the "**Purchase Agreement**" and the sale transaction contemplated thereunder, the "**Sale Transaction**") dated as of June 24, 2026, by and among First Brands Group Holdings, LLC and certain of its subsidiaries named therein, as Sellers (collectively, the "**Sellers**"), Jasper Acquisition Co., LLC, as Buyer (the "**Buyer**"), and Press-Seal Corporation, as Guarantor, which provides for an aggregate purchase price of $8,030,000 in cash and the assumption of certain Assumed Liabilities.

2. It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible. As this Court is aware, the Debtors' liquidity is limited, and the Buyer and the Debtors' key stakeholders have made clear their expectation that the Sale Transaction be consummated on an expedited basis. Although the Debtors ceased day-to-day operation of the Jasper Rubber business in March, the Buyer desires to recommence those operations at the facilities in Jasper,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms as elsewhere in the Motion, the Purchase Agreement, or the Wind Down Order, as applicable.

Indiana, and the sooner that the Buyer is able to do so, the more likely the Buyer will be able to rehire former employees of the Debtors and possibly retain customer relationships. The Debtors anticipate closing the Sale Transaction promptly following Court approval, which will inure to the benefit of the Debtors' estates.  Accordingly, prompt entry of the Sale Order is critical to preserve value and avoid disruption of the Sale Transaction.

3.      Accordingly, with the goal of maximizing value, the Debtors propose the following timeline for the consummation of the Sale Transaction:

| Event | Date |
| --- | --- |
| File and serve Notice of Sale Hearing | Contemporaneously with this Motion |
| Proposed Sale Hearing (the "**Sale Hearing**")[3] | July 2, 2026 |
| Written Sale Transaction objections due | 4:00 p.m. prevailing Central Time on July 1, 2026 |

4.      As the Court is aware, the Debtors have conducted a multi-month-long marketing and sale process, which began on January 5, 2026, with the Debtors' outreach to over 400 potential bidders (the "**Sale Process**").  As of the date hereof, the Debtors have obtained Court approval of and closed going-concern sales of various business lines as well as sales of discrete assets such as certain intellectual property.[4]  Further, since entry of the Wind Down Order,[5] the Debtors and their

---

[3]     The Debtors have requested that the Sale Hearing be held on July 2, 2026.  The Sale Hearing may be adjourned by the Debtors by filing a notice on the docket of these chapter 11 cases.

[4]     *See, e.g.*, *Order (A) Authorizing and Approving Sale of Certain of Debtors' Intellectual Property Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts, and (C) Granting Related Relief* (Docket No. 2399); *Order (A) Authorizing and Approving Sale of Debtors' Toledo Molding & Die Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2675); *Order (A) Authorizing and Approving the Debtors' Entry Into Stock and Asset Purchase Agreement with Flex-N-Gate For Sale of Debtors' Horizon Business Assets and Transferred Equity Interests Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2800).

[5]     "**Wind Down Order**" means the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale*

advisors have continued engaging with potential purchasers related to all of the Debtors' assets, including the Wind Down Assets.[6]  In furtherance thereof, the Debtors have engaged in good faith arm's length discussions with the Buyer regarding the sale of the Transferred Assets.  These discussions resulted in the Sellers and the Buyer reaching an agreement on the terms of the Sale Transaction and the Purchase Agreement.

5.      Five days prior to filing the Motion, the Debtors delivered a Wind Down Sale Notice to the applicable Wind Down Sale Notice Parties, none of whom objected to the Sale Transactions.  The Ad Hoc Group, the ABL Lenders, and Onset expressly consented to the Sale Transaction.

6.      For the above reasons and those set forth in the Motion, the Debtors believe the Sale Transaction is in the best interests of the Debtors, their estates, and all stakeholders and should be approved on the expedited timeline described herein.

### Relief Requested

7.      By this motion (the "**Motion**"),[7] pursuant to sections 105, 363, and 541 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 9008 of the

---

[6]  *of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No.2454).

[6]  "**Wind Down Assets**" has the meaning ascribed to such term in the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2216) (the "**Wind Down Motion**"), as modified by the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**First Expansion Notice**") and the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829] (the "**Second Expansion Notice**").

[7]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**") or in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608) (the "**DIP Order**"), as applicable.

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules")**, the Debtors request entry of an order (the "**Sale Order**"), substantially in the form attached hereto as **Exhibit A**:

    i.    authorizing the sale of the Transferred Assets to the Buyer pursuant to the Purchase Agreement, annexed as Exhibit 1 to the proposed form of Sale Order attached hereto as **Exhibit A**, free and clear of any and all liens, claims, encumbrances and other interests, except for Assumed Liabilities and Permitted Liens (each, as defined in the Purchase Agreement);

    ii.    authorizing and approving the form and manner of notice of the hearing on the sale of the Transferred Assets, substantially in the form attached hereto as **Exhibit B**; and

    iii.    granting related relief.

8.     In support of the Motion, the Debtors submit the declaration of Daniel Jerneycic, Managing Director at Alvarez & Marsal North America, LLC, the Debtors' financial advisors, which is filed contemporaneously herewith and is incorporated by reference herein.

## Background

9.     On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025 (the "**Petition Date**"), FBG and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.

10.     On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (Docket No. 313) (the "**Creditors' Committee**").

11.     The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

12.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration and incorporated herein by reference.

### Jurisdiction and Venue

13.     The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Sale Process

14.     On January 5, 2026, the Debtors, with assistance from Lazard, commenced a marketing and sale process for all of their assets and the equity in or assets of certain non-Debtor subsidiaries.  As a result of outreach to over 400 potentially interested parties, over 200 potential buyers executed confidentiality agreements and received access to a virtual dataroom with technical, commercial, and financial information regarding each of the Debtors' business units.

15.     On January 8, 2026, the Debtors filed the Bidding Procedures Motion,[8] which sought Court approval of an expedited timeline and auction procedures for the Sale Process.  The Debtors filed and served the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* (Docket No. 1324) (the "**Initial Notice**"), which provided all interested parties with notice

---

[8]     The "**Bidding Procedures Motion**" means the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* (Docket No. 1253) and the "**Bidding Procedures**" refers to the bidding procedures proposed thereunder.

of the Debtors' intent to sell all of their assets pursuant to one or more sale transactions.  On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix and the Sale Notice Parties (as defined in the Bidding Procedures Motion).  *See Affidavit of Service* (Docket No. 1718).  The Debtors subsequently published the Initial Notice in the national edition of *The New York Times* on January 16, 2026, as reflected in the *Certificate of Publication* (Docket No. 1645).

16.     However, shortly after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position further deteriorated and the Debtors found themselves unable to obtain additional funding or waivers to access additional liquidity from their lenders.  As a result the Debtors were forced to begin taking steps to wind down certain of their North American business operations.  At that point, it became clear to the Debtors and their advisors that consummating a sale transaction on the timeline contemplated by the Bidding Procedures Motion was no longer possible under the circumstances.

17.     In late January 2026, the Debtors and their advisors reached out to potential bidders and key stakeholders to apprise them of the Debtors' liquidity situation and request that any party interested in the Debtors' assets submit an indication of interest as soon as possible.  By February 5, 2026, the Debtors had received approximately 40 non-binding indications of interest ("**IOIs**") spanning several of their business units.  The Debtors and their advisors then worked to narrow the IOIs received into a core set of viable transactions that provided the highest or otherwise best value to the Debtors' estates.

18.     As part of these discussions, the Debtors considered interest in both going-concern sales and various sales for discrete categories of assets, such as intellectual property and equity

interests.  In connection with each, the Debtors considered, among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders.

19.     On March 14, 2026, Press-Seal Corporation, guarantor for the Sale Transaction, submitted a preliminary non-binding indication of interest regarding a potential acquisition of the Transferred Assets.

### Retention of Consultant and Winddown Process

20.     On April 16, 2026, the Court entered the Wind Down Order, pursuant to which, among other things, the Court authorized the Debtors and their Consultant (as defined in the Wind Down Motion) to sell Wind Down Assets.  The Wind Down Order authorizes the Debtors, in their business judgment, to expand the list of Wind Down Assets attached thereto in order to wind down additional brands, business units, or asset classes subject to the procedures set forth therein.  On May 15, 2026, the Debtors filed the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**First Expansion Notice**"), which was served on all parties entitled to service of such notice under the terms of the Wind Down Order, including the Debtors' Master Service List.  *See* Docket No. 2761.  Pursuant to the First Expansion Notice, the Debtors expanded, consistent with Paragraphs 50 and 51 of the Wind Down Order, the scope of brands, business units, and asset classes, including intellectual property, machinery and equipment and real estate, subject to the Wind Down Order to include, among other things, the Debtors' "Filters and Plugs" business unit and related legal entities, including the Debtors' Jasper Rubber business.  On May 28, 2026, the Debtors filed the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829], which was served on all parties entitled to service of such notice under the terms of the Wind Down

Order, including the Debtors' Master Service List (*see* Docket No. 2877), and expanded the Wind Down to First Brands Holdings, LLC and all Debtor subsidiaries.

21.      Prior to and following entry of the Wind Down Order, the Debtors continued to market the Transferred Assets.  Following weeks of good faith arm's-length negotiations between the Debtors and their advisors, and the Buyer, the parties reached the agreement reflected in the Purchase Agreement.  For the reasons set forth herein, the Debtors have determined the Sale Transaction represents the highest and otherwise best bid for the Transferred Assets and should be approved.

22.      Notwithstanding the relief granted pursuant to the Wind Down Order, at the Buyer's request as part of the bargained-for Sale Transaction, the Debtors are filing this Motion out of an abundance of caution seeking approval of the Sale Transaction and entry of the Sale Order.

### Proposed Terms of the Sale Transaction

23.      The chart below summarizes certain material terms of the Purchase Agreement.

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| **Purchase Price** | The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Assets and obligations of Sellers set forth in the Purchase Agreement shall be an amount in cash equal to $8,030,000 *plus* the assumption of the Assumed Liabilities.<br><br>Purchase Agreement § 3.01. |
| **Transferred Assets** | "**Transferred Assets**" means, collectively, to the maximum extent permitted by the Bankruptcy Code or other applicable Law Sellers' and their respective Affiliates' right, title and interest in and to, as of the Closing, the following assets, as the same currently exist as of the Agreement Date and shall exist immediately prior to the Closing, and in the case of any machinery, equipment, inventory or other tangible assets, to the extent physically located at, on or within the Transferred Owned Real Property as of the Agreement Date, in each case other than the Excluded Assets:<br><br>a.   all Owned Real Property listed on Section 2.02(a)(i) of the Disclosure Schedules (the "**Transferred Owned Real Property**") held by such Seller, together with all improvements, facilities, fixtures and appurtenances thereto |

---

9      Unless otherwise specified, all section references are to the Purchase Agreement.  The summary of the Purchase Agreement set forth herein is qualified in its entirety by the terms of the Purchase Agreement.

| **Material Terms of the Purchase Agreement[9]** |
|---|
| and all rights in respect thereof and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements, if any, related thereto and, with respect to any such real property, all rights of any Seller Party in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining to the Transferred Owned Real Property;<br><br>b.  all Contracts Related to the Business including those set forth on Section 2.02(a)(ii) of the Disclosure Schedules (including any Executory Contracts designated by Buyer in accordance with Section 2.06(a)) (collectively, the "**Transferred Contracts**") (the scope of any such assignment or assumption to be as agreed by the Parties pursuant to Section 2.06 and the Contract Assumption Order);[10]<br><br>c.  all Permits (including Environmental Permits) Related to the Business and all pending applications therefor (the "**Transferred Permits**") (for the avoidance of doubt, solely to the extent, if required under applicable Law, the applicable Government Authority Consents to or otherwise approves the assignment or transfer of the applicable Permit);<br><br>d.  all Business Intellectual Property, Business Technology and Process Parameters and Recipe Formulary;<br><br>e.  all rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, vendors, contractors, subcontractors or other third parties to the extent pertaining to the Business or any Transferred Assets and any letters of credits, parent guaranties or other credit support provided by such third parties to Sellers with respect to the Business or any Transferred Assets;<br><br>f.  the Transferred Books and Records;<br><br>g.  (A) all other personal property and interests therein owned by Sellers and their respective Affiliates (and including any such personal property that is subject to any leases between any of Sellers and Onset Related to the Business), including furniture, furnishings, machinery, office equipment, computers, servers, networks and communications equipment, vehicles, handling and logistics equipment, tangible embodiments and copies of any Business Intellectual Property and other tangible personal property (including, rights, if any, in any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, but excluding any physical assets covered by Section 2.02(a)(ix) below), in each case, Related to the Business, or (B) any tangible personal property on order to be delivered to any Seller that is Related to the Business; |

---

[10]    The Transferred Assets include certain Executory Contracts, approval of the assumption and assignment of which the Debtors will seek through the Court's *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1244] (the "**Contract Assumption Order**").

| Material Terms of the Purchase Agreement[9] |  |
| --- | --- |
|  | h.  (A) all Business Systems and any other Systems (other than software that is not Related to the Business) and (B) all personal devices (e.g., cell phones, computers, laptops, tablets, wi-fi hotspots and headsets); <br><br> i.  all packaging, supplies, replacement or component parts, safety stock, maintenance supplies, tooling, spares and parts maintained or held by or stored by or on behalf of any Seller, in each case of the foregoing, Related to the Business; <br><br> j.  all raw materials, works in progress, semi-finished and finished goods inventory Related to the Business; <br><br> k.  all other assets, properties and rights, whether tangible or intangible (other than Intellectual Property and Transferred Contracts) to the extent such assets, properties, or rights are Related to the Business; <br><br> l.  the assets listed on Section 2.02(a)(xii) of the Disclosure Schedules held by such Seller or any Affiliate of such Seller (to the extent such assets are Related to the Business); <br><br> m.  all rights and obligations under or arising out of all Insurance Policies for any of the Transferred Assets or Assumed Liabilities; and <br><br> n.  all goodwill of the Business. <br><br> Purchase Agreement § 2.02(a). |
| **Excluded Assets** | The following assets of or in the possession of Sellers (the "**Excluded Assets**") shall be retained by Sellers and their respective Affiliates: <br><br> a.  all Contracts held by such Seller (1) not Related to the Business, (2) Contracts rejected in the Bankruptcy Cases prior to the Closing Date in accordance with the Purchase Agreement, and (3) the Contracts set forth on Section 2.02(b)(i) of the Disclosure Schedules (collectively, "**Excluded Contracts**"); <br><br> b.  all accounts receivable as of the Closing; <br><br> c.  all Cash; <br><br> d.  all raw materials, works in progress, semi-finished and finished goods inventory Related to the Business that are (A) not physically located at, on or within the Transferred Owned Real Property as of the Agreement Date, (B) being held at the Transferred Owned Real Property on behalf of customers of the Business pursuant to consignment arrangements, or (C) being held at the Transferred Owned Real Property by Seller or their Affiliates on behalf suppliers of the Business under tolling or similar arrangements; <br><br> e.  other than the Transferred Owned Real Property, all right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such real property, all rights in respect thereof (including all options and rights of first refusal) and |

| **Material Terms of the Purchase Agreement**[9] |
|---|

| | all tenements, hereditaments, appurtenances and other property rights appertaining thereto; |
|---|---|
| f. | all Excluded Trademarks; |
| g. | all Intellectual Property, Technology and Systems (including all software that is not Related to the Business), other than the Business Intellectual Property, Business Technology, the Systems set forth in Section 2.02(a)(viii), and the Business Systems; |
| h. | all Avoidance Actions and all other Causes of Action (including counterclaims) and defenses held by any Seller, including those arising in connection with the Bankruptcy Cases; |
| i. | all biometric data, biometric identifiers, and biometric information, and any similar data used to uniquely identify an individual, in each case in its raw form, including, without limitation, fingerprints, voiceprints, retinal scans, iris scans, facial geometry or facial recognition data, hand or face templates, DNA, and any scans, images, recordings used to capture or generate such identifiers; |
| j. | all claims, rights or interests of Sellers in or to any refund, credit, rebate, abatement or other recovery for Taxes (other than in respect of any Taxes Buyer assumed and paid pursuant to the Purchase Agreement), or any other Tax assets (including any Tax attributes), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof); |
| k. | all Tax Returns and all records (including all working papers) related thereto and all refunds of Taxes for periods prior to the Closing; |
| l. | except as otherwise included in Section 2.02(a)(xiii), all Insurance Policies and all rights of any nature with respect to any such Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries; |
| m. | all Permits (other than the Transferred Permits) and all nontransferable Permits, including nontransferable Environmental Permits; |
| n. | all rights and interests of Sellers under the Transaction Agreements and any other sale agreements; |
| o. | all Employee Plans and all assets relating thereto; |
| p. | (A) all minute books (and other similar corporate records) and stock records, (B) any books and records relating to the Excluded Assets, (C) any books and records or other materials of or in the possession of Sellers that (1) any Seller is required by Law or by Order of the Bankruptcy Court to retain or (2) any Seller is prohibited by Law from delivering to Buyer, (D) any copies of any books and records that Sellers and their Affiliates retain pursuant to Section 7.03 or (E) any books, records, files or papers that are not Transferred Books and Records; |

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| | q. (A) all records and reports prepared or received by any Seller or any of its Affiliates in connection with the sale of the Business or the Transactions or any other Transaction Agreement, including all analyses Related to the Business or related to Buyer or any third-party bidder or potential purchaser, (B) all bids and expressions of interest received from third parties with respect to the Business and (C) all privileged communications described in Section 11.19; <br><br> r. all right, title and interest in and to all equity interests of any Person owned by any Seller; <br><br> s. all assets, properties, or rights of any Seller or any of its Affiliates that are not Related to the Business; and <br><br> t. any asset specifically identified on Section 2.02(b)(xx) of the Disclosure Schedules. <br><br> Purchase Agreement § 2.02(b). |
| **Assumed Liabilities** | On the terms and subject to the conditions of the Purchase Agreement and subject to the exclusions set forth in Section 2.02(d), as partial consideration for the Transferred Assets, Buyer or, subject to Section 11.08, one or more of its Affiliates shall, at the Effective Time, assume (and from and after the Closing, timely pay, discharge and perform in accordance with their terms) only the following Liabilities, without duplication and only to the extent not paid prior to the Closing and specifically excluding the Excluded Liabilities (collectively, the "**Assumed Liabilities**"): <br><br> a. all Liabilities, whether accruing on or after the Effective Time, with respect to Transfer Taxes to be borne by Buyer pursuant to Section 9.01; <br><br> b. all Cure Costs payable by Buyer pursuant to Section 2.06 and all Liabilities arising under the Transferred Contracts that arise on or after the Closing; and <br><br> c. all Liabilities relating to Buyer's ownership or operation of the Transferred Assets (including all Liabilities pertaining to Permitted Liens), to the extent arising from events, facts or circumstances that first occur from and after the Effective Time. <br><br> Purchase Agreement § 2.02(c). |
| **Excluded Liabilities** | Except for the Assumed Liabilities, neither Buyer nor its Affiliates, shareholders, officers, directors, employees or other representatives shall assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or any Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, asserted or unasserted, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter that arise from or relate to the Transferred Assets or the operation of the Business prior to the Closing (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers: <br><br> a. any Debt; |

| Material Terms of the Purchase Agreement[9] |
|---|

|  | b. | any Liability to the extent arising out of or related to any Excluded Asset, including arising under any contract or lease that is not a Transferred Contract; |
|---|---|---|
|  | c. | any Liability, obligation or commitment, whether or not accrued, assessed, or currently due and payable, for any: (A) Taxes imposed on or payable by Sellers for any Pre-Closing Tax period; (B) Taxes imposed with respect to any of the Transferred Assets, any of the Assumed Liabilities or the Business of any Pre-Closing Tax Period, allocated in accordance with Section 9.02; (C) Taxes imposed on or with respect to any of the Excluded Assets or any of the Excluded Liabilities for any Tax period; and (D) Periodic Taxes for which Sellers are responsible pursuant to Section 9.02; provided, that such Excluded Liabilities shall not include any Transfer Taxes or Periodic Taxes for which Buyer is responsible pursuant to Section 9.01 or Section 9.02; |
|  | d. | all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal, whether legal, equitable, common law, statutory, regulatory, or administrative, and whether arising under federal, state, local, or common law) against any Sellers or their Affiliates (including, for the avoidance of doubt, any Action related to negligence, fraud, breach of fiduciary duty, violations of Law, conspiracy, misfeasance, nuisance or under any other theory relating to any act, omission, conduct, performance or nonperformance of any Seller, or any of their Affiliates, or any of their respective directors, officers, employees, or agents), or related to the Transferred Assets (except to the extent constituting Cure Costs), which shall be pending or threatened or having any other status or with respect to facts, actions, omissions, conduct, circumstances or conditions existing, occurring or accruing prior to the Closing (including any breach, default, failure to perform, negligence, torts related to performance, violations of Law, conspiracy, nuisance, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind or any other act, omission, or other conduct), including for the avoidance of doubt any successor liability claims or that may be owed to or assessed by, any Government Authority or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing; |
|  | e. | all Liabilities arising under, in connection with, or pursuant to any Environmental Laws attributable to any facts or circumstances first occurring or existing on or prior to the Closing, including such Liabilities (x) that are dischargeable pursuant to Section 363 of the Bankruptcy Code, (y) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, and (z) from which the Transferred Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court or otherwise such Liabilities that do not transfer to Buyer by operation of law; |
|  | f. | all accounts payable existing on the Closing Date, including, for the avoidance of doubt, (A) invoiced accounts payable, and (B) accrued but uninvoiced accounts payable; |
|  | g. | all Liabilities relating to any current or former employees of Sellers or their Affiliates, including any Business Employee; |

14

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| | h.  any and all Liabilities related to the Onset Complaint; and<br><br>i.  Liabilities relating to amounts to be paid by Sellers pursuant to the Purchase Agreement, including brokers' fees.<br><br>Purchase Agreement § 2.02(d). |
| **Releases** | The Purchase Agreement does not contain any releases. |
| **Closing and Other Deadlines** | The closing of the sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place by telephone conference and electronic exchange of documents (or if, because of recordation purposes originals are needed, then, the exchange of such original documents) (or, if the Parties agree to hold a physical closing, at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020-1605), at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  The date on which the Closing occurs is referred to in the Purchase Agreement as the "**Closing Date**." For all purposes under the Purchase Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in the Purchase Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.<br><br>Purchase Agreement § 2.04. |
| **Closing Conditions** | The obligations of each Party to consummate the Transactions shall be subject to the satisfaction or waiver by such Party, at or before the Closing, of each of the following conditions:<br><br>a.  <u>Representations and Warranties</u>.  All representations and warranties of Sellers contained in the Purchase Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for purposes of determining the satisfaction of the condition in this clause (a), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties.<br><br>b.  <u>Covenants</u>.  The covenants contained in the Purchase Agreement required to be performed or complied with by Sellers at or before the Closing shall have been performed or complied with, except where the failure to so perform or comply would not reasonably be expected to have a Material Adverse Effect.<br><br>c.  <u>Closing Certificate</u>. Buyer shall have received a certificate signed by an authorized officer of each Seller, dated as of the Closing Date, certifying as to the satisfaction of the matters set forth in Sections 10.01(a) and (b). |

15

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| | d. Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to any stay.<br><br>e. Notice of Assumption of Transferred Contracts. Sellers shall have timely filed the Assumption and Assignment Notice for the Transferred Executory Contracts.<br><br>f. No Order. There shall be no Order in existence that prohibits the sale of the Transferred Assets or the other Transactions and no Government Authority in the United States shall have enacted, issued or promulgated any statute, rule or regulation that makes illegal the consummation of the Transactions.<br><br>Purchase Agreement § 10.01. |
| **Termination** | The Purchase Agreement may be terminated before Closing:<br><br>a. by the mutual written consent of Sellers and Buyer;<br><br>b. by either Sellers or Buyer, if the Closing shall not have occurred by July 15, 2026 (the "**Initial Outside Date**"); *provided,* that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order and if all other Closing Conditions shall have been fulfilled or waived, then the Initial Outside Date shall be automatically extended to the date that is seven (7) days from the Initial Outside Date (the "**Extended Outside Date**"); *provided, further*, that a Party whose material breach of the Purchase Agreement caused the failure to close may not terminate pursuant to this clause;<br><br>c. by either Sellers or Buyer, if any Government Authority of competent jurisdiction shall have issued a final, non-appealable Order permanently enjoining the consummation of the Transactions; *provided,* that this right shall not be available to a Party whose action or failure to act caused such Order;<br><br>d. by Sellers, if Buyer shall have breached any representation, warranty, or covenant in any material respect that would cause any Closing Condition set forth in Section 10.01 not to be satisfied and such breach is not cured within ten (10) Business Days after receipt by Buyer of written notice thereof (or, if earlier, the Initial Outside Date or Extended Outside Date, as applicable); *provided*, that no Seller is then in material breach of the Purchase Agreement;<br><br>e. by Buyer, if Sellers shall have breached any representation, warranty, or covenant in any material respect that would cause any Closing Condition set forth in Section 10.01 not to be satisfied and such breach is not cured within ten (10) Business Days after receipt by Sellers of written notice thereof (or, if earlier, the Initial Outside Date or Extended Outside Date, as applicable); *provided,* that Buyer is not then in material breach of the Purchase Agreement; or<br><br>f. by Buyer, if (i) any Seller moves to voluntarily dismiss its Bankruptcy Case or convert its Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or (ii) the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Cases of any Seller to a case under Chapter 7 of the Bankruptcy Code. |

| **Material Terms of the Purchase Agreement**[9] | |
|---|---|
| | Purchase Agreement § 11.04. |
| **Remedies; Limitation on Liability** | <u>Remedies; Specific Performance</u>.  Except to the extent set forth otherwise in the Purchase Agreement, all remedies under the Purchase Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.<br><br>Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of the Purchase Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of the Purchase Agreement and to enforce specifically the terms and provisions of the Purchase Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of the Purchase Agreement, and to specifically enforce the terms of the Purchase Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under the Purchase Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in the Purchase Agreement, and waives and releases all tort claims and tort Causes of Action that may be based upon, arise out of or relate to the Purchase Agreement, or the negotiation, execution or performance of the Purchase Agreement.<br><br>Purchase Agreement § 11.15.<br><br><u>Non-Recourse</u>.  All claims, obligations, Liabilities, Actions or Causes of Action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to the Purchase Agreement, or the negotiation, execution, or performance of the Purchase Agreement (including any representation or warranty made in, in connection with, or as an inducement to, the Purchase Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to the Purchase Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of any of the foregoing or any successors and assigns ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, Causes of Action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to the Purchase Agreement or based on, in respect of, or by reason of the Purchase Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Causes of Action, obligations and other Liabilities against any such Nonparty Affiliates.  It is expressly agreed that the Nonparty Affiliates to whom <u>Section 11.16</u> applies shall be third-party beneficiaries of <u>Section 11.16</u>.<br><br>Purchase Agreement § 11.16. |

17

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| **Record Retention** | Sellers and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date. Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of the period ending on (a) any applicable statute of limitations and (b) the Wind-Up Date. After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least ninety (90) days' prior written notice to Sellers of its intention to dispose of such books and records, and Sellers, and/or any of their respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.<br><br>Purchase Agreement § 7.03. |
| **Guarantee** | Press-Seal Corporation, an Indiana corporation (the "**Guarantor**"), irrevocably and unconditionally guarantees the due and punctual payment of the Specified Obligations upon the occurrence of, and only to the extent of, an uncured breach by Buyer of such Specified Obligations. Such guarantee is an absolute and unconditional guarantee of payment (and not performance) and not of collectability. The aggregate liability of the Guarantor shall not exceed the Required Amount. The Guarantor shall be entitled to assert any defenses available to Buyer, other than defenses arising from the insolvency or bankruptcy of Buyer. If the Guarantor is required to perform or satisfy any Specified Obligation pursuant to this Section 6.09, then, upon written notice to Sellers, the Guarantor shall be subrogated to, and shall be entitled to exercise, all rights and remedies of Buyer under this Agreement with respect to such Specified Obligations. In furtherance of the foregoing, the Guarantor shall be entitled, at its election, to assume the rights and obligations of Buyer under this Agreement to the extent necessary to perform and satisfy such Specified Obligations, and Sellers shall accept performance by the Guarantor in lieu of performance by Buyer with respect thereto. Upon such assumption, the Guarantor shall succeed to the rights of Buyer relating to the Specified Obligations so performed, and Buyer shall cooperate in good faith to effectuate the foregoing. The Guarantor may not assign any of its obligations hereunder without prior written consent of Sellers.<br><br>Purchase Agreement § 6.09 |

## The Sale Transaction is a Sound Exercise of Debtors' Business Judgment, in the Best Interests of Debtors' Estates and Stakeholders, and Should be Approved

**A.     Approval of the Sale Transaction Is Supported by Sound Business Judgment and Warranted Under Bankruptcy Code Section 363**

24.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated

18

business justification," as established by the Second Circuit in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale[.]"); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014).

