**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**DECLARATION OF DANIEL JERNEYCIC IN SUPPORT OF**
**EMERGENCY MOTION FOR ORDER (A) AUTHORIZING**
**THE SALE OF ASSETS OF THE JASPER RUBBER BUSINESS TO JASPER**
**ACQUISITION CO., LLC, AND (B) GRANTING RELATED RELIEF**

I, Daniel Jerneycic, pursuant to § 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I submit this declaration (the "**Declaration**") in support of the *Emergency Motion for Order (A) Authorizing the Sale of Assets of the Jasper Rubber Business to Jasper Acquisition Co., LLC, and (B) Granting Related Relief* (Docket No. 3055) (the "**Motion**")[2] filed by First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**").  The Motion seeks, among other things, approval of the sale of assets comprising the Debtors' "Jasper Rubber" business (collectively, and as defined and further described in the Purchase Agreement, the "**Transferred Assets**") pursuant to that certain *Asset Purchase Agreement* (the "**Purchase Agreement**" and the sale transaction thereunder, the "**Sale Transaction**") dated as of June 24, 2026, by and among First Brands Group Holdings, LLC and

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to such terms in the Motion.

certain of its subsidiaries named therein, as Sellers (collectively, the "**Sellers**"), Jasper Acquisition Co., LLC, as Buyer (the "**Buyer**"), and Press-Seal Corporation, as Guarantor, free and clear of any and all liens, claims, encumbrances and other interests, except for Assumed Liabilities and Permitted Liens (as defined in the Purchase Agreement), as set forth in the Purchase Agreement. The Motion further seeks approval of the form and manner of notice of the hearing on the sale of the Transferred Assets.

2.      This Declaration is based on my personal knowledge, education, experience and review of documents and other information relevant to my testimony.  If called to testify, I could and would testify competently to the matters set forth in my Declaration.  My compensation is not contingent upon or influenced by the substance of my testimony or the outcome of the Motion. I am authorized to submit this Declaration on behalf of the Debtors.

### Qualifications and Professional Background

3.      I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**").  On September 5, 2025, A&M was retained by the Company to, among other things, assist with liquidity management and forecasting, identifying cost-reduction opportunities, and contingency preparations for a potential chapter 11 filing.

4.      On October 23, 2025, I was appointed co-Chief Restructuring Officer of First Brands Group, LLC and its debtor affiliates.  From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts.  As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

5. I have nearly twenty-five years of experience as an advisor to large organizations, assisting them with analyzing and stabilizing their financial condition, and focused on financial analysis, operational turnarounds, and restructurings. I have experience in the automotive industry, specifically, where I have advised both OEMs and suppliers. My experience includes liquidity management and cash forecasting, financial modeling, cost reductions, customer and labor negotiations, strategic planning, and business plan development.

6. Prior to joining A&M, I was a Partner in Ernst & Young's Turnaround and Restructuring practice, where I served in a similar capacity. I earned a bachelor's degree from the University of Michigan, and a master's in accounting from University of Michigan's Ross business school. I am a Certified Public Accountant, Certified Insolvency Restructuring Advisor, and certified in Financial Forensics.

### Sale, Marketing and Wind Down Process

7. A&M has been actively involved in monitoring and forecasting the Debtors' liquidity and operations throughout these chapter 11 cases. The A&M team and I are intimately familiar with the Debtors' operations, as well as the operational requirements and constraints that have shaped the Debtors' financial position during these proceedings.

8. Shortly after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position further deteriorated and the Debtors were unable to obtain additional funding or waivers to access additional liquidity from their lenders. As a result the Debtors began taking steps to wind down certain of their North American business operations. At that point, it became clear that consummating a sale transaction on the timeline contemplated by the Bidding Procedures Motion was no longer possible under the circumstances.

9. In late January 2026, the Debtors and their advisors reached out to potential bidders and key stakeholders to apprise them of the Debtors' liquidity situation and request that any party interested in the Debtors' assets submit an indication of interest as soon as possible. By February 5, 2026, the Debtors had received approximately 40 non-binding indications of interest ("**IOIs**") spanning several of their business units. The Debtors and their advisors then worked to narrow the IOIs received into a core set of viable transactions that provided the highest or otherwise best value to the Debtors' estates.

10. As part of these discussions, the Debtors considered interest in both going-concern sales and various sales for discrete categories of assets, such as intellectual property and equity interests. In connection with each, the Debtors considered, among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders.

11. On March 14, 2026, Press-Seal Corporation, guarantor for the Sale Transaction, submitted a preliminary non-binding indication of interest regarding a potential acquisition of the Transferred Assets.

