**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*, | § § | Case No. 25-90399 (CML) |
| Debtors.[1] | § § | Jointly Administered |
| | § | |

**EVOLUTION'S EMERGENCY MOTION TO SUSPEND OR
CONTINUE PROCEEDINGS UNDER BANKRUPTCY RULE 8007 ON DEBTORS'
MOTION TO RELEASE FUNDS FROM THE FACTORED RECEIVABLES ACCOUNT**

> **Emergency relief has been requested. Relief is requested not later than July 9, 2026. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding sentence. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Pursuant to 11 U.S.C. § 105(a), Bankruptcy Rule 8007, and Local Rule 9013-1, Evolution[2] hereby files this emergency motion (the "Motion") to suspend or continue proceedings on Debtors' *Motion for an Order Authorizing the Release of Certain Funds from the Factored Receivables Account in Accordance with Prior Order and Stipulation With Third-Party Factors and Disbursements of Such Funds to the ABL Agent* [Docket No. 3039] (the "Release Motion"), which seeks the release of collateral in which Evolution asserts a perfected, first-priority security interest, until 14 days after entry of a final, non-appealable order resolving Evolution's claimed perfected, first-priority security interest.  In support of its Motion, Evolution respectfully states as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] "Evolution" means, collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P., and Evolution Credit Opportunity Master Fund III-B, LP.

**PRELIMINARY STATEMENT**[3]

1.      Evolution moves to suspend or continue proceedings on Debtors' Release Motion, including entry of its accompanying proposed order [Docket No. 3039-1] (the "Proposed Release Order").  The Release Motion and Proposed Release Order would release $25.7 million of cash collateral from the Factored Receivables Account over which Evolution claims a perfected, first-priority security interest—an issue pending in Evolution's adversary appeal from this Court's May 29, 2026 summary judgment order (the "SJ Order"), Docket No. 67 in Adversary No. 26-3006.[4] Specifically, Evolution's Appeal will dictate whether Evolution has a perfected security interest in certain of the Debtors' (the "Receivable Sellers") accounts receivable, the cash collateral securing Evolution's claim.  The Debtors' Release Motion—and any ensuing release of funds from the Factored Receivables Account—should not proceed before that question is answered in a final, non-appealable order.  There is no urgency to the Debtors' request.  But if the Release Motion is granted, $25.7 million of Evolution's collateral will have been dissipated even if Evolution is successful in its Appeal.

2.      Rather than wait for a final, non-appealable order, as required under the chapter 11 Plan they themselves proposed, the Debtors demand release of the $25.7 million to pay pre-petition claims of favored creditors—the ABL Secured Parties—outside of the protections of the Plan.  The Debtors also demand a non-consensual release of any claims Evolution could assert against the ABL Secured Parties to obtain the return of those funds upon establishing a perfected, first-priority security interest.

---

[3] Capitalized terms not otherwise defined have the meanings set forth in Evolution's motion for leave to appeal the SJ Order, attached hereto as **Exhibit 1**.

[4] The appeal is pending in the District Court under Civil Action No. 4:26-cv-04705 (the "Appeal").

3.      The Debtors' efforts are patently improper, as Evolution will show if proceedings on the Release Motion are not suspended or continued.  But the Court need not reach those issues because the Release Motion should be held in abeyance until Evolution's rights to the $25.7 million are determined pursuant to a final, non-appealable order.

4.      The Debtors have not articulated any need either they or the ABL Secured Parties have for the funds.  The Debtors concede that the $25.7 million will not be used to fund their operations or the reorganization; instead, it will be used only to pay down claims held by the ABL Secured Parties.  Release Motion ¶ 16.  They do not even try to argue that the ABL Secured Parties—massive banks with over half-a-trillion-dollars of market capitalization combined—require $25.7 million now.  And as set forth in their own Disclosure Statement, the Debtors were required only to *seek*, not obtain, the release of the funds—a condition they satisfied the moment they filed their motion.  Docket No. 3020 at 3 (ECF pp. 15).

5.      Yet Evolution will face irreparable harm if the $25.7 million is released.  Evolution already established its entitlement to adequate protection, and the $25.7 million was integral to that right.  But if the Release Motion is granted, the release of Evolution's cash collateral will be irreversible: by the terms of the Release Motion and the Proposed Release Order, once the funds are applied to the ABL Claims, they "shall not be subject to disgorgement, clawback, or avoidance." Proposed Release Order ¶ 2.  The clear intent of the Release Motion is to ensure that even if Evolution prevails on its pending adversary appeal and the SJ Order is reversed, Evolution will be left with nothing but an unsecured claim in the place of the $25.7 million.  That is textbook irreparable harm.   Debtors' preferred course—irrevocably release Evolution's liens before appellate review—is no way to resolve this dispute.

6.      The Court should grant a stay for those reasons alone.  But even if the Court applied the more stringent standard applicable to preliminary injunctions, the proceedings on the Release

3

Motion should still be suspended or continued.  Evolution's appeal presents a substantial case on a serious legal question.  *See In re Tex. Equip. Co.*, 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002). The Court's previous ruling on perfection turns on questions of law decided on the pleadings, and—as Evolution's motion for leave to appeal explains—it conflicts with every Court of Appeals to address the sufficiency of a financing statement, the scope of inquiry notice, and the irrelevance of the optional Seller/Buyer designation.  In contrast to the irreparable harm Evolution will suffer if the Release Motion is granted, neither the Debtors nor the ABL Secured Parties stand to suffer any harm by the Court preserving the status quo while Evolution's interest in the $25.7 million is resolved.  Indeed, the Debtors' own proposed Plan requires funds to stay in the Factored Receivables Account pending a final, non-appealable order resolving any disputes over the funds in the account.  There is no justification to eliminate this Plan requirement for $25.7 million by separate motion practice.

