**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**CERTIFICATE OF PUBLICATION**

I, Zachary Steinberg, declare and state as follows:

I am employed by Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent for the Debtors in the above-captioned chapter 11 cases.

This Certificate of Publication includes a certification verifying that the *Notice of (I) Conditional Approval of Disclosure Statement (II) Approval of (A) Solicitation and Voting Procedures, (B) Administrative Expense Claims Consent Program Opt-In Procedures, (C) Preference Settlement Opt-In Procedures, (III) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation of Plan, and (IV) Establishing Notice and Objection Procedures for Final Approval of Disclosure Statement and Confirmation of Plan*, as conformed for publication, was published on June 20, 2026 in the national edition of *The New York Times*, as described in the proof of publication attached as **Exhibit A**.

Dated: June 29, 2026

*/s/ Zachary Steinberg*
Zachary Steinberg

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

SRF 97039

**Exhibit A**



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

June 23, 2026

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

6/20/2026, NY/NATL, pg B3

*Larnyce Tabron*



ROWENA SORIANO
NOTARY PUBLIC
REG. # 00351915
MY COMMISSION EXPIRES
06302029
COMMONWEALTH OF VIRGINIA

**TRADE | AIRLINES**

## Direction of Trade Talks Gives Lawmakers Anxiety

FROM FIRST BUSINESS PAGE

Representative Linda T. Sánchez of California, the top Democrat on a House trade panel, said in an interview that she was a "big proponent" of maintaining the trilateral structure of U.S.M.C.A.

"I'm concerned that the Trump administration is going to abandon that and do these bilateral, like M.O.U.s, which don't have the full effect of Congress," she said, comparing Mr. Trump's trade deals to informal memorandums of understanding.

Mr. Trump negotiated U.S.M.C.A. in his first term to revise the North American Free Trade Agreement, which he called one of the worst deals ever. U.S.M.C.A. wrapped in priorities of both Republicans and Democrats, and its "implementation act" passed Congress with bipartisan support in 2020.

Since then, Mr. Trump and his advisers have grown more critical of the pact, seeing it as responsible for trade deficits with Canada and Mexico, America's biggest trading partners.

Under the terms of the agreement, the three countries promised to review the deal by July 1 of this year. During negotiations in Mexico last month, the United States proposed changes to the pact's rules for metals, cars and other goods, including raising the requirement for how much local materials cars need to be made with to be exempt from tariffs.



Jamieson Greer, the U.S. trade representative, said talks with Mexican representatives had been positive.

U.S.M.C.A. requires cars to source 75 percent of their content by value from North America to qualify for tariff-free treatment. The Trump administration would raise that threshold to 82 percent, while requiring 50 percent of a car's content to come from the United States, people familiar with the proposals said. The U.S. is also proposing expanding those requirements to new types of car parts and setting new content requirements for other industries, including electronics.

In an interview on Thursday, Jamieson Greer, the U.S. trade representative, said talks this week with Mexican officials had been positive, and included discussions of how to revive the global electronics supply chain in the United States and Mexico, while keeping the U.S. trade deficit with Mexico down.

"We certainly want more U.S. content, but to the extent we're going to be importing these other things, we want to have them as close to home as possible," he said of the electronics industry.

Mr. Greer has talked about the importance of keeping parts of U.S.M.C.A. intact, but the president has lately seemed far more critical. In France on Wednesday, Mr. Trump said the United States would "do better without" the pact.

"I would rather not have the agreement, but I may sign it," Mr. Trump said. "We do better as a country if we don't have an agreement."

U.S.M.C.A. and its predecessor, NAFTA, have always been somewhat divisive politically, but the three countries are carrying out negotiations over U.S.M.C.A.'s future at a sensitive political moment, as midterms loom and Mr. Trump's economy is on the ballot.

While some parties, like the United Automobile Workers union or Florida tomato growers, have intense criticisms of the pact, it has many defenders. The deal's future is particularly important for states that export farm goods, as well as those on U.S. borders that are economically integrated with Canada or Mexico.

In a hearing this month held by the House Committee on Agriculture, Representative Glenn Thompson of Pennsylvania, the committee's Republican chairman, said the agreement had proved "extremely beneficial" to farmers, ranchers, consumers "and the economy as a whole." But he conceded that it had provisions that could be improved.

Democrats are urging changes that they say would benefit workers and the environment. Ms. Sánchez led nearly 20 Democrats in a letter urging Mr. Greer to negotiate provisions that would target threats to economic security, strengthen workers' rights and add environmental protections.

Ms. Sánchez's district is particularly affected by trade because it is close to the Port of Los Angeles. After a public forum in a Los Angeles suburb, a small-business owner told her that he had to close his business because of Mr. Trump's tariffs. She said she was unsatisfied with the administration's engagement on U.S.M.C.A., and she blamed her Republican colleagues for ceding power to the president on trade.

"The administration doesn't seem particularly interested in involving Congress in these trade negotiations," Ms. Sánchez said.

Republicans have an even trickier calculus. Many come from states that are major exporters, but they also face potential political peril for standing up to the president's trade agenda. Since Mr. Trump's return to office, Republicans in Congress have repeatedly moved to try to block tariffs.

Many Republicans have tried to walk a line of voicing support for U.S.M.C.A. while saying it has room for improvements.

"A renewed U.S.M.C.A. really, I think, can hold our neighbors accountable, and then work for our own ag producers and our manufacturers," Representative Adrian Smith of Nebraska, the top Republican on a House trade panel, said. "Right now, our role is to elevate the profile of the policy and the issue itself, given its importance to our economy," he added.

Mr. Smith said he was "not a fan of tariffs" but had come around to some of the administration's efforts to open up foreign markets to American business.

Sidelined from the negotiations, Republican and Democratic lawmakers have penned letter after letter, held briefings with experts and traveled to Mexico City during talks last month to make their priorities heard.

The administration is also sparring with some lawmakers about the role Congress will play in the pact's approval. Mr. Greer said Thursday that he would seek Congress's approval if the revised pact made changes to U.S. law, but that the changes were more likely to affect Canada and Mexico than the United States.

"We don't really have to change our laws to get better terms of trade with Canada and Mexico," he said. "We need Canada and Mexico to change the way that they're treating our country."

The Constitution delegates trade as the legislative branch's responsibility. But the bill that Congress passed to enact U.S.M.C.A. gives the executive branch the power to modify certain rules, though some say the changes the administration is pushing for go beyond the scope Congress intended.

Mr. Smith said he could imagine "a path that would mean that Congress wouldn't necessarily need to vote on it again." But Democrats, including Ms. Sánchez, say Mr. Trump should submit the agreement for a congressional vote.

Lawmakers of both parties have also argued that, even if the administration doesn't need them to approve its changes, Mr. Trump should turn to Congress if he wants his policies to be long-lasting. Otherwise, the next president could unwind them.

Greta M. Peisch, a trade lawyer who served in the Office of the U.S. Trade Representative under the Biden administration, said there was a "bright line" legally dictating that Congress must have a role when U.S. law was changed or if the United States entered into a new trade agreement.

But if U.S.M.C.A. is modified without requiring changes to the law, it isn't clear what Congress's role ought to be. That, she said, is "a really big gray area."

*Tony Romm contributed reporting.*



EVELYN HOCKSTEIN/REUTERS
A soybean farm in Virginia. Agriculture has been a main topic of trade talks.



PHOTOGRAPHS by DeSEAN McCLINTON-HOLLAND FOR THE NEW YORK TIMES
If the buyer of Spirit's slots does not use Terminal A, also known as the Marine Air Terminal, it could leave the terminal underfunded, the Port Authority says.

## A Spirit Estate Sale at LaGuardia: 22 Flights

FROM FIRST BUSINESS PAGE

money to.

The F.A.A. has said it wants Spirit's LaGuardia slots to be absorbed by an airline that will continue to offer relatively low fares. If that does not happen, it might do away with the slots to ease congestion, Bryan Bedford, the F.A.A. administrator, told reporters last month.

The F.A.A. did not respond to requests for comment.

Two large airlines — Delta Air Lines and American Airlines — account for most of the flights at LaGuardia. Last summer, Delta had about 511 slots at the airport and American 327, out of a total of 1,141.

But flying at LaGuardia is not cheap. All airports charge airlines fees to fund infrastructure and other improvements. Those costs have been on the rise across the country, and LaGuardia is among the most expensive airports for carriers, aviation experts said.

"Slots are just not the same today that they were 20 years ago, just not the same value," said William Swelbar, an aviation consultant and economist.

JetBlue Airways, which has a large hub at Kennedy Airport, has cut back on flying at LaGuardia in recent years because of those rising costs. At an investor conference in March, the airline's president said JetBlue paid about $40 per departing passenger to fly at LaGuardia. JetBlue said in a statement that it was evaluating the opportunity to expand at LaGuardia but that it was also "mindful of the significant costs associated with operating at New York-area airports."

Frontier Airlines, Spirit's biggest rival among budget airlines, may bid for the slots, too. After Spirit and JetBlue proposed a merger in 2022, Frontier agreed to take those slots once the deal was completed. But the merger fell through when the Justice Department successfully sued to stop it, arguing that it was bad for consumers. Frontier had four slots at LaGuardia last year and declined to comment on whether it planned to bid for Spirit's slots.

Flying at LaGuardia could be risky for budget airlines. Spirit



Spirit has said its 22 LaGuardia flights could be worth up to $87 million.

failed partly because it flew at too many airports like LaGuardia that were dominated by larger carriers that had deeper pockets, owned more planes and flew to more places. The larger airlines can offer travelers more departures, more connecting flights and other perks that a smaller carrier cannot, experts said.

Spirit's 11 round-trip flights may not be enough to justify the expense of flying out of such a busy airport.

"The question is, what would you do with 22 slots at LaGuardia?" said Bob Mann, an industry consultant and a former airline executive.

Larger carriers like Delta or United Airlines, which dominates flying at Newark Liberty, have an easier time offsetting high airport costs because they make a lot of money from business and first-class seats, corporate customers, branded credit cards and loyalty programs.

The Port Authority of New York and New Jersey, which oversees the region's airports, bridges and other infrastructure, has pushed back on Spirit's planned auction, saying it should be more involved. Slots are useless without airport gates, the Port Authority argued, so any company assuming Spirit's slots must also take over its lease at Terminal A, which is also known as the Marine Air Terminal.

If an airline buys the slots but does not use Terminal A, it could cause congestion at other parts of the airport while leaving that terminal underfunded, the Port Authority argued. Terminal A opened in 1940 and is highly regarded by architecture and art experts for its Art Deco design and the large mural in its public spaces.

The process of replacing Spirit at Newark and LaGuardia should be "driven by competition, access and serving new or underserved markets," the Port Authority's executive director, Kathryn Garcia, said in a May letter to Mr. Bedford of the F.A.A. that was obtained by The New York Times.

At a hearing last week, Judge Sean H. Lane of U.S. Bankruptcy Court for the Southern District of New York, who is overseeing Spirit's bankruptcy, acknowledged the Port Authority's concerns but allowed the bidding process to begin anyway, saying his decision would amount to a "starting gun" in the race to find a buyer.

Airlines sometimes trade slots, especially when they are merging or selling themselves. But federal regulators often review such transactions and sometimes force companies to give up some airport access as a condition of merger approval. In 2013, for example, Southwest acquired a dozen slots at LaGuardia after American Airlines was forced to put them up for sale as part of its merger with US Airways.

Spirit's executives could earn big bonuses from the slot sales, according to a proposed incentive plan, a common part of bankruptcy proceedings intended to encourage top managers to maximize asset sales.

The Justice Department and unions representing pilots, flight attendants and other Spirit employees have pushed back on that plan, saying executives have already been handsomely paid while workers have been left without compensation for vacation and sick leave. But Judge Lane said he was inclined to allow it.

The bids for Spirit's slots are due by the end of this month.

Whatever happens, the slots will be a drop in the bucket compared with Spirit's other assets. Its planes, which are mostly sitting in desert storage in Arizona and California, and engines are worth up to $1.35 billion, according to a bankruptcy court document Spirit submitted in April.



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

In re: FIRST BRANDS GROUP, LLC, *et al.*, Debtors.[1]    Chapter 11    Case No. 25-90399 (CML)    (Jointly Administered)

NOTICE OF (I) CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT (II) APPROVAL OF (A) SOLICITATION AND VOTING PROCEDURES, (B) ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM OPT-IN PROCEDURES, (C) PREFERENCE SETTLEMENT OPT-IN PROCEDURES, (III) COMBINED HEARING TO CONSIDER FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN, AND (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN

TO ALL PARTIES IN INTEREST IN THE CHAPTER 11 CASES OF:

Name of Debtors: Airtex Industries, LLC; Airtex Products, LP; APC Intermediate Holdings, LLC; APC Parent, LLC; ASC Industries, Inc.; Autolink Operations LLC; AVM Export, Inc.; BPII Acquisition Company, LLC; BPI EC, LLC; BPII Holdings International, LLC; Brake Parts Inc China LLC; Brake Parts Inc India LLC; Brake Parts Inc LLC; Cardone Industries, Inc.; Carland Companies, Inc.; Carter Carburetor Holdings, LLC; Carter Carburetor, LLC; Carter Fuel Export, Inc.; Carter Fuel Systems, LLC; Champion Laboratories, Inc.; CWD Holding, LLC; CWD Intermediate Holdings I, LLC; CWD Intermediate Holdings II, LLC; CWD, LLC; Dalton Corporation; Dalton Corporation, Ashland Manufacturing Facility; Dalton Corporation, Kendallville Manufacturing Facility; Dalton Corporation, Stryker Machining Facility Co.; Dalton Corporation, Warsaw Manufacturing Facility; Eagle Casting Holdings, LLC; Eagle Casting, LLC; Eagle Machining, LLC; First Brands Group Holdings, LLC; First Brands Group Intermediate, LLC; First Brands Group, LLC; FRAM Group IP LLC; FRAM Group Operations LLC; FRAMAuto Holdings, LLC; Fuel Filter Technologies, Inc.; Global Reman Ventures, LLC; Heatherton Holdings, LLC; Hopkins Acquisition, Inc.; Hopkins Manufacturing Corporation; Horizon Euro Finance LLC; Horizon Global Americas Inc.; Horizon Global Company LLC; Horizon Global Corporation; Horizon International Holdings, LLC; International Holding Company, Inc.; International Brake Industries, Inc.; Jasper Acquisition Corp.; Jasper Rubber Products, Inc.; KTRI Holdings, Inc.; KTRI Offshore Holdings, LLC; Longman Enterprises, Inc.; PHNX Acquisition Corp.; Premier Marketing Group, LLC; Pylon Manufacturing Corp.; Pylon South Bend, Inc.; Qualis Automotive, L.L.C.; Qualis Enterprises, LLC; Qualitor Acquisition Inc.; Qualitor Automotive, LLC; Qualitor Subsidiary H, Inc.; Qualitor Subsidiary S, Inc.; Qualitor, Inc.; Reman Management International LLC; SDC TX, LLC; Smart Choice, LLC; Specialty Pumps Group, Inc.; Strongarm, LLC; TAE Brakes, LLC; TAE China Holdings, Inc.; Toledo Molding & Die, LLC; Transportation Aftermarket Enterprise, LLC; Trico Holding Corporation; Trico Products Corporation; Trico Technologies Corporation; Tridonex USA LLC; UCII Acquisition Holdings (No. 4) LLC; UCII International Holdings Parent Inc.; UCII International Holdings, Inc.; UCII International, LLC; UCII Pennsylvania, Inc.; UCII-Airtex Holdings, Inc.; United Components, LLC; Universal Auto Filter LLC; Viceroy Private Capital, LLC; Viper Acquisition I, Inc.; Viper Acquisition, Inc.; Wallros LLC; Wallros Midco LLC; WEM US Co.

PLEASE TAKE NOTICE OF THE FOLLOWING:

1. Conditional Approval of Disclosure Statement. On June 12, 2026, the United States Bankruptcy Court for the Southern District of Texas (the "Court") held a hearing at which it conditionally approved the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, filed on June 12, 2026 (Docket No. 2982) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "Disclosure Statement") of First Brands Group Holdings, LLC, its direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC (collectively, the "FBG Debtors"), and thereafter entered an order (Docket No. 2990) (the "Disclosure Statement Order") with respect thereto. The Disclosure Statement Order, among other things, authorizes the FBG Debtors to solicit votes on the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, filed on June 12, 2026 (Docket No. 2981) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "Plan").[2]

2. Combined Hearing. A hearing to consider final approval of the Plan and final approval of the Disclosure Statement (the "Combined Hearing") has been scheduled for July 28, 2026 at 9:00 a.m. (Central Time) before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in the Court. The Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than by a Court announcement providing for such adjournment or continuation on a docket. The Plan may be modified, if necessary prior to, during, or as a result of the Combined Hearing.

3. Voting Record Date. Holders of Claims in Class 4 (ABL Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), Class 6 (ABL Claims), Class 7 (General Unsecured Claims), and Class 8 (Subordinated Claims) as of June 13, 2026 who are otherwise eligible to vote shall be entitled to vote on the Plan.

4. Voting Deadline. If you want to complete a ballot and intend to vote on the Plan, you must execute and return your completed Ballot according to and as set forth in detail in the voting instructions on your Ballot so that it is actually received by the Debtors' voting agent, Kroll Restructuring Administration LLC ("Kroll") on or before July 20, 2026 at 5:00 p.m. (Central Time). ANY FAILURE TO FOLLOW THE INSTRUCTIONS INCLUDED WITH YOUR BALLOT AND YOUR VOTE.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

In re: OFFICE PROPERTIES INCOME TRUST, *et al.*, Debtors.[1]    Chapter 11    Case No. 25-90530 (CML)    (Jointly Administered)

NOTICE OF (I) ENTRY OF ORDER CONFIRMING FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OFFICE PROPERTIES INCOME TRUST AND ITS DEBTOR AFFILIATES, (II) OCCURRENCE OF SUCH PLAN'S EFFECTIVE DATE, AND (III) RELATED DEADLINES WITH RESPECT TO ADMINISTRATIVE EXPENSE AND REJECTION DAMAGE CLAIMS

THE LEGAL PROCEEDINGS AND RELATED TRANSACTIONS DESCRIBED IN THIS NOTICE (THIS "NOTICE") MAY AFFECT YOUR RIGHTS. PLEASE READ THE BELOW CAREFULLY AND TAKE NOTICE THAT:

On April 21, 2026, Office Properties Income Trust and its debtor affiliates (collectively, the "Debtors" or the "Reorganized Debtors", as applicable) filed the Fourth Amended Joint Chapter 11 Plan of Reorganization of Office Properties Income Trust and Its Debtor Affiliates [Docket No. 1223] (together with the Plan Supplement, in each case as amended, modified, or supplemented from time to time, the "Plan").[2]

The United States Bankruptcy Court for the Southern District of Texas (the "Court") held a hearing to consider confirmation of the Plan on April 22, 2026. On April 22, 2026, the Court entered the *Order Confirming the Fourth Amended Joint Chapter 11 Plan of Reorganization of Office Properties Income Trust and Its Debtor Affiliates* [Docket No. 1241] (the "Confirmation Order"). Pursuant to its terms, the Plan was substantially consummated and became effective on June 17, 2026 at 6:00 p.m. (prevailing Eastern Time) (the "Plan Effective Date").

Deadlines for Filing Administrative Claims and Contract Rejection Claims. The Court established July 17, 2026, (the "Administrative Claims Bar Date") as the deadline by which holders of Administrative Claims must (a) file on the Court's docket and (b) serve on the Notice and Claims Agent proofs of administrative claim against the Reorganized Debtors. The proof of administrative claim form (the "Proof of Administrative Claim Form") is available free of charge on the website of the Reorganized Debtors' Notice and Claims Agent, Kroll Restructuring Administration LLC (the "Notice and Claims Agent") https://restructuring.ra.kroll.com/OPI (the "Restructuring Website").

Holders of the following Administrative Claims are not required to file or serve a Proof of Administrative Claim on or before the Administrative Claims Bar Date solely with respect to such Administrative Claim: (a) an Administrative Claim against the Reorganized Debtors for which a signed proof of administrative claim has already been properly filed with the Clerk of the Court or the Notice and Claims Agent in a form substantially similar to the Proof of Administrative Claim Form; (b) an Administrative Claim that has been previously allowed and/or paid in full by the Debtors, in accordance with the Bankruptcy Code or an order of the Court; (c) an Administrative Claim that constitutes a Professional Fee Claim; and (d) any claim of any "governmental unit," as that term is defined under the Bankruptcy Code, under section 503(b)(1)(D) of the Bankruptcy Code (collectively, the "Excluded Administrative Claims").

All Holders of claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases (if any) must file a proof of claim against the Debtors (the "Contract Rejection Claims") on the date that is twenty-one (21) days following entry of the order (including the Confirmation Order) approving the rejection of the applicable Executory Contract or Unexpired Lease (the "Contract Rejection Bar Date"), and together with the Administrative Claims Bar Date, the "Applicable Bar Date"). The proof of claim form is available free of charge on the Restructuring Website. If applicable, a separate rejection notice will be sent to all known non-Debtor contract counterparties to such rejected contracts and leases (if any) with a proof of claim form (the "Proof of Contract Rejection Claim Form" and, together with the Proof of

Administrative Claim Form, the "Applicable Forms"). Contract Rejection Claims will be treated as Class 11 Trade and Vendor Claim or Class 12 Other General Unsecured Claim, respectively.

All Holders of Administrative Claims (other than Excluded Administrative Claims) and Contract Rejection Claims (if any) must (a) file on the Court's docket and (b) serve by overnight mail, courier service, hand delivery, regular mail, or in person) an original, written Proof of Administrative Claim Form or Proof of Contract Rejection Claim Form, as applicable, so as to be actually received by the Notice and Claims Agent, by no later than the Applicable Bar Date via electronic submission on the following webpage of the Restructuring Website: https://restructuring.ra.kroll.com/OPI, or, alternatively, at the following address: If by first-class mail: Office Properties Income Trust Claims Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850; If by hand delivery or overnight courier: Office Properties Income Trust Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.

The Applicable Forms will be deemed timely served only if actually received by the Notice and Claims Agent on or before the Applicable Bar Date. The Applicable Forms may not be delivered by facsimile, telecopy, or e-mail transmission. Any facsimile, telecopy, or electronic mail submissions will not be accepted and will not be deemed served unless the Applicable Form is submitted to the Notice and Claims Agent by overnight mail, courier service, hand delivery, regular mail, in person, or electronically through the Notice and Claims Agent.

Parties wishing to receive acknowledgment that their Applicable Forms were received by the Notice and Claims Agent must submit (a) a copy of the Applicable Form and (b) a self-addressed, stamped envelope (in addition to the original Applicable Form sent to the Notice and Claims Agent).

To be valid, your Applicable Form MUST be (a) signed by the applicable Holder of the Administrative Claim or Contract Rejection Claim, as applicable; (b) written in the English language; (c) denominated in lawful currency of the United States; and (d) submitted with copies of any supporting documentation or an explanation of why any such documentation is not available.

Any Holder of an Administrative Claim or Contract Rejection Claim (if any), as applicable, who is required, but fails, to file and serve the Applicable Form with the Notice and Claims Agent on or before the Applicable Bar Date shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors or the Reorganized Debtors, and the Debtors' and the Reorganized Debtors' property shall be forever discharged from any and all indebtedness or liability with respect to such claim.

The Plan and the Confirmation Order may be viewed for free on the Restructuring Website, or for a fee on the Court's website at http://www.txs.uscourts.gov/page/bankruptcy-court.

Dated: June 17, 2026, Houston, Texas, By Order of the Court, /s/ Timothy A. ("Tad") Davidson II, HUNTON ANDREWS KURTH LLP, Timothy A. ("Tad") Davidson II (Texas Bar No. 24012502), Ashley L. Harper (Texas Bar No. 24065272), Philip M. Guffy (Texas Bar No. 24113705), 600 Travis Street, Suite 4200, Houston, TX 77002, Telephone: (713) 220-4200, Email: taddavidson@hunton.com, ashleyharper@hunton.com, pguffy@hunton.com —and— LATHAM & WATKINS LLP, Ray C. Schrock (NY Bar No. 4860631), Anupama Yerramalli (NY Bar No. 4645859), Keith A. Simon (NY Bar No. 4636007), Ashley Gherbone Pezzi (NY Bar No. 5754213), Anthony R. Joseph (NY Bar No. 6329886), 1271 Avenue of the Americas, New York, NY 10020, Telephone: (212) 906-1200, Email: ray.schrock@lw.com, amy.yerramalli@lw.com, keith.simon@lw.com, ashley.pezzi@lw.com, anthony.joseph@lw.com, Attorneys for the Debtors and Debtors in Possession

A complete list of the Debtors in the Chapter 11 Cases may be obtained at https://restructuring.ra.kroll.com/OPI. The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

Capitalized terms used in this Notice but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

(Other Priority Claims), and Claims in Class 2 (Other Secured Claims), will receive a Notice of Non-Voting Status and Release Opt-In Form to opt-in to the Third-Party Releases set forth in the Plan. Holders of Claims in Class 9 (Intercompany Claims) and Class 10 (FBG Debtor Interests) are either Plan proponents or are controlled by Plan proponents and have waived receipt of any solicitation-related notices or materials.

5. Rule 3018 Motions. If any creditor (i) seeks to vote on the Plan but such holder's Claim is not listed on the FBG Debtors' Schedules, books and records, and the holder did not file a proof of claim; (ii) seeks to vote in a different amount than is reflected on the FBG Debtors' Schedules, books and records, or filed Proof of Claim; or (iii) is a holder of a Claim that is subject to an objection, a request for estimation, or an adversary proceeding as of July 3, 2026 at 5:00 p.m. (Central Time), (such Claim, a "Potentially Disallowed Claim"), such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes (a "Rule 3018(a) Motion") to vote on the Plan. Any Rule 3018(a) Motion must be filed with the Court not later than July 10, 2026 at 5:00 p.m. (Central Time). Upon the filing of any such Rule 3018(a) Motion, such creditor will receive a Provisional Ballot, which shall be tabulated in accordance with the guidelines provided in the Solicitation and Voting Procedures attached as Exhibit 2 to the Disclosure Statement Order.

7. Preference Settlement Opt-in Program. If you are a Trade Creditor, Supply Chain Financer, or factor of one or more FBG Debtors and you receive a Preference Settlement Opt-In Form and intend to participate in the Preference Settlement, you must: (i) follow the instructions carefully; (ii) complete all of the required information on the Preference Settlement Opt-In Form; and (iii) timely execute and return your completed Preference Settlement Opt-In Form according to and as set forth in detail in the instructions on your Preference Settlement Opt-In Form so that it is actually received by Kroll on or before 5:00 p.m. (Central Time) on the date that is forty-five (45) days after the Confirmation Date. ANY FAILURE TO FOLLOW THE INSTRUCTIONS INCLUDED WITH YOUR PREFERENCE SETTLEMENT OPT-IN FORM MAY DISQUALIFY YOUR OPT-IN FOR ELECTION.

8. Administrative Expense Claims Consent Program. If you are a holder of an Administrative Expense Claim and the Plan is confirmed, you will receive a Consent Program Opt-In Form following the Confirmation Date.

9. Objections to Confirmation. The deadline to object or respond to confirmation of the Plan or final approval of the Disclosure Statement is July 20, 2026 at 5:00 p.m. (Central Time) (the "Combined Objection Deadline").

10. Form and Manner of Objections. Objections and responses, if any, to confirmation of the Plan or final approval of the Disclosure Statement, must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party; (iv) provide the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed with the Bankruptcy Court (with proof of service) via ECF or by mailing to the Bankruptcy Court at United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 402, 4th Floor, Houston, Texas 77002, so as to be actually received no later than the Combined Objection Deadline.

11. UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT IS FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THEN THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT OR THE ADEQUACY THEREOF AND MAY NOT BE HEARD AT THE COMBINED HEARING.

12. Additional Information. If you wish to obtain information, contact Kroll by: (a) calling (646) 290-7146 (international, toll) or (877) 631-1351 (U.S./Canada, toll free); (b) writing to First Brands Group, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (first class mail, hand delivery or overnight mail); or (c) emailing FirstBrandsInfo@ra.kroll.com with "First Brands Solicitation Inquiry" in the subject line. Interested parties may also review and download the Disclosure Statement and the Plan free of charge at https://restructuring.ra.kroll.com/FirstBrands. In addition, the Disclosure Statement and the Plan are on file with the Bankruptcy Court and may be reviewed for a fee by accessing the Court's website: https://www.txs.uscourts.gov/. Note that a PACER password and login are needed to access documents on the Court's website. A PACER password can be obtained at https://pacer.uscourts.gov/.

13. You may also access electronic copies of the Plan, Disclosure Statement, and any other solicitation materials via the QR Code below. Please be advised that Kroll cannot provide legal advice.

YOU ARE ENCOURAGED
TO CAREFULLY REVIEW AND CONSIDER
THE PLAN, INCLUDING THE INJUNCTION,
RELEASE, AND EXCULPATION PROVISIONS
LOCATED IN SECTIONS 13.4, 13.5, AND
13.6 OF THE PLAN AS YOUR RIGHTS MIGHT
BE AFFECTED, UNLESS AN OBJECTION
IS TIMELY SERVED AND FILED IN
ACCORDANCE WITH THIS NOTICE, IT MAY
NOT BE CONSIDERED BY THE COURT.

A complete list of the Debtors in these Chapter 11 cases may be obtained at https://restructuring.ra.kroll.com/FirstBrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order.