**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **Debtors.**[1] | § | |

## DECLARATION OF MARC S. KIRSCHNER

I, Marc S. Kirschner, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.       I submit this Declaration (this "**Declaration**") expressing my opinions in connection with certain issues relating to the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3019)[2] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**") filed by the FBG Debtors.[3]

2.       If called to testify, I would testify competently to the opinions set forth in this Declaration.  My qualifications, experience, and background are set forth in greater detail below.

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/FirstBrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[3]    "**FBG Debtors**" means, collectively, First Brands Group Holdings, LLC, its direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases.

**Qualifications**

3.     I have been working with distressed companies and companies involved in bankruptcy proceedings for over 50 years, including as a bankruptcy/reorganization lawyer, chapter 11 trustee, litigation trustee, financial advisor, investment professional, and fiduciary.

4.     I am Founder and President of Kirschner Consulting Company.  I am also presently Senior Advisor to Teneo, a global consulting and financial advisory firm.  Prior to my involvement with Teneo, I was Senior Managing Director of Goldin Associates, a boutique financial advisory firm specializing in distressed securities, which was purchased by Teneo.

5.     Earlier in my career, I founded and led (from 1987 through 2001) the bankruptcy reorganization group in the New York office of the global law firm Jones Day, Reavis & Pogue (now called Jones Day).  I was also a member of the Jones Day firm-wide Executive Committee during various periods.

6.     Following my retirement from Jones Day, I was Managing Director and one of the key senior investment professionals of Resurgence Asset Management ("**Resurgence**"), an investment advisor registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended.  Resurgence invested in distressed securities with a view to substantial involvement in the reorganization process.  In connection with this role, I analyzed legal issues relating to all investments that Resurgence considered, developed legal strategy, and played a pivotal role in managing the investments through the reorganization process.  I was also Chief Operating Officer, General Counsel, member of the Executive Committee, and Chair of the Pricing Committee of Resurgence and in charge of the legal affairs of Resurgence's affiliate, First Commercial Credit Corporation, which provided credit protection to suppliers of companies in financial distress.  Major components of Resurgence's business (and my work there) included acquiring and prosecuting claims against debtors, as well as objecting to claims of other creditors.

2

7.      Over the course of my career, I have been involved in many significant "mega" bankruptcy cases, including *Mansfield Tire and Rubber Company* (the first major case under the then-new Bankruptcy Code), *Drexel Burnham Lambert Group* (at the time by far the largest global financial services bankruptcy case which was driven into bankruptcy by the abuse of junk bonds by Michael Milken, the founder of the junk bond business), *Federated Department Stores*, *Macy's Department Stores*, *Resorts International*, *Coleco Industries Inc.*, *Anchor Glass Container Company*, *ICO Global Communications*, *New York Daily News* (part of the *Maxwell Newspapers* precedent-setting cross-border cases), *Shea & Gould*, *Washington Group International*, *Sterling Chemicals*, *Refco Capital Markets* (the largest global financial services bankruptcy case after Drexel and before the Lehman Brothers bankruptcy), *Tribune Company, Millennium Health*, *Nine West Holdings*, *Le-Nature's Bottling Company*, and *Highland Capital Management*, among others.

8.      I have extensive experience serving as a litigation or liquidation trustee, including as trustee for the Tribune Litigation Trust, Millennium Health Corporate Claims Trust and Lenders Claims Trust, Nine West (NWHI Litigation Trust), Yellowstone Mountain Trust, Le-Nature's Bottling Company Trust, and Highland Capital Management Litigation Sub-Trust.  The purpose of these trusts was to pursue litigation claims and causes of action and to distribute the proceeds thereof to the beneficiaries of the trusts, which included secured and unsecured creditors of the debtors in those cases.

9.      My roles as a litigation or liquidation trustee have involved undertaking complex factual investigations and pursuing litigation in an effort to recover billions of dollars of losses resulting from fraud and management misconduct.  These investigations and lawsuits have involved actual and constructive fraudulent transfer claims, securities law violations, common law

fraud, breach of fiduciary duty, malpractice, misappropriation of assets, preferential transfers, equitable subordination, recharacterization of leases, claims against insurance companies, and related causes of action. The defendants in those actions have included major financial institutions, private equity firms, professional firms, equity holders, members of management, and members of boards of directors.

10.     In 2006, I was appointed as the chapter 11 trustee of Refco Capital Markets, Ltd. ("**RCM**"), the unregulated securities broker and largest unit of the Refco companies. In that role, I established and successfully implemented a procedure to resolve, in a compressed period of time set by the court, over $9 billion of claims scheduled by RCM as disputed or unliquidated. I also spearheaded the settlement of complex disputes among RCM's securities and foreign exchange customers as a building block to the global Refco settlement and chapter 11 plan, and negotiated the economic terms of the global settlement in the Refco cases. Many participants in the Refco cases have recognized the central role I played in bringing a prompt conclusion to one of the largest chapter 11 cases in history. I was later appointed as the post-effective date Plan Administrator for RCM and Litigation Trustee for the Refco Litigation Trust and Refco Private Actions Trust. As chapter 11 trustee, Plan Administrator, and Litigation Trustee in the Refco cases, I litigated and resolved billions of dollars of claims against the estate and on behalf of the estate against third parties.

11.     I also have substantial experience in fiduciary duty and corporate governance matters, and I regularly act as a fiduciary and in oversight roles. From 2010 to 2013, I was on the post-confirmation Audit Committee and the Governance Committee of Spectrum Brands, a large publicly traded company, and was the sole independent director of First Equity Card Corporation, a privately held company, during its out-of-court restructuring. From 2012 to

4

2018, I served on the Board of Directors of Washington Mutual Bank Liquidating Trust and as a member of its Special Litigation Committee.  I was also a member of the Board of Directors of certain companies in which Resurgence invested.

12.     I have served as an expert witness and have testified regarding the reasonableness of settlements in large, complex bankruptcy matters.  For example, I served as a rebuttal expert witness for plaintiffs Residential Funding Company, LLC and the ResCap Liquidating Trust, as to the reasonableness of a settlement in a multibillion-dollar residential mortgage-backed securities litigation.

13.     Many of the matters in which I have been involved present fact patterns similar to those at issue in the FBG Debtors' chapter 11 cases, including arrests and indictments of controlling insiders (e.g., Refco and Le-Nature's Bottling Company) at the beginning of the cases and with Millennium Health being charged with Medicare fraud, aggressive steps to conceal fraudulent conduct and massive losses, unsuccessful acquisitions, false and misleading audited financial statements, multiple off balance sheet transactions, massive claims against and on behalf of debtors, leases which were subject to recharacterization or equitable subordination claims, and creation of false books and records.

14.     I have a J.D. from the University of Michigan Law School and an undergraduate degree from Dartmouth College, where I graduated with distinction in economics. In 1994, I was inducted into the American College of Bankruptcy in its fifth class.  I have also published and lectured extensively on bankruptcy and restructuring topics.

15.     My qualifications and experience are disclosed in more detail in my CV, which is attached hereto as **Exhibit A**.

### Compensation

16.     Subject to Court approval, I am being compensated in accordance with the following terms and conditions:

    i.    a fixed fee of $200,000 through the completion of this Declaration, which serves as my expert report;

    ii.    $1,500 per hour from completion of this Declaration through and including any hearing related to confirmation of the Plan; and

    iii.    reimbursement for any reasonable and documented out-of-pocket expenses in connection with my services.

17.     My fees and expenses are not contingent upon the opinions I provide or the outcome resulting from my work.

### Scope of Assignment

18.     I have been retained by the Debtors' counsel, Weil, Gotshal & Manges LLP, to provide expert consulting services and expert testimony regarding the FBG Debtors' Estate Claims that will be transferred to the Litigation Trust in accordance with the terms of the Plan.  In particular, I have been asked to provide expert analysis and opinions as to the amount of proceeds that are reasonably expected to be generated from such Estate Claims and the anticipated timing thereof.  In connection with these services, I have prepared this Declaration reflecting my analysis and opinions regarding the Estate Claims.

19.     Since I began work for the FBG Debtors on June 20, 2026, I have engaged with the FBG Debtors and their advisors to better understand the FBG Debtors' Estate Claims, including through a review of documents and other applicable materials associated with such claims and causes of action.

20.     In addition to relying on my relevant experience, the materials I considered in connection with providing my opinions are reflected in **Exhibit B** attached hereto.

6

**<u>Opinions</u>**

21.     As more fully detailed below, and for the reasons stated herein, my opinions in this matter are as follows: (i) that the Estate Claims are valuable assets of the FBG Debtors, (ii) that it is reasonable to conclude that the various Estate Claims are reasonably probable to result in the recovery of proceeds in excess of what I understand is the approximately $2 billion required to satisfy certain obligations under the Plan, and (iii) that it is reasonably probable that at least these amounts could be recovered by a litigation trustee by the end of 2028.

**<u>Common Issues Supporting Estate Claims</u>**

22.     I am aware that certain separate criminal proceedings have been initiated against former executives of FBG[4] for actions related to certain of the Estate Claims, including:

- Patrick James, the Debtors' founder and former CEO, and his brother Edward James were indicted on January 29, 2026 in the Southern District of New York on charges including operating a continuing financial crimes enterprise, conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and numerous substantive counts of wire fraud and bank fraud;

- Stephen Graham, the Debtors' former CFO, has pled guilty to various counts of (i) wire fraud affecting a financial institution, (ii) bank fraud, and (iii) conspiracy to commit wire fraud; and

- Peter Andrew Brumbergs, the Debtors' former Senior VP of Finance, has pled guilty to various counts of (i) wire fraud affecting a financial institution, (ii) bank fraud, (iii) conspiracy to commit wire fraud affecting a financial institution and bank fraud, and (iv) conspiracy to commit money laundering.

23.     I understand that in connection with his guilty plea, Stephen Graham admitted under oath that as CFO he agreed with others to "inflate and report the financial performance of FBG on financial statements that were issued to FBG's lenders," knowing those statements contained false and misleading information, and that he personally presented the false

---

[4]     "**FBG**" or "**First Brands**" means, collectively, the Debtors and their non-Debtor affiliates.

and inflated statements in lender presentations to obtain financing on better terms.[5]   I also understand that in connection with his guilty plea, Andy Brumbergs admitted that, from approximately 2018 through 2025, he agreed with others to provide misleading financial statements and balance sheets to lenders that "included accounting adjustments that misstated First Brands' financial condition and results," and misrepresented the existence of inventory and equipment pledged or sold as collateral.[6]

24.     I am also aware that the Examiner's Report[7] in these chapter 11 cases identified that Patrick James and other insiders operated First Brands, SPVs, and non-Debtor entities as a "single liquidity generating and value extracting enterprise" and that third-party factoring and off-balance sheet structures raised financing based on receivables and collateral that, as the Examiner stated, were double-pledged, enlarged, or fabricated.[8]   The Examiner's Report also discusses the more than $700 million in identified transfers to Patrick James, the Patrick James Trust, and entities under his control.   Furthermore, the Examiner represents that various structures concealed the true representation of FBG's assets and liabilities; FBG did not "merely become insolvent."[9]

25.     In addition, I am familiar with the law in the Fifth Circuit, where courts recognize a "Ponzi Scheme Presumption" in connection with fraudulent transfer claims that allows courts to presume insolvency and actual intent to hinder, delay, or defraud for purposes of avoidance under section 548(a)(1)(A) if the plaintiff proves that the transferor operated as a Ponzi

---

[5]     Plea, *United States v. Stephen Graham*, No. 26-cr-00025 (AT) at 24–25 (S.D.N.Y.) (Mar. 2, 2026).
[6]     Plea, *United States v. Peter Andrew Brumbergs*, No. 26-cr-00025 (AT) at 24–25 (S.D.N.Y.) (Jan. 27, 2026).
[7]     *Report of E. Martin De Luca, Examiner* (Docket No. 2538).
[8]     *Id.*
[9]     *Id.*

scheme.[10]  In general terms, a Ponzi scheme is a situation where money contributed by subsequent investors or customers is used to pay original investors at substantial rates, which further helps to perpetuate a fraudulent enterprise.

26.    Moreover, I have extensive experience prosecuting and handling claims based on, among other things, actual and constructive fraudulent conveyances, breach of fiduciary duty, and professional negligence and have also successfully recovered on D&O insurance policies.  As it relates to actual fraudulent conveyance claims, the Bankruptcy Code provides for avoidance of transfers made less than two years prior to the petition date "if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any [creditor]."[11]  Based on my experience, state law fraudulent transfer statutes also provide remedies for actual fraudulent transfer claims under similar circumstances.  Even though actual fraud may be difficult to show on its face, courts generally review what are referred to as "badges of fraud" as proxies for direct evidence of the actual fraud.  I am familiar with badges of fraud analysis and have supported bringing claims against parties based on that analysis in prior cases where I was the litigation or chapter 11 trustee.  These badges are well known, as recognized by the Fifth Circuit, and include the following:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

---

[10]    I rely on the following cases for this statement:  *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 439 (Bankr. S.D. Tex. 2009), *aff'd sub nom. IFS Fin. Corp. v. Garcia Suarez*, No. 09-CV-3059 (VDG), 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015), and *subsequently aff'd*, 669 F.3d 255 (5th Cir. 2012); *Sec. and Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *Janvey v. Alguire*, 647 F.3d 585, 589 (5th Cir. 2011).

[11]    11 U.S.C. § 548(a)(1)(A).

pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.[12]

27.    In addition, to prevail on a claim for constructive fraudulent transfer, a litigation trustee would have to show that a debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer and that the debtor received less than reasonably equivalent value in connection with the transfer.

28.    Other claims that are often asserted by litigation trustees, and which I have asserted in such roles in the past, are claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, aiding and abetting fraudulent conveyance, professional negligence, and others. I am familiar with the elements of each such claim.

29.    I also believe it is significant that substantial work has already been undertaken to investigate the FBG Debtors' claims and causes of action and to understand the various transactions that support these claims.  This work has been done not only by the FBG advisors, but also by the Examiner, who separately has obtained additional information and conducted several interviews.  Because a litigation trustee will not be starting from scratch, and indeed there are already at least two adversary proceedings that have been commenced, I believe this will allow the litigation trustee to hit the ground running in pursuing these Estate Claims.

## Estate Claims

30.    The FBG Debtors' remaining assets include what in my opinion are valuable Estate Claims, including the following: (i) claims against third-party factors, including Katsumi Servicing, LLC ("**Katsumi**"), Leucadia Asset Management ("**LAM**"), an affiliate of Jefferies Financial Group Inc. ("**Jefferies**"), and others (the "**Third-Party Factoring Claims**"), and claims in connection with supply chain financing ("**SCF**") programs (the "**Supply Chain**

---

[12]    *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989) (citation omitted).

Financing Claims"), (ii) claims against lenders to the SPV Debtors,[13] including Onset Financial, Inc. ("**Onset**") and others (the "**SPV Lenders**" and such claims, the "**SPV Lender Claims**"), (iii) claims against Patrick James and other former insiders of the FBG Debtors (the "**Insider Claims**"), (iv) claims regarding the FBG Debtors' acquisition of business units at purchase prices that may have exceeded the fair market value of the assets acquired (the "**Suspect Acquisition Claims**"), and (v) certain other claims detailed herein, including preference claims (the "**Other Claims**").

31.     From information provided by the Debtors, I understand that the total gross amount potentially available with respect to all Estate Claims is as set forth in the chart below, broken down by type of claim.

| Estate Claims | Assertable Value |
|---|---|
| Third-Party Factoring Claims | $15.4 billion |
| Supply Chain Financing Claims | $4.7 billion |
| SPV Lender Claims | $2.5 billion |
| Insider Claims | $1.0 billion |
| Suspect Acquisition Claims | $1.6 billion |
| Other Claims | $280 million |
| **Total** | $25.4 billion |

    i.     **Factors Applicable To Third-Party Factoring Claims and Supply Chain Finance Claims**

32.     I believe that the FBG Debtors hold significant claims against third-party Factors as well as in connection with its SCF program on account of allegedly fraudulent practices in connection with the FBG Debtors' factoring and supply chain financing programs.  Based on

---

[13]     "**SPV Debtors**" means the direct and indirect Debtor subsidiaries of Viceroy other than the FBG Debtors.

11

the facts set forth in paragraphs 80–102 of the Moore Declaration,[14] other materials I have reviewed and the reasons set forth herein, I believe the FBG Debtors hold valuable claims against these parties, including fraudulent transfer claims, that are meritorious and likely to result in significant recoveries by a litigation trustee.

33.     I believe that a litigation trustee in this case could invoke the Ponzi Scheme Presumption to establish actual fraud by providing evidence that a Ponzi scheme existed and that each transferee received transfers of money from the Ponzi scheme.  In this regard, applicable case law supports that proof that a company operated as a fraudulent enterprise at the time of the transfer can be sufficient for purposes of the Ponzi Scheme Presumption.[15]  Significant here is also the fact that the mere presence of some legitimate investments or assets should not preclude the existence of a Ponzi scheme or application of the Ponzi Scheme Presumption.[16]  A litigation trustee would also only need to prove that a transferee received the subject transfers, even if they did not knowingly participate in the scheme.[17]  Even if the presumption does not prove applicable, it is my understanding that a litigation trustee would still be able to support an actual fraudulent transfer claim by showing the existence of "badges of fraud."

a.     FBG's Third-Party Factoring and Supply Chain Financing
       Programs Support a Ponzi Scheme Conclusion

34.     Based on my experience and review of the relevant documents and the facts set out in the Moore Declaration, it is my belief that FBG's prepetition practices involving third-party factoring and supply chain financing support a claim that they were Ponzi schemes, and that

---

[14]   *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* (Docket No. 3188) (the "**Moore Declaration**").

[15]   *See In re IFS Fin. Corp.*, 669 F.3d at 265; *In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 534-35 (9th Cir. 1990).

[16]   *See United States v. Murray,* 648 F.3d 251, 256 (5th Cir. 2011); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995).

[17]   *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

a litigation trustee would be able to invoke the Ponzi Scheme Presumption for actual fraudulent transfer claims.

35.     The investigation into FBG's prepetition third-party factoring and supply chain financing practices revealed substantial evidence that the Debtors' former officers engaged in a sustained, coordinated scheme to fraudulently obtain funds and misrepresent the Debtors' financial condition.[18]  The investigation uncovered pervasive manipulation and doctoring of the FBG Debtors' financial records, and the improper commingling of funds of the FBG Debtors and certain affiliates used to conceal other financial misconduct.[19]  Notably, the investigation found that $12 billion flowed through the Bowery Account between January 2022 and October 2025.[20]

36.     It appears that these falsified financial records likely served multiple purposes: *first*, to obtain financing by fabricating and inflating the collateral, receivables, and liabilities underlying FBG's factoring and supply chain financing; and *second*, to avoid detection by FBG's ABL and Term Lenders (among others) by presenting a picture of FBG's liquidity, profitability, and general solvency that were known to be false.[21]

37.     This commingling of funds would have obscured the true source of any given dollar once it arrived.[22]  Since it does not appear that FBG's underlying business was generating sufficient cash to satisfy factoring obligations, the FBG Debtors necessarily applied funds from new factoring submissions to fund existing factoring obligations as they matured.[23] This conduct appears to have created a cycle whereby new falsified invoices were continuously

---

[18]   Moore Decl. ¶ 59.
[19]   *Id.* ¶¶ 70–71.
[20]   *Id.* ¶ 73.
[21]   *Id.* ¶ 59.
[22]   *Id.* ¶¶ 73–74.
[23]   *Id.* ¶¶ 59–60.

needed to satisfy obligations to existing investors,[24] which I believe demonstrates the existence of a classic Ponzi scheme.

38.     Additionally, as to the SCF programs, I understand that facts uncovered through the investigation demonstrate that the FBG Debtors' former management created fake invoices, either Excel schedules of fake supplier invoices or fake invoices themselves, and submitted them to the third-party bill payers in order to maximize funding capacity available under the SCF programs.[25]   As just one example, the company created cover invoices, also referred to internally as "Dummy Invoices," which were then submitted to Crescendo Asset Management under the Raistone factoring program to support funding on invoices that apparently never existed.[26]   The facts support that this practice was not an isolated event.[27]

39.     These examples, in both the third-party factoring and SCF programs, support a conclusion that the FBG Debtors' prior management committed fraudulent acts to obtain additional credit that was used to pay off older credit, which, in my opinion, support a finding of a Ponzi scheme.   Accordingly, I believe it is reasonable to conclude that the Ponzi Scheme Presumption would apply to an actual fraudulent transfer claim that a litigation trustee would bring.

b.     <u>Recovery in the Absence of Ponzi Scheme</u>

40.     Even if a litigation trustee were unable to rely on the Ponzi Scheme Presumption, in my opinion the facts support a conclusion that there are substantial grounds for actual and constructive fraud claims.   Notably, and as described above, there exist facts to support the conclusion of a persistent illegal course of conduct, including many acts of intentional fraud to support the "badges of fraud."   Additionally, based on my review and understanding of the facts

---

[24]   *Id.*
[25]   *Id.* ¶ 97.
[26]   *Id.*
[27]   *Id.*

relevant to FBG's financial condition at the time, including documentary evidence and analysis of FBG's financial condition demonstrating, among other things, unreported liabilities in excess of $5 billion and guilty pleas from executives admitting that the fraudulent conduct dated back to as early as 2018, I believe there is a good faith basis to conclude that the FBG Debtors were insolvent when making the subject transfers.[28]  Furthermore, I understand from Mr. Moore's declaration that A&M has identified billions of dollars of transfers to factoring/supply chain financing parties made on account of false and fraudulent invoices.  Accordingly, in my opinion a litigation trustee would be able to establish fraudulent transfers claims, even without the benefit of the Ponzi Scheme Presumption.

c.      <u>Specific Third-Party Factor Examples</u>

41.     As an illustrative example of the FBG Debtors' Third-Party Factoring Claims, I believe that Katsumi—one of FBG's largest factoring counterparties, purchasing approximately $4.9 billion of prepetition factored invoices from the FBG Debtors from September 2023 until the Petition Date—would face liability because it appears that Katsumi had knowledge of particular facts such that it "should have known" of FBG's fraudulent scheme.[29]

42.     Specifically, facts exist demonstrating that Katsumi possessed contemporaneous evidence of unreliable financial reporting but continued transacting with FBG. For example, in September 2023, as part of an audit, Katsumi discovered that receivables it purchased from FBG did not match the underlying invoices, but instead, were falsified, fabricated, and inflated, in some instances by more than 180,000%.[30]  In that most extreme instance, an invoice worth $240.35 had been funded by Katsumi as if it were worth $434,997.58.[31]  Shortly thereafter,

---

[28]  *Id.* ¶¶ 77, 79, 143.
[29]  *Id.* ¶¶ 86–89.
[30]  *Id.* ¶ 86.
[31]  *Id.*

15

Katsumi informed FBG of the discrepancies it discovered in its audit, but rather than cease purchasing apparently fraudulent invoices, Katsumi continued to participate in FBG's factoring practice for more than two years.[32]

43.     There are also facts demonstrating that within a few months of Katsumi's suspicions of FBG's fraud, Katsumi sought to exit its investment by re-selling its purchased receivables.[33]   Another sophisticated observer, Apollo, based on information available to any financing counterparty of First Brands, identified serious misgivings regarding FBG's financial condition and prepared an internal deck suggesting that Apollo short FBG's debt.[34]   Based on these facts, I believe it is reasonable to conclude that Katsumi, which had access to even more specific information plus direct evidence of falsified invoices, knew or should have known that it was being paid on invoices that were, at least in part, fraudulent.

44.     The FBG Debtors' reconciliation reflects that Katsumi received approximately an estimated $3.8 billion in payment on account of fraudulent receivables from FBG in the period following its discovery of the discrepancies in the invoice data in September 2023.[35]

45.     Another example with respect to Third-Party Factoring Claims is LAM, an affiliate of Jefferies, who based on the information available to me had knowledge of particular facts supporting a conclusion that they "should have known" of FBG's fraudulent scheme.   I understand that LAM was among FBG's largest factoring counterparties, participating in more than $7.3 billion in factoring arrangements since January of 2023 with the FBG Debtors.[36]

---

[32]   *Id.* ¶ 89.
[33]   *Id.* ¶ 88.
[34]   *Id.* ¶ 66; *First Brands Overview* (April 2024), Apollo.
[35]   Moore Decl. ¶ 89.
[36]   *Id.* ¶ 93.

16

46.     Information I have reviewed supports the conclusion that Jefferies and its affiliates had access to the same information as Apollo, and also possessed contemporaneous evidence of unreliable financial reporting but continued participating in FBG's third-party factoring program.[37]  For example, evidence exists demonstrating that in January 2023, LAM sent FBG a series of diligence questions concerning FBG's accounts receivable and related financing, and requested an on-site visit and call with FBG's CFO.[38]  Rather than provide straightforward answers, Edward James responded by what appears to be threats to reconsider any future business with Jefferies, strongly implying that continuing to ask for diligence would foreclose future partnerships to the detriment of Jefferies' bottom line.[39]  I believe this provides a reasonable basis to conclude that LAM was on inquiry notice of FBG's fraudulent activity.

47.     In another exchange, while advising a potential investor in an FBG-related transaction, Jefferies encountered what appear to be additional red flags.[40]  To respond to a potential investor's diligence request, Jefferies bankers sent FBG's CFO diligence requests seeking historical cash flows associated with factoring activities and a reconciliation of adjusted EBITDA.  One Jefferies banker noted that FBG "[did] not want to disclose more than necessary."[41] The prospective investor's own diligence request flagged that FBG's reported cash flows from receivables had remained positive despite significantly growing revenues, which the investor flagged as inconsistent with typical accounting results.[42]  In my opinion, this is a red flag that a diligent counterparty reasonably could have discovered, and one that Jefferies' own investment banking arm appears to have identified internally in real time.

---

[37]   *Id.* ¶¶ 90–93.
[38]   *Id.* ¶ 90.
[39]   *Id.*
[40]   *Id.* ¶ 92.
[41]   *Id.*
[42]   *Id.*

48.     Subsequent to these events, LAM participated in $7.3 billion of additional third-party factoring, and LAM/Jefferies was paid more than $6.9 billion.[43]   The A&M team's reconciliation reflects that LAM/Jefferies received more than an estimated $4.2 billion in transfers on account of fraudulent receivables from FBG in the period since Jefferies/LAM became aware of these additional facts that also tend to show that Jefferies/LAM knew or should have known about the fraud in 2023.[44]

49.     Based on the above, I believe it is reasonable to conclude that a litigation trustee holds significant and valuable Third-Party Factoring Claims against Katsumi and Jefferies/LAM.  This would be in addition to recoveries against multiple other potential defendants that would be subject to similar Third-Party Factoring Claims.

d.     Supply Chain Financing Examples

50.     FBG's counterparties in its SCF program represent additional potential claims that could be pursued by a litigation trustee.  I understand that FBG's SCF program was run through a variety of portals that enabled FBG to pass off fabricated vendor or supplier invoices to a range of banks and institutional lenders.[45]

51.     I understand from the Moore Declaration that A&M has identified billions of dollars of transfers to SCF counterparties based on fraudulent payables supposedly but not actually owed by FBG to third-party vendors, suppliers and other creditors.

52.     For example, the facts uncovered through the investigation demonstrate that the FBG Debtors' former management created fake invoices, either Excel schedules of fake supplier invoices or fake invoices themselves, and submitted them to the third-party bill payers to

---

[43]   *Id.* ¶ 93.
[44]   *Id.*
[45]   *Id.* ¶¶ 96–100.

maximize funding capacity available under the SCF programs.[46]  As just one example, in February 2024 the company created a "cover" invoice, also referred to internally as a "Dummy Invoice," which was submitted to Crescendo Asset Management under the Raistone factoring program to support funding for $2.1 million of supposed freight invoices that in reality never existed.[47]  The SCF platform provider would then approve the fake invoices for payment on behalf of one or more financing parties, and based on the dummy invoices, funds were routed to a third-party bill payer, which in turn routed the funds to an account controlled by former management, based on payment instructions FBG provided.[48]  I understand these transactions were referred to internally as "round trip" payments and were tracked in an internal spreadsheet titled "Approved ROUNDTRIP Master."[49]  The facts support that this practice was not an isolated event.

53.     I further understand that a portion of the funds received from SCF lenders flowed through Bowery Finance II ("**Bowery**") and was transferred to operating entities in accordance with the "Bowery Splits," and that amounts received from Bowery relating to the SCF program were recorded on individual sites' books in various accounts and ultimately adjusted out at the direction of Andy Brumbergs and others.[50]  I understand Bowery was a Wells Fargo bank account belonging to Bowery Finance II, LLC, a non-Debtor entity that listed Patrick and Edward James as President and Executive Vice President, that was originally opened to run a self-administered factoring program funded by Wells Fargo but eventually was used to re-route funds from Patrick James affiliated entities to a variety of other Patrick James affiliated entities.[51]  In connection with this practice, just prior to the Debtors' bankruptcy, Andy Brumbergs instructed

---

[46]     *Id.* ¶ 97.
[47]     *Id.*
[48]     *Id.*
[49]     *Id.*
[50]     *Id.* ¶ 98.
[51]     *Id.* ¶ 73.

individuals in the Debtors' corporate accounting department to add a $1.2 billion SCF liability to the Debtors' books, effectively recording outstanding SCF liabilities that had previously been concealed.[52]  This adjustment stands in stark contrast to the SCF liabilities FBG had disclosed in prior years—approximately $543 million for 2023 and $682 million for 2024—each of which understated the actual SCF liabilities by hundreds of millions of dollars.[53]

54.    Further, PrimeRevenue is an example of a portal that FBG Debtors used in their SCF program, which served to connect vendors and suppliers, but also First Brands when it sought to pay vendors and seek reimbursement, with specific financial institutions working with PrimeRevenue.[54]  Specifically, there are facts to support that PrimeRevenue had actual knowledge that the cover invoices FBG submitted under the SCF program were fabricated.[55]  I understand that in the summer of 2024, PrimeRevenue employees working primarily with Edward James on the SCF program contacted FBG employees responsible for creating the cover invoices and told them to check the document's file properties going forward, effectively alerting them that PrimeRevenue had identified FBG employees, rather than any actual vendor, as the document's author in the file metadata.[56]  I understand that FBG understood PrimeRevenue's comment as confirmation that PrimeRevenue was aware the cover invoices were being generated internally by FBG rather than by its vendors.[57]

55.    Based on the above, I believe it is reasonable to conclude that a litigation trustee would have colorable claims relating to the SCF programs.

---

[52]  *Id.* ¶ 98.
[53]  *Id.*
[54]  *Id.* ¶ 101.
[55]  *Id.*
[56]  *Id.*
[57]  *Id.*

ii.      **SPV Lender Claims**

56.      Based on my review of various materials, I understand the prepetition Debtors engaged in multiple off-balance sheet financing arrangements using special purpose vehicles ("**SPVs**" and the "**SPV Facilities**").  This included, for example, off-balance sheet arrangements with (i) Onset, (ii) lenders to Carnaby Inventory II, LLC ("**Carnaby II**") and Carnaby Inventory III, LLC ("**Carnaby III**" and, together with Carnaby II, the "**CarVal Lenders**"), (iii) Aequum Capital Financial II LLC ("**Aequum**"), and (iv) Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P., Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds (collectively, "**Evolution**").

57.      As I explain in more detail below, I believe the SPV Facilities, from a structural standpoint, were unworkable, as they could not function as independent SPVs from the face of their transaction documents alone, and the SPV Facilities give rise to what I believe are numerous cognizable claims for fraudulent transfer and other avoidance actions against the counterparties to the SPV Facilities, including because of the following:

58.      The materials I reviewed support the conclusion that FBG, primarily through its officer Edward James, caused FBG-dominated and controlled SPV entities to enter into more than $2 billion dollars in inventory (or in the case of Onset also equipment) financings that neither the SPV entities nor FBG could afford to repay from operations.[58]  This conclusion is based on what appears to be insufficient value in the collateral that was the intended and only source of repayment.[59]  Based on my review and understanding of the facts relevant to the SPV entities' financial condition at the time, including documentary evidence and analysis of the SPV entities'

---

[58]   *Id*. ¶¶ 106, 124, 128.
[59]   *Id.* ¶¶ 105, 109.

21

financial condition, there is a good faith basis to believe that the SPV entities were insolvent from the start, and FBG could not generate from sales of inventory or its legitimate operations more generally the amounts required to satisfy this debt (which required more than $200 million a month to service its debts in 2025).[60]   At the same time, FBG needed to pay the debt service timely or risk losing its inventory or equipment against which liens had been granted under the SPV financing documents.[61]

59.     Contrary to presenting a legitimate profit-making opportunity, the materials I reviewed provide a reasonable basis to conclude that the SPV financings were dependent on repayment by FBG from other sources of cash (e.g., from the SPV Lenders themselves, whose loans were rerouted and used to pay other SPV Lenders, as well as funds received through factoring and supply chain transactions) that was used to pay and re-borrow from SPV Lenders.[62]   The information I reviewed also supports a conclusion that the SPV financings were part of a scheme to defraud FBG's existing lenders by concealing the existence of billions of dollars in debt and to use the same collateral already subject to ABL and Term Lender liens to obtain those loans.[63]   As a result, a litigation trustee could reasonably assert a claim that the transfers to SPV Lenders ultimately sourced from FBG were made in furtherance of a fraudulent scheme.

60.     There also is significant evidence to support a conclusion that the SPV Lenders knew or should have known about that fraudulent scheme.  This includes that (i) the SPV entities could not satisfy their obligations under the economics of the SPV Facilities as written, (ii) Onset, and perhaps other SPV Lenders, issued debt on well-above market terms, (iii) the control exerted by Patrick James and his prior legal troubles, (iv) initial transaction documents

---

[60]   *Id.* ¶¶ 105–106, 137.
[61]   *Id.* ¶ 105.
[62]   *Id.* ¶¶ 105–106, 137.
[63]   *Id.* ¶¶ 105, 124–127.

often contained no purchase prices or schedules of assets, (v) facially deficient borrowing base certificates, (vi) all functions of the SPV entities were performed by FBG employees and transaction documents were negotiated by FBG employees, and (vii) the SPV entities had no employees, assets, or inventory of their own, and deal documents did not provide them a means to generate profit from the inventory or assets that remained in the possession, use and control of FBG entities.[64]

61.    Based on the Moore Declaration, the amounts of what could reasonably support fraudulent transfer claims against the SPV Lenders are summarized below:

| SPV Facility | Total Paid - 90 Days | Total Paid - 1 Year | Total Paid - 4 Years |
|---|---|---|---|
| Onset | $ 46,143,097 | $ 987,417,170 | $ 2,331,851,090 |
| CarVal | 7,450,173 | | 92,816,984 |
| Aequum | 6,447,677 | | 29,085,602 |
| Evolution | - | | 73,477,450 |
| **Total** | **$ 60,040,946** | **$ 987,417,170** | **$ 2,527,231,125** |

62.    The SPV lending program conducted by Onset (the "**Onset Facility**") serves as a primary example.  Based on materials I reviewed, it appears that the Onset Facility was ostensibly structured as a three-step process: (i) an SPV such as Carnaby FA, LLC (a "**Carnaby Entity**") would purport to purchase PP&E or inventory from an FBG Debtor entity, (ii) the Carnaby Entity would then purportedly sell that PP&E or inventory to Onset in exchange for the funds that Onset had provided for the Carnaby Entity to purchase the PP&E or inventory, and (iii) the Carnaby Entity would then purportedly lease the PP&E or inventory back from Onset in exchange for monthly rental payments.[65]  At all times, the Carnaby Entity would also have to replace or replenish all inventory it purportedly leased from Onset.[66]

---

[64]    *Id.* ¶¶ 105, 130–135
[65]    *Id.* ¶¶ 110–111.
[66]    *Id.* ¶ 110.

63.     However, from a basic structural standpoint, the facts support that this facility could not operate as papered.  For example, Onset might provide a Carnaby Entity with $100 million.  The Carnaby Entity would have to use this $100 million to purportedly purchase $100 million in inventory from an FBG entity, replace any inventory sold, *and* service its debt obligations to Onset with interest rates as high as approximately 200%.[67]  Moreover, the FBG seller entity, and not the Carnaby Entity, retained possession and control of all inventory or PP&E purportedly subject to the sale leaseback arrangement.[68]  And, with respect to the PP&E transactions, while the deal documents require the FBG seller to act as a bailee for Onset, and therefore allow Onset to repossess all PP&E in the event of default, they do not require the FBG seller to remit any proceeds from the sale or use of PP&E to the Carnaby Entity purportedly leasing said PP&E.[69]  Thus, with no excess cash following a purported purchase of PP&E or inventory, no possession or control of the PP&E or inventory, and no means to generate profit from the PP&E or inventory, the Onset Facility obligated the Carnaby Entity, as a "lessee," to continually replace that PP&E or inventory and pay substantial debt servicing obligations to Onset.[70]  In my opinion, based on these structural facts alone, it is reasonable to conclude that Onset knew or should have known that the Carnaby Entities could not, in the absence of cash from other sources, service their debt obligations and abide by the terms of the Onset Facility.

64.     There are also facts supporting that the SPVs did not act independently and frequently failed to observe corporate formalities and did not operate as discrete corporate entities.[71]  Instead, I understand that the SPVs held no board meetings, adopted no resolutions, had

---

[67]   *Id.*

[68]   *Id.* ¶ 111.

[69]   *Id.*; *See* Acknowledgement and Waiver between Hopkins Manufacturing Corporation and Onset Financial, Inc. dated February 12, 2024.

[70]   *Id.* ¶¶ 109–112.

[71]   *Id.* ¶ 115.

no employees, and were at all times undercapitalized shells that required cash from other FBG and Patrick James-controlled entities to service their debt.[72]  Further, any limited functions performed by the SPVs were at all times performed by only a small number of employees of FBG.[73] Additionally, I understand the SPVs had dedicated accounts, but did not in practice maintain segregated cash accounts and instead commingled their cash with a host of other Patrick James entities.[74]  I further understand that Edward James barred all FBG employees other than a select few from dealing with or talking to Onset in relation to the SPV entities.[75]

65.     In addition, I understand facts exist demonstrating that proceeds that flowed into the SPVs were promptly transferred out, commingled, and disbursed to affiliates or to pay creditors.[76]  Many funds flowed to Bowery, the bank account described above that was used to commingle funds and facilitate transfers to a host of Patrick James entities.[77]  For example, in a December 2024 financing, approximately $41.5 million advanced by an SPV Lender was split across five FBG operating entities at arbitrary percentages, disguised as customer receipts.[78]  Facts also demonstrate that repayments to the off-balance-sheet lenders were likewise disguised.[79]

66.     I also understand that although the deal documents contemplated ongoing replacement of inventory and corresponding sale agreements, none of these follow-on agreements were ever entered into.[80]  And the same collateral that was purportedly sold to the SPV entities, as further described below, remained at all times in the possession of the FBG seller, and even on the FBG seller's balance sheet and borrowing base.  This meant that the same collateral was often

---

[72]  *Id.* ¶¶ 105, 115.
[73]  *Id.* ¶ 133.
[74]  *Id.* ¶¶ 116, 133.
[75]  *Id.* ¶ 135.
[76]  *Id.* ¶ 116.
[77]  *Id.* ¶ 125.
[78]  *Id*. ¶¶ 125–126.
[79]  *Id.* ¶ 126.
[80]  *Id.* ¶ 119.

double-pledged between SPV financers and existing FBG lenders.[81]   The facts demonstrate that despite what appears to be FBG's control over the SPV entities, practical and contractual requirements to pay the SPV debt obligations, and cross-pledged inventory, the SPV obligations were not disclosed on FBG's audited financials.[82]

67.     Further, I understand that there are other characteristics of the SPV Facilities suggesting that the SPVs did not operate as independent entities capable of undertaking the steps contemplated by their respective deal documents.[83]   For example, I understand the lending facility operated by the CarVal Lenders (the "**CarVal Facility**") contemplated a three-step process where: (i) an FBG entity, either Brake Parts Inc LLC ("**BPI**"), Trico Technologies Corporation, or Trico Products Corporation (collectively "**Trico**"), sold raw materials to Carnaby II or III, (ii) Carnaby II or III then manufactured the raw materials into finished goods, and (iii) BPI or Trico purchased the finished goods, and the cycle would repeat.[84]

68.     Yet, I understand that the books and records of Carnaby II and III suggest that none of these three steps were actually undertaken.  For example, the facts suggest that Carnaby II received over $47 million in June 2022 purportedly for the purchase of raw materials from BPI, but there is no record of Carnaby II directly transferring these funds to BPI.[85]   Further, I understand that the general ledgers of Carnaby II and III do not show increases for the subsequent purchases of raw materials or decreases for the sale of finished goods but instead show that the inventory was reduced monthly for cash received from assorted Patrick James entities to make debt service payments to the CarVal Lenders.[86]  And finally, I understand the FBG Debtors were

---

[81]    *Id.* ¶¶ 122–123.
[82]    *Id.* ¶ 124.
[83]    *Id.* ¶¶ 115–116.
[84]    *Id.* ¶¶ 117–118.
[85]    *Id.* ¶ 117.
[86]    *Id.* ¶¶ 117–118.

unable to locate any supplements reflecting the repurchase of finished goods following any initial transaction documents.[87]   Instead, it appears that the FBG Debtors recycled funds from SPV Lenders to pay preexisting creditors, including other SPV Lenders.[88]

69.     Further, the structure of the purported sale leaseback transactions involving inventory strikes me as irregular, as it featured the sale and leaseback of inventory that was not owned or possessed by the SPV entity, and instead remained at all times in the possession and control of an FBG entity, who would sell the inventory in the ordinary course of its business.

70.     Taken as a whole, the facts uncovered to date demonstrate that the SPVs had no independent revenue generating operations in the case of the PP&E financings, and insufficient revenue generating capability in the case of inventory financings, had substantial debt obligations, and relied on the continuous infusion of cash primarily from new loans from the SPV Lenders obtained mainly as a result of transfers originating from First Brands to satisfy prior debt incurred by the SPVs.  SPV cash, in other words, appears to have been sourced from a variety of new lender advances, and the Bowery account (funded mainly by First Brands)—not from the FBG entities contemplated under SPV deal documents.

71.     Based on my review of various materials, there were also numerous, discrete indicators that in my opinion support a conclusion that an SPV financer would have been on notice that the SPV Facilities were not a legitimate lending arrangement.  For example, in my experience, an entity seeking to ensure its secured status would typically file a UCC-1 financing statement.  Here, from the materials provided, and from what I understand was based on what appears to be consistent pushback from Edward James, Onset did not file any UCC-1 financing statements against the FBG Debtors until September 13, 2025 (just weeks before the Debtors filed

---

[87]   *Id*. ¶¶ 118, 120.
[88]   *Id*. ¶ 106.

27

for bankruptcy).[89]  Further, in response to an Onset outreach email to FBG employees regarding inventory inspections, Edward James told Onset that all communications should go through him "ALONE."[90]  This, in my view, supports a conclusion that Onset was aware that Edward James intended to keep the Onset Facility concealed from other FBG employees.  I understand that Edward James also unilaterally imposed severe limitations on Onset's ability to inspect its purported collateral.[91]  Additionally, Onset charged effective interest rates nearly as high as 200% for the sale leaseback transactions.[92]  I have experience with situations such as these in other cases involving allegations of fraud by insiders, who barred employees from dealing with investors.

72.     I understand that there are materials supporting the conclusion that other SPV Lenders were aware that they were not getting complete or adequate information to verify the location and amount of their purported collateral.  For example, I understand the CarVal Lenders received approximately seventy (70) borrowing base certificates over three years but these certificates only tracked inventory by generic SKU numbers, which would continuously turn over.[93]

a.     Ponzi Scheme Presumption

73.     Based on my understanding of the SPV Facilities and Debtors' off-balance sheet lending practices, I believe a litigation trustee would likely succeed in establishing that the SPV Facilities operated as a Ponzi scheme for purposes of the Ponzi Scheme Presumption.  In particular, I understand that, from a structural standpoint, the SPV transactions could not operate according to their deal documents.[94]  For example, the facts support the conclusion that the Onset

---

[89]   *Id*. ¶ 138.
[90]   *Id*. ¶ 135.
[91]   *See* March 10, 2023 Email from E. James to A. Brumbergs, S. Wallace, and K. Ruminski.
[92]   Moore Decl. ¶ 110.
[93]   *Id*. ¶ 132.
[94]   *Id*. ¶¶ 115–118.

Facility necessarily required the injection of outside funds, as the Carnaby Entities had no means to simultaneously purchase inventory or PP&E from an FBG entity, continually buy replacement inventory or PP&E, and pay Onset's very high interest rates.[95]  In other words, the Carnaby Entities had no means to pay Onset other than from sums deposited by FBG and sums deposited by subsequent investors.

74.     Further, the factual evidence gathered to date supports this conclusion.  For example, the funds transferred into and out of Carnaby II and III pursuant to the CarVal Facility do not appear to reflect the legitimate SPV operations consistent with the CarVal Facility deal documents.[96]  Instead, funds transferred by the CarVal Lenders appear to have been routed to a variety of Patrick James controlled entities, not BPI and Trico.[97]  Further, it does not appear that funds garnered from the manufacture and sale of finished goods (as contemplated by the CarVal Facility) were used to pay the CarVal Lenders.[98]

75.     Additionally, I also understand that as SPV payments came due, FBG created falsified invoices from an entity called CI Supply and routed payments through Carnaby I to whichever SPV entity had a debt payment due.[99]  In other words, the SPVs could only service their debt because Patrick James funneled cash to them from outside the purported transaction structure.[100]  Moreover, there are facts demonstrating that SPV funding was used to pay subsequent SPV debt.  For example, I understand that on November 27, 2024, Onset sent $158.4 million to Carnaby FA as part of Lease 8 under the Onset Facility.[101]  On the very same day, Carnaby FA

---

[95]     *Id.* ¶ 111.
[96]     *Id.* ¶¶ 117–120.
[97]     *Id.*
[98]     *Id.* ¶ 120.
[99]     *Id.* ¶ 126.
[100]    *Id.* ¶ 106, 126–127.
[101]    *Id.* ¶ 106.

sent $50.6 million to Carnaby IV, which helped fund the $81.2 million payment to Onset on November 29, 2024.[102]

76.     Taken together, I believe these factual findings would allow a litigation trustee to establish that the SPV Facilities operated as a Ponzi scheme for purposes of application of the Ponzi-Scheme Presumption.

### b.     Recovery in the Absence of a Ponzi Scheme

77.      Even in the absence of a Ponzi Scheme, I believe that a litigation trustee would still have significant and cognizable claims for recovery against Onset and other SPV lenders, including claims for recovery against subsequent transferees.

### (i)     *Actual and Constructive Fraudulent Transfer*

78.     Based on my understanding of the SPV facilities as not independent entities, the fact that FBG funds were being used for these transactions, and FBG's off-balance sheet lending practices, and given my experience in prosecuting claims such as these, I believe it is reasonable to conclude that a litigation trustee would succeed in recovering funds on behalf of the FBG entities based on claims of actual fraudulent transfer as it relates to the SPV Facilities. Utilizing the Onset Facility as an example, I believe a litigation trustee would succeed in establishing the existence of numerous of the relevant "badges of fraud" associated with actual fraudulent transfer.

79.     For example, the relationship between Onset and FBG, whereunder Edward James, the principal negotiator for the Carnaby Entities, invested *alongside* Onset in the hopes of extracting funds from the Debtors through the Onset Facility, supports a conclusion that the

---

[102]    *Id.*

transfers were made with the intent to defraud.[103]  Further, based on my review and understanding of the facts relevant to FBG's financial condition at the time, including documentary evidence and analysis of FBG's financial condition, there is a good faith basis to believe that FBG was insolvent at the time or rendered insolvent by the Onset Facility.  Based on the structure of the Onset Facility, the Carnaby Entities were obligated to pay substantial, above-market debt servicing with no viable means to pay this debt.[104]  Further, the SPV entities were undercapitalized shells, with no employees and no substantial capitalization or assets to perform under the SPV Facilities.[105] Through the use of guaranty agreements and eventual forbearance agreements, and because the FBG Debtors were functionally required and in fact did service all debt payments for the SPV entities, the Onset Facility also saddled the FBG Debtors with significant debt.[106]  In sum, the facts support the reasonable conclusion that the SPV entities were not truly separate and distinct corporate entities and were instead part and parcel of a larger scheme to secure additional funding for the FBG Debtors.[107]

80.     Additionally, in my opinion, the fact that the transactions with Onset involved triple-digit interest rates and the inability of the Carnaby Entities to repay their debt would provide substantial evidence that these transactions were made for inadequate consideration.[108] Further supporting this conclusion is the fact that although the FBG seller of inventory and PP&E, and not the Carnaby Entity or Onset, at all times retained use and control of the subject inventory

---

[103]   *Id.* ¶¶ 134–135.  I understand Onset contends that Edward James' role "added credibility to the deal structure," but this is evidence of lack of good-faith, arms-length negotiations and not an indicator of credibility.  This should also have been a red flag for Onset that Edward James was putting his personal interest ahead of those of FBG. *See* Onset Motion to Intervene in Adversary Proceeding, *First Brands Group, LLC v. Patrick James et al.*, Adv. Pro. No. 25-03803, ECF No. 71.
[104]   Moore Decl. ¶ 111.
[105]   *Id.* ¶¶ 112–116.
[106]   Moore Decl. ¶¶ 111–113.
[107]   *Id.* ¶¶ 115–121.
[108]   *Id.* ¶ 134.

or PP&E, FBG's audited financial statements did not disclose the Onset debt or even the existence of the Carnaby Entities.[109]  Further, I believe a litigation trustee could pursue claims based on theories of substantive consolidation and veil piercing or other theories relying on the conclusion that the SPV and FBG entities were one and the same.

81.     In addition, FBG's financial statements purported to disclose related obligations, yet did not even mention, much less describe, any of the Onset or other SPV financings, nor were the SPV entities' finances presented on a consolidated basis.[110]  The result is that more than $2 billion in debt secured by the same collateral utilized by First Brands' publicly disclosed lenders (such as the Term Loan Lenders and ABL Lenders) was not disclosed to First Brands' lenders and other stakeholders.[111]  The SPV entities and financial transactions were therefore used to conceal and mislead First Brands' creditors about First Brands' true financial condition.

82.     Taken together, these "badges of fraud" would likely allow a litigation trustee to establish the existence of actual fraudulent transfers as related to the SPV Facilities, even assuming failure to establish the Ponzi Scheme Presumption.

83.     Additionally, I believe it is reasonable to conclude that a litigation trustee would likely succeed in obtaining recoveries on claims of constructive fraudulent transfer.

84.     Based on my review and understanding of the facts relevant to FBG's financial condition at the time, including documentary evidence and analysis of FBG's financial condition, there is a good faith basis to believe that FBG was insolvent at the time, or rendered insolvent by the Onset Facility, to use one SPV entity as an example.  For example, based on the

---

[109]   *Id.* ¶¶ 111, 124.
[110]   *Id.* ¶ 124.
[111]   *Id.* ¶¶ 103, 105.

structure of the Onset Facility, the Carnaby Entities were saddled with substantial, above-market debt obligations with no viable means to pay this debt. And, despite issues with FBG's accounting and business practices that obscured the true financial condition of the company, FBG's business was losing money on the actual business of the sale of inventory related to the Onset Facility.[112] Further, I believe a litigation trustee would be able to demonstrate that the transactions with Onset were made for inadequate consideration and a lack of reasonably equivalent value given the triple-digit interest rates and the inability of the Carnaby Entities to repay their debts.[113]

85.     Finally, given the facts available to me, I believe the SPV financers' primary defense, taking as a "good faith transferee," is unlikely to succeed.[114] To establish such a defense, the SPV financers would need to prove that they operated without "knowledge or inquiry notice of fraud or insolvency."[115] Based on my understanding of the numerous "red flags" reflected in the materials and discussed above, I believe SPV financers would be unlikely to succeed on such good faith defense. It bears noting in that regard that Onset admittedly had reviewed First Brands' financial statements and therefore would have known that they did not disclose, in the related parties section or otherwise, the purported inventory and PP&E transactions between First Brands and the SPV entities.[116] I also have reviewed evidence suggesting that Onset did not file UCC-1s/perfection statements against FBG at Edward James' request.

86.     Based on the above, I believe that a litigation trustee would have significant and cognizable claims for recovery against Onset and other SPV Lenders. I understand that the FBG Debtors' investigation has identified: (i) more than $2.3 billion in transfers to Onset, with

---

[112]   *Id.* ¶¶ 109–114.
[113]   *Id.* ¶¶ 110, 134.
[114]   *See* 11 U.S.C. § 550(b)(2).
[115]   *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020).
[116]   *Id.* ¶ 138.

approximately $1 billion occurring in the year leading up to the Petition Date, (ii) more than $70 million in transfers to CarVal subject to recovery as fraudulent transfers, (iii) more than $92 million in transfers to another entity called Aequum subject to recovery as fraudulent transfers, and (iv) more than $29 million in transfers to Evolution subject to recovery as fraudulent transfers.[117]

### iii. **Insider Claims**

87. On November 3, 2025, the Debtors filed an adversary proceeding against Patrick James and certain affiliates (the "**James Adversary Proceeding**"), seeking over $830 million in damages and asserting eleven (11) counts of, among others, actual and constructive fraudulent transfers, turnover of estate property, and unjust enrichment.  Based on the allegations in the amended complaint in the James Adversary Proceeding (the "**James Complaint**"), as well as additional facts set forth in the Moore Declaration, I believe the Insider Claims are meritorious and reasonably likely to result in significant recoveries by the Litigation Trust.

88. As explained in greater detail in the James Complaint and the Moore Declaration, there is a significant amount of support for concluding that Patrick James frequently engaged in widespread prepetition fraud.  Based on my review of the relevant facts, I believe a litigation trustee will be able to demonstrate that Patrick James' prepetition conduct included (i) the misappropriation of hundreds of millions of dollars of FBG Debtor funds to enrich himself and his family, (ii) the falsification of invoices for the purpose of obtaining company financing, and (iii) the entry into several fraudulent transactions involving the SPV Debtors.

---

[117]   Moore Decl. ¶ 139.

a.      Background

(i)      *Misappropriation of FBG Debtor Funds*

89.      I believe there is a reasonable basis to conclude that sufficient facts exist to support causes of action that establish Patrick James misappropriated hundreds of millions of dollars of FBG Debtor funds to enrich himself and his family, including (a) the improper transfer of company dividends to the Patrick James Trust, (b) fraudulent transfers of the proceeds of company financing transactions for personal use, and (c) the use of company funds to pay for his and his family's lifestyle and personal business.[118]  Examples of such misappropriation include, among others:

i.      the transfer of over $708 million, with over $229 million in 2025 alone, out of FBG bank accounts and into the Patrick James Trust,[119]

ii.      the transfer of approximately $38 million of FBG cash to Larchmont LLC, an entity owned and controlled by Patrick James that is unrelated to FBG and appears to bear no legitimate business relationship to FBG,[120]

iii.      the transfer of more than $18 million from 2019 to 2025 from the FBG Debtors to Battery Park Holdings LLC ("**Battery Park**"), another non-FBG entity controlled by Patrick James, to pay for his and his family's personal expenses, and[121]

iv.      the use of $455,000 of FBG funds paid to Patrick James' private chef, in addition to other payments made for Patrick James' personal benefit including rent and interior design expenses.[122]

90.      As such, I believe the FBG Debtors have facts to support and recover on their claims that Patrick James fraudulently transferred hundreds of millions of dollars of funds belonging to the FBG Debtors prior to the start of the chapter 11 cases.

---

[118]   James Compl. ¶¶ 70–74.
[119]   Moore Decl. ¶ 142.
[120]   *Id*. ¶ 145.
[121]   *Id*. ¶ 147.
[122]   *Id*. ¶ 146.

(ii)    *Falsification of Invoices*

91.    According to investigations conducted by the FBG Debtors and their advisors, as of the Petition Date, Patrick James had caused FBG to incur at least $10.6 billion in total payments on account of fraudulent invoices.[123]  I understand that A&M conducted a forensic audit and investigation related to third-party factoring liabilities, which led to the discovery of significant discrepancies, including erroneous and fabricated invoices, between the data acquired from the third-party factors and the FBG Debtors' books and records, as explained in detail above.[124]  I also understand that the FBG Debtors' advisors identified three significant issues with the FBG Debtors' prepetition factoring practices under the leadership of Patrick James:

   i.    *First*, in many instances, the amount set forth on a factored invoice did not accurately reflect a customer's order, without any apparent reason for the discrepancy.  For example, in some instances, the amount set forth in a factored invoice was ten or more times higher than the actual amount of an invoice.

   ii.    *Second*, in many instances, purported invoices representing customer orders were created and submitted to third-party factoring parties for payment even though the FBG Debtors' books and records, in some cases, do not reflect that such customer invoices existed.

   iii.    *Third*, in many instances the same invoice was factored more than once to different third-party factors.[125]

(iii)    *SPV Debtor Transactions*

92.    Based on the facts I have reviewed, I believe that the FBG Debtors can show that the SPV Debtors engaged in several prepetition fraudulent transfers of FBG Debtor property to Patrick James.

---

[123]    *Id.* ¶¶ 82, 97.
[124]    *Id.* ¶¶ 80–95.
[125]    *Id.* ¶ 83.

93.     The James Complaint alleges eleven causes of action against Patrick James; the Patrick James Trust; the Entity Defendants;[126] Michael Baker; Andy Brumbergs; Stephen Graham; John and Jane Doe(s) 1-100; and ABC Corporation(s) 1-100.  The Onset Complaint alleges further causes of action against Edward James, another corporate insider.[127]

94.     Patrick James is the founder and former Chief Executive Officer of FBG. On January 29, 2026, Patrick James was indicted in the Southern District of New York on charges of conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, operating a continuing financial crimes enterprise, and numerous counts of wire fraud and bank fraud.[128]

95.     Edward James, Patrick James' brother and former Executive Vice President of FBG, was indicted on the same charges on January 29, 2026.[129]

96.     Michael Baker is FBG's former Chief Corporate Strategy Officer.[130]

97.     Andy Brumbergs is FBG's former Senior Vice President of Finance.[131] Brumbergs pleaded guilty in January 2026 to eight counts, including wire fraud, conspiracy to commit wire fraud, bank fraud, and conspiracy to commit money laundering.[132]  In his plea, Brumbergs admitted that between 2018 and 2025, he worked with others to provide lenders with misleading statements, including misstating FBG's financial condition, as well as the existence of inventory and equipment pledged or sold as collateral.[133]

---

[126]  "Entity Defendants" means Albion Realty, LLC ("**Albion Realty**"), Alester Technologies LLC ("**Alester**"), Battery Park Holdings LLC ("**Battery Park**"), Larchmont LLC ("**Larchmont**"), and Pegasus Aviation, LLC ("**Pegasus Aviation**").

[127]  Compl., *First Brands Group, LLC v. Onset Financial, Inc.,* No. 26-03005 (CML), Docket No. 1 ¶ 28.

[128]  *See* Indictment, *United States v. Patrick James & Edward James*, No. 26-cr-00029 (AT) (S.D.N.Y.) (Jan. 29, 2026).

[129]  *Id.* ¶ 8; *see also* Moore Decl. ¶ 79.

[130]  James Compl. ¶ 27.

[131]  Moore Decl. ¶ 59.

[132]  Plea, *United States v. Peter Andrew Brumbergs*, No. 26-cr-00025 (AT) (S.D.N.Y.) (Jan. 27, 2026).

[133]  *Id.*

98.    Stephen Graham is FBG's former Chief Financial Officer.[134]   Graham pleaded guilty on March 2, 2026, to four counts of bank fraud, wire fraud, and conspiracy to commit bank fraud and wire fraud.  In his plea, Graham admitted working with others to inflate and misrepresent FBG's finances in statements to lenders.[135]

99.    The Patrick James Trust was created on March 10, 2005 with Patrick James as Grantor and Thomas A. Haught as Trustee.[136]  Albion Realty, LLC is Patrick James' real estate holding company.[137]  Alester Technologies, LLC, I believe, is James' intellectual property holding company.[138]  Battery Park is a "personal" business of Patrick James.[139]  Larchmont, LLC is Patrick James' family office.[140]  And Pegasus Aviation, LLC is James' personal aircraft company.[141]

100.    Based on my review and experience, I believe these Insider Claims are meritorious and are reasonably likely to result in substantial recoveries.

b.    Claims

(i)    *Actual Fraudulent Transfer (against Patrick James, the Patrick James Trust, and the Entity Defendants)*

101.    I previously outlined the elements for an actual fraudulent transfer claim, including the badges of fraud that support such a claim.  Here, a majority of the badges of fraud are present.  Exhibit A to the James Complaint, which itself states it is a non-exhaustive list, traces 835 transfers totaling approximately $830 million from FBG's accounts to accounts held by James, entities under his control, or third parties for his and his family's personal benefit.[142]  I understand

---

[134]   Moore Decl. ¶ 59.
[135]   *See* Plea, *United States v. Stephen Graham*, 26-cr-00025 (AT) (S.D.N.Y.) (Mar. 2, 2026).
[136]   James Compl. ¶ 21.
[137]   Moore Decl. ¶ 150.
[138]   *Id.* ¶ 149.
[139]   *Id.* ¶ 147.
[140]   *Id.* ¶ 145.
[141]   *Id.* ¶ 151.
[142]   James Compl. ¶¶ 11, 72.

that A&M has also identified $136 million in additional transfers that may have been for Mr. James' benefit.[143]   The evidence of fraudulent intent that I have seen is overwhelming.   I understand that the Debtors and their advisors' investigations uncovered that more than $708 million in misappropriated funds was transferred to the Patrick James Trust with no apparent consideration to First Brands.[144]   For example, on April 5, 2022, Patrick James' Chief of Staff emailed Andy Brumbergs, writing that James "want[ed] a $10M tax distribution paid to him this week."[145]   Three days later, on April 8, 2022, FBG transferred $10 million to the Patrick James Trust.[146]   In October 2024, Andy Brumbergs indicated that he had been "instructed to make a $25 million USD distribution" to a Patrick James Trust account, and that same day FBG distributed $25 million into the specified account.[147]   I understand that the FBG Debtors' investigation revealed evidence of multiple badges of fraud, including: (i) no or inadequate consideration for these transfers, (ii) a close relationship between the transferor and the transferee (namely, that both were controlled by Patrick James), (iii) the retention of such property by the Patrick James entities, (iv) the improvement of Patrick James' financial condition after the transfers, and (v) the onset of financial difficulties after the transfers.

102.   In November 2025, the Court stated there was already "credence to establishing a likelihood of success of showing an actual intent to hinder [] or defraud creditors," which was when the facts were far less developed.[148]   I believe it is reasonable that a litigation trustee will establish liability for all transfers listed in Exhibit A of the James Complaint.

---

[143]   Moore Decl. ¶ 141.
[144]   *Id.* ¶ 142.
[145]   *Id.*
[146]   *Id.*
[147]   *Id.*
[148]   Transcript of Oral Ruling 22:11–15, *First Brands Group, LLC v. Patrick James et al.,* No. 25-03803 (CML), (Nov. 12, 2025).

(ii)    *Constructive Fraudulent Transfer (against Patrick James, the Patrick James Trust, and the Entity Defendants)*

103.    As explained, I am familiar with the elements necessary to establish constructive fraudulent transfer; I believe these elements are present here and would support recovery for a litigation trustee.

104.    For example, from the facts presented and as alleged, FBG received no—or in rare instances, little—value for the transfers to entities under Patrick James' control.  The hundreds of transfers, totaling at least $830 million from 2018 through 2025,[149] conferred no value on FBG and included payments to Battery Park (Patrick James "personal" business), payments for James' New York City townhouse, and distributions to the Patrick James Trust.[150]

105.    As explained, there is a good faith basis to believe that FBG was insolvent at the time or rendered insolvent by these transfers.

106.    Based on the facts known to date and the allegations in the James Complaint, I believe the constructive fraudulent transfer claims are viable and likely to result in a substantial return of funds to a litigation trustee.

(iii)    *Turnover of Estate Property, Money Had and Received, Unjust Enrichment, Constructive Trust, Illegal Dividend and Unlawful Distributions (against Patrick James, the Patrick James Trust, and the Entity Defendants)*

107.    I believe that a litigation trustee would reasonably be expected to establish that Patrick James, the Patrick James Trust, and the various James entities fraudulently transferred property of the FBG Debtors' estate, in which case, the trustee will have myriad avenues to recovery: through the federal turnover statute (11 U.S.C. § 542), money had and received, unjust enrichment, constructive trust, and illegal dividend and unlawful distribution statutes. I have

---

[149]    *See* James Compl. Ex. A; James Compl. ¶¶ 11, 72.
[150]    *See generally* Moore Decl. ¶¶ 141–148.

extensive experience with each of these types of causes of action and believe the facts here reasonably support claims and recovery based on these causes of action.

108.    The facts also support the reasonable conclusion that Patrick James and entities under his control engaged in conduct that diverted and misappropriated corporate funds to himself and his entities.  Patrick James, through his affiliated entities, received more than $708 million to the Patrick James Trust, $38 million to Larchmont (his family office), $34 million to Alester Technologies (an LLC owned by Patrick James) through a fraudulent intellectual property licensing scheme, and $18 million to Battery Park (a "personal" business).[151]  I further understand that between 2018 and 2025, approximately $38 million was paid to Larchmont, a company that when asked by an auditor what services it provided to First Brands, answered "Patrick James."[152] I understand that FBG and its advisors believe that Larchmont provided *no* services to First Brands.[153]

109.    I understand that all transfers identified in Exhibit A of the James Complaint originated from FBG's accounts and were directed to Patrick James and entities he controlled.[154] I further understand that the Debtors' investigation uncovered no legitimate corporate purpose that supports these expenses and that Patrick James has no lawful claim to these sums.  While serving as President and CEO of numerous FBG entities, Patrick James directed these substantial transfers to himself, the Patrick James Trust, and other entities he controlled, including $25 million to Trust accounts in January 2024 and $10 million in April 2022.[155]  These payments do not appear to have

---

[151]    *Id*. ¶¶ 142, 145, 147, 149.
[152]    *Id*. ¶ 145.
[153]    *Id.*
[154]    James Compl. ¶ 11.
[155]    Moore Decl. ¶¶ 73, 142.

been "reasonable compensation" or ordinary-course payments,[156] but rather, were payments used to fund Patrick James' family's lavish lifestyle at the company's expense.

110.    As previously stated, there is a good faith basis to believe that FBG was insolvent or nearing insolvency when these distributions were made and had no surplus from which to lawfully make them.  Because Delaware LLCs cannot make distributions to members other than for fair compensation for services while insolvent, and because James was already paid as CEO and allegedly directed falsification of company records, his knowledge of insolvency can reasonably be inferred.[157]

111.    Accordingly, for these reasons, and in my opinion based on my experience, a litigation trustee is likely to succeed in a claim to recover these wrongfully withheld funds.

    (iv)    ***Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, and Civil Conspiracy (against Patrick James, Edward James, Michael Baker, Andy Brumbergs, and Stephen Graham)***

112.    I have personal experience prosecuting breach of fiduciary duty and conspiracy claims.  While breach of fiduciary duty claims are dependent on the terms of the relevant agreements governing an LLC and will likely be hotly litigated, in my experience some aspect of these types of claims survive and may lead to recovery under Directors' & Officers' insurance.[158]  At a minimum, the conduct of these insiders is also relevant to establishing the overall nature of what appears to be the fraudulent enterprise the facts reasonably support, the indictments allege and the guilty pleas admit.

---

[156]    *See* 6 Del. Code § 18-607 (2025).

[157]    *See Miller v. Mott,* No. 23-50004 (CTG), 2023 WL 6467368, at *8 (Bankr. D. Del. Oct. 4, 2023) (holding that a Delaware LLC cannot "make distributions to members other than for fair compensation for services" when insolvent); *Ballantyne Brands, LLC v. Wiesehan (In re Ballantyne Brands, LLC)*, 656 B.R. 117, 165 (Bankr. W.D.N.C. 2023) (applying Delaware law) (holding that knowledge of insolvency can be reasonably inferred).

[158]    *See* Moore Decl. ¶ 159 (referencing up to $190 million in D&O insurance that may be available).

113. The facts here support a conclusion that Patrick James, Edward James, Michael Baker, Andy Brumbergs, and Stephen Graham all consciously and recklessly subordinated FBG's interests to secure fraudulent financing and divert company funds for Patrick James' personal use. Patrick James, in particular, appears to have exposed FBG to ruinous liabilities by misappropriating FBG Debtor funds, falsifying invoices, and directing SPVs to engage in fraudulent transfers of FBG Debtor property to himself. He set target financial outcomes for FBG and directed his senior officers to manufacture entities, invoices, and disclosures to achieve the desired outcomes.[159]

114. Edward James benefitted from sitting on both sides of transactions between Onset and FBG.[160] For example, he was the sole representative for FBG and the SPV entities across the table from Onset in transactions from which he personally profited; his interest, therefore, was in direct conflict with that of FBG.[161] Edward James exercised his power to benefit himself, acting in bad faith to the detriment of the company. The FBG Debtors and their creditors suffered damages proximately caused by Edward James' conduct.

115. I understand that the FBG Debtors' investigation revealed that Brumbergs personally manipulated invoice nomination files, including in one instance altering a package of invoices valued at approximately $2.3 million to reflect $11.2 million before submission to the factoring company.[162] And Brumbergs admitted under oath that between 2018 and 2025, he worked with others to provide misleading financial statements to lenders.[163]

---

[159] *Id.* ¶ 71.
[160] *Id.* ¶¶ 134–135.
[161] *Id.*
[162] *Id.* ¶ 83.
[163] Plea, *United States v. Peter Andrew Brumbergs*, No. 26-cr-00025 (AT) at 27–29 (S.D.N.Y.) (Jan. 27, 2026).

116.    Stephen Graham admitted under oath that from approximately 2018 to 2025, he agreed with others to inflate FBG's financial performance and personally presented false and inflated statements in lender presentations to obtain financing on better terms.[164]  Graham's willful misconduct facilitated the incurrence of unsustainable debt, directly and proximately causing the very bankruptcy that now burdens the estate.

117.    The James Adversary Complaint also alleges that Michael Baker assisted in structuring off-balance sheet debt and SPV financing facilities, causing FBG to incur debt that it could not repay, and failing to ensure reporting or controls to identify risks with FBG's fraudulent financing.[165]

118.    To the extent any purported waiver of fiduciary duties in FBG's organizational documents exculpates directors for monetary liability for breaches of the duty of care,[166] it remains my opinion that a litigation trustee should still seek relief against these individuals to the maximum extent permitted by law, including for breach of the duty of good faith and fair dealing, willful misconduct, actions undertaken in bad faith, and equitable remedies; FBG's organizational documents do not extend exculpation to actions undertaken in bad faith or willful misconduct.  And as noted, these claims could still potentially provide a basis for the litigation trustee to recover from the Directors' and Officers' insurance policies.

119.    Separate from any breach of fiduciary duty claims, I believe it is reasonable to conclude that a litigation trustee will be able to demonstrate that Patrick James, Michael Baker, Andy Brumbergs, and Stephen Graham worked together to effectuate the fraud that caused FBG to suffer damages.  Each individual's contribution was central: without Brumbergs manipulating

---

[164]    Plea, *United States v. Stephen Graham*, 26-cr-00025 (AT) at 24–25 (S.D.N.Y.) (Mar. 2, 2026).
[165]    James Compl. ¶ 198.
[166]    *Id.* ¶ 203.

invoices, Graham certifying false financials, Baker structuring the SPV Facilities, and Patrick James conducting the orchestra, the fraud could not have carried on for years.  A civil conspiracy requires only a "common understanding or design, even if tacit, to commit an unlawful act."[167] Here, this threshold is exceeded.

120.    The intra-corporate conspiracy doctrine does not bar this claim, as all employees acted outside the scope of their employment when colluding in illegal activities.[168] These individuals conspired to inflate FBG's assets, and then directed the funds to Patrick James' accounts, causing damage to First Brands.

121.    This claim is particularly valuable because it allows for punitive damages as a malice tort.[169]  A litigation trustee, therefore, may recover beyond compensatory damages for the Defendants' fraud and misconduct.

122.    The litigation of the claims against all the insiders—mainly, defendants in the James Complaint and those against Edward James in the Onset Complaint—is likely to be resolved expeditiously after the conclusion of the parallel criminal proceedings.[170]  The James Adversary Proceeding and the Onset Adversary Proceeding are both currently stayed.[171]

123.    Given that both Andy Brumbergs and Stephen Graham have already pleaded guilty, it is likely that the civil claims against them, requiring a lower burden of proof than

---

[167]   *Gosden v. Louis*, 687 N.E. 2d 481, 486 (Ohio Ct. App. 1996).
[168]   *See Barrow v. City of Hillview,* 775 F.App'x 801, 807 (6th Cir. 2019) (holding that there is "a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place").
[169]   *See Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 870 (Ohio 1998).
[170]   *See* Order *First Brands Group, LLC v. Patrick James*, Adv. Pro. No. 25-03803 (CML), Docket (staying all discovery in the James Adversary Proceeding pending the resolution of the parallel criminal case and directing the parties to file as to the status of the parallel criminal case no later than July 13, 2026 to advise whether any modification of the stay is warranted).
[171]   *See id.*; Order Extending Stay of Adversary Case Deadlines and Discovery, *First Brands Group, LLC v. Onset Fin., Inc.*, Adv. Pro. No. 25-03005 (CML), Docket No. 136; Statement Regarding Order Extending Stay of Adversary Case Deadlines and Discovery, *First Brands Group, LLC v. Onset Fin., Inc.*, Adv. Pro. No. 25-03005 (CML), Docket No. 139.

their criminal counterparts, will resolve with particular speed. As noted, the investigations to date will provide a litigation trustee with a robust, comprehensive factual record upon which to build a winning case.

124. Many of these Insider Claims provide alternative theories of liability for a litigation trustee to recover the same fraudulent transfers. A litigation trustee, therefore, is likely to establish liability. Though the funds sought in the James Adversary Proceeding could go to the government via forfeiture in the first instance, a litigation trustee can coordinate with the government for the return of these funds to their rightful place, with the estate. I have worked with the Government in multiple cases to coordinate the return of such funds to the estate and am confident that such coordination would be successful.

125. As explained, significant evidence supports the contention that the transfers at issue in Exhibit A of the James Complaint were made for no reasonably equivalent value, for the benefit of James—the transfers were made to entities under his direct control—the financial condition of FBG clearly worsened as a result of these transfers, and there is a good faith basis to believe that FBG was insolvent or became insolvent as a result of these transfers. I have reviewed and considered the various defenses asserted by the defendants in the adversary proceedings but believe it remains reasonable to conclude that these claims are viable and valuable and that a litigation trustee should prevail.

iv. **Suspect Acquisition Claims**

126. As discussed above, under section 548(a)(1)(B) of the Bankruptcy Code, a transaction may be avoided if a debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or

obligation."[172]  The value of a transfer is determined as of the date of the transfer, and courts consider all aspects of a transaction to determine whether a debtor received reasonably equivalent value.[173]  "The salient issue is whether the estate lost value."[174]

127.    The Estate Claims include fraudulent transfer claims to recover FBG Debtors' assets that were transferred through a series of transactions (the "**Suspect Acquisitions**") in which the FBG Debtors acquired business units at purchase prices that unreasonably exceeded the fair market value of the acquired assets.  Specifically, I understand that from 2022 to 2025, at the direction of Patrick James, FBG engaged in a series of acquisitions at well-above-market prices, receiving less than reasonably equivalent value; based on my review and understanding of the facts relevant to FBG's financial condition at the time, including documentary evidence and analysis of FBG's financial condition, there is a good faith basis to believe that FBG was already insolvent at this time as a result of James's widespread misconduct.[175]

128.    Based on the investigation, I believe that a litigation trustee will be able to meet its burden of establishing that through each of the Suspect Acquisitions, the FBG Debtors received less than reasonably equivalent value.  The investigation uncovered evidence that Patrick James caused the FBG Debtors to acquire entities that James owned, or in which he held an interest, through holding companies, at prices that likely far exceeded market value.[176]  For example, as detailed in the Moore Declaration, in 2023 and 2024, the FBG Debtors engaged in three acquisitions in which they paid aggregate purchase prices totaling approximately $488 million, where the assets were already owned or controlled by James, typically through

---

[172]  *German Pellets La., L.L.C. v. Wessel G M B H (In re La. Pellets, Inc.)*, 838 F. App'x 45, 49 (5th Cir. 2020).
[173]  *See In re Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).
[174]  *Id.* 442.
[175]  Moore Decl. ¶¶ 161–162.
[176]  *Id.* ¶ 157.

holding companies for aggregate purchase prices of approximately $66 million.[177]   While it is possible these assets may have increased in value following acquisition by the FBG Debtors, the gross disparity in purchase prices paid by the FBG Debtors and the purchase prices paid by the James-controlled entities (approximately $422 million) strongly suggests the FBG Debtors did not receive reasonably equivalent value in the acquisitions.[178]

129.   The investigation identified additional acquisitions that suggest the FBG Debtors did not receive reasonably equivalent value in the acquisitions.[179]   Even as to these transactions, however, the evidence indicates that James used the acquisitions as an opportunity to extract value from the FBG Debtors and to support his prepetition scheme.[180]   The Examiner's Report likewise found that James further extracted value through FBG's acquisitions, including through discrepancies between internally reported acquisition values and transaction payments, "side payments," and inflated purchase prices—for example, in connection with the FRAM/Autolite and "Winning" company acquisitions.[181]   For example, I understand that between 2022 and 2024, the FBG Debtors paid $1.6 billion in connection with ten acquisitions they consummated for various businesses.   Of those acquisitions, only three business units yielded going concern sales during these chapter 11 cases for an aggregate value of $195 million, against a combined acquisition cost of more than $641 million.[182]   The remaining seven businesses proved to be unsellable in these chapter 11 cases and were liquidated, yielding only $35 million to date, meaning that these assets lost 85% of their value.[183]

---

[177]   *Id.*
[178]   *Id.*
[179]   *Id.* ¶ 161.
[180]   *Id.*
[181]   Examiner's Report § VI.B.
[182]   Moore Decl. ¶ 162.
[183]   *Id.*

130.     Based on my review of the investigation conducted by A&M, it is evident that in each of the Suspect Acquisitions, the FBG Debtors' estates lost tremendous value.  The sellers of these business units benefitted from exorbitant purchase prices authorized by Patrick James as a means of extracting money from the FBG Debtors, rather than in exchange for reasonably equivalent value. At this same time, based on my review and understanding of the facts relevant to FBG's financial condition, including documentary evidence and analysis of FBG's financial condition, there is a good faith basis to believe that FBG was already insolvent due to James's widespread misconduct.

131.     The other element required to establish a fraudulent transfer claim under section 548(a)(1)(B) is that the debtor was insolvent on the date that such transfer was made or became insolvent as a result of such transfer.  A corporate debtor is insolvent when its "financial condition [is] such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[184]  Based on my review and understanding of the facts relevant to FBG's financial condition at the time, including documentary evidence and analysis of FBG's financial condition demonstrating, among other things, unreported liabilities in excess of $5 billion and guilty pleas from executives admitting that the fraudulent conduct dated back to as early as 2018, I believe there is a good faith basis to conclude that FBG was insolvent when making the subject transfers.[185]

     v.     **Other Claims.**

     a.     Helios Claims.

132.     Based on the facts set forth in paragraphs 165–167 of the Moore Declaration, my review of A&M's forensic investigation, and the reasons set forth herein, I believe

---

[184]   11 U.S.C. § 101(32)(A).
[185]   Moore Decl. ¶¶ 77–79.

the FBG Debtors hold significant claims for fraudulent transfer against Helios Strategic Advisors LLC ("**Helios**" and such claims, the "**Helios Claims**").

133.    It is my understanding that Helios operated as a broker retained to identify and arrange sources of funding for the Debtors in exchange for fees.[186]  In that capacity, Helios was responsible for brokering SPV financing arrangements, as well as the arrangements with certain factoring counterparties, including Katsumi.[187]  On the transactions it brokered, Helios collected fees which, based on the evidence uncovered, were used in part to funnel kickback payments to Edward James.[188]

134.    The investigation uncovered evidence establishing Edward James's undisclosed financial interest in Helios.[189]  Specifically, the investigation identified an Excel file maintained by Edward James tracking his personal investments, which reflects his interest in Helios in the amount of $20.5 million.[190]

135.    I believe a litigation trustee would likely succeed in a claim to recover funds based on claims of actual fraudulent transfer against Helios.  Based on the foregoing, it is my opinion that substantial evidence exists to support that Helios received substantial value from the Debtors in the form of brokerage fees and related payments, and that Helios served as a conduit for the diversion of estate assets to Edward James.  Accordingly, a litigation trustee can reasonably allege that these transfers were made with actual intent to hinder, delay, or defraud creditors.  As such, the fees collected by Helios and the kickbacks funneled through Helios to Edward James

---

[186]   *Id*. ¶ 165.
[187]   *Id*.
[188]   *Id*. ¶¶ 156, 167.
[189]   *Id*. ¶ 167.
[190]   *Id.*

would constitute transfers that may be avoided and recovered for the benefit of the FBG Debtors' estate.

136.    I also believe a litigation trustee would likely succeed in recovering funds based on constructive fraudulent transfer against Helios.   Given the apparent kickback arrangement, it is likely that Helios's fees exceeded the reasonably equivalent value of brokerage services actually provided, which the estate may recover under § 548(a)(1)(B) of the Bankruptcy Code if the Debtors were insolvent at the time of transfer.[191]  As such, I believe the Helios claims are meritorious and worthwhile for a litigation trustee to pursue, with FBG to Helios having transferred approximately $27.5 million from 2022 to 2025.

b.    Preference Claims

137.    The Estate Claims include preference claims (the "**Preference Claims**") that the FBG Debtors hold against creditors and counterparties who received transfers from the FBG Debtors during the applicable preference period prior to the Petition Date.[192]   In my experience, litigation trustees or debtors typically bring claims like these in most cases.  Here, a litigation trustee would likely consider bringing Preference Claims against potential defendants including trade vendors, suppliers, and other creditors who received payment on account of antecedent debt in the 90 days preceding the bankruptcy filing, or up to one year preceding the bankruptcy filing for transfers to "insiders" (as that term is defined in the Bankruptcy Code), including officers, directors, and affiliated entities of the FBG Debtors.

138.    As a general matter, to establish liability on the Preference Claims, a litigation trustee will need to prove by a preponderance of the evidence that the transfer at issue was made (i) to or for the benefit of a creditor, (ii) on account of a debt incurred before the transfer,

---

[191]    *Id*. ¶¶ 156, 167.
[192]    *See* 11 U.S.C. § 547(b).

(iii) while the applicable Debtor was insolvent, (iv) within the applicable statutory period, and (v) allowed the creditor to receive more than they otherwise would have if this were a chapter 7 liquidation. I have substantial experience prosecuting or supervising the prosecution of preference claims.

139. Based on the analysis conducted to date by the FBG Debtors' advisors, I understand that total gross transfers that may be subject to avoidance under section 547 of the Bankruptcy Code is more than $1.7 billion.

140. There are, however, defenses under the Bankruptcy Code to a preference claim that limit a transferee's liability. These defenses include: (i) the transfer occurred in the "ordinary course of business" between the parties, (ii) following the transfer, the creditor provided "new value" to the debtor that was (x) not secured by an otherwise unavoidable security interest and (y) not repaid by another unavoidable transfer, and (iii) the transfer was intended, and was in fact a substantially contemporaneous exchange for new value given to the debtor by the transferee.[193] In addition, I am aware that the Plan contains a "Preference Settlement" pursuant to which Trade Creditors could receive a complete release from Preference Claims and Factors and Supply Chain Financers could receive the benefits of a modified "new value" defense.[194] A Trade Creditor, Factor, or Supply Chain Financer may only receive these benefits if it (i) does not meet the definition of Adverse Conduct, as determined by a Final Order, (ii) is not a Specified Non-Released Party, and (iii) affirmatively elects to be a Preference Settlement Electing Creditor.

141. These defenses have the potential to reduce the amount of proceeds a litigation trustee could ultimately recover on account of the Preference Claims. Furthermore, although the Litigation Trust is being funded with $75 million to pursue the Estate Claims, it is

---

[193]   11 U.S.C. § 547(c)(1),(2),(4).
[194]   *See* Plan § 6.11.

possible that the Litigation Trust will retain contingency counsel to prosecute the Preference Claims, which would further reduce the amount of proceeds generated from the Preference Claims. While a more detailed analysis of defenses has not yet been performed, I understand that the FBG Debtors' advisors have analyzed total transfers which have been made to potential preference counterparties during the same period, and that gross transfers exceed these transfers by $304 million.

142.    In my experience, preference claims are often resolved without having to commence litigation.  Furthermore, preference claims are often settled in a matter of weeks or months once the debtor reaches out to the creditor to make a demand or commences an adversary proceeding.   Preference litigation is typically relatively straightforward and can proceed expeditiously.  Accordingly, I believe the Litigation Trust will be able to resolve a significant majority, if not all, of the Preference Claims by the second half of 2028.  Based on my experience, litigation trustees recover approximately 10% of the amount of preference claims.

## B.    Conclusions

143.    Based on the above and my extensive experience as a litigation trustee, I believe a litigation trustee can assert claims against the various defendants totaling in excess of $25 billion.  Because of the extensive work done in the various investigations, the overlapping nature of the claims, the $75 million in initial funding provided to a litigation trustee under the FBG Debtors' Plan, that adversary proceedings have been initiated, and the tools available to expedite proceedings through consolidation of common issues, I believe it is reasonably possible that recoveries in excess of $2 billion could be received by the end of 2028.  This amount represents less than 8% of the total amount of Estate Claims that I believe could be asserted by a litigation trustee and accounts for the uncertainty and time associated with litigation, and the potential that the FBG Debtors might settle certain litigation claims for less than the asserted amounts.

144.     Collectability: My opinion also takes into account collectability of judgments.  There always is risk that a plaintiff secures a large judgment but is unable to actually collect.  This risk is inherent in all litigation, but there are reasons to believe a litigation trustee will be able to collect on significant settlements or judgments involving the Estate Claims.

145.     First, as it pertains to Patrick and Edward James, I understand they have substantial assets, including from distributions that are the subject of the Estate Claims.[195]  While I understand neither is currently subject to an asset freeze, both have been indicted by the federal government, and it is reasonable to conclude that the Department of Justice would take steps to prevent the Jameses from dissipating assets if that were occurring.  I have extensive experience working alongside the government in matters that involved overlapping civil and criminal litigation, including with state attorneys general and US attorneys, and believe that a litigation trustee could successfully cooperate with government attorneys to further ensure collectability of recoveries.  Also, as mentioned above, there are significant D&O proceeds that may be available to satisfy Insider Claims against the Jameses.

146.     Second, as it pertains to other significant defendants, including Katsumi and LAM/Jefferies, I understand these entities are well capitalized and could sustain a significant judgment.  For example, Jefferies is a publicly traded company with a market capitalization exceeding $10 billion.[196]

147.     Timing: I believe it is reasonable to believe that a litigation trustee will recover sufficient funds by the end of 2028 to make the payments that I understand are required under the Plan for the Plan to become effective.  The Estate Claims represent a diverse portfolio

---

[195]   *See* Moore Decl. ¶ 142.
[196]   *Jefferies Fin. Grp. Inc.* (JEF:US), Bloomberg, https://www.bloomberg.com/quote/JEF:US (last visited July 9, 2026).

of claims and causes of action.  While a litigation trustee will not be able to fully control the speed at which litigation proceeds, it is reasonable to anticipate that certain of the claims and causes of action will result in settlements without full litigation.  Further, numerous claims, including those against Patrick James and Onset, have already been significantly investigated and are the subject of filed adversary proceedings, which will allow a litigation trustee to expeditiously seek recovery on those claims.  Numerous claims are also the subject of overlapping and ongoing criminal proceedings.  Based on my experience, I believe that a litigation trustee would be able to successfully cooperate with the government to further expedite recovery under the Estate Claims.

148.    Additionally, many of the avenues of recovery share common issues and questions, such as the application and effect of the Ponzi-Scheme Presumption, the badges of fraud, and solvency issues.  Given my successful experience in consolidating common issues in similar circumstances, I believe a litigation trustee could seek to have these issues resolved through consolidated and streamlined procedures that will allow for Estate Claims to be resolved more efficiently and expeditiously, recognizing that the individual due process rights of the varying defendants would have to be accounted for under any procedures established for consolidation.[197] Further, there are a significant number of claims that are based on theories of fraudulent transfer which have specific and discrete elements and causes of action and which can be heard by the Bankruptcy Court that may generate quicker recoveries than other Estate Claims given their nature. Additionally, based on my experience, I believe a litigation trustee could also seek to expedite matters through other methods such as (i) negotiating settlement agreements in advance of filing proceedings, (ii) seeking bilateral settlement negotiations, and (iii) entering into mediation with certain parties.  Given the strength of the claims, diversity of defendants and theories of recovery,

---

[197]   *See, e.g.*, *The Refco Litigation War*, attached hereto as **Exhibit C.**

significant advancement of many claims, and the potential for consolidation of common issues, I believe it is reasonable to conclude that a litigation trustee will succeed in recovering at least $2 billion on account of the Estate Claims by the end of 2028.

149.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 14, 2026                                    /s/ Marc S. Kirschner
New York, NY                                            Marc S. Kirschner