**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION FOR ORDER (A) APPROVING SALE TRANSACTION FOR CERTAIN OF THE DEBTORS' EQUITY INTERESTS AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) GRANTING RELATED RELIEF**

EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN JULY 22, 2026.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

A HEARING HAS BEEN REQUESTED ON THIS MATTER NOT LATER THAN JULY 22, 2026 IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.

YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

**Preliminary Statement**[2]

1. The Debtors are pleased to be before the Court seeking approval of the sale of the Debtors' equity interests in certain of their non-Debtor subsidiaries, specifically (i) all of the right, title and interest held by Debtor Carter Carburetor Holdings, LLC ("**Carter Carburetor**") in and to the issued and outstanding equity interests of Walbro Co., Ltd. ("**Walbro Japan**"), (ii) all of the right, title and interest held by Debtor WEM US Co. ("**WEM**") in and to the issued and outstanding equity interests of Walbro Fuel Systems and Technology (Thailand) Co., Ltd. ("**Walbro FST**"), and (iii) certain related assets, including the rights to certain related intercompany debt (collectively, and as defined and further described in the Purchase Agreement, the "**Transferred Interests**"). The Sale Transaction will be consummated pursuant to that certain *Purchase Agreement* (the "**Purchase Agreement**" and the sale transaction contemplated thereunder, the "**Sale Transaction**") dated as of July 15, 2026, by and among First Brands Group Holdings, LLC, Carter Carburetor, and WEM (collectively, the "**Sellers**") and Husqvarna Business Support AB (the "**Buyer**"), which provides for an aggregate purchase price of $12 million in cash.

---

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to such terms elsewhere in the Motion.

2.      It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible. As this Court is aware, the Debtors' liquidity is limited, and the Buyer and the Debtors' key stakeholders have made clear their expectation that the Sale Transaction be consummated on an expedited basis. A swift closing of the Sale Transaction—which the Debtors anticipate will occur within days of Court approval—is required by the Purchase Agreement, which provides that closing must occur by July 31, 2026 (the "**Outside Date**"), and will inure to the benefit of the Debtors' estates. Accordingly, prompt entry of the Sale Order is critical to preserve value and avoid disruption of the Sale Transaction. The relief requested in the Sale Order, including the findings and protections afforded to Buyer under sections 363(f) and 363(m) of the Bankruptcy Code and the protections against successor, derivative, transferee, and vicarious liability, is integral to the Sale Transaction, and the Debtors understand that the Buyer would not consummate the Sale Transaction without such relief.

3.      Accordingly, with the goal of maximizing value, the Debtors propose the following timeline for the consummation of the Sale Transaction:

| Event | Date |
| --- | --- |
| File and serve Notice of Sale Hearing | Contemporaneously with this Motion |
| Proposed Sale Hearing[3] | July 22, 2026 |
| Sale Transaction objections due | 4:00 p.m. prevailing Central Time on July 21, 2026 |

4.      As the Court is aware, the Debtors have conducted a multi-month-long marketing and sale process, which began on January 5, 2026, with the Debtors' outreach to over 400 potential bidders (the "**Sale Process**"). As of the date hereof, the Debtors have obtained Court approval of

---

[3]     The Debtors have requested that the Sale Hearing be held on July 22, 2026. The Sale Hearing may be adjourned by the Debtors by filing a notice on the docket of these chapter 11 cases.

and closed going-concern sales of various business lines as well as sales of discrete assets such as certain intellectual property.[4] The Debtors and their advisors have continued engaging with potential purchasers related to all of the Debtors' assets (including the Wind Down Assets).[5] In furtherance thereof, the Debtors have engaged in good faith arm's length discussions with the Buyer regarding the sale of the Transferred Interests. These discussions resulted in the Sellers and the Buyer reaching an agreement on the terms of the Sale Transaction and the Purchase Agreement.

5.      The Sale Transaction and the relief requested herein are supported by the Ad Hoc Group.

6.      For the above reasons and those set forth in the Motion, the Debtors believe the Sale Transaction is in the best interests of the Debtors, their estates, and all stakeholders and should be approved on the expedited timeline described herein.

## **Relief Requested**

7.      By this motion (the "**Motion**"),[6] pursuant to sections 105 and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 9008 of the Federal

---

[4]   *See, e.g.*, *Order (A) Authorizing and Approving Sale of Certain of Debtors' Intellectual Property Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts, and (C) Granting Related Relief* (Docket No. 2399); *Order (A) Authorizing and Approving Sale of Debtors' Toledo Molding & Die Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2675); *Order (A) Authorizing and Approving the Debtors' Entry Into Stock and Asset Purchase Agreement with Flex-N-Gate For Sale of Debtors' Horizon Business Assets and Transferred Equity Interests Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2800).

[5]   "**Wind Down Assets**" has the meaning ascribed to such term in the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2216) (the "**Wind Down Motion**").

[6]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**") or in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608) (the "**DIP Order**"), as applicable.

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules"),** the Debtors request entry of an order

(the "**Sale Order**"), substantially in the form attached hereto as **Exhibit A**:

     i.    authorizing the sale of the Debtors' equity interests in Walbro Japan and Walbro FST and the other Transferred Interests to Buyer pursuant to the Purchase Agreement, annexed as Exhibit 1 to the proposed form of Sale Order attached hereto as **Exhibit A**, free and clear of liens, claims, encumbrances and other interests, including all "Claims and Interests" as defined in the Sale Order, other than liabilities expressly assumed by Buyer or permitted to survive under the Purchase Agreement;

    ii.    authorizing and approving the Purchase Agreement with Buyer, including all of its terms and conditions, all ancillary documents, all Transaction Agreements, and all transactions contemplated therein, in all respects;

    iii.    authorizing and approving the form and manner of notice of the hearing on the sale of the Transferred Interests, substantially in the form attached hereto as **Exhibit B**;

    iv.    authorizing the Debtors to distribute the proceeds of the Sale Transaction as directed in the Purchase Agreement; and

    v.    granting related relief.

8.    In support of the Motion, the Debtors submit the declaration of Nicholas Haughey, Managing Director at Alvarez & Marsal North America, LLC, the Debtors' financial advisors (the "**Haughey Declaration**") and the declaration of Nate Walker, the Buyer's General Counsel, NA & VP Litigation, Product Safety & Compliance (the "**Walker Declaration**"), which are filed contemporaneously herewith and are incorporated by reference herein.

## Background

9.    On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code. Commencing on September 28, 2025 (the "**Petition Date**"), FBG and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.

10. On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (Docket No. 313) (the "**Creditors' Committee**").

11. The Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

12. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration and incorporated herein by reference.

## Jurisdiction and Venue

13. The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Sale Process

14. On January 5, 2026, the Debtors, with assistance from Lazard, commenced a marketing and sale process for all of their assets and the equity in or assets of certain non-Debtor subsidiaries. As a result of outreach to over 400 potentially interested parties, over 200 potential buyers executed confidentiality agreements and received access to a virtual dataroom with technical, commercial, and financial information regarding each of the Debtors' business units.

15.     On January 8, 2026, the Debtors filed the Bidding Procedures Motion,[7] which sought Court approval of an expedited timeline and auction procedures for the Sale Process. The Debtors filed and served the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* (Docket No. 1324) (the "**Initial Notice**"), which provided all interested parties with notice of the Debtors' intent to sell all of their assets pursuant to one or more sale transactions. On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix and the Sale Notice Parties (as defined in the Bidding Procedures Motion). *See Affidavit of Service* (Docket No. 1718). The Debtors subsequently published the Initial Notice in the national edition of *The New York Times* on January 16, 2026, as reflected in the *Certificate of Publication* (Docket No. 1645).

16.     However, shortly after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position further deteriorated and the Debtors found themselves unable to obtain additional funding or waivers to access additional liquidity from their lenders. As a result the Debtors were forced to begin taking steps to wind down certain of their North American business operations. At that point, it became clear to the Debtors and their advisors that consummating a sale transaction on the timeline contemplated by the Bidding Procedures Motion was no longer possible under the circumstances.

17.     In late January 2026, the Debtors and their advisors reached out to potential bidders and key stakeholders to apprise them of the Debtors' liquidity situation and request that any party

---

[7]     The "**Bidding Procedures Motion**" means the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* (Docket No. 1253) and the "**Bidding Procedures**" refers to the bidding procedures proposed thereunder.

interested in the Debtors' assets submit an indication of interest as soon as possible. Simultaneously, the Debtors engaged with the OEMs to determine whether they would be willing to provide funding to the Debtors to allow them to avoid an entire shutdown of their North American businesses and continue their efforts to pursue sales of their remaining business lines.

18.     The Debtors' discussions with the OEMs resulted in the parties reaching an agreement on a weekly operational funding arrangement and, on February 1, 2026, the Court approved an order with respect thereto. *See Order (I) Approving Funding Arrangement with Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1848) (the "**OEM Funding Order**"). The OEM funding arrangement provided the Debtors with immediate access to funding to be used solely to support operations and production at certain of the Debtors' business units that service the OEMs on a week-to-week basis.

19.     With this lifeline in hand, the Debtors and their advisors progressed discussions with numerous potential buyers, and by February 5, 2026, the Debtors had received approximately 40 non-binding indications of interest ("**IOIs**") spanning several of their business units. The Debtors and their advisors then worked to narrow the IOIs received into a core set of viable transactions that provided the highest or otherwise best value to the Debtors' estates.

20.     As part of these discussions, the Debtors considered interest in both going-concern sales and various sales for discrete categories of assets, such as intellectual property and equity interests. In connection with each, the Debtors considered, among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders. Ultimately, following good faith arm's-length negotiations between the Debtors and their advisors, the DIP Secured Parties, and the Buyer, the parties reached the agreement reflected in the Purchase

8

Agreement. For the reasons set forth herein, the Debtors believe the Sale Transaction represents the highest and otherwise best bid for the Transferred Interests and should be approved.

### Retention of Consultant and Winddown Process

21.     On April 16, 2026, the Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No.2454) (the "**Wind Down Order**"), pursuant to which, among other things, the Court authorized the Debtors and their Consultant (as defined in the Wind Down Motion) to sell certain Wind Down Assets.

22.     The Wind Down Order authorizes the Debtors, in their business judgment, to expand the list of Wind Down Assets attached thereto in order to wind down additional brands, business units, or asset classes subject to the procedures set forth therein. The Debtors believe they are authorized to expand the Wind Down Assets to include the Transferred Interests, and sell the Transferred Assets pursuant to the Wind Down Order. Out of an abundance of caution, however, the Debtors are instead filing this Motion to seek approval of the Sale Transaction and the related relief requested herein and to obtain the Sale Order.

### Sale of DIP Collateral

23.     The Transferred Interests that the Debtors seek to sell pursuant to this Motion constitute DIP Collateral (as defined in the DIP Order). The Debtors are requesting, by this Motion, authority to distribute the Debtor Closing Proceeds[8] generated by the Sale Transaction directly to

---

[8]     "**Debtor Closing Proceeds**" is defined in the Purchase Agreement as an amount equal to (a) the Base Purchase Price,  minus (b) the aggregate amount (not to exceed $300,000 in the aggregate) of fees and expenses of (i) Lazard Frères & Co. and Alvarez & Marsal North America, LLC, and (ii) counsel to Sellers incurred after March 15, 2026 in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, no other proration, setoff, adjustment, deduction or other reduction shall be applied in calculating the Debtor Closing Proceeds.

the DIP Secured Parties, to which the Ad Hoc Group has provided its consent. Pursuant to the Sale Order, payment of the Debtor Closing Proceeds to the DIP Secured Parties will reduce the outstanding DIP Obligations (as defined in the DIP Order) by such amount. In light of the above, the Debtors believe that the distribution of the Debtor Closing Proceeds to the DIP Secured Parties is in the best interest of the Debtors' estates and their creditors.

### Proposed Terms of the Sale Transaction

24.     The chart below summarizes certain material terms of the Purchase Agreement.

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| **Purchase Price** | The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Interests and obligations of Sellers set forth in the Purchase Agreement shall be an amount in cash equal to $12,000,000 and the assumption of the WEM Japan Payable.<br><br>Purchase Agreement § 3.01. |
| **Transferred Interests** | On the terms and conditions set forth in the Purchase Agreement, at the Closing:<br><br>(a) Carter Carburetor shall sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and accept from Carter Carburetor, all of the right, title and interest in and to the issued and outstanding equity interests of Walbro Japan (the "**Walbro Japan Equity Interests**");<br><br>(b) WEM shall sell, convey, assign, transfer and deliver to Buyer or one or more of its affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and accept from WEM, all of its right, title and interest in and to (i) the Walbro FST Debt, and (ii) the issued and outstanding equity interests of Walbro FST held by WEM (the "**WEM Walbro FST Equity Interests**");<br><br>(c) Applicable Obligee shall sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and accept from the Applicable |

---

[9]   Unless otherwise specified, all section references are to the Purchase Agreement. The summary of the Purchase Agreement set forth herein is qualified in its entirety by the terms of the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| | Obligee, all of their right, title and interest in and to the Walbro Intercompany Debt[10] and the Subject Marks;[11]<br><br>(d) Buyer shall assume, and agree to pay, perform and discharge when due, the WEM Japan Payable.<br><br>Purchase Agreement § 2.01. |
| **Excluded Assets** | All assets other than the Transferred Interests are excluded from the Sale Transaction (including, without limitation, any assets previously conveyed to any purchaser pursuant to the Prior Sale Agreements).[12] |
| **Assumed Liabilities** | None other than the WEM Japan Payable.[13] |
| **Releases** | As of the Closing, Sellers, on behalf of themselves and their Subsidiaries, (i) irrevocably and unconditionally waive, release, and forever discharge (a) the Transferred Entities and (b) Buyer and each of its respective current Representatives, stockholders, members, directors, managers, trustees, principals, predecessors, attorneys, accountants, advisors, representatives, successors, assigns, beneficiaries, heirs or |

---

[10]  "**Walbro Intercompany Debt**" means, collectively, the following liabilities, in an aggregate approximate amount (as of April 27, 2026) of $18,553,000: (a) the Walbro FST Debt, (b) the Walbro Thailand Debt, (c) the Walbro Japan Debt, and (d) the Walbro Switzerland Debt and (e) any other intercompany liability owed by any Transferred Entity to any Seller agreed in a writing signed by Buyer and Primary Seller.

[11]  "**Subject Marks**" means the rights (if any) held by the Sellers as of the date of the Purchase Agreement in any trademarks that are primarily related to the Walbro Asia Business and do not constitute either (x) Business Intellectual Property (as such term is defined in the Overdrive Agreement) or (y) Carter Carburetor Trademarks (as such term is defined in the Overdrive Agreement). For the avoidance of doubt, the Subject Marks do not include any assets previously conveyed to any purchaser pursuant to any Prior Sale Agreement (including pursuant to the Overdrive Agreement).

[12]  "**Prior Sale Agreements**" means (i) the Overdrive Agreement; (ii) that certain Asset Purchase Agreement, dated as of March 25, 2026, by and among Principal Seller, as Seller (as defined therein), PGI NorthStar LLC, as Buyer (as defined therein), and Premium Guard Incorporated, as Guarantor (as defined therein); (iii) that certain Asset Purchase Agreement, dated as of May 30 7, 2026, by and among FBGH, Toledo Molding & Die, LLC (together with FBGH, as Sellers defined therein), TNJ Ohio LLC, as Buyer (defined therein), and solely for purposes of Section 6.12, WMC – KSA Holdings LLC, as Guarantor (as defined therein), (iv) that certain Stock and Asset Purchase Agreement, dated as of May 19, 2026, by and among Principal Seller, the Asset Sellers and Intercompany Sellers party thereto, Horizon Euro Finance LLC, the Equity Sellers and Transferred Entities who thereafter became parties thereto, K2TR Corporation, Ventra Ohio LLC, Horizon SNK, LLC, Horizon ARK, LLC, Horizon Kansas LLC, and Flex-N-Gate, as Guarantor (solely for the purposes set forth therein); (v) that certain Asset Purchase Agreement, dated as of June 12, 2026, by and between Principal Seller and PGI Northstar LLC, and Premium Guard Incorporated, as Guarantor (solely for the purposes set forth therein); and (vi) That certain Settlement and Sale Agreement, dated as of May 19, 2026, by and among Principal Seller, Horizon Global Corporation, and the other Sellers party thereto, Cequent Nederland Holdings B.V., and each of the other Buyers party thereto.

[13]  "**WEM Japan Payable**" means the intercompany loan, as evidenced by that certain Intercompany Advances Promissory Note dated as of July 1, 2024, owed by Carter Carburetor (as debtor) to Walbro Japan (as creditor), in an amount equal to the aggregate principal amount of the Walbro Intercompany Debt as of the Closing Date.

| **Material Terms of the Purchase Agreement[9]** |
|---|
| executors (collectively, the "**Buyer Released Parties**") from any and all Released Claims, (ii) irrevocably covenant to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Buyer Released Party with respect to the Released Claims, and (iii) represent to the other Parties that Sellers have not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in the Purchase Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Sellers also hereby waive the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim. Notwithstanding the foregoing or anything to the contrary in the Purchase Agreement, and for the avoidance of doubt, Buyer Released Parties shall not include any of the Identified Defendants or any Immediate or Mediate Transferee of any value provided by the Debtors to any Identified Defendant.<br><br>As of the Closing, Buyer, on behalf of itself and its Subsidiaries (and any assignees in accordance with Section 12.08), (i) irrevocably and unconditionally waives, releases, and forever discharges Sellers and each of their respective current and former advisors, stockholders, members, directors, managers, trustees, principals, parents, Affiliates (other than the Transferred Entities), Subsidiaries, joint ventures, predecessors, attorneys, accountants, advisors, representatives, successors, assigns, beneficiaries, heirs or executors (collectively, the "**Seller Released Parties**") from any and all Released Claims, (ii) irrevocably covenants to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Seller Released Party with respect to the Released Claims, and (iii) represents to the other Parties that Buyer has not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in the Purchase Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Buyer also hereby waives the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim.<br><br>As of the Closing, (i) Sellers, on behalf of themselves and their Subsidiaries, irrevocably and unconditionally waive, release, and forever discharge the Transferred Entities from any and all Intercompany |

12

| **Material Terms of the Purchase Agreement[9]** | |
|---|---|
| | Released Claims and (ii) the Transferred Entities irrevocably and unconditionally waive, release, and forever discharge the Sellers and their Subsidiaries from any and all Intercompany Released Claims.<br><br>Purchase Agreement § 12.19. |
| **Closing and Other Deadlines** | The Closing shall take place by telephone conference and electronic exchange of documents (or if originals are needed, then, the exchange of such original documents) (or, if the Parties agree to hold a physical closing, at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020-1605), at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X of the Purchase Agreement (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing. The date on which the Closing occurs is referred to in the Purchase Agreement as the "Closing Date." For all purposes under the Purchase Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in the Purchase Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.<br><br>Purchase Agreement § 2.02. |
| **DIP Escrow Account** | On the Closing Date, Buyer shall pay, by wire transfer of immediately available funds, (x) the Debtor Closing Proceeds to the escrow agent for the DIP Escrow Account for deposit into the DIP Escrow Account, and (y) the remaining portion of the Base Purchase Price to the Professional Fee Escrow Account. Amounts on deposit in the DIP Escrow Account shall be distributed solely as, when and to the Persons provided in, and in the priorities and manner set forth in, the Sale Order, and neither Buyer nor any Debtor shall have any right to direct any disbursement or withdrawal therefrom except to the extent expressly authorized by the Sale Order and/or the DIP Order. Buyer acknowledges and agrees that all funds deposited into the DIP Escrow Account are not property of Buyer, are not subject to any right of setoff, recoupment or counterclaim by Buyer, and shall remain subject to the liens, claims, priorities and protections set forth in the DIP Order and the Sale Order until disbursed in accordance therewith.<br><br>Purchase Agreement § 3.01. |

13

| Material Terms of the Purchase Agreement[9] | |
|---|---|
| **Closing Conditions** | The obligations of Buyer and Sellers to consummate the Transactions shall be subject to (i) the Bankruptcy Court's entry of the Sale Order and such Sale Order not being subject to any stay, (ii) each party's execution and delivery, or causing to be executed and delivered, to the other party of all of the documents described in Section 2.03 of the Purchase Agreement to which it is a party, (iii) all representations and warranties of the other party contained in the Purchase Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for purposes of determining the satisfaction of the condition in clause (iii), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties and (iv) the covenants contained in the Purchase Agreement required to be performed or complied with by the other party at or before the Closing shall have been performed or complied with in all material respects.<br><br>Purchase Agreement § 10.01. |
| **Termination** | The Purchase Agreement may be terminated before Closing:<br><br>(a) by the mutual written consent of Principal Seller and Buyer;<br><br>(b) by either Principal Seller or Buyer, if the Closing shall not have occurred by July 31, 2026 (the "**Outside Date**"); provided, however, that, if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties or covenants contained in the Purchase Agreement by Buyer or Sellers, then the breaching Party may not terminate the Purchase Agreement pursuant to Section 11.01(b) of the Purchase Agreement; or<br><br>(c) by either Principal Seller or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Interests contemplated by the Purchase Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate the Purchase Agreement under Section 11.01(c) of the Purchase Agreement shall not be available to Principal Seller or Buyer whose action or failure to fulfill any obligation under the Purchase Agreement has been the cause of, or has resulted in, the issuance of such Order or other action. |

| **Material Terms of the Purchase Agreement[9]** | |
|---|---|
| | Purchase Agreement § 11.01. |
| **Remedies; Limitation on Liability** | Except to the extent set forth otherwise in the Purchase Agreement, all remedies under the Purchase Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.<br><br>Purchase Agreement § 12.17.<br><br>Notwithstanding anything in the Purchase Agreement or in any other Transaction Agreement to the contrary, (a) except in the event of willfully and knowingly committed fraud with the specific intent to deceive and mislead, the maximum aggregate Liability of Sellers under the Purchase Agreement shall not exceed $1,200,000 and (b) in no event shall any Party have any Liability under the Purchase Agreement (including under Article XII) for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of the Purchase Agreement); provided, that such limitation set forth in clause (b) of Section 12.05 of the Purchase Agreement shall not limit any Party's right to recover contract damages in connection with or resulting from such Party's failure to close the Transactions in breach or violation of the Purchase Agreement.<br><br>Purchase Agreement § 12.05. |
| **Record Retention** | Sellers and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date. Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of the period ending on (a) any applicable statute of limitations and (b) the Wind-Up Date. After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least ninety (90) days' prior written notice to Sellers of its intention to dispose of such books and records, and Sellers, and/or any of their respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect within ninety (90) days of such notice.<br><br>Purchase Agreement § 7.02. |

**The Sale Transaction is a Sound Exercise of Debtors' Business Judgment,**

**in the Best Interests of Debtors' Estates and Stakeholders, and Should be Approved**

A.  **Approval of the Sale Transaction and Distribution of Sale Proceeds Is Supported by Sound Business Judgment and Warranted Under Bankruptcy Code Section 363**

25. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale[.]"); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014).

26. When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 739 (Bankr. S.D. Tex. 2020) (quoting *Orman v. Cullman*, 794 A.2d 5, 19–20 (Del. Ch. 2002)); see also *In re Think3,*

*Inc.*, 529 B.R. 147, 181 (Bankr. W.D. Tex. 2015) ("When the business judgment rule applies, liability will result only if the action is proven to lack 'any rational business purpose.'") (quoting *Brehm v. Eisner*, 746 A.2d 244, 264 n.65 (Del. 2000)).

27.     A debtor has broad discretion in determining how assets are sold and, so long as a debtor maximizes the return to its estate, courts will defer to a debtor's business judgment regarding how to structure an asset sale—including whether by public auction or by private sale and whether to pursue a sale of individual assets or a going-concern bid. *See In re 9 Houston LLC*, 578 B.R. 600, 618 (Bankr. S.D. Tex. 2017) (holding debtor could sell its single asset, a 3.4-acre tract of land, pursuant to a private sale); *see also In re Envision Healthcare Corporation*, No. 23-90342 (CML) (Bankr. S.D. Tex. Aug. 1, 2023) (Docket No. 879) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction). Even where a debtor has previously filed bidding procedures, courts have approved the sale of assets pursuant to a private sale if, in the debtor's business judgment, a private sale will maximize value or is necessary under the circumstances. *See, e.g.*, *In re Katerra Inc.*, No. 21- 31861 (DRJ) (Bankr. S.D. Tex. July 8, 2021) (Docket No. 414) (approving private sale of assets to avoid immediate shutdown of certain business line, including termination of a significant number of employees, even though the debtors had previously filed bidding procedures); *In re 160 Royal Palm, LLC*, 600 B.R. 119, 128 (S.D. Fla. 2019) (authorizing debtors to withdraw auction procedures and pursue a private sale where public sale process had been repeatedly delayed by litigation and the assets had been sufficiently marketed under the bidding procedures); *In re Nashville Senior Care, LLC*, No. 23-02924 (MFH) (Bankr. M.D. Tenn. Nov. 8, 2023) (Docket No. 366) (approving private sale of assets and allowing the debtors to cancel scheduled auction pursuant to bidding procedures notwithstanding multiple

17

proposals for the assets because private sale purchaser submitted going-concern bid that offered materially higher economic terms for the purchased assets and required auction to be cancelled).

28. Moreover, Bankruptcy Rule 6004(f)(1) expressly permits private sales or sales conducted without an auction. Fed. R. Bankr. P. 6004(f)(1) ("A sale that is not in the ordinary course of business may be made by public auction or private sale."). Accordingly, if the Debtors conclude that conducting a private sale, as opposed to a public auction, is in the best interests of their estates, the Debtors should be permitted to do so. *See 9 Houston LLC*, 578 B.R. at 618 ("[T]he sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.") (quoting *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998)); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("there is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction") (quoting *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991)).

29. Strong business justification supports the Sale Transaction. First, the Debtors believe that the Sale Transaction presents the most value-maximizing path for the Transferred Interests and that further marketing, including by holding an auction, is unlikely to yield a higher or otherwise better result. The Debtors ran a broad, multi-month Sale Process and directly solicited interest from over 400 parties, including parties who had reached out to the Debtors' advisors expressing interest in the Debtors' assets. The Debtors widely publicized their Sale Process pursuant to the Initial Notice, which was filed and served on January 13, 2026, and the Publication Notice, which was published in *The New York Times* on January 16, 2026. *See* Docket Nos. 1718, 1645. As previously noted, the Debtors considered various factors for IOIs received, including

among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders. Ultimately, the Debtors and the Buyer reached the agreement reflected in the Purchase Agreement with respect to a sale of the Transferred Interests.

30.     The Debtors believe the Sale Transaction represents the highest and otherwise best bid for the Transferred Interests. Even if the Debtors had the liquidity to further market and/or auction the Transferred Interests—which they do not—the Debtors believe any incremental value achieved would likely be offset, if not exceeded, by the costs of the same. Moreover, given the circumstances of these chapter 11 cases and the type of assets being sold here—namely equity interests in certain non-Debtor entities—it is more likely that the value of such assets will decrease rather than increase with the passage of time.

31.     Second, consummating the Sale Transaction—including distributing the Debtor Closing Proceeds to the DIP Secured Parties—will further the Debtors' efforts to expeditiously wind down their assets in an organized fashion, reduce administrative and operating costs, and generate cash proceeds for the benefit of creditors. The Debtors believe this is the optimal path for the Debtors' estates and stakeholders under the facts and circumstances of these cases.

32.     For these reasons, the Sale Transaction (including the distribution of the Debtor Closing Proceeds directly to the DIP Secured Parties) is a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors' estates and stakeholders, and should be approved.

**B.     Approval of the Sale Transaction Free and Clear of Liens, Claims and Encumbrances Is Warranted Under Bankruptcy Code Section 363**

33.     The Debtors request approval to sell the Transferred Interests free and clear of any and all liens, claims, encumbrances, and other interests, except for Permitted Liens (as defined in the Purchase Agreement) and certain obligations and interests assumed by the Buyer in accordance

with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

    a.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.   such entity consents;

    c.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.   such interest is in bona fide dispute; or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

34. The Debtors believe that one or more of the tests of section 363(f) has been or will be satisfied with respect to the Transferred Interests. For example, the Ad Hoc Group has consented to the sale of the Transferred Interests free and clear, satisfying Bankruptcy Code section 363(f)(2). And, a party that fails to object to a sale transaction is deemed to have consented to such sale transaction provided that notice has been properly served. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.") (internal citations omitted); *In re McKinney Towne Crossing, L.P.*, No. 10-40348, 2012 WL 13341067, *3 (Bankr. E.D. Tex. June 28, 2012) (approving sale of assets

where the holders of interests "who did not object, or who withdrew their objections" were "deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code"). Moreover, if additional interests exist, the Debtors believe that any such parties could likely be compelled to accept monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. *See*, *e.g.*, Hr'g Tr. 81:1–8, *In re Steward Health Care Sys. LLC*, No. 24–90213 (CML) (Bankr. S.D. Tex. Sept. 4, 2024) (approving sale transaction where junior lienholder could be compelled to accept monetary satisfaction of their interests in a state foreclosure proceeding); *In re Color Star Growers of Colorado, Inc.*, No. 13–42959, 2009 WL 10813951, at *3 (Bankr. E.D. Tex. Nov. 18, 2009) (holding that where liens, which were junior and subordinate in priority to the liens held by senior consenting lenders, could be eliminated by a foreclosure sale that could be conducted by the senior consenting lenders, the junior lienholder could be compelled to accept a money satisfaction of its interest).

35.     Accordingly, the Debtors believe that the Transferred Interests may be transferred to the Buyer free and clear of all liens, claims, encumbrances, and other interests, except for Permitted Liens (as defined in the Purchase Agreement) and those not otherwise expressly assumed by the Buyer, and such transfer free and clear should be approved.

36.     The Debtors further request that the Sale Order provide that, upon the Closing Date and except as expressly set forth in the Purchase Agreement, all Claims and Interests of any kind or nature whatsoever against the Debtors, their estates, or the Transferred Interests shall be unconditionally released, discharged, and terminated to the fullest extent permitted by law as against Buyer, its affiliates, successors, assigns, property, and the Transferred Interests, and that all holders of such Claims and Interests shall be forever barred, estopped, and permanently

enjoined from asserting or pursuing such Claims and Interests against the foregoing parties or property.

**C.      Buyer Entitled to Good Faith Protections**

37.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor, notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] of a sale . . . of property does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

38.      As articulated by the Fifth Circuit, section 363(m) of the Bankruptcy Code "patently protects, from later modification on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *In re BNP Petroleum Corp.*, 642 Fed. App'x. 429, 434 (5th Cir. 2016) (quoting *Gilchrist v. Westcott (Matter of Gilchrist)*, 891 F.2d 559, 560 (5th Cir. 1990)). The Fifth Circuit has noted that the extension of protection to good faith purchasers under section 363(m) of the Bankruptcy Code "codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved." *Id*. Although the Bankruptcy Code does not define "good faith," in making determinations as to whether a purchaser was a "good faith" purchaser under section 363(m) of the Bankruptcy Code, courts have examined the integrity of the purchaser throughout the course of the sale process and considered whether the purchaser committed any dishonest or wrongful acts during such process. *See, e.g., id*. at 435 (affirming district court's finding of good faith where the district court

concluded that "there was no proof of fraud, collusion, or the taking of unfair advantage of other bidders" and that the purchaser's offer "provides some guaranteed value"); *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (noting that an appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

39.     The Debtors request a finding that Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m). The terms and conditions of the Purchase Agreement and the Sale Transaction have been negotiated by the Debtors and their advisors, the DIP Secured Parties, and Buyer at arm's length and in good faith. Buyer is represented by qualified counsel, and the Debtors believe that Buyer has not engaged in any conduct that would indicate or constitute a lack of good faith. The Debtors further request findings that Buyer is not an insider of the Debtors; that no common identity of directors, managers, controlling shareholders, or members exists between Buyer and the Debtors; that neither Buyer nor the Debtors engaged in any action or inaction that would implicate section 363(n) of the Bankruptcy Code; that the Purchase Agreement was negotiated at arm's length and without collusion; and that the protections afforded by section 363(m) are integral to the Sale Transaction and are a condition to Buyer's willingness to consummate the Sale Transaction. Accordingly, the Debtors believe that Buyer is entitled to the protections that Bankruptcy Code section 363(m) provides to a good faith purchaser.

**D.      Proposed Notice of Sale Hearing Provides Sufficient Notice to Parties in Interest**

40.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of a proposal to use, sell, or lease property of the estate other than in the ordinary course of business "unless the court, for cause, shortens the time or orders another

method of giving notice." Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested in this Motion. Concurrent with the filing of this Motion (or as soon as practicable following the date on which the Sale Hearing is scheduled), the Debtors will serve the notice of sale hearing, in the form attached as **Exhibit B** to this Motion (the "**Notice of Sale Hearing**"), by overnight mail; provided that to the extent email addresses are available for any of the foregoing parties, such parties will be served by email (collectively, the "**Sale Notice Parties**"):

a. the Office of the United States Trustee for the Southern District of Texas (Attn: Jayson Ruff, Esq.);

b. the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis;

c. the Internal Revenue Service;

d. the United States Attorney's Office for the Southern District of Texas;

e. Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Scott Greenberg, Esq., AnnElyse Scarlett Gains, Esq., Christina Brown, Esq., and Tommy Scheffer, Esq.) as counsel to the Ad Hoc Group;

f. Brown Rudnick LLP, 7 Times Square, New York, NY 10036, (Attn: Robert Stark, Esq., Bennett Silverberg, Esq., and Tristan Axelrod, Esq.), as counsel to the Creditors' Committee;

g. Norton Rose Fulbright US LLP, 2200 Ross Ave., Suite 3600, Dallas, TX 75201 (Attn: Toby Gerber, Esq. and Kristian Gluck, Esq.) and Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601 (Attn: Gregory Gartland, Esq. and Daniel J. McGuire, Esq.), each as counsel to Bank of America, N.A.;

h. Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019 (Attn: James Newton, Esq. and Ben Butterfield, Esq.) and Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Dennis Dunne, Esq., Lisa Laukitis, Esq., and Andrew Leblanc, Esq.), as co-counsel to Onset Financial, Inc. and Silver Point Capital, L.P.;

i. Herbert Smith Freehills Kramer LLP, 1177 Avenue of the Americas, New York, NY 10036 as counsel to Jefferies Finance LLC;

24

j.   ArentFox Schiff LLP, 555 South Flower Street, Los Angeles, CA 90071 (Attn: Eric Fromme, Jeffrey Gleit, and Matthew Bentley), as counsel to Wilmington Savings Fund Society, FSB;

k.   Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, OH 44114 (Attn: Sean Gordon and David Watson), as counsel to the Buyer;

l.   all persons that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating a sale transaction with respect to the Transferred Interests in whole or in part during the past 12 months;

m.   all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Transferred Interests (for whom identifying information and addresses are available to the Debtors);

n.   all federal, state, local, and foreign regulatory or taxing authorities, recording offices, and governmental units reasonably known to have an interest in the relief requested herein, including the transfer of the Transferred Interests free and clear of Claims and Interests; and

o.   any party that has requested notice pursuant to Bankruptcy Rule 2002.

41.   The Notice of Sale Hearing includes, among other things, the proposed date, time and place of the Sale Hearing and the deadline for filing any objections to the relief requested in this Motion and therefore complies with Bankruptcy Rule 2002(c). *See* Fed. R. Bankr. P. 2002(c)(1) (stating that the notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 180 (D. Del. 1991) (stating that the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

42.   The Debtors further submit that the methods of notice of this Motion, combined with the Initial Notice, constitute good and adequate notice of the proposed sale of the Transferred Interests and the proceedings with respect thereto, and that cause exists to shorten notice pursuant to Bankruptcy Rule 2002(a).

## Basis for Emergency Relief

43.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i). It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible. Because the Debtors' liquidity is constrained, any delay in obtaining entry of the Sale Order could jeopardize the Debtors' ability to continue operations and proceed toward closing. Prompt entry of the Sale Order is therefore imperative. Simply put, the relief requested in the Motion is critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Interests for the benefit of the Debtors' estates and stakeholders. Emergency relief is also necessary to preserve Buyer's benefit of the bargain under the Purchase Agreement, including the Outside Date, and Buyer's bargained-for receipt of a final, immediately effective Sale Order containing the findings, injunctions, free-and-clear protections, good-faith purchaser protections, and no-successor-liability protections described herein. For these reasons and those set forth in the Motion, the Debtors respectfully request that the Court approve the relief requested in the Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(h)

44.     Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.

45.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h), and provide that the Sale Order shall be effective and enforceable immediately upon entry, so that the Seller Parties and Buyer may close the Sale Transaction immediately upon entry of the Sale Order, subject to the Purchase Agreement. The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) will allow the Sale Transaction

to close as soon as possible and prevent further delay in the administration of these cases. The Debtors therefore respectfully submit that the Court waive the 14-day stay requirements contained in Bankruptcy Rule 6004(h).

### Notice

46.     Notice of this Motion will be provided to the Sale Notice Parties. Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

### No Prior Request

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the Sale Order (i) approving the Purchase Agreement and Transaction Agreements in all respects; (ii) authorizing the sale and transfer of the Transferred Interests to Buyer free and clear of all Claims and Interests other than those expressly assumed by Buyer or permitted to survive under the Purchase Agreement; (iii) granting Buyer all protections of a good-faith purchaser under section 363(m) of the Bankruptcy Code; barring successor, derivative, transferee, vicarious, and similar liability against Buyer and its affiliates, successors, and assigns; (iv) approving the notice procedures; waiving any applicable stay under Bankruptcy Rule 6004(h); and (iv) granting such other and further relief as the Court deems just and appropriate.

Dated: July 15, 2026
     New York, New York

         /s/ Cindi M. Giglio
         KATTEN MUCHIN ROSENMAN LLP
         Cindi M. Giglio
         Grace A. Thompson
         50 Rockefeller Plaza
         New York, New York 10020-1605
         Telephone: (212) 940-8800
         Facsimile: (212) 940-8776
         Email: cgiglio@katten.com
                grace.thompson@katten.com

         *Attorneys for Debtors*
         *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on July 15, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Cindi M. Giglio*
Cindi M. Giglio