**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**DECLARATION OF NICHOLAS HAUGHEY IN SUPPORT OF
EMERGENCY MOTION FOR ORDER (A) APPROVING SALE TRANSACTION FOR
CERTAIN OF THE DEBTORS' EQUITY INTERESTS AND RELATED ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
AND (B) GRANTING RELATED RELIEF**

I, Nicholas Haughey, pursuant to § 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I submit this declaration (the "**Declaration**") in support of the *Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Equity Interests and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) Granting Related Relief* (the "**Motion**")[2] filed by First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"). The Motion seeks, among other things, approval of the sale of (i) all right, title and interest held by Debtor Carter Carburetor Holdings, LLC ("**Carter Carburetor**") in and to the issued and outstanding equity interests of Walbro Co., Ltd., (ii) all right, title and interest held by Debtor WEM US Co. ("**WEM**")  in and to the issued

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to such terms in the Motion.

305562546

and outstanding equity interests of Walbro Fuel Systems and Technology (Thailand) Co., Ltd., and (iii) certain related assets (collectively, and as defined and further described in the Purchase Agreement, the "**Transferred Interests**"), pursuant to that certain Purchase Agreement, dated as of July 15, 2026 (the "**Purchase Agreement**"), by and among Debtors First Brands Group Holdings, LLC, Carter Carburetor, and WEM (collectively, the "**Sellers**") and Husqvarna Business Support AB ("**Buyer**"), free and clear of any and all liens, claims, encumbrances and other interests, except for Permitted Liens (as defined in the Purchase Agreement), certain assumed liabilities, and certain permitted encumbrances as set forth in the Purchase Agreement. The Motion further seeks approval of the form and manner of notice of the hearing on the sale of the Transferred Assets and authority to distribute the net proceeds of the Sale Transaction in the manner set forth in the Purchase Agreement.

2.      This Declaration is based on my personal knowledge, education, experience and review of documents and other information relevant to my testimony. If called to testify, I could and would testify competently to the matters set forth in my Declaration. My compensation is not contingent upon or influenced by the substance of my testimony or the outcome of the Motion. I am authorized to submit this Declaration on behalf of the Debtors.

**<u>Qualifications and Professional Background</u>**

3.      I am a Managing Director at Alvarez & Marsal North America LLC ("A&M"). On September 5, 2025, A&M was retained by the Debtors to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and undertake contingency preparations for a potential chapter 11 filing.

4.      I have been a member of the A&M team working on this matter since shortly after our retention. From the outset of A&M's retention, we have worked in coordination with the

305562546

Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

5.    I have over seventeen years of experience providing turnaround consulting, advisory services, and executive leadership to organizations across a variety of industries. I earned my bachelor's degree in finance from Wofford College and my master's degree in accountancy from the University of Notre Dame. In 2016, after seven years providing consulting and advisory services at A&M, I departed to serve as Vice President of Finance for Dex Media, a provider of advertising and customer relationship management software to small and medium-sized businesses. During my three years with Dex Media, I helped guide the company through a successful pre-packaged bankruptcy reorganization and negotiated key terms of the exit financing package, which reduced the company's debt from more than $2 billion to $600 million. Following Dex Media's successful turnaround, I joined A&M's Restructuring & Turnaround group, where I have spent approximately the last seven years advising company-side clients on financial modeling, cash forecasting and analysis, and corporate restructuring. During that time, I led the Chapter 11 bankruptcy planning and preparation, asset sale analysis, and estate liquidation work for Dean Foods Company, the largest dairy bottling operation in the United States. Recently, I served as Chief Restructuring Officer of Red Lobster, a restaurant chain with approximately 550 locations in the United States and Canada and more than 25 franchised locations in Latin America and Asia.

3

6.      I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I regularly advise distressed companies on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers, and strategic planning.

## **Sale, Marketing and Wind Down Process**

7.      A&M has been actively involved in monitoring and forecasting the Debtors' liquidity and operations throughout these chapter 11 cases. The A&M team and I are intimately familiar with the Debtors' operations, as well as the operational requirements and constraints that have shaped the Debtors' financial position during these proceedings.

8.      Shortly after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position further deteriorated and the Debtors were unable to obtain additional funding or waivers to access additional liquidity from their lenders. As a result the Debtors began taking steps to wind down certain of their North American business operations. At that point, it became clear that consummating a sale transaction on the timeline contemplated by the Bidding Procedures Motion was no longer possible under the circumstances.

9.      In late January 2026, the Debtors and their advisors reached out to potential bidders and key stakeholders to apprise them of the Debtors' liquidity situation and request that any party interested in the Debtors' assets submit an indication of interest as soon as possible. Simultaneously, the Debtors engaged with the OEMs to determine whether they would be willing to provide funding to the Debtors to allow them to avoid an entire shutdown of their North American businesses and continue their efforts to pursue sales of their remaining business lines.

4

305562546

10.    The Debtors' discussions with the OEMs resulted in the parties reaching an agreement on a weekly operational funding arrangement, which provided the Debtors with immediate access to funding to be used solely to support operations and production at certain of the Debtors' business units that service the OEMs on a week-to-week basis.

11.    With this lifeline in hand, the Debtors and their advisors progressed discussions with numerous potential buyers, and by February 5, 2026, the Debtors had received approximately 40 non-binding IOIs spanning several of their business units. The Debtors and their advisors then worked to narrow the IOIs received into a core set of viable transactions that provided the highest or otherwise best value to the Debtors' estates.

12.    As part of these discussions, the Debtors considered interest in both going-concern sales and various sales for discrete categories of assets, such as intellectual property and equity interests. In connection with each, the Debtors considered, among other things, (a) the structure and timeline of each proposed transaction, including time to close, (b) the form and amount of consideration offered, (c) execution risk, and (d) support from key stakeholders.

13.    Ultimately, following good faith arm's-length negotiations between the Debtors and their advisors, the DIP Secured Parties, and the Buyer, the parties reached the agreement reflected in the Purchase Agreement. For the reasons set forth herein and in the Motion, the A&M team and I believe the Sale Transaction pursuant to the Purchase Agreement represents the highest and otherwise best bid for the Transferred Interests and should be approved.

14.    I further understand that the Debtors are authorized to expand the Wind Down Assets to include the Transferred Interests, and sell the Transferred Assets pursuant to the Wind Down Order. Out of an abundance of caution, however, the Debtors are instead filing the Motion

305562546

to seek approval of the Sale Transaction and the related relief requested therein and to obtain the Sale Order.

### **Sale Transaction and Distribution of Debtor Closing Proceeds**

15.     Strong business justification supports the Sale Transaction. First, the A&M team and I believe that the Sale Transaction presents the most value-maximizing path for the Transferred Interests and that further marketing, including by holding an auction, is unlikely to yield a higher or otherwise better result. I understand that the Debtors ran a broad, multi-month Sale Process and directly solicited interest from over 400 parties, including parties who had reached out to the Debtors' advisors expressing interest in the Debtors' assets. The Debtors widely publicized their Sale Process pursuant to the Initial Notice, which was filed and served on January 13, 2026, and the Publication Notice, which was published in *The New York Times* on January 16, 2026. *See* Docket Nos. 1718, 1645.

16.     The A&M team and I believe the Sale Transaction represents the highest and otherwise best bid for the Transferred Interests. Even if the Debtors had the liquidity to further market and/or auction the Transferred Interests—which they do not—I understand that any incremental value achieved would likely be offset, if not exceeded, by the costs of the same. Moreover, given the circumstances of these chapter 11 cases and the type of assets being sold here—namely equity interests in certain non-Debtor entities—I understand that it is more likely that the value of such assets will decrease rather than increase with the passage of time. Additionally, I understand that the Sale Transaction and the relief requested in the Motion are supported by the Ad Hoc Group.

17.     Second, consummating the Sale Transaction—including distributing the Debtor Closing Proceeds to the DIP Secured Parties (as discussed below)—will further the Debtors'

305562546

efforts to expeditiously wind down their assets in an organized fashion, reduce administrative and operating costs, and generate cash proceeds for the benefit of creditors. The A&M team and I believe this is the optimal path for the Debtors' estates and stakeholders under the facts and circumstances of these cases.

18.     The A&M team and I believe the terms and conditions of the Purchase Agreement and the Sale Transaction have been negotiated by the Debtors and their advisors, the DIP Secured Parties, and the Buyer at arm's length and in good faith. I understand that the Buyer is represented by qualified counsel, and that the Buyer has not engaged in any conduct that would indicate or constitute a lack of good faith.

19.     I further understand that the Transferred Interests constitute DIP Collateral (as defined in the DIP Order). The Debtors are requesting authority to distribute the Debtor Closing Proceeds generated by the Sale Transaction directly to the DIP Secured Parties, to which I understand the Ad Hoc Group has provided its consent. I understand that payment of the Debtor Closing Proceeds to the DIP Secured Parties will reduce the outstanding DIP Obligations (as defined in the DIP Order) by such amount. In light of the above, the A&M team and I believe that the distribution of the Debtor Closing Proceeds to the DIP Secured Parties is in the best interest of the Debtors' estates and their creditors.

## Emergency Relief; Notice Procedures

20.     The Debtors are requesting that the Court approve the relief requested in the Motion on an emergency basis.

21.     It is critical that the Debtors obtain approval of the Sale Transaction as soon as possible. The Debtors' liquidity is constrained and the Buyer and the Debtors' key stakeholders have made clear their expectation that the Sale Transaction be consummated on an expedited basis.

305562546

Any delay in obtaining entry of the Sale Order could jeopardize the Debtors' ability to continue operations and proceed toward closing. Prompt entry of the Sale Order is thus critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Interests for the benefit of the Debtors' estates and stakeholders. I thus believe that a swift closing of the Sale Transaction, which the Debtors anticipate will occur within days of Court approval (and which is also required by the Purchase Agreement, which provides that closing must occur by July 31, 2026), will inure to the benefit of the Debtors' estates.

22. I further believe that the methods of notice of this Motion, combined with the Initial Notice, constitute good and adequate notice of the proposed sale of the Transferred Interests and the proceedings with respect thereto.

### Conclusion

23. The A&M team and I believe that (i) the Sale Transaction (including distribution of the Debtor Closing Proceeds directly to the DIP Secured Parties at closing) reflects the highest and otherwise best value reasonably attainable for the Transferred Interests, is supported by sound business judgment, and serves to maximize the value of the Debtors' estates for all parties in interest, and (ii) expedited approval of the Sale Transaction is critical to preserving the Debtors' ability to achieve the highest and otherwise best value for the Transferred Interests for the benefit of the Debtors' estates and stakeholders. Accordingly, I believe the Motion should be approved.

305562546

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 15, 2026
      Atlanta, Georgia

                                      */s/  Nicholas Haughey*
                                      Nicholas Haughey, Managing Director
                                      Alvarez & Marsal North America LLC