## EXHIBIT B

ABL Credit Agreement

*EXECUTION VERSION*

TENTH AMENDMENT TO ABL CREDIT AGREEMENT

THIS TENTH AMENDMENT TO ABL CREDIT AGREEMENT (this "Amendment") dated as of March 28, 2023 by and among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as Trico Group, LLC, the "Lead Borrower"), TRICO LIMITED, a limited company incorporated under the laws of England and Wales (the "UK Borrower"), TRICO BELGIUM SA, a Belgian limited liability company incorporated under the laws of Belgium, having its statutory seat at avenue Champion 1 – Aubange 1, 6790 Aubange, Belgium and registered with the CBE under company number 0451.868.065 (RPM Liège - subdivision Arlon) (the "Belgian Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as Trico Group Holdings, LLC, "Parent"), the other "Loan Parties" party hereto, the "Lenders" party hereto, and BANK OF AMERICA, N.A. ("Bank of America"), as administrative agent (the "Administrative Agent") and as collateral agent (the "Collateral Agent" and together with the Administrative Agent, the "Agents"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.

WITNESSETH

WHEREAS, the Lead Borrower, the UK Borrower, the other Loan Parties from time to time party thereto, the Lenders from time to time party thereto, and the Administrative Agent are parties to that certain ABL Credit Agreement dated as of February 2, 2018 (as amended prior to the date hereof and as further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, the Loan Parties have requested that the Lenders amend certain provisions of the Credit Agreement;

WHEREAS, the Loan Parties, the Agents and each lender party hereto as a Continuing Lender (each, a "Continuing Lender") has agreed to amend the Credit Agreement, but only on the terms and conditions herein set forth;

WHEREAS, each lender party hereto as an Exiting Lender (each an "Exiting Lender" and, together with the Continuing Lenders, the "Lenders") shall no longer be a Lender under the Credit Agreement from and after the Tenth Amendment Effective Date and the ABL Commitments and Letter of Credit Commitments of each such Exiting Lender shall be reallocated in accordance with Section 2(b) hereof;

WHEREAS, this Amendment shall be deemed to constitute an Extension Amendment; and

WHEREAS, the Lenders are willing to make such amendments to the Credit Agreement, in accordance with and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      Amendments to Credit Agreement.

AmericasActive:18122633.8

(a)     The Loan Parties, the Lenders and the Agents agree that on the Tenth Amendment Effective Date (as defined below), the Credit Agreement is hereby amended in its entirety to delete the bold, stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) so that, after giving effect to such amendments, it reads in the form set forth on Exhibit A hereto.  Each of the Loan Parties acknowledges and agrees that its obligations under the Loan Documents are, effective as of the Tenth Amendment Effective Date, modified as necessary to accommodate the amendment of the Credit Agreement pursuant hereto.

(b)     Schedule 2.01(a) (ABL Commitments) and 2.01(b) (Letter of Credit Commitments) to the Credit Agreement, which shall set forth the ABL Commitments and the Letter of Credit Commitments of the Lenders as of the Tenth Amendment Effective Date, are hereby amended in their entirety to read as attached hereto as Exhibit B.

2.     <u>Assignments and Reallocations</u>.

(a)     <u>Assignments and Exiting Lenders</u>.  On the Tenth Amendment Effective Date, (i) each Exiting Lender shall assign (or shall be deemed to assign) to each Continuing Lender, which assignment shall be deemed to satisfy the requirements thereof in Section 11.07 of the Credit Agreement, all of its ABL Commitments and the Letter of Credit Commitments (and its ABL Loans shall be consistent therewith), such that after giving effect thereto, its ABL Commitments and its Letter of Credit Commitments are as set forth on <u>Schedule 2.01(a)</u> and <u>2.01(b)</u> attached hereto as <u>Exhibit B</u>, together with any and all rights in respect thereof under the Credit Agreement and the other Loan Documents, as applicable, (ii) such Exiting Lender shall be repaid in full its share of the outstanding Obligations (including (A) all interest, fees and other amounts that may be due and payable in respect thereof and (B) an assumption of its Pro Rata Share of participations in the Letters of Credit) and (iii) the commitments and other obligations and rights (except as expressly set forth in the Existing Credit Agreement) of such Exiting Lender shall be terminated. The Borrowers hereby request that each Exiting Lender execute its respective signature page hereto, as Exiting Lender, to affect the assignments in this Section 2(a).  In accordance with Section 3.07 of the Credit Agreement, to the extent any Exiting Lender does not execute its signature page as Exiting Lender, such Exiting Lender shall be deemed to be a Non-Consenting Lender and the assignments specified in this Section 2(a) shall nevertheless be given full force and affect.

(b)     <u>Commitment Reallocation</u>.  The Administrative Agent is hereby authorized to take the actions specified in Section 11.07(d) of the Credit Agreement to cause the ABL Commitments and Letter of Credit Commitments (and cause the ABL Loans to be consistent therewith) to be those set forth on <u>Schedule 2.01(a)</u> and <u>2.01(b)</u> attached hereto as <u>Exhibit B</u>, including recording the assignments described herein in the Register, and such assignments shall be effective for all purposes of the Credit Agreement and each other Credit Document on the Tenth Amendment Effective Date.

(c)     <u>Order of Operation</u>. The amendments referred to in Section 1 hereof and the transactions referred to above in this Section 2 shall all occur concurrently on the Tenth Amendment Effective Date, but shall be deemed to occur in the following order: <u>first</u>, the assignments (or deemed assignments) specified in Section 2(a) hereof, <u>second,</u> the reallocation of commitments specified in Section 2(b) hereof, and <u>third</u> the amendments in Section 1 hereof.

AmericasActive:18122633.8

3.      Conditions to Effectiveness.  This Amendment shall become effective as of the day and year set forth above (the "Tenth Amendment Effective Date") upon satisfaction of the following conditions (in each case, in form and substance reasonably acceptable to the Administrative Agent):

(a)      Executed Documents.  The Administrative Agent shall have received each of the following documents (together with the schedules and exhibits thereto, if any), which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated the Tenth Amendment Effective Date:

(i)    this Amendment executed by the Borrowers, each other Loan Party party hereto, the Administrative Agent, the Collateral Agent, each Lender party hereto, the U.S. Swing Line Lender, the U.S. L/C Issuer and which shall constitute all Continuing Lenders under the Credit Agreement and, to the extent available pursuant to Section 2(a) hereof, each Exiting Lender; and

(b)      Closing Date Certificate. The Administrative Agent shall have received an executed copy of a certificate certifying: (i) no Default or Event of Default shall have occurred and be continuing or shall occur as a result of the transactions contemplated by this Amendment; (ii) the representations and warranties in Section 5 hereof shall be true and correct in all material respects (except to the extent that such representations and warranties (i) specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date, and (ii) are qualified as to "materiality", "Material Adverse Effect" or similar language, in which case they shall be true and correct in all respects as so qualified) as of the Tenth Amendment Effective Date (both before and after giving effect to this Amendment and the transactions contemplated hereby); and (iii) since December 31, 2021, no event, effect, occurrence, fact condition change or development shall have occurred that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      Opinions of Counsel to Loan Parties.  The Administrative Agent and its counsel shall have received (i) a customary opinion of Baker & Hostetler LLP, special counsel to the Loan Parties, (ii) a customary opinion of Norton Rose Fulbright LLP, UK counsel to the Administrative Agent, (iii) a customary opinion of Lydian, Belgian counsel to the Administrative Agent, and (iv) a customary opinion of NautaDutilh BV/SRL, Belgian counsel to the Belgian Borrower, in each case, in form and substance reasonably satisfactory to the Administrative Agent, dated as of the date hereof.

(d)      Officer's Certificates of Loan Parties. The Administrative Agent shall have received a certificate of the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, (A) attaching, or in each case of subclauses (i) and (ii) below certifying that there have been no changes to such Organizational Documents or signature and incumbency certificates of each Loan Party delivered to the Administrative Agent on the Closing Date, (i) copies of each Organizational Document of each Loan Party, to the extent applicable, certified as of the Tenth Amendment Effective Date or a recent date prior thereto by the appropriate Governmental Authority, (ii) signature and incumbency certificates of the officers or other authorized representatives of such Loan Party, and (iii) resolutions of the board of directors, board of managers or functional equivalent, as applicable, of such Loan Party approving and authorizing the execution, delivery and performance of this Amendment and any other documents required by the terms of this Amendment to which it is party, certified as of the

3

Tenth Amendment Effective Date as being in full force and effect without modification or amendment and (B) solely in the case of the U.S. Loan Parties, attaching a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, as applicable, each dated a recent date prior to the Tenth Amendment Effective Date.

(e)        <u>Fees and Expenses</u>. (i) The Administrative Agent (or their Affiliates) shall have received the fees agreed among the Borrower and the Administrative Agent, including fees for the benefit of the Continuing Lenders, which such fees shall be fully earned, due and payable on the Tenth Amendment Effective Date in immediately available funds and shall not be refundable and (ii) the Agents' counsel shall have received from the Borrowers payment of all reasonable and documented out-of-pocket expenses incurred in connection with this Amendment.

(f)        <u>Solvency Certificate</u>. The Administrative Agent shall have received an executed copy of the Solvency Certificate in the form of Exhibit K to the Credit Agreement as modified so that the certifications therein are made after giving to the transactions contemplated by this Amendment.

4.        <u>Amended Terms</u>.  On and after the Tenth Amendment Effective Date, all references to the Credit Agreement in each of the Loan Documents shall hereafter mean the Credit Agreement as amended by this Amendment.  Except as specifically amended hereby or otherwise agreed, the Credit Agreement is hereby ratified and confirmed and shall remain in full force and effect according to its terms.

5.        <u>Representations and Warranties of Borrowers</u>.  Each of the Loan Parties represents and warrants as follows:

(a)        It has taken all necessary action to authorize the execution, delivery and performance of this Amendment.

(b)        This Amendment has been duly executed and delivered by such Person and constitutes such Person's legal, valid and binding obligation, enforceable in accordance with its terms, except as such enforceability may be subject to (i) bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity) and (iii) principles of good faith and fair dealing.

(c)        Except to the extent that any such failure could not reasonably be expected to result in a Material Adverse Effect, no consent, approval, authorization or order of, or filing, registration or qualification with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by such Person of this Amendment except for approvals, consents, authorizations, actions, orders, notices and filings which have already been obtained.

(d)        The representations and warranties set forth in Article V of the Credit Agreement are true and correct in all material respects as of the date hereof (except for those which expressly relate to an earlier date); <u>provided</u> that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(e)       After giving effect to this Amendment, no event has occurred and is continuing which constitutes a Default or an Event of Default.

(f)       The Collateral Documents continue to create a valid security interest in, and Lien upon, the Collateral, in favor of the Collateral Agent, for the benefit of the Lenders, which security interests and Liens are perfected in accordance with the terms of the Collateral Documents and prior to all Liens other than Permitted Liens.

6.       <u>Reaffirmation of Obligations</u>.  Each Loan Party hereby ratifies the Loan Documents and acknowledges and reaffirms (a) that it is bound by all terms of the Loan Document applicable to it and (b) that it is responsible for the observance and full performance of its respective Obligations.

7.       <u>Loan Document</u>.  This Amendment shall constitute a Loan Document under the terms of the Credit Agreement.

8.       <u>Expenses</u>.  The Borrowers agree to pay all reasonable and documented out-of-pocket costs and expenses of the Agents in connection with the preparation, execution and delivery of this Amendment, including without limitation the reasonable and documented out-of-pocket fees and expenses of the Agents' legal counsel.

9.       <u>Entirety</u>.  This Amendment and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof.

10.       <u>Counterparts; Telecopy</u>.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Amendment or any other document required to be delivered hereunder, by fax transmission or e-mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Amendment.  Without limiting the foregoing, upon the request of any party, such fax transmission or e-mail transmission shall be promptly followed by such manually executed counterpart. This Amendment may be in the form of an Electronic Record and may be executed using Electronic Signatures (including, without limitation, facsimile and .pdf) and shall be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. This Amendment may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Amendment.   For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Agents of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.

11.       <u>GOVERNING LAW</u>.  THIS AMENDMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

12.       <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

AmericasActive:18122633.8

13.      Consent to Jurisdiction; Service of Process; Waiver of Jury Trial.   The jurisdiction, service of process and waiver of jury trial provisions set forth in Sections 11.15 and 11.16 of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

6

AmericasActive:18122633.8

IN WITNESS WHEREOF the parties hereto have caused this Amendment to be duly executed on the date first above written.

FIRST BRANDS GROUP, LLC,
as the Lead Borrower and a U.S. Borrower

By: _____
Name: Steve Graham
Title: Chief Financial Officer and Treasurer

TRICO LIMITED,
as a UK Borrower

By: _____
Name: Steve Graham
Title:   Secretary

TRICO BELGIUM SA,
as a Belgian Borrower

By: _____
Name: Steve Graham
Title:   Director

FIRST BRANDS GROUP INTERMEDIATE, LLC,
as Parent

By: _____
Name: Steve Graham
Title:   Chief Financial Officer and Treasurer

*Signature Page to Tenth Amendment*

AIRTEX INDUSTRIES, LLC
AIRTEX PRODUCTS, LP
APC PARENT, LLC
APC INTERMEDIATE HOLDINGS, LLC
ASC INDUSTRIES, INC.
AUTOLITE OPERATIONS LLC
AVM EXPORT, INC.
BPI ACQUISITION COMPANY, LLC
BPI EC, LLC
BPI HOLDINGS INTERNATIONAL, LLC
BRAKE PARTS INC CHINA LLC
BRAKE PARTS INC INDIA LLC
BRAKE PARTS INC LLC
CARTER FUEL EXPORT, INC.
CARTER FUEL SYSTEMS, LLC
CHAMPION LABORATORIES, INC.
CWD INTERMEDIATE HOLDINGS I, LLC
CWD INTERMEDIATE HOLDINGS II, LLC
CWD HOLDING, LLC
CWD, LLC
FRAM GROUP IP LLC
FRAM GROUP OPERATIONS LLC
FRAMAUTO HOLDINGS, LLC
FUEL FILTER TECHNOLOGIES, INC.
HEATHERTON HOLDINGS, LLC
KTRI HOLDINGS, INC.
KTRI OFFSHORE HOLDINGS, LLC
PREMIER MARKETING GROUP, LLC
QUALIS ENTERPRISES, LLC
QUALIS AUTOMOTIVE, L.L.C.
SPECIALTY PUMPS GROUP, INC.
STRONGARM, LLC
TRICO HOLDING CORPORATION
TRICO PRODUCTS CORPORATION
TRICO TECHNOLOGIES CORPORATION
UCI ACQUISITION HOLDINGS (NO. 4) LLC
UCI INTERNATIONAL HOLDINGS PARENT, INC.
UCI INTERNATIONAL HOLDINGS, INC.
UCI INTERNATIONAL, LLC
UCI PENNSYLVANIA, INC.
UCI-AIRTEX HOLDINGS, INC.
UNITED COMPONENTS, LLC
UNIVERSAL AUTO FILTER LLC,
as Guarantors

By: _____
Name: Steve Graham
Title:   Chief Financial Officer and Treasurer

*Signature Page to Tenth Amendment*

VIPER ACQUISITION, INC.
QUALITOR ACQUISITION INC.
QUALITOR, INC.
TRANSPORTATION AFTERMARKET
ENTERPRISE, LLC
TAE CHINA HOLDINGS, INC.
LONGMAN ENTERPRISES, INC.
QUALITOR SUBSIDIARY H, INC.
QUALITOR SUBSIDIARY S, INC.
PYLON MANUFACTURING CORP.
PYLON SOUTH BEND, INC.
VIPER ACQUISITION I, INC.
TAE BRAKES, LLC
INTERNATIONAL BRAKE INDUSTRIES, INC.
IBI INTERNATIONAL HOLDING COMPANY, INC.
QUALITOR AUTOMOTIVE, LLC,
as Guarantors

By:  _____
Name: Michael Baker
Title:   Chief Corporate Strategy Officer and Secretary

*Signature Page to Tenth Amendment*

BANK OF AMERICA, N.A.,
as Administrative Agent and as Collateral Agent

By: _____
Name:   Brian Scawinski
Title:   Vice President

BANK OF AMERICA, N.A.,
as a Continuing Lender, as U.S. Swing Line Lender and
as U.S. L/C Issuer

By: _____
Name:   Brian Scawinski
Title:   Vice President

BANK OF AMERICA, N.A. (acting through its London
Branch),
as a Continuing Lender

By: _____
Name:   Brian Scawinski
Title:   Vice President

TRUIST BANK,
as a Continuing Lender

By: _____
Name:   Pavo Hrkac
Title:   VP

*Signature Page to Tenth Amendment*

U.S. BANK NATIONAL ASSOCIATION,
as a Continuing Lender

By: _____

Name:  David Lawrence

Title:  Vice President

CAPITAL ONE, NATIONAL ASSOCATION,
as an Exiting Lender solely for purposes of Section
2(a) of this Amendment

By:

Name: Julianne Low
Title:   Senior Director

*Signature Page to Tenth Amendment*

**EXHIBIT A**

CONFORMED CREDIT AGREEMENT

[attached]

*EXHIBIT A*
*Conformed through ~~Ninth~~Tenth Amendment*

**PUBLISHED DEAL CUSIP NO. 89609UAA9**
**PUBLISHED ABL FACILITY CUSIP NO. 89609UAC5**

$250,000,000.00
ABL CREDIT AGREEMENT

Dated as of February 2, 2018
as amended by the First Amendment to ABL Credit Agreement dated June 1, 2018, the Second Amendment to ABL Credit Agreement dated of January 8, 2019, the Third Amendment to ABL Credit Agreement dated January 29, 2019, the Fourth Amendment to ABL Credit Agreement dated April 18, 2019, the Fifth Amendment to ABL Credit Agreement dated July 31, 2020, the Sixth Amendment to ABL Credit Agreement dated November 12, 2020, the Seventh Amendment to ABL Credit Agreement dated August 31, 2021, the Eight Amendment to ABL Credit Agreement dated June 24, 2022, the Ninth Amendment to ABL Credit Agreement dated October 12, 2022 and the Tenth Amendment to ABL Credit Agreement dated March 28, 2023

among

FIRST BRANDS GROUP, LLC,
as Lead Borrower,

TRICO LIMITED,
as UK Borrower,

TRICO BELGIUM SA,
as Belgian Borrower,

THE OTHER BORROWERS PARTY HERETO,

FIRST BRANDS GROUP INTERMEDIATE, LLC,
as Parent,

THE LENDERS PARTY HERETO

and

BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent

_____

BANK OF AMERICA, N.A.,

~~and~~

~~Wells Fargo Bank, National Association~~
as a Joint Lead Arranger, Joint Bookrunner and Syndication Agent

TRUIST BANK,
as a Joint Lead ~~Arrangers, Bookrunners and Syndication Agents~~Arranger and Joint Bookrunner

and

AmericasActive:~~18122631.2~~18122631.8

*EXHIBIT A*
*Conformed through ~~Ninth~~Tenth Amendment*

**PUBLISHED DEAL CUSIP NO. 89609UAA9**
**PUBLISHED ABL FACILITY CUSIP NO. 89609UAC5**

U.S. BANK NATIONAL ASSOCIATION,
as Senior Managing Agent

AmericasActive:~~18122631.2~~18122631.8

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** .................................................. 1

Section 1.01    Defined Terms ................................................................................. 1
Section 1.02    Other Interpretive Provisions ......................................................... 75
Section 1.03    Accounting Terms ........................................................................... 76
Section 1.04    Rounding ......................................................................................... 77
Section 1.05    References to Agreements, Laws, Etc .............................................. 77
Section 1.06    Times of Day ................................................................................... 77
Section 1.07    Timing of Payment or Performance .................................................. 77
Section 1.08    Currency Equivalents Generally ...................................................... 77
Section 1.09    Obligations of the Foreign Loan Parties .......................................... 78
Section 1.10    Certain Calculations and Tests ........................................................ 78
Section 1.11    Obligations of Certain Guarantors ................................................... 79
Section 1.12    Divisions .......................................................................................... 79

**ARTICLE II THE ABL COMMITMENTS AND CREDIT EXTENSIONS** ......................... 80

Section 2.01    The Loans ......................................................................................... 80
Section 2.02    Borrowings, Conversions and Continuations of Loans ................... 80
Section 2.03    Letters of Credit ............................................................................... 83
Section 2.04    Swing Line Loans ............................................................................ 94
Section 2.05    Prepayments ..................................................................................... 96
Section 2.06    Termination or Reduction of Commitments ..................................... 98
Section 2.07    Repayment of Loans ........................................................................ 100
Section 2.08    Interest ............................................................................................. 100
Section 2.09    Fees .................................................................................................. 101
Section 2.10    Computation of Interest and Fees .................................................... 101
Section 2.11    Evidence of Indebtedness ................................................................ 101
Section 2.12    Payments Generally ......................................................................... 102
Section 2.13    Sharing of Payments ........................................................................ 103
Section 2.14    Defaulting Lenders .......................................................................... 104
Section 2.15    Cash Collateral ................................................................................ 106
Section 2.16    Increase in ABL Commitments ....................................................... 106
Section 2.17    Additional Borrowers ...................................................................... 108
Section 2.18    Extension of Loans .......................................................................... 108
Section 2.19    Reallocation Mechanism ................................................................. 110
Section 2.20    Foreign Sublimit Reallocation Mechanism ..................................... 111

**ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY** ............ 112

Section 3.01    Taxes ................................................................................................ 112
Section 3.02    Illegality ........................................................................................... 118
Section 3.03    Inability to Determine Rates; Successor Rates ................................ 118
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on
                Interest Period Rate Loans .............................................................. 122
Section 3.05    Funding Losses ................................................................................ 123
Section 3.06    Matters Applicable to All Requests for Compensation ................... 124
Section 3.07    Replacement of Lenders under Certain Circumstances ................... 124
Section 3.08    Survival ............................................................................................ 125

**ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** ......................... 125

Section 4.01    Conditions of Initial Credit Extension ............................................ 126
Section 4.02    Conditions to All Credit Extensions ............................................... 129

i

**TABLE OF CONTENTS (Cont.)**

Page

**ARTICLE V REPRESENTATIONS AND WARRANTIES** 130

Section 5.01    Existence, Qualification and Power; Compliance with Laws 130
Section 5.02    Authorization; No Contravention 130
Section 5.03    Governmental Authorization; Other Consents 131
Section 5.04    Binding Effect 131
Section 5.05    No Material Adverse Effect 131
Section 5.06    Litigation; FCPA 131
Section 5.07    Ownership of Property; Liens; Insurance 131
Section 5.08    Creation and Perfection of Security Interests 132
Section 5.09    Environmental Compliance 132
Section 5.10    Taxes 133
Section 5.11    Compliance with ERISA 133
Section 5.12    Labor Matters 133
Section 5.13    Subsidiaries; Equity Interests 133
Section 5.14    Margin Regulations; Investment Company Act; PATRIOT Act 133
Section 5.15    Disclosure; Financial Statements 134
Section 5.16    Intellectual Property 134
Section 5.17    Solvency 135
Section 5.18    AML Laws; Anti-Corruption Laws and Sanctions 135
Section 5.19    Status as Senior Indebtedness 135
Section 5.20    Accounts and Inventory 135
Section 5.21    Accuracy of Borrowing Base 136
Section 5.22    Centre of Main Interests 136
Section 5.23    UK Pensions 136
Section 5.24    Covered Entity 136

**ARTICLE VI AFFIRMATIVE COVENANTS** 136

Section 6.01    Financial Statements 136
Section 6.02    Certificates; Reports; Other Information 137
Section 6.03    Notice Requirements; Other Information 139
Section 6.04    Environmental Matters 140
Section 6.05    Maintenance of Existence 140
Section 6.06    Maintenance of Properties 141
Section 6.07    Maintenance of Insurance 141
Section 6.08    Compliance with Laws 141
Section 6.09    Books and Records 141
Section 6.10    Inspection Rights 142
Section 6.11    Covenant to Guarantee Obligations and Give Security 142
Section 6.12    Further Assurances 145
Section 6.13    Taxes 145
Section 6.14    Ratings 145
Section 6.15    Use of Proceeds 145
Section 6.16    Lien Enhancements 146
Section 6.17    U.S 146
Section 6.18    Field Examinations; Appraisals 147
Section 6.19    Post-Closing Covenants 148
Section 6.20    [Reserved] 148
Section 6.21    UK Pension Plan Covenants 148
Section 6.22    Centre of Main Interests and Establishments 148
Section 6.23    Financial Assistance 149

AmericasActive:18122631.218122631.8

## TABLE OF CONTENTS (Cont.)

| | | Page |
|---|---|---|
| Section 6.24 | Notification of Foreign Account Debtors | 149 |
| Section 6.25 | UK Loan Party Cash Management | 149 |
| Section 6.26 | Belgian Loan Party Cash Management | 150 |
| Section 6.27 | MIRE Events | 151 |
| **ARTICLE VII NEGATIVE COVENANTS** | | **151** |
| Section 7.01 | Liens | 152 |
| Section 7.02 | Investments | 156 |
| Section 7.03 | Indebtedness | 159 |
| Section 7.04 | Fundamental Changes | 163 |
| Section 7.05 | Dispositions | 165 |
| Section 7.06 | Restricted Payments | 168 |
| Section 7.07 | Change in Nature of Business | 170 |
| Section 7.08 | Transactions with Affiliates | 171 |
| Section 7.09 | Prepayments and Modifications of Certain Indebtedness | 171 |
| Section 7.10 | Negative Pledge | 172 |
| Section 7.11 | Amendments to Organization Documents | 174 |
| Section 7.12 | Fixed Charge Coverage Ratio | 174 |
| Section 7.13 | Fiscal Year | 174 |
| Section 7.14 | Sanctions; Anti-Corruption Laws | 174 |
| **ARTICLE VIII PARENT COVENANT** | | **174** |
| **ARTICLE IX EVENTS OF DEFAULT AND REMEDIES** | | **175** |
| Section 9.01 | Events of Default | 175 |
| Section 9.02 | Remedies Upon Event of Default | 178 |
| Section 9.03 | Application of Funds | 178 |
| **ARTICLE X ADMINISTRATIVE AGENT AND OTHER AGENTS** | | **181** |
| Section 10.01 | Appointment and Authorization of Agents | 181 |
| Section 10.02 | Delegation of Duties | 183 |
| Section 10.03 | Liability of Agents | 183 |
| Section 10.04 | Reliance by Agents | 183 |
| Section 10.05 | Notice of Default | 184 |
| Section 10.06 | Credit Decision; Disclosure of Information by Agents | 184 |
| Section 10.07 | Indemnification of Agents | 185 |
| Section 10.08 | Agents in their Individual Capacities | 185 |
| Section 10.09 | Successor Agents | 185 |
| Section 10.10 | Administrative Agent May File Proofs of Claim; Credit Bidding | 186 |
| Section 10.11 | Other Agents; Arrangers and Managers | 187 |
| Section 10.12 | Reports and Financial Statements | 187 |
| Section 10.13 | Collateral and Guaranty Matters | 188 |
| Section 10.14 | Certain ERISA Matters | 189 |
| **ARTICLE XI MISCELLANEOUS** | | **190** |
| Section 11.01 | Amendments, Etc | 190 |
| Section 11.02 | Notices and Other Communications; Facsimile and Electronic Copies | 194 |
| Section 11.03 | No Waiver; Cumulative Remedies | 197 |
| Section 11.04 | Costs and Expenses | 197 |
| Section 11.05 | Indemnification | 198 |
| Section 11.06 | Payments Set Aside | 199 |

AmericasActive:18122631.218122631.8

## TABLE OF CONTENTS (Cont.)

**Page**

| | | |
|---|---|---|
| Section 11.07 | Successors and Assigns | 199 |
| Section 11.08 | Confidentiality | 204 |
| Section 11.09 | Setoff | 205 |
| Section 11.10 | Release of Collateral and Guarantee | 206 |
| Section 11.11 | Counterparts | 207 |
| Section 11.12 | Integration | 207 |
| Section 11.13 | Survival of Representations and Warranties | 207 |
| Section 11.14 | Severability | 207 |
| Section 11.15 | GOVERNING LAW | 207 |
| Section 11.16 | WAIVER OF RIGHT TO TRIAL BY JURY | 208 |
| Section 11.17 | Binding Effect | 208 |
| Section 11.18 | [Reserved] | 208 |
| Section 11.19 | PATRIOT Act | 209 |
| Section 11.20 | Interest Rate Limitation | 209 |
| Section 11.21 | ABL Intercreditor Agreement | 209 |
| Section 11.22 | Lead Borrower | 209 |
| Section 11.23 | No Fiduciary Duty | 210 |
| Section 11.24 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 210 |
| Section 11.25 | Hedge Banks and Cash Management Banks | 210 |
| Section 11.26 | Currency Indemnity | 211 |
| Section 11.27 | Collateral Allocation Mechanism | 212 |
| Section 11.28 | Acknowledgement Regarding Any Supported QFCs | 212 |

AmericasActive:18122631.218122631.8

SCHEDULES

Schedule 1.01(a)      -      Existing Letters of Credit
Schedule 1.01(b)      -      Subsidiary Guarantors
Schedule 1.01(d)      -      Collection Accounts
Schedule 1.01(e)             Specified Customers
Schedule 2.01(a)      -      ABL Commitments
Schedule 2.01(b)             Letter of Credit Commitments
Schedule 2.01(c)             Swing Line Commitments
Schedule 5.07(b)      -      Owned Real Property
Schedule 5.13         -      Subsidiaries and Other Equity Investments
Schedule 6.17         -      Deposit Accounts and Securities Accounts
Schedule 6.19         -      Post-Closing Covenants
Schedule 7.01(b)      -      Existing Liens
Schedule 7.02(e)      -      Investments
Schedule 7.03         -      Indebtedness
Schedule 7.03(e)      -      Permitted Non-Recourse Factoring Transactions

EXHIBITS

Exhibit A-1      -      Form of Committed Loan Notice
Exhibit A-2      -      Form of Request for Letter of Credit
Exhibit A-3      -      Form of Prepayment Notice
Exhibit B        -      Form of Swing Line Loan Notice
Exhibit C        -      Form of Note
Exhibit D        -      Form of Compliance Certificate
Exhibit E        -      Form of Assignment and Assumption
Exhibit F-1      -      Form of U.S. Guarantee
Exhibit F-2      -      Form of UK Guarantee
Exhibit F-3      -      Form of Belgian Guarantee
Exhibit G-1      -      Form of Pledge Agreement
Exhibit G-2      -      Form of U.S. Security Agreement
Exhibit G-3      -      Form of UK Security Agreement
Exhibit G-4      -      Form of Belgian Security Agreement
Exhibit H-1      -      Form of Intellectual Property Security Agreement
Exhibit H-2      -      Form of Intellectual Property Security Agreement Supplement
Exhibit I        -      Form of ABL Intercreditor Agreement
Exhibit J-1      -      Form of U.S. Tax Compliance Certificate (For Foreign Lenders that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-2      -      Form of U.S. Tax Compliance Certificate (For Foreign Participants that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-3      -      Form of U.S. Tax Compliance Certificate (For Foreign Participants that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-4      -      Form of U.S. Tax Compliance Certificate (For Foreign Lenders that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit K        -      Form of Solvency Certificate
Exhibit L        -      Borrowing Base Certificate
Exhibit M        -      Form of Perfection Certificate
Exhibit N        -      Form of Borrower Joinder Agreement

AmericasActive:18122631.218122631.8

ABL CREDIT AGREEMENT

This ABL CREDIT AGREEMENT (this "Agreement") is entered into as of February 2, 2018, among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as Trico Group, LLC, the "Lead Borrower"), TRICO LIMITED, a limited company organized under the laws of England and Wales (the "UK Borrower"), THE OTHER BORROWERS FROM TIME TO TIME PARTY HERETO, FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as Trico Group Holdings, LLC, "Parent"), THE LENDERS FROM TIME TO TIME PARTY HERETO, and BANK OF AMERICA, N.A. ("Bank of America"), as administrative agent (together with its permitted successors in such capacity, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent").

PRELIMINARY STATEMENTS

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, the Lenders have agreed to extend (a) to the U.S. Borrowers up to $235,000,000 (as of the Fifth Amendment Effective Date) aggregate principal amount of U.S. ABL Commitments (as such amount may be increased or reduced from time to time pursuant to this Agreement (the "U.S. ABL Facility")) and (b) to the Foreign Borrowers up to $15,000,000 (as of the Fifth Amendment Effective Date) aggregate principal amount of Foreign ABL Commitments (as such amount may be increased or reduced from time to time pursuant to this Agreement), the proceeds of which will be used for working capital, general corporate purposes or any other purpose not prohibited by the Loan Documents;

WHEREAS, the applicable Guarantors have agreed to guarantee the obligations of the applicable Borrowers hereunder; and

WHEREAS, the Borrowers and the Guarantors have agreed to secure their respective Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a first priority Lien (subject to Liens on the Term Priority Collateral in favor of the First Lien Agent and Second Lien Agent) on substantially all of their respective assets, subject to the terms and conditions set forth in the Collateral Documents.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Defined Terms

. As used in this Agreement, the following terms shall have the meanings set forth below:

"2019 Specified Acquisitions" means the Fram Acquisition, the Airtex Acquisition and the Anco Acquisition.

"2020 Specified Acquisitions" means the BPI Acquisition and the UCI Acquisition.

"ABL Commitment" and "ABL Commitments" means, (a) as to each Lender individually, its U.S. ABL Commitment and its Foreign ABL Commitment, as the context requires and (b) as to the

AmericasActive:18122631.218122631.8

Lenders collectively, the aggregate amount of the U.S. ABL Commitments and the Foreign ABL Commitments of the Lenders.

"ABL Exposure" means, (a) as to any Lender at any time, the sum of such Lender's U.S. ABL Exposure, plus the Dollar Equivalent Amount of such Lender's UK ABL Exposure, plus the Dollar Equivalent Amount of such Lender's Belgian ABL Exposure and (b) as to the Lenders collectively, the aggregate amount of U.S. ABL Exposure, the Dollar Equivalent Amount of UK ABL Exposure and the Dollar Equivalent Amount of the Belgian ABL Exposure of the Lenders.

"ABL Facility" means the U.S. ABL Facility and/or the Foreign ABL Facility, as the context requires.

"ABL Intercreditor Agreement" means the Amended and Restated ABL Intercreditor Agreement, dated as of February 26, 2019 (as amended as of the Fifth Amendment Effective Date and as may be further amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), among the Administrative Agent, the First Lien Agent, the Second Lien Agent and the U.S. Loan Parties.

"ABL Loan" means a U.S. Loan, a UK Loan, a Belgian Loan and/or an Extended ABL Loan, as the context requires.

"ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Account Debtor" means any Person who is or may become obligated under or on account of any Account, Contract Right, Chattel Paper or General Intangible.

"Acquisition" means the purchase or other acquisition of all or substantially all of the property and assets or business of any Person or of assets constituting a business unit, a line of business or division of such Person, or of a majority of the Equity Interests in a Person.

"Activation Notice" has the meaning set forth in Section 6.17(a)(i).

"Administrative Agent" has the meaning specified in the introductory paragraph of this Agreement .

"Administrative Agent's Office" means, the Administrative Agent's address and, as appropriate, account as set forth in Section 11.02, or such other address or account as the Administrative Agent may from time to time notify the Lead Borrower and the Lenders.

"Affected Class" has the meaning assigned to such term in Section 11.01(d).

"Affected Financial Institution" means (a) any EEA Financial Institution, or (b) any UK Financial Institution.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, controls, is Controlled by or is under common Control with the Person specified.

"Agent-Related Persons" mean the Agents and the Lead Arrangers, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

2

"Aggregate Borrowing Base" means the sum of the U.S. Borrowing Base, plus the Dollar Equivalent Amount of the UK Borrowing Base plus the Dollar Equivalent Amount of the Belgian Borrowing Base.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Airtex Acquired Assets" means the Shares and the Acquired Assets (each as defined in the Airtex PSA).

"Airtex Acquisition" means the Lead Borrower's acquisition, directly or indirectly, of the Airtex Acquired Assets pursuant to the Airtex PSA.

"Airtex PSA" means  that certain Stock and Asset Purchase Agreement, dated as of January 14, 2019, by and among First Brands Group, LLC (formerly known as Trico Group, LLC), Carter Fuel Systems, LLC, Specialty Pump Groups, Inc., UCI Acquisition Holdings (No. 4) LLC and UCI-Airtex Holdings, Inc.

"Alternative Currency Loan" means a Eurocurrency Rate Loan or a Foreign ABL Facility Daily Rate Loan, as applicable.

"AML Laws" means all Laws of any jurisdiction applicable to any Lender, the Borrowers, the Borrowers' respective Subsidiaries or any Guarantor from time to time concerning or relating to terrorism financing or money laundering, including, without limitation, Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957) and all Laws comprising or implementing these Laws.

"Anco Acquisition" means the Lead Borrower's acquisition, directly or indirectly, of all of the issued and outstanding equity interests of Federal-Mogul SA, a limited liability company (*société anonyme*) organized under the laws of Belgium, Federal-Mogul Motorparts Ploiesti Srl, a Romanian limited liability company organized under the laws of Romania, Federal-Mogul Sistemas de Limpadores de Para-Brisas Ltda., a limited liability company organized under the laws of Brazil, Subensambles Internacionales, S. de R.L. de C.V., a limited liability company organized under the laws of Mexico and Federal-Mogul Distribucion de Mexico, S. de R.L. de C.V., a limited liability company organized under the laws of Mexico and the assets acquired in connection therewith.

"Anti-Corruption Laws" means all Laws of any jurisdiction applicable to the Borrowers, the Borrowers' respective Subsidiaries or any Guarantor from time to time concerning or relating to bribery or corruption, including, without limitation, the FCPA.

"Applicable Borrowers" means the U.S. Borrowers, the UK Borrowers and/or the Belgian Borrowers, as the context requires.

"Applicable Commitment Fee Percentage" means (i) if the daily average unused portion of the aggregate ABL Commitments during the fiscal quarter ending on the date such fee is due does not exceed 50% of the aggregate amount of the ABL Commitments, a rate per annum equal to 0.25%, and (ii) if the daily average unused portion of the aggregate ABL Commitments during the fiscal quarter ending on the date such fee is due exceeds 50% of the aggregate amount of the ABL Commitments, a rate per annum equal to 0.375%.

"Applicable Currency" means (a) with respect to the U.S. Loans and U.S. L/C Advances, Dollars and any other freely transferable currency approved by all U.S. Lenders, the Administrative Agent and, in

3

the case of U.S. Letters of Credit, all U.S. L/C Issuers, and, in the case of U.S. Swing Line Loans, the U.S. Swing Line Lender, (b) with respect to UK Loans, Dollars, Sterling, Euros and any other freely transferable currency approved by all Foreign ABL Lenders, the Administrative Agent and, in the case of Foreign Letters of Credit, all Foreign L/C Issuers, and, in the case of Foreign Swing Line Loans, the Foreign Swing Line Lender and (c) with respect to Belgian Loans, Dollars, Euros and any other freely transferrable currency approved by all Foreign ABL Lenders, the Administrative Agent and, in the case of the Foreign Letters of Credit, all Belgian L/C Issuers, and, in the case of Foreign Swing Line Loans, the Foreign Swing Line Lender.

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Term SOFR Loans, Eurocurrency Rate Loans, Foreign ABL Facility Daily Rate Loans or Base Rate Loans, as applicable, as notified to the Administrative Agent and the Lead Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to Section 3.01(e) and Section 3.02, be changed by such Lender upon 10 days' prior written notice to the Administrative Agent and the Lead Borrower.

"Applicable Rate" means, (i) from the Closing Date to, but not including, the first Adjustment Date, the percentages set forth below as Level 2 and (ii) thereafter, the Applicable Rate shall be adjusted on the first day of each three month period, commencing with July 1, 2018 (each such date an "Adjustment Date"), effective prospectively, by reference to the Quarterly Average Excess Availability for the fiscal quarter most recently ending in accordance with the following grid; provided that, if the Administrative Agent is unable to calculate the Quarterly Average Excess Availability due to the Lead Borrower's failure to deliver any Borrowing Base Certificate when required hereunder, then the Applicable Margin shall automatically adjust to Level 3, effective prospectively from such due date until the earlier of (i) the next Business Day following receipt by the Administrative Agent of such Borrowing Base Certificate and (ii) the next Adjustment Date:

| Level | Quarterly Average Excess Availability | Applicable Rate for Interest Period Rate Loans, SONIA Rate Loans, or Foreign ABL Facility Daily Rate Loans (other than U.S. FILO Loans) | Applicable Rate for Base Rate Loans (other than U.S. FILO Loans) | ~~Applicable Rate for Term SOFR Loans that are U.S. FILO Loans~~ | ~~Applicable Rate for Base Rate Loans that are U.S. FILO Loans~~ |
|---|---|---|---|---|---|
| 1 | Greater than 66 2/3% of the Line Cap | ~~1.50%~~ 1.25% | ~~0.50%~~ 0.25% | ~~2.00%~~ | ~~1.00%~~ |
| 2 | Greater than 33 1/3% of the Line Cap but less than or equal to 66 2/3% of the Line Cap | ~~1.75%~~ 1.50% | ~~0.75%~~ 0.50% | ~~2.25%~~ | ~~1.25%~~ |
| 3 | Less than 33 1/3% of the Line Cap | ~~2.00%~~ 1.75% | ~~1.00%~~ 0.75% | ~~2.50%~~ | ~~1.50%~~ |

4

AmericasActive:~~18122631.2~~18122631.8

For Extended ABL Loans, the "Applicable Rate" with respect thereto shall be as set forth in the applicable Extension Amendment.

For the avoidance of doubt, it is understood and agreed that the margins for any day prior to the Eighth Amendment Effective Date shall be determined in accordance with this Agreement as in effect on such day; provided that all Loans outstanding on the Eighth Amendment Effective Date which are BSBY Loans or LIBOR Rate Loans (in each case, as defined in this Agreement immediately before giving effect to the Eighth Amendment) shall be permitted to continue as BSBY Loans or LIBOR Rate Loans, as applicable for the duration of such BSBY Loans' or LIBOR Rate Loans' respective Interest Periods and, upon expiration of such Interest Periods, such Loans shall be converted to a Term SOFR Loan and/or a Base Rate Loan pursuant to and in accordance with the terms hereof.

"Appropriate Lender" means, at any time, with respect to any Class, the Lenders of such Class.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit E.

"Attorney Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of any law firm or other external legal counsel.

"Attributable Indebtedness" means, at any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that appears on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" has the meaning specified in Section 4.01(g).

"Auto-Renewal Letter of Credit" has the meaning specified in Section 2.03(b)(iii).

"Available Amount" means, in respect of any Letter of Credit, at any time, the maximum amount available to be drawn under such Letter of Credit over the remaining life thereof (assuming compliance at such time with all conditions to drawing).

"Backstopped" means, in respect of any Letter of Credit, (a) a letter of credit, bank guarantee or similar instrument delivered to the L/C Issuer which may be drawn by the L/C Issuer to satisfy any obligations of the Borrowers in respect of such Letter of Credit or (b) cash or Cash Equivalents deposited with the L/C Issuer to satisfy any obligation of the Borrowers in respect of such Letter of Credit, in each case, in an amount equal to 102% of the L/C Exposure with respect to such Letter of Credit and on terms and pursuant to arrangements (including, if applicable, any appropriate reimbursement agreement) reasonably satisfactory to the respective L/C Issuer.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing

5

banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"Banking Services Reserves" means all Reserves which the Administrative Agent from time to time establishes in its Permitted Discretion for provided or outstanding Cash Management Obligations.

"Bank of America" has the meaning set forth in the introductory paragraph hereto.

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the greatest of (i) the Prime Rate, (ii) ½ of 1.00% per annum above the Federal Funds Rate; (iii)  Term SOFR on such day for an Interest Period of one (1) month plus 1.00%; and (iv) 1.00%.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Belgian ABL Exposure" means, (a) as to each Foreign ABL Lender individually, at any time, the sum of (i) the Dollar Equivalent Amount of the outstanding principal amount of all Belgian ABL Loans and Belgian Permitted Overadvances held by such Foreign ABL Lender (or its Applicable Lending Office), (ii) such Foreign ABL Lender's Foreign Swing Line Exposure and (iii) such Foreign ABL Lender's Foreign L/C Exposure, and (b) as to the Foreign ABL Lenders collectively, the aggregate amount of Belgian ABL Exposure of the Foreign ABL Lenders.

"Belgian ABL Loan" means an extension of credit by a Foreign ABL Lender to a Belgian Borrower pursuant to Section 2.01(c).

"Belgian Borrower" means (i) on the Fifth Amendment Effective Date, Trico Belgium SA and (ii) thereafter, each Belgian Domestic Subsidiary that becomes a party hereto as a "Belgian Borrower" and executes a Borrower Joinder Agreement, in each case, until such time as the relevant Subsidiary is released from its obligations hereunder in accordance with the terms and provisions hereof.

"Belgian Borrowing Base" means, as at any date of determination thereof, an amount equal to the sum of:

(a)      85% of the net Dollar Equivalent Amount of Eligible Accounts (other than Eligible Tooling Accounts) of the Belgian Borrower; plus

(b)      85% of the Dollar Equivalent Amount of the Net Orderly Liquidation Value of Eligible Inventory of the Belgian Borrower; minus

(c)      Reserves.

The Administrative Agent may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Belgian Borrowing Base.

Notwithstanding the foregoing, for the period from the Fifth Amendment Effective Date until October 29, 2020 (or such later date as may be agreed to by the Administrative Agent in its Permitted Discretion), (i) the Accounts and Inventory of the Belgian Borrower shall not be deemed ineligible solely as a result of the failure to deliver to the Administrative Agent all documentation that is necessary to

6

evidence a first priority perfected Lien in such Accounts and Inventory in favor of the Collateral Agent and (ii) until such time as such documentation is delivered to the Administrative Agent, the Belgian Borrowing Base shall not exceed $4,000,000. For the avoidance of doubt, if such documentation is not delivered to the Administrative Agent by October 29, 2020 (or such later date as may be agreed to by the Administrative Agent in its Permitted Discretion), the Belgian Borrowing Base shall be deemed to be zero as of the next succeeding calendar day, until the Administrative Agent's receipt of such documentation.

"Belgian Collateral" means all of the "Pledged Assets" referred to in the Belgian Collateral Documents and all of the other property and assets that are, or are required under the terms hereof to be, subject to Liens in favor of the Collateral Agent for the benefit of the Foreign Secured Parties.

"Belgian Collateral Documents" means, collectively, the Belgian Security Agreement, the Belgian Guarantee, the Belgian Control Agreements and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the Foreign Secured Obligations.

"Belgian Collection Account" has the meaning assigned to the term "Bank Accounts" in the Belgian Security Agreement.

"Belgian Control Agreement" has the meaning assigned to the term "Pledge Notice" in the Belgian Security Agreement.

"Belgian Domestic Subsidiary" means any Subsidiary of Parent that is organized under the laws of Belgium.

"Belgian Excess Availability" means, at any time, an amount equal to (a) the Belgian Line Cap at such time minus (b) the Belgian ABL Exposure at such time (calculated, with respect to any Defaulting Lender, as if such Defaulting lender had funded its Pro Rata Share of all outstanding Belgian ABL Loans).

"Belgian Guarantee" means any guarantee agreement entered into by a Belgian Loan Party with respect to the Foreign Obligations substantially in the form of Exhibit F-3.

"Belgian Guarantee Supplement" has the meaning specified in Section 6.11(a)(i).

"Belgian Line Cap" means, at any time, the least of (a) the maximum aggregate principal amount of Foreign ABL Commitments at such time minus the UK ABL Exposure, (b) the Belgian Borrowing Base at such time and (c) the Belgian Sublimit at such time.

"Belgian Loan" means an extension of credit in the form of a Belgian ABL Loan, a Belgian Permitted Overadvance and a Foreign Swing Line Loan.

"Belgian Loan Parties" means, collectively, the Belgian Borrowers, each Foreign Loan Guarantor that is a Belgian Domestic Subsidiary that has guaranteed the Foreign Obligations, and each other Belgian Domestic Subsidiary who becomes a party to this Agreement, a Collateral Document (other than solely as an issuer or third party charger) or the Guaranty pursuant to a Joinder Agreement, Guaranty Supplement or otherwise and their successors and assigns.

"Belgian Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Belgian Excess Availability is less than zero.

"Belgian Permitted Overadvance" means:

7

(a)      a Belgian Overadvance made pursuant to Section 2.02(i); and

(b)      a Belgian ABL Loan made by the Administrative Agent, in its Permitted Discretion, which is made at any time upon or during the occurrence of an Event of Default and which:

(i)      is made to maintain, protect or preserve the Belgian Collateral and/or the Foreign Secured Parties' rights under the Loan Documents or which is otherwise for the benefit of the Foreign Secured Parties; or

(ii)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any Foreign Obligation;

(iii)      is made to pay any other amount chargeable to any Belgian Loan Party hereunder; and

(iv)      together with all other Belgian Permitted Overadvances then outstanding, shall not exceed an amount equal to ten percent (10%) of the aggregate Foreign ABL Commitments at any time;

provided, that, (A) the foregoing shall not result in any claim or liability against the Administrative Agent (regardless of the amount of any Belgian Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Belgian Permitted Overadvances allowed hereunder, and (B) in no event shall the Administrative Agent make a Belgian Permitted Overadvance, if after giving effect thereto, (i) the principal amount of the Credit Extensions would exceed the aggregate ABL Commitments (as in effect prior to any termination of the ABL Commitments pursuant to Section 2.06 hereof) or (ii) the aggregate amount of the Belgian Permitted Overadvances plus Belgian ABL Exposure plus UK ABL Exposure would exceed the Foreign ABL Commitments.

"Belgian Security Agreement" means that certain all asset pledge agreement, including the pledge over the shares in Trico Belgium SA, substantially in the form of Exhibit G-4 (including any and all supplements thereto), dated as of the date hereof, with respect to the Foreign Secured Obligations, among the Belgian Loan Parties and the Collateral Agent, for the benefit of the Collateral Agent and certain of the other Secured Parties, and any other pledge or security agreement governed by the laws of Belgium entered into in connection with the Foreign Secured Obligations, after the Fifth Amendment Effective Date by any other Belgian Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Collateral Agent and certain of the other Secured Parties, each as may be amended, restated, supplemented or otherwise modified from time to time.

"Belgian Sublimit" means, as of the Fifth Amendment Effective Date, an amount equal to $10,000,000. The Belgian Sublimit is part of, and not in addition to, the Foreign ABL Commitments.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (pursuant to ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

8

"Blocked Account Bank" has the meaning set forth in Section 6.17(a).

"Bloomberg" means Bloomberg Index Services Limited.

"Borrower" or "Borrowers" means, individually or collectively, each U.S. Borrower, each UK Borrower and each Belgian Borrower.

"Borrower DTTP Filing" means an HM Revenue & Customs' Form DTTP2, duly completed and filed by the applicable UK Borrower within the applicable time limit, which contains the scheme reference number and jurisdiction of tax residence provided by a Lender to the applicable UK Borrower and the Administrative Agent.

"Borrower Joinder Agreement" means an agreement substantially in the form of Exhibit N.

"Borrowing" means (a) a borrowing consisting of U.S. ABL Loans of the same Type and, in the case of Interest Period Rate Loans, having the same Interest Period made by each of the U.S. Lenders pursuant to Section 2.01, (b) a borrowing consisting of UK ABL Loans of the same Type and having the same Interest Period made by each of the Foreign ABL Lenders pursuant to Section 2.01, (c) a borrowing consisting of Belgian ABL Loans of the same Type and having the same Interest Period made by each of the Foreign ABL Lenders pursuant to Section 2.01, (d) a borrowing consisting of Swing Line Loans or (e) a funding of Permitted Overadvances.

"Borrowing Base" means, with respect to the U.S. Borrowers, the U.S. Borrowing Base, with respect to the UK Borrowers, the UK Borrowing Base, and with respect to the Belgian Borrowers, the Belgian Borrowing Base. Each Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.02(a).

"Borrowing Base Certificate" means a certificate by a responsible officer of Lead Borrower, on its own behalf and on behalf of all other Loan Parties, substantially in the form of Exhibit L setting forth the calculation of the U.S. Borrowing Base, the UK Borrowing Base and the Belgian Borrowing Base, including, in each case, a calculation of each component thereof, all in such detail as shall be satisfactory to the Administrative Agent in its Permitted Discretion (with such changes therein as may be required by the Administrative Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time). All calculations of the Borrowing Base in connection with the preparation of any Borrowing Base Certificate shall originally be made by the Loan Parties and certified by the Lead Borrower to the Administrative Agent.

"BPI Acquisition" means the Lead Borrower's acquisition, directly or indirectly, of all of the issued and outstanding equity interests of BPI Acquisition Company, Inc., a Delaware corporation, and each of its direct and indirect subsidiaries each of which is set forth on Schedule 1.2(f) of that certain Securities Purchase Agreement, dated as of July 31, 2020, by and among BPI Acquisition Company, Inc., a Delaware corporation, the sellers listed on the signature pages thereto, including Torque BPI LLC, a Delaware limited liability company, Brake Parts Holdings, Inc., a Delaware corporation, Torque ~~Capita~~Capital Group, LLC and the supporting parties identified on the signature pages thereto.

"BPI Target" means the domestic subsidiaries acquired by the Lead Borrower pursuant to the BPI Acquisition that have executed a U.S. Guaranty Supplement.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and in the State of New York; provided that:

9

AmericasActive:~~18122631.2~~18122631.8

(a)      if such day relates to any interest rate settings as to a Term SOFR Loan, means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in New York City;

(b)      if such day relates to any interest rate settings as to any Loan denominated in Euros, any fundings, disbursements, settlements and payments in Euros in respect of any such Loan, or any other dealings in Euros to be carried out pursuant to this Agreement in respect of any such Loan, means a Business Day that is also a TARGET Day; and

(c)      if such day relates to any interest rate settings as to a Loan denominated in Sterling, means a day other than a day banks are closed for general business in London because such day is a Saturday, Sunday or a legal holiday under the laws of the United Kingdom.

"CAM Exchange" means the exchange of the Lenders' interests provided for in Section 11.27.

"CAM Exchange Date" means the date on which any event referred to in Section 9.01(f) or (g) occurs or the date on which the Obligations are accelerated in accordance with Section 9.02(b).

"CAM Percentage" means, as to each Lender, a fraction, expressed as a decimal, of which (a) the numerator shall be the aggregate Dollar Equivalent Amount of the Obligations owed to such Lender (whether or not at the time due and payable) immediately prior to the CAM Exchange Date and (b) the denominator shall be the aggregate Dollar Equivalent Amount (as so determined) of the Obligations owed to all the Lenders (whether or not at the time due and payable) immediately prior to the CAM Exchange Date.

"Capital Expenditures" means, with respect to the Borrowers and the other Restricted Subsidiaries for any period, the aggregate amount, without duplication, of (x) all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that would, in accordance with GAAP, be included as additions to property, plant and equipment and (y) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that are reported in the Lead Borrower's consolidated statement of cash flows for such period; provided, that Capital Expenditures shall not include (i) any expenditures for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with proceeds from any Disposition for aggregate consideration of less than $2,000,000 with respect to any transaction or series of related transactions and less than $5,000,000 in the aggregate during any Fiscal Year, (ii) expenditures financed with the proceeds of cash capital contributions or the net cash proceeds from the sale or issuance of Equity Interests (other than Disqualified Equity Interests) received or made by Parent (or any other Parent Company) and contributed to the Borrower, (iii) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party and for which none of the Loan Parties and their Subsidiaries have provided or are required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period), (iv) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (v) investments in respect of a Permitted Acquisition solely to the extent amounts paid in connection with such Permitted Acquisition would be treated as a capital expenditure in accordance with GAAP.

"Capital Lease" means, in respect of any Person, any lease of or other arrangement conveying the right to use, property (whether real, personal or mixed) by such Person as lessee which would, in

10

AmericasActive:18122631.218122631.8

accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person; provided that all leases of any Person that are or would have been characterized as operating leases in accordance with GAAP as in effect immediately prior to the Closing Date shall continue to be accounted for as operating leases (and not as Capital Leases) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such leases to be recharacterized as Capital Leases.

"Capital Lease Obligation" means, with respect to any Person, at any time of determination, all obligations of such Person as lessee under Capital Leases, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Cash Collateral" has the meaning specified in Section 2.15.

"Cash Collateralize" has the meaning specified in Section 2.15.

"Cash Collateralization" shall have a corresponding meaning hereunder.

"Cash Dominion Period" means the period during which a Cash Dominion Trigger Event has occurred and is continuing in accordance with the definition thereof.

"Cash Dominion Trigger Event" means any of (a) the occurrence of a Specified ABL Default or (b) the failure of the Borrowers to maintain ~~Excess~~Specified Availability of at least the greater of (i) $15,000,000 and (ii) 10% of the Line Cap.  A Cash Dominion Trigger Event shall continue until (x) a Specified ABL Default is no longer continuing or has been cured or waived, or (y) in the case of clause (b), the ~~Excess~~Specified Availability has been at least the greater of (i) $15,000,000 or (ii) 10% of the Line Cap, for a period of twenty (20) consecutive Business Days.

"Cash Equivalents" means any of the following, to the extent owned by Parent or any of its Restricted Subsidiaries, having a maturity of not greater than 365 days from the date of acquisition thereof:  (a) Dollars, (b) [reserved], (c) [reserved], (d) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (e) insured certificates of deposit, time deposits, money market deposits, bankers' acceptances and Eurodollar time deposits (or similar instruments), in each case with any commercial bank having capital and surplus of not less than $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person, (f) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities, (g) securities with maturities of 365 days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A-1 by S&P or P-1 by Moody's (or, if at any time neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized statistical rating agency), (h) commercial paper maturing no more than one year from the date of creation thereof and having a rating of at least A-1 by S&P or P-1 by Moody's, (i) securities with maturities of six (6) months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (e) of this definition, (j) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (d)

11

through (i) of this definition and (k) Investments, classified in accordance with GAAP as Current Assets of the Borrowers or any of the other Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $1,000,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (d) and (e) of this definition.

"Cash Management Agreement" means any agreement entered into by and between the Borrowers or any of the other Restricted Subsidiaries and any Cash Management Bank in respect of any Cash Management Obligations and that is designated in writing by the Borrowers and such Cash Management Bank to the Administrative Agent to be included as a Cash Management Agreement hereunder.

"Cash Management Bank" means any Lender, an Agent or a Lead Arranger or any Affiliate of a Lender, an Agent or a Lead Arranger (in each case, determined as of the time the applicable Cash Management Agreement was entered into) providing treasury, depository and/or cash management services (including credit cards, purchase cards and other similar arrangements) to the Borrowers or any of the other Restricted Subsidiaries or conducting any automated clearing house transfers of funds.

"Cash Management Obligations" means obligations owed by the Borrowers or any of the other Restricted Subsidiaries to any Cash Management Bank in respect of (a) any overdraft and related liabilities arising from treasury, depository or cash management services (including credit cards, purchase cards and other similar arrangements) and any automated clearing house transfers of funds, (b) commercial credit card and merchant card services and related liabilities and (c) supply chain financing and related liabilities.

"Casualty Event" means any casualty, loss, damage, destruction or any condemnation or other taking by a Governmental Authority pursuant to the power of eminent domain or other similar loss with respect to real or personal property or improvements of the Borrowers and the other Restricted Subsidiaries resulting in receipt by any Borrower or any other Restricted Subsidiary of payments or proceeds (including cash and Cash Equivalents) under any casualty insurance policy or proceeds of a condemnation award in respect of any such property.

"CFC" means a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"CFC Domestic Person" means any U.S. Domestic Subsidiary substantially all the assets of which consist of equity and/or debt of one or more CFCs and cash or cash equivalents.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law) (in each case, regardless of whether the same had been proposed as of the date of this Agreement); provided that notwithstanding anything herein the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the earliest to occur of:

12

AmericasActive:18122631.218122631.8

(a)      Parent ceasing to own directly 100% of the Equity Interests of the Lead Borrower (or, if applicable, any Successor Borrower);

(b)      the Lead Borrower ceasing to own, directly or indirectly, 100% of the Equity Interests of each other Borrower;

(c)      at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Parent in the aggregate;

(d)      at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the lesser of (i) 35% of the then outstanding voting stock of Parent in the aggregate and (ii) the aggregate amount of outstanding voting stock of Parent held, directly or indirectly, by the Permitted Holders; or

(e)      a "Change of Control" under (and as defined in) the First Lien Credit Agreement or the Second Lien Credit Agreement (or any equivalent occurrence under any Refinancing Indebtedness in respect thereof).

"Class" (a) when used with respect to Lenders, refers to whether such Lenders are U.S. Lenders, Foreign ABL Lenders, U.S. Swing Line Lenders, or Foreign Swing Line Lenders (b) when used with respect to ABL Commitments, refers to whether such ABL Commitments are U.S. ABL Commitments, Foreign ABL Commitments, U.S. Swing Line Commitments, Foreign Swing Line Commitments, U.S. Letter of Credit Commitments, or Foreign Letter of Credit Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are U.S. ABL Loans, UK ABL Loans, Belgian ABL Loans, U.S. Swing Line Loans, Foreign Swing Line Loans, U.S. Permitted Overadvances, UK Permitted Overadvances or Belgian Permitted Overadvances.

"Closing Date" means February 2, 2018, being the date on which all the conditions precedent in Section 4.01 were satisfied or waived in accordance with Section 11.01 and the initial Credit Extension was made.

"CME" means CME Group Benchmark Administration Limited.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means all the "Collateral" as defined in any Collateral Document, any "Secured Asset" as defined in any UK Collateral Document or any "Pledged Assets" as defined in any Belgian Collateral Documents, and shall include the UK Collateral, the Belgian Collateral the Term Priority Collateral and ABL Priority Collateral.

"Collateral Agent" has the meaning specified in the introductory paragraph of this Agreement.

"Collateral Access Agreement" has the meaning assigned to such term in the U.S. Security Agreement, the UK Security Agreement or the Belgian Security Agreement, as applicable.

AmericasActive:18122631.218122631.8

"Collateral Agent's Account" means the Deposit Account of the Collateral Agent that has been designated as such, in writing, by the Collateral Agent to Lead Borrower and the Lenders, or such other address or account as the Collateral Agent may from time to time notify the Borrowers and the Lenders.

"Collateral Documents" means, collectively, the U.S. Collateral Documents, the UK Collateral Documents, the Belgian Collateral Documents and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations.

"Collection Account" means the U.S. Collection Account, the UK Collection Account and/or the Belgian Collection Account, as the context requires.

"Commitment Fee" has the meaning assigned to such term in Section 2.09(a).

"Committed Loan Notice" means a notice of a Borrowing (other than a Swing Line Borrowing) pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A-1.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.).

"Communications" means any notice, request, election, representation, certificate, report, disclosure, authorization, or other information or statement relating hereto, including any Loan Document, Borrowing Base Certificate, Compliance Certificate, Committed Loan Notice, and other information, reports, financial statements and materials delivered by any Loan Party under the Loan Documents, as well as reports and other information provided by the Agents to Lenders in connection with the credit facility established by this Agreement.

"Company Competitor" means any competitor of the Borrowers and/or any of their Subsidiaries.

"Company Customers" means any customer of the Borrowers and/or any of their Subsidiaries.

"Company Model" means the financial model delivered by the Lead Borrower to the Lead Arrangers prior to the Closing Date, as amended or modified from time to time prior to the date hereof with the consent of the Administrative Agent.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Compliance Period" has the meaning set forth in the definition of Covenant Trigger Event.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Adjusted EBITDA" means, with respect to any Person on a consolidated basis for any period, the sum of:

      (a)    Consolidated Net Income for such period; plus

      (b)    without duplication and to the extent deducted in determining Consolidated Net Income for such period, the sum of:

            (i)    Consolidated Interest Expense for such period;

14

(ii)	federal, state and foreign income tax expense for such period and other taxes based on profits, revenue or capital, including, without limitation, franchise, property, premium and similar taxes based on income, profits, revenue or capital, ACA fees and taxes, and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds), including, in each case with respect to this <u>clause (ii)</u>, penalties and interest related to such taxes or arising from any tax examinations (in each case, net of tax refunds received in such period);

(iii)	all amounts attributable to depreciation and amortization expenses or charges for such period;

(iv)	the aggregate amount of all non-cash charges reducing Consolidated Net Income for such period; <u>provided</u> that any cash payments made with respect to any non-cash expenses or charges added back in calculating Consolidated Adjusted EBITDA for any earlier period pursuant to this clause (iv) shall be subtracted in calculating Consolidated Adjusted EBITDA for the period in which such cash payment is made until the entire amount previously added back with respect to such expense or charge has been deducted;

(v)	Transaction Expenses to the extent incurred during such period;

(vi)	non-recurring cash costs and expenses for such period in connection with any Investment (other than an Investment in the Lead Borrower or any of its Subsidiaries existing at the time of such Investment), Permitted Acquisition, Disposition, factoring or other Indebtedness or the issuance of Equity Interests or Indebtedness or the refinancing, modification or amendment thereof and the prepayment of Indebtedness (in each case, solely to the extent permitted hereunder);

(vii)	management fees expensed during such period to the extent permitted under <u>Section 7.06(j)</u>;

(viii)	expenses related to contributions to any Pension Plan;

(ix)	any realized or unrealized losses attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815;

(x)	currency conversion translation losses;

(xi)	any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any Disposition of assets permitted under this Agreement, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the applicable carrier that it does not intend to indemnify or reimburse such expenses, charges or losses; <u>provided</u> that such amount is in fact indemnified or reimbursed within one hundred eighty (180) days of the initial claim made under the relevant indemnification provisions;

(xii)	any expenses, charges or losses with respect to liability or casualty events or business interruption that are covered by insurance, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the insurer such amount will not be reimbursed by the insurer; <u>provided</u> that (i) such amount is in fact reimbursed within one hundred eighty (180) days of the initial claim and (ii) upon request of the Administrative Agent, the Lead Borrower shall provide reasonable documentation supporting such expenses, charges or losses for distribution to the Lenders;

15

(xiii)   (A~~) non-recurring or unusual charges (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and business optimization costs) or losses, restructuring charges, severance costs and relocation costs, (B~~) the amount of cost savings that have resulted from actions that have been implemented prior to the end of the relevant period, which, on a Pro Forma Basis, are realized or expected to be realized within the first 12 months following the event giving rise thereto as though such cost savings had been realized on the first day of the relevant period, so long as (1) such cost savings are reasonably identifiable and quantifiable and factually supportable, in each case as determined by the Chief Financial Officer in good faith and (2) no cost savings shall be added pursuant to this clause (~~B)~~A) to the extent duplicative of (x) any cost savings that have been included in the determination of Deemed EBITDA (as defined below) or (y) any expenses or charges relating to such cost savings that are included in clause (~~A) above or clause (C~~B) below, and (~~C)~~B) start-up costs, launch costs and any expenses, charges or losses related to pre-production activity; <u>provided</u> that the aggregate amount that may be added back to Consolidated Adjusted EBITDA pursuant to this <u>clause (b)(xiii)</u> in any Test Period shall not (i) exceed 25% of Consolidated Adjusted EBITDA (calculated prior to giving effect to any adjustment in this <u>clause (b)</u> ~~(other than clauses (b)(i), (ii) and (iii)) for any Test Period ending on or prior to March 30, 2021, (ii) exceed 20% of Consolidated Adjusted EBITDA (calculated prior to giving effect to any adjustment in this clause (b) (other than clauses (b)(i), (ii) and (iii)) for any Test Period ending on June 30, 2021 and or September 30, 2021 and (iii) exceed 15% of Consolidated Adjusted EBITDA (calculated prior to giving effect to any adjustment in this clause (b) (other than clauses (b)(i), (ii) and (iii)) for any Test Period ending on and after December 31, 2021~~;

(xiv)   without duplication of amounts added back to Consolidated Adjusted EBITDA pursuant to <u>clause (b)(i)</u> above or otherwise, the "interest" or financing charge component of Permitted Non-Recourse Factoring Transactions for such period;

(xv)   <u>without duplication of any amounts added back pursuant to clause (xiii),</u> non-recurring or unusual charges (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and business optimization costs) or losses, restructuring charges, severance costs and relocation costs <u>and synergies</u>, as determined by the Chief Financial Officer in good faith;

(xvi)   adjustments identified in the Company Model (including any cost savings identified therein);

(xvii)   expenses, charges, losses or deductions associated with the Equity Interests in an entity held by such Person attributable to the non-controlling interests or minority interests of third parties; and

(xviii)   any aggregate net loss on the Disposition of property and charges related to any asset write-off or write-down (in each case, other than the sale of accounts receivable and inventory in the ordinary course of business); <u>minus</u>

(c)   without duplication and to the extent included in Consolidated Net Income for such period, the sum of:

(i)   the aggregate amount of all non-cash items of income for such period, other than the accrual of revenue or recording of receivables in the ordinary course of business,

(ii)   any realized or unrealized gains attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815,

16

(iii)    currency conversion translation gains; and

(iv)    any aggregate net gains on the Disposition of property.

Notwithstanding the foregoing, Consolidated Adjusted EBITDA (a) for the fiscal quarter ended December 31, 2016 shall be deemed to be $33,891,000, (b) for the fiscal quarter ended March 31, 2017 shall be deemed to be $34,249,000, (c) for the fiscal quarter ended June 30, 2017 shall be deemed to be $15,920,000 and (d) for the fiscal quarter ended September 30, 2017 shall be deemed to be $15,940,000 (the "Deemed EBITDA").

For purposes of calculating Consolidated Adjusted EBITDA to determine compliance with the Financial Covenant for any Test Period (including any Test Period which would include a fiscal quarter in respect of which a Specified Equity Contribution was made) (and for no other purpose under the Loan Documents), Specified Equity Contributions shall be added to and included in Consolidated Adjusted EBITDA; provided that (a) in each Test Period, there shall be no more than two (2) fiscal quarters (which may be consecutive) in which a Specified Equity Contribution is made, (b) there shall be no more than five (5) Specified Equity Contributions during the term of the ABL Facility, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Lead Borrower to be in compliance with the Financial Covenant as of the first Test Period in respect of which such Specified Equity Contribution is made (without giving effect to any repayment of Indebtedness with the proceeds thereof), (d) all Specified Equity Contributions shall be disregarded for any purpose other than determining compliance with the Financial Covenant and shall not be considered in determining any covenant baskets (or compliance, on a Pro Forma Basis, with the Financial Covenant for the purposes of compliance with any other covenant), in each case solely during the Test Period in which the relevant Specified Equity Contribution is included in Consolidated Adjusted EBITDA and (e) there shall be no pro forma or other reduction of the amount of Indebtedness by the amount of any Specified Equity Contribution for purposes of determining compliance with the Financial Covenant for the compliance date in respect to which such Specified Equity Contribution is made (other than, with respect to any future Test Period that includes the fiscal quarter in which such compliance date occurs, with respect to any portion of such Specified Equity Contribution that is actually applied to repay any Indebtedness and without duplication of any amounts included in the calculation of Consolidated Adjusted EBITDA for such fiscal quarter).

"Consolidated First Lien Debt" means, with respect to the Lead Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a "first priority" Lien on any property of the Lead Borrower or the other Restricted Subsidiaries, including the Loans and the First Lien Term Loans.

"Consolidated Interest Expense" means, with respect to any Person for any Test Period, the sum of (i) consolidated total interest expense of such Person and its Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation (and without duplication), amortization of debt issuance costs and original issue discount, premiums paid to obtain payment, financial assurance or similar bonds, interest capitalized during construction, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capital Leases (regardless of whether accounted for as interest expense under GAAP), all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net obligations under any Swap Contracts constituting interest rate swaps, collars, caps or other arrangements requiring payments contingent upon interest rates of such Person and its Subsidiaries, any fees and/or expenses paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee), financing fees and costs of surety bonds in

17

connection with Indebtedness and cash interest expenses or financing costs related to the factoring agreements) plus (ii) all cash dividends paid or payable on preferred stock during such period other than to such Person or a Loan Party plus or less, as applicable, (iii) to the extent they would otherwise be included in interest expense under GAAP, unrealized gains and losses arising from derivative financial instruments issued by such Person for the benefit of such Person or its Subsidiaries, in each case determined on a consolidated basis for such period.

For purposes of this definition, interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of the Lead Borrower and the other Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of the Lead Borrower or is merged into or consolidated with the Loan Parties or any of their respective Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Lead Borrower) in which any other Person (other than the Loan Parties or any of their Restricted Subsidiaries) has a joint ownership interest, except to the extent that any such income is actually received by a Loan Party or such Restricted Subsidiary during such period in the form of dividends or similar distributions, (c) the undistributed earnings of any Restricted Subsidiary of the Lead Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of its charter or any agreement (other than under any Loan Document), instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (d) any after-tax gains or losses attributable to (i) disposed, abandoned, divested and/or discontinued assets, properties or operations (other than, at the option of the Lead Borrower, assets, properties or operations pending the disposal, abandonment, divestiture and/or termination thereof), (ii) the disposal, abandonment, divestiture and/or discontinuation of assets, properties or operations or (iii) asset Dispositions or returned surplus assets of any Pension Plan, (e) the income (or loss) attributable to the early extinguishment of Indebtedness, and (f) (to the extent not included in clauses (a) through (e) above) any net extraordinary gains or net extraordinary losses.

"Consolidated Total Assets" means, as of any date, the assets and properties of the Lead Borrower and the other Restricted Subsidiaries as of such date, determined on a consolidated basis in accordance with GAAP as set forth on the most recent consolidated balance sheet of the Lead Borrower delivered pursuant to Section 6.01.

"Consolidated Total Debt" means, with respect to the Lead Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, an amount equal to the sum of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), (h) (without duplication and only to the extent of Guarantee Obligations of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), and (k) of the definition thereof), and (k) of the definition thereof; provided that "Consolidated Total Debt" shall be calculated (x) net of Unrestricted Cash and (y) excluding any obligation, liability or indebtedness of Parent or any of its Restricted Subsidiaries if, upon or prior to the maturity thereof, there shall have been irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in any computation of Unrestricted Cash.

18

"Contract Right" means any right of any Loan Party to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means the U.S. Control Agreement, the UK Control Agreement and/or the Belgian Control Agreement, as the context requires.

"Covenant Trigger Event" means the failure of the Loan Parties at any time to maintain Excess Availability of at least the greater of (i) $15,000,000 and (ii) 10% of the Line Cap.  A Covenant Trigger Event shall continue until the Excess Availability  is equal to or greater than the greater of (x) $15,000,000 and (y) 10% of the Line Cap for a period of twenty (20) consecutive Business Days (the "Compliance Period").

"Covered Entity" has the meaning assigned to such term in Section 11.28.

"Covered Parties" has the meaning assigned to such term in Section 11.02(f).

"Covered QFC Party" has the meaning assigned to such term in Section 11.28.

"Credit Extension" means a Borrowing or a L/C Credit Extension.

"Currency Due" has the meaning assigned to such term in Section 11.26.

"Current Assets" means, at any date, all assets of the Lead Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) cash or Cash Equivalents (including cash and Cash Equivalents held on deposit for third parties by the Borrowers or any of the other Restricted Subsidiaries), (ii)  deferred bank fees and derivative financial instruments related to Indebtedness and (iii) the current portion of current and deferred income taxes and taxes based on profit or capital).

"Current Liabilities" means, at any date, all liabilities of the Lead Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current liabilities, other than (i) current maturities of long term debt, (ii) outstanding ABL Loans (including, without limitation, Swing Line Loans) and L/C Exposure, (iii) accruals of Consolidated Interest Expense (excluding Consolidated Interest Expense that is due and unpaid), (iv) obligations in respect of derivative financial instruments related to Indebtedness, (v) accruals of current and deferred income taxes and taxes based on profit or capital, (vi) liabilities in respect of unpaid earnouts, (vii) the accruals relating to restructuring reserves, (viii) liabilities in respect of funds of third parties on deposit with any Borrower or any of the other Restricted Subsidiaries and (ix) the current portion of any other long term liability for borrowed money.

"Daily Simple SOFR" means, with respect to any applicable determination date, the secured overnight financing rate published on the FRBNY website (or any successor source satisfactory to the Administrative Agent).

AmericasActive:18122631.218122631.8

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, fraudulent transfer, reorganization, or similar debtor relief Laws of the United States or any similar foreign, federal or state law for the relief of debtors from time to time in effect and affecting the rights of creditors generally.

"Deemed EBITDA" has the meaning specified in the definition of "Consolidated Adjusted EBITDA".

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.00% per annum; provided that with respect to a Term SOFR Loan, Eurocurrency Rate Loan or Foreign ABL Facility Daily Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender that (i) has failed to fund any portion of the ABL Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder (provided that any such Lender shall be a Defaulting Lender under this clause (i) solely (x) with respect to the ABL Facility with respect to which it has failed to fund and (y) during the occurrence and continuation of such failure to fund, until any such funding shortfall shall have been funded in full by such Lender), (ii) has notified the Lead Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other existing agreements under which it has an obligation to extend credit (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent to funding cannot be satisfied), (iii) failed, within three (3) Business Days after request by the Administrative Agent, to provide written confirmation that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (iii) upon receipt by the Administrative Agent and the Lead Borrower of such requested confirmation, (iv) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, (v) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or its parent company has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (which shall not include any Undisclosed Administration) or (vi) has become subject to a Bail-In Action; provided that (x) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to an SPC pursuant to Section 11.07(g) and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Lead Borrower) of non-cash consideration received by the Borrowers or any other Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05 that is designated as Designated

20

AmericasActive:18122631.218122631.8

Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Lead Borrower, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-Cash Consideration.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by a Person (including any sale of Equity Interests, but excluding any issuance by a Person of its own Equity Interests), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a Change of Control, Qualifying IPO or asset sale so long as any rights of the holders thereof upon the occurrence of a Change of Control, Qualifying IPO or asset sale event shall be subject to the occurrence of the Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety one (91) days after the Latest Maturity Date; provided that, (i) if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent or any of its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Parent or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations, (ii) no Equity Interest held by any future, present or former Representative (or its Affiliates or any Immediate Family Member who is a successor-in-interest to the relevant Representative) of the Borrowers (or any Parent Company or Subsidiary thereof) shall be considered a Disqualified Equity Interest because such Equity Interest is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time and (iii) any Equity Interests that would not constitute Disqualified Equity Interests but for provisions thereof that give the holders thereof (or the holders of any security into which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of any Change of Control, Qualifying IPO or any asset sale occurring prior to ninety one (91) days after the Latest Maturity Date shall not constitute Disqualified Equity Interests if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the Termination Date.

"Disqualified Institution" means (i) those Persons who have been identified to the Lead Arrangers in writing prior to the date hereof, (ii) Company Competitors and Company Customers who have been identified to the Lead Arrangers in writing prior to the date hereof and (iii) Affiliates of the Persons identified in clauses (i) and (ii) above that are identifiable as Affiliates thereof solely on the basis of such Person's name; provided, that the Lead Borrower may supplement the list of Disqualified Institutions that are Company Competitors and Affiliates thereof in writing to the Administrative Agent (it being understood that (A) any such supplement shall not apply retroactively to disqualify a Person that has previously acquired an assignment or participation interest in a Loan and (B) with effect from the date of the Administrative Agent's receipt of a notice from the Lead Borrower designating a Person as no longer being a "Disqualified Institution", references herein and in the other Loan Documents to a "Disqualified Institution" shall not include references to such Person) and provided, further, that Disqualified Institutions shall not include any Person which is a bona fide debt fund, investment vehicle, regulated bank entity or unregulated lending entity (other than any Person separately identified as a

21

Disqualified Institution pursuant to <u>clause (i)</u> or <u>(ii)</u> above) that is engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of business so long as any Person identified in clauses (i) through (iii) above does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.

"<u>Disregarded Domestic Person</u>" means any direct or indirect U.S. Domestic Subsidiary that is treated as disregarded for U.S. tax purposes and substantially all the assets of which consist of equity of one or more Foreign Subsidiaries and cash or cash equivalents.

"<u>Dollars</u>" means lawful money of the United States.

"<u>Dollar Equivalent Amount</u>" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in a currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent, at such time on the basis of the Spot Rate (determined as of the date of determination or such other date determined by the Administrative Agent) for the purchase of Dollars with such applicable currency, as the case may be..

"<u>Domestic Subsidiary</u>" means a U.S. Domestic Subsidiary, a UK Domestic Subsidiary and/or a Belgian Domestic Subsidiary, as the context requires.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eighth Amendment</u>" means that certain Eighth Amendment to ABL Credit Agreement, dated as of the Eighth Amendment Effective Date, by and among the Borrowers, the other Loan Parties party thereto, the Lenders and the Administrative Agent.

"<u>Eighth Amendment Effective Date</u>" means June 24, 2022.

"<u>Eligible Accounts</u>" means, at any time, each Account of a U.S. Loan Party or a Foreign Loan Party, other than any Account:

(a)      subject to <u>Sections 6.17(a)</u> and <u>6.25(b)(i)</u>, which is not subject to a first priority perfected Lien in favor of the Collateral Agent, which, in the case of Accounts of a UK Loan Party after compliance with <u>Section 6.25(b)</u>, shall mean not subject to a first priority perfected assignment by way of security or a first priority fixed charge;

(b)      which is subject to any Lien other than a Lien expressly permitted under <u>Section 7.01</u>, which does not have priority over the Lien in favor of the Collateral Agent;

22

(c)      (w) that is not eligible for factoring pursuant to a factoring program permitted pursuant to this Agreement, (x) with respect to which the scheduled due date is more than 180 days (or, with respect to AutoZone Parts, Inc., 220 days) after the date of the original invoice therefor, (y) which is unpaid more than 120 days after the date of the original invoice therefor or (z) which has been written off the books of such Loan Party or otherwise designated as uncollectible;

(d)      which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder pursuant to clause (c) above;

(e)      which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to all Loan Parties exceeds 25% of the aggregate amount of Eligible Accounts of all Loan Parties, to the extent of such excess;

(f)      with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Agreement has been breached and remains unwaived or is not true;

(g)      which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash- on-delivery or any other repurchase or return basis or (vi) relates to payments of interest;

(h)      for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by a Loan Party;

(i)      with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)      which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, interim receiver, monitor, administrator, custodian, trustee, sequestrator, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, interim receiver, monitor, administrator, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state, provincial, territorial, or federal bankruptcy laws, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent or (vi) ceased operation of its business (other than, in each case, post-petition accounts payable of an Account Debtor that is a debtor-in-possession under the Bankruptcy Code and reasonably acceptable to the Administrative Agent in its Permitted Discretion) or, in each case, the equivalent under any applicable Debtor Relief Laws;

(k)      which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)      (i) which is owed by an Account Debtor to a U.S. Loan Party which (A) does not maintain its chief executive office in the U.S. or by Canada or (B) is not organized under applicable law of the U.S., Canada, any state of the U.S. or any province or territory of Canada, or (ii) which is owed by an Account Debtor to a Foreign Loan Party which (A) does not maintain its chief executive office in the U.S. or any Eligible European Jurisdiction, or (B) is not organized under the applicable law of the U.S., any state of the U.S., or any Eligible European Jurisdiction, unless, in any such case, such

23

AmericasActive:18122631.218122631.8

Account is backed by a letter of credit reasonably acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent;

(m)    which is owed in any currency other than Dollars, with respect to the Accounts of the UK Loan Parties, Sterling, Euro or Dollars, or with respect to the Accounts of the Belgian Loan Parties, Euro or Dollars;

(n)    which is owed by (i) any Governmental Authority of any country other than the United States unless such Account is backed by a letter of credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent, or (ii) any Governmental Authority of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq., the "Assignment of Claims Act"), has been complied with to the Administrative Agent's satisfaction in its Permitted Discretion;

(o)    which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)    which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted (unless such Account Debtor has waived its right of set off in respect of such indebtedness to the Administrative Agent's satisfaction in its Permitted Discretion), but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(q)    which is subject to any counterclaim, deduction, defense, setoff or dispute, in each case, in writing, but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(r)    which is evidenced by any promissory note, chattel paper or instrument;

(s)    which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Loan Party has filed such report or qualified to do business in such jurisdiction;

(t)    with respect to which such Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, to the extent of such reduction, or any Account which was partially paid and such Loan Party created a new receivable for the unpaid portion of such Account;

(u)    which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state, provincial, territorial or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(v)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Loan Party has or has had an ownership interest in such goods, or which indicates any party other than such Loan Party as payee or remittance party;

(w)    which was created on cash on delivery terms;

AmericasActive:18122631.218122631.8

(x)     which (i) has been sold or factored, is intended to be sold or factored, or is subject to documentation that permits it to be sold or factored, by such Loan Party, including pursuant to any Permitted Non-Recourse Financing Transaction, (ii) is owed by an Account Debtor owing any Account which satisfies clause (i), including any Account Debtor owing any Account which has been posted to the Factoring Platform or (iii) is owed by a Specified Customer; provided that any Account that is excluded by the eligibility criteria in this clause (x) shall continue to be deemed ineligible until delivery of documentation reasonably requested by the Administrative Agent to evidence termination of such factoring arrangements and written notice from the Administrative Agent that such Accounts may be included in the Borrowing Base;

(y)     in the case of Accounts owing to any UK Loan Party, as to which the contract or agreement underlying such Account is governed by (or, if no governing law is expressed therein, is deemed to be governed by) the laws of any jurisdiction other than England and Wales;

(z)     in the case of Accounts owing to any Belgian Loan Party, as to which the contract or agreement underlying such Account is governed by (or, if no governing law is expressed therein, is deemed to be governed by) the laws of any jurisdiction other than Belgium;

(aa)     which is excluded from the scope of any Security Agreement by virtue of the definition of "Excluded Asset" (as defined therein);

(bb)     with respect to Accounts owed to UK Loan Parties, which is subject to any limitation on assignment or other restriction (whether arising by operation of law, by agreement or otherwise) which would, under the local governing law of the contract, have the effect of restricting the assignment for or by way of security or the creation of security, in each case, unless the Administrative Agent has reasonably determined that such limitation is not enforceable; or

(cc)     which the Administrative Agent determines, in the exercise of its Permitted Discretion, may not be paid by reason of the Account Debtor's inability to pay or which the Administrative Agent otherwise determines, in the exercise of its Permitted Discretion, is unacceptable for any reason whatsoever.

In determining the amount of an Eligible Account, the face amount of an Account may, in the Administrative Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (x) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (y) the aggregate amount of all cash received in respect of such Account but not yet applied by such Loan Party to reduce the amount of such Account. To the extent the Administrative Agent uses its Permitted Discretion under this definition to make the standards of eligibility hereunder more restrictive, then any such change will only be effective three Business Days after notice thereof from the Administrative Agent to the Lead Borrower.

The maximum aggregate amount of Specified Eligible European Accounts that may be included in the UK Borrowing Base and the Belgian Borrowing Base, collectively, at any time, before giving effect to the advance rate, is $3,000,000.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Lead Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate. To the extent the Administrative Agent uses its Permitted Discretion under this definition to make the standards of

AmericasActive:18122631.218122631.8

eligibility hereunder more restrictive, then any such change will only be effective three (3) Business Days after notice thereof from the Administrative Agent to the Lead Borrower.

"Eligible Assignee" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender.  Notwithstanding anything to the contrary herein, (i) (x) a Disqualified Institution or (y) any natural person shall, in each case, not be an "Eligible Assignee" and (ii) neither Parent nor any of its Affiliates may be an "Eligible Assignee".

"Eligible European Jurisdiction" shall mean each of Austria, Belgium, Denmark, Finland, France, Germany, Italy, Ireland, Luxembourg, the Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, Northern Ireland, and England and Wales, provided that the Administrative Agent may, in its Permitted Discretion, remove one or more of the countries comprising the Eligible European Jurisdictions and subsequently add one or more countries back as Eligible European Jurisdictions.

"Eligible In-Transit Inventory" means Inventory of a Loan Party that would not constitute Eligible Inventory solely because of clause (g) thereof, but as to which:

(a)      (i) it is finished goods that have been shipped from an Affiliate of a Loan Party (an "Affiliate Vendor") located in the People's Republic of China for receipt by a Loan Party inside the United States, but which has not yet been delivered to a Loan Party, (ii) it has not been in transit for more than 60 days and (iii) it is in an aggregate amount not to exceed $~~30,000,000~~50,000,000 (with respect to the amount included in the Borrowing Base after giving effect to the advance rate) at any time;

(b)      (i) the purchase order for such Inventory is in the name of a Loan Party, (ii) title to such Inventory has passed to a Loan Party and (iii) the Administrative Agent shall have received such evidence thereof as it may from time to time require;

(c)      (i) it is evidenced by (A) if required by the Administrative Agent during an In-Transit Documentation Period, negotiable tangible document of title, all originals of which have been delivered to the Administrative Agent or its nominated broker or forwarder, as agent or (B) if no In-Transit Documentation Period exists or if not required by the Administrative Agent under clause (A) above, a non-negotiable bill of lading, electronic bill of lading, sea way bill, or similar record providing for the right to take possession of the Inventory and (ii) such document of title or other record reflects (A) the consignee as "to order" of a Loan Party or (B) if required by the Administrative Agent during an In-Transit Documentation Period, names the Administrative Agent as consignee or provides for the consignee "to order" of the Administrative Agent, in the Administrative Agent's Permitted Discretion;

(d)      if required by the Administrative Agent during an In-Transit Documentation Period, each Person having control over such inventory (including the customs broker, freight forwarder and shipper, as applicable) shall have executed and delivered an agreement in form and substance reasonably satisfactory to the Administrative Agent pursuant to which, among other things, such Person agrees to act as agent and bailee for the benefit of the Administrative Agent and act solely upon the instructions of the Administrative Agent upon notice by the Administrative Agent;

(e)      as to which no Affiliate Vendor has asserted any right to reclaim, divert shipment of, repossess, stop delivery, claim any reservation of title or otherwise assert Lien rights against the Inventory;

(f)      which is shipped by a carrier that is not affiliated with the applicable Affiliate Vendor; and

26

(g)        which is insured to the reasonable satisfaction of the Administrative Agent.

"Eligible Inventory" means Inventory of a Loan Party other than any Inventory:

(a)        which is not subject to a first priority perfected Lien in favor of the Collateral Agent under, and governed by, the laws of the jurisdiction of the location of such Inventory (and in the case of Inventory of a UK Loan Party, its grant of a first priority floating charge under a UK Security Agreement that is duly registered at Companies House shall constitute a first priority perfected Lien for the purposes of this paragraph (a));

(b)        which is subject to any Lien other than a Lien expressly permitted pursuant to Section 7.01, which does not have priority over the Lien in favor of the Collateral Agent;

(c)        which is, in the Administrative Agent's determination exercised using its Permitted Discretion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d)        with respect to which any covenant, representation or warranty contained in this Agreement or in any Collateral Document has been breached or is not true and which does not conform to all standards imposed by any Governmental Authority of competent jurisdiction;

(e)        in which any Person other than such Loan Party shall (i) have any direct or indirect ownership, interest or title (including retention of title claims) or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein (other than rights of a bailee or transporter in the ordinary course of business), provided that Inventory of such Loan Party which may be subject to any rights of retention of title shall not be excluded from Eligible Inventory solely pursuant to this clause (e) in the event that a Letter of Credit has been issued under and in accordance with the terms of this Agreement for the purchase of such Inventory;

(f)        which is not finished goods, work-in-process, or raw materials, or which constitutes spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)        which is not located in the U.S., Canada, England or Wales (other than (i) Eligible In-Transit Inventory or (ii) additional Eligible Inventory which is in transit with a common carrier from vendors and suppliers, with respect to this clause (ii), in an aggregate amount not to exceed $5,000,00010,000,000 included in the Borrowing Base after giving effect to the advance rate at any time);

(h)        which is located in any location leased by such Loan Party unless (i) the lessor has delivered to the Collateral Agent a Collateral Access Agreement, (ii) a Reserve for rent, charges and other amounts due or to become due with respect to such facility has been established by the Administrative Agent in its Permitted Discretion or (iii) less than 90 days have passed since the Closing Date;

(i)        which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document, unless (i) such warehouseman or

27

bailee has delivered to the Collateral Agent a Collateral Access Agreement and such other documentation as the Collateral Agent or Administrative Agent may require, (ii) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion or (iii) less than 90 days have passed since the Closing Date;

(j)      which is being processed offsite at a third party location or outside processor, or is in- transit to or from such third party location or outside processor;

(k)      which is a discontinued product or component thereof;

(l)      which is the subject of a consignment by such Loan Party as consignor;

(m)      which is perishable;

(n)      which contains or bears any intellectual property rights licensed to such Loan Party unless the Administrative Agent is satisfied in its Permitted Discretion that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o)      which is not reflected in a current perpetual inventory report of such Loan Party, except with respect to any Inventory located at the Carter Fuel Systems facility located in Logansport, Indiana;

(p)      for which reclamation rights have been asserted by the seller;

(q)      with respect to Inventory of a UK Loan Party, which is not located at a facility in England, Wales or Belgium (other than Eligible Inventory which is in transit with a common carrier from vendors and suppliers in an aggregate amount not to exceed $the amount set forth in clause (g) above);

(r)      with respect to Inventory of a Belgian Loan Party, which is not located at a facility in Belgium (other than Eligible Inventory which is in transit with a common carrier from vendors and suppliers in an aggregate amount not to exceed the amount set forth in clause (g) above);

(s)      which the Administrative Agent otherwise determines in its Permitted Discretion is unacceptable for any reason whatsoever; or

(t)      which (i) has been sold or financed, or is intended to be sold or financed, by such Loan Party, including pursuant to any Permitted Inventory Financing or (ii) has been purchased by a customer who has purchased any Inventory from a Loan Party which satisfies clause (i), including any Inventory which has been posted to the Factoring Platform;

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Lead Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate. To the extent the Administrative Agent uses its Permitted Discretion under this definition to make the standards of eligibility hereunder more restrictive, then any such change will only be effective three (3) Business Days after notice thereof from the Administrative Agent to the Lead Borrower.

"Eligible Tooling Accounts" means Eligible Accounts that are owing by an Account Debtor who (i) has approved the completion (on terms, which shall include the production part approval process, and in writing acceptable to the Administrative Agent) of the specific tool manufactured for such Account

28

Debtor and which is in the possession of a Loan Party, and (ii) has been invoiced by the Loan Party for such tool.

"Environmental Action" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written request for information, notice of liability or potential liability, notice of governmental investigation, proceeding, consent order, consent decree or consent agreement relating in any way to any Environmental Law, any Environmental Permit, Hazardous Material or Environmental Liability including, without limitation, (a) by any Person with respect to enforcement (including citizen-suit enforcement pursuant to such provisions of Environmental Laws), Responses or damages, or (b) by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all Laws, decrees or other governmental restrictions of legal effect relating to the protection of the environment, to the Release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, or exposure to, Hazardous Materials.

"Environmental Liability" means any and all legal obligations or liabilities (including obligations to perform Response activities) related to Environmental Laws, Environmental Permits or Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other Governmental Authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that is under common control with the Borrowers or any of the other Restricted Subsidiaries and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Borrowers or any of the other Restricted Subsidiaries, notification of the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a

29

Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrowers or any of the other Restricted Subsidiaries or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA for which the Borrowers or any of the other Restricted Subsidiaries or any ERISA Affiliate may be directly or indirectly liable, (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA or (l) a Foreign Plan Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"EURIBOR Loan" means any Loan denominated in Euros bearing interest at a rate determined by reference to clause (a) of the definition of "Eurocurrency Rate".

"Euro" or "€" means the lawful currency of the Participating Member States.

"Eurocurrency Reserve Requirements" means for any day as applied to a Eurocurrency Rate Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the FRB or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB) maintained by a member bank of the Federal Reserve System.

"Eurocurrency Rate" means, for any Interest Period with respect to a Eurocurrency Rate Loan, denominated in Euros, the rate per annum equal to the Euro Interbank Offered Rate ("EURIBOR"), as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) (in such case, the "EURIBOR Screen Rate") on the day that is two TARGET Days preceding the first day of such Interest Period; provided that (x) if the Eurocurrency Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement and (y) such rate shall be adjusted for any Eurocurrency Reserve Requirement, if applicable.

"Eurocurrency Rate Loan" means any Loan that bears interest at a rate based on the definition of Eurocurrency Rate. All Loans denominated in Euro must be Eurocurrency Rate Loans.

"Event of Default" has the meaning specified in Section 9.01.

30

AmericasActive:18122631.218122631.8

"Excess Availability" means, at any time, an amount equal to (a) the Line Cap at such time, minus (b) the aggregate amount of ABL Exposure at such time.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Account" means each "Excluded Account", as such term is defined in any Security Agreement.

"Excluded Asset" means each "Excluded Asset", as such term is defined in any U.S. Security Agreement and any "Excluded Property", as such term is defined in any UK Security Agreement.

"Excluded Contribution" means the net proceeds or fair market value of property or assets (including cash) contributed to the Lead Borrower as a capital contribution or as a result of the sale or issuance of equity of Parent (or any other Parent Company), in each case, to the extent designated as an "Excluded Contribution" in a certificate of a Responsible Officer of the Lead Borrower delivered to the Administrative Agent (excluding Specified Equity Contributions).

"Excluded Subsidiary" means (a) any Subsidiary of Parent that is not a Wholly-owned Subsidiary; provided that no Person that is or becomes a Loan Party shall subsequently constitute an Excluded Subsidiary pursuant to this clause (a), (b) any Immaterial Subsidiary, (c) any Subsidiary of Parent that is prohibited by law, regulation or Contractual Obligation (in the case of a Contractual Obligation, not entered into in contemplation of the Transactions) from providing the applicable Guarantee or that would require a governmental (including regulatory) consent, approval, license or authorization (to the extent such consent, approval, license or authorization was not obtained) in order to provide such Guarantee or where the provision of such Guarantee would result in material adverse tax consequences as mutually determined by the Lead Borrower and the Administrative Agent, (d) any Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person, (e) any U.S. Domestic Subsidiary that is a direct or indirect Subsidiary of a (i) Foreign Subsidiary, UK Domestic Subsidiary or Belgian Subsidiary, (ii) CFC Domestic Person or (iii) Disregarded Domestic Person, (f) any not-for-profit Subsidiaries, captive insurance Subsidiaries and special purpose entities used for permitted financings, (g) any Subsidiary to the extent that the Administrative Agent and the Borrowers reasonably agree that the burden or cost of providing a Guarantee with respect to such Subsidiary shall be excessive in view of the benefits afforded thereby, (h) any UK Domestic Subsidiary that has no material assets other than the Equity Interests of one or more Foreign Subsidiaries and (i) any Belgian Domestic Subsidiary that has no material assets other than the Equity Interests of one or more Foreign Subsidiaries; provided that the term "Excluded Subsidiary" shall not include (i) the Borrowers or any Subsidiary that is an obligor (including pursuant to a Guarantee) under any First Lien Facility, First Lien Incremental Equivalent Debt, Second Lien Facility, any Subordinated Indebtedness or any Refinancing Indebtedness in respect of any of the foregoing or under any Material Indebtedness of a Loan Party or (ii) any Subsidiary of Parent that owns Equity Interests of a Loan Party, other than such Subsidiaries which constitute "Excluded Subsidiaries" pursuant to clause (c), (d) or (e) above.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the

31

portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means, (a) with respect to each Agent, each L/C Issuer and each Lender, Taxes imposed on or measured by net income (however denominated), net profits (including any branch profits taxes), franchise Taxes and backup withholding Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, being a resident of, or having its principal office or Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any withholding Tax that is imposed by the United States or, in the case of a payment of a Foreign Loan Party, that certain foreign jurisdiction (excluding the portion of withholding Taxes with respect to which the applicable Lender is entitled to claim a reduction under an income tax treaty or local Tax law of that certain foreign jurisdiction but assuming for these purposes (i) the completion of any necessary procedural formalities and, if applicable (ii) the satisfaction of any condition which relates to there being no special relationship between the relevant Foreign Loan Party and the Lender or between both of them and another person) on amounts payable to a Lender under the law in effect at the time (i) such Lender becomes a party to this Agreement other than pursuant to an assignment made under Section 3.07 or (ii) such Lender changes its lending office; provided that clause (b) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to clause (b)) do not exceed the indemnity payment or additional amounts that the Person making the assignment or transfer to such Lender or the Lender changing its lending office would have been entitled to receive in the absence of such assignment or transfer, other than an assignment made pursuant to Section 3.07(b) or in the absence of such change of lending office, (c) any  Tax that is attributable to a Lender's or Agent's failure to comply with Section 3.01(f), and (d) any withholding Taxes imposed under FATCA.

"Existing Credit Agreements" means, collectively, and in each case as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time prior to the date hereof: (i) that certain Credit and Guaranty Agreement, dated as of May 26, 2016, among, among others, Crowne Group, LLC, as borrower, Crowne Group Holdings, LLC, as holdings, HPS Investment Partners, LLC, as administrative agent and collateral agent, and the lenders party thereto and (ii) that certain Amended and Restated ABL Credit Agreement, dated as of May 26, 2016, among, among others, Crowne Group Holdings, LLC, as parent, Crowne Group, LLC, as borrower representative, the other borrowers party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A. and J.P. Morgan Europe, as administrative agent and collateral agent.

"Existing Letters of Credit" means those certain letters of credit relating to the Existing Credit Agreements and set forth on Schedule 1.01(a) hereto.

"Extended ABL Commitment" means a commitment of any Lender, established pursuant to Section 2.18, to make Extended ABL Loans to the Borrowers.

"Extended ABL Loan" means an ABL Loan that has been extended pursuant to an Extension.

"Extension" as defined in Section 2.18(a).

"Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent and the Lead Borrower, be in the form of an amendment and restatement of this Agreement) among the applicable Borrowers, the applicable extending Lenders, and the Administrative Agent.

"Extension Offer" as defined in Section 2.18(a).

AmericasActive:18122631.218122631.8

"Factored Accounts Schedule" means a schedule listing each Account Debtor (including Specified Customers) subject to any Permitted Non-Recourse Factoring Transaction (or similar factoring arrangement) and the corresponding Selling Trico Party and Factor (or other applicable parties to any similar factoring arrangement), as updated from time to time in accordance with Section 6.02.

"Factoring Platform" means (i) the platform utilized by LQX to provide the electronic marketplace and other services of LQX specified under the Corporate Seller Agreement, dated as of August 7, 2017, among Crowne Group, LLC, certain of its subsidiaries and LQX (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time) and (ii) any other platform utilized by any other provider of such services for the purpose of selling Accounts and Inventory.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code, and any legislation, regulation or guidance giving effect to such intergovernmental agreements.

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent. If the Federal Funds Rate is less than zero, it shall be deemed to be zero hereunder.

"Fee Letter" means the Amended and Restated Fee Letter dated as of the Fourth Amendment Effective Date between the Lead Borrower and the Administrative Agent.

"Fifth Amendment Effective Date" means July 31, 2020.

"Financial Covenant" means the covenant set forth in Section 7.12.

"First Amendment Effective Date" means June 1, 2018.

"First Lien Agent" means Jeffries Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent and collateral agent for the lenders from time to time party to the First Lien Credit Agreement.

"First Lien Credit Agreement" means the First Lien Term Loan Agreement, dated as of the Closing Date (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time), among, *inter alios*, Parent, the Lead Borrower, the First Lien Agent, and the lenders from time to time party thereto.

AmericasActive:18122631.218122631.8

"First Lien Facility" means the credit facility governed by the First Lien Credit Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for incremental, additional loans, or other long-term indebtedness permitted to be secured on a pari passu basis with the First Lien Obligations, or loans or other long-term indebtedness that replace or refinance such facilities (but in the case of any replacement or refinancing facility subject to the satisfaction of the requirements of Refinancing Indebtedness with respect thereto), including any such replacement or refinancing facility or indenture that increases or decreases the amount borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such indentures or credit facilities that replace or refinance such credit facility (or any subsequent replacement thereof), including to increase or decrease the amount thereof, in each case to the extent permitted by this Agreement (but in the case of any replacement or refinancing facility subject to the satisfaction of the requirements of Refinancing Indebtedness with respect thereto).

"First Lien Incremental Equivalent Debt" means the "Incremental Equivalent Debt" as defined in the First Lien Credit Agreement (as in effect on the Fourth Amendment Effective Date).

"First Lien Incremental Term Loans" means the "Incremental Term Loans" as defined in the First Lien Credit Agreement (as in effect on the Fourth Amendment Effective Date).

"First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"First Lien Loans" means the loans extended to the Lead Borrower pursuant to the First Lien Credit Agreement, (including without limitation the First Lien Term Loans, the First Lien Incremental Term Loans, the First Lien Incremental Equivalent Debt, and the First Lien Specified Term Refinancing Debt Loans).

"First Lien Obligations" means the "Obligations" as defined in the First Lien Credit Agreement.

"First Lien Specified Term Refinancing Debt Loans" means the "Specified Term Refinancing Debt Loans" as defined in the First Lien Credit Agreement (as in effect on the Fourth Amendment Effective Date).

"First Lien Term Loans" means the "Term Loans" as defined in the First Lien Credit Agreement.

"Fiscal Year" means the fiscal year of the Lead Borrower and the other Restricted Subsidiaries ending on December 31 of each calendar year.

"Fixed Charge Coverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries for such Test Period to (ii) Fixed Charges for such period.

"Fixed Charges" means, for any Test Period, the sum, without duplication, of (i) Consolidated Interest Expense of the Lead Borrower and the other Restricted Subsidiaries paid in cash for such Test Period, (ii) scheduled payments of principal on funded Indebtedness of the Lead Borrower and the other Restricted Subsidiaries to the extent paid in cash during such Test Period, (iii) Restricted Payments paid in cash during such Test Period, (iv) unfinanced cash Capital Expenditures for such period, and (v) the amount of cash payments made during such period in respect of federal, state, local and foreign income taxes.

34

"Foreign ABL Commitment" means (a) as to each Foreign ABL Lender individually, its obligation to make a Belgian ABL Loan to each Belgian Borrower and/or a UK ABL Loan to each UK Borrower pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01(c) hereto under the caption "Foreign ABL Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement and (b) as to the Foreign ABL Lenders collectively, the aggregate amount of the Foreign ABL Commitments of the Lenders (other than any Defaulting Lenders). The aggregate amount of the Foreign ABL Commitments on the Fifth Amendment Effective Date is $15,000,000.

"Foreign ABL Facility" means the aggregate principal amount of Foreign ABL Commitments (as such amount may be increased or reduced from time to time pursuant to this Agreement).

"Foreign ABL Facility Daily Rate" means in connection with the Foreign ABL Facility:

(a)      with respect to Loans denominated in Sterling, the SONIA Daily Rate;

(b)      with respect to Loans denominated in Euros, EURIBOR Screen Rate for Euro deposits with a term of one month commencing on the first Business Day of each month; and

(c)      with respect to Loans denominated in Dollars, the Term SOFR Screen Rate for Dollar deposits with a term of one month commencing on the first Business Day of each month;

provided that (x) in no event shall the Foreign ABL Facility Daily Rate be less than zero and (y) such rate shall be adjusted for any Eurocurrency Reserve Requirement, if applicable.

"Foreign ABL Facility Daily Rate Loan" means a Loan that bears interest at a rate based on the definition of "Foreign ABL Facility Daily Rate."

"Foreign ABL Lender" means, as of any date of determination, any Person with a Foreign ABL Commitment or, if all the Foreign ABL Commitments have terminated or expired, any Person with Belgian ABL Exposure or UK ABL Exposure, and any other Person that may be a party to this Agreement from time to time as a "Foreign ABL Lender" and, in the case of each such Foreign ABL Lender, including their respective successors and assigns as permitted hereunder and any lending office or branch of the foregoing (each of which is referred to herein as a "Foreign ABL Lender"). Unless the context otherwise requires, the term "Foreign ABL Lender" includes the Foreign Swing Line Lender and the Foreign L/C Issuer.

"Foreign Borrower" means each Belgian Borrower and each UK Borrower.

"Foreign Currency Scheduled Unavailability Date" has the meaning specified in Section 3.03(c).

"Foreign Loan Parties" means, collectively, the Belgian Loan Parties and the UK Loan Parties.

"Foreign L/C Advance" means each Foreign ABL Lender's funding of its participation in any Foreign L/C Borrowing in accordance with its Pro Rata Share.

"Foreign L/C Borrowing" means a Credit Extension resulting from a drawing by a Foreign Borrower under any Foreign Letter of Credit which has not been reimbursed on the applicable Honor Date or refinanced as a Borrowing.

"Foreign L/C Credit Extension" means, with respect to any Foreign Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

35

"Foreign L/C Exposure" means, with respect to any Foreign ABL Lender at any time, its Pro Rata Share of the Foreign L/C Obligation at such time.

"Foreign L/C Issuer" means Bank of America and any other Foreign ABL Lender that becomes an L/C Issuer in accordance with Section 2.03(k) or Section 11.07(i); in the case of each of clause (a) and (b) above, in its capacity as an issuer of Foreign Letters of Credit hereunder, or any successor issuer of Foreign Letters of Credit hereunder. Each Foreign L/C Issuer may, in its discretion, arrange for one or more Foreign Letters of Credit to be issued by Affiliates or branches of such Foreign L/C Issuer or such Affiliate (or other financial institution), in which case the term "Foreign L/C Issuer" shall include any such Affiliate or branch (or other financial institution) with respect to Letters of Credit issued by such Affiliate or branch (or other financial institution).

"Foreign L/C Obligation" means, as at any date of determination, the aggregate maximum amount available to be drawn under all outstanding Foreign Letters of Credit during the remaining life thereof plus the aggregate of all Unreimbursed Amounts in respect of Foreign Letters of Credit, including all Foreign L/C Borrowings.

"Foreign Letter of Credit" means a commercial/trade or standby letter of credit or letter of guarantee issued by a Foreign L/C Issuer for the account of a Foreign Borrower, any other Belgian Domestic Subsidiary and/or any other UK Domestic Subsidiary.

"Foreign Letter of Credit Commitment" means, with respect to any Foreign L/C Issuer, the amount set forth opposite such Foreign L/C Issuer's name on Schedule 2.01(b) hereto under the caption "Foreign Letter of Credit Commitment" or, if a Foreign L/C Issuer has entered into an Assignment and Assumption, set forth for such Foreign L/C Issuer in the Register maintained by the Administrative Agent pursuant to Section 11.07(c) as the Foreign L/C Issuer's "Foreign Letter of Credit Commitment" as such amount may be reduced at or prior to such time pursuant to Section 2.06 or as may be increased from time to time pursuant to the terms hereof. The total amount of the aggregate Foreign Letter of Credit Commitments shall not exceed the lesser of (a) $10,000,000 or (b) the aggregate amount of the Foreign ABL Commitments at any time.

"Foreign Letter of Credit Facility" means the revolving credit facility made available by the Foreign L/C Issuer pursuant to Section 2.03.

"Foreign Loan Guarantors" means, collectively, (a) each Subsidiary Guarantor that is a Belgian Domestic Subsidiary, (b) each Subsidiary Guarantor that is a UK Domestic Subsidiary and (c) each U.S. Loan Party.

"Foreign Obligations" means (a) for purposes of this Agreement, all advances to, and debts, liabilities and obligations of, (i) any Belgian Loan Party arising under any Loan Document or otherwise with respect to any Belgian ABL Exposure or (ii) any UK Loan Party arising under any Loan Document or otherwise with respect to any UK ABL Exposure, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Foreign Loan Party, as applicable, of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed or allowable claims in such proceeding and interest accruing at the Default Rate in accordance with Section 2.08(b) or (b) solely for purposes of the Belgian Guarantee and the Belgian Collateral Documents, the obligations specified in the foregoing clause (a)(i) and the other Foreign Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time or (c) solely for purposes of the UK Guarantee and the UK Collateral Documents, the

36

obligations specified in the foregoing clause (a)(ii) and the other Foreign Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time.  Without limiting the generality of the foregoing, the Foreign Obligations of the Foreign Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest (including interest accruing at the Default Rate in accordance with Section 2.08(b)), charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Foreign Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising. Notwithstanding the foregoing, the obligations of any Foreign Loan Party under any Secured Hedge Agreement or any Cash Management Agreement shall be secured and guaranteed pursuant to the relevant Collateral Documents, the U.S. Guaranty, the Belgian Guarantee and the UK Guarantee only to the extent that, and for so long as, the other Foreign Obligations are so secured and guaranteed. Notwithstanding the foregoing, Foreign Obligations of any Foreign Loan Party shall in no event include any Excluded Swap Obligations of such Foreign Loan Party, as applicable.

"Foreign Secured Obligations" means all Foreign Obligations of the Foreign Loan Parties now or hereafter existing under the Loan Documents (including the UK Secured Obligations), and any obligation of a Foreign Loan Party under any Secured Hedge Agreement (other than any Excluded Swap Obligation) and any Cash Management Obligation; provided that after a Change in Law after the Closing Date that would permit, in the reasonable judgment of the Lead Borrower, the Foreign Loan Parties to guaranty all Secured Obligations without adverse tax consequences, "Foreign Secured Obligations" shall mean all Secured Obligations.

"Foreign Secured Parties" means collectively, the Administrative Agent, the Collateral Agent, the Foreign ABL Lenders, the Foreign Swing Line Lender, the Foreign L/C Issuer and the Cash Management Banks and Hedge Banks holding Foreign Secured Obligations.

"Foreign Sublimit Reallocation" has the meaning specified in Section 2.20(a).

"Foreign Sublimit Reallocation Date" has the meaning specified in Section 2.20(a).

"Foreign Swing Line Commitment" means, with respect to the Foreign Swing Line Lender, the amount set forth opposite such Lender's name on Schedule 2.01(c) hereto under the caption "Foreign Swing Line Commitment" or, if a Swing Line Lender has entered into an Assignment and Assumption, set forth for such Swing Line Lender in the Register maintained by the Administrative Agent pursuant to Section 11.07(d) as the Swing Line Lender's "Foreign Swing Line Commitment" as such amount may be reduced at or prior to such time pursuant to Section 2.06. The total amount of the Foreign Swing Line Commitment shall not exceed the Foreign Swing Line Sublimit at any time.

"Foreign Swing Line Exposure" means, with respect to any Foreign ABL Lender at any time, its Pro Rata Share of the aggregate principal amount of all Foreign Swing Line Loans outstanding at such time.

"Foreign Swing Line Lender" means Bank of America, in its capacity as a provider of Foreign Swing Line Loans, or any successor swing line lender hereunder.

"Foreign Swing Line Loan" has the meaning specified in Section 2.04(a)(ii).

"Foreign Swing Line Sublimit" means an amount equal to the lesser of (x) $2,500,000 and (y) the aggregate available amount of the Foreign ABL Commitments. The Foreign Swing Line Sublimit is part of, and not in addition to, the Foreign ABL Commitments.

AmericasActive:18122631.218122631.8

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any of their respective Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any material transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"Foreign Subsidiary" means any direct or indirect Subsidiary of Parent other than a U.S. Domestic Subsidiary, a UK Domestic Subsidiary or a Belgian Domestic Subsidiary.

"Fourth Amendment" means that certain Fourth Amendment to ABL Credit Agreement, dated as of the Fourth Amendment Effective Date by and among the Borrowers, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Fourth Amendment Effective Date" means April 18, 2019.

"Fram Acquisition" means the Lead Borrower's acquisition of all the outstanding shares of capital stock of Autolife Operations LLC, a Delaware limited liability company, Fram Group Operations LLC, a Delaware limited liability company, FRAM Group IP LLC, a Delaware limited liability company and Autoparts Holdings (Luxembourg) S.à r.l, a company organized under the laws of Luxembourg.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Fee" has the meaning specified in Section 2.03(i).

"Fund" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, however, that if the Lead Borrower notifies the Administrative Agent that the Lead Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP, the methodologies thereunder or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Lead Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision

38

amended in accordance herewith and it is agreed that such amendment to effectuate such changes shall not require the payment of any amendment or similar fee to the Administrative Agent or the Lenders. Without limiting the generality of the foregoing, the Lead Borrower shall neither be deemed to be in compliance with any covenant hereunder nor out of compliance with any covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

"Governmental Authority" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, any central bank or supra-national authority and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"Granting Lender" has the meaning specified in Section 11.07(g).

"Guarantee Obligations" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means (a) with respect to the U.S. Obligations, Parent and the Subsidiary Guarantors that are U.S. Domestic Subsidiaries and, solely with respect to obligations under Secured Hedge Agreements (other than any Excluded Swap Obligation) and Cash Management Agreements of any U.S. Loan Party, the U.S. Borrowers and (b) with respect to Foreign Obligations, the Foreign Loan Guarantors and, solely with respect to obligations under Secured Hedge Agreements (other than any Excluded Swap Obligation) and Cash Management Agreements of any Foreign Loan Party, the Foreign Borrowers.

"Guaranty" means the U.S. Guarantee, UK Guarantee and/or the Belgian Guarantee, as the context requires, as supplemented by each applicable U.S. Guaranty Supplement, UK Guarantee Supplement or Belgian Guarantee Supplement delivered pursuant to Section 6.11.

AmericasActive:18122631.218122631.8

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise defined under or pursuant to any Environmental Law as "hazardous", "toxic", a "pollutant", a "contaminant", a "deleterious substance", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, urea formaldehyde insulation and chlorofluorocarbons and all other regulated ozone-depleting substances.

"Hedge Bank" means any Person that is a Lender, an Agent, a Lead Arranger or an Affiliate of the foregoing at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto.

"HMRC DT Treaty Passport scheme" means the Board of HM Revenue and Customs Double Taxation Treaty Passport scheme.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Immaterial Subsidiary" means any direct or indirect Restricted Subsidiary (other than a Borrower) designated as such in writing by the Lead Borrower to the Administrative Agent from time to time; provided that (i) no Immaterial Subsidiary shall have revenues for any fiscal quarter or total assets as of the last day of any fiscal quarter for which financial statements have been furnished in an amount that is equal to or greater than 2.5% of the consolidated total revenues or Consolidated Total Assets, as the case may be, for, or as of the last day of, such fiscal quarter, as the case may be, and (ii) Immaterial Subsidiaries, taken together, shall not have total revenues or total assets as of the last day of any fiscal quarter in an amount that is equal to or greater than 5.0% of the consolidated revenues or Consolidated Total Assets, as applicable, for, or as of the last day of, such fiscal quarter, as the case may be.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, corporation, limited liability company, partnership or other bona fide estate-planning vehicle the only stockholders, members, partners or beneficiaries of which are any of the foregoing individuals or a charity, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increased Amount Date" has the meaning specified in Section 2.16(a).

"Incremental ABL Cap" means $~~100,000,000~~150,000,000.

"Incremental ABL Commitment Increase" has the meaning specified in Section 2.16(a).

"Indebtedness" of any Person means, as to any Person at a particular time, without duplication, all of the following:

(a)	all obligations of such Person for borrowed money;

(b)	all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, but excluding all obligations of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(c)	all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person;

AmericasActive:~~18122631.2~~18122631.8

(d) all obligations, other than intercompany items, of such person to pay the deferred purchase price of property (other than trade accounts payable and accrued expenses arising in the ordinary course of business);

(e) the Attributable Indebtedness of such Person in respect of Capital Lease Obligations;

(f) without duplication, (i) all obligations, contingent or otherwise, of such Person to reimburse any bank or other Person in respect of amounts paid or payable under a letter of credit, bankers' acceptance or similar instrument, and (ii) all non-contingent obligations (and, for purposes of Indebtedness permitted under Section 7.03, all contingent obligations) of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

(g) all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on any property or asset of such Person, whether or not such obligation is assumed by such Person, provided that the aggregate amount of such obligations does not exceed the lesser of (i) the aggregate unpaid amount of the relevant obligation and (ii) the fair market value of the assets by which the obligations are secured;

(h) all guarantees by such Person of other obligations of third parties treated as Indebtedness pursuant to clauses (a)-(g) above or (i)-(l) below;

(i) all Disqualified Equity Interests of such Person;

(j) all net obligations arising under or in connection with Swap Contracts to which such Person is party;

(k) all purchase money obligations of such Person; and

(l) the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person shall not be liable therefor and only to the extent the relevant Indebtedness is of the type that would be included in the calculation of Consolidated Total Debt;

provided that (A) to the extent not constituting Indebtedness for borrowed money, Indebtedness shall not include (i) deferred compensation arrangements, (ii) earn-out obligations and purchase price adjustments unless and until the same are required by GAAP to be reflected on the balance sheet of such Person or (iii) non-compete or consulting obligations incurred in connection with permitted Acquisitions or Permitted Dispositions and (B) notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness hereunder but for the application of clause (B) of this proviso shall not be deemed an incurrence of Indebtedness hereunder.

"Indemnified Liabilities" has the meaning specified in Section 11.05.

AmericasActive:18122631.218122631.8

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.05.

"Information" has the meaning specified in Section 11.08.

"Intellectual Property" has the meaning specified in Section 5.16.

"Intellectual Property Security Agreement" means, collectively, any Intellectual Property Security Agreement executed by one or more U.S. Loan Parties substantially in the form of Exhibit H, as any such agreement may be supplemented by any Intellectual Property Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Intellectual Property Security Agreement Supplement" means a supplement to any Intellectual Property Security Agreement.

"Interest Payment Date" means, (a) as to any Interest Period Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the ABL Facility under which such Loan was made; provided that if any Interest Period for an Interest Period Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan, the first calendar day of each April, July, October and January and the Maturity Date of the ABL Facility under which such Loan was made; and (c) as to any SONIA Rate Loan or any Foreign ABL Facility Daily Rate Loan, the first calendar day of each month and the Maturity Date of the ABL Facility under which such Loan was made.

"Interest Period" means, as to each Interest Period Rate Loan, the period commencing on the date such Interest Period Rate Loan is disbursed or converted to or continued as an Interest Period Rate Loan, as applicable, and ending on the date one (1), three (3) or six (6) months and such other shorter interest period as may be permitted by the Lenders and the Administrative Agent, in each case as set forth by the Lead Borrower in its Committed Loan Notice; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date of the ABL Facility under which such Loan was made.

"Interest Period Rate Loan" means, collectively or individually as the context may require, a Term SOFR Loan or a Eurocurrency Rate Loan.

"In-Transit Documentation Period" means the period during which an In-Transit Documentation Trigger Event has occurred and is continuing in accordance with the definition thereof.

42

"In-Transit Documentation Trigger Event" means any of (a) the occurrence of a Specified ABL Default or (b) the failure of the Borrowers to maintain Excess Availability of at least the greater of (i) $30,000,000 and (ii) 20% of the Line Cap.  An In-Transit Documentation Trigger Event shall continue until (x) a Specified ABL Default is no longer continuing or has been cured or waived, or (y) in the case of clause (b), the Excess Availability has been at least the greater of (i) $30,000,000 or (ii) 20% of the Line Cap, for a period of twenty (20) consecutive Business Days.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or Indebtedness or the assets comprising a division or business unit or all or substantially all of the business of such Person (including any partnership or joint venture), or any capital contribution to such Person.

"Joinder Agreement" has the meaning specified in Section 2.16(b)(iv).

"Joining Belgian Borrower" has the meaning assigned to such term in Section 2.17.

"Joining Borrower" means, individually or collectively, as the context may require, a Joining U.S. Borrower, a Joining UK Borrower and/or a Joining Belgian Borrower.

"Joining UK Borrower" has the meaning assigned to such term in Section 2.17.

"Joining U.S. Borrower" has the meaning assigned to such term in Section 2.17

"Judgment Currency" has the meaning assigned to such term in Section 11.26.

"Latest Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any ABL Loan.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local laws, statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"L/C Advance" means a U.S. L/C Advance and/or a Foreign L/C Advance, as the context may require.

"L/C Borrowing" means a U.S. L/C Borrowing and/or a Foreign L/C Borrowing, as the context may require.

"L/C Credit Extension" means a U.S. L/C Credit Extension and/or a Foreign L/C Credit Extension, as the context may require.

"L/C Exposure" means U.S. L/C Exposure and/or Foreign L/C Exposure, as the context may require.

"L/C Issuer" means the U.S. L/C Issuer and/or the Foreign L/C Issuer, as the context may require.

"L/C Obligation" means a U.S. L/C Obligation and/or a Foreign L/C Obligation, as the context may require.

43

"LCA Election" has the meaning specified in Section 1.10.

"LCA Test Date" has the meaning specified in Section 1.10.

"Lead Arranger" means individually and "Lead Arrangers" means collectively, as of the Sixth Amendment Effective Date, Bank of America and Wells Fargo Bank, National Association, each, in its capacity as Lead Arranger and Bookrunner.

"Lender" means each U.S. Lender and/or each Foreign ABL Lender, as the context requires.

"Letter of Credit" means a U.S. Letter of Credit and/or a Foreign Letter of Credit, as the context may require.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"Letter of Credit Commitment" means the U.S. Letter of Credit Commitment and/or the Foreign Letter of Credit Commitment, as the context may require.

"Letter of Credit Facility Expiration Date" means the day that is five (5) Business Days prior to the scheduled Maturity Date then in effect for the ABL Facility.

"Letter of Credit Facility" means the U.S. Letter of Credit Facility and/or the Foreign Letter of Credit Facility, as the context may require.

"Letter of Credit Request" means a request for the issuance of a Letter of Credit pursuant to Section 2.03(b), which shall be substantially in the form of Exhibit A-2.

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest or interest in the nature of security whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Line Cap" means, at any time, the lesser of (a) the maximum aggregate principal amount of ABL Commitments at such time and (b) the Aggregate Borrowing Base at such time.

"Limited Condition Acquisition" means an Acquisition or Investment that the Lead Borrower or one or more of the other Restricted Subsidiaries is contractually committed to consummate and whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"Loan" means an extension of credit by a Lender to the Borrowers in the form of an ABL Loan, Swing Line Loan or Permitted Overadvance.

"Loan Account" has the meaning assigned to such term in Section 2.02(b).

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) Joinder Agreements, (v) Extension Amendments, (vi) Borrowing Base Certificates, (vii) the ABL Intercreditor Agreement, (viii) the Guaranty and (x) all other promissory notes, certificates, instruments and documents delivered from time to time by or on behalf of the Borrowers or any of the other Restricted Subsidiaries in connection herewith or therewith which have been designated as "Loan Documents".

44

"Loan Parties" means the U.S. Loan Parties and/or the Foreign Loan Parties, as the context requires.

"LQX" means LIQUIDX, Inc.

"Management Agreement" means the Management Services Agreement between the Lead Borrower and Larchmont, LLC, dated as of February 2, 2018 (as amended or otherwise modified from time to time in a manner not materially adverse to the Lenders).

"Master Agreement" has the meaning specified in the definition of "Swap Contract".

"Material Adverse Effect" means any event or circumstance which has a material adverse effect on (i) the business, properties, assets, financial condition or results of operations, in each case, of the Lead Borrower and the other Restricted Subsidiaries, taken as a whole, (ii) the rights and remedies of any Agent or the Lenders under any Loan Document or (iii) the ability of the Borrowers and the Guarantors (taken as a whole) to perform any of their obligations under the Loan Documents.

"Material Indebtedness" means any Indebtedness incurred or assumed by a Loan Party with an aggregate outstanding principal amount or committed amount in excess of $15,000,000.

"Material Owned Property" means any real property located in the United States, England and Wales or Belgium and owned by any Loan Party with a fair market value in excess of $1,000,0005,000,000 at the time of acquisition (such value to be reasonably estimated by the Borrowers in good faith).

"Maturity Date" means, with respect to the ABL Loans and Letters of Credit, February 2March 28, 20242028, or, with respect to any Extended ABL Loans, subject to Section 2.18, the final maturity date set forth in the applicable Extension Amendment; provided that the Maturity Date shall automatically become the date (the "Springing Maturity Date") that is ninety-one (91) days prior to the then-scheduled maturity date of the First Lien Term Loans or the Second Lien Term Loans (which, as of the Tenth Amendment Effective Date, is March 30, 2027) (as applicable, the "Term Loan Maturity Date") unless (i) on or prior to the Springing Maturity Date, the Term Loan Maturity Date is extended to a date not earlier than the date that is ninety-one (91) days after the Maturity Date, (ii) on or prior to the Springing Maturity Date, the First Lien Term Loans or the Second Lien Term Loans, as applicable, are refinanced with Indebtedness with a scheduled maturity date not earlier than the date that is ninety-one (91) days after the Maturity Date or (iii) on the Springing Maturity Date, the aggregate outstanding principal balance of the First Lien Term Loans and the Second Lien Term Loans is less than $100,000,000.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Mortgage" means collectively, the deeds of trust, trust deeds, deeds to secure debt, mortgages and other Collateral Documents (which, in the case of a UK Loan Party in respect of real property located in England and Wales means the UK Security Agreement and/or any additional mortgage document contemplated therein and in the case of a Belgian Loan Party in respect of real property located in Belgium means the Belgian mortgage deed and/or mortgage mandate) creating and evidencing a Lien on a Mortgaged Property made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent, executed and delivered pursuant to Section 6.11.

"Mortgage Policies" has the meaning specified in paragraph (c) of the definition of "Mortgage Requirement".

45

"Mortgage Requirement" means the Collateral Agent shall have received the Mortgages with respect to each Material Owned Property required to be delivered pursuant to Section 6.11 within the time period prescribed therein (the "Mortgaged Properties"), together with:

(a)     in the case of any real property located in the United States, a completed Life of Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Lead Borrower and each Loan Party relating thereto) and if any improvements on any Mortgaged Property are located in an area designated as a "special flood hazard area," evidence of such flood insurance as may be required under Section 6.07;

(b)     in the case of any real property located in the United States, evidence that counterparts of the Mortgages with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices as the Collateral Agent reasonably deems necessary to create a valid first and subsisting Lien on the property described therein in favor of the Collateral Agent for the benefit of the Secured Parties (subject only to Liens of the nature referred to in Section 5.07(b)) along with evidence reasonably satisfactory to the Administrative Agent that all filing and recording taxes and fees payable with respect to the Mortgages have been paid or received by the issuer of the Mortgage Policies;

(c)     (i) in the case of any real property located in the United States, fully paid American Land Title Association Lender's Extended Coverage (or other reasonably satisfactory coverage if such coverage is not available in the applicable jurisdiction) title insurance policies (the "Mortgage Policies") in form and substance reasonably satisfactory to the Administrative Agent, together with such endorsements (other than endorsements relating to creditors' rights) that are reasonably required by the Administrative Agent and which lenders typically receive in the jurisdiction where the Mortgaged Property is located, in an amount reasonably acceptable to the Administrative Agent (but in any event not to exceed the fair market value of the property as reasonably determined by the Lead Borrower in good faith), issued by title insurers reasonably acceptable to the Administrative Agent and insuring the Mortgages to be valid first (or where applicable in accordance with this Agreement, a second) and subsisting Liens on the real property described therein, in a customary form in the jurisdiction where the Mortgaged Property is located free and clear of all Liens (provided that if a survey is not available, such Mortgage Policies may include the standard survey exception and the Administrative Agent shall not require any endorsement that will require delivery of a survey), except Permitted Liens;

(d)     in the case of any real property located in the United States, customary opinions of local counsel for the relevant Loan Party (A) in the jurisdiction in which the relevant Mortgaged Property is located, including, without limitation, with respect to the enforceability of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent and (B) in the jurisdiction in which the relevant Loan Party is organized or formed, with respect to the valid existence, corporate power and authority of such Loan Party in the granting of the Mortgages, in form and substance reasonably satisfactory to the Administrative Agent;

(e)     such other actions that, in each case, the Administrative Agent may reasonably deem necessary in order to create valid and subsisting Liens on the property described in the Mortgages shall have been delivered or taken, in each case to the extent the same can be obtained or taken with the use of commercially reasonable efforts; it being understood that if the Administrative Agent so agrees, the relevant Loan Party may provide such existing surveys, abstracts, appraisals, legal opinions and/or other documents as may suffice to satisfy the requirements described in clauses (a) through (d) above;

(f)     ~~reasonably~~ satisfactory evidence of any additional insurance required to be maintained pursuant to Section 6.07;

AmericasActive:~~18122631.2~~18122631.8

(g)      in the case of any real property located in England and Wales, all relevant deliverables, and evidence of satisfaction of all relevant requirements, described in the UK Security Agreement and any additional mortgage document contemplated therein, in each case within the time periods contemplated therein unless otherwise agreed by the Administrative Agent in its sole discretion; and

(h)      in the case of any real property located in Belgium, all relevant deliverables, and evidence of satisfaction of all relevant requirements, described in the Belgian mortgage deed and/or mortgage mandate, in each case within the time periods contemplated therein unless otherwise agreed by the Administrative Agent in its sole discretion.

"Mortgaged Properties" has the meaning specified in the definition of "Mortgage Requirement".

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates is making or has an obligation to make contributions or with respect to which any Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Net Orderly Liquidation Value" means, with respect to Inventory or intangibles of any Person, the orderly liquidation value thereof as determined by an appraiser reasonably acceptable to the Administrative Agent in its Permitted Discretion, net of all costs of liquidation thereof.

"Non-Consenting Lender" has the meaning specified in Section 3.07(c).

"Non-Loan Party Subsidiary" means any Subsidiary of Parent that is not a Loan Party.

"Non-extension Notice Date" has the meaning specified in Section 2.03(b)(iii).

"Note" means a promissory note of the applicable Borrowers payable to a Lender of the applicable Class or its assigns, in substantially the form of Exhibit C hereto, evidencing the aggregate Indebtedness of such Borrowers to such Lender resulting from the Loans made by such Lender.

"Obligations" means the U.S. Obligations and/or the Foreign Obligations, as the context requires.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury, or any successor thereto.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any company incorporated in England and Wales, the certificate of incorporation, any certificate of incorporation on change of name, the memorandum and articles of association; (d) with respect to any company incorporated in Belgium, the articles of incorporation and the articles of association (statuten/statuts) and (e) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Agent, L/C Issuer or Lender, as the case may be, Taxes imposed as a result of a present or former connection between such Lender, L/C Issuer or Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender, L/C

47

Issuer or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means (a) with respect to the ABL Loans and Swing Line Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of ABL Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit or L/C Credit Extensions as a Borrowing) and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the outstanding amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit (including any refinancing of outstanding Unreimbursed Amounts under related Letters of Credit or related L/C Credit Extensions as a Borrowing) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"Overadvance" means a U.S. Overadvance, a UK Overadvance and/or a Belgian Overadvance, as the context requires.

"Parent" has the meaning specified in the introductory paragraph of this Agreement.

"Parent Company" means Parent and any other Person of which a Borrower is an indirect Wholly-owned Subsidiary.

"Participant" has the meaning specified in Section 11.07(e).

"Participant Register" has the meaning specified in Section 11.07(e).

"Participating Member State" means any member state of the European Union, , as formed by the Treaty on European Union on November 1, 1993 (the Maastricht Treaty), that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Payment Account" has the meaning assigned to such term in the UK Security Agreement.

"Payment Conditions" shall mean, with respect to any transaction, the following (it being understood that if the proceeds of the relevant payment will be applied to finance a Limited Condition Acquisition for which the Borrowers have made an LCA Election, the conditions set forth in clauses (b) and (c) shall be calculated as of the LCA Test Date for such Limited Condition Acquisition): (a) no Specified ABL Default exists or would result from the consummation of the relevant transactions, (b) as of the last day of the most recently ended Test Period for which financial statements are required to be delivered pursuant to Section 6.01 (or are actually delivered, if earlier) prior to such date of determination, the Fixed Charge Coverage Ratio shall be not less than 1.00:1.00 on a Pro Forma Basis

48

and (c) ~~Excess~~Specified Availability ~~(excluding the U.S. FILO Availability Amount)~~ shall be equal to or greater than the greater of (x) ~~15.0~~12.5% of the Line Cap and (y) $17,250,000, in each case, both (i) on a pro forma basis immediately after giving effect to such transaction and (ii) for the 30 consecutive calendar days immediately preceding such transaction; provided however that the condition set forth in clause (b) shall not be applicable if the Borrowers have ~~Excess~~Specified Availability ~~(excluding the U.S. FILO Availability Amount)~~ equal to or greater than the greater of (x) ~~20.0~~17.5% of the Line Cap and (y) $23,000,000, in each case, both (i) on a pro forma basis immediately after giving effect to such transaction and (ii) for the 30 consecutive calendar days immediately preceding such transaction.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrowers or any of the other Restricted Subsidiaries or ERISA Affiliates or to which the Borrowers or any of the other Restricted Subsidiaries or ERISA Affiliates contributes or has an obligation to contribute or with respect to which the Borrowers or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Perfection Certificate" means a certificate substantially in the form of Exhibit M.

"Permitted Acquisition" means the 2019 Specified Acquisitions, the 2020 Specified Acquisitions and any other Acquisition by the Borrowers or any of the other Restricted Subsidiaries; provided that:

(a)     both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), no Event of Default exists or would result from the consummation of such Acquisition (provided that, solely in connection with a Permitted Acquisition that is a Limited Condition Acquisition for which the Borrowers have made an LCA Election, (i) no Event of Default shall exist or would result from the consummation of such Acquisition as of the LCA Test Date for such Limited Condition Acquisition, both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition);

(b)     upon the consummation of such Acquisition, the Lead Borrower and the other Restricted Subsidiaries are in compliance with Section 7.07;

(c)     the total consideration paid by Loan Parties for (i) the Equity Interests of any Person that does not become a Loan Party and (ii) in the case of an asset Acquisition, assets that are not acquired by any Loan Party, shall not exceed, when taken together with the total consideration for all such Persons and assets so acquired after the Closing Date and investments pursuant to Section 7.02(c)(iv), the greater of $~~20,000,000~~150,000,000 and ~~20.0~~25.0% of Consolidated Adjusted EBITDA of the Lead Borrower and its Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(d)     the total consideration paid by U.S. Loan Parties for (i) the Equity Interests of any Person that becomes a Foreign Loan Party and (ii) in the case of an asset Acquisition, assets that are acquired by any Foreign Loan Party, shall not exceed, when taken together with the total consideration

49

for all such Persons and assets so acquired after the Closing Date and investments pursuant to Section 7.02(c)(i), $5,000,000(A) in an unlimited amount so long as the Payment Conditions shall have been satisfied on the date the definitive documentation in respect of such Permitted Acquisition are executed and (B) otherwise, $10,000,000; and

(e)    if the total consideration paid by Loan Parties for such Acquisition is greater than $10,000,000, and unless such Acquisition is made solely with the proceeds of Excluded Contributions, the Payment Conditions shall have been satisfied on the date the definitive documentation in respect of such Permitted Acquisition are executed.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment in accordance with customary and market business practices for comparable asset-based lending transactions.

"Permitted Disposition" means any Disposition permitted by Section 7.05.

"Permitted Foreign Currency" means Euros and Sterling.

"Permitted Holder" means each of Patrick James, and any family members of Patrick James (including his spouse, lineal descendants, spouses of such descendants, the lineal descendants of any such spouse and the spouses of any such spouse's lineal descendants), and trusts for estate planning purposes where any of the foregoing persons or a spouse of any such person is a beneficiary or trustee of any such trust or trusts, including a voting trust or any other business entity, regardless of form, organized solely for the benefit of one or more of the foregoing persons.  For purposes of this paragraph, the relationship of any person that is derived by or through legal adoption prior to age 18 shall be considered a natural one. A minor for whom an Equity Interest is held pursuant to a Uniform Transfers to Minors Act or similar law shall be considered a holder of an Equity Interest.

"Permitted Inventory Financing" means the financing, including pursuant to a sale, sale-leaseback, factoring, early-pay or similar arrangement, of inventory that does not constitute Eligible Inventory.

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Permitted Non-Recourse Factoring Transactions" means non-recourse factoring (or factoring where recourse is limited to customary warranties and indemnities) and early-pay arrangements listed on Schedule 7.03(e) (in each case, as in effect on the Seventh Amendment Effective Date or as the same may be amended, extended, supplemented or otherwise modified in accordance with this definition) or between a Borrower or any Subsidiary thereof (each such Person, a "Selling Trico Party") and any of (a) a third party commercial bank or an Affiliate thereof, or (b) any other Person which customarily acts as a factor under factoring or early pay arrangements in the ordinary course of its business (each such counterparty, a "Factor"), pursuant to which such Selling Trico Party sells Accounts, together with Related Assets, to such Factor in the ordinary course of business of such Borrower and its Subsidiaries; provided that (i) either (A) if the transaction does not involve an implied interest or similar financing component, the maximum discount for Accounts sold thereunder shall not exceed 5.0% of the face value thereof or (B) the implied interest or similar financing component of such Permitted Non-Recourse Factoring Transaction shall not exceed the Term SOFR Rate (or the equivalent term used in the documentation governing such Permitted Non-Recourse Factoring Transaction for the applicable period, in each case without giving effect to any floor) plus 5.00%, (ii) for Permitted Non-Recourse Factoring Transactions existing as of the Closing Date, the Lead Borrower shall have delivered the documentation governing such transaction to the   Administrative Agent prior to the Closing Date, and (B) for any

50

Permitted Non-Recourse Factoring Transaction consummated after the Closing Date, the Lead Borrower shall have delivered the documentation governing such transaction to the Administrative Agent at least two (2) Business Days prior to the consummation thereof, (iii) the risk of credit loss with respect to the Accounts subject thereof is transferred to the Factor thereunder, (iv) to the extent collection accounts are established in connection with such Permitted Non-Recourse Factoring Transaction for the purposes of the collection of Accounts subject to such Permitted Non-Recourse Factoring Transaction, the Loan Parties shall not permit the proceeds of any UK Collateral, Belgian Collateral or ABL Priority Collateral (which, for the avoidance of doubt does not include proceeds of the Accounts subject to such Permitted Non-Recourse Factoring Transaction) to be deposited or maintained in such collection accounts, (v) other than as set forth in clause (vi) below in the case of each Selling Trico Party to such Permitted Non-Recourse Factoring Transaction, neither Parent nor any of its Subsidiaries shall provide any credit support of any kind other than customary performance undertakings and (vi) other than customary performance undertakings and indemnities, the obligations thereunder shall not involve any recourse to Parent or any of its Subsidiaries other than to each Selling Trico Party party to such Permitted Non-Recourse Factoring Transaction, and such recourse to such Selling Trico Party shall be limited solely to a breach of a customary asset related representation thereunder and disputes.

"Permitted Overadvance" means a U.S. Permitted Overadvance, a UK Permitted Overadvance and/or a Belgian Permitted Overadvance, as the context requires.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained or contributed to by any Loan Party or any of the other Restricted Subsidiaries or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning specified in Section 11.02(e).

"Pledge Agreement" means the Pledge Agreement executed by the U.S. Loan Parties substantially in the form of Exhibit G-1, as supplemented by each applicable Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit A-3.

"Prime Rate" means the rate of interest announced by Bank of America from time to time as its prime rate. Such rate is set by Bank of America on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate publicly announced by Bank of America shall take effect at the opening of business on the day specified in the announcement.

"Priority Payable Reserve" means reserves for amounts secured by any Liens, choate or inchoate, which rank or are capable of ranking in priority to the Collateral Agent's or any other Secured Parties' Liens on the UK Collateral, Belgian Collateral or ABL Priority Collateral and/or for amounts which may represent costs relating to the enforcement of the Collateral Agent's Liens including, without limitation, in the Permitted Discretion of the Administrative Agent, (a) any such amounts due and not paid for wages, vacation pay, severance pay, amounts due and not paid under any legislation relating to workers' compensation or to employment insurance, (b) [reserved], (c) amounts currently or past due and not paid

51

for realty, municipal or similar taxes (to the extent impacting personal or movable property) and all unfunded wind-up or solvency deficiency amounts, (d) [reserved], or (e) any similar statutory or other claims that would have or would reasonably be expected to have priority over the Collateral Agent's or any other Secured Parties' Liens on the UK Collateral, Belgian Collateral or ABL Priority Collateral.

"Pro Forma Basis" means, with respect to any determination of the Fixed Charge Coverage Ratio, the Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that each Specified Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made and that:

(a)      (i)      in the case of any Disposition of all or substantially all of the Equity Interests of any Subsidiary of Parent (other than the Borrowers) or any division and/or product line of the Borrowers and/or any Restricted Subsidiary, income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, shall be excluded as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made, and

(ii)      in the case of any Permitted Acquisition and/or Investment described in the definition of the term "Specified Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction shall be included as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(b)      any retirement or repayment of Indebtedness (other than normal fluctuations in revolving Indebtedness incurred for working capital purposes) shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(c)      any Indebtedness incurred or assumed by the Borrowers or any of the other Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrowers to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a Eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Lead Borrower, and

(d)      the acquisition of any assets included in calculating Consolidated Total Assets, whether pursuant to any Specified Transaction or any Person becoming a Restricted Subsidiary or merging, amalgamating or consolidating with or into any Borrower or any of the other Restricted Subsidiaries, or the Disposition of any assets included in calculating Consolidated Total Assets described in the definition of "Specified Transaction" shall be deemed to have occurred as of the last day of such Test Period with respect to any test or covenant for which such calculation is being made.

52

In the case of any calculation of the Fixed Charge Coverage Ratio or Consolidated Total Assets for any event described above that occurs prior to the date on which financial statements have been (or are required to be) delivered for the fiscal quarter ending March 31, 2018, any such calculation required to be made on a "Pro Forma Basis" shall use (I) prior to the date on which the financial statements for the fiscal quarter ending March 31, 2018 have been (or are required to have been) delivered pursuant to Section 6.01(b), the financial statements of the Lead Borrower and the other Restricted Subsidiaries delivered pursuant to Section 4.01(g). and (II) on and after such date referred to in the foregoing clause (I), the financial statements of the Lead Borrower and the other Restricted Subsidiaries delivered pursuant to Section 6.01.  Notwithstanding the foregoing, the Lead Borrower shall not be required to (but may) make any determination on a Pro Forma Basis if the Specified Transaction does not involve consideration in excess of $500,0002,000,000.

"Pro Rata Share" means, with respect to each Lender at any time, (a)  with respect to U.S. ABL Commitments, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the U.S. ABL Commitments of such Lender under the U.S. ABL Facility at such time and the denominator of which is the amount of the aggregate U.S. ABL Commitments under the U.S. ABL Facility at such time and (b) with respect to Foreign ABL Commitments, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Foreign ABL Commitments of such Lender under the Foreign ABL Facility at such time and the denominator of which is the amount of the aggregate Foreign ABL Commitments under the Foreign ABL Facility at such time; provided that, in each case, if any ABL Commitment for any ABL Facility has been terminated, then the Pro Rata Share of any Lender as it pertains to such ABL Facility shall be determined based on the outstanding principal amount of such Lender's ABL Loans under such ABL Facility divided by the aggregate principal amount of all Outstanding Amounts under such ABL Facility.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 11.02(h).

"QFC Credit Support" has the meaning specified in Section 11.28.

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Qualifying IPO" means the issuance by Parent or any other Parent Company or any successor thereof of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

"Quarterly Average Excess Availability" shall mean, with respect to any date of determination, the average of the aggregate amount of the Excess Availability for the immediately preceding three (3) month period as calculated by the Administrative Agent.

"Ratio Debt Basket" means the "Ratio Debt Basket" as defined in the First Lien Credit Agreement (as in effect on the Fourth Amendment Effective Date).

"Reallocation" has the meaning specified in Section 2.19(a).

"Reallocation Date" has the meaning specified in Section 2.19(a).

53

"Refinancing Indebtedness" has the meaning specified in Section 7.03(y).

"Refunding Equity Interests" has the meaning specified in Section 7.06(k).

"Register" has the meaning specified in Section 11.07(d).

"Related Assets" means, (i) with respect to any Accounts sold pursuant to a Permitted Non-Recourse Factoring Transaction, all collateral securing such Accounts, all contracts and contract rights, guarantees or other obligations in respect of such Accounts, all records with respect to such Accounts and any other assets customarily transferred together with Accounts in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed, assigned or otherwise transferred by a Borrower or any other Restricted Subsidiary thereof party to such Permitted Non-Recourse Factoring Transaction to the factor thereunder and (ii) with respect to any inventory sold pursuant to a Permitted Inventory Financing, all collateral securing such inventory, all contracts and contract rights, guarantees or other obligations in respect of such inventory, all records with respect to such inventory and any other assets customarily transferred together with inventory in connection with a comparable inventory financing arrangement and which are sold, conveyed, assigned or otherwise transferred by a Borrower or any other Restricted Subsidiary thereof party to such Permitted Inventory Financing to the counterparty thereto.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leaching or migration of any Hazardous Material in or into the environment, including indoor air.

"Relevant Governmental Body" means (a) with respect to Loans denominated in Dollars, the Federal Reserve Board and/or FRBNY, or a committee officially endorsed or convened by the Federal Reserve Board and/or FRBNY, (b) with respect to Loans denominated in Sterling, the Bank of England, or a committee officially endorsed or convened by the Bank of England or, in each case, any successor thereto, and (c) with respect to Loans denominated in Euros, the European Central Bank, or a committee officially endorsed or convened by the European Central Bank or, in each case, any successor thereto or, in each case, any successor thereto.

"Relevant Rate" means with respect to any Credit Extension denominated in (a) Sterling, SONIA and (b) Euros, EURIBOR, as applicable.

"Relevant Rate Adjustment" has the meaning assigned to such term in Section 3.03(c)(ii).

"Relevant Rate Successor Rate" has the meaning assigned to such term in Section 3.03(c)(ii).

"Relevant Rate Successor Rate Conforming Changes" means, with respect to any proposed Relevant Rate Successor Rate for any Loan denominated in a Permitted Foreign Currency, any conforming changes to the Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the reasonable discretion of the Administrative Agent, to reflect the adoption and implementation of such Relevant Rate Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines in its reasonable discretion that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such Relevant Rate Successor Rate exists, in such other manner of administration as the Administrative Agent reasonably determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

54

"Reportable Event" means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

"Representatives" mean, with respect to any Person, the employees, directors, members of management, officers, managers, consultants, partners or independent contractors of such Person.

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of ABL Loans, the delivery of a Committed Loan Notice or Swing Line Loan Notice, as applicable, or (b) with respect to a Letter of Credit, the delivery of a Letter of Credit Request.

"Required Additional Debt Terms" means, with respect to any Indebtedness:

(a)      no Default or Event of Default shall exist and be continuing or would result from the incurrence of such Indebtedness, provided that, solely in connection with Indebtedness incurred to finance a Limited Condition Acquisition for which the Lead Borrower has made an LCA Election, (i) no Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition,

(b)      such Indebtedness shall not (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) have a scheduled final maturity earlier than the Latest Maturity Date; provided that any such Indebtedness that is unsecured or is secured on a junior lien or pari passu basis to the First Lien Term Loans shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(c)      the Weighted Average Life to Maturity applicable to such Indebtedness shall (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions), be equal to or greater than the Weighted Average Life to Maturity of the First Lien Term Loans, provided that any Indebtedness that is unsecured or is secured on a junior lien or pari passu basis to the First Lien Term Loans shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date,

(d)      [reserved],

(e)      if such Indebtedness is secured, the obligations in respect thereof shall not be secured by a Lien on any asset other than Collateral,

(f)      such Indebtedness shall not be subject to any Guarantee by any Person other than a Guarantor,

(g)      [if such Indebtedness is (x) secured by a Lien on the Collateral or (y) unsecured and subordinated to the Obligations, then, in each case, such notes or loans shall be subject to an intercreditor arrangement (including, in the case of clause (x), lien subordination provisions with respect to the Collateral, it being understood and agreed that no such Indebtedness shall be secured by liens on the ABL Priority Collateral, the Belgian Collateral or the UK Collateral that are pari passu or senior to the liens securing the Obligations) reasonably satisfactory in form and substance to the Administrative Agent,]

55

(h)      [reserved]; and

(i)      except as otherwise required by this definition, all other terms of such Indebtedness will be as agreed between the Lead Borrower and the lenders providing such Indebtedness; provided, that the other terms of such Indebtedness (other than terms related to pricing, fees and maturity) that are not substantially identical to the corresponding terms in the then existing First Lien Facility shall not be materially more favorable (taken as a whole) to the lenders providing such Indebtedness than such terms in the then existing First Lien Facility (as reasonably determined by the Lead Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the ABL Facility or (iii) applicable only after the Latest Maturity Date).

"Required Lenders" means, as of any date of determination, Lenders having more than 50% of the Total Facility Exposure; provided that (a) any unused ABL Commitment (if any) and the portion of the Total Facility Exposure held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders, and (b) at any time there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), "Required Lenders" must include at least two Lenders (who are not Affiliates of one another).

"Reserves" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain (including, without limitation, reserves for accrued and unpaid interest on the Secured Obligations, the Priority Payable Reserve, Banking Services Reserves, UK Related Reserves, reserves in relation to extended or extendible retention of title, volatility reserves, reserves for rent at locations leased by any Loan Party, and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for obligations under Hedge Agreements, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges), with respect to the Collateral, its value or the amount that the Administrative Agent might receive from the sale or other disposition thereof or the ability of the Administrative Agent to realize thereon, defaults and other matters; provided, however, that the Administrative Agent may not implement Reserves with respect to matters which are already specifically reflected as ineligible accounts or inventory. Any imposition of any Reserve or any change in the methodology of calculating Reserves will only be effective three Business Days after notice thereof from the Administrative Agent to the Lead Borrower; provided that the Borrowers shall not be entitled to request, and the Administrative Agent and the Lenders shall not be obligated to make, any ABL Loans hereunder that would result in, after giving effect to the Reserve in question, (a) the ABL Exposure exceeding the Line Cap, (b) the U.S. ABL Exposure exceeding the U.S. Line Cap, (c) the UK ABL Exposure exceeding the UK Line Cap or (d) the Belgian ABL Exposure exceeding the Belgian Line Cap.  If the event or condition which gave rise to the imposition of any Reserve no longer exists, then the applicable Reserve shall be automatically terminated.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Response" shall mean any investigations, assessments, studies, cleanup, response, remedial, removal, or corrective actions related to Environmental Laws, Environmental Permits, Environmental Actions or Hazardous Materials.

56

"Responsible Officer" means the chief executive officer, president, chief financial officer, or treasurer, any assistant treasurer, executive vice president, senior vice president or, in the case of a Foreign Loan Party, director, or, in each case, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent acceptable to the Administrative Agent in its sole discretion or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party).  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Debt" has the meaning specified in Section 7.09(a).

"Restricted Debt Payment" has the meaning specified in Section 7.09(a).

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities (other than dividends consisting of Qualified Equity Interests issued by such Person) or other property) with respect to any capital stock or other Equity Interest of such Person, or any payment (whether in cash, securities (other than Qualified Equity Interests) or other property), including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof).

"Restricted Subsidiary" means any Subsidiary of Parent.

"Restricting Information" has the meaning assigned to such term in Section 11.02(i).

"S&P" means S&P Global Ratings Inc., and its successors.

"Sale Leaseback Transaction" means any arrangement with any Person providing for the leasing by either of the Borrowers or any of the other Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrowers or such Restricted Subsidiary to such Person in contemplation of such leasing.

"Sanctioned Country" means, at any time, a country or territory that is the subject or target of any Sanctions broadly restricting or prohibiting dealings with or in such country or territory (including, as of the date hereof, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means any Person: (i) listed in any Sanctions-related list of designated Persons maintained by any Sanctions Authority, (ii)  located, organized or resident in, or any governmental entity or governmental instrumentality of, a Sanctioned Country, (iii) owned or controlled by, or acting for the benefit or on behalf of, directly or indirectly, any Person described in clauses (i) or (ii) hereof or (iv) otherwise the subject or target of any Sanctions.

"Sanctions" means the economic, financial or other sanctions laws, regulations or embargoes administered and enforced from time to time by any Sanctions Authority.

"Sanctions Authority" means (a) the United Nations Security Council, (b) the European Union and each of its member states, (c) the United States of America (including, without limitation, OFAC and the U.S. Department of State), (d)  the United Kingdom (including, without limitation, Her Majesty's Treasury) or (e) any other relevant national or supra-national sanctions authority with jurisdiction over a Borrower.

57

"Screen Rate" means the Term SOFR Screen Rate or the EURIBOR Screen Rate.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Amendment Effective Date" means January 8, 2019.

"Second Lien Agent" means Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the lenders from time to time party to the Second Lien Credit Agreement.

"Second Lien Credit Agreement" means the Second Lien Term Loan Agreement, dated as of February 26, 2019 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time), among, *inter alios*, Parent, the Lead Borrower, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto.

"Second Lien Facility" means the credit facility governed by the Second Lien Credit Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for incremental, additional loans, or other long-term indebtedness permitted to be secured on a pari passu basis with the Second Lien Obligations, or loans or other long-term indebtedness that replace or refinance such facilities (but in the case of any replacement or refinancing facility subject to the satisfaction of the requirements of Refinancing Indebtedness with respect thereto), including any such replacement or refinancing facility or indenture that increases or decreases the amount borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such indentures or credit facilities that replace or refinance such credit facility (or any subsequent replacement thereof), including to increase or decrease the amount thereof, in each case to the extent permitted by this Agreement (but in the case of any replacement or refinancing facility subject to the satisfaction of the requirements of Refinancing Indebtedness with respect thereto).

"Second Lien Loan Documents" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"Second Lien Loans" means the loans extended to the Lead Borrower pursuant to the Second Lien Credit Agreement, (including without limitation the Second Lien Term Loans).

"Second Lien Obligations" means the "Obligations" as defined in the Second Lien Credit Agreement.

"Second Lien Term Loans" means the "Term Loans" as defined in the Second Lien Credit Agreement.

"Secured Hedge Agreement" means any Swap Contract permitted under Section 7.03(d) that is entered into by and between any Loan Party or any Subsidiary and any Hedge Bank and that is designated in writing by the Borrowers and such Hedge Bank to the Administrative Agent to be included as a Secured Hedge Agreement.

"Secured Obligations" means the U.S. Secured Obligations and/or the Foreign Secured Obligations, as the context requires.

AmericasActive:18122631.218122631.8

"Secured Parties" means the U.S. Secured Parties and/or the Foreign Secured Parties, as the context requires.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means the U.S. Security Agreement, the UK Security Agreement and/or the Belgian Security Agreement, as the context requires.

"Selling Trico Party" has the meaning assigned to such term in the definition of "Permitted Non-Recourse Factoring Transactions".

"Seventh Amendment Effective Date" means August 30, 2021.

"Sixth Amendment Effective Date" means November 12, 2020.

"SOFR" means the secured overnight financing rate as administered by FRBNY (or a successor administrator).

"SOFR Adjustment" means (a) with respect to Daily Simple SOFR, 0.150.10%; and (b) with respect to Term SOFR, 0.10% for a one month Interest Period, 0.15% for a three month Interest Period and 0.25% for a six month Interest Period.

"Sold Entity or Business" means for any period any Person or any property or assets constituting a line of business or a division of a Person or all or substantially all of the assets of a Person sold, transferred or otherwise disposed of, closed or classified as discontinued operations (in each case, other than as a result of such Person, property, business or asset being held for sale, transfer or other disposition) by the Borrowers or any of the other Restricted Subsidiaries.

"Solvency Certificate" means the Solvency Certificate executed by certain Loan Parties substantially in the form of Exhibit K.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the Fair Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the Liabilities of such Person and its Subsidiaries taken as a whole, (b) the Present Fair Salable Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Subsidiaries taken as a whole do not have Unreasonably Small Capital and (d) such Person and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature. For purposes of this definition: (i) "Fair Value" means the amount at which the assets (both tangible and intangible), in their entirety, of such Person and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act; (ii) "Present Fair Salable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of such Person and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated; (iii) "Liabilities" means the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of such Person and its Subsidiaries taken as a whole, as of any date, determined in accordance with GAAP consistently applied; (iv) "will be able to pay their Liabilities as they mature" shall mean such Person and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those

AmericasActive:18122631.218122631.8

liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by such Person and its Subsidiaries and (v) "do not have Unreasonably Small Capital" means such Person and its Subsidiaries taken as a whole is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern (it being understood that "unreasonably small capital" depends on the nature of the particular business or business conducted or to be conducted, based on the needs and anticipated needs for the capital of the business conducted or anticipated to be conducted by such Person and its Subsidiaries).

"SONIA" means, with respect to any applicable determination date, the Sterling Overnight Index Average Reference Rate published on such date on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time); provided however that if such determination date is not a Business Day, SONIA means such rate that applied on the first Business Day immediately prior thereto.

"SONIA Adjustment" means, with respect to SONIA, 0.0326% per annum.

"SONIA Daily Rate" means, for any date, the rate per annum equal to SONIA determined pursuant to the definition thereof plus the SONIA Adjustment; provided that if the SONIA Daily Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"SONIA Rate Loan" means any Loan denominated in Sterling bearing interest at a rate determined by reference to the SONIA Daily Rate.

"SPC" has the meaning specified in Section 11.07(g).

"Specified ABL Default" means (a) any Event of Default pursuant to Section 9.01(a), Section 9.01(f) or Section 9.01(g); (c) a material misrepresentation of any Borrowing Base Certificate that resulted in a material overstatement of the Borrowing Base calculated therein, (d) any Event of Default arising from a failure to deliver any required Borrowing Base Certificate (and such failure continues for (x) five (5) Business Days with respect to Borrowing Base Certificates required to be delivered on a monthly basis and (y) three (3) Business Days with respect to Borrowing Base Certificates required to be delivered on a more frequent basis in accordance with Section 6.02(a)), (e) any Event of Default arising from failure to comply with the Financial Covenant when in effect (subject to the right of Parent to make a Specified Equity Contribution) and (f) a failure to comply with Section 6.17, 6.25 or 6.26 (after giving effect to any extensions approved by Administrative Agent); provided, that, for the ninety (90) calendar day period following the Closing Date any default under Section 6.17, 6.25 or 6.26 shall be subject to a five (5) Business Day grace period.

"Specified Availability" means the sum of (i) Excess Availability and (ii) Suppressed Availability.

"Specified Customers" means original equipment manufacturers, automotive aftermarket customers, automotive dealerships and those Persons listed on Schedule 1.01(e).

"Specified Eligible European Account" means any Account which is owed to any Foreign Loan Party by an Account Debtor which (i) maintains its chief executive office in France, Italy, Portugal or Spain or (ii) is organized under the laws of France, Italy, Portugal or Spain.

"Specified Equity Contribution" means the cash proceeds of a sale of, or contribution to, equity (which equity shall be common equity, or Qualified Equity Interests or other equity on terms and conditions reasonably acceptable to the Administrative Agent) in or to the Lead Borrower during any

60

fiscal quarter and on or prior to the day that is fifteen (15) Business Days after the day on which financial statements are required to be delivered for such fiscal quarter, which will, at the request of the Lead Borrower, be included in the calculation of Consolidated Adjusted EBITDA for purposes of determining compliance with the Financial Covenant at the end of such fiscal quarter and applicable subsequent periods.

"Specified Transaction" means the Transactions, any Permitted Acquisition or similar Investment, any Permitted Disposition of a Sold Entity or Business, any incurrence or repayment of Indebtedness or any other transaction, event or action that by the terms of this Agreement requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Spot Rate" means, on any date of determination, the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in the Administrative Agent's (or one of its Affiliate's) principal foreign exchange trading office for the first currency.

"Sterling" or "£" means the lawful currency of the United Kingdom.

"Subordinated Indebtedness" means any Indebtedness created, incurred or assumed by Parent or any of its Restricted Subsidiaries or in respect of which Parent or any of its Restricted Subsidiaries is liable, which is contractually subordinated in right of payment to the Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" of a Person shall refer to a Subsidiary or Subsidiaries of Parent.

"Subsidiary Borrowers" means the Borrowers other than the Lead Borrower until such time as such Persons are released from their obligations hereunder in accordance with the terms and provisions hereof.

"Subsidiary Guarantors" means (i) on the Closing Date, each Subsidiary listed on Schedule 1.01(b) hereto as a "U.S. Subsidiary Guarantor", "UK Subsidiary Guarantor" or "Belgian Subsidiary Guarantor" and (ii) thereafter, each Subsidiary that executes a Guaranty Supplement, in each case, until such time as the relevant Subsidiary is released from its obligations under the applicable Guaranty in accordance with the terms and provisions hereof.

"Successor Borrower" has the meaning specified in Section 7.04(a).

"Successor Rate" has the meaning set forth in Section 3.03(b).

"Supermajority Lenders" means, as of any date of determination, Lenders having more than 66-2/3% of the Total Facility Exposure; provided that (a) any unused ABL Commitment (if any) and the portion of the Total Facility Exposure held or deemed held by any Defaulting Lender shall be excluded

61

for purposes of making a determination of Supermajority Lenders, and (b) at any time there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), "Supermajority Lenders" must include at least two Lenders (who are not Affiliates of one another).

"Supported QFC" has the meaning specified in Section 11.28.

"Suppressed Availability" means, as of any date of determination, an amount equal to the positive difference, if any, of the Borrowing Base minus the ABL Commitment; provided that Suppressed Availability shall not exceed 5% of the aggregate ABL Commitments at any time.

"Swap Contract" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined by the Hedge Bank in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by the Hedge Bank.

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Commitment" means, with respect to a Swing Line Lender, such Lender's U.S. Swing Line Commitment and/or Foreign Swing Line Commitment, as the context requires.

"Swing Line Exposure" means, with respect to any Lender at any time, its U.S. Swing Line Exposure and/or its Foreign Swing Line Exposure, as the context requires.

"Swing Line Lender" means the U.S. Swing Line Lender and/or the Foreign Swing Line Lender, as the context requires.

"Swing Line Loan" means a U.S. Swing Line Loan and/or a Foreign Swing Line Loan, as the context requires.

AmericasActive:18122631.218122631.8

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"TARGET2" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

"TARGET Day" means any day on which TARGET2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euros.

"Tax Distributions" means for any period in which each of the Lead Borrower and Parent is a partnership or disregarded entity for U.S. federal income tax purposes, the Borrowers and their respective Subsidiaries may pay dividends or make distributions to Parent and Parent may distribute such amounts to the partners or members to whom the income earned by the Borrowers and their respective Subsidiaries is allocable for such purposes (either directly or indirectly through intermediary entities, as the case may be) in an aggregate amount not greater than the amount necessary for such partners or members, as the case may be, to pay their state and United States federal income tax liabilities, in each case, solely in respect of income earned by the Borrowers and their respective Subsidiaries that is allocable to them (but not, for the avoidance of doubt, any other Affiliate of the Borrowers) but not to exceed in any taxable year the state and United States income tax liabilities of such partners or members actually owed by such partners or members for such taxable year (calculated as taxable income, on a quarterly basis, multiplied by the highest combined federal, state and local tax rates taking into account the deductibility of state and local income taxes for federal income tax purposes, but without taking into account any potential effects of Sections 67 and 68 of the Code and reduced by any amounts required to be withheld by the Lead Borrower or Parent with respect to such partners or members under Section 1446 of the Code).

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority, including interest, additions to tax or penalties applicable thereto.

"Term Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Termination Date" means the date upon which all ABL Commitments have terminated and the Loans, together with all interest, fees and other Obligations (other than contingent indemnification Obligations for which no demand shall have been made), have been paid in full in cash.

"Term SOFR" means, (a) for any Interest Period relating to a Loan (other than a Base Rate Loan), a per annum rate equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to such Interest Period, with a term equivalent to such Interest Period (or if such rate is not published prior to 11:00 a.m. on the determination date, the applicable Term SOFR Screen Rate on the U.S. Government Securities Business Day immediately prior thereto), plus the SOFR Adjustment for such Interest Period; and (b) for any interest calculation relating to a Base Rate Loan on any day, a fluctuating rate of interest equal to the Term SOFR Screen Rate with a term of one month commencing that day; provided, that in no event shall Term SOFR be less than zero.

"Term SOFR Conforming Changes" means with respect to use, administration of or conventions associated with SOFR, Term SOFR or any proposed Successor Rate, as applicable, any conforming changes to the definitions of Base Rate, SOFR, Term SOFR and Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational

63

matters (including, for the avoidance of doubt, the definitions of Business Day and U.S. Government Securities Business Day, timing of borrowing requests or prepayment, conversion or continuation notices, and length of lookback periods) as may be appropriate, in the Administrative Agent's discretion, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of any Loan Document).

"Term SOFR Loan" means a Loan that bears interest based on clause (a) of the definition of Term SOFR.

"Term SOFR Replacement Date" has the meaning specified in Section 3.03(b).

"Term SOFR Scheduled Unavailability Date" has the meaning specified in Section 3.03(b).

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"Test Period" means, at any date of determination, the most recently completed four (4) consecutive fiscal quarters of the applicable Person ending on or prior to such date for which financial statements are required to have been delivered pursuant to Section 6.01(a) or (b), as applicable.

"Total Facility Exposure" means the sum of (a) the aggregate ABL Exposure of the Lenders and (b) the aggregate unused ABL Commitments (if any).

"Transaction Expenses" means any fees or expenses incurred or paid by the Lead Borrower (or any Parent Company) or any of the other Restricted Subsidiaries in connection with any of the following (but calculated without duplication of any amounts): (i) the Transactions, (ii) the internal restructuring commencing on or prior to the Closing Date (including amendments, modifications and the repayment of obligations under any contracts, leases or indebtedness in connection therewith) in an amount not to exceed $5,000,000, (iii) this Agreement and the other Loan Documents and the transactions contemplated to occur hereunder and thereunder, as applicable, (iv) the 2019 Specified Acquisitions and (v) the 2020 Specified Acquisitions.

"Transactions" means, collectively, (a) the funding of the ABL Loans on the Closing Date, (b) the repayment of the Indebtedness outstanding under the Existing Credit Agreements, (c) the incurrence of the loans and effectiveness of the commitments pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement, (d) the 2019 Specified Acquisitions, (e) the 2020 Specified Acquisitions, (f) the consummation of any other transactions in connection with the foregoing, including payment of deferred purchase price in connection therewith, and (g) the payment of the fees and expenses incurred in connection with any of the foregoing.

"Treasury Equity Interests" has the meaning specified in Section 7.06(k).

"Type" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include Term SOFR, the Eurocurrency Rate, SONIA and the Base Rate.

64

AmericasActive:18122631.218122631.8

"UCI Acquisition" means the acquisition by UCI International Holdings Parent, Inc., a wholly-owned Subsidiary of the Lead Borrower, of all of the outstanding equity interests of UCI International Holdings, Inc., via merger of its wholly-owned subsidiary with and into UCI International Holdings, Inc.

"UCI Target" means the domestic subsidiaries acquired by the Lead Borrower pursuant to the UCI Acquisition that have executed a U.S. Guaranty Supplement.

"UK ABL Exposure" means, (a) as to each Foreign ABL Lender individually, at any time, the sum of (i) the Dollar Equivalent Amount of the outstanding principal amount of all UK ABL Loans and UK Permitted Overadvances held by such Foreign ABL Lender (or its Applicable Lending Office), (ii) such Foreign ABL Lender's Foreign Swing Line Exposure and (iii) such Foreign ABL Lender's Foreign L/C Exposure, and (b) as to the Foreign ABL Lenders collectively, the aggregate amount of UK ABL Exposure of the Foreign ABL Lenders.

"UK ABL Loan" means an extension of credit by a Foreign ABL Lender to a UK Borrower pursuant to Section 2.01(b).

"UK Borrower" means (i) on the Closing Date, Trico Limited and (ii) thereafter, each UK Domestic Subsidiary that becomes a party hereto as a "UK Borrower" and executes a Borrower Joinder Agreement, in each case, until such time as the relevant Subsidiary is released from its obligations hereunder in accordance with the terms and provisions hereof.

"UK Borrowing Base" means, as at any date of determination thereof, an amount equal to the sum of:

(a)     85% of the net Dollar Equivalent Amount of Eligible Accounts (other than Eligible Tooling Accounts) of the UK Loan Parties; plus

(b)     85% of the Dollar Equivalent Amount of the Net Orderly Liquidation Value of Eligible Inventory constituting finished goods of the UK Loan Parties; minus

(c)     Reserves.

The Administrative Agent may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the UK Borrowing Base.

Notwithstanding the foregoing, for the period from the Closing Date until the earlier of (i) the 90th day after the Closing Date (or such later date as may be agreed to by the Administrative Agent in its Permitted Discretion) and (ii) the date on which the Lead Borrower delivers a reasonably satisfactory field examination and inventory appraisal, the UK Borrowing Base shall be deemed to be equal to $3,000,000.

"UK Collateral" means all of the "Secured Assets" referred to in the UK Collateral Documents and all of the other property and assets that are, or are required under the terms hereof to be, subject to Liens in favor of the Collateral Agent for the benefit of the Foreign Secured Parties.

"UK Collateral Documents" means, collectively, the UK Security Agreement, the UK Guarantee, the UK Share Charge, the UK Control Agreements and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the Foreign Secured Obligations and the UK Secured Obligations.

65

"UK Collection Account" has the meaning assigned to the term "Collection Account" in the UK Security Agreement.

"UK Control Agreement" has the meaning assigned to the term "Control Agreement" in the UK Security Agreement.

"UK Domestic Subsidiary" means any Subsidiary of Parent that is organized under the laws of England and Wales.

"UK Excess Availability" means, at any time, an amount equal to (a) the UK Line Cap at such time minus (b) the UK ABL Exposure at such time (calculated, with respect to any Defaulting Lender, as if such Defaulting lender had funded its Pro Rata Share of all outstanding UK ABL Loans).

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"UK Guarantee" means any guarantee agreement entered into by a UK Loan Party with respect to the Foreign Obligations substantially in the form of Exhibit F-2.

"UK Guarantee Supplement" has the meaning specified in Section 6.11(a)(ii).

"UK Line Cap" means, at any time, the least of (a) the maximum aggregate principal amount of Foreign ABL Commitments at such time minus the Belgian ABL Exposure, (b) the UK Borrowing Base at such time and (c) the UK Sublimit as such time.

"UK Loan" means an extension of credit in the form of a UK ABL Loan, a UK Permitted Overadvance and a Foreign Swing Line Loan.

"UK Loan Parties" means, collectively, the UK Borrowers, each Foreign Loan Guarantor that is a UK Domestic Subsidiary that has guaranteed the Foreign Obligations, and each other UK Domestic Subsidiary who becomes a party to this Agreement, a Collateral Document (other than solely as an issuer or third party charger) (including by way of UK Security Agreement Supplement) or the Guaranty pursuant to a Joinder Agreement, Guaranty Supplement or otherwise and their successors and assigns.

"UK Overadvance" means a Credit Extension to the extent that, immediately after its having been made, UK Excess Availability is less than zero.

"UK Pension Plans" means each pension plan, benefit plan, fund (including any superannuation fund) or other similar program that is established maintained or contributed to by a UK Loan Party or any UK Domestic Subsidiary of any UK Loan Party for the benefit of its UK employees or former UK employees, which plan, fund or similar program provides, or results in, retirement income or a deferral of income in contemplation of retirement.

"UK Pensions Act 2004" means the United Kingdom Pensions Act 2004 (c. 35).

"UK Pension Schemes Act 1993" means the United Kingdom Pension Schemes Act 1993 (c. 48).

66

"UK Permitted Overadvance" means:

(a)      a UK Overadvance made pursuant to Section 2.02(i); and

(b)      a UK ABL Loan made by the Administrative Agent, in its Permitted Discretion, which is made at any time upon or during the occurrence of an Event of Default and which:

(i)      is made to maintain, protect or preserve the UK Collateral and/or the Foreign Secured Parties' rights under the Loan Documents or which is otherwise for the benefit of the Foreign Secured Parties; or

(ii)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any Foreign Obligation;

(iii)      is made to pay any other amount chargeable to any UK Loan Party hereunder; and

(iv)      together with all other UK Permitted Overadvances then outstanding, shall not exceed an amount equal to ten percent (10%) of the aggregate Foreign ABL Commitments at any time;

provided, that, (A) the foregoing shall not result in any claim or liability against the Administrative Agent (regardless of the amount of any UK Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of UK Permitted Overadvances allowed hereunder, and (B) in no event shall the Administrative Agent make a UK Permitted Overadvance, if after giving effect thereto, (i) the principal amount of the Credit Extensions would exceed the aggregate ABL Commitments (as in effect prior to any termination of the ABL Commitments pursuant to Section 2.06 hereof) or (ii) the aggregate amount of the UK Permitted Overadvances plus UK ABL Exposure plus Belgian ABL Exposure would exceed the Foreign ABL Commitments.

"UK Related Reserves" means reserves with respect to the UK Borrowing Base, (i) for VAT, (ii) for the prescribed part of a UK Loan Party's net property that would be made available for the satisfaction of its unsecured liabilities pursuant to Section 176A of the United Kingdom's Insolvency Act 1986, and (iii) with respect to liabilities of a UK Loan Party which constitute preferential debts pursuant to Sections 175, 176ZA or 386 of the United Kingdom's Insolvency Act 1986.

"UK Security Agreement" means that certain debenture substantially in the form of Exhibit G-3 (including any and all supplements thereto), dated as of the date hereof, with respect to the Foreign Secured Obligations, among the UK Loan Parties and the Collateral Agent, for the benefit of the Collateral Agent and certain of the other Secured Parties, and any other debenture, pledge or security agreement governed by the laws of England and Wales entered into in connection with the UKSecured Obligations, after the Closing Date by any other UK Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Collateral Agent and certain of the other Secured Parties, each as may be amended, restated, supplemented or otherwise modified from time to time.

"UK Secured Obligations" means all UK Obligations of each UK Loan Party now or hereafter existing under the Loan Documents, and any obligation of a UK Loan Party under any Secured Hedge Agreement (other than any Excluded Swap Obligation) and any Cash Management Obligation; provided that after a Change in Law after the Closing Date that would permit, in the reasonable judgment of the

67

Lead Borrower, the UK Loan Parties to guaranty all Secured Obligations without adverse tax consequences, "UK Secured Obligations" shall mean all Secured Obligations.

"UK Security Agreement Supplement" has the meaning specified in Section 6.11(a)(iii).

"UK Share Charge" means that certain charge over shares in Trico Limited (including any and all supplements thereto), dated as of the date hereof, with respect to the UK Secured Obligations, among Trico Investments Corporation and the Collateral Agent, for the benefit of the Collateral Agent and certain of the other Secured Parties, and any other charge over shares in a UK Loan Party governed by the laws of England and Wales entered into in connection with the UK Secured Obligations after the Closing Date by any other Person (as required by this Agreement or any other Loan Document) for the benefit of the Collateral Agent and certain of the other Secured Parties, each as may be amended, restated, supplemented or otherwise modified from time to time.

"UK Sublimit" means, as of the Fifth Amendment Effective Date, an amount equal to $5,000,000. The UK Sublimit is part of, and not in addition to, the Foreign ABL Commitments.

"Unaudited Financial Statements" has the meaning specified in Section 4.01(g).

"Undisclosed Administration" means, in relation to a Lender or its parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such person is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"Unintentional Overadvance" means an Overadvance which, to the Administrative Agent's knowledge, did not constitute an Overadvance when made but which was or has become an Overadvance resulting from changed circumstances beyond the control of the Administrative Agent or any of the Lenders.

"United States" means the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"Unrestricted Cash" means all non-restricted cash and Cash Equivalents of the Loan Parties in deposit or securities accounts in which the Collateral Agent has "control" pursuant to and within the meaning of Section 9-104 and/or 9-106 of the UCC pursuant to the terms and conditions set forth in the Security Agreement or any other Collateral Document.

"U.S. ABL Commitment" means (a) as to each U.S. Lender individually, its obligation to make a U.S. ABL Loan to each U.S. Borrower pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such U.S. Lender's name on Schedule 2.01(a) hereto under the caption "U.S. ABL Commitment" or in the Assignment and Assumption pursuant to which such U.S. Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement and (b) as to the Lenders collectively, the aggregate amount of the U.S. ABL Commitments of the Lenders (other than any Defaulting Lenders). The aggregate amount of the U.S. ABL Commitments on the Fifth Amendment Effective Date is $235,000,000.

68

"U.S. ABL Exposure" means, (a) as to each U.S. Lender individually, at any time, the sum of (i) the outstanding principal amount of all U.S. ABL Loans and U.S. Permitted Overadvances held by such U.S. Lender (or its Applicable Lending Office), (ii) such U.S. Lender's U.S. Swing Line Exposure and (iii) such U.S. Lender's U.S. L/C Exposure, and (b) as to the U.S. Lenders collectively, the aggregate amount of U.S. ABL Exposure of the U.S. Lenders.

"U.S. ABL Facility" has the meaning set forth in the Preliminary Statements.

"U.S. ABL Loans" means an extension of credit by a U.S. Lender to a U.S. Borrower pursuant to Section 2.01(a) (including any U.S. FILO Loans).

"U.S. Borrower" means (i) on the Closing Date, the Lead Borrower and (ii) thereafter, each U.S. Domestic Subsidiary that becomes a party hereto as a "U.S. Borrower" and executes a Borrower Joinder Agreement, in each case, until such time as the relevant Subsidiary is released from its obligations hereunder in accordance with the terms and provisions hereof.

"U.S. Borrowing Base" means, as at any date of determination thereof, an amount equal to the sum of:

(a)     85% of the net amount of Eligible Accounts of the U.S. Loan Parties; plus

(b)     85% of the Net Orderly Liquidation Value of Eligible Inventory of the U.S. Loan Parties; plus

(c)     the U.S. FILO Availability Amount; minus

(c)     (d) Reserves.

For purposes hereof, the net amount of the U.S. Loan Parties' Eligible Accounts or Eligible Unbilled Accounts at any time shall be the face amount of such Eligible Accounts or Eligible Unbilled Accounts less any and all returns, rebates, discounts (which may, at Administrative Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time.

The Administrative Agent may, in its Permitted Discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the U.S. Borrowing Base.

Notwithstanding the foregoing, for the period from the Fifth Amendment Effective Date until the earlier of (i) November 28, 2020 (or such later date as may be agreed to by the Administrative Agent in its Permitted Discretion) and (ii) the date on which the Lead Borrower delivers a reasonably satisfactory field examination and inventory appraisal with respect to the BPI Target and the UCI Target, solely with respect to the inventory of the BPI Target and the UCI Target, the U.S. Borrowing Base with respect to such inventory shall be deemed to be 45% of the net book value of Eligible Inventory of the BPI Target and the UCI Target.

"U.S. Cash Collateral Account" has the meaning assigned to such term in Section 2.15.

"U.S. Collateral" means all of the "Collateral" referred to in the U.S. Collateral Documents and all of the other property and assets that are, or are required under the terms hereof to be, subject to Liens in favor of the Collateral Agent for the benefit of the Secured Parties.

AmericasActive:18122631.218122631.8

"U.S. Collateral Documents" means, collectively, the U.S. Security Agreement, the Intellectual Property Security Agreements, the U.S. Control Agreements, the Pledge Agreement and each of the other agreement, instrument or document that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties with respect to the Secured Obligations.

"U.S. Collection Account" means any of the deposit accounts set forth on Schedule 1.01(d) to this Agreement under the heading "U.S. Collection Account" (or such other deposit account(s) as Administrative Agent may agree), which have been established by the U.S. Loan Parties for purposes of the receipt of collections of ABL Priority Collateral in accordance with the terms hereof.

"U.S. Control Agreement" means, with respect to any Deposit Account (other than an Excluded Account) owned by a U.S. Loan Party, a deposit control agreement entered into by such U.S. Loan Party, the Blocked Account Bank, the Collateral Agent and the First Lien Agent.

"U.S. Domestic Subsidiary" means any Subsidiary of Parent that is organized under the laws of the United States, any state thereof or the District of Columbia.

"U.S. Excess Availability" means, at any time, an amount equal to (a) the U.S. Line Cap at such time minus (b) the U.S. ABL Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Pro Rata Share of all outstanding U.S. ABL Loans).

"U.S. FILO Accounts Percentage" means, on the Seventh Amendment Effective Date, 5%; provided that commencing on August 30, 2023 and continuing on the first day of each successive month thereafter until such percentage is reduced to 0%, such percentage shall be reduced by 0.42%.

"U.S. FILO Availability Amount" means on any date of determination, an amount equal to the sum of: (a) the U.S. FILO Accounts Percentage of the net amount of Eligible Accounts of the U.S. Loan Parties, plus (b) the U.S. FILO Inventory Percentage of the Net Orderly Liquidation Value of Eligible Inventory of the U.S. Loan Parties or, subject to the limitations set forth in the last sentence of the definition of U.S. FILO Inventory Percentage, solely with respect to the BPI Target and the UCI Target, the U.S. FILO Inventory Percentage of the net book value of Eligible Inventory of the BPI Target and the UCI Target.

"U.S. FILO Inventory Percentage" means, on the Seventh Amendment Effective Date, 10%; provided that commencing on August 30, 2023 and continuing on the first day of each successive month thereafter until such percentage is reduced to 0%, such percentage shall be reduced by 0.83%.

"U.S. FILO Loans" as defined in Section 2.01(a).

"U.S. Government Securities Business Day" means any Business Day, except any day on which the Securities Industry and Financial Markets Association, New York Stock Exchange or FRBNY is not open for business because the day is a legal holiday under New York law or U.S. federal law.

"U.S. Guarantee" means the Guarantee executed by the Loan Parties substantially in the form of Exhibit F-1.

"U.S. Guaranty Supplement" has the meaning specified in Section 6.11(a)(ii).

"U.S. L/C Advance" means each U.S. Lender's funding of its participation in any U.S. L/C Borrowing in accordance with its Pro Rata Share.

70

"U.S. L/C Borrowing" means a Credit Extension resulting from a drawing by a U.S. Borrower under any U.S. Letter of Credit which has not been reimbursed on the applicable Honor Date or refinanced as a Borrowing.

"U.S. L/C Credit Extension" means, with respect to any U.S. Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"U.S. L/C Exposure" means, with respect to any U.S. Lender at any time, its Pro Rata Share of the U.S. L/C Obligation at such time.

"U.S. L/C Issuer" means Bank of America and any other U.S. Lender that becomes an L/C Issuer in accordance with Section 2.03(k) or Section 11.07(i); in the case of each of clause (a) and (b) above, in its capacity as an issuer of U. S. Letters of Credit hereunder, or any successor issuer of U.S. Letters of Credit hereunder.

"U.S. L/C Obligation" means, as at any date of determination, the aggregate maximum amount available to be drawn under all outstanding U.S. Letters of Credit during the remaining life thereof plus the aggregate of all Unreimbursed Amounts in respect of U. S. Letters of Credit, including all U.S. L/C Borrowings.

"U.S. Lender" means, as of any date of determination, any Person with a U.S. ABL Commitment or, if all the U.S. ABL Commitments have terminated or expired, any Person with U.S. ABL Exposure, and any other Person that may be a party to this Agreement as a "U.S. Lender" from time to time and, in the case of each such U.S. Lender, including their respective successors and assigns as permitted hereunder and any lending office or branch of the foregoing (each of which is referred to herein as a " U.S. Lender").  Unless the context otherwise requires, the term "U.S. Lender" includes the U.S. Swing Line Lender and the U.S. L/C Issuer.

"U.S. Letter of Credit" means a commercial/trade or standby letter of credit or letter of guarantee issued by a U.S. L/C Issuer for the account of the U.S. Borrower and/or any other U.S. Domestic Subsidiary.

"U.S. Letter of Credit Commitment" means, with respect to any U.S. L/C Issuer, the amount set forth opposite such L/C Issuer's name on Schedule 2.01(b) hereto under the caption "U.S. Letter of Credit Commitment" or, if a U.S. L/C Issuer has entered into an Assignment and Assumption, set forth for such U.S. L/C Issuer in the Register maintained by the Administrative Agent pursuant to Section 11.07(c) as the U.S. L/C Issuer's "U.S. Letter of Credit Commitment" as such amount may be reduced at or prior to such time pursuant to Section 2.06 or as may be increased from time to time pursuant to the terms hereof. The total amount of the aggregate U.S. Letter of Credit Commitments shall not exceed the lesser of (a) $100,000,000 or (b) the aggregate amount of the U.S. ABL Commitments at any time.

"U.S. Letter of Credit Facility" means the revolving credit facility made available by the U.S. L/C Issuer pursuant to Section 2.03.

"U.S. Line Cap" means, at any time, the lesser of (a) the maximum aggregate principal amount of U.S. ABL Commitments at such time and (b) the U.S. Borrowing Base at such time.

"U.S. Loan" means an extension of credit in the form of a U.S. ABL Loan, a U.S. Permitted Overadvance and a U.S. Swing Line Loan.

"U.S. Loan Guarantors" means, collectively, Parent, the U.S. Borrowers and each Subsidiary Guarantor that is a U.S. Domestic Subsidiary.

71

"U.S. Loan Parties" means, collectively, the U.S. Loan Guarantors and each other U.S. Domestic Subsidiary who becomes a party to this Agreement, a U.S. Collateral Document (other than solely as an issuer or third party charger) or the U.S. Guaranty pursuant to a Joinder Agreement, U.S. Guaranty Supplement or otherwise and their successors and assigns.

"U.S. Obligations" means (a) for purposes of this Agreement, all advances to, and debts, liabilities and obligations of, any U.S. Loan Party arising under any Loan Document or otherwise with respect to any U.S. ABL Exposure, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any U.S. Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed or allowable claims in such proceeding and interest accruing at the Default Rate in accordance with Section 2.08(b) or (b) solely for purposes of the U.S. Guarantee and the U.S. Collateral Documents, (x) the obligations specified in the foregoing clause (a) and the other U.S. Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time.  Without limiting the generality of the foregoing, the U.S. Obligations of the U.S. Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest (including interest accruing at the Default Rate in accordance with Section 2.08(b)), charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any U.S. Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.  Notwithstanding the foregoing, the obligations of any U.S. Loan Party under any Secured Hedge Agreement or any Cash Management Agreement shall be secured and guaranteed pursuant to the U.S. Collateral Documents and the U.S. Guaranty only to the extent that, and for so long as, the other U.S. Obligations are so secured and guaranteed. Notwithstanding the foregoing, U.S. Obligations of any U.S. Loan Party shall in no event include any Excluded Swap Obligations of such U.S. Loan Party.

"U.S. Overadvance" means a Credit Extension to the extent that, immediately after its having been made, U.S. Excess Availability is less than zero.

"U.S. Permitted Overadvances" means:

> (a)      a U.S. Overadvance made pursuant to Section 2.02(i); and

> (b)      a U.S. ABL Loan made by the Administrative Agent, in its Permitted Discretion, which is made at any time upon or during the occurrence of an Event of Default and which:

>> (i)      is made to maintain, protect or preserve the U.S. Collateral and/or the Secured Parties' rights under the Loan Documents or which is otherwise for the benefit of the Secured Parties; or

>> (ii)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any U.S. Obligation;

>> (iii)      is made to pay any other amount chargeable to any U.S. Loan Party hereunder; and

>> (iv)      together with all other U.S. Permitted Overadvances then outstanding, shall not exceed an amount equal to ten percent (10%) of the aggregate U.S. ABL Commitments at any time;

72

provided, that, (A) the foregoing shall not result in any claim or liability against the Administrative Agent (regardless of the amount of any U.S. Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of U.S. Permitted Overadvances allowed hereunder, and (B) in no event shall the Administrative Agent make a U.S. Permitted Overadvance, if after giving effect thereto, the aggregate amount of the U.S. Permitted Overadvances plus U.S. ABL Exposure would exceed the U.S. ABL Commitments.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Required Lenders" means, as of any date of determination, U.S. Lenders having more than 50% of the U.S. ABL Exposure; provided that (a) any unused U.S. ABL Commitment (if any) and the portion of the U.S. ABL Exposure held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of U.S. Required Lenders, and (b) at any time there are two or more U.S. Lenders (who are not Affiliates of one another or Defaulting Lenders), "U.S. Required Lenders" must include at least two U.S. Lenders (who are not Affiliates of one another).

"U.S. Secured Obligations" means all U.S. Obligations of each U.S. Loan Party now or hereafter existing under the Loan Documents, and any obligation of a U.S. Loan Party under any Secured Hedge Agreement (other than any Excluded Swap Obligation) and any Cash Management Obligation.

"U.S. Secured Parties" means collectively, the Administrative Agent, the Collateral Agent, the U.S. Lenders, the U.S. Swing Line Lender, the U.S. L/C Issuers and the Cash Management Banks and Hedge Banks holding U.S. Secured Obligations.

"U.S. Security Agreement" means the Security Agreement executed by the U.S. Loan Parties substantially in the form of Exhibit G-2, as supplemented by each U.S. Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"U.S. Security Agreement Supplement" has the meaning specified in Section 6.11(a)(ii).

"U.S. Special Resolution Regimes" has the meaning specified in Section 11.28.

"U.S. Swing Line Commitment" means, with respect to the U.S. Swing Line Lender, the amount set forth opposite such Lender's name on Schedule 2.01(c) hereto under the caption "U.S. Swing Line Commitment" or, if a Swing Line Lender has entered into an Assignment and Assumption, set forth for such Swing Line Lender in the Register maintained by the Administrative Agent pursuant to Section 11.07(d) as the Swing Line Lender's "U.S. Swing Line Commitment" as such amount may be reduced at or prior to such time pursuant to Section 2.06. The total amount of the U.S. Swing Line Commitment shall not exceed the U.S. Swing Line Sublimit at any time.

"U.S. Swing Line Exposure" means, with respect to any Lender at any time, its Pro Rata Share of the aggregate principal amount of all U.S. Swing Line Loans outstanding at such time.

"U.S. Swing Line Lender" means Bank of America, in its capacity as a provider of U.S. Swing Line Loans, or any successor swing line lender hereunder.

"U.S. Swing Line Loan" has the meaning specified in Section 2.04(a)(i).

"U.S. Swing Line Sublimit" means an amount equal to the lesser of (x) $25,000,000 and (y) the aggregate available amount of the U.S. ABL Commitments.  The U.S. Swing Line Sublimit is part of, and not in addition to, the U.S. ABL Commitments.

73

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(B)(3).

"VAT" means (a) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and (b) any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

"VAT Recipient" has the meaning assigned to such term in Section 3.01(h).

"VAT Relevant Party" has the meaning assigned to such term in Section 3.01(h).

"VAT Supplier" has the meaning assigned to such term in Section 3.01(h).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years calculated to the nearest one-twelfth that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by any Borrower or any other Restricted Subsidiary or the ERISA Affiliates of such Borrower.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02   Other Interpretive Provisions

.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      (i)      The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

AmericasActive:18122631.218122631.8

(ii)     Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)     The term "including" is by way of example and not limitation.

(iv)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(d)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

(f)     For purposes of determining compliance with Section 7.01 or 7.03, in the event that a Lien or an item of Indebtedness meets the criteria of more than one of the categories in their respective sections or the defined terms used therein, the Lead Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify such Lien or item of Indebtedness (or any portion thereof, as applicable), and will be permitted to include the amount and type of such Lien or item of Indebtedness in one or more of the clauses contained in Section 7.01 or 7.03, as applicable; provided that all Indebtedness outstanding under the Loan Documents, the First Lien Loan Documents and the Second Lien Loan Documents will be deemed to have been incurred in reliance only on the exception in clauses (a) and (b), as applicable, of Section 7.03.

(g)     For purposes of determining the permissibility of any action, change, transaction or event that by the terms of the Loan Documents requires a calculation of any financial ratio or test (including the amount of Consolidated Adjusted EBITDA and/or Consolidated Total Assets), such financial ratio or test shall be calculated at the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be.

(h)     The determination of whether any Indebtedness that is permitted hereunder matures or requires certain payments prior to the Latest Maturity Date shall be made at the time of the incurrence of the relevant Indebtedness.

(i)     Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC, including the following which are capitalized herein or in the U.S. Security Agreement, as applicable: "Accounts"; "Chattel Paper"; "Certificate of Title"; "Commercial Tort Claim"; "Commodity Account"; "Commodity Contract"; "Deposit Accounts"; "Documents"; "Electronic Chattel Paper"; "Equipment"; "Fixtures"; "Goods"; "Instruments" (as defined in Article 9 rather than Article 3 of the UCC); "Inventory"; "Investment Property"; "Letter of Credit Rights"; "Securities"; "Securities Account"; "Securities Intermediary"; "Security Entitlement"; "Supporting Obligations"; and "Tangible Chattel Paper".

75

Section 1.03   Accounting Terms

.   (a)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing audited financial statements, except as otherwise specifically prescribed herein.

(b)      Notwithstanding anything to the contrary herein, financial ratios and tests (including the Fixed Charge Coverage Ratio and the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets) contained in this Agreement that are calculated with respect to any Test Period during which any Specified Transaction occurs shall be calculated with respect to such Test Period and such Specified Transaction on a Pro Forma Basis.  Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into any Borrower or any of the other Restricted Subsidiaries since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period.

(c)      Where reference is made to a Person "and its Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any subsidiaries other than Subsidiaries.

Section 1.04   Rounding

.   Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05   References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06   Times of Day

.   Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable); provided that, with respect to any borrowing, issuance, conversion, continuation, payment or prepayment of any UK Loan, all references to times of day shall be references to London time (daylight or standard, as applicable), with respect to any borrowing, issuance, conversion, continuation, payment or prepayment of any Belgian Loan, all references to times of day shall be references to Brussels time (daylight or standard, as applicable), and with respect to any Foreign Letter of Credit, all references to times of day shall be references to Brussels or London time (daylight or standard, as applicable), as applicable.

76

Section 1.07   Timing of Payment or Performance

. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day (unless such immediately succeeding Business Day is in the next calendar month, in which case the date of such payment or performance shall be the immediately preceding Business Day) and, in the case of any payment that accrues interest, interest thereon shall be payable for the period of such extension.

Section 1.08   Currency Equivalents Generally

.

(a)   For purposes of determining compliance under Sections 7.01, 7.02, 7.03, 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrowers' annual financial statements most recently delivered pursuant to Section 6.01(a) at the time of determination; provided that no Event of Default shall be deemed to have occurred thereafter solely as a result of such changes in rates of exchange thereafter.

(b)   Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrowers' consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

(c)   Notwithstanding anything to the contrary herein, for purposes of determining compliance with Section 7.12 with respect to the amount of any Indebtedness in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness is incurred. For purposes of any determination of Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the financial statements pursuant to Section 6.01(a) or (b), as applicable.

(d)   Except as otherwise expressly provided herein, the applicable amount of any currency for purposes of determining outstanding ABL Commitments or ABL Exposure (including for purposes of financial statements and all calculations in connection with the Borrowing Base, covenants, including the financial covenants) shall be the Dollar Equivalent Amount thereof (it being understood that amounts set forth in the Borrowing Base Certificate will be reported in the applicable local currencies and the Dollar Equivalent Amount by the Lead Borrower with the understanding that Administrative Agent shall determine the Dollar Equivalent Amount of the Borrowing Base at any time). For purposes of this Agreement and the other Loan Documents, where the permissibility of a transaction or determinations of required actions or circumstances depend upon compliance with, or are determined by reference to, amounts stated in Dollars, such compliance or determination shall be the Dollar Equivalent Amount of such amount and shall not be affected by subsequent fluctuations in exchange rates.

Section 1.09   Obligations of the Foreign Loan Parties

. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, no Foreign Loan Party shall be liable or in any manner responsible for, or be deemed to have guaranteed,

77

directly or indirectly, whether as a primary obligor, joint and several obligor, guarantor, indemnitor or otherwise, and none of their assets shall secure, directly or indirectly, any Obligation that is not a Foreign Secured Obligation (including, without limitation, principal, interest, fees, penalties, premiums, expenses, charges, reimbursements, indemnities or any other Obligations) under this Agreement or any other Loan Document.

Section 1.10   Certain Calculations and Tests

.

(a)      Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, for purposes of (i) determining compliance with any provision of this Agreement which requires calculation of the Fixed Charge Coverage Ratio, (ii) determining compliance with any provision of this Agreement which requires as a condition that no Default or Event of Default has occurred, is continuing or would result from the incurrence of any Indebtedness (including First Lien Incremental Term Loans and First Lien Incremental Equivalent Debt or Liens or the making of any Acquisitions or Investments, in each case, in connection with the consummation of a Limited Condition Acquisition or (iii) testing availability (other than Excess Availability) under baskets set forth in this Agreement (including any baskets based on a percentage of Consolidated Adjusted EBITDA), in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or of whether any Default or Event of Default has occurred, is continuing or would result therefrom or other applicable covenant shall, at the irrevocable option of the Lead Borrower (an "LCA Election"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into, but in no event more than 60 days prior to consummation of such Limited Condition Acquisition (the "LCA Test Date") and if, after such ratios and other provisions are measured on a Pro Forma Basis after giving effect to such Limited Condition Acquisition and any incurrence of Indebtedness (and the use of proceeds thereof) or Liens or the making of any Acquisitions or Investments, in each case, to be consummated in connection therewith, as if they occurred at the beginning of the Test Period being used to calculate such financial ratio ending prior to the LCA Test Date, the Lead Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratios and provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, if any of such ratios are exceeded as a result of fluctuations in such ratio (including due to fluctuations in Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries or the target of such Limited Condition Acquisition) at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether such Limited Condition Acquisition (and any incurrence of any Indebtedness or Liens or the making of any Acquisitions or Investments, in each case in connection therewith) is permitted hereunder.  If the Lead Borrower makes an LCA Election, then in connection with any calculation of any ratio, test or basket availability with respect to any Specified Transaction following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, for purposes of determining whether such subsequent Specified Transaction is permitted under the Loan Document, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated. Notwithstanding the foregoing, target assets shall not be included in the Borrowing Base during such period unless a reasonably satisfactory field examination and inventory appraisal has been conducted with respect to such target assets, and Section 4.02 must be satisfied with respect to the funding of any Loans or the making of any other Credit Extensions.

AmericasActive:18122631.218122631.8

(b)      The calculation of any ratio hereunder shall be made without regard to the netting of any cash proceeds of Indebtedness incurred by the Lead Borrower or any of the other Restricted Subsidiaries in connection with such transaction (but without limiting the pro forma effect of any prepayment of Indebtedness with such cash proceeds).

Section 1.11  Obligations of Certain Guarantors.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, no Guarantor that is a CFC shall be liable or in any manner responsible for, or be deemed to have guaranteed, directly or indirectly, whether as a primary obligor, joint and several obligor, guarantor, indemnitor or otherwise, and none of their assets shall secure, directly or indirectly, any U.S. Obligation (including, without limitation, principal, interest, fees, penalties, premiums, expenses, charges, reimbursements, indemnities or any other Secured Obligations) under this Agreement or any other Loan Document.

Section 1.12  Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

## THE ABL COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01   The Loans

. Subject to the terms and conditions set forth herein, (a) each U.S. Lender severally agrees to make (or cause its Applicable Lending Office to make) U.S. ABL Loans in Dollars to the U.S. Borrowers from time to time in an amount at any one time outstanding not to exceed the lesser of: (i) such U.S. Lender's U.S. ABL Commitment and (ii) such U.S. Lender's Pro Rata Share of U.S. Excess Availability at such time; (b) each Foreign ABL Lender severally agrees to make (or cause its Applicable Lending Office to make) UK ABL Loans in Dollars, Sterling or Euros to the UK Borrowers from time to time in an amount at any one time outstanding not to exceed the lesser of: (i) such Foreign Lender's Foreign ABL Commitment minus its Pro Rata Share of Belgian ABL Exposure and (ii) such Foreign ABL Lender's Pro Rata Share of UK Excess Availability at such time; and (c) each Foreign ABL Lender severally agrees to make (or cause its Applicable Lending Office to make) Belgian ABL Loans in Dollars or Euros to the Belgian Borrowers from time to time in an amount at any one time outstanding not to exceed the lesser of: (i) such Foreign ABL Lender's Foreign ABL Commitment minus its Pro Rata Share of UK ABL Exposure and (ii) such Foreign ABL Lender's Pro Rata Share of Belgian Excess Availability at such time, in each case, on any Business Day after the Closing Date until the Maturity Date, as requested by the Lead Borrower on its own behalf and on behalf of all other Borrowers in the manner set forth in Section 2.02 hereof; provided that after giving effect to any such Loan (i) the aggregate ABL Exposure does not exceed the Line Cap, (ii) the U.S. ABL Exposure does not exceed the U.S. Line Cap, (1) the UK ABL Exposure does not exceed the UK Line Cap, (iv) the Belgian ABL Exposure does not exceed the Belgian Line Cap, and (v) the U.S. ABL Exposure does not exceed the U.S. Borrowing Base. In no event shall Lenders have any obligation to honor a request for an ABL Loan if the sum of the aggregate outstanding Credit Extensions plus the requested ABL Loan would exceed the Line Cap. Within the foregoing limits, Borrowers may borrow, repay and reborrow ABL Loans.  The U.S. ABL Loans shall be secured by the Collateral of the U.S. Loan Parties and the Belgian ABL Loans and the UK ABL Loans shall be secured by the Collateral of the Foreign Loan Parties and the U.S. Loan Parties. (a)

79

ABL Loans denominated in Dollars may be Base Rate Loans or Term SOFR Loans, (b) ABL Loans denominated in Euros shall be Eurocurrency Rate Loans and (c) ABL Loans denominated in Sterling shall be SONIA Rate Loans, as further provided herein. ~~Notwithstanding anything to the contrary contained herein, and so long as the U.S. FILO Availability Amount is in effect, it is understood and agreed that all U.S. ABL Loans shall be deemed to be made first based on the U.S. FILO Availability Amount (to the extent any such amount is available) prior to any other component of the U.S. Borrowing Base (such U.S. ABL Loans made based on the U.S. FILO Availability Amount being referred to herein as, "U.S. FILO Loans").~~

Section 2.02   Borrowings, Conversions and Continuations of Loans

.

(a)        Each Borrowing, each conversion of ABL Loans from one Type to the other, and each continuation of Interest Period Rate Loans shall be made upon the Lead Borrower's irrevocable notice to the Administrative Agent of such Borrowing, conversion or continuation, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than (i) 11:00 a.m. two (2) Business Days prior to the requested date of any Borrowing or continuation or conversion of Interest Period Rate Loans (or any conversion of Base Rate Loans to Interest Period Rate Loans), (ii) 11:00 a.m. two (2) Business Days prior to the requested date of any Borrowing of SONIA Rate Loans and (iii) 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans or any continuation or conversion of Interest Period Rate Loans to Base Rate Loans.  Each telephonic notice by the Lead Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Except as provided in Section 2.03(c) and Section 2.04(b), and except with respect to the initial Credit Extension, each Borrowing of, continuation of or conversion of Loans, shall be in a principal amount of $500,000 (or the Dollar Equivalent Amount of the Applicable Currency) or a whole multiple of $100,000 (or the Dollar Equivalent Amount of the Applicable Currency) in excess thereof.  Each Committed Loan Notice shall specify, as applicable, (i) whether the Lead Borrower is requesting a Borrowing of U.S. ABL Loans, Borrowing of UK ABL Loans or Borrowing of Belgian ABL Loans, or, in the case of ABL Loans denominated in Dollars, a conversion or continuation of ABL Loans from one Type to the other, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of ABL Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing ABL Loans are to be converted, (v) the duration of the Interest Period with respect thereto and (vi) in the case of UK ABL Loans and/or Belgian ABL Loans, the currency for such UK ABL Loan or Belgian ABL Loan, as applicable.  If the Lead Borrower fails to specify a Type of Loan in a Committed Loan Notice with respect to ABL Loans or fails to give a timely request for conversion or continuation pursuant to a Committed Loan Notice, then the applicable ABL Loans shall be made as, continued as or converted to, a Base Rate Loan.  Any such automatic conversion to an Interest Period Rate Loan with an Interest Period of one (1) month shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Interest Period Rate Loans.  If the Lead Borrower requests a Borrowing of, conversion to, or continuation of Interest Period Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.  If no currency is specified, the requested Borrowing shall be in Dollars.  For the avoidance of doubt, the Borrowers and the Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)        Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Class of Loans (or of the details of the relevant conversion or continuation), and if no timely notice of a

80

conversion or continuation is provided by the Lead Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion described in Section 2.02(a).  In the case of each Borrowing, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its ABL Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than (i) 1:00 p.m., in the case of Term SOFR Loans, (2) 1:00 p.m., in the case of Alternative Currency Loans and (3) 2:00 p.m., in the case of Base Rate Loans, in each case on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Applicable Borrowers in like funds as received by the Administrative Agent either by (a) crediting the account of the Applicable Borrowers on the books of the Administrative Agent (the "Loan Account") with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Lead Borrower.

(c)     Except as otherwise provided herein, an Interest Period Rate Loan may be continued or converted only on the last day of an Interest Period for such Interest Period Rate Loan (unless the Borrowers pay the amount due, if any, under Section 3.05 in connection therewith).  During the existence of an Event of Default, upon notice to the Administrative Agent, the Required Lenders may require that no ABL Loans may be converted to or continued as Interest Period Rate Loans.

(d)     The Administrative Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for Interest Period Rate Loans upon determination of such interest rate.  The determination of the Term SOFR or the Eurocurrency Rate, as applicable, by the Administrative Agent shall be conclusive in the absence of manifest error. The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Base Rate, the Term SOFR Screen Rate, SOFR Adjustment or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Screen Rate, SOFR Adjustment, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Term SOFR Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions or other activities that affect any reference rate referred to herein, or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or any related spread or other adjustments thereto, in each case, in a manner adverse to the Borrowers. The Administrative Agent may select information source(s) in its discretion to ascertain any reference rate referred to herein or any alternative, successor or replacement rate (including any Successor Rate), or any component thereof, in each case pursuant to the terms hereof, and shall have no liability to any Lender, Loan Parties or other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise, and whether at law or in equity) for any error or other act or omission related to or affecting the selection, determination or calculation of any rate (or component thereof) provided by such information source(s).

(e)     Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than fifteen (15) Interest Periods in effect at any time for all Borrowings unless otherwise agreed between the Lead Borrower and the Administrative Agent.

81

(f)        The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)        If any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document, the Administrative Agent, without the request of the Lead Borrower, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Lender is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account of the Applicable Borrower notwithstanding that an Overadvance may result thereby.  The Administrative Agent shall advise the Lead Borrower of any such advance or charge as promptly as practicable upon the making thereof.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrowers' obligations under Section 2.05(c).  Any amount which is added to the principal balance of the Loan Account of the Applicable Borrower as provided in this Section 2.02(g) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans. The Administrative Agent shall make available to the Lead Borrower monthly statements regarding the Loan Account, including the outstanding principal amount of the Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses accrued hereunder or under the other Loan Documents.  Each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account statement between the Applicable Borrowers and the Appropriate Lenders.

(h)        The Administrative Agent, the Lenders, the Swing Line Lender and the L/C Issuer (as applicable) shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result.  The Administrative Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the L/C Issuers (as applicable) and the Borrowers and each Appropriate Lender shall be bound thereby.  Any U.S. Permitted Overadvance may constitute a U.S. Swing Line Loan, any UK Permitted Overadvance may constitute a Foreign Swing Line Loan and any Belgian Permitted Overadvance may constitute a Foreign Swing Line Loan.  A Permitted Overadvance is for the account of the Applicable Borrowers and shall constitute a Base Rate Loan and an Obligation and shall be repaid by the Applicable Borrowers in accordance with the provisions of Section 2.05(c).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.04 regarding the Lenders' obligations to purchase participations with respect to Swing Line Loans.  The Administrative Agent shall have no liability for, and no Loan Party or Secured Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

(i)        Notwithstanding anything to the contrary contained herein, at the request of the Lead Borrower, the Administrative Agent may in its sole discretion (but without any obligation to do so), make ABL Loans to the Borrowers, on behalf of the Appropriate Lenders, that cause (i) the U.S. ABL Exposure to exceed the U.S. Borrowing Base in effect at such time, (ii) the UK ABL Exposure to exceed the sum of the UK Borrowing Base in effect at such time and/or (iii) the Belgian ABL Exposure to exceed the sum of the Belgian Borrowing Base in effect at such time (any such ABL Loan to a U.S.

AmericasActive:18122631.218122631.8

Borrower, a "U.S. Overadvance", any such ABL Loan to a UK Borrower, a "UK Overadvance" and any such ABL Loan to a Belgian Borrower, a "Belgian Overadvance"); provided that no Default or Event of Default shall occur or result from the making of any Overadvance for as long as such Overadvance remains outstanding in accordance with the terms of this paragraph; provided further that, (A) the aggregate amount of outstanding Overadvances plus the aggregate ABL Exposure shall not exceed the aggregate ABL Commitments, (B) the aggregate amount of U.S. Overadvances plus U.S. ABL Exposure shall not exceed U.S. ABL Commitments, (C) the aggregate amount of UK Overadvances plus UK ABL Exposure shall not exceed Foreign ABL Commitments minus Belgian ABL Exposure and (D) the aggregate amount of Belgian Overadvances plus Belgian ABL Exposure shall not exceed Foreign ABL Commitments minus UK ABL Exposure.  Each Overadvance shall be an ABL Loan.  The authority of the Administrative Agent to make Overadvances is limited to an aggregate principal amount not to exceed, when taken together with the aggregate Outstanding Amount of all other Permitted Overadvances, ten percent (10%) of the aggregate ABL Commitments in effect at such time; provided that the Required Lenders may at any time revoke the Administrative Agent's authorization to make Overadvances.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof; provided that the Required Lenders may at any time restore the Administrative Agent's authorization to make Overadvances by written notice to the Administrative Agent thereof.  Each Overadvance shall mature and be due on the earliest of (i) the Latest Maturity Date, (ii) written demand by the Administrative Agent and (iii) thirty (30) days after the date on which such Overadvance is made; it being understood and agreed that no Overadvance shall cause the Total Facility Exposure of any Lender to exceed such Lender's ABL Commitment.  The making of an Overadvance on any one occasion shall not obligate the Administrative Agent to make any Overadvance on any other occasion.

Section 2.03   Letters of Credit

.

(a)      Letter of Credit Commitments.

(i)      Subject to the terms and conditions set forth herein, (A) each U.S. L/C Issuer agrees, in reliance upon the agreements of the other U.S. Lenders set forth in this Section 2.03, (x) from time to time on any Business Day during the period on and from the Closing Date until the Letter of Credit Facility Expiration Date, to issue U.S. Letters of Credit denominated in Dollars (or such other currencies as the U.S. L/C Issuer may agree) for the account of a U.S. Borrower (provided that any Letter of Credit may be for the account of any U.S. Domestic Subsidiary of a U.S. Borrower) and to amend U.S. Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (y) to honor drawings under the U.S. Letters of Credit and (B) the U.S. Lenders severally agree to participate in U.S. Letters of Credit issued pursuant to this Section 2.03(a)(i); provided that no U.S. L/C Issuer shall be obligated to make any U.S. L/C Credit Extension with respect to any U.S. Letter of Credit, and no U.S. Lender shall be obligated to participate in any U.S. Letter of Credit if after giving effect to such U.S. L/C Credit Extension, (A) the U.S. ABL Exposure would exceed the U.S. Line Cap, (c) [reserved], (d) the Outstanding Amount of the U.S. L/C Obligations would exceed the aggregate U.S. Letter of Credit Commitment, (e) the U.S. ABL Exposure of any U.S. Lender would exceed such U.S. Lender's share of the U.S. Line Cap, (E) the aggregate Outstanding Amount would exceed the Line Cap or (F) the U.S. ABL Exposure does not exceed the U.S. Borrowing Base; provided further that no U.S. L/C Issuer shall be obligated to make any U.S. L/C Credit Extension with respect to any U.S. Letter of Credit if after giving effect to such U.S. L/C Credit Extension the Outstanding Amount of the U.S. L/C Obligations of any U.S. L/C Issuer would exceed such U.S. L/C Issuer's Letter of Credit Commitment.  Within the foregoing limits, and subject to the terms and conditions hereof, the U.S. Borrowers' ability to obtain U.S. Letters of Credit shall be fully

AmericasActive:18122631.218122631.8

revolving, and accordingly each U.S. Borrower may, during the foregoing period, obtain U.S. Letters of Credit to replace U.S. Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)     Subject to the terms and conditions set forth herein, (A) each Foreign L/C Issuer agrees, in reliance upon the agreements of the other Foreign ABL Lenders set forth in this Section 2.03, (x) from time to time on any Business Day during the period on and from the Closing Date until the Letter of Credit Facility Expiration Date, to issue Foreign Letters of Credit denominated in Dollars, Euro or Sterling (or such other currencies as the Foreign L/C Issuer may agree) for the account of a Foreign Borrower (provided that any Letter of Credit may be for the account of any UK Domestic Subsidiary of the UK Borrower and/or Belgian Domestic Subsidiary of the Belgian Borrower) and to amend Foreign Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (y) to honor drawings under the Foreign Letters of Credit and (B) the Foreign ABL Lenders severally agree to participate in Foreign Letters of Credit issued pursuant to this Section 2.03(a)(ii); provided that no Foreign L/C Issuer shall be obligated to make any Foreign L/C Credit Extension with respect to any Foreign Letter of Credit, and no Foreign ABL Lender shall be obligated to participate in any Foreign Letter of Credit if after giving effect to such Foreign L/C Credit Extension, (A) the UK ABL Exposure would exceed the UK Line Cap, (B) the Belgian Exposure would exceed the Belgian Line Cap, (C) [reserved], (D) the Outstanding Amount of the Foreign L/C Obligations would exceed the aggregate Foreign Letter of Credit Commitment, (E) the UK ABL Exposure of any Foreign ABL Lender would exceed such Foreign ABL Lender's share of the UK Line Cap, (F) the Belgian ABL exposure of any Foreign ABL Lender would exceed such Foreign ABL Lender's share of the Belgian Line Cap, or (G) the aggregate Outstanding Amount would exceed the Line Cap; provided further that no Foreign L/C Issuer shall be obligated to make any Foreign L/C Credit Extension with respect to any Foreign Letter of Credit if after giving effect to such Foreign L/C Credit Extension the Outstanding Amount of the Foreign L/C Obligations of any Foreign L/C Issuer would exceed such Foreign L/C Issuer's Letter of Credit Commitment.  Within the foregoing limits, and subject to the terms and conditions hereof, the Foreign Borrowers' ability to obtain Foreign Letters of Credit shall be fully revolving, and accordingly each Foreign Borrower may, during the foregoing period, obtain Foreign Letters of Credit to replace Foreign Letters of Credit that have expired or that have been drawn upon and reimbursed.

(iii)     An L/C Issuer shall be under no obligation to issue any Letter of Credit if:

(A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or direct that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular;

(B)     subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance;

(C)     the expiry date of such requested Letter of Credit would occur after the Letter of Credit Facility Expiration Date;

84

AmericasActive:18122631.218122631.8

(D)      the issuance of such Letter of Credit would violate any Laws binding upon such L/C Issuer;

(E)      the Letter of Credit is to be denominated in a currency other than Dollars (or in the case of a Foreign Letter of Credit, Dollars, Euros or Sterling); or

(F)      the issuance of such Letter of Credit would violate one or more applicable policies of such L/C Issuer in place at the time of such issuance.

(iv)      An L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.  Notwithstanding the foregoing, neither Bank of America nor Truist Bank, in its capacity as U.S. L/C Issuer and Foreign L/C Issuer, shall not be under any obligation to issue commercial Letters of Credit or letters of guarantee.

(b)      Procedures for Issuance and Amendment of Letters of Credit; Auto Renewal Letters of Credit.

(i)      Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Lead Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application together with a Letter of Credit Request in respect of such L/C Credit Extension, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Such Letter of Credit Application must be received by the relevant L/C Issuer and the Administrative Agent not later than 12:00 noon at least three (3) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such earlier or later date and time as the relevant L/C Issuer may agree in a particular instance in its sole discretion.  In the case of a request for the issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer:  (A) whether the requested Letter of Credit is a U.S. Letter of Credit or a Foreign Letter of Credit; (B) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (C) the amount thereof; (D) the expiry date thereof; (E) the name and address of the beneficiary thereof; (F) the documents to be presented by such beneficiary in case of any drawing thereunder; (G) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (H) whether the Letter of Credit is to be issued for its own account or for the account of one of its Subsidiaries (provided that the applicable L/C Issuer shall have received all information reasonably requested to satisfy such L/C Issuer's "know your customer" and other similar requirements with respect to any such Subsidiary); and (I) such other matters as the relevant L/C Issuer may reasonably request.  In the case of a request for an amendment of any outstanding Letter of Credit, such request shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer (1) the Letter of Credit to be amended; (i) the proposed date of amendment thereof (which shall be a Business Day); (ii) the nature of the proposed amendment; and (iii) such other matters as the relevant L/C Issuer may reasonably request. Any request for a Letter of Credit or amendment thereto, once made shall be irrevocable.

(ii)      Promptly after receipt of any Letter of Credit Application or request for amendment, the relevant L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application or request for amendment from the Lead Borrower, and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof.  Upon receipt by the relevant L/C Issuer

85

of confirmation from the Administrative Agent that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower or Subsidiary, as the case may be, or enter into the applicable amendment, as the case may be.  Immediately upon the issuance of each U.S. Letter of Credit, and without any further action on the part of any U.S. L/C Issuer or the U.S. Lenders, each U.S. Lender shall be deemed to, and hereby irrevocably and unconditionally agrees, to acquire from the relevant U.S. L/C Issuer a risk participation in such U.S. Letter of Credit in an amount equal to the product of such U.S. Lender's Pro Rata Share times the amount of such U.S. Letter of Credit, effective upon the issuance of such U.S. Letter of Credit.  Immediately upon the issuance of each Foreign Letter of Credit, and without any further action on the part of any Foreign L/C Issuer or the Foreign ABL Lenders, each Foreign ABL Lender shall be deemed to, and hereby irrevocably and unconditionally agrees, to acquire from the relevant Foreign L/C Issuer a risk participation in such Foreign Letter of Credit in an amount equal to the product of such Foreign ABL Lender's Pro Rata Share times the amount of such Foreign Letter of Credit, effective upon the issuance of such Foreign Letter of Credit.

(iii)     If the Lead Borrower so requests in any applicable Letter of Credit Application, the relevant L/C Issuer shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the relevant L/C Issuer to prevent any such extension at least once in each twelve (12)-month period (commencing with the date of issuance of such Letter of Credit) by giving notice to the beneficiary thereof and such Borrower not later than a day (the "Non-extension Notice Date") in each such twelve (12)-month period to be agreed upon at the time such Letter of Credit is issued (which day must be at least thirty (30) days prior to the scheduled expiration of such Letter of Credit).  Unless otherwise directed by the relevant L/C Issuer, the Lead Borrower shall not be required to make a specific request to the relevant L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the applicable Lenders shall be deemed to have authorized (but may not require) the relevant L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Facility Expiration Date; provided that the relevant L/C Issuer shall have no obligation to permit any such extension if (A) the relevant L/C Issuer has determined that it would have no obligation at such time to issue such Letter of Credit in its extended form under the terms hereof (by reason of the provisions of Section 2.03(a)(iii)  or otherwise), or (B) it has received notice (which may be by telephone, followed promptly in writing, or in writing) on or before the day that is thirty (30) Business Days before the Non-extension Notice Date from the Administrative Agent or any Appropriate Lender, as applicable, or the Lead Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied.

(iv)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to the beneficiary thereof, the relevant L/C Issuer will also deliver to the Lead Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)     U.S. Drawings and Reimbursements; Funding of Participations.

(i)     Upon receipt from the beneficiary of any U.S. Letter of Credit of a compliant drawing under such Letter of Credit, the relevant U.S. L/C Issuer shall promptly notify the Administrative Agent thereof; provided that the Administrative Agent shall then promptly notify the Lead Borrower of such drawing.  On the second Business Day after the date on which the Lead Borrower shall have received notice of any payment by a U.S. L/C Issuer under a Letter

86

AmericasActive:18122631.218122631.8

of Credit (each such date, an "Honor Date"), the Lead Borrower shall reimburse such L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing.  If the Lead Borrower fails to so reimburse such L/C Issuer by such time, the Administrative Agent shall promptly notify each U.S. Lender of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such U.S. Lender's Pro Rata Share thereof.  In such event, Lead Borrower shall be deemed to have requested a Borrowing of U.S. ABL Loans that are Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans but subject to the amount of the unutilized portion of the U.S. ABL Commitments of the U.S. Lenders, and subject to the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice).  Any notice given by a U.S. L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)       Each U.S. Lender (including any such Lender acting as a U.S. L/C Issuer) shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of the relevant L/C Issuer at the applicable Administrative Agent's Office for payments in an amount equal to its Pro Rata Share of any Unreimbursed Amount in respect of a Letter of Credit not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.04(c)(iii), each U.S. Lender that so makes funds available shall be deemed to have made a U.S. ABL Loan that is a Base Rate Loan to the applicable U.S. Borrower in such amount.  The Administrative Agent shall remit the funds so received to the relevant U.S. L/C Issuer.

(iii)      With respect to any Unreimbursed Amount in respect of a U.S. Letter of Credit that is not fully refinanced by a Borrowing of U.S. ABL Loans that are Base Rate Loans for any reason (including due to failure of a Defaulting Lender to fund its Pro Rata Share of such Unreimbursed Amount to the extent not reimbursed or Cash Collateralized in accordance with Section 2.15), the U.S. Borrowers shall be deemed to have incurred from the relevant U.S. L/C Issuer a U.S. L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which U.S. L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each U.S. Lender's payment to the Administrative Agent for the account of the relevant U.S. L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such U.S. L/C Borrowing and shall constitute a U.S. L/C Advance from such U.S. Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)      Until each U.S. Lender funds its U.S. ABL Loan or U.S. L/C Advance pursuant to this Section 2.03(c), interest in respect of such U.S. Lender's Pro Rata Share of such amount shall be solely for the account of the relevant U.S. L/C Issuer.

(v)       Each U.S. Lender's obligation to make U.S. ABL Loans or U.S. L/C Advances to reimburse a U.S. L/C Issuer for amounts drawn under U.S. Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant U.S. L/C Issuer, any U.S. Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default; or (f) any other occurrence, event or condition, whether or not similar to any of the foregoing.  No such making of a U.S. L/C Advance shall relieve or otherwise impair the obligation of the U.S. Borrowers to reimburse the relevant U.S. L/C Issuer for the amount of any payment made by such U.S. L/C Issuer under any U.S. Letter of Credit, together with interest as provided herein.

87

(vi)     If any U.S. Lender fails to make available to the Administrative Agent for the account of the relevant U.S. L/C Issuer any amount required to be paid by such U.S. Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the Federal Funds Rate.  A certificate of the relevant U.S. L/C Issuer submitted to any U.S. Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(c)(vi) shall be conclusive absent manifest error.

(vii)     If, at any time after a U.S. L/C Issuer has made a payment under any U.S. Letter of Credit and has received from any U.S. Lender such U.S. Lender's L/C Advance in respect of such payment in accordance with this Section 2.03(c), the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the U.S. Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to each U.S. Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such U.S. Lender's U.S. L/C Advance was outstanding) in the same funds as those received by the Administrative Agent; provided that no such payments shall be distributed in respect of the Pro Rata Share of any Defaulting Lender that did not fund its participation obligations in respect of such U.S. Letter of Credit.

(viii)     If any payment received by the Administrative Agent for the account of a U.S. L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each U.S. Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such U.S. Lender, at a rate per annum equal to the Federal Funds Rate. The obligations of the U.S. Lenders under this Section 2.03(c)(viii) shall survive the payment in full of the U.S. Obligations and the termination of this Agreement.

(d)     Foreign Drawings and Reimbursements; Funding of Participations.

(i)     Upon receipt from the beneficiary of any Foreign Letter of Credit of a compliant drawing under such Letter of Credit, the relevant Foreign L/C Issuer shall promptly notify the Lead Borrower and the Administrative Agent thereof.  On the second Business Day after the date on which the Lead Borrower shall have received notice of any payment by a Foreign L/C Issuer under a Foreign Letter of Credit (each such date, an "Honor Date"), the Foreign Borrowers shall reimburse such L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing.  If the Foreign Borrowers fail to so reimburse such L/C Issuer by such time, the Administrative Agent shall promptly notify each Foreign ABL Lender of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such Foreign ABL Lender's Pro Rata Share thereof.  In such event, the Foreign Borrowers shall be deemed to have requested a Borrowing of Belgian ABL Loans or UK ABL Loans that are Foreign ABL Facility Daily Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, subject to the amount of the unutilized portion of the Foreign ABL Commitments of the Foreign ABL Lenders, and subject to the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice).  Any notice given by a Foreign L/C Issuer or the Administrative Agent pursuant to this Section

88

2.03(d)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Foreign ABL Lender (including any such Lender acting as a Foreign L/C Issuer) shall upon any notice pursuant to Section 2.03(d)(i) make funds available to the Administrative Agent for the account of the relevant Foreign L/C Issuer at the applicable Administrative Agent's Office for payments in an amount equal to its Pro Rata Share of any Unreimbursed Amount in respect of a Foreign Letter of Credit not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.04(c)(iii), each Foreign ABL Lender that so makes funds available shall be deemed to have made a UK ABL Loan that is a Foreign ABL Facility Daily Rate Loan to the applicable UK Borrower in such amount or a Belgian ABL Loan that is a Foreign ABL Facility Daily Rate Loan to the applicable Belgian Borrower in such amount, as applicable.  The Administrative Agent shall remit the funds so received to the relevant Foreign L/C Issuer.

(iii)     With respect to any Unreimbursed Amount in respect of a Foreign Letter of Credit that is not fully refinanced by a Borrowing of UK ABL Loans or Belgian ABL Loans, as applicable, for any reason (including due to failure of a Defaulting Lender to fund its Pro Rata Share of such Unreimbursed Amount to the extent not reimbursed or Cash Collateralized in accordance with Section 2.15), the Foreign Borrowers shall be deemed to have incurred from the relevant Foreign L/C Issuer a Foreign L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which Foreign L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Foreign ABL Lender's payment to the Administrative Agent for the account of the relevant Foreign L/C Issuer pursuant to Section 2.03(d)(ii) shall be deemed payment in respect of its participation in such Foreign L/C Borrowing and shall constitute a Foreign L/C Advance from such Foreign ABL Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)     Until each Foreign ABL Lender funds its UK ABL Loan, Belgian ABL Loan, or Foreign L/C Advance pursuant to this Section 2.03(d), interest in respect of such Foreign ABL Lender's Pro Rata Share of such amount shall be solely for the account of the relevant Foreign L/C Issuer.

(v)     Each Foreign ABL Lender's obligation to make UK ABL Loans, Belgian ABL Loans or Foreign L/C Advances to reimburse a Foreign L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(d), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant Foreign L/C Issuer, any Foreign Borrowers or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default; or (g) any other occurrence, event or condition, whether or not similar to any of the foregoing.  No such making of a Foreign L/C Advance shall relieve or otherwise impair the obligation of the Foreign Borrowers to reimburse the relevant Foreign L/C Issuer for the amount of any payment made by such Foreign L/C Issuer under any Foreign Letter of Credit, together with interest as provided herein.

(vi)     If any Foreign ABL Lender fails to make available to the Administrative Agent for the account of the relevant Foreign L/C Issuer any amount required to be paid by such Foreign ABL Lender pursuant to the foregoing provisions of this Section 2.03(d) by the time specified in Section 2.03(d)(ii), such Foreign L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon

89

for the period from the date such payment is required to the date on which such payment is immediately available to such Foreign L/C Issuer at a rate per annum equal to the Federal Funds Rate.  A certificate of the relevant Foreign L/C Issuer submitted to any Foreign ABL Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(d)(vi) shall be conclusive absent manifest error.

(vii)     If, at any time after a Foreign L/C Issuer has made a payment under any Foreign Letter of Credit and has received from any Foreign ABL Lender such Foreign ABL Lender's Foreign L/C Advance in respect of such payment in accordance with this Section 2.03(d), the Administrative Agent receives for the account of such Foreign L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Foreign Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to each Foreign ABL Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Foreign ABL Lender's Foreign L/C Advance was outstanding) in the same funds as those received by the Administrative Agent; provided that no such payments shall be distributed in respect of the Pro Rata Share of any Defaulting Lender that did not fund its participation obligations in respect of such Foreign Letter of Credit.

(viii)     If any payment received by the Administrative Agent for the account of a Foreign L/C Issuer pursuant to Section 2.03(d)(i) is required to be returned under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Foreign ABL Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Foreign ABL Lender, at a rate per annum equal to the Federal Funds Rate. The obligations of the Foreign ABL Lenders under this Section 2.03(d)(viii) shall survive the payment in full of the Foreign Obligations and the termination of this Agreement.

(e)     Obligations Absolute.  The obligation of the Applicable Borrowers to reimburse the relevant L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

90

(iv) any payment by the relevant L/C Issuer under such Letter of Credit against presentation of documents that do not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v) any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(vi) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

provided that the foregoing shall not excuse any L/C Issuer from liability to the Applicable Borrowers to the extent of any direct damages (as opposed to consequential, punitive or special damages, claims in respect of which are waived by the Applicable Borrowers to the extent permitted by applicable Law) suffered by the Borrowers to the extent such damages are determined by a final non-appealable judgment of a court of competent jurisdiction to have been caused by such L/C Issuer's gross negligence, bad faith or willful misconduct or material breach of this Agreement when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.

(f) Role of L/C Issuers. Each Lender and each Borrower agrees that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer (or any fronting, advising or confirming banks) shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuers, any Agent-Related Person nor any of the respective fronting, advising or confirming banks, or any permitted assignees of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct (with such absence to be presumed unless otherwise determined by a court of a competent jurisdiction in a final and non-appealable judgment); or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Letter of Credit Application. Each Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit, and none of the L/C Issuers, any Agent-Related Person nor any of the respective fronting, advising or confirming banks, or any permitted assignees of any L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this Section 2.03(g); provided that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers caused by such L/C Issuer's willful misconduct, bad faith, gross negligence or material breach of this Agreement or such L/C Issuer's willful misconduct or grossly negligent or bad faith failure to pay under any Letter of Credit after the presentation to it by the beneficiary of documents strictly complying with the terms and conditions of a Letter of Credit, in each case as determined by a final non-appealable judgment of a court of competent jurisdiction. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in substantial compliance with the terms of a Letter of Credit, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or purporting to transfer a Letter

91

of Credit or assign the proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     Letter of Credit Fees.  The U.S. Borrowers shall pay to the Administrative Agent for the account of each U.S. Lender in accordance with its Pro Rata Share a Letter of Credit fee for each U.S. Letter of Credit issued pursuant to this Agreement equal to the product of (i) the Applicable Rate for U.S. ABL Loans that are Interest Period Rate Loans and (ii) the daily maximum amount then available to be drawn under such U.S. Letter of Credit (excluding any portion thereof attributable to Unreimbursed Amounts); provided that U.S. Letter of Credit fees accrued with respect to any Pro Rata Share of any U.S. Letters of Credit during the period prior to the time any U.S. Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Administrative Agent so long as such U.S. Lender shall be a Defaulting Lender except to the extent that such U.S. Lender's Pro Rata Share of the U.S. Letter of Credit fee shall otherwise have been due and payable to such Defaulting Lender prior to such time; and provided further that no Letter of Credit fee shall accrue to any Defaulting Lender so long as such Lender shall be a Defaulting Lender.  The Foreign Borrowers shall pay to the Administrative Agent for the account of each Foreign ABL Lender in accordance with its Pro Rata Share a Foreign Letter of Credit fee for each Foreign Letter of Credit issued for the account of the Foreign Borrowers pursuant to this Agreement equal to the product of (i) the Applicable Rate for Foreign ABL Loans that are Interest Period Rate Loans and (ii) the daily maximum amount then available to be drawn under such Foreign Letter of Credit (excluding any portion thereof attributable to Unreimbursed Amounts); provided that Foreign Letter of Credit fees accrued with respect to any Pro Rata Share of any Foreign Letters of Credit during the period prior to the time any Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Administrative Agent so long as such Lender shall be a Defaulting Lender except to the extent that such Lender's Pro Rata Share of the Foreign Letter of Credit fee shall otherwise have been due and payable to such Defaulting Lender prior to such time; and provided further that no Letter of Credit fee shall accrue to any Defaulting Lender so long as such Lender shall be a Defaulting Lender. Such letter of credit fees shall be computed on a quarterly basis in arrears and shall be payable on the first calendar day of each April, July, October and January and on the Maturity Date, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Facility Expiration Date and thereafter on demand.

(h)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers. The U.S. Borrowers shall pay to the Administrative Agent, for the account of the U.S. L/C Issuer, a fronting fee (a "Fronting Fee") with respect to each U.S. Letter of Credit issued by it equal to 0.125% per annum of the daily maximum amount then available to be drawn under such Letter of Credit (excluding any portion thereof attributable to Unreimbursed Amounts).  The Foreign Borrowers shall pay to the Administrative Agent, for the account of the Foreign L/C Issuer, a Fronting Fee with respect to each Foreign Letter of Credit issued by it equal to 0.125% per annum of the daily maximum amount then available to be drawn under such Letter of Credit (excluding any portion thereof attributable to Unreimbursed Amounts). Such Fronting Fees shall be computed on a quarterly basis in arrears and shall be payable on the first calendar day of each April, July, October and January and on the Maturity Date with respect to the ABL Facility, as applicable, commencing with the first such date to occur after the issuance of such Letter of Credit.  In addition, each Applicable Borrower shall pay to the Administrative Agent (for the benefit of each L/C Issuer) for such L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect, provided, such L/C Issuer notifies Administrative Agent of such amounts.  Such customary fees and standard costs and charges are due and payable within five (5) Business Days of demand and are non-refundable.

(i)     Conflict with Letter of Credit Application.  Notwithstanding anything else to the contrary in any Letter of Credit Application, in the event of any conflict or inconsistency between the

92

AmericasActive:18122631.218122631.8

terms of any Loan Document and the terms of any Letter of Credit Application, the terms hereof shall control.

        (j)     <u>Addition of an L/C Issuer</u>.

        (i)     Any U.S. Lender (or any of its Subsidiaries or Affiliates) with the consent of the Lead Borrower may become an additional U.S. L/C Issuer hereunder pursuant to a written agreement among the Lead Borrower, the Administrative Agent and such U.S. Lender. The Administrative Agent shall notify the U.S. Lenders of any such additional L/C Issuer. Any Lender designated as a U.S. L/C Issuer pursuant to this <u>paragraph (i)</u> shall be deemed to be a "U.S. L/C Issuer" (in addition to being a U.S. Lender) in respect of U.S. Letters of Credit issued or to be issued by such U.S. Lender.

        (ii)     Any Foreign ABL Lender (or any of its Subsidiaries or Affiliates) with the consent of the Lead Borrower may become an additional Foreign L/C Issuer hereunder pursuant to a written agreement among the Lead Borrower, the Administrative Agent and such Foreign ABL Lender. The Administrative Agent shall notify the Foreign ABL Lenders of any such additional Foreign L/C Issuer. Any Lender designated as a Foreign L/C Issuer pursuant to this <u>paragraph (ii)</u> shall be deemed to be a "Foreign L/C Issuer" (in addition to being a Foreign ABL Lender) in respect of Foreign Letters of Credit issued or to be issued by such Foreign ABL Lender.

        (k)     <u>U.S. Borrower Obligations</u>. Notwithstanding the fact that any U.S. Letters of Credit are issued for the account of U.S. Domestic Subsidiaries of the U.S. Borrowers, any such U.S. L/C Obligations in respect of such Letters of Credit issued for the account of such Subsidiaries shall for all purposes constitute U.S. Obligations of the U.S. Borrowers under this Agreement, and any Credit Extensions in respect of U.S. Letters of Credit, as the case may be, shall be Credit Extensions made for the account of the U.S. Borrowers hereunder.

        (l)     <u>Foreign Borrower Obligations</u>. Notwithstanding the fact that any Foreign Letters of Credit are issued for the account of UK Domestic Subsidiaries of the UK Borrowers or Belgian Domestic Subsidiaries of the Belgian Borrowers, any such Foreign L/C Obligations in respect of such Letters of Credit issued for the account of such Subsidiaries shall for all purposes constitute Foreign Obligations of the Foreign Borrowers under this Agreement, and any Credit Extensions in respect of Foreign Letters of Credit, as the case may be, shall be Credit Extensions made for the account of the Foreign Borrowers hereunder.

        Section 2.04   Swing Line Loans

.

        (a)     <u>The Swing Line Loans</u>.

        (i)     Subject to the terms and conditions set forth herein, the U.S. Swing Line Lender agrees to make (or cause its Applicable Lending Office to make) loans in Dollars to the U.S. Borrowers from time to time (each such loan, a "<u>U.S. Swing Line Loan</u>") until the Business Day prior to the Maturity Date in an aggregate amount not to exceed at any time outstanding such Swing Line Lender's U.S. Swing Line Commitment at such time; <u>provided</u> that after giving effect to any Swing Line Loan, (i) the Outstanding Amount of U.S. Swing Line Loans shall not exceed the U.S. Swing Line Sublimit, (ii) the U.S. ABL Exposure shall not exceed the U.S. Line Cap, (iii) the aggregate Outstanding Amount shall not exceed the Line Cap, (iv) the U.S. ABL

93

Exposure of any Lender shall not exceed such Lender's share of the U.S. Line Cap then in effect and (v) the U.S. ABL Exposure does not exceed the U.S. Borrowing Base; and provided further that the U.S. Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan. Within the foregoing limits, and subject to the other terms and conditions hereof, the U.S. Borrowers may borrow U.S. Swing Line Loans under this Section 2.04(a)(i), prepay under Section 2.05, and reborrow under this Section 2.04.  Each U.S. Swing Line Loan shall be a Base Rate Loan.

(ii)    Subject to the terms and conditions set forth herein, the Foreign Swing Line Lender agrees to make (or cause its Applicable Lending Office to make) loans in Dollars, Sterling or Euros to the Foreign Borrowers from time to time (each such loan, a "Foreign Swing Line Loan") until the Business Day prior to the Maturity Date in an aggregate amount not to exceed at any time outstanding such Swing Line Lender's Foreign Swing Line Commitment at such time; provided that after giving effect to any Swing Line Loan, (i) the Outstanding Amount of Foreign Swing Line Loans does not exceed the Foreign  Swing Line Sublimit, (ii) the UK ABL Exposure shall not exceed the UK Line Cap, (iii) the Belgian ABL Exposure shall not exceed the Belgian Line Cap, (iv) the ABL Exposure shall not exceed the Line Cap, (v) the UK ABL Exposure of any Lender shall not exceed such Lender's share of the UK Line Cap then in effect and (vi) the Belgian ABL Exposure of any Lender shall not exceed such Lender's share of the Belgian Line Cap then in effect; and provided further that the Foreign Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan. Within the foregoing limits, and subject to the other terms and conditions hereof, the Foreign Borrowers may borrow Foreign Swing Line Loans under this Section 2.04(a)(ii), prepay under Section 2.05, and reborrow under this Section 2.04.  Each Foreign Swing Line Loan shall be a Foreign ABL Facility Daily Rate Loan.

(b)    U.S. Participation.  Immediately upon the making of a U.S. Swing Line Loan, each U.S. Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the U.S. Swing Line Lender a risk participation in such U.S. Swing Line Loan in an amount equal to the product of such U.S. Lender's Pro Rata Share times the amount of such U.S. Swing Line Loan.

(c)    Foreign Participation.  Immediately upon the making of a Foreign Swing Line Loan, each Foreign ABL Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Foreign Swing Line Lender a risk participation in such Foreign Swing Line Loan in an amount equal to the product of such Foreign ABL Lender's Pro Rata Share times the amount of such Foreign Swing Line Loan.

(d)    Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the applicable Swing Line Lender, which may be given by telephone.  Each such notice must be received by the applicable Swing Line Lender not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be an integral multiple of $100,000, (ii) the requested borrowing date, which shall be a Business Day, (iii) whether the requested Swing Line Loan is a U.S. Swing Line Loan or a Foreign Swing Line Loan and (iv) in the case of a Foreign Swing Line Loan, the currency for such Foreign Swing Line Loan.  Each such telephonic notice must be confirmed promptly by delivery to the applicable Swing Line Lender of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Promptly after receipt by the applicable Swing Line Lender of any telephonic Swing Line Loan Notice, the applicable Swing Line Lender shall, subject to the first proviso of Section 2.04(a)(i) or Section 2.04(a)(ii), as applicable, and, provided that all applicable conditions in Section 4.02 are satisfied, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Applicable Borrowers.  If no currency is specified, the requested Swing Line Borrowing shall be in Dollars.

94

(e)     Participations in Swing Line Loans.

(i)     The U.S. Swing Line Lender, in its sole and absolute discretion, may request in writing that each of the U.S. Lenders fund its risk participation in the relevant U.S. Swing Line Loan and the Foreign Swing Line Lender, in its sole and absolute discretion, may request in writing that each of the Foreign ABL Lenders fund its risk participation in the relevant Foreign Swing Line Loan.  Upon receipt of any such request, each Appropriate Lender shall make funds available to the Administrative Agent for the account of the applicable Swing Line Lender at the applicable Administrative Agent's Office for payments in an amount equal to its Pro Rata Share of the amount of the relevant Swing Line Loan not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent.  The Administrative Agent shall notify Lead Borrower of any participation in any Swing Line Loan acquired pursuant to this Section 2.04(f) and thereafter payments in respect of such Swing Line Loan shall be made to the Administrative Agent and not to the applicable Swing Line Lender.

(ii)    If any Lender fails to make available to the Administrative Agent for the account of a Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(f) by the time specified in Section 2.04(f), such Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available in the Applicable Currency to such Swing Line Lender at a rate per annum equal to the Federal Funds Rate.  A certificate of a Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (ii) shall be conclusive absent manifest error.

(iii)   Each U.S. Lender's obligation to purchase and fund risk participations in U.S. Swing Line Loans and each Foreign ABL Lender's obligations to purchase and fund risk participations in Foreign Swing Line Loans pursuant to this Section 2.04(f) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the applicable Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing.  No such funding of risk participations shall relieve or otherwise impair the obligation of the U.S. Borrowers to repay U.S. Swing Line Loans or the Foreign Borrowers to repay the Foreign Swing Line Loans, together with interest as provided herein.  The Administrative Agent shall request settlement with the U.S. Lenders, with respect to U.S. Swing Line Loans, and with the Foreign ABL Lenders, with respect to the Foreign Swing Line Loans, on a weekly basis, or on a more frequent basis if so determined by Administrative Agent in its sole discretion on behalf of a Swing Line Lender, with respect to the outstanding Swing Line Loan.

(f)     Repayment of Participations.

(i)     At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the applicable Swing Line Lender receives any payment on account of such Swing Line Loan, such Swing Line Lender will pay such funds to the Administrative Agent (in the same funds as those received by such Swing Line Lender), for further distribution to each Appropriate Lender in accordance with its Pro Rata Share of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded).

95

(ii)      If any payment received by a Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by such Swing Line Lender under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by such Swing Line Lender in its discretion), each Appropriate Lender shall pay to such Swing Line Lender its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate.  The Administrative Agent will make such demand upon the request of a Swing Line Lender.

(g)      Interest for Account of Swing Line Lender.  The U.S. Swing Line Lender shall be responsible for invoicing the U.S. Borrowers for interest on the U.S. Swing Line Loans and the Foreign Swing Line Lender shall be responsible for invoicing the Foreign Borrowers for interest on the Foreign Swing Line Loans.  Until each Lender funds its risk participation pursuant to this Section 2.04 to refinance such Lender's Pro Rata Share of any Swing Line Loan, interest in respect of such Pro Rata Share shall be solely for the account of the applicable Swing Line Lender.

(h)      Payments Directly to Swing Line Lender.  The U.S. Borrowers shall make all payments of principal and interest in respect of the U.S. Swing Line Loans directly to the U.S. Swing Line Lender and the Foreign Borrowers shall make all payments of principal and interest in respect of the Foreign Swing Line Loans directly to the Foreign Swing Line Lender.

Section 2.05   Prepayments

.

(a)      Optional Prepayments.  (i)  The Borrowers may, upon delivery of a Prepayment Notice by the Lead Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay ABL Loans in whole or in part without premium or penalty; provided that (1) such notice must be received by the Administrative Agent not later than (A) 1:00 p.m. three (3) Business Days prior to any date of prepayment of Interest Period Rate Loans, (B) 1:00 p.m. one (1) Business Days prior to any date of prepayment of SONIA Rate Loans and (C) 11:00 a.m. on any date of prepayment of Base Rate Loans (or, in each case, such later date to which the Administrative Agent may agree); and (2) any prepayment of Loans shall be made in the Applicable Currency in a principal amount of $500,000 (or the Dollar Equivalent Amount of the Applicable Currency) or a whole multiple of $100,000 (or the Dollar Equivalent Amount of the Applicable Currency) in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  The Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of an Interest Period Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of any Class of Loans pursuant to this Section 2.05(a) shall be applied ratably among the Loans of such Class and shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(ii)      Notwithstanding anything to the contrary contained in this Agreement, the Lead Borrower may rescind any notice of prepayment under Section 2.05(a) if such prepayment would have resulted from a refinancing, replacement or prepayment of all or a portion of the ABL Facility, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

96

(iii)     Any prepayment of U.S. ABL Loans pursuant to this Section 2.05(a) shall be applied ~~first,~~ to all U.S. ABL ~~Loans (other than any U.S. FILO Loans) and thereafter to all U.S. FILO~~ Loans.

(b)     Mandatory Prepayments.  (i)  Except for Permitted Overadvances, in the event and on such occasion that (A) the aggregate ABL Exposure exceeds the Line Cap on any Business Day, (h) the aggregate U.S. ABL Exposure exceeds the U.S. Line Cap on any Business Day, (i) the aggregate UK ABL Exposure exceeds the UK Line Cap on any Business Day, (D) the aggregate Belgian ABL Exposure exceeds the Belgian Line Cap on any Business Day, or (E) the U.S. ABL Exposure exceeds the U.S. Borrowing Base, on any Business Day, the Applicable Borrowers shall prepay, within two (2) Business Days following notice thereof from the Administrative Agent, the applicable ABL Loans, L/C Exposure and/or Swing Line Loans (or, in the case of L/C Exposure, shall cash collateralize such L/C Exposure in accordance with Section 2.03) in an aggregate amount equal to such excess (as determined by the Administrative Agent) with no permanent reduction of the ABL Commitments.  If a Borrower is required to provide (and has provided the required amount of) cash collateral pursuant to this Section and such excess is subsequently reduced, cash collateral in an amount equal to the lesser of (x) any such reduction and (y) the amount of such cash collateral (to the extent not previously applied to the Obligations set forth above) shall be applied first to pay any outstanding principal amount of Permitted Overadvances of such Borrower until such Permitted Overadvances are paid in full in cash, second to pay any outstanding principal amount of Swing Line Loans of such Borrower until such Swing Line Loans are paid in full in cash, third to pay any outstanding principal amount of ABL Loans of such Borrower until such ABL Loans are paid in full in cash and thereafter, promptly returned to such Borrower.

(ii)     The U.S. Borrowers shall, within two (2) Business Days following notice from the Administrative Agent, pay to the Administrative Agent for deposit in the U.S. Cash Collateral Account, an amount sufficient to cause the aggregate amount on deposit in the U.S. Cash Collateral Account to equal the amount by which the aggregate Available Amount of all U.S. Letters of Credit then outstanding exceeds the U.S. Letter of Credit Commitments on any Business Day (less any amount then on deposit in the U.S. Cash Collateral Account); it being understood and agreed that funds on deposit in the U.S. Cash Collateral Account as a result of the application of this Section 2.05(b)(ii) shall be released to the U.S. Borrowers immediately on the first day on which the aggregate Available Amount of all U.S. Letters of Credit then outstanding no longer exceeds the U.S. Letter of Credit Commitments.

(iii)     The Foreign Borrowers shall, within two (2) Business Days following notice from the Administrative Agent, pay to the Administrative Agent for deposit in the Foreign Cash Collateral Account, an amount sufficient to cause the aggregate amount on deposit in the Foreign Cash Collateral Account to equal the amount by which the aggregate Available Amount of all Foreign Letters of Credit then outstanding exceeds the Foreign Letter of Credit Commitments on any Business Day (less any amount then on deposit in the Foreign Cash Collateral Account); it being understood and agreed that funds on deposit in the Foreign Cash Collateral Account as a result of the application of this Section 2.05(b)(iii) shall be released to the UK Borrowers immediately on the first day on which the aggregate Available Amount of all Foreign Letters of Credit then outstanding no longer exceeds the Foreign Letter of Credit Commitments.

(iv)     Prepayments of the U.S. ABL Facility made pursuant to clause (i) of this Section 2.05(b) shall be applied first, to prepay to U.S. L/C Borrowings then outstanding until such advances are paid in full, second, to prepay U.S. Swing Line Loans then outstanding until such U.S. Swing Line Loans are paid in full~~,~~ and third, to prepay U.S. ABL Loans ~~(other than U.S. FILO Loans)~~ then outstanding comprising part of the same Borrowings until such U.S. ABL

97

AmericasActive:~~18122631.2~~18122631.8

~~Loans (other than U.S. FILO Loans) are paid in full, and fourth, to prepay U.S. FILO Loans then outstanding comprising part of the same Borrowings until such U.S. FILO~~ Loans are paid in full; provided that the remaining amount (if any) after the prepayment in full of such Loans and extensions of credit then outstanding may be retained by the U.S. Borrowers.  Each such prepayment shall be paid to the U.S. Lenders in accordance with their respective Pro Rata Shares.

(v)     Prepayments of the Foreign ABL Facility made pursuant to clause (i) of this Section 2.05(b) shall be applied first, to prepay to Foreign L/C Borrowings then outstanding until such advances are paid in full, second,  to prepay Foreign Swing Line Loans then outstanding until such Foreign Swing Line Loans are paid in full and third, to prepay UK ABL Loans and Belgian ABL Loans then outstanding comprising part of the same Borrowings until such UK ABL Loans and Belgian ABL Loans are paid in full; provided that the remaining amount (if any) after the prepayment in full of such Loans and extensions of credit then outstanding may be retained by the Foreign Borrowers, as applicable.  Each such prepayment shall be paid to the Foreign ABL Lenders in accordance with their respective Pro Rata Shares.

(c)     Interest, Funding Losses.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of an Interest Period Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Interest Period Rate Loan pursuant to Section 3.05.  If any payment of Interest Period Rate Loans otherwise required to be prepaid under Section 2.05(b) would be made on a day other than the last day of the applicable Interest Period therefor, the Lead Borrower may direct the Administrative Agent to (and if so directed, the Administrative Agent shall) deposit such payment in a deposit account pledged as Collateral until the last day of the applicable Interest Period at which time the Administrative Agent shall apply the amount of such payment to the prepayment of such Borrowings; provided, however, that such Loans shall continue to bear interest as set forth in Section 2.08 until the last day of the applicable Interest Period thereunder.

Section 2.06   Termination or Reduction of Commitments

.

(a)     Optional.

(i)     The Lead Borrower may, upon written notice in accordance with Section 11.02 to the Administrative Agent, terminate the unused U.S. ABL Commitments, or from time to time permanently reduce the unused U.S. ABL Commitments; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof and (iii) if, after giving effect to any reduction of the U.S. ABL Commitments, the U.S. Swing Line Sublimit or the U.S. Letter of Credit Commitment exceeds the amount of the U.S. ABL Commitment, such sublimit shall be automatically reduced by the amount of such excess.

(ii)     The Lead Borrower may, upon written notice in accordance with Section 11.02 to the Administrative Agent, terminate the unused Foreign ABL Commitments, or from time to time permanently reduce the unused Foreign ABL Commitments; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof and (iii) if, after giving effect

98

to any reduction of the Foreign ABL Commitments, the Foreign Swing Line Sublimit or the Foreign Letter of Credit Commitment exceeds the Foreign ABL Commitments, such sublimit shall be automatically reduced by the amount of such excess.

(iii)    Notwithstanding anything to the contrary contained in this Agreement, the Lead Borrower may rescind any notice to terminate or reduce unused ABL Commitments of any Class under this Section 2.06(a) if such termination or reduction would have resulted from a refinancing, replacement or prepayment of all or a portion of the ABL Facility, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(b)    Mandatory.

(i)    The ABL Commitments shall automatically terminate on the Maturity Date for the ABL Facility.  The Swing Line Commitments shall automatically terminate on the Maturity Date for the ABL Facility.  The Extended ABL Commitments shall automatically terminate on the maturity dates specified therefor in the applicable Extension Amendment or Refinancing Amendment.

(ii)    The U.S. Letter of Credit Facility shall be permanently reduced from time to time on the date of each reduction in the U.S. ABL Facility by the amount, if any, by which the amount of the U.S. Letter of Credit Facility exceeds the maximum committed amount of the U.S. ABL Facility after giving effect to such reduction of the U.S. ABL Facility.  The Foreign Letter of Credit Facility shall be permanently reduced from time to time on the date of each reduction in the Foreign ABL Facility by the amount, if any, by which the amount of the Foreign Letter of Credit Facility exceeds the maximum committed amount of the Foreign ABL Facility after giving effect to such reduction of the Foreign ABL Facility.

(iii)    The Swing Line Facility shall be permanently reduced from time to time on the date of reduction in the ABL Facility by the amount, if any, by which the amount of the Swing Line Sublimit exceeds the ABL Facility after giving effect to the reduction of the ABL Facility.

(c)    Application of Commitment Reductions; Payment of Fees.  The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of unused portions of the U.S. Letter of Credit Commitments, the Foreign Letter of Credit Commitments, the U.S. Swing Line Sublimit, the Foreign Swing Line Sublimit or the ABL Commitments under this Section 2.06.  Upon any reduction of unused ABL Commitments, the ABL Commitments of each Appropriate Lender shall be reduced by such Lender's Pro Rata Share of the amount by which such ABL Commitments are reduced (other than the termination of the ABL Commitment of any Lender as provided in Section 3.07).  All Commitment Fees accrued until the effective date of any termination of the ABL Commitments shall be paid on the effective date of such termination.

Section 2.07   Repayment of Loans

.

(a)    The U.S. Borrowers shall repay to the Administrative Agent for the ratable account of the U.S. Lenders on the Maturity Date for the U.S. ABL Facility the aggregate principal amount of its U.S. Loans outstanding on such date.  The U.S. Borrowers shall repay any U.S. Swing Line Loans on the Maturity Date for the U.S. ABL Facility.

99

(b)　　The UK Borrowers shall repay to the Administrative Agent for the ratable account of the Foreign ABL Lenders on the Maturity Date for the Foreign ABL Facility the aggregate principal amount of its UK Loans outstanding on such date. The Belgian Borrowers shall repay to the Administrative Agent for the ratable account of the Foreign ABL Lenders on the Maturity Date for the Foreign ABL Facility the aggregate principal amount of its Belgian Loans outstanding on such date. The Foreign Borrowers shall repay any Foreign Swing Line Loans on the Maturity Date for the Foreign ABL Facility.

Section 2.08   Interest

.

(a)　　Subject to the provisions of Section 2.08(b), (i) each Interest Period Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Interest Period Rate for such Interest Period, as the case may be, plus the Applicable Rate, (ii) each SONIA Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the SONIA Rate plus the Applicable Rate, (iii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate, (iv) each U.S. Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the relevant Applicable Rate for Base Rate Loans, and (v) each Foreign Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Foreign ABL Facility Daily Rate plus the relevant Applicable Rate for Foreign ABL Facility Daily Rate Loans. Notwithstanding anything to the contrary set forth herein, all Loans outstanding on the Eighth Amendment Effective Date which are BSBY Loans or LIBOR Rate Loans (in each case, as defined in this Agreement immediately before giving effect to the Eighth Amendment) shall be permitted to continue as BSBY Loans or LIBOR Rate Loans, as applicable, for the duration of such BSBY Loans' or LIBOR Rate Loans' respective Interest Periods and, upon expiration of such Interest Periods, such Loans shall be converted to a Term SOFR Loan and/or a Base Rate Loan pursuant to and in accordance with the terms hereof.

(b)　　Commencing upon the occurrence and during the continuance of any Specified ABL Default pursuant to clause (a) of the definition thereof, the Applicable Borrowers shall pay interest on the relevant overdue amounts at a fluctuating interest rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand.

(c)　　Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09   Fees

.  In addition to certain fees described in Section 2.03(h) and (i):

(a)　　Commitment Fee.  The Borrowers shall pay to the Administrative Agent for the account of each Lender in accordance with its Pro Rata Share of the ABL Commitments, a commitment fee (the "Commitment Fee") equal to the Applicable Commitment Fee Percentage per annum times the actual daily amount by which the aggregate ABL Commitment exceeds the sum of (A) the Outstanding

100

Amount of ABL Loans (disregarding for the purposes of such calculation, the Outstanding Amount of any Swing Line Obligations) and (B) Outstanding Amount of L/C Obligations; provided that the Commitment Fee accrued with respect to any Pro Rata Share of the ABL Commitments of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrowers so long as such Lender shall be a Defaulting Lender except to the extent that such Commitment Fee shall otherwise have been due and payable by the Borrowers prior to such time; and provided further that no Commitment Fee shall accrue on any Pro Rata Share of any ABL Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Commitment Fees shall be payable quarterly in arrears, commencing on March 31, 2018 and on the first calendar day of each April, July, October and January and on the Maturity Date of the ABL Facility, accruing from the Closing Date in the case of each initial Lender and from the effective date specified in the Assignment and Assumption pursuant to which each other Lender became a Lender, until the Termination Date.

(b)     Other Fees.  The Borrowers shall pay to the Agents such fees as shall have been separately agreed upon in the Fee Letter at the times so specified.

Section 2.10   Computation of Interest and Fees

. All computations of interest for Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11   Evidence of Indebtedness

.

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, in each case in the ordinary course of business.  Without limitation of Section 11.07(d), the accounts or records maintained by each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  It is understood and agreed that any Lender (and/or its applicable assign) in possession of a Note shall be required to return such Note to the Lead Borrower in accordance with Section 11.07(b) and upon the occurrence of the Termination Date (or as promptly as practicable thereafter).

AmericasActive:18122631.218122631.8

(b)      Entries made in good faith by each Lender in its account or accounts, shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement and the other Loan Documents; provided, further, that if such accounts are inconsistent with the Register, the Register shall prevail, absent manifest error.  The Register shall be available for inspection by the Borrowers and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.12   Payments Generally

.

(a)      All payments to be made by a Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds in the Applicable Currency not later than 3:00 p.m. (or at such later time as the Administrative Agent may agree) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office.  All payments received by the Administrative Agent after 3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      [Reserved].

(c)      Unless the Lead Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrowers or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrowers or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)      if a Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Applicable Borrowers to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which

102

may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, then in the event the Administrative Agent has funded a Loan in advance of receipt of funds from a Defaulting Lender or otherwise made a payment to the Applicable Borrowers on behalf of such Defaulting Lender, the Administrative Agent may make a demand therefor upon the Applicable Borrowers, and such Borrowers shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Applicable Borrowers may have against any Lender as a result of any default by a Lender hereunder.

A notice by the Administrative Agent to any Lender or the Lead Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this ARTICLE II, and such funds are not made available to the Applicable Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in ARTICLE IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan or purchase its participation.

(f)     Without limiting the obligations of any Lender to make Loans hereunder, nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular manner.

(g)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 9.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13   Sharing of Payments

.  If, other than as expressly provided elsewhere herein (including, without limitation, in Section 2.16 and Section 11.07), any Lender of any Class shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall

immediately (a) notify the Administrative Agent of such fact, and ii) purchase from the other Lenders of such Class such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender of such Class shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (1) the amount of such paying Lender's required repayment to (2) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.   Each Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 11.09) with respect to such participation as fully as if such Lender were the direct creditor of such Borrower in the amount of such participation.   The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.   Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14   Defaulting Lenders

.   Notwithstanding any other provision in this Agreement to the contrary, if at any time a Lender becomes a Defaulting Lender, then the following provisions shall apply so long as any Lender is a Defaulting Lender.

(a)   All or any part of the Swing Line Loans and L/C Exposure of such Defaulting Lender shall be reallocated (i) in the case of a Defaulting Lender that is a U.S. Lender, among the U.S. Lenders that are not Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent the sum of the U.S. ABL Exposures of the U.S. Lenders that are not Defaulting Lenders does not exceed the total amount of the U.S. ABL Commitments of the U.S. Lenders that are not Defaulting Lenders and (ii) in the case of a Defaulting Lender that is a Foreign ABL Lender, among the Foreign ABL Lenders that are not Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent the sum of the UK ABL Exposures and Belgian ABL Exposures of the Foreign ABL Lenders that are not Defaulting Lenders does not exceed the total amount of the Foreign ABL Commitments of the Foreign ABL Lenders that are not Defaulting Lenders; in each case, it being understood and agreed that upon any reallocation described in this Section 2.14, the fees payable to the Lenders pursuant to Section 2.03(h) and Section 2.09(a) shall be adjusted in accordance with the Pro Rata Shares of the relevant Lenders that are not Defaulting Lenders.

(b)   If the reallocation described in Section 2.14(a) above cannot be effected or can only be partially effected, upon one (1) Business Days' notice from the relevant Swing Line Lender or the relevant L/C Issuer, as the case may be, the Applicable Borrowers shall Cash Collateralize in accordance with Section 2.15 (or make other arrangements reasonably satisfactory to the relevant Swing Line Lender or the relevant L/C Issuer, as the case may be, with respect to) the amount of the U.S. Swing Line Exposure, Foreign Swing Line Exposure, U.S. L/C Exposure, or Foreign L/C Exposure, as the case may be, of such Defaulting Lender; it being understood and agreed that any such Cash Collateral shall be released immediately following (i) the elimination of the U.S. L/C Exposure, Foreign L/C Exposure, U.S.

104

AmericasActive:18122631.218122631.8

Swing Line Exposure, or Foreign Swing Line Exposure of the relevant Defaulting Lender (including by the termination of the relevant Lender's status as a Defaulting Lender or as a result of an assignment in accordance with Section 3.07) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral (including as a result of any subsequent reallocation of U.S. Swing Line Exposure, Foreign Swing Line Exposure, U.S. L/C Exposure or Foreign L/C Exposure among Applicable Lenders that are not Defaulting Lenders in accordance with Section 2.14(a) above).

(c)     The U.S. Swing Line Lender shall not be required to fund any portion of any U.S. Swing Line Loan requested to be made by the U.S. Borrowers that is attributable to the U.S. Swing Line Exposure of any Defaulting Lender and the U.S. L/C Issuer shall not be required to issue, amend, extend or renew any U.S. Letter of Credit unless, in each case, the U.S. Swing Line Lender or the U.S. L/C Issuer, as applicable, is reasonably satisfied that the U.S. Borrowers have Cash Collateralized or made other arrangements with respect to any U.S. Swing Line Exposure or U.S. L/C Exposure of such Defaulting Lender, as the case may be, or that any related U.S. Swing Line Exposure and/or U.S. L/C Exposure will be 100% covered by the U.S. ABL Commitments of U.S. Lenders that are not Defaulting Lenders.

(d)     The Foreign Swing Line Lender shall not be required to fund any portion of any Foreign Swing Line Loan requested to be made by the Foreign Borrowers that is attributable to the Foreign Swing Line Exposure of any Defaulting Lender and the Foreign L/C Issuer shall not be required to issue, amend, extend or renew any Foreign Letter of Credit unless, in each case, the Foreign Swing Line Lender or the Foreign L/C Issuer, as applicable, is reasonably satisfied that the Foreign Borrowers have Cash Collateralized or made other arrangements with respect to any Foreign Swing Line Exposure or Foreign L/C Exposure of such Defaulting Lender, as the case may be, or that any related Foreign Swing Line Exposure and/or Foreign L/C Exposure will be 100% covered by the Foreign ABL Commitments of Foreign ABL Lenders that are not Defaulting Lenders.

Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 11.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Lead Borrower as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, so long as no Default or Event of Default exists, as the Lead Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent or the Lead Borrower, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan was made or created, as applicable, at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders of the same Class as such Defaulting Lender on a *pro rata* basis prior to being applied to the payment of any Loans of, or L/C Exposure owed to, such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender or to post Cash Collateral pursuant to this Section

AmericasActive:18122631.218122631.8

2.14 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.15   Cash Collateral

.   If (a) any Event of Default occurs (other than under Section 9.01(f) or (g)) and is continuing, upon the election of the Administrative Agent, or at the direction of the Required Lenders, the Applicable Borrowers shall Cash Collateralize the L/C Obligations pursuant to Section 9.02(c) or (b) an Event of Default set forth under Section 9.01(f) or (g) occurs and is continuing, then the Applicable Borrowers shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such Event of Default) and shall do so not later than, 2:00 p.m. on the date that is one (1) Business Day immediately following the date on which the Lead Borrower receives such notice, in each case to the extent such amount has not been Backstopped.

For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Collateral Agent, for the benefit of the relevant L/C Issuer, Swing Line Lender and Lenders, as collateral for the L/C Obligations (in an amount equal to 102% of the L/C Exposure) and Swing Line Loans, cash, Cash Equivalents or deposit account balances ("Cash Collateral") pursuant to documentation in form and substance reasonably satisfactory to the Collateral Agent and the relevant L/C Issuer and/or the Swing Line Lender, as applicable (which documents are hereby consented to by the Lenders).  Derivatives of such term have corresponding meanings.  Cash Collateral shall be (a) with respect to pledges and deposits for the benefit of the relevant U.S. L/C Issuer, U.S. Swing Line Lender and other U.S. Lenders, maintained in blocked accounts at the Collateral Agent in the United States (the "U.S. Cash Collateral Account") and (b) with respect to pledges and deposits for the benefit of the relevant Foreign L/C Issuer, Foreign Swing Line Lender and the other Foreign ABL Lenders, maintained in blocked accounts at the Collateral Agent in Belgium and/or the United Kingdom (the "Foreign Cash Collateral Account").

Section 2.16   Increase in ABL Commitments

.

(a)      On or before the Maturity Date of the ABL Facility, the Lead Borrower may by written notice to the Administrative Agent elect to request increases in either the U.S. ABL Commitments or the Foreign ABL Commitments (each, an "ABL Commitment Increase", and collectively, the "ABL Commitment Increases").  Subject to the terms and conditions set forth in this Section 2.16, the ABL Commitments shall be increased on the relevant Increased Amount Date; provided that the aggregate amount of all such ABL Commitment Increases after the Fifth Amendment Effective Date shall not exceed the Incremental ABL Cap.  Each such notice shall specify the date (each, an "Increased Amount Date") on which the Lead Borrower proposes that such ABL Commitment Increase shall be effective; provided that any Lender offered or approached to provide all or a portion of any increased ABL Commitments may elect or decline, in its sole discretion, to provide such increased ABL Commitments.

(b)      Such ABL Commitment Increase shall become effective as of the Increased Amount Date; provided that

(i)      no Default or Event of Default shall exist and be continuing or would result from the incurrence of such ABL Commitment Increase; provided that, solely in connection with an ABL Commitment Increase incurred to finance a Limited Condition Acquisition for which the Lead Borrower has made an LCA Election, (i) no Default or Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition

Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition;

(ii)     the representations and warranties in ARTICLE V shall be true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respects) on and as of the date of incurrence of such Indebtedness to the same extent as though made on and as of that date, except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, solely in connection with any ABL Commitment Increase incurred to finance a Limited Condition Acquisition for which the Lead Borrower has made an LCA Election, the representations and warranties shall be made as of the LCA Test Date for such Limited Condition Acquisition and such Limited Condition Acquisition may be subject to customary "SunGard" conditionality;

(iii)     such ABL Commitment Increase shall be on the same terms and pursuant to the same documentation applicable to the ABL Facility (as amended from time to time) (including with respect to interest rate, maturity date and unused fees but excluding any terms or documentation with respect to upfront fees, customary arranger fees, original issue discount or similar fees);

(iv)     such ABL Commitment Increase shall be effected pursuant to one or more joinder agreements executed and delivered by the Applicable Borrowers, and one or more Lenders (and acknowledged by the Administrative Agent) and setting forth the terms applicable to such ABL Commitment Increase (each, a "Joinder Agreement"); and

(v)     such ABL Commitment Increase (if fully drawn) shall not cause the aggregate ABL Commitments (if fully drawn) to exceed the applicable limit or cap on the ABL Facility under the ABL Intercreditor Agreement, the First Lien Loan Documents or the Second Lien Loan Documents.

(c)     On any Increased Amount Date on which any ABL Commitment Increase becomes effective, subject to the foregoing terms and conditions, (i) each lender with a U.S. ABL Commitment pursuant to such Incremental ABL Commitment Increase, to the extent not already a U.S. Lender, shall become a U.S. Lender hereunder with respect to such U.S. ABL Commitment and (ii) each lender with a Foreign ABL Commitment pursuant to such Incremental ABL Commitment Increase, to the extent not already a Foreign ABL Lender, shall become a Foreign ABL Lender hereunder with respect to such Foreign ABL Commitment; provided that any financial institution that becomes a U.S. Lender or a Foreign ABL Lender that is not already a U.S. Lender or Foreign ABL Lender (as applicable) hereunder shall be satisfactory to the Lead Borrower and to the extent such consent would be required under Section 11.07 for an assignment of ABL Loans to such financial institution, (i) the Administrative Agent and (ii) the L/C Issuer and (iii) the Swing Line Lender.

(d)     The Lenders hereby irrevocably authorize the Administrative Agent to enter into (x) such amendments to this Agreement and the other Loan Documents with the Borrowers as may be necessary in order to increase the ABL Commitments pursuant to this Section 2.16, and (y) Joinder Agreements with the Applicable Borrowers and one or more lenders with such ABL Commitments, to the extent not already a Lender, without the consent of any other Lenders, to effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to effect the provisions of this Section 2.16 including, without limitation, to ensure that, upon the effectiveness of each ABL Commitment Increase of any Class, (i) the ABL Loans

made under such ABL Commitment Increase are included in each Borrowing of outstanding Loans of such Class on a pro rata basis and (ii) the Lender providing each ABL Commitment Increase shares ratably in the aggregate principal amount of all outstanding ABL Loans, Swing Loans and L/C Obligations of such Class.

(e)    This Section 2.16 shall supersede any provision of Section 2.13 and/or Section 11.01 to the contrary.

Section 2.17   Additional Borrowers

. The Lead Borrower may designate any Wholly- Owned Subsidiary of Parent that is a U.S. Domestic Subsidiary and a Restricted Subsidiary as a U.S. Borrower (each, a "Joining U.S. Borrower"), any Wholly-Owned Subsidiary of Parent that is a UK Domestic Subsidiary and a Restricted Subsidiary as a UK Borrower (each, a "Joining UK Borrower") or any Wholly-Owned Subsidiary of Parent that is a Belgian Domestic Subsidiary and a Restricted Subsidiary as a Belgian Borrower (each, a "Joining Belgian Borrower"), in each case subject to (a) the consent of the Administrative Agent (not to be unreasonably withheld or delayed), (b) satisfactory compliance with each Lender's "know your customer" and related diligence as required by each Lender and (c) the receipt by the Administrative Agent and the Collateral Agent of (i) amendments to this Agreement and the relevant Collateral Documents as the Collateral Agent deems reasonably necessary or advisable to facilitate such additional Borrower and to grant (to the extent not already granted) to the Collateral Agent, for the benefit of the applicable Secured Parties, Liens on the assets of such Joining Borrower consistent with the Liens and priority granted in the Collateral on the Closing Date, (ii) a counterpart of the Borrower Joinder Agreement, signed on behalf of the Joining Borrower (or a PDF or facsimile copy thereof) and a joinder agreement to the relevant Security Agreement and Guaranty, substantially in the form annexed thereto, (iii) a certificate of such Joining Borrower, in form and substance reasonably acceptable to the Administrative Agent, with appropriate insertions and attachments and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

Section 2.18   Extension of Loans

.

(a)    The Lead Borrower may, by written notice to the Administrative Agent from time to time, request an extension (each, an "Extension") of the maturity date of any Class of Loans and ABL Commitments to the extended maturity date specified in such notice.  Such notice shall (i) set forth the amount of Loans subject to such Extension (which shall be in a minimum amount of $10,000,000 (or the Dollar Equivalent Amount of the Applicable Currency) and minimum increments of $1,000,000 (or the Dollar Equivalent Amount of the Applicable Currency) above such amount), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten Business Days nor more than sixty days after the date of such Extension notice (or such longer or shorter periods as the Administrative Agent shall agree in its sole discretion)) and (iii) identify the relevant Class of Loans to which such Extension relates.  Each Lender of the applicable Class shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Borrowers.  If the aggregate principal amount of ABL Loans in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of ABL Loans subject to the Extension Offer as set forth in the Extension notice, then the ABL Loans of Lenders of the applicable Class shall be extended ratably up to

108

such maximum amount based on the respective principal amounts with respect to which such Lenders have accepted such Extension Offer.  If the aggregate principal amount of ABL Loans in respect of which Lenders shall have accepted the relevant Extension Offer is less than the maximum aggregate principal amount of ABL Loans subject to the Extension Offer as set forth in the Extension notice, then the ABL Loans of Lenders of the applicable Class shall be extended up to the amounts to which the Lenders accepting such Extension Offer shall have committed.

(b)     The following shall be conditions precedent to the effectiveness of any Extension:

(i)     no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension,

(ii)     the representations and warranties set forth in ARTICLE V and in each other Loan Document shall be deemed to be made and shall be true and correct in all material respects (or, with respect to such representations and warranties which by their terms contain materiality qualifiers, shall be true and correct in all respects) on and as of the effective date of such Extension; provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects (or, with respect to such representations and warranties which by their terms contain materiality qualifiers, shall be true and correct in all respects) as of such earlier date,

(iii)     the terms of such Extended ABL Loans shall comply with clauses (c) and (d) of Section 2.18; and

(iv)     no Lender shall be obligated to provide all or any portion of any such Extension and the determination to provide such Extension shall be within the sole and absolute discretion of such Lender.

(c)     The terms of each Extension shall be determined by the Borrowers and the applicable extending Lenders and set forth in an Extension Amendment; provided:

(i)     the final maturity date of any Extended ABL Loan shall be no earlier than the Latest Maturity Date for the ABL Facility, then in effect;

(ii)     the average weighted life to maturity of the Extended ABL Loans shall be no shorter than the remaining average weighted life to maturity of the existing ABL Loans;

(iii)     the Extended ABL Loans of any Class will rank pari passu in right of payment and with respect to security with the existing ABL Loans of such Class and the borrowers and guarantors of the Extended ABL Loans of any Class shall be the same as the Borrowers and Guarantors with respect to the existing ABL Loans of such Class;

(iv)     the interest rate margin, rate floors, fees, original issue discount and premium applicable to any Extended ABL Loans shall be determined by the Lead Borrower and the applicable extending Lenders;

(v)     the Extended ABL Loans may participate on a pro rata or less than pro rata (but not greater than pro rata) basis in voluntary or mandatory prepayments with the other ABL Loans; and

AmericasActive:18122631.218122631.8

(vi)     the terms of the Extended ABL Loans shall be substantially identical to the terms set forth in this Agreement (except as set forth in clauses (i) through (v) above), except for such terms as apply only after the Latest Maturity Date of the Loans which are not extended).

(d)     In connection with any Extension, the Borrowers, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension.   The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension.   Any Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrowers, to implement the terms of any such Extension, including any amendments necessary to establish Extended ABL Loans as a new Class or tranche of ABL Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrowers in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches), in each case on terms consistent with this section.

Section 2.19   Reallocation Mechanism.

(a)     Subject to the terms and conditions of this Section 2.19, the Lead Borrower may request that the Administrative Agent and Lenders change the then current allocation of each Lender's (and, if applicable, its Affiliate's) ABL Commitment between the U.S. ABL Commitments and the Foreign ABL Commitments in order to effect an increase or decrease in such ABL Commitments, with any such increase or decrease in the U.S. ABL Commitments to be accompanied by a concurrent and equal decrease or increase, respectively, in the Foreign ABL Commitments (each, a "Reallocation").   In addition to the conditions set forth in Section 2.19(b), any such Reallocation shall be subject to the following conditions: (i) the Lead Borrower shall have provided to the Administrative Agent a written request (in reasonable detail) at least fifteen Business Days prior to the requested effective date therefor (which effective date must be a Business Day) (the "Reallocation Date") setting forth the proposed Reallocation Date and the amounts of the proposed ABL Commitment reallocations to be effected, (ii) Administrative Agent consents to such Reallocation, (iii) any such Reallocation shall increase or decrease the applicable Commitments in an amount equal to $5,000,000 and in increments of $1,000,000 in excess thereof, (iv) no more than one Reallocation may be requested in any calendar quarter, (v) no Default or Event of Default shall have occurred and be continuing either as of the date of such request or on the Reallocation Date (both immediately before and after giving effect to such Reallocation), (vi) any increase in a U.S. ABL Commitment shall result in a dollar-for-dollar decrease in the Foreign ABL Commitment and any increase in a Foreign ABL Commitment shall result in a dollar-for-dollar decrease in the U.S. ABL Commitment, (vii) in no event shall the sum of the U.S. ABL Commitments and the Foreign ABL Commitments exceed the aggregate amount of the ABL Commitments then in effect, (viii) after giving effect to such Reallocation, no Overadvance would exist or would result therefrom, (ix) at least three Business Days prior to the proposed Reallocation Date, a Responsible Officer of the Lead Borrower shall have delivered to the Administrative Agent a certificate certifying as to compliance with preceding clause (v), which certificate shall be deemed recertified to the Administrative Agent by a Responsible Officer of the Lead Borrower on and as of the Reallocation Date and (x) the Foreign ABL Commitments shall not exceed $15,000,000 without the prior written consent of the Lenders.

(b)     The Administrative Agent shall promptly inform the Lenders of any request for a Reallocation.   If the conditions set forth in this Section are not satisfied on the applicable Reallocation Date (or, to the extent such conditions relate to an earlier date, such earlier date), the Administrative Agent shall notify the Lead Borrower in writing that the requested Reallocation will not be effectuated; provided that the Administrative Agent shall in all cases be entitled to rely (without liability) on the

AmericasActive:18122631.218122631.8

certificate delivered by the Lead Borrower pursuant to Section 2.19(a)(ix) in making its determination as to the satisfaction of the conditions set forth in Section 2.19(a)(v) and (ix).  On each Reallocation Date, the Administrative Agent shall notify the Lenders and the Lead Borrower, on or before 3:00 p.m. by facsimile, e-mail or other electronic means, of the occurrence of the Reallocation to be effected on such Reallocation Date, the amount of the Loans held by each such Lender (or an Affiliate thereof) as a result thereof and the amount of the U.S. ABL Commitments and the Foreign ABL Commitments of each such Lender as a result thereof.  To the extent necessary where a Lender in one ABL Commitment class and its separate affiliate that is a Lender in the other ABL Commitment class are participating in a Reallocation, the Reallocation among such Persons shall be deemed to have been consummated pursuant to an Assignment and Acceptance.  The respective Pro Rata Shares of the Lenders shall thereafter, to the extent applicable, be determined based on such reallocated amounts (subject to any subsequent changes thereto), and the Administrative Agent and the affected Lenders shall make such adjustments as the Administrative Agent shall deem reasonably necessary so that the outstanding Loans and L/C Obligations of each Lender equals its Pro Rata Share thereof after giving effect to the Reallocation.

Section 2.20   Foreign Sublimit Reallocation Mechanism.

(a)        Subject to the terms and conditions of this Section 2.20, the Lead Borrower may request that the Administrative Agent and Lenders change the then current allocation of each Lender's (and, if applicable, its Affiliate's) Foreign ABL Commitment between the Belgian Sublimit and the UK Sublimit in order to effect an increase or decrease in such Foreign ABL Commitments, with any such increase or decrease in the Belgian Sublimit to be accompanied by a concurrent and equal decrease or increase, respectively, in the UK Sublimit (each, a "Foreign Sublimit Reallocation").  In addition to the conditions set forth in Section 2.20 (b), any such Foreign Sublimit Reallocation shall be subject to the following conditions: (i) the Lead Borrower shall have provided to the Administrative Agent a written request (in reasonable detail) at least fifteen Business Days prior to the requested effective date therefor (which effective date must be a Business Day) (the "Foreign Sublimit Reallocation Date") setting forth the proposed Foreign Sublimit Reallocation Date and the amounts of the proposed Foreign ABL Commitment reallocations to be effected, (ii) Administrative Agent consents to such Foreign Sublimit Reallocation, (iii) any such Reallocation shall increase or decrease the applicable sublimit in an amount equal to $1,000,000 and in increments of $1,000,000 in excess thereof, (iv) no more than one Foreign Sublimit Reallocation may be requested in any calendar quarter, (v) no Default or Event of Default shall have occurred and be continuing either as of the date of such request or on the Foreign Sublimit Reallocation Date (both immediately before and after giving effect to such Foreign Sublimit Reallocation), (vi) any increase in the Belgian Sublimit shall result in a dollar-for-dollar decrease in the UK Sublimit and any increase in the UK Sublimit shall result in a dollar-for-dollar decrease in the Belgian Sublimit, (vii) in no event shall the sum of the UK Sublimit and the Belgian Sublimit exceed the aggregate amount of the Foreign ABL Commitments then in effect, (viii) after giving effect to such Foreign Sublimit Reallocation, no Overadvance would exist or would result therefrom, and (ix) at least three Business Days prior to the proposed Foreign Sublimit Reallocation Date, a Responsible Officer of the Lead Borrower shall have delivered to the Administrative Agent a certificate certifying as to compliance with preceding clause (v), which certificate shall be deemed recertified to the Administrative Agent by a Responsible Officer of the Lead Borrower on and as of the Foreign Sublimit Reallocation Date.

(b)        The Administrative Agent shall promptly inform the Lenders of any request for a Foreign Sublimit Reallocation.  If the conditions set forth in this Section are not satisfied on the applicable Foreign Sublimit Reallocation Date (or, to the extent such conditions relate to an earlier date, such earlier date), the Administrative Agent shall notify the Lead Borrower in writing that the requested Foreign Sublimit Reallocation will not be effectuated; provided that the Administrative Agent shall in all cases be entitled to rely (without liability) on the certificate delivered by the Lead Borrower pursuant to

AmericasActive:18122631.218122631.8

Section 2.20(a)(ix) in making its determination as to the satisfaction of the conditions set forth in Section 2.20(a)(v) and (ix).  On each Foreign Sublimit Reallocation Date, the Administrative Agent shall notify the Lenders and the Lead Borrower, on or before 3:00 p.m. by facsimile, e-mail or other electronic means, of the occurrence of the Foreign Sublimit Reallocation to be effected on such Foreign Sublimit Reallocation Date, the amount of the Loans held by each such Lender (or an Affiliate thereof) as a result thereof and the amount of the Belgian Sublimit and the UK Sublimit as a result thereof.  The respective Pro Rata Shares of the Lenders shall thereafter, to the extent applicable, be determined based on such reallocated amounts (subject to any subsequent changes thereto), and the Administrative Agent and the affected Lenders shall make such adjustments as the Administrative Agent shall deem reasonably necessary so that the outstanding Loans and L/C Obligations of each Lender equals its Pro Rata Share thereof after giving effect to the Foreign Sublimit Reallocation.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01   Taxes

.

(a)      Except as required by applicable Laws, any and all payments by a Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all Taxes.

If a Loan Party, or its applicable agent, shall be required by any Law to deduct (under applicable Laws, as determined in the good faith discretion of the applicable withholding agent) any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) with respect to Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings on account of Indemnified Taxes that are applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Loan Party (or withholding agent if applicable) shall make such deductions or withholdings, (iii) the applicable Loan Party (or withholding agent if applicable) shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Lead Borrower shall furnish to the Administrative Agent for its account or for the account of any other Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof, or in the event that the same is not available using commercially reasonable business efforts, such other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)      In addition, each U.S. Borrower and each Foreign Borrower agrees to pay any and all present or future stamp, fee, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any U.S. Obligation or Foreign Obligation, respectively, or from the execution, delivery, performance, enforcement or registration of any U.S. Obligation or Foreign Obligation, respectively, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07(a)) (all such non-excluded taxes, charges, duties, debits and levies described in this Section 3.01(b) being hereinafter referred to as "Other Taxes").

AmericasActive:~~18122631.2~~18122631.8

(c)        Each U.S. Borrower and each Foreign Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any Governmental Authority on amounts payable and paid under this Section 3.01) payable or paid by such Agent and such Lender under any U.S. Obligation or Foreign Obligation or otherwise arising in connection with any U.S. Obligation or Foreign Obligation, respectively, and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made in accordance with Section 3.06 hereof.  For the avoidance of doubt, such Borrower shall not be required to indemnify any Lender or Agent under this Section 3.01(c) with respect to any Taxes that have been compensated for by the payment of any additional amounts pursuant to Section 3.01(a) or (b).

(d)        If any Lender or Agent determines, in its reasonable discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall remit such refund as soon as practicable after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund) to such Borrower, net of all reasonable out-of-pocket expenses of the relevant Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority); provided that such Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at such Borrower's request, provide such Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (d), in no event will any Lender or Agent be required to pay any amount to the Borrowers pursuant to this paragraph (d) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid.  Subject to Section 3.01(e) below, nothing herein contained shall oblige any Lender or Agent to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof (or any other information relating to its Taxes that it deems confidential) or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)        Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a), 3.01(b) or 3.01(c) with respect to such Lender it will, if requested by the Lead Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan affected by such event; provided that (i) such designation would eliminate or reduce amounts payable pursuant to Section 3.01(a), 3.01(b) or 3.01(c), as the case may be, and (ii) such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no economic, legal or regulatory disadvantage; and provided further that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Section 3.01(a) or 3.01(c).  Each Borrower agrees to pay all reasonable out-of-pocket expenses incurred by any Lender or Agent in connection with any such designation in accordance with ~~Section 11.04~~ hereof.

113

(f)     (i) Any Lender (which term "Lender" shall include L/C Issuers for purposes of this Section 3.01(f)) that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.   In addition, any Lender, if reasonably requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f) (A)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), executed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of Internal Revenue Service Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that

114

such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     such Lender shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement;

(E)     (1) a Lender on the Closing Date that (x) holds a passport under the HMRC DT Treaty Passport scheme and (y) wishes such scheme to apply to a Loan to a UK Borrower under this Agreement, shall provide its scheme reference number and its jurisdiction of tax residence to that UK Borrower and the Administrative Agent within 5 Business Days of the Closing

115

AmericasActive:18122631.218122631.8

Date or, if later, within 5 Business Days of the date on which the UK Borrower becomes a party to this Agreement;

(2) a Lender which becomes a Lender hereunder after the Closing Date that (x) holds a passport under the HMRC DT Treaty Passport scheme and (y) wishes such scheme to apply to a Loan to a UK Borrower under this Agreement, shall provide its scheme reference number and its jurisdiction of tax residence to that UK Borrower and the Administrative Agent within 5 Business Days of the day on which the Lender becomes a Lender under this Agreement or, if later, within 5 Business Days of the date on which that UK Borrower becomes a party to this Agreement; and

(3) upon satisfying either clause (1) or (2) above, such Lender shall have satisfied its obligation under paragraph (f)(i) above with respect to that UK Borrower;

(F)     if a Lender has confirmed its scheme reference number and its jurisdiction of tax residence in accordance with paragraph (E) above, the relevant UK Borrower shall make a Borrower DTTP filing with respect to such Lender, and shall promptly provide such Lender with a copy of such filing; provided that, if that UK Borrower has made a Borrower DTTP Filing in respect of such Lender but: (1) such Borrower DTTP Filing has been rejected by HM Revenue & Customs; or (2) HM Revenue & Customs has not given that UK Borrower authority to make payments to such Lender without a deduction for tax within 60 days of the date of such Borrower DTTP Filing; and in each case, that UK Borrower has notified that Lender in writing of either (1) or (2) above, then such Lender and such UK Borrower shall co-operate in completing any additional procedural formalities necessary for such UK Borrower to obtain authorization to make that payment without withholding or deduction for Taxes imposed under the laws of the UK;

(G)     if a Lender has not confirmed its scheme reference number and jurisdiction of tax residence in accordance with paragraph (E) above, the relevant UK Borrower shall not make a Borrower DTTP Filing or file any other form relating to the HMRC DT Treaty Passport scheme in respect of that Lender's participation in any Loan unless the Lender otherwise agrees; and

(H)     a UK Borrower shall, promptly on making a Borrower DTTP Filing, deliver a copy of such Borrower DTTP Filing to the Administrative Agent for delivery to the relevant Lender.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for any Taxes imposed on or with respect to any payment made by any Borrower under any Loan Document attributable to such Lender (but only to the extent that any Borrower, Parent or any Subsidiary Guarantor has not already indemnified the Administrative Agent for such Taxes and

116

without limiting the obligation of the Borrowers, Parent or any Subsidiary Guarantor to do so).  Each Lender shall severally indemnify the Administrative Agent within 10 days after demand therefor, for (i) any taxes, including interest, additions to tax or penalties applicable thereto, attributable to such Lender's failure to comply with the provisions of Section 11.07(e) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes, taxes or Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)    VAT:

(i)    All amounts set out or expressed in a Loan Document to be payable by any party to any Lender that (in whole or in part) constitute the consideration for a supply for VAT purposes shall, except as otherwise agreed by such Lender, be deemed to be exclusive of any VAT that is chargeable on such supply.  Subject to paragraph (ii) below, if VAT is or becomes chargeable on any supply made by any Lender to any party under a Loan Document, such party shall pay to such Lender (in addition to and at the same time as paying any other consideration for such supply), an amount equal to the amount of such VAT (and such Lender shall promptly deliver to such party an invoice complying with the applicable legal requirements) unless such party is obligated by law to account directly to the applicable Governmental Authority for such VAT.

(ii)    If VAT is or becomes chargeable on any supply made by the Administrative Agent or any Lender (the "VAT Supplier") to any other Lender (the "VAT Recipient") under a Loan Document, and any party other than the VAT Recipient (the "VAT Relevant Party") is required by the terms of any Loan Document to pay an amount equal to the consideration for that supply to the VAT Supplier (rather than being required to reimburse or indemnify the VAT Recipient in respect of that consideration) (x) (where the VAT Supplier is the Person required to account to the relevant tax authority for the VAT) the VAT Relevant Party shall also pay to the VAT Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The VAT Recipient shall (where the immediately foregoing clause (x) applies) promptly pay to the VAT Relevant Party an amount equal to any credit or repayment the VAT Recipient receives from the relevant Governmental Authority which the VAT Recipient reasonably determines relates to the VAT chargeable on that supply and (y) (where the VAT Recipient is the Person required to account to the relevant Governmental Authority for the VAT) the VAT Relevant Party shall promptly, following demand from the VAT Recipient, pay to the VAT Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the VAT Recipient reasonably determines that it is not entitled to credit or repayment from the relevant Governmental Authority in respect of that VAT.

(iii)    Where a Loan Document requires any party to reimburse or indemnify any Lender for any cost or expense, such party shall reimburse or indemnify (as the case may be) such Recipient for the full amount of such cost or expense, including such part thereof as represents VAT, except to the extent that such Lender reasonably determines that it, or any member of its group, is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

117

AmericasActive:18122631.218122631.8

(iv)     Any reference in this Section 3.01(h) to any party shall, at any time when such party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994) or otherwise to a person treated as making or (as appropriate) receiving the supply under the grouping rules provided for in Article 11 of the Council Directive 2006/112/EEC on the common system of value added tax.

(v)     In relation to any supply made by a Lender to any party under a Loan Document, if reasonably requested by such Lender, such party must promptly provide such Lender with details of such party's VAT registration and such other information as is reasonably requested in connection with such Lender's VAT reporting requirements in relation to such supply.

Section 3.02   Illegality

.   If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority that is a court, statutory board or commission has asserted that it is unlawful, for any Lender or its Applicable Lending Office to perform any of its obligations hereunder, to make, maintain or fund Interest Period Rate Loans, SONIA Rate Loans or Foreign ABL Facility Daily Rate Loans, or to determine or charge interest rates or fees based upon SOFR, Term SOFR, EURIBOR or SONIA, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell bills of exchange denominated in, or to take deposits of a currency in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, in respect of the affected Loans, as applicable, (A) (i) any obligation of such Lender to make, maintain, issue, fund, commit to or participate in Interest Period Rate Loans, SONIA Rate Loans or Foreign ABL Facility Daily Rate Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended and Borrowers shall make such appropriate accommodations regarding affected Letters of Credit as the Administrative Agent or such Lender may reasonably request, as applicable and (ii) if such notice asserts the illegality of such Lender to make or maintain Base Rate Loans whose interest rate is determined by reference to Term SOFR, the interest rate applicable to such Lender's Base Rate Loans shall, as necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of Base Rate, in each case, until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist, (B) upon delivery of such notice, the Borrowers shall upon demand from such Lender (with a copy to the Administrative Agent), (x) prepay all affected Loans or (y) in the case of Term SOFR Loans, convert such Term SOFR Loans of such Lender to Base Rate Loans, either, in the case of Interest Period Rate Loans, on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Interest Period Rate Loans and charge applicable interest to such day, or otherwise immediately, if such Lender cannot so maintain such Interest Period Rate Loans, SONIA Rate Loans or Foreign ABL Facility Daily Rate Loans, (C) upon any such prepayment or conversion of a Loan pursuant to this Section 3.02, the Borrowers shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different Applicable Lending Office if such designation will avoid the need for any such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03   Inability to Determine Rates; Successor Rates

.

(a)     [Reserved].

118

(b)     Inability to Determine Term SOFR; Successor Rates for Term SOFR. With respect to the U.S. ABL Facility or Dollars funded under any Foreign ABL Facility, notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     If in connection with any request for a Term SOFR Loan or a conversion to or continuation thereof, as applicable, (A) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (x) no Successor Rate has been determined in accordance with Section 3.03(b)(ii) and the circumstances under clause (x) of Section 3.03(b)(ii) or the Term SOFR Scheduled Unavailability Date has occurred (as applicable) or (y) adequate and reasonable means do not otherwise exist for determining Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan  or in connection with an existing or proposed Base Rate Loan, or (B) the Administrative Agent or the Required Lenders determine that for any reason that Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Term SOFR Loan, the Administrative Agent will promptly so notify the applicable Borrower and each Lender.  Thereafter, (1) the obligation of the Lenders to make, maintain or convert Base Rate Loans to Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (2) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of such component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described above, until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (1) the applicable Borrower may revoke any pending request for a Borrowing, conversion, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans and (2) any outstanding Term SOFR Loans shall be deemed to convert to Base Rate Loans at the end of their respective Interest Periods.

(ii)     Notwithstanding anything to the contrary in this Agreement, the Credit Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the applicable Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the applicable Borrower) that the applicable Borrower or Required Lenders (as applicable) have determined, that:

(x)     adequate and reasonable means do not exist for ascertaining one, three and six month interest periods of Term SOFR, including, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(y)     CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or CME or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one, three and six month interest periods of Term SOFR or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease; provided, that, at the time of such statement, there is no successor administrator satisfactory to the Administrative Agent, that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one, three and

119

AmericasActive:18122631.218122631.8

six month interest periods of Term SOFR or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "Term SOFR Scheduled Unavailability Date");

then, on a date and time determined by the Administrative Agent (any such date, the "Term SOFR Replacement Date"), which date shall be at the end of an Interest Period or on the relevant Interest Payment Date, as applicable, for interest calculated and, solely with respect to clause (ii) above, no later than the Term SOFR Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with Daily Simple SOFR plus the SOFR Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "Successor Rate").

If the Successor Rate is Daily Simple SOFR plus the SOFR Adjustment, all interest will be payable on a quarterly basis.

Notwithstanding anything to the contrary herein or in the Credit Agreement, (A) if the Administrative Agent determines that Daily Simple SOFR is not available prior to the Term SOFR Replacement Date or (ii) if the events or circumstances of the type described in Section 3.03(b)(ii)(x) or Section 3.03(b)(ii)(y) have occurred with respect to the Successor Rate then in effect, then in each case, the Administrative Agent and the applicable Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.03(b) at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with an alternate benchmark rate giving due consideration to any evolving or then existing convention for such alternative benchmarks in similar U.S. dollar denominated syndicated credit facilities syndicated and agented in the United States and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for such benchmarks in similar U.S. dollar denominated credit facilities syndicated and agented in the United States, which adjustment or method for calculating such adjustment shall be published on an information service selected by the Administrative Agent from time to time in its discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments shall constitute a Successor Rate. Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the applicable Borrower unless, prior to such time, the Required Lenders deliver to the Administrative Agent written notice that such Required Lenders object to such amendment.

The Administrative Agent will promptly (in one or more notices) notify the applicable Borrower and each Lender of the implementation of any Successor Rate. A Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent market practice is not administratively feasible for the Administrative Agent, the Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent. Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero, the Successor Rate will be deemed to be zero for all purposes of this Agreement and the other Loan Documents.

The Administrative Agent may make Term SOFR Conforming Changes from time to time with respect to SOFR, Term SOFR or any Successor Rate. Notwithstanding anything to the contrary in any Loan Document, any amendment implementing such changes shall be effective without further action or consent of any party to any Loan Document. The Administrative Agent shall post or provide each such amendment to Lenders and the applicable Borrower reasonably promptly after it becomes effective.

120

(c)     Inability to Determine Alternative Currency Rates; Successor Rates for Alternative Currency Rates.

(i)     If in connection with any request for an Alternative Currency Loan or a conversion to or continuation thereof, (i)  the Administrative Agent determines that (A) no Relevant Rate Successor Rate for the Relevant Rate for the applicable currency has been determined in accordance with Section 3.03(c)(ii) and the circumstances under clause (A) of Section 3.03(c)(ii) or the Foreign Currency Scheduled Unavailability Date has occurred with respect to such Relevant Rate (as applicable), or (B) adequate and reasonable means do not otherwise exist for determining the Relevant Rate for the applicable currency for any determination date(s) or requested Interest Period, as applicable, with respect to a proposed Alternative Currency Loan, or (ii) the Administrative Agent or the Required Lenders determine for any reason that the Relevant Rate with respect to a proposed Loan denominated in an a currency for any requested Interest Period or  determination date(s) does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Parent or the applicable Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Loans in the affected currencies, as applicable, shall be suspended in each case to the extent of the affected Alternative Currency Loans or Interest Period or determination date(s), as applicable, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (B) immediately below of this Section, until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) Parent or the applicable Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of the affected Alternative Currency Loans or Interest Period or determination date(s), as applicable or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent Amount specified therein and (ii) any outstanding affected Alternative Currency Loans, at the election of Parent or the applicable Borrower, shall either (1) be converted into a Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent Amount of such outstanding Alternative Currency Loans at the end of the applicable Interest Period or interest payment period or (2) be prepaid at the end of the applicable Interest Period or interest payment period in full; provided that if no election is made by Parent or the applicable Borrower by the earlier of (x) the date that is three Business Days after receipt by Parent or the applicable Borrower of such notice and (y) the last day of the current Interest Period or interest payment period for the applicable Alternative Currency Loans, Parent or the applicable Borrower shall be deemed to have elected clause (1) above.

(ii)     With respect to any Permitted Foreign Currency, notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or Parent or the Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to Parent) that Parent or the Required Lenders (as applicable) have determined, that:

(A)     adequate and reasonable means do not exist for ascertaining the Relevant Rate for any applicable currency, including, without limitation, because the Screen Rate for the applicable currency is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(B)     the administrator of the Screen Rate for the applicable currency or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator has made a public statement identifying a specific date

121

AmericasActive:18122631.218122631.8

after which the Relevant Rate for the applicable currency or the Screen Rate for the applicable currency shall no longer be representative or made available, or permitted to be used for determining the interest rate of syndicated loans denominated in the applicable currency shall or will otherwise cease, provided that, in each case, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide the Relevant Rate after such specific date (such specific date, the "Foreign Currency Scheduled Unavailability Date");

then, in the case of clauses (A) – (B) above, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Parent may amend this Agreement solely for the purpose of replacing EURIBOR or SONIA in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with an alternate benchmark rate giving due consideration to any evolving or then-existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the applicable Permitted Foreign Currency for such alternative benchmarks and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the applicable Permitted Foreign Currency for such benchmarks, each of which adjustments or methods for calculating such adjustments shall be published on one or more information services as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated (a "Relevant Rate Adjustment", and any such proposed rate, a "Relevant Rate Successor Rate"), and any such amendment shall become effective at 5:00 p.m., on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Parent unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to any such amendment. If no Relevant Rate Successor Rate has been determined and the circumstances under clause (A) above exist or the Foreign Currency Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify Parent and each Lender.

The Administrative Agent will promptly (in one or more notices) notify Parent and each Lender of (x) any occurrence of any of the events, periods or circumstances under clauses (A) through (B) above, and (y) a Relevant Rate Successor Rate, as applicable.

Any Relevant Rate Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Relevant Rate Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any Relevant Rate Successor Rate as so determined would otherwise be less than zero, the Relevant Rate Successor Rate will be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Relevant Rate Successor Rate, the Administrative Agent will have the right to make Relevant Rate Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Relevant Rate Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative

122

Agent shall post each such amendment implementing such Relevant Rate Successor Rate Conforming Changes to the Parent and the Lenders reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in Section 3.03(c)(ii)(A)-(B) have occurred with respect to a Relevant Rate Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Relevant Rate Successor Rate".

Section 3.04  Increased Cost and Reduced Return; Capital Adequacy; Reserves on Interest Period Rate Loans

(a)      If any Lender reasonably determines that as a result of any Change in Law that (x) imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the applicable Eurocurrency Rate or Term SOFR) or (y) imposes on any Lender or the London interbank market or the European money market any other condition affecting this Agreement or Loans made by any Lender or any Letter of Credit or participation therein and with which such Lender is required to comply, in each case, after the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining its obligation to make any such Loan (other than a Base Rate Loan), or an increase in the cost to such Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04 any such increased costs or reduction in amount resulting from Indemnified Taxes, Connection Income Taxes or Excluded Taxes), then, in accordance with Section 3.06 hereof, the Lead Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  At any time when any Loan is affected by the circumstances described in this Section 3.04(a), the Borrowers may either (i) if the affected Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Lead Borrower receives any such demand from such Lender, or (ii) if the affected Loan is a then outstanding Term SOFR Loan, upon at least three (3) Business Days' notice to the Administrative Agent, require the affected Lender to convert such Term SOFR Loan into a Base Rate Loan, subject to the requirements of Section 3.05 to the extent applicable.

(b)      If any Lender determines that any Change in Law regarding liquidity or capital requirements with which such Lender (or its Applicable Lending Office) is required to comply, in each case after the date hereof, would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender to a level below that which such Lender or the corporation controlling such Lender could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of any corporation controlling such Lender with respect to capital adequacy) as a consequence of such Lender's obligations hereunder, in accordance with Section 3.06 below, the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(c)      Subject to Section 3.06(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

AmericasActive:18122631.218122631.8

(d)     If any Lender requests compensation under this <u>Section 3.04</u>, then such Lender will, if requested by the Lead Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; <u>provided</u> that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and <u>provided</u> <u>further</u> that nothing in this <u>Section 3.04(d)</u> shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to <u>Section 3.04(a)</u>, (<u>b</u>) or (<u>c</u>).

Section 3.05   Funding Losses

. In accordance with <u>Section 3.06</u> hereof, the Borrowers shall compensate any Lender for and hold any Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Interest Period Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by a Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow, continue or convert any Loan (other than a Base Rate Loan or a Foreign ABL Facility Daily Rate Loan) on the date or in the amount notified by such Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each Interest Period Rate Loan and/or each Foreign ABL Facility Daily Rate Loan made by it at Term SOFR, the Eurocurrency Rate or Foreign ABL Facility Daily Rate, as applicable, for such Loan by a matching deposit or other borrowing in the London interbank Eurodollar market or the European interbank market, respectively, for a comparable amount and for a comparable period, whether or not such Interest Period Rate Loan or Foreign ABL Facility Daily Rate was in fact so funded.

Section 3.06   Matters Applicable to All Requests for Compensation

. Any Agent or Lender claiming compensation under this <u>ARTICLE III</u> shall deliver a certificate to the Lead Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error (it being understood and agreed that such Agent or such Lender may use any reasonable averaging and attribution methods), and the basis therefor.  The Borrowers shall pay the relevant amounts to the relevant Agent or Lender within 30 days following receipt of the certificate described in the immediately preceding sentence.  With respect to any Lender's claim for compensation under <u>Section 3.01</u>, <u>Section 3.02</u>, <u>Section 3.03</u> or <u>Section 3.04</u>, the Borrowers shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Lead Borrower of the event that gives rise to such claim; <u>provided</u> that if the circumstance giving rise to such claim is retroactive, then such one hundred and eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrowers under <u>Section 3.02</u>, <u>Section 3.03</u> or <u>Section 3.04</u>, the Lead Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Interest Period Rate Loans or Foreign ABL Facility Daily Rate Loans, as applicable, from one Interest Period to another, or to convert Base Rate Loans into Interest Period Rate Loans or Foreign ABL Facility Daily Rate Loans, as applicable, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions

124

of Section 3.06(b) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

Section 3.07   Replacement of Lenders under Certain Circumstances

.

(a)    If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.04 or requires a Loan Party to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or Section 3.04 as a result of any condition described in such Sections or any Lender ceases to make Interest Period Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Applicable Borrowers may, in their sole discretion and at their sole expense and effort, on prior written notice to the Administrative Agent and such Lender, (A) terminate the U.S. ABL Commitments and/or Foreign ABL Commitments of such Lender and prepay such Lender's outstanding Loans in full at par or (B) replace any such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 11.07(b) (with any assignment fee to be paid by the Borrowers in such instance) all of its rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its rights and obligations with respect to the Class of Loans or ABL Commitments that is the subject of the related consent, waiver or amendment) to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender or other such Person; and provided further that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments, (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents and (C) no such assignment shall be made if it conflicts with applicable Laws.  A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by the Required Lenders or otherwise, the circumstances entitling the Borrowers to require such assignment cease to apply.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall execute and deliver an Assignment and Assumption with respect to such Lender's ABL Commitment and outstanding Loans.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's ABL Commitment and outstanding Loans, (B) all obligations of the Borrowers owing to the assigning Lender together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement shall be paid in full to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the Borrowers shall deliver to the assignee Lender a Note or Notes (or replacement Note or Notes, as the case may be) executed by the Applicable Borrowers the assignee Lender shall become a Lender hereunder with respect to the interests assigned, in addition to any other interest it may otherwise hold as a Lender under this Agreement, and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned interest, except with respect to provisions under this Agreement which survive the Termination Date, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender being replaced does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within two Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender being replaced, then such Lender being replaced shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender being replaced.

AmericasActive:18122631.218122631.8

(c)      In the event that (i) any Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 11.01 or all the Lenders of a certain Class and (iii) the Required Lenders or the Lenders holding a majority in outstanding principal amount of the Loans held by the relevant group of affected Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".  Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior notice to such Lender, to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out this provisions of this Section 3.07.

Section 3.08   Survival

. All of the Borrowers' obligations under this ARTICLE III shall survive the Termination Date.

**ARTICLE IV**

**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

Section 4.01   Conditions of Initial Credit Extension

. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except as otherwise agreed between the Borrowers and the Administrative Agent, each of which were satisfied or waived on the Closing Date:

(a)      Loan Documents.  The Administrative Agent shall have received of the following Loan Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)      this Agreement;

(ii)      the Collateral Documents;

(iii)      each Note requested by a Lender, if any;

(iv)      the U.S. Guaranty; and

(v)      the ABL Intercreditor Agreement.

(b)      Secretary's Certificate and Attachments.  The Administrative Agent shall have received a copy of an originally executed certificate from, in the case of each UK Loan Party, a director, and in the case of any other Loan Party, the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

126

(i)     <u>Organizational Documents</u>.   Attached thereto is a copy of each Organization Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)     <u>Signature and Incumbency</u>.   Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Loan Documents to which it is a party.

(iii)     <u>Resolutions</u>.  Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and the First Lien Loan Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)     <u>Good Standing Certificates</u>.   Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(v)     <u>Shareholder Resolutions</u>.  In the case of each UK Loan Party, attached thereto are copies of the resolutions of the shareholders of such UK Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which such UK Loan Party is a party.

(vi)     <u>Persons with Significant Control</u>. In the case of each UK Loan Party, that no "warning notice" or "restrictions notice" (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of the shares of such UK Loan Party.

(vii)     <u>Borrowing Limits</u>. In the case of each UK Loan Party, that the borrowing or guaranteeing or securing, as appropriate, of the UK Secured Obligations (as defined in this Agreement prior to the Fifth Amendment Effective Date) would not cause any borrowing, guarantee, security or similar limit which is binding on the Company to be exceeded.

(c)     <u>Committed Loan Notice/Letter of Credit Request; Letter of Direction; Flow of Funds Memorandum</u>.  The Administrative Agent shall have received a fully executed and delivered Committed Loan Notice, no later than (i) 11:00 a.m. on the Closing Date (in the case of Base Rate Loans) or (ii) 1:00 p.m. three (3) Business Days in advance of the Closing Date (in the case of Interest Period Rate Loans) (or, in each case such shorter period as may be agreed to by the Lead Arrangers) and/or Letter of Credit Request, no later than 11:00 a.m. two (2) Business Days in advance of the Closing Date, together with a customary direction letter attaching a flow of funds memorandum with respect to the Transactions and any of the other transactions contemplated by the Loan Documents or the First Lien Loan Documents to occur as of the Closing Date.

(d)     <u>Closing Date Certificate and Attachments</u>.  The following shall have occurred (or shall occur concurrently with the making of the Loans on the Closing Date), and the Administrative Agent shall have received an originally executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

AmericasActive:~~18122631.2~~18122631.8

(i) <u>Representations and Warranties</u>. Confirming satisfaction of the condition set forth in <u>Section 4.02(a)</u>.

(ii) <u>No Default or Event of Default</u>. Confirming satisfaction of the condition set forth in <u>Section 4.02(b)</u>.

(iii) <u>Material Adverse Effect</u>. Since December 31, 2016, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iv) <u>First Lien Loan Documents</u>. The Administrative Agent shall have received copies of each of the First Lien Loan Documents, duly executed by the parties thereto and in form and substance satisfactory to the Lenders, together with all agreements, instruments and other documents delivered in connection therewith as the Administrative Agent shall reasonably request.

(e) <u>Existing Indebtedness</u>. On the Closing Date, Parent and its Restricted Subsidiaries shall have:

(i) <u>Repayment</u>. Terminated all commitments and repaid in full all of the Indebtedness and other obligations outstanding under the Existing Credit Agreements (other than unasserted contingent obligations and the Existing Letters of Credit).

(ii) <u>Release of Liens</u>. (A) Delivered to the Administrative Agent any copies of documents or instruments to be returned, filed or that are otherwise necessary to evidence the release all Liens securing the Indebtedness and other obligations outstanding under the Existing Credit Agreements and (B) taken all other actions necessary or reasonably required by the Collateral Agent to establish the Collateral Agent will have a perfected first priority security interest in the Collateral (subject to Liens permitted under <u>Section 7.01</u> which by operation of law or contract would have priority over the Liens securing the Obligations).

(iii) <u>Existing Letters of Credit</u>. Made arrangements satisfactory to the Administrative Agent with respect to the cancellation of letters of credit outstanding issued under the Existing Credit Agreement or the issuances of Letters of Credit hereunder to support the obligations of Parent and its Restricted Subsidiaries with respect to any Existing Letters of Credit.

(iv) <u>Payoff Letters</u>. Delivered customary payoff letters in respect of each Existing Credit Agreement duly executed by the applicable agents and borrower under, and other applicable parties to, each Existing Credit Agreement.

(f) <u>Collateral</u>. The Collateral Agent shall have received:

(i) <u>Lien Searches</u>. The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(ii) [Reserved].

(iii) <u>UCC Financing Statements</u>. Copies of proper financing statements, filed or duly prepared for filing under the UCC in all United States jurisdictions that the

AmericasActive:18122631.218122631.8

Administrative Agent may deem reasonably necessary in order to perfect and protect the Liens created under the Collateral Documents on assets of Parent, the Borrowers and each Subsidiary Guarantor that is party to the Collateral Documents, covering the Collateral described therein.

(iv)   Securities.   Certificates, if any, representing the pledged equity accompanied by undated stock or membership interest powers executed in blank and instruments evidencing the pledged debt, as required pursuant to the Pledge Agreement or the UK Collateral Documents, as applicable, indorsed in blank (or confirmation in lieu thereof reasonably satisfactory to the Administrative Agent or its counsel that such certificates, powers and instruments have been sent for prompt delivery to the Collateral Agent or its counsel).

(v)   Perfection Certificate.   A completed perfection certificate, executed and delivered by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(g)   Financial Statements.   The Administrative Agent and the Lead Arrangers shall have received (i) an audited consolidated balance sheet and related statements of income and cash flows of the Lead Borrower and its Subsidiaries as of and for the Fiscal Year ended December 31, 2016 (the "Audited Financial Statements") and (ii) unaudited consolidated balance sheets and related statements of income and cash flows of the Lead Borrower and its Subsidiaries for the fiscal quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 (the "Unaudited Financial Statements"); provided that the financial statements described in this clause (g)  shall have been prepared in accordance with GAAP consistently applied.

(h)   Opinions of Counsel to Loan Parties.   The Administrative Agent and its counsel shall have received an opinion of (i) Jones Day, special counsel to the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date and (ii) Davis Polk & Wardwell London LLP, English counsel to the Lead Arrangers, as to matters of English law and in respect of the UK Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent, dated as of the Closing Date.

(i)   [Reserved].

(j)   Fees.   The Borrowers shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Lead Arrangers, the Administrative Agent, the Collateral Agent, the Lenders and third party service providers such fees payable to each such Person on the Closing Date to the extent due and invoiced at least two (2) Business Days prior to the Closing Date.

(k)   Solvency.   The Administrative Agent shall have received a copy of the executed Solvency Certificate.

(l)   "Know-Your-Customer", Etc.   The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under any "know-your-customer" Laws or AML Laws in order to allow the Lenders to comply therewith.

Each Lender and each Agent, by delivering its signature page to this Agreement and, if applicable, funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document, agreement, instrument, certificate or opinion required to be approved by such Lender or such Agent, as the case may be, on the Closing Date.

Section 4.02   Conditions to All Credit Extensions

129

.   The obligation of each Lender to honor any Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Interest Period Rate Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.16 hereof) is subject to the following conditions precedent:

(a)     the representations and warranties of the Borrowers and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension (immediately before and after giving effect to such Credit Extension); provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)     no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom;

(c)     the Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)     if, after giving effect to the requested Credit Extension, a Covenant Trigger Event would occur, the Administrative Agent shall have received a certificate from the Lead Borrower setting forth the calculation of the Fixed Charge Coverage Ratio and demonstrating compliance with the covenant set forth in Section 7.12 hereof; and

(e)     after giving effect to the requested Credit Extension, (i) the ABL Loans and outstanding amounts under the Letters of Credit shall not exceed the Line Cap, (ii) the U.S. ABL Loans and outstanding amounts under the Letters of Credit shall not exceed the U.S. Line Cap, (iii) the UK ABL Loans shall not exceed the UK Line Cap and (iv) the Belgian ABL Loans shall not exceed the Belgian Line Cap.

Each Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion or continuation of Loans to the other Type or a continuation of Interest Period Rate Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.16 hereof) submitted by the Lead Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(a) and Section 4.02(b) have been satisfied on and as of the date of the applicable Credit Extension; provided that, notwithstanding anything in this Section 4.02 to the contrary, any Request for Credit Extension in connection with any Indebtedness incurred under Section 2.16 may be subject to the more limited conditions set forth in paragraphs (b)(i) and (ii) thereof.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each of Parent and the Borrowers represents and warrants to the Agents and the Lenders on the Closing Date and on the date of each Credit Extension that:

Section 5.01   Existence, Qualification and Power; Compliance with Laws

130

AmericasActive:18122631.218122631.8

.   Each of the Borrowers, the Guarantors and each of the other Restricted Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction) (solely in the case of any such Person other than the Borrowers, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (b) has all requisite power and authority to (i) own or lease its assets and carry on its business (except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to the extent such Person is a Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (except where such failure could not reasonably be expected to have a Material Adverse Effect), (d) is in compliance with all Laws, orders, writs, injunctions and orders (except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect) and (e) has all requisite governmental licenses, authorizations, consents and approvals, if any, to operate its business as currently conducted (except where the failure to have such licenses, authorizations, consents and approvals could not reasonably be expected to have a Material Adverse Effect).

Section 5.02   Authorization; No Contravention

.   The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) are within such Loan Party's corporate or other organizational powers, iii) have been duly authorized by all necessary corporate or other organizational action, and iv) do not and will not (1) contravene the terms of any of such Person's Organization Documents, (2) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject (in each case in this clause (ii), except to the extent such conflict, breach, contravention or creation of a Lien could not reasonably be expected to have a Material Adverse Effect); or (3) violate any applicable Law (except to the extent such violation could not reasonably be expected to have a Material Adverse Effect).

Section 5.03   Governmental Authorization; Other Consents

.   Except to the extent that any such failure could not reasonably be expected to result in a Material Adverse Effect, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, any other Loan Document, any First Lien Loan Document or any Second Lien Loan Documents or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04   Binding Effect

131

.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05   No Material Adverse Effect

.  Since December 31, 20162022, no event, effect, occurrence, fact, condition, change or development has occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.06   Litigation; FCPA

.  There is no action, suit, investigation, litigation, proceeding or disputes affecting Parent or any of its Restricted Subsidiaries or any of their properties, pending or threatened in writing before any Governmental Authority or arbitrator that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07   Ownership of Property; Liens; Insurance

.

(a)      Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for the Liens and security interest created or permitted under the Loan Documents including, any Liens permitted under Section 7.01.

(b)      Each Borrower and each of the other Restricted Subsidiaries has (i) good and legal (or to the extent such real property is located in Texas, indefeasible) title in fee simple to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real property), or (iii) easements or other limited property interests in, all real property used in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Set forth as Schedule 5.07(b) hereto is a complete and accurate list of all real property owned in fee by the Borrowers or any of the other Restricted Subsidiaries as of the Closing Date, showing the title reference (if applicable), street address (if applicable), county, state and any other relevant jurisdiction and record owner.

(c)      The Borrowers and each of the other Restricted Subsidiaries maintains the insurance required by Section 6.07.

Section 5.08   Creation and Perfection of Security Interests

.

(a)      The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a valid, enforceable and, upon the making of the filings and the taking of the actions required under the terms of the Loan Documents, perfected security interest in the Collateral, securing the payment of the Secured Obligations, and having priority over all other Liens on the Collateral except Liens permitted under Section 7.01.

132

(b)      When the Intellectual Property Security Agreements are properly filed in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, to the extent such filings may perfect such interests, the Liens created by the U.S. Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents and Trademarks (each as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Liens permitted under Section 7.01 (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect the Collateral Agent's Lien on registered Patents, Trademarks and Copyrights acquired by the grantors thereof after the Closing Date).

Section 5.09   Environmental Compliance

. Except as could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(a)      The operations and properties of Parent, each Borrower and each of their respective Subsidiaries comply in all respects with all, and have not violated any, applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all applicable Environmental Permits. Parent, each Borrower and each of their respective Subsidiaries have no reasonable basis to believe that any such Environmental Permits will be revoked or adversely modified, or will not be timely renewed and complied with, in the ordinary course of business;

(b)      (i) There are no Environmental Liabilities of Parent, any Borrower or any of their respective Subsidiaries, and (ii) there are no facts, circumstances or conditions arising out of or relating to Parent, the Borrowers or any of their respective Subsidiaries, their respective operations or their respective currently or formerly owned, leased or operated facilities that would be reasonably likely to give rise to Environmental Liabilities or Environmental Actions against Parent, any Borrower or any of their respective Subsidiaries or be reasonably likely to require a net increase in Parent's, a Borrower's or their respective Subsidiaries' costs to maintain compliance with applicable Environmental Laws;

(c)      Neither Parent, any Borrower nor any of their respective Subsidiaries has received any written notice of, nor have they been subject to, any Environmental Action, nor is any Environmental Action pending or, to the knowledge of Parent or any Borrower, threatened as to Parent, such Borrower or any of their respective Subsidiaries; and

(d)      There has been no release of Hazardous Materials at, on, to, from or in any property or facility currently or formerly owned, leased, or operated by Parent, the Borrowers or any of their respective Subsidiaries.

Section 5.10   Taxes

. Parent, the Borrowers and each of their Restricted Subsidiaries have (a) timely filed all tax returns and reports required to be filed (taking into account extensions of time to file), and (b) timely paid all Taxes, shown on such returns and all other amounts of federal, provincial, state, municipal, foreign and other Taxes imposed upon them or their properties, income or assets otherwise due and payable, in each case except (i) with respect to amounts which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, if applicable, or (ii) where the failure to file or pay could not reasonably be expected to have a Material Adverse Effect. No material written claim has been asserted with respect to any Taxes, except (a) Taxes

133

that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11   Compliance with ERISA

.

(a)      Each Plan is in material compliance with the applicable provisions of ERISA, the Code and other federal or state Laws; and

(b)      (i) no ERISA Event has occurred prior to the date on which this representation is made that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect and (ii) none of the Borrowers or any of the other Restricted Subsidiaries or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.12   Labor Matters

. There are no strikes pending or threatened against the Borrowers or any of the other Restricted Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Except as could not reasonably be expected to have a Material Adverse Effect, (i) the hours worked and payments made to employees of the Borrowers or any of the other Restricted Subsidiaries have not been in violation in any respect of the Fair Labor Standards Act or any other applicable law dealing with such matters and (ii) all payments due from the Borrowers or any of the other Restricted Subsidiaries or for which any claim may be made against the Borrowers or any of the other Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrowers or such Restricted Subsidiary to the extent required by GAAP.

Section 5.13   Subsidiaries; Equity Interests

. As of the Fifth Amendment Effective Date, none of Parent or any of its Restricted Subsidiaries has any Subsidiaries other than those specifically disclosed on Schedule 5.13, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, and, if applicable, are fully paid and non-assessable and are owned by Parent or a Restricted Subsidiary (as applicable) free and clear of all Liens except those permitted under Section 7.01.  As of the Fifth Amendment Effective Date, Schedule 5.13 (a) sets forth the name and jurisdiction of organization of each Subsidiary of Parent and each of their respective Subsidiaries and (b) sets forth the ownership interest of Parent and its Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership.

Section 5.14   Margin Regulations; Investment Company Act; PATRIOT Act

.

(a)      None of Parent or any of its Restricted Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U issued by the FRB.

134

(b)      None of Parent or any of its Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)      None of Parent or any of its Restricted Subsidiaries is in violation in any material respect of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the PATRIOT Act and the use of proceeds of the Loans will not violate the Trading with the Enemy Act, as amended or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

Section 5.15   Disclosure; Financial Statements

i)   .

(a)      (i) No report, financial statement, certificate or other written information furnished by or on behalf of Parent or any of its Restricted Subsidiaries to any Lead Arranger, Agent or Lender (other than projections and other forward looking information and information of a general economic or general industry nature) in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when furnished, and when taken as a whole (including all supplements thereto), contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates thereto from time to time) and (ii) the projected financial information delivered by or on behalf of the Lead Borrower or any of the other Restricted Subsidiaries to any Lead Arranger, Agent or Lender was prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time such projected financial information were so delivered, it being understood that such financial projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Lead Borrower and the other Restricted Subsidiaries, that no assurance can be given that any particular financial projection or the financial projections taken as a whole will be realized and that actual results during the period or periods covered by any such financial projections may differ significantly from the projected results and such differences may be material.  As of the Fifth Amendment Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

(b)      The Audited Financial Statements and the Unaudited Financial Statements were prepared in conformity with GAAP (except as may be indicated in the notes thereto) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of the Unaudited Financial Statements, to changes resulting from audit and normal year-end adjustments.

Section 5.16   Intellectual Property

. Each Loan Party and each of the Restricted Subsidiaries owns or has a valid and enforceable right to use, any and all intellectual property and similar proprietary rights throughout the world, including any and all trademarks (including the associated goodwill), service marks (including the associated goodwill), trade names, domain names, copyrights, patents, licenses, know-how (including trade secrets and other patented and/or unpatentable proprietary or confidential information, systems or procedures), software, design rights, technology and all registrations and applications for registration of

135

any of the foregoing and all goodwill associated with any of the foregoing (collectively, "Intellectual Property") that are used or held for use in, or otherwise necessary for, the operation of their respective business as currently conducted and, to the knowledge of Parent and the Borrowers, the use of such Intellectual Property by such Loan Party or Restricted Subsidiary does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, any Intellectual Property held by any other Person, except, in each case, for such infringement, misappropriation or other violations, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of Parent and the Borrowers, the respective business of any Loan Party or any of its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property held by any Person except for such infringement, misappropriation or other violations, which either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any Intellectual Property, is filed and presently pending or, to the knowledge of Parent or the Borrowers, presently threatened in writing against any Loan Party or any of its Subsidiaries, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.17    Solvency

.    As of the Fifth Amendment Effective Date, after giving effect to the consummation of the transactions contemplated by the Fifth Amendment, Parent and its Restricted Subsidiaries are, on a consolidated basis, Solvent.

Section 5.18    AML Laws; Anti-Corruption Laws and Sanctions

.

(a)      None of the Parent, any Borrower, any Guarantor, any Subsidiary or any of their respective directors, officers or, to the Borrowers' knowledge, employees, agents or Affiliates is: (i) a Sanctioned Person, (ii) has engaged in the past five (5) years or intends to engage in the future in any dealings or transactions with, involving or for the benefit of, any Sanctioned Person, (iii) has taken or will take any action that would constitute or give rise to a violation of any AML Laws, Anti-Corruption Laws, or Sanctions or (iv) will directly or indirectly use any part of any proceeds of the Loans or Letters of Credit or lend, contribute, or otherwise make available such proceeds (A) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law or (B) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

(b)      The Lead Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Lead Borrower and its Subsidiaries, are in compliance with applicable Anti-Corruption Laws, AML Laws, and Sanctions in all respects.

Section 5.19    Status as Senior Indebtedness

.  The Obligations constitute (i) "ABL Obligations" under and as defined in the ABL Intercreditor Agreement and (ii) "senior indebtedness" under and as defined in any documentation governing any Subordinated Indebtedness.

136

Section 5.20   Accounts and Inventory

.

(a)      The Administrative Agent may rely, in determining which Accounts are Eligible Accounts, on the completeness and accuracy of all statements and representations made by the Borrowers with respect to any Account or Accounts in each Borrowing Base Certificate.

(b)      The Administrative Agent may rely, in determining which Inventory is Eligible Inventory, on the completeness and accuracy of all statements and representations made by the Borrowers with respect to any Inventory in each Borrowing Base Certificate.

Section 5.21   Accuracy of Borrowing Base

.  The information set forth in each Borrowing Base Certificate is true and correct in all material respects and has been prepared in accordance with the requirements of this Agreement. The Accounts that are identified by the Borrowers as Eligible Accounts and the Inventory that is identified by the Borrowers as Eligible Inventory, in each Borrowing Base Certificate submitted to the Administrative Agent, at the time of submission, comply in all material respects with the criteria set forth in the definitions thereof.

Section 5.22   Centre of Main Interests

.  For the purposes of the Regulation (EU) 2015/848 of 20 May 2015 on insolvency proceedings (recast), (the "Regulation"), each UK Loan Party's centre of main interests (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(1) of the Regulation) in any other jurisdiction.

Section 5.23   UK Pensions.  No UK Loan Party or any of its Subsidiaries is or has at any time: (i) been an employer (for the purposes of sections 38 to 51 of the UK Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the UK Pensions Schemes Act 1993); and (ii) been "connected" with, or an "associate" of, (as those terms are used in sections 38 and 43 of the UK Pensions Act 2004) such an employer.

Section 5.24   Covered Entity. No Loan Party is a Covered Entity.

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

Until the Termination Date, each of Parent and the Borrowers shall, and shall cause each other Restricted Subsidiary to:

Section 6.01   Financial Statements

.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      As soon as available, but in any event within (i) for the Fiscal Year of the Lead Borrower ended December 31, 2017, one-hundred-fifty (150) days after the end of such Fiscal Year and (ii) for each Fiscal Year of the Lead Borrower ended thereafter, ninety (90) days after the end of such Fiscal Year, a consolidated balance sheet of the Lead Borrower and the other Restricted Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations,

137

shareholders' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP and audited and accompanied by a (A) report and opinion of Cohen & Co. or any independent registered public accounting firm of nationally recognized standing (including, but not limited to, any of the "big 4" national firms) (or another accounting firm reasonably satisfactory to the Administrative Agent), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, (other than with regard to the occurrence of the Maturity Date in respect of the ABL Facility, any First Lien Facility or Second Lien Facility in the 12 month period following the date of the relevant auditor's report)) and (B) (i) a comparison against the figures for the previous Fiscal Year and (ii) commencing after the delivery of the first forecast under Section 6.01(b) below, a comparison of actual figures against the forecast for such Fiscal Year, all in reasonable detail.

(b)     As soon as available, but in any event, within, (i) for the fiscal quarter ending March 31, 2018, sixty (60) days after the end of each such fiscal quarter and (ii) for each applicable fiscal quarter ending thereafter, forty-five (45) days after the end of each of the first three (3) fiscal quarters of each Fiscal Year of the Lead Borrower, a consolidated balance sheet of the Lead Borrower and the other Restricted Subsidiaries as at the end of such fiscal quarter, and the related (A) consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and (B) consolidated statements of cash flows for the portion of the Fiscal Year then ended and, in the case of each of clauses (A) and (B) setting forth in each case (x) in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year and (y) "segment" level information with respect to revenues and gross margins.

(c)     Annual Forecasts and Budget; "Flash Reports".  As soon as available and in any event within (x) ninety (90) days after the end of each Fiscal Year, an annual budget prepared by management of Parent, consisting of condensed income statements on an annual basis for the Fiscal Year following the most recently ended Fiscal Year and showing financial projections for each fiscal quarter in the Fiscal Year covered thereby and (y) forty-five (45) days after the end of each Fiscal Year, "flash reports" relating to revenue, Consolidated Adjusted EBITDA and liquidity of the Borrowers and the other Restricted Subsidiaries with respect to the fourth fiscal quarter of such Fiscal Year.

(d)     Telephonic Meetings.  Each Borrower shall, following the delivery of the financial statements referred to in Section 6.01(a) and (b), as applicable, at such date and time as reasonably agreed by the Lead Borrower and the Administrative Agent, schedule one telephonic conference call per applicable period specified in Section 6.01(a) and Section 6.01(b) (but in no event more frequently than once per fiscal quarter) with directors and officers of the Borrowers reasonably requested by the Administrative Agent to attend (which may include the chief executive officer, the chief financial officer and the president of such Borrower) to discuss the contents of the relevant reports.

Section 6.02   Certificates; Reports; Other Information

. Deliver to the Administrative Agent for further distribution to each Lender:

(a)     on or before the thirtieth (30th) day of each fiscal month for the first three fiscal months following the Closing Date, and on or before the twentieth (20th) day of each fiscal month thereafter (or if, during the continuance of a Cash Dominion Trigger Event, the Administrative Agent has reasonably determined that such Borrowing Base Certificate shall be required on a more frequent basis (but in any event, not more frequently than on a weekly basis) on the fifth (5th) day following the end of the applicable weekly period), a Borrowing Base Certificate as of the last day of the immediately preceding month (or week, as the case may be), with such supporting materials as Administrative Agent shall reasonably request.  Together with each delivery of a Borrowing Base Certificate, the Loan Parties shall deliver to the Administrative Agent, in the form reasonably acceptable to the Administrative Agent:

138

(i)      a detailed aging of the Loan Parties' Accounts, including all invoices aged by invoice date and due date (with an explanation of the terms offered), prepared in a manner reasonably acceptable to the Administrative Agent, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)      a schedule detailing the Loan Parties' Inventory, in form reasonably satisfactory to the Administrative Agent, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Lead Borrower are deemed by the Administrative Agent to be appropriate in its Permitted Discretion, and (2) including a report of any variances or other results of Inventory counts performed by the Loan Parties since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Loan Parties and complaints and claims made in writing against the Loan Parties);

(iii)      a worksheet of calculations prepared by the Loan Parties to determine Eligible Accounts and Eligible Inventory (including identification of  such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion;

(iv)      a reconciliation of each Loan Party's Accounts and Inventory between (A) the amounts shown in such Loan Party's general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (a) above as of such date; and

(v)      a reconciliation of the loan balance per the Loan Parties' general ledger to the loan balance under this Agreement;.

Notwithstanding the foregoing, in connection with any transaction or series of related transactions (excluding dispositions of Inventory pursuant to Sections 7.05(b) or (i), but including a release of Collateral pursuant to Section 10.13) that decreases the Borrowing Base by more than $5,000,000 as a result of the removal or exclusions of assets therefrom: (i) the Lead Borrower shall at the time of (or prior to the consummation of) such transaction provide an updated Borrowing Base Certificate (giving effect to such transaction) and will on or prior to the date of consummation of such transaction make any mandatory prepayments required by Section 2.05 and (ii) if, giving effect to such transaction, a Covenant Trigger Event would occur, the Administrative Agent shall have received a certificate from the Lead Borrower demonstrating compliance with the covenant set forth in Section 7.12 hereof.

(b)      promptly upon the Administrative Agent's reasonable request in its Permitted Discretion:

(i)      copies of invoices issued by the Loan Parties in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)      copies of purchase orders, invoices and shipping and delivery documents in connection with any Inventory purchased by any Loan Party

(iii)      schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)      an updated customer list for the Loan Parties, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent in its Permitted Discretion and certified as true and correct in all material respects by a Financial Officer of the Lead Borrower in each case provided to the extent permitted by, and otherwise in compliance with, applicable data protection laws; and

(v)      a schedule and aging of the Loan Parties' accounts payable, delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent in its Permitted Discretion;

(c)      upon delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower (which Compliance Certificate shall set out a reasonably detailed calculation of Consolidated Adjusted EBITDA and the Fixed Charge Coverage Ratio and demonstrate compliance with Section 6.12 (whether or not tested)) and, together with each Compliance Certificate delivered in connection with the financial statements referred to in Section 6.01(a) and (b), a customary management discussion and analysis with respect to the financial statements accompanying such Compliance Certificate;

(d)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)      prompt written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's type of organization, (iii) in any Loan Party's jurisdiction of organization and (4) to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, in any Loan Party's organizational identification number;

(f)      ~~Promptly~~promptly following any reasonable request therefor by the Administrative Agent or any Lender through the Administrative Agent, (i) such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents and (ii) information and documentation requested for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws; and

(g)      promptly after (i) the addition of any Account Debtor owing any Account which has been sold or factored, is intended to be sold or factored, or is subject to documentation that permits it to be sold or factored, by a Loan Party, including pursuant to any Permitted Non-Recourse Financing Transaction or (ii) the termination of any and all documentation that permits the Accounts of such Account Debtor to be sold or factored that previously existed, an updated Factored Accounts Schedule;

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents or other information, or provides a link thereto at the website

140

address listed in <u>Section 11.02</u>, (ii) on which such documents are posted on the Lead Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (iii) on which such documents are available on the website of the SEC at http:/www.sec.gov; <u>provided</u> that the Lead Borrower shall notify (which notice may be delivered by facsimile or electronic mail as provided in <u>Section 11.02</u>) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (<u>i.e.</u>, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Section 6.03   Notice Requirements; Other Information

. Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of each of the following events or circumstances:

(a) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrowers propose to take with respect thereto;

(b) to the extent permissible by applicable requirements of Law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (i) against any Loan Party, that would reasonably be expected to result in a Material Adverse Effect and (ii) with respect to any Loan Document, in each case, together with the details thereof and any action taken or proposed to be taken with respect thereto;

(c) the occurrence of any ERISA Event or ERISA Events that has had or could reasonably be expected to have a Material Adverse Effect;

(d) the occurrence of any other matter that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(e) damage to, or condemnation of, a material portion of the Collateral, which notice shall specify the nature of such condition, event or change and what action, if any, Parent or the Borrowers have taken, is taking or proposes to take with respect thereto; and

(f) any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in such certification.

Section 6.04   Environmental Matters

. Except to the extent that failure to take the actions described in this <u>Section 6.04</u> could not reasonably be expected to have a Material Adverse Effect:

(a) comply and cause each of the Subsidiaries to comply, and take commercially reasonable efforts to cause all of their lessees to comply, with all applicable Environmental Laws and Environmental Permits, which compliance includes obtaining and renewing, and causing each of the Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for their operations and properties;

(b) conduct, cause each of the Subsidiaries to conduct, and take commercially reasonable efforts to cause any other Persons occupying or leasing their facilities or properties to conduct, any Response required by Environmental Law related to their facilities or properties, or at any

141

location which Parent, the Borrowers or any of their respective Subsidiaries conduct operations or business by contract or otherwise; provided, however, that neither Parent, the Borrowers nor any of their respective Subsidiaries shall be required to undertake any such Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances; and

(c)    promptly, and in any event within ten (10) Business Days of, either (i) receipt by Parent, the Borrowers or any of their respective Subsidiaries of any notice of an Environmental Action related to such Persons, or (ii) the occurrence of any Release that would reasonably be likely to result in Parent, the Borrowers or any of their respective Subsidiaries incurring Environmental Liability or being required to conduct a Response, provide written notice of such receipt or Release to the Administrative Agent, along with a description of actions proposed to be taken by Parent, the Borrowers or any of their respective Subsidiaries to address the Environmental Action or Release.

Section 6.05   Maintenance of Existence

. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in each case, (i) other than with respect to any Person (other than the Borrower), to the extent the board of directors (or equivalent governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrowers and the other Restricted Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to the Borrowers, any of the other Restricted Subsidiaries or the Lenders in any material respect, (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05 or (iii) with respect to any such Person (other than the Borrower), except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect.

Section 6.06   Maintenance of Properties

.   Maintain, preserve and protect all of its material tangible and intangible properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof, in each case except where failure to do so could not reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

Section 6.07   Maintenance of Insurance

.   Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and the other Restricted Subsidiaries) as are customarily carried by Persons engaged in similar businesses and owning or leasing similar properties in the same general areas in which such Borrower or such Restricted Subsidiary operates.   Each policy of property or general liability insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured (or similar status in the UK or Belgian insurance market place, as applicable) thereunder as its interests may appear and (ii) in the case of each casualty insurance policy (excluding any business interruption or personal injury insurance policy), contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties as the loss payee (or similar status in the UK or Belgian

142

insurance market place, as applicable) thereunder and, provide for prior written notice to the Collateral Agent of any modification or cancellation of such policy or the failure to pay any premiums thereunder. In addition to the foregoing, if any improvements located upon any Mortgaged Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), then the applicable Loan Party (i) shall maintain, or cause to be  maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to such Act and (ii) promptly upon request of the Administrative Agent or any Lender, will deliver to the Agent or such Lender, as applicable, evidence of such compliance in form and substance reasonably acceptable to the Agent and such Lender, including, without limitation, evidence of annual renewals of such insurance.

Section 6.08   Compliance with Laws

. Comply with the requirements of all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09   Books and Records

. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and permit the preparation of financial statements in conformity in all material respects with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrowers or any of the other Restricted Subsidiaries, as the case may be.

Section 6.10   Inspection Rights

.   Permit representatives and independent contractors, in each case designated by the Administrative Agent or any applicable Lender, to visit and inspect any properties of the Borrowers and the other Restricted Subsidiaries and in connection with such visit, to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, in each case, at such reasonable times during normal business hours and as often as may be reasonably requested, upon reasonable advance notice to the Lead Borrower; provided, however, that excluding any such visits and inspections during the continuance of an Event of Default, (i) such visits and inspections shall be coordinated through and by the Administrative Agent and (ii) the Administrative Agent and Lenders, taken as a whole, shall not exercise such rights more than one (1) time during any calendar year, (it being understood that such annual visit or inspection shall be at the Borrowers' expense); provided further that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrowers a reasonable opportunity to participate in any discussions with the Borrowers' independent public accountants.  None of the Borrowers nor any of the other Restricted Subsidiaries shall be required to disclose to the Administrative Agent or any Lender (or any authorized representative or independent contractor of any of them) any information (w) that is prohibited by Law to be disclosed, (x) that is subject to attorney-client privilege or similar privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure agreement or similar agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10 or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrowers or their respective Subsidiaries and/or any of their respective customers and/or suppliers; provided that, in the event the Borrowers or any Restricted Subsidiary thereof withholds information from the Administrative Agent or the Lenders in

143

reliance on this sentence, the Lead Borrower shall provide (to the extent possible without violation of such Law, attorney-client or similar privilege, attorney work product privilege or non-disclosure or similar agreement) to provide notice to the Administrative Agent or such applicable Lender that such information is being withheld and shall use commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable Law or non-disclosure or similar agreement or risk waiver of such attorney-client or similar privilege or attorney work product privilege.

Section 6.11   Covenant to Guarantee Obligations and Give Security

.

(a)     Upon (x) the formation or Acquisition by any Loan Party of any new direct or indirect Wholly-owned U.S. Domestic Subsidiary, UK Domestic Subsidiary or Belgian Domestic Subsidiary which is not an Excluded Subsidiary, including pursuant to a Permitted Acquisition or (y) any Excluded Subsidiary ceasing to constitute an Excluded Subsidiary, then the Borrowers shall, within sixty (60) days of the date of such formation, Acquisition or cessation (or (x) such later date as may be agreed by the Administrative Agent or (y) in the case of any U.S. Domestic Subsidiary formed or acquired in connection with the 2020 Specified Acquisitions, on the date of such formation, Acquisition or cessation):

(i)     if such Domestic Subsidiary is a Belgian Domestic Subsidiary, cause it or the relevant Loan Party to (1) duly execute and deliver to the Administrative Agent (x) a Belgian Security Agreement in substantially the same form attached as Exhibit G-4, and (y) a supplement or joinder to the Belgian Guarantee in substantially the form attached as Schedule 1 thereto (a "Belgian Guarantee Supplement"), (2) grant a charge over the shares issued by such Belgian Domestic Subsidiary and (3)  ensure that all other deliverables and requirements described in the aforementioned documents are so delivered or satisfied within the necessary timeframes; it being understood and agreed that with respect to any Collateral owned by any Restricted Subsidiary that becomes a Belgian Loan Party in accordance with this Section 6.11, for purposes of the requirements set forth in the Belgian Security Agreement, such Collateral shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Belgian Loan Party under this Section 6.11,

(ii)     if such Domestic Subsidiary is a U.S. Domestic Subsidiary, cause it to (1) duly execute and deliver to the Administrative Agent (A) a supplement (w) to the U.S. Security Agreement in substantially the form attached as Annex I thereto (a "U.S. Security Agreement Supplement"), (x) to the Pledge Agreement and (y) to the ABL Intercreditor Agreement in substantially the form attached as Exhibit C to the ABL Intercreditor Agreement and (z) to the U.S. Guarantee in substantially the form attached as Exhibit A thereto (a "U.S. Guaranty Supplement") and (B) if such Domestic Subsidiary owns registrations of or applications for U.S. Patents, Trademarks and/or Copyrights (each as defined in the U.S. Security Agreement) that constitute Collateral, an Intellectual Property Security Agreement and (2) deliver completed Uniform Commercial Code financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request; it being understood and agreed that with respect to any Collateral owned by any Restricted Subsidiary that becomes a U.S. Loan Party in accordance with this Section 6.11, for purposes of the requirements set forth in the Pledge Agreement and the U.S. Security Agreement, such Collateral shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a U.S. Loan Party under this Section 6.11,

144

(iii)     if such Domestic Subsidiary is a UK Domestic Subsidiary, cause it or the relevant Loan Party to (1) duly execute and deliver to the Administrative Agent a supplement or joinder (x) to the UK Security Agreement in substantially the form attached as Schedule 8 thereto (a "UK Security Agreement Supplement"), and (y) to the UK Guarantee in substantially the form attached as Exhibit A thereto (a "UK Guarantee Supplement"), (2) grant a charge over the shares issued by such UK Domestic Subsidiary and (3)  ensure that all other deliverables and requirements described in the aforementioned documents are so delivered or satisfied within the necessary timeframes; it being understood and agreed that with respect to any Collateral owned by any Restricted Subsidiary that becomes a UK Loan Party in accordance with this Section 6.11, for purposes of the requirements set forth in the UK Security Agreement, such Collateral shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a UK Loan Party under this Section 6.11,

(iv)     (A) if such Domestic Subsidiary is a U.S. Domestic Subsidiary, cause it to deliver to the Administrative Agent, upon the reasonable request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion in customary form, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to the matters contained in clause (ii) above and such other matters as the Administrative Agent may reasonably request, (B) if such Domestic Subsidiary is a UK Domestic Subsidiary, cause it to deliver to the Administrative Agent, upon the reasonable request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion in customary form, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Administrative Agent reasonably acceptable to the Administrative Agent as to the matters contained in clause (iii) above and such other matters as the Administrative Agent may reasonably request and (C) if such Domestic Subsidiary is a Belgian Domestic Subsidiary, cause it to deliver to the Administrative Agent, upon the reasonable request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion in customary form, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Administrative Agent reasonably acceptable to the Administrative Agent as to the matters contained in clause (i) above and such other matters as the Administrative Agent may reasonably request,

(v)     cause such Domestic Subsidiary to deliver to the Administrative Agent the secretary's certificates and attachments which would have been required to be delivered to the Administrative Agent pursuant to Section 4.01(b) if such Domestic Subsidiary had been a Guarantor on the Closing Date, and

(vi)     cause such Domestic Subsidiary (and the parent of each such Domestic Subsidiary that is a Loan Party) to deliver any and all certificates representing Equity Interests (to the extent certificated) and promissory notes that are required to be pledged pursuant to the Collateral Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank.

(b)     After the Closing Date, (x) promptly within ninety (90) days (or such later date as may be agreed by the Administrative Agent) after the acquisition of any Material Owned Property by any Loan Party, the Lead Borrower shall notify the Administrative Agent of such Material Owned Property and (y) promptly within ninety (90) days (or such later date as may be agreed by the Administrative Agent) after a request  from the Administrative Agent to comply with the Mortgage Requirement with respect to such Material Owned Property, request such Loan Party shall satisfy the Mortgage Requirement; it being understood  and agreed that, with respect to  any Material Owned

145

Property owned by any Domestic Subsidiary at the time such Domestic Subsidiary is required to become a Loan Party under this Section 6.11, such Material Owned Property shall be deemed to have been acquired by such Domestic Subsidiary on the first day of the time period within which such Domestic Subsidiary is required to become a Loan Party under this Section 6.11. Notwithstanding the foregoing, the Administrative Agent shall not enter into any Mortgage in respect of any Material Owned Real Property acquired by any Loan Party after the Fifth Amendment Effective Date until (1) the date that occurs forty-five (45) days after the Administrative Agent has delivered to the Lenders (which may be delivered electronically) the following documents in respect of such real property: (i) a completed flood hazard determination from a third party vendor, (ii) if such real property is located in a "special flood hazard area," (A) a notification to the applicable Loan Party of that fact and (if applicable) notification to the applicable Loan Party that flood insurance coverage is not available and (B) evidence of receipt by the applicable Loan Party of such notice, and (iii) if such notice is required to be provided to the applicable Loan Party and flood insurance is available in the community in which such real property is located, evidence of flood insurance, and (2) the Administrative Agent shall have received written confirmation from each of the Lenders that flood insurance due diligence and flood insurance compliance has been satisfactorily completed by the Lenders.

(c)     Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     the Loan Documents shall not require the creation or perfection of pledges of or security interests in, satisfaction of the Mortgage Requirement with respect to any Material Owned Property, or the delivery of particular documents with respect to, particular assets if and for so long as the Administrative Agent and the Borrowers determine in their reasonable discretion that the burden or cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance in respect of such assets shall excessive in view of the benefit of the security afforded thereby;

(ii)     [reserved];

(iii)     the Loan Parties shall not be required to (a) grant a security interest in any asset or perfect a security interest in any asset to the extent (and for the duration) that the relevant assets constitute Excluded Assets, (b) perfect a security interest in vehicles and any other assets subject to a certificate of title and letter of credit rights to the extent not perfected by the filing of a UCC-1 financing statement or, in the case of a UK Loan Party, a Companies House MR01 filing and (c) no action shall be required in order to create or perfect a security interest in any asset (i) with respect to the U.S. Loan Parties, located outside of the United States, (ii) with respect to the UK Loan Parties, located outside of England and Wales and (iii) with respect to the Belgian Loan Parties, located outside of Belgium; and

(iv)     the Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the time as set forth therein for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in its discretion, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Section 6.12   Further Assurances

. Promptly upon request by the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, assignments, Mortgages, deeds of trust, trust deeds, financing statements and continuations

AmericasActive:18122631.218122631.8

thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent, may reasonably require from time to time in order to (x) to the fullest extent permitted by applicable Law, subject any Loan Party's properties, assets, rights or interests that constitute Collateral to the Liens now or hereafter intended to be covered by any of the Collateral Documents and (y) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder (subject to Liens permitted by Section 7.01) and cause each of its Restricted Subsidiaries to do so, but in each case, subject to the limitations set forth herein and in the other Loan Documents.

Section 6.13   Taxes

. Pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a tax Lien upon any properties of Parent or any of its Restricted Subsidiaries not otherwise permitted under this Agreement; provided that none of Parent or any of its Restricted Subsidiaries shall be required to pay any such Tax,  with respect to amounts which are being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

Section 6.14   Ratings

. Use commercially reasonable efforts to maintain at all times (a) public corporate family ratings with respect to the Lead Borrower from Moody's and public corporate credit ratings with respect to the Lead Borrower from S&P and (b) public facility ratings with respect to the ABL Facility from each of S&P and Moody's (but, in each case, not any specific ratings).

Section 6.15   Use of Proceeds

. The proceeds of the ABL Loans and Letters of Credit shall be applied by the Borrowers for working capital, general corporate purposes or any other purpose not prohibited by the Loan Documents.

Section 6.16   Lien Enhancements

. If any holder of the First Lien Loans or Second Lien Loans or any agent thereof receives any guaranty from any Person, or is granted additional collateral to secure such First Lien Loans or Second Lien Loans after the Closing Date, the Loan Parties shall cause the same to be granted to the Collateral Agent for the benefit of the Secured Parties, to the extent required by the ABL Intercreditor Agreement.

Section 6.17   U.S. Loan Party Cash Management.  Except as otherwise agreed by the Administrative Agent:

(a)       Within ninety (90) days following the First Amendment Effective Date (or such later date agreed by the Administrative Agent in its Permitted Discretion),

(i)       Each U.S. Loan Party shall deliver, or cause to be delivered to the Collateral Agent, a U.S. Control Agreement with respect to each of its Deposit Accounts (other than Excluded Accounts) as set forth on Schedule 6.17 duly authorized, executed and delivered by each bank where a Deposit Account into which the proceeds of ABL Priority Collateral are deposited or are expected to be deposited or concentrated (other than Excluded Accounts) is maintained (each a "Blocked Account Bank"), the applicable U.S. Loan Party and the Collateral Agent; provided, that, the U.S. Loan Parties shall not be required to deliver a U.S. Control

147

Agreement with a Blocked Account Bank as to any Deposit Account that is an Excluded Account; provided further, that if a U.S. Control Agreement meeting the requirements of this Section 6.17 cannot be obtained within the required time period (as it may be extended by the Administrative Agent) then (i) the applicable U.S. Loan Party shall promptly take steps to close the affected Deposit Accounts and (ii) until such Deposit Accounts are closed, shall cause all funds in such affected Deposit Accounts to be transferred daily (or such longer interval as the Collateral Agent may agree) to a Deposit Account subject to a U.S. Control Agreement.  Each such U.S. Control Agreement shall provide, among other things, that (A) the Blocked Account Bank will comply with any instructions originated by Collateral Agent directing the disposition of the funds in such Deposit Account without further consent by the applicable U.S. Loan Party, (B) the Blocked Account Bank waives and agrees not to exercise any rights of setoff or recoupment or any other claim against the applicable Deposit Account other than for payment of its service fees and other charges directly related to the administration of such Deposit Account and for returned checks or other items of payment, (C) in the case of the U.S. Control Agreement for each U.S. Collection Account, upon the instruction of the Collateral Agent (an "Activation Notice"), the Blocked Account Bank will transfer each day by wire transfer or other electronic funds transfer all funds in such account to Collateral Agent's Account, provided, that, the Collateral Agent will not issue an Activation Notice except at such time as a Cash Dominion Triggering Event has occurred and is continuing, (D) in the case of the U.S. Control Agreements for any other Deposit Account that receives collections, the Blocked Account Bank will transfer each day, or at such other times as the Collateral Agent may agree, by wire transfer or other electronic funds transfer all funds in such account to the U.S. Collection Account, as the case may be, or directly to the Collateral Agent's Account, and (E) in the case of the U.S. Control Agreements for any other Deposit Account, upon an Activation Notice, the Blocked Account Bank will transfer each day by wire transfer or other electronic funds transfer all funds in such account to the Collateral Agent's Account, provided, that, the Collateral Agent will not issue such an Activation Notice under this clause (E) except at such time as an Event of Default has occurred and is continuing. The Collateral Agent hereby agrees to promptly send the Lead Borrower copies of all Activation Notices issued to any Blocked Account Bank.  In the event that the Collateral Agent has sent an Activation Notice with respect to a U.S. Collection Account, at any time after a Cash Dominion Triggering Event has ceased to exist in accordance with the definition of such term, the Collateral Agent will promptly, but in no event later than five (5) Business Days after such Cash Dominion Triggering Event has ceased to exist, send a notice to rescind the Activation Notice. In the event that any U.S. Control Agreement covering any Deposit Account does not provide that the Collateral Agent may rescind an Activation Notice in accordance with the terms hereof or any Blocked Account Bank refuses to acknowledge the rescission of any Activation Notice in accordance with the terms hereof, the Collateral Agent and the Loan Parties shall cooperate in good faith and take all reasonable actions to enter into a replacement Control Agreement that permits the applicable Loan Party access to the subject Deposit Account in accordance with the terms hereof until such time as another Activation Notice is issued.

(ii)    Each U.S. Loan Party shall obtain an authenticated U.S. Control Agreement from each issuer of uncertificated securities (other than Equity Interests in any Subsidiary of any U.S. Borrower), securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any U.S. Loan Party, or maintaining a Securities Account for such U.S. Loan Party, as set forth on Schedule 6.17; provided, that, the U.S. Loan Parties shall not be required to deliver a U.S. Control Agreement with respect to any Excluded Account.

(iii)   Each U.S. Borrower shall direct all Account Debtors or other obligors in respect of any amounts payable to the U.S. Borrowers comprising ABL Priority Collateral to

148

make payment of all such amounts to a U.S. Collection Account or otherwise ensure such amounts payable are promptly directed to a U.S. Collection Account.

(b)      So long as no Cash Dominion Triggering Event has occurred and is continuing (other than with respect to the addition or replacement of any Excluded Account), upon not less than five (5) Business Days' prior written notice to the Administrative Agent, the Lead Borrower may amend Schedule 6.17, to add or replace a Deposit Account or Blocked Account Bank or Securities Account or securities intermediary and shall upon such addition or replacement provide to the Administrative Agent an amended Schedule 6.17; provided, that prior to causing or permitting the balance in such Deposit Account or Securities Account to exceed the applicable thresholds for Excluded Accounts, the applicable Loan Party and such prospective Blocked Account Bank or securities intermediary shall have executed and delivered to the Collateral Agent a Control Agreement (including any acknowledgement and agreement of the Blocked Account Bank or securities intermediary with respect thereto).

(c)      On each Business Day during a Cash Dominion Period, the Collateral Agent shall apply all funds credited to the U.S. Collection Account on such Business Day or the immediately preceding Business Day (at the discretion of the Collateral Agent, whether or not immediately available) first to prepay any U.S. Permitted Overadvances that may be outstanding, pro rata, second to prepay the U.S. Swing Line Loans, pro rata, third to Cash Collateralize outstanding U.S. L/C Exposure, fourth to prepay the U.S. ABL Loans (other than U.S. ~~Swing Line Loans and U.S. FILO Loans), pro rata, fifth to prepay the U.S. FILO Loans (other than U.S.~~ Swing Line Loans), pro rata, ~~sixth~~fifth to prepay any UK Permitted Overadvances or Belgian Permitted Overadvances that may be outstanding, pro rata, ~~seventh~~sixth to prepay the Foreign Swing Loan Loans, pro rata, ~~eighth~~seventh to Cash Collateralize outstanding Foreign L/C Exposure and ~~ninth~~eighth to prepay the UK ABL Loans and the Belgian ABL Loans (other than Foreign Swing Line Loans), pro rata.

Section 6.18   Field Examinations; Appraisals

. Upon reasonable prior notice, the Administrative Agent or professionals (including investment bankers, consultants, accountants and lawyers) retained by the Administrative Agent shall conduct two (2) field examinations and one (1) inventory appraisal at the expense of the Loan Parties including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Loan Parties' business plan and cash flows, each calendar year; provided that, while ~~Excess~~Specified Availability is greater than the greater of (x) ~~20.0~~15.0% of the Line Cap and (B) $~~30,000,000~~22,500,000, the Administrative Agent may, in its Permitted Discretion, elect to conduct only one (1) field examination per calendar year at the expense of the Loan Parties; provided, further, that (x) at any time after the date on which Excess Availability has been less than the greater of (A) $18,750,000 and (B) 12.5% of the Line Cap, inventory appraisals may be conducted two (2) times during such calendar year at the expense of the Loan Parties and (y) field examinations and inventory appraisals may be conducted at any time during the continuance of a Specified ABL Default at the expense of Loan Parties.  No Borrowing Base calculation shall include Collateral acquired in a Permitted Acquisition or otherwise outside the ordinary course of business until completion of applicable field examinations and appraisals satisfactory to the Administrative Agent. Notwithstanding the foregoing, any field examination or any inventory appraisals conducted in respect of a Permitted Acquisition shall not be deemed a field examination or inventory appraisal for purposes of the limitations set forth in this Section 6.18 if the assets subject of such field examination and/or such inventory appraisal are limited to the assets acquired in such Permitted Acquisition.

Section 6.19   Post-Closing Covenants

149

.   Except as otherwise agreed by the Administrative Agent in its sole discretion, the Borrowers shall, and shall cause each of the other Loan Parties to, deliver each of the documents, instruments and agreements and take each of the actions set forth on Schedule 6.19 within the time periods set forth therein (or such longer time periods as determined by the Administrative Agent in its discretion).

Section 6.20   [Reserved].

Section 6.21   UK Pension Plan Covenants.

(a)      Each UK Loan Party will and will cause each of its Subsidiaries to ensure that all pension schemes operated by or maintained for their benefit and/or the benefit of any of their employees are fully funded based on the statutory funding objective under sections 221 and 222 of the UK Pensions Act 2004 and that no action or omission is taken by them in relation to such a pension scheme which has or is reasonably likely to have a Material Adverse Effect (including, without limitation, the termination or commencement of winding-up proceedings of any such pension scheme or any UK Loan Party or its Subsidiaries ceasing to employ any member of such a pension scheme).

(b)      Each UK Loan Party will and will cause each of its Subsidiaries to ensure that it is not and has not been at any time an employer (for the purposes of sections 38 to 51 of the UK Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the UK Pension Schemes Act 1993) or "connected" with or an "associate" of (as those terms are used in sections 38 or 43 of the UK Pensions Act 2004) such an employer

(c)      Each Loan Party will and will cause each of its Subsidiaries to deliver to the Administrative Agent at such times as those reports are prepared in order to comply with the then current statutory or auditing requirements (as applicable either to the trustees of any relevant schemes or to the UK Loan Party), actuarial reports in relation to all UK Pension Plans.

(d)      Each Loan Party will and will cause each of its Subsidiaries to promptly notify the Administrative Agent of any material change in the rate of contributions to any UK Pension Plan paid or recommended to be paid (whether by the scheme actuary or otherwise) or required (by law or otherwise).

Section 6.22   Centre of Main Interests and Establishments.

Each UK Loan Party shall ensure that its centre of main interests (as that term is used in Article 3(1) of the Regulation) remains in its jurisdiction of incorporation and it shall not take any action to change its centre of main interests. No UK Loan Party shall create or take any steps to create an "establishment" (as that term is used in Article 2(10) of the Regulation) in any other jurisdiction.

Section 6.23   Financial Assistance.

Each UK Loan Party shall comply in all respects with sections 678 and 679 of the United Kingdom's Companies Act 2006, including in relation to the execution of the UK Collateral Documents and payment of amounts due under this Agreement.

Section 6.24   Notification of Foreign Account Debtors.

At any time at the request of the Collateral Agent in its sole discretion following the commencement and during the continuation of a Cash Dominion Period, (i) each UK Loan Party agrees

150

that if any of its Account Debtors have not previously received notice of the security interest of the Collateral Agent over the Accounts, it shall promptly give notice to such Account Debtors and if any such UK Loan Party does not serve such notice, each of them hereby authorizes the Collateral Agent to serve such notice on their behalf and (ii) each Belgian Loan Party agrees that if any of its Account Debtors have not previously received notice of the security interest of the Collateral Agent over the Accounts, it shall promptly give notice to such Account Debtors and if any such Belgian Loan Party does not serve such notice, each of them hereby authorizes the Collateral Agent to serve such notice on their behalf.

Section 6.25   UK Loan Party Cash Management.

(a)      During the period beginning on the First Amendment Effective Date and ending on the date that is 90 days after the First Amendment Effective Date (or such later date as extended by the Administrative Agent in its sole discretion), and prior to compliance with Section 6.25(b), each UK Loan Party shall ensure that all proceeds of their Foreign ABL Priority Collateral are deposited in the UK Collection Accounts or the Payment Accounts.

(b)      Within 90 days of the First Amendment Effective Date (unless extended by the Administrative Agent in its sole discretion), each UK Loan Party shall:

(i)      deliver to the Administrative Agent (each in form and substance reasonably satisfactory to the Administrative Agent) (a) evidence that all of the collection accounts of UK Loan Parties which are not held with the Collateral Agent have been closed, (b) evidence that all of the cash management services of the UK Loan Parties have been transferred and established at Bank of America, N.A., acting through its London branch, including the opening of segregated collection accounts only containing proceeds of Foreign ABL Priority Collateral (the "New UK Collection Accounts") and all other operating and deposit accounts, (c) evidence that all Account Debtors of the UK Borrowers have been notified in writing to make payments with respect to the Accounts of the UK Borrowers to the New UK Collection Accounts; (d) duly executed deposit account control agreements (or other equivalent arrangement with similar effect) evidencing the Collateral Agent's exclusive control over such New UK Collection Accounts, (e) a supplemental deed relating to the UK Security Agreement duly executed by the UK Loan Parties creating, among other things, a fixed charge over such New UK Collection Accounts and all Accounts owed to the UK Borrowers, and (f) such further documents and authorizing resolutions as the Administrative Agent may reasonably require in connection with the completion, registration, perfection or enforceability of such supplemental deed (it being understood that as an accommodation to UK Loan Parties, the Administrative Agent and the Lenders have agreed to include the Eligible Accounts of the UK Borrowers in the UK Borrowing Base during such period and if at the conclusion of such period the conditions set forth in this Section 6.25(b) are not satisfied, the Eligible Accounts of the UK Borrowers shall be immediately excluded from the UK Borrowing Base); and

(ii)      ensure that all proceeds of Foreign ABL Priority Collateral are deposited directly into such New UK Collection Accounts.

(c)      During the period beginning on the First Amendment Effective Date and ending on the date that is 90 days after the First Amendment Effective Date (or such later date as extended by the Administrative Agent in its sole discretion), each UK Loan Party will provide periodic updates (at least monthly) to the Administrative Agent concerning such UK Loan Party's compliance with Section 6.25(b).

151

(d)        Each UK Loan Party will ensure that it shall comply with Clause 5.2 (Notice of Charge) of the UK Security Agreement in respect of (i) each New UK Collection Account and (ii) each Payment Account after compliance with Section 6.25(b).

(e)        Notwithstanding anything to the contrary in any Loan Document and having regard for Clause 1.3(d) of the UK Security Agreement, Clause 11.3 (Payment Accounts) of the UK Security Agreement shall apply to UK Collection Accounts (other than New UK Collection Accounts) in addition to Payment Accounts and no UK Loan Party shall be required to comply with (i) the provisions of Clause 5.2 (Notice of Charge), Clause 11.1 (Signing rights on bank accounts) or paragraphs (a) and (b) of Clause 11.2 (Collection Accounts) of the UK Security Agreement in respect of UK Collection Accounts (other than New UK Collection Accounts) or (ii) the provisions of Clause 5.2 (Notice of Charge) in respect of Payment Accounts prior to compliance with Section 6.25(b).

(f)        On each Business Day, the Collateral Agent shall apply all funds credited to any New UK Collection Account on such Business Day or the immediately preceding Business Day (at the discretion of the Collateral Agent, whether or not immediately available) first to prepay any UK Permitted Overadvances that may be outstanding, pro rata, second to prepay the Foreign Swing Line Loans, pro rata, third to Cash Collateralize outstanding Foreign L/C Exposure and fourth to prepay the UK ABL Loans (other than Foreign Swing Line Loans), pro rata.

Section 6.26   Belgian Loan Party Cash Management.

(a)        During the period beginning on the Fifth Amendment Effective Date and ending on the date that is 90 days after the Fifth Amendment Effective Date (or such later date as extended by the Administrative Agent in its sole discretion), and prior to compliance with Section 6.26(b), each Belgian Loan Party shall ensure that all proceeds of their Foreign ABL Priority Collateral are deposited in the Belgian Collection Accounts or the Payment Accounts.

(b)        Within 90 days of the Fifth Amendment Effective Date (unless extended by the Administrative Agent in its sole discretion), each Belgian Loan Party shall:

(i)        deliver to the Administrative Agent (each in form and substance reasonably satisfactory to the Administrative Agent) (a) evidence that all of the collection accounts of Belgian Loan Parties which are not held with the Collateral Agent have been closed, (b) evidence that all of the cash management services of the Belgian Loan Parties have been transferred and established at Bank of America, N.A., acting through its London branch, including the opening of segregated collection accounts only containing proceeds of Foreign ABL Priority Collateral (the "New Belgian Collection Accounts") and all other operating and deposit accounts, (c) evidence that all Account Debtors of the Belgian Borrowers have been notified in writing to make payments with respect to the Accounts of the Belgian Borrowers to the New Belgian Collection Accounts; (d) duly executed deposit account control agreements (or other equivalent arrangement with similar effect) evidencing the Collateral Agent's exclusive control over such New Belgian Collection Accounts, (e) a supplemental deed relating to the Belgian Security Agreement duly executed by the Belgian Loan Parties creating, among other things, a fixed charge over such New Belgian Collection Accounts and all Accounts owed to the Belgian Borrowers, and (f) such further documents and authorizing resolutions as the Administrative Agent may reasonably require in connection with the completion, registration, perfection or enforceability of such supplemental deed (it being understood that as an accommodation to Belgian Loan Parties, the Administrative Agent and the Lenders have agreed to include the Eligible Accounts of the Belgian Borrowers in the Belgian Borrowing Base during such period and if at the conclusion of such period the conditions set forth in this Section 6.26(b)

152

are not satisfied, the Eligible Accounts of the Belgian Borrowers shall be immediately excluded from the Belgian Borrowing Base); and

(ii)     ensure that all proceeds of Foreign ABL Priority Collateral are deposited directly into such New Belgian Collection Accounts.

(c)     During the period beginning on the Fifth Amendment Effective Date and ending on the date that is 90 days after the Fifth Amendment Effective Date (or such later date as extended by the Administrative Agent in its sole discretion), each Belgian Loan Party will provide periodic updates (at least monthly) to the Administrative Agent concerning such Belgian Loan Party's compliance with Section 6.26(b).

(d)     Each Belgian Loan Party will ensure that it shall comply with Clause 3.3.1 (Pledge Notice) of the Belgian Security Agreement in respect of (i) each New Belgian Collection Account and (ii) each Payment Account after compliance with Section 6.26(b).

(e)     On each Business Day, the Collateral Agent shall apply all funds credited to any New Belgian Collection Account on such Business Day or the immediately preceding Business Day (at the discretion of the Collateral Agent, whether or not immediately available) first to prepay any Belgian Permitted Overadvances that may be outstanding, pro rata, second to prepay the Foreign Swing Line Loans, pro rata, third to Cash Collateralize outstanding Foreign L/C Exposure and fourth to prepay the Belgian ABL Loans (other than Foreign Swing Line Loans), pro rata.

Section 6.27     MIRE Events. Each of the parties hereto acknowledges and agrees that, if there are any Mortgaged Properties, any increase, extension or renewal of any of the ABL Commitments (including the provision of ABL Commitment Increases or any other incremental credit facilities hereunder, but excluding (i) any continuation or conversion of borrowings, (ii) the making of any Loans or (iii) the issuance, renewal or extension of Letters of Credit) shall be subject to (and conditioned upon): (1) the prior delivery of all flood hazard determination certifications, acknowledgements and evidence of flood insurance and other flood-related documentation with respect to such Mortgaged Properties as required by the National Flood Insurance Act of 1968 (or any amendment or successor act thereto) and as otherwise reasonably required by the Administrative Agent and (2) the Administrative Agent shall have received written confirmation from the Lenders that flood insurance due diligence and flood insurance compliance has been satisfactorily completed by each of the Lenders.

## ARTICLE VII

## NEGATIVE COVENANTS

(i) Until the Termination Date, in the case of each provision of this Article VII, the Borrowers shall not, nor shall it permit any of the other Restricted Subsidiaries to, directly or indirectly:

Section 7.01   Liens

. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens pursuant to any Loan Document;

(b)     Liens existing on the Fifth Amendment Effective Date and listed on Schedule 7.01(b);

153

(c)     Liens for Taxes (i) not yet due and payable or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts (i) which are not yet overdue, (ii) which are overdue and which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (iii) the failure to make payment of which could not reasonably be expected to have a Material Adverse Effect;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation (including obligations in respect of letters of credit or bank guarantees in respect thereof), (ii) pledges and deposits in the ordinary course of business securing (A) liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrowers or any of the other Restricted Subsidiaries or (B) leases or licenses of property otherwise permitted by this Agreement (and, in each case, obligations in respect of letters of credit or bank guarantees in respect thereof) and (iii) pledges and deposits securing any settlement of litigation;

(f)     Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business (and, in each case, obligations in respect of indemnities, letters of credit or bank guarantees in respect thereof);

(g)     easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects, protrusions and other similar encumbrances and minor title defects, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions and declarations affecting real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness, and which do not in any case or in the aggregate materially and adversely interfere with the ordinary conduct of business of the applicable Person on the affected real property;

(h)     Liens securing Indebtedness permitted under Section 7.03(c); provided that (i) such Liens attach concurrently with or within one hundred and eighty (180) days after the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (iii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition plus the amount of any related interest, premiums, fees and/or expenses and/or other customary amounts; it being understood and agreed that individual financings by any lender may be cross-collateralized to other financings provided by such lender or its affiliates;

(i)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date and pursuant to an Acquisition permitted hereby; provided that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does

154

not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder), and (iii) the Indebtedness secured thereby is permitted under Section 7.03;

(j)      (i) Liens securing obligations of the type described in Section 7.03(i) and (ii) bankers' Liens and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrowers and/or any other Restricted Subsidiary granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank or banks in respect of cash management and/or operating account arrangements, including those involving pooled and netting arrangements;

(k)      Liens arising from precautionary Uniform Commercial Code financing statement filings;

(l)      Liens securing Indebtedness incurred in reliance on Section 7.03(n), subject to the Required Additional Debt Terms;

(m)      the modification, replacement, renewal or extension of any Lien permitted by clause (b)  or (h) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B)additions and accessions thereto and (a) proceeds and products thereof; and (5) the renewal, extension or refinancing of the obligations secured or benefited by such Liens, if such obligations are Indebtedness, is permitted pursuant to Section 7.03;

(n)      (i) leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to other Persons in the ordinary course of business which do not (x) interfere in any material respect with the business of the Borrowers or any of the other Restricted Subsidiaries (taken as a whole) or (y) secure any Indebtedness and (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrowers or any of their respective Restricted Subsidiaries or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(o)      Liens securing Indebtedness permitted to be assumed or incurred, as applicable, pursuant to Section 7.03(s) so long as the applicable conditions described in Section 7.03(s) have been satisfied;

(p)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(q)      Liens on (i) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies, (ii) on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto and (iii) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case securing Indebtedness permitted to be incurred pursuant to Section 7.03;

(r)      [reserved];

(s)      Liens securing judgments and awards for the payment of money not constituting an Event of Default under Section 9.01(h);

155

(t)        [reserved];

(u)        Liens not otherwise permitted by this Section 7.01 so long as the aggregate outstanding principal amount of the obligations secured thereby (together with the then outstanding principal amount of obligations secured by all other Liens incurred pursuant to this clause (u)) does not exceed $10,000,000the greater of (x) $150,000,000 and (y) 25.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) in the aggregate at any time; provided that any such Liens securing Indebtedness for borrowed money on assets constituting Collateral shall be secured on a junior lien basis to the Liens securing the ABL Facility on the Closing Date and shall be subject to an intercreditor agreement reasonably acceptable to the Administrative Agent;

(v)        Liens consisting of any (i) interest or title of a lessor or sub-lessor (or such lessor or sub-lessor's mortgagee or lender) under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject, (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii) or (v) deposits of cash with the owner or lessor of premises leased and operated by a Borrower or any other Restricted Subsidiary in the ordinary course of business of such Borrower or such Restricted Subsidiary to secure the performance of such Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

(w)        Liens solely on any cash earnest money deposits made by the Borrowers and/or any of the other Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder;

(x)        Liens securing Indebtedness permitted pursuant to Section 7.03(y); provided that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is refinanced other than (A) after acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (a) proceeds and products thereof and (6) if the Indebtedness being refinanced was subject to intercreditor arrangements, then any Refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements not materially less favorable, taken as a whole, than the intercreditor arrangements governing the Indebtedness that is refinanced or the intercreditor arrangements governing the relevant Refinancing Indebtedness shall be otherwise reasonably acceptable to the Administrative Agent;

(y)        Liens arising out of Sale Leaseback Transactions permitted pursuant to Section 7.05(n);

(z)        Subject to the terms of the ABL Intercreditor Agreement and for so long as the ABL Intercreditor Agreement is in full force and effect, Liens securing (i) the First Lien Loans, First Lien Obligations and any First Lien Incremental Equivalent Debt (or any equivalent term under any documentation governing any First Lien Facility) and (ii) the Second Lien Loans and Second Lien Obligations;

(aa)        Liens disclosed in any Mortgage Policy delivered pursuant to the terms hereof with respect to any Material Owned Property and any replacement, extension or renewal of any such Lien; provided that no such replacement, extension or renewal Lien shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof);

156

(bb)    Liens on securities that are the subject of repurchase agreements constituting Investments permitted under Section 7.02 arising out of the relevant repurchase transaction;

(cc)    Liens securing obligations in respect of letters of credit, bank guarantees, surety bonds, performance bonds or similar instruments permitted under Section 7.03;

(dd)    Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(ee)    Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of each of clauses (i) and (ii), securing intercompany Indebtedness permitted under Section 7.03;

(ff)    Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(gg)    Liens securing obligations under Swap Contracts in connection with any derivative transaction of the type permitted under Section 7.03(d);

(hh)    (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly-owned Subsidiaries;

(ii)    Liens on cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(jj)    Liens that are customary rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of a Borrower or any other Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business, (iii) relating to purchase orders and other agreements entered into with customers of a Borrower or any other Restricted Subsidiary in the ordinary course of business or (iv) relating to credit card processing arrangements entered into in the ordinary course of business;

(kk)    Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(ll)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to dispose of any property in a Disposition permitted under Section 7.04, in each case, solely to the extent such Investment or Disposition, as applicable, would have been permitted on the date of the creation of such Lien;

(mm)    Liens arising as a result of any Permitted Non-Recourse Factoring Transaction; provided that such Liens encumber solely the Accounts and the Related Assets sold in connection with such Permitted Non-Recourse Factoring Transaction; and

157

(nn)    Liens arising as a result of any Permitted Inventory Financing; provided that such Liens encumber solely the inventory and the Related Assets sold in connection with such Permitted Inventory Financing.

Section 7.02   Investments

. Make any Investments (directly or indirectly), except:

(a)    Investments by the Borrowers or any of the other Restricted Subsidiaries in cash or Cash Equivalents at the time of the relevant Investment;

(b)    loans and advances to Representatives in the ordinary course of the business of Parent or any of its Restricted Subsidiaries (i) in an aggregate principal amount, together with the then-outstanding principal amount of all other loans and advances made pursuant to this clause (b)(i), not to exceed the greater of $2,000,00030,000,000 and 2.05.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), or (ii) in connection with the relevant Person's purchase of Equity Interests of Parent or any other Parent Company so long as the proceeds of such loans and/or advances are substantially contemporaneously contributed to the Lead Borrower as consideration for the purchase of such Equity Interests;

(c)    Investments (i) by any Loan Party in any other Loan Party; provided that any such Investments pursuant to this clause (c)(i) by any U.S. Loan Party in any Foreign Loan Party shall not exceed, together with all Investments pursuant to this clause (c)(i), and the total consideration for all Permitted Acquisitions pursuant to clause (d) of the definition thereof, $5,000,000 in the aggregate at any time, (ii) by any Restricted Subsidiary that is not a Loan Party in any Loan Party, (7) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party and (8) by any Loan Party in any Restricted Subsidiary that is not a Loan Party in an aggregate outstanding amount, together with all Investments pursuant to this clause (c)(iv), all Investments pursuant to Section 7.02(m) and the total consideration for all Permitted Acquisitions pursuant to clause (c) of the definition thereof, not to exceed the greater of $20,000,000150,000,000 and 20.0% of Consolidated Adjusted EBITDA of the Borrowers and their Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(d)    Investments consisting of (or resulting from) Liens, Indebtedness, fundamental changes, Dispositions, Restricted Payments and/or Restricted Debt Payments permitted or not restricted under Section 7.01 (other than Section 7.01(bb)), Section 7.03 (other than Section 7.03(l) and (u)), Section 7.04 (other than Section 7.04(a)(ii)(B), (c) and (d)), Section 7.05 (other than Section 7.05(d) and (e)), Section 7.06 (other than Section 7.06(a) and (c)(ix)) and Section 7.09 respectively;

(e)    Investments existing on the Closing Date and listed on Schedule 7.02(e) or consisting of any modification, replacement, renewal, reinvestment or extension of any Investment existing on the Closing Date; provided that the amount of any Investment permitted pursuant to this Section 7.02(e) shall not be increased from the amount of such Investment on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by this Section 7.02;

(f)    Investments in Swap Contracts permitted under Section 7.03;

158

(g)      promissory notes and other non-cash consideration (including, without limitation, net exercise and net withholding of equity and equity-based awards) received in connection with Dispositions permitted by Section 7.05;

(h)      Permitted Acquisitions;

(i)      loans and advances of payroll payments or other compensation to present or former Representatives of any Parent Company (to the extent such payments or other compensation relate to services actually provided to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, attributable to the ownership or operations of any Subsidiary of any Parent Company other than any Borrower and/or its Subsidiaries)), any Borrower and/or any Subsidiary, in each case in the ordinary course of business;

(j)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(k)      Investments (i) received (A) in satisfaction or partial satisfaction thereof from financially troubled suppliers and/or account debtors to the extent reasonably necessary in order to prevent or limit loss, (B) in connection with the bankruptcy or reorganization of any Person, (a) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and (b) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes, (9) in the form of advances made to distributors, suppliers, licensors and licensees in the ordinary course of business or to the extent necessary to maintain the ordinary course of supplies to the Borrowers and/or any Restricted Subsidiary, (10) made in the ordinary course of business consisting of endorsements for collection or deposit and (iv) consisting of customary trade arrangements with customers in the ordinary course of business;

(l)      Investments consisting of the acquisition and/or retention by the Borrowers of obligations of one or more current or former Representatives of the Borrowers or any of the other Restricted Subsidiaries or any Parent Company in connection with any such Representative's acquisition of Equity Interests of the Lead Borrower or any Parent Company, so long as no cash is paid by the Borrowers or any of the other Restricted Subsidiaries to such officers or employees in connection with the acquisition of any such obligations; and

(m)      other Investments in an amount not to exceed $15,000,000, together with all Investments made pursuant to this clause (m), all Investments pursuant to Section 7.02(c)(iv), and the total consideration for all Permitted Acquisitions pursuant to clause (c) of the definition thereof, (i) the greater of (x) $150,000,000 and (y) 20.0% of Consolidated Adjusted EBITDA of the Lead Borrower and its Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(n)      Investments to the extent that payment therefor is made solely with Qualified Equity Interests of any Parent Company, in each case, to the extent not resulting in a Change of Control;

(o)      (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Borrowers or any other Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 7.02 to the extent that such Investments were not made in contemplation of or in connection with the relevant Acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant Acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement,

159

renewal or extension of any Investment permitted under clause (i) of this Section 7.02(o) so long as no such modification, replacement, renewal or extension thereof increases the amount of such Investment except as otherwise permitted by this Section 7.02;

(p)      (i) Guarantee Obligations in respect of leases (other than Capital Leases) or of other obligations not constituting Indebtedness, in each case, in the ordinary course of business and (ii) Guarantee Obligations constituting Indebtedness to the extent permitted by Section 7.03;

(q)      Investments in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under Section 7.06; provided that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable provision of Section 7.06;

(r)      Investments consisting of advances made to Trico Componentes, S.A. de C.V. in the ordinary course of business for payroll and other ordinary course expenses not to exceed $3,000,000 in any Fiscal Year, when taken together with the principal amount of all other Investments made pursuant to this clause (r) in such Fiscal Year;

(s)      Investments received in connection with the Disposition of assets permitted by Section 7.05;

(t)      Investments in the Borrowers, any Subsidiary and/or any joint venture in connection with intercompany cash management arrangements and related activities consistent with past practice and in the ordinary course of business;

(u)      Investments consisting of the grant of non-exclusive licenses or sublicenses of Intellectual Property pursuant to joint marketing arrangements with other Persons in the ordinary course of business;

(v)      Investments in an unlimited amount so long as the Payment Conditions are satisfied at the time such Investment is made (or, if the proceeds of the relevant Investments will be applied to finance a Limited Condition Acquisition for which the Borrowers have made an LCA Election, as of the LCA Test Date for such Limited Condition Acquisition); and

(w)      the Transactions and Investments made to effect the Transactions.

Notwithstanding the foregoing, in no event shall any Loan Party make any Investment of any Intellectual Property in (or otherwise Dispose any Intellectual Property to) any Subsidiary of Parent that is not a Loan Party, except for any Investment or Disposition of any Intellectual Property that, in the reasonable business judgment of the Borrower, (x) is immaterial to, or no longer used in or necessary for, the conduct of the business of any Loan Party or (y) is required by any applicable Law to be owned by a non-Loan Party in order for such non-Loan Party to engage in the business conducted by it on the Fourth Amendment Effective Date (or any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof).

Section 7.03    Indebtedness

.   Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

(a)      Indebtedness of the Borrowers and the other Loan Parties under the Loan Documents;

160

(b)      Indebtedness of the Borrowers or any Subsidiary Guarantor constituting First Lien Loans, First Lien Obligations, First Lien Incremental Equivalent Debt (or any equivalent term under any documentation governing any First Lien Facility), Second Lien Loans or Second Lien Obligations in an aggregate principal amount that does not exceed the "Term Priority Cap" (as defined in the ABL Intercreditor Agreement); provided that such Indebtedness is secured only by Liens permitted under Section 7.01(z);

(c)      Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness (excluding seller Indebtedness in respect of any Permitted Acquisition) not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (c), the greater of (x) $10,000,000120,000,000 and (y) 15.020.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(d)      Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks and not entered into for speculative purposes;

(e)      Indebtedness (but not for borrowed money) in respect of Permitted Non-Recourse Factoring Transactions (i) with respect to Accounts owing from Persons that are not Specified Customers, in an aggregate outstanding amount not to exceed $50,000,000 and (ii) with respect to Accounts owing from Persons that are Specified Customers;

(f)      Indebtedness incurred by any Loan Party or any Restricted Subsidiary of any Loan Party in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits, salary, wages or other compensation or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 Business Days following the incurrence thereof;

(g)      (A) contingent liabilities in respect of any indemnification, adjustment of purchase price, earn-out, non-compete, consulting, deferred compensation and similar obligations of one or more of the Borrowers or the other Restricted Subsidiaries incurred in the ordinary course of business or in connection with Acquisitions and Dispositions permitted hereby and (B) letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments issued in support of such liabilities;

(h)      reimbursement, indemnification or similar obligations (including any arising by right of subrogation) of one or more of the Borrowers or the other Restricted Subsidiaries in respect of performance, payment, surety, customs, stay, return of money or appeal bonds, performance and completion guaranties or similar instruments, in each case incurred in the ordinary course of business, for the benefit of one or more of the Borrowers or the other Restricted Subsidiaries;

(i)      Indebtedness in the ordinary course of business (i) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds and/or (ii) in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash

161

management and deposit accounts, including Cash Management Obligations and supplier finance or similar programs;

(j)     Indebtedness owed to any Person incurred to finance the premiums with respect to any insurance policy of any Parent Company, or Parent or its Restricted Subsidiaries in the ordinary course of business;

(k)     Indebtedness (but not for borrowed money) of any non-Loan Party in respect of Permitted Inventory Financing in an aggregate outstanding amount not to exceed $~~50,000,000~~100,000,000;

(l)     Indebtedness of (i) any Loan Party to any other Loan Party; provided that any such Indebtedness pursuant to this clause (l)(i) shall (x) not exceed the amount of Investments otherwise permitted under Section 7.02(c) and (y) be evidenced by a promissory note in form and substance reasonably satisfactory to the Administrative Agent which shall have been pledged to the extent required by the Security Agreement, (ii) any Non-Loan Party Subsidiary to any Non-Loan Party Subsidiary, (11) any Loan Party to any Non-Loan Party Subsidiary; provided that any such Indebtedness pursuant to this clause (l)(iii) shall be unsecured and expressly subordinated in right of payment to the Obligations and the First Lien Obligations, in each case, on terms reasonably satisfactory to the Administrative Agent or (12) any Non-Loan Party Subsidiary to any Loan Party; provided that any such Indebtedness pursuant to this clause (l)(iv) shall (x) not exceed the amount of Investments otherwise permitted under Section 7.02(c) and (y) be evidenced by a promissory note in form and substance reasonably satisfactory to the Administrative Agent which shall have been pledged to the extent required by the Security Agreement;

(m)     [reserved];

(n)     additional Indebtedness of any Loan Party in an amount not to exceed the aggregate principal amount of the Ratio Debt Basket at such time, subject to the Required Additional Debt Terms;

(o)     Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties in an aggregate outstanding principal amount not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (o), the greater of (i) $~~10,000,000~~150,000,000 and (13) ~~10.0~~25.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(p)     additional Indebtedness in an aggregate outstanding principal amount not to exceed ~~$30,000,000~~, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (p), the greater of (i) $150,000,000 and (ii) 25.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(q)     Indebtedness consisting of promissory notes issued by the Borrowers and the other Restricted Subsidiaries to current or former Representatives of any Parent Company or Parent or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative) to finance the purchase or redemption of Equity Interests permitted by Section 7.06;

(r)     [reserved];

162

(s)     Indebtedness of any Loan Party incurred to finance, or assumed in connection with, any Acquisition permitted hereunder after the Closing Date that is secured by a Lien on the Collateral that is pari passu or junior to the Lien securing the ABL Facility on the Closing Date or is unsecured; provided that after giving effect to such Acquisition as of the last day of the most recently ended Test Period for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable, prior to the date of incurrence thereof, the Borrowers could incur $1.00 of additional pari passu, junior or unsecured Indebtedness (as applicable) permitted by clause (n) of this Section (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrowers have made an LCA Election, availability under clause (n) of this Section shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for then-most recently ended Test Period on or prior to such LCA Test Date for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable)), and provided further, that (i) other than with respect to any Indebtedness assumed by any Loan Party in connection with such Acquisition, the Required Additional Debt Terms shall have been satisfied and (ii) with respect to any assumed Indebtedness, (x) such Indebtedness (A) was not incurred in contemplation of such Acquisition, (B) is secured only by the assets acquired in the applicable Acquisition (including any acquired Equity Interests) and products and proceeds thereof, accessions or additions thereto and improvements thereon but not any Accounts included as Eligible Accounts or Inventory included as Eligible Inventory and (C) the only obligors with respect to any such assumed Indebtedness shall be those Persons who were obligors of such Indebtedness prior to such Acquisition and (y) both immediately prior and after giving effect to the incurrence of such Indebtedness, no Event of Default shall exist or result therefrom (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrowers have made an LCA Election, (i) no Event of Default shall exist or would result therefrom as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition).

(t)     Indebtedness of the Borrowers and/or any other Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(u)     Guarantee Obligations by the Borrowers and/or any other Restricted Subsidiary of Indebtedness or other payment obligations of the Borrowers and/or any other Restricted Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.03 or other payment obligations not prohibited by this Agreement; provided that in the case of any Guarantee Obligation by any Loan Party of the payment obligations of any non-Loan Party, the related Investment is permitted under Section 7.02 (other than Section 7.02(d));

(v)     Indebtedness of the Borrowers and/or any other Restricted Subsidiary existing, or pursuant to commitments existing, on the Fifth Amendment Effective Date and described on Schedule 7.03;

(w)     [reserved];

(x)     Indebtedness of the Borrowers and/or any other Restricted Subsidiary consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

AmericasActive:18122631.218122631.8

(y)      the Borrowers and the other Restricted Subsidiaries may become and remain liable for any Indebtedness refinancing, refunding or replacing any Indebtedness permitted under <u>clauses (a)(iv)</u>, (<u>b</u>), (<u>c</u>), (<u>d</u>), (<u>e</u>), (<u>m</u>), (<u>n</u>), (<u>p</u>), (<u>s</u>), (<u>v</u>) and (<u>z</u>) of this <u>Section 7.03</u> ("<u>Refinancing Indebtedness</u>") and any subsequent Refinancing Indebtedness in respect thereof; <u>provided</u> that

(i)      the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this <u>Section 7.03</u> (<u>provided</u> that (1) such additional Indebtedness satisfies the other applicable requirements of this <u>Section 7.03</u> (with additional amounts incurred in reliance on this <u>clause (C)</u> constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of <u>Section 7.01</u>);

(ii)      other than in the case of Refinancing Indebtedness with respect to <u>clauses (c)</u> and (<u>z</u>) of this <u>Section 7.03</u>, (A) such Indebtedness has a final scheduled maturity on or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced;

(iii)      the covenants, events of default, and other terms of such Indebtedness (other than interest rate, payment premiums and redemptions or as otherwise provided in the other clauses of this <u>clause (y)</u>) shall be not materially more favorable (taken as a whole) to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than any covenants or any other provisions applicable only to periods after the Latest Maturity Date);

(iv)      in the case of Refinancing Indebtedness with respect to Indebtedness permitted or originally incurred under <u>clauses (a)(iv)</u>, (<u>b</u>), (<u>c</u>), (<u>e</u>), (<u>m</u>), (<u>n</u>), (<u>o</u>), (<u>p</u>), and (<u>z</u>) of this <u>Section 7.03</u>, the incurrence thereof shall be deemed to be incurred in reliance on the relevant clause noted above and not under this <u>clause (iv)</u>;

(v)      (A) to the extent secured, such Indebtedness (i) is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood that secured Indebtedness may be refinanced with unsecured Indebtedness) and (ii) is not secured by any Lien which extends to any asset not covered by the Lien securing the Indebtedness that is refinanced, refunded or replaced, and (B) if the Indebtedness being refinanced, refunded or replaced was originally contractually subordinated to the Obligations in right of payment (or the Liens securing such Indebtedness were originally contractually subordinated to the Liens on the Collateral securing the Secured Obligations), such Indebtedness is contractually subordinated to the Obligations in right of payment (or the Liens securing such Indebtedness are subordinated to the Liens on the Collateral securing the Secured Obligations) on terms not materially less favorable (as reasonably determined by the Lead Borrower), taken as a whole;

164

(vi)        such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to Section 7.03;

(vii)        at the time such Indebtedness is incurred, no Default or Event of Default shall have occurred and be continuing;

(viii)        [reserved]; and

(ix)        in the case of Refinancing Indebtedness with respect to Indebtedness permitted under Section 7.03(b), the Liens securing such Indebtedness shall be subject to the ABL Intercreditor Agreement;

(z)        Indebtedness of the Borrowers and/or any other Restricted Subsidiary incurred in connection with Sale Leaseback Transactions permitted pursuant to Section 7.05(n)(ii);

(aa)        [reserved];

(bb)        Indebtedness of the Borrowers and/or any other Restricted Subsidiary supported by any Letter of Credit the face amount of which is at least equal to the principal (or equivalent) amount of such Indebtedness; and

(cc)        without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrowers and/or any other Restricted Subsidiary hereunder.

Section 7.04    Fundamental Changes

.  Merge, dissolve, liquidate, consolidate or amalgamate with or into another Person, except that:

(a)        (i)(A) any Restricted Subsidiary that is a U.S. Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with a U.S. Borrower, (B) any Restricted Subsidiary that is a UK Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with a UK Borrower and (C) any Restricted Subsidiary that is a Belgian Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with a Belgian Borrower; provided that such Borrower shall be the continuing or surviving Person or if the Person formed by or surviving any such merger, consolidation or amalgamation is not such Borrower (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be (x) in the case of clause (a)(i)(A), an entity organized or existing under the law of the United States, any state thereof or the District of Columbia and (y) in the case of clause (a)(i)(B), an entity organized under the laws of England and Wales, (2) the Successor Borrower shall expressly assume the Obligations of the applicable Borrower in a manner and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrowers shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this

165

Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the applicable Borrower under this Agreement and the other Loan Documents, or (ii)(A) any Restricted Subsidiary that is a U.S. Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with any one or more other Restricted Subsidiaries that are U.S. Domestic Subsidiaries, (B) any Restricted Subsidiary that is a UK Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with any one or more other Restricted Subsidiaries that are UK Domestic Subsidiaries and (C) any Restricted Subsidiary that is a Belgian Domestic Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with any one or more other Restricted Subsidiaries that are Belgian Domestic Subsidiaries; provided that (A) when any Restricted Subsidiary that is a U.S. Loan Party is merging with another Restricted Subsidiary, (1) a U.S. Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the U.S. Obligations of the relevant U.S. Loan Party in a manner reasonably satisfactory to the Administrative Agent or (2) the relevant transaction shall be treated as an Investment and comply with Section 7.02, (B) when any Restricted Subsidiary that is a UK Loan Party is merging with another Restricted Subsidiary, (1) a UK Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the Foreign Obligations of the relevant UK Loan Party in a manner reasonably satisfactory to the Administrative Agent or (2) the relevant transaction shall be treated as an Investment and comply with Section 7.02 and (C) when any Restricted Subsidiary that is a Belgian Loan Party is merging with another Restricted Subsidiary, (1) a Belgian Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the Foreign Obligations of the relevant Belgian Loan Party in a manner reasonably satisfactory to the Administrative Agent or  (2) the relevant transaction shall be treated as an Investment and comply with Section 7.02;

(b)     any Restricted Subsidiary that is not a Loan Party may merge, consolidate or amalgamate with or dissolve or liquidate into any other Restricted Subsidiary that is not a Loan Party;

(c)     any Restricted Subsidiary may dissolve or liquidate; provided that if in connection with any such dissolution or liquidation, the dissolving entity transfers its assets to another Person and the transferor in such a transaction is a Loan Party, then (i) (x) if the transferor is a U.S. Loan Party, the transferee must be or become a U.S. Loan Party, (y) if the transferor is a UK Loan Party, the transferee must be or become a UK Loan Party or (z) if the transferor is a Belgian Loan Party, the transferee must be or become a Belgian Loan Party or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in each applicable Restricted Subsidiary in accordance with Section 7.02 (other than Section 7.02(d));

(d)     a Borrower may merge, amalgamate or consolidate with or dissolve or liquidate into any other Person; provided that (A) such Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is a Successor Borrower, (1) the Successor Borrower shall be (x) in the case of a merger with a U.S. Borrower, an entity organized or existing under the law of the United States, any state thereof or the District of Columbia, (y) in the case of a merger with a UK Borrower, an entity organized under the laws of England and Wales, and (z) in the case of a merger with a Belgian Borrower, an entity organized under the laws of Belgium, (2) the Successor Borrower shall expressly assume the Obligations of the applicable Borrower in a manner

166

AmericasActive:18122631.218122631.8

and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrowers shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the applicable Borrower under this Agreement and the other Loan Documents;

(e)     so long as no Default or Event of Default exists or would result therefrom, a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)), may be effected;

(f)     mergers, dissolutions, liquidations and/or consolidations, the purpose of which is to effect the Transactions.

Notwithstanding the foregoing, nothing in this Section 7.04 shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrowers and their Restricted Subsidiaries (taken as a whole).

Section 7.05   Dispositions

. Make any Disposition (directly or indirectly), except:

(a)     (i) Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, (ii) Dispositions of property no longer used or useful in the conduct of the business of the Borrowers and the other Restricted Subsidiaries and (iii) Dispositions of property that is economically impracticable to maintain;

(b)     Dispositions of inventory, immaterial assets and immaterial Intellectual Property, in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial Intellectual Property to lapse or be abandoned in the ordinary course of business) and non-exclusive licensing of Intellectual Property in the ordinary course of business;

(c)     Dispositions of property other than assets included on the current Borrowing Base Certificate to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

AmericasActive:18122631.218122631.8

(d)      Dispositions of property to the Borrowers or any of the other Restricted Subsidiaries; provided that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) if the relevant transaction constitutes an Investment, it is permitted under Section 7.02 and the transferee must pay fair market value (as reasonably determined by such Person);

(e)      Dispositions consisting of (or resulting from) Liens, Investments, fundamental changes, Restricted Payments and Restricted Debt Payments permitted (or not restricted) by Section 7.01 (other than Section 7.01(y)), Section 7.02 (other than Section 7.02(d)), Section 7.04 (other than Section 7.04(e)), Section 7.06 (other than Section 7.06(a)) and Section 7.09, respectively;

(f)      Dispositions of cash and Cash Equivalents;

(g)      Dispositions in connection with the unwinding of any Swap Contract pursuant to its terms;

(h)      Dispositions of assets; provided that

(i)      the purchase price paid to the Borrowers or other Restricted Subsidiary for such asset shall be no less than the fair market value of such asset at the time of such sale,

(ii)      with respect to any Disposition having a fair market value in excess of $2,500,00010,000,000, not less than 75% of the consideration for such disposition shall be paid in cash or Cash Equivalents; provided that for purposes of such 75% cash consideration requirement:

(A)      the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Borrowers or any other Restricted Subsidiary) of the Borrowers or any other Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto)) that are assumed by the transferee of any such assets and for which the Borrowers and/or the applicable other Restricted Subsidiary have been validly released by all relevant creditors in writing,

(B)      any securities received by the Borrowers or any other Restricted Subsidiary from such transferee that are converted by such Person into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within one hundred and eighty (180) days following the closing of the applicable Disposition, and

(C)      any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (h) that is at that time outstanding, not in excess of $2,500,000 shall be deemed to be cashthe greater of (x) $60,000,000 and (y) 10.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), and

AmericasActive:18122631.218122631.8

~~(iii)      if such Disposition includes, but is not limited to, Accounts or Inventory (whether as part of a sale of Equity Interests or otherwise) with a value in excess of $500,000:~~

~~(A)      the Lead Borrower shall provide prior written notice of such Disposition and an updated Borrowing Base Certificate (giving effect to such Disposition) and will on or prior to the date of consummation of such Disposition make any mandatory prepayments required by Section 2.05; and~~

~~(B)      if, giving effect to such Disposition, a Covenant Trigger Event would occur, the Administrative Agent shall have received a certificate from the Lead Borrower setting forth the calculation of the Fixed Charge Coverage Ratio and demonstrating compliance with the covenant set forth in Section 7.12 hereof; and~~

(iii)      ~~(iv)~~ no Default or Event of Default has occurred and is continuing at the time of the execution of the definitive agreement with respect to such Disposition or would result therefrom,

(i)      Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business (including sales to factors or other third parties);

(j)      leases, subleases, non-exclusive licenses or non-exclusive sublicenses of property in the ordinary course of business and which do not materially interfere with the business of the Borrowers or any of the other Restricted Subsidiaries;

(k)      transfers of property subject to foreclosure, eminent domain, casualty or condemnation proceedings (including in lieu thereof) or any similar proceedings;

(l)      any surrender, waiver, settlement, compromise, modification or release of contractual rights in the ordinary course of business, or the settlement, release or surrender of tort or other claims of any kind;

(m)      Dispositions of (i) Accounts and Related Assets pursuant to any Permitted Non-Recourse Factoring Transaction and (ii) inventory and Related Assets pursuant to any Permitted Inventory Financing;

(n)      Sale Leaseback Transactions so long as (i) any resulting Capital Lease is permitted under Section 7.03 or (ii) in an aggregate amount not to exceed ~~$30,000,000~~, together with the aggregate amount of all Sale Leaseback Transactions entered into pursuant to this clause (n)(ii), the greater of (x) $90,000,000 and (y) 15.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(o)      Dispositions not otherwise permitted by this Section 7.05 in an aggregate amount not to exceed $~~2,500,000~~25,000,000 in any Fiscal Year; provided, that if such Dispositions includes any Accounts or Inventory with a value in excess of $500,000, the Lead Borrower shall provide prior written notice and will make any mandatory prepayments required by Section 2.05;

(p)      Dispositions made pursuant to deferred compensation arrangements in the ordinary course of business;

AmericasActive:~~18122631.2~~18122631.8

(q)      Dispositions of Equity Interests made in connection with the exercise or settlement of equity-based awards outstanding as of the Closing Date or hereafter granted under the terms of any equity or equity-based compensation plans, programs, agreements or arrangements of any Parent Company or Parent or any of its Restricted Subsidiaries;

(r)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(s)      (i) Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), which (A) do not materially interfere with the business of the Borrowers and the other Restricted Subsidiaries or (B) relate to closed facilities or the discontinuation of any product line and (ii) expirations of options agreements in respect of real or personal property;

(t)      Dispositions of non-core assets acquired in connection with any Acquisition permitted hereunder, within ninety (90) days of the date of such Acquisition, are designated in writing to the Administrative Agent by the Lead Borrower as being held for sale and not for the continued operation of the Borrowers or any of the other Restricted Subsidiaries or any of their respective businesses; provided that no Default or Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed;

(u)      exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of property or assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Borrowers) for like property or assets; provided that upon the consummation of any such exchange or swap by any Loan Party, to the extent the property received does not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the property so exchanged or swapped; and

(v)      Dispositions of Inventory in an unlimited amount so long as (i) the Payment Conditions are satisfied at the time such Disposition is made and (ii) the Lead Borrower shall have provided the Administrative Agent an updated Borrowing Base Certificate (after giving effect to such Disposition).

To the extent that any Collateral is disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take (and shall take) any actions deemed appropriate in order to effect the foregoing.

Notwithstanding the foregoing, (i) nothing in this Section 7.05 shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrowers and their Restricted Subsidiaries (taken as a whole) and (ii) in no event shall any Loan Party Dispose of any Intellectual Property to any Subsidiary of Parent that is not a Loan Party, except for any Disposition of any Intellectual Property that, in the reasonable business judgment of the Borrower, (x) is immaterial to, or no longer used in or necessary for, the conduct of the business of any Loan Party or (y) is required by any applicable Law to be owned by a non-Loan Party in order for such non-Loan Party to engage in the business conducted by it on the Fourth Amendment Effective Date (or any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof).

Section 7.06   Restricted Payments

. Make, directly or indirectly, any Restricted Payment, except:

170

(a)      to the extent constituting Restricted Payments, the Borrowers and each of the other Restricted Subsidiaries may enter into and consummate transactions permitted or not restricted by any provision of Section 7.02 (other than Section 7.02(d) and (q)), Section 7.04, Section 7.05 (other than Section 7.05(e)) and/or Section 7.08 (other than Section 7.08(b) and (c));

(b)      any Restricted Subsidiary other than the Borrower may make Restricted Payments to the direct holders of its Equity Interests on a pro rata basis;

(c)      the payment of dividends or the payment of other distributions by Parent or any of its Restricted Subsidiaries to any Parent Company not to exceed amounts required for Parent or any other Parent Company to pay, in each case without duplication:

(i)      franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(ii)      Tax Distributions; provided that upon the request of the Administrative Agent, the Lead Borrower shall provide reasonable documentation supporting the basis of such Tax Distribution for distribution to the Lenders;

(iii)      (A) expenses relating to any Qualifying IPO, debt offering or Acquisition (whether or not successful) and (B) after the consummation of a Qualifying IPO, listing fees and other costs and expenses attributable to being a publicly traded company which are reasonable and customary;

(iv)      general corporate operating, overhead, administrative and legal costs and expenses incurred in the ordinary course of business;

(v)      reasonable   and   customary   indemnification   claims   made   by Representatives;

(vi)      audit, accounting and reporting expenses;

(vii)      insurance premiums;

(viii)      customary salary, bonus, severance and other benefits payable to current or former Representatives of any Parent Company consistent with past practice; and

(ix)      consideration for any Investment permitted under Section 7.02 (other than Section 7.02(d)); provided that (A) any Restricted Payment under this clause (c)(ix) shall be made substantially concurrently with the consummation of the relevant Investment and (B) the relevant Parent Company shall, promptly following the consummation of such Investment, cause (x) all property acquired to be contributed to the Borrowers or one or more of the other Restricted Subsidiaries or (y) the merger, consolidation or amalgamation of the Person formed or acquired into the Borrowers or one or more of the other Restricted Subsidiaries, in either case, in order to consummate such Investment in compliance with the applicable requirements of Section 7.02 as if undertaken as a direct Investment by the Borrowers or such other Restricted Subsidiary;

provided that any amount giving rise to a Restricted Payment made in reliance on Section 7.06(c)(i) through (viii) above shall be attributable to the relevant Parent Company's ownership of Parent and/or its Subsidiaries (and/or any of them);

171

AmericasActive:~~18122631.2~~18122631.8

(d)      (i) cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrowers or any Parent Company, (ii) payments made or expected to be made in respect of withholding or similar taxes payable by any future, present or former Representatives of any Parent Company, Parent or any of its Restricted Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative) and/or (iii) repurchases of Equity Interests in consideration of the payments described in clause (ii) above, including demand repurchases in connection with the exercise of stock options;

(e)      [reserved];

(f)      payments (including under any promissory note) to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) the repurchase, redemption, retirement or other acquisition of Qualified Equity Interests held by current or former Representatives of such Person (including any Parent Company) or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative); provided (i) that the aggregate cash consideration paid for all such redemptions and payments shall not exceed, in any Fiscal Year, (x) $~~2,500,000~~15,000,000, plus (y) the net cash proceeds of any "key man" life insurance policies contributed to the Borrowers, with any unused amounts in any Fiscal Year being carried over to the next two (2) succeeding (but no other) Fiscal Years and (ii) no Default or Event of Default is then continuing;

(g)      repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other securities if such Equity Interests represent a portion of the exercise price or tax withholding obligation of such options, warrants or other securities;

(h)      the declaration and payment of dividends on the Person's Equity Interests (or a Restricted Payment to any Parent Company to fund a payment of dividends on such entity's Equity Interests), following the first Qualifying IPO of such common stock after the Closing Date, of up to 6% per annum of the net cash proceeds received by (or, in the case of a Restricted Payment to a Parent Company, contributed to the capital of) the Borrowers in or from any such Qualifying IPO; provided no Default or Event of Default is then continuing;

(i)      Restricted Payments the proceeds of which are applied to effect the Transactions;

(j)      Restricted Payments to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) paying management fees in cash under the Management Agreement in an aggregate amount not to exceed $5,000,000 in any Fiscal Year; provided that no Default or Event of Default is then continuing;

(k)      Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Equity Interests ("Treasury Equity Interests") of the Borrowers and/or any other Restricted Subsidiary or (B) Equity Interests of any Parent Company, in the case of each of clauses (A) and (B), in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Borrowers and/or any other Restricted Subsidiary) of, Qualified Equity Interests of the Borrowers or any Parent Company to the extent any such proceeds are contributed to the capital of the Borrowers and/or any other Restricted Subsidiary in respect of Qualified Equity Interests ("Refunding Equity Interests") and (ii) declare and pay dividends on any Treasury Equity Interests out of the proceeds of the substantially concurrent sale (other than to the Borrowers or any other Restricted Subsidiary) of any Refunding Equity Interests;

172

(l)      additional Restricted Payments in an aggregate amount not to exceed $5,000,000, together with all Restricted Payment made pursuant to this clause (l), the greater of (i) $90,000,000 and (ii) 15.0% of Consolidated Adjusted EBITDA of the Lead Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable); and

(m)      Restricted Payments in an unlimited amount so long as the Payment Conditions are satisfied at the time such Restricted Payment is made.

Section 7.07   Change in Nature of Business

. Engage, directly or indirectly, in any line of business other than (i) those lines of business conducted by the Borrowers and the Restricted Subsidiaries on the date hereof or (ii) any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof or as otherwise consented to by the Administrative Agent.

Section 7.08   Transactions with Affiliates

. Enter into any transaction of any kind with any Affiliate of a Borrower, whether or not in the ordinary course of business other than:

(a)      transactions on terms, taken as a whole, substantially as favorable (or more favorable) to the Borrowers or such Restricted Subsidiary as would be obtainable by the Borrowers or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(b)      loans and other transactions by and among Parent and/or one or more of its Restricted Subsidiaries to the extent expressly permitted or not restricted under this ARTICLE VII;

(c)      (i) Restricted Payments expressly permitted under Section 7.06 (other than Section 7.06(a)) and (ii) Investments expressly permitted by Section 7.02(b), (i), (l), (o), (q) and (s);

(d)      the Transactions;

(e)      issuances of Equity Interests (other than Disqualified Equity Interests);

(f)      (i) expense reimbursement and employment, severance and compensation arrangements entered into by Parent or any of its Restricted Subsidiaries with their respective Representatives in the ordinary course of business, (ii) transactions pursuant to any employee compensation, benefit plan, equity-based incentive plan or arrangement, any health, disability or similar insurance plan which covers current or former Representatives or any employment or consulting contract or arrangement and (iii) the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(g)      the payment of reasonable and customary fees to, and indemnities provided on behalf of, Representatives of the Borrowers, any direct or indirect parent companies of Parent or any of its Restricted Subsidiaries (including any Parent Company) in the ordinary course of business;

(h)      [reserved];

(i)      Guarantees to the extent expressly permitted by Section 7.02 or Section 7.03;

173

(j)      transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair from a financial perspective (taken as a whole) to the Borrowers and/or the other applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Borrowers or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained in a comparable arm's-length transaction with a Person other than an Affiliate; and

(k)      any transaction in respect of which the Lead Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the applicable Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to such Borrower or the other applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person who is not an Affiliate.

Section 7.09   Prepayments and Modifications of Certain Indebtedness

.

(a)      Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner or make any cash payment, in each case, of any unsecured Indebtedness, any Subordinated Indebtedness or any Indebtedness secured on a junior lien basis to the Liens securing the Obligations (including the First Lien Loans, any First Lien Obligations, any First Lien Incremental Equivalent Debt or other First Lien Facility) (any such debt, "Restricted Debt"), or in violation of any subordination terms of any such Subordinated Indebtedness (any such payment, a "Restricted Debt Payment"), other than

(i)      regularly scheduled interest payments and payments of fees, expenses and indemnification obligations in respect of Restricted Debt, in each case when due and in amounts not to exceed the amounts required to be paid with respect thereto under the documents governing such Restricted Debt as in effect on the Fourth Amendment Effective Date,

(ii)      refinancings, replacements or exchanges of such Indebtedness for Refinancing Indebtedness permitted by Section 7.03(y),

(iii)      payments with, or conversions to, Equity Interests (other than Disqualified Equity Interests),

(iv)      payments made such that a loan will not be classified, at the issue date or thereafter, as an applicable high yield discount obligation for purposes of Code Section 163(i),

(v)      the Transactions, including the payment of Transaction Expenses,

(vi)      regularly scheduled payments of principal on any First Lien Facility or Second Lien Facility,

(vii)      any mandatory prepayments of any First Lien Facility or Second Lien Facility in accordance with the term of such Indebtedness as in effect on the Fourth Amendment Effective Date or pursuant to comparable provisions in any First Lien Facility or Second Lien Facility entered into after the Fourth Amendment Effective Date, and

174

(viii)   Restricted Debt Payments in an unlimited amount so long as the Payment Conditions are satisfied at the time such Restricted Debt Payment is made.

(b)   Amend or otherwise modify the terms of the documentation governing any Restricted Debt in a manner materially adverse to the Lenders; <u>provided</u> that the foregoing limitation shall not otherwise prohibit debt refinancing or replacing or an exchange of Restricted Debt.

Section 7.10   Negative Pledge

. Enter into or suffer to exist, incur or permit any of the Restricted Subsidiaries to enter into or suffer to exist any agreement or other arrangement that prohibits:

(a)   the ability of Parent, the Borrowers or any of the other Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations;

(b)   the ability of any Restricted Subsidiary to make any Restricted Payments with respect to any of its Equity Interests or to make or repay loans or advances to the Borrowers or any of the other Loan Parties; or

(c)   the ability of any Restricted Subsidiary to make loans or cash advances to the Borrowers or any of the other Loan Parties;

provided, that the foregoing shall not apply to:

(i)   any restriction or encumbrance with respect to any asset of and/or Equity Interest in any Restricted Subsidiary imposed pursuant to an agreement which has been entered into for the sale or disposition of such assets or all or a portion of the Equity Interests or assets of such Restricted Subsidiary, so long as such sale or disposition is permitted under this Agreement;

(ii)   Contractual Obligations binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary;

(iii)   customary provisions in joint venture agreements and other similar agreements applicable to joint ventures expressly permitted hereunder and applicable solely to the assets of and Equity Interests of and in such joint venture entered into in the ordinary course of business;

(iv)   restrictions imposed by any agreement relating to secured Indebtedness expressly permitted by this Agreement if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries or the property or assets intended to secure such Indebtedness;

(v)   any negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under <u>Section 7.03</u> but solely to the extent any negative pledge relates to the property financed by or the subject of or securing such Indebtedness or expressly permits Liens for the benefit of the Secured Parties with respect to the ABL Facility established hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably;

(vi)   restrictions on cash, other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

175

AmericasActive:<del>18122631.2</del>18122631.8

(vii)    customary non-assignment provisions with respect to leases or licensing agreements or other agreements entered into by the Borrowers or any of the other Restricted Subsidiaries, in each case entered into in the ordinary course of business;

(viii)   restrictions imposed by any agreement relating to Indebtedness permitted by Section 2.16, and 7.03(a), (b), (m), (n), (o), (p), (s) and (x) (with respect to the foregoing types of Indebtedness) if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries;

(ix)     restrictions set forth in any Loan Document, any Swap Contract and/or any agreement relating to any Cash Management Obligations;

(x)      [reserved];

(xi)     restrictions arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xii)    other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in the foregoing clauses of this Section 7.10; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrowers, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 7.11   Amendments to Organization Documents

.  Without the consent of the Administrative Agent, amend, or permit any of the Restricted Subsidiaries that are Loan Parties to amend, its certificate of incorporation or bylaws or other Organization Documents in any manner materially adverse to the interests of the Lenders (as reasonably determined by the Borrowers in good faith).

Section 7.12   Fixed Charge Coverage Ratio.

Upon the occurrence of a Covenant Trigger Event and for so long as a Covenant Trigger Event shall be continuing, the Borrowers shall not permit the Fixed Charge Coverage Ratio on the last day of each fiscal quarter of the Borrowers most recently ended prior to the commencement of a Covenant Trigger Period and each fiscal quarter ending during such Covenant Trigger Period, in each case, for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01, to be less than 1.00 to 1.00.

Section 7.13   Fiscal Year

.  Make any change in the Fiscal Year of Parent or any of its Restricted Subsidiaries; provided, that, the Lead Borrower may, upon written notice to the Administrative Agent, change their Fiscal Year to another date, in which case the Lead Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 7.14   Sanctions; Anti-Corruption Laws

AmericasActive:18122631.218122631.8

.   Use any part of any proceeds of the Loans or lend, contribute or other make available such proceeds: (i) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law; or (ii) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

## ARTICLE VIII

## PARENT COVENANT

Until the Termination Date, Parent shall not engage in any business or activity other than:

(a)      the ownership of all outstanding Equity Interests in the Lead Borrower and, indirectly, its Subsidiaries and joint ventures; provided that Parent shall not own directly any Equity Interests other than those of the Lead Borrower,

(b)      maintaining its corporate existence,

(c)      participating in tax, accounting and other administrative activities of the consolidated group of companies, including the Loan Parties, including (i) filing tax reports and paying Taxes, including interest, additions to tax or penalties applicable thereto, and other customary obligations in the ordinary course (and contesting any Taxes), (ii) preparing reports to Governmental Authorities and to its shareholders and (iii) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable requirements of law,

(d)      (i) the performance of obligations under the Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents, the documents governing Extended ABL Loans, and Refinancing Facilities and Guarantees of Indebtedness permitted under Section 7.03 and/or obligations that do not constitute Indebtedness (including, for the avoidance of doubt, guaranties of any lease obligations of any Loan Party or Subsidiary) and (ii) the creation of (a) Liens to secure Guarantees permitted under this clause (d) so long as the underlying Indebtedness is permitted to be secured on the same basis under Section 7.01 and (b) Liens of the types permitted under Section 7.01 (other than to secure debt for borrowed money),

(e)      the Transactions,

(f)      issuing its own Equity Interests (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Equity Interests),

(g)      holding, distributing and/or lending (A) cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or Permitted Dispositions made by, any of its Subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Equity Interests of, Parent pending the application thereof and (B) the proceeds of Indebtedness permitted by Section 7.03,

AmericasActive:~~18122631.2~~18122631.8

(h)  making payments of the type permitted under Section 7.06 and the performance of its obligations under any document, agreement and/or Investment contemplated by the Transactions or otherwise not prohibited under this Agreement,

(i)  complying with applicable requirements of law, and

(j)  activities incidental to the businesses or activities described in the foregoing clauses (a) through (i).

**ARTICLE IX**

**EVENTS OF DEFAULT AND REMEDIES**

Section 9.01  Events of Default

.  Any of the following events referred to in any of clauses (a) through (m) inclusive of this Section 9.01 shall constitute an "Event of Default":

(a)  Non-Payment.  Any Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or any L/C Obligation or deposit any funds as Cash Collateral in respect of L/C Obligations or (ii) pay within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)  Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a), Section 6.05(a) (with respect to the existence of Parent and the Borrowers), Section 6.15, Section 6.17, Section 6.25 (provided that, for the ninety (90) calendar day period following the Closing Date any default under Section 6.17 or Section 6.25 shall be subject to a five (5) Business Day grace period) or ARTICLE VII, as applicable, (ii) the Borrowers fail to perform or observe any term, covenant or agreement contained in any of Section 6.01, Section 6.02(a), Section 6.07, or Section 6.19 and such failure continues for five (5) Business Days after the earlier of (x) Borrowers' knowledge of such default and (y) receipt by the Borrowers of written notice thereof by the Administrative Agent or (iii) Parent fails to perform or observe any term, covenant or agreement contained in ARTICLE VIII; or

(c)  Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 9.01(a), (b), (l) or (m) hereof) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) Borrowers' knowledge of such default and (ii) receipt by the Borrowers of written notice thereof by the Administrative Agent; or

(d)  Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any certificate required to be delivered in connection herewith or therewith (other than with respect to any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be incorrect or misleading (after giving effect to any qualification therein) in all respects when made or deemed made; or

(e)  Cross-Default.  (i) Parent, the Borrowers or any of the other Restricted Subsidiaries (A) fails to make any payment beyond the applicable grace period with respect thereto, if any

178

AmericasActive:~~18122631.2~~18122631.8

(whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount in excess of $15,000,00090,000,000, or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness with an aggregate outstanding principal amount in excess of $15,000,00090,000,000 (other than, for the avoidance of doubt, with respect to Indebtedness consisting of obligations under Swap Contracts, termination events or equivalent events pursuant to the terms of the relevant Swap Contract which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, the effect of which failure is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (B) of this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; or

(f)     Insolvency Proceedings, Etc.   Parent, the Borrowers or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days (or, in respect of any UK Loan Parties only, 14 calendar days); or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days (or, in respect of any UK Loan Parties only, 14 calendar days); or

(g)     Inability to Pay Debts; Attachment.  (i) Parent, the Borrowers or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process in respect of a claim in excess of $15,000,00090,000,000 is issued or levied against all or any material part of the property of the Loan Parties, taken as a whole, and is not released, vacated, stayed or fully bonded within sixty (60) days after its issue or levy; or

(h)     Judgments.  There is entered against Parent, the Borrowers or any of the other Restricted Subsidiaries a final judgment or order for the payment of money in an aggregate amount in excess of $15,000,00090,000,000 (to the extent not effectively covered by insurance) and such judgment or order shall not have been paid, satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)     ERISA.   (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect or (ii) Parent, the Borrowers, any of the other Restricted Subsidiaries or ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

179

(j)    Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of the occurrence of the Termination Date or as a result of the release of any Loan Party therefrom in accordance with its terms or the terms hereof), purports to revoke or rescind any Loan Document or asserts in writing that any Guarantee, Collateral Document or subordination provision in respect of any Indebtedness in excess (in the aggregate) of $~~15,000,000~~90,000,000 is invalid or unenforceable; or

(k)    Change of Control.  There occurs any Change of Control;

(l)    Liens.  Any Lien on Collateral created under any Collateral Document ceases to be perfected with the priority required by the Collateral Documents and the ABL Intercreditor Agreement with respect to a material portion of the Collateral (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof); or

(m)    Borrowing Base Certificate.  The Borrowers fail to deliver a Borrowing Base Certificate in accordance with Section 6.02(a) hereof or any representation, warranty or certification in any Borrowing Base Certificate is materially false or misleading, and such default continues for (i) with respect to any Borrowing Base Certificate required to be delivered pursuant to Section 6.02(a) on a monthly basis, five (5) Business Days and (ii) with respect to any Borrowing Base Certificate required to be delivered pursuant to Section 6.02(a) on a weekly basis, three (3) Business Days; provided, however, that (A) immaterial errors in any Borrowing Base Certificate and (c) errors understating the Borrowing Base, in each case, shall not be Events of Default.

Section 9.02   Remedies Upon Event of Default

.  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligations shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default under Section 9.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrowers to

180

Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender; provided further that, in the case of the breach of any Financial Covenant, so long as, at such time, (x) the Lead Borrower shall have a right to receive a Specified Equity Contribution hereunder, (y) the Administrative Agent shall have received a written notice from the Lead Borrower that the Lead Borrower expects to receive such Specified Equity Contribution within fifteen (15) Business Days following the date on which the Lead Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02, and (z) the exercise of any such permitted Specified Equity Contribution shall cure such breach, upon receipt of the notice specified in clause (y) above within fifteen (15) Business Days following the date on which the Lead Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02, each of the Administrative Agent and each Lender agrees that it shall not exercise its rights and remedies arising from such Financial Covenant breach until the expiration of the fifteenth (15th) Business Day subsequent to the date on which the Lead Borrower is required to deliver a Compliance Certificate pursuant to Section 6.02 (provided, however, for the avoidance of doubt, that the foregoing shall not limit any right of the Administrative Agent and the Lenders hereunder to exercise any of their respective rights and remedies arising from any other breach of this Agreement; provided further that (x) no L/C Issuer shall be required to issue, amend or increase any Letters of Credit and (y) no Lender holding ABL Commitments shall be required to fund any ABL Loans or advances, in each case during the period of time between the breach of the Financial Covenant and fifteen (15) Business Days following the day on which financial statements are required to be delivered for such fiscal quarter).  For the avoidance of doubt, if the Lead Borrower exercises its right to receive a Specified Equity Contribution which cures a Financial Covenant breach, then the requirements of the Financial Covenant shall be deemed satisfied as of the end of the relevant quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach of the Financial Covenant that had occurred shall be deemed cured for the purposes of this Agreement.

Section 9.03   Application of Funds

.

(a) If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 9.02 (or after the U.S. Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the U.S. Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the U.S. Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III) payable to each Agent in its capacity as such;

Second, to payment of that portion of the U.S. Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the U.S. Lenders (including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the U.S. Lenders, to payment to the Administrative Agent of that portion of the U.S. Obligations constituting principal and accrued and unpaid interest on any U.S. Permitted Overadvances;

Fourth, to the extent that U.S. Swing Line Loans have not been refinanced by a U.S. Loan, payment to the U.S. Swing Line Lender of that portion of the U.S. Obligations constituting accrued and unpaid interest on the U.S. Swing Line Loans;

AmericasActive:18122631.218122631.8

Fifth, to payment of that portion of the U.S. Obligations ~~(other than U.S. FILO Loans)~~ constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the U.S. Lenders in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to payment of that portion of the U.S. Obligations constituting unpaid principal of U.S. Loans ~~(other than U.S. FILO Loans)~~, Unreimbursed Amounts in respect of U.S. Letters of Credit and U.S. L/C Borrowings, ratably among the U.S. Lenders in proportion to the respective amounts described in this clause Sixth held by them;

Seventh, to the Administrative Agent for the account of the U.S. L/C Issuers, to Cash Collateralize that portion of U.S. L/C Obligations comprised of the aggregate undrawn amount of U.S. Letters of Credit;

Eighth, to payment of that portion of the U.S. ~~Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest) on U.S. FILO Loans, ratably among the U.S. Lenders in proportion to the respective amounts described in this clause Eighth payable to them;~~

~~Ninth, to payment of that portion of the U.S. Obligations constituting unpaid principal of U.S. FILO Loans, ratably among the U.S. Lenders in proportion to the respective amounts described in this clause Ninth held by them;~~

~~Tenth, to payment of that portion of the U.S.~~ Obligations under Secured Hedge Agreements of U.S. Loan Parties and Cash Management Obligations that are U.S. Obligations, ratably among the U.S. Secured Parties in proportion to the respective amounts described in this clause ~~Tenth~~Eighth held by them;

~~Eleventh~~Ninth, to the payment of all other U.S. Obligations of the U.S. Loan Parties that are due and payable to the Administrative Agent and the other U.S. Secured Parties on such date, ratably based upon the respective aggregate amounts of all such U.S. Obligations owing to the Administrative Agent and the other U.S. Secured Parties on such date;

~~Twelfth~~Tenth, to the payment of all the Foreign Obligations of the Foreign Loan Parties that are due and payable to the Administrative Agent and  the other Foreign Secured Parties, as applicable, on such date in accordance with, and in the order set forth in, Section 9.03(b); and

Last, the balance, if any, after all of the U.S. Obligations and Foreign Obligations have been paid in full in cash, to the U.S. Borrowers or as otherwise required by Law.

Notwithstanding the foregoing, Defaulting Lenders shall not receive any payment prior to the payment in full of the U.S. Obligations and U.S. Secured Obligations set forth in clauses First through Twelfth above.

(b)    If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 9.02 (or after the UK Loans or the Belgian Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Foreign Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Foreign Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including any Attorney Costs payable

182

under Section 11.04 and amounts payable under ARTICLE III) payable to each Agent in its capacity as such;

Second, to payment of that portion of the Foreign Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Foreign ABL Lenders (including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Foreign ABL Lenders, to payment to the Administrative Agent of that portion of the Foreign Obligations constituting principal and accrued and unpaid interest on any UK Permitted Overadvances and Belgian Permitted Overadvances;

Fourth, to the extent that Foreign Swing Line Loans have not been refinanced by a UK Loan or Belgian Loan, as applicable, payment to the Foreign Swing Line Lender of that portion of the Foreign Obligations constituting accrued and unpaid interest on the Foreign Swing Line Loans;

Fifth, to payment of that portion of the Foreign Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Foreign ABL Lenders in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to payment of that portion of the Foreign Obligations constituting unpaid principal of UK Loans, Belgian Loans and Unreimbursed Amounts in respect of Foreign Letters of Credit and Foreign L/C Borrowings, ratably among the Foreign ABL Lenders in proportion to the respective amounts described in this clause Sixth held by them;

Seventh, to the Administrative Agent for the account of the Foreign L/C Issuers, to Cash Collateralize that portion of Foreign L/C Obligations comprised of the aggregate undrawn amount of Foreign Letters of Credit;

Eighth, to payment of that portion of the Foreign Obligations under Secured Hedge Agreements of Foreign Loan Parties and Cash Management Obligations that are Foreign Obligations, ratably among the Foreign Secured Parties in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to the payment of all other Foreign Obligations of the Foreign Loan Parties that are due and payable to the Administrative Agent and the other Foreign Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Foreign Obligations owing to the Administrative Agent and the other Foreign Secured Parties on such date; and

Last, the balance, if any, after all of the Foreign Obligations have been paid in full in cash, to the Foreign Borrowers or as otherwise required by Law.

Notwithstanding the foregoing, Defaulting Lenders shall not receive any payment prior to the payment in full of the Foreign Obligations and Foreign Secured Obligations set forth in clauses First through Ninth above.

(c)      Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Seventh above, together with any amounts in any Cash Collateral Account provided in respect of the L/C Exposure of any Defaulting Lender pursuant to Section 2.15, shall be applied to satisfy drawings under such Letters of Credit as they occur. To the extent any amounts have been deposited in the U.S. Cash Collateral Account or the Foreign Cash

AmericasActive:18122631.218122631.8

Collateral Account pursuant to Section 2.15 in respect of any Swing Line Exposure of any Defaulting Lender, such amounts shall be applied in accordance with clause Fourth above. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired and all outstanding Swing Line Loans have been satisfied in full, such remaining amount shall, to the extent that an Event of Default shall have occurred and be continuing, be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Applicable Borrowers.

## ARTICLE X

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 10.01 Appointment and Authorization of Agents

.

(a)    Each Lender hereby irrevocably appoints and designates Bank of America to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents, and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to each such Agent by the terms of this Agreement or any other Loan Document, together with such actions or powers as are reasonably incidental thereto. The provisions of this ARTICLE X are solely for the benefit of the Agents and the Lenders, and neither the Borrowers nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in an Agent's reasonable discretion or approval of any action or matter in an Agent's reasonable satisfaction, such Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law. No Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as such Agent or any other Agent-Related Person in any capacity.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements

184

AmericasActive:18122631.218122631.8

or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (14) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)     Bank of America shall also act as the Collateral Agent under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes Bank of America to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 10.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this ARTICLE X (including Section 10.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(c)     In respect of any Lien created by the Collateral Documents which is expressed to be or is construed to be governed by the law of any jurisdiction which would not recognise or give effect to the trust so expressed to be created under this Agreement, and to the fullest extent permissible under the laws of such jurisdiction, the Collateral Agent shall hold the Collateral as agent for the Secured Parties on the terms contained in this Agreement.

(d)     With respect to the Belgian Collateral Documents and in addition to the afore-mentioned, each Secured Party (other than the Collateral Agent) designates and appoints the Collateral Agent as its agent and representative (*vertegenwoordiger / représentant*) for the purposes of article 5 of the Belgian Financial Collateral Law and article 3 of title XVII "Security over moveable assets" of book III of the Belgian Civil Code.

(e)     Each Lender and each other Secured Party (by acceptance of the benefits of the Collateral Documents) hereby  acknowledges that it has received a copy of the ABL Intercreditor Agreement,   agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement to the extent then in effect, and authorizes and instructs the Collateral Agent to enter into the ABL Intercreditor Agreement as Collateral Agent and on behalf of such Lender or Secured Party.

Section 10.02 Delegation of Duties

. Each Agent may execute any and all of its duties and exercise its rights and powers under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates and Representatives as shall be deemed necessary by such Agent or sub-agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The exculpatory provisions of this ARTICLE X shall apply to any such sub-agent and to the Affiliates and Representatives of each Agent and any such

185

sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Loan Facility as well as activities as Administrative Agent and Collateral Agent. No Agent shall be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such agent, sub-agent or attorney-in-fact.

Section 10.03 Liability of Agents

. No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final and nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, the existence, value or collectability of the Collateral, any failure to monitor or maintain any part of the Collateral, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder or (c) be responsible for or have any duty to ascertain or inquire into the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 10.04 Reliance by Agents

.

(a)     Each Agent shall be entitled to rely, shall be fully protected in relying and shall not incur any liability for relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, made or otherwise authenticated by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)     For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or

186

accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 10.05 Notice of Default

. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless such Agent shall have received written notice from a Lender or the Lead Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default". Each Agent will promptly notify the Lenders of its receipt of any such notice. Each Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with ARTICLE IX; provided that unless and until an Agent has received any such direction, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 10.06 Credit Decision; Disclosure of Information by Agents

. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrowers and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 10.07 Indemnification of Agents

. Whether or not the transactions contemplated hereby are consummated, the Appropriate Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable

AmericasActive:18122631.218122631.8

judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.07. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 10.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Applicable Borrower; provided that such reimbursement by the Lenders shall not affect the Borrowers' continuing reimbursement obligations with respect thereto, if any. The undertakings in this Section 10.07 shall survive the Termination Date.

Section 10.08 Agents in their Individual Capacities

. Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, each Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them. With respect to its Loans, each Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include each such Agent in its individual capacity.

Section 10.09 Successor Agents

. Each Agent may resign as an Agent upon thirty (30) days' notice to the Lenders and the Lead Borrower. If an Agent resigns under this Agreement or any other Loan Document, the Required Lenders shall appoint a commercial bank or trust company with offices in the United States having combined capital and surplus in excess of $1,000,000,000 as successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Lead Borrower at all times other than during the existence of an Event of Default (which consent of the Lead Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of such Agent, such Agent may appoint, after consulting with the Lenders and, if no Event of Default has occurred and is continuing, procuring the consent of the Lead Borrower (which consent of the Lead Borrower shall not be unreasonably withheld or delayed), a successor agent satisfying the requirements set forth above from among the Lenders; provided that (i) nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of such Agent or any of the obligations thereof to assume such role or obligations and (ii) such appointment shall not be a condition to the effectiveness of such Agent's resignation. If an Agent becomes a Defaulting Lender or is or becomes an Affiliate of a Defaulting Lender, the Required Lenders or the Lead Borrower may at their option appoint a successor agent satisfying the requirements set forth above to replace such Agent, and such successor agent shall be appointed from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent,

188

as the case may be, and the retiring Agent's appointment, powers and duties as the Agent shall be terminated.  After the retiring Agent's resignation hereunder as an Agent, the provisions of this ARTICLE X and Section 11.04 and Section 11.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement.  If no successor agent has accepted appointment by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Lenders assuming the role of an Agent as specified in the immediately preceding sentence shall assume the rights and obligations of such Agent (including the indemnification provisions set forth in Section 10.07) as if each such Lender were such Agent; provided that nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of an Agent or any of the obligations thereof to assume such role or obligations.  Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor and, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents), the successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents.  Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate of any Disqualified Institution) may be appointed as a successor Agent.

Section 10.10 Administrative Agent May File Proofs of Claim; Credit Bidding

.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.04(f) and (g), Section 2.09 and Section 11.04 or otherwise hereunder) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Section 2.09 and Section 11.04 or otherwise hereunder.

189

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 10.11 Other Agents; Arrangers and Managers

.   None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent", Lead Arranger "lead arranger" or "sole bookrunner" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, to the extent such Person is a Lender, those applicable to all Lenders in such capacity.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender, or any trust or agency relationship with any Loan Party.  Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking any action hereunder.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 thereof, or any Debtor Relief Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable laws.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt interests of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid, (I) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (II) to adopt documents providing that the governance of the acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01, and (III) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 10.12 Reports and Financial Statements.  By signing this Agreement, each Lender:

(a)      agrees to furnish the Administrative Agent (and thereafter at such frequency as the Administrative Agent may reasonably request) with a summary of all Cash Management Obligations and Hedge Obligations due or to become due to such Lender. In connection with any distributions to be made hereunder, the Administrative Agent shall be entitled to assume that no amounts are due to any

190

Lender on account of Cash Management Obligations unless the Administrative Agent has received written notice thereof from such Lender;

(b)      is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Lead Borrower hereunder and all field examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the "Reports");

(c)      expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent, the Collateral Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)      agrees to keep all Reports confidential in accordance with the provisions of Section 11.08 hereof; and

(f)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (a) to hold the Administrative Agent, the Collateral Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (b) to pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.13 Collateral and Guaranty Matters.  The Secured Parties irrevocably authorize the Collateral Agent, at its option and in its discretion:

(a)      to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (a) upon termination of the aggregate ABL Commitments and payment in full of the Obligations (other than the contingent indemnification obligations for which no claim has been asserted), (b) constituting property being sold or otherwise Disposed of if the Lead Borrower certifies to the Collateral Agent that the sale or other Disposition is a Permitted Disposition (and the Collateral Agent may rely conclusively on any such certificate, without further inquiry), (c) constituting property in which any Loan Party did not own an interest at the time the security interest, mortgage or lien was granted or at any time thereafter, or (d) having a value in the aggregate in any twelve (12) month period of less than $1,000,000, and to the extent Collateral Agent may release its Lien upon any such Collateral pursuant to the sale or other Disposition thereof, such sale or other Disposition shall be deemed consented to by Lenders, (e) if required or permitted under the terms of any of the other Loan Documents, including the ABL Intercreditor Agreement or any other intercreditor agreement, or (f) if the release is approved, authorized or ratified in writing by the Required Lenders.

AmericasActive:18122631.218122631.8

(b)      to release or subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by the terms hereof; and

(c)      to release any Guarantor from its obligations under the applicable Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

(d)      Upon request by the Administrative Agent or Collateral Agent at any time, the Applicable Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the applicable Guaranty pursuant to this Section 10.13.  In each case as specified in this Section 10.13, the Collateral Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the relevant Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the applicable Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.13.  In addition to the foregoing, in the event that First Lien Agent shall release its Lien on any of the Term Priority Collateral at any time in exchange for other Term Priority Collateral in accordance with the terms of the First Lien Credit Agreement (other than as a result of payment in full of all obligations under the First Lien Credit Agreement), the Secured Parties irrevocably authorize and direct the Collateral Agent to release its Lien on such Term Priority Collateral subject to the receipt by Collateral Agent of a certificate duly executed and delivered by the Lead Borrower that the release of the Lien of First Lien Agent on such Term Priority Collateral in such circumstances is in accordance with the terms of the First Lien Credit Agreement, and Collateral Agent may rely conclusively on any such certificate, without further inquiry.

Section 10.14 Certain ERISA Matters

.

(a)      Lender Representations.  Each Lender represents and warrants, as of the date it became a Lender party hereto, and covenants, from the date it became a Lender party hereto to the date it ceases being a Lender party hereto, for the benefit of, the Agents and not, for the avoidance of doubt, to or for the benefit of the Loan Parties, that at least one of the following is and will be true: (i) Lender is not using "plan assets" (within the meaning of ERISA Section 3(42) or otherwise) of one or more Benefit Plans with respect to Lender's entrance into, participation in, administration of and performance of the Loans, Letters of Credit, ABL Commitments or Loan Documents; (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to Lender's entrance into, participation in, administration of and performance of the Loans, Letters of Credit, ABL Commitments and Loan Documents; (iii) (A) Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of Lender to enter into, participate in, administer and perform the Loans, Letters of Credit, ABL Commitments and Loan Documents, (C) the entrance into, participation in, administration of and performance of the Loans, Letters of Credit, ABL Commitments and Loan Documents satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (D) to the best knowledge of Lender, the requirements of subsection (a) of Part I

192

of PTE 84-14 are satisfied with respect to Lender's entrance into, participation in, administration of and performance of the Loans, Letters of Credit, ABL Commitments and Loan Documents; or (iv) such other representation, warranty and covenant as may be agreed in writing between any Agent, in its discretion, and Lender:

(b)     Further Lender Representation.   Unless Section 10.14(i) or (iv) is true with respect to a Lender, such Lender further represents and warrants, as of the date it became a Lender hereunder, and covenants, from the date it became a Lender to the date it ceases to be a Lender hereunder, for the benefit of, the Agents and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that no Agent is a fiduciary with respect to the assets of such Lender involved in its entrance into, participation in, administration of and performance of the Loans, Letters of Credit, ABL Commitments and Loan Documents (including in connection with the reservation or exercise of any rights by any Agent under any Loan Document).

## ARTICLE XI

## MISCELLANEOUS

Section 11.01 Amendments, Etc.

No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, or by the Administrative agent with the consent of the Required Lenders, and the Lead Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)     no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)     (x) change the number of Lenders or (y) reduce the percentage of the Commitments or the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders (or any of them) to take any action hereunder;

(ii)     except as otherwise permitted herein or in any other Loan Document, release Parent or any Subsidiary Guarantor (or otherwise limit Parent or such Subsidiary Guarantor's liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranties) if such release or limitation is in respect of all or substantially all of the value of the Guaranties;

(iii)     except as otherwise permitted herein or in any other Loan Document, release all or substantially all of the Collateral in any transaction or series of related transactions;

(iv)     amend, modify, terminate or waive any provision of the definition of "Required Lenders", "Pro Rata Share", "Supermajority Lenders", Sections 2.12, 2.13, 2.19(a)(x), 6.17(c) or 9.03, any other term or condition of this Agreement or any other Loan Document that would deprive a Lender of its Pro Rata Share of any payments to which it is entitled or change any other provision of this Agreement or any of the other Loan Documents that addresses the matters described in this clause (iv) or permit any action which would directly or indirectly have the effect of amending any of the provisions described in this clause (iv); provided, additional extensions of credit pursuant hereto may be included in the determination of "Required Lenders", "Pro Rata Share" or "Supermajority Lenders" on substantially the same basis as the ABL Commitments and the ABL Loans are included on the Closing Date;

(v)     except as otherwise permitted herein or in any other Loan Document, (A) subordinate the Liens on the Collateral in favor of the Collateral Agent for benefit of the Secured Parties or (B) subordinate the payment of the Secured Obligations;

(vi)     amend, modify, terminate or waive any term of condition of Section 11.01; or

(vii)     consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document;

(b)     no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent, but without the consent of the Required Lenders or any other Lender:

(i)     increase the ABL Commitments of a Lender without the consent of such Lender (it being understood that waivers or modifications of any condition precedent pursuant to Section 4.01 and 4.02 (other than with respect to Credit Extensions on the Closing Date), any Default or Event of Default pursuant to Section 9.01, any representation or warranty set forth in ARTICLE V, any covenant set forth in ARTICLE VI, ARTICLE VII and/or ARTICLE VIII, any mandatory prepayment required pursuant to Section 2.05(b) and/or any mandatory reduction of ABL Commitments pursuant to Section 2.06(b) shall not constitute an increase of the ABL Commitments of any Lender for the purpose of this clause (i));

(ii)     waive or reduce the principal of, or stated rate of interest on, or stated premium payable on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender (it being understood that any change in the definition of any ratio used in the calculation of such rate of interest or fees (or the component definitions thereof) shall not constitute a reduction in any rate of interest of fees and it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute a reduction or forgiveness of principal for the purpose of this clause (ii)); provided if the Required Lenders agree to waive any relevant Event of Default and such waiver is effective in accordance with this Section 11.01, then only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay interest at the Default Rate in connection with such waived Event of Default; provided, further, that no modification entered into pursuant to Section 3.03 shall constitute a reduction of, or a waiver or delay in payment of, the amount of any interest or fee for purposes of this clause (ii);

(iii)     postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.05(b)(v), Section 2.07 or Section 2.08, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender (other than, in each case, an extension for administrative reasons agreed by the Administrative Agent) (it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute an extension of the maturity date for purposes of this clause (iii));

(iv)     (A) amend clause (a) of the definition of "Applicable Currency" without the consent of each U.S. Lender, (B) amend clause (b) of the definition of "Applicable Currency" without the consent of each Foreign ABL Lender or (C) amend clause (c) of the definition of "Applicable Currency" without the consent of each Foreign ABL Lender; or

194

AmericasActive:18122631.218122631.8

(v)     extend the expiry date of Lender's Commitment (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default, representation, warranty, covenant mandatory prepayment or mandatory Commitment reduction shall not constitute an extension of a Commitment of any Lender);

(c)     no amendment, waiver or consent shall, unless in writing and signed by each Supermajority Lender for such amendment, waiver or consent make modifications to the Borrowing Base, U.S. Borrowing Base, UK Borrowing Base, the Belgian Borrowing Base or any components thereof which would result in an increase in the amount of the Borrowing Base (but such limitation shall not limit the right of the Collateral Agent to eliminate or reduce the amount of Reserves);

(d)     no amendment, waiver or consent shall affect the Lenders of a particular Class (the "Affected Class") in a disproportionate manner relative to the Lenders of any other Class without the written consent of both (A) the Lenders holding more than 50% of the aggregate ABL Exposure and unused ABL Commitments of the Affected Class and (B) the Required Lenders;

(e)     no amendment, waiver or consent shall permit the taking of Mortgages or changes to 6.07 or 6.27 without the consent of each Lender;

provided further that (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent or Lead Arranger, as applicable, in addition to the Lenders required above to take such action, affect the rights or duties of such Agent or Lead Arranger, as applicable, under this Agreement or the other Loan Documents (it being understood that only the consent of the Required Lenders (and no other Person other than (as applicable) the Borrower) is necessary to effectuate any forbearance agreement in respect of any Default or Event of Default), (B) the Letter of Credit Commitment of any L/C Issuer (but not the aggregate U.S. Letter of Credit Commitment, the aggregate Foreign Letter of Credit Commitment or aggregate Letter of Credit Commitment) may be reduced or increased solely with the consent of such L/C Issuer, (C) the scheduled maturity dates of part or all of any ABL Loans or ABL Commitments of any Lender may be extended solely with the consent of such Lender, (D) the scheduled amortization payment of any ABL Loan of any Lender may be reduced solely with the consent of such Lender, (E) any tranche of ABL Loans may be refinanced with a replacement tranche of ABL Loans, or modified with a lower rate of interest with the consent of each Lender holding the ABL Loans subject thereto, (F) any mandatory prepayment required pursuant to Section 2.05(b) may be waived with the consent of the Required Lenders, (G) no amendment, waiver or consent to this Agreement or any Collateral Document shall amend, modify or waive this Agreement or any Collateral Document so as to alter the ratable treatment of Obligations arising under the Loan Documents and Obligations arising under Hedge Agreements or the definition of "Hedge Bank," "Hedge Agreement," "Secured Hedge Agreement," "Swap Contract," "Obligations," or "Secured Obligations" (as defined in this Agreement or in any applicable Collateral Document) in each case in a manner adverse to any Hedge Bank with Obligations then outstanding without the written consent of any such Hedge Bank and (H) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender or the L/C Issuer, as the case may be, in addition to the Lenders required above to take such action, affect the rights or obligations of the Swing Line Lender or of the L/C Issuer, as the case may be, under this Agreement.

Notwithstanding anything to the contrary contained in this Section 11.01, (a) any guarantees, collateral security documents and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent acting on the advice of counsel and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent acting on the advice of counsel at the request of the Borrowers without the need to obtain the input or consent of any other Lender if such amendment, supplement or waiver is delivered in order to cause such guarantee, collateral security document or other document to

195

be consistent with this Agreement and the other Loan Documents and/or comply with relevant requirements of law or the advice of local counsel and (b) any intercreditor agreement entered into with respect to this Agreement may be amended, supplemented and/or waived with the consent of the Administrative Agent at the request of the Lead Borrower without the need to obtain the consent of any other Lender to give effect thereto and/or to carry out the purposes thereof and/or to reflect amendments, supplements, waivers and/or other modifications with respect to the treatment of any Equity Interests or Indebtedness to address the methodology (or any change therein) applied by any ratings agency in providing a rating of Parent or any other Parent Company, the Borrowers and/or any other Restricted Subsidiary so long as such amendment, supplement, waiver or modification is not materially adverse to the Lenders; it being understood that any amendment, supplement or waiver effecting a change to permit any transaction permitted under Sections 7.02, Section 7.06, Section 7.09 and Section 7.09 hereof is not materially adverse to the Lenders.

Notwithstanding anything in any Loan Document to the contrary, Term SOFR or any Foreign ABL Facility Daily Rate and related matters may be modified in accordance with Section 3.03 (as in effect on the date of the Eighth Amendment), and the Administrative Agent may make or adopt Benchmark Replacement Conforming Changes, Relevant Rate Successor Rate Conforming Changes and Term SOFR Conforming Changes, as applicable, from time to time and any amendment or notice implementing such changes will become effective without further action or consent of any other party; provided that the Administrative Agent shall post or otherwise provide the same to the Borrowers and the Lenders reasonably promptly after it becomes effective.  Notwithstanding the foregoing, the Administrative Agent and the Borrowers may amend, modify or supplement this Agreement or any other Loan Document to cure any ambiguity, error, omission, defect or inconsistency or any necessary or desirable technical change without any further action or consent of any other party to any Loan Document, so long as such amendment, modification or supplement does not materially and adversely affect the rights of any Lender.

Notwithstanding the foregoing, in addition to any credit extensions and related Refinancing Amendments effectuated without the consent of Lenders in accordance with Section 2.16, as applicable, this Agreement (including this Section 11.01 and Section 2.13) may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrowers (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the ABL Loans and the accrued interest and fees in respect thereof, (ii) to increase the ABL Commitments and (iii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new credit facilities; provided that, for the purpose of clarity, no such facility shall rank senior in right of payment or security to the original ABL Facility.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrowers and the lenders providing the relevant ABL Commitments set forth in Section 2.16, to the extent not already a Lender (but without the consent of any other Lender) to effectuate the provisions of Section 2.16.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent and the Borrowers to amend the provisions of Section 6.17 without the need to obtain the consent of any Lender so long as such amendment, supplement, waiver or modification is not materially adverse to the Lenders.

Section 11.02 Notices and Other Communications; Facsimile and Electronic Copies

.

196

(a)     General.   Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile or other electronic transmission) (and, as to service of process, only in writing and in accordance with applicable law) and, to the extent set forth in Section 11.02(e), in an electronic medium and delivered as set forth in Section 11.02(e).   All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Lead Borrower, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

FIRST BRANDS GROUP, LLC
127 Public Square, Suite 5110
Cleveland, Ohio 44114
Facsimile:  (216) 274-9027
Attention:  Patrick James, Chairman
Email:  patrick.james@trico-group.com

With a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Michael Baker
Telephone:  (212) 318-6855

(ii)     if to the Administrative Agent or the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

Bank of America, as Administrative Agent
135 South LaSalle Street, 9th Floor
Chicago, Illinois 60603
Attention:  Brian Scawinski
Email:  brian.scawinski@bofa.com
Telephone: (312) 881-9940

(iii)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrowers and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid (properly addressed); (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 11.02(b)) upon the sender's receipt of an acknowledgement from the

197

intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), when delivered; provided that notices and other communications to the Borrowers and Administrative Agent pursuant to ARTICLE II shall not be effective until actually received by such Person during the Person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)      Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or signed by facsimile or electronic transmission of a .pdf copy; provided that, if requested, original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission)

(c)      Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify each Agent and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Agent or Lender on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct as determined in a final and nonappealable judgment by a court of competent jurisdiction.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording. The indemnification by the Borrowers in this Section 11.04 shall survive the resignation of any Agent, the replacement of any Lender and the Termination Date.

(d)      Notice to other Loan Parties.  The Lead Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Lead Borrower in accordance with the provisions of this Section 11.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)      Each Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Lead Borrower.  Each Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders or actual or prospective assignees or participants by posting the Communications on Debt Domain, SyndTrak, IntraLinks or another relevant website or other information platform (the "Platform").

(f)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE" . THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT-RELATED PERSONS IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS,

198

DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "COVERED PARTIES") HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWERS' OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT (I) TO THE EXTENT THE LIABILITY OF ANY COVERED PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH COVERED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR A MATERIAL BREACH OF THIS AGREEMENT OR (II) IN THE CASE OF A CLAIM BY ANY THIRD PARTY AGAINST ANY INDEMNITEE, TO THE EXTENT SUCH DAMAGES WOULD OTHERWISE BE SUBJECT TO INDEMNIFICATION PURSUANT TO THE TERMS OF SECTION 11.05.

(g)      The Administrative Agent agrees that the receipt in accordance with this Section 11.02 of the Communications by the Administrative Agent at its e-mail address set forth in this Section 11.02 shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(h)      Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender").  Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Lead Borrower and the Administrative Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as either publicly available information or not material information for purposes of United States federal, state and other applicable securities laws (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 11.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be required to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(i)      EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT ANY PERSON FROM PURCHASING OR SELLING SECURITIES OF SUCH PERSON OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON.  EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION.  Each Lender that is not a Public Lender confirms to the Administrative Agent that such Lender has adopted and will maintain

199

internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective Contractual Obligations with respect to confidential and material non-public information. A Public Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "Restricting Information"), in which case it will identify itself to the Administrative Agent as a Public Lender. Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent-Related Persons, any Lender or any Loan Party concerning the ABL Facility in which Restricting Information may be discussed. No Agent-Related Person, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information. In particular, no Agent-Related Person shall have, and the Administrative Agent, on behalf of all Agent-Related Persons, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material non-public information or such Lender's compliance with applicable laws related thereto. Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that might contain Restricting Information. Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information). Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent. Each Public Lender confirms to the Administrative Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lenders may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information. Nothing in this Section 11.02(i) shall modify or limit a Lender's (including any Public Lender) obligations under Section 11.08 with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information. Each Public Lender hereby waives any claim or cause of action it may have or acquire against Parent and/or any of its Restricted Subsidiaries by virtue of its election to not receive any Restricting Information.

Section 11.03 No Waiver; Cumulative Remedies

. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 11.04 Costs and Expenses

. The U.S. Borrowers, jointly and severally, with respect to the U.S. Secured Obligations, the Foreign Borrowers, jointly and severally, with respect to the Foreign Secured Obligations, agree (a) to pay

AmericasActive:~~18122631.2~~18122631.8

or reimburse the Lead Arrangers and each Agent in its capacity as such for all reasonable and documented out of pocket costs and expenses incurred before (to the extent not reimbursed on the Closing Date), on or after the Closing Date in connection with the preparation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Lead Borrower or negotiated in consultation with the Lead Borrower (in each case, whether or not the transactions contemplated thereby are consummated), but limited, in the case of Attorney Costs, to the Attorney Costs of counsel for the Agents, taken as a whole, and, to the extent reasonably necessary, one local counsel in any relevant jurisdiction, and (b) to pay or reimburse the Lead Arrangers, each Agent and each Lender for all reasonable and documented out of pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), but limited, in the case of Attorney Costs, to the reasonable and documented costs and expenses of one counsel to the Administrative Agent and the Lenders, taken as a whole and, to the extent reasonably necessary, one local counsel to such Persons taken as a whole in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, one additional counsel to each group of affected persons similarly situated, taken as a whole). The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out of pocket expenses (other than Attorney Costs) incurred by the Administrative Agent. The agreements in this Section 11.04 shall survive the Termination Date. All amounts due under this Section 11.04 shall be paid within thirty (30) Business Days of receipt by the Lead Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Borrower fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

For the avoidance of doubt, this Section 11.04 shall not apply to Taxes arising with respect to payments to the Lenders under the Loan Documents, which shall be governed exclusively by Section 3.01.

Section 11.05 Indemnification

. The Borrowers shall indemnify and hold harmless each Agent-Related Person, the Lead Arranger, each Lender and their respective Affiliates, each L/C Issuer and any fronting, advising or correspond banks with respect to such Letters of Credit and their respective directors, officers, employees, partners, counsel, agents, trustees, investment advisors and attorneys in fact (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, Taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (but limited, in the case of Attorney Costs, to the reasonable and documented out-of-pocket fees and expenses of one counsel to all the Indemnitees, taken as a whole, and to the extent reasonably necessary, the reasonable and documented out-of-pocket fees and expenses of one local counsel to such Persons in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, the reasonable and documented out-of-pocket fees and expenses of one additional counsel to the affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or

AmericasActive:18122631.218122631.8

migrating from any property or facility currently or formerly owned, leased or operated by Parent, the Borrowers, or any of their respective Subsidiaries (or at which Parent, the Borrowers or any of their respective Subsidiaries has arranged for or caused any Release or disposal of Hazardous Materials), or any Environmental Action or Environmental Liability related to Parent, the Borrowers or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrowers or any other Loan Party or any of the Borrowers' or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as to any Indemnitees, be available to the extent that (x) such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of this Agreement or any of the other Loan Documents by, such Indemnitee or of any controlled Affiliate, director, officer, employee, counsel, agent or attorney in fact of such Indemnitee as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) if such indemnity relates to any dispute solely among the Indemnitees that does not involve an act or omission of the Borrowers or any of their respective Affiliates (other than indemnity for claims against the Agents or the Lead Arrangers in their respective capacities as such or disputes among L/C Issuers and any fronting, advising and corresponding banks), and the Borrowers shall be entitled to a refund and a return of any and all amounts paid to any Indemnitee for fees and expenses to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.  No Indemnitee nor any Loan Party nor any of their respective officers, directors, employees, agents, advisors or representatives shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document (other than in respect of any such damages incurred or paid by an Indemnitee to a third party unaffiliated with such Indemnitee).  All amounts due under this Section 11.05 shall be paid within thirty (30) days after written demand therefor, which demand shall set forth in reasonable detail the amount and nature of reimbursement claimed.  The agreements in this Section 11.05 shall survive the resignation of any Agent, the replacement of any Lender and the Termination Date.

Section 11.06 Payments Set Aside

. To the extent that any payment by or on behalf of the Borrowers is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 11.07 Successors and Assigns

.

202

AmericasActive:18122631.218122631.8

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby and, except as otherwise provided herein (including without limitation as permitted under Section 7.04), none of Parent, the Borrowers or any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under the other Loan Documents without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the requirements of Section 11.07(b), (ii) by way of participation in accordance with the provisions of Section 11.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.07(f) or (iv) to an SPC in accordance with the provisions of Section 11.07(g) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its ABL Commitment and the Loans (including for purposes of this Section 11.07(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it) with the prior written consent (such consent in each case not to be unreasonably withheld or delayed) of:

(A)     the Lead Borrower; provided that no consent of the Lead Borrower shall be required for an assignment to (1) a Lender, an Affiliate of a Lender or an Approved Fund relating thereto, (2) if an Event of Default pursuant to Section 9.01(a), (f) or (g) has occurred and is continuing, any Eligible Assignee or (3) such assignment occurs at any time prior to the earlier of (x) the date that the Administrative Agent shall notify the Borrowers that the primary syndication of the Loans has been completed, and (y) the sixtieth (60th) day following the Closing Date;

(B)     the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund relating thereto; and

(C)     (1) in the case of an assignment with respect to the U.S. ABL Facility, the U.S. L/C Issuer, (2) in the case of an assignment with respect to the Foreign ABL Facility, the Foreign L/C Issuer.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's ABL Commitment or Loans of any Class, the amount of the ABL Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrowers and the Administrative Agent otherwise consent; provided that (1) no such consent of the Borrowers to such lesser amount shall be required if any Event of Default of the type described in to Section 9.01(a), (f) or (g) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

203

(B)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and any applicable tax forms required by Section 3.01(f), if applicable; and

(C)      the relevant Eligible Assignee, if it is not then a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f).

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate ABL Facilities on a non-pro rata basis.

Notwithstanding anything in this Section 11.07 to the contrary, if the Lead Borrower has not given the Administrative Agent written notice of its objection to an assignment of ABL Loans within ten (10) Business Days after receipt of written notice of such assignment, the Borrowers shall be deemed to have consented to such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 11.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent; provided, that all Affiliates of the Administrative Agent shall be exempt from paying such processing and recordation fee in connection with ABL Loan assignments), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be party to this Agreement as a Lender with respect to the interest assigned and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement in addition to any rights and obligations otherwise held by such assignee as a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 (or any other increased costs protection provision), 11.04 and 11.05 and shall continue to be subject to the provisions of Section 11.08).  Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.

(c)      The Administrative Agent may provide the list of Disqualified Institutions to any potential Lender and shall provide the list of Disqualified Institutions upon the request of any Lender, in each case subject to the provisions in Section 11.08  If any assignment or participation under this Section 11.07 is made to any Disqualified Institution without the Lead Borrower's prior written consent, then the Borrowers may, at their sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any ABL Commitment of such Disqualified Institution and repay all obligations of the Borrowers owing to such Disqualified Institution (B) [reserved] and/or (a) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 11.07), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the applicable Disqualified Institution has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Institution paid for the applicable Loans and participations in L/C Advances and Swing Line Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the Applicable Borrowers, (II) in the case of clause (A), the Borrowers shall be liable to the relevant Disqualified Institution under Section 3.05 if any Interest Period Rate Loan owing to such Disqualified Institution is repaid or purchased other than on the last day of the Interest Period relating thereto and (III) in the case of clause (C), the relevant assignment shall otherwise comply with this

204

AmericasActive:18122631.218122631.8

Section 11.07 (except that no registration and processing fee required under this Section 11.07 shall be required with any assignment pursuant to this paragraph).  Nothing in this Section 11.07(c) shall be deemed to prejudice any right or remedy that the Borrowers may otherwise have at law or equity.  Each Lender acknowledges and agrees that Parent and its Subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this Section 11.07 insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Lead Borrower's prior written consent.  Additionally, each Lender agrees that the Borrowers may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 11.07(c) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.  Parent, the Borrowers and each Lender agree that (i) the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and (ii) the Administrative Agent shall not have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

(d)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the ABL Commitments of, and principal amounts (and related interest amounts) of the Loans, L/C Obligations (specifying the Unreimbursed Amounts), L/C Borrowings and amounts due under Section 2.04, owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice (but no Lender shall be entitled to view any information in the Register except such information contained therein with respect to the Class and amount of Obligations owing to such Lender).  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (d).  The Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(e)      Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than any Disqualified Institution or a natural person) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (15) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (16) the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  The Borrowers agrees that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements of Section 3.01, including Section 3.01(e) and Section 3.01(f) (it being understood that the documentation required under Section 3.01(f) shall be delivered to the participating Lender)), Section 3.04 and Section 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.07(b); provided that such Participant agrees to be subject to the provisions of Sections 3.01(e), 3.04(d) and 3.07 as if it were an assignee under Section 11.07(b).  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers,  maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any

205

Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participant Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

Notwithstanding anything to the contrary contained in this Agreement, a Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after such Participant acquired the applicable participation.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no pledge may be made to a Disqualified Institution and; provided further that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (other than a Disqualified Institution) identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the ABL Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrowers and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(h)     Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it in favor of any Person (other than a Disqualified Institution) and (2) any

206

Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee (other than a Disqualified Institution) for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 11.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(i)     Notwithstanding anything to the contrary contained herein, any L/C Issuer or the Swing Line Lender may, upon thirty (30) days' notice to the Lead Borrower and the Lenders, resign as an L/C Issuer or the Swing Line Lender, respectively; provided that on or prior to the expiration of such thirty (30) day period with respect to such resignation, the relevant L/C Issuer or the Swing Line Lender shall have used commercially reasonable efforts to identify, in consultation with the Lead Borrower, a successor L/C Issuer or Swing Line Lender willing to accept its appointment as successor L/C Issuer or Swing Line Lender, as applicable.  In the event of any such resignation of an L/C Issuer or the Swing Line Lender, the Lead Borrower shall be entitled to appoint either (A) the successor identified by the relevant L/C Issuer or Swing Line Lender in accordance with the immediately preceding sentence or (B) a Lender which is willing to accept such appointment as a successor L/C Issuer or Swing Line Lender hereunder; provided that, subject to the immediately preceding sentence, no failure by the Lead Borrower to appoint any such successor shall affect the resignation of the relevant L/C Issuer or the Swing Line Lender, as the case may be.  If an L/C Issuer resigns as an L/C Issuer, it shall retain all the rights and obligations of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)).  If the Swing Line Lender resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make, Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).  Notwithstanding the foregoing, any removal of Bank of America as the Administrative Agent pursuant to Section 10.09 shall also constitute its removal as Swing Line Lender and its removal as the L/C Issuer.

Section 11.08 Confidentiality

. Each of the Agents, each Lead Arranger and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed:

(a)     to its Affiliates and its and its Affiliates' Representatives, partners, trustees, investment advisors and agents, including accountants and independent auditors, legal counsel and other experts, agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the transactions contemplated or permitted hereby; provided that the relevant Agent, each Lead Arranger or Lender shall be responsible for its controlled Affiliates' and their respective directors', officers', employees' and agents' compliance with the terms of this Section 11.08,

(b)     to the extent requested or required by any Governmental Authority or examiner regulating any Lender (provided that such Lender that discloses any Information or any Loan Document pursuant to this clause (b) shall provide the Lead Borrower with prompt advance written notice of such disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority, self-regulatory authority, state insurance commissioners or the

207

AmericasActive:18122631.218122631.8

National Association of Insurance Commissioners exercising its examination or regulatory authority) to the extent practical and permitted by applicable Law);

(c)      to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (provided, that such Agent, each Lead Arranger or such Lender that discloses any Information or any Loan Document pursuant to this clause (c) shall provide the Lead Borrower with prompt written advance notice of such disclosure to the extent practical and permitted by applicable law);

(d)      to any other party to this Agreement;

(e)      subject to a written acknowledgment from the relevant recipient that the Information and/or Loan Document so disclosed is being disseminated on a confidential basis (on substantially the same, or at least as restrictive taken as a whole, as the terms set forth in this Section 11.08 or on such other terms to which the Lead Borrower provides written consent, to any pledgee referred to in Section 11.07(f) or Section 11.07(h), direct or indirect counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement;

(f)      with the written consent of the Lead Borrower;

(g)      to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.08 by the disclosing party;

(h)      to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the disclosing Person);

(i)      in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or in connection with the administration by the Agents of the Term Loan Facility;

(j)      to the extent that such Information (i) is received by such Person from a third party that is not, to such Person's knowledge, after reasonable investigation, subject to confidentiality, fiduciary or other legal obligations owing to Parent or its Restricted Subsidiaries or Affiliates or (ii) was already in such Person's possession (except to the extent received in a manner that would be restricted by the immediately-preceding subclause (i)) or is independently developed by such Person based exclusively on information the disclosure of which would not be restricted by this Section 11.08;

(k)      for purposes of establishing a "due diligence" defense; or

(l)      to the CUSIP Service Bureau or any similar agency in connection with the application, issuance, publishing and monitoring of CUSIP numbers or other identifiers with respect to the credit facilities hereunder.

In addition, the Agents, the Lead Arrangers and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the ABL Commitments, and the Credit Extensions.  For the purposes of this Section 11.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees,

208

investment advisors or agents, relating to Parent or any of its Restricted Subsidiaries or their business, other than any such information that is publicly available prior to disclosure by any Loan Party other than as a result of a breach of this Section 11.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.  Notwithstanding anything to the contrary in this Agreement, this Section 11.08 shall survive the Termination Date for a period of one (1) year.

Section 11.09 Setoff

. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrowers or any other Loan Party, any such notice being waived by the Borrowers (on its own behalf and on behalf of each Loan Party and the Restricted Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and the Restricted Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; provided that such Lender and its Affiliates shall not exercise any right of setoff given this Section 11.09 without obtaining the prior written consent of the Administrative Agent.  Each Lender agrees promptly to notify the Lead Borrower and the Administrative Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Agents and each Lender under this Section 11.09 are in addition to other rights and remedies (including other rights of setoff) that the Agents and such Lender may have.

Section 11.10 Release of Collateral and Guarantee

. (a) (i) Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party to any Person that is not a Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents or, subject to Section 11.01, if otherwise approved, authorized or ratified in writing by the Required Lenders, (ii) upon the Termination Date (and, concurrently therewith, to release all the Loan Parties from their obligations under the Loan Documents (other than those that specifically survive the Termination Date)), (iii) upon release of a Subsidiary Guarantor from its obligations under its Guaranty pursuant to clause (c) below, (iv) upon release of a Subsidiary Borrower from its obligations as a Borrower pursuant to clause (d) below, or (v) upon any asset ceasing to constitute Collateral, the Lenders irrevocably authorize the Agents, and the Agents agree, at the Borrower's expense, to execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

(b)     The Lenders irrevocably authorize the Agents, and the Agents agree, at the request of the Lead Borrower, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by clauses (h) and (i) of Section 7.01.

(c)     The Lenders irrevocably authorize the Agents, and the Agents agree, to release any Subsidiary Guarantor from its obligations under any Loan Document to which it is a party if such

209

Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

(d)  The Lenders irrevocably authorize the Administrative Agent, and the Administrative Agent agrees, to release any Subsidiary Borrower from its obligations under any Loan Document to which it is a party if such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

(e)  The Lenders irrevocably authorize the Agents, and the Agents agree, to enter into subordination or intercreditor agreements or arrangements with respect to Indebtedness (or Liens securing such Indebtedness) that is required or permitted to be pari passu with or subordinated to the Obligations or Secured Obligations hereunder.

Section 11.11 Counterparts

. A Communication, including any required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  An Electronic Signature on or associated with a Communication shall be valid and binding on each Loan Party and other party thereto to the same extent as a manual, original signature, and any Communication entered into by Electronic Signature shall constitute the legal, valid and binding obligation of each party, enforceable to the same extent as if a manually executed original signature were delivered. A Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  The parties may use or accept manually signed paper Communications converted into electronic form (such as scanned into pdf), or electronically signed Communications converted into other formats, for transmission, delivery and/or retention. Agent and Lenders may, at their option, create one or more copies of a Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Person's business, and may destroy the original paper document.  Any Communication in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything herein, (a) Agent is under no obligation to accept an Electronic Signature in any form unless expressly agreed by it pursuant to procedures approved by it; (b) each Secured Party shall be entitled to rely on any Electronic Signature purportedly given by or on behalf of a Loan Party without further verification; and (c) upon request by Agent, an Electronic Signature shall be promptly followed by a manually executed counterpart.  "Electronic Record" and "Electronic Signature" are used herein as defined in 15 U.S.C. § 7006.

Section 11.12 Integration

.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document (but excluding the ABL Intercreditor Agreement), the provisions of this Agreement shall control; provided that in the case of any conflict or inconsistency between the ABL Intercreditor Agreement and any other Loan Document, the terms of the ABL Intercreditor Agreement shall govern and control; provided further that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 11.13 Survival of Representations and Warranties

AmericasActive:18122631.218122631.8

.   All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

Section 11.14 Severability

.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.15 GOVERNING LAW

.

(a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

(b)   ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, PARENT, EACH BORROWER, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND PARENT AND THE BORROWERS HEREBY SUBMIT TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT. PARENT, EACH BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

Section 11.16 WAIVER OF RIGHT TO TRIAL BY JURY

.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING

211

UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.16 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.17 Binding Effect

. This Agreement shall become effective when it shall have been executed by Parent, the Borrowers, the Administrative Agent, and the Collateral Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of Parent, the Borrowers, each such Agent and each Lender and their respective successors and assigns, except that the Borrowers shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 11.18 [Reserved]

.

Section 11.19 PATRIOT Act

. Each Lender and the Administrative Agent hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of the Borrowers and other information that will allow such Lender and the Administrative Agent to identify the Borrowers in accordance with the PATRIOT Act. The Borrowers agree to provide, and to cause each other Loan Party to provide, such information promptly upon request.

Section 11.20 Interest Rate Limitation

. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 11.21 ABL Intercreditor Agreement

. REFERENCE IS MADE TO THE ABL INTERCREDITOR AGREEMENT. EACH LENDER HEREUNDER (a) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT AND (b)

AmericasActive:18122631.218122631.8

AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE ABL INTERCREDITOR AGREEMENT AS "ABL AGENT" AND ON BEHALF OF SUCH LENDER. THE PROVISIONS OF THIS SECTION 11.21 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO THE ABL INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE ABL INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE ABL INTERCREDITOR AGREEMENT. THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER ANY FIRST LIEN FACILITY AND SECOND LIEN FACILITY TO EXTEND CREDIT AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT.

Section 11.22 Lead Borrower.

Each Borrower hereby irrevocably appoints and designates Lead Borrower as its representative and agent and attorney-in-fact for all purposes under the Loan Documents, including requests for Loans, designation of interest rates, delivery or receipt of communications and all notices, preparation and delivery of Borrowing Base Certificates and financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with the Administrative Agent, the Collateral Agent and any Lender. Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any Loan Party by the Lead Borrower shall be deemed for all purposes to have been made by such Loan Party and shall be binding upon and enforceable against such Loan Party to the same extent as if made directly by such Loan Party and the Administrative Agent and the Lenders shall be entitled to rely thereon. Lenders may give any notice to or communication with a Borrower or other Loan Party hereunder to the Lead Borrower on behalf of such Borrower or Loan Party.

Section 11.23 No Fiduciary Duty

. Each Agent, each Lender and their Affiliates (collectively, the "Lender Affiliated Parties"), may have economic interests that conflict with those of the Loan Parties, and each Loan Party acknowledges and agrees that (a) nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Loan Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Loan Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Loan Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Loan Party on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents; (e) each Loan Party has its own legal and financial advisors to the extent it deemed appropriate; (f) each Loan Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Loan Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

213

Section 11.24 Acknowledgement and Consent to Bail-In of Affected Financial Institutions

. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 11.25 Hedge Banks and Cash Management Banks.

Administrative Agent hereby agrees to act as Administrative Agent and Collateral Agent hereby agrees to act as Collateral Agent for such Cash Management Banks and Hedge Banks and, by virtue of entering into a Cash Management Agreement or a Secured Hedge Agreement, as the case may be, the applicable Cash Management Bank or the Hedge Bank, as applicable, shall be automatically deemed to have appointed Administrative Agent as its Administrative Agent and Collateral Agent as its Collateral Agent and to have accepted the benefits of the Loan Documents. It is understood and agreed that the rights and benefits of each Cash Management Bank and Hedge Bank under the Loan Documents consist exclusively of such Cash Management Bank's and/or the Hedge Bank's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to the Collateral Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In connection with any distribution of payments or proceeds of Collateral, the Collateral Agent shall be entitled to assume no amounts are due or owing to any Cash Management Bank or a Hedge Bank, as the case may, unless such Cash Management Bank or Hedge Bank has provided a written certification (setting forth a reasonably detailed calculation) to the Administrative Agent as to the amounts that are due and owing to it and such written certification is received by the Administrative Agent a reasonable period of time prior to the making of such distribution. Neither the Administrative Agent nor the Collateral shall have any obligation to calculate the amount due and payable with respect to any Cash Management Obligations, but may rely upon the written certification of the amount due and payable from the applicable Cash Management Bank. In the absence of an updated certification, Administrative Agent and the Collateral Agent shall be entitled to assume that the amount due and payable to the applicable Cash Management Bank or the Hedge Bank, as applicable, is the amount last certified to the Administrative Agent or the Collateral Agent by such Cash Management Bank as being due and payable (less any distributions made to such Cash Management Bank or Hedge Bank, as the case may be, on account thereof). The Borrowers

214

AmericasActive:18122631.218122631.8

may enter into Cash Management Agreements with any Cash Management Bank, although Borrowers are not required to do so.  Each Borrower acknowledges and agrees that no Cash Management Bank has committed to provide any cash management services and that the providing of cash management services by any Cash Management Bank is in the sole and absolute discretion of such Cash Management Bank. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Cash Management Bank or Hedge Bank shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Secured Obligations owing thereunder, nor shall the consent of any such Cash Management Bank, Hedge Bank be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

Section 11.26 Currency Indemnity.

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any of the other Loan Documents, it becomes necessary to convert into the currency of such jurisdiction (the "Judgment Currency") any amount due under this Agreement or under any of the other Loan Documents in any currency other than the Judgment Currency (the "Currency Due"), then conversion shall be made at the exchange rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency at the spot selling rate on the Business Day before the day on which judgment is given. In the event that there is a change in the rate of exchange rate prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the applicable Borrowers will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, as may be necessary to ensure that the amount received by Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other of the Loan Documents in the Currency Due. If the amount of the Currency Due that the Administrative Agent is able to purchase is less than the amount of the Currency Due originally due to it, the applicable Loan Parties shall indemnify and save the Administrative Agent harmless from and against loss arising as a result of such deficiency.  The indemnity contained herein shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any of the other Loan Documents or under any judgment or order.

Section 11.27 Collateral Allocation Mechanism.

(a)     On the CAM Exchange Date, (i) the ABL Commitments shall automatically and without further act be terminated, (ii) each Lender shall immediately be deemed to have acquired participations in the Swing Line Loans and Permitted Overadvances in an amount equal to such Lender's CAM Percentage calculated pursuant to clause (a) of such definition (as in effect immediately prior to the CAM Exchange) of each Swing Line Loan and Permitted Overadvances outstanding on such date and shall promptly make payment therefor to the Administrative Agent, (iii) simultaneously with the automatic conversions pursuant to clause (iv) below, the Lenders shall automatically and without further act (and without regard to the provisions of Section 11.07) be deemed to have exchanged participations in the Borrowings and participations in the Letters of Credit, such that in lieu of the interest of each Lender in each Borrowing in which it shall participate as of such date (including such Lender's interest in the Secured Obligations of each Borrower in respect of each such Borrowing), such Lender shall hold a participation interest in every one of the Borrowings, and a participation in every one of the Letters of

215

Credit (including the Obligations of each Borrower in respect of each such Borrowing), whether or not such Lender shall previously have participated therein, equal to such Lender's CAM Percentage thereof and (iv) simultaneously with the deemed exchange of participation interests pursuant to clause (iii) above, all outstanding Borrowings denominated in Sterling or Euros shall, automatically and with no further action required, be converted into Dollars, determined using the Spot Rate calculated as of the Business Day immediately preceding the CAM Exchange Date, and on and after such date all such Borrowings shall constitute Borrowings payable in Dollars.  Each Lender hereby consents and agrees to the CAM Exchange, and each Lender agrees that the CAM Exchange shall be binding upon its successors and assigns and any Person that acquires a participation in its participation interests in any Borrowing or any participation in any Letter of Credit.  Each Lender agrees to surrender any promissory notes originally received by it in connection with its Loans hereunder to the Administrative Agent against delivery of any promissory notes evidencing its interests in the Loans executed and delivered by the Applicable Borrowers; provided that the failure of any Borrower to execute or deliver or of any Lender to accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the CAM Exchange.

(b)      As a result of the CAM Exchange, upon and after (b) the CAM Exchange Date, each payment received by the Administrative Agent pursuant to any Loan Document in respect of the Obligations shall be distributed to the Lenders pro rata in accordance with their respective CAM Percentages, subject to Section 9.03.  Any direct payment received by a Lender on or after the CAM Exchange Date, including by way of setoff, in respect of an Obligation shall be paid over to the Administrative Agent for distribution to the Lenders in accordance herewith.

Section 11.28 Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "Covered QFC Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered QFC Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered QFC Party or a BHC Act Affiliate of a Covered QFC Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered QFC Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered QFC Party with respect to a Supported QFC or any QFC Credit Support.

216

(b)      As used in this <u>Section 11.28</u>, the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Covered Entity</u>" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[Remainder of Page Intentionally Blank]

AmericasActive:18122631.218122631.8

**EXHIBIT B**

SCHEDULE 2.01(a)

ABL COMMITMENTS

| Lender | U.S. ABL Commitments | Foreign ABL Commitments |
| --- | --- | --- |
| Bank of America, N.A. | $117,500,000.00 | $7,500,000.00 |
| Truist Bank | $70,500,000.00 | $4,500,000.00 |
| U.S. Bank National Association | $47,000,000.00 | $3,000,000.00 |
| **Total** | $235,000,000.00 | $15,000,000.00 |

AmericasActive:18122633.8

SCHEDULE 2.01(b)

LETTER OF CREDIT COMMITMENTS

| Lender | U.S. Letter of Credit Commitments | Foreign Letter of Credit Commitments |
| --- | --- | --- |
| Bank of America, N.A. | $100,000,000.00 | $10,000,000.00 |
| **Total** | $100,000,000.00 | $10,000,000.00 |

AmericasActive:18122633.8