**EXHIBIT C**

ABL Security Agreement

**Execution Version**

ABL SECURITY AGREEMENT

By

TRICO GROUP HOLDINGS, LLC,

as Parent,

TRICO GROUP, LLC,

as Lead Borrower,

THE RESTRICTED SUBSIDIARIES OF THE LEAD BORROWER PARTY HERETO,

as Grantors,

GOLDMAN SACHS BANK USA,

as Collateral Agent

_____

Dated as of February 2, 2018

#90494261v8

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ........................................................................................................ 2

SECTION 1.01.    Uniform Commercial Code Defined Terms ........................................... 2

SECTION 1.02.    Credit Agreement Defined Terms.......................................................... 2

SECTION 1.03.    Definition of Certain Terms Used Herein .............................................. 2

SECTION 1.04.    Rules of Construction ............................................................................. 8

ARTICLE II AUTHORITY OF COLLATERAL AGENT ....................................................... 8

SECTION 2.01.    General Authority of the Collateral Agent over the Collateral ............. 8

SECTION 2.02.    Exercise of Powers.................................................................................. 9

SECTION 2.03.    Remedies Not Exclusive ......................................................................... 9

SECTION 2.04.    Waiver and Estoppel............................................................................... 9

SECTION 2.05.    Limitation on Collateral Agent's Duty in Respect of Collateral ......... 10

SECTION 2.06.    Limitation by Law ................................................................................ 10

ARTICLE III SECURITY INTEREST .................................................................................... 10

SECTION 3.01.    Security Interest .................................................................................... 10

SECTION 3.02.    No Assumption of Liability ................................................................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES................................................... 11

SECTION 4.01.    Intellectual Property.............................................................................. 11

SECTION 4.02.    Names, Type and Jurisdiction of Organization, Organizational
                 Identification Numbers ........................................................................ 12

SECTION 4.03.    Enforceability and Perfection.. ............................................................. 12

SECTION 4.04.    Deposit Accounts and Securities Accounts.. ........................................ 12

ARTICLE V COVENANTS...................................................................................................... 12

SECTION 5.01.    Protection of Security ........................................................................... 12

SECTION 5.02.    Further Assurances ............................................................................... 12

SECTION 5.03.    Taxes; Encumbrances ........................................................................... 13

SECTION 5.04.    Continuing Obligations of the Grantors................................................ 13

SECTION 5.05.    Liens on Collateral................................................................................ 13

SECTION 5.06.    Insurance................................................................................................ 13

SECTION 5.07.    Certain Covenants Regarding Intellectual Property.............................. 13

SECTION 5.08.    No Conflicts, Consents, etc................................................................... 14

SECTION 5.09.    Letter-of-Credit Rights.. ....................................................................... 14

SECTION 5.10.    Commercial Tort Claims. ...................................................................... 14

i

SECTION 5.11.     Collateral Access Agreements............................................................................... 14

ARTICLE VI REMEDIES ....................................................................................................... 15

SECTION 6.01.     Remedies upon Default........................................................................ 15

SECTION 6.02.     Application of Proceeds....................................................................... 17

SECTION 6.03.     Grant of License to Use Intellectual Property...................................... 17

ARTICLE VII MISCELLANEOUS............................................................................................ 17

SECTION 7.01.     Notices ................................................................................................ 17

SECTION 7.02.     Survival of Agreement........................................................................ 17

SECTION 7.03.     Binding Effect..................................................................................... 18

SECTION 7.04.     Successors and Assigns ...................................................................... 18

SECTION 7.05.     GOVERNING LAW............................................................................ 18

SECTION 7.06.     Waivers; Amendment; Several Agreement; Confidentiality .............. 18

SECTION 7.07.     WAIVER OF JURY TRIAL................................................................ 18

SECTION 7.08.     Severability ........................................................................................ 19

SECTION 7.09.     Counterparts........................................................................................ 19

SECTION 7.10.     Headings ............................................................................................. 19

SECTION 7.11.     Jurisdiction; Consent to Service of Process ....................................... 19

SECTION 7.12.     Termination......................................................................................... 20

SECTION 7.13.     Additional Grantors ........................................................................... 20

SECTION 7.14.     [Reserved]........................................................................................... 20

SECTION 7.15.     Collateral Agent Appointed Attorney-in-Fact ................................... 20

SECTION 7.16.     ABL Intercreditor Agreement............................................................ 21

**ANNEXES**

Annex I            Form of Supplement

**SCHEDULES**

Schedule I         Intellectual Property

Schedule II        Chief Executive Office, Type of Organization, Jurisdiction of Organization and Organizational Identification Number

Schedule III       Commercial Tort Claims

Schedule IV       Deposit Accounts and Securities Accounts

#90494261v8

# ABL SECURITY AGREEMENT

ABL SECURITY AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of February 2, 2018 among Trico Group, LLC, a Delaware limited liability company ("Lead Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), each Subsidiary Guarantor that is a U.S. Domestic Subsidiary and that is a party hereto or may become a party hereto pursuant to Section 7.13 of this Agreement (together with the Lead Borrower and Parent, the "Grantors") and Goldman Sachs Bank USA ("Goldman Sachs"), as collateral agent (in such capacity, and together with any successors in such capacity, the "Collateral Agent") for the Secured Parties (as defined in the Credit Agreement).

## R E C I T A L S

A.      Pursuant to that certain ABL Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Parent, the Lead Borrower, Trico Limited, a limited company organized under the laws of England and Wales (the "UK Borrower"), certain Subsidiaries of Parent party thereto as borrowers from time to time (together with the Lead Borrower and the UK Borrower, the "Borrowers"), the lenders party thereto from time to time (the "Lenders"), Goldman Sachs, in its capacity as Administrative Agent and Collateral Agent, the Grantors are required to enter into this Agreement.

B.      Each Grantor has, pursuant to that certain ABL Guaranty, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty"), among Parent, the Lead Borrower and each other guarantor party thereto and the Administrative Agent, among other things, unconditionally guaranteed the Obligations of the Lead Borrower and the other Loan Parties.

C.      The Lead Borrower and each other Grantor will receive substantial benefits from the execution and delivery of the Credit Agreement and performance of the obligations thereunder and is, therefore, willing to enter into this Agreement.

D.      It is contemplated that, to the extent permitted by the Credit Agreement, one or more of the Grantors and/or their Restricted Subsidiaries may enter into one or more Secured Hedge Agreements with one or more Hedge Banks.

E.      It is contemplated that, to the extent permitted by the Credit Agreement, one or more of the Grantors and/or their Restricted Subsidiaries may enter into one or more Cash Management Agreements with one or more Cash Management Banks.

F. It is contemplated that, to the extent permitted by the Credit Agreement, one or more of the Grantors and/or their Restricted Subsidiaries may request the issuance of Letters of Credit from one or more L/C Issuers.

G.      Contemporaneously with the execution and delivery of this Agreement, the Lead Borrower and the other Grantors have executed and delivered to the Collateral Agent an ABL Pledge Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Pledge Agreement").

H.      This Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties (as defined in the Credit Agreement) to secure the payment and performance of all of the Secured Obligations (as defined in the Credit Agreement).

#90494261v8

NOW THEREFORE, in consideration of the foregoing and other benefits accruing each Grantor, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby makes the following grant, agreements and representations and warranties to the Collateral Agent for the benefit of the Secured Parties (and each of their respective successors and permitted assigns), as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01.   Uniform Commercial Code Defined Terms.  Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC, including the following which are capitalized herein:

"Accounts"; "Certificate of Title"; "Chattel Paper"; "Commercial Tort Claim"; "Commodity Account"; "Commodity Contract"; "Deposit Accounts"; "Documents"; "Electronic Chattel Paper"; "Equipment"; "Fixtures"; "Goods"; "Instruments" (as defined in Article 9 rather than Article 3 of the UCC); "Inventory"; "Investment Property"; "Letter-of-Credit Rights"; "Letters of Credit"; "Securities"; "Securities Account"; "Securities Intermediary"; "Security Entitlement"; "Supporting Obligations"; and "Tangible Chattel Paper".

SECTION 1.02.    Credit Agreement Defined Terms.  Capitalized terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.

SECTION 1.03.   Definition of Certain Terms Used Herein.  As used herein, the following terms shall have the following meanings:

"Account Debtor" shall mean any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"Accounts Receivable" shall mean all Accounts and all right, title and interest in any returned goods, together with all rights, titles, securities and guarantees with respect thereto, including any rights to stoppage in transit, replevin, reclamation and resales, and all related security interests, liens, pledges and other related contracts, whether voluntary or involuntary, in each case whether now existing or owned or hereafter arising or acquired.

"Agreement" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Books and Records" shall mean all instruments, files, records, ledger sheets and documents (including, without limitation, customer lists, credit files, printouts and other computer output materials) evidencing, covering or relating to any of the Collateral.

"Collateral" shall mean with respect to each of the Grantors all of the following, in each case, whether now owned or hereafter acquired, wherever located and whether now or hereafter existing or arising:

(a)      Accounts Receivable;

(b)      Books and Records;

2

#90494261v8

(c)      cash, Money and Cash Equivalents

(d)      Chattel Paper;

(e)      Commercial Tort Claims specifically described on Schedule III, as such schedule may be supplemented from time to time pursuant to Section 5.10;

(f)      Documents;

(g)      Equipment;

(h)      Fixtures;

(i)      General Intangibles;

(j)      Goods;

(k)      Instruments;

(l)      Inventory;

(m)      Investment Property (including Securities Accounts and Commodity Accounts);

(n)      Letter-of-Credit Rights;

(o)      Supporting Obligations;

(p)      Deposit Accounts;

(q)      all Security Entitlements in any or all of the foregoing;

(r)      Intellectual Property

(s)      to the extent not covered by clauses (a) through (r) of this definition, all other personal property, whether tangible or intangible; and

(t)      Proceeds of any and all of the foregoing;

provided that, notwithstanding the foregoing, "Collateral" (and any of the component terms thereof) shall not include any (i) Securities Collateral (as defined in the Pledge Agreement) or other collateral for the Secured Obligations pledged under the Pledge Agreement, in each case to the extent an effective security interest has been granted in favor of the Collateral Agent in such property pursuant to the Pledge Agreement or (ii) Excluded Assets.

"Collateral Access Agreement" shall mean any landlord waiver or other agreement, in form and substance reasonably satisfactory to the Collateral Agent, between the Collateral Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Grantor for any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"Collateral Documents" shall mean the "U.S. Collateral Documents" as defined in the Credit Agreement.

"Collateral Estate" shall have the meaning assigned to such term in Section 2.01.

"Computer Software" shall mean all computer software, programs and databases in any form (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing.

"Copyright License" shall mean each written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party under any Copyright, including Computer Software (to the extent protected by copyright), now or hereafter owned by any Grantor or which such Grantor otherwise has the right to license, or granting any right to such Grantor under any Copyright now or hereafter owned by any third party, and all rights of such Grantor under any such agreement.

"Copyrights" shall mean any and all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all copyrights (whether statutory or common law, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Grantor, in each case, whether now owned or hereafter created or acquired by or assigned to such Grantor, including, without limitation, to the extent the same constitute Collateral, the copyrights, registrations and applications listed in Schedule I hereto, (b) all rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (c) all reissues, renewals, continuations and extensions thereof, (d) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (e) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"Credit Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Excluded Account" shall mean, (a) any Deposit Account that is used exclusively for payroll or payroll taxes, withholding tax or any other tax required to be collected, remitted or withheld, benefits, escrow, trust, cash collateral, customs or any other fiduciary account, (b) petty cash accounts, zero balance accounts and other Deposit Accounts with amounts on deposit which do not exceed $250,000 per such account and $500,000 in the aggregate for all such accounts at any one time; provided that the aggregate amount on deposit for all such accounts may exceed $500,000 so long as (i) such aggregate amount does not exceed $500,000 for more than five (5) consecutive Business Days and (ii) such aggregate amount does not at any time exceed $1,000,000 and (c) for the avoidance of doubt, Deposit Accounts permitted to be pledged to or maintained with a factoring counterparty in respect of a Permitted Non-Recourse Factoring Transaction.

"Excluded Assets" shall mean, collectively (a) leased real property (including requirements to deliver landlord lien waivers, estoppels, consents and collateral access letters), (b) fee-owned real property other than Material Owned Property, (c) all foreign Intellectual Property except to the extent perfection can be obtained by filing a UCC-1 financing statement and any intent to use Trademark application filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b), prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act, 15 U.S.C. § 1051(d) or "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act, 15 U.S.C. § 1051(c), with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent to use Trademark application under

4

applicable Law, (d) assets of and interests in partnerships, joint ventures and non-wholly-owned subsidiaries which cannot be pledged without the consent of one or more third parties (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), unless such consent has been obtained, or to the extent not permitted by the terms of such Person's organizational or joint venture document, (e) Excluded Equity, (f) any property as to which (and only for so long as) the Lead Borrower and the Collateral Agent determine in their reasonable discretion that the burden or cost of creating or perfecting a security interest therein is excessive in view of the benefit of the security to be afforded thereby, (g) any property and assets the pledge of, or perfection of a security interest in, which would require governmental consent, approval, license or authorization (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law) or the consent, approval, license or authorization of any third party to such pledge or security interest (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), unless such consent has been obtained (other than proceeds of such assets, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition), (h) all leases, contracts, agreements, licenses, franchises, charters, authorizations and permits to the extent the grant of a security interest therein is prohibited or is restricted by applicable law or by the terms thereof or that would require the consent of any Governmental Authority or third party to such pledge or security interest, unless such consent has been obtained, in each case except to the extent such prohibition or restriction is ineffective under the UCC (other than Proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) and so long as no such third party consent requirement was created in contemplation hereof, (i) any assets to the extent the grant or pledge of, or perfection of a security interest in to the extent the same would result in material adverse tax consequences (including, without limitation, as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) as mutually determined by the Lead Borrower and the Collateral Agent, (j) Commercial Tort Claims with a value of less than $500,000 except to the extent perfection can be obtained by filing a UCC-1 financing statement, (k) vehicles and any other assets subject to a certificate of title, (l) Letter of Credit Rights, with a value of less than $500,000 except to the extent perfection can be obtained by filing a UCC-1 financing statement, (m) any Excluded Accounts, (n) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time), (o) any assets of any Excluded Subsidiary (and any U.K. Domestic Subsidiary to the extent not constituting an Excluded Subsidiary), (p) other than with respect to the pledge of equity interests by a Grantor, any assets located outside of the United States; provided that no Grantor shall be required to take any action to perfect the pledge of equity interests by such Grantor in any jurisdiction other than the United States, (q) any Accounts disposed of pursuant to a Permitted Non-Recourse Factoring Transaction and any Related Assets in respect thereof, (r) any inventory disposed of pursuant to a Permitted Inventory Financing and any Related Assets in respect thereof and (s) any Proceeds, substitutions or replacements of any of the foregoing, but only to the extent such Proceeds, substitutions or replacements would otherwise constitute Excluded Assets.

"Excluded Equity" shall mean (a) any Voting Stock in excess of 65% of the issued and outstanding Voting Stock of each Wholly-owned Subsidiary that is a Foreign Subsidiary, U.K. Domestic Subsidiary, CFC Domestic Person or Disregarded Domestic Person (and Equity Interests in any Subsidiary of any such Person), (b) Equity Interests in any Immaterial Subsidiary, (c) Equity Interests in any captive insurance Subsidiary, (d) Equity Interests in not-for-profit Subsidiaries, (e) Equity Interests in special purpose entities used for securitization facilities and (f) Equity Interests in any broker-dealer Subsidiary.

"Excluded Perfection Action" shall mean, with respect to any Collateral, any action (a) in any foreign jurisdiction in order to create or perfect any security interests in assets located outside of the United States and (b) other than the filing of a UCC-1 financing statement, to perfect the Security Interest of the Collateral Agent in any Chattel Paper with a value of less than $500,000.

5

"General Intangibles" shall mean, collectively, all general intangibles (as such term is defined in the UCC), and in any event shall include, without limitation, all choses in action and causes of action and all other intangible personal property of any Grantor of every kind and nature now owned or hereafter acquired by any Grantor, including all rights and interests in partnerships, limited partnerships, limited liability companies and other unincorporated entities, corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Secured Hedge Agreements and other agreements), Intellectual Property, goodwill, registrations, franchises and tax refund claims.

"Grantors" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Intellectual Property" shall mean any and all intellectual property and similar proprietary rights of every kind and nature in any jurisdiction throughout the world now owned or hereafter acquired by any Grantor, including, without limitation, any and all (a) Patents, Copyrights, intellectual property rights in Computer Software, Licenses, Trademarks and Trade Secrets, (b) goodwill associated with any of the foregoing, (c) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (d) rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"Lead Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Lenders" shall have the meaning assigned to such term in the recitals of this Agreement.

"License" shall mean any Patent License, Trademark License or Copyright License including, without limitation, those listed on Schedule I hereto.

"Parent" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Patent License" shall mean any written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party to make, have made, use, import, offer to sell, or sell any invention on which a Patent, now or hereafter owned by any Grantor or which any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any right to make, have made, use, import, offer to sell or sell any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"Patents" shall mean any and all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all industrial designs, mask works, letters patent, all registrations and recordings thereof, and all applications for letters patent, including registrations, recordings and pending applications in the United States Patent and Trademark Office, including, to the extent the same constitute Collateral, those listed on Schedule I hereto and (b) all reissues, continuations, divisions, continuations in part, renewals or extensions thereof, and the inventions disclosed or claimed therein and patentable improvements thereto, including the right to make, use and/or sell the inventions disclosed or claimed therein and all improvements thereto, (c) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (d) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

6

"Permitted Liens" means any Liens permitted under Section 7.01 of the Credit Agreement.

"Pledge Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Pledged Securities" shall have the meaning assigned to such term in the Pledge Agreement.

"Pledgor" has the meaning specified in the Pledge Agreement.

"Proceeds" shall mean, collectively, all "proceeds," as such term is defined in the UCC, and in any event shall include, without limitation, any consideration received from the sale, exchange, license, lease or other disposition of any asset or property that constitutes Collateral, any value received as a consequence of the possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for (and the right to sue and recover for and the rights to damages or profits due or accrued arising out of or in connection with) (i) past, present or future infringement, misappropriation or other violations of any Patent now or hereafter owned by any Grantor, or licensed under a Patent License, (ii) past, present or future infringement, dilution, misappropriation or other violations of any Trademark now or hereafter owned by any Grantor or licensed under a Trademark License or injury to the goodwill associated with or symbolized by any Trademark now or hereafter owned by any Grantor, (iii) past, present or future breach of any License, (iv) past, present or future infringement, misappropriation or other violations of any Copyright now or hereafter owned by any Grantor and (v) past, present or future infringement, misappropriation or other violations of any other Intellectual Property now or hereafter owned by any Grantor or licensed under a Copyright License and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Security Interest" shall have the meaning assigned to such term in Section 3.01(a).

"Trademark License" shall mean any written agreement, now or hereafter in effect, pursuant to which any Grantor grants any right to any third party to use any Trademark now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any Trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

"Trademarks" shall mean all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all trademarks, service marks, domain names, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, slogans, social media identifiers or accounts and other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any State of the United States, and all extensions or renewals thereof, including, to the extent the same constitute Collateral, those listed on Schedule I hereto, (b) all goodwill associated therewith or symbolized thereby, (c) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, dilution, misappropriation or other violations thereof and (d) all rights to sue for past, present or future infringement, dilution, misappropriation or other violations thereof.

#90494261v8

"Trade Secrets" shall mean all of the following now owned or hereafter acquired by a Grantor in any jurisdiction throughout the world: (a) all confidential and proprietary information of each Grantor, including, without limitation, know-how, show-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, and databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, information., (b) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringement, misappropriation or other violations thereof and (c) all rights to sue for past, present or future infringement, misappropriation or other violations thereof.

"UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided, however, that if by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions relating to such provisions.

"Voting Stock" means, as to any issuer, the issued and outstanding shares of each class of capital stock or other ownership interests of such issuer entitled to vote (within the meaning of Treasury Regulation § 1.956-2(c)(2)).

SECTION 1.04.    Rules of Construction.   The provisions of Sections 1.02 through 1.08 of the Credit Agreement shall apply to this Agreement, *mutatis mutandis*.   In addition, where the context requires, provisions relating to any Collateral, when used in relation to a Grantor, shall refer to such Grantor's Collateral or any relevant part thereof.

**ARTICLE II**

**AUTHORITY OF COLLATERAL AGENT**

SECTION 2.01.    General Authority of the Collateral Agent over the Collateral.  By acceptance of the benefits of this Agreement and the other Collateral Documents, each Secured Party shall be deemed irrevocably (i) to consent to the appointment of the Collateral Agent as its agent hereunder and under the other Collateral Documents, (ii) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for enforcement of any provisions of this Agreement and the other Collateral Documents directly against any Grantor or the exercise of remedies hereunder or thereunder, (iii) to agree that such Secured Party shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor or to exercise any remedy hereunder or thereunder other than any rights of set-off it may have and (iv) to agree to be bound by the terms of this Agreement and the Collateral Documents.

The Collateral Agent hereby agrees that it holds and will hold all of its right, title and interest in, to and under the Collateral Documents and the Collateral granted to the Collateral Agent thereunder whether now existing or hereafter arising (all such right, title and interest being hereinafter referred to as the "Collateral Estate") under and subject to the conditions set forth in this Agreement and the other Loan Documents; and the Collateral Agent further agrees that it will hold such Collateral Estate for the benefit of the Secured Parties, as security for the enforcement of the payment of all Secured Obligations (subject to the limitations and priorities set forth herein and in the respective Collateral Documents and/or other

8

Loan Documents) and as security for the performance of and compliance with the covenants and conditions of this Agreement and the Loan Documents.

SECTION 2.02.    Exercise of Powers.  All of the powers, remedies and rights of the Collateral Agent as set forth in this Agreement may be exercised by the Collateral Agent in respect of any Collateral Document as though set forth in full therein and all of the powers, remedies and rights of the Collateral Agent as set forth in any Collateral Document may be exercised from time to time as herein and therein provided.

SECTION 2.03.    Remedies Not Exclusive.

(a)    No remedy conferred upon or reserved to the Collateral Agent herein or in the Collateral Documents is intended to be exclusive of any other remedy or remedies, but every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or in any Collateral Document or now or hereafter existing at law or in equity or by statute.

(b)    No delay or omission by the Collateral Agent to exercise any right, remedy or power hereunder or under any Collateral Document shall impair any such right, remedy or power or shall be construed to be a waiver thereof, and every right, power and remedy given by this Agreement or any other Collateral Document to the Collateral Agent may be exercised from time to time by the Collateral Agent in accordance with and subject to the limitations set forth in the Loan Documents.

(c)    If the Collateral Agent shall have proceeded to enforce any right, remedy or power under this Agreement or any other Collateral Document and the proceeding for the enforcement thereof shall have been discontinued or abandoned for any reason, then the Grantors, the Collateral Agent and the other Secured Parties shall, subject to any determination in such proceeding, severally and respectively be restored to their former positions and rights hereunder or thereunder with respect to the Collateral Estate and in all other respects, and thereafter all rights, remedies and powers of the Collateral Agent shall continue as though no such proceeding had been taken.

SECTION 2.04.    Waiver and Estoppel.

(a)    Subject to the terms of the Collateral Documents and the other Loan Documents, each Grantor agrees, to the extent it may lawfully do so, that it will not claim, or take the benefit or advantage of, any appraisement, valuation, stay, extension, moratorium, turnover or redemption law, or any law permitting it to direct the order in which the Collateral shall be sold, now or at any time hereafter in force, with the knowledge that such action is reasonably likely to hinder, delay or impede the performance or enforcement of this Agreement or any other Collateral Document and hereby waives all benefit or advantage of all such laws and covenants that it will not hinder, delay or impede the execution of any power granted to the Collateral Agent in this Agreement or any other Collateral Document, but will suffer and permit the execution of every such power as though no such law were in force; provided that nothing contained in this Section 2.04(a) shall be construed as a waiver of any rights of the Grantors under any applicable federal bankruptcy law or state insolvency law.

(b)    Each Grantor, to the extent it may lawfully do so, on behalf of itself and all Persons under its control who may claim through or under it, including without limitation any and all such Persons which are subsequent creditors, vendees, assignees and licensors, waives and releases all rights to demand or to have any marshaling of the Collateral upon any sale, whether made under any power of sale granted herein or in any Loan Document or pursuant to judicial proceedings or upon any foreclosure or any enforcement of this Agreement or any other Loan Document and consents and agrees that all the Collateral may at any such sale be offered and sold as an entirety.

9

(c)     Each Grantor waives, to the extent permitted by applicable law, presentment, demand, protest and any notice of any kind (except notices explicitly required hereunder or under any other Loan Document) in connection with this Agreement and the other Collateral Documents and any action taken by the Collateral Agent with respect to any Collateral.

SECTION 2.05.     Limitation on Collateral Agent's Duty in Respect of Collateral.     The Collateral Agent shall use reasonable care with respect to the Collateral in its possession; provided that the Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to which it accords its own property.  Beyond such duty and any other duties as to the custody thereof expressly provided herein or in any other Collateral Document and to account to the Secured Parties and the Grantors for monies and other property received by it hereunder or under any other Collateral Document and any other express duties specified in the Collateral Documents, the Collateral Agent shall not have any duty to the Grantors or to the Secured Parties as to any Collateral in its possession or control or in the possession or control of any of its agents or nominees, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except to the extent required by law.

SECTION 2.06.     Limitation by Law.     All rights, remedies and powers provided in this Agreement or any other Collateral Document may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions hereof are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement invalid, unenforceable in whole or in part or not entitled to be recorded, registered or filed under the provisions of any applicable law.

The provisions of this Article II are without limitation to the provisions under Article X of the Credit Agreement relating to the Collateral Agent.

**ARTICLE III**

**SECURITY INTEREST**

SECTION 3.01.   Security Interest.

(a)     As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Collateral Agent and its successors and permitted assigns, for the ratable benefit of the Secured Parties, a security interest in, all of such Grantor's right, title and interest in, to and under the Collateral of such Grantor, in each case, whether now existing or owned or hereafter arising or acquired, and wherever located.  The Liens granted hereunder to secure the Secured Obligations are referred to herein as the "Security Interest."

(b)     Without limiting the foregoing, the Collateral Agent is hereby authorized at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings and financing statements that describe the Collateral as "all assets" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC), continuation statements, filings with the United States Patent and Trademark Office, United States Copyright Office or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor, or the first priority thereof (other than with respect to any Term Priority Collateral) without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Collateral Agent as secured party.

10

#90494261v8

(c)     Notwithstanding anything in this Agreement to the contrary, in no event shall any Grantor be required to take any Excluded Perfection Action with respect to any Collateral.

SECTION 3.02.   No Assumption of Liability.  The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Grantors jointly and severally represent and warrant to the Collateral Agent and the Secured Parties on the Closing Date and on each date on which the representations and warranties contained in the Credit Agreement are made or required to be made:

SECTION 4.01.     Intellectual Property.

(a)     Except as would not reasonably be expected to result in a Material Adverse Effect, each Grantor owns all right, title and interest in or otherwise has a valid and enforceable right or license to use any and all Intellectual Property that is used or held for use in, or otherwise necessary for, the operation of such Grantor's business as currently conducted.  As of the date hereof, each Grantor represents and warrants that the Copyrights, Patents and Trademarks listed on Schedule I hereto include all active United States federal registrations of and active pending applications for United States federal registration of, Copyrights, Patents and Trademarks that constitute Collateral that such Grantor owns as of the date hereof and all material Copyright Licenses pursuant to which any Grantor is granted an exclusive license to one or more registered United States Copyrights that are specifically identified in such Copyright License.  To the knowledge of each of the Grantors, there are no proceedings pending against such Grantor with respect to the use by such Grantor of any Intellectual Property or challenging or questioning the validity or enforceability of any Intellectual Property, in each case, except where such use, invalidity or unenforceability would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, no Person is engaging in any activity that infringes, misappropriates or otherwise violates or conflicts with any Intellectual Property owned by such Grantor in a manner that would reasonably be expected to have a Material Adverse Effect.  Each Grantor has taken commercially reasonable efforts to maintain the confidentiality and value of all Trade Secrets necessary for the operation of the business of such Grantor except as would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, no Trade Secrets necessary for the operation of the business of any Grantor have been disclosed by such Grantor except pursuant to non-disclosure agreements and/or license agreements that contain non-disclosure restrictions, in each case, that have not been breached except as would not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each of the Grantors, the operation of such Grantor's business as currently conducted and the use of the Intellectual Property in connection therewith do not infringe or misappropriate the intellectual property rights of any third party in a manner that would reasonably be expected to have a Material Adverse Effect.

(b)     Each Grantor represents and warrants that a fully executed Intellectual Property Security Agreement containing a description of the Collateral consisting of United States registered Patents, United States registered Trademarks and United States registered Copyrights (and applications for any of the foregoing), including such Patents, Trademarks and Copyrights set forth on Schedule I, as applicable, and executed by each Grantor owning any such Collateral, have been delivered to the Collateral Agent for recording with the United States Patent and Trademark Office or the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as

11

applicable, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in respect of all Collateral consisting of Patents, Trademarks and Copyrights in which a security interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Collateral consisting of registered or applied for Patents, Trademarks and Copyrights acquired or developed by a Grantor after the date hereof).

SECTION 4.02.    Names, Type and Jurisdiction of Organization, Organizational Identification Numbers.  As of the date hereof, each Grantor hereby represents and warrants that Schedule II hereto sets forth (i) its exact legal name, (ii) its type of organization, (iii) its jurisdiction of organization, (iv) its tax identification number, (v) its organizational identification number and (vi) the address of its chief executive office.

SECTION 4.03.    Enforceability and Perfection.  The Security Interest constitutes (i) a legal and valid security interest in all the Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings of UCC-1 financing statements with respect to each Grantor and the filings described in Section 4.01(b), a perfected security interest in all Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any state thereof or the District of Columbia) pursuant to the UCC and (iii) subject to the filings described in Section 4.01(b), a security interest that shall be perfected in all Collateral in which a security interest may be perfected upon the receipt and recording of an Intellectual Property Security Agreement with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three-month period after the date hereof pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one-month period after the date hereof pursuant to 17 U.S.C. § 205.

SECTION 4.04.    Deposit Accounts and Securities Accounts. Set forth on Schedule IV (as such Schedule may be updated from time to time subject to Section 6.17 of the Credit Agreement and provided that Grantors comply with Section 6.17 of the Credit Agreement) is a listing of all of Grantors' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or and Securities Accounts maintained with such Person.

**ARTICLE V**

**COVENANTS**

SECTION 5.01.    Protection of Security.  Each Grantor shall, at its own cost and expense, take any and all actions reasonably necessary to defend its right, interest and title in and to the Collateral against all Persons and to defend the Security Interest of the Collateral Agent in the Collateral and the first priority thereof (other than any Term Priority Collateral) against any Lien other than Permitted Liens, except where failure to do so is otherwise permitted (or not prohibited) under the Credit Agreement.

SECTION 5.02.    Further Assurances.  Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments, agreements and documents and take all such actions, in each case as the Collateral Agent may from time to time reasonably request to assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby and by the other Loan Documents, subject in all respects to the limitations set forth in the Credit Agreement and the other Loan Documents.

#90494261v8

SECTION 5.03.    Taxes; Encumbrances.  During the continuance of an Event of Default, the Collateral Agent at its option may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Collateral except to the extent the same constitute Permitted Liens, and may pay for the maintenance and preservation of the Collateral to the extent any Grantor fails to do so as required by this Agreement, and each Grantor jointly and severally agrees to reimburse the Collateral Agent for any payment made or any expense incurred by the Collateral Agent pursuant to the foregoing authorization in accordance with Sections 11.04 and 11.05 of the Credit Agreement; provided, however, that nothing in this Section 5.03 shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, liens, security interests or other encumbrances or maintenance or preservation as set forth herein or in the other Loan Documents.

SECTION 5.04.    Continuing Obligations of the Grantors.  As between the Grantors and the Collateral Agent, each Grantor shall remain liable to observe and perform in all material respects all the conditions and obligations to be observed and performed by it under each material contract, agreement or instrument relating to the Collateral.

SECTION 5.05.    Liens on Collateral.  Except as permitted under the Credit Agreement, none of the Grantors shall grant any Lien in respect of the Collateral other than Liens securing the Secured Obligations and Permitted Liens.

SECTION 5.06.    Insurance.  Each Grantor irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent), until the occurrence of the Termination Date, as such Grantor's true and lawful agent (and attorney in fact) for the purpose, during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.  So long as no Event of Default has occurred and is continuing, all actions to be taken with respect to the making, settling and adjusting of claims under insurance policies may be taken by the Grantors without any requirement of participation or consent from the Collateral Agent.

SECTION 5.07.    Certain Covenants Regarding Intellectual Property.

(a)    Except to the extent otherwise permitted under the Credit Agreement, with respect to each item of its Intellectual Property, (i) each Grantor shall take, at its expense, all commercially reasonable steps, including, without limitation, with respect to Intellectual Property owned by such Grantor that is registered or for which an application for registration is pending, in the U.S. Patent and Trademark Office and the U.S. Copyright Office, to maintain the validity and enforceability of such Intellectual Property and (ii) unless using Grantor's commercially reasonable judgment it is prudent to do so, no Grantor shall discontinue use of or otherwise abandon any of its Intellectual Property, or abandon any right to file an application for any Patent, Trademark, or Copyright.

(b)    Except to the extent otherwise permitted under the Credit Agreement, and unless using Grantor's commercially reasonable judgment it is prudent to do so, each Grantor shall use proper statutory notice as required by law in connection with its use of its Intellectual Property and no Grantor shall do or knowingly omit to do any act whereby any of its Intellectual Property is likely to lapse or become invalid or unenforceable or placed in the public domain.

#90494261v8

(c)     In the event that any Grantor, either itself or through any agent, employee, licensee or designee acting on behalf of such Grantor, files an application for or, following the Closing Date (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), becomes the registered owner of any United States Registered Patent, Trademark or Copyright or becomes the exclusive licensee of a United States Registered Copyright pursuant to a Copyright License, such Grantor shall notify the Collateral Agent on or before the date on which financial statements are required to be delivered pursuant to Section 6.01(a) or (b), as applicable, of the Credit Agreement for the fiscal quarter in which the relevant event occurred (or such longer period as the Collateral Agent may reasonably agree), and execute and deliver to the Collateral Agent, at such Grantor's expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, as the Collateral Agent may reasonably request and require to evidence the Collateral Agent's security interest in such registered Patent, Trademark, Copyright (or application therefor) or Copyright License.  Each Grantor hereby appoints the Collateral Agent as its attorney in fact to execute and file such writings solely for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; such power, being coupled with an interest, is irrevocable until the Termination Date.

(d)     Upon and during the continuance of an Event of Default, each Grantor shall upon the written request of the Collateral Agent use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor of each Copyright License, Patent License or Trademark License to effect the assignment (during the continuance of such Event of Default) of all of such Grantor's right, title and interest thereunder to the Collateral Agent or its designee.

SECTION 5.08.     No Conflicts, Consents, etc.  In the event that an Event of Default has occurred and is continuing and the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney in fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the reasonable request of the Collateral Agent, such Grantor agrees to use commercially reasonable efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 5.09.     Letter-of-Credit Rights.  If any Grantor is at any time a beneficiary under a letter of credit with an aggregate face amount in excess of $500,000 now or hereafter issued in favor of such Grantor that is not a Supporting Obligation with respect to any of the Collateral, such Grantor shall promptly notify the Collateral Agent thereof and, at the written request and option of the Collateral Agent, such Grantor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, use commercially reasonable efforts to arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under such letter of credit, with the Collateral Agent agreeing that the proceeds of any drawing under such letter of credit are to be paid to the applicable Grantor unless an Event of Default has occurred and is continuing.

SECTION 5.10.     Commercial Tort Claims.  If any Grantor shall at any time hold or acquire a Commercial Tort Claim in an amount reasonably estimated to exceed $500,000, such Grantor shall promptly notify the Collateral Agent thereof in a writing signed by such Grantor, including a summary description of such claim, and Schedule III shall be deemed to be supplemented to include such description of such commercial tort claim as set forth in such writing.

SECTION 5.11.     Collateral Access Agreements.  Each Grantor shall use commercially reasonable efforts to obtain a Collateral Access Agreement, from the lessor of each leased property, mortgagee of owned property or bailee or consignee with respect to any warehouse, processor or

#90494261v8

converter facility or other location where Collateral with an aggregate value in excess of $500,000 is stored or located, which agreement or letter shall provide access rights, contain a waiver or subordination of all Liens or claims that the landlord, mortgagee, bailee or consignee may assert against the Inventory at that location, and shall otherwise be reasonably satisfactory in form and substance to the Collateral Agent; provided that no such Collateral Access Agreement shall be required prior to the date that is 90 days (or such longer period as the Collateral Agent may agree in its sole discretion) following the Closing Date. Such Grantor shall timely and fully pay and perform in all material respects its obligations under all leases and other agreements with respect to each leased location or third party warehouse where any Collateral having value in excess of $100,000 is or may be located.

## ARTICLE VI

## REMEDIES

SECTION 6.01.     Remedies upon Default.

(a)     After the occurrence and during the continuance of an Event of Default, it is agreed that the Collateral Agent shall have the right to take any of or all the following actions at the same or different times: (a) with respect to any Collateral consisting of Intellectual Property, to exercise the rights expressly granted to it pursuant to Section 6.03(a) hereof, subject to Section 6.03(b) hereof, and (b) with or without legal process and with or without prior demand for performance, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral and, generally, to exercise any and all rights afforded to a secured party under the UCC or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Collateral Agent shall have the right, subject to the mandatory requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate.  The Collateral Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(b)     To the extent prior notice is required by applicable law, the Collateral Agent shall give the applicable Grantor ten (10) days' prior written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the UCC) of the Collateral Agent's intention to make any sale or other disposition of such Grantor's Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine.  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall reasonably determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time

15

#90494261v8

and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by law, private) sale made pursuant to this Section 6.01, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any Secured Obligation then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.  For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof, the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding any cure of any Event of Default or any repayment of the Obligations following the entry into such an agreement.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver.  Each Grantor acknowledges that any sale pursuant to the provisions of this Section 6.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-611 of the UCC.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, the Grantors shall remain liable for the deficiency.

(c)     At any time upon the occurrence and during the continuance of an Event of Default, the Collateral Agent or its designee may (i) make direct verification from Account Debtors with respect to any or all Accounts that are part of the Collateral, (ii) notify Account Debtors of any Grantor that the Accounts, Chattel Paper, Letters of Credit, Letter-of-Credit Rights, Instruments or Documents of such Grantor that are part of the Collateral have been assigned to the Collateral Agent, for the benefit of the Secured Parties, or that the Collateral Agent has a security interest therein, or (iii) collect the Accounts, Chattel Paper, Letters of Credit, Letter-of-Credit Rights, Instruments and Documents of any Grantor that are part of the Collateral directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

(d)     At any time upon the occurrence and during the continuance of an Event of Default, the Collateral Agent may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person, except to the extent expressly provided in the Credit Agreement or any other Loan Document (which notice is hereby expressly waived to the maximum extent permitted by the UCC or any other applicable law), (i) with respect to any Grantor's Deposit Accounts in which the Collateral Agent's Security Interest is perfected by control under Section 9-104 of the UCC, instruct the bank maintaining such Deposit Account for the applicable Grantor to pay the balance of such Deposit Account to or for the benefit of the Collateral Agent, and (ii) with respect to any Grantor's Securities Accounts in which the Collateral Agent's Security Interest is perfected by control under Section 9-106 of the UCC, instruct the securities intermediary maintaining such Securities Account for the applicable Grantor to (A) transfer any cash in such Securities Account to or for the benefit of the Collateral Agent, or (B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of the Collateral Agent.

SECTION 6.02.      Application of Proceeds.  The proceeds of any sale of Collateral pursuant to Section 6.01, as well as any Collateral consisting of cash required to be applied by the terms of this Agreement, shall be applied by the Collateral Agent in accordance with Section 9.03 of the Credit Agreement.

SECTION 6.03.      Grant of License to Use Intellectual Property.

(a)      Subject to clause (b) below, solely for the purposes of the exercise by the Collateral Agent of its rights and remedies under this Article at and during such time as the Collateral Agent shall be lawfully or contractually entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent an irrevocable, royalty-free, nonexclusive license to make, have made, use, sell, copy, distribute, perform, reproduce, publicly display, make derivative works and otherwise exploit any of the Collateral consisting of Intellectual Property now owned or hereafter acquired by such Grantor, solely to the extent permissible under the Licenses and applicable Laws relevant to such Collateral (a "Permitted Purpose"), and such license shall include reasonable access to all media in which any of the licensed items may be recorded or stored and to all Computer Software used for the compilation or printout thereof.  The Collateral Agent shall comply with the terms of all Licenses and applicable Laws in connection with its exercise of this license and shall obtain all necessary consents and pay all royalties and other compensation due pursuant to such Licenses to the extent arising from its exercise of this license.

(b)      The use of such license by the Collateral Agent may be exercised, at the option of the Collateral Agent, solely after the occurrence and during the continuation of an Event of Default, and only for a Permitted Purpose.  Such license shall be irrevocable until the Termination Date.  Nothing in this Section grants, or shall require a Grantor to grant, with respect to its property any license that is prohibited by applicable Laws or would constitute a breach by a Grantor of any third party contract, license, agreement, instrument or other document concerning such property.  Notwithstanding the existence of any Event of Default, any license rights granted under the Collateral under this Section are subject to all other earlier license rights granted by any Grantor to any third party that are not otherwise prohibited by this Agreement.  In the event the license set forth in this Section is exercised with regard to any Trademarks, then the following shall apply: (i) all goodwill arising from any licensed or sublicensed use of any Trademark shall inure to the benefit of the owners of such Trademarks; and (ii) the licensed or sublicensed Trademarks shall only be used by the Collateral Agent and its sublicensees in association with goods or services of a quality and nature consistent with the quality and reputation with which such Trademarks were associated when used by the applicable Grantor prior to the exercise of the license rights set forth herein.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.01.   Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 11.02 of the Credit Agreement.  All communications and notices hereunder to each Grantor shall be given to it in care of the Lead Borrower at the Lead Borrower's address set forth in Section 11.02 of the Credit Agreement.

SECTION 7.02.   Survival of Agreement.   All covenants, agreements, representations and warranties made by any Grantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Collateral Agent and the other Secured Parties and shall survive the making by

17

#90494261v8

the Lenders of the Loans, regardless of any investigation made by the Secured Parties or on their behalf, and shall continue in full force and effect until the Termination Date.

SECTION 7.03.  Binding Effect.  This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective successors and permitted assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective successors and permitted assigns, except that no Grantor shall have the right to assign its rights or obligations hereunder or any interest herein (and any such assignment shall be void) except as permitted by any of the other Loan Documents.

SECTION 7.04.  Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

SECTION 7.05.  GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 7.06.  Waivers; Amendment; Several Agreement; Confidentiality.

(a)  No failure or delay of the Collateral Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provisions of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Grantor in any case shall entitle such Grantor or any other Grantor to any other or further notice or demand in similar or other circumstances

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into among the Lead Borrower, the Collateral Agent and the other Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consents required in accordance with Section 11.01 of the Credit Agreement.

(c)  This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

(d)  The Collateral Agent agrees to maintain the confidentiality of Loan Party Information as provided in Section 11.08 of the Credit Agreement.

SECTION 7.07.  WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS

18

RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 7.07 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 7.08.   Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.  It is understood and agreed among the parties that this Agreement shall create separate security interests in the Collateral securing the Secured Obligations as provided in Section 3.01, and that any determination by any court with jurisdiction that the security interest securing any Secured Obligation or class of Secured Obligations is invalid for any reason shall not in and of itself invalidate the Security Interest securing any other Secured Obligations hereunder.

SECTION 7.09.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or electronic transmission of a .pdf copy or an executed counterpart of this Agreement shall be effective as delivery of an original executed counterpart hereof; provided that original signatures shall be promptly delivered thereafter, it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

SECTION 7.10.   Headings.  Article and section headings used herein are for the purpose of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 7.11.   Jurisdiction; Consent to Service of Process.

(a)     ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT THE COLLATERAL AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER THIS AGREEMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND PARENT,

19

THE LEAD BORROWER AND EACH OTHER GRANTOR HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT.

(b)      Each party to this Agreement irrevocably consents to service of process in the manner provided for in Section 11.02 of the Credit Agreement. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 7.12.    Termination.

(a)      This Agreement and the Security Interest (i) shall automatically terminate on the Termination Date, and (ii) shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment in respect of any Secured Obligation is rescinded or must otherwise be restored by any Secured Party upon any bankruptcy or reorganization of any Grantor or otherwise. Any execution and delivery of termination statements or documents pursuant to this Section 7.12(a) shall be without recourse to or warranty by the Collateral Agent.

(b)      Under the circumstances described in Section 11.10 of the Credit Agreement, the security interest in the Collateral described therein shall be automatically terminated and released without any further action and the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and other documents that such Grantor shall reasonably request to evidence such termination or release and shall return to such Grantor any Collateral owned by such Grantor that is in the Collateral Agent's possession. Any execution and delivery of UCC termination statements and similar documents pursuant to this Section 7.12(b) shall be without recourse to or warranty by the Collateral Agent.

SECTION 7.13.    Additional Grantors. To the extent any Restricted Subsidiary that is a U.S. Domestic Subsidiary shall be required to become a Grantor pursuant to any Loan Document, upon execution and delivery by such Restricted Subsidiary of an instrument in the form of Annex I hereto, such Restricted Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor thereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 7.14.    [Reserved].

SECTION 7.15.    Collateral Agent Appointed Attorney-in-Fact. Each Grantor hereby appoints the Collateral Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable until the Termination Date and is coupled with an interest; provided that the Collateral Agent shall only take any action pursuant to such appointment after the occurrence and during the continuation of an Event of Default. Without limiting the generality of the foregoing, the Collateral Agent shall have the right, after the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor, (a) to receive, endorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give

20

discharges and releases of all or any of the Collateral; (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all monies due or to become due under and by virtue of any Collateral; (d) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (e) to send verifications of Accounts constituting Collateral to any Account Debtor; (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (h) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent with respect to Accounts constituting Collateral; and (i) to use, sell, assign, transfer, license, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the monies due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

SECTION 7.16.  <u>ABL Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this Agreement in any Collateral and the exercise of any right or remedy by the Collateral Agent with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement with the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control.

[Signature Pages Follow]

21

#90494261v8

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

TRICO GROUP HOLDINGS, LLC
TRICO GROUP, LLC
AVM EXPORT, INC.
CARTER FUEL EXPORT, INC.
CARTER FUEL SYSTEMS, LLC
HEATHERTON HOLDINGS, LLC
KTRI HOLDINGS, INC.
KTRI OFFSHORE HOLDINGS, LLC
PREMIER MARKETING GROUP, LLC
STRONGARM, LLC
TRICO HOLDING CORPORATION
TRICO PRODUCTS CORPORATION
TRICO TECHNOLOGIES CORPORATION, as
Grantors

By:_____
      Name:  Stephen Graham
      Title:   Chief Financial Officer, Treasurer and
              Secretary

[Signature Page to ABL Security Agreement]

GOLDMAN SACHS BANK USA, as Collateral Agent

By:_____

Name: C.D. JOHNSTON

Title: Authorized Signatory

[Signature Page to ABL Security Agreement]

Annex I to the
**First Lien Security Agreement**

<u>Form of Supplement to Security Agreement</u>

SUPPLEMENT NO. ___ (this "<u>Supplement</u>") dated as of [_____], to the ABL Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>") dated as of February 2, 2018 among Trico Group, LLC, a Delaware limited liability company (the "<u>Lead Borrower</u>"), Trico Group Holdings, LLC, a Delaware limited liability company ("<u>Parent</u>"), each Subsidiary Guarantor that is a U.S. Domestic Subsidiary and that is a party thereto or may become a party thereto pursuant to <u>Section 7.13</u> of the Security Agreement (together with the Lead Borrower and Parent, the "<u>Grantors</u>") and Goldman Sachs Bank USA ("<u>Goldman Sachs</u>"), as collateral agent (in such capacity, and together with any successors in such capacity, the "<u>Collateral Agent</u>") for the Secured Parties (as defined in the Credit Agreement referred to below).

A.      Reference is made to (a) the ABL Credit Agreement, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Parent, the Lead Borrower, Trico Limited, a limited company organized under the laws of England and Wales (the "<u>UK Borrower</u>"), certain Subsidiaries of Parent party thereto as borrowers from time to time (together with the Lead Borrower and the UK Borrower, the "<u>Borrowers</u>"), the Lenders party thereto and Goldman Sachs, in its capacity as Administrative Agent and Collateral Agent and (b) the ABL Pledge Agreement, dated as of February 2, 2018, among certain Pledgors and the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Pledge Agreement</u>", and together with the Security Agreement, the "<u>Collateral Documents</u>").

B.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement.

C.      Pursuant to <u>Section 6.11</u> of the Credit Agreement (and subject to certain limitations specified therein), certain Wholly-owned U.S. Domestic Subsidiaries (each as defined in the Credit Agreement) are required to enter into the Collateral Documents upon the occurrence of certain events and circumstances specified therein.  The undersigned Subsidiary (the "<u>New Grantor</u>") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a party to the Collateral Documents.

Accordingly, the Collateral Agent and the New Grantor agree as follows:

SECTION 1.    In accordance with <u>Section 6.11</u> of the Credit Agreement, <u>Section 7.13</u> of the Security Agreement and <u>Section 21</u> of the Pledge Agreement, the New Grantor by its signature below becomes a Grantor and Pledgor under each of the Security Agreement and the Pledge Agreement, as applicable, with the same force and effect as if originally named therein as a party thereto and hereby (a) agrees to all terms and provisions of the Security Agreement and the Pledge Agreement applicable to it as a Grantor and Pledgor, as applicable, thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor and Pledgor, as applicable, thereunder are true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualification therein) on and as of the date hereof (after giving effect to this Supplement); it being understood and agreed that any such representation or warranty that expressly refers to an earlier date shall be deemed to refer to the date hereof.  In furtherance of the foregoing, the New Grantor, as security for the payment or performance, as the case may be, in full of the Secured Obligations, does hereby grant to the Collateral Agent (and its successors and permitted assigns), for the benefit of the Secured Parties

#90494261v8

(and their respective successors and permitted assigns), a security interest in all of the New Grantor's right, title and interest in and to the Collateral (as defined in the Security Agreement) of the New Grantor and the Securities Collateral (as defined in the Pledge Agreement) of the New Grantor. Each of the Collateral Documents is hereby incorporated herein in its entirety by reference.

SECTION 2. The New Grantor represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally any by general equitable principles.

SECTION 3. This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Collateral Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Grantor. Delivery of an executed signature page to this Supplement by facsimile transmission or electronic transmission of a .pdf copy or an executed counterpart of this Agreement shall be effective as delivery of a manually executed counterpart of this Supplement.

SECTION 4. Except as expressly supplemented thereby, each of the Collateral Documents shall remain in full force and effect.

SECTION 5. THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6. In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Collateral Documents shall not in any way be affected or impaired thereby (it being understood that the invalidity a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties hereto shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 7.01 of the Security Agreement. All communications and notices hereunder of the New Grantor shall be given to it in care of the Lead Borrower at the Lead Borrower's address as provided in Section 11.02 of the Credit Agreement.

SECTION 8. The New Grantor agrees to reimburse the Collateral Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement, including, subject to the limitations set forth in Section 11.04 of the Credit Agreement, the reasonable fees, other charges and disbursements of external counsel for the Collateral Agent.

#90494261v8

IN WITNESS WHEREOF, the New Grantor has duly executed this Supplement as of the day and year first above written.

[Name of New Grantor]

By:_____

      Name:
      Title:

Schedule I
Intellectual Property

Copyrights:

| Grantor | Name of Copyright | Registration Number | Registration Date |
|---|---|---|---|
| Trico Products Corporation | Conventional "Wiper Motor- Controller" Software Program | TX0007318849 | 9/8/2010 |
| Trico Products Corporation | LIN " Wiper Motor- Controller" Software Program | TX0007417054 | 7/10/2011 |
| Trico Products Corporation | Conventional "wiper- motor controller" software program. TX 7- 318-849. | V3606D589 | 8/3/2011 |
| Trico Products Corporation | Conventional "wiper motor-controller" software program & 1 other title. | V3628D427 | 10/14/2014 |
| Trico Products Corporation | Conventional "Wiper Motor- Controller" & 1 other title. | V9918D934 | 10/6/2014 |
| Trico Products Corporation | Conventional "Wiper Motor-Controller" & 1 other title. | V9918D935 | 10/6/2014 |
| Trico Products Corporation | Conventional "Wiper Motor-Controller" software program and 1 other title. | V9937D081 | 6/6/2016 |
| Trico Products Corporation | Conventional "Wiper Motor-Controller" software program and 1 other titles. | V9937D082 | 6/6/2016 |
| Trico Products Corporation | Conventional "Wiper Motor-Controller" software program and 1 other title. | V9937D281 | 6/6/2016 |

Patents:

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Carter Fuel Systems, LLC | Grounding Device for Brushless Electric Motor | 14588555 | 1/2/15 | 9680355 | 06/13/2017 |

1

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---------|---------------|-------------------|-----------|--------------------|--------------------|
| Carter Fuel Systems, LLC | Self-Cleaning Fuel Pump | 14293759 | 6/2/14 | -- | -- |
| Carter Fuel Systems, LLC | Electrical Diagnostic Tool | 13757297 | 2/1/13 | 9128137 | 09/08/2015 |
| Carter Fuel Systems, LLC | Permanent magnet segment for use with a BLDC motor assembly | 13616909 | 9/14/12 | 8987964 | 03/24/2015 |
| Carter Fuel Systems, LLC | Device for fastening and electrically connecting a circuit board to a motor | 13587558 | 10/4/12 | 9169833 | 10/27/2015 |
| Carter Fuel Systems, LLC | Fuel Pump Assembly With Grounded Plastic Components And Fuel Tank Assembly Therewith And Method Of Construction Thereof | 13447843 | 4/16/12 | 9267473 | 02/23/2016 |
| Carter Fuel Systems, LLC | Fuel Level Sensor for Marine Fuel Vapor Separator External to Unit | 13354373 | 1/20/12 | 9404454 | 08/02/2016 |
| Carter Fuel Systems, LLC | Alcohol Detector and Method | 1332959 | 12/21/11 | 8973426 | 03/10/2015 |
| Carter Fuel Systems, LLC | Marine Fuel System with Spill Control Feature | 13242555 | 9/23/11 | 9151255 | 10/06/2015 |
| Carter Fuel Systems, LLC | Diesel Fuel System with Advanced Priming | 13008696 | 1/18/11 | 9316187 | 04/19/2016 |
| Carter Fuel Systems, LLC | Thermoelectric Cooled Pump | 12938975 | 11/3/10 | 9234483 | 01/12/2016 |

2

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Carter Fuel Systems, LLC | BLDC Motor And Pump Assembly With Encapsulated Circuit Board | 11435958 | 5/17/06 | 7411326 | 8/12/08 |
| Carter Fuel Systems, LLC | BLDC Motor Assembly | 11746086 | 5/9/07 | 7847457 | 12/7/10 |
| Carter Fuel Systems, LLC | Electric Fuel Pump Tester And Method | 13213587 | 8/19/11 | 8494706 | 7/23/13 |
| Carter Fuel Systems, LLC | Electric Fuel Pump Testing Method And Apparatus | 12412570 | 3/27/09 | 7997127 | 8/16/11 |
| Carter Fuel Systems, LLC | Electrical Connector Integrity Tester | 11959552 | 12/19/07 | 7710121 | 5/4/10 |
| Carter Fuel Systems, LLC | Fuel Rail Vent System | 12478980 | 6/5/09 | 8042522 | 10/25/11 |
| Carter Fuel Systems, LLC | Fuel Transfer Pump And Control | 09647645 | 10/3/00 | 6382225 | 5/7/02 |
| Carter Fuel Systems, LLC | Fuel Transfer Pump and Control | 09893940 | 6/28/01 | 6494226 | 12/17/02 |
| Carter Fuel Systems, LLC | Fuel Transfer Pump and Control | 10273486 | 10/18/02 | 6792966 | 9/21/04 |
| Carter Fuel Systems, LLC | Fuel Vapor Separator | 11857575 | 9/19/07 | 7431021 | 10/7/08 |
| Carter Fuel Systems, LLC | Fuel Vapor Separator For Internal Combustion Engine | 10819050 | 4/6/04 | 6857419 | 2/22/05 |
| Carter Fuel Systems, LLC | In-Tank Water Control | 09765009 | 1/18/01 | 6435142 | 8/20/02 |

3

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---------|----------------|--------------------|-----------| --------------------|-------------------|
| Carter Fuel Systems, LLC | Marine Fuel Delivery System With Plastic Housing And Method Of Construction Thereof | 12768398 | 4/27/10 | 8459235 | 6/11/13 |
| Carter Fuel Systems, LLC | Fuel Vapor Separator With Evaporative Emissions Chamber And Marine Fuel System And Engine Therewith | 12548813 | 8/27/09 | 8166955 | 5/1/12 |
| Carter Fuel Systems, LLC | Marine Fuel Vapor Separator With Vent Control Device | 11538473 | 10/4/06 | 7503314 | 3/17/09 |
| Carter Fuel Systems, LLC | Marine Vapor Separator With Bypass Line | 10933748 | 9/3/04 | 7168414 | 1/30/07 |
| Carter Fuel Systems, LLC | Marine-Vapor Separator | 09375727 | 8/17/99 | 6257208 | 7/10/01 |
| Carter Fuel Systems, LLC | Method Of Making A BLDC Motor Assembly | 12942264 | 11/9/10 | 8291574 | 10/23/12 |
| Carter Fuel Systems, LLC | Snap Assembly Decoupled Float Vapor Vent Apparatus | 12630538 | 12/3/09 | 8528526 | 9/10/13 |
| Carter Fuel Systems, LLC | System And Method For Manufacturing A Brushless DC Motor Fluid Pump | 11461505 | 8/1/06 | 7931448 | 4/26/11 |
| Carter Fuel Systems, LLC | Two Stage Pulse Pump | 09268479 | 3/16/99 | 6158972 | 12/12/00 |

4

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Carter Fuel Systems, LLC | Vapor Vent Control Apparatus, System And Outboard Marine Engine Therewith | 12604538 | 10/23/09 | 8371271 | 2/12/13 |
| Carter Fuel Systems, LLC | Voltage Compensating Piston Fuel Pump And Fuel Delivery System Therewith | 12974218 | 12/21/10 | 8657586 | 2/25/14 |
| Carter Fuel Systems, LLC | Water Cooled Electric Fuel Pump For Marine Propulsion | 09307665 | 5/10/99 | 6322410 | 11/27/01 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Lift Assist And Damper Arrangement | 13046959 | 3/14/11 | 9834971 | 12/05/17 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Gas Spring With Integrated Lead Screw Drive | 10883202 | 7/1/04 | 8118285 | 2/21/12 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Seal | 09257333 | 2/25/99 | 6179297 | 1/30/01 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Linear Actuator For A Powered Vehicle Lift Gate | 10056642 | 10/26/01 | 6707173 | 3/16/04 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Vehicle Liftgate Control System | 10948908 | 9/24/04 | 7034485 | 4/25/06 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Sealed Gas Spring Cover | 11386280 | 3/22/06 | 8689953 | 4/8/14 |

5

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | Selectively Fixed Damper | 14461771 | 08/18/2014 | -- | -- |
| Trico Products Corporation | Working Of A Metallic Strip Under Heating and Tensile Force | 09134561 | 8/14/98 | 6063216 | 5/16/00 |
| Trico Products Corporation | Windscreen Wiper | 09806807 | 6/25/01 | 6836925 | 1/4/05 |
| Trico Products Corporation | Windscreen Wiper | 09806920 | 6/25/01 | 6951043 | 10/4/05 |
| Trico Products Corporation | Windscreen Wiper | 09806921 | 6/25/01 | 6799348 | 10/5/04 |
| Trico Products Corporation | Beam Blade Wiper Assembly Having Improved Coupler | 09611189 | 7/6/00 | 6550096 | 4/22/03 |
| Trico Products Corporation | Beam Blade Wiper Assembly Having Improved Windlift Characteristics | 09610499 | 7/6/00 | 6675433 | 1/13/04 |
| Trico Products Corporation | Cantilevered Beam-Blade Windshield-Wiper Assembly | 09785784 | 2/16/01 | 6651292 | 11/25/03 |
| Trico Products Corporation | Method and Apparatus for Flexible Manufacturing a Discrete Curved Product from Feed Stock | 09900075 | 7/6/01 | 6622540 | 9/23/03 |
| Trico Products Corporation | Tandem Windshield Wiper System with Direct Drive Motor | 10839358 | 5/5/04 | 7389561 | 6/24/08 |

6

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | Tandem Windshield Wiper System with Bellcrank Linkage | 10839063 | 5/5/04 | 7392565 | 7/1/08 |
| Trico Products Corporation | Direct Drive Windshield Wiper Assembly | 11228703 | 9/16/05 | 7171718 | 2/6/07 |
| Trico Products Corporation | Direct Drive Windshield Wiper Assembly | 11229752 | 9/19/05 | 7676880 | 3/16/10 |
| Trico Products Corporation | Universal Wiper Adaptor and Wiper Blade Assembly Incorporating Same | 10637835 | 8/8/03 | 7055207 | 6/6/06 |
| Trico Products Corporation | Electric Motor Having Convex High-Speed Brush | 11089901 | 3/25/05 | 7265475 | 9/4/07 |
| Trico Products Corporation | Breakaway Mounting Bracket Assembly for a Wiper System | 12576365 | 10/9/09 | 7823246 | 11/2/10 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly Having an Airfoil | 11345930 | 2/2/06 | 7861363 | 1/4/11 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly Having an Airfoil | 12587958 | 10/15/09 | 8024836 | 9/27/11 |
| Trico Products Corporation | Breakaway Mounting Bracket Assembly for a Wiper System | 11397049 | 4/3/06 | 7805799 | 10/5/10 |
| Trico Products Corporation | Wiper Coupler and Wiper Assembly Incorporating Same | 11397048 | 4/3/06 | 7774892 | 8/17/10 |

7

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---------|----------------|-------------------|-----------|--------------------|--------------------|
| Trico Products Corporation | Wiper System Having a Pin-Style Wiper Arm and Wiper Assembly | 11585531 | 10/24/06 | 7802341 | 9/28/10 |
| Trico Products Corporation | Wiper Assembly Having Side-Saddle Coupler | 12062976 | 4/4/08 | 8042218 | 10/25/11 |
| Trico Products Corporation | Collapsible Pivot Body for a Windshield Wiper System | 12587858 | 10/14/09 | 8516647 | 8/27/13 |
| Trico Products Corporation | Windshield Wiper Assembly Having an Optimized Airfoil | 12660414 | 2/26/10 | 8336158 | 12/25/12 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly | 12779278 | 5/13/10 | 8261403 | 9/11/12 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly | 12779290 | 5/13/10 | 8397341 | 3/19/13 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly | 13676328 | 11/14/12 | 8555456 | 10/15/13 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly | 13676361 | 11/14/12 | 8490239 | 7/23/13 |
| Trico Products Corporation | Wiper Coupler and Wiper Assembly Incorporating Same | 12819363 | 6/21/10 | 8468641 | 6/25/13 |
| Trico Products Corporation | Wiper Coupler and Wiper Assembly Incorporating Same | 13845337 | 3/18/13 | 8713747 | 5/6/14 |

8

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | Wiper Arm Having Swivel Cover Allowing Access to Head and Pivot Shaft | 13070897 | 3/24/11 | 8205292 | 6/26/12 |
| Trico Products Corporation | Windshield Wiper Package | 29369739 | 9/13/10 | D686912 | 7/30/2013 |
| Trico Products Corporation | Windshield Wiper Blade | 29471929 | 11/06/13 | D702617 | 4/15/14 |
| Trico Products Corporation | Wiper Package | 29356084 | 2/19/10 | D658494 | 5/1/12 |
| Trico Products Corporation | Windshield Wiper Arm | 29402266 | 9/22/11 | D664491 | 7/31/12 |
| Trico Products Corporation | Windshield Wiper Arm | 29409590 | 12/26/11 | D664911 | 8/7/12 |
| Trico Products Corporation | Wiper Blade Airfoil | 29437291 | 11/15/12 | D702616 | 4/15/14 |
| Trico Products Corporation | Wiper Blade Package | 29437309 | 11/15/12 | D692750 | 11/5/13 |
| Trico Products Corporation | Wiper Blade Coupler | 29437314 | 11/15/12 | D702618 | 4/15/14 |
| Trico Products Corporation | Wiper Blade | 29437319 | 11/15/12 | D704126 | 5/6/14 |
| Trico Products Corporation | Wiper Blade | 29437312 | 11/15/12 | D704618 | 5/13/14 |
| Trico Products Corporation | Pivot Body for Windshield Wiper System | 12946376 | 11/15/10 | 8745810 | 6/10/14 |
| Trico Products Corporation | Universal Coupler for a Beam Blade Windshield Wiper Assembly | 13232514 | 9/14/2011 | 8938847 | 01/27/2015 |

9

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | Universal Coupler for a Beam Blade Windshield Wiper Assembly | 13232627 | 9/14/2011 | 9003596 | 04/14/2015 |
| Trico Products Corporation | Beam Blade Windshield Wiper Assembly Having a Fluid Manifold Mounting System | 13239501 | 9/22/2011 | 9045114 | 06/02/2015 |
| Trico Products Corporation | Windshield Wiper Having a Coupler with Positive Locking Features | 13288578 | 11/3/2011 | 8881338 | 11/11/2014 |
| Trico Products Corporation | Beam Blade Wiper Assembly Having Self-Locking End Cap | 13302339 | 11/22/2011 | 8857009 | 10/14/2014 |
| Trico Products Corporation | Wiper Coupler Assembly and Wiper Assembly Incorporating Same | 13677423 | 11/15/2012 | 9221429 | 12/29/2015 |
| Trico Products Corporation | Packaging Assembly for Wiper Assembly | 13677540 | 11/15/2012 | 8800769 | 08/12/2014 |
| Trico Products Corporation | Wiper Coupler and Adaptor and Wiper Assembly Incorporating Same | 13693568 | 12/4/2012 | 9533655 | 01/03/2017 |
| Trico Products Corporation | Holder Assembly for Wiper Assemblies | 13723415 | 12/21/2012 | -- | -- |
| Trico Products Corporation | Wiper Coupler Adaptor and Wiper Assembly Incorporating Same | 13733458 | 1/3/2013 | 9260084 | 02/16/2016 |

10

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---------|----------------|--------------------|-----------|---------------------|-------------------|
| Trico Products Corporation | Wiper Arm Assembly Having Pivotal Cover Allowing Access to Pivot Shaft | 13733523 | 1/3/2013 | 9260082 | 02/16/2016 |
| Trico Products Corporation | Heated Wiper Assembly | 13869202 | 4/24/2013 | 9248808 | 02/02/2016 |
| Trico Products Corporation | Mounting Assembly for Wiper Blade and Wiper Arm | 13870590 | 4/25/2013 | 9616854 | 04/11/2017 |
| Trico Products Corporation | Mounting Assembly for Wiper Blade and Wiper Arm | 13875457 | 5/2/2013 | 9227599 | 01/05/2016 |
| Trico Products Corporation | Windshield Wiper Assembly | 13910350 | 6/05/2013 | 8819889 | 09/02/2014 |
| Trico Products Corporation | Universal Coupler Assembly and Wiper Assembly Incorporating the Same | 14321872 | 7/2/14 | 9771052 | 09/26/2017 |
| Trico Products Corporation | Wiper System Having Resilient Interface Assembly for Worm Driven Reduction Gear Motor | 14092229 | 11/27/2013 | 9731683 | 08/15/2017 |
| Trico Products Corporation | Coupler Assembly for Wiper Assembly | 14093987 | 12/2/2013 | 9493140 | 11/15/2016 |
| Trico Products Corporation | Universal Coupler for a Beam Blade Windshield Wiper Assembly | 14094078 | 12/2/2013 | 9434354 | 10/06/2016 |

11

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | End Cap for Retaining Wiper Element of Wiper Assembly | 14094831 | 12/3/2013 | 9744945 | 08/29/2017 |
| Trico Products Corporation | End Cap for Wiper Assembly | 14107128 | 12/16/2013 | -- | -- |
| Trico Products Corporation | Wiper Motor Drive System Having Breakaway Clutch | 14174124 | 2/06/2014 | 9604602 | 03/28/2017 |
| Trico Products Corporation | Wiper Adaptor and Wiper Assembly Incorporating Same | 14231907 | 4/1/2014 | 9539987 | 01/10/2017 |
| Trico Products Corporation | Wiper Adaptor and Wiper Assembly Incorporating Same | 14231951 | 4/1/2014 | 9434355 | 10/06/2016 |
| Trico Products Corporation | Motor Assembly and Method of Biasing the Same | 14705129 | 5/6/15 | 9709155 | 07/18/2017 |
| Trico Products Corporation | Wiper Assembly Having an End Cap | 14289902 | 5/29/2014 | 9421951 | 08/23/2016 |
| Trico Products Corporation | Wiper Adaptor and Wiper Assembly Incorporating Same | 14289813 | 5/29/2014 | 9663071 | 05/30/2017 |
| Trico Products Corporation | Method of Creating Spherical Bushing Geometry in Injection Molded Brush Cartridge | In Development | -- | -- | -- |
| Trico Products Corporation | Package | 29390266 | 4/22/2011 | D744331 | 12/01/2015 |

12

#90536818v3

| Grantor | Name of Patent | Application Number | File Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | Wiper Coupler Adapter And Wiper Assembly Incorporating Same | 15043934 | 02/15/2016 | -- | -- |
| Trico Products Corporation | Wiper Adapter and Wiper Assembly Incorporating The Same | 14757739 | 12/23/2015 | -- | -- |
| Trico Products Corporation | Wiper adapter and wiper assembly incorporating the same | 14757740 | 12/23/2015 | -- | -- |
| Trico Products Corporation | Windshield wiper having a coupler with positive locking features | 14515758 | 10/16/2014 | 9731685 | 08/15/2017 |
| Trico Products Corporation | Fuel Pump Assembly With Grounded Plastic Components And Fuel Tank Assembly Therewith And Method Of Contruction Thereof | 13447843 | 4/16/2012 | 9267473 | 2/23/2016 |

Trademarks:

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| CARTER FUEL SYSTEMS, LLC | CARTER | 73409563 | 1/17/83 | 1307664 | 12/4/84 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | STRONGARM  STRONGARM | 77463000 | 5/1/08 | 3649551 | 7/7/09 |

13

#90536818v3

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | STRONGARM | 77462783 | 5/1/08 | 3649549 | 7/7/09 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | MIGHTY LIFT! | 78728252 | 10/6/2005 | 3455341 | 6/24/2008 |
| Strongarm, LLC (registered in the name of AVM Industries, LLC) | MIGHTY LIFT! | 87420525 | 4/21/2017 | 5335225 | 11/14/2017 |
| AVM Industries, LLC | AVM | 87227516 | 11/5/2016 | 5367669 | 1/2/2018 |
| Trico Products Corporation | ALL WEATHER (stylized letters) | 75409333 | 12/22/97 | 2299346 | 12/14/99 |
| Trico Products Corporation | EXACT FIT | 76046065 | 5/11/00 | 2575252 | 6/4/02 |
| Trico Products Corporation | TRICO INSITES | 85598836 | 4/16/12 | 4202550 | 9/4/12 |
| Trico Products Corporation | TRICO ICE | 85528729 | 1/30/12 | 4273359 | 1/8/13 |
| Trico Products Corporation | TRICO INSTINCT | 86232263 | 3/26/14 | 4664872 | 12/30/2014 |
| Trico Products Corporation | XTRACLEAR | 85666246 | 7/1/12 | 4401380 | 9/10/13 |
| Trico Products Corporation | TRICO ONYX | 85963710 | 6/19/13 | 4470690 | 1/21/14 |
| Trico Products Corporation | TRICO SENTRY | 86022040 | 7/29/13 | 4585882 | 8/12/2014 |
| Trico Products Corporation | TRICO VIRTUAL WIPER SPECIALIST | 86105848 | 10/30/13 | 4983639 | 6/21/2016 |

14

#90536818v3

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | GLOBAL I (word mark) | 78011589 | 6/7/00 | 2560433 | 4/9/02 |
| Trico Products Corporation | INNOVISION | 78437495 | 6/18/04 | 3083676 | 4/18/06 |
| Trico Products Corporation | NEOFORM | 77010092 | 9/28/06 | 3294538 | 9/18/07 |
| Trico Products Corporation | NU-VISION (word mark) | 74414473 | 7/19/1993 | 1830279 | 4/12/94 |
| Trico Products Corporation | OPTIMIZER | 74392841 | 5/20/1993 | 1877162 | 1/31/95 |
| Trico Products Corporation | RAINGUARD (word mark) | 74345587 | 1/4/1993 | 1846190 | 7/19/94 |
| Trico Products Corporation | ROBERK (word mark) | 76006435 | 3/21/00 | 2438477 | 3/27/01 |
| Trico Products Corporation | SWIFT | 77715084 | 4/16/09 | 3782567 | 4/27/10 |
| Trico Products Corporation | THE FOREMOST IN WIPER TECHNOLOGY | 77012664 | 10/03/06 (effective filing date 5/2/07 due to amendment to Supp register) | 3266549 Supplemental Register | 7/17/07 |
| Trico Products Corporation | TRICO (word mark) | 75536768 | 8/17/98 | 2292526 | 11/16/99 |
| Trico Products Corporation | TRICO (and pyramid design, without border) | 73213249 | 4/26/79 | 1,200,365 | 7/6/82 |
| Trico Products Corporation | TRICO (and windshield design with little car) | 71529725 | 7/26/47 | 507812 | 3/22/49 |
| Trico Products Corporation | TRICO (stylized letters) | 71170909 | 10/18/22 | 167037 | 4/24/23 |

15

#90536818v3

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | TRICO FLEX | 77714971 | 4/16/09 | 3779335 | 4/20/10 |
| Trico Products Corporation | TRICO VISIONALL (word mark) | 75249073 | 2/27/97 | 2179565 | 8/4/98 |
| Trico Products Corporation | HIGHGLIDE | 85366348 | 7/8/11 | 4176978 | 7/17/12 |
| Trico Products Corporation | TRICO WIPER SYSTEMS: INNOVATIONS SEEN CLEAR ACROSS THE GLOBE | 76199303 | 1/12/01 | 2630493 | 10/8/02 |
| Trico Products Corporation | TSN Logo | 76575289 | 2/12/04 | 2980567 | 8/2/05 |
| Trico Products Corporation | VISIONALL | 77704967 | 4/2/09 | 3698542 | 10/20/09 |
| Trico Products Corporation | WIPER BLADES THAT JUST CLICK ON EASY | 78482595 | 9/13/04 | 3011377 | 11/1/05 |
| Trico Products Corporation | Wiper World Design | 75295052 | 5/20/97 | 2217868 | 1/12/99 |
| Trico Products Corporation | WORLD CLASS (word mark) | 75686893 | 4/20/99 | 2750687 | 8/12/03 |
| Trico Products Corporation | DUAL-SHIELD | 77961929 | 3/18/10 | 3963165 | 5/17/11 |
| Trico Products Corporation | ENGINEERED BY TRICO | 77961984 | 3/18/10 | 3963168 | 5/17/11 |
| Trico Products Corporation | MEMORY CURVE STEEL | 77832175 | 9/22/09 | 3986390 | 6/28/11 |
| Trico Products Corporation | TRICO (new logo) | 85071490 | 6/25/10 | 3999585 | 7/19/11 |
| Trico Products Corporation | TRICO CHILL | 85118315 | 8/30/10 | 3959966 | 5/10/11 |

16

#90536818v3

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---------|-------------------|--------------------|-------------|---------------------|-------------------|
| Trico Products Corporation | TRICO FACTORY REPLACEMENT CENTER | 85197248 | 12/14/10 | 4199254 | 8/28/12 |
| Trico Products Corporation | FOR THE BEST VIEW ALL AROUND YOU | 77982581 | 3/5/10 | 4053667 | 11/8/11 |
| Trico Products Corporation | TRICO FORCE | 85238146 | 2/9/11 | 4094644 | 1/31/12 |
| Trico Products Corporation | TRICO SEEING YOU THROUGH | 85084721 | 7/14/10 | 4013718 | 8/16/11 |
| Trico Products Corporation | TRICO SENSE | 85084692 | 7/14/10 | 4007438 | 8/2/11 |
| Trico Products Corporation | TRICO TECH | 77831351 | 9/21/09 | 3877920 | 11/16/10 |
| Trico Products Corporation | TRICO VIEW | 77981292 | 12/1/09 | 3939063 | 3/29/11 |
| Trico Products Corporation | TRICO VIEW | 85293965 | 4/13/11 | 4455407 | 12/24/13 |
| Trico Products Corporation | VORTEC | 85327240 | 5/23/11 | 4140278 | 5/8/12 |
| Trico Products Corporation | SHIELD | 85184460 | 11/24/10 | 3989595 | 7/5/11 |
| Trico Products Corporation | ALL SEASON PLUS | 75535540 | 8/23/98 (convention priority 5/6/98 Canada) | 2354612 | 6/6/00 |
| Trico Products Corporation | METALIST TRIDON (stylized words/Tridon in small print) | 74578643 | 9/26/94 | 1935187 | 11/14/95 |
| Trico Products Corporation | METALIST | 74526428 | 5/19/94 | 1968886 | 4/16/96 |

17

#90536818v3

| Grantor | Name of Trademark | Application Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| Trico Products Corporation | RAINPRO & Design | 74500760 | 3/16/94 (convention priority - Canada) | 1923542 | 10/3/95 |
| Trico Products Corporation | THIN REPLACEMENT REFILL TRIDON (and design) | 75053853 | 2/5/96 | 2024029 | 12/17/96 |
| Trico Products Corporation | TRIDON | 75041700 | 1/11/96 | 2022109 | 12/10/96 |
| Trico Products Corporation | TRICO RAIN PRO | 87014604 | 4/26/2016 | -- | -- |
| Trico Products Corporation | SELL UP, SURF'S UP | 86749881 | 9/8/2015 | 5083420 | 11/15/2016 |
| Trico Products Corporation | SEEING YOU THROUGH | 86645000 | 5/29/2015 | 4880932 | 1/5/2016 |
| Trico Products Corporation | TRICO | 87178893 | 10/21/2016 | -- | -- |
| Trico Products Corporation | TRICO WINTEREDGE | 87294978 | 1/10/17 | -- | -- |
| Trico Products Corporation | TRICO ULTRA | 87442066 | 5/9/2017 | -- | -- |
| Trico Products Corporation | TRICOPRO | 87621196 | 9/25/2017 | -- | -- |
| Trico Products Corporation | TRICO SHIELD | 87672908 | 11/6/2017 | -- | -- |

Intellectual Property Licenses:

1. Consulting Services Agreement between Trico Products Corporation and Adriaan Retief Swanepoel, an individual ("Swanepoel"), dated August 13, 1998, and Inventor Agreement between Trico Products Corporation and Swanepoel dated August 13, 1998, in each case as amended, pursuant to which Swanepoel licenses certain Intellectual Property to Trico Products Corporation.

2. Trademark License Agreement between Trico Products Corporation and Ideal Clamp Products, Inc. (as successor to Tridon Incorporated), dated June 25, 2007, as modified, pursuant to which Trico Products Corporation was granted a Trademark License.

3. Global cross-licensing rights granted by Federal-Mogul Corporation and Federal-Mogul Friction Products GmbH (collectively, "FM") to Trico Products Corporation with respect to certain Patents of FM.

#90536818v3

4. Global cross-licensing rights granted by Robert Bosch LLC and Robert Bosch GmbH (collectively, "<u>Bosch</u>") to Trico Products Corporation with respect to certain Patents of Bosch.

Schedule II
Chief Executive Office, Type of Organization,
Jurisdiction of Organization and Organizational Identification Number

| Name of Grantor | Type of Organization | Jurisdiction of Organization / Formation | Tax Identification Number | Organizational Identification Number | Address of Chief Executive Office |
|---|---|---|---|---|---|
| AVM Export, Inc. | Corporation | Delaware | 46-2326920 | 5294418 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Carter Fuel Export, Inc. | Corporation | Delaware | 46-3738996 | 5403958 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Carter Fuel Systems, LLC | Limited Liability Company | Delaware | 46-2883328 | 5334634 | 101 East Industrial Blvd. Logansport, IN 46947 |
| Heatherton Holdings, LLC | Limited Liability Company | Delaware | 36-4872564 | 6461724 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Premier Marketing Group, LLC | Limited Liability Company | Ohio | 45-5278587 | 2106792 | 3108 Hwy 76 East Marion, SC 29571 |
| KTRI Holdings, Inc. | Corporation | Delaware | 26-0332927 | 4362414 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |

20

#90536818v3

| Name of Grantor | Type of Organization | Jurisdiction of Organization / Formation | Tax Identification Number | Organizational Identification Number | Address of Chief Executive Office |
|---|---|---|---|---|---|
| KTRI Offshore Holdings, LLC | Limited liability company | Delaware | N/A | 4377318 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Strongarm, LLC | Limited Liability Company | Ohio | 20-5109574 | 1627849 | 3108 Hwy 76 East Marion, SC 29571 |
| Trico Group Holdings, LLC | Limited liability company | Delaware | 82-4069383 | 6714073 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Trico Group, LLC | Limited Liability Company | Delaware | 46-2872032 | 5304130 | 127 Public Square, Suite 5110 Cleveland, OH 44114 |
| Trico Holding Corporation | Corporation | Delaware | 16-1271407 | 2084882 | 3255 W Hamlin Rd, Rochester Hills, MI 48309 |
| Trico Products Corporation | Corporation | New York | 16-0665680 | 15149 | 3255 W Hamlin Rd, Rochester Hills, MI 48309 |
| Trico Technologies Corporation | Corporation | Delaware | 74-2404797 | 2084885 | 3255 W Hamlin Rd, Rochester Hills, MI 48309 |

21

Schedule III
Commercial Tort Claims

None.

22

#90536818v3

Schedule IV
Deposit Accounts and Securities Accounts

| Name of Grantor | Type/Purpose of Account | Bank Name | Account Number |
|---|---|---|---|
| Trico Group, LLC | Concentration Account | JPMorgan Chase Bank, N.A. | 226537739 |
| Trico Group, LLC | ZBA | JPMorgan Chase Bank, N.A. | 510010569 |
| Trico Group, LLC | Restricted Cash | JPMorgan Chase Bank, N.A. | 683291327 |
| AVM Export, Inc. | IC DISC | JPMorgan Chase Bank, N.A. | 530557565 |
| Carter Fuel Export, Inc. | IC DISC | JPMorgan Chase Bank, N.A. | 532856700 |
| Carter Fuel Systems, LLC | Cash Collateral Account | JPMorgan Chase Bank, N.A. | 496605002 |
| Carter Fuel Systems, LLC | ZBA | JPMorgan Chase Bank, N.A. | 227627607 |
| Carter Fuel Systems, LLC | CDA | JPMorgan Chase Bank, N.A. | 227627618 |
| Carter Fuel Systems, LLC | Collection Account | Fifth Third Bank | 7914640573 |
| Carter Fuel Systems, LLC | CDA | JPMorgan Chase Bank, N.A. | 680675050 |
| Carter Fuel Systems, LLC | Blocked Account | JPMorgan Chase Bank, N.A. | 680675035 |
| Carter Fuel Systems, LLC | Collection Account | JPMorgan Chase Bank, N.A. | 737931753 |
| Heatherton Holdings, LLC | ZBA | JPMorgan Chase Bank, N.A. | 927810189 |
| Heatherton Holdings, LLC | ZBA | JPMorgan Chase Bank, N.A. | 927810031 |
| Heatherton Holdings, LLC | Controlled Disbursements (ZBA) | JPMorgan Chase Bank, N.A. | 927809637 |

23

#90536818v3

| Name of Grantor | Type/Purpose of Account | Bank Name | Account Number |
|---|---|---|---|
| Premier Marketing Group, LLC | Cash Collateral Account | JPMorgan Chase Bank, N.A. | 496604997 |
| Premier Marketing Group, LLC | ZBA | JPMorgan Chase Bank, N.A. | 226630917 |
| Premier Marketing Group, LLC | CDA | JPMorgan Chase Bank, N.A. | 226630939 |
| Strongarm, LLC | Cash Collateral Account | JPMorgan Chase Bank, N.A. | 496604948 |
| Strongarm, LLC | Cash Collateral EXIM Account | JPMorgan Chase Bank, N.A. | 496604955 |
| Strongarm, LLC | ZBA | JPMorgan Chase Bank, N.A. | 226571695 |
| Strongarm, LLC | CDA | JPMorgan Chase Bank, N.A. | 226571706 |
| Trico Products Corporation | Deposit | PNC Bank N.A. | 1131393873 |
| Trico Products Corporation | Deposit | PNC Bank N.A. | 4239738523 |
| Trico Products Corporation | Deposit | PNC Bank N.A. | 4239737133 |
| Trico Products Corporation | Deposit | PNC Bank N.A. | 4239737141 |
| Trico Products Corporation | Deposit | Citi Bank | 38562527 |
| Trico Products Corporation | Deposit | Royal Bank of Canada | 01084 100-043-9 |
| Trico Products Corporation | Collection Account | JPMorgan Chase Bank, N.A. | 710599973 |

24