# EXHIBIT D

ABL Intercreditor Agreement

*Execution Version*

**AMENDMENT NO. 1 TO AMENDED AND RESTATED INTERCREDITOR AGREEMENT**

AMENDMENT NO. 1 (this "**Amendment**"), dated as of July 31, 2020, to the Amended and Restated Intercreditor Agreement, dated as of February 26, 2019 (as amended, modified, refinanced and/or restated from time to time prior to the date hereof, the "**Existing ABL Intercreditor Agreement**"; and the Existing ABL Intercreditor Agreement, as amended by this Amendment, the "**Intercreditor Agreement**"), by and among BANK OF AMERICA, N.A., in its capacity as administrative agent and collateral agent under the ABL Loan Documents (as defined therein) (the "**ABL Collateral Agent**"), JEFFERIES FINANCE LLC, in its capacity as administrative agent and collateral agent under the First Lien Loan Documents (as therein defined) (as successor to Credit Suisse AG, Cayman Islands Branch, the "**First Lien Collateral Agent**"), JEFFERIES FINANCE LLC, in its capacity as administrative agent and collateral agent under the Second Lien Loan Documents (as therein defined) (as successor to Credit Suisse AG, Cayman Islands Branch, the "**Second Lien Collateral Agent**"; and, together with the First Lien Collateral Agent, the "**Term Collateral Agents**") and acknowledged and agreed by each other Loan Party (as defined therein). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Intercreditor Agreement.

## RECITALS:

WHEREAS, pursuant to Section 9.3(b) of the Intercreditor Agreement, the ABL Collateral Agent, the Term Collateral Agents, First Brands Group Intermediate, LLC (f/k/a Trico Group Holdings, LLC), a Delaware limited liability company ("**Holdings**"), First Brands Group, LLC (f/k/a Trico Group, LLC), a Delaware limited liability company (the "**Borrower**"), the ABL Guarantors and the Term Guarantors and the other Loan Parties party hereto have agreed to amend certain provisions of the Existing ABL Intercreditor Agreement as described herein (the "**ABL Intercreditor Amendments**"), and each such Person has agreed to the making of the ABL Intercreditor Amendments, subject to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the premises and the agreements, provisions and covenants contained herein, the parties hereto hereby agree as follows:

**SECTION 1** *Amendments*. On the Amendment No. 1 Effective Date, the Existing ABL Intercreditor Agreement (including the schedules and exhibits thereto) shall be amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Intercreditor Agreement attached as <u>Annex I</u> hereto.

**SECTION 2**. *Effectiveness of Amendment.* This Amendment shall become effective as of the first date (the "**Amendment No. 1 Effective Date**") on which and each of the following conditions shall have been satisfied:

(a)     the ABL Collateral Agent, the First Lien Collateral Agent, the Second Lien Collateral Agent and the Loan Parties shall have executed this Amendment, and the ABL Collateral Agent and the Term Collateral Agents shall have each received executed counterparts of this Amendment;

(b)     the satisfaction of the conditions to the effectiveness of that certain Amendment No. 5 to First Lien Term Loan Agreement, dated as of the date hereof, by and among the Borrower, Holdings, the other Loan Parties party thereto, the First Lien Collateral Agent, Credit Suisse AG, Cayman Islands Branch, as existing agent, and the lenders party thereto, except for satisfaction of the condition listed in Section 10(n)(iv) of Amendment No. 5 to First Lien Term Loan Agreement ;

1

(c)      the satisfaction of the conditions to the effectiveness of that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated as of the date hereof, by and among the Borrower, Holdings, the other Loan  Parties party thereto, the Second Lien Collateral Agent, Credit Suisse AG, Cayman Islands Branch, as existing agent, and the lenders party thereto, except for satisfaction of the condition listed in Section 2(i)(iv) of Amendment No. 1 to the Second Lien Term Loan Agreement; and

(d)      the satisfaction of the conditions to the effectiveness of that certain Fifth Amendment to ABL Credit Agreement, dated as of the date hereof, by and among the Borrower, Holdings, the other Loan Parties party thereto, the ABL Collateral Agent and the lenders party thereto, except for satisfaction of the condition listed in Section 3(b)(iii) of the Fifth Amendment to ABL Credit Agreement.

**SECTION 3**.  *Intercreditor Agreement Governs*.  Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of any party under the Intercreditor Agreement, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Intercreditor Agreement, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

**SECTION 4**.  *Counterparts.*  This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile or electronic (i.e., "pdf" or "tif") transmission shall be effective as delivery of a manually executed counterpart of this Amendment.  Any signature to this Amendment may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  Each of the parties hereto represents and warrants to the other parties that it has the corporate capacity and authority to execute this Amendment through electronic means and there are no restrictions for doing so in that party's constitutive documents.  For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Amendment.

**SECTION 5**.  *Miscellaneous.*

(a)      *Incorporation*.  The provisions of this Amendment are deemed incorporated into the Intercreditor Agreement as if fully set forth therein.

(b)      *Entire Agreement.*  This Amendment and the Intercreditor Agreement in each case as amended, restated, amended and restated, supplemented or otherwise modified from time to time on or prior to the date hereof, constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

(c)      *Severability; Governing Law; Waiver of Right to Trial by Jury*.  The following provisions of the Intercreditor Agreement are hereby incorporated by reference as if set forth fully herein, *mutatis mutandis*: Section 9.7 (*Governing Law*) and Section 9.14 (*Waiver of Jury Trial*).

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

BANK OF AMERICA, N.A., as ABL Collateral Agent

By: _____

Name: Charles Fairchild
Title: Senior Vice President

[*Signature Page - Amendment No. 1 to Intercreditor Agreement*]

JEFFERIES FINANCE LLC, as First Lien Collateral Agent

By: _____
　　Name: Paul Chisholm
　　Title: Managing Director


JEFFERIES FINANCE LLC, as Second Lien Collateral Agent

By: _____
　　Name: Paul Chisholm
　　Title: Managing Director


[*Signature Page – Amendment No. 1 to Intercreditor Agreement*]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as the predecessor First Lien Collateral Agent and as the predecessor Second Lien Collateral Agent (solely for the purposes of Section 9.22 of the Intercreditor Agreement)

By: _____

Name: Lingzi Huang
Title: Authorized Signatory

By: _____

Name: Nicolas Thierry
Title: Authorized Signatory

ACKNOWLEDGED AND ACCEPTED:

**ASC Industries, Inc.**
**Autolite Operations LLC**
**AVM Export, Inc.**
**Carter Fuel Systems, LLC**
**Carter Fuel Export, Inc.**
**First Brands Group, LLC**
**First Brands Group Holdings, LLC**
**FRAM Group IP LLC**
**FRAM Group Operations LLC**
**FRAMAUTO HOLDINGS, LLC**
**Heatherton Holdings, LLC**
**KTRI Holdings, Inc.**
**KTRI Offshore Holdings, LLC**
**Premier Marketing Group, LLC**
**Specialty Pumps Group, Inc.**
**Strongarm, LLC**
**Trico Holding Corporation**
**Trico Products Corporation**
**Trico Technologies Corporation**
**Airtex Industries, LLC**
**Airtex Products, LP**
**CHAMPION LABORATORIES, INC.**
**FUEL FILTER TECHNOLOGIES, INC.**
**UCI Acquisition Holdings (No. 4) LLC**
**UCI International Holdings, Inc.**
**UCI International Holdings Parent, Inc.**
**UCI International, LLC**
**UCI Pennsylvania, Inc.**
**UCI-Airtex Holdings, Inc.**
**United Components, LLC**
**Universal Auto Filter LLC**
**BPI Acquisition Company, Inc.**
**BPI Holdings International, Inc.**
**Brake Parts Holdings, Inc.**
**Brake Parts Inc LLC**
**Brake Parts Inc India LLC**
**BPI EC, LLC**
**Brake Parts Inc China LLC**

By: _____
 Name:   Brian Troyer
 Title:    General Counsel, EVP & Secretary

[*Signature Page – Amendment No. 1 to Intercreditor Agreement*]

**ANNEX I**
[See attached]

*Execution Version*

**Annex I**

**AMENDED AND RESTATED INTERCREDITOR AGREEMENT**

**dated as of**

**February 26, 2019,**

**(as amended on July 31, 2020),**

**among**

**BANK OF AMERICA, N.A.,**
**as ABL Collateral Agent,**

~~**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**~~
**JEFFERIES FINANCE LLC,**
**as First Lien Collateral Agent,**

~~**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**~~
**JEFFERIES FINANCE LLC,**
**as Second Lien Collateral Agent,**

**EACH ADDITIONAL JUNIOR OBLIGATIONS AGENT**

**and**

**EACH ADDITIONAL PARI PASSU OBLIGATIONS AGENT**

**Table of Contents**

**Page**

SECTION 1. DEFINITIONS ................................................................................................ 2
    1.1.    Defined Terms ............................................................................................... 2
    1.2.    Construction ................................................................................................ 19
    1.3.    Terms Defined in UCC ............................................................................ ~~19~~20

SECTION 2. LIEN PRIORITIES ....................................................................................... 20
    2.1.    Relative Priorities ...................................................................................... 20
    2.2.    Prohibition on Contesting Liens or Obligations ...................................... ~~22~~23
    2.3.    No New Liens ........................................................................................... ~~22~~23
    2.4.    Cooperation in Designating Collateral ..................................................... ~~23~~24
    2.5.    Revolving Nature of ABL Obligations ..................................................... ~~23~~24
    2.6.    No Subordination of the Relative Priority of Claims ............................... 24

SECTION 3. EXERCISE OF REMEDIES .......................................................................... 24
    3.1.    Exercise of Remedies by Term Collateral Agents ................................... 24
    3.2.    Exercise of Remedies by ABL Collateral Agent ...................................... 25
    3.3.    Exclusive Enforcement Rights .................................................................. 26
    3.4.    Claimholders Permitted Actions ............................................................... ~~26~~27
    3.5.    Retention of Proceeds ............................................................................... ~~28~~29
    3.6.    Non-Interference ....................................................................................... 29
    3.7.    Inspection and Access Rights ................................................................... ~~29~~30
    3.8.    Sharing of Information and Access ........................................................... ~~31~~32
    3.9.    Tracing of and Priorities in Proceeds ...................................................... 32
    3.10.    Permits and Licenses ............................................................................... ~~32~~33

SECTION 4. PROCEEDS ................................................................................................ ~~33~~34
    4.1.    Application of Proceeds ............................................................................ ~~33~~34
    4.2.    Turnover ................................................................................................... ~~34~~35

SECTION 5. RELEASES; DISPOSITIONS; OTHER AGREEMENTS ............................ ~~35~~36
    5.1.    Releases .................................................................................................... ~~35~~36
    5.2.    Insurance .................................................................................................. ~~37~~38
    5.3.    Amendments; Refinancings ...................................................................... 38
    5.4.    Bailee for Perfection ................................................................................ 40
    5.5.    When Discharge of Obligations Deemed to Not Have Occurred ............. 42
    5.6.    Injunctive Relief ....................................................................................... 43
    5.7.    Obligations Purchase Right ....................................................................... ~~43~~44

SECTION 6. INSOLVENCY PROCEEDINGS .................................................................. ~~44~~45
    6.1.    Financing .................................................................................................. 45
    6.2.    Sales ......................................................................................................... ~~46~~47
    6.3.    Relief from the Automatic Stay ............................................................... 47
    6.4.    Adequate Protection ................................................................................. ~~47~~48
    6.5.    Section 1111(b) of the Bankruptcy Code ................................................. 49
    6.6.    Avoidance Issues ...................................................................................... 49
    6.7.    Plan of Reorganization ............................................................................. ~~49~~50
    6.8.    Separate Grants of Security and Separate Classification .......................... 50

(i)

~~#4814-6502-9968~~
#91731356v11

6.9. Post-Petition Interest ................................................................................ ~~50~~51

SECTION 7. RELIANCE; WAIVERS; ETC. .......................................................................... 51

7.1. Reliance ...................................................................................................... 51
7.2. No Warranties or Liability ......................................................................... ~~51~~52
7.3. No Waiver of Lien Priorities...................................................................... 52
7.4. Obligations Unconditional ......................................................................... ~~55~~56

SECTION 8. REPRESENTATIONS AND WARRANTIES .................................................... 56

8.1. Representations and Warranties of Each Collateral Agent ........................... 56

SECTION 9. MISCELLANEOUS ............................................................................................ 56

9.1. Conflicts...................................................................................................... 56
9.2. Continuing Nature of this Agreement; Severability .................................... ~~56~~57
9.3. Amendments; Waivers ............................................................................... ~~56~~57
9.4. Additional Obligations .............................................................................. ~~57~~58
9.5. Information Concerning Financial Condition of Certain Entities ............... ~~58~~59
9.6. Subrogation ................................................................................................ 59
9.7. Governing Law ........................................................................................... ~~59~~60
9.8. Submission to Jurisdiction ........................................................................ ~~59~~60
9.9. Notices ........................................................................................................ ~~60~~61
9.10. Successors and Assigns .............................................................................. 61
9.11. Headings ..................................................................................................... ~~61~~62
9.12. Severability ................................................................................................ ~~61~~62
9.13. Counterparts; Integration; Effectiveness ................................................... ~~61~~62
9.14. WAIVER OF JURY TRIAL........................................................................ ~~61~~62
9.15. Additional Loan Parties ............................................................................ 62
9.16. No Third Party Beneficiaries ..................................................................... 62
9.17. Provisions Solely to Define Relative Rights.............................................. 62
9.18. Specific Performance.................................................................................. ~~62~~63
9.19. Further Assurances ..................................................................................... ~~62~~63
9.20. ABL Intercreditor Agreement Acknowledgement ...................................... ~~62~~63
9.21. Intercreditor Agreements ........................................................................... ~~62~~63
9.22. Amendment and Restatement; Successor Agents ....................................... 63

~~#4814-6502-9968~~
#91731356v11

This **AMENDED AND RESTATED INTERCREDITOR AGREEMENT** is dated as of February 26, 2019, and entered into by and among **BANK OF AMERICA, N.A.**, in its capacity as administrative agent and collateral agent under the ABL Loan Documents (as defined below), including its successors and assigns in such capacity from time to time (the "ABL Collateral Agent"), on behalf of itself and the other ABL Claimholders (as defined below), ~~CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH~~**JEFFERIES FINANCE LLC** (as successor to Credit Suisse AG, Cayman Islands Branch), in its capacity as collateral agent under the First Lien Loan Documents (as defined below), including its successors and assigns in such capacity from time to time (the "First Lien Collateral Agent"), on behalf of itself and the other First Lien Claimholders (as defined below), ~~CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,~~**JEFFERIES FINANCE LLC** (as successor to Credit Suisse AG, Cayman Island Branch) in its capacity as collateral agent under the Second Lien Loan Documents (as defined below), including its successors and assigns in such capacity from time to time (the "Second Lien Collateral Agent"; and, together with the First Lien Collateral Agent, the "Term Collateral Agents"), on behalf of itself and the other Second Lien Claimholders (as defined below), and each **ADDITIONAL JUNIOR OBLIGATIONS AGENT** and each **ADDITIONAL PARI PASSU OBLIGATIONS AGENT** that, in each case, shall have become a party hereto pursuant to Section 9.4.

## RECITALS

Reference is made to that certain Intercreditor Agreement, dated as of February 2, 2018, among the ABL Collateral Agent, the First Lien Collateral Agent and each Additional Pari Passu Obligations Agent party thereto from time to time (the "Existing Intercreditor Agreement").

On the date hereof, the parties hereto have agreed to amend and restate the Existing Intercreditor Agreement pursuant to Section 9.3(b) hereof, on the terms set forth herein.

Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent"), certain of the Borrower's Subsidiaries from time to time party thereto as co-borrowers (such Subsidiaries, collectively, the "ABL Co-Borrowers"; together with the Borrower, collectively, the "ABL Borrowers"), the lenders from time to time party thereto, Bank of America, N.A., as administrative agent, and the ABL Collateral Agent, have entered into that certain ABL Credit Agreement, dated as of February 2, 2018 (the "ABL Credit Agreement").

Parent, certain of Parent's Subsidiaries from time to time party thereto as guarantors (Parent and such Subsidiaries, collectively, the "ABL Guarantors") and the ABL Collateral Agent have entered into that certain ABL Guaranty, dated as of February 2, 2018 (the "ABL Guarantee Agreement").

The Borrower, Parent, the lenders from time to time party thereto and Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent (the "First Lien Administrative Agent") and as First Lien Collateral Agent, have entered into that certain First Lien Term Loan Agreement, dated as of February 2, 2018 (the "First Lien Credit Agreement").

Parent, certain of Parent's Subsidiaries from time to time party thereto as guarantors (Parent and such Subsidiaries, collectively, the "First Lien Guarantors"), the First Lien Administrative Agent and the First Lien Collateral Agent have entered into that certain First Lien Guaranty, dated as of February 2, 2018 (the "First Lien Guarantee Agreement").

The Borrower, Parent, the lenders from time to time party thereto and Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent (the "Second Lien Administrative Agent"; and, together with the First Lien Administrative Agent, the "Term Administrative Agents") and as Second Lien Collateral Agent, have entered into that certain Second Lien Term Loan

#4814-6502-9968
#91731356v11

Agreement, dated as of the date hereof (the "Second Lien Credit Agreement"; and, together with the First Lien Credit Agreement, the "Term Credit Agreements").

Parent, certain of Parent's Subsidiaries from time to time party thereto as guarantors (Parent and such Subsidiaries, collectively, the "Second Lien Guarantors"; and, together with the First Lien Guarantors, the "Term Guarantors"), the Second Lien Administrative Agent and the Second Lien Collateral Agent have entered into that certain Second Lien Guaranty, dated as of the date hereof (the "Second Lien Guarantee Agreement").

The obligations of the ABL Borrowers that are U.S. Loan Parties and the ABL Guarantors that are U.S. Loan Parties under the ABL Credit Agreement and the U.S. ABL Guarantee Agreement are to be secured (a) on a first priority basis, by Liens on the ABL Priority Collateral of such ABL Borrowers and such ABL Guarantors and (b) on a third priority basis, by Liens on the Term Priority Collateral of such ABL Borrowers and such ABL Guarantors.

The obligations of the Borrower and the Term Guarantors under the First Lien Credit Agreement and the First Lien Guarantee Agreement are to be secured (a) on a first priority basis, by Liens on the Term Priority Collateral of the Borrower and the Term Guarantors and (b) on a second priority basis, by Liens on the ABL Priority Collateral of the Borrower and the Term Guarantors.

The obligations of the Borrower and the Term Guarantors under the Second Lien Credit Agreement and the Second Lien Guarantee Agreement are to be secured (a) on a second priority basis, by Liens on the Term Priority Collateral of the Borrower and the Term Guarantors and (b) on a third priority basis, by Liens on the ABL Priority Collateral of the Borrower and the Term Guarantors.

The ABL Loan Documents and the Term Loan Documents provide, among other things, that the ABL Claimholders and the Term Claimholders shall set forth in this Agreement their respective rights and remedies with respect to the Collateral and certain other matters.

The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, the First Lien Collateral Agent, on behalf of itself and the other First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the other Second Lien Claimholders have agreed to the intercreditor and other provisions set forth in this Agreement.

**AGREEMENT**

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1. Definitions.**

1.1.  Defined Terms. As used in the Agreement, the following terms shall have the following meanings:

"ABL Borrowers" has the meaning set forth in the recitals to this Agreement.

"ABL Cash Management Agreement" means "Cash Management Agreement" as such term is defined in the ABL Credit Agreement.

#4814-6502-9968
#91731356v11

"ABL Cash Management Obligations" means "Cash Management Obligations" as such term is defined in the ABL Credit Agreement.

"ABL Cash Management Bank" means "Cash Management Bank" as such term is defined in the ABL Credit Agreement.

"ABL Claimholders" means the ABL Collateral Agent, the ABL Lenders, the ABL Issuing Banks, the ABL Swing Line Lender, and the other holders of ABL Obligations (including any such holders that are ABL Cash Management Banks or ABL Hedge Banks).

"ABL Collateral" means any and all assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, subject, or purported under the terms of any ABL Collateral Document to be subject, to any Lien securing any ABL Obligations.

"ABL Collateral Agent" has the meaning set forth in the preamble to this Agreement.

"ABL Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any ABL Loan Document and any documents that are designated under any ABL Loan Document as "ABL Collateral Documents" for purposes of this Agreement.

"ABL Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"ABL Default" means any "Event of Default" as such term is defined in the ABL Credit Agreement.

"ABL Guarantee Agreement" has the meaning set forth in the recitals to this Agreement.

"ABL Guarantors" has the meaning set forth in the recitals to this Agreement.

"ABL Hedge Bank" means any counterparty to an ABL Secured Hedge Agreement entered into with any ABL Borrower or ABL Guarantor that is an Agent, Arranger or Lender or any of their respective Affiliates as of the Closing Date or at the time such Person has entered into an ABL Secured Hedge Agreement.

"ABL Issuing Banks" means the "L/C Issuers" as such term is defined in the ABL Credit Agreement.

"ABL Lenders" means the "Lenders" as such term is defined in the ABL Credit Agreement.

"ABL Lenders Lien" means all Liens on the Collateral securing the ABL Obligations, whether created under the ABL Collateral Documents or acquired by possession, statute (including any judgment lien), operation of law, subrogation or otherwise and whether or not created following the commencement of any Insolvency Proceeding, now or hereafter held by or on behalf of the ABL Collateral Agent or any other ABL Claimholders, or any agent or trustee therefor.

"ABL Loan Documents" means the ABL Credit Agreement, the ABL Guarantee Agreement, the ABL Collateral Documents and each of the other "Loan Documents" (as defined in the ABL Credit Agreement), and any other document or instrument (including any ABL Cash Management Agreement or any ABL Secured Hedge Agreement) executed or delivered at any time in connection with any ABL Obligations.

#4814-6502-9968
#91731356v11

"ABL Obligations" means the "Secured Obligations" as such term is defined in the ABL Credit Agreement (or any equivalent term in any Refinancing thereof), including (a) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to the ABL Credit Agreement, (b) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the ABL Credit Agreement, (c) all ABL Cash Management Obligations and ABL Secured Hedging Obligations, and (d) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the ABL Loan Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Lien Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Claimholders and the First Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

"ABL Priority Cap" means, as of any date of determination, the sum of:

(a)     an aggregate principal amount not to exceed $~~150,000,000~~250,000,000; plus

(b)     Permitted Overadvances (as defined in the ABL Credit Agreement as in effect on the date hereof, without giving effect to any amendments thereto made after the date hereof) in an aggregate principal amount not to exceed $15,000,000; provided that Permitted Overadvances in excess of the ABL Commitments shall be permitted for purposes of this definition; plus

(c)     all ABL Cash Management Obligations and ABL Secured Hedging Obligations to the extent constituting ABL Obligations; plus

(d)     all other ABL Obligations but only in respect of or attributable to subsections (a), (b) and (c) above (including ABL Obligations constituting accrued and unpaid interest (including interest accruing at the default interest rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"ABL Priority Collateral" means all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency Proceeding) and wherever located (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any provision of any other Bankruptcy Law), would constitute ABL Collateral):

(a)     all Accounts (other than Accounts arising under agreements for the sale of Term Priority Collateral described in clauses (a) through (f) of the definition of such term to the extent constituting identifiable Proceeds of such Term Priority Collateral);

(b)     Inventory;

(c)     all Payment Intangibles, including all corporate and other tax refunds and including all rights to payment arising therefrom in a credit-card, debit-card, prepaid-card or other payment-card transaction (other than any Payment Intangibles arising under agreements for the sale of Term Priority Collateral described in clauses (a) through (f) of the definition of such term to the extent constituting identifiable Proceeds of such Term Priority Collateral);

4

(d)	all Deposit Accounts, Securities Accounts and Commodity Accounts (in each case, subject to Section 3.9, other than the Term Priority Accounts) and all Money, Financial Assets, cash equivalents and other assets contained in, or credited to, and all Securities Entitlements arising from, any such Deposit Accounts, Securities Accounts or Commodity Accounts (in each case, subject to Section 3.9, except (i) to the extent constituting identifiable Proceeds of Term Priority Collateral and (ii) Equity Interests or Instruments evidencing indebtedness to the extent such indebtedness is not relating to, evidencing or owing in respect of, ABL Priority Collateral) (for the avoidance of doubt all Deposit Accounts and Securities Accounts containing "Qualified Cash" (as defined in the ABL Credit Agreement) constitute ABL Priority Collateral);

(e)	(i) 50% of any business interruption insurance and (ii) all rights to credit insurance with respect to any Accounts (in each case, regardless of whether the ABL Collateral Agent is the loss payee thereof);

(f)	to the extent evidencing, governing, securing or otherwise relating to any of the items constituting ABL Priority Collateral under clauses (a) through (e) above, all (i) General Intangibles, including all purchase agreements, contractual arrangements, and purchase orders with foreign vendors and foreign purchasers (excluding Intellectual Property (but subject to the rights of the ABL Collateral Agent under Section 3.10), Indebtedness (or any evidence thereof) owing to any Loan Party by Parent or any of the subsidiaries of Parent, and any Equity Interests and including any and all contracts, contract rights and other General Intangibles providing for or relating to the sale or other Disposition of Inventory), (ii) Instruments (including Promissory Notes), (iii) Documents (including each warehouse receipt or bill of lading covering any Inventory), (iv) insurance policies (regardless of whether the ABL Collateral Agent is the loss payee thereof), (v) export or other licenses from any Governmental Authority to sell or to manufacture Inventory, and (vi) Chattel Paper (including all Electronic Chattel Paper and all Tangible Chattel Paper);

(g)	all collateral and guarantees given by any other Person with respect to any of the foregoing, and all other Supporting Obligations (including Letter-of-Credit Rights) with respect to any of the foregoing;

(h)	all books and Records to the extent relating to any of the foregoing (including customer lists, files, correspondence, tapes, computer programs, printouts and computer records); and

(i)	all Products and Proceeds of the foregoing.

Notwithstanding the foregoing, the term "ABL Priority Collateral" shall not include any assets referred to in clauses (a), (b) and (c)  of the definition of the term "Term Priority Collateral".  Proceeds of Excluded Assets that would otherwise constitute ABL Priority Collateral shall be deemed to be ABL Priority Collateral.

"ABL Secured Hedge Agreement" means "Secured Hedge Agreement" as such term is defined in the ABL Credit Agreement.

"ABL Secured Hedging Obligations" means any "Secured Obligations" (as defined in the ABL Credit Agreement) in respect of any ABL Secured Hedge Agreement.

"ABL Standstill Period" has the meaning set forth in Section 3.2(a).

"ABL Swing Line Lender" means the "Swing Line Lender" as such term is defined in the ABL Credit Agreement.

#4814-6502-9968
#91731356v11

"Additional Agent" means any Additional Pari Passu Obligations Agent or Additional Junior Obligations Agent.

"Additional Junior Obligations" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including any "Incremental Term Facility", "Incremental Equivalent Debt", "Refinancing Facility" and "Specified Term Refinancing Debt" (in each case, as such terms are defined in the Second Lien Credit Agreement) (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Junior Obligations Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional Junior Obligations Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the ABL Credit Agreement, the Term Credit Agreements, each Additional Pari Passu Obligations Agreement then in effect and each other Additional Junior Obligations Agreement then in effect to be secured by Liens on the Collateral ranking junior in priority to the Liens on the Collateral securing the First Lien Obligations and, with respect to any such Collateral constituting ABL Priority Collateral, junior in priority to the ABL Lenders Liens and (b) the Loan Parties have granted Liens on the Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"Additional Junior Obligations Agent" means any Person appointed to act as trustee, collateral agent or a similar representative for the holders of Additional Junior Obligations pursuant to any Additional Junior Obligations Agreement.

"Additional Junior Obligations Agreement" means the indenture, credit agreement or other definitive agreement under which any Additional Junior Obligations are incurred.

"Additional Pari Passu Obligations" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including any "Incremental Term Facility", "Incremental Equivalent Debt", "Refinancing Facility" and "Specified Term Refinancing Debt" (in each case, as such terms are defined in the First Lien Credit Agreement) (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Pari Passu Obligations Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional Pari Passu Obligations Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the ABL Credit Agreement, the Term Credit Agreements, each Additional Junior Obligations Agreement then in effect and each other Additional Pari Passu Obligations Agreement then in effect to be secured by Liens on the Collateral ranking pari passu in priority with the Liens on the Collateral securing the First Lien Obligations (without regard to the control of remedies) and, with respect to any Collateral constituting ABL Priority Collateral, ranking junior in priority to the ABL Lenders Liens and (b) the Loan Parties have granted Liens on the Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"Additional Pari Passu Obligations Agent" means any Person appointed to act as trustee, collateral agent or a similar representative for the holders of Additional Pari Passu Obligations pursuant to any Additional Pari Passu Obligations Agreement.

6

#4814-6502-9968
#91731356v11

"Additional Pari Passu Obligations Agreement" means the indenture, credit agreement or other definitive agreement under which any Additional Pari Passu Obligations are incurred.

"Administrative Agent" means the ABL Administrative Agent or the Term Administrative Agents, as the context may require.

"Agreement" means this Amended and Restated Intercreditor Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*).

"Borrower" has the meaning set forth in the recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Cash Collateral" has the meaning set forth in Section 6.1.

"Claimholders" means the ABL Claimholders and the Term Claimholders, or any of them, as the context may require.  Any references herein to "related" Claimholders of any Collateral Agent shall mean, with respect to the ABL Collateral Agent, the ABL Claimholders and, with respect to the Term Collateral Agents, the Term Claimholders.

"Class" refers to either (a) the ABL Collateral Agent, the ABL Claimholders, the ABL Obligations, the ABL Priority Collateral, the ABL Credit Agreement, the ABL Collateral Documents and the ABL Loan Documents, on the one hand, as opposed to (b) the Term Collateral Agents, the Term Claimholders, the Term Obligations, the Term Priority Collateral, the Term Credit Agreements, the Term Collateral Documents and the Term Loan Documents, on the other hand.  Solely for purposes of this Agreement and subject to Section 9.21, the First Lien Collateral Agents, the First Lien Claimholders, the First Lien Obligations, the First Lien Priority Collateral, the First Lien Credit Agreements, the First Lien Collateral Documents, the First Lien Loan Documents, the Second Lien Collateral Agents, the Second Lien Claimholders, the Second Lien Obligations, the Second Lien Priority Collateral, the Second Lien Credit Agreements, the Second Lien Collateral Documents and the Second Lien Loan Documents shall be deemed to be a single Class.

"Collateral" means all of the assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, that constitute ABL Collateral or Term Collateral.

"Collateral Agent" means the ABL Collateral Agent or the Term Collateral Agents, as the context may require.

"Collateral Documents" means the ABL Collateral Documents and the Term Collateral Documents, or any of them, as the context may require.

"Controlling Collateral Agent" means the ABL Collateral Agent and the Controlling Term Agent.

"Controlling Term Agent" means (a) at any time prior to the Discharge of First Lien Obligations (other than amounts that exceed the Maximum First Priority Obligations Amount (as such term is defined in the First Lien/Second Lien Intercreditor Agreement)), the "Designated First Priority Representative" (as such term is defined in the First Lien/Second Lien Intercreditor Agreement) and (b)

7

after the Discharge of First Lien Obligations (other than amounts that exceed the Maximum First Priority Obligations Amount (as such term is defined in the First Lien/Second Lien Intercreditor Agreement)) has occurred and the ABL Collateral Agent has received written notice thereof from the Borrower and the "Designated Second Priority Representative" (as such term is defined First Lien/Second Lien Intercreditor Agreement), such Designated Second Priority Representative.

"Credit Documents" means the ABL Loan Documents and the Term Loan Documents, or any of them, as the context may require.

"DIP Financing" has the meaning set forth in Section 6.1(a).

"Discharge" means Discharge of ABL Obligations or Discharge of Term Obligations, as the context requires.

"Discharge of ABL Obligations" means, except to the extent otherwise expressly provided in Sections 5.5 and 6.6, (a) the ABL Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in full (or cash collateralized or defeased in accordance with the terms of the ABL Loan Documents), (b) all commitments to extend credit under the ABL Loan Documents have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the ABL Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the ABL Loan Documents).  Upon the written request by the Controlling Term Agent or any ABL Borrower, the ABL Administrative Agent shall promptly deliver a written notice to the Controlling Term Agent and the ABL Borrowers stating that (to the extent such events have occurred) the events described in clauses (a), (b) and (c) have occurred.

"Discharge of ABL Priority Obligations" means the Discharge of ABL Obligations other than the principal amounts under the ABL Loan Documents that exceed the ABL Priority Cap.

"Discharge of First Lien Obligations" means, except to the extent otherwise expressly provided in Sections 5.5 and 6.6, (a) the First Lien Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in full (or cash collateralized or defeased in accordance with the terms of the First Lien Loan Documents), (b) all commitments to extend credit under the First Lien Loan Documents have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the First Lien Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the First Lien Loan Documents).  Upon the written request by ABL Collateral Agent, Second Lien Collateral Agent or the Borrower, the First Lien Collateral Agent shall promptly deliver a written notice to ABL Collateral Agent, Second Lien Collateral Agent and the Borrower stating that (to the extent such events have occurred) the events described in clauses (a), (b) and (c) have occurred.

"Discharge of First Lien Priority Obligations" means the Discharge of First Lien Obligations other than the principal amounts under the First Lien Loan Documents that exceed the First Lien Priority Cap.

"Discharge of Second Lien Obligations" means, except to the extent otherwise expressly provided in Sections 5.5 and 6.6, (a) the Second Lien Obligations (other than those that constitute Unasserted Contingent Obligations) have been paid in full (or cash collateralized or defeased in accordance with the terms of the Second Lien Loan Documents), (b) all commitments to extend credit under the Second Lien Loan Documents have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the Second Lien Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the Second Lien Loan Documents).  Upon the

#4814-6502-9968
#91731356v11

written request by ABL Collateral Agent, First Lien Collateral Agent or the Borrower, the Second Lien Collateral Agent shall promptly deliver a written notice to ABL Collateral Agent, First Lien Collateral Agent and the Borrower stating that (to the extent such events have occurred) the events described in clauses (a), (b) and (c) have occurred.

"Discharge of Second Lien Term Priority Obligations" means the Discharge of Second Lien Obligations other than the principal amounts under the Second Lien Loan Documents that exceed the Second Lien Priority Cap.

"Discharge of Term Obligations" means the time at which both the Discharge of First Lien Obligations and Discharge of Second Lien Obligations shall have occurred.

"Discharge of Term Priority Obligations" means the time at which both the Discharge of First Lien Priority Obligations and Discharge of Second Lien Term Priority Obligations shall have occurred.

"Disposition" or "Dispose" means the sale, assignment, transfer, license, lease (as lessor), exchange or other disposition (including any sale and leaseback transaction) of any Collateral.

"Enforcement Notice" means a written notice delivered by the ABL Collateral Agent to the Controlling Term Agent stating that an ABL Default or by any Term Collateral Agent to the other Collateral Agents stating that a Term Default, as applicable, has occurred and is continuing and that an Exercise of Secured Creditor Remedies has commenced or is about to be commenced with respect to the ABL Priority Collateral or the Term Priority Collateral, as applicable.

"Enforcement Period" means the period of time following the receipt by any Collateral Agent of an Enforcement Notice from another Collateral Agent and continuing until the earliest of (a) (i) in case of an Enforcement Period commenced by the Controlling Term Agent, the Discharge of Term Priority Obligations and (ii) in the case of an Enforcement Period commenced by the ABL Collateral Agent, the Discharge of ABL Priority Obligations, (b) the ABL Collateral Agent or the Controlling Term Agent, as applicable, agreeing in writing to terminate the Enforcement Period initiated by such Collateral Agent and (c) the date on which the ABL Default or the Term Default, as applicable, that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Collateral Agent or the Controlling Term Agent, as applicable, or waived in writing in accordance with the requirements of the applicable Credit Documents.

"Equity Interests" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

"Excluded Assets" shall mean (a) with respect to any Term Priority Collateral, any "Excluded Assets" as such term is defined in the Term Loan Documents as in effect on the date hereof or (b) with respect to any ABL Priority Collateral, any "Excluded Assets" as such term is defined in the U.S. ABL Loan Documents as in effect on the date hereof.

"Exercise any Secured Creditor Remedies" or "Exercise of Secured Creditor Remedies" means (a) the taking of any action (or joining with any other Person (other than the other Collateral Agents to the extent provided in Section 3.4(i)) in taking any action) to enforce any Lien in respect of the Collateral, including the institution of any foreclosure proceedings, the giving of notice of any public or private sale

#4814-6502-9968
#91731356v11

or other Disposition pursuant to Article 8 or Article 9 of the UCC or other applicable law or any action to vacate, obtain relief from or modify a stay or other injunction restricting any such enforcement or any other exercise of rights or remedies with respect to any Collateral described in this definition, (b) after the occurrence of a Term Default or an ABL Default, as applicable, the exercise of (or joining with any other Person (other than the other Controlling Collateral Agent to the extent provided in Section 3.4(i)) in exercising) any right or remedy provided to a secured creditor under the ABL Loan Documents or the Term Loan Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Loan Party or the taking of any action or the exercise of any right or remedy in respect of the set off or recoupment against any Collateral or proceeds of any Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including credit bidding or otherwise accepting any Collateral in full or partial satisfaction of a Lien, (c) after the occurrence of a Term Default or an ABL Default, as applicable, the Disposition of all or any material portion of the Collateral, by private or public sale or any other means, (d) after the occurrence of a Term Default or an ABL Default, as applicable, the solicitation of bids by a Controlling Collateral Agent from third parties to conduct the liquidation of any Collateral, (e) after the occurrence of a Term Default or an ABL Default, as applicable, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties by a Controlling Collateral Agent for the purposes of valuing, marketing, or Disposing of, any Collateral, or (f) the exercise of any other enforcement right relating to any Collateral (including the exercise of any voting rights relating to any Equity Interests constituting Collateral) whether under the ABL Loan Documents, the Term Loan Documents, under applicable law, in equity, in an Insolvency Proceeding, or otherwise; it being acknowledged and agreed that none of the following will constitute an Exercise of Secured Creditor Remedies for purposes of this Agreement: (i) the exercise of cash dominion by the ABL Collateral Agent over the Deposit Accounts of any Loan Party that constitute ABL Priority Collateral and application of funds in connection therewith against the ABL Obligations pursuant to the ABL Credit Agreement, (ii) the imposition of a default interest rate or late fee, (iii) the collection and application of monies deposited from time to time in any Term Priority Account, to the extent constituting Term Priority Collateral, against the Term Obligations pursuant to the provisions of the Term Loan Documents prior to the occurrence of a Term Default, (iv) the filing of a proof of claim or a statement of interest in any Insolvency Proceeding, (v) the consent by the ABL Collateral Agent to the Disposition by any Loan Party of any of the ABL Priority Collateral prior to the occurrence of an ABL Default, (vi) the consent of the Term Collateral Agents to the Disposition by any Loan Party of any Term Priority Collateral and (vii) the acceleration of the Term Obligations or the ABL Obligations.

"First Lien Administrative Agent" has the meaning set forth in the recitals to this Agreement.

"First Lien Claimholders" means the First Lien Administrative Agent, the First Lien Collateral Agent, the First Lien Lenders and the other holders of First Lien Obligations (including any such holders that are Term Cash Management Banks or Term Hedge Counterparties).

"First Lien Collateral" means any and all assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, subject, or purported under the terms of any First Lien Collateral Document to be subject, to any Lien securing any First Lien Obligations.

"First Lien Collateral Agent" has the meaning set forth in the preamble to this Agreement.

"First Lien Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any First Lien Loan Document and any documents that are designated under any First Lien Loan Document as "First Lien Collateral Documents" for purposes of this Agreement.

10

"First Lien Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"First Lien Default" means any "Event of Default" as such term is defined in the First Lien Credit Agreement.

"First Lien Guarantee Agreement" has the meaning set forth in the recitals to this Agreement.

"First Lien Guarantors" has the meaning set forth in the recitals to this Agreement.

"First Lien Lenders" means the "Lenders" as such term is defined in the First Lien Credit Agreement.

"First Lien Lenders Lien" means all Liens on the Collateral securing the First Lien Obligations, whether created under the First Lien Collateral Documents or acquired by possession, statute (including any judgment lien), operation of law, subrogation or otherwise and whether or not created following the commencement of any Insolvency Proceeding, now or hereafter held by or on behalf of the First Lien Collateral Agent or any other First Lien Claimholders, or any agent or trustee therefor.

"First Lien Loan Documents" means the First Lien Credit Agreement, the First Lien Guarantee, the First Lien Collateral Documents, and each of the other "Loan Documents" (as defined in the First Lien Credit Agreement), and any other document or instrument (including any Term Cash Management Agreement or any Term Secured Hedge Agreement) executed or delivered at any time in connection with any First Lien Obligations.

"First Lien Obligations" means the "Obligations" of each Loan Party as defined in the First Lien Credit Agreement (or any equivalent term in any Refinancing thereof), including any Additional Pari Passu Obligations, including (a) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to the First Lien Credit Agreement or the applicable Additional Pari Passu Obligations Agreement, (b) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Lien Credit Agreement or the applicable Additional Pari Passu Obligations Agreement, (c) all Term Cash Management Obligations and Term Secured Hedging Obligations, and (d) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the First Lien Loan Documents or the applicable Additional Pari Passu Obligations Agreement, in each case whether or not allowed or allowable in an Insolvency Proceeding; provided that to the extent any Indebtedness thereunder is expressly provided thereunder to be secured on a junior basis to the Liens securing the First Lien Obligations in existence on the date hereof, such Indebtedness shall not constitute First Lien Obligations.  To the extent any payment with respect to any First Lien Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Term Claimholders and the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

"First Lien Priority Cap" means, as of any date of determination, the sum of:

(a)     an amount, not to exceed the sum of (i) $721,714,794.30 plus (ii) the aggregate principal amount of (1) Incremental Loans made and outstanding under the Incurrence-Based Incremental Amount (each as defined in the First Lien Credit Agreement (as in effect on the date hereof, without giving

11

#4814-6502-9968
#91731356v11

effect to any amendments thereto made after the date hereof)) pursuant to Section 2.16 of the First Lien Credit Agreement (as in effect on the date hereof, without giving effect to any amendments thereto made after the date hereof) and (2) the loans and commitments made and outstanding by the First Lien Claimholders after the date of this Agreement pursuant to Sections 7.03(m), 7.03(n) and 7.03(s) of the First Lien Credit Agreement (as in effect on the date hereof, without giving effect to any amendments thereto made after the date hereof); plus

(b)      all Term Cash Management Obligations and Term Secured Hedging Obligations to the extent constituting First Lien Obligations; plus

(c)      all other First Lien Obligations but only in respect of or attributable to subsections (a) and (b) above (including First Lien Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"First Lien/Second Lien Intercreditor Agreement" has the meaning set forth in the First Lien Credit Agreement, as in effect on the date hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the U.S., the U.S., or a foreign government or any other political subdivision thereof, including central banks and supra national bodies.

"Indebtedness" means all obligations that constitute "Indebtedness" within the meaning of the ABL Credit Agreement or the Term Credit Agreements, as applicable.

"Insolvency Proceeding" means any voluntary or involuntary case or proceeding of which any Loan Party is the subject and in respect of bankruptcy, insolvency, winding up, receivership, dissolution, liquidation, reorganization or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

"Intellectual Property" means "Intellectual Property" as such term is defined in the ABL Credit Agreement and the Term Credit Agreements.

"Junior Claimholders" means, as to any Collateral, the Claimholders whose Liens on such Collateral are junior and subordinate to the Liens of the other Claimholders on such Collateral as set forth in Section 2.1.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any capital lease having substantially the same economic effect as any of the foregoing), in each case, in the

12

#4814-6502-9968
#91731356v11

nature of security; <u>provided</u> that in no event shall an operating lease in and of itself be deemed to constitute a Lien on any asset.

"<u>Loan Parties</u>" means Parent, the Borrower, the ABL Co-Borrowers, the ABL Guarantors, the Term Guarantors and each other Subsidiary Guarantor (as such term is defined in the ABL Credit Agreement and the Term Credit Agreements) other than, in the case of the ABL Credit Agreement, any such Loan Party that is not a U.S. Loan Party. All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"<u>Mortgage</u>" has the meaning set forth in the ABL Credit Agreement and/or the Term Credit Agreements, as the context requires.

"<u>Non-Conforming Plan of Reorganization</u>" means any Plan of Reorganization the provisions of which are inconsistent with, or are in contravention of, the relative Lien priorities or the other provisions of this Agreement, including any Plan of Reorganization that purports to re-order (whether by subordination, invalidation or otherwise) or otherwise disregard, in whole or part, the provisions of Section 2 (including the relative Lien priorities of Section 2.1), 4 or 6.

"<u>Notification of Proceeds</u>" has the meaning set forth in Section 3.9(b).

"<u>Obligations</u>" means the ABL Obligations and the Term Obligations, or any of them, as the context requires.

"<u>Parent</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"<u>Plan of Reorganization</u>" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of dispositive plan of arrangement proposed in or in connection with any Insolvency Proceeding.

"<u>Pledged Collateral</u>" has the meaning set forth in Section 5.4(a).

"<u>Post-Petition Interest</u>" means interest (including interest accruing at the default rate specified in the applicable Credit Documents), fees, expenses and other charges that pursuant to the ABL Collateral Documents or the Term Collateral Documents, as the case may be, continue to accrue after the commencement of any Insolvency Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, or in any such Insolvency Proceeding.

"<u>Purchase Event</u>" means, with respect to the Obligations of any Class, the occurrence of any of the following: (a) the occurrence of an event of default under any Credit Documents in respect of any Class arising from the failure of any Loan Party to pay any principal, interest or fees when due and payable thereunder, (b) any Exercise of Secured Creditor Remedies by the Collateral Agent of such Class or the institution of any Insolvency Proceeding or (c) an acceleration of the Obligations of such Class in accordance with the terms of the Credit Documents of such Class.

"<u>Recovery</u>" has the meaning set forth in Section 6.6.

#4814-6502-9968
#91731356v11

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Refinancing Indebtedness" means the Indebtedness or other Obligations resulting from the Refinancing of any other Indebtedness or other Obligations.

"Second Lien Administrative Agent" has the meaning set forth in the recitals to this Agreement.

"Second Lien Claimholders" means the Second Lien Administrative Agent, the Second Lien Collateral Agent, the Second Lien Lenders and the other holders of Second Lien Obligations.

"Second Lien Collateral" means any and all assets of any Loan Party, now existing or hereafter acquired, whether real, personal or mixed, subject, or purported under the terms of any Second Lien Collateral Document to be subject, to any Lien securing any Second Lien Obligations.

"Second Lien Collateral Agent" has the meaning set forth in the preamble to this Agreement.

"Second Lien Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any Second Lien Loan Document and any documents that are designated under any Second Lien Loan Document as "Second Lien Collateral Documents" for purposes of this Agreement.

"Second Lien Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"Second Lien Default" means any "Event of Default" as such term is defined in the Second Lien Credit Agreement.

"Second Lien Guarantee Agreement" has the meaning set forth in the recitals to this Agreement.

"Second Lien Guarantors" has the meaning set forth in the recitals to this Agreement.

"Second Lien Lenders" means the "Lenders" as such term is defined in the Second Lien Credit Agreement.

"Second Lien Lenders Lien" means all Liens on the Collateral securing the Second Lien Obligations, whether created under the Second Lien Collateral Documents or acquired by possession, statute (including any judgment lien), operation of law, subrogation or otherwise and whether or not created following the commencement of any Insolvency Proceeding, now or hereafter held by or on behalf of the Second Lien Collateral Agent or any other Second Lien Claimholders, or any agent or trustee therefor.

"Second Lien Loan Documents" means the Second Lien Credit Agreement, the Second Lien Guarantee Agreement, the Second Lien Collateral Documents, and each of the other "Loan

14

#4814-6502-9968
#91731356v11

Documents" (as defined in the Second Lien Credit Agreement), and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations.

"Second Lien Obligations" means the "Obligations" of each Loan Party as defined in the Second Lien Credit Agreement (or any equivalent term in any Refinancing thereof), including any Additional Junior Obligations, including (a) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to the Second Lien Credit Agreement or the applicable Additional Junior Obligations Agreement, (b) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the Second Lien Credit Agreement or the applicable Additional Junior Obligations Agreement, and (c) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the Second Lien Loan Documents or the applicable Additional Junior Obligations Agreement, in each case whether or not allowed or allowable in an Insolvency Proceeding.  To the extent any payment with respect to any Second Lien Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Term Claimholders and the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

"Second Lien Priority Cap" means, as of any date of determination, the sum of:

(a)     an aggregate principal amount, not to exceed the sum of (i) $100,000,000 plus an additional principal amount solely to the extent arising from the capitalization of interest at a rate not to exceed 2.00% per annum and capitalized in accordance with the Second Lien Credit Agreement as in effect on the date hereof and (ii) 100% of the aggregate principal amount of the loans and commitments made and outstanding by the Second Lien Claimholders after the date of this Agreement and outstanding pursuant to Sections 2.16, 7.03(m), 7.03(n) and 7.03(s) of the Second Lien Credit Agreement (as in effect on the date hereof without giving effect to any amendments thereto made after the date hereof); plus

(b)     all other Second Lien Obligations but only in respect of or attributable to subsection (a) above (including Second Lien Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"Senior Claimholders" means, as to any Collateral, the Claimholders whose Liens on such Collateral are senior to the Liens of the Claimholders of the other Class on such Collateral pursuant to the terms of this Agreement.  The parties hereto acknowledge that the ABL Claimholders are the Senior Claimholders with respect to the ABL Priority Collateral and the Term Claimholders are the Senior Claimholders with respect to the Term Priority Collateral, and that, accordingly, any reference herein to the "Senior Claimholders" shall be construed as a reference to the ABL Claimholders insofar as the ABL Priority Collateral is concerned and to the Term Claimholders insofar as the Term Priority Collateral is concerned.

"Senior Collateral Agent" means, as to any Collateral, the Collateral Agent whose Liens on such Collateral, held by it for its benefit and the benefit of its related Claimholders, are senior to the Liens on such Collateral held by the Collateral Agent of the other Class, for its benefit and the benefit of its related Claimholders.  The parties hereto acknowledge that the ABL Collateral Agent is the Senior

15

#4814-6502-9968
#91731356v11

Collateral Agent with respect to the ABL Priority Collateral and the Term Collateral Agents are the Senior Collateral Agent with respect to the Term Priority Collateral, and that, accordingly, any reference herein to the "Senior Collateral Agent" shall be construed as a reference to the ABL Collateral Agent insofar as the ABL Priority Collateral is concerned and to the Term Collateral Agents insofar as the Term Priority Collateral is concerned.

"Senior Liens" means (a) with respect to the ABL Priority Collateral or the Term Lenders Liens on the ABL Priority Collateral, the ABL Lenders Liens on such Collateral, and (b) with respect to the Term Priority Collateral or the ABL Lenders Liens on the Term Priority Collateral, the Term Lenders Liens on such Collateral, and, in each case, any Liens incurred in connection with any Refinancing of Senior Obligations that are deemed to be Senior Liens under Section 5.5.

"Senior Obligations" means, with respect to any Collateral or any Liens thereon, any Obligations that are secured by Senior Liens on such Collateral.

"Senior Priority Collateral" means (a) with respect to the ABL Collateral Agent and any other ABL Claimholders, all ABL Priority Collateral and (b) with respect to the Term Collateral Agents and any other Term Claimholders, Term Priority Collateral.

"Subject Obligations" has the meaning set forth in Section 5.7(a).

"Subject Secured Parties" has the meaning set forth in Section 5.7(a).

"Subsidiary" shall have the meaning set forth in the ABL Credit Agreement and Term Credit Agreements in effect on the date hereof and shall exclude any Subsidiary that is not a U.S. Subsidiary.  Unless otherwise specified, all references herein to Subsidiaries shall be deemed to refer to Subsidiaries of the Borrower.

"Term Administrative Agents" has the meaning set forth in the recitals to this Agreement.

"Term Cash Management Agreement" means "Cash Management Agreement" as such term is defined in the First Lien Credit Agreement.

"Term Cash Management Obligations" means "Cash Management Obligations" as such term is defined in the First Lien Credit Agreement.

"Term Cash Management Bank" means "Cash Management Bank" as such term is defined in the First Lien Credit Agreement.

"Term Claimholders" means the First Lien Claimholders and the Second Lien Claimholders.

"Term Collateral" means the First Lien Collateral and the Second Lien Collateral.

"Term Collateral Agents" has the meaning set forth in the preamble to this Agreement.

"Term Collateral Documents" means the First Lien Collateral Documents and the Second Lien Collateral Documents.

"Term Credit Agreements" has the meaning set forth in the recitals to this Agreement.

"Term Default" means any First Lien Default or Second Lien Default.

16

"Term DIP Financing" has the meaning set forth in Section 6.1(b).

"Term Guarantors" has the meaning set forth in the recitals to this Agreement.

"Term Lenders" means the First Lien Lenders and the Second Lien Lenders.

"Term Lenders Lien" means any First Lien Lenders Lien or Second Lien Lenders Lien.

"Term Loan Documents" means the First Lien Loan Documents and the Second Lien Loan Documents.

"Term Obligations" means the First Lien Obligations and the Second Lien Obligations.

"Term Priority Accounts" means any Deposit Accounts or Securities Accounts that are required to be established pursuant to the Term Loan Documents for purposes of exclusively holding identifiable Proceeds of the Term Priority Collateral (it being understood that any property in such Deposit Accounts or Securities Accounts which is not identifiable proceeds of Term Priority Collateral shall not be Term Priority Collateral solely by virtue of being on deposit in or credited to any such Deposit Account or Securities Account).

"Term Priority Cap" means the sum of the First Lien Priority Cap and the Second Lien Priority Cap.

"Term Priority Collateral" means all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency Proceeding) and wherever located (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any provision of any other Bankruptcy Law), would constitute Term Collateral):

(a)      all Equipment and all real property and interests therein (including both fee and leasehold interests) and all Fixtures;

(b)      all Intellectual Property (other than any computer programs and any support and information relating thereto that constitute Inventory pursuant to Section 1.3 and subject to the rights of the ABL Collateral Agent under Section 3.10);

(c)      all Equity Interests and other Investment Property (other than Investment Property constituting ABL Priority Collateral under clause (c) of the definition of such term);

(d)      except to the extent constituting ABL Priority Collateral under clause (e) of the definition of such term, all Instruments, Documents and General Intangibles (including all Indebtedness between or among Parent and any of its Subsidiaries);

(e)      all Term Priority Accounts and all Money, Financial Assets, Securities Entitlements or other assets contained in, or credited to, or arising from any such Term Priority Account (in each case, except to the extent constituting identifiable Proceeds of ABL Priority Collateral);

(f)      all insurance policies relating to Term Priority Collateral (regardless of whether any Term Collateral Agent is the loss payee thereof), but, for the avoidance of doubt, excluding 50% of any business interruption insurance and all credit insurance with respect to any Accounts, each of which constitutes ABL Priority Collateral;

17

#4814-6502-9968
#91731356v11

(g)     all Commercial Tort Claims;

(h)     all other Collateral not constituting ABL Priority Collateral;

(i)     all collateral and guarantees given by any other Person with respect to any of the foregoing, and all Supporting Obligations (including Letter-of-Credit Rights) with respect to any of the foregoing;

(j)     all books and Records to the extent relating to any of the foregoing (including files, correspondence, tapes, computer programs, printouts and computer records); and

(k)     all Products and Proceeds of the foregoing.

Notwithstanding the foregoing, the term "Term Priority Collateral" shall not include any assets referred to in clauses (a), (b), (c), (d) and (e) of the term "ABL Priority Collateral". Proceeds of Excluded Assets that would otherwise constitute Term Priority Collateral shall be deemed to be Term Priority Collateral.

"Term Secured Hedge Agreement" means "Secured Hedge Agreement" as such term is defined in the First Lien Credit Agreement.

"Term Hedge Counterparty" means any counterparty to a Term Secured Hedge Agreement entered into with a Loan Party the obligations under which constitute Term Secured Hedging Obligations.

"Term Secured Hedging Obligations" means any "Secured Obligations" (as defined in the First Lien Credit Agreement) in respect of any Term Secured Hedge Agreement.

"Term Standstill Period" has the meaning set forth in Section 3.1(a).

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"Unasserted Contingent Obligations" means, at any time, ABL Obligations and Term Obligations (as applicable) for indemnification in respect of which no demand has been made at such time (it being understood that, in respect of ABL Obligations, contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit shall not constitute Unasserted Contingent Obligations).

"Use Period" means, with respect to any Term Priority Collateral, the period (a) commencing on the later of (i) the date on which the ABL Collateral Agent (or any ABL Claimholder acting with the consent of the ABL Collateral Agent) commences an Enforcement Period in connection with any ABL Priority Collateral and (ii) the date on which the ABL Collateral Agent delivers, in accordance with Section 3.7, a written notice to the Controlling Term Agent electing to exercise its access rights pursuant to Section 3.7 with respect to such Term Priority Collateral, and (b) ending, with respect to any Term Priority Collateral, on the earliest to occur of (i) the 180th day after the date (the "Initial Access Date") on which the ABL Collateral Agent, or its designee, initially obtains the ability to take physical possession of, remove, or otherwise control physical access to, or actually uses, the ABL Priority Collateral located on such Term Priority Collateral, (ii) the date on which all or substantially all of the ABL Priority Collateral located on such Term Priority Collateral is removed, sold, collected or liquidated and (iii) the termination of such Enforcement Period.  If any stay or other order that prohibits any of the ABL Collateral Agent or the other ABL Claimholders from commencing and continuing to Exercise any Secured Creditor Remedies

18

#4814-6502-9968
#91731356v11

or from liquidating or selling the ABL Priority Collateral has occurred by the operation of law or has been entered by a court of competent jurisdiction after the Initial Access Date, the 180-day period referred to in clause (i) above shall be tolled during the pendency of any such stay or other order and the Use Period, to the extent the expiration thereof is to be determined by reference to clause (i) above, shall be extended by a corresponding number of days, provided that if, after the lifting of such stay or other order, fewer than 90 days shall remain in the Use Period, then the Use Period shall be extended so that the ABL Collateral Agent and the other ABL Claimholders have 90 days remaining in the Use Period upon lifting of the stay or other order.

"U.S. ABL Collateral Documents" means any ABL Collateral Document executed by a U.S. Loan Party.

"U.S. ABL Guarantee Agreement" means "U.S. Guarantee" as such term is defined in the ABL Credit Agreement.

"U.S. ABL Loan Documents" means any ABL Loan Document executed by a U.S. Loan Party.

"U.S. Loan Party" means any Loan Party organized under the laws of any state within the United States or the District of Columbia.

"U.S. Subsidiary" means any Subsidiary of the Parent that is organized under the laws of the United States, any state thereof or the District of Columbia.

1.2.    Construction.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The term "or" shall be construed to have, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  Unless the context requires otherwise:

(a)    except as otherwise provided herein, any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified;

(b)    any reference herein to any Person shall be construed to include such Person's successors and assigns;

(c)    the words "herein", "hereof", and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections and Annexes shall be construed to refer to Sections and Annexes of this Agreement;

(e)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, real, personal or mixed, including cash, securities, accounts, and contract rights;

19

(f)     any references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs; and

(g)     any references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

1.3.     Terms Defined in UCC.  Terms defined in the UCC that are not otherwise defined in this Agreement are used herein as defined in Articles 8 or 9 of the UCC in effect in the State of New York from time to time, as the context may require (including, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms:   "Accounts", "Chattel Paper", "Commodity Account", "Commercial Tort Claims", "Deposit Account", "Document", "Electronic Chattel Paper", "Equipment", "Financial Asset", "Fixtures", "General Intangible" (except that such term shall include all interest rate or currency protection or hedging arrangements, all licenses, permits, concessions and authorizations and all Intellectual Property (in each case, regardless of whether characterized as General Intangibles under the UCC)), "Goods" (except that such term shall include all Equipment and Inventory (in each case, regardless of whether characterized as Goods under the UCC)), "Instrument", "Inventory" (except that such term shall include all computer programs embedded in any Inventory and all supporting information relating to such programs, in each case that are included in the definition of Goods under the UCC (in each case, regardless of whether characterized as Inventory under the UCC), but not, for the avoidance of doubt, any other Intellectual Property), "Investment Property", "Letter-of-Credit Right", "Money", "Payment Intangibles", "Promissory Notes", "Records", "Securities Accounts", "Securities Entitlement", "Supporting Obligation", "Tangible Chattel Paper" and "Uncertificated Securities").

**SECTION 2.  Lien Priorities.**

2.1.     Relative Priorities.  (a) Notwithstanding (i) the date, time, method, manner, or order of grant, attachment, or perfection of any ABL Lenders Lien or any Term Lenders Lien on any Collateral (including, in each case, irrespective of whether any such ABL Lenders Lien or Term Lenders Lien is granted (or secures Obligations relating to the period) before or after the commencement of any Insolvency Proceeding), (ii) any contrary provision of the UCC or any other applicable law or of the ABL Loan Documents or the Term Loan Documents, as applicable, (iii) any defect or deficiencies in, or failure to attach or perfect, any ABL Lenders Lien or any Term Lenders Lien or (iv) any other circumstance whatsoever:

(A)     Term Collateral Agents, for themselves and on behalf of the other Term Claimholders, hereby agree that:

(1)     any Lien on the ABL Priority Collateral securing the ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap) now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the ABL Priority Collateral securing the Term Obligations now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor; any Lien on the ABL Priority Collateral securing any of the Term Obligations now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap);

20

#4814-6502-9968
#91731356v11

(2)      any Lien on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the ABL Priority Collateral securing Term Obligations in excess of the Term Priority Cap now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor; and any Lien on the ABL Priority Collateral securing Term Obligations in excess of the Term Priority Cap now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap;

(3)      any Lien on the Term Priority Collateral securing the ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap) now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing Term Obligations in excess of the Term Priority Cap now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing any Term Obligations in excess of the Term Priority Cap now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing any ABL Obligations (other than the principal amount of such ABL Obligations in excess of the ABL Priority Cap).

(B)      ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby agrees that:

(1)      any Lien on the Term Priority Collateral securing the Term Obligations (other than the principal amount of such Term Obligations in excess of the Term Priority Cap) now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing the ABL Obligations now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing any of the ABL Obligations now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing any Term Obligations (other than the principal amount of such Term Obligations in excess of the Term Priority Cap);

(2)      any Lien on the Term Priority Collateral securing Term Obligations in excess of the Term Priority Cap now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor shall be senior in

21

#4814-6502-9968
#91731356v11

right, priority, operation, effect and in all other respects to any Lien on the Term Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the Term Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Priority Collateral securing Term Obligations in excess of the Term Priority Cap; and

(3)     any Lien on the ABL Priority Collateral securing the Term Obligations (other than the principal amount of such Term Obligations in excess of the Term Priority Cap) now or hereafter held by or for the benefit or on behalf of any Term Claimholder or any agent or trustee therefor shall be senior in right, priority, operation, effect and in all other respects to any Lien on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor; and any Lien on the ABL Priority Collateral securing ABL Obligations in excess of the ABL Priority Cap now or hereafter held by or for the benefit or on behalf of any ABL Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any Term Obligations (other than the principal amount of such Term Obligations in excess of the Term Priority Cap).

(b)     The priority and subordination of Liens provided for in this Agreement (i) shall continue to be effective with respect to any part of the Collateral from and after the date hereof whether such Liens are declared, or ruled to be, invalid, unenforceable, void or not allowed by a court of competent jurisdiction or otherwise, and whether as a result of any action taken by the Term Collateral Agents or the ABL Collateral Agent, as applicable, or any failure by any such Person to take any action with respect to any financing statement (including any amendment to or continuation thereof), mortgage or other perfection document, or otherwise and (ii) are intended to be effective whether or not such Liens are subordinated to any Lien securing any other obligation of the Borrower, any other Loan Party or any other Person (but only to the extent that such subordination is permitted pursuant to the terms of the ABL Credit Agreement, the Term Credit Agreements and each Additional Junior Obligations Agreement and each Additional Pari Passu Obligations Agreement then in effect or as contemplated in Section 6.1).

2.2.     Prohibition on Contesting Liens or Obligations.  Each of the Term Collateral Agents, for itself and on behalf of each other Term Claimholder, and the ABL Collateral Agent, for itself and on behalf of each other ABL Claimholder, agrees that it and its related Claimholders will not (and hereby waive any right to), directly or indirectly, contest or question the validity or enforceability of, or support any other Person in contesting or questioning the validity or enforceability of, in any proceeding (including any Insolvency Proceeding) (a) the existence, priority, validity, extent, perfection or enforceability of any ABL Lenders Lien or any Term Lenders Lien, (b) the priority, validity, extent or enforceability of any Obligations, including the allowability or priority of any Obligations in any Insolvency Proceeding or (c) the relative rights and duties of the Claimholders granted and/or established in this Agreement; provided, however that nothing in this Agreement shall be construed to prevent or impair the rights of the ABL Collateral Agent, any other ABL Claimholder, the Term Collateral Agents or any other Term Claimholder to enforce the terms of this Agreement, including the provisions of this Agreement relating to the priority and subordination of the Liens securing the ABL Obligations and the Term Obligations, as applicable.

22

#4814-6502-9968
#91731356v11

2.3.     No New Liens.  (a) Whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the parties hereto agree, subject to Section 6, that:

(i)       no Loan Party shall grant, and the Term Collateral Agents shall not accept from any Loan Party, any additional Liens under any Term Collateral Document on any asset to secure any Term Obligation unless such Loan Party also grants a Lien on such asset to secure the ABL Obligations concurrently with the grant of a Lien thereon in favor of the Term Collateral Agents in accordance with the relative Lien priorities set forth in this Agreement; and

(ii)      no Loan Party shall grant, and the ABL Collateral Agent shall not accept from any Loan Party, any additional Liens under any ABL Collateral Documents on any asset to secure any ABL Obligations unless such Loan Party grants a Lien on such asset to secure the Term Obligations concurrently with the grant of a Lien thereon in favor of the ABL Collateral Agent in accordance with the relative Lien priorities set forth in this Agreement;

provided that the foregoing shall not apply to (i) Liens on any asset of any Loan Party granted to secure Obligations of any Class if such asset is expressly excluded from the grant of a security interest by such Loan Party pursuant to the Collateral Documents of the other Class, (ii) additional Liens on any asset of any Loan Party granted to secure Obligations of any Class if, prior to such grant, such Loan Party has offered in writing to grant a Lien on such asset to secure Obligations of the other Class and the Collateral Agent of such other Class has affirmatively declined in writing to accept such Lien; and provided further that the attachment of any previously granted Lien to any after-acquired property of the type covered by such Lien immediately prior thereto shall not be deemed to be an acceptance of an additional Lien for the purposes of this Section 2.3, and (iii) Material Owned Property (as such term is defined in the First Lien Credit Agreement), as to which ABL Claimholders do not, pursuant to the terms of the ABL Loan Documents require a Lien.

(b)      To the extent that the provisions of Section 2.3(a) are not complied with for any reason, (i) without limiting any other rights and remedies available to the ABL Collateral Agent or the other ABL Claimholders, the Term Collateral Agents, on behalf of the Term Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted and accepted in contravention of Section 2.3(a) shall be subject to Section 4.2 and the Term Collateral Agents also shall hold and be deemed to have held such Liens for the benefit of the ABL Collateral Agent and the other ABL Claimholders subject to the provisions set forth herein, and (ii) without limiting any other rights and remedies available to the Term Collateral Agents or the other Term Claimholders, the ABL Collateral Agent, on behalf of the ABL Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted and accepted in contravention of Section 2.3(a) shall be subject to Section 4.2 and the ABL Collateral Agent also shall hold and be deemed to have held such Liens for the benefit of the Term Collateral Agents and the other Term Claimholders subject to the provisions set forth herein.

2.4.     Cooperation in Designating Collateral.  In furtherance of Section 9.19, each of the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that it and its related Claimholders will, subject to the other provisions of this Agreement, upon request by the ABL Collateral Agent or the Term Collateral Agents, cooperate in good faith (and will direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Priority Collateral and the Term Priority Collateral, as the case may be, and the steps taken to perfect the ABL Lenders Liens or the Term Lenders Liens, as the case may be, and the identity of the respective parties obligated under the ABL Loan Documents and the Term Loan Documents, as the case may be.  In addition, each of the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral

23

#4814-6502-9968
#91731356v11

Agents, for themselves and on behalf of the other Term Claimholders, agrees that, in the event that (a) the ABL Collateral Agent receives any business interruption insurance proceeds, the ABL Collateral Agent shall deliver to the Controlling Term Agent 50% of such proceeds and (b) any Term Collateral Agent receives any business interruption insurance proceeds, such Term Collateral Agent shall deliver to the ABL Collateral Agent 50% of such proceeds.

2.5.     Revolving Nature of ABL Obligations.  Each Term Administrative Agent, for itself and on behalf of the other Term Claimholders, expressly acknowledges and agrees that (a) the ABL Credit Agreement includes a revolving commitment and that in the ordinary course of business the ABL Administrative Agent and the ABL Lenders will apply payments and make advances thereunder, (b) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, subject to the ABL Priority Cap, (c) all cash collateral received by the ABL Administrative Agent or the ABL Collateral Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time and from time to time and (d) the advance rates under the ABL Credit Agreement may be reduced, the eligibility criteria for purposes of the Borrowing Base (as defined in the ABL Credit Agreement) may be modified and Reserves (as defined in the ABL Credit Agreement) may be imposed, under the terms of the ABL Credit Agreement, in each case without altering or otherwise affecting the relative Lien priorities set forth in this Agreement.

2.6.     No Subordination of the Relative Priority of Claims.  Notwithstanding anything to the contrary contained herein, the subordination of the Term Lenders Liens to the ABL Lenders Liens and of the ABL Lenders Liens to the Term Lenders Liens as set forth herein is with respect to the relative priority of the respective Liens held by or on behalf of the Term Claimholders or the ABL Claimholders only and shall not constitute a subordination of the Term Obligations to the ABL Obligations or the ABL Obligations to the Term Obligations.

**SECTION 3.  Exercise of Remedies**.

3.1.     Exercise of Remedies by Term Collateral Agents.  Until the Discharge of ABL Priority Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, each Term Collateral Agent, for itself and on behalf of the other Term Claimholders, agrees that the Term Claimholders:

(a)     will not exercise or seek to exercise any rights or remedies with respect to any ABL Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral); provided, however, that the Controlling Term Agent may exercise any or all such rights or remedies (including any Exercise of Secured Creditor Remedies with respect to any ABL Priority Collateral) after the passage of a period of at least 180 days after the date on which the ABL Collateral Agent received written notice from either Term Collateral Agent that the maturity of the Term Obligations has been accelerated; provided, further, however, that notwithstanding anything to the contrary contained herein, in no event will the Term Collateral Agents or any other Term Claimholder exercise any rights or remedies with respect to the ABL Priority Collateral if, notwithstanding the expiration of such 180-day period, the ABL Collateral Agent or any other ABL Claimholder (x) shall have commenced and is diligently pursuing the exercise of its rights or remedies with respect to all or a material portion of the ABL Priority Collateral (prompt written notice of such exercise to be given to the Controlling Term Agent by the ABL Collateral Agent, provided that the failure to give such notice shall not affect the ABL Collateral Agent's or any other ABL Claimholders' rights hereunder) or (y) shall have been stayed by operation of law or any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the Term Collateral Agents and the other Term Claimholders may not pursuant to this Section 3.1(a) exercise any rights or remedies with respect to the ABL Priority Collateral,

24

#4814-6502-9968
#91731356v11

the "Term Standstill Period"); provided that in the event that at any time after the Term Collateral Agent has sent a notice to the ABL Collateral Agent to commence the Term Standstill Period, the Term Default that was the basis for such notice is cured or waived or otherwise ceases to exist, and any notice of acceleration has been rescinded by the Term Collateral Agent, then the notice to commence the Term Standstill Period shall automatically and without further action of the parties be deemed rescinded and no Term Standstill Period shall have been deemed to have commenced;

(b)     will not directly or indirectly contest, protest or object to or hinder any Exercise of Secured Creditor Remedies by the ABL Collateral Agent or any other ABL Claimholder with respect to any ABL Priority Collateral;

(c)     will have no right to direct the ABL Collateral Agent to Exercise any Secured Creditor Remedies with respect to any ABL Priority Collateral or to take any other action under the ABL Loan Documents with respect to any ABL Priority Collateral; and

(d)     will not object to (and hereby waive any and all claims with respect to) the forbearance by the ABL Collateral Agent or the other ABL Claimholders from Exercising any Secured Creditor Remedies with respect to any ABL Priority Collateral;

provided, however, that, in each case under this Section 3.1, the Term Lenders Liens shall remain on any Proceeds (other than those Proceeds properly applied to the ABL Obligations in accordance with Section 4.1(a)) resulting from actions taken by the ABL Collateral Agent or any other ABL Claimholder with respect to the ABL Priority Collateral (subject to the relative Lien priorities described in Section 2).

3.2.    Exercise of Remedies by ABL Collateral Agent.  Until the Discharge of Term Priority Obligations has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the ABL Claimholders:

(a)     will not exercise or seek to exercise any rights or remedies with respect to any Term Priority Collateral (including any Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral); provided, however, that the ABL Collateral Agent may exercise any or all such rights or remedies (including any Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral) after the passage of a period of at least 180 days after the date on which the Controlling Term Agent received written notice from the ABL Collateral Agent that the maturity of the ABL Obligations has been accelerated; provided further, however, that notwithstanding anything to the contrary contained herein, in no event will the ABL Collateral Agent or any other ABL Claimholder exercise any rights or remedies with respect to the Term Priority Collateral if, notwithstanding the expiration of such 180-day period, any Term Collateral Agent or any Term Claimholder (x) shall have commenced and is diligently pursuing the exercise of its rights or remedies with respect to all or a material portion of the Term Priority Collateral (prompt written notice of such exercise to be given to the ABL Collateral Agent by the Term Collateral Agents, provided that the failure to give such notice shall not affect the Term Collateral Agents' or any other Term Claimholders' rights hereunder) or (y) shall have been stayed by operation of law or any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the ABL Collateral Agent and the other ABL Claimholders may not pursuant to this Section 3.2(a) exercise any rights or remedies with respect to the Term Priority Collateral, the "ABL Standstill Period"); provided that in the event that at any time after the ABL Collateral Agent has sent a notice to the Controlling Term Agent to commence the ABL Standstill Period, the ABL Default that was the basis for such notice is cured or waived or otherwise ceases to exist, and any notice of acceleration has been rescinded by the ABL Collateral Agent, then the notice to commence the ABL Standstill Period shall

25

#4814-6502-9968
#91731356v11

automatically and without further action of the parties be deemed rescinded and no ABL Standstill Period shall have been deemed to have commenced;

(b)     will not directly or indirectly contest, protest or object to or hinder any Exercise of Secured Creditor Remedies by the Term Collateral Agents or any other Term Claimholder with respect to any Term Priority Collateral;

(c)     will have no right to direct the Term Collateral Agents to Exercise any Secured Creditor Remedies with respect to any Term Priority Collateral or to take any other action under the Term Loan Documents with respect to any Term Priority Collateral; and

(d)     will not object to (and hereby waives any and all claims with respect to) the forbearance by the Term Collateral Agents or any other Term Claimholder from the Exercise of Secured Creditor Remedies with respect to any Term Priority Collateral

provided, however, that, in each case under this Section 3.2, the ABL Lenders Liens shall remain on any Proceeds (other than those Proceeds properly applied to the Term Obligations in accordance with Section 4.1(b)) resulting from actions taken by the Term Collateral Agents or any other Term Claimholder with respect to the Term Priority Collateral (subject to the relative Lien priorities described in Section 2).

3.3.     Exclusive Enforcement Rights.  (a) Until the Discharge of ABL Priority Obligations has occurred and except as provided in Sections 3.1(a) and 3.4, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the ABL Collateral Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to the ABL Priority Collateral (including the exercise of any right under any lockbox agreement, control agreement, landlord waiver, bailee's letter, consignee agreement or any similar agreement or arrangement with respect to the ABL Priority Collateral) without any consultation with or the consent of the Term Collateral Agents or any other Term Claimholder; provided, however, that the Term Lenders Liens shall remain on any Proceeds (other than those properly applied to the ABL Obligations in accordance with Section 4.1(a)) resulting from actions taken by the ABL Collateral Agent or any other ABL Claimholder with respect to the ABL Priority Collateral (subject to the relative Lien priorities described in Section 2).

(b)     Until the Discharge of Term Priority Obligations has occurred and except as provided in Sections 3.2(a), 3.4 and 3.7, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, the Controlling Term Agent shall have the exclusive right to Exercise any Secured Creditor Remedies with respect to the Term Priority Collateral (including the exercise of any right under any lockbox agreement, control agreement, landlord waiver, bailee's letter, consignee agreement or any similar agreement or arrangement with respect to the Term Priority Collateral) without any consultation with or the consent of the ABL Collateral Agent or any other ABL Claimholder; provided, however, that the ABL Lenders Liens shall remain on any Proceeds (other than those properly applied to the Term Obligations in accordance with Section 4.1(b)) resulting from actions taken by the Controlling Term Agent or any other Term Claimholder with respect to the Term Priority Collateral (subject to the relative Lien priorities described in Section 2).

(c)     In connection with any Exercise of Secured Creditor Remedies with respect to any of its Senior Priority Collateral, each of the Term Collateral Agents, the other Term Claimholders, the ABL Collateral Agent and the other ABL Claimholders may enforce the provisions of the Term Collateral Documents or ABL Collateral Documents, as applicable, and exercise rights, powers and remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by any Senior Claimholder to Dispose of its Senior Priority Collateral upon foreclosure, to incur expenses in connection with such

26

#4814-6502-9968
#91731356v11

Disposition, and to exercise with respect to its Senior Priority Collateral all the rights and remedies of a secured creditor under applicable law.

3.4.   Claimholders Permitted Actions.   Anything to the contrary in Sections 3.1 and 3.2 notwithstanding, each of the Term Collateral Agents, the other Term Claimholders, the ABL Collateral Agent and the other ABL Claimholders may, but shall not be obligated to:

(a)   if an Insolvency Proceeding has been commenced by or against the Borrower or any other Loan Party, file a proof of claim or statement of interest with respect to the Term Collateral or the ABL Collateral, as the case may be, or otherwise with respect to the Term Obligations or the ABL Obligations, as the case may be;

(b)   take any action (not adverse to the priority status of the Liens on the Senior Priority Collateral of the Collateral Agent and other Claimholders of the other Class, or the rights of the Collateral Agent or any other Claimholders of the other Class to Exercise any Secured Creditor Remedies) in order to create, perfect, preserve, protect or prove (but, subject to Section 3.1(a) or 3.2(a), as the case may be, not enforce) its Lien on its Term Collateral or ABL Collateral, as the case may be, in each case, to the extent not inconsistent with the terms of this Agreement;

(c)   file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any Person objecting to or otherwise seeking the disallowance of its claims or any claims of the other Claimholders of its Class or the avoidance of any Liens on any Collateral securing any Obligations of its Class, in each case, to the extent not inconsistent with the terms of this Agreement;

(d)   file any pleadings, objections, motions or agreements that assert rights or interests available to unsecured creditors of the Loan Parties arising under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, in each case not inconsistent with the terms of this Agreement; provided that any judgment Lien obtained in connection therewith shall be subject to the relative Lien priorities set forth in this Agreement;

(e)   vote on any Plan of Reorganization, file any proof of claim and make other filings and make any arguments and motions, in each case to the extent not inconsistent with the terms of this Agreement;

(f)   exercise any of its other rights or remedies referred to in Section 3.1(a) or 3.2(a), as the case may be, after the expiration of the Term Standstill Period or ABL Standstill Period, as applicable, or in Section 3.7 or 3.8 to the extent permitted thereby;

(g)   make a cash bid on all or any portion of the Term Collateral or the ABL Collateral, as applicable, in any foreclosure proceeding or action;

(h)   make a credit bid on all or any portion of the Term Collateral or the ABL Collateral, as applicable, provided that there is a Discharge of any Senior Obligations secured by Senior Liens on such Collateral in cash in full prior to or upon consummation of any such credit bid;

(i)   join in (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Senior Priority Collateral of the other Class initiated by any Claimholder of the other Class to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or

27

#4814-6502-9968
#91731356v11

otherwise interfere with the Exercise of Secured Creditor Remedies by the Claimholders of other Class (it being understood that (i) with respect to ABL Priority Collateral, neither the Term Collateral Agents nor any other Term Claimholder shall be entitled to receive any Proceeds thereof unless otherwise expressly permitted herein and (ii) with respect to the Term Priority Collateral, neither the ABL Collateral Agent nor any other ABL Claimholder shall be entitled to receive any Proceeds thereof unless otherwise expressly permitted herein);

(j)        engage or retain consultants, valuation firms, appraisers, investment bankers and accountants, and perform or engage third parties to perform audits, examinations and appraisals of any Collateral, for the sole purpose of valuing such Collateral and not for the purpose of marketing or conducting a Disposition of such Collateral; provided, however, that the Junior Claimholders with respect to any Collateral shall not take any of the foregoing actions if such actions would interfere in any material respect with the enforcement by the Senior Claimholders with respect to such Collateral of their Senior Liens; and

(k)        commence, or join in filing of a petition for the commencement of, any involuntary Insolvency Proceeding of the type described in clause (a), (b) or (d) of the definition of such term or exercise any of its rights during any Insolvency Proceeding to the extent expressly permitted by Section 6.

Except as expressly set forth in this Agreement (including Sections 3.1(a), 3.2(a), 3.4 and 6), each Term Claimholder and each ABL Claimholder shall have any and all rights and remedies it may have as a creditor (including as an unsecured creditor) under any applicable law, including the right to the Exercise of Secured Creditor Remedies; provided, however, that (a) the Exercise of Secured Creditor Remedies with respect to the Collateral (and any judgment Lien obtained in connection therewith or otherwise) shall be subject to the Lien priorities set forth herein and to the provisions of this Agreement, and (b) the exercise of any rights or remedies as unsecured creditors of the Loan Parties shall not be inconsistent with the terms of this Agreement. The ABL Collateral Agent and the other ABL Claimholders may enforce the provisions of the ABL Loan Documents, the Term Collateral Agents and the other Term Claimholders may enforce the provisions of the Term Loan Documents, and the Collateral Agents and the other Claimholders may Exercise any Secured Creditor Remedies, all in such order and in such manner as they may determine in the exercise of their sole discretion, consistent with the terms of this Agreement (including Sections 2, 3 and 6) and mandatory provisions of applicable law; provided, however, that each of the ABL Collateral Agent and the Controlling Term Agent agrees to provide to the other (x) an Enforcement Notice prior to its Exercise of Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to the Borrower or any other Loan Party; provided further, however, that the ABL Collateral Agent's failure to provide copies of any such notices to the Term Collateral Agents shall not impair any of the ABL Collateral Agent's or other ABL Claimholders' rights hereunder or under any of the ABL Loan Documents, and the Term Collateral Agents' failure to provide copies of any such notices to the ABL Collateral Agent shall not impair any of the Term Collateral Agents' or any other Term Claimholders' rights hereunder or under any of the Term Loan Documents. Each of the Term Collateral Agents, for itself and on behalf of each other Term Claimholder, and the ABL Collateral Agent, for itself and on behalf of each other ABL Claimholder, agrees that it and its related Claimholders will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the Term Collateral Agents and each other Term Claimholder, against either the ABL Collateral Agent or any other ABL Claimholder, and in the case of the ABL Collateral Agent and each other ABL Claimholder, against either the Term Collateral Agents or any other Term Claimholder, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such Person with respect to the Collateral which is consistent with the terms of this Agreement, and none of such Persons shall be liable for any such action taken or omitted to be taken.

28

#4814-6502-9968
#91731356v11

3.5.    Retention of Proceeds.

(a)    The Term Claimholders shall not be permitted to retain any proceeds of ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies in any circumstance unless and until the Discharge of ABL Priority Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to Section 4.2.

(b)    The ABL Claimholders shall not be permitted to retain any proceeds of Term Priority Collateral in connection with any Exercise of Secured Creditor Remedies in any circumstance unless and until the Discharge of Term Priority Obligations has occurred, and any such proceeds received or retained in any other circumstance will be subject to Section 4.2.

(c)    Notwithstanding anything contained in this Agreement to the contrary, in the event of any Disposition or series of related Dispositions that includes ABL Priority Collateral and Term Priority Collateral where the aggregate sales price is not allocated between the ABL Priority Collateral and the Term Priority Collateral being Disposed (including in connection with or as a result of the sale of the Equity Interests of a Loan Party), solely for purposes of this Agreement, the portion of the aggregate sales price determined to be Proceeds of the ABL Priority Collateral on the one hand and Proceeds of the Term Priority Collateral on the other hand shall be allocated first to the ABL Priority Collateral in an amount equal to the lesser of (x) the total proceeds of such Disposition and (y) the book value of such sold ABL Priority Collateral recorded on the applicable Loan Party's books in accordance with GAAP on the date of such Disposition, with the balance, if any, allocated to the Term Priority Collateral.

3.6.    Non-Interference.  Subject to Sections 3.1, 3.2, 3.3, 3.4, and 6.4(b), each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby:

(a)    agrees that it and its related Claimholders will not, directly or indirectly, knowingly take any action that would restrain, hinder, limit, delay, or otherwise interfere with any Exercise of Secured Creditor Remedies by the Claimholders of the other Class with respect to any Senior Priority Collateral of such other Class, or that is otherwise prohibited hereunder, including any Disposition of any Senior Priority Collateral of such other Class, whether by foreclosure or otherwise;

(b)    waives any and all rights it or its related Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the Claimholders of the other Class seek to enforce or collect any Obligations of such other Class (subject to the terms of this Agreement insofar as any such enforcement or collection relates to the Collateral constituting junior priority Collateral of such other Class) or to enforce or realize their Senior Liens on any Senior Priority Collateral of such other Class, regardless of whether any action or failure to act by or on behalf of any Claimholders of such other Class is adverse to the interest of it or its related Claimholders; and

(c)    agrees that it and its related Claimholders will not knowingly take or cause to be taken any action the purpose or effect of which is to make any junior lien that it or any of its related Claimholders has on any Collateral equal with, or to give it or its related Claimholders any preference or priority relative to, any Senior Lien on such Collateral;

(d)    agrees it will not seek, and will waive any right, to have any Senior Priority Collateral or any part thereof of the other Class marshaled upon any foreclosure or other Disposition of such Senior Priority Collateral; and

29

#4814-6502-9968
#91731356v11

(e)     will not attempt, directly or indirectly, whether by judicial proceedings (including in any Insolvency Proceeding) or otherwise, to challenge the enforceability of any provision of this Agreement.

3.7.    <u>Inspection and Access Rights</u>.

(a)     If the Term Collateral Agents, or any agent or representative of the Term Collateral Agents, shall, after any Term Default, obtain possession or physical control of any of the Term Priority Collateral, such Term Collateral Agent shall promptly notify the ABL Collateral Agent in writing of that fact, and the ABL Collateral Agent shall, within 30 calendar days thereafter, notify the Term Collateral Agents in writing as to whether the ABL Collateral Agent desires to exercise its access rights under this Section 3.7 with respect to such Term Priority Collateral.  Upon delivery of such notice by the ABL Collateral Agent to the Term Collateral Agents, the parties shall confer in good faith to coordinate with respect to the ABL Collateral Agent's exercise of such access rights.  Consistent with the definition of "Use Period," access rights may apply to differing parcels of real properties at differing times, in which case, a differing Use Period will apply to each such property.

(b)     Without limiting any rights the ABL Collateral Agent or any other ABL Claimholder may otherwise have under applicable law or by agreement and whether or not the Term Collateral Agents or any other Term Claimholder has commenced and is continuing to Exercise any Secured Creditor Remedies of the Term Claimholders, in the event any Term Collateral Agent, or any agent or representative of the Term Collateral Agents, shall have obtained possession or physical control of any Term Priority Collateral and the ABL Collateral Agent shall have delivered the written notice of its intent to exercise its access rights under this Section 3.7 as provided in Section 3.7(a), then the ABL Collateral Agent or any other Person (including any ABL Claimholder) acting with the consent, or on behalf, of the ABL Collateral Agent shall have the right, and the Term Collateral Agents and the other Term Claimholders will reasonably cooperate in connection therewith, at the sole cost and expense of the ABL Collateral Agent and the other ABL Claimholders and upon reasonable advance written notice to the Term Collateral Agents, during the Use Period (i) during normal business hours on any Business Day, to access ABL Priority Collateral that (A) is stored or located in or on, (B) has become an accession with respect to (within the meaning of Section 9-335 of the UCC), or (C) has been commingled with (within the meaning of Section 9-336 of the UCC) any such Term Priority Collateral, and (ii) access, on a non-exclusive basis, any such Term Priority Collateral (including Equipment (including any processors, computers and other machinery related to the storage or processing of records, documents or files), Fixtures, Intellectual Property, General Intangibles and real property), for purposes of (A) assembling and storing the ABL Priority Collateral and completing the processing of and turning into finished goods of any ABL Priority Collateral consisting of work-in process, semi-finished goods or raw materials, (B) selling any or all of the ABL Priority Collateral located on such Term Priority Collateral, whether in bulk, in lots or to customers in the ordinary course of business or otherwise, (C) removing any or all of the ABL Priority Collateral located on such Term Priority Collateral, or (D) taking reasonable actions to protect, secure and otherwise enforce the rights of the ABL Collateral Agent and the other ABL Claimholders in and to the ABL Priority Collateral, <u>provided</u> that if the ABL Collateral Agent conducts a public auction or private sale of the ABL Priority Collateral at any of the real properties subject to a Mortgage that constitutes Term Priority Collateral, the ABL Collateral Agent shall provide the Term Collateral Agents with two Business Days' advance written notice and use reasonable efforts to hold such auction or sale in a manner which would not unduly disrupt the Term Collateral Agents' or any other Term Claimholder's use of such real properties.  The Term Collateral Agents and the other Term Claimholders may not sell, assign or otherwise transfer the Term Priority Collateral prior to the expiration of the Use Period unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.7.

30

#4814-6502-9968
#91731356v11

(c)      During the period of actual occupation, use and/or control by the ABL Collateral Agent or any other ABL Claimholder (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral pursuant to Section 3.7(b), the ABL Collateral Agent and the other ABL Claimholders shall be obligated to promptly repair at their expense any actual physical damage (but not any diminution in value) to such Term Priority Collateral or other assets or property on which such Term Priority Collateral is located resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear).  In the event, and only in the event, that in connection with its use of some or all of the premises constituting Term Priority Collateral, the ABL Collateral Agent requires the services of any employees of any Loan Party, the ABL Claimholders shall pay directly to any such employees the appropriate, allocated wages of such employees, if any, during the time periods that the ABL Collateral Agent requires their services to the extent not paid for by the Loan Parties.  Notwithstanding the foregoing, in no event shall the ABL Collateral Agent or the other ABL Claimholders have any liability to the Term Collateral Agents or the other Term Claimholders pursuant to this Section 3.7 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral or other assets or property on which such Term Priority Collateral is located existing prior to the date of the exercise by the ABL Collateral Agent or the other ABL Claimholders of their rights under this Section 3.7 and the ABL Collateral Agent and the other ABL Claimholders shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Collateral Agent or any other ABL Claimholders, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Priority Collateral by the ABL Collateral Agent or any other ABL Claimholders in the manner and for the time periods specified under this Section 3.7 (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear. Without limiting the rights granted in this Section 3.7, the ABL Collateral Agent and the ABL Claimholders shall reasonably cooperate with the Term Collateral Agents and the other Term Claimholders in connection with any efforts made by the Term Collateral Agents and the other Term Claimholders to sell the Term Priority Collateral.

(d)      The ABL Collateral Agent and the other ABL Claimholders shall not be obligated to pay any amounts to the Term Collateral Agents or the other Term Claimholders (or any Person claiming by, through or under the Term Claimholders, including any purchaser of the Term Priority Collateral) or to the Loan Parties for or in respect of the use by the ABL Collateral Agent and the other ABL Claimholders of the Term Priority Collateral pursuant to this Section 3.7; provided that the ABL Claimholders shall be obligated to reimburse the Term Collateral Agents and the other Term Claimholders for their reasonable out-of-pocket costs and expenses incurred as a result of the Term Collateral Agents and the other Term Claimholders providing access and use of the Term Priority Collateral to the ABL Collateral Agent or any other ABL Claimholder (or any other Person acting with the consent, or on behalf, of any of the foregoing) at the written request of the ABL Collateral Agent as contemplated by Section 3.7(b).

(e)      The ABL Claimholders shall (i) use the Term Priority Collateral in accordance with applicable law, (ii) insure for damage to property and liability to Persons, including property and liability insurance for the benefit of the Term Claimholders, and (iii) pay, indemnify and hold the Term Collateral Agents, the other Term Claimholders and each of their respective officers, agents, directors and employees harmless from and against any third party liability resulting solely and directly from the ABL Collateral Agent's or any other ABL Claimholders' or any of their respective agents, representatives or invitees', occupancy, use or control of the Term Priority Collateral as set forth in this Section 3.7 (ordinary wear and tear excepted (it being understood that any equipment breakdowns or any wear or loss of tools in the ordinary course of operations shall be deemed to be ordinary wear and tear)).

31

(f)       The Term Collateral Agents and the other Term Claimholders shall use commercially reasonable efforts to not hinder or obstruct the ABL Collateral Agent and the other ABL Claimholders from exercising the rights described in Section 3.7(b).

(g)       Subject to the terms hereof, the Controlling Term Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral, without the involvement of or interference by any ABL Claimholder or liability to any ABL Claimholder, as long as, in the case of an actual sale, the respective purchaser assumes and agrees to the obligations of the Term Collateral Agents and the other Term Claimholders under this Section 3.7.

3.8.    Sharing of Information and Access.  Subject to the confidentiality limitations imposed by law or agreement (other than any agreement to the extent the confidentiality provisions of such agreement are for the benefit of any Loan Party), in the event that the ABL Collateral Agent shall, in the exercise of its rights under the ABL Collateral Documents or otherwise, receive possession or control of any books and records (whether in the form of a writing or stored in any data equipment or data record in the physical possession of the ABL Collateral Agent) of any Loan Party which contain information identifying or pertaining to the Term Priority Collateral, the ABL Collateral Agent shall, upon written request from the Controlling Term Agent and as promptly as practicable thereafter, either make available to the Controlling Term Agent such books and records for inspection and duplication or provide to the Controlling Term Agent copies thereof.  Subject to the confidentiality limitations imposed by law or agreement (other than any agreement to the extent the confidentiality provisions of such agreement are for the benefit of any Loan Party), in the event that either Term Collateral Agent shall, in the exercise of its rights under the Term Collateral Documents or otherwise, receive possession or control of any books and records (whether in the form of a writing or stored in any data equipment or data record in the physical possession of either Term Collateral Agent) of any Loan Party which contain information identifying or pertaining to any of the ABL Priority Collateral, such Term Collateral Agent shall, upon written request from the ABL Collateral Agent and as promptly as practicable thereafter, either make available to the ABL Collateral Agent such books and records for inspection and duplication or provide the ABL Collateral Agent copies thereof.

3.9.    Tracing of and Priorities in Proceeds.  (a) The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, further agree that until the earlier of an issuance of any Enforcement Notice by such Claimholder or a bankruptcy or insolvency constituting a Term Default or a bankruptcy or insolvency constituting an ABL Default, as applicable, then exists, any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Loan Party to acquire other property which is Collateral shall not (solely as between the Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative Lien priorities in the Collateral which was so acquired.

(b)       Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, acknowledges that, under the terms of the ABL Loan Documents, the Loan Parties are or may be required to ensure that all payments on Accounts constituting ABL Priority Collateral, or on other ABL Priority Collateral, are made to Deposit Accounts or lockboxes related thereto that constitute ABL Priority Collateral, and agrees that, notwithstanding anything to the contrary set forth herein, no ABL Claimholder shall have any duty, responsibility or obligation to any Term Claimholder with respect to such Deposit Accounts or lockboxes, including no obligation to pay over to any Term Claimholder any payments received into any such Deposit Account or lockbox at any time.  Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that, notwithstanding anything to the contrary set forth herein (including Section 4.2) to the extent that Proceeds of any Term Priority Collateral are deposited into any Deposit Accounts or lockboxes and are subsequently applied to repay or prepay the ABL Obligations, in the absence of the ABL Administrative Agent's willful misconduct or gross negligence

32

(such absence to be presumed unless otherwise determined by a final, non-appealable judgment of a court of competent jurisdiction), the sole remedy of the Term Claimholders with regard to such Proceeds shall be to proceed directly against the Loan Parties unless, prior to the time such proceeds are applied to repay or prepay the ABL Obligations, the ABL Administrative Agent has actually received a Notification of Proceeds. For purposes of the foregoing, a "Notification of Proceeds" means a notice in writing from the Controlling Term Agent or any Loan Party to the ABL Administrative Agent containing the following information: (a) the Term Priority Collateral being sold or otherwise Disposed, (b) the proposed date of the sale or other Disposition, (c) the approximate amount of Proceeds therefrom and (d) the name and contact information of the buyer or transferee of such Term Priority Collateral or, in the case of an auction, of the auctioneer.

3.10. Permits and Licenses. (a) Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, (i) consents to the grant by the Borrower or any other Loan Party to the ABL Collateral Agent of a non-exclusive royalty-free license to use any Intellectual Property of such Loan Party that is subject to a Lien held by the Term Collateral Agents and (ii) grants, in its capacity as a Claimholder and to the extent of its rights and interests therein, to the ABL Collateral Agent a non-exclusive royalty-free license to use any Intellectual Property constituting Term Priority Collateral that is subject to a Senior Lien held by the Term Collateral Agents (and, as applicable, to Dispose of any such Intellectual Property that is embedded in or otherwise integral to any Inventory, to the extent the Loan Party owning such Inventory would Dispose of such Intellectual Property in connection with the Disposition of such Inventory), in each case in connection with the Exercise of Secured Creditor Remedies of any Lien held by the ABL Collateral Agent upon any Inventory or other ABL Priority Collateral of any Loan Party and to the extent the use of such Intellectual Property is necessary or appropriate, in the good faith opinion of the ABL Collateral Agent, to process, ship, produce, store, complete, supply, lease, sell or otherwise Dispose of any such Inventory or other ABL Priority Collateral in any lawful manner in connection with such Exercise of Secured Creditor Remedies.

(b) Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that if the ABL Collateral Agent shall require rights available under any permit or license controlled by the Term Collateral Agents or any other Term Claimholder in connection with the Exercise of Secured Creditor Remedies, the Term Collateral Agents or such other Term Claimholder shall take all such actions as shall be reasonably available to it (at the sole cost and expense of the Loan Parties), consistent with applicable law, and as shall be reasonably requested by the ABL Collateral Agent to make such rights available to the ABL Collateral Agent, subject to the Term Lenders Liens. The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that if the Term Collateral Agents shall require rights available under any permit or license controlled by the ABL Collateral Agent or any other ABL Claimholder in connection with the Exercise of Secured Creditor Remedies, the ABL Collateral Agent or such other ABL Claimholder shall take all such actions as shall be reasonably available to it (at the sole cost and expense of the Loan Parties), consistent with applicable law, and as shall be reasonably requested by the Term Collateral Agents to make such rights available to the Term Collateral Agents, subject to the ABL Lenders Liens.

(c) The Term Collateral Agents and the other Term Claimholders may not sell, assign or otherwise transfer the Term Priority Collateral unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.10.

**SECTION 4.  Proceeds**.

4.1. Application of Proceeds.

#4814-6502-9968
#91731356v11

(a)     Prior to the Discharge of ABL Obligations, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, any ABL Priority Collateral received in connection with any Exercise of Secured Creditor Remedies (including as a result of any collection, sale, foreclosure or other realization or distribution of or in respect of any ABL Priority Collateral (whether or not expressly characterized as such) or in any Insolvency Proceeding) shall be applied in the following order of priority:

(i)     first, to the ABL Obligations (other than the principal amount thereof in excess of the ABL Priority Cap) and for cash collateral as required under the ABL Loan Documents, and in such order as specified in the applicable ABL Loan Documents until the Discharge of ABL Priority Obligations has occurred;

(ii)     second, to the Term Obligations (other than the principal amount thereof in excess of the Term Priority Cap) in such order as specified in the applicable Term Loan Documents until the Discharge of Term Priority Obligations has occurred;

(iii)     third, to the principal amount of the ABL Obligations in excess of the ABL Priority Cap until the Discharge of ABL Obligations has occurred; and

(iv)     fourth, to the principal amount of the Term Obligations in excess of the Term Priority Cap.

(b)     Prior to the Discharge of Term Obligations, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, any Term Priority Collateral received in connection with any Exercise of Secured Creditor Remedies (including as a result of any collection, sale, foreclosure or other realization or distribution of or in respect of any Term Priority Collateral (whether or not expressly characterized as such) or in any Insolvency Proceeding) shall be applied in the following order of priority

(i)     first, to the Term Obligations (other than the principal amount thereof in excess of the Term Priority Cap) and for cash collateral as required under the Term Loan Documents, and in such order as specified in the applicable Term Loan Documents until the Discharge of Term Priority Obligations has occurred;

(ii)     second, to the ABL Obligations (other than the principal amount thereof in excess of the ABL Priority Cap) in such order as specified in the applicable ABL Loan Documents until the Discharge of ABL Priority Obligations has occurred;

(iii)     third, to the principal amount of the Term Obligations in excess of the Term Priority Cap until the Discharge of Term Obligations has occurred; and

(iv)     fourth, to the principal amount of the ABL Obligations in excess of the ABL Priority Cap.

(c)     If any Exercise of Secured Creditor Remedies with respect to the Collateral produces non-cash proceeds, then such non-cash proceeds shall, subject to Section 4.2, be held by the Collateral Agent that conducted such Exercise of Secured Creditor Remedies and/or sold for cash prior to the application of the proceeds thereof as additional Collateral and, at such time as such non-cash proceeds are monetized, shall be applied as set forth above.

34

#4814-6502-9968
#91731356v11

4.2.    <u>Turnover</u>.  So long as the Discharge of Senior Obligations with respect to any Collateral has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Loan Party, if (a) any Junior Claimholder of any Class receives any Collateral that is subject to any Senior Lien or any Proceeds of any such Collateral, or any other payment in connection with or on account of such Collateral, (i) in connection with the enforcement or exercise of any right or remedy (including any right of set-off) relating to such Collateral, the transfer of such Collateral or Proceeds to any Junior Claimholder by any Person holding a Lien on such Collateral that is subordinate to the junior Lien on such Collateral, or proceeds of any insurance policy claim or of any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of such Collateral or (ii) as a distribution or recovery in any Insolvency Proceeding, (b) any Junior Claimholder receives, in contravention of Section 2.3, any Collateral of the type that would not constitute Senior Priority Collateral of such Junior Claimholder, or any Proceeds of any such Collateral, or any other payment in connection with or on account of such Collateral, or (c) any Junior Claimholder receives any additional Collateral referred to in Section 6.4 that pursuant to such Section is subject to the provisions of this Section 4.2, or any Proceeds of such additional Collateral, or any other payment in connection with or on account of such additional Collateral, then, in each case, such Collateral or Proceeds thereof, or such other payment, shall be segregated and held in trust and forthwith, to the extent not prohibited by applicable law, shall be transferred or paid over to the Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements, for application in accordance with Section 4.1 (to the extent required), or as a court of competent jurisdiction may otherwise direct; <u>provided</u>, <u>however</u>, (A) in the case of any Proceeds of Term Priority Collateral received by the ABL Collateral Agent or any other ABL Claimholder in connection with a Disposition of Term Priority Collateral by any Loan Party, unless a Notification of Proceeds has been received by the ABL Collateral Agent (and in each case subject to Section 3.9(b)), neither the ABL Collateral Agent nor any other ABL Claimholder shall have any obligation to transfer or pay over any Proceeds of such Disposition to the Term Collateral Agents, and (B) any payments made by the Loan Parties in respect of the Term Obligations with proceeds of loans or advances under the ABL Loan Documents shall not constitute a breach of this Section 4.2 and shall not be subject to any turnover as provided for in this Section 4.2.  Until the Discharge of ABL Priority Obligations occurs, each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, hereby irrevocably constitutes and appoints the ABL Collateral Agent and any officer or agent of the ABL Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Term Collateral Agents or the other Term Claimholders, as the case may be, or in the ABL Collateral Agent's own name, from time to time in the ABL Collateral Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 4.2 with respect to ABL Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2 with respect to ABL Priority Collateral.  Until the Discharge of Term Priority Obligations occurs, ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby irrevocably constitutes and appoints the Controlling Term Agent and any officer or agent of the Controlling Term Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the ABL Collateral Agent or the other ABL Claimholders, as the case may be, or in the Controlling Term Agent's own name, from time to time in the Controlling Term Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 4.2 with respect to Term Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2 with respect to Term Priority Collateral.

SECTION 5.    <u>**Releases; Dispositions; Other Agreements**</u>.

5.1.    <u>Releases</u>.

#4814-6502-9968
#91731356v11

(a)      If, in connection with the Exercise of Secured Creditor Remedies by the ABL Collateral Agent with respect to ABL Priority Collateral as provided for in Section 3 (including any Disposition of any ABL Priority Collateral by any Loan Party with the consent of the ABL Collateral Agent acting in accordance with the terms of the ABL Loan Documents), the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, releases any of its ABL Lenders Liens on any part of the ABL Priority Collateral, then the Term Lenders Liens of the Term Collateral Agents on such ABL Priority Collateral shall be automatically, unconditionally, and simultaneously released; provided, however, that, to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations in accordance with Section 4.1(a), the Term Collateral Agents shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  Each of the Term Collateral Agents, for itself or on behalf of the other Term Claimholders, promptly shall execute and deliver to the ABL Collateral Agent such termination or amendment statements, releases, and other documents as the ABL Collateral Agent may reasonably request in writing to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other Term Claimholders.

(b)      If, in connection with the Exercise of Secured Creditor Remedies by the Term Collateral Agents with respect to Term Priority Collateral as provided for in Section 3 (including any Disposition of any Term Priority Collateral by any Loan Party with the consent of the Controlling Term Agent acting in accordance with the terms of the Term Loan Documents), the Controlling Term Agent, for itself and on behalf of the other Term Claimholders, releases any of its Term Lenders Liens on any part of the Term Priority Collateral, then the ABL Lenders Liens of the ABL Collateral Agent on such Term Priority Collateral shall be automatically, unconditionally, and simultaneously released; provided, however, that, to the extent the Proceeds of such Term Priority Collateral are not applied to reduce Term Obligations in accordance with Section 4.1(b), the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  The ABL Collateral Agent, for itself or on behalf of the other ABL Claimholders, promptly shall execute and deliver to the Term Collateral Agents such termination or amendment statements, releases, and other documents as the Controlling Term Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other ABL Claimholders.

(c)      If, in connection with any Disposition of any ABL Priority Collateral permitted under the terms of the ABL Loan Documents and the terms of the Term Loan Documents, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, releases any of its ABL Lenders Liens on the portion of the ABL Priority Collateral that is the subject of such Disposition, then the Term Lenders Liens of the Term Collateral Agents on such Collateral shall be automatically, unconditionally, and simultaneously released; provided, that to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations in accordance with Section 4.1(a), the Term Collateral Agents shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  Each of the Term Collateral Agents, for itself or on behalf of the other Term Claimholders, promptly shall execute and deliver to the ABL Collateral Agent such termination or amendment statements, releases, and other documents as the ABL Collateral Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other Term Claimholders.

(d)      If, in connection with any Disposition of any Term Priority Collateral permitted under the terms of the Term Loan Documents and the terms of the ABL Loan Documents, the Controlling Term Agent, for itself and on behalf of the other Term Claimholders, releases any of its Term Lenders Liens on the portion of the Term Priority Collateral that is the subject of such Disposition, then the ABL Lenders Liens of the ABL Collateral Agent on such Collateral shall be automatically, unconditionally, and simultaneously released; provided that to the extent the Proceeds of such Term Priority Collateral are not applied to reduce Term Obligations in accordance with Section 4.1(b), the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  The ABL Collateral Agent,

36

#4814-6502-9968
#91731356v11

for itself or on behalf of the other ABL Claimholders, promptly shall execute and deliver to the Controlling Term Agent such termination or amendment statements, releases, and other documents as the Controlling Term Agent may reasonably request to effectively confirm such release, at the cost and expense of the Loan Parties and without the consent or direction of any other ABL Claimholders.

(e)     Until the Discharge of ABL Obligations occurs, each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, hereby irrevocably constitutes and appoints the ABL Collateral Agent and any officer or agent of the ABL Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Term Collateral Agents or the other Term Claimholders, as the case may be, or in the ABL Collateral Agent's own name, from time to time as elected by the ABL Collateral Agent in good faith, for the purpose of carrying out the terms of this Section 5.1 with respect to ABL Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to ABL Priority Collateral, including any endorsements or other instruments of transfer or release.

(f)     Until the Discharge of ABL Obligations occurs, to the extent that the ABL Claimholders (i) have released any Lien on ABL Priority Collateral and any such Lien is later reinstated or (ii) obtain any new Lien on assets constituting ABL Priority Collateral from Loan Parties, then, subject to the proviso contained in Section 2.3, the Term Claimholders shall be granted a Lien on any such ABL Priority Collateral, subject to the relative Lien priorities set forth in Section 2.1.

(g)     Until the Discharge of Term Obligations occurs, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, hereby irrevocably constitutes and appoints the Controlling Term Agent and any officer or agent of the Controlling Term Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the ABL Collateral Agent or the other ABL Claimholders, as the case may be, or in the Controlling Term Agent's own name, from time to time as elected by the Controlling Term Agent in good faith, for the purpose of carrying out the terms of this Section 5.1 with respect to Term Priority Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to Term Priority Collateral, including any endorsements or other instruments of transfer or release.

(h)     Until the Discharge of Term Obligations occurs, to the extent that the Term Claimholders (i) have released any Lien on Term Priority Collateral and any such Lien is later reinstated or (ii) obtain any new Liens on assets constituting Term Priority Collateral from Loan Parties, then, subject to the proviso contained in Section 2.3, the ABL Claimholders shall be granted a Lien on any such Term Priority Collateral, subject to the relative Lien priorities set forth in Section 2.1.

5.2.     Insurance.

(a)     Unless and until the Discharge of ABL Obligations has occurred:  (i) the ABL Collateral Agent and the other ABL Claimholders shall have the sole and exclusive right, subject to the rights of the Loan Parties under the ABL Loan Documents, to adjust and settle any claim under any insurance policy to the extent solely in respect of ABL Priority Collateral (including any claim in respect of any business interruption insurance or credit insurance with respect to any Accounts) and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) to the extent solely in respect of the ABL Priority Collateral; and (ii) all proceeds of any such insurance claim and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of ABL

37

#4814-6502-9968
#91731356v11

Priority Collateral, shall be paid, subject to the rights of the Loan Parties under the ABL Loan Documents, in accordance with Section 4.1(a).

(b)      Unless and until the Discharge of Term Obligations has occurred:   (i) the Controlling Term Agent and the other Term Claimholders shall have the sole and exclusive right, subject to the rights of the Loan Parties under the Term Loan Documents, to adjust and settle any claim under any insurance policy to the extent solely in respect of Term Priority Collateral and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) to the extent solely in respect of Term Priority Collateral; and (ii) all proceeds of any such insurance claim and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of Term Priority Collateral, shall be paid, subject to the rights of Loan Parties under the Term Loan Documents, in accordance with Section 4.1(b).

Notwithstanding anything contained in this Agreement to the contrary, in the event that any proceeds are derived from any claim under any insurance policy in respect of both ABL Priority Collateral and Term Priority Collateral where the allocation of proceeds is not stipulated between ABL Priority Collateral and Term Priority Collateral, then solely for purposes of this Agreement, the portion of the aggregate proceeds deemed to be proceeds of the ABL Priority Collateral on the one hand and Term Priority Collateral on the other hand shall be determined by first allocating to the ABL Priority Collateral an amount equal to the lesser of (x) the total proceeds of such insurance policy and (y) the book value of such ABL Priority Collateral subject to such insurance event recorded on the applicable Loan Party's books in accordance with GAAP on the date of the loss associated with the insurance proceeds, with the balance, if any, allocated to the Term Priority Collateral.  If any insurance claim includes both ABL Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to ABL Priority Collateral and Term Priority Collateral, and if the ABL Collateral Agent and the Controlling Term Agent are unable after negotiating in good faith to agree on the settlement for such claim, each Controlling Collateral Agent may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the parties.  If a Collateral Agent or any other Claimholder of any Class shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Section 5.2, it shall pay such proceeds over to the Controlling Collateral Agent of the other Class in accordance with the terms of Section 4.2.

5.3.    <u>Amendments; Refinancings</u>.

(a)      The U.S. ABL Loan Documents and the ABL Obligations may be amended, restated, Refinanced, supplemented or otherwise modified in accordance with their terms without the consent of any Term Collateral Agent or any Term Claimholder, all without affecting the Lien priorities provided for herein or the other provisions hereof; <u>provided</u>, <u>however</u>, that, without the consent of the Controlling Term Agent, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement; <u>provided</u>, <u>further</u>, <u>that</u>, the applicable agent for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

(b)      The First Lien Loan Documents and the First Lien Obligations may be amended, restated, Refinanced (as permitted pursuant to the terms of the ABL Loan Documents and the Second Lien Loan Documents), supplemented or otherwise modified in accordance with their terms without the consent of ABL Administrative Agent, any ABL Claimholder, Second Lien Collateral Agent or any Second Lien Claimholder, all without affecting the Lien priorities provided for herein or the other provisions hereof; <u>provided</u>, <u>however</u>, that, without the consent of the ABL Administrative Agent and Second Lien Collateral Agent, no such amendment, restatement, Refinancing, supplement or modification (or successive

38

#4814-6502-9968
#91731356v11

amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement; provided, further, that, the applicable agent for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

(c)     The Second Lien Loan Documents and the Second Lien Obligations may be amended, restated, Refinanced (as permitted pursuant to the terms of the ABL Loan Documents and the First Lien Loan Documents), supplemented or otherwise modified in accordance with their terms without the consent of ABL Administrative Agent, any ABL Claimholder, First Lien Collateral Agent or any First Lien Claimholder, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the ABL Administrative Agent and First Lien Collateral Agent, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement; provided, further, that, the applicable agent for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

(d)     In connection with any Refinancing, the ABL Collateral Agent and the Term Collateral Agents shall enter (and are hereby authorized to enter without the consent of any other Claimholder), at the written request and expense of the Loan Parties, into such amendments or other modifications of this Agreement as are reasonably necessary to add the new collateral agent (or similar representative) in respect of such Refinancing Indebtedness as a party hereto and to provide such new collateral agent (or similar representative), and the other holders of such Refinancing Indebtedness, the rights and obligations hereunder of the Collateral Agent in respect of, or the holders of, the Indebtedness or other Obligations being Refinanced and to otherwise reflect such Refinancing (and in connection therewith to provide for technical modifications to this Agreement to facilitate the foregoing), it being the intent that such amendments or other modifications (x) establish that the Liens on any Collateral securing any Refinancing Indebtedness will have the same priorities relative to the Liens on such Collateral securing Obligations of the other Class as the Liens that secured the Indebtedness being Refinanced had immediately prior to such Refinancing and (y) provide to the parties benefited by the Liens on any Collateral securing such Refinancing Indebtedness the same rights and obligations relative to the parties holding Liens on such Collateral securing Obligations of the other Class as the parties that were benefited by the Liens that secured such Indebtedness or other Obligations being Refinanced had immediately prior to such Refinancing.

(e)     Notwithstanding the terms of Section 5.3(d):

(i)     In the event that the Term Collateral Agents have not commenced the actions contemplated by Section 5.3(d) in connection with any permitted Refinancing of the ABL Obligations within 10 Business Days after the delivery by the Borrower to the Term Collateral Agents of a written request to do so, then, unless the Term Collateral Agents have provided written notice to the Borrower and the ABL Collateral Agent within such 10 Business Days' period setting forth in reasonable detail the basis for its determination that it is not required to take such action in accordance with Section 5.3(d), the ABL Collateral Agent, without the consent of the Term Collateral Agents, is authorized to amend or otherwise modify this Agreement in the manner set forth in Section 5.3(d); provided that such Refinancing (and any Liens relating thereto), are permitted under the Term Loan Documents then extant.

(ii)    Notwithstanding the terms of Section 5.3(d), in the event that the ABL Collateral Agent does not take the actions contemplated by Section 5.3(d) in connection with any permitted Refinancing of the Term Obligations within 10 Business Days after the delivery by the Borrower to the ABL Collateral Agent of a written request to do so, then, unless the ABL Collateral

39

#4814-6502-9968
#91731356v11

Agent has provided written notice to the Borrower and the Controlling Term Agent within such 10 Business Days' period setting forth in reasonable detail the basis for its determination that it is not required to take such action in accordance with Section 5.3(d), the Term Collateral Agents, without the consent of the ABL Collateral Agent, is authorized to amend or otherwise modify this Agreement in the manner set forth in Section 5.3(d); provided that such Refinancing (and any Liens relating thereto), are permitted under the ABL Loan Documents then extant.

(f)     So long as the Discharge of ABL Obligations has not occurred, each Term Collateral Document shall include the following language (or similar language acceptable to the ABL Collateral Agent): "Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this Agreement in any Collateral and the exercise of any right or remedy by the Collateral Agent with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement. In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

(g)     So long as the Discharge of Term Obligations has not occurred, each U.S. ABL Collateral Document shall include the following language (or similar language acceptable to the Term Collateral Agents): "Notwithstanding anything herein to the contrary, the Liens and security interests granted to the ABL Collateral Agent pursuant to this Agreement in any Collateral and the exercise of any right or remedy by the ABL Collateral Agent with respect to any Collateral hereunder are subject to the provisions of the ABL Intercreditor Agreement. In the event of any conflict between the terms of the ABL Intercreditor Agreement and the terms of this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

5.4.     Bailee for Perfection.

(a)     The ABL Collateral Agent and the Term Collateral Agents each agree to hold or control that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) (such Collateral, which shall include Collateral subject to deposit account control agreements or security account control agreements, being referred to as the "Pledged Collateral"), as gratuitous bailee and as a non-fiduciary agent for the Term Collateral Agents or the ABL Collateral Agent, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC), solely for the purpose of perfecting the security interest granted under the Term Loan Documents or the U.S. ABL Loan Documents, as applicable, subject to the terms and conditions of this Section 5.4. The Term Collateral Agents and the other Term Claimholders hereby appoint the ABL Collateral Agent as their gratuitous bailee for the purposes of perfecting their security interest in all Pledged Collateral in which the ABL Collateral Agent has a perfected security interest under the UCC. The ABL Collateral Agent and the other ABL Claimholders hereby appoint the Term Collateral Agents as their gratuitous bailee for the purposes of perfecting their security interest in all Pledged Collateral in which the Term Collateral Agents has a perfected security interest under the UCC. Each of the ABL Collateral Agent and the Term Collateral Agents hereby accept such appointments pursuant to this Section 5.4(a) and acknowledges and agrees that it shall act for the benefit of the Claimholders of the other Class with respect to any Pledged Collateral and that any proceeds received by the ABL Collateral Agent or the Term Collateral Agents, as the case may be, under any Pledged Collateral shall be applied in accordance with Section 4. Unless and until the Discharge of ABL Obligations has occurred, the Term Collateral Agent agrees to promptly notify the ABL Collateral Agent of any Pledged Collateral constituting ABL Priority Collateral held or controlled by it (or its agents or bailees, other than the ABL Collateral Agent) or actually known by it to be held or controlled by any other Term Claimholders, and at any time prior to the Discharge of ABL Obligations, the Term Collateral Agents and each other Term Claimholder agrees to deliver to the ABL Collateral Agent any such Pledged

40

#4814-6502-9968
#91731356v11

Collateral held by it, together with any necessary endorsements (or otherwise allow the ABL Collateral Agent to obtain control of such Pledged Collateral).  Subject to Section 3.9(b) and except as otherwise provided in Section 4.2 in respect of Proceeds of Term Priority Collateral, unless and until the Discharge of Term Obligations has occurred, the ABL Collateral Agent agrees to promptly notify the Term Collateral Agents in writing of any Pledged Collateral constituting Term Priority Collateral held or controlled by it (or its agents or bailees, other than the Term Collateral Agents) or actually known by it to be held by any other ABL Claimholders, and at any time prior to the Discharge of Term Obligations, the ABL Collateral Agent and each other ABL Claimholder agrees to deliver to the Controlling Term Agent any such Pledged Collateral held by it, together with any necessary endorsements (or otherwise allow the Term Collateral Agents to obtain control of such Pledged Collateral).

(b) Subject to the terms of this Agreement, until the Discharge of ABL Priority Obligations has occurred, the ABL Collateral Agent shall be entitled to deal with the ABL Priority Collateral in accordance with the terms of the ABL Loan Documents as if the Liens of the Term Collateral Agents under the Term Loan Documents did not exist.  The rights of the Term Collateral Agents in respect of any ABL Priority Collateral shall at all times be subject to the terms of this Agreement.

(c) Subject to the terms of this Agreement, until the Discharge of Term Priority Obligations has occurred, the Controlling Term Agent shall be entitled to deal with the Term Priority Collateral in accordance with the terms of the Term Loan Documents as if the Liens of the ABL Collateral Agent under the ABL Loan Documents did not exist.  The rights of the ABL Collateral Agent in respect of any Term Priority Collateral shall at all times be subject to the terms of this Agreement.

(d) The ABL Collateral Agent shall have no obligation whatsoever to the Term Collateral Agents or any other Term Claimholder to ensure that the Pledged Collateral is genuine or owned by any of Loan Parties or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The Term Collateral Agents shall have no obligation whatsoever to the ABL Collateral Agent or any other ABL Claimholder to ensure that the Pledged Collateral is genuine or owned by any of Loan Parties or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the ABL Collateral Agent under this Section 5.4 shall be limited solely to holding or controlling the Pledged Collateral as bailee and agent in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of ABL Priority Obligations as provided in paragraph (f) of this Section 5.4. The duties or responsibilities of the Term Collateral Agents under this Section 5.4 shall be limited solely to holding or controlling the Pledged Collateral as bailee and agent in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of Term Priority Obligations as provided in paragraph (g) of this Section 5.4.

(e) The ABL Collateral Agent acting pursuant to this Section 5.4 shall not have by reason of the ABL Collateral Documents, the Term Collateral Documents, this Agreement, or any other document a fiduciary relationship in respect of the Term Collateral Agents or any other Term Claimholder. The Term Collateral Agents acting pursuant to this Section 5.4 shall not have by reason of the ABL Collateral Documents, the Term Collateral Documents, this Agreement, or any other document a fiduciary relationship in respect of the ABL Collateral Agent or any other ABL Claimholder.

(f) Upon the Discharge of ABL Priority Obligations, the ABL Collateral Agent (i) shall deliver or cause to be delivered the remaining Pledged Collateral (if any) in its possession or in the possession of its agents or bailees (other than the Term Collateral Agents), together with any necessary endorsements, <u>first</u>, to the Controlling Term Agent to the extent Term Obligations remain outstanding as confirmed in writing by any Term Collateral Agent, and, to the extent that both Term Collateral Agents confirm no Term Obligations are outstanding, <u>second</u>, to the applicable Loan Party to the extent no ABL Obligations or Term Obligations that are secured by such Pledged Collateral remain outstanding (in each

41

#4814-6502-9968
#91731356v11

case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction may otherwise direct and (ii) will cooperate with the Term Collateral Agents and such Loan Party, as the case may be, in assigning (without recourse to or warranty by the ABL Collateral Agent or any other ABL Claimholder or agent or bailee thereof) control over any other ABL Priority Collateral under its control.  At such time, the ABL Collateral Agent further agrees to take, at the sole cost and expense of the Loan Parties, all other action reasonably requested in writing by the Controlling Term Agent (including amending any outstanding control agreements) to enable the Controlling Term Agent to obtain a first priority security interest in the Collateral.

(g)     Upon the Discharge of Term Priority Obligations, the Term Collateral Agents (i) shall deliver the remaining Pledged Collateral (if any) in its possession or in the possession of its agents or bailees (other than the ABL Collateral Agent) together with any necessary endorsements, first, to the ABL Collateral Agent to the extent the ABL Obligations remain outstanding as confirmed in writing by the ABL Collateral Agent, and, to the extent that the ABL Collateral Agent confirms no ABL Obligations are outstanding, second, to the applicable Loan Party to the extent no ABL Obligations or Term Obligations that are secured by such Pledged Collateral remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction might otherwise direct and (ii) will cooperate with the ABL Collateral Agent and such Loan Party, as the case may be, in assigning (without recourse to or warranty by the Term Collateral Agents or any other Term Claimholder or agent or bailee thereof) control over any other Term Priority Collateral under its control. At such time, the Term Collateral Agents further agree to take, at the sole cost and expense of the Loan Parties, all other action reasonably requested in writing by the ABL Collateral Agent (including amending any outstanding control agreements) to enable the ABL Collateral Agent to obtain a first priority security interest in the Collateral.

5.5.    When Discharge of Obligations Deemed to Not Have Occurred.

(a)     If the Loan Parties enter into any Refinancing of the ABL Obligations with Indebtedness permitted under the Term Loan Documents that is intended to be (and under the Term Loan Documents is permitted to be) secured by the ABL Priority Collateral on a basis that is senior to the Term Lenders Liens thereon and by the Term Priority Collateral on a basis that is junior to the Term Lenders Liens thereon, then a Discharge of ABL Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the Refinancing Indebtedness in respect of such ABL Obligations shall be treated as ABL Obligations for all purposes of this Agreement, including for purposes of the relative Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent (or similar representative) in respect of the obligations under such Refinancing shall be the ABL Collateral Agent for all purposes of this Agreement; provided, however, that the holders of such Refinancing Indebtedness, and the collateral agent (or similar representative) of such holders, bind themselves to the terms of this Agreement pursuant to an amendment or joinder effected in accordance with Section 5.3(d) or Section 9.4, as applicable.

(b)     If the Loan Parties enter into any Refinancing of the First Lien Obligations with Indebtedness permitted under the ABL Loan Documents that is intended to be (and under the ABL Loan Documents is permitted to be) secured by the Term Priority Collateral on a basis that is senior to the ABL Lenders Liens thereon and by the ABL Priority Collateral on a basis that is junior to the ABL Lenders Liens thereon, then a Discharge of First Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the Refinancing Indebtedness in respect of such First Lien Obligations shall be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the relative Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent (or similar representative) in respect of the obligations under such Refinancing shall be the First Lien Collateral Agent for all purposes of this Agreement; provided, however, that the holders of such Refinancing Indebtedness, and the collateral agent (or similar representative) of such holders, bind themselves to the terms of this

42

Agreement pursuant to an amendment or joinder effected in accordance with Section 5.3(d) or Section 9.4, as applicable.

(c)     If the Loan Parties enter into any Refinancing of the Second Lien Obligations with Indebtedness permitted under the ABL Loan Documents that is intended to be (and under the ABL Loan Documents is permitted to be) secured by the Term Priority Collateral on a basis that is senior to the ABL Lenders Liens thereon and by the ABL Priority Collateral on a basis that is junior to the ABL Lenders Liens thereon, then a Discharge of Second Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, and the Refinancing Indebtedness in respect of such Second Lien Obligations shall be treated as Second Lien Obligations for all purposes of this Agreement, including for purposes of the relative Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent (or similar representative) in respect of the obligations under such Refinancing shall be the Second Lien Collateral Agent for all purposes of this Agreement; provided, however, that the holders of such Refinancing Indebtedness, and the collateral agent (or similar representative) of such holders, bind themselves to the terms of this Agreement pursuant to an amendment or joinder effected in accordance with Section 5.3(d) or Section 9.4, as applicable.

5.6.     Injunctive Relief.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agree that should any Claimholder in any way take, attempt to, or threaten to take any action contrary to terms of this Agreement with respect to the Collateral, or fail to take any action required by this Agreement, the Term Collateral Agents, the ABL Collateral Agent or any other Claimholder, as the case may be, may obtain relief against such Claimholder by injunction, specific performance, or other appropriate equitable relief, it being understood and agreed that non-breaching Claimholders' damages from such actions may at that time be difficult to ascertain and may be irreparable, and (b) each Claimholder waives any defense that other Claimholders can demonstrate damage and/or be made whole by the awarding of damages.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the ABL Collateral Agent or the other ABL Claimholders or the Term Collateral Agents or the other Term Claimholders, as the case may be.

5.7.     Obligations Purchase Right.

(a)     Without prejudice to the enforcement of any remedies of any Claimholder, whether under the Credit Documents or otherwise, the Collateral Agents of each Class, on behalf of its related Claimholders, agrees that, in the event a Purchase Event of the type described in clause (c) of the definition of such term shall have occurred, or any other Purchase Event shall have occurred with respect to Obligations of such Class (the "Subject Obligations" which, if such Subject Obligations are the Term Obligations, shall include both the First Lien Obligations and the Second Lien Obligations), the Claimholders of the other Class (or any of them) may, at their sole expense and effort, upon notice to the ABL Collateral Agent if the ABL Obligations are such first Class or the Term Collateral Agent if the Term Obligations are such first class (which notice shall be irrevocable and shall specify the date of closing (which shall be not less than five (5) nor more than thirty (30) Business Days after the receipt by the applicable Collateral Agents of such first Class of the irrevocable notice from the Controlling Collateral Agent of the other Class' election to exercise the purchase option as provided for in this Section 5.7), require the Claimholders holding the Subject Obligations (the "Subject Secured Parties") to assign and delegate to the Claimholders of such other Class, without warranty or representation or recourse, all (but not less than all) of the Subject Obligations (including all, but not less than all, unfunded commitments under the applicable Credit Documents, if any, that are in effect); provided that (i) such assignment and delegation

43

#4814-6502-9968
#91731356v11

shall not conflict with any applicable law and (ii) the Claimholders of such other Class shall have paid to the applicable Collateral Agent or Collateral Agents of such first Class, for the account of the Subject Claimholders, in immediately available funds, an amount equal to 100% of the principal of all Indebtedness included in such Subject Obligations plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (including prepayment fees) and all premiums applicable thereto and all the other Subject Obligations then outstanding (which shall include, with respect to (A) the aggregate face amount of the letters of credit, cash collateral in an amount equal to 102% thereof, (B) any ABL Secured Hedging Obligations, 100% of the aggregate amount of such ABL Secured Hedging Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the relevant ABL Secured Hedge Agreements giving rise to such ABL Secured Hedging Obligations were terminated at such time, (C) any ABL Cash Management Obligations, 100% of the aggregate amount of such ABL Cash Management Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the ABL Cash Management Agreement giving rise to such ABL Cash Management Obligations were terminated at such time (or, if not then terminable, if such ABL Cash Management Agreement were terminated on the first date on which the party providing such services would be entitled to terminate it (assuming that such party promptly takes all actions (including the giving of any notice of termination) that under the terms of such ABL Cash Management Agreement are required to be taken in order to effect such termination)), (D) any Term Secured Hedging Obligations, 100% of the aggregate amount of such Term Secured Hedging Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the relevant Term Secured Hedge Agreements giving rise to such Term Secured Hedging Obligations were terminated at such time, and (E) any Term Cash Management Obligations, 100% of the aggregate amount of such Term Cash Management Obligations (giving effect to any netting arrangements) that any Loan Party or a Subsidiary would be required to pay if the Term Cash Management Agreement giving rise to such Term Cash Management Obligations were terminated at such time (or, if not then terminable, if such Term Cash Management Agreement were terminated on the first date on which the party providing such services would be entitled to terminate it (assuming that such party promptly takes all actions (including the giving of any notice of termination) that under the terms of such Term Cash Management Agreement are required to be taken in order to effect such termination)). In order to effectuate the foregoing, the applicable Collateral Agent or Collateral Agents of such first Class shall calculate, upon the written request of the Collateral Agent of such other Class from time to time, the amount in cash (and, with respect to clause (A) above, cash collateral) that would be necessary so to purchase the Subject Obligations. Notwithstanding anything herein to the contrary, so long as the First Lien Collateral Agent is the Controlling Term Agent, only the First Lien Collateral Agent and the First Lien Claimholders may exercise the purchase right specified in this Section 5.7.

(b)        Following exercise of any such purchase right by the Claimholders of any Class in accordance with the terms of this Section 5.7, the Claimholders shall cooperate in consummating promptly thereafter such assignment and delegation using the applicable assignment forms provided in the Credit Documents of the applicable Class or, if no such assignment forms are provided, using the assignment and assumption forms customary for the type of Obligations being assigned. In addition, contemporaneously with the consummation of the purchase by the Claimholders of any Class of the Subject Obligations of the other Class, the Collateral Agent and Administrative Agent of such purchased Class shall resign as the "Collateral Agent" and "Administrative Agent" under the applicable Credit Documents (and shall execute and deliver all such documents and instruments reasonably requested by the Collateral Agent of the purchasing Class to assign and transfer any Collateral, together with any and all rights under third-party agreements related to Collateral and/or access thereto, to the Collateral Agent of the purchasing Class and to maintain the validity, perfection and priority of the Liens on the Collateral in favor of the Collateral Agent of the purchasing Class) and the Collateral Agent of the purchasing Class shall be designated as the successor "Collateral Agent" under the Credit Documents of the purchased Class and the Administrative

44

Agent of the purchasing Class shall be designated as the successor "Administrative Agent" under the Credit Documents of the purchased Class.

### SECTION 6.  **Insolvency Proceedings**.

6.1.   Financing.

(a)   Until the Discharge of ABL Obligations, if any Loan Party shall be subject to any Insolvency Proceeding and the ABL Collateral Agent consents to the use of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code; herein, "Cash Collateral") constituting ABL Priority Collateral or consents to permit any Loan Party to obtain financing provided by any one or more ABL Claimholders or any other Person under Section 364 of the Bankruptcy Code or under any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, secured by a Lien on such ABL Priority Collateral that is (i) senior to or pari passu with the ABL Lenders Liens on the ABL Priority Collateral and (ii) junior to the Term Lenders Liens on the Term Priority Collateral (such financing, which may include a "roll-up" or "roll-over" of all or any of the ABL Obligations, is referred to herein as a "DIP Financing"), and if the Loan Parties desire to obtain authorization from the applicable Bankruptcy Court to use such Cash Collateral or to obtain such DIP Financing, then each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that, so long as the maximum principal amount of such DIP Financing (and any unfunded commitments under such DIP Financing and the face amount of any letters of credit or other financial accommodations issued and outstanding under such DIP Financing), does not exceed 115% of the principal balance of the ABL Obligations as of the date of the commencement of such Insolvency Proceeding, the Term Claimholders will consent (and hereby are deemed to have consented to), and will not object to or oppose, or support any other Person objecting to or opposing, such use of such Cash Collateral or such DIP Financing and, to the extent the ABL Lenders Liens on the ABL Priority Collateral are subordinated to or pari passu with any new Liens securing such DIP Financing, each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, will subordinate (and hereby subordinates) the Term Lenders Liens on the ABL Priority Collateral (x) to the Liens securing such DIP Financing (the extent consistent with the other provisions of this Agreement) and (y) to any professional fee or U.S. trustee fee "carve-out"; provided that (A) the Term Collateral Agents and the other Term Claimholders shall retain the Term Lenders Liens on the Collateral and, as to the Term Priority Collateral only, the Term Lenders Liens shall have the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on the Term Priority Collateral securing such DIP Financing shall be junior and subordinate to the Term Lenders Liens on the Term Priority Collateral, (B) all Liens on ABL Priority Collateral securing any such DIP Financing shall be senior to or pari passu with the ABL Lenders Liens on the ABL Priority Collateral and (C) the terms of such DIP Financing or Cash Collateral order do not require any Term Claimholders to extend additional credit pursuant to such DIP Financing or Cash Collateral order.  The foregoing provisions of this Section 6.1(a) shall not restrict the Term Collateral Agents or any other Term Claimholders from objecting to or opposing any provision in any Cash Collateral order or DIP Financing documentation relating to any provision or content of a Plan of Reorganization other than a condition in the DIP Financing that provides that all Obligations in respect of such DIP Financing must be paid in full upon the confirmation of any Plan of Reorganization; provided that the inability of the Term Claimholders to receive a Lien on actions under Chapter 5 of the Bankruptcy Code or proceeds thereof shall not affect the agreements and waivers set forth in this section.

(b)   Until the Discharge of Term Obligations, if any Loan Party shall be subject to any Insolvency Proceeding and the Controlling Term Agent consents to the use of Cash Collateral constituting Term Priority Collateral or consents to permit any Loan Party to obtain financing provided by any one or more Term Claimholders or any other Person under Section 364 of the Bankruptcy Code or under any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, secured by a Lien on such Term Priority Collateral that is (i) senior to or pari passu with the Term Lenders Liens

#4814-6502-9968
#91731356v11

on the Term Priority Collateral and (ii) junior to the ABL Lenders Liens on the ABL Priority Collateral (such financing, which may include a "roll-up" or "roll-over" of all or any of the Term Obligations, is referred to herein as a "Term DIP Financing"), and if the Loan Parties desire to obtain authorization from the applicable Bankruptcy Court to use such Cash Collateral or to obtain such Term DIP Financing, then the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that, so long as the principal amount of such Term DIP Financing (x) if the Controlling Term Agent is the First Lien Agent, does not exceed 115% of the principal balance of the First Lien Obligations as of the date of the commencement of such Insolvency Proceeding and (y) if the Controlling Term Agent is the Second Lien Collateral Agent, does not exceed 115% of the principal balance of the principal balance of the Second Lien Obligations as of the date of the commencement of such Insolvency Proceeding, the ABL Claimholders will consent (and hereby are deemed to have consented to), and will not object to or oppose, or support any other Person objecting to or opposing, such use of such Cash Collateral or such Term DIP Financing and, to the extent the Term Lenders Liens on the Term Priority Collateral are subordinated to or pari passu with any new Liens securing such Term DIP Financing, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, will subordinate (and hereby subordinates) the ABL Lenders Liens on the Term Priority Collateral (x) to the Liens securing such Term DIP Financing (to the extent consistent with the other provisions of this Agreement) and (y) to any professional fee or U.S. trustee fee "carve-out"; provided that (A) the ABL Collateral Agent and the other ABL Claimholders shall retain the ABL Lenders Liens on the Collateral and, as to the ABL Priority Collateral only, the ABL Lenders Liens shall have the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on the ABL Priority Collateral securing such Term DIP Financing shall be junior and subordinate to the ABL Lenders Liens on the ABL Priority Collateral, (B) all Liens on Term Priority Collateral securing any such Term DIP Financing shall be senior to or pari passu with the Term Lenders Liens on the Term Priority Collateral and (C) the terms of such Term DIP Financing or Cash Collateral order do not require any ABL Claimholders to extend additional credit pursuant to such Term DIP Financing or Cash Collateral order. The foregoing provisions of this Section 6.1(b) shall not restrict the ABL Collateral Agent or any other ABL Claimholder from objecting to or opposing any provision in any Cash Collateral order or Term DIP Financing documentation relating to any provision or content of a Plan of Reorganization other than a condition in the Term DIP Financing that provides that all Obligations in respect of such Term DIP Financing must be paid in full upon the confirmation of any Plan of Reorganization; provided that the inability of the ABL Claimholders to receive a Lien on actions under Chapter 5 of the Bankruptcy Code or proceeds thereof shall not affect the agreements and waivers set forth in this section.

(c)     Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that, with respect to any Cash Collateral use or DIP Financing that meets the requirements of Section 6.1(a), no Term Claimholder will request adequate protection in connection with its rights as a holder of Liens on the ABL Priority Collateral, except as expressly agreed by the ABL Collateral Agent or as permitted by Section 6.4(b)(ii). The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that, with respect to any Cash Collateral use or Term DIP Financing that meets the requirements of Section 6.1(b), no ABL Claimholder will request adequate protection in connection with its rights as a holder of Liens on the Term Priority Collateral, except as expressly agreed by the Term Collateral Agents or as permitted by Section 6.4(b)(ii).

(d)     All ABL Lenders Liens granted to the ABL Collateral Agent or any other ABL Claimholder, and all Term Lenders Liens granted to the Term Collateral Agents or any other Term Claimholders, in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the parties to be and shall be deemed to be subject to the Lien priorities set forth in Section 2.1 and the other terms and conditions of this Agreement.

6.2.     Sales.   Subject to Section 3.7, each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL

46

#4814-6502-9968
#91731356v11

Claimholders, agrees that the Term Claimholders or the ABL Claimholders, as the case may be, will consent to (and hereby are deemed to have consented to), and will not object or oppose (or support any Person in objecting to or opposing), a motion to Dispose any Senior Priority Collateral of the other Class free and clear of any Liens under Section 363 of the Bankruptcy Code (or any comparable provision of any other similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law), including any motion for approval of bidding procedures in connection therewith or any other related or ancillary matters, if the requisite ABL Claimholders under the ABL Credit Agreement or the requisite Term Claimholders under the Term Credit Agreements, as the case may be, have consented to such Disposition of such assets, so long as the Liens of the Term Claimholders or the ABL Claimholders, as the case may be, on such assets attach to the proceeds thereof subject to the relative Lien priorities set forth in this Agreement and such motion does not impair the rights of the Term Claimholders or the ABL Claimholders, as the case may be, under Section 363(k) of the Bankruptcy Code (so long as the right of the Term Claimholders to offset their Term Obligations against the purchase price for any ABL Priority Collateral exists only after the Discharge of ABL Obligations and the right of the ABL Claimholders to offset their ABL Obligations against the purchase price for any Term Priority Collateral exists only after the Discharge of Term Obligations).

6.3.    Relief from the Automatic Stay.

(a)    Until the Discharge of ABL Obligations has occurred, the Term Collateral Agents, on behalf of itself and the other Term Claimholders, agrees that the Term Claimholders will not seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of the ABL Priority Collateral without the prior written consent of the ABL Collateral Agent.

(b)    Until the Discharge of Term Obligations has occurred, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, agrees that the ABL Claimholders will not seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of the Term Priority Collateral without the prior written consent of the Term Collateral Agents.

6.4.    Adequate Protection.

(a)    In any Insolvency Proceeding, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agree that the ABL Claimholders or the Term Claimholders, as the case may be, will not object to or oppose (or support any other Person objecting to or opposing) (i) any motion or other request for adequate protection by (x) the Term Collateral Agents or any other Term Claimholder, with respect to the Term Priority Collateral, prior to the Discharge of Term Obligations or (y) the ABL Collateral Agent or any other ABL Claimholder, with respect to the ABL Priority Collateral, prior to the Discharge of ABL Obligations, as the case may be, or (ii) any objection claiming a lack of adequate protection by (x) the Term Collateral Agents or any other Term Claimholder, with respect to the Term Priority Collateral, prior to the Discharge of Term Obligations, or (y) the ABL Collateral Agent or any other ABL Claimholder, with respect to the ABL Priority Collateral, prior to the Discharge of ABL Obligations, as the case may be.

(b)    In any Insolvency Proceeding:

(i)    The Term Collateral Agents and the other Term Claimholders may seek adequate protection with respect to their rights in the Term Priority Collateral, and the ABL Collateral Agent and the other ABL Claimholders may seek adequate protection with respect to

47

#4814-6502-9968
#91731356v11

their rights in the ABL Priority Collateral. Notwithstanding the foregoing, however, (1) the Term Claimholders shall not be permitted to receive Post-Petition Interest payments or adequate protection payments from the proceeds of ABL Priority Collateral or any DIP Financing permitted under Section 6 before the Discharge of ABL Obligations, other than with the prior consent of the ABL Claimholders, and (2) the ABL Claimholders shall not be permitted to receive Post-Petition Interest and adequate protection payments from the proceeds of Term Priority Collateral or any Term DIP Financing permitted under Section 6 before the Discharge of Term Obligations other than with the prior consent of the Term Claimholders.

(ii)    Notwithstanding anything in this Section 6 to the contrary, (A) to the extent that the Term Collateral Agents or any other Term Claimholders are granted adequate protection in the form of an additional or replacement Lien on assets of the same type as the Term Priority Collateral, the ABL Claimholders shall be permitted to seek a Lien on such Collateral subject to the relative Lien priority set forth in Section 2.1 (and neither the Term Collateral Agents nor any other Term Claimholder shall object to or oppose (or support any other Person objecting to or opposing) any motion by any ABL Claimholder to receive such a Lien), and (B) to the extent that the ABL Collateral Agent or any other ABL Claimholders are granted adequate protection in the form of an additional or replacement Lien on assets of the same type as the ABL Priority Collateral, the Term Claimholders shall be permitted to seek a Lien on such Collateral subject to the relative Lien priority set forth in Section 2.1 (and neither the ABL Collateral Agent nor any other ABL Claimholder shall object to or oppose (or support any other Person objecting to or opposing) any motion by any Term Claimholder to receive such a Lien).

(iii)   If any ABL Claimholder seeks or requires (or is otherwise granted) adequate protection of its ABL Lenders Liens on the Term Priority Collateral in the form of additional or replacement Lien on assets of the same type as the Term Priority Collateral, then the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, agrees that the Term Collateral Agents shall be entitled to be granted an additional or replacement Lien on such assets as adequate protection of its senior interest in the Term Priority Collateral and that the additional or replacement Lien thereon of the ABL Collateral Agent or any other ABL Claimholder shall be subordinated and junior to the additional or replacement Lien thereon of the Term Collateral Agents on the same basis as the ABL Lenders Liens are subordinated to the Term Lenders Liens with respect to the Term Priority Collateral under Section 2.1; provided that, to the extent the Term Collateral Agents is not granted such adequate protection in the applicable form, any such additional or replacement Lien and any amounts recovered by or distributed to the ABL Collateral Agent or any other ABL Claimholder pursuant to or as a result of such Lien shall be subject to Section 4.2 to the extent not inconsistent with an order of a court of competent jurisdiction.

(iv)   If any Term Claimholder seeks or requires (or is otherwise granted) adequate protection of its Term Lenders Liens on the ABL Priority Collateral in the form of additional or replacement Lien on assets of the same type as the ABL Priority Collateral, then each of the Term Collateral Agents, for itself and on behalf of the Term Claimholders, agrees that the ABL Collateral Agent shall be entitled to be granted an additional or replacement Lien on such assets as adequate protection of its senior interest in the ABL Priority Collateral and that the additional or replacement Lien thereon of the Term Collateral Agents or any other Term Claimholder shall be subordinated and junior to the additional or replacement Lien thereon of the ABL Collateral Agent on the same basis as the Term Lenders Liens are subordinated to the ABL Lenders Liens with respect to the ABL Priority Collateral under Section 2.1; provided that, to the extent the ABL Collateral Agent is not granted such adequate protection in the applicable form, any such additional or replacement Lien and any amounts recovered by or distributed to the Term Collateral Agents or any other Term Claimholder pursuant to or as a result of such Lien shall be

48

#4814-6502-9968
#91731356v11

subject to Section 4.2 to the extent not inconsistent with an order of a court of competent jurisdiction.

(v)    Except as expressly set forth in Sections 6.1, 6.2 and 6.3 and this Section 6.4, nothing herein shall limit the rights of the Term Collateral Agents or any other Term Claimholder, or the rights of the ABL Collateral Agent or any other ABL Claimholder, to seek adequate protection with respect to their rights in the Collateral in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

6.5.    Section 1111(b) of the Bankruptcy Code.  Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, and the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that neither it nor its related Claimholders shall object to or oppose (or support any other Person objecting to or opposing), or take any other action to impede, in any Insolvency Proceeding, the right of any Claimholder of the other Class to make an election under Section 1111(b)(2) of the Bankruptcy Code with respect to the Senior Priority Collateral of such Claimholder of the other Class.  Each of the Term Collateral Agents, for itself and the other Term Claimholders, and the ABL Collateral Agent, for itself and the other ABL Claimholders, waives any claim it or its related Claimholders may hereafter have against any Claimholder of the other Class arising out of (a) the election by such Claimholder of the other Class of the application of Section 1111(b)(2) of the Bankruptcy Code or (b) any cash collateral or financing arrangement, and any related grant of a security interest in the Senior Priority Collateral of such Claimholder of the other Class, made in accordance with Section 6.1 in any Insolvency Proceeding.

6.6.    Avoidance Issues.  If any Claimholder is required in any Insolvency Proceeding or otherwise to turn over, disgorge or otherwise pay to the estate of any Loan Party any amount paid in respect of the ABL Obligations or the Term Obligations, as the case may be (a "Recovery"), then such Claimholder shall be entitled to a reinstatement of the ABL Obligations or the Term Obligations, as the case may be, with respect to all such recovered amounts, and all rights, interests, priorities and privileges recognized in this Agreement shall apply with respect to any such reinstated ABL Obligations or Term Obligations, as the case may be.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement.  This Section 6.6 shall survive the termination of this Agreement.

6.7.    Plan of Reorganization.

(a)    If, in any Insolvency Proceeding, debt obligations of any reorganized Loan Party secured by Liens upon any property of the reorganized Loan Party are distributed or reinstated (in whole or in part) pursuant to a Plan of Reorganization, both on account of the ABL Obligations and on account of the Term Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Term Obligations are secured by Liens upon the same property, the relative Lien priorities and other provisions of this Agreement will survive the distribution of such debt obligations pursuant to such Plan of Reorganization and will apply with like effect to the Liens securing such debt obligations.

(b)    The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that neither it nor its related Claimholders shall (i) take or support any other Person in taking any action that is inconsistent with the relative Lien priorities or other provisions of this Agreement or (ii) propose, vote for, or otherwise support directly or indirectly any Non-Conforming Plan of Reorganization (and, in the event

49

#4814-6502-9968
#91731356v11

of any such proposal, vote or other support of a Non-Conforming Plan of Reorganization by a Claimholder of any Class, the Collateral Agent of the other Class shall be entitled to have any such proposal, vote or support changed or withdrawn).

6.8.     Separate Grants of Security and Separate Classification.  The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, acknowledges and agrees that (a) the respective grants of Liens pursuant to the ABL Collateral Documents and the Term Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Collateral, (i) the Term Obligations are fundamentally different from the ABL Obligations and (ii) the ABL Obligations are fundamentally different from the Term Obligations and, in each case, must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Claimholders and the Term Claimholders in respect of the Collateral constitute claims of the same class (rather than at least two separate classes of secured claims with the relative Lien priorities described in Section 2.1), then the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, and each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, hereby acknowledge and agree that all distributions from the Collateral shall be made as if such claims were of two separate classes of junior and senior claims (with the effect being that, to the extent that (x) if the aggregate value of the ABL Priority Collateral is sufficient (for this purpose ignoring all claims held by the Term Claimholders thereon), the ABL Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other ABL Obligations, all amounts owing in respect of Post-Petition Interest that is available from the ABL Priority Collateral, before any distribution is made in respect of the Term Obligations with respect to the ABL Priority Collateral, with each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agreeing to turn over to the ABL Collateral Agent amounts otherwise received or receivable by any of them with respect to the ABL Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries on the Term Obligations, and (y) if the aggregate value of the Term Priority Collateral is sufficient (for this purpose ignoring all claims held by the ABL Claimholders thereon), the Term Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other Term Obligations, all amounts owing in respect of Post-Petition Interest that is available from the Term Priority Collateral, before any distribution is made in respect of the ABL Obligations with respect to the Term Priority Collateral, with the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agreeing to turn over to the Term Collateral Agents amounts otherwise received or receivable with respect to such Term Priority Collateral by any of them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries on the ABL Obligations).  This Section 6.8 is intended to govern the relationship between the classes of claims held by the ABL Claimholders, on the one hand, and a collective class of claims comprised of each series of claims of the Term Claimholders (as opposed to separate classes of each such series of claims), on the other hand, and, for the avoidance of doubt, nothing set forth herein shall in any way alter or modify the relationship of each series of such separate claims held by the holders of the Term Obligations, including as set forth in the First Lien/Second Lien Intercreditor Agreement if in effect, or otherwise cause such different claims to be combined into one or more classes or otherwise classified in a manner that violates the First Lien/Second Lien Intercreditor Agreement if in effect.

6.9.     Post-Petition Interest.

(a)     The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that none of them shall object to or oppose (or support any other Person objecting to or opposing) any claim by the Term Collateral Agents or any other Term Claimholder for allowance in any Insolvency

50

#4814-6502-9968
#91731356v11

Proceeding of Term Obligations consisting or alleged to consist of Post-Petition Interest to the extent of the value of the Term Lenders Liens on the Term Priority Collateral (without regard to the existence of the ABL Lenders Liens thereon) or on the ABL Priority Collateral (after taking into account the ABL Lenders Liens thereon); provided, that, Term Claimholders shall not be permitted to receive Post-Petition Interest payments from the proceeds of ABL Priority Collateral or any  DIP Financing permitted under Section 6.1(a) prior to the Discharge of ABL Obligations, other than with the prior consent of the ABL Claimholders.

(b)        Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that none of them shall object to or oppose (or support any other Person objecting to or opposing) any claim by the ABL Collateral Agent or any other ABL Claimholder for allowance in any Insolvency Proceeding of ABL Obligations consisting or alleged to consist of Post-Petition Interest to the extent of the value of the ABL Lenders Liens on the ABL Priority Collateral (without regard to the existence of the Term Lenders Liens thereon) or on the Term Priority Collateral (after taking into account the Term Lenders Liens thereon); provided, that, ABL Claimholders shall not be permitted to receive Post-Petition Interest payments from the proceeds of Term Priority Collateral or any Term DIP Financing permitted under Section 6.1(b) prior to the Discharge of Term Obligations, other than with the prior consent of the Term Claimholders.

## SECTION 7.  Reliance; Waivers; Etc.

7.1.     Reliance.  Other than any reliance on the terms of this Agreement, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges that they have, independently and without reliance on the Term Collateral Agents or any other Term Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the ABL Loan Documents and be bound by the terms of this Agreement, and that they will continue to make their own credit decision in taking or not taking any action under the ABL Loan Documents or this Agreement.  Other than any reliance on the terms of this Agreement, the Term Collateral Agents, on behalf of itself and the other Term Claimholders, acknowledges that they have, independently and without reliance on the ABL Collateral Agent or any other ABL Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Term Loan Documents and be bound by the terms of this Agreement, and that they will continue to make their own credit decision in taking or not taking any action under the Term Loan Documents or this Agreement.

7.2.     No Warranties or Liability.  The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges and agrees that, except as set forth in Section 8, neither the Term Collateral Agents nor any other Term Claimholder has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the Term Loan Documents, the ownership of any Collateral, or the perfection or priority of any Liens thereon.  Except as otherwise expressly provided herein, the Term Collateral Agents and the other Term Claimholders will be entitled to manage and supervise the Term Loan Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  The Term Collateral Agents, on behalf of itself and the other Term Claimholders, acknowledges and agrees that, except as set forth in Section 8, neither the ABL Collateral Agent nor any other ABL Claimholder has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any of the ABL Loan Documents, the ownership of any Collateral, or the perfection or priority of any Liens thereon.  Except as otherwise expressly provided herein, the ABL Claimholders will be entitled to manage and supervise the ABL Loan Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  Except as

51

#4814-6502-9968
#91731356v11

expressly provided herein, the Term Collateral Agents and the other Term Claimholders shall have no duty to the ABL Collateral Agent or any other ABL Claimholders, and the ABL Collateral Agent and the other ABL Claimholders shall have no duty to the Term Collateral Agents and the other Term Claimholders, to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of a default or an event of default under any agreements with any Loan Party (including the ABL Loan Documents and the Term Loan Documents), regardless of any knowledge thereof which they may have or be charged with. The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, acknowledges and agrees that the Term Collateral Agents may, but shall have no obligation to, take all actions it determines necessary or advisable to perfect or continue the perfection of the Term Lenders Liens on any Collateral, and the Term Collateral Agents shall not be liable for any lapse of perfection or for maintaining perfection. The Term Collateral Agents, on behalf of itself and the other Term Claimholders, acknowledges and agrees that the ABL Collateral Agent may, but shall have no obligation to, take all actions it determines necessary or advisable to perfect or continue the perfection of the ABL Lenders Liens on any Collateral, and the ABL Collateral Agent shall not be liable for any lapse of perfection or for maintaining perfection.

7.3.    No Waiver of Lien Priorities.

(a)     No right of the ABL Collateral Agent or any other ABL Claimholder to enforce any provision of this Agreement or any U.S. ABL Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Loan Party or by any act or failure to act by the ABL Collateral Agent or any other ABL Claimholder or by any noncompliance by any Person with the terms, provisions, and covenants of this Agreement, any of the ABL Loan Documents or any of the Term Loan Documents, regardless of any knowledge thereof which the ABL Collateral Agent or any other ABL Claimholder may have or be otherwise charged with. No right of the Term Collateral Agents or any other Term Claimholder to enforce any provision of this Agreement or any Term Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Loan Party or by any act or failure to act by the Term Collateral Agents or any other Term Claimholder or by any noncompliance by any Person with the terms, provisions, and covenants of this Agreement, any of the Term Loan Documents or any of the ABL Loan Documents, regardless of any knowledge thereof which the Term Collateral Agents or any other Term Claimholder may have or be otherwise charged with.

(b)     Without in any way limiting the generality of Section 7.3(a), but subject to any rights of the Loan Parties under the ABL Loan Documents and the Term Loan Documents and subject to the provisions of Section 5.3(a), the ABL Collateral Agent and any other ABL Claimholder may, at any time and from time to time in accordance with the ABL Loan Documents and/or applicable law, without the consent of, or notice to, the Term Collateral Agents or any other Term Claimholder, without incurring any liabilities to the Term Collateral Agents or any other Term Claimholder and without impairing or releasing the relative Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Term Collateral Agents or the other Term Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following:

(i)      make loans and advances to an ABL Borrower or any other Loan Party, issue, guaranty or obtain letters of credit for account of an ABL Borrower or any other Loan Party or otherwise extend credit to an ABL Borrower or any other Loan Party, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(ii)     change the manner, place, or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase, or alter the terms of, any of the ABL Obligations or any guarantee thereof or any other liability of any Loan Party, or any liability incurred directly or indirectly in respect thereof (including any increase in (so long as such increase

52

#4814-6502-9968
#91731356v11

does not cause the maximum principal amount drawable or outstanding principal balance under the ABL Credit Agreement to exceed the ABL Priority Cap) or extension of the ABL Obligations, without any restriction as to the amount, tenor, or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any ABL Lenders Liens, the ABL Obligations, or any of the ABL Loan Documents;

(iii)   sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the ABL Priority Collateral or any liability of any Loan Party to the ABL Claimholders or any liability incurred directly or indirectly in respect thereof;

(iv)   settle or compromise any ABL Obligation or any other liability of any Loan Party or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the ABL Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

(v)   exercise or delay in or refrain from exercising any right or remedy against any Loan Party or any other Person, elect any remedy and otherwise deal freely with any Loan Party or any ABL Priority Collateral and any security and any guarantor or any liability of any Loan Party to any ABL Claimholders or any liability incurred directly or indirectly in respect thereof;

provided that the foregoing shall not (x) limit or otherwise affect in any way any Loan Party's obligations or liabilities under the Term Loan Documents to the extent any of the foregoing constitutes a violation of any of the Term Loan Documents or (y) limit the restrictions set forth in Section 5.3(a) or be deemed to be a waiver by the Term Collateral Agents or any other Term Claimholder of any liability of, or any claim against, the ABL Collateral Agent or any other ABL Claimholder arising on account of any such violation.

(c)   Except as otherwise provided herein, each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that the ABL Collateral Agent and the other ABL Claimholders shall have no liability to the Term Collateral Agents and the other Term Claimholders, and the Term Collateral Agents and the other Term Claimholders hereby waive any claim against the ABL Collateral Agent or any other ABL Claimholder, arising out of any and all actions which the ABL Collateral Agent or any other ABL Claimholder may, pursuant to the terms hereof, take, permit or omit to take with respect to:

(i)   the ABL Loan Documents (other than this Agreement);

(ii)   the collection of the ABL Obligations; or

(iii)   the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any ABL Priority Collateral.

Each of the Term Collateral Agents, for itself and on behalf of the other Term Claimholders, agrees that the ABL Collateral Agent and the other ABL Claimholders have no duty to them in respect of the maintenance or preservation of the ABL Priority Collateral, the ABL Obligations, or otherwise (other than the obligations of the ABL Claimholders under this Agreement).

(d)   Without in any way limiting the generality of Section 7.3(a), but subject to any rights of the Loan Parties under the ABL Loan Documents and the Term Loan Documents and subject to the provisions of Section 5.3(b) and/or Section 5.3(c), as applicable, the Term Collateral Agents and any

53

#4814-6502-9968
#91731356v11

other Term Claimholder may, at any time and from time to time in accordance with the Term Loan Documents and/or applicable law, without the consent of, or notice to, the ABL Collateral Agent or any other ABL Claimholder, without incurring any liabilities to the ABL Collateral Agent or any other ABL Claimholder and without impairing or releasing the relative Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the ABL Collateral Agent or the other ABL Claimholders is affected, impaired, or extinguished thereby) do any one or more of the following:

(i)      make loans and advances to the Borrower or any other Loan Party, issue, guaranty or obtain letters of credit for account of the Borrower or any other Loan Party or otherwise extend credit to the Borrower or any other Loan Party, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(ii)     change the manner, place, or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase, or alter, the terms of any of the Term Obligations or any guarantee thereof or any other liability of any Loan Party, or any liability incurred directly or indirectly in respect thereof (including any increase in (so long as such increase does not cause the outstanding principal balance under the applicable Term Credit Agreement to exceed the First Lien Priority Cap or the Second Lien Priority Cap, as applicable) or extension of the Term Obligations, without any restriction as to the amount, tenor, or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify, or supplement in any manner any Term Lenders Liens, the Term Obligations, or any of the Term Loan Documents;

(iii)    sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the Term Priority Collateral or any liability of any Loan Party to the Term Claimholders or any liability incurred directly or indirectly in respect thereof;

(iv)     settle or compromise any Term Obligation or any other liability of any Loan Party or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Term Obligations) in any manner or order that is not inconsistent with the terms of this Agreement; and

(v)      exercise or delay in or refrain from exercising any right or remedy against any Loan Party or any other Person, elect any remedy and otherwise deal freely with any Loan Party or any Term Priority Collateral and any security and any guarantor or any liability of any Loan Party to any Term Claimholders or any liability incurred directly or indirectly in respect thereof;

provided that the foregoing shall not (x) limit or otherwise affect in any way any Loan Party's liability under the ABL Loan Documents to the extent any of the foregoing constitutes a violation of any of the ABL Loan Documents or (y) limit the restrictions set forth in Section 5.3(b) and/or Section 5.3(c), as applicable, or be deemed to be a waiver by the ABL Collateral Agent or any other ABL Claimholder of any liability of, or any claim against, the Term Collateral Agents or any other Term Claimholder arising on account of any such violation.

(e)      Except as otherwise provided herein, the ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the Term Collateral Agents and the other Term Claimholders shall have no liability to the ABL Collateral Agent and the other ABL Claimholders, and the ABL Collateral Agent and the other ABL Claimholders hereby waive any claim against the Term Collateral

54

#4814-6502-9968
#91731356v11

Agents or any other Term Claimholder, arising out of any and all actions which the Term Collateral Agents or any other Term Claimholder may, pursuant to the terms hereof, take, permit or omit to take with respect to:

> (i)      the Term Loan Documents (other than this Agreement);

> (ii)     the collection of the Term Obligations; or

> (iii)    the foreclosure upon, or sale, liquidation, or other Disposition of, or the failure to foreclose upon, or sell, liquidate, or otherwise Dispose of, any Term Priority Collateral.

The ABL Collateral Agent, for itself and on behalf of the other ABL Claimholders, agrees that the Term Collateral Agents and the other Term Claimholders have no duty to them in respect of the maintenance or preservation of the Term Priority Collateral, the Term Obligations, or otherwise (other than the obligations of the Term Claimholders under this Agreement).

(f)      Until the Discharge of Term Obligations or the Discharge of ABL Obligations, as the case may be, has occurred, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the Term Collateral Agents, on behalf of itself and the other Term Claimholders, agrees that neither it nor its related Claimholders shall assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead, or otherwise assert, or otherwise claim the benefit of, any marshaling, appraisal, valuation, or other similar right that may otherwise be available under applicable law with respect to the Senior Priority Collateral of the other Class or any other similar rights a junior secured creditor may have under applicable law.

7.4.    Obligations Unconditional. All rights, interests, agreements and obligations of the ABL Collateral Agent and the other ABL Claimholders and the Term Collateral Agents and the other Term Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)      any lack of validity or enforceability of any ABL Loan Documents or any Term Loan Documents;

(b)      except as otherwise expressly set forth in this Agreement, any change in the time, manner, or place of payment of, or in any other terms of, all or any of the ABL Obligations or Term Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Loan Document or any Term Loan Document;

(c)      except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Obligations or any guarantee thereof;

(d)      the commencement of any Insolvency Proceeding; or

(e)      any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the ABL Collateral Agent, any other ABL Claimholder or any ABL Obligations or the Term Collateral Agents, any other Term Claimholder or any Term Obligations in respect of this Agreement.

#4814-6502-9968
#91731356v11

**SECTION 8.** **Representations and Warranties**.

8.1.    Representations and Warranties of Each Collateral Agent.  The ABL Collateral Agent and the Term Collateral Agents each represents and warrants to the other that it has been authorized by the ABL Lenders or the Term Lenders, as applicable, under the ABL Credit Agreement or the Term Credit Agreements, as applicable, to enter into this Agreement and that this Agreement has been duly executed and delivered by it.

**SECTION 9.** **Miscellaneous**.

9.1.    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Loan Document or any Term Loan Document, the provisions of this Agreement shall govern.  Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Claimholders, negate, impair, waive or cancel any rights granted to, or create any liability or obligation of, any Loan Party in the ABL Loan Documents and the Term Loan Documents or impose any additional obligations on the Loan Parties (other than as expressly set forth herein).  Notwithstanding the foregoing, solely as among the Term Claimholders, in the event of any conflict between this Agreement and the First Lien/Second Lien Intercreditor Agreement, the provisions of the First Lien/Second Lien Intercreditor Agreement shall govern and control.

9.2.    Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the ABL Collateral Agent and the Term Collateral Agents.  This is a continuing agreement of Lien subordination (as opposed to debt or claim subordination), and the Claimholders of any Class may continue, at any time and without notice to the Collateral Agent or the other Claimholders of the other Class, to extend credit and other financial accommodations to or for the benefit of any Loan Party constituting ABL Obligations or Term Obligations, as the case may be, in reliance hereon.  The ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the Term Collateral Agents, on behalf of itself and the other Term Claimholders, hereby waive any right any of them may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.  Consistent with, but not in limitation of, the preceding sentence, the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the Term Collateral Agents, on behalf of itself and the other Term Claimholders, irrevocably acknowledge that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable law other than under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.  Any provision of this Agreement that is prohibited or unenforceable shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Loan Party shall include such Loan Party as debtor and debtor in possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.  Except as set forth in Section 6.6, this Agreement shall automatically terminate and be of no further force and effect (a) with respect to the ABL Collateral Agent, the other ABL Claimholders, and the ABL Obligations, on the date that the Discharge of ABL Obligations has occurred, and (b) with respect to the Term Collateral Agents, the other Term Claimholders and the Term Obligations on the date that the Discharge of Term Obligations has occurred.

9.3.    Amendments; Waivers.

#4814-6502-9968
#91731356v11

(a)     No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by Section 9.3(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)     No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by (a) ABL Collateral Agent (in accordance with the ABL Credit Agreement) and each Term Collateral Agent (in accordance with the applicable Term Credit Agreement) with respect to any amendment or modification, and (b) the Loan Parties, solely with respect to any amendments or modifications that (A) adversely affect any obligation or right of the Loan Parties hereunder or under the ABL Loan Documents or the Term Loan Documents or impose any additional obligations on the Loan Parties, (B) change the rights of the Loan Parties to refinance the ABL Obligations or the Term Obligations or (C) modify the definitions of "ABL Priority Cap", "First Lien Priority Cap" or "Second Lien Priority Cap".  In addition, each waiver, if any, with respect to any aspect of this Agreement shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  The ABL Collateral Agent and the Term Collateral Agents shall provide the Loan Parties with written notice (together with a true and correct copy) of each proposed amendment or other modification to this Agreement prior to the effectiveness thereof.

9.4.     Additional Obligations.

(a)     To the extent, but only to the extent, permitted by the provisions of each then extant ABL Credit Agreement and Term Credit Agreement (including, in each case, pursuant to any consent or waiver thereto or thereunder), the Borrower may incur or issue and sell one or more series or classes of Additional Pari Passu Obligations and/or one or more series or classes of Additional Junior Obligations.

Any such series or class of Additional Pari Passu Obligations may be secured by a first-priority, senior Lien on the Term Priority Collateral and a junior-priority, subordinated Lien on the ABL Priority Collateral, in each case under and pursuant to the Term Collateral Documents for such Series of Additional Pari Passu Obligations, if and subject to the condition that, unless such Indebtedness is part of an existing Series of Additional Pari Passu Obligations represented by an Additional Pari Passu Obligations Agent already party to this Agreement, the Additional Pari Passu Obligations Agent with respect to any such Additional Pari Passu Obligations becomes a party to this Agreement by satisfying the conditions set forth in this Section 9.4.  Upon any Additional Pari Passu Obligations Agent so becoming a party hereto in accordance with the terms thereof, all Additional Pari Passu Obligations of such series shall also be entitled to be so secured by a senior Lien on the Term Priority Collateral and by a subordinated Lien on the ABL Priority Collateral in accordance with the terms hereof and thereof.

Any such series or class of Additional Junior Obligations may be secured by a junior-priority, subordinated Lien on the Term Priority Collateral and a junior-priority, subordinated Lien on the ABL Priority Collateral, in each case under and pursuant to the Term Collateral Documents for such series of Additional Junior Obligations, if and subject to the condition that, unless such Indebtedness is part of an existing series of Additional Junior Obligations represented by an Additional Junior Obligations Agent already party to this Agreement, the Additional Junior Obligations Agent with respect to any such

57

Additional Junior Obligations becomes a party to this Agreement by satisfying the conditions set forth in this Section 9.4.  Upon any Additional Junior Obligations Agent so becoming a party hereto in accordance with the terms thereof, all Additional Junior Obligations of such series shall also be entitled to be so secured by a subordinated Lien on the Term Priority Collateral and by a subordinated Lien on the ABL Priority Collateral in accordance with the terms hereof and thereof.

(b)     In order for an Additional Agent to become a party to this Agreement:

(i)     such Additional Agent shall have executed and delivered to each other then-existing Additional Agent, ABL Collateral Agent and Term Collateral Agent a Joinder Agreement substantially in the form of Exhibit A hereto (with such changes as may be reasonably approved by the ABL Collateral Agent and Controlling Term Agent and such Additional Agent) pursuant to which such Additional Agent becomes an Additional Pari Passu Obligations Agent or Additional Junior Obligations Agent hereunder and the related ABL Claimholders or Term Claimholders, as applicable, become subject hereto and bound hereby;

(ii)     the Borrower shall have delivered a designation to each other then-existing Additional Agent, ABL Collateral Agent and Term Collateral Agent substantially in the form of Exhibit B hereto, pursuant to which an officer of the Borrower shall (A) identify the Indebtedness to be designated as Additional Pari Passu Obligations or Additional Junior Obligations, as applicable, and the initial aggregate principal amount of such Indebtedness, (B) identify the Additional Pari Passu Obligations Agreement or Additional Junior Obligations Agreement as applicable, (C) specify the name and address of the applicable Additional Agent, (D) certify that such Indebtedness, is permitted to be incurred, secured and guaranteed by each then extant ABL Credit Agreement and Term Credit Agreement and (E) attach to such designation true and complete copies of each of the Additional Pari Passu Obligations Agreement or Additional Junior Obligations Agreement, as applicable, relating to such Additional Pari Passu Obligations or Additional Junior Obligations, as applicable.

(iii)     Upon the execution and delivery of a Joinder Agreement by an Additional Pari Passu Obligations Agent or an Additional Junior Obligations Agent, as the case may be, in each case in accordance with this Section 9.4, each other Additional Agent, ABL Collateral Agent and Term Collateral Agent shall acknowledge receipt thereof by countersigning a copy thereof and returning the same to such Additional Agent; provided that the failure of any other Additional Agent, ABL Collateral Agent and Term Collateral Agent to so acknowledge or return the same shall not affect the status of such additional Indebtedness as Additional Pari Passu Obligations or Additional Junior Obligations, as the case may be, if the other requirements of this Section 9.4 are complied with.

(c)     With respect to any incurrence, issuance or sale of Indebtedness after the date hereof under any Additional Pari Passu Obligations Agreement or Additional Junior Obligations Agreement, in each case, of Additional Pari Passu Obligations or series of Additional Junior Obligations whose Additional Agent is already a party to each of this Agreement, the requirements of Section 9.4 shall not be applicable and such Indebtedness shall automatically constitute Additional Pari Passu Obligations or Additional Junior Obligations so long as such Indebtedness is permitted to be incurred, secured and guaranteed by each Additional Pari Passu Obligations Agreement, Additional Junior Obligations Agreement, ABL Credit Agreement and Term Credit Agreement.

9.5.     <u>Information Concerning Financial Condition of Certain Entities</u>.  Neither any Term Collateral Agent nor ABL Collateral Agent hereby assumes responsibility for keeping each other informed of the financial condition of the Loan Parties and all other circumstances bearing upon the risk of

58

#4814-6502-9968
#91731356v11

nonpayment of the ABL Obligations or the Term Obligations.  Each Term Collateral Agent and ABL Collateral Agent hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event any Term Collateral Agent or ABL Collateral Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide or update any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information.  Neither ABL Collateral Agent nor any Term Collateral Agent shall have any responsibility to monitor or verify the financial condition of the Loan Parties.

9.6.   Subrogation.  (a) With respect to any payments or distributions in cash, property, or other assets that the Term Collateral Agents or any other Term Claimholders pay over to the ABL Collateral Agent or any other ABL Claimholders under the terms of this Agreement, the Term Collateral Agents and the other Term Claimholders shall be subrogated to the rights of the ABL Collateral Agent and the other ABL Claimholders and (b) with respect to any payments or distributions in cash, property, or other assets that the ABL Collateral Agent or any other ABL Claimholders pay over to the Term Collateral Agents or the other Term Claimholders under the terms of this Agreement, the ABL Collateral Agent and the other ABL Claimholders shall be subrogated to the rights of the Term Collateral Agents and the other Term Claimholders; provided, however, that each of the ABL Collateral Agent, for itself and the other ABL Claimholders, and each of the Term Collateral Agents, for itself and the other Term Claimholders, agrees not to assert or enforce any such rights of subrogation it or they may acquire as a result of any payment hereunder until the Discharge of ABL Obligations or Discharge of Term Obligations, as applicable, has occurred.  Any payments or distributions in cash, property or other assets received by the ABL Collateral Agent or any other ABL Claimholders that are paid over to the Term Collateral Agents or any other Term Claimholders pursuant to this Agreement shall not reduce any of the ABL Obligations.  Any payments or distributions in cash, property or other assets received by the Term Collateral Agents or any other Term Claimholders that are paid over to the ABL Collateral Agent or any other ABL Claimholders pursuant to this Agreement shall not reduce any of the Term Obligations.  Notwithstanding the foregoing provisions of this Section 9.6, none of the ABL Claimholders shall have any claim against any of the Term Claimholders for any impairment of any subrogation rights herein granted to the ABL Claimholders, and none of the Term Claimholders shall have any claim against any of the ABL Claimholders for any impairment of any subrogation rights herein granted to the Term Claimholders.

9.7.   Governing Law.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.8.   Submission to Jurisdiction.

(a)     Each ABL Collateral Agent, on behalf of itself and the other ABL Claimholders represented by it, and each Term Collateral Agent, on behalf of itself and the other Term Claimholders represented by it, and the Loan Parties hereby agree that each ABL Claimholder, each Term Claimholder and each Loan Party shall irrevocably and unconditionally submit, for itself and its property, to the exclusive general jurisdiction of the Supreme Court of the State of New York and of the United States District Court of the Southern District of New York, sitting in the Borough of Manhattan in the City of New York, and any appellate court from any thereof (except that, (x) in the case of any Mortgage or other Security Document, proceedings may also be brought by the applicable ABL Collateral Agent or Term Collateral Agent in the state in which the respective mortgaged property or Collateral is located or any other relevant jurisdiction and (y) in the case of any Insolvency Proceedings with respect to any Loan Party, actions or

59

proceedings related to this Agreement and the other ABL Loan Documents or Term Loan Documents may be brought in such court holding such Insolvency Proceedings), in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment with respect to this Agreement, and each ABL Collateral Agent, on behalf of itself and the other ABL Claimholders represented by it, and each Term Collateral Agent, on behalf of itself and the other Term Claimholders represented by it, and the Loan Parties hereby irrevocably and unconditionally agree that all of their respective claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court.  Each ABL Collateral Agent, on behalf of itself and the other ABL Claimholders represented by it, and each Term Collateral Agent, on behalf of itself and the other Term Claimholders represented by it, and the Loan Parties hereby further agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)	Each ABL Collateral Agent, on behalf of itself and the other ABL Claimholders represented by it, each Term Collateral Agent, on behalf of itself and the other Term Claimholders represented by it, and the Loan Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in the first sentence of paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)	Each ABL Collateral Agent, on behalf of itself and the other ABL Claimholders represented by it, each Term Collateral Agent, on behalf of itself and the other Term Claimholders represented by it, and the Loan Parties hereby irrevocably consents to service of process in the manner provided for notices (other than facsimile or email) in Section 9.9.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

9.9.	Notices.

(a)	Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email.

(b)	All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.9 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.9 or (ii) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that received notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in clause (c) below shall be effective as provided in such clause (c).

(c)	Notices and other communications hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the parties hereto.  Each party hereto may, in its discretion, agree to

60

#4814-6502-9968
#91731356v11

accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth on <u>Annex I</u> hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.10.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the ABL Claimholders and Term Claimholders and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.

9.11.    <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.12.    <u>Severability</u>.  To the extent permitted by law, any provision of this Agreement that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.13.    <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  This Agreement shall become effective when it shall have been executed by each party hereto.

9.14.    <u>WAIVER OF JURY TRIAL</u>.  ABL COLLATERAL AGENT, ON BEHALF OF ITSELF AND THE OTHER ABL CLAIMHOLDERS REPRESENTED BY IT, EACH TERM COLLATERAL AGENT, ON BEHALF OF ITSELF AND THE OTHER TERM CLAIMHOLDERS REPRESENTED BY IT, THE LOAN PARTIES, AND EACH OTHER PARTY HERETO, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B)

#4814-6502-9968
#91731356v11

ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.14.

9.15. <u>Additional Loan Parties</u>. Each Person that becomes a Loan Party after the date hereof shall become a party to this Agreement upon execution and delivery by such Person of an Assumption Agreement in substantially the form of <u>Exhibit C</u> hereto.

9.16. <u>No Third Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of and bind each of the ABL Claimholders and the Term Claimholders. Other than with respect to Sections 5.3 and 9.4, which shall also inure to the benefit of the Borrower, in no event shall any Loan Party be a third party beneficiary of this Agreement.

9.17. <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Collateral Agents and the other Term Claimholders, on the other hand (other than Sections 5.3 and 9.4, under which the Borrower shall be a third party beneficiary). Other than Sections 5.3 and 9.4, which shall also inure to the benefit of the Borrower, no Loan Party or any other creditor thereof shall have any rights hereunder and no Loan Party may rely on the terms hereof. Nothing in this Agreement shall impair, as between the Loan Parties and the ABL Collateral Agent and the other ABL Claimholders, or as between the Loan Parties and the Term Collateral Agents and the other Term Claimholders, the obligations of the Loan Parties to pay principal, interest, fees and other amounts as provided in the ABL Loan Documents and the Term Loan Documents, respectively.

9.18. <u>Specific Performance</u>. Each of the ABL Collateral Agent and the Term Collateral Agents may demand specific performance of this Agreement. Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in any Insolvency Proceeding, the ABL Collateral Agent or the Term Collateral Agents may seek such or any other relief as if it were the "holder" of the claims of the Claimholders of the other Class under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by the Claimholders of the other Class.

9.19. <u>Further Assurances</u>. Each of the ABL Collateral Agent and the Term Collateral Agents agrees to take such further action and shall execute (without recourse or warranty) and deliver such additional documents and instruments (in recordable form, if requested in writing) as the ABL Collateral Agent or the Controlling Term Agent, as the case may be, may request to effectuate the terms of and the relative Lien priorities contemplated by this Agreement, all at the expense of the Loan Parties.

9.20. <u>ABL Intercreditor Agreement Acknowledgement</u>. Reference is made to the ABL Intercreditor Agreement Acknowledgement executed and delivered in respect of this Agreement (a) on the date hereof by the Borrower and each other Loan Party that is a Loan Party on the date hereof and (b) after the date hereof, pursuant to the terms of the Collateral Documents, by each Subsidiary of Parent that becomes a Loan Party after the date hereof.

9.21. <u>Intercreditor Agreements</u>. This Agreement is the "ABL Intercreditor Agreement" referred to in the ABL Credit Agreement and this Agreement is the "ABL Intercreditor Agreement" referred to in the Term Credit Agreements. Nothing in this Agreement shall be deemed to modify the rights, remedies and obligations as between the First Lien Agent and the First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders, on the other hand, as set forth in the First Lien/Second Lien Intercreditor Agreement. Nothing in this Agreement shall be deemed to modify the

62

#4814-6502-9968
#91731356v11

rights, remedies and obligations as among the First Lien Secured Parties set forth in any pari passu intercreditor agreement entered into among such parties. Nothing in this Agreement shall be deemed to modify the rights, remedies and obligations as among the Second Lien Claimholders set forth in any pari passu intercreditor agreement entered into among such parties.

9.22.    Amendment and Restatement; Successor Agents. This Agreement amends and restates the Existing Intercreditor Agreement as of ~~the date hereof~~February 26, 2019 and shall not constitute a novation of the Existing Intercreditor Agreement. From and after ~~the date hereof~~February 26, 2019 until July 31, 2020, Credit Suisse AG, Cayman Islands Branch is vested with all the rights, powers, discretion and privileges of the First Lien Collateral Agent, as described herein, and Credit Suisse AG, Cayman Islands Branch assumes from and after the Effective Date the obligations, responsibilities and duties of Goldman Sachs Bank USA as the predecessor First Lien Collateral Agent, in accordance with the terms hereof and, Goldman Sachs Bank USA is discharged from all of its duties and obligations as the First Lien Collateral Agent under the Existing Intercreditor Agreement and this Agreement. Nothing in this Agreement shall be deemed a termination of the provisions of the Existing Intercreditor Agreement or this Agreement that survive Goldman Sachs Bank USA's resignation in its capacity as First Lien Collateral Agent, which provisions shall inure to the benefit of Goldman Sachs Bank USA as the predecessor First Lien Collateral Agent as to any actions taken or omitted to be taken while it was First Lien Collateral Agent under the Existing Intercreditor Agreement. Goldman Sachs Bank USA as the predecessor First Lien Collateral Agent consents to this Section 9.22, including the amendment and restatement of the Existing Intercreditor Agreement. From and after July 31, 2020, Jefferies Finance LLC is vested with all the rights, powers, discretion and privileges of the First Lien Collateral Agent, as described herein, and Jefferies Finance LLC assumes from and after July 31, 2020 the obligations, responsibilities and duties of Credit Suisse AG, Cayman Islands Branch as the predecessor First Lien Collateral Agent, in accordance with the terms hereof and, Credit Suisse AG, Cayman Islands Branch is discharged from all of its duties and obligations as the First Lien Collateral Agent under this Agreement. Nothing in this Agreement shall be deemed a termination of this Agreement that survive Credit Suisse AG, Cayman Islands Branch's resignation in its capacity as First Lien Collateral Agent, which provisions shall inure to the benefit of Credit Suisse AG, Cayman Islands Branch as the predecessor First Lien Collateral Agent as to any actions taken or omitted to be taken while it was First Lien Collateral Agent under this Agreement. Credit Suisse AG, Cayman Islands Branch as the predecessor First Lien Collateral Agent consents to this Section 9.22. From and after July 31, 2020, Jefferies Finance LLC is vested with all the rights, powers, discretion and privileges of the Second Lien Collateral Agent, as described herein, and Jefferies Finance LLC assumes from and after July 31, 2020 the obligations, responsibilities and duties of Credit Suisse AG, Cayman Islands Branch as the predecessor Second Lien Collateral Agent, in accordance with the terms hereof and, Credit Suisse AG, Cayman Islands Branch is discharged from all of its duties and obligations as the Second Lien Collateral Agent under this Agreement. Nothing in this Agreement shall be deemed a termination of this Agreement that survive Credit Suisse AG, Cayman Islands Branch's resignation in its capacity as Second Lien Collateral Agent, which provisions shall inure to the benefit of Credit Suisse AG, Cayman Islands Branch as the predecessor Second Lien Collateral Agent as to any actions taken or omitted to be taken while it was Second Lien Collateral Agent under this Agreement. Credit Suisse AG, Cayman Islands Branch as the predecessor Second Lien Collateral Agent consents to this Section 9.22.

[Signature Page Follows]

63

~~#4814-6502-9968~~
~~#91731356v11~~

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Intercreditor Agreement as of the date first written above.

**BANK OF AMERICA, N.A.**,
as ABL Collateral Agent

By: _____
    Name:
    Title:

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**,
as First Lien Collateral Agent

By: _____
    Name:
    Title:

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**,
as Second Lien Collateral Agent

By: _____
    Name:
    Title:

[Signature Page to ABL Intercreditor Agreement]

#4814-6502-9968
#91731356v11

**GOLDMAN SACHS BANK USA**,
as the predecessor First Lien Collateral Agent (solely for
purposes of Section 9.22)


By: _____
　　　Name:

　　　Title

#4814-6502-9968
#91731356v11

# ANNEX I

Notice Addresses

(a)      if to the First Lien Collateral Agent, at:
         Credit Suisse AG, Cayman Islands Branch,
         Eleven Madison Avenue - 9th Floor
         New York, NY 10010
         Attention: David R Bankert
(b)      if to the Second Lien Collateral Agent, at:
Credit Suisse AG, Cayman Islands Branch Credit Suisse AG, Cayman Islands Branch,

# ANNEX I

## Notice Addresses

(a)        if to the First Lien Collateral Agent, at:
        Jefferies Finance LLC
        ~~Eleven~~520 Madison Avenue ~~– 9th Floor~~
        New York, ~~NY 10010~~New York 10022
        Attention: ~~David R Bankert~~Account Officer – Trico Group
        Facsimile No.: (212) 284-3444
        E-Mail Address: JFIN.Admin@jefferies.com

(b)        if to the Second Lien Collateral Agent, at:
        Jefferies Finance LLC
        520 Madison Avenue
        New York, New York 10022
        Attention: Account Officer – Trico Group
        Facsimile No.: (212) 284-3444
        E-Mail Address: JFIN.Admin@jefferies.com

(c)        if to the ABL Collateral Agent, at:
        Bank of America, N.A.
        135 South LaSalle Street, Suite 925
        Chicago, Illinois 60603
        Attention: Account Officer, Trico Corporation

# ABL INTERCREDITOR AGREEMENT ACKNOWLEDGMENT

1.      Acknowledgement.   Trico Group, LLC, a Delaware limited liability company (the "Borrower"), Trico Group Holdings, LLC, a Delaware limited liability company ("Parent") and each of the undersigned U.S. subsidiaries of Parent (together with Parent and the Borrower, collectively, the "Loan Parties") acknowledges that it has received a copy of the Amended and Restated Intercreditor Agreement dated as of February 26, 2019, among Bank of America, N.A., as ABL Collateral Agent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as First Lien Collateral Agent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as Second Lien Collateral Agent, each Additional Junior Obligations Agent and each Additional Pari Passu Obligations Agent (the "ABL Intercreditor Agreement") as in effect on the date hereof, and consents thereto, agrees to recognize all rights granted thereby to the ABL Collateral Agent, the other ABL Claimholders, the Term Collateral Agents and the other Term Claimholders, and agrees that it shall not do any act or perform any obligation which is not in accordance with the agreements set forth in the ABL Intercreditor Agreement as in effect on the date hereof (and, to the extent such Loan Party has been notified of the terms of any amendment, as amended or otherwise modified pursuant thereto).   Each of the Loan Parties further acknowledges and agrees that (a) other than with respect to Section 9.3(b) of the ABL Intercreditor Agreement, under which the Borrower is a third party beneficiary, no Loan Party is a beneficiary or third party beneficiary of the ABL Intercreditor Agreement, (b) no Loan Party has any rights under the ABL Intercreditor Agreement, and no Loan Party may rely on the terms of the Intercreditor Agreement, in each case other than Section 9.3(b) of the ABL Intercreditor Agreement, which also inure to the benefit of the Borrower, and (c) nothing in the ABL Intercreditor Agreement shall impair, as between the Loan Parties and the ABL Collateral Agent and the other ABL Claimholders, or as between the Loan Parties and the Term Collateral Agents and the other Term Claimholders, the obligations of the Loan Parties to pay principal, interest, fees and other amounts as provided in the ABL Loan Documents or the Term Loan Documents, respectively.

2.      Notices.   The address of the Loan Parties for purposes of all notices and other communications hereunder and under the ABL Intercreditor Agreement is:

> Trico Group, LLC
> 127 Public Square, Suite 5110
> Cleveland, Ohio 44114
> Facsimile:  (216) 274-9027
> Attention:   Patrick James, Chairman
> Email:  PJames@CrowneGroupLLC.com

> With a copy (which shall not constitute notice) to:
> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: Michael Baker
> Telephone:  (212) 318-6855
> Email: MichaelBaker@paulhastings.com

Any notice or other communication hereunder or under the ABL Intercreditor Agreement shall be in writing and may be personally served or sent by facsimile or United States mail or courier service or electronic mail and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.

#4814-6502-9968
#91731356v11

3.      Counterparts.  This Acknowledgement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute one document. Delivery of an executed signature page to this Acknowledgement by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be as effective as delivery of a manually signed counterpart of this Acknowledgement.

4.      Governing Law.   THIS ACKNOWLEDGEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

5.      Credit Document.  This Acknowledgement shall constitute an ABL Loan Document and a Term Loan Document.

6.      Miscellaneous.  The provisions of Sections 9.6 and 9.7 of the ABL Intercreditor Agreement will apply with like effect to this Acknowledgement, *mutatis mutandis* as though the references therein to the ABL Collateral Agent or the Term Collateral Agents refer instead to each Loan Party.  The ABL Collateral Agent, the other ABL Claimholders, the Term Collateral Agents and the other Term Claimholders are the intended beneficiaries of this Acknowledgement.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the ABL Intercreditor Agreement.

[Signature Page Follows]

2

#4814-6502-9968
#91731356v11

**ACKNOWLEDGED AS OF THE DATE FIRST WRITTEN ABOVE:**

**TRICO GROUP HOLDINGS, LLC**,
as Parent

By:_____
Name: _____
Title: _____

**TRICO GROUP, LLC**,
as the Borrower

By:_____
Name: _____
Title: _____

**CARTER FUEL SYSTEMS, LLC**
as Loan Party,

By:_____
Name: _____
Title: _____

**STRONGARM, LLC**,
as Loan Party,

By:_____
Name: _____
Title: _____

[Signature Page to Intercreditor Agreement Acknowledgment]

#4814-6502-9968
#91731356v11

**KTRI HOLDINGS, INC.**,
as Loan Party,

By:_____
Name: _____
Title: _____


**HEATHERTON HOLDINGS, LLC**,
as Loan Party,

By:_____
Name: _____
Title: _____


**CARTER FUEL EXPORT, INC.**,
as Loan Party,

By:_____
Name: _____
Title: _____


**PREMIER MARKETING GROUP**,
LLC as Loan Party

By:_____
Name: _____
Title: _____


[Signature Page to Intercreditor Agreement Acknowledgment]

**AVM EXPORT, INC.**,
as Loan Party

By:_____
Name: _____
Title: _____

**TRICO PRODUCTS CORPORATION**,
as Loan Party

By:_____
Name: _____
Title: _____

**KTRI OFFSHORE HOLDINGS, LLC**
as Loan Party

By:_____
Name: _____
Title: _____

**TRICO HOLDING CORPORATION**,
as Loan Party

By:_____
Name: _____
Title: _____

[Signature Page to Intercreditor Agreement Acknowledgment]

#4814-6502-9968
#91731356v11

**TRICO TECHNOLOGIES CORPORATION,**
as Loan Party

By:
Name:
Title:

**ASC INDUSTRIES, INC.,**
as Loan Party

By:
Name:
Title:

**SPECIALTY PUMPS GROUP, INC.,**
as Loan Party

By:
Name:
Title:

**FRAMAUTO HOLDINGS, LLC,**
as Loan Party

By:
Name:
Title:

[Signature Page to Intercreditor Agreement Acknowledgment]

**AUTOLITE OPERATIONS LLC,**
as Loan Party


By: _____
Name: _____
Title: _____


**FRAM GROUP OPERATIONS,**
as Loan Party


By: _____
Name: _____
Title: _____


**FRAM GROUP IP LLC,**
as Loan Party


By: _____
Name: _____
Title: _____


[Signature Page to Intercreditor Agreement Acknowledgment]

Exhibit A to Amended and Restated Intercreditor Agreement

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [     ], 20[ ] to the AMENDED AND RESTATED INTERCREDITOR AGREEMENT dated as of February 26, 2019 (the "Intercreditor Agreement"), among Bank of America, N.A., as ABL Collateral Agent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as First Lien Collateral Agent, and Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as Second Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC, ("Parent"), Trico Group, LLC (the "Borrower") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

As a condition to the ability of the Borrower to incur [Additional Pari Passu Obligations] [Additional Junior Obligations] after the date of the Intercreditor Agreement and to secure such [Additional Pari Passu Obligations] [Additional Junior Obligations] with a lien on the Collateral and to have such [Additional Pari Passu Obligations] [Additional Junior Obligations] guaranteed by the Loan Parties, in each case under and pursuant to the applicable Loan Documents, each of the [Additional Pari Passu Obligations Agent] [Additional Second Priority Representative] in respect of such [Additional Pari Passu Obligations] [Additional Junior Obligations] is required to become an [Additional Pari Passu Obligations Agent] [Additional Second Priority Representative], under, and the related [Claimholders] in respect thereof are required to become subject to and bound by, the Intercreditor Agreement.  Section 9.4 of the Intercreditor Agreement provides that such [Additional Pari Passu Obligations Agent] [Additional Second Priority Representative] may become an [Additional Pari Passu Obligations Agent] [Additional Second Priority Representative] under, and the related [Claimholders] may become subject to and bound by, the Intercreditor Agreement pursuant to the execution and delivery by the [Additional Pari Passu Obligations Agent] [Additional Second Priority Representative] of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 9.4 of the Intercreditor Agreement.  The undersigned [Additional Pari Passu Obligations Agent]  [Additional Second Priority Representative] (the "New Representative") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

Accordingly, the New Representative agrees as follows:

In accordance with Section 9.4 of the Intercreditor Agreement, the Additional Agent by its signatures below become a [Additional Pari Passu Obligations Agent] [Additional Junior Obligations Agent] under, and the related [Claimholders] represented by it become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the Additional Agent had originally been named therein as a [Additional Pari Passu Obligations Agent] [Second Priority Representative] and each of the Additional Agent, on behalf of itself and each other [Claimholder] represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement applicable to it as a [Additional Pari Passu Obligations Agent] [Additional Junior Obligations Agent] and to the [Claimholders] represented by it as [First Lien Claimholders]  [Second Lien Claimholders].  Each reference to a ["Additional Pari Passu Obligations Agent"]  ["Additional Junior Obligations Agent"] in the Intercreditor Agreement shall be deemed to include the Additional Agent and each reference to ["First Lien Claimholders"] ["Second Lien Claimholders"] shall include the [additional First Lien Claimholders] [additional Second Lien Claimholders] represented by such Additional Agent.  The Intercreditor Agreement is hereby incorporated herein by reference.

Each of the Additional Agent represents and warrants to the other Additional Agents, the ABL

Exhibit A – Page 1

#4814-6502-9968
#91731356v11

Collateral Agent, the Term Collateral Agent and the other Claimholders that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [Additional Pari Passu Obligations Agreement] [Additional Junior Obligations Agreement] and related loan documents relating to such [Additional Pari Passu Obligations] [Additional Junior Obligations] provides that, upon the New Representative's entry into this Agreement, the [additional First Lien Claimholders] [additional Second Lien Claimholders] in respect of such [Additional Pari Passu Obligations] [Additional Junior Obligations] will be subject to and bound by the provisions of the Intercreditor Agreement as [First Lien Claimholders] [Second Lien Claimholders].

This Joinder Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

**THIS JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Any provision of this Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.  All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

[Remainder of this page intentionally left blank]

Exhibit A – Page 2

#4814-6502-9968
#91731356v11

IN WITNESS WHEREOF, the Additional Agent has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL AGENT],
as [            ] for the holders of [                    ]

By: _____
    Name:
    Title:


Address for notices:

_____

_____
    attention of:_____
    Telecopy:_____


Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE PARI PASSU
OBLIGATIONS AGENT],
as [Insert title of Agent]


By: _____
    Name:
    Title:


Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE JUNIOR OBLIGATIONS],
as [Insert title of Agent]


By: _____
    Name:
    Title:


Exhibit A – Page 3

#4814-6502-9968
#91731356v11

Exhibit B to the Amended and Restated Intercreditor Agreement

[FORM OF] DEBT DESIGNATION NO. [ ] (this "Designation") dated as of [      ], 20[ ] with respect to the AMENDED AND RESTATED INTERCREDITOR AGREEMENT dated as of February 26, 2019 (the "Intercreditor Agreement"), among Bank of America, N.A., as ABL Collateral Agent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as First Lien Collateral Agent, and Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as Second Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC ("Parent"), Trico Group, LLC (the "Borrower") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Designation is being executed and delivered in order to designate additional secured Obligations of the Borrower and the Loan Parties as [Additional Pari Passu Obligations][Additional Junior Obligations] entitled to the benefit of and subject to the terms of the Intercreditor Agreement.

The undersigned, the duly appointed [*specify title of Responsible Officer*] of the Borrower hereby certifies on behalf of the Borrower that:

1. Borrower intends to incur Indebtedness (the "Designated Obligations") in the initial aggregate principal amount of [          ] pursuant to the following agreement: [*describe credit/loan agreement indenture or other agreement giving rise to Additional Pari Passu Obligations or Additional Junior Obligations, as the case may be*] (the "Designated Agreement") which will be [Additional Pari Passu Obligations][Additional Junior Obligations].

2. The incurrence of the Designated Obligations is permitted to be incurred, secured and guaranteed by each extant ABL Loan Document and Term Loan Document.

3. The name and address of the Additional Agent for such Designated Obligations is:

   [Insert name and all capacities; Address]

   Telephone:     _____

   Fax:     _____

   Email     _____

4. Attached hereto are true and complete copies of each of the Additional [Pari Passu/Junior] Agreement relating to such Additional [Pari Passu/Junior] Obligations.

[Remainder of this page intentionally left blank]

Exhibit B – Page 1

#4814-6502-9968
#91731356v11

IN WITNESS WHEREOF, the Borrower has caused this Designation to be duly executed by the undersigned Responsible Officer as of the day and year first above written.

TRICO GROUP, LLC

By: _____

  Name:
  Title:

Exhibit B – Page 2

Exhibit C to the Amended and Restated Intercreditor Agreement

[FORM OF] LOAN PARTY JOINDER AGREEMENT NO. [ ] dated as of [      ], 20[  ] (the "Loan Party Joinder Agreement") to the AMENDED AND RESTATED INTERCREDITOR AGREEMENT dated as of February 26, 2019 (the "Intercreditor Agreement"), among Bank of America, N.A., as ABL Collateral Agent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as First Lien Collateral Agent, and Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as Second Lien Collateral Agent, and each other Additional Agent that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by, Trico Group Holdings, LLC, ("Parent"), Trico Group, LLC (the "Borrower") and each of the other Loan Parties party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "New Loan Party") wishes to acknowledge and agree to the Intercreditor Agreement and become a party thereto and to acquire and undertake the rights and obligations of a Loan Party thereunder.

Accordingly, the New Loan Party agrees as follows for the benefit of the ABL Collateral Agent, Term Collateral Agents, Additional Agents and the other Claimholders:

The New Loan Party (a) acknowledges and agrees to, and becomes a party to the Intercreditor Agreement as a Loan Party, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of a Loan Party under the Intercreditor Agreement.  This Loan Party Joinder Agreement supplements the Intercreditor Agreement and is being executed and delivered by the New Loan Party pursuant to Section 9.15 of the Intercreditor Agreement.

The New Loan Party represents and warrants to the ABL Collateral Agent, Term Collateral Agents, Additional Agents and the other Claimholders that (a) it has full power and authority to enter into this Loan Party Joinder Agreement, in its capacity as a Loan Party and (b) this Loan Party Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Loan Party Joinder Agreement.

This Loan Party Joinder Agreement may be executed by one or more of the parties to this Loan Party Joinder Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Loan Party Joinder Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

THIS LOAN PARTY JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS LOAN PARTY JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Any provision of this Loan Party Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any

Exhibit C – Page 1

#4814-6502-9968
#91731356v11

jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.

Exhibit C – Page 2

IN WITNESS WHEREOF, the New Loan Party has duly executed this Loan Party Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[_____]

By: _____
Name:
Title:

Exhibit C – Page 3

#4814-6502-9968
#91731356v11

**EXHIBIT J-1**

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement"), among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as TRICO GROUP, LLC) (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as TRICO GROUP HOLDINGS, LLC), the LENDERS FROM TIME TO TIME PARTY THERETO and SAGARD HOLDINGS MANAGER (US) LLC (the "Sagard Administrative Agent") and GLAS USA LLC (the "GLAS Administrative Agent") and together with the Sagard Administrative Agent, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"). Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its Foreign Lender status on Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____

    Name:

    Title:

Date: _____ __, 20[ ]

**EXHIBIT J-2**

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement"), among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as TRICO GROUP, LLC) (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as TRICO GROUP HOLDINGS, LLC), the LENDERS FROM TIME TO TIME PARTY THERETO and SAGARD HOLDINGS MANAGER (US) LLC (the "Sagard Administrative Agent") and GLAS USA LLC (the "GLAS Administrative Agent") and together with the Sagard Administrative Agent, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"). Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its Foreign Lender status on Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
    Name:
    Title:

Date: _____ __, 20[ ]

**EXHIBIT J-3**

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement"), among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as TRICO GROUP, LLC) (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as TRICO GROUP HOLDINGS, LLC), the LENDERS FROM TIME TO TIME PARTY THERETO and SAGARD HOLDINGS MANAGER (US) LLC (the "Sagard Administrative Agent") and GLAS USA LLC (the "GLAS Administrative Agent") and together with the Sagard Administrative Agent, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"). Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
    Name:
    Title:

Date: _____ __, 20[ ]

J-3-1

**EXHIBIT J-4**

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect on the date hereof, the "Credit Agreement"), among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as TRICO GROUP, LLC) (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as TRICO GROUP HOLDINGS, LLC), the LENDERS FROM TIME TO TIME PARTY THERETO and SAGARD HOLDINGS MANAGER (US) LLC (the "Sagard Administrative Agent") and GLAS USA LLC (the "GLAS Administrative Agent") and together with the Sagard Administrative Agent, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"). Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with Internal Revenue Service Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or (ii) an Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
    Name:
    Title:

Date: _____ __, 20[ ]

**EXHIBIT K**

**[FORM OF] SOLVENCY CERTIFICATE**

I, the undersigned [chief financial officer][other senior officer with similar title] of FIRST BRANDS GROUP INTERMEDIATE, LLC, a Delaware limited liability company (formerly known as TRICO GROUP HOLDINGS, LLC) ("Parent"), in that capacity only and not in my individual capacity (and without personal liability), do hereby certify as of the date hereof, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such facts and circumstances after the date hereof), that:

1.       Reference is hereby made to the First Lien Term Loan Agreement, dated as of June 16, 2025 (the "First Lien Credit Agreement") among FIRST BRANDS GROUP, LLC, a Delaware limited liability company (formerly known as TRICO GROUP, LLC) (the "Borrower"), the Parent, the LENDERS FROM TIME TO TIME PARTY THERETO and SAGARD HOLDINGS MANAGER (US) LLC (the "Sagard Administrative Agent") and GLAS USA LLC (the "GLAS Administrative Agent") and together with the Sagard Administrative Agent, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent"). Unless otherwise defined herein, capitalized terms used in this certificate shall have the meanings set forth in the Credit Agreement, as context may suggest.

2.       For purposes of this certificate, the terms below shall have the following definitions:

(a)      "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of Parent and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(b)      "Present Fair Salable Value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of Parent and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

(c)      "Liabilities"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of Parent and its Subsidiaries taken as a whole, as of the date hereof after giving effect to the consummation of the Transactions, determined in accordance with GAAP consistently applied.

(d)      "Will be able to pay their Liabilities as they mature"

Parent and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become

I-1-2

payable, in light of business conducted or anticipated to be conducted by Parent and its Subsidiaries taken as a whole.

        (e)        "Do not have Unreasonably Small Capital"

Parent and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern. I understand that "unreasonably small capital" depends upon the nature of the particular business or businesses conducted or to be conducted, and I have reached my conclusion based on the needs and anticipated needs for capital of the business conducted or anticipated to be conducted by Parent and its Subsidiaries taken as a whole.

        3.        For purposes of this certificate, I, or officers of Parent under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

        (a)        I have reviewed the financial statements referred to in Section 4.01(g) of the Credit Agreement.

        (b)        I have knowledge of and have reviewed to my satisfaction the Credit Agreement.

        (c)        As [chief financial officer] [other senior officer with similar title] of Parent, I am familiar with the financial condition of Parent and its Subsidiaries.

        4.        Based on and subject to the foregoing, I hereby certify on behalf of Parent that after giving effect to the consummation of the Transactions, it is my opinion that (i) the Fair Value of the assets of Parent and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of Parent and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) Parent and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (iv) Parent and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

*[Signature Page Follows]*

K-2

K-3

IN WITNESS WHEREOF, Parent has caused this certificate to be executed on its behalf by the undersigned as of the date first written above.

FIRST BRANDS GROUP INTERMEDIATE, LLC

By:_____
Name:
Title:

K-3

**EXHIBIT L**

**FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT**

[See Attached]

**TERM INTERCREDITOR AGREEMENT**

Term Intercreditor Agreement (this "<u>Agreement</u>"), dated as of March 30, 2021, (a) by and among (i) Jefferies Finance LLC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, and as more specifically defined below, the "<u>Initial First Priority Representative</u>") for the Initial First Priority Secured Creditors (as defined below) secured pursuant to the Initial First Priority Agreement (as defined below), (ii) Jefferies Finance LLC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, and as more specifically defined below, the "<u>Initial Second Priority Representative</u>") for the Initial Second Priority Secured Creditors (as defined below) secured pursuant to the Initial Second Priority Agreement (as defined below), and (iii) each other First Priority Representative and Second Priority Representative (each, as defined below) that from time to time becomes a party hereto pursuant to the terms hereof, and (b) acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company ("<u>Parent</u>"), First Brands Group, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), and each of the other Loan Parties (as defined below).

WHEREAS, on February 26, 2019, Parent, the Borrower and the other Loan Parties party thereto entered into the Term Intercreditor Agreement (the "<u>Original Intercreditor Agreement</u>") with Credit Suisse AG, Cayman Islands Branch, as the administrative agent and collateral agent under the Existing Initial First Priority Agreement (as defined below), and Credit Suisse AG, Cayman Islands Branch, as the administrative agent and collateral agent under the Existing Initial Second Priority Agreement (as defined below);

WHEREAS, Parent, the Borrower, the Initial First Priority Representative and certain financial institutions and other entities are parties to the first lien senior secured First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated as of October 23. 2018, as further amended by that certain Amendment No. 2 to First Lien Term Loan Agreement, dated as of January 24, 2019, as further amended by that certain Amendment No. 3 to First Lien Term Loan Agreement, dated as of February 26, 2019, as further amended by that certain Amendment No. 4 to First Lien Term Loan Agreement, dated as of May 21, 2020, as further amended by that certain Amendment No. 5 to First Lien Term Loan Agreement, dated as of July 31, 2020, as further amended by that certain Amendment No. 6 to First Lien Term Loan Agreement, dated as of November 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified immediately prior to the date hereof, the "<u>Existing Initial First Priority Agreement</u>"), pursuant to which such financial institutions and other entities have agreed to make loans to the Borrower; and

WHEREAS, Parent, the Borrower, the Initial Second Priority Representative and certain financial institutions and other entities are parties to the second lien senior secured Second Lien Term Loan Agreement, dated as of February 26, 2019 (as amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated as of July 30, 2020, and as further amended, restated, amended and restated, supplemented or otherwise immediately prior to the date hereof, the "<u>Existing Initial Second Priority Agreement</u>"), pursuant to which such financial institutions and other entities have agreed to make loans to the Borrower;

WHEREAS, the Borrowers intends to refinance (the "2021 Refinancing") the entire amount of the term loans outstanding immediately prior to the date hereof under (i) the Existing Initial First Priority Agreement, with new term loans incurred pursuant to that certain Refinancing Agreement (First Lien), dated as of the date hereof (the "First Priority Refinancing Agreement"), by and among Parent, the Borrower, the lender party thereto and the Initial First Priority Representative, and (ii) the Existing Initial Second Priority Agreement, with new term loans incurred pursuant to that certain Refinancing Agreement (Second Lien), dated as of the date hereof (the "Second Priority Refinancing Agreement"), by and among Parent, the Borrower, the lender party thereto and the Initial Second Priority Representative;

WHEREAS, the parties hereto desire to amend and restate the Original Intercreditor Agreement to, among other things, reflect the 2021 Refinancing;

WHEREAS, the Borrower and the other Loan Parties have granted to the Initial First Priority Representative senior security interests in the Common Collateral (as defined below) as security for payment and performance of the First Priority Obligations;

WHEREAS, the Borrower and the other Loan Parties have granted to the Initial Second Priority Representative junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations; and

WHEREAS, from time to time, the Borrower may, subject to the terms and conditions hereof, designate additional Indebtedness as First Priority Obligations or Second Priority Obligations.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which are expressly recognized by all of the parties hereto, the Initial First Priority Representative (for itself and on behalf of the Initial First Priority Secured Creditors), the Initial Second Priority Representative (for itself and on behalf of the Initial Second Priority Secured Creditors), each Additional First Priority Representative (for itself and on behalf of the Additional First Priority Secured Creditors for which it is Additional First Priority Representative) and each Additional Second Priority Representative (for itself and on behalf of the Additional Second Priority Secured Creditors for which it is Additional Second Priority Representative) agree to amend and restate the Original Intercreditor Agreement in its entirety as follows:

SECTION 1.Definitions.

1.1.    Defined Terms. The following terms, as used herein, have the following meanings:

"2021 Refinancing" has the meaning set forth in the recitals of this Agreement.

"ABL Intercreditor Agreement" means the Amended and Restated ABL Intercreditor Agreement, dated as of February 26, 2019, by and among Bank of America, N.A., as administrative agent and collateral agent for the ABL Secured Parties (as defined therein), the Initial First Priority Representative for the Initial First Priority Secured Creditors and the Initial Second Priority Representative for the Initial Second Priority Secured Creditors, as amended by

2

that certain Amendment No. 1 to Amended and Restated Intercreditor Agreement, dated as of July 31, 2020, and as further amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Additional Debt" means Additional First Priority Debt and Additional Second Priority Debt.

"Additional First Priority Agreement" means any agreement evidencing Additional First Priority Debt designated as such in writing by the Borrower to the extent permitted to be so designated under each then extant First Priority Agreement and Second Priority Agreement.

"Additional First Priority Debt" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including, without limitation, any "Incremental Facility", "Incremental Equivalent Debt" and "Specified Refinancing Debt" (in each case, as such terms are defined in the Initial First Priority Agreement) (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional First Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional First Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the Initial First Priority Agreement, the Initial Second Priority Agreement, each other Additional First Priority Agreement then in effect and each Additional Second Priority Agreement then in effect to be secured by Liens on the Common Collateral ranking pari passu in priority with the applicable First Priority Liens and the Liens on the Common Collateral securing other Additional First Priority Debt (without regard to the control of remedies) and ranking senior to the Second Priority Liens and (b) the Loan Parties have granted Liens on the Common Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"Additional First Priority Representative" has the meaning set forth in the definition of First Priority Representative.

"Additional First Priority Secured Parties" means, with respect to any Series of Additional First Priority Debt, the First Priority Secured Parties in respect thereof.

"Additional Representative" means, as the case may be, an Additional First Priority Representative and/or an Additional Second Priority Representative.

"Additional Second Priority Agreement" means any agreement evidencing Additional Second Priority Debt designated as such in writing by the Borrower to the extent permitted to be so designated under each then extant First Priority Agreement and Second Priority Agreement.

"Additional Second Priority Debt" means Indebtedness of the Loan Parties incurred following the date of this Agreement, including, without limitation, any "Incremental Term Facility", "Incremental Equivalent Debt" and "Specified Term Refinancing Debt" (in each case, as such terms are defined in the Initial Second Priority Agreement) (together with all obligations

3

in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Second Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the relevant Additional Second Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) to the extent (a) such Indebtedness and such obligations in respect of such Indebtedness are permitted by the terms of the First Priority Agreement, the Second Priority Agreement, each Additional First Priority Agreement then in effect and each other Additional Second Priority Agreement then in effect to be secured by Liens on the Common Collateral ranking pari passu in priority with the applicable Second Priority Liens and the Liens on the Common Collateral securing other Additional Second Priority Debt (without regard to the control of remedies) and ranking junior in priority to the First Priority Liens and (b) the Loan Parties have granted Liens on the Common Collateral to secure such Indebtedness and such obligations in respect of such Indebtedness.

"Additional Second Priority Representative" has the meaning set forth in the definition of Second Priority Representative.

"Additional Second Priority Secured Parties" means, with respect to any Series of Additional Second Priority Debt, the Second Priority Secured Parties in respect thereof.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

"Business Day" has the meaning set forth in the Initial First Priority Agreement.

"Borrower" has the meaning set forth in the introductory paragraph hereof.

"Cash Management Agreement" has the meaning set forth in the Initial First Priority Agreement.

"Cash Management Bank" has the meaning set forth in the Initial First Priority Agreement.

"Cash Management Obligations" has the meaning set forth in the Initial First Priority Agreement.

"Common Collateral" means all assets that are both First Priority Collateral and Second Priority Collateral.

"Default Rate" has the meaning set forth in Section 6(d)(i).

"Designated First Priority Representative" means (i) if at any time there is only one Series of First Priority Obligations then extant, the First Priority Representative for the First Priority Secured Parties in such Series and (ii) at any time when clause (i) of this definition does

4

not apply, either (a) if the First Priority Obligations Series Payment Date with respect to the First Priority Obligations in respect of the Initial First Priority Agreement has not occurred, the Initial First Priority Representative and (b) if the First Priority Obligations Series Payment Date with respect to the First Priority Obligations in respect of the Initial First Priority Agreement has occurred, the First Priority Representative for the First Priority Secured Parties in respect of the Series of First Priority Obligations representing a majority in aggregate principal amount of all extant First Priority Obligations at such time.

"Designated Second Priority Representative" means (i) if at any time there is only one Series of Second Priority Obligations then extant, the Second Priority Representative for the Second Priority Secured Parties in such Series and (ii) at any time when clause (i) of this definition does not apply, either (a) if the Initial Second Priority Agreement is then in effect, the Initial Second Priority Representative and (b) if the Initial Second Priority Agreement is no longer in effect, the Second Priority Representative for the Second Priority Secured Parties in respect of the Series of Second Priority Obligations representing a majority in aggregate principal amount of all extant Second Priority Obligations at such time.

"DIP Financing" has the meaning set forth in Section 5.2.

"Enforcement Action" means (a) the taking of any action (or joining with any other Person (other than the First Priority Representative to the extent provided in Section 3.2) in taking any action) to enforce any Lien in respect of the Common Collateral, including the institution of any foreclosure proceedings, the giving of notice of any public or private sale or other disposition pursuant to Article 8 or Article 9 of the UCC or other applicable law or any action to vacate, obtain relief from or modify a stay or other injunction restricting any such enforcement or any other exercise of rights or remedies with respect to any Common Collateral, (b) the exercise of (or joining with any other Person (other than the First Priority Representative to the extent provided in Section 3.2) in exercising) any right or remedy provided to a secured creditor under the First Priority Documents or Second Priority Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Loan Party or the taking of any action or the exercise of any right or remedy in respect of the set off or recoupment against any Common Collateral or proceeds of any Common Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including credit bidding or otherwise accepting any Common Collateral in full or partial satisfaction of a Lien, (c) the disposition of all or any material portion of the Common Collateral, by private or public sale or any other means, (d) the solicitation of third parties to conduct the liquidation of any Common Collateral, (e) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties for the purposes of valuing, marketing, or the disposition of, any Common Collateral, or (f) the exercise of any other enforcement right relating to any Common Collateral (including the exercise of any voting rights relating to any equity interests constituting Common Collateral) whether under the First Priority Documents, Second Priority Documents, under applicable law, in equity, in an Insolvency Proceeding, or otherwise; it being acknowledged and agreed that none of the following will constitute an Enforcement Action for purposes of this Agreement: (i) the imposition of a default rate or late fee, (ii) the filing of a proof of claim or a statement of interest in any Insolvency Proceeding and (iii) the acceleration of the First Priority Obligations or the Second Priority Obligations.

"Existing Initial First Priority Agreement" has the meaning set forth in the recitals of this Agreement.

"Existing Initial Second Priority Agreement" has the meaning set forth in the recitals of this Agreement.

"Extended Period" has the meaning set forth in Section 3.2.

"First Priority Agreement" means the collective reference to (a) the Initial First Priority Agreement, (b) each Additional First Priority Agreement and (c) any secured credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement that Refinances any other then extant First Priority Agreement pursuant to Section 9.6 hereof. Unless the context otherwise requires, any reference to the First Priority Agreement hereunder shall be deemed a reference to each First Priority Agreement then extant.

"First Priority Collateral" means all assets, whether now owned or hereafter acquired by the Borrower or any other Loan Party, in which a Lien is granted or purported to be granted to any First Priority Secured Party as security for any First Priority Obligation.

"First Priority Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any First Priority Agreement, and any other documents that are designated under any First Priority Agreement as "First Priority Collateral Documents" for purposes of this Agreement.

"First Priority Debt" means (a) Indebtedness of the Loan Parties incurred pursuant to the Initial First Priority Agreement (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by the Initial First Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the Initial First Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) and (b) all Additional First Priority Debt.

"First Priority Documents" means each First Priority Agreement, each First Priority Collateral Document and each First Priority Guarantee.

"First Priority Guarantee" means any guarantee by any Loan Party of any or all of the First Priority Obligations.

"First Priority Lien" means any Lien created by any First Priority Collateral Documents.

"First Priority Obligations" means (a) with respect to the Initial First Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the Initial First Priority Agreement (or any equivalent term in any Refinancing thereof), including any Additional First Priority Debt, provided, that any Cash Management Obligations and Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder and (b) with respect to each other First

6

Priority Agreement, (i) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to such First Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to such First Priority Agreement, (iii) all Secured Hedging Obligations; provided, that any Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder, (iv) all Cash Management Obligations; provided, that any Cash Management Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder and (v) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the applicable First Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any First Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

"First Priority Obligations Payment Date" means the date on which the First Priority Obligations Series Payment Date has occurred for each Series of First Priority Obligations.

"First Priority Obligations Series Payment Date" means, with respect to each Series of First Priority Obligations, the date on which (a) the First Priority Obligations of that Series (other than those that constitute Unasserted Contingent Obligations) have been paid in full in cash (or cash collateralized or defeased in accordance with the terms of the First Priority Documents), (b) all commitments to extend credit under the First Priority Documents for that Series have been terminated and (c) there are no outstanding letters of credit or similar instruments issued under the First Priority Documents for that Series (other than such as have been cash collateralized or defeased in accordance with the terms of the First Priority Documents). The First Priority Obligations Series Payment Date with respect to any Series of First Priority Obligations shall not be deemed to have occurred unless all of the foregoing claims have actually been paid in full in cash, whether or not such amounts are allowed or disallowed vis-a-vis the Borrower, and notwithstanding any discharge of any or all such claims pursuant to section 1141(d) of the Bankruptcy Code or otherwise. Upon the written request by any Second Priority Representative or the Borrower, the applicable First Priority Representative for that Series shall promptly deliver a written notice to each Second Priority Representative and the Borrower stating that (to the extent such events have occurred) the events described in the foregoing clauses (a), (b) and (c) have occurred.

"First Priority Refinancing Agreement" has the meaning set forth in the recitals of this Agreement.

"First Priority Representative" means (i) in the case of the First Priority Obligations or First Priority Secured Parties secured pursuant to the Initial First Priority Agreement, the Initial First Priority Representative, and (ii) in the case of any Additional First Priority Debt or any

7

Additional First Priority Secured Parties of any Series, the trustee, administrative agent, collateral or similar agent named as the First Priority Representative for such Series in the applicable Joinder Agreement (each, in the case of this clause (ii), together with its successors and assigns in such capacity, an "Additional First Priority Representative").

"First Priority Secured Parties" means each First Priority Representative, each Secured Party (or equivalent term) as defined in any First Priority Collateral Documents or any First Priority Agreement, and any other holders of the First Priority Obligations.

"Indebtedness" means (i) debt for borrowed money, including obligations evidenced by bonds, debentures, notes or other similar instruments (other than any obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees and similar obligations), (ii) Cash Management Obligations, (iii) Secured Hedging Obligations and (iv) any other "Indebtedness" within the meaning of the Initial First Priority Agreement or the Initial Second Priority Agreement.

"Initial First Priority Agreement" means the Existing Initial First Priority Agreement, as amended by the First Priority Refinancing Agreement.

"Initial First Priority Representative" has the meaning set forth in the introductory paragraph hereof.

"Initial First Priority Secured Creditors" means the "Secured Parties" as defined in the Initial First Priority Agreement (or any equivalent term in any Refinancing thereof).

"Initial Second Priority Agreement" means the Existing Initial Second Priority Agreement, as amended by the Second Priority Refinancing Agreement.

"Initial Second Priority Representative" has the meaning set forth in the introductory paragraph hereof.

"Initial Second Priority Secured Creditors" means the "Secured Parties" as defined in the Initial Second Priority Agreement (or any equivalent term in any Refinancing thereof).

"Insolvency Proceeding" means any voluntary or involuntary case or proceeding of which any Loan Party is the subject and in respect of bankruptcy, insolvency, winding up, receivership, dissolution, liquidation, reorganization or assignment for the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

"Joinder Agreement" means a supplement to this Agreement in the form of Exhibit A hereto, required to be delivered by an Additional Representative to each other then-existing First Priority Representative and Second Priority Representative pursuant to Section 9.4 hereof.

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases (as defined in the Initial First Priority Agreement) but excluding operating leases) or any other security interest or interest in the nature of security

8

whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Loan Party" means Parent, the Borrower and each of the Guarantors (as such term is defined in the Initial First Priority Agreement). All references in this Agreement to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding.

"Maximum First Priority Obligations Amount" means, as of any date of determination:

(a)     an aggregate principal amount, not to exceed the sum of (i) $1,735,110,000, plus (ii) 100% of the aggregate principal amount of the Term Loans (as defined in the Initial First Priority Agreement as in effect on the date hereof) incurred after the date of this Agreement pursuant to Sections 2.16, 7.03(m), 7.03(n) and 7.03(s) of the Initial First Priority Agreement (without giving effect to any amendments thereto), plus (iii) the aggregate principal amount of any Revolving Commitments (as defined in the Initial First Priority Agreement as in effect on the date hereof) provided after the date of this Agreement pursuant to Section 2.16 of the Initial First Priority Agreement (without giving effect to any amendments thereto) minus (x) the aggregate principal amount of any repayments of Term Loans (as defined in the Initial First Priority Agreement as in effect on the date hereof) under the Initial First Priority Agreement after the date of this Agreement; minus (x) the aggregate principal amount of any reduction of the Revolving Commitments (as defined in the Initial First Priority Agreement as in effect on the date hereof) under the Initial First Priority Agreement after the date of this Agreement, plus

(b)     First Priority Obligations constituting Secured Hedging Obligation and Cash Management Obligations; provided, that any Cash Management Obligations and Secured Hedging Obligations that are secured on a first priority basis on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) shall not be included hereunder, plus

(c)     all other First Priority Obligations but only in respect of or attributable to subsections (a) and (b) above (including First Priority Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"Maximum First Priority Obligations Payment Date" means the date on which the First Priority Obligations Series Payment Date has occurred for each Series of First Priority Obligations in an amount up to the Maximum First Priority Obligations Amount.

"Maximum Second Priority Obligations Amount" means, as of any date of determination:

(a)     the sum of (i) $540,000,000 plus (ii) 100% of the loans made after the date of this Agreement pursuant to Sections 2.16, 7.03(m), 7.03(n) and 7.03(s) of the Initial

Second Priority Agreement (without giving effect to any amendments thereto); <u>minus</u> the aggregate principal amount of any repayments of Term Loans (as defined in the Initial Second Priority Agreement as in effect on the date hereof) under the Initial Second Priority Agreement after the date of this Agreement, <u>plus</u>

(b) all other Second Priority Obligations but only in respect of or attributable to subsection (a) above (including Second Priority Obligations constituting accrued and unpaid interest (including interest accruing at the default rate and any Post-Petition Interest), premiums (including tender premiums and prepayment premiums), underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities).

"<u>Original Intercreditor Agreement</u>" has the meaning set forth in the recitals of this Agreement.

"<u>Parent</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"<u>Post-Petition Interest</u>" means interest (including interest accruing at the default rate specified in the applicable First Priority Agreement and/or Second Priority Agreement), fees, expenses and other charges that pursuant to the First Priority Documents or the Second Priority Documents, as the case may be, continue to accrue after the commencement of any Insolvency Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Code or any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law, or in any such Insolvency Proceeding.

"<u>Purchase</u>" has the meaning set forth in <u>Section 3.7(b)</u>.

"<u>Purchase Notice</u>" has the meaning set forth in <u>Section 3.7(a)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.7(c)</u>.

"<u>Purchasing Parties</u>" has the meaning set forth in <u>Section 3.7(b)</u>.

"<u>Recovery</u>" has the meaning set forth in <u>Section 5.5</u>.

"<u>Refinance</u>" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "<u>Refinanced</u>" and "<u>Refinancing</u>" have correlative meanings.

"Second Priority Agreement" means the collective reference to (a) the Initial Second Priority Agreement, (b) each Additional Second Priority Agreement and (c) any secured credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement that Refinances any other then extant Second Priority Agreement pursuant to Section 9.6 hereof. Unless the context otherwise requires, any reference to the Second Priority Agreement hereunder shall be deemed a reference to each Second Priority Agreement then extant.

"Second Priority Collateral" means all assets, whether now owned or hereafter acquired by the Borrower or any Loan Party, in which a Lien is granted or purported to be granted to any Second Priority Secured Party as security for any Second Priority Obligation.

"Second Priority Collateral Documents" means the "Collateral Documents" or "Security Documents" (or equivalent term) as defined in any Second Priority Agreement and any documents that are designated under any Second Priority Agreement as "Second Priority Collateral Documents" for purposes of this Agreement.

"Second Priority Creditors" means the "Secured Parties" (or equivalent term) as defined in any Second Priority Collateral Documents or any Second Priority Agreement, the Second Priority Representatives and any other Persons to whom Second Priority Obligations are owing.

"Second Priority Debt" means (a) Indebtedness of the Loan Parties incurred pursuant to the Initial Second Priority Agreement (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by the Initial Second Priority Agreement (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency Proceeding at the rate provided in the Initial Second Priority Agreement, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency Proceeding)) and (b) all Additional Second Priority Debt.

"Second Priority Documents" means each Second Priority Agreement, each Second Priority Collateral Document and each Second Priority Guarantee.

"Second Priority Guarantee" means any guarantee by any Loan Party of any or all of the Second Priority Obligations.

"Second Priority Lien" means any Lien created by any Second Priority Collateral Documents.

"Second Priority Obligations" means (a) with respect to the Initial Second Priority Agreement, all "Secured Obligations" of each Loan Party as defined in the Initial Second Priority Agreement (or any equivalent term in any Refinancing thereof), including any Additional Second Priority Debt, and (b) with respect to each other Second Priority Agreement, (i) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made or other indebtedness issued or incurred pursuant to such Second Priority Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to such Second Priority

11

Agreement and (iii) all guarantee obligations, fees, expenses and other amounts payable from time to time pursuant to the applicable Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency Proceeding. To the extent any payment with respect to any Second Priority Obligation (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any First Priority Secured Party, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second Priority Secured Parties hereunder, be deemed to be reinstated and outstanding as if such payment had not occurred.

"Second Priority Refinancing Agreement" has the meaning set forth in the recitals of this Agreement.

"Second Priority Representative" means (i) in the case of the Second Priority Obligations or the Second Priority Secured Parties secured pursuant to the Initial Second Priority Agreement, the Initial Second Priority Representative, and (ii) in the case of any Additional Second Priority Debt or any Additional Second Priority Secured Parties of any Series, the trustee, administrative agent, collateral or similar agent named as the Second Priority Representative for such Series in the applicable Joinder Agreement (each, in the case of this clause (ii), together with its successors and assigns in such capacity, an "Additional Second Priority Representative").

"Second Priority Secured Parties" means each Second Priority Representative, each Second Priority Creditor and any other holders of the Second Priority Obligations.

"Secured Hedge Agreement" has the meaning set forth in the Initial First Priority Agreement.

"Secured Hedging Obligations" means any "Secured Obligations" (as defined in the Initial First Priority Agreement) in respect of any Secured Hedge Agreement.

"Secured Parties" means the First Priority Secured Parties and the Second Priority Secured Parties.

"Series" means, (i) with respect to First Priority Debt or Second Priority Debt, all First Priority Debt or Second Priority Debt, as applicable, represented by the same First Priority Representative or Second Priority Representative acting in the same capacity and (ii) with respect to First Priority Obligations or Second Priority Obligations, all such obligations secured by the same First Priority Collateral Documents or same Second Priority Collateral Documents, as the case may be.

"Standstill Period" has the meaning set forth in Section 3.2.

"Surviving Obligations" has the meaning set forth in Section 3.7(b).

"Unasserted Contingent Obligations" means, at any time, First Priority Obligations for indemnification in respect of which no demand has been made at such time.

"Uniform Commercial Code" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Common Collateral..

1.2.     Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified; provided, that except in connection with any amendments, restatements, supplements or other modifications permitted pursuant to Section 6 hereof, (x) any term defined by reference to the Initial First Priority Agreement shall have the meaning ascribed to such term in the Initial First Priority Agreement as in effect on the date hereof and (y) any term defined by reference to the Initial Second Priority Agreement shall have the meaning ascribed to such term in the Initial Second Priority Agreement as in effect on the date hereof, (ii) any reference herein to any Person shall be construed to include such Person's successors or permitted assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections shall be construed to refer to Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 2. Lien Priorities.

2.1.     Subordination of Liens. (a)Subject to the order of application of proceeds set forth in Section 4.1, any and all Liens now existing or hereafter created or arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless of how or when acquired, whether by grant, statute, operation of law, subrogation or otherwise are expressly junior in priority, operation and effect to any and all Liens on the Common Collateral now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First Priority Obligations (other than any First Priority Obligations in excess of the Maximum First Priority Obligations Amount (such excess, the "Excess First Priority Obligations")), notwithstanding (i) anything to the contrary contained in any agreement or filing to which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other Liens, or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any First Priority Document or Second Priority Document or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Second Priority Obligations or (y) otherwise subordinated, voided, avoided, invalidated or lapsed.

13

(b)     No First Priority Secured Party or Second Priority Secured Party shall object to or contest, or support any other Person in contesting or objecting to, in any proceeding (including any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of any security interest in the Common Collateral granted to the other. Notwithstanding any failure by any First Priority Secured Party or Second Priority Secured Party to perfect its security interests in the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to the First Priority Secured Parties or the Second Priority Secured Parties (but subject to the order of application of proceeds set forth in Section 4.1), the priority and rights as between the First Priority Secured Parties and the Second Priority Secured Parties with respect to the Common Collateral shall be as set forth herein.

2.2.     Nature of First Priority Obligations. Each Second Priority Representative on behalf of itself and the other Second Priority Secured Parties represented by it acknowledges that, subject to Section 4.1 and 6, the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof, but only so long as, except in the case of any DIP Financing, any such obligations are permitted to be incurred pursuant to the Second Priority Documents. The lien priorities provided in Section 2.1 and the provisions of Section 4.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Priority Obligations or the Second Priority Obligations, or any portion thereof.

2.3.     Agreements Regarding Actions to Perfect Liens. (a) [Reserved].

(b)     Each Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties represented by it that each Second Priority Collateral Document (excluding any Uniform Commercial Code financing statement or similar instrument) securing Common Collateral in favor of or for the benefit of such Second Priority Representative and the other Second Priority Secured Parties represented by it shall, unless otherwise agreed to by the Designated First Priority Representative, contain the following notation (or language to similar effect approved by the Designated First Priority Representative): "Notwithstanding anything herein to the contrary, the lien and security interest created by this agreement on the property described herein and the exercise of any right or remedy by the collateral agent hereunder is subject to the provisions of the Term Intercreditor Agreement, dated as of March 30, 2021 (the "Intercreditor Agreement"), among Jefferies Finance LLC, as administrative agent and collateral agent for the Initial First Priority Secured Creditors, Jefferies Finance LLC, as administrative agent and collateral agent for the Initial Second Priority Secured Creditors, and each other First Priority Representative and Second Priority Representative from time to time party thereto, and acknowledged and agreed to by certain other persons party or that may become party thereto from time to time, as amended, restated, amended and restated, modified or supplemented from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this

14

Agreement (other than Section [●][1]), the terms of the Intercreditor Agreement shall govern and control."

(c)    Each First Priority Representative hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) over Common Collateral pursuant to the First Priority Collateral Documents, such possession or control is also for the benefit of and on behalf of, and the First Priority Representative or such third party holds such possession or control as bailee and agent for, the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment and agency for perfection being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code). Nothing in the preceding sentence shall be construed to impose any duty on any First Priority Representative (or any third party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Representative or any other Second Priority Secured Party with any rights with respect to such Common Collateral beyond those specified in this Agreement; provided that subsequent to the occurrence of the Maximum First Priority Obligations Payment Date, the First Priority Representative shall (i) deliver to the Second Priority Representative, at the Borrower's sole cost and expense, the Common Collateral in its possession or control together with any necessary endorsements to the extent required by the Second Priority Documents (and to the extent not so required, such delivery shall be made to the Borrower) or (ii) direct and deliver such Common Collateral as a court of competent jurisdiction otherwise directs, and provided, further, that the provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First Priority Secured Parties on the one hand and the Second Priority Secured Parties on the other hand and shall not impose on the First Priority Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds thereof) that would conflict with prior perfected Liens or any claims thereon in favor of any other Person that is not a Secured Party.

2.4.    <u>No New Liens; Release of Liens</u>.

(a)    So long as the First Priority Obligations Payment Date has not occurred, the parties hereto agree that (i) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any Second Priority Obligation if these same assets are not subject to, and do not become subject to, one or more Liens securing each of the First Priority Obligations (including as a result of the release of any Lien securing the First Priority Obligations) and (ii) if any Second Priority Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any Second Priority Obligation which assets are not also subject to the First Priority Lien of each First Priority Representative under the respective First Priority Documents (including as a result of the release of any Lien securing the First Priority Obligations), then such Second Priority Representative, upon demand by any First Priority Representative, will without the need for any further consent of any other Second Priority Secured Party, notwithstanding anything to the contrary in any other Second Priority Document either (x) release such Lien or (y) assign it to such First Priority Representative as security for the applicable

---

[1] Insert reference to applicable security interest granting clause.

15

First Priority Obligations (in which case the Second Priority Representative may retain a junior Lien on such assets subject to the terms hereof). To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Secured Parties, the Second Priority Representative and the other Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

(b)     So long as there are any outstanding Second Priority Obligations (other than those that constitute indemnification obligations in respect of which no claim has been made at such time), the parties hereto agree that (i) there shall be no Lien, and no Loan Party shall have any right to create any Lien, on any assets of any Loan Party securing any First Priority Obligation if these same assets are not subject to, and do not become subject to, one or more Liens securing each of the Second Priority Obligations (including as a result of the release of any Lien securing the Second Priority Obligations) and (ii) if any First Priority Secured Party shall acquire or hold any Lien on any assets of any Loan Party securing any First Priority Obligation which assets are not also subject to the Second Priority Lien of each Second Priority Representative under the respective Second Priority Documents (including as a result of the release of any Lien securing the Second Priority Obligations), then such First Priority Representative, upon demand by any Second Priority Representative, will without the need for any further consent of any other First Priority Secured Party, notwithstanding anything to the contrary in any other First Priority Document either (x) release such Lien or (y) assign it to such Second Priority Representative as security for the applicable Second Priority Obligations (in which case the First Priority Representative may retain a senior Lien on such assets subject to the terms hereof). To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the Second Priority Secured Parties, the First Priority Representative and the other First Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

SECTION 3.Enforcement Rights.

3.1.     Exclusive Enforcement. Until the Maximum First Priority Obligations Payment Date has occurred, whether or not an Insolvency Proceeding has been commenced by or against any Loan Party, the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the provisos set forth in Sections 3.2 and 5.1. Upon the occurrence and during the continuance of an "Event of Default" under and as defined in the First Priority Documents, the Designated First Priority Representative on behalf of the other First Priority Secured Parties may take and continue any Enforcement Action with respect to the Common Collateral permitted under the First Priority Documents in such order and manner as it may determine in its sole discretion.

3.2.     Standstill and Waivers. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that, until the Maximum First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)     they will not take or cause to be taken any Enforcement Action with respect to the Common Collateral and they will not take or receive any distribution (whether or not constituting First Priority Collateral or the proceeds thereof) from the Borrower, any other Loan Party or any of their respective bankruptcy estates on account of or in exchange for such party's interest in the Common Collateral or other rights as a secured creditor in respect of the Common Collateral;

(b)     they will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties;

(c)     they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including the filing or commencement of, or the joining in the filing or commencement of, an Insolvency Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party with respect to the Common Collateral; provided, that the Liens of the Second Priority Secured Parties attach to the proceeds (if any) of any such foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral with the same priority and validity as the Liens held by the Second Priority Secured Parties and such Liens remain subject to the terms of this Agreement;

(d)     they have no right to (i) direct either any First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or (ii) consent or object to the exercise by any First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or to the timing or manner in which any such right is exercised or not exercised;

(e)     [reserved]; and

(f)     they will not seek, and hereby waive any right, to have the Common Collateral or any part thereof marshaled upon, or in connection with, any foreclosure or other disposition of the Common Collateral;

provided that, notwithstanding the foregoing, any Second Priority Secured Party may exercise its rights and remedies in respect of the Common Collateral, including taking any Enforcement Actions, under, and to the extent provided for in, the Second Priority Collateral Documents or applicable law after the passage of a period of 210 days (the "Standstill Period") from the date of delivery of a notice in writing by the applicable Second Priority Representative to each First Priority Representative of its intention to exercise such rights and remedies, which notice may only be delivered following the occurrence of and during the continuation of an "Event of Default" under and as defined in the applicable Second Priority Agreement and the applicable Second Priority Representative has demanded repayment of all the principal amount of any Second Priority Obligations thereunder; provided, further, however, that, notwithstanding the foregoing, in no event shall any Second Priority Secured Party exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (i) any First Priority Secured

17

Party shall have commenced and be diligently pursuing the exercise of any of its rights and remedies with respect to all or any material portion of the Common Collateral or (ii) an Insolvency Proceeding in respect of any Loan Party shall have been commenced (the period during which any event described in the preceding clause (i) or (ii) is continuing, the "Extended Period"); and provided, further, that in any Insolvency Proceeding commenced by or against any Loan Party, each Second Priority Representative and the other Second Priority Secured Parties may take any action not prohibited by or inconsistent with this Agreement.

Notwithstanding the foregoing, the Second Priority Representative and the Second Priority Secured Parties may:

(1)    file a claim or statement of interest with respect to the Second Priority Obligations; provided that an Insolvency Proceeding has been commenced by or against the Loan Parties;

(2)    take any action (not adverse to the priority status of the Liens on the First Priority Collateral, or the rights of any First Priority Representative or the First Priority Secured Parties to exercise remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce or receive any value on account of) its rights in, and perfection and priority of its Lien on, the Common Collateral;

(3)    file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Secured Parties, including any claims secured by the Common Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)    file any pleadings, objections, motions or agreements or take any positions that assert rights or interests available to unsecured creditors of the Loan Parties arising under either any Insolvency Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(5)    vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Priority Obligations and the Common Collateral;

(6)    exercise any of its rights or remedies with respect to the Common Collateral after the termination of the Standstill Period to the extent permitted by this Agreement, including Section 3.2;

(7)    present a cash or credit bid (in each case, so long as such bid provides for payment in full in cash of the Maximum First Priority Obligations Amount) at any Section hearing or with respect to any other Common Collateral disposition;

18

(8)   bid for or purchase Common Collateral at any private or judicial foreclosure upon such Common Collateral initiated by the First Priority Representative and the First Priority Secured Parties, so long as the cash proceeds of such bid are sufficient to cause the Maximum First Priority Obligations Payment Date to occur;

(9)   join in (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the First Priority Collateral initiated by any First Priority Secured Party to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with the any Enforcement Action by the First Priority Secured Parties;

(10)   engage or retain consultants, valuation firms, appraisers, investment bankers and accountants, and perform or engage third parties to perform audits, examinations and appraisals of any Common Collateral, for the sole purpose of valuing such Common Collateral and not for the purpose of marketing or conducting a disposition of such Common Collateral; provided, however, that the Second Priority Secured Parties with respect to any Common Collateral shall not take any of the foregoing actions if such actions would interfere in any material respect with the enforcement by the First Priority Secured Parties with respect to such Common Collateral of their First Priority Liens; and

(11)   commence, or join in filing of a petition for the commencement of, any involuntary Insolvency Proceeding or exercise any of its rights during any Insolvency Proceeding to the extent expressly permitted by Section 5.

3.3.   Judgment Creditors. In the event that any Second Priority Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, any such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Liens and the First Priority Obligations) to the same extent as other Liens securing the Second Priority Obligations are subject to the terms of this Agreement.

3.4.   Cooperation. (a) Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that each of them shall take such actions as any First Priority Representative shall reasonably request in writing in connection with the exercise by the First Priority Secured Parties of their rights set forth herein.

(b)   Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, agrees that, commencing upon the later of the expiration of the Standstill Period and the expiration of the Extended Period, each of them shall take such actions as any Second Priority Representative shall reasonably request in writing in connection with the exercise by the Second Priority Secured Parties of their secured creditor rights expressly set forth herein.

19

3.5. <u>No Additional Rights For the Loan Parties Hereunder</u>. If any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by any First Priority Secured Party or Second Priority Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second Priority Secured Party.

3.6. <u>Actions Upon Breach</u>. (a)Should any Second Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement in a manner contrary to this Agreement), or fail to take any action expressly required by this Agreement to be taken by such Second Priority Secured Party, any First Priority Secured Party may obtain relief against such Second Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby waives (to the extent it may lawfully do so) any defense any Second Priority Secured Party may have that the First Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

(b) Should any First Priority Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Common Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement in a manner contrary to this Agreement), or fail to take any action expressly required by this Agreement to be taken by such First Priority Secured Party, any Second Priority Secured Party may obtain relief against such First Priority Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the First Priority Representative on behalf of each First Priority Secured Party that (i) the Second Priority Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, hereby waives (to the extent it may lawfully do so) any defense any First Priority Secured Party may have that the Second Priority Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.7. <u>Option to Purchase</u>. (a) Each First Priority Representative agrees that it will give each Second Priority Representative written notice within ten Business Days of: (i) the occurrence of an event of default under any First Priority Agreement arising from the failure of any Loan Party to pay principal, interest or fees when due and payable thereunder that is not cured, or waived by the applicable First Lien Creditors, within 60 days of its occurrence, (ii) the commencement of an Enforcement Action or the institution of any Insolvency Proceeding or (iii) the acceleration of the First Priority Obligations. Upon receipt of such notice by each Second Priority Representative, any Second Priority Secured Party shall have the option, but in no event the obligation, by irrevocable written notice (the "<u>Purchase Notice</u>") delivered by such Second Priority Representative to each First Priority Representative no later than ten Business Days after receipt by such Second Priority Representative of such notice, to purchase all (but not less than all) of the First Priority Obligations from the First Priority Secured Parties. If more than one

20

Second Priority Representative exercises its purchase option, the purchase shall be allocated among such purchasing Second Priority Representatives pro rata by principal amount of Second Priority Obligations.

(b)     On the date specified by the Second Priority Representative in the Purchase Notice (which shall be a Business Day not less than five Business Days, nor more than ten Business Days, after receipt by the First Priority Representative of the Purchase Notice), the First Priority Secured Parties shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Second Priority Secured Parties electing to purchase pursuant to Section 3.7(a) (the "Purchasing Parties"), and the Purchasing Parties shall purchase in cash (the "Purchase") from the First Priority Secured Parties, the First Priority Obligations; provided, that the First Priority Obligations purchased shall not include any rights of First Priority Secured Parties with respect to indemnification and other obligations of the Loan Parties under the First Priority Documents that are expressly stated to survive the termination of the First Priority Documents (the "Surviving Obligations").

(c)     Without limiting the obligations of the Loan Parties under the First Priority Documents to the First Priority Secured Parties with respect to the Surviving Obligations (which shall not be transferred in connection with the Purchase), on the date of the Purchase, the Purchasing Parties shall (i) pay to the First Priority Secured Parties as the purchase price (the "Purchase Price") therefor the full amount of all First Priority Obligations then outstanding and unpaid at par (including principal, accrued and unpaid interest at the contract rate, fees, breakage costs, attorneys' fees and expenses, and, in the case of any Secured Hedge Agreements, the amount that would be payable by the relevant Loan Party thereunder if it were to terminate such Secured Hedge Agreements on the date of the Purchase or, if not terminated, an amount determined by the relevant First Priority Secured Party to be reasonably necessary to collateralize its credit risk arising out of such Secured Hedge Agreements), (ii) agree to reimburse the First Priority Secured Parties for any loss, cost, damage or expense (including attorneys' fees and expenses) in connection with any fees, costs or expenses related to any checks or other payments provisionally credited to the First Priority Obligations or as to which the First Priority Secured Parties have not yet received final payment and (iii) agree, after written request from the First Priority Representative, to reimburse the First Priority Secured Parties in respect of indemnification obligations of the Loan Parties under the First Priority Documents as to matters or circumstances known to the Purchasing Parties at the time of the Purchase which could reasonably be expected to result in any loss, cost, damage or expense to any of the First Priority Secured Parties, provided that, in no event shall any Purchasing Party have any liability for such amounts in excess of proceeds of Common Collateral actually received by the Purchasing Parties.

(d)     The Purchase Price shall be remitted by wire transfer in immediately available funds to such account(s) of each applicable First Priority Representative as it shall designate to the Purchasing Parties. Each First Priority Representative shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the Purchase Price to the First Priority Secured Parties represented by it in accordance with the respective First Priority Agreements. Interest shall be calculated to but excluding the day on which the Purchase occurs if the amounts so paid by the Purchasing Parties to the account designated by the First Priority Representative are received in such account prior to 12:00 noon, New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Purchasing Parties to

21

the account designated by the First Priority Representative are received in such account later than 12:00 noon, New York City time.

(e)     The Purchase shall be made without representation or warranty of any kind by the First Priority Secured Parties as to the First Priority Obligations, the Common Collateral or otherwise and without recourse to the First Priority Secured Parties, except that the First Priority Secured Parties shall represent and warrant: (i) the amount of the First Priority Obligations being purchased, (ii) that the First Priority Secured Parties own the First Priority Obligations being purchased free and clear of any Liens and (iii) that the First Priority Secured Parties have the right to assign the First Priority Obligations being assigned and the assignment is duly authorized.

(f)     The parties hereto hereby acknowledge and agree that in no event shall the Second Priority Representative (i) be deemed to be a Purchasing Party for purposes of this Section 3.7, (ii) be subject to or liable for any obligations of a Purchasing Party pursuant to this Section 3.7 or (iii) incur any liability to any First Priority Secured Party or any other Person in connection with any Purchase pursuant to this Section 3.7.

(g)     To the extent that any First Priority Secured Party is in breach of the provisions of this Section 3.7, a Purchasing Party may, but shall not be obligated to, extend the date of the proposed Purchase on a day for day basis during the period of any breach by such First Priority Secured Party.

3.8.     Rights as Unsecured Creditors. The Second Priority Representative and the Second Priority Secured Parties may exercise rights and remedies available to unsecured creditors against the Loan Parties, in each case not inconsistent with the terms of this Agreement; provided that in the event that any Second Priority Secured Party becomes a judgment Lien creditor in respect of the Common Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens securing the Second Priority Obligations are subject to this Agreement.

3.9.     Second Lien Interest, Principal, Etc.. Except as otherwise provided in Section 3.2 hereof with respect to recoupment or set-off against Common Collateral or proceeds thereof, nothing in this Agreement shall prohibit the receipt by the Second Priority Representative or any Second Priority Secured Parties of the required payments of interest, principal and other amounts owed in respect of the Second Priority Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second Priority Representative or any Second Priority Secured Parties of rights or remedies as a secured creditor (including set off) or enforcement in contravention of this Agreement of any Lien held by any of them.

SECTION 4. Application of Proceeds of Common Collateral; Dispositions and Releases of Common Collateral; Inspection and Insurance.

4.1.     Application of Proceeds; Turnover Provisions. Until the First Priority Obligations Payment Date has occurred, all First Priority Collateral and proceeds thereof (including any interest earned thereon) received in connection with an Enforcement Action,

22

whether or not pursuant to an Insolvency Proceeding, and any distribution (whether or not constituting First Priority Collateral or the proceeds thereof) from the Borrower, any other Loan Party or any of their respective bankruptcy estates on account of or in exchange for such party's interest in the First Priority Collateral or other rights as a secured creditor in respect of the First Priority Collateral, shall be distributed as follows: <u>first</u> to the respective First Priority Representatives for application to the respective First Priority Obligations in accordance with the terms of the respective First Priority Documents; <u>provided</u> that the amount of First Priority Obligations eligible for application under this clause "first" shall not exceed the Maximum First Priority Obligations Amount, <u>second</u>, to the respective Second Priority Representatives for application to the respective Second Priority Obligations in accordance with the terms of the respective Second Priority Documents; <u>provided</u> that the amount of Second Priority Obligations eligible for application under this clause "second" shall not exceed the Maximum Second Priority Obligations Amount, <u>third</u> to the respective First Priority Representatives for application to all remaining respective First Priority Obligations (including any Excess First Priority Obligations) in accordance with the terms of the respective First Priority Documents, until the First Priority Obligations Payment Date has occurred and <u>fourth</u>, to the extent constituting Common Collateral, to the respective Second Priority Representatives for application to all remaining respective Second Priority Obligations in accordance with the terms of the respective Second Priority Documents. Until the occurrence of the First Priority Obligations Payment Date, any First Priority Collateral, including any such First Priority Collateral constituting proceeds, that may be received by any Second Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Designated First Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received, with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the Designated First Priority Representative to make any such endorsements as agent for the Second Priority Representative (which authorization, being coupled with an interest, is irrevocable). For so long as any Second Priority Obligations are outstanding, any Second Priority Collateral, including any such Second Priority Collateral constituting proceeds, that may be received by any First Priority Secured Party in violation of this Agreement shall be segregated and held in trust and promptly paid over to the Designated Second Priority Representative, for the benefit of the Second Priority Secured Parties, in the same form as received, with any necessary endorsements, and each First Priority Secured Party hereby authorizes the Designated Second Priority Representative to make any such endorsements as agent for the First Priority Representative (which authorization, being coupled with an interest, is irrevocable)

4.2. <u>Releases of Second Priority Lien</u>. (a) Upon any release, sale or disposition of Common Collateral permitted pursuant to the terms of the First Priority Documents that results in the release of the First Priority Lien on any Common Collateral (excluding any sale or other disposition that is expressly prohibited by the Second Priority Agreement as in effect on the date hereof unless such sale or disposition is consummated (x) in connection with an Enforcement Action after the occurrence and during the continuance of an "Event of Default" under and as defined in the First Priority Documents or (y) after the institution of any Insolvency Proceeding, (i) the Second Priority Lien on such Common Collateral (excluding any portion of the proceeds of such Common Collateral remaining after the Maximum First Priority Obligations Payment Date occurs), (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, such Loan Party's liability in respect of the Second Priority

Obligations) shall be automatically and unconditionally released to the same extent as so released by the First Priority Secured Parties with no further consent or action of any Person, and (ii) the Second Priority Creditors shall be deemed to have consented under the Second Priority Documents to such release, sale or disposition of such Common Collateral (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, the release of such Loan Party's liability in respect of the Second Priority Obligations), and to have waived the provisions of the Second Priority Documents to the extent necessary to permit such release, sale or disposition (and in the case of any release, sale or disposition of all or substantially all of the equity interests or assets of any Loan Party that constitute Common Collateral that has guaranteed any Second Priority Obligations, the release of such Loan Party's liability in respect of the Second Priority Obligations); provided, that no such release, consent, waiver or other action described in clauses (i) and (ii) above shall occur without the consent of the Second Priority Representative unless (x) the net proceeds of the disposition of any such Common Collateral are applied to repay (and, to the extent applicable, permanently reduce commitments with respect to) the First Priority Obligations, (y) in the case of a sale of any ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), the net proceeds of the disposition of any such Common Collateral are applied to repay (and, to the extent applicable, permanently reduce commitments with respect to) the ABL Obligations (as defined in the ABL Intercreditor Agreement) or (z) the Liens of the Second Priority Secured Parties attach to the proceeds of the disposition of any such Common Collateral with the same priority and validity as the Liens held by Second Priority Secured Parties on such Common Collateral.

(b)     Upon delivery to each Second Priority Representative of a notice from the applicable First Priority Representative or the Borrower, which notice states that any release of Liens securing or supporting any First Priority Obligations has become effective (or shall become effective upon the satisfaction of any condition or occurrence of any event, including the release by each Second Priority Representative), each Second Priority Representative shall, at the sole cost of the Borrower, promptly execute and deliver such release documents and instruments and shall take such further actions as any First Priority Representative shall reasonably request in writing to evidence any release of the Second Priority Lien or any release of the applicable Loan Party guarantor of the Second Priority Obligations (which shall be subject to identical conditions or contingencies, if applicable), in each case as provided in paragraph (a) of this Section 4.2. Each Second Priority Representative hereby appoints each First Priority Representative and any officer or duly authorized person of the First Priority Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Second Priority Representative and in the name of the Second Priority Representative or in such First Priority Representative's own name, from time to time, in such First Priority Representative's sole discretion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this Section 4.2, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

4.3.     Inspection Rights and Insurance. (a) Until the Maximum First Priority Obligations Payment Date has occurred, any First Priority Secured Party and its representatives

24

may at any time inspect, repossess, remove and otherwise deal with the Common Collateral to the extent permitted in accordance with the terms of the First Priority Documents, and the First Priority Representative may advertise and conduct public auctions or private sales of the Common Collateral, in each case without the involvement of or interference by any Second Priority Secured Party or liability to any Second Priority Secured Party, but with a prior written notice to the Designated Second Priority Representative.

(b)     Proceeds of Common Collateral include insurance proceeds in respect of such Common Collateral and therefore the lien priorities provided in Section 2.1 shall govern the ultimate disposition of casualty insurance proceeds. Until the Maximum First Priority Obligations Payment Date has occurred, the Designated First Priority Representative shall have the sole and exclusive right, subject to the rights of the Loan Parties under the First Priority Documents, to adjust or settle any insurance claims in the event of any covered loss, theft or destruction of Common Collateral to the extent provided for, and in accordance with, the First Priority Agreements. To the extent provided in the applicable First Priority Documents or Second Priority Documents, as the case may be, all proceeds of such insurance shall be remitted to the Designated First Priority Representative or the Designated Second Priority Representative, as the case may be, and each of the Second Priority Representatives and First Priority Representatives shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1.

SECTION 5.Insolvency Proceedings.

5.1.     Filing of Motions. Until the Maximum First Priority Obligations Payment Date has occurred, each Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties represented by it that no Second Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that (a) violates, or is prohibited by, this Agreement, (b) asserts any right, benefit or privilege that arises in favor of the Second Priority Secured Parties, in whole or in part, as a result of their interest in the Common Collateral (unless the assertion of such right is expressly permitted by this Agreement) or (c) challenges the validity, priority, enforceability or voidability of any Liens or claims held by any First Priority Representative or any other First Priority Secured Party with respect to the Common Collateral, or the extent to which the First Priority Obligations constitute secured claims or the value thereof under Section 506(a) of the Bankruptcy Code or otherwise; provided that the Second Priority Representative may (i) file a proof of claim in an Insolvency Proceeding and (ii) file any necessary responsive or defensive pleadings in opposition to any motion or other pleadings made by any Person objecting to or otherwise seeking the disallowance of any claims of the Second Priority Secured Parties on the Common Collateral, subject to the limitations contained in this Agreement and only if consistent with the terms and the limitations on the Second Priority Representative imposed hereby. Each First Priority Representative agrees on behalf of itself and the other First Priority Secured Parties represented by it that no First Priority Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case that challenges the validity, priority, enforceability or voidability of any Liens or claims held by any Second Priority Representative or any other Second Priority Secured

25

Party, or the extent to which the Second Priority Obligations constitute secured claims under Section 506(a) of the Bankruptcy Code or otherwise.

5.2.    Financing Matters. If any Loan Party becomes subject to any Insolvency Proceeding at any time prior to the Maximum First Priority Obligations Payment Date, and if any First Priority Representative or the other First Priority Secured Parties desire to consent (or not object) to the use of cash collateral under the Bankruptcy Code or to provide financing to any Loan Party under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Loan Party by any third party (any such financing, "DIP Financing"), then each Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties represented by it, that each Second Priority Secured Party (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such cash collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4 below or with the written consent of the First Priority Representative, (c) will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens (i) to such DIP Financing on the same terms as the First Priority Liens are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (ii) to any adequate protection provided to the First Priority Secured Parties and (iii) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties, and (d) agrees that notice received two calendar days prior to the entry of an order approving such usage of cash collateral or approving such financing shall be adequate notice; provided that (i) the Second Priority Representative retains the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the DIP Financing, (ii) (A) the DIP Financing or cash collateral order does not compel the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document or (B) the DIP Financing documentation or cash collateral order does not expressly require the sale or other liquidation of a material portion of the Common Collateral prior to a default under the DIP Financing documentation or cash collateral order and (iii) the aggregate principal amount of Indebtedness for borrowed money under the DIP Financing plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the First Priority Documents outstanding immediately prior to the commencement of such Insolvency Proceeding (which excludes any obligations with respect to Secured Hedge Agreements and Cash Management Agreements that constitute First Priority Obligations) does not exceed 120% of the aggregate principal amount of Indebtedness for borrowed money under the First Priority Documents outstanding immediately prior to the commencement of such Insolvency Proceeding.

No Second Priority Creditor may propose or provide any DIP Financing which (i) rolls-up or otherwise includes or refinances all or any portion of any pre-petition Second Priority Obligations, (ii) is secured by Liens on the Common Collateral ranking senior or pari passu in priority with the First Priority Liens and the Liens on the Common Collateral securing any Additional First Priority Debt, (iii) compels the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document, (iv) expressly requires the sale or other liquidation of a material portion of the Common Collateral prior to a default under such DIP Financing documentation or (v) is otherwise inconsistent with any provision of this Agreement.

Nothing in this Agreement limits or impairs the right of a Second Priority Secured Party to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more First Priority Secured Parties) or cash collateral to the extent the DIP Financing does not meet the requirements of this Agreement.

5.3.     Relief From the Automatic Stay. Each Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties represented by it, that none of them will seek, or support any person in seeking, relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case in respect of any Common Collateral, without the prior written consent of each First Priority Representative.

5.4.     Adequate Protection. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that, prior to the Maximum First Priority Obligations Payment Date, none of them shall object, contest, or support any other Person objecting to or contesting, (a) any request by any First Priority Representative or the other First Priority Secured Parties for adequate protection of its interest in the Common Collateral or any adequate protection provided to such First Priority Representative or the other First Priority Secured Parties, (b) any objection by any First Priority Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based on a claim of a lack of adequate protection in the Common Collateral or (c) the payment of interest, fees, expenses or other amounts to any First Priority Representative or any other First Priority Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, further agrees that, prior to the Maximum First Priority Obligations Payment Date, none of them shall assert or enforce any claim under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise that is senior to or on a parity with the First Priority Liens for costs or expenses of preserving or disposing of any Common Collateral. Notwithstanding anything to the contrary set forth in this Section and in Section 5.2(c)(ii), but subject to all other provisions of this Agreement (including Section 5.2(c)(i) and Section 5.3), in any Insolvency Proceeding, (i) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection consisting of additional collateral (with replacement Liens on such additional collateral) and/or superpriority claims in connection with any DIP Financing or use of cash collateral with respect to the Common Collateral, and the Second Priority Secured Parties do not object to the adequate protection being provided to the First Priority Secured Parties, then in connection with any such DIP Financing or use of cash collateral each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties, may, as adequate protection of their interests in the Common Collateral, seek or accept (and the First Priority Representative and the First Priority Secured Parties shall consent to and not object to, contest or support any other Person objecting to or contesting) adequate protection consisting solely of (x) a replacement Lien on the same additional collateral, subordinated to the Liens securing the First Priority Obligations and such DIP Financing on the same basis as the other Second Priority Liens on the Common Collateral are so subordinated to the First Priority Obligations under this Agreement and/or (y) superpriority claims junior in all respects to the superpriority claims granted to the First Priority Secured Parties; provided, however, that the inability of the Second Priority Secured Parties to receive any such junior replacement Lien or junior superpriority claims shall not affect the agreements and waivers set forth in this Section 5.4; provided, further, that each Second Priority Representative shall have

27

irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, on behalf of itself and the Second Priority Secured Parties represented by it, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claims; (ii) if the First Priority Secured Parties are granted, as adequate protection or otherwise, post-petition interest (in an amount that is equal to or exceeds the pre-default rate) and reasonable fees and expenses of counsel and financial advisors and consultants of any First Priority Representative, then each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties represented by it, may seek or accept, whether as adequate protection or otherwise (x) the payment of post-petition interest (in an amount that is equal to or exceeds the pre-default rate) and (y) the reasonable fees and expenses of counsel and financial advisors and consultants for the Second Priority Representative; (iii) if the First Priority Secured Parties (or any subset thereof) are granted any other adequate protection not described in clauses (i) or (ii) above, then each Second Priority Representative, on behalf of itself and any of the Second Priority Secured Parties represented by it, may seek or accept, and the First Priority Secured Parties shall consent to and not object, contest or support any other Person objecting to or contesting, the same adequate protection (which, if applicable, shall be junior in all respects to such adequate protection granted to the First Priority Secured Parties); provided, however, in the event any Second Priority Representative, on behalf of itself and the Second Priority Secured Parties represented by it, seeks or accepts adequate protection in accordance with clause (i) above and such adequate protection is granted in the form of additional collateral, then such Second Priority Representative, on behalf of itself or any of the Second Priority Secured Parties represented by it, agrees that each First Priority Representative shall also be granted a senior Lien on such additional collateral as security for the applicable First Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Priority Obligations shall be subordinated to the Liens on such collateral securing the First Priority Obligations and any such DIP Financing (and all obligations relating thereto) and any other Liens granted to the First Priority Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Priority Obligations are subordinated to such First Priority Obligations under this Agreement. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, agrees that except as expressly set forth in this Section none of them shall seek or accept adequate protection with respect to their interests in the Common Collateral or any payments of post-petition interest, expenses or other amounts in respect of the Second Priority Obligations, in each case, without the prior written consent of the Designated First Priority Representative. None of the Second Priority Representatives or Second Priority Secured Parties shall oppose or seek to challenge any claim by any First Priority Representative or any other First Priority Secured Party for allowance in any Insolvency Proceeding of First Priority Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the First Priority Representatives on behalf of the First Priority Secured Parties on the Common Collateral or any other First Priority Secured Party's Lien on the Common Collateral, without regard to the existence of the Liens of the Second Priority Representatives or the other Second Priority Secured Parties on the Common Collateral. None of the First Priority Representatives or First Priority Secured Parties shall oppose or seek to challenge any claim by any Second Priority Representative or any other Second Priority Secured Party for allowance in any Insolvency Proceeding of Second Priority Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the Second

28

Priority Representatives on behalf of the Second Priority Secured Parties on the Common Collateral or any other Second Priority Secured Party's Lien on the Common Collateral, after taking into account the First Priority Obligations.

5.5.     Avoidance Issues. If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, because such amount was avoided or ordered to be paid or disgorged for any reason, including because it was found to be a fraudulent or preferential transfer, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date shall be deemed not to have occurred. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Second Priority Representative, on behalf of itself and each of the other Second Priority Secured Parties represented by it, agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6.     Asset Dispositions in an Insolvency Proceeding. In an Insolvency Proceeding, neither the Second Priority Representative nor any other Second Priority Secured Party shall oppose any sale or disposition of any assets of any Loan Party constituting Common Collateral that is supported by any First Priority Representative and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale or disposition supported by the First Priority Secured Parties and to have released their Liens on such assets constituting Common Collateral; provided that pursuant to court order, the Liens of the Second Priority Secured Parties attach to the proceeds of the disposition with the same priority and validity as the Liens held by Second Priority Secured Parties on such Common Collateral and the Liens remain subject to the terms of this Agreement.

5.7.     Separate Grants of Security and Separate Classification. Each Secured Party acknowledges and agrees that (a) the grants of Liens pursuant to the First Priority Collateral Documents and the Second Priority Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the First Priority Obligations and the Second Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Loan Parties in respect of the

29

Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the claims held by the Second Priority Secured Parties. Each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, hereby acknowledges and agrees to turn over to the Designated First Priority Representative amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties.

5.8.    No Waivers of Rights of First Priority Secured Parties. Subject to the terms of this Agreement, any First Priority Representative or any other First Priority Secured Party may object in any Insolvency Proceeding or otherwise to any action taken by any Second Priority Secured Party not expressly permitted hereunder, including the seeking by any Second Priority Secured Party of adequate protection (except as provided in Section 5.4).

5.9.    Other Matters. So long as the Maximum First Priority Obligations Payment Date has not occurred each Second Priority Representative, on behalf of itself and each applicable Second Priority Secured Party, agrees that it will not file, propose, support or vote in favor of any plan of reorganization that is inconsistent in any manner with the terms of this Agreement.

5.10.    Effectiveness in Insolvency Proceedings. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding. The relative rights of the Secured Parties as to the Common Collateral and proceeds thereof shall continue after the commencement of any Insolvency Proceeding on the same basis as prior to the date of the petition therefor, subject to any court order approving the financing of, or use of cash collateral by, any Loan Party. All references herein to any Loan Party shall include such Loan Party as a debtor-in-possession and any receiver or trustee for such Loan Party.

5.11.    Reorganization Securities. If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Priority Obligations and on account of Second Priority Obligations, then, to the extent the debt obligations distributed on account of the First Priority Obligations and on account of the Second Priority Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations, provided that this provision shall not affect the relative rankings of the First Priority Obligations and the Second Priority Obligations in such Insolvency Proceeding.

SECTION 6.Amendments to Loan Documents.

(a)    Other than as set forth in Section 6(d) below, the Second Priority Documents may be amended, restated, Refinanced, supplemented or otherwise modified in

30

accordance with their terms without the consent of any First Priority Representative or any First Priority Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the First Priority Representative, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement.

(b)     Other than as set forth in Section 6(c) below, the First Priority Documents may be amended, restated, Refinanced, supplemented or otherwise modified in accordance with their terms without the consent of any Second Priority Representative or any Second Priority Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, however, that, without the consent of the Second Priority Representative, no such amendment, restatement, Refinancing, supplement or modification (or successive amendments, restatements, Refinancings, supplements or modifications) shall contravene any provision of this Agreement.

(c)     Notwithstanding Section 6(b) above, the First Priority Documents may not be amended, restated, Refinanced, supplemented or otherwise modified without the written consent of the applicable Second Priority Representative if such amendment, restatement, Refinancing, supplement or other modification:

(i)   increases (A) the interest rate, including by increasing the "applicable margin" or similar component of the interest rate (including original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity)) or by modifying the method of computing interest (including increases to any interest rate "floor" (but solely to the extent that, at the time of such amendment, restatement, Refinancing, supplement or other modification, such increase in "floor" would result in a higher interest rate)), so that the interest rate is increased by more than 5.00% per annum in the aggregate or (B) a letter of credit, commitment, facility, utilization or similar ongoing fee (but excluding any arrangement, structuring and underwriting fees and commissions and any amendment fees); provided, that (I) increases in an underlying reference rate resulting from LIBOR not being available or a replacement of LIBOR as the applicable reference rate (as provided by the Initial First Priority Agreement as in effect as of the date hereof or as otherwise implemented by then-existing market practice), (II) accrual of interest at the "Default Rate" as defined in the Initial First Priority Agreement in effect as of the date hereof or, for any rate in any such amendment, restatement, Refinancing, supplement or other modification, a rate that corresponds to such "Default Rate" or (III) any such amendment, restatement, Refinancing, supplement or other modification in connection with the exercise of any "most favored nations" clause in the Initial First Priority Agreement as in effect on the date hereof, in each case, will not be included in determining whether an increase under clauses (A) and (B) above has occurred; or

(ii) changes or adds, or has the effect of changing or adding, as applicable, any provision that restricts one or more Loan Parties from

31

making payments of the Second Priority Obligations that would otherwise be permitted under the Initial Second Priority Agreement as in effect on the date hereof.

(d)     Notwithstanding Section 6(a) above, the Second Priority Documents may not be amended, restated, Refinanced, supplemented or otherwise modified without the written consent of the applicable First Priority Representative if such amendment, restatement, Refinancing, supplement or other modification:

(i)     increases (A) the interest rate, including by increasing the "applicable margin" or similar component of the interest rate (including original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity)) or by modifying the method of computing interest (including increases to any interest rate "floor" (but solely to the extent that, at the time of such amendment, restatement, Refinancing, supplement or other modification, such increase in "floor" would result in a higher interest rate)), so that the interest rate is increased by more than 2.00% per annum in the aggregate or (B) a letter of credit, commitment, facility, utilization or similar ongoing fee (but excluding any arrangement, structuring and underwriting fees and commissions and any amendment fees); provided, that (I) increases in an underlying reference rate resulting from LIBOR not being available or a replacement of LIBOR as the applicable reference rate (as provided by the Initial Second Priority Agreement as in effect as of the date hereof or as otherwise implemented by then-existing market practice), (II) accrual of interest at the "Default Rate" as defined in the Initial Second Priority Agreement in effect as of the date hereof or, for any rate in any such amendment, restatement, Refinancing, supplement or other modification, a rate that corresponds to such "Default Rate", (III) any such amendment, restatement, Refinancing, supplement or other modification in connection with the exercise of any "most favored nations" clause in the Initial Second Priority Agreement as in effect on the date hereof and (IV) any changes to the cash or pay-in-kind interest rate or fees in connection with Section 2.08(e) of the Initial Second Priority Agreement as in effect on the date hereof, in each case, will not be included in determining whether an increase under clauses (A) and (B) above has occurred;

(ii)    shortens the maturity date of the Second Priority Debt to a date that is earlier than the date set forth in clause (a) of the definition of "Maturity Date" in the Initial Second Priority Agreement as in effect on the date hereof;

(iii)   changes or adds, or has the effect of changing or adding, as applicable, any provision that restricts one or more Loan Parties from making payments of the First Priority Obligations that would otherwise be permitted under the Initial First Priority Agreement as in effect on the date hereof; or

(iv) changes or adds, or has the effect of changing or adding, as applicable, any covenants or events of default thereunder to make them more restrictive as to any Loan Party, unless comparable modifications are also offered to any applicable First Priority Representative and First Priority Secured Party for inclusion in any applicable First Priority Documents that maintain, to the extent applicable, the covenant cushion levels between the covenants in the Initial First Priority Agreement as in effect on the date hereof and the covenants in the Initial Second Priority Agreement as in effect on the date hereof.

SECTION 7.Reliance; Waivers; etc.

7.1.    Reliance. The First Priority Documents are deemed to have been executed and delivered and all extensions of credit thereunder prior to, on or after the date hereof are deemed to have been made or incurred, in reliance upon this Agreement. Each Second Priority Representative, on behalf of itself and the Second Priority Secured Parties represented by it, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties. The Second Priority Documents are deemed to have been executed and delivered and all extensions of credit thereunder on or after the date hereof are deemed to have been made or incurred, in reliance upon this Agreement. Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, expressly waives all notices of the acceptance of and reliance on this Agreement by the Second Priority Representative and the other Second Priority Secured Parties.

7.2.    No Warranties or Liability. Each Second Priority Representative and each First Priority Representative acknowledges and agrees that it has not made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any First Priority Document or any Second Priority Document. Except as otherwise provided in this Agreement, each Second Priority Representative and each First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3.    No Waivers. No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by any noncompliance by any Loan Party with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

SECTION 8.Obligations Unconditional.

8.1.    First Priority Obligations Unconditional. All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Priority Document;

(b)    any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other

33

modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c) prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the First Priority Obligations, or of any of the Second Priority Representative or any other Second Priority Secured Party, or any Loan Party, to the extent applicable, in respect of this Agreement (other than the occurrence of the First Priority Obligations Payment Date).

8.2. <u>Second Priority Obligations Unconditional</u>. All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Loan Parties) hereunder, shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Second Priority Document;

(b) any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c) any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d) any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Second Priority Obligations or any First Priority Secured Party in respect of this Agreement, or any Loan Party, to the extent applicable, other than payment in full in cash of the Second Priority Obligations.

SECTION 9.<u>Miscellaneous</u>.

9.1. <u>Conflicts</u>. In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, the parties hereto acknowledge that the terms of this Agreement are not intended to and shall not, as between the Loan Parties and the Secured Parties, negate, impair, waive or cancel any rights granted to, or create any liability or obligation of, any Loan Party in the First Priority Documents and the Second Priority Documents or impose any additional obligations on the Loan Parties (other than as

34

expressly set forth herein). Notwithstanding the foregoing, solely in respect of the relative rights between the ABL Secured Parties (as defined in the ABL Intercreditor Agreement) on the one hand and the First Priority Secured Parties and Second Priority Secured Parties, collectively, on the other hand, and not to any rights or obligations between the First Priority Secured Parties and the Second Priority Secured Parties, in the event of any conflict between this Agreement and the ABL Intercreditor Agreement, the provisions of the ABL Intercreditor Agreement shall govern.

9.2. <u>Continuing Nature of Provisions</u>. This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligation Payment Date shall have occurred subject to the reinstatement as expressly set forth herein. This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, Borrower or any other Loan Party on the faith hereof.

9.3. <u>Amendments; Waivers</u>. Except as set forth in Section 9.15, no amendment, waiver or other modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by (i) each First Priority Representative (in accordance with the applicable First Priority Agreement) and each Second Priority Representative (in accordance with the applicable Second Priority Agreement) with respect to any amendment, waiver or other modification, and (ii) the Loan Parties, solely with respect to any amendments, waivers or other modifications that (I) materially adversely affect any obligation or right of the Loan Parties hereunder or under the First Priority Documents or the Second Priority Documents or impose any additional obligations on the Loan Parties, (II) adversely affect the rights of the Loan Parties to refinance the First Priority Obligations or the Second Priority Obligations or (III) modify the definitions of "Maximum First Priority Obligations Amount" or "Maximum Second Priority Obligations Amount". In addition, each waiver, if any, with respect to any aspect of this Agreement shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. The First Priority Representative and the Second Priority Representative shall provide the Loan Parties with written notice (together with a true and correct copy) of each proposed amendment or other modification to this Agreement prior to the effectiveness thereof. Notwithstanding the provisions of any other First Priority Document or Second Priority Document, each First Priority Representative (in accordance with the applicable First Priority Agreement) and each Second Priority Representative (in accordance with the applicable Second Priority Agreement) may, with the consent of the Loan Parties for any amendments, restatements, amendment and restatements, supplements or other modifications that directly and materially adversely affect any Loan Party, make any amendments, restatements, amendment and restatements, supplements or other modifications to this Agreement to correct any ambiguity, defect or inconsistency contained herein without the consent of any other Person.

9.4. <u>Additional Debt Facilities</u>.

(a) To the extent, but only to the extent, permitted by the provisions of each then extant First Priority Agreement and Second Priority Agreement (including, in each case, pursuant to any consent or waiver thereto or thereunder), the Borrower may incur or issue and sell

one or more series or classes of Additional First Priority Debt and/or one or more series or classes of Additional Second Priority Debt.

Any such series or class of Additional First Priority Debt may be secured by a first-priority, senior Lien on the Common Collateral, in each case under and pursuant to the First Priority Collateral Documents for such Series of Additional First Priority Debt, if and subject to the condition that, unless such Indebtedness is part of an existing Series of Additional First Priority Debt represented by a First Priority Representative already party to this Agreement, the Additional First Priority Representative with respect to any such Additional First Priority Debt becomes a party to this Agreement by satisfying the conditions set forth in this Section 9.4. Upon any Additional First Priority Representative so becoming a party hereto, all First Priority Obligations of such Series shall also be entitled to be so secured by a senior Lien on the Common Collateral in accordance with the terms hereof and thereof.

Any such series or class of Additional Second Priority Debt may be secured by a junior-priority, subordinated Lien on the Common Collateral, in each case under and pursuant to the relevant Second Priority Collateral Documents for such Series of Additional Second Priority Debt, if and subject to the condition, unless such Indebtedness is part of an existing Series of Additional Second Priority Debt represented by a Second Priority Representative already party to this Agreement, the Additional Second Priority Representative with respect to any such Additional Second Priority Debt becomes a party to this Agreement by satisfying the conditions set forth in this Section 9.4. Upon any Additional Second Priority Representative so becoming a party hereto, all Second Priority Obligations of such Series shall also be entitled to be so secured by a subordinated Lien on the Common Collateral in accordance with the terms hereof and thereof.

(b) In order for an Additional Representative to become a party to this Agreement:

(i) such Additional Representative shall have executed and delivered to each other then-existing First Priority Representative and Second Priority Representative a Joinder Agreement substantially in the form of Exhibit A hereto (with such changes as may be reasonably approved by the Designated First Priority Representative and such Additional Representative) pursuant to which such Additional Representative becomes an Additional First Priority Representative or Additional Second Priority Representative hereunder and the related First Priority Secured Parties or Second Priority Secured Parties, as applicable, become subject hereto and bound hereby;

(ii) the Borrower shall have delivered a designation to each other then-existing First Priority Representative and Second Priority Representative substantially in the form of Exhibit B hereto, pursuant to which an officer of the Borrower shall (A) identify the Indebtedness to be designated as Additional First Priority Debt or Additional Second Priority Debt, as applicable, and the initial aggregate principal amount of such Indebtedness, (B) identify the Additional First Priority Agreement or Additional Second Priority Agreement as applicable, (C) specify the name and address of the applicable Additional Representative, (D) certify that such Additional Debt, is permitted to be incurred, secured and

36

guaranteed by each then extant First Priority Agreement and Second Priority Agreement and (D) attach to such designation true and complete copies of each of the First Priority Agreement or Second Priority Agreement, as applicable, relating to such Additional First Priority Debt or Additional Second Priority Debt, as applicable.

(iii) Upon the execution and delivery of a Joinder Agreement by an Additional First Priority Representative or an Additional Second Priority Representative, as the case may be, in each case in accordance with this Section 9.4, each other First Priority Representative and Second Priority Representative shall acknowledge receipt thereof by countersigning a copy thereof and returning the same to such Additional Representative; provided that the failure of any First Priority Representative or Second Priority Representative to so acknowledge or return the same shall not affect the status of such Additional Debt as Additional First Priority Debt or Additional Second Priority Debt, as the case may be, if the other requirements of this Section 9.4 are complied with.

(c)     With respect to any incurrence, issuance or sale of Indebtedness after the date hereof under any Additional First Priority Agreement or Additional Second Priority Agreement, in each case, of a Series of Additional First Priority Debt or Series of Additional Second Priority Debt whose Additional First Priority Representative or Additional Second Priority Representative, as applicable, is already a party to each of this Agreement, the requirements of this Section 9.4 shall not be applicable and such Indebtedness shall automatically constitute Additional First Priority Debt or Additional Second Priority Debt so long as such Indebtedness is permitted to be incurred, secured and guaranteed by each First Priority Agreement and Second Priority Agreement.

9.5.    Information Concerning Financial Condition of the Borrower and the Loan Parties. Neither any Second Priority Representative nor any First Priority Representative hereby assumes responsibility for keeping each other informed of the financial condition of the Borrower and of any of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations. Each Second Priority Representative and each First Priority Representative hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances. In the event any Second Priority Representative or any First Priority Representative, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide or update any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation not a part of its regular business routine, or (c) to disclose any other information. Neither any First Priority Representative nor any Second Priority Representative shall have any responsibility to monitor or verify the financial condition of the Borrower or of any of the Loan Parties.

9.6.    Refinancings. The First Priority Obligations and the Second Priority Obligations may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any First Priority Agreement or any Second Priority Agreement) of, any First Priority

Representative or Second Priority Representative or any Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, that (i) such Refinancing is permitted pursuant to the terms of each then extant First Priority Agreement and Second Priority Agreement and (ii) the Representative for the holders of obligations in respect of such Refinancing shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 9.4 hereof.

9.7.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.8.    Submission to Jurisdiction. (a) Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby agree that each First Priority Secured Party, each Second Priority Secured Party and each Loan Party shall irrevocably and unconditionally submit, for itself and its property, to the exclusive general jurisdiction of the courts of the State of New York sitting in New York County or of the United States for the Southern District of such State, and any appellate court from any thereof (except that, (x) in the case of any Mortgage (as defined in the Initial First Priority Agreement) or other First Priority Collateral Document or Second Priority Collateral Document, proceedings may also be brought by the applicable First Priority Representative or Second Priority Representative in the state in which the respective mortgaged property or Common Collateral is located or any other relevant jurisdiction and (y) in the case of any Insolvency Proceedings with respect to any Loan Party, actions or proceedings related to this Agreement and the other First Priority Documents or Second Priority Documents may be brought in such court holding such Insolvency Proceedings), in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment with respect to this Agreement, and each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably and unconditionally agree that all of their respective claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court. Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, and each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby further agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)    Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in the first sentence of paragraph (a) of this Section and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each First Priority Representative, on behalf of itself and the other First Priority Secured Parties represented by it, each Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties represented by it, and the Loan Parties hereby irrevocably consents to service of process in the manner provided for notices (other than facsimile or email) in Section 9.9. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

9.9. Notices.

(a) Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email.

(b) All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.9 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.9 or (ii) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that received notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in clause (c) below shall be effective as provided in such clause (c).

(c) Notices and other communications hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the parties hereto. Each party hereto may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(d) For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth on Exhibit D

39

hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.10. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Common Collateral.

9.11. <u>Headings</u>. Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.12. <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreements shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.13. <u>Counterparts; Integration; Effectiveness</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile transmission or electronic transmission of a .pdf copy of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement; provided that original signatures shall be promptly delivered thereafter, it being understood that that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission. The words "execution," "signed," "signature," and words of like import in the Agreement, or any notice, certificate or other instrument delivered in connection herewith shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.14. <u>WAIVER OF JURY TRIAL</u>. EACH FIRST PRIORITY REPRESENTATIVE, ON BEHALF OF ITSELF AND THE OTHER FIRST PRIORITY SECURED PARTIES REPRESENTED BY IT, EACH SECOND PRIORITY REPRESENTATIVE, ON BEHALF OF ITSELF AND THE OTHER SECOND PRIORITY SECURED PARTIES REPRESENTED BY IT, THE LOAN PARTIES, AND EACH OTHER PARTY HERETO, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE,**

**THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.14</u>.**

9.15. <u>Additional Loan Parties</u>. Parent and Borrower agree that, if any Person shall become a Loan Party after the date hereof, it will promptly cause such Person to become a party to this Agreement upon execution and delivery by such Person of a Loan Party Joinder Agreement in the form of <u>Exhibit C</u> hereto. Upon such execution and delivery, such Person will become a Loan Party hereunder with the same force and effect as if originally named as a Loan Party herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder. The rights and obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding the addition of any new Loan Party as a party to this Agreement.

9.16. <u>Amendment and Restatement</u>. From and after the date hereof, the Original Intercreditor Agreement shall be amended and restated in its entirety by this Agreement, and the Original Intercreditor Agreement shall thereafter be of no further force and effect. This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Original Intercreditor Agreement. On and after the date hereof, (i) all references to the Original Intercreditor Agreement (or to any amendment or any amendment and restatement thereof) in the Second Priority Documents shall be deemed to refer to the Original Intercreditor Agreement as amended and restated hereby (as it may be further amended, restated, amended and restated or otherwise modified) and (ii) all references to any section (or subsection) of the Original Intercreditor Agreement shall be amended to become, *mutatis mutandis*, references to the corresponding provisions of this Agreement.

[Remainder of page intentionally left blank]

41

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**JEFFERIES FINANCE LLC**,
as First Lien Collateral Agent

By: _____
    Name:   Jason Kennedy
    Title:   Managing Director

**JEFFERIES FINANCE LLC**,
as Second Lien Collateral Agent

By: _____
    Name:   Jason Kennedy
    Title:   Managing Director

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**PARENT**

FIRST BRANDS GROUP
INTERMEDIATE, LLC

By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**Borrower**

FIRST BRANDS GROUP, LLC

By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**SUBSIDIARY GUARANTORS**

AUTOLITE OPERATIONS LLC
CARTER FUEL SYSTEMS, LLC
STRONGARM, LLC
KTRI HOLDINGS, INC.
HEATHERTON HOLDINGS, LLC
CARTER FUEL EXPORT, INC.
PREMIER MARKETING GROUP, LLC
AVM EXPORT, INC.
TRICO PRODUCTS CORPORATION
KTRI OFFSHORE HOLDINGS, LLC
TRICO HOLDING CORPORATION
TRICO TECHNOLOGIES CORPORATION
ASC INDUSTRIES, INC.
SPECIALTY PUMPS GROUP, INC.
AIRTEX INDUSTRIES, LLC
AIRTEX PRODUCTS, LP
CHAMPION LABORATORIES, INC.
FUEL FILTER TECHNOLOGIES, INC.
UCI ACQUISITION HOLDINGS (NO. 4) LLC
UCI INTERNATIONAL HOLDINGS, INC.
UCI INTERNATIONAL HOLDINGS PARENT, INC.
UCI INTERNATIONAL, LLC
UCI PENNSYLVANIA, INC.
UCI-AIRTEX HOLDINGS, INC.
UNITED COMPONENTS, LLC
UNIVERSAL AUTO FILTER LLC
BPI ACQUISITION COMPANY, INC.
BPI HOLDINGS INTERNATIONAL, INC.
BRAKE PARTS HOLDINGS, INC.
BRAKE PARTS INC LLC
BRAKE PARTS INC INDIA LLC
BPI EC, LLC
BRAKE PARTS INC CHINA LLC
APC Parent, Inc.
APC Intermediate Holdings, Inc.
CWD Intermediate Holdings, Inc.
CWD Holding Corp.
CWD Intermediate Holding Corp.
CWD, LLC
Qualis Enterprises, Inc.
Qualis Automotive, L.L.C.


By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary


[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**SUBSIDIARY GUARANTORS**

FRAM GROUP IP LLC
FRAM GROUP OPERATIONS LLC
FRAMAUTO HOLDINGS LLC


By: _____
Name: Brian Troyer
Title: General Counsel, EVP and Secretary

[Signature Page to First Lien-Second Lien Intercreditor Agreement]

**Exhibit A to the**
**Term Intercreditor Agreement**

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "Intercreditor Agreement"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("Parent"), First Brands Group, LLC, a Delaware limited liability company (the "Borrower") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

As a condition to the ability of the Borrower to incur [Additional First Priority Debt] [Additional Second Priority Debt] after the date of the Intercreditor Agreement and to secure such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] with a lien on the Common Collateral and to have such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] guaranteed by the Loan Parties, in each case under and pursuant to the applicable [First Priority Documents] [Second Priority Documents], each of the [Additional First Priority Representative] [Additional Second Priority Representative] in respect of such [Additional First Priority Debt] [Additional Second Priority Debt] and related [First Priority Obligations] [Second Priority Obligations] is required to become an [Additional First Priority Representative] [Additional Second Priority Representative], under, and the related [First Priority Secured Parties] [Second Priority Secured Parties] in respect thereof are required to become subject to and bound by, the Intercreditor Agreement. Section 9.4 of the Intercreditor Agreement provides that such [Additional First Priority Representative] [Additional Second Priority Representative] may become an [Additional First Priority Representative] [Additional Second Priority Representative] under, and the related [First Priority Secured Parties] [Second Priority Secured Parties] may become subject to and bound by, the Intercreditor Agreement pursuant to the execution and delivery by the [Additional First Priority Representative] [Additional Second Priority Representative] of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 9.4 of the Intercreditor Agreement. The undersigned [Additional First Priority Representative] [Additional Second Priority Representative] (the "New Representative") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

Accordingly, the New Representative agrees as follows:

In accordance with Section 9.4 of the Intercreditor Agreement, the New Representative by its signatures below become a [First Priority Representative] [Second Priority Representative] under, and the related [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by it become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Representative had originally

Exhibit A – Page 1

been named therein as a [First Priority Representative] [Second Priority Representative] and each of the New Representative, on behalf of itself and each other [Additional First Priority Secured Party] [Additional Second Priority Secured Party] represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement applicable to it as a [First Priority Representative] [Second Priority Representative] and to the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by it as [First Priority Secured Parties] [Second Priority Secured Parties]. Each reference to a ["First Priority Representative"] ["Second Priority Representative"] in the Intercreditor Agreement shall be deemed to include the New Representative and each reference to ["First Priority Secured Parties"] ["Second Priority Secured Parties"] shall include the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] represented by such New Representative. The Intercreditor Agreement is hereby incorporated herein by reference.

Each of the New Representative represents and warrants to the other First Priority Representatives and Second Priority Representatives and the other Secured Parties that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [First Priority Documents] [Second Priority Documents] relating to such [Additional First Priority Debt] [Additional Second Priority Debt] provides that, upon the New Representative's entry into this Agreement, the [Additional First Priority Secured Parties] [Additional Second Priority Secured Parties] in respect of such [Additional First Priority Debt] [Additional Second Priority Debt] will be subject to and bound by the provisions of the Intercreditor Agreement as [First Priority Secured Parties] [Second Priority Secured Parties].

This Joinder Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

**THIS JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Any provision of this Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE],
as [  ] for the holders of [                    ]

By: _____
    Name:
    Title:

Address for notices:

_____

_____
attention of: _____
Telecopy:   _____

Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE FIRST
PRIORITY REPRESENTATIVE],
as [Insert title of Representative]

By: _____
    Name:
    Title:

Receipt of the foregoing acknowledged:
[NAME OF APPLICABLE SECOND
PRIORITY REPRESENTATIVE],
as [Insert title of Representative]

By: _____
    Name:
    Title:

**Exhibit B to the**
**Term Intercreditor Agreement**

[FORM OF] DEBT DESIGNATION NO. [ ] (this "<u>Designation</u>") dated as of [ ], 20[ ] with respect to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "<u>Intercreditor Agreement</u>"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("<u>Parent</u>"), First Brands Group, LLC, a Delaware limited liability company (the "<u>Borrower</u>") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Designation is being executed and delivered in order to designate additional secured Obligations of the Borrower and the Loan Parties as [Additional First Priority Debt][Additional Second Priority Debt] entitled to the benefit of and subject to the terms of the Intercreditor Agreement.

The undersigned, the duly appointed [*specify title of Responsible Officer*] of the Borrower hereby certifies on behalf of the Borrower that:

1. Borrower intends to incur Indebtedness (the "<u>Designated Obligations</u>") in the initial aggregate principal amount of [   ] pursuant to the following agreement: [*describe credit/loan agreement indenture or other agreement giving rise to Additional First Priority Debt or Additional Second Priority Debt, as the case may be*] (the "<u>Designated Agreement</u>") which will be [Additional First Priority Debt][Additional Second Priority Debt].

2. The incurrence of the Designated Obligations is permitted to be incurred, secured and guaranteed by each extant First Priority Document and Second Priority Document.

3. The name and address of the Additional Representative for such Designated Obligations is:

   [Insert name and all capacities; Address]
   Telephone: _____
   Fax: _____
   Email _____

4. Attached hereto are true and complete copies of each of the [First/Second] Priority Agreement relating to such Additional [First/Second] Priority Debt.

[Remainder of this page intentionally left blank]

Exhibit B – Page 1

IN WITNESS WHEREOF, the Borrower has caused this Designation to be duly executed by the undersigned Responsible Officer as of the day and year first above written.

FIRST BRANDS GROUP, LLC

By: _____
     Name:
     Title:

**Exhibit C to the**
**Term Intercreditor Agreement**

[FORM OF] LOAN PARTY JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] (the "Loan Party Joinder Agreement") to the TERM INTERCREDITOR AGREEMENT, dated as of March 30, 2021 (the "Intercreditor Agreement"), among Jefferies Finance LLC, as Initial First Priority Representative, and Jefferies Finance LLC, as Initial Second Priority Representative, and each other First Priority Representative and Second Priority Representative that from time to time becomes a party thereto pursuant to the terms thereof, and acknowledged and agreed to by First Brands Group Intermediate, LLC, a Delaware limited liability company, ("Parent"), First Brands Group, LLC, a Delaware limited liability company (the "Borrower") and each of the other Loan Parties from time to time party thereto.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "New Loan Party") wishes to acknowledge and agree to the Intercreditor Agreement and become a party thereto and to acquire and undertake the rights and obligations of a Loan Party thereunder.

Accordingly, the New Loan Party agrees as follows for the benefit of the First Priority Representatives, Second Priority Representatives and the other Secured Parties:

The New Loan Party (a) acknowledges and agrees to, and becomes a party to the Intercreditor Agreement as a Loan Party, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of a Loan Party under the Intercreditor Agreement. This Loan Party Joinder Agreement supplements the Intercreditor Agreement and is being executed and delivered by the New Loan Party pursuant to Section 9.15 of the Intercreditor Agreement.

The New Loan Party represents and warrants to each First Priority Representative, each Second Priority Representative and to the other Secured Parties that (a) it has full power and authority to enter into this Loan Party Joinder Agreement, in its capacity as a Loan Party and (b) this Loan Party Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Loan Party Joinder Agreement.

This Loan Party Joinder Agreement may be executed by one or more of the parties to this Loan Party Joinder Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Loan Party Joinder Agreement by e-mail or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

Exhibit C – Page 1

THIS LOAN PARTY JOINDER AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS LOAN PARTY JOINDER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Any provision of this Loan Party Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

All communications and notices hereunder shall be in writing and given as provided in Section 9.9 of the Intercreditor Agreement.

[Remainder of page intentionally left blank]

Exhibit C – Page 2

IN WITNESS WHEREOF, the New Loan Party has duly executed this Loan Party Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[_____]

By: _____
     Name:
     Title:

Exhibit C – Page 3

**Exhibit D to the**
**Term Intercreditor Agreement**

**ADDRESSES FOR NOTICES**

Address for Notices of all Loan Parties:

FIRST BRANDS GROUP, LLC
127 Public Square, Suite 5110
Cleveland, Ohio 44114
Attention: Patrick James, Chairman
Facsimile No.: (216) 274-9027
Email Address: patrick.james@trico-group.com

With a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Michael Baker
Telephone: (212) 318-6855

Address for Notices of Initial First Priority Representative:

Jefferies Finance LLC
520 Madison Avenue
New York, NY 10022
Attention: Account Officer – Trico Group
Facsimile No.: (212) 284-3444
Email Address: JFIN.Admin@jefferies.com

Address for Notices of Initial Second Priority Representative:

Jefferies Finance LLC
520 Madison Avenue
New York, NY 10022
Attention: Account Officer – Trico Group
Facsimile No.: (212) 284-3444
Email Address: JFIN.Admin@jefferies.com

Exhibit D – Page 1
