# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**DECLARATION OF CHARLES M. MOORE
IN SUPPORT OF EMERGENCY MOTION OF
DEBTORS FOR ORDER (I) APPROVING FUNDING
ARRANGEMENT WITH CERTAIN OEM CUSTOMERS; (II) MODIFYING
THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF**

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**"). On September 5, 2025, A&M was retained by the Company (as defined below) to, among other things, assist with liquidity management and forecasting, identifying cost-reduction opportunities, and contingency preparations for a potential chapter 11 filing. On September 24, 2025, Global Assets LLC and twelve of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28, 2025 (as applicable, the "**Petition Date**"), First Brands Group LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Debtors**," and together with their non-debtor affiliates, the "**Company**").

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2. On September 24, 2025, I was appointed as Chief Restructuring Officer of First Brands Group, LLC and on October 13, 2025, I was appointed as Interim Chief Executive Officer. From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22).

3. I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

4. I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments. I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning. I have served as Chief Restructuring Officer for,

2

among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

5.      I submit this declaration (the "**Declaration**") in support of the *Emergency Motion of Debtors for Order (I) Approving Funding Arrangement with Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (the "**Motion**") filed by the Debtors.[2]

6.      Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by A&M employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, or the other advisors to the Debtors, including Weil, Gotshal & Manges LLP and Lazard Frères & Co. LLC, and/or (v) my experience as a restructuring professional.  I will receive no additional compensation in exchange for my testimony.  If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases. I am authorized to submit this declaration on behalf of the Debtors.

## Liquidity and Need for Immediate Funding

7.      A&M has been actively involved in monitoring and forecasting the Debtors' liquidity throughout these chapter 11 cases.  This has included preparing and reviewing short-term cash forecasts and cash flow reporting, and analyzing anticipated receipts and disbursements required to fund ordinary course operations (including payroll, vendor payments, inventory purchases, taxes, insurance, rent, and professional fees).

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Term Sheet (as defined herein), as applicable.

3

8.      Based on the Debtors' most recent weekly liquidity reporting prepared by A&M, attached hereto as **Exhibit A** (the "**Liquidity Report**"), as of January 23, 2026 (preliminary), the Debtors had approximately $82.8 million of unrestricted cash.  After giving effect to the $50.0 million minimum liquidity covenant required under the DIP Facility, the Debtors had approximately $32.8 million of covenant headroom as of that date.  In addition, the Debtors held approximately $102.6 million of cash that was classified as restricted and therefore not currently available to fund the Debtors' operations.  Such restricted cash includes cash collected since the Petition Date, primarily related to prepetition accounts receivable, that is segregated in accordance with established prepetition factoring segregation protocols; amounts may also include certain funds related to postpetition sales and accounts receivable that remain subject to validation and release under applicable procedures.

9.      As reflected in the Liquidity Report, the Debtors' accessible liquidity has deteriorated rapidly over a matter of weeks.  For example, as of January 2, 2026, the Debtors had approximately $194.8 million of unrestricted cash (approximately $144.8 million of covenant headroom after giving effect to the $50.0 million minimum liquidity covenant).  That headroom declined to approximately $106.8 million as of January 9, 2026, approximately $63.4 million as of January 16, 2026, and approximately $32.8 million as of January 23, 2026.

10.      Absent additional funding, including under the Funding Arrangement described below, the Debtors' accessible liquidity (including unrestricted cash and any borrowing availability actually available to the Debtors, together with continued authority to use cash collateral, as applicable) would be insufficient to fund ordinary course operations beyond the current week.  Specifically, the Debtors' ordinary-course cash requirements— including payroll, vendor payments, taxes, insurance, and professional fees— are substantial and have recently

reduced the Debtors' covenant headroom by tens of millions of dollars on a weekly basis, as reflected in the Liquidity Report. With only approximately $32.8 million of covenant headroom as of January 23, 2026, absent the OEM funding the Debtors are projected to consume their remaining liquidity headroom during the week ending January 30, 2026 and would be unable to continue operations beyond that point.

11. I also believe the Debtors have already implemented meaningful cost-saving measures, such that their current rate of liquidity consumption cannot be materially reduced in the near term while maintaining operations. At a minimum, the Debtors cannot reduce liquidity consumption to a level that would preserve any covenant headroom beyond this week absent additional funding.

12. The Liquidity Report also reflects that the Debtors currently have no borrowing availability under the ABL Facility (including due to the cash dominion blocker) and have not received, and do not expect to receive, additional funding from the DIP lenders or the ABL lenders. As a result, and because the Debtors' efforts to accelerate customer receipts beyond ordinary terms have not generated sufficient incremental liquidity—indeed, acceleration of accounts receivable from other customers is no longer anticipated based on those negotiations—the Debtors' ability to continue operating their remaining business units is currently dependent on customer funding being provided on a week-to-week basis by the OEM Customers.

13. These liquidity constraints reached an inflection point in late January 2026. With no actionable incremental financing available and insufficient accessible liquidity to continue operating on an ordinary course basis, the Debtors would be required to commence a full wind-down of their remaining operations beginning this week. As described below, the Debtors' ability to avoid an immediate liquidation of their remaining operating business units depends on obtaining

emergency Court approval of the Funding Arrangement and receiving continued customer funding on a week-to-week basis.

<b><u>No Alternative Funding Available</u></b>

14.     The DIP Financing was only ever expected to stretch through the end of January 2026. As such, the Debtors and their advisors have been exploring every conceivable avenue at their disposal to bring in additional liquidity and funding, including by: (i) requesting that customers remit past due receivables while providing comfort to customers that were hesitant to remit receipts due to potential double payment liability; (ii) negotiating accelerated payment terms with certain existing customers, which those customers declined; (iii) soliciting funding proposals from stakeholders and outside parties for additional financing, including requesting incremental funding from the DIP lenders, which the DIP lenders declined to provide on terms acceptable to the Company, and reviewing a term sheet from the ABL lenders that would have imposed consents and conditions that were not workable; (iv) attempting to release additional segregated non-factored cash from the Factored Receivables Account, which was met with opposition by certain of the third-party factors; (v) launching and continuing a comprehensive process to sell certain of the Debtors' business units; and (vi) preserving liquidity by taking preventive actions such as stop shipping, implementing cost reductions, facility closures, and requesting customers to pull forward accounts payable to pay the Debtors on expedited terms.

15.     These efforts still led the Debtors to this breaking point. Based on the Debtors' negotiations with customers, the Debtors do not expect any meaningful acceleration of accounts-receivable payments. The Debtors also do not anticipate the release of non-factored cash from the Factored Receivables Account in the near term. Likewise, without immediate incremental financing, it would not be feasible to consummate a sale of certain business units on the necessary timeline. At a minimum, none of these alternatives would deliver liquidity quickly

6

enough to preserve the Debtors' covenant headroom beyond this week. Moreover, the Debtors' outreach to stakeholders other than the OEM Customers has not yielded any actionable funding proposals.

16. Thus, I understand that the Debtors lack any alternative actionable financing or sale proposals that would allow the Debtors to raise the liquidity necessary to continue funding operations in their key business units. The Debtors desperately need to bolster liquidity to bridge through the conclusion of an expedited sale process or, alternatively, an orderly wind-down.

17. The Debtors are at a critical juncture in these chapter 11 cases. Negotiations regarding a sale process, wind-down, liquidity, and a potential resolution of these chapter 11 cases are well underway among the Debtors and their key stakeholders. The Debtors, in consultation with their advisors, determined that continuation of the sale process would require the Debtors to obtain additional liquidity through entry into the Funding Arrangement. Without this liquidity, the Debtors will be unable to continue funding the manufacture of component parts that are the lifeblood of their business and of critical importance to the OEM Customers. The Debtors have no actionable alternative funding options available at this time.

**Facility Closures**

18. Due to the aforementioned liquidity constraints, the Debtors were forced to take immediate steps to reduce cash burn and preserve remaining liquidity, which included implementing significant operational reductions by ceasing operations at seventeen (17) facilities, including all facilities of Brakes and Autolite Operations LLC ("**Autolite**"), as well as one facility of each of Hopkins Manufacturing Corporation and Horizon Global Corporation, which collectively had approximately 4,000 employees. Going-forward production in North America is expected to be limited to those business units and facilities supporting OEM Customers that have agreed to provide customer funding, and the Debtors have commenced wind-down activities for

7

business units that are not covered by the Funding Arrangement. The Debtors are only able to avert an entire shutdown of their North American businesses and layoffs of approximately 13,000 additional employees through the Funding Arrangement.

19. Based on my experience and work with the Debtors' management team and advisors, absent approval of the Funding Arrangement and continued customer funding from the OEM Customers, the Debtors will be forced to shut down and liquidate the remainder of their North American businesses on an accelerated basis, destroying significant value to the detriment of all stakeholders. Such outcomes materially impair going-concern value and harm employees, customers, vendors, and other stakeholders. Accordingly, approval of the Funding Arrangement is necessary to avoid immediate and irreparable harm to the Debtors' estates and key stakeholders, including the Debtors' employees that are the lifeblood of the business.

### Funding Arrangement

20. The Debtors, with advice from their advisors, determined that entry into the Funding Arrangement to receive immediate funding for operations is the value-maximizing (and only) path forward. The Debtors have explored all available options and alternatives to secure additional funding but have been unsuccessful. However, as part of that process, the Debtors and their advisors engaged with certain of their largest original equipment manufacturer customers (the "**OEM Customers**") regarding the estates' immediate liquidity needs. I understand those discussions resulted in a series of agreements memorialized in the Term Sheet, pursuant to which the OEM Customers have agreed to provide weekly operational funding (and, in the case of Trico Products Corporation, a one-time "prime the pump" funding) that is treated as prepayment for future production and that is used to support continued production at and for the specific business units identified on an agreed funding chart (the "**Funding Chart**"), beginning on or about January 26, 2026. Subject to Section 6(c) of the Term Sheet, finished goods produced after January 23,

8

2026, will only be sold to the OEM Customers so long as the applicable OEM Customer is providing Funding. I understand that the Funding Arrangement is conditioned on, among other things, receipt of the secured creditor confirmations described in the Term Sheet, and Court approval. I also understand that the DIP Secured Parties have agreed to the Funding Arrangement. Under the Term Sheet, the OEM Customers are obligated to remit their Funding for the week of January 25, 2026 no later than January 28, 2026. I further understand that the Debtors expect to receive approximately $48 million of customer funding for the current week by January 28, 2026, which will provide the Debtors with liquidity to fund limited operations and production at the funded business units through January 30, 2026, with Court approval of the Funding Arrangement as a condition subsequent to such funding. The OEM Customers have not committed to provide customer funding beyond the current week, and any additional customer funding is expected to be negotiated and provided on a week-to-week basis in accordance with the Term Sheet.

21. The OEM Customers' willingness to provide Funding is also conditioned on, among other things, receipt of written confirmation from each secured creditor (or its advisors) holding a lien on cash, deposit accounts, receivables, inventory, and/or machinery and equipment at the relevant business units that, unless a Funding Termination Date (as defined in the Term Sheet) has occurred or the Debtors or the Participating Customers have failed to comply with their obligations under the Adequate Protection Mechanism (as defined in the Term Sheet), such secured creditor (i) will not sweep or otherwise exercise dominion or control over the Funding (or any proceeds of accelerated payables), (ii) will not seek to take possession or otherwise exercise control over any raw materials, work-in-process, or finished goods inventory of the relevant business units, (iii) will forbear from taking actions to repossess or liquidate tooling, machinery, or equipment collateral or otherwise take actions that would adversely impact production while

9

Funding is being provided, and (iv) acknowledges, among other things, that the Debtors' entry into the Funding transactions does not constitute an Event of Default (or similar event) under any existing debt or financing agreement, including the DIP Facility. Such confirmations also include acknowledgements, as set forth in the Term Sheet, regarding the treatment of the Funding as prepayments (and not postpetition proceeds) and the preservation of secured creditors' interests through the Adequate Protection Mechanism.

22. I understand that the OEM Customers also required, as a condition to providing Funding, specific protections relating to their ongoing production needs, including, among other things, that after February 2, 2026 each OEM Customer will be afforded stay relief, upon one business day's notice (email suffices) to the advisors to the Debtors and the Secured Parties, to terminate applicable supply contracts and remove its customer-owned tooling, along with any work-in-process or finished goods inventory purchased or processed solely with Funding, if it elects to do so, as further described in the Term Sheet. Subject to the conditions set forth in the Term Sheet, raw materials may also be removed where such raw materials (i) are exclusively used for production for the exercising OEM Customer (or all other affected OEM Customers consent) and (ii) were purchased solely with Funding or constitute "Excluded OEM Inventory" (as defined in the Term Sheet). I further understand that the Term Sheet requires the Debtors to use commercially reasonable efforts to seek Court approval of one or more private sales of one or more of the funded business units on as expedited a timeline as the Court will allow, including by filing a motion seeking approval of private sale no later than the week of February 9, 2026 as a condition to further Funding.

23. Based on my experience as a restructuring professional and my familiarity with the Debtors' operations and liquidity constraints, I believe that the conditions set forth in the

Funding Arrangement are reasonable and appropriate under the circumstances of these chapter 11 cases. The OEM Customers would not agree to provide this essential funding absent the rights and protections in the Funding Arrangement. These conditions are necessary to secure critical funding at a time when no other viable financing alternative is available. At the same time, they preserve the OEM Customers' rights and ensure that those customers receive the benefit of their bargain in exchange for the substantial and immediate financial commitments they have agreed to make. The terms of the Funding Arrangement were the product of extensive, arm's-length negotiations conducted by experienced professionals. In my judgment, the conditions reflected in the Funding Arrangement are both essential and justified to enable the Debtors to continue operating their key business units and to preserve value for all stakeholders.

24. In addition, the Term Sheet includes an adequate protection mechanism (the "**Adequate Protection Mechanism**") designed to maintain the status quo for secured creditors with asserted liens on raw materials and inventory at the relevant business units. Among other things, the Debtors will initially measure and report the aggregate value of Participating Customer Group-specific raw materials, work-in-process, and finished goods inventory (collectively, the "**OEM Inventory**") at each funded business unit as of January 23, 2026 (the "**Benchmark Inventory Level**"), and will deliver such report to the participating OEM Customers and the Secured Parties no later than January 30, 2026. Thereafter, the Debtors will measure the OEM Inventory on a weekly basis (as of Friday of each week) and report the value against the Benchmark Inventory Level to the participating OEM Customers and the Secured Parties by no later than 12:00 p.m. ET the following Thursday, as set forth in the Term Sheet. To the extent the value of OEM Inventory that is collateral of the Debtors' secured creditors (including the DIP Secured Parties and the Prepetition Secured Parties (as defined in the DIP Order, and

together, the "**Secured Parties**")) has declined as measured against the Benchmark Inventory Level on a business unit level, and the applicable OEM Customer continues to provide Funding to such business unit, such diminution is expected to be addressed through future Funding and continued production of OEM Inventory.  If an OEM Customer is no longer providing Funding to an applicable business unit, it remains obligated to fund its allocated share of any diminution in OEM Inventory through the period it was providing Funding to that business unit, and shall fund such amount (not later than five business days after the Funding Termination Date (as defined in the Term Sheet), subject to extension if additional time is needed to reconcile the reporting) into a segregated account held by the Debtors for the benefit of secured creditors (the "**Inventory Diminution Account**"), with such funds subject to the terms of the DIP Order.  To the extent any diminution is on account of disputed collateral, the associated cash will remain in the Inventory Diminution Account pending resolution of such dispute.  For the avoidance of doubt, to the extent an OEM Customer has provided or bailed certain raw materials and/or component parts relating to the production of OEM Inventory, such raw materials and/or component parts are not included as part of OEM Inventory for purposes of the Adequate Protection Mechanism.  I understand that the Term Sheet provides that this Adequate Protection Mechanism does not apply to the Trico business unit.

25.     As set forth in the Term Sheet, the customer funding does not cover the purchase of any raw materials, work-in-process, or finished goods inventory subject to liens asserted by CarVal, and any purchase of such inventory will be subject to direct discussions between the Participating Customers and CarVal; nothing in the Funding Arrangement is intended to alter or impact any order lifting the stay in favor of CarVal.  Except as expressly provided in the Term Sheet, nothing therein amends, waives, modifies, or otherwise affects the DIP Facility or the

DIP Order, including the Debtors' obligation to maintain cash and cash equivalents of not less than $50,000,000.

26. Additionally, in connection with the Funding Arrangement, the Debtors are permitted to, and intend to, use a portion of Funding proceeds to pre-fund a segregated account (the "**Employee Liability Account**") with funds reserved to satisfy certain potential liabilities of, and benefits provided by, the Debtors with respect to employees (including with respect to paid time off ("**PTO**")), to the extent set forth in the Funding Chart, subject to all applicable budget and disbursement consent requirements that the Debtors must adhere to pursuant to the DIP Order. Although the Debtors are continuing to provide benefits to their employees in the ordinary course, reserving and segregating funds for PTO and other potential employee-related liabilities will help ensure that benefits are not abruptly halted and that payouts can be honored in the event buyers are not secured for the Debtors' remaining businesses.

27. I believe that the agreements the Debtors have secured from the OEM Customers are essential to allow the vast majority of the Debtors' operations to continue. These accommodations, which are memorialized in the Term Sheet, were the product of good-faith and arms' length negotiations and represent significant value for the Debtors, their estates, and all parties in interest. The Term Sheet also provides for an adequate protection mechanism and reporting obligations intended to protect the interests of the Debtors' secured creditors at the funded business units. The Funding Arrangement will allow the Debtors the opportunity to continue operating certain of the Debtors' businesses, find purchasers for business units currently being marketed, and provide a runway for the Debtors to negotiate with their stakeholders for the resolution of these cases.

**The Decision to Enter Funding Arrangement**

28. I believe that entry into the Funding Arrangement is undoubtedly in the best interest of the Debtors, their estates, and their stakeholders. The Funding Arrangement is essential to the Debtors' continuation of the vast majority of their operations, and provides for the opportunity to consummate sales of the Debtors' remaining businesses. The Funding Arrangement will also provide the Debtors an opportunity to continue their case resolution negotiations with their stakeholders. As such, I believe the Debtors' determination to enter into the Funding Arrangement with the OEM Customers is a valid and sound exercise of the Debtors' business judgment.

29. Absent approval by the Court of the Funding Arrangement, the Debtors will be unable to prosecute a value-maximizing sale process for their remaining businesses. The Debtors will be forced to immediately shut down all remaining operations in North America, terminate thousands of additional employees, and liquidate their remaining operating business units on an accelerated basis. The Funding Arrangement will provide the Debtors with immediate additional liquidity in the form of customer prepayments that will allow the Debtors to fund production for the OEM Customers at the funded business units and pay attendant corporate and case costs, including payroll, subject to the DIP Order. Given the Debtors' limited liquidity and the absence of incremental funding from the DIP lenders or the ABL lenders on the terms and timeline required, these accommodations are necessary to avoid a further decline of the Debtors' financial position, mass layoffs of all or nearly all of the Debtors' workforce, and a shutdown of the Debtors' remaining operations. As the Debtors have insufficient available liquidity to fund their operations even for a short period of time absent this customer funding, they require immediate access to the funding offered by the OEM Customers. I believe that the Funding Arrangement constitutes the best available arrangement under the circumstances for the

14

continuation of business between the Debtors and the OEM Customers while the Debtors pursue expedited sale transactions for the funded business units.

### Conclusion

30.     Based on my experience as a restructuring professional, my familiarity with the Debtors, and my extensive discussions with the Debtors' management team and advisors, I believe the Debtors will materially benefit from approval of the Funding Arrangement.  For these reasons and those set forth above, I believe that the Debtors' determination to move forward with the Funding Arrangement is a sound exercise of their business judgment, and it would be appropriate for the Court to grant approval of the Funding Arrangement as contemplated by the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

January 28, 2026          /s/ Charles M. Moore
Cleveland, OH             Charles M. Moore, Managing Director
                          Alvarez & Marsal North America LLC

**Exhibit A**

**Exhibit A**

**Preliminary Weekly Liquidity Reporting**

*$ in millions USD*

| | As of: 1/2/2026 | | | As of: 1/9/2026 | | | As of: 1/16/2026 | | | Preliminary as of: 1/23/2026 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash** | | | | | | | | | | | | |
| **North America** | **Debtor** [1] | **Non-Debtor** | **Total** | **Debtor** [1] | **Non-Debtor** | **Total** | **Debtor** [1] | **Non-Debtor** | **Total** | **Debtor** [1] | **Non-Debtor** | **Total** |
| United States | $299.9 | $0.0 | $300.0 | $273.0 | $0.0 | $273.0 | $225.2 | $0.1 | $225.2 | $184.1 | $0.0 | $184.1 |
| Canada | 1.4 | 1.8 | 3.2 | 1.4 | 1.7 | 3.1 | 1.3 | 1.8 | 3.1 | 1.3 | 1.8 | 3.1 |
| Mexico | – | 17.4 | 17.4 | – | 16.4 | 16.4 | – | 21.4 | 21.4 | – | 16.1 | 16.1 |
| **Total North America Cash** | **$301.3** | **$19.2** | **$320.5** | **$274.4** | **$18.1** | **$292.5** | **$226.4** | **$23.3** | **$249.7** | **$185.4** | **$17.9** | **$203.3** |
| (-) Restricted Cash [2] | (106.5) | – | (106.5) | (117.5) | – | (117.5) | (113.1) | – | (113.1) | (102.6) | – | (102.6) |
| **Total North America Available Cash** | **194.8** | **19.2** | **214.0** | **156.8** | **18.1** | **174.9** | **113.4** | **23.3** | **136.7** | **82.8** | **17.9** | **100.7** |

| **Minimum Liquidity Covenant** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debtor Unrestricted Cash | | $194.8 | | $156.8 | | $113.4 | | $82.8 |
| (+) ABL Availability | | – | | – | | – | | – |
| **Total Liquidity** | | **$194.8** | | **$156.8** | | **$113.4** | | **$82.8** |
| (-) Minimum Liquidity Covenant | | 50.0 | | 50.0 | | 50.0 | | 50.0 |
| **Covenant Headroom** | | **$144.8** | | **$106.8** | | **$63.4** | | **$32.8** |
| **Pass / Fail** | | Pass | | Pass | | Pass | | Pass |

**Notes**

(1) Debtor cash includes ~$0.9M of collections at non-debtor entity as of 1/23/26 to be swept into segregated debtor account.

(2) Restricted cash includes cash collected since the filing date, primarily related to prepetition accounts receivable, segregated in accordance with established prepetition factoring segregation protocols.  Amounts may include some funds related to post-petition sales/AR,

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**DECLARATION OF CHARLES M. MOORE
IN SUPPORT OF EMERGENCY MOTION OF
DEBTORS FOR ORDER (I) APPROVING FUNDING
ARRANGEMENT WITH CERTAIN OEM CUSTOMERS; (II) MODIFYING
THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF**

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**").  On September 5, 2025, A&M was retained by the Company (as defined below) to, among other things, assist with liquidity management and forecasting, identifying cost-reduction opportunities, and contingency preparations for a potential chapter 11 filing.  On September 24, 2025, Global Assets LLC and twelve of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28, 2025 (as applicable, the "**Petition Date**"), First Brands Group LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Debtors**," and together with their non-debtor affiliates, the "**Company**").

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2. On September 24, 2025, I was appointed as Chief Restructuring Officer of First Brands Group, LLC and on October 13, 2025, I was appointed as Interim Chief Executive Officer. From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22).

3. I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

4. I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments. I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning. I have served as Chief Restructuring Officer for,

2

among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

5. I submit this declaration (the "**Declaration**") in support of the *Emergency Motion of Debtors for Order (I) Approving Funding Arrangement with Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (the "**Motion**") filed by the Debtors.[2]

6. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by A&M employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, or the other advisors to the Debtors, including Weil, Gotshal & Manges LLP and Lazard Frères & Co. LLC, and/or (v) my experience as a restructuring professional. I will receive no additional compensation in exchange for my testimony. If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases. I am authorized to submit this declaration on behalf of the Debtors.

**Liquidity and Need for Immediate Funding**

7. A&M has been actively involved in monitoring and forecasting the Debtors' liquidity throughout these chapter 11 cases. This has included preparing and reviewing short-term cash forecasts and cash flow reporting, and analyzing anticipated receipts and disbursements required to fund ordinary course operations (including payroll, vendor payments, inventory purchases, taxes, insurance, rent, and professional fees).

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Term Sheet (as defined herein), as applicable.

8. Based on the Debtors' most recent weekly liquidity reporting prepared by A&M, attached hereto as **Exhibit A** (the "**Liquidity Report**"), as of January 23, 2026 (preliminary), the Debtors had approximately $82.8 million of unrestricted cash. After giving effect to the $50.0 million minimum liquidity covenant required under the DIP Facility, the Debtors had approximately $32.8 million of covenant headroom as of that date. In addition, the Debtors held approximately $102.6 million of cash that was classified as restricted and therefore not currently available to fund the Debtors' operations. Such restricted cash includes cash collected since the Petition Date, primarily related to prepetition accounts receivable, that is segregated in accordance with established prepetition factoring segregation protocols; amounts may also include certain funds related to postpetition sales and accounts receivable that remain subject to validation and release under applicable procedures.

9. As reflected in the Liquidity Report, the Debtors' accessible liquidity has deteriorated rapidly over a matter of weeks. For example, as of January 2, 2026, the Debtors had approximately $194.8 million of unrestricted cash (approximately $144.8 million of covenant headroom after giving effect to the $50.0 million minimum liquidity covenant). That headroom declined to approximately $106.8 million as of January 9, 2026, approximately $63.4 million as of January 16, 2026, and approximately $32.8 million as of January 23, 2026.

10. Absent additional funding, including under the Funding Arrangement described below, the Debtors' accessible liquidity (including unrestricted cash and any borrowing availability actually available to the Debtors, together with continued authority to use cash collateral, as applicable) would be insufficient to fund ordinary course operations beyond the current week. Specifically, the Debtors' ordinary-course cash requirements— including payroll, vendor payments, taxes, insurance, and professional fees— are substantial and have recently

reduced the Debtors' covenant headroom by tens of millions of dollars on a weekly basis, as reflected in the Liquidity Report. With only approximately $32.8 million of covenant headroom as of January 23, 2026, absent the OEM funding the Debtors are projected to consume their remaining liquidity headroom during the week ending January 30, 2026 and would be unable to continue operations beyond that point.

11. I also believe the Debtors have already implemented meaningful cost-saving measures, such that their current rate of liquidity consumption cannot be materially reduced in the near term while maintaining operations. At a minimum, the Debtors cannot reduce liquidity consumption to a level that would preserve any covenant headroom beyond this week absent additional funding.

12. The Liquidity Report also reflects that the Debtors currently have no borrowing availability under the ABL Facility (including due to the cash dominion blocker) and have not received, and do not expect to receive, additional funding from the DIP lenders or the ABL lenders. As a result, and because the Debtors' efforts to accelerate customer receipts beyond ordinary terms have not generated sufficient incremental liquidity—indeed, acceleration of accounts receivable from other customers is no longer anticipated based on those negotiations—the Debtors' ability to continue operating their remaining business units is currently dependent on customer funding being provided on a week-to-week basis by the OEM Customers.

13. These liquidity constraints reached an inflection point in late January 2026. With no actionable incremental financing available and insufficient accessible liquidity to continue operating on an ordinary course basis, the Debtors would be required to commence a full wind-down of their remaining operations beginning this week. As described below, the Debtors' ability to avoid an immediate liquidation of their remaining operating business units depends on obtaining

emergency Court approval of the Funding Arrangement and receiving continued customer funding on a week-to-week basis.

**No Alternative Funding Available**

14. The DIP Financing was only ever expected to stretch through the end of January 2026. As such, the Debtors and their advisors have been exploring every conceivable avenue at their disposal to bring in additional liquidity and funding, including by: (i) requesting that customers remit past due receivables while providing comfort to customers that were hesitant to remit receipts due to potential double payment liability; (ii) negotiating accelerated payment terms with certain existing customers, which those customers declined; (iii) soliciting funding proposals from stakeholders and outside parties for additional financing, including requesting incremental funding from the DIP lenders, which the DIP lenders declined to provide on terms acceptable to the Company, and reviewing a term sheet from the ABL lenders that would have imposed consents and conditions that were not workable; (iv) attempting to release additional segregated non-factored cash from the Factored Receivables Account, which was met with opposition by certain of the third-party factors; (v) launching and continuing a comprehensive process to sell certain of the Debtors' business units; and (vi) preserving liquidity by taking preventive actions such as stop shipping, implementing cost reductions, facility closures, and requesting customers to pull forward accounts payable to pay the Debtors on expedited terms.

15. These efforts still led the Debtors to this breaking point. Based on the Debtors' negotiations with customers, the Debtors do not expect any meaningful acceleration of accounts-receivable payments. The Debtors also do not anticipate the release of non-factored cash from the Factored Receivables Account in the near term. Likewise, without immediate incremental financing, it would not be feasible to consummate a sale of certain business units on the necessary timeline. At a minimum, none of these alternatives would deliver liquidity quickly

6

enough to preserve the Debtors' covenant headroom beyond this week.  Moreover, the Debtors' outreach to stakeholders other than the OEM Customers has not yielded any actionable funding proposals.

16. Thus, I understand that the Debtors lack any alternative actionable financing or sale proposals that would allow the Debtors to raise the liquidity necessary to continue funding operations in their key business units.  The Debtors desperately need to bolster liquidity to bridge through the conclusion of an expedited sale process or, alternatively, an orderly wind-down.

17. The Debtors are at a critical juncture in these chapter 11 cases.  Negotiations regarding a sale process, wind-down, liquidity, and a potential resolution of these chapter 11 cases are well underway among the Debtors and their key stakeholders.  The Debtors, in consultation with their advisors, determined that continuation of the sale process would require the Debtors to obtain additional liquidity through entry into the Funding Arrangement.  Without this liquidity, the Debtors will be unable to continue funding the manufacture of component parts that are the lifeblood of their business and of critical importance to the OEM Customers.  The Debtors have no actionable alternative funding options available at this time.

**Facility Closures**

18. Due to the aforementioned liquidity constraints, the Debtors were forced to take immediate steps to reduce cash burn and preserve remaining liquidity, which included implementing significant operational reductions by ceasing operations at seventeen (17) facilities, including all facilities of Brakes and Autolite Operations LLC ("**Autolite**"), as well as one facility of each of Hopkins Manufacturing Corporation and Horizon Global Corporation, which collectively had approximately 4,000 employees.  Going-forward production in North America is expected to be limited to those business units and facilities supporting OEM Customers that have agreed to provide customer funding, and the Debtors have commenced wind-down activities for

business units that are not covered by the Funding Arrangement. The Debtors are only able to avert an entire shutdown of their North American businesses and layoffs of approximately 13,000 additional employees through the Funding Arrangement.

19. Based on my experience and work with the Debtors' management team and advisors, absent approval of the Funding Arrangement and continued customer funding from the OEM Customers, the Debtors will be forced to shut down and liquidate the remainder of their North American businesses on an accelerated basis, destroying significant value to the detriment of all stakeholders. Such outcomes materially impair going-concern value and harm employees, customers, vendors, and other stakeholders. Accordingly, approval of the Funding Arrangement is necessary to avoid immediate and irreparable harm to the Debtors' estates and key stakeholders, including the Debtors' employees that are the lifeblood of the business.

**Funding Arrangement**

20. The Debtors, with advice from their advisors, determined that entry into the Funding Arrangement to receive immediate funding for operations is the value-maximizing (and only) path forward. The Debtors have explored all available options and alternatives to secure additional funding but have been unsuccessful. However, as part of that process, the Debtors and their advisors engaged with certain of their largest original equipment manufacturer customers (the "**OEM Customers**") regarding the estates' immediate liquidity needs. I understand those discussions resulted in a series of agreements memorialized in the Term Sheet, pursuant to which the OEM Customers have agreed to provide weekly operational funding (and, in the case of Trico Products Corporation, a one-time "prime the pump" funding) that is treated as prepayment for future production and that is used to support continued production at and for the specific business units identified on an agreed funding chart (the "**Funding Chart**"), beginning on or about January 26, 2026. Subject to Section 6(c) of the Term Sheet, finished goods produced after January 23,

8

2026, will only be sold to the OEM Customers so long as the applicable OEM Customer is providing Funding. I understand that the Funding Arrangement is conditioned on, among other things, receipt of the secured creditor confirmations described in the Term Sheet, and Court approval. I also understand that the DIP Secured Parties have agreed to the Funding Arrangement. Under the Term Sheet, the OEM Customers are obligated to remit their Funding for the week of January 25, 2026 no later than January 28, 2026. I further understand that the Debtors expect to receive approximately $48 million of customer funding for the current week by January 28, 2026, which will provide the Debtors with liquidity to fund limited operations and production at the funded business units through January 30, 2026, with Court approval of the Funding Arrangement as a condition subsequent to such funding. The OEM Customers have not committed to provide customer funding beyond the current week, and any additional customer funding is expected to be negotiated and provided on a week-to-week basis in accordance with the Term Sheet.

21. The OEM Customers' willingness to provide Funding is also conditioned on, among other things, receipt of written confirmation from each secured creditor (or its advisors) holding a lien on cash, deposit accounts, receivables, inventory, and/or machinery and equipment at the relevant business units that, unless a Funding Termination Date (as defined in the Term Sheet) has occurred or the Debtors or the Participating Customers have failed to comply with their obligations under the Adequate Protection Mechanism (as defined in the Term Sheet), such secured creditor (i) will not sweep or otherwise exercise dominion or control over the Funding (or any proceeds of accelerated payables), (ii) will not seek to take possession or otherwise exercise control over any raw materials, work-in-process, or finished goods inventory of the relevant business units, (iii) will forbear from taking actions to repossess or liquidate tooling, machinery, or equipment collateral or otherwise take actions that would adversely impact production while

9

Funding is being provided, and (iv) acknowledges, among other things, that the Debtors' entry into the Funding transactions does not constitute an Event of Default (or similar event) under any existing debt or financing agreement, including the DIP Facility. Such confirmations also include acknowledgements, as set forth in the Term Sheet, regarding the treatment of the Funding as prepayments (and not postpetition proceeds) and the preservation of secured creditors' interests through the Adequate Protection Mechanism.

22. I understand that the OEM Customers also required, as a condition to providing Funding, specific protections relating to their ongoing production needs, including, among other things, that after February 2, 2026 each OEM Customer will be afforded stay relief, upon one business day's notice (email suffices) to the advisors to the Debtors and the Secured Parties, to terminate applicable supply contracts and remove its customer-owned tooling, along with any work-in-process or finished goods inventory purchased or processed solely with Funding, if it elects to do so, as further described in the Term Sheet. Subject to the conditions set forth in the Term Sheet, raw materials may also be removed where such raw materials (i) are exclusively used for production for the exercising OEM Customer (or all other affected OEM Customers consent) and (ii) were purchased solely with Funding or constitute "Excluded OEM Inventory" (as defined in the Term Sheet). I further understand that the Term Sheet requires the Debtors to use commercially reasonable efforts to seek Court approval of one or more private sales of one or more of the funded business units on as expedited a timeline as the Court will allow, including by filing a motion seeking approval of private sale no later than the week of February 9, 2026 as a condition to further Funding.

23. Based on my experience as a restructuring professional and my familiarity with the Debtors' operations and liquidity constraints, I believe that the conditions set forth in the

10

Funding Arrangement are reasonable and appropriate under the circumstances of these chapter 11 cases. The OEM Customers would not agree to provide this essential funding absent the rights and protections in the Funding Arrangement. These conditions are necessary to secure critical funding at a time when no other viable financing alternative is available. At the same time, they preserve the OEM Customers' rights and ensure that those customers receive the benefit of their bargain in exchange for the substantial and immediate financial commitments they have agreed to make. The terms of the Funding Arrangement were the product of extensive, arm's-length negotiations conducted by experienced professionals. In my judgment, the conditions reflected in the Funding Arrangement are both essential and justified to enable the Debtors to continue operating their key business units and to preserve value for all stakeholders.

24. In addition, the Term Sheet includes an adequate protection mechanism (the "**Adequate Protection Mechanism**") designed to maintain the status quo for secured creditors with asserted liens on raw materials and inventory at the relevant business units. Among other things, the Debtors will initially measure and report the aggregate value of Participating Customer Group-specific raw materials, work-in-process, and finished goods inventory (collectively, the "**OEM Inventory**") at each funded business unit as of January 23, 2026 (the "**Benchmark Inventory Level**"), and will deliver such report to the participating OEM Customers and the Secured Parties no later than January 30, 2026. Thereafter, the Debtors will measure the OEM Inventory on a weekly basis (as of Friday of each week) and report the value against the Benchmark Inventory Level to the participating OEM Customers and the Secured Parties by no later than 12:00 p.m. ET the following Thursday, as set forth in the Term Sheet. To the extent the value of OEM Inventory that is collateral of the Debtors' secured creditors (including the DIP Secured Parties and the Prepetition Secured Parties (as defined in the DIP Order, and

11

together, the "**Secured Parties**")) has declined as measured against the Benchmark Inventory Level on a business unit level, and the applicable OEM Customer continues to provide Funding to such business unit, such diminution is expected to be addressed through future Funding and continued production of OEM Inventory.  If an OEM Customer is no longer providing Funding to an applicable business unit, it remains obligated to fund its allocated share of any diminution in OEM Inventory through the period it was providing Funding to that business unit, and shall fund such amount (not later than five business days after the Funding Termination Date (as defined in the Term Sheet), subject to extension if additional time is needed to reconcile the reporting) into a segregated account held by the Debtors for the benefit of secured creditors (the "**Inventory Diminution Account**"), with such funds subject to the terms of the DIP Order.  To the extent any diminution is on account of disputed collateral, the associated cash will remain in the Inventory Diminution Account pending resolution of such dispute.  For the avoidance of doubt, to the extent an OEM Customer has provided or bailed certain raw materials and/or component parts relating to the production of OEM Inventory, such raw materials and/or component parts are not included as part of OEM Inventory for purposes of the Adequate Protection Mechanism.  I understand that the Term Sheet provides that this Adequate Protection Mechanism does not apply to the Trico business unit.

25.     As set forth in the Term Sheet, the customer funding does not cover the purchase of any raw materials, work-in-process, or finished goods inventory subject to liens asserted by CarVal, and any purchase of such inventory will be subject to direct discussions between the Participating Customers and CarVal; nothing in the Funding Arrangement is intended to alter or impact any order lifting the stay in favor of CarVal.  Except as expressly provided in the Term Sheet, nothing therein amends, waives, modifies, or otherwise affects the DIP Facility or the

12

DIP Order, including the Debtors' obligation to maintain cash and cash equivalents of not less than $50,000,000.

26.     Additionally, in connection with the Funding Arrangement, the Debtors are permitted to, and intend to, use a portion of Funding proceeds to pre-fund a segregated account (the "**Employee Liability Account**") with funds reserved to satisfy certain potential liabilities of, and benefits provided by, the Debtors with respect to employees (including with respect to paid time off ("**PTO**")), to the extent set forth in the Funding Chart, subject to all applicable budget and disbursement consent requirements that the Debtors must adhere to pursuant to the DIP Order. Although the Debtors are continuing to provide benefits to their employees in the ordinary course, reserving and segregating funds for PTO and other potential employee-related liabilities will help ensure that benefits are not abruptly halted and that payouts can be honored in the event buyers are not secured for the Debtors' remaining businesses.

27.     I believe that the agreements the Debtors have secured from the OEM Customers are essential to allow the vast majority of the Debtors' operations to continue.  These accommodations, which are memorialized in the Term Sheet, were the product of good-faith and arms' length negotiations and represent significant value for the Debtors, their estates, and all parties in interest.  The Term Sheet also provides for an adequate protection mechanism and reporting obligations intended to protect the interests of the Debtors' secured creditors at the funded business units.  The Funding Arrangement will allow the Debtors the opportunity to continue operating certain of the Debtors' businesses, find purchasers for business units currently being marketed, and provide a runway for the Debtors to negotiate with their stakeholders for the resolution of these cases.

**The Decision to Enter Funding Arrangement**

28.     I believe that entry into the Funding Arrangement is undoubtedly in the best interest of the Debtors, their estates, and their stakeholders.  The Funding Arrangement is essential to the Debtors' continuation of the vast majority of their operations, and provides for the opportunity to consummate sales of the Debtors' remaining businesses.  The Funding Arrangement will also provide the Debtors an opportunity to continue their case resolution negotiations with their stakeholders.  As such, I believe the Debtors' determination to enter into the Funding Arrangement with the OEM Customers is a valid and sound exercise of the Debtors' business judgment.

29.     Absent approval by the Court of the Funding Arrangement, the Debtors will be unable to prosecute a value-maximizing sale process for their remaining businesses.  The Debtors will be forced to immediately shut down all remaining operations in North America, terminate thousands of additional employees, and liquidate their remaining operating business units on an accelerated basis. The Funding Arrangement will provide the Debtors with immediate additional liquidity in the form of customer prepayments that will allow the Debtors to fund production for the OEM Customers at the funded business units and pay attendant corporate and case costs, including payroll, subject to the DIP Order.  Given the Debtors' limited liquidity and the absence of incremental funding from the DIP lenders or the ABL lenders on the terms and timeline required, these accommodations are necessary to avoid a further decline of the Debtors' financial position, mass layoffs of all or nearly all of the Debtors' workforce, and a shutdown of the Debtors' remaining operations.  As the Debtors have insufficient available liquidity to fund their operations even for a short period of time absent this customer funding, they require immediate access to the funding offered by the OEM Customers.  I believe that the Funding Arrangement constitutes the best available arrangement under the circumstances for the

14

continuation of business between the Debtors and the OEM Customers while the Debtors pursue expedited sale transactions for the funded business units.

## Conclusion

30.     Based on my experience as a restructuring professional, my familiarity with the Debtors, and my extensive discussions with the Debtors' management team and advisors, I believe the Debtors will materially benefit from approval of the Funding Arrangement.  For these reasons and those set forth above, I believe that the Debtors' determination to move forward with the Funding Arrangement is a sound exercise of their business judgment, and it would be appropriate for the Court to grant approval of the Funding Arrangement as contemplated by the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

January 28, 2026                                    /s/ Charles M. Moore
Cleveland, OH                                       Charles M. Moore, Managing Director
                                                    Alvarez & Marsal North America LLC

16

**Exhibit A**

**Exhibit A**

**Preliminary Weekly Liquidity Reporting**

*$ in millions USD*

|  | As of: 1/2/2026 | | | As of: 1/9/2026 | | | As of: 1/16/2026 | | | Preliminary as of: 1/23/2026 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash** | | | | | | | | | | | | |
| **North America** | Debtor [1] | Non-Debtor | Total | Debtor [1] | Non-Debtor | Total | Debtor [1] | Non-Debtor | Total | Debtor [1] | Non-Debtor | Total |
| United States | $299.9 | $0.0 | $300.0 | $273.0 | $0.0 | $273.0 | $225.2 | $0.1 | $225.2 | $184.1 | $0.0 | $184.1 |
| Canada | 1.4 | 1.8 | 3.2 | 1.4 | 1.7 | 3.1 | 1.3 | 1.8 | 3.1 | 1.3 | 1.8 | 3.1 |
| Mexico | – | 17.4 | 17.4 | – | 16.4 | 16.4 | – | 21.4 | 21.4 | – | 16.1 | 16.1 |
| **Total North America Cash** | **$301.3** | **$19.2** | **$320.5** | **$274.4** | **$18.1** | **$292.5** | **$226.4** | **$23.3** | **$249.7** | **$185.4** | **$17.9** | **$203.3** |
| (-) Restricted Cash [2] | (106.5) | – | (106.5) | (117.5) | – | (117.5) | (113.1) | – | (113.1) | (102.6) | – | (102.6) |
| **Total North America Available Cash** | **194.8** | **19.2** | **214.0** | **156.8** | **18.1** | **174.9** | **113.4** | **23.3** | **136.7** | **82.8** | **17.9** | **100.7** |

| **Minimum Liquidity Covenant** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Debtor Unrestricted Cash | | $194.8 | | $156.8 | | $113.4 | | $82.8 |
| (+) ABL Availability | | – | | – | | – | | – |
| **Total Liquidity** | | **$194.8** | | **$156.8** | | **$113.4** | | **$82.8** |
| (-) Minimum Liquidity Covenant | | 50.0 | | 50.0 | | 50.0 | | 50.0 |
| **Covenant Headroom** | | **$144.8** | | **$106.8** | | **$63.4** | | **$32.8** |
| **Pass / Fail** | | Pass | | Pass | | Pass | | Pass |

**Notes**

(1) Debtor cash includes ~$0.9M of collections at non-debtor entity as of 1/23/26 to be swept into segregated debtor account.

(2) Restricted cash includes cash collected since the filing date, primarily related to prepetition accounts receivable, segregated in accordance with established prepetition factoring segregation protocols. Amounts may include some funds related to post-petition sales/AR,