# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| FIRST BRANDS GROUP, LLC *et al.*,[1] | Case No. 25-90399 (CML) |
| Debtors. | (Jointly Administered) |

**ONSET FINANCIAL, INC.'S OPPOSITION TO MOTION OF DEBTORS FOR AN
ORDER FURTHER EXTENDING EXCLUSIVE PERIODS PURSUANT TO SECTION
1121(d) OF THE BANKRUPTCY CODE**

Onset Financial, Inc. ("Onset") submits this opposition (the "Opposition") to the *Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 2522] (the "Second Exclusivity Motion").[2] In support of the Opposition, Onset respectfully states as follows:[3]

**PRELIMINARY STATEMENT**

1. The Court should deny the Second Exclusivity Motion with respect to the Carnaby Debtors (defined herein). Exclusivity exists to give debtors time to reorganize and pursue a value-maximizing transaction, not to hamstring certain estates (and their creditors). These principles

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] On May 13, 2026, the United States Trustee (the "UST") moved for an order to convert or dismiss the Chapter 11 Cases. *See United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* [Dkt. No. 2670] (the "UST Motion to Dismiss"). Onset reserves all rights with respect to the UST Motion to Dismiss, including Onset's right to object to such motion to the extent it seeks to convert the Carnaby Debtors' Chapter 11 Cases to chapter 7. Like Onset, however, the UST recognizes that the Debtors intend to abandon efforts to reorganize all but one of the Debtors and have proposed a plan that "improperly favor[s] a limited group of professionals and lenders." UST Motion to Dismiss ¶ 3; *see id.* ¶ 2 ("[T]he Debtors seek to dispose of the assets and claims of 111 [of the 112 Debtors] without providing those entities' creditors the protections guaranteed to them under the Code . . . .").

[3] Capitalized terms not defined herein shall have the meaning assigned to them in the Second Exclusivity Motion.

compel denial of the Debtors' motion to extend the exclusive periods for the Carnaby Debtors for the reasons discussed below.

2.      Since the inception of these cases, Onset—by far the Carnaby Debtors' most significant creditor and one of the largest stakeholders in these Chapter 11 Cases—has warned that the Debtors' joint management and representation was hopelessly conflicted and that the Debtors would sacrifice the Carnaby Debtors' interests in favor of those of the FBG Debtors.

3.      The filed plan proves Onset right. The Debtors have filed a chapter 11 plan for *one entity*—Premier Marketing Group, LLC—and abandoned a path forward for the *111* remaining Debtors, including the Carnaby Debtors, converting them to chapter 7 on the effective date of the chosen Debtor's plan. Through the plan, the Debtors, the DIP Lenders, and the Creditors' Committee seek to centralize prosecution of *all* of the Debtors' litigation claims for the benefit of *some* creditors of their choosing—a subset which, unsurprisingly, does not include Onset (and other creditors deemed "Ineligible" under the Debtors' own extrajudicial formulation). To make matters worse, that plan and the underlying, not-yet-filed Global Settlement apparently reflect no input, engagement, or negotiations with Benjamin Duster, the appointed independent director for the Carnaby Debtors (and other SPV debtors). That the sole representative of the Carnaby Debtors —who the Debtors insisted was installed to protect against the highly prejudicial outcome for the Carnaby Debtors that the Debtors now ask this Court to approve—was not consulted on the plan is telling.

4.      The Debtors are not merely picking sides; they seek to weaponize their chapter 11 plan to affirmatively shackle the Carnaby Debtors. The plan would transfer the FBG Debtors' claims, including those asserted jointly with the Carnaby Debtors, into a litigation trust established

2

for the sole benefit of the Debtors' preferred creditors. The Carnaby Debtors would be converted to chapter 7 and left to fend for themselves.

5.      And fend for themselves they must. The Litigation Trust will not only receive $75 million in funding but also take possession of all investigative and discovery work product the Debtors and their professionals have accumulated throughout these Chapter 11 Cases. But this continuity of knowledge, vast and expensive work product, and privilege developed by the chapter 11 professionals representing *all* Debtors will benefit only those creditors the Debtors have deemed eligible. By contrast, the Carnaby Debtors' claims will be left to unfunded chapter 7 trustees entirely new to these proceedings, with no access to the institutional knowledge, privilege, or dedicated funding that the plan provides to the Litigation Trust. It is astounding—but unfortunately, not surprising—that fiduciaries for the Carnaby Debtors even considered, much less agreed, to such an unfair outcome.

6.      But the plan's prejudicial treatment does not stop there. Onset holds claims against both the FBG Debtors and the Carnaby Debtors, but the plan designates Onset as an "Ineligible Creditor," denying it the recoveries afforded to other, similarly situated creditors of the FBG Debtors. And the plan goes further still, presumably excluding Onset from receiving the diligence materials necessary to bid as part of the contemplated marketing process. As the Carnaby Debtors' most significant creditor, Onset should not be forced to sit idle while the Debtors block the ability to generate value-maximizing alternatives for the Carnaby Debtors. Whatever "cause" the Debtors might say exists for the FBG Debtors certainly does not apply to the Carnaby Debtors.

7.      As the Debtors intend to abandon the Carnaby Debtors to chapter 7 liquidation, the Debtors plainly have no need to retain the exclusive right to propose and solicit a reorganization plan for such entities. Indeed, because the Debtors suffer from material conflicts of interest, they

3

are functionally incapable of pursuing a plan that would maximize value for the Carnaby Debtors and their creditors. Terminating exclusivity does not prevent the Debtors from pursuing a plan for the Carnaby Debtors, it simply allows for competition from their creditors who would be free to do the same, providing a critical safeguard for those creditors.

8. Denying the Debtors' requested extension would afford creditors like Onset a meaningful opportunity to participate in a process from which they have, to date, been excluded. Onset is currently evaluating a standalone chapter 11 plan for the Carnaby Debtors that would establish a separate litigation trust to pursue the Carnaby Debtors' claims, including claims against the James brothers and other culpable parties. In short, ending the Exclusive Periods as to the Carnaby Debtors would create a meaningful path to additional recoveries for creditors at no downside to the remaining estates.

9. The Bankruptcy Code provides for the rules, regulations, and processes by which creditors are to be treated in a bankruptcy case. The Debtors propose to rewrite—or disregard entirely—the Bankruptcy Code's protections. That *some* creditors may benefit from the Debtors' approach is not a basis to approve a plan that runs roughshod over other creditors' statutory rights. With respect to the Carnaby Debtors, continued exclusivity is unwarranted and the Carnaby Debtors' creditors should be afforded the opportunity to pursue value-maximizing outcomes for the Carnaby Debtors.

10. The Court should deny the Second Exclusivity Motion as to the Carnaby Debtors.

## BACKGROUND

### I. Onset provides billions in financing to the Debtors.

11. Since 2018, Onset has provided the Debtors with significant liquidity. Over the course of nearly a decade, Onset funded roughly $3 billion to several of the Debtors on account of

inventory and equipment. Accordingly, Onset has claims against certain of the FBG Debtors[4] and certain of the SPV Debtors (defined herein).

12. Beginning on May 9, 2018, Onset and Trico Products Corporation ("Trico Products") entered into direct lease transactions (the "Trico Transactions"). The terms of the Trico Transactions are governed by a single master lease agreement—*Master Lease Agreement No. OFI1045321* (the "Trico MLA"). *See* Cross-Claim Complaint Ex. 3. Several FBG Debtors—specifically, Brake Parts Inc India LLC; First Brands Group Intermediate, LLC; and First Brands Group, LLC (f/k/a Trico Group, LLC)—also agreed to guarantee Trico Products's obligations to Onset under the Trico MLA. *See id.* Exs. 15, 17, 20. Accordingly, pursuant to the Trico MLA, Onset has claims against those FBG Debtors.

13. Beginning in January 2022, Onset entered into a series of sale-and-leaseback transactions (the "Carnaby Transactions") with certain Debtors that had been formed to facilitate the Carnaby Transactions (the "SPV Debtors"). The terms of the Carnaby Transactions are governed by certain master lease agreements among Onset, the relevant SPV Debtors, and certain affiliates of such SPV Debtors. *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2692] (the "Revised PM Disclosure Statement") at 58. In particular:

---

[4] The FBG Debtors that guaranteed the Trico Products's obligations with respect to the Trico Transactions (defined herein) are Brake Parts Inc India LLC; First Brands Group Intermediate, LLC; and First Brands Group, LLC (f/k/a Trico Group, LLC). *See Onset Financial, Inc.'s Answer and Counterclaim, Cross-Claim, and Third-Party Complaint*, *First Brands Group, LLC v. Onset Financial, Inc. et al.*, No. 4:26-ap-03005 (Bankr. S.D. Tex. Feb. 19, 2026) [Dkt. No. 16] (the "Cross-Claim Complaint") Exs. 15, 17, 20; *Schedule A/B: Property for Non-Individual First Brands Group Intermediate, LLC* [Dkt. No. 1417] at 65; *Schedule A/B: Property for Non-Individual Brake Parts Inc India LLC* [Dkt. No. 1469] at 66.

The FBG Debtors that guaranteed the Carnaby Debtors' obligations with respect to the Carnaby Transactions (described herein) are Eagle Casting, LLC; First Brands Group Holdings, LLC; and Viceroy Private Capital, LLC. *See* Revised PM Disclosure Statement Ex. D; *Schedule A/B: Property for Non-Individual Eagle Casting, LLC* [Dkt. No. 1519] at 77; *Schedule A/B: Property for Non-Individual First Brands Group Holdings, LLC* [Dkt. No. 1412] at 43; *Schedule A/B: Property for Non-Individual Viceroy Private Capital, LLC* [Dkt. No. 1501] at 49.

In addition to those guarantors, Onset has a claim as a lessor to Trico Products Corporation under the Trico Transactions (described below). *See* Revised PM Disclosure Statement Ex. D; *Schedule A/B: Property for Non-Individual Trico Products Corporation* [Dkt. No. 1444] at 183.

- On June 28, 2022, Onset and Carnaby Inventory IV, LLC ("Carnaby IV") entered into *Master Lease Agreement No. OFI1445416* (the "Carnaby IV MLA"). *Id.* The obligations of Carnaby IV under this agreement were guaranteed by Carnaby Inventory Holdings IV, LLC—Carnaby IV's direct parent—and also by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; First Brands Group Holdings, LLC ("FBG Holdings"); and Viceroy Private Capital, LLC ("Viceroy"). *Id.*

- On October 24, 2023, Onset and Carnaby FA, LLC ("Carnaby FA") entered into *Master Lease Agreement No. OFI1545465* (the "Carnaby FA MLA" and, together with the Carnaby IV MLA, the "Carnaby MLAs"). *Id.* The obligations of Carnaby FA, LLC under this agreement were guaranteed by Carnaby FA Holdings, LLC—Carnaby FA's direct parent—and by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC; FBG Holdings; and Viceroy. *Id.*

Accordingly, pursuant to the Carnaby MLAs, the following SPV Debtors owe obligations to Onset: Carnaby IV; Carnaby Inventory Holdings IV, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby FA; Carnaby FA Holdings, LLC, and Eagle Casting Holdings, LLC (collectively, the "Carnaby Debtors"). *Id.* The following FBG Debtors also owe obligations to Onset pursuant to the Carnaby MLAs: FBG Holdings; Eagle Casting, LLC; and Viceroy. *Id.*

14.     The structure of the transactions between Onset and the various Debtors—including the relevant FBG Debtors and the SPV Debtors—is detailed in the Cross-Claim Complaint. *See* Cross-Claim Complaint ¶ 123. As of the Petition Date, the value of the Debtors' outstanding obligations under the Carnaby MLAs (and the lease and forbearance agreements arising under the master lease agreements) totaled approximately $1.88 billion, consisting of approximately $1.35 billion on account of inventory and $528 million on account of equipment. *Id.* ¶¶ 147, 191.

## II.     Onset and other creditors warn that the Debtors are conflicted.

15.     Throughout the course of the Chapter 11 Cases, Onset (alongside certain other creditors) has repeatedly warned that the Debtors' management and advisors suffer from conflicts of interest and that they therefore cannot adequately represent the interests of the Carnaby Debtors.

6

16.     In particular, on November 14, 2025, Onset filed an omnibus limited objection to certain of the Debtors' retention applications, specifically objecting to the SPV Debtors utilizing the same professionals as the FBG Debtors. *Onset Financial, Inc.'s Omnibus Limited Objection to the Debtors' Retention Applications for Weil, Gotshal & Manges LLP, Lazard Frères & Co. LLC, and Alvarez & Marsal North America, LLC* [Dkt. No. 679] (the "Omnibus Objection"). Onset warned that, because the two groups of Debtors hold adverse interests, the proposed joint representation would compromise the professionals' disinterestedness and likely result in the subordination of the SPV Debtors' interests (including the Carnaby Debtors') to those of the FBG Debtors. Omnibus Objection ¶ 1. While the Debtors insisted that their professionals would not take sides, Onset insisted that unconflicted professionals were needed to take the SPV Debtors' sides, which the proposed professionals could not do because they represented all of the Debtors. *See* Omnibus Objection ¶¶ 3–5, 29–31. Certain of the Debtors' other creditors filed similar objections, pointing to the same conflicts of interest.[5]

17.     In response, the Debtors argued that they had—without consulting any of their creditors—appointed an "independent director" for Viceroy and the SPV Debtors (including the Carnaby Debtors)—to handle matters where the FBG Debtors and the SPV Debtors (including the Carnaby Debtors) had a conflict.[6]

---

[5]     *Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil Gotshal & Manges LLP, (II) Lazard Frères & Co. LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Dkt. No. 644] ¶¶ 1–2; *Aequum Capital Financial II LLC's Joinder to the Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil Gotshal & Manges LLP, (II) Lazard Frères & Co. LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Dkt. No. 656] ¶ 1; *Omnibus Limited Objection of the Carnaby Secured Lenders to Debtors' Motions to Authorize the Retention of Professionals* [Dkt. No. 649] ¶ 4.

[6]     *See Debtors' Omnibus Reply to SPV Lenders' Objections to Retention Applications* [Dkt. No. 870] ¶¶ 2, 26-27.

7

III.  **The Debtors file an adversary proceeding against Patrick James, and Onset seeks to intervene to protect the Carnaby Debtors' interests.**

18.   On November 11, 2025, the Debtors—including the Carnaby Debtors—commenced an adversary proceeding (the "Patrick James Adversary Proceeding") against Patrick James, the Debtors' founder and former Chief Executive Officer. *See First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. 2025).

19.   On November 14, 2025, Onset filed a motion to intervene in the Patrick James Adversary Proceeding. *See Motion of Onset Financial, Inc. for Entry of an Order Pursuant to Federal Rule of Civil Procedure 24 and Federal Rule of Bankruptcy Procedure 7024 Authorizing Intervention in Adversary Proceeding*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. Nov. 14, 2025) [Dkt. No. 71] ("Onset's Intervention Motion"). Onset argued that, as the Carnaby Debtors' most significant creditor, it had a direct interest in the framing of the adversary proceeding (*id*. ¶¶ 42–46) and that the Debtors could not adequately represent Onset's interest because they represented competing constituencies, were constrained by financing restrictions barring positions adverse to the prepetition term loan lenders, and had demonstrated animus toward Onset (*id*. ¶¶ 47–51). Onset was concerned that the inherent conflict in the Debtors pursuing all of the claims collectively without separate representation of the Carnaby Debtors would potentially prejudice the pursuit, adjudication, and settlement of that lawsuit. *See id.*

IV.  **The Debtors file an adversary proceeding against Onset and others.**

20.   On January 9, 2026, the Debtors—again, including the Carnaby Debtors—commenced an adversary proceeding (the "Onset Adversary Proceeding" and, together with the Patrick James Adversary Proceeding, the "Adversary Proceedings") against Onset, Edward James (the brother of Patrick James and the Debtors' former executive vice president), and certain related

8

entities. *See First Brands Group LLC v. Onset*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. 2026).

21. In response, Onset filed a motion for judgment on the pleadings with respect to the claims raised against Onset and also asserted various counterclaims, third-party claims, and cross-claims. *See generally* Cross-Claim Complaint. Currently, at the Debtors' request, the Court has stayed the Onset Adversary Proceeding. *See Order Staying Adversary Case Deadlines and Discovery*, *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. Mar. 24, 2026) [Dkt. No. 78]. A discovery stay is in place in the Patrick James Adversary Proceeding, and all case deadlines are currently abated. *See Order [Staying Discovery]*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. April 17, 2026) [Dkt. No. 181]; *May 8, 2026 Order*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. May 8, 2026) [Dkt. No. 191].

**V.** **The Debtors file the plan in pursuit of the FBG Debtors' interest and to the direct detriment of the Carnaby Debtors'.**

22. On January 22, 2026, the Debtors filed the *Motion of Debtors for an Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 1674] (the "First Exclusivity Motion"), requesting an extension of both the initial period during which the debtors enjoy the exclusive right to file a chapter 11 plan and the subsequent period to solicit acceptances thereof (together, the "Exclusive Periods"). On February 17, 2026, the Court granted the First Exclusivity Motion, extending the Exclusive Periods to April 22, 2026, and June 22, 2026, respectively. *Order Extending Exclusive Periods* [Dkt. No. 1939].

23. On April 22, 2026, the Debtors filed the Second Exclusivity Motion, seeking another 90-day extension of the Exclusive Periods to July 21, 2026, and September 21, 2026, respectively. In support of their requested extensions, the Debtors stated that they had "reached an

9

agreement . . . on a chapter 11 plan, and anticipate filing the Plan and Disclosure Statement in the coming weeks." Second Exclusivity Motion ¶ 40.

24.     Before the Debtors filed any plan, Onset repeatedly sought to be involved in the negotiations and discussions regarding the development of the Debtors' forthcoming plan and path forward for the Chapter 11 Cases. The Debtors consistently rebuffed Onset's outreach, developing the plan, and later revising it, without consulting, conferring with, or otherwise engaging Onset.

25.     On April 28, 2026, the Debtors filed the *Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2544], and, the following day, the Debtors filed a disclosure statement for such plan. *See Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2545].

26.     On May 15, 2026, the Debtors filed a revised version of the *Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2678] (the "Revised PM Plan") and, on May 18, 2026, filed the Revised PM Disclosure Statement.

27.     Although the Chapter 11 Cases involve 112 debtor entities, each with its own chapter 11 case (*see* Second Exclusivity Motion ¶ 35), the Revised PM Plan provides a path forward for just a single Debtor—Premier Marketing Group, LLC (the "Plan Debtor"). *See* Revised PM Disclosure Statement at 1 ("The Disclosure Statement describes the chapter 11 plan of the Plan Debtor and classifies and treats Claims against and Interests in the Plan Debtor *only*." (emphasis added)). With respect to the Chapter 11 Cases filed by the other Debtors, the Debtors intend to convert all such cases to cases under chapter 7 after the Revised PM Plan goes effective. *Id.* ("Following the Effective Date, the chapter 11 cases of the Debtors other than the Plan Debtor will be converted to cases under chapter 7 . . . .").

28.     The Revised PM Plan classifies the Debtors into two groups—the "FBG Debtors" and the "SPV Debtors." Revised PM Plan at 14, 25. The FBG Debtors comprise the companies that hold and operate the Debtors' businesses, including FBG Holdings, its Debtor subsidiaries, and Viceroy. *Id.* at 14 (defining "FBG Debtors"). In contrast, the SPV Debtors are certain special-purpose Debtor subsidiaries of Viceroy, including the Carnaby Debtors. *Id.* at 25 (defining "SPV Debtors").

29.     The Revised PM Plan provides for, among other things, the establishment of a litigation trust (the "Litigation Trust"), which will be vested with all claims and causes of action held by the FBG Debtors' estates (the "Estate Claims"). *Id.* at 13–14 (defining "Estate Claims"), *id.* at 18 (defining "Litigation Trust"); *see id.* Art. VI (outlining structure of Litigation Trust). Specifically, the DIP Secured Parties will submit a credit bid for all the Estate Claims, and, if the FBG Debtors determine that such credit bid is the best offer, the FBG Debtors will transfer the Estate Claims to the Plan Debtor, which will then transfer such claims to the Litigation Trust free and clear of all liens, claims, encumbrances, and interests. Revised PM Disclosure Statement at 2, 27. The Litigation Trust will be funded with $75 million to pursue claims against the fraudsters that caused the Debtors' collapse. *Id*. at 2.

30.     Although the Carnaby Debtors are plaintiffs in both the Patrick James Adversary Proceeding and the Onset Adversary Proceeding, the Litigation Trust is built around the FBG Debtors' claims and recoveries, and the ability to participate in Litigation Trust Distributions is premised on holding claims against the FBG Debtors—not claims against the Carnaby Debtors. Revised PM Plan at 12–13, 38–39. Put simply, a creditor of the Carnaby Debtors—which are ***co-plaintiffs*** with the FBG Debtors in the adversary proceedings against the James brothers—is excluded from Litigation Trust distributions merely because it is owed money by a Carnaby

11

Debtor. *See id*. And there are yet further restrictions. For example, even though Onset holds substantial claims against the FBG Debtors that guaranteed Carnaby IV's and Carnaby FA's respective obligations to Onset, the Revised PM Plan defines "Ineligible Creditors" to include defendants named or to be named by the Debtors in the Onset Adversary Proceeding. *Id*. at 16–17, 39. Incredibly, also deemed "ineligible" is ***any party*** that files an objection to the Revised PM Plan or the Global Settlement. *Id.* The cost of exercising a statutory right to object to a plan is permanent ineligibility to share in the recoveries from the Litigation Trust that similarly situated creditors will enjoy. The Litigation Trust accordingly creates a recovery mechanism that excludes disfavored creditors and creditors that dare to object, even those holding claims against the FBG Debtors, like Onset.

31. The Revised PM Plan's disparate treatment extends beyond Litigation Trust distributions. The Revised PM Plan fails to explain how the proceeds of the Debtors' claims in the Adversary Proceedings—which were filed by ***all*** the Debtors, including the Carnaby Debtors— will be allocated among the various plaintiffs and their successors in interest. In addition, all books, records, and investigative findings of the FBG Debtors, including findings of the Examiner and professionals retained during these Chapter 11 Cases, will be made available only to the Litigation Trust. The Plan says nothing about the records and work product of the Carnaby Debtors, on whose behalf this investigative work was also performed. *See id.* at 18–19 (defining "Litigation Trust Assets"). The Plan does say, however, that privilege held by "any one or more of the Debtors" will be transferred to the Litigation Trust, cutting of the Carnaby Debtors' access to *their own* privileged information, including information necessary to pursue remaining claims. *See id.* at 55. The Carnaby Debtors' estates will be converted to chapter 7; a trustee—that has no funding,

institutional knowledge, background on this case, or any investigative work product—will be appointed to liquidate the Carnaby Debtors' valuable estate causes of action.

32.     In sum, through the Revised PM Plan, the Debtors seek to transfer the Estate Claims to the Litigation Trust to fund recoveries for the FBG Debtors' creditors alone, while effectively preventing Onset from receiving distributions from the Litigation Trust and sabotaging the Carnaby Debtors as a competing co-plaintiff.

## ARGUMENT

33.     Section 1121(d)(1) of the Bankruptcy Code provides that the Exclusive Periods may be increased or reduced "for cause." That section operates to ensure that the debtor does not abuse exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 95-989, at 118 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5904. Indeed, Section 1121 is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise" and "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988); *see In re Gialamas*, No. 18-13341, 2019 WL 6215974, at *3 (Bankr. W.D. Wis. Nov. 20, 2019) (concluding that "concerns about undue pressure coupled with the fact that [debtor and creditor] have not been in negotiation about the terms of a plan, weighs against any further extensions").

34.     The party seeking the extension—here, the Debtors—bears the burden of establishing sufficient cause. *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014). The Bankruptcy Code does not define "cause" under section 1121(d); instead, the court has "broad discretion to determine what is sufficient

cause" depending on the "facts and circumstances in each individual case." *In re Sharon Steel Corp.*, 78 B.R. 762, 764–65 (Bankr. W.D. Pa. 1987). Courts in this district consider the *Adelphia* factors when evaluating whether sufficient cause exists; the factors relevant to the present case include:

- the size and complexity of the case;

- the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

- the existence of good-faith progress toward reorganization;

- whether the debtor has made progress in negotiations with its creditors;

- whether the debtor has demonstrated reasonable prospects for filing a viable plan; and

- whether the debtor is utilizing exclusivity in order to pressure creditors to submit to the debtor's reorganization demands.

*In re New Millennium Mgmt., LLC*, 2014 WL 792115, at *6 (citing *In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 600–01 (Bankr. S.D.N.Y. 2014)); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160–61 (5th Cir. 1988) (upholding the district court's decision to shorten debtor's exclusivity period under section 1121(d)(1) when the court could infer that the debtor's delayed bankruptcy petition "had as a major purpose the delay of the creditors' efforts at reorganization . . . .").

35. A court's decision to extend a debtor's exclusive period "is a serious matter" and extensions are not granted "routinely nor cavalierly." *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (internal quotation marks omitted) (quoting *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)). Evaluating cause "requires a court to engage in a careful balancing of competing factors"—no single factor is dispositive. *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011). But particular importance is placed on whether the

14

debtor can show good faith progress toward a reorganization. *See In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987) ("In virtually every case where an extension has been granted, the debtor has shown substantial progress has been made in formulating a plan during the first 120 days."); *see GMG Cap. Partners III, L.P.*, 503 B.R. at 601, 603 (denying request for extension of exclusivity period where debtor "had sufficient time to enter into good faith negotiations with its creditors," among other factors); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (concluding that the debtor did not meet its burden of establishing good cause to grant an extension of the exclusivity period because it failed to show that the requested extension was likely "to significantly improve progress toward an effective reorganization").

36.     Courts evaluate cause on a case-by-case basis and may extend or shorten the Exclusive Periods with respect to only a subset of the chapter 11 cases at issue. *See In re Geriatrics Nursing Home*, 187 B.R. 128, 132 (D.N.J. 1995) (noting that courts are authorized under section 1121(d) to modify Exclusive Periods "on a case-specific basis"). Furthermore, the joint administration of multiple chapter 11 cases does not require that each debtor receive the same treatment. *See In re Las Torres Dev., L.L.C.,* 413 B.R. 687, 693 (Bankr. S.D. Tex. 2009) ("Joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates." (internal quotation marks omitted)).

37.     Finally, even if the debtor establishes cause, the plain text of section 1121(d) allows the Court to exercise its discretion and deny the request nonetheless. *Sharon Steel Corp.*, 78 B.R. at 763 ("In exercising its discretion . . . the court *may* refuse to extend the exclusivity period even if there is a showing of cause.").

15

**I.**     <u>The Debtors fail to demonstrate that cause exists for their requested extension.</u>

      **A.**     **The Debtors have not progressed toward, and will not file, a viable reorganization plan for the Carnaby Debtors.**

38.     The Debtors have disclaimed any intent to file a reorganization plan for 111 of the 112 Debtor entities in these Chapter 11 Cases, including the Carnaby Debtors. Instead, as the Debtors have plainly stated, if the Revised PM Plan goes effective, the Debtors will convert all their remaining Chapter 11 Cases, including the cases filed by the Carnaby Debtors, to cases under chapter 7. Revised PM Disclosure Statement at 1.

39.     With respect to the Carnaby Debtors, the lack of "cause" to extend the Exclusive Periods is inarguable. The purpose of exclusivity is to provide a debtor with sufficient time to formulate, negotiate, and propose a plan; here, the Debtors admit they have no intention of undertaking any of these tasks with respect to the Carnaby Debtors. That the Debtors have walked away from the Carnaby Debtors tilts the *Adelphia* factors decidedly in favor of denying the Second Exclusivity Motion:

- *Need for sufficient time to permit the debtor to negotiate a plan of reorganization*: the Debtors have no need for additional time to negotiate a reorganization plan that they do not intend ever to develop.

- *Good-faith progress toward reorganization*: the Debtors have not made any progress, let alone good-faith progress, toward reorganizing the Carnaby Debtors; it now appears that the Debtors never pursued a chapter 11 reorganization for those entities at all.

- *Reasonable prospects for filing a viable plan*: the Debtors, by their own admission, do not intend to file a viable reorganization plan for the Carnaby Debtors; accordingly, there are no reasonable prospects for filing a viable plan.

40.     By contrast, denying the Second Exclusivity Motion with respect to the Carnaby Debtors would yield meaningful benefits at no cost to any estate. It would give Onset—the most significant party in interest—the ability to facilitate the Carnaby Debtors' path to exit and to maximize recoveries. And allowing Onset the ability to evaluate and propose an alternative plan,

which would apply only to the Carnaby Debtors, would cost the Debtors nothing—the Debtors would remain free to focus their efforts on implementing the Revised PM Plan and liquidating the remaining Debtors. The Debtors even retain the ability to change course and propose a plan for the Carnaby Debtors. But if they do elect to do so, creditors like Onset will have a meaningful procedural safeguard in the ability to propose their own plan in competition with the Debtors.

**B.      The Debtors have not made any progress in negotiations with Onset, the Carnaby Debtors' most significant creditor.**

41.      Another *Adelphia* factor—whether the Debtors have made progress in negotiations with the creditors of the Carnaby Debtors—favors ending the Exclusive Periods. The Debtors stated their intent to engage "key stakeholders" (Second Exclusivity Motion ¶ 33), but the Debtors have not even attempted, let alone progressed, plan negotiations with Onset. Despite repeatedly affirming their status as fiduciaries for the Carnaby Debtors and their commitment to adequately represent those debtors' interests,[7] the Debtors developed the Revised PM Plan—including the structure and funding of the Litigation Trust and the conversion of the remaining Chapter 11 Cases to chapter 7—without consulting, conferring with, or otherwise engaging Onset, by far the Carnaby Debtors' largest creditor. Instead, the Debtors cut Onset out of the plan-development process entirely, rejecting Onset's requests to be included in discussions and negotiating only with their preferred constituencies—the Ad Hoc Group and the Creditors' Committee. *See* Second Exclusivity Motion ¶ 26 (noting that "the Debtors, the Ad Hoc Group, and the Creditors' Committee agreed to comprehensive settlement and are finalizing a restructuring support agreement"). Tellingly, the Revised PM Plan also reflects seemingly no input or negotiation with

---

[7]      *See*, *e.g.*, *Objection to [Onset's Intervention Motion]* ¶ 29, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. 2025) [Dkt. No. 100] (arguing that the Debtors, as "fiduciaries of the estates," adequately represent Onset's interest in the Patrick James Adversary Proceeding).

the independent director, Benjamin Duster, who was appointed by the Debtors for the very purpose of safeguarding the interests of the Carnaby Debtors that they now entirely disregard.[8]

42. Moreover, the structure of the Revised PM Plan is further proof that, rather than working toward a consensual solution that would maximize the value of the Debtors' estates for the benefit of *all* the Debtors' stakeholders, the Debtors prefer to exclude Onset (and the Carnaby Debtors) entirely. For example, the Revised PM Plan categorizes Onset as an "Ineligible Creditor" that is barred from receiving any distributions from the Litigation Trust (*see* Revised PM Plan at 16–17), even though Onset has not been found liable for any wrongdoing and, on the contrary, is one of the principal victims of the fraud scheme perpetrated by Patrick and Ed James along with other First Brands insiders.[9] The Examiner's interim report accords, identifying no wrongdoing by Onset but implicating other parties.[10]

43. The Revised PM Plan's unaddressed deficiencies with respect to the Carnaby Debtors further confirm the absence of any meaningful engagement with such Debtors' creditors. Although the Debtors have filed the Revised PM Plan, the plan intentionally and systematically places a thumb on the scale for the FBG Debtors at the expense of the SPV Debtors, including the Carnaby Debtors, belying the Debtors' assertion that they are working "to build as much consensus

---

[8] *See, e.g., Debtors' Omnibus Reply to SPV Lenders' Objections to Retention Applications* ¶ 2 [Dkt. No. 870] (noting that the Debtors had adopted certain measures to resolve conflict-of-interest issues, including by appointing an independent director for Viceroy and the SPV Debtors, who has "exclusive authority over any matters involving conflicts between the SPV Debtors and the FBG Debtors" and "will retain conflicts counsel in the event any conflict matters arise.").

[9] *See Onset Financial, Inc.'s Amended Motion to Reconsider the Order Staying Adversary Case Deadlines and Discovery, First Brands Group, LLC v. Onset Financial, Inc.*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. Mar. 31, 2026) [Dkt. No. 103] ¶¶ 5–6 ("As reflected in the [criminal] indictment [against Patrick and Ed James], Onset was one of the principal victims of a complex fraud scheme perpetrated by Patrick James . . . and his brother, Ed James . . . along with other First Brands insiders. . . . Patrick, together with Ed and other company insiders, concealed First Brands' true financial condition from Onset . . . and misrepresented the manner in which they used those funds in order to repeatedly induce Onset to provide funding that they then stole.").

[10] *See Report of E. Martin de Luca, Examiner* [Dkt. No. 2479] at 4–5, 81–89.

in support of the [PM] Plan as possible" (Second Exclusivity Motion ¶ 33) and confirming that the Debtors were never engaged in a good-faith effort to maximize value for the Carnaby Debtors' estates. As further explained in the *Objection and Reservation of Rights of Onset Financial, Inc. to Debtors' Disclosure Statement Motion*, filed concurrently with this Opposition, among other issues, the Revised PM Plan:

- fails to explain how the proceeds of the Debtors' claims in the Adversary Proceedings—which were filed by **all** the Debtors, including the Carnaby Debtors—will be allocated amongst the various plaintiffs and their successors in interest and how the Carnaby Debtors' interest in such proceeds will be preserved and protected;

- creates an unfair disparity in how claims will be prosecuted—seeding the Litigation Trust with $75 million in funding, all investigative and discovery work product, and the continuity of privilege developed by the Debtors' professionals, while leaving the Carnaby Debtors' claims to unfunded chapter 7 trustees without the benefit of such institutional knowledge or resources; and

- unjustifiably excludes Onset from receiving distributions from the Litigation Trust and, effectively, bidding on the Estate Claims even though Onset also holds claims against the FBG Debtors.

44.     The Debtors have made no indication that they are working or will work to address these outstanding issues. Instead, they have affirmatively announced that it is the end of the road for the Carnaby Debtors and no plan will be forthcoming for them. This is the exact opposite of "progress in negotiations." Creditors like Onset should not suffer further extensions of exclusivity that serve no purpose. The Court should deny the Second Exclusivity Motion.

C.     **Extending the Exclusive Periods would only pressure creditors like Onset to submit to the Debtors' demands.**

45.     A further relevant *Adelphia* factor asks whether the debtor is utilizing exclusivity to pressure creditors to submit to the debtor's demands. Here, the answer is yes. The Debtors have been using their Exclusive Periods to both shut Onset out of the plan process and prevent it from protecting the value of the Carnaby Debtors' assets—even though the Debtors have picked a side

19

and disclaimed any effort to reorganize the Carnaby Debtors. This is no coincidence: the Carnaby Debtors' litigation assets and the FBG Debtors' litigation assets involve overlapping defendants with limited insurance and personal resources, including the James brothers and other former officers who are targets of both Adversary Proceedings. By electing to preserve and prosecute only the FBG Debtors' claims through the Litigation Trust—seeded with $75 million in funding, all investigative and discovery work product, and the continuity of privilege developed by the Debtors' professionals throughout these Chapter 11 Cases—the Debtors have clearly chosen to advance the interests of one group of creditors at the expense of another.

46.     Extending exclusivity would prevent Onset and other creditors from protecting the Carnaby Debtors' assets that, absent intervention, risk being subordinated to or consumed by the Litigation Trust's first-mover prosecution of overlapping claims against the same defendants and from the same shared insurance pool. Furthermore, as explained, the Revised PM Plan brands Onset as an "Ineligible Creditor" barred from receiving Litigation Trust distributions, effectively prohibits Onset from receiving diligence relating to the Estate Claims' marketing process, and consigns the Carnaby Debtors to chapter 7 liquidation. Moreover, any creditor that files an objection to the Revised PM Plan or objects to or opts out of the related Global Settlement is deemed an "Ineligible Creditor" barred from receiving Litigation Trust distributions—leaving creditors to choose between accepting the Debtors' terms or forfeiting their recovery. This is precisely the type of creditor coercion that exclusivity should not facilitate. *GMG Cap. Partners III, L.P.*, 503 B.R. at 602 (denying request for extension of exclusivity when debtor was clearly using "the exclusivity motion as a tactical weapon in its ongoing war with" its principal creditors); *In re Geriatrics Nursing Home*, 187 B.R. at 132 ("[T]he plan exclusivity provisions should not be

20

employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory.").

47.     The Debtors cannot weaponize exclusivity; extending it here for the Carnaby Debtors—where the Debtors have disclaimed any future plans for such entities—would enable them to do just that. Permitting the Debtors to maintain exclusivity under these circumstances would serve no legitimate purpose—it would only prevent creditors from proposing an alternative plan that would give the Carnaby Debtors' estates and their stakeholders a meaningful path to recovery.

### D.     The Carnaby Debtors' Chapter 11 Cases are neither large nor complex.

48.     Finally, although the Debtors argue the Chapter 11 Cases, when considered in their totality, may be large and complex, the Debtors do not argue that the chapter 11 cases of the Carnaby Debtors, by themselves, are large and complex. Nor could they—as special-purpose vehicles created for specified purposes, the Carnaby Debtors are not operating entities and have simple capital structures and very few parties in interest. Their primary assets are inventory or equipment, which will be appraised, marketed, and liquidated by Hilco Global pursuant to motions currently pending before the Court,[11] and causes of action, which a liquidation trust for the Carnaby Debtors may pursue. In light of such circumstances, the chapter 11 cases of the Carnaby Debtors are neither large nor complex. *See, e.g.*, *In re New Meatco Provisions, LLC*, No. 2:13-BK–22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (denying motion to extend exclusivity in part because the circumstances of the case were "neither large or complex," since there was "no business to reorganize" and the case involved liquidation).

---

[11]     *See generally Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims and Encumbrances; and (III) Granting Related Relief* [Dkt. No. 2454].

49.     Moreover, even assuming *arguendo* that the relevant Chapter 11 Cases are large and complex (they are not), the existence of that single *Adelphia* factor does not justify extending the Exclusive Periods. *See Sharon Steel Corp.*, 78 B.R. at 763 (denying the debtors' motion to extend the Exclusive Periods even though the debtor's case was "larger and more complex than other chapter 11 cases where the initial 120 day exclusivity period has been extended"); *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) (discussing how, when presented with "one of the all-time largest and most complex chapter 11 cases" the bankruptcy court denied a request for an extension "in the face of apparent deadlock, after which a consensual plan was achieved" (citations omitted)).

## CONCLUSION

50.     For the reasons set forth herein, the Court should deny the Second Exclusivity Motion as to the Carnaby Debtors and grant such other relief as the Court deems just and proper.

Dated: May 19, 2026
Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
Carrie H. Cohen (admitted *pro hac vice*)
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 19th day of May 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re<br><br>FIRST BRANDS GROUP, LLC *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**ONSET FINANCIAL, INC.'S OPPOSITION TO MOTION OF DEBTORS FOR AN**
**ORDER FURTHER EXTENDING EXCLUSIVE PERIODS PURSUANT TO SECTION**
**1121(d) OF THE BANKRUPTCY CODE**

Onset Financial, Inc. ("Onset") submits this opposition (the "Opposition") to the *Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 2522] (the "Second Exclusivity Motion").[2] In support of the Opposition, Onset respectfully states as follows:[3]

**PRELIMINARY STATEMENT**

1. The Court should deny the Second Exclusivity Motion with respect to the Carnaby Debtors (defined herein). Exclusivity exists to give debtors time to reorganize and pursue a value-maximizing transaction, not to hamstring certain estates (and their creditors). These principles

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] On May 13, 2026, the United States Trustee (the "UST") moved for an order to convert or dismiss the Chapter 11 Cases. *See United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* [Dkt. No. 2670] (the "UST Motion to Dismiss"). Onset reserves all rights with respect to the UST Motion to Dismiss, including Onset's right to object to such motion to the extent it seeks to convert the Carnaby Debtors' Chapter 11 Cases to chapter 7. Like Onset, however, the UST recognizes that the Debtors intend to abandon efforts to reorganize all but one of the Debtors and have proposed a plan that "improperly favor[s] a limited group of professionals and lenders." UST Motion to Dismiss ¶ 3; *see id.* ¶ 2 ("[T]he Debtors seek to dispose of the assets and claims of 111 [of the 112 Debtors] without providing those entities' creditors the protections guaranteed to them under the Code . . . .").

[3] Capitalized terms not defined herein shall have the meaning assigned to them in the Second Exclusivity Motion.

compel denial of the Debtors' motion to extend the exclusive periods for the Carnaby Debtors for the reasons discussed below.

2.      Since the inception of these cases, Onset—by far the Carnaby Debtors' most significant creditor and one of the largest stakeholders in these Chapter 11 Cases—has warned that the Debtors' joint management and representation was hopelessly conflicted and that the Debtors would sacrifice the Carnaby Debtors' interests in favor of those of the FBG Debtors.

3.      The filed plan proves Onset right. The Debtors have filed a chapter 11 plan for *one entity*—Premier Marketing Group, LLC—and abandoned a path forward for the *111* remaining Debtors, including the Carnaby Debtors, converting them to chapter 7 on the effective date of the chosen Debtor's plan. Through the plan, the Debtors, the DIP Lenders, and the Creditors' Committee seek to centralize prosecution of *all* of the Debtors' litigation claims for the benefit of *some* creditors of their choosing—a subset which, unsurprisingly, does not include Onset (and other creditors deemed "Ineligible" under the Debtors' own extrajudicial formulation). To make matters worse, that plan and the underlying, not-yet-filed Global Settlement apparently reflect no input, engagement, or negotiations with Benjamin Duster, the appointed independent director for the Carnaby Debtors (and other SPV debtors). That the sole representative of the Carnaby Debtors —who the Debtors insisted was installed to protect against the highly prejudicial outcome for the Carnaby Debtors that the Debtors now ask this Court to approve—was not consulted on the plan is telling.

4.      The Debtors are not merely picking sides; they seek to weaponize their chapter 11 plan to affirmatively shackle the Carnaby Debtors. The plan would transfer the FBG Debtors' claims, including those asserted jointly with the Carnaby Debtors, into a litigation trust established

2

for the sole benefit of the Debtors' preferred creditors. The Carnaby Debtors would be converted to chapter 7 and left to fend for themselves.

5. And fend for themselves they must. The Litigation Trust will not only receive $75 million in funding but also take possession of all investigative and discovery work product the Debtors and their professionals have accumulated throughout these Chapter 11 Cases. But this continuity of knowledge, vast and expensive work product, and privilege developed by the chapter 11 professionals representing *all* Debtors will benefit only those creditors the Debtors have deemed eligible. By contrast, the Carnaby Debtors' claims will be left to unfunded chapter 7 trustees entirely new to these proceedings, with no access to the institutional knowledge, privilege, or dedicated funding that the plan provides to the Litigation Trust. It is astounding—but unfortunately, not surprising—that fiduciaries for the Carnaby Debtors even considered, much less agreed, to such an unfair outcome.

6. But the plan's prejudicial treatment does not stop there. Onset holds claims against both the FBG Debtors and the Carnaby Debtors, but the plan designates Onset as an "Ineligible Creditor," denying it the recoveries afforded to other, similarly situated creditors of the FBG Debtors. And the plan goes further still, presumably excluding Onset from receiving the diligence materials necessary to bid as part of the contemplated marketing process. As the Carnaby Debtors' most significant creditor, Onset should not be forced to sit idle while the Debtors block the ability to generate value-maximizing alternatives for the Carnaby Debtors. Whatever "cause" the Debtors might say exists for the FBG Debtors certainly does not apply to the Carnaby Debtors.

7. As the Debtors intend to abandon the Carnaby Debtors to chapter 7 liquidation, the Debtors plainly have no need to retain the exclusive right to propose and solicit a reorganization plan for such entities. Indeed, because the Debtors suffer from material conflicts of interest, they

3

are functionally incapable of pursuing a plan that would maximize value for the Carnaby Debtors and their creditors. Terminating exclusivity does not prevent the Debtors from pursuing a plan for the Carnaby Debtors, it simply allows for competition from their creditors who would be free to do the same, providing a critical safeguard for those creditors.

8.      Denying the Debtors' requested extension would afford creditors like Onset a meaningful opportunity to participate in a process from which they have, to date, been excluded. Onset is currently evaluating a standalone chapter 11 plan for the Carnaby Debtors that would establish a separate litigation trust to pursue the Carnaby Debtors' claims, including claims against the James brothers and other culpable parties. In short, ending the Exclusive Periods as to the Carnaby Debtors would create a meaningful path to additional recoveries for creditors at no downside to the remaining estates.

9.      The Bankruptcy Code provides for the rules, regulations, and processes by which creditors are to be treated in a bankruptcy case. The Debtors propose to rewrite—or disregard entirely—the Bankruptcy Code's protections. That *some* creditors may benefit from the Debtors' approach is not a basis to approve a plan that runs roughshod over other creditors' statutory rights. With respect to the Carnaby Debtors, continued exclusivity is unwarranted and the Carnaby Debtors' creditors should be afforded the opportunity to pursue value-maximizing outcomes for the Carnaby Debtors.

10.     The Court should deny the Second Exclusivity Motion as to the Carnaby Debtors.

## BACKGROUND

### I.      Onset provides billions in financing to the Debtors.

11.     Since 2018, Onset has provided the Debtors with significant liquidity. Over the course of nearly a decade, Onset funded roughly $3 billion to several of the Debtors on account of

4

inventory and equipment. Accordingly, Onset has claims against certain of the FBG Debtors[4] and certain of the SPV Debtors (defined herein).

12. Beginning on May 9, 2018, Onset and Trico Products Corporation ("Trico Products") entered into direct lease transactions (the "Trico Transactions"). The terms of the Trico Transactions are governed by a single master lease agreement—*Master Lease Agreement No. OFI1045321* (the "Trico MLA"). *See* Cross-Claim Complaint Ex. 3. Several FBG Debtors—specifically, Brake Parts Inc India LLC; First Brands Group Intermediate, LLC; and First Brands Group, LLC (f/k/a Trico Group, LLC)—also agreed to guarantee Trico Products's obligations to Onset under the Trico MLA. *See id.* Exs. 15, 17, 20. Accordingly, pursuant to the Trico MLA, Onset has claims against those FBG Debtors.

13. Beginning in January 2022, Onset entered into a series of sale-and-leaseback transactions (the "Carnaby Transactions") with certain Debtors that had been formed to facilitate the Carnaby Transactions (the "SPV Debtors"). The terms of the Carnaby Transactions are governed by certain master lease agreements among Onset, the relevant SPV Debtors, and certain affiliates of such SPV Debtors. *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2692] (the "Revised PM Disclosure Statement") at 58. In particular:

---

[4]    The FBG Debtors that guaranteed the Trico Products's obligations with respect to the Trico Transactions (defined herein) are Brake Parts Inc India LLC; First Brands Group Intermediate, LLC; and First Brands Group, LLC (f/k/a Trico Group, LLC). *See Onset Financial, Inc.'s Answer and Counterclaim, Cross-Claim, and Third-Party Complaint*, *First Brands Group, LLC v. Onset Financial, Inc. et al.*, No. 4:26-ap-03005 (Bankr. S.D. Tex. Feb. 19, 2026) [Dkt. No. 16] (the "Cross-Claim Complaint") Exs. 15, 17, 20; *Schedule A/B: Property for Non-Individual First Brands Group Intermediate, LLC* [Dkt. No. 1417] at 65; *Schedule A/B: Property for Non-Individual Brake Parts Inc India LLC* [Dkt. No. 1469] at 66.

The FBG Debtors that guaranteed the Carnaby Debtors' obligations with respect to the Carnaby Transactions (described herein) are Eagle Casting, LLC; First Brands Group Holdings, LLC; and Viceroy Private Capital, LLC. *See* Revised PM Disclosure Statement Ex. D; *Schedule A/B: Property for Non-Individual Eagle Casting, LLC* [Dkt. No. 1519] at 77; *Schedule A/B: Property for Non-Individual First Brands Group Holdings, LLC* [Dkt. No. 1412] at 43; *Schedule A/B: Property for Non-Individual Viceroy Private Capital, LLC* [Dkt. No. 1501] at 49.

In addition to those guarantors, Onset has a claim as a lessor to Trico Products Corporation under the Trico Transactions (described below). *See* Revised PM Disclosure Statement Ex. D; *Schedule A/B: Property for Non-Individual Trico Products Corporation* [Dkt. No. 1444] at 183.

5

- On June 28, 2022, Onset and Carnaby Inventory IV, LLC ("Carnaby IV") entered into *Master Lease Agreement No. OFI1445416* (the "Carnaby IV MLA"). *Id.* The obligations of Carnaby IV under this agreement were guaranteed by Carnaby Inventory Holdings IV, LLC—Carnaby IV's direct parent—and also by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; First Brands Group Holdings, LLC ("FBG Holdings"); and Viceroy Private Capital, LLC ("Viceroy"). *Id.*

- On October 24, 2023, Onset and Carnaby FA, LLC ("Carnaby FA") entered into *Master Lease Agreement No. OFI1545465* (the "Carnaby FA MLA" and, together with the Carnaby IV MLA, the "Carnaby MLAs"). *Id.* The obligations of Carnaby FA, LLC under this agreement were guaranteed by Carnaby FA Holdings, LLC— Carnaby FA's direct parent—and by Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC; FBG Holdings; and Viceroy. *Id.*

Accordingly, pursuant to the Carnaby MLAs, the following SPV Debtors owe obligations to Onset: Carnaby IV; Carnaby Inventory Holdings IV, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby FA; Carnaby FA Holdings, LLC, and Eagle Casting Holdings, LLC (collectively, the "Carnaby Debtors"). *Id.* The following FBG Debtors also owe obligations to Onset pursuant to the Carnaby MLAs: FBG Holdings; Eagle Casting, LLC; and Viceroy. *Id.*

14. The structure of the transactions between Onset and the various Debtors—including the relevant FBG Debtors and the SPV Debtors—is detailed in the Cross-Claim Complaint. *See* Cross-Claim Complaint ¶ 123. As of the Petition Date, the value of the Debtors' outstanding obligations under the Carnaby MLAs (and the lease and forbearance agreements arising under the master lease agreements) totaled approximately $1.88 billion, consisting of approximately $1.35 billion on account of inventory and $528 million on account of equipment. *Id.* ¶¶ 147, 191.

## II. **Onset and other creditors warn that the Debtors are conflicted.**

15. Throughout the course of the Chapter 11 Cases, Onset (alongside certain other creditors) has repeatedly warned that the Debtors' management and advisors suffer from conflicts of interest and that they therefore cannot adequately represent the interests of the Carnaby Debtors.

16.     In particular, on November 14, 2025, Onset filed an omnibus limited objection to certain of the Debtors' retention applications, specifically objecting to the SPV Debtors utilizing the same professionals as the FBG Debtors. *Onset Financial, Inc.'s Omnibus Limited Objection to the Debtors' Retention Applications for Weil, Gotshal & Manges LLP, Lazard Frères & Co. LLC, and Alvarez & Marsal North America, LLC* [Dkt. No. 679] (the "Omnibus Objection"). Onset warned that, because the two groups of Debtors hold adverse interests, the proposed joint representation would compromise the professionals' disinterestedness and likely result in the subordination of the SPV Debtors' interests (including the Carnaby Debtors') to those of the FBG Debtors. Omnibus Objection ¶ 1. While the Debtors insisted that their professionals would not take sides, Onset insisted that unconflicted professionals were needed to take the SPV Debtors' sides, which the proposed professionals could not do because they represented all of the Debtors. *See* Omnibus Objection ¶¶ 3–5, 29–31. Certain of the Debtors' other creditors filed similar objections, pointing to the same conflicts of interest.[5]

17.     In response, the Debtors argued that they had—without consulting any of their creditors—appointed an "independent director" for Viceroy and the SPV Debtors (including the Carnaby Debtors)—to handle matters where the FBG Debtors and the SPV Debtors (including the Carnaby Debtors) had a conflict.[6]

---

[5]     *Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil Gotshal & Manges LLP, (II) Lazard Frères & Co. LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Dkt. No. 644] ¶¶ 1–2; *Aequum Capital Financial II LLC's Joinder to the Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil Gotshal & Manges LLP, (II) Lazard Frères & Co. LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Dkt. No. 656] ¶ 1; *Omnibus Limited Objection of the Carnaby Secured Lenders to Debtors' Motions to Authorize the Retention of Professionals* [Dkt. No. 649] ¶ 4.

[6]     *See Debtors' Omnibus Reply to SPV Lenders' Objections to Retention Applications* [Dkt. No. 870] ¶¶ 2, 26-27.

III. **The Debtors file an adversary proceeding against Patrick James, and Onset seeks to intervene to protect the Carnaby Debtors' interests.**

18. On November 11, 2025, the Debtors—including the Carnaby Debtors—commenced an adversary proceeding (the "Patrick James Adversary Proceeding") against Patrick James, the Debtors' founder and former Chief Executive Officer. *See First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. 2025).

19. On November 14, 2025, Onset filed a motion to intervene in the Patrick James Adversary Proceeding. *See Motion of Onset Financial, Inc. for Entry of an Order Pursuant to Federal Rule of Civil Procedure 24 and Federal Rule of Bankruptcy Procedure 7024 Authorizing Intervention in Adversary Proceeding*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. Nov. 14, 2025) [Dkt. No. 71] ("Onset's Intervention Motion"). Onset argued that, as the Carnaby Debtors' most significant creditor, it had a direct interest in the framing of the adversary proceeding (*id*. ¶¶ 42–46) and that the Debtors could not adequately represent Onset's interest because they represented competing constituencies, were constrained by financing restrictions barring positions adverse to the prepetition term loan lenders, and had demonstrated animus toward Onset (*id*. ¶¶ 47–51). Onset was concerned that the inherent conflict in the Debtors pursuing all of the claims collectively without separate representation of the Carnaby Debtors would potentially prejudice the pursuit, adjudication, and settlement of that lawsuit. *See id.*

IV. **The Debtors file an adversary proceeding against Onset and others.**

20. On January 9, 2026, the Debtors—again, including the Carnaby Debtors—commenced an adversary proceeding (the "Onset Adversary Proceeding" and, together with the Patrick James Adversary Proceeding, the "Adversary Proceedings") against Onset, Edward James (the brother of Patrick James and the Debtors' former executive vice president), and certain related

8

entities. *See First Brands Group LLC v. Onset*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. 2026).

21. In response, Onset filed a motion for judgment on the pleadings with respect to the claims raised against Onset and also asserted various counterclaims, third-party claims, and cross-claims. *See generally* Cross-Claim Complaint. Currently, at the Debtors' request, the Court has stayed the Onset Adversary Proceeding. *See Order Staying Adversary Case Deadlines and Discovery*, *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. Mar. 24, 2026) [Dkt. No. 78]. A discovery stay is in place in the Patrick James Adversary Proceeding, and all case deadlines are currently abated. *See Order [Staying Discovery]*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. April 17, 2026) [Dkt. No. 181]; *May 8, 2026 Order*, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. May 8, 2026) [Dkt. No. 191].

## V. **The Debtors file the plan in pursuit of the FBG Debtors' interest and to the direct detriment of the Carnaby Debtors'.**

22. On January 22, 2026, the Debtors filed the *Motion of Debtors for an Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 1674] (the "First Exclusivity Motion"), requesting an extension of both the initial period during which the debtors enjoy the exclusive right to file a chapter 11 plan and the subsequent period to solicit acceptances thereof (together, the "Exclusive Periods"). On February 17, 2026, the Court granted the First Exclusivity Motion, extending the Exclusive Periods to April 22, 2026, and June 22, 2026, respectively. *Order Extending Exclusive Periods* [Dkt. No. 1939].

23. On April 22, 2026, the Debtors filed the Second Exclusivity Motion, seeking another 90-day extension of the Exclusive Periods to July 21, 2026, and September 21, 2026, respectively. In support of their requested extensions, the Debtors stated that they had "reached an

agreement . . . on a chapter 11 plan, and anticipate filing the Plan and Disclosure Statement in the coming weeks." Second Exclusivity Motion ¶ 40.

24. Before the Debtors filed any plan, Onset repeatedly sought to be involved in the negotiations and discussions regarding the development of the Debtors' forthcoming plan and path forward for the Chapter 11 Cases. The Debtors consistently rebuffed Onset's outreach, developing the plan, and later revising it, without consulting, conferring with, or otherwise engaging Onset.

25. On April 28, 2026, the Debtors filed the *Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2544], and, the following day, the Debtors filed a disclosure statement for such plan. *See Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2545].

26. On May 15, 2026, the Debtors filed a revised version of the *Chapter 11 Plan of Premier Marketing Group, LLC* [Dkt. No. 2678] (the "Revised PM Plan") and, on May 18, 2026, filed the Revised PM Disclosure Statement.

27. Although the Chapter 11 Cases involve 112 debtor entities, each with its own chapter 11 case (*see* Second Exclusivity Motion ¶ 35), the Revised PM Plan provides a path forward for just a single Debtor—Premier Marketing Group, LLC (the "Plan Debtor"). *See* Revised PM Disclosure Statement at 1 ("The Disclosure Statement describes the chapter 11 plan of the Plan Debtor and classifies and treats Claims against and Interests in the Plan Debtor *only*." (emphasis added)). With respect to the Chapter 11 Cases filed by the other Debtors, the Debtors intend to convert all such cases to cases under chapter 7 after the Revised PM Plan goes effective. *Id.* ("Following the Effective Date, the chapter 11 cases of the Debtors other than the Plan Debtor will be converted to cases under chapter 7 . . . .").

28.     The Revised PM Plan classifies the Debtors into two groups—the "FBG Debtors" and the "SPV Debtors." Revised PM Plan at 14, 25. The FBG Debtors comprise the companies that hold and operate the Debtors' businesses, including FBG Holdings, its Debtor subsidiaries, and Viceroy. *Id.* at 14 (defining "FBG Debtors"). In contrast, the SPV Debtors are certain special-purpose Debtor subsidiaries of Viceroy, including the Carnaby Debtors. *Id.* at 25 (defining "SPV Debtors").

29.     The Revised PM Plan provides for, among other things, the establishment of a litigation trust (the "Litigation Trust"), which will be vested with all claims and causes of action held by the FBG Debtors' estates (the "Estate Claims"). *Id.* at 13–14 (defining "Estate Claims"), *id.* at 18 (defining "Litigation Trust"); *see id.* Art. VI (outlining structure of Litigation Trust). Specifically, the DIP Secured Parties will submit a credit bid for all the Estate Claims, and, if the FBG Debtors determine that such credit bid is the best offer, the FBG Debtors will transfer the Estate Claims to the Plan Debtor, which will then transfer such claims to the Litigation Trust free and clear of all liens, claims, encumbrances, and interests. Revised PM Disclosure Statement at 2, 27. The Litigation Trust will be funded with $75 million to pursue claims against the fraudsters that caused the Debtors' collapse. *Id*. at 2.

30.     Although the Carnaby Debtors are plaintiffs in both the Patrick James Adversary Proceeding and the Onset Adversary Proceeding, the Litigation Trust is built around the FBG Debtors' claims and recoveries, and the ability to participate in Litigation Trust Distributions is premised on holding claims against the FBG Debtors—not claims against the Carnaby Debtors. Revised PM Plan at 12–13, 38–39. Put simply, a creditor of the Carnaby Debtors—which are *co-plaintiffs* with the FBG Debtors in the adversary proceedings against the James brothers—is excluded from Litigation Trust distributions merely because it is owed money by a Carnaby

11

Debtor. *See id.* And there are yet further restrictions. For example, even though Onset holds substantial claims against the FBG Debtors that guaranteed Carnaby IV's and Carnaby FA's respective obligations to Onset, the Revised PM Plan defines "Ineligible Creditors" to include defendants named or to be named by the Debtors in the Onset Adversary Proceeding. *Id.* at 16–17, 39. Incredibly, also deemed "ineligible" is **any party** that files an objection to the Revised PM Plan or the Global Settlement. *Id.* The cost of exercising a statutory right to object to a plan is permanent ineligibility to share in the recoveries from the Litigation Trust that similarly situated creditors will enjoy. The Litigation Trust accordingly creates a recovery mechanism that excludes disfavored creditors and creditors that dare to object, even those holding claims against the FBG Debtors, like Onset.

31. The Revised PM Plan's disparate treatment extends beyond Litigation Trust distributions. The Revised PM Plan fails to explain how the proceeds of the Debtors' claims in the Adversary Proceedings—which were filed by **all** the Debtors, including the Carnaby Debtors— will be allocated among the various plaintiffs and their successors in interest. In addition, all books, records, and investigative findings of the FBG Debtors, including findings of the Examiner and professionals retained during these Chapter 11 Cases, will be made available only to the Litigation Trust. The Plan says nothing about the records and work product of the Carnaby Debtors, on whose behalf this investigative work was also performed. *See id.* at 18–19 (defining "Litigation Trust Assets"). The Plan does say, however, that privilege held by "any one or more of the Debtors" will be transferred to the Litigation Trust, cutting of the Carnaby Debtors' access to *their own* privileged information, including information necessary to pursue remaining claims. *See id.* at 55. The Carnaby Debtors' estates will be converted to chapter 7; a trustee—that has no funding,

institutional knowledge, background on this case, or any investigative work product—will be appointed to liquidate the Carnaby Debtors' valuable estate causes of action.

32.     In sum, through the Revised PM Plan, the Debtors seek to transfer the Estate Claims to the Litigation Trust to fund recoveries for the FBG Debtors' creditors alone, while effectively preventing Onset from receiving distributions from the Litigation Trust and sabotaging the Carnaby Debtors as a competing co-plaintiff.

## ARGUMENT

33.     Section 1121(d)(1) of the Bankruptcy Code provides that the Exclusive Periods may be increased or reduced "for cause." That section operates to ensure that the debtor does not abuse exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 95-989, at 118 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5904. Indeed, Section 1121 is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise" and "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988); *see In re Gialamas*, No. 18-13341, 2019 WL 6215974, at *3 (Bankr. W.D. Wis. Nov. 20, 2019) (concluding that "concerns about undue pressure coupled with the fact that [debtor and creditor] have not been in negotiation about the terms of a plan, weighs against any further extensions").

34.     The party seeking the extension—here, the Debtors—bears the burden of establishing sufficient cause. *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014). The Bankruptcy Code does not define "cause" under section 1121(d); instead, the court has "broad discretion to determine what is sufficient

13

cause" depending on the "facts and circumstances in each individual case." *In re Sharon Steel Corp.*, 78 B.R. 762, 764–65 (Bankr. W.D. Pa. 1987). Courts in this district consider the *Adelphia* factors when evaluating whether sufficient cause exists; the factors relevant to the present case include:

- the size and complexity of the case;

- the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

- the existence of good-faith progress toward reorganization;

- whether the debtor has made progress in negotiations with its creditors;

- whether the debtor has demonstrated reasonable prospects for filing a viable plan; and

- whether the debtor is utilizing exclusivity in order to pressure creditors to submit to the debtor's reorganization demands.

*In re New Millennium Mgmt., LLC*, 2014 WL 792115, at *6 (citing *In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 600–01 (Bankr. S.D.N.Y. 2014)); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160–61 (5th Cir. 1988) (upholding the district court's decision to shorten debtor's exclusivity period under section 1121(d)(1) when the court could infer that the debtor's delayed bankruptcy petition "had as a major purpose the delay of the creditors' efforts at reorganization . . . .").

35.     A court's decision to extend a debtor's exclusive period "is a serious matter" and extensions are not granted "routinely nor cavalierly." *In re All Seasons Indus., Inc.,* 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (internal quotation marks omitted) (quoting *In re McLean Indus., Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)). Evaluating cause "requires a court to engage in a careful balancing of competing factors"—no single factor is dispositive. *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011). But particular importance is placed on whether the

14

debtor can show good faith progress toward a reorganization. *See In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987) ("In virtually every case where an extension has been granted, the debtor has shown substantial progress has been made in formulating a plan during the first 120 days."); *see GMG Cap. Partners III, L.P.*, 503 B.R. at 601, 603 (denying request for extension of exclusivity period where debtor "had sufficient time to enter into good faith negotiations with its creditors," among other factors); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (concluding that the debtor did not meet its burden of establishing good cause to grant an extension of the exclusivity period because it failed to show that the requested extension was likely "to significantly improve progress toward an effective reorganization").

36.     Courts evaluate cause on a case-by-case basis and may extend or shorten the Exclusive Periods with respect to only a subset of the chapter 11 cases at issue. *See In re Geriatrics Nursing Home*, 187 B.R. 128, 132 (D.N.J. 1995) (noting that courts are authorized under section 1121(d) to modify Exclusive Periods "on a case-specific basis"). Furthermore, the joint administration of multiple chapter 11 cases does not require that each debtor receive the same treatment. *See In re Las Torres Dev., L.L.C.,* 413 B.R. 687, 693 (Bankr. S.D. Tex. 2009) ("Joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates." (internal quotation marks omitted)).

37.     Finally, even if the debtor establishes cause, the plain text of section 1121(d) allows the Court to exercise its discretion and deny the request nonetheless. *Sharon Steel Corp.*, 78 B.R. at 763 ("In exercising its discretion . . . the court *may* refuse to extend the exclusivity period even if there is a showing of cause.").

15

## I. The Debtors fail to demonstrate that cause exists for their requested extension.

### A. The Debtors have not progressed toward, and will not file, a viable reorganization plan for the Carnaby Debtors.

38.   The Debtors have disclaimed any intent to file a reorganization plan for 111 of the 112 Debtor entities in these Chapter 11 Cases, including the Carnaby Debtors. Instead, as the Debtors have plainly stated, if the Revised PM Plan goes effective, the Debtors will convert all their remaining Chapter 11 Cases, including the cases filed by the Carnaby Debtors, to cases under chapter 7. Revised PM Disclosure Statement at 1.

39.   With respect to the Carnaby Debtors, the lack of "cause" to extend the Exclusive Periods is inarguable. The purpose of exclusivity is to provide a debtor with sufficient time to formulate, negotiate, and propose a plan; here, the Debtors admit they have no intention of undertaking any of these tasks with respect to the Carnaby Debtors. That the Debtors have walked away from the Carnaby Debtors tilts the *Adelphia* factors decidedly in favor of denying the Second Exclusivity Motion:

- *Need for sufficient time to permit the debtor to negotiate a plan of reorganization*: the Debtors have no need for additional time to negotiate a reorganization plan that they do not intend ever to develop.

- *Good-faith progress toward reorganization*: the Debtors have not made any progress, let alone good-faith progress, toward reorganizing the Carnaby Debtors; it now appears that the Debtors never pursued a chapter 11 reorganization for those entities at all.

- *Reasonable prospects for filing a viable plan*: the Debtors, by their own admission, do not intend to file a viable reorganization plan for the Carnaby Debtors; accordingly, there are no reasonable prospects for filing a viable plan.

40.   By contrast, denying the Second Exclusivity Motion with respect to the Carnaby Debtors would yield meaningful benefits at no cost to any estate. It would give Onset—the most significant party in interest—the ability to facilitate the Carnaby Debtors' path to exit and to maximize recoveries. And allowing Onset the ability to evaluate and propose an alternative plan,

16

which would apply only to the Carnaby Debtors, would cost the Debtors nothing—the Debtors would remain free to focus their efforts on implementing the Revised PM Plan and liquidating the remaining Debtors. The Debtors even retain the ability to change course and propose a plan for the Carnaby Debtors. But if they do elect to do so, creditors like Onset will have a meaningful procedural safeguard in the ability to propose their own plan in competition with the Debtors.

**B.      The Debtors have not made any progress in negotiations with Onset, the Carnaby Debtors' most significant creditor.**

41.      Another *Adelphia* factor—whether the Debtors have made progress in negotiations with the creditors of the Carnaby Debtors—favors ending the Exclusive Periods. The Debtors stated their intent to engage "key stakeholders" (Second Exclusivity Motion ¶ 33), but the Debtors have not even attempted, let alone progressed, plan negotiations with Onset. Despite repeatedly affirming their status as fiduciaries for the Carnaby Debtors and their commitment to adequately represent those debtors' interests,[7] the Debtors developed the Revised PM Plan—including the structure and funding of the Litigation Trust and the conversion of the remaining Chapter 11 Cases to chapter 7—without consulting, conferring with, or otherwise engaging Onset, by far the Carnaby Debtors' largest creditor. Instead, the Debtors cut Onset out of the plan-development process entirely, rejecting Onset's requests to be included in discussions and negotiating only with their preferred constituencies—the Ad Hoc Group and the Creditors' Committee. *See* Second Exclusivity Motion ¶ 26 (noting that "the Debtors, the Ad Hoc Group, and the Creditors' Committee agreed to comprehensive settlement and are finalizing a restructuring support agreement"). Tellingly, the Revised PM Plan also reflects seemingly no input or negotiation with

---

[7]      *See*, *e.g.*, *Objection to [Onset's Intervention Motion]* ¶ 29, *First Brands Group LLC v. James*, Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. 2025) [Dkt. No. 100] (arguing that the Debtors, as "fiduciaries of the estates," adequately represent Onset's interest in the Patrick James Adversary Proceeding).

the independent director, Benjamin Duster, who was appointed by the Debtors for the very purpose of safeguarding the interests of the Carnaby Debtors that they now entirely disregard.[8]

42. Moreover, the structure of the Revised PM Plan is further proof that, rather than working toward a consensual solution that would maximize the value of the Debtors' estates for the benefit of *all* the Debtors' stakeholders, the Debtors prefer to exclude Onset (and the Carnaby Debtors) entirely. For example, the Revised PM Plan categorizes Onset as an "Ineligible Creditor" that is barred from receiving any distributions from the Litigation Trust (*see* Revised PM Plan at 16–17), even though Onset has not been found liable for any wrongdoing and, on the contrary, is one of the principal victims of the fraud scheme perpetrated by Patrick and Ed James along with other First Brands insiders.[9] The Examiner's interim report accords, identifying no wrongdoing by Onset but implicating other parties.[10]

43. The Revised PM Plan's unaddressed deficiencies with respect to the Carnaby Debtors further confirm the absence of any meaningful engagement with such Debtors' creditors. Although the Debtors have filed the Revised PM Plan, the plan intentionally and systematically places a thumb on the scale for the FBG Debtors at the expense of the SPV Debtors, including the Carnaby Debtors, belying the Debtors' assertion that they are working "to build as much consensus

---

[8] *See, e.g.*, *Debtors' Omnibus Reply to SPV Lenders' Objections to Retention Applications* ¶ 2 [Dkt. No. 870] (noting that the Debtors had adopted certain measures to resolve conflict-of-interest issues, including by appointing an independent director for Viceroy and the SPV Debtors, who has "exclusive authority over any matters involving conflicts between the SPV Debtors and the FBG Debtors" and "will retain conflicts counsel in the event any conflict matters arise.").

[9] *See Onset Financial, Inc.'s Amended Motion to Reconsider the Order Staying Adversary Case Deadlines and Discovery*, *First Brands Group, LLC v. Onset Financial, Inc.*, Adv. Pro. No. 26-ap-03005 (CML) (Bankr. S.D. Tex. Mar. 31, 2026) [Dkt. No. 103] ¶¶ 5–6 ("As reflected in the [criminal] indictment [against Patrick and Ed James], Onset was one of the principal victims of a complex fraud scheme perpetrated by Patrick James . . . and his brother, Ed James . . . along with other First Brands insiders. . . . Patrick, together with Ed and other company insiders, concealed First Brands' true financial condition from Onset . . . and misrepresented the manner in which they used those funds in order to repeatedly induce Onset to provide funding that they then stole.").

[10] *See Report of E. Martin de Luca, Examiner* [Dkt. No. 2479] at 4–5, 81–89.

in support of the [PM] Plan as possible" (Second Exclusivity Motion ¶ 33) and confirming that the Debtors were never engaged in a good-faith effort to maximize value for the Carnaby Debtors' estates. As further explained in the *Objection and Reservation of Rights of Onset Financial, Inc. to Debtors' Disclosure Statement Motion*, filed concurrently with this Opposition, among other issues, the Revised PM Plan:

- fails to explain how the proceeds of the Debtors' claims in the Adversary Proceedings—which were filed by **all** the Debtors, including the Carnaby Debtors—will be allocated amongst the various plaintiffs and their successors in interest and how the Carnaby Debtors' interest in such proceeds will be preserved and protected;

- creates an unfair disparity in how claims will be prosecuted—seeding the Litigation Trust with $75 million in funding, all investigative and discovery work product, and the continuity of privilege developed by the Debtors' professionals, while leaving the Carnaby Debtors' claims to unfunded chapter 7 trustees without the benefit of such institutional knowledge or resources; and

- unjustifiably excludes Onset from receiving distributions from the Litigation Trust and, effectively, bidding on the Estate Claims even though Onset also holds claims against the FBG Debtors.

44.     The Debtors have made no indication that they are working or will work to address these outstanding issues. Instead, they have affirmatively announced that it is the end of the road for the Carnaby Debtors and no plan will be forthcoming for them. This is the exact opposite of "progress in negotiations." Creditors like Onset should not suffer further extensions of exclusivity that serve no purpose. The Court should deny the Second Exclusivity Motion.

C.      **Extending the Exclusive Periods would only pressure creditors like Onset to submit to the Debtors' demands.**

45.     A further relevant *Adelphia* factor asks whether the debtor is utilizing exclusivity to pressure creditors to submit to the debtor's demands. Here, the answer is yes. The Debtors have been using their Exclusive Periods to both shut Onset out of the plan process and prevent it from protecting the value of the Carnaby Debtors' assets—even though the Debtors have picked a side

19

and disclaimed any effort to reorganize the Carnaby Debtors. This is no coincidence: the Carnaby Debtors' litigation assets and the FBG Debtors' litigation assets involve overlapping defendants with limited insurance and personal resources, including the James brothers and other former officers who are targets of both Adversary Proceedings. By electing to preserve and prosecute only the FBG Debtors' claims through the Litigation Trust—seeded with $75 million in funding, all investigative and discovery work product, and the continuity of privilege developed by the Debtors' professionals throughout these Chapter 11 Cases—the Debtors have clearly chosen to advance the interests of one group of creditors at the expense of another.

46.     Extending exclusivity would prevent Onset and other creditors from protecting the Carnaby Debtors' assets that, absent intervention, risk being subordinated to or consumed by the Litigation Trust's first-mover prosecution of overlapping claims against the same defendants and from the same shared insurance pool. Furthermore, as explained, the Revised PM Plan brands Onset as an "Ineligible Creditor" barred from receiving Litigation Trust distributions, effectively prohibits Onset from receiving diligence relating to the Estate Claims' marketing process, and consigns the Carnaby Debtors to chapter 7 liquidation. Moreover, any creditor that files an objection to the Revised PM Plan or objects to or opts out of the related Global Settlement is deemed an "Ineligible Creditor" barred from receiving Litigation Trust distributions—leaving creditors to choose between accepting the Debtors' terms or forfeiting their recovery. This is precisely the type of creditor coercion that exclusivity should not facilitate. *GMG Cap. Partners III, L.P.*, 503 B.R. at 602 (denying request for extension of exclusivity when debtor was clearly using "the exclusivity motion as a tactical weapon in its ongoing war with" its principal creditors); *In re Geriatrics Nursing Home*, 187 B.R. at 132 ("[T]he plan exclusivity provisions should not be

employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory.").

47. The Debtors cannot weaponize exclusivity; extending it here for the Carnaby Debtors—where the Debtors have disclaimed any future plans for such entities—would enable them to do just that. Permitting the Debtors to maintain exclusivity under these circumstances would serve no legitimate purpose—it would only prevent creditors from proposing an alternative plan that would give the Carnaby Debtors' estates and their stakeholders a meaningful path to recovery.

**D.     The Carnaby Debtors' Chapter 11 Cases are neither large nor complex.**

48. Finally, although the Debtors argue the Chapter 11 Cases, when considered in their totality, may be large and complex, the Debtors do not argue that the chapter 11 cases of the Carnaby Debtors, by themselves, are large and complex. Nor could they—as special-purpose vehicles created for specified purposes, the Carnaby Debtors are not operating entities and have simple capital structures and very few parties in interest. Their primary assets are inventory or equipment, which will be appraised, marketed, and liquidated by Hilco Global pursuant to motions currently pending before the Court,[11] and causes of action, which a liquidation trust for the Carnaby Debtors may pursue. In light of such circumstances, the chapter 11 cases of the Carnaby Debtors are neither large nor complex. *See, e.g.*, *In re New Meatco Provisions, LLC*, No. 2:13-BK–22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (denying motion to extend exclusivity in part because the circumstances of the case were "neither large or complex," since there was "no business to reorganize" and the case involved liquidation).

---

[11]   *See generally Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims and Encumbrances; and (III) Granting Related Relief* [Dkt. No. 2454].

49.     Moreover, even assuming *arguendo* that the relevant Chapter 11 Cases are large and complex (they are not), the existence of that single *Adelphia* factor does not justify extending the Exclusive Periods. *See Sharon Steel Corp.*, 78 B.R. at 763 (denying the debtors' motion to extend the Exclusive Periods even though the debtor's case was "larger and more complex than other chapter 11 cases where the initial 120 day exclusivity period has been extended"); *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) (discussing how, when presented with "one of the all-time largest and most complex chapter 11 cases" the bankruptcy court denied a request for an extension "in the face of apparent deadlock, after which a consensual plan was achieved" (citations omitted)).

## CONCLUSION

50.     For the reasons set forth herein, the Court should deny the Second Exclusivity Motion as to the Carnaby Debtors and grant such other relief as the Court deems just and proper.

Dated: May 19, 2026
      Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
Carrie H. Cohen (admitted *pro hac vice*)
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 19th day of May 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry