# EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

## DEBTORS' REPLY IN SUPPORT
## OF DISCLOSURE STATEMENT MOTION

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this reply (this "**Reply**") to the objections and responses (collectively, the "**Objections**") to the Motion,[2] seeking, among other things, conditional approval of the *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* (Docket No. 2733) (as may be amended from time to time, the "**Disclosure Statement**") filed in connection with the proposed *Chapter 11 Plan of Premier Marketing Group, LLC* (Docket No. 2738) (as may be amended from time to time,

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    "**Motion**" means the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Plan; (V) Establishing Global Settlement Election Procedures; and (VI) Granting Related Relief* (Docket No. 2546).

the "**Plan**").[3]  In support of this Reply and the relief requested in the Motion, the Debtors respectfully represent as follows:

### Preliminary Statement

1.      The Debtors believe they have fully resolved three parties' Objections out of the nine Objections filed, and that a number of other parties' Objections have been resolved.

2.      Debtor, Premier Marketing Group, LLC (the "**Plan Debtor**") seeks conditional approval of the Disclosure Statement for a chapter 11 plan of liquidation that provides for an orderly wind down of the Debtors' estates through the monetization of assets that serve as the collateral of the Debtors' secured lenders by establishing three trusts and the distribution of proceeds to creditors.  The Plan does not exist in a vacuum.

3.      The Plan is the product of extensive arm's-length and good faith negotiations among the Debtors, the Ad Hoc Group, and the Creditors' Committee, including through mediation led by the Honorable Judge Marvin Isgur.  These negotiations culminated in an agreement on a global settlement (the "**Global Settlement**"), which serves as the foundation for the Plan, and averts the imminent risk of (i) the DIP Secured Parties and ABL Secured Parties foreclosing on their collateral and terminating the Debtors' use of cash collateral (which cash collateral is also being used in connection with finalizing various OEM sales), and (ii) a value-destructive, premature conversion to chapter 7 that would almost certainly result in no recovery to administrative, priority, and general and unsecured creditors.  The Debtors believe that the Plan is in the best interests of creditors and should be approved.

---

[3]     Capitalized terms used but not otherwise defined in herein shall have the meanings ascribed to such terms in the Motion, Disclosure Statement, or Plan, as applicable.

4. The Debtors have worked diligently to respond to the nine (9) filed objections and address feedback received from various stakeholders, including by adding additional information to the Disclosure Statement and making certain revisions to the Plan. Among the key changes to the Plan are:

(i) removing the provision that Eligible Creditors that object to the Plan or Global Settlement become Ineligible Creditors and therefore do not participate in the Global Settlement (Plan §§ 1.1 (definition of Ineligible Creditors); 5.2(g));

(ii) removing the requirement for Eligible Creditors to opt in to participate in the Global Settlement, *provided* that any Eligible Creditor that provides written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation Trust Interest will be considered an Ineligible Creditor and will not participate in the Global Settlement (*id.* §1.1 (definition of Ineligible Creditors));

(iii) amending the definition of "Ineligible Creditor" by replacing the "Adverse Conduct" standard to only disqualify creditors with claims that are subject to disallowance under section 502 or subordination under section 510 of the Bankruptcy Code or applicable law, as determined by a Final Order, for purposes of determining which creditors are "Eligible Creditors" that may participate in the Global Settlement (*id* §§ 1.1 (definition of Ineligible Creditors); 5.2(g));

(iv) making the Preference Settlement and all third-party releases an opt-in structure that provides Trade Creditors, Supply Chain Financers, and Factors no less than 45 days following the Effective Date to decide whether to opt in (and in the case of Trade Creditors, a further extension until 30 days following service of a complaint filed by the Litigation Trustee) (Plan §§ 1.1 (definition of Preference Settlement Election Form); 6.11(b));

(v) clarifying that "Disputed" assets, including as between the FBG Debtors and SPV Debtors and with respect to Factors asserting ownership interests in receivables, will remain with the applicable Debtor (including any Converting Debtor) until adjudicated by the Court (Plan § 1.1 (definitions of ABL Collateral Trust Assets, DIP Collateral Trust Assets, and Litigation Trust Assets)); and

(vi) extending various dates and deadlines, including moving up the Plan Supplement deadline to provide 10 days before the objection deadline (Disclosure Statement Order § 50).

5. As a result of these efforts, the Debtors believe the revised Disclosure Statement and Plan resolve many of the objections to conditional approval of the Disclosure Statement.

6. Attached hereto as **Exhibit A** is a chart listing the issues raised in each Objection and the Debtors' response thereto (the "**Objection Chart**"). The Debtors also respond to Objections (i) arguing the Plan is patently unconfirmable (many of which are premature and merely disguised objections to the Global Settlement and or confirmation of the Plan) and (ii) to the proposed confirmation schedule.

7. For the reasons set forth herein, the Court should approve the Disclosure Statement and allow solicitation of the Plan to proceed on the Debtors' proposed schedule.

## Reply

### I. THE PLAN IS NOT PATENTLY UNCONFIRMABLE.

8. Certain of the Objections are not objections to the adequacy of the information provided in the Disclosure Statement, but are objections to the Plan and/or Global Settlement that should be deferred to the Confirmation Hearing and considered at that time. *See, e.g.*, *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings."); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("[T]he Court will not look behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement.").

9. Nevertheless, for the reasons set forth below, none of these Objections provide a basis to deny approval of the Disclosure Statement or confirmation of the Plan.

**a.** **The Debtors Have Revised the Criteria for Ineligible Creditors.**

10. Multiples parties have objected to the Disclosure Statement and Plan on the basis that the definition of Ineligible Creditors under the Plan includes parties that file an objection to the Plan or Global Settlement. Certain of these parties also object to the standard for determining whether a creditor is an Ineligible Creditor. As noted above, the definition of Ineligible Creditor has been modified to (i) remove the filing of an objection to the Plan or Global Settlement as a basis for ineligibility (*i.e.*, parties may object to the Plan and Global Settlement without losing "Eligible Creditor" status) and (ii) provide that a Person is an Ineligible Creditor only if it holds a claim subject to disallowance under section 502 or subordination under the Bankruptcy Code or applicable law. The definition of Ineligible Creditor now reads:

> "**Ineligible Creditors**" means (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests. For the avoidance of doubt, DIP Secured Parties, First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are not and will not be deemed or construed to be Ineligible Creditors.

11. Accordingly, these Objections are now moot.

**b.** **The Plan Does Not Contravene the Bankruptcy Code's Priority Scheme**

12. The U.S. Trustee, TQL, and certain other parties argue that the Plan is patently unconfirmable because administrative, priority, and general unsecured creditors are

treated *pari passu* under the Litigation Trust Waterfall, purportedly in violation of the Bankruptcy Code's priority scheme.[4] These objections are incorrect for a number of reasons.

13. These objections take exception with the Global Settlement, not the Plan. The Plan provides for payment in full of the Administrative Expense Claims and Priority Claims against the Plan Debtor in accordance with section 1129(a)(9) of the Bankruptcy Code. The Global Settlement provides for (among other things) the sale of Estate Claims to the DIP Secured Parties in exchange for a credit bid of certain of their DIP A Claims. In addition, the DIP Secured Parties have provided a number of other concessions and value to the Debtors' estates under the Plan, which are not cost-neutral to the DIP Secured Parties. For example, following the sale of the Estate Claims, the DIP Lenders have agreed to contribute the acquired Estate Claims into the Litigation Trust that will prosecute such claims and pursue proceeds to be distributed to creditors, including the administrative, priority, and general unsecured creditors of the FBG Debtors, in accordance with the Litigation Trust Waterfall instead of owning those Estate Claims outright. In addition, the holders of DIP A Claims are funding the Litigation Trust with the Litigation Trust Backstop Parties providing a backstop to such funding, ensuring that Eligible Creditors are able to participate in a fully capitalized Litigation Trust. Absent the Global Settlement, the DIP Secured Parties would assert an entitlement to credit bid their secured claims (or foreclose) to become the outright, indefeasible owner of substantially all of the FBG Debtors' assets without any obligation to monetize assets for the benefit of other creditors.[5]

---

[4]    *See* U.S. Trustee Obj. ¶¶ 26–32; TQL Obj. ¶ 16.

[5]    *See Preferred Display, Inc. v. CVS Pharmacy, Inc.*, 923 F.Supp.2d 505, 511 (S.D.N.Y. 2013) (noting that under New York Law, where a secured party instituted the public sale of collateral and then purchased the collateral itself, the sale "terminated any subordinate interests in the collateral"); *Atlas MF Mezzanine Borrower, LLC v. Macquarie Texas Loan Holder LLC*, 105 N.Y.S.3d 59, 65–66 (2019) (noting that pursuant to the New York Uniform Commercial Code, a secured party's disposition of collateral after a default "(1) transfers to a transferee for value all of the debtor's rights in the collateral; (2) discharges the security interest under which the disposition is made; and (3) discharges any subordinate security interest or other subordinate lien") (citing N.Y.U.C.C. § 9–

14. The absolute priority rule is not implicated here. All priority creditors of the Plan Debtor are being paid in full or otherwise receiving the treatment prescribed by section 1129 of the Bankruptcy Code. Administrative and priority creditors of the FBG Debtors are not receiving any treatment under the Plan. Rather, all Eligible Creditors of the FBG Debtors are receiving entitlements to Litigation Trust Interests under the Global Settlement. None of the objectors point to any requirement that priority creditors of any Debtor other than the Plan Debtor must be treated similarly to the priority creditors of the Plan Debtor. They are not creditors of the Plan Debtor. Such creditors do, however, maintain their claims against their Debtors—the FBG Debtors—and retain any rights they may have in the subsequent chapter 7 cases of those Debtors.

15. Moreover, none of the proposed recoveries for the FBG Debtors' claimants are estate assets. The Litigation Trust Assets will be acquired by the DIP Secured Parties pursuant to the Estate Claim Credit Bid Transaction (if it constitutes the highest or otherwise best offer following the marketing process) from the FBG Debtors and subsequently contributed to the Litigation Trust. Litigation Trust interests will then be issued to creditors of the Plan Debtor and Eligible Creditors of the FBG Debtors. These assets will be monetized and distributed to the Litigation Trust beneficiaries in accordance with the Litigation Trust Waterfall. These distributions are not a "gift of estate property." Rather, they will be distributions on account of assets that were purchased under section 363 of the Bankruptcy Code by the DIP Secured Parties

---

617(a)(1)–(3)); *SR Construction, Inc. v. Palm Springs II, LLC (In re Palm Springs II), LLC*, No. 20-CV-3486 (JJB), 2021 WL 5331001, *9–10 (Bankr. S.D. Tex. 2021) (where a sale of the debtor's estate assets occurred and a secured creditor was the highest or only bidder via a credit bid, the secured party becomes the owner of the assets following the closing of the sale, leaving "other creditors with nothing"); *United Mine Works of America Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1153 (11th Cir. 2018) ("If the secured creditors submit the highest (or only) bid for the company and acquire the bankruptcy estate's assets, the creditors are, in effect, able to use the § 363 sale to trade their debt for control of the business.").

and transferred to the Litigation Trust.[6] Ultimately, any distributions from the Litigation Trust are distributions of **proceeds from the DIP Secured Parties' properly acquired property**, which would not be property of the Debtors' estates following the sale and therefore not subject to the absolute priority rule.[7]

16.     *Moreover*, even if the proceeds from the Litigation Trust Assets were property of the estate, in the Fifth Circuit, "[s]enior creditors may share proceeds with junior creditors as long as the junior creditors receive what they would have received otherwise without such sharing."[8] Under this precedent, it is permissible for a senior creditor to share its own recovery with junior creditors, so long as any non-consenting creditor still receives whatever recovery it would have received (if anything) notwithstanding the gifting.[9]

---

[6]     *See In re ICL Holding Co.*, 802 F.3d 547, 555–56 (3d Cir. 2015) (finding that payments from secured lender group directly to unsecured creditors from trust funded by secured lender group did not qualify as estate property); *In re Com. Loan Corp.*, 363 B.R. 559, 565 (Bankr. N.D. Ill. 2007) ("On confirmation, the bankruptcy estate ceases to exist unless the plan provides otherwise" and claims which were transferred to a trust at confirmation "no longer belonged to the estate" as of the transfer); *Globaleyes Telecommunications, Inc. v. Verizon N., Inc.*, 425 B.R. 481, 496 (S.D. Ill. 2010) ("the confirmation of a Chapter 11 plan ends the existence of the bankruptcy estate. . . .").

[7]     *See In re ACI Concrete Placement of Kansas, LLC*, 604 B.R. 400, 407 (Bankr. D. Kan. 2019) (finding that payment of fees did not violate the Code's priority rules or *Jevic* where those fees were being paid from carve-out funds that constituted a secured lender's collateral, and which would otherwise be distributed to the secured lender).

[8]     *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 321–21 (Bankr. S.D. Tex. 2024); *see also In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) ("The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive as least as much as what they would without the sharing. For instance, a secured creditor could share its proceeds with unsecured creditors whose priority came behind that of the IRS.").

[9]     *See In re Idearc Inc.*, 423 B.R. 138, 172 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) (confirming plan that provided a gift to a junior class because it was "being gifted from [a secured lender's] collateral—and will not be made from the Debtors' assets"); *In re Basic Energy Servs., Inc.*, No. 21-9002 (DRJ) (Bankr. S.D. Tex Nov. 8, 2021) (Docket No. 686) (approving global settlement that established a pool for the recoveries of general unsecured creditors funded by secured noteholders); *In re ADPT DFW Holdings LLC*, No. 17-31432 (SGJ) (Bankr. N.D. Tex. Sept. 29, 2017) (Docket No. 822) (confirming plan and approving settlement that provided holders of common equity interests an opportunity to release their claims and causes of action against the debtors' secured lender in exchange for the opportunity to share in recoveries from a litigation trust).

17. Notably, the FBG Debtors believe that under the Global Settlement, all relevant claimants (including administrative, priority, and unsecured creditors of the FBG Debtors) will receive more than what they would have otherwise received absent the settlement. Accordingly, absent the settlement, recoveries for junior creditors (including administrative and priority creditors) from the Litigation Trust Assets (or any other assets) would almost certainly be zero.

18. On the other hand, under the Global Settlement, Eligible Creditors will receive Litigation Trust Interests that permit them to receive proceeds from the monetization of the Litigation Trust Assets. This value is not illusory—subject to the claims acceptance and reconciliation processes contemplated under the Plan and Global Settlement, Eligible Creditors begin sharing in distributions after the Litigation Trust has distributed $400 million of aggregate proceeds to other beneficiaries, well in advance of repayment of the approximately $1.4 billion of outstanding New Money DIP Loans. Accordingly, the Global Settlement is permissible as administrative, priority, and unsecured creditors are no worse off.

19. That conclusion is not altered by *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). There, the Supreme Court held that bankruptcy courts may not approve structured dismissals of chapter 11 cases that provide for the distribution of estate property in violation of the Bankruptcy Code's priority scheme without the consent of affected creditors.[10] However, as explained above, the distributions are not estate property. Additionally, the ruling in *Jevic* was limited to structured dismissals. There is no dismissal, structured or otherwise, involved in the Global Settlement. Rather, the Global Settlement is integrated into and effectuated

---

[10] *Id.* at 455.

9

by (i) a chapter 11 plan for the Plan Debtor, and (ii) conversion to chapter 7 for the Converting Debtors. That puts the Global Settlement outside the ambit of *Jevic*.[11]

20. Further, the facts of *Jevic* are easily distinguished. Of many notable differences, in *Jevic*, the proposed settlement included a release of a fraudulent transfer claim asserted by the unsecured creditors' committee on the estate's behalf and such claim was unencumbered (*i.e.*, neither the claim nor the proceeds were subject to a lien).[12] Therefore, by releasing the claim, the non-consenting priority creditors were made worse off by the settlement, as they otherwise would have had superior rights in the proceeds of the claim being disposed of under the settlement.[13] In other words, the dissenting creditors' only chance of recovery was eliminated by the settlement.[14] Here, the DIP Secured Parties have superpriority liens on the Litigation Trust Assets, making the proposed distributions a carve out from the DIP Secured Parties' collateral. Moreover, unlike *Jevic*, the benefits of the Global Settlement inure to all junior creditors (including administrative creditors).

21. Finally, the Global Settlement is undoubtedly in furtherance of significant Bankruptcy Code objectives.[15] Unlike *Jevic*, rather than skipping a class of priority creditors

---

[11] *See id.* at 456 ("It is important to keep in mind that Chapter 11 foresees three possible outcomes. The first is a bankruptcy-court-confirmed plan. . . . The second possible outcome is conversion of the case to a Chapter 7 proceeding. . . . The third possible outcome is dismissal of the Chapter 11 case.").

[12] *See In re Jevic Holding Corp.,* 787 F.3d 173, 176 (3d Cir. 2015), as amended (Aug. 18, 2015), *rev'd and remanded sub nom. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017).

[13] *Jevic*, 580 U.S. at 463–64.

[14] *Id.* at 462 ("Respondents concede that the structured dismissal approved by the Bankruptcy Court contained distribution conditions that skipped over petitioners, ensuring that petitioners received nothing on their multimillion-dollar WARN claim against the Jevic estate.").

[15] In the process of explaining its holding, the Supreme Court in *Jevic* acknowledged in dicta that there are judicially-created exceptions to the absolutely priority rule not specifically found in the Bankruptcy Code, but which advance "significant Code-related objectives." *Jevic*, 580 U.S. at 468 (discussing "'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims."). The Supreme Court noted that such permissible distributions tend to "enable a successful reorganization and make even the disfavored creditors better off." *Id.* (internal quotations omitted)

entirely, the proposed Litigation Trust Waterfall includes administrative and priority creditors as Eligible Creditors, who begin recovering on their claims after only $400 million in recoveries by other beneficiaries under the Global Settlement. Such recoveries are in excess of the anticipated recoveries that such creditors would likely otherwise receive in a crash conversion to chapter 7 by all Debtors and an attendant foreclosure by the DIP Secured Parties and ABL Secured Parties on their respective collateral. Such a result would be value destructive, and all creditors would be worse off than what is provided under the Global Settlement.

### c.     The Global Settlement is Not a Sub Rosa Plan

22.     The U.S. Trustee and LAM argue that the Plan is patently unconfirmable due to the terms of the Global Settlement creating a *sub rosa* plan.[16] This objection is misplaced for a number of reasons.

23.     First, the Debtors are not seeking approval of the Global Settlement at the Disclosure Statement hearing. Rather, as disclosed in the Disclosure Statement, the FBG Debtors intend to file a motion seeking approval of the Global Settlement in the near term and will ask to have it heard at the Confirmation Hearing.

24.     In any event, the Global Settlement does not constitute a *sub rosa* plan. Quite the opposite; it is a foundational building block for, and incorporated into, the Plan, which will be solicited and voted on and will otherwise be subject to all requirements under section 1129 of the Bankruptcy Code.[17] The Global Settlement would provide essential funding and a

---

(citing *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004)); *see also Toibb v. Radloff*, 501 U.S. 157, 163 (1991) ("Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate.").

[16]     *See* U.S. Trustee Obj. ¶¶ ¶¶ 28–32; LAM Obj. ¶ 43.

[17]     *See In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014) (noting that "a settlement agreement which is a 'necessary step toward, or building block of, a plan of reorganization' does not constitute in improper sub rosa plan"); *In re River Canyon Real Est. Invs., LLC*, No. 12-20763 (EEB) 2010 WL 11833506 at *26 (Bankr. D. Colo. 2010) (holding settlement that transferred debtors' ownership in collateral was not a sub rosa plan over senior lienholders' objection because "no provision [] would wipe out the liens of other creditors," and

11

framework to enable the monetization of the FBG Debtors' remaining undisputed assets. Most importantly, the Global Settlement provides for the transfer of estate claims and causes of action of the FBG Debtors to the Litigation Trust for prosecution by the Litigation Trustee, which will be funded with at least $75 million ($25 million from the DIP Lenders' cash collateral and $50 million in committed funding). In connection with the Global Settlement, the Litigation Trust will distribute any recoveries from Litigation Trust Assets in accordance with the Litigation Trust Waterfall. Although approval of the Global Settlement will be sought concurrently with Plan confirmation, the Global Settlement is a necessary stepping stone of the Plan and it complies with the Bankruptcy Code. All FBG Creditors rights as to their original FBG Debtor are fully preserved, without offset for recoveries they may obtain through the Litigation Trust Waterfall. If any assets are ultimately not Litigation Trust Assets and remain behind at the applicable FBG Debtor – because of an ownership dispute or otherwise – neither the Global Settlement nor the Plan Debtors' Plan impacts creditor rights at the FBG Debtors' estates.

25. A "sub rosa" plan is any agreement that operates as a disguised plan that effectively "short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan."[18] In *Braniff*, the Fifth Circuit held a proposed transaction was a sub rosa plan because it would have disposed of substantially all of the debtor's assets and left "little prospect or occasion for further reorganization."[19]

---

given that the settlement was being prosecuted at the same time as the plan itself, objections regarding "automatic stay provisions" or sub rosa plan concerns should be resolved).

[18] *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983); *see also Bergemann, Inc. v. Babcock and Wilcox Co. (In re Babcock and Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) (stating a sub rosa plan "gut[s] the bankruptcy estate before reorganization or [changes] the fundamental nature of the estate's assets in such a way that limits a future reorganization plan").

[19] *In re Braniff*, 700 F.2d at 940.

26.     The Fifth Circuit also "reject[s] sub rosa arguments where the transaction in question 'does not alter creditors' rights, dispose of assets and release claims to the extent proposed in the wide ranging transaction disapproved in *Braniff*.'"[20]  And the Fifth Circuit in *Braniff* even acknowledged that the Bankruptcy Code "provides for certain adjustments in the rights of creditors pursuant to a valid § 363 transaction in order to provide 'adequate protection' to secured creditors."  *In re Braniff*, 700 F.2d at 940 n.2.

27.     The Global Settlement is not an impermissible sub rosa plan, is distinct from *Braniff*, and does not "predetermin[e] the terms and conditions of any plan" for the FBG Debtors.  Unlike *Braniff*, where the proposed settlement (i) only permitted the debtor to distribute assets (travel script) to certain parties (employees and shareholders) under any future plan and (ii) required the secured creditors to vote a portion of their claims in favor of *any* future chapter 11 plan supported by the creditors' committee, the Global Settlement does not (x) dictate the terms of a future plan because the FBG Debtors (other than the Plan Debtor) will have their chapter 11 cases converted to chapter 7 on the Effective Date,[21] and (y) require any party to vote in favor of the proposed Plan.  Further, Eligible Creditors who receive the benefits of the Global Settlement will retain all claims they have against the applicable FBG Debtors and the third-party releases are limited and consensual (by affirmatively opting in), unlike the broad releases of all claims sought in *Braniff*.

28.     The U.S. Trustee's sub rosa objection relies heavily on *In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex 2009), where the court denied a proposed section 363

---

[20]     *In re ASARCO LLC*, No. 05-21207 (RSS), 2009 WL 8176641, at *48 (Bankr. S.D. Tex. June 5, 2009) (quoting *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Electric Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997)).

[21]     *Cf. Braniff*, 700 F.2d at 940 (denying settlement because it would have "establish[ed] the terms of the plan sub rosa in connection with the sale of assets").

sale for substantially all of the debtor's assets outside the confirmation process because the sale lacked a sufficient business justification and would only benefit the debtor's secured lender. Here, (i) the proposed sale is being conducted in connection with the confirmation process, (ii) there is a valid business justification for consummating the sales now based on the DIP Secured Parties' rights to exercise remedies and take outright ownership of the assets, and (iii) the proposed sale would benefit all creditors, including junior administrative, priority, and general unsecured creditors.

29. Accordingly, the Plan and Global Settlement, taken together, are not impermissible *sub rosa* plans of the FBG Debtors.

### d. The Plan's Treatment of Administrative Expense Claims Complies with the Bankruptcy Code and the DIP Order.

30. The U.S. Trustee and TQL argue the Plan is not confirmable because it does not provide for the payment in full of all Administrative Expense Claims against all Debtors.[22] The Plan, however, is not a joint plan; rather, it is proposed by only the Plan Debtor and treats only Claims against and Interests in the Plan Debtor, including Administrative Expense Claims against the Plan Debtor. Indeed, the Plan provides for payment in full in cash of all Allowed Administrative Expense Claims against the Plan Debtor, as required by section 1129(a)(9) of the Bankruptcy Code.[23] There is no requirement under the Bankruptcy Code that a plan proposed by one debtor provide for the payment of all priority claims against any affiliated debtor. Therefore, this objection should be overruled.

31. Additionally, the U.S. Trustee and TQL argue the Plan and Global Settlement violate the provisions of the DIP Order that provide for the funding of the

---

[22] *See* TQL Obj. ¶ 16.

[23] *See* Plan § 2.1(a).

Administrative Expense Claims Basket.[24]  However, the Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the plain language of the DIP Order, claims that qualify under the Administrative Expense Claims Basket are only payable "following the indefeasible payment in full in cash of the New Money DIP Loans."[25]  Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash," as required to trigger the Administrative Expense Claims Basket pursuant to the DIP Order,[26] because holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for certain of their DIP A Claims.  A DIP Lenders' agreement to take *per se* impairment on the repayment of new, postpetition capital—particularly where the magnitude of such fresh capital exceeds one billion dollars—is a concession that cannot be overstated and should not be overshadowed.  The arguments raised in the Objections ignore the terms of the DIP Order (including that this Plan does not trigger the Administrative Expense Claims Basket, which would only be important absent impairment of DIP A Claims).

32.     Moreover, these Objections also overlook that the DIP Secured Parties would likely take outright ownership of the Estate Claims if the Global Settlement is not approved.  The Administrative Expense Claims Basket, therefore, would not be triggered in any alternative scenario.

33.     Accordingly, these Objections also should be overruled.

---

[24]  *See* UST Obj. ¶ ¶ 37–38; TQL Obj. ¶ 13.

[25]  *See* DIP Order ¶ 8(b) (emphasis added).

[26]  "When construing an agreed or negotiated form of order . . . the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."  *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011); *see also In re Sanchez Energy Corp.*, No. 19-34508, 2022 WL 2912076, at *5 (Bankr. S.D. Tex. July 22, 2022) ("Contract terms should be given their plain, ordinary meaning."); *In re Celsius Network LLC*, 649 B.R. 87, 98 (Bankr. S.D.N.Y. 2023) ("When a contract's terms are unambiguous, courts apply them as written.").

e.      **The Estate Claims Credit Bid Is Not Improper.**

34.     The U.S. Trustee alleges in its Objection that the DIP Secured Parties are prohibited from credit bidding on Avoidance Actions because their liens only extend to the proceeds of the Avoidance Actions and not the actions themselves.  This Objection cannot withstand scrutiny.  Although the DIP Secured Parties only have a lien on proceeds of Avoidance Actions, they can still cash bid to purchase those claims outright and doing so would be the functional equivalent of a credit bid.  Any cash payment for the Avoidance Actions would itself constitute Avoidance Proceeds,[27] which would then be paid right back to the DIP Secured Parties to reduce their claims.  There is no prohibition in the Bankruptcy Code from a debtor accepting claims reduction as a form of consideration for a sale.

f.    **The Plan Does Not Effectuate a Substantive Consolidation.**

35.     LAM's objection suggests a presumption that the Debtors are or will be substantively consolidated, such that they are improperly severing the Plan Debtor from all other Debtors, or selectively substantively consolidating for some purposes but not others.  *See* Docket No. 2705 ¶¶ 36–42.  LAM points to the Examiner's preliminary determination that "[t]here are colorable claims for substantive consolidation of First Brands and its affiliated debtors."  *Id.* ¶ 37.

36.     Neither the Plan nor the Global Settlement substantively consolidate any of the FBG Debtors' cases.  Through the Global Settlement and the transactions contemplated thereunder, as with numerous other disputes, the Debtors seek to settle and resolve any issues

---

[27]     "***Avoidance Proceeds***" under the DIP Order means "any property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise."  DIP Order ¶ 8(a).

16

surrounding substantive consolidation of the FBG Debtors without the cost and expense of litigating such issues.[28]

37.      Morerover, substantive consolidation would not provide any benefit to the Debtors or their creditors.  Whether the FBG Debtors are substantively consolidated or not, nearly all their assets (including Estate Claims or the proceeds thereof) are, at a minimum, encumbered by senior DIP liens securing approximately $2.5 billion in aggregate DIP Claims (*i.e.*, approximately $1.4 billion in DIP A Claims and $1.1 billion in Roll-Up Claims) before even addressing the remaining balance of Roll-Up Claims or the substantial security interests of the Prepetition Secured Parties.  Other of the FBG Debtors' assets are encumbered by liens securing the full amount of outstanding DIP Obligations (approximately $5 billion) and prepetition term loan claims ($2.5 billion), totaling approximately $7.5 billion.  As an alternative to the Debtors' secured lenders obtaining relief from the automatic stay to foreclose on substantially all their assets, the Debtors have put forth the Plan and Global Settlement to monetize their remaining assets and so that ***all creditors*** have an opportunity to share in assets of the estates.  As the Debtors will show, this is the best (and likely only) path available to distribute estate assets to anyone but senior secured lenders.

## II.      THE PROPOSED CONFIRMATION TIMELINE SHOULD BE APROVED.

38.      TQL objects to the Debtors' proposed confirmation timeline, and argues that the proposed opt-out deadline requires creditors to make irrevocable elections and grant broad third-party releases before the Court determines whether the plan is confirmable and before information contained in the Plan Supplement becomes available.[29]  *First*, under the proposed

---

[28]    All rights and obligations of the SPV Debtors are untouched by the Global Settlement, including surrounding substantive consolidation.

[29]    *See* TQL Obj. ¶ 21.

Plan, as amended, Eligible Creditors do not have to make any election or grant any releases to be eligible to receive Class 3(b) Litigation Trust Interests. *Second*, under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which provides ample time for Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors to review the Plan, Plan Supplement, and related materials and make an informed decision regarding whether to contribute their direct claims to the Litigation Trust for prosecution and opt-in to the limited Third-Party Releases under the Plan in exchange for receiving the benefits of the Preference Settlement, including a waiver of Preference Actions against Trade Creditors and the Modified New Value Element for Supply Chain Financers and Factors. *Third*, despite TQL's assertion, the Third-Party Releases that creditors may **opt-in** to under the Plan are narrow and do not contemplate releasing the FBG Debtors (besides the Plan Debtor).

39. The Debtors filed the original versions of the Plan and Disclosure Statement approximately three weeks ago. Under the Debtors' amended proposed confirmation and solicitation timeline, which extends the timeline by nineteen (19) days, the Plan Supplement will be filed on June 1, 2026 and the Voting Deadline and Combined Objection Deadline will be on June 10, 2026. Thus, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline.[30]

---

[30] *See Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. June 2, 2025) (Docket No. 5036) (providing for a Plan Supplement filing deadline 7 days before the voting deadline); *ConvergeOne Holdings, Inc.*, No. 24-90194 (CML) (Bankr. S.D. Tex. Apr. 4, 2025) (Docket No. 81) (providing for a Plan Supplement filing deadline 8 days before the voting deadline); *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Nov. 19, 2024) (Docket No. 71) (providing for a plan objection deadline 2 days after the deadline to file the plan supplement); *In re DRF Logistics, LLC*, No. 24-90447 (Bankr. S.D. Tex. Sep.. 24, 2024) (Docket No. 276) (providing for a Plan Supplement filing deadline 7 days before the Voting Deadline); *In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Nov. 17, 2023) (Docket No. 1447) (providing for a Voting Deadline that was 5 days after the Plan Supplement Filing Deadline and a confirmation hearing scheduled 7 days after the Plan

40.     Finally, no creditors whose votes are being solicited to make an informed decision are prejudiced by the Debtors' proposed confirmation and solicitation timeline.  Notably, only the Plan Debtor's creditors holding Roll-Up Claims, First Lien Claims, Second Lien Claims, ABL Claims, and General Unsecured Claims (which consists of only one general unsecured creditor, with which the Debtors are discussing a settlement regarding the Allowed amount of such claim) are entitled to vote to accept or reject the Plan.  Besides the Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors, who have until forty-five (45) days after the Effective Date to opt-in to the Preference Settlement, no other creditors have any vote, election, or decision to make whatsoever regarding their claim in the proposed confirmation and solicitation timeline.  Therefore, the universe of applicable interested parties that must make an informed decision is relatively small and the Debtors' proposed confirmation and solicitation timeline is appropriate.

41.     Accordingly, the Debtors submit that their proposed solicitation and voting procedures are consistent with the Bankruptcy Code and prior practices of this Court and should be approved.

## Conclusion

42.     For the reasons set forth herein and in the Motion, the Debtors respectfully request that the Court approve the Disclosure Statement on a conditional basis.

---

Objection Deadline); *In re Basic Energy Servs. Inc.*, No. 21-90002 (CML) (Bankr. S.D. Tex. Jun. 28, 2022) (Docket No. 1272) (providing for a Plan Supplement filing deadline of 5 days before the Voting Deadline and a Plan Objection Deadline that was 6 days before the confirmation hearing); *In re Benefytt Technologies, Inc.*, No. 23-90566 (Bankr. S.D. Tex. Nov. 17, 2023) (Docket No. 330) (providing for a plan supplement filing deadline of 7 days before the voting deadline and a plan objection deadline that was 5 days before the confirmation hearing).

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested in the Motion and such other and further relief as the Court may deem just and appropriate.

Dated: May 20, 2026
      Houston, Texas

*/s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: gabriel.morgan@weil.com
      clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: matt.barr@weil.com
      sunny.singh@weil.com
      andriana.georgallas@weil.com
      kevin.bostel@weil.com
      jason.george@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on May 20, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Clifford W. Carlson_
Clifford W. Carlson

**<u>Exhibit A</u>**

**Objection Chart**

*In re First Brands Group, LCC, et al.*
CH. 11 CASE NO. 25-90399 (CML)

SUMMARY CHART OF OBJECTIONS TO PROPOSED DISCLOSURE STATEMENT AND DEBTORS' RESPONSES[1]

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| **Filed Objections and Reservations of Rights** | | | | |
| 1. | [2647] | Total Quality Logistics, LLC ("**TQL**") | i. TQL asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | |
| | | | a. A valuation of the litigation trust and recovery estimates for administrative expense claims, making it impossible for creditors to make informed judgments about the plan. (¶ 10). | Recovery estimates from the Litigation Trust would necessarily reflect attorney evaluations of claims and likelihood of settlement, are protected by attorney-client privilege and the work-product doctrine, and would prejudice the Debtors' ability to monetize Estate Claims. *See* Disclosure Statement §§ I.A.1, IV.K. The Disclosure Statement nonetheless provides Illustrative Recovery Scenarios sufficient to enable Eligible Creditors to evaluate expected distributions from the Litigation Trust at varying levels of distributable proceeds. *See* Disclosure Statement § I.A.1(c); Ex. F (Illustrative Recovery Scenarios). |
| | | | b. How non-voting administrative expense creditors are protected when the plan eliminates their statutory priority rights through an opt-out mechanism. (¶ 20). | The Plan provides for payment in full in cash of all Allowed Administrative Expense Claims against the Plan Debtor, as required by section 1129(a)(9) of the Bankruptcy Code. *See* Disclosure Statement § I.E. Holders of Administrative Expense Claims against any FBG Debtor (other than the Plan Debtor) are not bound by any opt-out mechanism; if such creditors are Eligible Creditors, they may provide written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation trust Interest. If they choose to provide such written notice, they retain their claims against the applicable FBG Debtors, and their claims will be treated in accordance with the priority scheme under chapter 7 of the Bankruptcy Code. *See* Disclosure Statement §§ I.A.1(e); I.B.1. |
| | | | c. The amount of the two proposed credit bid amounts, which are necessary for creditors to determine whether DIP lenders will be made whole and what realistic recovery electing creditors can expect. (¶ 13). | The Disclosure Statement provides disclosure regarding the Estate Claims Credit Bid Transaction and the DIP Collateral Credit Bid Transaction, including the parties, collateral, and process by which the DIP Secured Parties will credit bid. *See* Disclosure Statement §§ I; IV.P.2–3. The Disclosure Statement provides that the Debtors anticipate |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Reply in Support of Disclosure Statement Motion* to which this chart is attached (the "**Reply**"), the applicable Objection, the Plan, or the Disclosure Statement, as applicable. This chart summarizes certain key issues raised in the Objections. To the extent that an Objection or a specific point raised in an Objection is not addressed herein, the Debtors reserve the right to respond to such Objection at the Combined Hearing.

| Filed Objections and Reservations of Rights | | | | | |
|---|---|---|---|---|---|

| | | | | | that the amounts of the Credit Bids will be disclosed no later than the filing of the Plan Supplement. *See* Disclosure Statement §§ I.A.4. |
|---|---|---|---|---|---|
| | | | d. How a non-operating entity with no assets other than undetermined interests in insurance policies and investments, no gross revenue, and only one unsecured creditor, has authority or standing to propose a plan that eliminates the priority rights of creditors of the other Debtor entities. (¶ 18). | | The Disclosure Statement explains that the Plan does not eliminate the priority rights of creditors of the other FBG Debtors. As the Plan Debtor, Premier Marketing Group, LLC is authorized under section 1121 of the Bankruptcy Code to propose its own plan, which incorporates a Global Settlement that may affect the FBG Debtors' estates with their consent and Court approval. Creditors of the FBG Debtors (other than the Plan Debtor) may provide written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation trust Interest. If they choose to provide such written notice, they retain their claims against the applicable FBG Debtors, and their claims will be treated in accordance with the priority scheme under chapter 7 of the Bankruptcy Code. *See* Disclosure Statement §§ I.A.1(e); I.B.1. |
| | | | ii. TQL asserts that the Disclosure Statement violates the DIP Order by failing to explain how it will satisfy the requirement to pay administrative expense claims of all DIP Loan Parties before paying Roll-Up Obligations, as the Disclosure Statement only addresses payment of the Plan Debtor's administrative expenses. (¶¶ 11–12). | | The Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the DIP Order, the Administrative Expense Claims Basket is only triggered "following the indefeasible payment in full in cash of the New Money DIP Loans." *See* DIP Order ¶ 8(b). Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash." Rather, holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for their DIP A Claims. |
| | | | iii. TQL asserts that the Disclosure Statement contains contradictions regarding the effect of inaction by Eligible Creditors, stating both that creditors who do not opt out "shall retain all of its rights and claims" while also providing that inaction results in automatic enrollment as an "Electing Creditor" in the Litigation Trust, creating confusion about whether creditors preserve or waive their rights. (¶¶ 14–15). | | The Disclosure Statement clarifies that all Eligible Creditors will receive Class 3(b) Litigation Trust Interests on account of their Eligible Creditor Claims, subject to a Claim acceptance process administered by the GUC Ombudsman, and may receive distributions from the Litigation Trust in accordance with the Litigation Trust Agreement and the Plan. Eligible Creditors are not required to opt in or to submit any election form to receive Class 3(b) Litigation Trust Interests; such Eligible Creditors may choose not to participate in the Global Settlement at any time by providing written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interest. *See* Disclosure Statement § I.  The Plan only contemplates an "opt in" structure for Trade Creditors, Supply Chain Financers, and Factors that have the option to participate in the "Preference Settlement." Pursuant to this structure, such creditors are given the option to opt in to and receive the benefits of the Preference Settlement, in exchange for which such creditors will (i) consent |

2

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| | | | | | to the third-party releases contained in the Plan and (ii) contribute all of their Direct Creditor Claims to the Litigation Trust. *Id.* |
| | | | iv. TQL asserts that because no bar date for filing proofs of claim has been established, the estimated $5.6 billion in general unsecured claims and $223 million in administrative expense claims are based solely on the Debtors' books and records, preventing creditors from assessing their pro-rata share and making informed election decisions. (¶ 19). | No bar date is required to be set before solicitation. *See, e.g.*, *In re Hornblower Holdings LLC*, No. 24-90061 (MI) (Bankr. S.D. Tex. Apr. 16, 2024) (Docket No 549) (approving disclosure statement on conditional basis where debtors solicited based on their Schedules and proofs of claim filed before the Voting Record Date). Nevertheless, the Disclosure Statement, as amended, provides that the Debtors estimate that potential Eligible Creditor Claims total approximately $5.9 billion, consisting of $223 million in Administrative Expense Claims, $77 million in Priority Tax Claims and Other Priority Claims, and $5.6 billion in General Unsecured Claims. See Disclosure Statement § I.B.4. The Disclosure Statement also discloses the risk that these estimates may be too high or low. § V.A.8.<br><br>To determine the amount of potential Eligible Creditor Claims, the Debtors conducted a thorough analysis of their books and records. The Disclosure Statement also provides sufficient information regarding the process for reconciling Eligible Creditor Claims, which will be conducted by the GUC Ombudsman pursuant to Reconciliation Procedures to be agreed upon by the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee. Because the reconciliation of Eligible Creditor Claims will be performed by the GUC Ombudsman after the Effective Date, Eligible Creditors are not prejudiced, since their claims will be addressed in accordance with the Bankruptcy Code and Reconciliation Procedures<br><br>Finally, the Disclosure Statement provides Illustrative Recovery Scenarios from which creditors may evaluate potential recoveries; the absence of a bar date does not preclude approval of the Disclosure Statement. *See* Disclosure Statement, Ex. F. |
| | | | v. TQL asserts that the proposed opt-out deadline requires creditors to make irrevocable elections and grant broad third-party releases before the Court determines whether the plan is confirmable and before critical plan supplement information becomes available. (¶ 21). | As explained in the Reply, the Debtors filed the original versions of the Plan and Disclosure Statement approximately three weeks ago. Under the Debtors' amended proposed confirmation and solicitation timeline, which extends the timeline by nineteen (19) days, the Plan Supplement will be filed on June 1, 2026 and the Voting Deadline and Combined Objection Deadline will be on June 10, 2026. Thus, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and |

3

| **Filed Objections and Reservations of Rights** | | | | |
|---|---|---|---|---|
| | | | | Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| 2. | [2705] | Leucadia Asset Management LLC, acting through its Point Bonita Capital Division, LAM Trade Finance Group LLC, and LAM TFG I SPV LLC (the "**LAM Parties**") | i.  The LAM Parties assert the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding:<br><br>***\* The Debtors believe the changes made to the Disclosure Statement resolve the LAM Parties' objection, subject to the LAM Parties' confirmation.*** | The LAM Parties' Objection raises confirmation-stage issues—substantive consolidation, the Eligible/Ineligible Creditor construct, scheduling, good-faith/section 1129(a)(3), and sub rosa—rather than disclosure adequacy.  The Debtors have nonetheless addressed the LAM Parties' principal concerns as follows:<br><br>(i)  the Disclosure Statement clarifies that the Plan is not predicated on substantive consolidation, that nothing in the Plan requires substantive consolidation of the Plan Debtor with the other FBG Debtors, and that disputed inter-Debtor and inter-creditor issues are addressed through the Global Settlement and the residual chapter 7 process (*see* Disclosure Statement §§ I.A, V);<br><br>(ii)  the definition of "Ineligible Creditor" has been amended to remove "Adverse Conduct" and is now defined as (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests;<br><br>(iii)  the Plan provision deeming any objecting party an Ineligible Creditor has been removed, so that exercising the right to object does not render a creditor an Ineligible Creditor (*see* Disclosure Statement § I.C);<br><br>(iv)  whether the Eligible/Ineligible distinction is consistent with sections 502(d) and 510 of the Bankruptcy Code, and whether the Plan satisfies section 1129(a)(3) and is not a sub rosa plan as to the non-Plan Debtors, are confirmation issues that the Debtors will address at the Confirmation Hearing; |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

**Filed Objections and Reservations of Rights**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | (v) the revised confirmation schedule provides creditors a reasonable opportunity to evaluate the Plan and Election Materials (*see* Disclosure Statement §§ I.B, I.C); and |
| | | | | | (vi) the Litigation List of Ineligible Creditors, Plan Supplement, and identification of trustees will be filed in accordance with the schedule set forth in the Disclosure Statement (*see* Disclosure Statement §§ I.A, I.C). |
| | | | a. | Whether the plan is predicated on substantive consolidation or how issues of substantive consolidation will be resolved, given the Examiner's findings. (¶¶ 36–42). | The Debtors are not substantively consolidating through the Plan or Global Settlement. The Debtors are seeking to resolve any potential substantive consolidation issues through the Global Settlement, avoiding significant litigation. As explained in ¶¶ 35–37 of the Reply, substantive consolidation provides no benefit to the FBG Debtors or their creditors, given the amount of senior liens encumbering substantially all their assets and claims. |
| | | | b. | The criteria for being deemed an Ineligible Creditor for engaging in "Adverse Conduct" and whether the Litigation Trustee has discretion to add creditors the list of Ineligible Creditors on a finding of Adverse Conduct. (¶¶ 29–31, 35). | The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" has been removed from the definition of "Ineligible Creditor." "Ineligible Creditors" now include (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests. *See* Disclosure Statement § I.C.2. |
| | | | i. | The LAM Parties assert that the distinction between Eligible Creditors and Ineligible Creditors diverge from Bankruptcy Code's disallowance and subordination provisions. (¶ 34). | *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | ii. | The LAM Parties assert that designating any creditor filing an objection as an "Ineligible Creditor" violates Section 1129(a)(3)'s good faith requirement and Section 1109(b)'s participatory rights. (¶ 46). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. | The LAM Parties assert that the confirmation timeline is unreasonable given the plan's novelty and complexity, and because critical documents including the Plan Supplement, Litigation List, and identification of trustees will not be disclosed until seven days before the objection deadline. (¶ 49). | Under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which provides ample time for Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors to review Plan, Plan Supplement, and related materials and make an informed decision regarding whether to contribute their direct claims to the Litigation Trust and opt- |

5

| | | | | | |
|---|---|---|---|---|---|
| | | | **Filed Objections and Reservations of Rights** | | |
| | | | | | in to the limited Third-Party Releases under the Plan in exchange for receiving the benefits of the Preference Settlement, including a waiver of Preference Actions against Trade Creditors and the Modified New Value Element for Supply Chain Financers and Factors.<br><br>As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | iv. | The LAM Parties assert that proposing a plan for a single debtor to resolve the FBG Debtors' chapter 11 cases is a sub rosa plan for the FBG Debtors (¶ 43). | Neither the Plan nor the Global Settlement is a sub rosa plan, but in any event, the Debtors are not seeking approval of the Plan and Global Settlement at the conditional Disclosure Statement hearing, and any such objections will be appropriately addressed at the confirmation hearing, not the conditional Disclosure Statement hearing. *See* Reply ¶¶ 22–29. |
| | | | v. | The LAM Parties request (a) a four-week advance disclosure of any Litigation List of ineligible creditors, and (b) a reasonable schedule for parties to conduct discovery and litigate confirmation issues. (¶¶ 39, 42). | As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* The Plan and Disclosure Statement have been amended such that the Litigation List construct has been removed. |
| 3. | 2712 | Katsumi Servicing, LLC ("**Katsumi**") | i. | Katsumi objects to the proposed confirmation timeline alleging that creditors are not afforded sufficient time to evaluate the Plan, the Disclosure Statement, and the documents to be filed as part of the Plan Supplement to fairly exercise their rights. (¶¶ 1–7). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj.<br><br>As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |

| Filed Objections and Reservations of Rights | | | | |
|---|---|---|---|---|
| | | | ii. Katsumi asserts The Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | |
| | | | a. The Plan's distinction between Eligible Creditors and Ineligible Creditors. (¶¶ 9–16). | *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | b. The interplay of the Adverse Conduct determination related to Ineligible Creditors and the Litigation Trust, and the Preference Settlement. (¶¶ 17–25). | The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" has been removed from the definition of "Ineligible Creditor." *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | c. The Plan's definition of ABL Collateral Trust Assets as it relates to Factors' rights to factored receivables. (¶¶ 26–30). | The Disclosure Statement outlines a clear process for addressing competing claims to inventory and accounts receivable: (i) the Factored Receivables Account established pursuant to the Cash Management Order will remain in place and continue to be administered consistent with Cash Management Order, with assets subject to a bona fide dispute held pending final adjudication; and (ii) the DIP Collateral Trust Assets and ABL Collateral Trust Assets expressly exclude any assets subject to a bona fide dispute, including disputes asserted by Evolution and other Third-Party Factors. See Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 (bona fide dispute mechanism), I.B.8 (SPV Debtor assets).<br><br>Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | d. The factual support for the Plan's releases to allow creditors to assess the reasonableness of the $400 million threshold for Litigation Trust participation. (¶¶ 31–33). | The reasonableness of the Plan and Global Settlement is an issue that will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. In any event, the Creditors' Committee, who serves as the statutory fiduciary for all general unsecured creditors, evaluated the Plan and Global Settlement and (i) recommends that holders of General Unsecured Creditors against the Plan Debtor vote to accept the Plan, (ii) supports confirmation of the Plan and approval of the Global Settlement, and (iii) recommends that all Eligible Creditors carefully evaluate the terms of the Preference Settlement, including the required contribution of Direct Creditor Claims to the Litigation Trust. |

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| | | | | iii. Katsumi argues that the Plan creates an impermissible "death trap" by rendering any creditor that files an objection to the Plan or Global Settlement an Ineligible Creditor. (¶¶ 23–24). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| 4. | 2716 | Onset Financial Inc ("**Onset**") | | i. Onset argues that it has not had sufficient time to review the Plan, Disclosure Statement, and related documents including documents to be included as part of the Plan Supplement. (¶ 19). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj. <br><br> As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | | ii. Onset objects to the conversion of the Carnaby Debtors and argues it should be permitted to develop a standalone chapter 11 plan for those debtors. (¶ 19). | The Debtors have revised the Plan to only provide for the conversion of the chapter 11 cases FBG Debtors (other than the Plan Debtor) to cases under chapter 7 of the Bankruptcy Code, and not the conversion of the SPV Debtors' chapter 11 cases. Therefore this objection is moot. Disclosure Statement § IV.P.9. The Debtors intend to convert the SPV Debtors' cases at a later time, by separate motion. |
| | | | | iii. Onset argues the Debtors do not have justification for categorically excluding those named in the Onset Complaint, those that have engaged in Adverse Conduct, or those that object to the Plan, from potential recovery on their claims against the FBG Debtors. (¶ 19). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. <br><br> The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" and inclusion of "SPV Lenders" has been removed from the definition of "Ineligible Creditor." *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | | iv. Onset alleges that the Plan does not contain a mechanism to ensure that the Carnaby Debtors will have access to the books, records, and investigative findings of the Debtors that will be transferred to the Litigation Trust, which Onset asserts as essential because it argues the Carnaby Debtors have claims of their own. (¶ 19). | Onset's and the Carnaby Debtors' rights are reserved with respect to the Plan's treatment of such assets to be transferred to the Litigation Trust. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| | | | v. Onset argues that the Plan impermissibly restricts setoff rights by requiring that holders of Claims obtain the Plan Debtor's or Wind Down Administrator's consent to file a setoff motion on or before the Confirmation Date. (¶ 19). | Onset's rights are reserved with respect to the Plan's treatment of setoff rights. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | vi. Onset objects to the Plan's transfers of the right to recover from the Debtors' shared D&O insurance policies to the Litigation Trust without any mechanism for reserving coverage for the Carnaby Debtors' claims. (¶ 19). | Onset's and the Carnaby Debtors' rights are reserved with respect to their ability to pursue claims under the D&O policies if they so choose. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | vii. Onset objects to the Estate Claims Marketing Process as categorically excluding Onset from participation and as not being designed to maximize value of the Debtors' estates. (¶ 19). | The Estate Claims Marketing process is a marketing and sale process for the Litigation Trust Assets, including the Estate Claims, which include Claims against Onset in the Onset Adversary Proceeding. Therefore, Onset cannot be permitted to participate and obtain insight into the value of such claims or purchase such claims against themselves. *Id.* § I.A.1. |
| | | | viii. Onset objects to the definition of "Estate Claims" on the grounds that such definition does not explain how proceeds of the Debtors' claims in the James Adversary Proceeding and the Onset Adversary Proceeding, which were commenced jointly by the FBG Debtors and the Carnaby Debtors, will be allocated. (¶ 19). | The Disclosure Statement includes an additional disclosure that, in cases where both an FBG Debtor and one or more SPV Debtors assert Claims against a common defendant, the Plan and Confirmation Order make no determination regarding proper allocation and all rights regarding any allocation dispute shall be preserved. |
| 5. | 2717 | ING Belgium S.A./N.V. ("**ING Belgium**" | i. ING Belgium joins the legal arguments made by Katsumi and the LAM Parties. | *See* responses to Objections of LAM and Katsumi. |
| 6. | 2718 | Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") | i. The U.S. Trustee objects to the Global Settlement as asserting that it is impermissible sub rosa plan because it allows the DIP Secured Parties to credit bid on Estate Claims on which they lack a lien, transfers those claims to the Plan Debtor for no value, and circumvents § 1129(a)(9)'s requirement to pay $223 million in administrative claims in full on the Effective Date. (¶¶ 26–32). | Neither the Plan nor the Global Settlement is a sub rosa plan, but in any event, the Debtors are not seeking approval of the Plan and Global Settlement at the conditional Disclosure Statement hearing. *See* Reply ¶¶ 22–29. |
| | | | ii. The U.S. Trustee asserts that classifying objecting creditors as "Ineligible Creditors" is coercive and provides different treatment to similarly situated creditors within the same class in violation of section 1123(a)(4). (¶¶ 21(f), 39–40). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. The U.S. Trustee alleges that the Disclosure Statement does not include adequate information, including no liquidation analysis, and most exhibits to the | The Disclosure Statement provides Illustrative Recovery Scenarios sufficient to enable Eligible Creditors to evaluate expected distributions from the Litigation Trust at varying |

9

| Filed Objections and Reservations of Rights | |
|---|---|
| Disclosure Statement Motion's proposed order (including ballots, notices, and election forms) have not been provided. (¶¶ 21(e)). | levels of distributable proceeds. *See* Disclosure Statement § I.A.1(c); Ex. F (Illustrative Recovery Scenarios). Further, with respect to the liquidation analysis, the Plan Debtor has no known assets other than equity interests in AVM. The Plan Debtor does not believe there is equity value in AVM. The Plan Debtor, therefore, believes that each holder of an Allowed Claim or Interest against the Plan Debtor that is classified under the Plan would not receive any recovery on account of its Allowed Claim or Interest in a chapter 7 case of the Plan Debtor. Accordingly, the Plan Debtor believes the Plan satisfies the best interests test. *See id.* § VII.C.4. <br><br> The Solicitation Procedures and various election forms were filed at Docket No. 2704 with amended versions of such documents filed contemporaneously herewith. |
| iv. The U.S. Trustee objects to the proposed confirmation timeline, arguing that the Debtors have not established cause under Fed. R. Bankr. P. 9006(c) to shorten the time periods required by the Bankruptcy Rules. (¶¶ 21(d), 50–52). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj. <br><br> As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| v. The U.S. Trustee also argues that the Global Settlement seeks to alter key terms of the DIP Order by allowing the DIP Secured Parties to credit bid on Estate Claims that the DIP Order specifically excluded from their collateral and by enabling them to avoid the subordination of their approximately $3.3 billion in Roll-Up Obligations to up to $200 million in unpaid administrative claims as required by the DIP Order. (¶¶ 37–38). | The Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the DIP Order, the Administrative Expense Claims Basket is only triggered "following the indefeasible payment in full in cash of the New Money DIP Loans." *See* DIP Order ¶ 8(b). Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash." Rather, holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for their DIP A Claims. |
| vi. The U.S. Trustee alleges that the Plan cannot satisfy section 1129(a)(7)'s "best interests" test because it bars objecting creditors from receiving distributions as "Ineligible Creditors." (¶¶ 41–43). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| vii. The U.S. Trustee objects to the Plan's permanent discharge injunction as violating section 1141(d)(3) because the Debtors are liquidating substantially all | Any issues with respect to the Plan's proposed discharge will be appropriately addressed at confirmation, rather than at the conditional Disclosure Statement hearing. |

10

| | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | of their assets and do not engage in business after consummation of the Plan. (¶¶ 21(c), 44–49). | |
| | | | viii. The U.S. Trustee objects to the Plan's exculpation provision as impermissibly including parties not entitled to exculpation in the Fifth Circuit, extending beyond section 1125(e) of the Bankruptcy Code. (¶¶ 21(g), 54–58). | Any issues with respect to the Plan's exculpation provisions will be appropriately addressed at confirmation, not the conditional Disclosure Statement hearing. |
| | | | ix. The U.S. Trustee assert that the Plan's injunction and gatekeeper provisions violate the Bankruptcy Code and Fifth Circuit precedent in *Highland II* by requiring non-debtor third parties to seek bankruptcy court permission to bring suit against entities that do not exist until the Effective Date. (¶¶ 21(h), 61–64). | The inclusion of the two members of the Special Committee as "Exculpated Parties" is consistent with Fifth Circuit precedent, including the Fifth Circuit's holding in *Highland I*[2] because the Special Committee members acted as estate fiduciaries throughout the Debtors' chapter 11 cases. The Court should reject this improper reading of *Highland I* because, there, the court found that each of the three independent directors appointed as fiduciaries were properly exculpated under the plan.[3] Citing section 1107(a) of the Bankruptcy Code, the Court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.[4] Nor did *Highland I* impose the requirement that independent directors must be appointed by the Court in order to qualify for an exculpation, as the U.S. Trustee suggests. *Id.* |
| 7. | 2727 | Carnaby Secured Lenders ("**CarVal**") | i. CarVal objects to the proposed confirmation timeline, arguing that the Plan's complex structure demands a longer objection timeline. (¶¶ 1–4, 15–17). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj.  As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | ii. CarVal alleges that the documents to be filed as part of the Plan Supplement are material agreements underpinning the Plan and that parties will not have | As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the |

---

2    *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) ("**Highland I**").

3    *See Highland I*, 48 F.4th at 437-38.

4    *Id.* At 437.

| | | **Filed Objections and Reservations of Rights** | | |
|---|---|---|---|---|
| | | | sufficient time to review such documents before the Combined Objection Deadline to understand how the documents might impact their rights. (¶¶ 2, 13). | Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | iii. | CarVal argues that the Plan's exclusion of objecting creditors as Ineligible Creditors from receiving distributions from the Litigation Trust, violates the bankruptcy Code's requirement for equality of distributions. (¶¶ 18, 20). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | iv. | CarVal objects to the Plan's release, exculpation, and injunction provisions as overly broad. (¶ 18). | Any issues with respect to the Plan's release, exculpation, and injunction provisions is an issue that will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. In any event, |
| | | v. | CarVal argues that the Plan inappropriately channels all Debtors' privileges, books, records, and other materials relevant to any future litigation into the Litigation Trust and places onerous restrictions on the sharing of such information by the Litigation Trustee, which CarVal assert will hinder the SPV Debtors' ability to pursue their own causes of action. (¶ 21). | Carval's rights are reserved with respect to the Plan's treatment of such assets to be transferred to the Litigation Trust. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | vi. | CarVal argues that an express carve-out of the release and injunction provisions should be added to the Plan to avoid any prejudice to the rights of the SPV Debtors, their estates, and their creditors, because the SPV Debtors stand to receive no benefit from the Plan. (¶ 23). | Such issues with respect to the Plan's release and injunction provisions will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | **Resolved Objections** | | |
| 1. | 2629 | Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P. (as successor in interest to Evolution | i. Evolution asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | The Debtors have substantially augmented the Disclosure Statement to address Evolution's concerns and have, among other things, added the disclosures described below in response to the Evolution Objection. *See* Disclosure Statement §§ I.A.2, I.A.3, I.B.7, I.B.8. |
| | | | a. The valuation of assets subject to three proposed plan transactions and the impact on Evolution's asserted rights. (¶ 25). | The Disclosure Statement provides sufficient information regarding the three Plan Transactions, including the parties, collateral, process, and illustrative recoveries for creditors . *See* Disclosure Statement §§ I.A.1, IV.K, Ex. F (Illustrative Recovery Scenarios). The Plan Debtor added a disclosure explaining that they are unable to provide an estimate of the anticipated distributable proceeds on behalf of such claims because any such estimate would need to take into account typical litigation risks as well as claim-specific factors, which would necessarily include the Debtors' counsels' evaluations of the |

| | **Filed Objections and Reservations of Rights** | | |
|---|---|---|---|
| | Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP ("**Evolution**") | | value of claims and the likelihood of settlement. To the extent any objectors argue that a lack of value in the Estate Claims raises issues of confirmability, such objections are Confirmation Objections and should be considered at the Confirmation Hearing. Section I.B.4; s*ee In re U. S. Brass Corp.*, 194 B.R. 420, 426 (Bankr. E.D. Tex. 1996) (holding it was "sufficient that [the debtors] describe the litigation and disclose that they are unable to estimate [its] value"). Such estimates are therefore protected by relevant privileges, including attorney-client privilege, and would constitute attorney work product, and could prejudice the Debtors' ability to prosecute such claims. Nevertheless, the Debtors believe the substantial detail provided in Sections I.A.1 and IV.K of the Disclosure Statement with respect to the litigation claims, including, among other things, the current status of each litigation claim, is sufficient to enable creditors to evaluate each of the Debtors' claims for purposes of electing whether to vote in favor of the Plan. |
| | | b. How the proposed plan transactions will be reconciled with Evolution's pending lien priority actions (Adversary Proceedings Nos. 25-03800 and 26-03006) in which Evolution asserts perfected, first-priority liens on assets of the Evolution SPV Debtors and prepetition receivables of certain FBG Debtors. (¶¶ 28–31). | As the Disclosure Statement explains, the DIP Secured Parties' credit bid is on the FBG Debtors' Estate Claims and the FBG Debtors' interests in the DIP Collateral, and does not extend to assets of, or claims against, the Evolution SPV Debtors. *See* Disclosure Statement § I.B.8 ("What is Happening to the Assets (Including Claims) of the SPV Debtors?") (confirming that SPV Debtor assets remain in possession of the SPV Debtors and all rights are reserved as to ownership disputes between the FBG Debtors and the SPV Debtors). Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | The Disclosure Statement further confirms that only assets and Claims that are not subject to a bona fide dispute may be transferred to the DIP Collateral Trust or the ABL Collateral Trust, and that no asset subject to a bona fide dispute vests in any Trust unless and until the parties agree or a court confirms the relevant lenders' validly perfected senior Lien. *See* Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 ("What Happens if There Is a Dispute Between the Trusts Over the Rightful Owner of an Asset?"). For the avoidance of doubt, only assets that are not subject to a bona fide dispute can be transferred to the applicable Trust. *See* Disclosure Statement § I.B.7. |
| | | c. The sources of the $25 million in cash from the Debtors' balance sheet being used to fund one-third of the Litigation Trust and whether any of this | The Disclosure Statement explains that the $25 million in Litigation Trust funding contributed by the FBG Debtors is sourced from the DIP Lenders' cash collateral, and is not drawn from the segregated Factored Receivables Account or otherwise from |

13

| Filed Objections and Reservations of Rights | |
|---|---|
| cash may be subject to asserted liens by third parties such as Evolution. (¶¶ 33–35). | prepetition receivables subject to Evolution's asserted liens. *See* Disclosure Statement §§ I.A, I.A.1, I.A.3(a), I.B.8. Evolution's asserted lien rights in factored and unfactored receivables remain protected by the Factored Receivables Account and the bona fide dispute framework, and nothing in the Disclosure Statement alters those rights. *See* Disclosure Statement §§ I.A.2(a), I.A.3(a), I.B.7.<br><br>Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| d. The rights of other lenders asserting priority liens to disputed assets and how the Debtors intend to determine which inventory products, values, and accounts receivable are owned by which Debtor and how to address disputes between the DIP Secured Parties or the ABL Secured Parties, on one hand, and other secured lenders and Third-Party Factors such as Evolution, on the other hand. (¶ 32). | The Disclosure Statement outlines a clear process for addressing competing claims to inventory and accounts receivable: (i) the Factored Receivables Account established pursuant to the Cash Management Order will remain in place and continue to be administered consistent with Cash Management Order, with assets subject to a bona fide dispute held pending final adjudication; and (ii) the DIP Collateral Trust Assets and ABL Collateral Trust Assets expressly exclude any assets subject to a bona fide dispute, including disputes asserted by Evolution and other Third-Party Factors. *See* Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 (bona fide dispute mechanism), I.B.8 (SPV Debtor assets).<br><br>Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| e. How the Litigation Trustee and other parties will coordinate and allocate insurance policy proceeds between the FBG Debtors' Estate Claims and separate claims being pursued by the Evolution SPV Debtors. (¶¶ 36–39). | The Disclosure Statement provides that only the FBG Debtors' rights to recover proceeds from insurance policies are considered Estate Claims. *See* Disclosure Statement § I.A.1. The SPV Debtors' rights to Insurance Proceeds are fully preserved. |
| f. Clarification that the Plan will not transfer attorney-client privileges held by the Evolution SPV Debtors to the Litigation Trust, as the Evolution SPV Debtors maintain independent privileges that now reside with their chapter 7 trustee. (¶ 40). | The Disclosure Statement clarifies that the transfer of attorney-client and other privileges to the Litigation Trust is limited to privileges held by the FBG Debtors, and does not affect, transfer, or impair the independent privileges of the Evolution SPV Debtors, which now reside with the chapter 7 trustee for those estates. *See* Disclosure Statement §§ I.A.1, V.B. |

14

| | | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|---|
| 2. | 2709 | Keystone Automotive Operations, Inc. and Uni-Select, Inc. (together, "**KAO/Uni**") | i. | KAO/Uni asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding procedures for how other creditors may become Eligible Creditors, and details on claims filing and reconciliation procedures, given the lack of a bar date. (¶¶26–29). | *See* above Response 1(iv) to TQL Obj. |
| | | | ii. | KAO/Uni asserts the Plan is patently unconfirmable because it violates Section 1123(a)(4) of the Bankruptcy Code by providing different treatment to creditors within the same class based on whether they object to the Plan and Global Settlement. (¶¶14–16). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. | KAO/Uni asserts the Plan impermissibly strips defendants of affirmative defenses, including setoff and recoupment rights. (¶¶ 18–21). | KAO/Uni's rights are reserved with respect to the Plan's treatment of affirmative defenses, setoff, and recoupment rights. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**DEBTORS' REPLY IN SUPPORT**
**OF DISCLOSURE STATEMENT MOTION**

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this reply (this "**Reply**") to the objections and responses (collectively, the "**Objections**") to the Motion,[2] seeking, among other things, conditional approval of the *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* (Docket No. 2733) (as may be amended from time to time, the "**Disclosure Statement**") filed in connection with the proposed *Chapter 11 Plan of Premier Marketing Group, LLC* (Docket No. 2738) (as may be amended from time to time,

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  "**Motion**" means the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Plan; (V) Establishing Global Settlement Election Procedures; and (VI) Granting Related Relief* (Docket No. 2546).

the "**Plan**").[3] In support of this Reply and the relief requested in the Motion, the Debtors respectfully represent as follows:

## Preliminary Statement

1. The Debtors believe they have fully resolved three parties' Objections out of the nine Objections filed, and that a number of other parties' Objections have been resolved.

2. Debtor, Premier Marketing Group, LLC (the "**Plan Debtor**") seeks conditional approval of the Disclosure Statement for a chapter 11 plan of liquidation that provides for an orderly wind down of the Debtors' estates through the monetization of assets that serve as the collateral of the Debtors' secured lenders by establishing three trusts and the distribution of proceeds to creditors. The Plan does not exist in a vacuum.

3. The Plan is the product of extensive arm's-length and good faith negotiations among the Debtors, the Ad Hoc Group, and the Creditors' Committee, including through mediation led by the Honorable Judge Marvin Isgur. These negotiations culminated in an agreement on a global settlement (the "**Global Settlement**"), which serves as the foundation for the Plan, and averts the imminent risk of (i) the DIP Secured Parties and ABL Secured Parties foreclosing on their collateral and terminating the Debtors' use of cash collateral (which cash collateral is also being used in connection with finalizing various OEM sales), and (ii) a value-destructive, premature conversion to chapter 7 that would almost certainly result in no recovery to administrative, priority, and general and unsecured creditors. The Debtors believe that the Plan is in the best interests of creditors and should be approved.

---

[3] Capitalized terms used but not otherwise defined in herein shall have the meanings ascribed to such terms in the Motion, Disclosure Statement, or Plan, as applicable.

4. The Debtors have worked diligently to respond to the nine (9) filed objections and address feedback received from various stakeholders, including by adding additional information to the Disclosure Statement and making certain revisions to the Plan. Among the key changes to the Plan are:

(i) removing the provision that Eligible Creditors that object to the Plan or Global Settlement become Ineligible Creditors and therefore do not participate in the Global Settlement (Plan §§ 1.1 (definition of Ineligible Creditors); 5.2(g));

(ii) removing the requirement for Eligible Creditors to opt in to participate in the Global Settlement, *provided* that any Eligible Creditor that provides written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation Trust Interest will be considered an Ineligible Creditor and will not participate in the Global Settlement (*id.* §1.1 (definition of Ineligible Creditors));

(iii) amending the definition of "Ineligible Creditor" by replacing the "Adverse Conduct" standard to only disqualify creditors with claims that are subject to disallowance under section 502 or subordination under section 510 of the Bankruptcy Code or applicable law, as determined by a Final Order, for purposes of determining which creditors are "Eligible Creditors" that may participate in the Global Settlement (*id* §§ 1.1 (definition of Ineligible Creditors); 5.2(g));

(iv) making the Preference Settlement and all third-party releases an opt-in structure that provides Trade Creditors, Supply Chain Financers, and Factors no less than 45 days following the Effective Date to decide whether to opt in (and in the case of Trade Creditors, a further extension until 30 days following service of a complaint filed by the Litigation Trustee) (Plan §§ 1.1 (definition of Preference Settlement Election Form); 6.11(b));

(v) clarifying that "Disputed" assets, including as between the FBG Debtors and SPV Debtors and with respect to Factors asserting ownership interests in receivables, will remain with the applicable Debtor (including any Converting Debtor) until adjudicated by the Court (Plan § 1.1 (definitions of ABL Collateral Trust Assets, DIP Collateral Trust Assets, and Litigation Trust Assets)); and

(vi) extending various dates and deadlines, including moving up the Plan Supplement deadline to provide 10 days before the objection deadline (Disclosure Statement Order § 50).

5. As a result of these efforts, the Debtors believe the revised Disclosure Statement and Plan resolve many of the objections to conditional approval of the Disclosure Statement.

6. Attached hereto as **Exhibit A** is a chart listing the issues raised in each Objection and the Debtors' response thereto (the "**Objection Chart**"). The Debtors also respond to Objections (i) arguing the Plan is patently unconfirmable (many of which are premature and merely disguised objections to the Global Settlement and or confirmation of the Plan) and (ii) to the proposed confirmation schedule.

7. For the reasons set forth herein, the Court should approve the Disclosure Statement and allow solicitation of the Plan to proceed on the Debtors' proposed schedule.

## Reply

## I. THE PLAN IS NOT PATENTLY UNCONFIRMABLE.

8. Certain of the Objections are not objections to the adequacy of the information provided in the Disclosure Statement, but are objections to the Plan and/or Global Settlement that should be deferred to the Confirmation Hearing and considered at that time. *See, e.g.*, *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings."); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("[T]he Court will not look behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement.").

9. Nevertheless, for the reasons set forth below, none of these Objections provide a basis to deny approval of the Disclosure Statement or confirmation of the Plan.

4

**a.     The Debtors Have Revised the Criteria for Ineligible Creditors.**

10.     Multiples parties have objected to the Disclosure Statement and Plan on the basis that the definition of Ineligible Creditors under the Plan includes parties that file an objection to the Plan or Global Settlement.  Certain of these parties also object to the standard for determining whether a creditor is an Ineligible Creditor.  As noted above, the definition of Ineligible Creditor has been modified to (i) remove the filing of an objection to the Plan or Global Settlement as a basis for ineligibility (*i.e.*, parties may object to the Plan and Global Settlement without losing "Eligible Creditor" status) and (ii) provide that a Person is an Ineligible Creditor only if it holds a claim subject to disallowance under section 502 or subordination under the Bankruptcy Code or applicable law.  The definition of Ineligible Creditor now reads:

> "**Ineligible Creditors**" means (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests.  For the avoidance of doubt, DIP Secured Parties, First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are not and will not be deemed or construed to be Ineligible Creditors.

11.     Accordingly, these Objections are now moot.

**b.     The Plan Does Not Contravene the Bankruptcy Code's Priority Scheme**

12.     The U.S. Trustee, TQL, and certain other parties argue that the Plan is patently unconfirmable because administrative, priority, and general unsecured creditors are

5

treated *pari passu* under the Litigation Trust Waterfall, purportedly in violation of the Bankruptcy Code's priority scheme.[4]  These objections are incorrect for a number of reasons.

13.     These objections take exception with the Global Settlement, not the Plan. The Plan provides for payment in full of the Administrative Expense Claims and Priority Claims against the Plan Debtor in accordance with section 1129(a)(9) of the Bankruptcy Code.  The Global Settlement provides for (among other things) the sale of Estate Claims to the DIP Secured Parties in exchange for a credit bid of certain of their DIP A Claims.  In addition, the DIP Secured Parties have provided a number of other concessions and value to the Debtors' estates under the Plan, which are not cost-neutral to the DIP Secured Parties.  For example, following the sale of the Estate Claims, the DIP Lenders have agreed to contribute the acquired Estate Claims into the Litigation Trust that will prosecute such claims and pursue proceeds to be distributed to creditors, including the administrative, priority, and general unsecured creditors of the FBG Debtors, in accordance with the Litigation Trust Waterfall instead of owning those Estate Claims outright. In addition, the holders of DIP A Claims are funding the Litigation Trust with the Litigation Trust Backstop Parties providing a backstop to such funding, ensuring that Eligible Creditors are able to participate in a fully capitalized Litigation Trust.  Absent the Global Settlement, the DIP Secured Parties would assert an entitlement to credit bid their secured claims (or foreclose) to become the outright, indefeasible owner of substantially all of the FBG Debtors' assets without any obligation to monetize assets for the benefit of other creditors.[5]

---

[4]     *See* U.S. Trustee Obj. ¶¶ 26–32; TQL Obj. ¶ 16.

[5]     *See Preferred Display, Inc. v. CVS Pharmacy, Inc.*, 923 F.Supp.2d 505, 511 (S.D.N.Y. 2013) (noting that under New York Law, where a secured party instituted the public sale of collateral and then purchased the collateral itself, the sale "terminated any subordinate interests in the collateral"); *Atlas MF Mezzanine Borrower, LLC v. Macquarie Texas Loan Holder LLC*, 105 N.Y.S.3d 59, 65–66 (2019) (noting that pursuant to the New York Uniform Commercial Code, a secured party's disposition of collateral after a default "(1) transfers to a transferee for value all of the debtor's rights in the collateral; (2) discharges the security interest under which the disposition is made; and (3) discharges any subordinate security interest or other subordinate lien") (citing N.Y.U.C.C. § 9–

6

14.     The absolute priority rule is not implicated here.  All priority creditors of the Plan Debtor are being paid in full or otherwise receiving the treatment prescribed by section 1129 of the Bankruptcy Code.  Administrative and priority creditors of the FBG Debtors are not receiving any treatment under the Plan.  Rather, all Eligible Creditors of the FBG Debtors are receiving entitlements to Litigation Trust Interests under the Global Settlement.  None of the objectors point to any requirement that priority creditors of any Debtor other than the Plan Debtor must be treated similarly to the priority creditors of the Plan Debtor.  They are not creditors of the Plan Debtor.  Such creditors do, however, maintain their claims against their Debtors—the FBG Debtors—and retain any rights they may have in the subsequent chapter 7 cases of those Debtors.

15.     Moreover, none of the proposed recoveries for the FBG Debtors' claimants are estate assets.  The Litigation Trust Assets will be acquired by the DIP Secured Parties pursuant to the Estate Claim Credit Bid Transaction (if it constitutes the highest or otherwise best offer following the marketing process) from the FBG Debtors and subsequently contributed to the Litigation Trust.  Litigation Trust interests will then be issued to creditors of the Plan Debtor and Eligible Creditors of the FBG Debtors.  These assets will be monetized and distributed to the Litigation Trust beneficiaries in accordance with the Litigation Trust Waterfall.  These distributions are not a "gift of estate property."  Rather, they will be distributions on account of assets that were purchased under section 363 of the Bankruptcy Code by the DIP Secured Parties

---

617(a)(1)–(3)); *SR Construction, Inc. v. Palm Springs II, LLC (In re Palm Springs II), LLC*, No. 20-CV-3486 (JJB), 2021 WL 5331001, *9–10 (Bankr. S.D. Tex. 2021) (where a sale of the debtor's estate assets occurred and a secured creditor was the highest or only bidder via a credit bid, the secured party becomes the owner of the assets following the closing of the sale, leaving "other creditors with nothing"); *United Mine Works of America Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1153 (11th Cir. 2018) ("If the secured creditors submit the highest (or only) bid for the company and acquire the bankruptcy estate's assets, the creditors are, in effect, able to use the § 363 sale to trade their debt for control of the business.").

and transferred to the Litigation Trust.[6] Ultimately, any distributions from the Litigation Trust are distributions of **proceeds from the DIP Secured Parties' properly acquired property**, which would not be property of the Debtors' estates following the sale and therefore not subject to the absolute priority rule.[7]

16.     *Moreover*, even if the proceeds from the Litigation Trust Assets were property of the estate, in the Fifth Circuit, "[s]enior creditors may share proceeds with junior creditors as long as the junior creditors receive what they would have received otherwise without such sharing."[8]   Under this precedent, it is permissible for a senior creditor to share its own recovery with junior creditors, so long as any non-consenting creditor still receives whatever recovery it would have received (if anything) notwithstanding the gifting.[9]

---

[6]   *See In re ICL Holding Co.*, 802 F.3d 547, 555–56 (3d Cir. 2015) (finding that payments from secured lender group directly to unsecured creditors from trust funded by secured lender group did not qualify as estate property); *In re Com. Loan Corp.*, 363 B.R. 559, 565 (Bankr. N.D. Ill. 2007) ("On confirmation, the bankruptcy estate ceases to exist unless the plan provides otherwise" and claims which were transferred to a trust at confirmation "no longer belonged to the estate" as of the transfer); *Globaleyes Telecommunications, Inc. v. Verizon N., Inc.*, 425 B.R. 481, 496 (S.D. Ill. 2010) ("the confirmation of a Chapter 11 plan ends the existence of the bankruptcy estate. . . .").

[7]   *See In re ACI Concrete Placement of Kansas, LLC*, 604 B.R. 400, 407 (Bankr. D. Kan. 2019) (finding that payment of fees did not violate the Code's priority rules or *Jevic* where those fees were being paid from carve-out funds that constituted a secured lender's collateral, and which would otherwise be distributed to the secured lender).

[8]   *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 321–21 (Bankr. S.D. Tex. 2024); *see also In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) ("The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive as least as much as what they would without the sharing. For instance, a secured creditor could share its proceeds with unsecured creditors whose priority came behind that of the IRS.").

[9]   *See In re Idearc Inc.*, 423 B.R. 138, 172 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) (confirming plan that provided a gift to a junior class because it was "being gifted from [a secured lender's] collateral—and will not be made from the Debtors' assets"); *In re Basic Energy Servs., Inc.*, No. 21-9002 (DRJ) (Bankr. S.D. Tex Nov. 8, 2021) (Docket No. 686) (approving global settlement that established a pool for the recoveries of general unsecured creditors funded by secured noteholders); *In re ADPT DFW Holdings LLC*, No. 17-31432 (SGJ) (Bankr. N.D. Tex. Sept. 29, 2017) (Docket No. 822) (confirming plan and approving settlement that provided holders of common equity interests an opportunity to release their claims and causes of action against the debtors' secured lender in exchange for the opportunity to share in recoveries from a litigation trust).

17.     Notably, the FBG Debtors believe that under the Global Settlement, all relevant claimants (including administrative, priority, and unsecured creditors of the FBG Debtors) will receive more than what they would have otherwise received absent the settlement. Accordingly, absent the settlement, recoveries for junior creditors (including administrative and priority creditors) from the Litigation Trust Assets (or any other assets) would almost certainly be zero.

18.     On the other hand, under the Global Settlement, Eligible Creditors will receive Litigation Trust Interests that permit them to receive proceeds from the monetization of the Litigation Trust Assets.  This value is not illusory—subject to the claims acceptance and reconciliation processes contemplated under the Plan and Global Settlement, Eligible Creditors begin sharing in distributions after the Litigation Trust has distributed $400 million of aggregate proceeds to other beneficiaries, well in advance of repayment of the approximately $1.4 billion of outstanding New Money DIP Loans.  Accordingly, the Global Settlement is permissible as administrative, priority, and unsecured creditors are no worse off.

19.     That conclusion is not altered by *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).  There, the Supreme Court held that bankruptcy courts may not approve structured dismissals of chapter 11 cases that provide for the distribution of estate property in violation of the Bankruptcy Code's priority scheme without the consent of affected creditors.[10] However, as explained above, the distributions are not estate property.  Additionally, the ruling in *Jevic* was limited to structured dismissals.  There is no dismissal, structured or otherwise, involved in the Global Settlement.  Rather, the Global Settlement is integrated into and effectuated

---

[10]     *Id.* at 455.

by (i) a chapter 11 plan for the Plan Debtor, and (ii) conversion to chapter 7 for the Converting Debtors. That puts the Global Settlement outside the ambit of *Jevic*.[11]

20.     Further, the facts of *Jevic* are easily distinguished. Of many notable differences, in *Jevic*, the proposed settlement included a release of a fraudulent transfer claim asserted by the unsecured creditors' committee on the estate's behalf and such claim was unencumbered (*i.e.*, neither the claim nor the proceeds were subject to a lien).[12] Therefore, by releasing the claim, the non-consenting priority creditors were made worse off by the settlement, as they otherwise would have had superior rights in the proceeds of the claim being disposed of under the settlement.[13] In other words, the dissenting creditors' only chance of recovery was eliminated by the settlement.[14] Here, the DIP Secured Parties have superpriority liens on the Litigation Trust Assets, making the proposed distributions a carve out from the DIP Secured Parties' collateral. Moreover, unlike *Jevic*, the benefits of the Global Settlement inure to all junior creditors (including administrative creditors).

21.     Finally, the Global Settlement is undoubtedly in furtherance of significant Bankruptcy Code objectives.[15] Unlike *Jevic*, rather than skipping a class of priority creditors

---

[11]   *See id.* at 456 ("It is important to keep in mind that Chapter 11 foresees three possible outcomes. The first is a bankruptcy-court-confirmed plan. . . . The second possible outcome is conversion of the case to a Chapter 7 proceeding. . . . The third possible outcome is dismissal of the Chapter 11 case.").

[12]   *See In re Jevic Holding Corp.,* 787 F.3d 173, 176 (3d Cir. 2015), as amended (Aug. 18, 2015), *rev'd and remanded sub nom. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017).

[13]   *Jevic*, 580 U.S. at 463–64.

[14]   *Id*. at 462 ("Respondents concede that the structured dismissal approved by the Bankruptcy Court contained distribution conditions that skipped over petitioners, ensuring that petitioners received nothing on their multimillion-dollar WARN claim against the Jevic estate.").

[15]   In the process of explaining its holding, the Supreme Court in *Jevic* acknowledged in dicta that there are judicially-created exceptions to the absolutely priority rule not specifically found in the Bankruptcy Code, but which advance "significant Code-related objectives." *Jevic*, 580 U.S. at 468 (discussing "'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims."). The Supreme Court noted that such permissible distributions tend to "enable a successful reorganization and make even the disfavored creditors better off." *Id.* (internal quotations omitted)

10

entirely, the proposed Litigation Trust Waterfall includes administrative and priority creditors as Eligible Creditors, who begin recovering on their claims after only $400 million in recoveries by other beneficiaries under the Global Settlement. Such recoveries are in excess of the anticipated recoveries that such creditors would likely otherwise receive in a crash conversion to chapter 7 by all Debtors and an attendant foreclosure by the DIP Secured Parties and ABL Secured Parties on their respective collateral. Such a result would be value destructive, and all creditors would be worse off than what is provided under the Global Settlement.

### c. The Global Settlement is Not a Sub Rosa Plan

22. The U.S. Trustee and LAM argue that the Plan is patently unconfirmable due to the terms of the Global Settlement creating a *sub rosa* plan.[16] This objection is misplaced for a number of reasons.

23. First, the Debtors are not seeking approval of the Global Settlement at the Disclosure Statement hearing. Rather, as disclosed in the Disclosure Statement, the FBG Debtors intend to file a motion seeking approval of the Global Settlement in the near term and will ask to have it heard at the Confirmation Hearing.

24. In any event, the Global Settlement does not constitute a *sub rosa* plan. Quite the opposite; it is a foundational building block for, and incorporated into, the Plan, which will be solicited and voted on and will otherwise be subject to all requirements under section 1129 of the Bankruptcy Code.[17] The Global Settlement would provide essential funding and a

---

(citing *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004)); *see also Toibb v. Radloff*, 501 U.S. 157, 163 (1991) ("Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate.").

[16]  *See* U.S. Trustee Obj. ¶¶ ¶¶ 28–32; LAM Obj. ¶ 43.

[17]  *See In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014) (noting that "a settlement agreement which is a 'necessary step toward, or building block of, a plan of reorganization' does not constitute in improper sub rosa plan"); *In re River Canyon Real Est. Invs., LLC*, No. 12-20763 (EEB) 2010 WL 11833506 at *26 (Bankr. D. Colo. 2010) (holding settlement that transferred debtors' ownership in collateral was not a sub rosa plan over senior lienholders' objection because "no provision [] would wipe out the liens of other creditors," and

framework to enable the monetization of the FBG Debtors' remaining undisputed assets. Most importantly, the Global Settlement provides for the transfer of estate claims and causes of action of the FBG Debtors to the Litigation Trust for prosecution by the Litigation Trustee, which will be funded with at least $75 million ($25 million from the DIP Lenders' cash collateral and $50 million in committed funding). In connection with the Global Settlement, the Litigation Trust will distribute any recoveries from Litigation Trust Assets in accordance with the Litigation Trust Waterfall. Although approval of the Global Settlement will be sought concurrently with Plan confirmation, the Global Settlement is a necessary stepping stone of the Plan and it complies with the Bankruptcy Code. All FBG Creditors rights as to their original FBG Debtor are fully preserved, without offset for recoveries they may obtain through the Litigation Trust Waterfall. If any assets are ultimately not Litigation Trust Assets and remain behind at the applicable FBG Debtor – because of an ownership dispute or otherwise – neither the Global Settlement nor the Plan Debtors' Plan impacts creditor rights at the FBG Debtors' estates.

25. A "sub rosa" plan is any agreement that operates as a disguised plan that effectively "short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan."[18] In *Braniff*, the Fifth Circuit held a proposed transaction was a sub rosa plan because it would have disposed of substantially all of the debtor's assets and left "little prospect or occasion for further reorganization."[19]

---

given that the settlement was being prosecuted at the same time as the plan itself, objections regarding "automatic stay provisions" or sub rosa plan concerns should be resolved).

[18] *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983); *see also Bergemann, Inc. v. Babcock and Wilcox Co. (In re Babcock and Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) (stating a sub rosa plan "gut[s] the bankruptcy estate before reorganization or [changes] the fundamental nature of the estate's assets in such a way that limits a future reorganization plan").

[19] *In re Braniff*, 700 F.2d at 940.

26. The Fifth Circuit also "reject[s] sub rosa arguments where the transaction in question 'does not alter creditors' rights, dispose of assets and release claims to the extent proposed in the wide ranging transaction disapproved in *Braniff*.'"[20] And the Fifth Circuit in *Braniff* even acknowledged that the Bankruptcy Code "provides for certain adjustments in the rights of creditors pursuant to a valid § 363 transaction in order to provide 'adequate protection' to secured creditors." *In re Braniff*, 700 F.2d at 940 n.2.

27. The Global Settlement is not an impermissible sub rosa plan, is distinct from *Braniff*, and does not "predetermin[e] the terms and conditions of any plan" for the FBG Debtors. Unlike *Braniff*, where the proposed settlement (i) only permitted the debtor to distribute assets (travel script) to certain parties (employees and shareholders) under any future plan and (ii) required the secured creditors to vote a portion of their claims in favor of *any* future chapter 11 plan supported by the creditors' committee, the Global Settlement does not (x) dictate the terms of a future plan because the FBG Debtors (other than the Plan Debtor) will have their chapter 11 cases converted to chapter 7 on the Effective Date,[21] and (y) require any party to vote in favor of the proposed Plan. Further, Eligible Creditors who receive the benefits of the Global Settlement will retain all claims they have against the applicable FBG Debtors and the third-party releases are limited and consensual (by affirmatively opting in), unlike the broad releases of all claims sought in *Braniff*.

28. The U.S. Trustee's sub rosa objection relies heavily on *In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex 2009), where the court denied a proposed section 363

---

[20] *In re ASARCO LLC*, No. 05-21207 (RSS), 2009 WL 8176641, at *48 (Bankr. S.D. Tex. June 5, 2009) (quoting *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Electric Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997)).

[21] *Cf. Braniff*, 700 F.2d at 940 (denying settlement because it would have "establish[ed] the terms of the plan sub rosa in connection with the sale of assets").

13

sale for substantially all of the debtor's assets outside the confirmation process because the sale lacked a sufficient business justification and would only benefit the debtor's secured lender. Here, (i) the proposed sale is being conducted in connection with the confirmation process, (ii) there is a valid business justification for consummating the sales now based on the DIP Secured Parties' rights to exercise remedies and take outright ownership of the assets, and (iii) the proposed sale would benefit all creditors, including junior administrative, priority, and general unsecured creditors.

29.     Accordingly, the Plan and Global Settlement, taken together, are not impermissible *sub rosa* plans of the FBG Debtors.

> **d.     The Plan's Treatment of Administrative Expense Claims Complies with the Bankruptcy Code and the DIP Order.**

30.     The U.S. Trustee and TQL argue the Plan is not confirmable because it does not provide for the payment in full of all Administrative Expense Claims against all Debtors.[22] The Plan, however, is not a joint plan; rather, it is proposed by only the Plan Debtor and treats only Claims against and Interests in the Plan Debtor, including Administrative Expense Claims against the Plan Debtor. Indeed, the Plan provides for payment in full in cash of all Allowed Administrative Expense Claims against the Plan Debtor, as required by section 1129(a)(9) of the Bankruptcy Code.[23] There is no requirement under the Bankruptcy Code that a plan proposed by one debtor provide for the payment of all priority claims against any affiliated debtor. Therefore, this objection should be overruled.

31.     Additionally, the U.S. Trustee and TQL argue the Plan and Global Settlement violate the provisions of the DIP Order that provide for the funding of the

---

[22]    *See* TQL Obj. ¶ 16.

[23]    *See* Plan § 2.1(a).

Administrative Expense Claims Basket.[24]  However, the Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the plain language of the DIP Order, claims that qualify under the Administrative Expense Claims Basket are only payable "following the indefeasible payment in full in cash of the New Money DIP Loans."[25]  Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash," as required to trigger the Administrative Expense Claims Basket pursuant to the DIP Order,[26] because holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for certain of their DIP A Claims.  A DIP Lenders' agreement to take *per se* impairment on the repayment of new, postpetition capital—particularly where the magnitude of such fresh capital exceeds one billion dollars—is a concession that cannot be overstated and should not be overshadowed.  The arguments raised in the Objections ignore the terms of the DIP Order (including that this Plan does not trigger the Administrative Expense Claims Basket, which would only be important absent impairment of DIP A Claims).

32.     Moreover, these Objections also overlook that the DIP Secured Parties would likely take outright ownership of the Estate Claims if the Global Settlement is not approved.  The Administrative Expense Claims Basket, therefore, would not be triggered in any alternative scenario.

33.     Accordingly, these Objections also should be overruled.

---

[24]   *See* UST Obj. ¶ ¶ 37–38; TQL Obj. ¶ 13.

[25]   *See* DIP Order ¶ 8(b) (emphasis added).

[26]   "When construing an agreed or negotiated form of order . . . the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."  *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011); *see also In re Sanchez Energy Corp.*, No. 19-34508, 2022 WL 2912076, at *5 (Bankr. S.D. Tex. July 22, 2022) ("Contract terms should be given their plain, ordinary meaning."); *In re Celsius Network LLC*, 649 B.R. 87, 98 (Bankr. S.D.N.Y. 2023) ("When a contract's terms are unambiguous, courts apply them as written.").

### e.    The Estate Claims Credit Bid Is Not Improper.

34.    The U.S. Trustee alleges in its Objection that the DIP Secured Parties are prohibited from credit bidding on Avoidance Actions because their liens only extend to the proceeds of the Avoidance Actions and not the actions themselves.   This Objection cannot withstand scrutiny.   Although the DIP Secured Parties only have a lien on proceeds of Avoidance Actions, they can still cash bid to purchase those claims outright and doing so would be the functional equivalent of a credit bid.   Any cash payment for the Avoidance Actions would itself constitute Avoidance Proceeds,[27] which would then be paid right back to the DIP Secured Parties to reduce their claims.   There is no prohibition in the Bankruptcy Code from a debtor accepting claims reduction as a form of consideration for a sale.

### f.    The Plan Does Not Effectuate a Substantive Consolidation.

35.    LAM's objection suggests a presumption that the Debtors are or will be substantively consolidated, such that they are improperly severing the Plan Debtor from all other Debtors, or selectively substantively consolidating for some purposes but not others.  *See* Docket No. 2705 ¶¶ 36–42.  LAM points to the Examiner's preliminary determination that "[t]here are colorable claims for substantive consolidation of First Brands and its affiliated debtors."  *Id.* ¶ 37.

36.    Neither the Plan nor the Global Settlement substantively consolidate any of the FBG Debtors' cases.  Through the Global Settlement and the transactions contemplated thereunder, as with numerous other disputes, the Debtors seek to settle and resolve any issues

---

[27]  "***Avoidance Proceeds***" under the DIP Order means "any property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise."  DIP Order ¶ 8(a).

16

surrounding substantive consolidation of the FBG Debtors without the cost and expense of litigating such issues.[28]

37.     Morerover, substantive consolidation would not provide any benefit to the Debtors or their creditors.  Whether the FBG Debtors are substantively consolidated or not, nearly all their assets (including Estate Claims or the proceeds thereof) are, at a minimum, encumbered by senior DIP liens securing approximately $2.5 billion in aggregate DIP Claims (*i.e.*, approximately $1.4 billion in DIP A Claims and $1.1 billion in Roll-Up Claims) before even addressing the remaining balance of Roll-Up Claims or the substantial security interests of the Prepetition Secured Parties.  Other of the FBG Debtors' assets are encumbered by liens securing the full amount of outstanding DIP Obligations (approximately $5 billion) and prepetition term loan claims ($2.5 billion), totaling approximately $7.5 billion.  As an alternative to the Debtors' secured lenders obtaining relief from the automatic stay to foreclose on substantially all their assets, the Debtors have put forth the Plan and Global Settlement to monetize their remaining assets and so that ***all creditors*** have an opportunity to share in assets of the estates.  As the Debtors will show, this is the best (and likely only) path available to distribute estate assets to anyone but senior secured lenders.

## II.     THE PROPOSED CONFIRMATION TIMELINE SHOULD BE APROVED.

38.     TQL objects to the Debtors' proposed confirmation timeline, and argues that the proposed opt-out deadline requires creditors to make irrevocable elections and grant broad third-party releases before the Court determines whether the plan is confirmable and before information contained in the Plan Supplement becomes available.[29]  *First*, under the proposed

---

[28]    All rights and obligations of the SPV Debtors are untouched by the Global Settlement, including surrounding substantive consolidation.

[29]    *See* TQL Obj. ¶ 21.

17

Plan, as amended, Eligible Creditors do not have to make any election or grant any releases to be eligible to receive Class 3(b) Litigation Trust Interests. *Second*, under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which provides ample time for Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors to review the Plan, Plan Supplement, and related materials and make an informed decision regarding whether to contribute their direct claims to the Litigation Trust for prosecution and opt-in to the limited Third-Party Releases under the Plan in exchange for receiving the benefits of the Preference Settlement, including a waiver of Preference Actions against Trade Creditors and the Modified New Value Element for Supply Chain Financers and Factors. *Third*, despite TQL's assertion, the Third-Party Releases that creditors may **opt-in** to under the Plan are narrow and do not contemplate releasing the FBG Debtors (besides the Plan Debtor).

39. The Debtors filed the original versions of the Plan and Disclosure Statement approximately three weeks ago. Under the Debtors' amended proposed confirmation and solicitation timeline, which extends the timeline by nineteen (19) days, the Plan Supplement will be filed on June 1, 2026 and the Voting Deadline and Combined Objection Deadline will be on June 10, 2026. Thus, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline.[30]

---

[30] *See Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. June 2, 2025) (Docket No. 5036) (providing for a Plan Supplement filing deadline 7 days before the voting deadline); *ConvergeOne Holdings, Inc.*, No. 24-90194 (CML) (Bankr. S.D. Tex. Apr. 4, 2025) (Docket No. 81) (providing for a Plan Supplement filing deadline 8 days before the voting deadline); *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Nov. 19, 2024) (Docket No. 71) (providing for a plan objection deadline 2 days after the deadline to file the plan supplement); *In re DRF Logistics, LLC*, No. 24-90447 (Bankr. S.D. Tex. Sep.. 24, 2024) (Docket No. 276) (providing for a Plan Supplement filing deadline 7 days before the Voting Deadline); *In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Nov. 17, 2023) (Docket No. 1447) (providing for a Voting Deadline that was 5 days after the Plan Supplement Filing Deadline and a confirmation hearing scheduled 7 days after the Plan

40.     Finally, no creditors whose votes are being solicited to make an informed decision are prejudiced by the Debtors' proposed confirmation and solicitation timeline.  Notably, only the Plan Debtor's creditors holding Roll-Up Claims, First Lien Claims, Second Lien Claims, ABL Claims, and General Unsecured Claims (which consists of only one general unsecured creditor, with which the Debtors are discussing a settlement regarding the Allowed amount of such claim) are entitled to vote to accept or reject the Plan.  Besides the Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors, who have until forty-five (45) days after the Effective Date to opt-in to the Preference Settlement, no other creditors have any vote, election, or decision to make whatsoever regarding their claim in the proposed confirmation and solicitation timeline.  Therefore, the universe of applicable interested parties that must make an informed decision is relatively small and the Debtors' proposed confirmation and solicitation timeline is appropriate.

41.     Accordingly, the Debtors submit that their proposed solicitation and voting procedures are consistent with the Bankruptcy Code and prior practices of this Court and should be approved.

## Conclusion

42.     For the reasons set forth herein and in the Motion, the Debtors respectfully request that the Court approve the Disclosure Statement on a conditional basis.

---

Objection Deadline); *In re Basic Energy Servs. Inc.*, No. 21-90002 (CML) (Bankr. S.D. Tex. Jun. 28, 2022) (Docket No. 1272) (providing for a Plan Supplement filing deadline of 5 days before the Voting Deadline and a Plan Objection Deadline that was 6 days before the confirmation hearing); *In re Benefytt Technologies, Inc.*, No. 23-90566 (Bankr. S.D. Tex. Nov. 17, 2023) (Docket No. 330) (providing for a plan supplement filing deadline of 7 days before the voting deadline and a plan objection deadline that was 5 days before the confirmation hearing).

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested in the Motion and such other and further relief as the Court may deem just and appropriate.

Dated: May 20, 2026
      Houston, Texas

                                   */s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: gabriel.morgan@weil.com
       clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: matt.barr@weil.com
       sunny.singh@weil.com
       andriana.georgallas@weil.com
       kevin.bostel@weil.com
       jason.george@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

20

**Certificate of Service**

I hereby certify that on May 20, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                */s/ Clifford W. Carlson*
                                                Clifford W. Carlson

**Exhibit A**

**Objection Chart**

*In re First Brands Group, LCC, et al.*
CH. 11 CASE NO. 25-90399 (CML)

SUMMARY CHART OF OBJECTIONS TO PROPOSED DISCLOSURE STATEMENT AND DEBTORS' RESPONSES[1]

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | **Filed Objections and Reservations of Rights** | |
| 1. | 2647 | Total Quality Logistics, LLC ("**TQL**") | i. TQL asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | |
| | | | a. A valuation of the litigation trust and recovery estimates for administrative expense claims, making it impossible for creditors to make informed judgments about the plan. (¶ 10). | Recovery estimates from the Litigation Trust would necessarily reflect attorney evaluations of claims and likelihood of settlement, are protected by attorney-client privilege and the work-product doctrine, and would prejudice the Debtors' ability to monetize Estate Claims. *See* Disclosure Statement §§ I.A.1, IV.K. The Disclosure Statement nonetheless provides Illustrative Recovery Scenarios sufficient to enable Eligible Creditors to evaluate expected distributions from the Litigation Trust at varying levels of distributable proceeds. *See* Disclosure Statement § I.A.1(c); Ex. F (Illustrative Recovery Scenarios). |
| | | | b. How non-voting administrative expense creditors are protected when the plan eliminates their statutory priority rights through an opt-out mechanism. (¶ 20). | The Plan provides for payment in full in cash of all Allowed Administrative Expense Claims against the Plan Debtor, as required by section 1129(a)(9) of the Bankruptcy Code. *See* Disclosure Statement § I.E. Holders of Administrative Expense Claims against any FBG Debtor (other than the Plan Debtor) are not bound by any opt-out mechanism; if such creditors are Eligible Creditors, they may provide written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation trust Interest. If they choose to provide such written notice, they retain their claims against the applicable FBG Debtors, and their claims will be treated in accordance with the priority scheme under chapter 7 of the Bankruptcy Code. *See* Disclosure Statement §§ I.A.1(e); I.B.1. |
| | | | c. The amount of the two proposed credit bid amounts, which are necessary for creditors to determine whether DIP lenders will be made whole and what realistic recovery electing creditors can expect. (¶ 13). | The Disclosure Statement provides disclosure regarding the Estate Claims Credit Bid Transaction and the DIP Collateral Credit Bid Transaction, including the parties, collateral, and process by which the DIP Secured Parties will credit bid. *See* Disclosure Statement §§ I; IV.P.2–3. The Disclosure Statement provides that the Debtors anticipate |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Reply in Support of Disclosure Statement Motion* to which this chart is attached (the "**Reply**"), the applicable Objection, the Plan, or the Disclosure Statement, as applicable. This chart summarizes certain key issues raised in the Objections. To the extent that an Objection or a specific point raised in an Objection is not addressed herein, the Debtors reserve the right to respond to such Objection at the Combined Hearing.

| **Filed Objections and Reservations of Rights** |
|---|

<table>
<tr>
<td colspan="5"></td>
<td>that the amounts of the Credit Bids will be disclosed no later than the filing of the Plan Supplement. *See* Disclosure Statement §§ I.A.4.</td>
</tr>
<tr>
<td colspan="4">d. How a non-operating entity with no assets other than undetermined interests in insurance policies and investments, no gross revenue, and only one unsecured creditor, has authority or standing to propose a plan that eliminates the priority rights of creditors of the other Debtor entities. (¶ 18).</td>
<td>The Disclosure Statement explains that the Plan does not eliminate the priority rights of creditors of the other FBG Debtors. As the Plan Debtor, Premier Marketing Group, LLC is authorized under section 1121 of the Bankruptcy Code to propose its own plan, which incorporates a Global Settlement that may affect the FBG Debtors' estates with their consent and Court approval. Creditors of the FBG Debtors (other than the Plan Debtor) may provide written notice to the Litigation Trustee that such Eligible Creditor (i) does not wish to participate in the Global Settlement, and (ii) disclaims its Class 3(b) Litigation trust Interest. If they choose to provide such written notice, they retain their claims against the applicable FBG Debtors, and their claims will be treated in accordance with the priority scheme under chapter 7 of the Bankruptcy Code. *See* Disclosure Statement §§ I.A.1(e); I.B.1.</td>
</tr>
<tr>
<td colspan="4">ii. TQL asserts that the Disclosure Statement violates the DIP Order by failing to explain how it will satisfy the requirement to pay administrative expense claims of all DIP Loan Parties before paying Roll-Up Obligations, as the Disclosure Statement only addresses payment of the Plan Debtor's administrative expenses. (¶¶ 11–12).</td>
<td>The Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the DIP Order, the Administrative Expense Claims Basket is only triggered "following the indefeasible payment in full in cash of the New Money DIP Loans." *See* DIP Order ¶ 8(b). Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash." Rather, holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for their DIP A Claims.</td>
</tr>
<tr>
<td colspan="4">iii. TQL asserts that the Disclosure Statement contains contradictions regarding the effect of inaction by Eligible Creditors, stating both that creditors who do not opt out "shall retain all of its rights and claims" while also providing that inaction results in automatic enrollment as an "Electing Creditor" in the Litigation Trust, creating confusion about whether creditors preserve or waive their rights. (¶¶ 14–15).</td>
<td>The Disclosure Statement clarifies that all Eligible Creditors will receive Class 3(b) Litigation Trust Interests on account of their Eligible Creditor Claims, subject to a Claim acceptance process administered by the GUC Ombudsman, and may receive distributions from the Litigation Trust in accordance with the Litigation Trust Agreement and the Plan. Eligible Creditors are not required to opt in or to submit any election form to receive Class 3(b) Litigation Trust Interests; such Eligible Creditors may choose not to participate in the Global Settlement at any time by providing written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interest. *See* Disclosure Statement § I.

The Plan only contemplates an "opt in" structure for Trade Creditors, Supply Chain Financers, and Factors that have the option to participate in the "Preference Settlement." Pursuant to this structure, such creditors are given the option to opt in to and receive the benefits of the Preference Settlement, in exchange for which such creditors will (i) consent</td>
</tr>
</table>

2

| | | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|---|
| | | | | | to the third-party releases contained in the Plan and (ii) contribute all of their Direct Creditor Claims to the Litigation Trust. *Id.* |
| | | | | iv. TQL asserts that because no bar date for filing proofs of claim has been established, the estimated $5.6 billion in general unsecured claims and $223 million in administrative expense claims are based solely on the Debtors' books and records, preventing creditors from assessing their pro-rata share and making informed election decisions. (¶ 19). | No bar date is required to be set before solicitation. *See, e.g.*, *In re Hornblower Holdings LLC*, No. 24-90061 (MI) (Bankr. S.D. Tex. Apr. 16, 2024) (Docket No 549) (approving disclosure statement on conditional basis where debtors solicited based on their Schedules and proofs of claim filed before the Voting Record Date). Nevertheless, the Disclosure Statement, as amended, provides that the Debtors estimate that potential Eligible Creditor Claims total approximately $5.9 billion, consisting of $223 million in Administrative Expense Claims, $77 million in Priority Tax Claims and Other Priority Claims, and $5.6 billion in General Unsecured Claims. See Disclosure Statement § I.B.4. The Disclosure Statement also discloses the risk that these estimates may be too high or low. § V.A.8. |
| | | | | | To determine the amount of potential Eligible Creditor Claims, the Debtors conducted a thorough analysis of their books and records. The Disclosure Statement also provides sufficient information regarding the process for reconciling Eligible Creditor Claims, which will be conducted by the GUC Ombudsman pursuant to Reconciliation Procedures to be agreed upon by the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee. Because the reconciliation of Eligible Creditor Claims will be performed by the GUC Ombudsman after the Effective Date, Eligible Creditors are not prejudiced, since their claims will be addressed in accordance with the Bankruptcy Code and Reconciliation Procedures |
| | | | | | Finally, the Disclosure Statement provides Illustrative Recovery Scenarios from which creditors may evaluate potential recoveries; the absence of a bar date does not preclude approval of the Disclosure Statement. *See* Disclosure Statement, Ex. F. |
| | | | | v. TQL asserts that the proposed opt-out deadline requires creditors to make irrevocable elections and grant broad third-party releases before the Court determines whether the plan is confirmable and before critical plan supplement information becomes available. (¶ 21). | As explained in the Reply, the Debtors filed the original versions of the Plan and Disclosure Statement approximately three weeks ago. Under the Debtors' amended proposed confirmation and solicitation timeline, which extends the timeline by nineteen (19) days, the Plan Supplement will be filed on June 1, 2026 and the Voting Deadline and Combined Objection Deadline will be on June 10, 2026. Thus, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and |

3

| | | | | |
|---|---|---|---|---|
| **Filed Objections and Reservations of Rights** | | | | |
| | | | | Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| 2. | 2705 | Leucadia Asset Management LLC, acting through its Point Bonita Capital Division, LAM Trade Finance Group LLC, and LAM TFG I SPV LLC (the "**LAM Parties**") | i. The LAM Parties assert the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: <br><br> ***\* The Debtors believe the changes made to the Disclosure Statement resolve the LAM Parties' objection, subject to the LAM Parties' confirmation.*** | The LAM Parties' Objection raises confirmation-stage issues—substantive consolidation, the Eligible/Ineligible Creditor construct, scheduling, good-faith/section 1129(a)(3), and sub rosa—rather than disclosure adequacy. The Debtors have nonetheless addressed the LAM Parties' principal concerns as follows: <br><br> (i) the Disclosure Statement clarifies that the Plan is not predicated on substantive consolidation, that nothing in the Plan requires substantive consolidation of the Plan Debtor with the other FBG Debtors, and that disputed inter-Debtor and inter-creditor issues are addressed through the Global Settlement and the residual chapter 7 process (*see* Disclosure Statement §§ I.A, V); <br><br> (ii) the definition of "Ineligible Creditor" has been amended to remove "Adverse Conduct" and is now defined as (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests; <br><br> (iii) the Plan provision deeming any objecting party an Ineligible Creditor has been removed, so that exercising the right to object does not render a creditor an Ineligible Creditor (*see* Disclosure Statement § I.C); <br><br> (iv) whether the Eligible/Ineligible distinction is consistent with sections 502(d) and 510 of the Bankruptcy Code, and whether the Plan satisfies section 1129(a)(3) and is not a sub rosa plan as to the non-Plan Debtors, are confirmation issues that the Debtors will address at the Confirmation Hearing; |

4

| | | | | | **Filed Objections and Reservations of Rights** |
|---|---|---|---|---|---|
| | | | | | (v) the revised confirmation schedule provides creditors a reasonable opportunity to evaluate the Plan and Election Materials (*see* Disclosure Statement §§ I.B, I.C); and |
| | | | | | (vi) the Litigation List of Ineligible Creditors, Plan Supplement, and identification of trustees will be filed in accordance with the schedule set forth in the Disclosure Statement (*see* Disclosure Statement §§ I.A, I.C). |
| | | | a. | Whether the plan is predicated on substantive consolidation or how issues of substantive consolidation will be resolved, given the Examiner's findings. (¶¶ 36–42). | The Debtors are not substantively consolidating through the Plan or Global Settlement. The Debtors are seeking to resolve any potential substantive consolidation issues through the Global Settlement, avoiding significant litigation. As explained in ¶¶ 35–37 of the Reply, substantive consolidation provides no benefit to the FBG Debtors or their creditors, given the amount of senior liens encumbering substantially all their assets and claims. |
| | | | b. | The criteria for being deemed an Ineligible Creditor for engaging in "Adverse Conduct" and whether the Litigation Trustee has discretion to add creditors the list of Ineligible Creditors on a finding of Adverse Conduct. (¶¶ 29–31, 35). | The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" has been removed from the definition of "Ineligible Creditor." "Ineligible Creditors" now include (i) any Person holding an Eligible Creditor Claim that is subject to (a) disallowance, including, for the avoidance of doubt, pursuant to section 502(d) of the Bankruptcy Code, or (b) subordination pursuant to section 510(b) of the Bankruptcy Code or any other applicable law, as determined by a Final Order; (ii) the ABL Secured Parties; (iii) the Debtors, including the Converting Debtors; and (iv) solely for the purposes of the Global Settlement, any Eligible Creditor that provides written notice to the GUC Ombudsman that such Eligible Creditor (a) does not wish to participate in the Global Settlement, and (b) disclaims its Class 3(b) Litigation Trust Interests. *See* Disclosure Statement § I.C.2. |
| | | | i. | The LAM Parties assert that the distinction between Eligible Creditors and Ineligible Creditors diverge from Bankruptcy Code's disallowance and subordination provisions. (¶ 34). | *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | ii. | The LAM Parties assert that designating any creditor filing an objection as an "Ineligible Creditor" violates Section 1129(a)(3)'s good faith requirement and Section 1109(b)'s participatory rights. (¶ 46). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. | The LAM Parties assert that the confirmation timeline is unreasonable given the plan's novelty and complexity, and because critical documents including the Plan Supplement, Litigation List, and identification of trustees will not be disclosed until seven days before the objection deadline. (¶ 49). | Under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which provides ample time for Eligible Creditors that are Trade Creditors, Supply Chain Financers, and Factors to review Plan, Plan Supplement, and related materials and make an informed decision regarding whether to contribute their direct claims to the Litigation Trust and opt- |

5

| | | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|---|
| | | | | | in to the limited Third-Party Releases under the Plan in exchange for receiving the benefits of the Preference Settlement, including a waiver of Preference Actions against Trade Creditors and the Modified New Value Element for Supply Chain Financers and Factors. |
| | | | | | As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | iv. | The LAM Parties assert that proposing a plan for a single debtor to resolve the FBG Debtors' chapter 11 cases is a sub rosa plan for the FBG Debtors (¶ 43). | Neither the Plan nor the Global Settlement is a sub rosa plan, but in any event, the Debtors are not seeking approval of the Plan and Global Settlement at the conditional Disclosure Statement hearing, and any such objections will be appropriately addressed at the confirmation hearing, not the conditional Disclosure Statement hearing. *See* Reply ¶¶ 22–29. |
| | | | v. | The LAM Parties request (a) a four-week advance disclosure of any Litigation List of ineligible creditors, and (b) a reasonable schedule for parties to conduct discovery and litigate confirmation issues. (¶¶ 39, 42). | As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* The Plan and Disclosure Statement have been amended such that the Litigation List construct has been removed. |
| 3. | 2712 | Katsumi Servicing, LLC ("**Katsumi**") | i. | Katsumi objects to the proposed confirmation timeline alleging that creditors are not afforded sufficient time to evaluate the Plan, the Disclosure Statement, and the documents to be filed as part of the Plan Supplement to fairly exercise their rights. (¶¶ 1–7). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj. As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |

| Filed Objections and Reservations of Rights | | | | |
|---|---|---|---|---|
| | | | ii. Katsumi asserts The Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | |
| | | | a. The Plan's distinction between Eligible Creditors and Ineligible Creditors. (¶¶ 9–16). | *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | b. The interplay of the Adverse Conduct determination related to Ineligible Creditors and the Litigation Trust, and the Preference Settlement. (¶¶ 17–25). | The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" has been removed from the definition of "Ineligible Creditor." *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | c. The Plan's definition of ABL Collateral Trust Assets as it relates to Factors' rights to factored receivables. (¶¶ 26–30). | The Disclosure Statement outlines a clear process for addressing competing claims to inventory and accounts receivable: (i) the Factored Receivables Account established pursuant to the Cash Management Order will remain in place and continue to be administered consistent with Cash Management Order, with assets subject to a bona fide dispute held pending final adjudication; and (ii) the DIP Collateral Trust Assets and ABL Collateral Trust Assets expressly exclude any assets subject to a bona fide dispute, including disputes asserted by Evolution and other Third-Party Factors. See Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 (bona fide dispute mechanism), I.B.8 (SPV Debtor assets). Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | d. The factual support for the Plan's releases to allow creditors to assess the reasonableness of the $400 million threshold for Litigation Trust participation. (¶¶ 31–33). | The reasonableness of the Plan and Global Settlement is an issue that will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. In any event, the Creditors' Committee, who serves as the statutory fiduciary for all general unsecured creditors, evaluated the Plan and Global Settlement and (i) recommends that holders of General Unsecured Creditors against the Plan Debtor vote to accept the Plan, (ii) supports confirmation of the Plan and approval of the Global Settlement, and (iii) recommends that all Eligible Creditors carefully evaluate the terms of the Preference Settlement, including the required contribution of Direct Creditor Claims to the Litigation Trust. |

| | | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|---|
| | | | | iii. Katsumi argues that the Plan creates an impermissible "death trap" by rendering any creditor that files an objection to the Plan or Global Settlement an Ineligible Creditor. (¶¶ 23–24). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| 4. | 2716 | Onset Financial Inc ("**Onset**") | | i. Onset argues that it has not had sufficient time to review the Plan, Disclosure Statement, and related documents including documents to be included as part of the Plan Supplement. (¶ 19). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj. <br><br> As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | | ii. Onset objects to the conversion of the Carnaby Debtors and argues it should be permitted to develop a standalone chapter 11 plan for those debtors. (¶ 19). | The Debtors have revised the Plan to only provide for the conversion of the chapter 11 cases FBG Debtors (other than the Plan Debtor) to cases under chapter 7 of the Bankruptcy Code, and not the conversion of the SPV Debtors' chapter 11 cases. Therefore this objection is moot. Disclosure Statement § IV.P.9. The Debtors intend to convert the SPV Debtors' cases at a later time, by separate motion. |
| | | | | iii. Onset argues the Debtors do not have justification for categorically excluding those named in the Onset Complaint, those that have engaged in Adverse Conduct, or those that object to the Plan, from potential recovery on their claims against the FBG Debtors. (¶ 19). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. <br><br> The Plan and Disclosure Statement have been amended such that engaging in "Adverse Conduct" and inclusion of "SPV Lenders" has been removed from the definition of "Ineligible Creditor." *See* above Response 2(b) to LAM Obj. regarding changes to definition of "Ineligible Creditor"; Disclosure Statement § I.C.2. |
| | | | | iv. Onset alleges that the Plan does not contain a mechanism to ensure that the Carnaby Debtors will have access to the books, records, and investigative findings of the Debtors that will be transferred to the Litigation Trust, which Onset asserts as essential because it argues the Carnaby Debtors have claims of their own. (¶ 19). | Onset's and the Carnaby Debtors' rights are reserved with respect to the Plan's treatment of such assets to be transferred to the Litigation Trust. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |

| | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|
| | | | v. Onset argues that the Plan impermissibly restricts setoff rights by requiring that holders of Claims obtain the Plan Debtor's or Wind Down Administrator's consent to file a setoff motion on or before the Confirmation Date. (¶ 19). | Onset's rights are reserved with respect to the Plan's treatment of setoff rights. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | vi. Onset objects to the Plan's transfers of the right to recover from the Debtors' shared D&O insurance policies to the Litigation Trust without any mechanism for reserving coverage for the Carnaby Debtors' claims. (¶ 19). | Onset's and the Carnaby Debtors' rights are reserved with respect to their ability to pursue claims under the D&O policies if they so choose. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | vii. Onset objects to the Estate Claims Marketing Process as categorically excluding Onset from participation and as not being designed to maximize value of the Debtors' estates. (¶ 19). | The Estate Claims Marketing process is a marketing and sale process for the Litigation Trust Assets, including the Estate Claims, which include Claims against Onset in the Onset Adversary Proceeding. Therefore, Onset cannot be permitted to participate and obtain insight into the value of such claims or purchase such claims against themselves. *Id.* § I.A.1. |
| | | | viii. Onset objects to the definition of "Estate Claims" on the grounds that such definition does not explain how proceeds of the Debtors' claims in the James Adversary Proceeding and the Onset Adversary Proceeding, which were commenced jointly by the FBG Debtors and the Carnaby Debtors, will be allocated. (¶ 19). | The Disclosure Statement includes an additional disclosure that, in cases where both an FBG Debtor and one or more SPV Debtors assert Claims against a common defendant, the Plan and Confirmation Order make no determination regarding proper allocation and all rights regarding any allocation dispute shall be preserved. |
| 5. | 2717 | ING Belgium S.A./N.V. ("**ING Belgium**" | i. ING Belgium joins the legal arguments made by Katsumi and the LAM Parties. | *See* responses to Objections of LAM and Katsumi. |
| 6. | 2718 | Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") | i. The U.S. Trustee objects to the Global Settlement as asserting that it is impermissible sub rosa plan because it allows the DIP Secured Parties to credit bid on Estate Claims on which they lack a lien, transfers those claims to the Plan Debtor for no value, and circumvents § 1129(a)(9)'s requirement to pay $223 million in administrative claims in full on the Effective Date. (¶¶ 26–32). | Neither the Plan nor the Global Settlement is a sub rosa plan, but in any event, the Debtors are not seeking approval of the Plan and Global Settlement at the conditional Disclosure Statement hearing. *See* Reply ¶¶ 22–29. |
| | | | ii. The U.S. Trustee asserts that classifying objecting creditors as "Ineligible Creditors" is coercive and provides different treatment to similarly situated creditors within the same class in violation of section 1123(a)(4). (¶¶ 21(f), 39–40). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. The U.S. Trustee alleges that the Disclosure Statement does not include adequate information, including no liquidation analysis, and most exhibits to the | The Disclosure Statement provides Illustrative Recovery Scenarios sufficient to enable Eligible Creditors to evaluate expected distributions from the Litigation Trust at varying |

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| | | | | Disclosure Statement Motion's proposed order (including ballots, notices, and election forms) have not been provided. (¶¶ 21(e)). | levels of distributable proceeds. *See* Disclosure Statement § I.A.1(c); Ex. F (Illustrative Recovery Scenarios). Further, with respect to the liquidation analysis, the Plan Debtor has no known assets other than equity interests in AVM. The Plan Debtor does not believe there is equity value in AVM. The Plan Debtor, therefore, believes that each holder of an Allowed Claim or Interest against the Plan Debtor that is classified under the Plan would not receive any recovery on account of its Allowed Claim or Interest in a chapter 7 case of the Plan Debtor. Accordingly, the Plan Debtor believes the Plan satisfies the best interests test. *See id.* § VII.C.4.<br><br>The Solicitation Procedures and various election forms were filed at Docket No. 2704 with amended versions of such documents filed contemporaneously herewith. |
| | | | iv. | The U.S. Trustee objects to the proposed confirmation timeline, arguing that the Debtors have not established cause under Fed. R. Bankr. P. 9006(c) to shorten the time periods required by the Bankruptcy Rules. (¶¶ 21(d), 50–52). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj.<br><br>As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | v. | The U.S. Trustee also argues that the Global Settlement seeks to alter key terms of the DIP Order by allowing the DIP Secured Parties to credit bid on Estate Claims that the DIP Order specifically excluded from their collateral and by enabling them to avoid the subordination of their approximately $3.3 billion in Roll-Up Obligations to up to $200 million in unpaid administrative claims as required by the DIP Order. (¶¶ 37–38). | The Administrative Expense Claims Basket is not triggered by the Plan or Global Settlement because, under the DIP Order, the Administrative Expense Claims Basket is only triggered "following the indefeasible payment in full in cash of the New Money DIP Loans." *See* DIP Order ¶ 8(b). Under the Plan and Global Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash." Rather, holders of New Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust in exchange for their DIP A Claims. |
| | | | vi. | The U.S. Trustee alleges that the Plan cannot satisfy section 1129(a)(7)'s "best interests" test because it bars objecting creditors from receiving distributions as "Ineligible Creditors." (¶¶ 41–43). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | vii. | The U.S. Trustee objects to the Plan's permanent discharge injunction as violating section 1141(d)(3) because the Debtors are liquidating substantially all | Any issues with respect to the Plan's proposed discharge will be appropriately addressed at confirmation, rather than at the conditional Disclosure Statement hearing. |

| **Filed Objections and Reservations of Rights** ||||||
|---|---|---|---|---|---|
| | | | | of their assets and do not engage in business after consummation of the Plan. (¶¶ 21(c), 44–49). | |
| | | | viii. | The U.S. Trustee objects to the Plan's exculpation provision as impermissibly including parties not entitled to exculpation in the Fifth Circuit, extending beyond section 1125(e) of the Bankruptcy Code. (¶¶ 21(g), 54–58). | Any issues with respect to the Plan's exculpation provisions will be appropriately addressed at confirmation, not the conditional Disclosure Statement hearing. |
| | | | ix. | The U.S. Trustee assert that the Plan's injunction and gatekeeper provisions violate the Bankruptcy Code and Fifth Circuit precedent in *Highland II* by requiring non-debtor third parties to seek bankruptcy court permission to bring suit against entities that do not exist until the Effective Date. (¶¶ 21(h), 61–64). | The inclusion of the two members of the Special Committee as "Exculpated Parties" is consistent with Fifth Circuit precedent, including the Fifth Circuit's holding in *Highland I*[2] because the Special Committee members acted as estate fiduciaries throughout the Debtors' chapter 11 cases. The Court should reject this improper reading of *Highland I* because, there, the court found that each of the three independent directors appointed as fiduciaries were properly exculpated under the plan.[3] Citing section 1107(a) of the Bankruptcy Code, the Court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.[4] Nor did *Highland I* impose the requirement that independent directors must be appointed by the Court in order to qualify for an exculpation, as the U.S. Trustee suggests. *Id.* |
| 7. | 2727 | Carnaby Secured Lenders ("**CarVal**") | i. | CarVal objects to the proposed confirmation timeline, arguing that the Plan's complex structure demands a longer objection timeline. (¶¶ 1–4, 15–17). | As explained above, the under the revised proposed confirmation timeline, the deadline to opt-in to the Preference Settlement is forty-five (45) days after the Effective Date of the Plan, which is plenty of time for Trade Creditors, Supply Chain Financers, and Factors to review the related materials and make an informed decision as to participating in the Preference Settlement. *See* Response 3(iv) to LAM Parties Obj.<br><br>As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | ii. | CarVal alleges that the documents to be filed as part of the Plan Supplement are material agreements underpinning the Plan and that parties will not have | As explained above and in the Reply, interested parties will have been afforded six (6) weeks total from the filing dates of the original Plan and Disclosure Statement to the |

[2] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) ("**Highland I**").

[3] *See Highland I*, 48 F.4th at 437-38.

[4] *Id.* At 437.

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| | | | | sufficient time to review such documents before the Combined Objection Deadline to understand how the documents might impact their rights. (¶¶ 2, 13). | Voting Deadline and Combined Objection Deadline. *See* above response to TQL Obj. 1(ii); Reply ¶ 39. Nine (9) days between the filing of the Plan Supplement and the Voting Deadline and Combined Objection Deadline is adequate, reasonable, and consistent with timelines of similar cases. *Id.* |
| | | | iii. | CarVal argues that the Plan's exclusion of objecting creditors as Ineligible Creditors from receiving distributions from the Litigation Trust, violates the bankruptcy Code's requirement for equality of distributions. (¶¶ 18, 20). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iv. | CarVal objects to the Plan's release, exculpation, and injunction provisions as overly broad. (¶ 18). | Any issues with respect to the Plan's release, exculpation, and injunction provisions is an issue that will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. In any event, |
| | | | v. | CarVal argues that the Plan inappropriately channels all Debtors' privileges, books, records, and other materials relevant to any future litigation into the Litigation Trust and places onerous restrictions on the sharing of such information by the Litigation Trustee, which CarVal assert will hinder the SPV Debtors' ability to pursue their own causes of action. (¶ 21). | Carval's rights are reserved with respect to the Plan's treatment of such assets to be transferred to the Litigation Trust. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | vi. | CarVal argues that an express carve-out of the release and injunction provisions should be added to the Plan to avoid any prejudice to the rights of the SPV Debtors, their estates, and their creditors, because the SPV Debtors stand to receive no benefit from the Plan. (¶ 23). | Such issues with respect to the Plan's release and injunction provisions will appropriately be addressed at confirmation, not at the conditional Disclosure Statement hearing. |
| | | | | **Resolved Objections** | |
| 1. | 2629 | Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P. (as successor in interest to Evolution | i. | Evolution asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding: | The Debtors have substantially augmented the Disclosure Statement to address Evolution's concerns and have, among other things, added the disclosures described below in response to the Evolution Objection. *See* Disclosure Statement §§ I.A.2, I.A.3, I.B.7, I.B.8. |
| | | | a. | The valuation of assets subject to three proposed plan transactions and the impact on Evolution's asserted rights. (¶ 25). | The Disclosure Statement provides sufficient information regarding the three Plan Transactions, including the parties, collateral, process, and illustrative recoveries for creditors . *See* Disclosure Statement §§ I.A.1, IV.K, Ex. F (Illustrative Recovery Scenarios). The Plan Debtor added a disclosure explaining that they are unable to provide an estimate of the anticipated distributable proceeds on behalf of such claims because any such estimate would need to take into account typical litigation risks as well as claim-specific factors, which would necessarily include the Debtors' counsels' evaluations of the |

| | | | | |
|---|---|---|---|---|
| | | **Filed Objections and Reservations of Rights** | | |

| | | Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP (“**Evolution**”) | | value of claims and the likelihood of settlement. To the extent any objectors argue that a lack of value in the Estate Claims raises issues of confirmability, such objections are Confirmation Objections and should be considered at the Confirmation Hearing. Section I.B.4; s*ee In re U. S. Brass Corp.*, 194 B.R. 420, 426 (Bankr. E.D. Tex. 1996) (holding it was "sufficient that [the debtors] describe the litigation and disclose that they are unable to estimate [its] value"). Such estimates are therefore protected by relevant privileges, including attorney-client privilege, and would constitute attorney work product, and could prejudice the Debtors' ability to prosecute such claims. Nevertheless, the Debtors believe the substantial detail provided in Sections I.A.1 and IV.K of the Disclosure Statement with respect to the litigation claims, including, among other things, the current status of each litigation claim, is sufficient to enable creditors to evaluate each of the Debtors' claims for purposes of electing whether to vote in favor of the Plan. |
| | | | b. How the proposed plan transactions will be reconciled with Evolution's pending lien priority actions (Adversary Proceedings Nos. 25-03800 and 26-03006) in which Evolution asserts perfected, first-priority liens on assets of the Evolution SPV Debtors and prepetition receivables of certain FBG Debtors. (¶¶ 28–31). | As the Disclosure Statement explains, the DIP Secured Parties' credit bid is on the FBG Debtors' Estate Claims and the FBG Debtors' interests in the DIP Collateral, and does not extend to assets of, or claims against, the Evolution SPV Debtors. *See* Disclosure Statement § I.B.8 ("What is Happening to the Assets (Including Claims) of the SPV Debtors?") (confirming that SPV Debtor assets remain in possession of the SPV Debtors and all rights are reserved as to ownership disputes between the FBG Debtors and the SPV Debtors). Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a.<br><br>The Disclosure Statement further confirms that only assets and Claims that are not subject to a bona fide dispute may be transferred to the DIP Collateral Trust or the ABL Collateral Trust, and that no asset subject to a bona fide dispute vests in any Trust unless and until the parties agree or a court confirms the relevant lenders' validly perfected senior Lien. *See* Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 ("What Happens if There Is a Dispute Between the Trusts Over the Rightful Owner of an Asset?"). For the avoidance of doubt, only assets that are not subject to a bona fide dispute can be transferred to the applicable Trust. *See* Disclosure Statement § I.B.7. |
| | | | c. The sources of the $25 million in cash from the Debtors' balance sheet being used to fund one-third of the Litigation Trust and whether any of this | The Disclosure Statement explains that the $25 million in Litigation Trust funding contributed by the FBG Debtors is sourced from the DIP Lenders' cash collateral, and is not drawn from the segregated Factored Receivables Account or otherwise from |

| | | | Filed Objections and Reservations of Rights | |
|---|---|---|---|---|
| | | | cash may be subject to asserted liens by third parties such as Evolution. (¶¶ 33–35). | prepetition receivables subject to Evolution's asserted liens. *See* Disclosure Statement §§ I.A, I.A.1, I.A.3(a), I.B.8. Evolution's asserted lien rights in factored and unfactored receivables remain protected by the Factored Receivables Account and the bona fide dispute framework, and nothing in the Disclosure Statement alters those rights. *See* Disclosure Statement §§ I.A.2(a), I.A.3(a), I.B.7.<br><br>Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | d. The rights of other lenders asserting priority liens to disputed assets and how the Debtors intend to determine which inventory products, values, and accounts receivable are owned by which Debtor and how to address disputes between the DIP Secured Parties or the ABL Secured Parties, on one hand, and other secured lenders and Third-Party Factors such as Evolution, on the other hand. (¶ 32). | The Disclosure Statement outlines a clear process for addressing competing claims to inventory and accounts receivable: (i) the Factored Receivables Account established pursuant to the Cash Management Order will remain in place and continue to be administered consistent with Cash Management Order, with assets subject to a bona fide dispute held pending final adjudication; and (ii) the DIP Collateral Trust Assets and ABL Collateral Trust Assets expressly exclude any assets subject to a bona fide dispute, including disputes asserted by Evolution and other Third-Party Factors. *See* Disclosure Statement §§ I.A.2(a) (DIP Collateral Trust Assets), I.A.3(a) (ABL Collateral Trust Assets), I.B.7 (bona fide dispute mechanism), I.B.8 (SPV Debtor assets).<br><br>Additionally, the Disclosure Statement clarifies that, for the avoidance of doubt, DIP Collateral Trust Assets and ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders or (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | e. How the Litigation Trustee and other parties will coordinate and allocate insurance policy proceeds between the FBG Debtors' Estate Claims and separate claims being pursued by the Evolution SPV Debtors. (¶¶ 36–39). | The Disclosure Statement provides that only the FBG Debtors' rights to recover proceeds from insurance policies are considered Estate Claims. *See* Disclosure Statement § I.A.1. The SPV Debtors' rights to Insurance Proceeds are fully preserved. |
| | | | f. Clarification that the Plan will not transfer attorney-client privileges held by the Evolution SPV Debtors to the Litigation Trust, as the Evolution SPV Debtors maintain independent privileges that now reside with their chapter 7 trustee. (¶ 40). | The Disclosure Statement clarifies that the transfer of attorney-client and other privileges to the Litigation Trust is limited to privileges held by the FBG Debtors, and does not affect, transfer, or impair the independent privileges of the Evolution SPV Debtors, which now reside with the chapter 7 trustee for those estates. *See* Disclosure Statement §§ I.A.1, V.B. |

| | | | | **Filed Objections and Reservations of Rights** | |
|---|---|---|---|---|---|
| 2. | 2709 | Keystone Automotive Operations, Inc. and Uni-Select, Inc. (together, "**KAO/Uni**") | i. | KAO/Uni asserts the Disclosure Statement does not contain "adequate information" under section 1125 of the Bankruptcy Code regarding procedures for how other creditors may become Eligible Creditors, and details on claims filing and reconciliation procedures, given the lack of a bar date. (¶¶26–29). | *See* above Response 1(iv) to TQL Obj. |
| | | | ii. | KAO/Uni asserts the Plan is patently unconfirmable because it violates Section 1123(a)(4) of the Bankruptcy Code by providing different treatment to creditors within the same class based on whether they object to the Plan and Global Settlement. (¶¶14–16). | The Plan and Disclosure Statement have been amended such that filing an objection to the Plan or Global Settlement is no longer criteria for being deemed an Ineligible Creditor. |
| | | | iii. | KAO/Uni asserts the Plan impermissibly strips defendants of affirmative defenses, including setoff and recoupment rights. (¶¶ 18–21). | KAO/Uni's rights are reserved with respect to the Plan's treatment of affirmative defenses, setoff, and recoupment rights. In any event, such an objection is to be addressed at confirmation, not at the conditional Disclosure Statement hearing. |