# EXHIBIT 6

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |

**DECLARATION OF CHARLES M. MOORE IN SUPPORT**
**OF (I) THE PROPOSED CONFIRMATION SCHEDULE AND**
**(II) THE DEBTORS' OBJECTION TO UNITED STATES TRUSTEE'S**
**MOTION TO CONVERT OR DISMISS PURSUANT TO 11 U.S.C. § 1112(b)**

I, Charles M. Moore, pursuant to § 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I submit this declaration (the "**Declaration**") in support of (i) the *Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2906) (the "**Objection**")[2] and (ii) the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures,*

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]     Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to such terms in the Objection (filed contemporaneously herewith), the Joint Plan (as defined herein), or the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (filed contemporaneously herewith) (as may be further amended, supplemented, or modified from time to time, the "**Disclosure Statement**"), as applicable.

*(V) Establishing Preference Settlement Notice and Opt In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related Relief* (the "**DS Motion**"), each filed contemporaneously herewith by First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-debtor affiliates, the "**Company**"), in these chapter 11 cases.

2.     This Declaration is based on my personal knowledge, education, experience and review of documents and other information relevant to my testimony. If called to testify, I could and would testify competently to the matters set forth in my Declaration. My compensation is not contingent upon or influenced by the substance of my testimony or the outcome of the Objection, the *United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2670) (the "**UST Motion**"), or the DS Motion. I am authorized to submit this Declaration on behalf of the Debtors.

<u>**Qualifications and Professional Background**</u>

3.     I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**"). On September 5, 2025, A&M was retained by the Company to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and undertake contingency preparations for a potential chapter 11 filing. On September 24, 2025, Global Assets, LLC and twelve of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28, 2025 (as applicable, the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.

4.     On September 24, 2025, I was appointed as Chief Restructuring Officer of First Brands Group, LLC and, on October 13, 2025, I was appointed as Interim Chief Executive

Officer. From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22).

5. I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

6. I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments. I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning. I have served as Chief Restructuring Officer for, among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

3

**The UST Motion**

7.     I understand that the U.S. Trustee has moved to dismiss or convert these chapter 11 cases to chapter 7 based on its assertions that there exists a "substantial or continuing loss" to the Debtors' estates and that there is no "reasonable likelihood of rehabilitation." As CEO, I am intimately familiar with the Debtors' financial condition, current expenses, proposed budget and the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 2907) (the "**Joint Plan**"). Based on my understanding of these cases and the Joint Plan, I strongly disagree with the UST's statements.

*A. The Debtors Have Paid the Vast Majority of Administrative Expense Claims*

8.     First, I disagree with the UST's assertion that the Debtors and their estates have suffered a "substantial or continuing loss." In that regard, I believe it is relevant to note the unique circumstances of these cases. These chapter 11 cases were commenced in September 2025 against the backdrop of massive suspected fraud and accounting irregularities. The former CEO and his brother were subsequently indicted and charged with conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and multiple counts of wire fraud and bank fraud. In a separate but related matter, former officers Peter Brumbergs and Stephen Graham each pleaded guilty in connection with their roles in the alleged fraudulent scheme and are cooperating with the government. The Debtors filed these cases with approximately $11.5 billion in prepetition liabilities, including approximately $6 billion in funded debt obligations, at least $2.3 billion in factoring liabilities, at least $2.3 billion in off-balance sheet financing liabilities incurred through special purpose vehicles, and approximately $900 million in unsecured supply chain financing liabilities. Despite these extraordinary hurdles, the Debtors achieved hard-fought results, including obtaining $1.1 billion of new money DIP financing and the consummation of four sale transactions—the sale of the Walbro business for $50 million, the sale of intellectual property for

4

$25 million in cash plus royalties, the sale of the TMD business line for approximately $80 million, the sale of the Horizon North America business for approximately $64 million, and the sale of the ASC business assets for approximately $2 million —generating approximately $221 million in aggregate sale proceeds (plus future royalties) to pay down secured claims.  Critically, three of these transactions—the Walbro, TMD, and Horizon North America sales—maintained those businesses as going concerns and preserved more than 2,000 jobs.  Moreover, through extensive mediation overseen by the Honorable Judge Marvin Isgur and subsequent good-faith negotiations, the Debtors achieved consensus around the Joint Plan which the Debtors now seek to solicit and confirm.

9.      I am aware that certain administrative expenses have accrued during the course of these chapter 11 cases and remain unpaid.  This is not surprising given the extraordinary circumstances under which these cases were commenced, including a tangled corporate structure involving over one hundred Debtors, unreliable books and records inherited from former management, fraud and allegations of embezzlement committed by prior leadership.  Under these unprecedented conditions, the estates incurred certain expenditures that remain outstanding.  However, my team and I, along with the Debtors' other professionals, have taken extraordinary measures to stabilize the Debtors' financial position and arrest further diminution in estate value on a go-forward basis.  Those efforts included, among other things, obtaining substantial funding from the Debtors' OEM customers from late January 2026 through the current period, which allowed the Debtors to fund continued operations of certain business units and case costs, facilitated going-concern sales, and enabled the Debtors to negotiate a chapter 11 plan which, if confirmed, provides the best and only path to pay or repay administrative and priority claims in full and a meaningful opportunity to provide recoveries to general unsecured creditors.

5

10. Since the Petition Date, the Debtors have paid more than $1.8 billion in administrative expense claims. As of mid-May, the Debtors have estimated accrued and unpaid administrative expense claims of $222 million comprised of (i) $147 million unpaid administrative expense claims incurred since the Petition Date, (ii) approximately $38 million of 503(b)(9) claims, and (iii) an additional 20% estimate for expenses that have not yet been invoiced. Accordingly, the Debtors have satisfied more than 91% of administrative expense claims that have come due and payable since the Petition Date. Of the remaining due and payable administrative expense claims that have not been paid, the vast majority of these were incurred before February 1, 2026.

### B. The Payment of Administrative Expenses in Full Through the Proposed Confirmation Timeline

11. My team and I have prepared a budget, attached hereto as Exhibit A (the "**Confirmation Budget**"). The Confirmation Budget identifies three discrete funding sources—continued OEM funding for operating expenses during the wind-down period for certain business units, proposed funding from the ABL Secured Parties, and freed cash reserves—which, in the aggregate, provides the Debtors with sufficient liquidity to pay administrative expense claims projected to be incurred during the period required to solicit and confirm the Joint Plan. As a result, allowing the proposed solicitation of the Joint Plan and Disclosure Statement to go forward will not result in any additional unpaid administrative expenses.

12. I understand that the Ad Hoc Group SteerCo and the Creditors' Committee support the Confirmation Budget and corresponding timeline for solicitation and confirmation of the Joint Plan. The Debtors are in discussions with the ABL Secured Parties and are working to secure their consent on the Confirmation Budget in advance of the June 12th hearing. Upon confirmation of consent from the ABL Secured Parties and Ad Hoc Group SteerCo, the Debtors

will have necessary consent to utilize cash collateral pursuant to the Confirmation Budget, which preserves estate assets and funds these cases through the anticipated Confirmation Date.

13. As stated, consent of the secured lenders for use of cash collateral in connection with the Confirmation Budget is being sought in connection with solicitation and confirmation of the Joint Plan. I understand that such consent would not extend to a chapter 7 conversion and I believe it is unlikely that a chapter 7 trustee would have access to these alternative funding sources. A chapter 7 trustee would also not have a source of unencumbered assets with which to fund administration of the chapter 7 cases, and it is unclear how a trustee could fund a comparable resolution that preserves, let alone maximizes, estate assets.

14. I also believe that a chapter 7 trustee would need to incur substantial additional administrative expenses not required under the Confirmation Budget, including the costs of retaining and educating new professionals, re-negotiating agreements with lenders, and potentially litigating with secured parties, all without a clear timeline, funding source, or ending point. I believe that there is a substantial risk that the Debtors' secured lenders would succeed in foreclosing upon and/or otherwise obtaining ownership of all or substantially all of the Debtors' assets, including the Estate Claims.

15. By contrast, the Confirmation Budget benefits from minimized expenses, committed funding, and a defined conclusion: upon confirmation of the Joint Plan, the funding mechanisms contemplated thereunder—including $75 million of funding for the Litigation Trust—would replace the Confirmation Budget's interim sources, preserving value of estate assets and monetizing claims. Based on my team's review of the financial circumstances of these Debtors, the Confirmation Budget and the Joint Plan together offer a path to resolving these cases and maximizing the value of estate assets that a conversion or dismissal cannot.

16.      For these reasons, I disagree with the U.S. Trustee's contention that the Debtors are suffering a substantial or continuing loss to the Debtors' estates.

C. *The Joint Plan Provides for Administrative Expense and Priority Claimants To Be Paid in Full and in Cash On the Effective Date*

17.      I am also familiar with the Debtors' recently filed Joint Plan for First Brands Group Holdings, LLC, its direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC (together, the "**FBG Debtors**").  Unlike the Debtors' previously filed chapter 11 plan, the newly filed Joint Plan reflects a joint plan encompassing all FBG Debtors and provides for payment in full, in cash, of all administrative expense and priority claims against all FBG Debtors on or before the Effective Date.

18.      The cornerstone of the Joint Plan pertains to the creation and funding of a Litigation Trust to pursue and monetize estate claims and causes of action.  In that regard, the FBG Debtors hold claims and causes of action which I understand to be valuable (albeit heavily encumbered).  These estate claims include, among others, causes of action filed against Patrick James and certain related entities as described in *First Brands Group LLC v. James*, Adv. Pro. No. 25-3803 (CML) (Bankr. S.D. Tex. 2025) (the "**James Adversary**"); as well as claims asserted against Edward James, Onset Financial, Inc., and certain related entities as detailed in *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. 2026) (the "**Onset Adversary**").  In total, these two lawsuits alone seek more than $2.7 billion in compensation.

19.      I understand discovery in both of these cases is presently stayed pending the criminal trial *United States v. Patrick James & Edward James*, 26 Cr. 29 (AT) (S.D.N.Y.), which is currently set for February 2027.  I further understand that the Government, in its successful stay motion, argued that there are overlapping issues in the James and Onset Adversaries and the criminal trial (e.g., the schemes to defraud lenders regarding the liabilities and financial condition

8

of the Company, the alleged fraudulent transfers and diversion of assets, and the sham transactions with Onset) and that the outcome of the criminal proceedings would "simplify the adversary proceedings through judicial determination of the key issues and collateral estoppel. . . ."

20.     In addition to the James and Onset Adversaries, the Litigation Trust will be vested with all Avoidance Actions arising under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, Recovery Actions (including commercial tort claims, section 506(c) recoveries, and proceeds of postpetition transfer claims), Government Forfeiture Proceeds, Insurance Recoveries (including all D&O liability insurance policies), and Direct Creditor Claims contributed by Preference Settlement Electing Creditors.  The Litigation Trust will also include all claims for fraudulent transfer, breach of fiduciary duty, RICO, aiding and abetting, unjust enrichment, equitable subordination, alter ego, and corporate veil piercing, among others, as well as any claims against SPV Lenders, section 506(c) and 552(b) surcharge rights, and any Disputed Alester IP recovered through Avoidance or Recovery Actions.  The Debtors have identified significant transfers to alleged insiders and Specified Non-Released Parties within the applicable lookback period, as potential avoidance claims that would constitute Litigation Trust Assets.

21.     As discussed below, the Litigation Trust will have significant funding—a minimum of $75 million and the ability to raise additional financing—to prosecute these and other estate claims and causes of action and bring them to a conclusion within a reasonable time.

22.     These claims and causes of action (or the proceeds thereof) are subject to significant liens in favor of the DIP Lenders.  As set forth in the DIP Order, certain of the Estate Claims (i.e., previously encumbered claims) are subject to senior liens for the full amount of the outstanding DIP Obligations and prepetition term loan and ABL claims—an aggregate of approximately $7.9 billion—while other Estate Claims (or, in the case of Avoidance Actions, the

proceeds thereof) are subject to senior DIP liens for approximately $2.4 billion in aggregate DIP Claims (i.e., approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims). The Joint Plan, however, provides for Estate Claims and Causes of Action to be transferred to a Litigation Trust where distributions will be made pursuant to a proposed waterfall, a summary of which is attached hereto as Exhibit B (the "**Litigation Trust Waterfall**").

23.    Under the Litigation Trust Waterfall (as modified in the amended Joint Plan), administrative and priority claims will be paid in full on or before the Effective Date and before any litigation recoveries are provided to holders of the $3.5 billion in Roll-Up Claims, prepetition secured claims, and general unsecured claims. Moreover, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Trust obtains approximately $1.9 billion in proceeds, even assuming no participation in the Administrative Expense Claim Consent Program.

D. *The Benefits to Creditors of the Joint Plan Would Be Lost in a Chapter 7 Liquidation And Creditors Would Be Substantially Worse Off*

24.    I expect administrative expense, priority, and unsecured creditors to be materially worse off in the event of conversion to chapter 7. As a threshold matter, all or substantially all of the Debtors' remaining assets, including most notably the claims and causes of action (or proceeds thereof) are encumbered by billions of dollars in secured claims. In total, certain Estate Claims are encumbered by as much as $7.9 billion in secured claims (approximately $4.9 billion in DIP Claims, $2.6 billion in term loan claims, and $400 million of ABL Claims). With respect to the Debtors' claims and causes of action and/or proceeds that were unencumbered on the Petition Date (including claims arising under chapter 5 of the Bankruptcy Code), the proceeds of such claims and causes of action are encumbered by at least $1.3 billion of DIP A

Claims, and, with the possible exception of $200 million in administrative expense claims, the approximately $2.4 billion of DIP Claims reflected in the DIP Hurdle. Under the Joint Plan, however, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Litigation Trust recovers approximately $1.9 billion in proceeds.

25. These and other substantial benefits of the Joint Plan would be lost in a chapter 7. I believe that in a chapter 7 scenario, a trustee would have no unencumbered assets with which to provide adequate protection, and the DIP Lenders would likely exercise remedies to foreclose on and/or otherwise control their collateral or would contest any attempt by a chapter 7 trustee to control estate claims or causes of action without their consent. This may result in no available recoveries for a chapter 7 trustee to pay any chapter 11 administrative expense, priority, or general unsecured claims.

26. Even assuming the chapter 7 debtors somehow maintained ownership and control over the Estate Claims, administrative creditors would still not be entitled to any recovery until after the DIP A Claims, any litigation financing claims, and chapter 7 administrative expenses were repaid in full. Therefore, at a minimum, the first $1.3 billion in DIP A claims must be paid in full before any administrative expense creditor can receive any recovery. After the DIP A Claims are satisfied in full in cash, administrative expense claims may receive only up to $200 million in total recoveries pursuant to the Administrative Expense Claims Basket established under the DIP Order. Beyond that $200 million basket, no distributions to holders of remaining administrative expense claims may be made until the DIP Hurdle—totaling approximately $2.4 billion as of the anticipated Confirmation Date (comprising approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims)—is satisfied in full in cash.

11

27. Further, the DIP A Claims are estimated to be approximately $1.3 billion as of the anticipated Confirmation Date, and will not accrue postpetition interest for purposes of recoveries under the Litigation Trust Waterfall, which significantly benefits junior creditors. However, in a chapter 7 scenario, the DIP A Claims will continue to accrue interest (at the default rate which adds an additional 2% per annum on top of the existing rate) until they are repaid in full.

28. Also, whereas the Joint Plan provides for a clear means of financing the Litigation Trust to monetize Estate Claims, a chapter 7 trustee would not have access to litigation funding provided under the Joint Plan, or any funds or meaningful runway with which to pursue alternative funding. In other words, upon conversion, a chapter 7 trustee would lack the means to pursue Estate Claims, including claims arising under chapter 5 of the Bankruptcy Code. To the extent a trustee were able to secure funding, I believe such funding would likely be on significantly more expensive terms than provided in the Joint Plan.

29. With the accrual of interest on the DIP A Claims at the higher default rate, more expensive litigation financing obligations (assuming funding could even be obtained by the chapter 7 trustee), and the substantial additional costs of a chapter 7 administration, the Debtors believe that a chapter 7 trustee would need to obtain substantially more litigation recoveries before any distributions to administrative, priority, or unsecured claims could begin. It would also take materially more litigation recoveries to pay such claims in full as compared to the Joint Plan.

30. For these reasons, I believe administrative expense, priority, and unsecured creditors would be materially worse off in the event of conversion or dismissal.

**The DS Motion**

31. I believe that the Debtors' proposed timeline for consideration of the Disclosure Statement and Joint Plan is reasonable and necessary in light of the financial realities of these cases. The Debtors' proposed solicitation and confirmation timeline includes the following dates:

| PROPOSED SOLICITATION AND CONFIRMATION TIMETABLE | |
| --- | --- |
| Requested Conditional Disclosure Statement Hearing | **June 12, 2026 at 10:00 a.m. (Central Time)** |
| Voting Record Date, Administrative Claims Record Date, and Preference Settlement Record Date | **June 15, 2026** |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, Non-Voting Packages, Consent Program Materials, and Preference Settlement Materials | **Within two (2) business days after entry of the Proposed Order, or as soon as reasonably practicable thereafter** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **July 3, 2026 at 5:00 p.m. (Central Time)** |
| Plan Supplement Filing Deadline | **June 22, 2026** |
| Litigation Trust Distribution Record Date & DIP Collateral Trust Distribution Record Date | **June 22, 2026 (which date may be extended by mutual agreement among the FBG Debtors and Ad Hoc Group)** |
| Rule 3018(a) Motion Deadline | **July 10, 2026 at 5:00 p.m. (Central Time)** |
| Voting Deadline and Release Opt-In Deadline | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Deadline to Object to Disclosure Statement and Plan | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Litigation Trust Interest Response Deadline & DIP Collateral Trust Interest Response Deadline | **July 20, 2026 (which date may be extended by mutual agreement among the FBG Debtors and Ad Hoc Group)** |
| Ballot Certification Deadline | **July 27, 2026** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 27, 2026** |
| Requested Combined Hearing | **July 28, 2026 (subject to the Court's Availability)** |

| Preference Settlement Opt-In Deadline | **Forty-five (45) days following the Confirmation Date (except as otherwise provided herein)** |
|---|---|
| Consent Program Opt-In Deadline | **Sixty (60) days following the Confirmation Date** |

32. Notably, the proposed timeline incorporates a full solicitation process and provides all parties in interest 28 days to object to the Joint Plan after the filing of the Plan Supplement. The Confirmation Budget reflects the Debtors' ability to fund these cases through the proposed Confirmation Date, subject to receiving consent to use certain cash collateral. After the Confirmation Date, the litigation funding provided for in the Joint Plan and Litigation Trust Agreement will commence. I understand that the Confirmation Budget and corresponding timeline is supported by the Ad Hoc Group SteerCo and the Creditors' Committee. The Debtors are in discussions with the ABL Secured Parties and are working to secure their consent to the Confirmation Budget in advance of a hearing on the DS Motion and Objection.

33. As set forth in the Confirmation Budget, if the Debtors obtain the requisite lender consents, the Debtors have funds necessary to solicit and confirm the Joint Plan and pay all expenses as they become due between now and the anticipated Confirmation Date. At present, the Debtors are working to secure the necessary consent for the Confirmation Budget, and understand that the Ad Hoc Group and ABL Secured Parties would be unwilling to consent to any budget that provides for any additional delay.

34. Accordingly, I believe the relief requested in the DS Motion is necessary and appropriate under the circumstances of these chapter 11 cases.

## **Conclusion**

35.     I believe dismissal or conversion of these cases would be materially worse for creditors.  Converting these cases now, mere weeks before a hard-earned rehabilitation could be realized, would waste months of effort, incur unnecessary expenses, and leave these estates with no meaningful funding or clear path forward.  I therefore believe the Joint Plan represents the best available path forward for these estates and their creditors.  For the above reasons, I believe that the relief sought by the UST Motion should be denied, the Debtors' proposed solicitation timeline and procedures should be authorized, and the disclosure statement should be approved on a conditional basis.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  June 5, 2026
        Oakland County, Michigan

*/s/ Charles M. Moore*
Charles M. Moore, Managing Director
Alvarez & Marsal North America LLC

# EXHIBIT A

## Confirmation Budget

**FBG Debtors**

**Cash Flow Forecast**

*$ in millions USD*

| | | HZN Close | P+DS Amend. | DS & UST Hrg. | OEM Exit | Plan Supp. | | | | Obj. Deadline | Confirmation | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #** | | **Wk 1** | **Wk 2** | **Wk 3** | **Wk 4** | **Wk 5** | **Wk 6** | **Wk 7** | **Wk 8** | **Wk 9** | **Wk 10** | | **Total** | |
| *Week Ending* | | 5/29/26 | 6/5/26 | 6/12/26 | 6/19/26 | 6/26/26 | 7/3/26 | 7/10/26 | 7/17/26 | 7/24/26 | 7/31/26 | | **10-Weeks** | |
| **Receipts** | | | | | | | | | | | | | | |
| FBG | $ | 3.5 | 3.2 | 3.2 | 2.7 | 5.2 | 5.5 | 5.5 | 5.5 | 5.5 | 5.2 | $ | 45.0 | (1/5) |
| OEM | | 31.7 | 6.6 | 6.6 | 6.6 | - | - | - | - | - | - | | 51.5 | (3) |
| **Total receipts** | $ | 35.1 | 9.8 | 9.8 | 9.3 | 5.2 | 5.5 | 5.5 | 5.5 | 5.5 | 5.2 | $ | 96.5 | |
| **Operating disbursements:** | | | | | | | | | | | | | | |
| Vendor Payments | $ | (9.9) | (1.8) | (1.8) | (1.8) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | $ | (15.6) | (4) |
| Critical Vendor Payments | | - | - | - | - | - | - | - | - | - | - | | - | |
| Payroll - Wages & Benefits | | (6.7) | (1.3) | (1.3) | (1.3) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | | (17.2) | (5) |
| Tariffs | | (0.6) | (0.4) | (0.4) | (0.4) | - | - | - | - | - | - | | (1.9) | |
| Leases & Rent | | (2.8) | (1.1) | (1.1) | (1.1) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | | (11.6) | |
| Insurance | | (1.6) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | | (2.1) | |
| Taxes | | (3.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | | (3.1) | (6) |
| Other | | (0.7) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | | (2.0) | |
| Liquidity Enhancement | | - | - | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | | 11.0 | (7) |
| **Total operating disbursements** | $ | (25.3) | (5.0) | (3.6) | (3.6) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | $ | (42.5) | |
| **Net operating cash flow** | $ | 9.9 | 4.8 | 6.2 | 5.7 | 4.3 | 4.7 | 4.7 | 4.7 | 4.7 | 4.3 | $ | 54.1 | |
| **Non-operating items:** | | | | | | | | | | | | | | |
| ABL Interest | $ | - | - | - | - | - | - | - | - | - | - | $ | - | |
| DIP Interest | | - | - | - | - | - | - | - | - | - | - | | - | |
| Rx costs | | (20.3) | (6.8) | (7.5) | (6.1) | (5.4) | (5.4) | (4.9) | (4.8) | (4.3) | (4.9) | | (70.4) | |
| Other non-operating | | (0.9) | (0.4) | (0.4) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | | (2.4) | |
| **Total non-operating items** | $ | (21.2) | (7.2) | (7.9) | (6.5) | (5.5) | (5.5) | (5.0) | (4.9) | (4.4) | (4.9) | $ | (72.8) | |
| **Net cash flow** | $ | (11.3) | (2.4) | (1.6) | (0.8) | (1.1) | (0.8) | (0.2) | (0.2) | 0.3 | (0.6) | $ | (18.7) | |
| **Bank cash balance, beg.** | $ | 39.8 | 31.4 | 30.4 | 28.8 | 27.9 | 26.8 | 26.0 | 25.8 | 25.6 | 26.0 | $ | 39.8 | |
| Net cash flow | | (11.3) | (2.4) | (1.6) | (0.8) | (1.1) | (0.8) | (0.2) | (0.2) | 0.3 | (0.6) | | (18.7) | |
| SPV / TSA Funding | | 1.4 | 1.4 | - | - | - | - | - | - | - | - | | 2.8 | (8) |
| Rx Fees Sale Escrow | | 1.5 | - | - | - | - | - | - | - | - | - | | 1.5 | (9) |
| **Bank cash balance, end.** | $ | 31.4 | 30.4 | 28.8 | 27.9 | 26.8 | 26.0 | 25.8 | 25.6 | 26.0 | 25.4 | $ | 25.4 | |
| (-) Minimum cash need | $ | (26.2) | (25.4) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | $ | (25.0) | (2) |
| **Cash surplus (shortfall)** | $ | 5.1 | 5.0 | 3.8 | 2.9 | 1.8 | 1.0 | 0.8 | 0.6 | 1.0 | 0.4 | $ | 0.4 | |

**Notes & Assumptions**

1) Assumes ABL lenders consent to $31MM sweep from post-petition A/R collections for: (a) $7MM of ABL professional fees; (b) $9MM of facility costs; and (c) $15MM of case costs through emergence

2) Assumes AHG lenders consent to $22MM reduction in minimum cash requirement for $22MM of AHG professional fee payments ($14MM paid since 4/1/26 + $8MM of forecasted payments funded via min. cash reduction)

3) Assumes weekly payment from Ford to cover portion of weekly spend for 3 weeks after Horizon sale closing. Receipt equal to lesser of: (a) $3.5MM; or (b) 50% of projected FBG spend excluding ABL and AHG pro fees

4) Vendor payments forecast intended to capture various spend types required to execute wind-down and operate through emergence (e.g., IT, insurance, rent, utilities, tariffs, taxes, etc.)

5) Assumes $12MM of FBG / non-OEM payroll wages & benefits are paid using existing cash on hand in the Employee Liability Account

6) Includes payment of outstanding Canada GST taxes

7) Assumes $11MM of liquidity enhancement is realized in forecast period from: (a) favorable actuals / conservatism; (b) extended OEM funding timelines; and (c) restricted cash usage for other expenses

8) Approximately $2.8MM of operating costs assumed to be paid using restricted cash on hand related to buyer TSAs and SPV funding; no net impact to operating cash

9) Approximately 60% of Lazard success fees assumed to paid into escrow at closing using sale proceeds, with remaining portion being paid using cash on hand

1

**EXHIBIT B**

**Litigation Trust Waterfall**

This exhibit provides an illustrative summary of the recoveries that holders of Litigation Trust Interests may receive on account of the monetization of the Litigation Trust Assets pursuant to the Litigation Trust Waterfall set forth in Section 6.5 of the Plan and described in Section I.A.1(c) of the Disclosure Statement. This exhibit is qualified in its entirety by reference to the Plan, the Litigation Trust Agreement, and the Disclosure Statement.

The recovery scenarios set forth herein are based on certain assumptions developed by the FBG Debtors and their advisors, and are presented solely for illustrative purposes. The Litigation Trust's actual recoveries, the timing of any such recoveries, and the resulting distributions to holders of Litigation Trust Interests are inherently uncertain, depend on numerous factors outside of the FBG Debtors' control, and may differ materially from the illustrative amounts shown below. *See* Section V.B.8 of the Disclosure Statement for a discussion of certain risk factors that could affect the Litigation Trust's recoveries.

## I.   **Overview of the Litigation Trust Waterfall**

On the Confirmation Date, or as soon thereafter as reasonably practicable, the Litigation Trust will be vested with the Litigation Trust Assets, which consist primarily of the Estate Claims (including the claims related to the (i) James Adversary Proceeding; (ii) the Onset Adversary Proceeding; (iii) Avoidance Actions; (iv) Recovery Actions, (v) assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement; (vi) all rights of the FBG Debtors to recover proceeds from insurance policies that provide or may provide coverage for the Estate Claims; and (vii) certain other Claims and Causes of Action of the FBG Debtors) and the Direct Creditor Claims of Preference Settlement Electing Creditors. The Litigation Trustee will monetize the Litigation Trust Assets and, after payment of the costs of administering the Litigation Trust and prosecuting, settling, or otherwise disposing of the Estate Claims, will distribute the resulting distributable proceeds to holders of Litigation Trust Interests, Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in accordance with the Litigation Trust Waterfall.

*(a)   Litigation Trust Beneficiaries*

The Litigation Trust will issue three classes of beneficial interests:

1.   Class 1 Litigation Trust Interests, granted to the Litigation Trust Class 1 Funding Contributors on account of the Litigation Trust Funding Contributions and, if applicable, on account of any Additional Class 1 Litigation Trust Funding;

2. Class 2 Litigation Trust Interests, granted to the holders of Allowed[1] DIP A Claims; and

3. Class 3 Litigation Trust Interests, comprised of (x) Class 3(a) Litigation Trust Interests, granted to holders of Allowed Roll-Up Claims, (y) Class 3(b) Litigation Trust Interests, granted to the Claims Ombudsman, as agent to the holders of Allowed General Unsecured Claims and Allowed Subordinated Claims, and (z) Class 3(c) Litigation Trust Interests, granted to the holders of Allowed First Lien Claims and/or Second Lien Claims.

Each such class of beneficial interest will entitle its holders to share in distributions of proceeds from the monetization of the Litigation Trust Assets in accordance with the Litigation Trust Waterfall, as described below. Holders of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are also entitled to receive certain distributions under the Litigation Trust Waterfall, as described below.

*(b)      Litigation Trust Waterfall*

Except as may be altered by the provisions of Additional Waterfall Litigation Trust Funding, distributions from the Litigation Trust are subject to the priorities set forth in the Litigation Trust Waterfall under Section 6.5 of the Plan, which provides for distributions among the three classes of Litigation Trust Interests as follows:

1. *First*, to holders of Class 1 Litigation Trust Interests (or, if applicable, Additional Class 1 Litigation Trust Interests), which will receive the amounts to which they are entitled pursuant to Section 6.5(b)(i), (ii), and (iii) of the Plan in respect of principal and investment return from the Litigation Trust Class 1 Funding Commitments, the Litigation Trust Class 1 Funding Contributions, and any Additional Class 1 Litigation Trust Funding (the "**First Return Threshold**");

2. *Second*, following satisfaction of the First Return Threshold until aggregate distributions from the Litigation Trust (including distributions pursuant to Section 6.5(b) of the Plan) are equal to $350,000,000 (the "**Second Return Threshold**"), (x) 15% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and (y) 85% to holders of Class 2 Litigation Trust Interests;

3. *Third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests from the Litigation Trust equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) (the "**Final Return Threshold**"): (a) 10% to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), (b) 74% to holders of Class 2 Litigation Trust Interests, and (c) 16% to the holders of Class 3 Litigation Trust Interests (subject to payment of Settled Administrative Expense

---

[1] The Debtors make no admission as to the allowance of any Claim and refer to claims as "Allowed" herein solely for the purpose of providing estimates with respect to this illustrative summary of the recoveries that holders of Litigation Trust Interests may receive on account of the monetization of the Litigation Trust Assets pursuant to the Litigation Trust Waterfall.

Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(b) of the Plan); and; and

4. *Fourth*, following the satisfaction of the Final Return Threshold, (x) 10% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) and (y) 90% to the holders of Class 3 Litigation Trust Interests (subject to payment of Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(b) of the Plan).

Set forth below is a table demonstrating the percentage of distributions to be made among the various classes of Litigation Trust Interests based on aggregate distributions from the Litigation Trust.

| Class | Aggregate Distributions | | | | |
|---|---|---|---|---|---|
| | $0 – $90 million[2] | $90 million – $350 million | $350 million – $1.8 billion | $1.8 billion – $1.9 billion[3] | Over $1.9 billion |
| Class 1 (Litigation Funding) | 100% | 15% | 10% | 10% | 10% |
| Class 2 (DIP A Claims) | – | 85% | 74% | – | – |
| Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, Other Priority Claims | – | – | 16% | 90% | – |
| Class 3 (Roll-Up Claims, General Unsecured Claims, First Lien Claims, and Second Lien Claims) | – | – | – | – | 90% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** |

---

[2] This assumes (x) there is no Additional Litigation Trust Funding and (y) the 1.75x multiple on invested capital exceeds the 20.0% internal rate of return on the Litigation Trust Class 1 Funding Contributions.

[3] This assumes no participation in the Administrative Expense Claims Consent Program.

Distributions to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) described above will be paid in accordance with the following, set forth in Section 6.5(b) of the Plan:

1. *First*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with their respective Litigation Trust Class 1 Funding Contributions, until each Litigation Trust Class 1 Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (b) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x, with such returns being measured from the date of each Litigation Trust Class 1 Funding Contribution;

2. *Second*, to the Litigation Trust Class 1 Funding Contributors in an amount accrued on the daily undrawn amounts of their respective Litigation Trust Class 1 Funding Commitments at the rate of 5.0% *per annum*; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution in respect of undrawn Litigation Trust Class 1 Funding Commitments for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor;

3. *Third*, to the Litigation Trust Backstop Parties until each such Litigation Trust Backstop Party has received an amount equal to 5.0% of the amount of such Litigation Trust Backstop Party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party; *provided* that (1) no Litigation Trust Backstop Party will be entitled to receive any such distribution for any period during which such Litigation Trust Backstop Party is a Defaulting Contributor and (2) if a Litigation Trust Backstop Party becomes a Defaulting Contributor, such Litigation Trust Backstop Party's Litigation Trust Backstop Commitments and fees in respect thereof may be terminated or reallocated in Litigation Trustee's reasonable discretion; and

4. *Fourth*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Class 1 Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Class 1 Funding Contributors, for the life of the Litigation Trust; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor.

Distributions to the holders of Class 2 Litigation Trust Interests described above will be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders.

Distributions to holders of Class 3 Litigation Trust Interests described above will be paid in accordance with the following, set forth in Section 6.5(d) of the Plan:

1. *First*, to the holders of Settled Administrative Expense Claims, pro rata based on the aggregate amount of Allowed Settled Administrative Expense Claims, until each such holder has received distributions equal to the amount of its Allowed Settled Administrative Expense Claim;

6

2. *Second*, to the holders of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims), pro rata based on the aggregate amount of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims) held by such holders, until each such holder has received distributions equal to the amount of its Allowed Administrative Expense Claim;

3. *Third*, to holders of Allowed Other Priority Claims, pro rata based on the aggregate amount of Allowed Other Priority Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Other Priority Claim;

4. *Fourth*, to holders of Priority Tax Claims, pro rata based on the aggregate amount of Allowed Priority Tax Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Priority Tax Claim;

5. *Fifth*, to all holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, pro rata based on the aggregate amount of Allowed Roll-Up Claims (i.e., $3,300,000,000), Allowed First Lien Claims as of the Confirmation Date, Allowed Second Lien Claims as of the Confirmation Date, and Allowed General Unsecured Claims held by such holders, until each holder has received distributions equal to the amount of its respective Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims; and

6. *Sixth*, to holders of Allowed Subordinated Claims, pro rata based on the amount of Allowed Subordinated Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Subordinated Claim.

The chart below illustrates the distribution of distributable proceeds pursuant to the Litigation Trust Waterfall:

**<u>Litigation Trust Waterfall</u>**



## II. <u>Illustrative Recovery Scenarios and Principal Assumptions</u>

The illustrative recoveries to holders of Litigation Trust Interests and to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims at varying levels of Litigation Trust distributable proceeds may be summarized as follows and as reflected in the graphic below, and subject entirely to the principal assumptions set forth below:

- At distributable proceeds of approximately $90 million (i.e., satisfaction of the estimated First Return Threshold), all distributable proceeds are distributed to holders of Class 1 Litigation Trust Interests, and no distributions are made to holders of Class 2 or Class 3

Litigation Trust Interests or holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Other Priority Claims.

- At distributable proceeds of approximately $350 million (i.e., satisfaction of the Second Return Threshold), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $129 million in the aggregate and holders of Class 2 Litigation Trust Interests are estimated to receive approximately $221 million in the aggregate; holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Class 3 Litigation Trust Interests do not receive any distribution.

- At distributable proceeds of approximately $1.0 billion, holders of Class 1 Litigation Trust Interests are estimated to receive approximately $194 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $702 million in the aggregate, holders of Allowed Administrative Expense Claims are estimated to receive approximately $104 million in the aggregate and shared *pro rata* amongst such holders, and no distributions are made to holders of Other Priority Claims, Priority Tax Claims, and Class 3 Litigation Trust Interest.

- At distributable proceeds of approximately $1.85 billion (i.e., satisfaction of the estimated Final Return Threshold and the point at which the DIP A Claims are estimated to be paid in full), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $280 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of Allowed Administrative Expense Claims and Other Priority Claims are estimated to receive approximately $241 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims), holders of Priority Tax Claims will receive $19 million in the aggregate and shared *pro rata* among such holders, and no distributions are made to holders of Class 3 Litigation Trust Interests.

- At distributable proceeds of approximately $1.92 billion (i.e., the point at which Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to be paid in full), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $286 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of Allowed Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to receive approximately $300 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in aggregate, assuming no holders of Administrative Expense Claims opt in to the Administrative Expense Claims Consent Program), and no distributions are made to holders of Class 3 Litigation Trust Interests.

- At distributable proceeds of approximately $3.00 billion, holders of Class 1 Litigation Trust Interests are estimated to receive approximately $394 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of

Allowed Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to receive approximately $300 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in aggregate, assuming no holders of Administrative Expense Claims opt in to the Administrative Expense Claims Consent Program), and holders of Class 3 Litigation Trust Interests are estimated to receive approximately $971 million in the aggregate and shared *pro rata* amongst holders of Class 3(a) Litigation Trust Interests, Class 3(b) Litigation Trust Interests, and Class 3(c) Litigation Trust Interests (representing an estimated recovery of approximately 8.4% on the aggregate Allowed amount of Class 3 Claims, assuming approximately $11.532 billion in Class 3 Litigation Trust Interests).

Collectively, holders of Class 1 and Class 2 Litigation Trust Interests are projected to receive approximately 86% of the first $1.856 billion of Litigation Trust distributable proceeds, at which point the DIP A Claims are estimated to be satisfied in full. Once the estimated Final Return Threshold of approximately $1.856 billion is reached, the Litigation Trust will distribute 90% of all subsequent distributions to the remaining Priority Tax Claims until they are satisfied in full (estimated to be at $1.921 billion of distributable proceeds), with the remaining 10% paid to holders of Class 1 Litigation Interests. Following the satisfaction in full of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, holders of Class 3 Litigation Trust Interests are projected to receive 90% of all subsequent distributions, with the remaining 10% paid to holders of Class 1 Litigation Trust Interests. Holders of Class 3 Litigation Trust Interests share pro rata in such distributions based on their respective Allowed Claims, as described above.

The illustrative recovery scenarios set forth herein were prepared by the FBG Debtors, in consultation with their advisors, and are based on the following principal assumptions:

1. **Estimated Allowed Claims**. The estimated Allowed amount of claims for purposes of distributions for each class reflected in the illustrative scenarios is $13.218 billion in the aggregate (and assumes there is no participation in the Administrative Expense Claims Consent Program), comprising (i) approximately $50 million of Class 1 Litigation Trust Interests, (ii) approximately $1.335 billion of Allowed DIP A Claims for the Class 2 Litigation Trust Interests, (iii) approximately $300 million in Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, and (iv) approximately $11.532 billion of aggregate claims for Class 3 Litigation Trust Interests, consisting of approximately (a) $3.3 billion of Class 3(a) Roll-Up Claims, (b) $5.641 billion of Allowed General Unsecured Claims, and (c) $2.591 billion of Class 3(c) First Lien Claims and Second Lien Claims.

2. **Litigation Trust Funding**. The illustrative scenarios assume that the Litigation Trust is funded with $25 million of Cash from the FBG Debtors' balance sheet and $50 million of Initial Litigation Trust Funding Commitments provided and backstopped by the Litigation Trust Class 1 Funding Contributors, and that no Additional Litigation Trust Funding Commitments are made or drawn. If Additional Litigation Trust Funding Commitments are made or drawn, the illustrative recoveries set forth above will change. The illustrative scenarios further assume that all $50 million of Initial Litigation Trust Funding Commitments are drawn, such that no undrawn commitment fee accrues for purposes of the First Return Threshold calculation. The $25 million of Cash from the FBG Debtors' balance sheet is treated as Class 2 Litigation Trust Interests and is not reflected in the Class 1 hurdle.

10

3. **Estimated Class 1 Hurdle**. The First Return Threshold is estimated at approximately $90 million, comprising the $50 million of Initial Litigation Trust Funding Commitments, approximately $38 million of IRR/MOIC hurdle, and approximately $3 million of backstop fees. The Final Return Threshold (i.e., the distributable-proceeds level at which the DIP A Claims are estimated to be satisfied in full and Class 2 ceases to participate in further distributions) is estimated at approximately $1.880 billion. These estimates are based on assumptions regarding, among other things, the timing of recoveries and the calculation of accrued interest and exit premium on the DIP A Claims, and may change.

The chart below provides an example of the illustrative recoveries to holders of Litigation Trust Interests at varying levels of Litigation Trust distributable proceeds under five (5) different scenarios:

**Illustrative Recoveries**



**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**DECLARATION OF CHARLES M. MOORE IN SUPPORT**
**OF (I) THE PROPOSED CONFIRMATION SCHEDULE AND**
**(II) THE DEBTORS' OBJECTION TO UNITED STATES TRUSTEE'S**
**MOTION TO CONVERT OR DISMISS PURSUANT TO 11 U.S.C. § 1112(b)**

I, Charles M. Moore, pursuant to § 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I submit this declaration (the "**Declaration**") in support of (i) the *Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2906) (the "**Objection**")[2] and (ii) the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures,*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to such terms in the Objection (filed contemporaneously herewith), the Joint Plan (as defined herein), or the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (filed contemporaneously herewith) (as may be further amended, supplemented, or modified from time to time, the "**Disclosure Statement**"), as applicable.

*(V) Establishing Preference Settlement Notice and Opt In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related Relief* (the "**DS Motion**"), each filed contemporaneously herewith by First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-debtor affiliates, the "**Company**"), in these chapter 11 cases.

2.     This Declaration is based on my personal knowledge, education, experience and review of documents and other information relevant to my testimony.  If called to testify, I could and would testify competently to the matters set forth in my Declaration.  My compensation is not contingent upon or influenced by the substance of my testimony or the outcome of the Objection, the *United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2670) (the "**UST Motion**"), or the DS Motion.  I am authorized to submit this Declaration on behalf of the Debtors.

## Qualifications and Professional Background

3.     I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**").  On September 5, 2025, A&M was retained by the Company to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and undertake contingency preparations for a potential chapter 11 filing.  On September 24, 2025, Global Assets, LLC and twelve of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28, 2025 (as applicable, the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.

4.     On September 24, 2025, I was appointed as Chief Restructuring Officer of First Brands Group, LLC and, on October 13, 2025, I was appointed as Interim Chief Executive

2

Officer. From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22).

5.      I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

6.      I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments. I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning. I have served as Chief Restructuring Officer for, among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

**The UST Motion**

7.      I understand that the U.S. Trustee has moved to dismiss or convert these chapter 11 cases to chapter 7 based on its assertions that there exists a "substantial or continuing loss" to the Debtors' estates and that there is no "reasonable likelihood of rehabilitation."  As CEO, I am intimately familiar with the Debtors' financial condition, current expenses, proposed budget and the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 2907) (the "**Joint Plan**").  Based on my understanding of these cases and the Joint Plan, I strongly disagree with the UST's statements.

*A.   The Debtors Have Paid the Vast Majority of Administrative Expense Claims*

8.      First, I disagree with the UST's assertion that the Debtors and their estates have suffered a "substantial or continuing loss."  In that regard, I believe it is relevant to note the unique circumstances of these cases.  These chapter 11 cases were commenced in September 2025 against the backdrop of massive suspected fraud and accounting irregularities.  The former CEO and his brother were subsequently indicted and charged with conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and multiple counts of wire fraud and bank fraud.  In a separate but related matter, former officers Peter Brumbergs and Stephen Graham each pleaded guilty in connection with their roles in the alleged fraudulent scheme and are cooperating with the government.  The Debtors filed these cases with approximately $11.5 billion in prepetition liabilities, including approximately $6 billion in funded debt obligations, at least $2.3 billion in factoring liabilities, at least $2.3 billion in off-balance sheet financing liabilities incurred through special purpose vehicles, and approximately $900 million in unsecured supply chain financing liabilities.   Despite these extraordinary hurdles, the Debtors achieved hard-fought results, including obtaining $1.1 billion of new money DIP financing and the consummation of four sale transactions—the sale of the Walbro business for $50 million, the sale of intellectual property for

4

$25 million in cash plus royalties, the sale of the TMD business line for approximately $80 million, the sale of the Horizon North America business for approximately $64 million, and the sale of the ASC business assets for approximately $2 million —generating approximately $221 million in aggregate sale proceeds (plus future royalties) to pay down secured claims. Critically, three of these transactions—the Walbro, TMD, and Horizon North America sales—maintained those businesses as going concerns and preserved more than 2,000 jobs. Moreover, through extensive mediation overseen by the Honorable Judge Marvin Isgur and subsequent good-faith negotiations, the Debtors achieved consensus around the Joint Plan which the Debtors now seek to solicit and confirm.

9. I am aware that certain administrative expenses have accrued during the course of these chapter 11 cases and remain unpaid. This is not surprising given the extraordinary circumstances under which these cases were commenced, including a tangled corporate structure involving over one hundred Debtors, unreliable books and records inherited from former management, fraud and allegations of embezzlement committed by prior leadership. Under these unprecedented conditions, the estates incurred certain expenditures that remain outstanding. However, my team and I, along with the Debtors' other professionals, have taken extraordinary measures to stabilize the Debtors' financial position and arrest further diminution in estate value on a go-forward basis. Those efforts included, among other things, obtaining substantial funding from the Debtors' OEM customers from late January 2026 through the current period, which allowed the Debtors to fund continued operations of certain business units and case costs, facilitated going-concern sales, and enabled the Debtors to negotiate a chapter 11 plan which, if confirmed, provides the best and only path to pay or repay administrative and priority claims in full and a meaningful opportunity to provide recoveries to general unsecured creditors.

5

10. Since the Petition Date, the Debtors have paid more than $1.8 billion in administrative expense claims. As of mid-May, the Debtors have estimated accrued and unpaid administrative expense claims of $222 million comprised of (i) $147 million unpaid administrative expense claims incurred since the Petition Date, (ii) approximately $38 million of 503(b)(9) claims, and (iii) an additional 20% estimate for expenses that have not yet been invoiced. Accordingly, the Debtors have satisfied more than 91% of administrative expense claims that have come due and payable since the Petition Date. Of the remaining due and payable administrative expense claims that have not been paid, the vast majority of these were incurred before February 1, 2026.

B. *The Payment of Administrative Expenses in Full Through the Proposed Confirmation Timeline*

11. My team and I have prepared a budget, attached hereto as Exhibit A (the "**Confirmation Budget**"). The Confirmation Budget identifies three discrete funding sources—continued OEM funding for operating expenses during the wind-down period for certain business units, proposed funding from the ABL Secured Parties, and freed cash reserves—which, in the aggregate, provides the Debtors with sufficient liquidity to pay administrative expense claims projected to be incurred during the period required to solicit and confirm the Joint Plan. As a result, allowing the proposed solicitation of the Joint Plan and Disclosure Statement to go forward will not result in any additional unpaid administrative expenses.

12. I understand that the Ad Hoc Group SteerCo and the Creditors' Committee support the Confirmation Budget and corresponding timeline for solicitation and confirmation of the Joint Plan. The Debtors are in discussions with the ABL Secured Parties and are working to secure their consent on the Confirmation Budget in advance of the June 12th hearing. Upon confirmation of consent from the ABL Secured Parties and Ad Hoc Group SteerCo, the Debtors

will have necessary consent to utilize cash collateral pursuant to the Confirmation Budget, which preserves estate assets and funds these cases through the anticipated Confirmation Date.

13. As stated, consent of the secured lenders for use of cash collateral in connection with the Confirmation Budget is being sought in connection with solicitation and confirmation of the Joint Plan. I understand that such consent would not extend to a chapter 7 conversion and I believe it is unlikely that a chapter 7 trustee would have access to these alternative funding sources. A chapter 7 trustee would also not have a source of unencumbered assets with which to fund administration of the chapter 7 cases, and it is unclear how a trustee could fund a comparable resolution that preserves, let alone maximizes, estate assets.

14. I also believe that a chapter 7 trustee would need to incur substantial additional administrative expenses not required under the Confirmation Budget, including the costs of retaining and educating new professionals, re-negotiating agreements with lenders, and potentially litigating with secured parties, all without a clear timeline, funding source, or ending point. I believe that there is a substantial risk that the Debtors' secured lenders would succeed in foreclosing upon and/or otherwise obtaining ownership of all or substantially all of the Debtors' assets, including the Estate Claims.

15. By contrast, the Confirmation Budget benefits from minimized expenses, committed funding, and a defined conclusion: upon confirmation of the Joint Plan, the funding mechanisms contemplated thereunder—including $75 million of funding for the Litigation Trust—would replace the Confirmation Budget's interim sources, preserving value of estate assets and monetizing claims. Based on my team's review of the financial circumstances of these Debtors, the Confirmation Budget and the Joint Plan together offer a path to resolving these cases and maximizing the value of estate assets that a conversion or dismissal cannot.

16.     For these reasons, I disagree with the U.S. Trustee's contention that the Debtors are suffering a substantial or continuing loss to the Debtors' estates.

C.  *The Joint Plan Provides for Administrative Expense and Priority Claimants To Be Paid in Full and in Cash On the Effective Date*

17.     I am also familiar with the Debtors' recently filed Joint Plan for First Brands Group Holdings, LLC, its direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC (together, the "**FBG Debtors**").  Unlike the Debtors' previously filed chapter 11 plan, the newly filed Joint Plan reflects a joint plan encompassing all FBG Debtors and provides for payment in full, in cash, of all administrative expense and priority claims against all FBG Debtors on or before the Effective Date.

18.     The cornerstone of the Joint Plan pertains to the creation and funding of a Litigation Trust to pursue and monetize estate claims and causes of action.  In that regard, the FBG Debtors hold claims and causes of action which I understand to be valuable (albeit heavily encumbered).  These estate claims include, among others, causes of action filed against Patrick James and certain related entities as described in *First Brands Group LLC v. James*, Adv. Pro. No. 25-3803 (CML) (Bankr. S.D. Tex. 2025) (the "**James Adversary**"); as well as claims asserted against Edward James, Onset Financial, Inc., and certain related entities as detailed in *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. 2026) (the "**Onset Adversary**").  In total, these two lawsuits alone seek more than $2.7 billion in compensation.

19.     I understand discovery in both of these cases is presently stayed pending the criminal trial *United States v. Patrick James & Edward James*, 26 Cr. 29 (AT) (S.D.N.Y.), which is currently set for February 2027.  I further understand that the Government, in its successful stay motion, argued that there are overlapping issues in the James and Onset Adversaries and the criminal trial (e.g., the schemes to defraud lenders regarding the liabilities and financial condition

8

of the Company, the alleged fraudulent transfers and diversion of assets, and the sham transactions with Onset) and that the outcome of the criminal proceedings would "simplify the adversary proceedings through judicial determination of the key issues and collateral estoppel. . . ."

20. In addition to the James and Onset Adversaries, the Litigation Trust will be vested with all Avoidance Actions arising under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, Recovery Actions (including commercial tort claims, section 506(c) recoveries, and proceeds of postpetition transfer claims), Government Forfeiture Proceeds, Insurance Recoveries (including all D&O liability insurance policies), and Direct Creditor Claims contributed by Preference Settlement Electing Creditors. The Litigation Trust will also include all claims for fraudulent transfer, breach of fiduciary duty, RICO, aiding and abetting, unjust enrichment, equitable subordination, alter ego, and corporate veil piercing, among others, as well as any claims against SPV Lenders, section 506(c) and 552(b) surcharge rights, and any Disputed Alester IP recovered through Avoidance or Recovery Actions. The Debtors have identified significant transfers to alleged insiders and Specified Non-Released Parties within the applicable lookback period, as potential avoidance claims that would constitute Litigation Trust Assets.

21. As discussed below, the Litigation Trust will have significant funding—a minimum of $75 million and the ability to raise additional financing—to prosecute these and other estate claims and causes of action and bring them to a conclusion within a reasonable time.

22. These claims and causes of action (or the proceeds thereof) are subject to significant liens in favor of the DIP Lenders. As set forth in the DIP Order, certain of the Estate Claims (i.e., previously encumbered claims) are subject to senior liens for the full amount of the outstanding DIP Obligations and prepetition term loan and ABL claims—an aggregate of approximately $7.9 billion—while other Estate Claims (or, in the case of Avoidance Actions, the

9

proceeds thereof) are subject to senior DIP liens for approximately $2.4 billion in aggregate DIP Claims (i.e., approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims). The Joint Plan, however, provides for Estate Claims and Causes of Action to be transferred to a Litigation Trust where distributions will be made pursuant to a proposed waterfall, a summary of which is attached hereto as Exhibit B (the "**Litigation Trust Waterfall**").

23.    Under the Litigation Trust Waterfall (as modified in the amended Joint Plan), administrative and priority claims will be paid in full on or before the Effective Date and before any litigation recoveries are provided to holders of the $3.5 billion in Roll-Up Claims, prepetition secured claims, and general unsecured claims. Moreover, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Trust obtains approximately $1.9 billion in proceeds, even assuming no participation in the Administrative Expense Claim Consent Program.

D. *The Benefits to Creditors of the Joint Plan Would Be Lost in a Chapter 7 Liquidation And Creditors Would Be Substantially Worse Off*

24.    I expect administrative expense, priority, and unsecured creditors to be materially worse off in the event of conversion to chapter 7. As a threshold matter, all or substantially all of the Debtors' remaining assets, including most notably the claims and causes of action (or proceeds thereof) are encumbered by billions of dollars in secured claims. In total, certain Estate Claims are encumbered by as much as $7.9 billion in secured claims (approximately $4.9 billion in DIP Claims, $2.6 billion in term loan claims, and $400 million of ABL Claims). With respect to the Debtors' claims and causes of action and/or proceeds that were unencumbered on the Petition Date (including claims arising under chapter 5 of the Bankruptcy Code), the proceeds of such claims and causes of action are encumbered by at least $1.3 billion of DIP A

Claims, and, with the possible exception of $200 million in administrative expense claims, the approximately $2.4 billion of DIP Claims reflected in the DIP Hurdle. Under the Joint Plan, however, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Litigation Trust recovers approximately $1.9 billion in proceeds.

25. These and other substantial benefits of the Joint Plan would be lost in a chapter 7. I believe that in a chapter 7 scenario, a trustee would have no unencumbered assets with which to provide adequate protection, and the DIP Lenders would likely exercise remedies to foreclose on and/or otherwise control their collateral or would contest any attempt by a chapter 7 trustee to control estate claims or causes of action without their consent. This may result in no available recoveries for a chapter 7 trustee to pay any chapter 11 administrative expense, priority, or general unsecured claims.

26. Even assuming the chapter 7 debtors somehow maintained ownership and control over the Estate Claims, administrative creditors would still not be entitled to any recovery until after the DIP A Claims, any litigation financing claims, and chapter 7 administrative expenses were repaid in full. Therefore, at a minimum, the first $1.3 billion in DIP A claims must be paid in full before any administrative expense creditor can receive any recovery. After the DIP A Claims are satisfied in full in cash, administrative expense claims may receive only up to $200 million in total recoveries pursuant to the Administrative Expense Claims Basket established under the DIP Order. Beyond that $200 million basket, no distributions to holders of remaining administrative expense claims may be made until the DIP Hurdle—totaling approximately $2.4 billion as of the anticipated Confirmation Date (comprising approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims)—is satisfied in full in cash.

27. Further, the DIP A Claims are estimated to be approximately $1.3 billion as of the anticipated Confirmation Date, and will not accrue postpetition interest for purposes of recoveries under the Litigation Trust Waterfall, which significantly benefits junior creditors. However, in a chapter 7 scenario, the DIP A Claims will continue to accrue interest (at the default rate which adds an additional 2% per annum on top of the existing rate) until they are repaid in full.

28. Also, whereas the Joint Plan provides for a clear means of financing the Litigation Trust to monetize Estate Claims, a chapter 7 trustee would not have access to litigation funding provided under the Joint Plan, or any funds or meaningful runway with which to pursue alternative funding. In other words, upon conversion, a chapter 7 trustee would lack the means to pursue Estate Claims, including claims arising under chapter 5 of the Bankruptcy Code. To the extent a trustee were able to secure funding, I believe such funding would likely be on significantly more expensive terms than provided in the Joint Plan.

29. With the accrual of interest on the DIP A Claims at the higher default rate, more expensive litigation financing obligations (assuming funding could even be obtained by the chapter 7 trustee), and the substantial additional costs of a chapter 7 administration, the Debtors believe that a chapter 7 trustee would need to obtain substantially more litigation recoveries before any distributions to administrative, priority, or unsecured claims could begin. It would also take materially more litigation recoveries to pay such claims in full as compared to the Joint Plan.

30. For these reasons, I believe administrative expense, priority, and unsecured creditors would be materially worse off in the event of conversion or dismissal.

**The DS Motion**

31.     I believe that the Debtors' proposed timeline for consideration of the Disclosure Statement and Joint Plan is reasonable and necessary in light of the financial realities of these cases.  The Debtors' proposed solicitation and confirmation timeline includes the following dates:

| PROPOSED SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Requested Conditional Disclosure Statement Hearing | **June 12, 2026 at 10:00 a.m. (Central Time)** |
| Voting Record Date, Administrative Claims Record Date, and Preference Settlement Record Date | **June 15, 2026** |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, Non-Voting Packages, Consent Program Materials, and Preference Settlement Materials | **Within two (2) business days after entry of the Proposed Order, or as soon as reasonably practicable thereafter** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **July 3, 2026 at 5:00 p.m. (Central Time)** |
| Plan Supplement Filing Deadline | **June 22, 2026** |
| Litigation Trust Distribution Record Date & DIP Collateral Trust Distribution Record Date | **June 22, 2026 (which date may be extended by mutual agreement among the FBG Debtors and Ad Hoc Group)** |
| Rule 3018(a) Motion Deadline | **July 10, 2026 at 5:00 p.m. (Central Time)** |
| Voting Deadline and Release Opt-In Deadline | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Deadline to Object to Disclosure Statement and Plan | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Litigation Trust Interest Response Deadline & DIP Collateral Trust Interest Response Deadline | **July 20, 2026 (which date may be extended by mutual agreement among the FBG Debtors and Ad Hoc Group)** |
| Ballot Certification Deadline | **July 27, 2026** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 27, 2026** |
| Requested Combined Hearing | **July 28, 2026 (subject to the Court's Availability)** |

14

| Preference Settlement Opt-In Deadline | **Forty-five (45) days following the Confirmation Date (except as otherwise provided herein)** |
| --- | --- |
| Consent Program Opt-In Deadline | **Sixty (60) days following the Confirmation Date** |

32.     Notably, the proposed timeline incorporates a full solicitation process and provides all parties in interest 28 days to object to the Joint Plan after the filing of the Plan Supplement.  The Confirmation Budget reflects the Debtors' ability to fund these cases through the proposed Confirmation Date, subject to receiving consent to use certain cash collateral.  After the Confirmation Date, the litigation funding provided for in the Joint Plan and Litigation Trust Agreement will commence.  I understand that the Confirmation Budget and corresponding timeline is supported by the Ad Hoc Group SteerCo and the Creditors' Committee.  The Debtors are in discussions with the ABL Secured Parties and are working to secure their consent to the Confirmation Budget in advance of a hearing on the DS Motion and Objection.

33.     As set forth in the Confirmation Budget, if the Debtors obtain the requisite lender consents, the Debtors have funds necessary to solicit and confirm the Joint Plan and pay all expenses as they become due between now and the anticipated Confirmation Date.  At present, the Debtors are working to secure the necessary consent for the Confirmation Budget, and understand that the Ad Hoc Group and ABL Secured Parties would be unwilling to consent to any budget that provides for any additional delay.

34.     Accordingly, I believe the relief requested in the DS Motion is necessary and appropriate under the circumstances of these chapter 11 cases.

**Conclusion**

35.  I believe dismissal or conversion of these cases would be materially worse for creditors.  Converting these cases now, mere weeks before a hard-earned rehabilitation could be realized, would waste months of effort, incur unnecessary expenses, and leave these estates with no meaningful funding or clear path forward.  I therefore believe the Joint Plan represents the best available path forward for these estates and their creditors.  For the above reasons, I believe that the relief sought by the UST Motion should be denied, the Debtors' proposed solicitation timeline and procedures should be authorized, and the disclosure statement should be approved on a conditional basis.

*[Remainder of Page Intentionally Left Blank]*

16

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  June 5, 2026
        Oakland County, Michigan


_/s/ Charles M. Moore_
Charles M. Moore, Managing Director
Alvarez & Marsal North America LLC

17

## EXHIBIT A

**Confirmation Budget**

**FBG Debtors**

**Cash Flow Forecast**

*$ in millions USD*

| | HZN Close | P+DS Amend. | DS & UST Hrg. | OEM Exit | Plan Supp. | | | | Obj. Deadline | Confirmation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Total | |
| Week Ending | 5/29/26 | 6/5/26 | 6/12/26 | 6/19/26 | 6/26/26 | 7/3/26 | 7/10/26 | 7/17/26 | 7/24/26 | 7/31/26 | 10-Weeks | |
| **Receipts** | | | | | | | | | | | | |
| FBG | $ 3.5 | $ 3.2 | $ 3.2 | $ 2.7 | $ 5.2 | $ 5.5 | $ 5.5 | $ 5.5 | $ 5.5 | $ 5.2 | $ 45.0 | (1/5) |
| OEM | 31.7 | 6.6 | 6.6 | 6.6 | - | - | - | - | - | - | 51.5 | (3) |
| **Total receipts** | $ 35.1 | $ 9.8 | $ 9.8 | $ 9.3 | $ 5.2 | $ 5.5 | $ 5.5 | $ 5.5 | $ 5.5 | $ 5.2 | $ 96.5 | |
| **Operating disbursements:** | | | | | | | | | | | | |
| Vendor Payments | $ (9.9) | $ (1.8) | $ (1.8) | $ (1.8) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (15.6) | (4) |
| Critical Vendor Payments | - | - | - | - | - | - | - | - | - | - | | |
| Payroll - Wages & Benefits | (6.7) | (1.3) | (1.3) | (1.3) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) | (17.2) | (5) |
| Tariffs | (0.6) | (0.4) | (0.4) | (0.4) | - | - | - | - | - | - | (1.9) | |
| Leases & Rent | (2.8) | (1.1) | (1.1) | (1.1) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (11.6) | |
| Insurance | (1.6) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | (2.1) | |
| Taxes | (3.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (3.1) | (6) |
| Other | (0.7) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (2.0) | |
| Liquidity Enhancement | - | - | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 11.0 | (7) |
| **Total operating disbursements** | $ (25.3) | $ (5.0) | $ (3.6) | $ (3.6) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (42.5) | |
| **Net operating cash flow** | $ 9.9 | $ 4.8 | $ 6.2 | $ 5.7 | $ 4.3 | $ 4.7 | $ 4.7 | $ 4.7 | $ 4.7 | $ 4.3 | $ 54.1 | |
| **Non-operating items:** | | | | | | | | | | | | |
| ABL Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| DIP Interest | - | - | - | - | - | - | - | - | - | - | - | |
| Rx costs | (20.3) | (6.8) | (7.5) | (6.1) | (5.4) | (5.4) | (4.9) | (4.8) | (4.3) | (4.9) | (70.4) | |
| Other non-operating | (0.9) | (0.4) | (0.4) | (0.4) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (2.4) | |
| **Total non-operating items** | $ (21.2) | $ (7.2) | $ (7.9) | $ (6.5) | $ (5.5) | $ (5.5) | $ (5.0) | $ (4.9) | $ (4.4) | $ (4.9) | $ (72.8) | |
| **Net cash flow** | $ (11.3) | $ (2.4) | $ (1.6) | $ (0.8) | $ (1.1) | $ (0.8) | $ (0.2) | $ (0.2) | $ 0.3 | $ (0.6) | $ (18.7) | |
| **Bank cash balance, beg.** | $ 39.8 | $ 31.4 | $ 30.4 | $ 28.8 | $ 27.9 | $ 26.8 | $ 26.0 | $ 25.8 | $ 25.6 | $ 26.0 | $ 39.8 | |
| Net cash flow | (11.3) | (2.4) | (1.6) | (0.8) | (1.1) | (0.8) | (0.2) | (0.2) | 0.3 | (0.6) | (18.7) | |
| SPV / TSA Funding | 1.4 | 1.4 | - | - | - | - | - | - | - | - | 2.8 | (8) |
| Rx Fees Sale Escrow | 1.5 | - | - | - | - | - | - | - | - | - | 1.5 | (9) |
| **Bank cash balance, end.** | $ 31.4 | $ 30.4 | $ 28.8 | $ 27.9 | $ 26.8 | $ 26.0 | $ 25.8 | $ 25.6 | $ 26.0 | $ 25.4 | $ 25.4 | |
| (-) Minimum cash need | $ (26.2) | $ (25.4) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | $ (25.0) | (2) |
| **Cash surplus (shortfall)** | $ 5.1 | $ 5.0 | $ 3.8 | $ 2.9 | $ 1.8 | $ 1.0 | $ 0.8 | $ 0.6 | $ 1.0 | $ 0.4 | $ 0.4 | |

**Notes & Assumptions**

1) Assumes ABL lenders consent to $31MM sweep from post-petition A/R collections for: (a) $7MM of ABL professional fees; (b) $9MM of facility costs; and (c) $15MM of case costs through emergence

2) Assumes AHG lenders consent to $22MM reduction in minimum cash requirement for $22MM of AHG professional fee payments ($14MM paid since 4/1/26 + $8MM of forecasted payments funded via min. cash reduction)

3) Assumes weekly payment from Ford to cover portion of weekly spend for 3 weeks after Horizon sale closing. Receipt equal to lesser of: (a) $3.5MM; or (b) 50% of projected FBG spend excluding ABL and AHG pro fees

4) Vendor payments forecast intended to capture various spend types required to execute wind-down and operate through emergence (e.g., IT, insurance, rent, utilities, tariffs, taxes, etc.)

5) Assumes $12MM of FBG / non-OEM payroll wages & benefits are paid using existing cash on hand in the Employee Liability Account

6) Includes payment of outstanding Canada GST taxes

7) Assumes $11MM of liquidity enhancement is realized in forecast period from: (a) favorable actuals / conservatism; (b) extended OEM funding timelines; and (c) restricted cash usage for other expenses

8) Approximately $2.8MM of operating costs assumed to be paid using restricted cash on hand related to buyer TSAs and SPV funding; no net impact to operating cash

9) Approximately 60% of Lazard success fees assumed to paid into escrow at closing using sale proceeds, with remaining portion being paid using cash on hand

1

**EXHIBIT B**

**Litigation Trust Waterfall**

This exhibit provides an illustrative summary of the recoveries that holders of Litigation Trust Interests may receive on account of the monetization of the Litigation Trust Assets pursuant to the Litigation Trust Waterfall set forth in Section 6.5 of the Plan and described in Section I.A.1(c) of the Disclosure Statement. This exhibit is qualified in its entirety by reference to the Plan, the Litigation Trust Agreement, and the Disclosure Statement.

The recovery scenarios set forth herein are based on certain assumptions developed by the FBG Debtors and their advisors, and are presented solely for illustrative purposes. The Litigation Trust's actual recoveries, the timing of any such recoveries, and the resulting distributions to holders of Litigation Trust Interests are inherently uncertain, depend on numerous factors outside of the FBG Debtors' control, and may differ materially from the illustrative amounts shown below. *See* Section V.B.8 of the Disclosure Statement for a discussion of certain risk factors that could affect the Litigation Trust's recoveries.

## I.      **Overview of the Litigation Trust Waterfall**

On the Confirmation Date, or as soon thereafter as reasonably practicable, the Litigation Trust will be vested with the Litigation Trust Assets, which consist primarily of the Estate Claims (including the claims related to the (i) James Adversary Proceeding; (ii) the Onset Adversary Proceeding; (iii) Avoidance Actions; (iv) Recovery Actions, (v) assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement; (vi) all rights of the FBG Debtors to recover proceeds from insurance policies that provide or may provide coverage for the Estate Claims; and (vii) certain other Claims and Causes of Action of the FBG Debtors) and the Direct Creditor Claims of Preference Settlement Electing Creditors. The Litigation Trustee will monetize the Litigation Trust Assets and, after payment of the costs of administering the Litigation Trust and prosecuting, settling, or otherwise disposing of the Estate Claims, will distribute the resulting distributable proceeds to holders of Litigation Trust Interests, Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in accordance with the Litigation Trust Waterfall.

### (a)      *Litigation Trust Beneficiaries*

The Litigation Trust will issue three classes of beneficial interests:

1. Class 1 Litigation Trust Interests, granted to the Litigation Trust Class 1 Funding Contributors on account of the Litigation Trust Funding Contributions and, if applicable, on account of any Additional Class 1 Litigation Trust Funding;

2. Class 2 Litigation Trust Interests, granted to the holders of Allowed[1] DIP A Claims; and

3. Class 3 Litigation Trust Interests, comprised of (x) Class 3(a) Litigation Trust Interests, granted to holders of Allowed Roll-Up Claims, (y) Class 3(b) Litigation Trust Interests, granted to the Claims Ombudsman, as agent to the holders of Allowed General Unsecured Claims and Allowed Subordinated Claims, and (z) Class 3(c) Litigation Trust Interests, granted to the holders of Allowed First Lien Claims and/or Second Lien Claims.

Each such class of beneficial interest will entitle its holders to share in distributions of proceeds from the monetization of the Litigation Trust Assets in accordance with the Litigation Trust Waterfall, as described below. Holders of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are also entitled to receive certain distributions under the Litigation Trust Waterfall, as described below.

*(b)     Litigation Trust Waterfall*

Except as may be altered by the provisions of Additional Waterfall Litigation Trust Funding, distributions from the Litigation Trust are subject to the priorities set forth in the Litigation Trust Waterfall under Section 6.5 of the Plan, which provides for distributions among the three classes of Litigation Trust Interests as follows:

1. *First*, to holders of Class 1 Litigation Trust Interests (or, if applicable, Additional Class 1 Litigation Trust Interests), which will receive the amounts to which they are entitled pursuant to Section 6.5(b)(i), (ii), and (iii) of the Plan in respect of principal and investment return from the Litigation Trust Class 1 Funding Commitments, the Litigation Trust Class 1 Funding Contributions, and any Additional Class 1 Litigation Trust Funding (the "**First Return Threshold**");

2. *Second*, following satisfaction of the First Return Threshold until aggregate distributions from the Litigation Trust (including distributions pursuant to Section 6.5(b) of the Plan) are equal to $350,000,000 (the "**Second Return Threshold**"), (x) 15% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and (y) 85% to holders of Class 2 Litigation Trust Interests;

3. *Third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests from the Litigation Trust equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) (the "**Final Return Threshold**"): (a) 10% to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), (b) 74% to holders of Class 2 Litigation Trust Interests, and (c) 16% to the holders of Class 3 Litigation Trust Interests (subject to payment of Settled Administrative Expense

---

[1]   The Debtors make no admission as to the allowance of any Claim and refer to claims as "Allowed" herein solely for the purpose of providing estimates with respect to this illustrative summary of the recoveries that holders of Litigation Trust Interests may receive on account of the monetization of the Litigation Trust Assets pursuant to the Litigation Trust Waterfall.

Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(b) of the Plan); and; and

4. *Fourth*, following the satisfaction of the Final Return Threshold, (x) 10% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) and (y) 90% to the holders of Class 3 Litigation Trust Interests (subject to payment of Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(b) of the Plan).

Set forth below is a table demonstrating the percentage of distributions to be made among the various classes of Litigation Trust Interests based on aggregate distributions from the Litigation Trust.

| Class | Aggregate Distributions | | | | |
|---|---|---|---|---|---|
| | $0 – $90 million[2] | $90 million – $350 million | $350 million – $1.8 billion | $1.8 billion – $1.9 billion[3] | Over $1.9 billion |
| Class 1 (Litigation Funding) | 100% | 15% | 10% | 10% | 10% |
| Class 2 (DIP A Claims) | – | 85% | 74% | – | – |
| Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, Other Priority Claims | – | – | 16% | 90% | – |
| Class 3 (Roll-Up Claims, General Unsecured Claims, First Lien Claims, and Second Lien Claims) | – | – | – | – | 90% |
| Total | 100% | 100% | 100% | 100% | 100% |

---

[2] This assumes (x) there is no Additional Litigation Trust Funding and (y) the 1.75x multiple on invested capital exceeds the 20.0% internal rate of return on the Litigation Trust Class 1 Funding Contributions.

[3] This assumes no participation in the Administrative Expense Claims Consent Program.

Distributions to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) described above will be paid in accordance with the following, set forth in Section 6.5(b) of the Plan:

1. *First*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with their respective Litigation Trust Class 1 Funding Contributions, until each Litigation Trust Class 1 Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (b) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x, with such returns being measured from the date of each Litigation Trust Class 1 Funding Contribution;

2. *Second*, to the Litigation Trust Class 1 Funding Contributors in an amount accrued on the daily undrawn amounts of their respective Litigation Trust Class 1 Funding Commitments at the rate of 5.0% *per annum*; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution in respect of undrawn Litigation Trust Class 1 Funding Commitments for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor;

3. *Third*, to the Litigation Trust Backstop Parties until each such Litigation Trust Backstop Party has received an amount equal to 5.0% of the amount of such Litigation Trust Backstop Party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party; *provided* that (1) no Litigation Trust Backstop Party will be entitled to receive any such distribution for any period during which such Litigation Trust Backstop Party is a Defaulting Contributor and (2) if a Litigation Trust Backstop Party becomes a Defaulting Contributor, such Litigation Trust Backstop Party's Litigation Trust Backstop Commitments and fees in respect thereof may be terminated or reallocated in Litigation Trustee's reasonable discretion; and

4. *Fourth*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Class 1 Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Class 1 Funding Contributors, for the life of the Litigation Trust; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor.

Distributions to the holders of Class 2 Litigation Trust Interests described above will be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders.

Distributions to holders of Class 3 Litigation Trust Interests described above will be paid in accordance with the following, set forth in Section 6.5(d) of the Plan:

1. *First*, to the holders of Settled Administrative Expense Claims, pro rata based on the aggregate amount of Allowed Settled Administrative Expense Claims, until each such holder has received distributions equal to the amount of its Allowed Settled Administrative Expense Claim;

2. *Second*, to the holders of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims), pro rata based on the aggregate amount of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims) held by such holders, until each such holder has received distributions equal to the amount of its Allowed Administrative Expense Claim;

3. *Third*, to holders of Allowed Other Priority Claims, pro rata based on the aggregate amount of Allowed Other Priority Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Other Priority Claim;

4. *Fourth*, to holders of Priority Tax Claims, pro rata based on the aggregate amount of Allowed Priority Tax Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Priority Tax Claim;

5. *Fifth*, to all holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, pro rata based on the aggregate amount of Allowed Roll-Up Claims (i.e., $3,300,000,000), Allowed First Lien Claims as of the Confirmation Date, Allowed Second Lien Claims as of the Confirmation Date, and Allowed General Unsecured Claims held by such holders, until each holder has received distributions equal to the amount of its respective Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims; and

6. *Sixth*, to holders of Allowed Subordinated Claims, pro rata based on the amount of Allowed Subordinated Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Subordinated Claim.

The chart below illustrates the distribution of distributable proceeds pursuant to the Litigation Trust Waterfall:

**Litigation Trust Waterfall**



## II.   Illustrative Recovery Scenarios and Principal Assumptions

The illustrative recoveries to holders of Litigation Trust Interests and to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims at varying levels of Litigation Trust distributable proceeds may be summarized as follows and as reflected in the graphic below, and subject entirely to the principal assumptions set forth below:

- At distributable proceeds of approximately $90 million (i.e., satisfaction of the estimated First Return Threshold), all distributable proceeds are distributed to holders of Class 1 Litigation Trust Interests, and no distributions are made to holders of Class 2 or Class 3

Litigation Trust Interests or holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Other Priority Claims.

- At distributable proceeds of approximately $350 million (i.e., satisfaction of the Second Return Threshold), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $129 million in the aggregate and holders of Class 2 Litigation Trust Interests are estimated to receive approximately $221 million in the aggregate; holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Class 3 Litigation Trust Interests do not receive any distribution.

- At distributable proceeds of approximately $1.0 billion, holders of Class 1 Litigation Trust Interests are estimated to receive approximately $194 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $702 million in the aggregate, holders of Allowed Administrative Expense Claims are estimated to receive approximately $104 million in the aggregate and shared *pro rata* amongst such holders, and no distributions are made to holders of Other Priority Claims, Priority Tax Claims, and Class 3 Litigation Trust Interest.

- At distributable proceeds of approximately $1.85 billion (i.e., satisfaction of the estimated Final Return Threshold and the point at which the DIP A Claims are estimated to be paid in full), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $280 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of Allowed Administrative Expense Claims and Other Priority Claims are estimated to receive approximately $241 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims), holders of Priority Tax Claims will receive $19 million in the aggregate and shared *pro rata* among such holders, and no distributions are made to holders of Class 3 Litigation Trust Interests.

- At distributable proceeds of approximately $1.92 billion (i.e., the point at which Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to be paid in full), holders of Class 1 Litigation Trust Interests are estimated to receive approximately $286 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of Allowed Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to receive approximately $300 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in aggregate, assuming no holders of Administrative Expense Claims opt in to the Administrative Expense Claims Consent Program), and no distributions are made to holders of Class 3 Litigation Trust Interests.

- At distributable proceeds of approximately $3.00 billion, holders of Class 1 Litigation Trust Interests are estimated to receive approximately $394 million in the aggregate, holders of Class 2 Litigation Trust Interests are estimated to receive approximately $1.335 billion in the aggregate (representing a 100% recovery on the estimated Allowed amount of the DIP A Claims), holders of

Allowed Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims are estimated to receive approximately $300 million in the aggregate (representing a 100% recovery on the estimated Allowed amount of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in aggregate, assuming no holders of Administrative Expense Claims opt in to the Administrative Expense Claims Consent Program), and holders of Class 3 Litigation Trust Interests are estimated to receive approximately $971 million in the aggregate and shared *pro rata* amongst holders of Class 3(a) Litigation Trust Interests, Class 3(b) Litigation Trust Interests, and Class 3(c) Litigation Trust Interests (representing an estimated recovery of approximately 8.4% on the aggregate Allowed amount of Class 3 Claims, assuming approximately $11.532 billion in Class 3 Litigation Trust Interests).

Collectively, holders of Class 1 and Class 2 Litigation Trust Interests are projected to receive approximately 86% of the first $1.856 billion of Litigation Trust distributable proceeds, at which point the DIP A Claims are estimated to be satisfied in full. Once the estimated Final Return Threshold of approximately $1.856 billion is reached, the Litigation Trust will distribute 90% of all subsequent distributions to the remaining Priority Tax Claims until they are satisfied in full (estimated to be at $1.921 billion of distributable proceeds), with the remaining 10% paid to holders of Class 1 Litigation Interests. Following the satisfaction in full of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, holders of Class 3 Litigation Trust Interests are projected to receive 90% of all subsequent distributions, with the remaining 10% paid to holders of Class 1 Litigation Trust Interests. Holders of Class 3 Litigation Trust Interests share pro rata in such distributions based on their respective Allowed Claims, as described above.

The illustrative recovery scenarios set forth herein were prepared by the FBG Debtors, in consultation with their advisors, and are based on the following principal assumptions:

1. **Estimated Allowed Claims**. The estimated Allowed amount of claims for purposes of distributions for each class reflected in the illustrative scenarios is $13.218 billion in the aggregate (and assumes there is no participation in the Administrative Expense Claims Consent Program), comprising (i) approximately $50 million of Class 1 Litigation Trust Interests, (ii) approximately $1.335 billion of Allowed DIP A Claims for the Class 2 Litigation Trust Interests, (iii) approximately $300 million in Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, and (iv) approximately $11.532 billion of aggregate claims for Class 3 Litigation Trust Interests, consisting of approximately (a) $3.3 billion of Class 3(a) Roll-Up Claims, (b) $5.641 billion of Allowed General Unsecured Claims, and (c) $2.591 billion of Class 3(c) First Lien Claims and Second Lien Claims.

2. **Litigation Trust Funding**. The illustrative scenarios assume that the Litigation Trust is funded with $25 million of Cash from the FBG Debtors' balance sheet and $50 million of Initial Litigation Trust Funding Commitments provided and backstopped by the Litigation Trust Class 1 Funding Contributors, and that no Additional Litigation Trust Funding Commitments are made or drawn. If Additional Litigation Trust Funding Commitments are made or drawn, the illustrative recoveries set forth above will change. The illustrative scenarios further assume that all $50 million of Initial Litigation Trust Funding Commitments are drawn, such that no undrawn commitment fee accrues for purposes of the First Return Threshold calculation. The $25 million of Cash from the FBG Debtors' balance sheet is treated as Class 2 Litigation Trust Interests and is not reflected in the Class 1 hurdle.

3. **Estimated Class 1 Hurdle**.  The First Return Threshold is estimated at approximately $90 million, comprising the $50 million of Initial Litigation Trust Funding Commitments, approximately $38 million of IRR/MOIC hurdle, and approximately $3 million of backstop fees.  The Final Return Threshold (i.e., the distributable-proceeds level at which the DIP A Claims are estimated to be satisfied in full and Class 2 ceases to participate in further distributions) is estimated at approximately $1.880 billion.  These estimates are based on assumptions regarding, among other things, the timing of recoveries and the calculation of accrued interest and exit premium on the DIP A Claims, and may change.

The chart below provides an example of the illustrative recoveries to holders of Litigation Trust Interests at varying levels of Litigation Trust distributable proceeds under five (5) different scenarios:

### Illustrative Recoveries



11