# EXHIBIT 9

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **PREMIER MARKETING GROUP, LLC,** | § | **Case No. 25-90420 (CML)** |
| | § | |
| | § | |
| | § | |
| **Debtor.**[1] | § | |

## CHAPTER 11 PLAN OF
## <u>PREMIER MARKETING GROUP, LLC</u>[2]

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtor and Debtor in Possession*

April 28, 2026
Houston, Texas

---

[1] The Debtor's service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] All Definitive Documents, including the Plan and the Disclosure Statement, remain subject to ongoing review, revision, and further negotiation by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties in all respects.

**Table of Contents**

**Page**

ARTICLE I.     Definitions and Interpretation. ...............................................................1

1.1    Definitions. ............................................................................................................1
1.2    Interpretation; Application of Definitions; Rules of Construction. ..............................23
1.3    Reference to Monetary Figures. ..................................................................................23
1.4    Consent Rights. ...........................................................................................................23
1.5    Controlling Document. ................................................................................................24

ARTICLE II.    Administrative Expense Claims, DIP A Claims, Professional Fee Claims,
               Restructuring Expenses, and Priority Tax Claims. ...................................24

2.1    Administrative Expense Claims. ..................................................................................24
2.2    DIP A Claims. ..............................................................................................................24
2.3    Professional Fee Claims. .............................................................................................25
2.4    Restructuring Expenses. ..............................................................................................26
2.5    Priority Tax Claims. ....................................................................................................26

ARTICLE III.   Classification of Claims and Interests. ......................................................26

3.1    Classification in General. ............................................................................................26
3.2    Summary of Classification of Claims and Interests. ....................................................27
3.3    Special Provision Governing Unimpaired Claims. ......................................................27
3.4    Elimination of Vacant Classes. ...................................................................................27
3.5    Voting Classes; Presumed Acceptance by Non-Voting Classes. .................................27
3.6    Voting; Presumptions; Solicitation. ............................................................................28
3.7    Cramdown. ..................................................................................................................28
3.8    No Waiver. ..................................................................................................................28

ARTICLE IV.    Treatment of Claims and Interests. ..........................................................28

4.1    Class 1:  Other Priority Claims. ..................................................................................28
4.2    Class 2:  Other Secured Claims. ..................................................................................29
4.3    Class 3:  Roll-Up Claims. ............................................................................................29
4.4    Class 4:  First Lien Claims. ..........................................................................................29
4.5    Class 5:  Second Lien Claims. .....................................................................................30
4.6    Class 6:  ABL Claims. ..................................................................................................30
4.7    Class 7:  General Unsecured Claims. ...........................................................................31
4.8    Class 8:  Plan Debtor Interests. ...................................................................................31

ARTICLE V.     Means for Implementation. ......................................................................31

5.1    Compromise and Settlement of Claims, Interests, and Controversies. ........................31
5.2    Global Settlement. .......................................................................................................32
5.3    Sources of Consideration for Distributions. ................................................................35

| 5.4 | Implementation. | 35 |
|---|---|---|
| 5.5 | Litigation Trust Funding Commitments. | 36 |
| 5.6 | Factored Receivables Account. | 37 |
| 5.7 | Wind Down Accounts. | 37 |
| 5.8 | Corporate Action. | 38 |
| 5.9 | Wind Down Administrator. | 38 |
| 5.10 | Governance. | 39 |
| 5.11 | Cancellation of Existing Securities, Agreements, and Liens. | 40 |
| 5.12 | Dissolution of Plan Debtor. | 40 |
| 5.13 | Effectuating Documents; Further Transactions. | 40 |
| 5.14 | Closing of the Chapter 11 Case. | 40 |

**ARTICLE VI.  Litigation Trust.** .......................................................................................**41**

| 6.1 | Establishment of the Litigation Trust. | 41 |
|---|---|---|
| 6.2 | Funding of and Transfer of Assets into the Litigation Trust. | 41 |
| 6.3 | Litigation Trust Waterfall. | 44 |
| 6.4 | Class 1 Litigation Trust Interests Waterfall. | 44 |
| 6.5 | Administration of the Litigation Trust. | 45 |
| 6.6 | Litigation Trust Oversight Committee. | 45 |
| 6.7 | Litigation Trustee. | 45 |
| 6.8 | Preference Actions. | 47 |
| 6.9 | Fees and Expenses of the Litigation Trust. | 50 |
| 6.10 | Indemnification. | 50 |
| 6.11 | Dissolution of the Litigation Trust. | 50 |
| 6.12 | Records. | 51 |
| 6.13 | Turnover of DIP Collateral. | 51 |
| 6.14 | Assignment of Horizon Alester IP. | 51 |
| 6.15 | Non-Transferability. | 51 |
| 6.16 | Litigation Trust Tax and Other Matters. | 51 |

**ARTICLE VII.  DIP Collateral Trust.** ..............................................................................**55**

| 7.1 | Establishment of the DIP Collateral Trust. | 55 |
|---|---|---|
| 7.2 | Transfer of Assets into the DIP Collateral Trust. | 55 |
| 7.3 | DIP Collateral Trustee. | 56 |
| 7.4 | Fees and Expenses of the DIP Collateral Trust. | 57 |
| 7.5 | Indemnification. | 57 |
| 7.6 | Dissolution of the DIP Collateral Trust. | 57 |
| 7.7 | Records. | 58 |
| 7.8 | Non-Transferability. | 58 |
| 7.9 | DIP Collateral Trust Tax and Other Matters. | 58 |

**ARTICLE VIII.  ABL Collateral Trust.** ............................................................................**60**

| 8.1 | Establishment of the ABL Collateral Trust. | 60 |
|---|---|---|
| 8.2 | Transfer of Assets into the ABL Collateral Trust. | 60 |

8.3     ABL Collateral Trust Waterfall. .................................................................61

8.4     ABL Collateral Trustee. ...............................................................................61

8.5     Fees and Expenses of the ABL Collateral Trust. ........................................63

8.6     Indemnification. ..........................................................................................63

8.7     Dissolution of the ABL Collateral Trust. ...................................................63

8.8     Records. .......................................................................................................64

8.9     Non-Transferability. ...................................................................................64

8.10    ABL Collateral Trust Tax and Other Matters. ...........................................64

**ARTICLE IX.    Direct Claims Trust** ..........................................................................**67**

9.1     Establishment of the Direct Claims Trust. .................................................67

9.2     Transfer of Assets into the Direct Claims Trust. ........................................67

9.3     Direct Claims Trust Waterfall. ...................................................................68

9.4     Direct Claims Trustee. ................................................................................68

9.5     Fees and Expenses of the Direct Claims Trust. ..........................................68

9.6     Indemnification. ..........................................................................................68

9.7     Dissolution of the Direct Claims Trust. ......................................................69

9.8     Non-Transferability. ...................................................................................69

9.9     Direct Claims Trust Tax and Other Matters. ..............................................69

**ARTICLE X.    Distributions.** .....................................................................................**71**

10.1    Distributions Generally. ..............................................................................71

10.2    No Postpetition Interest on Claims. ............................................................71

10.3    Distribution Record Date. ...........................................................................71

10.4    Date of Distributions. ..................................................................................72

10.5    Reserve on Account of Disputed Claims. ...................................................72

10.6    Distributions After Effective Date. .............................................................73

10.7    Delivery of Distributions. ...........................................................................73

10.8    Unclaimed Property. ...................................................................................73

10.9    Satisfaction of Claims. ................................................................................74

10.10  Manner of Payment Under Plan. .................................................................74

10.11  Minimum Distribution. ...............................................................................74

10.12  Setoffs and Recoupments. ...........................................................................74

10.13  Withholding and Reporting Requirements. .................................................75

10.14  Disbursing Agent. .......................................................................................75

10.15  Allocation of Distributions Between Principal and Interest ........................76

**ARTICLE XI.    Procedures for Resolving Claims.** ....................................................**76**

11.1    Allowance of Claims. .................................................................................76

11.2    Objections to Claims. ..................................................................................77

11.3    Estimation of Claims. ..................................................................................77

11.4    Claim Resolution Procedures Cumulative. .................................................77

11.5    Adjustment to Claims Register Without Objection. ....................................78

11.6    No Distributions Pending Allowance. .........................................................78

11.7    Amendments to Claims. ........................................................................................78

**ARTICLE XII.   Executory Contracts and Unexpired Leases. ...............................................78**

12.1    Rejection of Executory Contracts and Unexpired Leases. .............................78
12.2    Survival of Indemnification Obligations. .....................................................79
12.3    Rejection Damages Claims. ...........................................................................79
12.4    Insurance Policies. ........................................................................................79
12.5    Reservation of Rights. ...................................................................................80

**ARTICLE XIII. Conditions Precedent to Occurrence of Effective Date. .............................80**

13.1    Conditions Precedent to Effective Date. ........................................................80
13.2    Waiver of Conditions Precedent. ...................................................................82
13.3    Effect of Failure of a Condition. ...................................................................82
13.4    Effect of Vacatur of Confirmation Order. ......................................................82

**ARTICLE XIV. Effect of Confirmation. ...............................................................................82**

14.1    Binding Effect. ..............................................................................................82
14.2    Vesting of Assets. ..........................................................................................83
14.3    Pre-Confirmation Injunctions and Stays. .....................................................83
14.4    Plan Injunction. .............................................................................................83
14.5    Releases. ........................................................................................................86
14.6    Exculpation. ...................................................................................................88
14.7    Waiver of Statutory Limitation on Releases. .................................................89
14.8    Injunction Related to Releases and Exculpation. ...........................................89
14.9    Subordinated Claims. ....................................................................................89
14.10   Retention of Causes of Action and Reservation of Rights. ...........................90
14.11   Ipso Facto and Similar Provisions Ineffective. .............................................90
14.12   Solicitation of Plan. .......................................................................................90

**ARTICLE XV.   Retention of Jurisdiction. ...................................................................90**

15.1    Retention of Jurisdiction. ..............................................................................90
15.2    Courts of Competent Jurisdiction. .................................................................93

**ARTICLE XVI. Miscellaneous Provisions. ...........................................................................93**

16.1    Statutory Fees. ..............................................................................................93
16.2    Exemption from Certain Transfer Taxes. ......................................................93
16.3    Dissolution of Creditors' Committee. ............................................................94
16.4    Request for Expedited Determination of Taxes of the Plan Debtor. ..............94
16.5    Dates of Actions to Implement Plan. ............................................................94
16.6    Amendments. .................................................................................................94
16.7    Revocation or Withdrawal of Plan. ...............................................................95
16.8    Notice of Effective Date. ...............................................................................95
16.9    Substantial Consummation. ...........................................................................95

16.10  Governing Law. ...................................................................................................95
16.11  Immediate Binding Effect. ...................................................................................95
16.12  Successors and Assigns. ......................................................................................96
16.13  Entire Agreement. ................................................................................................96
16.14  Severability of Plan Provisions. ..........................................................................96
16.15  Additional Documents. ........................................................................................96
16.16  Deemed Acts. .......................................................................................................96
16.17  Computing Time. ..................................................................................................97
16.18  Exhibits to Plan. ...................................................................................................97
16.19  Notices. .................................................................................................................97
16.20  Reservation of Rights............................................................................................100

Premier Marketing Group, LLC (the "**Plan Debtor**" and, collectively with its debtor affiliates in the Chapter 11 Cases, the "**Debtors**")[1] proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*ABL Agent* has the meaning set forth in the DIP Order.

*ABL Borrowers* has the meaning set forth in the DIP Order.

*ABL Claims* means all Secured Claims (including all accrued and unpaid interest, fees, charges, expenses, and other amounts) arising from the ABL Credit Agreement and the DIP Order relating to the ABL Credit Agreement.

*ABL Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VIII of the Plan to hold, transfer, sell, monetize, or abandon the ABL Collateral Trust Assets and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan.

*ABL Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the ABL Collateral Trust, establishing the terms and conditions of the ABL Collateral Trust, the rights of, and limitations on, the ABL Collateral Trust Interests, and pursuant to which the ABL Collateral Trustee shall manage and administer the ABL Collateral Trust Assets.

*ABL Collateral Trust Assets* means any ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (i) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected, Lien on such collateral, senior in lien priority to liens securing the DIP Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected, first-priority Lien on such collateral. The ABL Collateral Trust Assets will be identified in a schedule to be filed as part of the Plan Supplement, which schedule shall be prepared in consultation with the ABL Agent. To the extent the ABL Agent disagrees with the scope of the ABL Collateral Trust Assets set forth in the Plan Supplement, the ABL Agent may seek appropriate relief from the Bankruptcy Court.

*ABL Collateral Trust Beneficiaries* means the holders of the ABL Collateral Trust Interests.

*ABL Collateral Trust Interests* means the beneficial interests in the ABL Collateral Trust granted to holders of Allowed ABL Claims, which beneficial interests shall entitle holders

---

[1]  A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands.

to share in distributions in accordance with the ABL Collateral Trust Waterfall.

*ABL Collateral Trust Waterfall* means the method for making distributions to the holders of ABL Collateral Trust Interests in the order of priority set forth in <u>Section 8.3</u> of the Plan and the ABL Collateral Trust Agreement.

*ABL Collateral Trustee* means the trustee for the ABL Collateral Trust, which, unless otherwise disclosed in the Plan Supplement, shall be the ABL Agent.

*ABL Credit Agreement* means that certain *ABL Credit Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Group Intermediate, LLC, (iii) the other borrowers from time to time party thereto, (iv) Bank of America, N.A., as administrative agent and collateral agent, and (v) the lenders from time to time party thereto.

*ABL Guarantors* has the meaning set forth in the DIP Order.

*ABL Intercreditor Agreement* has the meaning set forth in the DIP Order.

*ABL Loan Parties* means, collectively, the ABL Borrowers and other ABL Guarantors.

*ABL Priority Collateral* has the meaning set forth in the DIP Order.

*ABL Secured Parties* has the meaning set forth in the DIP Order.

*Ad Hoc Group* has the meaning set forth in the DIP Order.

*Ad Hoc Group SteerCo* means the institutions that comprise the members of the steering committee of the Ad Hoc Group as of the date of the execution of the Plan Support Agreement.

*Additional Unencumbered Property* has the meaning set forth in the DIP Order.

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving a Debtor's Estate and operating a Debtor's business, other than Professional Fee Claims, Restructuring Expenses, DIP A Claims, Roll-Up Claims, and Priority Tax Claims.

*Adverse Conduct* has the meaning set forth in <u>Section 6.8(a)</u> of the Plan

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one

or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Alester Agreements* means, collectively, (i) that certain *Contribution Agreement*, dated December 30, 2022, by and between TAE Brakes, LLC and Alester Technologies, LLC; (ii) that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC; (iii) that certain *Intellectual Property License Agreement*, dated as of February 8, 2023, by and between First Brands Group, LLC and Alester Technologies, LLC; (iv) that certain *Contribution Agreement*, dated July 3, 2023, by and between Cardone Industries, Inc. and Alester Technologies, LLC; and (v) that certain *Contribution Agreement*, dated September 29, 2023, by and between Carter Carburetor Holdings, LLC and Alester Technologies, LLC.

*Allowed* means, with respect to any Claim against or Interest in the Plan Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder; (ii) any Claim against or Interest in the Plan Debtor as to which the liability of the Plan Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (iii) any Claim against or Interest in the Plan Debtor expressly Allowed under the Plan; or (iv) any Claim against the Plan Debtor that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed.

*Available Cash* means with respect to each Trust (i) Cash on hand (including any amounts invested pending distribution) of such Trust, as of the date of determination, realized from the Trust's assets *less* (ii) (a) any fees and costs incurred by the Trust associated with the collection of such proceeds, (b) any amounts reserved in respect of Disputed Claims, and (c) any reserves established in the good faith discretion of the Trustee to pay (w) any obligations or liabilities of the Trust, (x) any costs or expenses of the Trust or the Trustee, (y) any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or (z) any amounts needed to maintain the value of any assets of the Trust.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

3

***Avoidance Proceeds*** means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

***Backstop Parties*** means, collectively, the holders of DIP A Claims that are members of the Ad Hoc Group SteerCo and sign a backstop commitment letter in connection with the Effective Date.

***Ballot*** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

***Business Day*** means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

***Cash*** means legal tender of the United States of America.

***Cash Management Order*** means the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (Docket No. 604).

***Cause of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or

recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession, Wind Down Administrator, or Trustee to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Actions.

***Challenge Period*** has the meaning set forth in the DIP Order.

***Chapter 11 Case*** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

***Claims and Noticing Agent*** means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

***Claims Register*** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

***Class*** means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

***Class 1 Litigation Trust Interests*** means the beneficial interests in the Litigation Trust granted to the Litigation Trust Funding Contributors.

***Class 2 Litigation Trust Interests*** means the beneficial interests in the Litigation Trust granted to holders of Allowed DIP A Claims.

***Class 3 Litigation Trust Interests*** means, collectively, the (i) Class 3(a) Litigation Trust Interests, (ii) Class 3(b) Litigation Trust Interests, and (iii) Class 3(c) Litigation Trust Interests.

***Class 3(a) Litigation Trust Interests*** means the beneficial interests in the Litigation Trust granted to the holders of Allowed Roll-Up Claims.

***Class 3(b) Litigation Trust Interests*** means the beneficial interests in the Litigation Trust granted to the GUC Ombudsman as agent to the holders of Electing Creditor Claims.

***Class 3(c) Litigation Trust Interests*** means the beneficial interests in the Litigation Trust granted to the holders of Allowed First Lien Claims and/or Allowed Second Lien Claims.

***Class 1 DIP Collateral Trust Interests*** means the beneficial interests in the DIP Collateral Trust granted to the DIP Collateral Funding Parties (as defined in the DIP Collateral Trust Agreement).

***Class 2 DIP Collateral Trust Interests*** means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims.

***Class 3 DIP Collateral Trust Interests*** means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed Roll-Up Claims.

***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order.

***Confirmation Hearing*** means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

***Contracts Procedure Order*** means the *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* (Docket No. 1244).

***Converting Debtor*** means any Debtor, upon the conversion of its Chapter 11 Case to a proceeding under chapter 7 of the Bankruptcy Code.

***Credit Bid Claims*** means the sum of the amount of Claims retired pursuant to the Estate Claims Credit Bid, *plus* the sum of the amount of Claims retired pursuant to the DIP Collateral Credit Bid.

***Creditors' Committee*** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *United States Trustee's Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 313) filed on October 9, 2025, as reconstituted from time to time.

***D&O Policy*** means all directors and officers liability insurance policies (including any runoff policies or tail policies related to or associated with the foregoing) issued or providing coverage at any time to any of the Debtors, for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

***Debtor(s)*** has the meaning set forth in the introductory paragraph of the Plan.

***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure

Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Support Agreement, including any term sheets or ancillary agreements appended thereto; (viii) the ABL Collateral Trust Agreement; (ix) the DIP Collateral Trust Agreement; (x) the Litigation Trust Agreement; (xi) the Direct Claims Trust Agreement; (xii) the DIP Collateral Credit Bid APA; and (xiii) the Estate Claims Credit Bid APA.

*DIP A Claims* means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) held by a DIP Lender arising from the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement) and the DIP Order on account of the New Money DIP Loans as of the Effective Date.

*DIP Claims* means, collectively, the DIP A Claims and Roll-Up Claims.

*DIP Collateral* has the meaning set forth in the DIP Order.

*DIP Collateral Credit Bid* means a credit bid and equivalent release of the DIP Loan Parties of the Allowed DIP A Claims in the amount of $[_] in consideration of the sale of the DIP Collateral Trust Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust.

*DIP Collateral Credit Bid APA* means the purchase and sale agreement providing for, among other things, the sale of the DIP Collateral Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust.

*DIP Collateral Credit Bid Transaction* means the sale of the DIP Collateral Trust Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust pursuant to the DIP Collateral Credit Bid APA in accordance with Section 5.2(f) of the Plan.

*DIP Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VI of the Plan to hold, transfer, sell, monetize, or abandon the DIP Collateral Trust Assets and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan.

*DIP Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the DIP Collateral Trust, establishing the terms and conditions of the DIP Collateral Trust, the rights of, and limitations on, the DIP Collateral Trust Interests, and pursuant to which the DIP Collateral Trustee shall manage and administer the DIP Collateral Trust Assets.

*DIP Collateral Trust Assets* means all DIP Collateral, other than the Litigation Trust Assets and the ABL Collateral Trust Assets, for which, on the date the DIP Collateral Trust is established, (i) no bona fide dispute exists as to whether the DIP Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the liens securing the ABL Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties have a validly perfected, first-priority Lien in such collateral. The DIP Collateral Trust Assets shall include any

DIP SPV Collateral Trust Recoveries.  The DIP Collateral Trust Assets will be identified in a schedule to be filed as part of the Plan Supplement.

***DIP Collateral Trust Beneficiaries*** means the holders of the DIP Collateral Trust Interests.

***DIP Collateral Trust Interests*** means collectively, the (i) Class 1 DIP Collateral Trust Interests, (ii) Class 2 DIP Collateral Trust Interests, and (iii) Class 3 DIP Collateral Trust Interests.

***DIP Collateral Trust Waterfall*** means the method for distributing the DIP Collateral Trust Assets, net of expenses, as will be set forth in the DIP Collateral Trust Agreement.

***DIP Collateral Trustee*** means the trustee for the DIP Collateral Trust.  The identity of the initial DIP Collateral Trustee will be disclosed in the Plan Supplement.

***DIP Credit Agreement*** means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of October 2, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among (i) First Brands Group, LLC, as Borrower and Debtor and Debtor-in-Possession, (ii) First Brands Group Intermediate, LLC, as Parent and a Debtor and Debtor-in-Possession, (iii) the lenders party thereto, (iv) Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, and (v) OPY Credit Corp., as Trading Agent.

***DIP Documents*** has the meaning set forth in the DIP Order.

***DIP Loan Parties*** has the meaning set forth in the DIP Order.

***DIP Obligations*** has the meaning set forth in the DIP Order.

***DIP Order*** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

***DIP Secured Parties*** has the meaning set forth in the DIP Order.

***DIP SPV Collateral Trust Recoveries*** means any DIP SPV Recovery that arises out of litigation involving a Lien or ownership dispute over tangible property (including, among others, disputes with Onset Financial, Inc. regarding interests in machinery and equipment) that would otherwise constitute a DIP Collateral Trust Asset.

***DIP SPV Recoveries*** means any recoveries on account of any Lien asserted by the DIP Secured Parties in any assets owned by an SPV Debtor pursuant to the DIP Order or any adequate protection stipulation entered into with an SPV Lender.

***Direct Claims Trust*** means that certain liquidating trust to be established in accordance with ARTICLE IX of the Plan to hold, transfer, sell, monetize, or abandon the Direct Claims Trust Assets and make distributions to the Direct Claims Trust Beneficiaries in accordance with the Direct Claims Trust Agreement.

***Direct Claims Trust Agreement*** means the agreement evidencing the terms and provisions governing the Direct Claims Trust, establishing the terms and conditions of the Direct Claims Trust, the rights of, and limitations on, the Direct Claims Trust Interests, and pursuant to which the Direct Claims Trustee shall manage and administer the Direct Claims Trust Assets.

***Direct Claims Trust Assets*** means the Direct Creditor Claims of Direct Claims Trust Electing Creditors.

***Direct Claims Trust Beneficiaries*** means the holders of the Direct Claims Trust Interests.

***Direct Claims Trust Electing Creditor*** means any Eligible Creditor or holder of a Roll-Up Claim, First Lien Claim, and/or Second Lien Claim who timely elects on the Direct Claims Trust Election Form to contribute its Direct Creditor Claims to the Direct Claims Trust.

***Direct Claims Trust Election Form*** means the form, approved under the Disclosure Statement Order, sent to Eligible Creditors and holders of Roll-Up Claims, First Lien Claims, and/or Second Lien Claims, pursuant to which such holders may opt in to (i) contributing their Direct Creditor Claims to the Direct Claims Trust in exchange for Direct Claim Trust Interests and (ii) granting the releases contained in Section 14.5 of the Plan.

***Direct Claims Trust Interests*** means the beneficial interests in the Direct Claims Trust granted to the Direct Claims Trust Electing Creditors.

***Direct Claims Trustee*** means the trustee for the Direct Claims Trust. The identity of the initial Direct Claims Trustee will be disclosed in the Plan Supplement.

***Direct Creditor Claims*** means the direct (non-derivative) Claims held by Direct Claims Electing Creditors (i) against any non-Debtor Person (other than a Released Party) and (ii) that relate to the Debtors' prepetition operations. For the avoidance of doubt, Direct Creditor Claims shall not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.

***Disbursing Agent*** means the Trustees or such Entity or Entities designated by a Trustee to make or facilitate distributions required by the Plan and, in the case of Electing Creditor Claims, the GUC Ombudsman.

***Disclosure Statement*** means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

9

***Disclosure Statement Order*** means the order entered by the Bankruptcy Court (i) conditionally approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) authorizing solicitation of the Plan.

***Disputed*** means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE XI of the Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed; or (iv) any Claim that is otherwise disputed by the Debtors, the Wind Down Administrator, or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Plan Debtor, Wind Down Administrator, or any party in interest disputes the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

***Disputed Alester IP*** means all assets, including intellectual property, covered by the Alester Agreements.

***Disputed Claim Reserve*** means any assets of the Plan Debtor, ABL Collateral Trust Assets, DIP Collateral Trust Assets, or Litigation Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded with Cash and/or proceeds of such assets, as applicable, in accordance with the terms of the Plan.

***Distribution Record Date*** means the Effective Date.

***Effective Date*** means the date that is the first Business Day on which all conditions to the effectiveness of the Plan set forth in Section 13.1 of the Plan have been satisfied or waived in accordance with Section 13.2 of the Plan.

***Electing Creditor*** means any Eligible Creditor who (i) timely elects on the Global Settlement Election Form to share in the distributions to the holders of Class 3(b) Litigation Trust Interests in accordance with the Litigation Trust Waterfall; and (ii) is not an Ineligible Creditor.

***Electing Creditor Claims*** means the Administrative Expense Claims, Other Secured Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims against one or more of the FBG Debtors (other than the Plan Debtor) held by Electing Creditors. Any Electing Creditor Claims arising out of a Claim against an FBG Debtor for which one or more other FBG Debtors have joint and several liability shall be treated as a single Electing Creditor Claim for purposes of receiving Class 3(b) Litigation Trust Interests and receiving distributions from the Litigation Trust.

***Eligible Creditor*** means any holder of an Administrative Expense Claim, Other Secured Claim, Priority Tax Claim, Other Priority Claim, or General Unsecured Claim against one or more of the FBG Debtors (other than the Plan Debtor), as of the Voting Record Date.

***Emergence Steps Memo*** means a memorandum, to be included in the Plan Supplement, describing the steps necessary to implement the Plan.

***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

***Estate(s)*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

***Estate Claims*** means any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, against any Person, seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors taken as a whole, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates; and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with a FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, any Disputed Alester IP recovered from an Avoidance Action of an FBG Debtor. For the avoidance of doubt, Estate Claims shall not include any claims and/or remedies that are held by an SPV Debtor.

***Estate Claims Credit Bid*** means a credit bid and equivalent release of the DIP Loan Parties of the Allowed DIP A Claims in the amount of $[_] in consideration of the sale of the Litigation Trust Assets to the Plan Debtor, as agent and/or on behalf of the holders of Allowed DIP A Claims, and subsequent transfer of such assets to the Litigation Trust.

***Estate Claims Credit Bid APA*** means the purchase and sale agreement providing for, among other things, the sale of the Litigation Trust Assets to the Plan Debtor, and subsequent transfer of such assets to the Litigation Trust.

11

***Estate Claims Credit Bid Transaction*** means the sale of the Litigation Trust Assets to the Plan Debtor, as agent and/or on behalf of the holders of Allowed DIP A Claims, and subsequent transfer to the Litigation Trust pursuant to the Estate Claims Credit Bid APA in accordance with Section 5.2(e) of the Plan.

***Examiner*** means Martin De Luca, in his capacity as examiner, appointed pursuant to the *Order Approving the Appointment of Examiner* (Docket No. 1260).

***Examiner Account*** means the segregated bank account established by the Debtors to hold amounts that are exclusively available for the payment of fees and expenses of the Examiner and his professionals.

***Exculpated Parties*** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the FBG Debtors; (ii) the members of the Special Committees; and (iii) the Creditors' Committee and each of its members in their official capacity.

***Factor*** means any Person that purchased, or intended or agreed to purchase, accounts receivable at a discount from one or more FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

***Factored Receivables Account*** has the meaning set forth in the Cash Management Order.

***FBG Debtors*** means First Brands Group Holdings, LLC, its Debtor subsidiaries, and Viceroy.

***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

***Final Return Threshold*** has the meaning set forth in the Section 6.3 of the Plan.

***First Lien Claims*** means, collectively, the First Lien Term Loan Claims and the Side-Car Term Loan Claims.

*First Lien Secured Parties* has the meaning set forth in the DIP Order.

*First Lien Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders and letter of credit issuers from time to time party thereto.

*First Lien Term Loan Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expense, other amounts, and/or deficiency Claims) through the Effective Date arising from the First Lien Term Loan Agreement and the DIP Order relating to the First Lien Term Loan Agreement.

*First Return Threshold* has the meaning set forth in the Section 6.3 of the Plan.

*General Unsecured Claim* means any Claim (other than an Intercompany Claim) that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*Global Settlement* means the settlement among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee, the terms of which are incorporated in Section 5.2 of the Plan.

*Global Settlement Election Form* means the form, approved under the Disclosure Statement Order, sent to Eligible Creditors, pursuant to which such holders may opt out of (i) being treated as Electing Creditors and share in the distributions to the holders of the Class 3(b) Litigation Trust Interests in accordance with the Litigation Trust Waterfall and (ii) granting the releases contained in Section 14.5 of the Plan.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*GUC Ombudsman* means a representative selected by the Ad Hoc Group and Creditors' Committee that shall have the duties and responsibilities described in Section 5.2(k) hereof. The identity of the GUC Ombudsman will be disclosed in the Plan Supplement.

*Horizon Alester Agreement* means that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC.

*Horizon Alester IP* means all assets, including intellectual property, covered by the Horizon Alester Agreement.

*Impaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Indemnification Obligations* means a Debtor's indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation

13

or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, and officers that are currently employed by, or serving on the board of managers of, such Debtor, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by such Debtor as of the date immediately prior to the Effective Date.

*Independent Manager Policies* means the primary and excess D&O Policies issued to Mayfair Enterprises, LLC, as named insured, that have a policy period of September 26, 2025 to September 26, 2026 and are numbered: (i) XDO000165-0925 (issued by Convex North American Insurance Services, Inc.), (ii) AMB06760 (issued by Ambridge Partners LLC), (iii) EQ5EX00296-251 (issued by Everest National Insurance Company), (iv) 100625436251 (issued by Starr Indemnity & Liability Company), (v) 833891932 (issued by Continental Casualty Company), (vi) CRDO-0000058-00 (issued by Celerity Risk), (vi) B1976DO00007206 (issued by Lloyds Syndicate BEAT 4242), and (vii) ELU206779-25 (issued by XL Specialty Insurance Company).

*Ineligible Creditors* means, (i) in accordance with section 502(d) of the Bankruptcy Code, (a) any defendants named or to be named in the James Complaint or Onset Complaint, or (b) any Person that engaged in Adverse Conduct; (ii) any SPV Lender; (iii) the ABL Secured Parties; and (iv) the Converting Debtors.

*Insurance Company* means all Persons that issued, or that have any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under, or with respect to, any Insurance Policy, and any third party administrator, parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing, solely in their capacity as such with respect to an Insurance Policy.

*Insurance Policies* means any insurance policies, insurance contracts, binders, certificates, or reinsurance policies, whether currently known or unknown, issued to or that provides or may provide coverage (whether as the primary or additional insured or otherwise) at any time to any of the Debtors or any of their predecessors or subsidiaries, or under which any of the foregoing have sought or may seek such coverage, including, but not limited, to any such policies for directors' and officers' liability, general liability, workers' compensation, any excess or umbrella policies, and all agreements, documents, or instruments relating thereto.

*Insurance Rights* means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Insurance Policies now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including: (i) any Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (ii) the refusal of any Insurance Company to compromise and settle any claim or provide defense to any claim; (iii) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (iv) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (v) any right to receive proceeds with respect to any Insurance Policy or a coverage action.

14

***Intercompany Claim*** means any Claim held by a Debtor against another Debtor arising before the Petition Date.

***Interest*** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Claim against a Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

***Interim Compensation Procedures Order*** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 699), as may be amended, modified, or supplemented from time to time.

***International Emergency Economic Powers Act*** means sections 1701–1708 of title 50 to the United States Code, as may have been amended from time to time.

***IRS*** means the United States Internal Revenue Service.

***James Complaint*** means the adversary proceedings against Patrick James et al. (Adv. Pro. Case No. 25-03803).

***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

***Litigation List*** has the meaning set forth in <u>Section 6.8(b)</u> of the Plan.

***Litigation SPV Trust Recoveries*** means any DIP SPV Recovery that is not a DIP SPV Collateral Trust Recovery.

***Litigation Trust*** means that certain liquidating trust to be established in accordance with <u>ARTICLE VI</u> of the Plan to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

***Litigation Trust Agreement*** means the agreement evidencing the terms and provisions governing the Litigation Trust, establishing the terms and conditions of the Litigation Trust, the Litigation Trust Funding Commitments, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets.

***Litigation Trust Assets*** means, as of the date the Litigation Trust is established, (i) $25,000,000 in Cash from the FBG Debtors' balance sheet; (ii) all Estate Claims; (iii) all rights, privileges, and defenses of the FBG Debtors relating to the Estate Claims; (iv) all Insurance Rights of the FBG Debtors with respect to Insurance Policies that provide or may provide coverage for the Estate Claims, including for the avoidance of doubt, the D&O Policies; (v) all books, records, and investigative and/or discovery findings of the FBG Debtors, including to the extent such records are owned or controlled by advisors to the FBG Debtors, any independent director or

manager of the FBG Debtors, the Examiner and the advisors thereto, and the advisors to the Creditors' Committee; *provided* that (i) the Debtors' Professionals, (ii) any independent director or manager of the FBG Debtors, (iii) the Examiner and the advisors thereto, and (iv) the Creditors' Committee's Professionals shall not be required to turnover any work product and communications but each such professional, in its sole discretion, may compile (in a digest or other appropriate format) its material findings, information, and records and provide the Litigation Trust with such compilation and/or enter into common interest or other agreements sufficient to facilitate the turnover of any work product or communications; (vi) all Litigation SPV Trust Recoveries; (vii) all assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their Estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement.

*Litigation Trust Beneficiaries* means the holders of the Litigation Trust Interests.

*Litigation Trust Funding Agreement* means any agreement pursuant to which a Litigation Trust Funding Contributor contributes or commits to contribute Cash or other property to the Litigation Trust in exchange for the applicable Litigation Trust Interests applicable to such Litigation Trust Funding Contributor.

*Litigation Trust Funding Commitments* means $50,000,000 of Cash contributions provided to the Litigation Trust pursuant to the terms of the Litigation Trust Agreement or any Litigation Trust Funding Agreement.

*Litigation Trust Funding Contribution*s means the funding under the Litigation Trust Funding Commitments.

*Litigation Trust Funding Contributors* means holders of Allowed DIP A Claims that choose to participate in the Litigation Trust Funding Commitments pursuant to the terms of the Litigation Trust Agreement.

*Litigation Trust Interests* means, collectively, the (i) Class 1 Litigation Trust Interests, (ii) Class 2 Litigation Trust Interests, and (iii) Class 3 Litigation Trust Interests.

*Litigation Trust Oversight Committee* has the meaning set forth in the Litigation Trust Agreement and initially shall be comprised of four (4) members. The identity of the initial members of the Litigation Trust Oversight Committee will be disclosed in the Plan Supplement.

*Litigation Trust Waterfall* means the method for making distributions to the holders of Litigation Trust Interests in accordance with the priorities set forth in Section 6.3 of the Plan and the Litigation Trust Agreement.

*Litigation Trustee* means the person or institution to be identified in the Plan Supplement, as trustee for the Litigation Trust.

*Major Decision* shall have the meaning set forth in the Litigation Trust Agreement.

*New Money DIP Loans* has the meaning set forth in the DIP Order.

*Onset Complaint* means the adversary proceedings against Onset Financial, Inc. et al. (Adv. Pro. Case No. 26-03005).

*Other Priority Claim* means any Claim entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

*Other Secured Claim* means any Secured Claim, other than an Administrative Expense Claim, a DIP A Claim, a Roll-Up Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim.

*Parent Guarantors* has the meaning set forth in the DIP Order.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means September 29, 2025.

*Plan* means this chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of the Plan.

*Plan Debtor* has the meaning set forth in the introductory paragraph of the Plan.

*Plan Debtor Interests* means any Interests in the Plan Debtor.

*Plan Supplement* means a supplemental appendix to the Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms the Plan, the Bankruptcy Code, and the Bankruptcy Rules, which may include: (i) the Schedule of Retained Causes of Action; (ii) the disclosure of the identity of the Wind Down Administrator; (iii) the Wind Down Budget; (iv) the disclosure of the identity of the GUC Ombudsman; (v) the disclosure of the identity of the Litigation Trustee; (vi) the disclosure of the identity of the initial members of the Litigation Trust Oversight Committee; (vii) the Litigation Trust Agreement and any Litigation Trust Funding Agreement; (viii) a schedule of the Litigation Trust Assets; (ix) the Estate Credit Bid APA; (x) the Litigation List; (xi) the disclosure of the identity of the DIP Collateral Trustee; (xii) the DIP Collateral Trust Agreement; (xiii) a schedule of the DIP Collateral Trust Assets; (xiv) the DIP Collateral Credit Bid APA; (xv) the disclosure of the identity of the ABL Collateral Trustee; (xvi) the ABL Collateral Trust Agreement; (xvii) a schedule of the ABL Collateral Trust Assets; (xviii) the Direct Claims Trust Agreement; (xix) the disclosure of the identity of the Direct Claims Trustee; (xx) the Emergence Steps Memo; (xxi) a non-exhaustive schedule listing Persons who are not Released Parties or Representatives under the Plan; and (xxii) any other agreement, instrument, schedule, exhibit, or document designated by the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed)) as a Plan Supplement document. Through the Effective Date, the Plan Debtor shall have the right to amend any

schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.

*Plan Support Agreement* means that certain *Plan Support Agreement*, dated as of April [●], 2026, by and among (i) the FBG Debtors, (ii) certain holders of DIP A Claims, Roll-Up Claims, First Lien Claims and/or Second Lien Claims, and (iii) the Creditors' Committee, as may be amended, supplemented, or otherwise modified from time to time.

*Preference Actions* means all Causes of Action arising under section 547 of the Bankruptcy Code.

*Prepetition Collateral* has the meaning set forth in the DIP Order.

*Prepetition Secured Parties* has the meaning set forth in the DIP Order.

*Priority Tax Claim* means any Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata Share* means (i) that proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class; (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable; and (iii) with respect to the distribution of the Class 3(b) Litigation Trust Interests in accordance with the Plan, that portion that an Allowed General Unsecured Claim against the Plan Debtor or accepted Electing Creditor Claim bears to the aggregate amount of Allowed General Unsecured Claims and accepted Electing Creditor Claims.

*Professional* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court and the Examiner and advisers thereto.

*Professional Fee Claim* means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date.

*Professional Fees Escrow Account* has the meaning set forth in the DIP Order.

*Proof of Claim* means a proof of Claim filed against the Plan Debtor in the Chapter 11 Cases.

*Recovery Actions* has the meaning set forth in the DIP Order.

*Recovery Action Proceeds* has the meaning set forth in the DIP Order.

*Reinstate, Reinstated, or Reinstatement* means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

*Released Parties* means collectively, and in each case solely in their capacities as such, (i) the Plan Debtor and its Estate; (ii) the members of the Special Committees (including any subcommittees thereof); (iii) the Specified Executives; (iv) the Professionals; (v) each of the following, solely in their capacity as such, (a) the Creditors' Committee and each of its members, (b) the DIP Secured Parties, (c) the Prepetition Secured Parties, (d) the Backstop Parties, (e) the Litigation Trust Contributors, (f) the DIP Collateral Funding Parties, and (g) solely with respect to each of the foregoing Persons in clauses (b) and (f), their Representatives; *provided* that, notwithstanding anything in the Plan to the contrary, no Specified Non-Released Party shall be a Released Party; *provided further* that any Person that does not opt in to granting the releases set forth in the Plan shall not be a Released Party.

*Releasing Parties* means, collectively: (i) the holders of all Claims that vote to accept the Plan; (ii) the holders of all Claims that are presumed to accept the Plan and opt in to granting the releases set forth in the Plan; (iii) the holders of all Claims that vote to reject the Plan, but opt in to granting the releases set forth in the Plan; (iv) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or reject the Plan, but opt in to granting the releases set forth in the Plan; (v) the holders of all Claims that receive the Global Settlement Election Form and do not opt out of being treated as Electing Creditors and granting the releases set forth in the Plan; and (vi) the holders of all Claims that receive the Direct Claims Trust Election Form and opt in to being treated as Direct Claims Trust Electing Creditors and granting the releases set forth in the Plan.

*Representative* means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

*Required Consenting Lenders* has the meaning set forth in the Plan Support Agreement.

*Restructuring Expenses* means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the advisors to the (i) Ad Hoc Group, and (ii) the DIP Secured Parties, accrued since the inception of their respective engagements and continuing through the implementation of the restructuring transactions and in accordance with their respective engagement letters or fee letters with the Plan Debtor and/or any applicable order of the Bankruptcy Court.

*Retained Causes of Action* means the Causes of Action retained by the Plan Debtor and transferred to the Litigation Trust, as listed and described in the Schedule of Retained Causes of Action.

*Roll-Up Claims* means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the DIP Credit Agreement or any other Loan Document

(as defined in the DIP Credit Agreement) and the DIP Order on account of the Roll-Up Obligations.

*Roll-Up Obligations* has the meaning set forth in the DIP Order.

*Sacred Right* shall have the meaning set forth in the Litigation Trust Agreement.

*Schedule of Retained Causes of Action* means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Plan Debtor and transferred to the Litigation Trust.

*Schedules* means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

*Second Lien Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the Second Lien Term Loan Agreement and the DIP Order relating to the Second Lien Term Loan Agreement.

*Second Lien Term Loan Agreement* means that certain *Second Lien Term Loan Agreement*, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Second Lien Term Loan Secured Parties* has the meaning set forth in the DIP Order.

*Second Return Threshold* has the meaning set forth in the Section 6.3 of the Plan.

*Secured Claim* means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Plan Debtor or the Wind Down Administrator, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

*Side-Car Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) GLAS USA LLC, as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

***Side-Car Term Loan Claims*** means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the Side-Car Term Loan Agreement and the DIP Order relating to the Side-Car Term Loan Agreement.

***Special Committees*** means, collectively, the special committees of the boards of managers of (i) First Brands Group Holdings, LLC, First Brands Group Intermediate, LLC, and First Brands Group, LLC, each comprised of Neal Goldman and William Transier, and (ii) Viceroy, comprised of Benjamin Duster, Neal Goldman, and William Transier.

***Specified Executives*** means, collectively, (i) Charles M. Moore, as Interim Chief Executive Officer and/or Chief Restructuring Officer of the Debtors; (ii) Daniel Jerneycic and Gaurav Malhotra, as Chief Restructuring Officers of the Debtors; and (iii) Paul Kosturos, as Chief Financial Officer of the Debtors.

***Specified Non-Released Parties*** means (i) any Person against which any action has been commenced on behalf of a Debtor or its Estate in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing, including, for the avoidance of doubt, any defendants named in the James Complaint or the Onset Complaint; (ii) any Person identified as a defendant or a potential defendant of a Cause of Action in the Plan Supplement; and (iii) any subsequent transferee of any of the foregoing with respect to any assets of or transfers by the Debtors or their affiliates.

***SPV Debtors*** means the Debtor subsidiaries of Viceroy other than the FBG Debtors.

***SPV Independent Manager*** means Benjamin Duster, in his capacity as independent manager of Viceroy.

***SPV Lender*** means any lender or financing party (including, for the avoidance of doubt, Onset Financial, Inc.) that provided financing to an SPV Debtor and its agents.

***SPV-ABL Wind Down Account*** has the meaning set forth in the Wind Down Order.

***SPV-DIP Wind Down Account*** has the meaning set forth in the Wind Down Order.

***Statutory Fees*** means all fees and charges assessed against the Plan Debtor's Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

***Supply Chain Financer*** means any financial institution, fund, or other Person that (i) provided financing or liquidity to suppliers or vendors of one or more FBG Debtors or reimbursed any FBG Debtor Affiliate for providing such financing or liquidity in connection with such suppliers' or vendors' accounts receivable arising from the supply of goods or services to such FBG Debtors, whether through supply chain financing programs, reverse factoring arrangements, receivables purchase facilities, or similar arrangements; or (ii) remitted payments on behalf of one or more FBG Debtors relating to accounts payable arising from the supply of goods or services to such FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

***Trade Creditor*** means any Person (including any Person that was paid through a

payment intermediary but excluding any such payment intermediary) that holds a General Unsecured Claim as of the Petition Date against an FBG Debtor arising from the ordinary course of the FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date, excluding any Person whose claim arises from a (secured or unsecured) loan, financing arrangement, bond, note, or other financial indebtedness.

*Trademarks* means all trademarks, service marks, trade names, corporate names, trade dress, logos and other similar indica of source or origin, including all applications, registrations, extensions and renewals of the foregoing and all goodwill associated with the foregoing.

*Treasury Regulations* means the regulations of the United States Treasury.

*Trust Agreements* means, collectively, the ABL Collateral Trust Agreement, the DIP Collateral Trust Agreement, and the Litigation Trust Agreement.

*Trust Beneficiaries* means, collectively, the ABL Collateral Trust Beneficiaries, the DIP Collateral Trust Beneficiaries, and the Litigation Trust Beneficiaries.

*Trustees* means, collectively, the ABL Collateral Trustee, the DIP Collateral Trustee, and the Litigation Trustee.

*Trusts* means, collectively, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust.

*U.S. Trustee* means the United States Trustee for Region 7.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Viceroy* means Viceroy Private Capital, LLC.

*Voting Record Date* has the meaning set forth in the Disclosure Statement Order.

*Wind Down* means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the assets owned by the Plan Debtor following the Effective Date, if any; (ii) resolve, terminate, or wind down any remaining liabilities of the Plan Debtor's Estate; (iii) reconcile all Claims against the Plan Debtor; and (iv) administer the Plan and make distributions in accordance with the Plan.

*Wind Down Administrator* means the administrator appointed by the Plan Debtor whose duties will include, among other things, effectuating the Wind Down in accordance with the Plan.

*Wind Down Budget* means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the date the Wind Down is completed, which budget shall be prepared by the Plan Debtor.

*Wind Down Order* means *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2454).

*Wind Down Reserve* means a deposit account or other Cash reserve held by the Wind Down Administrator to be funded in accordance with the Wind Down Budget, which shall be available and used only to satisfy costs and expenses of the Wind Down; *provided* that any funds remaining in the Wind Down Reserve on the date the Wind Down is completed (as determined in the Wind Down Administrator's sole discretion) shall be turned over to the DIP Collateral Trust.

### 1.2  *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3  *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4  *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the Required Consenting Lenders or the Creditors' Committee set forth herein, in the Plan Support Agreement, or in the DIP Order, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents), shall be incorporated

herein by this reference (including the applicable definitions in <u>ARTICLE I</u> hereof) and fully enforceable as if stated in full herein.

### 1.5 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement or any other exhibit, schedule, or annex to the Plan, the terms of the relevant document in the Plan Supplement or such exhibit, schedule, or annex, shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

**ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, DIP A CLAIMS, PROFESSIONAL FEE CLAIMS, RESTRUCTURING EXPENSES, AND PRIORITY TAX CLAIMS.**

### 2.1 *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim against the Plan Debtor agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim against the Plan Debtor becomes an Allowed Administrative Expense Claim, each such holder of an Allowed Administrative Expense Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.2 *DIP A Claims.*

**(a) Allowance**. On the Effective Date, the DIP A Claims shall be deemed Allowed against the Plan Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order. The Allowed amount of the DIP A Claims shall be set forth in the notice of occurrence of the Effective Date filed in accordance with <u>Section 16.8</u> of the Plan.

**(b) Treatment**. Except to the extent that a holder of an Allowed DIP A Claim against the Plan Debtor agrees to less favorable treatment of such Claim, on the Effective Date, each such holder shall receive (i) on account of the Estate Claims Credit Bid, its Pro Rata Share of the Class 2 Litigation Trust Interests, and (ii) on account of the DIP Collateral Credit Bid, its Pro Rata Share of the Class 2 DIP Collateral Trust Interests. For the avoidance of doubt, any DIP A Claims not included in the Estate Claims Credit Bid or the DIP Collateral Credit Bid shall not be released under or affected by the Plan and shall remain enforceable against the DIP Loan Parties and Parent Guarantors.

**2.3** *Professional Fee Claims.*

**(a)** All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is ninety (90) calendar days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

**(b)** Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) upon such terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors, out of the Professional Fees Escrow Account; or (ii) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered. Agreement to the Global Settlement is conditioned upon the FBG Debtors', Ad Hoc Group's, and Creditors' Committee's agreement to a budget (the "**Agreed Budget**") solely for amounts that can be paid using DIP Term Loan Collateral, Prepetition Term Loan Collateral, or otherwise that may be asserted against the DIP Collateral Trust, Litigation Trust, or against the Plan Debtor for all Professionals. Pursuant to the Global Settlement, no Allowed Professional Fees of Professionals may be paid from the $25,000,000 of FBG Debtor cash to be contributed to the Litigation Trust as provided for herein.

**(c)** Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order, may be paid at the times and in the amounts authorized pursuant to such orders.

**(d)** Five (5) Business Days before the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims; *provided* that, notwithstanding the foregoing, the Debtors may not fund any amounts into the Professional Fees Escrow Account that would cause the FBG Debtors to have in the aggregate less than $25,000,000 in Cash on their balance sheet on the Effective Date without the consent of the Required Consenting Lenders. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account shall be retained by the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget. When all costs and expenses of the Wind Down have been paid in full, any remaining amounts in the Professional Fees Escrow Account shall be released from such escrow and revert to, and ownership thereof shall vest in, the DIP Collateral Trust without any further action or order of the Bankruptcy Court.

**(e)** The Wind Down Administrator is authorized to pay compensation for services rendered to the Plan Debtor or reimbursement of expenses incurred on behalf of the Plan

Debtor after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the Plan and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Plan Debtor's receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Plan Debtor at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

### 2.5 *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim against the Plan Debtor agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, at the option of the Wind Down Administrator, either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Wind Down Administrator reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1 *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2**   *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Plan Debtor and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | Roll-Up Claims | Impaired | Yes |
| 4 | First Lien Claims | Impaired | Yes |
| 5 | Second Lien Claims | Impaired | Yes |
| 6 | ABL Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Plan Debtor Interests | Impaired | No (Deemed to Reject) |

**3.3**   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Plan Debtor, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims against the Plan Debtor, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims against the Plan Debtor.

**3.4**   *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim against or Interest in the Plan Debtor that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.5**   *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contained Claims eligible to vote and no holder of such Claims votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**3.6** *Voting; Presumptions; Solicitation.*

**(a)** **Acceptance by Certain Impaired Classes**. Only holders of Claims in Classes 3, 4, 5, 6, and 7 are entitled to vote to accept or reject the Plan.

**(b)** **Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**(c)** **Deemed Rejection by Certain Impaired Classes.** Holders of Interests in Class 8 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**3.7** *Cramdown.*

If any Class entitled to vote on the Plan does not vote to accept the Plan, the Plan Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**3.8** *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim against the Plan Debtor.

**ARTICLE IV.**     **TREATMENT OF CLAIMS AND INTERESTS.**

**4.1** *Class 1:  Other Priority Claims.*

**(a)** **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim against the Plan Debtor agrees to less favorable treatment, each holder of an Allowed Other Priority Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, at the option of the Wind Down Administrator:

(i)     payment in full in Cash; or

(ii)     such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

**(b)** **Impairment and Voting**: Class 1 is Unimpaired, and holders of Other Priority Claims against the Plan Debtor are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims against the Plan Debtor are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

28

**4.2** *Class 2: Other Secured Claims.*

**(a)** **Treatment:** Except to the extent that a holder of an Allowed Other Secured Claim against the Plan Debtor agrees to less favorable treatment of such Claim, each holder of an Allowed Secured Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, at the option of the Wind Down Administrator:

> (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) the Effective Date, and (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

> (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

> (iii) such other treatment so as to render such holder's Allowed Other Secured Claim against the Plan Debtor Unimpaired.

**(b)** **Impairment and Voting:** Class 2 is Unimpaired, and holders of Other Secured Claims against the Plan Debtor are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims against the Plan Debtor are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**4.3** *Class 3: Roll-Up Claims.*

**(a)** **Allowance**. On the Effective Date, the Roll-Up Claims shall be deemed Allowed against the Plan Debtor in the amount of $3,300,000,000.

**(b)** **Treatment**: Except to the extent that a holder of an Allowed Roll-Up Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Roll-Up Term Loan Claim, on the Effective Date, each such holder shall receive, on account of its Allowed Roll-Up Term Loan Claim against the Plan Debtor, its Pro Rata Share of (i) the Class 3(a) Litigation Trust Interests, and (ii) the Class 3 DIP Collateral Trust Interests. For the avoidance of doubt, the Roll-Up Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)** **Impairment and Voting:** Class 3 is Impaired, and, thus, holders of Roll-Up Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.4** *Class 4: First Lien Claims.*

**(a)** **Allowance**. On the Effective Date, the First Lien Claims shall be deemed Allowed against the Plan Debtor in the full amount, then outstanding as described in the DIP Credit Agreement and DIP Order.

29

**(b)     Treatment:**  Except to the extent that a holder of an Allowed First Lien Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed First Lien Claim, on the Effective Date, each such holder shall receive, on account of its Allowed First Lien Claim against the Plan Debtor, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  For the avoidance of doubt, the First Lien Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)     Impairment and Voting:**  Class 4 is Impaired, and, thus, holders of First Lien Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

### 4.5     *Class 5:  Second Lien Claims.*

**(a)     Allowance**.  On the Effective Date, the Second Lien Claims shall be deemed Allowed against the Plan Debtor in the full amount then outstanding, as described in the DIP Credit Agreement and DIP Order.

**(b)     Treatment:**  Except to the extent that a holder of an Allowed Second Lien Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Second Lien Claim, on the Effective Date, each such holder shall receive, on account of its Allowed Second Lien Claim against the Plan Debtor, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  For the avoidance of doubt, the Second Lien Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)     Impairment and Voting:**  Class 5 is Impaired, and, thus, holders of Second Lien Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

### 4.6     *Class 6:  ABL Claims.*

**(a)     Allowance**.   On the Effective Date, the ABL Claims shall be deemed Allowed against the Plan Debtor in the amount set forth in the notice of occurrence of the Effective Date filed in accordance with Section 16.8 of the Plan.

**(b)     Treatment**:  Except to the extent that a holder of an Allowed ABL Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Claim, on the Effective Date, each such holder shall receive, on account of its Allowed ABL Claim against the Plan Debtor, its Pro Rata Share of the ABL Collateral Trust Interests.  For the avoidance of doubt, the ABL Claims against the ABL Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such ABL Loan Parties.=

**(c)     Impairment and Voting**:  Class 6 is Impaired, and, thus, holders of ABL Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.7** *Class 7: General Unsecured Claims.*

    **(a)** **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final settlement, release, and discharge of such Allowed General Unsecured Claim, each such holder shall receive its Pro Rata Share of the Class 3(b) Litigation Trust Interests.

    **(b)** **Impairment and Voting:** Class 7 is Impaired, and, thus, holders of Allowed General Unsecured Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.8** *Class 8: Plan Debtor Interests.*

    **(a)** **Treatment**: On the date that the Plan Debtor's Chapter 11 Case is closed, and without the need for any further corporate or limited liability company action or approval of any members, board of managers, managers, management, or Interest holders of the Plan Debtor, all Plan Debtor Interests shall be cancelled. Holders of Plan Debtor Interests shall not receive any distributions on account of such Interests unless and until any Allowed Claims for which the Plan Debtor has a continuing obligation to pay following the Effective Date are satisfied in full, in which case each holder of a Plan Debtor Interest shall receive its Pro Rata Share of any residual distributable value of the Plan Debtor.

    **(b)** **Impairment and Voting:** Class 8 is Impaired. Holders of Plan Debtor Interests are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Plan Debtor Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Plan Debtor Interests.

**ARTICLE V.** **MEANS FOR IMPLEMENTATION.**

**5.1** *Compromise and Settlement of Claims, Interests, and Controversies.*

    Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and the releases contained in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest. The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan, including the Global Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the Global Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.

31

**5.2**     *Global Settlement.*

(a)     **Overview**.  Pursuant to sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement among the Debtors, the Ad Hoc Group, and the Creditors' Committee.  The compromises and settlements included in the Global Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors' Estates.  The principal terms of the Global Settlement are reflected below.

(b)     **Enforcement of Remedies**.  The DIP Secured Parties have superpriority liens on (i) all prepetition and postpetition property of the FBG Debtors, including the DIP Loan Parties and Parent Guarantors, and all proceeds thereof, including all Estate Claims, (ii) all Additional Unencumbered Property, and (iii) all Prepetition Collateral (other than ABL Priority Collateral, on which the liens of the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are junior to those of the ABL Secured Parties). The DIP Secured Parties have alleged that various events of default have occurred and are continuing under the DIP Documents.  The DIP Loan Parties do not have sufficient funds to indefeasibly pay the DIP Obligations in full in Cash.  The Global Settlement incorporates a consensual arrangement to (i) permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto and (ii) provide recoveries to junior creditors of the FBG Debtors which allows such creditors to participate in recovery prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

(c)     **Expiration of Challenge Rights**.  The Challenge Period shall be deemed to expire against all parties in the Chapter 11 Cases (unless already expired pursuant to the terms of the DIP Order) on the Effective Date.

(d)     **Allowance of Claims**.   On the Effective Date, (i) the DIP A Claims shall be deemed allowed against each FBG Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order; (ii) the Roll-Up Claims shall be deemed allowed against each FBG Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order; (iii) the First Lien Term Loan Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the First Lien Term Loan Agreement; (iv) the Side-Car Term Loan Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the Side-Car Term Loan Agreement; and (v) the Second Lien Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the Second Lien Term Loan Agreement.

(e)     **Estate Claims Credit Bid Transaction**.  The Debtors are conducting a marketing and sale process for the Estate Claims.  Pursuant to the Global Settlement, on the Effective Date, subject to the terms of the "fiduciary out" under the Plan Support Agreement,

32

unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee), the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned, conveyed, transferred, and delivered, the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the Estate Claims Credit Bid APA, to the Plan Debtor free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets shall be the Estate Claims Credit Bid. Simultaneously with such transfer, the Plan Debtor shall assign, convey, transfer, and deliver the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).

(f) **DIP Collateral Credit Bid Transaction**. Pursuant to the Global Settlement, on the Effective Date, the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned conveyed, transferred, and delivered, the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the DIP Collateral Credit Bid APA, to the Plan Debtor free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for the DIP Collateral Assets shall be the DIP Collateral Credit Bid. Immediately following such transfer, the Plan Debtor shall assign, convey, transfer, and deliver the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the DIP Collateral Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).

(g) **Litigation Trust Funding Commitments**. Pursuant to the Global Settlement, the Litigation Trust Funding Contributors will provide the Litigation Trust Funding Commitments and Litigation Trust Funding Contributions to the Litigation Trust pursuant to the Litigation Trust Agreement, which commitments and contributions shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust, and costs of monetizing the Litigation Trust Assets. The Litigation Trust Funding Commitments and Litigation Trust Funding Contributions are necessary and incidental to the liquidating purpose of the Litigation Trust.

(h) **Litigation Trust Distributions**. The Litigation Trustee shall make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Waterfall, as set forth in Section 6.3 of the Plan.

(i) **Electing Creditors.** All Eligible Creditors shall be given the option, in connection with solicitation of the Disclosure Statement, to receive Class 3(b) Litigation Trust Interests entitling them to receive distributions from the Litigation Trust in accordance with the Litigation Trust Agreement and the Plan. The distributions allocable to Class 3(b) Litigation Trust Interests from the Litigation Trust may be held in trust (in whole or in part) by the GUC Ombudsman pending a claims acceptance process for the Electing Creditor Claims to be determined by the GUC Ombudsman in consultation with the Litigation Trustee. Electing Creditor Claims that are determined to be accepted following such claim acceptance process shall be entitled to their Pro Rata Share of the Class 3(b) Litigation Trust Interests. If an Eligible Creditor does not timely opt out of being an Electing Creditor on the Global Settlement Election Form, then

such creditor shall retain all of its rights and claims against the Estates and the Debtors against which such party currently asserts a right or claim. The Litigation Trustee is authorized to determine whether any Electing Creditor is an Ineligible Creditor prior to making any distributions to holders of Class 3 Litigation Trust Interests; *provided* that an Ineligible Creditor may seek relief from the Bankruptcy Court opposing such a determination. For the avoidance of doubt, Ineligible Creditors shall not be entitled to share in distributions from the Litigation Trust.

(j)     **Electing Creditor Waiver**.  In exchange for becoming an Electing Creditor, each Electing Creditor shall be deemed to (i) have waived any objections to the Plan, Confirmation Order, and any related settlements and relief sought in furtherance thereof, including the Global Settlement, and (ii) be a Releasing Party and grant the releases contained in Section 14.5(b) of the Plan. In addition, if an Electing Creditor holds a Claim against an FBG Debtor for which one or more other FBG Debtors have joint and several liability, such Electing Creditor agrees it shall have only a single Electing Creditor Claim for purposes of receiving Class 3(b) Litigation Trust Interests and receiving distributions from the Litigation Trust.

(k)     **GUC Ombudsman**.  The GUC Ombudsman shall be appointed prior to the Effective Date and shall serve as the holder of record of the Class 3(b) Litigation Trust Interests (and, in such capacity shall provide the Litigation Trustee with a properly completed IRS Form W-9) and, except as provided herein, shall not have any duties until distributions of Litigation Trust Assets are anticipated to be paid to holders of Class 3 Interests. In connection with the aforementioned distributions, the GUC Ombudsman shall be responsible solely for reconciling Electing Creditor Claims and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith.  As permitted or required by applicable law, the GUC Ombudsman may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity. *See* Section 6.16(d) of the Plan. The GUC Ombudsman shall only withhold distributions where necessary and shall otherwise be required to make minimum and/or interim distributions expeditiously.  All costs of the GUC Ombudsman to reconcile Electing Creditor Claims and make distributions to holders of Class 3(b) Litigation Trust Interests shall be paid from the distributions otherwise distributable to holders of Class 3(b) Litigation Trust Interests and shall not be otherwise chargeable against the Plan Debtor or the Litigation Trust. Subject to a budget agreed to by the Litigation Trustee, the Creditors' Committee, the Ad Hoc Group, and the GUC Ombudsman prior to the Effective Date, the Litigation Trust will fund certain costs unrelated to reconciliation for the GUC Ombudsman.  However, if an agreement on such budget cannot be reached, the cost of reconciling Electing Creditor Claims shall be paid from the distributions otherwise distributable to holders of Class 3(b) Litigation Trust Interests. The GUC Ombudsman may request additional funding from the Litigation Trustee to perform reconciliation duties.

(l)     **Conversion of Remaining Debtors' Chapter 11 Cases**. The Confirmation Order shall provide that, following the Effective Date and transfer of the Litigation Trust Assets to the Litigation Trust, the DIP Collateral Trust Assets to the DIP Collateral Trust, and the ABL Collateral Trust Assets to the ABL Collateral Trust, each of the Debtors' Chapter 11 Cases (other than the Plan Debtor), to the extent not previously converted, will be converted to a case under chapter 7 of the Bankruptcy Code; *provided* that, notwithstanding any provision of the Bankruptcy

Code or any provision herein to the contrary, including, without limitation, section 362 of the Bankruptcy Code, in the event that any FBG Debtor's case is converted to a case under chapter 7 of the Bankruptcy Code or any FBG Debtor commences or becomes subject to a subsequent case under any chapter of the Bankruptcy Code, (i) the automatic stay provisions of section 362 of the Bankruptcy Code, or any other stay that may arise by operation of law or otherwise, shall not apply to, limit, or otherwise affect the Litigation Trustee's rights, powers, and authority to prosecute, compromise, settle, collect, and otherwise enforce the Estate Claims, and (ii) the Litigation Trustee shall be entitled to continue to prosecute, compromise, settle, collect, and otherwise enforce the Estate Claims in all respects as though no such conversion or subsequent case had occurred. Any chapter 7 trustee or other fiduciary appointed in any such converted or subsequent case shall have no right, title, or interest in or to the Estate Claims, and the Estate Claims shall not constitute property of the estate in any such converted or subsequent case. The Bankruptcy Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this provision, including any disputes concerning the Litigation Trustee's rights to prosecute, settle, and collect on the Estate Claims.

(m)     **Survival of Claims**.  The DIP A Claims (other than the DIP A Claims subject to the Estate Claims Credit Bid and DIP Collateral Credit Bid), Roll-Up Claims, First Lien Claims, Second Lien Claims, ABL Claims, Electing Creditor Claims, and Claims of non-Electing Creditors against the Estates of the FBG Debtors (other than the Plan Debtor) are preserved and may continue to be asserted against the chapter 7 estates of the applicable FBG Debtor and shall not be reduced by the amount of any Trust distributions made on or after the Effective Date.

### 5.3     *Sources of Consideration for Distributions.*

Cash distributions under the Plan shall be funded with Cash proceeds available from:  (i) Cash available on or after the Effective Date in accordance with the Plan; and (ii) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter in the Professional Fees Escrow Account shall be retained by the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget until transferred by the Wind Down Administrator to the DIP Collateral Trust).

### 5.4     *Implementation.*

The following implementation transactions shall be consummated in accordance with the Emergence Steps Memo:

(i)      On or in connection with the Effective Date, the FBG Debtors shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction.

(ii)     On or in connection with the Effective Date, the Litigation Trust shall be established and administered pursuant to the Litigation Trust Agreement and the Plan.  On, before, or after the Effective Date, the Litigation Trust Assets shall transfer to the Litigation Trust

automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the Litigation Trust, the Litigation Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iii)    On or in connection with the Effective Date, the DIP Collateral Trust shall be established and administered pursuant to the DIP Collateral Trust Agreement and the Plan.  On, before, or after the Effective Date, the DIP Collateral Trust Assets shall transfer to the DIP Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the DIP Collateral Trust, the DIP Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iv)    On or in connection with the Effective Date, the ABL Collateral Trust shall be established and administered pursuant to the ABL Collateral Trust Agreement and the Plan.  On the Effective Date, the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets and transferred such ABL Collateral Trust Assets to the ABL Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the ABL Collateral Trust, the ABL Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(v)    On or in connection with the Effective Date, the Direct Claims Trust shall be established and administered pursuant to the Direct Claims Trust Agreement and the Plan.  On the Effective Date, the Direct Claims Trust Electing Creditors shall be deemed to have transferred their Direct Creditor Claims to the Direct Claims Trust automatically and without further action of the Bankruptcy Court.

(vi)    On the Effective Date, the Wind Down Reserve shall be established and funded in accordance with the Wind Down Budget.

(vii)    On or in connection with the Effective Date, the Debtors shall transfer the (a) Professional Fees Escrow Account, (b) the Factored Receivables Account, and the (c) Examiner Account to the Plan Debtor.

(viii)    After the Effective Date, the Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order and the Plan.

### 5.5    *Litigation Trust Funding Commitments.*

The terms of the Litigation Trust Funding Commitments shall be set forth in the Litigation Trust Agreement or in any Litigation Trust Funding Agreement.  Upon execution of the Litigation Trust Agreement or any Litigation Trust Funding Agreement, the Litigation Trust

Funding Commitments shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur or enforce the obligations under the Litigation Trust Agreement or in any Litigation Trust Funding Agreement with respect to the Litigation Trust Funding Commitments and use the proceeds of such Litigation Trust Funding Commitments, in each case, in accordance with the terms of the Plan, the Confirmation Order, the Litigation Trust Agreement, and any Litigation Trust Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Trust Agreement and any Litigation Trust Funding Agreement, in each case, shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.6 *Factored Receivables Account.*

Following the Effective Date, the Factored Receivables Account shall be transferred to the Plan Debtor, and the Wind Down Administrator shall assume the obligations for administering the Factored Receivables Account. The Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order, including providing the reporting set forth in paragraph 7 of the Cash Management Order. The Confirmation Order shall provide that (i) the FBG Debtors, including the Plan Debtor, shall continue to direct, to the extent received by the FBG Debtors, and segregate all collections into the Factored Receivables Account and (ii) the Plan Debtor and the Wind Down Administrator shall not disburse any such segregated funds from the Factored Receivables Account pending further order of the Bankruptcy Court after notice to the ABL Agent and all other affected parties and all such parties being provided an opportunity to be heard; *provided* that the Plan Debtor and the Wind Down Administrator shall not be required to segregate any funds received on account of any postpetition sale and related invoice. The Confirmation Order shall further provide that the Wind Down Administrator shall be authorized to administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the funds on deposit in the Factored Receivables Account; *provided* that the Wind Down Administrator shall do so at the ABL Collateral Trust's sole cost and expense (paid in advance); *provided further* that the ABL Agent shall have the right to direct the Wind Down Administrator with respect to the prosecution of the FBG Debtors' interests in the Factored Receivables Account and the ABL Agent's prior written consent shall be required for any settlement, compromise, or other disposition of such interests. The foregoing provisions shall be binding on any chapter 7 trustees appointed in any chapter 7 cases of the FBG Debtors.

### 5.7 *Wind Down Accounts.*

Following the Effective Date, the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account each shall be transferred to the Plan Debtor, and the Wind Down Administrator shall assume the obligations for administering the such accounts. The Wind Down Administrator shall administer the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account in accordance with the Wind Down Order.

**5.8**   *Corporate Action.*

**(a)**   Following the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan or the Confirmation Order (including any action to be undertaken by the Plan Debtor, the Debtors, the Wind Down Administrator, the Trustees, or the Trusts) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Plan Debtor, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the organizational structure of the Plan Debtor, and any other action required by the Plan Debtor in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Plan Debtor or its Estate.

**(b)**   The authorizations and approvals contemplated by this Section 5.8 shall be effective notwithstanding any requirements under non-bankruptcy law.

**(c)**   The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**5.9**   *Wind Down Administrator.*

**(a)**   **Wind Down**.   After the Effective Date, pursuant to the Plan, the Wind Down Administrator shall effectuate the Wind Down without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

**(b)**   **Authority of the Wind Down Administrator**.   The Wind Down Administrator shall have the authority and right on behalf of the Plan Debtor, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

> (i)   coordinate with the Trustees and any chapter 7 trustees appointed in any chapter 7 cases of the FBG Debtors with respect to the transfer and turnover of information;

> (ii)   administer the Plan Debtor's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the Plan Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of the Plan Debtor ending after the Petition Date through the liquidation of the Plan Debtor as determined under applicable tax laws, and (c) representing the interest and account of the Plan Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, or proceeding or audit;

38

(iii)     (a) administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the Factored Receivables Account in accordance with the Cash Management Order and the Plan, (b) administer the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account in accordance with the Wind Down Order, (c) administer the Professional Fees Escrow Account in accordance with the DIP Order and facilitate distributions from such account to satisfy Allowed Professional Fee Claims, and (d) administer the Examiner Account and facilitate distributions from such account to satisfy the Allowed fee and expenses of the Examiner and its professionals;

(iv)     pay statutory fees in accordance with Section 16.1 of the Plan;

(v)     close the Chapter 11 Case of the Plan Debtor; and

(vi)     perform other duties and functions that are consistent with the Plan or as the Wind Down Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan.

**(c)     Indemnification**.  The Plan Debtor shall indemnify and hold harmless the Wind Down Administrator, solely in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of the Wind Down Administrator's bad faith, gross negligence, willful misconduct, or criminal conduct.

**5.10     *Governance*.**

**(a)**     On the Effective Date, the authority, power and incumbency of the persons then acting as directors, managers, members, officers, and other authorized persons of the Plan Debtor shall be terminated and such persons shall be deemed to have resigned.  On the Effective Date, the Wind Down Administrator shall serve as the initial director or manager, as applicable, and sole officer of the Plan Debtor after the Effective Date until such time as the Plan Debtor goes out of existence, by dissolution or otherwise.

**(b)**     The Wind Down Administrator, on behalf of the Plan Debtor, may appoint one or more directors or managers of the Plan Debtor to serve after the Effective Date.  The Wind Down Administrator, on behalf of the Plan Debtor, may elect such additional directors(s), manager(s), and/or officer(s) of the Plan Debtor as the Wind Down Administrator deems necessary to implement the Plan and the actions contemplated herein.  The Wind Down Administrator, on behalf of the Plan Debtor, shall, after the Effective Date, have the power to act by written consent to remove any manager or officer of the Plan Debtor at any time with or without cause.

**(c)**     As of the Effective Date, the governing documents of the Plan Debtor may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of the Plan.

**5.11**    *Cancellation of Existing Securities, Agreements, and Liens.*

Except for the purpose of evidencing a right to a distribution pursuant to the Plan, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Interest holders of the Plan Debtor, all notes, instruments, other securities, and other evidence of debt issued to the Plan Debtor, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Plan Debtor thereunder shall be deemed fully satisfied, released, and discharged.

**5.12**    *Dissolution of Plan Debtor.*

On or after the Effective Date, the Wind Down Administrator may complete the winding up of the Plan Debtor without the necessity for any other or further actions to be taken by or on behalf of the Plan Debtor or its members, managers, directors, management, or Interest holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution or cancellation with the appropriate governmental authorities, and any such certificate of dissolution or cancellation may be filed by the Wind Down Administrator without need for any authorization, signature or other act of any Person, including without limitation any holder of any Claim or Interest.  On or after the Effective Date, the Wind Down Administrator may engage in any other transaction in furtherance of the Plan.  Any such transactions may be effective without any further action by the members, managers, directors, management, or Interest holders of the Plan Debtor.

**5.13**    *Effectuating Documents; Further Transactions.*

**(a)**    On and after the Effective Date, the Wind Down Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Plan Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(b)**    On and after the Effective Date, the Trustees are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(c)**    Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Interest holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Interest holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

**5.14**    *Closing of the Chapter 11 Case.*

After the Effective Date, the Wind Down Administrator shall be authorized, but not

directed, to submit a motion for orders that close and issue final decree for the Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the Plan Debtor's Chapter 11 Case two (2) years after the Effective Date has occurred.

## ARTICLE VI.    LITIGATION TRUST.

### 6.1    *Establishment of the Litigation Trust.*

On or prior to the Effective Date, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

### 6.2    *Funding of and Transfer of Assets into the Litigation Trust.*

(a)    On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the Estate Claims Credit Bid Transaction, the Plan Debtor shall transfer its remaining interests in the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement. The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust. The act of transferring the Litigation Trust Assets, as authorized by the Plan and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (including, for the avoidance of doubt, any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets

in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b)     All Causes of Action, claims, rights, and interests transferred, assigned, or otherwise conveyed to the Litigation Trust from each FBG Debtor's Estate shall remain separate and distinct from the Causes of Action, claims, rights, and interests transferred from the Estates of any other FBG Debtor.  The Litigation Trust shall hold, administer, and prosecute such Causes of Action on behalf of each contributing FBG Debtor's Estate as though such Causes of Action continued to be held by such FBG Debtor's Estate independently.  No defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust shall be entitled to assert, as a defense, setoff, recoupment, counterclaim, or reduction of any kind, any claim, defense, or right arising from or relating to such party's dealings, transactions, or relationships with any FBG Debtor other than the specific FBG Debtor whose estate originally held the Cause of Action being prosecuted.  For the avoidance of doubt, the consolidation of Causes of Action within the Litigation Trust for administrative convenience shall not operate to merge, consolidate, or otherwise combine the separate and distinct claims of the respective FBG Debtor Estates, nor shall such consolidation permit any party to assert cross-FBG Debtor defenses or to reduce its liability on a Cause of Action held by one FBG Debtor's Estate by reference to any claim, credit, or defense arising from such party's relationship with a different FBG Debtor.

(c)     Notwithstanding any provision herein, any Person against whom an Estate Claim is asserted by the Litigation Trustee shall be prohibited from asserting, filing, or prosecuting any counterclaim, setoff, recoupment, or other affirmative claim against the Litigation Trustee in connection with, arising out of, or related to such Estate Claim.  Any such counterclaim, setoff, recoupment, or affirmative claim that a defendant to an Estate Claim may have, whether arising before or after the Petition Date, shall be asserted solely against the Debtor or the Estate, as applicable.  Any defendant to an Estate Claim who wishes to assert a counterclaim, setoff, recoupment, or other affirmative claim must file a Proof of Claim in accordance with the procedures and deadlines established by the Bankruptcy Court and/or the Bankruptcy Code. Failure to timely file a Proof of Claim in accordance with such procedures and deadlines shall result in such counterclaim, setoff, recoupment, or affirmative claim being forever barred and discharged pursuant to the terms of the Plan and the Confirmation Order.  For the avoidance of doubt, the assignment of any Estate Claim by the Debtor, the Estate, or Litigation Trustee acting on behalf of the Estate or Litigation Trust shall not create any privity of contract, successor liability, or other legal relationship between the Litigation Trustee and any defendant to such Estate Claim that would permit the assertion of any counterclaim, setoff, recoupment, or affirmative defense directly against the Litigation Trustee, except to the extent such defense is limited to reducing or offsetting the Litigation Trustee's affirmative recovery on the specific Estate Claim itself.

(d)     All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by (1) any one or more of the Debtors or (2) any prepetition or postpetition committee or subcommittee of the board of managers or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the analysis or prosecution of any Litigation Trust Assets (the "**Transferred Privileged**

**Information**") shall be transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

(e) The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the Debtors (or the ABL Collateral Trust or DIP Collateral Trust) have an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Debtors (or the ABL Collateral Trust or DIP Collateral Trust), as applicable, (or their designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Debtors (or the ABL Collateral Trust or DIP Collateral Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which a Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the applicable Debtor shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where a Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the applicable Debtor (or the ABL Collateral Trustee or DIP Collateral Trustee). The Litigation Trust and Debtors have agreed that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

(f) Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

(g) Pursuant to, *inter alia,* Federal Rule of Evidence 502(c), if a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such disclosure shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the disclosure notify the Litigation Trust of the disclosure and shall demand that all recipients of the inadvertently disclosed Transferred Privileged Information return or confirm the destruction of

such materials. Notwithstanding anything herein to the contrary, the Litigation Trustee has no obligation to waive privilege over any communications, information, or other similar materials when fulfilling its duties to meet and confer with any party in interest.

### 6.3 *Litigation Trust Waterfall*.

Proceeds from the monetization of the Litigation Trust Assets, net of expenses, shall be distributed to Litigation Trust Beneficiaries as follows: (i) *first*, to holders of Class 1 Litigation Trust Interests, which shall receive the amounts to which they are entitled pursuant to Section 6.4 of the Plan solely in respect of the Litigation Trust Funding Commitments (the "**First Return Threshold**"); (ii) *second*, following satisfaction of the First Return Threshold until aggregate distributions (including distributions pursuant to Section 6.4) equal $400,000,000 (the "**Second Return Threshold**"), (a) 15% to the holders of Class 1 Litigation Trust Interests, and (b) 85% to holders of Class 2 Litigation Trust Interests; (iii) *third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests equal the sum of the Allowed amount of the DIP A Claims (as of the Effective Date), *plus*, without duplication, any Credit Bid Claims (the "**Final Return Threshold**"), (a) 10% to holders of Class 1 Litigation Trust Interests, (b) 74% to holders of Class 2 Litigation Trust Interests, and (c) 16% to the holders of Class 3 Litigation Trust Interests; and (iv) *fourth*, following the satisfaction of the Final Return Threshold, (a) 10% to the holders of Class 1 Litigation Trust Interests and (b) 90% to the holders of Class 3 Litigation Trust Interests. Distributions to (i) holders of Class 1 Litigation Trust Interests shall be paid in accordance with Section 6.4 of the Plan; (ii) holders of Class 2 Litigation Trust Interests shall be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders; and (iii) holders of Class 3 Litigation Trust Interests shall be paid pro rata based on the aggregate Allowed amount of Roll-Up Claims, Electing Creditor Claims, First Lien Claims, and Second Lien Claims held by such holders. Any provisions providing for the Litigation Trust to obtain additional funding, including any potential adjustments to the Litigation Trust Waterfall, shall be set forth in the Litigation Trust Agreement.

### 6.4 *Class 1 Litigation Trust Interests Waterfall*.

Distributions to the holders of Class 1 Litigation Trust Interests shall be paid as follows:

> (i) *First*, to the Litigation Trust Funding Contributors, pro rata in accordance with their respective Litigation Trust Funding Contributions, until each Litigation Trust Funding Contributor has received an amount equal to the greater of (i) an internal rate of return on such Litigation Trust Funding Contributions equal to 20.0% and (ii) a multiple on invested capital on such Litigation Trust Funding Contributions of 1.75x, with each of such returns being measured from the date of such Litigation Trust Funding Contributions;

> (ii) *Second*, to the Litigation Trust Funding Contributors, pro rata in accordance with the amounts of their respective undrawn Litigation Trust Funding Commitments, until each such Litigation Trust

44

Funding Contributor has received an amount equal to 5.0% of the amount of such undrawn Litigation Trust Funding Commitment;

(iii)     *Third*, to the Backstop Parties until each such Backstop Party has received an amount equal to 5.0% of the amount of such Backstop Party's Litigation Trust Funding Commitment (whether drawn or undrawn) backstopped by such Backstop Party; and

(iv)     *Fourth*, to the Litigation Trust Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Funding Contributors, for the life of the Litigation Trust.

**6.5     *Administration of the Litigation Trust.***

The Litigation Trust shall be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control.

**6.6     *Litigation Trust Oversight Committee.***

On the Effective Date, the Litigation Trust Oversight Committee shall be appointed in accordance with the terms of the Litigation Trust Agreement.  The duties and obligations of the members of the Litigation Trust Oversight Board shall be set forth in the Litigation Trust Agreement.

**6.7     *Litigation Trustee.***

**(a)     Appointment of Litigation Trustee.**  Upon the establishment of the Litigation Trust, the Litigation Trustee shall be appointed.  The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 6.7 of the Plan.  Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

**(b)     Functions of the Litigation Trustee.**  On and after the date the Litigation Trust is established, the Litigation Trustee shall carry out the functions set forth in this Section 6.7 and may take such actions, under the supervision or with the approval of the Litigation Trust Oversight Committee, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

45

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)    take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(iii)   open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iv)    maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(vii)   conduct investigations of the Estate Claims pursuant to Bankruptcy Rule 2004;

(viii)  pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Estate Claims and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement;

(ix)    protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law;

(x)     administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(xi)    calculate and make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan;

46

(xii)     invest Cash, as available, and any income earned thereon;

(xiii)    retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable;

(xiv)    determine whether any Electing Creditor is an Ineligible Creditor at any time prior to making distributions to the holders of the Class 3(b) Litigation Trust Interests; *provided* that an Ineligible Creditor may seek relief from the Bankruptcy Court opposing such a determination;

(xv)     dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement; and

(xvi)    take any other actions not inconsistent with the provisions hereof and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**6.8** *Preference Actions.*

**(a)** **Excluded Parties**.  All parties excluded pursuant to any component of this Section 6.8(a) are "**Excluded Parties**."  The terms relating to Preference Actions do not apply to Excluded Parties.  These terms apply only to creditors (including and together with any affiliates of such creditors):

(i)     who, in the reasonable discretion of the Litigation Trustee, did not (i) engage in wrongful, actual or constructively fraudulent conduct against the Debtors, affiliates of Debtors, or otherwise participated, conspired with, or acted in concert with, any entity that participated in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or affiliates of Debtors), (ii) receive an avoidable transfer on grounds other than Section 547 of the Bankruptcy Code from the Debtors, or (iii) receive a transfer in good faith (collectively, (i) through (iii), "**Adverse Conduct**");

(1)   A party not expressly named in the Litigation List (as defined below) shall be treated as an Excluded Party based on Adverse Conduct only if the Litigation Trustee either alleges and/or pleads facts alleging Adverse Conduct as (a) an element of the Preference Action or (b) (x) a cause of action in a complaint or (y) in a pleading or other filing, and in the case of both (x) and (y), in a complaint, pleading, or other filing, as applicable, that is filed prior to or substantially contemporaneously with the filing of a Preference Action.  If a creditor obtains a verdict in their favor on all such alleged Adverse Conduct in a Final Order, or such allegations of Adverse Conduct are withdrawn

or counts related to such Adverse Conduct are dismissed with prejudice or on a voluntary basis by the Litigation Trustee, or dismissed without prejudice but the Litigation Trustee makes a final determination not to refile, and therefore no longer qualifies as an Excluded Party, then such creditor shall retain the benefits in this proposal (assuming all other conditions are met).

(2) For the avoidance of doubt, nothing herein shall require the Litigation Trustee to obtain a finding, determination, or Final Order related to Adverse Conduct prior to initiating a Preference Action.

(ii) that are not SPV Lenders; and

(iii) that are Electing Creditors under the Plan. Preference Actions against Ineligible Creditors and/or non-Electing Creditors shall not be subject to these terms and may be prosecuted by the (i) Litigation Trust or (ii) the FBG Debtors or their Estates, as applicable

**(b)** **Litigation List**. The Plan Supplement shall include an agreed upon non-exhaustive list (the "**Litigation List**") of enumerated litigation targets that are believed to have participated in Adverse Conduct, which shall include an initial list of Excluded Parties. For the avoidance of doubt, any Person that is charged with a crime based on conduct related to the Debtors shall be on the Litigation List, or if charged subsequent to the filing of the Plan Supplement, shall be deemed to have been on the Litigation List. For the avoidance of doubt, the Litigation Trustee is not limited in any way in prosecuting any claim or cause of action against any Person not on the Litigation List, other than as set forth in this Section 6.8 of the Plan with respect to Preference Actions, and no Person shall be entitled to rely on its absence from the Litigation List for any reason other than as set forth in this Section 6.8 of the Plan with respect to Preference Actions.

**(c)** **Preference Actions Against Trade Creditors**. Subject to the terms of Section 6.8(a), no Preference Actions shall be brought against Trade Creditors.

**(d)** **Preference Actions Against Supply Chain Financers and Factors**. Subject to the terms of Section 6.8(a), Preference Actions against Supply Chain Financers and Factors shall be brought only after the Litigation Trustee conducts reasonable due diligence and makes a good faith attempt to meet and confer with the putative defendant, which meet and confer shall include providing such putative defendant with the Litigation Trustee's analysis with respect to such putative defendant's defenses under Section 547(c)(4) of the Bankruptcy Code (the "**New Value Defense**") and providing such putative defendant with an opportunity to identify additional new value (as defined in Section 547 of the Bankruptcy Code) which was not included in the Litigation Trustee's analysis. Prior to commencing a Preference Action, the Litigation Trustee must consider the information timely provided by such putative defendant and any other affirmative defenses timely articulated by such putative defendant and provide a report to the Litigation Trust Oversight Committee setting forth the basis for litigating the Preference Action.

(i)     If the Litigation Trustee, in his reasonable discretion, prosecutes a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee agrees that in such prosecution new value includes any subsequent payment made by a Supply Chain Financer or Factor at the request of the FBG Debtors as part of the factoring or supply chain financing agreement (*i.e.*, it shall include payments to legitimate vendors of the FBG Debtors and payments made at the direction of the FBG Debtors on non-legitimate or "cover invoices"), without regard to which FBG Debtor entity such payment by a Supply Chain Financer or Factor was made on behalf of, as long as it was made on behalf of a Debtor (the "**Modified New Value Elements**"), then the prosecution shall not be considered a Sacred Right but instead a Major Decision.  For the avoidance of doubt, all other elements of any Preference Action and affirmative defenses thereto, including any other component of a New Value Defense, shall apply in accordance with applicable law, including that such new value must still have been provided by the Supply Chain Financer or Factor subsequent to the applicable alleged preferential payment by the Debtor

(ii)    In connection with any prosecution by the Litigation Trustee that utilizes the Modified New Value Elements, to the extent that any payment made by a Supply Chain Financer or Factor was received by a non-Debtor (*e.g.*, it was made to a legitimate creditor of a non-Debtor, the funds were ultimately received by an Eligible Creditor or its affiliates) and the Supply Chain Financer or Factor has the right to recover such payment from that non-Debtor, such right must be assigned to the Litigation Trust for prosecution by the Litigation Trust in order for such payment to qualify as new value and for the creditor to receive the benefit of a prosecution utilizing Modified New Value Elements (and that such assignment may be conditional upon the payment being considered new value).

(iii)   If the Litigation Trustee, in his reasonable discretion, seeks to prosecute a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee determines, in his reasonable discretion, to seek to prosecute such Preference Action without utilizing all of the Modified New Value Elements, then proceeding with the Preference Action shall be considered a Sacred Right instead of a Major Decision; *provided* that, the only modifications to the Modified New Value Elements that the Litigation Trustee is permitted to make under this subparagraph is to assert that (a) the alleged new value was provided on behalf of a non-Debtor entity (*e.g.*, a payment on an invoice owed by a non-Debtor); or (b) the alleged new value provided was not received directly or indirectly by a Debtor or by Bowery Finance II,  and therefore, in both cases, does not qualify as new value.

(iv) For the avoidance of doubt, if a Supply Chain Financer or Factor (i) is or becomes an Excluded Party or (ii) did not transact with FBG in good faith, then none of the provisions of this Section 6.8(d) shall apply to such Person. Nothing in this Section 6.8(d) shall shift the burden of proof under applicable law with respect to Preference Actions.

(e) **Litigation Trust's Authority to Commence Preference Actions**. The Litigation Trust's authority to commence Preference Actions against Supply Chain Financers and Factors shall exist only if the process in Section 6.8(d) above is undertaken by the Litigation Trustee in good faith. Good faith shall be conclusively established if the Preference Action is authorized by a majority of the Litigation Trust Oversight Committee, in accordance with the Litigation Trust Agreement; *provided* that the absence of any such authorization shall not establish a lack of good faith.

6.9 *Fees and Expenses of the Litigation Trust.*

(a) Following the establishment of the Litigation Trust, expenses of the Litigation Trust shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(b) The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Assets, including any Estate Claims).

6.10 *Indemnification.*

The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and the members of the Litigation Trust Oversight Committee, in their capacities as such, for any losses incurred in such capacities, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

6.11 *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the date the Litigation Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect

50

the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 6.12  *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of the Litigation Trust Assets.

### 6.13  *Turnover of DIP Collateral.*

If the Litigation Trust, the ABL Collateral Trust, or the Direct Claims Trust receives DIP Collateral Trust Assets, such DIP Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the DIP Collateral Trust.

### 6.14  *Assignment of Horizon Alester IP.*

To the extent (i) all or a portion of the Horizon Alester IP is sold (the "**Purchased Horizon Alester IP**") and (ii) the resolution, final judgment  or settlement of the James Complaint results in the avoidance of purported transfers of such Purchased Horizon Alester IP and recovery of such Purchased Horizon Alester IP by the Litigation Trust (as assignee of the FBG Debtors and their Estates), the Litigation Trustee, on behalf of the Litigation Trust, shall, in accordance with any applicable purchase agreements, execute a supplemental assignment agreement assigning, conveying, transferring, and delivering  the Purchased Horizon Alester IP to the applicable purchaser.

### 6.15  *Non-Transferability.*

The Litigation Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

### 6.16  *Litigation Trust Tax and Other Matters.*

**(a)    Tax Treatment.**  The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the Litigation Trust Assets to the Litigation Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust.  Accordingly, absent definitive

guidance to the contrary, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

>    **(b)**     **Liquidation Purpose of the Litigation Trust; No Successor in Interest.**
The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

>    **(c)**     **Cash Investments.** The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

>    **(d)**     **Tax Reporting and Tax Payments.**

>    >    (i)      The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.16(d). The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying

52

beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the Litigation Trust, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets as of the date the Litigation Trust is established. The Litigation Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)     Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) under the Litigation Trust Agreement if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Litigation Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising

53

from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)     The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Litigation Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the Litigation Trust. Similarly, the GUC Ombudsman may request expedited determinations of taxes under section 505(b) of the Bankruptcy Code in respect of any assets allocable to, or held on account of, Disputed Electing Creditor Claims that it has treated as a disputed ownership fund or other separate taxable entity.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee or, in respect of Disputed Electing Creditor Claims, the GUC Ombudsman so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Litigation Trustee), the Litigation Trustee or the GUC Ombudsman (as applicable) may elect to treat any Litigation Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Litigation Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Litigation Trustee, the GUC Ombudsman and Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)   The treatment provided in this Section 6.16, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

54

## ARTICLE VII.        DIP COLLATERAL TRUST.

### 7.1        *Establishment of the DIP Collateral Trust.*

On or prior to the Effective Date, the DIP Collateral Trust shall be established in accordance with the DIP Collateral Trust Agreement for the purpose of being vested with and liquidating the DIP Collateral Trust Assets, and making distributions to the DIP Collateral Trust Beneficiaries in accordance with the terms of the DIP Collateral Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the DIP Collateral Trust's primary purpose is liquidating the DIP Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the DIP Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the DIP Collateral Trust Assets and provide for the orderly liquidation thereof.

### 7.2        *Transfer of Assets into the DIP Collateral Trust.*

On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the DIP Collateral Credit Bid Transaction, the Plan Debtor shall transfer its remaining interests in the DIP Collateral Trust Assets to the DIP Collateral Trust, and all such assets shall vest in the DIP Collateral Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the DIP Collateral Trustee, in accordance with the Plan and the DIP Collateral Trust Agreement.  The DIP Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the DIP Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the DIP Collateral Trust.  The act of transferring the DIP Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the DIP Collateral Trust as if the asset or right was still held by the applicable Debtor.  Upon the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust, the Debtors shall have no interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust.  Upon delivery of the DIP Collateral Trust Assets to the DIP Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the DIP Collateral Trust shall vest in the DIP Collateral Trust and its representatives, and the Debtors and the DIP Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.  The DIP Collateral Trustee shall agree to accept and hold the DIP Collateral Trust Assets in the DIP Collateral Trust for the benefit of the DIP Collateral Trust Beneficiaries, subject to the terms of the Plan and the DIP Collateral Trust Agreement.

**7.3** *DIP Collateral Trustee.*

**(a)** **Appointment of DIP Collateral Trustee.** Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall be appointed as trustee of the DIP Collateral Trust. The powers, rights and responsibilities of the DIP Collateral Trustee shall be as specified in the DIP Collateral Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 7.3 of the Plan. Other rights and duties of the DIP Collateral Trustee and the DIP Collateral Trust Beneficiaries shall be as set forth in the DIP Collateral Trust Agreement.

**(b)** **Functions of the DIP Collateral Trustee.** Following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee and/or the DIP Collateral Trust, as applicable, shall carry out the functions set forth in this Section 7.3 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the DIP Collateral Trust Agreement. Such functions shall include any and all powers and authority to:

(i) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the DIP Collateral Trust;

(ii) take any actions necessary to (A) resolve all matters related to the DIP Collateral Trust Assets and (B) vest such assets in the DIP Collateral Trust;

(iii) open and maintain bank accounts on behalf of or in the name of the DIP Collateral Trust;

(iv) maintain the books and records and accounts of the DIP Collateral Trust and obtain any necessary insurance;

(v) coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the DIP Collateral Trust Assets in accordance with the DIP Collateral Trust Agreement;

(vii) administer the DIP Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the DIP Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)  calculate and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan;

(ix)  invest Cash, as available, and any income earned thereon;

(x)  retain, compensate and employ professionals to represent the DIP Collateral Trust or the DIP Collateral Trustee, as applicable;

(xi)  dissolve the DIP Collateral Trust in accordance with the terms of the DIP Collateral Trust Agreement; and

(xii)  take any other actions not inconsistent with the provisions hereof that the DIP Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

7.4  *Fees and Expenses of the DIP Collateral Trust.*

Following the establishment of the DIP Collateral Trust, expenses of the DIP Collateral Trust shall be paid from the DIP Collateral Trust Assets in the ordinary course of business, in accordance with the Plan and the DIP Collateral Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the DIP Collateral Trustee, on behalf of the DIP Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the DIP Collateral Trustee, are necessary to assist the DIP Collateral Trustee in the performance of the DIP Collateral Trustee's duties under the Plan and the DIP Collateral Trust Agreement, subject to any limitations and procedures established by the DIP Collateral Trust Agreement.

7.5  *Indemnification.*

The DIP Collateral Trust shall indemnify and hold harmless the DIP Collateral Trustee, in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

7.6  *Dissolution of the DIP Collateral Trust.*

In no event shall the DIP Collateral Trust be dissolved later than five (5) years from the date the DIP Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the DIP Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the DIP Collateral Trust Assets.

**7.7** *__Records.__*

   The DIP Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the DIP Collateral Trustee, for the disposition of DIP Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**7.8** *__Non-Transferability.__*

   The DIP Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**7.9** *__DIP Collateral Trust Tax and Other Matters.__*

   **(a)**  **Tax Treatment.** The DIP Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the DIP Collateral Trustee), all parties (including, without limitation, the Debtors, the DIP Collateral Trustee, and the DIP Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in satisfaction of their Claims, followed by (ii) the transfer of such assets by such holders to the DIP Collateral Trust in exchange for the beneficial interests in the DIP Collateral Trust. Accordingly, absent definitive guidance to the contrary, the DIP Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of DIP Collateral Trust Assets.

   **(b)**  **Liquidation Purpose of the DIP Collateral Trust; No Successor in Interest.** The DIP Collateral Trust shall be established for the primary purpose of liquidating and distributing the DIP Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the DIP Collateral Trust. Accordingly, the DIP Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the DIP Collateral Trust Assets, make timely distributions to the DIP Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration. The DIP Collateral Trustee shall distribute at least annually to the DIP Collateral Trust Beneficiaries any Available Cash. The DIP Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the DIP Collateral Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the DIP Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or DIP Collateral Trust Agreement to the contrary, the DIP Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the DIP Collateral Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the DIP Collateral Trustee to invest the DIP Collateral Trust Assets, the proceeds thereof, or any income earned by the DIP Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements.  The DIP Collateral Trustee may expend the Cash of the DIP Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the DIP Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the DIP Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the DIP Collateral Trust in accordance with the Plan and the DIP Collateral Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The DIP Collateral Trustee shall file tax returns for the DIP Collateral Trust treating the DIP Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 7.9(d).  The DIP Collateral Trustee also shall annually send to each holder of a DIP Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the DIP Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall make a good faith determination of the fair market value of the DIP Collateral Trust Assets as of the date the DIP Collateral Trust is established.  The DIP Collateral Trustee shall provide all parties with such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)     Allocations of DIP Collateral Trust taxable income among DIP Collateral Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the DIP Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of DIP Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the DIP

59

Collateral Trust. Similarly, taxable loss of the DIP Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining DIP Collateral Trust Assets. The tax book value of DIP Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date DIP Collateral Trust Assets are transferred to the DIP Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv) The DIP Collateral Trust shall be responsible for payment, out of DIP Collateral Trust Assets, of any taxes imposed on the DIP Collateral Trust or the DIP Collateral Trust Assets.

(v) The DIP Collateral Trustee may request an expedited determination of taxes of the DIP Collateral Trust under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the DIP Collateral Trust for all taxable periods through the dissolution of the DIP Collateral Trust.

(vi) The treatment provided in this Section 7.9, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE VIII.     ABL COLLATERAL TRUST.

### 8.1     *Establishment of the ABL Collateral Trust.*

On or prior to the Effective Date, the ABL Collateral Trust shall be established in accordance with the ABL Collateral Trust Agreement for the purpose of being vested with and liquidating the ABL Collateral Trust Assets and making distributions to holders of Allowed Claims in accordance with the terms of the ABL Collateral Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the ABL Collateral Trust's primary purpose is liquidating the ABL Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the ABL Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the ABL Collateral Trust Assets and provide for the orderly liquidation thereof.

### 8.2     *Transfer of Assets into the ABL Collateral Trust.*

On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the DIP Collateral Credit Bid Transaction, the Debtors shall transfer the ABL Collateral Trust Assets to the ABL Collateral Trust, and all such assets shall vest in the ABL

Collateral Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the ABL Collateral Trustee, in accordance with the Plan and the ABL Collateral Trust Agreement. The ABL Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the ABL Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the ABL Collateral Trust. The act of transferring the ABL Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the ABL Collateral Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust, the Debtors shall have no interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Upon delivery of the ABL Collateral Trust Assets to the ABL Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the ABL Collateral Trust shall vest in the ABL Collateral Trust and its representatives, and the Debtors and the ABL Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The ABL Collateral Trustee shall agree to accept and hold the ABL Collateral Trust Assets in the ABL Collateral Trust for the benefit of the ABL Collateral Trust Beneficiaries, subject to the terms of the Plan and the ABL Collateral Trust Agreement.

### 8.3    *ABL Collateral Trust Waterfall*.

Proceeds of the ABL Collateral Trust Assets, net of expenses, shall be distributed to ABL Collateral Trust Beneficiaries as follows: one-hundred percent (100%) of such proceeds shall be distributed to the ABL Collateral Trust Beneficiaries until aggregate distributions equal the Allowed amount of the ABL Claims; *provided* that any proceeds of the ABL Collateral Trust Assets in excess of the Allowed amount of the ABL Claims shall be deemed to be DIP Collateral Trust Assets and shall be turned over to the DIP Collateral Trust and distributed in accordance with the Plan. Distributions to holders of ABL Collateral Trust Interests shall be paid pro rata based on the ABL Collateral Trust Interests held by such holders.

### 8.4    *ABL Collateral Trustee*.

(a)    **Appointment of ABL Collateral Trustee.**  Upon the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall be appointed as the trustee of the ABL Collateral Trust. The initial ABL Collateral Trustee shall be selected and appointed by the ABL Agent, and the ABL Agent shall have the sole right to remove and replace the ABL Collateral Trustee. The powers, rights and responsibilities of the ABL Collateral Trustee shall be as specified in the ABL Collateral Trust Agreement and Plan and shall include the authority and responsibility

to fulfill the items identified in this <u>Section 8.4</u> of the Plan.  Other rights and duties of the ABL Collateral Trustee and the ABL Collateral Trust Beneficiaries shall be as set forth in the ABL Collateral Trust Agreement.

(b)     **Functions of the ABL Collateral Trustee.**  Following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee and/or the ABL Collateral Trust, as applicable, shall carry out the functions set forth in this <u>Section 8.4</u> and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the ABL Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)      perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the ABL Collateral Trust;

(ii)     take any actions necessary to (A) resolve all matters related to the ABL Collateral Trust Assets and (B) vest such assets in the ABL Collateral Trust;

(iii)    open and maintain bank accounts on behalf of or in the name of the ABL Collateral Trust;

(iv)    maintain the books and records and accounts of the ABL Collateral Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the ABL Collateral Trust Assets in accordance with the ABL Collateral Trust Agreement;

(vii)   administer the ABL Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the ABL Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)  calculate and make distributions of the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan;

(ix)    invest Cash, as available, and any income earned thereon;

(x)     retain, compensate and employ professionals to represent the ABL Collateral Trust or the ABL Collateral Trustee, as applicable;

(xi)    provide funding for the administration of the Factored Receivables Account and prosecution of the FBG Debtors' interests in the Factored Receivables Account in accordance with the Plan;

(xii)   dissolve the ABL Collateral Trust in accordance with the terms of the ABL Collateral Trust Agreement; and

(xiii)  take any other actions not inconsistent with the provisions hereof that the ABL Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**8.5     *Fees and Expenses of the ABL Collateral Trust.***

Following the establishment of the ABL Collateral Trust, expenses of the ABL Collateral Trust shall be paid from the ABL Collateral Trust Assets in the ordinary course of business, in accordance with the Plan and the ABL Collateral Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the ABL Collateral Trustee, on behalf of the ABL Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the ABL Collateral Trustee, are necessary to assist the ABL Collateral Trustee in the performance of the ABL Collateral Trustee's duties under the Plan and the ABL Collateral Trust Agreement, subject to any limitations and procedures established by the ABL Collateral Trust Agreement.

**8.6     *Indemnification.***

The ABL Collateral Trust shall indemnify and hold harmless the ABL Collateral Trustee and the ABL Agent, in their capacities as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**8.7     *Dissolution of the ABL Collateral Trust.***

In no event shall the ABL Collateral Trust be dissolved later than five (5) years from the date the ABL Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the ABL Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the ABL Collateral Trust Assets.

**8.8** *Records.*

The ABL Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the ABL Collateral Trustee, for the disposition of ABL Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**8.9** *Non-Transferability.*

The ABL Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**8.10** *ABL Collateral Trust Tax and Other Matters.*

**(a) Tax Treatment.** The ABL Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity). Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the ABL Collateral Trustee), all parties (including, without limitation, the Debtors, the ABL Collateral Trustee, and the ABL Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the ABL Collateral Trust Assets by the Debtors to the ABL Collateral Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive ABL Collateral Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the ABL Collateral Trust in exchange for the beneficial interests in the ABL Collateral Trust. Accordingly, absent definitive guidance to the contrary, the ABL Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of ABL Collateral Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

**(b) Liquidation Purpose of the ABL Collateral Trust; No Successor in Interest.** The ABL Collateral Trust shall be established for the primary purpose of liquidating and distributing the ABL Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the ABL Collateral Trust. Accordingly, the ABL Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the ABL Collateral Trust Assets, make timely distributions to the ABL Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration. The ABL Collateral Trustee shall distribute at least annually to the ABL Collateral Trust Beneficiaries any Available Cash. The ABL Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the ABL

64

Collateral Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the ABL Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or ABL Collateral Trust Agreement to the contrary, the ABL Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the ABL Collateral Trust as set forth in the Plan.

(c) **Cash Investments.** The right and power of the ABL Collateral Trustee to invest the ABL Collateral Trust Assets, the proceeds thereof, or any income earned by the ABL Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The ABL Collateral Trustee may expend the Cash of the ABL Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the ABL Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the ABL Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the ABL Collateral Trust in accordance with the Plan and the ABL Collateral Trust Agreement (including, without limitation, the payment of any taxes).

(d) **Tax Reporting and Tax Payments.**

(i) The ABL Collateral Trustee shall file tax returns for the ABL Collateral Trust treating the ABL Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 8.10(d). The ABL Collateral Trustee also shall annually send to each holder of a ABL Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the ABL Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii) As soon as practicable following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall make a good faith determination of the fair market value of the ABL Collateral Trust Assets as of the date the ABL Collateral Trust is established. The ABL Collateral Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii) Allocations of ABL Collateral Trust taxable income among ABL Collateral Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash

65

representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the ABL Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of ABL Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the ABL Collateral Trust. Similarly, taxable loss of the ABL Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining ABL Collateral Trust Assets. The tax book value of ABL Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date ABL Collateral Trust Assets are transferred to the ABL Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The ABL Collateral Trust shall be responsible for payment, out of ABL Collateral Trust Assets, of any taxes imposed on the ABL Collateral Trust or the ABL Collateral Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)      The ABL Collateral Trustee may request an expedited determination of taxes of the ABL Collateral Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the ABL Collateral Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the ABL Collateral Trust (or any such disputed ownership fund or other separate taxable

66

entity) for all taxable periods through the dissolution of the ABL Collateral Trust.

(vi)   Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the ABL Collateral Trustee of a private letter ruling if the ABL Collateral Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such ABL Collateral Trustee), the ABL Collateral Trustee may elect to treat any ABL Collateral Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the ABL Collateral Trustee and ABL Collateral Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)   The treatment provided in this Section 8.10, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE IX.   DIRECT CLAIMS TRUST.

### 9.1   *Establishment of the Direct Claims Trust.*

On or prior to the Effective Date, the Direct Claims Trust shall be established in accordance with the Direct Claims Trust Agreement for the purpose of being vested with and liquidating the Direct Claims Trust Assets and making distributions to the Direct Claims Trust Beneficiaries in accordance with the terms of the Direct Claims Trust Agreement. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Direct Claims Trust's primary purpose is liquidating the Direct Claims Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Direct Claims Trust's liquidating purpose and reasonably necessary to conserve and protect the Direct Claims Trust Assets and provide for the orderly liquidation thereof.

### 9.2   *Transfer of Assets into the Direct Claims Trust.*

**(a)**   Upon the establishment of the Direct Claims Trust, the Direct Claims Trust Electing Creditors shall be deemed to have transferred their Direct Creditor Claims to the Direct Claims Trust in exchange for Direct Claims Trust Interests, and all such Direct Creditor Claims shall vest in the Direct Claims Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Direct Claims Trustee, in accordance with the Direct Claims Trust Agreement. The Direct Claims Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Direct Claims Trust, which may have a separate legal existence, but which shall be considered

sub-accounts or sub-trusts of the Direct Claims Trust. The act of transferring the Direct Claims Trust Assets, as authorized by the Plan and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Direct Claims Trust, in any judicial, arbitration, or administrative proceeding. For the avoidance of doubt, the Direct Claims Trust shall not obtain, prosecute, control, or otherwise use or attempt to use the Estate Claims and shall have no interest therein.

### 9.3    *Direct Claims Trust Waterfall.*

The proceeds from the monetization of the Direct Claims Trust Assets shall be distributed to the Direct Claims Trust Beneficiaries in accordance with the Direct Claims Trust Agreement.

### 9.4    *Direct Claims Trustee.*

**(a)    Appointment of Direct Claims Trustee.** Upon the establishment of the Direct Claims Trust, the Direct Claims Trustee shall be appointed. The powers, rights and responsibilities of the Direct Claims Trustee shall be as specified in the Direct Claims Trust Agreement.

**(b)    Functions of the Direct Claims Trustee.** On and after the date the Direct Claims Trust is established, the Direct Claims Trustee shall carry out the functions set forth in this the Direct Claims Trust Agreement and may take such actions, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Direct Claims Trust Agreement.

### 9.5    *Fees and Expenses of the Direct Claims Trust.*

**(a)** Following the establishment of the Direct Claims Trust, expenses of the Direct Claims Trust shall be paid from the Direct Claims Trust Assets in the ordinary course of business, in accordance with the Direct Claims Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Direct Claims Trustee, on behalf of the Direct Claims Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the Direct Claims Trustee, are necessary to assist the Direct Claims Trustee in the performance of the Direct Claims Trustee's duties under the Direct Claims Trust Agreement, subject to any limitations and procedures established by the Direct Claims Trust Agreement.

**(b)** The Direct Claims Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Direct Claims Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Direct Claims Trust Assets).

### 9.6    *Indemnification.*

The Direct Claims Trust shall indemnify and hold harmless the Direct Claims Trustee, in its capacity as such, for any losses incurred in such capacities, except to the extent such

losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**9.7** *Dissolution of the Direct Claims Trust.*

In no event shall the Direct Claims Trust be dissolved later than five (5) years from the date the Direct Claims Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Direct Claims Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Direct Claims Trust Assets.

**9.8** *Non-Transferability.*

The Direct Claims Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**9.9** *Direct Claims Trust Tax and Other Matters.*

**(a)    Tax Treatment.**  The Direct Claims Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Direct Claims Trustee), the Direct Claims Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Direct Claims Trust Assets.

**(b)    Liquidation Purpose of the Direct Claims Trust; No Successor in Interest.**  The Direct Claims Trust shall be established for the primary purpose of liquidating and distributing the Direct Claims Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Direct Claims Trust.  Accordingly, the Direct Claims Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Direct Claims Trust Assets, make timely distributions to the Direct Claims Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The Direct Claims Trustee shall distribute at least annually to the Direct Claims Trust Beneficiaries any Available Cash.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Direct Claims Trustee expressly for such purpose. Notwithstanding anything in the Plan or Direct Claims Trust Agreement to the contrary, the Direct Claims Trustee shall always act consistently with, and not contrary to, the purpose of the Direct Claims Trust as set forth in the Plan.

**(c)    Cash Investments.**  The right and power of the Direct Claims Trustee to invest the Direct Claims Trust Assets, the proceeds thereof, or any income earned by the Direct

Claims Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.  The Direct Claims Trustee may expend the Cash of the Direct Claims Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Direct Claims Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Direct Claims Trust) and (iii) to satisfy other respective liabilities incurred by the Direct Claims in accordance with the Direct Claims Trust Agreement (including, without limitation, the payment of any taxes).

**(d)     Tax Reporting and Tax Payments.**

(i)     The Direct Claims Trustee shall file tax returns for the Direct Claims Trust treating the Direct Claims Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 9.9(d)</u>. The Direct Claims Trustee also shall annually send to each holder of a Direct Claims Trust Interest, a separate statement regarding the receipts and expenditures of the Direct Claims Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the Direct Claims Trust, the Direct Claims Trustee shall make a good faith determination of the fair market value of the Direct Claims Trust Assets as of the date the Direct Claims Trust is established.  The Direct Claims Trustee shall provide all parties with such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)     Allocations of Direct Claims Trust taxable income among Direct Claims Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Direct Claims Trust had distributed all its assets (valued at their tax book value) to the holders of Direct Claims Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Direct Claims Trust.  Similarly, taxable loss of the Direct Claims Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Direct Claims Trust Assets.  The tax book value of Direct Claims Trust Assets for purpose of this paragraph shall equal their fair market value on the date Direct

70

Claims Trust Assets are transferred to the Direct Claims Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Direct Claims Trust shall be responsible for payment, out of Direct Claims Trust Assets, of any taxes imposed on the Direct Claims Trust or the Direct Claims Trust Assets.

(v)     The treatment provided in this Section 9.9, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE X.     DISTRIBUTIONS.

### 10.1     *Distributions Generally.*

**(a)     Plan Debtor Distributions**.  On or after the Effective Date, the Wind Down Administrator shall commence all distributions pursuant to the Plan to holders of Allowed Claims against the Plan Debtor only in accordance with the terms of the Plan and the Confirmation Order, and only to the extent that the Plan Debtor has sufficient assets (or income and/or proceeds realized from such assets) to make such payments in accordance with and to the extent provided for in the Plan and the Confirmation Order; *provided* that the assets used to make such payments shall not include any Litigation Trust Assets or DIP Collateral Trust Assets.

**(b)     Trust Distributions**.  On or after the Effective Date, the Trustees shall make all distributions to Trust Beneficiaries only in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreements, as applicable, and only to the extent that the Trusts have sufficient assets (or income and/or proceeds realized from such assets) to make such distributions in accordance with and to the extent provided for in the Plan, the Confirmation Order, and the Trust Agreements, as applicable.

**(c)**     The Wind Down Administrator and the Trustees shall not be required to give any bond or surety or other security for the performance of their duties under the Plan or the Trust Documents.

### 10.2     *No Postpetition Interest on Claims.*

Unless otherwise provided in the Plan, the Confirmation Order, the DIP Order, the Trust Agreements, as applicable, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 10.3     *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of

71

holders of Claims or Interests in each Class, as maintained by the Plan Debtor or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date. Neither the Plan Debtor, the Wind Down Administrator, nor the Trustees shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

### 10.4 *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 10.5 *Reserve on Account of Disputed Claims.*

**(a)** From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Wind Down Administrator or the applicable Trustee shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in a filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Wind Down Administrator or the applicable Trustee. Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Wind Down Administrator or the applicable Trustee for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Wind Down Administrator or the applicable Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order or settlement.

**(b)** Subject to the other provisions of the Plan regarding timing of distributions, after a Disputed Claim becomes an Allowed Claim, the Wind Down Administrator or the applicable Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan or the applicable Trust Document and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto). The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class. Each holder of a Disputed Claim that ultimately becomes an

Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for distribution pursuant to the foregoing clause (i) is insufficient to remit distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from the applicable Trusts' assets.

(c)     The Wind Down Administrator and the Trustees shall not be required to make any distributions from a Disputed Claims Reserve as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

(d)     Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 10.5.

**10.6     _Distributions After Effective Date._**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**10.7     _Delivery of Distributions._**

(a)     Subject to Bankruptcy Rule 9010, the Wind Down Administrator and the Trustees, as applicable, shall make all distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by the Plan at (a) the address of such holder on the books and records of the Debtors or its agents, (b) at the address in any written notice of address change delivered to the Wind Down Administrator or the Trustees, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable.  Subject to Section 10.8 of the Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Wind Down Administrator or Trustees, as applicable, have been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

(b)     The Debtors shall use commercially reasonable efforts to provide the Wind Down Administrator and the Trustees with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.

**10.8     _Unclaimed Property._**

(a)     Six (6) months from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed against the Plan Debtor, all distributions payable on account of such Claim or Interest that are unclaimed pursuant to Section 10.8(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Wind Down Administrator, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Wind Down Administrator shall have no obligation to attempt to locate any holder of an

Allowed Claim against the Plan Debtor other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**(b)** A distribution made pursuant to the Plan shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Wind Down Administrator of an intent to accept a particular distribution, (iii) responded to a request by the Wind Down Administrator or a Disbursing Agent for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 10.9 *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims against the Plan Debtor under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims against the Plan Debtor.

### 10.10 *Manner of Payment Under Plan.*

Except as otherwise specifically provided herein, at the option of the Wind Down Administrator, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Wind Down Administrator. Any wire transfer fees incurred by the Wind Down Administrator in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's distribution.

### 10.11 *Minimum Distribution.*

The Wind Down Administrator shall have no obligation to make a distribution under the Plan that is less than $100.00 in Cash.

### 10.12 *Setoffs and Recoupments.*

**(a)** Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, the Wind Down Administrator may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim against the Plan Debtor and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Plan Debtor or its successors may hold against the holder of such Allowed Claim; *provided* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Debtor, its Estate, or the Wind Down Administrator of any claims, rights, or Causes of Action that the Plan Debtor may possess against the holder of such Claim.

**(b)** In no event shall any Holder of a Claim be entitled to set off any such Claim against any claim, right, or Cause of Action of the Plan Debtor, unless (i) the Plan Debtor or the Wind Down Administrator, as applicable, has consented or (ii) such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder

asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence before the Effective Date.

### 10.13 *Withholding and Reporting Requirements.*

**(a)** **Withholding Rights**. In connection with the Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any Entity issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

**(b)** **Forms.** Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the Plan Debtor, the Wind Down Administrator, a Trustee, or Disbursing Agent, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Debtor, the Wind Down Administrator, a Trustee, Disbursing Agent, or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding. If such request is made and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Debtor or the applicable Trust and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against the Plan Debtor, the Plan Debtor's Estate, the Trusts, and their respective property.

**(c)** The FBG Debtors shall cooperate in good faith with the Wind Down Administrator, the Trustees and the GUC Ombudsman to comply with the withholding and reporting requirements outlined in this Section 10.13 of the Plan.

### 10.14 *Disbursing Agent.*

**(a)** The Wind Down Administrator and the Trustees shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required

under the Plan, the Confirmation Order, and the Trust Agreements. The Wind Down Administrator and the Trustees may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b)     From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Plan Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or the Trust Documents or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(c)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(d)     Except as otherwise ordered by the Bankruptcy Court and, in the case of the GUC Ombudsman, subject to Section 5.2(k) hereof, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Wind Down Administrator or the applicable Trust in the ordinary course of business.

### 10.15   *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in the Plan or as otherwise required by law (as determined by the Wind Down Administrator, the Trustees or the GUC Ombudsman, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest (including original issuance discount).

## ARTICLE XI.     PROCEDURES FOR RESOLVING CLAIMS.

### 11.1   *Allowance of Claims.*

The Wind Down Administrator shall have and shall retain any and all rights and defenses that the Plan Debtor had with respect to any Claim against the Plan Debtor. Except as

76

expressly provided in the Plan or in any order entered in the Plan Debtor's Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim against the Plan Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order in the Plan Debtor's Chapter 11 Case allowing such Claim.

### 11.2    *Objections to Claims.*

As of the Effective Date, the Wind Down Administrator shall be entitled to object to Claims against the Plan Debtor.  Any objections to Claims against the Plan Debtor shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Wind Down Administrator may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in its sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

### 11.3    *Estimation of Claims.*

The Wind Down Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim against the Plan Debtor pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Debtor had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Wind Down Administrator may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated; *provided* that, for the avoidance of doubt, the GUC Ombudsman shall be responsible solely for reconciling Electing Creditor Claims in accordance with the Plan.

### 11.4    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

**11.5** *Adjustment to Claims Register Without Objection.*

Any Claim or Interest against the Plan Debtor that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Wind Down Administrator upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**11.6** *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**11.7** *Amendments to Claims.*

A Claim against the Plan Debtor may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Wind Down Administrator, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

**ARTICLE XII.       EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**12.1** *Rejection of Executory Contracts and Unexpired Leases.*

**(a)** As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Plan Debtor is a party shall be deemed rejected by the Plan Debtor (and not any other Debtor) except for an executory contract or unexpired lease that: (i) was previously assumed or rejected by the Plan Debtor pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a separate assumption or rejection motion or request filed by the Plan Debtor on or before the Effective Date; (iv) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Policy or other insurance policy to which the Plan Debtor is a beneficiary or an insured. For the avoidance of doubt, (a) the Plan Debtor may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date and (b) the FBG Debtors (other than the Plan Debtor) may assume, assume and assign, or reject any executory contract or unexpired lease before, on, or after the Effective Date pursuant to the Contracts Procedures Order or otherwise in accordance with applicable bankruptcy law.

**(b)** Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections provided for in the Plan pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**12.2** *Survival of Indemnification Obligations.*

Any and all obligations of a Debtor to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the such Debtor's corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims against the Plan Debtor arising under the foregoing documents shall be treated as General Unsecured Claims to the extent Allowed. Notwithstanding anything in the Plan to the contrary, the Plan Debtor's Indemnification Obligation shall be assumed by the Plan Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 12.2.

**12.3** *Rejection Damages Claims.*

**(a)** Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Plan Debtor's executory contracts or unexpired leases pursuant to the Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

**(b)** Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Plan Debtor's Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Plan Debtor, its Estate, or the property for any of the foregoing without the need for any objection by the Plan Debtor or Wind Down Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Plan Debtor's prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims.

**12.4** *Insurance Policies.*

**(a)** Each of the Plan Debtor's Insurance Policies and any agreements, documents, or instruments related thereto, as of the Effective Date, shall be deemed to be and treated as executory contracts and shall be assumed by the Plan Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.

**(b)** Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance

Policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law.

(c)     All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies.

(d)     On the Effective Date, all rights and obligations of the FBG Debtors, if any, under the D&O Policies shall transfer to the Litigation Trust in accordance with the Plan and the Litigation Trust shall assume the FBG Debtors' obligations for administering such policies.  For the avoidance of doubt, the transfer of the Insurance Rights of the FBG Debtors' and their Estates to recover proceeds from D&O Policies to the Litigation Trust, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

(e)     On the Effective Date, all rights and obligations of the FBG Debtors, if any, under the Independent Manager Policies shall transfer to the Plan Debtor and the Plan Debtor shall assume the Debtors' obligations, if any, for administering such policy.

### 12.5     *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the Plan Debtor of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Plan Debtor or any other party that any such contract or lease is or is not an executory contract or unexpired lease or that the Plan Debtor, its Estate, or its Affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Wind Down Administrator, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Wind Down Administrator, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**ARTICLE XIII.     CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

### 13.1     *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Disclosure Statement Order shall have been entered;

**(b)** the closings of the Estate Claims Credit Bid Transaction and DIP Collateral Credit Bid Transaction each shall have occurred;

**(c)** the Litigation Trust has been established and the Litigation Trust Assets have been transferred to the Litigation Trust;

**(d)** the Litigation Trust Interests have been issued in a form and manner satisfactory to the Required Consenting Lenders and the Creditors' Committee;

**(e)** the DIP Collateral Trust has been established and the DIP Collateral Trust Assets have been transferred to the DIP Collateral Trust;

**(f)** the DIP Collateral Trust Interests have been issued in a form and manner satisfactory to the Required Consenting Lenders;

**(g)** the ABL Collateral Trust has been established and the ABL Collateral Trust Assets have been transferred to the ABL Collateral Trust;

**(h)** the Plan Supplement and all of the schedules, documents, supplements, and exhibits thereto shall have been filed in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders, and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed), and be consistent in all material respects with the Plan Support Agreement;

**(i)** the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay or injunction;

**(j)** all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

**(k)** all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received;

**(l)** the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in the Plan;

**(m)** all actions, documents, certificates, and agreements necessary to implement the Plan, including the Global Settlement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws; and

**(n)** all fees, expenses, and other amounts due and payable to the Ad Hoc Group Advisors pursuant to the DIP Order and the Plan, including, without limitation, the Restructuring Expenses shall have been paid in full.

81

**13.2** *Waiver of Conditions Precedent.*

(a) Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XIII may be waived, in whole or in part, by the Plan Debtor, with the consent of the Creditors' Committee and the Required Consenting Lenders (not to be unreasonably withheld, conditioned, or delayed), without leave of or order of the Bankruptcy Court.

(b) Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**13.3** *Effect of Failure of a Condition.*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Plan Debtor, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Plan Debtor or any other Entity.

**13.4** *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Plan Debtor and all holders of Claims and Interests in the Plan Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of the Plan Debtor's obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Plan Debtor or any other Entity or to prejudice in any manner the rights of the Plan Debtor or any other Entity in any further proceedings involving the Plan Debtor or otherwise.

**ARTICLE XIV. EFFECT OF CONFIRMATION.**

**14.1** *Binding Effect.*

As of the Effective Date, the Plan shall bind (i) the Debtors, including the Plan Debtor; (ii) the Wind Down Administrator; (iii) the Litigation Trustee and the Litigation Trust; (iv) the DIP Collateral Trustee and the DIP Collateral Trust; (v) the ABL Collateral Trustee and the ABL Collateral Trust; (vi) the Direct Claims Trustee and the Direct Claims Trust; (vii) any successor to the Debtors, including any chapter 7 trustee appointed in any Debtor's chapter 7 case; (viii) all holders of Claims against and Interests in the Debtors, including Electing Creditors, and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, (d) voted to reject the Plan, and/or (e) received any distribution

under the Plan; (ix) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; (x) each Entity acquiring property under the Plan and the Confirmation Order; and (xi) any and all non-Debtor parties to executory contracts and unexpired leases with the Plan Debtor.

### 14.2 *Vesting of Assets.*

Except as otherwise provided in the Plan (including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7), the Plan Supplement, or the Confirmation Order, on and after Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Litigation Trust Assets, the DIP Collateral Trust Assets, and the ABL Collateral Trust Assets shall vest in the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law.  Subject to the terms of the Plan, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, and the ABL Collateral Trust Agreement, on and after the Effective Date, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests against the Plan Debtor without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Plan Debtor or Wind Down Administrator may pay the charges that it incurs on behalf of the Plan Debtor's Estate after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 14.3 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Plan Debtor's Chapter 11 Case, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, no injunction or stay shall interfere with the administration of the Litigation Trust or the prosecution of claims owned by such Litigation Trust.

### 14.4 *Plan Injunction.*

**(a)      Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, for the avoidance of doubt, exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims.**

**(b)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released**

or discharged pursuant to the Plan, including under **Section 14.5(a)** or **Section 14.5(b)** of the Plan, or (ii) subject to exculpation pursuant to **Section 14.6** of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Plan Debtor, the Plan Debtor's Estate, the Wind Down Administrator, the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to **Section 14.6** of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to **Section 14.5(a)** or **Section 14.5(b)** of the Plan; and (G) exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, the Plan Debtor or its Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(c) Subject in all respects to **Section 15.1** of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Exculpated Party that arose or arises from, in whole or in part: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind

Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been exculpated and, only to the extent legally permissible and as provided for in Section 15.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(d)     As of the Effective Date, all Persons other than the Litigation Trust are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Claim (including in any proceeding in a judicial, arbitral, administrative, or other forum). If any Person other than the Litigation Trust commences, conducts, or continues litigation or prosecution of an Estate Claim without a prior determination by the Bankruptcy Court that the claim or cause of action is not an Estate Claim, the Litigation Trust shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such claim or Cause of Action is an Estate Claim and that this injunction has been violated. Upon such determination, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Litigation Trust. For the avoidance of doubt, no Person other than the Litigation Trust (including a defendant in such action) is entitled to enforce this Section 14.4(d).

(e)     The injunctions in this Section 14.4 shall extend to any successors of the Plan Debtor, the Wind Down Administrator, the Litigation Trust and the Litigation Trustee, the DIP Collateral Trust and the DIP Collateral Trustee, and the ABL Collateral Trust and the ABL Collateral Trustee and each of their respective property and interests in property.

14.5     *Releases.*

(a)     Releases by the FBG Debtors and their Estates.  Except as otherwise expressly set forth below in this Section 14.5, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the FBG Debtors, their Estates, and successors and assigns, including the Wind Down Administrator, the Litigation Trust, the Litigation Trustee, the DIP Collateral Trust, the DIP Collateral Trustee, the ABL Collateral Trust, and the ABL Collateral Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the FBG Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other

agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 14.5(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; *provided* that, for the avoidance of doubt, the releases granted under this Section 14.5(a) are binding on successors to the FBG Debtors, including the chapter 7 estate of an FBG Debtor and any trustee appointed to oversee the chapter 7 estate of such FBG Debtor.

(b)     Third-Party Releases.  Notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct

**Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 14.5(b) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released under the Plan.**

### 14.6 *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place from the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 14.6 shall not release or exculpate (a) any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Exculpated Party, or (b) any post-

Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 14.7 *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XIV OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 14.5 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 14.8 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 14.9 *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Debtor and the Wind Down Administrator reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**14.10** _**Retention of Causes of Action and Reservation of Rights.**_

Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, the Plan Debtor, the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**14.11** _**Ipso Facto and Similar Provisions Ineffective.**_

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

**14.12** _**Solicitation of Plan.**_

As of the Confirmation Date: (a) the Plan Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Plan Debtor and each of its respective managers, directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation in such solicitation, and therefore are not, and on account thereof shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

**ARTICLE XV.        RETENTION OF JURISDICTION.**

**15.1** _**Retention of Jurisdiction.**_

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Plan Debtor's Chapter 11 Case for, among other things, the following purposes:

(a) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(b) to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(c) to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d) to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(e) to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Estate Claims;

(f) to hear and determine settlements and disputes with respect to any DIP Collateral Trust Asset;

(g) to hear and determine settlements and disputes with respect to any ABL Collateral Trust Asset;

(h) to hear and determine any disputes with respect to the Factored Receivables Account and the funds deposited therein;

(i) to hear and determine any disputes with respect to the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account and the funds deposited therein;

(j) to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, or the ABL Collateral Trustee;

(k) to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(l) to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(m) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy

91

Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

**(n)** to hear and determine all Professional Fee Claims;

**(o)** to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

**(p)** to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

**(q)** to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

**(r)** to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, the Plan Supplement, and the Confirmation Order;

**(s)** to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**(t)** to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

**(u)** to hear and determine any other matters related to the Plan Debtor's Chapter 11 Case and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

**(v)** to resolve any disputes concerning whether a Person had sufficient notice of the Plan Debtor's Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Plan Debtor's Chapter 11 Case, or any bar date or established in the Plan Debtor's Chapter 11 Case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

**(w)** to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XIV of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

**(x)** to enforce all orders previously entered by the Bankruptcy Court;

**(y)** to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Plan Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

92

**(z)** to recover all assets of the Litigation Trust, DIP Collateral Trust, the ABL Collateral Trust, the Plan Debtor and property of the Plan Debtor's Estate, wherever located; and

**(aa)** to enter a final decree closing the Plan Debtor's Chapter 11 Case.

### 15.2 *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XVI.    MISCELLANEOUS PROVISIONS.

### 16.1 *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Plan Debtor in full on the Effective Date.  On and after the Effective Date, the Wind Down Administrator shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, Wind Down Administrator, on behalf of the Plan Debtor, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of the Plan Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 16.2 *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Plan Debtor; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), including with respect to any transfers to or by the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 16.3 *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Debtors, the Wind Down Administrator, the Trusts, and the Trustees shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except for any Professional Fees incurred by the Creditors' Committee, including with respect to any appeal of the Plan and as agreed pursuant to the Agreed Budget.

### 16.4 *Request for Expedited Determination of Taxes of the Plan Debtor.*

The Plan Debtor and the Wind Down Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Plan Debtor filed, or to be filed, for any and all taxable periods ending after the Petition Date.

### 16.5 *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 16.6 *Amendments.*

(a) **Plan Modifications.** The Plan may be amended, supplemented, or otherwise modified by the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee, not to be unreasonably withheld, conditioned or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the Litigation Trust, the DIP Collateral Trust, or the treatment of holders of Allowed Claims pursuant to the Plan, the Plan Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, supplemented, or otherwise modified.

(b) **Certain Technical Amendments.** Prior to the Effective Date, the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee, not to be unreasonably withheld, conditioned or delayed) may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the Litigation Trust, the DIP Collateral Trust, the ABL Trust, or the treatment of the holders of Claims or Interests under the Plan.

### 16.7 *Revocation or Withdrawal of Plan*.

The Plan Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Plan Debtor or any other Person, (ii) prejudice in any manner the rights of the Plan Debtor or any other Person, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by the Plan Debtor or any other Person.

### 16.8 *Notice of Effective Date*.

As soon as practicable, the Plan Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 16.9 *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 16.10 *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that the Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under the Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 16.11 *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Electing Creditors, the Released Parties, the Exculpated Parties, each of their respective successors and assigns, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors.

**16.12 *Successors and Assigns.***

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**16.13 *Entire Agreement.***

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

**16.14 *Severability of Plan Provisions.***

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Plan Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Plan Debtor or the Wind Down Administrator (as the case may be), and (c) non-severable and mutually dependent, unless otherwise agreed in the Plan Support Agreement.

**16.15 *Additional Documents.***

On or before the Effective Date, the Plan Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**16.16 *Deemed Acts.***

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**16.17**  *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**16.18**  *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**16.19**  *Notices.*

All notices, requests, and demands hereunder to be effective shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Plan Debtor, to:

Premier Marketing Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn: Charles M. Moore, Chief Executive Officer
Email: cmoore@alvarezandmarsal.com

with a copy (which will not constitute notice) to:

97

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:   Matthew S. Barr
        Sunny Singh
        Andriana Georgallas
        Kevin Bostel
        Jason H. George
Email: matt.barr@weil.com
        sunny.singh@weil.com
        andriana.georgallas@weil.com
        kevin.bostel@weil.com
        jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson
Email: clifford.carlson@weil.com

(2) If to the Ad Hoc Group to:

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, New York 10166
Attn:    Scott J. Greenberg
         AnnElyse Scarlett Gains
         Christina M. Brown
Email: sgreenberg@gibsondunn.com
        agains@gibsondunn.com
        christina.brown@gibsondunn.com

(3) If to the Creditors' Committee, to:

**Brown Rudnick LLP**
7 Times Square
New York, New York 10036
Attn:   Robert J. Stark
        Bennett S. Silverberg
        Kenneth J. Aulet
Email: rstark@brownrudnick.com
        bsilverberg@brownrudnick.com
        kaulet@brownrudnick.com

98

(4) If to the Wind Down Administrator to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(5) If to the Litigation Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(6) If to the DIP Collateral Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(7) If to the ABL Collateral Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(8) If to the Direct Claims Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

After the Effective Date, the Wind Down Administrator has authority to send a notice to Persons providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Persons must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the Effective Date, the Wind Down Administrator is authorized to limit the list of Persons receiving

documents pursuant to Bankruptcy Rule 2002 to those Persons that have filed such renewed requests.

### 16.20  *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Plan Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Debtor or any other Persons with respect to any Claims or Interests prior to the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated: April 28, 2026
New York, New York

Respectfully submitted,


By:  /s/  Charles M. Moore
Name: Charles M. Moore
Title: Chief Executive Officer

*On behalf of Premier Marketing Group, LLC*

[*Signature Page to Chapter 11 Plan*]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **PREMIER MARKETING GROUP, LLC,** | § | **Case No. 25-90420 (CML)** |
| | § | |
| | § | |
| | § | |
| **Debtor.**[1] | § | |

## CHAPTER 11 PLAN OF
## <u>PREMIER MARKETING GROUP, LLC</u>[2]

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
| Clifford W. Carlson (24090024) | Matthew S. Barr (admitted *pro hac vice*) |
| 700 Louisiana Street, Suite 3700 | Sunny Singh (admitted *pro hac vice*) |
| Houston, Texas 77002 | Andriana Georgallas (admitted *pro hac vice*) |
| Telephone:  (713) 546-5000 | Kevin Bostel (admitted *pro hac vice*) |
| Facsimile:  (713) 224-9511 | Jason H. George (admitted *pro hac vice*) |
| | 767 Fifth Avenue |
| | New York, New York 10153 |
| | Telephone:  (212) 310-8000 |
| | Facsimile:  (212) 310-8007 |

*Attorneys for Debtor and Debtor in Possession*

April 28, 2026
Houston, Texas

---

[1]    The Debtor's service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    All Definitive Documents, including the Plan and the Disclosure Statement, remain subject to ongoing review, revision, and further negotiation by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties in all respects.

**Table of Contents**

Page

**ARTICLE I.     Definitions and Interpretation.** ...........................................................1

    1.1     Definitions. ..........................................................................................................1
    1.2     Interpretation; Application of Definitions; Rules of Construction. ...............................23
    1.3     Reference to Monetary Figures. ..................................................................................23
    1.4     Consent Rights. ..........................................................................................................23
    1.5     Controlling Document. ..............................................................................................24

**ARTICLE II.     Administrative Expense Claims, DIP A Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims.** ....................................24

    2.1     Administrative Expense Claims. ................................................................................24
    2.2     DIP A Claims. ..........................................................................................................24
    2.3     Professional Fee Claims. ..........................................................................................25
    2.4     Restructuring Expenses. ..........................................................................................26
    2.5     Priority Tax Claims. ..................................................................................................26

**ARTICLE III.     Classification of Claims and Interests.** ...............................................26

    3.1     Classification in General. ..........................................................................................26
    3.2     Summary of Classification of Claims and Interests. .................................................27
    3.3     Special Provision Governing Unimpaired Claims. .....................................................27
    3.4     Elimination of Vacant Classes. ................................................................................27
    3.5     Voting Classes; Presumed Acceptance by Non-Voting Classes. ..............................27
    3.6     Voting; Presumptions; Solicitation. ..........................................................................28
    3.7     Cramdown. ................................................................................................................28
    3.8     No Waiver. ................................................................................................................28

**ARTICLE IV.     Treatment of Claims and Interests.** ....................................................28

    4.1     Class 1:  Other Priority Claims. ..............................................................................28
    4.2     Class 2:  Other Secured Claims. ..............................................................................29
    4.3     Class 3:  Roll-Up Claims. ........................................................................................29
    4.4     Class 4:  First Lien Claims. ......................................................................................29
    4.5     Class 5:  Second Lien Claims. ..................................................................................30
    4.6     Class 6:  ABL Claims. ..............................................................................................30
    4.7     Class 7:  General Unsecured Claims. ........................................................................31
    4.8     Class 8:  Plan Debtor Interests. ................................................................................31

**ARTICLE V.     Means for Implementation.** ....................................................................31

    5.1     Compromise and Settlement of Claims, Interests, and Controversies. .......................31
    5.2     Global Settlement. ....................................................................................................32
    5.3     Sources of Consideration for Distributions. ..............................................................35

| | | |
|---|---|---|
| 5.4 | Implementation. | 35 |
| 5.5 | Litigation Trust Funding Commitments. | 36 |
| 5.6 | Factored Receivables Account. | 37 |
| 5.7 | Wind Down Accounts. | 37 |
| 5.8 | Corporate Action. | 38 |
| 5.9 | Wind Down Administrator. | 38 |
| 5.10 | Governance. | 39 |
| 5.11 | Cancellation of Existing Securities, Agreements, and Liens. | 40 |
| 5.12 | Dissolution of Plan Debtor. | 40 |
| 5.13 | Effectuating Documents; Further Transactions. | 40 |
| 5.14 | Closing of the Chapter 11 Case. | 40 |

**ARTICLE VI.  Litigation Trust.** ......**41**

| | | |
|---|---|---|
| 6.1 | Establishment of the Litigation Trust. | 41 |
| 6.2 | Funding of and Transfer of Assets into the Litigation Trust. | 41 |
| 6.3 | Litigation Trust Waterfall. | 44 |
| 6.4 | Class 1 Litigation Trust Interests Waterfall. | 44 |
| 6.5 | Administration of the Litigation Trust. | 45 |
| 6.6 | Litigation Trust Oversight Committee. | 45 |
| 6.7 | Litigation Trustee. | 45 |
| 6.8 | Preference Actions. | 47 |
| 6.9 | Fees and Expenses of the Litigation Trust. | 50 |
| 6.10 | Indemnification. | 50 |
| 6.11 | Dissolution of the Litigation Trust. | 50 |
| 6.12 | Records. | 51 |
| 6.13 | Turnover of DIP Collateral. | 51 |
| 6.14 | Assignment of Horizon Alester IP. | 51 |
| 6.15 | Non-Transferability. | 51 |
| 6.16 | Litigation Trust Tax and Other Matters. | 51 |

**ARTICLE VII.  DIP Collateral Trust.** ......**55**

| | | |
|---|---|---|
| 7.1 | Establishment of the DIP Collateral Trust. | 55 |
| 7.2 | Transfer of Assets into the DIP Collateral Trust. | 55 |
| 7.3 | DIP Collateral Trustee. | 56 |
| 7.4 | Fees and Expenses of the DIP Collateral Trust. | 57 |
| 7.5 | Indemnification. | 57 |
| 7.6 | Dissolution of the DIP Collateral Trust. | 57 |
| 7.7 | Records. | 58 |
| 7.8 | Non-Transferability. | 58 |
| 7.9 | DIP Collateral Trust Tax and Other Matters. | 58 |

**ARTICLE VIII.  ABL Collateral Trust.** ......**60**

| | | |
|---|---|---|
| 8.1 | Establishment of the ABL Collateral Trust. | 60 |
| 8.2 | Transfer of Assets into the ABL Collateral Trust. | 60 |

8.3    ABL Collateral Trust Waterfall. ........................................................................61
8.4    ABL Collateral Trustee. ....................................................................................61
8.5    Fees and Expenses of the ABL Collateral Trust. ..............................................63
8.6    Indemnification. ................................................................................................63
8.7    Dissolution of the ABL Collateral Trust. ..........................................................63
8.8    Records. .............................................................................................................64
8.9    Non-Transferability. .........................................................................................64
8.10  ABL Collateral Trust Tax and Other Matters. ..................................................64

**ARTICLE IX.    Direct Claims Trust** ......................................................................**67**

9.1    Establishment of the Direct Claims Trust. .........................................................67
9.2    Transfer of Assets into the Direct Claims Trust. ...............................................67
9.3    Direct Claims Trust Waterfall. ..........................................................................68
9.4    Direct Claims Trustee. .......................................................................................68
9.5    Fees and Expenses of the Direct Claims Trust. .................................................68
9.6    Indemnification. ................................................................................................68
9.7    Dissolution of the Direct Claims Trust. .............................................................69
9.8    Non-Transferability. .........................................................................................69
9.9    Direct Claims Trust Tax and Other Matters. .....................................................69

**ARTICLE X.    Distributions.** ................................................................................**71**

10.1  Distributions Generally. .....................................................................................71
10.2  No Postpetition Interest on Claims. ....................................................................71
10.3  Distribution Record Date. ...................................................................................71
10.4  Date of Distributions. .........................................................................................72
10.5  Reserve on Account of Disputed Claims. ...........................................................72
10.6  Distributions After Effective Date. ....................................................................73
10.7  Delivery of Distributions. ..................................................................................73
10.8  Unclaimed Property. ..........................................................................................73
10.9  Satisfaction of Claims. .......................................................................................74
10.10 Manner of Payment Under Plan. ........................................................................74
10.11 Minimum Distribution. ......................................................................................74
10.12 Setoffs and Recoupments. ..................................................................................74
10.13 Withholding and Reporting Requirements. ........................................................75
10.14 Disbursing Agent. ..............................................................................................75
10.15 Allocation of Distributions Between Principal and Interest ...............................76

**ARTICLE XI.    Procedures for Resolving Claims.** ..............................................**76**

11.1  Allowance of Claims. .........................................................................................76
11.2  Objections to Claims. .........................................................................................77
11.3  Estimation of Claims. .........................................................................................77
11.4  Claim Resolution Procedures Cumulative. ........................................................77
11.5  Adjustment to Claims Register Without Objection. ...........................................78
11.6  No Distributions Pending Allowance. ................................................................78

11.7    Amendments to Claims. ...................................................................................................78

**ARTICLE XII.   Executory Contracts and Unexpired Leases. ................................................78**

12.1    Rejection of Executory Contracts and Unexpired Leases. ...........................................78
12.2    Survival of Indemnification Obligations. ....................................................................79
12.3    Rejection Damages Claims. ..........................................................................................79
12.4    Insurance Policies. .......................................................................................................79
12.5    Reservation of Rights. ..................................................................................................80

**ARTICLE XIII. Conditions Precedent to Occurrence of Effective Date. .............................80**

13.1    Conditions Precedent to Effective Date. ......................................................................80
13.2    Waiver of Conditions Precedent. .................................................................................82
13.3    Effect of Failure of a Condition. ..................................................................................82
13.4    Effect of Vacatur of Confirmation Order. ...................................................................82

**ARTICLE XIV. Effect of Confirmation. .................................................................................82**

14.1    Binding Effect. .............................................................................................................82
14.2    Vesting of Assets. .........................................................................................................83
14.3    Pre-Confirmation Injunctions and Stays. ....................................................................83
14.4    Plan Injunction. ............................................................................................................83
14.5    Releases. .......................................................................................................................86
14.6    Exculpation. ..................................................................................................................88
14.7    Waiver of Statutory Limitation on Releases. ...............................................................89
14.8    Injunction Related to Releases and Exculpation. .........................................................89
14.9    Subordinated Claims. ...................................................................................................89
14.10   Retention of Causes of Action and Reservation of Rights. ..........................................90
14.11   Ipso Facto and Similar Provisions Ineffective. ...........................................................90
14.12   Solicitation of Plan. ......................................................................................................90

**ARTICLE XV.   Retention of Jurisdiction. .................................................................90**

15.1    Retention of Jurisdiction. .............................................................................................90
15.2    Courts of Competent Jurisdiction. ...............................................................................93

**ARTICLE XVI. Miscellaneous Provisions. ............................................................................93**

16.1    Statutory Fees. .............................................................................................................93
16.2    Exemption from Certain Transfer Taxes. ....................................................................93
16.3    Dissolution of Creditors' Committee. ..........................................................................94
16.4    Request for Expedited Determination of Taxes of the Plan Debtor. ............................94
16.5    Dates of Actions to Implement Plan. ...........................................................................94
16.6    Amendments. ................................................................................................................94
16.7    Revocation or Withdrawal of Plan. ..............................................................................95
16.8    Notice of Effective Date. ..............................................................................................95
16.9    Substantial Consummation. ..........................................................................................95

16.10   Governing Law. ........................................................................................................95

16.11   Immediate Binding Effect. .....................................................................................95

16.12   Successors and Assigns. .........................................................................................96

16.13   Entire Agreement. ..................................................................................................96

16.14   Severability of Plan Provisions. ............................................................................96

16.15   Additional Documents. ..........................................................................................96

16.16   Deemed Acts. .........................................................................................................96

16.17   Computing Time. ...................................................................................................97

16.18   Exhibits to Plan. ....................................................................................................97

16.19   Notices. ..................................................................................................................97

16.20   Reservation of Rights. .........................................................................................100

Premier Marketing Group, LLC (the "**Plan Debtor**" and, collectively with its debtor affiliates in the Chapter 11 Cases, the "**Debtors**")[1] proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.　　　　DEFINITIONS AND INTERPRETATION.

### 1.1　　*Definitions.*

The following terms shall have the respective meanings specified below:

*ABL Agent* has the meaning set forth in the DIP Order.

*ABL Borrowers* has the meaning set forth in the DIP Order.

*ABL Claims* means all Secured Claims (including all accrued and unpaid interest, fees, charges, expenses, and other amounts) arising from the ABL Credit Agreement and the DIP Order relating to the ABL Credit Agreement.

*ABL Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VIII of the Plan to hold, transfer, sell, monetize, or abandon the ABL Collateral Trust Assets and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan.

*ABL Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the ABL Collateral Trust, establishing the terms and conditions of the ABL Collateral Trust, the rights of, and limitations on, the ABL Collateral Trust Interests, and pursuant to which the ABL Collateral Trustee shall manage and administer the ABL Collateral Trust Assets.

*ABL Collateral Trust Assets* means any ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (i) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected, Lien on such collateral, senior in lien priority to liens securing the DIP Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected, first-priority Lien on such collateral. The ABL Collateral Trust Assets will be identified in a schedule to be filed as part of the Plan Supplement, which schedule shall be prepared in consultation with the ABL Agent. To the extent the ABL Agent disagrees with the scope of the ABL Collateral Trust Assets set forth in the Plan Supplement, the ABL Agent may seek appropriate relief from the Bankruptcy Court.

*ABL Collateral Trust Beneficiaries* means the holders of the ABL Collateral Trust Interests.

*ABL Collateral Trust Interests* means the beneficial interests in the ABL Collateral Trust granted to holders of Allowed ABL Claims, which beneficial interests shall entitle holders

---

[1]　A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands.

to share in distributions in accordance with the ABL Collateral Trust Waterfall.

***ABL Collateral Trust Waterfall*** means the method for making distributions to the holders of ABL Collateral Trust Interests in the order of priority set forth in Section 8.3 of the Plan and the ABL Collateral Trust Agreement.

***ABL Collateral Trustee*** means the trustee for the ABL Collateral Trust, which, unless otherwise disclosed in the Plan Supplement, shall be the ABL Agent.

***ABL Credit Agreement*** means that certain *ABL Credit Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Group Intermediate, LLC, (iii) the other borrowers from time to time party thereto, (iv) Bank of America, N.A., as administrative agent and collateral agent, and (v) the lenders from time to time party thereto.

***ABL Guarantors*** has the meaning set forth in the DIP Order.

***ABL Intercreditor Agreement*** has the meaning set forth in the DIP Order.

***ABL Loan Parties*** means, collectively, the ABL Borrowers and other ABL Guarantors.

***ABL Priority Collateral*** has the meaning set forth in the DIP Order.

***ABL Secured Parties*** has the meaning set forth in the DIP Order.

***Ad Hoc Group*** has the meaning set forth in the DIP Order.

***Ad Hoc Group SteerCo*** means the institutions that comprise the members of the steering committee of the Ad Hoc Group as of the date of the execution of the Plan Support Agreement.

***Additional Unencumbered Property*** has the meaning set forth in the DIP Order.

***Administrative Expense Claim*** means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving a Debtor's Estate and operating a Debtor's business, other than Professional Fee Claims, Restructuring Expenses, DIP A Claims, Roll-Up Claims, and Priority Tax Claims.

***Adverse Conduct*** has the meaning set forth in Section 6.8(a) of the Plan

***Affiliate*** means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one

2

or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Alester Agreements* means, collectively, (i) that certain *Contribution Agreement*, dated December 30, 2022, by and between TAE Brakes, LLC and Alester Technologies, LLC; (ii) that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC; (iii) that certain *Intellectual Property License Agreement*, dated as of February 8, 2023, by and between First Brands Group, LLC and Alester Technologies, LLC; (iv) that certain *Contribution Agreement*, dated July 3, 2023, by and between Cardone Industries, Inc. and Alester Technologies, LLC; and (v) that certain *Contribution Agreement*, dated September 29, 2023, by and between Carter Carburetor Holdings, LLC and Alester Technologies, LLC.

*Allowed* means, with respect to any Claim against or Interest in the Plan Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder; (ii) any Claim against or Interest in the Plan Debtor as to which the liability of the Plan Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (iii) any Claim against or Interest in the Plan Debtor expressly Allowed under the Plan; or (iv) any Claim against the Plan Debtor that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed.

*Available Cash* means with respect to each Trust (i) Cash on hand (including any amounts invested pending distribution) of such Trust, as of the date of determination, realized from the Trust's assets *less* (ii) (a) any fees and costs incurred by the Trust associated with the collection of such proceeds, (b) any amounts reserved in respect of Disputed Claims, and (c) any reserves established in the good faith discretion of the Trustee to pay (w) any obligations or liabilities of the Trust, (x) any costs or expenses of the Trust or the Trustee, (y) any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or (z) any amounts needed to maintain the value of any assets of the Trust.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

3

*Avoidance Proceeds* means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

*Backstop Parties* means, collectively, the holders of DIP A Claims that are members of the Ad Hoc Group SteerCo and sign a backstop commitment letter in connection with the Effective Date.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

*Cash Management Order* means the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (Docket No. 604).

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or

recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession, Wind Down Administrator, or Trustee to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Actions.

*Challenge Period* has the meaning set forth in the DIP Order.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Claims and Noticing Agent* means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*Claims Register* means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*Class* means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Class 1 Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the Litigation Trust Funding Contributors.

*Class 2 Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to holders of Allowed DIP A Claims.

*Class 3 Litigation Trust Interests* means, collectively, the (i) Class 3(a) Litigation Trust Interests, (ii) Class 3(b) Litigation Trust Interests, and (iii) Class 3(c) Litigation Trust Interests.

*Class 3(a) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed Roll-Up Claims.

*Class 3(b) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the GUC Ombudsman as agent to the holders of Electing Creditor Claims.

*Class 3(c) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed First Lien Claims and/or Allowed Second Lien Claims.

5

*Class 1 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to the DIP Collateral Funding Parties (as defined in the DIP Collateral Trust Agreement).

*Class 2 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims.

*Class 3 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed Roll-Up Claims.

*Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

*Contracts Procedure Order* means the *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* (Docket No. 1244).

*Converting Debtor* means any Debtor, upon the conversion of its Chapter 11 Case to a proceeding under chapter 7 of the Bankruptcy Code.

*Credit Bid Claims* means the sum of the amount of Claims retired pursuant to the Estate Claims Credit Bid, *plus* the sum of the amount of Claims retired pursuant to the DIP Collateral Credit Bid.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *United States Trustee's Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 313) filed on October 9, 2025, as reconstituted from time to time.

*D&O Policy* means all directors and officers liability insurance policies (including any runoff policies or tail policies related to or associated with the foregoing) issued or providing coverage at any time to any of the Debtors, for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

*Debtor(s)* has the meaning set forth in the introductory paragraph of the Plan.

*Definitive Documents* means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure

6

Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Support Agreement, including any term sheets or ancillary agreements appended thereto; (viii) the ABL Collateral Trust Agreement; (ix) the DIP Collateral Trust Agreement; (x) the Litigation Trust Agreement; (xi) the Direct Claims Trust Agreement; (xii) the DIP Collateral Credit Bid APA; and (xiii) the Estate Claims Credit Bid APA.

*DIP A Claims* means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) held by a DIP Lender arising from the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement) and the DIP Order on account of the New Money DIP Loans as of the Effective Date.

*DIP Claims* means, collectively, the DIP A Claims and Roll-Up Claims.

*DIP Collateral* has the meaning set forth in the DIP Order.

*DIP Collateral Credit Bid* means a credit bid and equivalent release of the DIP Loan Parties of the Allowed DIP A Claims in the amount of $[_] in consideration of the sale of the DIP Collateral Trust Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust.

*DIP Collateral Credit Bid APA* means the purchase and sale agreement providing for, among other things, the sale of the DIP Collateral Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust.

*DIP Collateral Credit Bid Transaction* means the sale of the DIP Collateral Trust Assets to the Plan Debtor and subsequent transfer of such assets to the Litigation Trust pursuant to the DIP Collateral Credit Bid APA in accordance with Section 5.2(f) of the Plan.

*DIP Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VI of the Plan to hold, transfer, sell, monetize, or abandon the DIP Collateral Trust Assets and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan.

*DIP Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the DIP Collateral Trust, establishing the terms and conditions of the DIP Collateral Trust, the rights of, and limitations on, the DIP Collateral Trust Interests, and pursuant to which the DIP Collateral Trustee shall manage and administer the DIP Collateral Trust Assets.

*DIP Collateral Trust Assets* means all DIP Collateral, other than the Litigation Trust Assets and the ABL Collateral Trust Assets, for which, on the date the DIP Collateral Trust is established, (i) no bona fide dispute exists as to whether the DIP Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the liens securing the ABL Claims, or (ii) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties have a validly perfected, first-priority Lien in such collateral.  The DIP Collateral Trust Assets shall include any

DIP SPV Collateral Trust Recoveries. The DIP Collateral Trust Assets will be identified in a schedule to be filed as part of the Plan Supplement.

*DIP Collateral Trust Beneficiaries* means the holders of the DIP Collateral Trust Interests.

*DIP Collateral Trust Interests* means collectively, the (i) Class 1 DIP Collateral Trust Interests, (ii) Class 2 DIP Collateral Trust Interests, and (iii) Class 3 DIP Collateral Trust Interests.

*DIP Collateral Trust Waterfall* means the method for distributing the DIP Collateral Trust Assets, net of expenses, as will be set forth in the DIP Collateral Trust Agreement.

*DIP Collateral Trustee* means the trustee for the DIP Collateral Trust. The identity of the initial DIP Collateral Trustee will be disclosed in the Plan Supplement.

*DIP Credit Agreement* means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of October 2, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among (i) First Brands Group, LLC, as Borrower and Debtor and Debtor-in-Possession, (ii) First Brands Group Intermediate, LLC, as Parent and a Debtor and Debtor-in-Possession, (iii) the lenders party thereto, (iv) Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, and (v) OPY Credit Corp., as Trading Agent.

*DIP Documents* has the meaning set forth in the DIP Order.

*DIP Loan Parties* has the meaning set forth in the DIP Order.

*DIP Obligations* has the meaning set forth in the DIP Order.

*DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

*DIP Secured Parties* has the meaning set forth in the DIP Order.

*DIP SPV Collateral Trust Recoveries* means any DIP SPV Recovery that arises out of litigation involving a Lien or ownership dispute over tangible property (including, among others, disputes with Onset Financial, Inc. regarding interests in machinery and equipment) that would otherwise constitute a DIP Collateral Trust Asset.

*DIP SPV Recoveries* means any recoveries on account of any Lien asserted by the DIP Secured Parties in any assets owned by an SPV Debtor pursuant to the DIP Order or any adequate protection stipulation entered into with an SPV Lender.

***Direct Claims Trust*** means that certain liquidating trust to be established in accordance with ARTICLE IX of the Plan to hold, transfer, sell, monetize, or abandon the Direct Claims Trust Assets and make distributions to the Direct Claims Trust Beneficiaries in accordance with the Direct Claims Trust Agreement.

***Direct Claims Trust Agreement*** means the agreement evidencing the terms and provisions governing the Direct Claims Trust, establishing the terms and conditions of the Direct Claims Trust, the rights of, and limitations on, the Direct Claims Trust Interests, and pursuant to which the Direct Claims Trustee shall manage and administer the Direct Claims Trust Assets.

***Direct Claims Trust Assets*** means the Direct Creditor Claims of Direct Claims Trust Electing Creditors.

***Direct Claims Trust Beneficiaries*** means the holders of the Direct Claims Trust Interests.

***Direct Claims Trust Electing Creditor*** means any Eligible Creditor or holder of a Roll-Up Claim, First Lien Claim, and/or Second Lien Claim who timely elects on the Direct Claims Trust Election Form to contribute its Direct Creditor Claims to the Direct Claims Trust.

***Direct Claims Trust Election Form*** means the form, approved under the Disclosure Statement Order, sent to Eligible Creditors and holders of Roll-Up Claims, First Lien Claims, and/or Second Lien Claims, pursuant to which such holders may opt in to (i) contributing their Direct Creditor Claims to the Direct Claims Trust in exchange for Direct Claim Trust Interests and (ii) granting the releases contained in Section 14.5 of the Plan.

***Direct Claims Trust Interests*** means the beneficial interests in the Direct Claims Trust granted to the Direct Claims Trust Electing Creditors.

***Direct Claims Trustee*** means the trustee for the Direct Claims Trust. The identity of the initial Direct Claims Trustee will be disclosed in the Plan Supplement.

***Direct Creditor Claims*** means the direct (non-derivative) Claims held by Direct Claims Electing Creditors (i) against any non-Debtor Person (other than a Released Party) and (ii) that relate to the Debtors' prepetition operations. For the avoidance of doubt, Direct Creditor Claims shall not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.

***Disbursing Agent*** means the Trustees or such Entity or Entities designated by a Trustee to make or facilitate distributions required by the Plan and, in the case of Electing Creditor Claims, the GUC Ombudsman.

***Disclosure Statement*** means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

*Disclosure Statement Order* means the order entered by the Bankruptcy Court (i) conditionally approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) authorizing solicitation of the Plan.

*Disputed* means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE XI of the Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed; or (iv) any Claim that is otherwise disputed by the Debtors, the Wind Down Administrator, or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Plan Debtor, Wind Down Administrator, or any party in interest disputes the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

*Disputed Alester IP* means all assets, including intellectual property, covered by the Alester Agreements.

*Disputed Claim Reserve* means any assets of the Plan Debtor, ABL Collateral Trust Assets, DIP Collateral Trust Assets, or Litigation Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded with Cash and/or proceeds of such assets, as applicable, in accordance with the terms of the Plan.

*Distribution Record Date* means the Effective Date.

*Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of the Plan set forth in Section 13.1 of the Plan have been satisfied or waived in accordance with Section 13.2 of the Plan.

*Electing Creditor* means any Eligible Creditor who (i) timely elects on the Global Settlement Election Form to share in the distributions to the holders of Class 3(b) Litigation Trust Interests in accordance with the Litigation Trust Waterfall; and (ii) is not an Ineligible Creditor.

*Electing Creditor Claims* means the Administrative Expense Claims, Other Secured Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims against one or more of the FBG Debtors (other than the Plan Debtor) held by Electing Creditors. Any Electing Creditor Claims arising out of a Claim against an FBG Debtor for which one or more other FBG Debtors have joint and several liability shall be treated as a single Electing Creditor Claim for purposes of receiving Class 3(b) Litigation Trust Interests and receiving distributions from the Litigation Trust.

*Eligible Creditor* means any holder of an Administrative Expense Claim, Other Secured Claim, Priority Tax Claim, Other Priority Claim, or General Unsecured Claim against one or more of the FBG Debtors (other than the Plan Debtor), as of the Voting Record Date.

***Emergence Steps Memo*** means a memorandum, to be included in the Plan Supplement, describing the steps necessary to implement the Plan.

***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

***Estate(s)*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

***Estate Claims*** means any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, against any Person, seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors taken as a whole, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates; and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with a FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, any Disputed Alester IP recovered from an Avoidance Action of an FBG Debtor. For the avoidance of doubt, Estate Claims shall not include any claims and/or remedies that are held by an SPV Debtor.

***Estate Claims Credit Bid*** means a credit bid and equivalent release of the DIP Loan Parties of the Allowed DIP A Claims in the amount of $[_] in consideration of the sale of the Litigation Trust Assets to the Plan Debtor, as agent and/or on behalf of the holders of Allowed DIP A Claims, and subsequent transfer of such assets to the Litigation Trust.

***Estate Claims Credit Bid APA*** means the purchase and sale agreement providing for, among other things, the sale of the Litigation Trust Assets to the Plan Debtor, and subsequent transfer of such assets to the Litigation Trust.

11

***Estate Claims Credit Bid Transaction*** means the sale of the Litigation Trust Assets to the Plan Debtor, as agent and/or on behalf of the holders of Allowed DIP A Claims, and subsequent transfer to the Litigation Trust pursuant to the Estate Claims Credit Bid APA in accordance with Section 5.2(e) of the Plan.

***Examiner*** means Martin De Luca, in his capacity as examiner, appointed pursuant to the *Order Approving the Appointment of Examiner* (Docket No. 1260).

***Examiner Account*** means the segregated bank account established by the Debtors to hold amounts that are exclusively available for the payment of fees and expenses of the Examiner and his professionals.

***Exculpated Parties*** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the FBG Debtors; (ii) the members of the Special Committees; and (iii) the Creditors' Committee and each of its members in their official capacity.

***Factor*** means any Person that purchased, or intended or agreed to purchase, accounts receivable at a discount from one or more FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

***Factored Receivables Account*** has the meaning set forth in the Cash Management Order.

***FBG Debtors*** means First Brands Group Holdings, LLC, its Debtor subsidiaries, and Viceroy.

***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

***Final Return Threshold*** has the meaning set forth in the Section 6.3 of the Plan.

***First Lien Claims*** means, collectively, the First Lien Term Loan Claims and the Side-Car Term Loan Claims.

***First Lien Secured Parties*** has the meaning set forth in the DIP Order.

***First Lien Term Loan Agreement*** means that certain *First Lien Term Loan Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders and letter of credit issuers from time to time party thereto.

***First Lien Term Loan Claims*** means all Claims (including all accrued and unpaid interest, fees, charges, expense, other amounts, and/or deficiency Claims) through the Effective Date arising from the First Lien Term Loan Agreement and the DIP Order relating to the First Lien Term Loan Agreement.

***First Return Threshold*** has the meaning set forth in the Section 6.3 of the Plan.

***General Unsecured Claim*** means any Claim (other than an Intercompany Claim) that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

***Global Settlement*** means the settlement among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee, the terms of which are incorporated in Section 5.2 of the Plan.

***Global Settlement Election Form*** means the form, approved under the Disclosure Statement Order, sent to Eligible Creditors, pursuant to which such holders may opt out of (i) being treated as Electing Creditors and share in the distributions to the holders of the Class 3(b) Litigation Trust Interests in accordance with the Litigation Trust Waterfall and (ii) granting the releases contained in Section 14.5 of the Plan.

***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

***GUC Ombudsman*** means a representative selected by the Ad Hoc Group and Creditors' Committee that shall have the duties and responsibilities described in Section 5.2(k) hereof. The identity of the GUC Ombudsman will be disclosed in the Plan Supplement.

***Horizon Alester Agreement*** means that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC.

***Horizon Alester IP*** means all assets, including intellectual property, covered by the Horizon Alester Agreement.

***Impaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

***Indemnification Obligations*** means a Debtor's indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation

or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, and officers that are currently employed by, or serving on the board of managers of, such Debtor, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by such Debtor as of the date immediately prior to the Effective Date.

*Independent Manager Policies* means the primary and excess D&O Policies issued to Mayfair Enterprises, LLC, as named insured, that have a policy period of September 26, 2025 to September 26, 2026 and are numbered: (i) XDO000165-0925 (issued by Convex North American Insurance Services, Inc.), (ii) AMB06760 (issued by Ambridge Partners LLC), (iii) EQ5EX00296-251 (issued by Everest National Insurance Company), (iv) 100625436251 (issued by Starr Indemnity & Liability Company), (v) 833891932 (issued by Continental Casualty Company), (vi) CRDO-0000058-00 (issued by Celerity Risk), (vi) B1976DO00007206 (issued by Lloyds Syndicate BEAT 4242), and (vii) ELU206779-25 (issued by XL Specialty Insurance Company).

*Ineligible Creditors* means, (i) in accordance with section 502(d) of the Bankruptcy Code, (a) any defendants named or to be named in the James Complaint or Onset Complaint, or (b) any Person that engaged in Adverse Conduct;  (ii) any SPV Lender; (iii) the ABL Secured Parties; and (iv) the Converting Debtors.

*Insurance Company* means all Persons that issued, or that have any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under, or with respect to, any Insurance Policy, and any third party administrator, parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing, solely in their capacity as such with respect to an Insurance Policy.

*Insurance Policies* means any insurance policies, insurance contracts, binders, certificates, or reinsurance policies, whether currently known or unknown, issued to or that provides or may provide coverage (whether as the primary or additional insured or otherwise) at any time to any of the Debtors or any of their predecessors or subsidiaries, or under which any of the foregoing have sought or may seek such coverage, including, but not limited, to any such policies for directors' and officers' liability, general liability, workers' compensation, any excess or umbrella policies, and all agreements, documents, or instruments relating thereto.

*Insurance Rights* means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Insurance Policies now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including: (i) any Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (ii) the refusal of any Insurance Company to compromise and settle any claim or provide defense to any claim; (iii) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (iv) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (v) any right to receive proceeds with respect to any Insurance Policy or a coverage action.

*Intercompany Claim* means any Claim held by a Debtor against another Debtor arising before the Petition Date.

*Interest* means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Claim against a Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

*Interim Compensation Procedures Order* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 699), as may be amended, modified, or supplemented from time to time.

*International Emergency Economic Powers Act* means sections 1701–1708 of title 50 to the United States Code, as may have been amended from time to time.

*IRS* means the United States Internal Revenue Service.

*James Complaint* means the adversary proceedings against Patrick James et al. (Adv. Pro. Case No. 25-03803).

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Litigation List* has the meaning set forth in Section 6.8(b) of the Plan.

*Litigation SPV Trust Recoveries* means any DIP SPV Recovery that is not a DIP SPV Collateral Trust Recovery.

*Litigation Trust* means that certain liquidating trust to be established in accordance with ARTICLE VI of the Plan to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

*Litigation Trust Agreement* means the agreement evidencing the terms and provisions governing the Litigation Trust, establishing the terms and conditions of the Litigation Trust, the Litigation Trust Funding Commitments, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets.

*Litigation Trust Assets* means, as of the date the Litigation Trust is established, (i) $25,000,000 in Cash from the FBG Debtors' balance sheet; (ii) all Estate Claims; (iii) all rights, privileges, and defenses of the FBG Debtors relating to the Estate Claims; (iv) all Insurance Rights of the FBG Debtors with respect to Insurance Policies that provide or may provide coverage for the Estate Claims, including for the avoidance of doubt, the D&O Policies; (v) all books, records, and investigative and/or discovery findings of the FBG Debtors, including to the extent such records are owned or controlled by advisors to the FBG Debtors, any independent director or

15

manager of the FBG Debtors, the Examiner and the advisors thereto, and the advisors to the Creditors' Committee; *provided* that (i) the Debtors' Professionals, (ii) any independent director or manager of the FBG Debtors, (iii) the Examiner and the advisors thereto, and (iv) the Creditors' Committee's Professionals shall not be required to turnover any work product and communications but each such professional, in its sole discretion, may compile (in a digest or other appropriate format) its material findings, information, and records and provide the Litigation Trust with such compilation and/or enter into common interest or other agreements sufficient to facilitate the turnover of any work product or communications; (vi) all Litigation SPV Trust Recoveries; (vii) all assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their Estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement.

*Litigation Trust Beneficiaries* means the holders of the Litigation Trust Interests.

*Litigation Trust Funding Agreement* means any agreement pursuant to which a Litigation Trust Funding Contributor contributes or commits to contribute Cash or other property to the Litigation Trust in exchange for the applicable Litigation Trust Interests applicable to such Litigation Trust Funding Contributor.

*Litigation Trust Funding Commitments* means $50,000,000 of Cash contributions provided to the Litigation Trust pursuant to the terms of the Litigation Trust Agreement or any Litigation Trust Funding Agreement.

*Litigation Trust Funding Contribution*s means the funding under the Litigation Trust Funding Commitments.

*Litigation Trust Funding Contributors* means holders of Allowed DIP A Claims that choose to participate in the Litigation Trust Funding Commitments pursuant to the terms of the Litigation Trust Agreement.

*Litigation Trust Interests* means, collectively, the (i) Class 1 Litigation Trust Interests, (ii) Class 2 Litigation Trust Interests, and (iii) Class 3 Litigation Trust Interests.

*Litigation Trust Oversight Committee* has the meaning set forth in the Litigation Trust Agreement and initially shall be comprised of four (4) members. The identity of the initial members of the Litigation Trust Oversight Committee will be disclosed in the Plan Supplement.

*Litigation Trust Waterfall* means the method for making distributions to the holders of Litigation Trust Interests in accordance with the priorities set forth in Section 6.3 of the Plan and the Litigation Trust Agreement.

*Litigation Trustee* means the person or institution to be identified in the Plan Supplement, as trustee for the Litigation Trust.

*Major Decision* shall have the meaning set forth in the Litigation Trust Agreement.

*New Money DIP Loans* has the meaning set forth in the DIP Order.

*Onset Complaint* means the adversary proceedings against Onset Financial, Inc. et al. (Adv. Pro. Case No. 26-03005).

*Other Priority Claim* means any Claim entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

*Other Secured Claim* means any Secured Claim, other than an Administrative Expense Claim, a DIP A Claim, a Roll-Up Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim.

*Parent Guarantors* has the meaning set forth in the DIP Order.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means September 29, 2025.

*Plan* means this chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of the Plan.

*Plan Debtor* has the meaning set forth in the introductory paragraph of the Plan.

*Plan Debtor Interests* means any Interests in the Plan Debtor.

*Plan Supplement* means a supplemental appendix to the Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms the Plan, the Bankruptcy Code, and the Bankruptcy Rules, which may include: (i) the Schedule of Retained Causes of Action; (ii) the disclosure of the identity of the Wind Down Administrator; (iii) the Wind Down Budget; (iv) the disclosure of the identity of the GUC Ombudsman; (v) the disclosure of the identity of the Litigation Trustee; (vi) the disclosure of the identity of the initial members of the Litigation Trust Oversight Committee; (vii) the Litigation Trust Agreement and any Litigation Trust Funding Agreement; (viii) a schedule of the Litigation Trust Assets; (ix) the Estate Credit Bid APA; (x) the Litigation List; (xi) the disclosure of the identity of the DIP Collateral Trustee; (xii) the DIP Collateral Trust Agreement; (xiii) a schedule of the DIP Collateral Trust Assets; (xiv) the DIP Collateral Credit Bid APA; (xv) the disclosure of the identity of the ABL Collateral Trustee; (xvi) the ABL Collateral Trust Agreement; (xvii) a schedule of the ABL Collateral Trust Assets; (xviii) the Direct Claims Trust Agreement; (xix) the disclosure of the identity of the Direct Claims Trustee; (xx) the Emergence Steps Memo; (xxi) a non-exhaustive schedule listing Persons who are not Released Parties or Representatives under the Plan; and (xxii) any other agreement, instrument, schedule, exhibit, or document designated by the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed)) as a Plan Supplement document. Through the Effective Date, the Plan Debtor shall have the right to amend any

17

schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.

***Plan Support Agreement*** means that certain *Plan Support Agreement*, dated as of April [●], 2026, by and among (i) the FBG Debtors, (ii) certain holders of DIP A Claims, Roll-Up Claims, First Lien Claims and/or Second Lien Claims, and (iii) the Creditors' Committee, as may be amended, supplemented, or otherwise modified from time to time.

***Preference Actions*** means all Causes of Action arising under section 547 of the Bankruptcy Code.

***Prepetition Collateral*** has the meaning set forth in the DIP Order.

***Prepetition Secured Parties*** has the meaning set forth in the DIP Order.

***Priority Tax Claim*** means any Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

***Pro Rata Share*** means (i) that proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class; (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable; and (iii) with respect to the distribution of the Class 3(b) Litigation Trust Interests in accordance with the Plan, that portion that an Allowed General Unsecured Claim against the Plan Debtor or accepted Electing Creditor Claim bears to the aggregate amount of Allowed General Unsecured Claims and accepted Electing Creditor Claims.

***Professional*** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court and the Examiner and advisers thereto.

***Professional Fee Claim*** means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date.

***Professional Fees Escrow Account*** has the meaning set forth in the DIP Order.

***Proof of Claim*** means a proof of Claim filed against the Plan Debtor in the Chapter 11 Cases.

***Recovery Actions*** has the meaning set forth in the DIP Order.

***Recovery Action Proceeds*** has the meaning set forth in the DIP Order.

***Reinstate, Reinstated, or Reinstatement*** means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

18

***Released Parties*** means collectively, and in each case solely in their capacities as such, (i) the Plan Debtor and its Estate; (ii) the members of the Special Committees (including any subcommittees thereof); (iii) the Specified Executives; (iv) the Professionals; (v) each of the following, solely in their capacity as such, (a) the Creditors' Committee and each of its members, (b) the DIP Secured Parties, (c) the Prepetition Secured Parties, (d) the Backstop Parties, (e) the Litigation Trust Contributors, (f) the DIP Collateral Funding Parties, and (g) solely with respect to each of the foregoing Persons in clauses (b) and (f), their Representatives; *provided* that, notwithstanding anything in the Plan to the contrary, no Specified Non-Released Party shall be a Released Party; *provided further* that any Person that does not opt in to granting the releases set forth in the Plan shall not be a Released Party.

***Releasing Parties*** means, collectively: (i) the holders of all Claims that vote to accept the Plan; (ii) the holders of all Claims that are presumed to accept the Plan and opt in to granting the releases set forth in the Plan; (iii) the holders of all Claims that vote to reject the Plan, but opt in to granting the releases set forth in the Plan; (iv) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or reject the Plan, but opt in to granting the releases set forth in the Plan; (v) the holders of all Claims that receive the Global Settlement Election Form and do not opt out of being treated as Electing Creditors and granting the releases set forth in the Plan; and (vi) the holders of all Claims that receive the Direct Claims Trust Election Form and opt in to being treated as Direct Claims Trust Electing Creditors and granting the releases set forth in the Plan.

***Representative*** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

***Required Consenting Lenders*** has the meaning set forth in the Plan Support Agreement.

***Restructuring Expenses*** means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the advisors to the (i) Ad Hoc Group, and (ii) the DIP Secured Parties, accrued since the inception of their respective engagements and continuing through the implementation of the restructuring transactions and in accordance with their respective engagement letters or fee letters with the Plan Debtor and/or any applicable order of the Bankruptcy Court.

***Retained Causes of Action*** means the Causes of Action retained by the Plan Debtor and transferred to the Litigation Trust, as listed and described in the Schedule of Retained Causes of Action.

***Roll-Up Claims*** means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the DIP Credit Agreement or any other Loan Document

19

(as defined in the DIP Credit Agreement) and the DIP Order on account of the Roll-Up Obligations.

*Roll-Up Obligations* has the meaning set forth in the DIP Order.

*Sacred Right* shall have the meaning set forth in the Litigation Trust Agreement.

*Schedule of Retained Causes of Action* means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Plan Debtor and transferred to the Litigation Trust.

*Schedules* means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

*Second Lien Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the Second Lien Term Loan Agreement and the DIP Order relating to the Second Lien Term Loan Agreement.

*Second Lien Term Loan Agreement* means that certain *Second Lien Term Loan Agreement*, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Second Lien Term Loan Secured Parties* has the meaning set forth in the DIP Order.

*Second Return Threshold* has the meaning set forth in the <u>Section 6.3</u> of the Plan.

*Secured Claim* means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Plan Debtor or the Wind Down Administrator, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

*Side-Car Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) GLAS USA LLC, as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Side-Car Term Loan Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from the Side-Car Term Loan Agreement and the DIP Order relating to the Side-Car Term Loan Agreement.

*Special Committees* means, collectively, the special committees of the boards of managers of (i) First Brands Group Holdings, LLC, First Brands Group Intermediate, LLC, and First Brands Group, LLC, each comprised of Neal Goldman and William Transier, and (ii) Viceroy, comprised of Benjamin Duster, Neal Goldman, and William Transier.

*Specified Executives* means, collectively, (i) Charles M. Moore, as Interim Chief Executive Officer and/or Chief Restructuring Officer of the Debtors; (ii) Daniel Jerneycic and Gaurav Malhotra, as Chief Restructuring Officers of the Debtors; and (iii) Paul Kosturos, as Chief Financial Officer of the Debtors.

*Specified Non-Released Parties* means (i) any Person against which any action has been commenced on behalf of a Debtor or its Estate in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing, including, for the avoidance of doubt, any defendants named in the James Complaint or the Onset Complaint; (ii) any Person identified as a defendant or a potential defendant of a Cause of Action in the Plan Supplement; and (iii) any subsequent transferee of any of the foregoing with respect to any assets of or transfers by the Debtors or their affiliates.

*SPV Debtors* means the Debtor subsidiaries of Viceroy other than the FBG Debtors.

*SPV Independent Manager* means Benjamin Duster, in his capacity as independent manager of Viceroy.

*SPV Lender* means any lender or financing party (including, for the avoidance of doubt, Onset Financial, Inc.) that provided financing to an SPV Debtor and its agents.

*SPV-ABL Wind Down Account* has the meaning set forth in the Wind Down Order.

*SPV-DIP Wind Down Account* has the meaning set forth in the Wind Down Order.

*Statutory Fees* means all fees and charges assessed against the Plan Debtor's Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Supply Chain Financer* means any financial institution, fund, or other Person that (i) provided financing or liquidity to suppliers or vendors of one or more FBG Debtors or reimbursed any FBG Debtor Affiliate for providing such financing or liquidity in connection with such suppliers' or vendors' accounts receivable arising from the supply of goods or services to such FBG Debtors, whether through supply chain financing programs, reverse factoring arrangements, receivables purchase facilities, or similar arrangements; or (ii) remitted payments on behalf of one or more FBG Debtors relating to accounts payable arising from the supply of goods or services to such FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

*Trade Creditor* means any Person (including any Person that was paid through a

21

payment intermediary but excluding any such payment intermediary) that holds a General Unsecured Claim as of the Petition Date against an FBG Debtor arising from the ordinary course of the FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date, excluding any Person whose claim arises from a (secured or unsecured) loan, financing arrangement, bond, note, or other financial indebtedness.

***Trademarks*** means all trademarks, service marks, trade names, corporate names, trade dress, logos and other similar indica of source or origin, including all applications, registrations, extensions and renewals of the foregoing and all goodwill associated with the foregoing.

***Treasury Regulations*** means the regulations of the United States Treasury.

***Trust Agreements*** means, collectively, the ABL Collateral Trust Agreement, the DIP Collateral Trust Agreement, and the Litigation Trust Agreement.

***Trust Beneficiaries*** means, collectively, the ABL Collateral Trust Beneficiaries, the DIP Collateral Trust Beneficiaries, and the Litigation Trust Beneficiaries.

***Trustees*** means, collectively, the ABL Collateral Trustee, the DIP Collateral Trustee, and the Litigation Trustee.

***Trusts*** means, collectively, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust.

***U.S. Trustee*** means the United States Trustee for Region 7.

***Unimpaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

***Viceroy*** means Viceroy Private Capital, LLC.

***Voting Record Date*** has the meaning set forth in the Disclosure Statement Order.

***Wind Down*** means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the assets owned by the Plan Debtor following the Effective Date, if any; (ii) resolve, terminate, or wind down any remaining liabilities of the Plan Debtor's Estate; (iii) reconcile all Claims against the Plan Debtor; and (iv) administer the Plan and make distributions in accordance with the Plan.

***Wind Down Administrator*** means the administrator appointed by the Plan Debtor whose duties will include, among other things, effectuating the Wind Down in accordance with the Plan.

***Wind Down Budget*** means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the date the Wind Down is completed, which budget shall be prepared by the Plan Debtor.

22

***Wind Down Order*** means *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2454).

***Wind Down Reserve*** means a deposit account or other Cash reserve held by the Wind Down Administrator to be funded in accordance with the Wind Down Budget, which shall be available and used only to satisfy costs and expenses of the Wind Down; *provided* that any funds remaining in the Wind Down Reserve on the date the Wind Down is completed (as determined in the Wind Down Administrator's sole discretion) shall be turned over to the DIP Collateral Trust.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the Required Consenting Lenders or the Creditors' Committee set forth herein, in the Plan Support Agreement, or in the DIP Order, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents), shall be incorporated

23

herein by this reference (including the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

### 1.5    *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement or any other exhibit, schedule, or annex to the Plan, the terms of the relevant document in the Plan Supplement or such exhibit, schedule, or annex, shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each.  If there is any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

### ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, DIP A CLAIMS, PROFESSIONAL FEE CLAIMS, RESTRUCTURING EXPENSES, AND PRIORITY TAX CLAIMS.

### 2.1    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim against the Plan Debtor agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim against the Plan Debtor becomes an Allowed Administrative Expense Claim, each such holder of an Allowed Administrative Expense Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.2    *DIP A Claims.*

**(a)    Allowance**.  On the Effective Date, the DIP A Claims shall be deemed Allowed against the Plan Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order.  The Allowed amount of the DIP A Claims shall be set forth in the notice of occurrence of the Effective Date filed in accordance with Section 16.8 of the Plan.

**(b)    Treatment**.  Except to the extent that a holder of an Allowed DIP A Claim against the Plan Debtor agrees to less favorable treatment of such Claim, on the Effective Date, each such holder shall receive (i) on account of the Estate Claims Credit Bid, its Pro Rata Share of the Class 2 Litigation Trust Interests, and (ii) on account of the DIP Collateral Credit Bid, its Pro Rata Share of the Class 2 DIP Collateral Trust Interests.  For the avoidance of doubt, any DIP A Claims not included in the Estate Claims Credit Bid or the DIP Collateral Credit Bid shall not be released under or affected by the Plan and shall remain enforceable against the DIP Loan Parties and Parent Guarantors.

**2.3** *Professional Fee Claims*.

**(a)** All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is ninety (90) calendar days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

**(b)** Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) upon such terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors, out of the Professional Fees Escrow Account; or (ii) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered. Agreement to the Global Settlement is conditioned upon the FBG Debtors', Ad Hoc Group's, and Creditors' Committee's agreement to a budget (the "**Agreed Budget**") solely for amounts that can be paid using DIP Term Loan Collateral, Prepetition Term Loan Collateral, or otherwise that may be asserted against the DIP Collateral Trust, Litigation Trust, or against the Plan Debtor for all Professionals. Pursuant to the Global Settlement, no Allowed Professional Fees of Professionals may be paid from the $25,000,000 of FBG Debtor cash to be contributed to the Litigation Trust as provided for herein.

**(c)** Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order, may be paid at the times and in the amounts authorized pursuant to such orders.

**(d)** Five (5) Business Days before the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims; *provided* that, notwithstanding the foregoing, the Debtors may not fund any amounts into the Professional Fees Escrow Account that would cause the FBG Debtors to have in the aggregate less than $25,000,000 in Cash on their balance sheet on the Effective Date without the consent of the Required Consenting Lenders. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account shall be retained by the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget. When all costs and expenses of the Wind Down have been paid in full, any remaining amounts in the Professional Fees Escrow Account shall be released from such escrow and revert to, and ownership thereof shall vest in, the DIP Collateral Trust without any further action or order of the Bankruptcy Court.

**(e)** The Wind Down Administrator is authorized to pay compensation for services rendered to the Plan Debtor or reimbursement of expenses incurred on behalf of the Plan

25

Debtor after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Restructuring Expenses*.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the Plan and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Plan Debtor's receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Plan Debtor at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

### 2.5 *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim against the Plan Debtor agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, at the option of the Wind Down Administrator, either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Wind Down Administrator reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.  CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1 *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2** *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Plan Debtor and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | Roll-Up Claims | Impaired | Yes |
| 4 | First Lien Claims | Impaired | Yes |
| 5 | Second Lien Claims | Impaired | Yes |
| 6 | ABL Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Plan Debtor Interests | Impaired | No (Deemed to Reject) |

**3.3** *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Plan Debtor, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims against the Plan Debtor, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims against the Plan Debtor.

**3.4** *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim against or Interest in the Plan Debtor that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.5** *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contained Claims eligible to vote and no holder of such Claims votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**3.6** *Voting; Presumptions; Solicitation.*

**(a)** **Acceptance by Certain Impaired Classes**. Only holders of Claims in Classes 3, 4, 5, 6, and 7 are entitled to vote to accept or reject the Plan.

**(b)** **Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**(c)** **Deemed Rejection by Certain Impaired Classes.** Holders of Interests in Class 8 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**3.7** *Cramdown.*

If any Class entitled to vote on the Plan does not vote to accept the Plan, the Plan Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**3.8** *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim against the Plan Debtor.

**ARTICLE IV.** **TREATMENT OF CLAIMS AND INTERESTS.**

**4.1** *Class 1: Other Priority Claims.*

**(a)** **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim against the Plan Debtor agrees to less favorable treatment, each holder of an Allowed Other Priority Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, at the option of the Wind Down Administrator:

(i) payment in full in Cash; or

(ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

**(b)** **Impairment and Voting**: Class 1 is Unimpaired, and holders of Other Priority Claims against the Plan Debtor are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims against the Plan Debtor are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

**4.2** **_Class 2: Other Secured Claims._**

**(a)** **Treatment:** Except to the extent that a holder of an Allowed Other Secured Claim against the Plan Debtor agrees to less favorable treatment of such Claim, each holder of an Allowed Secured Claim against the Plan Debtor shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, at the option of the Wind Down Administrator:

      (i)      payment in full in Cash in an amount equal to such Claim, payable on the later of (x) the Effective Date, and (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

      (ii)     transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

      (iii)    such other treatment so as to render such holder's Allowed Other Secured Claim against the Plan Debtor Unimpaired.

**(b)** **Impairment and Voting:** Class 2 is Unimpaired, and holders of Other Secured Claims against the Plan Debtor are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims against the Plan Debtor are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**4.3** **_Class 3:  Roll-Up Claims._**

**(a)** **Allowance**. On the Effective Date, the Roll-Up Claims shall be deemed Allowed against the Plan Debtor in the amount of $3,300,000,000.

**(b)** **Treatment**: Except to the extent that a holder of an Allowed Roll-Up Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Roll-Up Term Loan Claim, on the Effective Date, each such holder shall receive, on account of its Allowed Roll-Up Term Loan Claim against the Plan Debtor, its Pro Rata Share of (i) the Class 3(a) Litigation Trust Interests, and (ii) the Class 3 DIP Collateral Trust Interests. For the avoidance of doubt, the Roll-Up Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)** **Impairment and Voting:** Class 3 is Impaired, and, thus, holders of Roll-Up Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.4** **_Class 4:  First Lien Claims._**

**(a)** **Allowance**. On the Effective Date, the First Lien Claims shall be deemed Allowed against the Plan Debtor in the full amount, then outstanding as described in the DIP Credit Agreement and DIP Order.

**(b)** **Treatment:** Except to the extent that a holder of an Allowed First Lien Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed First Lien Claim, on the Effective Date, each such holder shall receive, on account of its Allowed First Lien Claim against the Plan Debtor, its Pro Rata Share of the Class 3(c) Litigation Trust Interests. For the avoidance of doubt, the First Lien Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)** **Impairment and Voting:** Class 4 is Impaired, and, thus, holders of First Lien Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

### 4.5 *Class 5: Second Lien Claims.*

**(a)** **Allowance**. On the Effective Date, the Second Lien Claims shall be deemed Allowed against the Plan Debtor in the full amount then outstanding, as described in the DIP Credit Agreement and DIP Order.

**(b)** **Treatment:** Except to the extent that a holder of an Allowed Second Lien Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Second Lien Claim, on the Effective Date, each such holder shall receive, on account of its Allowed Second Lien Claim against the Plan Debtor, its Pro Rata Share of the Class 3(c) Litigation Trust Interests. For the avoidance of doubt, the Second Lien Claims against the DIP Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such DIP Loan Parties and Parent Guarantors.

**(c)** **Impairment and Voting:** Class 5 is Impaired, and, thus, holders of Second Lien Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

### 4.6 *Class 6: ABL Claims.*

**(a)** **Allowance**. On the Effective Date, the ABL Claims shall be deemed Allowed against the Plan Debtor in the amount set forth in the notice of occurrence of the Effective Date filed in accordance with Section 16.8 of the Plan.

**(b)** **Treatment**: Except to the extent that a holder of an Allowed ABL Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Claim, on the Effective Date, each such holder shall receive, on account of its Allowed ABL Claim against the Plan Debtor, its Pro Rata Share of the ABL Collateral Trust Interests. For the avoidance of doubt, the ABL Claims against the ABL Loan Parties, other than the Plan Debtor, shall not be released under or affected by the Plan and shall remain enforceable against such ABL Loan Parties.=

**(c)** **Impairment and Voting**: Class 6 is Impaired, and, thus, holders of ABL Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.7** *Class 7: General Unsecured Claims.*

**(a)** **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim against the Plan Debtor agrees to less favorable treatment of such Claim, in full and final settlement, release, and discharge of such Allowed General Unsecured Claim, each such holder shall receive its Pro Rata Share of the Class 3(b) Litigation Trust Interests.

**(b)** **Impairment and Voting:** Class 7 is Impaired, and, thus, holders of Allowed General Unsecured Claims against the Plan Debtor are entitled to vote to accept or reject the Plan.

**4.8** *Class 8: Plan Debtor Interests.*

**(a)** **Treatment**: On the date that the Plan Debtor's Chapter 11 Case is closed, and without the need for any further corporate or limited liability company action or approval of any members, board of managers, managers, management, or Interest holders of the Plan Debtor, all Plan Debtor Interests shall be cancelled. Holders of Plan Debtor Interests shall not receive any distributions on account of such Interests unless and until any Allowed Claims for which the Plan Debtor has a continuing obligation to pay following the Effective Date are satisfied in full, in which case each holder of a Plan Debtor Interest shall receive its Pro Rata Share of any residual distributable value of the Plan Debtor.

**(b)** **Impairment and Voting:** Class 8 is Impaired. Holders of Plan Debtor Interests are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Plan Debtor Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Plan Debtor Interests.

**ARTICLE V.** **MEANS FOR IMPLEMENTATION.**

**5.1** *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and the releases contained in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest. The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan, including the Global Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the Global Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.

**5.2**     *Global Settlement.*

(a)     **Overview**.  Pursuant to sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement among the Debtors, the Ad Hoc Group, and the Creditors' Committee. The compromises and settlements included in the Global Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors' Estates.  The principal terms of the Global Settlement are reflected below.

(b)     **Enforcement of Remedies**.  The DIP Secured Parties have superpriority liens on (i) all prepetition and postpetition property of the FBG Debtors, including the DIP Loan Parties and Parent Guarantors, and all proceeds thereof, including all Estate Claims, (ii) all Additional Unencumbered Property, and (iii) all Prepetition Collateral (other than ABL Priority Collateral, on which the liens of the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are junior to those of the ABL Secured Parties). The DIP Secured Parties have alleged that various events of default have occurred and are continuing under the DIP Documents.  The DIP Loan Parties do not have sufficient funds to indefeasibly pay the DIP Obligations in full in Cash.  The Global Settlement incorporates a consensual arrangement to (i) permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto and (ii) provide recoveries to junior creditors of the FBG Debtors which allows such creditors to participate in recovery prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

(c)     **Expiration of Challenge Rights**.  The Challenge Period shall be deemed to expire against all parties in the Chapter 11 Cases (unless already expired pursuant to the terms of the DIP Order) on the Effective Date.

(d)     **Allowance of Claims**.   On the Effective Date, (i) the DIP A Claims shall be deemed allowed against each FBG Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order; (ii) the Roll-Up Claims shall be deemed allowed against each FBG Debtor in the full amount then outstanding under the DIP Credit Agreement and DIP Order; (iii) the First Lien Term Loan Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the First Lien Term Loan Agreement; (iv) the Side-Car Term Loan Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the Side-Car Term Loan Agreement; and (v) the Second Lien Claims shall be deemed allowed against each FBG Debtor (other than Viceroy) in the full amount then outstanding under the Second Lien Term Loan Agreement.

(e)     **Estate Claims Credit Bid Transaction**.  The Debtors are conducting a marketing and sale process for the Estate Claims.  Pursuant to the Global Settlement, on the Effective Date, subject to the terms of the "fiduciary out" under the Plan Support Agreement,

32

unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee), the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned, conveyed, transferred, and delivered, the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the Estate Claims Credit Bid APA, to the Plan Debtor free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets shall be the Estate Claims Credit Bid. Simultaneously with such transfer, the Plan Debtor shall assign, convey, transfer, and deliver the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).

(f) **DIP Collateral Credit Bid Transaction**. Pursuant to the Global Settlement, on the Effective Date, the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned conveyed, transferred, and delivered, the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the DIP Collateral Credit Bid APA, to the Plan Debtor free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for the DIP Collateral Assets shall be the DIP Collateral Credit Bid. Immediately following such transfer, the Plan Debtor shall assign, convey, transfer, and deliver the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the DIP Collateral Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).

(g) **Litigation Trust Funding Commitments**. Pursuant to the Global Settlement, the Litigation Trust Funding Contributors will provide the Litigation Trust Funding Commitments and Litigation Trust Funding Contributions to the Litigation Trust pursuant to the Litigation Trust Agreement, which commitments and contributions shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust, and costs of monetizing the Litigation Trust Assets. The Litigation Trust Funding Commitments and Litigation Trust Funding Contributions are necessary and incidental to the liquidating purpose of the Litigation Trust.

(h) **Litigation Trust Distributions**. The Litigation Trustee shall make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Waterfall, as set forth in Section 6.3 of the Plan.

(i) **Electing Creditors.** All Eligible Creditors shall be given the option, in connection with solicitation of the Disclosure Statement, to receive Class 3(b) Litigation Trust Interests entitling them to receive distributions from the Litigation Trust in accordance with the Litigation Trust Agreement and the Plan. The distributions allocable to Class 3(b) Litigation Trust Interests from the Litigation Trust may be held in trust (in whole or in part) by the GUC Ombudsman pending a claims acceptance process for the Electing Creditor Claims to be determined by the GUC Ombudsman in consultation with the Litigation Trustee. Electing Creditor Claims that are determined to be accepted following such claim acceptance process shall be entitled to their Pro Rata Share of the Class 3(b) Litigation Trust Interests. If an Eligible Creditor does not timely opt out of being an Electing Creditor on the Global Settlement Election Form, then

such creditor shall retain all of its rights and claims against the Estates and the Debtors against which such party currently asserts a right or claim.  The Litigation Trustee is authorized to determine whether any Electing Creditor is an Ineligible Creditor prior to making any distributions to holders of Class 3 Litigation Trust Interests; *provided* that an Ineligible Creditor may seek relief from the Bankruptcy Court opposing such a determination.  For the avoidance of doubt, Ineligible Creditors shall not be entitled to share in distributions from the Litigation Trust.

(j)     **Electing Creditor Waiver**.  In exchange for becoming an Electing Creditor, each Electing Creditor shall be deemed to (i) have waived any objections to the Plan, Confirmation Order, and any related settlements and relief sought in furtherance thereof, including the Global Settlement, and (ii) be a Releasing Party and grant the releases contained in Section 14.5(b) of the Plan.  In addition, if an Electing Creditor holds a Claim against an FBG Debtor for which one or more other FBG Debtors have joint and several liability, such Electing Creditor agrees it shall have only a single Electing Creditor Claim for purposes of receiving Class 3(b) Litigation Trust Interests and receiving distributions from the Litigation Trust.

(k)     **GUC Ombudsman**.  The GUC Ombudsman shall be appointed prior to the Effective Date and shall serve as the holder of record of the Class 3(b) Litigation Trust Interests (and, in such capacity shall provide the Litigation Trustee with a properly completed IRS Form W-9) and, except as provided herein, shall not have any duties until distributions of Litigation Trust Assets are anticipated to be paid to holders of Class 3 Interests.  In connection with the aforementioned distributions, the GUC Ombudsman shall be responsible solely for reconciling Electing Creditor Claims and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith.  As permitted or required by applicable law, the GUC Ombudsman may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity.  *See* Section 6.16(d) of the Plan.  The GUC Ombudsman shall only withhold distributions where necessary and shall otherwise be required to make minimum and/or interim distributions expeditiously.  All costs of the GUC Ombudsman to reconcile Electing Creditor Claims and make distributions to holders of Class 3(b) Litigation Trust Interests shall be paid from the distributions otherwise distributable to holders of Class 3(b) Litigation Trust Interests and shall not be otherwise chargeable against the Plan Debtor or the Litigation Trust. Subject to a budget agreed to by the Litigation Trustee, the Creditors' Committee, the Ad Hoc Group, and the GUC Ombudsman prior to the Effective Date, the Litigation Trust will fund certain costs unrelated to reconciliation for the GUC Ombudsman.  However, if an agreement on such budget cannot be reached, the cost of reconciling Electing Creditor Claims shall be paid from the distributions otherwise distributable to holders of Class 3(b) Litigation Trust Interests.  The GUC Ombudsman may request additional funding from the Litigation Trustee to perform reconciliation duties.

(l)     **Conversion of Remaining Debtors' Chapter 11 Cases**.  The Confirmation Order shall provide that, following the Effective Date and transfer of the Litigation Trust Assets to the Litigation Trust, the DIP Collateral Trust Assets to the DIP Collateral Trust, and the ABL Collateral Trust Assets to the ABL Collateral Trust, each of the Debtors' Chapter 11 Cases (other than the Plan Debtor), to the extent not previously converted, will be converted to a case under chapter 7 of the Bankruptcy Code; *provided* that, notwithstanding any provision of the Bankruptcy

34

Code or any provision herein to the contrary, including, without limitation, section 362 of the Bankruptcy Code, in the event that any FBG Debtor's case is converted to a case under chapter 7 of the Bankruptcy Code or any FBG Debtor commences or becomes subject to a subsequent case under any chapter of the Bankruptcy Code, (i) the automatic stay provisions of section 362 of the Bankruptcy Code, or any other stay that may arise by operation of law or otherwise, shall not apply to, limit, or otherwise affect the Litigation Trustee's rights, powers, and authority to prosecute, compromise, settle, collect, and otherwise enforce the Estate Claims, and (ii) the Litigation Trustee shall be entitled to continue to prosecute, compromise, settle, collect, and otherwise enforce the Estate Claims in all respects as though no such conversion or subsequent case had occurred. Any chapter 7 trustee or other fiduciary appointed in any such converted or subsequent case shall have no right, title, or interest in or to the Estate Claims, and the Estate Claims shall not constitute property of the estate in any such converted or subsequent case. The Bankruptcy Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this provision, including any disputes concerning the Litigation Trustee's rights to prosecute, settle, and collect on the Estate Claims.

**(m)** **Survival of Claims**. The DIP A Claims (other than the DIP A Claims subject to the Estate Claims Credit Bid and DIP Collateral Credit Bid), Roll-Up Claims, First Lien Claims, Second Lien Claims, ABL Claims, Electing Creditor Claims, and Claims of non-Electing Creditors against the Estates of the FBG Debtors (other than the Plan Debtor) are preserved and may continue to be asserted against the chapter 7 estates of the applicable FBG Debtor and shall not be reduced by the amount of any Trust distributions made on or after the Effective Date.

### 5.3 *Sources of Consideration for Distributions.*

Cash distributions under the Plan shall be funded with Cash proceeds available from: (i) Cash available on or after the Effective Date in accordance with the Plan; and (ii) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter in the Professional Fees Escrow Account shall be retained by the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget until transferred by the Wind Down Administrator to the DIP Collateral Trust).

### 5.4 *Implementation.*

The following implementation transactions shall be consummated in accordance with the Emergence Steps Memo:

(i) On or in connection with the Effective Date, the FBG Debtors shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction.

(ii) On or in connection with the Effective Date, the Litigation Trust shall be established and administered pursuant to the Litigation Trust Agreement and the Plan. On, before, or after the Effective Date, the Litigation Trust Assets shall transfer to the Litigation Trust

automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the Litigation Trust, the Litigation Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iii)    On or in connection with the Effective Date, the DIP Collateral Trust shall be established and administered pursuant to the DIP Collateral Trust Agreement and the Plan. On, before, or after the Effective Date, the DIP Collateral Trust Assets shall transfer to the DIP Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the DIP Collateral Trust, the DIP Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iv)    On or in connection with the Effective Date, the ABL Collateral Trust shall be established and administered pursuant to the ABL Collateral Trust Agreement and the Plan. On the Effective Date, the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets and transferred such ABL Collateral Trust Assets to the ABL Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the ABL Collateral Trust, the ABL Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(v)    On or in connection with the Effective Date, the Direct Claims Trust shall be established and administered pursuant to the Direct Claims Trust Agreement and the Plan. On the Effective Date, the Direct Claims Trust Electing Creditors shall be deemed to have transferred their Direct Creditor Claims to the Direct Claims Trust automatically and without further action of the Bankruptcy Court.

(vi)    On the Effective Date, the Wind Down Reserve shall be established and funded in accordance with the Wind Down Budget.

(vii)    On or in connection with the Effective Date, the Debtors shall transfer the (a) Professional Fees Escrow Account, (b) the Factored Receivables Account, and the (c) Examiner Account to the Plan Debtor.

(viii)    After the Effective Date, the Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order and the Plan.

### 5.5    *Litigation Trust Funding Commitments.*

The terms of the Litigation Trust Funding Commitments shall be set forth in the Litigation Trust Agreement or in any Litigation Trust Funding Agreement. Upon execution of the Litigation Trust Agreement or any Litigation Trust Funding Agreement, the Litigation Trust

36

Funding Commitments shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur or enforce the obligations under the Litigation Trust Agreement or in any Litigation Trust Funding Agreement with respect to the Litigation Trust Funding Commitments and use the proceeds of such Litigation Trust Funding Commitments, in each case, in accordance with the terms of the Plan, the Confirmation Order, the Litigation Trust Agreement, and any Litigation Trust Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Trust Agreement and any Litigation Trust Funding Agreement, in each case, shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.6 *Factored Receivables Account.*

Following the Effective Date, the Factored Receivables Account shall be transferred to the Plan Debtor, and the Wind Down Administrator shall assume the obligations for administering the Factored Receivables Account. The Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order, including providing the reporting set forth in paragraph 7 of the Cash Management Order. The Confirmation Order shall provide that (i) the FBG Debtors, including the Plan Debtor, shall continue to direct, to the extent received by the FBG Debtors, and segregate all collections into the Factored Receivables Account and (ii) the Plan Debtor and the Wind Down Administrator shall not disburse any such segregated funds from the Factored Receivables Account pending further order of the Bankruptcy Court after notice to the ABL Agent and all other affected parties and all such parties being provided an opportunity to be heard; *provided* that the Plan Debtor and the Wind Down Administrator shall not be required to segregate any funds received on account of any postpetition sale and related invoice. The Confirmation Order shall further provide that the Wind Down Administrator shall be authorized to administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the funds on deposit in the Factored Receivables Account; *provided* that the Wind Down Administrator shall do so at the ABL Collateral Trust's sole cost and expense (paid in advance); *provided further* that the ABL Agent shall have the right to direct the Wind Down Administrator with respect to the prosecution of the FBG Debtors' interests in the Factored Receivables Account and the ABL Agent's prior written consent shall be required for any settlement, compromise, or other disposition of such interests. The foregoing provisions shall be binding on any chapter 7 trustees appointed in any chapter 7 cases of the FBG Debtors.

### 5.7 *Wind Down Accounts.*

Following the Effective Date, the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account each shall be transferred to the Plan Debtor, and the Wind Down Administrator shall assume the obligations for administering the such accounts. The Wind Down Administrator shall administer the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account in accordance with the Wind Down Order.

**5.8**     *Corporate Action.*

**(a)**     Following the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan or the Confirmation Order (including any action to be undertaken by the Plan Debtor, the Debtors, the Wind Down Administrator, the Trustees, or the Trusts) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Plan Debtor, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the organizational structure of the Plan Debtor, and any other action required by the Plan Debtor in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Plan Debtor or its Estate.

**(b)**     The authorizations and approvals contemplated by this Section 5.8 shall be effective notwithstanding any requirements under non-bankruptcy law.

**(c)**     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**5.9**     *Wind Down Administrator.*

**(a)     Wind Down**.  After the Effective Date, pursuant to the Plan, the Wind Down Administrator shall effectuate the Wind Down without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

**(b)     Authority of the Wind Down Administrator**.  The Wind Down Administrator shall have the authority and right on behalf of the Plan Debtor, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

>       (i)     coordinate with the Trustees and any chapter 7 trustees appointed in any chapter 7 cases of the FBG Debtors with respect to the transfer and turnover of information;

>       (ii)     administer the Plan Debtor's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the Plan Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of the Plan Debtor ending after the Petition Date through the liquidation of the Plan Debtor as determined under applicable tax laws, and (c) representing the interest and account of the Plan Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, or proceeding or audit;

38

(iii)    (a) administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the Factored Receivables Account in accordance with the Cash Management Order and the Plan, (b) administer the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account in accordance with the Wind Down Order, (c) administer the Professional Fees Escrow Account in accordance with the DIP Order and facilitate distributions from such account to satisfy Allowed Professional Fee Claims, and (d) administer the Examiner Account and facilitate distributions from such account to satisfy the Allowed fee and expenses of the Examiner and its professionals;

(iv)    pay statutory fees in accordance with <u>Section 16.1</u> of the Plan;

(v)    close the Chapter 11 Case of the Plan Debtor; and

(vi)    perform other duties and functions that are consistent with the Plan or as the Wind Down Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan.

**(c)    Indemnification**.  The Plan Debtor shall indemnify and hold harmless the Wind Down Administrator, solely in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of the Wind Down Administrator's bad faith, gross negligence, willful misconduct, or criminal conduct.

**5.10    _Governance_.**

**(a)**    On the Effective Date, the authority, power and incumbency of the persons then acting as directors, managers, members, officers, and other authorized persons of the Plan Debtor shall be terminated and such persons shall be deemed to have resigned.  On the Effective Date, the Wind Down Administrator shall serve as the initial director or manager, as applicable, and sole officer of the Plan Debtor after the Effective Date until such time as the Plan Debtor goes out of existence, by dissolution or otherwise.

**(b)**    The Wind Down Administrator, on behalf of the Plan Debtor, may appoint one or more directors or managers of the Plan Debtor to serve after the Effective Date.  The Wind Down Administrator, on behalf of the Plan Debtor, may elect such additional directors(s), manager(s), and/or officer(s) of the Plan Debtor as the Wind Down Administrator deems necessary to implement the Plan and the actions contemplated herein.  The Wind Down Administrator, on behalf of the Plan Debtor, shall, after the Effective Date, have the power to act by written consent to remove any manager or officer of the Plan Debtor at any time with or without cause.

**(c)**    As of the Effective Date, the governing documents of the Plan Debtor may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of the Plan.

**5.11** *Cancellation of Existing Securities, Agreements, and Liens.*

Except for the purpose of evidencing a right to a distribution pursuant to the Plan, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Interest holders of the Plan Debtor, all notes, instruments, other securities, and other evidence of debt issued to the Plan Debtor, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Plan Debtor thereunder shall be deemed fully satisfied, released, and discharged.

**5.12** *Dissolution of Plan Debtor.*

On or after the Effective Date, the Wind Down Administrator may complete the winding up of the Plan Debtor without the necessity for any other or further actions to be taken by or on behalf of the Plan Debtor or its members, managers, directors, management, or Interest holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution or cancellation with the appropriate governmental authorities, and any such certificate of dissolution or cancellation may be filed by the Wind Down Administrator without need for any authorization, signature or other act of any Person, including without limitation any holder of any Claim or Interest. On or after the Effective Date, the Wind Down Administrator may engage in any other transaction in furtherance of the Plan. Any such transactions may be effective without any further action by the members, managers, directors, management, or Interest holders of the Plan Debtor.

**5.13** *Effectuating Documents; Further Transactions.*

**(a)** On and after the Effective Date, the Wind Down Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Plan Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(b)** On and after the Effective Date, the Trustees are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(c)** Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Interest holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Interest holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

**5.14** *Closing of the Chapter 11 Case.*

After the Effective Date, the Wind Down Administrator shall be authorized, but not

directed, to submit a motion for orders that close and issue final decree for the Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the Plan Debtor's Chapter 11 Case two (2) years after the Effective Date has occurred.

## ARTICLE VI.    LITIGATION TRUST.

### 6.1    *Establishment of the Litigation Trust.*

On or prior to the Effective Date, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

### 6.2    *Funding of and Transfer of Assets into the Litigation Trust.*

**(a)**    On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the Estate Claims Credit Bid Transaction, the Plan Debtor shall transfer its remaining interests in the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement. The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust. The act of transferring the Litigation Trust Assets, as authorized by the Plan and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (including, for the avoidance of doubt, any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets

in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b) All Causes of Action, claims, rights, and interests transferred, assigned, or otherwise conveyed to the Litigation Trust from each FBG Debtor's Estate shall remain separate and distinct from the Causes of Action, claims, rights, and interests transferred from the Estates of any other FBG Debtor. The Litigation Trust shall hold, administer, and prosecute such Causes of Action on behalf of each contributing FBG Debtor's Estate as though such Causes of Action continued to be held by such FBG Debtor's Estate independently. No defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust shall be entitled to assert, as a defense, setoff, recoupment, counterclaim, or reduction of any kind, any claim, defense, or right arising from or relating to such party's dealings, transactions, or relationships with any FBG Debtor other than the specific FBG Debtor whose estate originally held the Cause of Action being prosecuted. For the avoidance of doubt, the consolidation of Causes of Action within the Litigation Trust for administrative convenience shall not operate to merge, consolidate, or otherwise combine the separate and distinct claims of the respective FBG Debtor Estates, nor shall such consolidation permit any party to assert cross-FBG Debtor defenses or to reduce its liability on a Cause of Action held by one FBG Debtor's Estate by reference to any claim, credit, or defense arising from such party's relationship with a different FBG Debtor.

(c) Notwithstanding any provision herein, any Person against whom an Estate Claim is asserted by the Litigation Trustee shall be prohibited from asserting, filing, or prosecuting any counterclaim, setoff, recoupment, or other affirmative claim against the Litigation Trustee in connection with, arising out of, or related to such Estate Claim. Any such counterclaim, setoff, recoupment, or affirmative claim that a defendant to an Estate Claim may have, whether arising before or after the Petition Date, shall be asserted solely against the Debtor or the Estate, as applicable. Any defendant to an Estate Claim who wishes to assert a counterclaim, setoff, recoupment, or other affirmative claim must file a Proof of Claim in accordance with the procedures and deadlines established by the Bankruptcy Court and/or the Bankruptcy Code. Failure to timely file a Proof of Claim in accordance with such procedures and deadlines shall result in such counterclaim, setoff, recoupment, or affirmative claim being forever barred and discharged pursuant to the terms of the Plan and the Confirmation Order. For the avoidance of doubt, the assignment of any Estate Claim by the Debtor, the Estate, or Litigation Trustee acting on behalf of the Estate or Litigation Trust shall not create any privity of contract, successor liability, or other legal relationship between the Litigation Trustee and any defendant to such Estate Claim that would permit the assertion of any counterclaim, setoff, recoupment, or affirmative defense directly against the Litigation Trustee, except to the extent such defense is limited to reducing or offsetting the Litigation Trustee's affirmative recovery on the specific Estate Claim itself.

(d) All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by (1) any one or more of the Debtors or (2) any prepetition or postpetition committee or subcommittee of the board of managers or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the analysis or prosecution of any Litigation Trust Assets (the "**Transferred Privileged**

42

**Information**") shall be transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

       **(e)**     The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the Debtors (or the ABL Collateral Trust or DIP Collateral Trust) have an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Debtors (or the ABL Collateral Trust or DIP Collateral Trust), as applicable, (or their designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Debtors (or the ABL Collateral Trust or DIP Collateral Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which a Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the applicable Debtor shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where a Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the applicable Debtor (or the ABL Collateral Trustee or DIP Collateral Trustee). The Litigation Trust and Debtors have agreed that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

       **(f)**     Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

       **(g)**     Pursuant to, *inter alia,* Federal Rule of Evidence 502(c), if a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such disclosure shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the disclosure notify the Litigation Trust of the disclosure and shall demand that all recipients of the inadvertently disclosed Transferred Privileged Information return or confirm the destruction of

43

such materials. Notwithstanding anything herein to the contrary, the Litigation Trustee has no obligation to waive privilege over any communications, information, or other similar materials when fulfilling its duties to meet and confer with any party in interest.

### 6.3 *Litigation Trust Waterfall.*

Proceeds from the monetization of the Litigation Trust Assets, net of expenses, shall be distributed to Litigation Trust Beneficiaries as follows: (i) *first*, to holders of Class 1 Litigation Trust Interests, which shall receive the amounts to which they are entitled pursuant to Section 6.4 of the Plan solely in respect of the Litigation Trust Funding Commitments (the "**First Return Threshold**"); (ii) *second*, following satisfaction of the First Return Threshold until aggregate distributions (including distributions pursuant to Section 6.4) equal $400,000,000 (the "**Second Return Threshold**"), (a) 15% to the holders of Class 1 Litigation Trust Interests, and (b) 85% to holders of Class 2 Litigation Trust Interests; (iii) *third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests equal the sum of the Allowed amount of the DIP A Claims (as of the Effective Date), *plus*, without duplication, any Credit Bid Claims (the "**Final Return Threshold**"), (a) 10% to holders of Class 1 Litigation Trust Interests, (b) 74% to holders of Class 2 Litigation Trust Interests, and (c) 16% to the holders of Class 3 Litigation Trust Interests; and (iv) *fourth*, following the satisfaction of the Final Return Threshold, (a) 10% to the holders of Class 1 Litigation Trust Interests and (b) 90% to the holders of Class 3 Litigation Trust Interests. Distributions to (i) holders of Class 1 Litigation Trust Interests shall be paid in accordance with Section 6.4 of the Plan; (ii) holders of Class 2 Litigation Trust Interests shall be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders; and (iii) holders of Class 3 Litigation Trust Interests shall be paid pro rata based on the aggregate Allowed amount of Roll-Up Claims, Electing Creditor Claims, First Lien Claims, and Second Lien Claims held by such holders. Any provisions providing for the Litigation Trust to obtain additional funding, including any potential adjustments to the Litigation Trust Waterfall, shall be set forth in the Litigation Trust Agreement.

### 6.4 *Class 1 Litigation Trust Interests Waterfall.*

Distributions to the holders of Class 1 Litigation Trust Interests shall be paid as follows:

    (i)    *First*, to the Litigation Trust Funding Contributors, pro rata in accordance with their respective Litigation Trust Funding Contributions, until each Litigation Trust Funding Contributor has received an amount equal to the greater of (i) an internal rate of return on such Litigation Trust Funding Contributions equal to 20.0% and (ii) a multiple on invested capital on such Litigation Trust Funding Contributions of 1.75x, with each of such returns being measured from the date of such Litigation Trust Funding Contributions;

    (ii)    *Second*, to the Litigation Trust Funding Contributors, pro rata in accordance with the amounts of their respective undrawn Litigation Trust Funding Commitments, until each such Litigation Trust

Funding Contributor has received an amount equal to 5.0% of the amount of such undrawn Litigation Trust Funding Commitment;

(iii) *Third*, to the Backstop Parties until each such Backstop Party has received an amount equal to 5.0% of the amount of such Backstop Party's Litigation Trust Funding Commitment (whether drawn or undrawn) backstopped by such Backstop Party; and

(iv) *Fourth*, to the Litigation Trust Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Funding Contributors, for the life of the Litigation Trust.

### 6.5 *Administration of the Litigation Trust.*

The Litigation Trust shall be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan. In the event of any inconsistency between the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control.

### 6.6 *Litigation Trust Oversight Committee.*

On the Effective Date, the Litigation Trust Oversight Committee shall be appointed in accordance with the terms of the Litigation Trust Agreement. The duties and obligations of the members of the Litigation Trust Oversight Board shall be set forth in the Litigation Trust Agreement.

### 6.7 *Litigation Trustee.*

**(a)** **Appointment of Litigation Trustee.** Upon the establishment of the Litigation Trust, the Litigation Trustee shall be appointed. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 6.7 of the Plan. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

**(b)** **Functions of the Litigation Trustee.** On and after the date the Litigation Trust is established, the Litigation Trustee shall carry out the functions set forth in this Section 6.7 and may take such actions, under the supervision or with the approval of the Litigation Trust Oversight Committee, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Litigation Trust Agreement. Such functions shall include any and all powers and authority to:

45

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)     take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(iii)     open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iv)     maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi)     accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(vii)     conduct investigations of the Estate Claims pursuant to Bankruptcy Rule 2004;

(viii)     pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Estate Claims and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement;

(ix)     protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law;

(x)     administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(xi)     calculate and make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan;

46

(xii)    invest Cash, as available, and any income earned thereon;

(xiii)    retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable;

(xiv)    determine whether any Electing Creditor is an Ineligible Creditor at any time prior to making distributions to the holders of the Class 3(b) Litigation Trust Interests; *provided* that an Ineligible Creditor may seek relief from the Bankruptcy Court opposing such a determination;

(xv)    dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement; and

(xvi)    take any other actions not inconsistent with the provisions hereof and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6.8    *Preference Actions.*

(a)    **Excluded Parties**.  All parties excluded pursuant to any component of this Section 6.8(a) are "**Excluded Parties**."  The terms relating to Preference Actions do not apply to Excluded Parties.  These terms apply only to creditors (including and together with any affiliates of such creditors):

(i)    who, in the reasonable discretion of the Litigation Trustee, did not (i) engage in wrongful, actual or constructively fraudulent conduct against the Debtors, affiliates of Debtors, or otherwise participated, conspired with, or acted in concert with, any entity that participated in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or affiliates of Debtors), (ii) receive an avoidable transfer on grounds other than Section 547 of the Bankruptcy Code from the Debtors, or (iii) receive a transfer in good faith (collectively, (i) through (iii), "**Adverse Conduct**");

(1)    A party not expressly named in the Litigation List (as defined below) shall be treated as an Excluded Party based on Adverse Conduct only if the Litigation Trustee either alleges and/or pleads facts alleging Adverse Conduct as (a) an element of the Preference Action or (b) (x) a cause of action in a complaint or (y) in a pleading or other filing, and in the case of both (x) and (y), in a complaint, pleading, or other filing, as applicable, that is filed prior to or substantially contemporaneously with the filing of a Preference Action.  If a creditor obtains a verdict in their favor on all such alleged Adverse Conduct in a Final Order, or such allegations of Adverse Conduct are withdrawn

or counts related to such Adverse Conduct are dismissed with prejudice or on a voluntary basis by the Litigation Trustee, or dismissed without prejudice but the Litigation Trustee makes a final determination not to refile, and therefore no longer qualifies as an Excluded Party, then such creditor shall retain the benefits in this proposal (assuming all other conditions are met).

(2) For the avoidance of doubt, nothing herein shall require the Litigation Trustee to obtain a finding, determination, or Final Order related to Adverse Conduct prior to initiating a Preference Action.

(ii) that are not SPV Lenders; and

(iii) that are Electing Creditors under the Plan. Preference Actions against Ineligible Creditors and/or non-Electing Creditors shall not be subject to these terms and may be prosecuted by the (i) Litigation Trust or (ii) the FBG Debtors or their Estates, as applicable

**(b) Litigation List**. The Plan Supplement shall include an agreed upon non-exhaustive list (the "**Litigation List**") of enumerated litigation targets that are believed to have participated in Adverse Conduct, which shall include an initial list of Excluded Parties. For the avoidance of doubt, any Person that is charged with a crime based on conduct related to the Debtors shall be on the Litigation List, or if charged subsequent to the filing of the Plan Supplement, shall be deemed to have been on the Litigation List. For the avoidance of doubt, the Litigation Trustee is not limited in any way in prosecuting any claim or cause of action against any Person not on the Litigation List, other than as set forth in this Section 6.8 of the Plan with respect to Preference Actions, and no Person shall be entitled to rely on its absence from the Litigation List for any reason other than as set forth in this Section 6.8 of the Plan with respect to Preference Actions.

**(c) Preference Actions Against Trade Creditors**. Subject to the terms of Section 6.8(a), no Preference Actions shall be brought against Trade Creditors.

**(d) Preference Actions Against Supply Chain Financers and Factors**. Subject to the terms of Section 6.8(a), Preference Actions against Supply Chain Financers and Factors shall be brought only after the Litigation Trustee conducts reasonable due diligence and makes a good faith attempt to meet and confer with the putative defendant, which meet and confer shall include providing such putative defendant with the Litigation Trustee's analysis with respect to such putative defendant's defenses under Section 547(c)(4) of the Bankruptcy Code (the "**New Value Defense**") and providing such putative defendant with an opportunity to identify additional new value (as defined in Section 547 of the Bankruptcy Code) which was not included in the Litigation Trustee's analysis. Prior to commencing a Preference Action, the Litigation Trustee must consider the information timely provided by such putative defendant and any other affirmative defenses timely articulated by such putative defendant and provide a report to the Litigation Trust Oversight Committee setting forth the basis for litigating the Preference Action.

(i)    If the Litigation Trustee, in his reasonable discretion, prosecutes a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee agrees that in such prosecution new value includes any subsequent payment made by a Supply Chain Financer or Factor at the request of the FBG Debtors as part of the factoring or supply chain financing agreement (*i.e.*, it shall include payments to legitimate vendors of the FBG Debtors and payments made at the direction of the FBG Debtors on non-legitimate or "cover invoices"), without regard to which FBG Debtor entity such payment by a Supply Chain Financer or Factor was made on behalf of, as long as it was made on behalf of a Debtor (the "**Modified New Value Elements**"), then the prosecution shall not be considered a Sacred Right but instead a Major Decision.  For the avoidance of doubt, all other elements of any Preference Action and affirmative defenses thereto, including any other component of a New Value Defense, shall apply in accordance with applicable law, including that such new value must still have been provided by the Supply Chain Financer or Factor subsequent to the applicable alleged preferential payment by the Debtor

(ii)    In connection with any prosecution by the Litigation Trustee that utilizes the Modified New Value Elements, to the extent that any payment made by a Supply Chain Financer or Factor was received by a non-Debtor (*e.g.*, it was made to a legitimate creditor of a non-Debtor, the funds were ultimately received by an Eligible Creditor or its affiliates) and the Supply Chain Financer or Factor has the right to recover such payment from that non-Debtor, such right must be assigned to the Litigation Trust for prosecution by the Litigation Trust in order for such payment to qualify as new value and for the creditor to receive the benefit of a prosecution utilizing Modified New Value Elements (and that such assignment may be conditional upon the payment being considered new value).

(iii)    If the Litigation Trustee, in his reasonable discretion, seeks to prosecute a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee determines, in his reasonable discretion, to seek to prosecute such Preference Action without utilizing all of the Modified New Value Elements, then proceeding with the Preference Action shall be considered a Sacred Right instead of a Major Decision; *provided* that, the only modifications to the Modified New Value Elements that the Litigation Trustee is permitted to make under this subparagraph is to assert that (a) the alleged new value was provided on behalf of a non-Debtor entity (*e.g.*, a payment on an invoice owed by a non-Debtor); or (b) the alleged new value provided was not received directly or indirectly by a Debtor or by Bowery Finance II,  and therefore, in both cases, does not qualify as new value.

49

(iv) For the avoidance of doubt, if a Supply Chain Financer or Factor (i) is or becomes an Excluded Party or (ii) did not transact with FBG in good faith, then none of the provisions of this Section 6.8(d) shall apply to such Person. Nothing in this Section 6.8(d) shall shift the burden of proof under applicable law with respect to Preference Actions.

(e) **Litigation Trust's Authority to Commence Preference Actions**. The Litigation Trust's authority to commence Preference Actions against Supply Chain Financers and Factors shall exist only if the process in Section 6.8(d) above is undertaken by the Litigation Trustee in good faith. Good faith shall be conclusively established if the Preference Action is authorized by a majority of the Litigation Trust Oversight Committee, in accordance with the Litigation Trust Agreement; *provided* that the absence of any such authorization shall not establish a lack of good faith.

### 6.9 *Fees and Expenses of the Litigation Trust*.

(a) Following the establishment of the Litigation Trust, expenses of the Litigation Trust shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(b) The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Assets, including any Estate Claims).

### 6.10 *Indemnification*.

The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and the members of the Litigation Trust Oversight Committee, in their capacities as such, for any losses incurred in such capacities, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

### 6.11 *Dissolution of the Litigation Trust*.

In no event shall the Litigation Trust be dissolved later than five (5) years from the date the Litigation Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect

the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 6.12 *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of the Litigation Trust Assets.

### 6.13 *Turnover of DIP Collateral.*

If the Litigation Trust, the ABL Collateral Trust, or the Direct Claims Trust receives DIP Collateral Trust Assets, such DIP Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the DIP Collateral Trust.

### 6.14 *Assignment of Horizon Alester IP.*

To the extent (i) all or a portion of the Horizon Alester IP is sold (the "**Purchased Horizon Alester IP**") and (ii) the resolution, final judgment  or settlement of the James Complaint results in the avoidance of purported transfers of such Purchased Horizon Alester IP and recovery of such Purchased Horizon Alester IP by the Litigation Trust (as assignee of the FBG Debtors and their Estates), the Litigation Trustee, on behalf of the Litigation Trust, shall, in accordance with any applicable purchase agreements, execute a supplemental assignment agreement assigning, conveying, transferring, and delivering  the Purchased Horizon Alester IP to the applicable purchaser.

### 6.15 *Non-Transferability.*

The Litigation Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

### 6.16 *Litigation Trust Tax and Other Matters.*

**(a)**     **Tax Treatment.**  The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the Litigation Trust Assets to the Litigation Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust.  Accordingly, absent definitive

51

guidance to the contrary, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)     **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

(c)     **Cash Investments.** The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.16(d). The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying

beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the Litigation Trust, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets as of the date the Litigation Trust is established.  The Litigation Trustee shall provide all parties with such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) under the Litigation Trust Agreement if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust.  Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.  More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Litigation Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims.  In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising

53

from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)     The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Litigation Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the Litigation Trust. Similarly, the GUC Ombudsman may request expedited determinations of taxes under section 505(b) of the Bankruptcy Code in respect of any assets allocable to, or held on account of, Disputed Electing Creditor Claims that it has treated as a disputed ownership fund or other separate taxable entity.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee or, in respect of Disputed Electing Creditor Claims, the GUC Ombudsman so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Litigation Trustee), the Litigation Trustee or the GUC Ombudsman (as applicable) may elect to treat any Litigation Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Litigation Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Litigation Trustee, the GUC Ombudsman and Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)   The treatment provided in this Section 6.16, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

54

**ARTICLE VII.        DIP COLLATERAL TRUST.**

> **7.1        *Establishment of the DIP Collateral Trust.***

On or prior to the Effective Date, the DIP Collateral Trust shall be established in accordance with the DIP Collateral Trust Agreement for the purpose of being vested with and liquidating the DIP Collateral Trust Assets, and making distributions to the DIP Collateral Trust Beneficiaries in accordance with the terms of the DIP Collateral Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the DIP Collateral Trust's primary purpose is liquidating the DIP Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the DIP Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the DIP Collateral Trust Assets and provide for the orderly liquidation thereof.

> **7.2        *Transfer of Assets into the DIP Collateral Trust.***

On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the DIP Collateral Credit Bid Transaction, the Plan Debtor shall transfer its remaining interests in the DIP Collateral Trust Assets to the DIP Collateral Trust, and all such assets shall vest in the DIP Collateral Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the DIP Collateral Trustee, in accordance with the Plan and the DIP Collateral Trust Agreement. The DIP Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the DIP Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the DIP Collateral Trust. The act of transferring the DIP Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the DIP Collateral Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust, the Debtors shall have no interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust. Upon delivery of the DIP Collateral Trust Assets to the DIP Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the DIP Collateral Trust shall vest in the DIP Collateral Trust and its representatives, and the Debtors and the DIP Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The DIP Collateral Trustee shall agree to accept and hold the DIP Collateral Trust Assets in the DIP Collateral Trust for the benefit of the DIP Collateral Trust Beneficiaries, subject to the terms of the Plan and the DIP Collateral Trust Agreement.

**7.3**     *DIP Collateral Trustee.*

**(a)     Appointment of DIP Collateral Trustee.**  Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall be appointed as trustee of the DIP Collateral Trust.  The powers, rights and responsibilities of the DIP Collateral Trustee shall be as specified in the DIP Collateral Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 7.3 of the Plan.  Other rights and duties of the DIP Collateral Trustee and the DIP Collateral Trust Beneficiaries shall be as set forth in the DIP Collateral Trust Agreement.

**(b)     Functions of the DIP Collateral Trustee.**  Following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee and/or the DIP Collateral Trust, as applicable, shall carry out the functions set forth in this Section 7.3 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the DIP Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the DIP Collateral Trust;

(ii)     take any actions necessary to (A) resolve all matters related to the DIP Collateral Trust Assets and (B) vest such assets in the DIP Collateral Trust;

(iii)     open and maintain bank accounts on behalf of or in the name of the DIP Collateral Trust;

(iv)     maintain the books and records and accounts of the DIP Collateral Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi)     accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the DIP Collateral Trust Assets in accordance with the DIP Collateral Trust Agreement;

(vii)     administer the DIP Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the DIP Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)    calculate and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan;

(ix)    invest Cash, as available, and any income earned thereon;

(x)    retain, compensate and employ professionals to represent the DIP Collateral Trust or the DIP Collateral Trustee, as applicable;

(xi)    dissolve the DIP Collateral Trust in accordance with the terms of the DIP Collateral Trust Agreement; and

(xii)    take any other actions not inconsistent with the provisions hereof that the DIP Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**7.4**     *Fees and Expenses of the DIP Collateral Trust.*

Following the establishment of the DIP Collateral Trust, expenses of the DIP Collateral Trust shall be paid from the DIP Collateral Trust Assets in the ordinary course of business, in accordance with the Plan and the DIP Collateral Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the DIP Collateral Trustee, on behalf of the DIP Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the DIP Collateral Trustee, are necessary to assist the DIP Collateral Trustee in the performance of the DIP Collateral Trustee's duties under the Plan and the DIP Collateral Trust Agreement, subject to any limitations and procedures established by the DIP Collateral Trust Agreement.

**7.5**     *Indemnification.*

The DIP Collateral Trust shall indemnify and hold harmless the DIP Collateral Trustee, in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**7.6**     *Dissolution of the DIP Collateral Trust.*

In no event shall the DIP Collateral Trust be dissolved later than five (5) years from the date the DIP Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the DIP Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the DIP Collateral Trust Assets.

**7.7** *__Records.__*

The DIP Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the DIP Collateral Trustee, for the disposition of DIP Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**7.8** *__Non-Transferability.__*

The DIP Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**7.9** *__DIP Collateral Trust Tax and Other Matters.__*

**(a)      Tax Treatment.**  The DIP Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the DIP Collateral Trustee), all parties (including, without limitation, the Debtors, the DIP Collateral Trustee, and the DIP Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in satisfaction of their Claims, followed by (ii) the transfer of such assets by such holders to the DIP Collateral Trust in exchange for the beneficial interests in the DIP Collateral Trust. Accordingly, absent definitive guidance to the contrary, the DIP Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of DIP Collateral Trust Assets.

**(b)      Liquidation Purpose of the DIP Collateral Trust; No Successor in Interest.**  The DIP Collateral Trust shall be established for the primary purpose of liquidating and distributing the DIP Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the DIP Collateral Trust.  Accordingly, the DIP Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the DIP Collateral Trust Assets, make timely distributions to the DIP Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The DIP Collateral Trustee shall distribute at least annually to the DIP Collateral Trust Beneficiaries any Available Cash.  The DIP Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the DIP Collateral Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the DIP Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or DIP Collateral Trust Agreement to the contrary, the DIP Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the DIP Collateral Trust as set forth in the Plan.

(c)      **Cash Investments.**  The right and power of the DIP Collateral Trustee to invest the DIP Collateral Trust Assets, the proceeds thereof, or any income earned by the DIP Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements.  The DIP Collateral Trustee may expend the Cash of the DIP Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the DIP Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the DIP Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the DIP Collateral Trust in accordance with the Plan and the DIP Collateral Trust Agreement (including, without limitation, the payment of any taxes).

(d)      **Tax Reporting and Tax Payments.**

(i)      The DIP Collateral Trustee shall file tax returns for the DIP Collateral Trust treating the DIP Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 7.9(d).  The DIP Collateral Trustee also shall annually send to each holder of a DIP Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the DIP Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)      As soon as practicable following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall make a good faith determination of the fair market value of the DIP Collateral Trust Assets as of the date the DIP Collateral Trust is established.  The DIP Collateral Trustee shall provide all parties with such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)      Allocations of DIP Collateral Trust taxable income among DIP Collateral Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the DIP Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of DIP Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the DIP

59

Collateral Trust.  Similarly, taxable loss of the DIP Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining DIP Collateral Trust Assets.  The tax book value of DIP Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date DIP Collateral Trust Assets are transferred to the DIP Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    The DIP Collateral Trust shall be responsible for payment, out of DIP Collateral Trust Assets, of any taxes imposed on the DIP Collateral Trust or the DIP Collateral Trust Assets.

(v)    The DIP Collateral Trustee may request an expedited determination of taxes of the DIP Collateral Trust under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the DIP Collateral Trust for all taxable periods through the dissolution of the DIP Collateral Trust.

(vi)    The treatment provided in this Section 7.9, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE VIII.    ABL COLLATERAL TRUST.

### 8.1    *Establishment of the ABL Collateral Trust.*

On or prior to the Effective Date, the ABL Collateral Trust shall be established in accordance with the ABL Collateral Trust Agreement for the purpose of being vested with and liquidating the ABL Collateral Trust Assets and making distributions to holders of Allowed Claims in accordance with the terms of the ABL Collateral Trust Agreement and the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the ABL Collateral Trust's primary purpose is liquidating the ABL Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the ABL Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the ABL Collateral Trust Assets and provide for the orderly liquidation thereof.

### 8.2    *Transfer of Assets into the ABL Collateral Trust.*

On the Effective Date or as soon as reasonably practicable thereafter and following the consummation of the DIP Collateral Credit Bid Transaction, the Debtors shall transfer the ABL Collateral Trust Assets to the ABL Collateral Trust, and all such assets shall vest in the ABL

Collateral Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the ABL Collateral Trustee, in accordance with the Plan and the ABL Collateral Trust Agreement. The ABL Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the ABL Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the ABL Collateral Trust. The act of transferring the ABL Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the ABL Collateral Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust, the Debtors shall have no interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Upon delivery of the ABL Collateral Trust Assets to the ABL Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the ABL Collateral Trust shall vest in the ABL Collateral Trust and its representatives, and the Debtors and the ABL Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The ABL Collateral Trustee shall agree to accept and hold the ABL Collateral Trust Assets in the ABL Collateral Trust for the benefit of the ABL Collateral Trust Beneficiaries, subject to the terms of the Plan and the ABL Collateral Trust Agreement.

### 8.3 *ABL Collateral Trust Waterfall*.

Proceeds of the ABL Collateral Trust Assets, net of expenses, shall be distributed to ABL Collateral Trust Beneficiaries as follows: one-hundred percent (100%) of such proceeds shall be distributed to the ABL Collateral Trust Beneficiaries until aggregate distributions equal the Allowed amount of the ABL Claims; *provided* that any proceeds of the ABL Collateral Trust Assets in excess of the Allowed amount of the ABL Claims shall be deemed to be DIP Collateral Trust Assets and shall be turned over to the DIP Collateral Trust and distributed in accordance with the Plan. Distributions to holders of ABL Collateral Trust Interests shall be paid pro rata based on the ABL Collateral Trust Interests held by such holders.

### 8.4 *ABL Collateral Trustee*.

(a) **Appointment of ABL Collateral Trustee.** Upon the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall be appointed as the trustee of the ABL Collateral Trust. The initial ABL Collateral Trustee shall be selected and appointed by the ABL Agent, and the ABL Agent shall have the sole right to remove and replace the ABL Collateral Trustee. The powers, rights and responsibilities of the ABL Collateral Trustee shall be as specified in the ABL Collateral Trust Agreement and Plan and shall include the authority and responsibility

to fulfill the items identified in this <u>Section 8.4</u> of the Plan. Other rights and duties of the ABL Collateral Trustee and the ABL Collateral Trust Beneficiaries shall be as set forth in the ABL Collateral Trust Agreement.

(b)     **Functions of the ABL Collateral Trustee.**  Following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee and/or the ABL Collateral Trust, as applicable, shall carry out the functions set forth in this <u>Section 8.4</u> and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the ABL Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the ABL Collateral Trust;

(ii)     take any actions necessary to (A) resolve all matters related to the ABL Collateral Trust Assets and (B) vest such assets in the ABL Collateral Trust;

(iii)     open and maintain bank accounts on behalf of or in the name of the ABL Collateral Trust;

(iv)     maintain the books and records and accounts of the ABL Collateral Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the other Trustees, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors;

(vi)     accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the ABL Collateral Trust Assets in accordance with the ABL Collateral Trust Agreement;

(vii)     administer the ABL Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the ABL Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)     calculate and make distributions of the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan;

(ix)     invest Cash, as available, and any income earned thereon;

(x)     retain, compensate and employ professionals to represent the ABL Collateral Trust or the ABL Collateral Trustee, as applicable;

(xi)    provide funding for the administration of the Factored Receivables Account and prosecution of the FBG Debtors' interests in the Factored Receivables Account in accordance with the Plan;

(xii)   dissolve the ABL Collateral Trust in accordance with the terms of the ABL Collateral Trust Agreement; and

(xiii)  take any other actions not inconsistent with the provisions hereof that the ABL Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**8.5** ***Fees and Expenses of the ABL Collateral Trust.***

Following the establishment of the ABL Collateral Trust, expenses of the ABL Collateral Trust shall be paid from the ABL Collateral Trust Assets in the ordinary course of business, in accordance with the Plan and the ABL Collateral Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the ABL Collateral Trustee, on behalf of the ABL Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the ABL Collateral Trustee, are necessary to assist the ABL Collateral Trustee in the performance of the ABL Collateral Trustee's duties under the Plan and the ABL Collateral Trust Agreement, subject to any limitations and procedures established by the ABL Collateral Trust Agreement.

**8.6** ***Indemnification.***

The ABL Collateral Trust shall indemnify and hold harmless the ABL Collateral Trustee and the ABL Agent, in their capacities as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**8.7** ***Dissolution of the ABL Collateral Trust.***

In no event shall the ABL Collateral Trust be dissolved later than five (5) years from the date the ABL Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the ABL Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the ABL Collateral Trust Assets.

**8.8** *Records.*

The ABL Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the ABL Collateral Trustee, for the disposition of ABL Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**8.9** *Non-Transferability.*

The ABL Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**8.10** *ABL Collateral Trust Tax and Other Matters.*

**(a)** **Tax Treatment.** The ABL Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity). Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the ABL Collateral Trustee), all parties (including, without limitation, the Debtors, the ABL Collateral Trustee, and the ABL Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the ABL Collateral Trust Assets by the Debtors to the ABL Collateral Trust as (i) the transfer of such assets by the Debtors directly to the holders of Allowed Claims entitled to receive ABL Collateral Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the ABL Collateral Trust in exchange for the beneficial interests in the ABL Collateral Trust. Accordingly, absent definitive guidance to the contrary, the ABL Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of ABL Collateral Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

**(b)** **Liquidation Purpose of the ABL Collateral Trust; No Successor in Interest.** The ABL Collateral Trust shall be established for the primary purpose of liquidating and distributing the ABL Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the ABL Collateral Trust. Accordingly, the ABL Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the ABL Collateral Trust Assets, make timely distributions to the ABL Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration. The ABL Collateral Trustee shall distribute at least annually to the ABL Collateral Trust Beneficiaries any Available Cash. The ABL Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the ABL

64

Collateral Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the ABL Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or ABL Collateral Trust Agreement to the contrary, the ABL Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the ABL Collateral Trust as set forth in the Plan.

(c)     **Cash Investments.** The right and power of the ABL Collateral Trustee to invest the ABL Collateral Trust Assets, the proceeds thereof, or any income earned by the ABL Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The ABL Collateral Trustee may expend the Cash of the ABL Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the ABL Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the ABL Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the ABL Collateral Trust in accordance with the Plan and the ABL Collateral Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The ABL Collateral Trustee shall file tax returns for the ABL Collateral Trust treating the ABL Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 8.10(d). The ABL Collateral Trustee also shall annually send to each holder of a ABL Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the ABL Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall make a good faith determination of the fair market value of the ABL Collateral Trust Assets as of the date the ABL Collateral Trust is established. The ABL Collateral Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)     Allocations of ABL Collateral Trust taxable income among ABL Collateral Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash

65

representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the ABL Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of ABL Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the ABL Collateral Trust. Similarly, taxable loss of the ABL Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining ABL Collateral Trust Assets. The tax book value of ABL Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date ABL Collateral Trust Assets are transferred to the ABL Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The ABL Collateral Trust shall be responsible for payment, out of ABL Collateral Trust Assets, of any taxes imposed on the ABL Collateral Trust or the ABL Collateral Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)     The ABL Collateral Trustee may request an expedited determination of taxes of the ABL Collateral Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the ABL Collateral Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the ABL Collateral Trust (or any such disputed ownership fund or other separate taxable

66

entity) for all taxable periods through the dissolution of the ABL Collateral Trust.

(vi) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the ABL Collateral Trustee of a private letter ruling if the ABL Collateral Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such ABL Collateral Trustee), the ABL Collateral Trustee may elect to treat any ABL Collateral Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the ABL Collateral Trustee and ABL Collateral Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii) The treatment provided in this <u>Section 8.10</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE IX. DIRECT CLAIMS TRUST.

### 9.1 *<u>Establishment of the Direct Claims Trust</u>.*

On or prior to the Effective Date, the Direct Claims Trust shall be established in accordance with the Direct Claims Trust Agreement for the purpose of being vested with and liquidating the Direct Claims Trust Assets and making distributions to the Direct Claims Trust Beneficiaries in accordance with the terms of the Direct Claims Trust Agreement. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Direct Claims Trust's primary purpose is liquidating the Direct Claims Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Direct Claims Trust's liquidating purpose and reasonably necessary to conserve and protect the Direct Claims Trust Assets and provide for the orderly liquidation thereof.

### 9.2 *<u>Transfer of Assets into the Direct Claims Trust</u>.*

**(a)** Upon the establishment of the Direct Claims Trust, the Direct Claims Trust Electing Creditors shall be deemed to have transferred their Direct Creditor Claims to the Direct Claims Trust in exchange for Direct Claims Trust Interests, and all such Direct Creditor Claims shall vest in the Direct Claims Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Direct Claims Trustee, in accordance with the Direct Claims Trust Agreement. The Direct Claims Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Direct Claims Trust, which may have a separate legal existence, but which shall be considered

sub-accounts or sub-trusts of the Direct Claims Trust. The act of transferring the Direct Claims Trust Assets, as authorized by the Plan and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Direct Claims Trust, in any judicial, arbitration, or administrative proceeding. For the avoidance of doubt, the Direct Claims Trust shall not obtain, prosecute, control, or otherwise use or attempt to use the Estate Claims and shall have no interest therein.

### 9.3    *Direct Claims Trust Waterfall.*

The proceeds from the monetization of the Direct Claims Trust Assets shall be distributed to the Direct Claims Trust Beneficiaries in accordance with the Direct Claims Trust Agreement.

### 9.4    *Direct Claims Trustee.*

**(a)    Appointment of Direct Claims Trustee.** Upon the establishment of the Direct Claims Trust, the Direct Claims Trustee shall be appointed. The powers, rights and responsibilities of the Direct Claims Trustee shall be as specified in the Direct Claims Trust Agreement.

**(b)    Functions of the Direct Claims Trustee.** On and after the date the Direct Claims Trust is established, the Direct Claims Trustee shall carry out the functions set forth in this the Direct Claims Trust Agreement and may take such actions, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Direct Claims Trust Agreement.

### 9.5    *Fees and Expenses of the Direct Claims Trust.*

**(a)** Following the establishment of the Direct Claims Trust, expenses of the Direct Claims Trust shall be paid from the Direct Claims Trust Assets in the ordinary course of business, in accordance with the Direct Claims Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Direct Claims Trustee, on behalf of the Direct Claims Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred that, in the discretion of the Direct Claims Trustee, are necessary to assist the Direct Claims Trustee in the performance of the Direct Claims Trustee's duties under the Direct Claims Trust Agreement, subject to any limitations and procedures established by the Direct Claims Trust Agreement.

**(b)** The Direct Claims Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Direct Claims Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Direct Claims Trust Assets).

### 9.6    *Indemnification.*

The Direct Claims Trust shall indemnify and hold harmless the Direct Claims Trustee, in its capacity as such, for any losses incurred in such capacities, except to the extent such

68

losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

### 9.7     *Dissolution of the Direct Claims Trust.*

In no event shall the Direct Claims Trust be dissolved later than five (5) years from the date the Direct Claims Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Direct Claims Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Direct Claims Trust Assets.

### 9.8     *Non-Transferability.*

The Direct Claims Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

### 9.9     *Direct Claims Trust Tax and Other Matters.*

(a)     **Tax Treatment.**  The Direct Claims Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Direct Claims Trustee), the Direct Claims Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Direct Claims Trust Assets.

(b)     **Liquidation Purpose of the Direct Claims Trust; No Successor in Interest.**  The Direct Claims Trust shall be established for the primary purpose of liquidating and distributing the Direct Claims Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Direct Claims Trust.  Accordingly, the Direct Claims Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Direct Claims Trust Assets, make timely distributions to the Direct Claims Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The Direct Claims Trustee shall distribute at least annually to the Direct Claims Trust Beneficiaries any Available Cash.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Direct Claims Trustee expressly for such purpose. Notwithstanding anything in the Plan or Direct Claims Trust Agreement to the contrary, the Direct Claims Trustee shall always act consistently with, and not contrary to, the purpose of the Direct Claims Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the Direct Claims Trustee to invest the Direct Claims Trust Assets, the proceeds thereof, or any income earned by the Direct

Claims Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements. The Direct Claims Trustee may expend the Cash of the Direct Claims Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Direct Claims Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Direct Claims Trust) and (iii) to satisfy other respective liabilities incurred by the Direct Claims in accordance with the Direct Claims Trust Agreement (including, without limitation, the payment of any taxes).

**(d)** **Tax Reporting and Tax Payments.**

(i) The Direct Claims Trustee shall file tax returns for the Direct Claims Trust treating the Direct Claims Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 9.9(d). The Direct Claims Trustee also shall annually send to each holder of a Direct Claims Trust Interest, a separate statement regarding the receipts and expenditures of the Direct Claims Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii) As soon as practicable following the establishment of the Direct Claims Trust, the Direct Claims Trustee shall make a good faith determination of the fair market value of the Direct Claims Trust Assets as of the date the Direct Claims Trust is established. The Direct Claims Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii) Allocations of Direct Claims Trust taxable income among Direct Claims Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Direct Claims Trust had distributed all its assets (valued at their tax book value) to the holders of Direct Claims Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Direct Claims Trust. Similarly, taxable loss of the Direct Claims Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Direct Claims Trust Assets. The tax book value of Direct Claims Trust Assets for purpose of this paragraph shall equal their fair market value on the date Direct

70

Claims Trust Assets are transferred to the Direct Claims Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Direct Claims Trust shall be responsible for payment, out of Direct Claims Trust Assets, of any taxes imposed on the Direct Claims Trust or the Direct Claims Trust Assets.

(v)      The treatment provided in this Section 9.9, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE X.     DISTRIBUTIONS.

### 10.1     *Distributions Generally.*

**(a)     Plan Debtor Distributions**.  On or after the Effective Date, the Wind Down Administrator shall commence all distributions pursuant to the Plan to holders of Allowed Claims against the Plan Debtor only in accordance with the terms of the Plan and the Confirmation Order, and only to the extent that the Plan Debtor has sufficient assets (or income and/or proceeds realized from such assets) to make such payments in accordance with and to the extent provided for in the Plan and the Confirmation Order; *provided* that the assets used to make such payments shall not include any Litigation Trust Assets or DIP Collateral Trust Assets.

**(b)     Trust Distributions**.  On or after the Effective Date, the Trustees shall make all distributions to Trust Beneficiaries only in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreements, as applicable, and only to the extent that the Trusts have sufficient assets (or income and/or proceeds realized from such assets) to make such distributions in accordance with and to the extent provided for in the Plan, the Confirmation Order, and the Trust Agreements, as applicable.

**(c)**     The Wind Down Administrator and the Trustees shall not be required to give any bond or surety or other security for the performance of their duties under the Plan or the Trust Documents.

### 10.2     *No Postpetition Interest on Claims.*

Unless otherwise provided in the Plan, the Confirmation Order, the DIP Order, the Trust Agreements, as applicable, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 10.3     *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of

holders of Claims or Interests in each Class, as maintained by the Plan Debtor or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date. Neither the Plan Debtor, the Wind Down Administrator, nor the Trustees shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

### 10.4    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 10.5    *Reserve on Account of Disputed Claims.*

**(a)**    From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Wind Down Administrator or the applicable Trustee shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in a filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Wind Down Administrator or the applicable Trustee. Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Wind Down Administrator or the applicable Trustee for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Wind Down Administrator or the applicable Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order or settlement.

**(b)**    Subject to the other provisions of the Plan regarding timing of distributions, after a Disputed Claim becomes an Allowed Claim, the Wind Down Administrator or the applicable Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan or the applicable Trust Document and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto). The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class. Each holder of a Disputed Claim that ultimately becomes an

Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for distribution pursuant to the foregoing clause (i) is insufficient to remit distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from the applicable Trusts' assets.

**(c)**　The Wind Down Administrator and the Trustees shall not be required to make any distributions from a Disputed Claims Reserve as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

**(d)**　Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 10.5.

### 10.6　*Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10.7　*Delivery of Distributions.*

**(a)**　Subject to Bankruptcy Rule 9010, the Wind Down Administrator and the Trustees, as applicable, shall make all distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by the Plan at (a) the address of such holder on the books and records of the Debtors or its agents, (b) at the address in any written notice of address change delivered to the Wind Down Administrator or the Trustees, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable.　Subject to Section 10.8 of the Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Wind Down Administrator or Trustees, as applicable, have been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

**(b)**　The Debtors shall use commercially reasonable efforts to provide the Wind Down Administrator and the Trustees with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.

### 10.8　*Unclaimed Property.*

**(a)**　Six (6) months from the later of:　(i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed against the Plan Debtor, all distributions payable on account of such Claim or Interest that are unclaimed pursuant to Section 10.8(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Wind Down Administrator, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Wind Down Administrator shall have no obligation to attempt to locate any holder of an

Allowed Claim against the Plan Debtor other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

(b)     A distribution made pursuant to the Plan shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Wind Down Administrator of an intent to accept a particular distribution, (iii) responded to a request by the Wind Down Administrator or a Disbursing Agent for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 10.9     *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims against the Plan Debtor under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims against the Plan Debtor.

### 10.10     *Manner of Payment Under Plan.*

Except as otherwise specifically provided herein, at the option of the Wind Down Administrator, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Wind Down Administrator. Any wire transfer fees incurred by the Wind Down Administrator in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's distribution.

### 10.11     *Minimum Distribution.*

The Wind Down Administrator shall have no obligation to make a distribution under the Plan that is less than $100.00 in Cash.

### 10.12     *Setoffs and Recoupments.*

(a)     Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, the Wind Down Administrator may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim against the Plan Debtor and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Plan Debtor or its successors may hold against the holder of such Allowed Claim; *provided* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Debtor, its Estate, or the Wind Down Administrator of any claims, rights, or Causes of Action that the Plan Debtor may possess against the holder of such Claim.

(b)     In no event shall any Holder of a Claim be entitled to set off any such Claim against any claim, right, or Cause of Action of the Plan Debtor, unless (i) the Plan Debtor or the Wind Down Administrator, as applicable, has consented or (ii) such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder

asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence before the Effective Date.

### 10.13 *Withholding and Reporting Requirements*.

(a) **Withholding Rights**. In connection with the Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any Entity issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b) **Forms.** Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the Plan Debtor, the Wind Down Administrator, a Trustee, or Disbursing Agent, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Debtor, the Wind Down Administrator, a Trustee, Disbursing Agent, or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding. If such request is made and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Debtor or the applicable Trust and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against the Plan Debtor, the Plan Debtor's Estate, the Trusts, and their respective property.

(c) The FBG Debtors shall cooperate in good faith with the Wind Down Administrator, the Trustees and the GUC Ombudsman to comply with the withholding and reporting requirements outlined in this Section 10.13 of the Plan.

### 10.14 *Disbursing Agent*.

(a) The Wind Down Administrator and the Trustees shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required

75

under the Plan, the Confirmation Order, and the Trust Agreements. The Wind Down Administrator and the Trustees may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b)     From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Plan Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or the Trust Documents or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(c)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(d)     Except as otherwise ordered by the Bankruptcy Court and, in the case of the GUC Ombudsman, subject to Section 5.2(k) hereof, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Wind Down Administrator or the applicable Trust in the ordinary course of business.

### 10.15   *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in the Plan or as otherwise required by law (as determined by the Wind Down Administrator, the Trustees or the GUC Ombudsman, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest (including original issuance discount).

## ARTICLE XI.      PROCEDURES FOR RESOLVING CLAIMS.

### 11.1   *Allowance of Claims.*

The Wind Down Administrator shall have and shall retain any and all rights and defenses that the Plan Debtor had with respect to any Claim against the Plan Debtor. Except as

76

expressly provided in the Plan or in any order entered in the Plan Debtor's Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim against the Plan Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order in the Plan Debtor's Chapter 11 Case allowing such Claim.

### 11.2    *Objections to Claims.*

As of the Effective Date, the Wind Down Administrator shall be entitled to object to Claims against the Plan Debtor.  Any objections to Claims against the Plan Debtor shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Wind Down Administrator may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in its sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

### 11.3    *Estimation of Claims.*

The Wind Down Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim against the Plan Debtor pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Debtor had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Wind Down Administrator may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated; *provided* that, for the avoidance of doubt, the GUC Ombudsman shall be responsible solely for reconciling Electing Creditor Claims in accordance with the Plan.

### 11.4    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

**11.5** *Adjustment to Claims Register Without Objection.*

Any Claim or Interest against the Plan Debtor that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Wind Down Administrator upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**11.6** *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**11.7** *Amendments to Claims.*

A Claim against the Plan Debtor may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Wind Down Administrator, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

**ARTICLE XII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**12.1** *Rejection of Executory Contracts and Unexpired Leases.*

**(a)** As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Plan Debtor is a party shall be deemed rejected by the Plan Debtor (and not any other Debtor) except for an executory contract or unexpired lease that: (i) was previously assumed or rejected by the Plan Debtor pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a separate assumption or rejection motion or request filed by the Plan Debtor on or before the Effective Date; (iv) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Policy or other insurance policy to which the Plan Debtor is a beneficiary or an insured. For the avoidance of doubt, (a) the Plan Debtor may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date and (b) the FBG Debtors (other than the Plan Debtor) may assume, assume and assign, or reject any executory contract or unexpired lease before, on, or after the Effective Date pursuant to the Contracts Procedures Order or otherwise in accordance with applicable bankruptcy law.

**(b)** Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections provided for in the Plan pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**12.2** *Survival of Indemnification Obligations.*

Any and all obligations of a Debtor to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the such Debtor's corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims against the Plan Debtor arising under the foregoing documents shall be treated as General Unsecured Claims to the extent Allowed. Notwithstanding anything in the Plan to the contrary, the Plan Debtor's Indemnification Obligation shall be assumed by the Plan Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 12.2.

**12.3** *Rejection Damages Claims.*

**(a)** Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Plan Debtor's executory contracts or unexpired leases pursuant to the Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

**(b)** Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Plan Debtor's Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Plan Debtor, its Estate, or the property for any of the foregoing without the need for any objection by the Plan Debtor or Wind Down Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Plan Debtor's prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims.

**12.4** *Insurance Policies.*

**(a)** Each of the Plan Debtor's Insurance Policies and any agreements, documents, or instruments related thereto, as of the Effective Date, shall be deemed to be and treated as executory contracts and shall be assumed by the Plan Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.

**(b)** Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance

Policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law.

**(c)** All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies.

**(d)** On the Effective Date, all rights and obligations of the FBG Debtors, if any, under the D&O Policies shall transfer to the Litigation Trust in accordance with the Plan and the Litigation Trust shall assume the FBG Debtors' obligations for administering such policies. For the avoidance of doubt, the transfer of the Insurance Rights of the FBG Debtors' and their Estates to recover proceeds from D&O Policies to the Litigation Trust, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

**(e)** On the Effective Date, all rights and obligations of the FBG Debtors, if any, under the Independent Manager Policies shall transfer to the Plan Debtor and the Plan Debtor shall assume the Debtors' obligations, if any, for administering such policy.

### 12.5 *Reservation of Rights.*

**(a)** Neither the exclusion nor the inclusion by the Plan Debtor of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Plan Debtor or any other party that any such contract or lease is or is not an executory contract or unexpired lease or that the Plan Debtor, its Estate, or its Affiliates has any liability thereunder.

**(b)** Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Wind Down Administrator, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**(c)** Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Wind Down Administrator, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**ARTICLE XIII.** **CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

### 13.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

**(a)** the Disclosure Statement Order shall have been entered;

80

**(b)** the closings of the Estate Claims Credit Bid Transaction and DIP Collateral Credit Bid Transaction each shall have occurred;

**(c)** the Litigation Trust has been established and the Litigation Trust Assets have been transferred to the Litigation Trust;

**(d)** the Litigation Trust Interests have been issued in a form and manner satisfactory to the Required Consenting Lenders and the Creditors' Committee;

**(e)** the DIP Collateral Trust has been established and the DIP Collateral Trust Assets have been transferred to the DIP Collateral Trust;

**(f)** the DIP Collateral Trust Interests have been issued in a form and manner satisfactory to the Required Consenting Lenders;

**(g)** the ABL Collateral Trust has been established and the ABL Collateral Trust Assets have been transferred to the ABL Collateral Trust;

**(h)** the Plan Supplement and all of the schedules, documents, supplements, and exhibits thereto shall have been filed in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders, and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed), and be consistent in all material respects with the Plan Support Agreement;

**(i)** the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay or injunction;

**(j)** all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

**(k)** all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received;

**(l)** the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in the Plan;

**(m)** all actions, documents, certificates, and agreements necessary to implement the Plan, including the Global Settlement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws; and

**(n)** all fees, expenses, and other amounts due and payable to the Ad Hoc Group Advisors pursuant to the DIP Order and the Plan, including, without limitation, the Restructuring Expenses shall have been paid in full.

**13.2** *Waiver of Conditions Precedent.*

**(a)** Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XIII may be waived, in whole or in part, by the Plan Debtor, with the consent of the Creditors' Committee and the Required Consenting Lenders (not to be unreasonably withheld, conditioned, or delayed), without leave of or order of the Bankruptcy Court.

**(b)** Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

**(c)** The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**13.3** *Effect of Failure of a Condition.*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Plan Debtor, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Plan Debtor or any other Entity.

**13.4** *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Plan Debtor and all holders of Claims and Interests in the Plan Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of the Plan Debtor's obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Plan Debtor or any other Entity or to prejudice in any manner the rights of the Plan Debtor or any other Entity in any further proceedings involving the Plan Debtor or otherwise.

**ARTICLE XIV.     EFFECT OF CONFIRMATION.**

**14.1** *Binding Effect.*

As of the Effective Date, the Plan shall bind (i) the Debtors, including the Plan Debtor; (ii) the Wind Down Administrator; (iii) the Litigation Trustee and the Litigation Trust; (iv) the DIP Collateral Trustee and the DIP Collateral Trust; (v) the ABL Collateral Trustee and the ABL Collateral Trust; (vi) the Direct Claims Trustee and the Direct Claims Trust; (vii) any successor to the Debtors, including any chapter 7 trustee appointed in any Debtor's chapter 7 case; (viii) all holders of Claims against and Interests in the Debtors, including Electing Creditors, and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, (d) voted to reject the Plan, and/or (e) received any distribution

under the Plan; (ix) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; (x) each Entity acquiring property under the Plan and the Confirmation Order; and (xi) any and all non-Debtor parties to executory contracts and unexpired leases with the Plan Debtor.

### 14.2 *Vesting of Assets.*

Except as otherwise provided in the Plan (including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7), the Plan Supplement, or the Confirmation Order, on and after Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Litigation Trust Assets, the DIP Collateral Trust Assets, and the ABL Collateral Trust Assets shall vest in the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law. Subject to the terms of the Plan, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, and the ABL Collateral Trust Agreement, on and after the Effective Date, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests against the Plan Debtor without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Plan Debtor or Wind Down Administrator may pay the charges that it incurs on behalf of the Plan Debtor's Estate after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 14.3 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Plan Debtor's Chapter 11 Case, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. For the avoidance of doubt, no injunction or stay shall interfere with the administration of the Litigation Trust or the prosecution of claims owned by such Litigation Trust.

### 14.4 *Plan Injunction.*

**(a)     Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, for the avoidance of doubt, exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims.**

**(b)     Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released**

or discharged pursuant to the Plan, including under **Section 14.5(a)** or **Section 14.5(b)** of the Plan, or (ii) subject to exculpation pursuant to **Section 14.6** of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Plan Debtor, the Plan Debtor's Estate, the Wind Down Administrator, the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to **Section 14.6** of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to **Section 14.5(a)** or **Section 14.5(b)** of the Plan; and (G) exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, the Plan Debtor or its Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(c)     Subject in all respects to **Section 15.1** of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind

Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been exculpated and, only to the extent legally permissible and as provided for in Section 15.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(d)     As of the Effective Date, all Persons other than the Litigation Trust are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Claim (including in any proceeding in a judicial, arbitral, administrative, or other forum). If any Person other than the Litigation Trust commences, conducts, or continues litigation or prosecution of an Estate Claim without a prior determination by the Bankruptcy Court that the claim or cause of action is not an Estate Claim, the Litigation Trust shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such claim or Cause of Action is an Estate Claim and that this injunction has been violated. Upon such determination, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Litigation Trust. For the avoidance of doubt, no Person other than the Litigation Trust (including a defendant in such action) is entitled to enforce this Section 14.4(d).

(e)     The injunctions in this Section 14.4 shall extend to any successors of the Plan Debtor, the Wind Down Administrator, the Litigation Trust and the Litigation Trustee, the DIP Collateral Trust and the DIP Collateral Trustee, and the ABL Collateral Trust and the ABL Collateral Trustee and each of their respective property and interests in property.

14.5 *Releases.*

(a) Releases by the FBG Debtors and their Estates. Except as otherwise expressly set forth below in this Section 14.5, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the FBG Debtors, their Estates, and successors and assigns, including the Wind Down Administrator, the Litigation Trust, the Litigation Trustee, the DIP Collateral Trust, the DIP Collateral Trustee, the ABL Collateral Trust, and the ABL Collateral Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the FBG Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other

agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 14.5(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; *provided* that, for the avoidance of doubt, the releases granted under this Section 14.5(a) are binding on successors to the FBG Debtors, including the chapter 7 estate of an FBG Debtor and any trustee appointed to oversee the chapter 7 estate of such FBG Debtor.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct

**Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this <u>Section 14.5(b)</u> shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released under the Plan.**

14.6 *<u>Exculpation</u>.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Direct Claims Trust; the Direct Claims Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, ABL Collateral Trust, and the Direct Claims Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Direct Claims Trust Interests); the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place from the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this <u>Section 14.6</u> shall not release or exculpate (a) any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud committed by such Exculpated Party, or (b) any post-

Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 14.7 *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XIV OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 14.5 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 14.8 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 14.9 *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Debtor and the Wind Down Administrator reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**14.10** *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in the Plan, including in all respects Sections 14.5(a), 14.5(b), 14.6, and 14.7, the Plan Debtor, the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**14.11** *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

**14.12** *Solicitation of Plan.*

As of the Confirmation Date: (a) the Plan Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Plan Debtor and each of its respective managers, directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation in such solicitation, and therefore are not, and on account thereof shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

**ARTICLE XV.     RETENTION OF JURISDICTION.**

**15.1** *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Plan Debtor's Chapter 11 Case for, among other things, the following purposes:

**(a)** to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

**(b)** to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

**(c)** to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

**(d)** to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

**(e)** to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Estate Claims;

**(f)** to hear and determine settlements and disputes with respect to any DIP Collateral Trust Asset;

**(g)** to hear and determine settlements and disputes with respect to any ABL Collateral Trust Asset;

**(h)** to hear and determine any disputes with respect to the Factored Receivables Account and the funds deposited therein;

**(i)** to hear and determine any disputes with respect to the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account and the funds deposited therein;

**(j)** to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, or the ABL Collateral Trustee;

**(k)** to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

**(l)** to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

**(m)** to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy

Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(n)     to hear and determine all Professional Fee Claims;

(o)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(p)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(q)     to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

(r)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, the Plan Supplement, and the Confirmation Order;

(s)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(t)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(u)     to hear and determine any other matters related to the Plan Debtor's Chapter 11 Case and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(v)     to resolve any disputes concerning whether a Person had sufficient notice of the Plan Debtor's Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Plan Debtor's Chapter 11 Case, or any bar date or established in the Plan Debtor's Chapter 11 Case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(w)     to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XIV of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(x)     to enforce all orders previously entered by the Bankruptcy Court;

(y)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Plan Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

**(z)** to recover all assets of the Litigation Trust, DIP Collateral Trust, the ABL Collateral Trust, the Plan Debtor and property of the Plan Debtor's Estate, wherever located; and

**(aa)** to enter a final decree closing the Plan Debtor's Chapter 11 Case.

### 15.2 *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XVI. MISCELLANEOUS PROVISIONS.

### 16.1 *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Plan Debtor in full on the Effective Date. On and after the Effective Date, the Wind Down Administrator shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, Wind Down Administrator, on behalf of the Plan Debtor, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of the Plan Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 16.2 *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Plan Debtor; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), including with respect to any transfers to or by the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 16.3    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.  The Debtors, the Wind Down Administrator, the Trusts, and the Trustees shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except for any Professional Fees incurred by the Creditors' Committee, including with respect to any appeal of the Plan and as agreed pursuant to the Agreed Budget.

### 16.4    *Request for Expedited Determination of Taxes of the Plan Debtor.*

The Plan Debtor and the Wind Down Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Plan Debtor filed, or to be filed, for any and all taxable periods ending after the Petition Date.

### 16.5    *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 16.6    *Amendments.*

(a)    **Plan Modifications.**    The Plan may be amended, supplemented, or otherwise modified by the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee, not to be unreasonably withheld, conditioned or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the Litigation Trust, the DIP Collateral Trust, or the treatment of holders of Allowed Claims pursuant to the Plan, the Plan Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, supplemented, or otherwise modified.

(b)    **Certain Technical Amendments.**    Prior to the Effective Date, the Plan Debtor (with the consent of the Required Consenting Lenders and the Creditors' Committee, not to be unreasonably withheld, conditioned or delayed) may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the Litigation Trust, the DIP Collateral Trust, the ABL Trust, or the treatment of the holders of Claims or Interests under the Plan.

94

### 16.7    *Revocation or Withdrawal of Plan.*

The Plan Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Plan Debtor or any other Person, (ii) prejudice in any manner the rights of the Plan Debtor or any other Person, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by the Plan Debtor or any other Person.

### 16.8    *Notice of Effective Date.*

As soon as practicable, the Plan Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 16.9    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 16.10    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that the Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under the Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 16.11    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Electing Creditors, the Released Parties, the Exculpated Parties, each of their respective successors and assigns, and any chapter 7 trustees appointed in any chapter 7 cases of the Debtors.

**16.12** *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**16.13** *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

**16.14** *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Plan Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Plan Debtor or the Wind Down Administrator (as the case may be), and (c) non-severable and mutually dependent, unless otherwise agreed in the Plan Support Agreement.

**16.15** *Additional Documents.*

On or before the Effective Date, the Plan Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Plan Debtor, the Wind Down Administrator, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**16.16** *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**16.17** *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**16.18** *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**16.19** *Notices.*

All notices, requests, and demands hereunder to be effective shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Plan Debtor, to:

Premier Marketing Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn: Charles M. Moore, Chief Executive Officer
Email: cmoore@alvarezandmarsal.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:   Matthew S. Barr
          Sunny Singh
          Andriana Georgallas
          Kevin Bostel
          Jason H. George
Email:  matt.barr@weil.com
          sunny.singh@weil.com
          andriana.georgallas@weil.com
          kevin.bostel@weil.com
          jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson
Email:  clifford.carlson@weil.com

(2) If to the Ad Hoc Group to:

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, New York 10166
Attn:    Scott J. Greenberg
          AnnElyse Scarlett Gains
          Christina M. Brown
Email:  sgreenberg@gibsondunn.com
          agains@gibsondunn.com
          christina.brown@gibsondunn.com

(3) If to the Creditors' Committee, to:

**Brown Rudnick LLP**
7 Times Square
New York, New York 10036
Attn:   Robert J. Stark
          Bennett S. Silverberg
          Kenneth J. Aulet
Email:  rstark@brownrudnick.com
          bsilverberg@brownrudnick.com
          kaulet@brownrudnick.com

(4) If to the Wind Down Administrator to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(5) If to the Litigation Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(6) If to the DIP Collateral Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(7) If to the ABL Collateral Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

(8) If to the Direct Claims Trustee to:

[●]

with a copy (which shall not constitute notice) to:

[●]

After the Effective Date, the Wind Down Administrator has authority to send a notice to Persons providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Persons must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the Effective Date, the Wind Down Administrator is authorized to limit the list of Persons receiving

documents pursuant to Bankruptcy Rule 2002 to those Persons that have filed such renewed requests.

### 16.20 *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Plan Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Debtor or any other Persons with respect to any Claims or Interests prior to the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 28, 2026
      New York, New York

Respectfully submitted,

By:   */s/ Charles M. Moore*
      Name: Charles M. Moore
      Title: Chief Executive Officer

*On behalf of Premier Marketing Group, LLC*

[*Signature Page to Chapter 11 Plan*]