IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | Re: Docket Nos. 3144 & 3151 |

### DEBTORS' OBJECTION TO EMERGENCY MOTION OF EVOLUTION CREDIT PARTNERS TO COMPEL SEGREGATION AND TURNOVER OF POST-PETITION ACCOUNTS RECEIVABLE COLLECTED

First Brands Group, LLC ("**FBG**") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] file this objection (this "**Objection**") in response to the Turnover Motion[3] filed by Evolution[4] and the Joinder[5] filed by the SPV Chapter 7 Trustee.[6]  The Debtors respectfully represent as follows:

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Turnover Motion or the Adequate Protection Stipulation (each, as defined herein), as applicable.

Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**").

[3]  "**Turnover Motion**" means the *Emergency Motion of Evolution Credit Partners to Compel Segregation and Turnover of Post-Petition Accounts Receivables Collected* (Docket No. 3144).

[4]  "**Evolution**" means, collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[5]  "**Joinder**" means the *Joinder of SPV Debtors' Trustee Ronald Sommers in Evolution's Emergency Motion to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* (Docket No. 3151).

[6]  "**SPV Chapter 7 Trustee**" means Ronald J. Sommers, the chapter 7 trustee of the cases of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC together, the "**Evolution Borrowers**").

**Preliminary Statement**

1.       Evolution's Turnover Motion is facially and fatally defective as a matter of procedure, wrong on the substance, and outright misleading about the Court's prior rulings and supposed representations by the Debtors.

2.       To start, the Turnover Motion is procedurally improper:   Evolution expressly seeks turnover of alleged Evolution Collateral and, effectively, a preliminary injunction pending the outcome of the ongoing Evolution adversary proceeding to determine whether:  (a) the Evolution Borrowers owned the inventory (and proceeds thereof) on the Petition Date as required for Evolution to have a lien in such inventory at all; and (b) in any event, whether the ABL Lenders or the DIP Lenders (each as defined in the Interim DIP Order[7]) have senior liens over such assets. *See* Turnover Motion ¶ 21 (seeking an order compelling the Debtors to transfer $21.5 million[8] to Evolution and "prohibiting the Debtors from using, disbursing, or otherwise disposing of any funds collected on account of post-petition accounts receivable from the Warehouses pending turnover to Evolution").  That requested relief clearly falls within the ambit of matters that must be brought as an adversary proceeding under the Bankruptcy Rules.  *See* Fed. R. Bankr. P. 7001(a) (making a "proceeding to recover money or property" an adversary proceeding governed by Part VII of the Bankruptcy Rules).

3.       Moreover, Evolution filed the Turnover Motion on seven days' notice without a single witness statement or other evidence in support.  Evolution points to nothing to demonstrate that emergency relief is warranted, after waiting almost six months following the

---

[7]     "**Interim DIP Order**" refers to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 217).

[8]     The Turnover Motion asserts total collections of $21.5 million, but the Debtors' records show the amount to be $21.2 million.

Court's prior ruling on these matters. The Turnover Motion should be denied on procedural grounds alone, requiring Evolution to pursue the requested relief in an adversary proceeding and on full notice, at which time the Debtors will be prepared to put on witnesses and other evidence to rebut Evolution's baseless assertions.

4.       Evolution is also wrong on the substance. Its primary legal contention is that the Court required the FBG Debtors to identify and segregate inventory sale proceeds retroactively from the Petition Date to January 20, 2026 as a remedy for breaching the Adequate Protection Stipulation (defined below)—yet the Court ruled precisely the opposite. At the January 20 Hearing (defined below), Evolution's counsel argued that the Debtors should not be permitted to use or collect receipts generated from any sales of any Brakes Parts Inc LLC ("**BPI**") inventory going back to the Petition Date. Jan. 20, 2026 Hr'g Tr. (Docket No. 1672) (the "**Jan. 20 Tr.**") at 30:25–31:6; 34:1–6. The Court expressly held that the Adequate Protection Stipulation did ***not*** require the Debtors take such curative actions or post cash collateral, stating "[t]here is no remedy for specific performance in [the Adequate Protection Stipulation] so that the Debtor is not required itself to provide any kind of curative action." Jan. 20 Tr. at 45:4–8. The Court went on to find that the Adequate Protection Stipulation required only that the FBG Debtors cease their ongoing purchase and use of asserted Evolution inventory collateral located in certain specified Warehouses (defined below). But as a result of the breach, the Court stated the Debtors "would not be required to . . . exercise any curative actions . . . ***or put . . . any kind of cash in a segregated account***." *Id.* at 45:15–19 (emphasis added). Therefore, nothing in the Court's ruling required the Debtors to retroactively identify and segregate past proceeds collected that may (or may not) have been generated from inventory previously located at the relevant Warehouses.

5.      Evolution relies upon and quotes inapplicable portions of the January 20 Hearing transcript where the Court was referring to a situation where the Debtors and Evolution reach an agreement to sell inventory from the Warehouse ***going forward***.[9]  Since January 20, 2026, the FBG Debtors have not sold any inventory from the Warehouses and have identified and segregated all proceeds received since January 20, 2026 in full compliance with the Court's January 20 Ruling.

6.      Evolution's remaining legal contentions are equally groundless.  It invokes several other orders, none of which support its requests for relief.  The Cash Management Order provision on which Evolution relies, for instance, only required segregation of collections on account of ***prepetition*** sales, not collections based on postpetition sales, which are at issue here. *See* Cash Management Order ¶ 6.  It also invokes the retroactive application of section 363 of the Bankruptcy Code to cash of the FBG Debtors as if Evolution were a secured creditor of the FBG Debtors holding valid liens against their assets and traceable cash collateral.  But Evolution claims to be a secured creditor of the Evolution Borrowers only, and not even they had automated systems for tracking, reporting, and segregating inventory, accounts receivable, or cash proceeds from the Warehouses.  And of course, neither did the FBG Debtors.

7.      Further, Evolution's assertion that the ABL Lenders and DIP Lenders do not oppose its alleged liens in inventory, accounts receivable, and resulting cash is simply wrong.[10]

---

[9]   Evolution misleadingly cites to the Jan. 20 Tr. to suggest the Court required the Debtors to segregate proceeds collected ***prior to*** the hearing.  Turnover Motion ¶ 13 (citing Jan. 20 Tr. at 49:18–21).  But a fulsome read of the surrounding discussion shows the Court clearly talking about a situation where the parties agreed to sell additional inventory ***going forward***. *See* Jan. 20 Tr. at 49:2–22.

[10]  Evolution further misleads the Court when it says it has already established an undisputed first-priority lien in the inventory located in the Warehouses, as "confirmed" by the Adequate Protection Stipulation and January 20 Ruling. *See* Turnover Motion at ¶¶ 22, 25.  First, Evolution acknowledges that the Debtors dispute the Evolution Borrowers ever owned the relevant inventory, Turnover Motion at 10 n.4, which necessarily impacts Evolution's purported liens granted by the Evolution Borrowers.  In addition, all rights to challenge Evolution's liens were

4

As reflected in the objections filed by the ABL Lenders and DIP Lenders to the Turnover Motion, Evolution's interests are vigorously opposed on several fronts, and for good reasons.[11]  That is why, months ago, Evolution itself commenced an adversary proceeding to determine: (a) whether the Evolution Borrowers ever had an ownership interest in the disputed inventory on the Petition Date; and (b) whether the ABL Lenders (which assert a first-priority lien in the inventory contrary to Evolution's assertions) have a priority lien superior to Evolution's.  Even if the ABL Lenders were not asserting a lien over the inventory (and resulting cash), the DIP Lenders would have a first-priority lien if the Court determines that the FBG Debtors, and not the Evolution Borrowers, owned the relevant inventory on the Petition Date.

8.      The Turnover Motion is misleading in other respects as well, particularly the unsupported accusation that, in the wake of the January 20 Ruling, the Debtors' professionals misled Evolution about the existence of cash receipts from the Petition Date to January 20.  In the first instance, the Debtors to this day do not know how much cash was generated from sales of inventory from the four disputed Warehouses because no such reporting existed prior to or as of the Petition Date.  The best the Debtors were able to do after the January 20 Ruling was compile, through a time-consuming process, information that allowed them to match receipts to inventory sold from two BPI distribution centers.  Consistent with the Court's ruling to segregate receipts received by the Debtors going forward, the Debtors agreed only to provide Evolution with reporting on a *go forward* basis showing the receipts and the segregation of such funds.  When the

---

expressly reserved under the Adequate Protection Stipulation and January 20 Ruling.  *See* Adequate Protection Stipulation ¶ 6; Jan. 20 Tr. at 46:11–17; 49:2–12.

[11]   Contrary to Evolution's assertions, the ABL Lenders did not "disclaim" their interest in the Evolution Collateral in the schedule of ABL Trust Assets that was filed as part of the Plan Supplement.  That non-exhaustive list, with rights of all parties being preserved, included "[a]ll inventory of the FBG Debtors constituting ABL Priority Collateral, whether now owned or hereafter acquired and wherever located."  It further included assets subject to a bona fide dispute found to be ABL Priority Collateral by Final Order or settlement.

SPV Chapter 7 Trustee recently asked the Debtors to undertake the onerous process of compiling this information from the Petition Date to January 20, the Debtors voluntarily undertook the effort. That new report showed $21.2 million in receipts received since the Petition Date (and most while the Adequate Protection Stipulation was in effect).

9.      Evolution also seems to imply that it would have immediately sought relief from the Court had it known that there were any cash proceeds received from September 2025 to January 2026, but that it was misled into inaction for nearly six months.  Again, this pre-January 20 reporting and the discussions with Evolution in the wake of the January 20 Ruling all occurred when the Debtors only had high-level reporting at the business unit (BPI) level.  And, the Debtors had accurately conveyed that (i) they had been unable to collect on a significant amount of BPI accounts receivable due to difficulties with customers, and (ii) as of the January 20 Ruling, the Debtors did not have reporting to link accounts receivables and collections to the inventory shipped from the distribution centers that included the Warehouses, the so-called Midwest Distribution Center (the "**MDC**") and the West Coast Distribution Center (the "**WDC**") (much less the four specific disputed Warehouses that partially supply them).  To be clear, at no time did the Debtors tell Evolution that *no* relevant receipts had been collected before the January 20 Ruling. To the contrary, prior reporting provided to Evolution showed inventory sales and receipts from BPI inventory, which Evolution knew would have been derived in part from the two relevant distribution centers, the MDC and WDC.

10.      In sum, Evolution sat by for nearly six months and now suddenly seeks what amounts to a preliminarily injunction to force the FBG Debtors to somehow go back in time to identify and segregate cash received dating back to the Petition Date, and to do so by an "emergency" motion for turnover.  For all these reasons, the Turnover Motion should be denied.

6

The Court should also decline to grant any relief to the SPV Chapter 7 Trustee for the same reasons.

**Background**

**I.      Evolution Adequate Protection Stipulations**

11.      In connection with the Interim DIP Order, the Debtors and Evolution entered into the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 216) (the "**Initial AP Stipulation**").   On November 9, 2026, the Debtors and Evolution then entered into the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 609) (the "**Adequate Protection Stipulation**").

12.      During the term of the Adequate Protection Stipulation (November 9, 2025 to January 5, 2026), the FBG Debtors were permitted to use and sell asserted Evolution Collateral under certain circumstances.  Namely, the FBG Debtors were required to replenish inventory levels at certain specified warehouses at which Evolution asserts a senior lien in inventory (the "**Warehouses**") or post cash collateral into a segregated account to the extent of any inventory level deficit.  Adequate Protection Stipulation ¶ 4.  For any inventory transferred to the FBG Debtors that was replenished, such transfer was "free and clear of any and all liens, claims, or encumbrances," and each of such transfers to the FBG Debtors "constitute[d] a legal, valid, binding, and effective transfer of such asserted Evolution Collateral, and no such transfer shall be subject to avoidance under any provision of the Bankruptcy Code or otherwise."  *Id.* ¶ 4(E).

13.      Contrary to what Evolution now says, nothing in the Adequate Protection Stipulation required the Debtors to proactively "segregate collections of accounts receivable generated from sales of Evolution's inventory."  *See* Turnover Motion ¶ 9.  In fact, the absence of such a provision was expressly negotiated among the parties, because the Debtors did not have

7

that level of tracing and segregation. The FBG Debtors were simply required to replenish inventory to maintain certain levels or post cash to the Segregated Account.

14. To the extent of any diminution, the Adequate Protection Stipulation further granted Evolution adequate protection liens against assets of the Evolution Borrowers (which have since converted to chapter 7) and superpriority administrative expense claims against the Evolution Borrowers. Adequate Protection Stipulation ¶ 5. The grant of any other replacement liens was expressly subject to the true sales provisions set forth in paragraph 4 of the Adequate Protection Stipulation. *Id.* ¶¶ 2, 4. And finally, any liens or interests granted to Evolution were subject in their entirety to the Evolution Collateral Review, which preserved the Debtors' and other interested parties' ability to review and challenge Evolution's prepetition claims and liens against the asserted Evolution Collateral. *Id.* at 4.

15. It was under the Adequate Protection Stipulation that the Debtors collected the majority of postpetition receipts that Evolution now asserts should be retroactively segregated and turned over to Evolution.

## II. January 20 Ruling

16. On January 20, 2026, the Court held a continued hearing (the "**January 20 Hearing**," and the Court's ruling at the January 20 Hearing, the "**January 20 Ruling**") on *Evolution's* Emergency *Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 1076). At the previous hearing held on January 13, 2026, the Court asked the Debtors and Evolution to be prepared to argue what the appropriate remedy would be if the Court were to find that the Debtors violated the Adequate Protection Stipulation. At the January 20 Hearing, Evolution's counsel argued that the Debtors should be unable to use or collect receipts generated from any sales of any BPI inventory going from the Petition Date. Jan. 20 Tr. at 30:25–31:6; 34:1–6. The Debtors responded that the

only remedy provided by the Adequate Protection Stipulation was that the FBG Debtors had to cease purchasing inventory located in the Warehouses.  January 20 Tr. at 8:15–16:19.

17.    In the January 20 Ruling, the Court held that the Debtors breached the Adequate Protection Stipulation, which had expired by its own terms on January 5, 2026 (Jan. 20 Tr. at 36:5–6; 43:22), and as a result, the Debtors were prohibited from further use or sales of the asserted Evolution Collateral without Evolution's consent (Jan. 20 Tr. at 44:3–19; 48:6–16). Importantly, the Court found that the FBG Debtors' discontinued purchase and use of asserted Evolution Collateral was the only remedy provided for by the Adequate Protection Stipulation. *Id.* at 44:3–19.  ("In the event the Debtors fail to exercise curative actions before the expiration of the five-day cure period . . . the Debtors are prohibited from continuing to purchase Evolution collateral. That is what the stipulation as provided, and that's a remedy.").  The Court further noted that "[t]here is no remedy for specific performance in [the Adequate Protection Stipulation] so that the Debtor is not required itself to provide any kind of curative action." *Id.* at 45:4–8.  And, as a result of the breach, the Debtors "would not be required to . . . exercise any curative actions . . . *or put . . . any kind of cash in a segregated account*." *Id.* at 45:15–19 (emphasis added).  The Court noted but reserved on the extent of any diminution liens or claims arising under the Adequate Protection Stipulation against the Evolution Borrowers and their assets, *id.* at 46:18–47:18, but in no event ordered the Debtors to retroactively identify or segregate receivables already collected prior to January 20, 2026.

18.    Following the January 20 Hearing and discussions with Evolution's advisors, the Debtors developed a method to track receipts from all inventory coming out of the distribution centers that are largely supplied by the Warehouses, the MDC and WDC.  The MDC and WDC include the Warehouses as well as other inventory facilities, which therefore results in

an over-inclusive metric for tracking receipts related to inventory sourced from the Warehouses. As detailed more below, the Debtors agreed with Evolution on a method of tracking, segregating, and reporting all MDC and WDC-related receipts on a go-forward basis. In accordance with this agreed methodology, the Debtors have collected $1.6 million into a segregated account subject to resolution of disputes with Evolution.

19.     Several months later, in June 2026, the SPV Chapter 7 Trustee requested that the Debtors apply the same methodology retroactively to determine the aggregate amount of MDC and WDC-related receipts dating back to the Petition Date. In response, the Debtors' advisors undertook to implement the same tracking methodology retroactively and determined that the Debtors have collected, in the aggregate, $21.2 million of postpetition receipts for inventory sourced from the MDC and WDC since the Petition Date. The majority of those collections occurred during the term of the Adequate Protection Stipulation and prior to the January 20 Ruling. All $1.6 million that has been collected since the January 20 Ruling has been segregated.

**Objection**

I.     **Retroactive Segregation of Cash Receipts Was Not Required by the January 20 Ruling and the Debtors Made no Misrepresentations to Evolution**

20.     As noted, nothing in the January 20 Ruling required the Debtors to retroactively segregate any cash proceeds generated from inventory sourced from the Warehouses. Following the January 20 Ruling, advisors to the Debtors and Evolution engaged in discussions regarding tracking and reporting. At that time, the Debtors did not have a process for tracking and segregating cash collected on account of asserted Evolution Collateral sold from the Warehouses. Following a meet and confer and further email correspondence, the Debtors and Evolution reached an agreement on a methodology regarding ***go-forward*** identification and segregation of any receipts related to inventory sourced from the WDC and MDC.

21.     The Debtors and Evolution specifically agreed, on go-forward basis, that the Debtors would track 100% of cash proceeds of all postpetition sales of inventory sourced from the MDC or WDC as an overinclusive proxy for inventory coming from the Warehouses.  The Debtors further agreed to continue providing reporting on inventory levels at the Warehouses and other BPI locations.  The agreement was clear that the Debtors would only be tracking and segregating receipts on a go-forward basis.

22.     The Debtors have segregated approximately $1.6 million of receipts collected following the January 20 Ruling attributable to all inventory sourced from the MDC and WDC, and will continue to collect and segregate any additional cash collected from postpetition sales of inventory sourced from the MDC and WDC.

23.     Evolution baselessly claims that the Debtors and their advisors have misrepresented the status of their efforts to collect accounts receivable related to the asserted Evolution Collateral.  *See* Turnover Motion ¶¶ 4, 32–33.  Since close to the Petition Date, the Debtors have provided reporting to Evolution (including weekly cash flow budget variance reporting, sales reporting by business unit, collateral summaries with business-unit level detail, and accounts receivable summary reports showing balance changes over time, again with business-unit level detail) that clearly implied receipts had been generated by sales of BPI inventory based on BPI sales activity and changes in BPI accounts receivable and inventory balances, some of which would necessarily have been sourced from the MDC and WDC.  It is therefore disingenuous (at best) for Evolution to now claim that they were unaware that the Debtors had been collecting receipts relating to inventory sourced from the Warehouses.

24.     Following the January 20 Ruling, the Debtors represented to Evolution that a large portion of BPI accounts receivable remained uncollected due to a few of the largest BPI

11

customers that were refusing to pay or, in some cases, having accounts receivable that were not yet due.  That was and remains true.

25.     The Debtors have also consistently maintained and conveyed to Evolution (including following the January 20 Ruling) the difficulty in tracing receipts related to inventory sourced specifically from the four Warehouses.[12]  At no point did the Debtors or their advisors tell Evolution that the Debtors had not collected on *any* accounts receivable related to inventory sourced from the Warehouses—only that such collections were limited due to difficulties with certain customers, on-going commercial discussions, or receivables that were not yet due and payable (based on long standard payment terms), and otherwise not readily traceable to that inventory based on system and reporting limitations.

26.     As noted, several months later, following conversion of the Evolution Borrowers' cases to chapter 7 and demands by the SPV Chapter 7 Trustee, the Debtors initiated a manual process to use a similar methodology to track receipts generated from inventory sourced from the MDC and WDC going back before the January 20 Ruling to the Petition Date.  That process gave rise to the $21.2 million figure that Evolution now demands be segregated.  In the nearly six months during which the Debtors operated under an agreed-upon reporting and segregation regime, Evolution did not ask for that information before the SPV Chapter 7 Trustee made his request.  And, contrary to Evolution's suggestions, that was not information the Debtors had or that was readily available to them until the Debtors recently compiled such data at the

---

[12]     As explained in greater detail in the *Debtors' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Emergency Request for Use of Alleged Cash Collateral* (Docket No. 1280) (the "**Stipulation Objection**"), Evolution and the Debtors agreed that reporting under the Adequate Protection Stipulation would include  data from the MDC and WDC (which included certain facilities in addition to the Warehouses in which Evolution did not have a lien in inventory) because "[t]hose were the best available reports the Company could run at the time." *See* Stipulation Objection ¶ 2.

request of the SPV Chapter 7 Trustee, at which point the information was promptly provided to the SPV Chapter 7 Trustee.

**II.      Evolution Has Not Provided any Basis for Emergency Consideration of the Turnover Motion**

27.      The Court should decline to hear the Turnover Motion on an emergency basis.   Evolution expressly requested this retroactive segregation remedy at the January 20 Hearing, and the Court declined to order such remedy.  Evolution also initially asked the Debtors for retroactive reporting and segregation, but dropped the request and the parties reached an agreement between the parties on go-forward reporting and segregation.  Evolution has sat on its hands for nearly six months.  On this ground alone, Evolution should not be entitled to emergency consideration of its belated Turnover Motion.

28.      Nor can Evolution show that collections received by the Debtors prior to the January 20 Ruling even still exist.  To the contrary, the Debtors have been reporting significant cash burn since January, including millions of dollars spent directly on protecting and preserving the inventory at the four Warehouses.  It is highly unlikely that any cash receipts received between late September and January still exist.  Evolution's recourse therefore is to assert a claim against the Evolution Borrowers and their assets.

29.      Critically, the majority of the postpetition MDC and WDC receipts were collected while the Adequate Protection Stipulation was in place, and the FBG Debtors replenished most inventory transferred to them with replacement inventory of equal value.  By operation of the Adequate Protection Stipulation, that replenished inventory therefore transferred to the FBG Debtors free and clear of any interests.  To the extent the Court ultimately determines that Evolution holds a first-priority lien on the Evolution Collateral, then Evolution will have every

13

opportunity to pursue adequate protection liens and claims against the Evolution Borrowers and their assets.

30.     Finally, even if it is ultimately determined that the Evolution Borrowers ever owned the asserted Evolution Collateral, and that Evolution holds a senior secured interest in that inventory, the FBG Debtors have significant claims for preserving and maintaining the asserted Evolution Collateral, including warehouse rent and other storage and handling costs. Those claims must be adjudicated together with any claims Evolution or the Evolution Borrowers seek to assert against the FBG Debtors.

## Conclusion

31.     Evolution has failed to demonstrate that the relief it seeks is warranted, and the Court should therefore deny the Turnover Motion.

For the foregoing reasons, the Debtors respectfully request that the Court deny the

Turnover Motion.

Dated: July 16, 2026
        Houston, Texas

                                        /s/  Clifford W. Carlson
                                        WEIL, GOTSHAL & MANGES LLP
                                        Gabriel A. Morgan (24125891)
                                        Clifford W. Carlson (24090024)
                                        700 Louisiana Street, Suite 3700
                                        Houston, Texas 77002
                                        Telephone:  (713) 546-5000
                                        Facsimile:  (713) 224-9511
                                        Email:   gabriel.morgan@weil.com
                                                 clifford.carlson@weil.com

                                        -and-

                                        WEIL, GOTSHAL & MANGES LLP
                                        Matthew S. Barr (admitted *pro hac vice*)
                                        Sunny Singh (admitted *pro hac vice*)
                                        Robert S. Berezin (admitted *pro hac vice*)
                                        Andriana Georgallas (admitted *pro hac vice*)
                                        Kevin Bostel (admitted *pro hac vice*)
                                        Jason H. George (admitted *pro hac vice*)
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Email:   matt.barr@weil.com
                                                 sunny.singh@weil.com
                                                 robert.berezin@weil.com
                                                 andriana.georgallas@weil.com
                                                 kevin.bostel@weil.com
                                                 jason.george@weil.com

                                        *Attorneys for Debtors*
                                        *and Debtors in Possession*

**Certificate of Service**

I hereby certify that on July 16, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                    /s/  Clifford W. Carlson
                                                    Clifford W. Carlson