**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Docket Nos. 3210, 3211, 3223 & 3224** |

**DEBTORS' OMNIBUS OBJECTION TO THE EMERGENCY MOTIONS TO COMPEL**
**FILED BY THE LAM PARTIES (DKT. 3210) AND KATSUMI (DKT. 3211)**
**AND THE JOINDERS FILED BY ONSET (DKT. 3223) AND EVOLUTION (DKT. 3224)**

First Brands Group, LLC ("**FBG**") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] file this omnibus objection (this "**Objection**") to (i) the *LAM Parties' Emergency Motion to Compel Production of Documents and Interrogatory Responses from Debtors* (Dkt. 3210) (the "**LAM Motion**"), filed by the LAM Parties (as defined in the LAM Motion) and (ii) the *Emergency Motion of Katsumi Servicing, LLC to Compel Debtors to Produce Complete Responses and Documents in Response to Discovery Served Upon the Debtors* (Dkt. 3211) (the "**Katsumi Motion**," and together with the LAM Motion, the "**Motions**"), filed by Katsumi (as defined in the Katsumi Motion). The Debtors also object to (i) *Onset Financial, Inc.'s Joinder and Statement in Support of LAM Parties' and Katsumi Servicing, LLC's Motions to Compel Production of Documents and Interrogatory Responses from Debtors* (Dkt. 3223) (the "**Onset Joinder**") filed

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan (Dkt. 3019) or the Motions (each, as defined herein), as applicable. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**").

by Onset (as defined in the Onset Motion) and (ii) *Evolution's Joinder to LAM Parties', Katsumi's Emergency Motions to Compel Production of Documents And Interrogatory Responses* (Dkt. 3224) (the "**Evolution Joinder**" and together, the "**Joinders**") filed by Evolution (as defined in the Evolution Motion).  The Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.     The LAM Parties and Katsumi know they are targets of identified claims that are included among the Estate Claims.  They are not mere "creditors" seeking to understand a Plan.  Similarly, Onset is already a defendant in an adversary proceeding brought by the Debtors and Evolution has been involved in what can best be described as near constant litigation with the Debtors.  These parties appear to have two primary goals: attempt to secure discovery into the Debtors' privileged analyses related to claims against them and force the Debtors into a chapter 7 liquidation along the way.  To advance these goals, the LAM Parties and Katsumi inundated the Debtors with burdensome and disproportionate discovery requests, and now seek to leverage those requests to push the confirmation hearing by claiming that the Debtors' responses are deficient.  They also take issue with the timing of the Debtors' disclosure of the expert declaration of Marc Kirschner and argue that, by filing the declaration of Charles Moore, the Debtors have purportedly waived privilege over "facts developed" in the Special Committee Investigation related to the Estate Claims.  As detailed herein, none of these kitchen-sink-style arguments are persuasive and the Motions should be denied.

2.     Most notably, the Motions completely mischaracterize the status of discovery in this matter and the scope of the Debtors' privilege assertions, which were narrowed in response to the meet and confer process, even before the Motions were filed.  Contrary to the LAM Parties' characterizations, for example, the Debtors are *not* taking the position that *"every*

*single communication"* with the Ad Hoc Group is privileged.  *See* LAM Mot. ¶ 4 (emphasis added).  Nor are the Debtors arguing that "they enjoy a common interest privilege with the Ad Hoc Group that covers *every* communication dating to early January."  *See* LAM Mot. ¶ 5 (emphasis added).  Katsumi repeats similarly incorrect characterizations, claiming that the Debtors are using mediation privilege as a "blanket shield" and implying that the Debtors have refused to produce prepetition communications from September 1, 2025 to September 28, 2025 between the Debtors and the Ad Hoc Group or DIP Secured Parties.  Katsumi Mot. ¶¶ 17, 25.  None of this is true.

3.       The Debtors have already produced—among *many* other documents— responsive communications between (1) the Debtors' advisors and the Ad Hoc Group advisors from September 1, 2025 to September 28, 2025 (the "**Prepetition Period**"), (2) the Debtors' advisors and the Ad Hoc Group advisors, Creditors' Committee advisors, and ABL advisors from January 1, 2026 to January 28, 2026 (the "**Pre-mediation Period**"), and (3) the Debtors' advisors and the Ad Hoc Group advisors, Creditors' Committee advisors, and ABL advisors from March 27, 2026 to May 20, 2026 (the "**Post-mediation Period**").  The Motions do not mention any of these productions, despite Katsumi and the LAM Parties having already received two of the three productions *before* filing their Motions and, at least Katsumi's counsel, being aware that the Debtors were finalizing for production communications from the Post-mediation Period (which have since been produced).  These productions align with the Debtors' positions on privilege:

4.       **First**, the mediation privilege protects documents, information, and communications exchanged in relation to mediation between the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Lenders (the "**Negotiation Parties**") during the Court-ordered mediation period, which ran from January 29, 2026 to March 27, 2026, as extended and renewed (the "**Formal Mediation Period**").

3

5.      **Second**, the common interest privilege protects documents, information, and communications related to the Plan (including the Plan settlement) and prosecuting the Plan exchanged between the Negotiation Parties from <u>May 20, 2026 (the date the Debtors, the Ad Hoc Group, and the Creditors' Committee reached an agreement in principle and announced such agreement in open Court[3]) to present</u> (the "**Post-settlement Period**").

6.      **Third**, with respect to potential claims and causes of action that the Debtors may have, the Debtors have a common interest with the UCC from its inception and with the Ad Hoc Group from September 27, 2025, the date the terms of a DIP financing agreement were agreed in principle.

7.      The LAM Parties and Katsumi (in addition to Evolution and Onset) ignore all of this. They also incorrectly claim that the Debtors refuse to provide a categorical privilege log and misrepresent the scope of the Debtors' document productions. Regarding a categorical privilege log, the Debtors had already agreed to provide one and are currently finalizing it for production. That is more than *EXCO* required, where Judge Isgur declined to order any privilege log for mediation documents at all. Hr'g Tr. 42:7–12, *In re EXCO Res., Inc.*, No. 18-30155 (Bankr. S.D. Tex. Nov. 30, 2018) [Dkt. 1413] (mediation documents are "totally privileged" and "no log would have to occur for those"). On the scope of the Debtors' document productions, for example, the LAM Parties write that "[A]s recently as July 15, the Debtors have produced documents, including productions made to others in these cases, and have provided dataroom information (largely public documents)." LAM Mot. ¶ 18. This is a misleading description of the Debtors' productions. First, the Debtors produced extensive information from across these chapter 11 cases—including deposition transcripts and exhibits, responses to prior discovery requests, and the

---

[3] May 20, 2026 Hr'g Tr. 12:17–13:1 [Dkt. 2789]

Debtors' many prior document productions (which were burdensome and largely irrelevant)—*as expressly requested* by the LAM Parties and Katsumi.  There should be absolutely no implication that the Debtors dumped prior data on these parties—they received exactly what they asked for— or that this prior data is all that the Debtors have produced.  Indeed, the Debtors' productions have included (among other documents) board minutes and materials, emails to potential bidders in connection with the Estate Claims Marketing Process, non-privileged documents provided to the Examiner, the documents underlying the declarations of Mr. Moore and Mr. Kirschner, executed common interest agreements, data-rich excel spreadsheets concerning various topics, including administrative expense and priority claims, and negotiation materials during the Pre-mediation Period and Post-mediation Period.  To suggest that the Debtors have been stonewalling discovery is demonstrably false.

8.      The LAM Parties and Katsumi raise other arguments, including claiming prejudice based on insufficient interrogatory responses and the alleged delayed disclosure of Mr. Kirschner as a litigation assessment expert for the Debtors.  But these claims are also without merit.  The Debtors' interrogatory responses were sufficient, and will be supplemented in any event to account for the filed Declarations.  And the Debtors' disclosure of Mr. Kirschner creates no prejudice, including because all parties in interest will have an opportunity to depose Mr. Kirschner next week (ten days after his declaration was filed) and cross examine Mr. Kirschner at the hearing (two weeks after his declaration was filed).

9.      For these reasons and as set forth in more detail herein, the Court should deny the Motions and the Joinders.

## BACKGROUND

10. On June 17, 2026, the LAM Parties served their First Set of Requests for Production (Nos. 1–21); on June 17, 2026 Onset served its First Set of Requests for Production (Nos. 1–14); on June 22, 2026, Katsumi served its First Set of Interrogatories (Nos. 1–24) and First Request for Production of Documents (Nos. 1–31); and on June 24, 2026, the LAM Parties served their First Set of Interrogatories (Nos. 1–17). The Debtors served responses and objections and began producing documents on a rolling basis. The Debtors' productions, which are substantially complete, include new collection volumes FBG_CH1_001 through FBG_CH1_007, comprising FBG_CH1_00000001 through FBG_CH1_00206938, together with re-productions of the Debtors' prior productions in these chapter 11 cases. The Debtors have also produced communications, across responsive periods, as detailed herein. The parties conferred regarding the various discovery requests, and through the meet and confer process, the Debtors narrowed their initial assertion of privilege to the scope detailed herein. The Debtors are currently preparing a categorical privilege log.

11. On July 14, 2026, the Debtors filed the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* (Dkt. 3188) and the *Declaration of Marc S. Kirschner* (Dkt. 3190), with an application to retain Mr. Kirschner as an expert effective June 20, 2026. Mr. Moore and Mr. Kirschner are scheduled to be deposed on July 23 and July 24 respectively.

12. Shortly before midnight on July 15, 2026, the LAM Parties and Katsumi filed the Motions, which Evolution and Onset joined the following day. The Motions seek to compel document production, interrogatory responses, and to continue the Confirmation Hearing scheduled to begin July 28, 2026, among other relief.

## ARGUMENT

**A.     The Debtors' Assertion of Mediation Privilege is Consistent with the Mediation Orders**

13.     The LAM Parties and Katsumi argue that the Debtors are misapplying the mediation privilege and (at least Katsumi) argues that the mediation privilege extends to "just the submissions to Judge Isgur" and only to "the actual days [the Debtors] were in a mediation session before Mediator Judge Isgur."   Katsumi Motion ¶ 20.   But these narrow applications of the mediation privilege run counter to the  mediation orders entered by the Court.   *See Agreed Mediation Order Appointing Judge Marvin Isgur As Mediator* (Dkt. 1822) (the "**First Mediation Order**") (order entered January 29, 2026); *Notice of Extension of Mediation Period* (Dkt. 1974) (extending mediation through February 27, 2026); *Second Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Dkt. 2005) (the "**Second Mediation Order**"); and *Third Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Dkt. 2186) (the "**Third Mediation Order**," and together with the First Mediation Order and the Second Mediation Order, the "**Mediation Orders**") (extending mediation to March 27, 2026).

14.     The plain language of the Mediation Orders provides in most relevant part that "[a]ny (a) discussions among the Parties, including discussions with or in the presence of the Mediator; (b) mediation statements or any other documents or information provided to the Mediator or the Parties in the course of the Mediation; (c) correspondence, draft resolutions produced in connection with, or as a result of, the Mediation; and (d) offers and counteroffers" . . . shall "***not be admissible, discoverable or otherwise used for any purpose in any proceeding outside of the Mediation, including any judicial or administrative proceeding***" (among other protections).   Mediation Orders ¶ 8 (emphasis added).   The Mediation Orders further prohibit the Debtors from disclosing the information detailed in (a)-(d).   *Id.*   The Mediation Orders therefore

7

unambiguously support the Debtors' position: information exchanged during the Formal Mediation Period between the Negotiation Parties concerning topics addressed during mediation is expressly protected by the mediation privilege. *See id.* Judge Isgur reached the same conclusion from the bench in *In re EXCO Resources, Inc.*, holding that the mediation privilege applies "outside of the four corners of the mediation rooms" and reaches "all the communications in furtherance of the mediation proceedings." Hr'g Tr. 39:24–40:2, *In re EXCO Res., Inc.*, No. 18-30155 (Bankr. S.D. Tex. Nov. 30, 2018) [Dkt. 1413] ("[I]t just makes no sense to limit it to the room. . . . [T]he idea is to have confidential mediation.").

15.     For periods *outside* the Formal Mediation Period, the Debtors are not claiming privilege (except with respect to the two common interest subjects detailed below) and have produced responsive communications between the Negotiation Parties across three periods that are responsive to the LAM Parties' and Katsumi's requests: (i) the Prepetition Period, (ii) the Pre-mediation Period, and (iii) the Post-mediation Period. This reflects that the Debtors have in fact taken an appropriately tailored privilege approach, producing communications outside the Formal Mediation Period while asserting the mediation privilege over only the Formal Mediation Period. The arguments asserted by the LAM Parties and Katsumi are thus belied by the Debtors' document productions and should be denied.

**B.     The Debtors' Common Interest Assertions are Narrowly Drawn and Well Founded**

16.     The LAM Parties argue that the Debtors have asserted "an extremely broad, blanket common interest position," that "[a] bidder and a seller do not have a common interest with respect to a bid" so "the Estate Claims Credit Bid Transaction simply cannot be a matter of common interest," and that, absent document-by-document review and a privilege log, the Court should "find that the privilege has been waived." LAM Mot. ¶¶ 32, 36, 38. Katsumi likewise

describes the Debtors' responses as "blanket assertions of mediation and common interest privilege." Katsumi Mot. ¶ 3. Evolution joins both motions and adds that the doctrine reaches only actual or "potential co-defendants" facing a "palpable threat of litigation." Evolution Mot. ¶¶ 4-5. Onset likewise contends the Debtors are withholding "essentially all of the Debtors' communications with the Plan Negotiation Parties since the Petition Date." Onset Mot. ¶ 10. These are strawman arguments, as none of them align with the Debtors' actual position on common interest privilege.

17. The Debtors are asserting common interest over two subjects: **(1)** the investigation into and the prosecution of Estate Claims (shared with the Creditors' Committee from its inception and the Ad Hoc Group from September 27, 2025, when an agreement in principle was reached on DIP financing) (the "**Estate Claims Common Interest**") and **(2)** Plan settlement negotiations and prosecution of the Plan (shared with the Negotiation Parties from May 20, 2026—the date an agreement in principle was reached—to present) (the "**Plan Settlement Common Interest**"). The Debtors are simply not asserting common interest privilege over every communication.

18. Regarding the Estate Claims Common Interest, the Debtors share a common legal interest with the Creditors' Committee and the Ad Hoc Group in maximizing the estate's recoveries and preparing strong cases against potential defendants (like the LAM Parties, Katsumi, Onset, and Evolution). The discovery requests at issue in the Motions underscore the importance of the Estate Claims Common Interest: the very parties that the Debtors, the Creditors' Committee, and the Ad Hoc Group are developing claims against should not be able to use plan discovery to secure analysis and strategic assessment, for example, related to prosecuting claims against them. This is consistent with settled law. In *In re Hardwood P-G, Inc.*, the court held a common interest

properly asserted among a debtor, the creditors' committee, and the lenders because "[t]he common legal goal of investigating and recovering the debtors' assets existed between the debtors, the Committee, and the Banks," which were "working in concert to recover, through litigation, causes of action of the estate." 403 B.R. 445, 461 (Bankr. W.D. Tex. 2009); *accord In re Age Refining, Inc.*, 447 B.R. 786, 806 (Bankr. W.D. Tex. 2011) (counsel for parties sharing a common interest in current or potential litigation may exchange information without waiver); *In re Maxus Energy Corp.*, 617 B.R. 806, 824 (Bankr. D. Del. 2020) ("It is not surprising that the Debtors would be discussing case strategy with the OCC from the inception of the OCC.").

19.     The Plan Settlement Common Interest is equally well grounded.  Once parties reach agreement on the material terms of a restructuring, even where their interests "are not completely in accord," they "share the common legal interest of obtaining approval of their settlement and confirmation" of the plan.  *In re Tribune Co.*, 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3, 2011).  The interest arises when material terms are agreed, not when the plan is filed, *id.* at *5, and courts fix the date with precision.  *See In re Imerys Talc Am., Inc.*, 2021 WL 12302368, at *5, *8 (Bankr. D. Del. Feb. 23, 2021) (fixing the specific dates on which the plan proponents "had a common legal interest in confirming the Plan" and in maximizing estate assets); *see also In re Imerys Talc Am., Inc.*, 2021 WL 12217315, at *3-4 (Bankr. D. Del. Aug. 10, 2021) (no protection for exchanges between still-adverse negotiating counterparties).

20.     To the extent the LAM Parties, Katsumi, Evolution, or Onset are advancing (or joining) an argument that the Debtors' and the Ad Hoc Group have waived privilege with respect to the Estate Claims Common Interest because the DIP Secured Parties are credit bidding on the Estate Claims, this argument is without merit.  Courts have found a common legal interest between a debtor and the very lenders credit-bidding for its assets and serving as stalking horse.

*See Velo Holdings, Inc. v. Paymentech, LLC (In re Velo Holdings, Inc.)*, 473 B.R. 509, 517 (Bankr. S.D.N.Y. 2012).

21.     Nor is there anything to the argument that the Ad Hoc Group, as a participant in the Estate Claims Marketing Process, received "factual information beyond what other bidders received." LAM Mot. ¶ 31. That the Ad Hoc Group knows more about the assets than potential bidders is not unusual nor a basis for requiring the production of privileged documents. Additionally, the remedy for correcting this alleged asymmetry (which the Debtors' dispute) would be disclosure to the potential bidders pursuant to a confidentiality agreement. Not production to the very defendants the estate is focused on pursuing.

22.     Instead, if the LAM Parties, Katsumi, and others want to advance a challenge to the Estate Claims Marketing Process based on an alleged asymmetry of information or any other perceived flaw, they can make that legal argument in their objection to the Plan. At a higher level, the attempt to use the Estate Claims Marketing Process as a hook for waiver and an avenue for accessing privileged information on Estate Claims further highlights that the discovery requests are not really about the confirmation hearing, but rather pretext for future defendants securing legal analyses concerning the claims that will be filed against them.

23.     Finally, the demand that the Court "find that the privilege has been waived" unless the Debtors undertake a document-by-document review, LAM Mot. ¶ 38 (citing *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017)), fails on its own terms. *BDO* requires that a log "provide sufficient information to permit courts and other parties to test the merits of" the privilege claim, and it locates waiver in "unjustified delay, inexcusable conduct, or bad faith," not in an adversary's preference for a different logging format. 876 F.3d at 697. Here, the Debtors

11

have agreed to prepare a categorical privilege log, which will provide sufficient information to assess the Debtors' privilege positions (which are also detailed herein).

**C.      The Debtors Have Not Waived Privilege By Detailing Facts Relevant to the Estate Claims In the Moore Declaration**

24.      The LAM Parties argue that by filing Mr. Moore's declaration the Debtors "waived privilege over the facts developed in their Special Committee Investigation," and that the Debtors "cannot selectively disclose the conclusions from their investigation that suit their interests and then claim privilege or work product over other facts discovered in the course of the investigation on related matters."  LAM Mot. ¶¶ 8, 42.  Katsumi similarly argues that the Debtors "cannot refuse disclosure, and then put Mr. Moore on the witness stand to testify about a funds-flow analysis while simultaneously claiming that the underlying work papers supporting that analysis are privileged."  Katsumi Mot. ¶ 44.  Onset extends the argument to the confirmation declarations, each of which, it contends, "selectively discloses conclusions drawn from the Debtors' purportedly privileged investigation while relying upon substantive materials that the Debtors refuse to produce." Dkt. 3223 ¶ 11.  These arguments are squarely foreclosed by well-established case law.

25.      First, it is well established that *facts* are not privileged, and the Debtors are not claiming privilege over facts.  "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *see SEC v. Brady*, 238 F.R.D. 429, 439 (N.D. Tex. 2006) (the privilege "does not protect against discovery of underlying facts from their source merely because those facts have been communicated to an attorney").  The same is true of work product. "[T]he work product immunity protects only the documents themselves and not the underlying facts." *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir.

12

1982).  Applying this fundamental principle, the LAM Parties' argument that the Debtors "waived privilege over the facts developed in their Special Committee Investigation" makes no sense. LAM Mot. ¶ 8.

26.     The Debtors are not claiming privilege over *facts* discovered during the course of the investigation, which is what Mr. Moore's testimony covers.  Instead, the Debtors are asserting privilege over their privileged analyses, assessment, and strategic communications regarding those facts.  In *Doe 1 v. Baylor University*, the court required the university's corporate representative to testify to "the factual bases of the Findings of Fact" produced by outside counsel's internal investigation while protecting "the significance that attorneys have attached to the facts, or the conclusions drawn from them." 2018 WL 11471254, at *2 (W.D. Tex. Oct. 11, 2018).  This is analogous to the fact-based testimony set forth in Mr. Moore's declaration.

27.     Nor have the Debtors wielded any sword.  A "sword/shield" waiver occurs only when a client "affirmatively rel[ies] on attorney-client communications to support an element of a legal claim or defense." *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018).  That privileged material might be "helpful" to an adversary "is not a sufficient basis for abrogating the privilege," *id.* at 561 (quoting *In re Burlington N., Inc.*, 822 F.2d 518, 533 (5th Cir. 1987)), and the client "must rely on privileged advice from his counsel to make his claim or defense," *id.* (quoting *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008)).  Mr. Moore's testimony concerning the facts underlying the Estate Claims is completely distinguishable.

28.     Movants' own authorities confirm the line, because in every one of their cases, the "sword" was privileged material itself (not facts).  For example, in *In re Anadarko Petroleum Corp. Sec. Litig.*, No. 4:20-cv-00576, 2023 WL 2733401 (S.D. Tex. Mar. 31, 2023), counsel disclosed the substance of the privileged investigation, including witness interviews and

13

internal documents, to the company's outside auditor across a dozen conference calls, and then withheld the same materials in litigation. *Id.* at *1, *3. *Willy v. Administrative Review Board* states the same requirement, that waiver follows when a party "uses confidential information against his adversary." 423 F.3d 483, 497 (5th Cir. 2005). And in *Toshiba International Corp. v. Kalaga*, a court in this district held that the sword-shield doctrine "does not apply" absent selective presentation of privileged materials to prove a point. 2020 WL 13413222, at *3 (S.D. Tex. May 26, 2020). Mr. Moore's declaration presents no privileged material at all. It recites facts, which were never privileged and which the LAM Parties, Katsumi, Evolution, and Onset remain free to test, including based on the extensive underlying materials produced and in the deposition of Mr. Moore.

29.     This Court has already confronted, and rejected, precisely this "sword/shield" objection. At the confirmation hearing in *Steward*, objectors moved to strike a witness's recovery analysis because certain inputs came from counsel. The Court declined, reasoning that the witness "took that input, but he provided an analysis and he created . . . a chart. So it's not all . . . like pay down of Class A, estimated allowed admin claims. There's a lot there and you can't just strike the entire chart." *In re Steward Health Care Sys., LLC*, No. 24-90213 (Bankr. S.D. Tex.), Hr'g Tr. July 14, 2025 (Day 1) 175:11-15 [Dkt. 5723]. The Court ruled that "a number that has been stated from counsel," as to which the witness could provide no further detail, would come in for what it was worth. *Id.* at 180:22-181:4. "It will be what it is. In other words, I'm not striking it. But certainly, that number will have the meaning that it has . . . which will be . . . an untested number," one that, as the Court agreed, "goes to credibility." *Id.* at 181:6-15. And when the objection was renewed, the Court framed the question as one of proof rather than

14

privilege, whether the Debtors "presented enough facts for the Court to make an independent determination about certain issues." Hr'g Tr. July 15, 2025 (Day 2) 100:3-7 [Dkt. 5746].

30.     This framework governs here, and is even more applicable because the factual inputs in Mr. Moore's declaration were not provided by counsel.  The Debtors bear their burden with facts, Movants may test those facts, and anything they cannot test goes to weight.  It is not a basis for waiver, and it is certainly not a basis for the LAM Parties' alternative demand that the Moore and Kirschner testimony be excluded wholesale, or for Onset's request to strike the declarations to the extent they rest on unproduced materials.  Dkt. 3223 at 8.

### D.     The Debtors' Expert Disclosure Is Not Prejudicial

31.     Although they provide no specifics, Katsumi and the LAM Parties argue that they are prejudiced by the timing of the Debtors' disclosure of Marc Kirschner as an expert witness on assessing litigation claims and suggest that the Debtors were obligated to disclose Mr. Kirschner by the interrogatory "deadlines" that the LAM Parties and Katsumi unilaterally declared. *See* LAM Mot. ¶ 10; Katsumi Mot. ¶ 12.  This argument is without merit.  First, the Debtors were not obligated to disclose Mr. Kirschner or submit his declaration by any specific date in the context of the confirmation hearing.  *See* Fed. R. Bankr. P. 9014(c) (Rule 26(a)(2)'s expert-disclosure requirements do not apply in a contested matter unless the court directs otherwise); *In re Couture Hotel Corp.*, 536 B.R. 712, 723–24 (Bankr. N.D. Tex. 2015) ("a hearing to consider confirmation of a plan of reorganization is a contested matter, not an adversary proceeding," and Rule 26(a)(2) is among the provisions that "shall not apply in a contested matter unless the court directs otherwise"); *In re Yellow Corp.*, 676 B.R. 516, 532–33 (Bankr. D. Del. 2025) (denying motion to exclude confirmation testimony of debtors' financial advisor who provided no Rule 26(a)(2) report, because "[t]he confirmation hearing is a 'contested matter'" and the court would "apply the rules as they are written").  The Court entered a scheduling order setting forth a "Solicitation and

15

Confirmation Timetable" with relevant deadlines—including a deadline for objections to the disclosure statement and Plan—leading up to the July 28, 2026 combined hearing. *See* Order Scheduling Combined Hearing at 7 (Dkt. 2990) (the "**Scheduling Order**"). The Scheduling Order does not set a declaration or expert disclosure deadline. *See id.* Nor can the LAM Parties and Katsumi create a deadline by requesting (without court order) interrogatory responses by a certain date.

32.     Second, the Debtors' expert disclosure is not prejudicial. Absent a deadline, the Debtors filed Mr. Kirschner's declaration at a reasonable time, two weeks before the confirmation hearing, with all interested parties having ten days to prepare for the July 24 deposition of Mr. Kirschner. This timeline does not prejudice Katsumi or the LAM Parties, who will have an opportunity to depose and cross examine Mr. Kirschner, nor do they explain how it creates any prejudice (because there is *no* prejudice): all parties in interest will have had approximately ten days to prepare for Mr. Kirschner's deposition, the opportunity to depose him, and the opportunity to cross examine him at the confirmation hearing. Additionally, Mr. Kirschner is presenting expert opinion on his assessment of the litigation claims and related issues relevant to the Debtors' burden at the confirmation hearing. While significant, his opinions are not of the type that—like an economist opining on damages or an engineer opining on design flaws—would require significant preparation to depose or cross examine.

33.     Rather than identify the prejudice that they will purportedly suffer, the LAM Parties and Katsumi imply that the Debtors intentionally and improperly withheld information and suggest that adjourning the confirmation hearing or excluding Mr. Kirschner's testimony is the remedy. Katsumi Mot. ¶ 50. But the Debtors were not playing games and there is no reason to adjourn the confirmation hearing. The Debtors reasonably engaged Mr. Kirschner as a consulting

expert on June 20, provided him with information so that he could consider if he would provide a report, and proceeded to file a supporting expert report and put forth Mr. Kirschner as a testifying witness thereafter.  This is a normal process and the Debtors were entitled to consult with Mr. Kirschner and understand his opinions before presenting him as a testifying expert.

### E.    The Debtors' Interrogatory Responses Are Not Deficient

34.    Katsumi and the LAM Parties both argue that the Debtors' interrogatory responses are deficient and seek to compel the Debtors to supplement them.  LAM Motion at 1; Katsumi Mot. ¶ 3.  The Court should deny this relief.  First, the interrogatories served by the LAM Parties and Katsumi predominately target privileged information and were admittedly prepared in collaboration to purposely "serve requests covering different topics."  Katsumi Mot. at 2.  This highlights the bigger picture: Katsumi and the LAM Parties are working together to access broader scope discovery and fighting tooth and nail—under the guise of confirmation discovery—to secure privileged information and analyses to inform their defense to the claims that a litigation trustee will likely pursue against them.  The Court should not permit this.

35.    Second, the Debtors' interrogatory responses are sufficient and comply with their obligations.  For the vast majority of the interrogatories, the Debtors responded with reference to what was then their forthcoming declarations and supporting evidence, which were filed and produced shortly after the Debtors served their interrogatory responses.  The Debtors are currently finalizing supplemental interrogatories identifying responsive documents that the Debtors produced (by production bates number) and citations to the responsive declaration sections for those interrogatories that reference the Debtors' declarations and/or documents.  This should resolve the majority of the objections raised by Katsumi and the LAM Parties.

36.    Additionally, both Katsumi and the LAM Parties served interrogatories that appear designed to invade the mediation and common interest privileges.  For example, Katsumi

17

Interrogatory No. 14 asks the Debtors to "[d]escribe with particularity the ***Debtors' work and conclusions*** under applicable state law as to which Causes of Action, Estate Claims or other claims or causes of action may be transferred or contributed to the Litigation Trust or the Litigation Trust Assets." Katsumi Mot., Ex. 2 at 63 (Debtors' Responses and Objections to Katsumi Interrogatory No. 14) (emphasis added).  The Debtors should not be required to divulge privileged information.

37.     It is also inaccurate to suggest that the Debtors have not provided substantive responses to interrogatories.  For example, LAM Interrogatory No. 11 asked whether creditors in Classes 4, 5, and 6 hold secured claims, and not only deficiency claims, at each Debtor entity.  The Debtors answered directly: the First Lien Claims in Class 4 and the Second Lien Claims in Class 5 are treated as unsecured under the Plan; the ABL Claims in Class 6 are treated as secured; the collateral securing the ABL Claims will be transferred to the ABL Collateral Trust; and the amount of any deficiency claims will depend on the proceeds the ABL Collateral Trust generates. *See* LAM Motion, Ex. G (Debtors' Responses and Objections to LAM Interrogatories) at 112 (Interrogatory No. 11); *see also id*. at 113–14, 116 (Interrogatory Nos. 12, 13, and 15).

38.     Overall, the Debtors' responses are sufficient, comply with their discovery obligations, and will soon be supplemented in any event to account for the Debtors' recently filed declarations and document productions.  The Court should therefore deny the LAM Parties' and Katsumi's requests to compel interrogatory responses.

**F.     No Award of Expenses to Katsumi Under Rule 37(a)(5) Is Appropriate**

39.     Katsumi asks for its reasonable expenses, including attorneys' fees, incurred in connection with its Motion.  Katsumi Mot. ¶ 11; Fed. R. Civ. P. 37(a)(5), made applicable by Fed. R. Bankr. P. 7037 and 9014(c).  The request fails at the threshold because Rule 37(a)(5)(A) permits an award only if the motion is granted, and the Katsumi Motion should be denied for the reasons stated above.  Even where a motion succeeds, the court must not order

payment if the opposing party's position was "substantially justified" or if "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii)-(iii).  Both exceptions apply here.

40.   The Debtors' positions are substantially justified.  A position meets that standard where there is a "genuine dispute," where "reasonable people could differ as to [the appropriateness of the contested action]," or, put differently, where it is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (construing the phrase in light of the identical standard governing "attorney's fees for resisting discovery"). The Advisory Committee said the same when it adopted the provision: where "the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court," "the losing party is substantially justified in carrying the matter to court."  Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment.  The Debtors' objections rest on the Court's mediation orders (Dkt. Nos. 1822, 2005, 2186) and on the common interest doctrine as the courts of this circuit have applied it, *see supra* §§ A, B; they were stated in the Debtors' responses and objections, explained at the parties' conferences, and confirmed in writing on July 16, 2026.  A privilege position grounded in the Court's own orders and in settled authority is a genuine dispute, whatever its ultimate resolution.

41.   An award would in any event be unjust.  Katsumi certified an impasse on July 13, 2026 and filed its Motion two days later, on an emergency basis, requesting relief by July 16, 2026.  Katsumi Mot. at 1, 21.  By that time, however, the Debtors' rolling productions were already continuing, the Debtors had already confirmed they would be producing of the Post-mediation Period communications, and were already actively preparing a categorical privilege log. The expenses Katsumi seeks would be borne by the Debtors' estates, and so by their creditors, on

19

the eve of confirmation, against a record of production volumes exceeding 200,000 pages, re-productions of the Debtors' prior productions, and a categorical privilege log (among other things). The rule exists "to deter a party from pressing to a court hearing frivolous requests for or objections to discovery," Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment, not to tax an estate for defending considered objections.

## CONCLUSION

42.     For the foregoing reasons, the Debtors respectfully request that the Court deny the Motions and the Joinders and grant such other and further relief as is just and proper.

Dated:  July 17, 2026
     Houston, Texas

                                      */s/ Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:    gabriel.morgan@weil.com
           clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Robert S. Berezin (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  matt.barr@weil.com
       sunny.singh@weil.com
       robert.berezin@weil.com
       theodore.tsekerides@weil.com
       christine.calabrese@weil.com


*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on July 17, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  Christine A. Calabrese*
Christine A. Calabrese
