IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| IN RE: | § | CASE NO. 18-30155-H1-11 |
| | § | HOUSTON, TEXAS |
| EXCO RESOURCES, INC. ET AL. | § | FRIDAY, |
| | § | NOVEMBER 30, 2018 |
| DEBTOR. | § | 1:29 P.M. TO 2:25 P.M. |

MOTION HEARING

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURT RECORDER:                 RUBEN CASTRO

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
Tel: 281-277-5325 ▼ Fax: 281-277-0946
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**DEBTORS' EXHIBIT NO. 7**
**Page 1 of 50**

2

APPEARANCES:


FOR THE DEBTORS:                    KIRKLAND & ELLIS, LLP
                                   Michael B. Slade, Esq.
                                   Alexandra Schwarzman, Esq.
                                   601 Lexington Ave
                                   New York, NY  10022
                                   212-446-4800

FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:               JACKSON WALKER LLP
                                   Patricia Tomasco, Esq.
                                   1401 McKinney Street
                                   Suite 1900
                                   Houston, TX  77010
                                   713-752-4276

                                   BROWN RUDNICK LLP
                                   Kenneth Aulet, Esq.
                                   Sigmund Wissner-Gross, Esq.
                                   7 Times Square
                                   New York, NY  10036
                                   212-209-4930

FOR BLUESCAPE RESOURCES
COMPANY, LLC:                      BRACEWELL, LLP
                                   Stephen Crain, Esq.
                                   Bradley Benoit, Esq.
                                   Kurt Mayr, Esq.
                                   711 Louisiana
                                   Suite 2300
                                   Houston, TX  77002

LSP INVESTMENT ADVISORS, LLC:      WHITE & CASE, LLC
                                   Gregory Starner, Esq.
                                   Thomas E. Lauria, Esq.
                                   Michael C. Shepherd, Esq.
                                   1155 Avenue of the Americas
                                   New York, NY  10036
                                   212-819-8200

FAIRFAX FINANCIAL HOLDINGS
LIMITED:                           KASOWITZ BENSON
                                   Andrew K. Glenn, Esq.
                                   Markson Miller, Esq.
                                   1633 Broadway
                                   New York, NY  10019
                                   212-506-1700


JUDICIAL TRANSCRIBERS OF TEXAS, LLC


**DEBTORS' EXHIBIT NO. 7**
**Page 2 of 50**

3

HOUSTON, TEXAS; FRIDAY, NOVEMBER 30, 2018; 1:29 P.M.

THE COURT:  Good afternoon.  Please be seated.

All right.  We are here in the EXCO Resources matter, it's 18-30155 and the Gen 4 Investment opportunities adversary proceeding which is 18-3295.  We'll take appearances in court and then any on the telephone.

MR. SLADE:  Good afternoon, Your Honor.  Mike Slade and Alexandra Schwarzman for the Debtors.

THE COURT:  Good afternoon.

MR. CRAIN:  Stephen Crain and Brad Benoit from Bracewell for the Bluescape entities.

THE COURT:  Good afternoon.

MS. TOMASCO:  Good afternoon, Your Honor.  Patty Tomasco, Jackson Walker on behalf of the Official Unsecured Creditors Committee.

THE COURT:  Good afternoon.

MR. STARNER:  Good afternoon, Your Honor.  Greg Starner of White & Case on behalf of the LSP parties, here with my partner Michael Shepherd in the courtroom.  I believe I'm also joined by my partner Tom Lauria on the line.

THE COURT:  I think he is here, let me be certain.  Mr. Lauria is that you on the line?

MR. LAURIA:  That is me, Your Honor.  Thank you. Tom Lauria of White & Case for LSP.

DEBTORS' EXHIBIT NO. 7
Page 3 of 50

4

THE COURT:  Good afternoon.

Who else is appearing in this case this afternoon?

MR. AULET:  This is Ken Aulet from Brown Rudnick for the Creditors Committee, and I think Mr. Gross is also on the line from a different phone number.

THE COURT:  All right.  Thank you.  From the 860 area code who do we have?  860-286-0448 is the number.

MR. GROSS:  Your Honor, Sigmund Wissner-Gross on the other line for Brown Rudnick also for the committee.

THE COURT:  I'm sorry, I just missed your name, could I get you to repeat that for me?

MR. GROSS:  Sigmund Wissner-Gross from Brown Rudnick, also for the committee.

THE COURT:  Thank you, sir.

From the 908 area code?

MR. GLENN:  Good afternoon, Your Honor.  Andrew Glenn, Kasowitz Bensen LLP on behalf of Fairfax, my colleague Markson Miller (phonetic) is also joining.

THE COURT:  Thank you.

Mr. Mayr?

MR. MAYR:  Yes, Your Honor.  Kurt Mayr on behalf of the Bluescape entities joining my colleagues Mr. Benoit and Crain that are there in the courtroom with you.

THE COURT:  Thank you.  Good afternoon.

DEBTORS' EXHIBIT NO. 7
Page 4 of 50

5

All right.  Mr. Starner did you want to begin today?

MR. STARNER:  Thank you, Your Honor.  Greg Starner Wright & Case on behalf of the LSP parties.  We're here on our Motion to Compel, Your Honor, as you know.  What I thought I would do was kind of outline briefly what we're seeking and then how I think two privilege that have been asserted and discuss both of those kind of in turn.  I think frankly, the key issue is the scope of the mediation privilege, you know, when it started, when it ended, and the scope of it.  And if we can talk a little bit about the common interest privilege which is almost like a fall back privilege they're asserting here.

But just first, just to highlight what we are seeking, the subject of what we're looking for is, you know, we're seeking discovery we're going into negotiations of the settlement.  We've talked with you, I think, a number of times now about the key issues we're focused on which includes the treatment of LSP's claim in connection with the settlement, particularly the fact they're being asked to give up 18 percent of their recoveries and also waive their deficiency claims as part of settling the claims.  And that's what -- obviously one of the key issues in this case that goes to a number of our objections I think we outlined a number of those for you on Monday.  I go into

**DEBTORS' EXHIBIT NO. 7**
**Page 5 of 50**

6

classification, disparate treatment, whether the plan's been proposed in good faith and whether the settlement's fair and reasonable.

So those are the materials we are seeking, so what's being withheld?  The Debtors and the settling parties -- we've asked for the similar materials from all of them -- all of them are asserting the same privileges and there's two.  One, they're asserting the privilege under the mediation ADR local rule 1604(i) and their position is that they're not going to produce any communications between them as of July 19, 2018, to date.  And the second privilege they're asserting is the common interest privilege which they assert began or existed as of August 7th.  And so I'll just take each of those in turn, Your Honor.

The first, is just as a kind of threshold matter, as the Court I'm sure is fully aware, it's the parties that are proposing to withhold documents on the basis of privilege that have the burden.  With respect to mediation privilege, so the local rule, you know, we believe on its face, the plain terms of the local rule applied to communications made during proceedings.  And they're relying upon that rule to withhold four-and-a-half months of communications, you know, from the day the Court issued its order directing the parties to mediation to date.  And we just believe that's an overly broad assertion and use of

**DEBTORS' EXHIBIT NO. 7**
**Page 6 of 50**

that rule and not consistent with the intent of that rule. We believe it should it be limited to the discussions amongst the parties during mediation sessions.

Now, we're also not asking -- we're not seeking those communications, we're not seeking mediation statements submitted to Judge Jones, we're asking about communications to Judge Jones. The mediation here occurred on four discreet dates: August 6th, August 7th, August 27th, and September 21st. And we believe that the ADR mediation privilege should be limited to communications during those sessions.

THE COURT: Is there any authority that supports your position on that?

MR. STARNER: You know, Your Honor. There's not really a lot of law on this at all. You saw on both parties, nobody -- we were unable to find any cases that directly consider the scope of this particular rule. You know, there is some reference to the idea of a mediation privilege under Federal Law, kind of the general scope of that, but again I think that's generally is limited to mediation proceedings and has not been applied, certainly in none of the cases cited by the other parties, none of that was applied to a period of months.

And I think that would go, really contrary to the purpose of the rule. If parties to a proceeding can start

8

mediation day one of a case and continue that mediation perpetuated throughout the case, they can potentially use that as basis to withhold all the communication between the parties. We don't believe that was the intent of the rule. We think it should be limited to actual mediation proceedings.

There are other rules that may come into play. Obviously the Federal rule 408, which is a different rule that applies --

THE COURT: Well I don't -- I don't think rule 408 in general protects against discovery it protects against use.

MR. STARNER: Correct, Your Honor.

THE COURT: But the mediation rule, protects against discovery, and so I think they may do different functional things, I guess, it protects against discovery and use, but I guess if you can't discover you can't use it.

MR. STARNER: Right.

THE COURT: But is there -- they gave me some case law -- and I agree that it's not the strongest in the world -- but is there anything at all that would go with such a narrow interpretation, because yours seems awfully narrow.

I mean, it would -- if I read it the way that you're reading it then if there was a communication where

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 8 of 50**

9

the mediator called people together before the proceedings started and it wasn't the face-to-face kind of in room thing, but it was a -- he picks up the phone and he calls and says tell me what your disputes about, probably excludes that, too, under quite the narrow reading that you're giving.

So is there anything that supports going as narrow as what you're saying?

MR. STARNER:  But, I think, as I mentioned before, we're not asking for those type of communications, Your Honor.

THE COURT:  You may not be asking for them, but I'm trying to live with the reading that you're giving me which is I think it was -- I don't mean to use some of the pejorative terms that they used about it -- because I think we are here on a hard question.

But yours was, if it didn't occur within the four walls of that mediation session, it isn't a mediation privilege, it may be something else, it may be you're not seeking it, but it isn't a mediation privilege.  Is there anything that supports that at all, because I mean, I'm not seeing it?

MR. STARNER:  We have not -- we didn't find any cases that have considered that question.  So we didn't find any courts that come out really either way on that specific

**DEBTORS' EXHIBIT NO. 7**
**Page 9 of 50**

10

question.

THE COURT:  And is it the rule that makes it privileged or is federal policy that makes it privileged?

MR. STARNER:  You know, I guess I would suggest that the local rule is the one that's kind of on point, but I think it's informed by maybe some of the policy considerations behind the idea of a mediation privilege.  I don't think we were able to find necessarily any legislative history behind the rule, I think we looked for that, weren't able to find that.

THE COURT:  I'm unaware of any as well.  Okay.

MR. STARNER:  So I think we have to kind of fall back on the plain terms.  I agree, Your Honor, that some of the practical considerations are relevant here, and I guess I would suggest to the Court that one of those considerations should be on the facts of this case.  That the idea that you would be able to assert the privilege for a period of four-and-a-half months, particularly after the period of time which they're taking the position they had an agreement, which I'll get to in a minute, their position is that for purpose of common interest, at least -- now whether that's inconsistent with this, they're positon on mediation privilege is another question -- but for common interest they say we had a deal as of August 7th.

So, you know, I think I would suggest to the

**DEBTORS' EXHIBIT NO. 7**
**Page 10 of 50**

11

Court that at some point you have to cut off, there has to be a stop date for that mediation privilege.

THE COURT:  So what do you do -- it's pretty common when I've done mediations that there's something that says, if the parties have a dispute about what this mediation agreement means, they can come back to me and I'll try and work through that.  And, perhaps because I don't do such a good job, I have those often where people have to come back, but that must still be part of the mediation, right?  So you have --

MR. STARNER:  They go back --

THE COURT:  You have what you think --

MR. STARNER:  -- to the mediator, the neutral --

THE COURT:  -- is an agreement --

MR. STARNER:  -- and raise issues, you mean?

THE COURT:  You have what you think is an agreement, and there's an interpretive dispute about it.  Or sometimes you'll have an agreement between Party A and Party B, but not between Party A and Party C, and so you'll sign up the B agreement and then you'll come back with just A and C.  How do I cavern this all out --

MR. STARNER:  I think two things, Your Honor.

THE COURT:  Yeah.

MR. STARNER:  One the idea of going back to the neutral, the mediator, you know, Judge Jones in this

12

instance, I believe that would probably fall more, much more, closer to the intent of mediation proceedings in my view.  You have the mediation sessions, but, if there are follow-ups, whether it includes all the parties or some subset, but particularly with that neutral involved with mediating, actively mediating, between the parties, I believe that would likely fall closer to the scope of the agreement.

However, that's not what's at issue here.  The allegation is that there was a deal, a partial deal at least, between certain parties, which the Debtors are seeking to use affirmatively as a basis to support their plan, and to support their decision to treat the LSP and the other non-insider secured creditors a certain way.

THE COURT:  When you say they're trying to use it, I think I've been pretty clear that part of what you're seeking they're going to have a really heavy burden to not get me to grant --

MR. STARNER:  And I'll get to that.  Yeah.  Absolutely, Your Honor.

THE COURT:  But using it to say, here's a deal which came out of a black box, but this is the deal that were implementing is one thing, and I think we all agree they get to say at least that much.  And I think what I have told you preliminarily and I've seen nothing to change my

**DEBTORS' EXHIBIT NO. 7**
**Page 12 of 50**

13

mind about it, is I'm not going to let them say, because it came out of that black box it was, therefore, done in good faith.  If you're telling me --

MR. STARNER:  And that may be --

THE COURT:  -- some other thing.  Then I need to understand.

MR. STARNER:  And that may be the rules of the road that we need to get today, that may be helpful for us ultimately, but I think we'd still, you know, believe that at least on the facts in this case and what's at issue, the idea that there is no end date for the mediation that's been ongoing.

And particularly, Your Honor, there is --

THE COURT:  Is it still ongoing, or has it stopped?

MR. STARNER:  As far as I understand, that's the Debtors' position.

THE COURT:  Do you know?

MR. STARNER:  I'm afraid I -- well very good question.  We have not been invited, we've certainly not been involved in mediation.

THE COURT:  Okay.

MR. STARNER:  I'll say this, at least with respect to it, there's a number of issues --

THE COURT:  Do you want to go?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 13 of 50**

14

MR. STARNER:  We're always open --

THE COURT:  I could probably arrange that.

MR. STARNER:  Your Honor, we are certainly always open to negotiate a resolution.  And frankly the parties have been certainly working in that direction recently, we just have not been able to make progress unfortunately.

THE COURT:  Okay.

MR. STARNER:  But I'll say this, on the scope of the privilege, there just has to be some end date.  In addition to that, there are issues that were still being negotiated and the difficulty we have is, okay, so there's still open issues that we believe are still being negotiated and a big issue here is their position that certain things, particularly the fact that we would pay for the settlement both out of our initial recoveries on our secured claim and give up our deficiency claim.  That was somehow decided in mediation.  And our view we were not asked to agree to that, we did not agree to that as part of that mediation, so --

THE COURT:  But I don't think we have a dispute about that right?  As I understand it, there is no dispute that they're saying that's what this class, were asking this class to vote to do, and we're trying to drag you along into that unwillingly and you have not volunteered to do that.  I don't think we have a factual dispute there for which we need any discovery.  And that's -- there is an agreement and

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

you're not a signatory.  So I'm not sure where we need any discovery abut that question.

Am I wrong about that?

MR. STARNER:  Well I think to the extent they're purporting to and I think we've addressed this in terms of sword and shield --

THE COURT:  I don't think they're purporting to bind you at all.

MR. STARNER:  Well, seeking to use the mediation --

THE COURT:  They're purporting to try and bind you with 1129.

MR. STARNER:  -- as a basis to rationalize or justify the treatment or their plan --

THE COURT:  But I'm not going to do that.

MR. STARNER:  Right.  And that's a key issue, Your Honor, frankly that is important to us.  Ultimately if --

THE COURT:  Let me ask this.  Does it make sense to see if they're going to fight you and me on that battle so that you know what you're arguing about?

Because again, I think it's really difficult for me to let them go into the interior of the mediation and to lock you out of discovery.  Although I start with the belief that they can't do it, they want to argue against that and

DEBTORS' EXHIBIT NO. 7
Page 15 of 50

16

maybe I should hear that and then come back to you to let you finish where you are.

MR. STARNER:  That's a good point and I'm happy to do that, Your Honor.  And I'll deal with that sword and shield piece after we hear what they're position is.

THE COURT:  Okay.

MR. STARNER:  Do you want me to briefly address the common interest privilege?

THE COURT:  Let me just hear this one piece and well come right --

MR. STARNER:  Certainly.

THE COURT:  -- back to common interest.

Do you all want to speak to that, or is there one leader?  Mr. Slade, your leader.

MR. SLADE:  Mr. Slade is our leader.

THE COURT:  All right.  Is there a mediation agreement to that affect or that's just?

MR. SLADE:  I can't talk about it, Your Honor, it's privileged.

(Laughter)

MR. SLADE:  Good afternoon, Your Honor.  Mike Slade for --

THE COURT:  So just on this one --

MR. SLADE:  -- the Debtors.

THE COURT:  -- narrow question.  Are you going to

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

17

argue that you can use events within the mediation to prove good faith?

MR. SLADE:  Like the back and forth between the parties and the mediation?  I don't intend to --

THE COURT:  That you in fact -- are you going to use anyone saying we negotiated in good faith at the mediation?

MR. SLADE:  I think the fact that there was a mediation --

THE COURT:  There was a mediation.

MR. SLADE:  Yes.

THE COURT:  But as to what happened in it.

MR. SLADE:  Yeah.  We don't intend to put on evidence of what happened during the mediation other than the fact that this was mediated.

THE COURT:  But even a conclusion that says -- I don't think I can let you say -- have your witness say -- he can say we went to mediation, but he can't say we negotiated in good faith at the mediation, because that's telling me their position as to what occurred within the mediation.  So I don't think I can let you do that and that's why, I want a clear statement about that.

MR. SLADE:  I just want to step back for a second, because the confirmation standard under 1129(a)(3) has like literally nothing to do with that.  I mean the

18

Fifth Circuit has said what that means in the *Sun Country* case that we cited and what LS Power cited in their brief.

What happened in that case, was there was a creditor that specifically argued that the plan was not in good faith. So what the Debtor had done in that case was change the treatment for a specific secured -- for a group of unsecured creditors from unimpaired to impaired and the argument was the specific reason they did that was to take advantage of the one secured creditor and confirm a plan around them, and the Fifth Circuit said, that's not relevant to good faith. They said what's relevant to good faith is what the purpose of the -- whether the purpose of the plan is --

THE COURT: I just want to know -- not whether you think it's relevant or not, I want to know whether you're going to ever have a witness that you attempt to say that what occurred within the mediation occurred in good faith?

MR. SLADE: I guess, I just don't know the answer to that question, Your Honor. I mean --

THE COURT: He's asking me to issue in effect -- I forget if he used these words -- but a limine -- a limine order that says you can't put on that testimony.

MR. SLADE: Testimony --

THE COURT: You can't have a witness testify that

19

what occurred in the mediation occurred in good faith without breaking the mediation privilege yourself.  You can't do a sword and shield.  It's one of the three things I think he asked me for.

MR. SLADE:  I just don't think that could possibly be the answer, because what the mediation --

THE COURT:  You don't think what could be the answer?

MR. SLADE:  That can't be the answer, that we're barred from putting on testimony that the parties negotiated and they came up with -- and there was a mediation and they came up with this answer.  Because what the mediation rule says is that the information cannot be disclosed.  It's not discretionary.  There's no indication that, that's something that can be -- it says cannot be disclosed to anyone including the Court.  So how could -- there are situations like in any plan.

THE COURT:  So you can't then have a witness tell me, that they negotiated in good faith at the mediation, right?  How can he ever challenge that conclusion?

MR. SLADE:  So what you're saying is that under the rule, the rule basically prohibits anyone from saying that on the witness stand at a hearing.

THE COURT:  That's his motion and it seems to me that with you saying he can't figure out what happened at

20

the mediation that you can't have a witness that just gives me the conclusion. Everyone will stipulate. He'll stipulate that there was a mediation. His position is, that what occurred at the mediation was collusive activity to the disadvantage of his client. And, if you're guy wants to get up and give me the conclusion that what he did at the mediation was in good faith, and he can't prove that it was collusive, I've tied his hands unfairly.

And so I don't -- but I think the solution is, he probably can't get into whether there was collusion within the mediation but you can't testify as to the conclusion that it was in good faith because it's conclusionary and not subject to cross-examination.

MR. SLADE: Okay. I think I'm in the same place as Your Honor. I don't have -- I don't plan to have anybody sit on the stand and talk about what happened during the mediation, and so I'm not sure how that person --

THE COURT: How about a conclusion that it was in good faith?

MR. SLADE: That what actually took place at the mediation was in good faith?

THE COURT: No. Will there be a question for example, did you negotiate with the other side in good faith at the mediation?

MR. SLADE: Okay.

21

THE COURT:  You can't ask that.

MR. SLADE:  I understand what Your Honor is saying.

THE COURT:  And do you have any argument against that?

MR. SLADE:  I mean, I guess my argument would be under, Your Honor's interpretation of the rule then no one could ever elicit that testimony at a trial.  Because the rule specifically says you can't disclose it to anyone including the Court.  I don't think that, that would -- what Your Honor just said would kind of preclude anybody from testifying as to the good faith nature of a negotiation in any hearing --

THE COURT:  Well, no.

MR. SLADE:  -- because that's what this rule says.

THE COURT:  Well, no, because you could have good faith negotiations outside of mediation.

MR. SLADE:  Okay.

THE COURT:  The question is, can you testify about good faith negotiations with in the mediation?  And let me just say, I don't really think I'm tying your hands behind your back, because if I'm going to bar him to go into it, it doesn't seem to me at all fair, but you're burden isn't to prove that you negotiated in good faith, it's to

**DEBTORS' EXHIBIT NO. 7**
**Page 21 of 50**

22

prove you proposed in good faith.  And those are different things.

MR. SLADE:  Ms. Schwarzman and Ms. Tomasco are in violent agreement with Your Honor, so I'm going to join them and agree with Your Honor.

THE COURT:  Well, let me ask Bluescape and Fairfax if they're going to agree to, because if so, then I may just start the hearing by granting the limine -- I'm sorry, I don't know if that's the word you used, but that's the way I'm thinking of it is a limine motion.  I think you used -- he maybe even used that word.  But basically granting the limine so we then know what the rest of the fights about.

MR. CRAIN:  Stephen Crain from Bluescape, we would agree as well.

THE COURT:  All right.

And Fairfax's position?

MR. GLENN:  We also agree, Your Honor.  For the record Andrew Glenn.

THE COURT:  All right.  Then I am granting what I'm describing as the limine part of the motion, and we'll figure out how to document that at the end of the hearing.

Now, you go ahead with the rest of your argument.

MR. STARNER:  Thank you, Your Honor.

I'll turn now to the common interest privilege

and this I think there's two points here I wanted to raise with the Court.  One's kind of scope and timing of the privilege that's been asserted and the second is really more of a reservation of rights, kind of, to be determined piece of this.

On the common interest, as I said, they're taking the position that they --

THE COURT:  First of all, I'm glad you're thinking of it that way, because that's very much the way I was thinking of it coming in, but go ahead.

MR. STARNER:  Some of this is a little bit premature and not before the Court --

THE COURT:  No it's fair.  It's fair.

MR. STARNER:  -- but I do want to raise a few pieces of this.

They're taking the position they had an agreement as of August 7th.  You know, it's our view that at least certain terms we believe a number of material terms are not agreed to as of that date.  It's a little bit of a black box, of course, we don't know.  But certainly from the record that is apparent to us, you know, there were certain issues that had not been agreed to as of that date.

So our position is, if they didn't have an agreement on particular terms or issues, they cannot have a common interest as to those issues.  And that's kind of our

24

threshold issue and so were kind of stuck in a position where they're asserting we had this deal on all material economic terms, which is their definition they don't define what that means, they just said, take our word for it, all material terms were decided, and so you don't get anything. Now there's two or three problems with that.

First problem is, Your Honor, as you well know it's not just about having a common interest, the underlying communications have to privileged so that the communication has to be an attorney client privilege communication or a work product privilege.  That's where I think I have to reserve my rights, because were not yet in a position really to test that.

I do have an issue to raise with the Debtors -- we only have one privileged log to date, it's the Debtors. And the only description I have on that privilege log -- and I'm happy to show the Court -- is "privileged communication."  In our view that does not comply with rule 26, we have no way to assess whether or not a particular communication we believe in fact is privileged, at least inside the common interest piece of it.  So that's an issue we have, because obviously the Court knows commercial discussions, business discussions those would not be privileged.

So for that piece we have to kind of reserve our

**DEBTORS' EXHIBIT NO. 7**
**Page 24 of 50**

25

rights and we haven't yet had the privileged logs from Fairfax, Bluescape, or the Committee.  So for that particular issue we believe that's going to be something we need further information from the parties about and may need to raise with the Court.  Because we believe there are a number of commercial discussions that are being had.  So to be clear, we've got nothing from (indiscernible).

THE COURT:  I think, I'm a few degrees off of what you're saying, but not a magnitude off of what you're saying, which is --

MR. STARNER:  Okay.  So let me tap back towards, Your Honor.

THE COURT:  What is that now?

MR. STARNER:  If you tell me where you are, maybe I'll try to tap back towards you.

THE COURT:  Well I just want to get you to maybe tell me why my definition, which is a few degrees off yours, is wrong.

MR. STARNER:  Okay.

THE COURT:  You can agree, it seems to me, that we're going to oppose LS Power at every step of the way with respects to whether they can scuttle the releases, and then have a common interest to be your enemy without having agreed on the details of how to do that.  And that an issue could arise over which there wasn't an agreement on exactly

26

what to do and the parties get to discuss amongst themselves how to do -- how to implement their common interest which wouldn't really have been an agreement it would be implementation of the agreement, and I think that may still be covered by the common interest.

Conversely, if a new issue arose where a new enemy approached and it wasn't LS, and they approached from a different angle.  The fact that they had a common interest with respect to opposing anything your client might have wanted to have done, would not extend that common interest to some new attack until they had reached an agreement on that.

So the common interest I don't think can protect every discussion they might have about everything, but I don't think it's so narrow that it can only protect discussions about things that are agreed upon.  And I want to hear your feedback about that.

MR. STARNER:  Your Honor, I think I'm close to that.  I guess, I'll just put a slight twist on it and give you a particular example that we're concerned about.

We believe there are material terms that were still being negotiated after August 7th, what they're asserting as common interest.  Specifically, the idea that they would be asking LSP as a non-insider, senior-secured creditor to give up its deficiency claim as part of the

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 26 of 50**

settlement consideration, we believe that was not something that the parties had agreed about on August 7th.

Now, did Fairfax and Bluescape have an interest in selling the claims against them at that time, with the committee and the Debtors? Yes. That interest doesn't necessarily give them a common interest to then shield all their communications and negotiations about how they actually paid for that settlement though. And the fact that --

THE COURT: I'm not sure that I'm agreeing with you, because if they had a common interest in reaching goal A even if you weren't yet on the radar screen, I thought that the Fifth Circuit case law that I read would extend to that.

MR. STARNER: Well, Your Honor, you don't have a common interest until you actually are aligned. So I mean arguably --

THE COURT: Agree with that.

MR. STARNER: -- when all the parties at the beginning of this case had a common interest --

THE COURT: But they don't need to be aligned on the detail they need to be aligned on the goal, right?

MR. STARNER: But, I mean, Judge, that may just go a little bit too far, I would suggest. The idea of being aligned on the goal. You know, everyone's goal is probably

28

to maximize their own interest.  The Debtors have particular goals in mind of maximizing the interest of all the creditors.

THE COURT:  Well, no the two have to agree on a common goal.

MR. STARNER:  And I guess if they decide they're goals are aligned, I would just argue that if the details of how they would go about doing that.  Because there's a big difference between saying, in this instance, Bluescape and Fairfax saying we're willing to pay out of our own recoveries and our own pocket for this settlement, you know in fact were willing to use other people's currency to do that.  I think that's an important distinction as to where they were in the negotiations and why that would necessarily be fully aligned at that time.

THE COURT:  Let me take your example, then. Let's just -- and I haven't -- as I read their answer, there is a formal joint interest agreement between them that has been withheld from you.

MR. STARNER:  That's Fairfax and Bluescape.  Yes. That's slightly different point.  But yes they had an agreement prepetition.

THE COURT:  So if Fairfax and Bluescape had a joint agreement, and that joint agreement was to pursue all avenues towards getting a release and that they agreed they

29

would bear that cost 70/30.  I'm making stuff up.  And then as they figure out how to implement that, one way to implement that is to get a class vote so that the whole class gets a release.  It's not that they necessarily wanted to drag you along that's just what ended up happening in terms of the ultimate agreement.

I don't think they need to have agreed in the beginning that they were going to try and drag you along. They needed to agree in the beginning that they were going to do what it took to get a release and share costs in the example I gave.  I'm not saying those are necessary events.

MR. STARNER:  But you have -- just to that example, Your Honor, if I may.  You have Fairfax and Bluescape on one side that may have a common interest.  You have the committee on the other side and you have the Debtors on a third side.  Each of them, I think, in approaching that question all have separate kind of interest and ultimately how they decide to resolve their -- you know, it's an adversarial process where they negotiated this.

THE COURT:  So you're saying when Fairfax and Bluescape -- they could have a joint interest agreement where you can't get their documents, but if they then negotiate with the committee and there is no joint interest agreement with the committee, oral or written, that whatever occurs between them and the committee would be subject to

30

discovery?

MR. STARNER:  I'm not necessarily limited to -- in my mind it does not turn on an agreement, written or oral, it's about whether or not those interests are aligned or whether they were negotiating --

THE COURT:  Okay.

MR. STARNER:  -- at arm's length.

THE COURT:  But let's assume there was no agreement in your example between the committee on the one side and the Bluescape and Fairfax on the other?  You're telling me that Bluescape and Fairfax their own discussions might be privileged but their discussions with the committee would not be.

MR. STARNER:  We are focused on the discussions --

THE COURT:  I'm not sure they disagree with that so I need to understand if there is -- there may or may not be a disagreement about that.

MR. STARNER:  Okay.  And I would just include --

THE COURT:  I didn't realize we had a fight there.

MR. STARNER:  -- the Debtors also in that three-part kind of conversation.

THE COURT:  I don't know if we have a dispute about that or not.  I was not aware of that particular line

31

drawing exercise until you just --

MR. STARNER:  Well I'm hopeful that you and I don't have a dispute about it, I think I have a dispute with the Debtors, Fairfax, and Bluescape about that.

THE COURT:  I don't know if we do or not.  If we did, I missed it in the writing.  I sort of missed you raising it, I missed them answering it, that's a new issue for me.

MR. STARNER:  Okay.

THE COURT:  But I wouldn't think --

MR. STARNER:  You know, the nuances we put on it --

THE COURT:  -- I will just tell you that my top of the head answer is that until you have a joint interest you can't protect the discussions.  So, if the committee remained at loggerheads with Fairfax and Bluescape, those committee versus Fairfax and Bluescape discussions I doubt are governed by any joint interest privilege.  So if we have a dispute about that, right now at least my first reaction is, your right.

MR. STARNER:  And this is where I get to the reservation point, Your Honor, and needing more information, because frankly generally how you go about testing this issue is you get a privileged log, you see a description of the communication, you potentially ask for more details from

32

the party who's asserting the privilege, then you bring that particular -- those particular documents to the Court and say we think these are not covered by common interest.

THE COURT:  How many documents do we have?

MR. STARNER:  I believe the Debtors' privilege log was something, you know, a few hundred documents it was voluminous.

But in terms of the period that we're focused on obviously is just the common interest I think that hundreds of documents were withheld --

THE COURT:  Mostly emails or like -- I'm trying to figure out if I have to read them all, what you're asking me to do.  I don't know if you are going to ask me to read --

MR. STARNER:  Well I think they are mostly emails.

THE COURT:  Okay.

MR. STARNER:  I don't necessarily know were asking you to do anything yet, Your Honor, because right now --

THE COURT:  But I mean it may make some sense at some point to take them for an in camera review --

MR. STARNER:  Potentially.

THE COURT:  --and I'm trying to figure out if I'm capable of doing that with time limits.  But if it's a

33

hundred emails or two hundred emails, that's not a big deal. If it's 200, 60 page agreements, that's a pretty big deal.

MR. STARNER:  My suggestion, Your Honor, is that the parties -- we still haven't got the privilege logs from the other parties, we need to get those, have an opportunity to review them, give us a chance to meet and confer, because I think the first question for us is going to be please provide us more details --

THE COURT:  Right.  Right.

MR. STARNER:  And then potentially be able to tee it up, Your Honor, in a way that's manageable.  So I think that's where I would go with the common interest piece.

THE COURT:  Fair enough.

MR. STARNER:  So I think I'll pause or stop there, unless of course there's any questions.  I had some kind of discovery schedule kind of an update to provide to the Court, but maybe I'll reserve on that until after we finish arguing.

THE COURT:  Thank you, Mr. Starner.

MR. STARNER:  Thank you, Your Honor.

THE COURT:  Mr. Slade?

MR. SLADE:  Thank you, Your Honor.  A few things, first.  I think the common interest -- if the mediation privilege is what we've talked about it being I think the common interest privilege is of less relevance, because most

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 33 of 50**

of the documents would be covered by the mediation privilege.  But to the extent we get to the common interest privilege.  Here's what happened.

We had mediations on August 6th and 7th.  At the end of the 7th we had agreement in principle on all material, economic terms we actually had a hearing in front of Your Honor the next day, on August the 8th.  In which Mr. Greco said we have agreement on all material economic terms.  And I remember LS Power expressing, you know, they were unhappy with that agreement on economic terms, so there's not -- there's not a dispute that as of that date there was an agreement between the committee, the company, Fairfax, and Bluescape on any matter that would be relevant to LS Power.

The details that we were negotiating between then and the filing of the plan, you know, there were disagreements on some of the details that's sure, but I don't even understand why those would be relevant to LS Power.

And with respect to the common interest privilege, it's far broader than Mr. Starner suggested.  I think the key case on that is Judge Clark's opinion in the *Harwood* case.  I'm not sure if, Your Honor, had a chance to look at that.  We cited it and they cited it also in their briefs.  That was a case where Judge Clark found that there

**DEBTORS' EXHIBIT NO. 7**
**Page 34 of 50**

was a common interest between the banks, the Debtors and the committee, because they were joining forces for the ultimate purpose of confirming a liquidating plan.  That was the common goal.  There were details that there were issues between the parties on, but that was the common goal.  The three entities were working towards the common and ultimately accessible purpose of pursing a plan of reorganization that would get confirmed.  And so that's, you know, pretty right on point --

THE COURT:  But in Mr. Starner's example where you only have some of those parties, yet in bed together and other people haven't pulled the sheets over them yet, do you agree that there wouldn't be a joint interest privilege?

MR. SLADE:  So I think it depends on whether there was a difference of opinion over something that was material to the common goal.  If there was I agree with --

THE COURT:  No.  But we started off by me saying look you can have disputes about how to implement your common interest and that remains common interest, and he doesn't disagree with that.

MR. SLADE:  Yes.

THE COURT:  But you have to start with a common interest.  And so if it turns out -- and I want to go back to this hypothetical, because he gets to challenge what you're saying.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 35 of 50**

36

Bluescape and Fairfax have decided on a common interest, the committee hasn't joined in that common interest yet.  The communications between Bluescape and Fairfax on the one hand and the committee on the other are not subject to a common interest privilege.

MR. SLADE:  I agree, there's definitely no common interest privilege between the settling parties prior to August 7th, because prior to August 7th there hadn't been agreement on a common --

THE COURT:  But if Bluescape and Fairfax may have had their own agreement that took place in June, their June to August discussions would have been privileged between themselves but not with the committee, right?

MR. SLADE:  Yes.

THE COURT:  Okay.  Then I think we have somewhat of a consensus on that fine point that Mr. Starner agrees.

MR. SLADE:  Yes.  But I think where he -- where we part company and I think Your Honor parted company with LS Power on this also is, you know, there's agreement in principle on the material economic terms of the plan --

THE COURT:  Every little dispute doesn't destroy that common interest, I agree with that.

MR. SLADE:  Okay.

And just so Your Honor is clear on the amount of documents, I want to make sure -- it's correct that they've

had a privilege log since I think Monday, if they have issues with that, they should let us know.  We haven't heard any issues with that privilege log yet, but were happy to address that with them.  There are about, it's like a little less than 300 documents on the log, but just so we're clear that log only goes through August 7th.  We have the documents since then up to the filing of the -- basically through the Disclosure Statement approval, but we have -- so there's no log of those, we would have to do that, if Your Honor ordered us to do that.

But there is a log and we have all the -- we produced all the documents prior to July 19th that hit their search terms.  The period between that and August 7th is when -- is the nature of the log.  So there's going to be -- if Your Honor orders us to produce more documents there will be a longer log.

THE COURT:  Got it.  Mr. Crain.

MR. CRAIN:  Stephen Crain for the Bluescape entities.  And I just wanted to, I guess, alert the Court is the right term to what we've done and our approach.  So we have produced documents, a log will be forthcoming today, and we have -- there are fences around what we have produced and what we're logging, so prepetition we have a common interest agreement with Fairfax, so --

THE COURT:  Is that in writing?

**DEBTORS' EXHIBIT NO. 7
Page 37 of 50**

38

MR. CRAIN:  It is in writing, Your Honor.  It doesn't have to be, but it is.

So prepetition we received threats of litigation from creditors.  Those threats then sort of blossomed into the complaint that was drafted by the Creditors Committee that now has been cribbed by LS Power, and so from the get go, we have potential co-defendants that have now become real co-defendants that are completely aligned, they're both large creditors alleged to have abused their insider status.

So that, that, that notion captures a group of documents that we claim are subject to privilege, those communications in the furtherance of our legal work as it relates between Bluescape, Bracewell, and Fairfax, and their Counsel.

THE COURT:  Well that's limited then by communications between --

MR. CRAIN:  It is.

THE COURT:  -- Fairfax, Bluescape and their Counsel and not with any third parties, right?

MR. CRAIN:  Correct.  So among the documents produced would be documents between Bluescape and Debtors prior to the common interest privilege date of August 7th.

One thing I want to correct on something Mr. Starner said is that we -- and he hasn't seen our production so it's unfair for me to be critical of him, I just want to

**DEBTORS' EXHIBIT NO. 7**
**Page 38 of 50**

39

correct the record on it -- he said we're using these privileges -- he broadly said all the parties are using these privileges to prevent the production of documents after June 19th.  That's not true.  There are certain documents that we're withholding between June 19th and August 7th that are subject --

UKNOWN:  July.

MR. CRAIN:  July 19th, I can't read my own writing.  July 19th that's when the order for mediation came out.  So there are -- let me back up.  There are documents between the dates, July 19th and August 7th that we're withholding on the mediation privilege, but there are documents we're not withholding because they're not subject to that privilege.

So there are documents that are not subject to our joint common interest privilege with Fairfax that are there and are also not subject to any common interest privilege with the Debtors that are being produced in that time period.  And then subsequent to August 7th were relying upon the same common interest privilege that Mr. Slade described.

THE COURT:  All right.  Thank you.

I want to take each thing individually.

First, does the mediation privilege apply outside of the four corners of the mediation rooms?  My answer is it

40

does.  The mediation privilege applies to all the communications in furtherance of the mediation proceedings. I accept the reasoning found in the response brief that a lot of the language in that would be irrelevant if it was only the four corners of the room; for example, the scheduling issue and the final document issue.  But also the principle of it just makes no sense to limit it to the room. That the idea is to have confidential mediation.

Number two, I may have made an error in ordering the mediation without an end date, but my error isn't going to change the privilege.  The argument that three or four months seems excessive for a mediation privilege has some appeal to me, but I'm not going to go back and rewrite history.  If there's a party that thinks the order was too open-ended or that we should have terminated it or in otherwise limited it, that's something that should have come up, maybe I should have done it on my own, the argument has a lot of appeal, but there's no way that I can go back and redo that today.

Number three, as I indicated before, I will grant the limine motion.  I'm not going to allow the mediation to be used as a sword and shield.  There will be no testimony by any party about the internal communications that occurred from the point that we issued the mediation order until the mediation either ended or ends.  And I don't know if it's

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

41

ended yet or not.  That may be a factual issue for trial as to when it ends, or has ended.  It's something I don't know, but until it ends or has ended either by my order or by the mediator declaring -- the mediator being Judge Jones -- declaring that it's over.  One of those two things has to occur for it to end.

Normally these things end because there's a -- there really is a termination, everybody knows when they end it.  This one seems to have dragged a lot, it seems to have been productive a lot, that's not a complaint, but this problem is not one that I can solve by, I think, retroactively changing the rules.

The common interest doctrine, I think there is no longer much of a dispute about between the parties.  It only applies to parties that have a common interest, it does not apply to parties that are communicating with others, merely because the others have a common interest.  But it does apply to the resolution of matters that arise by the parties that have the common interest if they have individualized disputes.

Number four, with respect to all documents that are pre-mediation documents or that are documents that arose after the mediation commenced but not as part of the mediation process for which a privilege is alleged, there does need to be appropriate descriptors as argued by

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 41 of 50**

42

Mr. Starner.  And I'll order the privilege logs -- I've set a deadline for you-all, if you can't make this deadline by today, I'm not saying you would violate the order, but the descriptors need to be added promptly to those.  He's entitled to know what those documents are, so that he can challenge the privilege.

I'm not making that same order as to the mediation documents because I think they're sort of totally privileged, if they were within the mediation itself, and that no log would have to occur for those.  That's not an attorney-client privilege matter, it's a mediation privilege matter.

With that said, I think Mr. Starner wanted to then address how we move ahead on the balance of discovery matters.  So I'm going to call on him again and I'll also let people voice for the Record any further objections that they might have to that ruling.

MR. STARNER:  Thank you, Your Honor.  Thank you for your ruling.  I think that gives the parties some directions.  I will just say on the privilege log that'll be an issue that we're going to need to kind of work through and may need to get back in front of the Court on.

I just wanted to give the Court an update on where we are on discovery.  To-date, I understand that, you know, we've gotten the documents that we're going to get

**DEBTORS' EXHIBIT NO. 7**
**Page 42 of 50**

43

from the Debtors.

I understand there's been some start of a rolling production from some of the other parties.  We haven't yet received all of the documents yet from the Committee, Fairfax, and Bluescape, but I believe that they are working towards the Court's deadline of today.  So we'll see what we get.

So we'll need to look at those documents, we'll need to see those privilege logs, and kind of see if there are any issues or disputes that we need to raise between the parties and potentially with the Court.

In terms of depositions --

THE COURT:  When do you think you might next need some time from me?

MR. STARNER:  Well, it kind of goes into, you know, where we are on the schedule.  Right now we've got about eight depositions scheduled for next week.  We have an expert that we're working with and potentially seeking to confirm on liquidation.  You know, we obviously took the Courts comments on valuation and identified a liquidation expert to assist us to what extent we kind of finally confirm and have him, you know, up and running is something we're working with him on.

The deposition of the Debtors' liquidation expert is today.  My colleague is taking that deposition.  And so

44

were working in that direction also.  This is all just, I just wanted to highlight things we are doing within the schedule that we currently have and just highlight that.

In terms of the depositions, I just wanted to flag, there may be an issue or two there that we may have to raise with the Court.  We don't yet have confirmed dates for Bluescape's 30(b)(6) or Mr. Wilder (phonetic).  And I think we just recently were advised by Fairfax that they're not going to produce Mr. Watsa (phonetic), who's the principle kind of decision-maker for Fairfax.  They are going to make a 30(b)(6) witness available and so we'll need to determine whether that's an issue we have to raise with the Court.

And just in terms of looking forward, one other issue that we are asking the Debtors for some information about is the exit financing.  As the Court may recall, Counsel for the Debtors advised the Court that the schedule we're on in part turns on that exit financing.  We haven't seen any documentation regarding the commitment on the new 2L financing, and it's our view that to the extent that exit financing is going to be, you know, kind of the basis for the current schedule or for a schedule, it would be important for, you know, that kind of documentation information to be in the record, and so we're going to kind of see where that is.  We understand that may be kind of in flux a little bit.

DEBTORS' EXHIBIT NO. 7
Page 44 of 50

45

So I just wanted to highlight those or kind of some of the moving parts, Your Honor.  And so it may be helpful to have another Status Conference next week to see, you know, what's realistic in terms of a start date for confirmation.

THE COURT:  What day would be most helpful in your mind to schedule that for?

MR. STARNER:  Well, I think we're going to be in Dallas a lot next week, actually, Your Honor.  But nonetheless if it can be done telephone --

THE COURT:  There's a phone.

MR. STARNER:  Whenever the Court's available, we're happy to make ourselves available.

THE COURT:  Okay.  I mean when -- forget that you're in Dallas or that I'm in --

MR. STARNER:  Either Tuesday or Wednesday I think would give us a time just if there's some issues on the depositions, maybe Tuesday, Your Honor, if that works for the Court?

THE COURT:  Tuesday is my worst day.

MR. STARNER:  Okay.

THE COURT:  Monday or Wednesday are better but I'll find a way to do it on Tuesday if we need to.  But Wednesday afternoon would work much better for me if that accommodates the parties?

46

MR. STARNER:  Okay.  I think, from my perspective I think that might be helpful to have that at least placeholder.

THE COURT:  Mr. Slade?

MR. SLADE:  Thank you, Your Honor.  Wednesday afternoon works fine for a Status Conference.  There will be a deposition ongoing, but I'm sure we can have somebody else cover it while certain of us get on the phone with the Court.

As far as --

THE COURT:  I'll be on the phone as well, by the way, I won't be here.

MR. SLADE:  Okay.

THE COURT:  But I can do it Wednesday.

MR. SLADE:  That's great.

As far as the exit financing goes, this is the first time hearing of issues, but I'm happy to work with Counsel.  We produced a lot of documents already that related to the exit financing, and the 2L process is ongoing, as I think everybody knows.

The one issue I wanted to raise is this issue of LS Power is going to have an expert, we've been asking, you know, when we would see a report so that we can have a deposition scheduled, and we haven't gotten an answer to that.  So I'm not -- I'd just like to know when -- if

47

there's going to be an expert on the other side, when we're going to see a report and when we can take that person's deposition prior to confirmation.

THE COURT:  Okay.

MR. SLADE:  And I'm happy to have a call with Your Honor on Wednesday whenever you would like to set it.

THE COURT:  I'm sorry what did you say about Wednesday afternoon?

MR. SLADE: I'm happy to have a call whenever Your Honor would like to set it.

THE COURT:  So let me just look at my plane schedule for that day.  And this is going to be a tentative conference, right>  You-all are going to contact Ms. Do will be out of town, so can I get you-all to contact Mr. Castro and he'll arrange it with me, assuming that you want it.  But I'll tentatively give you a time right now, but it won't be final until you tell him that you need it.

MR. SLADE:  Absolutely.

THE COURT:  It sounds like you're in depos and I'm at a Judicial Conference meeting, so.

Just looking for when my return flight is, so that I'm not talking to you from an airplane.

MR. SLADE:  All right.  That used to be possible.

THE COURT:  What is that?

MR. SLADE:  That used to be possible, the air

DEBTORS' EXHIBIT NO. 7
Page 47 of 50

48

phones, no longer.

(Pause in proceedings.)

THE COURT:  I didn't ask the folks on the phone whether Wednesday afternoon works for everybody, I'm assuming it's okay from the sort of silence I'm getting, but.

Do you-all want to call it for 2:00 o'clock Houston time?

MR. SLADE:  That sounds fine for me, Your Honor.

MR. STARNER:  That's fine for me.

THE COURT:  Okay.  We'll set a tentative further discovery conference for 2:00 o'clock p.m. Houston time Wednesday, December the 5th.

That conference will only occur if the parties jointly contact Mr. Castro and tell him to get me on the phone.  So let him know if you would by the end of the day on Tuesday.  I won't have any other plans, so it'll be fine if I learn that late.

Does that work for everybody?

(No audible answer.)

THE COURT:  Is there anything else we can accomplish today?

What do we need to do to document the ruling, was it clear enough that you-all can just live with the tape, or do you-all want to get a written order on the ruling?  What

do you-all want to do?  I know you-all are really busy.

MR. SLADE:  I think my inclination would be to just use the transcript and --

MR. STARNER:  That's fine with me, Your Honor, I think the transcript probably is good enough for us.

THE COURT:  Okay.

MR. STARNER:  And if we have any disputes at the hearing, we can obviously raise it with the Court.

THE COURT:  That's fine.  All right.

If there's anything I can do to further the resolution of matters between all you-all let me know, I have expressed, tried to express a view that I think it is -- generally equitable subordination claims lose.  I'm not sure this is one that's a loser is probably the best way of putting it, and it would probably be productive to have further discussions between the parties about it.

MR. SLADE:  Yeah.  The one thing I should tell Your Honor, is Your Honor last time we were here asked us to draft language that would make clear in the confirmation order that was preserved.  We have done that and we have provided it to LS Power and we're just waiting for them to respond to it.

THE COURT:  Yeah.  I'm just not sure that this is a riskless event that we're heading into for anybody and you-all really ought to be having discussions, but -- I

50

mean, the other side of it is it's very interesting from my point of view.  I get to worry about things I don't usually worry about.  I'm just not sure that's very helpful to everybody else.

MR. SLADE:  Yes.

THE COURT:  I appreciate the quality of the argument and really the integrity with which everybody is arguing this, it's just so nice to see from all sides.  So, I thank you all, and we'll be in adjournment.

MR. SLADE:  Thank you.

MR. STARNER:  Thank you.

THE CLERK:  All rise.

(These proceedings concluded at 2:25 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #59671*

*DATE FILED:  DECEMBER 5, 2018*

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 7**
**Page 50 of 50**