IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 24-90213-11 |
| | § HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § MONDAY, |
| LLC, | § JULY 14, 2025 |
| | § |
| DEBTORS. | § 1:01 P.M. TO 7:49 P.M. |

## **PLAN CONFIRMATION HEARING**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:          YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**DEBTORS' EXHIBIT NO. 8**
**Page 1 of 265**

2

**APPEARANCES**:


FOR DEBTORS, STEWARD HEALTH        WEIL GOTSHAL & MANGES, LLP
CARE SYSTEM, LLC, ET AL.:          Clifford Carlson, Esq.
                                   700 Louisiana Street
                                   Suite 1700
                                   Houston, TX 77002
                                   713-546-5000

                                   WEIL GOTSHAL & MANGES, LLP
                                   David J. Cohen, Esq.
                                   Robert Berezin, Esq.
                                   Theodore Tsekerides, Esq.
                                   Christine Calabrese, Esq.
                                   Jason George, Esq.
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   212-310-8000

FOR TRACO INTERNATIONAL            STEPTOE, LLP
GROUP:                             Timothy Walsh, Esq.
                                   Michele Jacobson, Esq.
                                   1114 Avenue of the Americas
                                   New York, NY 10036
                                   212-378-7573

FOR THE OFFICIAL COMMITTEE         AKIN GUMP STRAUSS HAUER & FELD
OF UNSECURED CREDITORS:            Brad Kahn, Esq.
                                   Avi Luft, Esq.
                                   One Bryant Park
                                   Bank of America Tower
                                   New York NY 10036
                                   212-872-8121

FOR CERTAIN DEFERRED               VERRILL DANA, LLP
COMPENSATION PARTICIPANTS:         Robert Keach, Esq.
                                   1 Portland Street
                                   Portland, ME 04101
                                   207-253-4528

FOR THE COMMONWEALTH               PILLSBURY WINTHROP SHAW PITTMAN
OF MASSACHUSETTS AND               Andrew M. Troop, Esq.
ATTORNEY GENERAL OF THE            31 West 52nd Street
COMMONWEALTH OF MASSACHUSETTS:     New York, NY 10019
                                   212-858-1660

**DEBTORS' EXHIBIT NO. 8**
**Page 2 of 265**

3

**APPEARANCES (CONT'D):**

FOR THE CHUBB COMPANIES:        DUANE MORRIS, LLP
                                Jessica Bonteque, Esq.
                                335 Madison Avenue
                                New York, NY 10017
                                212-692-1036

FOR THE US TRUSTEE:             OFFICE OF THE US TRUSTEE
                                Ha Minh Nguyen, Esq.
                                515 Rusk Avenue, Suite 3516
                                Houston, TX 77002
                                202-590-7962

FOR INTUITIVE SURGICAL,         MITBY PACHOLDER JOHNSON, PLLC
INC.:                           Michael Barnhart, Esq.
                                1001 McKinney Street
                                Suite 925
                                Houston, TX 77002
                                713-234-1446

FOR THE INTERNAL REVENUE        DEPARTMENT OF JUSTICE
SERVICE:                        David Adams, Esq.
                                717 N. Harwood Street
                                Suite 400
                                Dallas, TX 75201
                                214-880-9721

FOR PAUL IGOE, PERSONAL         KELLER BENVENUTTI KIM, LLP
REPRESENTATIVE OF THE           Barry D. Spears, Esq.
ESTATE OF JULIA IGOE:           2630 Exposition Blvd.
                                Suite 203
                                Austin, TX 78703
                                512-328-3924

FOR THE FILO SECURED            MILBANK, LLP
PARTIES:                        Michael Price, Esq.
                                55 Hudson Yards
                                New York, NY 10001
                                212-530-5577

FOR VARIAN MEDICAL SYSTEMS,     MILLER CANFIELD PADOCK &
INC.:                             STONE, PC
                                Marc N. Swanson, Esq.
                                150 W. Jefferson Avenue
                                Suite 2500
                                Detroit, MI 48226
                                313-496-7591

**DEBTORS' EXHIBIT NO. 8**
**Page 3 of 265**

4

**APPEARANCES (CONT'D):**

FOR SODEXO OPERATIONS, LLC          REED SMITH, LLP
AND AFFILIATES:                     Michael Cooley, Esq.
                                    2850 N. Harwood Street
                                    Suite 1500
                                    Dallas, TX 75201
                                    469-680-4213

FOR GETINGE USA SALES, INC.:        ALSTON & BIRD, LLP
                                    Jacob Johnson, Esq.
                                    One Atlantic Center
                                    1201 W. Peachtree Street
                                    Suite 4900
                                    Atlanta, GA 30309
                                    404-881-7282

FOR FINANCIAL RECOVERY              LOWENSTEIN SANDLER, LLP
SERVICES, LLC D/B/A                 Michael S. Etkin, Esq.
FINANCIAL RECOVERY                  One Lowenstein Drive
STRATEGIES:                         Roseland, NJ 07068
                                    973-597-2312

FOR RECRUITWELL:                    ANTHONY & PARTNERS, LLC
                                    Stephenie Anthony, Esq.
                                    100 S. Ashley Drive
                                    Suite 1600
                                    Tampa, FL 33602
                                    813-273-5616

FOR LABORATORY CORPORATION          VINSON & ELKINS, LLP
OF AMERICA AND MEDTOX               William L. Wallander, Esq.
LABORATORIES, INC.:                 2001 Ross Avenue
                                    Suite 3900
                                    Dallas, TX 75201
                                    214-220-7905

FOR EKKEHARD KASPER, M.D.:          HODGSON RUSS, LLP
                                    James C. Thoman, Esq.
                                    140 Pearl Street
                                    Suite 100
                                    Buffalo, NY 14202
                                    716-856-4000


(Please also see Electronic Appearances.)

**DEBTORS' EXHIBIT NO. 8**
**Page 4 of 265**

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CRAIG JOHNSON | | | | |
| By Declaration | 49 | . | . | . |
| By Ms. Calabrese | . | . | 69 | . |
| By Ms. Jacobson | . | 52 | . | 74 |
| By Mr. Troop | . | 61 | . | 75 |
| By Mr. Luft | . | 71 | . | . |
| | | | | |
| ALAN CARR | | | | |
| By Mr. Tsekerides | 76 | . | 123 | . |
| By Ms. Jacobson | . | 82 | . | 125 |
| By Mr. Keach | . | 104 | . | 126 |
| By Mr. Adams | . | 114 | . | . |
| By Mr. Troop | . | 119 | . | 127 |
| By Mr. Luft | 121 | . | . | . |
| | | | | |
| JOHN CASTELLANO | | | | |
| By Mr. Berezin | 137 | . | 252 | . |
| By Mr. Keach | . | 161 | . | 262 |
| By Mr. Adams | . | 214 | . | . |
| By Mr. Nguyen | . | 230 | . | . |
| By Mr. Spears | . | 214 | . | . |
| By Mr. Troop | . | 245 | . | . |
| By Ms. Jacobson | . | . | . | 261 |

| EXHIBITS: | Admitted |
|---|---|
| ECF 5380 | 136 |
| ECF 5453-1 THROUGH -5 | 136 |
| ECF 5453-6 | 45 |
| ECF 5453-7 | 47 |
| ECF 5453-8 | 48 |
| ECF 5453-9 THROUGH -10 | 136 |
| ECF 5453-11 | 43 |
| ECF 5453-12 | 46 |
| REMAINING DOCS | 49 |
| ECF 5453-13 THROUGH -17 | 136 |
| ECF 5470-1 THROUGH -32 | 136 |
| ECF 5498-1 | 265 |

**\*\*\***

6

**HOUSTON, TEXAS; MONDAY, JULY 14, 2025; 1:01 P.M.**

THE COURT:  All right.  Good afternoon, everyone. This is Judge Lopez, today is July 14.  I'm going to call the 1:00 p.m. case, and we're here for final approval of a disclosure statement and plan confirmation in connection with the Steward Health Care bankruptcy cases.

Before we get started, in some very tough times for folks in the State of Texas and I just want to send my thoughts and prayers to anyone who may have known anyone affected for what happened in Kerr County.  So let's get started.

MR. CARLSON:  Good afternoon, Your Honor.  Cliff Carlson of Weil Gotshal on behalf of the Debtors.  And joining me in the courtroom here is Robert Berezin, David Cohen, Ted Tsekerides, Stephanie Morrison, Christine Calabrese and then we have Jeff Saferstein virtually as well.

THE COURT:  Okay.  Good afternoon.

MS. JACOBSON:  Good morning, Your Honor.  Michele Jacobson from Steptoe on behalf of TRACO International Group.

THE COURT:  Good to see you.

MS. JACOBSON:  Good to see you.

THE COURT:  Good afternoon.

MR. KAHN:  Good afternoon, Your Honor.  Brad Kahn, Akin Gump Strauss Hauer & Feld, joined by Sarah Schultz and Avi Luft on behalf of the Official Committee of Unsecured

Creditors.

THE COURT:  Good afternoon.

Mr. Keach, good afternoon.

MR. KEACH:  Good afternoon, Your Honor.  Robert Keach of Verrill Dana, LLP, on behalf of certain deferred compensation participants.  I'm here with Brian Hogue from Diamond McCarthy.

THE COURT:  Good afternoon.

Drew.

MR. TROOP:  Good afternoon, Your Honor.  Andrew Troop together with James Dickinson from Pillsbury Winthrop Shaw Pittman on behalf of the Commonwealth of Massachusetts. And I guess I'm technically also supposed to say that I'm a Special Assistant Attorney General here on behalf of the Attorney General for the Commonwealth of Massachusetts.

THE COURT:  Good afternoon.

MS. BONTEQUE:  Good afternoon, Your Honor.  Jessica Bonteque from Duane Morris appearing on behalf of the Chubb Companies.  Thank you, Your Honor.

THE COURT:  Good afternoon.

Mr. Nguyen, good afternoon.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen for the US Trustee.

MR. BARNHART:  Michael Barnhart on behalf of Intuitive Surgical Incorporated, and with me is Mr. Steven

DEBTORS' EXHIBIT NO. 8
Page 7 of 265

8

Mitby of our firm.

THE COURT:  Good afternoon.

MR. ADAMS:  Good afternoon, Your Honor.  David Adams, Department of Justice on behalf of the United States and it's agency the Internal Revenue Service.

THE COURT:  Good afternoon.

MR. SPEARS:  Good afternoon, Your Honor.  Barry Spears on behalf of Paul Igoe, personal representative of the estate of Julia Igoe.

THE COURT:  Good afternoon.

Anyone else in the courtroom wish to make an appearance?

MR. PRICE:  Your Honor, Michael Price of Milbank on behalf of the FILO secured parties.  I'm joined by my colleagues, Samir Vora and Brian Kinney and Andrew Harmeyer.

THE COURT:  Good afternoon.

Okay.  I'll do a check.  Anyone on the line, if you wish to make an appearance, why don't you hit 5 star, we'll un-mute your line.  I'd ask parties to please make an electronic appearance as well.  That means jumping on the Southern District of Texas webpage, find my homepage, you'll find a place to make an electronic appearance.

Okay.  Let's see, it looks like I've got -- here's a 313 number -- I've got like 6.

MR. SWANSON:  Thank you, Your Honor.  Marc Swanson,

9

Miller Canfield Paddock & Stone, on behalf of Varian Medical Systems, Inc.

THE COURT:  Good afternoon.

A 214 number.

MR. COOLEY:  Good afternoon, Your Honor.  Michael Cooley from Reed Smith appearing for Sodexo Operations, LLC and affiliates, together with my co-counsel, Jami Nimeroff from Brown Nimeroff, LLC.

THE COURT:  Okay.  A 404 number.  I better put on these cheaters to make sure I've got them right.  Go ahead.

MR. JOHNSON:  Good afternoon, Your Honor.  Jacob Johnson from Alston & Bird on behalf of Getinge USA Sales, LLC.

THE COURT:  A 973 number.

(No audible response.)

THE COURT:  A 973 number.

MR. ETKIN:  Yes, Your Honor, that might be me.

THE COURT:  Yes, Mr. Etkin, sure.  Good afternoon.

MR. ETKIN:  How are you, Judge Lopez?  Michael Etkin for Financial Recovery Services.

THE COURT:  Okay.  I've got an 813 number.  81 --

MS. ANTHONY:  Good afternoon.  This is Stephenie Anthony for RecruitWell, of Anthony & Partners.

THE COURT:  Good afternoon.

A 917 number.  I've got two more.

10

MR. WALSH:  Good afternoon, Your Honor.  Tim Walsh from Steptoe on behalf of TRACO.

THE COURT:  Good afternoon.

A 214 number.

MR. WALLANDER:  Your Honor, Bill Wallander, Vinson & Elkins, with K.E. Grissel on behalf of Lab Corp of America and Medtox Laboratories.

THE COURT:  Okay.  And a 315 number.

MR. THOMAN:  Good afternoon, Your Honor.  James Thoman, Hodgson Russ, counsel for Dr. Ekkehard Kasper.

THE COURT:  Okay.  If I have un-muted your line, I'd ask that you please just monitor yourselves, keep your phone on mute just so we can all hear each other in the courtroom. But I will keep your lines un-muted.  But just take a look at your phone and just place it on mute.  There's some -- I'm still hearing a little bit of back noise.  Oh, perfect.

Okay.  Good afternoon.

MR. COHEN:  Good afternoon, Your Honor.  For the Record David J. Cohen of Weil Gotshal & Manges on behalf of the Debtors.  As discussed last week, I would prepare to propose -- propose to proceed today is provide a quick overview of what to expect today and tomorrow and then allow other parties that are providing support or making substantive objections to make a quick hopefully 2 to 3 minute opening remark should they like to do so.

**DEBTORS' EXHIBIT NO. 8**
**Page 10 of 265**

11

THE COURT:  Good luck.

MR. COHEN:  My hope is we don't have folks making, you know, duplicative statements or coming off really just to reserve rights.  Frankly we've resolved about 40 out of 50 of the objections that were filed in advance of the hearing.  We filed an amended agenda this morning that highlights those resolutions.  So I'm hoping it's a narrower group that will rise, at least for the openings.

And I think if we're finalizing language in the confirmation order with folks, or have finalized language already and it just hasn't been filed, I don't think folks need to reserve rights.  Obviously they're welcome to if they feel like it's necessary.  And I think it would be a smaller group, you know, that's objecting, that even the folks that appeared at the beginning.

THE COURT:  Okay.

MR. COHEN:  So then I think we propose to jump into the evidence.  We have 4 witnesses in the courtroom today for each of whom we filed Declarations that we'd like to move in as their direct testimony when we get there after the openings.  First we have Mr. Craig Johnson of Kroll who'll provide evidence related to the Debtors' voting and solicitation procedures.  We have Mr. Alan Carr of the Debtors' Transformation Committee who'll be testifying in relation to the Debtors' investigation of certain claims.  We

12

have of course Mr. Castellano, the Debtors' CRO, who'll be testifying in support of the plan's feasibility and generally in support of the plan and the 1129 standards.  And finally we have Mr. Marc Brown of AlixPartners who'll be testifying in support of the Debtors' satisfaction of the best interest test.

I don't believe that any of the objectors plan on calling any witnesses.  So with those witnesses it's our hope and our expectation that we can at least get through the evidence this afternoon, and then use tomorrow's session for closing statements.  That would be our objective.

THE COURT:  Okay.

MR. COHEN:  In terms of table setting I'll just be brief and say we're very pleased with the results of the solicitation process.  It resulted in over 3700 general unsecured creditors voting on the plan.  Over 80 percent in number of those and 93 percent in dollar amount voted to accept the plan in addition to getting 100 percent of the votes from the classes of FILO lenders and PBGC claims.

And through the solicitation process we were also able to utilize the admin consent program to, subject to confirmation, satisfy an additional $33 million of admin claims.  That's in addition to the 20 million we were able to satisfy using the vendor fund from the TSA transaction back in March.

**DEBTORS' EXHIBIT NO. 8**
**Page 12 of 265**

13

So really from the time that we set out, you know, late last year to address the historical admin claims we've been able to satisfy nearly 55 million of those claims.  And we think the evidence will show today that the Debtors have a good handle on and can satisfy the remaining allowable admin claims with the anticipated proceeds of litigation.

And respect to the litigation assets and our ability to go effective, we know Your Honor asked us to put more meat on the bone during the decision regarding the FILO settlement. We think we've done that with the Castellano and the Carr Declarations that were filed and the evidence that will be put forth today and with the detail in our confirmation brief.

In response we've seen the objectors' arguments, we think they're going to boil down to a couple of paradoxical positions.  I think, 1, is they're going to say the Debtors haven't provided information to satisfy their burden, while at the same time they're going to be saying that any evidence that the Debtors have provided is privileged or hearsay and should be excluded.  So I think you're going to have to contend with that issue.

And then, 2, I think in a sort of conflicting manner they're going to say that the Debtors experience an independent -- independent directors and special committee approved a release of what they're calling our valuable claims and at the same time they're going to spend a lot of time

**DEBTORS' EXHIBIT NO. 8**
**Page 13 of 265**

14

today saying that all of the causes of action and litigation claims that the Debtors have preserved and are pursuing now actively have very limited value and so the plan isn't feasible.

So we think the Court will ultimately see through the fallacies and inconsistencies in sort of this block confirmation at all costs approach, and we very much look forward to putting on our case today and meeting our burden. So unless Your Honor has any other questions at the outset, I'm happy to turn it over.

THE COURT:  Just one clarifying question for me and then one -- and if confirmation hearing.  TRACO filed an emergency motion in limine to exclude certain portions of the Castellano, and probably Carr, decs.  How do you plan on -- like before, as you set the table in terms of moving decs in, what thoughts do you have on how to proceed with that, just -- and I want to give TRACO -- but I know -- you're already standing there, I might as well ask.

MR. COHEN:  Yeah, I'll let Mr. Berezin address that question.

THE COURT:  Oh, Mr. Berezin.

MR. BEREZIN:  So, Your Honor, we can handle that however you'd like, whether you'd like to have argument before the Declarations go in or you'd like to have the Declarations go in and then have the testimony come out and you can make a

15

decision as to whether there's been a probatory, or at issue waiver.

THE COURT:  Okay.  Let me -- just that -- I'll hear from TRACO in a minute, but just let me ask the other question.  This is more of a kind of clarification bankruptcy question, or just to confirm it on the Record.  There's a proposed estimated -- pick which word you want, the effective date won't happen if the plan is confirmed, I'm sort of estimating early 2027.  Let's just use that.

If we get to 2027, all the litigation happens, the plan is confirmed, and let's just assume that ]indiscernible 1:14:08] process, Debtors don't have enough money to pay admins in full.  Let's just -- I don't want to get into mid-points and all that, let's just assume worst case scenario you lose on everything, you just don't have enough money to get there.  What happens?

MR. COHEN:  I think, Your Honor, has the opportunity to order appropriate relief at that time.  I think there's some of the cases that are cited in the various --

THE COURT:  In other words --

MR. COHEN:   -- parties' briefs --

THE COURT:   -- as the plan goes -- can the plan still go effective, let me ask you that.

MR. COHEN:  Oh, if we get to 2027, the plan can still go effective at a later date.  2027 is not a certain --

**DEBTORS' EXHIBIT NO. 8**
**Page 15 of 265**

16

THE COURT:  I'm just assuming --

MR. COHEN:   -- deadline.

THE COURT:   -- you lose, I'm saying you lose, you lost everything.  I'm just -- I'm trying -- I'm giving you worse hypothetical downside, call it what you want.  You can't pay admins in full.  We get to the point where it's just clear the Debtors cannot pay admin claims in full.  I'm using 2027, I got it --

MR. COHEN:  Right.

THE COURT:   -- it's a proxy, but just --

MR. COHEN:  Yeah.

THE COURT:   -- can the plan go effective if you cannot pay admins in full?

MR. COHEN:  From my perspective the plan can only effective -- it can only go effective if we pay admins in full because if we -- what we wouldn't want to have happen is go effective because we've technically satisfied the conditions to effectiveness, which I recognize don't explicitly say that, but you'd be immediately in default under the plan.  So from our perspective as a practical matter the plan can't go effective unless we've satisfied 1129(a)(9), and our position to either pay it or reserved for administrative expense claims.

THE COURT:  Okay.  Thank you.  Yeah, let me hear from TRACO just that in terms of --

**DEBTORS' EXHIBIT NO. 8**
**Page 16 of 265**

17

MS. JACOBSON:  Your Honor, just in terms of when the issue of our motion in limine needs to be addressed, I think it needs to be addressed prior to evidence coming in.  So it needs to be addressed before the Declarations are offered.

THE COURT:  It sounds like to me, and I don't want to put -- you tell me if I've got -- if I understand.  That's right, it appears to me that you're objecting to portions of the Declaration.

MS. JACOBSON:  That's right and --

THE COURT:  So --

MS. JACOBSON:   -- the appendix to the Castellano --

THE COURT:   -- what normally happens is the unobjected portions can come in and the objection portions don't, and if the Debtors want to -- that doesn't mean the Debtors aren't -- the Debtors can put -- I'm making up, Castellano, Carr on the stand and they can try to get what they want in and then we'll go question-by-question.  In other words, I don't -- I don't think I need to deal with the motion in limine now without hearing anything.  I'd like to hear it but we'd go question-by-question.

But the paragraphs that you don't like, they come out, they just come out, they're not -- I'm not going to overrule now and take up whether -- I don't know what Castellano's going to say and I don't know what Carr is going to say.  I know what they -- I know what's written --

**DEBTORS' EXHIBIT NO. 8**
**Page 17 of 265**

18

MS. JACOBSON:  Right.

THE COURT:  -- but in terms of answering the questions it just comes out and they can put on a direct and they can try to get whatever they want in and you can object and we'll see where it goes.

MS. JACOBSON:  I suppose the --

THE COURT:  In other words --

MS. JACOBSON:  -- the problem is that they're putting in the Declaration as their direct examination.

THE COURT:  Right.  But that's what I'm saying, it will come in minus paragraphs, and you all are going to have to figure out what paragraphs those are.

MS. JACOBSON:  All right.  I mean we could do that.

THE COURT:  In other words, what you object to just doesn't come in because there's an objection to it.  So it just doesn't come and I'm making -- put Castellano and Carr up and -- but they still get to prove it up, it doesn't go away automatically, you just -- we just go question-by-question.

MR. BEREZIN:  That was my question, Your Honor, that we can still put our witnesses on.

THE COURT:  Yeah.  No, you --

MR. BEREZIN:  It's just everything that's going in that's not objected to is direct and then we'll supplement and there'll be objections and you can deal with it at that time.

THE COURT:  Yeah, I think that's the way I would --

**DEBTORS' EXHIBIT NO. 8**
**Page 18 of 265**

19

and that way nothing -- in other words, if you all can agree as to what, if anything, you know, you agree on that you -- or you don't object to in the Declarations, but the ones that -- paragraphs that you or anyone has an objection to, they come out, and then the witness comes on and we'll have to -- the Debtors get an opportunity to supplement it.

MS. JACOBSON:  Okay.

THE COURT:  Does that work?

MS. JACOBSON:  Thank you, Your Honor.

THE COURT:  Okay.

MS. JACOBSON:  That's fine.  Thank you, Your Honor.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Your Honor, the one thing we would request is I think it is unclear, at least to us, which are --

THE COURT:  Yeah.

UNIDENTIFIED SPEAKER:   -- unobjectionable and which --

THE COURT:  I was going to give you all a few minutes just to kind of figure that out.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  But just to kind of talk at the outset about that.

MS. JACOBSON:  Okay.

THE COURT:  Okay.  Does anyone else wish to be heard

**DEBTORS' EXHIBIT NO. 8**
**Page 19 of 265**

20

about --

MR. KAHN:  Good afternoon again, Your Honor.  Brad Kahn, Akin, on behalf of the Creditors Committee.  I will take Mr. Cohen's admonition, he wanted me to keep it under 2 minutes, I'm going to try to keep it under 1 minute for my really brief opening.

Your Honor said at the disclosure statement hearing that the Court wanted to hear from unsecured creditors, wanted to hear their votes.  And the unsecured creditors have spoken, and as Mr. Cohen alluded to, they overwhelmingly support this plan.  Over 80 percent in number and over 93 percent in amount.  And they do so understanding that it's going to take some time until distributions make their way down to unsecured creditors because they recognize, as we noted at the DS hearing, that this plan is the best path forward to allow for unsecured creditor recoveries.  That's thousands of creditors that believe this plan is the best path forward.

The Court is going to hear from a handful of objecting parties holding a small fraction of claims that oppose this plan.  And they do so seemingly against their economic self-interest and against the interest of the large majority of the unsecured creditor body.  Contrary to the objections, the Committee believes that the evidence is going to demonstrate that the Debtors have satisfied their burden for confirmation of the plan.  And with that the Committee

**DEBTORS' EXHIBIT NO. 8**
**Page 20 of 265**

21

will reserve the rest for closing.

THE COURT:  How -- and it -- since you're -- not because you're stand here, let me just throw a -- I never liked it when judges like at the end just kind of threw a concept out there and no one had an opportunity to think about it.  So I don't know if the issues as to feasibility, 1122, if any, that's -- whatever's going to come out, I'm going to -- the things that are objected to I'm going to let come out and we'll see where the evidence goes.

And I'll throw 2 concepts out there that I want the parties to at least think about.  One is, and I didn't see it raised too much, but under the Debtor kind of medical liability claims procedures, if I understand it correctly, if I confirm the plan, the stay kind of remains in effect, and a trustee, what we call the litigation trustee gets to see information from other parties.  So other parties are going to have to put together -- put together a packet of information so that the trustee can then kind of put together an offer, see if they can settle it.  Right?

MR. KAHN:  Yeah, the plan administrator will be --

THE COURT:  Right.

MR. KAHN:  -- taking on that role, yes.

THE COURT:  They'll take it up.  Right.  I'm sorry. I better get my lingo right.  Yes, the administrator would -- yeah.  No, no, I want to make sure I'm right.  That's right

22

because I don't confuse the 2 concepts.  You're right, the administrator is going to see a packet of information and then if -- and then I'm going to mandate people to mediation, which I've never done going 6 years on the bench.  And then after that I'm going to force them to -- if that doesn't work, then I'm going to force them to an arbitration.

MR. KAHN:  That last part I think is inaccurate, Your Honor --

THE COURT:  Go ahead.

MR. KAHN:   -- which is --

THE COURT:  I want you to clarify for me, because I --

MR. KAHN:   -- they can opt out of that and go back into the state tort system.  You are mandating the mediation portion.  And by the way, somebody correct me if I have this wrong, but after that mediation either succeeds or fails --

THE COURT:  My understanding --

MR. KAHN:   -- if it fails --

THE COURT:   -- and I want you to -- because, again, that's why words matter, I want somebody to kind of -- I don't want to do this at the 11th hour on a Tuesday afternoon and everybody's tired.  Just think about it now.  I want to know, it goes -- does it go mandatory mediation to mandatory arbitration where everybody has to split the arbitration cost, or does it go mandatory mediation, you get to opt out right

there, or maybe go into -- before you go into the tort system. If somebody can just clarify that for me --

MR. KAHN:  Yep.

THE COURT:   -- that would be --

MR. KAHN:  My understanding is the option to go into -- I'm going to let Mr. George cover it since he was the --

THE COURT:  George, why don't you --

MR. GEORGE:  Good afternoon, Your Honor.  Jason George, Weil Gotshal, for the Debtors.  After the mediation claimants will have an option to either agree to binding arbitration, so that's their choice if they want to go into arbitration, or they can just go directly to the tort system.

THE COURT:  So there's a stopping point there.  So I'm either going to -- after the mediation they can stop and agree to go to binding mediation or they can go into the tort system.

MR. GEORGE:  That's correct, Your Honor.

THE COURT:  Okay.  And who are the mediators?  Or what's the process for selecting mediators?

MR. GEORGE:  I believe it's going to be consistent with the AAA arbitration procedures.

THE COURT:  Okay.  Okay.  Okay.  Thank you.  That was an important clarification for me to just make sure that I understood kind of how that process worked.

**DEBTORS' EXHIBIT NO. 8**
**Page 23 of 265**

24

The other concept that I want to throw out there for parties to think about as they form their arguments, and this has nothing to do with that portion of it, so as it relates to feasibility I want -- seriously I want people to help me think through this, this case is -- what this plan proposes is different than like 99.9 percent of other cases in a Chapter 11 case in which at a plan confirmation a Debtor is going -- a bankruptcy court is going to analyze a Debtor's proposed plan and then determine whether the plan is feasible more likely than not to lead to another liquidation or another reorganization unless the plan provides for doing that. Right?

But what this plan proposes is actually if -- at the end of the case we'll know and the plan can't go effective. So it feels to me that feasibility is more of a timing issue. We -- at the end of the day you can't go effective.  So in other words you're either going to -- the question is, does feasibility in this case, is it already written into the plan because we don't have to -- we don't have to make an assumption, we'll know at the end of -- and we can stop and -- or I can say, We've had enough here, the case converts.

Based on my understanding of the plan, if you can't -- and the only way I would I way I would confirm it is -- and I know parties -- I want people to think about this, I'm not confirming any case, I'll just be very clear,

regardless of the arguments in which admins don't get paid in full.  I'm not allowing for an exception in which admins -- unless they've agreed to it on a one-off with a particular party, somebody can agree, I file an $100,000 admin claim, I agree to 50, that's not what I'm talking about.  I'm talking about a pro rata across the board no matter how -- what your claim is on the allowed basis.

So it's feasibility come down to here, in this case a timing assessment in which there's something put in that confirmed -- I don't want to use the word confirm -- that assures that the plan cannot go effective because unlike most other cases, we'll actually know whether you can pay admins in full and whether more like than not the plan can do what it says it can do in terms of liquidation.  You'll know by the end -- beginning of 2027 a bunch of these claims that you say are worth it, are worth it.  I don't know if you will or not.

But I got it, it's a timing issue, whether we look at it today and when people are relying -- I've been thinking about this concept because it's already written into the plan, which is something that you never see in traditional Chapter 11 cases in which the Bankruptcy Court makes an assessment on the spot about feasibility and that's why you have to have preponderance of the evidence whether it's more likely than not that it's not going to lead to another reorganization or liquidation.

26

In this case it's either going to work or this case liquidates based upon our understanding of what's going to happen. And I just want people to help me think through what that means, and if I'm thinking about it right or not. I don't want anyone to answer the question though. It's not the time because if I open one door, then everybody's to speak, and it's not that, it's I don't want that. I'm just throwing out what the understanding is. If you get to 2027 you either have the money and you can pay admins or you don't.

So the plan itself may have already written it in, a concept, and I just -- I understand there's a threshold question though as to whether a plan can even allow this in the first instance, and I take the objection seriously. So I don't want to prejudge, I'm just throwing out as we think through these issues. I'd rather people started to think about it now than me surprise people at the 11th hour with what I was thinking on those 2 concepts so.

I'm having trouble with the forced mediation and I'm thinking about the issues there. And I don't want to say anything else because I don't know what's going to come into evidence one way or the other, so I don't want to tell you what troubles me in a Declaration that may or may not be in. So I think we've just got to take it one step at a time, but those are global concepts that I think parties should -- concepts that -- I don't know, but maybe what makes the most

**DEBTORS' EXHIBIT NO. 8**
**Page 26 of 265**

sense now is for me to let parties have a few minutes off the Record and then -- while I step off -- and then you all can agree as to what, if anything, how much of the Johnson Declaration you want out.  That was a joke on the Kroll parties.

(Laughter.)

THE COURT:  But on the more substantive ones you all can take a few minutes and then let me know.  How much time you think you need?

MR. GEORGE:  Why don't we start with 15 minutes, Your Honor.

THE COURT:  So what I will do is -- just check in around 1:45.  But I know we have a little over 100 people on the line, so I'd rather come back on the Record -- come on up, Mr. Troop -- I'd rather folks come on the Record -- I'd rather come on the Record I should say, announce what we're doing, and then if there's going to be any further continuance or anything, but the parties can continue to talk.

Mr. Troop?

MR. TROOP:  Thank you, Your Honor.  Do you want to hear sort of our short opening statement now --

THE COURT:  Yes, absolutely.

MR. TROOP:   -- or wait?

THE COURT:  Absolutely before I do it, yeah.

MR. TROOP:  Thank you, Your Honor.  Your Honor, I

28

will try to be short, brief even for me and objectively short in time.  Your Honor, there are just a few points that I want to make.  When we were here for the FILO hearing I missed the hearing itself, the settlement hearing, but I listened to your ruling carefully.  And you made a sharp distinction between the issues that you were considering then and the issues that you'd be considering now.  And today and tomorrow will be the test of the latter.

Secondly, Your Honor, I want to point out that I think that when you talk about when this is going to happen, their projected effective date potential, and I'm not going to argue the point that you just made, I just want to make 2 observations.  I believe the Declarations now say that they will happen by the middle of 2027, by June of 2027, not the beginning of 2027.

And I also believe I heard Mr. Cohen say earlier, and maybe this will require some clarification as we listen to the question that you just posed to all of us about what happens if the projections are -- the projections -- the guesses, the swags are just wrong, and when are we going to pull the plug on that.  Because I thought I heard Mr. Cohen say earlier, Well, if it doesn't happen in 2027, it could happen later.

And I'm not sure whether implicit in your question is that you're asking for people to provide you with an end

DEBTORS' EXHIBIT NO. 8
Page 28 of 265

date where it's a go or no go, or whether this is a conversation, a hearing, an evidentiary presentation that we may have again and again and again between now and the time that the plug get pulled, or potentially gets pulled.

So, Your Honor, that's in response to the things here today -- I'm sorry, go ahead.

THE COURT: No, no, no, I was going to tell you the framing of the question was to just determine what happens if we -- whatever date we get to. I didn't want to prejudge what anyone was going to say. A lot of times people puts stuff in writing and then show up in court and say something a lot of times differently or adjusting, so I didn't want to prejudge what any of the witnesses would say on that side.

But ultimately I'm kind of assuming the worst case scenario for the Debtors, you know, is there a circumstance -- what I was really trying to ferret out was, was there -- would there be a circumstance in which someone would ask me to permit a plan to go effective in which admins would not be paid in full. That was really what I was just trying to get to, and I wanted to clarify that I would not.

And I'm not saying anyone was or was not, that's what I was -- I just wanted that to be clear because it's not an express condition precedent in -- to the effectiveness of a plan, that admins get paid in full and people can waive conditions, and I didn't want to get -- I never wanted to

get -- assuming if I confirm the plan, and I'm not saying I would or wouldn't, but I didn't want to -- I wanted to up front just clarify that on the Record so that it was -- because that would then lead to this other question about, you know, kind of what does feasibility look like in that world.

MR. TROOP:  Understood, Your Honor, and I appreciate the clarification, and again, without arguing --

THE COURT:  Yep.

MR. TROOP:   -- because I wasn't going to make this point.

THE COURT:  Yep.  Yeah.

MR. TROOP:  For us I think that highlights the issue of what does it mean to have a feasible liquidating plan with an unknown effective date and whether that's confirmable, whether that should be confirmable, whether the parties that extended, I'll be so bold as to say life-saving credit to these hospitals, should be left in the morass.  Or they should be -- they should know it's time and there's a Chapter 7 case then moving forward or some other alternative in this plan.

But, Your Honor, I also want to take -- point out 2 things for you.  They are in part related and they have to do with solicitation in voting --

THE COURT:  Okay.

MR. TROOP:   -- in connection with this case.  The Debtors and the Creditors Committee like to give you the

31

numbers in the aggregate.  And Mr. Castellano in his Declaration has made a full on case for the substantive consolidation of these Debtors, yet they also want to count the votes individually by Debtor, and then they take those numbers and they moosh them together in order to make their representation to you that the plan has been overwhelmingly accepted by general unsecured creditors.

And I'd like to point out 2 things in connection with that analysis, Your Honor.  It's have your cake and eat it too --  or maybe 3 things.  The second thing, Your Honor, is let's just look at the votes across the Debtors. Extrapolating through the filed proofs of claim and the reports that have been filed there's been 1 claim filed by a company called Cross Country Healthcare Staffing, it provides staffing services, and they filed a $38.3 million claim against 167 Debtors.  That comes out to be about $6.2 billion in the aggregate, Your Honor.

THE COURT:  Is that a -- is that 1 claim filed against a bunch of different people?

MR. TROOP:  That's 1 claim filed against --

THE COURT:  In other words, but --

MR. TROOP:   -- the same claim filed against 167 Debtors.

THE COURT:  Right.  But is it a dupe is what I'm asking.

32

MR. TROOP:  Well, Your Honor, it seems -- it looks exactly the same --

THE COURT:  I guess we don't know.  I just -- I didn't know if you knew up to that --

MR. TROOP:  It looks exactly the same.

THE COURT:  But at times people don't know and they filed 1 recovery, but based upon -- yeah, but I get the point.

MR. TROOP:  Okay.  But first of all, Your Honor, it's inconceivable that a staffing company who provides leased employees would have a claim against every one of the 167 Debtors.  That's first.  And the second thing, Your Honor, if you adjust for that 167 yes votes and give them 1 yes vote and then put together all the other yes votes, the voting comes out as follows, 444 point approximately 1 million dollars in unsecured creditors voted yes for the plan and $471 million in creditors voted no.

When you look at it from that perspective it is impossible to say that this claim -- that this case, this Chapter 11 plan has been overwhelmingly adopted, supported by all -- by general unsecured creditors.  Your Honor, in fact, they can't even satisfy the voting requirement on the consolidated basis that they're arguing for.  They haven't asked for it, but they're arguing for in the Castellano Declaration, and in the plan and the disclosure statement.

The second thing, Your Honor, in connection with the

DEBTORS' EXHIBIT NO. 8
Page 32 of 265

voting, I'm sure it wasn't lost on the Court, but in connection with Mr. Johnson's Declaration there are 22 pages of excluded votes.  That's 648 when you adjust for eliminating for later corrections from his original, 648 excluded votes that total $736 million.  That $736 million when on a non-due basis you have about $900 million of voting claims counted in the case.  So 73 out of 90, right, that weren't counted.

And there's got to be some explanation for that. The people whose votes didn't count, when you look at that list, they are sophisticated parties.  Sort of hard to imagine that 648 of them, or any significant portion of them made an intentional mistake in submitting their ballots.  And we know that under the solicitation procedures Kroll was authorized to go back to people who had deficient ballots and ask them questions and try to get them to fix it.

And, Your Honor, we think that's something that needs to be explored today in determining whether this overall process has been fair and those are 2 issues which have come to light in light of the filing of the Johnson Declaration last week, after objections were due as I recall, and it's why we're raising them now in our opening statement, sort of like for the reasons you did, Your Honor.  We're trying not to ambush anyone in connection with the questions that are coming.

We think these are important systemic questions that

**DEBTORS' EXHIBIT NO. 8**
**Page 33 of 265**

need to be answered, and answered fairly and completely.  And they need to be reconciled between the Debtors both wanting substantive consolidation but wanting to satisfy confirmation requirements without substantive consolidation.

And then on that last one, Your Honor, I'll simply note that even on the non-substantive consolidation basis -- process count each vote separately for each Debtor.  If we did our math right, the creditors of the 3 largest Debtors in this family voted no.  They voted no.  I think that's an important consideration for the Court as you think about this argument, confirm this plan because creditors want it, and with a very tough hill to climb.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. ADAMS:  I'll be brief, Your Honor.  David Adams, Department of Justice, on behalf of the Internal Revenue Service.  I do want to respond to a comment Committee counsel made.  We're not a small creditor here, we're not one of the outliers that he referred to.  The IRS has filed numerous claims, amended numerous claims.  We have approximately I believe 130 claims live against the 167 Debtors.

We did 120 votes with IRS counsel, coordinating with them.  The total priority and general unsecured claims of the Internal Revenue Service is $112.2 million.  30.7 million priority, 81.5 million general unsecured.  Debtors have acknowledged that they didn't pay their payroll taxes when

35

they filed their -- this case.  ECF 20 -- I'm sorry, ECF Number 15 was their emergency motion to pay wages and salaries and benefits and so forth.

They admit CARES Act deferrals, which many companies took advantage of as provided by Congress.  Those involve certain 941 quarters for the 2020 tax period.  They also required those companies to pay back the deferred amount of taxes that they didn't pay in initially, or that they might have filed an amended tax -- employment tax return and got a refund.  The Debtors admit in their papers at ECF 15, Paragraphs 31-32, that they have 28.5 million of unpaid CARES Act deferrals four years from the very first payment date.

They also admit that they had 42 million roughly of outstanding payroll taxes as of the petition date.  When the IRS has gone through all the returns -- the -- all the tax accounts for the Debtors, for the 941s, 940s, 720s, quarterly returns, 1120 corporate tax returns, excise tax returns, federal withholding returns, 944 returns which is an annual withhold return, Your Honor, we get to 112.2 million.

THE COURT:  Got it.

MR. ADAMS:  We're not a small player.  We are a big player and this is the government, the United States, that is the one that is severely affected here.  Thank you, Your Honor.

THE COURT:  Affected in which way?

36

MR. TROOP:  Well --

THE COURT:  Just, I'm not agreeing or disagreeing, I just want to make sure that I understand it --

MR. TROOP:  Well --

THE COURT:   -- as I take my notes here.

MR. TROOP:  Sure.  That if all that's going to be paid is just admins, and we do have administrative claims and we have more administrative claims for the Debtors' failure to make payments on 2024 employment taxes.  We have some 2024 employment tax returns that still haven't been filed.  So we're going to file a $5 million estimated claim on that for one of the Debtors.  It's an unfortunate situation that we're -- that we're in.

THE COURT:  I just want to make sure that I'm understanding.  The concern is, is that no one -- you're concerned that your priority claim is not being kind of properly accounted for in connection with the plan?

MR. TROOP:  Well, I mean it's addressed in the plan, it's a matter of whether it's going to be paid, Your Honor.  But luckily we have other provisions in the Internal Revenue Code that we can look at with respect to employment taxes.

THE COURT:  But I'm just trying to understand, when you say, We're being harmed, what's the specific harm that you're saying -- you said if they're just paying admins, I was trying to draw the connecting --

**DEBTORS' EXHIBIT NO. 8**
**Page 36 of 265**

37

MR. TROOP:  Well, if the --

THE COURT:   -- draw the line between the two.

MR. TROOP:   -- if the Plan is only going to pay administrative claims them, yes, then ours is not going to even receive its priority.

THE COURT:  Oh, you --

MR. TROOP:  But it's a matter, as the counsel pointed out, are there even going -- is this plan and are the Debtors even going to be able to pay the administrative claims of which the IRS does have administrative --

THE COURT:  Got it.

MR. TROOP:   -- claims, who will have more administrative claims.

THE COURT:  Got it.

MR. TROOP:  As I mentioned we have right now an unfiled return for a period that's estimated to be a $5 million liability.  So it's not just a little capsule that they're talking about.  But the main point is that counsel for the Committee's statement of small players, outliers, that's not us.

THE COURT:  Understood.

MR. TROOP:  We have a $81 million general unsecured over the 166 [sic] Debtors.  Thank you, Your Honor.

THE COURT:  Thank you very much.  All right.

MS. BONTEQUE:  Your Honor, very briefly.  Jessica

38

Bonteque appearing on behalf of the Chubb Companies.  I rise to simply put on the Record that we have been in -- we still have a live objection filed at 5369 but we have been in active negotiations with Debtors' counsel and we fully anticipate that there will be consensual confirmation order language that we can report to Your Honor tomorrow.  But we simply reserve all rights with regard to our objection as there is a few remaining points.

Thank you, Your Honor.

THE COURT:  Thank you.

Yep, if anyone wants to tell me -- if anyone just reserves their rights, I got it, if there's a lot of objections, there's no need to -- but if you want to highlight something, come in.

Mr. Keach.

MR. KEACH:  Thank you, Your Honor.  Robert Keach for certain participants in the deferred compensation plan.  I'll be very brief.  Your Honor, I rise to make one point and I believe Your Honor reserved this in your earlier remarks so I'll be very brief.  But I do want to emphasize that what we don't wish to do is to accept the normalization of the concept that the Debtors are attempting to put before the Court, and that is that if they're successful in their evidentiary presentation today, that this plan is confirmable.

What they purport to be able to prove if they're

DEBTORS' EXHIBIT NO. 8
Page 38 of 265

successful in all respects, is that this Debtor might have an opportunity to pay its administrative claims and priority claims 2 years from now.  I would submit, Your Honor, that even if they're successful, the plan's not confirmable, that that's legally impermissible under the Code.  There's not a single reported case that comes close to that, not a single one, notwithstanding their presentation in the brief.

The one case that they point to is probably more of a cautionary tale than a favorable citation, and that's *Sears*. *Sears* was an unmitigated disaster.  The consequence of the way *Sears* was wrapped up is that today vendors who previously might have extended credit to failing retailers stopped much sooner.  The consequence of that case is that you have vendors who won't participate even in critical vendor programs in retail cases for fear of not getting their administrative claims paid.

The systemic impact of that kind of precedent lasts, and lasts for a long time.  So there's a reason why these claims are supposed to be paid on an effective date that has some reasonable proximity to confirmation.  Because any other solution, a solution that says, If I can afford to pay my claims 2 years from now, I'll pay them and I'll meet my effective date obligations in 2 years, that concept makes a mockery of the whole idea of an effective date.

And I just didn't want to lose that concept, Your

40

Honor, and this idea that we're going to have an evidentiary presentation that proves they can do it.  Thank you.

THE COURT:  Thank you.

Okay.  All right.  Come back on 2:05.  There's 1 question for everyone, you all may have discussed it, how late are we going today?  And that's -- it's important, we're in Texas so getting air conditioning is an important concept for all of you, making sure that I've appropriately -- now we can do this my style, you all can pack lunches and we can get through a lot today.

I think parties should at a minimum plan to be here till 7:00, and then we'll see where this goes, which means I need you all to agree so that we can start getting the evidentiary presentation done and let's see how close we get to finishing evidence.  If we get close to concluding with all the evidence, and I don't know where it goes, I don't know who's going to do what, but if we get close to finishing, I want to finish today and give parties, you know, the morning to prepare for closings and then we'll see where that goes, but if it spills over, it just spills over, we'll see where it goes.

But let me get off the bench.  Why don't you all take about 10 minutes to see if you can agree on the decs and we'll go from there.  Thank you.

MR. KEACH:  Thank you, Your Honor.

DEBTORS' EXHIBIT NO. 8
Page 40 of 265

COURT SECURITY OFFICER:  All rise.

(Recess taken from 1:49 p.m. to 2:06 p.m.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.  Good afternoon. Judge Lopez back on the record in Steward.  Someone want to tell me where we are?

MS. JACOBSON:  Yes, Your Honor.  During the break, I went over the Declaration, the paragraphs to which we objected in the Declarations with Debtors' counsel.  They did not agree to any of them.  So therefore, I'd like to put on the record the paragraphs to which we object based upon our motion in limine.

THE COURT:  Well, they're just going to come out. If you object, they come out, and then someone can get it on.

MS. JACOBSON:  Yes.

THE COURT:  That's --

MS. JACOBSON:  Yeah.

THE COURT:  So just tell me.

MS. JACOBSON:  Yes.

THE COURT:  Why don't we just go -- just so -- more for me, just one by one, we go through each Declaration, and the parties can tell me if they agree to the admission or not the admission.  And I can then just kind of have the Declaration -- pull the Declaration up here, and then someone can tell me which paragraphs.

We can just kind of do it one by one.  There's four decs, I believe, right?

MS. JACOBSON:  Yes.

DEBTORS' EXHIBIT NO. 8
Page 41 of 265

42

THE COURT:  Why don't we start with Johnson?

MS. JACOBSON:  Okay.  With Johnson, there --

THE COURT:  Hold on.  Let me just pull up the ECF number.  I want to just pull up so I can see which ones we're talking about here.  Just give me one moment.  Okay.  Lt's just -- I think it's 5346, 5347 are the decs.  One is the sealed version; one is the unsealed version.  But just for purposes of where we are.  Okay.

MS. JACOBSON:  All right.

THE COURT:  Which --

MS. JACOBSON:  So for document 5219, the initial Declaration of Mr. Castellano --

THE COURT:  Let's start with Johnson just so --

MS. JACOBSON:  Oh, Johnson?

THE COURT:  Yeah, yeah.

MS. JACOBSON:  There are no issues with --

THE COURT:  Okay.

MS. JACOBSON:  -- Mr. Johnson's.

THE COURT:  Any objection to the admission of the Declaration of Craig Johnson?  I'm looking at ECF numbers and counsel, just correct me if -- tell me if I got it right.  There's a kind of an unredacted and then a sealed version at 5346 and 5347.  Any objection?

MS. JACOBSON:  Your Honor, I have it at 5453-11 of the amended --

43

THE COURT:  Oh, you're using --

MS. JACOBSON:  -- of the exhibit list.

THE COURT:  -- the witness and exhibit list.

MS. JACOBSON:  That's exact --

THE COURT:  You're using the right stuff.

MS. JACOBSON:  Yes.  So, Your Honor, it's the Declaration of Craig Johnson at 5453-11 --

THE COURT:  54 --

MS. JACOBSON:  -- which is Exhibit 12.

THE COURT:  Hang on.  Just 5450 -- it's Exhibit 12?

MS. JACOBSON:  It's Exhibit 12 of the exhibit list, which is docketed at ECF 5453-11.

THE COURT:  Okay.  Any objection to the admission?

(No verbal response.)

THE COURT:  Okay.  Johnson is admitted.

(Exhibit 12 of ECF 5453-11 received in evidence.)

THE COURT:  Okay.  Let us go to then Castellano.

MS. JACOBSON:  Yes.  The initial Declaration of Mr. Castellano, the -- we --

THE COURT:  Wait, wait.  Let's just identify the docket number.  The initial is at docket -- if we're using 5453 as our guide, or is there a supplemental?  Just tell me which one you want me to use just so that we're all clear.  We're using docket numbers and we have a clean record.

MR. BEREZIN:  Your Honor, the Debtors offer the

44

initial Declaration of John R. Castellano.  That is at docket number 5453-6 less the objected-to paragraphs that we will take up as we go.

THE COURT:  Okay.  I'm just pulling it up right now. So I'm looking at the initial Declaration of John Castellano in support of plan confirmation, 5453-6.  Okay.

MR. BEREZIN:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

MS. JACOBSON:  And the paragraphs to which an objection has been lodged are paragraphs 4,23 --

THE COURT:  Hold on.  I'm -- 4 -- 4?

MS. JACOBSON:  Paragraph 4.

THE COURT:  Uh-huh.

MS. JACOBSON:  Paragraph 23.

THE COURT:  Okay.

MS. JACOBSON:  Paragraph 27.

THE COURT:  Just give me one second.  I'm just taking a quick look.  Okay.

MS. JACOBSON:  423 -- excuse me -- 42325.

THE COURT:  Wait.  4 -- oh, 42325?

MS. JACOBSON:  Yeah.

THE COURT:  Okay.

MS. JACOBSON:  And paragraphs 47 through 51.

THE COURT:  Just so I'm clear so far -- 4, 23, 25, 47 through 51?

**DEBTORS' EXHIBIT NO. 8
Page 44 of 265**

45

MS. JACOBSON:  And Exhibit A.

THE COURT:  And Exhibit A.  Okay.

MS. JACOBSON:  Mr. Castellano filed a supplemental Declaration.

MR. BEREZIN:  Why don't we offer it and then you can put in your --

MS. JACOBSON:  Oh, okay.  Go ahead.

MR. BEREZIN:  -- for the record.

THE COURT:  Okay.

MS. JACOBSON:  Yes.

THE COURT:  So 5450 -- 5453-6 minus 4, 23, 25 -- excuse me, 4, 23, 25, 47 through 51, and Exhibit A; is that right?

MS. JACOBSON:  Yes, that's right.

THE COURT:  Okay.  That's admitted.

(Exhibit 5453-6 minus paragraphs 4, 23, 25, 47-51 and Exhibit A received in evidence.)

MR. BEREZIN:  Thank you, Your Honor.  And then the Debtors also offer the supplemental Declaration of John R. Castellano.  That appears at 5453-12 minus the objected-to paragraphs.

THE COURT:  Okay.

Counsel, whenever you're ready.

MS. JACOBSON:  Yes.  The objected-to paragraphs are paragraphs 49 --

46

THE COURT:  Okay.

MS. JACOBSON:  -- 53, 54, and Exhibit A.

THE COURT:  49, 53, 54, and Exhibit A.

MS. JACOBSON:  That's right.

THE COURT:  Any other objection by any party?

(No verbal response.)

THE COURT:  Okay.  The supplemental Declaration is admitted minus 49, 53, 54, and Exhibit A.

(Exhibit 5453-12 minus paragraphs 49, 53, 54, and Exhibit A received in evidence.)

THE COURT:  Okay.

MR. BEREZIN:  Okay.  The next one is Debtors are offering Alan Carr.  He's at 5453-7.

THE COURT:  5453-7 is the Carr.  Okay.  Just give me one second.  Let me just get there.  Okay.

MS. JACOBSON:  And the paragraphs to which we object are paragraphs 19, 20, 26 --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- 35 --

THE COURT:  35.

MS. JACOBSON:  -- 36 --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- 42, 43, and 48.

THE COURT:  Okay.  Any other -- anyone else wish to be heard?

**DEBTORS' EXHIBIT NO. 8**
**Page 46 of 265**

47

MR. BEREZIN:  I heard 35, 36.  What was the one after that?  Sorry.

THE COURT:  42 --

MR. BEREZIN:  42.

THE COURT:  -- 43, 48.

MR. BEREZIN:  42, 43.  Did I get that right?

MS. JACOBSON:  Yes.

THE COURT:  Okay.

MR. BEREZIN:  can we just read them back so I make sure I --

THE COURT:  Yeah, yeah, yeah.  5453-7 at 19, 20, 26, 35, 36, 42, 43, 48 is what I have.

MR. BEREZIN:  Okay.  Thank you, Your Honor.

MS. JACOBSON:  That's correct, Your Honor.

THE COURT:  Okay.  Perfect.

MR. BEREZIN:  Thank you.

THE COURT:  The Carr Declaration is admitted with -- minus these paragraphs.

(Exhibit 5453-7 minus paragraphs 19, 20, 26, 35, 36, 42, 43 and 48 received in evidence.)

MR. BEREZIN:  Okay.  Last one, Your Honor.  This is the Declaration of Mark J. Brown.

THE COURT:  Brown.

MR. BEREZIN:  That is at 5453-8 less -- and then the Debtors offer the Declaration minus the objected-to paragraph.

48

THE COURT:  Okay.  5453-8.  Okay.

MS. JACOBSON:  And the objected-to paragraph is paragraph 20.

THE COURT:  Okay.  Anyone else wish to be heard?

(No verbal response.)

THE COURT:  5453-8 minus paragraph 20.  It is admitted.

(Exhibit 5453-8 minus paragraph 20 received in evidence.)

THE COURT:  So my understanding, just so we're clear, I'm not going to go through these specific lenses, Johnson Declaration 5453-11 has come in; Castellano, 5453-6 minus the paragraphs that were read into the record and the Exhibit A; 5453-12, the supplemental Castellano Declaration minus the paragraphs and the attached Exhibit A; 5453-7, Carr, minus the paragraphs that were stated on the record; and Brown, 5453-8 minus -- I'll call it paragraph 20 because it was just one paragraph.  Do I have it?  Okay.  They're admitted.

MR. BEREZIN:  Thank you, Your Honor.  There's also the issue of exhibits.

THE COURT:  Yes.

MR. BEREZIN:  So we have a number of exhibits.  I don't believe that they implicate any of these issues.  So they are at 5453 where a number of them -- obviously, we would exclude what we just went through.  So at 5453, other than

49

5453 --

THE COURT:  Other than the decs we just talked about?

MR. BEREZIN:  Exactly, Your Honor.  So that's it for the record -- 5453-6, 5453-8.

THE COURT:  I've got 6, 7, 8, and 11.

MR. BEREZIN:  That's right, Your Honor.

THE COURT:  All right.

MR. BEREZIN:  And 12 --

THE COURT:  Oh, that's right.  Sorry, for Johnson.

MR. BEREZIN:  -- for Johnson.  That's all four though.  So the Debtors offer --

THE COURT:  So, hold on a second.  I messed up.  I've got 6, 7, 8, and 12 is the right --

MR. BEREZIN:  6, 7, 8 --

THE COURT:  And 11?

MR. BEREZIN:  -- 11, and 12.  Those are the Declarations.

THE COURT:  All right.  Any -- let me just ask if there's any objection to the admission of any other documents.

(No verbal response.)

THE COURT:  Okay.  Remaining documents are admitted.

(Remaining documents received in evidence.)

MR. BEREZIN:  Thank you, Your Honor.

THE COURT:  Thank you.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 49 of 265**

50

All right.  How do the parties wish to proceed?  Let me just note we're going to be here for a while.  I don't mind just for the housekeeping because I know folks are going to be in the back and it could be uncomfortable before we get started.

I don't mind folks having coffee, water, or any of that stuff.  Just nothing crunchy obviously.  It's happened.  And as folks leave for tonight, whatever trash is here, just please make sure that you leave with it.

And the last time I had a really big trial in the Red River case, I had to put the chairs back and find out where they went.  And I'm asking that we not -- just help me out -- if you remember where you had a chair, just put it back where you found it and I'll be happy.

Okay.  Let's proceed.  Thank you.

MS. CALABRESE:  Thank you, Your Honor.  The Debtors have already submitted the Declaration of Mr. Johnson, who is here and available for any Cross.

THE COURT:  Okay.  Anyone have any questions?

MS. JACOBSON:  I do, Your Honor.

THE COURT:  Okay.

Mr. Johnson, why don't you come on up?  I should note I'm throwing no shade to the lawyers at Red River.  It was the folks in the back.  I don't know who they were, but they kept the chairs.

51

Mr. Johnson, will you please raise your right hand. Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Okay.  We'll let the Record reflect the witness has been properly sworn in.  Just so we can do a mic check, can you just spell your last name for the Record?

THE WITNESS:  Yes, Your Honor.  Johnson, J-O-H-N-S-O-N.

THE COURT:  Okay.  Counsel, you may proceed.

MS. JACOBSON:  Does the witness have a copy of his Declaration?

MS. CALABRESE:  No.

MS. JACOBSON:  Okay.  I can supply a copy of the Declaration, but it's going to be at Document 5436 which was when it was filed.

THE COURT:  Yeah.  I think the ECF number -- you can confirm it, the ECF number.

MS. CALABRESE:  Your Honor, I have copies of the ECF number if that's easier.  And if you'd --

MS. JACOBSON:  Yeah.

MS. CALABRESE:  -- like one, counsel?

MS. JACOBSON:  Yes.

MS. CALABRESE:  May I approach, Your Honor?

THE COURT:  Yes.  Thank you.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MS. JACOBSON:

Q    Good afternoon, Mr. Johnson.  I'm Michele Jacobson from Steptoe, and I represent TRACO International Group.  I have a few questions for you on your Declaration.  If you would, please turn to footnote 7 of your Declaration.  Are you there?

A    I'm there.

Q    Sir, do I understand correctly that Kroll made the decision not to send TRACO a ballot even though the schedules reflected that SMG show TRACO as a creditor?

A    The schedules show TRACO as having an intercompany claim.

Q    Okay.  And did you come to learn that TRACO was not an intercompany claim or TRACO's claims were not intercompany claims for the purposes of the plan?

A    We understood that TRACO filed a motion on the 3018 making those assertions.

Q    And -- well, do you now understand that the claims that TRACO holds are not intercompany claims for purposes of the plan?

A    I understand that that is what's been agreed to.

Q    Okay.  Well, are you aware that TRACO requested that the Debtors issue a ballot to TRACO and that the Debtors initially refused?

A    I'm aware that the Debtors requested us to put together a

ballot for TRACO which we did.

Q    And that was after the motion was filed?

A    That is correct.

Q    Okay.  Now, sir, if we take a look at your -- the exhibits to your Declaration and specifically Exhibit A, the votes were tabulated by Debtor; is that right?

A    That is correct.

Q    They were not consolidated here?

A    That is correct.

Q    So if we turned, for example, to the back of Exhibit A, we would not find totals of, you know, or percentages of accepting and rejecting?

A    Are you asking on a consolidated basis?

Q    Yes.

A    That's correct.

Q    All right.  So, and for example, let's turn to page 15, if you would, 15 of 22 and have a look at the results for Steward Health Care System, LLC.  It's the second to the bottom.

A    I see it.

Q    Okay.

        THE COURT:  I'm not there.

        MS. JACOBSON:  Okay.

        THE COURT:  Get me there.

        MS. JACOBSON:  Page --

CRAIG JOHNSON - CROSS BY MS. JACOBSON                    54

THE COURT:  Oh, I see it -- 15 of 22.

MS. JACOBSON:  15 of 22, Your Honor.

THE COURT:  Got it, got it, got it.  Yep.

MS. JACOBSON:  It's the second to the last.

THE COURT:  You got it.

BY MS. JACOBSON:

Q    Sir, you understand that Steward Health Care System, LLC is the parent company?

A    I was not aware of that but --

Q    Are they the lead Debtor in these cases?

A    Yes, they are.

Q    Okay.  And what is the result with respect to the general unsecured creditors for Steward Health Care System, LLC?

A    There were 706 votes to accept, 122 votes to reject.  The votes to accept represented $258,269,785.35.  And the votes to reject reflected $146,528,987.68 to reject.

Q    And what was the class voting result for the general unsecured creditors for Steward Health Care System, LLC?

A    It was a -- a reject.

Q    And let's turn to page 17 to Steward Medical Group.  And that's the third one down.

A    I see it.

Q    Let's just, if you would, tell us what the class voting result was for the general unsecured creditors of Steward Medical Group.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 54 of 265**

A     For Steward Medical Group, Inc., class 4 general unsecured claims, 154 votes accepted the plan; 53 votes rejected the plan; votes in favor, votes to accept the plan represented $47,304,524.42.  Votes to reject reflected $73,002,146.59.

Q     And what was the class voting results?

A     That class voted to reject.

Q     Sir, do you understand that Steward Health Care System, LLC and Steward Medical Group were one of the largest Debtors in terms of numbers and amounts of claims?

A     I did not do that analysis.

Q     Okay.  Let's also have a look at -- let's turn to the front of Exhibit A.  Sir, were you in the courtroom for the openings this afternoon?

A     I was.

Q     The remarks.  And did you hear the remark concerning Cross Country, the staffing company with the $38,000,286,433.26 claim?

A     I remember the remarks.  I don't recall if that number was cited precisely.

Q     Okay.  I think the number was 38.3 million that was cited.

A     Okay.

Q     So you're not wrong.  Sir, if we take a look at just starting -- well, let's turn to page 3 of 22.  And we look at

a column, the column that's amount accepting, we can see the 38,000,286,433.28 repeated for multiple Debtors.  Would you agree with me?  For example, Choice Care Clinic of Louisiana, we can see that figure.

A    I see that figure.  Yes.

Q    Okay.  And we can see that multiple times on this page.

A    I certainly see it more than once.

Q    Yeah.  Did Kroll do -- and we've done a tally and have also looked at the actual proof of claim filed by this Cross Country Creditor, that they filed this amount for 167 Debtors. Was there any effort by Kroll to weed out claims which were asserted against multiple of the Debtors?

A    It's not our role to conduct a legal analysis of that nature.

Q    Was this at all pointed out to the Debtors?

A    I don't understand your question.

Q    Well, was it ever discussed with the Debtors that there were Creditors who filed the same dollar amount proof of claim for multiple Debtors?

A    I don't recall if that conversation was ever had, but it's seen on the claims register.

Q    And you would agree with me that a 38.4 million or 38.286 million-dollar claim could have an impact on the percentage of amount accepting with respect to, you know, with respect to the amounts?

A     Yes, It's a large number.

Q     Now let's turn to your Exhibit B.  What's your Exhibit B?

A     Exhibit B lists the votes that were invalidated and therefore not included in the tabulation.

Q     And there are 23 pages of excluded votes?

A     That is correct.

Q     And if we look at the last column which you have -- which is your column, reasons for exclusion, is it fair to say that the vast majority of excluded ballots were excluded because the holder did not indicate a vote to accept or reject the plan on the submitted ballot?

A     That's a fair statement.

Q     Now, sir, let's just talk about process.  The ballots were completed online if the Creditor did not ask for a printed ballot; is that right?

A     The Creditor had the opportunity to submit its vote online through our e-ballot portal, correct, or request a printed ballot.

Q     Okay.  So it wasn't possible to upload a PDF of a ballot; is that right?

A     That's correct.

Q     Okay.  So the Creditors actually had to fill in the boxes to accept or reject, including for opt outs on the online form?

A     Correct.

CRAIG JOHNSON - CROSS BY MS. JACOBSON                    58

Q    All right.  Did Kroll attempt to contact those Creditors who had invalid ballots?

A    No.

Q    Did you add up the number of invalid ballots by any chance?

A    Yes.

Q    How many invalid ballots were there?

A    Looks like there's approximately 785, 790.

Q    And did you -- have you added up the voting amount for the excluded ballots?

A    No, I haven't done that.

Q    If you would, let's take a look at Steward Health Care beginning on page 12 of your Exhibit B.

A    Steward Health Care Systems, LLC?

Q    Yes, yes.

A    Okay.

Q    Steward Health Care System, LLC, which is probably about, I don't know, a third down the page.  And if we look to the column of voting amount, we see a $1.398 million claim, a $561,000 claim, an $864,000 claim, a $6.5 million claim.

I'm not going to go through all of them, but if we keep going down, we even have a $33.8 million claim that was excluded.  You see that?

A    I do see that.

Q    So -- and you would agree with me that some of these

CRAIG JOHNSON - CROSS BY MS. JACOBSON

59

amounts -- well, let's focus on the $33.8 million ballot that was rejected.  That amount would be material in terms of voting for a particular class, whether it was accept or reject.

A    It's a large amount.  Yes.

Q    It's a large amount.  Did you do any kind of self-reflection as to why it was that there were over 700 ballots that were rejected during the -- during this vote?

A    Yes.  I mean, if you're asking about in particular the -- the ballots where the holder did not indicate --

Q    Yes.

A    -- a vote to accept or reject?

Q    Yes.

A    We did look into that, and it turns out that the vast majority did opt out.  So they did -- they did indicate that they had access to the portal or the voting mechanism and did exercise a right.  Now why they didn't vote, I -- I can't surmise.

Q    Could there have been confusion in terms of utilizing the form online, online voting?

A    I don't think so.  It's fairly straightforward.

Q    You think it's normal to have 700 ballots in a particular solicitation be excluded?

A    Well, when framed against the numbers in the case, it's not unusual.  I think there was something along the lines of

CRAIG JOHNSON - CROSS BY MS. JACOBSON                60

23,000 ballots that went out and a couple thousand valid

votes.  So it's not -- that's not an unusual return rate of

invalid votes.  And in fact, a number of them were superseded

by otherwise valid votes.

Q    I'm not -- I wasn't asking about those.

A    Okay.

Q    So in terms though -- you indicated that there was a

large amount of the vote that went out.  What was the -- how

many votes were turned in?

A    I believe there were roughly 3,700 votes that were turned

in roughly.

Q    Right.  And of those, that means we had over 20 percent

--

A    No, I take that back.  That was the valid votes.  They

were on top of that, the 700 or so invalid votes, which I

think gets us closer to 4,500 --

Q    Okay.

A    -- votes returned.

Q    But I'm trying to figure out.  So you had how many votes

were returned?

A    Including valid and invalid votes?

Q    Valid and invalid.

A    I think it's close to 4,500.

Q    Right.  So you had, if my math is right, at least a 15

percent invalid ballots?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

A     That's correct.

Q     Okay.

          MS. JACOBSON:  Thank you, Your Honor.  I have nothing further.

          THE COURT:  Okay.  Does anyone else have any questions for this witness in the form of Cross?

          Mr. Troop.

                         CROSS-EXAMINATION

BY MR. TROOP:

Q     Hello, Mr. Johnson.

A     Hello, Mr. Troop.

Q     How are you?

A     Very good.

Q     Andrew Troop representing the Commonwealth of Massachusetts.  Mr. Johnson, in connection with the Cross Country Healthcare Staffing claim, did they vote yes?

A     They voted yes.  Correct.

Q     And did you count it 167 times?

A     We counted it once at each Debtor, so 167 times.

Q     Okay.

A     Correct.

Q     Have you undertaken or did you undertake any analysis to determine what the acceptance or rejection rate for the plan might have been if everyone only had one vote against a consolidated Debtor?

CRAIG JOHNSON - CROSS BY MR. TROOP                    62

A    I did not.

Q    And why didn't you do that?

A    Well, the plan did not call for substantive consolidation, nor did the procedures for voting.

Q    And you know the plan doesn't call for substantive consolidation why?

A    Because I reviewed the plan provisions relating to voting, and I did not see any indication that we were to tabulate the claims on a substantively consolidated basis.

Q    Did you review the plan for the provisions with regard to the pool of assets to be distributed to Creditors --

A    I did not.

Q    -- and how that was going to take place?  So you don't know whether the plan, in fact, provides that a Creditor who filed 167 claims for the same amount, for 6 point -- total of $6.2 billion will get a distribution under the plan based on $6.2 billion' worth of claims or $38.3 million' worth of claims, do you?

A    I don't.

Q    Would that impact your understanding as to whether the plan was, in fact, accepted by -- what were the numbers, upwards of 80 percent of all Creditors in dollar and amount?

A    Again, we were -- our task was to solicit votes and tabulate votes.  We weren't conducting any legal analysis. Pursuant to the procedures, there was no indication that we

CRAIG JOHNSON - CROSS BY MR. TROOP                    63

were to tabulate on a consolidated basis what the results would look like if they were tabulated on a consolidated basis.  I don't know.

Q    But the analysis as to how to count the votes was a legal analysis, right?

A    Can you repeat that question?

Q    So the analysis as to how to tabulate the votes which you reviewed was a legal analysis.  You analyzed your legal obligations with regard to counting votes?

MS. CALABRESE:  Objection.  Privilege to the extent it calls for a privilege.

MR. TROOP:  May I parse on that, Your Honor?

THE COURT:  No, I didn't understand it.

MS. CALABRESE:  Sorry.

THE COURT:  It's okay.  Mr. Johnson, you can answer with your -- why don't you repeat the question.

BY MR. TROOP:

Q    When you concluded what your obligations were with regard to tabulating votes, that was a legal analysis, correct?

MS. CALABRESE:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  That's an administrative analysis. We're looking -- we're looking.  We're -- we're implementing the plan.  I'm sorry.  We're implementing the procedures as they are approved by the Court in a role as the solicitation

agent.

BY MR. TROOP:

Q    And so you made a conclusion as to what your legal obligations were, correct?

MS. CALABRESE:  Objection.  Asked and answered, Your Honor.

THE COURT:  He can answer.

THE WITNESS:  I made no legal conclusion.

BY MR. TROOP:

Q    You're a barred lawyer, aren't you, Mr. Johnson?

A    That is correct.

Q    You were a practicing bankruptcy lawyer?

A    That is correct.

Q    At Weil Gotshal?

A    Correct.

Q    Among other firms.

A    Weil was the only one.

Q    I couldn't remember.  Thank you.  I'll leave that one. Do you -- when you -- did you do the same analysis when you read the solicitation procedures and requirements as to what your obligations were, meaning Kroll's obligations were?

A    Our obligations are to implement the procedures as they are approved by the Court.

Q    And did -- I'm sorry.  Go ahead.

A    So we analyzed those procedures to make sure we were

CRAIG JOHNSON - CROSS BY MR. TROOP

65

implementing them correctly.

Q    Do those procedures provide you with the leeway to follow up on ballots to determine whether they were accurately cast?

A    There is a provision in the procedures that provide the Debtors and the solicitation agent the ability to cure deficiencies.  But that is, I believe it's a may, not a shall.

Q    When you got in 790 invalid ballots, did you talk to the Debtor's counsel about whether you should follow up to cure the deficiencies?

A    Not to my recollection.

Q    Why not?

A    Because the number did not strike me as -- well, because we're not required to, and the number did not strike me as unusual.

Q    So it didn't -- why didn't it not surprise you as unusual for about 800 out of 4,500 cast ballots to come back and be excluded for having failed to check boxes?

A    Well, among other reasons, a large number of them checked other boxes.  So there was indication that these parties knew what they were doing and their abstention was intentional.

Q    So you concluded their abstention was intentional?

A    You're asking me if there were red flags.  We looked into it, and the fact that they opted out is an indication that it was intentional.

Q    Did you call one to determine whether the failure to

CRAIG JOHNSON - CROSS BY MR. TROOP                    66

check yes or no for voting the plan was intentional?

A    We did not.

Q    Have you had another case that you can cite where the excluded rate approaches 15 percent of all returned ballots?

A    Off the top of my head, I believe PG&E was one of those cases where there were a large number of excluded ballots.

Q    And do you know that because you did the tabulation in the case, or you know that anecdotally?

A    I handled the tabulation.  I was involved in the tabulation in that case, and that's how I'm aware of it.

Q    And in PG&E -- I'm sorry; let me ask a question differently.  In connection with the 790 invalid excluded ballots, did you analyze how many of those ballots were cast by, I believe you -- let's call them sophisticated parties, businesses, large businesses, the like, and individuals?

A    I did not conduct that analysis, no.

Q    In PG&E, did you conduct that analysis?

A    I don't recall.  That was years ago.

Q    So do you have -- so you have no present recollection of what the excluded rate was in PG&E, do you?

A    I just know it's an example of a case where there was a high level of invalid votes.

Q    Others?

A    I can't think of others offhand, but --

Q    And Mr. Johnson, earlier you were in the courtroom for my

opening statement, correct?

A     Yes.

Q     And you heard me provide the number of 648 excluded ballots which would have been more favorable to your percentages than yours, correct?

A     (No verbal response.)

Q     Could you answer verbally, please?

A     Correct.

Q     And other than PG&E, have you ever filed a Declaration in support of voting, tabulating votes where you had 22 pages of excluded votes?

A     Anecdotally, I've filed Declarations that have probably had more than 22 pages of excluded votes.

Q     Anecdotally?

A     Anecdotally, I don't --

Q     Yeah.  So you think?

A     Yes.  It's not a -- a shocking number of pages of invalid votes.

Q     Bigger type or smaller type than you used on this Declaration?

A     Same type.

Q     It was a joke, Mr. Johnson.  Although I can't see the Judge's face right now, so I don't know whether he appreciated it.  The -- since the statement this morning, did you undertake any analysis to determine what would happen to the

DEBTORS' EXHIBIT NO. 8
Page 67 of 265

votes if you excluded 167 $38.3 million dollar yes votes?

A    I did not.

Q    And since math is not my strong point, is 38.3, which is the approximate amount of the claim, times 167 $6.2 billion?

A    That's your math, not mine.

Q    Yeah, well, I guess we're both lawyers.  We can hide behind that.  And you have no sense as to what the 790 invalid ballots added up to in terms of total votes cast --

A    No.

Q    -- the amount?

A    I do not.

Q    Would it surprise you if I said when we did the math on the 648 excluded votes, it was approximately $736 million?

A    Well, I know that there were some large numbers on that exhibit, so if that's what your math indicates, then it wouldn't surprise me.

        MR. TROOP:  Can I have one second, Your Honor?

        THE COURT:  Of course.

        MR. TROOP:  Your Honor, I'll pass the witness. Thank you.

        THE COURT:  Thank you.

        Does anyone else have any questions for this witness in the form of cross?  Any redirect?

        MS. CALABRESE:  Yes, Your Honor.  Just brief.

        THE COURT:  Okay.  Can you just state your name for

the Record again, counsel, just so we have a good clean Record.

MS. CALABRESE:  Sure.  Christine Calabrese of Weil Gotshal & Manges --

THE COURT:  Okay.

MS. CALABRESE:  -- for the Debtors.

REDIRECT EXAMINATION

BY MS. CALABRESE:

Q   Mr. Johnson, since the voting results have been finalized, has any invalidated voter contacted Kroll to say they meant to vote against the plan?

A   No.

Q   Thank you.

MS. CALABRESE:  Nothing further, Your Honor.

THE COURT:  Any further questions for this witness?

MR. TROOP:  I have one more.

THE COURT:  Okay.

(No verbal response.)

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MR. TROOP:

Q   You're also the -- Kroll is also the noticing agent in this case, isn't it?

A   Correct.

Q   Do you know whether your tabulation was served on every

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

one of the 4,500 parties who voted or didn't vote on the plan or was excluded on the plan?

A    Pursuant to our solicitation of -- affidavit of solicitation, it indicates that the mailing went out.

Q    I'm sorry.  I'm confused by the answer.  The solicitation of mailing, meaning that your affidavit went out to the 4,500 included and excluded votes?

A    Can you repeat your question?

Q    Sure.  Did you give -- I'll ask the question differently. Did you provide any notice to a Creditor whose ballot you excluded from tabulation that their ballot had been excluded?

A    No.

Q    Then let me ask the follow-up question just from your experience.  In the lack of getting that knowledge, would you have expected any Creditor to call you to change their vote?

A    Can you repeat that question again, Mr. Troop?

Q    In light of the fact that you did not provide notice to a voter whose ballot that you excluded, in your experience, has anyone ever called you to say, oh, I need to change my vote, which you excluded?

A    I -- I don't recall.

Q    So the answer is no, right?

A    I don't --

        MR. TROOP:  I'll withdraw the question, Your Honor.

        THE COURT:  Thank you.

MR. LUFT:  Your Honor, may I?

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. LUFT:

Q    Mr. Johnson, good afternoon.  Avi Luft of Akin Gump on behalf of the Official Committee of Unsecured Creditors.  I'm going to ask you just look at Exhibit B.  It's your Declaration.

A    I'm looking at it.

Q    Okay.  And I'll admit this is not scientific because I've just sort of heard this argument.  But let's turn to page 11 of 23.  Do you see that?

A    I'm on page 11.

Q    If you look down maybe ten lines or so, there's an entry for Atlantic Specialty Insurance Company.  Voting amount about $33.8 million.

A    I see it.

Q    And it doesn't say accept or reject there, right?

A    Correct.

Q    So what does that mean?  Is that one of the excluded votes?

A    Yes.

Q    Okay.  If I turn to the next page and I look about four lines down, can you see that same name and that exact same amount of number -- amount of money?

A    I'm just double checking the number.

Q    Again, $33,825, --

A    Yes.

Q    -- 422?

A    Uh-huh.

Q    And then if I look down maybe another 15 lines, you see it again, Atlantic Specialty Insurance Company for $33,825,422.

A    I see it.

Q    So right now we're at about 100 million of the total they've been giving you of excluded claims, all from the exact same person; does that seem right?

A    That seems right, yes.

Q    Okay.  And if I was to -- and again, I'm sorry I didn't prepare this ahead of time, but if I turn to page 16 of 23, if you look towards the middle of the page, do you see two more entries from Atlantic Specialty Insurance Company each time for an additional 33,825,422?

A    Yes, I see that.

Q    So if my math is right, that puts us at around $167 million just from that one entity, right?  Does that seem right to you?

A    Correct.  That's -- I think you cited five --

Q    Yeah.

A    -- instances --

**DEBTORS' EXHIBIT NO. 8**
**Page 72 of 265**

CRAIG JOHNSON - CROSS BY MR. LUFT                    73

Q    Okay.

A    -- of 33 million.

Q    Turn to page 17.  If you look, do you see about 15 lines down that exact same amount again takes us to about 200 million; does that seem right?

A    That's the sixth instance.  Yes.

Q    Right.  And if we look down the page, we see it again. Do you see that?

A    I see it.

Q    All right.  So now we're at around $234 million just from that one entity?

A    Well, it's the 33 million times seven.

Q    Right.

A    Whatever that is.

Q    Okay.  I'm not going to keep flipping through here. There may be more, but -- so all those amounts would be included in the totals that objecting counsel has been giving to you of the amounts of money that have counted as excluded votes, correct?

A    If the objecting counsel was counting all the -- all the amounts on Exhibit B, yes, that would be included.

        MR. LUFT:  Thank you.  I have no further questions.

        THE COURT:  One leads to four.  I know how it goes. Go ahead, go ahead.

        MS. JACOBSON:  Just one more.

RECROSS-EXAMINATION

BY MS. JACOBSON:

Q    Mr. Johnson, those votes from Atlantic Specialty, they weren't included in the voting results, correct?

A    Those specific votes, no, they were not.

Q    They were excluded.

A    They were excluded.

Q    So they in no way could have influenced the tallies that you show in Exhibit A?

A    Not the votes that counsel for Akin just ran through, no.

Q    Right.

However, the staffing company, Cross Country, those were included, those 167 votes were included in the voting tallies on Exhibit A, correct?

A    If they -- if they were valid votes and didn't appear in Exhibit B, yes, they were included.

MS. JACOBSON:  Thank you.

MS. CALABRESE:  Your Honor, we'd ask for the Court to excuse Mr. Johnson.

THE COURT:  Wait.  Hold on.  I've got to -- before I can excuse him, I've got to see if anyone has any further questions.

MS. CALABRESE:  Oh.

MR. TROOP:  Nice try.

MS. CALABRESE:  Sorry.

FURTHER RECROSS-EXAMINATION

BY MR. TROOP:

Q    And so, Mr. Johnson, just to put a fine point on it, there were five or six votes cast by the same party totaling over $200 million.  And although you had authority under the solicitation proceedings -- solicitation procedures to call them and say, what's up, you didn't, correct?

A    Correct.

MR. TROOP:  Thank you.  No further questions, Your Honor.

THE COURT:  Anyone have any further questions?

Mr. Johnson, thank you very much for your time.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Any objection to excusing Mr. Johnson?

(No verbal response.)

THE COURT:  All right.  Mr. Johnson, thank you very much for your time.

THE WITNESS:  Thank you.

THE COURT:  I'll give you a parting gift.  You can grab your Declaration on the way out.  All right?

(Witness excused.)

THE COURT:  Mr. Tsekerides?

MR. TSEKERIDES:  Yes.  Ted Tsekerides for the Debtors.  We call Alan Carr.

THE COURT:  Okay.  Mr. Carr?

ALAN CARR - DIRECT BY MR. TSEKERIDES

76

MR. BEREZIN:  Your Honor, I'm going to put his Declaration with XX's over the paragraphs --

THE COURT:  Okay.

MR. BEREZIN:  -- that were excluded on the --

THE COURT:  Thank you.  By X, you mean just the X over the paragraphs that he's not covered?

MR. BEREZIN:  Yeah.

THE COURT:  Yeah.  You've got it.  Okay.  Oh, absolutely.

If you'd raise your right hand.  Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  All right.  We'll let the record reflect the witness has been properly sworn in.

Mr. Carr, if you can, just so we can do a mic check, just spell your name into the record.

THE WITNESS:  Alan Carr, A-L-A-N, C-A-R-R.

THE COURT:  Okay.  Mr. Tsekerides, you may proceed.

MR. TSEKERIDES:  Thank you.

DIRECT EXAMINATION

BY MR. TSEKERIDES:

Q   Good afternoon, Mr. Carr.  Your Declaration has been admitted into evidence subject to certain exclusions.  I put an X over the paragraphs that are excluded.  If you could turn to your Declaration, page 8.  Let me know when you're there.

A    I'm there.

Q    Okay.  If you look at paragraphs 22 to 25 under the heading, 2016 distributions, just take a look at those.  I'm going to ask you a question about them.

A    Okay.

Q    Okay.  Do you have a view as to whether the Debtors have colorable and substantial claims relating to the 2016 distributions that are in your Declaration?

A    Yes, I believe we do.

Q    And you see the numbers reflected in paragraph 24?

A    Yes.

Q    Are those the numbers at issue on that claim?

A    Yes.

Q    If you can turn to page 10 and take a look at paragraphs 31 to 34.

A    Okay.

Q    What do these paragraphs relate to?

A    These relate to the 2021 distributions to various parties in the amount of, I believe it's $111 million.

Q    And do you have a view as to whether the Debtors have colorable and substantial claims based on this transaction?

A    I do.

Q    Do you have a view as to whether or not the entity SHCS was insolvent at the time of that distribution?

A    I believe they were.

Q    Take a look at paragraphs 40 and 41.

A    Okay.

Q    What do those relate to?

A    These relate to the sale of the value-based care assets to CareMax and then the transfer of a large portion of the proceeds to people outside of the -- the Debtors.

Q    And do you have a view as to whether or not the Debtors have colorable and valuable claims based on that transaction?

A    I believe they do.

Q    And do you have a view as to whether or not the Debtors were insolvent at the time of that transaction?

A    I believe they were.

Q    Are you familiar with claims related to corporate waste?

A    Yes.

Q    In your own words -- don't look at the Declaration for this -- what are the claims that the Debtors have related to corporate waste?

A    The two that come to mind are the proceeds from the planes used by certain executives, what appears to have been for personal use, and also a $2 million donation to Rosa O. Valdes' Children's School.

Q    Now, with respect to the planes, are you personally aware of any letters or efforts that the Debtors made to advise MHS with respect to the Debtor's views relating to the sale of those planes?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

A    I am.

Q    And what was in that letter?

A    That letter was to put the MHS parties on notice that the Debtors believe they have a right to those proceeds and to segregate those proceeds.

THE COURT:  Mr. Tsekerides, let me -- just for clarification, I want to make sure that you're referring to the MHS?

MR. TSEKERIDES:  MHS.  Yeah.

THE COURT:  I just want the record to be clear.  Thank you.

MR. TSEKERIDES:  Sure.

BY MR. TSEKERIDES:

Q    And if we added up -- so we looked at the 2016 distribution, I'll take you to paragraph 24.  Let me know when you're there.

A    I'm there.

Q    So you have 719 and 68 million, correct?

A    Correct.

Q    Okay.  And those would be amounts that the Debtors would be seeking in any claim based on the 2016 distribution, correct?

A    Correct.

Q    And then on page 10, paragraph 31, that's 111 million distribution.  Do you see that?

A     Yes.

Q     Are those generally the amounts that the Debtors would be seeking in any claim brought on that transaction?

A     Well, that's the amount for the fraudulent conveyance.

Q     Is that the amount that would be sought, generally, if a complaint were filed?

THE COURT:  Which paragraph are you on, Mr. Tsekerides?

MR. TSEKERIDES:  These are 31 to 34.

THE COURT:  Thank you.  I apologize.

THE WITNESS:  Yes, but it does not include potential claims for breaches of fiduciary duty.

BY MR. TSEKERIDES:

Q     Oh, so that could be more?

A     Yes.

Q     And then we have the transaction -- I didn't ask you about this, but since we're there, on page 12 -- there were no objections on these paragraphs -- on page 12, there's a reference to 2021 Miami Hospital acquisition.  Do you see that?

A     Yes.

Q     Okay.  What's that one about?

A     That one is about the purchase of five hospitals from Tenet Healthcare.

Q     And do you have a belief that the Debtors have valuable

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 81 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 81 of 265

ALAN CARR - DIRECT BY MR. TSEKERIDES

81

and colorable claims related to that transaction?

A    Yes, I do.

Q    And then on the CareMax transaction, how much was involved in that one?  If you look at 40 and 41.

A    I think the entire transaction was $194 million, and all but 60 -- 60.5 million left the company upon closing.

Q    So have you tallied up CareMax, Tenet 111 million distribution and the 2016 distribution for the amount that could be sought by the Debtors?  Have you tallied that up?

A    Well, it's hard to because of the breach of fiduciary duty claims.  But when it comes to the fraudulent conveyances, I can certainly do the math on -- on the 2016 distribution, which is about $780 million.

Then you add to that when it comes to the Miami hospitals -- I'm sorry.  Then you have the -- the 2021 distribution of $111 million.  Just add that on top.  So, conveniently, that's $900 million by my math roughly.

Then you have the Miami hospitals.  That would be the amount that was overpaid for those hospitals that I don't have a firm number on.

Then you have the CareMax on top of that, which is 134 went out.  So just taking the more conservative number of the 900 I've already built up, plus 134, you're at roughly $1.3 or $1.03, I guess, billion.  I think that -- I think that's the math you're looking for.  Plus then, you know,

potential breach of fiduciary duty claims.

MR. TSEKERIDES:  Okay.  Your Honor, I have nothing further on the direct.  I'll obviously reserve on redirect.

THE COURT:  Thank you.

Any cross?

MS. JACOBSON:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. JACOBSON:

Q    Sir, do you have your Declaration in front of you?

A    I do.

Q    Good afternoon, Mr. Carr.  My name is Michele Jacobson. I'm here on behalf of TRACO International Group.

A    Good afternoon.

Q    Let's talk about the transformation committee.  The board of managers of Steward established the transformation committee; is that right?

A    That is my understanding of what predated me.  It was formed when I was -- when I joined the board.

Q    And you're a member of that committee?

A    I am.

Q    And the transformation committee's charter was amended by the board of Steward to establish a subcommittee, which was the investigation subcommittee; is that right?

A    That's right.

Q    And you sit on that investigation subcommittee along with

**DEBTORS' EXHIBIT NO. 8**
**Page 82 of 265**

Mr. Transier; is that right?

A    That's correct.

Q    And the subcommittee was charged with investigating whether Steward or its subsidiaries have potential claims or causes of action; is that right?

A    That's correct.

Q    You didn't go out and do that investigation yourself, did you?

A    Well, I oversaw it with Mr. Transier and directed our advisors to assist us in that.

Q    Right.  The subcommittee instructed Weil to conduct an investigation into potential causes of action in favor of the Debtors, right?

A    We instructed Weil and Alix to assist us.

Q    Okay.

A    AlixPartners.

Q    Right.  And you had multiple meetings with Weil to go over their findings; is that right?

A    Them and AlixPartners.

Q    And Weil provided you and Mr. Transier their initial findings and then issued you a final report dated December 13th, 2024; is that right?

        MR. TSEKERIDES:  Your Honor, I rise only because this was one of the paragraphs that they moved to strike, and now they're asking questions about it.  So, I mean

specifically about the report, they struck that one.

THE COURT:  Ms. Jacobson?

MS. JACOBSON:  I'm asking how it is that --

THE COURT:  No, I just want a specific question. Are you referring to something that you actually intentionally struck from the report?

MS. JACOBSON:  No, I'm not.  I'm just asking whether the report -- I want to know whether the report, the investigative report, was actually produced in this proceeding.

THE COURT:  That's a different question than what you're asking.

MS. JACOBSON:  Okay.  Well, I'll ask it another way.

THE WITNESS:  The question that was asked --

THE COURT:  Huh?

THE WITNESS:  Okay.

THE COURT:  Yeah.

THE WITNESS:  The question that was asked if they --

THE COURT:  Yeah.  Wait, wait.

THE WITNESS:  -- had a report.  Yeah.

THE COURT:  And whether there was any data to report.

MS. JACOBSON:  Okay.  Fair.  Okay.  That's fine.

BY MS. JACOBSON:

Q    The report that was provided to you by counsel was not

produced in this proceeding; is that right?

A     I believe that's correct.

Q     Now during your direct examination, Mr. Tsekerides asked you to add up the aggregate amount of damages to the best of your ability of the various causes of action that were listed in your Declaration; is that right?

A     That's what he asked me.

Q     Right.  Sir, it's fair to say that the amount of damages sought in any given litigation may not be the amount won in either the litigation or in a settlement scenario.

A     Is that a question?

Q     Yeah.  Is it fair to say that that's the case?

A     Yes.

Q     Now the Debtors cannot predict with any certainty the outcome or effect of the resolution of claims; is that right?

A     That's correct as a general matter.

Q     Right.  And an adverse outcome in any litigation on which distributions under the plan depend could materially affect the recovery of Creditors or the Debtor's ability to confirm the plan, right?

A     I think you're asking me two different questions there. Could you break them down?

Q     Well, an adverse outcome -- first of all, are you familiar with the disclosure statement that was filed by the Debtors in this matter, the disclosure statement for the plan?

ALAN CARR - CROSS BY MS. JACOBSON                86

A     Yes, generally, but not word by word.

Q     Okay.  So let me break down what was a statement from that disclosure statement.  An adverse outcome in any litigation, any of the litigations that you talk about in your Declaration, could materially affect the recovery of Creditors in this matter, correct?

A     I'll take your word for that as a quote.

Q     Well, I'm not -- I'm just going to -- I'm asking you that question outside of the statement in the disclosure.  So I'm asking you the question.  So an adverse outcome in any of the litigations that you talked about in your Declaration could materially affect the recovery of Creditors under the plan.

A     Maybe I can help you here.  As a matter, when you have potential causes of action that have a headline amount, and I didn't cover all causes of action this estate holds, but by definition, if you do not recover everything that's claimed, there's less in the estate, and therefore recoveries will be less.

Q     Right.  And as for the timing of the effective date of the plan, the Debtors have estimated that it is reasonably likely to occur in early 2027, although it could reasonably occur earlier or later; is that fair?

A     That's what I believe it says.

Q     And it's also a fair point, right?

A     A fair point in what manner?

**DEBTORS' EXHIBIT NO. 8**
**Page 86 of 265**

Q    Well, you said that's what it says.  Are you referring to the disclosure statement?

A    I'm referring to your statement that you read to me.  You asked me what the -- what the disclosure statement said.  I agree with you what the disclosure statement said.

Q    Well, I'm not asking you what the disclosure statement said, sir.  My question to you was that as with respect to the timing of the effective date of the plan, that the Debtors estimate that it is reasonably likely to occur in early 2027, but it could reasonably occur earlier or later?

A    Yes.

Q    Okay.  And by early 2027, the Debtors actually mean by mid-year 2027; is that fair?

A    I heard that in opening statements.  I thought it was early 2027.  But Mr. Castellano's testimony or his Declaration may have been amended to that date.

Q    Okay.  Now you went through a number of causes of action that the Debtors might have during your direct examination.  In fact, none of those litigations have been commenced; is that right?

A    That's correct.

Q    And while you -- now, sir, you understand that after complaints are served, the defendants have a period of time to answer or otherwise move against a complaint?

A    Yes.

Q     And if a motion to dismiss is filed, there's no certainty as to when those motions will be decided?

A     That's correct.

Q     And you also understand that parties in litigations are entitled to take discovery; is that fair?

A     Yes.

Q     And you're also aware that after discovery, there's a potential for dispositive motions to be filed on one or both -- by one or both sides?

A     Yes.

Q     And then whether it's from a decision on those dispositive motions or a verdict at trial, either or both sides could take an appeal?

A     Yes.

Q     And you are aware that an appeal itself could take a good part of a year, if not more?

A     Depends on the court and the situation, but I've seen that.

Q     Okay.  So let's first turn to the 2016 distributions. And that's --

A     Page -- page 8.

Q     -- at page 8.

A     Yep.

Q     Yep.  Now I believe you said that this is a fraudulent conveyance claim?

A     Yes.

Q     And in order for a fraudulent conveyance claim to succeed, the company must have been insolvent or rendered insolvent by a transaction; is that right?

A     That's my understanding.

Q     Now while you've looked at the company's balance sheets for the years 2014 through 2019 or thereabouts, you have not engaged any experts to conduct evaluation of Steward during that period, correct?

A     I have not.  The transformation -- the subcommittee of the transformation committee did not retain an expert to look at the solvency in the way you would expert testimony in actual litigation.  That's correct.

Q     Well, and you don't recall AlixPartners doing any historical analysis that would have been relevant as to your view of the solvency of Steward?

A     I do not.

Q     And you're not aware of outside counsel retaining any experts to conduct evaluation of the company at any point in time; is that right?

A     Correct.

Q     And you have not seen any solvency memoranda prepared by a third party; is that correct?

A     That's correct.

Q     And your subcommittee did not retain any third parties to

conduct a solvency analysis of Steward at any given point of time, correct?

A    That's correct.

Q    So not in 2016, not 2017, not 2020, not 2021, not 2022; is that right?

A    That's right.

Q    Now, sir, it's fair to say that you've had some experience with fraudulent conveyance investigations?

A    Yes.

Q    And in your experience, you've never been involved in a case where a Court has accepted a balance sheet determination alone as a determination as to the solvency or insolvency of any entity at the time of a transaction?

A    I couldn't recall one, no.

Q    And, sir, you're not aware of Steward reaching any financial covenants in any of its loan obligations during the period 2016 to 2020; is that right?

A    I'm not aware, but that may or may not be true as a factual matter.  I wasn't aware of any.

Q    Okay.  And you've not seen any audit reports where the auditor stated that there was substantial doubt that Steward could continue as a going concern during the period 2016 to 2020?

A    That's correct.  But it doesn't mean they don't exist.  I just haven't seen audit reports.

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 91 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 91 of 265

ALAN CARR - CROSS BY MS. JACOBSON

91

Q   Okay.  Who were Steward's auditors during that period of time; do you know?

A   I do not.

Q   So what balance sheets did you look at?

A   An internally-prepared balance sheet that was provided to me.

Q   So not the formal balance sheets or financial statements of Steward?

A   I don't know what you mean by formal.

Q   Well, their balance sheets that were then audited by their auditors.

A   I don't know whether the balance sheets I saw were audited, but they came from the company's books and records.

Q   So you looked at the company's books and records, but you did not ask to look at the audited financial statements of the company?

A   I look at what was provided to me, which was internal books and records, which was a balance sheet that I reviewed for the years 2014 through 2019.

Q   Okay.  And who provided those to you?

A   They were provided to me by either one or both of AlixPartners and Weil.

Q   Did you ask to see the audited financial statements of the company?

A   No.

Q    Now while you say you have a good faith belief that Steward may have been insolvent or rendered insolvent in 2016, you are not making a conclusion, but that further inquiry is merited; is that right?

A    Correct.

Q    Now, sir, the 2016 transaction occurred almost seven and a half years prior to the commencement of this bankruptcy proceeding, right?

A    Correct.

Q    Sir, you're familiar with statutes of limitation for fraudulent conveyance matters; is that fair?

A    Yes.  They vary by state in my experience.

Q    Right.  And you've determined that under state law, claims related to the 2016 distributions are time barred; is that right?

A    Purely under state law, yes.

Q    Right.  And in order to utilize the golden creditor concept in bankruptcy to extend the statute of limitations, you need a golden creditor, right?

A    That's my understanding.

Q    Right.  And in your experience, a golden creditor could be the IRS, but you are not aware of any amounts owed to the IRS from 2016 that are still outstanding, right?

A    I'm not aware whether there are or are not.  I know the IRS has filed a proof of claim in this case.

**DEBTORS' EXHIBIT NO. 8**
**Page 92 of 265**

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 93 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 93 of 265

ALAN CARR - CROSS BY MS. JACOBSON                    93

Q    Well, you've seen no analysis that discusses whether the IRS is a Creditor in 2016; is that right?

A    I don't recall.

Q    And if there's no golden creditor, this 2016 claim is not viable, correct?

A    If there's no golden creditor, yes, that's correct.

Q    And this is a claim, and I think you went over this in your direct examination, that if we added it up, it was roughly $788 million; is that right?

A    That's right.

Q    Now let's turn to page 9, which is -- you call it the trio of transactions.

A    Correct.

Q    While you discuss these transactions involving Cerberus, NPT, and others, none of them actually forms the basis of any of the claims that you are -- that Debtors intend to bring at present; is that right?

A    Well, I believe they are arguably part of a overall plan and scheme that resulted in the ability for the 2021 distribution.

Q    But none of them -- but you don't presently intend to bring claims against Cerberus and MPT, do you?

A    Related to this matter?

Q    Yes.

A    This -- no.

Q   Right.  So your discussion of the trio of transactions really only relates to potential claims relating to distributions of $111 million made in 2021 to Dr. de la Torre and others; is that right?

A   That's the current belief, yes.

Q   Again, this is a fraudulent conveyance claim.

A   I believe it's also a breach of fiduciary duty claim.

Q   But those -- so let me break that down a minute.  In order for there to have been a breach of duty of care or loyalty by the directors, there would have had to have been a fraudulent conveyance; is that right?

A   I'm not sure that's the case.

Q   Well, on what basis would there be an assertion of a breach of duty against the directors and officers if there was not a fraudulent conveyance?

A   Dr. de la Torre modified the corporate documents as soon as the -- right -- right before this transaction was made when the $111 million went out to circumvent the governance of the board so that he alone could approve a transfer of money out of the company.

Q   Do you know whether the corporate documents of the company permitted him to do that?

A   I do not.

Q   Okay.  So again, your claim that this is a fraudulent conveyance, the sole basis of your belief is again your review

of the balance sheets of the company; is that right?

A    My -- my sole basis for the -- the -- the good faith belief that the company was insolvent --

Q    Yes.

A    -- is based on that, yes.

Q    Okay.  And again, you did not retain any third parties to conduct a solvency analysis of Steward in 2020 or 2021 or at any particular point in time, right?

A    I think I agreed to that earlier.

Q    Right.  And you're not aware of any -- again, you haven't seen them -- so you're not aware of any audit reports with going concern warnings at that time, whether or not they exist?

A    I'm not aware whether they do or don't.

Q    Okay.  Let's turn to the 2021 Miami Hospital acquisition, which is on page 12 of your Declaration.  So if I understand this correctly, this claim relates to Steward's purchase of five Miami hospitals and physician practices from Tenet Healthcare.

A    Correct.

Q    And the basis of the claim, you indicate that there's a claim against, I believe, Tenet, and also a claim against the directors and officers.  What's the basis of the claim?

A    The basis of the claim against Tenet would be a fraudulent conveyance claim.

Q     Okay.  So let's just pause there for a moment.  Is it your testimony that, first of all, in order for there to be a fraudulent conveyance claim, the transaction would have needed to have occurred at a time where the company was insolvent or the transaction made it insolvent; is that right?

A     That would be an element of the claim, yes.

Q     Right.  Another element of the claim would need to be that -- and I think you mention it -- that the Debtors didn't receive reasonably equivalent value for their purchase.

A     Yes, that's right.

Q     Okay.  So no evaluation has been done, to your knowledge, of the Miami hospitals as of 2021; is that right?

A     None was done at the direction of the committee.

A     Right.  So, and I believe during your direct examination, you could not put a figure on -- or damages amount based upon the 2021 Miami hospital acquisition.  And that's because you don't know what the value of those hospitals actually were in 2021; is that right?

A     That'd be right.  We're preserving the claim.

Q     Right.  You're saying you do not believe they were worth 1.1 billion, but you don't know what they were worth; isn't that right?

A     That's correct.

Q     And your claims against the board that you note here, that -- those claims would only be merit worthy if, in fact,

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 97 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 97 of 265

ALAN CARR - CROSS BY MS. JACOBSON

97

the hospitals were worth less than $1.1 billion; is that right?

A    I'm not sure about that.

Q    Well, if the hospitals were worth $1.1 billion, then you wouldn't have a claim against the directors for having done the transaction, would you?

A    I don't know.

Q    You don't know.  Okay.  And just to be clear, the claim, the purported claim against Tenet for fraudulent transfer, I just want to -- let's just get a level set here.  In your experience with fraudulent conveyances, it's the value of the asset at the time of the transaction that's relevant, right?

A    Correct.

Q    Right.  It's not the value years later, right?

A    Generally, I agree with that statement.

Q    And again, just to be clear, no valuation has been done with respect to the value of the Miami hospitals in 2021, correct?

A    The committee, the subcommittee did not ask for that work to be done.

Q    Let's turn to the 2022 CareMax transaction.  That's on page 13 of your Declaration.

A    Okay.

Q    You note this was an all-stock transaction where no cash changed hands; is that right?

A     That's my understanding.

Q     And you note at paragraph 40 of your Declaration that the value of the stock was 134 million; is that right?

A     Well, I believe -- please let me look at this for a moment.

Q     Sure.

A     I believe 134 million of the value of the overall purchase price was transferred to parties outside the estate; 60.5 stayed in the estate.  So the overall consideration at the last line was $194 million.

Q     But you don't know where those figures were arrived from, right?

A     Those figures were provided to us by our advisors.

Q     And who were your advisors?

A     AlixPartners and Weil Gotshal.  And I've seen documentation on those transfers.

Q     Was what you were provided by Weil Gotshal in the report?

A     It may have been an exhibit, a ZIP file of -- of backup information.

Q     Let's turn to your section on additional litigation assets.  And let's talk about TRACO.  You state that the conduct of TRACO's directors and officers resulted in significant harm to the Debtor's estates.

A     Yes.

Q     First, to be clear, this is not a claim against TRACO

itself, right?

A     Not the claim that we're preserving.  But I don't believe TRACO is a released party either as far as I know.

Q     When you say these are things that you're preserving, preserving in what way?  What do you mean by that?

A     Meaning we're not giving a release to TRACO.

Q     No, I -- my question -- you've used the word preserving before.  Does that mean in this context that you may or may not bring certain claims that are in your Declaration; you're just preserving them?

A     The exercise was to determine if there are certain parties who should benefit from a release or not.  And based on the evidence on TRACO, there's not a basis to provide them with a release.  So we're reserving rights against TRACO.

Q     I wasn't asking you about releases.  You've used the word preserve a couple of times in your testimony in relationship to a variety of these transactions or potential causes of action that you've set out.

Is it you're preserving them in the sense that you may or may not pursue those litigations, but you're just preserving the ability to do so?

A     Well, yes.  We are preserving the rights, the decision by the litigation trustee of which claims to actually bring or not bring will be in that person's decision-making authority.  But we are not doing is -- once, if you don't preserve, if you

ALAN CARR - CROSS BY MS. JACOBSON

100

grant a release, you are walking away from a potential cause of action.  And that's not something we're doing here.

Q    Okay.  I didn't ask you about that, but that's fine. Let's continue to talk about TRACO.  But even though you are not releasing TRACO, I just want to understand whether this discussion about TRACO, this is not what you're describing here, is not a claim against TRACO itself.

A    That's right.  It's potential breach of fiduciary duty claims against Dr. de la Torre, Dr. Callum, and Mr. King-Shaw.

Q    Right.  And the claim against the directors of TRACO is that insurance premiums were paid by physicians to Steward for malpractice insurance, and that Steward never transferred those payments to TRACO?

A    That's part of it, yes.

Q    And that as a result, the physicians don't have insurance coverage.

A    Nor does the company.

Q    Which company?

A    Steward Health Care.

Q    Well, and part of your claim is that Drs. Callum and de la Torre and Mr. King-Shaw also sat on the Steward board.

A    That's correct.

Q    But you would need legal advice as to what claims the Debtors would have against the them in their capacity as TRACO directors; is that right?

A     Whether it's them as TRACO directors or Steward directors, we need to preserve claims.  They're -- they're -- they're -- they're single individuals and they're sitting on both sides of a transaction here.  And we have evidence that they were parties who are directing Steward not to transfer money to TRACO.  So it's a closed system, in a sense.  The whole transaction, it doesn't smell right.

Q     Well, but you would need legal advice as to what claims the Debtors would actually have against the TRACO directors, focusing on the TRACO directors.

A     But we can dance on the head of that pin if you want to.  The directors are the same people.  So whether the claims are them sitting as directors of Steward or TRACO, that's where I would need the advice of where the -- how the claim is pursued.  It's the same individuals.

Q     Well, sir, you're not aware of a dollar amount by which the Debtors believe that they've been damaged as a result of these alleged breaches of fiduciary duty relating to TRACO, right?

A     I think I testified in my deposition that I didn't have a view on the amount of damages for any of the breaches of fiduciary duty claim because that will be determined by a Court at a later date if and when these claims are brought, all these breach of fiduciary duty claims.  I didn't estimate any of those.

Q    Sir, are you aware that TRACO is a Panamanian company?

A    I am.

Q    Do you know what Panama law is regarding the relationship of a parent to its subsidiary?

A    I am not certain of that.

Q    Do you know what Panamanian law provides with respect to potential claims against TRACO's directors as you've described?

A    I do not.

Q    Do you know what Panama law is with respect to commingling of funds between the parent and a subsidiary?

A    I do not.

Q    And what about Panama law governing fiduciary duties of managers of captives?

A    I do not.

Q    Sir, the plan is not feasible until there are litigation recoveries; is that fair?

A    That's fair.

Q    And you still believe -- and you believe that the plan would still be feasible without all of the investigation claims that you've mentioned?

A    Correct.  My view is the feasibility math to get to a place where administrative and priority Creditors are paid and the FILO is paid off can be accomplished without any recovery from the claims in my affidavit.

ALAN CARR - CROSS BY MS. JACOBSON

103

Q    Well, do you know if Mr. Castellano agrees with you?

A    I believe he does.

Q    In any event, your view depends on administrative claims being at $111 million; is that right?

A    That's the number I testified in deposition.  I don't recall the exact number.

Q    But if those administrative amounts are higher, that could change.  You might actually need some of these investigative litigations.

A    Certainly at a point, there could be a crossover.  Yes.

Q    Do you have -- Mr. Carr, in your Declaration, you describe the releases and exculpations that the plan contains for certain parties; is that right?

A    Yes.

Q    And it was the investigation subcommittee, you and Mr. Transier, who made those decisions?

A    We made the initial determination of who we thought should get a release.  It's a very limited list.  And then we shared those recommendations with the UCC and the FILO lenders as well.  And the list that is in the plan is a smaller version of that list.

Q    And the transformation committee, yourself and Mr. Transier, included is one of the exculpated parties, correct?

A    Yes, we are.

**DEBTORS' EXHIBIT NO. 8**
**Page 103 of 265**

MS. JACOBSON:  I have nothing further at this time.

THE COURT:  Thank you.

MS. JACOBSON:  Thank you.

THE COURT:  Anyone else have any questions in the form of Cross?

Mr. Keach?

CROSS-EXAMINATION

BY MR. KEACH:

Q    Mr. Carr, good afternoon.

A    Good afternoon.

Q    Robert Keach for certain deferred compensation participants.  In your Declaration, you discuss the releases and exculpations that the plan provides for, correct, at paragraphs 51 through 67?

A    Correct.

Q    And on those subjects, this is your best testimony?

A    I'm sorry?

Q    And on those subjects, you're offering these paragraphs as your testimony, correct?

A    Correct.

Q    I want to explore something you were just talking about with counsel.  You were talking about the overlap of the TRACO board with the Steward board.  And you indicated that one of the reasons that the board was not considering giving a release and was preserving causes of action was because

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 105 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 105 of 265

ALAN CARR - CROSS BY MR. KEACH

105

certain of those directors were, quote, sitting on both sides of the transaction.  Did you -- did I summarize your testimony correctly?

A    I think that's -- something along those lines.

Q    Right.  And what's the problem with that?

A    Well, when it comes to TRACO, it feels like it's a party who's complaining about actions that were taken by their directors to direct funds not to be sent from Steward to pay for insurance for the benefit of Steward.

Q    Right.  But it's generally a problem with directors if they're sitting on both sides of the transaction, right?

A    Not necessarily always.  It depends on the related party nature of the transaction.

Q    All right.  Is it common for directors to exclude themselves from considerations when they're the beneficiaries of the decision being made?

A    Well, I think you're asking a very different question there.  It's not uncommon under Delaware law.  I sit on boards all the time.  If I'm receiving a personal benefit on a decision of a board to consider recusing myself if that's what you're asking.

Q    Right.  And you do that on a regular basis under those circumstances, correct?

A    If it comes up to me.  I'm often the person who's the independent who doesn't have the related party interest.  But

I've seen that done all the time in boardrooms.

Q    All right.  And you just responded to counsel.  With respect to the subject of releases under the plan, those releases were voted on by the investigation subcommittee, correct?

A    Correct.

Q    And you're a member of that subcommittee, correct?

A    Correct.

Q    And yet you granted yourself a release.

A    I didn't grant anything, but I did approve putting my name on the list.

Q    All right.  And did you approve putting Mr. Transier's name on the list?

A    I did.

Q    And was he the other member of the investigation committee?

A    He is.

Q    Did you ever consider having other members of the board other than the two of you approve your releases?

A    No.

            MR. KEACH:  May I approach, Your Honor?

            THE COURT:  Of course.

BY MR. KEACH:

Q    Mr. Carr, I'm going to show you what is Exhibit A from the disclosure statement.  And we discussed this in your

deposition, as you recall, correct?

A    Correct.

Q    And this is a list of individual released parties who, in other words, parties who are receiving releases under the plan; is that correct?

A    Correct.  This is the list I referred to in the previous question as my testimony related to that.

Q    All right.  And let's just back up to provide a little bit of context.  And I mentioned that you discussed this at paragraphs 51 through 67 of your Declaration.  The plan provides for releases and exculpations, correct?

A    Correct.

Q    What is your understanding of the distinction between those two things?

A    My understanding is that exculpation protects the parties being exculpated for actions taken during the bankruptcy and releases -- or go out on a temporal basis further.

Q    Generally speaking, from the petition date to the confirmation date?

A    I'm not sure whether it's confirmation or -- or effective date.

Q    And but it generally protects parties who are estate fiduciaries for their conduct from the petition date forward to either the confirmation date or the effective date, as the case may be.

A    That's correct.

Q    Okay.  And releases in the context of the plan, the releases actually extend to the conduct of those parties prior to the bankruptcy; is that correct?

A    Yes.

Q    And in fact, the plan provides for two different kinds of releases, right?  So there are releases being granted by the Debtor, correct?

A    Correct.

Q    And those releases are the Debtor's direct and derivative claims?

A    I believe that's correct.

Q    Okay.  And the plan also provides for third-party releases to the extent that the holders of those claims do not opt out of the release provisions of the plan, correct?

A    Correct.  And I think I should clarify.  The releases also have carve outs for -- for gross negligence, willful misconduct, things of that sort, even though a release is to be granted.

Q    In the case of the Debtor's releases?

A    Correct.

Q    Let me direct you to the list I handed you, Exhibit A, from the disclosure statement.  You indicated that the investigation committee in approving releases reviewed this list?

A     Yes.

Q     And approved that these parties should be among the parties to relieve releases of -- releases from the Debtor of direct and derivative claims; is that correct?

A     Correct.

Q     Who supplied the investigation committee with this list?

A     We worked on this with a combination of Weil and AlixPartners.

Q     Okay.  In other words, together Weil and AlixPartners and the investigation committee developed this list?

A     Yes.  I don't remember who gave the first list.  Some of the names are people that Bill and I did not work with on a day-to-day basis.  Mr. Castellano, for example, worked with certain people.  Weil worked with certain people.  So they were able to provide us feedback around the value provided by them.

Q     And just for the record, Bill is William Transier.

A     Oh, I'm sorry.  Yes.

Q     All right.  Are any of the people on this list paying any money into the plan for the satisfaction of claims?

A     No.

Q     Are any of the people on this list providing any other monetary consideration in exchange for a release?

A     No.

Q     Are any of the people on this list going to be active

ALAN CARR - CROSS BY MR. KEACH

110

participants in the monetization of the assets described in your Declaration after confirmation of the plan should the Plan be confirmed?

A    Mr. Castellan would know better, but I do believe some of these people are continuing to assist us in monetizing the remaining non-litigation assets, including possibly escrows from prior sale transactions, transitioning businesses, and also potentially being helpful witnesses on the litigation side.

Q    All right.  Do you know -- can you look at this list and tell me who those people would be?

A    I cannot.

Q    Other than those people -- and would you agree that that's a small percentage of this list, people who fit into that category?

A    I can tell you it's not all of them.  I don't know the exact percentage.

Q    All right.  And with respect to the rest, is it fair to say that these people are receiving releases entirely because of their prior service to the Debtors or to the board?

A    Well, they're receiving it for two reasons.  One, for their private service and also because we didn't find any reasonable or pursuable claims against these parties.  So we weren't giving up anything from our perspective.

Q    You mean the investigation committee did not find any or

did not uncover any claims against these parties.

A    That's correct.

Q    All right.  But if there are no claims against the parties, why do you need to give them a release?

A    Well, that's not the analysis we did.  We're looking at -- we're giving our sleeves off our vest by giving the release since there's no claims there anyway.

Q    All right.  What did you do to investigate the possibility of claims against other members of the board, for example, who are on this list?

A    We directed Weil to interview the directors.  They reported back to us the level of cooperation and disclosure they provided.  Not all directors that were on the board when I was on the board during the whole period are on this list.  So only select directors are on this list.

Q    And other than that prior board service, and other than the fact that your limited investigation did not reveal any claims, what is the -- what other basis is there providing -- for providing a release to these parties?

A    Without them getting releases, there is a chance that somebody could bring a claim against them which we don't think would be colorable where many of the parties in this have the right to indemnification from the company; or in addition, to pursue for officers and directors tapping into the insurance coverage, which we see as a valuable potential asset to the

company.

And I've seen in prior cases where parties who are dragged in the litigation, despite there not being significant or material claims against them, they still tap in and deplete the resources of the corpus of the insurance coverage.

Q   But that would be true whether or not the claims against them were colorable or not colorable, correct?

A   Yes, but it would be a bad business decision to allow them to eat into it because there's less dollars available potentially from the insurance coverage.

Q   So a release doesn't distinguish between parties who have valid colorable claims versus parties who don't, does it?

A   Like I said, these parties, we don't believe there are colorable claims against them.  So giving them release, again, as I -- it maybe a tortured analogy -- sleeves off our vest.

Q   Okay.  Is General McMaster going to assist in the monetization of assets moving forward?

A   No.

Q   Is Mr. Boehner going to contribute in the monetization of assets moving forward?

A   I think he prefers Speaker Boehner but no.

Q   He hasn't been speaker for quite a while so --

A   I think once you're speaker, you'll be speaker.

Q   There's a political comment I'll refrain from making.  Does Mr. and/or Speaker Boehner, does he -- is he assisting on

ALAN CARR - CROSS BY MR. KEACH

113

the monetization of assets going forward?

A    No.

Q    Are any of the parties on this list, to your knowledge, going to work for the litigation trust of which these causes of action are going to be transferred?

A    Well, I don't know that they're going to work for them, but I think some of them have indicated they'd be available to help the litigation trustee with facts for the litigation and potentially be witnesses.

Q    Do you know which of those parties on the list might be potential witnesses in future litigation?

A    I don't know to the extent that the litigation trustee makes those decisions.

Q    But you don't know if any of these people are going to be witnesses, do you?

A    I don't -- have them -- I -- the transformation -- the subcommittee has not made a determination or a litigation strategy around that.  The litigation trustee will determine that.

Q    Right.  So you don't know that any of these people are going to be witnesses, correct?

A    I don't know if they will or they won't.

Q    Okay.  Did any of these people specifically request the investigation committee or the transformation committee to grant them a release?

**DEBTORS' EXHIBIT NO. 8**
**Page 113 of 265**

A    Not as far as I know.

Q    Did any of these people condition their future cooperation on receiving a release?

A    Not as far as I know.

MR. KEACH:  Nothing further, Your Honor.

THE COURT:  Thank you.

Does anyone else, in the form of cross, have any questions for this witness?

CROSS-EXAMINATION

BY MR. ADAMS:

Q    Mr. Carr, my name is David Adams with the Department of Justice.  I'm representing the IRS in this proceeding.

A    Good afternoon.

Q    Okay.  I just have some questions I want to ask you about some individuals.  So if you'll look in your Declaration, page 20.

A    Sorry.

Q    I believe it's paragraph A.  I just want to go through the names, and then I have a couple of follow-up questions.  Okay.

THE COURT:  You said paragraph 20?

MR. ADAMS:  I'm sorry.  Paragraph 60 on page 20.

THE COURT:  Oh.  I was going to say that's Strauss.

MR. ADAMS:  My mistake, Your Honor.

THE COURT:  No, no, no.  Thank you.

ALAN CARR - CROSS BY MR. ADAMS

115

BY MR. ADAMS:

Q    Paragraph A.

A    Yes.

Q    Do you see that --

A    I --

Q    -- at the bottom of the page?

A    -- I do.

Q    Okay.  So I just want to go through these names with you, and if you could tell me what their capacity was or is with the companies, I would appreciate it.  So we'll start first with Mr. Barrnhardt.

A    I don't know.

Q    Okay.  Euguene (Jay) Sullivan?

A    I don't recall if he was -- I believe he was -- I understand he was very involved with the monetization of assets.  I don't think he's a lawyer, but a business person.

Q    Gail Schlesinger?

A    I don't know.

Q    Henry (Nick) Nickells?

A    I don't recall.  And to be clear, I don't know -- now I know that we went through these names with Weil and Alix at the time, and they explained what they did.  I just don't recall at this point on many of these names.  If I don't know, that's why.  There was a discussion at the time about each of these parties, but I don't recall the answer to those

**DEBTORS' EXHIBIT NO. 8**
**Page 115 of 265**

Case 25-90399  Document 3239-8  Filed in TXSB on 07/19/26  Page 116 of 265
Case 24-90213  Document 5723  Filed in TXSB on 07/20/25  Page 116 of 265

ALAN CARR - CROSS BY MR. ADAMS

116

questions now.

Q    Okay.  And when was that discussion with Weil and Alix?

A    Probably a couple months ago when we first worked on this plan in these releases.

Q    Okay.  So Mr. Nickells, you don't know what his capacity with the Debtors --

A    I don't recall.

Q    Jeffery Morales?

A    I heard his name a lot.  I'm just not recalling now in what capacity?

Q    Jennifer Hunt?

A    I'm not sure.  She may have been one of the in-house lawyers, but I don't recall.

Q    Dr. Joseph Weinstein?

A    He I recall.  He was very helpful to the transformation committee to talk to us about what was happening in the hospitals to ensure good -- good care was being provided to our patients.  I don't know what his title is, whether it's director of medical operations, but he was a very senior person, very clear and very helpful.

Q    Mary Beth Taylor?

A    She may have been -- the one of the people was very involved in the -- I think it's Brightwood Marine business, BMI.  I'm not sure it was Mary or Jennifer, but I think it was Mary, Mary Beth who helped the transition to that.

Q    Nathalie Hibble?

A    I don't recall.

Q    Octavio Diaz?

A    I don't recall.

Q    Rick Iannessa?

A    I don't recall.

Q    Susan Brown?

A    I believe she's either the one with -- she was either the one with Brightwood Marine -- I may be getting that name wrong -- or she's an in-house lawyer.  I don't recall.  Again, I recall having a conversation with, particularly with Mr. Castellano around -- and -- and Weil, for that matter, what roles they played and why they were on this list.

Q    So she was either affiliated with the Brightwood Marine or some type of in-house counsel?

A    That's my best recollection.  But it could be something else.  That's --

Q    Okay.  All right.  So Mr. Barrnhardt, Mr. Sullivan you think dealt with monetizing assets.  Ms. Schlesinger, Mr. Nickells, Mr. Morales, Ms. Hibble, Mr. Diaz, Mr. Iannessa, all of those people, you don't recall what capacity they had with the company as we are here today; is that correct?

A    That's correct.

Q    Okay.  Yet you approved them to have releases, correct?

A    That's correct.

ALAN CARR - CROSS BY MR. ADAMS

118

Q    Okay.  Are you aware that there are unpaid employment taxes postpetition of the Debtors?

A    I think I heard it today in your opening statement, but I'm not sure I was aware of that.

Q    Okay.  So no discussion with AlixPartners about the status of the Debtor's postpetition tax obligations; is that your testimony?

A    I have no recollection.

Q    Okay.  So you don't know --

A    That's correct.

Q    -- about the status of the postpetition employment taxes by the Debtors?

A    That's correct.

Q    Have you seen any of the IRS's claims for postpetition employment taxes?  These would be administrative claims which you are familiar with as a former bankruptcy attorney.

A    I have not seen the IRS proofs of claim.

Q    Okay.  You haven't seen the prepetition claims; you haven't seen their administrative claims?

A    I haven't seen any of the IRS --

Q    Okay.

A    -- proof of claims -- proofs of claim.

Q    Okay.

        MR. ADAMS:  That's all, Your Honor.

        THE COURT:  Thank you.

Does anyone else have any questions for this witness?  Mr. Troop.

MR. TROOP:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. TROOP:

Q    Good afternoon, Mr. Carr.  Andrew Troop from Pillsbury on behalf of the Commonwealth of Massachusetts.

A    Good afternoon, Mr. Troop.

Q    Mr. Carr, I just want to make sure I understand some parts of your testimony accurately.  Is it fair to characterize your testimony as saying that the claims which you have addressed in your Declaration are unnecessary for the Court to consider in connection with feasibility of the plan?

A    Well, I think they can be considered.  What I am saying is that my belief is that if there was no recovery on those, it's a reasonable determination that we will be feasible by some point in early 2027 based on the other claims the estate holds.

Q    And in connection with your testimony -- well, say that again, please, because I was confused.

A    What I'm saying is that these claims may be brought, may be settled earlier, which would obviously bring us closer to the date of administrative solvency earlier than projected, but based upon my understanding and belief is that do not need any recovery from these claims in my Declaration to get to a

ALAN CARR - CROSS BY MR. TROOP

120

point of administrative solvency by -- by early 2027.

Q    So these claims are unnecessary in your opinion, to reach administrative solvency?

A    Correct.

Q    And -- strike that.  At any point today, have you provided any sense of probability as to the amount that will be collected on these claims?

A    The -- I believe my deposition I provided --

Q    That wasn't my question, Mr. Carr.  Have you provided any testimony today about the probability that value will -- the -- of the amount that these claims are likely to be resolved at?

A    In my Declaration?  You mean with the claims in my Declaration, correct?

Q    Yeah, in your Declaration.

A    I have not.

Q    You have not.  Have you provided any testimony about the probability that if you recover a dollar on any of these claims, they will be collectible, that dollar will be collectible?

A    I have not provided any testimony.

MR. TROOP:  Your Honor, I'm going to let the parties get through their questions and reserve a motion to strike.

THE COURT:  Okay.

MR. TROOP:  Thank you.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 120 of 265**

THE COURT:  Thank you.

Any Redirect?

MR. TSEKERIDES:  Yes.

Anybody else?

THE COURT:  Oh, I should ask, yeah, if anyone else had any questions in the form of Cross.

MR. TROOP:  Your Honor, if the Committee has questions, I would ask that they go now --

THE COURT:  Yeah.

MR. TROOP:  -- before the redirect.

THE COURT:  I think that's right just in terms of --

MR. TROOP:  Sorry, Ted.

MR. TSEKERIDES:  Yeah, I'm fine.

MR. TROOP:  I know you wanted to get in there.

CROSS-EXAMINATION

BY MR. LUFT:

Q    Good afternoon, Mr. Carr.

A    Good afternoon.

Q    Avi Luft of Akin Gump on behalf of the Official Committee of Unsecured Creditors.

A    Good afternoon.

Q    I want to take you back to the questions that counsel for TRACO was asking you.  Okay?

A    Okay.

Q    Do you recall being asked questions relating to Dr. de la

Torre's role in connection with both TRACO and Steward?

A    Yes.

Q    What is your understanding of his role in connection with both entities?

A    My understanding is that he was the CEO of Steward Health, and I believe he actually owns the equity of TRACO, and he's also a member of the board of TRACO.  I don't know what other titles he has at TRACO.

Q    Now, Mr. Carr, I understood from your Declaration that you referenced fiduciary duty and fraudulent transfer claims in connection with 2016, 2021, the Tenet transaction, the CareMax transaction, as well as transactions with TRACO; is that a fair summary?

A    Well, you said two different things there.  I think there were -- for 2016, the only claims that we found so far are fraudulent conveyance claims.  The later transactions, most have fraudulent conveyance and/or breach of fiduciary duty claims.

Q    Thank you.  Could you describe for the Court generally, in your view, what Dr. de la Torre's role is in connection with all those claims?

A    He's certainly a beneficiary of many of the fraudulent conveyances.

Q    And would he have had a role in the board in connection with any fiduciary duty claims?

A    Yes, he's a director.

Q    Okay.  If the claims against Dr. de la Torre that TRACO's counsel attacked fail or are not brought, would that inure to Mr. -- to Dr. de la Torre's benefit?

A    The claims against TRACO or against him?

Q    The claims against Dr. de la Torre.

A    Can you repeat the question, please?

Q    Sure.  If the claims against Dr. de la Torre, which you have described, whether it be fraudulent transfer or fiduciary duty, fail or are not brought, would that be to Dr. de la Torre's benefit?

A    Of course it would.

Q    And if those same claims that TRACO's counsel attacked fail or are not brought, what impact would that likely have on the recovery of the med mal unsecured Creditors that TRACO was supposed to insure?

        MS. JACOBSON:  Objection, Your Honor.  It goes beyond the scope of the direct and cross.

        THE COURT:  I agree.

        MR. LUFT:  Okay.  Then I have no further questions.

        THE COURT:  Okay.  Thank you.

                REDIRECT EXAMINATION

BY MR. TSEKERIDES:

Q    Mr. Carr, just a few follow-up questions.  You were asked some questions on preservation of claims, but are you aware if

the Debtors intend to actually file complaints on any of these transactions that are in your Declaration?

A    Yes, we do.

Q    Okay.  And have you approved the filing of complaints related to any of those transactions?

A    I have.

Q    You were asked some questions about releases.  Why did the subcommittee agree to include these individuals that were on that list you were shown as released parties?

A    Well, as I explained earlier, these are parties who provided value to the Debtors.  They -- they had a historical knowledge.  They knew the inner workings of the business to help monetize assets.  They helped with the investigation as well.  There was nothing found to be claims against them.

And also the concern that to the extent they're beneficiaries of D&O coverage, claims that I don't think exist being brought would deplete the insurance policy.

Q    Now you went through the list, I think, with the IRS lawyer.  And putting aside that you didn't remember everybody today, when you approved including those people on the list, did you know then why they were going to be on the list?

A    Absolutely.

Q    And sitting here today, if you believed that the Debtors had valuable claims against any of those individuals on the released party list, would you have agreed to include them?

A    No.  In fact, there were people that we talked about who may have been on an earlier version of this list that we took off because we wanted to preserve claims.

MR. TSEKERIDES:  Okay.  I have nothing further, Your Honor.

THE COURT:  Any Recross?  I got -- yes, I got that right.  Yes.

MS. JACOBSON:  Just a question.

RECROSS-EXAMINATION

BY MS. JACOBSON:

Q    Sir, you indicated that you had approved that certain complaints would be filed.  You haven't approved that all of them be filed, have you?

A    I have approved the filing of a complaint.

Q    Of a complaint?

A    Correct.

Q    Not five or six or seven of the ones that we went over today?

A    I have filed -- I have approved to file the complaint which incorporates several of the claims in my Declaration.

Q    Okay.  Well, once if this -- well, actually, under the FILO settlement, there is a litigation trust and a litigation trustee; is that right?

A    That's correct.

Q    And the litigation trustee will make assessments as to

which claims to bring and which not to bring, fair?

A    If they've not been brought by -- by the current transformation committee.  That's correct.

Q    Okay.  Thank you.

MS. JACOBSON:  I have nothing further.

RECROSS-EXAMINATION

BY MR. KEACH:

Q    Very briefly, Mr. Carr, do you remember the list I put in front of you?  Do you still have it?

A    I do.

Q    All right.  With respect to the officers and employees who are on that list, were they compensated for the work that they did for the company?

A    While they were at the company, yes.

Q    Okay.  So they received salaries or wages for what they did?

A    Yes.

Q    And what they were asked to do during the time that they were employed was within the scope of their employment?

A    I believe generally, yes.

Q    So they've already been paid for what they did, right?

A    They've been paid their salary.

Q    Thanks.

MR. KEACH:  Nothing further.

THE COURT:  Okay.  Mr. Troop?

RECROSS-EXAMINATION

BY MR. TROOP:

Q    Mr. Carr, when will that complaint get filed?

A    Imminently.

Q    What does that mean?

A    In the next day or so.

Q    Before the trust goes effective?

A    Yes.

Q    Why hasn't it been filed already?

MR. TSEKERIDES:  I'll allow him to answer without disclosing privilege, but I think the reasoning behind why we do things I think is privileged.  If he has a non-privileged basis, that's fine.  But otherwise, I'm going to object on privileged grounds.

THE COURT:  Okay.  Mr. Carr, with that instruction.

THE WITNESS:  Yeah.  I cannot answer that without referring to legal advice.

BY MR. TROOP:

Q    So you have deferred the filing of the complaint solely based on legal advice?

MR. TSEKERIDES:  Object to the form.  I don't think he said anything about deferring.

THE WITNESS:  No, we have not deferred.

THE COURT:  I'll sustain the objection.

BY MR. TROOP:

Q    You have not yet filed the complaint solely based on legal advice.

        MR. TSEKERIDES:  Object to the form. Mischaracterizes his testimony.

        THE COURT:  He can answer.

        THE WITNESS:  We have not filed the complaint yet.

BY MR. TROOP:

Q    That's nonresponsive.  Mr. Carr, please answer my question.

        MR. TSEKERIDES:  I object to his characterization, Your Honor.

        THE WITNESS:  Please ask it again.

        THE COURT:  Go ahead.  Ask it again, Mr. Troop.

BY MR. TROOP:

Q    Is it your testimony that you have not yet filed the complaint based on the advice of counsel?

        MR. TSEKERIDES:  Object to the form.

        THE COURT:  He asked if that was his testimony and I'll accept it for that.

        THE WITNESS:  The decision to not do it was based in part on legal advice.

BY MR. TROOP:

Q    What part was not based on legal advice?

A    I'm having trouble to think how to answer this without giving legal advice.  The decision by myself, and Mr. Transier

was to not file it as of today.

Q   And on what basis, other than legal advice, did you reach that conclusion?

A   There was no reason we needed to file it before today.

Q   Why was there no reason that you needed to file it before today?

MR. TSEKERIDES:  Again, same direction, Your Honor, or same objection.

MR. TROOP:  (Inaudible), Your Honor.

THE COURT:  Understood.  He can answer if it doesn't imply legal advice.

THE WITNESS:  We can file the complaint whenever we want.

BY MR. TROOP:

Q   Did you believe that you, the Debtor, obtained a tactical advantage in this confirmation hearing by having not filed the complaint?

MR. TSEKERIDES:  Object to the form and object to legal advice as well, and to the characterization and harassment as well.

THE COURT:  I don't know if it's harassment, but I'll --

MR. TSEKERIDES:  Pretty close.

THE COURT:  -- get you on the form.

BY MR. TROOP:

ALAN CARR - RECROSS BY MR. TROOP                    130

Q    Mr. Carr, I am trying --

A    I was concerned that actually --

        THE COURT:  Hold on.

        MR. TSEKERIDES:  Hold, wait.

        THE COURT:  You've got to ask another question.

        MR. TSEKERIDES:  He sustained the objection.

        THE WITNESS:  Sorry.

BY MR. TROOP:

Q    Do you believe that the Debtors have obtained a tactical, any advantage in this confirmation hearing by not yet filing the complaint?

A    I do not.  In fact, I thought filing it on the eve of the hearing would actually be a dirty tactic.

Q    Why?

A    Because that was my opinion.  I thought it was a sharp tactic to file it on the eve of a hearing before this Court.

Q    Because you didn't want to disclose the claims in the complaint?

A    No.

Q    But isn't the whole basis of your testimony the claims that have translated themselves into this complaint, not the whole, but at least with regard to the claims in the complaint?

A    I don't think the claims will be a mystery.  They're disclosed in my -- in my affidavit, my Declaration.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 130 of 265**

ALAN CARR - RECROSS BY MR. TROOP                    131

Q     And what details in the complaint, if you would have filed it, would have been sharp elbowed, which I think is sort of the way you described it?

MR. TSEKERIDES:  Object to the form.  I don't think he said details in the complaint but --

THE COURT:  No, sustained.

BY MR. TROOP:

Q     Are there details in the complaint which had they been filed, you thought would have been, and forgive me, I can't remember the exact words that you used, but sharp-elbowed practice?

A     That's not what I meant.  No.

Q     What did you mean?

A     I meant I thought filing a complaint on the evening when we're coming into a court, when the testimony is in, would have been viewed by this Court and others as a sharp tactic, just the strategic move to file it in the middle of a pending confirmation hearing.

Q     And you reached that conclusion, even though you say that every one of the issues about the claims that are in the complaint are in issue today?

MR. TSEKERIDES:  Object to the form.  Can I have that read back?  I don't know that I understood that question.

MR. TROOP:  I'll try it again, Your Honor.

THE COURT:  Okay.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 131 of 265**

BY MR. TROOP:

Q    I believe you testified that there is nothing in the complaint that you've authorized which would be a surprise to anyone in light of your Declaration and your testimony today. Is that an accurate summary of your testimony?

A    It is.

Q    Then explain to me why it would have been inappropriate or unfair to file the complaint if all of those issues have already been joined through your Declaration and through your testimony.

MR. TSEKERIDES:  Object to the form.  He didn't say inappropriate or unfair.

THE WITNESS:  My views were --

THE COURT:  Overruled, overruled.

MR. TSEKERIDES:  Hold on.  Let's wait for a ruling.

THE COURT:  Overruled.  He can answer.  If that's your understanding, just --

THE WITNESS:  Yes.

THE COURT:  Go ahead.

THE WITNESS:  I think you're conflating my testimony here.  My view is that I was coming to court to testify on my Declaration about the cause of action around the releases. And to file a claim on the eve of coming into court just felt wrong to me, and that was my decision.

BY MR. TROOP:

Q    So is it your testimony now that the only relevance of your Declaration is to the releases?

MR. TSEKERIDES:  Object to the form.  That's not what he said.

THE COURT:  Sustained.

MR. TROOP:  Could I have his answer read back, please, Your Honor, to my former question so I could understand how --

THE COURT:  Mr. Troop, I mean, come on, Mr. Troop. That's -- I got what you're -- he said those words, but that's not what he's saying, and I think we all know that.  He just testified for an hour about your claims.  And now you're asking if the only thing he talked about was releases?

I just think, sure, we can go through this, and then we can ask other questions and we can do this.  I think I get the points that are being asked.

But if you want to know, is the only purpose you're here to testify about releases, Mr. Carr?

THE WITNESS:  No.

THE COURT:  Did you get your answer, Mr. Troop?

MR. TROOP:  Thank you, Your Honor.  Nothing further, Your Honor.

THE COURT:  Any further direct?

MR. TSEKERIDES:  Nothing further, Your Honor.  We'd ask if Mr. Carr can be excused so he can catch a flight.

THE COURT:  Any objections?

MR. TROOP:  Your Honor, could I have a minute?

THE COURT:  Of course.

(Pause)

MR. TROOP:  Thank you, Your Honor.  We're going to reserve on objections as to ultimate relevance or weight with regard to this testimony.

THE COURT:  Okay.  I think that's fair.  Everybody's rights are reserved.

MR. TROOP:  Thank you.

THE COURT:  Let me just ask before I release him.  Does anyone else have any questions?

(No verbal response.)

THE COURT:  Okay.  Mr. Carr, thank you very much.

(Witness excused.)

THE COURT:  Why don't we take a ten-minute break?  We'll come back at 4:30.  Thank you.

COURT SECURITY OFFICER:  All rise.

(Recess taken from 4:20 p.m. to 4:32 p.m.)

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  Okay.  We are back on the Record in Steward.

And I'm going to turn on my camera.  Just give me a moment.  Give me one moment and we'll get started.

(Pause in the proceedings)

135

THE COURT:  Just one moment.  Oh, here we go.

Okay.  We are back on the Record in Steward.  Let's see.  Okay.  Good afternoon, Counsel.

MR. BEREZIN:  Good afternoon.  Robert Berezin, Weil, Gotshal & Manges, on behalf of the Debtors.

Your Honor, I am told that I may have made an omission or many in the introduction of the exhibits.  So, if I could, just to make sure that we have everything in the record, just run through the exhibit numbers that we are offering and just make sure that is taken care of.

THE COURT:  Okay.

MR. BEREZIN:  Okay.  I apologize for that.

THE COURT:  No worries.

MR. BEREZIN:  Okay.  We start with ECF 5380, 5453-1 through 5453-5, 5953-9 through 5953-10, 5453-13 through 5453-17, 5470-1 through 5470-32.

THE COURT:  Wait, what?  Can you repeat that one?  5470?

MR. BEREZIN:  5470-1 --

THE COURT:  Uh-huh.

MR. BEREZIN:  -- through 5470-32.

THE COURT:  Okay.

(Participants confer.)

MR. BEREZIN:  Oh, I see.  The -- so, Your Honor, the 5470 is just that's it, there's no dash, so it's 5470 --

136

THE COURT:  Oh --

(Participants confer.)

MR. BEREZIN:  So we're on 5470, Your Honor.  But we also have 5470-1 through 5470-32.

THE COURT:  Got it.

MR. BEREZIN:  And then we have 5471, and then we have 5471-1 through 36.  We're almost done.

THE COURT:  Okay.

MR. BEREZIN:  5472 through 5472-37.  So I think this is 5472, then there's 5472-1 through 5472-37.

THE COURT:  Okay.

MR. BEREZIN:  Then we have 5506 and 5580.

So, Your Honor, Debtors offer these exhibits.  I don't feel as bad, now that I got this wrong, because it's sort of complicated.  But Debtors offer those exhibits.

THE COURT:  Any objection to the admission of any of these documents stated on the record?

(No verbal response)

THE COURT:  Okay.  They are admitted.

(ECF 5380, 5453-1 through -5, 09 through -10, -13 through -17, 5470-1 through -32 received in evidence.)

MR. BEREZIN:  Thank you, Your Honor.

THE COURT:  Without repeating it, though.

MR. BEREZIN:  Yeah.

(Laughter)

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

137

MR. BEREZIN:  That was a bit of a torture, exercise in torture.

The Debtors call John Castellano, Your Honor.

THE COURT:  Okay.

MR. BEREZIN:  May I approach, Your Honor, with this deck?

THE COURT:  Yeah.  Just let me swear him in.

Mr. Castellano, can you raise your right hand?

(Witness sworn.)

THE COURT:  Okay.  You can -- and if you can just do the mic check and just spell your last name for the record.

THE WITNESS:  Test, Castellano, C-a-s-t-e-l-l-a-n-o.

THE COURT:  Okay.  And we'll let the Record reflect the witness has been properly sworn in.

You may approach.

MR. BEREZIN:  Thank you, Your Honor.

THE COURT:  Mr. Berezin, whenever you're ready.

MR. BEREZIN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BEREZIN:

Q   Good afternoon, Mr. Castellano.

A   If you could turn to Exhibit 5453-6, which is your initial Declaration.

A   Yes, I see it.

Q   All right.  And if you could turn to Page 4.

A     Paragraph 4?

Q     Sorry.  Paragraph 4.

If I could direct your attention to the first sentence of your Declaration, you testified in this Declaration that the Debtors would be able to satisfy the conditions to the effectiveness of the plan, including payment of allowed administrative expenses -- expense claims.  And I want to focus your attention on what the Debtors did to analyze the filed administrative claims, to determine what the estimated amount should be.

A     So the -- and the -- and the process was very similar from the priority claims.  We took both of those into consideration.

So, after -- after bar dates and, really, throughout most of this case, once claims had been filed, members of my team, effectively, opened up each of the -- each and every claim to understand what the nature of the claim was, evaluate any supporting documentation, if there was supporting documentation, and really examining the company's books and records, working with individuals at the company to assess whether or not the claims were valid.

And for many of the admin claims, because many of those related to claims from vendors, there was -- and many times interaction with the actual vendor itself, to obtain supporting documentation to obtain invoices, shipping logs,

whatever it was, to determine whether or not -- if the company, either had that information on its books and records, or not, to really get an assessment of if the claim was valid.

With that information, looking at all of the claims that were filed -- filed, we also then worked with the Weil Gotshal team to determine if we need to put -- or object to claims, which we have done omnibus objections.  The Weil team would then review the same details that the AlixPartners team reviewed, to determine, if there was a basis, what the basis was to actually object to the claims.

So, through -- throughout that process -- and I think we're up to our twenty-fifth or twenty-sixth omnibus objection as it relates to expunging or trying to resolve or objecting to administrative and priority claims.  So it was a fairly robust process.

Q    And do you have a level of confidence -- well, how would you describe the estimated amounts of administrative and priority claims that you've testified to?

A    Yes.  So, right now, we're estimating administrative -- allow -- allowable administrative claims would be approximately $71 million allowable; priority claims would be approximately $34 million.

Based on the work that my team has done for the last several months, being fairly granular, fairly diligent, as well as the reviews that have occurred with the Weil Gotshal

team, I feel pretty confident, in terms of the outcome of the claims -- claims review process.

It's not uncommon in a case of this size that a significant number of claims are filed, duplicates, redundant claims, claims that have no basis in sufficient information. But we have spent a significant amount of time to ensure that we got what I believe is a fairly accurate representation of what the liability side will be as it relates to the requirement to go effective of settling allowed administrative and priority claims.

Q   Thank you.

In Paragraph 4, there's a reference to an estimated aggregate amount of claims and the timing of receipt of proceeds.  Do you see that?

A   I do.

Q   Okay.  Can you explain what that testimony is based on?

A   Yeah.  This testimony is based on my assessment of the process that we undertook to determine a bigger and diverse mix of litigation causes of action, as well as the duration of monetizing those causes of action and the claims necessary to go effective.  This is my conclusion, my own reasonable business judgment of making an assessment as it relates to will the Debtors be able to satisfy those claims; so, through an aggregation of a significant amount of work undertaken to really determine what the path forward here will be with the

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

141

complex structure that we have in front of us.

Q    And if you could turn to Paragraph 25 of your initial Declaration?

A    I'm there.

Q    Okay.  Do you see that it's -- it states that:

"-- I estimate that the Debtors' remaining assets will generate distributable proceeds of at least $46 million on account of their non-litigation assets, and between approximately 506 million and 742 million (with a midpoint of approximately 627 million) on account of their litigation assets, net of contingency counsel fees and litigation funding costs and expenses, including the variable component payable to the litigation funders under the litigation funding agreement."

Do you see that?

A    I do.

Q    Just focusing on the estimated recoveries, net recoveries, that you've described in Paragraph 25.  Can you please describe the process that -- on which that estimate is based -- or withdrawn.

What is that estimate based on?

A    So the estimate is -- is effectively a culmination of evaluating the various litigation causes of action, the process we followed to identify what potential recovery values would be from those various causes of action, but then really

aggregating all of that into a model to determine what the potential recovery -- net recovery values would be, after taking into consideration the operational aspects of the FILO settlement, the expenses necessary to obtain these recoveries, the expenses necessary to support both the plan trust, as well as the litigation trust, and -- and other -- and other obligations.

This would be -- this is representing my assessment of three points; a low, medium, and a high, as it relates to net proceeds following the process of identifying counsel, providing counsel with adequate information, adequate diligence, they providing their input to that, and just evaluating the overall -- the overall output of that.

Q    And you mentioned --

MS. JACOBSON:  Excuse me, Your Honor.

THE COURT:  Uh-huh.

MS. JACOBSON:  I object to this testimony and move to strike it.  This is exactly what we put forward in our motion in limine, which was that this model that Mr. Castellano is talking about was -- had within it advice of counsel, and we were foreclosed from asking information about the outcomes because it was the output of -- we couldn't examine the input of what went into the numbers.

THE COURT:  Uh-huh.

MS. JACOBSON:  And we were repeatedly shut down.

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

143

THE COURT:  Why don't we take it question by question?

MS. JACOBSON:  Well, I mean I object to this answer --

THE COURT:  Overruled.

MS. JACOBSON:  -- and move to strike it.

THE COURT:  Overruled.

Ask the next question.

I haven't heard anything privileged or anything opening up any doors.  I hear -- I only heard a question about a model, that a model had outputs.  That's the only thing I've heard.  I haven't heard anything specific about the model yet, what went into the model; I haven't gotten there yet, so --

MS. JACOBSON:  I believe, Your Honor, respectfully, I think he said that counsel --

THE COURT:  Provided some information.  But that's -- if that's the basis of your objection, then that objection is overruled.  If -- I don't know -- he's just describing the information.  He's not saying specifically, he's not saying he relied on it.  He hasn't said anything else, other than this is what went into it.  So that's overruled.

You can ask the next question.

MR. BEREZIN:  Thank you, Your Honor.

BY MR. BEREZIN:

Q    Now you testified that the dollar amounts, you estimated

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

144

the aggregate proceeds here, you said that they were aggregated.  Can you just explain to what extent does the aggregated numbers you provided disclose any of the litigation-specific estimates that counsel provided?

A    No, these aggregated numbers do not.  As described throughout the disclosure statement, somewhat in my Declaration, the Debtors have a significant number of material litigation causes of action.

Counsel that is specific to and understands those causes of action did provide inputs as it relates to their perspective.  In order to aggregate and determine whether or not this plan could be feasible, we had to aggregate those inputs, as well a layer on the actual cost of prosecuting the litigation, the cost necessary to support the estate, and accumulate what that output would be.

So this is -- you know, this is just an aggregation of those -- of a few of those inputs, plus everything else necessary to run the balance of this estate.

Q    Thank you, Mr. Castellano.

Can we turn to Paragraph 48 of your initial Declaration then?

(Pause in the proceedings)

A    I'm there.

Q    Okay.  And we see, in Paragraph 48, it states that the estimated amount ...

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

145

"In regard to the estimated amount and timing of recoveries, it is my commercial understanding that it is reasonable to expect by early 2027 an aggregate net recovery from the litigation assets of approximately 567 million."

Q   Do you see that?

A   I do.

Q   Now can you please tell the Court what that reasonable expectation, as you state in this document, is based on?

A   Yeah.  So this is my conclusion of having been working on this particular matter for 21 months, understanding aspects of the various litigation causes of action and really looking at the process by which the Debtors developed these estimates, in terms of identifying, interviewing various counsels, selecting various counsels very diligently, providing them with -- providing counsel with the necessary information for them to reach their conclusion.  I took all of that, along with the timing, the potential timing of recovery, and then really took all of that into consideration with the costs necessary to prosecute the cases, support the cases, support this process, as well as the liability side.

So, as I took all of those inputs into consideration, just based on my experience with doing this, I think it is -- I said this previously and I still think it is reasonable to expect, by early 2027, that there will be this amount of recoveries, approximately.  In this particular Declaration, I

think it's five -- it's five sixty-seven.  I think it went up slightly in the supplemental Declaration.  But you know, this is what -- this is based on my business understanding, as well as evaluating all of the claims necessary to go effective, administrative and priority.

Q    And you stated that -- well, let me -- withdrawn.

Let me ask whether -- to what extent would -- is your conclusion, as stated in this paragraph, based on the accuracy or validity of the individual litigation-specification estimates provided by counsel?

A    Yeah.  I can't speak to the voracity of the inputs.  I'm not a litigator.  These are very complex litigations.

I can speak to the process we followed, to ensure that we identified, in my professional opinion, the best counsel for each one of these litigation causes of action.  The thoroughness of what they did to determine what their perspective was, potential likely recovery, I can't really comment on that because, in many instances, it's just not my area of expertise.

But what I can comment on, though, is how we aggregated all of this and took into consideration, as I said -- stated previously, what's necessary to attain these recoveries and look at this on a consolidated basis.  So, on a consolidated basis, this is my -- my business judgment, as it relates to is it reasonable to expect, understanding the process we've run

through to actually attain these -- some of these, obviously, were critical inputs because this is, effectively, the balance of what the company has, litigation causes of action.  But individually, I can't speak to those.

I can speak to the aggregate totals.  I can speak to the reasonableness of the process we followed and my general business understanding of many of these claims and causes of action.

Q    And is any of that testimony based on privileged information provided by counsel?

A    No, it is not.

Q    And you testified about the aggregate amounts, in terms of the timing, so how much in the aggregate would be -- you expect to receive over time.  Can you explain to the Court what the basis is, the entire basis of your testimony regarding the timing of when proceeds would be available to the estates?

A    Yeah.  It -- I mean, I'd say it's a combination of a few things.

A number of these litigation causes of action; for example, preferences that are described in the disclosure statement, claims against commercial insurance payers, a significant amount of work has already been underway by the respective counsels for both of those litigation work streams. And frankly, from -- from a preference perspective, we've

actually been receiving -- we've been actually receiving distributions from the work that's been done by the Togut law firm.

So, as it relates to -- and then one of the other litigation work streams, Norwood, a very, very complex litigation that's been going on for five years, there's a trial scheduled for January of 2026. That's a fact that's not coming from counsel.

But taking into consideration the work that has been done to date, along with the input as it relates to counsel's input, in terms of when they felt some of these causes of action can be monetized, again, that was the input, in terms of the timing, as it relates to how we would monetize these litigation causes of action.

Q   And to the extent that your testimony that it's reasonably likely that the Debtors will receive the aggregate amounts in the time frame, to what extent is that based on what counsel has provided or told you?

A   Yeah. The aggregate -- the aggregate timing is -- is based on the -- my general business understanding of these claims. So, you know, this is really -- yeah -- yes, there was -- there were -- counsel had some guidance on that. But at least I was able to use my own general understanding of having been with this company for the last 21 months to determine, in my own mind, whether or not an estimated timing

DEBTORS' EXHIBIT NO. 8
Page 148 of 265

was reasonable.

Q    And just looking at Paragraph 48(iv), there is a reference there to:

"-- the progress made, and reasonably expected to be made, in the pursuit of the Debtors' claims and causes of action and a commercial understanding of when proceeds are reasonably likely to be realized as a result."

Do you see that?

A    I do.

Q    Okay.  To what extent is that testimony based upon privileged information, information specifically counsel's litigation-specific estimates of timing?

A    It's not.  That was based on my assessment.

Q    Based entirely on your assessment and not on what counsel has told you?

A    That's correct.

Q    Thank you.

If you could turn to Exhibit A of your Declaration.

(Pause in the proceedings)

Q    Can you describe what this is?  What is Exhibit A?

A    So Exhibit A is meant to illustrate what the expected cash flows will be from, in the aggregate, monetizing litigation causes of action, as well as non-litigation assets, by year, taking into consideration the cost necessary to monetize those assets, to determine what net cash flow from

asset monetization would be.

Effectively, the line item litigation funding variable component is a function of the FILO settlement.

Total expenses, effectively, represents operating expenses necessary to manage both the litigation trust, as well as the plan trust; payroll, employees, insurance, IT information, costs to determine what the net available cash flow would be by year.

We then layer next to that the pay-down pursuant to the FILO settlement of the Class A interests, which, effectively, is the litigation funding, the DIP, the pre-petition bridge, and MOIC.

And then, based on my assessment of cash flows and, at the time we did this Declaration, our estimate of allowable priority and administrative claims, we revised this number in my supplemental Declaration, when we -- when I believe it's reasonable to assume, taking into consideration all of the factors that I just discussed, when we can potentially go effective, which I would still say is early 2027.

Q    Thank you, Mr. Castellano.

And in the total -- let me just direct your attention to total litigation proceeds, net row.

A    Yes.

Q    Do you see that?

A    Yes.

Q    Can -- does this row disclose, for example, in H2, second half of 2025, or in the -- in 2026, does this row disclose which litigations contribute to these aggregate amounts, as provided by counsel?

A    No, this is not disclosing that level of granularity. This is aggregated in total.

Q    Now Exhibit A shows the -- what I think you've described as the "mid case."  Is that correct?

A    That's correct.

Q    Has -- have the Debtors produced to the objecting parties a version of Exhibit A showing any other case?

A    We did.

Q    And can you describe what the -- that -- those cases show?

A    Yeah.  There's a low case, a mid case, and a high case. This is the mid case.

The low case, effectively, shows the same conclusion, that, based on, again, my reasonable assessment, my understanding of these causes of action, that -- as well as our estimated allowed admin and priority claims, that the Debtors -- it's reasonably likely that the Debtors will go effective by settling their allowable admin and priority claims early 2027.

Q    And your testimony that the figures in Exhibit A support your conclusion that the Debtors are reasonably likely to go

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 152 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 152 of 265

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

152

effective in early 2027.  Can you please describe the extent to which you're relying on privileged advice; specifically, in this case, the input for specific litigation estimates that were provided by counsel?

A    Well, as I -- as I said, this is an aggregation of a process, as well as taking into consideration everything necessary to continue to prosecute these cases post-confirmation date.

Frankly, none of the counsels that we work with really have any idea of what it was going to take to actually go effective.  They were focusing specifically on their own litigation.

Looking at our claims, looking at how we adjudicate the claims, looking at the FILO settlement, how we actually had to fund the FILO settlement, what expenses were necessary to run the estate, this is all based off of my general business understanding of these cases and how to move this forward.

Q    That's in terms of your testimony, right?

A    Yes.

Q    So you've got a model, the model has inputs from counsel.  Is that correct?

A    That's correct.

Q    Okay.  And your testimony today, is that based -- just to make sure the record is a hundred percent clear -- are you basing any of your testimony that it's reasonable that we'll

go effective at a certain time early 2027 on what counsel told you?

A   No, I'm not basing it on that.

Q   In the course of formulating your testimony, the conclusions you've drawn, did you have occasion to compare the total amount of asserted damages against the amount that you would need to go effective in early 2025; i.e., to pay all of the valid administrative expense and priority claims?

A   Yes, I did take a look at that.

And you meant early 2027, not early 2025?

Q   Apologies.  Early 2027.

A   Yes, I did look at that.

Q   Okay.  And can you explain to the Court what the total -- first, what are the total aggregate asserted damages?

A   Yeah.  The total aggregate asserted damages are about three to $3.3 billion.

Again, we're not anticipating to collect three to $3.3 billion, that's the asserted damages.  Based on the aggregate estimated net recoveries, I arrived at -- and I believe I disclosed this -- approximately $377 million needs to be recovered in order to ensure that we could cover the allowable administrative and priority claims.

That represents, I think, 13 percent of the estimated -- or the alleged damage claims, which was another factor that I felt made this reasonable.  We were not seeking something like

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

154

75 percent, 80 percent. This was a -- what I felt to be a lower percentage of the alleged damage claims.

Q    Thank you, Mr. Castellano.

If you could now just turn your attention to what's been -- what has been marked as Exhibit 5453-12. That's your supplemental Declaration.

A    Yes, I have it.

Q    And -- thank you.

If you could turn to Paragraph 49.

(Pause in the proceedings)

A    Yes, I'm there.

Q    And do you see that Paragraph 49 is very similar to a paragraph you had in your earlier Declaration?

A    Yes, it is.

Q    And then -- but the -- at sort of the end of the paragraph, you describe some figures; specifically, the total amount of administrative expense claims that will be allowed is estimated at 70.9, and the total amount of priority claims that will be allowed is estimated at 34 million. Is that true? Is that correct?

A    That's correct.

Q    Okay. So can you just describe what process led to the 70.9 and 34 million estimate?

A    Yes. I think -- I mean, I think I touched on this earlier. But again, since the -- the bar date, and frankly,

throughout the case, but really, since the bar date, which was December 20th, my -- my team has, effectively, evaluated, you know, opened up and reviewed every single claim.  There's approximately 2,800 administrative claims, 1,400 priority claims have been filed.

Opening up each claim, evaluating what was provided, what language was included in the claim, comparing that to the company's books and records, working with people at the company to make an assessment if it's a valid claim or not, and at times, many times, on the vendor claims, actually interacting with the vendors to make sure that, if we had a disagreement, we had to validate if our books were right or if their books were right.  And it went both ways, sometimes we were right; sometimes the vendors were right.

But really, coming to a conclusion for each claim, what the potential disposition is.  Obviously, we do believe we have administrative claims that we owe and priority claims that we owe.

But then, for those claims that we felt we -- we don't know or we -- or need to be adjusted from the claims register, we've been working with the Weil Gotshal team.  They then evaluate the same information that my team put together, claim by claim, to determine what the most appropriate disposition would be for those claims.  And I think -- as I said previously, I think we're up to 25 or 26 omnibus objections

throughout this case.

This waterfall in Paragraph 50 and 51 is meant to -- just to describe the roll forward from the amount of claims forward as of July 8th to what I believe will be the estimated allowed admin and priority claims.

Q    And if you could then turn to Paragraph 53.

A    Yes, I'm there.

Q    And this paragraph is also similar to one that was in your initial Declaration, but some of the figures are different.  Is that right?

A    That is correct.

Q    Can you just explain, first of all, whether the -- whether these estimates are in any way based on privileged information that counsel provided regarding the litigation-specific recoveries?

A    No.  This is -- again, this is an aggregation of taking those inputs, but then actually putting it in and understanding what it was going to be -- what it would cost to actually get these -- get these amounts.  And this is really based, again, on my assessment and my knowledge of these claims and what the potential recovery ranges can be.

Q    And can you explain to the Court, in general terms, why the various figures changed, as indicated?  If you could just walk the Court through.

A    Yeah.  It was primarily one situation.  In my initial

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 157 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 157 of 265

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

157

Declaration, we described the situation, the litigation situation that we had with HSA, who acquired four of our hospitals in Southern Florida. There was a dispute in front of this Court.

We ultimately came to a business resolution, and the amount of the business resolution -- which I believe has been stipulated and has been ordered -- was greater than the assumption that I had in the model by about four or $5 million. That was really the driver.

Q   Okay. And then if you could look at Exhibit A that's referenced at the end of that paragraph in your initial Declaration.

A   Yes, I'm there.

Q   Now you've testified about Exhibit A in the prior Declaration. Could you explain to the Court the extent to which this is different and how it's different?

A   Just generally speaking, it is the same structure. It's an aggregation of the estimated litigation proceeds, taking into consideration the cost necessary to fund the FILO settlement, as well as the operating expenses.

I would say the one other difference here, in the initial Declaration, I had an estimate for what the administrative consent program -- the administrative claims consent program would yield. We replaced that with the actual results in the initial Declaration because we still did not have the actual

JOHN CASTELLANO - DIRECT BY MR. BEREZIN

158

output.  We assumed a 75 percent acceptance rate to the administrative consent program.  Where we're at now is a 40 percent acceptance rate.

So the admin numbers are higher by about six to $10 million in this scenario, as compared to the initial Declaration, Exhibit A, but the same concept.

Q   And your testimony, as reflected in this table on Exhibit A, to what extent is this -- is it -- is this Exhibit A and your testimony about it based on privileged information?

A   No, this is not based on privileged information.  This -- this is an aggregation of the model that -- that my team built to -- to determine what the cash flows would be over the next three to four years, taking into consideration the waterfall of the expenses and the necessary claims to settle, to go effective.

Q   And if I could just -- you mentioned it.  So can I direct your attention to the portion of the table estimated allowed administrative claims?

A   Yes.

Q   And can you just explain to the Court that figure and then the treatment of priority claims and then how much is left?

A   Yes.  So the estimated allowed administrative expense claims, the vast majority of that represents what I would call "trade vendor claims."

We also have a provision in there, approximately $18 million, for post-petition medical liability claims, as well as worker compensation claims.

The allowed -- the estimated allowed priority claim I think are fairly consistent with the gentleman from the IRS that was discussing what he felt were the priority claims; I think we were pretty close with that.

This is -- this is also assuming that, in order to go effective, we only need to pay -- at this point in time, we would be three years into the five-year period of time of what needs to be paid for priority tax claims to go effective, which is why you'll see, in 2028, we're illustrating the balance of the priority claims to go effective.

And then the last line item in 2027 represents transaction fees, which would represent the transaction fees for the Debtors' professionals, if those transaction fees are approved, they would be settled at the time of going effective.

The net result, at the end of 2028, would be potential distributable value of $235 million to the remaining creditors of the estate.

Q   Thank you, Mr. Castellano.

MR. BEREZIN:  We'll reserve to redirect, Your Honor.

THE COURT:  Okay.  Cross.

MS. JACOBSON:  Your Honor, I'm not going to begin

JOHN CASTELLANO - DIRECT BY MR. BEREZIN                160

with the cross.

THE COURT:  Okay.

MS. JACOBSON:  But one of my other colleagues, I believe, will.

I'm just going to renew my objection to strike the testimony relating to Exhibit A and the timing and the estimated recoveries.

And the reason why I'm doing that, Your Honor, is, during the deposition, when we asked questions of that nature, we were told that -- and I'm quoting from Mr. Berezin:

"Estimated recoveries and timing of recoveries is from counsel, so I'm not going to let him testify."

Okay?  And this was a repeated --

THE COURT:  Bring it up --

MS. JACOBSON:  -- instruction.

THE COURT:  -- in cross.  Bring it up in cross.

MS. JACOBSON:  All right.

THE COURT:  You can cross him on it.

MS. JACOBSON:  All right.  Thank you.

THE COURT:  I'm not going to rule.

(Pause in the proceedings)

THE COURT:  By the way, I'm not foreclosing anyone's ability.  What I don't want to do is get into quotes and then people start getting into legal argument.  I just think you can cross him on it.  He said what he said.  Now somebody can

JOHN CASTELLANO - CROSS BY MR. KEACH                161

cross him and let's just keep going.

Mr. Keach.

MR. KEACH:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KEACH:

Q    Mr. Castellano, good afternoon.  Good evening, almost.

A    Good afternoon.

Q    The process of developing your projections of litigation recoveries that you just referred to in reference to the Exhibit A to your Declaration, you described in your deposition last Thursday -- and I just want to read you your description, so that we can then ask the very questions Your Honor was just inviting me to ask.

And so, in response to the question you said the following:

"So this is -- I'm speaking on behalf of my knowledge of my knowledge of the process, and I think I've gone through this a few times today.  So, after we had settled all of the hospitals and identified what remaining litigation causes of action we had, we interviewed various counsels for each of one of -- each one of those causes of action, selected what I believed to be the best of each of those -- best for each of those causes of action, provided them with access to whatever information was necessary for them to make their evaluations.  They developed their own expert perspective on

what the potential outcomes could be.  I can't tell you the time frame because all of that came from their work product. I am very comfortable that it was a reasonable, thorough, diligent process, which yielded the results that we have on Exhibit A."

Do you remember that testimony?

A    I do.

Q    All right.  Is that a fair description of the process you went through?

A    I think so.

Q    All right.  So let's take that a step at a time.

You were involved in interviewing each of the -- there are different counsel for different of these causes of action. Is that correct?

A    Yes.

Q    All right.  And were you involved in the selection of those counsel; you, personally?

A    Not all of them, no.

Q    Okay.  And which ones were you personally involved in selecting?

A    The Togut law firm for preferences, the King & Spaulding law firm for commercial pair litigation, and another part of the King & Spaulding law firm for the Blue Cross/Blue Shield litigation.

Q    And what other law firms are going to be working on the

causes of action that make up the revenue that's in your Exhibit A?

A    Todd & Weld has been representing the company for the last five years, as it relates to the Norwood matter.

And then Kobre & Kim is going to facilitate the various investigations of committee causes of action.

Q    And these largely are the causes of action that were described in Mr. Carr's Declaration, correct?  The Kobre & Kim.

A    That's correct, yes.

Q    And those, generally speaking, are causes of action for fraudulent conveyance, breach of fiduciary duty, and the other causes of action he described against insiders of the Debtor, correct?

A    Yeah.  And whatever was contained in the disclosure statement, yes.

Q    All right.  And in Mr. Carr's Declaration.

A    Yes.

Q    Okay.  And so, when each of those counsel were selected, your -- you say, in the process, you provided to them whatever information was necessary for them to make their evaluations.  What evaluations were you talking about?

A    In order for them to determine what the potential recovery would be for the cause of action that they were involved in, we wanted -- I wanted to ensure, we wanted to

ensure that they had the right information to be able to evaluate what could a potential recovery be.

Q    All right.  And did each of those counsel develop an evaluation with respect to what the potential recovery could be on their particular cause of action or causes of action?

A    They did.

Q    All right.  And did they present them to you?

A    I think it would have been a combination of, for some of them, myself and Weil, Weil Gotshal.  I think on the -- as it relates to the investigation potential recovery, I think that was just directly with Weil, and then Weil discussed that with me.

Q    All right.  But eventually, the product of each counsel's projections of recoveries got to you.

A    Their perspective on the potential recovery.

Q    Right.  Their input to you as to what they thought the potential recovery would be, that made its way to you as part of this process, correct?

A    Yes.

Q    Okay.  And some of those firms are working on a contingent fee, correct?

A    Yes.

Q    And which firms are working on a contingent fee?

A    The King & Spaulding firm that is representing the company for the Blue Cross -- Blue Cross/Blue Shield antitrust

DEBTORS' EXHIBIT NO. 8
Page 164 of 265

matter and the Togut law firm that is representing the Debtors as it relates to preferences.

Q   Okay.  And all of the other firms who are working on these particular causes of action, they're working on an hourly rate basis, correct?

A   Yes.

Q   Now, as part of this process of their providing to you their evaluations, their projections of recoveries, did the hourly firms also present you with budgets?

A   Yes, they did.  We did get input as to what their expected costs would be.

Q   All right.  And in those budgets, those inputs on projected costs, those were presented to you, as well.

A   Ultimately, yes.

Q   All right.  What do you mean by "ultimately"?  Did you have them before you prepared Exhibit A?

A   No.

Q   Well --

A   I'm sorry.  Did I have them before I prepared Exhibit A?

Q   Right.

A   Yes.

Q   Okay.  Exhibit A being the Exhibit A that you and Mr. Berezin just went through in some detail.

A   Yes.

THE COURT:  Can you just clarify which Exhibit A?

There were just two of them.  I just -- before the initial and the supplemental, or just the supplemental and not the initial?

THE WITNESS:  No, I had it -- I had the expense -- the projected expenses before either one.

THE COURT:  Okay.  Thank you.

I apologize, Mr. Keach.

MR. KEACH:  No.  And I'll --

THE COURT:  I just --

MR. KEACH:  -- try to be clearer on that one --

THE COURT:  Go ahead.

MR. KEACH:  -- going forward, Your Honor.

BY MR. KEACH:

Q    And for our purposes at the moment -- and if I shift gears I'll let you know -- I'm referring to Exhibit A on your initial Declaration.  All right?  Not the Exhibit A on your supplemental Declaration.

A    Okay.

Q    We'll get to both eventually.

So, prior to your creating Exhibit A, you had, for the hourly firms, their budgets, their projected costs of achieving recoveries, and you had their projected recoveries. Is that correct?

A    Oh, yes.

Q    All right.  And you had their projected time to achieve

those recoveries, didn't you?

A    Yes.

Q    Okay.  And in the answer I just read you, you've indicated to the questioner that you couldn't reveal the time for -- that it would take to recover each of those amounts in each of those causes of action because that was work product of counsel.  Is that correct?

A    Yes.

Q    Now, as to the Exhibit A on your -- again, we're referring to your initial Declaration.  The line item, the second line item on Exhibit A, is total litigation proceeds, net, right?  Do you see that?

A    I do.

Q    And there is a number for the second half of 2025, and there are numbers for 2026 and 2027, correct?

A    And 2028, as well.

Q    Right.

And when you refer to that as "total litigation proceeds, net," what is the netting?  What's being netted from the larger number to get to the smaller number?

A    That would be the -- either the contingency fee for those law firms that operate on a contingency, or the estimated hourly expenses; effectively, the legal cost.

Q    All right.  So, in determining the netting process for each of those periods, you used the budgets that had been

provided to you by the hourly firms, correct?

A     I did.

Q     And you obviously used the contingent fee amounts that would have applied to each of the recoveries by the contingent fee firms, correct?

A     Yes.

Q     So, in order to do that, for example, you would have to know that, in the second half of 2025, certain recoveries were going to come in from the contingent law firms, in order to apply the contingent fee to net, correct?

A     Are you asking me if there's --

Q     I'm asking you that question.

A     I'm -- I'm not sure I'm understanding the question.

Q     Well, you wouldn't know to net out contingent fees to get to the net number in the first column if you didn't project you were going to recover on contingent fee amounts in that period, correct?

A     But are you asking me if there's fees that are contingent in the first column?

Q     I'm simply saying that, if there were, you would have to -- if you were recovering on -- if you were netting out contingent fees in your netting process, you would only do so if the money coming in the net period was coming in from one of the causes of action being done on a contingent fee basis, correct?  You wouldn't subtract contingent fees if there were

no money coming in from a contingent fee litigation, right?

A    That's right.

Q    All right.  And you would also have to subtract, on a netting basis, expenses that were attributable to hourly work on hourly litigation, correct?

A    Yes.

Q    All right.  And you'd have to do that for each of the time periods, correct?

A    That's correct.

Q    And so, for each of the -- for the development of each of the numbers on that total litigation proceeds, net line, you specifically utilized the inputs provided to you by counsel, whether hourly or contingent fee, that you've just described, correct?

A    Yeah, I think I did say that that input came from counsel.

Q    Right.

     In fact, it would have been impossible to do that line without relying specifically on counsel's budgets and on the contingent fee amounts that were attributable to each period, correct?

A    One more time, please.

          MR. KEACH:  Can you read that back to him?

          THE COURT:  Oh, she's just taking notes.

          MR. KEACH:  Oh, I'll -- that's fine.  I'll ask him

again.

(Laughter)

MR. KEACH:  You know I'm a relic.  What can I say?

THE COURT:  No, you got to get your --

MR. KEACH:  I remember when people actually used to type this.

THE COURT:  You got to show up with your own.

(Laughter)

(Participants confer.)

MR. KEACH:  I'll ask you again.

BY MR. KEACH:

Q    So, in order to generate each of those numbers, you would specifically have to use input from counsel as the amounts that were going to be recovered in each of those periods and whether or not contingent fees or budgeted amounts were going to reduce the recovery, correct?

A    I had to use inputs from counsel, yes.

Q    All right.  In fact, the total litigation proceeds, net is entirely based on inputs from counsel because there's no other factor in those numbers, correct?

A    That's correct, yes.

Q    All right.  And so, when you just said to Mr. Berezin, in response to his question, that that was entirely your work product, and that you weren't relying on inputs from counsel, that answer was incorrect --

MR. BEREZIN:  That's --

Q    -- wasn't it?

MR. BEREZIN:  Object.  Mischaracterizes the question and the answer.

THE COURT:  He can answer the question.  Overruled.

THE WITNESS:  Yeah, I don't think that is incorrect because this schedule wasn't prepared by counsel; this schedule was prepared by my team.

BY MR. KEACH:

Q    But it was prepared with inputs from counsel, correct?

A    I -- I think I said that.

Q    Right.

And so, when you say that this was an aggregation that your team prepared, it is an aggregation specifically of information provided to you by counsel as to the amount of recovery, the timing of the recovery, and the amount it was going to cost to get there.  Isn't that true?

A    No, it's not.

Q    Well, what else is in there, other than very information counsel gave you as to when they were going to recover, how much they were going to recover, and how much it was going to cost?  What other factor is in those numbers?

A    Are you talking about the entire exhibit?

Q    I'm talking about total litigation proceeds, net.  We're on the same line we've been on for the last five minutes.

MR. BEREZIN:  It's -- counsel.

A    Yes.  That -- that line did come as an input from counsel, and I think I did say that.

Q    Right.

And so, when you refer to it as an "aggregation," it's an aggregation of inputs from counsel, but it's not an aggregation of inputs from counsel and something else, correct?

A    For that particular line item, yes.

Q    Right.

And I go back to your description of the process that I read to you and the specific intervention by Mr. Berezin and your acknowledgment of same, that you couldn't answer questions about the timing because that was work product and you couldn't answer other similar questions because that was attorney/client privilege.  But as you just admitted, that entire line was based on inputs from counsel, correct?

MR. BEREZIN:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  If we're talking about the total litigation proceeds line, yes, that is -- that is an input from -- from the various counsels.

BY MR. KEACH:

Q    And can you do the rest of this chart without that line?  Can you get to the outcome you're trying to get to without

that particular line of totals?

A    Well, it's an important input, obviously.

MR. KEACH:  All right.  Your Honor, move to strike all of his testimony about this exhibit and about the outcome of litigation and the possible results of litigation as they relate to future distributions under the plan.

MR. BEREZIN:  So, Your Honor, the -- if the question is does the -- did -- are inputs in this chart, were they derived from counsel, the answer is yes.  If the question is, is any of his testimony about whether the receipt of the proceeds are reasonably likely to occur by early 2027, it's unequivocal the answer is no.  None of that testimony is based on what counsel provided him.

He based, as he testified, his opinion or conclusions about supporting feasibility, not based on those inputs, but rather, based on his business understanding and several non-privileged factors that he's described in hideous detail, so --

MR. KEACH:  Your Honor, may I respond to that briefly?

THE COURT:  Yeah, but he's got to be able to finish.

MR. KEACH:  I'm sorry.  Go ahead.

MR. BEREZIN:  Okay.  So, to put privileged information at issue, a party has to rely on that privileged information in the testimony, in order to prove and establish

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 174 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 174 of 265

JOHN CASTELLANO - CROSS BY MR. KEACH                    174

their case.

That -- the cases that have been cited are cases where you've got a director accused of bad faith and says well, I relied on counsel.  You have an infringer, a trademark infringer, who relied on counsel and that it wasn't, therefore, infringement.

Mr. Castellano has been scrupulous in his Declaration and in his testimony today that he is not basing his testimony on what counsel told him.  They can ask him all day long whether he --

THE COURT:  But that's not entirety true, is it, right?  Part of what he's basing his testimony is on this line, isn't it?

MR. BEREZIN:  It is based on the -- yes, there is a -- there are inputs that he received from counsel.

THE COURT:  Right.  So part of this testimony -- it's not entirely, it's part of it.

MR. BEREZIN:  It's not entirely, but it is not at issue.  You're right, Your Honor, but it's not at issue.  It is tangential to the testimony that he's offered and the conclusions that he's offering.

THE COURT:  I know.  But I think Mr. Keach is asking a different question, which is whether I should strike all of his testimony about this chart.  I don't know if I should because I think it just goes to what it does.  It just -- I

think you just strike the -- I think those are numbers, but those numbers are meaningless.  Maybe that's just the answer.

Mr. Keach?

MR. KEACH:  No, Your Honor.  And let me go to -- let me just go to the heart of it.

THE COURT:  Let -- I'll tell you why, in other words.

MR. KEACH:  Yeah.

THE COURT:  In other words, can -- if you can tell me other lines, like total non-litigation assets to litigation variable funding, he did say -- like, in other words, he took that input, but he provided an analysis and he created -- him and his team created a chart.  So it's not all -- like pay down of Class A, estimated allowed admin claims.  There's a lot there and you can't just strike the entire chart.

Now, whether you can receive the proceeds in 2027, I'm not sure anyone can tell you that, anyway, by the way.  I don't think anybody can do this.  And I'm not sure I want to get into that kind of analysis because it would tell folks like TRACO to slow-play it, right?  Or --

MR. KEACH:  Right.

THE COURT:  -- to not slow-play it or to play it around that it's 2027.  I meant TRACO's board, not TRACO.  I don't want to get into folks who are -- who may get sued, to think that they've got -- you know, they can just play

**DEBTORS' EXHIBIT NO. 8**
**Page 175 of 265**

something out until 2027 or 2028, and that's what you get the answer to.  But I just think that means what it -- it says what it says, but I'm not sure it means anything.

MR. KEACH:  Your --

THE COURT:  In other words, I don't think I strike any -- I'm -- I want to be really clear.  I think the answer is total litigation proceeds, net, that's an input from counsel, upon which no one has been able to see anything.  So I'm not sure, when you run the math through, whether all the math on the bottom ending cash works.  But there are other inputs in here that I think come from him and his team, and I think I've got to keep that.

MR. KEACH:  Sure.  And let me go to why it's problematic.  And it may not be problematic over time, with the right kind of cure, right?  The problem is that -- and I could go through the deposition in detail, and I'd be happy to do that.  And maybe the best way to do that is with a writing.

But there are numerous occasions.  For example, I asked a question as to those -- that particular line item, so are there proceeds from each of the five causes of action you described within those numbers, over those three years.  And the response was he can't answer that, that's attorney/client privilege.

I asked specifically what -- whether or not he had been advised about the timing of recoveries by counsel as a

basis for putting the particular numbers in the particular columns because, remember, we're talking about does this stuff come in by the first half of 2027 or not.  And the answer was he can't answer that because that comes from counsel, that's privileged, right?

So the problem is they're presenting this as the entire basis for their feasability analysis, the entire basis for saying that they will pay their administrative claims by the first half of 2027, but they're denying everyone the opportunity to test the voracity of that testimony.

THE COURT:  That's why I asked whether feasibility has been looked through everyone through the wrong lens.

MR. KEACH:  And I don't -- and I -- we may be conflating feasibility in the usual concept with ability to meet your 1129(a)(9) obligations because I think we're talking about the latter throughout this case, not so much a classic feasibility test.  In other words --

THE COURT:  The text will control, right?

MR. KEACH:  Right.

And in this case, they can't meet their obligations there --

THE COURT:  Okay.

MR. KEACH:  -- or they can't establish that they can.

THE COURT:  I don't know if they can or can't.  I

haven't -- we haven't concluded everything, so I don't want to be able to say --

MR. KEACH:  Well, understood.

THE COURT:  -- whether they can --

MR. KEACH:  Understood.

THE COURT:  -- or they can't.  But I get the argument.  I'm not sure it's striking.  It says what it says, that there's a number here that my lawyers gave me and I can't -- and I'm using it, but no one can test it, so it will be -- it will be what it is and --

MR. KEACH:  Yeah, and that's the point we made --

THE COURT:  That --

MR. KEACH:  -- in the motion.

THE COURT:  That may be their point, right?

MR. KEACH:  Well, that's the point we made in the motion, which is nobody has been allowed to test this number.

THE COURT:  No.  I got it.

MR. KEACH:  All right.

THE COURT:  I got it.

Yes, Counsel, I know you're back there.  I wanted to just give you an opportunity.

MR. LUFT:  Absolutely, Your Honor.  If you want to hear more, it would be great.

THE COURT:  No, no, no, I don't --

MR LUFT:  (Indiscernible).

JOHN CASTELLANO - CROSS BY MR. KEACH

179

THE COURT:  I haven't -- no, no, no.  You haven't spoken and I think it would be rude.

MR LUFT:  Thank you, Your Honor.  I appreciate it. Avi Luft from Akin Gump.

On this issue, Your Honor, I think the way I look at this and the way I think the law should look at this is there's a line item, it's as we've said, it's an input, right? The same way if I -- he had just aggregated the total damages asserted, it would be an input.  Obviously, damages are -- come up -- counsel comes up with damages, right?  That's -- it's litigation, we know what we're talking about here, right? They assert a number, we get to a total amount, it's an input here.

This is an input which is derived from counsel saying, overall, this is where we think things may come out. Mr. Keach and his colleagues are more than welcome to say -- come up and argue that they reviewed the litigations and they think that there's a different number that come out.  I don't think that changes the overall analysis.

The fact is boards constantly take information from counsel, make judgments.  And courts don't say well, you have to tell me everything the board heard.  If you think of any business judgment, right?  You ask the Court, the Court may get to hear did you ask counsel, was it a question they inquired about, was there inquiry, did you do that work, yes,

**DEBTORS' EXHIBIT NO. 8**
**Page 179 of 265**

yes, yes, yes, yes.  But you don't get to say great, now tell me what they did because --

THE COURT:  No, I agree --

MR LUFT:  -- once we go there --

THE COURT:  I --

MR. LUFT:  -- Your Honor, we get right into the --

THE COURT:  No, but I --

MR LUFT:  -- mini-trial, right?

THE COURT:  But I think what Mr. Keach is getting to is kind of a different point, which was -- and I don't want to put words in your mouth, Mr. Keach.  But it's more like part one of the -- part one of the testimony was this was just my analysis, and now we're getting to except for this line item. I just think that's where they're going.

MR LUFT:  I hear you, Your Honor.

THE COURT:  And so you can't -- you know, then what happens to the math?  Do you believe the number, not believe the number?  And what happens to the math and whether this takes the whole thing out?  I think that goes to the broader point.

To me, Mr. Keach, I think there's a lot of inputs here.  My ruling will be the number -- that will be a number that has been stated from counsel, which the witness, from what it appears, was unable to provide any more detail based upon deposition testimony to the contrary.  I believe he also

said that, in terms of the agreement -- excuse me -- the timing of 2027, he said what he said on his deposition and I'll take it for what it -- for what it's worth.  I think that's the way we'll continue.

MR. KEACH:  Understood, Your Honor.

THE COURT:  It will be what it is.  In other words, I'm not striking it.  But certainly, that number will have the meaning that it has --

MR. KEACH:  And it --

THE COURT:  -- which will be --

MR. KEACH:  -- at a minimum --

THE COURT:  -- an untested number.

MR. KEACH:  -- goes to -- at a minimum, it goes to credibility.

THE COURT:  Absolutely.

MR. KEACH:  All right.

THE COURT:  Okay?

MR LUFT:  Thank you, Your Honor.

THE COURT:  Uh-huh.

MR. BEREZIN:  Your Honor, if I could just respond quickly --

THE COURT:  Yeah, absolutely.

MR. BEREZIN:  -- to some of what Mr. Keach said, that this is the entire basis of the case.  I just --

THE COURT:  Oh, I think you get to argue.

JOHN CASTELLANO - CROSS BY MR. KEACH

182

MR. BEREZIN:  Okay.

THE COURT:  I think -- I'm -- I mean, obviously, he just started it up, but I think you get to argue something at the end.  And again --

MR. BEREZIN:  Okay.  So I --

THE COURT:  -- all the evidence --

MR. BEREZIN:  We won't --

THE COURT:  -- isn't in.

MR. BEREZIN:  -- do it now.  Okay.

THE COURT:  All right.  There was a lot of other testimony.

MR. BEREZIN:  That's fine, Your Honor.  Thank you.

THE COURT:  I should say there's a lot of the -- there are plenty of exhibits that have been admitted.  And I think --

MR. BEREZIN:  It took a lot --

THE COURT:  -- people have --

MR. BEREZIN:  -- of effort.

THE COURT:  -- the opportunity to make whatever arguments.  That's why I'm placing a premium on closing, rather than where we are today.  Okay?

MR. BEREZIN:  Thank you, Your Honor.

THE COURT:  Mr. Keach, you may continue.  I apologize.

MR. KEACH:  Oh, no worries.  Thank you, Your Honor.

**DEBTORS' EXHIBIT NO. 8**
**Page 182 of 265**

BY MR. KEACH:

Q   Mr. Castellano, in your -- in both of your Declarations, I think you referred to the fact -- or the projection that the Debtors would be able to pay their allowed administrative expenses and their allowed priority expenses in early 2027. Is that a fair characterization of your testimony?

A   Yes, it is.

Q   And when you were being deposed on Thursday, you were asked that question and somebody said that early, meaning the first quarter of 2027. And do you recall what your response was?

A   Yes.

Q   And was your response that you meant the first half of 2027?

A   Yes.

Q   And so, when you say "early 2027," you mean on or before June 30, 2027.

A   That's correct.

Q   Okay. And if you can go to Paragraph 48 of your initial Declaration. Excuse me.

     (Pause in the proceedings)

A   I'm there.

Q   And you say in Paragraph 48 that:

     "In regard to the estimated amount and timing of recoveries, it is my commercial understanding that it is

reasonable to expect by early 2027 an aggregate net recovery from the litigation assets of approximately 567 million."

Do you see that?

A    Yes.

Q    And you derive that reasonable expectation from the line item in Exhibit A that we were just discussing, correct?

A    Yes.

(Pause in the proceedings)

Q    In terms of administrative expenses, what is your projection for administrative expenses that would permit you -- permit the Debtor -- excuse me -- to pay its administrative expense by June 30, 2027?

A    What is my estimate?

Q    Yeah.  What is the amount -- what are you assuming the amount of allowed administrative expenses to be in early 2027, such that you -- the Debtors would be able to pay them in full, based on these projections?

A    And you just said administrative, right?

Q    Yeah, just -- I just want to focus on administrative for now.

A    Yeah, I think it would be Exhibit A of the supplemental Declaration, approximately $84.2 million.

Q    Okay.  And what is the amount of estimated priority claims?

A    Thirty-four million.

Q    And referring now to your supplemental Declaration.  Do you have in your Declaration an estimate of the administrative expense claim breakdown necessary to get to your 70.9 million number?

And let me just take the mystery out of it.  I'm referring to Paragraph 50 of your --

A    Yes.

Q    -- supplemental dec.

A    I'm looking at Paragraph 50.  I'm not sure if that's answering the question.

Q    It -- I think it does; and, if it doesn't, I'll move on.

So is Paragraph 50 your summary of the total amount -- and your -- I would say your progression, the total amount of administrative claims filed as of July 8, 2025, and then the progress of objections to those claims and other events necessary to arrive at a net final number of 70.9 million?

A    It is.  And the reason that you don't see 70.9 in Exhibit A is that we're doing exhibit -- I'm doing Exhibit A on a gross basis, so it's not taking into consideration preference waivers, potential preference waivers, which is contained in Paragraph 50.

Q    Right.  So you just added the preference waivers back to get the number in Exhibit A.

A    Correct.

Q    All right.  But focusing on Paragraph 50 for now, so

JOHN CASTELLANO - CROSS BY MR. KEACH

186

claims filed as of July 8, 2025, 103.4 billion.  And then you have two additions relating to post-admin bar date claims and estimate of post-petition medical liability and workers' comp claims, like an extra 30 million, correct?

A    Yes.

Q    And then you have minus objections ordered and withdrawn, voided claims, 100.2 billion, correct?

A    Yes.

Q    And that line item relates to orders that have been entered or claims that have been withdrawn or voided by the consent of the claimant?

A    Correct.

Q    Okay.  So those are final reductions.

A    Correct.

Q    Okay.  Then you have minus executed settlements and stipulations, 87.2 million.  Did I read that correctly?

A    You did.

Q    And again, those are settlements and stipulations that are done.

A    Correct.

Q    They may or may not have been approved by the Court, but they've been signed by the other party and by the Debtors.

A    Correct.

Q    Okay.  And so those are final reductions, correct?

A    Yes.

**DEBTORS' EXHIBIT NO. 8**
**Page 186 of 265**

JOHN CASTELLANO - CROSS BY MR. KEACH

187

Q    The next item is minus pending objections filed, 2.5 billion, right?

A    Correct.

Q    And those are objections that have been filed, but not yet adjudicated, correct?

A    Yes.  I think two of the omnibus objections that roll into that two and a half billion dollars, I believe are -- I believe the information has been provided to the Court; I don't believe they've been ordered, but they will be ordered.

Q    Because the time period has run on objections to the -- I mean responses to the objections?

A    Yes.  And there was some feedback from some of the creditors, but it didn't result in anything materially different.

A    Do you know how much of the 2.5 billion is represented by the omnibus objections that you think have matured?

A    Yeah, I want to say it's like -- I think it's like $50 million.

Q    Okay.  So not a big takedown on the two and a half billion.

A    Correct.

Q    All right.  Minus pending settlement stipulations, 178.6 million.  Again, those are settlements that have been reached, stipulations that have been reached or agreed to, but not yet finally ordered.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 187 of 265**

A     That's what this represents.  I believe we resolved one of the larger stipulations this morning.  That's like in excess of $100 million, it's probably even closer to $150 million, I believe, but that was finalized this morning.

Q     "Finalized" in the sense of approved by the Court, or "finalized" as between the parties?

A     Between the parties.  Sorry.

Q     Okay.  The next line item is minus anticipated forthcoming objections, 374.9 million.  Do you see that?

A     I do.

Q     All right.  And those are objections that haven't been filed yet, correct?

A     Again, some of them have because this was produced -- this schedule was produced probably July 7th -- I'm sorry -- July --

Q     It looks like it was filed on July 10th.

A     Yes, it was probably produced July 9th, so --

Q     All right.

A     -- five days ago.

       There has been something that has been filed, I just -- I can't recall the amount.

Q     Okay.  But not progressed, not adjudicated, not --

A     Correct.  It just got filed.

Q     All right.  And then we have minus claims satisfied pursuant to the admin expense claims consent program payments,

JOHN CASTELLANO - CROSS BY MR. KEACH                    189

12.5 million.

Now the opt-out -- the threshold, in terms of that program, was not reached in the voting process, correct?

A    Correct.

Q    But the Debtors and the committee and the FILO lenders decided to waive that threshold and move forward?

A    I don't believe the FILO lenders needed to participate in that decision; it was just the Debtors and the UCC.

Q    Apologies.

But the waiver was agreed to and is -- and the threshold was waived.

A    Correct.

Q    Right?

And so the 12.5-million-dollar reduction, which was the set-aside for that, still a relevant deduction.

A    Correct.

Q    And then you have minus claims waived pursuant to administrative expense claims consent program, 20.4 million. Does that number have to be adjusted, in terms of the actual acceptance of the program?

A    So this number was current.  This number is different than what was used in the initial Declaration.

Q    All right.

A    This number was current as of July 9th.

We may have had one or two more vendors that have decided

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 190 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 190 of 265

JOHN CASTELLANO - CROSS BY MR. KEACH

190

to opt in, but it's not going to be materially different, it's not going to be -- it's certainly not more, it's going to be higher, but I just can't -- it's not that much different than 20.4.

Q    Okay.  And then you have -- here's the minus for offsets for preference waives you've talked about, which is the difference between the two exhibits, correct?

A    That's correct, yes.

Q    Okay.  All right.  So, without going through the whole chart again, if I look at pending objections filed of 2.5 billion, understanding there's been a minor, modest downturn in that, and anticipated forthcoming objections, 347.9 million -- some of those may have been filed; some of them are awaiting being filed -- to get to the 70.9 million, the Debtors have to win 100 percent of the objections aggregating roughly $2.847 billion, correct?

A    Yes.

Q    And what percentage of those objections can the Debtors afford to lose and not be able to pay administrative expenses in full by June 30, 2027?

A    I'm not -- I'm not sure putting a percentage on that is -- is going to be that meaningful.

        I mean, I think, looking at the nature of the two -- just taking the two and a half billion dollars --

Q    Uh-huh.

A    -- I'm reasonably comfortable that we will likely succeed --

Q    Well, that's not my --

A    -- on the --

Q    That's not my question.  But if you can't -- let me just ask it in a slightly different way.

What total amount of administrative expenses would have to exist on June 30, 2027, such that, based on your projections, the Debtors could not afford to pay them?

THE COURT:  Do you mean June 30 or July 30th?

MR. KEACH:  Excuse me.  June -- I think June 30 is the end of the six months, right?

THE COURT:  Oh, yes, thank you.

MR. KEACH:  Okay.

THE COURT:  Oh, oh, 2027.

MR. KEACH:  '27.

THE COURT:  Yes, yes.  I apologize.

MR. KEACH:  Did I say something else?  I'm sorry.

THE COURT:  No, no, no, no.  That was me.

MR. KEACH:  Yeah.

THE COURT:  I misunderstood.  I apologize.  Thank you.

MR. KEACH:  No worries.

THE WITNESS:  Yeah.  I mean, if you look at Exhibit A of the supplemental Declaration, we're looking at ending

**DEBTORS' EXHIBIT NO. 8
Page 191 of 265**

cash of $235 million.  So one could say there's $235 million of potential additional administrative expenses that could become allowed, yet still go effective with all of the other assumptions associated with Exhibit A.

BY MR. KEACH:

Q    Right.

And if I aggregate the two numbers I just talked about, the 2.5 billion and the 347.9 million -- right?  Your cushion is 10 -- roughly 10 percent of those two numbers together, correct?

A    That sounds about right, yes.

(Pause in the proceedings)

Q    Let's just take a step back and talk about the origin of the administrative claims.

So the unpaid administrative claims, at the moment -- and let's just focus on your net number of roughly 71 million.  These administrative claims arose because, during the case, the Debtor could not afford to pay for goods and services rendered to it during the case, correct?

A    I think the 70.9 also includes -- or the seventy-one, if we want to use that, also includes unliquidated provisions for administrative claims associated with medical liability claims and worker comp claims, so it's -- it's less than $71 million, in terms of liquidated -- liquidated claims.

Q    But those were allowable expenses the Debtor incurred as

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 193 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 193 of 265

JOHN CASTELLANO - CROSS BY MR. KEACH

193

a consequence of its post-petition operations that it could not pay from either borrowings or cash -- current cash flow, correct?

A    When you said -- which -- which are you referring to?

Q    I'm referring to the entirety of the 71 million.

A    No.  I think I just said that 18 million of it is unliquidated.

Q    All right.  And so, for the difference, fifty-two point whatever --

A    The balance.

Q    -- million, those are, essentially, currently occurring vendor and other similar claims that could not be paid by the Debtor, correct?

A    Those are valid estimated administrative claims post-petition that have not been paid.

Q    All right.  And were there -- there were times during the administration of the case -- and Mr. Carr has testified that this burden fell on you -- that you had to choose which administrative claims to pay and which claims not to pay, correct?

A    Yes, we had to -- we had a finite amount of cash and we needed to determine which vendors to pay and which vendors not to pay.

Q    Right.

And the sum total of those decisions is why there is now

an aggregate of more than 50 million of unpaid vendor claims.

A     That's right.

Q     As of right now -- and I'm saying every -- something everybody in the room knows, but for the record -- what's left of the Debtors' pre-petition business?

A     The pre-petition business?

Q     Yeah.  Does the Debtor have any pre-petition operations that it's still engaged in?  Is it running any hospitals?

A     No, it's not.

Q     Is it running any clinics?

A     It is not.

Q     It's not doing any of the things it did previously.  All those assets have been sold, correct?

A     Correct.

Q     Or if not sold, the hospitals were closed.

A     Correct.

Q     Right.

So all that exists of the Debtor at the moment are these residual assets described in your Declaration that need to be liquidated and monetized, correct?

A     That's right, yes.

Q     All right.  Now I think I asked you this question in your deposition.

After the settlement is consummated, all of the various entities that make up the 167 Debtors, or whatever the number

is, all of those are empty shells after that, correct?

A    Perhaps maybe from a business perspective.  I don't want to comment from a legal perspective.  But I mean, effectively, all of the assets will -- will effectively transfer as a result of the final --

Q    None of those --

A    -- settlement.

Q    -- entities is going to have any assets inside of them, correct?

A    To my knowledge, that's right.  Yes.

Q    All right.

(Pause in the proceedings)

Q    I want to get into -- a little bit into this process under which the litigation moves forward, and specifically talk about the litigation funding for a moment.

You did describe, in the sum of your two Declarations, the litigation funding, correct?

A    I believe so.

Q    All right.  And in fact, your chart refers to that litigation funding being one of the things that's being paid off and netting to the amount, correct?

A    It is, yeah.  I just don't remember if, in the Declaration, I actually describe -- I may have.  I -- I'd have to look at the Declaration.  But yes, that line item does represent the litigation funding.

JOHN CASTELLANO - CROSS BY MR. KEACH

196

Q    And it's described, in any event, in the plan and disclosure statement, correct?

A    Correct.

Q    Yeah.

And in the FILO settlement that's been approved?

A    Correct.

Q    All right.  Is the litigation funding providing new money to the Debtors?

A    So I think we discussed this in my deposition.  The way the litigation funding works is, as proceeds are collected from any asset, whether it's a litigation asset or something like accounts receivable, that will, effectively, provide capacity under the litigation funding, such that it can be technically loaned to the litigation trust for operating purposes.

Q    All right.  And I think I used the analogy during your deposition that it's like a revolver that's been maxed out, right?  Basically, if the Debtor collects money and pays down the revolver, it can borrow the amount it's paid down.  But if it doesn't collect money and pay down the amount, it cannot borrow, correct?

A    It's capped out on utilizing collections and -- it is -- it is like a revolver.  But I'm a little confused with the "maxed out" piece, but I -- it's like a revolver.

Q    Right.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 8**
**Page 196 of 265**

So, essentially, it's a process of recycling collections, in order to continue to fund the litigation moving forward.

MR. BEREZIN:  Objection to form.

THE COURT:  Sustained.

BY MR. KEACH:

Q    Can you -- if there are no collections, is there any borrowing under the facility?

A    I guess it depends if there was previous collections, and there's capacity that just hasn't been used by the litigation trust.  So it's hard to answer the hypothetical.

Q    There'd have to be some collections in order to create capacity at some point in time, correct?

A    That's right.

Q    And as that capacity is used, there have to be more collections to create additional capacity?

A    That's right.

Q    All right.  Now some of the major litigation here is being prosecuted by firms on an hourly basis, correct?

A    Yes.

Q    And those firms are billing monthly?

A    Periodically, yes.

Q    And what happens if they are rendering services and provide a monthly invoice and there are insufficient collections to justify borrowing under the litigation funding, do they just not get paid?

A    Well, I guess that's going to be a question for the litigation trustee.

Q    But that's how you understand the facility works, correct?

A    Yeah, I mean if there are no funds available, it would be hard to pay an invoice.  But I also think there would probably be a discussion with the Class A interest holders.

Q    Do any of those firms engagement letters commit them to keep working if they're not being paid?

A    I have not reviewed their engagement letters.  I don't know if they have language like that in there.

Q    Have you ever reviewed the engagement letters?

A    Yes, I did see those engagement letters.  I don't recall seeing that kind of language.

Q    Is it not usual language, is it?

A    It is not.

Q    Have you modeled out whether or not that event can occur? Whether or not hourly firms will incur fees beyond the point at which collections have come in to pay them?

A    The way that we built the model, we feel that it -- again based on estimated timing of collections, that there isn't necessarily a working capital issue which is what you're describing.

Q    Right.  But if your timing's off on the timing of when you receive collections, this is a part of litigation after

all, you could have a situation where you couldn't fund the counsel who are doing the litigation, correct?

A    Yeah, the only thing I would -- in the strictest sense, yes, but what I would say is there's a diverse set of assets here as it relates to being able to assume something will -- something is expected to becoming in.

Q    But your ability to fund the litigation under this particular facility is dependent upon the timing of the collections matching up with the timing of the incurring of liabilities to firms, correct?

A    That is, yes.

Q    Mr. Castellano, in your supplemental Declaration, did you provide an opinion as to whether or not the plan meets the so-called best interest test?

A    I reference in my Declaration that I relied on the Declaration of Marc Brown, as it relates to satisfying the best interest test.

Q    Right.  So let's turn to page 23, paragraphs 44, and 45.

A    Yes, I'm there.

Q    All right.  I mean that's your testimony as to the best interest test, correct?

A    Based on the Declaration of Marc Brown, yes.

Q    All right.  So just so we're entirely clear as to your Declaration, your testimony as to compliance with the best interest test relies entirely on Mr. Brown's Declaration,

correct?

A    That's what I'm referencing here, yes.

Q    All right.  You didn't form an independent opinion on that subject?

A    I reviewed his Declaration and I understand what his Declaration was saying.

Q    Right.  But you didn't do any work beyond reading his Declaration and putting his conclusion into this statement?

A    Marc Brown developed and drove the process on the liquidation analysis.

Q    Right.  And you didn't do that analysis yourself, correct?

A    Yes.

MR. KEACH:  And you're relying on Mr. Brown's analysis for the conclusions stated in paragraph 44, and 45?

MR. BEREZIN:  I'll object, Your Honor.  It mischaracterizes the witness' testimony.  To the extent he's talking about 44, I'm not objecting.  But 45 is distinct from 44.  He hasn't testified that that comes from Mr. Brown.

THE COURT:  I think that's fair.

BY MR. KEACH:

Q    Your testimony in paragraph 45 as to the tax deduction issue and the tax issue generally, do you see that?

A    Yes.

Q    Is that based on Mr. Brown's Declaration?

A     No.

Q     What's that based on?

A     It's based on my knowledge of the tax analysis that was performed by BDO, the company's tax advisor.

MR. KEACH:  May I approach, Your Honor?

THE COURT:  Oh, of course.

MR. KEACH:  Would the bench like a copy of this, Your Honor?

THE COURT:  Is it on the docket, Counsel, or is it just for --

MR. KEACH:  It is -- actually it was an exhibit to the deposition.  We put it on our exhibit list but only by reference.

THE COURT:  So yeah, please, thank you.

MR. BEREZIN:  I do think this is in evidence, Your Honor, but --

THE COURT:  All right.

MR. KEACH:  Yeah, I'm not -- if it's on your witness list separately, I'm not aware of it, but we did put it on our exhibit list specifically by reference to it being a deposition exhibit so --

BY MR. KEACH:

Q     Mr. Castellano, I'm going to show you what apparently is in evidence as an exhibit.  We'll get the appropriate reference here.  But it looks like it was originally docket

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 202 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 202 of 265

JOHN CASTELLANO - CROSS BY MR. KEACH                      202

5471-33, sealed, but I believe it was unsealed just for reference.  Is this the analysis you're referring to that was done by BDO?

A     Yes, this is one of the analyses, yes.

Q     Was there more than one?

A     I know that they provided also another summary memo describing the tax implications of a Chapter 7 liquidation.

Q     All right.  We'll get to that.  But in terms of the analysis that you referred to being done by BDO, is this that analysis?

A     This is the output that I'm familiar with, yes.

Q     All right.  And each of these pages of this exhibit are marked draft for illustrative purposes only, do you see that?

A     I do.

Q     Did you ever see this analysis in final form?

A     I did not.

Q     And if I look at the second page -- excuse me, the second sentence on the first page, beginning with the words this draft illustration, it says this draft illustration is based on a number of underlying models and calculations, parens the quote draft underlying models, closed quote, closed parens, all of which are based on information and assumptions provided by the company and discussions with legal advisors for the company and Alex Partners, period.

BDO has not and will not audit or take any other action

to verify the accuracy or completeness of any information or assumptions on which the draft underlying models, or the draft illustration are based, and assumes no obligation to do so. Did I read that correctly?

A     Yes.

Q     All right.  Do you know what information and assumptions were provided by the company, the legal advisors for the company and Alex Partners to BDO?

A     Yeah, I believe they had requested a significant amount of information.  At least I know what came from my team were things like the expenses incurred as it relates to Chapter 11, professional fees, interest expense incurred, some cashflow information like that.  That's what my team had provided BDO.

I mean when it says the company, that effectively is what information was provided to BDO through my team on behalf of the company.  I don't know what the legal advisors which would have been Weil, if they -- what they provided, other than I know conversations.  I don't know if they provided any specific information.

Q     Were you involved in those conversations among BDO, Weil and your team?

A     Some of them.  I don't think I was involved in all of them.

Q     And do you know what was provided during -- and this is a yes or no question first.  Do you know what was provided in

those conversations to BDO?

A    Yes.

Q    And what was that?

A    I mean it was just general discussions of the potential transaction structure and what potentially could happen in a liquidation.

Q    All right.  And do you understand the attached charts to be variations on the modeling of the questions you presented?

A    Yes, there was different scenarios that BDO was referencing, was looking at given the complex structure of this particular deal.

Q    All right.  And they looked at each and all of these different scenarios?

A    I'm sorry, they did what?

Q    And they looked -- and they examined each of these as an alternative scenario based on alternative facts?

A    Yes.

Q    Do you know if one particular model was eventually chosen to represent the transaction?

A    Which transaction are you referring to?

Q    The sort of hypothetical comparison between a Chapter 11 liquidation and a Chapter 7 liquidation?

A    Yeah, I don't know if I would say that one was picked because obviously it's a liquidation.  It was really more to inform what could the potential range of impact be.

Q    And again, you've never seen a final version of any of these, correct?

A    I have not.

Q    All right.  And do you know when you received the exhibit I just put in front of you?

A    Probably sometime in April.

Q    Okay.  So before the disclosure statement was sent to everybody?

A    Yes.

        MR. KEACH:  May I approach, Your Honor?

        THE COURT:  Of course.  Thank you.

BY MR. KEACH:

Q    Mr. Castellano, I'm going to show you what's been marked as document 5471-32, sealed, and again represented, I believe these were unsealed.  Mr. Castellano, is this the additional memorandum that you were referring to in your testimony from BDO?

A    Yes.

Q    And this one is signed?

A    It is.

Q    By Kevin Wilkes?  It looks like he was a tax principal at BDO?

A    Correct.

Q    Okay.  Do you know when you received this letter?

A    Probably 10 days ago, two weeks ago.

206

Q    So after the disclosure statement was sent to parties?

A    Yes.

Q    And so it's fair to say that any description of the tax consequences of conversion that were contained in the disclosure statement were not based on this document, correct?

A    I don't know if I can say that.

Q    Well, you didn't have this document before the disclosure statement went out, so it -- you couldn't have relied on it for the disclosure statement, correct?

A    But the concept of what's codified in this document has been discussed from BDO as the implication of a Chapter 7 process --

Q    All right.

A    -- going back to April.

Q    And so when you look at this document, are there various numbers in the document?

A    Yes.

Q    And those numbers are all in brackets, correct?

A    Yes.

Q    What does that normally mean to you when numbers are in brackets in a document?

A    Potentially subject to change.

Q    Right.  It means they haven't been finalized, correct?

A    Which is the equivalent of subject to change.

Q    Right.  So we can agree that these numbers are subject to

change?

A    Yes.

Q    Now when you say that the opinions you stated in paragraph 45 of your supplemental Declaration were based on this analysis, we're talking about whatever's contained in these two documents, correct, or sets of documents?

A    Yes, and then just the knowledge of having the discussions with BDO going through this process.

Q    But other than your exchange with BDO as reflected in these documents, it's not based on anything else, meaning your opinion in this paragraph?

A    It's based on input from BDO, the implications of what a Chapter 7 impact could have from a tax perspective.

Q    And do you have any input from them that are not reflected in the documents that we've just shown you?

A    No, this was the basis of what drove paragraph 45.

Q    Okay.  In considering the application of the best interest test, did you consider the value of releases being provided by the Debtor to parties, or which would be provided as a consequence of the third party releases both under the plan?

A    Yeah.  Again I didn't prepare the liquidation analysis.

Q    And that was Mr. Brown who did that?

A    Yes.

        MR. KEACH:  All right.  But I'm specifically asking

JOHN CASTELLANO - CROSS BY MR. KEACH          208

for your knowledge, and if this is Mr. Brown's knowledge, you can certainly tell me, but did you in expressing the opinions that you put into the supplemental Declaration at paragraph 45, which is your testimony under oath, did you consider the impact on the individual creditors of the granting of releases to either third parties, or to the Debtor as a consequence of the plan?

MR. BEREZIN:  Objection, compound.

THE COURT:  He can answer.

MR. CASTELLANO:  Yeah, my understanding is pursuant to also the '99 FILO settlement, that the releases will be effective regardless of confirmation of the plan.

BY MR. KEACH:

Q   Is it your testimony that the plan doesn't provide any releases that are not already provided in the FILO settlement?

A   No.

Q   All right.  With respect to the releases that are provided in the plan that are not provided by the FILO settlement, did you take those releases into account in determining the application of the best interest test?

A   Yeah, I think that's just a question you have to ask Mr. Brown.

Q   Okay.  In other words, you didn't, and you don't know if Mr. Brown did?

A   I just can't recall at this time.

Q    Okay.  Mr. Castellano, just one, hopefully one last set of questions.  You're the chief restructuring officer of the Debtors, correct?

A    Yes.

Q    All right.  And you sat on the board?

A    No.

Q    Apologies.  You certainly had interaction with the board, correct, in your role as the CRO?

A    Yeah.  To be clear, I am a member of the transformation committee but I am not on the board.

Q    Correct.  And let's just focus on the transformation committee for a second.  Did the transformation committee ever consider disgorgement of professional fees as a mechanism for paying the administrative expenses?

A    No, it did not.

Q    Okay.  Do you know how much professional -- what's the total amount of professional fees that have been funded during this case?

A    Yes.

Q    And what is that number?

A    Yeah, I think it's in excess of $300 million.

Q    And so disgorgement of a very small amount of professional fees would pay your $70.9 million, or at least a proportion or percentage of that amount much more quickly than waiting until June 30, 2027, correct?

A    Disgorgement of professional fees for services that have been rendered, that has -- that just has not been -- that was not anything discussed.

Q    All right.  But not paying people for services and goods rendered was a choice you made, right?

A    It was an unfortunate product of the circumstances we were facing.

Q    Right.  But just to be clear, neither you nor the board ever considered disgorging a relatively small amount of professional fees in order to pay a majority of the unpaid administrative expenses, is that correct?

A    We did not.

MR. KEACH:  Okay.  May I have a moment, Your Honor.

THE COURT:  Of course.

BY MR. KEACH:

Q    Mr. Castellano, just referring to exhibit A, to both exhibit A's, your initial Declaration and your supplemental Declaration, those are based on modeling done by you and your team at Alex Partners, correct?

A    My team, yes.

Q    Have those models ever been produced to anybody other than Debtor's counsel?

A    The output has, but yes.

Q    The information that's in the chart.  But the actual models themselves, have they been produced?

JOHN CASTELLANO - CROSS BY MR. KEACH                     211

A    They have not.

Q    And do you consider those to be work product or privileged?

A    I consider those to be models that do have an input that's considered privileged or work product.

Q    Well, exhibit A is an example of something that has inputs from counsel in it, and is your work product.  Are the models that you produced the same as the exhibit A in that respect?

A    The models have much more detail to it.

Q    Understood.  But they're the product of your own work and your own team and some inputs from counsel, correct?

A    There is an input from counsel in there, yes.

Q    And to date, those have not been produced as part of any of the discovery requested by various parties, correct?

A    Yeah, every data output has been but not the detail underlying models.

MR. KEACH:  In the process we described by which you talked to counsel, received their projections, received their timelines and their expense budgets, during that process, did any of those counsel express to you the probabilities of recovering specific amounts in specific causes of action?  It's a yes or no question?

MR. BEREZIN:  Yeah.  The witness can answer.  You can answer yes or no.

MR. CASTELLANO:  The difficulty is the word probability.  What do you mean by probability?

BY MR. KEACH:

Q    Do you not understand the definition of probability?

A    No, I understand the definition of probability.  We spent a lot of time at the deposition talking about probability.

Q    So based on your understanding of probability, did any counsel relate to you any opinion regarding the probability of specific recoveries in specific causes of action?

A    Not probabilities.

Q    Okay.  Did they present to you the likelihood of recovering specific percentages or specific amounts?

A    One more time, please.

Q    Sure.  Let me rephrase it --

A    Yeah.

MR. KEACH:  -- and take it one piece at a time.  Did any counsel express to you the likelihood of recovering a specific amount, a range of amounts as to any particular cause of action?

MR. BEREZIN:  You can answer yes or no.

MR. CASTELLANO:  That's a compound question.

MR. BEREZIN:  Yeah, you can answer it.

THE COURT:  Well, hold on.

MR. CASTELLANO:  Yeah, I don't know which question to answer.

MR. BEREZIN:  Objection, compound, okay.  Now he has to rule, see, even though we had it going there.

MR. KEACH:  Let me wait for the Court to rule on Mr. Berezin's objection.

THE COURT:  I will sustain the objection.

MR. KEACH:  All right.  You got one, Rob.

BY MR. KEACH:

Q   Did counsel relate to you the likelihood of recovery in any particular cause of action?

A   No.

MR. KEACH:  Did you ever have a conversation with counsel when you discussed with counsel whether it was more likely than not that you would recover any particular amount on any particular cause of action?

MR. BEREZIN:  Yes or no.

MR. CASTELLANO:  No.

BY MR. KEACH:

Q   All right.  Did any counsel ever express to you any opinion regarding the possibility that you would recover or not recover with respect to any particular cause of action?

A   Yes.

Q   Okay.  And did any of those counsel in any particular cause of action give you a range of possible recoveries?

A   Yes.

MR. KEACH:  And did the counsel who provided you

JOHN CASTELLANO - CROSS BY MR. KEACH                    214

with a range of possible recoveries give you odds as to the likelihood of recovering anywhere along that range?

MR. BEREZIN:  Yes or no.

MR. CASTELLANO:  No.

MR. KEACH:  Did you ask?

MR. BEREZIN:  I think whether he asked is a request for legal advice, Your Honor.  I would instruct the witness not to answer, privilege.

THE COURT:  Okay.

BY MR. KEACH:

Q    Did you seek an opinion as to the probability of recovery with respect to any of the particular causes of action from any of the counsel employed?

A    No.

MR. KEACH:  Nothing further, Your Honor.

THE COURT:  Thank you.  Anyone else have any questions in the form of cross?

CROSS-EXAMINATION

BY MR. ADAMS:

Q    Mr. Castellano, my name is David Adams, with the Department of Justice.  I'm here on behalf of the IRS.  I have some questions I'd like to run by you, and then I have an exhibit I want to show you and go through some names if we can.

If you were in the courtroom with Mr. Carr, you'll

understand my questions, as far as the individuals.

A     Sure.

Q     Okay.  Now you had testified -- looking at exhibit A, you testified that the priority tax claims, 34 million, if you want to take a look at that, or if you're familiar with it?

A     Yeah, I'm familiar with it, yes.

Q     Okay.  Can you tell me how much of that is IRS priority claims?

A     I know there is a substantial amount of that is IRS.  I just don't remember the specific amount, but a substantial amount of it is IRS priority claims.

Q     Okay.  Were you in the courtroom when I made my opening statement to the Court?

A     I was in the courtroom.  I don't remember the opening statement though, unfortunately.  I'm sorry.

(Electronic announcement: Our system will end this conference in five minutes.)

          THE COURT:  Just one moment.

(Electronic announcement: To extend this call for one hour, please enter the moderator PIN now.  Your conference has been extended for 60 minutes.)

          THE COURT:  I apologize.

BY MR. ADAMS:

Q     No offense taken, Mr. Castellano.

A     That was not my fault.

Q     You know, it's IRS taxes, we're dealing with.  This morning I mentioned that based on the proofs of claim that have been filed by the Service in all 167 of the Debtor's cases -- well, actually, I'm sorry, let me backtrack.

Not all of the Debtor's cases did the IRS file a proof of claim.  I think there may be 20 or so that they did not.  I've got a list.  So let's just say there was 140 that were filed in the various Debtor's cases.

Those claims, at least as of the last filed claims is around $30.7 million.

A     Okay.

Q     Okay.  So that's going to basically leave a spread of about 3.3 million in your chart, exhibit A, for all the rest of the priority tax claimants.  Would you agree?

A     Well, I would agree that your number, minus 34, gets to that --

Q     Okay.

A     -- sum but I'm not sure I'm agreeing.  I know that the IRS has filed claims.  We have been reviewing these, and I know members of my team have been sending you information.  I just can't speak to the number that you just referenced.

Q     Fine.  Okay.  All right.  Well, just taking the IRS' claims as they are filed, their prima facie valid, okay, until there's an objection and we have a ruling by the Court, if they are 30.7 million, then that's 3.3 million roughly,

according to your exhibit A for all the other types of

priority tax claims for all the other tax claimants, would you

agree?  Just simple math.

A    Well, I think I already agreed to the math.

Q    Okay.

A    I just -- I can't agree to the 30.7, or what the number

is because we'd have to look at each claim.

Q    Does this $34 million also, does it include

administrative tax claims?

A    No, because this is priority.

Q    Okay.  How much are the administrative tax claims because

I don't see that reflected here?  You gave me a total for --

or you gave the Court a total, I believe 70 million for

administrative claims, but I don't know what the breakout of

that is.  So can you help me there?

A    I don't have that detail in front of me right now.  I

can't remember what -- I can't remember a dollar amount of

what's in the -- depending on which exhibit A you're looking

at --

Q    It's your original Declaration, Mr. Castellano.

A    Okay.  I think we have --

Q    And then in your earlier testimony I believe it was,

there was about 70.9 --

A    Yeah.

Q    -- rounding to 70 million, for allowable administrative

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 218 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 218 of 265

JOHN CASTELLANO - CROSS BY MR. ADAMS                    218

claims, and I'm just trying to understand how much of that is administrative tax claims?

A    And I'm sorry, I don't remember the number.

Q    Okay. Yeah. Okay. You're aware that there's a pending tax court case, correct, involving the Debtors?

A    There is a lot of court cases involving the Debtors. I'm not sure which one you're referring to.

Q    I'm referring to the Debtors versus Commissioner of Internal Revenue Service, pending in the United States Tax Court involving two tax shares. Are you aware of that?

A    That, I'm aware of it. I don't know the details of it.

Q    Okay. All right. At issue is approximately $17 million of income taxes. So let me ask you this. If the IRS prevails in the Tax Court proceedings, is your testimony based on exhibit A, that the IRS will not be paid until the earliest of 2027, or 2028. Would that be correct? Go ahead and assume that the IRS prevails on the 17 million?

A    Yes.

        MR. ADAMS: Okay. Yeah. Okay. Your Honor, may I approach?

        THE COURT: Yes, of course.

        MR. ADAMS: Okay.

BY MR. ADAMS:

Q    All right. Mr. Castellano, I want to go through these names with you. If you'll let me know what your understanding

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 219 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 219 of 265

JOHN CASTELLANO - CROSS BY MR. ADAMS

219

of their positions and job duties at the Debtors, I would appreciate it.

A     Certainly.

Q     Okay.  We'll start with Mr. Carr, who I think we already know his position, what he did based on his testimony earlier.  Next name is Carlos Hernandez?

A     He was a board member and Steward Health Care's parent company board.

Q     Okay.  Was he an officer or employee of the company?

A     He was not.

Q     Okay.  So board member only.  Okay.  David Barnhart?

A     So David was the former chief information officer for Steward.

Q     Okay.  Former CIO?

A     Correct.

Q     Okay.  Eugene A. Sullivan?

A     Mr. Sullivan is one of Steward's in-house legal counsel.

Q     Okay.  Gail Schlesinger?

A     Ms. Schlesinger used to work at the company's United States financial health plan which was managing on behalf of BMI, a medical plan for the Department of Defense.

Q     General McMaster?

A     He was a board member.

Q     Henry Nichols?

A     He was the corporate controller.

Q    Jeffrey Morales?

A    He was the executive vice present of M&A.

Q    Mergers and acquisitions?

A    Yes, I'm sorry, yes.

Q    Okay.  Jennifer Hunt?

A    She was the former head of finance of the USFHP, medical program that I referenced earlier.

Q    That's the BMI, correct?

A    That's correct, yes.

Q    Okay.  John Boehner, I'm assuming board director?

A    Board member only, correct.

Q    Okay.  We'll skip yourself.  You've been testifying. Joseph Weinstein?

A    Dr. Weinstein was the chief medical officer and the -- he managed all the primary care physicians of the company's risk based pay organization stewardship.

Q    Okay.  Catchina Potter?

A    She worked in human resources.

Q    Okay.  Mary Beth Taylor?

A    She was the chief accounting officer.

Q    Okay.  You said was, so she's no longer with the company?

A    Correct.

Q    Okay.  Natalie Hibble?

A    She was one of the other in-house legal counsels.

Q    Octavio Diaz?

A    Dr. Diaz was the head physician for the northeast operations.

Q    Rich Iannessa?

A    Rich was the vice president of Robo Recycle Management.

Q    Is that dealing with payables and receivables?

A    No, it's dealing with billings and collections.

Q    For the -- okay.  Well, which leads to payables and receivables?

A    No, just leads to receivables.

Q    Receivables?

A    Yes.

Q    Okay.  Vimala, not sure how you say the very last name?

A    Yeah, so Sister --

Q    Can you help me out?

A    -- Vi, she's a Catholic nun, and she was on the board. She's still on the board.

Q    Okay.  Board member only?

A    Correct.

Q    Okay.  Susan Brown?

A    She was the head of operations of the USFHP health plan with BMI.

Q    Is it --

A    She's still an employee but her role was managing the USFHP health plan with BMI.

Q    Okay.  But then again you referred to her later, that's

JOHN CASTELLANO - CROSS BY MR. ADAMS

222

with the defense department, correct?

A    Correct.

Q    Yeah.  Okay.  Mr. Transier?

A    He's a member of the transformation committee, an independent director.

Q    Of the board itself?

A    Correct.

Q    Okay.  Ann Marie Driscoll?

A    Human resources.

Q    And Patrick Lombardo?

A    Senior executive -- I'm sorry.  Executive vice president of human resources.

Q    So the only person really as far as any kind of accounting or payment of funds by the Debtor was Mr. Nichols, and maybe Mary Beth Taylor.  Did Mr. Nichols report to Ms. Taylor?

A    Mr. Nichols did report to Ms. Taylor but I'm not sure I understood the question you were asking.

Q    That's all I wanted to know is who reported -- did he report to her?

A    He did.

Q    Okay.  And so is Mr. Nichols still with the Debtors?

A    No, he is not.

Q    Okay.  All right.  So all the finance functions of the Debtor are being handled by Alex Partners, would that be

JOHN CASTELLANO - CROSS BY MR. ADAMS                    223

correct?

A    No.

Q    And -- no?

A    No, that's not correct.

Q    How are they being handled?

A    So we have -- so Ms. Taylor resigned like two weeks ago. She's still a contractor helping with the transition.  But we had a temporary individual that was providing accounting consulting services.

That individual is now the corporate controller.  And we have probably -- we, Steward has 10 or so, 10 to 15 or so, accounting, treasury, accounts payable people in their finance function.  So they're managing the finance function.

I mean Alex Partners, my team has been intimately involved for quite some time, but they're managing the nuts and bolts of the day-to-day activity.

Q    Okay.  All right.  Can you tell the Court who this new corporate controller is?

A    Yes.

Q    His name?

A    Alan Burke.

Q    How do you spell the last name?

A    B-U-R-K-E.

Q    Okay.  When did Mr. Burke take on that position?

A    So he's been working with the company probably over the

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

last three years but then when Ms. Taylor resigned, I just put him in that role.  He had been working hand in hand with her for like the last three years so --

Q    Okay.  So he was working under her, in her department, would that be fair?

A    Correct.

Q    Okay.  All right.  Now you'd said earlier that, believe when Ms. French was asking you questions, that you decided which administrative claims to pay?

A    Well, I don't know if I would characterize it that way. I personally didn't decide which administrative claims to pay. What period of time are you talking about?

Q    Well, it would be from May 6, 2024, to the present, any kind of administrative claim?

A    So my team, with the company's team, each week would assess what liquidity we have, what liquidity we had, what expenses were coming due and how we can settle our expenses in the ordinary course as much as possible.

It wasn't me personally doing that.

Q    Okay.  But it is the team that you were involved in making this decision?

A    Along with the company, yes.

Q    Yes.  Okay.  All right.  And you're aware that there are IRS administrative claims for unpaid employment taxes?  Are you aware of that?

A    I am aware of that.  A member of my team has been working with you on providing the information.  I don't believe any of those are outstanding.  I believe they've been paid but maybe not processed.  But I understand that you've been provided information.

Q    Right.  Okay.  And so we'll be continuing that.  It is the IRS' position that there are still a significant amount of unpaid employment taxes.  And so when the -- for example, are you familiar with a form 940 employment tax return?

A    Yes.

Q    Okay.  So you know that's due after the conclusion of the year.  It's based on the wages that were paid in the prior year.  So here we have an administrative claim for looks like seven of the Debtors that still have outstanding administrative -- or have unpaid employment taxes that would be considered administrative claims.

Is it your testimony that the IRS is going to have to wait until 2027 for those claims to be paid?

A    Well, I'd say it's my testimony that we -- members of my team want to continue to work with you because we think we have paid those.  So I understand I'm not in the middle of this chain of exchange of information.

We think we've paid so we want to, and we have -- I understand we've been providing you information and we will continue to do that because we think we've actually paid

JOHN CASTELLANO - CROSS BY MR. ADAMS                  226

those.

Q    Okay.  But let's take it this way.  You haven't paid all your IRS taxes, employment taxes specifically.  Is the IRS going to have to wait until 2027 to be paid?

A    So if it turns out that we have not paid our employment taxes, I would have to look at that situation at that point in time.  It is my understanding that we have paid.

MR. ADAMS:  I understand what you believe.  And obviously IRS has a different position on that because we believe that there are unpaid employment taxes post petition.  And if that turns out to be true, when will the Debtors pay them?

MR. BEREZIN:  Your Honor, objection, asked and answered.

MR. ADAMS:  He answered -- he hasn't, Your Honor.

THE COURT:  Yeah, I know.  I'll allow him to answer the question.

MR. CASTELLANO:  If it turns out that we have not paid post petition employment taxes, and if we do not have the liquidity to pay them, yes, potentially it could be 2027.  I just don't know -- I'm just not familiar enough with the situation that you're putting in front of me.

BY MR. ADAMS:

Q    Okay.  Well, you're the chief restructuring officer and I understand you're working with your team from Alex Partners.

I will continue to work with them.  Hopefully we can resolve --

A    Please do, yes.

MR. ADAMS:  -- you know, administrative claim issues.  That's all, Your Honor.

THE COURT:  Thank you very much.  Does anyone else in the form of cross for Mr. Castellano have any questions?  Yes, sir?

MALE SPEAKER:  May I have a moment, Your Honor, I need to speak with Debtors' counsel.

THE COURT:  Yeah, absolutely.  Well, while they're talking, I'm just going to speak at the 10,000 foot level in terms of housekeeping.  I think I didn't give everyone fair warning about dinner tonight.

And I think what makes the most sense is to finish with this witness today, start back up at 1:00, but give everyone a fair warning, pack a lunch and dinner.  We're going to finish tomorrow all the way regardless of what time.

I'm prepared to go as late as 10:00, and we'll go -- we'll keep going until we're done but that'll be my goal.  But I don't -- I've got to give everyone fair warning.  The vending machines you will not find enthusiastic at this time of night.

And I think it'd be highly unfair.  And from also -- I don't -- it's not an encouragement to go till 10:00.  What

JOHN CASTELLANO - CROSS BY MR. ADAMS

228

I'm saying is I'm prepared to go as late as we have to, to get this done and maybe we can start with Brown tomorrow.

One question that I did have is once the Debtors finish with their evidentiary -- I should say once we finish with Brown and you get exhibits, are there any other witnesses that I should be aware of that would testify in support of plan confirmation or the motion to dismiss?

MR. BEREZIN:  Mr. Brown would be our last witness, Your Honor.

THE COURT:  Okay.  Anyone, Mr. Keach, are y'all planning on bringing anyone else in terms of the motion to dismiss?

MR. KEACH:  Your Honor, I'm not aware that we plan to bring in any independent witnesses --

THE COURT:  Okay.

MR. KEACH:  -- in addition to the witnesses --

THE COURT:  I'm just trying to get a sense from timing.  Okay.  Traca, anyone else?

FEMALE SPEAKER:  No.

THE COURT:  Okay.  Thank you.

MR. ADAMS:  Your Honor?

THE COURT:  Yes.

MR. ADAMS:  I did file a witness exhibit list for the --

THE COURT:  You did.

MR. ADAMS:  -- IRS with Ms. Basaldura's Declaration. I would hope, based on my discussion with Mr. Castellano that we could just offer that along with the chart that basically was giving all the IRS' claims and basically an update that she'd prepared as far as --

THE COURT:  In terms of submitting the Declaration?

MR. ADAMS:  Yes, Your Honor.

THE COURT:  Okay.

MR. ADAMS:  And I would just like to -- if we --

THE COURT:  Can you just confer with counsel just to see if they agree?

MR. ADAMS:  That's what I was going to ask, Your Honor.

THE COURT:  Yeah, you got it.

MR. ADAMS:  We'd just confer with counsel.  If we can do that, then I don't have to call her, do a proffer.  I think it would be very simple, Your Honor.

THE COURT:  Okay.  Yeah.  No, absolutely.  I'll give y'all an opportunity to speak and maybe we can do that.  Why don't we just take five minutes and allow them -- have an opportunity to speak.  Thank you.

COURT SECURITY OFFICER:  All rise.

(Recess taken from 6:46 p.m. to 6:53 p.m.)

COURT SECURITY OFFICER:  All rise.  Please be seated.

THE COURT:  Okay.  We are back on the Record in Steward.

MR. BARN:  Apologize, Your Honor.

THE COURT:  No worries.

MR. BARN:  Michael Barn, on behalf Intuitive Surgical.  We resolved some issues with the Debtor, and we've got our numbers worked out.  We have a little bit to do on the word smithing, but we're going to not ask any questions.

THE COURT:  Okay.  Thank you.  Does anyone else -- yeah, Mr. Nguyen?

MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen, for the U.S. Trustee.

CROSS-EXAMINATION

BY MR. NGUYEN:

Q   Mr. Castellano, it's nice to see you again.

A   Good to see you.

Q   Mr. Castellano, I represent the United States Trustee.  I just have a couple of questions in terms of the professional fees.  Earlier you mentioned to Mr. Keach that about 300 million in fees have been paid, accrued?

A   Yes.

Q   How much of that 300 million have been paid?

A   I think we have 30 or 40 million in the professional fee escrow accounts so those haven't actually been paid to the professionals.

Q    So 270 have already been -- I'm trying to understand?

A    Yeah, I think that that's -- I think that's the most recent numbers that are in -- that I'm recalling right now.

Q    And your fees goes through the Alex Partners engagement with the Debtors, is that how that works?

A    That's correct.

Q    And then how much have Alex Partners billed for -- the estate for its services?

A    The number in my head, when my head goes back to when we got engaged but that includes prepetition so I -- it's probably, I'm going to guess somewhere around $50 million.

Q    Okay.  And the Weil team, the Debtors' counsel, above 100 million so far?

A    Again the numbers I have in my mind go back to when everyone started so I just -- I don't have what was incurred post filing.

Q    And would you agree with me professional fees, they all fall under the administrative claims priority?

A    Yes.

Q    Okay.  And I'm just trying to understand the basis for the determination of why some admin claims were paid and other admin claims were not paid.  So for example, if this was a hospital case, so if you have a company that changed the bedsheets, provide janitorial services to the hospital post petition, and that company sends an invoice to the hospital,

that would be an admin claim, correct?

A    Yes.

Q    And just use a real example, Sodexo, are you familiar with Sodexo?

A    I am.

Q    They provide food for patients, right?

A    Yes.

Q    And they have a relatively large administrative claim?

A    I know they -- I don't know the amount, I don't know the dollar amount.  I do know that they have one, yes.

Q    Okay.  And how about Northstar Anesthesia, that's a company that would provide medication to patients at the hospital, correct?

A    That's correct, yes.

Q    And if they'd provided the services to the Debtors post petition, that would also be an admin claim, correct?

A    Yes, it would be, yes.

Q    So in terms of priority and there was some of your testimony that you and your team made a determination of which admin claims to be paid, what's the difference between those admin claims and the professional fees, and why was it the decision to pay the professional fees and not those other admin claimants?

A    So we need to probably be clear that we are still paying administrative creditors that are necessary for the estate.  I

mean it's not just professionals that are getting paid.  We pay about a million dollars a week in non-professional administrative claims.

So yes, there was -- and I think it's well documented that this was a case, an unfortunate situation where we had a significant amount of claims and not as much liquidity necessary to pay.

so we were making decisions based on, as it relates to who's necessary to support the estate at a point in time.

Q    But the decision has always been to pay the professionals in full?

A    There are professionals that actually haven't been paid.

Q    But there's a reserve for those professionals, correct?

A    No, there are actually some professionals that have not been paid from prepetition fees.

Q    From -- well, I'm talking about for the post petition?

A    Yeah, and we've been late on a number of administrative professionals as well too.

Q    And you've been a restructuring professional, I've seen your name in a lot of older bankruptcy cases.  I'm not going to say them out because people are going to work backward and figure out how long you've been doing this.

A    I've been doing this for awhile.  I don't take offense to it.  And it looks like it too.

Q    You've read about equal treatment about commonly situated

JOHN CASTELLANO - CROSS BY MR. NGUYEN

234

creditors, right?  That's a phrase in bankruptcy --

A    Yes.

Q    -- you've heard before?

A    Yes, I'm familiar with it.

Q    So I'm just trying to understand.  But you were in the courtroom when Judge Lopez asked that question about the effective date, whether, you know, if you go to 2027, June 30, 2027, that I'm just use a sport metaphor, game 7 of the World Series, the bases are loaded, you're up and you're getting ready, and you swing, and you strike out.

What would happen at that point, once -- if you strike out, the litigation trust doesn't provide payment in full, what happens next?  I'm trying to understand that from your perspective?

A    Let me recount your hypothetical just so I know how to answer it.

Q    Right.

A    If what you're asking me, if we don't monetize any litigation, or not to extend, and there's no more litigation to monetize, and we have -- we don't have enough liquidity to pay whatever the administrative and priority claims are, my business understanding is that we would not be able to go effective.

Q    And in terms of that concept I talked about, equal treatment, the professional fees, when are they expected to be

paid in full under the plan?

A    It's a complicated formula pursuant to the FILO settlement trust.  It would likely be early '26, potentially, provided that they're approved.

Q    Well, let's be specific.  I'm not talking about the professional fees for the trust.  I'm talking about the professional fees that it has incurred, the 300 million in this case.  When do you expect that to be paid in full?

A    Yeah, I'm talking about the same professionals.  There's a formula in the FILO settlement agreement as it relates to Debtors retained professionals.  There's a 10 percent hold back.

Q    Okay.

A    And that will get paid probably early '26, sometime in early '26.

Q    But there's about 270 million that's already been paid, correct?

A    I believe that's -- that may include some prepetition dollars.  I just can't remember but yes.

Q    And --

A    There has been a balance that has been paid clearly.

Q    -- so if you swing and miss, June 30, 2027, is there anything in the plan that you're aware of to bring back these fees and equalize the distribution amongst all the admin claimants?

A    I'm not aware if there's a provision like that.

Q    So there could be a possibility that in June 30, 2027, that there's going to be some admin claimants who will be getting zero if you swing and miss while other admin claimants are paid in full?

A    Again if you're taking your hypothetical --

Q    Correct.

A    -- which I'm not going to assess if that hypothetical is realistic given where we're at right now, I think there could potentially be a risk.

        MR. NGUYEN:  Thank you, Your Honor.  No more questions.

        THE COURT:  Thank you.

        Anyone else have any questions?

        MR. SPEARS:  Good evening, Your Honor.

        THE COURT:  Good evening.

        MR. SPEARS:  Berry Spears for the record.

                    CROSS-EXAMINATION

BY MR. SPEARS:

Q    Mr. Castellano, it's nice to see you again.

A    It's good seeing you too.

Q    I just wanted to follow up on a few questions that Mr. Ha just -- were asking you about.  But before I get into the -- let me just make sure that my understanding is correct if that's all right.  I think based on your earlier testimony,

DEBTORS' EXHIBIT NO. 8
Page 236 of 265

Mr. Keach, in the paragraph 48 of your Declaration --

A   Which Declaration?

Q   I believe it's your supplemental Declaration.  But it's -- but I think your testimony was that unpaid administrative claims are estimated to be 70.9 million, is that right?

A   I just need to find -- if you can give me a minute, I just want to --

Q   Hang on just a minute.  Let me -- I can tell you for sure what the number is, what the paragraph is.  I think it's 49, 48 or 49.

A   Are you referring to paragraph 50?

Q   Okay, 50.  Sorry about that.  Yes, sir, it is 50.

A   Okay.

Q   The amount of admin claims are 70.9 million?  That's based on your reconciliation of books and records, right?

A   Yes, plus some other estimates as have been noted in here.

Q   Right.  And 34 million in priority claims?

A   Correct.

Q   Right.  Okay.  So of the 70.9, that's comprised primarily of vendor claims, 53 million approximately, right?  And med mal and worker's comp claims of approximately 18 million?

A   Correct.

Q   Is that right?

A    Correct.

Q    Can you tell me a little about the med mal and worker's comp claims?  How many are there?

A    In terms of what I -- well, my recollection in terms of what's been filed, on a post petition basis, I believe there's two, one med mal claim, and one worker's comp claim.

Q    So two claims for that -- for both of those categories?

A    One each.

Q    One each.  And do you recall what the med mal claim is?

A    Yes, it's the -- I think we've talked about this before. It's the --

Q    The Igoe claim?

A    The Igoe claim.  And then there's a smaller worker's comp claim.

Q    And you're aware that the -- you've seen the Igoe claim before, have you not?

A    Yes.

Q    And it's filed in the amount of 25 million?

A    Correct.

Q    How did you get to an aggregate of those two categories of 18 million?  Based on just the Igoe claim?

A    Well, it's not based on the Igoe claim.  The 18 --

Q    The Igoe claim's 25 million, and the category is in your estimate med mal and worker's comp claims, 18 million?

A    I understand.  That's what the Igoe claim has been filed

for.  It hasn't been adjudicated and determined --

Q    That's right.

A    Yeah.  So I understand it's $25 million, but the $18 million is actuary -- is a member -- is an amount that was derived by the company's actuaries, Oliver Wyman, that had been working with the company for years in terms of providing estimates of -- based on historical trends, based on claims, what we expected exposure could be.

Q    And they've actually provided you with that analysis?

A    It was provided to Weil, Gotshal, and then I've seen it, yes.

Q    So of the -- Mr. Ha talked to you a little about this. Of the professional fee claims that have accrued to date, that total is about 300 million that's been paid?

A    Yes, and I just cannot recall if all of that was post petition or not.

Q    Sure.  I'm not going to hold you to the number --

A    Yeah.

Q    -- but just in the general range, it's the 300 --

A    It's around --

Q    -- million?

A    Yes.

Q    270 of which has been paid, 30 of which is in a fee escrow account.

A    Round numbers, yes.

Q    Right.  And Mr. Ha asked you what happens if at the end of the -- to use his baseball analogy, there's not enough money to go around.  You can't go effective.  What happens then if you can't go effective?  Do you have an understanding of what the result is at that point?

A    I would imagine that the Court would decide the fate of the cases at that point in time.  You know, again, it just depends on the circumstances, but yes, I don't think we can go effective.

Q    Your lawyer seemed to indicate this morning in his opening comments that June 30, 2027, might not be the end date.  It could be extended beyond that.  Is that right?

A    So again, I think -- well, the hypothetical that I was given is that there's literally no litigation any longer, everything has been lost.  I can't recall the circumstances with Mr. Cohen responded to the Judge.

I just don't remember the specifics as it -- I mean June -- well, first off, I've never said June 30th.  It's early 2027.

Q    Well --

A    And I don't -- just if I can finish.  I don't believe right now that we're saying there is a date certain.

Q    Early June, '27, however, based on your testimony but for Mr. Troop and Mr. Keach, was that it could be up to June 30, 2027?

A    It's early -- my definition of early 2027 is the first six months of 2027.  I'm not saying a specific date.

Q    The last day of the first six months is June 30, 2027, is it not?

A    That is correct, yes.

Q    And so do you have an understanding as to whether the Debtors would intend, or have the intention to extend -- or attempt to extend the effective date beyond June 30, 2027, if you don't in fact have the cash available to pay all administrative claims in full?

A    I mean I guess at that point in time, whoever is here, it well be me, whoever is here is going to have to decide what to do with these cases.

MR. SPEARS:  Well, you're asking the Court today --

THE COURT:  Who let you out?  I just wanted to --

MALE SPEAKER:  It's really not funny.

THE COURT:  I apologize.

BY MR. SPEARS:

Q    Mr. Castellano, you're asking the Court today --

A    Yes.

Q    -- to confirm a plan that has these provisions in it, and whether it's you or someone else at the helm, I think the creditors are entitled to know what the company's intentions are.  Do you have an understanding of what they are?

A    Well, I have an understanding of what we're putting

forth.  I have a very good understanding of, you know, my sense of why I think I've reached a conclusion that I do believe confirmation is warranted and that we should reasonably be likely to effective in early 2027.  I've not made a suggestion if we can't, what can happen at that point in time.

Q    Well, in your professional life of -- with Alex and others, assuming there are others that preceded your employment with Alex, have you ever made a mistake in your projections?

A    Projections change, yes.

Q    Right.  They do change.  And what happens if your projections in this case change and aren't correct?  What happens on June 30, 2027, do you know?  Do you have an understanding?

A    Yeah, my business understanding is if there's truly no future value of any assets and there's still outstanding liabilities, yes, I don't think the plan can go effective.  At some point, the case would probably convert.  But that is just my business understanding of the hypothetical you laid out.

Q    But you've also testified that as far as you're concerned, that is in fact the end date?  It won't extend beyond June 30, 2027?

A    Well, I don't believe that I've characterized it that way.  I do think it's reasonably likely that we can go

effective early 2027.

Q    I hadn't said that.

A    But I think the disclosure statement was clear that it could be later and it could be sooner.  This is litigation and there's timing issues with litigation.

Q    I understand that as well.  But what I'm trying to understand as an administrative creditor or representing an administrative creditor what realistic expectations are given the fact that as you've just acknowledged, projections can change and projections aren't always accurate.

So assuming the projections change, or your projections aren't accurate, what happens on June 30, 2027?  Can you tell us?

A    I thought I did.  I mean if there's truly no asset value, no likelihood of collecting on any litigation, and there's no liquidity left, yes, I think the Court will have to take into consideration what the options are, and yes, it likely probably would be a conversion.  But that would be my assessment of it.

Q    Have you had a discussion about at that point disgorgement of professional fees?

A    I have not had that discussion, no.

Q    Do you have an estimate as to what the amount of professional fees that are to be incurred from confirmation through a June 30, 2027 effective date?

JOHN CASTELLANO - CROSS BY MR. SPEARS                    244

A     So I mean it's combined in the numbers in exhibit A.

Q     And do you know what those numbers are just -- not including in the aggregate number, just what the fees are, fees and expenses?

A     If you look at exhibit A, there's expenses I believe of $55 million, and then there will be some incremental litigation fees contained in the litigation proceeds net line. The $55 million is not professional -- it's not professionals only.

That includes employees, that includes insurance, IT.  I can't give you -- I don't recall the specific build up but we do have estimates in there.

Q     All right.  One final question for you.  You had mentioned that there was a 10 percent hold back for payment of professional fee claimants, is that right?

A     That's correct, yes.

Q     And that's not -- is that hold back held in the fee escrow, or is that retained by the Debtors in possession?

A     Neither.  The hold back is truly a hold back.  It's not actually funded in the escrow account.  It's not -- it would only get paid under certain conditions contained in the FILO settlement provided that there's liquidity to make those payments at some point in the future.

Q     So it's not a fee reduction, it's simply a hold back but it could get paid so that the professional fee claimants would

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

get 100 percent of all of the fees and expenses that they've accrued along the way, isn't that accurate?

A    It is a hold back, yes.

MR. SPEARS:  All right.  Thank you, sir.

THE COURT:  Thank you.

Mr. Troop?

MR. TROOP:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. TROOP:

Q    Hello, Mr. Castellano.  Andrew Troop, for the Commonwealth of Massachusetts.

You just referenced a report that I hadn't heard about before, the Oliver -- a report from Oliver Wyman on medical malpractice claims.  Was that accurate?

A    In the analysis that Oliver Wyman did, yes.

Q    When did you get that analysis?

A    The first time I saw it was probably sometime last year, towards the end of last year.  I may have seen it even before then.

Q    But it hasn't been updated in connection with your estimate of $18 million in worker's comp and med mal claims for ultimate allowable claims, has it?

A    That's correct.

Q    And you said that it was an actuarial analysis.  Could you tell us what you mean by that, what you meant by that?

**DEBTORS' EXHIBIT NO. 8**
**Page 245 of 265**

JOHN CASTELLANO - CROSS BY MR. TROOP

246

A     Sure.  Oliver Wyman, as actuaries, the actuaries analyze -- Oliver Wyman has been working with the company for years.  I don't know how long, but it's been a long time.

So they have trends of cases with statistics of payments, and they use that from an actuarial prospective to predict what potential exposure could be.

Q     So was there any specific analysis done of the merits and value of the claim of the Igoe Estate, in coming up with your estimate?

A     I know that's just one claim, so no, there wasn't like a modification for just one claim that had just been filed.

Q     The event happened last year though, correct?

A     Yeah, but I thought the claim got filed -- the claim was filed towards the end of last year.  I can't recall at this point.

Q     I understand, but --

A     Yeah.

Q     -- Oliver Wyman doesn't do its analysis based on proofs of claim that was filed, right?  It does its analysis on a different basis, correct?

A     They don't -- I'm kind of figuring they don't use proofs of claim.  I don't know the actual details of what they use for their actuarial analysis.  People at the company provide that information.  And they also have access to it because they've been working with the company for years.

Q    So you don't know whether Oliver Wyman included the claim of the Igoe Estate in its actuarial estimate of 18 -- $15 million, I think was actually the number for --

A    That's correct.

Q    Has anyone evaluated the merits of the Igoe claim for you in coming up with your estimates?

A    Not for the estimates, but I understand that we have retained counsel that's working on understanding that particular claim.

Q    Okay.  But it's not -- so the number is not -- doesn't correlate to the actual claim, the number -- the $15 million estimate of ultimately allowable medical malpractice claims does not correlate to the actual claim that was filed, correct?

A    Yeah, that's correct because it was an actuarial assessment of potential exposure based on historical claims.

Q    How many claims were filed against Steward in the last actuarial estimate?

A    I guess I think about bankruptcy claims?

Q    No.  How many medical malpractice claims that were assumed by Oliver Wyman to have been asserted against the company in coming up with its $15 million estimate on which your analysis relies?

A    I don't know.

Q    Do you know whether any of those claims were a wrongful

JOHN CASTELLANO - CROSS BY MR. TROOP                    248

death claim for $25 million?

A    I do not.

MR. TROOP:  One second, Your Honor.  Mr. Castellano, as I understand it, your authority under the settlement, the FILO SG, is up to $125 million of effectively cash collections to fund expenses of the Estate?  Is that -- do I remember correctly?

(Electronic announcement:  Our system will end this conference in five minutes.  To extend this call for one hour, please enter the moderator PIN now.  Your conference has been extended for 60 minutes.)

MR. CASTELLANO:  When you say my authority?

BY MR. TROOP:

Q    The Estate's authority, the Trust's authority, but $125 million for -- of collections can be used for administrative expenses post confirmation?

A    So it would be pursuant to a FILO settlement, it's litigation financing that would be part of the litigation trust to fund the expenses of the litigation trust which include -- which will include the plan trust.

Q    So when you gave your numbers before from your schedule A of $55 million for trust kind of expenses that were different than litigation funding expenses, those are different numbers?

A    That's correct.

Q    So you're expecting like $180 million to be expended in

Case 25-90399   Document 3239-8   Filed in TXSB on 07/19/26   Page 249 of 265
Case 24-90213   Document 5723   Filed in TXSB on 07/20/25   Page 249 of 265

JOHN CASTELLANO - CROSS BY MR. TROOP

249

connection with pursuing litigation and administering the trust?

A    I don't know where you're getting 180 from.

Q    Well, I thought you said it was 55?

A    What I said was 55 were operating expenses.

Q    For operating expenses?

A    Yes.

Q    And what operations has this liquidated Debtor have on a go forward basis?

A    They're going to have to fund IT systems.  They're going to have to pay insurance.  They're going to have a trustee. They're going to have counsel in addition to counsel specific to the litigation trust.

There will be employees, not many, but there will be employees.  There is going to be operating expenses.

Q    And so that's $55 million for operating expenses, and then another $125 million of potential litigation funding?

A    I don't think you can conflate the two.

Q    I said additional.  I wasn't conflating anything.

A    I'm sorry.  I used the wrong word.  I don't think you can add the two.  There is a $125 million available to the litigation trust to fund its expenses, broadly speaking.  The document will speak for itself.

But what I'm saying is there will be funds necessary to fund counsel that's going to work the litigation causes of

action.  There will be operating expenses.  There will be employees.  There's IT systems that -- these aren't going to be material.

But those are expenses.  So I wouldn't say it's 55 million plus 125 million.  125 million is effectively -- we've called it the revolver, and that's effectively what it is, to run the litigation trust.

Q    The litigation trust.  So between the litigation trust and the operating expenses, your analysis assumes that there'll be $180 million spent between those two categories?

A    No, that's not what I'm saying.  There is funding available to fund the working capital necessary to support the litigation trust.

Q    How did that number -- how was that number arrived at if not from an estimate as to what it would cost?

A    Which number are you referring to?

Q    $125 million?

A    The $125 million was arrived at through a significant amount of negotiations with the FILO lenders.  I can't recall exactly how that number ultimately came up because there were so many different negotiations.

But that was the most that the FILO lenders would provide to fund the litigation trust.

Q    In your opinion, will that be sufficient to fund the litigation trust?

A    Yes.

Q    On what do you base that?

A    I base that on my general understanding of what it's going to cost based on input that I've received, based on the costs of the FILO settlement, the expenses of the FILO settlement for litigation, the litigation funding variable component as well as just understanding what the trustee is going to cost.

Q    That funding amount doesn't include the amount that'll be paid for contingent fee counsel, correct?

A    Which amount are you referring to?

Q    125?  I'm only going to focus on the 125 right now.

A    So contingency counsel will get paid as a deduct from whatever collections they arrive at from the litigation that they're focusing on.

Q    So the amounts to be paid by the litigation trust for its use and expenses, if there is any contingent fee recovery will exceed $125 million?

A    I'm sorry.  I'm not following the question.

Q    And I'm sorry, it's late for all of us.

A    Yes.

Q    I apologize --

A    It is.

Q    -- for not being clear.  And I was on a plane for 10 and a half hours yesterday so I could be particularly dazzled at

the moment.  What I'm trying to understand is, what is the $125 million in litigation funding going to be used for?

A    It's going to be used to fund the expenses necessary for the litigation trust to pursue litigation causes of action. That will be a combination of legal fees, operating expenses necessary to fund the litigation fund for the next I think three and a half years.

Q    And in that number, do you know what is the budget for hourly litigation attorneys?

A    I just don't have it at the top of my head, but yes, it's in there.  I just can't recall what that number is.

Q    And in your opinion, no more than $125 million will be necessary for the trust to do -- to take its litigation to conclusion, or just for the next three years?  I just want to be sure I understand what your testimony --

A    To take its litigation to conclusion.

MR. TROOP:  Okay.  No further questions, Your Honor.

THE COURT:  Thank you.  Anyone else have any questions in the form of cross.  Any redirect?

MR. BEREZIN:  Actually I have a few -- no.  Yeah, a few redirect questions, Your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. BEREZIN:

Q    Mr. Castellano, in terms of the total administrative

expense claims that have incurred so far, is that about $2.8 million, $2.8 billion?

A    Yes.

Q    Okay.  And do you recall the amount of administrative expense claims that have been paid to date?

A    Yeah, I think it's probably like $2.7 billion.

Q    Does the 2.7 -- 82.6 billion refresh your recollection?

A    It does.

Q    And is that the amount?

A    Yes.

Q    Okay.  And do you recall the percentage of unpaid administrative claims when you compare it to the 2.8 billion?

A    I think it's like three percent, two to three percent.

        MR. BEREZIN:  Okay.  You testified -- well, withdrawn.  If you could turn to the document that you were shown by counsel.  It has a list of names of released parties.

        And I'm wondering if you could, for the Court, just walk through this list and to the extent that a employee has provided services in connection with the Chapter 11, and to the extent they're going to provide services in the future, if you could describe those?

        MALE SPEAKER:  Your Honor, I don't think that was shown to this witness.

        MR. CASTELLANO:  I have it right here.

        MR. BEREZIN:  Yeah, it was clearly shown to the

witness.

THE COURT:  Yeah, I --

MR. BEREZIN:  And he was asked about it.

THE COURT:  Okay.

MR. CASTELLANO:  So David Barnhart, he was the company's chief information officer so he clearly provided services while he was employed.  He is now part of a Quorum.  Back in the March, the Court approved our sale of our TSA business to Quorum.

So all of the Debtor's IT systems transferred to Quorum, so David Barnhart effectively runs, as we speak today, and will for several months in the future all of the IT systems of the Debtor today and what will become the litigation trust and the plan trust sometime this week.

Jay Sullivan, he is in-house counsel.  He is fairly intimately familiar with a lot of the med mal claimants, claims issues, litigation issues like that.  He's also -- he's been with the company for several years so he will continue providing support necessary for resolving and addressing med mal claimants, med mal issues.  And he also has a further deep understanding of a lot of the commercial contracts.

BY MR. BEREZIN:

Q    Is he involved at all in the Norwood case?

A    Yes, he is.

Q    Okay.

JOHN CASTELLANO - REDIRECT BY MR. BEREZIN                    255

A    Yeah.  Gail Schlesinger, to the extent we still have litigation issues BMI, she will be instrumental in addressing those issues on a go forward basis.  Nick Nichols and Mary Beth Taylor together, while we do have an interim corporate controller, I think I mentioned Mr. Alan Burke, there's just a significant amount of work in terms of transitioning a lot of the accounting work over to a new staff.

But Nick Nichols, in particular, also has a significant understanding of a lot of the accounting work between Steward and Traco.  To the extent that we continue to -- to the extent that we still continue what we're doing with Traco issues, he would be instrumental in the future as it relates to at least addressing the books and records between Traco and Steward.

Jeff Morales has been focusing on monetizing the company's miscellaneous joint ventures, clinics, and he has a fairly deep commercial understanding and has been assisting with collecting miscellaneous deposits, miscellaneous receivables from customers, from commercial payers. Apologize.

So he will continue to be providing that service on a go forward basis.  Dr. Jennifer Hunt and Sue Brown, will Jennifer Hunt is now part of BMI.  To the extent we still have issues with BMI, I know she has been helpful to at least understanding some of the business issues between Steward and BMI.

Sue Brown was the former CEO.  Again I think to the extent we still have issues with BMI, I think Sue Brown can be useful in that.  Dr. Weinstein, the former chief medical officer, he is now part of the company that we sold our stewardship business to.

I can't recall the name now.  But he also has a significant amount of understanding of a lot of the issues that were identified as part of the overall investigations as it relates to issues with the former members of management.

I think he can be helpful with consult in that area. Natalie Hibble is in-house counsel, has a deep understanding of the commercial contracts and will be helpful in trying to resolve claims with commercial payers and other institutions.

Dr. Diaz, he is no longer employed.  He's just on a contract now with Steward but he will be instrumental as a witness in Norwood because he was running all of the northeast hospitals.

And Rich Iannessa, he too went over to Quorum as David Barnhart, so he is effectively the individual that works on collecting our receivables, as well as he'll be supporting King & Spalding in their pursuit of collections of commercial payer litigation because of his intimate knowledge of Steward's billing practices.

Q   Thank you.  Mr. Keach asked you some questions about the two BDO analyses.  Do you recall that?

A    I do.

Q    For at least the number one, that it had the draft markings. Do you recall that one?

A    Yes.

Q    Can you explain what the process was that led to that document so the Court understands why it was prepared?

A    Yes. As we were negotiating a path forward with our FILO lenders and we understood what was important to the FILO lenders in terms of setting up a litigation trust, once we had a general outline of what that was going to look like, we also realized that the tax situation for Steward was extremely, extremely complex, compounded by the fact that with the MPT transaction and a few of the other elements of the restructuring, there is a significant amount of taxable income generated as a result of forgiveness of debt and other things like that.

So we engaged, and BDO has been the company's tax advisor for years, so they're intimately familiar with the tax situation for the Company. So we had engaged BDO to understand on a go forward basis what -- how to minimize taxes in the event we can confirm the plan.

And at the time, in the event that the FILO settlement was approved -- obviously the FILO settlement has been approved. So as we worked through that, we then also realized we then need to understand what the potential implications are

if we can work through a plan, what are the implications if we can actually go forward with the Chapter 11 plan, are there potentially negative tax implications.

As they analyzed it, they identified that yes, there are potentially material negative tax implications.  So that was the genesis of what ultimately -- while it still says draft, what was ultimately that particular document.

MR. BEREZIN:  And I just want to understand the significance to you of the draft.  Documents are marked draft because the analysis is just not something you would rely on, or consider as a business purpose?

MR. KEACH:  Leading.  This is --

MR. BEREZIN:  I haven't asked the question yet.

THE COURT:  You were still leading.  Go ahead.

MR. BEREZIN:  I'll reask it, Your Honor.

BY MR. BEREZIN:

Q    Can you explain the -- how did you as a business person interpret the draft on those documents as far as how you would consider them going forward?

A    Yeah, given the amount of time we spent with BDO, understanding what the potential implications would be if we couldn't confirm this plan, while it says draft, I interpret that to be it's just not something we finalized from the perspective of it's not as if we're trying to go, convert to Chapter 7.

But we just need to understand what the implications are. I think there's a significant amount of work that BDO did, and there's some -- yes, it is draft. They obviously have qualifications on the lead page.

But I think it is reliable from the perspective of what could happen given their extensive knowledge and the amount of time they spent on analyzing this potential situation in the event this actually converted to a Chapter 7 liquidation.

Q   And in the other BDO document, Mr. Keach pointed out that the numbers were in brackets. The same question, what was the impact on you as far as -- from a business perspective, seeing those brackets?

A   Yeah, it's kind of the same issue. We never finalized the actual calculations because it's not our intent in the first place to convert to Chapter 7. But again they had done a significant amount of work that I felt comfortable from a business perspective, this is a risk in the event this converts to a Chapter 7.

Q   Just a quick question about some of the objections that have been filed. For example, are you familiar with the $9 billion priority claim that's been filed?

A   Yes.

Q   What's your understanding of that claim based on the process you've undertaken and described today?

A   Yeah. So when you open up the claim, that $9 billion

**DEBTORS' EXHIBIT NO. 8**
**Page 259 of 265**

JOHN CASTELLANO - REDIRECT BY MR. BEREZIN                    260

claim, for one is handwritten, and the justification for $9 billion is something to the effect of liability for take over, something like that.

It really just didn't make any sense.  There wasn't, to me, any justification for a $9 billion claim.  There's no support, other than the handwritten markings on the claim itself.

Q    And are there any other examples of administrative expense claims that are similar in nature, that come to mind? And I realize it's late.

A    Yeah, there's two -- well, there's one other priority claim filed for a -- I'm sorry.  Two priority claims filed for a billion dollars each with no support.  Yet both were marked off with, like the priority box, so at most they would be entitled to, I think, $15,000 or so.

But again, no support was provided.  It was a former employee that hadn't been employed by the company for years, and there was no records of what justification there could be for two, $1 billion claims.

Q    And are you familiar with a $1.3 billion administrative claim filed by Care Max and its affiliates?

A    I am.

Q    Can you explain what that claim is?

A    Yes.  So Care Max, as part of -- the company and Care Max had a commercial relationship post Care Max transaction, and

**DEBTORS' EXHIBIT NO. 8**

they had filed a claim for services incurred prior to the petition date, pursuant to the contracts that ultimately got transferred to Care Max.

Again, it's multiple Debtors which added up to $1.3 billion which we've put on one of our omnibus objections to reclassify those from administrative to unsecured.

MR. BEREZIN:  Thank you, Mr. Castellano.

Nothing further from the Debtors, Your Honor.

MS. JACOBSON:  I have one.

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MS. JACOBSON:

Q    Mr. Castellano, you testified on Redirect that more than, I think you said $2 billion in admin claims had been paid to date?

A    Correct.

Q    Okay.  Sir, do you believe that that excuses the fact that there are still a significant amount of administrative claims that remain unpaid to date?

A    I'm not sure I know what you mean by excuse?

Q    Well, does the fact that $2 billion have been paid to date provide comfort to the administrative claimants who remain unpaid to date?

A    I think the number's actually 2.8 billion.

Q    Okay.

**DEBTORS' EXHIBIT NO. 8**
**Page 261 of 265**

A     It doesn't provide me comfort.  I mean, look, I wish you had the ability to actually settle all of our administrative claims as they came due.  It's just unfortunate what the situation was in this particular case.

So I wouldn't say it provides me comfort.  I'm not joyous about the fact that we can't pay administrative creditors.  I do think it is important that the Debtors actually have paid quite a bit of administrative claims over the course of these cases.

But I don't take comfort in not being able to settle all of administrative claims.

MS. JACOBSON:  And those who have remained unpaid are not taking comfort from the two billion, 2.8 billion that have been paid.  Is that fair?

MR. BEREZIN:  Objection, Your Honor, speculation.

THE COURT:  Witness can answer.

MR. CASTELLANO:  I'm sure they're not satisfied by that because they provided services or goods, and unfortunately there just wasn't funds to pay them.

MS. JACOBSON:  Thank you.

THE COURT:  Mr. Keach?

MR. KEACH:  Yes, very quickly, Your Honor, because I do appreciate the hour.

RECROSS-EXAMINATION

BY MR. KEACH:

Q    Mr. Castellano, you went through a number of people on the released parties list who are going to have sort of continuing functions of one kind or another on Redirect; is that correct?

A    Yes.

Q    And let me just ask you the same questions I asked Mr. Carr earlier.  In those various roles, whether those are contract parties or employees, they're going to be compensated for those services, correct?

A    Yes, they will be.

Q    All right.  And that's in fact part of the cost of administration that you built into your budget that'll be funded by the ongoing cashflow, correct?

A    Well, that's right.

Q    All right.  And none of those people asked for a release, correct?

A    They certainly didn't ask me for a release.

Q    And to the best of your knowledge, none of those people's conditioning any of the services that you described on receiving a release, is that correct?

A    That's right.

          MR. KEACH:  Nothing further, Your Honor.

          THE COURT:  Anyone else have any questions?

          MR. BEREZIN:  Nothing further from the Debtors, Your Honor.

264

THE COURT:  Mr. Castellano, thank you very much for your time.

MR. CASTELLANO:  Thank you.

(Witness excused.)

THE COURT:  Okay.  Let's break for the evening. We'll start at 1:00 p.m.  You're free to leave your stuff. I'd just ask that you -- I've got a few hearings in the morning, but they're probably -- if you'll just give me a second.

They're probably virtual so you can leave your stuff wherever it is.  I'd just ask that you keep the trash and just leave it outside.

MR. BEREZIN:  Your Honor, we apologize.

THE COURT:  Yes.  Hold on a second, folks.  Before we break.

MR. BEREZIN:  One housekeeping --

THE COURT:  Yes.

MR. BEREZIN:  -- the IRS' exhibit.

MR. ADAMS:  So Your Honor, I want to move, with Debtor's counsel, we've made agreements to obviously get with Alex Partners, and we'll get an IRS person there.  I've told counsel I will come down from Dallas, meet with them on this since I've been involved with this case from the very, very beginning.

So with that, Your Honor, the United States moves

**DEBTORS' EXHIBIT NO. 8**
**Page 264 of 265**

265

for the admission of the Declaration of Dorkas Balsadura

(phonetic).  It is Document 5498-1.

THE COURT:  Any objection to the admission?

MR. BEREZIN:  There is no objection, Your Honor.

THE COURT:  5498-1 is admitted.

(ECF 5498-1 received in evidence.)

MR. ADAMS:  Thank you, Your Honor.

THE COURT:  Thank you very much.  Any other housekeeping before we break for the night?

(No audible response.)

THE COURT:  All right.  Folks, thank you very much. I'm just going to sit here and clean up.

Thank you very much.  Have a good evening.

(Proceeding adjourned at 7:49 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69909*

*DATE FILED:  JULY 20, 2025*