IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 24-90213-11 |
| | § HOUSTON, TEXAS |
| STEWARD HEALTH CARE | § TUESDAY, |
| SYSTEM, LLC, ET AL, | § JULY 15, 2025 |
| DEBTORS. | § 1:01 P.M. TO 6:46 P.M. |

## **PLAN CONFIRMATION DAY TWO**

BEFORE THE HONORABLE CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

CASE MANAGER:                   ROSARIO SALDANA

ELECTRONIC RECORDING OFFICER:  YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**DEBTORS' EXHIBIT NO. 9**
**Page 1 of 218**

2

**APPEARANCES**:

| | |
|---|---|
| FOR THE DEBTORS: | WEIL, GOTSHAL & MANGES LLP<br>David Cohen, Esq.<br>Robert Keach, Esq.<br>Robert Berizen, Esq.<br>Jason George, Esq.<br>767 Fifth Avenue<br>New York, NY 10153<br>212-310-8000 |
| | WEIL, GOTSHAL & MANGES LLP<br>Cifford Carlson, Esq.<br>700 Louisiana St., Ste. 3700<br>Houston, TX  77002<br>713-546-5000 |
| FOR THE OFFICIAL COMMITTEE<br>OF UNSECURED CREDITORS: | AKIN GUMP STRAUSS HAUER & FELD<br>Brad Kahn, Esq.<br>Sarah Schultz, Esq.<br>2300 N. Field St., Ste. 1800<br>Dallas, TX 75201<br>214-969-2800 |
| FOR FILO SECURED PARTIES: | MILBANK LLP<br>Michael Price, Esq.<br>55 Hudson Yards<br>New York, NY 10001<br>212-530-5000 |
| FOR TRACO Investment<br>Management, LLC: | STEPTOE LLP<br>Kerri A. Lyman, Esq.<br>633 West Fifth St., Ste. 1900<br>Los Angeles, CA  90071<br>213-439-9423 |
| FOR THE COMMONWEALTH OF<br>MASSACHUSETTS: | PILLSBURY WINTHROP SHAW<br>Andrew Troop, Esq.<br>31 West 52nd Street<br>New York, NY  10019<br>212-858-1000 |

**DEBTORS' EXHIBIT NO. 9**
**Page 2 of 218**

3

**APPEARANCES (CONT'D):**

FOR THE CHUBB COMPANIES:            DUANE MORRIS LLP
                                    Jessica Bonteque, Esq.
                                    22 Vanderbilt
                                    335 Madison Avenue, 23rd Floor
                                    New York, NY  10017
                                    212-692-1036


(Please also see Electronic Appearances.)

**DEBTORS' EXHIBIT NO. 9**
**Page 3 of 218**

4

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARC BROWN | | | | |
| By Mr. Berezin | 7 | . | . | . |
| By Mr. Keach | . | 8 | . | . |

CLOSINGS:
| | |
|---|---|
| By Mr. Cohen | 27, 206 |
| By Mr. George | 64 |
| By Mr. Kahn | 72 |
| By Mr. Price | 82 |
| By Ms. Bonteque | 85 |
| By Ms. Jacobson | 87 |
| By Mr. Keach | 121 |
| By Mr. Troop | 159 |
| By Mr. Adams | 173 |
| By Mr. Nguyen | 180 |
| By Mr. Spears | 191 |

*** 

**DEBTORS' EXHIBIT NO. 9**
**Page 4 of 218**

5

**HOUSTON, TEXAS; TUESDAY, JULY 15, 2025; 1:01 P.M.**

THE COURT:  Let's get started.  Today is July 15th.  This is Judge Lopez.  I'm calling the 1:00 p.m. continuation of the Steward -- I'll call it final hearing on Disclosure Statement, Plan Confirmation, Motion to Convert or Dismiss as well.

No need for parties to make their appearances.  They'll continue for purposes of today.  If you're on the phone, I'd ask that you just make a electronic appearance again today.

There are a number of lines who I had promised.  If you just hit five star, I will unmute your line.  No need to make an appearance.

I'm just going to unmute them, and then we will get started.

While that is happening, is there any housekeeping we need to take care of today, or should we -- are we just going to proceed with Brown?

MR. BEREZIN:  I don't believe there's any housekeeping issues.  Yes, Your Honor.  We can -- the Debtors, if you're ready.

THE COURT:  Okay.  Just give me a second.  I'm going to just unmute a few lines here.

MR. BEREZIN:  Yep.

THE COURT:  Please just keep your lines muted.  I've

6

unmuted a 973 and a 917 number.  And I will turn this to active cameras.

You're saying you'll be ready to go?  Okay.  Okay. Let's get started.  Mr. Berezin, good afternoon.

MR. BEREZIN:  Good afternoon, Your Honor.  Robert Berezin, Weil Gotshal & Manges, on behalf of the Debtors.

The Debtors call Marc J. Brown.

THE COURT:  Okay.

Mr. Brown, good afternoon.  Can you raise your right hand.  Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Okay.  We'll let the Record reflect the witness has been properly sworn in and answered in the affirmative.

(Witness sworn.)

THE COURT:  Just so we can do a mic check, can you please just spell your last name into the Record.

THE WITNESS:  Brown, B-R-O-W-N.

THE COURT:  Okay.  Mr. Berezin, whenever you're ready.

MR. BEREZIN:  Thank you, Your Honor.

May I approach to provide what's been marked as Document 5453-8, which is his Declaration, to the witness?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. BEREZIN:

Q    Mr. Brown, if you could turn to paragraph 20 of your Declaration.

A    Okay.

Q    Now, Mr. Brown, do you have -- do you make an assumption about incremental taxes in a Chapter 7 compared to a Chapter 11 in reaching the conclusions in your Declaration?

A    I do.

Q    Can you explain what it is that you assume?

A    I assumed that there's incremental taxes in a Chapter 7 versus a Chapter 11 based on discussions with Mr. Castellano and his team, as well as a review of the BDO tax documents that were discussed yesterday.

Q    And can you please describe in a little more detail the assumption that you're utilizing to come to the estimate that you have in paragraph 20, which is $24.5 to $28.1 million?

A    Sure.  Again, the specific numbers based on the BDO analysis, which, you know, they looked at the structure of the proposed Chapter 11 plan and the fact that it would be a deemed liquidation of the estate for tax purposes, which would trigger tax deductions under the Chapter 11 plan.  And for that to happen under the Chapter 7 would be unlikely.

Q    And why is that?

A    The -- the estate under Chapter 7 would have to

effectively put itself in the same position as the Chapter 11

plan in a short period of time, which is impractical.

MR. BEREZIN:  Your Honor, we have no further

questions for direct.  The rest of his Declaration is in

evidence.

THE COURT:  Okay.  Proceed with cross-examination.

CROSS-EXAMINATION

BY MR. KEACH:

Q    Good afternoon, Mr. Brown.

A    Good afternoon.

Q    Robert Keach for certain deferred compensation claimants.

With respect to the testimony you just gave about paragraph

20, the BDO documents you're referring to are the same

documents that Mr. -- were introduced when Mr. Castellano

testified yesterday?

A    I believe so, yes.

Q    All right.  Are there any other BDO documents that you

have reviewed that were not part of the exhibits yesterday?

A    Well, I didn't actually see the exhibits.  I was in

court, but there was no screen flashed up.  But I assume it's

the two BDO documents that have been put into evidence.

Q    And there are only two that you're aware of?

A    That's all I've seen.

Q    Okay.  Were you personally involved in the discussions

with BDO that Mr. Castellano referred to yesterday?

A    I know there were some calls.  I was trying to remember if I actually was a participant in any of those calls.  I certainly discussed it with Mr. Castellano and his team and my team.

Q    But you don't recall whether you were on the calls or not?

A    I don't.

Q    Okay.  Were you involved in any meetings with Weil and the AlixPartners teams where this topic was specifically discussed?

A    It was discussed in meetings, sure.

Q    All right.  And you recall being present at those meetings?

A    Correct.

Q    And you recall any discussion at those meetings that provided substance with respect to the tax issue not included in the BDO documents?

A    No.

Q    Mr. Brown, I'm going to ask that you turn to paragraph 17 of your Declaration.  Do you have that in front of you?

A    I do.

Q    In paragraph 17, you talk about the assets available to a Chapter 7 Trustee if the case were to be converted; is that correct?

A    That is what's contained in that paragraph, yes.

Q    And just so the Record's clear, this analysis assumes, as has occurred subject to appellate issues, it assumes the approval and implementation of the so-called FILO secured party settlement; is that correct?

A    It does.

Q    And in paragraph 17, you say, "As a result of the limited available assets, the Debtors projected liquidity in a Chapter 7 case and the anticipated cost and expenses in Chapter 7, I believe that the Trustee" -- and just so the record's clear, when you refer to Trustee here, you're referring to the Chapter 7 Trustee, correct?

A    Yes.

Q    All right.  So I'll go on.  "I believe that the Trustee would not have ready access to capital to fund the winddown of the estate and would need to quickly monetize the class B interests to cover estate claims and expenses, including taxes."

        (Someone speaking on the phone line.)

            THE COURT:  That was -- I apologize, Mr. Keach.

            MR. KEACH:  No worries.  No worries.

BY MR. KEACH:

Q    Did you hear what I read?

A    I did, yeah.

Q    Okay.  And then your next sentence is, "Given this lack of liquidity, comma, I believe the Trustee would have to sell

the estate's class B interests at a discount in order to raise the liquidity necessary to service the estate's ongoing expenses, including income taxes due in or before December 2025."  Did I read that correctly?

A     You did.

Q     All right.  And your final sentence is, "As a result of those things, you believe distributable assets to creditors and ultimately Creditor recoveries would be lower in a Chapter 7 than under the plan."  Did I read that correctly?

A     You did.

Q     All right.  And so your assumption and your conclusion is based on the fact that a Chapter 7 Trustee would not have access to capital other than the $6.5 million provided under the settlement; is that correct?

A     Yes.  The Trustee would have two assets -- the 6.5 million and the class B interests.

Q     Are you familiar with the fact that Chapter 7 administrative expenses have priority over Chapter 11 administrative expenses?

A     I am.

Q     All right.  Are you familiar with the concept of disgorgement?

A     Generally.

Q     So do you understand that a Chapter 7 Trustee, in order to fund Chapter 7 administrative expenses, could ask that, or

MARC BROWN - CROSS BY MR. KEACH

12

in fact, demand and receive orders to the effect that professional fees would be disgorged to the Chapter 7 estate to cover the administrative expenses of the Chapter 7?

MR. BEREZIN:  Objection, Your Honor.  Calls for a legal conclusion.  And it's an incomplete assumption as it does not address the circumstances and orders that were issued pursuant to which payments were made to professionals.

MR. KEACH:  I'm asking for his understanding.

THE COURT:  Well, I can -- comfortable with him answering the question whether he's -- he has an understanding of whether a Chapter 7 Trustee could ask for disgorgement.

I think that's where you were going, Mr. Keach.

MR. KEACH:  It was, Your Honor.

THE COURT:  Okay.  In a general sense.

THE WITNESS:  Yeah, in a general sense, not as a lawyer or here giving legal opinions.  I know it's a concept. I know that I've done 85 liquidation analyses.  I've reviewed 50 or more, and I've never seen that as an assumption.

BY MR. KEACH:

Q    And you weren't asked to make that assumption?

A    I was not.

Q    And you did not make that assumption?

A    Yeah.  Again, based on my experience, I haven't seen that assumed before.

Q    All right.  And I didn't ask what your experience was.  I

asked, did you make that assumption here?

A    I did not.

Q    All right.  And nobody suggested that you make it?

A    No.

Q    All right.  If, in fact, a Chapter 7 Trustee was available to disgorge professional fees, there are professional fees in this case that have been paid, correct?

A    There are fees that have been paid.  There are fees that have been held back.

Q    Okay.  And you were here for Mr. Castellano's testimony yesterday?

A    I was.

Q    And you understand that something like $270 million in professional fees have been paid?

A    I think it was in that ballpark.

Q    And again, your conclusion in this paragraph and your ultimate opinion in this paragraph is premised on the idea that the Chapter 7 Trustee would only have access to the 6.5 million.  It would not be able to achieve administrative solvency in the Chapter 7 by virtue of disgorgement; is that correct?

A    That's correct.  I mean, I think it would have --

Q    That's correct, right?

A    I believe the disgorgement has some issues with it.

Q    And on what do you base your belief that disgorgement has

some issues?

A    Just the practical time limits.  Right.  You'd have to get a Trustee appointed.  They'd have to get familiar with the estate and understand.  Maybe there's claims here for disgorgement.  You'd have to get attorneys to go pursue those claims.  You'd have to adjudicate those claims fully to get the cash to pay the taxes by the end of the year.

Q    You understand that in a Chapter 7, the Trustee's appointed immediately, correct?

A    I don't think it's within an hour, but yeah, it's fairly -- fairly rapid.

Q    All right.  You understand there's some major time lag between when the case converts and the 7 Trustee is appointed?

A    No, I'm just saying there's a process, right.  That Trustee has to get up to speed on the assets at hand, whether it's a widget maker or in this case --

Q    How much up to speed do you have to be to notice that $270 million in professional fees have been paid and you wanted to disgorge some to run your Chapter 7 case.  Did that take a lot of experience in this case?

A    I think you'd have to understand whether you even thought you had a valid claim to get the disgorgement.

Q    Yeah.  Do you have any other reason to believe there'd be some delay other than that?

A    Just the general judicial process of having to go pursue

MARC BROWN - CROSS BY MR. KEACH

15

claims if you chose to pursue them.

Q   Did you say that you think there's some issues here with respect to disgorgement because you've been informed by counsel that there might be issues?

A   No, just that it, you know, have it -- having worked in bankruptcies, having worked around the courts, courts take time.

Q   Have you ever been involved in a case where disgorgement occurred?

A   No.

Q   So you're not familiar with the process at all, right?

A   Other than it's a general legal process, no.

Q   So your assumption about delay or your assumption about process is a subject of conjecture, not experience, correct?

A   Disagree.

Q   Well, you have no experience with the process. You just said that, right?

A   I have significant experience with litigation in courts.

Q   You have no experience whatsoever with the disgorgement process, correct?

A   I have not pursued fees in a disgorgement matter, no.

Q   And you have not been involved in any case where it occurred, correct?

A   Not that I -- not that I recall.

Q   Right. So the short answer is you have no experience

with this concept.  And so whatever your answer is, it's not based on experience, is it?

A    I guess I disagree.  Maybe specifically on disgorgement, but with general litigation and how it takes time to pursue claims, I have lots of experience with that.

Q    Can you take a look at paragraph 18 of your Declaration?

A    Okay.

Q    In paragraph 18, you refer to, quote, "general inefficiencies caused by the sudden transferring the estate over to a new party will have access to liquidity to facilitate a smooth transition from the Debtor's existing professionals."  Do you see that?

A    I do.

Q    Okay.  You understand that the FILO settlement results in a transfer of all of the assets of these estates to a liquidation trust, right?

        MR. BEREZIN:  Objection, Your Honor. Mischaracterizes the plan and the evidence.

        MR. KEACH:  Actually, I was referring to the settlement, not the plan.

        THE COURT:  Why don't you ask the question again, Mr. Keach.

        MR. KEACH:  Sure.

BY MR. KEACH:

Q    Do you understand that the now-approved settlement with

the FILO-secured parties results in a transfer of all of the assets of the Debtors' estates to a litigation trust?

A     That's my understanding.

Q     And do you understand that there are professionals in place who are currently involved in pursuing the various litigation and nonlitigation assets that will eventually be transferred to that trust?

A     I do.

Q     All right.  And those professionals are going to go forward in service of the trust, right, not of the bankruptcy estate?

A     They're certainly working for the trust.  I don't know exactly how they're retained.

Q     And those professionals are going to continue to work those assets in the context of the settlement, whether there's a conversion or an 11, correct?

A     I think you can make that assumption.

Q     Right.  So there's no disruption as a consequence of that, right?  Those professionals are there.

A     There's a disruption to the estate and to the plan trust.

Q     Because the 7 Trustee is the holder of the class B interests and not a committee appointed under the plan or an administrator appointed under the plan?

A     Sure.  Those folks have had history with Steward and the claims and the assets, and now you've got someone new.

MARC BROWN - CROSS BY MR. KEACH

18

Q    How much history does it take to hold onto a class B interest and wait?

A    Well, I think what a Trustee is doing here, they're coming in and looking at the assets available to them, which is the class B interests primarily, and assessing, you know, what is that interest and when is it going to pay me and realizing that I don't have enough money to pay the taxes that are due in four months.  And I'm going to have to hire tax professionals, attorneys to help me in my process, other advisors, financial advisors, and realizing that you don't have liquidity to -- to pay all that.

Q    Unless they can get the liquidity from the $270 million paid to the lawyers and the other professionals, right?

A    If -- if they're able to pursue that in your hypothetical and actually get in money, $28 million before the end of the year, it's possible.

Q    Right.  Yeah, in fact, $28 million only takes about a 10 percent disgorgement.  That's probably a walk in the park.

        MR. BEREZIN:  Objection, Your Honor.

        MR. KEACH:  I'll withdraw the question.  I'll withdraw.

BY MR. KEACH:

Q    Other than the lack of liquidity that you referred to in paragraph 18, is there anything else where you think the, quote, disruption is going to affect recoveries?

DEBTORS' EXHIBIT NO. 9

A    I just think there's incremental costs in a Chapter 7. Not large in this case.  I didn't assume large costs, but you've got a Trustee fee and you just -- folks are going to maybe leave.  Folks that were willing to work for a Chapter 11 are -- are less certain to work in Chapter 7.

Q    Well, what's left of the Chapter 11 those folks are working for that wouldn't exist in a 7 in your opinion?

A    Well, there's certainly -- you've got the litigation trust, and you've got the plan trust, and you've got the TSA, and you've got folks, you know, doing the things you need to do to wind up an estate -- filing tax returns, you know, legal elements.

Q    And your understanding is the 7 Trustee couldn't hire those people?

A    They could.  They may not want to stay.

Q    Have you talked to any of those people about whether they would stay in a 7?

A    I have not.

Q    All right.  So you don't know whether they would or they wouldn't?

A    I just know that generally, Chapter 7 causes disruption based on experience.

Q    You think is the Chapter 7 materially different than a fully liquidating post confirmation 11 in your view?

A    Again, at least perceptually for sure, an employee may

**DEBTORS' EXHIBIT NO. 9**
**Page 19 of 218**

choose to move elsewhere when things change.

Q    Do you think anybody has a misperception about what this 11 looks like after the settlement is done and after confirmation of this proposed plan?

A    I'm not sure.

Q    Do you think anybody is fooled into thinking this is not just a liquidation?

MR. BEREZIN:  Objection, Your Honor.  Vague and calls for speculation.

THE COURT:  Sustained.

BY MR. KEACH:

Q    In the context of this case, the facts of this case, right, what is it about a Chapter 7 you think would be discouraging to the people who are going to continue to work for the litigation trust or for the plan trust?

A    Sure.  I mean, in -- in the liquidating 11 under the plan and the structure, you have a horizon that's set where you know you have a job for a certain amount of time.  In a Chapter 7, that's not necessarily the case.

Q    How is it the people working in this liquidating plan for the either litigation trust or the plan trust know they have a job for a particular period of time?

A    Because they would understand that there is litigation being pursued over a certain period of time.

Q    Isn't that true regardless of who's holding the class B

interests?  That litigation is going to be pursued regardless of holding of who's holding the class B interest, correct?

A    Well, not necessarily.  So if the Trustee needs to sell the class B in short order to pay for all the expenses, then you know, the -- the employees are going to understand that. They're not -- it's going to be additional uncertainty for them.

Q    Aside from that assumption, which I think we've established is on shaky ground, what's different?  Why would anybody who's working in the -- working for the Chapter 11 entities presume they're going to have a job for a particular period of time?

A    At least based on my understanding -- and I assume the folks working for whatever entity is going to exist at that point would have a deeper understanding than I do -- but this isn't being settled up in a day.

Q    Right.  But do you understand that the litigation goes forward regardless of who owns the class B interests?

A    I do, but I think it changes the thought process.  It certainly would change my thought process if I were sitting there as a mid-level accounting professional at Steward to understand a change in that dynamic for sure.

Q    But you're not staying, are you?  You're not one of the people who's staying, are you?

A    I am currently not employed by Steward, no.

Q   Right.  And you're not staying on as a consultant to the plan trust, are you?

A   I haven't been asked to, no.

Q   Mr. Brown, other than the concerns expressed in your Declaration, are there any other factors you think differentiate the result in a class in a Chapter 7, again, post-FILO settlement and the liquidating Chapter 11 proposed by the plan?

MR. BEREZIN:  I just object to -- it's essentially asking the witness to have a memory of everything in his Declaration and then discern from that whether there's anything else.  It's an unfair question.

THE COURT:  No.  Overruled.  He can answer.

THE WITNESS:  I mean, I think my Declaration lays out the primary points, if that answers your question.

BY MR. KEACH:

Q   Well, are there secondary points that you have in mind that you think differentiate a 7 from an 11 under these circumstances?

A   I'd have to review my Declaration to see if I had everything.

Q   So without doing so, you're not aware of anything you left out?

A   You know, we talked about the liquidity.  I don't think I get into the buyer's perspective, but certainly a buyer is

going to not pay top dollar for this.

Q    You're assuming that there is a sale of the class B interests in that sentence.

A    I am making that assumption, yes.

Q    But on the assumption that the Trustee can otherwise finance the 7, then the Trustee's choice would be just to hold the class B interests and wait for the litigation proceeds to drop into it, correct?

A    If the Trustee was able to generate $45 million or so in short order under your hypothetical, potentially.  I -- it seems farfetched.

Q    Well, he's got $270 million worth of targets, sir. Thanks.

        MR. KEACH:  No further questions, Your Honor.

        THE COURT:  Okay.

        Anyone else have any questions for this witness?

        Any Redirect?

        MR. BEREZIN:  No, Your Honor.  May the witness be excused?

        THE COURT:  Any objection to Mr. Brown being excused?

    (No verbal response.)

        THE COURT:  Mr. Brown, thank you very much for your time, sir.

        THE WITNESS:  Thank you, Your Honor.

24

(Witness steps down.)

MR. COHEN:  I think that concludes the evidence for today.  I think if we could, we'd request a short break before closing argument unless Your Honor has any questions or anything else.

THE COURT:  Let me just kind of make sure that procedurally I've done this right.  So the Debtors rest on their case-in-chief?

MR. COHEN:  We do, Your Honor.

THE COURT:  Okay.  Is there anyone who opposes the plan who wishes to present -- well, let me ask:  Anyone else who supports the plan have any other evidence that they wish to present in their -- to the Court?

(No verbal response.)

THE COURT:  Anyone who opposes the plan?

Oh, go ahead, counsel.

MR. KAHN:  No, Your Honor.  Not from the Committee.

THE COURT:  Okay.  Thank you.

Anyone who opposes the plan have any testimony or documents they wish to admit at this time?

MR. KEACH:  The participants have no further evidence at this time.

MS. LYMAN:  TRACO has no further evidence at this time, Your Honor.

THE COURT:  Okay.

25

Let me just ask the Commonwealth and the Office of the United States Trustee and DOJ just to confirm because I know they're in the courtroom.

MR. CURTIS:  No, Your Honor.

THE COURT:  Thank you.  I'm just going by memory of folks who submitted witness and exhibit lists.

MR. TROOP:  Your Honor, Andrew Troop for the Commonwealth.  No additional evidence.

THE COURT:  Thank you.  I know your Declaration came in last night.

UNIDENTIFIED MALE:  Our Declaration came in yesterday, so no additional evidence, Your Honor.

THE COURT:  Okay.  Does anyone else have any?  Can I consider the evidentiary record closed?

(No verbal response.)

THE COURT:  Okay.  I will consider the evidentiary record closed at this point.

In terms of -- I think now you were going to -- I just want to make sure that we were clear.  So in terms of a short break, what did you have in mind?

MR. COHEN:  I think 15 or 20 minutes would be fine, Your Honor.

THE COURT:  Okay.  And then we'll proceed to closings.

MR. COHEN:  Indeed.

26

THE COURT:  Okay.  Okay.  Yeah.  Why don't we start closings at 1:45?  I know I placed a premium on closings, but I think, you know, you start going over 30 minutes, you're going to start to get the stare.  I've just got to make sure that you're -- but I don't want to foreclose.  Just if you see it.  I'm not going to ring any bells or anything.  But just to make sure.  I'm really just more focused on the evidence is what it is at this point.

I think harmonizing it for me and getting into the law and the issues, I think is the premium there.  But I'm going to give everyone an opportunity to speak as well as any parties on the phone as well.  Okay.  We'll start at 1:45. I'm just going to sign something here.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken from 1:28 p.m. to 1:47 p.m.)

THE COURT:  All right.  We're back on the Record in Steward.

Before we get started, I just wanted to thank all the parties for all the briefing, all the arguments that were made to the Court.  I very much appreciate the professionalism.  I thank everyone for taking the time and putting in such quality argument in front of the Court.

Okay.  We'll begin.

MR. COHEN:  Thank you, Your Honor.  Good afternoon.

27

For the Record, David J. Cohen from Weil Gotshal on behalf of the Debtors.  Thank you for that short break.  It gave us an opportunity to file a demonstrative for closing argument that we've prepared at Docket Number 5614.

I know we just got it on file.  I think there's copies that have been handed out to the parties or about to be handed to the parties.  I have a copy here for Your Honor, if I can approach.

THE COURT:  Okay.  Thank you.

MR. COHEN:  And Ms. Finlay from my team has control of the presentation, and we can walk through it on the screen for those parties that are dialed in as well.

THE COURT:  All right.  There, I see you there.

MR. COHEN:  If I can correct the Record, there's not a copy for Mr. Troop.

MR. TROOP:  And I'm -- thank you.  I appreciate that.

MR. COHEN:  But we will get him one promptly, and he can follow along.  Okay.

THE COURT:  Mr. Troop, do you need a copy?

MR. TROOP:  No, we're set, Your Honor.

THE COURT:  Okay.

MR. TROOP:  Thank you.

CLOSING ARGUMENTS

BY MR. COHEN:  So in terms of our closing

28

presentation, I'll plan to provide a quick introduction and address the arguments regarding feasibility and Section 1129(a)(9).  Mr. Carlson will speak to the best interests test, classification, and solicitation.  And then Mr. George from our team will address any arguments regarding the releases and exculpation under the plan.

And of course, if there's any other issues that Your Honor has been thinking about and would like us to address, we certainly will.

So, just as an introduction, Your Honor, at the final settlement hearing, you indicated that you wanted to hear from creditors.  We now know creditors do want this plan. Mr. Carlson will address some of the arguments regarding classification and solicitation that were raised in the openings.

But the fact remains, of the 3,700 claims that voted on the plan in accordance with the solicitation procedures, approximately 3,000 of them voted to accept, with an impaired accepting class at every Debtor.

And of the approximately 258,000 parties that were served with notice of the plan in this confirmation hearing, only a few objections remain, namely, TRACO, the deferred comp participants, Massachusetts, the U.S. Trustee, and the Igoe estate.  There may be a couple of others that I've missed, but I'm sure those folks will speak up.

**DEBTORS' EXHIBIT NO. 9**
**Page 28 of 218**

29

You know, those were the main participants over the last 24 hours.  All the main objectors employ sort of a kitchen sink approach to try to attack the plan from various angles and push these cases into Chapter 7.

The heart of objections really focus on feasibility, the treatment of administrative creditors, and the best interests of creditors.

Your Honor, we're highly confident that confirming these cases at this juncture is the best outcome for creditors that we could ask for in these cases.  We've already come a long way in terms of being able to sell assets, save hospitals, save jobs, and advance litigation frankly, against all odds, when you think back to some of the darker moments of these cases.

And you know, Your Honor, you know, both of us were standing here when we had to deal with the closure of a couple Massachusetts hospitals, you know, the Pennsylvania hospital being caught in a rock and a hard place with MPT and the lenders.

So, you know, frankly, I think it's monumentous that we've even gotten to this point.  And to be able to bring about a resolution of these cases we think in an efficient manner is a responsible thing to do.  It will also maximize recoveries, minimize claims.

We've been working with closely with Monica

Blacker's team from Force Partners, who's going to step in and act as the plan administrator role if we confirm alongside Mr. Transier and Mr. Carr, as well as Ms. Demetra Liggins from McGuire Woods on a smooth transition of the day-to-day administration of the estate.

And I know that's going to be hugely beneficial. And of course, the Weil team.  And even though he may not like it, Mr. Castellano, I know he'll be there to aid in the transition and continue to support the estate and the litigation trust's efforts on critical issues, including supporting litigation, both affirmative and defensive, managing multiple Government investigations, and addressing the myriad of issues that this complicated estate deals with on a daily basis that don't bubble up to this Court.

Conversely, we think the alternative is really not an alternative.  Conversion of Chapter 7 in likely one of the largest Chapter 7s in history, it will just result in more claims, less creditors being paid, and a significant impairment of litigation recoveries the Debtors have been working so hard to develop so they can pay admin and priority creditors in full.

And to be clear for the Record, I know Your Honor asked this at the outset, this plan would only go effective once there's enough cash or reserve to pay or reserve for admin claims in full.

31

That's what the models are provided for.  That's what we intend.  We view that as a CP to the effective date and not a waivable one.  And if we need to document that in a confirmation order or plan to make that express, we can absolutely do that.

So now that we've concluded the evidence, we would submit the Debtors have met their burden for confirmation by a preponderance of the evidence, and we'll walk through each of the elements that you see here on the page, beginning with feasibility.

We heard Your Honor yesterday.  You want to know what the parties think is necessary to satisfy 1129(a)(11) of the Code.  Well, like Your Honor said in Red River, interpreting the Bankruptcy Code begins with analyzing the text.

And we know that in the Fifth Circuit, the text is always alpha.  Notably, the word feasible does not appear in the Code.  The Code simply states that confirmation of the plan is not likely to be followed by the liquidation of the Debtor or any successor of the Debtor under the plan unless such liquidation is proposed in the plan.

Now I know Your Honor heard a lot of evidence yesterday about the projected recoveries on the Debtor's litigation claims, the ability to satisfy all admin and priority creditors.

32

The Debtors wanted to make sure that the Court and creditors understood these are real claims that will be pursued, that we've got a handle on the claims against the estate, and the plan is not some visionary scheme.  Right.  There's cases that say if it's a visionary scheme that doesn't satisfy feasibility.

But taking a step back at bottom, the Debtors' plan is a plan of liquidation; and therefore, it satisfies the technical requirement of section 1129(a)(11) as liquidation is proposed in the plan.  Numerous Courts have acknowledged that plans of liquidation de facto satisfy (a)(11).

The use of that approach has been recognized by judges in this circuit including Judge Houser in *In Re Heritage Organizations, LLC*, and Judge Bohm in *Cypruswood Land Partners*.

Two Courts outside this district have been direct about it.  In *In Re Pero Bros. Farms, Inc.*, 90 B.R. 562 (Bankr. S.D. Fla. 1988) said the feasibility test has no application to a liquidation plan.  And in *47th and Belleview Partners*, which you can see on the screen, said feasibility under the literal wording of 1129(a)(11) of the Bankruptcy Code is unnecessary to be shown when liquidation is proposed in the plan.

And more recently, a Bankruptcy Court in *Cash Cloud* found the plan of liquidation was satisfied under (a)(11)

**DEBTORS' EXHIBIT NO. 9**
**Page 32 of 218**

33

because the purpose of the proposed plan itself is the liquidation of the Debtor.  And I think there's a great quote from the Court there that we've got on the screen of the demonstrative.

It says, "The degree of certainty required for a Chapter 11 plan to be feasible varies from case to case and plan to plan.  In this instance, is there certainty that the proposed creditor trust will succeed in collecting all of the assets it pursues?  No.  Is there certainty that a Chapter 7 Trustee would succeed in collecting all of the assets that he or she pursues?  No.  Is certainty required?  No.  Is there a sufficient showing of certainty that the claims of the estate will be pursued?  Yes."

Clearly, we have that here.  And, Your Honor, this interpretation isn't contained to just Courts in Missouri and Nevada and Southern District of Florida, where I'm from.  It's been adopted by one of the most prominent bankruptcy judges to sit on the bench.

In In re Cellular Info. Systems, 171 B.R. 926, Judge Lifland held that a plan does not fail the feasibility test if there is a possibility or even a probability of a liquidation under a plan so long as the means for liquidation is proposed in the plan.

Here the means of liquidation are proposed in the plan.  The plan contemplates the establishment of two

34

liquidating trusts, the transfer of the Debtors' remaining interest assets to the trust, the appointment of liquidating Trustees, the financing of the trust, and mechanisms to distribute trust assets to creditors.

On that alone, the Debtors submit the plan satisfies 1129(a)(11) on its face.

But even if the Court doesn't adopt the simpler feasibility approach based on the text, and we think it can, the Debtors have still met their burden to establish feasibility under the case law applicable to plans of reorganization.

Namely, is there a reasonable prospect for success? We will get to the evidence, but just to focus on the standard for a second because we don't think it's a high hurdle. Feasibility, it's clear, is not guaranteed success.  It's a reasonable probability.

Some of the objectors asked for a backstop for payment of claims and if we had one, or wanted to know if Mr. Castellano was going to achieve 100 percent success on all of his claims objections.

But as the Fifth Circuit is recognized in *Briscoe*, the Court need not require a guarantee of success.  Rather, as Judge Rodriguez said in *Pearl Resources*, "The parameters articulated in the statute are relatively low."

And going back to the Fifth Circuit in *T-H New*

*Orleans*, even if the projections are aggressive, the Court could find the plan feasible.  I referred to this earlier, but the purpose of the feasibility test is really to prevent confirmation of visionary schemes which promise creditors more than a Debtor can possibly attain.  That's in *Lakeside Global II Limited*.

That's not what this is.  And we think that with the evidence in front of the Court about what we've already done and what we expect to do around the claims and causes of action and the claims against the estate that we can certainly say we have a reasonable probability and more than that to be able to go effective.  And that is certainly everybody in the estate's single mission to be able to do that.

In terms of the evidence, the evidence and the sources of recovery that came not just from the testimony of Mr. Castellano and Mr. Carr, but also the exhibits that are in evidence related to each of the estate's litigation claims is substantial and credible.

And none of the objectors presented any evidence as to why the Debtors' litigation assets do not have significant value or the value ascribed to them by the Debtors.  We believe we've put the necessary meat on the bone.

And with respect to the hurdle of administrative and priority claims that need to be satisfied for the plan to go effective, we think the Court should find Mr. Castellano's

36

testimony to be extremely credible.

Him and his team have been on the front lines dealing with these claims day to day.  He knows them cold. And while various parties appointed to the significant claims that have yet to be expunged from the claims register, those arguments just aren't credible.

The Record is clear that the billions of unexpunged claims that the objectors hang their hat on are really just a sort of type of frivolous throw ins that don't impede confirmation.

The Debtors estimate that there's a -- and Mr. Castellano testified to this -- there's a hurdle of approximately 377 million of net proceeds that need to be received to repay the FILO lenders class A interest, administrative expense claims, and priority claims.

Mr. Castellano testified that the Debtors only need to recover 13 percent -- 13 percent of the damages sought in these litigations in order to go effective by early 2027. That's not based on the advice of counsel.  That's just the math relative to the 3 to 3.3 billion damages that Mr. Castellano testified to.

Mr. Castellano also testified that he conservatively estimates receiving between -- somewhere between 575 and $792 million for a midpoint range of 677 million, including a net recovery of approximately 567 million by early 2027.

**DEBTORS' EXHIBIT NO. 9**
**Page 36 of 218**

And the evidence shows that even when you add in what can be the conceivable maximum that the various objectors that have been putting forth argument in this Court could obtain allowance of, of admin, priority, or constructive trust claims, and you can see them on the far-right bar there, we believe that we can still go effective.

Further, what Mr. Castellano's testimony showed is that a midpoint recovery, he expects there to be at least $235 million of recoveries beyond the admin and priority claims.

What he also said is that the effective date of the plan is reasonably likely to occur in early 2027 and that he believes the Debtors will have sufficient cash flow to make all payments required to consummate the plan.

Perhaps most importantly to prove that the liquidation itself is feasible, Mr. Castellano testified that the litigation trust and the estate will have sufficient funding to administer themselves and to pursue their valuable claims and causes of action.

With respect to the litigation claims and causes of action, we know there's been a lot of debate about inclusion and what the value the Court can ascribe to the total litigation proceeds line in Exhibit A, which is reproduced here on the slide.

But we think that there's enough in the record to support these estimates.  Again, even if Your Honor ignores

38

those, there's enough evidence in the record to support that these estimates were reasonable based on the Debtors' judgment.

The fact that the independent experience transformation committee, Weil, AlixPartners, the input of five sets of law firms reviewed by the creditors committee, Akin, FTI.  I mean, this was the basis for these parties going forward proposing this plan and supporting it.

But even if the Court doesn't want to rely on the Debtors' estimates, this Court is perfectly capable of forming an opinion about the reasonable prospects of the Debtors achieving recovery on their litigation.

This Court assesses the prospects for litigation all the time, including when, for example, assessing whether to approve settlements under 19 and a low-risk range of reasonableness standard.

We cited here to a Judge Walrath decision in *Washington Mutual* with respect to the assessment of a planned settlement, a confirmation, which makes it clear that it is sufficient for the Court to assess litigation based on positions asserted by the parties.

Here the Court has enough information regarding the Debtors' claims, the objectors' criticisms of those claims, and based on the evidence provided, and based on the low standard under Fifth Circuit law for feasibility, to determine

39

that there's a reasonable prospect of success based on the varied mix of litigation claims that the Debtors have.

Turn to the next slide.  We can do that by looking at things like the total amount of damages sought, the diversified mix of the claims, the progress that's been made or expected to be made, and reasonable assumptions that this Court could make about how quickly litigation could advance based on the information provided.

Those litigation assets, as we've been talking about for months, are substantial, with more than 3 billion in damages being asserted and they're listed on this page in five broad categories.  These are not speculative claims.  All of them are being actively prosecuted.

Norwood, it's a $589 million business interruption claim about a hospital that, in fact, flooded and, in fact, was closed for years.  And after the insurer Zurich tried to evade payment and push off this trial that's scheduled in early January, in January 2026, including twice in the last couple of months both times, the Trial Judge said, no, we're going forward with this trial.  The Court is holding this in January, and this will be a substantial source of recovery for the trust and the estate.

In terms of the payroll litigation, the Debtors have $349 million in claims against commercial payors for nonpayment from medical services actually rendered.  King &

**DEBTORS' EXHIBIT NO. 9**
**Page 39 of 218**

40

Spalding is an active arbitration, mediation, or negotiation with 21 commercial payors across the country.

And Mr. Castellano testified that all of these disputes will be resolved by early 2027.  That's his expectation.  Mr. Castellano also testified that the Debtors have made demands or commenced adversary proceedings asserting claims of approximately $380 million for preferences.

Those litigations have already started to bear fruit.  As of June 27th, they had brought in 6.5 million when Mr. Castellano testified.  And just in the last two weeks, that number has doubled to 14 million.  There are stipulations which we refer to here that have been filed on the docket.

Those are admin claim waivers, cash recoveries.  You know, this is generating proceeds in real time.  And overall, the nature of these types of claims, we both know they rarely go to trial.  And so we expect those recoveries to come in over the course of '26 and '27.

On Blue Cross, the Debtors have retained King & Spalding and have a pending complaint that was filed in April pursuant to which the Debtors will assert damages of 1 billion.  Again, not a speculative claim.  Blue Cross has already agreed to a $2.8 billion class action settlement for the same causes of action with parties the Debtors have opted out of because they believe there's significant value here.

And with respect to the insider investigation

**DEBTORS' EXHIBIT NO. 9**
**Page 40 of 218**

41

claims, Mr. Carr testified that the fraudulent transfer claims against insiders will assert claims of over $1 billion related to prepetition distributions to shareholders while insolvent, as well as numerous other transactions.

And in fact, the Debtors represented by Kobre & Kim are planning to imminently file a complaint asserting fraudulent transfer and breach of fiduciary duty claims. Moreover, even though Mr. Carr testified he has not established an estimate for the variety of breach of fiduciary duty claims that this estate can bring, he did testify that there was $120 million in D&O insurance for actions from 2020 to 2025 and a remaining $110 million policy for any conduct arising pre-2020.

Moreover, the damages identified by Mr. Carr do not include claims that the litigation trust or the Debtors, you know, expect to bring or may bring related to Tenet, conduct related to TRACO, and the corporate waste claims that were discussed on the record.  So that's the litigation claims.

In terms of the admin and priority claims, you can see here that -- Mr. Castellano testified to this -- the Debtors have reconciled every proof of claim.  And between the stipulations that we have with creditors and the admin consent program process we have stipulated, assuming the plan is confirmed, we will have stipulated allowed admin claim amounts with over 1,600 admin creditors.

42

But when you take into account the claims reconciliation process and the objection process, the remaining amount of the claims required to be paid on the effective date is approximately $53 million.

You can see the 52.9 gray bar there on the right. That's the liquidated admin claims, sort of.  I'll call them the vendor claims.  Plus, there's an actuary estimate of $18 million for postpetition med mal and workers comp, even though to date only one medical malpractice claim has been filed.  So we think that's a conservative estimate.

We also have approximately 30 million in priority tax claims.  Mr. Castellano testified, Your Honor, that over the pendency of these cases, the Debtors have paid 98 percent of all admin claims, a total of 2.8 billion.

It's not -- I know a lot of parties like to sort of say this -- it's not as if the Debtors ignored their admin claims for months.  It's quite the opposite.  The Debtors have continued to pay for necessary admin claims for necessary services or those that provide ongoing value, and have taken significant efforts and fought tooth and nail with the FILO lenders, with MPT and others to get funding to pay the old admin claims.

We've utilized the TSA vendor fund, the MPT escrow account, and now the admin consent program, if the plan is confirmed, to get $15 million of the FILO lender's collateral

43

to collectively satisfy over 50 million of the historical admin claims.

We don't take any comfort or joy in the balance that remains.  That's why we're working so hard to do this, and it's why we're advocating for this result.  It's the path to get this done and get these creditors paid.

Your Honor will recall that back in December, after we set an admin bar date, we identified that there was $100 million of admin claims outstanding.  And we've worked tirelessly to address that amount.  That brings us to today, and that's how we've gotten to that $50 million number that's outstanding.

We set out to get a handle on it.  We got the number down, and we're working to accomplish our goal.  We think we have the momentum to get this done.

In terms of the estimate of the claims to be satisfied, the number of claims that have been objected to is substantial.  There's over 2,800 admin proofs of claim. There's over 1,300 priority proofs of claim.  We've objected to 2,800 claims so far to be able to reduce those numbers down significantly.

And we have pending objections filed with respect to 13 billion of such claims.  The objectors say that the projected amount is unrealistic, arguing that the Debtors' estimates require near-perfect execution of the Debtors'

44

objections to claims.

It's really not true.  As Mr. Castellano testified to, the billions of dollars of claims that the objectors point to are just not real.  You can see here the $14 billion number.  Next to it represents the majority of that amount, a $9 billion priority claim that was handwritten, filed by an individual for threat, abuse, and violation of takeover, whatever that means.  I think we can disregard that one.

There's another 2 billion in priority claims by two individuals who really have no contact with the Debtors.  And a $1.2 billion claim filed by CareMax for prepetition activity, something that the Debtors really didn't have any interaction with postpetition.  That's another one I think we can disregard.

The list goes on and on.  We've identified sort of these large claims here that are that are frivolous, Your Honor.  And we've included references to the proofs of claim as well as a schedule in the demonstrative with some more detail.  I think Your Honor can take judicial notice of those claims and review those and see that they are what they are.

Ultimately, the Debtors' claims estimates and their reasonable good faith estimates based on the Debtors' and their advisors thorough and methodical review of all asserted claims, that's what it's based on.

The vast majority of our anticipated objections or

45

pending objections seek disallowance on clear cut legal and procedural grounds.  So for all the dust that has been kicked up about the amount of claims that are pending, we cited to a case here, *Cajun Electric Power*.  Speculative prospects of failure cannot defeat feasibility.

Moving on to 1129(a)(9), which has gotten a lot of focus, again the text provides that for persons holding allowed claims of the type listed in 507(a), they shall receive cash equal to the allowed amount of such claim.

The plan does provide for full payment of those allowed claims.  And as all Courts have recognized, there is nothing in the Code or the case law that says that a plan has to go effective by a date certain, some specific date.

The Third Circuit has held that each bankruptcy is unique.  While a reorganization plan typically becomes immediately effective after it's confirmed, in some cases there can be a significant delay.

Really, the effective date -- this is in *Wonder Corp. of America* -- should be no later than is reasonably necessary to accomplish a legitimate purpose.  The Debtors obviously have a legitimate purpose here.

The objectors point to case law that says an extended executory period is unreasonable if creditors are forced to bear all the risk of the delay.  And that's -- they cite to *In re Yates* for that.

But reliance on *Yates* is misguided as other Courts have held that if between confirmation and effective date there is no real danger of prejudice, that even a delay of months or years may be permissible.

Here creditors are not being asked to bear the risk and there's no prejudice.  Creditors would bear the risk in a Chapter 7 instead, whereas Mr. Brown testified, significant benefits from the plan will be lost.

Rather, confirmation and the executory period provides the time and opportunity to build on the momentum of the Debtors' advances in these cases to date to get to the effective date and get admin and priority creditors paid in full.

The cases the objectors cite to, like *Vagu*, *Krueger*, *Yates*, involved hopeless sale processes, Debtors transferring money to insiders in bankruptcy, or Debtors failing to make progress after a plan with contingencies was confirmed.

That's not what this case is.  As Your Honor is well aware, we've made incredible progress.  And we would propose that if the plan is confirmed, the plan administrator committee and the litigation Trustee continue to hold status conferences to report to the Court on progress, just like we've done with Your Honor since late last year so the Court and creditors can stay apprised of what I know will be continued substantial progress.

47

While this isn't the way that we drew it up, I would say that having a period between confirmation and the effective date is consistent with many plans these days -- plans that require regulatory approvals, plans that require financing, plans that require time for the Debtors to monetize assets.

Again, the objectors point to cases that say the effective date can't be that distant. But again, the Court in *Central European* held that a delay of months or years may be permissible where there's no real danger to creditors or prejudice.

And the cases generally suggest that the proposed effective date must be reasonable in the circumstances. We would submit the plan's anticipated effective date in early 2027, which we're all hoping goes faster. We all recognize that it could be faster. It could take longer, but we would submit it's not too distant based on the circumstances of these cases.

As Your Honor knows, from January 2024, prepetition and onward, there was a continuous liquidity crisis at a company that operated 31 hospitals that basically lasted up until the Debtor signed the FILO settlement in April 2025. And that gave us an extension of the maturity date through confirmation of the plan.

Given the necessary and critical costs that were

incurred to sell the hospitals, safely close the two that had to be closed, sell the physician network, transfer the BMI program, continue to provide TSA services, and then transfer those again, all with the backdrop of a liquidity crisis that this company suffered for, for 15 months, it is not unreasonable that the pursuit of claims has really only heated up in the last four to five months.

And we have been able to accomplish a lot in that time frame.  And so the projected timeline to realize those litigations is rational and it's not longer than is necessary to achieve the liquidation of assets and have the plan go effective.

Lastly, we cited to *Sears*.  Mr. Keach noted that *Sears* was, quote, "an unmitigated disaster."  Well, in *Sears*, there was a lot of discussions going on that looked a lot like this, and that plan went effective and admin and priority creditors got paid in full at the end of the day.

As Mr. Carlson will explain, those creditors will not get paid if Mr. Keach and others' wishes are granted and these cases are converted to Chapter 7.  I'll turn it over to Mr. Carlson.

MR. CARLSON:  Good afternoon, Your Honor.  Cliff Carlson for the Debtors.  So I'll start with the best interests test and I'll try to be brief because you just heard that testimony from Mr. Brown.

49

We think it's clear from the evidence here that the best interests test is satisfied for the one class that this really matters, which is general unsecured claims.  The other two classes voted 100 percent in favor of the plan.

And you see here that the results of that liquidation analysis show that in a Chapter 7, the range of recoveries is between 0.5 percent and 5.6 percent for GUCs.  And in an 11, it's between approximately 3.9 percent and 21.6 percent.

And really, I'll walk through now the underlying assumptions in Mr. Brown's testimony, but I don't think any of them were really controverted.  And there's no evidence in these cases that have been presented to rebut anything that Mr. Brown is relying on here.

First, it assumes that the FILO settlement is approved, which is how the settlement works.  And it's implemented pursuant to the order approving that settlement, and that all the assets of the estate are transferred into the trust and that the estate assets would be $6.5 million in cash, and the estate's interest in the litigation trust, the class B interests.

And of course, you know, the evidence showed that would -- that the evidence in the testimony from Mr. Brown was that in a chapter 7 trust, there would be incremental tax claims as a result of not confirming a plan and getting the

50

benefit of tax deductions under an 11 Under a plan.

And in those circumstances, there would be incremental tax liabilities of approximately 24.5 to $28 million.  And that would be payable in December of 2025.  And that was based on the analysis that was provided by BDO.  And I think you heard from Mr. Castellano There was a lot of work that went into that.  It was reliable.  You know, notwithstanding that there were brackets and draft notes on the top.

And so there's really nothing in the evidence to challenge the fact that that tax will come due in a 7 that won't come due in 11.

Your Honor, there's also a number of other benefits that -- and oh, sorry -- and as a result of that and other factors, the Chapter 7 Trustee would be forced to sell the estate's interests in the class B trust and the class B interest at a 50 percent discount.

And that's based on a number of factors, including the fact that they would be -- they'd have to be liquidated in order to be able to satisfy that tax obligation.

In addition, Your Honor, I think there are a number of benefits under the plan that would not be realized under a 7, and you heard the testimony on that.  The estate and the Chapter 7 Trustee would lose the $15 million in estate funding, including the 12.5 million that would be used to fund

DEBTORS' EXHIBIT NO. 9
Page 50 of 218

51

the admin consent program.

And the net effect of that program is a $32.5 million net reduction in admin claims.  So that benefit would be lost.  We would also lose the benefit of the FILO lenders' agreement to subordinate their litigation financing fees.  And so that's another lost benefit.

And of course, there would be incremental costs in a new Chapter 7 Trustee coming and hiring new professionals, and that's also reflected.

Your Honor, I think the focus of, you know, Mr. Keach's testimony or Mr. Keach's cross was really about, well, what about other sources of recovery like disgorgement. And I think the evidence here is clear that disgorgement is not really a viable source of recovery under these circumstances.

And that's why you heard from Mr. Brown that he's never, you know, he's never assumed disgorgement.  And that's -- and that makes sense because, you know, the professional fees that were paid in these cases, of course, were paid out of a professional fee escrow.

And so there's a number of questions and it's highly speculative that any type of disgorgement claim could be successful on the timeline where a Chapter 7 Trustee only has a few months to get in and to prosecute to conclusion a disgorgement action.

So I don't think that that's a viable source of recovery for a Chapter 7 Trustee, nor are the releases under the plan. I think you heard plenty of evidence from Mr. Castellano and Mr. Carr that we've run a robust investigation. The estate is doing everything it absolutely can, working with the creditors committee and the FILO lenders to preserve all the valuable causes of action in these cases.

And those are being transferred to litigation trusts. Nothing is being left. And you heard the short list of individual released parties here, which are also the same releases that were already granted by this Court under the FILO settlement order and will go into effect in any event.

And so, Your Honor, we think, you know, again, no alternative evidence or modeling that was presented by any of the objecting parties, we think this is a clear cut -- the evidence demonstrates that the best interests test is satisfied with respect to all of the classes, including the general unsecured claims.

So moving to slide 19, Your Honor, here, I think just while we're talking about what would happen in a 7, we'll briefly talk about the outstanding motions to convert. I think this, frankly, these motions are moot if the Court confirms today.

But I think it's based on the evidence in the record that the movants are not able to meet either of the required

prongs under section 1112(b)(4), (a)(4)(A) here in particular if the Court confirms under the second prong.

And you see here that of course, you know, this prong is applicable even under a Chapter 11 plan of liquidation and Courts have held that in this District.

So, Your Honor, moving to the voting results.  Here we have three voting classes -- the FILO bridge claims, which have claims that 99 of the Debtors, all 99 of those Debtors voted to accept; and at class 2, we had 105 out of the 167 Debtors except for the general unsecured claims; and then of course, the class 5, the PBGC claims, all 167 Debtors voted to accept.

And so the result of that is we have an impaired accepting class.  We have at least one impaired accepting class at all 167 Debtors.  We've got at least two impaired accepting classes at 135 Debtors and then three at 69 Debtors in these cases.

And I'll briefly focus a little bit -- I usually wouldn't -- we wouldn't talk this much about solicitation, but I do want to briefly talk about the testimony of Mr. Johnson and the focus of questioning that came from Mr. Troop and others.

I think what the evidence showed pretty clearly here is that the Debtors did, in fact, through Kroll, followed the solicitation procedures that were approved by this Court, and

54

no evidence to the contrary has been presented here.  And that we ran a fair and equitable voting process, and it was consistent with those procedures in the Bankruptcy Code.

You know, as it relates to the Cross, the so-called Cross Country vote, again, I think we heard from Mr. Johnson on this point.  There was a $38 million claim filed at each of the Debtors.  Those were non-CUD, non-contingent, non-unliquidated, non-disputed claims.  And so Kroll, in accordance with the procedures, validated them.

And I think what you saw from Mr. Troop was all that you can conclude from his line of questioning is that, well, if you just take one of those votes out, the results will -- could change.  But the procedures don't require, you know, don't require us to object to claims, don't require us to confirm, you know, confirm defective ballots.

And talking about the excluded ballots for a second, you heard from Mr. Johnson that there was nothing atypical about that as well.  The ballots that were submitted that abstained -- that's what the procedures contemplate -- many of them abstained, and they did so by not checking a yes or no vote.

And many of them, of course, were doing so to opt out of the third-party release.  And so the evidence you have before you, Your Honor, is that Kroll applied the hierarchy and the procedures to a T, and there was zero evidence

**DEBTORS' EXHIBIT NO. 9**
**Page 54 of 218**

presented by any of the objecting parties to suggest otherwise or that there was anything improper about our process.

I think the other point you heard from Mr. Troop was, well, why didn't she substantively consolidate the votes? You're doing so for the -- for purposes of distribution. But our procedures and our plan, you know, don't contemplate that, and there's no reason we need to.

And there are plenty of plans that provide for substantive consolidation of distribution purposes that don't for voting, including *Sears*, for example. And so if there was an issue and folks thought that that was appropriate, they should have raised it before the solicitation procedures order was entered by this Court.

And then I think as it relates to TRACO, you know, you heard testimony from Mr. Johnson there, which is Kroll reviewed the schedules, saw a scheduled intercompany claim by TRACO, and flagged it as an intercompany claim so TRACO didn't get a ballot.

And subsequently that was rectified as soon as, you know, once the motion was filed and there were discussions and a $60 million ballot was provided to TRACO, and they voted to reject the plan. So there's nothing -- there were no issues with respect to that, the TRACO motion, which was withdrawn.

And so, Your Honor, unless if you have anything on voting, I'm going to move on to substantive consolidation. As

56

I mentioned, the plan does provide for limited substantive consolidation for distribution purposes.

There was comprehensive testimony that came in from Mr. Castellano as to the challenges and impracticabilities of reconciling intercompany claims of $11 billion when the company operated as a consolidated company and didn't have -- didn't record their intercompanies. And I think, you know, and again, I don't think anyone's challenging that, but the evidence -- we think that the evidence submitted satisfies the 9019 standards as well as the hopeless entanglement test under the case law.

Moving on to classification. So here, Your Honor, there were a few objecting parties that argued that it was improper for the Debtors to separately classify the FILO bridge claims and the PBGC claims from other GUCs.

And of course, the Code and the case law provides Debtors with substantial flexibility in how they classify their claims. And here, for as long as there's a reasonable basis for classification claims within a particular class, I'll start with the FILO claims.

This one, I think, is pretty easy. These claims were separately classified because they're secured by all of the Debtors' assets. These are secured claims. And so, of course, they were separately classified.

I think the argument you may hear is, well, under

the FILO settlement, you know, these claims were being treated, and in exchange for the FILO settlement, they're getting the Class A-2 interest. And so it's not the plan that's doing the impairing; it's the FILO settlement.

But that's not how the settlement works. That's not how our plan works. The settlement hasn't gone into effect yet. We've got, you know, we've got two -- there are two aspects of the FILO bridge claims that are left or that will be left following implementation of the settlement.

There's the $41 million in bridge claims that will be exchanged for the Class A-2 interests. And then there's a $10 million secured claim. That's the retained FILO claim that's being -- that's also being treated under the plan. And so that both of those claims are being impaired under section 5.3 of the plan -- I'm sorry, 4.3 of the plan.

And so, Your Honor, we think it's very clear the FILO bridge claims are appropriately classified separately from the general unsecured claims.

Moving to the PBGC claims, here, Your Honor, Mr. Castellano testified that they were separately classified due to the unique legal rights that they had separate and apart from all the general unsecured claims. And that's for the main one being that they're joint and severally liable under federal statute under ERISA.

And based on those unique legal rights, their

DEBTORS' EXHIBIT NO. 9
Page 57 of 218

58

objection to substantive consolidation or threatened objection to substantive consolidation for distribution purposes, the fact that they would be entitled to 100, you know, repayment on their claims at a rate of 167 times more than any other GUC, and also disputes over the amount and priority of their claim, we entered into a settlement to recognize those legal rights that are distinct from other general unsecured claimants.

And that settlement that was entered into with PBGC did resolve a number of those disputes -- all of those disputes around the amount and priority of their claims.  It dealt with the fact that they have joint and severally liable claims against all 167 of the Debtors.

It resolved, you know, how the plan would be terminated, and it also avoided litigation over substantive consolidation and other issues around all that.

And so here, you know, the uncontroverted testimony that came in from Mr. Castellano and all the reasons for separately classifying them, we think is more than appropriate to have them as a separate class here.

I would note, you know, there are other, you know, all of the other cases, I don't think there's a single case where a Court has said that the PBGC claims can't be separately classified from other general unsecured claims.

And there are cases like *Sears* where the Court has

**DEBTORS' EXHIBIT NO. 9
Page 58 of 218**

59

overruled an objection on the basis that they need to be --
PBGC claims should be classified with other GUCs.  And so, you
know, I think the cases that the objecting parties really rely
on here is the *Greystone* case, the Fifth Circuit case from
'91.

But, you know, that case is different and
distinguishable for a number of reasons.  In that case, the
Debtor sought a cram down plan over their secured noteholder
who bifurcated their claim to a, you know, $5 million secured
claim, $3.5 million unsecured claim.  And then they created a
trade class for $10,000.

And they wanted their trade class to be their
impaired accepting class.  Judge Edith Jones, you know, in the
Fifth Circuit said, just didn't accept the testimony that --
said there was no testimony.  There was no -- there were zero
witnesses that provided a business, a valid business reason
for separately classifying them.

And said, if you look at, you know, they said, well,
we're, you know, we need to take care of -- the attorneys
argued we need to take care of our trade creditors.  But if
you looked at the way trade creditors were treated, they
received the exact same treatment as the unsecured deficiency
claim for, you know, less than 4 percent.  So the Court just
rejected that argument.

They also made this -- they also said, well, there

60

are legal reasons for separately classifying the unsecured deficiency claim because there's no recourse under state law. And the Court again said, well, no, we reject that argument because the Code, section 1111(b) gets rid of that distinction.

And so the Code basically unimpairs that and makes those, you know, made that legal distinction, you know, not applicable. And so I really don't think *Greystone* is on point for these cases.

And, you know, like I said, there's no -- there was no challenges or any evidence introduced to suggest otherwise and challenge the business reasons for separately classifying the PBGC claims.

Your Honor, I'll briefly touch on the no disparate treatment argument that we heard, that we saw in a lot of the briefing and that, you know, certain parties here object to the plan on the basis that administrative expense claims and professional fee claims are treated differently or unfairly.

I think that's just incorrect as a matter of law under 1123(a)(4), which is only applicable on its face to the treatment of claims in a class, which is not -- these are -- neither of these claims are classified, and they're not even in their own, like, class.

And so I think right there, you -- that argument fails as a matter of law. And we've cited to a number of

61

cases in our brief that support that and haven't seen any single case cited by any of the objecting parties to suggest otherwise.

But even if you get past that and you just looked at how the claims are treated, I think the unfair discrimination argument, it sort of ignores a few different things.  One, it, I think it, you know, it doesn't account for the fact that -- well, first I think it's inconsistent with the record in these cases that professionals are being treated differently and unfairly.

I think you heard from Mr. Castellano that the estate is presently paying administrative expenses, including nonprofessionals that are arising and for services rendered in these.  And I think you also heard, of course, that certain professionals in these cases are agreeing to a deferral of a portion of their fees.

But in addition to that, I think it also fails to account for the fact that professionals are differently situated in any event than other admin creditors because of the protections that are afforded to professionals under the DIP order that this Court approved that provides for a professional fee escrow and payment out of that which is not property of the estate.  And of course, the interim compensation procedures.

And so there's really nothing unusual for how

**DEBTORS' EXHIBIT NO. 9
Page 61 of 218**

62

professional fee claims are being treated under our plan and in liquidating plan as this one.  It's consistent with, you know, the plan provides that, you know, professional fee claims are to be paid in accordance with the existing interim comp order and subject to the normal rules for review and Court approval.

So, Your Honor, moving for those reasons, we don't think that the disparate treatment argument has any merit.

Moving to the administrative expense claim.  We've also received a number of objections to the admin consent program.  You know, the Court has already approved all of the procedures and forms under the solicitation order.

We think that we've implemented those procedures in accordance with that order and that the Debtor solicitation agent, you know, mailed the consent program materials to each of the eligible admin creditors.

You know, just to give you some of the stats that you may have seen them on earlier slides, approximately 1,780 of those admin claimants received an opt-out form for an aggregate amount of 104.5 million.

THE COURT:  I'm familiar with the numbers.  You can proceed.

MR. CARLSON:  I'll move on.  But I think, Your Honor, I think we -- so, you know, we'd ask that, of course, this administrative expense claims consent program be approved

**DEBTORS' EXHIBIT NO. 9**
**Page 62 of 218**

63

as part of confirmation if the Court confirms.

And so I'll move on from there.  Before turning it over to Mr. George to address the release exculpation injunction arguments raised by the UST and others, as well as the medical liability procedures, let me just quickly -- I won't go through all the 1129 factors because I think most of them --

THE COURT:  I won't let you either.

MR. CARLSON:  Fair enough.  I guess that's the look. But I do want to briefly touch on the good faith factor in section 1129(a)(3).  There's been a lot of mudslinging against the Debtors, the professionals, the UCC, the independent directors, and you know, at the end of the day, there's not a shred of evidence that's been to question the good faith of these parties and that everybody's trying to work as hard as they can to navigate a difficult situation and try to come up with the best path forward for maximizing value for the estate.

And the fact remains at the end of the day that this really is the only and best option for maximizing value that's left.  And so, Your Honor, with that, I'd turn the podium over to Mr. George.

THE COURT:  Thank you.

MR. GEORGE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

**DEBTORS' EXHIBIT NO. 9**
**Page 63 of 218**

64

CLOSING ARGUMENTS

BY MR. GEORGE:  For the Record, Jason George, Weil Gotshal & Manges, on behalf of the Debtors.  As Mr. Carlson pointed out, I'll address the release and exculpation provisions in the plan and also briefly respond to Your Honor's comments yesterday about the medical liability claims procedures.

Starting with the Debtor releases, the plan in section 12.6(a) provides for a release of certain claims and causes of action by the Debtors.  The release parties include the FILO parties and their professionals, the creditors committee and its members and professionals, and a limited set of Debtor-related parties, including the transformation committee and CRO, directors and officer of the Debtors' hospital entities, and a limited set of corporate-level directors and employees.

As Mr. Carr testified yesterday, these releases are narrowly tailored to preserve the estate's valuable claims and causes of action.  This is not a case where the Debtors are granting broad releases of all parties upon confirmation of the plan.

You know, quite the opposite.  The plan is designed to preserve the estate's valuable claims and causes of action to be prosecuted by the litigation trust for the benefit of the estate and its creditors.

65

The Debtor releases were authorized after a thorough multi-month investigation led by the investigation subcommittee.  The corporate-level directors and employees receiving a release are very limited in scope.  They're listed in Exhibit A of the plan.

As reflected by yesterday's testimony, none of these individuals were involved in the various transactions that were subject to the investigation.  There's no indication of any wrongdoing by any of these parties.  And the parties provided, and in many instances continue to provide significant and integral contributions to the Debtors' restructuring efforts, including their efforts to monetize the remaining litigation assets.

Importantly, the investigation did not reveal any viable, valuable claims against the parties that are being released by the Debtors.  And the releases are supported by both the creditors committee and the FILO parties.

Your Honor also previously ruled that the releases by the Debtors are appropriate in the context of the FILO settlement motion, finding, among other things, that they're fair and reasonable -- fair, equitable, and reasonable given exchange for and supported by fair consideration.

I think the same rationale applies here, Your Honor, for the Debtor releases under the plan, and we think those releases should be approved.

66

Turning to the third-party releases, that's section 12.6(b) of the plan, the United States Trustee argues, as it has in many other cases, that the releases are nonconsensual because creditors required to opt out of granting them.

This objection has been overruled by this Court on multiple occasions, including recently in *DocuData*, *Patera*, and *Robertshaw*. As set forth in our reply brief, the third-party releases in the plan are fully consensual as parties received adequate notice of the releases and had the opportunity to opt out.

I think the evidence also reflects that the process worked here. As set forth in Mr. Johnson's Declaration, more than 2,500 parties exercised the right to opt out of granting those releases, which is a considerable amount.

Next, Your Honor, it's the exculpation provision. That's section 12.7 of the plan. The only objection here is that the members of the transformation Committee should not be exculpated parties based on the Fifth Circuit's decision in *Highland Capital*.

In *Highland*, the Fifth Circuit ruled that three independent directors appointed pursuant to a court-approved settlement between the Debtor and the creditors committee were entitled to exculpation because the independent directors effectively acted as Chapter 11 Trustees despite not being appointed by the Court in that exact capacity.

**DEBTORS' EXHIBIT NO. 9
Page 66 of 218**

67

The same is true here with respect to the transformation committee.  The transformation committee has been empowered by Steward's board to exercise its full and exclusive authority to oversee and make all decisions relating to the administration of the Chapter 11 cases.

I don't believe anyone disputes that the transformation committee members are disinterested.  Instead, the U.S. Trustee and the Commonwealth argue that *Highland* does not apply because the transformation committee are professionals that were retained prepetition by the Debtors rather than pursuant to a Court order.

You know, we don't think this distinction matters, and we disagree with this narrow interpretation of *Highland*. As Judge Isgur ruled in *Instant Brands*, disinterested fiduciaries, such as the transformation committee members, perform the same functions as bankruptcy Trustees; and therefore, should be entitled to identical protections which would include exculpation.

The exculpation provision in this plan is consistent with similar provisions recently approved by this Court in *DocuData*, *Wellpath*, and *DRF Logistics*.  Each of those plans included independent directors as exculpated parties, despite the directors being retained by the Debtors and their appointments not formally being approved by the Court.

Next, Your Honor, is the plan injunction.  That's

68

section 12.5(a) of the plan.  There are two main objections to this provision.  First, the U.S. Trustee argues that the injunction is an equivalent of a nonconsensual third-party release.

This is just, I think, a repackaging of the same argument that the releases themselves are not consensual, so we think those should be overruled on the same basis.

And second, Massachusetts has argued that the plan injunction is the functional equivalent of a discharge and that the Debtors are not eligible for discharge under Section 1141(d) of the Bankruptcy Code.

The Debtors disagree with this characterization. The plan injunction is a standard provision in Chapter 11 plans.  It's necessary to effectuate the terms of the plan. However, to make it abundantly clear that the Debtors will not receive a discharge, we've added language to the confirmation order that's at paragraph 16 that explicitly states the Debtors will not receive a discharge under the plan.  I think that should resolve that concern, Your Honor.

And last, the gatekeeper provision that section 12.5(b) of the plan citing to *Highland Two*, the U.S. Trustee argues that the gatekeeper provision is overly broad as it applies to claims against released parties in addition to the exculpated parties.

However, in *Highland Two*, the Fifth Circuit limited

69

the gatekeeper provision there to just claims against the exculpated party after also narrowing the plan injunction to apply to only claims against those parties.

The concern in that case is that the injunction and gatekeeper provisions would have applied to third-party claims that could not be released under the plan on a nonconsensual basis.  That concern is not present here.

The gatekeeper provision only applies to claims against the released parties.  And I'll quote the plan here. "To the extent the claims are asserted by or on behalf of releasing parties, those claims are also subject to the plan injunction if they're consensually released under the plan."

There's no mismatch between the release, exculpation injunction, and gatekeeper provisions.  They all sync up.  And again, Your Honor, you've ruled on this issue before.  This came up in the *DocuData* case.

Judge Perez ruled on it in the *Katera* case where the gatekeeper provisions were approved that applied to claims of releasing parties that were assertable against the released parties.  That's it for the release provisions, Your Honor. Unless you have any questions, I can briefly hit on the medical liability claims procedures.

THE COURT:  No questions.

MR. GEORGE:  So, yesterday, Your Honor, you asked about the mandatory mediation provision.  It's very common in

70

cases where there's a significant number of tort claims that need to be reconciled for Courts to require parties to participate in alternative dispute resolution.

Just to name a few, the plan in *Tehum* required claimants to participate in nonbinding arbitration before opting into the tort system.  The same for the trust distribution procedures that were approved by Judge Isgur in the *Honx* case and in --

THE COURT:  Would you agree that in *Tehum*, someone could opt out of the entire tort system itself?

MR. GEORGE:  Opt out of the tort system?

THE COURT:  I mean, opt out of the entire plan itself.  Just go right to the tort system.  Just file something -- I want to go after.  Would you agree with me on that?

MR. GEORGE:  I know it was before Your Honor, so I would certainly agree with you, but I do believe in --

THE COURT:  What's the argument?  Are you going to still seek mandatory mediation?

MR. GEORGE:  I think it's a helpful provision to facilitate consensual resolutions.  You know, a lot of these parties, if they go straight to the tort system, it can result in the occurrence of defense fees that ultimately come out of the general unsecured creditor's pocket.

And I think, you know, having a, you know, having

the parties get in the same room and facilitate conversations would be helpful for both the claimants and the estates.

THE COURT:  Okay.  Thank you.

MR. GEORGE:  We also, you know, just also believe it's consistent with this Court's procedures.  But I can move on from that point, Your Honor.

THE COURT:  I would.  I would.  Go ahead.

MR. GEORGE:  I also would like to -- last point. Just there were very few objections overall to the medical liability claims procedures filed by claimants.  I think there were just three in total.  None of them relate to the mediation provisions.

And the Debtors were able to resolve all the objections from the claimants consensually so I don't believe they're at issue today.  That's all I have for now, Your Honor.

THE COURT:  Are you still asking me to reimpose the automatic stay on a party, on a claim that I've consensually, with the support of the committee and the Debtors, lifted the automatic stay?

MR. GEORGE:  I think it's a temporary provision, Your Honor, to --

THE COURT:  I'm just asking yes or no.

MR. GEORGE:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

**DEBTORS' EXHIBIT NO. 9**
**Page 71 of 218**

72

MR. GEORGE:  Thank you.  I'll cede the podium to Mr. Kahn.

THE COURT:  Okay.  Thank you.

Good afternoon, Mr. Kahn.

MR. KAHN:  Good afternoon, Your Honor.  And for the record, Brad Kahn, Akin Gump Strauss Hauer & Feld, on behalf of the Official Committee of Unsecured Creditors.

CLOSING ARGUMENTS

BY MR. KAHN:  We don't have a colorful or flashy demonstrative, Your Honor, but if we did, it might just be a single slide.  And on that slide would be a big bold, big bold font, just one figure -- 13 percent.

The Court heard Mr. Castellano testify yesterday that in his view, the Debtors need only recover 13 percent of their demanded litigation claims to pay administrative and priority claims in full.

Maybe that framing is a little simplistic, but it's not really that far off.  Feasibility, as we note in our brief, does not require a guarantee of success.  Rather, the Debtor has to demonstrate a reasonable probability of success by a preponderance of the evidence.

So what does that mean here in the context of a liquidating case where the assets left to liquidate are predominantly litigation claims?  It certainly can't mean that the Debtors should have to guarantee success on all the

**DEBTORS' EXHIBIT NO. 9**
**Page 72 of 218**

litigation claims to be pursued by the trust.

But it should mean that this Court, having consumed evidence about the nature of the claims, the amount of damages to be asserted in the aggregate, and the work that the Debtors have done to reconcile and estimate admin and priority claims, can find that there is sufficient evidence that the Debtors have a reasonable probability of success to recover sufficient funds to pay admin and priority claims.

Mr. Castellano testified that the aggregate damages to be asserted in the litigation claims is somewhere between 3.0 and $3.3 billion.  And he testified that a 13 percent recovery on those claims would be sufficient to pay admin and priority Claims in full.

The Court also heard testimony from Mr. Carr about the nature of some of these claims and additional testimony from Mr. Castellano's Declarations about some of the other claims.

As Mr. Cohen said, and I apologize, there's going to be a little bit of overlap with what Mr. Cohen said, but I think it's important to hear it from the creditors' perspective.  These aren't crazy speculative claims.  These are the types of claims this Court sees every single day -- preferences, fraudulent conveyances, claims for breaches of fiduciary duty, insurance claims.

More precisely, Mr. Carr submitted testimony with

some details about these claims that further demonstrate their likely value.  And I'm going to go through them a little bit because it also ties everything back a little bit into the history of this case.

With respect to the fraudulent conveyance claims, we're not talking about wildly complicated *Caesar*-style LBO transactions.  These are bald straight dividends while the Debtors were allegedly insolvent, not particularly complicated, tens if not hundreds of millions of dollars to Ralph de la Torre and his fellow shareholders.

And with respect to fiduciary duty claims, it's not a giant leap to envision what these claims look like.  Again, where Dr. de la Torre is a controlling shareholder and/or a board member, pushed Steward into value-destructive transactions and took out millions and millions of dollars for himself and his fellow shareholders, all while running the Steward hospitals into the ground to the extent that as Your Honor recalls, the Debtors could barely sell any of them for any real value.

And all while the Debtors ran up approximately $1 billion in prepetition trade payables -- $1 billion for an operating business in prepetition trade payables.  And I'm sorry Mr. Castellano is catching some shrapnel here today, but I may not have been doing this as long as Mr. Castellano, but I've never seen that kind of figure before in my time doing

75

this.

That's $1 billion owed to nurses, employees, health care service vendors, all focused intently on trying to ensure these hospitals could continue to serve their communities. And as noted about these fiduciary duty claims -- and again, Mr. Cohen covered this as well -- there's over $100 million in D&O insurance coverage available should these claims be successful.

That's not to mention the preference claims where the Togut firm has already started bringing in proceeds. And if anybody was watching the docket day or getting docket alerts on their firm -- on their phone, saw dozens more filed today. Or the commercial payer litigation claims, which are the disclosure statement notes, can be asserted for approximately $350 million.

They're just ordinary-course claims that medical companies bring all the time for underpayment against commercial payors. These are not speculative claims. And the record is here for this Court to determine that the Debtors have a reasonable likelihood of achieving the modest recovery on these types of claims that would result in proceeds sufficient to pay admin and priority claims.

Importantly, Your Honor, the committee is a fiduciary with members that represent these very nurse staffing companies, trade vendors, unions, pensioners,

**DEBTORS' EXHIBIT NO. 9**
**Page 75 of 218**

76

diligencies claims, and the likely outcome of this plan and determined in their capacity as fiduciaries to support this plan and recommend that unsecured creditors vote in favor of this plan.

And Your Honor knows from this case that this committee is no rubber stamp.  This committee does its work, and this committee believes that these claims can be reasonably monetized to result in recoveries not only for admin and priority claims, but for unsecured creditors, and that this plan is in the best interests of the Debtors' estates.

The objectors have offered no evidence that the estimated net recoveries from the litigation claims should be anything different than set forth in the Exhibit A to Mr. Castellano's two Declarations.

We heard TRACO's counsel try to poke some holes in some of the claims in her cross-examination of Mr. Carr, but nothing rose to the level of saying that these claims are worthless or should be valued in any different way that should lead this Court to say, you know what; I don't think these claims are real.

And this entire exercise has been and continues to be oddly perverse and perplexing.  The objectors, including TRACO, are actively trying to devalue and discredit the very litigation claims that are literally the only source of

77

recovery for them as well to the extent they have allowed claims.

And to what end?  We heard Mr. Carr testify that Dr. de la Torre is the shareholder and director of TRACO, and is the likely target of most of the claims that's described in Mr. Carr's Declaration.

And the Court heard Mr. Carr testify that Dr. de la Torre stands to benefit from the failure of any of these claims.  But let's set that aside.  Again, there is no evidence that offers this Court a more plausible or reliable estimate of the net litigation proceeds in this case.

Instead, the hypotheticals raised by objector after objector were what if the estate gets nothing, right.  There were baseball analogies.  The estate strikes out.  That's not the reasonably likely outcome here.  And your Court and the Court can see that from the testimony it already has.

There is sufficient evidence in the record for the Court to determine that the Debtors have a reasonable probability of success in achieving the necessary recoveries on over $3 billion in asserted claims.  And these are, again, types of claims that this Court can easily understand and evaluate.  Again, 13 percent.

Let's talk about the effective date.  With respect to the length of time it's projected to take to get to the effective date, which I believe Mr. Keach yesterday called a

78

mockery, I think Mr. Keach has it wrong.

There's nothing in the Code that prohibits a Debtor from taking the time reasonably required to liquidate its assets in order to make distributions to creditors in satisfaction of the confirmation requirements.

Moreover, where the remaining assets are litigation claims that have to be liquidated, it's entirely reasonable for that process to take a little more time.  The objecting parties may wish -- heck, we may wish that the Debtors had different kinds of assets to liquidate.

That's not what we've got.  We've got litigation claims.  The alternative view espoused by the objecting parties makes no sense when taken to its logical conclusion. In the objector's view, a liquidating plan of any kind that requires some time to liquidate assets in order to pay admin claims just can never be feasible.

That cannot be the right conclusion, and it should not be the right conclusion when the better outcome for creditors is that the Debtors be granted a reasonable amount of time to maximize the value of the remaining assets, repay admin and priority creditors, and distribute funds to unsecured creditors.

Here, where the remaining assets are litigation claims, it's also not unreasonable to think that that process may take upwards of 18 months.  These are litigations.  That's

79

the time it takes.

As the committee notes in its reply brief, the cases cited by the objectors for the proposition that the effective date cannot be so far past confirmation are distinguishable, and Mr. Cohen touched on a number of these.

But again, those were instances where the assets were really truly largely speculative or operating assets were already being granted to the Debtors' insiders while admin creditors were waiting to get paid.

The arguments with respect to the effective date also focus on this assertion that by having a long executory period that the burdens of consummating the plan are being placed onto administrative creditors.

I'm going to approach this from a little bit of a different angle than Mr. Cohen.  I think what this argument really does is it ignores the unfortunate fact that we're already there.  We've been in that position since last fall when the Debtors asked for an admin bar date and a stay of all the motions to compel payment that were before this Court.

But there's no nefarious plot here to leave admin creditors holding the bag while someone steals away with the assets.  In fact, it's quite the opposite.  The Debtors and the committee negotiated the terms of this plan and the FILO settlement with the entire goal being to put the estate in a position to pay admin and priority creditors.

80

If we wanted to plot a terrible outcome for admin creditors, we could have consented to the FILO lenders lifting the stay and foreclosing on the assets.  That would have been a lot easier.

And again, what's odd about these objections is that instead of assessing the various alternatives that can maximize value for the repayment of creditors, the objecting parties are solely focused on trying to prevent the plan.

Again, they ask what happens if the Debtors' projections are all wrong and the claims all fail, but they don't grapple with what happens if the plan is not confirmed at all, if this case converts and admin and priority creditors are fully subordinated to the FILO and DIP claims with no requirement that they be paid a penny.

But if there's insufficient funding for the Trustee to pursue the litigations in a value-maximizing fashion, the objecting parties cannot demonstrate to this Court that there are better -- that that's a better outcome for creditors, including themselves.

Conversely, the Debtors have indeed demonstrated that the plan offers the best outcome for the estate's creditors.

Briefly, on the releases unless, sorry, if Your Honor has questions on the feasibility and effective date of the plan.

**DEBTORS' EXHIBIT NO. 9**
**Page 80 of 218**

81

THE COURT:  (No verbal response.)

MR. KAHN:  All right.  Thanks, Your Honor.

On the releases, Your Honor heard testimony yesterday about the number of listed release parties.  And on this topic, the committee will only add that this Court can be assured that the committee scrutinized the releases.

Remember, we have every incentive to preserve claims against as many parties as possible to get as much money as possible into the hands of unsecured creditors.  The committee heavily negotiated these releases with the Debtors, and we don't believe the estate has claims of any relevant value against the parties that are being released.

And just as importantly, as demonstrated by some of the testimony yesterday, the estate benefits from not having folks who are, you know, trying to defend against valueless claims eating into the D&O policies with defense costs.

Those are the topics that the committee wanted to address.  Your Honor, I would reserve for any rebuttal as needed, but if Your Honor has any questions, I'm happy to --

THE COURT:  No questions.  Thank you very much.

MR. KAHN:  Thank you, Your Honor.

THE COURT:  Let me ask does anyone else who supports the plan wish to be heard?

MR. PRICE:  Good afternoon.

THE COURT:  Good afternoon.

**DEBTORS' EXHIBIT NO. 9**
**Page 81 of 218**

MR. PRICE:  Michael Price of Milbank on behalf of the FILO secured parties.

CLOSING ARGUMENTS

BY MR. PRICE:  Your Honor, I will be brief.  I rise just to say that while the creation of the trust pursuant to the FILO settlement has already been approved, will occur regardless of what Your Honor rules today, I do want it to be clear that we support the plan.

And I want to tell you why because I think it's relevant to all creditors, including the objecting parties. We see a real benefit to having our deal implemented in the context of this plan, which ensures the continued existence of the Chapter 11 estate.

That means that the litigation trust can continue to look to the estate's personnel and resources in connection with pursuing the litigation claims and monetizing the remaining assets that are being transferred into the trust.

And again, the trust is going to do that regardless, but it may not be as seamless.  There's a risk that the recoveries will come in more slowly, that information may be harder to locate, that resolving matters in which both the trust and the estate have an interest could become more complicated.

And that means that it will become more expensive and less efficient.  That's why we've agreed to contribute $15

83

million and provide other tangible benefits in the context of a plan confirmation scenario that aren't otherwise being provided.

We think the plan is the best way to ensure optimal execution of the monetization effort under these circumstances, not only so that the FILO claims will get repaid, but also to maximize the recoveries that are available to other creditors.

We wouldn't be doing this if we didn't think that it was a path that allowed for maximal recoveries.  So I'm not going to get into the weeds on all the issues that others have covered or will cover.

But I do want to just note that we think any other alternative will be significantly less efficient.  And those are inefficiencies that are likely to be borne by the junior creditors simply by virtue of their position in the waterfall.

There was just one specific point that I wanted to raise on the fee escrow and disgorgement topic, because I think it's important and it may be something that folks, you know, it may not be well appreciated by them because it relates to the settlement, and that's that the proceeds that were funded into the fee escrow came from cash collateral.

And if they're not utilized for the purpose of payment of fees, and if amounts ultimately come back into the estate, they're not simply unencumbered amounts that are

DEBTORS' EXHIBIT NO. 9
Page 83 of 218

84

available for distribution outside of the trust waterfall.

That's actually expressed in the settlement.  It shows up on the first page of the settlement term sheet that was attached to the order that Your Honor entered approving the settlement at ECF number 5035.

It's in footnote 2, and it provides that the trust will have a senior entitlement under the settlement to, quote, "retained collateral," which is defined to include the estate's reversionary interest in the fee escrow and any amounts in the account.

And that same footnote is even clearer.  It provides that to the extent the estates realize cash or other value that comprises or would have comprised FILO DIP collateral, then those amounts must be promptly turned over to the trust for distribution under the trust waterfall.

And that's not -- shouldn't be surprising to anybody.  That's -- we're just replicating the entitlements that were already there under the DIP order that was entered, you know, over a year ago now.

But I did want to make folks aware of it because it's something in which my clients have an interest, and even in their capacity as, you know, their successors as class A interest holders in the trust are going to be senior in that waterfall.

And that doesn't mean that other creditors wouldn't

85

necessarily benefit from amounts that came in, but they come first to the top layer of the distribution priority.

Your Honor, that's really all I have.  Unless you have questions for me, we'd submit that Your Honor can confirm the plan, given the information that's been presented, and that you should confirm the plan.

THE COURT:  Thank you.

MR. PRICE:  Thank you.

THE COURT:  Does anyone else who supports the plan wish to be heard?

MS. BONTEQUE:  Good afternoon, Your Honor.  Jessica Bonteque from Duane Morris representing the Chubb Companies.

CLOSING ARGUMENTS

BY MS. BONTEQUE:  I rise simply to put on the Record that yesterday, I preserved and reserved rights that we were negotiating language to put in the confirmation order.

We received agreement on that language this morning. And pursuant to that language being included in the confirmation order, as agreed, the Chubb Companies support confirmation of the plan.  Thank you, Your Honor.

THE COURT:  Thank you very much.

Anyone else wish to be heard?

(No verbal response.)

THE COURT:  Why don't we take, like, a ten-minute break and we'll start with those who oppose the plan.  Thank

86

you.

(Recess taken from 3:11 p.m. to 3:21 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated, everyone.

Yesenia, let me know when we're ready.  Are we ready?

We are back on the Record in Steward.

MR. AKIN:  Your Honor, if I may for one second?

THE COURT:  Yes.

MR. AKIN:  Excuse me interacting on the phone.

THE COURT:  Yes, Mr. Akin.  Good afternoon.

MR. AKIN:  Good afternoon.  I just didn't want to interrupt the flow of more substantive closing arguments.  And similar to Chubb's Counsel I just wanted to advise the Court that we have been negotiating new language to deal with our concerns that were reflected in the initial reservation of rights that we filed and the supplement that we filed.

And we have agreed on language.  We were able to walk and chew gum during the confirmation hearing and that language will, I suspect, be included in the finally submitted confirmation order.  So we are resolved.

THE COURT:  Perfect timing.  Thank you.

What did y'all do to the folks on the left side of the room?

(Laughter.)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 9**
**Page 86 of 218**

UNIDENTIFIED SPEAKER:  Your Honor, I do --

THE COURT:  I just wanted to know, do we need to give them a few moments?  I didn't want to start if there were folks that were outside or if they just intentionally left.

UNIDENTIFIED SPEAKER:  I'll go look.

UNIDENTIFIED SPEAKER:  That's what I rose to say, Your Honor.  I think there are people who want to speak who are still outside the courtroom --

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  -- and I will not confirm or deny my political readings in light of your observation.

THE COURT:  Thank you.

UNIDENTIFIED SPEAKER:  Definitely not in this State.

THE COURT:  Like what did I say?

UNIDENTIFIED:  City, good City.

(Pause in the proceedings.)

UNIDENTIFIED SPEAKER:  Your Honor, I know one person who wasn't found.

(Pause in the proceedings.)

THE COURT:  Let's get started.

MS. JACOBSON:  Good afternoon, Your Honor.  Michelle Jacobson from Steptoe on behalf of TRACO International Group.

CLOSING ARGUMENTS

BY MS. JACOBSON:  Your Honor, this Plan should not be confirmed.  This case is administratively insolvent and

**DEBTORS' EXHIBIT NO. 9**
**Page 87 of 218**

88

there was no evidence to the contrary.  When the Court approved the FILO settlement, Your Honor recognized that there was major issue looming on the horizon, Plan feasibility.

Your Honor expressed concerns about the administrative claims and warned the Debtors that they were going to have to put, quote, "some meat on the bone," unquote, to prove what they are saying and that they will not at Plan -- quote, "not a Plan confirmation have the right to just tell me that they think it's going to be worth billions of dollars in litigation and leave it there."

Your Honor also previewed that the Debtors needed to show why they picked 2027 and how long the litigation would last.  And that's because the language of Section 1129(a)(9) of the Code is quite clear that a plan may only be confirmed if administrative and priority claims will be paid on the effective date of the plan.  That's mandatory.  The Debtors have not put more meat on the bone and they have not met their burden of proof.

If anything, Your Honor, more questions were raised during this hearing than answered.  And to top it all off, the solicitation and ballot and voting processes were so flawed that one creditor was allowed to vote its $38.3 million claim against 167 Debtors, to the tune of over $6 billion, while 15 percent of the ballots that were turned in were excluded. Kroll made no effort to contact these 23 -- the 23 pages of

**DEBTORS' EXHIBIT NO. 9
Page 88 of 218**

89

creditors in an effort to cure although it was authorized to do so.  Hundreds of millions of dollars of claims were not voted.  More on that later.

But even with this voting irregularity, the general unsecured creditors of Steward Health Care and Steward Medical Group rejected the Plan.  Those two Debtors were the largest by claim in number and largest by amount.  This was not a Plan that was accepted overwhelmingly as the Debtors and Creditors' Committee contended.  It was the opposite.

Now, Your Honor, the Debtors have the burden of showing by a preponderance of the evidence that their Plan meets the requirements of Section 1129(a)(9) and that their Plan is feasible.  First of all, casting aspersions about the motivations of various objectors surely does not substitute for fulfilling the burden of meeting the burden of proof.  It is no substitution.

The Fifth Circuit has ruled that liquidation plans must meet all of the requirements of Section 1129(a), except (a)(8).  And that's the *In re Sandy Ridge* case.  So to the extent that the Debtors suggest otherwise by citing other jurisdictions, that is not the law in this circuit.  They must meet all of the other requirements other than (a)(8).  And their Plan is not feasible.

Their argument is like a house of cards, built on the assumption that they will have nearly a 100 percent

DEBTORS' EXHIBIT NO. 9
Page 89 of 218

90

success rate on their objections to admin and priority claims and that they will be able to recover and collect hundreds of millions of dollars in damages and that they can do this all by early 2027.  If any of those foundational cards falls, the entire structure of the Plan crumbles.

So let's turn first to the effective date.  The Debtors say that it is reasonable that the Plan's effective date would be early 2027.  But we've come to learn during these proceedings that early 2027 means any date up to June 30th, 2027.  That's not really what I consider to be early 2027, but there you have it.  That's two years, that's two years, from today, essentially, or two weeks ago.  Roughly two years.

The Debtors themselves can't offer any assurance as to the actual timing of the effective date and of course since many of the components going into monetization are litigation assets, it's really not possible to do so with any assurance. They just rely on Mr. Castellano's Exhibit A for which we don't have the model, we don't have the underlying inputs, and we don't have the assumptions.  I'll get to that in a little bit.

But, Your Honor, none of the litigations that Mr. Castellano and Mr. Carr discussed so far advanced that they are able to say with any degree of confidence what and when its resolution will be.  The Debtors actually admitted

DEBTORS' EXHIBIT NO. 9
Page 90 of 218

91

this in the Disclosure Statement by stating that the effective date could actually occur earlier or later than early 2027 and that any of those outcomes would be a reasonable result under the circumstances of this case.  And that's from the Disclosure Statement at paragraph roman numeral (I)(b)(i)(G).

It is perfectly reasonable to conclude that the litigations will not resolve by early 2027 and the effective date could be much later if it occurs at all.  Your Honor, if all outcomes are reasonable, then all we are left with is a moving target of an effective date with no degree of certainty as to when it will occur, if at all.  The Plan essentially provides no meaningful effective date at all and the Debtors cannot meet their burden of proof without one.

But even if the Debtors could provide any assurance that the effective date is reasonably likely to occur in early 2027, it's just too long to wait.  We have cited a number of cases in our brief demonstrating that a plan cannot be feasible if it sets an effective date in the distant future, which is what this Plan does.  And we cited *In re Potomac Iron Works*, where one year was too long.

And we also cited *In re Premiere Network Services, Inc.*, a 2005 case from the Northern District of Texas, which rejected an effective date tied to the Debtor prevailing in certain contract disputes.  And *Premiere* is instructive here because the Debtors are doing the same thing that the *Premiere*

**DEBTORS' EXHIBIT NO. 9**
**Page 91 of 218**

92

Debtors tried to do.  Because although they have identified a timeframe, they can't defend that timeframe and admit that it's reasonable it won't occur.

Now most of the cases that the Debtors rely on for the proposition that a delayed effective date is okay, usually involve delays between confirmation and effectiveness for far shorter periods than the one proposed here.  And in most of those cases, the reason for delay was far more concrete. Awaiting an outcome in liti -- for example, there were regulatory approvals that were needed, there was a closing date for some real estate that was within a reasonable period, and the like.  Awaiting an outcome in litigation that has not been brought or has only recently been brought is a far cry from awaiting regulatory approval or securing financing.

And I do want to turn to *Sears* for a moment, that the Debtors claimed was "particularly instructive," and that's their quote not mine, and was support for their remote and uncertain effective date.  But as Mr. Keach stated in his opening, *Sears* should not be viewed as anything other than a cautionary tale predicated on aspirational litigation recoveries.  In *Sears*, the Debtor settled litigation three years after confirmation for $180 million, which was a fraction of the 1.4 billion that the Debtors claimed they were worth.  *Sears* is not a model to reply upon.

Now the central question here is whether the Debtors

93

will be able to pay the admin and priority claims in full on the effective date.  There are three components to this question.  One, what is the true amount of the admin and priority claims; two, how much money will be available to pay those claims; and, three, are they reasonably likely to be able to pay those claims when they say they will.  All three components present very real concerns here.  And the Debtors have not met their burden of proof on any of them.

First of all, the admin and priority claims.  The inquiry doesn't really advance beyond this point unless the Court accepts that the Debtors will have close to a 100 percent success rate on their pending and anticipated challenges of 2.848 billion in challenges to administrative expense claims and 11.2 billion in challenges to priority claims.  The Debtors are essentially asking this Court to adjudicate their objections and anticipated objections before even any responses have been filed.  The Court should not prejudge the validity of the Debtors' objections, and the Debtors should have filed their objections sooner so that they could have been resolved by the time of this hearing.  But instead, the Debtors simply asked the Court to trust them.

The Debtors are also being very aggressive in discounting allowed administrative claims.  They really make no allowance whatsoever for any margin of error.  They have budgeted, for example, zero dollars for TRACO's administrative

94

claim even though Mr. Castellano admits in his Declaration that the premium owed to TRACO for the post-petition period exceeds by $10 million the amounts that Steward paid out on TRACO's behalf.

We also heard about the Igoe medical malpractice claim for $25 million. But the Debtors, you know, say, well that claim hasn't been adjudicated yet. Well, a lot of these claims haven't been adjudicated yet, Your Honor. The Debtors say trust us. We're going to win. They should've -- they should've gotten these done in plenty of time so that we could have known the result, but that hasn't happened.

Mr. Castellano also mentioned three priority claims. One for 9 billion and two for 1 billion each that he testified had no basis. But even if he's right about that, all we have is his testimony about what the claims say and their validity. That still leaves 200 million in other priority claims that could go against the Debtor and 2.8 billion in admin claims. So with such aggressive projections that the Debtors are making on their admin and priority claims, it stands to reason that the Debtors could be off by even a few percentage points.

Mr. Castellano testified that a reduction of 10 percent or more of the unresolved admin claims would result in the Plan not going effective. It's game over. 10 percent. It's not crazy to think that 10 percent of all of the claims that remain to be adjudicated will not go their way.

**DEBTORS' EXHIBIT NO. 9**
**Page 94 of 218**

95

Now Mr. Castellano testified on redirect that the Debtors have been able to pay 2.7 billion in administrative claims during these proceedings, a sort of pat-yourself-on-the-back piece of testimony.  But even Mr. Castellano had to admit that that is no solace to an unpaid admin or priority claimholder that others got paid earlier or others somehow received priority to them in whatever the Debtors decided was more important to pay.

Let me turn next to the monetization of assets. That's the next component.  I will focus on the purported litigation assets, because the estimated non-litigation assets of that $46 million, that $46 million is not adequate to establish the feasibility.  So I'm going to just go right into the litigation claims.

Now as for those claims, the Debtors put forth a chart, Castellano Exhibit A, which does not provide the inputs on what it's based.  So let's just put some framework around this.  We don't know how much the Debtors are assuming each asset is likely to bring in, or importantly, when.  If we were in another bankruptcy proceeding and there was a building in the Debtor's portfolio, we would expect to see a value -- some valuations as to how much the building was reasonably worth, and we would want to know what is being done to market the asset so we could determine when those proceeds might come in.

The Debtor affirmatively put forth these litigation

**DEBTORS' EXHIBIT NO. 9**
**Page 95 of 218**

assets as the basis for its claim of feasibility.  The fact that they are causes of action doesn't excuse them from providing adequate information to allow the parties and this Court to assess whether the Debtors' estimates are reasonable or whether they are pipe dreams.  We shouldn't have to rely on the Debtors' say-so that these assets can bring in what they say they can and when.  And respectfully, I don't believe that's what Your Honor envisioned when you said that you wanted more meat on the bone.

We understand the Court's ruling on our motion *in limine* and that you would take in -- that Your Honor would take in Mr. Castellano's testimony as to the value of these assets for whatever it was worth.  For the record, we still respectfully disagree for the reasons explained in our motion. And we heard, during Mr. Castellano's testimony, that the Debtors did not produce the model on which their analysis was based, and actually directed Mr. Castellano at his deposition not to answer any questions relating to the quantum or timing of recovery of litigation assets on the grounds of privilege. And as a result, the parties were not able to test either Mr. Castellano's testimony or the estimates for net litigation recoveries on Exhibit A to both of his Declarations.

And it is for that reason that we move to strike his testimony on this issue and we renew that motion now.  It should not be ignored that Mr. Castellano during his

DEBTORS' EXHIBIT NO. 9
Page 96 of 218

testimony, I think it was during his direct, he was prompted to testify that Exhibit A to both of his Declarations was his so-called business opinion and was not based on privileged information.  He was forced to admit on cross that indeed the most important line item on the entire exhibit, total litigation proceeds net, was supplied by counsel.  And, Your Honor, if you have handy the PowerPoint that the Debtors used --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- if you take a look -- if you would look -- kindly look at slide 9, we can see --

THE COURT:  Give me one second to get there.

MS. JACOBSON:  Yeah.

THE COURT:  Okay.

MS. JACOBSON:  So what we're looking at here is the line which is the second line down, total litigation proceeds net.

THE COURT:  Oh, yeah.

MS. JACOBSON:  That was -- that information was all supplied by counsel.  And it is that line item which predicts what recoveries the Debtors will achieve and when.  And those are the two questions that are central to Plan feasibility and the effective date.  And those figures are absolutely untested.

And I want to -- you know, at the bottom of that

98

slide, they quote from *In re Washington Mutual* where they are saying well, Your Honor, you can assess, you can assess the value of all of the causes of action that we may have.  But here, in the quote itself, it says, "It is sufficient to present the Court with the legal positions asserted by each side and the facts relevant to those issues."

THE COURT:  That I determine, yeah.

MS. JACOBSON:  Your Honor, you don't have -- you know, you have bare descriptions of potential litigations and you do not have any access to any defenses or the answers.

THE COURT:  Then I should bring Mr. DelaTorre up here?

MS. JACOBSON:  Your Honor, with respect -- and that's --

THE COURT:  How do I do that?  Should I bring Mr. DelaTorre up here?

MS. JACOBSON:  We don't have the burden of proof, Your Honor.

THE COURT:  I'm not saying you do.  I'm asking you to assess it.  In other words, how does a Debtor do that?  Does a Debtor subpoena parties and then bring them in and say, now you put on your defenses or --

MS. JACOBSON:  No.  I don't think this --

THE COURT:  -- how does that work?

MS. JACOBSON:  I don't think this is a mini trial.

I think they need to give enough information about a particular claim and when it's filed and how long they believe it's going to --

THE COURT:  I agree with that.  I'm just talking about -- I haven't heard about the other side's defenses, right?

MS. JACOBSON:  Uh-huh.

THE COURT:  But I think you did raise them, right? You brought up the golden creditor, you brought up --

MS. JACOBSON:  Yeah.  And I'll go through some --

THE COURT:  -- statute of limitations.

MS. JACOBSON:  -- I'll go --

THE COURT:  But in terms of -- I don't think I'm ever in a case, unless there's active litigation between two parties, right?  I could probably hear the defenses that Mr. Keach's clients have, which are on appeal which I can't talk about --

MS. JACOBSON:  Uh-huh.

THE COURT:  -- but potentially a Debtor may want to bring a cause of action or preserve a cause of action against a third party.  Unless I can bring that person in, I'll never hear what their defenses are, I'm really only going to hear what the Debtors think their claim is worth.  Unless that parties submits to the jurisdiction of the court and then files a notice of appearance.  It gets tricky.  That's the

100

only tricky part there.

MS. JACOBSON:  Yeah.  I --

THE COURT:  But I agree with you, it's their burden and they've got to put on facts.  And I understand the argument that you're making, is that you don't believe they're presented enough facts for the Court to make an independent determination about certain issues.

MS. JACOBSON:  Yeah.  That's correct, Your Honor.  And the parties weren't able to test that.  We weren't able to test the total litigation proceeds line net --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- because they blocked us --

THE COURT:  Agreed.

MS. JACOBSON:  -- on attorney-client privilege.

THE COURT:  Agreed.

MS. JACOBSON:  So it's just, you know, take it, take -- you know, this is our view of it and nobody can test it.

Now, Your Honor, to be clear, we are not interested in conducting individual mini trials.  That's not what we're talking about.  We're talking about trying to examine what money is -- what -- you know, how long is it going to take to get these assets monetized and if they're -- I mean, that's the central issue.  And they have not put on, I would say, admissible evidence to that point.  Let's call it that.

THE COURT:  Understood.

101

MS. JACOBSON:  For example, you know, we have their chart, Exhibit A.  We don't know really anything about it.  We don't know the actual values that were provided, whether they were adjusted, whether they weighed various data points, how did they determine timing for recovery, and whether they put in any discounts for valuations.  We don't know any of this.  And because we don't know anything about Exhibit A to test its reasonableness, there is really no admissible evidence on the central point of the amount of the recovery and the timing.

So let me turn briefly to the investigation claims discussed in Mr. Carr's Declaration.

THE COURT:  Okay.

MS. JACOBSON:  We don't know whether they are -- you know, where they fall in this total litigation proceeds line or what year.  We have -- we really don't have any idea.  But -- and even Mr. Carr acknowledged the often time-consuming nature of litigation because none of these claims have been brought.  I understand they're saying one is imminent, but litigation can take an awful long time.

So let's turn to -- well, let's -- broadly categorizing the claims, the Debtors purport to have fraudulent conveyance claims.  But we heard testimony from Mr. Carr that they have done no solvency analysis at any given point in time for the company.  Mr. Carr didn't look at the companies' audited financial statements and he only reviewed

102

some internal balance sheets.  And we don't know what he's actually reviewed.

So they haven't investigated the essential threshold building block to a claim for fraudulent conveyance, which is whether the company was insolvent or was rendered insolvent by a transaction.  And Mr. Carr recognized and testified that although he had been involved in many fraudulent conveyance cases, he's never seen -- he's never seen a judge find one based on a balance sheet test alone.

Parenthetically, the Debtors marked a new exhibit, Exhibit 60, yesterday which is the Debtors' audited financial statement for the years ended 12/31/20 and 2019.

THE COURT:  Was that moved into the record by any chance?

MS. JACOBSON:  I think it was.  Number 60?

UNIDENTIFIED SPEAKER:  I believe it was, Your Honor.

THE COURT:  Okay.

MS. JACOBSON:  Okay.  And if Your Honor takes a look at Exhibit 60, you will see that it's indeed an audited financial statement and there was no going concern warning from the auditors who found that the companies' financials were presented fairly.

Just a few notes on the claims themselves.  The 2016 transaction, that was allegedly worth roughly 788 million as a fraudulent conveyance, was admitted by Mr. Carr to be time

barred under state law.  And without a golden creditor there could be no extensions of the statute of limitations.  And Mr. Carr could not identify a golden creditor that would have a claim against the Debtors in 2016.  We talked about the IRS, but he doesn't know whether they would have any outstanding payables from 2016.

And in any event, I think, and critically, Mr. Carr testified that he was not even making any conclusion about the solvency of Steward in 2016, just that further inquiry was merited.  There's no there there.  He's still looking into it.  Or he has to.  The 2020 Trio transaction claim is also a fraudulent conveyance claim.  It's -- there was no solvency analysis done to establish that Steward was insolvent in 2020.  And the claim against the D&Os for that transact -- those transactions or for that claim would also be reliant on whether in fact the Debtor was insolvent at that time.  And we don't know that.

The Miami Hospital Acquisition is listed as a $1.1 billion purchase.  Mr. Carr contended that Steward did not receive adequate value for the hospital, so essentially the claim is Steward overpaid for -- allegedly overpaid for these Miami hospitals.  But Mr. Carr did not point to any evidence to support -- to support that because he had done no valuation of the Miami hospitals' value in 2021.  You know, just because those hospitals were sold during these bankruptcy proceedings,

104

you can't look at the sale price then, you know, as -- during bankruptcy, you need to know what the value was in 2021.  And Mr. Carr said he hadn't yet done that, they hadn't done that valuation, so he couldn't even tell us what the damages would have been.

The 2022 CareMax transactions is woefully short on information and I would submit that it provides no insight as to what any purported damages from that one is.

And, lastly, the claim relating to the TRACO Captive Program is I think even more hopelessly confused.  It seems from Mr. Carr that this claim is predicated on Steward's failure to turn over premium owed to its subsidiary TRACO resulting in the claimed depravation of insurance for physicians and Steward.  How Steward's wrongdoing gives rise to a claim against TRACO's directors or officers is a little mystifying.

THE COURT:  It's an interesting question.  I've thought about this because I don't know the answer.  How is that different than the claim that you're bringing, saying hey, by the way Steward, you owe me 170 million bucks, right?  And they're saying, I think I know the answer.  I don't know if it's true or not.  I have no clue.  But they think they know the answer.  Give me a chance to try to go get the money and then -- because I think TRACO -- I think your client was wronged.  There was money that was supposed to go there and it

didn't go there.  You're asking for -- saying, hey, you guys owe me money.  They're saying, hey, I want to bring litigation.  I think it was your board, or members of your board, who did it in their individual capacity.  How is the claim different?

I guess the cause of action may be different, but the ask of pointing to Steward and saying, you guys owe me some money.  You guys owe my client some money.  And they're saying I think you're right.  I think they were supposed to pay you some money and they didn't and I think I know who it is.  How do we -- in other words, why are you challenging that one?

MS. JACOBSON:  I'm simply saying that the claim -- the claim just isn't well articulated.  I'm not certain --

THE COURT:  I got it.  But --

MS. JACOBSON:  -- what they're saying.

THE COURT:  -- you certainly appear to agree, because you filed a motion in the case saying they owe me money.

MS. JACOBSON:  They do.  They do.

THE COURT:  So then if the case liquidates, I convert the case, how are you -- going to the conversion piece --

MS. JACOBSON:  Uh-huh.

THE COURT:  -- that you filed a joinder to, how is

106

your client better off today?

MS. JACOBSON:  I think our client is equally the same.  I don't think that there is --

THE COURT:  So you don't think there's any chance that they can come up with the money to at least try to pay your client assuming you establish a claim, and that process will take care of itself.  Let's just say you're owed 100 million.  I'm making something up.

MS. JACOBSON:  176 million to be --

THE COURT:  Okay.  So let's go with the 176.  You're saying don't even -- or we think -- let's see if a Chapter 7 Trustee can go after the money and get me the 176 because I think I'm owed 176.  In other words, they're saying give me a chance to try to go after the 176 for you if that's what you're owed.  I think I can pay it.  Right?  And they're high, mid, low, and people can quibble about the number, but let's just assume they're saying I think I can pay all admins in full.

Your client is saying, I'm owed 176 million, convert the case, I would rather take my chances with a Chapter 7 Trustee.  That's what effectively you're doing by filing a joinder because you're effectively saying let's give it to a Chapter 7 Trustee to go do that, don't take the shot.

MS. JACOBSON:  So our claim is -- was basically preserved --

107

THE COURT:  But I get the disgorgement piece.

MS. JACOBSON:  Pardon?

THE COURT:  I guess one could argue go get it from the professionals and then give me the money.  I think the disgorgement argument that people have been raising.

MS. JACOBSON:  Yes, Your Honor, that is a distinct possibility.  We -- our position is that money was never -- should never have been part of the estate when it went -- when it went into Chapter 11 because we were a non-Debtor.

THE COURT:  Right.

MS. JACOBSON:  So by that point in time, we should have been separated from the company.  All our assets should have -- should not have remained on the balance sheet of Steward.

THE COURT:  Right.  So let's assume you're right, you're owed 176 million.  How does Chapter 7 put you in a better position than you are --

MS. JACOBSON:  I think --

THE COURT:  -- if I confirm the Plan?

MS. JACOBSON:  I think that we --

THE COURT:  I'm trying to understand the TRACO Marine -- your client -- not TRACO.  I'm trying to understand your client's kind of specific joinder and how --for the reasons that it wants -- is asking for the case to convert.  That's what I'm trying -- I get don't confirm a plan, you

108

don't meet the standards.

MS. JACOBSON:  Yes.

THE COURT:  That's a whole different piece.  There's a separate piece that's saying in -- like confirmation of a plan will either happen or not happen, but confirmation -- let's just say the denial of confirmation doesn't immediately lead to liquidation or to conversion to a 7.  So then now I'm kind of tapping into the joinder to the motion to convert.  Why does your client want to convert?

MS. JACOBSON:  Well, I think that there are avenues available to a Chapter 7 Trustee that are -- you know, that are not part of this Plan, including the disgorgement.  Their releases, you know, are not -- you know, the release aspect is, you know, different in a Chapter 7.  You don't get the releases.  Although part of the FILO settlement had some releases in it, and Your Honor has, you know, ordered --

THE COURT:  I can't -- I can't talk about that one.

MS. JACOBSON:  You can't talk about that one.  I know it's up on appeal.  But at least as things stand right now --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- we're going to have a litigation trust that's going to go off and it's going to do what it's going to do whether we have -- whether this Plan is confirmed or not.  That's the way matters stand right now.  So everyone,

DEBTORS' EXHIBIT NO. 9
Page 108 of 218

109

even in a 7, there's still going to be that litigation trust which will generate, you know --

THE COURT:  Assuming the Chapter 7 Trustee can find professionals and continue and --

MS. JACOBSON:  Yeah.

THE COURT:  -- all that.

MS. JACOBSON:  I think that there's no reason to believe that the professionals that are currently handling those litigations would run for the hills.

THE COURT:  Let's say Kobre Kim was on an hourly. Do you think they will --

MS. JACOBSON:  I think --

THE COURT:  They're not going running for the hills, it's just there's either going to be money to pay for --

MS. JACOBSON:  Right.

THE COURT:  There's funding and there's not funding. So the Chapter 7 Trustee would have to come up with some money --

MS. JACOBSON:  Yes.

THE COURT:  -- to do so.  And let's say that he couldn't.  And I guess if the disgorgement were to work, then arguably one could -- that would be the source of funding. The reason I'm asking, I'm not questioning -- I know confirmation is their burden.  That's their burden.  You all filed a joinder so now I'm kind of going to your burden.  I

**DEBTORS' EXHIBIT NO. 9**
**Page 109 of 218**

110

understand -- I don't fully appreciate the fight between the Commonwealth and the Debtors.  That has never really been kind of previewed 100 percent in front of me.  I know that folks have been having a lot of conversations about that.

MS. JACOBSON:  I can't answer those questions.

THE COURT:  No, no, no, no.  And I don't want kind of a blow-by-blow.  I'm just saying I haven't had a kind of a full hearing in front of that.  But I -- I get it.  I get there's some fight going on there and there's regulatory stuff and there's -- there's stuff there.  I just needed to understand kind of your client's position because your client has an affirmative -- and I'm going to ask Mr. Keach the same thing, because his clients either have -- I think, if I understand Mr. Keach's clients, it's the same group.  But I can be wrong about that.  Mr. Keach will tell me if it's the same clients who have appealed the kind of, what I would call the Rabbi Trust motion.

So -- and whether his clients are going to be in and out in the next, I don't know, whenever District Court rules or the Fifth Circuit or wherever it goes.  So how does conversion help one way or the other when the District Court is either going to say it's your money or it's not?  I don't -- I don't -- I just need to understand the particular angle --

MS. JACOBSON:  Well, you'll --

111

THE COURT:  -- because it's your burden on those. But I was just speaking as to your client.

MS. JACOBSON:  Uh-huh.

THE COURT:  But I think you have articulated it for me.

MS. JACOBSON:  Right.

THE COURT:  Okay.

MS. JACOBSON:  And we also hold an administrative claim that --

THE COURT:  Right.  But that's what I'm saying.  You think you're better off taking the chance with the Chapter 7 Trustee to pursue your $170 million claim than what's being proposed here.

MS. JACOBSON:  I think that's right.

THE COURT:  Okay.

MS. JACOBSON:  And I think that's what our clients would like to see happen.

THE COURT:  And who are your clients?

MS. JACOBSON:  TRACO.

THE COURT:  And who --

MS. JACOBSON:  We represent TRACO, the company.

THE COURT:  Right.  That's what I thought.  It's not TRACO the board, right?

MS. JACOBSON:  No.  We do not represent the board, we do not represent the members of the board, including

112

Dr. DellaTorre.

THE COURT:  Uh-huh.

MS. JACOBSON:  We don't represent them.  We are acting for the TRACO company in these cases.  And we are trying to do what we can to get money in --

THE COURT:  Uh-huh.

MS. JACOBSON:  -- so that we can act as an insurer and do what insurer is supposed to do.

THE COURT:  Uh-huh.

MS. JACOBSON:  And right now we've been stripped of our assets, and we are trying to get the assets back so that we can act as an insurer.

THE COURT:  Okay.  Thank you.  That's what I needed to know.

MS. JACOBSON:  Thank you, Your Honor.

I do want -- also, Mr. Carr testified about the investigation claims.  Mr. Castellano mentioned or testified to the *Blue Cross/Blue Shield* case which was recently filed for an anti-trust violation.  It's a brand new antitrust case. I would doubt that's in the two-year window given the complexities of an antitrust case.  And Blue Cross/Blue Shield has been involved in antitrust litigations with a class and multi-district litigation for 12 years.  Steward opted out but it's probably a long row to hoe there.

THE COURT:  I knew an antitrust case that settled in

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

113

four months.  Mr. Keach was the fee examiner in that case.

MS. JACOBSON:  I think that's a fantastic result but --

THE COURT:  Craig Johnson wrote the Declaration in support of voting.  It went full circle.

MS. JACOBSON:  It's a small world.

THE COURT:  On July 2nd he submitted it -- how crazy is that -- 2013.  Anyway, I digress.

MS. JACOBSON:  You've got a great memory, Your Honor.

THE COURT:  Or a bad one.

MS. JACOBSON:  And the *Norwood Hospital* claim --

THE COURT:  Right.  That's a trial.  That's either going to --

MS. JACOBSON:  Right.  It has a trial.  It's been pending since 2021 and it's been very hard fought.  So even if the case goes forward in early 2026, there's -- we don't know whether there will be appeals from that by one or both parties.  Litigation is difficult to predict.

And I think one of the issues that is really just floating around here is what happens if June 30th arrives --

THE COURT:  Right.

MS. JACOBSON:  -- and the admins and the priority claims are not paid, what happens then?  Now while Mr. Castellano doesn't believe that that will happen

**DEBTORS' EXHIBIT NO. 9**
**Page 113 of 218**

114

necessarily, the Disclosure Statement has that language in there that it's reasonable that it could be later, right?  So what happens?  Now there's no satisfying answer that can be really supplied and I don't think Mr. Castellano supplied one. And that's really because there isn't one.

The administrative and priority claims holders will be in the same boat that they're in today.  They won't have been paid.  And, you know, and two years will have lapsed and, you know, this case may convert at that time.  We may be back here on June 30th.  Or they -- as they propose it, this effective date could be rolling.  I don't know.  They haven't guaranteed that they'll do it by, you know, June 30th.

But, Your Honor, you stated yesterday that you could not confirm a Plan where the admins and the priority claims were not paid in full.  That's what the Code requires.

THE COURT:  Yeah.  No, that wasn't a kind of unique perspective.

MS. JACOBSON:  No, it wasn't.  No, no.

THE COURT:  I agree.

MS. JACOBSON:  And there's a reason for that in the Code.  I mean, you know, and here I would submit that the case that they've put on for the effective date just has a lot of holes in it.  It's like swiss cheese.  You know, its got all these holes, no admissible evidence came in on it, and it's litigation assets.  We just don't know.  So, Your Honor, the

Plan fails and it can't be confirmed because it's not feasible and because the Debtors are in fact administratively insolvent.

Now I'm going to turn very briefly to the issue of the third party releases, because others I know will address that.  It is TRACO's position that the releases are unreasonably broad and extend, for example, to the Transformation Committee, or at least the exculpation does.  Now I will say, just as an aside on these issues, in our objection we had pointed out that we objected because TRACO's recoupment and setoff rights were not preserved.  And the Debtors had offered to a number of other objectors that carveout, you know, for recoupment and setoff.

So we ask -- I think it was an oversight, because we didn't have it in a separate portion of our objection, it was in one of the paragraphs.  We've reached out to the Debtors and we asked them that to the extent that Your Honor confirms the Plan, and we don't think you should, but if you did that we should also have a similar carveout for recoupment and setoff.

THE COURT:  Where's the language that you're referring -- you're referring to some -- you have some -- is there language in -- like would it be in a confirmation order?  Is that what you're --

MS. JACOBSON:  It's already -- I think the Debtor

116

has filed in their order a number of paragraphs.  I don't know what paragraph --

THE COURT:  Oh, oh, oh.  I know which ones you're talking about.  Yes, yes, yes.

MS. JACOBSON:  It's a whole litany of people --

THE COURT:     Yes, yes, yes.

MS. JACOBSON:  -- Massachusetts, including --

THE COURT:  Got it.

MS. JACOBSON:  -- a whole load of them have it.  We would like the same one.

THE COURT:  Those paragraphs.  Those paragraphs, yes.  I've seen them.

MS. JACOBSON:  Yes.  We want the same ones.  And I -- just for a brief moment I want to talk about the balloting.

THE COURT:  Yes.

MS. JACOBSON:  I touched on it a little bit.  First of all, we have objected to the treatment of PBGC as a separate class.  While the Debtors have pointed out that clearly other cases have treated PBGC as a separate class, I don't believe there are any cases which require Your Honor to put them in a separate class.  And I would say that.

THE COURT:  Uh-huh.

MS. JACOBSON:  And we believe that putting them in a separate class was a way in which to attempt to effectuate a cramdown because they, in their settlement agreement, agreed

117

that they would vote yes, they would accept the Plan. And we believe that it's an impermissible gerrymander.

But moving on to the actual vote and the tally. This Cross Country proof of claim, I took a look at it, it's on the docket. It was a claim against Steward for 30 -- essentially $38 million. And apparently, according to the proof of claim, they settled with Steward about two or three months ahead of the bankruptcy.

THE COURT: Is the proof of claim in evidence?

MS. JACOBSON: It's on the docket. I -- you know. And apparently it was for an aggregate total of 38 million against the Debtors. That's how it's framed on the proof of claim.

THE COURT: Uh-huh.

MS. JACOBSON: And they voted 167 times for that $38 million claim that was an aggregated claim. I think a $38 million claim in 167 voters kind of skews things. And, you know, it would be our request that the Court require a new tabulation.

THE COURT: Based on what evidence?

MS. JACOBSON: Based on what --

THE COURT: Just on the facial claim of which no one ever put up in front of me in connection with the case, that's what I'm being asked to do? Craig Johnson was on the stand. How come nobody put him -- how come no one walked him through

118

the proof of claim?  In other words, there was a way to do this if that's what you were asking for.  But to ask me in closing to require a vote based upon a creditor name and the number and how the creditor voted, I think is a difficult task for me based on the record.  But I get the ask.

MS. JACOBSON:  You get it.  Okay.  Thank you, Your Honor.

And I would also like to discuss the 23 pages of excluded ballots.

THE COURT:  Got a question for you there.  Tell me when someone -- find me an example in which one of them was improperly described by Mr. Johnson.

MS. JACOBSON:  We're not -- we don't have access, you know, to --

THE COURT:  I'm just saying.  But that could have been subpoenaed or questioned or asked for.  And I --

MS. JACOBSON:  This was -- Your Honor --

THE COURT:  -- didn't get any -- in other words, what do I do?  I have testimony where he says no one -- these folks did not check a box one way or the other, and it doesn't surprise me that there's that many folks who do this, and I do this a lot.  That's his testimony.  But a bunch of them opted out, so they did stuff and the procedures don't require me to call.  What do I do with that?

MS. JACOBSON:  Well, Your Honor, I mean respectfully

119

the balloting was filed I think on -- I think it was the 10th.

THE COURT:  Uh-huh.  Did anyone ask me for time?

MS. JACOBSON:  Pardon?

THE COURT:  Did anyone ask me for an emergency continuance?

MS. JACOBSON:  No, we did not.

THE COURT:  I don't know what to do with it.  That's what I'm -- and I'm not saying anyone did anything wrong, I just don't know what to do with that.  Clearly, I take voting procedures really seriously, clearly from prior writings is what I mean.  But I don't know what to do with Johnson's testimony.  But I get the point.  There are a lot of folks who -- and there were some folks who -- and I also said -- like I get the substance of points, but on that I -- Johnson says, look, someone voted, there were a bunch of votes that weren't counted, but had that person voted -- checked the box one way or the other, I would have counted it because that's what I supposed to do.

MS. JACOBSON:  It's just an oddity.  I mean the fact that they --

THE COURT:  That's what I'm saying.  But what makes it an oddity?  In terms of -- what basis do I have to know that it's an oddity?  Facially.

MS. JACOBSON:  I --

THE COURT:  Does it compare to --

**DEBTORS' EXHIBIT NO. 9**
**Page 119 of 218**

120

MS. JACOBSON:  Well, I just think that a 15 percent excluded rate for not voting to accept or reject when you manage to check an opt out on third party releases and the process was one that you had to like check it online, which is not as, you know, easy as uploading a ballot, it has some error --

THE COURT:  Is it?  I don't know.  Uploading is easier than checking it on a box?  I don't know.  I haven't seen it.

MS. JACOBSON:  Well, I mean I can only tell you we helped our client file it --

THE COURT:  Understood.

MS. JACOBSON:  -- and it was not an easy process. But that's anecdotal and it's not evidence.

THE COURT:  No, no, no.  That's good to know. That's good to know.  Thank you.

MS. JACOBSON:  Your Honor, I would just -- and I'll -- I know others are going to go so I'm going to wrap up.  And I'm going to wrap up by simply stating that the Debtors have not met their burden of showing the feasibility of this Plan and they've not satisfied the Bankruptcy Code's requirements to confirm.  And while the Debtors have suggested that this Plan represents the only path forward, there are the various motions to convert, as you and I just discussed.  And I will reserve any comments that I might have.  We were only a

121

joinder on those conversion motions.

THE COURT:  No, no, no.  Agreed.

MS. JACOBSON:  So I will reserve any additional comments until then.

THE COURT:  Thank you.

MS. JACOBSON:  And in sum, this Court should not approve a Plan that does not demonstrate the administrative claims will be paid in full.  And this Plan doesn't do it.

Thank you.

THE COURT:  Thank you very much.

Good afternoon.  Mr. Keach, did you change firms?

MR. KEACH:  I did, Your Honor.

THE COURT:  I try to stay within the loop within six months.  I don't know, am I in or out of my window here?  I did --

MR. KEACH:  I did and very positively.  Thank you.

THE COURT:  Okay.  Great.  Okay.

CLOSING ARGUMENTS

BY MR. KEACH:  Your Honor, I rise to address, as Your Honor's indicated, both the objection to confirmation filed by the participants, who are the same clients, by the way --

THE COURT:  Okay.  Perfect.  Thank you.

MR. KEACH:  -- who are taking the appeal, except the number of clients we have gained has actually increased since

122

we started the appeal, which may tell you something about the level of concern by the client group as a whole.

But I rise to address both the objection to confirmation and the motion to convert, and I know Your Honor's interested in both.

And I'm reminded frankly of those hearings that we were previously together at in which Your Honor was quite clear regarding the 5th Circuit's approach to statutory construction and the significance of focusing on text and the text being alpha.  And I think that focus in this particular instance reads to the inescapable conclusion that Your Honor cannot confirm this plan.  And, in fact, Congress specifically anticipated that in circumstances like this where they're administratively insolvent liquidating Chapter 11 estates, then the request of a creditor, the Court is, in fact, required to convert the case rather than confirm a plan as an alternative.  And I'll tie those things together.

First and foremost, and we had this exchange I think yesterday briefly and I believe it to be true, I think the conversation around feasibility of the plan, which borrows from the language of some of the cases on extended effective dates, is a little misplaced because I really think what the parties are talking about is a failure to comply with 1129(a)(9) and therefore also a failure to comply with 1129(a)(1).

123

1129(a)(9) of course requires that two kinds of claims, administrative claims and priority claims, be paid in full on the effective date. Congress, as it so often does in the Bankruptcy Code we all love and work with, did not define effective date. But what's clear from that language was that a plan has to set an effective date and that the kinds of claims that exist inside of those two provisions and that are addressed by those provisions must be paid on that effective date. In other words, the effective date has to be established and it can't be an amorphous set of conditions.

And, in fact, this plan does not set an effective date. And the Debtors admit that it does not set an effective date. And Mr. Castellano, to his credit, repeatedly rejected any attempt to tie him to a particular date by which he would pay administrative claims and priority claims.

And I will take full responsibility for putting everybody's mind on June 30, 2027 because of course that was the mid-point that Mr. Castellano referred to -- or the end point that Mr. Castellano referred to in his deposition testimony when he defined early to mean the first 6 months of 2027.

But let's be clear, the evidence is very clear that Mr. Castellano emphatically denied that that was the date upon which claims would be paid, or had to be paid. We've all lapsed into this shorthand of what happens if June 30 comes

**DEBTORS' EXHIBIT NO. 9**
**Page 123 of 218**

124

and goes.  But, in fact, this plan doesn't set that as an effective date.  It sets no effective date.

And we can start by taking the Debtors at their own words.  At Page 12 of the disclosure statement the Debtors, in the document they used to solicit both votes and opt outs of both releases and administrative claim discounts, said as follows,

"However, the timing of the effective date in the distribution to holders of allowed administrative expense claims are indeterminate and will depend in part on the level of participation of the administrative expense claims consent program.  The Debtors anticipate that the more holders that choose to timely, properly and affirmatively opt out of the administrative claims consent program, the longer it will take for the Debtors to have sufficient cash to satisfy all allowed administrative expense claims, thus ultimately delaying or even potentially contributing to risking the occurrence of the effective date."

The effective date in this plan, Your Honor, is reduced to simply when we have enough money to meet our effective date obligations that will be the effective date. And this Court doesn't know what that date is, I certainly don't know what that date is, Mr. Castellano hopes and maybe even firmly believes that that date will be not later than June 30, 2027, but the disclosure statement and his testimony

**DEBTORS' EXHIBIT NO. 9**
**Page 124 of 218**

makes it clear that it might later.

But the short answer is we all have no idea, and the Debtors have therefore not established that there is an effective date to this plan, and that is a fatal flaw in this plan.  And what they are asking the Court to do here is unprecedented.  Completely unprecedented.

THE COURT:  Well, compare it to *American Airlines*, a case that you know.  Before the --

MR. KEACH:  By the way, I think I reduced fees for that administrative -- for that antitrust case by the way.

THE COURT:  Just before the plan gets confirmed --

MR. KEACH:  Right.

THE COURT:   -- according to -- there's a plan of merger between AMR, US Air.  Before you get to plan confirmation the United States Department of Justice files an antitrust lawsuit.

MR. KEACH:  Right.

THE COURT:  No time line.  No one had any idea at that time when that plan would be -- if that plan could be confirmed, or the time line I should say for the effective date based on litigation.  An antitrust, as Ms. Jacobs said, could take years, plus appeals.  That plan was confirmed.  Are you saying that it's unprecedented that a case without a known -- put *Sears* aside because --

MR. KEACH:  Right.

126

THE COURT:   -- are you saying that regulatory approvals -- like there's a known time line or litigation with the Department of Justice on antitrust on a merger between 2 of the largest airlines in history was -- how was it -- I get you don't -- I get people don't like it but the concept of unprecedented is what I'm having trouble --

MR. KEACH:  Yeah, and I think --

THE COURT:   -- contemplating because at that moment in time no one had any idea how long that litigation --

MR. KEACH:  Sure.

THE COURT:   -- was going to take, and that case was still confirmed.  So to argue that it was unprecedented when many of the same people were in the room, I don't understand how that -- I don't understand what you -- maybe we just have different definitions of unprecedented.

MR. KEACH:  Yeah, well, and I'm happy to address that, Your Honor --

THE COURT:  Okay.

MR. KEACH:   -- because I think the cases that deal with the late effective dates break into 2 pretty clear categories.

THE COURT:  Let's use litigation with the Department of Justice right before --

MR. KEACH:  Yeah --

THE COURT:   -- right before plan confirmation gets

127

filed.

MR. KEACH:  I think when the Department of Justice brings the litigation, that's a crucial distinction, and the cases have a very clear distinction for example.

THE COURT:  But you just said it was -- that it's unknown when the effective date will occur.  Right?  No one has any idea, plus appeals and --

MR. KEACH:  Sure.

THE COURT:   -- so --

MR. KEACH:  And I think the cases make a very clear distinction between cases where the Debtor says, Someday I'll have enough money to pay you and that's the date, and cases where third parties are driving delays on the effective date.

THE COURT:  Now you're making a distinction between not knowing the effective date and who's driving the unknown of the --

MR. KEACH:  Because that's --

THE COURT:   -- effective date?

MR. KEACH:   -- exactly what the cases do.

THE COURT:  Forget the cases.

MR. KEACH:  All right.

THE COURT:  Let's talk about whether it's unprecedented for someone to not know what the effective date of a plan is.  The Debtor can't walk in and tell the Court, The date of the effective -- the effective date will be X

128

because I'm being sued and I may win, they may win litigation, people have appeals, but I can't tell you today, but if I don't -- this whole plan is built upon a merger and that merger is being challenged by the Government.

MR. KEACH:  Right.  But you know that the effective date will take place when that merger issues is resolved. Right?  In other words, there's a definitive date.

THE COURT:  I agree.  So now let's take --

MR. KEACH:  Right.

THE COURT:   -- now let's take that and let's put --

MR. KEACH:  But that's very different than I hope I have --

THE COURT:  So let's just say --

MR. KEACH:   -- enough money.

THE COURT:  No, no, no, no, no.  But -- well, when the litigation is resolved we'll know if there's enough money, so let's just say --

MR. KEACH:  But we don't know that we'll have enough money, that's the difference.  Right?  In other words, the effective date in the case of a regulatory approval issue you -- when the parties establish that regulatory approval is expected to be obtained, there's no real issue about that but there's a process to go through.

The issue about whether the merger will be approved or not --

THE COURT:  Which the whole plan is premised upon.

MR. KEACH:  Sure.

THE COURT:  So I can't make any distributions, I can't do --

MR. KEACH:  Right.

THE COURT:   -- anything that this plan contemplates unless this gets approved which means I've got to hit a home run.

MR. KEACH:  Right.

THE COURT:  Right.  It's not a single, not a double, I've got to win it all.

MR. KEACH:  You've got to get approval because there's only -- it's a binary.  Right?

THE COURT:  It's a binary, so I've got to hit a home run on everything, plus appeals.

MR. KEACH:  Right.  This is not a binary, this is --

THE COURT:  I know.

MR. KEACH:   -- I hope I recover on all this stuff and have enough money when we're done.  That's the --

THE COURT:  But it's the same -- it's the same concept.  Right?  I can't do what the plan tell -- I can't do what I want to contemplate under the plan unless I get X.

MR. KEACH:  Sure.  And --

THE COURT:  Right.

MR. KEACH:   -- and for example the cases on appeals

DEBTORS' EXHIBIT NO. 9
Page 129 of 218

130

make a very clear distinction, when another party is taking an appeal and the Debtor has to wait out the appeal, that delayed effective date has been allowed in cases.  When the Debtor's taking the appeal, not.

THE COURT:  But we -- no one knew it at the time of plan -- no one knew that at plan confirmation in *American Airlines*.  And *Sears* is -- *Sears* was permitted, so the Court allowed it.  Whether -- how it turned out, I don't know, it's -- that's what I'm saying, it's --

MR. KEACH:  And, Your Honor --

THE COURT:  I get our point, but it's not unprecedented if *Sears* -- if it happened in *Sears*.  Now people may not like the result in *Sears* but it's not unprecedented that it happened in *Sears* and that it happened in *American Airlines* or in *World Com* where there was fresh start accounting and the SEC had to approve it.  Right?  And so no one knew whether the SEC was going to approve fresh start accounting in *World Com*, just coming up with examples off the top of my head.

MR. KEACH:  Sure.

THE COURT:  No one knows whether the SEC is going to approve fresh start accounting and when that was going to happen, but it had to happen.  There was a ton of regulatory issues that were happening in connection with those cases and no one knew the effective date.  No one could say it with

certainty.  You could surmise it.  Now I got it, it's different in litigation, but AMR certainly has litigation.

And now whether -- people can agree or disagree with the case and Judge Lange's decision in that case, but the fact that it never happened -- I'm not being asked to do something that hasn't been done before.

MR. KEACH:  Well, I think, Your Honor, *Sears* aside, and I don't know if anybody file a motion to convert in *Sears*, I'd have to look at that Record.

THE COURT:  It was contested.

MR. KEACH:  Right.

THE COURT:  By the former owner really, the former owners were --

MR. KEACH:  But, and I'll get to my point on the -- and I'll move more quickly to my point on the conversion --

THE COURT:  No, no, no, take your time.

MR. KEACH:  No, no, I'll because --

THE COURT:  I just -- I --

MR. KEACH:   -- because I think it goes to the point.  I do think the case of the Debtor saying, I hope to raise enough money through litigation to pay my administrative claims, my accrued administrative claims in the case, is treated differently by Congress than the kinds of regulatory and other conditional approvals you're talking about.

THE COURT:  Okay.

132

THE COURT:  And I think, in fact, the language of the Code specifically contemplates that from the standpoint of Congress, if a creditor objected, *Sears* should never have happened, and the result that the Debtors want in this case never should have happened.  And the reason for that is as follows.

Conversion under 1112 is mandatory for cause.  For cause is defined in 4(a) as a substantial or continuing loss.  In other words, a substantial historical loss is sufficient.  And an absence of rehabilitation, and it is clear in every case decided with the exception of  1 outlier that I am aware of, that a liquidating case is not a case in which the rehabilitation of the Debtor is possible.  Rehabilitation is not that a plan is confirmed.  Rehabilitation is that the Debtor is restoring its pre-petition business.  Every case that's looked at it, but 1, has decided that that way, including cases in this Circuit.

THE COURT:  So 4(a) also -- let's just say, so 1112, to kind of play around with the text with you, it says, Don't convert a case to a 7 or dismiss a case if the Court identifies unusual circumstances that the case is not in the best interest -- converting is not in the best interest of the estate, and the Debtor establishes that there's a reasonable likelihood that a plan will be confirmed and the ground for converting we're dismissing include an act or omission, right,

**DEBTORS' EXHIBIT NO. 9**
**Page 132 of 218**

133

other than under 4(a) --

MR. KEACH:  Other than 4(a).

THE COURT:   -- for which there's a reasonable justification for the omission.

MR. KEACH:  Right.

THE COURT:  All right.

MR. KEACH:  So you have the option of saying there's an imminent plan to be confirmed and therefore I can avoid conversion unless the ground is 4(a).  If the ground is 4(a), which is it in this case, that's not an option you have.

THE COURT:  Right.  But that --

MR. KEACH:  Your only --

THE COURT:   -- that doesn't mean I can't confirm the plan.  Right?  That moots the whole concept --

MR. KEACH:  Well, no, if you must convert, then you can't confirm the plan.  And confirmation of an imminent plan --

THE COURT:  Likelihood to confirm a plan.

MR. KEACH:   -- is an option if it's not 4(a).

THE COURT:  They're on the table on the same day. In other words, if a Debtor puts forth a plan --

MR. KEACH:  Right.

THE COURT:   -- and the plan is confirmable, but the case could also be converted --

MR. KEACH:  If the Debtor puts forth a plan and the

134

grounds for conversion were under 4(a), you don't have the option of converting -- of confirming that plan, you must convert.

THE COURT:  So --

MR. KEACH:  That's what that section means.

THE COURT:   -- so you're saying -- hold on, I want to get this right.

MR. KEACH:  Right.

THE COURT:  I know, I really want to get this right. What was the -- you're saying that if the Debtor runs into administrative issues any case can be converted upon a simple motion.  Right?

MR. KEACH:  It's not administrative issues --

THE COURT:  No, no, it's substantial.

MR. KEACH:   -- it's a substantial loss.  Right.

THE COURT:  Right.

MR. KEACH:  And Mr. Castellano --

THE COURT:  No, no, that's what I'm saying.  So --

MR. KEACH:  Right.

THE COURT:   -- a Chapter 11 Debtor falls behind on his mortgage.

MR. KEACH:  Right.  If it's a substantial loss in the context of the case, yes.  And Mr. Castellano conceded that point.  Right?

THE COURT:  Wow, Mr. Keach.  Wow.

135

MR. KEACH:  And the disclosure statement --

THE COURT:  No, I'm just saying, just wow.  That's just --

MR. KEACH:   -- the disclosure statement in this case --

THE COURT:  Subchapter -- there won't be a Subchapter 5 case confirmed if -- well, I guess 1112 doesn't really apply, but --

MR. KEACH:  Right.

THE COURT:   -- yeah, if -- small 11s won't survive what you're saying.  You're saying don't -- I get the concept of don't --

MR. KEACH:  If it --

THE COURT:   -- if a plan cannot be confirmed, and there's a pending motion to dismiss, but if someone satisfies 1129, you're saying that I don't have the option to approve a Chapter 11 plan.

MR. KEACH:  Not if a party simultaneously meets the requirements of establishing cause --

THE COURT:  Where is -- where is that in the Code?

MR. KEACH:   -- under 4(a).

THE COURT:  Where is that in the Code?

MR. KEACH:  It's right in front of you, Your Honor.

THE COURT:  Oh.

MR. KEACH:  You have the option of confirming an

**DEBTORS' EXHIBIT NO. 9**
**Page 135 of 218**

imminently confirmable plan except if the motion for convert is based on 4(a), in which case you do not.

THE COURT:  Mr. Keach, I will let you take that one upstairs if I convert -- if I confirm --

MR. KEACH:  All right.

THE COURT:  -- this plan.  Good luck.

MR. KEACH:  And I think those -- I think these two in that language and the effective date language I think go hand-in-hand.  Right?  Congress insisted, and I think you've indicated, Your Honor, this principle you think is --

THE COURT:  So in other words --

MR. KEACH:  -- immutable, which is administrative expenses are supposed to be paid.  Right?  We're not supposed to have administratively insolvent estates that continue on indefinitely and then bring forward plans that say, Give me a couple more years, I'll sue a bunch of people and pay my administrative expenses.

THE COURT:  I totally agree with that.

MR. KEACH:  And Congress has said --

THE COURT:  I totally agree with that.

MR. KEACH:  -- and I think this provision establishes clearly and unequivocally --

THE COURT:  I totally agree with that.

MR. KEACH:  -- that Congress has said that if a creditor comes forward, files a motion to convert, establishes

cause under 4(a), that converting that plan, even if Your Honor sincerely believes it's the better option, is not an option you have.

THE COURT:  Wow.

MR. KEACH:  The options the Code gives you are you can appoint a Trustee or --

THE COURT:  Yes, now --

MR. KEACH:  -- you can appoint an examiner.  And as you found in *Red River* --

THE COURT:  Wow.

MR. KEACH:  -- neither of those things applies here.

THE COURT:  Your logic would apply in Subchapter 5.

MR. KEACH:  I appreciate that.

THE COURT:  Just want to make sure you're clear.

MR. KEACH:  I understand, Your Honor.  As you know, I'm a --

THE COURT:  No, no, I'm just making sure we're --

MR. KEACH:  -- co-draft person of Subchapter 5 and I accept that premise.

THE COURT:  Okay.

MR. KEACH:  All right.  And so, Your Honor, if -- the short answer is, right, you can try to make sure that you don't have creditors pressing motions to convert.

THE COURT:  I can't -- I can't control that.

138

MR. KEACH:  I understand.  And what Congress said was, If --

THE COURT:  Including -- including creditors who have claims on appeal, I can't even -- I can't even control that who may or may not -- the District Court may or may not decide whether they even have a claim against the estate or not.

MR. KEACH:  Well, there's no question that even if we lose our appeal, we have claims against the estate, but --

THE COURT:  Right.  But, no, what I'm saying is, but it would apply in a situation in which the only claim would --

MR. KEACH:  Well, I mean --

THE COURT:   -- require that because the claim would be pending on appeal.  Right?

MR. KEACH:  Right.

THE COURT:  And so in other words it -- anyone -- the US Trustee could file one.

MR. KEACH:  Right.  Obviously cause must be established under 4(a), but in this case that cause is admitted, notwithstanding their PowerPoint which brushed past this point as fast as it could.  In this case there's no question that there were historical substantial losses as conceded by Mr. Castellano's testimony, there were considerable accumulation of administrative expenses that were not paid --

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 9**
**Page 138 of 218**

THE COURT:  See, I --

MR. KEACH:   -- that will not be paid for up to two years.

THE COURT:  Let's read the Code together.

MR. KEACH:  All right.

THE COURT:  You read, 1112(b)(1), why you're going to -- right?

MR. KEACH:  Yeah, I'm happy to, Your Honor.

THE COURT:  Right.  No, except as --

MR. KEACH:  Shall convert a case --

THE COURT:  No, no, no, except as provided in 2 --

MR. KEACH:  Right.

THE COURT:   -- and Subsection (c).  Right?

MR. KEACH:  And 2 does not apply if the grounds for converting or dismiss the case at 4(a) --

THE COURT:  No, no, let's just -- let's just read. On a request of a party-in-interest, which you certainly have, and after notice and a hearing, the Court shall convert a case under this chapter, or dismiss, whichever is in the best interest of the estate, right, for cause unless the Court determines that the appointment of a Trustee is --

MR. KEACH:  Or an examiner.

THE COURT:   -- or an examiner.  Right?

MR. KEACH:  Right.

THE COURT:  So theoretically I could just -- if

**DEBTORS' EXHIBIT NO. 9**
**Page 139 of 218**

140

could appoint a Chapter -- so the answer is I could appoint a Chapter 11 Trustee and this would end.

MR. KEACH:  You could.  Or appoint an examiner --

THE COURT:  That's your reading.  I'm saying that's your --

MR. KEACH:  -- and those -- and --

THE COURT:  -- that's your holistic reading, or can appoint an examiner.

MR. KEACH:  Well, sure.  And those would --

THE COURT:  And that would holistically -- I could appoint an examiner, confirm the case, and that would -- that's the way you read the Code.

MR. KEACH:  Yeah, if appointing an examiner or a Trustee were --

THE COURT:  Was in the best interest of the estate.

MR. KEACH:  Right.  And --

THE COURT:  I think it's in the best interest of the estate, Castellano's out, I'm appointing a Chapter 11 Trustee, here's a Chapter 11 plan, what do you want to do?

MR. KEACH:  And Your Honor's decision would then be tested based on whether or not that was an abuse of discretion to do so because it was a meaningless event in the course of the case.

THE COURT:  Right.

MR. KEACH:  I don't disagree with you.

141

THE COURT:  Okay.  Then we go to 2.  The Court may not convert a case --

MR. KEACH:  2 clearly does not apply if 4(a) applies.

THE COURT:  Right.  So in other words -- right.

MR. KEACH:  And there's -- and there's --

THE COURT:  So the term cause includes --

MR. KEACH:   -- case law -- and there's case law in this district on that, it's cited in our motion to convert.

THE COURT:  No, no, no question about it, I just --

MR. KEACH:  Right.

THE COURT:   -- I just want -- I just want you firmly on the Record on your position.

MR. KEACH:  Right.

THE COURT:  That's all I'm doing.

MR. KEACH:  Right.  And --

THE COURT:  Okay.

MR. KEACH:   -- we say the same thing in our motion to convert, Your Honor.

THE COURT:  No, no, no, I read it, I just didn't fully -- I didn't -- okay.

MR. KEACH:  All right.

THE COURT:  That's all I needed to know, Mr. Keach.  Thank you.

MR. KEACH:  Thank you.  And, Your Honor, so let me

142

go back to where I started, which is there's no effective date, and we'll -- I'll pull off my unprecedented comment respectfully to the Court.  But in the context of a plan, and I think in light of the language that we were just going over, this should not be a surprise to anybody.

Sears aside, there is no -- and Sears is not a reported decision by the way, there was no reported decision anywhere, and this is what I meant by unprecedented, there's no reported decision anywhere where a Debtor has been allowed to define the effective date as when I have enough money to pay my effective date obligations.  That is unprecedented, and that is what I'm saying the Debtors are doing here.

The evidence clearly establishes that's what the Debtors are doing here, and I would submit that that is contrary to the language and purpose of 1129(a)(9) and therefore also results in a violation of 1129(a)(1).  You cannot have a plan as a matter of law where the effective date is defined as whenever we have enough money to meet our effective date obligations.  It would render 1129(a)(9) a ridiculous exercise in circularity.  Every Debtor will always be able to meet its obligation because they would simply say, Give me time, I'll time it.

THE COURT:  Right.  But we both agree that conceptually, I'm not saying what I'll do, but conceptually, right, that's where I was going with the meat on the bone

143

stuff.

MR. KEACH:  Sure.

THE COURT:  You can't just come in and just say, Give me two years and I'll show up and I'll give you payments. So, right, just like someone can just say, Give me eight months.  Well, for what do you need it?  Right?

MR. KEACH:  Sure.  And I --

THE COURT:  And what are you going to do with it?

MR. KEACH:   -- and I think you asked for the meat on the bones and obviously ultimately, Your Honor, you're the fact finder here, you're weighing the evidence.

THE COURT:  According to you I don't even have to do anything, I can just convert -- I just need to convert --

MR. KEACH:  Well, I think you have to convert if we continue to ask for it, yes.

THE COURT:  Uh-huh.  Well, let me just get you on the Record.  Are you asking for the conversion?

MR. KEACH:  We are, Your Honor.

THE COURT:  Okay.  That's all I needed to know.

MR. KEACH:  And you -- and I think you asked through my colleague what -- or impliedly what our motivation might be there.

THE COURT:  No, no, I didn't ask what your implied motivation was, I just wanted you on the Record --

MR. KEACH:  Yeah, no, we continue --

144

THE COURT:  -- for these positions.

MR. KEACH:  -- to press the motion to convert.

THE COURT:  Okay.  Thank you.

MR. KEACH:  And so I do think that --

THE COURT:  But what I wanted to know was, just to understand, if there's a motion to convert, right, someone files a motion, someone files a joinder --

MR. KEACH:  Sure.

THE COURT:  -- different joinders are different I think from an initial joinders.  I just needed to understand because they had -- TRACO had filed a motion separately asking for the estate to pay funds, and so I needed to understand you want to convert, so obviously you're asking for relief but then don't want the relief that they're offering.  I think it's a little different.

MR. KEACH:  Right.  Yeah, and --

THE COURT:  That's what I was trying to make sure, that I understood.

MR. KEACH:  Yeah, and --

THE COURT:  And I needed to understand from your client's perspective because I didn't want to presume there could be someone else and there could be -- they could be in a different position from someone that you represented.

MR. KEACH:  Sure.  And I'll go on the Record briefly as to why we think conversion is better for my client's

interest, Your Honor.  As Your Honor knows, we filed a class action adversary.  We want to obtain relief for the full class, that the assets at issue here, the so-called Rabbi Trust assets, belonged as a matter of law to those participants and beneficiaries and not to the Debtors' estate.

Should we prevail on appeal, and neither you nor I will talk about our perceptions of the odds there, but should we prevail appeal, and should that cause of action go forward we do not want any class member to be restricted by any of the releases contained in the plan or by any deemed third-party releases that may apply to them because they either did not opt out or simply did not vote or did not file a proof of claim.

And in the event of conversion it is emphatically true that there will be no such restriction on their recovery or on their ability to sue the members of the board who are responsible for those choices, the people who administered the plan who are responsible for those choices, and ho restriction on their ability to claw back that money from the people who received it, including the FILO lenders and the professionals. That's why we want conversion, Your Honor.

THE COURT:  Understood.

MR. KEACH:  And that is a fair transition, and I'm taking up more time than I wanted, Your Honor, but --

THE COURT:  No, no, I engaged in a dialogue with

146

you.  I think you need to take as much time as you want.

MR. KEACH:  Sure.  But let me go to this issue of releases.  I think regardless of Your Honor's choice around confirmation I have made it very clear that I think confirmation is not a legally permissible choice because the Debtors cannot meet the confirmation standards and cannot be -- and the plan cannot be confirmed in the face of the motion to convert.

There should be no releases in this plan.  I am not -- I'm not attacking the exculpations, I think exculpations are an extension of the Barton Doctrine and are frankly just a recognition that from the petition date to the confirmation date that the parties who are exculpated are generally operating under Court supervision and generally operating under Court orders, and that exculpations prevent essentially collateral attacks on the Court's orders and third-party litigation, similar to what the Barton Doctrine is intended to do.  So I'm not attacking exculpations.

But there should be no releases for claims resulting out of pre-petition conduct here.  And whether or not those are through the opt out program, and I understand the 5th Circuit approves of opt out programs, I don't frankly disagree, I was on the side of -- I was on the amicas brief side of *Perdue* that lost, not won.  And so I am not opposed to opt out releases as a concept.

**DEBTORS' EXHIBIT NO. 9**
**Page 146 of 218**

147

But I think whether or not you're doing opt out mechanisms or non-consensual releases or even frankly opt in mechanisms, releases have to be supported by consideration by the released parties. And the testimony in this case is unequivocal that the parties being granted releases here under the plan have provided no consideration for those releases other than their compensated service as employees or officers, or directors in that case. That, under every case that's been decided, is insufficient to justify a release.

And I think that's true whether or not you're supporting opt out programs based on Judge Goldblatt's contract theory or, you know, default theory. All of the cases, including recent Southern District cases of opting out mechanism, Southern District of New York, not Texas, I appreciate there's 2 of them now, including those recent cases still look and rely on the contributions being made by their released parties. And there simply is no consideration here.

And I think whatever happens, if Your Honor were to confirm, and I've made my point clear about whether you should or you shouldn't or can, the releases should come out of this plan. Among other reasons we've asked, well, what happens when we get to June 30 or whatever that date is? I would also ask the Court to contemplate what happens in the 2 years while we're waiting.

There were 2500 or something opt outs. Okay. I

**DEBTORS' EXHIBIT NO. 9**
**Page 147 of 218**

148

know that my clients opted out, I know that a lot of other people, and who were deferred comp participants, opted out. But aside from that there are lots of other people who opted out who may, in fact, have claims against people on the released party list and who will be bringing litigation.

That raises a number of issues.  Do the -- and the plan by the way doesn't provide for the releases to be effective until the plan goes effective.  That is less clear regarding the exculpations.  What's less clear is how the injunctions operate.  Would our litigation, even though my clients have opted out, be seen as "interfering with the operation of the plan" even though the plan's not yet effective?  Would we have to go through the gatekeeper provision, and if we did, would you even have constitutional authority to gatekeep our cause of action?

I think Your Honor's going to be called upon constantly during this 3-year period to address these issues because of the number of opt outs.  And there are no clear answers under the plan, and frankly I don't know why anybody should be put to the trouble of having to go through that, either the people who have to come to you, or Your Honor, when we are all in complete limbo as to whether the plan will ever be effective.

It's one thing to have to go through a process. When a plan is confirmed everybody knows what the rules are

149

going to be. But the Debtors here are asking us to go through a set of procedures and rules and limits on the ability of people to exercise their rights to due process and to bring causes of action when we don't even know if the plan will ever go effective. The effective date is, in their words, indeterminate. Why should we be governed by a plan document at all for the 2-year period when we don't know if it's ever going to happen?

And in this case I would submit that question is even more focused because a settlement's been approved. Right? And I appreciate the settlement's on appeal and if that appeal is successful, obviously everybody wants to figure out what that means. But in the interim the settlement's in effect. The liquidation's going to go forward, the professionals are going to work for the litigation trust. That process is going to happen. The plan confirmation adds nothing to that.

This plan exists for two reasons. Let's just be honest with ourselves. It exists for two reasons, to provide an extra $15 million worth of money, some of which is apparent -- well, although money is fungible, some of which may or may not be going to fund the admin consent program, some of which may or may not be going to professionals. And the only other reason for this plan to exist is to gather exculpations and releases. It has no other function.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 9**
**Page 149 of 218**

150

Everything else happens as a product of the FILO settlement.

So in this case putting everybody through going through the hoops for two years while we figure out if this plan is effective is even more egregious because the more important work is still going to happen anyway.  And trust me, Your Honor, I think lots of people have accused the objecting parties here of hoping that the causes of action are not successful.  Of course not.

Obviously I want these causes of action to be successful because if I lose on appeal, and all of my clients are unsecured creditors, I want them to be able to recover some money.  Whether or not those are recovered in a 7 or an 11 or otherwise.  But that's going to happen regardless of whether you confirm the plan.  That money is going to come in as a consequence of the litigation that's being conducted by the litigation trust.

THE COURT:  Why do you feel so confident based on the Record?  In other words, what's the -- the Chapter 7 Trustee -- I just want to walk through this because I --

MR. KEACH:  Sure.

THE COURT:   -- a Chapter 7 Trustee gets appointed.

MR. KEACH:  Right.

THE COURT:  All right.  It's not the matrix so they're going to have to kind of -- you can't just download them with the information, she or he is going to have to get

up to speed and they'll get up to speed.  The Debtors are telling me that there's a risk that professional -- in other words, that there's some folks who are on an hourly fee, they may not continue on the hourly fee and so you trust -- or if your -- relies on the liquidating -- the liquidation analysis and the assumptions in there, is that the Chapter 7 Trustee is going to have to act quickly because there's not going to be enough money, and the Chapter 7 Trustee's going to have to go get professionals --

MR. KEACH:  Sure.  Let's take those --

THE COURT:   -- which puts the --

MR. KEACH:   -- one at a time.

THE COURT:  Yeah.  No, no, I'm throwing them all after the concept, so in terms of things will continue, they're saying no and I wanted to give you an opportunity to kind of give me your side.

MR. KEACH:  Sure.  First and foremost, the settlement clearly provides, and Your Honor acknowledged this when you approved the settlement, the settlement stands on its own, it's not conditioned on confirmation, it goes forward whether confirmation happens or not.  That -- nobody's contesting that premise.

So let's talk about the litigation and this fear that people will walk away.  First and foremost, Mr. Carr testified in his deposition and reaffirmed that meeting the

effective date is not dependent upon the so-called investigation claims. In other words, the claims against insiders and the -- you know, Mr. -- Dr. Disatori (phonetic), et al., they can get 0 on those claims and according to Mr. Carr still go effective. Right?

So we should be focused on everything but those claims. Right? Those claims are being pursued by Kobre & Kim on an hourly basis, we'll come back to that. But they're not -- they're not essential to this effective date argument because they claim they don't need any of that money.

If you look at every other piece of the puzzle here in terms of go-forward claims, the monetization of the so-called non-litigation assets is nearly complete. That's not really a factor. The preference actions are being pursued on a contingent fee basis, there's no reason to believe that TOGA (phonetic) wouldn't work for the Chapter 7 Trustee on a contingent fee basis.

But in any event this is a false choice because they're all working for the litigation trust after this goes into effect. So it isn't the Chapter 7 Trustee who's going to have to convince those people to stay on, they're staying on anyway. One of the King & Spaulding cases, I think the Blue Cross Blue Shield litigation, also on a contingency fee basis. Right?

The only other significant part of that group is the

Norwood litigation which is already scheduled for trial.  I think it's probably beyond reason that those guys would walk away at this point just because the 7 Trustee now holds the Class B interests and not somebody else.  So it's pretty clear that litigation is going to go forward regardless, at least the litigation the Debtors have testified is essential to meeting the effective date.

So their complaint about what happens if there's a 7 Trustee holding the Class B interest is, well, the 7 Trustee will have to dispose of the Class B interests in order to get money to administer what's left of the estate, the sort of wind down aspects of the estate, which has been described as not significant aspects and not expensive aspects.

But the 7 Trustee has a means to acquire money in order to do that.  Obviously the 7 Trustee is going to have $6-1/2 million, I don't know whether that's enough or not. The Debtors haven't told us what that wind down budget is, apart from everything else.  But it's starting with $6-1/2 million, on top of which, and we don't need to prejudge whether or not disgorgement is or is not permissible, we don't have in front of Your Honor whether or not the various mechanisms for funding professional fees would create any kind of exception to disgorgement in this case.  I would submit they would not.  The professional fee escrow is not a carve out, and so I don't think you get there, but we don't have to

154

decide that question today.

THE COURT:  But you --

MR. KEACH:  The 7 Trustee will administer the wind down if there's any wind down to administer --

THE COURT:  Tell me --

MR. KEACH:   -- with the $6-1/2 million.

THE COURT:   -- let me push you on -- let me push you on the -- not push you, ask you questions, because I know you raised the disgorgement --

MR. KEACH:  Right.

THE COURT:   -- issue.  How would that work?  Just that --

MR. KEACH:  Sure.  I --

THE COURT:   -- it didn't get fleshed out in the testimony, so from a kind of a legal standpoint how do you think that would work?

MR. KEACH:  Yeah --

THE COURT:  Or what did you envision or what were you contemplating?  I know the witness -- I think you got out of him, I've never been in one of these disgorgements --

MR. KEACH:  Right.

THE COURT:   -- and so we never kind of got into that --

MR. KEACH:  Yeah.

THE COURT:   -- a little bit.  So I just kind of

**DEBTORS' EXHIBIT NO. 9**
**Page 154 of 218**

155

wanted to make sure that -- one of my questions is how did Mr. Keach envision that to work, because you said there was like $270 million --

MR. KEACH:  Yeah, I've actually -- I've actually -- you know, one of the benefits of being old, Your Honor, is I've actually been in a case involving this kind of disgorgement, an 11 that converted to a 7.  And very simply the 7 Trustee simply demanded of each of the paid professionals in the case -- and by the way, theoretically you could actually demand anybody who's been paid in the case, vendors, the case law unfortunately professionals -- for professionals seems to make a distinction in terms of priority of going after the professionals first as a matter of policy, but I don't think that's embedded in the statute.

THE COURT:  But within the statute how does a professional --

MR. KEACH:  Yeah, I mean basically what Chapter 7 provides is that Chapter 7 administrative expenses have priority and the courts have developed the disgorgement doctrine as a way of enforcing that priority.  And so what actually happens practically --

THE COURT:  No, it's an atextual --

MR. KEACH:  It's --

THE COURT:   -- position.

MR. KEACH:   -- it's a court-created remedy to put

teeth on that priority.  Right?

THE COURT:  Yeah.  No, no, no, I understand it.  I understand it.

MR. KEACH:  And simply the 7 Trustee demands the return of funds.  If they don't come in, those parties get sued.  But what I've actually seen done is it's been ordered -- in the case I was involved in it was ordered on motion, it was allocated among all the professionals that they would contribute X amount as an initial disgorgement with rights to the Trustee to seek additional disgorgement moving forward.

And the -- and in that case every single professional complied because it's not they have a choice, and that's the way it went.

THE COURT:  Understood.

MR. KEACH:  But I think it's a red herring to say that the Chapter 7 Trustee holding the Class B interest is problematic.  And, look, if there's a tax consequence to conversion -- and conversion is mandatory, then there's a tax consequence and it'll have to be dealt with.  But I think the evidence is pretty clear that there are as many possible monetary advantages to the 7 in terms of saving money in administration as adding to money in administration.

And so I basically have made my point regarding releases, Your Honor.  And let me just make a couple of very

quick points that have been touched on by other people and then I will, unless Your Honor has questions, cede the podium.

The Debtors' other fatal flaw is they don't have an accepting impaired class. It is -- and I won't touch the gerrymandering argument, I think that's been made and responded to, Your Honor understands that argument. I'm sure I have nothing more to add to that debate.

So let me focus on the fact that Classes 3 and 5 are not impaired. The entire treatment of Class 3 was set out in the FILO settlement. It's dictated by the FILO settlement and as Your Honor has found, and as the parties all concede, the FILO settlement is no contingent in any way, shape or form on confirmation. That happens whether or not the plan is confirmed or not, and that is by definition not plan impairment, that's impairment by settlement agreement, and that doesn't make a class impaired for voting purposes.

With respect to Class 5 which is the PBGC, one thing you didn't see in the PowerPoint presentation because it's not there is there's no provision in that settlement agreement that conditions it on confirmation. None. It happens whether or not confirmation happens or not. And that again is by definition impairment by settlement agreement, not by plan.

If Class 3 is not impaired and Class 5 is not impaired, Class 4, whatever you may think of how they decided to tabulate the votes, and I would submit, Your Honor, that if

158

you polled every creditor in this case as to whether or not they thought they were voting on 167 separate plans, or just 1 plan, they would probably tell you they thought they were voting on 1 plan.  Not the plan for the Physicians Group of Arizona, but the plan for the Steward Health Care Debtors.

But aside from that point it doesn't matter how you tabulate the votes because if you combine them, you clearly have the GUCs rejecting because they can't meet the 2/3 in dollar amount.  If you don't combine them, they conceded in their PowerPoint presentation they had 40 or something Debtors including the 2 major Debtors, whoever, rejecting Class 4. And if we're right with respect to the lack of impairment of 3 and 5, they fail under 1129(a)(10) and there's nothing Your Honor can do to help them if they fail 1129(a)(10).

THE COURT:  No, I don't care about helping anyone, but I --

MR. KEACH:  I understand.

THE COURT:   -- get the concept.

MR. KEACH:  I understand.  And those are the points I wanted to emphasize, Your Honor.  I don't intend by excluding any particular argument here to have waived any argument to either to convert or in the objection to confirmation.  But if Your Honor has no further questions --

THE COURT:  No, no, no, I appreciate --

MR. KEACH:   -- given the house I will cede the

159

podium.

THE COURT:   -- I appreciate our conversation. Thank you, Mr. Keach, as always.

MR. KEACH:   Thank you.

MR. TROOP:   Almost good evening, Your Honor.   Andrew Troop on behalf of the Commonwealth of Massachusetts.

THE COURT:   Yeah, yeah.

CLOSING ARGUMENTS

BY MR. TROOP:   It's evening at home, I can say that for sure.   Your Honor, I actually want to start where you started yesterday.

THE COURT:   Oh, boy, you don't have to tell me where I started yesterday.

MR. TROOP:   Right, particularly -- yeah, because I think it informs what we've all been through right now.   The question is whether, if the plan effectively has a fail safe that says it will never go effective because -- unless administrative and priority claims are paid in full, that you can confirm the plan notwithstanding 1129(a)(9).   And I think if you look at this from a textual perspective, the answer to that has to be no.

You have to find by a preponderance of the evidence that the Debtors have established that that condition will be met.   Right?   That statutory condition will be met.   And that statutory condition is very different than the other

160

conditions that we see in plans all the time, whether that's regulatory approval closing on a transaction, closing on a financing.

Your Honor, we have all been involved in cases where there is a miss between the confirmation order being entered and the effective date where the effective date cannot occur. And it could be it could require modifications to the plan, it could require tons of things.  But it's not a case where the Court didn't find, right, the -- by a preponderance of the evidence that the statutory requirements of 1129(a)(9) would be met.

And so, Your Honor, I think it's -- I think it is too easy to say that, well, because there are other cases where there has been an extended period of time for conditions to be satisfied before people got paid or could get paid, to say that this plan can be confirmed.  Based on the lack of credible admissible evidence properly capable of being tested, right, to confirm that you can find with a reasonable amount of confidence that you need it is more likely than not that administrative and priority claims will get paid.

Second, Your Honor, I just want to say and underscore that this is the -- I guess I'd use -- someone accused me of saying this yesterday, but the conflation of feasibility and paying administrative and priority creditors in full, because the amounts just can't be divorced.  Right?

161

It can't be divorced.  And it can't simply be enough to say that because this plan is a liquidating plan and there's -- therefore it is unlikely, right, there won't be another liquidation because that's what the plan provides, that the substantive analysis about whether the plan is feasible now, and perhaps a more generic sense, has satisfied because it really is focused on the finding for administrative expenses.

The second thing that I'd like to highlight, Your Honor, is there was a lot of talk about these claims aren't speculative.  As Mr. Keach says, and I will emphasize from the perspective of the Commonwealth of Massachusetts, pursue every claim you've identified.  We wish you luck, we hope that you recover.  But speculative in this context is whether there is sufficient evidence for you to conclude that the amounts to be recovered will be recovered sufficient to allow the -- sufficient to an 1129(a)(9) finding.

And on that there's no admissible evidence in front of you in that regard.  There's evidence in front of you that they are going to assert claims with really large amounts. Okay.  I don't know how you draw from that that it is reasonably likely that they're going to collect, whether from the basis of liability and no evidence with regard to actual collectability was presented to Your Honor at all, right, that they're going to realize that, or even 13 percent of that.

In that regard speculative is speculative the way we

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 9**
**Page 161 of 218**

162

talk about it in the context of seeking damages in a tort or contract claim.  You can find like here it's speculative, whether you'll find liability, but there's -- but damages are speculative.  And collectability is speculative.  And this is not a 9919 standard, Your Honor.  They're not here telling you, Approve my settlement with X because the resolution falls within the range of potential litigated results, or it's above the lowest reasonable recovery.  Courts in this Circuit define it, as they do everywhere in the country, using that language sometimes interchangeably.

That's not the case here where you've got a settlement in front of you, and what you're looking at is the claim is X, the defense is X.  In my reasonable judgment is it going to fall between here and there, because the most important part of that analysis for feasibility is that if this was a settlement, the money would come in.  You could value the money that comes in by the money that comes in.

And on top of that, Your Honor, if a non-Debtor party to that settlement fails to perform after you have approved the settlement, the estate's got a claim against the non-Debtor party.  Right?  And you've identified -- and you've effectively found what the damages are.  It's the failure to perform under the settlement.  Here there's no correlation.  There's clearly no causation between 1 or 2 on this particular part.  So for speculative, speculative is speculative.

163

And then finally -- and in this regard to also just underscore something that Mr. Keach said and Ms. Jacobson said, and which I believe all the witnesses, in fact, testified to, whether you confirm this plan or not, these claims are preserved, and they're put in a litigation trust and they get preserved, and they get pursued.

In fact, they're in the litigation trust, they're not going to be in the control of the Debtor between now and the effective date. They're not going to be -- even if you convert the case, Your Honor, I'm not going to argue conversion, but the reality is even if there's a Chapter 7 Trustee, the Chapter 7 Trustee isn't going to make the decisions with regard to the prosecution of those litigation claims which are now in the litigation trust. Unless, as everyone said, your decision gets overturned on appeal, and then we'll have to deal with that. But for the purposes of this hearing we have to -- we have to treat that as the order as to what's going to happen.

Your Honor, I want to make a quick observation about the voting issues here. And in that regard, Your Honor, I want to direct your attention to Mr. Castellano's Declarations.

THE COURT: Both or --

MR. TROOP: Yeah, I believe it's in both, but, Your Honor, I honestly can't remember at the moment.

164

Mr. Castellano sets forth the facts for a full fledged substantive consolidation of all 167 Debtors.  He says it's impossible to pull them apart.  It's impossible to pull them apart.  He doesn't say, I want limited substantive consolidation, simply because it's more efficient because the money's going to come in as a pool and I can therefore distribute it as a pool.

And the Debtors, Your Honor, with regard to the tabulation of their votes should not on the one hand ask you to approve substantive consolidation based on a full-throated evidentiary -- non -- I will say not controverted evidentiary presentation by Mr. Castellano that full-fledged substantive consolidation is appropriate here, but yet, however you want to look at Mr. Johnson's testimony yesterday, I believe it's indisputable that a $38.3 million claim got counted 167 times. I think that that's a real question, Your Honor, whether the Debtors should be allowed to have its cake and eat it too, whether that's the fair result here, the confirmable result here.

Your Honor, I want to underscore a decidedly different point with regard to, and I'm not going to argue about the PBGC, but the FILO claim being impaired for voting purposes, at 13 percent recovery, accept Mr. Castellano's statement, All I've got to do is get 13 percent, and I can pay in full and have money left over.  That means there's value to

pay that $10 million unsecured claim out of the FILO's collateral.

By definition that means the plan isn't impairing them.  That means by definition you could let the FILOs retain their lien on all of their assets and get paid in full.  I don't know how you look at the numbers that have been presented other than to confirm that understanding.  It's not -- I'm not going to re-argue the FILO settlement, Your Honor.

So, Your Honor, it's very hard for me to understand how the plan impairs the FILO creditors, that it -- the FILO claims, Your Honor, and that's not to say that there might not be a benefit to everybody from what they decided to do.  But as you've held consistently, in *Weatherby*, in *Sandy Hook*, right, there might be something that's in front of you which is the alternative that everybody is screaming for.  But if the Code doesn't permit it, if case law doesn't support it, you can't approve it.

And in that regard, Your Honor, and for those -- and there's just one other thing that I'd like to identify that parties haven't talked about --

THE COURT:  Okay.

MR. TROOP:  -- directly yet.  Your Honor, I don't know whether it's 97 percent of the administrative expense claims, which I thought was the testimony yesterday were 98

166

percent of the administrative expense claims, which I believe Mr. Cohen represented today had been paid.

And I think that there is a suggestion that under the circumstances you should discount the fact that there are still unpaid administrative expenses because they did so well in paying their employees --

THE COURT:  Yeah, I don't think --

MR. TROOP:  Right.

THE COURT:   -- that has any bearing on plan confirmation, the fact that someone has paid other people.

MR. TROOP:  Yes, but, Your Honor, the flip side is, right --

THE COURT:  Okay.

MR. TROOP:   -- and we know this as bankruptcy practitioners, right, if administrative expense creditors in this case are subjected to a plan of reorganization where they're not going to be paid in full, okay, through a confirmed Chapter 11 plan.  We all understand you take the risk at a Chapter 7 conversion and you might not paid in full on your administrative expense claims.

But in a confirmed Chapter 11 plan, I'll speak for myself, but I think we all know this, when our clients come to us and say, Do I take the risk of extending credit to a Chapter 11 Debtor, do I do it, or I do -- or do I do what the professionals did in the settlement and say, Put money

**DEBTORS' EXHIBIT NO. 9**
**Page 166 of 218**

specifically aside for me.

Leave aside whether that's enforceable or not, how you're going to rule on that ultimately, but do we take our lead from the professionals in the case, do we say, Eh, you know what, Your Honor, we're going to insist on payment in advance, we're going to insist on cash on delivery.  We're going to turn everything, in my opinion, about what that administrative expense priority is supposed to do to encourage the extension of post-petition credit to a Debtor-in-possession on its head because, as you said, it's irrelevant that 97 or 98 percent of the people got paid, what people are gambling on, are they going to be in the 2 or 3 percent that don't get paid.

And confirming this plan on the facts presented to you now, right, about the reasonable likelihood that there will be payment in full says, just as other parties have said, right, those unpaid administrative expense creditors will take the risk.  And, Your Honor, you know, from the Commonwealth of Massachusetts' perspective, as you know, we advanced $70 million in credit to the estates, that we have disputes over that.  Right?  There are disputes over that.  No disputes?  We advanced it?

UNIDENTIFIED SPEAKER:  You granted $70 million.

MR. TROOP:  Okay.  So we advanced --

UNIDENTIFIED SPEAKER:  I know there's dispute over

168

that.

MR. TROOP:   -- $70 million, and if you look at all this, we're not anywhere in that $70 million of allowed administrative expense claims.  But it's going to cause someone at the Commonwealth of Massachusetts to say, Do I do that?  There may be reasons to do it in a particular case, or not to do it in a particular case, but it's clearly going to require more in terms of protections in order to be able to do it.

And, Your Honor, I submit that that's the reason not to approve this plan.  That's the reason the Commonwealth of Massachusetts opposes confirmation.  It's a travesty in this case, but it will be a travesty in other cases.  And there should not be that kind of precedent set here, that one can confirm a plan of reorganization without credible admissible evidence that has been properly tested and not excluded because the Debtors claimed privilege to support a finding that 1129(a)(9) has been satisfied.  Has been satisfied.

So, Your Honor, and I don't want to go over other -- retread other issues.  I don't know if you have any other questions for me in this regard.

THE COURT:  No, and I want parties to know, just I know you're highlighting, you're doing exactly what I asked you to do, highlighting the points that you want.  I've read every word of every brief, and I understand that no one is

169

waiving any arguments and those arguments are all -- remain as if they do.

MR. TROOP:  And I appreciate that, Your Honor.  And although it's out of order I'm also going to say that, and I'm sure I'm speaking for everyone in the courtroom, throughout this case we've all appreciated your time, your attention, the attention of your staff --

THE COURT:  I very much appreciate it.

MR. TROOP:   -- the issues that needed to come in front of you including on these 2 days, and the time that you've set aside for us.  I don't -- Your Honor, you have -- you have tough decisions to make.  We recognize that, though we think there's the right chute to come out on.  But we understand that you wear the robe and you're going to have to make that decision.

And we'll have -- will -- I'm talking about the large we here --

THE COURT:  The collective.

MR. TROOP:   -- right, the collective, not the Borg Collective but the collective -- that's the second case I used a *Star Trek* metaphor.  Your Honor, we'll have our appellate rights if we need to exercise them.  We all understand that, we understand all arguments are preserved.  So thank you for your time and attention, Your Honor.

THE COURT:  Thank you very much.

DEBTORS' EXHIBIT NO. 9
Page 169 of 218

170

Just before we kind of continue can I just get a sense of who else in the courtroom wishes to addresses the Court. I'm just -- we're starting to get to the point where the AC's going to -- I've got to make adjustments and -- I don't want to use high -- mid-points, that's going to --

(Laughter.)

THE COURT: But how much -- how much time do you think you're going to need in terms of closing?

MR. ADAMS: Your Honor, I would expect maybe 10minutes for myself on behalf of the IRS.

THE COURT: Okay. Mr. Nguyen?

MR. ADAMS: I've got a very focused closing.

UNIDENTIFIED SPEAKER: I've got the -- effectively as well, 10 minutes.

THE COURT: Huh?

UNIDENTIFIED SPEAKER: About 10 minutes.

THE COURT: About 10 minutes.

UNIDENTIFIED SPEAKER: 10 or 15 minutes, Your Honor.

THE COURT: About 10 or 15. Is there anyone else? Is there any --

MR. TROOP: Your Honor, I forgot to put one thing on the Record.

THE COURT: Yeah.

MR. TROOP: I'm old, but I'm not as old as Mr. Keach, I just wanted to be clear.

(Laughter.)

THE COURT:  Let me just ask, is there anyone on the phone who wishes to address the Court?  Just to -- just trying to get a sense of timing.  Just give me one second.

(Pause in the proceedings.)

THE COURT:  Anyone on the line who knows they're going to want to address the Court, please hit five star and just let me know.

(Pause in the proceedings.)

THE COURT:  Why don't we just take a -- well, just one moment.  There's a 214 number.

(No audible response.)

THE COURT:  A 214 number.  Mr. Cooley?

MR. COOLEY:  Good afternoon, Your Honor.  It's Michael Cooley from Reed Smith appearing for Sodexo.

I wanted to let the Court know we were able to resolve our objections with the Debtors.  Those objections -- those resolutions have been incorporated into the confirmation order.  I didn't know if it would be appropriate or if the Debtors were planning to go through it at some point simply because some of those --

THE COURT:  Let me --

MR. COOLEY:  -- revisions to the order --

THE COURT:  -- they have to hear if there's going to be --

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

172

MR. COOLEY:   -- don't just address our claims.

THE COURT:   -- an order first, Mr. Cooley.

(Laughter.)

MR. COOLEY: Understood.  Understood, Your Honor.
But the resolution of our objections included language that
impacts administrative claims generally so I didn't know if it
would be appropriate for us to walk the Court through those at
some point or if that would be later after the Court has
defined what to do about the bigger picture.

THE COURT: I'm going to -- no, it's a fair -- I
appreciate the statement.  I want to rule first and then, if
we get there, then talk about what an order looks like.  I
think just to be fair to all the parties.

Can we just take 5 minutes?  I just want to make an
adjustment, and then we will finish with closings and we'll
see where that goes.  Okay.  Just thank you.

MR. TROOP: Can we take --

THE COURT: Oh, no --

MR. TROOP:   -- can we take 10 minutes only because
the line is generally long.

THE COURT: Yes, 10 minutes is -- yeah, 10 minutes
is fine.  But, Mr. Troop, we're going to start with you, I
think you said you wanted to put one more thing on the Record,
right?

MR. TROOP:  I did, Your Honor.  I did --

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

**DEBTORS' EXHIBIT NO. 9**
**Page 172 of 218**

MR. KEACH:  It was the Keach is older.

MR. TROOP:  I respectfully just (indiscernible).

MR. KEACH:  I concede -- we already did it, I concede to be.

MR. TROOP:  I've wanted to make you laugh, Your Honor.

(Laughter.)

THE COURT:  Thank you.  10 minutes.  Thank you.

(Recess taken from 5:28 p.m. to 5:39 p.m.)

THE COURT:  Okay.  We are back on the Record in Steward Health Care.

Good evening, Counsel.  If you can just state your name for the Record, and you may begin.

CLOSING ARGUMENTS

BY MR. ADAMS:  Thank you.  Your Honor, David Adams, Department of Justice, on behalf of the IRS, an agency of the United States.  The IRS objected to the Debtors' plan on various grounds, Your Honor, including the injunctions, releases, including the exculpations, that is attempt to shield persons that may be responsible for accounting and remitting trust fund employment taxes to the IRS, whether prepetition or post petition.

As pointed out in the IRS objection, any attempt to shield any person including members of the transformation committee, Mr. Carr, Mr. Castellano, Mr. Transier, who is listed -- those were listed as exculpated party.

That's in violation of the Anti-Injunction Act, under 26 USC 7421(a).  Again we cited the JJ Rebar court case,

174

644 F3rd 952, of the Ninth Circuit.  The Debtors, in their brief, which is ECF 5439, at page 180, at the very bottom, romanette six.

THE COURT:  Hold on, let me -- give me --

MR. ADAMS:  Sure, Your Honor.

THE COURT:  Yeah.  Can you give me that ECF number again?

MR. ADAMS:  Yes, Your Honor.  It's 5439, and it'd be at the very bottom of page 180.

THE COURT:  One, eight, zero?

MR. ADAMS:  One, eight, zero, Yes, Your Honor.

THE COURT:  You're bringing back memories of -- it was a long one, yes.

MR. ADAMS:  That's said twice.

THE COURT:  Let's see.  Yes, okay, tell me what --

MR. ADAMS:  Okay.

THE COURT:  I'm there.

MR. ADAMS:  So romanette six, I'm sorry, Your Honor, says the plain objection attempts -- and this is not the objection that the IRS launched.  Plain objection attempts to prohibit the IRS from investigating persons responsible for trust fund recovery balance in violation of the Anti-Injunction Act, under 26 USC 7421(a).

Pending resolution, the Debtors have included language in the confirmation order they believe resolves this

175

aspect, paragraph 70 to 77. I'm sorry, 70 to 71. We go over to the confirmation order which is ECF 5438-1, page 34 -- 54.

THE COURT: Wait.

MR. ADAMS: ECF 5438-1.

THE COURT: Let me get past all these adversaries. 5438?

MR. ADAMS: Dash one, Your Honor. It was an attachment to the notice.

THE COURT: I have not reviewed the confirmation order intentionally. I wanted to keep things separate, at least. So 5438-1, okay. I'm there.

MR. ADAMS: Page 54, which is paragraph 70, and you'll see it says United States, as to the United States, its agencies or any instrumentalities thereof --

THE COURT: Got it.

MR. ADAMS: -- notwithstanding anything to the contrary in the plan, or any definitive document shall not. And romanette two then has a long list and so forth. And the way the IRS sees this, when you get to -- it's like okay.

You have all -- we have feasibilities that the United States Government can pursue these different claims, investigations and so forth. But then the provided however said -- that language says provided, however, that the foregoing shall not diminish the scope of any exculpation, finding or protection to which any person's entitled under the

176

plan, the confirmation order limit 25E.

So the language proposed by the Debtor in paragraph 70, Romanette ii, in the confirmation order, to the IRS appears to provide the IRS with full investigative powers. That's the language prior to the provided however.

But the provided however language states, as I just said, the foregoing shall not diminish the scope of the exculpation, finding or protections to which any person is entitled.

The Government's -- this provided however language, however, seeks to nullify the IRS' investigative powers as to any person including Mr. Castellano, or the members of the transformation committee.

Now Mr. Castellano, if you remember, testified yesterday that he and his group decided which administrative expenses to pay. Now Mr. Castellano and I differed yesterday because he believes the IRS employment taxes have been fully paid.

Well, the IRS obviously disagrees as I told him because the IRS has filed administrative claims for unpaid employment taxes. Now whether that's statutory additions or what they are. Okay.

So to the extent that any of those administrative claims or priority claims, Your Honor, within three years of the petition date, involve trust fund recovery penalties, this

177

Court cannot prevent the IRS from making a determination of who is a responsible person.

This provided however language should be stricken from the confirmation order, and again, that is the Anti-Injunction Act, and there's -- and then that's under 26 USC 7421(a), which says no court can enjoin the IRS from making that determination or collection thereof, subject to certain exceptions in other sections in the Internal Revenue Code.

And we've lodged the objection to these exculpations in the IRS' objection, Your Honor.  I'm just merely restating. Finally, regardless of IRS' investigation, and depending on what happens with the sit down with the financial advisors, to the extent there are unpaid employment taxes, Your Honor --

THE COURT:  You don't have --

MR. ADAMS:  -- prepetitioner administrative --

THE COURT:  You don't want the plan to bind your ability to go after kind of a --

MR. ADAMS:  That is -- it cannot bind the IRS, okay. That violates the Anti-Injunction Act.

THE COURT:  Your concern is that language doesn't go far enough to make it clear that you may -- your concern, if I understand it correctly -- I'm not agreeing or disagreeing.  I just want to make sure that I -- the concern is that you can investigate but you can't really enforce, if --

MR. ADAMS:  No, we can enforce because that would

178

violate the Anti-Injunction Act.  We can go -- we can investigate a third party.

THE COURT:  I'm not -- but is your concern that the language in the plan may limit you to --

MR. ADAMS:  I think it's an attempt to try to do that.  I don't think it -- what I would like if the Court to strike that provided however provision.

THE COURT:  Okay.

MR. ADAMS:  That's what I'm objecting to here.

THE COURT:  Got it.

MR. ADAMS:  That basically that -- aside from packed lumber, as far as who is an exculpated party the Fifth Circuit has blessed, we understand that.  Okay.  My objection that I filed went to the transformation committee including Mr. Castellano who's a member, Mr. Carr, Mr. Transier.

So the extent -- and Mr. Castellano has already testified.  He and his group decided which administrative claimants to pay.  We've got unpaid employment taxes.  To the extent we've got unpaid TFRP's, I'm going to have IRS do an investigation.

And if that turns out to be the case, then there's going to be a third party TFRP assessment.  And --

THE COURT:  Makes sense.

MR. ADAMS:  -- finally, Your Honor, for jurisdiction purposes, this Court does not have jurisdiction over any third

179

party to decide their tax liabilities in any manner.  That's the Fifth Circuit Prescription Home Health Care case, 316 F3rd 542, Fifth Circuit, 2002.

That was actually started in San Antonio, by the Honorable Craig Gargotta, went up to the Fifth Circuit. That's all I have, Your Honor.  Thank you, unless you have other -- unless you have questions.

THE COURT:  Is there language -- in other words, is there -- does that go to language as well, or you're trying to -- on the jurisdiction point.

MR. ADAMS:  No, it just -- you won't be able to make a TFRP determination instead of Mr. Castellano.  He would have to --

THE COURT:  Nor do I want -- no, I --

MR. ADAMS:  Right.  He would have -- there are certain -- he can find him a tax lawyer --

THE COURT:  No, I got it.

MR. ADAMS:  -- he's got to figure out how to address those.  If he --

THE COURT:  If there's an assessment, that's not something I --

MR. ADAMS:  That's not -- you're not going to see it.  He's got to go to district court on that.

THE COURT:  Yeah, I got it.  Thank you.

MR. ADAMS:  Okay.  Thank you, Your Honor.

DEBTORS' EXHIBIT NO. 9
Page 179 of 218

180

THE COURT:  Thank you very much.  I appreciate it.

MR. ADAMS:  Yes.  Bless you.

THE COURT:  Got it.  Thank you.

Mr. Nguyen, good afternoon, or good evening, or good something.  Good to see you.

MR. NGUYEN:  I think it's still afternoon maybe.  Good afternoon, Your Honor.  Ha Nguyen, for the U.S. Trustee.  We'll just go with that.  Your Honor, thank you for the opportunity for the closing.

CLOSING ARGUMENTS

BY MR. NGUYEN:  The U.S. Trustee opposes confirmation of the plan because it violates 1129(a)(9)(A).  The U.S. Trustee further submits that conversion is appropriate because it states administratively insolvent.

And I know, Your Honor is going to ask me whether I prescribe to Mr. Keach reading of the statute.  I'm just going to respond to that now.  The way normally how we --

THE COURT:  I wasn't going to ask you.  It's too late to ask all these questions.  Unless you just tell me what you want.

MR. NGUYEN:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. NGUYEN:  We filed a motion to dismiss as well, and that conversation came up --

THE COURT:  Yeah.

**DEBTORS' EXHIBIT NO. 9**
**Page 180 of 218**

181

MR. NGUYEN:  -- and I just want to make sure our position is clear.  There may be some merits to Mr. Keach reading of the statute, but he's welcome to push that position with you.  However, the U.S. Trustee, when we filed this motion to dismiss, and I think Mr. Carlson reached out to me about how we want to have the motion to dismiss, dismissed.

In most of the cases, if the plan is not confirmed, the U.S. Trustee would ask for a dismissal, and that's how we typically handle these.  You know, to the extent that we can foreclose you under 1112, we exercise discretion not to do that because --

THE COURT:  Understood.

MR. NGUYEN:  -- I wouldn't push for dismissal of a plan that otherwise complies with all the 1129 requirement. It just doesn't make sense.  So that's why we always take the step one in determining whether the 1129 requirements are met, and step two is whether we show cause under 1112.

Your Honor, with respect to confirmation, Ms. Jacobson, Mr. Keach and Mr. Troop hits on a lot of evidence and a lot of the points.  I'm just going to hit some of the highlights.

And for the U.S. Trustee, the issues boil down to the effective date and the treatment of administrative claimants under the plan.  With respect to the effective date, the words that are used in the statute under 1129(a)(9),

182

really need to have some meaning.

In this case, the Debtors are seeking to have the effective date extended out to maybe nearly two years from now, and maybe the plan may go effective in two years.  I think Mr. Cohen, in his opening said, well, it might go further than that, or it might go -- Mr. Castellano says it might be sooner than that.

And the problem with moving the goal posts constantly with the effective date is -- and I'll give you an example, and I think no one really would care about this example besides myself.

345(b), which is collateralizing money of the estate when you get cash management motions.  When Debtors come in, one of the first days, they're like well, we can't collateralize the bank, we can't open new -- what they would ask is for maybe 30, 45 day extension.

That 30 days expired.  They come to the U.S. Trustee and say we missed -- we need another 30 days.  And you know, or else we'll go to court and we'll try to work it out.  And then we're at 60 days, and they ask for another 30 days.

And the reason I'm bringing that up is if we're continually moving the compliance deadline and the need to comply with certain provisions of the Code, you're giving up de facto waiver of that rule.

So by the time, maybe 90 days down the road, if we

183

give them three extension, the plan's already confirmed.  They say, well, we don't to comply with 345(b) anymore because that doesn't apply.

So that's kind of a waiver.  And the reason why I bring that up is two years is not within a reasonable period of time, and it really disregard the language of the text, because you don't really have an effective date because it's constantly moving.

So would a plan be feasible if the Debtor says, well, you know, let's extend the effective date five years, and maybe if I hit a home run on my litigations, maybe then I can pay off all my admins.

If Your Honor confirms a plan that says that, then I think that's a de facto waiver of 1129(a)(9)(A).  So I think that's an important -- and then Mr. Keach characterized it better.

We need a date certain for the effective date.  And I know in some regulatory situation, you can't have that.  But to propose a plan where nobody in the room can give a reasonable estimation of when these claims will be paid, or at all, I think it's very hard for this Court to confirm and say --

THE COURT:  And I'll tell everybody what I'm -- what I've been wrestling with.  I had a case.  This will come as no surprise to anyone.  I think you may have been here for that

184

one too.

Debtor was proposing the sale of some oil and gas leases to a third party.  Had to go to regulatory approval through the State, Texas Railroad Commission.

MR. NGUYEN:  Polaris?  Is it Polaris?

THE COURT:  Yeah, took like --

MR. NGUYEN:  Yeah.

THE COURT:  -- five months past.  Railroad Commission is saying we've run out our own process.  You can't tell us what you're going to do.  We run out our own process.  And so it created a -- I know that's different than litigation which the Debtors driving.

And I get the point, but it's -- I'm thinking not just about this case but other cases as well, and maybe the difference is one drives it, one doesn't.  But yeah, there's something when the regulatory agency is saying I run my own process, I do what I do.

I take my time, call me.  You know, I'll let you know when I'm done, and I'll tell you if they're approved or not approved.  And you have whatever appellate rights you have, and you know, stop asking.

MR. NGUYEN:  That's correct.  And if I remember --

THE COURT:  I mean, you know, sovereignty.

MR. NGUYEN:  Yeah, if I remember correctly, Your Honor, the Debtors in Polaris actually came in here and moved

185

to enforce the sale order.

THE COURT:  Wow.

MR. NGUYEN:  And try to bind the administrative judge who was determining the Railroad Commission's issue. And I think Your Honor didn't do that.

THE COURT:  Yeah, no, I didn't.

MR. NGUYEN:  They asked but Your Honor didn't.  Your Honor, just to bring up 1129(a)(9)(A) issue, one reason why you need the effective date to be somewhat within a reasonable period of time is a lot of these admin creditors, they're unimpaired.

Under the plan, they don't have the right to vote. I mean if you move them two years, three years, four years, then they start into the period of them being impaired whether they need to get paid interest.

You know, that's one of the impairment issue that I wrestle with.  The further you push that issue, you're impairing an administrative creditor who didn't have a chance to vote on the plan.  And I think that's a big issues.

THE COURT:  Yeah, I think that goes to Mr. Troop's point of it's kind of a de facto extension of credit I think is the argument that was there.  Yeah.

MR. NGUYEN:  And Judge, I know Mr. Troop mentioned this.  I wrote it in our papers, and I think I mentioned it at the disclosure statement hearing.  And I probably will say it

186

every chance I get.

The administrative priority is a core promise of the Bankruptcy Code for those that continue to provide services to the Debtors post bankruptcy.  It is pivotal, actually pivotal in a health care case such as this one because you need the janitorial person that will come and clean up the hospital room.

You need people to change the bed sheets.  My wife is in health care.  I understand a lot of the stuff that they have to do in the hospital.  And you need someone to feed the patients, and I think -- and I don't envy the Court on having to make this decision today because this is a very important decision, not just for this case, but for bankruptcy cases going forward.

To allow this sort of plan where you're essentially putting all of the risk on these administrative creditors who didn't -- were not part of the 2.7 billion, but they -- for some reason, they weren't paid.

To take all of the risk, to wait about two years, and maybe not even get paid within the two years, I think it's unfair just from my perspective looking at it while I know other admins are paid in full.

And would have just immense repercussions on how bankruptcy practice is done in the Southern District of Texas. And you heard from one lawyer today that represents the

187

Commonwealth of Massachusetts.

I heard from other lawyers that represent admin creditors as clients, whether they would continue to provide services before cases that are filed in the Southern District of Texas if this plan is approved.

From a system perspective, it's detrimental.  It is absolutely detrimental to -- I just think about the next health care case that comes in, and you know, it's not 32 hospitals.

It's a single hospital, and they can't find people to clean the bed sheets, to provide janitorial service, to provide food for patients because they're afraid of being stiffed at the end, despite the promise that Congress have given them under 1129(a)(9).

I think that's very important, and I think it's a very tough decision for this Court to make in terms of the impact of Your Honor's decision today.  Just talk about the motion dismissal a little bit.

I think everybody that sat through Mr. Castellano's testimony yesterday, I don't think anyone had the impression that the company's doing really well.  They have about $72 million which is a generous estimation that they might reduce the 2.8 billion that's currently on file after the 9 billion that were pointed out.

Seventy-two million of unpaid debt, post petition,

188

it's a lot.  And Your Honor, I think in any other case where if the Debtor comes in here and they haven't been paying their utilities, they haven't been paying their employees, they haven't been paying certain vendors that are crucial to their business, they'd be gone the very next day.

You would get an emergency motion under 1112(b) from either a creditor, us, or maybe the court choose sua sponte, looks at the operating report.  And I know Judge Norman sometimes examines the operating reports, and if there's negative cashflow, that Debtor's no longer here.

There's no stretching of the effective date.  Maybe I get lucky and get some litigation coming in.  1112l says what it says.  And so in terms of just the testimony and the evidence for the administrative insolvency, I think it's very clear.

270,000, 270 million, I'm sorry.  We're working with big numbers here.  In professional fees.  I think after the disclosure statement hearings, Mr. Castellano testified that from the date of the disclosure hearing to confirmation is going to be an additional 35 million in fees.

So if you say that the company doesn't -- didn't have a substantial historical loss and a continuing diminution of their estate, I mean the last two days demonstrate there's a huge diminution of the estate whether it -- for this confirmation hearing.

189

So I think the 1112 requirements have been met.  And Your Honor doesn't confirm the plan, I think dismissal's appropriate.  And before I -- I just want to go back to the consent opt out program for a little bit.

The U.S. Trustee has really issues but putting a burden on administrative claimants who opt out, or if they don't opt out, they would otherwise take a 50 percent haircut, and maybe share in about $50 million in funds.

Nowhere in the Code does it require an administrative creditor to opt out, to participate in this program.  What they do is they file a motion and then Your Honor grant the admin claim or not.

There's really no -- and I know the Court takes a strong textualist view of the Code, and if you look at the 1129(a)(9), it says that unless the creditor otherwise agree.  I think it's a little bit different than the third party consent issue because I give you an example.

If I send Mr. Troop just a crazy order, and I said, Mr. Troop, if you don't respond to my email within 24 hours, I'm going to mark this as an agreed order and I'm going to send it to Judge Lopez.

I probably would get sanctioned if I sent you that order, Your Honor, because there's no agreement between us two.  And the word agree, in 1129(a)(9) doesn't say deem agreement, implied agreement.

190

It says the creditor needs to agree.  And that's why the consent program doesn't work.  And it runs contrary to 1129(a)(9).  And lastly, Your Honor, I just don't want to be remiss with talking about the opt out for the third party releases.

We wrote a lot about that in this case and in other cases.  And Your Honor probably heard from me before, and we respect your decision in Robert Shaw.  So with the opt out, we'll just stand on our pleading.

We do have an appeal in the Container Store, and Judge Rosenthal is either going to tell us that we're wrong or we're right, and we'll go from there.  I know Mr. Keach is not attacking the exculpation provision.

But in our objection, we are attacking the exculpation provision.  I think Pac Lumber was pretty clear in terms of who gets an exculpation.  I think the Fifth Circuit, that they were clear in Pac Lumber.

But they ruled in Highland Capital One which they explained that the exculpation is for the Debtor, the committee and its members, and in similar instances, independent managers appointed by the court.

And certain courts weren't following their instructions in Highland One, and in Highland Two says, well, I thought we were clear.  Let us be crystal clear in Highland Two, and they reiterated what they say in Pac Lumber, what

191

they said in Highland One, and then it's in Highland Two.

The transformation committee, it's not appointed by the Court.  It's not protected by the Barden Doctrine.  It includes the CRO, Mr. Carr and Mr. Transier.  And they're retained by the Estate, and they were never appointed by the Court.

So if the Fifth Circuit was not clear in Highland One, they made it crystal clear in Highland Two.  The transformation committee cannot be exculpated.  Thank you, Your Honor.

THE COURT:  Thank you.  How many Highlands are we up to now, Mr. Nguyen?  No, I was just trying to remember how many Highlands are we up to now?

MALE SPEAKER:  They're the same thing.

MR. ADAMS:  Justice Sotomayor asked about Highland yesterday's legal argument, Your Honor.

THE COURT:  Is that right?

MR. ADAMS:  I went to the argument because Highland is my case for the IRS.

THE COURT:  That's right.  Good evening.

CLOSING ARGUMENTS

BY MR. SPEARS:  Good evening, Your Honor.  For the Record, Berry Spears, on behalf Paul G. Igoe, personal representative of the Estate of Julia J. Igoe.  Your Honor, in this case, Mr. Igoe was not allowed to vote as an

**DEBTORS' EXHIBIT NO. 9**
**Page 191 of 218**

192

administrative creditor.

He had -- he was disenfranchised from the plan because his status as an administrative claimant. And I think that's important, and I'll come back to it here later in my argument.

But I wanted to make that point at the very outset. Mr. Cohen, in his argument to the Court today, I thought was as convincing as he could be under the circumstances, and said, you know, Judge, we don't have to show certainty.

All we have to show is reasonable likelihood. And I agree with him on some levels. I don't think he's right as to everything, and for that reason, I want to talk about it because as it relates to the plan as proposed, and in particular the treatment of administrative claims, we don't have certainty, and certainty is required.

We were heartened yesterday by the Court's opening comments that said I'm not going to confirm a plan that doesn't pay administrative and priority claimants in full. And that's terrific, but that's the law.

That's not a stretch for this Court. But in fact, there is a difference in treatment under the plan here where professional fee claimants who have already been paid something like $270 million, and there's another 30, 35 million sitting in the fee escrow account.

And Mr. Castellano had testified at the disclosure

193

statement hearing that all the professional fees would be paid, he expected by the end of this year, 12/31/25.  So the professional fee claimants do have some certainty as to payment.

But the administrative claimants in the case and the priority claimants in the case don't enjoy the same certainty that the professional fee claimants have.  And believe me, it gives me no pleasure to talk about professional fee disgorgement.

That's not a topic that is close to my heart.  But I think it is -- it becomes an issue in this case, and once again, in a moment, I'll tie that back hopefully with a nice little string.

There was -- I would also say there's no ability it appears to me -- if I'm misreading the plan, I'm sure Debtors' counsel will clarify it, but there's no ability to claw back the payment of professional fees once paid.

And I think that's inappropriate, and it's also a problem if in fact the case -- the Court decides to convert the cases so imposing parties have asked.  So by December 31, 2025, certainty is provided to the fee professional claimants.

There's not that same certainty afforded to other administrative claimants, and priority fee claimants.  And instead they are required to rely upon projections, projections which Mr. Castellano, from that witness stand,

194

agreed with me that we're not always correct.

There is no certainty as to projections, and that's one of the reasons why the treatment of the administrative fee claimants or the administrative claimants and priority tax claimants isn't necessarily fair, and their treatment is in fact discriminatory. As justification for --

THE COURT: I've been asking this of everyone so don't read anything into it. Just to make sure that I kind of understand, just give me -- with respect to the amount that is alleged -- I know that there was some disputes. Where do things stand in the process of your client's claim?

MR. SPEARS: So our claim is filed in the amount of 25 million. It hasn't been objected to, to date. We have filed actions against the parties who we believe to be -- who had liability for Ms. Igoe's death.

THE COURT: Is there a pending matters?

MR. SPEARS: There is, in Superior Court, in the Commonwealth of Massachusetts. That was filed approximately two weeks ago.

THE COURT: Okay.

MR. SPEARS: The reason being, you have to -- under Massachusetts law, you have to give notice to potentially offending parties six months, and I think the theory for that is that they then get with their insurance carriers, or their lawyers and perhaps a dialogue is started.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

195

But here there was nothing but crickets.  And in fact -- and so we were -- we filed the litigation.

THE COURT:  Got it.

MR. SPEARS:  I think it was June 24th.

THE COURT:  Okay.

MR. SPEARS:  And so that's where I think -- that's the setting of the table for --

THE COURT:  Let me --

MR. SPEARS:  -- the Igoe claim.

THE COURT:  I don't know the facts of the case.

MR. SPEARS:  They're horrible.

THE COURT:  In terms of the details, and I don't know who's right or who's wrong.  And I don't want to --

MR. SPEARS:  Well --

THE COURT:  I want to ask you a question but I don't want to -- I'm going to ask you a legal question putting aside -- obviously someone passed away and that's terrible liability and all that.

Putting all that aside, and getting away from the facts of the matter, from a purely bankruptcy perspective, 1129(a)(9) issue, on behalf of your client, kind of the reverse of what others are alleging which is, you know, in a way, you don't know when your claim is going to be allowed.

So therefore, it's arguable -- you know, you don't need an effective date of six months from now because --

196

unless you settled or something.  People settle --

MR. SPEARS:  Right.

THE COURT:  -- and people can do all that stuff. But in theory, there is no known date by which that gets tried, and I don't even want to be in there -- get into Commonwealth state law or issues.

I'm just -- I'm asking kind of a pure bankruptcy. How do I think about -- if from the perspective of a claimant, how do I think about the effective date and the certainty from 1129(a)(9) standpoint, from a client in which may not have an allowed claim until 2027?

MR. SPEARS:  So it's an excellent question, and I'm not sure that I have answer that'll satisfy the Court.  But this is the way that we thought through this issue that absolutely --

THE COURT:  But before you -- I will tell you, there's an argument to say that their burden to go prove, you know, by the way --

MR. SPEARS:  Right.

THE COURT:  -- they're the ones that have to show it to be allowed.  There's going to be money there, or that you can pay --

MR. SPEARS:  Well, that's --

THE COURT:  -- so I get that argument.  That may be where you're going.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

197

MR. SPEARS:  That is where we're going.  And so my position would be that they -- that the Debtors are required to either pay or escrow for the payment eventually, whenever there is a judgment or if there's a settlement.

And hopefully, I mean I would tell you as an officer of the court, my sincere hope is that the claim would be settled without the necessity of having to go through the tort system to essentially retry what are incredibly horrible and horrible facts surrounding the death of Ms. Igoe, at the hands of Saint Elizabeth's Hospital in Boston.

But I think you're right.  We, that is, the Igoe's don't have a date certain by which that litigation would be completed, or -- and frankly, if it goes into the tort system, it probably won't be resolved by June, 2027.

I'm guessing based on what I've been told by plaintiff's counsel in Massachusetts.  But that kind of begs the issue a little bit because irrespective, the Debtors have to escrow around that claim, or provide payment for -- provide for complete payment of that claim whenever it does materialize.

And I was -- I apologize to the Court because my train of thought kind of got off kilter here.  Let me just kind of get back to my notes, and if I don't answer the question, Your Honor, I hope that you'll pull me back to it.

But I think I can.  As justification for

198

discriminatory treatment for administrative claimants and priority tax claimants, vis-à-vis, the professional fees claimants, for example -- and by the way, it's not just the professional fee claimants.

As Mr. Castellano testified, they've paid a lot of administrative claimants.  And in fact, I think Mr. Cohen today told us it was 97, or 98 percent of administrative claimants.

They too would be exposed to a potential disgorgement should that actually be required.  Our sincere hope is that it wouldn't be.  You know, our goal, or our thoughts about the procedure, the litigation is God speed and good luck.

I hope you recover everything and more than what you've projected.  But also being a realist and having been in this -- been a lawyer for 35 years, I know that projections don't always come to pass, especially when it relates to litigation.

And I think the conversation that you've had this afternoon with both Mr. Keach and Mr. Troop and others about the effective date is very important, and I'm not going to retread all of those discussions.

But I was struck by Mr. Carlson's argument to the Court that the difference in the treatment of administrative claims and professional fee claimants, for example, and other

199

administrative claims could be excused, or overlooked -- my word not his -- by virtue of the fact that the Estate had been paying administrative claims.

I don't think that provides any -- I don't think it's relevant in the least. I think as counsel for the Department of Justice has pointed out, and the United States Trustee's office, the fact that there's $52 million in outstanding payments is horrendous.

And it's certainly horrendous from the perspective of those claimants who haven't been paid. Mr. Carlson suggested that well, you know, the professionals have agreed to deferrals.

Well, okay, I guess -- I mean I don't know that that's true but I'll take him at his word for it. But I would note a deferral is not a reduction. A deferral is just a delay in payment.

Professional fee claims, he says, are subject to the terms of the DIP order, and of the fee, the interim fee procedures, and I understand that. But I will also point out to the Court that the Igoe's, for example, and other administrative fee claimants, or administrative and priority tax claimants, didn't enjoy the opportunity to participate, or even have any input in the signing of those orders.

Those orders were first day orders. Our claim arose after the commencement of this case. So we come to you today

without even having had an opportunity to participate in that process.

And I don't think the fact that there was a DIP order and interim fee procedures binds this Court to provisions in the plan as it relates to the payment, or a subsequent Chapter 7 Trustee, on the payment of professional fee claims.

And the last thing that Mr. Carlson said with respect to these issues was that the administrative fee procedure order should be -- in the plan was approved -- should be approved because the Court approved the forms in the disclosure statement hearing.

I don't think that -- I don't think one follows the other.  Just because the Court approved the format, or the forms that were attached to the disclosure statement doesn't mean that you provided preapproval of the process itself.

And if in fact the process is flawed, then this is the time to address it.  You know, FILO counsel pointed out to the Court that if in fact there was a disgorgement, that the fee, professional fee amounts would be subject to their lien.

I haven't looked at their documents, and I don't know whether that's true.  But I think it's -- I found that incredibly interesting, and again, I have a proposed fix for the Court to consider should it decide that it's going to confirm the plan.

201

It should be done with some modifications.  I would say that, you know, as I started this statement today, Your Honor, Mr. Igoe and frankly others were heartened by the Court's point that you weren't willing to confirm a plan that didn't pay administrative claimants, priority tax claimants in full.

And in fact, as we both kind of chuckled about, that's not a stretch for the Court because that's what the Code says.  But let there be no mistake, that's not what Debtor intended to do.

The plan provides clearly, and until they caught with their pants down on this issue, they would have allowed for there to be a confirmation and effective date that didn't provide for full and complete payment of administrative claimants.

That's clear from the text.  So be that as it may, how do we solve this problem.  I've got a suggestion for you.  No further orders should be signed or entered until June 30, 2027, with respect to professional fee payments.

There is about 30, to $35 million in the fee escrow account.  Nothing should come out of that.  And all pending applications should be abated subject to occurrence of an effective date at which point, if in fact there is an effective date, then we will know that administrative claimants are either paid in full, or escrowed around for

202

payment in full.

And in fact, at that time, all of the professionals, and we can disburse the $35 million, or whatever is in the fee escrow account, the Milbank lawyers don't have to be concerned about their interest under the FILO settlement because it is preserved for payment to professionals.

And then at the end of the day, the professionals will in fact be paid in full.  But they are on a par with all of the unpaid administrative claimants and priority tax claimants.

That's what the Code requires.  That's what Congress envisioned.  That's what 1129(a)(9) says.  And that creates -- that gets this Court out of the bit of a pickle because what you do is -- and I would also ask the Court to set a firm effective date and not leave it up to chance or leave it open --

THE COURT:  Let me tell you what I wrestle with, with that.  If it's fraudulent transfer litigation, I can guarantee that I won't anyone slow play.  It doesn't mean we'll be rushed, but it'll be with purpose.

One can consider a hypothetical in which I said Jan 1, 2027, and here you have motions to dismiss, motion to -- which people have the right to do.  And then I'm telling -- arguably in a court in another jurisdiction, well, you better hurry up and -- you know, I'm telling them how long

**DEBTORS' EXHIBIT NO. 9**
**Page 202 of 218**

203

to take on -- in a motion to dismiss.

So I get the firm date concerns you, but I understand the arguments.  Well, Judge, well then if that's -- people have rights, and I can't tell a court how fast to do. I can tell you how fast I go, but I can't tell a court in another jurisdiction, you know.

MR. SPEARS:  Two comments.

THE COURT:  This is how long you take on your motion to dismiss.  Here's how long --

MR. SPEARS:  Yeah.

THE COURT:  -- to take on summary judgment.  Here's what to do.  On issues that I -- Lopez, you haven't even seen.

MR. SPEARS:  Right.  I totally --

THE COURT:  And so the firm date --

MR. SPEARS:  -- understand.

THE COURT:  But I got the point that they think that it can be done by January, 2027.  There's a trial starting -- it's the -- I understand this point.  Conceptually, I'm just telling you what I wrestle -- everyone, what I wrestle with by saying it all has to be done by this date because -- right, on the -- there's two sides of the coin.

At some point, someone can theoretically slow play it.  At the same time, they can come back and say, well, the flip side which everyone on this side is saying, well, that's real cool.

204

But then somebody's going to show up, you know, 30 days before June 30th, so on June 1, you're going to get a motion asking you to extend it to 2029.

MR. SPEARS:  A couple of thoughts about it, Your Honor, and I've wrestled with this as well.

THE COURT:  I'm not highlighting anything to anybody who hasn't been thinking about, but those are the -- I get the dual sides of the concern.

MR. SPEARS:  I'm involved in a piece of litigation pending in the Central District of California, where we represent the Trustee, and it's a fraudulent conveyance cause of action that's been pending.  And we've been going at it for over two years.  So --

(Electronic announcement:  Our system will end this conference in five minutes.  To extend this call for one hour, please enter the moderator PIN now.)

(Spontaneous laughter.)

MR. SPEARS:  Speaking of going at it.

THE COURT:  Speaking of going at it.

MALE SPEAKER:  You better hurry, Berry.

MR. SPEARS:  I better hurry.

THE COURT:  Now.  Apologize.

(Electronic announcement:  Your conference has been extended for 60 minutes.)

MR. SPEARS:  And I understand.  So I -- my point is

**DEBTORS' EXHIBIT NO. 9**
**Page 204 of 218**

205

there is no certainty in litigation, and you've heard that 100 times today.  But this is a bit of a different shade of that. Even where parties are focused, and the Court is focused with moving it with all deliberate speed, sometimes it doesn't.

There is a -- there's a momentum that created on its own time and place, that irrespective of the intentions of the parties, it's not --

THE COURT:  I agree.

MR. SPEARS:  So -- and I hear what you're saying about informing other courts, but I've also been around the block a time or two, and I appreciate the fact that other judges are -- they're not unsympathetic to the plight that you would be in.

That is to say, that you're dealing with -- not that you're telling them what they have to do in their court, but informing them that, you know, these are important issues that are pending here.

And my experience is that they will do their best to accommodate and respect what Your Honor is doing.  The other piece of that, I think is you don't want to incentivize somebody to affirmatively slow the ball down, the defendants in these actions for example, by giving them a date by which they know if they hang on, they're going to be Scott free.

Clearly that can't happen.  And the Court can build into his order, your order the ability to extend that upon due

206

cause.  And certainly, I don't think anybody in this room would want you to shut down, or even convert the cases when you were on the cusp of a judgment, or rendering a decision in some of these important pieces of litigation.

Obviously there a lot of interests that have to be protected, and the administrative claimant interest is as important as is the professional fee claimant and the priority tax claimants, and the rights of the Debtor to recover these recoveries in these five kinds of litigation that will benefit all of the unsecured creditors hopefully, if the projections are accurate.

So I don't know if the Court has any more questions, or if I have addressed the --

THE COURT:  No more questions.

MR. SPEARS:  -- issue that you were interested in.

THE COURT:  You certainly have.  I very much appreciate our conversation.  Thank you.

MR. SPEARS:  Thank you, Judge.

THE COURT:  Okay.  Let me just ask, anyone else wish to be heard?

Come on up, Counsel.

MR. COHEN:  Thank you, Your Honor.  For the Record, David Cohen, for the Debtors.

CLOSING ARGUMENTS

BY MR. COHEN:  I just wanted to touch on a few

207

points, Your Honor.  Mr. Nguyen mentioned that we're pairing up the admin claimants and people keep identifying vendors, you know, the folks that change the beds referenced a couple times.

The vendors aren't objecting to the plan.  There's no vendor standing up here objecting to the plan.  And a majority of the large ones opted out of the admin consent program, meaning they want to preserve their claims and get paid on the effective date.

And I think that speaks volumes that they did that and that they aren't here in your Court objecting.  A couple of things on Mr. Carr's testimony because I think some of the things that came on in Ms. Jacobson's closing may have been from his deposition and they weren't on the record today, or accurate, just to clarify.

Mr. Carr did testify his good faith belief that Steward was insolvent at all the relevant times for the transactions he identified.  He also said further inquiry was required for the 2016.  I think both things are true.  He believes they were insolvent and there'll be more inquiry, of course, in discovery.

On the basis for his insolvency, Ms. Jacobson put forth exhibit number 60, which was the audited financial statements for 2020, and 2019.  Those show a negative equity in the company of 1.5 billion, in 2020, and 1.2 billion in

2019.

Multiple dividends for hundreds of millions of dollars were issued following that time.  Mr. Carr did testify to the amount of the Care Max dividend as well.  That's in his testimony.

And I don't think it matters in terms of sort of the golden creditor analysis, but respect to the notion that there was no IRS claim from 2016, there is a claim, claim number 14601 in the claims register where the IRS did file a proof of claim asserting amounts dating back to 2016.

There was also a lot of talk about how there was no evidence of collectability.  I think the record is clear that the vast majority of the defendants, like the commercial payers, Zurich and the like, are large corporations, solvent entities.

And with respect to the insiders, there is evidence in the exhibits as to the existence of assets of those parties including things like ranches and yachts.  So we do think there's a lot of evidence in the record as to the litigation claims.

Their value, their collectability, the nature of their claims, the time line, the key facts underlying them, their status and the Debtors assessments and projections in the aggregate.

Ms. Jacobson's argument that the Debtors sort of

209

have to lay bare with the individual claims and causes of action are worth and what the timing could be.  You know, we do that, Your Honor, we might as well slash the value of those assets significantly.

And then the testimony doesn't even ring true anymore.  And we literally have the defendants in the litigation asking us to say, hey, show us what you think, show us your privileged information, waive privilege and then there's a subject matter waiver, and they can access everything.

That can't be the right answer.  I mean a simple example, Your Honor's familiar with the AHS litigation.  You'll recall the Debtor asserted a $29 million claim again AHS.  They were able to settle that for $15 million.

Mr. Castellano testified that his model had it in there for $5 million.  So the Debtors had a conservative estimate in the model.  They recovered triple that estimate.  If we were forced to waive privilege and that information would come out, that recovery's not coming into the Estate.

So think about all these litigations.  We have the prospect of getting triple what's in there.  We have the prospect of getting less, we have the prospect of getting more.  If we can't go effective, or sorry, we can't get a confirmation of a plan because we can't provide that detail, there's going to be a significant impairment of value.

**DEBTORS' EXHIBIT NO. 9**
**Page 209 of 218**

210

That's what Mr. Brown testified to, if we give that information.  There's also a significant impairment of value.  On 1129(a)(9), there was a couple of provisions, or Mr. Troop and Keach both provided their interpretations 1129(a)(9).

I think Mr. Troop said if you look at the text, he thinks it says on a preponderance of the evidence that the admin creditors will be paid on the effective date.  It does not say that.

It just says the plan provides that, or the text of our plan does provide that.  Mr. Troop also said something that Your Honor needs to find that it is more likely than not that all administrative creditors be paid in full.

I didn't see that in any case, and it's certainly not in the Bankruptcy Code.  We went through the case law on feasibility.  Even in the most stringent standard you could apply in the Fifth Circuit, it's a reasonable prospect of success.

And I would just go back to those cases that we flagged in our presentation, and the various ways that the Court can find the plan is feasible.  Mr. Keach also said that (a)(9) says a plan needs to set an effective date.

I didn't see that anywhere in 1129(a)(9).  Notwithstanding what counsel to the Igoe Estate said, there was no intent to pull a fast one.  Nobody's pants -- you know, was caught with their pants down.

211

We were very clear at the beginning of the hearing, and we don't appreciate those kinds of comments.  There's been a lot of discussion about moving the goal posts.  What happens if June 30th comes and goes.

We aren't there.  If we are there, I think if we're in the final stages of reconciling admin claims and preparing to make distributions, or we're just shy of being able to pay admin claimants in full, I don't think anybody's going to complain about getting a little more time to get paid.

If the Estate has completely struck out as some parties have speculated, I expect Your Honor will order a different path.  I'm sure of that.  The effective date conditions are clear.

We said we would add a specific condition regarding payment of admin claims if folks thought that was necessary. Again this notion of a deadline, you know, they seem to want us to set a deadline by which the plan has to go effective.

I think that creates issues.  Ms. Jacobson mentioned the Premier Network case.  That was a case where they actually did set a 120 day deadline to go effective, and the court said I don't think you're going to hit that deadline because you've got parties you're fighting with.

They told me they're going to be appealing your confirmation order all the way up, and so there's no chance that you're going to have a non-appealable order within

212

120 days and resolve litigation with them.

And that's why they found the plan wasn't feasible. So that's just a set up to come back and say the plan isn't feasible. It's not unprecedented to have an undetermined effective date.

I think the American Airlines example is a great one. And that was binary. And that was a go, or no go. Here, it's not binary. You've got dozens, if not 100's, of claims to pursue. There a lot of ways for this Estate to get there on this particular plan given the diversified mix of assets that we have to get enough in.

Ms. Jacobson also mentioned Sears being a failure. I thought it was ironic. She said the estate only got -- I think it was 180 million, out of $1.4 billion claims. Conveniently, that equals 13 percent of the claim which is the same number that Castellano said we need for all of our claims to go effective.

And again unlike Sears, we have a variety of claims and causes of action against a number of defendants, not just claims against the founder like Sears did with Eddie Lampert.

Here we have billions of claims in addition to those that the Estate has against the insiders. You recall Mr. Carr's testimony that he thinks there was enough with the other claims to get there.

That doesn't mean you shouldn't take those into

**DEBTORS' EXHIBIT NO. 9**
**Page 212 of 218**

213

account as I think I heard someone suggest.  That's cushion.
Certainly not unprecedented per Sears.  There's also a case
called Cash Cloud which we referred to in our presentation.

It's in our brief.  That's a reported decision.  It
was in our papers in our deck.  I know Mr. Keach said I was
going too quickly.  But that case had a CP to effectiveness
that the Debtors have enough to pay admin claims.

They expected a multi-month delay, and their path to
get there was to pursue claims against insiders.  And that
court authorized the plan without establishing a fixed
effective date.

Mr. Keach said I think we should convert every
single liquidating plan.  He pointed to there being a
substantial or continuing loss to the Estate.  I don't think
there's anything in the evidence that shows that.

I think the record of these cases is that we've
gotten rid of billions and billions of liabilities of the
Estate.  People want to know why we put in the 98 percent of
admin claims being paid.

I think that supports the notion in addition to the
billions of secured claims that have been eliminated, that
there hasn't been a substantial and continuing loss.  We're
continuing progress.  We've been paying down the FILO balance.

And again, even if there were, there is a likelihood
of rehabilitation I think based on the evidence we provided in

**DEBTORS' EXHIBIT NO. 9**
**Page 213 of 218**

214

support of feasibility.  Mr. Keach said the plan doesn't do anything besides provide $15 million in releases.

I think the plan does a lot.  I think the record is unconverted with respect to Mr. Brown's testimony which was very credible.  We could break down the components.  There's the 15 million in cash, the further subordination of claims by the FILO, the important litigants.

The continuation of the corpus of this Estate, with its books and records, its personnel, its 20-plus employees, that's supporting all the activities of the litigation trust, okay.

And the plan administrator committee is the representative of the Estate to enforce the Estate's consent rights and objection rights with respect to settlements.  So that's important.

Mr. Carr and Mr. Transier are going to put forth all their knowledge to the plan administrator committee and the Estate, and work with Ms. Blacker.  That's going to help facilitate the pursuit of the claims, and that's going to act as a check on the litigation Trustee.

If there are settlements that they believe are below value, or are, you know, insufficient from their perspective, when they're representing the interest of the admin creditors and the general unsecured creditors, I think they're going to play a really important role there.

215

And the Chapter 7 Trustee who doesn't have the historical knowledge, doesn't have the experience with this company and with these claims, they're just not going to be in a position to do that.

The Estate will also continue to handle the reconciliation of administrative claims and priority claims. You can't get people paid unless you do that.  How are we going to figure out if we have allowed and disallowed claims if we lose that personnel, those 20 employees and Ms. Blacker and the Force 10 team that has been taking over from Alix, and with continued access to AlixPartners.

There's the tax efficiency of the plan versus Chapter 7, which Mr. Brown and Castellano testified to credibly.  And there's absolutely zero evidence in the record that Chapter 7 is better, or there are additional assets available to a Chapter 7 estate upon a conversion.

Mr. Price noted correctly that the Chapter 7 Trustee would be the successor to the Estate and subject to the settlement with the FILO lenders which says that any disgorgement, not directly but the effect of that language is any disgorgement would be advanced back to the litigation trust and go back to the waterfall.

So the notion that you could, you know, cure any liquidity issues in the Chapter 7 estate through a disgorgement, it's just not going to work.  I think the last

216

thing I'll mention is classification.

I think Mr. Keach and Mr. Troop got it wrong on classification.  Mr. Troop said he didn't understand it.  The effect of the FILO settlement is the FILO retaining claims.  Those claims, if the plan isn't confirmed, just stay as secured claims.

The same secured claims that they've had since prior to the petition date.  Those are secured by substantially all the assets of the Estate.  It's only if the plan is confirmed that those claims get a different treatment.

So the impairment is happening under the plan.  The classification is solely appropriate just as any senior secured lender would have a separate classification under a plan.

And the PDGC settlement just to clear that up, there was a term sheet that was incorporated into the plan.  That settlement has never been approved by the Court.  It isn't effective until the plan is confirmed and subject to entry of the confirmation order.

So again, the impairment is happening under the plan, not under a separate settlement.  I'm sure I could say a lot more, Your Honor, but I think I'll just leave it at that unless you have any questions.

THE COURT:  No questions.  I want to thank everyone for their time.  I'm going to take 24 hours and I'm going to

**DEBTORS' EXHIBIT NO. 9**
**Page 216 of 218**

217

think about -- there's a lot of exhibits, lot to think about, lot of arguments.

If you can believe it, a Chapter 11 case filed while we were all here.  Yeah, but Perez to the rescue.  He got the case.  So I don't have to -- I can focus 100 percent on this and I don't have to think about first day.

So why don't parties plan on just -- you can come back, dial in, whatever you want, 2:00 o'clock tomorrow.  And I think I'll be ready.  If I wake up and I still need -- I can't do it, and I understand that there could be ramification.

But if I don't feel comfortable, I will post something, I'll write something early in the morning, not to kind of jam anyone.  But I can work all night, and I plan on it.

I just want to think about some things and a lot of evidence has been presented and a lot of documents have been admitted.  And I just I want to think about everything tonight.  I think everyone's made really good arguments and I just want to take some time and consider, carefully consider everything.

So I thank everyone.  And I will open up the line, but you should think about tomorrow, 2:00 p.m. Central.  Just be ready.  I think I'll be ready, but I reserve the right to kind of just reach out to parties, but I won't jam anyone.

218

It won't be kind of a 1:30.  I can't do it.  It'll be by 9:00 o'clock in the morning, you'll know if it's a go for 2:00 p.m. Central.

Thank you very much.  Have a good evening.

(Proceedings concluded at 6:46 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69920*

*DATE FILED:  JULY 22, 2025*