**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.**[*] | § | **(Jointly Administered)** |
| | § | |

**REPLY IN SUPPORT OF LAM PARTIES' EMERGENCY MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES**

Leucadia Asset Management LLC, acting through its Point Bonita Capital Division,

LAM Trade Finance Group LLC, and LAM TFG I SPV LLC (collectively, the "**LAM Parties**"),

respectfully submit this reply in support of their *Emergency Motion to Compel Production of*

*Documents and Interrogatory Responses from Debtors* (Dkt. 3210) (the "**Motion**" or **"Motion to**

**Compel**").

**Preliminary Statement**[1]

1.      The LAM Parties are among the biggest victims of the Debtors' criminal fraud.

They intend to object to the Debtors' Chapter 11 plan on multiple grounds,[2] including that the

Plan is not feasible and that various aspects of the Plan are transparently designed to benefit

those that were "in the room" for the Plan negotiations and to penalize the LAM Parties and

others that were on the outside.

---

[*]  A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these Chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[1]  Capitalized terms not defined have the meanings used in the Motion.

[2]  The objection deadline is tomorrow, July 20.

2.      The LAM Parties served discovery.  When the Debtors declined to provide much of what was requested, the LAM Parties filed the Motion.  While the Debtors have responded by impugning the LAM Parties' motives (*see* Obj. ¶ 1), the LAM Parties will let the record speak for itself in that area.  The reality is that the LAM Parties have been highly cooperative with the Debtors, resolving numerous disputes, and have resorted to litigation only when faced with a liquidating plan—designed without their input—that singles them out for disparate treatment.

3.      Since the Motion was filed, the discovery dispute has been narrowed in two ways. *First*, soon after the filing, the Debtors retreated from their position they could assert mediation privilege for the period after the mediation ended on March 27, 2026.  The Debtors agreed instead that, at least for the period between March 27 and May 20, "neither the mediation privilege nor the common interest privilege apply with respect to Plan negotiations."[3]

4.      *Second*, the Debtors have agreed to provide a categorical privilege log.  Before the Motion was filed, the Debtors had conveyed to the LAM Parties, on July 9, that they did "*not* believe that a privilege log is appropriate" and thus did "*not* agree that the Debtors will prepare a privilege log."  Mot. Ex. E at 1 (emphasis added).  Although the Debtors stated in the same email that they "*may* be willing to *consider* a categorical privilege log," *id*., and made similar comments in meet and confer sessions, the Debtors have now committed to furnish a log— although, to this day, they have not agreed, at least in a clear way, to collect and review the communications that may appear on the log.

5.      Despite these steps in the right direction, the Motion is not resolved.  As explained below, the Debtors are still taking untenable positions regarding discovery.  Before

---

[3]  The email in which the Debtors altered their position is attached as Exhibit A.  The LAM Parties do not know if the Debtors would have changed their position absent the Motion.

addressing those positions, however, the LAM Parties need to respond to Paragraph 2 of the Debtors' objection, in which the Debtors claim that:

> the Motions completely mischaracterize the status of discovery in this matter and the scope of the Debtors' privilege assertions, which were narrowed in response to the meet and confer process, even before the Motions were filed.  Contrary to the LAM Parties' characterizations, for example, the Debtors are *not* taking the position that "*every single communication*" with the Ad Hoc Group is privileged.  *See* LAM Mot. ¶ 4 (emphasis added).  Nor are the Debtors arguing that "they enjoy a common interest privilege with the Ad Hoc Group that covers *every* communication dating to early January."  *See* LAM Mot. ¶ 5 (emphasis added).

6.      That paragraph is inaccurate in almost every way.  First, the Debtors did *not* "narrow" their mediation-privilege assertion *before* the Motion was filed; they narrowed it *after* the Motion was filed.  *See* Ex. 1.  Second, Paragraph 4 of the Motion did *not* say that the Debtors were withholding "every single communication with the Ad Hoc Group."  That is a misquotation.  Rather, Paragraph 4 stated that the Debtors were asserting "'mediation privilege' covering *every single communication* with the Ad Hoc Group—the prevailing bidder from their sale process—dating back to January 27, 2026."  Third, when the LAM Parties stated, in Paragraph 5 of the Motion, that the Debtors "appeared" to be asserting common interest going back to January, that was based on the Debtors' own statement that "*common interest* and mediation privilege with the Ad Hoc Group" would "significantly limit (*and in some circumstances likely eliminate*) *any* responsive non-privileged communications on topics including Estate Claims and Plan negotiations."  Mot. Ex. E (emphasis added).  The LAM Parties, in sum, did not "mischaracterize" anything.

7.      Conscious of the burden imposed on the Court by this kind of discovery dispute, we attempt below to cut through the issues and focus on what remains outstanding for the Court to resolve (assuming no consensual resolution).

## Reply

**A.      Open Issue #1:  Communications with Bidders Regarding Estate Claims**

8.      In the Motion, the LAM Parties asked the Court to compel the Debtors to produce their communications with bidders for their assets, including the Ad Hoc Group as credit bidder, regarding the assets being sold.  The LAM Parties are entitled to that discovery to answer basic questions, including:  What information was made available to bidders?  Did all bidders have access to the same information as the Ad Hoc Group?  And to what extent did bidders have the information that Charles Moore has now publicly disclosed in his declaration?  Having tethered their Plan to a sale process, the Debtors need to answer those questions.

9.      In their Objection, the Debtors argue that the "asymmetry of information" among bidders can be presented as "legal argument."  Obj. ¶ 22.  But to make a legal argument, parties need to know the facts.  Either the Debtors need to produce their communications with the Ad Hoc Group, or they need to say in a clear way—in a compliant privilege log—what communications occurred and are being withheld, so that the fact of the communications is disclosed, and any privilege claim can be tested.  Notably, in their Objection, the Debtors first concede that the Ad Hoc Group "knows more about the assets than potential bidders," but they then assert that there is only an "alleged" asymmetry of information, "which the Debtors' dispute."  Obj. ¶ 21.  The Debtors cannot simultaneously dispute that there was an asymmetry of information and refuse to respond to discovery on that issue.

10.      Since no privilege log has been provided, the LAM Parties do not know exactly what is being withheld.  There is no question, however, that the Debtors must at least produce whatever *factual information* they shared with the Ad Hoc Group regarding the assets being sold.  *E.g.*, *Adams* v. *Memorial Hermann*, 973 F.3d 343, 350 (5th Cir. 2020) ("the work-product doctrine protects only the [attorney's work product] and not the underlying facts" (alteration in

4

original) (internal quotation marks and citation omitted)); *accord Pedersen* v. *Kinder Morgan, Inc.*, 2023 WL 6441948, at *4 (S.D. Tex. Sept. 29, 2023).

11.     More broadly, given the Ad Hoc Group's participation in the auction for the Debtors' assets, there is reason to conclude that the interests of the Debtors and the Ad Hoc Group were "adverse rather than common," precluding any common interest claim. *SB IP Holdings LLC* v. *Vivint Smart Home, Inc.*, 2022 WL 19977100, at *4 (E.D. Tex. Aug. 18, 2022).[4] The Fifth Circuit takes a narrow view of common interest, recently reaffirming that "the two types of communications protected under the [common legal interest] privilege are: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel." *United States* v. *Brown*, 151 F.4th 647, 656 (5th Cir. 2025) (quoting *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001)).  The common interest further depends on there being a "palpable threat of litigation" relating to both parties. *Id*. at 657.  The Debtors do not cite *Brown* or explain how common legal interest could apply to communications over 10 months in a situation well removed from the posture described in *Brown*.

---

[4] The Debtors cite an out-of-circuit case, *In re Velo Holdings, Inc.*, 473 B.R. 509 (Bankr. S.D.N.Y. 2012), for the proposition that a debtor can have a common interest with its stalking horse bidder.  In *Velo*, however, the common interest with respect to restructuring proposals was applied only after the parties had agreed to the terms of a restructuring; a separate common interest in avoiding termination of an agreement began only after the parties received a letter threatening such a termination.  Moreover, the decision was predicated on *actual review* of documents after the court rejected a sweeping privilege claim of the kind the Debtors have asserted here:

> [T]he Court required Vertrue to provide a privilege log identifying each document Vertrue claims is privileged. . . .  Vertrue had not submitted a privilege log when the common interest doctrine issue was initially presented to the Court.  Fed. R. Civ. P. 45(d)(2)(A) requires a person withholding documents under a claim of privilege to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."  Without knowing the dates of the communications, authors, addressees, who received copies, and the subject matter, and an *in camera* review of documents, if necessary, it is impossible to know whether the documents or communications were subject to attorney-client privilege or work product protection in the first instance, and, if so, whether the result is altered by any subsequent communications between Vertrue and its counsel, and the lenders or their counsel.

*Velo*, 473 B.R. 509, 513 & n.2.

12.     In any case, the Court should not accept the Debtors' apparent blanket refusal to produce communications with their credit bidder regarding the assets being sold.  The Debtors need to collect and review responsive communications, determine whether there is a basis to assert privilege, and then either produce the documents or provide a compliant log.  Under Fifth Circuit law, any such log—whether categorical or document-by-document—must address "the roles of the parties to the communications" and "the nature of the communications" in order to preserve privilege.  *United States* v. *Fluitt*, 99 F.4th 753, 763 (5th Cir. 2024).[5]

### B.     Open Issue #2:  The Special Committee Investigation

13.     As noted in the Motion, the LAM Parties requested "[a]ll Documents and Communications relating to the Special Committee Investigation (as defined in the Disclosure Statement)."  Mot. Ex. B at 7.  In response, the Debtors broadly asserted privilege.

14.     On January 14, the Debtors filed the Declaration of Charles Moore.  In their objection, the Debtors assert that the declaration did not implicate privilege, or affect any kind of waiver, because "[t]he Debtors are not claiming privilege over *facts* discovered during the course of the investigation, which is what Mr. Moore's testimony covers.  Instead, the Debtors are asserting privilege over their privileged analyses, assessment, and strategic communications regarding those facts."  Obj. ¶ 26.

15.     The problem for the Debtors is that the Moore declaration is not limited to "facts"—as opposed to analyses, assessments, and conclusions, including analyses that undoubtedly involved input and guidance of counsel.  Mr. Moore's declaration describes and relies on:  (a) "analyses" by A&M personnel regarding commingling of assets and cash across

---

[5]  Contrary to the suggestion in Paragraph 23 of the Debtors' objection, the LAM Parties have not taken the position that a privilege log has to list every document, rather than being categorical.  A categorical format, however, does not excuse a party from *collecting and reviewing* each document in a category where some documents may be privileged but others are not.

entities, flows of funds across accounts, and entities, and fraudulent adjustments to records (¶¶ 71-75); (b) a solvency "analysis" covering multiple years (¶¶ 77-78); and a "forensic" analysis of the Debtors' factoring practices (¶¶ 81-83).  (The Debtors may or may not have included these "analyses" in the approximately 14,000 documents produced over the last few days.)

16.     Beyond those financial analyses, the declaration presents material from the investigation that is self-evidently work product.  For example, in paragraphs 85 through 93, Mr. Moore presents a factual narrative—as to which he has no personal knowledge—to argue that Katsumi and LAM Parties were presented with "red flags," a term used in Ponzi scheme cases. The notion that Mr. Moore has just presented "facts" (Obj. ¶ 25)—when he has essentially pasted sections of a trial brief into his declaration—defies credulity.  Paragraphs 85 through 93 are not "facts" to which Mr. Moore can testify; they instead represent a set of investigatory results curated by counsel to support a legal argument.

17.     Allowing the Debtors to pick and choose which work product to disclose, while withholding other results and materials (including materials, such as interview notes, that may support different conclusions), does not comply with the sword-shield rule.  *See* Mot. ¶¶ 42-43.

C.     **Open Issue #3:  Interrogatories**

18.     The Motion asked the Court to direct the Debtors to respond to particular interrogatories served by the LAM Parties.  In particular, in response to **Interrogatory Nos. 5, 6 and 8**, the Debtors should at least be required to state what information they disclosed to bidders, including the Ad Hoc Group, to state whether bidders other than Ad Hoc Group were provided the same information as the Ad Hoc Group, and if not, what different information was provided. The Debtors should also be required to respond to three contention interrogatories: **Nos. 10, 14, and 16**.  *See* Mot. ¶¶ 47-54.

19.      The Debtors contend that they provided substantive responses to *other* interrogatories (Obj. ¶ 37), but they do not contend that they responded to the ones discussed in the Motion.  Instead, the Debtors vaguely promise to identify documents that bear on some (but not all) of those unanswered interrogatories.  *Id*. ¶ 35.  Rather than punting further, the Debtors should be required to respond in a clear way to the interrogatories at issue.

**D.      Open Issue #4:  Timing and Process**

20.      The LAM Parties are not interested in delay for its own sake.  Devoting more time and money to litigation will not help anyone.  But the process has to be fair.  At this point, the LAM Parties face an objection deadline of July 20, depositions for the next week (sometimes double tracked), and a trial on July 28.  Depending on how the Court decides the Motion, the following should be considered in deciding on the path forward:

- Document Productions.  The Debtors have produced over 14,000 documents since July 15, including the documents that were apparently relied on by Mr. Moore and Mr. Kirschner.

- Additional Productions.  To the extent the Court directs the Debtors to review or produce any additional documents, those documents will need to be reviewed and produced.

- Privilege log.  As of this filing, the Debtors have not provided one.  They also have not clearly agreed to collect and review the documents from periods where they claim a privilege applies.

- Interrogatories.  As discussed, the Debtors have continued to avoid responses and are now saying they will identify responsive documents instead.

- Declarations.  While the LAM Parties take at face value the Debtors' statements regarding the timing of their declarations (Obj. ¶ 33), the fact remains that the Debtors

disclosed an expert—who is expressing opinions regarding a broad record and range of issues—on very short notice.  The LAM Parties tried to get ahead of this problem by asking, on June 24, that any experts and their opinions be disclosed in early July.  The Debtors opted to wait until July 14, less than a week before the objection deadline and two weeks before the hearing.

21.	Based on all of the above, there is ample basis to adjust the schedule to ensure a fair process.  The LAM Parties, however, are prepared to move forward on any schedule directed by the Court.


Dated:  July 19, 2026
Houston, Texas


*/s/ Paul E. Heath*

| **VINSON & ELKINS LLP** | **WACHTELL, LIPTON, ROSEN & KATZ** |
|---|---|
| Paul E. Heath (TX 09355050) | Emil A. Kleinhaus (admitted *pro hac vice*) |
| Matthew D. Struble (TX 24102544) | Michael H. Cassel (admitted *pro hac vice*) |
| 845 Texas Avenue, Suite 4700 | Angela K. Herring (admitted *pro hac vice*) |
| Houston, TX  77002 | 51 West 52nd Street |
| Tel.:  713.758.2222 | New York, NY  10019 |
| Email: pheath@velaw.com | Tel.:  212.403.1000 |
| mstruble@velaw.com | Email: eakleinhaus@wlrk.com |
| | mhcassel@wlrk.com |
| | akherring@wlrk.com |

***COUNSEL TO THE LAM PARTIES***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<em>/s/ Paul E. Heath</em><br>One of Counsel

# EXHIBIT A

| | |
|---|---|
| **From:** | Calabrese, Christine <Christine.Calabrese@weil.com> |
| **Sent:** | Thursday, July 16, 2026 12:12 AM |
| **To:** | Kelley, Charles S. (Mayer Brown LLP); Herring, Angela K.; Cassel, Michael H.; Waldock, Katherine P.; Heath, Paul E. (Vinson & Elkins LLP); Struble, Matthew D. (Vinson & Elkins LLP); Kleinhaus, Emil A. |
| **Cc:** | Tsekerides, Theodore; Berezin, Robert; Barr, Matt; Singh, Sunny (Weil, Gotshal & Manges LLP); Carlson, Clifford; Patel, Keya; Lane, Jack; Project Overdrive Lit Associates; George, Jason; Ferrier, Kyle; Findlay, Loren; Rhine, Fredrick |
| **Subject:** | RE: First Brands \| Discovery Requests (LAM/Katsumi) |

> **\*\*External Email-Use Caution\*\***

Counsel,

Further to our call on Monday, with respect to the mediation privilege, the Debtors can agree that <u>for the period March 27, 2026 (the close of formal mediation) to May 20, 2026 (</u>the date the Debtors announced an agreement in principle with the AHG, UCC, and ABL on the record), neither the mediation privilege nor the common interest privilege apply with respect to Plan negotiations.  The Debtors continue to assert the mediation/common interest privilege with the AHG, UCC, and ABL from May 20 to present.  For the avoidance of doubt, this does not change the Debtors' position with respect to Estate Claims and related investigations: the Debtors and the UCC shared a common interest from the UCC's inception and the Debtors and the AHG shared a common interest from September 27, 2025, the date an agreement on the DIP was reached in principle.

Best,
Christine

**Christine A. Calabrese**

Weil, Gotshal & Manges LLP
+ 1 212 310-8083 Direct
+1 202 213-7892 Mobile

---

**From:** Calabrese, Christine
**Sent:** Monday, July 13, 2026 4:12 PM
**To:** 'Kelley, Charles S.' <CKelley@mayerbrown.com>; Herring, Angela K. <AKHerring@wlrk.com>; Cassel, Michael H. <MHCassel@wlrk.com>; 'Waldock, Katherine P.' <KPWaldock@wlrk.com>; Heath, Paul E. (Vinson & Elkins LLP) <pheath@velaw.com>; Struble, Matthew D. (Vinson & Elkins LLP) <mstruble@velaw.com>; Kleinhaus, Emil A. <EAKleinhaus@WLRK.com>
**Cc:** Tsekerides, Theodore <theodore.tsekerides@weil.com>; Berezin, Robert <robert.berezin@weil.com>; Barr, Matt <Matt.Barr@weil.com>; Singh, Sunny <sunny.singh@weil.com>; Carlson, Clifford <Clifford.Carlson@weil.com>; Patel, Keya <Keya.Patel@weil.com>; Lane, Jack <Jack.Lane@weil.com>; Project Overdrive Lit Associates <Project.Overdrive.Lit.Associates@weil.com>; George, Jason <Jason.George@weil.com>; Ferrier, Kyle <Kyle.Ferrier@weil.com>; Findlay, Loren <Loren.Findlay@weil.com>; Rhine, Fredrick <Fredrick.Rhine@weil.com>
**Subject:** First Brands \| Discovery Requests (LAM/Katsumi)

Counsel,

Further to our call earlier today, we wanted to provide clarifying details regarding the Debtors' productions of prior document productions, responsive to LAM RFP No. 3 and Katsumi RFP No. 16.  At a high level (as further detailed below): the Debtors' provided (1) certain productions via both FTP and hard drive as certain productions were originally made via hard drive due to size and therefore not available via FTP, (2) a hard drive containing all productions *minus* productions to the UCC in connection with the DIP hearing, and (3) a production via CloudShare yesterday containing productions to the UCC in connection with the DIP hearing.

The Debtors' prior productions were in connection with the following matters: (1) DIP Financing Motion (Dkt. 49), (2) Factoring Procedures Motion (Dkt. 807), (3) *Evolution Credit Opportunity Master Fund II-B, L.P. et al v. First Brands Group, LLC et al* (Adv. Pro. No. 25-03800), (4) *Bank of America, N.A. et al v. Aequum Capital Financial II LLC et al* (Adv. Pro. No. 26-03091), and (5) Rule 2004 Requests.

**The following production volumes were provided via both hard drive and KLD FTP**:
- FBG_ABL_001; FBG_ABL_002; FBG_ABL_003; FBG_ABL_004; FBG_ABL_005; FBG_AEQ_001; FBG_AEQ_002; FBG_AEQ_002_Overlay; FBG_AEQ_003; FBG_AEQ_004; FBG_AEQ_005; FBG_AEQ_006; FBG_AEQ_007; FBG_AEQ_008; FBG_AEQ_009; FBG_AEQ_010; FBG_AEQ_011; FBG_BOA_001; FBG_BOA_002; FBG_BOA_003; FBG_BOA_004; FBG_BOA_005; FBG_BOA_006; FBG_BOA_007; FBG_BOA_008; FBG_BOA_009; FBG_BOA_010; FBG_BOA_011; FBG_CarVal_001; FBG_CarVal_002; FBG_CarVal_003; FBG_CarVal_004; FBG_CarVal_005; FBG_CarVal_006; FBG_CarVal_007; FBG_CarVal_008; FBG_CarVal_009; FBG_CarVal_010; FBG_CarVal_011; FBG_CarVal_012; FBG_CarVal_013; FBG_CarVal_014; FBG_CarVal_015; FBG_CarVal_016; FBG_CarVal_017; FBG_CarVal_018; FBG_DIP_001; FBG_EVL_001; FBG_EVL_002; FBG_EVL_003; FBG_EVL_004; FBG_EVL_005; FBG_EVL_006; FBG_EVL_007; FBG_EVL_008; FBG_EVL_009; FBG_EVL_AP_001; FBG_EVL_AP_002; FBG_EVL_AP_003; FBG_EVL_AP_004; FBG_EVL_AP_005; FBG_ING_001; FBG_KAT_001; FBG_KAT_002; FBG_KAT_003; FBG_ULT_001; FBG_UMB_001; FBG_UMB_002; FBGH001; FBGH002; FBGH003; FBGH004; FBGH005; FBGH006; FBGH006_Overlay; FBGH007; FBGH008; FBGH009; FBGH010; FBGH011; FBGH012; FBGH013; FBGH014

**The following production volumes were provided via hard drive only**:
- FBG_ARAB-BANKING_001; FBG_ARAB-BANKING_002; FBG_ARAB-BANKING_003; FBG_ARAB-BANKING_004; FBG_ARAB-BANKING_005; FBG_ARAB-BANKING_006; FBG_ARAB-BANKING_007; FBG_ARAB-BANKING_008; FBG_ARAB-BANKING_009; FBG_ARAB-BANKING_010; FBG_ARAB-BANKING_011; FBG_ARAB-BANKING_012; FBG_ARAB-BANKING_013; FBG_ARAB-BANKING_014; FBG_ARAB-BANKING_015; FBG_EVOLUTION_001; FBG_EVOLUTION_002; FBG_EVOLUTION_003; FBG_EVOLUTION_004; FBG_EVOLUTION_005; FBG_EVOLUTION_006; FBG_EVOLUTION_007; FBG_EVOLUTION_008; FBG_EVOLUTION_009; FBG_EVOLUTION_010; FBG_EVOLUTION_011; FBG_EVOLUTION_012; FBG_EVOLUTION_013; FBG_EVOLUTION_014; FBG_EVOLUTION_015; FBG_ING-BELGIUM_001; FBG_ING-BELGIUM_002; FBG_ING-BELGIUM_003; FBG_ING-BELGIUM_004; FBG_ING-BELGIUM_005; FBG_ING-BELGIUM_006; FBG_ING-BELGIUM_007; FBG_ING-BELGIUM_008; FBG_ING-BELGIUM_009; FBG_ING-BELGIUM_010; FBG_ING-BELGIUM_011; FBG_ING-BELGIUM_012; FBG_ING-BELGIUM_013; FBG_ING-BELGIUM_014; FBG_ING-BELGIUM_015; FBG_ING-BELGIUM_016; FBG_KATSUMI_001; FBG_KATSUMI_002; FBG_KATSUMI_003; FBG_KATSUMI_004; FBG_KATSUMI_005; FBG_KATSUMI_006; FBG_KATSUMI_007; FBG_KATSUMI_008; FBG_KATSUMI_009; FBG_KATSUMI_010; FBG_KATSUMI_011; FBG_KATSUMI_012; FBG_KATSUMI_013; FBG_KATSUMI_014; FBG_KATSUMI_015; FBG_KATSUMI_016; FBG_KATSUMI_017; FBG_KATSUMI_018; FBG_KATSUMI_019; FBG_KATSUMI_020; FBG_KATSUMI_021; FBG_LAM_001; FBG_LAM_002; FBG_LAM_003; FBG_LAM_004; FBG_LAM_005; FBG_LAM_006; FBG_LAM_007; FBG_LAM_008;

FBG_LAM_009; FBG_LAM_010; FBG_LAM_011; FBG_LAM_012; FBG_LAM_013; FBG_LAM_014; FBG_LAM_015; FBG_LAM_016; FBG_LAM_017; FBG_LAM_018; FBG_LAM_019; FBG_LAM_020; FBG_LAM_021; FBG_LAM_022; FBG_LAM_023; FBG_Raistone_001; FBG_Raistone_002; FBG_Raistone_003; FBG_Raistone_004; FBG_Raistone_005; FBG_Raistone_006; FBG_Raistone_007; FBG_Raistone_008; FBG_Raistone_009; FBG_Raistone_010; FBG_Raistone_011; FBG_Raistone_012; FBG_Raistone_013; FBG_Raistone_014; FBG_Raistone_015; FBG_Raistone_016; FBG_Raistone_017; FBG_Raistone_018; FBG_Raistone_019

**The following production volumes were provided via Weil Cloudshare only:**

- FBG_UCC_001; FBG_UCC_002; FBG_UCC_003; FBG_UCC_004; FBG_UCC_005; FBG_UCC_006; FBG_UCC_007; FBG_UCC_008

Please let us know if you have any questions.

Best,
Christine



**Christine A. Calabrese**
Counsel
Pronouns: She/her/hers

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
christine.calabrese@weil.com
+1 212 310 8083 Direct
+1 202 213 7892 Mobile

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.