IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**LIMITED OBJECTION OF PRIMEREVENUE, INC. TO JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**

Creditor PrimeRevenue, Inc. ("PrimeRevenue") hereby files this limited objection to the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors (the "Plan"), and the Plan Supplement (the "Plan Supplement") filed by the FBG Debtors. [Docs. 3019, 3046.] PrimeRevenue objects to the FBG Debtors including PrimeRevenue on the list of Supply Chain Financers in the Plan Supplement because PrimeRevenue is a Trade Creditor and not a Supply Chain Financer.[1] The FBG Debtors' misclassification of PrimeRevenue as a Supply Chain Financer, instead of a Trade Creditor, wrongfully deprives PrimeRevenue of a full release from Preference Actions afforded to Trade Creditors under the Preference Settlement set forth in Section 6.11 of the Plan.

**A.     The FBG Debtors' Plan and Plan Supplement.**

1.      On September 28, 2025 (the "Petition Date"), First Brands Group, LLC ("FBG") and the other FBG Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

2.      On June 16, 2026, FBG Debtors filed the solicitation version of the Plan. [Doc. 3019.]

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

301088566v2

3.      The Plan defines Supply Chain Financer as follows:

*Supply Chain Financer* means any financial institution, fund, or other Person (other than any ABL Lender in its capacity as such) that (i) provided (or asserts that it provided) financing or liquidity to suppliers or vendors of one or more FBG Debtors or reimbursed any FBG Debtor Affiliate for providing such financing or liquidity in connection with such suppliers' or vendors' accounts receivable arising from the supply of goods or services to such FBG Debtors, whether through supply chain financing programs, reverse factoring arrangements, receivables purchase facilities, or similar arrangements; or (ii) remitted payments (or asserts that it remitted payments) on behalf of one or more FBG Debtors relating to accounts payable arising from the supply of goods or services to such FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

[*Id.* at 33-34.]

4.      The Plan defines Trade Creditor as follows:

*Trade Creditor* means any Person (including any Person that was paid through a payment intermediary but excluding any such payment intermediary) that, as of the Petition Date, holds a General Unsecured Claim against an FBG Debtor arising from the ordinary course of the FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date, excluding any Person whose claim arises from a (secured or unsecured) loan, financing arrangement, bond, note, or other financial indebtedness. For the avoidance of doubt, a Trade Creditor shall not include any Entity that qualifies as a Factor or Supply Chain Financer.

[*Id.* at 34.]

5.      As explained in the Disclosure Statement for the Plan, the Plan affords Trade Creditors, Supply Chain Financers, and Factors[2] an opportunity to participate in the Preference Settlement and become Preference Settlement Electing Creditors by completing and returning an opt-in form.  [Doc. 3020 at 16.]

6.      However, the Plan provides different treatment to Trade Creditors who are Preference Settlement Electing Creditors than Supply Chain Financers who are Preference Settlement Electing Creditors:

---

[2] The FBG Debtors do not maintain that PrimeRevenue is a Factor, which it is not.

Trade Creditors that are Preference Settlement Electing Creditors will be released from Preference Actions under the Plan, and Supply Chain Financers and Factors that are Preference Settlement Electing Creditors will receive the benefit of certain procedures, including the "Modified New Value Element", with respect to Preference Actions asserted against them, as described in more detail in Section 6.11 of the Plan.

[*Id.*]

7.       The Plan defines Preference Settlement Electing Creditor as follows:

***Preference Settlement Electing Creditor*** means any Trade Creditor, Supply Chain Financer, or Factor who (i) timely elects on the Preference Settlement Opt-In Form to (a) participate in, and receive the benefits of, the Preference Settlement, (b) grant the releases contained in Section 13.5(b) of the Plan, and (c) contribute all of its Direct Creditor Claims to the Litigation Trust; *provided* that any such creditor that is later determined to be ineligible for the Preference Settlement in accordance with Section 6.11 hereof shall not be a Releasing Party.

[*Id.* at 28.]

8.       PrimeRevenue qualifies as a Preference Settlement Electing Creditor in that it has timely submitted the Preference Settlement Opt-In Form.

9.       The Preference Settlement in Section 6.11 of the Plan "applies only to Trade Creditors, Supply Chain Financers, and Factors who:

(i)       do not meet the definition of Adverse Conduct, as determined by a Final Order;

(ii)      are not Specified Non-Released Parties; and

(iii)     are Preference Settlement Electing Creditors."[3]

[Doc. 3019, § 6.11(a).]

10.      With respect to Trade Creditors, the Preference Settlement provides that "[n]o Preference Actions shall be brought against Trade Creditors who meet the criteria set forth in Section 6.11(a) of the Plan."  [*Id.*, § 6.11(d).]

11.      Conversely, the Plan leaves Supply Chain Financers vulnerable to Preference

---

[3] PrimeRevenue satisfies the criteria of Section 6.11(a)(i) and (ii).

Actions even if they satisfy the criteria of Section 6.11(a):

> Preference Actions against Supply Chain Financers and Factors who meet the criteria set forth in Section 6.11(a) of the Plan shall be brought only after the Litigation Trustee conducts reasonable due diligence and makes a good faith attempt to meet and confer with the putative defendant, which meet and confer shall include providing such putative defendant with the Litigation Trustee's analysis with respect to such putative defendant's defenses under section 547(c)(4) of the Bankruptcy Code (the "New Value Defense") and providing such putative defendant with an opportunity to identify additional new value (as defined in section 547 of the Bankruptcy Code) which was not included in the Litigation Trustee's analysis.

[*Id.*, § 6.11(e).]

12. On June 23, 2026, the FBG Debtors filed in the Supplement, in which PrimeRevenue is listed as a Supply Chain Financer. [Doc. 3046-4 at 90.]

**B.     PrimeRevenue's Trade Creditor Services to FBG.**

13. PrimeRevenue holds a general unsecured claim against FBG in the amount of $393,750.00. [Doc. 1411 at 190; Claim No. 2279.]

14. FBG disclosed in its Statement of Financial Affairs that it made payments to PrimeRevenue in the amount of $393,750.00 within 90 days before the Petition Date. [Doc. 1523 at 49.] PrimeRevenue denies any liability under 11 U.S.C. § 547.

15. PrimeRevenue is a technology company that provides a Software as a Service (SaaS) platform used by companies and financial institutions to facilitate supply chain financing. Companies like FBG upload account receivables and/or account payables with extended payment terms to PrimeRevenue's platform where the receivable or payables are matched with partner financial institutions who provide the supply chain financing to FBG.

16. PrimeRevenue interacted with FBG through three types of services.

17. First, through PrimeRevenue's SCiSupplier module, FBG could upload its payment obligations to other suppliers to the PrimeRevenue platform through which drafts were created and

4

sold to supply chain financers if the payee suppliers transferred the drafts owed by FBG to the financers.

18.     Second, through PrimeRevenue's SciCustomer module, FBG could upload data related to receivables owed to FBG by its customers and could receive funding from supply chain financers.

19.     Third, FBG participated as supplier on other PrimeRevenue customers' SCiSupplier modules, whereby it would sell receivables owed to it by other PrimeRevenue customers.

20.     PrimeRevenue's claim against FBG, and the payments made by FBG to PrimeRevenue, relate to FBG's use of PrimeRevenue's SCiSupplier module.  FBG agreed to pay PrimeRevenue a monthly subscription fee pursuant to a Master Services Agreement dated effective December 7, 2016, [4] as amended by that certain Assignment, Assumption and Amendment Agreement dated February 2, 2018, as further amended by that certain Amendment One to Master Services Agreement dated May 30, 2019, as further amended by that certain Amendment Two to Master Services Agreement dated November 25, 2019, as further amended by that certain Name Change and Amendment Agreement dated May 17, 2023, as further amended by that certain Amendment Four to Master Services Agreement dated June 27, 2023, as further amended by that certain Amendment Five to Master Services Agreement dated January 16, 2024, as further amended by that certain Amendment Six to Master Services Agreement dated September 20, 2024 (collectively, the "Agreement").

21.     PrimeRevenue never provided financing or liquidity to FBG or any other entity, or reimbursed any FBG Debtor Affiliate or other entity for providing such financing or liquidity.

---

[4] PrimeRevenue initially entered into the Master Services Agreement with Crown Group, LLC, the predecessor to Trico Group, LLC, which changed its name to FBG.

Rather, its supply chain management software services pair suppliers and financers who then transact with each other.

22.     Nor did PrimeRevenue ever remit payment on behalf of FBG or any other entity relating to accounts payable arising from the supply of goods or services to FBG or any other entity.  Again, PrimeRevenue's supply chain management software services pair suppliers and financers who transmit payments directly to each other.

**C.      Objection and Argument**

23.     The FBG Debtors' Plan includes all general unsecured claims in Class 7, but provides different treatment to the holders of general unsecured claims based on the FBG Debtors' definitions of Trade Creditor, on the one hand, and Supply Chain Financer or Factor, on the other, and the FBG Debtors' designations of which claimants fall into which bucket.

24.     Under the FBG Debtors' Plan, Trade Creditors who opt in to the Preference Settlement are given a full release from any Preference Actions, but entities designed by the FBG Debtors as Supply Chain Financers or Factors do not receive a full release from any Preference Actions.

25.     The FBG Debtors misclassified PrimeRevenue as a Supply Chain Financer in the Plan Supplement and are wrongfully depriving it of the full release from any Preference Action that it is entitled to as a Trade Creditor of FBG.

26.     PrimeRevenue is a technology company that provides a SaaS platform used by companies, such as FBG, and financial institutions to facilitate supply chain financing.

27.     PrimeRevenue never provided any financing or liquidity to FBG or any other entity, never reimbursed any FBG Debtor Affiliate or other entity for providing such financing or liquidity, and never remitted payment on behalf of FBG or any other entity relating to accounts

payable arising from the supply of goods or services to FBG or any other entity.

28.     Instead, PrimeRevenue provided a technology platform where FBG and Supply Chain Financers could transact with each other and FBG could obtain supply chain financing directly from the Supply Chain Financiers without any money flowing through PrimeRevenue.

29.     PrimeRevenue's general unsecured claim against FBG, and the payments FBG identified making to PrimeRevenue within 90 days of the Petition Date, are based on the a monthly subscription fees owed by FBG to PrimeRevenue under the Agreement in exchange for FBG's use of PrimeRevenue's SCiSupplier module.

30.     As such, PrimeRevenue is a holder of "a General Unsecured Claim against an FBG Debtor arising from the ordinary course of the FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date," and falls squarely within the definition of a Trade Creditor, not a Supply Chain Financer.

WHEREFORE, PrimeRevenue, Inc. respectfully requests the Bankruptcy Court grant its Limited Objection, designate PrimeRevenue, Inc. as a Trade Creditor, strike PrimeRevenue, Inc. from the list of Supply Chain Financers in the Plan Supplement, and grant such other and further relief as may be just proper under the circumstances.

[SIGNATURE APPEARS ON THE FOLLOWING PAGE.]

This 20th day of July, 2026.

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Brian J. Levy*

Brian J. Levy
Georgia Bar No. 302518
blevy@taftlaw.com
3343 Peachtree Road NE
Suite 1600
Atlanta, Georgia 30326
Telephone: (404) 233-7000

COUNSEL FOR PRIMEREVENUE, INC.
*Pro Hac Vice Application Pending*

8

## CERTIFICATE OF SERVICE

I hereby certify that this day I electronically filed the foregoing LIMITED OBJECTION OF PRIMEREVENUE, INC. TO JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS with the Clerk of Court using the CM/ECF system which will automatically send an email notification of such filing to the attorneys of record.

This 20th day of July, 2026.

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Brian J. Levy*
Brian J. Levy
Georgia Bar No. 302518
blevy@taftlaw.com
3343 Peachtree Road NE
Suite 1600
Atlanta, Georgia 30326
Telephone: (404) 233-7000

COUNSEL FOR PRIMEREVENUE, INC.
*Pro Hac Vice Application Pending*