**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.**[*] | § | **(Jointly Administered)** |
| | § | |
| | § | |

**LAM PARTIES' OBJECTION TO CONFIRMATION OF JOINT CHAPTER 11 PLAN
OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**

---

[*] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**TABLE OF CONTENTS**

**Page**

Preliminary Statement.................................................................................................... 1

Relevant Background ...................................................................................................... 5

    A.     The LAM Parties' relationship with the Debtors....................................................5

    B.     An Examiner is appointed to investigate First Brands and concludes that substantive consolidation is warranted. ...................................................................6

    C.     First Brands sues the James brothers and Onset. .....................................................7

    D.     Patrick James and Edward James face indictments, and Andrew Brumbergs pleads guilty to fraud on LAM and others. ...........................................7

    E.     The Debtors file a Plan for one Debtor to resolve 112 cases..................................8

    F.     The Debtors propose a new Plan for all Debtors, which involves a sale process for all of the Debtors' Estate Claims...........................................................8

Objections to Confirmation............................................................................................ 10

I.     The Plan does not comply with Section 1129(a)(11) of the Bankruptcy Code, because it is not feasible. ........................................................................................... 10

    A.     The "delayed effective date" structure is impermissible or at least highly suspect..........................................................................................................10

    B.     The market evidence defeats the Debtors' position on feasibility........................12

    C.     The Debtors have not shown they are likely to recover $2 billion.  Nor have they shown that they are likely to recover anything from the LAM Parties.....................................................................................................................14

II.    The Plan does not comply with Section 1129(a)(9)(A) of the Bankruptcy Code, because priority claims will not be paid in full on the statutory effective date. ............... 20

    A.     The "effective date" of a plan is a statutory term, not a matter for the Debtors to decide. .................................................................................................20

    B.     The Debtors cannot use Section 363 to deprive the "effective date" of any significance. ...........................................................................................................23

III.     The Plan does not comply with Section 1123(a)(4) of the Bankruptcy Code, because it discriminates between unsecured creditors without a legal basis. ................... 26

    A.     The Preference Settlement provides disparate treatment and recoveries to similarly-situated Class 7 Creditors. .......................................................................26

    B.     Section 1123(a)(4) does not permit discrimination among similarly situated creditors without a Code-based reason......................................................28

IV.     The Plan impermissibly consolidates the Debtors' estates for certain purposes but not for others. .................................................................................................... 30

    A.     The factual record demonstrates that substantive consolidation is necessary. ...............................................................................................................31

    B.     The Plan impermissibly uses substantive consolidation in a tactical way to benefit some creditors over others. .....................................................................35

V.      The Plan impermissibly classifies unsecured deficiency claims separately from other unsecured claims............................................................................................ 37

VI.     The Plan should not be confirmed for other reasons as well. ........................................ 39

    A.     The definition of "Estate Claims" is overbroad. ......................................................39

    B.     Section 9.11(b)'s treatment of setoff rights lacks any basis. ................................40

    C.     The sale of Estate Claims must conform to applicable transfer restrictions.........40

Reservations of Rights .......................................................................................................... 42

Conclusion .............................................................................................................................. 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. N. Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'Ship*,
    526 U.S. 434 (1999)............................................................................................12

*Begier* v. *I.R.S.*,
    496 U.S. 53 (1990)..............................................................................................18

*Caplin & Drysdale, Chartered* v. *United States*,
    491 U.S. 617 (1989)............................................................................................19

*Citizens Nat. Bank of Kirksville, Mo.* v. *Comm'r of Internal Revenue*,
    122 F.2d 1011 (8th Cir. 1941) ....................................................................19 n.19

*Crabtree* v. *Allstate Property & Casualty Ins. Co.*,
    140 F.4th 623 (5th Cir. 2025) .............................................................................41

*CSI Worldwide, LLC* v. *TRUMPF Inc.*,
    944 F.3d 661 (7th Cir. 2019) .......................................................................35 n.26

*Czyzewski* v. *Jevic Holding Corp.*,
    580 U.S. 451 (2017)............................................................................................25

*Donell* v. *Kowell*,
    533 F.3d 762 (9th Cir. 2008) .......................................................................16 n.14

*GE Capital Commercial, Inc.* v. *Worthington Nat'l Bank*,
    754 F.3d 297 (5th Cir. 2014) .......................................................................15 n.12

*Granada Wines, Inc.* v. *New England Teamsters & Trucking Indus. Pension Fund*,
    748 F.2d 42 (1st Cir. 1984)..........................................................................38 n.28

*Hamilton* v. *Lanning*,
    560 U.S. 505 (2010)............................................................................................21

*Holloway* v. *Wells Fargo Bank, N.A.*,
    2013 WL 6912690 (N.D. Tex. Dec. 30, 2013) ............................................41 n.29

*In re 23andMe Holding Co.*,
    674 B.R. 487 (Bankr. E.D. Mo. 2025)................................................................40

*In re Abbotts Dairies of Pa.*,
    788 F.2d 143 (3d Cir. 1986)...........................................................................13 n.8

*In re Allied Mech. Servs., Inc.*,
   885 F.2d 837 (11th Cir. 1989) ................................................................................23

*In re Alpine Summit Energy Partners, Inc.*,
   2026 WL 823740 (Bankr. S.D. Tex. Mar. 24, 2026) .............................................18

*In re Am. Cap. Equipment, LLC*,
   688 F.3d 145 (3d Cir. 2012).....................................................................................11

*In re Amco Ins.*,
   444 F.3d 690 (5th Cir. 2006) ..................................................................................31

*In re Arabella Petroleum Co., LLC*,
   647 B.R. 851 (Bankr. W.D. Tex. 2022) ..................................................................17

*In re Archdiocese of Saint Paul & Minneapolis*,
   579 B.R. 188 (Bankr. D. Minn. 2017) ................................................................11 n.6

*In re Augie/Restivo Baking Co.*,
   860 F.2d 515 (2d Cir. 1988).....................................................................................32

*In re Bake-Line Grp., LLC*,
   359 B.R. 566 (Bankr. D. Del. 2007) .......................................................................18

*In re Barakat*,
   99 F.3d 1520 (9th Cir. 1996) .............................................................................39 n.28

*In re Barrow Shaver Res. Co.*,
   2026 WL 1399325 (Bankr. S.D. Tex. May 18, 2026) .......................................19 n.19

*In re Bean*,
   252 F.3d 113 (2d Cir. 2001)...............................................................................19 n.20

*In re Borders Grp., Inc.*,
   453 B.R. 477 (Bankr. S.D.N.Y. 2011).....................................................................26

*In re Bos. Post Rd. Ltd. P'ship*,
   21 F.3d 477 (2d Cir. 1994)................................................................................38 n.28

*In re Briscoe Enters., Ltd., II*,
   994 F.2d 1160 (5th Cir. 1993) .................................................................................39

*In re Bryson Props., XVIII*,
   961 F.2d 496 (4th Cir. 1992) .............................................................................39 n.28

*In re Buccaneer Res., L.L.C.*,
   912 F.3d 291 (5th Cir. 2019) ...................................................................................39

*In re Colony Hill Assoc.*,
   111 F.3d 269 (2d Cir. 1997)......................................................................................13 n.8

*In re ConvergeOne Holdings, Inc.*,
   2025 WL 4700341 (S.D. Tex. Sep. 25, 2025) ................................................................12, 28

*In re Cybridge Corp.*,
   312 B.R. 262 (D.N.J. 2004) ...................................................................................17 n.16

*In re DeBerry*,
   945 F.3d 943 (5th Cir. 2019). ................................................................................ 16-17

*In re Deqser, LLC*,
   2026 WL 1096542 (Bankr. D. Del. Apr. 22, 2026) .................................................................12

*In re E'Lite Eyewear Holding, Inc.*,
   2009 WL 349832 (Bankr. E.D. Tex. Feb. 5, 2009) ................................................................31

*In re Extended Stay, Inc.*,
   2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ......................................................36 n.27

*In re First Conn. Consulting Grp., Inc.*,
   579 B.R. 673 (Bankr. D. Conn. 2018) .................................................................11 n.6

*In re Ford*,
   967 F.2d 1047 (5th Cir. 1992) .......................................................................35 n.26

*In re Geneva ANHX IV, LLC*,
   496 B.R. 888 (Bankr. C.D. Ill. 2013).................................................................36 n.27

*In re Good*,
   428 B.R. 235 (Bankr. E.D. Tex. 2010) ...........................................................................22

*In re Gould & Eberhart Gear Mach. Corp.*,
   80 B.R. 614 (D. Mass. 1987) ...........................................................................23

*In re Greystone III Joint Venture*,
   995 F.2d 1274 (5th Cir. 1991) ..........................................................5, 38, 39 n.28

*In re Hoopai*,
   581 F.3d 1090 (9th Cir. 2009) ...........................................................................22

*In re Jackson Brewing Co.*,
   624 F.2d 599 (5th Cir. 1980) ...........................................................................30

*In re J.E. Marion, Inc.*,
   199 B.R. 635 (Bankr. S.D. Tex. 1996) ...........................................................................41

*In re Little Creek Dev. Co.*,
    779 F.2d 1068 (5th Cir. 1986) ...................................................................................11

*In re Lopez*,
    897 F.3d 663 (5th Cir. 2018) ....................................................................................21

*In re Lotspeich*,
    328 B.R. 209 (B.A.P. 10th Cir. 2005)..................................................................13 n.8

*In re Lumber Exch. Bldg. Ltd. P'ship*,
    968 F.2d 647 (8th Cir. 1992) ...............................................................................39 n.28

*In re Maple Mortg., Inc.*,
    81 F.3d 592 (5th Cir. 1996) .......................................................................................18

*In re Molycorp, Inc.*,
    562 B.R. 67 (Bankr. D. Del. 2017) ...........................................................................23

*In re M.T.G., Inc.*,
    164 F.4th 564 (6th Cir. 2026) ..............................................................................19 n.20

*In re Musil*,
    99 B.R. 448 (Bankr. D. Kan. 1988) ...........................................................................21

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)............................................................................... *passim*

*In re Pacific Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ...............................................................................22 n.21

*In re Permian Producers Drilling, Inc.*,
    263 B.R. 510 (W.D. Tex. 2000)..................................................................................31

*In re Positive Health Mgmt., Inc.*,
    769 F.3d 899 (5th Cir. 2014) ...............................................................................16 n.14

*In re QVC Grp., Inc.*,
    2026 WL 2058528 (Bankr. S.D. Tex. July 15, 2026)................................................13

*In re Reagor-Dykes Motors, LP*,
    2022 WL 2046144 (Bankr. N.D. Tex. June 3, 2022).............................................15 n.13

*In re Red River Talc LLC*,
    670 B.R. 251 (Bankr. S.D. Tex. 2025) ......................................................................11

*In re Sanchez Energy Corp.*,
    139 F.4th 411 (5th Cir. 2025) ....................................................................................17

*In re Schauer*,
   835 F.2d 1222 (8th Cir. 1987) ...................................................................................41

*In re Sentry Operating Co. of Texas, Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) .....................................................................38

*In re Serta Simmons Bedding, L.L.C.*,
   125 F.4th 555 (5th Cir. 2024) ............................................................................ *passim*

*In re Seven Seas Petroleum, Inc.*,
   522 F.3d 575 (5th Cir. 2008) ...................................................................................39

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005)................................................................................15 n.12

*In re Slabbed New Media, LLC*,
   557 B.R. 911 (Bankr. S.D. Miss. 2016).............................................................11 n.6

*In re Steward Health Care System, LLC*,
   No. 24-90213-11 (Bankr. S.D. Tex. July 16, 2025)....................................... 11 & n.7

*In re Teleservices Grp., Inc.*,
   469 B.R. 713 (Bankr. W.D. Mich. 2012)..........................................................20 n.20

*In re Texas Extrusion Corp.*,
   844 F.2d 1142 (5th Cir. 1988) ...........................................................................25, 26

*In re T-H New Orleans Ltd. P'Ship*,
   116 F.3d 790 (5th Cir. 1997) ...................................................................................10

*In re TMT Procurement Corp.*,
   764 F.3d 512 (5th Cir. 2014) .............................................................................12, 26

*In re Wesco Aircraft Holdings, Inc.*,
   2024 WL 156211 (Bankr. S.D. Tex. Jan. 14, 2024) .........................................39, 40

*In re Winn-Dixie Stores, Inc.*,
   356 B.R. 239 (Bankr. M.D. Fla. 2006) .............................................................36 n.27

*Integrated Solutions, Inc.* v. *Service Support Specialties, Inc.*,
   124 F.3d 487 (3d Cir. 1997)......................................................................................41

*Janvey* v. *Brown*,
   767 F.3d 430 (5th Cir. 2014) ............................................................................16 n.14

*Janvey* v. *GMAG, L.L.C.*,
   592 S.W.3d 125 (Tex. 2019)..............................................................................16 n.15

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)......................................................................................39 n.28

*Law Office of Rogelio Solis PLLC* v. *Curtis*,
    83 F.4th 409 (5th Cir. 2023) ...............................................................................................18

*Luis* v. *United States*,
    578 U.S. 5 (2016)...............................................................................................................19

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund* v. *WithumSmith
    Brown, P.C.*,
    692 F.3d 283 (3d Cir. 2012)...........................................................................................35 n.26

*PHH Mortgage Corp.* v. *Johnson*,
    563 F. Supp. 3d 627 (S.D. Tex. 2021) ...............................................................................13

*Ransom* v. *FIA Card Servs., N.A.*,
    562 U.S. 61 (2011)..............................................................................................................21

*Scholes* v. *Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ...........................................................................................16 n.14

*Textron Fin., Inc.* v. *Bash*,
    2019 WL 3290257 (N.D. Ohio July 22, 2019) ................................................................17 n.16

*United States* v. *Betancourt*,
    422 F.3d 240 (5th Cir. 2005) ..........................................................................................19 n.17

*United States* v. *Brumbergs*,
    No. 26 Cr. 25, Dkt. 13 (S.D.N.Y. Jan. 27, 2026)......................................................................8

*United States* v. *Davidson*,
    139 F.2d 908 (5th Cir. 1943) ..........................................................................................19 n.19

*United States* v. *Martinez*,
    228 F.3d 587 (5th Cir. 2000) ..........................................................................................19 n.18

*United States* v. *Patrick James & Edward James*,
    No. 26 Cr. 29 (S.D.N.Y. Jan. 27, 2026)..................................................................................8

*United States* v. *Pelullo*,
    178 F.3d 196 (3d Cir. 1999).............................................................................................19 n.18

*United States* v. *Stowell*,
    133 U.S. 1 (1890)................................................................................................................19

*United States* v. *United States Currency in the Amount of $228,536.00*,
    895 F.2d 908 (2d Cir. 1990)...........................................................................................19 n.18

**Statutes and Rules**

11 U.S.C. § 363 ................................................................................................................... *passim*

11 U.S.C. § 363(b) ........................................................................................................................8

11 U.S.C. § 363(m) ........................................................................................................... *passim*

11 U.S.C. § 502 ...........................................................................................................................36

11 U.S.C. § 502(d) ......................................................................................................................29

11 U.S.C. § 502(e)(1)(B) ......................................................................................................28, 29

11 U.S.C. § 506(a) ....................................................................................................................5, 37

11 U.S.C. § 510 ...........................................................................................................................36

11 U.S.C. § 544(b) ......................................................................................................................18

11 U.S.C. § 547(b) ......................................................................................................................18

11 U.S.C. § 547(c)(4) ..................................................................................................................37

11 U.S.C. § 548(a) ......................................................................................................................18

11 U.S.C. § 548(c) ......................................................................................................................15

11 U.S.C. § 550 .......................................................................................................................15, 18

11 U.S.C. § 550(d) ........................................................................................................ 16, 17 & n.16

11 U.S.C. § 553(a) ......................................................................................................................40

11 U.S.C. § 1101(2) ....................................................................................................................22

11 U.S.C. § 1122 .........................................................................................................................38

11 U.S.C. § 1123(a)(4) ...................................................................................................4, 26, 28, 36

11 U.S.C. § 1123(b)(3) ..........................................................................................................25, 30

11 U.S.C. § 1123(b)(4) ..........................................................................................................25, 26

11 U.S.C. § 1129 .........................................................................................................................36

11 U.S.C. § 1129(a)(1) ................................................................................................................36

11 U.S.C. § 1129(a)(9) ..........................................................................................................23, 25

11 U.S.C. § 1129(a)(9)(A) ................................................................................... *passim*

11 U.S.C. § 1129(a)(11).................................................................................................2, 10

18 U.S.C. § 981(a)(1)...................................................................................................19

18 U.S.C. § 982(a)(1)...................................................................................................19

21 U.S.C. § 853(c) ......................................................................................................19

Fed. R. Evid. 502(b).........................................................................................39 n.28, 41

Fed. R. Evid. 502(d).....................................................................................................41

*Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817 (2008) ...........................................................42

UVTA § 8(a) ................................................................................................................15

## Other Authorities

2 Collier on Bankruptcy ¶ 105.09 (15th ed. rev. 2005) ...................................................31

Black's Law Dictionary, *Date* (12th ed. 2024)..............................................................21

Douglas G. Baird, *Elements of Bankruptcy* 240–41 (6th ed. 2014)................................23

Webster's New Collegiate Dictionary (1975 ed.)...........................................................21

Leucadia Asset Management LLC, acting through its Point Bonita Capital Division, LAM Trade Finance Group LLC ("**LAM TFG**"), and LAM Trade Finance Group I SPV LLC ("**LAM SPV**") (collectively, "**LAM**" or the "**LAM Parties**"), hereby submit this objection to the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors (the "**Plan**") (Dkt. 3019), and respectfully state as follows:[1]

### **Preliminary Statement**

1.      The LAM Parties are among the biggest victims of the Debtors' criminal fraud. As of the Petition Date, First Brands had caused LAM TFG to pay approximately $700 million for receivables that in many cases did not exist.  More broadly, over the course of its six-year relationship with the Debtors, LAM TFG paid the Debtors approximately $450 million more than it ever received, such that LAM TFG is a massive "net loser" from the Debtors' fraud.

2.      Although the Debtors have no operating assets, no business to reorganize, and insufficient cash to pay administrative and priority claims, they are nonetheless seeking to confirm a Chapter 11 plan.  Their idea is to pursue causes of action against various parties, and to pay priority claims with the proceeds they hope to generate, with the plan becoming "effective" only when those claims are paid.  But, setting aside whether a "delayed effective date" plan of this kind can ever be approved, there are many reasons why *this Plan* cannot be approved.  Most fundamentally, the Plan requires the Court to suspend disbelief and to conclude that the Debtors have causes of action worth approximately $2 billion—the threshold to pay priority claims— when their DIP loans trade at a small fraction of that amount, and no outside buyer has offered to buy the claims.  In addition, the Plan transparently discriminates in favor of the creditors who

---

[1] Capitalized terms not defined have the meanings ascribed to them in the Plan.  Emphases are added unless otherwise noted.

were "in the room" for the Plan negotiations—providing Trade Creditors (and others actively represented by the Creditors' Committee) with materially better treatment than the LAM Parties and other factors.

3.      The Plan has the following core elements, among others:

      a.      The Debtors will "sell" their remaining assets, namely Estate Claims, to the DIP A lenders, who will receive and retain the protections of Section 363(m), regardless of whether the "Effective Date" occurs.

      b.      The "buyers" will contribute the Estate Claims to a Litigation Trust, which will pursue claims against "Specified Non-Released Parties," while compromising or foregoing claims against other unsecured creditors, in particular Trade Creditors.

      c.      Although the estates will be substantively consolidated for distribution purposes, and for purposes of value-based defenses in litigation against certain unsecured creditors (the ones eligible for the "Preference Settlement"), the estates will *not*, at least by virtue of the Plan, be consolidated for other purposes.

      d.      The proceeds of the Estate Claims will be used to pay priority claims, with the "Effective Date" not occurring until those claims are paid, even though the Plan (per Section 15.11) will otherwise be "*effective*" and "*binding*" as of the "Confirmation Date."

      e.      For purposes of voting on the Plan, secured lenders' deficiency claims are being classified separately from other unsecured claims, ensuring that there is an impaired accepting class for voting purposes.

4.      Confirmation should be denied on multiple grounds.  First, the Debtors cannot demonstrate that the Plan is feasible, as required by Section 1129(a)(11).  To demonstrate feasibility, the Debtors need to prove that the Estate Claims are likely to yield more than $1.965 billion in proceeds.  *See* Moore Decl. ¶ 228.[2]  As of this filing, however, the DIP A Loans trade at around 18 cents on the dollar, implying that the Debtors' assets, including Estate Claims, have a value below $200 million.  Beyond that, the Debtors' own marketing process confirms that the

---

[2] "Moore Decl." refers to the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* filed at Dkt. 3188.

value of the Estate Claims is at best speculative and uncertain, since no one has been willing to make an offer to buy those claims.  Moore Decl. ¶¶ 41–43.

5.      The Debtors will argue that the Estate Claims are worth dramatically more than the market indicates.  But the Debtors cannot contend *both* that they ran a full and fair marketing process, where parties had access to the information necessary to bid on the Estate Claims, *and* that the true value of the Estate Claims is far greater than their market value.  Moreover, if the Court looks beyond the market evidence to the substance of the claims, as the Debtors are urging, the record still will not remotely support the conclusion that a $2 billion recovery is "probable."  As to the LAM Parties in particular, there is no basis to conclude that any recovery is likely.  *See* Point I, *infra*.

6.      Second, setting aside feasibility, the Plan violates Section 1129(a)(9)(A), which requires that priority claims be paid "on the *effective date* of the plan."  The term "effective date" is not defined in the Code, and it should therefore be given its plain meaning—namely, the date that material provisions are binding on parties, and certainly must be a date before the plan is substantially consummated.  Here, all the relief that matters will occur on or near the "Confirmation Date."  Indeed, the Plan, in Section 15.11, says in so many words that its terms will be "*binding*" and "*immediately effective*" as of the "Confirmation Date."  Since the statutory "effective date" in this case is *not* the Plan's "Effective Date," the Debtors cannot defer payment of administrative expense claims until the "Effective Date" occurs.  Nor is it appropriate for the Plan to be subject to Section 363(m), such that the plan proponents permanently receive all the benefits of confirming a plan *regardless* of whether the Plan ultimately meets the requirement to pay administrative and priority claims.  *See* Point II, *infra*.

7.      <u>Third</u>, the Plan provides different treatment to unsecured creditors in the same class, in violation of Section 1123(a)(4).  One of the key features of the Plan, for which the Creditors' Committee bargained, is the so-called "Preference Settlement."  Under the Preference Settlement, "Trade Creditors" get a reprieve from preference claims.  Other general unsecured creditors, while not escaping preference liability entirely, obtain the benefit of a "modified new value" defense.  By contrast, creditors such as LAM TFG are not eligible for this treatment, because they are "Specified Non-Released Parties," which is tied to allegations of "Adverse Conduct," a made-up, non-statutory concept that the plan proponents are using to pick winners and losers.  This is exactly the kind of equal-treatment violation that the Fifth Circuit rejected in *Serta*.  *See* Point III, *infra*.

8.      <u>Fourth</u>, the Plan is flawed insofar as it substantively consolidates the Debtors' estates for certain purposes, and for the benefit of certain favored creditors, but not for other purposes and for the benefit of other creditors.  The Debtors have conceded that they ran a fraudulent enterprise, with no respect for corporate boundaries.  It is also clear, from the Debtors' own statements, that the Debtors' assets are hopelessly scrambled.  In recognition of those facts, the Plan substantively consolidates for purposes of distribution, and it also—via the Preference Settlement—stipulates in advance that favored creditors can consolidate the estates for purposes of defending against preference claims.  But the Debtors have resisted substantive consolidation for other purposes.  That does not work.  As Judge Ambro explained in *In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005), "pretend consolidation" for certain purposes and not others "remake[s] substantive consolidation not as a remedy, but rather a stratagem," and is not permissible.  *See* Point IV, *infra*.

9.      Fifth, the Debtors have misclassified their creditor classes.  The Debtors admit that their prepetition secured lenders only have deficiency claims under Section 506(a). Nonetheless, they have classified those deficiency claims separately from General Unsecured Claims, on the basis (as stated in interrogatory responses) that the "holders of such claims have different legal rights against the estates."  Dkt. 3210, Ex. G at 22.  That rationale for separate classification of deficiency claims was rejected in *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991).  *See* Point V, *infra*.

10.     For those reasons and others set forth below, confirmation should be denied.

## Relevant Background

### A.      The LAM Parties' relationship with the Debtors.

11.     The LAM Parties are third-party factoring counterparties that were victims of the Debtors' elaborate fraud, resulting in hundreds of millions of dollars in losses.  LAM TFG purchased approximately $885 million in facially legitimate receivables from First Brands that remained outstanding on the Petition Date.  *See, e.g.*, Proof of Claim Nos. 2294, 2295, 2298, 2299, 2302, 2304, 2305, 2307, 2308, 2310.[3]

12.     As the record of these cases has made clear, First Brands sold fabricated, inflated, or double-pledged invoices to third-party factors including LAM TFG.  Although the exact amount the LAM Parties will be able to recover from legitimate First Brands receivables has not been determined, the LAM Parties have a massive fraud claim against First Brands for amounts advanced in connection with fake, inflated, or double-sold invoices.

---

[3] LAM SPV is a special-purpose vehicle that purchased receivables from LAM TFG after they were purchased by LAM TFG.  As a result, it has its own rights vis-à-vis the Debtors and has filed its own proofs of claim.  *See, e.g.*, Proof of Claim Nos. 2290, 2291, 2293, 2296, 2297, 2300, 2301, 2303, 2306, 2309, 2311.  Leucadia Asset Management LLC, a subsidiary of Jefferies Financial Group Inc., is a separate management entity and asserts objections solely on behalf of LAM TFG and LAM SPV.

13.     In 2019, LAM TFG entered into a master agreement with First Brands under which it would purchase receivables from certain First Brands entities[4] (as amended and restated from time to time, the "**MRPA**").  Each of the First Brands parties to the MRPA agreed to be jointly and severally liable for any liabilities under that agreement.

14.     The Master Agreement was, as its name implies, a master agreement to govern further transactions.  Day-to-day, LAM TFG would purchase receivables nominated by First Brands for purchase, and provide consideration.  As the receivables became due, LAM TFG would receive repayments on those receivables, an arrangement that remained in place from 2019 until First Brands defaulted in 2025.

15.     As the Debtors have acknowledged, LAM TFG was a substantial "net loser" from the Debtors' fraud, as it transferred hundreds of millions of dollars more to the Debtors than it received from the Debtors.  Moore Decl. ¶ 93.

**B.      An Examiner is appointed to investigate First Brands and concludes that substantive consolidation is warranted.**

16.     On October 8, 2025, the Raistone factoring parties moved for an appointment of an examiner.  Dkt. 307.  On October 15, 2025, the Office of the United States Trustee made a similar motion.  Dkt. 340.  On November 10, 2025, the LAM Parties filed a response in support of both motions and likewise requested that an examiner be appointed.  Dkt. 617.

17.     The Examiner was appointed on January 9, 2026.  The Examiner filed a report with preliminary findings and conclusions on April 27, 2026.  Dkt. 2538.  As the Debtors' Disclosure Statement states, the Examiner's report "largely corroborates findings and assertions

---

[4] Under the operative version of the MRPA, dated September 19, 2022 (and subsequently amended, most recently on May 27, 2025), the particular Debtor entities that sold receivables include:  Trico Products Corporation; Carter Fuel Systems; LLC; ASC Industries, Inc.; Fram Group Operations LLC; Brake Parts Inc. LLC; Champion Laboratories, Inc.; Qualis Automotive, L.L.C.; Pylon Manufacturing Corp.; and CWD, LLC.  First Brands Group LLC provided a guarantee.

that the FBG Debtors have made and alleged in the ongoing adversary proceedings, finding that First Brands and a network of affiliated SPVs and non-Debtor entities were operated as a single enterprise directed by the Founder and others for the purpose of generating and extracting liquidity through structures that concealed the true perimeter of the business and depleted value available to creditors." Dkt. 2545 at 32. The Examiner's investigation was not completed due to lack of available funding.

### C. First Brands sues the James brothers and Onset.

18. On November 3, 2025, the Debtors commenced an adversary proceeding against Patrick James and various entities associated with him. Adv. Pro. No. 25-3803, Dkt. 17. The Debtors filed an amended complaint on January 19, 2026, in which they added additional defendants, including former First Brands executives Michael Baker, Andrew Brumbergs, and Stephen Graham. Adv. Pro. No. 25-3803, Dkt. 141. In the complaint, the Debtors allege that James, abetted by the others, incurred billions of dollars in factoring liabilities based "on non-existent or doctored invoices," engaged in fraudulent SPV financing, failed to properly account for supply chain financing, and concealed First Brands' financial position. *Id.* ¶¶ 5–8.

19. On January 9, 2026, the Debtors filed a separate action against Onset Financial Inc., Edward James, and others, alleging that Edward James and Onset conspired to defraud creditors and extract value from First Brands through purported sale-leaseback transactions. *See* Adv. Pro. No. 26-3005, Dkt. 1 (Bankr. S.D. Tex. Jan. 9, 2026).

### D. Patrick James and Edward James face indictments, and Andrew Brumbergs pleads guilty to fraud on LAM and others.

20. On January 27, 2026, an indictment was unsealed in the United States District Court for the Southern District of New York, in which the United States alleged that Patrick James and Edward James engaged in fraudulent schemes against First Brands' lenders and

financing partners, including "faked and falsely inflated invoices" sold to factors, and double- and triple-pledging collateral.  *See* Sealed Indictment, *United States* v. *Patrick James & Edward James*, No. 26 Cr. 29 (S.D.N.Y. Jan. 27, 2026) ¶ 2.

21.     On the same day, former First Brands Vice President of Finance Andrew Brumbergs pled guilty to an information accusing him of many of the same offenses.  *See United States* v. *Brumbergs*, No. 26 Cr. 25, Dkt. 13 (S.D.N.Y. Jan. 27, 2026).  In his allocution, Mr. Brumbergs stated, among other things, that between 2020 and 2025 he, "together with others, misrepresented First Brands' accounts receivable to third-party factoring companies and an investment bank in order to obtain financing for the company First Brands."  *Id.* at 28:13.  In his venue proffer, the U.S. Attorney specifically named Jefferies as one of the victims of the fraud. *Id.* at 31:24.

**E.      The Debtors file a Plan for one Debtor to resolve 112 cases.**

22.     On April 28, one of the Debtors—Premier Marketing Group, LLC—proposed a plan.  The plan was negotiated among the Debtors, the Ad Hoc Group, and the Creditors' Committee.  The LAM Parties were not included in the mediation and subsequent discussions that led up to the filing.  The mechanics of the plan transactions were quite complicated, involving a Section 363(b) sale of all estate claims owned by 111 other Debtors, and a combination of credit bids and foreclosures for the remaining assets.  The plan ultimately failed after the Court declined to conditionally approve its disclosure statement.

**F.      The Debtors propose a new Plan for all Debtors, which involves a sale process for all of the Debtors' Estate Claims.**

23.     Following the failure of the Premier Marketing Group Plan, the Debtors resumed negotiations with their secured creditors and the Creditors' Committee and, on June 5, 2026,

filed an amended plan and disclosure statement.  Again, the LAM Parties were not included in the plan discussions.

24.     The new Plan is predicated on a sale of the Estate Claims, either through a credit bid by the DIP A lenders or a third-party bid.  The Debtors produced 302 documents that they have represented reflect the dataroom provided to potential bidders.[5]  Those materials show that third-party bidders were given minimal substantive information, beyond what is publicly available, regarding the claims being marketed.

25.     Specifically, the materials include a 10-page "Teaser" that includes public information about claims against Patrick James and Onset, and then refers generally to other "avoidance actions"—without accompanying detail regarding the transfers or the defendants that would be the subject of the avoidance actions.

26.     Beyond the Teaser, the documents in the dataroom consisted mainly of (1) public litigation filings (91 documents), including filings related to pending suits against Jefferies and affiliates, and (2) 210 documents relating to Onset's financing.  Bidders apparently did not receive detailed information about potential avoidance actions until weeks after the published bid deadline.  For example, there is no evidence that the Debtors disclosed to third-party bidders which specific entities would be targets of such actions, the quantum of transfers to such entities, or analysis of recovery prospects or defenses.

27.     The Debtors have asserted mediation and common interest privileges to shield communications with their primary bidder, the Ad Hoc Group, regarding the Estate Claims and other topics.  They have also refused to answer interrogatories regarding how the information

---

[5]  Long after the published bidding deadline, additional documents were apparently added to the dataroom when the Debtors filed the Moore and Kirschner declarations.

supplied to the Ad Hoc Group compared to the information supplied to other bidders. As a result, the LAM Parties do not yet know the extent to which the DIP A lenders received more information than other bidders (as the LAM Parties expect to be the case). The LAM Parties filed a motion to compel to address those and other discovery deficiencies. *See* Dkt. 3210. That motion remains pending.

### Objections to Confirmation

**I.     The Plan does not comply with Section 1129(a)(11) of the Bankruptcy Code, because it is not feasible.**

28.     The Bankruptcy Code's feasibility requirement is embedded in Section 1129(a)(11) of the Code, which states that a court can only confirm a plan if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Section 1129(a)(9)(A) provides further that, "on the effective date of the plan, the holder of" each administrative expense claim has to "receive on account of such claim cash equal to the allowed amount of such claim."

29.     To demonstrate feasibility, the debtor must show that a plan has "a reasonable probability of success." *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790, 801 (5th Cir. 1997). In this case, therefore, the Debtors would need to show that they are likely to recover the approximately $2 billion necessary to pay administrative expense claims in full. Moore Decl. ¶ 228. The Debtors cannot demonstrate feasibility.

**A.     The "delayed effective date" structure is impermissible or at least highly suspect.**

30.     The type of plan the Debtors have put forward—namely a plan that depends on disputed litigation claims to go "effective"—is enormously controversial. The Third Circuit has disapproved of this structure, holding that a "plan will not be feasible if its success hinges on

future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *In re Am. Cap. Equipment, LLC*, 688 F.3d 145, 156 (3d Cir. 2012).[6]

31.     Although the Fifth Circuit has not directly addressed the issue, the Court of Appeals has stated that, where "there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*," and that "[r]esort to the protection of the bankruptcy laws is not proper." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) (internal quotation marks and citations omitted).  That reasoning, the Court explained, applies not only to the "commencement" of a Chapter 11 case but also to its "prosecution" and to "confirmation" of any plan. *Id.* at 1071; *cf. In re Red River Talc LLC*, 670 B.R. 251, 306 (Bankr. S.D. Tex. 2025) (absence of any "real business to operate or save" or "employees to consider" weighed against good faith finding).

32.     *Little Creek Development* and similar cases leave little or no room for a Chapter 11 plan filed by a former criminal enterprise, with no remaining business, that hinges entirely on future potential litigation recoveries.  Although the LAM Parties acknowledge the *Steward* case,[7] currently on appeal, this is a materially different situation.  In particular, unlike in *Steward*, where the evidentiary record was largely uncontested, the evidence here will make clear that (a) the Debtors' feasibility position is at odds with multiple market metrics and (b) the Debtors have not come close to showing they are likely to recover $2 billion, let alone by 2028.

---

[6]  Other courts agree with the Third Circuit's approach.  *See, e.g.*, *In re Slabbed New Media, LLC*, 557 B.R. 911, 917 (Bankr. S.D. Miss. 2016); *In re Archdiocese of Saint Paul & Minneapolis*, 579 B.R. 188, 203–04 (Bankr. D. Minn. 2017); *In re First Conn. Consulting Grp., Inc.*, 579 B.R. 673, 686 (Bankr. D. Conn. 2018).

[7]  *In re Steward Health Care System, LLC*, No. 24-90213-11, July 16, 2025 Hr'g Tr. at 3:2–60:21 (Bankr. S.D. Tex.), *appeals docketed*, Nos. 25-cv-2825, 25-cv-3755, 25-cv-3824, 25-cv-3830 (S.D. Tex.).

**B.      The market evidence defeats the Debtors' position on feasibility.**

33.      In a Chapter 11 case, the "the best way to determine value is exposure to a market." *Bank of Am. N. Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'Ship*, 526 U.S. 434, 457 (1999) *accord In re Deqser, LLC*, 2026 WL 1096542, at *2 n.6 (Bankr. D. Del. Apr. 22, 2026) (Goldblatt, J.) (citing *LaSalle* as "reflecting the Bankruptcy Code's general preference for market-based valuations over judicial valuation"); *In re ConvergeOne Holdings, Inc.*, 2025 WL 4700341, at *6–8 (S.D. Tex. Sep. 25, 2025).

34.      Three key market indicators demonstrate that those with an economic stake in the outcome do not agree with the Debtors' proposed valuation of the Estate Claims:  (a) the trading prices for the Debtors' debt instruments, (b) the results of the Estate Claims Marketing Process, and (c) the price obtained via the winning bid (the Estate Claims Credit Bid Transaction).

35.      Starting with the trading prices of First Brands' debt:  As of this filing, the DIP A loans trade at just over 18 cents on the dollar.  That trading price implies that the *total market value* of the DIP A Facility is less than $200 million.  The next-most-senior tranche, the DIP B Roll-Up Loans, last traded above one penny on the dollar in early January 2026.

36.      The second indication that the Estate Claims are not likely to yield $2 billion is that the Estate Claims Marketing Process has not generated actionable bids, let alone bids for close to that level.  The Debtors cannot assert, on the one hand, that they marketed the Estate Claims in a robust way and, on the other hand, that the claims' true value is close to $2 billion, when no one stepped up to buy the claims.

37.      Finally, if the Estate Claims are determined, for feasibility purposes, to have a likely value of $2 billion or more, then the Estate Claims Credit Bid Transaction is on its face not a good-faith purchase.  In the Fifth Circuit, a "good-faith purchaser" is required to purchase estate assets "for value."  *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014)

(citations omitted).  That requirement has consistently been interpreted to mean that the purchaser must pay a fair price for the assets compared to their appraised value, with multiple courts holdings that the price must exceed 75% of the appraised value.[8]  Here, even if the DIP A Claims were valued at their full face amount of $1.1 billion—despite their market value being far lower—that is less than 60% of the ~$2 billion necessary for feasibility purposes.

38.     There are also other issues with the sale that warrant heightened scrutiny.  The evidence will show that there has been unequal access to information as between the DIP A Lenders and other potential bidders.  In addition, the sale of the Estate Claims to the DIP A Lenders is inextricably tied to a release of all claims against the Debtors' directors and officers, among others.[9]  In *PHH Mortgage Corp.* v. *Johnson*, the district court stated that it is a "noncontroversial proposition" that Section 363 sale decisions "mustn't be compromised by 'self interest or self dealing,'" with that court only affirming a sale because all estate debts would be satisfied.  563 F. Supp. 3d 627, 632 (S.D. Tex. 2021) (Eskridge, J.) (citation omitted).  In a context where many debts of the estate will go unsatisfied, tying the sale to the release of insiders requires that the sale be subject to searching review.  *See generally In re QVC Grp., Inc.*, 2026 WL 2058528, at *30–32 & nn.292–293 (Bankr. S.D. Tex. July 15, 2026) (collecting cases), *appeal docketed*, No. 26-cv-5680 (S.D. Tex. July 17, 2026).

---

[8]  *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 149 (3d Cir. 1986) ("Traditionally, courts have held that [f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets." (internal quotation marks and citation omitted)); *In re Colony Hill Assoc.*, 111 F.3d 269, 276 (2d Cir. 1997) ("Courts have held that a purchaser who pays 75% of the appraised value of the assets has tendered value, as that term is used for purposes of § 363(m)." (internal quotation marks and citation omitted)); *In re Lotspeich*, 328 B.R. 209, 218 (B.A.P. 10th Cir. 2005) ("[G]ood faith was established with respect to a purchaser when . . . the purchaser paid value, which is defined as at least 75% of the appraised value of the assets.").

[9]  Plan § 5.1 ("The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.").

**C.   The Debtors have not shown they are likely to recover $2 billion.  Nor have they shown that they are likely to recover anything from the LAM Parties.**

39.     Having failed to attract any bids that would support their position on feasibility, the Debtors commissioned an expert opinion, in the form of the Declaration of Marc S. Kirschner.[10]  Mr. Kirschner opines that the Debtors have "valuable" claims and that "it is reasonably probable" that $2 billion "*could* be recovered by a litigation trustee by the end of 2028."  Kirschner Decl. ¶ 21.  He also says "it is reasonably *possible* that recoveries in excess of $2 billion *could* be received by the end of 2028."  *Id*. ¶ 143.

40.     In defending those highly qualified opinions, Mr. Kirschner maintains that the trustee "can assert claims" for recoveries in excess of $25 billion, *the full gross amount of transfers made by First Brands to various parties*.  *Id*. ¶ 143.  Mr. Kirschner, however, does not engage at all with the market evidence and the sale process.  Moreover, his expert opinion, to the extent admissible, offers only a superficial and high-level discussion of the claims at issue, based on limited information and without detailed consideration of the facts and legal issues bearing on each claim.  In that context, while Mr. Kirschner touts headline numbers consisting of gross transfer amounts, he devotes little attention to the array of obstacles a trustee would face in pursuing avoidance and other claims.

41.     As to *preference claims*, Mr. Kirschner acknowledges that, while the Debtors transferred some $1.7 billion in the 90-day preference period, the overwhelming majority of those transfers were offset by new value,[11] and that even the net amount of the transfers (~$304 million) may not be recoverable based on defenses including the "ordinary course"

---

[10]  Dkt. 3190.  The LAM Parties reserve all rights and objections with respect to Mr. Kirschner's declaration and proposed testimony, including objections to admissibility and to the timing and completeness of his disclosures.

[11]  As to LAM TFG, the Moore declaration acknowledges that 90-day transfers received by LAM TFG are fully offset.  *See* Moore Decl. ¶ 164.

defense. *Id.* ¶¶ 139–142.  Ultimately, Mr. Kirschner retreats to a vague assertion that, as a generic matter, without taking into account particular facts, his experience is that a 10% recovery on preference claims can be achievable.  *Id.* ¶ 142.  That is evidence of nothing.

42.     As to *fraudulent transfer claims*, Mr. Kirschner cannot escape the fact that many or all of the payments at issue, at least to factors such as LAM TFG, discharged valid contractual obligations—presenting a threshold obstacle to any claim.[12]  Mr. Kirschner's response is that all the transfers at issue will be subject to the so-called "Ponzi scheme presumption," and thus presumptively avoidable as actual-intent fraudulent transfers.  *Id.* ¶ 33.  But that argument too will face significant obstacles, given the Debtors' broad-ranging operations, financial debt, and other aspects of the business that do not resemble a Ponzi scheme.[13]  Even if the "Ponzi scheme" argument were accepted, however, the trustee would still have to overcome defenses to satisfy Section 550's recovery requirements.  Mr. Kirschner barely scratches the surface on these issues. As to the LAM Parties in particular, Mr. Kirschner's declaration does not come close to demonstrating that recovery is likely, for multiple reasons.

43.     ***First***, both Section 548(c) of the Bankruptcy Code and analogous provisions of the UVTA provide a defense to transferees that give value in "good faith."  11 U.S.C. § 548(c); UVTA § 8(a).  Under longstanding case law, in the context of a Ponzi scheme, "net losers" give

---

[12]  *In re Sharp Int'l Corp.*, 403 F.3d 43, 46 (2d Cir. 2005) (transaction that is "at most a mere preference between creditors" not avoidable as either constructive or actual-intent fraudulent transfer), cited with approval in *GE Capital Commercial, Inc.* v. *Worthington Nat'l Bank*, 754 F.3d 297, 313 n.22 (5th Cir. 2014).

[13]  In a recent decision involving similar facts—including an automotive-industry debtor that defrauded lenders through, among other things, double-pledging collateral to multiple financing counterparties—the Bankruptcy Court for the Northern District of Texas *declined* to characterize the debtor as a "Ponzi scheme," finding that the debtor "did not operate as an investment scheme whereby money from later investors was used to pay new investors," instead "accessed capital through traditional financing that created debtor-creditor relationships."  *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *4 (Bankr. N.D. Tex. June 3, 2022).

value for all the transfers they receive.[14]  As the Debtors concede, LAM TFG was a "net loser"

by at least $400 million.  *See* Moore Decl. ¶ 93.  Accordingly, LAM TFG—along with other "net

losers"—does not have liability if it acted in "good faith."

44.     At first, Mr. Kirschner does not acknowledge the good faith defense, stating—

wrongly—that a litigation trustee would "only need to prove that a transferee received the

subject transfers."  Kirschner Decl. ¶ 33.  Mr. Kirschner ultimately tries to suggest that the LAM

Parties "should have known" about the First Brands fraud—and was on "inquiry notice" of the

fraud—based on selective descriptions of two episodes from 2023.  *Id*. ¶¶ 46, 48.  In one of the

episodes, Leucadia personnel requested an on-site visit and call with First Brands' CFO to

conduct diligence, and the CFO pushed back.  In the second episode, a potential investor asked

an investment banker at Jefferies about a potential inconsistency that any lender or investor

would have seen in First Brands' financial statements.  Kirschner Decl. ¶¶ 46–47.  The notion

that either episode put the LAM Parties "on notice" of the factoring fraud, for purposes of a

good-faith analysis or otherwise, is farfetched in the extreme.[15]  The LAM Parties will address

this issue further at the upcoming hearing.

45.     ***Second***, under controlling Fifth Circuit authority, Section 550(d)'s "single-

satisfaction rule" bars a trustee from obtaining a recovery where the transferred value was

returned to the debtor pre-petition.  In *In re DeBerry*, a chapter 7 trustee sought to recover an

allegedly fraudulent transfer from an initial transferee even though the transferee had already

remitted the amounts at issue back to the debtor before the bankruptcy.  945 F.3d 943, 945–46

---

[14]  This issue has arisen repeatedly in the Ponzi scheme context.  *See In re Positive Health Mgmt., Inc.*, 769 F.3d 899, 906–08 (5th Cir. 2014); *Janvey* v. *Brown*, 767 F.3d 430, 439–43 (5th Cir. 2014); *Donell* v. *Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Scholes* v. *Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995).

[15]  Under the case law that Mr. Kirschner appears to be relying (without saying so), bad faith would require not only "inquiry notice" but also that LAM TFG had "initial suspicions" that it did not "diligently investigate." *Janvey* v. *GMAG, L.L.C.*, 592 S.W.3d 125, 133 (Tex. 2019).  Mr. Kirschner does not appear to focus on that aspect.

(5th Cir. 2019).  The Fifth Circuit rejected the claim, holding that the "bankruptcy trustee cannot 'recover' property that the transferee returned to the debtor before the bankruptcy filing."  *Id*. at 948.  The Fifth Circuit reaffirmed the same principle in *In re Sanchez Energy Corp.*, holding again that "a trustee cannot use Section 550(a) to recover the value of property that was already returned to the estate."  139 F.4th 411, 420 (5th Cir.), *cert. denied*, 146 S. Ct. 840 (2025); *see also In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 879–80 (Bankr. W.D. Tex. 2022) (applying Section 550(d)'s single-satisfaction rule to reduce fraudulent transfer judgment by amounts transferred to the debtor before the bankruptcy).

46.     In this case, First Brands repeatedly made payments to LAM TFG connected to receivables that LAM TFG understood it had purchased, but it then sold more receivables to LAM TFG—inducing LAM TFG to make payments *back to First Brands*.  Stated differently, First Brands apparently used the factoring program like a revolving credit facility, repeatedly drawing up to its limit, making payments, *but then drawing again*.  As of the Petition Date, the Debtors had drawn hundreds of millions *more* than LAM TFG ever received.  Although Mr. Kirschner aggregates the payments made from First Brands to LAM TFG, he does not account for the amounts sent back to the Debtors, including amounts that offset prior payments from First Brands.  His declaration therefore does not account for the single-satisfaction rule, which has been applied in various cases involving factoring or revolving credit.[16]  More broadly, it ignores *DeBerry*'s basic principle that a trustee cannot be allowed to receive a "windfall through the avoidance provisions."  *DeBerry*, 945 F.3d at 947 (citation omitted).

---

[16]  *See, e.g.*, *In re Cybridge Corp.*, 312 B.R. 262, 270–72 (D.N.J. 2004) (factor that collected receivables but later advanced more cash to the debtor had no fraudulent transfer liability per Section 550(d)); *Textron Fin., Inc.* v. *Bash*, 2019 WL 3290257, at *6 (N.D. Ohio July 22, 2019) (counting cumulative rather than net transfers would "create a windfall to the estate . . . especially so here when the Trustee seeks to recover eighteen times the credit limit applicable to the parties' transaction").

47. ***Third***, Mr. Kirschner does not consider whether First Brands had an equitable interest in the funds it transferred to LAM TFG and others. A preference or fraudulent transfer claim requires a "transfer of an interest of the debtor in property." 11 U.S.C. §§ 544(b), 547(b), 548(a). The trustee has to show that, prior to the transfer, the debtor had an equitable interest in the property at issue, and not just legal title. *See, e.g.*, *Begier* v. *I.R.S.*, 496 U.S. 53, 58–59 (1990); *Law Office of Rogelio Solis PLLC* v. *Curtis*, 83 F.4th 409, 413 (5th Cir. 2023); *In re Maple Mortg., Inc.*, 81 F.3d 592, 595 (5th Cir. 1996).

48. Here, the Debtors admit that much of the money transferred to factoring counterparties was itself stolen from either that same factoring party or other fraud victims. *See* Moore Decl. ¶¶ 74, 84. In addition, Mr. Brumbergs pleaded guilty to an information stating that all property "that constitutes or is derived from proceeds traceable to" the Debtors' fraud, including the factoring fraud, is forfeitable to the U.S. government. The import of the Debtors' admissions, and the guilty plea, is that—at the time of the relevant transfers—the funds at issue, although possessed by the debtors, were not equitably owned by them, because they were direct, traceable proceeds of an admitted theft-by-fraud. *See, e.g.*, *In re Alpine Summit Energy Partners, Inc.*, 2026 WL 823740, at *10 (Bankr. S.D. Tex. Mar. 24, 2026); *In re Bake-Line Grp., LLC*, 359 B.R. 566, 569–71 (Bankr. D. Del. 2007). As a matter of non-bankruptcy law, the rights of the victims of the theft were superior to those of general creditors in respect of those identifiable funds, and therefore those funds were not "asset[s] of the debtor's estate" recoverable under Section 550. *Maple Mortg.*, 81 F.3d at 595.

49. Nor does Mr. Kirschner consider the forfeiture powers of the U.S. government, and the effect of those powers on First Brands' interests in property. Under federal law, property is subject to forfeiture if it is derived from proceeds traceable to a violation of wire fraud, bank

fraud, or conspiracy to commit wire or bank fraud statutes, or if it was involved in a money laundering offense.[17]  18 U.S.C. §§ 981(a)(1), 982(a)(1).  Importantly, the government's interest in such property arises at the moment of the "commission of the act."  21 U.S.C. § 853(c).[18]  As the Supreme Court has explained, the federal government's interest amounts to "a statutory conveyance" as of the date of the offense, although it "need[s] judicial condemnation to perfect it."  *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 627 (1989) (citing *United States* v. *Stowell*, 133 U.S. 1, 19 (1890)).  That kind of conveyance—namely one that is effective immediately but subject to later perfection—is the definition of an equitable interest in property, which is sufficient to exclude it from the Debtors' estates.[19]  As Justice Breyer explained in his plurality opinion in *Luis* v. *United States*, the government's rights that vest upon commission of the offense are akin to the rights of "a secured creditor with a lien on the defendant's tainted assets superior to that of most any other party."  578 U.S. 5, 16 (2016).  From that starting point, a debtor's transfer of funds subject to the government's lien amounts only to a transfer of the debtor's valueless interest in those funds, precluding or at least significantly complicating any fraudulent transfer theory.[20]

---

[17]  The scope of traceability is broad, including "all proceeds obtained from unlawful conduct and property traceable to those proceeds."  *United States* v. *Betancourt*, 422 F.3d 240, 250 (5th Cir. 2005).

[18]  *See United States* v. *Martinez*, 228 F.3d 587, 590 (5th Cir. 2000) (relation back doctrine vests title to criminal proceeds in Government at time the crime occurs); *United States* v. *United States Currency in the Amount of $228,536.00*, 895 F.2d 908, 916 (2d Cir. 1990) (because "the forfeiture occurs when the crime is committed," a defendant has no interest in the forfeited property "as of that moment"); *United States* v. *Pelullo*, 178 F.3d 196, 201 (3d Cir. 1999) ("Because we conclude that the Forfeiture Order divested Pelullo of any interest in the property, we agree with the Government" that it is not part of the bankruptcy estate).

[19]  *See, e.g.*, *In re Barrow Shaver Res. Co.*, 2026 WL 1399325, at *17 (Bankr. S.D. Tex. May 18, 2026); *Citizens Nat. Bank of Kirksville, Mo.* v. *Comm'r of Internal Revenue*, 122 F.2d 1011, 1014 (8th Cir. 1941) ("An equitable title is a right possessed by a person to have the legal title to property transferred to him upon the performance of specified conditions." (citation omitted)); *United States* v. *Davidson*, 139 F.2d 908, 913 (5th Cir. 1943) (Waller, J., concurring) ("Equitable title is a right imperfect at law, but which may be perfected by the aid of a court of chancery by compelling parties to do that which in good faith they are bound to do, or removing obstacles interposed in bad faith to the prejudice of another." (citation omitted)).

[20]  *See In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001) ("[U]nder § 550, the Trustee is entitled to recover only the equity [debtor] held in the Property."); *In re M.T.G., Inc.*, 164 F.4th 564, 579 (6th Cir. 2026) ("Because an estate can

50.     Looking beyond the elements of and defenses to the Estate Claims, and the numerous obstacles that any trustee will have to recovery, Mr. Kirschner's analysis of collectability also provides no support to the Debtors.  As regards the LAM Parties, Mr. Kirschner observes that "*Jefferies* is a publicly traded company with a market capitalization exceeding $10 billion."  Kirschner Decl. ¶ 146.  Mr. Kirschner, however, says nothing about the specific entity that contracted with First Brands, namely LAM TFG, nor does he try to argue that Jefferies could have any liability for that entity's debts.  Mr. Kirschner, moreover, says nothing about collecting from Onset, or from whichever Katsumi entity that contracted with First Brands.  Mr. Kirschner, in sum, although claiming that his opinion "takes into account collectability" (*id*. ¶ 144), provides no basis to conclude that the trustee would be able to collect.

**II.     The Plan does not comply with Section 1129(a)(9)(A) of the Bankruptcy Code, because priority claims will not be paid in full on the statutory effective date.**

**A.     The "effective date" of a plan is a statutory term, not a matter for the Debtors to decide.**

51.     Section 1129(a)(9)(A) of the Bankruptcy Code provides that, absent agreement to the contrary, the plan *must* provide for payment in cash of administrative expense claims "on the *effective date* of the plan."  11 U.S.C. § 1129(a)(9)(A).  The question, then, is when will the "effective date" occur?  The Debtors say it will occur on what they define as the "Effective Date," which is tied to payment of administrative and priority claims.  But the statute does not support that result for *this* Plan.  The real "effective date" of this Plan, for purposes of the statute, is the "Confirmation Date," when the Plan sale transactions will occur and the Plan will bind all

---

only recover the value of its equity in property as of the petition date, MTG would have nothing to recover."); *In re Teleservices Grp., Inc.*, 469 B.R. 713, 763 n.157 (Bankr. W.D. Mich. 2012) ("[A] trustee's attempted recovery of fully encumbered property, no matter how fraudulent, would be pointless under either Sections 548 or 544(b).").

parties.  Since administrative expense claims are not being paid on the Confirmation Date, the Plan is not confirmable.

52.     As with all statutory interpretation, the starting point is the text.  Section 1129(a)(9)(A) requires payment of administrative expense claims on the "effective date," but does not define that term.  "When terms used in a statute are undefined, we give them their ordinary meaning."  *In re Lopez*, 897 F.3d 663, 669 (5th Cir. 2018) (quoting *Hamilton* v. *Lanning*, 560 U.S. 505, 513 (2010)); *accord Ransom* v. *FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011).  Black's Law Dictionary defines "effective date" as "[t]he date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect."  Black's Law Dictionary, *Date* (12th ed. 2024).  Other dictionary definitions from around the time of the Bankruptcy Code's enactment are similar, defining "effect" to mean "a quality or state of being operative," and "effective" to mean "ready for service or action."  *In re Musil*, 99 B.R. 448, 450 (Bankr. D. Kan. 1988) (citing Webster's New Collegiate Dictionary (1975 ed.)).

53.     Applying the dictionary definition of "effective date," this Plan becomes effective on the Confirmation Date or immediately thereafter.  The Plan immediately binds all relevant parties (§ 13.1), vests the Debtors' assets in the various trusts (§ 13.2), enters injunctions against interference with the Plan transactions (§ 13.4), grants releases in favor of various parties (§ 13.5), and authorizes the dissolution of the Debtors starting right after the Confirmation Date (§ 5.10).  Most glaringly, *the Plan states expressly that its terms are "binding" and "immediately effective" as of the Confirmation Date* (§ 15.11).

54.     What the text suggests, the statutory context confirms.  The Bankruptcy Code states that a plan is "substantially consummated" once there has been a "transfer of all or

-21-

substantially all of the property proposed by the plan to be transferred," "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan," and "commencement of distribution under the plan." 11 U.S.C. § 1101(2). Here, all three of those events happen on the Confirmation Date or immediately thereafter. A plan cannot be substantially *consummated* (as in completed), but not "*effective*."

55.     The reasoned cases reach the same result. The Ninth Circuit, evaluating the plain meaning of the term "effective date," has stated that the "most logical interpretation, and that endorsed by the courts and commentators that have addressed the issue, is that the effective date is the date the plan becomes binding on the parties." *In re Hoopai*, 581 F.3d 1090, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted). A bankruptcy court in the Eastern District of Texas has likewise held that "[t]he effective date is usually understood as the date on which the provisions of a plan of reorganization become effective and binding on the parties." *In re Good*, 428 B.R. 235, 244 (Bankr. E.D. Tex. 2010) (citation omitted).[21] The Plan here states expressly that it is both "binding" and "effective" upon the parties as of the *Confirmation Date* (§ 15.11).

56.     The Debtors' position appears to be that the plan proponents can unilaterally determine the "Effective Date" of their Plan. That may be true for the *contractual* "Effective Date," the date after which the debtor plans to take certain actions described in the plan. But, as *In re Good* explains, the contractual effective date "may coincide with the statutory effective

---

[21] In *In re Pacific Lumber Co.*, the Fifth Circuit stated that "[u]nder 11 U.S.C. § 1129(a)(9)(A), [an] administrative expense must be paid in cash at the time of *confirmation*," and remanded for consideration of whether a purported administrative expense had to be paid in a confirmation appeal otherwise dismissed as equitably moot following substantial consummation. 584 F.3d 229, 250 (5th Cir. 2009). The result suggests that plans must not reach substantial consummation without having paid administrative claims.

date, or, as in this case, the contractual effective date may occur much later than the statutory effective date."  428 B.R. at 245.  Here, because the *statutory* "effective date" is the Confirmation Date—at a time when administrative expense claims will not be paid in full—the Plan does not satisfy Section 1129(a)(9).

**B.      The Debtors cannot use Section 363 to deprive the "effective date" of any significance.**

57.      Even if the Debtors had the power to define the "effective date" (which they do not), the structure of this Plan—and in particular its purported reliance on Section 363—is transparently designed to deprive the "effective date," as that term is used in Section 1129(a)(9), of any significance.

58.      Section 1129(a)(9) reflects a statutory bargain:  to obtain the benefits of confirming a Chapter 11 plan, administrative and priority claims have to be paid.  This is consistent with the "overriding policy that a debtor's efforts to reorganize shall be financed by the debtor, not the debtor's post-petition creditors."  *In re Allied Mech. Servs., Inc.*, 885 F.2d 837, 839 (11th Cir. 1989) (quoting *In re Gould & Eberhart Gear Mach. Corp.*, 80 B.R. 614, 617 (D. Mass. 1987)); *see generally In re Molycorp, Inc.*, 562 B.R. 67, 77–78 (Bankr. D. Del. 2017) (citing Douglas G. Baird, *Elements of Bankruptcy* 240–41 (6th ed. 2014)).

59.      The Debtors here do not want to accept that bargain.  Instead, they want to wrap the entire Plan in a Section 363 sale that occurs on the Confirmation Date, and then to use Section 363(m) to prevent any unwinding of the Plan—*regardless of whether the Plan ultimately pays the administrative and priority claims.*  To achieve this result, the plan proponents have inserted provisions in the Plan under which:  (a) the Plan is simultaneously a Section 363 Sale of

the Estate Claims to the Ad Hoc Group[22]; (b) each provision of the Plan is dependent on and non-severable from other provisions;[23] (c) the "sale" will go effective as soon as the Confirmation Order is entered, with all stays (even automatic stays) being waived and all material provisions of the Plan—except the ones addressing administrative and priority claims— becoming effective immediately.[24]  Based on those provisions, the plan proponents will argue that, regardless of whether the Plan ever ends up *actually* paying the administrative and priority claims, every court's hands are forever tied, by virtue of Section 363(m), and the Plan is not subject to being unwound even if it never satisfies the Code's confirmation requirements.[25]  In

---

[22]  Plan § 5.1 ("Pursuant to **sections 363** and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and the releases contained in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim against or Interest in an FBG Debtor and any distribution to be made on account of such Claim or Interest.  The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan, including the Plan Settlement."); Plan § 5.2 ("Pursuant to sections 105(a), 361, **363**, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee (the '**Plan Settlement**').  The compromises and settlements included in the Plan Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan. **Entry of the Confirmation Order shall** constitute the Bankruptcy Court's **approval of the Plan Settlement** under sections 105(a), 361, **363**, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable and in the best interests of the FBG Debtors' Estates.").

[23]  *Id.*; *see* Plan § 15.14 ("The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan, and (c) non-severable and mutually dependent."); Plan § 5.1 ("The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.").

[24]  Plan § 12.2 ("The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry."); Plan § 15.11 ("Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, the holders of Claims or Interests against the FBG Debtors (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Preference Settlement Electing Creditors, the Released Parties, the Releasing Parties, the Exculpated Parties, and each of their respective successors and assigns.").

[25]  *See also* Plan § 12.3 ("If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the FBG Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute

short, the Debtors want all the benefits of confirming a plan—releases, exculpations, and the like—regardless of whether they actually fulfill the Code's statutory bargain.

60. This proposed use of Section 363 is a paradigmatic "end-run around the Bankruptcy Code." *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 588 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 397 (2025). The payment of all administrative and priority claims as a precondition to gaining the benefits of a plan is a matter "'long [ ] considered fundamental to the Bankruptcy Code,'" and so the Debtors would require "a textual hook sufficient to show that Congress intended such 'a major departure'" to permit Section 363 to render Section 1129(a)(9)'s requirement potentially nugatory. *Id.* at 589 (quoting *Czyzewski* v. *Jevic Holding Corp.*, 580 U.S. 451, 465 (2017)) (alteration in original). But there is no such hook here.

61. One of the hallmarks of an end-run around the Code is the use of a general statutory provision instead of a specifically applicable one. In *Serta*, the debtors used the general settlement power of Section 1123(b)(3) to functionally override an express Code disallowance provision. Here, Section 1123(b)(4) directly authorizes plans to "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4). By contrast, although not deciding the issue, the Fifth Circuit has expressed "doubt" that Section 363 is even applicable to plan sales, because "[t]here is a definite implication that [section 363] concern[s] the trustee's authority during the administration of the estate and not at the final disposition of the property of the estate pursuant to a plan of reorganization." *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1165 (5th Cir. 1988).

---

an admission, acknowledgement, offer, or undertaking by the FBG Debtors or any other Entity; *provided that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order*.").

62.     The Debtors' attempt to use the non-facially applicable provision (Section 363) over the *directly* applicable one (Section 1123(b)(4)) is clearly aimed at obtaining the benefits of Section 363(m). But there is no reason to believe that Congress would have "intended some kind of a work-around" from the limitations of Section 1123(b)(4). *Serta*, 125 F.4th at 590; *see Texas Extrusion*, 844 F.2d at 1165. Moreover, the statutory purpose of Section 363(m) is "to give finality to those orders and judgments upon which third parties rely," but that is not what is happening here. *TMT Procurement Corp.*, 764 F.3d at 521. In this case, there is no outside third-party purchaser in need of protection.

63.     The Court, accordingly, should not allow the plan proponents to use Section 363(m) to insulate this Plan from review, or to preclude this Court's ability to unwind the Plan and the benefits it affords if it fails to live up to the Code's statutory requirements. Likewise, given that there is no operating business or third-party buyer, and no urgency to transferring estate assets to the trust, there is no good cause to waive any of the automatic 14-day stays provided by the Bankruptcy Rules. *See In re Borders Grp., Inc.*, 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011) (Glenn, J.).

**III.     The Plan does not comply with Section 1123(a)(4) of the Bankruptcy Code, because it discriminates between unsecured creditors without a legal basis.**

     **A.     The Preference Settlement provides disparate treatment and recoveries to similarly-situated Class 7 Creditors.**

64.     Section 1123(a)(4) of the Bankruptcy Code provides that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

65.     In the Plan before the Court, all general unsecured creditors—a group that includes trade creditors, supply chain financers, factors, and other claimants—are placed together

in Class 7. But the Plan does not provide the members of Class 7 with the "same treatment." Instead, it selectively affords substantial benefits to favored creditors through the "Preference Settlement."

66.     Section 6.11 of the Plan describes the "Preference Settlement," which is available to certain "Trade Creditors, Supply Chain Financers, and Factors who: (i) do not meet the definition of Adverse Conduct, as determined by a Final Order; (ii) are not Specified Non-Released Parties; and (iii) are Preference Settlement Electing Creditors." "Adverse Conduct" is a non-statutory term made up by the plan proponents. It is defined to include not only conduct regulated by the Bankruptcy Code, but also other unspecified "wrongful" or "constructively fraudulent" conduct. "Adverse Conduct":

> means (i) engaged in wrongful, actual, or constructively fraudulent conduct against any Debtor or Affiliate of any Debtor, or otherwise participated, conspired with, or acted in concert with, any Person that engaged in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or Affiliates of Debtors), (ii) received an avoidable transfer on grounds other than section 547 of the Bankruptcy Code from any of the Debtors, or (iii) received a transfer not in good faith. (Plan at 4.)

67.     The "Specified Non-Released Parties" are listed in Exhibit 8 to the Plan Supplement filed on June 23, 2026. The LAM Parties are identified as Specified Non-Released Parties, with no explanation for how the selection was made.

68.     Under the terms of the Preference Settlement, Specified Non-Released Parties, such as the LAM Parties, are not eligible to participate. By contrast, eligible creditors receive significant benefits. As an accommodation to the Creditors' Committee, "Trade Creditors" that opt in are protected from preference actions. Plan § 6.11(d). Qualifying Supply Chain Financers and Factors likewise receive protection, as they are entitled to take advantage of "Modified New Value Elements," under which all entities are automatically consolidated for purposes of a subsequent new value defense. *Id.* § 6.11(e)(i)–(iii).

**B.      Section 1123(a)(4) does not permit discrimination among similarly situated creditors without a Code-based reason.**

69.      The Fifth Circuit's decision in *Serta*, as well as the district court's decision in *ConvergeOne*, render the Preference Settlement impermissible under Section 1123(a)(4).  The Preference Settlement is special treatment for certain unsecured creditors over others, with no Code-based reason that authorizes such disparate treatment.

70.       In *Serta*, the debtors agreed to an "uptier" transaction with certain of its lenders, and provided an indemnity against litigation liability.  In Serta's 2023 bankruptcy, the debtors agreed that the prepetition indemnity had to be disallowed pursuant to Section 502(e)(1)(B), but effectively reinstated that indemnity as a "settlement" with the participating lenders.  The bankruptcy court approved the plan.

71.      The Fifth Circuit reversed, holding, *inter alia*, that the indemnity "settlement" violated Section 1123(a)(4).  It was of no moment that the settlement was offered to all class members, including both lenders that participated in the uptier and others that did not; the court said it was obliged to "look below the surface to determine whether the distributions [are] in fact equal in value." *Serta*, 125 F.4th at 592.  And beneath the surface, the reinstatement of the indemnity was of great value to the exchanging lenders and of none to the others.

72.      Following *Serta*, the district court in *In re ConvergeOne Holdings*, 2025 WL 4700341 (S.D. Tex. Sept. 25, 2025), also found a Section 1123(a)(4) violation.  There, the debtors entered into a prepetition restructuring support agreement with certain lenders that agreed to take back debt and received the right to purchase new equity at a discount, while other lenders were excluded from the opportunity to participate.  The court held that this opportunity constituted treatment for the claim within the meaning of Section 1123(a)(4).  Unlike in *Serta*, the court observed, "there was not even any pretense of equal participation." *Id.* at \*10.  Without

-28-

a market test, and without any exchange of value for the opportunity to invest, the court could not find that the favored lenders' backstop justified the different treatment.

73.     Under this case law, the Debtors cannot nominally give all creditors in a class the same treatment, while in reality allocating substantial value to some members of the class but not others.  Moreover, the Debtors cannot provide a valuable opportunity to some creditors to improve their recoveries, especially based on arbitrary, non-Code-based criteria, without offering it to all creditors on the same basis.

74.     But that is exactly what is happening:  Some creditors have been totally excluded from the Preference Settlement (the "Specified Non-Released Parties"); other creditors can be disqualified later for non-Code-based reasons (the "Adverse Conduct" definition), and there is no market test of any kind to test the value being given to the favored creditors, or the value of what the favored creditors are giving to the estate in the form of direct claims.  Indeed, those values may differ enormously—some creditors might have substantial potential preference liability and others may have none; some may have valuable direct claims and others not.

75.     The Plan also violates *Serta* because it functionally reinstates through a "settlement" a type of claim that the Code requires to be disallowed.  Just as the *Serta* uptier participants that benefited from the prepetition indemnity were required to have those claims disallowed until the indemnity became noncontingent (11 U.S.C. § 502(e)(1)(B)), claimants who have benefitted from a preference are required to have their unsecured claims disallowed until the preference has been returned (11 U.S.C. § 502(d)).  Here, by "settling" preference liability with select claimants, the Plan effectively reinstates unsecured claims that the Code otherwise disallows.  *See Serta*, 125 F.4th at 590 (rejecting argument that "a § 1123(b)(3)(A) settlement could . . . resurrect a clearly disallowed claim or related indemnity").

-29-

76.     Beyond all this, the "Preference Settlement" bears no resemblance to a "settlement" that might be permissible under 11 U.S.C. § 1123(b)(3).  The *Jackson Brewing* factors require evaluation of the probability of success in litigation, the complexity of the litigation and its expense, and other factors bearing on the wisdom of the compromise.  *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).  The Debtors have not done that. Instead, by their own admission, the plan proponents wanted to make the Preference Settlement—and in particular the Modified New Value Elements—available to creditors that, in their unsupported view, "acted in good faith," while not allowing "potential 'bad actors' to benefit from the Modified New Value Elements."  Moore Decl. ¶ 29.  "Good faith" or "bad faith" has nothing to do with the "new value" defense or preference liability, and being a "potential bad actor," under a non-statutory definition, is not a basis to discriminate among similarly-situated creditors.  The Debtors have basically admitted that they are entering into the Preference Settlement to choose winners and losers based on arbitrary criteria, not based on litigation risk or the other factors that could justify a settlement under the case law.

## IV.     The Plan impermissibly consolidates the Debtors' estates for certain purposes but not for others.

77.      From the outset of this case, the Creditors' Committee's refrain has been to ask whether First Brands was a business with a fraud attached, or a fraud with a business attached.  It is now clear that the fraud was wide-ranging.  Consistent with that reality, the evidence— confirmed by the Debtors' own admissions—indicates that First Brands did not respect corporate formalities.

78.     Rather than acknowledge the obvious, namely that the corporate distinctions at First Brands were illusory and therefore substantive consolidation is required for all purposes, the Plan is predicated on substantive consolidation for *some* purposes—including distribution of

assets and extending special favors to particular creditors in the context of the Preference

Settlement—but denying substantive consolidation for other purposes.  That is impermissible.

79.     Courts consistently recognize that, whatever else may be true about substantive

consolidation, substantive consolidation "at its core is equity," such that "[i]ts exercise must lead

to an equitable result."  *In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005).  The Debtors

employing substantive consolidation to make their plan confirmable and to extend benefits to

favored creditors, while denying those benefits to certain disfavored creditors, amounts to "a

pretend consolidation" improperly being "used as a sword and not a shield."  *Id.*

A.     **The factual record demonstrates that substantive consolidation is necessary.**

80.     The Debtors' own admissions, as well as the manner in which they have

prosecuted this Plan, demonstrate that substantive consolidation is necessary.

81.     Courts within the Fifth Circuit have generally coalesced on a list of factors that

courts should consider in evaluating whether substantive consolidation is appropriate.  *See In re*

*E'Lite Eyewear Holding, Inc.*, 2009 WL 349832, at *3 (Bankr. E.D. Tex. Feb. 5, 2009); *accord*

*In re Amco Ins.*, 444 F.3d 690, 697 n.5 (5th Cir. 2006) (citing 2 Collier on Bankruptcy

¶ 105.09(1)(d) (15th ed. rev. 2005)); *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 518

(W.D. Tex. 2000).  The factors include:  (1) the degree of difficulty in segregating and

ascertaining individual assets and liabilities; (2) the presence or absence of consolidated financial

statements; (3) the commingling of assets and business functions; (4) the unity of interests and

ownership between the various corporate entities; (5) the existence of parent and intercorporate

guarantees on loans; and (6) the transfer of assets without formal observance of corporate

formalities.  *In re E'Lite Eyewear Holding, Inc.*, 2009 WL 349832, at *3.

82.     Those individual factors are discussed immediately below.  The key purpose of

the factors, however, is that they help answer the question of "(i) whether creditors dealt with the

entities as a single economic unit and did not rely on their separate identity in extending credit . . . . ; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 519 (2d Cir. 1988) (internal quotation marks and citations omitted); *accord Owens Corning*, 419 F.3d at 211.

83. **Segregation of assets and liabilities.** The Debtors have acknowledged that segregating individual assets and liabilities in these cases would be enormously difficult or impossible. Mr. Moore has testified that "[i]t would be impracticable and unduly burdensome to validate the accuracy of the FBG Debtors' intercompany balances due to voluminous transactions that occurred." Moore Decl. ¶ 15.

84. With respect to factoring in particular, the Debtors and their former personnel have admitted facts that would make it nearly impossible to determine which entities actually received stolen factoring proceeds, and thus which entities the factors have claims against for receipt of stolen funds. For example, Mr. Moore claims "that the money received from factoring parties in many instances was cycled back to pay other or the same factoring parties in satisfaction of earlier liabilities." Moore Decl. ¶ 84. It is likely that many debtor entities received the benefit of stolen money from the LAM Parties; the money may have been provided to one entity, but then immediately transferred to another. The same appears to have been true with respect to amounts obtained via the Debtors' other frauds. Moore Decl. ¶ 74. As Mr. Moore testified earlier in these cases, "[t]his company operated in a way that cash was moving around not only amongst all of the First Brands entities, but even outside with SPV entities and entities owned and controlled by Patrick James." Nov. 3, 2025 Moore Dep. Tr. 330:5-330:9.

85. With respect to assets, allocating the value of the Debtors' only material assets— the Estate Claims—is likely impossible. Dollars flowing from First Brands' various fraudulent

money-raising schemes reached many individual entities within the First Brands system.

Determining which estates are entitled to greater or lesser value from particular Estate Claims

likely could not be accomplished in any reasonable manner, to say nothing of potential

intercompany estate claims.  Notably, neither Mr. Moore's nor Mr. Kirschner's declaration even

tries to address the value of the Estate Claims on a debtor-by-debtor basis, instead presenting

potential claims on an aggregate basis.

86.    **Fraudulent consolidated financials.**  First Brands generally functioned by

providing fraudulent financial statements to its counterparties.  Moore testifies that "my team at

A&M uncovered pervasive manipulation and doctoring of the FBG Debtors' financial records."

Moore Decl. ¶ 70.  The Debtors have further admitted that "the Debtors (excluding the SPV

Debtors) ordinarily prepared financial statements on a consolidated basis with their non-Debtor

affiliates," and that "the Debtors' accounting policies, processes, and historical practices were

primarily designed to support consolidated reporting" rather than individual reporting.  Dkt. 1567

at 3–4.

87.    **Commingled assets and business functions.**  The evidence suggests that

pervasive commingling of assets and business functions took place.  Mr. Moore states that "the

Debtors' former management improperly commingled the funds of the FBG Debtors and certain

affiliates in order to conceal their financial misconduct," and that "James commingled First

Brands' business accounts with personal funds . . . and used the Debtors' funds for personal use."

Moore Decl. ¶¶ 73, 145.

88.    **Pervasive control by Patrick James.**  The evidence demonstrates that the entire

First Brands enterprise was controlled by Patrick James and his close associates.  Patrick James

was the 100% direct or indirect owner of every First Brands entity.  The Debtors, agreeing with

the Examiner, have admitted that "First Brands and a network of affiliated SPVs and non-Debtor entities were operated as a single enterprise directed by the Founder and others for the purpose of generating and extracting liquidity through structures that concealed the true perimeter of the business and depleted value available to creditors."  Dkt. 3020 (Disclosure Statement) at 51.

89.     The evidence also demonstrates that certain First Brands regularly purchased entities that were "already owned or controlled, typically through holding companies" by Patrick James "at prices that appear to greatly exceed the value of the underlying assets."  Moore Decl. ¶ 157.  And Patrick James routinely extracted value from First Brands.  Moore Decl. ¶ 177.

90.     **Overlapping guarantees.**  The Debtors' funded debt benefited from guarantees at substantially all First Brands entities.  Disclosure Statement at 30.  Many other creditors had guarantees or joint-and-several liability from multiple entities.  And given the credible allegations of fraud, many creditors likely have overlapping claims for return of funds from multiple entities.

91.     **Lack of corporate formalities**.  The Debtors admit that "the SPV Entities failed to observe corporate formalities and did not in fact operate as discrete corporate entities."  Moore Decl. ¶ 115.  Indeed, the *core mechanic* of the SPV fraud seems to have been purporting to transfer assets to the SPV Entities, but apparently not actually following through on those transactions.  Moore Decl. ¶¶ 117–119.  The Debtors also appear to have routinely made intercompany cash transfers or transfers to Patrick James entities with no respect for formalities, and in many cases with active intent to defraud.  Moore Decl. ¶¶ 73–74, 126, 155.

*     *     *

92.     The bottom line is that, as one would expect in a pervasive fraud case, "Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise *Jarndyce and*

*Jarndyce,* the fictional suit in Dickens' *Bleak House* where only the professionals profited."

*Owens Corning*, 419 F.3d at 211 n.20.  Substantive consolidation is plainly warranted.

> **B.      The Plan impermissibly uses substantive consolidation in a tactical way to benefit some creditors over others.**

93.      The Debtors do not generally dispute that substantive consolidation is warranted. The Plan employs substantive consolidation for purposes of distributing assets of the estates and setting recovery amounts, and *de facto* awards substantive consolidation for purposes of defending against claims by the estate to creditors that opt-in to the Preference Settlement.  But having chosen to use substantive consolidation for those purposes, the Debtors cannot selectively withhold substantive consolidation for other purposes and to other creditors.

94.      As a threshold matter, there is no question that the Plan substantively consolidates in a way that affects the LAM Parties.  LAM TFG negotiated for joint-and-several claims against multiple Debtor entities, including a parent guarantee.  Absent substantive consolidation, LAM TFG would be entitled to recover from each obligor.[26]

95.      By contrast, other creditors have non-guaranteed claims against a single entity. Absent substantive consolidation, those creditors could only recover from those single entities. And, to the extent some entities have stronger Estate Claims than others, those creditors would be only sharing in their obligors' recoveries.  Here, however, the Debtors are not even *attempting* to allocate each estate's share of the Litigation Trust, or to examine any of the inter-debtor claims that may exist, or to evaluate which Debtors may be relatively more valuable than others.

---

[26]  *See, e.g.*, *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund* v. *WithumSmith Brown, P.C.*, 692 F.3d 283, 295–96 (3d Cir. 2012) (stating rule that creditor with claims against multiple estates has right to "recover dividends from each estate in bankruptcy upon the full amount of his claim . . . *until from all sources he has received full payment of his claim*" (emphasis in original) (citation omitted)); *CSI Worldwide, LLC* v. *TRUMPF Inc.*, 944 F.3d 661, 663 (7th Cir. 2019) (Easterbrook, J.) ("Seeking to recover one debt from multiple persons is common and proper."); *In re Ford*, 967 F.2d 1047, 1052–53 (5th Cir. 1992) (declining to disallow joint-and-several liability claims as "contingent").

96.     Accordingly, *absent substantive consolidation*, this Plan could not be confirmed. Among other things, the Plan would violate Section 1123(a)(4) and Section 1129(a)(1) by providing unequal treatment to claims in the same class, because creditors with equally valid claims against a debtor would be treated differently based solely on whether they have claims against another debtor.  The Bankruptcy Code permits disallowance or subordination of claims only on the grounds specified in Section 502 or Section 510; having a claim against multiple debtors is not one of those grounds.

97.     Having taken advantage of the benefits of substantive consolidation in order to satisfy Section 1129's confirmation requirements—and in the process having prevented creditors like LAM TFG from pursuing separate claims against separate entities—the Debtors cannot turn around and preserve their corporate distinctions when it suits them.  As Judge Ambro wrote in *Owens Corning*:

> [P]erhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (*i.e.,* a pretend consolidation for all but the Banks).  **If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place?**  In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, **favor other creditors**, and yet trump possible Plan objections by the Banks.  Such "deemed" schemes we deem not Hoyle.

419 F.3d at 216.[27]

---

[27] This holding of *Owens Corning* has been cited with approval in other cases. *In re Winn-Dixie Stores, Inc.* states that "[i]t is the opinion of the Court that such 'deemed' consolidation can be equated with a company being slightly liquidated, or a person being somewhat bankrupt.  Similarly, consolidation is an either-or scenario.  There is no middle ground." 356 B.R. 239, 252 n.15 (Bankr. M.D. Fla. 2006).  In *In re Geneva ANHX IV, LLC*, the court likewise concluded that a proposed use of substantive consolidation was an impermissible tactical attempt to gain an advantage over a disfavored constituency.  496 B.R. 888, 901 (Bankr. C.D. Ill. 2013) (citing *Owens Corning*); *accord In re Extended Stay, Inc.*, 2020 WL 10762310, at *50 (Bankr. S.D.N.Y. Aug. 8, 2020) (describing *Owens Corning* and *Geneva* as cases where debtors "sought to employ substantive consolidation in furtherance of the confirmation of their respective plans of reorganization, and to the detriment of a targeted group of creditors").

98.     The Preference Settlement further illustrates that the Debtors are using substantive consolidation in a tactical way rather than as a remedy.  Under the Preference Settlement, certain participating creditors are receiving the right to use the "Modified New Value Defense," which, for purposes of calculating subsequent new value under 11 U.S.C. § 547(c)(4), permits them to aggregate all new value given to *any* First Brands entity.  That is another way of saying that the favored creditors get the benefit of substantive consolidation, but other creditors do not.  It is hard to imagine a more straightforward case of a debtor using substantive consolidation with a "primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights."  *Owens Corning*, 419 F.3d at 211.

99.     The Plan, accordingly, must be modified to make clear that the substantive consolidation effectuated by the Plan is substantive consolidation for *all* purposes, including for purposes of avoidance actions and defenses to such actions.

**V.      The Plan impermissibly classifies unsecured deficiency claims separately from other unsecured claims.**

100.    The Plan unfairly distorts the voting process by separately classifying unsecured deficiency claims and other unsecured claims.  Gerrymandering of this sort is inconsistent with Fifth Circuit authority, which provides that similar claims may not be classified separately absent a legitimate justification.

101.    Section 506(a) of the Bankruptcy Code provides that an allowed claim is secured only to the extent of the value of the creditor's interest in the debtor's interest in property, with the balance being an unsecured deficiency claim.  There is no dispute that the claims in Class 4 and 5 (the prepetition First Lien Claims) are wholly unsecured claims.  With respect to the claims in Class 6 (the ABL Lenders), those claims are either not impaired (because the ABL Lenders are taking over their collateral to the extent of the secured portion of their claim) or are

-37-

likewise unsecured deficiency claims.  Moreover, the ABL Lenders do not have collateral at every entity, so at least at some entities the ABL Lenders have only deficiency claims.

102.    Where one group of unsecured creditors is placed in a different class from other unsecured creditors, the plan proponents bear the burden of proving that voting classes in a plan are appropriately designed.  *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).  The Fifth Circuit has articulated "one clear rule" of claim classification under Section 1122 of the Bankruptcy Code:  "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."  *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991).

103.    In their response to Interrogatory 12 from the LAM Parties' First Set of Interrogatories in Connection with Plan Confirmation, the Debtors seek to justify separate claims classification on the basis that "the Claims in Classes 4, 5, and 6 arise out of different credit agreements with the Debtors, whereas the Claims in Class 7 are general unsecured claims" and so the "holders of such claims have different legal rights against the estates."  Dkt. 3210 Ex. G at 22.

104.    But that is precisely the rationale that was rejected in *Greystone III*.  *In Greystone III*, the debtor attempted to separately classify an undersecured lender's deficiency claim from the claims of general unsecured trade creditors.  *Greystone III*, 995 F.2d at 1277.  The Fifth Circuit concluded that the debtor's scheme was impermissible and that substantially similar claims may be separately classified only where a legitimate justification exists that is independent of the debtor's desire to obtain a favorable vote on confirmation.  *Id.* at 1279.[28]

---

[28] Other courts agree.  *See In re Bos. Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994) ("[S]eparate classification of unsecured claims solely to create an impaired assenting class will not be permitted."); *Granada Wines, Inc.* v. *New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984) ("The general rule regarding classification is that 'all creditors of equal rank with claims against the same property should

105. The rationale sometimes advanced for separate classification is that certain creditors possess a unique stake in the future operations of the reorganized debtor, such as a continuing trade relationship or another non-creditor interest in the reorganized enterprise. *See, e.g.*, *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993). Here, the Debtors have wound down their operations and are liquidating their remaining assets, which consist of litigation claims. There is no basis to classify separately based on an ongoing business.

106. Accordingly, because the Debtors have not identified any legitimate basis to classify unsecured deficiency claims separately from other unsecured claims, the Court should reject the Debtors' proposed classification and deny confirmation.

## VI. The Plan should not be confirmed for other reasons as well.

### A. The definition of "Estate Claims" is overbroad.

107. The Plan's definition of "Estate Claims," which are being sold and subject to the Plan Injunction, sweeps broader than Fifth Circuit precedent. As Judge Isgur recently explained, "[c]ourts in this Circuit engage in an injury-focused analysis when determining whether a creditor's claim belongs to the bankruptcy estate," which "focuses on whether the debtor could have raised the claim as of the commencement of the case." *In re Wesco Aircraft Holdings, Inc.*, 2024 WL 156211, at *4 (Bankr. S.D. Tex. Jan. 14, 2024) (citing *In re Buccaneer Res., L.L.C.*, 912 F.3d 291, 293–94 (5th Cir. 2019) and *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008)). "A claim does not belong to the estate merely because the debtor has also been

---

be placed in the same class.") (citation omitted); *In re Bryson Props., XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) ("[C]lassification [that] is clearly for the purpose of manipulating voting [] may not stand."); *John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159–60 (3d Cir. 1993) (Alito, J.) (finding that deficiency claims were not sufficiently distinct from trade creditors to be placed in different classes and citing *Greystone III* with approval); *In re Lumber Exch. Bldg. Ltd. P'ship*, 968 F.2d 647, 649 (8th Cir. 1992) (same); *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996) ("We agree with the principles enunciated in the *Greystone III* line of cases, that is, absent legitimate business or economic justification, it is impermissible for Debtor to classify [a] deficiency claim separately from general unsecured claims.").

harmed by the same series of events," and the estate and the creditor "may have separate claims against a third party arising out of the same events." *Id.* (citations omitted).

108.     The definition of "Estate Claims," as used in the Plan, does not conform to those limitations.  Plan at 14.  Among other things, the definition purports to include any claim "that is duplicative of an Estate Claim" or any other claim "that is in substance an Estate Claim." *Id*. But the mere fact that a creditor and the estate may have apparently duplicative claims does not mean that the claim is only assertable by the estate, in particular if the claim is not one that the debtor itself could have asserted pre-bankruptcy.  The definition of Estate Claims should be amended to conform with controlling precedent:  claims that the Debtors could have asserted pre-bankruptcy, plus the avoidance claims set out in Chapter 5 of the Bankruptcy Code.

**B.       Section 9.11(b)'s treatment of setoff rights lacks any basis.**

109.     Section 9.11(b) of the Plan purports to require entities with potential rights of setoff against the Debtors to file a motion before the Confirmation Date or lose their rights. There is no legal basis for that.  Section 553 provides that, with exceptions not applicable here, the Bankruptcy Code "*does not* affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553(a).  The Plan departs from Section 553:  it purports to affect rights of setoff outside of the specific Code-based grounds.  The provision is also unfair to creditors that hold setoff rights, because even the existence of a right of setoff may not even be apparent until the estate asserts affirmative claims as to which a setoff or similar right may exist.

**C.       The sale of Estate Claims must conform to applicable transfer restrictions.**

110.     Section 363 does not authorize overriding state law restrictions on transferability of estate property. *See In re 23andMe Holding Co.*, 674 B.R. 487, 504–05 (Bankr. E.D. Mo.

-40-

2025), *appeal docketed*, No. 25-cv-999 (E.D. Mo. July 7, 2025); *Integrated Solutions, Inc.* v. *Service Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997); *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir. 1987).  That rule applies to restrictions on assigning or transferring state-law causes of action.  *See Crabtree* v. *Allstate Property & Casualty Ins. Co.*, 140 F.4th 623, 625–26 (5th Cir. 2025); *In re J.E. Marion, Inc.*, 199 B.R. 635, 637 (Bankr. S.D. Tex. 1996).  Sections 6.2(a) and (b) of the Plan appear to attempt to override such restrictions.  To conform with Section 363, the confirmation order should make clear that, as to state-law claims, state-law defenses based on the permissibility of an assignment are fully preserved.

111.    Sections 6.2(f) and (g) of the Plan also impermissibly seek to override transfer restrictions, in this case with respect to effects on privileged information.  Section 6.2(f) states that, pursuant to Fed. R. Evid. 502(d), privileges are not waived by the transfer of information to the Litigation Trust.  Section 6.2(g) provides that under Fed. R. Evid. 502(b), inadvertent disclosure of privileged information held by the Litigation Trust does not waive privilege.  Neither Fed. R. Evid. 502(b) nor (d) authorize that relief.  The Statement of Congressional Intent accompanying the passage of Rule 502 makes clear that Rule 502(d) "authorizes a court to enter orders only in the context of litigation pending before the court," "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege," and "is designed to enable a court to enter an order . . . that will allow the parties to conduct and respond to discovery expeditiously, without the need for exhaustive pre-production privilege review."[29]  Rule 502(d) has no application to information transfers in connection with a sale of claims.  Similarly, Rule 502(b) applies to inadvertent disclosures "made in a federal proceeding;" it too has no

---

[29] *Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817 (2008); *accord Holloway* v. *Wells Fargo Bank, N.A.*, 2013 WL 6912690, at *1–2 (N.D. Tex. Dec. 30, 2013) ("Rule 502(d) was intended to protect disclosures made in the context of discovery").

application outside of an active discovery process.  Under Section 363, the effect of the sale of claims and transfer of information on privilege must be determined under applicable law, not inapplicable provisions of the Federal Rules of Evidence.

## Reservations of Rights

112.    Discovery is ongoing.  The Debtors produced thousands of documents in the days before this objection is being filed, they have not yet provided a privilege log, and deposition discovery has not commenced.  Substantial discovery disputes remain open and subject to a pending motion to compel.  The LAM Parties reserve the right to amend and supplement this objection based on discovery and other developments.

113.    The LAM Parties also object to the Disclosure Statement on the same grounds as this Confirmation Objection.

114.    The LAM Parties reserve the right to join any other objection filed in connection with the Confirmation Hearing.

## Conclusion

115.    For the reasons set forth above, the LAM Parties respectfully request that the Court deny confirmation of the Plan.

-42-

Dated:  July 20, 2026
Houston, Texas

/s/  Paul E. Heath

**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
845 Texas Avenue, Suite 4700
Houston, TX  77002
Tel:  713.758.2222
Email: pheath@velaw.com
        mstruble@velaw.com

**WACHTELL, LIPTON, ROSEN & KATZ**
Emil A. Kleinhaus (admitted *pro hac vice*)
Michael H. Cassel (admitted *pro hac vice*)
Angela K. Herring (admitted *pro hac vice*)
51 West 52nd Street
New York, NY  10019
Tel:  212.403.1000
Email: eakleinhaus@wlrk.com
        mhcassel@wlrk.com
        akherring@wlrk.com

***COUNSEL TO LAM PARTIES***

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Matthew D. Struble*
One of Counsel

-43-