**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| FIRST BRANDS GROUP, LLC, *et al.*, | ) Case No. 25-90399 (CML) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |
| | ) **Re: Docket No. 2981** |

**EVOLUTION'S OBJECTION TO JOINT CHAPTER 11 PLAN**
**OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**

Evolution[2] hereby submits this objection (this "Objection") to confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 2981] (as amended, modified, or supplemented from time to time, including by the Plan Supplement,[3] the "Plan").[4]  In support of this Objection, Evolution respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      These chapter 11 cases began as one of the largest reported frauds in history and have only continued to deteriorate post-petition.  The Debtors accrued astronomical administrative expenses and professional fees while their operations crumbled. They then failed to sell their assets as a going concern, and ultimately were forced to liquidate.  Instead of converting these cases to chapter 7 as they long ago should have, the Debtors propose another unconfirmable Plan. With

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] "Evolution" shall mean, individually and collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[3] The "Plan Supplement" shall refer to Docket No. 3049, as may be amended, modified, or further supplemented from time to time.

[4] Capitalized terms used herein but not defined shall be given the meaning ascribed them in the Plan.

nowhere left to turn to finance the Plan, the Debtors perpetuate the same "scheme" they claim resulted in these Chapter 11 Cases—seeking assets from one set of victims to pay others they favor. The Plan relies upon strained interpretations of the Bankruptcy Code and its confirmation requirements, and cannot be confirmed.

2.      On the effective date of a chapter 11 plan—the date the transactions in the Plan are implemented and become binding upon all parties in interest—the Bankruptcy Code requires the debtor to pay all its administrative expenses in full. Knowing they cannot meet this requirement, the Debtors ask this Court to simply pretend the effective date will not occur until after they have irrevocably transferred all assets to their favored lenders—regardless of whether the Plan ever becomes actually effective—with effectiveness dependent on obtaining judgments and recovering over $1.9 billion in net proceeds through litigation. In other words, the Plan "goes effective" in all but name upon confirmation—irreversibly vesting all assets in the Plan Trusts—while leaving administrative creditors and other claimants dependent on uncertain litigation recoveries for payment that may never come from insiders of questionable creditworthiness and other fraud victims of questionable liability.

3.      Among other things, under the Plan, on or shortly after the Confirmation Date:

- The Debtors "shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction" and "the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets," irreversibly vesting the Debtors' core assets in the Litigation Trust, DIP Collateral Trust, and ABL Collateral Trust, respectively (Plan § 5.3);

- Participating creditors who entered into the Preference Settlement "shall be deemed to have, without any further action, automatically and irrevocably transferred [their Direct Claims] to the Litigation Trust (without recourse and free and clear . . .)" (Plan § 6.2(a));

- The Litigation Trust will be funded by the participating lenders with $75 million (including $50 million of new financing) (Plan § 6.3(a));

- The remainder of the Debtors' assets shall vest in the Wind Down Administrator (Plan § 5.3(vi));

- Broad releases, injunctions, and exculpation will be granted and become effective (Plan §§ 13.3-6);

- The Wind Down Administrator will be authorized to conduct the Wind Down "without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules" (Plan § 5.7(a)); and, of course,

- The Debtors' and lenders' professionals will be paid in full in an amount exceeding $245 million on account of their administrative claims (*See* Docket No. 2670, ¶ 16).

4.     As a result, the DIP Secured Parties and ABL Secured Parties immediately gain irrevocable control of all the Debtors' assets through the Plan Trusts, without recourse to the estates should the Plan not be consummated. The Debtors' and lenders' professionals will also be paid in full. And yet, other administrative expense creditors who involuntarily financed these chapter 11 cases must sit back and wait on the prayer that the Estate Causes of Action will be litigated to final judgments worth nearly $2 billion, that such judgments will be enforceable and recoverable, and eventually distributed to creditors.

5.     The Debtors argue it will be relatively easy to recover $2 billion, representing "only 8%" of the assessed assertable value of their claims and causes of action, relying upon the Confirmation Declarations.[5]  As a result, the Debtors assert the Plan effective date can occur within 18 months of the Confirmation Date.  This assumption relies on the accuracy of the Debtors' views regarding (a) the allowable amount of administrative expense and other priority claims required to be paid, (b) the value of their claims and causes of action, and (c) the collectability of sufficient amounts. The Confirmation Declarations' lofty promises are not supported by the facts and are

---

[5] The "Confirmation Declarations" shall refer collectively to (a) the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* [Docket No. 3188] (the "Moore Declaration"), and (b) the *Declaration of Marc S. Kirschner* [Docket No. 3190] (the "Kirschner Declaration").

3

insufficient to sustain the Debtors' burden of proof. Among other things, the Kirschner Declaration (i) double counts claims and potential recoveries, (ii) fails to account for potential applicable defenses, (iii) includes claims and causes of action owned by non-FBG Debtors, (iv) hand-waves away questions of collectability, and (v) provides no analysis or basis for the projected 2028 effective date.

6.      If the Confirmation Declarations prove overly optimistic, there is no recourse—administrative and general unsecured creditors receive ***nothing*** while the DIP Lenders and ABL Lenders retain possession of all the Debtors' assets transferred upon confirmation, benefit from valuable releases, and move on free of Court oversight. The Bankruptcy Code does not permit a Plan to be confirmed on the basis of a pipe dream, and that is what the Confirmation Declarations and the Plan describe.  For that reason, and as set forth in greater detail herein, the Court should not confirm the Plan.

**RELEVANT BACKGROUND**

**A.      Commencement of the Chapter 11 Cases**

7.      On September 24, 2025 (the "SPV Petition Date"), the Evolution SPV Debtors (as defined below), together with certain affiliates, each filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code. On September 28, 2025 (the "FBG Petition Date" and collectively with the SPV Petition Date, the "Petition Dates"), First Brands Group, LLC and the remainder of the Debtors (i.e., the non-SPV Debtors, the "FBG Debtors") followed suit, each filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      Evolution's numerous financial relationships with the Debtors, their special-purpose vehicle subsidiaries (the "Evolution SPV Debtors"), the accounts receivable and supply chain financings they provided, and the post-petition disputes that ultimately resulted in the

conversion of the Evolution SPV Debtors' chapter 11 cases to chapter 7 are well known to the Court. They are described in detail in *Evolution's Objection to Disclosure Statement for Chapter 11 Plan of Premier Marketing Group, LLC* [Docket No. 2629, ¶¶ 8-19] and are incorporated herein by reference.

9. As described in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [Docket No. 22] (the "First Day Declaration"), the Debtors entered chapter 11 having admitted to fraudulently duplicating and fabricating invoices under their third-party factoring program and defrauding creditors of up to $2.3 billion. First Day Decl., ¶¶ 72, 94–95. Evolution was among those defrauded, losing hundreds of millions of dollars.

**B.      The Plan—Effective Immediately, Except Where Inconvenient**

10. On April 29, 2026, the Debtors, the Ad Hoc Group, and the Creditors' Committee first announced a "Global Settlement" to be implemented through a chapter 11 plan for a single debtor, and enforced upon the creditors of the remaining FBG Debtors. That same day, the Debtors filed an emergency motion seeking conditional approval of the Disclosure Statement and scheduling a combined hearing on final approval and confirmation for May 29, 2026. [Docket No. 2546].

11. On May 26, 2026, this Court denied conditional approval of the Disclosure Statement. Docket No. 2814. The Court expressed concern, among other things, that the single-Debtor plan structure was inappropriate because the settlement "decides what assets stay in 111 other estates," meaning "the creditors most affected by the settlement wouldn't be the ones casting votes on the plan."

12. Following the Court's ruling, the parties revised their approach. On June 12, 2026, the Court conditionally approved the Disclosure Statement and scheduled the Combined Hearing

for July 28, 2026.  Docket No. 2990.  The Debtors then filed revised versions of the Plan and Disclosure Statement on June 17, 2026.  Docket Nos. 3021-1, 3021-2.  On June 23, 2026, the Debtors filed the Plan Supplement, which included, among other things, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, the ABL Collateral Trust Agreement, and the Schedule of Specified Non-Released Parties.  Docket No. 3046; *see* Plan Supp., Ex. 4, 6-8.

13.     Under the revised Plan, upon entry of the Confirmation Order—not the Effective Date—all of the FBG Debtors' assets will be transferred to the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust (collectively, the "Plan Trusts"). Plan, §§ 6.2, 7.2, 8.2. Specifically, the FBG Debtors "shall be deemed to have, without any further action, automatically and irrevocably granted, released, transferred, conveyed, assigned and delivered" all assets to the applicable trusts "without recourse and free and clear of all Liens, Claims, encumbrances and Interests."  *Id.*  Title to these assets will vest in the trusts upon the Confirmation Date, with all transactions becoming binding on all parties.  Plan, §§ 5.11, 13.1, 15.11.

14.     The DIP Secured Parties and ABL Secured Parties, through the Plan Trusts, will immediately receive title to, and begin to be repaid from, the Debtors' physical assets, including all warehouses, inventory, accounts receivable, and intellectual property. The Wind-Down Administrator will receive title to the remainder of the Debtors' assets to administer and liquidate without further Court oversight or need to conform to the Bankruptcy Code and Bankruptcy Rules. Plan § 5.7(a). The chapter 11 professionals and lender professionals will be paid in full. Plan § 2.3.

15.     Nonetheless, the Plan will not "go effective" until the Litigation Trust has recovered at least $1.9 billion to pay administrative claims in full.  Plan, Art. XII, § 12.1(o); *see also* Disclosure Statement at 21–22 ("holders of Class 3 Litigation Trust Interests would receive no recoveries until Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims were repaid in full in accordance

with the Litigation Trust Waterfall. This would require approximately $1.9 billion in aggregate distributions to be made before holders of Class 3 Litigation Trust Interests begin to recover.").[6]

16.     Moreover, the Plan is revocable by the Debtors at will prior to the Effective Date, but there is no explanation of what would happen in that scenario.  Plan, § 15.7. The trust agreements do not provide for return of assets to the Debtors' estates or conversion to Chapter 7 in the event the Plan fails to go effective.  Instead, the DIP Secured Parties and ABL Secured Parties would simply retain possession of the assets transferred upon confirmation, with no recourse to other creditors.  *See* Plan, §§ 7.2, 8.2; ABL Collateral Trust Agreement, § 2.4(a).

### C.      The Debtors' Purported Path to Effectiveness

17.     The Debtors rely upon the Confirmation Declarations to support their contention that the Plan is feasible and has a reasonable likelihood of being consummated.  The Moore Declaration provides a purported description of the lengthy, involved, and sophisticated "Scheme" conducted by the Debtors' management in defrauding investors. The Kirschner Declaration, in turn—without any analysis of litigation timelines, schedules, or other contingencies, delays, or hurdles—opines that the causes of action associated with the Scheme will generate at least $2 billion by the end of 2028. Kirschner Decl., ¶ 21.

18.     <u>The Asserted Scheme Describes Evolution as a Victim, Not a Participant</u>. The Debtors' Scheme began in 2018 and continued until Evolution's diligent questions and requests for information regarding its collateral ultimately led to its unraveling, as the Evolution SPV

---

[6] The Disclosure Statement provides that all Administrative Expense Claims would be paid in full, with holders of Priority Tax Claims recovering approximately $19 million upon recovering $1.85 billion of distributable proceeds. The Disclosure Statement further provides that all Priority Tax Claims and Other Priority Claims will be paid in full at distributable proceeds of $1.92 billion, a $70 million difference between measurement points.  *See* Disclosure Statement, Ex. F at 9.  The Disclosure Statement thus projects only $89 million of Other Priority Claims and Priority Tax Claims, an estimate that is facially questionable when the United States alone has filed a $285 million tariff-related claim.  Proof of Claim No. 2059.

Debtors filed for bankruptcy, followed within days by the FBG Debtors. According to the Moore Declaration, the Debtors operated the Scheme by:

> (a) fabricating financial statements to misrepresent the FBG Debtors' dire financial condition; (b) fabricating accounts receivable to obtain cash from third party factoring parties; (c) fabricating supplier and vendor payables to obtain cash from supply chain financing ("SCF") parties ("SCF Lenders"); and (d) causing inadequately capitalized special purpose vehicles (each, an "SPV Entity" and collectively, the "SPV Entities") to enter into inventory and equipment financing facilities to obtain cash where: (i) the assets of such SPV Entities were of insufficient value to perform under the financing documents (e.g., to purchase inventory for fair value and sell it for a far greater amount required to replace the inventory and service the debt); (ii) existing lender collateral was purportedly double pledged or sold without notice or compensation to those lenders; and (iii) the resulting billions of dollars was concealed from FBG's existing lenders and other stakeholders.

Moore Decl., ¶ 59. The Debtors estimate approximately $25.4 billion of aggregate transfers were made in the four years leading up to the Petition Date from the Debtors to their Third-Party Factors ($15.3 billion), SCF Lenders ($4.7 billion), SPV Lenders ($2.5 billion), Insiders ($988 million), and other Insider-related acquisitions ($2 billion), and believe these amounts may be recoverable by the Litigation Trust. *Id.*, ¶ 61.

19.     The Moore Declaration describes substantial allegations regarding the knowledge and purported involvement of certain Third-Party Factors, SCF Lenders, and SPV Lenders in furtherance of the Scheme, describing "red flags" available to certain Third-Party Factors,[7] SCF Lenders,[8] and SPV Lenders.[9]  While Evolution will leave to each relevant counterparty to respond

---

[7] Moore Decl., ¶¶ 85-94 (describing material informational discrepancies and due diligence blind spots asserted to be known by Katsumi, Jefferies, and LAM).

[8] Moore Decl., ¶ 101 (describing information asserted to be known by SCF platform PrimeRevenue).  Evolution was not an SCF Lender through the PrimeRevenue platform.

[9] Moore Decl., ¶¶ 128-138 (describing documentary deficiencies in SPV Lender documentation that allegedly should have put SPV Lenders on notice of the fraudulent nature of the financing involved, including for Aequum and CarVal that the purported inventory purchase agreements "were executed but contained *no purchase price and no schedule of assets or inventory*").

to allegations made against them, the Moore Declaration is more notable to Evolution for what it *does not* allege:

    a.   There is no allegation Evolution had any information as a Third-Party Factor that would have put it on notice of the Scheme. Instead, the Moore Declaration readily admits 100% of Evolution's factored invoices were fraudulently created by Debtors' management to induce Evolution's loans. Moore Decl., ¶ 95 (describing $8 billion of payments to LAM and Katsumi "in furtherance of the Scheme" and none to Evolution).

    b.   There is no allegation the LiquidX SCF platform in which Evolution participated had any information that the invoices submitted to its program may have been fraudulent.  Moore Decl., ¶ 102 (describing PrimeRevenue's awareness of employee-generated invoices without asserting any other SCF Lenders were on notice of the purported Scheme).

    c.   There are also no allegations or evidence that Evolution or the Evolution SPV Borrowers benefited from the Scheme, round-tripped payments to their benefit, or had any reason to know of the Scheme. While the Moore Declaration alleges Carnaby and Onset participated in or furthered the Scheme, round-tripped payments to themselves, and were aware that the inventory being financed was not validly purchased because there were no SKU-detail schedules and pricing information, the Debtors simultaneously assert liability against Evolution for protecting itself in exactly the manner described, by requiring SKU-level detailed documents, which were ultimately fraudulent. Moore Decl., ¶¶ 121-23.

20.    Simply put, as to Evolution, the Moore Declaration includes nothing more than a generic description of being a fraud victim. Indeed, as the Debtors have acknowledged, Evolution's inventory lending program with the Evolution SPV Lenders worked as intended for a period of time. *See* First Day Decl., ¶ 61 (acknowledging the Evolution SPV Debtors "collectively held approximately $376 million in inventory" as of August 2, 2025).  And when Evolution's diligence requests began to uncover the fraud, Evolution terminated its lending programs with the Debtors, and the Evolution SPV Debtors filed the first of these Chapter 11 Cases on an emergency basis.

21.    Ultimately, like the other SPV Lenders, Evolution lost money on its investment and financing of the SPV Debtors.  *See* Moore Decl., ¶ 103 (noting the SPV Lenders "advanced approximately $2.73 billion that flowed through the SPV Entities" and "received transfers from

the FBG Debtors, through the SPV Entities as intermediaries, of approximately $2.4 billion"—an aggregate loss of over $300 million).  For Evolution specifically, over $230 million of principal balance remains outstanding on its loans to the Evolution SPV Debtors.

22.     Nonetheless, without accounting for any potential defenses and without any further justification for their assertions, the Moore Declaration purports to identify $350 million of recoverable payments made to Evolution.  Moore Decl., ¶ 61.

23.     <u>The Kirschner Declaration's Flawed Premises</u>. The Kirschner Declaration identifies up to $25.4 billion of potential estate claims[10] based on the aggregate amount of transfers made from the Debtors as set forth in the Moore Declaration (*see* Kirschner Decl., ¶ 31; *supra* ¶ 18).  Kirschner relies on this headline total to support his assertion that $2 billion would be recovered by the end of 2028, but this total wildly misrepresents the potential amounts actually recoverable by any litigation trustee. Among other things:

   a.  The Kirschner Declaration relies entirely upon the facts set forth in the Moore Declaration, and thus suffers from the same deficiencies, including that no evidence exists or is offered to support $350 million of asserted potential claims against Evolution;

   b.  The Kirschner Declaration's valuations hinge upon the premise that all transfers between the FBG Debtors and their Third-Party Factors, SCF Lenders, and SPV Lenders are subject to clawback as a result of the "Ponzi Scheme Presumption," ignoring potentially applicable defenses, including good faith recipient, return of principal, new value added, ordinary course of business, and other defenses not discussed or accounted for.  Kirschner Decl., ¶¶ 34-39; 73-76.[11]

---

[10] This despite the Debtors having valued and marketed the estate claims and causes of action as approximately $2.7 billion when soliciting purchasers. *See generally* Disclosure Statement, Ex. E (Marketing Materials) (describing the complaint against Patrick James alleging damages, "including alleged transfers of more than $700 million between 2018 and 2025" and the complaint against Onset where the Debtors seek to "avoid and recover more than $2 billion in alleged actual and constructive fraudulent transfers under chapter 5 of the Bankruptcy Code").

[11] Notably, once again, not a single evidentiary assertion is made in these paragraphs relating to Evolution. Nonetheless, Kirschner asserts his statements support over $350 million of recoverable transfers from Evolution relating to its Third-Party Factoring and SCF Lending programs (Kirschner Decl., ¶ 61) and SPV Lending activities (*Id.*, ¶ 86).

c. The Kirschner Declaration describes up to $830 million of claims relating to transfers made to Patrick James and other Insiders, but concedes that a substantial number of these transactions occurred through the SPV Debtors and may give rise to claims held not by the FBG Debtors, but by the separately administered and non-Plan proponent SPV Debtors, which are not included within the Estate Claims administered by the Litigation Trust. Kirschner Decl., ¶¶ 92-100.

d. The Kirschner Declaration baselessly assumes that, because Insiders received avoidable transfers, they are equally capable of repaying such amounts and are not currently judgment proof. Kirschner Decl., ¶ 145. While the Kirschner Declaration notes "significant D&O proceeds [] may be available to satisfy Insider Claims against the Jameses," coverage does not exceed $190 million, less than 20% of the claimed damages from Insiders.

## OBJECTION

24.     Regardless of convenience or creditor support, it is unquestionable law that every plan must comply with the Bankruptcy Code.[12]  The Court has a "mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation," including those enumerated in Section 1129(a). *See In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988).  And while the Bankruptcy Code provides substantial benefits to debtors, it likewise provides important creditor protections "such as the right to receive payment in full of administrative priority claims on the effective date of the plan (§ 1129(a)(9)), and expectations, such as the requirement that the plan must provide creditors with at least as much as they would receive in a chapter 7 liquidation (§ 1129(a)(7)), and the requirement that the plan must be feasible (§ 1129(a)(11))." *In re Good*, 428 B.R. 235, 242 (Bankr. E.D. Tex. 2010).

25.     For the reasons set forth below, the Court cannot confirm the Plan, as it does not satisfy the confirmation requirements set forth in Section 1129(a).  Namely, the Plan fails to satisfy

---

[12] It is not surprising that each Debtor will have multiple impaired accepting classes of creditors from the Term Loan Secured Parties and ABL Secured Parties who will obtain all of the Plan's benefits and protections immediately, and who were involved in crafting the Plan.

the Bankruptcy Code's requirements that (i) administrative expense claimants be paid in full in cash as of the effective date of the plan (Section 1129(a)(9)(A)), and (ii) the liquidation plan set forth in the Plan be feasible (Section 1129(a)(11)).

**A.    The Plan Cannot be Confirmed Because it Fails to Pay Administrative Expenses and Priority Tax Claims as Proscribed by the Bankruptcy Code.**

26.    The Debtors' Plan asks this Court to answer a simple question: when does a chapter 11 plan become effective under the Bankruptcy Code? Is it the date the debtor files a notice of effective date, reciting the magic words to "effectuate" the plan, or is it something more? The Debtors posit the former, asking the Court to ignore the plain meaning of the term to find in their favor and confirm the Plan.

27.    Although the term "effective date" is not defined in the Bankruptcy Code, "[t]he effective date is usually understood as the 'date on which the provisions of a plan of reorganization become effective and binding on the parties.'" *Id.* at 244. As one recent bankruptcy court opined, "the effective date of the plan marks the dividing line between the time when the debtor is 'in' bankruptcy and the date when it emerges from bankruptcy protection." *In re Smallhold, Inc.*, 675 B.R. 313, 317-18 (Bankr. D. Del. 2025) (CTG).

28.    Here, upon confirmation of the Plan, every transaction is consummated and irreversibly binding upon all parties. Among other things, on the Confirmation Date:

- The Debtors "shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction" and "the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets," irreversibly vesting the Debtors' most valuable assets in the Litigation Trust, DIP Collateral Trust, and ABL Collateral Trust, respectively (Plan § 5.3);

- Participating creditors who entered into the Preference Settlement "shall be deemed to have, without any further action, automatically and irrevocably transferred [their Direct Claims] to the Litigation Trust (without recourse and free and clear . . .)" (Plan § 6.2(a));

12

- The Litigation Trust will be funded by the participating lenders with $75 million (including $50 million of new financing) (Plan § 6.3(a));

- The remainder of the Debtors' assets shall vest in the Wind Down Administrator (Plan § 5.3(vi));

- Broad releases, injunctions, and exculpation will be granted and become effective (Plan §§ 13.3-6);

- The Wind Down Administrator will be authorized to conduct the Wind Down "without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules" (Plan § 5.7(a)); and

- The Debtors and lender professionals will be paid in full in an amount exceeding $245 million (*See* Docket No. 2670, ¶ 16).

29.     Under any definition of the term, the Plan becomes effective as of the Confirmation Date.  All transactions contemplated by the Plan will have occurred, binding on all parties. The entities and corporate structures contemplated by the Plan will be established. The Debtors' remaining assets will vest in the Wind-Down Administrator outside the Court's jurisdiction. The Debtors will no longer be "in" bankruptcy.

30.     Despite the above, the Debtors ask this Court to pretend the effective date will not occur until the Litigation Trust has not only been created, funded by the Litigation Funding Parties, and vested with the Estate Causes of Action under the Plan, but also until the Litigation Trustee has taken custody of the Debtors' books and records, hired counsel, filed complaints against counterparties, conducted discovery and litigated those complaints, received a judgment under a final non-appealable order, and executed on such judgments until the Litigation Trust has recovered $2 billion.  Plan § 12.1(o).

31.     In the intervening years between the Confirmation Date—when the DIP Secured Parties and ABL Secured Parties begin to recover on their claims and obtain control of all the Debtors' assets—and the supposed Effective Date, when such lenders will have recovered enough to be willing to share, the Bankruptcy Code offers no protections, and neither does the Plan. If the

Plan fails to become effective due to insufficient litigation recoveries, the estates' assets and oversight of this Court will be long in the rearview mirror.

32. For the reasons set forth above, the Plan becomes "effective" under any applicable definition on the Confirmation Date. As a result, the Plan cannot be confirmed because it violates Section 1129(a)(9) and fails to provide for payment in full in cash of administrative expense claims on the effective date.

33. Notwithstanding the foregoing, if the Debtors are correct the Plan does not "go effective" until such unknown date in the future when the Litigation Trust has recovered approximately $2 billion of distributable proceeds, then Plan confirmation must nonetheless be denied as the Plan does not provide for a feasible transaction.

**B.      The Plan Cannot Be Confirmed Because It Relies Upon Unfeasible Transactions and Overinflated Projections of Potential Recoveries**

34. Section 1129(a)(11) requires a debtor to prove, by a preponderance of the evidence, that a Chapter 11 plan is feasible.  The Fifth Circuit does not require a debtor's plan to guarantee success, but it does require a "reasonable assurance of commercial viability" and a "reasonable probability of success." *Fin. Sec. Assurance v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997).  Consistent with that standard, courts have recognized that liquidating Chapter 11 plans remain subject to § 1129(a)(11)'s feasibility requirement, which is satisfied only where the liquidation itself is feasible rather than contingent on speculative future events.  *Compare In re Robertshaw US Holding Corp.*, 662 B.R. 300, 321 (Bankr. S.D. Tex. 2024) (confirming liquidating plan because funding and implementation were sufficiently certain), and *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311–12 (Bankr. N.D. Tex. 2007) (finding plan feasible because implementation was not dependent on future uncertain events), *with In re Premiere Network Servs., Inc.*, 2005 Bankr. LEXIS 2298, at *13–18 (Bankr.

N.D. Tex. July 1, 2005) (denying confirmation where the plan's implementation depended on speculative future funding and litigation).

35.     The Plan proposed by the Debtors fails to satisfy this standard because it relies upon home-run litigation recoveries before it can even admit to becoming effective.  Certainly, bankruptcy courts can and regularly do approve plans where recoveries depend upon litigation outcomes.  But that is not the case here.  Instead, the Plan's *effectiveness* and implementation are contingent not only on whether the Litigation Trust can obtain judgments for nearly $2 billion, but also on whether it can recover such vast sums. The Plan should not be confirmed where "the successful performance of [the Plan's] terms" are "dependent or contingent upon any future, uncertain event." *Heritage*, 375 B.R. at 311–12; *see also In re Am. Cap. Equipment, LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("[a] plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.").

36.     If the Plan is ultimately unable to go effective, creditors of the Debtors and their estates have no recourse to recover the transferred assets.  Plan § 13.1.  If the Litigation Trust Funding runs dry, the Estate Claims are not returned to the benefit of the Debtors, and the Direct Claims are not restored to contributing creditors.  The DIP Secured Parties and ABL Secured Parties will maintain title to all the Debtors' assets through the Plan Trusts. The professionals will not be required to disgorge any of the payments they will receive on the Confirmation Date. But administrative expense creditors will be left holding the bag once again as the Plan fails to be implemented. This is precisely the outcome the Bankruptcy Code seeks to prohibit. The Debtors propose to "circumvent the [Bankruptcy] Code's procedural safeguards" by obtaining irrevocable distributions of Debtor assets in violation of the Bankruptcy Code's distributive principles

pursuant to a Plan that will never become effective.  The Court cannot confirm the proposed Plan. *See Czyzewski v. Jevid Holding Corp.*, 580 U.S. 451, 468 (2017).

37.     The Debtors Vastly Overstate Potential Litigation Claim Values.  The Confirmation Declarations purport to paint a picture of more than $25 billion in recoverable avoidance actions, seemingly implying that the Court should not worry about the inherent uncertainty of litigation in assessing the Plan's feasibility. But the facially evident issues with the Debtors' assessments of potential claim values give rise to substantial questions regarding the Plan's likelihood of success and weigh against confirmation.

38.     "Although § 1129(a)(11) does not require a plan's success to be guaranteed, the plan must nevertheless propose a realistic and workable framework. In other words, the plan must be reasonably likely to succeed on its own terms . . . ." *Am. Cap. Equip.*, 688 F.3d at 156.  Relying upon the Confirmation Declarations, the Debtors assert the Plan is feasible because "the Litigation Trust will generate sufficient distributable value (i.e., more than $2 billion) to satisfy all such administrative and priority claims in full in cash by the end of 2028."  Moore Decl., ¶ 228.

39.     Among the $25 billion in projected assertable claims, the Kirschner Declaration identifies approximately $22.6 billion purportedly recoverable from Third-Party Factoring Claims ($15.4 billion), SCF Lending Claims ($4.7 billion), and SPV Lender Claims ($2.5 billion). These totals represent the aggregate payments issued from the Debtors to the subject counterparties under each relevant financing program over the four years preceding the Petition Date. What the totals fail to account for are any potential defenses to such asserted claims.

40.     The Kirschner Declaration posits that, for each of these asserted claims, the Debtors will rely upon the Ponzi Scheme Presumption, which generally "allows courts to presume insolvency and actual intent to hinder, delay, or defraud for purposes of avoidance under section

16

548(a)(1)(A) if the plaintiff proves that the transferor operated as a Ponzi scheme." Kirschner Decl., ¶ 25. Evolution reserves all rights with respect to the invocation of the Ponzi Scheme Presumption in connection with any asserted claims. But even assuming the Debtors are correct that the Ponzi Scheme Presumption applies to render every transfer from the Debtors *potentially* subject to clawback as an actual fraudulent transfer, the presumption does not override applicable defenses; it merely shifts the burden to defendants to demonstrate such defenses' applicability. *See Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (evaluating whether defendants had successfully proven any defenses following application of the Ponzi Scheme Presumption in favor of plaintiffs).

41. Moreover, the Ponzi Scheme Presumption applies not to double-victimize defendants, but rather to more easily provide for clawback from participants who may have profited from the underlying scheme. For that reason, the Ponzi Scheme Presumption does not apply to the return of a defendant's underlying investment. *See, e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("In the case of Ponzi schemes, the general rule is that a defrauded investor gives value to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal.") (collecting cases); *see also* Weil Restructuring Blog, *Keep Your Claws Off My Principal: Eleventh Circuit Weighs in on Recovery of Fraudulent Transfers in Ponzi Schemes* (same).[13]

42. Applying just these modifiers to the Debtors' assumptions embedded in the Confirmation Declarations belies the significant overestimation of potential claims and causes of action, and the risk this Plan will never become effective. Solely as applied to Evolution, the

---

[13] https://restructuring.weil.com/avoidance-actions/keep-your-claws-off-my-principal-eleventh-circuit-weighs-in-on-recovery-of-fraudulent-transfers-in-ponzi-schemes/ (last accessed: July 20, 2026).

Confirmation Declarations assert approximately $277 million of potential claims relating to payments received under the Third-Party Factoring Program and approximately $73 million of potential claims relating to payments received from the Evolution SPV Borrowers over the 4 years prior to the Petition Date.  These asserted claims do not account for the return of principal, nor any other defenses.  For example, Evolution financed and loaned the Debtors over $242 million under the Third-Party Factoring Program, and approximately $230 million was loaned to the Evolution SPV Borrowers during that time period.  If accounted for, the return of principal alone would completely eliminate the asserted liability.  With respect to the Third-Party Factoring Program alone, the asserted liability would be reduced from $277 million to $35 million, subject to further defenses, before even accounting for other applicable defenses.

43.     Extrapolated to the other potential defendants identified, the amount of potential assertable claims tumbles from over $25 billion to just over $3 billion on this reason alone—and even further once other defenses are considered. Before even considering collectability and timing concerns, it is clear the Debtors' projections are wildly over-optimistic and the Plan is not feasible.

44.     As for collectability and timing of potential recoveries, the Debtors rely entirely on the Kirschner Declaration, which gives such concerns short shrift. For collectability, Kirschner provides no assessment of whether the defendants are creditworthy, instead assuming that because they received hundreds of millions of dollars worth of fraudulent transfers, they must equally be able to repay those amounts.  *See* Kirschner Decl., ¶ 145.  With respect to financial non-insider defendants, Kirschner merely references the market capitalization of Jefferies, an affiliate of a single potential defendant, without explaining how that is relevant to the assessment of even such affiliate's liability, no explanation as to why Jefferies would be independently directly liable for such a judgment, and certainly no explanation as to its connection to any other potential defendant.

18

With respect to timing concerns, the Kirschner Declaration merely assumes that, given the diversity of claims and defendants, it is likely that a litigation trustee would recover at least $2 billion from settlements within 18 months.  This assessment is not backed up by any estimate of the timeline for litigating causes of action of sufficient value to recover such amounts and does not assess the likelihood of any appeals and the timeline for such consideration.

45.     The Confirmation Declarations are built on unsupported assumptions, and the Plan is built on a hope and a prayer where all Plan proponents walk away with the immediate benefits and leave the long-term risks of administration to the Debtors' other victims. This is not how chapter 11 is designed to function.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Evolution respectfully requests the Court enter an order denying confirmation of the Plan, and granting such other and further relief as the Court deems appropriate.

[*Remainder of page intentionally left blank.*]

Respectfully submitted this 20th day of July 2026.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    Emily F. Shanks
    Texas Bar No. 24110350
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com
             eshanks@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    Vincent Indelicato (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:      vindelicato@proskauer.com

- and -

    Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Email:      cdale@proskauer.com

- and -

    Jordan E. Sazant (admitted *pro hac vice*)
70 W Madison St., Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3500
Email:      jsazant@proskauer.com

*Counsel to Evolution*

20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of July 2026, he caused a true and correct copy of the foregoing document by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner