**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** [1] | ) | **Case No. 25-90399 (CML)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |
| | ) | |

**UNITED STATES TRUSTEE'S OBJECTION TO (I) FINAL APPROVAL OF
DISCLOSURE STATEMENT, (II) CONFIRMATION OF THE PLAN AND
(III) REQUEST FOR ORDER CONVERTING CASES**

Related ECF No. 3019 and 3020

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") hereby files this objection to (i) final approval of the *Disclosure Statement* [ECF No. 3020] (the "**Disclosure Statement**") and (ii) confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [ECF No. 3019] (the "**Plan**") and represents as follows:

## I.      INTRODUCTION

1.      The Plan is the perfect illustration of the sunk-cost fallacy.  This sixth iteration of the Plan still fails to give administrative creditors what they are due under the Bankruptcy Code. Since late 2025, the Debtors have known they were administratively insolvent and could not pay their post-petition creditors as they became due. In this situation, the Bankruptcy Code has a safety valve–*conversion*.  But rather than convert, the Debtors have unbelievably sextupled down by

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/FirstBrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

proposing, *yet again*, another non-confirmable plan that favors the DIP Secured Parties, giving them assets and releases on the Confirmation Date, while simultaneously turning administrative creditors into involuntary plan financiers by denying them full and prompt payment. And because the Bankruptcy Code is premised on the Debtors paying their debts as they became due, lest the cases be converted, administrative creditors have been denied the rights codified in the Bankruptcy Code, a seat at the table, and a collective voice in this Court to protect those rights.  As set forth herein, the Debtors' sixth iteration of the Plan remains mired in issues and should not be confirmed.

2.      *First*, the Plan is premised on the Court allowing the DIP Secured Parties to foreclose on Estate Claims on the Confirmation Date rather than the Effective Date (which may never occur) even though their liens only extend to the proceeds of those assets.  Then, a Litigation Trust will be created from this improper transfer, granting the DIP Secured Parties control over the claims that they otherwise would not have.  The Debtors in turn will release their claims against the DIP Secured Parties—the value of which remains unknown to creditors.

3.      Since the Court is being asked to approve a transfer of the Debtors' most valuable assets as part of a settlement of its claims against the DIP Secured Parties without any guarantee that all administrative and priority creditors will be paid in full, the Court should ask, what happens if the Effective Date never occurs? Are the Estate Claims returned to the Debtors? Are statutes of limitations tolled, and, if not, did creditors just lose out on that value? Are any releases or elections effective?[2] What if distributions were made to some but not all the administrative creditors? Other

---

[2] The terms of the Plan are unclear, but the answers seem to be *no* the Litigation Trust retains control of the assets even if the Effective Date never occurs, and limitations don't matter because the releases against the DIP Secured Parties remain binding.  *See* ECF No. 3019, p. 106 Secs. 12.3–12.4.

questions undoubtedly exist, but these demonstrate the consequences that flow when transactions are approved on dates that are far removed from the Plan's Effective Date.

4.      *Second*, the Plan is still premised on a flawed belief that the DIP Secured Parties can credit bid for the Estate Claims, which include Avoidance Actions, even though the Court only granted a lien on the *proceeds* of such causes of actions. This is a distinction with a difference that cannot be glossed over. Allowing the Plan to modify the DIP Order, which the Debtors originally touted as providing adequate assurance of payment to administrative claims, gives the DIP Secured Parties more rights than they are due and is therefore inequitable.

5.      *Third*, the Plan provides no definitive timeframe for when the Litigation Trust or DIP Collateral Trust will compensate administrative creditors. Although the Debtors technically claim they will pay administrative claimants on the Effective Date, this date cannot occur unless a litany of conditions precedent are met, the most relevant of which is having sufficient Cash on hand to pay all Allowed and Disputed Administrative Expense, Priority Tax, and Other Priority Claims. Based on the Debtors' own projections, they need to recover *at least* $1.8 billion[3] to achieve this milestone. The Debtors, however, do not, and cannot, assure the Court that the Plan can *ever* go effective and certainly cannot provide practical evidence that priority claimants can be paid within five years of the Debtors' respective Petition Dates.  If the Plan never goes effective, it appears the transfer to the Litigation Trust and the releases to the DIP Secured Parties remain binding.

6.      *Fourth*, the Plan's feasibility is premised on an unfair and prejudicial scheme that treats administrative claimants as a de facto class of claims by forcing them to elect into treatment

---

[3] If no administrative claimants elect to reduce their claims, $1.9 billion will be needed to pay all administrative and priority claimants in full.

other than full payment.  Having incurred $222 million in administrative claims, the Debtors offer administrative claimants an "election" to reduce their claims by 50% as the only option to satisfy this total debt.  In doing so, the Debtors have created disproportionate treatment by allowing some to be paid before other similarly situated administrative creditors.  As a result, creditors who do not make the election, and thus never affirmatively agree to less favorable treatment, are prejudiced despite never even having the right to contest that treatment.  The inclusion of this so-called election is coercive and punishes administrative creditors who have already paid the freight of these cases. Indeed, it disproportionately harms the largest of these creditors who have no incentive to reduce their claims by 50%.

7.        *Fifth*, administrative creditors may be entitled to charge interest on their unpaid post-petition balances pursuant to their contracts or under applicable state law, and the Bankruptcy Code *does not* preclude administrative creditors from asserting these amounts.  But the Plan does not propose to compensate these creditors for the *years* it may take to pay off their claims.  By failing to provide interest, the Debtors will not be providing them with the value of their allowed claims in cash on the Effective Date regardless of when that happens.

8.        *Sixth*, the problems with the Plan are an extension of the issues with the Disclosure Statement itself. The Disclosure Statement does not provide adequate information about the value or collectability of the Estate Claims, much less a justifiable timeline on when those Estate Claims might become cash to fund the Plan. This is particularly problematic for the administrative claimants who are asked to reduce their claims but have no idea if that means their claims will be paid two years early or two days early. In short, the projected recoveries are illusory because *nothing* in the Disclosure Statement establishes that the Litigation Trustee (i) will be successful in obtaining favorable judgments against the defendants of the Estate Claims, (ii) will be able to

collect the amounts of the judgments from the various defendants, or (iii) can achieve such results within two years of the confirmation date (or even within five years of the Petition Dates).[4] If anything, two years to liquidate $1.8 billion in claims seems fanciful given the nature and wealth of the known defendants.[5]

9.      The infirmities in the Plan and Disclosure Statement are the same fundamental shortcomings as prior versions. These issues cannot be fixed by allowing the Debtors to continue in chapter 11. The Debtors cannot pay their administrative claimants. There is nothing left to reorganize. There is nothing left to do other than litigate and liquidate the claims that remain. Consequently, final approval of the Disclosure Statement should be denied, the Plan should not be confirmed, and these cases should be converted to chapter 7.

## II.      BACKGROUND

10.      On September 24, 2025, certain of the Debtors filed Voluntary Petitions for relief under chapter 11 of the Bankruptcy Code, and the remaining Debtors filed their Voluntary Petitions on September 28, 2025 (collectively, the "**Petition Dates**").  These chapter 11 cases are being jointly administered.

11.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.      On November 9, 2026, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to*

---

[4] The DIP Collateral Trust can also be used to fund these claims.  However, upon information and belief, their value is insufficient to pay all claims.

[5] *See generally, Serta Simmons Bedding LLC v. AG Ctr. St. P'ship (In re Serta Simmons Bedding, LLC)*, 2026 Bankr. LEXIS 1696 (July 7, 2026).

*Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief*

("**DIP Order**"). The DIP Order only provided the DIP Secured Parties with liens on the proceeds

of the Avoidance Actions (as defined in the DIP Order) and not the Avoidance Actions themselves.

See ECF No. 608 at ¶ 8. The DIP Order also provides that the DIP Secured Parties' Roll-Up

Obligations of approximately $3.3 billion are subordinated to all unpaid and undisputed

administrative expense claims up to $200 million. *Id.* at 42.

13.     An order conditionally approving the Disclosure Statement and setting a

confirmation hearing was entered on June 12, 2026. ECF No. 2990. Solicitation copies of the Plan

and Disclosure Statement were filed on June 16, 2026. Multiple prior plans and disclosure

statements have been filed.[6]

14.     The Plan depends on a determination that the proceeds of the Avoidance Actions

are encumbered by the DIP Secured Parties' lien.  ECF No. 3046-9 at. 2.[7]

15.     The Plan has several provisions that become operative on the Confirmation Date,[8]

rather than the Effective Date.[9]  On the Confirmation Date, the following items become operative:

  a.  The *DIP A Claims* (i.e. the New Money DIP Loans and all accrued and unpaid
      interest and expenses related thereto) and *Roll-Up Claims* are allowed, ECF No.
      3019 at p. 16, Sec. 2.2(a), and  Sec. 4.3;

---

[6] See ECF Nos. 2544, 2545, 2678, 2692, 2733, 2738, 2785, 2786, 2907, 2912.

[7] Pinpoint citations are to the page of the PDF rather than the page of the document in the footer.

[8] "***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order and the Definitive Documents are in form and substance acceptable to the Ad Hoc Group SteerCo and the Creditors' Committee." ECF No. 3019 at p. 14.

[9] "***Effective Date*** means the date that is the first Business Day on which all conditions to the effectiveness of the Plan set forth in Section 12.1 of the Plan have been satisfied or waived in accordance with Section 12.2 of the Plan." *Id.* at p. 20.  A condition precedent to the occurrence of the Effective Date is that the Liquidation Trust and/or the DIP Collateral Trust have enough cash on hand to pay, or escrow money to pay, all Allowed and Disputed Administrative Expense, Priority Tax, and Other Priority Claims, except those disallowed by a order of the Court.  *Id.* at p. 105, Sec. 12.1(o).

b. The *Estate Claims Credit Bid Transaction* and the *DIP Collateral Credit Bid Transaction* become operative, those assets are transferred to the *Litigation Trust* and the *DIP Collateral Trust* free and clear of all Liens, Claims, encumbrances and Interests and the Debtors' claims against the DIP Secured Parties are released, *id.* at 21, Secs. 5.1–5.2, Art VI, 7, Art. VII., 107 Sec. 13.2;

c. The *DIP Collateral Trust Oversight Committee* and the *Litigation Trust Oversight Committees* are formed granting control of the Estate Claims to the DIP Secured Parties, *id.* at 18, 26; and

d. The *Professional Fee Escrow* is funded, *see id.* at Secs. 2.3–2.4.

16. On the Effective Date the following items become operative:

a. Administrative Expense and Priority Claims will be paid in full, *id.* at Sec. 2.1, Sec. 2.5, Sec. 4.1;

b. Third Party Releases and Exculpations for actions taking place on or before the Effective Date become operative, *id.* at Sec. 13.5(b), Sec. 13.6;

c. The Plan will be substantially consummated, *id.* at Sec. 15.9.

17. The Debtors speculate that the Effective Date is likely to occur in the "second half of 2028." ECF No. 3020 Art. I, Sec. D.7. Should the Effective Date never occur or if the Confirmation Order is vacated, all provisions will be null and void, *except* the Credit Bid transactions and related releases. *See id.* at Secs. 12.3–12.4.

18. The Plan also creates an *Administrative Expense Claims Consent Program*, which will prioritize the payment of claimants who elect to reduce their administrative claims by 50%, affecting recoveries for other similarly situated administrative creditors who choose not to make such an election. ECF No. 3019 at Sec. 6.5(d). The Plan does not provide interest on these claims for the years it may take to be repaid. Upon information and belief, administrative claimants' post-petition agreements may include the right to charge interest on their unpaid invoices.

19. According to the Debtors' waterfall analysis, priority creditors will be repaid in full only after $1.8 billion is recovered through litigation *and* administrative claimants reduce their claims by 50% pursuant to the Administrative Claims Consent Program Opt-In. *See* ECF No. 3020

at 7. If administrative claimants do not opt in, $1.9 billion will be needed to repay administrative and priority claimants in full. *Id.*

20.     Although the Disclosure Statement and Liquidation Analysis give information about how much needs to be collected for administrative and priority claimants to be paid in full and some information concerning which claims are available, they provide no information about how collectible any of these amounts are or when such amounts might be reduced to cash.  The CRO's prior testimony was that no investigation has been done into the collectability of any claims, and no guarantees could be made on whether priority claimants could be paid in full by September 2030.

### III.     OBJECTION

21.     As set forth in more detail below, the U.S. Trustee objects for the following reasons:

    a.  The Plan is not proposed in good faith as required by section 1129(a)(3) because:

        i.  it is premised on the Estate Claims Credit Bid Transaction which requires the Court to bless an improper transfer;

        ii.  it makes the Estate Claims Credit Bid Transaction effective on the Confirmation Date rather than the Effective Date;

        iii.  it treats Administrative Claims as a de facto class without giving them the legal protections afforded to classes of claims;

        iv.  the Administrative Expense Claims Consent Program is improper and coercive because it elicits an election to reduce a claim and consent to an unreasonably delay in payment to a group of creditors who are statutorily entitled to payment in full; and

        v.  the delayed Effective Date is prejudicial to administrative claimants who are treated as a de facto class but were not afforded a collective voice to negotiate terms, or to vote on that treatment;

    b.  There is no guarantee that the Effective Date will occur by September 2030 as required by section 1129(a)(9)(C), or that the Effective Date will ever occur as required by section 1129(a)(9)(A);

c. The Disclosure Statement does not include adequate information to enable a creditor to make an informed judgment about value of the Estate Claims, the probability of success in litigating Estate Claims, the time to liquidate such claims, or the collectability of the Estate Claims;

d. The permanent discharge injunction violates 11 U.S.C. § 1141(d)(3) because the Debtors are liquidating substantially all of their assets and the primary purpose of the Plan is to distribute the proceeds from their liquidation;

e. The exculpation provision impermissibly includes parties or entities not entitled to exculpation in the Fifth Circuit; and

f. The permanent injunction and gatekeeper provisions violate the Bankruptcy Code and Fifth Circuit precedent set forth in *Highland II*.[10]

g. It unnecessarily contains a waiver of the fourteen-day stay period pursuant to Fed. R. Bankr. P. 3020(e)

**A.     The Plan Is Not Proposed in Good Faith.**

22.     For a plan to be proposed in good faith, it "must fairly achieve a result consistent with the Code." *In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991) (citing *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984). Good faith must be viewed "in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a *reasonable opportunity* to make a fresh start. *In re Sun County Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (emphasis added). A plan satisfies the good faith requirement when "it is proposed with the legitimate and honest purpose to reorganize and *has a reasonable hope of success.*" *Id.* (emphasis added). As explained so eloquently by Collier, good faith is a bedrock of bankruptcy:

> Good faith has served many functions in American bankruptcy law. Its placement in the list of confirmation requirements signifies Congress's intent that there be some check on the mechanical requirements found in other subsections of section 1129. That is, although Congress intended to, and did, craft specific provisions with respect to most aspects of reorganization, the changing nature of business and reorganizations generally required that courts have some leeway to see if the plan

---

[10] *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 132 F.4th 353 (5th Cir. 2025) ("*Highland II*").

proffered squares with the general intent of the Code. With respect to chapter 11 confirmations, section 1129(a)(3) serves that goal.

Collier on Bankruptcy ¶ 1129.02[3][a] (16th Ed. 2026).

23.     This Plan is dependent on the fatal premise that the DIP Secured Parties have a right to "bid" on Estate Claims when their collateral rights only extend to the *proceeds* of those claims. *See* ECF No. 608 at pp. 41–42 ¶ 8.  Limiting the DIP Secured Parties' lien to the proceeds is a routine and intentional order that prevented the DIP Secured Parties from controlling the Estate's litigation claims against them.  If the Plan is confirmed, thereby blessing this improper transfer, the Estate Claims will be irrevocably transferred out of the Debtors' estates *on the Confirmation Date*, and the DIP Secured Parties will be granted control of the litigation and released from any claims against them.

24.     The advantages given to the DIP Secured Parties disadvantage the administrative creditors as they are now asked to finance recoveries of *at least* $1.8 billion. To be clear, the Debtors *hope* that they can collect $1.8 billion by the second half of 2028, but litigation is an unpredictable asset that takes time to liquidate and collect.  Not only may assets be located outside the United States, but assets that exist *today* may be dissipated by the time the Litigation Trustee can even attempt collection *years* from now.

25.     The Plan also impermissibly treats Administrative Claimants as a de facto class of claims contrary to their rights under the Bankruptcy Code. *See* 11 U.S.C. §§ 1129(a)(9)(A, 1123(a)(1). Rather than get paid as their debts become due, the Plan offers them elections, reductions and delays in payment—treatment reserved for creditors which have the protections under 11 U.S.C. §§1123(a)(4) and 1126.

26.     Further, the creation of the *Administrative Expense Claims Consent Program* also evidences bad faith because creditors with debts totaling $222 million are being asked to reduce

their claims by 50% resulting in a disparate treatment of similarly situated creditors.[11] Creditors who elect to receive less will prime other similarly situated administrative creditors who did not make the election and did not agree to less favorable treatment. *See* 11 U.S.C. § 1123(a)(4). It may well be the case that creditors with larger claims will be prejudiced because they have no incentive to reduce their claims.

27.     And because the Plan does not provide a definitive timeline on how much faster a creditor might get paid for making the election, they do not know if reducing a claim for prompter payment provides any value. The delay in obtaining recoveries and the timing of distributions may provide electing creditors with no meaningful benefit.

28.     Administrative creditors have had no collective voice in this process  because they correctly believed, and apparently mistakenly assumed, that they would be protected from delinquency by the Bankruptcy Code. This Plan impairs them as a de facto class but does afford them the protections that other classes of claims have under the Bankruptcy Code such as the right to vote on the Plan. *See* 11 U.S.C. §§ 1123(a)(1), 1129(a)(9)(A).

29.     Even if the Debtors could meet the other technical requirements of section 1129(a)—which they cannot—this Plan does not follow the spirit of the Bankruptcy Code.  This Plan is expensive and favors certain parties over others. There is no fresh start to grant and no reasonable opportunity to reorganize.  Approving this Plan is a bad precedent: it encourages future debtors and lenders to find schemes to fleece those who, in reliance on the Bankruptcy Code's unequivocal protections, provide post-petition goods and services to debtors.

---

[11] Professional Fee Claimants, who are administrative claimants, have negotiated a carve-out to pay themselves *in full* shortly after the Confirmation Date.

30.     Based on the totality of the circumstances, the Plan was not submitted in good faith as required by 11 U.S.C. § 1129(a)(3).

**B.     The Debtors Provide No Guarantee the Plan Will Go Effective in Five Years, if Ever**

31.     To confirm a plan, a Debtor must pay administrative claimants "cash equal to the allowed amount of such claim" on the plan's effective date, and priority tax claims must be paid no later than five years from the petition date.  11 U.S.C. § 1129(a)(9)(A), (C).  The term "effective date" is not defined by the Bankruptcy Code.  Generally, issues regarding the "effective date" relate to the valuation and its timing when considering cram down under 11 U.S.C. § 1129(b)(2).

32.     Administrative creditors have funded $222 million under the Plan.  These amounts were owed since late 2025.  No interest has been paid to them or will be paid to them for the time they go unpaid.  The long delay of the effective date under the plan denies creditors "cash equal to the allowed amount of such claim" because it does not consider the risk or lost value associated with delayed repayments.  In fact, the Debtors are asking that these creditors agree to be paid less than the face value of their claims. Accordingly, the Debtors have not satisfied the requirement of 1129(a)(9)(A).

33.     And because litigation claims are volatile, the Debtors have not offered and cannot offer assurance that enough cash will be collected to pay priority claimants in full by September 2030.  Accordingly, the Debtors have not satisfied the requirement under section 1129(a)(9)(C).

**C.     The Disclosure Statement Does Not Include Adequate Information.**

34.     Pursuant to section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information." 11 U.S.C. § 1125(b). Adequate information implicitly includes a representation that the proposed plan is one that can be confirmed.

12

35.     The Bankruptcy Code defines adequate information to mean

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125(a)(1).

36.     "[M]ere allegations or opinions, unsupported by factual information, do not meet the required standard" for adequate information. *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981).  As noted above, the Debtors do not provide adequate information to support their assertion that they will be able to go effective by the end of 2028.  They provide nothing more than their opinion.  Moreover, they provide no information regarding the collectability of the Estate Claims, which is a material consideration for the value of the Estate Claims.

37.     If a defect renders a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before parties proceed with considering confirmation of the plan itself.  *In re American Capital Equipment*, LLC, 688 F.3d 145, 153-54 (3d Cir. 2012).  *See also In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

38.     Further, if the plan is patently unconfirmable on its face, approval of the disclosure statement must be denied. *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re American Cap. Equip., LLC*, 688 at 154 (3d Cir. 2012)(the Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore,

13

to decline to approve a disclosure statement when the plan it supports may not be confirmable). A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing. *Id*. at 154-55.

39. The Plan and Disclosure Statement do not satisfy the Bankruptcy Code's requirements for adequate information and leave administrative and priority claimants without the information or assurances needed to make an informed decision. The Disclosure Statement lacks adequate information to enable administrative claimants to make an informed decision about the likelihood that their claims will be paid in full within any specified period. It also lacks information about how reducing their claim will expedite payment of their claim.

40. The Disclosure Statement also lacks adequate information to enable priority claimants to make an informed decision about the likelihood that their claims will be paid in full within the five years of the Petition Dates required by the Bankruptcy Code. The Disclosure Statement lacks adequate information to enable claimants to assess the collectability of the Estate Claims that will fund their payments. 11 U.S.C. §§ 1129(a)(9), 507(a)(2), and 503(b) & (c).

**D.     The Plan Violates 11 U.S.C. § 1141(d)(3).**

41. The Bankruptcy Code provides that "[t]he confirmation of a plan does not discharge a debtor if: (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; *and* (C) the debtor would be denied a discharge under § 727(a) of this title if the case were a case under chapter 7 of this title. 11 U.S.C. § 1141(d)(3).

42. Even though the Plan triggers all the requirements of 11 U.S.C. § 1141(d)(3), thereby limiting Debtors from receiving a discharge, certain provisions of the Plan impermissibly

14

seek to discharge and permanently enjoin the holders of claims against the Debtors in violation of 11 U.S.C. § 1141(d)(3).

43.     The Plan Injunction provisions contained in section 14 of the Plan violate 11 U.S.C. § 1141(d)(3).  Those provisions misrepresent that creditors give up their rights against the Debtors because they will receive distributions under the Plan.[12]

44.     Additionally, any provisions of the Plan that also state that Holders of Claims receive distributions "in full and final satisfaction, settlement, release" of their Claims improperly discharge the Debtors in violation of 11 U.S.C. § 1141(d)(3).

45.     The Plan's full and final settlement and release and permanent injunction provisions perform the same function as the discharge injunction under 11 U.S.C. § 524.  11 U.S.C. §§ 524(a)(2) and (3) describe the effect of a discharge as operating "as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset" debts and liabilities of a debtor or against property of a debtor. 11 U.S.C. §§ 524(a)(2) and (3). The old adage of "if it walks like a duck and quacks like a duck, then it is a duck" remains true. The provisions of the Plan operate as a discharge injunction against the Holders of Claims in violation of 11 U.S.C. § 1141(d)(3).  *See, e.g., In re Bigler, LP,* 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010) ("An injunction preventing the post-confirmation prosecution of claims would certainly operate as a discharge of the Debtors."); *In re SunCruz Casinos, LLC,* 342 B.R. 370, 380 (Bankr. S.D. Fla. 2006) ("The net effect of the provisions of § 1141(d)(3) is that a corporate debtor which is liquidated under chapter 11 and does not continue in business after its chapter 11 plan goes into effect does not receive a bankruptcy discharge.").

---

[12] *See* Plan at Articles 4.1(a), 4.2(a), 4.3(b), 4.4(b), 4.5(b), 4.6(b), 4.7(a), 5.11, 10.9 and 14.4(b)

46.     The Debtors may easily remedy the Plan to comply with section 1141(d)(3) of the Bankruptcy Code.  First, the Debtors should modify the injunction in section 14.4(b) of the Plan to expire upon completion of the liquidation activities in the Plan and the distribution by the Wind Down Administrator and Trustees.  Second, the Debtors should remove the language from the treatment of the various classes "each Holder of a […] Claim will receive, in full and final satisfaction of such Claim"… With those modifications, the Plan will no longer violate section 1141(d)(3) of the Bankruptcy Code and can therefore satisfy 11 U.S.C. § 1129(a)(1).

**E.     The Exculpation Provisions in the Plan Violate Fifth Circuit Law.**

47.     The Plan' seeks to exculpate the "Special Committee," which is not permitted under Fifth Circuit law.  The Fifth Circuit limits exculpation to the debtor(s) proposing the plan, official committees and their members in their official capacity, and trustees or similar persons entitled to the protections of the Barton doctrine.

48.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provision is overly broad in violation of Fifth Circuit precedent. The Fifth Circuit in 2022 affirmed that, following its prior decision in *Bank of New York Tr. Co., NA v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*) 584 F.3d 229 (5th Cir. 2009), "any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct *within the scope of their duties*, 11 U.S.C. § 1103(c), and the trustees *within the scope of their duties . . . ."* *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022) (emphasis added) ("*Highland I*").

49.     The Fifth Circuit in *Highland II* also analyzed whether the independent directors—who were selected by the Official Committee of Unsecured Creditors as part of a settlement and appointed  by the bankruptcy court to act together as the bankruptcy trustee—could be exculpated and concluded that they could under the unique facts of the case:

> That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*.  We answer in the affirmative.  As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital.  Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee.  See 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01.  It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501.  Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

*Id.* at 437.

50.     The Debtors, the creditors' committee and its members, and trustees are the only parties for which the Fifth Circuit has allowed exculpation.  Under *Highland I*, "Special Committees" and their members, as that term is defined in the Plan, are not entitled to exculpation.  Indeed, the Fifth Circuit in *Highland I* struck from the definition of exculpated parties numerous parties, including professionals retained by the Debtors and the Claimant Trust in the Highland case, among others. *Id.* at 438. Thus, to be consistent with *Pacific Lumber* and *Highland I*, the definition of "Exculpated Party" in the Plan must exclude the members of Special Committees.

**F.     The Injunction and Related Gatekeeping Provisions Violate Fifth Circuit Precedent and the Bankruptcy Code.**

51.     The Plan also includes a gatekeeper provision that would require parties to seek this Court's permission to sue the Claims Ombudsman, Wind Down Co, and the Plan Administrator, who do not yet exist, in contravention of Fifth Circuit law. The Bankruptcy Court may not approve the provisions at Art. 14.4(b) that enjoin actions against Released Parties and Exculpated Parties arising from a broad swath of claims and direct that any such claims against said parties be brought to the bankruptcy court as a gatekeeper.[13]

---

[13] As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release ***in exactly one context***: asbestos-related bankruptcies, and these cases are not asbestos-related. *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)).

52.    The Fifth Circuit recently made this point clear with its *Highland II* decision when it stated, "[e]ven before *Purdue Pharma*, this court had held the same: that any provision that non-consensually releases non-debtors from liability for debts and/or conduct, ***and any injunction that acts to shield non-debtors from such liability***, must be struck from a bankruptcy confirmation plan." *Highland II*, 132 F.4th at 358–59  (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009)) (Fifth Circuit case law "seem[s] broadly to foreclose non-consensual non-debtor releases ***and*** permanent injunctions.") (emphasis added); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059, 1061-62 (5th Cir. 2012); *In re Zale Corp.*, 62 F.3d at 760 ("[W]e must overturn a § 105 injunction if it effectively discharges a nondebtor.").

53.    The Fifth Circuit further clarified that gatekeeper provisions cannot be broader than exculpation provisions:

> [T]he proper reading of *Highland I* is to require the bankruptcy court to narrow the definition of 'Protected Parties' used in the Gatekeeper Clause coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision, to read simply: 'collectively, (i) the Debtor; (ii) the Independent Directors, for conduct within the scope of their duties; (iii) the Committee; and (iv) the members of the Committee in their official capacities, for conduct within the scope of their duties.' Both (1) the opinion's plain language and (2) the change made to the opinion on rehearing elucidate this holding.

*Highland II*, 132 F.4th at 360.

54.    To comply with the Fifth Circuit's directives in *Highland II*, the injunction language in section 13.4(b) of the Plan must be stricken or limited to the Debtors and the Exculpated Parties. In addressing the injunction and gatekeeper issues, the Fifth Circuit in *Highland II* clarified that those protective provisions must be limited to those parties entitled to exculpation as held in *Highland I*.

55.    Additionally, in *Highland II*, the Fifth Circuit also held that the *Barton* doctrine would allow for a gatekeeping provision, but only for claims brought "'against the trustee or other

bankruptcy-court-appointed officer, for acts done in the actor's official capacity' in a bankruptcy proceeding, even if the bankruptcy court would not have jurisdiction to actually adjudicate those claims" *Highland II*, 132 F.4th at 359 (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015)).  Accordingly, the gatekeeping language in section 14.4(b) of the Plan must be stricken or, again, limited to cover only the Debtors and Exculpated Parties. The gatekeeping provision, as written, would require hundreds of non-debtor third parties to seek permission from the bankruptcy court to sue the Claims Ombudsman, Wind Down Co., and the Plan Administrator, each of which does not even exist until the Effective Date and therefore is not protected by the *Barton* doctrine.

56.     In light of the foregoing, the injunction and gatekeeping provisions must be limited to the parties that are properly exculpated under a plan, which in the present case are the Debtors, the Committee, and the members of the Committee in their capacity as such, and no other parties.

**G.     Objection to Waiver of Stay Pursuant to Fed. R. Bank. P. 3020(e)**

57.     The U.S. Trustee objects to any waiver of the fourteen-day stay period pursuant to Fed. R. Bankr. P. 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *Id*.  The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.

## IV.     CONCLUSION

58.     The Court should deny final approval of the Disclosure Statement for failing to provide adequate information and confirmation of the Plan because it (i) is not proposed in good faith (ii) improperly transfers the Debtors' remaining valuable assets to the DIP Secured Parties

19

(iii) avoids the protections of the Bankruptcy Code such as the requirement to pay all administrative claims of these Debtors in full without uncertainty and delay, (iv) does not assure that priority claims will be paid within 5 years of the Petition Dates and (v) contains discharge, gatekeeper, and injunction provisions that violate the Bankruptcy Code and controlling precedent. Instead, the Court should convert these cases to chapter 7.

WHEREFORE, the U.S. Trustee requests that (i) approval of the Disclosure Statement be denied, (ii) Plan confirmation be denied, (iii) that the cases be converted, and (iv) for such other and further relief to which he may be entitled in law or equity.

Date: July 20, 2026

Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7, SOUTHERN AND WESTERN
DISTRICTS OF TEXAS

By: */s/ Vianey Garza*
    Jayson B. Ruff, Trial Attorney
    Michigan Bar No. P69893
    (713) 718-4662 – Telephone
    Email: Jayson.b.ruff@usdoj.gov
    Vianey Garza, Trial Attorney
    Tex. Bar No. 24083057/Fed. ID No. 1812278
    (713) 718-4650 – Telephone
    Email: Vianey.Garza@usdoj.gov
    Office of the United States Trustee
    515 Rusk, Suite 3516
    Houston, Texas 77002
    (713) 718-4670 – Fax

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026 a copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases.

*/s/ Vianey Garza*
Vianey Garza