**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**PRELIMINARY OBJECTION OF KATSUMI SERVICING, LLC**
**TO (I) CONFIRMATION OF JOINT CHAPTER 11 PLAN AND**
**(II) FINAL APPROVAL OF DISCLOSURE STATEMENT**

Katsumi Servicing, LLC ("Katsumi"), by and through its undersigned counsel, hereby files

this preliminary objection (this "Objection") to confirmation of the *Joint Chapter 11 Plan of First*

*Brands Group, LLC and Certain Affiliated Debtors* [Dkt. No. 3019] (the "Plan")[2] and final

approval of the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and*

*Certain Affiliated Debtors* [Dkt. No. 3020] (the "Disclosure Statement"), and in support of thereof,

Katsumi respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Plan cannot be confirmed because it fails multiple, independent prerequisites

to confirmation under Sections 1122, 1123, and 1129 of the Bankruptcy Code and, at its core,

relies on unsupportable legal artifices designed to work an end-run around some of the Bankruptcy

Code's most basic protections.

2.      First, the Plan is not grounded in the "reasonable assurance of success" that the

Fifth Circuit demands.  The foundation of the Plan rests entirely on a liquidation trustee's hoped-

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Plan.

for "success" in recovering billions of dollars that the FBG Debtors' own declarants, resting on selective facts and impermissible legal conclusions, concede is aspirational. Such speculation falls well short of the reasonable assurance of success required by Section 1129.

3. Second, the same speculation infects the Plan's treatment of administrative claims. Section 1129(a)(9)(A) mandates that administrative claims be paid in full, in cash, on the effective date. The Plan's delayed "Effective Date" construct, however, is itself a misnomer: because the Plan would bind parties, vest assets, and authorize dissolution immediately upon confirmation, the effective date is, in substance, the Confirmation Date itself—a date on which administrative claims plainly cannot and will not be paid in full in cash, violating Section 1129(a)(9)(A).

4. Third, in a transparent attempt to gain support from certain favored constituencies, the Plan improperly manipulates treatment within classes, Bankruptcy Code-mandated classification schemes, Section 363 protections, and selective substantive consolidation—each to the detriment of Katsumi and similarly-situated creditors. Among other defects:

- The Preference Settlement grants Trade Creditors the option to obtain a complete release, while Factors and Supply Chain Financers holding roughly $1.8 billion in identical exposure remain fully exposed to litigation, in violation of Section 1123(a)(4)'s requirement of equal treatment for creditors in the same class;

- The "Specified Non-Released Party" construct would categorically deny an entire subset of similarly situated creditors, unilaterally targeted by the FBG Debtors, any opportunity to participate in that settlement at all;

- The Estate Claims Credit Bid Transaction impermissibly allows the DIP Secured Parties to credit bid on Avoidance Actions that are expressly excluded from their DIP Collateral, in an attempt to insulate the Plan under the (inapplicable) provisions of Section 363(m);

- The Plan improperly classifies unsecured deficiency claims separately from other unsecured claims, and separately classifies various deficiency claims of secured creditors separately for voting purposes even though they are treated as economically fungible under the Litigation Trust Waterfall, which is precisely the vote-gerrymandering the Fifth Circuit has repeatedly condemned; and

2

- The Plan invokes limited substantive consolidation to benefit favored creditors under the Preference Settlement, while denying Katsumi and other Factors the corresponding benefit of consolidation for purposes of defending against the very claims asserted against them.

5. Fourth, even if any of the above issues could be remedied, the Plan has a number of other unconfirmable defects that preclude confirmation. Among other things, the Plan attempts to impermissibly and unilaterally (i) rewrite this Court's prior orders governing administration of the Factored Receivables Account, the effect of which would modify the Factors' rights in any related funds, (ii) expand the scope of estate property to sweep in any directs claims individually held by creditors, and (iii) extinguish creditors' rights of setoff outside the confines set by Section 553 of the Bankruptcy Code.

6. Finally, the Disclosure Statement should not be approved on a final basis. It misleadingly assures creditors that substantive consolidation applies "solely for purposes of distributions," when the Plan itself confirms otherwise, and it says nothing about the practical consequences to creditors, like Katsumi, if the Plan is confirmed but the Effective Date never occurs.

7. For all these reasons, this Court should deny confirmation of the Plan and approval of the Disclosure Statement.

**OBJECTION**

**I.      The Plan is Not Feasible**

8. Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by an unplanned liquidation or the need for further reorganization; in other words, the proposed plan must be feasible. 11 U.S.C. § 1129(a)(11); *In re T-H New Orleans Ltd.*, 116 F.3d 790, 801 (5th Cir. 1997). The Fifth Circuit has interpreted Section 1129(a)(11) as requiring the plan proponent to establish, by a preponderance of evidence, that there is a

"reasonable assurance of success" and that the plan may "not be speculative or based on unreasonable assumptions." *In re Cantu*, 398 F. App'x 76, 78 (5th Cir. 2010); *T-H New Orleans Ltd. Partnership*, 116 F.3d at 801.  The plan proponent must show that the plan can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan.  *See In re Northbelt, LLC*, 630 B.R. 228, 279 (Bankr. S.D. Tex. 2020).  In determining whether a plan is feasible, courts rely on an "inquiry [that] is peculiarly fact intensive and requires a case-by-case analysis." *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

### A.    The FBG Debtors' Recovery Projections Rely on Speculation, Not Evidence

9.    "To establish feasibility of a plan, the debtor must present proof through *reasonable projections* that there will be sufficient cash flow to fund the plan." *In re Idearc Inc.*, 423 B.R. 138, 167 (Bankr. N.D. Tex. 2009), *aff'd,* 662 F.3d 315 (5th Cir. 2011).  "Such projections cannot be speculative, conjectural or unrealistic." *Id.*; *accord In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168 (5th Cir. 2011).  Here, the FBG Debtors' projected recoveries are rank speculation.

10.    The feasibility of the FBG Debtors' Plan relies entirely on hoped-for recoveries from future litigation claims, most of which have not even been the subject of a filed complaint. The FBG Debtors have little remaining going-concern business operations, and virtually all (if not all) of their tangible assets have already been the subject of fire sales or, to the extent not yet sold, are proposed to be turned over to the ABL and DIP Secured Parties.  There is no reorganization and no future cash from operations to fund the substantial administrative claims, for which no bar date has been set, that must be paid in full under a plan. *See* 11 U.S.C. §§ 1129(a)(9)(A).

11.    Instead, the Plan is a pure liquidating plan, pursuant to which the Estate Claims, as Mr. Moore concedes, must yield in excess of $1.965 billion in net proceeds to be able to pay such unknown amount of administrative claims in full. *See Declaration of Charles M. Moore in Support*

4

*of Confirmation of FBG Debtors' Chapter 11 Plan* [Dkt. No. 3188] (the "Moore Declaration"), at

¶ 228. The FBG Debtors themselves concede that it is uncertain whether they can satisfy this

prerequisite for reaching the Effective Date. Disclosure Statement at 94 ("The ability for the

Litigation Trust to recover on Estate Claims is subject to the inherent risks…includ[ing]

*uncertainty concerning whether these actions and litigations will be successful and, even if*

*successful, the amount and timing of recoveries that may be realized*." (emphasis added).

12.     The FBG Debtors' recently filed declarations do nothing to convert their

aspirational views on feasibility into the "reasonable assurance of success" required by the Fifth

Circuit.  *See generally* Moore Decl.; *Declaration of Marc S. Kirschner* [Dkt. No. 3190] (the

"Kirschner Declaration").  Both declarations instead make obvious that the Plan's feasibility rests

entirely on the hoped-for outcome of unadjudicated litigation against defendants who, in many

instances, have not even been named; or if they have, against whom such litigation is currently

stayed.[3]

13.     At the outset, Mr. Moore concedes that the Litigation Trust would need to generate

approximately $2 billion to satisfy the FBG Debtors' own estimate (without the benefit of a bar

date) of $222 million in Administrative Expense Claims and $78 million in Priority Claims.  By

basic math, this is an amount roughly nine times the Litigation Trust's committed funding of $75

million (plus up to $37.5 million in discretionary funding). The Litigation Trust is expected to use

this funding to finance litigation against potentially hundreds of defendants in scores of complex

lawsuits.  Because the Litigation Trust will almost certainly require additional funding beyond the

committed $75 million, the FBG Debtors acknowledge that additional priming of recoveries to

---

[3] Katsumi acknowledges that it is one of few parties that have been threatened with potential litigation.  Such conclusory allegations, without evidence and due process, do not satisfy the FBG Debtors' burdens here or in any future actions.  Katsumi reserves all of its rights, defenses and affirmative claims, including claims against the parties that have made such unfounded allegations.

holders of Class 2 Litigation Trust Interests may occur as a result. Disclosure Statement at 94. In other words, the roughly $2 billion hurdle set forth in the Litigation Trust Waterfall (at which point administrative claimants would hypothetically be paid in full), is already a moving target and subject to dilution, including by future funding needs.

14. Rather than provide independent assurance that these preliminary requirements for any distributions to others can be achieved, Mr. Moore's opinion that the Litigation Trust will generate "more than $2 billion" in distributable value by the end of 2028 rests entirely on the Kirschner Declaration. Moore Decl. ¶ 229 ("Based on my personal knowledge of the facts and the Kirschner Declaration, I believe the Litigation Trust will generate sufficient distributable value…"). But Mr. Kirschner's opinion supplies no more assurance than Mr. Moore's. Mr. Kirschner was retained by FBG Debtors' counsel *less than one month ago*, just after the conditional Disclosure Statement hearing where feasibility was hotly contested, for the express purpose of opining on the amount and timing of proceeds expected from the Estate Claims in support of confirmation, likely as a result of comments made by this Court at such hearing. Kirschner Decl. ¶¶ 18–19; Transcript of Disclosure Statement Hearing, June 12, 2026, at 231:21-232:1 ("I want to be really clear here though today the Debtors are going to have to satisfy every section required under the Code [at confirmation] …. Based on what I heard today, feasibility is going to be an obvious issue."). His opinion, in turn, is built entirely on a selective review of facts supplied by the Moore Declaration without any independent verification. This is circular: the FBG Debtors' financial advisor opines that recoveries will be sufficient because a newly-retained litigation expert says so, and that expert's opinion is, in turn, built on the same financial advisor's back-of-the-napkin valuation of those claims.

15. Even if Mr. Kirschner's opinion were taken at face value (and his report and testimony is not excluded, as Katsumi intends to seek by separate motion), his conclusory estimate falls well short of the "reasonable assurance of success" standard. His attempt to define the universe of "reasonably possible" recovery on unliquidated, and largely unasserted, claims is pure speculation and is unsupported by any reliable analysis. *See In re Idearc Inc.*, 423 B.R. at 167 (projections "cannot be speculative, conjectural or unrealistic"). In one sense, this is not surprising, as Mr. Kirschner is not a forensic accountant, valuation professional, economist, or statistician, and he has never valued a litigation portfolio, much less one of this magnitude in a case of this obvious complexity in such a short time period. The closest he comes to this is relying on his quintessentially anecdotal experience in *Refco Capital Markets*, a single, unrelated case nearly two decades ago that he personally administered as trustee.

16. Instead, based on his reliance on a discrete set of "facts" that were selectively disclosed to him by the FBG Debtors' advisors, Mr. Kirschner makes a number of sweeping generalizations: he opines that the "Ponzi scheme presumption" would likely apply here, and relying on a handful of cites to the Moore Declaration, he declares that a "good-faith transferee" defense would not apply to various of the Factors. Putting aside that his ultimate legal conclusions are inadmissible under the Federal Rules of Evidence,[4] Mr. Kirschner's testimony also plainly fails one of the other basic "conditions imposed by the Federal Rules of Evidence on the admissibility of expert opinion testimony"—namely, "that the testimony be 'based on sufficient facts or data.'" *See, e.g.*, *Moore v. International Paint L.L.C.*, 547 F. App'x 513 (5th Cir. 2013) (citing Rule 702(b) of the Federal Rules of Evidence). Indeed, there is no way a single litigation expert, especially

---

[4] *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001) (holding that neither Rule 702 nor 704 of the Federal Rules of Evidence "permit[s] expert witnesses to offer conclusions of law").

one retained exactly 24 days prior to the filing of his "expert" opinion, could comprehend the factual record developed over the last 10 months in this unprecedented case. At least as to Preference Actions, Mr. Kirschner is willing to admit that "a more detailed analysis of defenses has not yet been performed" (Kirschner Decl. ¶ 141), but he nonetheless is comfortable assuming a 10% recovery rate on preference claims—again, based solely on his anecdotal experience as a litigation trustee and without any actual historical recovery data or other quantitative support.

17.  Nor does the Plan or the Kirschner Declaration contain any analysis of defendants' ultimate collectability. Instead, the FBG Debtors warn that "even if the Litigation Trust were to secure favorable judgments, there is no guarantee that the Trust would be able to collect all or a portion of any judgment due to, among other reasons, the financial condition of defendants." Disclosure Statement at 95. This conclusory statement is yet another telling admission of how the FBG Debtors hope to have it both ways—they are not willing to stand behind their estimates of recovery, but they want to shift the risk of feasibility to a subset of creditors. In the end, the FBG Debtors rely on pure conjecture and inadmissible opinion testimony to try to meet their case on feasibility. For that reason alone, the Plan is unconfirmable.

        **B.**        **The Plan Effective Date is Speculative**

18.  The FBG Debtors concede that the Effective Date is a moving target, confirming the speculative nature of the FBG Debtors' attempted feasibility showing. The FBG Debtors state that "the Effective Date is reasonably likely to occur in the second half of 2028, although the Effective Date may reasonably or in fact occur earlier or later than the second half of 2028". Disclosure Statement at 28. In other words, the FBG Debtors really do not know if or when the Effective Date will occur—it could reasonably occur before, during or later than the second half of 2028—and the FBG Debtors' own words betray that their Plan provides no reasonable assurance of ever going effective. The FBG Debtors' sham effectiveness condition (namely, the effective

date will be when, and if, they have the money to pay administrative claims, however uncertain) should not be permitted.

19. A comparison of this Plan against the plan approved in *In re Steward Health Care System LLC* confirms, rather than cures, the Plan's infeasibility. No. 24-90213 (Bankr. S.D. Tex.) [Dkt. No. 5793]. In *Steward*, the debtors' non-litigation assets, alone, were projected to generate at least $46 million, and the debtors' litigation assets were separately projected to generate between $529 million and $746 million (with a midpoint of $631 million), against total administrative and priority claims, totaling approximately $104.9 million in the aggregate, that were filed by the administrative claims bar date that had expired over five months prior to plan solicitation. *See* Debtors' Mem. of Law in Supp. of Confirmation, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 10, 2025) [Dkt. No. 5439] (the "Steward Confirmation Brief"), ¶¶ 172–175. Under the debtors' low-case litigation recovery scenario there, and even assuming the debtors lost every one of their pending claim objections, the debtors projected that the Steward plan would still go effective with a cushion of more than $235 million to satisfy such administrative and priority claims. *Id.* ¶¶ 9, 182. The FBG Plan has no such initial funding, nor any such recovery cushion. The FBG Debtors cannot and do not identify any non-litigation assets to fund any shortfall, and Mr. Moore concedes that the $1.965 billion the Litigation Trust must generate to satisfy Administrative Expense Claims and Priority Claims sits barely below Mr. Kirschner's single-point, unhedged and convenient (particularly given the FBG Debtors' burden) recovery estimate of "in excess of $2 billion." *Compare* Moore Decl. ¶ 228, *with* Kirschner Decl. ¶ 143. There is no analog here to the "even in the worst case" analysis that it appears the lower court decided was sufficient to support feasibility in *Steward*.

9

20.     Further, many of the claims underlying the Steward litigation assets were considerably less speculative than the Estate Claims here. The Steward litigation assets consisted of, in addition to preference claims, contractual-based claims for outstanding accounts receivable and insurance claims for property damage—categories of claims with an established basis for valuation and a track record of recovery, and which were largely based on explicit agreements that set forth the parties' respective obligations. *See* Steward Confirmation Brief ¶ 184.  Here, however, the FBG Estate Claims depend on the novel application of the Ponzi Scheme's tort-based presumption against parties that were dealing with traditional, operating company debtors, and litigation against dozens, if not hundreds, of defendants who will vigorously contest liability. Kirschner Decl. ¶¶ 56–59, 122–123. The Plan's complete dependence on a single recovery estimate derived from contested fraud theories, applied in a context fall afield of any traditional Ponzi scheme, falls well short of the reasonable assurance of success the Fifth Circuit requires.  As one example of the failure of Mr. Kirschner to consider all aspects of potential litigation, he fails to analyze whether and to what extent the Factors and any parties might be "net losers" in the context of a potential, unproven Ponzi Scheme presumptions, and instead he just includes the total outflows made to Factors, not the contemporaneous inflows to the FBG Debtors (in the case of Factors, from their regular, ordinary course purchase of receivables).

21.     In sum, the FBG Debtors have not carried their burden to demonstrate feasibility under Section 1129(a)(11). The Plan depends on hoped-for and hypothetical Litigation Trust recoveries that the FBG Debtors, their own declarants, and perhaps most importantly, their own marketing process, either concede or make clear are wholly speculative.  Because the Plan's feasibility rests on a circular chain of speculative assumptions rather than the "reasonable assurance of success" that the Fifth Circuit requires, confirmation must be denied.

**II.  Administrative Claims will Not be Paid in Full in Cash on the Functional Effective Date of the Plan**

22. Section 1129(a)(9)(A) of the Bankruptcy Code provides that, absent agreement to the contrary, the plan *shall* provide for payment in full, in cash, of administrative expense claims "on the effective date of the plan." 11 U.S.C. § 1129(a)(9)(A). The Bankruptcy Code does not define "effective date," so the term must be given its ordinary meaning—namely, the date on which an instrument becomes enforceable or otherwise takes effect. *In re Ultra Petroleum Corp.*, 624 B.R. 178, 186 (Bankr. S.D. Tex. 2020), *aff'd*, 51 F.4th 138 (5th Cir. 2022).  Applying that ordinary meaning, the Plan becomes effective, for virtually all practical purposes, on the Confirmation Date or immediately thereafter, effectively rendering the Plan's delayed "Effective Date" nothing more than an artificial construct that the FBG Debtors seek to employ as an end-run around Section 1129(a)(9)(A).  The Plan immediately binds all relevant parties, vests the FBG Debtors' assets in the various trusts, enters injunctions against interference with the Plan transactions, grants releases, and authorizes dissolution of the FBG Debtors starting right after the Confirmation Date. Plan §§ 13.1, 13.2, 13.4, 13.5, 5.10.  Indeed, the Plan states expressly that its terms are "binding" and "immediately effective" as of the Confirmation Date. Plan § 15.11.

23. Other provisions of the Bankruptcy Code confirm this reading.  For example, a plan is "substantially consummated" upon a transfer of all or substantially all of the property proposed to be transferred, assumption of the business or management of substantially all of the property dealt with by the plan, or commencement of distributions under the plan. 11 U.S.C. § 1101(2). All of those events are contemplated by the Plan to occur on or immediately after the Confirmation Date.  Only a tortured reading of the Bankruptcy Code could justify approval of a plan construct under which it is substantially consummated but not yet "effective."

11

24.     Because the statutory "effective date" here is the Confirmation Date or immediately thereafter—at a time when Administrative Expense Claims and Priority Claims will not and cannot be paid in full—the Plan does not satisfy Section 1129(a)(9)(A).

**III.     The Plan Fails to Provide Equal Treatment to Similarly-Situated Creditors**

25.     Section 1129(a)(1) of the Bankruptcy Code conditions confirmation on plan compliance with the applicable provisions of the Bankruptcy Code, including Section 1123(a)(4). Section 1123(a)(4) of the Bankruptcy Code, in turn, requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).  The Plan violates that core requirement of treating similarly situated creditors in the same fashion.

26.     Courts regularly have held that the "same treatment" requirement in Section 1123(a)(4) means that claimants within the same class all have the "*same opportunity*" for recovery. *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (emphasis added) (referencing *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity" for recovery)).  Where some creditors in a class are offered "[a]n exclusive opportunity resulting in a significant disparity in value, without consideration for the [*sic*] opportunity itself," while other creditors in the same class are denied that opportunity, that disparity in and of itself violates § 1123(a)(4).   *In re ConvergeOne Holdings, Inc.*, 2025 WL 4700341, at *7 (S.D. Tex. Sept. 25, 2025).

27.     Here, the Plan violates Section 1123(a)(4) in at least two ways, either of which independently bars confirmation: (i) the Plan's "Preference Settlement" (a thinly-veiled attempt to use a settlement structure to not only deliver support from the Creditors' Committee but also to

distract from the Bankruptcy Code's substantive requirements) arbitrarily allocates additional recovery to Trade Creditors that is not offered to similarly classified Factors and Supply Chain Financers; and (ii) the Plan categorically excludes certain creditors designated by the FBG Debtors in their unilateral discretion, as Specified Non-Released Parties, from opting into the Preference Settlement, despite nominally holding the same type of claims, and in the same class, as other creditors that remain eligible to participate.

> **A. The Plan Grants Trade Creditors a Complete Release of Preference Liability While Leaving Similarly Classified Factors and Supply Chain Financers <u>Exposed to Preference Actions</u>**

28. The Plan classifies Trade Creditors, Factors, and Supply Chain Financers alike in Class 7 and as "Preference Settlement Eligible Creditors," and nominally affords each the same opportunity to elect into the Preference Settlement. This proposed treatment is likely illusory, as the actual opportunity to elect into the Preference Settlement, however, diverges sharply by creditor type: eligible Trade Creditors receive, as part of their recovery under the Plan, a complete release of preference liability, while eligible Factors and Supply Chain Financers remain exposed to Preference Actions and receive only limited procedural protections in defending against such actions.

29. A plan cannot satisfy Section 1123(a)(4)'s equal-treatment requirement merely by extending nominally identical settlement opportunities to class members where the resulting value differs by group membership. *See In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 591–92 (5th Cir. 2024); *ConvergeOne*, 2025 WL 4700341, at *6–7. Courts must "look below the surface to determine whether the distributions were in fact equal in value," rather than accept a plan's facial uniformity at face value. *Serta*, 125 F.4th at 592 (citing *W.R. Grace & Co.*, 729 F.3d at 327); *ConvergeOne*, 2025 WL 4700341, at *10 (applying the same "look below the surface" inquiry). Equal treatment "does not require 'precise equality, only approximate equality,'" but it does

"prohibit[] disparate treatment with respect to value," including where some class members tender the same consideration in exchange for a settlement that has a markedly lower economic value than those received by co-class members. *Serta*, 125 F.4th at 591-92 (citing *W.R. Grace & Co.*, 729 F.3d at 327); *see also ConvergeOne*, 2025 WL 4700341, at *7 ("An exclusive opportunity resulting in a significant disparity in value, without consideration for the [*sic*] opportunity itself, qualifies as treatment for a claim under § 1123(a)(4).").

30. The Plan's Preference Settlement fails under this recent Fifth Circuit precedent. Trade Creditors, Factors, and Supply Chain Financers are all purportedly classified together as "Preference Settlement Eligible Creditors" with identical opt-in mechanics to participate: (i) timely elect to participate by submitting a Preference Settlement Opt-In Form, (ii) grant the third-party releases contained in Section 13.5(b) of the Plan, and (iii) contribute their Direct Creditor Claims to the Litigation Trust. Plan § 1.1. But if such constituents do opt in, the benefit they receive is markedly different depending on their label: Trade Creditors receive a complete release from preference liability, *see* Plan § 6.11(d), while Factors and Supply Chain Financers would remain fully exposed to preference actions, with some lesser procedural protections (*i.e.*, the Modified New Value Elements and pre-suit meet-and-confer process). Plan §§ 6.11(d), (e). Much like the settlement indemnity in *Serta*, which was nominally awarded to all class members but whose expected value varied dramatically depending on each member's pre-petition conduct, the Preference Settlement is nominally offered to all Preference Settlement Eligible Creditors but would provide an indisputably different level of litigation protection depending on whether the electing creditor is a Trade Creditor or a Factor or Supply Chain Financer. *See Serta*, 125 F.4th at 591–92. This "equal opportunity, unequal result" structure does not satisfy what Section 1123(a)(4) demands.

14

31.     The scale of the disparity underscores its significance. Trade Creditors hold the smallest tranche of preference exposure—approximately $205 million—yet receive a complete release, while Factors and Supply Chain Financers allegedly holding the lion's share of preference exposure—approximately $1.8 billion combined—remain exposed to litigation, receiving only limited procedural benefits. [5] In *ConvergeOne*, the district court found that an eight-figure reallocation of value, reflected in a 31% higher average recovery for the majority lenders, was sufficient to extend the disparity "far beyond approximate equality." *ConvergeOne*, 2025 WL 4700341, at *9-10.  The disparity here is even more stark, because it is a difference in kind, not merely degree.  Trade Creditors are released from all preference liability, while Factors and Supply Chain Financers remain exposed to litigation, with attendant additional costs that are difficult to quantify but would nonetheless be borne by such potential defendants.

32.     To the extent the FBG Debtors contend that the differing treatment of Trade Creditors and Factors or Supply Chain Financers merely reflects pre-existing differences in the nature of their claims or business arrangements with the FBG Debtors, *ConvergeOne* forecloses that argument. There, the district court rejected the argument that unequal treatment originating before the bankruptcy filing—the exclusion of the minority lenders from prepetition restructuring negotiations—was not relevant. *See ConvergeOne*, 2025 WL 4700341, at *10-11 (explaining that "the fact that the unequal treatment happened before the bankruptcy petition was even filed does not insulate the Plan from the requirements of § 1123(a)(4)."). The operative question is not whether some pre-petition or definitional distinction can be invoked after the fact to rationalize

---

[5] Although the likely reason for this disparate treatment is patently obvious – to get the support of a creditors' committee that is often dominated by trade creditors, a debtor often proposes "to bury" preference claims – here it is striking given the relative size of non-trade creditors vis a vis trade creditors and the potential difficulty in proving preference claims against parties that in good faith funded the Debtors on regular intervals (i.e., in the ordinary course of business) and after being repaid (i.e., for new value).

unequal treatment, but whether the Plan itself delivers equal value to similarly classified creditors. And particularly here, where the Plan is a liquidating plan, there is no rational basis for bestowing additional benefit to Trade Creditors. All three groups of Preference Settlement Eligible Creditors tender identical consideration in exchange for participating in the Preference Settlement: they opt in, grant the releases required by Section 13.5(b) of the Plan, and contribute their Direct Creditor Claims to the Litigation Trust. Plan § 1.1.

33.     In sum, because the Preference Settlement affords Trade Creditors economic value that is categorically unavailable to similarly classified Factors and Supply Chain Financers, without any corresponding difference in the consideration each group tenders, the Plan violates Section 1123(a)(4).

**B.      The Specified Non-Released Party Construct Denies Similarly-Situated Creditors the Opportunity to Participate in the Preference Settlement**

34.     The Plan also violates Section 1123(a)(4) of the Bankruptcy Code because it excludes from the Preference Settlement any Trade Creditor, Factor or Supply Chain Financer designated as a Specified Non-Released Party, notwithstanding that such creditors are in the same class and hold the same type of claim as creditors that remain eligible to participate.

35.     Where a plan denies an entire subset of similarly-situated creditors the opportunity to participate in a benefit—rather than merely producing an unequal result from a nominally uniform opportunity—the Section 1123(a)(4) violation is, clearer. *Serta*, 125 F.4th at 592 ("[T]he unequal treatment in this case implicates both opportunity and result."). In *ConvergeOne*, for example, the district court found a categorical exclusion of this kind "perhaps more straightforward" to resolve than the value-disparity analysis in *Serta*, because the excluded creditors were never offered the opportunity to participate in the first place, thereby leaving "not even any pretense of equal participation." *ConvergeOne*, 2025 WL 4700341, at *10–11. Nor may a debtor escape

16

Section 1123(a)(4) by tying a creditor's exclusion to a facially neutral criterion that bears no relationship to the nature of the creditor's claim. *See Serta*, 125 F.4th at 592 & n.24.

36.     Here, the Plan limits the Preference Settlement to Trade Creditors, Factors, and Supply Chain Financers that (i) do not meet the definition of Adverse Conduct, as determined by a Final Order, and (ii) are not Specified Non-Released Parties. Plan § 6.11(a).[6]  A "Specified Non-Released Party" is neither a statutory term, nor a bankruptcy term of art; it is a definitional term invested in this Plan for parties that the FBG Debtors have unilaterally elected to exclude from the settlement they purport to offer to unsecured creditors.

37.     The disparity arising from the Specified Non-Released Party exclusion is more egregious than the disparity addressed immediately above, because it eliminates the opportunity altogether for an entire subset of otherwise similarly situated creditors (some of which were among the largest victims in these cases) to opt into the "settlement" structure.  The disparity between Trade Creditors and Factors or Supply Chain Financers at least shares a common starting point: all such creditors are nominally permitted to elect into the settlement, and the disparity arises only from the value ultimately received.  The Specified Non-Released Party exclusion, by contrast, denies a certain subset of the same class that opportunity altogether—any eligible creditor so designated ***by the FBG Debtors, unilaterally in their sole discretion***, is excluded from the settlement regardless of whether it opts in and tenders the requisite consideration. This is precisely the structure that *ConvergeOne* found "perhaps more straightforward" than *Serta*, because "there was not even any pretense of equal participation" once the excluded creditors were never offered the opportunity to participate in the first place.  *ConvergeOne*, 2025 WL 4700341, at *10-11.

---

[6] Through discovery, Katsumi is seeking whether any Factors or Supply Chain Financiers qualify to participate in the Preference Settlement or whether their purported inclusion therein is simply illusory.

Nothing in the Plan ties Specified Non-Released Party status to any objective difference in the nature of the creditor's claim; instead, the designation turns on whether the FBG Debtors or the Litigation Trustee have identified the creditor as a defendant or potential defendant—precisely the kind of facially neutral criterion that *Serta* cautioned courts to look behind rather than accept at face value. *See Serta*, 125 F.4th at 592 & n.24 (a plan cannot escape Section 1123(a)(4) by conditioning a benefit on a superficially neutral criterion, as illustrated by a hypothetical plan provision awarding value only to class members headquartered in a particular state).

38.     For these reasons, the Preference Settlement violates the equal-treatment requirement of Section 1123(a)(4) and, accordingly, the Plan cannot be confirmed under Section 1129(a)(1).

**IV.     The Estate Claims Credit Bid Transaction Impermissibly Permits the DIP Secured Parties to Credit Bid on Assets that are Not DIP Collateral**

39.     Section 363(k) of the Bankruptcy Code permits a secured creditor to credit bid "at a sale ... of property that is subject to a lien that secures an allowed claim." 11 U.S.C. § 363(k). But the secured creditor's right to credit bid is limited to its collateral.  *See In re The Free Lance-Star Publishing Co. of Fredericksburg, Va.*, 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (creditor "does not have a right to assert a credit bid on assets that do not secure [its] allowed claim"); *In re Wisconsin & Milwaukee Hotel LLC*, Slip Copy, at *12 (Bankr. E.D. Wis. 2026) ("[N]either § 363(k) nor any other provision of the Bankruptcy Code entitles [a secured creditor] to credit bid" where the property to be sold is not subject to its lien); *In re Hickey Properties, Ltd.*, 181 B.R. 171, 173 (Bankr. D. Vt. 1995) (secured creditor holding a security interest in virtually all of the debtor's

assets "is not entitled to credit bid any portion of its secured claim" as to property in which it holds no security interest).

40.     The Final DIP Order [Dkt. No. 608] grants the DIP Secured Parties superpriority claims and liens on "DIP Collateral."  Final DIP Order, ¶¶ 8(a), 11.  DIP Collateral is broadly defined to include all pre-petition and post-petition property of the FBG Debtors and all proceeds thereof, but specifically "*excluding* claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the 'Avoidance Actions')[.]" Final DIP Order ¶ 8(a) (emphasis added). Put simply, the DIP Secured Parties' liens attach only to the proceeds and recoveries if and when ultimately generated by Avoidance Actions—not to the underlying claims and causes of action themselves. The Plan itself acknowledges this very distinction, reciting that "[t]he DIP Secured Parties have superpriority liens on…all Estate Claims (excluding Avoidance Actions but including Avoidance Proceeds)." Plan § 5.2(b).

41.     Notwithstanding this express carve-out, the Plan contemplates that the DIP Secured Parties will acquire the Avoidance Actions themselves, and not merely their proceeds, through the Estate Claims Credit Bid Transaction.  Under Section 5.2(e) of the Plan, the FBG Debtors are to sell, assign, convey, transfer, and deliver the Litigation Trust Assets to the DIP Secured Parties, with "[t]he aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets" consisting of the Estate Claims Credit Bid.  Plan § 5.2(e).  The "Litigation Trust Assets" being sold in this transaction expressly include "all Estate Claims"—which, in turn, include Avoidance Actions and Avoidance Proceeds").  Plan § 1.1.

42.     The Estate Claims Credit Bid Transaction thus proposes to do precisely what the Bankruptcy Code expressly forbids and the Final DIP Order precluded:  it would permit the DIP

Secured Parties to credit bid their Allowed DIP A Claims to purchase assets that are not their collateral. As a result, the Estate Claims Credit Bid is impermissible as a matter of law, rendering the Plan unconfirmable to the extent it relies on the Estate Claims Credit Bid Transaction to fund recoveries under the Plan.

43.     The Estate Claims Credit Bid Transaction is yet another instance where the FBG Debtors and the other supporters of the Plan seek to benefit from artificial "finality" to shelter Plan transactions from effective appellate review, using the "good faith purchaser" protections of Section 363(m). But even if it could be applicable here (which is doubtful under governing Fifth Circuit precedent),[7] the purpose of Section 363(m) is "to give finality to those orders and judgments upon which third parties rely," *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014), but there is no outside third-party purchaser here in need of such protection. The Court therefore should not permit the FBG Debtors to use Section 363(m) to insulate the Plan from review or to foreclose the Court's ability to unwind the Plan if it fails to go effective.

## V.     The Plan is Not Confirmable Because it Impermissibly Classifies Substantially Similar Claims in Different Classes

44.     Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Courts in the Fifth Circuit have interpreted this principle to hold that claims which are substantially similar should be placed in the same class, and that, to the extent separate classification of such claims is permitted, "such classification may only be undertaken for

---

[7] Notably, Section 1123(b)(4)—not Section 363—is the Code provision that directly authorizes a plan to "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4). The Fifth Circuit has expressed doubt that Section 363 is even applicable to plan sales, because Section 363 concerns "the trustee's authority during the administration of the estate and not at the final disposition of the property of the estate pursuant to a plan of reorganization." *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1166 (5th Cir. 1988).

reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1278–79 (5th Cir. 1991). The "one clear rule" that emerges from this line of authority is that a plan proponent may not "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id*. at 1279; *see also In re Pacific Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 860–61 (Bankr. S.D. Tex. 2001).

45. As discussed in greater detail below, the Plan's classification scheme cannot withstand this level of scrutiny in at least two material respects.

## A. The Plan Impermissibly Classifies Unsecured Deficiency Claims Separately from Other Unsecured Claims

46. The Plan also fails, on its face, by classifying portions of any of the Secured Claims that constitute deficiency claims—which are, by definition, unsecured claims against the FBG Debtors' estates that are legally indistinguishable in priority and character from the General Unsecured Claims—separately from the Class 7 General Unsecured Claims, in an apparent attempt to either artificially impair or gerrymander such other classes of Secured Claims.

47. This is precisely the classification scheme the Fifth Circuit has repeatedly rejected. In *Greystone*, the plan at issue placed an undersecured lender's unsecured deficiency claim in a class separate from all other unsecured claims. *Greystone*, 995 F.2d at 1277. The Fifth Circuit held that this classification scheme violated Section 1122(a) because a plan proponent may not separately classify substantially similar claims absent a legitimate justification. *Greystone*, 995 F.2d at 1279. To the extent the FBG Debtors' attempt to justify separate classification on the basis of their prepetition relationship with the Secured Parties, that argument fares no better than the one Greystone specifically rejected. *Id*. That any deficiency claims of those Secured Parties trace back to what was once a secured financing arrangement does not alter the legal character of the resulting

21

deficiency claim—which, once bifurcated under Section 506(a)—stands on the same unsecured footing and carries the same priority and rights as the Class 7 General Unsecured Claims. *See id.; see also Pacific Lumber*, 584 F.3d at 250-51.

48.     Nor can the FBG Debtors rely on any purported need to preserve ongoing business relationships or another non-creditor interest that courts have accepted as valid justifications for separate classification of similar claims.  *See, e.g.*, *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993); *In re Robertshaw US Holding Corp.*, 662 B.R. 300 (Bankr. S.D. Tex. 2024). The Plan is a liquidating plan and the FBG Debtors have no ongoing operations to preserve, leaving no going-concern rationale that could justify separate classification of the Secured Parties' deficiency claims from other unsecured claims.

49.     Accordingly, because the FBG Debtors have not identified—and cannot identify— any legitimate basis to classify the Secured Parties' deficiency claims (if and where applicable) separately from other unsecured claims, the Plan's classification fails to satisfy Section 1122(a) of the Bankruptcy Code.

### B.     The Plan's Settlement Construct Relies on Improper Classification

50.     The Plan's settlement structure with respect to the various classes of secured claims also does not comply with the requirements of Section 1122(a) of the Bankruptcy Code, as required by Section 1129(a)(1).  At the outset of these cases, the DIP Secured Parties required a 3:1 roll up of their pre-petition claims as a condition to their lending.  This created a heightened level of protection for the DIP Secured Parties, ensuring that their related administrative claim would be in excess of $4.4 billion. If such claim were left unaltered by the Plan, the hurdle for recovery (and thus feasibility) would, as a matter of basic math, be at least double (if not more) of the approximately $2 billion recovery hurdle under the current Plan construct.

51.     Perhaps regretting that their roll-up requirement at the outset of these cases could make confirmation of a plan now impossible, the DIP Secured Parties pivoted to the current Plan construct, forgoing the requirement that their roll-up claims be paid in full on the Effective Date. That decision then cascades through the Plan, as their attempt to retroactively "unroll" the roll-up and have such claims now be effectively reinstated as allowed First Lien and Second Lien Claims, fundamentally changes the analysis of how and whether such claims can be separately classified from General Unsecured Claims.

52.     The Plan's classification scheme cannot survive this scrutiny.  Notwithstanding the DIP Secured Parties' apparent decision to "unroll" the roll-up—in contradiction of the express limitations set forth in the Final DIP Order (*see* Final DIP Order, ¶ 25(d))—and reinstate portions of their claims in substance as First Lien and Second Lien Claims, the Plan classifies Roll-Up Claims, First Lien Claims, and Second Lien Claims into three separate voting classes—Classes 3, 4, and 5, respectively—while placing General Unsecured Claims into a fourth, entirely separate class, Class 7.  *See* Plan § 3.2.  Yet, under the Litigation Trust Waterfall, holders of Allowed Roll-Up Claims, First Lien Claims, Second Lien Claims and General Unsecured Claims all share *pro rata* in the very same distribution tier "based on the aggregate amount" of their combined claims. *See id*. § 6.5(d)(v).  To that end, the Plan fixes the allowed amount of the Roll-Up Claims at $3.3 billion—as opposed to the more than $4.4 billion in DIP-related administrative claims the Roll-Up Claims would otherwise represent—such that they may be pooled and paid *pro rata* alongside the First Lien, Second Lien and General Unsecured Claims.  *See id*.  As such, the Plan treats these four classes of claims as economically fungible for purposes of actual recovery, notwithstanding their separate classification for purposes of voting.

53.    This is also precisely the kind of classification scheme that *Greystone* and its progeny condemn.  Where, as here, claims are treated identically for distribution purposes, there can be no legitimate, non-vote-related reason to divide them into separate classes for voting purposes. *See Greystone*, 995 F.2d at 1280 (rejecting separate classification where "there is no separate treatment of the trade creditors" relative to the claim from which they were segregated); *cf. Robertshaw US Holding Corp.*, 662 B.R. at 318-19.  Indeed, the Plan's classification scheme is the exact inverse of the one blessed in *Robertshaw*: rather than mirroring a waterfall that keeps like claims together, the Plan's classification scheme artificially separates for voting purposes claims that the Litigation Trust Waterfall keeps together, *pro rata*, for recovery purposes.

54.    The only plausible explanation for the divergence between economic treatment and voting classification is the FBG Debtors' desire to manufacture multiple impaired, consenting classes that remain effectively controlled by the same constituency. This is the same maneuver that the Fifth Circuit has repeatedly rejected. *See In re Pacific Lumber Co.*, 584 F.3d at 250-51 (condemning the "bifurcation of unsecured 'trade' claims and the Noteholders' deficiency claim" that were "on equal footing," and reiterating that "[f]acilitating a plan's confirmation is definitely not a valid justification" for separate classification); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. at 861. As in *Greystone*, the FBG Debtors have offered no evidence, much less a "good business reason," for treating the Roll-Up, First Lien, and Second Lien Claims as sufficiently distinct from General Unsecured Claims to warrant separate voting classes, particularly where the Plan's Litigation Trust Waterfall erases any such distinction at the point of distribution. *See Greystone*, 995 F.2d at 1280–81.

55.    For these reasons, the Plan's classification scheme fails to satisfy Section 1122(a), precluding confirmation under Section 1129(a)(1).

## VI.   The Plan Impermissibly Consolidates the FBG Debtors' Estates for Certain Purposes but Not for Others

56.   The Plan is predicated on substantive consolidation for some purposes—including distribution of estate assets and, through the Preference Settlement, defending against avoidance actions—while denying substantive consolidation for other purposes. That selective approach is impermissible.

57.   Substantive consolidation is an equitable remedy such that "its exercise must lead to an equitable result." *In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005). Using substantive consolidation to render a plan confirmable and to extend benefits to favored creditors, while denying those same benefits to disfavored creditors, amounts to "a pretend consolidation" being "used as a sword and not a shield." *Id*.

58.   Courts within the Fifth Circuit consider several factors in evaluating whether substantive consolidation is appropriate, including: (i) the difficulty of segregating and ascertaining individual assets and liabilities; (ii) the presence or absence of consolidated financial statements; (iii) the commingling of assets and business functions; (iv) the unity of interests and ownership between the various entities; (v) the existence of parent and intercompany guarantees; and (vi) the transfer of assets without observance of corporate formalities. *In re E'Lite Eyewear Holding, Inc.*, 2009 WL 349832, at *3 (Bankr. E.D. Tex. Feb. 5, 2009); *In re Amco Ins.*, 444 F.3d 690, 697 n.5 (5th Cir. 2006).

59.   The record here satisfies those factors. The FBG Debtors have acknowledged that segregating individual assets and liabilities would be "impracticable and unduly burdensome" given the voluminous intercompany transactions among the FBG Debtors, and that money received from factoring parties was routinely "cycled back" to pay other, or the same, factoring parties. Moore Decl. ¶¶ 15, 84. The FBG Debtors have likewise admitted that they historically

25

prepared financial statements on a consolidated basis with non-Debtor affiliates, that their accounting practices were designed to support consolidated—not individual—reporting, and that "pervasive manipulation and doctoring" of financial records occurred. Moore Decl. ¶ 70; *Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 1565], at 3-4.

60.     The Examiner appointed in these cases concluded—and the FBG Debtors have adopted the finding—that First Brands and a network of affiliated SPVs and non-Debtor entities "were operated as a single enterprise directed by [Patrick James] and others for the purpose of generating and extracting liquidity through structures that concealed the true perimeter of the business and depleted value available to creditors." Disclosure Statement at 51.

61.     Given this pervasive disregard of corporate boundaries, the Plan's selective use of substantive consolidation for distribution purposes and for the benefit of creditors eligible to participate in the Preference Settlement, but not for other purposes or other creditors, "remake[s] substantive consolidation not as a remedy, but rather a stratagem." *Owens Corning*, 419 F.3d at 216.  This tactical use is illustrated by the Preference Settlement itself. Factors and Supply Chain Financers that opt in receive the benefit of "Modified New Value Elements," which permit aggregation of new value given to any First Brands entity—the functional equivalent of substantive consolidation for purposes of calculating a new-value defense—while creditors excluded from the Preference Settlement, including Katsumi and other similarly situated Factors and Supply Chain Financers, receive no such benefit.  Plan § 6.11(e).

62.     For these reasons, the Plan should be modified to make clear that the substantive consolidation it effectuates applies for all purposes, including for purposes of avoidance actions

and defenses to such actions, rather than being deployed selectively for the sole benefit of the FBG Debtors.

## VII.     The Plan Contains Numerous Other Defects that Preclude Confirmation

### A.     The Definition of ABL Collateral Trust Assets Alters Prior Orders Governing the Factored Receivables Account

63.     This Court's prior orders governing the release of funds from the Factored Receivables Account established a standard for release that is predicated, among other things, on whether a Factor had a colorable claim of ownership.  The Plan's definition of "ABL Collateral Trust Assets," however, seeks to rewrite this Court's order to abandon that standard in favor of a different framework that favors the ABL Secured Parties to the detriment of Factors.

64.     Specifically, under the Initial Factoring Order [Dkt. No. 1133], this Court authorized the release of certain funds from the Factored Receivables Account to the FBG Debtors' operating accounts, but only with respect to receivables for which no Factor had asserted a colorable claim of ownership.  In other words, the threshold inquiry governing the release of funds from the Factored Receivables Account was ownership: if a Factor purchased a receivable, and funds in the Factored Receivables Account were attributable to that purchased receivable, those funds belonged to the Factor.

65.     The Plan's definition of "ABL Collateral Trust Assets" turns this standard on its head. Under the Plan, "ABL Collateral Trust Assets" are defined to include "any amounts in the Factored Receivables Account that are determined by a Final Order to be property of an FBG Debtor's Estate, *but excluding any amounts in the Factored Receivables Account that the Bankruptcy Court determines by a Final Order that a Factor has a validly perfected first-priority security interest in such amounts.*"  Plan § 1.1 (emphasis added).

66.     Through this definition, the Plan not only presumes that all funds in the Factored Receivables Account are estate property, but it replaces the Initial Factoring Order's ownership-based inquiry with a lien-perfection analysis that requires Factors to demonstrate not that they purchased and own the underlying receivables, but instead that they hold a "validly perfected first-priority security interest" in amounts held in the Factored Receivables Account.  The practical effect of this change is to recharacterize true sale arrangements as secured lending transactions, relegating Factors to the status of secured creditors bearing the burden of proving lien perfection and priority against the ABL Secured Parties without the formality of an adversary proceeding. That standard is fundamentally inconsistent with the Initial Factoring Order and the Bankruptcy Rules.  *See* Fed. R. Bankr. P. 7001(2).

67.     In addition, the Plan's definition of "ABL Collateral Trust Assets" also contains a final proviso stating that, "[f]or the avoidance of doubt … ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor, the SPV Lenders, or the DIP Secured Parties." Plan § 1.1. Although this proviso purports to protect Factor property, it does not cure the defects raised above, and causes more confusion that will undoubtedly be used against the Factors or other parties in future proceedings. Rather than restoring the ownership-based inquiry that governed under the Initial Factoring Order, the proviso simply restates the same burden shift and lien-perfection standard as the operative test for exclusion from the ABL Collateral Trust.

68.     The prejudice to Factors is not trivial.  Under Section 5.4 of the Plan, the ABL Agent, after the Effective Date, shall have "the right to direct the Wind Down Administrator with respect to the prosecution of the FBG Debtors' interests in the Factored Receivables Account,"

and "the ABL Agent's prior written consent shall be required for any settlement, compromise, or other disposition of such interests." Plan § 5.4. Put simply, the Plan purports to grant a separate class of creditors unilateral control over the prosecution and settlement of ownership disputes with respect to non-estate property. The Plan cannot rewrite prior orders of this Court, especially in a manner that prejudices other parties in a procedurally defective fashion, and the Plan cannot be confirmed absent changes to this definition.

### B.    The Definition of Estate Claims is Impermissibly Overbroad

69.    Pursuant to Section 541 of the Bankruptcy Code, the commencement of a bankruptcy case creates an estate that, subject to certain exceptions, consists of "all legal or equitable interests of the debtor in property as of the commencement of a case" as determined by applicable state law. 11 U.S.C. § 541(a)(1); *see Butner v. United States*, 440 U.S. 48 (1979). The Bankruptcy Code does not, however, permit a debtor unilaterally to expand the scope of estate property. *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 433-34 (1972) (trustee lacks standing to assert claims belonging solely to the debtor's creditors). The determination of whether a pre-petition claim belongs to the estate turns on whether the debtor itself could have asserted the claim prior to bankruptcy; claims arising pre-petition based on a creditor's own particularized injury remain the property of that creditor. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 586 (5th Cir. 2008). Put simply, the scope of estate property is determined by the Bankruptcy Code, and not by how a debtor chooses to define it.

70.    The Plan's definition of "Estate Claims" contains impermissibly broad catch-all language designed to sweep individual creditor claims into the estate, defining Estate Claims to include any and all claims and/or remedies of the FBG Debtors or their Estates against third parties, including: (i) "any Claim that is duplicative of an Estate Claim"; (ii) "any other Claim that is in

29

substance an Estate Claim"; and (iii) any Claim related to the FBG Debtors, the Chapter 11 Cases, or the Estates "that is a general claim with no particularized injury arising from it[.]"  Plan § 1.1.

71.     Each of these three catch-alls independently exceeds what the Bankruptcy Code defines as estate property.  The FBG Debtors' attempt to capture as estate property "any Claim ... that is a general claim with no particularized injury arising from it" cannot be reconciled with governing law.  Plan § 1.1.  The Fifth Circuit has rejected the "general" versus "personal" injury standard the FBG Debtors attempt to invoke, holding that the relevant inquiry instead turns on "the nature of the injury for which relief is sought" and the "relationship between the debtor and the injury." *Seven Seas Petroleum*, 522 F.3d at 584. Under that standard, a claim is not property of the estate unless the FBG Debtors themselves could have asserted it before the commencement of these Chapter 11 Cases, regardless of labeling.

72.     The FBG Debtors' effort to characterize as estate property any claim that is "duplicative of an Estate Claim" or "in substance an Estate Claim" fares no better.  Plan § 1.1. That language supplies no ascertainable standard—it does not identify what makes a claim "duplicative," or when a claim is "in substance" an Estate Claim—and instead leaves that characterization to the unchecked discretion of the Litigation Trustee. Courts have rejected comparably vague and self-serving definitions that would permit a debtor to appropriate claims belonging to third parties. *See In re Bogdan*, 414 F.3d 507, 512 (4th Cir. 2005) (noting that "whether a cause of action belongs to the bankruptcy estate or to an individual creditor" is a legal determination, not one subject to a debtor's self-serving definitions).

73.     Additionally, the current formulation of Estate Claims renders the Plan's carve-out for "Direct Creditor Claims" entirely illusory. The Plan defines Direct Creditor Claims narrowly to exclude "(i) any Estate Claims, (i) Claims that are duplicative of Estate Claims, or (iii) Claims

that are plead as direct Claims but in substance are Estate Claims." Plan § 1.1. Because "duplicative of" and "in substance" an Estate Claim are themselves undefined, however, any claim the Litigation Trustee wishes to appropriate can simply be labeled as falling within one of those categories, effectively stripping creditors of any meaningful right to pursue claims that belong to them individually.

74.     In sum, the Plan's definition of "Estate Claims" improperly expands estate property beyond what Section 541 and established case law permit and, as a result, threatens to strip Factors, like Katsumi, of direct creditor claims they hold individually (*e.g.*, claims against the owners and members of the FBG Debtors' prepetition management who defrauded them), and to transfer those claims involuntarily to the Estates. At a minimum, the final proviso in the definition of Estate Claims should be stricken from the Plan. *See* Plan § 1.1 ("… *provided* that Estate Claims shall also include any Claim that is duplicative of an Estate Claim, any Claim related to (i) – (iv) above that is a general claim with no particularized injury arising from it, or any other Claim that is in substance an Estate Claim.").

### C.     The Plan Impermissibly Extinguishes Creditor Setoff Rights

75.     Section 9.11(b) of the Plan purports to require any entity holding a potential right of setoff against the FBG Debtors to file a motion asserting that right before the Confirmation Date or forfeit it. There is no legal basis for that requirement. Section 553 of the Bankruptcy Code provides that, subject to exceptions not applicable here, the Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

76.     The Plan departs from Section 553 by purporting to extinguish setoff rights outside of the specific, Code-based grounds for disallowing or limiting them. That approach is particularly

31

unfair to creditors that hold setoff rights because the existence of a setoff right may not even become apparent until the Estates or the Litigation Trustee later assert affirmative claims against which a setoff could be available. Accordingly, Section 9.11(b) of the Plan should be stricken in its entirety or, at a minimum, conformed to the requirements of Section 553 of the Bankruptcy Code.

77.    In a similar vein, nothing in the Plan or any confirmation order should change, preclude or otherwise limit any and all defenses that a putative or actual defendant may raise to defend against any claims asserted by the Litigation Trust, including, without limitation, whether any such claim transferred to the Litigation Trust may have been transferred in contravention of applicable law.  Accordingly, the Plan should be modified to make clear that all such defenses are expressly preserved.

**D.    The Plan's Third-Party Release, Exculpation and Injunction Provisions are <u>Impermissible</u>**

78.    The Plan's third-party release, exculpation, and related injunction provisions, as set forth in Sections 13.4(b), 13.5(b), 13.6, and 13.8, are impermissible under the Bankruptcy Code and controlling Fifth Circuit precedent, and the Plan should not be confirmed unless these interlocking provisions are narrowed.

79.    In the Fifth Circuit, exculpation must "be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties and the trustees within the scope of their duties." *Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 438 (5th Cir. 2022). The Plan, however, defines "Exculpated Parties" to include Neal Goldman, William Transier, and Benjamin Duster in their capacities as members of the Special Committees, and Goldman and Transier in their capacities as Independent Managers of the FBG

32

Debtors—non-debtor individuals who fall outside the narrow category of parties *Highland* permits to be exculpated.

80.    The Plan's third-party release provisions compound this problem. Section 13.5(b) deems each "Releasing Party" to have conclusively released each "Released Party," a term that sweeps far beyond the FBG Debtors and their Estates to include, among others, the Special Committee members and Independent Managers, the Ad Hoc Group and its members, the DIP Secured Parties, and the Prepetition Secured Parties.  Plan § 13.5(b). Third-party releases of this kind are extraordinary relief that the Fifth Circuit has long viewed with skepticism, holding that "[s]ection 524(e) only releases the debtor, not co-liable third parties" (*Pacific Lumber*, 584 F.3d at 252 (5th Cir. 2009)), and the Supreme Court has confirmed that the Bankruptcy Code does not authorize a release and injunction that seeks to discharge claims against a nondebtor without the consent of the affected claimants. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024). None of the non-debtor parties swept into the Released Parties definition have filed for bankruptcy or demonstrated an identity of interest with the Debtors sufficient to justify a nonconsensual discharge of claims against them, and the Debtors have not shown that releases of this scope are essential to the Plan's success.

81.    The Plan's injunction provisions independently and impermissibly enforce these overbroad release and exculpation provisions. Section 13.4(b) of the Plan permanently enjoins any entity holding a Claim, Interest, or Cause of Action that is released under Section 13.5(a) or (b), or subject to exculpation under Section 13.6, from commencing or continuing any action, enforcing any judgment, or creating any lien against the Released Parties or Exculpated Parties. Section 13.8, in turn, separately provides that the Confirmation Order "shall permanently enjoin the commencement or prosecution … of any Claims … released or exculpated pursuant to the

Plan." Plan § 13.8.  However, because the Fifth Circuit does allow permanent injunctions so long as there is consent (*see In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–702 (Bankr. W.D. Tex. 2011), and a court must reject an injunction if it effectively discharges a nondebtor (*see In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995), the Plan's injunction provisions cannot stand to the extent they enforce releases and exculpation that exceed what *Pacific Lumber* and *Highland* permit.

82.     For these reasons, the Court should deny confirmation or, at a minimum, modify Sections 13.4(b), 13.5(b), 13.6, and 13.8 to satisfy binding Fifth Circuit precedent.

## VIII.    The Disclosure Statement Should Not be Approved on a Final Basis

83.     Section 1125(a)(1) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," meaning "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  Courts in the Fifth Circuit have interpreted this requirement to mean that a plan proponent must "adequately, not selectively, disclose fully and precisely all information a creditor would reasonably want before voting on the plan."  *Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc. (In re Westland Oil)*, 157 B.R. 100, 104 (S.D. Tex. 1993).

84.     The Disclosure Statement falls short of this standard in two independent respects: it selectively and misleadingly discloses the scope of the Plan's substantive consolidation, and it says nothing about what, if anything, will be required or likely to occur should the Plan be confirmed but the Effective Date never occur.  Because each defect deprives creditors of information they need to cast an informed vote, the Disclosure Statement should not be approved on a final basis.

**A.      The Disclosure Statement Lacks Adequate Information Regarding Substantive Consolidation**

85.      The Disclosure Statement misrepresents substantive consolidation, a central and non-severable feature of the Plan. *See* Plan §§ 5.1, 15.14.  It repeatedly assures creditors that consolidation applies "[s]olely for purposes of distributions under the Plan" (*see* Disclosure Statement at 23 and 82), yet the Plan's use of substantive consolidation extends to voting and classification as well.

86.      A plain reading of the Plan confirms this.  Section 3.1 provides that "[a] Claim or Interest is placed in a particular Class for all purposes, including *voting, confirmation, and distribution* under the Plan."  Plan § 3.1 (emphasis added).  Consistent with that provision, the Plan uses a single classification scheme across all of the FBG Debtors: creditors vote on a single Plan, and creditors of each debtor are grouped into single classes regardless of which such they hold a claim against.  Plan § 4.7.  When a creditor's claim against one debtor is combined with claims against other debtors for purposes of classification and voting, that is substantive consolidation, irrespective of whatever label the FBG Debtors attach to it.  By omitting this reality, the Disclosure Statement mischaracterizes and misleads creditors into believing that consolidation is limited solely to distributions.  That omission deprives creditors of the information necessary to evaluate a central, non-severable feature of the Plan in violation of Section 1125(a)(1).

**B.      The Disclosure Statement Contains No Disclosure Regarding the Non-Occurrence of the Effective Date**

87.      The Disclosure Statement does not merely fail to adequately disclose the consequences if the Effective Date never occurs, *it does not address the topic at all*.

88.      The Plan contemplates an extraordinary gap between the Confirmation Date and the Effective Date.  The FBG Debtors estimate that the Effective Date is "reasonably likely to occur in the second half of 2028"—roughly two years after the anticipated Confirmation Date—

but concede that it "may reasonably or in fact occur earlier or later than the second half of 2028." Disclosure Statement at 28. That gap is no small matter: the Effective Date is subject to at least sixteen conditions precedent, principally including that the Litigation Trust and/or DIP Collateral Trust "shall have sufficient Cash on hand" to satisfy all administrative and priority claims. Plan § 12.1(o). As detailed above, satisfaction of that condition depends entirely on whether the Litigation Trust generates in excess of $1.965 billion in net proceeds from Estate Claims that, by the FBG Debtors' own admission, are unliquidated, largely unasserted, and subject to the "inherent risks" of litigation, including "uncertainty concerning whether these actions and litigations will be successful and, even if successful, the amount and timing of recoveries that may be realized." Disclosure Statement at 94. Because the FBG Debtors' recovery estimate rests on speculation rather than the "reasonable assurance of success" required for feasibility, *see* Section I, *supra*, there is a very real risk that the Effective Date's cash-on-hand condition will never be satisfied, leaving the Plan confirmed but never effective for an indeterminate period while creditors, like Katsumi, may remain subject to litigation and other burdens under a Plan that never takes effect.

89. Section 12.3 of the Plan addresses this scenario only in conclusory fashion, stating that if the Effective Date does not occur, "the Plan shall be null and void in all respects" and that nothing in the Plan shall "constitute a waiver or release of any Claims" or "prejudice in any manner the rights of any Entity." Plan § 12.3. Yet, the Disclosure Statement offers no further details about the practical consequences of non-effectiveness for stakeholders who, by that point, may have operated and bared the burdens under a confirmed but never-effective Plan for an extended and indeterminate period.

36

90. For these reasons, the FBG Debtors have not met their burden under Section 1125(a)(1) of the Bankruptcy Code, and the Court therefore should deny final approval of the Disclosure Statement.

## RESERVATION OF RIGHTS

91. Katsumi expressly reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection and to raise further and other objections at the Combined Hearing, or at any further hearing on the Plan and Disclosure Statement.

92. Without limiting the generality of the foregoing, Katsumi disputes the broad, conclusory allegations with respect to Katsumi in the Moore and Kirschner Declarations as inaccurate, one-sided and inconsistent with the full factual record, and in that regard, Katsumi expressly reserves all rights, claims, defenses and remedies with respect thereto.

## CONCLUSION

WHEREFORE, Katsumi respectfully requests that this Court (i) deny confirmation of the Plan, (ii) deny final approval of the Disclosure Statement, (iii) modify the terms of the Plan consistent with this Objection, and/or (iv) grant such other relief as is just and proper.

*[Remainder of page intentionally left blank]*

Dated: July 20, 2026
Houston, Texas

/s/  Charles S. Kelley
**MAYER BROWN LLP**
Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, Texas 77002
Telephone: (713) 238-3000
Email: ckelley@mayerbrown.com

Sean T. Scott (admitted *pro hac vice*)
Kyle J. TumSuden (admitted *pro hac vice*)
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Email: stscott@mayerbrown.com
      ktumsuden@mayerbrown.com

Richard A. Stieglitz (admitted *pro hac vice*)
Lauren C. Blanchard (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Email: rstieglitz@mayerbrown.com
      lblanchard@mayerbrown.com


*Counsel to Katsumi Servicing, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 20, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notification of such filing to all attorneys of record.

*/s/ Charles S. Kelley*
Charles S. Kelley