**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.,* | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| | § | |
| | § | |
| **Debtors.**[1] | § | |
| | § | |

**CARNABY SECURED LENDERS' OBJECTION TO JOINT CHAPTER 11 PLAN OF
FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**
Related to ECF No. 3019

The lenders (the "Carnaby Secured Lenders") under that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement")[2] and that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement,"[3] and together with the Carnaby II Credit Agreement, the "Carnaby Credit Agreements") by and through their undersigned counsel, hereby file this objection (the "Objection") to confirmation of the *Joint Chapter 11 Plan of First Brands*

---

[1]    A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    The Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), dated as of May 31, 2022, was entered into among Carnaby Inventory II, LLC, ("Carnaby II") as Borrower, First Brands Group, LLC ("FBG"), as the Servicer, First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors, the Carnaby Secured Lenders party thereto from time to time, and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Brake Parts Inc. LLC ("BPI") and certain non-Debtor affiliates party thereto.

[3]    The Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), dated as of July 6, 2022, was entered into among Carnaby Inventory III, LLC ("Carnaby III," and together with Carnaby II, the "Carnaby Debtors"), as Borrower, First Brands Group, LLC ("FBG"), as the Servicer, FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors, the Carnaby Secured Lenders party thereto from time to time, and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, the "Trico Entities") and certain non-Debtor affiliates party thereto.

1

*Group, LLC and Certain Affiliated Debtors* [ECF No. 3019] (the "Plan").[4]   In support of the Objection, the Carnaby Secured Lenders respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      The Plan does not meet the requirements and standards for confirmation under the Bankruptcy Code.  Through the Plan, the FBG Debtors seek to transfer all of their assets to their DIP Lenders and ABL Lenders, pay their professionals' fees and expenses, and secure exculpations for their professionals and estate fiduciaries, all without paying their Administrative Expense Claims—including the Carnaby Secured Lenders' substantial Administrative Expense Claims—or priority Claims in full in cash upon the Plan's effectiveness.  The unlawful treatment of Administrative Expense and priority Claims, as well as other fundamental deficiencies, renders the Plan unconfirmable.

2.      The Plan proposes that, on the Confirmation Date, the FBG Debtors will (1) transfer substantially all of their assets to various Trusts controlled by the DIP Lenders or ABL Lenders; (2) turn over the management of the FBG Debtors' assets to those Trusts; and (3) make distributions of Trust interests to creditors, entitling at least the FBG Debtors' DIP Lenders and ABL Lenders to near-term distributions of assets from the Trusts.  But it does not propose to pay the FBG Debtors' administrative and priority creditors until the "Effective Date," which will likely not occur for at least 18 months, if it ever occurs at all.  Since section 1129(a)(9) of the Bankruptcy Code provides that a chapter 11 plan may only be confirmed if it pays all administrative and priority claims in full on the date it actually becomes effective—which here is the Confirmation Date—FBG Debtors' Plan is unconfirmable.  Moreover, given that there is no credible evidence

---

[4]     Capitalized terms not defined herein shall have the definition contained in the *Disclosure Statement for the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [ECF No. 3020] (the "Disclosure Statement") and the Plan.

NA_DECHERT.96345197.9

that the "Effective Date," as defined in the Plan, will ever occur, the Plan is not feasible under section 1129(a)(11) and thus cannot be confirmed for this reason alone.

3.      In addition, the Plan elevates the priority of certain Administrative Expense Claims over others based solely on the holders' willingness to settle their claims for 50% of their face value.  Nothing in the Bankruptcy Code authorizes this scheme, and Supreme Court precedent squarely prohibits it.

4.      Finally, the Plan contains other provisions that violate the Bankruptcy Code including, among other things, by purporting to transfer causes of action to the FBG Debtors' estates free and clear of certain defenses, counterclaims, setoff rights and rights of recoupment, by taking assets that belong to the SPV Debtors for the benefit of the FBG Debtors, and by providing exculpation and limitations on lawsuits for the benefit of the directors of the SPV Debtors (who are not Plan parties) in violation of applicable Fifth Circuit law.  These provisions also render the Plan unconfirmable.

## BACKGROUND

### A.      The Carnaby Secured Lenders' Financings

5.      The Carnaby Secured Lenders hold approximately $160 million in principal amount of secured loans owing from the Debtors, Carnaby Inventory II, LLC and Carnaby Inventory III, LLC (together, the "Carnaby II and III Debtors") which are special purpose entities formed for the purpose of facilitating the Carnaby Secured Lenders' financing.[5]  Pursuant to the

---

[5]     The Carnaby Secured Lenders have filed proofs of claim against each of the FBG Debtors, which constitute *prima facie* evidence of the validity and amount of their claims pursuant to Bankruptcy Rule 3001(f).  *See* Proof of Claim Nos. 2665, 2670–2675.  The FBG Debtors have not filed any objection to the Carnaby Secured Lenders' proofs of claim.  Further, the FBG Debtors have stipulated to certain claims of the Carnaby Secured Lenders against the FBG Debtors certain amounts for voting purposes.  *See Stipulation Authorizing Deemed Filing of Claims by GLAS Trust Company LLC, as Administrative Agent for the Carnaby II and III Secured Lenders and Allowing Claims Solely for Voting Purposes Pursuant to Bankruptcy Rule 3018* [ECF No. 3199].

NA_DECHERT.96345197.9

Carnaby Credit Agreements and the related Transaction Documents (as defined in the Carnaby Credit Agreements), each of the Carnaby II and III Debtors has pledged substantially all of its assets to secure the Carnaby Secured Lenders' obligations.

6. In addition to the obligations owed by Carnaby II and III Debtors, the Carnaby Secured Lenders hold direct claims against several "FBG Debtors," including First Brands Group Holdings, LLC, which guaranteed the Carnaby loans, as well as First Brands Group LLC, Brake Parts Inc. LLC, Trico Technologies Corporation, and Trico Products Corporation, all of which executed either the Carnaby Credit Agreements or ancillary Transaction Documents, made various representations and warranties to the Carnaby Secured Lenders, and undertook various covenants and obligations for the benefit of those lenders. Through their all-asset security interests in the Carnaby II and III Debtors' assets, the Carnaby Secured Lenders also have liens in all claims the Carnaby II and III Debtors hold against the FBG Debtors arising out of the Transaction Documents.

**B.      The Carnaby Secured Lenders' Administrative Claims**

7. The Carnaby Secured Lenders also hold substantial Administrative Expense Claims against certain FBG Debtors, including BPI and each of the Trico Entities for post-petition transactions, including for breach of the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* [ECF No. 230] (as modified by the Parties thereto from time to time, the "Carnaby Secured Lender Interim AP Order").

8. Under the Carnaby Secured Lender Interim AP Order, BPI and each of the Trico Entities were authorized as "Debtor Purchasers" to purchase "Carnaby Inventory Collateral" at "Fair Market Value" from the Carnaby II and III Debtors for cash payments, or for eligible accounts receivable up to $20 million in the aggregate. *See* Carnaby Secured Lender Interim AP Order ¶ 3. The order further directed that cash proceeds from such sales would be deposited into

4

a segregated "Adequate Protection Account" free from any other liens. *See id.* It further provided that no transfers of the Carnaby Secured Lenders inventory collateral to any FBG Debtors or otherwise except in compliance with the terms specified were permissible absent the Carnaby Secured Lenders' consent. *Id.*

9. In material breach of those obligations, from and after the Petition Date, the Debtor Purchasers received and resold the Carnaby Secured Lenders' collateral without ever paying Carnaby II or Carnaby III cash proceeds or eligible accounts receivable for such goods. Accordingly, no cash proceeds were ever deposited into an Adequate Protection Account. Instead it appears the Debtor Purchasers simply took finished goods inventory of Carnaby II and Carnaby III outright either (a) without providing the consideration required under the Carnaby Secured Lenders Interim AP Order or (b) in some instances, by apparently making payment in raw materials (which was not permitted under the Carnaby Secured Lender Interim AP Order prior to in November 2025).[6] Thus, the Debtor Purchasers (and FBG as their controlling affiliate) diverted the proceeds from postpetition sales of the Carnaby II and III Debtors' inventory collateral to fund the FBG Debtors' general operations and the administrative costs of these Chapter 11 Cases. These breaches give rise to administrative expense claims against each applicable Debtor Purchaser and FBG.

10. The Carnaby Secured Lender Interim AP Order granted the Carnaby Secured Lenders first-priority, automatically perfected liens on all Carnaby Inventory Collateral transferred to the Debtor Purchasers pending resale and all eligible accounts receivable constituting the proceeds thereof. *Id.* ¶¶ 3, 4.

---

[6] Carnaby Secured Lender Interim AP Order ¶ 3; *Corrected Amended Declaration of Philip J. Gund in Support of (I) Carnaby Secured Lenders' Request for Adequate Protection and (II) Emergency Motion of the Carnaby Secured Lenders for Relief from the Automatic Stay for Cause, Including Lack of Adequate Protection* [ECF No. 1644] (the "Gund Declaration") ¶¶ 32–35

11. In addition, the Carnaby II and III Debtors hold Administrative Expense Claims under section 503(b)(9) of the Bankruptcy Code against BPI and the Trico Entities for unpaid amounts attributable to any Carnaby II and III Debtors' inventory those entities received during the twenty-day period immediately preceding their Petition Date.

12. No bar date has been set in these cases either with respect to General Unsecured Claims or Administrative Expense Claims.

## C. The FBG Debtors' Plan of Reorganization

13. Following a prior failed effort, the FBG Debtors' filed their current Plan on June 5, 2026, seeking confirmation on an accelerated timeline using a Disclosure Statement that was conditionally approved by order of the Bankruptcy Court entered June 12, 2026.

14. As described more thoroughly below, the Plan is chiefly intended to achieve three ends. *First*, it consummates two credit bids and a secured creditor foreclosure to irrevocably place substantially all of the assets of the FBG Debtors' estates into various Trusts on the Confirmation Date, the most important of which is the Litigation Trust, which will be under the administration of the DIP Lenders. *Second*, it vests the Litigation Trust with, and empowers it to pursue, the FBG Debtors' Estate Claims and authorizes the Litigation Trust to immediately begin making distributions to its financing providers and the DIP Lenders while holding in abeyance the "Effective Date" by which Administrative Expense Claims must be paid. *Finally*, the Plan's release, exculpation, and injunction provisions, which take effect before the "Effective Date" of the Plan, will protect the Plan's proponents (and their related parties) against claims of other parties in interest. The FBG Debtors and their DIP Lenders designed the Plan's novel structure to transfer all of the FBG Debtors' assets to the Trusts and reap for themselves substantially all the benefits

NA_DECHERT.96345197.9

of a confirmed and consummated chapter 11 plan without meeting the Bankruptcy Code's requirement that all administrative claims be paid in full on the date the plan goes effective.

### D.     The Creation of the Trusts and the Credit Bids

15.     On the Confirmation Date or as soon as reasonably practicable thereafter, the Plan establishes three Trusts and transfers all of the FBG Debtors' assets to them automatically and without further Bankruptcy Court action.   Specifically: (a) the Litigation Trust Assets "shall transfer to the Litigation Trust automatically;" (b) the DIP Collateral Trust Assets "shall transfer to the DIP Collateral Trust automatically;" and (c) the ABL Secured Parties "shall be deemed to have foreclosed on the ABL Collateral Trust Assets and transferred such ABL Collateral Trust Assets to the ABL Collateral Trust automatically."  Plan §§ 5.3(ii)–(iv).

16.     Each of these automatic transfers is irrevocable and vests the assets transferred into the applicable Trust "free and clear of all Liens, Claims, encumbrances and Interests."  Plan § 6.2(a), 7.2(a), and 8.2.

17.     The Plan employs two separate credit bids by the DIP Secured Parties — the Estate Claims Credit Bid and the DIP Collateral Credit Bid — to effectuate the transfers to the Litigation Trust and the DIP Collateral Trust.  The "Estate Claims Credit Bid" is defined as "a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the Litigation Trust Assets and transfer of such assets to the Litigation Trust."  Plan § 1.1 (definition of "Estate Claims Credit Bid").  The "DIP Collateral Credit Bid" is likewise "a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust."  Plan § 1.1 (definition of "DIP Collateral Credit Bid").  Through these credit bids, the DIP Secured Parties will effectively acquire all of the FBG Debtors' assets (other than the ABL Priority Collateral)—including all Estate Claims and all of the FBG

NA_DECHERT.96345197.9

Debtors' associated books and records and rights and privileges.  Plan § 5.2(e)–(f).  The ABL Collateral Trust Assets will be automatically deemed to have been foreclosed on by the ABL Secured Parties.  Plan § 4.6(b).

18.     The Estate Claims to be purchased via the Estate Claims Credit Bid include Avoidance Actions over which the DIP Parties have a lien on the proceeds but no security interests in such actions, but which have seemingly been included among the assets subject to the Estate Claims Credit Bid as part of the Plan Settlement.  *See* Plan § 1.1  (definition of "Estate Claims"); §5.2(b).

19.     The Plan provides that the credit bids of Allowed DIP A Claims shall constitute the consideration paid for all assets transferred to the Litigation Trust and the DIP Collateral Trust and that section 363(m) protections apply to each of these transactions.  Plan §§ 5.2(e)–(f).  The Plan itself serves as the motion seeking Bankruptcy Court approval of both the Estate Claims Credit Bid Transaction and the DIP Collateral Credit Bid Transaction—there is no separate motion contemplated or pending.  *Id.*

### E.     Administration of the Trusts

20.     Upon establishment of the Trusts on the Confirmation Date, the Plan: (i) appoints Litigation Trustee and the Litigation Trust Oversight Committee, *see* Plan §§  6.9(a)–6.10, (ii) appoints the DIP Collateral Trustee and the DIP Collateral Trust Oversight Committee, *see* Plan §§ 7.5(a), 7.7, and (iii) appoints the ABL Collateral Trustee subject to the oversight of the ABL Agent, *see* Plan § 8.4. The Plan and the applicable Trust Agreements vest the various Trustees with the management and administration of their respective trust assets.  Plan §§ 6.8, 7.5(b), 8.4(b).

21.     The Litigation Trust Oversight Committee includes four members.  The Ad Hoc Group of DIP Secured Parties appoints three of the members, and the Creditors' Committee appoints the fourth. *See* Disclosure Statement, Section I.A.1(d).

### F.        Issuance of the Litigation Trust Interests

22.        The Plan provides for the issuance of several classes or sub-classes of Litigation Trust Interests, all of which are issued on the Confirmation Date.  *See* Plan § 1.1 (definitions of "Class 1 Litigation Trust Interests," "Class 2 Litigation Trust Interests," "Class 3(a) Litigation Trust Interests," "Class 3(b) Litigation Trust Interests," and "Class 3(c) Litigation Trust Interests"; Plan §§ 4.3(b), 4.4(b), 4.5(b), 4.7(a).  Additional Class 1 Litigation Trust Interests may be issued on or after the Confirmation Date to holders that provide additional funding to the Litigation Trust. *See* Plan § 1.1, (definition of "Additional Class 1 Litigation Trust Interests.")

23.        Although Plan provides that all holders of Allowed General Unsecured Claims against the FBG Debtors automatically receive, on the Confirmation Date, their pro rata share of the Class 3(b) Litigation Trust Interests "in full and final settlement, and release" of their claims, Plan § 4.7(a), all of the Class 3(b) Litigation Trust Interests are issued to the Claims Ombudsman who holds them as agent for holders of General Unsecured Claims pending a claims resolution process.  Plan § 5.2(g); Litigation Trust Agreement § 7.1.  Thus, all Class 3(b) Litigation Trust Interests will be fully issued on the Confirmation Date.

24.        Holders of Administrative Expense Claims are entitled to distributions from the Litigation Trust pursuant to the Litigation Trust Waterfall (described below), but are not in fact issued Litigation Trust Interests and are not beneficiaries of the Litigation Trust. *See* Plan § 1.1 (definition of "Litigation Trust Beneficiaries").  Since they hold no Litigation Trust Interests, the Claims Ombudsman responsible for objecting to, settling, or reconciling their Administrative Expense Claims and for making any payments owed to holders of Administrative Expense Claims under the Litigation Trust Waterfall expressly does not owe them any fiduciary duties. *See* Litigation Trust Agreement, Section 7.1(d).

9

G. **Litigation Trust Waterfall; Threshold Proceeds Required for Non-Funder, Non-DIP Distributions.**

25.     Section 6.5 of the Plan sets forth the Litigation Trust Waterfall, which governs the order of all distributions from the Litigation Trust.  *See* Plan § 6.5; *see also* Litigation Trust Agreement § 3.2.  In summary, the waterfall operates as follows:

26.     *First*: to holders of Class 1 Litigation Trust Interests (i.e., the Litigation Trust Class 1 Funding Contributors, consisting of certain DIP Lenders who provide the $50 million in initial funding), until each such holder receives the greater of a 1.75x multiple on invested capital or a 20% IRR on its Litigation Trust Class 1 Funding Contributions, plus a 5% per annum undrawn commitment fee, plus a 5% backstop fee (the "First Return Threshold").  Plan § 6.5(a)(i), (b).

27.     *Second*: following satisfaction of the First Return Threshold until aggregate Litigation Trust distributions reach $350,000,000 (the "Second Return Threshold"): 15% to Class 1 Litigation Trust Interest holders and 85% to Class 2 Litigation Trust Interest holders (i.e., holders of Allowed DIP A Claims).  Plan § 6.5(a)(ii).

28.     *Third*: from the Second Return Threshold ($350 million) until Class 2 holders have received aggregate distributions equal to the Allowed DIP A Claims as of the Confirmation Date (the "Final Return Threshold," estimated at approximately $1.3 billion, *see* Disclosure Statement at 3): 10% to Class 1 Litigation Trust Interest holders, 74% to Class 2 Litigation Trust Interest holders, and 16% to Class 3 Litigation Trust Interest holders; *provided* that distributions of this 16% allocation to Class 3 holders are subject to a second Class 3 Litigation Trust Interests Waterfall (as defined below).  Plan § 6.5(a)(iii).

29.     *Fourth*: after the Final Return Threshold: 10% to Class 1 holders and 90% to Class 3 holders (again, subject to the Class 3 Litigation Trust Interests Waterfall described below).  Plan § 6.5(a)(iv).

10

30.     Section 6.5(d) of the Plan subjects all distributions to holders of Class 3 Litigation Trust Interests (whether made in the third or fourth step of the general Litigation Trust Waterfall above) to a secondary waterfall (the "Class 3 Litigation Trust Interests Waterfall") that renders payments to holders of Class 3 Litigation Trust Interests subject to prior payment in full of Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims.  *See* Plan §§ 6.5(a)(iii), 6.5(a)(iv), and 6.5(d).  Under the Class 3 Litigation Trust Interests Waterfall, Settled Administrative Expense Claims are paid first in priority in their full settled amount before payment in full of non-settled Allowed Administrative Expense Claims, then Allowed Other Priority Claims, then Priority Tax Claims and then pro-rata to holders of Class 3(a), 3(b), and 3(c) Litigation Trust Claims based on the Allowed amounts of their underlying claims, then to holders of Allowed Subordinated Claims.  *See* Plan § 6.5(d)(i)-(vi).

31.     As set forth in the Disclosure Statement, Disclosure Statement § I.A.1(c), the following chart illustrates the distribution percentages to recipients of payments from the Litigation Trust based on its aggregate distributions, assuming $1.3 billion of Allowed DIP A Claims:

NA_DECHERT.96345197.9

| Aggregate Distributions | $0–$90M (First Return Threshold) | $90M–$350M (Second Return Threshold) | $350M–~$1.8B (Final Return Threshold) | $1.8B–~$1.9B | Over ~$1.9B |
|---|---|---|---|---|---|
| **Class 1 (Litigation Funders)** | 100% | 15% | 10% | 10% | 10% |
| **Class 2 (DIP A Claims)** | — | 85% | 74% | — | — |
| **Settled Admin. Exp. Claims, Admin. Exp. Claims, Priority Tax Claims, Other Priority Claims** | — | — | 16% (pro rata, after Settled Admin Claims paid first) | 90% | — |
| **Class 3 (Roll-Up Claims, GUCs, First Lien Claims, Second Lien Claims)** | — | — | — | — | 90% |
| Total | 100% | 100% | 100% | 100% | 100% |

32.     The foregoing establishes that for any party other than the Litigation Trust Funders (Class 1 Litigation Trust Interest holders) or holders of DIP A Claims (Class 2 Litigation Trust Interest holders) to receive any distribution from the Litigation Trust, the Litigation Trust must first collect and distribute at least $350 million in aggregate proceeds.  Disclosure Statement § I.A.1(c), I.D.6.  Given the waterfall structures, the payment of Administrative Expense Claims in full and the occurrence of the Effective Date cannot occur until the Litigation Trust has assets sufficient to make distributions of approximately $1.9 billion in aggregate.  *Id.*; Plan § 12.1(o).  To the extent the pool of Allowed Administrative Expense Claims exceeds the FBG Debtors' estimates the required distribution thresholds may be higher than these estimates.  Likewise, should more holders of Administrative Expense Claims agree to accept settlement under the Administrative Expense Claims Consent Program (described below), the thresholds may be lower.

33.     The Plan acknowledges these speculative recoveries from the Litigation Trusts represent most creditors' sole potential source of any recovery from the FBG Debtors' estates.

12

NA_DECHERT.96345197.9

Disclosure Statement §§ V.B.8, V.B.9; *see also id*. § I.A.1(b)–(c).  There is no credible analysis that could support a finding that such creditors are likely to recover anything through this structure.

### H.      Settled Administrative Expense Claims.

34.      The Plan creates the "Administrative Expense Claims Consent Program," pursuant to which holders of Administrative Expense Claims may elect to compromise the Allowed amount of their claims in exchange for priority treatment within the Litigation Trust Waterfall.  Plan § 1.1 (definition of "Administrative Expense Claims Consent Program").  Holders who affirmatively opt in within 60 days of the Confirmation Date will have their claim deemed "Allowed" in an amount equal to 50% of the "Reconciled Amount" identified in the Consent Program Opt-In Form—defined as a "Settled Administrative Expense Claim."  Disclosure Statement § I.C.  The trade-off is that holders of Settled Administrative Expense Claims receive their distributions from the Litigation Trust before any other Allowed Administrative Expense Claims are paid—specifically, once aggregate distributions exceed the $350 million Second Return Threshold, the 16% share allocated to Class 3 flows first to Settled Administrative Expense Claims (pro rata) until paid in full, then to other Allowed Administrative Expense Claims.  Plan § 6.5(d)(i)–(ii); Disclosure Statement § I.C.

35.      If the Litigation Trust is unable to make distributions sufficient to satisfy all Allowed Administrative Expense Claims in full, payments made to holders of Settled Administrative Expense Claims are "not subject to clawback or disgorgement."  Plan § 1.1 (definition of "Administrative Expense Claims Consent Program"); Disclosure Statement § I.D.2. Holders who do not opt in to the Administrative Expense Claims Consent Program retain their full Allowed claim but receive no distribution from the Litigation Trust until all Settled Administrative Expense Claims are paid in full.  *Id*; Plan § 6.5(d)(ii).

NA_DECHERT.96345197.9

I.      **Commencement of Distributions from the Trusts.**

36.      Neither the Plan nor the Litigation Trust Agreement ties the commencement of Litigation Trust distributions to the occurrence of the Effective Date.  Litigation Trust Interests themselves are issued "on or after the Confirmation Date"—not on the "Effective Date."  Litigation Trust Agreement § 2.5, 3.1.

37.      The Plan expressly requires the Litigation Trust to "distribute at least annually to the Litigation Trust Beneficiaries any Available Cash."  Plan § 6.19(b).  The Litigation Trust Agreement reinforces this: Section 5.10(c) of the Litigation Trust Agreement requires the Litigation Trustee to "cause the Litigation Trust to distribute, no less frequently than annually, all Available Cash" to the applicable Litigation Trust Beneficiaries, subject only to reserves necessary to maintain the value of the Litigation Trust Assets or meet claims and contingent liabilities.  Litigation Trust Agreement § 5.10(c).  The Litigation Trustee may make these distributions "only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement after Litigation Trust Proceeds are received by the Litigation Trust"—with no condition that the "Effective Date" has occurred.  Litigation Trust Agreement § 5.10(b).

38.      In addition, Section 2.4 of the Litigation Trust Agreement separately provides that the Litigation Trust "also shall make payments to holders of Allowed Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims to the extent set forth in the Plan."  Litigation Trust Agreement § 2.4.

39.      By contrast, holders of Allowed Administrative Expense Claims who do not opt in to the Consent Program are entitled to payment on "the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim."  Plan

NA_DECHERT.96345197.9

§ 2.1(a). Thus, the Plan and the Litigation Trust Agreement create a deliberate two-track structure: distributions to the Funders, DIP Lenders, and holders of Settled Administrative Expense Claims commence immediately upon the Litigation Trust receiving proceeds from the Confirmation Date forward, while non-settling Administrative Expense Claimants (and by virtue of the Litigation Trust Waterfalls, all subsequent recipients of Litigation Trust payments) must wait for the "Effective Date."

### J.    Conditions Precedent to the Effective Date.

40.    Section 12.1 of the Plan sets forth 16 separate conditions that must each be satisfied before the "Effective Date" can occur, virtually all of which will be satisfied on or before the Confirmation Date or immediately following entry of the Confirmation Order.

41.    Indeed, only condition 12.1(o), is subject to any meaningful implementation delay:

> "(o)    the Litigation Trust and/or the DIP Collateral Trust shall have "sufficient Cash on hand" to (i) satisfy in full (x) all Allowed Administrative Expense Claims against the FBG Debtors (unless an applicable holder consents to different treatment) in accordance with section 1129(a)(9)(A) of the Bankruptcy Code and (y) all Allowed Priority Tax Claims and Allowed Other Priority Claims that are required to be paid on the Effective Date, under the terms of the Plan (the "Effective Date Priority Claims"), and (ii) reserve for all Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims actually asserted in a timely filed proof of claim. Plan § 12.1(o)."

42.    In other words, the Plan will be effectively implemented upon entry of the Confirmation Order and only the Bankruptcy Code's firm confirmation requirement—that all Allowed Administrative Expense Claims be paid in full—is held in abeyance until the Litigation Trust and/or the DIP Collateral Trust raises sufficient funds for the Effective Date to occur. Plan § 12.1(o).

NA_DECHERT.96345197.9

**K.     Disclosure Statement Estimate of Effective Date Timing.**

43.     There is no assurance that the Effective Date will ever occur.  The Disclosure Statement expressly acknowledges the extended timeline between Confirmation and the anticipated Effective Date.  Disclosure Statement § V.A.3.  Under the heading "When do the FBG Debtors Anticipate the Effective Date Will Occur?", the Disclosure Statement states: "Based on the FBG Debtors' reasonable estimates, the FBG Debtors are estimating that the Effective Date is reasonably likely to occur in the second half of 2028, although the Effective Date may reasonably or in fact occur earlier or later than the second half of 2028."  Disclosure Statement § I.D.7.  The Disclosure Statement further acknowledges that "there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan" as a result of the amount of secured, administrative, and priority claims asserted against the FBG Debtors' estates and the forecasted timeline for monetizing the Litigation Trust Assets.  Disclosure Statement §§ I.A, I.C.

44.     The doubt around the occurrence of the Effective Date is tied largely to the Litigation Trust's ability to generate sufficient funds to repay in full (or in their settlement amounts) all Allowed Administrative Expense Claims—the total amount of which is highly uncertain.  In his *Declaration of Charles M. Moore in Support of Confirmation of the FBG Debtors' Chapter 11 Plan* [ECF No. 3188] (the "Moore Declaration"), the Debtors' Chief Restructuring Officer purports to estimate the size of the Administrative Expense Claims pool.  Moore estimates an aggregate of approximately $222 million in such claims, derived from: (i) approximately $147 million in postpetition administrative expense claims incurred since the Petition Date; (ii) approximately $38 million in section 503(b)(9) claims; and (iii) an additional 20% "cushion" applied to the aggregate of both figures.  Moore Decl. ¶ 193.  He estimates that Priority Claims will total $78 million.  *Id*. ¶ 201.  Critically, Moore bases these estimates on

16

numerous assumptions regarding the success of objections to various asserted administrative expense claims and expressly excludes numerous asserted administrative expense claims, including at least $53 million in aggregate Administrative Expense Claims (such as the Longkou Administrative Expense Claim) to which Moore asserts the Debtors will object. *See id.* ¶¶ 208–215.

45.     The Court has not set an Administrative Expense Claims bar date, meaning that the universe of potentially assertable Administrative Expense Claims remains open and unknown as of the date of this Objection.  Mr. Moore's estimates are also based on a review of the Debtors' Claims Register Extract as of July 6, 2026, and thus exclude more than a dozen Claims that have been filed since that date. *See e.g.*, ECF No. 3152, 3158–59, 3165–3176, 3178–79, 3182–83, 3240. It also does not account for future Administrative Expense Claims that will undoubtedly be filed. Although Moore includes a 20% contingency buffer, there is no basis to conclude that buffer will be sufficient to capture the magnitude of Administrative Expense Claims yet to be filed.

46.     In a failed attempt to demonstrate that proceeds from the Litigation Trust's prosecution of Estate Claims will pay all of the Administrative Expense Claims in full, Moore—who is not a lawyer or an expert on recoverability of litigation claims and avoidance actions, and whose declaration does not meet the standards of an expert report—submits in his declaration inadmissible hearsay, speculation, and legal conclusions concerning asset values and purported nature of various Estate Claims sounding in fraudulent transfer, preference, and other causes of action to be transferred to the Litigation Trust. *See* Moore Decl. at 24–78.

47.     In total, Moore identifies gross transfers during the four years preceding the Petition Date exceeding approximately $25.4 billion in the aggregate, including over $15.4 billion to accounts receivable factoring programs, approximately $4.7 billion to supply chain finance

17

programs, approximately $2.5 billion to the SPV Lenders (predominantly about $2.3 billion to Onset alone), $989 million to insiders, primarily Patrick James and entities under his control, and $1.9 billion to other entities. Moore Decl. ¶ 61.

48.    The gross transfer figures identified by Moore are not equivalent to claims, however.  Moore includes a recitation of purported "uncovered facts" in a transparent attempt to suggest that all of the Debtors' creditors (other than the DIP Lenders) and particularly the SPV Debtors (and their stakeholders) received various fraudulent transfers and preferences.  Many of the facts Moore alleges as evidence of fraudulent transfers are wrong or misleading and have already been refuted in prior filings made in these cases.[7]  Taking only one example with respect to the Carnaby Secured Lenders, Moore's allegation that BPI and Trico never received the proceeds of their sales of inventory to the Carnaby II and III SPVs ignores his own prior testimony and the Debtors' Cash Management Motion, which make clear that accounts of BPI and Trico are swept daily into FBG's main concentration account—the same account in which Moore concedes the proceeds of Carnaby II's and Carnaby III's inventory purchases were deposited.  *See Declaration of Charles M. Moore in Support of the Debtors' First Day Relief* [ECF No. 51] ¶ 81; *see also* Cash Management Order [ECF No. 604] at Sch. 1.[8]  Even if the funds were initially paid to BPI or Trico accounts (to the extent accounts even existed), they would have been immediately

---

[7]    The Carnaby Secured Lenders addressed numerous of these allegations when made by Moore's colleague Daniel Jerneycic in connection with their motions to dismiss the Carnaby II and Carnaby III cases and to lift the automatic stay.  *See generally Omnibus Reply in Support of Carnaby Secured Lenders' (I) Motion to Dismiss, and (II) Motion for Relief from Automatic Stay* [ECF No. 1639] (the "Carnaby Secured Lenders Lift Stay Reply").  The full litany of Moore's many misstatements and misleading statements is too long to be included in this Objection and the Carnaby Secured Lenders reserve all rights to dispute such facts.

[8]    For greater detail on these specific allegations and countervailing facts, *see* Carnaby Secured Lenders Lift Stay Reply [ECF No. 1639] at Section IV.

NA_DECHERT.96345197.9

and automatically swept to the concentration account anyway.  Thus, the deposit of such funds in the concentration account rather than BPI or Trico accounts is a distinction without a difference.

49.    Moore also attempts to advance legal analysis and conclusions he is unqualified to make—for example, he makes the conclusory statement that "the SPV Entities failed to observe corporate formalities and did not in fact operate as discrete corporate entities." *See* Moore Decl. ¶ 115.  In making this conclusion, he points out that there were no board meetings.  Again, Moore ignores (or is unaware of) countervailing facts such as the fact that the Carnaby II and Carnaby III SPV Debtors' governing documents specifically provide that they operate as special purpose vehicles under applicable Delaware law, cannot have their own employees, and will be single member managed—all features common to special purpose entities of this nature.  *See* Carnaby II LLC Agreement at §§ 9(a), 9(e)(i), 9(e)(v)(M); Carnaby III LLC Agreement at §§ 9(a), 9(e)(i), 9(e)(v)(M).[9]

50.    To address the likelihood of recovery and potential value of the Estate Claims, the Debtors also filed the *Declaration of Marc S. Kirschner* [ECF No. 3190] (the "Kirschner Declaration").

51.    Kirschner was retained on June 20, 2026—a mere twenty-four days before the Kirschner Declaration was filed on July 14, 2026.  Without doing any independent factual investigation, he submits as expert testimony a conclusion that it is "reasonably probable" that the Litigation Trust will realize proceeds in excess of $2 billion by year-end 2028 from Estate Claims arising largely out of claims for actual and constructive fraudulent transfer and preferential transfers.  Kirschner Decl. ¶¶ 19 and 21.  The optimism of the Kirschner statement stands in

---

9    For greater detail on these specific allegations and countervailing facts, *see* Carnaby Secured Lenders Lift Stay Reply [ECF No. 1639] ¶¶ 106–08.

NA_DECHERT.96345197.9

contrast, however, to the Disclosure Statement, which indicates that the "amount of recoveries on the Estate Claims… are unknown and contingent on numerous factors," that realizing value "may take multiple years," and that "even if the Litigation Trust were to secure favorable judgments, there is no guarantee that the Trust would be able to collect all or a portion of any judgment due to, among other reasons, the financial condition of defendants."  Disclosure Statement § V.B.9.

52.     Kirschner's opinion rests almost entirely on Moore's recitations and opinions, and on statements included in other filings such as the Examiner's Report rather than any independent forensic investigation of the Debtors' books and records.[10]  Thus, Kirschner's report is based entirely on second or third-hand statements.  His view of what is "reasonably probable" should be given little, if any, weight.  In an attempt to bridge the gap between Moore's gross transfer figures and a $2 billion litigation recovery conclusion, Kirschner relies heavily on the Ponzi scheme presumption.  *See id*. at ¶ 25.[11]  But that doctrine has no application to this case.  The application of the doctrine requires: (i) a fraudulent investment scheme in which money contributed by later investors is used to repay earlier investors, (ii) that the enterprise is "insolvent from its inception," (iii) the investors are promised (and the earlier investors are paid) outsize dividends or returns, and

---

[10]   Of the 197 footnotes cited in the Kirschner Declaration 143 are direct citations to purported facts asserted in the Moore Declaration.  *See e.g*., Kirschner Decl. at fns. 18-113.  In fact, in the entirety of his declaration, aside from two citations to pleas made by Stephen Graham and Peter Brumbergs and a single email sent by Edward James on March 10, 2023, Kirschner cites no actual book, record, or other primary evidence of the Debtors that he has reviewed.  *See id*. at fns. 5,6, and 91.

[11]   The cases that Kirschner relies upon either undermine his position or are distinguishable:  *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 445–46 (Bankr. S.D. Tex. 2009), (dismissing fraudulent transfer claims against multiple outside investors who established they received the disputed transfers "in good faith and for reasonably equivalent value," except for one $2,000 transfer received by the promoter after they learned of the fraud), *aff'd sub nom. IFS Fin. Corp. v. Garcia Suarez*, No. 09-3056 (VDG), 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015), and *subsequently aff'd*, 669 F.3d 255 (5th Cir. 2012); *Sec. and Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 299-301 (5th Cir. 2007) (applying Ponzi scheme presumption where transferor was an entity "created to perpetuate an illegal Ponzi scheme" whose assets "resulted from fraudulent activities," with no legitimate business operations); *Janvey v. Alguire*, 647 F.3d at 589 (defining a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.").

NA_DECHERT.96345197.9

thus (iv) the early investor payments are inherently fraudulent (and actual fraudulent intent can be presumed) because the debtor is intentionally overpaying to dupe and induce new investors. *Janvey v. Alguire*, 647 F.3d 585, 597-98 (5th Cir. 2011); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012).

53.     Kirschner also relies heavily on purported "badges of fraud" to conclude that one defense assertable by potential defendants to the Estate Claims—the "good faith transferee" defense under 11 U.S.C. § 550(b)(2) may be unavailable to certain potential defendants. *See id*. at ¶ 85 (citing *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020)).

54.     Ignoring the Fifth Circuit requirements for application of the Ponzi scheme presumption[12] and countervailing facts that would undermine any "badges of fraud,"[13] Kirschner does not cite a single case that applies a presumption of actual fraud to commercial loan payments. Nonetheless, he assumes that this case will break new ground and the presumption will be liberally applied across the alleged Estate Claims identified by Moore.

55.     Given that these cases involve commercial loan repayments, not inflated returns on equity, Kirschner's methodology is invalid.  This case is nothing like Robert Stanford's Ponzi scheme, in which he sold high-return certificates of deposit to investors and covered redemptions by inducing new investors with reports of repayment at high rates. *Janvey v. Alguire*, 647 F.3d at 597-98.

---

[12]    *See infra* ¶¶ 83–86 (discussing the Fifth Circuit's narrow application of the Ponzi Scheme Presumption to true Ponzi schemes and the inapplicability of the presumption to business that engage in fraud in connection with their operations).

[13]    *See infra* ¶¶ 87–92 (discussing controlling Fifth Circuit authority on the good faith transferee defense, knowledge imputation, and inquiry notice, and the insufficiency of Kirschner's "badges of fraud" analysis).

NA_DECHERT.96345197.9

56.     Further, any lawsuits are likely to be vigorously contested and delayed by the pending criminal proceedings, and the ability to collect large judgments (if successful) against the primary defendants, the James brothers and Onset, are uncertain.

57.     Moreover, according to Moore, the FBG Debtors formally marketed the Estate Claims for sale to twenty-six sophisticated litigation finance and claims acquisition firms, granting data room access and extending the bid deadline. *See* Moore Decl. ¶¶ 38–43. Not a single one submitted a bid—and only two even executed a non-disclosure agreement—which is powerful evidence that the value of the Estate Claims and the likelihood of collection is far below the estimates provided by Moore and Kirschner. *Id*. ¶ 42.

**L.     Effect of Non-Occurrence of Effective Date; Revocation of Plan.**

58.     The Plan contains three provisions addressing the consequences of the Effective Date failing to occur or the FBG Debtors revoking the Plan, each leading to the same basic result: the Plan is rendered null and void, with no waiver of claims, no prejudice to any entity's rights, and no admission by the FBG Debtors—but with all asset transfers to the Trusts remaining irrevocable pursuant to the protections afforded under sections 363(m) and 364(e) of the Bankruptcy Code. Specifically, Section 12.3 provides that if the Effective Date does not occur, the Plan shall be null and void in all respects. Plan § 12.3. Finally, Section 15.7 separately reserves to the FBG Debtors the unqualified right to revoke or withdraw the Plan prior to the Effective Date, in which event the Plan shall be null and void in all respects and any settlement, compromise, or document executed pursuant to the Plan shall be deemed null and void. Plan § 15.7. In each case, the carveout for sections 363(m) and 364(e) protections applies—meaning that the asset transfers to the Trusts on the Confirmation Date are intended to be irrevocable. In all events, the FBG Debtors will be empty shells following the transfers of their assets on the Confirmation Date

and thus any language suggesting that parties in interest will be restored to the status quo ante is illusory.

**M.     Debtor Releases; Effectiveness as of the Confirmation Date.**

59.     Section 13.5(a) of the Plan contains sweeping Debtor releases that will take effect prior to the Plan's Effective Date.  Under the Plan, the FBG Debtors, their Estates, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust are each deemed to have "conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever . . . whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise." Plan § 13.5(a).  The Released Parties include the FBG Debtors themselves, the Special Committee members, the Independent Managers, the Specified Executives, the Professionals, the Creditors' Committee and its members, the Ad Hoc Group and its members (including the Ad Hoc Group SteerCo), the DIP Secured Parties, the Prepetition Secured Parties, the ABL Parties, the Litigation Trust Backstop Parties, the Litigation Trust Class 1 Funding Contributors, and the DIP Collateral Trust Funding Contributors.   Plan § 1.1 (definition of "Released Parties").  These Debtor releases are expressly effective as of "the Confirmation Date and Effective Date, as applicable." Plan § 13.5(a).  For certain material aspects of the release, the operative date is the Confirmation Date itself—not the Effective Date.  *Id.*  Third-party releases under Section 13.5(b), which are opt-in releases of limited significance, are only effective as of the Effective Date.  *Id.* § 13.5(b).

60.     The Plan also confers blanket exculpation protections under Section 13.6 upon defined "Exculpated Parties" which includes (i) the FBG Debtors, (ii) Neal Goldman, William Transier, and Benjamin Duster in their capacities as Special Committee members, (iii) Neal

NA_DECHERT.96345197.9

Goldman and William Transier in their capacities as Independent Managers, and (iv) the Creditors' Committee and covers all conduct occurring from the Petition Date through the Effective Date and extends across *all* Debtor estates—including SPV Debtor estates whose creditors receive no benefit from the Plan.  *See* Plan § 13.6.

### N.        Plan Injunction.

61.        Section 13.4 of the Plan contains the Plan Injunction, which prohibits all holders of Claims and Interests and other parties in interest from "taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including . . . exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims."  Plan § 13.4(a).  It also permanently enjoins all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are released under Section 13.5(a) or 13.5(b) or subject to exculpation under Section 13.6 from, among other things: commencing or continuing any suit, action, or proceeding; enforcing any judgment; creating or perfecting any Lien; asserting any right of setoff; or acting in any manner not in compliance with the Plan.  Plan § 13.4(b)(A)–(G).

62.        While certain of the injunction provisions only take effect after the Effective Date, all parties in interest are immediately subject to a restrictive gatekeeping prohibition in 13.4(c) that will require Bankruptcy Court approval before any action related in any way to *any* Debtors (including SPV Debtors) may be commenced against any Exculpated Party.

63.        Additionally, as of the Effective Date, all persons other than the Litigation Trust are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Claim.  Plan § 13.4(d).  A further injunction related to releases and exculpation, provided in Section 13.8, is contained in the Confirmation Order itself and

24

permanently enjoins the prosecution of any Claims or Causes of Action released or exculpated under the Plan.  Plan § 13.8.

64.     None of the injunction provisions include a carveout or other means to allow creditors of the SPV Debtors (or the SPV Debtors estates themselves) to exercise their rights arising out of the SPV Debtors or their estates, many of which likely overlap with the FBG Debtors' Estate Claims.

## **ARGUMENT**

### I.      **The Plan Does Not Meet the Confirmation Standards of the Bankruptcy Code and Therefore Cannot be Confirmed**

65.     The FBG Debtors, as the proponents of the Plan, have the burden of proving that all elements of 11 U.S.C. § 1129(a) are satisfied.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009). The FBG Debtors must satisfy their burden of proof as to the Plan's compliance with section 1129(a) by a preponderance of evidence.  *In re Briscoe Enters., Ltd. II,* 994 F.2d 1160, 1165 (5th Cir. 1993), *cert. denied,* 510 U.S. 992 (1993).  The Debtors cannot meet their evidentiary burden.  The Plan does not provide for the payment of Administrative Expense Claims in full on its "effective date"—the date the transfer of all estate assets and other meaningful elements of the Plan occurs—as required under Section 1129(a)(9).  Instead, the Plan delays these required payments unless and until such time as recoveries from the Litigation Trust are sufficient to satisfy them.  Thus, the Plan violates section 1129(a)(9) and cannot be confirmed. In addition, as these recoveries are highly speculative, and there is no evidence that they are likely to be sufficient to pay all Administrative Expense Claims, the Plan is not feasible under Section 1129(a)(11).  Moreover, the Plan deprives holders of Administrative Expense Claims and other parties in interest—such as the SPV Debtors and their stakeholders—of fundamental rights in violation of the Bankruptcy Code and applicable law.  Accordingly, the FBG Debtors cannot meet

25

their evidentiary burden and demonstrate their ability to satisfy the requirements of confirmation under the Bankruptcy Code.

> A. **The Delayed Effective Date Construct Renders the Plan Unconfirmable Under Section 1129(a)(9) of the Bankruptcy Code**

66. Under section 1129(a)(9) of the Bankruptcy Code, unless the holder of an administrative claim has agreed to different treatment, a plan must provide that "*on the effective date of the plan*, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim[.]"  11 U.S.C. § 1129(a)(9)(A) (emphasis added).  Although the term "effective date" appears in several provisions of the Bankruptcy Code, it is not defined therein.  Rather, it is "commonly understood [that the effective date is] the date on which the plan goes into effect, which means the debtor begins implementing the plan and making payments to creditors." *In re Faye Foods, Inc.*, 766 F. App'x 204, 211 (6th Cir. 2019).  *See In re Potomac Iron Works, Inc.*, 217 B.R. 170, 172 (Bankr. D. Md. 1997) ("Effective date is . . . the point in time when the plan can and should be susceptible of implementation and commencement of the operation of its provisions.")  Notwithstanding the nomenclature that the FBG Debtors have adopted in the Plan, it is clear that the true "effective date" of the Plan will be the Confirmation Date or soon thereafter, when the Debtors begin implementing the Plan and making distributions of Trust interests to certain creditors.  The Plan, however, does not require the FBG Debtors to pay Allowed Administrative Expense Claims on the Confirmation Date—the date the Plan goes effective—in violation of section 1129(a)(9).  This renders the Plan unconfirmable, and the FBG Debtors' definition of the "Effective Date" as a date that may occur in 2028, if at all, does not cure this fatal flaw.

67. It is clear under the Plan that, on the Confirmation Date, all of the FBG Debtors' property will be irrevocably transferred to the Trusts through the "Estate Claims Credit Bid

26

Transaction" and the "DIP Collateral Credit Bid Transaction." The Plan provides that "[t]he Litigation Trust shall be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan" while the Litigation Trust Agreement's operative provisions all take effect from the Confirmation Date. *See* Plan Art. VI § 6.2; Litigation Trust Agreement § 2.2 (providing that Litigation Trust assets shall be transferred to and automatically vested in the Litigation Trust following the occurrence of the Confirmation Date); § 2.1(b) (appointing the Litigation Trustee as of the Confirmation Date); § 5.2(i) (obligating the Litigation Trustee to "accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets.").

68.     In addition, distributions will commence on the Confirmation Date, as the DIP Collateral Trust Interests, ABL Collateral Trust Interests, and Litigation Trust interests will all be initially issued and distributed on the Confirmation Date. Moreover, the Plan and the Litigation Trust Agreement make clear that the distributions from the assets of the Litigation Trust to holders of Litigation Trust Interests and other creditors are required to be done expeditiously after the Confirmation Date, including no less than annual distributions of Available Cash. As the FBG Debtors estimate that the "Effective Date" will not occur until 2 years after the Confirmation Date, there may be substantial distributions of Litigation Trust Assets to holders of Litigation Trust Interests well in advance of the Plan's purported "Effective Date." Moreover, none of these provisions are revocable if there is no "Effective Date," as such term is used under the Plan.

69.     Thus, the Plan goes "effective" on the Confirmation Date, and the nomenclature used does not alter that reality. This becomes even more obvious when considering the definition of "substantial consumption" which *is* defined by the Bankruptcy Code. If a plan has been

27

substantially consummated, it has necessarily been "implemented" and the effective date has occurred.

70.    Substantial Consummation is defined in Section 1101(2) to mean:

(A)    transfer of all or substantially all of the property proposed

by the plan to be transferred;

(B)    assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C)    commencement of distribution under the plan.

11 U.S.C. § 1101(2).

71.    Here all three elements for "substantial consummation" are slated to occur on the Confirmation Date or shortly thereafter and well before the "Effective Date" as defined under the Plan.  The fact that certain provisions of the Plan only go in effect at the time of the "Effective Date," such as the third-party release under Section 13.5(b), does not change this result.  While these provisions may only take effect years in the future, the Plan will be implemented in almost every other respect and in ways that are irrevocable, binding on, and prejudicial to, most of the FBG Debtors' stakeholders.  To approve the Plan's delayed effective date construct in this case would read out of the Bankruptcy Code the fundamental confirmation requirement under Section 1129(a)(9) that all administrative claims be paid in full on the date the plan becomes effective. Such a ruling would undermine future restructurings as parties may not be willing to provide post-petition credit to future debtors.

**B.    The Plan Does Not Satisfy the Feasibility Requirements of Section 1129(a)(11) of the Bankruptcy Code.**

72.    The FBG Debtors do not have sufficient unencumbered assets to pay their administrative claims.  Moreover, it is undisputable that all administrative creditors have not

agreed to waive the requirement that their administrative claim be paid on the date the plan goes effective. Thus, it is clear that the Plan is not feasible and cannot meet the requirements of section 1129(a)(11).

73.     Although the Court has not set a bar date for either prepetition claims or for administrative claims, the FBG Debtors estimate that they will ultimately have approximately $300 million in aggregate of Administrative Expense Claims and Priority Claims. *See* Moore Decl. ¶ 228. To satisfy those claims under the Litigation Trust Waterfall, the Litigation Trust would need to recover approximately $1.9 billion in litigation proceeds from the Estate Claims. *Id.* Since they do not have $1.9 billion in recoveries earmarked before implementation of their Plan, the FBG Debtors propose to implement their Plan on the Confirmation Date but not pay the Administrative Expense Claims and Priority Claims until they collect the $2 billion in litigation recoveries. *Id.* If the FBG Debtors never recover the $1.9 billion, or the administrative or priority claims turn out to be higher amounts, the Plan would never have an "Effective Date," although it would already have been implemented.

74.     Because "feasibility is mandatory," "the certainty of the plan's implementation is required to be in place at the time of the confirmation hearing," and "extending and creating uncertainty as to the effective date forces…priority claimants to subsidize the proposed Plan and bear the risks of failure.," *In re Premiere Network Servs.*, No. 04-33402 (HDH), 2005 Bankr. LEXIS 2298 at *13, *16 (Bankr. N.D. Tex. July 1, 2005).

75.     Courts regularly confirm plans that include delays between confirmation and effectiveness to allow debtors to satisfy conditions, such as regulatory approvals that the debtors are likely to obtain in a short period of time. Courts regularly deny confirmation of plans, however, that provide for delayed effective dates to allow the debtors to collect assets post-confirmation,

29

even in situations where debtors are not, as they are here, seeking to irrevocably transfer their assets and substantially consummate a plan without meeting the confirmation requirements. *Id.* at *16; *In re Potomac Iron Works, Inc.*, 217 B.R. at 171.

76.     For example, in *In re Potomac Iron Works, Inc.*, the court found that a plan could not be confirmed where the effective date was set one year from confirmation to allow the debtor to collect accounts receivable. 217 B.R. at 174–75. Further, in *In re Premiere Network Servs.*, the court found that "the evidence did not establish that the Debtor will obtain an 'effective date' or that creditors will really be paid something under the plan" because the debtor's ability to obtain sufficient funds to make distributions depended on its assumption of certain contracts, which was uncertain due to the counterparty's objections. *In re Premiere Network Servs.*, 2005 Bankr. LEXIS 2298, at *13–*18. Further, the Court found that the effective date "should not be established in an effort to buy time to comply with the other provisions of § 1129." *Id*. at *16.

77.     The Plan proponents heavily rely on this Court's decision in *Steward Health Care*. *See In re Steward Health Care System LLC*, No. 24-90213 (CML), ECF No. 5774 (Bankr. S.D. Tex. July 25, 2025); *see also* Transcript of Plan Confirmation Hearing Day Three, *In re Steward Health Care System LLC*, No. 24-90213 (CML), ECF No. 5724 (the "<u>Steward Confirmation Hearing Transcript</u>"). The FBG Debtors' Plan, however, is nothing like that approved in *Steward*.

78.     When this Court confirmed the *Steward* plan, the foundational asset transfer had already been separately and independently approved through the FILO Settlement Order—entered before the confirmation hearing—pursuant to which the FILO parties had already committed through a prior, binding judicial settlement to accept litigation trust interests in satisfaction of their claims and to provide the litigation funding on which the plan's success depended. *See Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of*

30

*Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief, In re Steward*, Case No. 24-90213 (CML), ECF No. 5035 (Bankr. S.D. Tex. June 2, 2025) (the "FILO Settlement Order"), ¶¶ 2, 5, 6, 16, 22, 24. Thus, in *Steward*, the Court was not being asked to approve the transfer of the asset sale as part of the confirmation of the plan—that transfer had already occurred and been approved pursuant to a separate evidentiary settlement hearing. *See* Steward Confirmation Hearing Transcript, [ECF No. 5724] at 8:24–9:24.

79.     In addition, in *Steward* the administrative expense claims bar date had already occurred at the time of confirmation and the debtors had succeeded in disallowing over $100 billion in asserted administrative claims and reducing their aggregate administrative expense claims estimate to approximately $108 million—a settled, reconciled figure. *See* Steward Disclosure Statement [ECF No. 5028] at 84–86. Consequently, in *Steward*, the plan could become effective and pay administrative claims in full once roughly $300 million in proceeds were available for distribution from approximately $3 billion in colorable claims vested in the *Steward* litigation trust—a number of which claims had already been commenced in litigation at the time of confirmation. Steward Confirmation Hearing Transcript [ECF No. 5724] at 37:4–38:3.

80.     Finally, when this Court confirmed the *Steward* plan, it specifically conditioned such confirmation on the ability to unwind the plan's effect if time proved that the recovery of sufficient proceeds for the effective date would be unlikely. *See* Steward Confirmation Transcript at 39:21–24 ("I assure everyone, if this is going nowhere in 2026, I will—I've no qualms about telling the Debtors it's a no-go on the effective date, you can't do this").

31

81.   Here, the Court has not yet set an administrative expense claims bar date.  No final reconciliation of administrative expense claims has occurred.  Although one lawsuit has been commenced against certain insiders, it has been stayed at the request of the Department of Justice to avoid interference with their criminal prosecutions.  The FBG Debtors assert that, based on their estimate of the Administrative Expense Claims' final allowed amounts, the Litigation Trust would need to recover approximately $2 billion by the end of 2028 to go effective. There is no credible evidence that such threshold can be met.

82.   Moreover, the Plan provides for certain irrevocable provisions, such as transfer of the Estate Claims into the Litigation Trust.  This forecloses—through strained use of Section 363(m)'s protections—any possible unwind of such transfers in the event of non-occurrence of the Effective Date following confirmation of the Plan.  *See* 11 U.S.C. § 363(m).  Thus, unlike *Steward*—but like the plan in *In re Premiere*—the Plan irrevocably shifts the significant risk of the Litigation Trust's failure to satisfy the preconditions to the Effective Date to non-favored creditors, and there can be no showing that the FBG Debtors can satisfy their obligations under the Plan.

83.   Indeed, the FBG Debtors' ability to make payments of Administrative Expense Claims mandated by the Bankruptcy Code depends entirely on speculative litigation recoveries exceeding a minimum of $1.9 billion.  The FBG Debtors' sole evidence that they will be able satisfy this requirement are the testimonies of Moore and Kirschner each of which are, to the extent admissible, not reliable.

84.   Much of Moore's testimony is one-sided, and relies on a spin of disputed facts.  Moreover, much of his declaration is inadmissible hearsay based on the work of others,

speculation, and legal assertions he is unqualified to make.[14]  For example, ignoring that certain of the SPV Debtors are member managed special purpose entities, Moore asserts without any factual basis that the SPV Debtors "failed to observe corporate formalities and did not in fact operate as discrete corporate entities."  Moore Decl. ¶ 115.  Similarly, Moore's intimation that BPI and the Trico Entities never received the purchase price for their inventory sales to Carnaby II and Carnaby III because such funds were deposited into FBG's main concentration account, completely ignores that BPI's and the Trico Entities' own bank accounts are automatically swept daily to the same FBG concentration account, and that FBG is the servicer under the Carnaby Credit Agreements.

85.    Moore presents many of the facts he alleges are "red flags" in a deliberately non-specific manner to suggest general market awareness of the James brothers' and FBG Debtors' fraudulent activities well before to their bankruptcy filings.  Yet, in early July 2025, before the Debtors failed attempt to refinance their debt, the trading prices for the FBG Debtors' secured debt make clear that such activities were not known.[15]

86.    Kirschner, the FBG Debtors' proffered expert, opines that $2 billion in recoveries is "reasonably probable" by year-end 2028.  Kirschner Decl. ¶ 21.  Yet, this testimony rests on Kirschner's unquestioning acceptance of highly disputed facts presented in the Moore Declaration and a proposed application of the Ponzi scheme presumption that is far past the breaking point.  Similarly, the "badges of fraud" on which Kirschner relies are not indicative of anything meaningful—again the market price of the FBG Debtors' debt prior to bankruptcy refutes the notion that lenders were on notice of wrongdoing.

---

[14] *See infra* Section IV regarding objections to Moore and Kirschner's testimony.

[15] For example, on July 1, 2025, The FBG Debtors' First Lien Term Loans traded around 95 cents on the dollar and the Second Lien Term Loans traded at roughly 90 cents.  *See* Bloomberg Screenshots, Ex. 1, 2.

NA_DECHERT.96345197.9

87.     Moreover, Kirschner's information is second or third-hand at best.  He relies without question or qualification on the factual—and legal—conclusions set forth in the Moore Declaration.  While Kirschner includes a Materials Considered exhibit to his declaration that includes a handful of original contracts and emails, *see* Kirschner Decl. at Exh. B, he cites a grand total of [three] of these documents in his entire 56-page declaration.  *See* Kirschner Decl. at fns. 5, 6, and 91.  Instead, virtually all of the factual assertions on which he relies are adopted wholesale from Moore' testimony.  *See generally, id*. at fns. 18–195.  As discussed above, Moore's declaration does not constitute an even-handed recitation of relevant material and thus Kirschner's view is unduly rosy concerning the strength of potential claims.

88.     Kirschner's analysis also relies heavily on the mistaken impression that because the Debtors' and James brothers' actions were fraudulent, the Ponzi presumptions would automatically apply and all of their transfers to creditors would be deemed to have been made while insolvent and with the actual intent to hinder, delay, and defraud creditors.  That is not the law in the Fifth Circuit which applies the presumption sparingly and only where it makes sense–where, among other things, the nature of an investment scheme is such that by definition the fraudulent enterprise is insolvent from the outset and by definition transfers are made with actual fraudulent intent because they are inflated.  *Janvey v. Alguire*, 647 F.3d at 597–98.  Indeed, in the *Janvey* case the Court made clear that even where there is a Ponzi scheme, not all transfers are subject to the presumption–in that case the transfers presumed fraudulent were those to those of investors promised high rates of return whose redemptions were paid with the investments of subsequent investors.  *Id.*

89.     The Fifth Circuit views the Ponzi Scheme Presumption narrowly and has defined a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors

34

generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Id*. A Ponzi scheme is, "as a matter of law, insolvent from its inception." *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

90.    However, the mere presence of fraudulent activity is insufficient to merit application of the presumption. *See In re Reagor-Dykes Motors, LP*, No. 18-50214 (RLJ), 2022 WL 2046144, at *4 (Bankr. N.D. Tex. June 3, 2022); *In re Texas E&P Operating, Inc.*, No. 17-34386 (SGJ), 2022 WL 2719472, at *11 (Bankr. N.D. Tex. July 13, 2022). Additionally, even where the presumption applies, it does not negate the ability of transferee to prove the other elements of a "good faith transferee" defense, such as the provision of value. *See Janvey v. Golf Channel Inc.*, 487 S.W. 3d 560, 582 (Tex. Nov. 15, 2024).

91.    In *Reagor-Dykes*, a debtor automotive dealership engaged in a series of fraudulent activities to obtain financing to keep its floundering business operating, including, *inter alia*: (i) by obtaining cash advances for non-existent vehicles that had been previously sold and (2) by obtaining "floorplan" financing from multiple creditors using a single vehicle. *See Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *2. The trustee of the Reagor-Dykes liquidating trust subsequently brought preference and fraudulent transfer claims against Ford Motor Credit Company to recover thousands of payments made under the floorplan loans to Ford. *See id*. at *4. After an extensive analysis of Fifth Circuit caselaw on the Ponzi Scheme Presumption, the *Reagor-Dykes* court rejected the trustee's proposed application of the Ponzi Scheme Presumption, stating bluntly:

NA_DECHERT.96345197.9

"Reagor-Dykes operated multiple car dealerships throughout west Texas and the metroplex; as is common in the industry, Reagor-Dykes' inventory was financed by large floorplan loans—Ford Credit's being the largest by far. Reagor-Dykes generated large sales and huge revenues. It was never a Ponzi scheme. While Ponzi schemes have been defined in different ways, they are, at bottom, investment scams. A Ponzi scheme is not a legitimate business, and investment deals are different from debtor-creditor relations. Every Fifth Circuit case discussed above concerns investment schemes. The Circuit has not addressed the application of the Ponzi-Scheme Presumption in a case where the transfers are payments made under a traditional debtor-creditor relationship. The payments here were required under a legitimate floorplan loan. They were not Ponzi-scheme payments made to lure other new investors. Further, in *Templeton*, the court held that a "Ponzi-like" (rather than a classic or pure Ponzi) scheme was not enough to create an exception to the ordinary-course-of-business defense.  Reagor-Dykes, despite its many acts of fraud, was not a wholly illegitimate business; it is a business that failed from its profligate ways."

See *id*. at *7–8 (citing *Templeton v. O'Cheskey* (*In re Am. Hous. Fund.*), 785 F.3d 143 (5th Cir. 2015) (internal citation omitted)).

92.     The *Reagor-Dykes* ruling is on all fours with the FBG Debtors' cases.  While the Debtors, the James brothers, and their affiliates may have engaged in extensive fraud, the Debtors also conducted legitimate automotive parts manufacturing operations that generated actual revenue to support their businesses and service their financing obligations to their creditors, including the SPV lenders that financed those operations.  Kirschner's conclusory presumption that all SPV loan repayments were made with the intent to defraud creditors simply makes no sense and is in no way supported by the cases he cites.  To the contrary, his analysis flies in the face of *Reagor-Dykes* and Fifth Circuit's "limited application of the Ponzi-Scheme Presumption to true Ponzi-schemes." *See id.* at *8.

93.     As an example, with respect to the Carnaby Secured Lenders, it is clear that they received nothing as part of any Ponzi scheme.  The Carnaby Secured Lenders provided value in the form of a secured lending facility and their receipt of regularly scheduled interest payments at commercial rates based on standard documentation is not a form of "overpayment intended to

36

induce other investments" or otherwise fraudulent. *Cf. Janvey v. Alguire*, 647 F.3d at 597–98. The Carnaby Secured Lenders simply received interest in a total amount less than the principal loaned pursuant to legitimate lending arrangements which financed the manufacture of raw materials into finished goods for sale by the FBG Debtors to third parties. *See, e.g., Janvey v. Golf Channel Inc.*, 487 S.W. 3d at 582.

94.     Even if the Debtors and James brothers applied proceeds received in subsequent financings alongside legitimate revenue to meet their ongoing debt obligations while insolvent, this would not permit application of the Ponzi Scheme Presumption and would not render the debt payments fraudulent. *See In re Chris Pettit & Assocs., P.C.*, No. 24-05034 (CAG), 2024 WL 5316334, at *11 (Bankr. W.D. Tex. Dec. 16, 2024) ("the Court will not extend the Ponzi-scheme presumption to Ponzi-like frauds").

95.     Kirschner also disregards potential "good faith transferee" defenses available to SPV financiers under 11 U.S.C. § 550(b)(1)—applicable where transfers made to the SPV lenders initially went to the SPV Debtors. A "good faith transferee" defense is not negated even in a case in which the Ponzi Scheme Presumption applies, as the presumption establishes only the debtor's intent—it says nothing about a transferee's good faith. *See Williams v. FDIC (In re Positive Health Mgmt.)*, 769 F.3d 899, 901, 908-09 (5th Cir. 2014) (holding that a good faith transferee retains a § 548(c) lien to the extent of value given, even where the underlying transfer is avoided, because the good faith defense and the Ponzi scheme presumption operate on independent tracks); *Warfield v. Byron*, 436 F.3d 551, 558–60 (5th Cir. 2006) (same); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 801–02 (5th Cir. 2002). The "good faith transferee" defense under Section 550(b) would nullify any potential recovery to the Litigation Trust as it provides a complete defense to the transferee from a fraudulent transfer claim. *Picard v. Citibank, N.A. (In*

37

*re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 181–82 (2d Cir. 2021) (comparing Section 550(b)(1)'s complete defense to Section 548(c)'s partial defense).

96.     Much of Kirschner's Declaration appears to be deliberately non-specific—mixing broad and generic references to conduct by "SPV Entities" or "SPV financiers" with specific references to individual entities—so as to impute evidence that might invalidate one SPV lender's "good faith transferee" defense to other, non-related SPV lenders. *See e.g.*, Kirschner Decl. ¶¶ 67, 75, and 86.

97.     Based solely on statements from Moore, Kirschner suggests that the FBG Debtors' and SPV Debtors' books and records do not indicate that the transactions contemplated by the Carnaby Credit Agreements actually occurred. *See* Kirschner Decl. at ¶¶ 67–68. Yet, even if this were true, which the Carnaby Secured Lenders dispute, Mr. Moore says that this has only come to light in hindsight with the benefit of a forensic audit after the commencement of these cases. *Compare Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171,191 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) (the inquiry notice analysis is a subjective inquiry into what the defendant actually knew, not what it was charged with knowing on a theory of constructive notice); *In re Nieves*, 648 F.3d 232 (4th Cir. 2011) (knowledge under § 550(b)(1) means actual knowledge of facts leading a reasonable person to believe the transfer was voidable—not constructive notice of what forensic investigation might later reveal). Nowhere do Kirschner or Moore suggest that the Carnaby Secured Lenders received the Debtors' purportedly fraudulent books and records or knew of the absence of any such transactions prior to their receipt of regularly scheduled interest payments under the Carnaby Credit Agreements.

98.     With respect to information actually alleged to have been received by the Carnaby Secured Lenders, Kirschner identifies only that the borrowing base certificates tracked generic

SKU numbers that continuously turn over as evidence that the Carnaby Secured Lender "were aware that they were not getting complete or adequate information". *See* Kirschner Decl. ¶ 72 (citing Moore Decl. ¶ 132). Nowhere, however, do Kirschner (or Moore) allege that use of generic SKU number tracking for goods of the kind used in the FBG Debtors' operations differs from common industry practice, that tracking of unique identifiers is essential in inventory reporting under commercial lending arrangements, or that any of the other purported deficiencies in the Carnaby Secured Lenders' borrowing base certificates would give rise to inquiry notice—all elements that a future Litigation Trustee would be required to prove in future litigation. Nevertheless, the Debtors are effectively asking the Court to adopt a central component of Kirschner's valuation of the Estate Claims litigation—namely, that all "SPV financiers," writ large, "would be unlikely to succeed on [their] good faith defense[s]." *Id.* ¶ 85. As noted however, supra at ¶ 85, the trading price of the Debtors' secured debt in July 2025 suggests that market participants were unaware that the certifications of the Debtors' management could not be relied upon, which negates Kirschner's assumptions.

99.     When assessing the viability and potential collection of Estate Claims in these cases, the Court should give far more weight to the market price of the DIP Loans and the results of the FBG Debtors' marketing process for the sale of the Estate Claims. The DIP Loans, including the DIP A Loans, trade at a large discount, implying that the market does not believe that the Estate Claims will provide recoveries anywhere close to that suggested by Moore and Kirschner. In addition, according to the Debtors, twenty-six sophisticated litigation finance and claims acquisition firms—whose business it is to evaluate and price precisely these kinds of Estate Claims—were given full access to the Debtors' data room, and none offered a single bid when the FBG Debtors formally marketed their Estate Claims. Indeed, only two even elected to execute a

39

non-disclosure agreement.  *See* Moore Decl. ¶ 42.   The unanimous verdict of twenty-six independent, self-interested market participants who reviewed the Estate Claims and declined to offer anything for them when they stood to be the first to collect from any Litigation Trust recovery strongly suggests that any recovery on these Estate Claims remains highly speculative.

## II.   The Settled Administrative Claim Mechanism Cannot be Approved.

100.   Under the Plan, the Administrative Expense Claims of parties that settle with the Debtors for 50% of the face amount of their claims "shall receive distributions from the Litigation Trust before payment of other Allowed Administrative Expense Claims."  Plan at 26 (definition of "Settled Administrative Expense Claims.").  Although the Bankruptcy Code allows for certain administrative expense claims to have priority over others, *see*, *e.g.*, 11 U.S.C. § 507(b), none of those situations include the debtors dictating the elevation of priority through a "consent program." The Plan would allow the FBG Debtors to treat two claims of the same priority differently based solely on whether the claimant has accepted the FBG Debtors' settlement offer.  This runs afoul of recent Supreme Court decisions, including *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) which found that that parties cannot avoid the Bankruptcy Code's substantive restrictions and major policy prescriptions by way of "settlement."  *See id*. at 986 (supporting its analysis by referencing analogous "proposed transactions that lower courts have refused to allow on the ground that they circumvent the Code's procedural safeguards.").  Further, the Supreme Court expressly recognized that invoking a "rare case" exception to allow a "settlement" to circumvent the Code would have "consequences [that] are potentially serious[,]" including "changes in the bargaining power of different classes of creditors even in bankruptcies that do not end in structured dismissals."  *Id.* at 986–87 (emphasis added).

101.   To the extent Congress has established a hierarchy of priorities for the payment of claims (as Congress has done under the Code), Congress' priorities cannot be disregarded, *Jevic*,

40

580 U.S. at 465; nor are courts free to create alternative priority and payment structures, *see United States v. Noland*, 517 U.S. 535, 540–41 (1996) (explaining that Congress sets the Code's priorities, not the courts). Because the Plan neither respects the payment priority of non-Settled Administrative Expense Claims, nor provides for their payment in full, it should not be confirmed.

### III.   The Plan Harms Creditors of the SPV Debtors and the SPV Debtors' Estates

#### C.   The Plan Improperly Seeks to Grant the Litigation Trustee Greater Interests Than the FBG Debtors Possess

102.   The Plan cannot vest the Litigation Trust (or the other Trusts) with greater assets, powers, or defenses than the FBG Debtors (or their estates) or deprive other parties in interest—such as the SPV Debtors—of their assets or rights. Section 541(a) creates an estate that is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "When a trustee pursues a cause of action under § 541(a), the trustee brings the action as successor to the debtor's interest in property and, as such, the trustee is subject to all defenses, including *in pari delicto*, that would have been available to the defendant against the debtor." *In re Motorwerks, Inc.*, 371 B.R. 281, 288 (Bankr. S.D. Ohio 2007); *see also In re Segerstrom*, 247 F.3d 218, 224 (5th Cir. 2001) ("When a trustee prosecutes a right of action derived from the debtor, the trustee stands in the shoes of the debtor…The trustee is subject to all defenses available against the debtor, and must prove all elements that the debtor herself would be required to prove."); *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996) (trustee "stands in the shoes of the debtor" and "can take no greater rights than the debtor himself had."); *Matter of Gebco Inv. Corp.*, 641 F.2d 143, 146 (3d Cir. 1981) (same).

103.   Prior to the Conditional Disclosure Statement Approval Hearing, At the request of various objecting parties, the Debtors modified the Plan to preserve certain defenses of Litigation Trust defendants in future litigation. *See* Plan at Art. VI § 6.2(c). Nonetheless, these preservations

do not go far enough, and the transfer does not preserve such rights as required by law. For instance, no preservations have been added in respect of the DIP Collateral Trust or the ABL Collateral Trust. Additionally, the preservations are limited to defenses arising out of facts stemming from defendants' dealings with the FBG Debtors only. *See* Plan at Art. VI § 6.2(c). Yet, given the facts alleged, it is clear that parties' dealings with other affiliates of the FBG Debtors, including the SPV Debtors, non-Debtor affiliates, and other entities associated with the FBG Debtors former management likely give rise to defenses, counterclaims, rights of recoupment, setoff and offset, and other legal and equitable doctrines (such as *in pari delicto*, alter ego, and veil piercing) that would otherwise be assertable if the FBG Debtors brought the Estate Claims themselves.

104. Accordingly, the Plan must include an express statement that, in bringing any future litigation, each of the Trusts (including the Litigation Trust) will remain subject to all applicable defenses, rights of recoupment, setoff and offset, and legal and equitable doctrines that any defendant may have asserted by virtue of its relationship with or arising out of facts in respect of any or all of the FBG Debtors, the SPV Debtors, or their affiliates.

105. The Plan must also be revised to preserve the assets of the SPV Debtors and allow reasonable access to their assets including books and records and privileged information for their estates and stakeholders. Presently, the Plan seeks to take assets belonging to the SPV Debtors to provide an unjust and unearned advantage to the Litigation Trust—and its principal beneficiaries, the DIP Lenders and Prepetition Secured Parties—in all future litigation by channeling all FBG Debtors' privileges, books, records, and other materials relevant to any future litigation into the Litigation Trust and places onerous restrictions on the sharing of such information. *See generally* Plan at Art. VI §§ 6.2(a)-(h).

NA_DECHERT.96345197.9

106.     While the Plan provides for the joint vesting of privileged information in the FBG Debtors, the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust to the extent such information relates to matters in which more than one of such entities assert any interest, s*ee* Plan § 6.2(e), no such provision is made for the SPV Debtors.  Yet, the SPV Debtors, both contractually and by their very nature as special purpose entities, have common interests in many of the FBG Debtors' assets and books and records.  *See e.g.*, Carnaby II Credit Agreement, §§ 6.2(a)–(f) (obligating FBG as Servicer to, *inter alia*, administer collections required to service the obligations under the Carnaby II Credit Agreement and to hold in trust for SPV Debtor Carnaby II and the Carnaby Secured Lenders all records relating  to the collateral under the Carnaby II Credit Agreement); Carnaby III Credit Agreement § 6.2(a)–(f) (same with respect to Carnaby III).

107.     In fact, the Plan provides that Litigation Trust Assets will be deemed to exclude assets of the SPV Debtors only to the extent "determined by a Final Order to be property of the SPV Debtors or their Estates."  *See* Plan § 1.1 Def. Litigation Trust Assets.

108.     Such provisions will only degrade the ability of the SPV Debtors, their estate fiduciaries, and their creditors to pursue causes of action for the benefit of SPV Debtors' stakeholders.  They also create—apparently intentionally—an asymmetric information advantage with respect to joint assets in favor of the Litigation Trust in all future litigation brought against the SPV Debtors and their stakeholders.  This impermissibly and without justification deprives the SPV Debtors and their creditors of valuable property rights and limits their ability to pursue certain defenses that would otherwise be available to them.  Accordingly, the Plan must be revised.

**D.      The Plan's Broad Exculpation and Injunction Provisions Materially Impact the SPV Debtors' Estates**

109.     Although the Plan only purports to reorganize the FBG Debtors, it includes broad exculpation provisions which would eliminate or impede potential claims and causes of action that

NA_DECHERT.96345197.9

may be brought by creditors of the SPV Debtors and/or their estates for their creditors' benefit. The Plan also contains onerous and broad injunctive provisions (including a broad "gatekeeper" limitation in Plan § 13.4(c)) that will impair the ability of creditors of the SPV Debtors and their estates to pursue causes of action which should not be impacted by the Plan at all. *See* Plan § 13.4(c) (prohibiting causes of action to be commenced against any Exculpated Party absent Court approval). This is particularly inappropriate given the fact that the Plan provides no recoveries for the SPV Debtors' estates.

110. As a general matter, only a plan of reorganization may provide a discharge of liabilities and even then, only to the Debtor under such plan. 11 U.S.C. § 524(e). *See also In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) ("Section 524(e) only releases the debtor, not co-liable third parties.") (finding that Section 524(e) did not authorize releases to non-Debtors, since "Section 524(e) only releases the debtor, not co-liable third parties."). A chapter 7 liquidation provides no discharge to Debtors. 11 U.S.C. § 727(a)(1); *see also Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 803-804 (5th Cir. 1997) (extending lack of discharge to liquidating plans under Chapter 11). Though the Fifth Circuit has found that there are some exceptions where a Plan may provide a "specific discharge or release" to some non-Debtors, *Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286 (5th Cir. 2016), the scope of the releases must be "clear and unambiguous" and "expressly release[] a third party from liability." *Id.* (citing *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987)); *see also In re Applewood Chair Co.*, 203 F.3d 914, 919–20 (5th Cir. 2000) (declining to grant discharge against third parties where the plan did not provide for a "specific discharge"). Most critically, the Fifth Circuit has held that a plan may not exculpate non-debtors. *Matter of Highland Capital Management, L.P.*, 48 F.4th 419, 437 (5th Cir. 2022) (requiring that "[Fifth Circuit] precedent and § 524(e) require any exculpation

NA_DECHERT.96345197.9

in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties.")

111.    Here, the Plan includes the members of the Debtors' Special Committees as Exculpated Parties which is simply not permitted under *Highland Capital*. *Id*. Moreover, the only Debtor to which the Plan applies are the FBG Debtors.  Yet, the Plan's exculpation provisions would exculpate all of the Exculpated Parties for all actions related to *every Debtor's estate*.  This expansion of the exculpation's scope beyond the FBG Debtors is also in direct opposition of *Highland Capital*. *Id*.

112.    Additionally, there are no express carveouts or reservations to ensure causes of action held by the SPV Debtors, their estates, and their creditors are safeguarded from the impact of the Plan's exculpation and injunction provisions.  For example, no provision expressly preserves Administrative Expense Claims or Causes of Action held by the creditors of SPV Debtors or held by the SPV Debtors' estates that stem from violations by the Exculpated Parties (such as the FBG Debtors) of prior Court orders such as the Carnaby Secured Lender Interim AP Order.

113.    The inclusion of such sweeping exculpation and injunction provisions without safeguards for the SPV Debtors and their estates is simply inappropriate where, as here, the SPV Debtors estates will receive no benefit from the Plan, the SPV Debtors and their creditors likely hold claims stemming from the FBG Debtors' violations of Court orders, and the SPV Debtors' largest creditors will in all likelihood have their rights and interests affirmatively harmed by the Plan's other mechanics.  Absent inclusion of such safeguards, the Plan is not confirmable.

**IV.    <u>The Plan is Not Proposed in Good Faith</u>.**

114.    To be confirmed a chapter 11 plan must have been "proposed in good faith and not by any means forbidden by law.  *See* 11 U.S.C. § 1129(a)(3).  Whether a plan is proposed in good

45

faith is an issue which "should be evaluated in light of the totality of the circumstances surrounding establishment of the plan, mindful of the purposes underlying the Bankruptcy Code." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) (internal quotation marks and citations omitted). "'To be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy Code].'" *In re QVC Group Inc.*, No. 26-90447 (ARP), 2026 WL 2058528, at *40 (Bankr. S.D. Tex. July 15, 2026) (quoting *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991)).

115.    It is clear from its very structure that the FBG Debtors' Plan fails the requirements of confirmation—not as a result of some minor technicality or quirk of voting—but by design.  Its delayed effective date construct coupled with its permanent transfer of Estate Claims to the Litigation Trust is intended to permanently convey the benefits of a chapter 11 plan on the Litigation Trusts' senior tier beneficiaries, the DIP Lenders, while denying administrative expense creditors their express rights under the Bankruptcy Code.  The reason for this is clear, potential recoveries from the Litigation Trust are highly speculative and cannot serve as the basis for a feasible plan as of the Plan's confirmation date—the date the Plan actually becomes "effective" as such term is used under the Bankruptcy Code.  Moreover, holders of administrative expense claims are forced to make a Hobson's Choice of taking 50% haircut on their claims or standing on their rights and subordinating their already slim likelihood of repayment in violation of the Bankruptcy Code.  Each of these elements is a fundamental and essential component of the FBG Debtors' Plan structure and each violates the Bankruptcy Code.  Such a cynical construct is the very definition of bad faith and cannot be confirmed.

## V.    <u>Reservation of Rights Regarding Moore and Kirschner Declarations.</u>

116.    The Moore Declaration and Kirschner Declaration contain numerous factual allegations regarding the Carnaby Secured Lenders and the course of conduct between them and

NA_DECHERT.96345197.9

the Debtors. Many of these allegations are unreliable characterizations and hearsay. *See e.g.*, Moore Decl. ¶¶ 124 (unattributed interviews with "corporate accounting staff"), 138 (no source for "admissions" made by Onset). Others are legal opinions Moore is unqualified to offer and which Kirschner merely adopts wholesale to present his own purported analysis and erroneous interpretation of Fifth Circuit law. *See e.g.* Moore Decl. ¶¶ 106 (opining on "hallmarks" of a fraudulent scheme), 115 (opining on observance of corporate formalities), ¶ 143 (opining on legality of dividends under "applicable law"); Kirschner Decl. ¶¶ 57–58, 64, and 85 (adopting legal assertions made by Moore). Most importantly, many of them are not true and it is premature for the Court to make any binding fact findings with respect to such facts in connection with the Confirmation Hearing. To the extent the Court makes any findings, it should not be binding on any parties in connection with the any other matter. The Carnaby Secured Lenders reserve all rights to dispute the facts on a final basis.

## **RESERVATION OF RIGHTS**

117. The Carnaby Secured Lenders expressly reserve all rights, claims, defenses, and arguments, whether legal or equitable, including, without limitation, the right to amend, supplement, or modify this Objection at or prior to any hearing on approval of the Disclosure Statement, or confirmation of the Plan as a result of any amendment to either of the foregoing, or at any other time as may be permitted by the Court.[16]

118. As of the date of the filing of this Objection, no proposed findings of fact or form of proposed Confirmation Order have been filed. The Carnaby Secured Lenders reserve all rights to object to any such findings of fact or the terms included in the proposed Confirmation Order.

---

[16] As the date of this Objection, discovery regarding the FBG Debtors' Plan and the evidence to be proffered in support thereof remains ongoing and the Carnaby Secured Lenders reserve the right to amend this Objection to the extent new facts or evidence are uncovered in discovery.

NA_DECHERT.96345197.9

## CONCLUSION

WHEREFORE, the Carnaby Secured Lenders respectfully request that the Court deny confirmation of the Plan.

NA_DECHERT.96345197.9

Dated:      July 20, 2026                Respectfully submitted,
               Houston, Texas

/s/ Allan S. Brilliant
Allan S. Brilliant (admitted *pro hac vice*)
Gary J. Mennitt (admitted *pro hac vice*)
Stephen M. Wolpert (admitted *pro hac vice*)
Eric O. Hilmo (admitted *pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Email:   allan.brilliant@dechert.com
        gary.mennitt@dechert.com
        stephen.wolpert@dechert.com
        eric.hilmo@dechert.com

-and-

John F. Higgins (TX Bar No. 09597500)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email:   jhiggins@porterhedges.com
        myoung-john@porterhedges.com
        jkeefe@porterhedges.com

**Counsel to the Carnaby Secured Lenders**

49

**Certificate of Service**

I certify that on July 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ John F. Higgins
John F. Higgins