**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, LLC, et al.,[1] | Case No. 25-90399 (CML) |
| Debtors. | |

**OBJECTION OF TOTAL QUALITY LOGISTICS, LLC TO JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS DATED JUNE 16, 2026 AND DISCLOSURE STATEMENT DATED JUNE 17, 2026**

Total Quality Logistics, LLC ("TQL") hereby objects to *THE JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS* ("FBG Debtors") dated June 16, 2026 [Doc. 3019] ("Plan") and *DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS* dated June 17, 2026, and, in support thereof, states as follows:

**PRELIMINARY STATEMENT**

TQL does not generally oppose confirmation of a plan of liquidation for the FBG Debtors. Rather, TQL objects to this Plan as currently drafted for the specific reasons set forth herein. Most fundamentally, it is inequitable that the Debtors have selectively honored certain provisions of the Final DIP Order — including the professional fee carve-out and the priority of lender claims — while entirely ignoring the protections expressly bargained for in § 8(b) of the Final DIP Order for the benefit of administrative expense creditors. The $200 million Administrative Expense Claims Basket and subordination of certain claims to administrative expense claims established in § 8(b)

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

was specifically designed to protect parties like TQL who provided post-petition goods and services in reliance on those protections. Yet, neither the Plan, the Liquidation Analysis, nor any of the declarations submitted in support of confirmation appear to contain any analysis of how administrative expense creditors would be treated if the § 8(b) protections from the Final DIP Order were honored. TQL also objects to the Plan to the extent it provides materially better treatment to certain administrative expense creditors over others through the Consent Program, without the individual consent of each affected creditor as required by the Bankruptcy Code.

First, the Plan is unconfirmable because, despite its novelty and complexity, it fails to satisfy the basic requirement of the Bankruptcy Code of providing adequate means for the Plan's implementation under 11 U.S.C. § 1123.

Second, the Plan does not satisfy the confirmation standards imposed by 11 U.S.C. § 1129. Thus, the sophisticated edifice that FBG Debtors have proposed over several iterations of plans fails not for complex reasons, but for simple ones. Despite statutory requirements, FBG Debtors have not proposed a plan that provides the same treatment for each administrative expense claim and is thus not fair and equitable. Instead, the Plan bifurcates administrative expense claims into two groups, effectively conditioning any meaningful prospect of payment on a holder's agreement to reduce its claim by 50%. This bifurcation is an attempt to avoid the framework of 11 U.S.C. § 1129(a)(9)(A), which provides that on the effective date of a plan, the holder of an administrative claim will receive, on account of such claim, cash equal to the allowed amount of the claim itself. This Plan's structure forces administrative creditors to choose between bad or worse potential recoveries, without consent. The FBG Debtors' argument that there is consent is misleading; while it may be consensual to opt in, the FBG Debtors ignore the dispositive point: non-participating creditors do not consent to being subordinated to a discounted priority class, nor to bearing the heightened risk that their administrative claims will never be paid. Ultimately, the Consent

Program creates a *superpriority* administrative claims class at the detriment of the remainder of the administrative claimants.

Third, and in furtherance of the foregoing, the FBG Debtors have proposed a Plan that may never go effective, in contravention of 11 U.S.C. § 1129, due to a long list of conditions precedent. Thus, even under the most favorable reading of the Plan, FBG Debtors have proposed only a plan that *might* pay administrative claim holders—but that is not what the Bankruptcy Code requires. A plan that will *perhaps* pay the administrative expense claims is inadequate. Confirming this Plan would allow the FBG Debtors to circumvent the Bankruptcy Code's mandatory protections for administrative creditors while ensuring priority recovery for secured lenders. This Plan therefore is detrimental to not only the practical interests of numerous administrative expense claimants who worked for the Debtors during these cases, but also threatens broader bankruptcy policies.

Finally, the core deficiencies identified in TQL's prior *OBJECTION OF TOTAL QUALITY LOGISTICS, LLC TO DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS DATED JUNE 5, 2026* [Doc. 2975] ("TQL's Prior Objection") – namely that creditors were provided inadequate information as required under § 1125(b) of the Bankruptcy Code to enable TQL and other creditors to make an informed judgment about the proposed plan – appear to still remain unresolved even after FBG Debtors filed their supplement to the Plan on June 23, 2026 [Doc. 3046] (the "Plan Supplement"). The Debtors' Liquidation Analysis states that the Administrative Expense Claims Basket is not triggered because DIP A Claims are not paid in full in a chapter 7 liquidation. (*Id*. at Ex. 9, p. 10.) But it does not disclose the DIP lenders' expected recoveries from assets assumed to be foreclosed upon, information necessary to assess whether the DIP A Claims could be satisfied and the basket triggered. In other words, the Debtors have structured both the Plan and the Liquidation Analysis

to ensure the basket trigger never fires, while never disclosing the value of assets flowing to DIP lenders that would reveal whether that conclusion is accurate.

## BACKGROUND

1.       On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Commencing on September 28, 2025, First Brands Group, LLC and ninety-eight (98) debtor affiliates each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

2.       On November 9, 2025, this Court entered the final order authorizing the Debtors to obtain post-petition financing [Doc. 608] ("Final DIP Order"). Paragraph 8(b) of the Final DIP Order provides certain protections to unpaid and undisputed administrative expense claims of the Debtors, including, without limitation, establishing an Administrative Expense Claims Basket (as defined in the Final DIP Order) of $200 million for the holders of administrative expense claims and specifying that "remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket", as long as the New Money DIP Loans (as defined in the Final DIP Order) are paid in full. (Final DIP Order ¶ 8(b).)

3.       In his Declaration in Support of the Final DIP Order, the Debtors' Interim Chief Executive Officer, Charles M. Moore declared, in pertinent part:

### Administrative Expense Claims Basket

50.       The DIP Lenders have agreed to subordinate all $3.3 billion in Roll-Up Obligations to certain categories of administrative expense claims (including payroll, trade claims, section 503(b)(9) claims) up to an aggregate cap of $200 million (the "Aggregate Administrative Expense Claims Basket") in the event the Debtors' estates are

administratively insolvent. Under my supervision, the A&M team sized the Administrative Expense Claims Basket based on a variety of factors, including, but not limited to, the Debtors' average run rate over a two-week period, the amount of two weeks of accrued and unpaid payroll for U.S. salaried and hourly employees, and approximately one and a half weeks of total vendor spend, among other things.

51.     I believe the sizing of the Aggregate Administrative Expense Claims Basket and underlying assumptions are reasonable given the Debtors' average historical spend since commencing these cases and will materially reduce and potentially eliminate the risk to parties providing postpetition goods and services to the Debtors.

[Doc. 527, p. 21.]

4.      On April 29, 2026, Debtor Premier Marketing Group, LLC filed the PMG Disclosure Statement [Doc. 2545].

5.      On May 12, 2026, TQL filed TQL's Objection to the Disclosure Statement dated April 29, 2026 [Doc. 2647].

6.      On May 27, 2026, this Court entered an order denying conditional approval of the PMG Disclosure Statement for reasons stated on the record at the May 26, 2026 hearing [Doc. 2814].

7.      On June 5, 2026, the FBG Debtors filed the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors [Doc. 2907] (the "June 5th Plan"). On that same day, FBG Debtors filed the related Disclosure Statement [Doc. 2912].

8.      On June 11, 2026, TQL filed its Objection to the Disclosure Statement Dated June 5, 2026 [Doc. 2975] ("TQL's Prior Objection").

9.      On June 12, 2026, the Court conditionally approved the Debtors' proposed disclosure statement [Doc. 2990] ("Disclosure Statement Order").

10.     On June 16, 2026, FBG Debtors filed an updated Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors [Doc. 3019] (the "Plan").

11.     On June 17, 2026, FBG Debtors filed an updated Disclosure Statement For Joint Chapter 11 Plan Of First Brands Group, LLC And Certain Affiliated Debtors [Doc. 3020] (the "Disclosure Statement").

12.     The Court set a combined hearing for final approval of the Disclosure Statement and Plan confirmation for July 28, 2026.

13.     The Plan and Disclosure Statement Order make July 20, 2026, the deadline for voting on the Plan or objecting to the Plan and Disclosure Statement, making this Objection timely.

14.     TQL is a logistics services provider with administrative expense claims against the FBG Debtors for services provided over the course of approximately five months following the Petition Date, generating 114 documented unpaid invoices totaling $268,499.20.

15.     On May 12, 2026, TQL filed its Emergency Motion to Allow Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and Compel Payment [Doc. 2644], which motion remains pending before this Court.

## **OBJECTIONS**

### A.  **The Plan Does Not Meet the Requirements of § 1123(a)(5)**

16.     The Plan is unconfirmable under the requirements of 11 U.S.C. § 1123. Section 1123 governs the contents of a reorganization plan, dividing its provisions into mandatory requirements that a plan *must* include and discretionary provisions that a plan *may* include. The Bankruptcy Code mandates the following:

> § 1123 (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan **shall**—
> …
>
> (5) provide adequate means for the plan's implementation…

17.     This provision is not optional. The Bankruptcy Code's discretionary provisions are outlined in 11 U.S.C. § 1123(b). FBG Debtors' Plan cannot be confirmed because the terms of the Plan fail under the cited requirement.

18.     As noted, under 11 U.S.C. § 1123 (a)(5), a plan must provide adequate means for the plan's implementation. However, this Plan might never satisfy the earlier thresholds of payments, estimated at $1.9 billion, required before administrative expense claim holders (who do not settle) are paid in full. (*See* Disclosure Statement p. 11). The means used in this Plan is a monetized litigation vehicle. For those creditors further from the highest priority thresholds, it is not clear that FBG Debtors have provided adequate means for the plan's mechanisms to be implemented. Given that $1.9 billion must be recovered by the Plan's litigation trust (the "Litigation Trust") before administrative expense claims that have **not** agreed to reduce their claims by 50% can be paid in full, it is unclear if administrative claims will be paid at all. (*See* Disclosure Statement p. 11.)  While the FBG Debtors' Plan states that all administrative claims will be paid in full on the effective date, that assertion is clearly not grounded in reality. Instead, it appears to be little more than conclusory, boilerplate language included solely to create the appearance of compliance with the Bankruptcy Code, rather than a feasible commitment capable of being performed, evidenced by the Plan taken as a whole. Accordingly, the Plan does not satisfy 11 U.S.C. § 1123(a)(5) because it fails to provide adequate, non-speculative means for implementing payment of administrative expense claims.

19.     The FBG Debtors estimate in the Disclosure Statement that "the Effective Date is reasonably likely to occur in the second half of 2028, although the Effective Date may reasonably or in fact occur earlier or later than the second half of 2028." (Disclosure Statement p. 28.) The FBG Debtors do not appear to provide further support or explanation as to how they determined this estimated Effective Date nor how any current or future potential stays of litigation (due to any

potential criminal or bankruptcy proceedings of the defendants or otherwise) could affect the Effective Date. This cavalier approach cannot be considered sufficient.

20.     *Sixteen* conditions precedent must all be satisfied before the Effective Date occurs, including trusts having sufficient cash to pay all admin claims in full (Plan pp. 98-99). The Disclosure Statement admits distributions to non-consenting holders are "indeterminate" and "not required to be reserved for" while also admitting the failure of this condition would nullify the plan; these sections should be read in parallel –

> ### *What Happens if a Holder of an Administrative Expense Claim Does Not Opt In?*
>
> **All holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-in to the Administrative Expense Claims Consent Program will be paid in full on the Effective Date.** However, the timing of the Effective Date and distributions to holders of Allowed Administrative Expense Claims who do not opt in are indeterminate, are not required to be reserved for, and will depend in part on the level of participation in the Administrative Expense Claims Consent Program. Further, in the event the Litigation Trust is unable to make distributions sufficient to satisfy Allowed Administrative Expense Claims in full, payments made to holders of Settled Administrative Expense Claims are not subject to clawback or disgorgement. The Debtors anticipate that the more holders that choose not to timely, properly, and affirmatively opt-in to the Administrative Expense Claims Consent Program, the longer it will take for the FBG Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially contributing to risking the occurrence of the Effective Date.

(Disclosure Statement p. 26.)

> **12.3** *Effect of Failure of a Condition.*
> If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the FBG Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the FBG Debtors or any other Entity; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

(Disclosure Statement p. 100.)

21.     Because the Plan conditions effectiveness on numerous conditions precedent—including sufficient cash to pay administrative expense claims in full—while providing that the

Plan may become null and void if those conditions are not satisfied, the Plan does not provide an enforceable or reliable mechanism for implementation.

22. The Plan's own disclosures confirm that the proposed means of implementation are speculative rather than adequate. Although the Plan states that non-consenting holders of allowed administrative expense claims will be paid in full on the Effective Date, the Disclosure Statement admits that both the timing of that Effective Date and distributions to those holders are "indeterminate," are "not required to be reserved for," and depend in part on participation in the Consent Program. (Disclosure Statement p. 26.) The Plan further contemplates that the Litigation Trust may be unable to make distributions sufficient to satisfy allowed administrative expense claims in full, while protecting payments made to settled administrative expense claimants from clawback or disgorgement. (Plan p. 4) Those provisions only make sense if nonpayment of administrative expense claims is anticipated as a real possibility, which in turn suggests FBG Debtors understand a plan that pays the administrative creditors cannot be implemented or the only plan that can be implemented will not pay the administrative creditors. The former does not comply with 11 U.S.C. § 1123(a)(5) and the latter does not comply with 11 U.S.C. § 1129, as will be discussed further below.

**B.** **The Plan Does Not Meet the Confirmation Requirements of 11 U.S.C. § 1129**

23. Second, and more fundamentally, the same defects that render the Plan structurally deficient under 11 U.S.C. § 1123(a)(5) also prevent confirmation under 11 U.S.C. § 1129. First, the Plan does not provide a concrete, enforceable means to pay administrative expense claims as required. Despite many different iterations of the Plan, none have provided even an estimated date on which administrative expense claims will be paid. Instead, payment is tied to a future occurrence (or rather, a multitude of occurrences in the context of a litigation trust). Payment thus

depends on a contingency—*if* the litigation trust generates billions, *then* administrative creditors will be paid. But this is not what 11 U.S.C. § 1129 requires.

> § 1129. Confirmation of plan
> (a) The court shall confirm a plan only if all of the following requirements are met:
> ...
> **(9)** Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
> **(A)** with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
> ….

Section 507(a)(2) establishes second priority status to administrative expenses allowed under Section 503(b), which in turn applies to post-petition services provided to debtors including costs and expenses of preserving the estate, wages and salaries for services rendered after commencement of the case. Section 1129(a)(9) requires payment in cash—not the hope of payment or the recovery of payment subject to waterfall thresholds. The Bankruptcy Code requires payment in cash on the effective date of the plan, which would require the debtor to have the cash and to have an effective date, neither of which are certain under FBG Debtors' Plan.

24.     Further, the Plan has created a purported Consent Program that is in fact detrimental to holders of administrative expense claims. The Plan requires holders of administrative expense claims, like TQL, to make an election within 60 days of the Confirmation Date under an Administrative Expense Claims Consent Program ("Consent Program") that materially affects potential recoveries and the timing of those recoveries. (Plan p. 26.) Under the Consent Program, FBG Debtors will purportedly provide TQL with a "Reconciled Amount" of TQL's administrative expense claim and ask TQL to accept half of the Reconciled Amount in exchange for a higher payment priority with a limited time to object in the event Debtor provides an inaccurate Reconciled Amount. In other words, the FBG Debtors are attempting to create a super-priority

administrative claims class at the detriment of administrative claimants who do not wish to only receive half of their owed claim.

25.     Under the Plan, administrative expense claims are tied to a complex trust structure through which litigation recoveries and other trust proceeds are distributed by waterfall. Holders of administrative expense claims may participate in the Consent Program by agreeing to reduce their claims to 50% of the Debtors' reconciled amount; those settled administrative expense claims are then paid ahead of non-participating administrative expense claims, but only after the first $350 million in distributable proceeds from the Litigation Trust Waterfall. (Plan pp. 49-57.)

26.     Holders who do not opt in remain entitled only to later pro rata payment, if any, from available trust proceeds after the "settled" administrative expense claims are paid, with the timing and amount of any such distributions dependent on the level of participation in the Consent Program, the amount of litigation recoveries, and the operation of the Plan's trust waterfalls – all of which have no evidentiary support with respect to valuations.

27.     While it is alleged to be consensual to opt into the Consent Program, no consent has been provided by those who do not opt in which is critical as it affects their already speculative potential recovery. While the Bankruptcy Code permits individual claimants to consent to less favorable treatment, it does not permit a plan to manufacture leverage by apparently making full recovery dependent on whether similarly situated administrative creditors accept a discounted, higher-priority recovery path.

28.     Even more, in addition the Plan creates a bifurcated treatment of administrative expense claims that is detrimental to "regular" administrative claimants as they have to wait for payment, and if such payment cannot be achieved the "regular" claimant has no recourse as payment made to the "settled" administrative claims cannot be subject to disgorgement. Thus, the FBG Debtors have created a kind of "super priority" administrative expense claim class, albeit one

11

that is cut to 50% of what they were supposed to be paid on the effective date, again without consent by those affected.

29.     The Bankruptcy Code did not intend to place administrative claim holders into a prisoner's dilemma whereby they would have to weigh their payment prospects alongside those of other administrative creditors, resulting in worse outcomes for both. Instead, the Bankruptcy Code simply requires administrative claims to be paid in full on the effective date under 11 U.S.C. § 1129(a)(9)(A). If the Plan cannot meet this basic requirement, the Plan cannot be confirmed.

C.   **The Plan Fails to Explain Disregard of Final DIP Order's Protections to Holders of Administrative Expense Claims**

30.     The Plan fails to sufficiently explain how it (and its establishment of the multiple trusts and waterfalls) satisfies the protections afforded to the Specified Administrative Expense Claims as defined and established in the Final DIP Order (Final DIP Order ¶ 8(b), pp. 42-43.) Particularly, the Plan fails to describe why distributions of proceeds under the various trusts established in the Plan to the holders of the New Money DIP Loans (defined in the Final DIP Order) would not trigger the payment of Specified Administrative Expense Claims from the $200 million Administrative Expense Claims Basket established in ¶ 8(b) of the Final DIP Order.

31.     The Debtors' own CEO Mr. Moore declared this basket would "materially reduce and potentially eliminate the risk to parties providing postpetition goods and services." [Doc. 527, p. 21.] However, as described, the new Plan still appears to be paying claims of prepetition lenders including the asset based lenders, which under the Final DIP Order should have been subordinated to the Administrative Expense Claims Basket, prior to administrative expense claims (*See* ¶ 8(b) of the Final DIP Order providing "the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket", as long as the New Money DIP Loans are paid in full).

32.     The Debtors have essentially structured the Plan to selectively honor certain DIP Order protections — including the professional fee carve-out and lender priority — while engineering around the administrative expense basket in ¶ 8(b) of the Final DIP Order. The Debtors have never explained why this is consistent with the spirit and purpose of ¶ 8(b) of the Final DIP Orde, and the Liquidation Analysis and supporting declarations contain no analysis of what administrative expense creditors would recover if the protections to administrative expense creditors in ¶ 8(b) of the Final DIP Order were applied as intended.

33.     The Debtors' own Liquidation Analysis reveals the problem in a single sentence: Note [R] states that "since DIP A Claims are not paid in full in a chapter 7 liquidation, the Administrative Expense Claims Basket is not triggered under the DIP Order." (Plan Supplement Ex. 9, p. 10.) But that is not proof; it is an argument dressed as analysis.

34.     The Liquidation Analysis *never* shows what DIP lenders actually recover from the assets they assume will be foreclosed upon — assets that could well satisfy the DIP A Claims in full and trigger the basket. The Debtors have structured both the Plan and the Liquidation Analysis to ensure the basket trigger never fires, while never fully disclosing the value of assets flowing to DIP lenders that would reveal whether that conclusion is accurate.

35.     FBG Debtors have not proposed a Plan that provides holders of administrative expense claims a better opportunity for recovery on their administrative expense claims than would otherwise be provided to them if the protections given to them in ¶ 8(b) of the Final DIP Order were not disregarded nor have they provided sufficient evidence in the Liquidation Analysis or otherwise that administrative expense creditors are better off having the provisions of ¶ 8(b) ignored. [Doc. 3020 pp. 2-5, 19-28, 83-88.]

36.     Finally, it should be noted that contrary to the Debtors' stated assumptions in the Liquidation Analysis, the requirements of the Court's Final DIP Order were intended to persist even after a conversion to chapter 7:

> Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code **or converting these Chapter 11 Cases to cases under chapter 7**: (A) the DIP Superpriority Claims, the Prepetition Adequate Protection Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and **shall maintain their priorities as provided in the Orders until all DIP Obligations and Adequate Protection Obligations shall have been paid in full** (and that such DIP Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) **the other rights granted by the Orders, including with respect to the Carve-Out, shall not be affected**; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

 (DIP Order, p. 70.)

### D.  Critical Financial and Other Information Is Still Missing

37.     The Plan and Plan Supplement fail to provide basic financial and other information creditors need to be able to meaningfully evaluate their recovery prospects. For example, the credit bid amounts are still not currently disclosed and were not included in the Plan Supplement filed June 23, 2026. Also, as discussed above, he Plan Supplement provides asset valuations in its Liquidation Analysis that depend on a number of assumptions, including that the DIP secured parties would foreclose on the estate claims (Plan Supplement Ex. 9, p. 1). FBG Debtors further claim the encumbered nature of substantially all assets would preclude recovery in chapter 7. However, the liquidation analysis does not show the recovery for the DIP lender through assets they assume will be foreclosed. As such, critical information is missing from the Disclosure Statement and Plan.

38.     Moreover, major categories of value are excluded from the liquidation analysis. The liquidation analysis does not include FBG Debtors' **$4 billion** in subsidiary investments with

a note saying: "Investment in subsidiaries constitutes DIP Collateral. The Liquidation Analysis assumes all non-US Debtor entities enter into local insolvency or similar proceedings, as required by local laws and regulations. This analysis assumes liabilities exceed asset recovery values, if any, in these non-US Debtor entities, resulting in no recovery to FBG Debtors, as equity holders." (*Id*. at 9.) Likewise, FBG Debtors do not include **$2 billion** in intellectual property and other intangible property from the liquidation analysis. (*Id*. at 8.) The Debtors' stated reason is "[the analysis] assumes all remaining intellectual property assets of the FBG Debtors are sold prior to the Liquidation Date with the proceeds reducing the DIP A Claims prior to the Liquidation Date." (*Id*.) Overall, FBG Debtors appear to be stating that in chapter 7 everything would go to the DIP Lenders as collateral, but this ignores the Final DIP Order, including the administrative expenses claims basket. Additionally, for most of the categories presented in the liquidation analysis, including cash, AR, inventory, machinery, and real property, FBG Debtors are making substantial adjustments which appear to take into account payments to secured lenders for their liens. As such, the financial information presented is missing categories of value, presumes no application of the DIP Order requirements set forth in ¶ 8(b), and has provided no update on credit bid amounts which bear directly on creditor recoveries.

39.     The DIP Collateral Trust assets are presented in Schedule I (Plan Supplement Ex. 6, p. 61). However, FBG Debtors have provided a list of assets with no fair market valuations. The notes indicate that when FBG Debtors valued real property, those valuations were "based on trial balance values (net of depreciation)" (Plan Supplement Ex. 9, p. 8). However, trial balance employs book value—original historical costs plus improvements, minus accumulated depreciation, although land in generally not depreciated. A trial balance reflects accounting records, but not liquidation value. As such, the liquidation analysis for real property is an estimate

of realizable value for FBG Debtors' real property, which is the point of the liquidation analysis in the first place.

40.     Holders of administrative expense claims and other creditors cannot evaluate expected distributions under this Disclosure Statement and Plan. Key questions remain about whether the DIP A Claims (defined in the Plan) could be substantially satisfied from proceeds from the DIP Collateral Trust alone and if the complex multiple trust structure and waterfall mechanisms are necessary or warranted. FBG Debtors have not provided adequate valuation of the assets throughout the various updates of disclosure statements and plans; this persistent lack of meaningful information has not been corrected by the Plan Supplement and is worrisome to creditors. On the whole, the Plan Supplement does not demonstrate whether the Plan provides greater recovery than creditors would otherwise receive in a chapter 7 and if the Administrative Expense Claims Basket and other protections set forth in ¶ 8(b) of the Final DIP Order were otherwise honored and followed.

### E.  ABL Collateral Trust Assets Paid Directly to ABL Lenders

41.     The Final DIP Order's subordination language applies to the asset pools transferred to the proposed trusts under this new Plan. The Final DIP Order states, in pertinent part:

> "up to an aggregate amount of **$200 million** shall be paid (the 'Administrative Expense Claims Basket'), and... **the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims** from the Administrative Expense Claims Basket."

(Final DIP Order ¶ 8(b) (emphasis added).)

However, pursuant to the Plan, it appears that ABL priority collateral will be transferred directly to the ABL Secured Parties via a consensual foreclosure, with any surplus going to the DIP Collateral Trust. (Plan pp. 81-89.) The Final DIP Order ¶ 8(b) subordinates "Prepetition Liens" (which is expressly defined in ¶ G(xviii) on p. 19 of the DIP Order to include ABL Liens)

16

to the payment of the $200 million administrative expense claims basket once the New Money DIP Loans (defined in the Final DIP Order) are satisfied. The Plan's structure appears to bypass this entirely. FBG Debtors have not demonstrated the Plan may diverge from the provisions in ¶ 8(b) of the Final DIP Order regarding the Administrative Expense Claims Basket and payment priority of Specified Administrative Expense Claims (each as defined in ¶ 8(b) of the Final DIP Order).

F. **Unresolved Ambiguities in Trust Waterfall Mechanisms**

42.     It remains unclear why under the Litigation Trust Waterfall the return thresholds do not appear to take into account aggregate distributions received under both the DIP Collateral Trust and Litigation Trust to determine if distributions equal to the amount of the DIP A Claims, as of the Confirmation Date, have been received by the holders of Allowed DIP A Claims in order to allow payment of 100% of Litigation Trust proceeds to thereafter be paid to holders of administrative expense claims until paid in full. (Disclosure Statement pp. 10-13.) The Disclosure Statement describes the DIP Collateral Trust Waterfall (defined in the Plan) on the other hand as including such mechanism, stating with respect to distributions from the DIP Collateral Trust:

> "*Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Allowed Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full."

(Disclosure Statement p. 16 (italics in original).)

43.     There appears to remain a conflict between how the DIP Collateral Trust Waterfall operates and what happens when aggregate distributions equal the amount of Allowed DIP A Claims.  In the fourth step of the DIP Collateral Trust Waterfall, as noted, the Disclosure Statement provides: "*Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2

DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt , any reduction for Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Allowed Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full." (Disclosure Statement p. 16 (italics in original).) However, immediately following the fourth step, the Disclosure Statement provides: "Following aggregate distributions equal to the amount of Allowed DIP A Claims as of the Confirmation Date, any residual value will be paid as directed by the DIP Collateral Trust Oversight Committee, subject to Bankruptcy Court approval." (*Id.*)  It is also not entirely clear whether upon the occurrence of the fourth step of the DIP Collateral Trust Waterfall if Settled Administrative Expense Claims (defined in the Plan, where holders agreed to 50%) would be paid before other administrative expense claims or if that is being limited to proceeds from the Litigation Trust.

## RESERVATION OF RIGHTS

TQL reserves all of its rights, claims, interests and remedies, including, without limitation: (a) the right to supplement this Objection; (b) the right to conduct discovery and present evidence relating to any of the foregoing; and (c) all other of its rights and claims available to TQL. Given the condensed timeline on which FBG Debtors have proceeded and the voluminous nature of the documents, TQL reserves all rights to supplement this Objection.

## CONCLUSION

As set forth above, the Plan is unconfirmable and should not be approved. The Plan fails to provide adequate means for the Plan's implementation as required under 11 U.S.C. § 1123(a)(5), fails to provide for payment of administrative expense claims in full in cash on the effective date as required by 11 U.S.C. § 1129(a)(9)(A), and impermissibly conditions any meaningful recovery

for administrative creditors on a Consent Program that requires holders to reduce their claims by 50% while leaving non-consenting administrative creditors dependent on uncertain trust recoveries and waterfall mechanics. The Plan also fails to explain how its proposed trust structure and distributions can be reconciled with the protections afforded to holders of specified administrative expense claims under the Final DIP Order, including the $200 million Administrative Expense Claims Basket, and continues to omit critical valuation and recovery information necessary to assess the Plan's effect on administrative creditors. TQL has not agreed to different treatment of its administrative expense claim and objects to confirmation of any Plan that does not comply with the Bankruptcy Code and this Court's prior orders by providing for full and timely payment of TQL's administrative expense claims.

WHEREFORE, for the reasons set forth herein, TQL respectfully requests that the Court sustain this Objection, deny final approval of the Disclosure Statement, deny confirmation of the Plan, and grant TQL such further and additional relief as the Court may deem just and proper.

Dated:  July 20, 2026

By: /s/ Yosina M. Lissebeck
    Yosina M. Lissebeck
yosina.lissebeck@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-0500
Attorneys for Total Quality Logistics, LLC

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, LLC, et al. [1] | Case No. 25-90399 (CML) |
|  | (Jointly Administered) |
| Debtors. |  |

**ORDER SUSTAINING OBJECTION OF TOTAL QUALITY LOGISTICS, LLC TO JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS DATED JUNE 16, 2026 AND DISCLOSURE STATEMENT DATED JUNE 17, 2026**

The Court, having considered the Objection of Total Quality Logistics, LLC to Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors Dated June 16, 2026 ("Objection")[2] and the Plan, HEREBY ORDERS THAT:

1.      The Objection is sustained.

2.      Final approval of the Disclosure Statement is denied.

3.      Confirmation of the Plan is denied.

4.      This Order is effective immediately upon entry.

5.      This Court shall retain jurisdiction over the matters arising from or related to the interpretation, implementation, or enforcement of this Order.

Dated: _____, 2026
Houston, Texas

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.
[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

## **CERTIFICATE OF SERVICE**

I certify that on July 20, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Bankruptcy Court for the Southern District of Texas, using the CM/ECF system. The ECF system will send a "Notice of Electronic Filing" to all counsel of record who have consented in writing to accept service of this document by electronic means.

/s/ Yosina Lissebeck
Yosina Lissebeck