25.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 739 (Bankr. S.D. Tex. 2020) (quoting *Orman v. Cullman*, 794 A.2d 5, 19–20 (Del. Ch. 2002)); see also *In re Think3, Inc.*, 529 B.R. 147, 181 (Bankr. W.D. Tex. 2015) ("When the business judgment rule applies, liability will result only if the action is proven to lack 'any rational business purpose.'" (quoting *Brehm v. Eisner*, 746 A.2d 244, 264 n.65 (Del. 2000)).

26.     A debtor has broad discretion in determining how assets are sold and, so long as a debtor maximizes the return to its estate, courts will defer to a debtor's business judgment regarding how to structure an asset sale—including whether by public auction or by private sale and whether to pursue a sale of individual assets or a going-concern bid.  *See In re 9 Houston LLC*,

578 B.R. 600, 618 (Bankr. S.D. Tex. 2017) (holding debtor could sell its single asset, a 3.4-acre tract of land, pursuant to a private sale); *see also In re Envision Healthcare Corporation*, No. 23-90342 (CML) (Bankr. S.D. Tex. Aug. 1, 2023) (Docket No. 879) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction).  Even where a debtor has previously filed bidding procedures, courts have approved the sale of assets pursuant to a private sale if, in the debtor's business judgment, a private sale will maximize value or is necessary under the circumstances.  *See, e.g.*, *In re Katerra Inc.*, No. 21- 31861 (DRJ) (Bankr. S.D. Tex. July 8, 2021) (Docket No. 414) (approving private sale of assets to avoid immediate shutdown of certain business line, including termination of a significant number of employees, even though the debtors had previously filed bidding procedures); *In re 160 Royal Palm, LLC*, 600 B.R. 119, 128 (S.D. Fla. 2019) (authorizing debtors to withdraw auction procedures and pursue a private sale where public sale process had been repeatedly delayed by litigation and the assets had been sufficiently marketed under the bidding procedures); *In re Nashville Senior Care, LLC*, No. 23-02924 (MFH) (Bankr. M.D. Tenn. Nov. 8, 2023) (Docket No. 366) (approving private sale of assets and allowing the debtors to cancel scheduled auction pursuant to bidding procedures notwithstanding multiple proposals for the assets because private sale purchaser submitted going-concern bid that offered materially higher economic terms for the purchased assets and required auction to be cancelled).

27.     Moreover, Bankruptcy Rule 6004(f)(1) expressly permits private sales or sales conducted without an auction.  Fed. R. Bankr. P. 6004(f)(1) ("A sale that is not in the ordinary course of business may be made by public auction or private sale.").  Accordingly, if the Debtors conclude that conducting a private sale, as opposed to a public auction, is in the best interests of their estates, the Debtors should be permitted to do so.  *See 9 Houston LLC*, 578 B.R. at 618 ("[T]he sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample

20

discretion to administer the estate, including authority to conduct public or private sales of estate property.") (quoting *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998)); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("there is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction") (quoting *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991)).

28.     Strong business justification supports the Sale Transaction.   First, the Debtors believe that the Sale Transaction presents the most value-maximizing path for the Transferred Assets and that further marketing, including by holding an auction, is unlikely to yield a higher or otherwise better result.  The Debtors ran a broad, multi-month Sale Process and directly solicited interest from over 400 parties, including parties who had reached out to the Debtors' advisors expressing interest in the Debtors' assets.  The Debtors widely publicized their Sale Process pursuant to the Initial Notice, which was filed and served on January 13, 2026, and the Publication Notice, which was published in *The New York Times* on January 16, 2026. *See* Docket Nos. 1718, 1645.  As previously noted, the Debtors considered various factors for IOIs received, including among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders.  Ultimately, the Debtors and the Buyer reached the agreement reflected in the Purchase Agreement with respect to a sale of the Transferred Assets.

29.     The Debtors believe the Sale Transaction represents the highest and otherwise best bid for the Transferred Assets.  Even if the Debtors had the liquidity to further market and/or auction the Transferred Assets—which they do not—the Debtors believe any incremental value achieved would likely be offset, if not exceeded, by the costs of the same.  Moreover, given the

circumstances of these chapter 11 cases, it is likely that the value of such assets will decrease rather than increase with the passage of time.

30.     Second, consummating the Sale Transaction will further the Debtors' efforts to expeditiously wind down their assets in an organized fashion, reduce administrative and operating costs, and generate cash proceeds for the benefit of creditors.  The Debtors believe this is the optimal path for the Debtors' estates and stakeholders under the facts and circumstances of these cases.

31.     For these reasons, the Sale Transaction is a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors' estates and stakeholders, and should be approved.

**B.      Approval of the Sale Transaction Free and Clear of Liens, Claims and Encumbrances Is Warranted Under Bankruptcy Code Section 363**

32.     The Debtors request approval to sell the Transferred Assets free and clear of any and all liens, claims, encumbrances, and other interests (except for Assumed Liabilities and Permitted Liens) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.   such entity consents;

c.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.   such interest is in bona fide dispute; or

e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

33.     The Debtors believe that one or more of the tests of section 363(f) has been or will be satisfied with respect to the Transferred Assets.  For example, the Ad Hoc Group has consented to the sale of the Transferred Assets free and clear, satisfying Bankruptcy Code section 363(f)(2). And, a party that fails to object to a sale transaction is deemed to have consented to such sale transaction provided that notice has been properly served.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.") (internal citations omitted); *In re McKinney Towne Crossing, L.P.*, No. 10-40348, 2012 WL 13341067, *3 (Bankr. E.D. Tex. June 28, 2012) (approving sale of assets where the holders of interests "who did not object, or who withdrew their objections" were "deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code").  Moreover, if additional interests exist, the Debtors believe that any such parties could likely be compelled to accept monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code.  *See*, *e.g.*, Hr'g Tr. 81:1–8, *In re Steward Health Care Sys. LLC*, No. 24–90213 (CML) (Bankr. S.D. Tex. Sept. 4, 2024) (approving sale transaction where junior lienholder could be compelled to accept monetary satisfaction of their interests in a state foreclosure proceeding); *In re Color Star Growers of Colorado, Inc.*, No. 13–42959, 2009 WL 10813951, at *3 (Bankr. E.D. Tex. Nov. 18, 2009) (holding that where liens, which were junior and subordinate in priority to the liens held by

23

senior consenting lenders, could be eliminated by a foreclosure sale that could be conducted by the senior consenting lenders, the junior lienholder could be compelled to accept a money satisfaction of its interest).

34.     Accordingly, the Debtors believe that the Transferred Assets may be transferred to the Buyer free and clear of all liens, claims, encumbrances, and other interests (other than Assumed Liabilities and Permitted Liens), and that such transfer should be approved free and clear.

**C.     Buyer Entitled to Good Faith Protections**

35.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor, notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] of a sale . . . of property does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

36.     As articulated by the Fifth Circuit, section 363(m) of the Bankruptcy Code "patently protects, from later modification on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *In re BNP Petroleum Corp.*, 642 Fed. App'x. 429, 434 (5th Cir. 2016) (quoting *Gilchrist v. Westcott (Matter of Gilchrist)*, 891 F.2d 559, 560 (5th Cir. 1990)).  The Fifth Circuit has noted that the extension of protection to good faith purchasers under section 363(m) of the Bankruptcy Code "codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved." *Id*.  Although the Bankruptcy Code does not define "good faith," in making determinations as to

whether a purchaser was a "good faith" purchaser under section 363(m) of the Bankruptcy Code, courts have examined the integrity of the purchaser throughout the course of the sale process and considered whether the purchaser committed any dishonest or wrongful acts during such process. *See*, *e.g.*, *id*. at 435 (affirming district court's finding of good faith where the district court concluded that "there was no proof of fraud, collusion, or the taking of unfair advantage of other bidders" and that the purchaser's offer "provides some guaranteed value"); *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (noting that an appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

37.     The Debtors request a finding that the Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m).  The terms and conditions of the Purchase Agreement and the Sale Transaction have been negotiated by the Debtors and their advisors and the Buyer at arm's length and in good faith.  The Buyer is represented by qualified counsel, and the Debtors believe that the Buyer has not engaged in any conduct that would indicate or constitute a lack of good faith.  Accordingly, the Debtors believe that the Buyer is entitled to the protections that Bankruptcy Code section 363(m) provides to a good faith purchaser.

**D.     Proposed Notice of Sale Hearing Provides Sufficient Notice to Parties in Interest**

38.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of a proposal to use, sell, or lease property of the estate other than in the ordinary course of business "unless the court, for cause, shortens the time or orders another method of giving notice."  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date,

time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested in this Motion.

39.     Before consummating any Wind Down Sale, the Wind Down Order requires the Debtors to serve a Wind Down Sale Notice at least two days prior. *See* Wind Down Order ¶¶ 12, 25-26. In accordance with the Wind Down Order, on June 19, 2026, the Debtors served a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties comprising: the U.S. Trustee, the Ad Hoc Group, the Creditors' Committee, the known creditors with an Asserted Interest, and the Landlord for the applicable Location with respect to the Transferred Assets. The Notice Period has expired, and no Wind Down Sale Notice Party objected. Further, the Debtors obtained the consent of all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets. *See* Wind Down Order ¶¶ 25-26, 42.

40.     Additionally, concurrent with the filing of this Motion (or as soon as practicable following the date on which the Sale Hearing is scheduled), the Debtors will serve the notice of sale hearing, in the form attached as **Exhibit B** to this Motion (the "**Notice of Sale Hearing**"), by overnight mail; provided that to the extent email addresses are available for any of the foregoing parties, such parties will be served by email (collectively, the "**Sale Notice Parties**"):

  a.   the Office of the United States Trustee for the Southern District of Texas (Attn: Jayson Ruff, Esq.);

  b.   the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis;

  c.   the Internal Revenue Service;

  d.   the United States Attorney's Office for the Southern District of Texas;

  e.   Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Scott Greenberg, Esq., AnnElyse Scarlett Gains, Esq., Christina Brown, Esq., and Tommy Scheffer, Esq.) as counsel to the Ad Hoc Group;

f.  Brown Rudnick LLP, 7 Times Square, New York, NY 10036, (Attn: Robert Stark, Esq., Bennett Silverberg, Esq., and Tristan Axelrod, Esq.), as counsel to the Creditors' Committee;

g.  Norton Rose Fulbright US LLP, 2200 Ross Ave., Suite 3600, Dallas, TX 75201 (Attn: Toby Gerber, Esq. and Kristian Gluck, Esq.) and Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601 (Attn: Gregory Gartland, Esq. and Daniel J. McGuire, Esq.), each as counsel to Bank of America, N.A.;

h.  Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019 (Attn: James Newton, Esq. and Ben Butterfield, Esq.) and Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Dennis Dunne, Esq., Lisa Laukitis, Esq., and Andrew Leblanc, Esq.), as co-counsel to Onset Financial, Inc. and Silver Point Capital, L.P.;

i.  Herbert Smith Freehills Kramer LLP, 1177 Avenue of the Americas, New York, NY 10036 as counsel to Jefferies Finance LLC;

j.  ArentFox Schiff LLP, 555 South Flower Street, Los Angeles, CA 90071 (Attn: Eric Fromme, Jeffrey Gleit, and Matthew Bentley), as counsel to Wilmington Savings Fund Society, FSB;

k.  Taft Stettinius & Hollister LLP, 301 East Fourth Street, Suite 2800, Cincinnati, OH 45202-4257 (Attn: W. Timothy Miller), as counsel to the Buyer;

l.  all persons that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating a sale transaction with respect to the Transferred Assets in whole or in part during the past 12 months;

m.  all parties listed on the creditor matrices for the Sellers that are Debtors, including any applicable taxing authorities;

n.  all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Transferred Assets (for whom identifying information and addresses are available to the Debtors); and

o.  any party that has requested notice pursuant to Bankruptcy Rule 2002.

41.  The Notice of Sale Hearing includes, among other things, the proposed date, time and place of the Sale Hearing and the deadline for filing any objections to the relief requested in this Motion and therefore complies with Bankruptcy Rule 2002(c).  *See* Fed. R. Bankr. P. 2002(c)(1) (stating that the notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 180 (D.

27

Del. 1991) (stating that the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).  As soon as reasonably practicable following the date hereof, the Debtors will publish the Notice of Sale Hearing in *The Indianapolis Star*.

42.     The Debtors further submit that the methods of notice of this Motion, combined with the Initial Notice, constitute good and adequate notice of the proposed sale of the Transferred Assets and the proceedings with respect thereto, and that cause exists to shorten notice pursuant to Bankruptcy Rule 2002(a).

## **Basis for Emergency Relief**

43.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i).  It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible.  Because the Debtors' liquidity is constrained, any delay in obtaining entry of the Sale Order could jeopardize the Debtors' ability to continue operations and proceed toward closing.  Prompt entry of the Sale Order is therefore imperative. Simply put, the relief requested in the Motion is critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Assets for the benefit of the Debtors' estates and stakeholders.  For these reasons and those set forth in the Motion, the Debtors respectfully request that the Court approve the relief requested in the Motion on an emergency basis.

**Waiver of Rules 6004(h)**

44.     Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.

45.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h).  The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) will allow the Sale Transaction to close as soon as possible and prevent further delay in the administration of these cases.  The Debtors respectfully submit that the Court waive the 14-day stay requirements contained in Bankruptcy Rule 6004(h).

**Notice**

46.     Notice of this Motion will be provided to the Sale Notice Parties.  Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Prior Request**

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Sale Order granting the relief herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 24, 2026
      New York, New York

                                          */s/  Cindi M. Giglio*
                                          KATTEN MUCHIN ROSENMAN LLP
                                          Cindi M. Giglio
                                          Grace A. Thompson
                                          50 Rockefeller Plaza
                                          New York, New York 10020-1605
                                          Telephone:  (212) 940-8800
                                          Facsimile:  (212) 940-8776
                                          Email:  cgiglio@katten.com
                                                        grace.thompson@katten.com

                                          *Attorneys for Debtors*
                                          *and Debtors in Possession*

## **Certificate of Service**

I hereby certify that on June 24, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  Grace A. Thompson*
Grace A. Thompson

**<u>Exhibit A</u>**
**Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**ORDER AUTHORIZING AND APPROVING THE SALE OF ASSETS OF THE**
**JASPER RUBBER BUSINESS TO JASPER ACQUISITION CO., LLC**

Upon the Motion[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), seeking entry of an order (this "**Order**") pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9008, and section N of the Procedures for Complex Cases in the Southern District of Texas (i) authorizing the sale of the Transferred Assets to the Buyer pursuant to that certain *Asset Purchase Agreement*, dated as of June 24, 2026 (together with all other agreements, documents, and instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Purchase Agreement**", a true and correct copy of which is attached hereto as **Exhibit 1**), by and among First Brands Group Holdings, LLC and certain of its subsidiaries named therein, as Sellers (collectively, the "**Sellers**"), Jasper Acquisition Co., LLC, as Buyer (the "**Buyer**"), and Press-Seal Corporation, as Guarantor, free and clear of all

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  As used herein, "**Motion**" means the *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]).

liens, claims, encumbrances and interests, except for Assumed Liabilities and Permitted Liens, (ii) authorizing and approving the form and manner of notice of the hearing on the sale of the Transferred Assets, and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the Jerneycic Declaration,[3] the First Day Declaration,[4] any other declaration filed in support of the Sale and the record of the Sale Hearing; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

> A.   On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

---

[3]   The "**Jerneycic Declaration**" means the *Declaration of Daniel Jerneycic in Support of Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]).

[4]   The "**First Day Declaration**" means the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22).

"**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

B.	The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.  On October 9, 2025, the United States Trustee for Region 7 appointed an official committee of unsecured creditors [Docket No. 113].

C.	The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

D.	The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E.	On January 8, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* [Docket No. 1253] (the "**Bidding Procedures Motion**"), which sought Court approval of an expedited timeline and auction procedures for the Debtors' sale process.  The Debtors filed the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* [Docket No. 1324] (the "**Initial Notice**"), which provided all interested parties with

notice of the Debtors' intent to sell all their assets pursuant to one or more sale transactions.  On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix, and the Sale Notice Parties (as defined in the Bidding Procedures Motion). *See Affidavit of Service* [Docket No. 1718]. The Debtors subsequently published the Initial Notice in the national edition of The New York Times on January 16, 2026, as reflected in the *Certificate of Publication* [Docket No. 1645] (the "**Initial Publication Notice**").

F.　　　On March 23, 2026, the Debtors filed the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2216] (the "**Wind Down Motion**"), which disclosed the Debtors' intention to wind down certain brands and asset classes.  On March 24, 2026, the Wind Down Motion was served on the Debtors' Master Service List [Docket No. 2239].

G.　　　On April 16, 2026, the Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No.2454) (the "**Wind Down Order**"), pursuant to which, among other things, the Court authorized the Debtors and their Consultant (as defined in the Wind Down Motion) to sell certain Wind Down Assets.

H.　　　On May 15, 2026, the Debtors filed the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**First Expansion Notice**"), which was served on all parties entitled to

service of such notice under the terms of the Wind Down Order, including the Debtors' Master Service List. *See* Docket No. 2761. Pursuant to the First Expansion Notice, the Debtors expanded, consistent with Paragraphs 50 and 51 of the Wind Down Order, the scope of brands, business units, and asset classes, including intellectual property, machinery and equipment and real estate, subject to the Wind Down Order to include, among other things, the Debtors' "Filters and Plugs" business unit and related legal entities, including the Debtors' Jasper Rubber business.

I.  On May 28, 2026, the Debtors filed the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829], which was served on all parties entitled to service of such notice under the terms of the Wind Down Order, including the Debtors' Master Service List (*see* Docket No. 2877), and expanded the Wind Down to First Brands Holdings, LLC and all Debtor subsidiaries.

J.  In accordance with the Wind Down Order, on May 27, 2026, the Debtors and Hilco Merchant Resources, LLC entered into a Machinery and Equipment Agreement under which Hilco Merchant Resources, LLC serves as the Debtors' exclusive agent with respect to specified machinery and equipment.

K.  In accordance with the Wind Down Order, on May 28, 2026, the Debtors and Hilco IP Services, LLC, Hilco Real Estate, LLC, and Hilco Global Mexico, S. de R.L. de C.V. entered into an Intangible Assets, Real Estate and Other Assets Marketing Agreement under which those entities serve as the Debtors' exclusive agents with respect to specified intangible assets, real estate, and other assets.

L.  In accordance with the Wind Down Order, the Debtors selected Buyer as the purchaser of certain assets (the "**Transferred Assets**") related to the Debtors' business commonly known as the "Jasper Rubber Products", as more particularly described in the Purchase Agreement.

M.      On June 24, 2026, First Brands Group Holdings, LLC and certain of its subsidiaries (each, a "**Seller**") and Buyer entered into the Purchase Agreement, under which Buyer agreed to purchase the Transferred Assets for $8,030,000 in cash and the assumption of the Assumed Liabilities, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order, free and clear of all Liens, Liabilities, claims, and interests other than the Assumed Liabilities and Permitted Liens (the "**Sale**").  The Transferred Assets include certain Executory Contracts, approval of the assumption and assignment of which the Debtors will seek through the Court's *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1244].

N.      In accordance with the Wind Down Order, on June 19, 2026, the Debtors served a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties comprising:  the U.S. Trustee, the Ad Hoc Group, the Creditors' Committee, the known creditors with an Asserted Interest, and the Landlord for the applicable Location with respect to the Transferred Assets.  The Wind Down Sale Notice: (a) identified the Transferred Assets (including the business units and legal entities with which the Transferred Assets are associated), (b) identified Buyer as the purchaser of the Transferred Assets, (c) stated the $8,030,000 purchase price, (d) stated that the Transferred Assets constitute Overlapping Collateral, and (e) described the other significant terms of the Sale.  The Notice Period set forth in the Wind Down Order has expired, and either (i) parties entitled to object have not interposed an objection to the Sale, or (ii) the Debtors have obtained the consent of those parties whose consent to the Sale is required by the Wind Down Order, including

all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets. *See* Wind Down Order ¶¶ 25-26, 42.

O.     On June [__], 2026, the Debtors filed the *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]) (the "**Motion**").

P.     On June [__], 2026, the Debtors served notice of the Purchase Agreement, the Sale and Sale Hearing, in the form attached as **Exhibit B** to the Motion (the "**Jasper Sale Notice**") on the Sale Notice Parties.   The Debtors subsequently published the Jasper Sale Notice in *The Indianapolis Star* as reflected in the *Certificate of Publication* [Docket No. _____] (the "**Jasper Publication Notice**").

Q.     Entry of this Order is in all respect consistent with the Wind Down Order, in the best interest of the Debtors and their creditors and parties in interest, and necessary and appropriate to approve the Purchase Agreement and the Sale, authorize the transfer of the Transferred Assets, and grant Buyer the protections set forth herein.

R.     The Jerneycic Declaration supports the Sale and the relief granted in this Order.

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is GRANTED as set forth herein.

2.     Any objections, responses or reservations of rights filed or asserted in regard to the Sale and the relief granted herein, to the extent not resolved as set forth herein, settled, or waived as announced to the Court on the record at the Sale Hearing, are hereby overruled on the merits in their entirety.

A. **Jurisdiction and Statutory Predicates**

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

4.      The statutory predicates for the relief granted herein are sections 105(a), 363, and 541 of the Bankruptcy Code and Rules 2002, 6004, and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  This Order is a final and appealable order. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014.  Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

B. **Background, Business Justification, and Notice**

5.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and authorization to close, and compelling circumstances to promptly consummate, the Sale and the other transactions contemplated by the Purchase Agreement, pursuant to Sections 105, 363, 1107, and 1108 of the Bankruptcy Code, prior to and outside of a plan of reorganization for any Seller, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, creditors, and other parties in interest.  Such business reasons include, but are not limited to, the fact that:  (i) there is substantial risk of depreciation of the value of the Transferred Assets if the Sale is not consummated promptly; (ii) the Sale of the Transferred Assets and the assumption of the Assumed

Liabilities pursuant to the Purchase Agreement at the Closing present the best opportunity and represent the best method to maximize the value of the Transferred Assets for the benefit of the Debtors, their estate, creditors, and other parties in interest; (iii) the purchase price and other terms set forth in the Purchase Agreement constitute the highest or otherwise best offer received for the Transferred Assets; and (iv) unless the Sale is concluded expeditiously, as provided for in the Wind Down Order and this Order and pursuant to the Purchase Agreement, the Debtors and their estates could receive significantly less value for all stakeholders.

6. The Debtors, in consultation with the Consultant and their advisors, reasonably determined in their business judgment that the Purchase Agreement represents the highest or otherwise best actionable transaction available for the Transferred Assets under the circumstances and is in the best interests of the Debtors, their estates, creditors, and parties in interest.  Under the Purchase Agreement, Buyer will pay a cash purchase price of $8,030,000 and will assume certain Assumed Liabilities in exchange for the Transferred Assets, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order.  The purchase and sale of the Transferred Assets was marketed, brokered, and facilitated by the Consultant solely in the Consultant's capacity as agent for the Debtors pursuant to the Wind Down Order, and the Consultant is not taking title to the Transferred Assets before the Sale and is not a party to the Purchase Agreement.

7. The Sale is a Wind Down Sale under the Wind Down Order.  The Transferred Assets are Wind Down Assets under the Wind Down Order or are otherwise authorized to be sold pursuant to this Order, the Bankruptcy Code, the Purchase Agreement, and any other applicable orders.  All requirements under the Wind Down Order, including any required notice, consent,

asset designation, asset-class or legal-entity addition, objection-period expiration, or further-order requirement has been satisfied, waived, resolved, or approved by this Order.

8.  Entry of this Order approving the Sale, the Purchase Agreement, and all provisions thereof are a necessary condition precedent to the Buyer consummating the Sale. The provisions of this Order and the Purchase Agreement and the transactions contemplated by this Order and the Purchase Agreement and Sale to the Buyer are inextricably linked and technically and collectively constitute a single, integrated transaction.

9.  The Debtors have noticed the Sale through (i) the Wind Down Sale Notice served on all parties required to receive notice under the Wind Down Order, (ii) the Jasper Sale Notice served on the Sale Notice Parties, and (iii) the Jasper Publication Notice. The Wind Down Sale Notice identified the Transferred Assets, the applicable business units and legal entities, the Buyer, the Purchase Price, whether the Transferred Assets constitute Overlapping Collateral, and the other significant terms of the Sale. The applicable notice periods have expired, and all objections, if any, have been resolved, withdrawn, waived, or are overruled by this Order. The Debtors have obtained consent to the Sale from all known creditors with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets.

10.  The notice provided in connection with the Sale, the Purchase Agreement, and this Order, including the Wind Down Sale Notice served on the Wind Down Sale Notice Parties and the Jasper Sale Notice served on the Sale Notice Parties, is proper, timely, good, sufficient, and adequate notice to each party entitled to such notice in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007 and Local Bankruptcy Rule 2002-1 and 9013-1, the Wind Down Order, and the circumstances of these chapter 11 cases. No other or further notice is required. With respect to parties whose identities or addresses are not

reasonably ascertainable by the Debtors, publication of notice of the Sale as evidence by the Initial Publication Notice and the Jasper Rubber Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties. A reasonable opportunity to object or to be heard regarding the relief granted in this Order was afforded to all interested persons and entities entitled to such opportunity.

## C. **Transferred Assets and Property of the Estate**

11.    The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code or otherwise consist of transferable interests owned by one or more Debtors. Those assets and interests may be sold under sections 363(b) and 363(f) of the Bankruptcy Code, and the transfer approved by this Order shall vest Buyer with the Debtors' right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims and interests, except solely for Assumed Liabilities.

12.    Pursuant to Sections 105(a), 363(b), and 363(f), of the Bankruptcy Code, and subject to the terms and conditions of the Purchase Agreement, the Debtors are authorized and directed to sell, transfer, convey, assign, and deliver the Transferred Assets to Buyer or one or more controlled affiliates or designees designated by Buyer under the Purchase Agreement (each, a "**Buyer Designee**") at the Closing in accordance with the Purchase Agreement, subject only to the Assumed Liabilities and Permitted Liens. The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (as defined in the Purchase Agreement).

13.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Transferred Assets to the Buyer (or any Buyer Designee) in accordance with the Purchase Agreement and this Order.

14.     At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Buyer (or any Buyer Designee) pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Transferred Assets.

15.     This Order shall be effective as a determination that, as of the Closing, (a) the Transferred Assets shall have been transferred to the Buyer (or any Buyer Designee) free and clear of all Liens, Liabilities, claims, or interests, subject only to the Assumed Liabilities and the Permitted Lien, (b) holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code and holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Transferred Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing, and (c) the conveyances described herein have been effected.  The Transferred Assets are sold free and clear of any reclamation rights.

16.     Any Lien, Liability, claim, or interest in the Transferred Assets (other than an Assumed Liability or Permitted Lien) shall attach solely to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that it had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and all rights, claims, objections, defenses, and challenges of the Debtors, their estates, the Creditors'

Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

17.     Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding any Lien, Liability, claim, or interest arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets, and the ownership, sale, or operation of the Transferred Assets prior to Closing or the transfer of the Transferred Assets to the Buyer (or any Buyer Designee), are hereby forever barred, estopped, and permanently enjoined from asserting such Liens, Liabilities, claims, or interests against any Buyer Party and its property (including, without limitation, the Transferred Assets). Following the Closing, no such holder of any Lien, Liability, claim, or interest shall interfere with the Buyer's (or any Buyer Designee's) title to or use and enjoyment of the Transferred Assets based on or related to any such Lien, Liability, claim or interest, or based on any action the Debtors may take in their Chapter 11 cases.

### D.  Approval of the Purchase Agreement and Sale

18.     The Purchase Agreement and all other ancillary documents, including any other documents contemplated by the Purchase Agreement or that are necessary or appropriate to complete the transactions provided for in the Purchase Agreement, and all of the terms and conditions thereof, and the Sale and related transactions contemplated therewith, are hereby approved in all respects.  The failure specifically to include any particular terms of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Purchase Agreement and the Sale be authorized and approved in their entireties.

19.     Pursuant to section 363 of the Bankruptcy Code, entry by the Debtors into the Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents are authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the sale of the Transferred Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (b) enter into all other agreements contemplated by the Purchase Agreement and consummate all other transactions contemplated by the Purchase Agreement, (c) consummate the Sale as contemplated in the Purchase Agreement and this Order, (d) continue performance under and make all payments required by the Purchase Agreement, and (e) execute and deliver, perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the Sale, or as may be reasonably necessary or appropriate to implement or perform any of the obligations contemplated by the Purchase Agreement and any other documentation relating to the Sale, all without further order of the Court.

20.     The transfer of the Transferred Assets to Buyer or any Buyer Designee shall vest Buyer or such Buyer Designee, as applicable, with all right, title, and interest in and to the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities and Permitted Liens.

21.     Each Buyer Designee shall be entitled to the protections of this Order with respect to the Transferred Assets acquired by such Buyer Designee.

22. Buyer and any Buyer Designee are good-faith purchasers for value within the meaning of section 363(m) of the Bankruptcy Code and are entitled to the full protections of section 363(m) with respect to the Sale and the Transferred Assets. Buyer is not an "insider" of any Debtor within the meaning of section 101(31) of the Bankruptcy Code. The consideration to be paid by the Buyer under the Purchase Agreement was negotiated at arm's length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and is fair and reasonable under the circumstances. The Sale contemplated by the Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

23. Neither the Debtors, Buyer, nor any Buyer Designee has engaged in any conduct that would permit the Sale, the Purchase Agreement, or any transaction contemplated thereby to be avoided, set aside, or otherwise challenged under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Transferred Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

24. Except as expressly provided in the Purchase Agreement or this Order, Buyer is purchasing the Transferred Assets on an "as is, where is" basis as to their physical condition, location, completeness, operability, merchantability, fitness for any particular purpose, and quality, and the Sale is final. This paragraph does not limit, modify, or impair: (a) the Debtors' obligation to transfer their right, title, and interest in the Transferred Assets free and clear of Liens,

Liabilities, claims, and interests as provided in this Order; (b) Buyer's no-successor-liability, excluded-liability, environmental, free-and-clear sale, and other protections under this Order; (c) Buyer's express rights, representations, warranties, covenants, or remedies under the Purchase Agreement or this Order; or (d) any non-waivable state or federal law relating to implied warranties for latent defects.

25.     All persons and entities, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce any Liens, Liabilities, claims, or interests against Buyer, Buyer's affiliates, Buyer's designees, the Transferred Assets, or any of Buyer's successors or assigns, except solely with respect to Assumed Liabilities and Permitted Liens.

26.     The Debtors, the Consultant, any warehouseman, bailee, custodian, agent, affiliate, employee, representative, or other person or entity in possession, custody, or control of any Transferred Assets shall surrender such Transferred Assets to Buyer or the applicable Buyer Designee on the Closing Date.

27.     No executory contract or unexpired lease of any Debtor or Seller is being assumed by the Debtors or assigned to Buyer under section 365 of the Bankruptcy Code or this Order, and Buyer shall not assume or be liable for any obligations thereunder.  Nothing in this paragraph limits Buyer's acquisition of rights that constitute Transferred Assets and are transferable without assumption and assignment under section 365 of the Bankruptcy Code.

### E. Section 363(f) Findings

28.     The Sale of the Transferred Assets to the Buyer (or any Buyer Designee) under the terms of the Purchase Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Transferred Assets will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial rights, title, and interests in the Transferred Assets free and clear of any and all Liens, Liabilities, claims, and interests, and will not subject any Buyer or any Buyer Designee to any Liens, Liabilities, claims, and interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Purchase Agreement with respect to the Assumed Liabilities and Permitted Liens.  The transfer of the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests (other than Assumed Liabilities and Permitted Liens) satisfies section 363(f) of the Bankruptcy Code because one or more of the following standards is satisfied with respect to each such Lien, Liability, claim or interest:  (a) applicable nonbankruptcy law permits sale of the Transferred Assets free and clear of such Lien, Liability, claim, or interest; (b) the holder of such Lien, Liability, claim or interest has consented, failed to object after receiving adequate notice, or is deemed to have consented; (c) to the extent such Lien, Liability, claim, or interest constitutes a lien, the purchase price for the Transferred Assets is greater than the aggregate value of all liens on the Transferred Assets; (d) such Lien, Liability, claim, or interest is in bona fide dispute; or (e) the holder of such Lien, Liability, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Lien, Liability, claim, or interest.

29.     The holders of Liens, Liabilities, claims, and interests will be adequately protected because any valid, enforceable, and non-avoidable Lien, Liability, claim, or interest (other than an

Assumed Liability or Permitted Lien) shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale to the same extent and with the same validity, priority, force, and effect that such Lien, Liability, claim, and interest had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

30.     The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale (i) if the transfer of the Transferred Assets were not free and clear of all interests of any kind or nature whatsoever or (ii) if the Buyer or any of his affiliates or designees would, or in the future could, be liable for any interests, in each case, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities and the Permitted Liens.  Not transferring the Transferred Assets free and clear of all interests of any kind or nature whatsoever would adversely impact the Debtors' efforts to maximize the value of the Transferred Assets.

### F.   No Successor Liability and No Assumed Liabilities

31.     Neither the Buyer nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "**Buyer Parties**") is a continuation of the Debtors or their estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or

their estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and any of the Debtors.

32.     Buyer shall not be deemed, as a result of the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the ownership, operation or removal of the Transferred Assets, or the consummation of the transactions approved by this Order, to:  (a) be a successor to any Debtor or its estate; (b) be a continuation or substantial continuation of any Debtor or any Debtor's business; (c) have merged with any Debtor; (d) be part of a de facto merger with any Debtor; (e) be a mere continuation of any Debtor; (f) be a successor employer; (g) be a joint employer; (h) have common identity or continuity of enterprise with any Debtor; (i) be liable under any product-line, substantial-continuity, continuity-of-enterprise, successor-liability, transferee-liability, de facto merger, alter ego, veil-piercing, agency, vicarious liability, or similar theory; or (j) be liable for any Lien, Liability, claim, or interest arising from or relating to the Transferred Assets, the Debtors, the Debtors' businesses, or the Debtors' ownership, operation, shutdown, use, sale, transfer, removal, or disposition of the Transferred Assets before the Closing Date, except solely for the Assumed Liabilities and Permitted Liens.

33.     Except for the Assumed Liabilities and Permitted Liens expressly set forth in the Purchase Agreement, Buyer shall not assume, shall not be deemed to assume, and shall have no liability or responsibility for any Liability, Lien, claim, interest, debt, obligation, commitment, demand, expense, loss, cause of action, damage, penalty, fine, cost, duty, contract, lease, agreement, guarantee, warranty, litigation, judgment, assessment, tax, interest, encumbrance, or other obligation in respect of any Debtor, any Debtor's estate, any predecessor, affiliate, owner, equityholder, officer, director, manager, employee, agent, or representative of any Debtor, or any other person or entity, whether known or unknown, fixed or contingent, liquidated or unliquidated,

matured or unmatured, asserted or unasserted, arising before, on, or after the Petition Date or before, on, or after the Closing Date.

34.     Without limiting the foregoing, except solely for the Assumed Liabilities and Permitted Liens, Buyer shall not assume or be liable for any Liens, Liabilities, claims, or interests arising under, relating to, or based upon in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, Liens, Liabilities, claims (including intercompany claims), or interests on account of:

(a)     any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, conditional sale right, title retention right, mechanic's lien, materialman's lien, warehouse lien, carrier lien, judgment lien, tax lien, statutory lien, possessory lien, or similar interest;

(b)     any debt, claim (including any intercompany claim), obligation, or liability of any Debtor or any Debtor's estate;

(c)     any executory contract or unexpired lease of any Debtor or Seller;

(d)     any cure cost or default, claim, liability, or obligation under any executory contract or unexpired lease of any Debtor or Seller;

(e)     any collective bargaining agreement, memorandum of understanding, side letter, grievance, arbitration, labor agreement, union agreement, or obligation to any labor organization;

(f)     any claim under the Worker Adjustment and Retraining Notification Act, any state WARN Act or any similar plant-closing, mass-layoff, wage, notice, severance, or employee-protection statute;

(g)     any wage, salary, payroll, commission, bonus, incentive, vacation, paid-time-off, severance, retention, change-in-control, workers' compensation, unemployment, employee-benefit, retiree-benefit, health, welfare, medical, life insurance, disability, COBRA, pension, retirement, withdrawal-liability, multiemployer-plan, defined-benefit-plan, defined-contribution-plan, ERISA, PBGC, controlled-group, fiduciary, funding, termination, premium, contribution, or benefit claim;

(h)     any claim under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the National Labor Relations Act, the Labor Management Relations Act, the Occupational Safety and Health Act, ERISA, COBRA, or any other federal, state, or local labor, employment, employee-benefit, pension, workplace, health, safety, discrimination, wage, hour, leave, retaliation, or similar law;

(i)     any successor-liability, successor-employer, single-employer, joint-employer, de facto merger, substantial-continuity, mere-continuation, continuity-of-enterprise, product-line, alter-ego, agency, veil-piercing, transferee-liability, vicarious liability, or similar claim or theory;

(j)     any product liability, warranty, recall, customer claim, personal injury, property damage, tort, negligence, strict liability, indemnity, contribution, reimbursement, or similar claim arising from or relating to any Debtor's pre-Closing Date ownership, operation, design, manufacture, sale, distribution, repair, service, warranty, or use of any product, asset, equipment, inventory, tooling, or property;

(k)     any tax, bulk sale, bulk transfer, unclaimed property, escheat, sales, use, transfer, recording, stamp, documentary, value-added, excise, property, franchise, income, payroll, withholding, or similar claim, except as expressly allocated to Buyer under the Purchase Agreement;

(l)     any environmental claim, environmental liability, environmental fine, environmental penalty, environmental violation, environmental response cost, remediation cost, closure cost, corrective-action obligation, disposal liability, off-site disposal claim, natural resource damage claim, contamination claim, permit violation, air-emission claim, wastewater claim, stormwater claim, hazardous-waste claim, or release claim;

(m)     any liability arising from any litigation, arbitration, administrative proceeding, investigation, audit, notice of violation, regulatory action, enforcement action, consent order, settlement, judgment, decree, or claim against any Debtor or relating to any Debtor's pre-Closing Date conduct; and

(n)     any liability arising from or relating to the Debtors' operation, ownership, use, possession, shutdown, storage, removal, abandonment, rejection, sale, transfer, disposition, or wind-down of any assets, facilities, properties, contracts, leases, businesses, or operations before the Closing Date (collectively, "**Successor or Transferee Liability**").

35.     All persons and entities holding Liens, Liabilities, claims or interests of any kind or nature, including as a result of Successor or Transferee Liability, against any Debtor, any Debtor's estate, the Transferred Assets, or the proceeds thereof, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred,

estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce, including through any setoff, right of subrogation, or recoupment of any kind, any such Liens, Liabilities, claims or interests against Buyer, any Buyer's Designee, any Buyer Parties, the Transferred Assets, or any of Buyer's or its affiliates' successors or assigns, except solely with respect to the Assumed Liabilities expressly set forth in the Purchase Agreement.

### G. **Liens, Proceeds, and Recording**

36. All Liens, Liabilities, claims, and interests released from the Transferred Assets shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that such Liens, Liabilities, claims, and interests had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

37. This Order shall be effective as a determination that, as of the Closing Date, all Liens, Liabilities, claims, and interests against the Transferred Assets have been unconditionally released, discharged, and terminated as to Buyer and the Transferred Assets, except solely for Assumed Liabilities and Permitted Liens.

38. This Order is binding upon and shall govern the acts of all filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities. All such persons, agencies and entities are authorized and directed to accept this Order, the Purchase Agreement, any bill of sale, assignment, certificate, or other transfer document as conclusive evidence of the release, discharge, and

termination of all Liens, Liabilities, claims, and interests against Buyer or the Transferred Assets and as authority to record, file, or register the transfer of the Transferred Assets to Buyer free and clear of all Liens, Liabilities, claims and interests, except solely for Assumed Liabilities and Permitted Liens.

39.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, Liabilities, claims, or interests against or in the Transferred Assets does not deliver appropriate termination statements, instruments of satisfaction, releases, or other documents, Buyer and the Debtors are authorized to execute and file such termination statements, releases, satisfactions, or other instruments on behalf of such person or entity solely with respect to the Transferred Assets.

### H.  Bulk Sales, Transfer Taxes, and Resale Certificates

40.     No bulk sales, bulk transfer, bulk notice, successor-liability tax notice, or similar law shall apply to the Sale, the Purchase Agreement, the transfer of the Transferred Assets, or any transactions authorized by this Order.

41.     The transfer of the Transferred Assets shall not be subject to any stamp, transfer, recording, documentary, sales, use, or similar tax, fee, assessment, or charge.

42.     Buyer and the Debtors are authorized to provide and execute any resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate, or similar document available under applicable law in connection with the Sale or transfer of the Transferred Assets.

43.     All filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities are authorized and directed to accept this Order and any resale certificate, exemption certificate, direct-pay

permit, manufacturing exemption certificate, tax-exemption certificate, or similar document as sufficient evidence of any applicable exemption.

## I.   Additional Provisions

44.      Nothing in any chapter 11 plan, confirmation order, conversion order, dismissal order, appointment order, trustee appointment, plan supplement, trust agreement, collateral trust agreement, wind-down agreement, or other document or order in these chapter 11 cases or any successor case (including a converted case under chapter 7) shall conflict with, supersede, modify, impair, or otherwise affect Buyer's rights under the Purchase Agreement or this Order.  The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in these Chapter 11 cases; (b) converting these Chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing these Chapter 11 cases; or (d) pursuant to which this Court abstains from hearing these Chapter 11 cases. The terms and provisions of this Order, notwithstanding the entry of any such orders described in (a)–(d) above, shall continue in these Chapter 11 cases, or following dismissal of these Chapter 11 cases.

45.      This Order and the Purchase Agreement shall be binding in all respects upon the Debtors, their estates, Buyer, all creditors (whether known or unknown), all holders of Liens, Liabilities, claims, and interests, all contract counterparties, all governmental units, all landlords, all employees, all labor organizations, all benefit plans, all pension funds, all successors and assigns, any subsequently appointed chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary, and all other parties in interest.

46.     No chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary appointed in these chapter 11 cases or any successor case shall have authority to reject, avoid, unwind, rescind, revoke, modify, or otherwise impair the Purchase Agreement, the Sale, the transfer of the Transferred Assets, or Buyer's rights under this Order.

47.     To the extent this Order conflicts with any prior order of this Court, including any order governing rejection, abandonment, assignment, disposition, wind-down, sale, transfer, liens, collateral, cash collateral, or adequate protection, this Order shall govern solely with respect to the Sale, the Transferred Assets, Buyer, and the transactions approved herein.

48.     No access agreement, utility agreement, landlord agreement, service-provider agreement, licensor agreement, creditor agreement, contract-counterparty agreement, or other agreement entered into under or in connection with the Wind Down Order shall modify, impair, condition, or limit Buyer's rights under the Purchase Agreement or this Order, or impose any liability or obligation on Buyer, unless Buyer is a party to such agreement or expressly agrees in writing to be bound by it.

49.     To the extent of any conflict between this Order and the Purchase Agreement, this Order shall govern.

50.     The Debtors, Buyer, and any Buyer Designee are authorized and directed to take all actions necessary or appropriate to implement and effectuate the relief granted in this Order, including executing and delivering any further instruments of sale, transfer, conveyance, assignment, confirmation, or correction reasonably necessary to transfer, convey, and assign to Buyer or any Buyer Designee all Transferred Assets and any additional assets or properties that

should have been transferred or assigned to Buyer or any Buyer Designee as Transferred Assets under the Purchase Agreement.

51.     The requirements of Bankruptcy Rule 6004(h) are waived.  This Order is effective and appealable immediately upon entry, without any stay.

52.     The Court retains exclusive jurisdiction to interpret, implement, enforce, and resolve any disputes arising under or related to this Order, including, without limitation, the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the Assumed Liabilities, the Permitted Liens, the liabilities excluded under the Purchase Agreement or this Order, transfer documents, and any related documents, claims, disputes, or proceedings.

Signed:  [_], 2026

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Purchase Agreement**

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**dated as of June 24, 2026**

**by and among**

**First Brands Group Holdings, LLC**

**And its Subsidiaries named herein, as Sellers**

**and**

**Jasper Acquisition Co., LLC, as Buyer**

**and**

**Press-Seal Corporation, as Guarantor**
**(solely for purposes of Section 5.08 and Section 6.09)**

NOTE: CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION.  NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.

305541580

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS ..................................................................................................1

    Section 1.01.    Certain Defined Terms.................................................................1

ARTICLE II PURCHASE AND SALE; CLOSING ...................................................14

    Section 2.01.    Reserved......................................................................................14

    Section 2.02.    Purchase and Sale of Transferred Assets ...............................14

    Section 2.03.    Assignment of Certain Transferred Assets ............................19

    Section 2.04.    Closing.......................................................................................20

    Section 2.05.    Certain Closing Deliverables ..................................................20

    Section 2.06.    Designated Contracts; Cure Costs ..........................................21

    Section 2.07.    Wrong Pockets...........................................................................22

ARTICLE III PURCHASE PRICE ..........................................................................23

    Section 3.01.    Purchase Price............................................................................23

    Section 3.02.    Proration for Periodic Expenses. .............................................24

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ..............................24

    Section 4.01.    Formation and Qualification....................................................24

    Section 4.02.    Authority of Sellers; Enforceability........................................24

    Section 4.03.    No Conflict ................................................................................24

    Section 4.04.    Consents and Approvals ...........................................................25

    Section 4.05.    Title............................................................................................25

    Section 4.06.    Brokers.......................................................................................25

    Section 4.07.    No Other Representations or Warranties .................................25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ..................................27

    Section 5.01.    Formation and Authority of Buyer; Enforceability ...............27

    Section 5.02.    No Conflict ................................................................................27

    Section 5.03.    Consents and Approvals ...........................................................28

    Section 5.04.    Absence of Restraints; Compliance with Laws and Actions..................28

    Section 5.05.    Financial Ability; Non-Insider Status......................................28

    Section 5.06.    Brokers.......................................................................................28

    Section 5.07.    Investigation..............................................................................29

i

Section 5.08.     Representations of the Guarantor ...........................................................29

ARTICLE VI ADDITIONAL AGREEMENTS.................................................................30

Section 6.01.     Conduct of Business Before the Closing .................................................30

Section 6.02.     Access to Information...............................................................................30

Section 6.03.     Confidentiality .........................................................................................30

Section 6.04.     Regulatory Approvals. .............................................................................30

Section 6.05.     Third Party Consents ...............................................................................31

Section 6.06.     Intercompany Obligations........................................................................31

Section 6.07.     Cooperation..............................................................................................31

Section 6.08.     Bulk Transfer Laws .................................................................................31

Section 6.09.     Guarantee. The Guarantor........................................................................31

ARTICLE VII POST-CLOSING COVENANTS .............................................................32

Section 7.01.     Access .......................................................................................................32

Section 7.02.     Intellectual Property Matters ...................................................................32

Section 7.03.     Preservation of Books and Records ..........................................................33

Section 7.04.     Further Assurances ...................................................................................33

ARTICLE VIII BANKRUPTCY PROVISIONS ..............................................................33

Section 8.01.     Bankruptcy Court Filings.........................................................................33

ARTICLE IX TAX MATTERS.........................................................................................34

Section 9.01.     Transfer Taxes .........................................................................................34

Section 9.02.     Tax Adjustments.......................................................................................34

Section 9.03.     Tax Cooperation .......................................................................................35

Section 9.04.     Survival.....................................................................................................35

Section 9.05.     Adjustment to Purchase Price ..................................................................35

ARTICLE X CONDITIONS TO CLOSING; TERMINATION........................................35

Section 10.01.    Closing Conditions ...................................................................................35

Section 10.02.    Waiver of Closing Conditions ..................................................................36

Section 10.03.    Frustration of Closing Conditions.............................................................36

Section 10.04.    Termination...............................................................................................36

Section 10.05.    Effect of Termination................................................................................37

ARTICLE XI MISCELLANEOUS ....................................................................................37

Section 11.01.  Rules of Construction ........................................................................37

Section 11.02.  Expenses .............................................................................................37

Section 11.03.  Notices ................................................................................................38

Section 11.04.  Survival................................................................................................38

Section 11.05.  Limitation on Liability; No Post-Closing Recourse .............................39

Section 11.06.  Public Announcements .......................................................................39

Section 11.07.  Severability .........................................................................................39

Section 11.08.  Assignment .........................................................................................39

Section 11.09.  No Third-Party Beneficiaries...............................................................40

Section 11.10.  Entire Agreement................................................................................40

Section 11.11.  Amendments; Waiver .........................................................................40

Section 11.12.  Governing Law ...................................................................................40

Section 11.13.  Dispute Resolution; Consent to Jurisdiction.......................................40

Section 11.14.  Waiver of Jury Trial............................................................................41

Section 11.15.  Remedies; Specific Performance .........................................................41

Section 11.16.  Non-Recourse .....................................................................................42

Section 11.17.  Disclosure Schedules and Exhibits......................................................42

Section 11.18.  Provision Respecting Legal Representation .........................................42

Section 11.19.  Privilege ..............................................................................................43

Section 11.20.  Counterparts........................................................................................43

EXHIBITS

Exhibit A      Form of Bill of Sale, Assignment and Assumption Agreement

Exhibit B      Forms of IP Assignment Agreements

Exhibit C      Form of Sale Order

This ASSET PURCHASE AGREEMENT, dated as of June 24, 2026 (the "**Agreement Date**"), is made by and among First Brands Group Holdings, LLC, a Delaware limited liability company ("**Principal Seller**") and the Subsidiaries of the Principal Seller that are indicated on the signature pages attached hereto (together with the Principal Seller, each a "**Seller**" and, collectively, "**Sellers**"), Jasper Acquisition Co., LLC, an Indiana limited liability company ("**Buyer**" and, together with Sellers, the "**Parties**"), and, solely for purposes of Section 5.08 and Section 6.09, Press-Seal Corporation, an Indiana corporation (the "**Guarantor**"). Capitalized terms used herein shall have the meanings set forth herein, including in Article I.

## RECITALS

On or about September 24, 2025 and September 28, 2025, Principal Seller and certain of its Affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**" and such cases, "**Bankruptcy Cases**");

Sellers own certain assets relating to the Business, which assets are being sold to Buyer (or its Designated Buyer) in connection with the wind-down of Sellers' operations pursuant to the Bankruptcy Cases and, which Buyer understands, are not being sold as a going-concern transfer of an operating business, but Sellers understand that Buyer intends to recommence operation of the Business, including rehiring certain of the Sellers' former employees, post-Closing; and

Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, the Business and the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Certain Defined Terms.

"**Action**" means any claim, Avoidance Action, Cause of Action, lawsuit, litigation, arbitration, mediation, audit, investigation (including any informal claims or demands, or formal or informal request for documents, information, or testimony), hearing, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever, whether arising under federal, state, or local law, whether civil or criminal, whether legal, equitable, common law, statutory, regulatory, or administrative, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, seeking any form of relief whatsoever commenced, brought, conducted or heard by or before, or otherwise involving, any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; *provided*, *however*, that for the purposes of this Agreement no Seller shall be deemed an Affiliate of Buyer.

"**Agreement**" means this Asset Purchase Agreement, dated as of the Agreement Date, by and among Sellers and Buyer, including the Disclosure Schedules and the schedules and Exhibits, and all amendments to such agreement made in accordance with Section 11.11.

"**Agreement Date**" has the meaning set forth in the Preamble.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02(c).

"**Avoidance Action**" means any Action of any Seller for avoidance, recovery, subordination or other relief arising under chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer, or similar Laws.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Base Purchase Price**" has the meaning set forth in Section 3.01.

"**Bill of Sale, Assignment and Assumption Agreement**" has the meaning set forth in Section 2.05(a)(i).

"**Business**" means the business, commonly known as the "Jasper Rubber Products" business, as previously operated, directly or indirectly, by the applicable Sellers or their Affiliates prior to the Agreement Date at, from or through any of the Transferred Owned Real Property (and no other locations), consisting of the development, design, manufacture, sourcing, marketing, distribution and sale of products and services under or primarily associated with (i) automotive, commercial and industrial precision-molded rubber, thermoplastic and elastomer components for vibration and structural control, sealing and isolation products for passenger cars, light trucks, powersports and small engines and (ii) the "Jasper Rubber" brand name.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in New York City, New York are required or authorized by Law to be closed.

2

"**Business Employee**" means each employee of each Seller that is, or was, primarily dedicated to the Business (i.e., spends 51% or more of his or her working time on the Business).

"**Business Intellectual Property**" means all (a) Business Registered IP, (b) unregistered Intellectual Property (other than Business Registered IP) (i) owned or purported to be owned by a Seller or any of its respective Affiliates and (ii) Related to the Business, (c) unregistered Trademarks owned by or purported to be owned by any Seller or any of their respective Affiliates that consist of or otherwise include "Jasper Rubber", "Jasper Rubber Products", or any variations, translations or derivatives thereof anywhere in the world, and (d) any foreign counterparts to any of the foregoing clauses (a)-(c).

"**Business Registered IP**" means all issued patents, patent applications, Trademark registrations, Trademark applications, copyright registrations, copyright applications, Internet domain names (including www.jasperrubber.com) and social media names and identifiers (a) owned or purported to be owned by any Seller or any of their respective Affiliates and (b) Related to the Business. For clarity, "Business Registered IP" includes those items set forth on Section 2.02(a)(iv) of the Disclosure Schedules.

"**Business Systems**" means all Systems that are (a) owned or leased by a Seller or any of their respective Affiliates, (b) Related to the Business and (c) physically located at the Transferred Owned Real Property as of the Agreement Date.

"**Business Technology**" means all Technology that is (a) owned or purported to be owned or leased by a Seller or any of its Affiliates and (b) Related to the Business.

"**Buyer Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Buyer is named as a party on the signature pages thereto.

"**Buyer Transactions**" means the transactions contemplated by the Buyer Transaction Agreements.

"**Cash**" means (a) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, securities, securities entitlements, instruments and other investments, calculated in accordance with GAAP and Sellers' and their respective Affiliates' books and records, and (b) all bank accounts and securities accounts; provided, that "Cash" shall exclude all Deposits.

"**Causes of Action**" means any claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, disputed or undisputed, liquidated or unliquidated, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Agreement Date, in contract, in tort, at law, in equity, or otherwise.

"**Change**" has the meaning set forth in the definition of "Material Adverse Effect".

"**Claims**" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including (x) all "claims," within the meaning of Section 101(5) of the Bankruptcy Code and (y) all Avoidance Actions) or rights of set-off or recoupment.

"**Closing**" has the meaning set forth in Section 2.04.

"**Closing Conditions**" means the conditions to the obligations of the Parties to consummate the Transactions, as set forth in Section 9.05.

"**Closing Date**" has the meaning set forth in Section 2.04.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the Confidentiality Agreement dated as of March 10, 2026, by and among Press-Seal Corporation, Principal Seller and Viceroy Private Capital, LLC, as the same may be amended from time to time in accordance with its terms.

"**Consent**" means any consent, approval or authorization.

"**Consultant**" means Hilco Merchant Resources, LLC and its Affiliates.

"**Consultant Fees and Expenses**" means, as of the Closing, all fees, commissions, reimbursements, expenses and other amounts accrued, payable or otherwise owed to Hilco under or pursuant to (a) that certain Amended and Restated Consulting and Marketing Services Agreement, dated March 13, 2026 and effective as of February 13, 2026, by and among Consultant, Hilco Receivables, LLC, Hilco Global Professional Services, LLC and First Brands Group, LLC, (b) that certain Machinery and Equipment Marketing Agreement, dated as of May 27, 2026, by and between Consultant and First Brands Group Holdings, LLC, its debtor subsidiaries and Viceroy Private Capital, LLC and (c) that certain Intangible Assets, Real Estate, and Other Assets Marketing Agreement, dated as of May 28, 2026, by and among Hilco IP Services, LLC, Hilco Real Estate, LLC, Hilco Global Mexico, S. de R.L. de C.V. and First Brands Group Holdings, LLC, its debtor subsidiaries and Viceroy Private Capital, LLC.

"**Contract**" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, or purchase order that is currently in effect.

4

"**Contract Assumption Order**" means the *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1244].

"**Contracting Parties**" has the meaning set forth in <u>Section 11.16</u>.

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the applicable Seller, and the assignment to Buyer, of the Transferred Contracts to which such Seller is party, as determined by the Bankruptcy Court or agreed to by the applicable Seller and the non-Seller counterparty to the applicable Transferred Contract.

"**Debt**" means, without duplication, all monetary obligations (including accrued interest related thereto) (a) for borrowed money from third party lending sources, (b) evidenced by notes, bonds, debentures, mortgages or similar instruments, but excluding letters of credit, banker's acceptance or similar instrument to the extent not drawn upon, in each case, from third party lending sources, (c) under any leases required to be recorded as capital leases under GAAP, (d) trade payables, accrued expenses (including employment-related expenses), and (e) obligations to reimburse any person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal, or surety bond, performance and completion guaranty or similar instrument, in each case, calculated in accordance with GAAP and Sellers' and their respective Affiliates' books and records.

"**Debtors**" means the entities set forth on <u>Schedule D</u>.

"**Deposits**" means all deposits paid to or held in trust by, any third party (including customer deposits and security deposits for rent, electricity, telephone or otherwise and adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code) and prepaid or deferred charges and expenses paid to any third party.

"**DIP Escrow Account**" means the Escrow Account (as defined in the DIP Order).

"**DIP Order**" means the *Final Order (a) Authorizing the Debtors to (i) Obtain Postpetition Financing, (ii) Use Cash Collateral, and (iii) Grant Liens and Provide Superpriority Administrative Expense Claims; (b) Granting Adequate Protection to Prepetition Secured Parties; (c) Modifying the Automatic Stay; and (d) Granting Related Relief* (Docket No. 597).

"**Disclosure Schedules**" means the disclosure schedules dated as of the Agreement Date delivered by Sellers to Buyer, which form a part of this Agreement.

"**Effective Time**" means 12:01 a.m. (local time) on the Closing Date.

"**Employee Plans**" means each "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and each other retirement, pension, salary continuation, savings, welfare benefit (including all disability, sick leave, death benefit, group insurance, hospitalization, medical, dental, life, Code Section 125 "cafeteria" or "flexible" benefit plan), bonus, executive compensation, employee loan, relocation, repatriation, stock option, stock purchase, restricted stock, profits interest, phantom equity or other equity or equity-based incentive, deferred compensation, employment, offer letter, retention, termination, severance, change-in-control, transaction bonus plan, program, agreement or arrangement, whether written or oral, and any other employee benefit plan, policy, practice or arrangement, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the Transactions), in each case (i) sponsored, maintained, contributed to, or required to be contributed to by any Seller or any Affiliate of any Seller, including ERISA Affiliates, and pursuant to which Sellers or their Affiliates, including ERISA Affiliates, currently have any direct or indirect obligation or Liability with respect to any Business Employee or any former employee who would have been a Business Employee if employed as of the Agreement Date or (ii) for which any Business Employee or any former employee who would have been a Business Employee if employed as of the Agreement Date (or any dependent or beneficiary thereof) has any present or future right to compensation or benefits.

"**Environmental Law**" means any Law relating to: (i) pollution or the protection of natural resources or the environment, (ii) the protection of worker or human health and safety (as worker or human health and safety pertains to exposure to Hazardous Materials), or (iii) the handling, generation, processing, sale, distribution, management, manufacture, marketing, use, presence, treatment, storage, transport, release or threatened release of, contamination by, or exposure to, any Hazardous Material.

"**Environmental Permit**" means any Permit that is issued, authorized, granted or required by a Government Authority under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that, together with Sellers, would be deemed a "single employer" within the meaning of Section 414 of the Code or Section 4001(b)(1) of ERISA or that is a member of the same "controlled group" as Sellers pursuant to Section 4001(a)(14) of ERISA.

"**Excluded Assets**" has the meaning set forth in Section 2.02(b).

"**Excluded Contracts**" has the meaning set forth in Section 2.02(b)(i).

"**Excluded Liabilities**" has the meaning set forth in Section 2.02(d).

"**Excluded Trademarks**" means all Trademarks, Internet domain names and other source identifiers owned by any Seller or any of its Affiliates and not included in the Business Intellectual Property and goodwill, registrations and applications relating to any of the foregoing.

6

"**Executory Contract**" means any executory Contract (including any unexpired leases) Related to the Business, to which any Seller or any Debtor is a party or a beneficiary.

"**Executory Contract List**" has the meaning set forth in Section 2.06(a).

"**Exhibits**" means the exhibits to this Agreement (as may be amended from time to time in accordance herewith) which form a part of this Agreement.

"**Extended Outside Date**" has the meaning set forth in Section 10.04(b).

"**GAAP**" means U.S. generally accepted accounting principles.

"**Government Authority**" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"**Guarantor**" has the meaning set forth in the recitals.

"**Hazardous Materials**" means any substance, material, chemical or waste that is defined, listed, classified, designated or regulated as "hazardous," "toxic," "radioactive," "corrosive" or as a "pollutant," or "contaminant" or words of similar meaning, import or regulatory effect, under, or for which Liability or legally binding standards of conduct may be imposed pursuant to, any Environmental Law, including petroleum products or byproducts, per- and polyfluoroalkyl substances, radioactive material, asbestos or asbestos containing materials, lead, polychlorinated biphenyls, noise, odor, urea formaldehyde, radiation, and mold.

"**Initial Outside Date**" has the meaning set forth in Section 10.04(b).

"**Insurance Policies**" means, collectively, all policies and programs of or agreements for insurance and interests in insurance pools and programs of Sellers Related to the Business (in each case including self-insurance and insurance from Affiliates).

"**Intellectual Property**" means, collectively, any and all intellectual property rights and proprietary rights in any jurisdiction, whether registered or unregistered, including: (a) patents and patent applications, including reissues, divisions, continuations, continuations-in-part, extensions and reexaminations; (b) copyrights, moral rights, mask work rights, database rights, configuration and historical transaction data and design rights, including all applications, registrations, extensions, renewals and reversions of the foregoing; (c) Trademarks; (d) Trade Secrets; (e) Internet domain names; (f) social media usernames and identifiers (including social media handles); (g) intellectual property rights in or to Technology; (h) rights and remedies against past, present and future infringement, misappropriation or other violation of any of the foregoing; and (i) rights to claim priority or register any of the foregoing.

"**IP Assignment Agreements**" has the meaning set forth in Section 2.05(a)(ii).

"**IRS**" means the U.S. Internal Revenue Service.

7

"**Knowledge of Sellers**" means the actual knowledge of the Persons listed on Section 1.01(b) of the Disclosure Schedules.

"**Law**" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, treaty, Order, or other requirement or rule of law (including common law) promulgated by a Government Authority.

"**Liabilities**" means any liability, Debt, guarantee, Claims (including as defined in the Bankruptcy Code), demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown, fixed or otherwise, or due or to become due) of every kind and description, including all fines, penalties, losses, costs, interest, charges, damages, assessments, deficiencies, judgments, awards and expenses related thereto.

"**Lien**" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, mortgage, lease, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, servitude, covenant, encroachment, option, right of use, first offer, or first refusal, setoff, recoupment, right of recovery, or final Order of any Government Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.  Without limiting the foregoing, "Lien" also includes, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or the Seller, to use any portion of the Transferred Assets.

"**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance, or occurrence (each, a "**Change**") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (i) the business, operations, properties, assets or condition (financial or otherwise) of the Business or (ii) the ability of Sellers to consummate the Transactions contemplated hereby; *provided*, that, solely with respect to clause (i) above, none of the following, either alone or in combination, will constitute a Material Adverse Effect: (a) any Change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (b) any Change that generally affects any industry in which the Business operates; (c) general business or economic conditions in any of the geographical areas in which any of Sellers or the Business operates; (d) national or international political or social conditions, including any Change arising in connection with hostilities, acts of war, sabotage or terrorism or military action or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military action, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (e) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, cyberattack, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event or any global health conditions or any action by any Government Authority related to the foregoing; (f) any actions taken by Buyer or its Affiliates or specifically contemplated to be taken or omitted to be taken by any Seller pursuant to this Agreement or any other Transaction

8

Agreement or actions taken or omitted to be taken by any Seller at the request or with the consent of Buyer; (g) any Changes in applicable Laws or GAAP (or other relevant accounting rules); (h) any Change resulting from the filing or pendency of the Bankruptcy Cases, any Action that arises from or is in connection with the Bankruptcy Cases or adjudicated in the Bankruptcy Court and connected to the Debtors, or any reasonably anticipated effects of such filing, pendency or Action (other than the complete cessation of operations of any Seller, the conversion of any Sellers' Chapter 11 cases to Chapter 7 under the Bankruptcy Code, or the dismissal of any of Sellers' Chapter 11 cases); (i) any Change resulting from the public announcement of the entry into this Agreement, compliance with the terms of this Agreement or the consummation of the Transactions; (j) any Change arising from or relating to the imposition, modification or escalation of tariffs, trade restrictions, customs duties, import or export controls or localization requirements applicable to automotive parts or related raw materials; (k) any Change arising from or relating to disruptions affecting the automotive supply chain generally, including shortages or delays in the availability of raw materials, components, semiconductors, steel, aluminum, resins, logistics or transportation services; (l) any Change arising from or relating to changes in automotive safety, emissions, fuel economy, electrification or autonomous vehicle Laws, regulations or standards of general applicability to automotive suppliers; (m) any loss or reduction of customers or customer relationships, or any decline in revenues attributable thereto; or (n) any effects or Changes arising from or related to the breach of this Agreement by Buyer or Guarantor; *provided further,* that the exceptions set forth in clauses (a) through (e) of this definition shall not be regarded as exceptions solely to the extent that any such described Change has a disproportionately adverse impact on the Business or Sellers, as compared to other companies similarly situated in the industries in which the Business or Sellers operate.

"**Nonparty Affiliates**" has the meaning set forth in Section 11.16.

"**Onset**" means Onset Financial, Inc., together with its Affiliates.

"**Onset Complaint**" means the Complaint in *First Brands Group, LLC, et al. v. Onset Financial, Inc., et al.*, Adv. Pro. No. 26-03005 (Bankr. S.D. Tex.).

"**Order**" means any order, writ, judgment, injunction, decree or award entered by or with any Government Authority.

"**Owned Real Property**" means any real property that is owned by any Seller.

"**Periodic Taxes**" has the meaning set forth in Section 9.02.

"**Permits**" means all permits, licenses, authorizations, clearances, closures, decisions, registrations, concessions, grants, franchises, certificates, waivers and filings issued or required by any Government Authority under applicable Law, in each case, necessary for the operation of the Business.

"**Permitted Liens**" means the following Liens (which shall not include any Liens of or asserted by Onset): (a) Liens for Taxes, or other governmental assessments, charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings or that may thereafter be paid without penalty; (b) Liens secured by deposits made in the ordinary

course of business in connection with workers' compensation, unemployment insurance or other types of social security; and (c) with respect to Transferred Owned Real Property: (1) defects or imperfections of title, exceptions, easements, licenses, options to license, covenants, rights-of-way, covenants, servitudes, restrictions and other similar charges, defects or encumbrances or any non-monetary title matters (A) that do not, individually or in the aggregate, materially interfere with the operation of the Business or use of such Transferred Owned Real Property or materially impair the value of the Transferred Assets or the Transferred Owned Real Property, (B) that are revealed in an investigation of title report or commitment made available to Buyer, or (C) matters that would be shown by a survey of the Transferred Owned Real Property, or (2) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Government Authority; and (d) Liens set forth on Section 1.01(c) of the Disclosure Schedules.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association, Government Authority, organization or other legal entity.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Closing Date.

"**Process Parameters and Recipe Formulary**" means, as Related to the Business, all cure profiles, mixing procedures, equipment settings, and related manufacturing know-how related to the machinery and equipment constituting Transferred Assets, together with all current and historical rubber compound formulations and associated documentation.

"**Purchase Price**" has the meaning set forth in Section 3.01.

"**Related to the Business**" means primarily related to, primarily held for use in, or primarily used in connection with the Business.

"**Released Claims**" means with respect to any party, any and all of such party's rights, commitments, actions, debts, claims, counterclaims, suits, Causes of Action, Avoidance Actions, damages, demands, losses, obligations, costs, expenses, compensation and other Liabilities of every kind and nature whatsoever, whether known or unknown, matured or contingent and whether arising in Law, in equity or otherwise, in each case based upon facts, circumstances or occurrences existing at or prior to the Closing, and solely to the extent arising in connection with the Bankruptcy Cases or the negotiation and documentation of this Agreement and the Transactions.

"**Representative**" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, financial advisors or other representatives of such Person.

"**Required Amount**" shall mean an amount equal to (a) the full amount of the cash required to consummate the Transactions on the terms contemplated by the Transaction Agreements (including, for the avoidance of doubt, the payment of the Base Purchase Price), plus (b) all Cure Costs payable pursuant to Section 2.06.

"**Required Approvals**" means **Error! Reference source not found.**any Governmental Approvals required in connection with the Transactions.

"**Sale Order**" shall be an Order or Orders by the Bankruptcy Court, in substantially the form of Exhibit C or otherwise in form and substance acceptable to Sellers, Buyer and Guarantor: (a) approving and authorizing (i) Sellers' entry into and performance of this Agreement and the terms and conditions hereof, including pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (ii) the sale of the Transferred Assets to Buyer on the terms and subject to the conditions set forth herein and free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), (iii) the payment of the Consultant Fees and Expenses to the Wind-Down Deposit Account, the payment of any Tax Payoff Amount to the applicable party or parties as directed by Sellers in accordance with the Tax Payoff Notice, and the payment of the remainder of the Base Purchase Price to the DIP Escrow Account for further distribution in accordance with the terms of the Wind-Down Order, the DIP Order and the Sale Order and (iv) Sellers to consummate the Transactions; (b) finding that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and that the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (c) recognizing that Sellers will assume and assign to Buyer the Transferred Executory Contracts pursuant to the Contract Assumption Order, subject to Buyer's payment of the Cure Claims and Buyer's provision of adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) as required by the Contract Assumption Order; (d) finding that Buyer shall not be deemed to assume or become responsible for any Liability that is not an Assumed Liability; and (d) finding that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.

"**Sellers' Advisors**" has the meaning set forth in Section 4.07.

"**Seller Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Seller is a party thereto.

"**Seller Transactions**" means the transactions contemplated by the Seller Transaction Agreements.

"**Specified Obligations**" means Buyer's obligation to pay (a) the full amount of the cash required to consummate the Transactions on the terms contemplated by the Transaction Agreements (including, for the avoidance of doubt, the payment of the Base Purchase Price) and (b) all Cure Costs payable pursuant to Section 2.06.

"**Straddle Period**" has the meaning set forth in Section 9.02.

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election

11

of the board of directors or other governing body of such Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

"**Systems**" means all servers, network and telecommunications equipment, and other computer systems, including software, firmware, hardware, networks, interfaces, platforms and related systems, used to process, store, maintain, or operate data, information or functions.

"**Tax**" or "**Taxes**" means (i) any and all federal, state, provincial, local, foreign and other income, excise, gross receipts, ad valorem, value-added (including VAT), import duties, sales, use, production, employment, social security, unemployment, severance, withholding, franchise, profits, registration, license, lease, service, service use, goods and services, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, real or personal property, leasing, transfer, payroll, intangibles or other taxes, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto and (ii) any and all liability for the payment of any amounts as a result of any express obligation to indemnify any other Person, or any successor or transferee Liability, in respect of any items described in clause (i) above.

"**Tax Returns**" means all returns and reports (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes.

"**Taxing Authority**" means any federal, state, local or foreign jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection of such Taxes for such jurisdiction.

"**Tax Payoff Amount**" means the aggregate amount of Taxes owed by Sellers and to be paid from the Base Purchase Price at Closing in respect of any Transferred Assets and/or Related to the Business (together with any interest, penalties, or other amounts required to be paid to satisfy such Taxes in full), as specified in the Tax Payoff Notice.

"**Tax Payoff Notice**" means a written notice specifying (a) the applicable party or parties to which the Tax Payoff Amount is to be paid, as directed by Sellers, (b) the dollar amount payable to such payee or payees and (c) wire transfer instructions for such payee or payees.

"**Technology**" means all technology, software, computer programs (whether in source code, object code or other form), databases, designs, procedures, models, discoveries, processes, techniques, methods, ideas, know-how, research and development, tools, algorithms, specifications, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, documentation, works of authorship, and other similar materials, and all recordings, graphs, drawings, reports, analyses and other writings.

"**Third Party Consents**" has the meaning set forth in Section 6.05.

"**Trade Secrets**" means all trade secrets, as defined in the Uniform Trade Secrets Act published by the Uniform Law Commission, as amended.

12

"**Trademarks**" means all trademarks, service marks, trade names, corporate names, trade dress, logos and other similar indica of source or origin, including all applications, registrations, extensions and renewals of the foregoing and all goodwill associated with the foregoing.

"**Transaction Agreements**" means this Agreement, the Bill of Sale, Assignment and Assumption Agreement, the IP Assignment Agreements, and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transaction Dispute**" has the meaning set forth in Section 11.12.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Taxes**" means all sales, use, purchase, excise, gross receipts, ad valorem, direct or indirect real property, conveyance, transfer, intangible, stamp, stock transfer, personal property transfer, business and occupation, value added (including VAT), transaction securities transaction, recording, documentary, filing, Permit or authorization, leasing, license, lease, service, service use, severance, profits, gains, property registration, motor vehicle registration, title recording and other amounts payable in respect of transfer filings, imposed by any Government Authority and similar fees, duties, imposts, levies and other non-income Taxes, together with any interest and any penalties, additions to tax or additional amounts imposed by any Government Authority with respect thereto.

"**Transferred Assets**" has the meaning set forth in Section 2.02(a).

"**Transferred Books and Records**" means (a) books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists, lists of suppliers and personnel and employment records, in each case, to the extent Related to the Business, other than any Tax Returns and all records (including all working papers) related thereto and any Excluded Assets, and (b) Intellectual Property dockets, prosecution files and invention disclosures, to the extent pertaining to Business Intellectual Property.

"**Transferred Contracts**" has the meaning set forth in Section 2.02(a)(ii).

"**Transferred Executory Contract**" has the meaning set forth in **Error! Reference source not found.**.

"**Transferred Owned Real Property**" has the meaning set forth in Section 2.02(a)(i).

"**Transferred Permits**" has the meaning set forth in Section 2.02(a)(iii).

"**U.S.**" means the United States of America.

13

"**VAT**" means: (a) any value added tax imposed under the UK Value Added Tax Act 1994 and legislation and regulations supplemental thereto; (b) any Tax imposed in compliance with the council directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and (c) any other Tax of a similar nature (including, without limitation, sales tax, use tax, consumption tax and goods and services tax), whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in (a) or (b), or elsewhere.

"**Wind-Down Deposit Account**" means the Consultant deposit account to be used for deposit of the Consultant Fees and Expenses and distribution thereof pursuant to the Wind-Down Order.

"**Wind-Down Order**" means  that certain *Order Pursuant to Section 363 of the Bankruptcy Code (i) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (ii) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (iii) Granting Related Relief* [Docket No. 2454], entered by the Bankruptcy Court on April 16, 2026, in the Bankruptcy Cases, as such order may be amended, modified or supplemented from time to time.

"**Wind-Up Date**" means with respect to any Seller (that is a Debtor), the date upon which such Seller's corporate or entity existence ceases to exist.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

Section 2.01.   Reserved.

Section 2.02.   Purchase and Sale of Transferred Assets.

(a)      Transferred Assets.   Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order and to the exclusions set forth in Section 2.02(b) and Section 2.03, at the Closing, Sellers hereby, and Sellers will cause their respective Affiliates to, sell, convey, assign, transfer and deliver to Buyer or, subject to Section 11.08, one or more of its Affiliates, and Buyer or, subject to Section 11.08, one or more of its Affiliates shall purchase, acquire and accept from each such Seller and any of its Affiliates, all of such Seller's and its respective Affiliates' right, title and interest in, to and under the Transferred Assets, free and clear of all Liens, other than Permitted Liens. The Parties acknowledge that the Transferred Assets constitute a discrete set of assets being sold in a wind-down context and not a going-concern transfer of an operating business but Sellers understand that Buyer intends to recommence operation of the Business post-Closing. "**Transferred Assets**" means, collectively, to the maximum extent permitted by the Bankruptcy Code or other applicable Law Sellers' and their respective Affiliates' right, title and interest in and to, as of the Closing, the following assets, as the same currently exist as of the Agreement Date and shall exist immediately prior to the Closing, and in the case of any machinery, equipment, inventory or other tangible assets, to the extent physically located at, on or within the Transferred Owned Real Property as of the Agreement Date, in each case other than the Excluded Assets:

14

(i)        all Owned Real Property listed on Section 2.02(a)(i) of the Disclosure Schedules (the "**Transferred Owned Real Property**") held by such Seller, together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements, if any, related thereto and, with respect to any such real property, all rights of any Seller Party in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining to the Transferred Owned Real Property;

(ii)       all Contracts Related to the Business including those set forth on Section 2.02(a)(ii) of the Disclosure Schedules (including any Executory Contracts designated by Buyer in accordance with **Error! Reference source not found.**) (collectively, the "**Transferred Contracts**") (the scope of any such assignment or assumption to be as agreed by the Parties pursuant to Section 2.06 and the Contract Assumption Order);

(iii)      all Permits (including Environmental Permits) Related to the Business and all pending applications therefor (the "**Transferred Permits**") (for the avoidance of doubt, solely to the extent, if required under applicable Law, the applicable Government Authority Consents to or otherwise approves the assignment or transfer of the applicable Permit);

(iv)      all Business Intellectual Property, Business Technology and Process Parameters and Recipe Formulary;

(v)       all rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, vendors, contractors, subcontractors or other third parties to the extent pertaining to the Business or any Transferred Assets and any letters of credits, parent guaranties or other credit support provided by such third parties to Sellers with respect to the Business or any Transferred Assets;

(vi)      the Transferred Books and Records;

(vii)     (A) all other personal property and interests therein owned by Sellers and their respective Affiliates (and including any such personal property that is subject to any leases between any of Sellers and Onset Related to the Business), including furniture, furnishings, machinery, office equipment, computers, servers, networks and communications equipment, vehicles, handling and logistics equipment, tangible embodiments and copies of any Business Intellectual Property and other tangible personal property (including, rights, if any, in any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, but excluding any physical assets covered by Section 2.02(a)(ix) below), in each case, Related to the Business, or (B) any tangible personal property on order to be delivered to any Seller that is Related to the Business;

(viii)    (A) all Business Systems and any other Systems (other than software that is not Related to the Business) and (B) all personal devices (e.g., cell phones, computers, laptops, tablets, wi-fi hotspots and headsets);

15

(ix)     all packaging, supplies, replacement or component parts, safety stock, maintenance supplies, tooling, spares and parts maintained or held by or stored by or on behalf of any Seller, in each case of the foregoing, Related to the Business;

(x)     all raw materials, works in progress, semi-finished and finished goods inventory Related to the Business;

(xi)     all other assets, properties and rights, whether tangible or intangible (other than Intellectual Property and Transferred Contracts) to the extent such assets, properties, or rights are Related to the Business;

(xii)     the assets listed on Section 2.02(a)(xi) of the Disclosure Schedules held by such Seller or any Affiliate of such Seller (to the extent such assets are Related to the Business); and

(xiii)     all rights and obligations under or arising out of all Insurance Policies for any of the Transferred Assets or Assumed Liabilities;

(xiv)     all goodwill of the Business.

(b)     Excluded Assets.  Notwithstanding anything to the contrary herein, the following assets of or in the possession of Sellers (the "**Excluded Assets**") shall be retained by Sellers and their respective Affiliates:

(i)     all Contracts held by such Seller (1) not Related to the Business, (2) Contracts rejected in the Bankruptcy Cases prior to the Closing Date in accordance with this Agreement, and (3) the Contracts set forth on Section 2.02(b)(i) of the Disclosure Schedules (collectively, "**Excluded Contracts**");

(ii)     all accounts receivable as of the Closing;

(iii)     all Cash;

(iv)     all raw materials, works in progress, semi-finished and finished goods inventory Related to the Business that are (A) not physically located at, on or within the Transferred Owned Real Property as of the Agreement Date, (B) being held at the Transferred Owned Real Property on behalf of customers of the Business pursuant to consignment arrangements, or (C) being held at the Transferred Owned Real Property by Seller or their Affiliates on behalf suppliers of the Business under tolling or similar arrangements;

(v)     other than the Transferred Owned Real Property, all right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such real property, all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto;

(vi)     all Excluded Trademarks;

16

(vii)    all Intellectual Property, Technology and Systems (including all software that is not Related to the Business), other than the Business Intellectual Property, Business Technology, the Systems set forth in Section 2.02(a)(viii), and the Business Systems;

(viii)   all Avoidance Actions and all other Causes of Action (including counterclaims) and defenses held by any Seller, including those arising in connection with the Bankruptcy Cases;

(ix)    all biometric data, biometric identifiers, and biometric information, and any similar data used to uniquely identify an individual, in each case in its raw form, including, without limitation, fingerprints, voiceprints, retinal scans, iris scans, facial geometry or facial recognition data, hand or face templates, DNA, and any scans, images, recordings used to capture or generate such identifiers;

(x)     all claims, rights or interests of Sellers in or to any refund, credit, rebate, abatement or other recovery for Taxes (other than in respect of any Taxes Buyer assumed and paid pursuant to this Agreement), or any other Tax assets (including any Tax attributes), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof);

(xi)    all Tax Returns and all records (including all working papers) related thereto and all refunds of Taxes for periods prior to the Closing;

(xii)   except as otherwise included in Section 2.02(a)(xiii), all Insurance Policies and all rights of any nature with respect to any such Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries;

(xiii)  all Permits (other than the Transferred Permits) and all nontransferable Permits, including nontransferable Environmental Permits;

(xiv)   all rights and interests of Sellers under the Transaction Agreements and any other sale agreements;

(xv)    all Employee Plans and all assets relating thereto;

(xvi)   (A) all minute books (and other similar corporate records) and stock records, (B) any books and records relating to the Excluded Assets, (C) any books and records or other materials of or in the possession of Sellers that (1) any Seller is required by Law or by Order of the Bankruptcy Court to retain or (2) any Seller is prohibited by Law from delivering to Buyer, (D) any copies of any books and records that Sellers and their Affiliates retain pursuant to Section 7.03 or (E) any books, records, files or papers that are not Transferred Books and Records;

(xvii)  (A) all records and reports prepared or received by any Seller or any of its Affiliates in connection with the sale of the Business or the Transactions or any other Transaction Agreement, including all analyses Related to the Business or related to Buyer or any third-party bidder or potential purchaser, (B) all bids and expressions of interest received from third parties with respect to the Business and (C) all privileged communications described in Section 11.1919;

(xviii)  all right, title and interest in and to all equity interests of any Person owned by any Seller;

(xix)   all assets, properties, or rights of any Seller or any of its Affiliates that are not Related to the Business; and

(xx)   any asset specifically identified on Section 2.02(b)(xx) of the Disclosure Schedules.

(c)   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and subject to the exclusions set forth in Section 2.02(d), as partial consideration for the Transferred Assets, Buyer or, subject to Section 11.08, one or more of its Affiliates shall, at the Effective Time, assume (and from and after the Closing, timely pay, discharge and perform in accordance with their terms) only the following Liabilities, without duplication and only to the extent not paid prior to the Closing and specifically excluding the Excluded Liabilities (collectively, the "**Assumed Liabilities**"):

(i)   all Liabilities, whether accruing on or after the Effective Time, with respect to Transfer Taxes to be borne by Buyer pursuant to Section 9.01;

(ii)   all Cure Costs payable by Buyer pursuant to Section 2.06 and all Liabilities arising under the Transferred Contracts that arise on or after the Closing; and

(iii)   all Liabilities relating to Buyer's ownership or operation of the Transferred Assets (including all Liabilities pertaining to Permitted Liens), to the extent arising from events, facts or circumstances that first occur from and after the Effective Time.

(d)   Excluded Liabilities.  Except for the Assumed Liabilities, neither Buyer nor its Affiliates, shareholders, officers, directors, employees or other representatives shall assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or any Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, asserted or unasserted, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter that arise from or relate to the Transferred Assets or the operation of the Business prior to the Closing (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers:

(i)   any Debt;

(ii)   any Liability to the extent arising out of or related to any Excluded Asset, including arising under any contract or lease that is not a Transferred Contract;

(iii)   any Liability, obligation or commitment, whether or not accrued, assessed, or currently due and payable, for any: (A) Taxes imposed on or payable by Sellers for any Pre-Closing Tax period; (B) Taxes imposed with respect to any of the Transferred Assets, any of the Assumed Liabilities or the Business of any Pre-Closing Tax Period, allocated in accordance

18

with Section 9.02; (C) Taxes imposed on or with respect to any of the Excluded Assets or any of the Excluded Liabilities for any Tax period; and (D) Periodic Taxes for which Sellers are responsible pursuant to Section 9.02; provided, that such Excluded Liabilities shall not include any Transfer Taxes or Periodic Taxes for which Buyer is responsible pursuant to Section 9.01 or Section 9.02;

(iv)    all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal, whether legal, equitable, common law, statutory, regulatory, or administrative, and whether arising under federal, state, local, or common law) against any Sellers or their Affiliates (including, for the avoidance of doubt, any Action related to negligence, fraud, breach of fiduciary duty, violations of Law, conspiracy, misfeasance, nuisance or under any other theory relating to any act, omission, conduct, performance or non-performance of any Seller, or any of their Affiliates, or any of their respective directors, officers, employees, or agents), or related to the Transferred Assets (except to the extent constituting Cure Costs), which shall be pending or threatened or having any other status or with respect to facts, actions, omissions, conduct, circumstances or conditions existing, occurring or accruing prior to the Closing (including any breach, default, failure to perform, negligence, torts related to performance, violations of Law, conspiracy, nuisance, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind or any other act, omission, or other conduct), including for the avoidance of doubt any successor liability claims or that may be owed to or assessed by, any Government Authority or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

(v)    all Liabilities arising under, in connection with, or pursuant to any Environmental Laws attributable to any facts or circumstances first occurring or existing on or prior to the Closing, including such Liabilities (x) that are dischargeable pursuant to Section 363 of the Bankruptcy Code, (y) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, and (z) from which the Transferred Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court or otherwise such Liabilities that do not transfer to Buyer by operation of law;

(vi)    all accounts payable existing on the Closing Date, including, for the avoidance of doubt, (A) invoiced accounts payable, and (B) accrued but uninvoiced accounts payable;

(vii)    all Liabilities relating to any current or former employees of Sellers or their Affiliates, including any Business Employee;

(viii)    any and all Liabilities related to the Onset Complaint; and

(ix)    Liabilities relating to amounts to be paid by Sellers pursuant to this Agreement, including brokers' fees.

Section 2.03.    Assignment of Certain Transferred Assets.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or

19

resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Government Authority), would constitute a breach or other contravention thereof or a violation of applicable Law or Order of the Bankruptcy Court (other than a breach, contravention or violation that can be overridden by the Sale Order). If, on the Closing Date, any such Consent has not been obtained, or if an attempted transfer or assignment thereof would be ineffective or a violation of applicable Law or Order of the Bankruptcy Court, Sellers and Buyer will, and subject to Section 6.05, cooperate in good faith to enter into a mutually agreeable arrangement (at Buyer's cost and expense) under which (a) Buyer would, in compliance with applicable Law or Order of the Bankruptcy Court, obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset in accordance with this Agreement, including, for example (and without limitation of other similar arrangements being employed instead and in place thereof), by subcontracting, sublicensing or subleasing such Transferred Asset to Buyer or (b) Sellers would enforce for the benefit (and at the expense) of Buyer any and all of Sellers' rights, claims or benefit against a third party associated with such Transferred Asset and Sellers would promptly pay to Buyer when received all monies received by them under any such Transferred Asset, claim, right or benefit (net of Sellers' expenses incurred in connection with any assignment or other performance contemplated by this Section 2.03), in each case, until the earlier of (i) the date the Bankruptcy Court enters an Order converting the Bankruptcy Cases of any Seller to a case under Chapter 7 of the Bankruptcy Code, (ii) the effective date of any Chapter 11 plan of reorganization filed by any Seller and (iii) the applicable Wind-Up Date for any Seller.

Section 2.04.   Closing.  The closing of the sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place by telephone conference and electronic exchange of documents (or if, because of recordation purposes originals are needed, then, the exchange of such original documents) (or, if the Parties agree to hold a physical closing, at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020-1605), at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Section 9.05 (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.05.   Certain Closing Deliverables.  At the Closing:

(a)      Sellers shall deliver or cause to be delivered to Buyer the following:

(i)      a counterpart of the Bill of Sale, Assignment and Assumption Agreement for the Transferred Assets, in the form attached hereto as Exhibit A (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by the applicable Seller;

(ii)     a counterpart of the Registered IP Assignment Agreement and General IP Assignment Agreement, each in the form attached hereto as Exhibit B (collectively, the "**IP Assignment Agreements**"), each duly executed by the applicable Sellers;

(iii)     the officers' certificates required to be delivered pursuant to Section 10.01(c);

(iv)     a duly executed original copy of each deed or comparable instruments of transfer or conveyance, in recordable form, conveying the Transferred Owned Real Property to Buyer free and clear of all Liens (to the extent so ordered pursuant to the Sale Order), other than Permitted Liens, together with duly executed sales disclosure forms, if applicable;

(v)     an IRS Form W-9 or appropriate IRS Form W-8, as applicable, from each Seller (or its regarded owner) selling, conveying or transferring any Transferred Assets;

(vi)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers and Buyer, as may be necessary to convey the Transferred Assets to Buyer.

(b)     Buyer shall deliver or cause to be delivered to Sellers (or, in the case of clause (b)(i), as directed by Sellers pursuant to Section 3.01) the following:

(i)     an amount equal to the Base Purchase Price by wire transfer of immediately available funds, with (A) an amount equal to the Consultant Fees and Expenses paid to the Wind-Down Deposit Account, (B) the Tax Payoff Amount paid to the applicable party or parties as directed by Sellers in accordance with the Tax Payoff Notice, and (C) the remainder of the Base Purchase Price paid to the escrow agent for the DIP Escrow Account for deposit into the DIP Escrow Account, in each case in the amounts provided by Sellers pursuant to Section 3.01;

(ii)     all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Sellers promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(iii)     a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer; and

(iv)     a counterpart of the IP Assignment Agreements, each duly executed by Buyer.

Section 2.06.   Designated Contracts; Cure Costs.

(a)     Section 2.03Designation and Assignment. On or before the Agreement Date, Sellers shall have provided Buyer with (i) a list of all Executory Contracts (including unexpired leases) and (ii) copies of the Executory Contracts in Sellers' possession, in each case, Related to the Business (the "**Executory Contract List**").  Within three (3) business days of the Agreement Date (the "**Designation Deadline**"), Buyer may designate, by written notice to Sellers,

21

each Executory Contract it wishes to have assumed by Sellers and assigned to Buyer effective at Closing (each such Contract, a "**Transferred Executory Contract**"). Within three (3) business days of the Designation Deadline, Sellers shall file an "Assumption and Assignment Notice" (as defined in the Contract Assumption Order), indicating the Sellers' intent to assume or assume and assign the Transferred Executory Contracts pursuant to section 365 of the Bankruptcy Code effective as of Closing. Sellers shall use commercially reasonable efforts to assume and assign the Transferred Executory Contracts pursuant to the Contract Assumption Order.

(b)	All Executory Contracts not designated as a Transferred Executory Contract by Buyer on or before the Designation Deadline shall be deemed an Excluded Contract. Buyer may, at any time prior to entry of an order of the Court authorizing the assumption and assignment of any Transferred Executory Contract, revoke the prior designation of such Executory Contract as a Transferred Executory Contract by written notice to Sellers, and such Contract shall thereupon be deemed an Excluded Contract. No designation or revocation of a designation shall result in any adjustment to the Purchase Price. The Debtors reserve all rights to reject any Excluded Contract in accordance with Section 365 of the Bankruptcy Code.

(c)	Cure Costs. Subject to Section 2.03, pursuant to Section 365 of the Bankruptcy Code and the Contract Assumption Order, each Seller shall assume and assign to Buyer, and Section 2.02(a)(ii)Buyer shall assume from such Seller, each Transferred Executory Contract. All Cure Costs shall be paid by Buyer and Sellers shall not have any Liability therefor. If any non-Debtor counterparty objects to the proposed Cure Costs or assumption and assignment of a Transferred Executory Contract and such objection is not resolved prior to the Closing Date, then such Contract shall be deemed an Excluded Contract unless Buyer (x) pays the undisputed portion of Cure Costs at Closing and (y) reserves funding for the disputed portion pending resolution by the Bankruptcy Court or consensual agreement.

Section 2.07.	Wrong Pockets. Following the Closing (but prior to the Wind-Up Date with respect to any obligations of Sellers or their Affiliates), if any Party becomes aware that (a) any Transferred Assets or Assumed Liabilities have not been transferred to Buyer or (b) any assets or Liabilities not intended under the terms of this Agreement to be transferred to Buyer have been so transferred, such Party will promptly notify the other Party and transfer the relevant asset or Liability to the other Party at no additional expense to the receiving Party to the extent still remaining with Sellers or their Affiliates.

Section 2.08.	Designated Buyers.

(a)	In connection with the Closing, without limitation by the terms of Section 11.08, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.08, one (1) or more Affiliates to purchase specified Transferred Assets, (any such Affiliate of Buyer that shall be properly designated by Buyer in accordance with this Section 2.08, a "**Designated Buyer**"). At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing. After the Closing, any reference to Buyer made in this Agreement in respect of any purchase or assumption referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. Buyer shall be jointly and severally liable for all obligations of Buyer and its Designated

Buyer(s) under this Agreement as to any particular Assumed Liability that a Designated Buyer is assuming at the Closing.

(b)     The designation of a Designated Buyer in accordance with Section 2.08(a) shall be made by Buyer by way of a written notice to be delivered to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to the Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets Buyer intends such Designated Buyer(s) to purchase and/or assume, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.  Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to Section 2.08(a) shall not relieve Buyer of any of its obligations under this Agreement (or otherwise) and Buyer shall remain jointly and severally liable therefor.

## ARTICLE III

## PURCHASE PRICE

Section 3.01.  Purchase Price.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Assets and obligations of Sellers set forth in this Agreement shall be an amount in cash equal to $8,030,000 (the "**Base Purchase Price**") *plus* the assumption of the Assumed Liabilities (collectively, the "**Purchase Price**"). On the Closing Date, Buyer shall pay, by wire transfer of immediately available funds, the Base Purchase Price as follows: (a) an amount equal to the Consultant Fees and Expenses shall be paid to the Wind-Down Deposit Account, (b) the Tax Payoff Amount shall be paid to the applicable party or parties as directed by Sellers in accordance with the Tax Payoff Notice and (c) the Base Purchase Price less the Consultant Fees and Expenses and the Tax Payoff Amount shall be paid to the escrow agent for the DIP Escrow Account for deposit into the DIP Escrow Account. No later than two (2) Business Days prior to the Closing, Sellers shall confirm to Buyer the respective amounts owed to Hilco under each agreement described in the definition of Consultant Fees and Expenses. No later than one (1) Business Day prior to the Closing, Sellers shall deliver to Buyer (x) a Tax Payoff Notice and (y) a written flow of funds setting forth the respective dollar amounts of the Base Purchase Price to be paid to (i) the Wind-Down Deposit Account in respect of the Consultant Fees and Expenses, (ii) the applicable party or parties as directed by Sellers in respect of the Tax Payoff Amount and (iii) the escrow agent for the DIP Escrow Account for deposit into the DIP Escrow Account. Amounts on deposit in the DIP Escrow Account shall be distributed solely as, when and to the Persons provided in, and in the priorities and manner set forth in, the Sale Order, and neither Buyer nor any Debtor shall have any right to direct any disbursement or withdrawal therefrom except to the extent expressly authorized by the Sale Order and/or the DIP Order. As of the Closing, Buyer acknowledges and agrees that all funds deposited into the DIP Escrow Account are not property of Buyer, are not subject to any right of setoff, recoupment or counterclaim by Buyer, and shall remain subject to the liens, claims, priorities and protections set forth in the DIP Order and the Sale Order until disbursed in accordance therewith.

23

Section 3.02.   Proration for Periodic Expenses. Sellers shall use commercially reasonable efforts to cause any and all public utilities to issue final bills to Sellers on the basis of readings made as of the Closing Date and all amounts payable pursuant to such bills shall be paid by Sellers. Buyer shall, if required, by the respective utility companies or agencies, pay any necessary deposits in order to effect the transfer of utility service to Buyer.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer that, except as set forth in the Disclosure Schedules:

Section 4.01.   Formation and Qualification.  Each Seller is a corporation, limited liability company or other entity duly incorporated, formed or organized, validly existing (or are otherwise dormant) and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect, and has the requisite corporate or other appropriate power and authority to operate its business as now conducted except where the failure to have such power and authority would not reasonably be expected to have a Material Adverse Effect. Each Seller is duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, is in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.   Authority of Sellers; Enforceability.   The execution, delivery and performance by each Seller of the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party have been duly authorized by all requisite corporate or organizational action on the part of such Seller. Except for such authorizations as may be required by the Bankruptcy Court, this Agreement has been duly executed and delivered by Sellers, and upon execution and delivery thereof, the other Seller Transaction Agreements will be duly executed and delivered by the applicable Sellers party thereto, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Seller Transaction Agreements will constitute, legal, valid and binding obligations of Sellers party thereto, enforceable against Sellers party thereto in accordance with their respective terms.

Section 4.03.   No Conflict.   Subject to the extent of the Sale Order by the Bankruptcy Court, provided that all Consents, waivers or other actions listed on Section 4.03 of the Disclosure Schedules or described in Section 4.04 have been obtained or satisfied, and except as may result from any facts or circumstances relating to Buyer or its Affiliates, the execution, delivery and performance by Sellers of the Seller Transaction Agreements do not and will not:

(i)      violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of any of Sellers;

24

(ii)     violate in any material respect any Law or Order applicable to Sellers or the Business; or

(iii)     violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right to terminate, cancel or accelerate, or result in a loss of a material benefit under, any material Transferred Contract that would not reasonably be expected to have a Material Adverse Effect.

Section 4.04.   Consents and Approvals.   Subject to the extent of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by Sellers of the Seller Transaction Agreements do not and will not require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority (other than the Bankruptcy Court) by any Seller, except (a) where the failure to obtain such Consent or waiver, or to take such action or make such filing or notification would not reasonably be expected to have a Material Adverse Effect or (b) as may be necessary as a result of any facts or circumstances relating to Buyer or Buyer's Affiliates.

Section 4.05.   Title. Except for Permitted Liens and Liens that will be removed or released by operation of the Sale Order and the Wind-Down Order, the Transferred Assets (other than (i) any personal property leased pursuant to a Transferred Contract, and (ii) any Intellectual Property licensed pursuant to a Transferred Contract) are owned by or otherwise made available to Sellers, and at the Closing, subject to Section 2.03 and Buyer's payment of Cure Costs in accordance with Section 2.06, Buyer will own each of the Transferred Assets or will be vested with good title to such Transferred Assets, as the case may be, free and clear of all Liens (other than Permitted Liens), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

Section 4.06.   Absence of Certain Changes. Since June 15, 2026, neither Sellers nor any of their Affiliates, nor any agent, representative or other Person acting on behalf of Sellers has sold, transferred, conveyed, distributed, abandoned, relocated, removed, scrapped, disposed of, pledged, encumbered or otherwise caused any tangible personal property, machinery, equipment, inventory (other than inventory owned by customers of Sellers), furniture, fixtures, tools (other than tools and tooling owned by customers of Sellers), spare parts, supplies or other tangible assets Related to the Business and located at the Transferred Owned Real Property as of June 15, 2026 to cease being located at the Transferred Owned Real Property, except for any such actions or omissions that, individually or in the aggregate, are de minimis and would not be material to the Business or the Transferred Assets, taken as a whole.

Section 4.07.   Brokers.   Except for fees and expenses of Lazard Frères & Co. and Alvarez & Marsal North America, LLC (collectively, the "**Sellers' Advisors**"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Sellers or any of their respective Affiliates in connection with the Transactions.

Section 4.08.   No Other Representations or Warranties.  Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules), none of Sellers or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on

25

behalf of Sellers or any of their respective Affiliates, including any representation or warranty regarding any Seller or any other Person, any Transferred Assets, any Liabilities of any Seller, including any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred pursuant to the Transaction Agreements or any other matter, and Sellers hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of any Seller or any other Person, including any of their respective Representatives.  Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules), each Seller hereby (a) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Transferred Assets or the Business, and (b) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers), including omissions therefrom.  Without limiting the foregoing, no Seller makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyer or any of its Affiliates or any Representatives of Buyer of any of its Affiliates regarding the probable success, profitability or value of the Transferred Assets or the Business.  The disclosure of any matter or item in any Disclosure Schedule or other schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would reasonably be expected to result in a Material Adverse Effect.

Section 4.09.  "As Is, Where Is" Sale.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT THE SALE OF THE TRANSFERRED ASSETS HEREUNDER IS MADE PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND THE SALE ORDER IN CONNECTION WITH THE WIND-DOWN OF SELLERS' OPERATIONS AND NOT AS A GOING-CONCERN TRANSFER.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV (AS MODIFIED BY THE DISCLOSURE SCHEDULES), THE TRANSFERRED ASSETS ARE BEING SOLD AND CONVEYED ON A "WHERE-IS" AND, AS TO CONDITION, "AS-IS" BASIS, WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN, LATENT OR PATENT, AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. SELLERS HEREBY EXPRESSLY DISCLAIM, AND BUYER HEREBY EXPRESSLY WAIVES, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, (A) THE IMPLIED WARRANTY OF MERCHANTABILITY, (B) THE IMPLIED WARRANTY OF FITNESS FOR ANY PURPOSE OR FOR A PARTICULAR PURPOSE, (C) THE IMPLIED WARRANTY OF CONFORMITY TO MODELS OR SAMPLES, (D) ANY WARRANTY OF TITLE, POSSESSION, QUIET ENJOYMENT OR SIMILAR WARRANTY (EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THE SALE ORDER OR IN ANY TRANSACTION AGREEMENT), (E) ANY WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE, AND (F) ANY WARRANTY REGARDING THE CONDITION, QUALITY, SUITABILITY, MARKETABILITY, VALUE, OR FUTURE PERFORMANCE OF THE TRANSFERRED ASSETS. BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED ITS

OWN INDEPENDENT INSPECTION AND INVESTIGATION OF THE TRANSFERRED ASSETS AND IS RELYING SOLELY THEREON AND NOT ON ANY STATEMENT, REPRESENTATION, OR WARRANTY OF ANY SELLER OR ANY OF THEIR RESPECTIVE AFFILIATES, REPRESENTATIVES, OR AGENTS (INCLUDING HILCO MERCHANT RESOURCES, LLC, HILCO RECEIVABLES, LLC, HILCO GLOBAL PROFESSIONAL SERVICES, LLC OR THEIR AFFILIATES). BUYER FURTHER ACKNOWLEDGES THAT, FROM AND AFTER THE CLOSING, BUYER SHALL HAVE NO RIGHT OF RECOURSE AGAINST ANY SELLER OR ANY OF THEIR RESPECTIVE AFFILIATES, REPRESENTATIVES, OR AGENTS WITH RESPECT TO THE TRANSFERRED ASSETS OR THEIR CONDITION, AND ALL SALES SHALL BE FINAL. THIS SECTION IS CONSISTENT WITH AND INTENDED TO GIVE FULL EFFECT TO PARAGRAPH 29 OF THE WIND-DOWN ORDER, WHICH PROVIDES THAT ALL SALES OF WIND DOWN ASSETS SHALL BE "AS IS" AND FINAL.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers, and Guarantor (solely for purposes of Section 5.08) represents and warrants to Sellers, that:

Section 5.01.   <u>Formation and Authority of Buyer; Enforceability</u>.  Buyer is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Buyer Transaction Agreements (including the consummation of the Buyer Transactions).  The execution, delivery and performance of the Buyer Transaction Agreements by Buyer (including the consummation of the Buyer Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Buyer, and no shareholder or other similar approval is required in connection with Buyer's execution, delivery and performance of the Buyer Transaction Agreements.  This Agreement has been, and upon execution and delivery thereof, the other Buyer Transaction Agreements will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Buyer Transaction Agreements will constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 5.02.   <u>No Conflict</u>.   Provided that all Consents, waivers and other actions described in Section 5.03 have been obtained, the execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not:

(a)      violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Buyer;

(b)      violate in any material respect any Law or Order applicable to Buyer; or

27

(c)      violate or conflict with, result in any breach of, or constitute a violation or default (or, any event that, with notice or lapse of time, or both would constitute a default) under, or give to any Person any right to terminate, accelerate or cancel, or result in any material loss under, or the creation of any Lien on any assets or properties of Buyer pursuant to, any Contract to which Buyer or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, accelerations, or Liens as would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.03.   <u>Consents and Approvals</u>.   The execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not require any Consent, waiver or other action by, or any filing with or notification to, any Government Authority, except where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.04.   <u>Absence of Restraints; Compliance with Laws and Actions</u>.

(a)      To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(b)      Buyer is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(c)      There are no Actions pending or, to the knowledge of Buyer, threatened, that would affect or delay in any material respect Buyer's ability to perform its obligations under the Buyer Transaction Agreements or to consummate the Transactions contemplated by the Buyer Transaction Agreements.

Section 5.05.   <u>Financial Ability; Non-Insider Status</u>.   At Closing, Buyer will have (a) access to sufficient immediately available funds and the financial ability to pay all Required Amounts and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Buyer Transaction Agreements.   Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.   Buyer further represents and warrants that neither Buyer nor any of its Affiliates is an "insider" of any Seller or any Debtor, as such term is defined in Section 101(31) of the Bankruptcy Code.

Section 5.06.   <u>Brokers</u>.   Except for fees and expenses of True North Strategic Advisors, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer or any of Buyer's Affiliates in connection with the Transactions.   Buyer is solely responsible for the fees and expenses of True North Strategic Advisors.

Section 5.07.  Investigation.  Buyer acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Transferred Assets, the Assumed Liabilities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to, all such projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about Sellers, the Transferred Assets, the Assumed Liabilities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, as it has requested or otherwise requires to enter into this Agreement.  Buyer further acknowledges and agrees that (x) the only representations and warranties made by Sellers are the representations and warranties expressly set forth in Article IV (as modified by the Disclosure Schedules) and Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Sellers or any of their Affiliates, any Representatives of Sellers or any of their Affiliates or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Sellers' Advisors, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information and (y) any claims Buyer may have for breach of any representation or warranty shall be based solely on the representations and warranties of Sellers expressly set forth in Article IV (as modified by the Disclosure Schedules), subject to the exclusive remedies set forth herein.  Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Transferred Assets constitute a discrete set of assets (and not a going-concern business) being transferred on a "**where-is**" and, as to condition, "**as-is**" basis, with all faults and defects whether known or unknown, subject only to the representations and warranties contained in Article IV (as modified by the Disclosure Schedules), without any other representations or warranties of any nature whatsoever.

Section 5.08.  Representations of the Guarantor. The Guarantor has and will have the financial capacity to pay and perform its obligations under this Agreement, and all funds necessary for such Guarantor to fulfill its obligations under this Agreement, including the obligations under Section 6.09, and such financial capacity shall be available to such Guarantor for so long as this Guarantee shall remain in effect in accordance with this Agreement. The Guarantor is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement by the Guarantor has been duly and validly authorized by all requisite corporate or other applicable organizational action by the Guarantor, and no other proceedings on the part of the Guarantor are necessary to authorize the execution, delivery or performance of this Agreement by the Guarantor. This Agreement has been duly and validly executed and delivered by the Guarantor and, as of the date hereof, is in full force and effect and constitutes a valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, subject to the Bankruptcy and Equity Exception.

29

**ARTICLE VI**

**ADDITIONAL AGREEMENTS**

Section 6.01.   <u>Conduct of Business Before the Closing</u>.  Buyer acknowledges that Sellers are not currently operating the Business as a going concern, have very few employees and that the Transferred Assets are being sold in the context of the Bankruptcy Cases and <u>Section 6.01</u>a wind-down of Sellers' operations. Subject to the foregoing, except (a) as required by applicable Law, by Order of the Bankruptcy Court or as result of Sellers being subject to the Bankruptcy Cases, (b) as required by the terms of any Buyer Transaction Agreement, or (c) for matters identified on Section 6.01 of the Disclosure Schedules, Sellers shall (i) use commercially reasonable efforts to maintain the Transferred Assets in their current condition (subject to ordinary wear and tear), (ii) not grant any Lien on any Transferred Assets (whether tangible or intangible); or (iii) sell, transfer, lease, sublease or otherwise dispose of any Transferred Assets having a value in excess of fifteen thousand dollars ($15,000).

Section 6.02.   <u>Access to Information</u>.  During the Pre-Closing Period, upon reasonable prior written notice to Sellers, Buyer and its Representatives shall be granted reasonable access to the Transferred Owned Real Property and the Transferred Assets during normal business hours for any reasonable business purpose related to consummating the Transactions, subject to (a) applicable confidentiality obligations, (b) Sellers' reasonable security and safety requirements, (c) such access not unreasonably interfering with the wind-down activities of Sellers, and (d) applicable Law (including any Order of the Bankruptcy Court). Buyer and its Representatives shall not conduct any sampling or testing of soil, groundwater, air, or other environmental media without the prior written consent of Sellers.

Section 6.03.   <u>Confidentiality</u>.  Buyer acknowledges that the Confidential Information and Transaction Information (each as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under <u>Section 6.02</u>, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Buyer, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the obligations under the Confidentiality Agreement shall terminate.  If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its respective terms; *provided*, that the term of the Confidentiality Agreement as set forth therein shall be amended to refer to two (2) years from the date of termination of this Agreement.  For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the Confidentiality Agreement shall continue in full force and effect in accordance with its terms (as modified by the previous sentence).

Section 6.04.   <u>Regulatory Approvals.</u>  Each Party shall, and shall cause its Affiliates to, use commercially reasonable efforts to make all required filings and promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any Required Approvals or action of the Bankruptcy Court, which are governed exclusively by <u>Article VIII</u>) that may be, or become,

necessary for the execution and delivery of, and performance of its obligations pursuant to, the Transaction Agreements (including the consumption of the Transactions) (collectively, the "**Governmental Approvals**").

Section 6.05.   Third Party Consents.   Each Party agrees to cooperate and use commercially reasonable efforts to obtain any other consents and approvals from any third person other than a Government Authority that may be required in connection with any Transaction (the "**Third Party Consents**").   Notwithstanding anything in this Agreement to the contrary, no Seller or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent.   For the avoidance of doubt, any cooperation obligation of any Seller under this Section 6.05 shall terminate with respect to such Seller on the Wind-Up Date.   For the avoidance of doubt, no representation, warranty or covenant of any Seller contained in any Transaction Agreement shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third Party Consents.

Section 6.06.   Intercompany Obligations.   Sellers shall take or cause to be taken such actions as may be necessary to ensure that any intercompany claims are not enforced against the Sellers or the Transferred Assets. The Sale Order shall provide that Buyer is acquiring the Transferred Assets free and clear of any intercompany obligations.

Section 6.07.   Cooperation.   During the Pre-Closing Period, (a) Sellers and Buyer shall, and shall cause their respective Affiliates to, (i) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use commercially reasonable efforts to cause all Closing Conditions to be met as promptly as practicable and in any event on or before the Initial Outside Date, and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions of the other Party.

Section 6.08.   Bulk Transfer Laws.   Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws (including under any Tax Laws) of any jurisdiction in connection with the Transactions and Buyer hereby waives all claims related to the noncompliance therewith.

Section 6.09.   Guarantee.   The Guarantor hereby irrevocably and unconditionally guarantees the due and punctual payment of the Specified Obligations upon the occurrence of, and only to the extent of, an uncured breach by Buyer of such Specified Obligations. Such guarantee is an absolute and unconditional guarantee of payment (and not performance) and not of collectability. The aggregate liability of the Guarantor shall not exceed the Required Amount. The Guarantor shall be entitled to assert any defenses available to Buyer, other than defenses arising from the insolvency or bankruptcy of Buyer. If the Guarantor is required to perform or satisfy any Specified Obligation pursuant to this Section 6.09, then, upon written notice to Sellers, the Guarantor shall be subrogated to, and shall be entitled to exercise, all rights and remedies of Buyer

31

under this Agreement with respect to such Specified Obligations. In furtherance of the foregoing, the Guarantor shall be entitled, at its election, to assume the rights and obligations of Buyer under this Agreement to the extent necessary to perform and satisfy such Specified Obligations, and Sellers shall accept performance by the Guarantor in lieu of performance by Buyer with respect thereto. Upon such assumption, the Guarantor shall succeed to the rights of Buyer relating to the Specified Obligations so performed, and Buyer shall cooperate in good faith to effectuate the foregoing. The Guarantor may not assign any of its obligations hereunder without prior written consent of Sellers.

Section 6.10.  <u>Insurance</u>.  At all times from the Agreement Date through the Effective Time, the Transferred Asset shall be covered by one or more policies of commercial general liability insurance with limits no less than $20,000,000 that are issued by financially sound and reputable insurers.

**ARTICLE VII**

**POST-CLOSING COVENANTS**

Section 7.01.  <u>Access</u>.  From and after the Closing Date, upon reasonable prior written notice to Buyer, Sellers and their Representatives shall be granted reasonable access to the Transferred Owned Real Property during normal business hours for any reasonable business purpose, including the preparation or amendment of Tax Returns, satisfaction of obligations in connection with the Bankruptcy Cases, or any other matter relating to the rights or obligations of Sellers under any Transaction Agreement, subject to (a) applicable confidentiality obligations, (b) Buyer's reasonable security and safety requirements, and (c) such access not unreasonably interfering with Buyer's operations. Notwithstanding the foregoing, for the longer of (1) any applicable statute of limitations and (2) the period ending on the Wind-Up Date, Sellers shall have continued access to all Transferred Books and Records as is reasonably necessary to administer the Bankruptcy Cases and Sellers may retain copies of such Transferred Books and Records.

Section 7.02.  <u>Intellectual Property Matters</u>. Sellers hereby covenant and agree with the Buyer that, following the Closing, each Seller shall, and shall cause each of its respective Affiliates and the other Debtors to, discontinue the use of the name "Jasper Rubber", "Jasper Rubber Products" and any derivative thereof, and, as soon as reasonably practicable following the Closing (and in any event, no later than August 31, 2026), each Seller shall, and shall cause each of its respective Affiliates and the other Debtors to, provide the Buyer with evidence of the name change from "Jasper Rubber Products" to such other names as they may choose, provided such names do not include "Jasper Rubber" (or any derivative thereof) and are not otherwise confusingly similar thereto. Each Seller hereby consents to Buyer and its Affiliates filing, after Closing, such business name registrations and name change certificates (and related withdrawals/terminations) as Buyer reasonably determines necessary or advisable in connection with Buyer's or its Affiliates' post-Closing use of "Jasper Rubber", "Jasper Rubber Products" or any derivations thereof, and shall execute and deliver such customary supporting documents or consents as Buyer may reasonably

32

request, it being understood that the obligations of each Seller under this <u>Section 7.02</u> shall terminate with respect to such Seller on the Wind-Up Date.

Section 7.03.   <u>Preservation of Books and Records</u>.   Sellers and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date.   Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of the period ending on (a) any applicable statute of limitations and (b) the Wind-Up Date.   After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least ninety (90) days' prior written notice to Sellers of its intention to dispose of such books and records, and Sellers, and/or any of their respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04.   <u>Further Assurances</u>.   From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquaintances and other documents or instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party, it being understood that the obligations of each Seller under this <u>Section 7.04</u> shall terminate with respect to such Seller on the Wind-Up Date; *provided, however*, that except for Buyer's obligations to discharge an Assumed Liability and as otherwise provided pursuant to <u>Section 2.05</u>, nothing in this <u>Section 7.04</u> shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

Section 7.05.   <u>Additional Matters</u>. Section 7.05 of the Disclosure Schedules shall set forth any additional post-Closing covenants applicable to the Transactions.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01.   <u>Bankruptcy Court Filings</u>.

(a)      Sellers shall seek entry of the Sale Order through the filing on or before June 23, 2026 of a motion and notice of this Agreement, the proposed Transactions and the proposed Sale Order in form and substance reasonably satisfactory to Buyer on not less than 7 days' prior notice to all parties entitled to receipt of such notice under Rule 2002(a)(2) of the Federal Rules of Bankruptcy Procedure.   Sellers shall also provide publication notice of the proposed Transactions in *The Indianapolis Star* and the *Indianapolis Business Journal* in a manner approved by the Bankruptcy Court.

(b)      Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing

necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder.  In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(c)    Sellers may modify the Sale Order pursuant to discussions with the Office of the United States Trustee assigned to the Bankruptcy Cases, the Bankruptcy Court, any creditor or any other party in interest as long as any such modifications to the Sale Order are acceptable to Buyer.

Section 8.02.  <u>Not a Back-up Bidder</u>. Sellers and Buyer agree that, notwithstanding anything in any Bankruptcy Court Order to the contrary, Buyer shall not be required to act as a "Back-Up Bidder" absent consent of Buyer and the Guarantor.

**ARTICLE IX**

**TAX MATTERS**

Section 9.01.  <u>Transfer Taxes</u>.  Notwithstanding anything to the contrary in this Agreement, Buyer shall promptly (and in any event no later than the time prescribed under applicable Law) pay and discharge any Transfer Taxes imposed or arising with respect to the Transactions and shall promptly provide Sellers evidence of such payment.  Buyer shall indemnify, defend and hold harmless Sellers or any of their Affiliates or Representatives from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law in which case Buyer shall indemnify, defend and hold harmless Sellers for an amount equal to any such Transfer Taxes).  The party required by Law to file a Tax Return with respect to such Transfer Taxes shall, with the cooperation of the other Parties, timely prepare and file such Tax Return.  If Sellers or any of their Affiliates is required to pay any Transfer Tax, Buyer shall within five (5) Business Days of receipt of evidence of filing reimburse Sellers for any Transfer Taxes paid by Sellers or their Affiliate in connection with the filing of the applicable Tax Return.  Buyer and Sellers each agree to timely sign and deliver (or to cause their respective Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes (it being understood that Sellers and their cooperation obligation hereunder shall cease as of the Wind-Up Date).  No sums payable, or consideration given, by Buyer under this Agreement should be reduced by the amount of any Transfer Tax, and Buyer shall pay any Transfer Tax on those sums or consideration.  All refunds or credits of VAT paid by Buyer under this <u>Section 9.01</u> shall belong to Buyer.

Section 9.02.  <u>Tax Adjustments</u>.  For purposes of any Taxes which need to be apportioned under this Agreement between a taxable period beginning before and ending on or after the Closing Date (a "**Straddle Period**") that are imposed upon or assessed directly against the Transferred Assets on a periodic basis ("**Periodic Taxes**," including real estate Taxes, personal property Taxes and similar Taxes, and for the avoidance of doubt not to include Taxes of Sellers, income Taxes, or Transfer Taxes), such Taxes will be apportioned and prorated between Sellers and Buyer as of

34

the Closing Date, based on such Party's proportionate share of such Taxes, which shall, in the case of Buyer, be equal to the product obtained by multiplying (a) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Straddle Period, multiplied by (b) the number of days in the Straddle Period following the Closing Date. Buyer shall bear such post-Closing portion of Periodic Taxes and Sellers shall bear the remaining portion of such Taxes. If the precise amount of any such Periodic Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed using the last fully ascertainable tax bill for the Tax period immediately preceding the Straddle Period.

Section 9.03.    Tax Cooperation.   Without limiting the obligations set forth in Sections 6.02 and 7.01, the Parties shall furnish or cause to be furnished to each other, upon request, and at the sole cost of the requesting Party, as promptly as practicable, such information and assistance relating to the Transferred Assets, the Assumed Liabilities or the Business as is reasonably necessary for the filing of Tax Returns, the making of any election related to Taxes permitted to be made under this Agreement, and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating to Taxes (it being understood that Sellers and their cooperation obligations hereunder shall cease as of the Wind-Up Date). Buyer agrees that it shall preserve and keep, or cause to be preserved and kept, all original books and records in respect of the Business relating to Taxes with respect to taxable years or periods (or portion thereof) ending on or before the Closing Date and in the possession of Buyer or its Affiliates in accordance with Section 7.03.

Section 9.04.    Survival.  The obligations of Buyer set forth in Section 9.01 (Transfer Taxes), Section 9.02 (Tax Adjustments) and Section 9.03 (Tax Cooperation) shall survive the Closing until the first (1st) anniversary of the Closing Date. For the avoidance of doubt, nothing in this Article IX shall create any post-Closing obligation or Liability of Sellers to Buyer.

Section 9.05.   Adjustment to Purchase Price.  The Parties agree to treat any payment made pursuant to this Agreement as an adjustment to the Purchase Price for all Tax purposes, unless otherwise required by applicable Law.

## ARTICLE X

## CONDITIONS TO CLOSING; TERMINATION

Section 10.01. Closing Conditions.   The obligations of each Party to consummate the Transactions shall be subject to the satisfaction or waiver by such Party, at or before the Closing, of each of the following conditions:

(a)     Representations and Warranties.  All representations and warranties of Sellers contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for purposes of determining the satisfaction of the condition in this clause (a), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties.

35

(b)     Covenants.  The covenants contained in this Agreement required to be performed or complied with by Sellers at or before the Closing shall have been performed or complied with, except where the failure to so perform or comply would not reasonably be expected to have a Material Adverse Effect.

(c)     Closing Certificate. Buyer shall have received a certificate signed by an authorized officer of each Seller, dated as of the Closing Date, certifying as to the satisfaction of the matters set forth in Sections 10.01(a) and (b).

(d)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to any stay.

(e)     Notice of Assumption of Transferred Contracts. Sellers shall have timely filed the Assumption and Assignment Notice for the Transferred Executory Contracts in accordance with Section 2.06(a).

(f)     No Order.  There shall be no Order in existence that prohibits the sale of the Transferred Assets or the other Transactions and no Government Authority in the United States shall have enacted, issued or promulgated any statute, rule or regulation that makes illegal the consummation of the Transactions.

Section 10.02. Waiver of Closing Conditions.  Section 9.05Upon the occurrence of the Closing, any Closing Condition that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

Section 10.03. Frustration of Closing Conditions.  Section 9.05Neither Sellers nor Buyer may rely on the failure of any Closing Condition to be satisfied if such failure was caused by such Party's failure to act in good faith.

Section 10.04. Termination.  This Agreement may be terminated before the Closing:

(a)     by the mutual written consent of Sellers and Buyer;

(b)     by either Sellers or Buyer, if the Closing shall not have occurred by July 15, 2026 (the "**Initial Outside Date**"); *provided,* that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order and if all other Closing Conditions shall have been fulfilled or waived, then the Initial Outside Date shall be automatically extended to the date that is seven (7) days from the Initial Outside Date (the "**Extended Outside Date**"); *provided, further*, that a Party whose material breach of this Agreement caused the failure to close may not terminate pursuant to this Section 10.04(b)clause;

(c)     by either Sellers or Buyer, if any Government Authority of competent jurisdiction shall have issued a final, non-appealable Order permanently enjoining the consummation of the Transactions; *provided,* that this right Section 10.04(c)shall not be available to a Party whose action or failure to act caused such Order;

(d)     by Sellers, if Buyer shall have breached any representation, warranty, or covenant **Error!  Reference source not found.**in any material respect that would cause any

Closing Condition set forth in Section 10.01 not to be satisfied and such breach is not cured within ten (10) Business Days after receipt by Buyer of written notice thereof (or, if earlier, the Initial Outside Date or Section 10.04(b) Extended Outside Date, as applicable); *provided*, that no Seller is then in material breach of this Agreement;

(e)  by Buyer, if Sellers shall have breached any representation, warranty, or covenant **Error! Reference source not found.** in any material respect that would cause any Closing Condition set forth in Section 10.01 not to be satisfied and such breach is not cured within ten (10) Business Days after receipt by Sellers of written notice thereof (or, if earlier, the Initial Outside Date or Section 10.04(b) Extended Outside Date, as applicable); *provided,* that Buyer is not then in material breach of this Agreement; or

(f)  by Buyer, if (i) any Seller moves to voluntarily dismiss its Bankruptcy Case or convert its Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or (ii) the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Cases of any Seller to a case under Chapter 7 of the Bankruptcy Code.

Section 10.05. Effect of Termination.  If this Agreement is terminated pursuant to Section 10.04, this Agreement shall become null and void and of no further force or effect, except that (i) Section 6.03 (Confidentiality), (ii) this Section 10.05, and (iii) Article XI (Miscellaneous) shall survive such termination; *provided*, that nothing herein shall release any Party from Liability for any knowing and intentional breach of this Agreement prior to the date of termination or for willfully and knowingly committed fraud by such Party with the specific intent to deceive and mislead, as determined by the Bankruptcy Court, or impair any Party's right to seek specific performance pursuant to Section 11.15.  Buyer acknowledges that the agreements contained in this Section 10.05 are an integral part of the Transactions and that Sellers may seek any other remedies at Law or equity arising from Buyer's breach of this Agreement.

**ARTICLE XI**

**MISCELLANEOUS**

Section 11.01. Rules of Construction.  Unless the context otherwise requires: (a) references to any statute, rule or regulation include such statute, rule or regulation as amended, modified or replaced from time to time; (b) when calculating periods of time, the reference date is excluded and, if the last day falls on a non-Business Day, the period ends on the next Business Day; (c) words in the singular include the plural and vice versa, and words of one gender include the other gender; (d) headings are for convenience only and shall not affect interpretation, and references to "Article," "Section," "Schedule" and "Exhibit" refer to this Agreement unless otherwise specified; (e) "include," "includes" and "including" mean "including, without limitation," "or" is not exclusive, and "$" means U.S. dollars; (f) each Party has participated in the negotiation and drafting of this Agreement, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision herein; and (g) prior drafts shall not be used as an aid of construction.

Section 11.02. Expenses.  Except as specified in the Transaction Agreements, each Party will pay its own costs and expenses, including legal, consulting, financial advisor, accounting and

other fees and expenses, incurred in connection with the Transaction Agreements and the Transactions.

Section 11.03. Notices.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) upon receipt when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 11.03):

| | |
|---|---|
| If to Sellers, to: | First Brands Group Holdings, LLC<br>127 Public Square, Suite 300<br>Cleveland, OH 44114<br>Attention: Charles M. Moore<br>E-mail: cmoore@alvarezandmarsal.com |
| with a copy (which will not constitute notice) to: | Katten Muchin Rosenman LLP<br>50 Rockefeller Plaza<br>New York, NY 10020-1605<br>Attention: Evan S. Borenstein; Cindi M. Giglio; Steven J. Reisman<br>E-mail: eborenstein@katten.com; cgiglio@katten.com; sreisman@katten.com |
| If to Buyer or Guarantor, to: | Press-Seal Corporation<br>2424 West State Blvd.<br>Fort Wayne, Indiana 46808<br>Attention:  Peter J. Skinner, CEO<br>E-mail: pskinner@press-seal.com |
| with a copy (which will not constitute notice) to: | Taft Stettinius & Hollister LLP<br>One Indiana Square, Suite 3500<br>Indianapolis, Indiana 46024<br>Attention:  Zachary E. Klutz; W. Timothy Miller<br>E-mail:     zklutz@taftlaw.com; miller@taftlaw.com |

Section 11.04. Survival.  Except for any covenant that by its terms is to be performed (in whole or in party) by any Party following the Closing (which covenants shall survive the Closing in accordance with their terms),  none of the representations, warranties, or covenants of any Seller set forth in Section 9.04Section 10.05this Agreement shall survive the Closing, and each of the same shall terminate and be of no further force or effect as of the Effective Time. For the avoidance of doubt, no claim (other than for willfully and knowingly committed fraud with the specific intent

38

to deceive and mislead) may be brought against any Seller or any of its Affiliates, Representatives, or agents after the Closing based on any representation, warranty, or pre-Closing covenant of any Seller set forth herein. The covenants of Buyer that by their terms are to be performed following the Closing (including Buyer's obligations under Article IX and Section 11.05) shall survive the Closing in accordance with their terms.

Section 11.05. <u>Limitation on Liability; No Post-Closing Recourse</u>.   Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary: (a) Sellers shall have no Liability to Buyer or any of its Affiliates following the Closing with respect to any matter arising under or relating to this Agreement or any other Transaction Agreement (other than Liability for willfully and knowingly committed fraud with the specific intent to deceive and mislead); (b) Buyer acknowledges that, as of the Closing, it shall have no right of recourse, offset, claim, counterclaim or Action of any kind against any Seller or any of their respective Affiliates, Representatives, or agents (including Hilco Merchant Resources, LLC, Hilco Receivables, LLC, Hilco Global Professional Services, LLC or their affiliates) with respect to any matter arising under or relating to this Agreement or the Transferred Assets, except as expressly set forth in this Agreement with respect to pre-Closing covenants that by their terms survive the Closing; and (c) in no event shall any Party have any Liability under this AgreementArticle XI for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); *provided,* that such limitation set forth in clause (c) of this Section 11.05 shall not limit any Party's right to recover contract damages in connection with or resulting from such Party's failure to close the Transactions in breach or violation of this Agreement.

Section 11.06. <u>Public Announcements</u>.  No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, conditioned or delayed), except as is required by applicable Law or by Order of the Bankruptcy Court (in which case the disclosing Party, to the extent practicable under the circumstances and permissible by Law, shall (a) advise the other Parties before making such disclosure and (b) provide each such other Party a reasonable opportunity to review and comment on such release or announcement and consider in good faith any comments with respect thereto).

Section 11.07. <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the Government Authority making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 11.08. <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; *provided, however*, that (a) Buyer may assign this Agreement and any or all rights under this Agreement to any of its Affiliates and (b) Sellers may assign any of their rights or obligations under this Agreement to any of their Affiliates or to any plan administrator, liquidator, liquidating trust, "winddown" vehicle, examiner, receiver, trustee or similar party appointed on its behalf following the Closing; *provided, further*, that no such assignment pursuant to the foregoing shall release any other Party from any Liability under this Agreement.  Any attempted assignment in violation of this <u>Section 11.08</u> shall be void *ab initio*.

Section 11.09. <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to (i) Guarantor and (ii) the Nonparty Affiliates pursuant to <u>Section 11.16</u>, Katten Muchin Rosenman LLP pursuant to <u>Section 11.18</u> or as otherwise expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party, including any Affiliates of any Party.

Section 11.10. <u>Entire Agreement</u>.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all Exhibits and Schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 11.11. <u>Amendments; Waiver</u>.   This Agreement may be amended, restated, supplemented or otherwise modified only by written agreement duly executed by Buyer and Sellers.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 11.12. <u>Governing Law</u>.  This Agreement, and any Action or claim that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 11.13. <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)       Without limiting any Party's right to appeal any Order of the Bankruptcy Court (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected

with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.03 (as may be updated from time to time in accordance with Section 11.03); *provided, however*, that upon the closing of the Bankruptcy Cases, or if the Bankruptcy Court does not have subject matter jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (or, solely in the event the Court of Chancery of the State of Delaware declines to exercise such jurisdiction, the exclusive jurisdiction of any federal or state court sitting in the City of Wilmington, Delaware) and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)        submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)       agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)      agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 11.03 (as may be updated from time to time in accordance with Section 11.03) of any process required by any such court, will be effective service of process; *provided, however*, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)       The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

Section 11.14. Waiver of Jury Trial.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this Section 11.14 with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 11.15. Remedies; Specific Performance.

(a)       Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not

41

exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort Causes of Action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 11.16. <u>Non-Recourse</u>.  All claims, obligations, Liabilities, Actions or Causes of Action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of any of the foregoing or any successors and assigns ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, Causes of Action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Causes of Action, obligations and other Liabilities against any such Nonparty Affiliates.  It is expressly agreed that the Nonparty Affiliates to whom this <u>Section 11.16</u> applies shall be third-party beneficiaries of this <u>Section 11.16</u>.

Section 11.17. <u>Disclosure Schedules and Exhibits</u>.  The Disclosure Schedules, schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement. Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall have the meanings set forth in this Agreement. Any matter disclosed in the Disclosure Schedules under any specific section shall be deemed disclosed and incorporated by reference in any other section to the extent the applicability to such other section is reasonably apparent on its face.

Section 11.18. <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Katten Muchin Rosenman LLP may serve as counsel to Sellers, on the one hand, and any Debtor, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Katten Muchin Rosenman LLP may serve as counsel to any Seller or any Affiliate or Representative of any Seller, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates and Representatives to consent to waive any conflict of interest arising from such representation.

Section 11.19. <u>Privilege</u>.  Buyer, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of potential willfully and knowingly committed fraud with the specific intent to deceive and mislead (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between any Seller and their respective current or former Affiliates or Representatives and their counsel, including Katten Muchin Rosenman LLP, made before the consummation of the Closing in connection with the negotiation, preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall continue after the Closing to be privileged communications with such counsel and neither Buyer nor any of its former or current Affiliates or Representatives nor any Person purporting to act on behalf of or through Buyer or any of its current of former Affiliates or Representatives, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Buyer or the Business or on any other grounds.

Section 11.20. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Sellers and Buyer have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**PRINCIPAL SELLER:**

FIRST BRANDS GROUP HOLDINGS, LLC

By: _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**SELLERS:**

JASPER ACQUISITION CORP.

By: _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

JASPER RUBBER PRODUCTS, INC.

By: _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

[Signature Page to Asset Purchase Agreement]

**BUYER:**

JASPER ACQUISITION CO., LLC

Signed by:

*Peter J. Skinner*

By: _____
E89BAC38EF4E46B

Name: Peter J. Skinner
Title: President

**GUARANTOR (solely for purposes of Section 6.09):**

PRESS-SEAL CORPORATION

Signed by:

*Peter J. Skinner*

By: _____
E89BAC38EF4E46B

Name: Peter J. Skinner
Title: Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

EXHIBIT A

**FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [●], 2026, is made by and among First Brands Group Holdings, LLC, Jasper Rubber Products, Inc. and Jasper Acquisition Corp. (each, individually, an "Assignor", and collectively, "Assignors") and Jasper Acquisition Co., LLC, an Indiana limited liability company ("Assignee") (each of the Assignors and Assignee, a "Party" and, together, the "Parties"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in that certain Asset Purchase Agreement (as amended, supplemented or otherwise modified, the "Purchase Agreement"), dated as of June 24, 2026, by and among Assignors, Assignee, and, solely for purposes of Section 5.08 and Section 6.09 thereof, Press-Seal Corporation, an Indiana corporation ("Guarantor")).

**WHEREAS**, Assignors and Assignee have entered into the Purchase Agreement pursuant to which Assignors desire to sell to Assignee, and Assignee desires to purchase from Assignors, the Transferred Assets, and Assignee desires to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement;

**WHEREAS**, pursuant to the Purchase Agreement and this Agreement, each of the Assignors shall sell, convey, assign, transfer and deliver to Assignee, and Assignee shall purchase, acquire and accept from each such Assignor, all of such Assignor's right, title and interest in, to and under the Transferred Assets, in each case on the terms and subject to the conditions set forth in the Purchase Agreement and the Sale Order;

**WHEREAS**, pursuant to the Purchase Agreement and this Agreement, Assignee shall assume and thereafter timely pay, discharge and perform in accordance with their terms the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement; and

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Assignment of Transferred Assets.  Effective as of the Effective Time, on the terms and subject to the conditions set forth in the Purchase Agreement (including Sections 2.02(a), 2.02(b) and 2.03 thereof) and the Sale Order, each Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee, and Assignee hereby purchases, acquires and accepts from each such Assignor, all of such Assignor's right, title and interest in, to and under the Transferred Assets.

2.      Assumption of Assumed Liabilities.  Effective as of the Effective Time, on the terms and subject to the conditions set forth in the Purchase Agreement (including Sections 2.02(c), 2.02(d), 2.03 and 2.06 thereof), Assignee hereby assumes and agrees to timely pay, discharge and perform in accordance with their terms the Assumed Liabilities.

3.      No Additional Representations; "As-Is, Where-Is" Sale.  This Agreement does not create or expand any representation or warranty of any Assignor made in the Purchase

305600737

Agreement, and the Transferred Assets are being sold and conveyed pursuant to Section 363 of the Bankruptcy Code and the Sale Order in connection with the wind-down of Assignors' operations and not as a going-concern transfer, on a "where-is" and, as to condition, "as-is" basis, with all faults and defects, subject only to the representations and warranties expressly set forth in Article IV of the Purchase Agreement (as modified by the Disclosure Schedules).

4.    Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

5.    Conflict.  The respective rights and obligations of Assignors and Assignee with respect to the Transferred Assets sold, conveyed, assigned, transferred and delivered hereby and the Assumed Liabilities assumed hereby shall be governed exclusively by the Purchase Agreement, Sale Order and this Agreement shall not alter, amend, expand or diminish any liability, obligation, representation, warranty, covenant, right or remedy arising under the Purchase Agreement.  If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

6.    Remedies; Limitations on Liability.  The remedies of the Parties, and any limitations on liability, survival, recourse or damages with respect to any breach of this Agreement, shall be as set forth in the Purchase Agreement.

7.    Notices.  All notices and other communications under or by reason of this Agreement shall be given in accordance with Section 11.03 of the Purchase Agreement.

8.    Severability.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the Government Authority making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

9.    Amendments.  This Agreement may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

10.    Further Assurances.  From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquaintances and other documents or instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the transactions contemplated by this Agreement and the Purchase Agreement as may be reasonably requested by the other Party, it being understood that the obligations of each Assignor under this Section shall terminate with respect to such Assignor on the Wind-Up Date; provided, however, that except for Assignee's obligations to discharge an Assumed Liability and as otherwise provided pursuant to Section 2.05 of the Purchase Agreement, nothing in this Section

shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation to, any third party following the Closing.

11. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

12. Governing Law. This Agreement, and any Action or claim that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

13. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except to the extent expressly set forth in the Purchase Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

14. Entire Agreement. This Agreement, the Purchase Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof. Notwithstanding any other provision of this Agreement to the contrary, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall control.

[*Signature page follows*]

IN WITNESS WHEREOF, Assignors and Assignee have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

ASSIGNORS
FIRST BRANDS GROUP HOLDINGS, LLC

By: _____
Name:
Title:

JASPER ACQUISITION CORP.

By: _____
Name:
Title:

JASPER RUBBER PRODUCTS, INC.

By: _____
Name:
Title:

[SIGNATURE PAGE TO BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT]

ASSIGNEE
JASPER ACQUISITION CO., LLC


By: _____
Name:
Title:

[SIGNATURE PAGE TO BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT]

**EXHIBIT B**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT ("Assignment"), dated [●], 2026, is by and between [Seller Party], a [●] organized and existing under the laws of [●] ( "Assignor"), and Jasper Acquisition Co., LLC, a limited liability company organized and existing under the laws of Indiana ("Assignee") (each of Assignor and Assignee, a "Party" and, together, the "Parties").

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of June 24, 2026, by and among First Brands Group Holdings, LLC, Assignor and Assignee (as amended, supplemented or otherwise modified, the "Purchase Agreement"), Assignor has agreed to sell, convey, assign, transfer, and deliver, or cause Assignor to sell, convey, assign, transfer, and deliver, to Assignee, and Assignee agreed to purchase, acquire and accept delivery from Assignor, all of Assignor's right, title and interest in, to, and under the intellectual property set forth on Exhibit A hereto (the "Assigned IP"), which constitutes Transferred Assets (as defined in the Purchase Agreement).

NOW, THEREFORE, in consideration of the mutual agreements, covenants and other premises set forth herein and in the Purchase Agreement and for other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged:

1. Assignment of Intellectual Property. Assignor hereby sells, assigns and transfers to Assignee all of its right, title and interest in, to and under the Assigned IP as set forth in Exhibit A, free and clear of any liens, encumbrances, or security interests, and all other corresponding rights at common law or otherwise that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, and together with all of the goodwill associated with and symbolized by the trademarks included in the Assigned IP.

2. No Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE PURCHASE AGREEMENT, NO EXPRESS OR IMPLIED WARRANTIES ARE GIVEN BY ASSIGNOR WITH RESPECT TO ANY ASSIGNED IP REGARDING THE VALIDITY, REGISTRABILITY, TITLE, SCOPE, ENFORCEABILITY OR NON-INFRINGEMENT OF ANY INTELLECTUAL PROPERTY SUBJECT TO THIS AGREEMENT.

3. Binding Agreement. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

4. Severability. If any term or provision of this Assignment is held invalid, illegal or unenforceable in any respect under any applicable law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Assignment will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other government authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

5. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

6. <u>Further Assurances</u>.  Each of the Parties shall execute and deliver such additional documents, papers, instruments, conveyances, assurances, forms, and authorizations, and take such other actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment, including any actions required to file and record this Assignment, or the equivalent of this Assignment to the extent required with the United States Patent and Trademark Office, United States Copyright Office or any relevant offices in non-U.S. jurisdictions as necessary to record Assignee as the assignee and owner of the Assigned IP.

7. <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

8. <u>Governing Law</u>.  This Assignment, and any Action or claim that may be based upon, arise out of or relate or be incidental to any Transaction, this Assignment, the Purchase Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

9. <u>No Third-Party Beneficiaries</u>.  Nothing in this Assignment shall create or be deemed to create any third-party beneficiary rights in any person not a party hereto, including any affiliates of any Party.

10. <u>Entire Agreement; Precedence</u>.  This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof. Notwithstanding any other provision of this Assignment to the contrary, in the event and to the extent that there shall be a conflict between the provisions of this Assignment and the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall control.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the date first above written.

**Assignor:**

**[●]**

By: _____

Name:
Title:

[SIGNATURE PAGE TO IP ASSIGNMENT AND ASSUMPTION AGREEMENT]

**Assignee:**

JASPER ACQUISITION CO., LLC

By: _____

Name:
Title:

[SIGNATURE PAGE TO IP ASSIGNMENT AND ASSUMPTION AGREEMENT]

**EXHIBIT A**

**ASSIGNED IP**

[Relevant portions of [Schedule 2.02] (Intellectual Property) of the Purchase Agreement to be included here.]

**EXHIBIT C**

**FORM OF SALE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**ORDER AUTHORIZING AND APPROVING THE SALE OF ASSETS OF THE**
**JASPER RUBBER BUSINESS TO JASPER ACQUISITION CO., LLC**

Upon the Motion[2] of First Brands Group, LLC and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

seeking entry of an order (this "**Order**") pursuant to sections 105 and 363 of the Bankruptcy Code

and Bankruptcy Rules 2002, 6004, and 9008, and section N of the Procedures for Complex Cases

in the Southern District of Texas (the "**Complex Case Procedures**") (i) authorizing the sale of the

Transferred Assets to the Buyer pursuant to that certain *Asset Purchase Agreement*, dated as of

June 24, 2026 (together with all other agreements, documents, and instruments, deliverable

thereunder or attached thereto or referenced therein, and as may be amended, supplemented, or

otherwise modified from time to time in accordance with the terms thereof, the "**Purchase**

**Agreement**", a true and correct copy of which is attached hereto as **Exhibit 1**), by and among First

Brands Group Holdings, LLC and certain of its subsidiaries named therein, as Sellers (collectively,

the "**Sellers**"), Jasper Acquisition Co., LLC, as Buyer (the "**Buyer**"), and Press-Seal Corporation,

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these
chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    As used herein, "**Motion**" means the *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper
Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]).

as Guarantor, free and clear of all liens, claims, encumbrances and interests, except for Assumed Liabilities and Permitted Liens, (ii) authorizing and approving the form and manner of notice of the hearing on the sale of the Transferred Assets, and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the Jerneycic Declaration,[3] the First Day Declaration,[4] any other declaration filed in support of the Sale and the record of the Sale Hearing; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

---

[3]   The "**Jerneycic Declaration**" means the *Declaration of Daniel Jerneycic in Support of Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]).

[4]   The "**First Day Declaration**" means the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22).

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

B.      The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.  On October 9, 2025, the United States Trustee for Region 7 appointed an official committee of unsecured creditors [Docket No. 113].

C.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

D.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      On January 8, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* [Docket No. 1253] (the "**Bidding Procedures Motion**"), which sought Court approval of an expedited timeline and auction procedures for the Debtors' sale

process.  The Debtors filed the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* [Docket No. 1324] (the "**Initial Notice**"), which provided all interested parties with notice of the Debtors' intent to sell all their assets pursuant to one or more sale transactions.  On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix, and the Sale Notice Parties (as defined in the Bidding Procedures Motion). *See Affidavit of Service* [Docket No. 1718]. The Debtors subsequently published the Initial Notice in the national edition of The New York Times on January 16, 2026, as reflected in the *Certificate of Publication* [Docket No. 1645] (the "**Initial Publication Notice**").

F.      On March 23, 2026, the Debtors filed the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2216] (the "**Wind Down Motion**"), which disclosed the Debtors' intention to wind down certain brands and asset classes.  On March 24, 2026, the Wind Down Motion was served on the Debtors' Master Service List [Docket No. 2239].

G.      On April 16, 2026, the Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No.2454) (the "**Wind Down Order**"), pursuant to which, among other things, the Court authorized the Debtors and their Consultant (as defined in the Wind Down Motion) to sell certain Wind Down Assets.

H.       On May 15, 2026, the Debtors filed the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**First Expansion Notice**"), which was served on all parties entitled to service of such notice under the terms of the Wind Down Order, including the Debtors' Master Service List. *See* Docket No. 2761.  Pursuant to the First Expansion Notice, the Debtors expanded, consistent with Paragraphs 50 and 51 of the Wind Down Order, the scope of brands, business units, and asset classes, including intellectual property, machinery and equipment and real estate, subject to the Wind Down Order to include, among other things, the Debtors' "Filters and Plugs" business unit and related legal entities, including the Debtors' Jasper Rubber business.

I.       On May 28, 2026, the Debtors filed the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829], which was served on all parties entitled to service of such notice under the terms of the Wind Down Order, including the Debtors' Master Service List (*see* Docket No. 2877), and expanded the Wind Down to First Brands Holdings, LLC and all Debtor subsidiaries.

J.       In accordance with the Wind Down Order, on May 27, 2026, the Debtors and Hilco Merchant Resources, LLC entered into a Machinery and Equipment Agreement under which Hilco Merchant Resources, LLC serves as the Debtors' exclusive agent with respect to specified machinery and equipment.

K.       In accordance with the Wind Down Order, on May 28, 2026, the Debtors and Hilco IP Services, LLC, Hilco Real Estate, LLC, and Hilco Global Mexico, S. de R.L. de C.V. entered into an Intangible Assets, Real Estate and Other Assets Marketing Agreement under which those entities serve as the Debtors' exclusive agents with respect to specified intangible assets, real estate, and other assets.

L.      In accordance with the Wind Down Order, the Debtors selected Buyer as the purchaser of certain assets (the "**Transferred Assets**") related to the Debtors' business commonly known as the "Jasper Rubber Products", as more particularly described in the Purchase Agreement.

M.      On June 24, 2026, First Brands Group Holdings, LLC and certain of its subsidiaries (each, a "**Seller**") and Buyer entered into the Purchase Agreement, under which Buyer agreed to purchase the Transferred Assets for $8,030,000 in cash and the assumption of the Assumed Liabilities, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order, free and clear of all Liens, Liabilities, claims, and interests other than the Assumed Liabilities and Permitted Liens (the "**Sale**").  The Transferred Assets include certain Executory Contracts, approval of the assumption and assignment of which the Debtors will seek through the Court's *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1244].

N.      In accordance with the Wind Down Order, on June 19, 2026, the Debtors served a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties comprising:  the U.S. Trustee, the Ad Hoc Group, the Creditors' Committee, the known creditors with an Asserted Interest, and the Landlord for the applicable Location with respect to the Transferred Assets.  The Wind Down Sale Notice: (a) identified the Transferred Assets (including the business units and legal entities with which the Transferred Assets are associated), (b) identified Buyer as the purchaser of the Transferred Assets, (c) stated the $8,030,000 purchase price, (d) stated that the Transferred Assets constitute Overlapping Collateral, and (e) described the other significant terms of the Sale.  The Notice Period set forth in the Wind Down Order has expired, and either (i) parties

entitled to object have not interposed an objection to the Sale, or (ii) the Debtors have obtained the consent of those parties whose consent to the Sale is required by the Wind Down Order, including all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets. *See* Wind Down Order ¶¶ 25-26, 42.

O.   On June [__], 2026, the Debtors filed the *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [_]) (the "**Motion**").

P.   On June [__], 2026, the Debtors served notice of the Purchase Agreement, the Sale and Sale Hearing, in the form attached as **Exhibit B** to the Motion (the "**Jasper Sale Notice**") on the Sale Notice Parties.   The Debtors subsequently published the Jasper Sale Notice in *The Indianapolis Star* as reflected in the *Certificate of Publication* [Docket No. ____] (the "**Jasper Publication Notice**").

Q.   Entry of this Order is in all respect consistent with the Wind Down Order, in the best interest of the Debtors and their creditors and parties in interest, and necessary and appropriate to approve the Purchase Agreement and the Sale, authorize the transfer of the Transferred Assets, and grant Buyer the protections set forth herein.

R.   The Jerneycic Declaration supports the Sale and the relief granted in this Order.

**IT IS HEREBY ORDERED THAT:**

1.   The Motion is GRANTED as set forth herein.

2.   Any objections, responses or reservations of rights filed or asserted in regard to the Sale and the relief granted herein, to the extent not resolved as set forth herein, settled, or waived as announced to the Court on the record at the Sale Hearing, are hereby overruled on the merits in their entirety.

A.  **Jurisdiction and Statutory Predicates**

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

4.      The statutory predicates for the relief granted herein are sections 105(a), 363, and 541 of the Bankruptcy Code and Rules 2002, 6004, and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  This Order is a final and appealable order. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014.  Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

B.  **Background, Business Justification, and Notice**

5.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and authorization to close, and compelling circumstances to promptly consummate, the Sale and the other transactions contemplated by the Purchase Agreement, pursuant to Sections 105, 363, 1107, and 1108 of the Bankruptcy Code, prior to and outside of a plan of reorganization for any Seller, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, creditors, and other parties in interest.  Such business reasons include, but are not limited to, the fact that:  (i) there is substantial risk of depreciation of the value of the Transferred Assets if the Sale is not consummated promptly; (ii) the Sale of the Transferred Assets and the assumption of the Assumed

Liabilities pursuant to the Purchase Agreement at the Closing present the best opportunity and represent the best method to maximize the value of the Transferred Assets for the benefit of the Debtors, their estate, creditors, and other parties in interest; (iii) the purchase price and other terms set forth in the Purchase Agreement constitute the highest or otherwise best offer received for the Transferred Assets; and (iv) unless the Sale is concluded expeditiously, as provided for in the Wind Down Order and this Order and pursuant to the Purchase Agreement, the Debtors and their estates could receive significantly less value for all stakeholders.

6.      The Debtors, in consultation with the Consultant and their advisors, reasonably determined in their business judgment that the Purchase Agreement represents the highest or otherwise best actionable transaction available for the Transferred Assets under the circumstances and is in the best interests of the Debtors, their estates, creditors, and parties in interest.  Under the Purchase Agreement, Buyer will pay a cash purchase price of $8,030,000 and will assume certain Assumed Liabilities in exchange for the Transferred Assets, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order.  The purchase and sale of the Transferred Assets was marketed, brokered, and facilitated by the Consultant solely in the Consultant's capacity as agent for the Debtors pursuant to the Wind Down Order, and the Consultant is not taking title to the Transferred Assets before the Sale and is not a party to the Purchase Agreement.

7.      The Sale is a Wind Down Sale under the Wind Down Order.  The Transferred Assets are Wind Down Assets under the Wind Down Order or are otherwise authorized to be sold pursuant to this Order, the Bankruptcy Code, the Purchase Agreement, and any other applicable orders.  All requirements under the Wind Down Order, including any required notice, consent,

asset designation, asset-class or legal-entity addition, objection-period expiration, or further-order requirement has been satisfied, waived, resolved, or approved by this Order.

8.      Entry of this Order approving the Sale, the Purchase Agreement, and all provisions thereof are a necessary condition precedent to the Buyer consummating the Sale. The provisions of this Order and the Purchase Agreement and the transactions contemplated by this Order and the Purchase Agreement and Sale to the Buyer are inextricably linked and technically and collectively constitute a single, integrated transaction.

9.      The Debtors have noticed the Sale through (i) the Wind Down Sale Notice served on all parties required to receive notice under the Wind Down Order, (ii) the Jasper Sale Notice served on the Sale Notice Parties, and (iii) the Jasper Publication Notice. The Wind Down Sale Notice identified the Transferred Assets, the applicable business units and legal entities, the Buyer, the Purchase Price, whether the Transferred Assets constitute Overlapping Collateral, and the other significant terms of the Sale. The applicable notice periods have expired, and all objections, if any, have been resolved, withdrawn, waived, or are overruled by this Order. The Debtors have obtained consent to the Sale from all known creditors with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets.

10.      The notice provided in connection with the Sale, the Purchase Agreement, and this Order, including the Wind Down Sale Notice served on the Wind Down Sale Notice Parties and the Jasper Sale Notice served on the Sale Notice Parties, is proper, timely, good, sufficient, and adequate notice to each party entitled to such notice in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007 and Local Bankruptcy Rule 2002-1 and 9013-1, the Wind Down Order, and the circumstances of these chapter 11 cases. No other or further notice is required. With respect to parties whose identities or addresses are not

reasonably ascertainable by the Debtors, publication of notice of the Sale as evidence by the Initial Publication Notice and the Jasper Rubber Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties.  A reasonable opportunity to object or to be heard regarding the relief granted in this Order was afforded to all interested persons and entities entitled to such opportunity.

### C.  Transferred Assets and Property of the Estate

11.     The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code or otherwise consist of transferable interests owned by one or more Debtors.  Those assets and interests may be sold under sections 363(b) and 363(f) of the Bankruptcy Code, and the transfer approved by this Order shall vest Buyer with the Debtors' right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims and interests, except solely for Assumed Liabilities.

12.     Pursuant to Sections 105(a), 363(b), and 363(f), of the Bankruptcy Code, and subject to the terms and conditions of the Purchase Agreement, the Debtors are authorized and directed to sell, transfer, convey, assign, and deliver the Transferred Assets to Buyer or one or more controlled affiliates or designees designated by Buyer under the Purchase Agreement (each, a "**Buyer Designee**") at the Closing in accordance with the Purchase Agreement, subject only to the Assumed Liabilities and Permitted Liens.  The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (as defined in the Purchase Agreement).

13.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Transferred Assets to the Buyer (or any Buyer Designee) in accordance with the Purchase Agreement and this Order.

14.     At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Buyer (or any Buyer Designee) pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Transferred Assets.

15.     This Order shall be effective as a determination that, as of the Closing, (a) the Transferred Assets shall have been transferred to the Buyer (or any Buyer Designee) free and clear of all Liens, Liabilities, claims, or interests, subject only to the Assumed Liabilities and the Permitted Lien, (b) holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code and holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Transferred Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing, and (c) the conveyances described herein have been effected.  The Transferred Assets are sold free and clear of any reclamation rights.

16.     Any Lien, Liability, claim, or interest in the Transferred Assets (other than an Assumed Liability or Permitted Lien) shall attach solely to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that it had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and all rights, claims, objections, defenses, and challenges of the Debtors, their estates, the Creditors'

Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

17.     Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding any Lien, Liability, claim, or interest arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets, and the ownership, sale, or operation of the Transferred Assets prior to Closing or the transfer of the Transferred Assets to the Buyer (or any Buyer Designee), are hereby forever barred, estopped, and permanently enjoined from asserting such Liens, Liabilities, claims, or interests against any Buyer Party and its property (including, without limitation, the Transferred Assets). Following the Closing, no such holder of any Lien, Liability, claim, or interest shall interfere with the Buyer's (or any Buyer Designee's) title to or use and enjoyment of the Transferred Assets based on or related to any such Lien, Liability, claim or interest, or based on any action the Debtors may take in their Chapter 11 cases.

D.   **Approval of the Purchase Agreement and Sale**

18.     The Purchase Agreement and all other ancillary documents, including any other documents contemplated by the Purchase Agreement or that are necessary or appropriate to complete the transactions provided for in the Purchase Agreement, and all of the terms and conditions thereof, and the Sale and related transactions contemplated therewith, are hereby approved in all respects.  The failure specifically to include any particular terms of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Purchase Agreement and the Sale be authorized and approved in their entireties.

19.     Pursuant to section 363 of the Bankruptcy Code, entry by the Debtors into the Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents are authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the sale of the Transferred Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (b) enter into all other agreements contemplated by the Purchase Agreement and consummate all other transactions contemplated by the Purchase Agreement, (c) consummate the Sale as contemplated in the Purchase Agreement and this Order, (d) continue performance under and make all payments required by the Purchase Agreement, and (e) execute and deliver, perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the Sale, or as may be reasonably necessary or appropriate to implement or perform any of the obligations contemplated by the Purchase Agreement and any other documentation relating to the Sale, all without further order of the Court.

20.     The transfer of the Transferred Assets to Buyer or any Buyer Designee shall vest Buyer or such Buyer Designee, as applicable, with all right, title, and interest in and to the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities and Permitted Liens.

21.     Each Buyer Designee shall be entitled to the protections of this Order with respect to the Transferred Assets acquired by such Buyer Designee.

22.     Buyer and any Buyer Designee are good-faith purchasers for value within the meaning of section 363(m) of the Bankruptcy Code and are entitled to the full protections of section 363(m) with respect to the Sale and the Transferred Assets.  Buyer is not an "insider" of any Debtor within the meaning of section 101(31) of the Bankruptcy Code.  The consideration to be paid by the Buyer under the Purchase Agreement was negotiated at arm's length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and is fair and reasonable under the circumstances.  The Sale contemplated by the Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

23.     Neither the Debtors, Buyer, nor any Buyer Designee has engaged in any conduct that would permit the Sale, the Purchase Agreement, or any transaction contemplated thereby to be avoided, set aside, or otherwise challenged under section 363(n) of the Bankruptcy Code.  The consideration provided by the Buyer for the Transferred Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

24.     Except as expressly provided in the Purchase Agreement or this Order, Buyer is purchasing the Transferred Assets on an "as is, where is" basis as to their physical condition, location, completeness, operability, merchantability, fitness for any particular purpose, and quality, and the Sale is final.  This paragraph does not limit, modify, or impair:  (a) the Debtors' obligation to transfer their right, title, and interest in the Transferred Assets free and clear of Liens,

Liabilities, claims, and interests as provided in this Order; (b) Buyer's no-successor-liability, excluded-liability, environmental, free-and-clear sale, and other protections under this Order; (c) Buyer's express rights, representations, warranties, covenants, or remedies under the Purchase Agreement or this Order; or (d) any non-waivable state or federal law relating to implied warranties for latent defects.

25.     All persons and entities, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce any Liens, Liabilities, claims, or interests against Buyer, Buyer's affiliates, Buyer's designees, the Transferred Assets, or any of Buyer's successors or assigns, except solely with respect to Assumed Liabilities and Permitted Liens.

26.     The Debtors, the Consultant, any warehouseman, bailee, custodian, agent, affiliate, employee, representative, or other person or entity in possession, custody, or control of any Transferred Assets shall surrender such Transferred Assets to Buyer or the applicable Buyer Designee on the Closing Date.

27.     No executory contract or unexpired lease of any Debtor or Seller is being assumed by the Debtors or assigned to Buyer under section 365 of the Bankruptcy Code or this Order, and Buyer shall not assume or be liable for any obligations thereunder.  Nothing in this paragraph limits Buyer's acquisition of rights that constitute Transferred Assets and are transferable without assumption and assignment under section 365 of the Bankruptcy Code.

E.  **Section 363(f) Findings**

28.     The Sale of the Transferred Assets to the Buyer (or any Buyer Designee) under the terms of the Purchase Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Transferred Assets will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial rights, title, and interests in the Transferred Assets free and clear of any and all Liens, Liabilities, claims, and interests, and will not subject any Buyer or any Buyer Designee to any Liens, Liabilities, claims, and interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Purchase Agreement with respect to the Assumed Liabilities and Permitted Liens.  The transfer of the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests (other than Assumed Liabilities and Permitted Liens) satisfies section 363(f) of the Bankruptcy Code because one or more of the following standards is satisfied with respect to each such Lien, Liability, claim or interest:  (a) applicable nonbankruptcy law permits sale of the Transferred Assets free and clear of such Lien, Liability, claim, or interest; (b) the holder of such Lien, Liability, claim or interest has consented, failed to object after receiving adequate notice, or is deemed to have consented; (c) to the extent such Lien, Liability, claim, or interest constitutes a lien, the purchase price for the Transferred Assets is greater than the aggregate value of all liens on the Transferred Assets; (d) such Lien, Liability, claim, or interest is in bona fide dispute; or (e) the holder of such Lien, Liability, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Lien, Liability, claim, or interest.

29.     The holders of Liens, Liabilities, claims, and interests will be adequately protected because any valid, enforceable, and non-avoidable Lien, Liability, claim, or interest (other than an

Assumed Liability or Permitted Lien) shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale to the same extent and with the same validity, priority, force, and effect that such Lien, Liability, claim, and interest had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

30.     The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale (i) if the transfer of the Transferred Assets were not free and clear of all interests of any kind or nature whatsoever or (ii) if the Buyer or any of his affiliates or designees would, or in the future could, be liable for any interests, in each case, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities and the Permitted Liens.  Not transferring the Transferred Assets free and clear of all interests of any kind or nature whatsoever would adversely impact the Debtors' efforts to maximize the value of the Transferred Assets.

**F.  No Successor Liability and No Assumed Liabilities**

31.     Neither the Buyer nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "**Buyer Parties**") is a continuation of the Debtors or their estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or

their estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and any of the Debtors.

32.     Buyer shall not be deemed, as a result of the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the ownership, operation or removal of the Transferred Assets, or the consummation of the transactions approved by this Order, to:  (a) be a successor to any Debtor or its estate; (b) be a continuation or substantial continuation of any Debtor or any Debtor's business; (c) have merged with any Debtor; (d) be part of a de facto merger with any Debtor; (e) be a mere continuation of any Debtor; (f) be a successor employer; (g) be a joint employer; (h) have common identity or continuity of enterprise with any Debtor; (i) be liable under any product-line, substantial-continuity, continuity-of-enterprise, successor-liability, transferee-liability, de facto merger, alter ego, veil-piercing, agency, vicarious liability, or similar theory; or (j) be liable for any Lien, Liability, claim, or interest arising from or relating to the Transferred Assets, the Debtors, the Debtors' businesses, or the Debtors' ownership, operation, shutdown, use, sale, transfer, removal, or disposition of the Transferred Assets before the Closing Date, except solely for the Assumed Liabilities and Permitted Liens.

33.     Except for the Assumed Liabilities and Permitted Liens expressly set forth in the Purchase Agreement, Buyer shall not assume, shall not be deemed to assume, and shall have no liability or responsibility for any Liability, Lien, claim, interest, debt, obligation, commitment, demand, expense, loss, cause of action, damage, penalty, fine, cost, duty, contract, lease, agreement, guarantee, warranty, litigation, judgment, assessment, tax, interest, encumbrance, or other obligation in respect of any Debtor, any Debtor's estate, any predecessor, affiliate, owner, equityholder, officer, director, manager, employee, agent, or representative of any Debtor, or any other person or entity, whether known or unknown, fixed or contingent, liquidated or unliquidated,

matured or unmatured, asserted or unasserted, arising before, on, or after the Petition Date or before, on, or after the Closing Date.

34.     Without limiting the foregoing, except solely for the Assumed Liabilities and Permitted Liens, Buyer shall not assume or be liable for any Liens, Liabilities, claims, or interests arising under, relating to, or based upon in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, Liens, Liabilities, claims (including intercompany claims), or interests on account of:

(a)     any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, conditional sale right, title retention right, mechanic's lien, materialman's lien, warehouse lien, carrier lien, judgment lien, tax lien, statutory lien, possessory lien, or similar interest;

(b)     any debt, claim (including any intercompany claim), obligation, or liability of any Debtor or any Debtor's estate;

(c)     any executory contract or unexpired lease of any Debtor or Seller;

(d)     any cure cost or default, claim, liability, or obligation under any executory contract or unexpired lease of any Debtor or Seller;

(e)     any collective bargaining agreement, memorandum of understanding, side letter, grievance, arbitration, labor agreement, union agreement, or obligation to any labor organization;

(f)      any claim under the Worker Adjustment and Retraining Notification Act, any state WARN Act or any similar plant-closing, mass-layoff, wage, notice, severance, or employee-protection statute;

(g)      any wage, salary, payroll, commission, bonus, incentive, vacation, paid-time-off, severance, retention, change-in-control, workers' compensation, unemployment, employee-benefit, retiree-benefit, health, welfare, medical, life insurance, disability, COBRA, pension, retirement, withdrawal-liability, multiemployer-plan, defined-benefit-plan, defined-contribution-plan, ERISA, PBGC, controlled-group, fiduciary, funding, termination, premium, contribution, or benefit claim;

(h)      any claim under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the National Labor Relations Act, the Labor Management Relations Act, the Occupational Safety and Health Act, ERISA, COBRA, or any other federal, state, or local labor, employment, employee-benefit, pension, workplace, health, safety, discrimination, wage, hour, leave, retaliation, or similar law;

(i)      any successor-liability, successor-employer, single-employer, joint-employer, de facto merger, substantial-continuity, mere-continuation, continuity-of-enterprise, product-line, alter-ego, agency, veil-piercing, transferee-liability, vicarious liability, or similar claim or theory;

(j)      any product liability, warranty, recall, customer claim, personal injury, property damage, tort, negligence, strict liability, indemnity, contribution, reimbursement, or similar claim arising from or relating to any Debtor's pre-Closing Date ownership, operation, design, manufacture, sale, distribution, repair, service, warranty, or use of any product, asset, equipment, inventory, tooling, or property;

(k)     any tax, bulk sale, bulk transfer, unclaimed property, escheat, sales, use, transfer, recording, stamp, documentary, value-added, excise, property, franchise, income, payroll, withholding, or similar claim, except as expressly allocated to Buyer under the Purchase Agreement;

(l)     any environmental claim, environmental liability, environmental fine, environmental penalty, environmental violation, environmental response cost, remediation cost, closure cost, corrective-action obligation, disposal liability, off-site disposal claim, natural resource damage claim, contamination claim, permit violation, air-emission claim, wastewater claim, stormwater claim, hazardous-waste claim, or release claim;

(m)     any liability arising from any litigation, arbitration, administrative proceeding, investigation, audit, notice of violation, regulatory action, enforcement action, consent order, settlement, judgment, decree, or claim against any Debtor or relating to any Debtor's pre-Closing Date conduct; and

(n)     any liability arising from or relating to the Debtors' operation, ownership, use, possession, shutdown, storage, removal, abandonment, rejection, sale, transfer, disposition, or wind-down of any assets, facilities, properties, contracts, leases, businesses, or operations before the Closing Date (collectively, "**Successor or Transferee Liability**").

35.     All persons and entities holding Liens, Liabilities, claims or interests of any kind or nature, including as a result of Successor or Transferee Liability, against any Debtor, any Debtor's estate, the Transferred Assets, or the proceeds thereof, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred,

estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce, including through any setoff, right of subrogation, or recoupment of any kind, any such Liens, Liabilities, claims or interests against Buyer, any Buyer's Designee, any Buyer Parties, the Transferred Assets, or any of Buyer's or its affiliates' successors or assigns, except solely with respect to the Assumed Liabilities expressly set forth in the Purchase Agreement.

### G. Liens, Proceeds, and Recording

36. All Liens, Liabilities, claims, and interests released from the Transferred Assets shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that such Liens, Liabilities, claims, and interests had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

37. This Order shall be effective as a determination that, as of the Closing Date, all Liens, Liabilities, claims, and interests against the Transferred Assets have been unconditionally released, discharged, and terminated as to Buyer and the Transferred Assets, except solely for Assumed Liabilities and Permitted Liens.

38. This Order is binding upon and shall govern the acts of all filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities. All such persons, agencies and entities are authorized and directed to accept this Order, the Purchase Agreement, any bill of sale, assignment, certificate, or other transfer document as conclusive evidence of the release, discharge, and

termination of all Liens, Liabilities, claims, and interests against Buyer or the Transferred Assets and as authority to record, file, or register the transfer of the Transferred Assets to Buyer free and clear of all Liens, Liabilities, claims and interests, except solely for Assumed Liabilities and Permitted Liens.

39.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, Liabilities, claims, or interests against or in the Transferred Assets does not deliver appropriate termination statements, instruments of satisfaction, releases, or other documents, Buyer and the Debtors are authorized to execute and file such termination statements, releases, satisfactions, or other instruments on behalf of such person or entity solely with respect to the Transferred Assets.

### H.  Bulk Sales, Transfer Taxes, and Resale Certificates

40.     No bulk sales, bulk transfer, bulk notice, successor-liability tax notice, or similar law shall apply to the Sale, the Purchase Agreement, the transfer of the Transferred Assets, or any transactions authorized by this Order.

41.     The transfer of the Transferred Assets shall not be subject to any stamp, transfer, recording, documentary, sales, use, or similar tax, fee, assessment, or charge.

42.     Buyer and the Debtors are authorized to provide and execute any resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate, or similar document available under applicable law in connection with the Sale or transfer of the Transferred Assets.

43.     All filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities are authorized and directed to accept this Order and any resale certificate, exemption certificate, direct-pay

permit, manufacturing exemption certificate, tax-exemption certificate, or similar document as sufficient evidence of any applicable exemption.

## I. Additional Provisions

44. Nothing in any chapter 11 plan, confirmation order, conversion order, dismissal order, appointment order, trustee appointment, plan supplement, trust agreement, collateral trust agreement, wind-down agreement, or other document or order in these chapter 11 cases or any successor case (including a converted case under chapter 7) shall conflict with, supersede, modify, impair, or otherwise affect Buyer's rights under the Purchase Agreement or this Order. The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in these Chapter 11 cases; (b) converting these Chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing these Chapter 11 cases; or (d) pursuant to which this Court abstains from hearing these Chapter 11 cases. The terms and provisions of this Order, notwithstanding the entry of any such orders described in (a)–(d) above, shall continue in these Chapter 11 cases, or following dismissal of these Chapter 11 cases.

45. This Order and the Purchase Agreement shall be binding in all respects upon the Debtors, their estates, Buyer, all creditors (whether known or unknown), all holders of Liens, Liabilities, claims, and interests, all contract counterparties, all governmental units, all landlords, all employees, all labor organizations, all benefit plans, all pension funds, all successors and assigns, any subsequently appointed chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary, and all other parties in interest.

46. No chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary appointed in these chapter 11 cases or any successor case shall have authority to reject, avoid, unwind, rescind, revoke, modify, or otherwise impair the Purchase Agreement, the Sale, the transfer of the Transferred Assets, or Buyer's rights under this Order.

47. To the extent this Order conflicts with any prior order of this Court, including any order governing rejection, abandonment, assignment, disposition, wind-down, sale, transfer, liens, collateral, cash collateral, or adequate protection, this Order shall govern solely with respect to the Sale, the Transferred Assets, Buyer, and the transactions approved herein.

48. No access agreement, utility agreement, landlord agreement, service-provider agreement, licensor agreement, creditor agreement, contract-counterparty agreement, or other agreement entered into under or in connection with the Wind Down Order shall modify, impair, condition, or limit Buyer's rights under the Purchase Agreement or this Order, or impose any liability or obligation on Buyer, unless Buyer is a party to such agreement or expressly agrees in writing to be bound by it.

49. To the extent of any conflict between this Order and the Purchase Agreement, this Order shall govern.

50. The Debtors, Buyer, and any Buyer Designee are authorized and directed to take all actions necessary or appropriate to implement and effectuate the relief granted in this Order, including executing and delivering any further instruments of sale, transfer, conveyance, assignment, confirmation, or correction reasonably necessary to transfer, convey, and assign to Buyer or any Buyer Designee all Transferred Assets and any additional assets or properties that

should have been transferred or assigned to Buyer or any Buyer Designee as Transferred Assets under the Purchase Agreement.

51.     The requirements of Bankruptcy Rule 6004(h) are waived.  This Order is effective and appealable immediately upon entry, without any stay.

52.     The Court retains exclusive jurisdiction to interpret, implement, enforce, and resolve any disputes arising under or related to this Order, including, without limitation, the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the Assumed Liabilities, the Permitted Liens, the liabilities excluded under the Purchase Agreement or this Order, transfer documents, and any related documents, claims, disputes, or proceedings.

Signed:  [_], 2026

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

**FORM OF SALE ORDER**

**Exhibit 1**

**Purchase Agreement**

**Exhibit B**
**Notice of Sale Hearing**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | **(Emergency Hearing Requested)** |
| | § | |

**NOTICE OF HEARING ON SALE**
**OF ASSETS OF THE JASPER RUBBER BUSINESS**

On [●], 2026, First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. [●]) (the "**Motion**")[2] for the entry of an order (the "**Sale Order**") (a) authorizing the sale of the assets comprising the Debtors' "**Jasper Rubber**" business (collectively, and as defined and further described in the Purchase Agreement, the "**Transferred Assets**") pursuant to that certain *Asset Purchase Agreement*, dated as of June 24, 2026 (the "**Purchase Agreement**" and the sale transaction thereunder, the "**Sale Transaction**"), by and among First Brands Group Holdings, LLC and certain of its subsidiaries named therein, as Sellers (collectively, the "**Sellers**"), Jasper Acquisition Co., LLC, as Buyer (the "**Buyer**"), and Press-Seal Corporation, as Guarantor, which provides for an aggregate purchase price of $8,030,000 in cash and the assumption of certain Assumed Liabilities.

Copies of the Motion, the Purchase Agreement, and the Sale Order, as well as all exhibits thereto, and all other related documents filed with the Court, may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent, Kroll Restructuring Administration LLC, located at https://restructuring.ra.kroll.com/firstbrands.

**Important Dates and Deadlines**

- **Sale Objection Deadline**.  Written objections to the Sale Transaction (a "**Sale Objection**") must be (i) filed in accordance with the requirements set forth herein and in the Motion, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Notice Parties (as defined herein) so as to be received **on [●], 2026, at 4:00 p.m. (prevailing Central Time)**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Purchase Agreement (as defined herein), as applicable.

**(the "Sale Objection Deadline")** (in accordance with the Procedures for Complex Cases in the Southern District of Texas).

- **Sale Motion and Hearing**.  A hearing to approve the Motion will be held before the Honorable Christopher Lopez, in the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street., Courtroom 401, Houston, TX 77002 on **[●], 2026, at [●] [a.m./p.m.] (prevailing Central Time)** or such other date as determined by the Bankruptcy Court.  You may participate in the hearing either in person or by an audio and video connection. Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510 and entering the conference code 590153. Video communication will be by use of the Gotomeeting Platform. Connect via the free Gotomeeting Application or click the link on Judge Lopez's home page (https://www.gotomeet.me/JudgeLopez) on the Southern District of Texas website. The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.

### Filing Objections

Written Sale Objections, if any, must (i) comply with the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, (ii) state, with specificity, the legal and factual basis thereof, and, (iii) be filed with the Bankruptcy Court by **[●], 2026, at 4:00 p.m. (prevailing Central Time)** (in accordance with the Procedures for Complex Cases in the Southern District of Texas) and served via email on the following parties:  (a) First Brands Group, LLC, 127 Public Square, Suite 5300, Cleveland, OH 44114 (Attn: Chuck Moore (cmoore@alvarezandmarsal.com)); (b) counsel for the Debtors, Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 3700, Houston, TX 77002 (Attn: Gabriel A. Morgan, Esq. (gabriel.morgan@weil.com) and Clifford W. Carlson, Esq. (clifford.carlson@weil.com)) and 767 Fifth Avenue, New York, NY 10153 (Attn: Matthew S. Barr, Esq. (matt.barr@weil.com), Sunny Singh, Esq. (sunny.singh@weil.com), Kevin Bostel, Esq. (kevin.bostel@weil.com), Andriana Georgallas, Esq. (andriana.georgallas@weil.com), Gavin Westerman, Esq. (gavin.westerman@weil.com), and Mariel E. Cruz, Esq. (mariel.cruz@weil.com)) and Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020 (Attn: Cindi M. Giglio (cgiglio@katten.com) and Grace A. Thompson (grace.thompson@katten.com)); (c) counsel to the Ad Hoc Group, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Scott Greenberg, Esq. (SGreenberg@gibsondunn.com), AnnElyse Scarlett Gains, Esq. (AGains@gibsondunn.com) Christina Brown, Esq. (CBrown@gibsondunn.com), and Tommy Scheffer, Esq. (TScheffer@gibsondunn.com)); (d) counsel to the Creditors' Committee, Brown Rudnick LLP, 7 Times Square, New York, NY 10036, (Attn: Robert Stark, Esq. (RStark@brownrudnick.com), Bennett Silverberg, Esq. (BSilverberg@brownrudnick.com), and Tristan Axelrod, Esq. (TAxelrod@brownrudnick.com)); (e) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Jayson Ruff, Esq.); (f) co-counsel to Silver Point Capital, L.P. and Onset Financial, Inc., Morrison & Foerster LLP, 250 West 55th Street New York, NY 10019 (Attn: James Newton, Esq. (jnewton@mofo.com) and Ben Butterfield, Esq. (bbutterfield@mofo.com)); (g) co-counsel to Silver Point Capital, L.P. and Onset Financial, Inc., Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Dennis Dunne, Esq. (ddunne@milbank.com), Lisa Laukitis, Esq. (llaukitis@milbank.com), and Andrew Leblanc, Esq. (aleblanc@milbank.com)); (h) counsel to Bank of America, N.A., Norton Rose Fulbright US LLP, 2200 Ross Ave., Suite 3600 Dallas, TX 75201 (Attn: Toby Gerber, Esq.

35

(toby.gerber@nortonrosefulbright.com) and Kristian Gluck, Esq. (kristian.gluck@nortonrosefulbright.com)) and Winston & Strawn, LLP, 35 West Wacker Drive Chicago, IL 60601 (Attn: Gregory Gartland Esq. (ggartland@winston.com) and Daniel J. McGuire, Esq. (dmcguire@winston.com)); and (i) counsel to Buyer, Taft Stettinius & Hollister LLP, 301 East Fourth Street, Suite 2800, Cincinnati, OH 45202-4257 (Attn: W. Timothy Miller (miller@taftlaw.com)) (collectively, the "**Objection Notice Parties**").

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE FOREGOING REQUIREMENTS OR THE REQUIREMENTS CONTAINED IN THE MOTION BY THE APPLICABLE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, ANY ORDER APPROVING THE SALE TRANSACTION OR THE DEBTORS' CONSUMMATION OF THE SALE TRANSACTION.**

Dated: [●], 2026
       Houston, Texas

                _/s/  [DRAFT]_
                KATTEN MUCHIN ROSENMAN LLP
                Cindi M. Giglio
                Grace A. Thompson
                50 Rockefeller Plaza
                New York, New York 10020-1605
                Telephone:  (212) 940-8800
                Facsimile:  (212) 940-8776
                Email: cgiglio@katten.com
                      grace.thompson@katten.com

                *Attorneys for Debtors*
                *and Debtors in Possession*

300361038v2

305586975v7_392664-00010 6/24/2026 10:07 PM