### Sale Transaction

12. Strong business justification supports the Sale Transaction. First, the A&M team and I believe that the Sale Transaction presents the most value-maximizing path for the Transferred Assets and that further marketing, including by holding an auction, is unlikely to yield a higher or otherwise better result. I understand that the Debtors ran a broad, multi-month Sale Process and directly solicited interest from over 400 parties. The Debtors widely publicized their Sale Process pursuant to the Initial Notice, which was filed and served on January 13, 2026, and the Publication

Notice, which was published in *The New York Times* on January 16, 2026. *See* Docket Nos. 1718, 1645.

13.     Since entry of the Wind Down Order,[3] the Debtors and their advisors have continued engaging with potential purchasers related to all of the Debtors' assets, including the Wind Down Assets.[4]  In my opinion, the Debtors have engaged in good faith arm's length discussions with the Buyer regarding the sale of the Transferred Assets.  These discussions resulted in the Sellers and the Buyer reaching an agreement on the terms of the Sale Transaction and the Purchase Agreement.

14.     The A&M team and I believe the Sale Transaction represents the highest and otherwise best bid for the Transferred Assets.  Even if the Debtors had the liquidity to further market and/or auction the Transferred Assets—which they do not—I understand that any incremental value achieved would likely be offset, if not exceeded, by the costs of the same. Moreover, given the circumstances of these chapter 11 cases, I believe that it is likely that the value of such assets will decrease rather than increase with the passage of time.

15.     Second, consummating the Sale Transaction will further the Debtors' efforts to expeditiously wind down their assets in an organized fashion, reduce administrative and operating costs, and generate cash proceeds for the benefit of creditors.  The A&M team and I believe this

---

[3]     "**Wind Down Order**" means the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No.2454).

[4]     "**Wind Down Assets**" has the meaning ascribed to such term in the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2216) (the "**Wind Down Motion**").

is the optimal path for the Debtors' estates and stakeholders under the facts and circumstances of these cases.

16.     The A&M team and I believe the terms and conditions of the Purchase Agreement and the Sale Transaction have been negotiated by the Debtors and their advisors and the Buyer at arm's length and in good faith.  I understand that the Buyer is represented by qualified counsel, and that the Buyer has not engaged in any conduct that would indicate or constitute a lack of good faith.

**Emergency Relief; Notice Procedures**

17.     The Debtors are requesting that the Court approve the relief requested in the Motion on an emergency basis.

18.     It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible.  The Debtors' liquidity is limited, and the Buyer and the Debtors' key stakeholders have made clear their expectation that the Sale Transaction be consummated on an expedited basis.  Any delay in obtaining entry of the Sale Order could jeopardize the Debtors' ability to continue operations and proceed toward closing.  Prompt entry of the Sale Order is thus critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Assets for the benefit of the Debtors' estates and stakeholders.  I thus believe that a swift closing of the Sale Transaction, which the Debtors anticipate will occur promptly following Court approval, will inure to the benefit of the Debtors' estates and is critical to preserve value and avoid disruption of the Sale Transaction.

19.     I understand that, concurrent with the filing of the Motion or as soon as reasonably practicable following the date hereof, the Debtors will (i) serve the notice of sale hearing to the Sale Notice Parties, as set forth in the Motion (the "**Notice of Sale Hearing**") and (ii)  publish the

Notice of Sale Hearing in *The Indianapolis Star*. Additionally, I understand that five days prior to filing the Motion, the Debtors delivered a Wind Down Sale Notice to the applicable Wind Down Sale Notice Parties, none of whom objected to the Sale Transaction, and that the Ad Hoc Group, the ABL Lenders, and Onset expressly consented to the Sale Transaction.

20.     Therefore, I believe that the methods of notice of the Motion and the Sale Transaction, combined with the Initial Notice, constitute good and adequate notice of the proposed sale of the Transferred Assets and the proceedings with respect thereto.

### Conclusion

21.     The A&M team and I believe that (i) the Sale Transaction reflects the highest and otherwise best value reasonably attainable for the Transferred Assets, is supported by sound business judgment, and serves to maximize the value of the Debtors' estates for all parties in interest, and (ii) expedited approval of the Sale Transaction is critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Assets for the benefit of the Debtors' estates and stakeholders. Accordingly, I believe the Motion should be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 24, 2026
        Chicago, Illinois

                                          /s/   *Daniel Jerneycic*
                                          Daniel Jerneycic, Managing Director
                                          Alvarez & Marsal North America LLC

## Certificate of Service

I hereby certify that on June 24, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  Grace A. Thompson
Grace A. Thompson