7.      Accordingly, Evolution respectfully requests that the Court enter an order suspending or continuing proceedings on Debtors' Release Motion, including entry of the Proposed Release Order, until 14 days after entry of a final, non-appealable order resolving Evolution's claimed perfected, first-priority security interest.

## **JURISDICTION AND VENUE**

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein include 11 U.S.C. § 105(a), Bankruptcy Rules 8007(a)(1)(C), (a)(1)(D), and (e), as well as Rule 9013-1(i) of the Bankruptcy Local Rules.

**RELEVANT BACKGROUND**

10.     This Court is already familiar with the history between Evolution and the Debtors, since Evolution set out the basis for its perfected, first-priority interest in its initial objection [Docket No. 1032], in its adversary complaint [Adv. Pro. No. 26-03006, Docket No. 1], and in its opposition and cross-motion for summary judgment in its adversary proceeding [Adv. Pro. No. 26-03006, Docket No. 47].  The relevant history is also set forth in Evolution's recent motion for leave to appeal the SJ Order, attached hereto as **Exhibit 1**.  Evolution will therefore only set forth the facts most pertinent to this Motion.

A.      **The Debtors Use Evolution's Cash Collateral Without Consent and Without Providing Adequate Protection**

11.     The Debtors have been collecting payments on prepetition receivables, including those generated by the Receivable Sellers, and segregating the cash into a Factored Receivables Account.

12.     On December 1, 2025, the Debtors filed a motion [Docket No. 807] (the "Factoring Procedures Motion") seeking authorization to implement procedures that would enable them to use tens of millions of dollars in the Factored Receivables Account.  On December 19, 2025, Evolution objected to the Factoring Procedures Motion, asserting that the Debtors could not release Evolution's cash collateral without providing adequate protection.  *See* Docket No. 1032 ¶¶ 6-14, 32-40, 53.  On December 22, 2025, Evolution also joined the objections of certain other factors. *See* Docket No. 1056.

13.     On December 31, 2025, the Court permitted the Debtors to release up to $60 million in funds from the Factored Receivables Account.  *See* Docket No. 1133 (the "December 31 Order").  Evolution appealed the December 31 Order.  Docket No. 1158; Civil Action No. H-26-73, Docket No. 2.

**B.      The District Court Finds That Evolution Was Not Adequately Protected**

14.      On January 31, 2026, the District Court entered an order [Civil Action No. H-26-73, Docket No. 28] (the "District Court Order") determining that, "[a]t the time Evolution appealed, its interest was not adequately protected because the Factored Receivables Account did not include enough to cover Evolution's $60.5 million interest." District Court Order at 10. The District Court also held that, "absent clear evidence or legal precedent that refutes the claimant's right to an asserted property interest, the claimant is entitled to adequate protection until an adversary proceeding determines the validity, extent, and priority of the asserted property interest." *Id.* at 8. The District Court remanded the order to this Court to determine whether Evolution is adequately protected. *Id.* at 10.

**C.      This Court Orders That Evolution Be Adequately Protected**

15.      On February 9, 2026, Evolution filed an emergency motion for adequate protection, arguing that, "pending a final determination in the Adversary, Evolution is entitled to adequate protection for its claim, interest, and fees," and requesting that the Court enter an order compelling the Debtors to replenish $25.7 million, which comprised the released funds in which Evolution claimed an interest. Docket No. 1892 ¶ 3; Exhibit 4 (March 9, 2026 Hearing Tr.) at 9:15-25.

16.      On March 12, 2026, the Court entered an order granting Evolution's emergency motion for adequate protection, requiring the Debtors to "deposit $25.7 million into the Factored Receivables Account on or before March 19, 2026" ("Returned Funds"). Docket No. 2127 at 2.

**D.      Evolution's Adversary Proceeding and the Court's SJ Order**

17.      On January 9, 2026, Evolution commenced an adversary proceeding against the Receivable Sellers and the agents for certain of their lenders to establish that Evolution has a perfected, first-priority lien on the Section 5(g) Receivables. *See* Adv. Pro. No. 26-03006, Docket No. 1; *see also* Exhibit 1 (Evolution's Motion for Leave to Appeal the SJ Order), at ¶ 17.

6

18.     Evolution asserted a single count, seeking a declaration that "Evolution has a perfected, first-priority lien and security interest in the Collateral." Exhibit 1 ¶ 18.

19.     The adversary proceeding defendants each filed motions to dismiss, which were converted to motions for summary judgment. *Id.* ¶ 19.

20.     On May 29, 2026, the Court issued the SJ Order, ruling that "Evolution does not have a perfected security interest in the non-purchased receivables," thereby granting Defendants' motions for summary judgment on perfection and denying Evolution's request for a declaration that it has a perfected first-priority lien. *Id.* ¶ 20.

**E.     Evolution's Pending Appeal of the Summary Judgment Order**

21.     On June 12, 2026, Evolution appealed the Court's SJ Order. *See* Adv. Pro. No. 26-03006, Docket No. 71. Evolution also filed a motion for leave to appeal the SJ Order, which argued that (i) the Court's SJ Order was a final order appealable as of right, and (ii) in the event the District Court found the SJ Order to not be appealable as of right, the District Court should grant Evolution leave to appeal the order because it meets all the criteria for an interlocutory appeal. *See* Exhibit 1 ¶¶ 3-11.

22.     In support of its motion for leave to appeal, Evolution argued that the Court's ruling on perfection is a controlling issue of law for which there exists substantial grounds for difference of opinion. *Id.* ¶¶ 36-52. Evolution also argued that immediate appeal was necessary because, if the Court's SJ Order was not reversed, the Debtors would be able to avoid Evolution's security interest under section 544(a) of the Bankruptcy Code. *See id.* ¶¶ 29-31, 37.

23.     On June 15, 2026, the Appeal was docketed at Case No. 26-04705 and assigned to District Judge Lee H. Rosenthal. *See* Adv. Pro. No. 26-03006, Docket No. 75. On June 26, 2026, the adversary proceeding defendants opposed leave to appeal, asserting that leave to appeal should be denied because the "priority issue between Evolution and the Prepetition Lenders remains in

dispute." Adv. Pro. No. 26-03006, Docket No. 81 ¶ 16; *accord* Adv. Pro. No. 26-03006, Docket No. 82 ¶ 3, Docket No. 83 ¶ 1. The DIP Agent (Wilmington Savings Fund Society, FSB) also argued that, despite the SJ Order, "the Court will still need to answer the ultimate question at issue in this case—who is entitled to the proceeds of Debtors' nonpurchased receivables," and until it does so, "neither the DIP Secured Parties nor the Prepetition Secured Parties can collect on the proceeds of the non-purchased receivables." Adv. Pro. No. 26-03006, Docket No. 83 ¶ 5-6 & n.6.

F.     **The Debtors' Plan Contemplates Seeking the Release of Evolution's Cash Collateral to Pay the ABL Agent**

24.     On June 16, 2026, the Debtors filed a proposed joint chapter 11 plan [Docket No. 3019] (the "Plan"). In their accompanying Disclosure Statement [Docket No. 3020], the Debtors stated that, "[i]n exchange for the [Ad Hoc Group's] and ABL Parties' support for [the Debtors'] Confirmation Budget … , the Debtors agree to certain terms and conditions, including: … the Debtors will *seek to obtain* the release of $25.7 million in the Factored Receivables Account that was returned to the account as adequate protection pending a determination of Evolution's lien … and use such funds to pay down the ABL Secured Parties no later than July 10, 2026." Docket No. 3020 at 3 (ECF p. 15) (emphasis added). The Disclosure Statement does not say that the Debtors must actually "obtain" the funds, only that they must "seek" to obtain them. *See id.*

25.     According to the Disclosure Statement, the "ABL Collateral Trust Assets" will include the "FBG Debtors' Interest in [the] Factored Receivables Account." Docket No. 3020 at 18 (ECF p. 30). And "[i]f there is a dispute as to whether an asset is a[n] … ABL Collateral Trust Asset, such dispute will be resolved either by the mutual consent of the DIP Secured Parties, the ABL Secured Parties, and/or the Litigation Trust or by the Bankruptcy Court and, upon entry of a Final Order or mutual agreement, such asset will automatically vest in the … ABL Collateral Trust, as applicable. Until any such bona fide dispute is resolved the FBG Debtors will hold such asset pending an adjudication or settlement." *Id.* at 6 (ECF p. 18). The Plan provides that, "[f]or the

8

avoidance of doubt, … ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of … any of the Factors … or (b) subject to a validly perfected first-priority Lien asserted by a Factor."  Docket No. 3019 at 2 (ECF p. 8).

26.     A "Final Order" under the Plan means a final, non-appealable order or judgment— *i.e.*, an order or judgment "which has not been reversed, vacated, or stayed" and to which the time to appeal has expired or all appeals have been exhausted.  *Id.* at 15-16 (ECF pp. 21-22).[5]

27.     In a hearing on June 12, 2026, Debtors' counsel acknowledged that the portions of the Plan pertaining to the Factored Receivables Account are "a little confusing."  Exhibit 2 (June 12, 2026 Hearing Tr.) at 199:6.  To clarify, Debtors' counsel explained that no disputed collateral is going to the ABL Collateral Trust, and that if it turns out that disputed collateral belongs to a factoring party, the collateral goes to that factoring party:

> There's the ABL trust.  No disputed collateral is going to the ABL trust.  There's a DIP trust.  No disputed collateral is going to the DIP trust.  There's a litigation trust, claims trust, no disputed collateral. So what happens to all the disputed collateral?  Chapter 11 estates continue under a wind-down administrator who's going to figure out and continue to administer those assets and figure out the disputes. And if they get resolved in favor of one of the DIP lenders or ABL lenders, then they go to the trust.  If it turns out that that collateral belongs to a factoring party, they go to a factoring party.

*Id.* at 199:7-18.

---

[5] The full definition of "Final Order" is as follows: "***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment."  Docket No. 3019, at 15-16 (ECF pp. 21-22).

**G.** **The Debtors Seek to Release Evolution's Cash Collateral**

28.      Notwithstanding Evolution's pending Appeal and the language of the Plan, the Debtors filed their Release Motion on June 22, 2026, along with the Proposed Release Order [Docket No. 3039-1].  The Release Motion asserts that "the Debtors are required to seek to obtain the release of the Returned Funds back into the Debtors' operating accounts, and such Returned Funds, if and when released, will be used to pay down ABL Claims (as defined in the Plan)." Release Motion ¶ 16.  The Debtors have not explained why the ABL Secured Parties should receive a preferential payment, and the actual release of funds is not a condition to the ABL Lenders providing funding.

29.      The Proposed Release Order would "immediately release[]" Evolution's cash collateral—the $25.7 million of Returned Funds—"into the Debtors' operating accounts" and authorize the Debtors to "apply the Released Funds to pay down the ABL Claims," favoring the ABL Claims over all other claims through a payment outside the Plan.  *See* Proposed Release Order ¶ 1.

30.      The Debtors also request a non-consensual release of claims in favor of the ABL Secured Parties.  Specifically, their Proposed Release Order provides that even if the SJ Order were reversed, "[o]nce the Released Funds have been applied to pay down the ABL Claims …, such funds shall not be subject to disgorgement, clawback, or avoidance from the ABL Secured Parties, except if the Court determines the DIP Secured Parties have priority over the Released Funds or other amounts in the Factored Receivables Account." *Id.* ¶ 2.  Any claims that Evolution has to obtain the return of those funds from the ABL Secured Parties would be extinguished.

## LEGAL STANDARD

31.      The Court has the authority and discretion to suspend or continue proceedings on the Release Motion.  Federal Rule of Bankruptcy 8007 permits the Court to, among other things,

10

enter orders "suspending, modifying, restoring, or granting an injunction," as well as orders "suspending or continuing" "other proceedings in the case" while an appeal is pending. *See* Fed. R. Bankr. P. 8007(a)(1)(C), (a)(1)(D), and (e)(1).  This rule is "by its design a flexible tool which permits a bankruptcy court to uniquely tailor relief to the circumstances of the case" and allows the bankruptcy judge to "design stays to avoid unjust results." *In re Gleasman*, 111 B.R. 595, 599 (Bankr. W.D. Tex. 1990) (analyzing former Bankruptcy Rule 8005 [previous version of Rule 8007, effective before Dec. 1, 2014]).

32.     Section 105(a) of the Bankruptcy Code likewise allows the Court to "issue any order, process, or judgment" that is "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  11 U.S.C. § 105(a); *see also, e.g.*, *In re Hunt*, 93 B.R. 484, 491, 498 (Bankr. N.D. Tex. 1988) (issuing an injunction pursuant to section 105(a) and explaining that "the Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings"); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992) (affirming issuance of preliminary injunction "pursuant to [the bankruptcy court's] powers set forth in section 105(a)"); *accord Tex. Top Cop Shop, Inc. v. Bondi*, 2025 WL 2609731, at *1 n.2 (5th Cir. Aug. 5, 2025) ("The decision to hold a case in abeyance lies squarely within a court's discretion.  As the Supreme Court has long recognized, 'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) (same).

33.     When determining whether stay or suspend proceedings, "many courts consider the standard for granting a preliminary injunction as a guideline." *In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 168 (E.D. Tex. 1993).  That standard does not apply rigidly because "[s]lavish

adherence" to it "for stays [of proceedings] … would impermissibly shackle the bankruptcy judge and so undermine the intended flexibility" of Bankruptcy Rule 8007.  *Gleasman*, 111 B.R. at 600; *see also Westwood Plaza*, 150 B.R. at 168 ("The use of [the preliminary injunction] standard, however, is to assist a court in the exercise of its discretion and not provide a rigid set of mandatory rules for a court to follow.").

34.     Thus, courts are guided, but not bound, by the following factors: "(1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of a stay will substantially injure other interested parties; and (4) where the public interest lies."  *Vote.Org v. Callanen*, 39 F.4th 297, 302 (5th Cir. 2022); *In re First South Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987) (applying these four criteria and staying bankruptcy proceedings); *In re Friendship Diaries*, 2014 WL 527232, at *1-2 (Bankr. N.D. Tex. Feb. 10, 2014) (applying four criteria and issuing stay pending appeal); *accord In re Motors Liquidation Co.*, 539 B.R. 676, 683-86 (Bankr. S.D.N.Y. 2015) (granting preliminary injunction under Bankruptcy Rule 8007(a)(1)(C) to "delay[] distributions" of trust funds under a chapter 11 plan pending plaintiffs' appeal of a separate judgment).[6]

## ARGUMENT

### I.     THE COURT SHOULD EXERCISE ITS DISCRETION TO SUSPEND OR CONTINUE PROCEEDINGS ON THE RELEASE MOTION

35.     The Court should suspend or continue all proceedings on the Release Motion, including entry of the Proposed Release Order and its release of $25.7 million of Evolution's cash collateral, pending issuance of a final, non-appealable order resolving the Appeal and the question of whether Evolution has a perfected, first-priority interest in the Section 5(g) Receivables.

---

[6] While the Fifth Circuit has not articulated a standard for lower courts to follow when determining whether to stay "other proceedings" under subdivision (e) of Rule 8007, "[i]t has been held that the standards governing a stay under subdivision (e) are the same as those governing a stay under subdivision (a)." COLLIER ON BANKRUPTCY ¶ 8007.12 n.4 (16th ed. 2026).

36.     The Debtors do not even attempt to demonstrate a need for the funds they seek. Rather, they openly acknowledge those funds will ***not*** be used for operations, but will instead be used to make payments outside of the Plan to their preferred lenders, the ABL Secured Parties. *See infra* § II(C).

37.     At the same time, Evolution faces immediate irreparable harm absent a stay, as the release of funds risks eliminating Evolution's appellate right to establish it has a perfected, first-priority interest in the $25.7 million.  Specifically, the Debtors demand an order that "such funds shall not be subject to disgorgement, clawback, or avoidance from the ABL Secured Parties," Proposed Release Order ¶ 2, giving the ABL Lenders a *de facto* first-priority secured interest even if Evolution establishes that it perfected its lien and has priority over the ABL Secured Parties to those funds.  That is patently inequitable and will irreparably harm Evolution, which will never be able to recover those funds even if it establishes it has a perfected, first priority interest in them. *See also infra* § II(B).[7]  This also constitutes an impermissible non-consensual release of claims in favor of the ABL Secured Parties, as Evolution will effectively lose its ability to assert a claim— *e.g.*, for restitution, unjust enrichment, or conversion—even if the Appeal is successful and Evolution establishes its claim.

38.     But even if that language from the Proposed Release Order were eliminated, Evolution would still be irreparably harmed by the release of the funds.  The ABL Secured Parties have effectively conceded this point.  In seeking a preliminary injunction to enjoin Aequum from transferring funds to Wells Fargo (Aequum' s lender), the ABL Secured Parties stated that they would be "irreparably harmed just the moment that happens" because the funds would be

---

[7] The very purpose of setting aside $25.7 million as adequate protection for Evolution was to avoid the diminution in value of Evolution's claim. The Debtors should not be allowed to strip Evolution of that adequate protection— rendering that portion securing its claim unrecoverable—before a final, non-appealable order resolving Evolution's interest.

"commingled with other cash," leaving the ABL Secured Parties with not "a very strong conversion claim … just simply because the cash will have been commingled." Exhibit 3 (June 17, 2026 Aequum Hearing Tr.) at 114:2-11. The Court agreed, stating the release would leave the ABL Secured Parties with "no effective remedy." *Id.* at 155:9-21. Evolution should receive the same protection.

39.     The Release Motion and Proposed Release Order also contradict the Debtors' commitments in their own proposed Plan. The Plan states that any assets "that are determined by Final Order" to be property of the factors (including Evolution) shall ***not*** be included in the ABL Collateral Trust Assets. Docket No. 3019 at 2 (ECF p. 8); *see also id.* at 15-16 (ECF pp. 21-22) (definition of "Final Order"). But if the Release Motion is granted, even if Evolution's Appeal is resolved in its favor and the decision reached a "Final Order" in Evolution's favor, $25.7 million of Evolution's cash collateral would ***already*** have been released to the ABL Secured Parties— violating the terms of the Plan right out of the gate.

40.     Likewise, Debtors' counsel represented that "[n]o disputed collateral is going to the ABL trust," and that "[i]f it turns out that that [disputed] collateral belongs to a factoring party, they go to a factoring party." Exhibit 2 (June 12, 2026 Hearing Tr.) at 199:7-20. Here, there exists a bona fide dispute as to Evolution's entitlement to the disputed collateral, and yet, the Release Motion seeks to release the funds before the entry of a final, non-appealable order.

41.     The Court should exercise its discretion to suspend all proceedings relating to Debtors' Release Motion, including entry of the Proposed Release Order, pending a final, non-appealable order resolving Evolution's claim to a perfected, first-priority interest in the Section 5(g) Receivables.

14

## II.     PROCEEDINGS SHOULD BE SUSPENDED OR CONTINUED UNDER THE PRELIMINARY INJUNCTION STANDARD

42.     Even if the preliminary injunction standard were applied, the applicable factors weigh in favor of staying proceedings relating to the Release Motion pending a final, non-appealable order resolving Evolution's claim that it has a perfected, first-priority interest in the Section 5(g) Receivables.

### A.     Evolution is Likely to Succeed on the Merits of Its Appeal

43.     "[T]he Fifth Circuit has explained that the movant need not always show a probability of success on the merits" to obtain a stay; instead, "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Tex. Equip.*, 283 B.R. at 227. (citation omitted).

44.     The movant "more easily satisfies [this] first element" when the appeal concerns "questions of law, … especially questions involving the application of law, or when the law has not been definitively addressed by a higher court." *Id.* at 227 (citation omitted) (finding first element satisfied and granting stay pending appeal where "[t]he underlying facts were not disputed" and the court "construed the meaning of the operative documents and therefore the court's conclusions were principally legal in nature").

45.     Here, because Evolution's Appeal concerns questions of law decided on the pleadings, *see* Exhibit 1 ¶ 37 n.9, this Court can find that Evolution presents a substantial case on the merits without expressing doubts as to the soundness of its own decision in the SJ Order. *See Tex. Equip.*, 283 B.R. at 227 ("The court believes its decision sound but acknowledges that a denial of a stay effectively shuts off the [plaintiffs'] right of review"); *Westwood Plaza*, 150 B.R. at 168 (granting motion to stay and explaining that "though the Court believes its decision is correct, there are important legal questions involved"); *accord Friendship Dairies*, 2014 WL 527232 at *2

15

(granting a stay and explaining that "it is difficult to conceive of a court finding that its own order is likely to be reversed," but that the "standard is not *that* stringent" (emphasis in original)).

46.      As explained in Evolution's motion for leave to appeal the SJ Order, Evolution's Appeal concerns a controlling issue of law for which there exists substantial grounds for difference of opinion.  Exhibit 1 ¶¶ 36-52.

47.      *First*, the SJ Order's analysis in ruling against Evolution on the issue of perfection "applied the wrong standard when evaluating the sufficiency of [Evolution's] financing statements," and that "[e]very Court of Appeals to opine on the issue has distinguished between contracts and financing statements, noting that 'less detail is required in the financing statement' because unlike a contract, a financing statement merely 'serves to give notice that the secured party who filed **may have** a security interest in the collateral and that further inquiry with respect to the security agreement will be necessary to disclose the complete state of affairs.'"  Exhibit 1 ¶ 41 & n.10 (collecting cases).  A financing statement that can be read two ways—"one of which may cover the collateral at issue and one of which does not"—is sufficient because it provides inquiry notice; it "has served its purpose of alerting subsequent creditors to the possibility that a piece of collateral **may be** covered."  *Id.* ¶ 42 (quoting *ProGrowth Bank, Inc. v. Wells Fargo Bank, NA.,* 558 F.3d 809, 814 (8th Cir. 2009)).  The SJ Order's analysis, however, failed to consider that the collateral described in Evolution's financing statements included receivables "transferred," which includes the creation of a lien—and that, thus, at least one reasonable interpretation of Evolution's financing statement is that it covers liens on the Section 5(g) Receivables.  *Id.* ¶¶ 44-48.

48.      *Second*, the SJ Order stated that the "UCC's notice-filing system is not designed to require third parties to obtain, read, and parse the underlying agreement to determine the scope of a secured party's collateral."  *Id.* ¶ 50.  As Evolution's motion for leave explained, that conclusion is contrary to the decisions of every Court of Appeals that has opined on the issue, which hold that

16

upon notice that a secured party "***may*** have" a security interest in the collateral, it is "***incumbent*** upon the subsequent creditor to investigate whether the collateral at issue is in fact covered by a security agreement." *Id.* & n.11 (collecting cases). That would include reviewing Section 5(g) of the Factoring Agreement. *Id.* ¶¶ 50-51.

49. *Third*, the SJ Order stated that it "[found] additional support from Evolution selecting the optional 'Seller/Buyer' designation in the financing statements." *Id.* ¶ 52. As explained in Evolution's motion for leave, reliance on this Seller/Buyer designation to find that a creditor has not perfected its security interest is unprecedented. *Id.* Neither the Court nor the Debtors cited any authority—and Evolution has found none—suggesting such a designation has any bearing on the scope of the collateral description in the financing statement.

50. Accordingly, even if the Court "believes its decision [is] sound," Evolution's pending Appeal involves important questions of law, and as explained below, the "balance of the equities weighs heavily in favor of granting the stay." *Tex. Equip.*, 283 B.R. at 227. The Court should find Evolution has presented a substantial case on the merits.

**B. A Stay is Necessary to Prevent Irreparable Harm**

51. Staying the Release Motion and any release of Evolution's cash collateral is the only way to avoid irreparably harming Evolution.

52. *First*, if $25.7 million of Evolution's cash collateral is released, the Debtors will have effectively eliminated Evolution's lien on those funds. Courts have held that "the prospective loss of [a secured creditor's] status quo security interest" is "sufficient to constitute the irreparable harm needed to justify an injunction," *e.g.*, *Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, 2018 WL 4179456, at *2 (D. Del. Aug. 31, 2018) (collecting cases), and an injunction is an even more drastic remedy than a stay.

53.     *Second*, the Proposed Release Order, by its express terms, states that "[o]nce the Released Funds have been applied to pay down the ABL Claims …, such funds shall not be subject to disgorgement, clawback, or avoidance from the ABL Secured Parties, except if the Court determines the DIP Secured Parties have priority over the Released Funds or other amounts in the Factored Receivables Account." Proposed Release Order ¶ 2. In other words, **even if Evolution is successful in its pending adversary appeal and the SJ Order is reversed**, it will be impossible under the Proposed Release Order for Evolution to claw back the $25.7 million released to the Debtors (and then to the ABL Secured Parties), leaving Evolution irreparably harmed. *See Motors Liquidation Co.*, 539 B.R. at 683 (finding irreparable injury element satisfied because "as a practical matter, it would be impossible or very difficult to get any distributions back"). Evolution would be left with only a claim against the Debtors, which the Proposed Release Order states "shall be satisfied solely from the [remaining amounts] in the Factored Receivables Account or other assets of the applicable Debtor's estate," Proposed Release Order ¶ 2—*i.e.*, leaving Evolution with an unsecured claim for that amount.

54.     As noted above, this Court considered a similar issue recently in the Aequum adversary proceeding [Case No. 26-03091]. There, the plaintiffs—Bank of America, Wilmington Savings Fund Society, FSB, and GLAS USA LLC—sought a preliminary injunction to enjoin Aequum from "distributing any past or future proceedings realized from a sale or other disposition" of certain inventory collateral. [Case No. 26-03091, Docket No. 30 ¶ 6.] The plaintiffs argued that, absent an injunction, plaintiffs would face "immediate and irreparable harm" because Aequum "intends to distribute the proceeds from those sales (which are encumbered by [p]laintiffs' liens) to its own creditors and investors, thereby leaving [p]laintiffs without an adequate remedy at law." *Id.* ¶ 2. So too here.

55.     In granting the plaintiffs' preliminary injunction in the Aequum proceeding, this Court concluded that "once funds are deposited and comingled … the proceeds are going to … be

untraceable.  And which could effectively end this litigation and irreparably harm [the plaintiffs'] ability to claim a security interest in the funds that are disbursed, … that there'll be no effective remedy for this Court. … [T]he Court can maintain the status quo and issue a preliminary … injunction to protect a remedy." Exhibit 3 (June 17, 2026 Aequum Hearing Tr.) at 155:9-21.  These same reasons apply here.

56.     *Next*, the Debtors will likely argue that the release of $25.7 million of Evolution's cash collateral renders Evolution's pending Appeal, as it relates to those funds, equitably moot. The only basis for the Debtors releasing $25.7 million of Evolution's cash collateral is that Evolution purportedly lacks a perfected, first-priority security interest in the Section 5(g) Receivables.  *See* Release Motion ¶¶ 15, 19-20.  But whether Evolution's Section 5(g) Interest is perfected is the precise issue currently pending in Evolution's Appeal.  *See* Exhibit 1 ¶ 22.  The release of the $25.7 million from the Factored Receivables Account, notwithstanding Evolution's pending Appeal, risks effectively rendering the portion of the appeal applicable to those funds moot and unreviewable, which is improper.  *See, e.g.*, *Tex. Equip.*, 283 B.R. at 228 (finding irreparable harm element satisfied where the failure to obtain a stay would make the "sale of [] property at issue in both the adversary and the contested matter … irreversible, even if the court is found to have erred in its judgment in the adversary"); *Westwood Plaza*, 150 B.R. at 169 (finding irreparable harm because, "if the stay is not granted … consummation of the Plan may render any challenges to the confirmation moot").  The "threat of equitable mootness is enough to satisfy the requirement of showing some irreparable injury." *E.g.*, *In re Gen. Motors Corp.*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009) (emphasis in original); *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *3 (Bankr. W.D. Tex. Dec. 21, 2009) (applying the holding of *General Motors*).[8]

---

[8] Evolution expressly reserves all rights and does not concede that its Appeal is or will become moot; it merely acknowledges the potential risk of equitable mootness.

19

57.     *Finally*, the arguments Debtors have raised in opposing Evolution's motion for leave to appeal demonstrate their transparent strategy to block appellate review so they can dissipate Evolutions' cash collateral.  They argue in their opposition brief that the SJ Order is not final, and therefore not appealable, because the "priority issue between Evolution and the Prepetition Lenders remains in dispute."  Adv. Pro. No. 26-03006, Docket No. 81 ¶ 16; *accord* Adv. Pro. No. 26-03006, Docket No. 82 ¶ 3.  And in its capacity as DIP Agent, the Wilmington Savings Fund Society, FSB defendant argued that, despite the SJ Order, "neither the DIP Secured Parties nor the Prepetition Secured Parties can collect on the proceeds of the non-purchased receivables" until the priority issue is resolved in Evolution's adversary proceeding.  Adv. Pro. No. 26-03006, Docket No. 83 ¶ 5-6 & n.6.

58.     These positions flatly contradict Debtors' Release Motion, which argues that the ABL Secured Parties "hold a first priority lien" in the Section 5(g) Receivables, that the SJ Order rendered Evolution's lien "avoidable" and junior in priority, and that the Court should authorize the release of $25.7 million of Evolution's cash collateral to pay down the ABL Secured Parties' claims.  *See* Release Motion ¶¶ 17, 19.  Staying proceedings on the Release Motion will prevent the Debtors' self-serving gamesmanship and avoid irreparable harm to Evolution.

## C.     A Stay Will Not Substantially Injure Other Parties

59.     While releasing the funds will cause irreparable harm to Evolution, suspending proceedings on the Release Motion will not harm any other parties.

60.     The Debtors acknowledge the $25.7 million will **not** be used to fund their operations but instead will be "used to pay down ABL Claims."  Release Motion ¶ 16.  That is the purpose of the Plan—not a motion under Section 105(a) of the Code.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466 (2017) (rejecting attempts to make "general end-of-case distributions of estate assets to creditors" outside a "Chapter 7 liquidation or Chapter 11 plan"); *In*

*re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993) (holding that Section 105(a) does not allow "payment of post-petition funds to satisfy pre-petition claims").

61.     Nowhere in the Release Motion do the Debtors articulate any need to pay down the ABL Claims at this time, or why the Debtors cannot follow the Plan they proposed and wait until after Evolution's adversary appeal is finally resolved, as contemplated by the Plan for every other creditor.  The ABL Secured Parties—*i.e.*, Bank of America and the ABL Lenders—have also not professed any need for the funds.  The ABL Lenders are massive banks with plenty of cash and large market capitalizations.  *See* Docket No. 1285-7 (10th Amendment to ABL Credit Agreement), at ECF pp. 11-14 (listing ABL Lenders).  The Release Motion also states that the ABL Secured Parties have agreed to "turn[] over any property received by the ABL Secured Parties through this Motion and any related order to the DIP Agent if the Court determines that the DIP Secured Parties have priority over [the Released Funds]."  Release Motion ¶ 17 n.5.  If the ABL Secured Parties needed the $25.7 million, they would not have agreed to turn the funds over in those circumstances.  That the ABL Secured Parties have agreed to turn over the funds to the DIP Agent—but not Evolution—if a superior interest is established only underscores that the goal is to cut off Evolution's lien and its rights to an appeal.  There is simply no deadline, shortfall, prejudice, or emergency necessitating the release of funds to the ABL Secured Parties at this time.[9]

62.     Holding the Release Motion in abeyance merely preserves the status quo.  The Debtors' prepetition accounts receivable have been sitting in the Factored Receivables Account

---

[9] Even if the Debtors were to feign a sudden need for Evolution's cash collateral, that would not be a sufficient reason to release the funds. *See, e.g.*, *In re Goode*, 235 B.R. 584, 590 (Bankr. E.D. Tex. 1999) ("While the … ramifications of failing to get [authorization to use creditor's cash collateral] can be devastating to a debtor's case, that fact alone simply cannot suffice as the sole means by which to justify the use of a creditor's cash collateral."); *see also id.* (explaining that "[c]ash collateral is a precious commodity," and its use "can be granted only when the creditor's interest in those funds can be adequately protected"); *see also In re Scott*, 2011 WL 13394235, at *3 (Bankr. E.D. Mich. June 29, 2011) (explaining that the "important substantial and procedural rights [to adequate protection] cannot be sacrificed [at the] altar" of expediency).

21

for at least six months, *see, e.g.*, Docket No. 807 ¶ 5 (explaining that, "[p]ursuant to the Final Cash Management Order [dated November 7, 2025], the Debtors have [] established a new bank account (the 'Factored Receivables Account') to segregate and hold the Collected Receipts"), and the specific $25.7 million sought by the Release Motion has been sitting in the Factored Receivables Account for more than three months, *see* Docket No. 2127 ¶ 2 (ordering the Debtors to "deposit $25.7 million into the Factored Receivables Account on or before March 19, 2026"). There is no reason the funds cannot continue to sit in the Factored Receivables Account pending resolution of Evolution's Appeal.

63.     While the Debtors claim that "[t]he release of the Returned Funds no later than July 10, 2026 was a material inducement to obtain the ABL Secured Parties' agreement to fund the budget pursuant to the Funding Settlement," Release Motion ¶ 17, that is not true. The Disclosure Statement states that as a condition for the ABL Parties' support for the Confirmation Budget, "the Debtors will *seek to obtain* the release of $25.7 million in the Factored Receivables Account that was returned to the account as adequate protection pending a determination of Evolution's lien … and use such funds to pay down the ABL Secured Parties no later than July 10, 2026." Docket No. 3020 at 3 (ECF p. 15) (emphasis added). In other words, the Debtors are required only to *seek* (but not obtain) the funds, further evidence that neither the Debtors nor the ABL Secured Parties have an immediate need for them.[10] But even if the Court were to credit the Debtors' position that seeking the funds was a "material inducement" to fund their budget, *see* Release Motion ¶ 17, the

---

[10] Debtors cannot actually believe the *release* of funds is necessary by July 10, 2026. They filed the Release Motion on June 22, 2026, with any objections due by July 13, 2026. And a hearing will presumably follow sometime thereafter.

22

Debtors satisfied that condition by seeking the funds, and granting Evolution a stay of the *release* of the funds would not change that fact.[11]

64.     In sum, the Debtors cannot show that staying proceedings on the Release Motion will harm any party.

**D.     The Public Interest Favors a Stay**

65.     The public-interest element "usually plays a prominent role when the court's judgment involves public rights, or the private rights of many individuals," as opposed to cases, as here, "merely involv[ing] the private rights of two claimants to property." *Tex. Equip.*, 283 B.R. at 228 (citation omitted).  Even so, there is "a public interest in protecting the right to appellate review when it can be done without undue prejudice to the side that won below." *Motors Liquidation Co.*, 539 B.R. at 687.

66.     Here, given the legal issues involved, and the fact that staying proceedings would not impair the public interest, the Court should find that Evolution has satisfied this element and grant Evolution's Motion.

## EMERGENCY CONSIDERATION

67.     Pursuant to Bankruptcy Local Rule 9013-1(i), emergency consideration is appropriate.  Evolution has sought the Debtors' consent to stay proceedings on the Release Motion until Evolution's security interest is resolved in a final, non-appealable order, to no avail.  Objections to the Release Motion are due by July 13, 2026, and Evolution requires relief before that time.  If the Release Motion is granted, Evolution faces irreparable harm.  But if the Court grants this Motion to stay proceedings, there will be no need for further briefing or consideration

---

[11] Even if the Plan required the Debtors to obtain (rather than merely seek) the $25.7 million as a condition of funding their budget, that would have effectively required the Debtors to bargain away Evolution's rights, which is inequitable and would frustrate Evolution's right to an appeal.

of the Release Motion, thereby saving time, expense, and resources for all parties and the Court. Evolution respectfully requests emergency consideration of this Motion on or before July 9, 2026.

## **CONCLUSION**

Tor the reasons set forth herein, Evolution respectfully requests that the Court enter an order suspending or continuing proceedings on Debtors' Release Motion, including entry of the Proposed Release Order, until 14 days after entry of a final, non-appealable order resolving Evolution's claimed perfected, first-priority security interest; and (b) granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

24

Respectfully submitted this 29th day of June 2026,

**GRAY REED**

By: */s/ Jason S. Brookner*

Jason S. Brookner
Texas Bar No. 24033684
Emily F. Shanks
Texas Bar No. 24110350
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:        (713) 986-7000
Facsimile:        (713) 986-7100
Email:        jbrookner@grayreed.com
        eshanks@grayreed.com

- and -

**ELSBERG BAKER & MARURI PLLC**

Michael Duke (admitted *pro hac vice*)
David Elsberg (admitted *pro hac vice*)
Vivek Tata (admitted *pro hac vice*)
Garrett Gerber (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
Ella Epstein (admitted *pro hac vice*)
350 Fifth Avenue, 38th Floor
New York, NY 10018
Telephone:    (212) 597-2600
Email:        delsberg@elsberglaw.com
        mduke@elsberglaw.com
        vtata@elsberglaw.com
        ggerber@elsberglaw.com
        aparks@elsberglaw.com
        eepstein@elsberglaw.com

-and-

**PROSKAUER ROSE LLP**

Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:    (212) 969-3000
Email:        vindelicato@proskauer.com
        mkoch@proskauer.com

- and -

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone:    (617) 526-9600
Email:        cdale@proskauer.com

*Counsel to Evolution*

25

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 29th day of June 2026, he caused a true and correct copy of the foregoing document by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner