**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FIRST BRANDS GROUP, LLC, *et al.*, | : | Case No. 25-90399 (CML) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |

**OBJECTION OF PATRICK JAMES AND RELATED ENTITIES
TO CONFIRMATION OF JOINT PLAN OF FIRST BRANDS
GROUP, LLC AND CERTAIN AFFILIATED DEBTORS [DKT. 3021]**

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these Chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

OBJECTION..................................................................................................................................8

    A.    DEBTORS' ALLEGATIONS RELATING TO MR. JAMES ARE INSUFFICIENT TO MAKE OUT CLAIMS AGAINST HIM FOR WRONGDOING .............................................8

    B.    DEBTORS DO NOT CONNECT MR. JAMES TO THIRD-PARTY FACTORING................18

    C.    DEBTORS DO NOT TIE MR. JAMES TO SUPPLY-CHAIN FINANCING.........................20

    D.    DEBTORS DO NOT IDENTIFY ANY ROLE PLAYED BY MR. JAMES WITH RESPECT TO OFF-BALANCE SHEET FINANCING .........................................................21

    E.    DEBTORS DO NOT REVEAL SPECIFIC CONDUCT BY MR. JAMES WITH RESPECT TO ALLEGED FALSE FINANCIAL REPORTING...........................................22

    F.    PLAN CANNOT BE CONFIRMED AS A MATTER OF LAW ........................................24

    G.    RESERVATION OF RIGHTS....................................................................................26

CONCLUSION.............................................................................................................................27

i

## PRELIMINARY STATEMENT[2]

1. Congress requires chapter-11 plans to pay administrative expenses in cash and in full. Otherwise cases convert. Attempting an end-run around the Bankruptcy Code, and notwithstanding a stay of the Adversary Proceeding they demanded months ago, the Debtors want to prosecute their claims against Mr. James on a rushed basis at the confirmation hearing. The putative goal is to prove the claims will generate sufficient recoveries to pay the post-petition DIP financing and administrative expense claims (by an "effective date" in 2028). To that end, the Debtors are asking the Court to validate and value their claims at the confirmation hearing.

2. By pressing the estates' claims against Mr. James and the Related Entities, the Debtors have run afoul of the Court's Orders in the Adversary Proceeding that stayed Mr. James and the Related Entities from defending that action just as it stayed the Debtors from prosecuting it.[3] The Court entered those Orders at the Debtors' behest, after they maintained that the estates

---

[2] The non-Debtor entities affiliated with Mr. James (the "**James Entities**"), including but not limited to the "**Related Entities**" (The Patrick James Trust; Albion Realty, LLC; Alester Technologies, LLC; Battery Park Holdings LLC; Larchmont LLC; and Pegasus Aviation LLC), also are named as defendants in First Brands Group, LLC, et al. v. James et al. (In re First Brands Group, LLC, et al.), Adv. Proc. No. 25-03803 (the "**Adversary Proceeding**"). The "**Plan**" refers to the Joint Chapter 11 Plan Of First Brands Group, LLC And Certain Affiliated Debtors [Dkt. 3021] (as amended); "**Disclosure Statement**" refers to the Disclosure Statement For Joint Chapter 11 Plan Of First Brands Group, LLC And Certain Affiliated Debtors [Dkt. 3021] (as amended). Capitalized terms not defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, and the Moore Declaration (defined below), as applicable.

[3] Order Granting Case Deadline Clarification [Adv. Proc. Dkt. 195] ("The Court hereby clarifies that all case deadlines, including deadlines to respond to pending motions to dismiss (ECF Nos. 155, 170, 173, 174) and the Motion for Withdrawal of Reference (ECF No. 172) have been held in abeyance pending the issuance of a scheduling order."); see also Stay Order [Adv. Proc. Dkt. 181] ("[T]he Court hereby STAYS all discovery in this case, pending the resolution of the parallel criminal case, United States v. Patrick James & Edward James, 26 Cr. 29 (AT) (S.D.N.Y.).").

1

had no resources to prosecute the proceeding and pursue those claims[4] and that the Government's request to defer litigation until the conclusion of the criminal trial in New York should be granted.[5]

3.      To support their view of events, the Debtors rely on facts carefully selected for two declarations.[6]  Whether those declarations comport with the Court's Stay Orders or otherwise offer impermissible expert testimony subject to exclusion on other grounds is the subject of a separate motion.[7]  But it cannot be disputed the Debtors prepared those Declarations free from Mr. James' and the Related Entities' ability to use time and the Federal Rules of Procedure in the Adversary Proceeding to take discovery of the Debtors and third parties like Mr. Brumbergs and Mr. Graham to test, challenge, and rebut the Debtors' assertions.  The scheduling order to which the parties agreed in the Adversary Proceeding in November 2025 before the stay contemplated 6-7 months of discovery and a trial date in mid-June 2026.[8]  The outcome the Debtors want now, which is to rush the litigation over two weeks, is inappropriate and promises only to disenfranchise Mr. James and the Related Entities and trample on their due process rights.  At this point, the only appropriate time and place for a court to evaluate those claims is the Adversary Proceeding after

---

[4]     See Emergency Motion to Amend Case Schedule at ¶ 5 [Adv. Proc. Dkt. 152] ("First Brands is experiencing an acute liquidity crisis that impacts the overall chapter 11 proceedings"); Feb. 23 Hr'g Tr. at 8:11-13 ("... unfortunately, a repeat issue in this case, case funding, you know, though, you know, whatever the Chapter 11 Plan process or an alternative, which we continue to discuss as well ..."); May 8 Hr'g Tr. at 7:7 ("[A]s Your Honor knows, the Debtors' liquidity is limited."); Joint Statement of the Debtors, Peter Andrew Brumbergs, and Stephen Graham Regarding Case Schedule [Adv. Proc. Dkt. 179].

[5]     Government's Motion to Stay at 26 [Adv. Proc. Dkt. 167]; Emergency Motion for Clarification of Case Deadlines at ¶ 7 [Adv. Proc. Dkt. 187] ("all case deadlines—including the response deadlines for . . . motions" be stayed "until after the resolution of the parallel criminal action"); Status Update Regarding the Patrick James Criminal Case at ¶ 7 [Adv. Proc. Dkt. 203] ("the Debtors respectfully submit that no modification of the stay is warranted until after the conclusion of the criminal trial," in part because "the Debtors submit that a criminal conviction would meaningfully narrow the issues for trial in this case, conserving the resources of the Debtors and this Court.").

[6]     See Declaration of Charles M. Moore [Dkt. 3188] (the "**Moore Declaration**") and the Declaration of Marc S. Kirschner [Bankr. Dkt. 3190] (the "**Kirschner Declaration**," with the Moore Declaration, the "**Declarations**")).

[7]     Contemporaneously with this objection, Mr. James and the Related Entities are filing a motion to exclude the testimony of Mr. Moore and Mr. Kirschner.

[8]     See Adv. Proc. Dkt. 97.

the defendants have been given ample opportunity to fully-develop the record, including one involving depositions of witnesses like Mr. Brumbergs and Mr Graham who are off limits at the Government's insistence.  Until then, the Debtors should be precluded from prosecuting the claims asking the Court to make findings based on their cherry-picked record.

4.      In any event, the Debtors' evidence suffers from various infirmities precluding a finding claims can be made against Mr. James—let alone that they will generate enough to pay DIP and admin claims.  Their evidentiary showing falls woefully short of proving up the Adversary Proceeding's eleven (11) counts.[9]

5.      *First*, the Debtors do not detail the statements Mr. James allegedly made; when he made them; to whom he made them; and how he furthered any alleged fraud or directed others to do so.  Instead, the Debtors rely on innuendo and aspersion to provide vague and unspecific support for claims that must be proven with particularity, e.g., actual fraudulent transfer and constructive fraudulent transfer showing insolvency and lack of reasonable equivalent value on a debtor-by-debtor basis.

6.      *Second,* the Debtors do not present testimonial evidence from percipient witnesses to these prepetition events.  The Debtors' Declarant (Mr. Moore) is the CRO hired shortly before the Debtors filed for bankruptcy—not a fact witness.  That leaves the Debtors either pointing to the unfinished Examiner Report[10] or employing hearsay to repeat statements made by others, e.g.,

---

[9]     The Counts are:  Count 1:  Turnover Of Estate Property Pursuant to 11 U.S.C. § 542; Count 2:  Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(1), 6 Del. Code § 1304(a)(1); Count 3:  Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(2), 6 Del. Code § 1304(a)(2); Count 4:  Money Had and Received Pursuant to Ohio Law; Count 5:  Unjust Enrichment Pursuant to Delaware and Ohio Law; Count 6:  Constructive Trust Pursuant to Delaware and Ohio Law; Count 7:  Accounting Pursuant to Delaware and Ohio Law; Count 8:  Illegal Dividend and Unlawful Distribution Pursuant to 8 Del. C. § 170, 8 Del. C. § 174, and 6 Del. C. § 18-607; Count 9:  Breach of Fiduciary Duty pursuant to Delaware Law; Count 10:  Aiding and Abetting Breach of Fiduciary Duty under Delaware Law; and Count 11:  Civil Conspiracy pursuant to Ohio Law.

[10]    See Moore Decl. ¶ 168 (listing Examiner as source of statement that BDO was engaged because they are unsophisticated); ¶ 153 (deferring to Examiner discussion of FRAM/Autolite acquisition).  The Examiner's

3

Mr. Brumbergs and Mr. Graham,[11] regurgitating what is said in the plea allocutions as if the cooperators themselves were providing testimony in these cases subject to cross examination.[12] The Debtors take significant license here, parking the plea allocutions (admissions) alongside the Indictment (unproven accusations) in an effort to prove Mr. James engaged in wrongdoing. Note, the Government has opposed these individuals sitting depositions or testifying in the Adversary Proceeding (and presumably this case) by seeking a stay, thereby precluding these out-of-court statements from being tested through cross examination. Selective testimony channeled through declarants is not a viable work around, much less competent evidence.

7. ***Third,*** the Debtors do not supply documents directly attributable to Mr. James to support their claims. Of the approximately 40 documents examined in the Declarations, apart

---

preliminary so-called "findings" are mere assertions that "are no more binding on the court than those of any other attorney's." The Examiner Report is just "a one-sided presentation of the facts" where "the people who were investigated" are not afforded the opportunity to be present during witness examinations, to propound cross-examination questions, or to ensure documents are not "cherry-picked" by the producing party. See In re Ionosphere Clubs, Inc., 156 B.R. 414, 432-33 (Bankr. S.D.N.Y. 1993); see also In re Apex Oil Co., 101 B.R. 92, 99 (Bankr. E.D. Mo. 1989) ("[Examiner] has no more rights and responsibilities than any other attorney also bearing the denomination 'officer of the court.'"); In re Fibermark, 339 B.R. 321, 327 (Bankr. D. Vt. 2002) ("[T]he evidence and findings in an examiner's report that underlie the examiner's conclusions are not binding" and "have no binding effect on the court"); see also In re Rickel & Assoc., Inc., 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002) ("The Report is hearsay"); In re Apex Oil Co., 101 B.R. at 99 ("[T]he Examiner's findings are no more binding on the Court than those of other attorneys.").

[11]  See Moore Decl. ¶¶ 70, 79, 80, 122, 127.

[12]  See Moore Decl. ¶ 70 ("Based on the allocution of Andy Brumbergs (Brumbergs Plea at 27-28), I understand that, beginning at least as early as 2018, Patrick James and Edward James, among others, caused the FBG Debtors to provide lenders with a version of financial statements that did not reflect the Company's true financial position."); ¶ 79 ("Andy Brumbergs likewise admitted that, from approximately 2018 through 2025, he agreed with others to provide misleading financial statements to lenders that 'included accounting adjustments that misstated First Brands' financial condition and results,' and misrepresented the existence of inventory and equipment pledged or sold as collateral."); ¶ 80 ("Andy Brumbergs has admitted under oath that, between approximately 2020 and 2025, he and others knowingly submitted falsified invoice information to factoring companies and investors in order to secure 'a higher financing or higher proceeds' than the true receivables would have justified."); ¶ 122 ("Andy Brumbergs admitted under oath that, between approximately 2020 and 2025, he and others misrepresented the nature and existence of collateral pledged to off-balance-sheet lenders, including by failing to disclose that the collateral had already been pledged to lenders. (Brumbergs Plea at 29.)"); ¶ 127 ("In his plea allocution, Andy Brumbergs admitted that, between approximately 2020 and 2025, he and others misrepresented the nature and existence of collateral pledged to off-balance-sheet lenders, and further admitted that, from approximately 2022 to 2025, he agreed to structure cash transfers to conceal the source of proceeds obtained from off-balance-sheet lenders by dividing them into smaller amounts sent to multiple company-owned accounts. (Brumbergs Plea at 30.)").

4

from analyses A&M prepared itself, nearly all are emails, texts, and internal records that were created by Mr. Brumbergs, Mr. Graham, Edward James, or accounting personnel acting at their direction—not Patrick James; documents of third-party lenders; and the plea allocutions of Messrs. Brumbergs and Graham.  That leaves the Debtors aggregating documents prepared or sent by others (not Patrick James) and purporting to extrapolate meanings from those documents that comport with the Debtors' litigation narrative, many times based on their supposed "understanding"—the basis for which is not articulated, much less presented in any competent form.[13]

8.      ***Fourth***, the evidence the Debtors have submitted in connection with confirmation is internally inconsistent.  Patrick James built a business described in these cases as spanning five continents and employing 26,000 people;[14] having twenty-five well-known brands exclusively supplying the auto industry's largest after-market customers, including well-known automotive retailers (Napa Auto Parts, AutoZone, O'Reilly, and Advanced Auto Parts), national retailers (Walmart and Costco), and original equipment manufacturers (OEMs); and having weathered COVID and interest rate hikes.[15]

---

[13]   For example, in maintaining the "FBG Debtors' former management manipulated the Company's financial records according to a top-down process," the Moore Declaration refers to a communication that allegedly "dictated false manual adjustments to the Company's financials, including … directing that the Company 'reduce factoring by 3. Reduce interest by 6. Reduce non–cash by 14. Increase restructuring 14,' without any apparent business justification for these manual adjustments." (Moore Decl. ¶ 71).  Mr. James is not alleged to have sent this communication.  And as the Moore Declaration states, it was "***Andy Brumbergs*** [who] ***implemented corresponding accounting changes***" in response to Mr. Graham's text, i.e., "at the close of each reporting period, ***Andy Brumbergs prepared documents*** setting target financial outcomes for the Company known as 'Results Bridges,' ***which we understand were based on his discussions with Patrick James***.  ***The accounting department*** would then translate these 'Results Bridges' into 'Adjustments Bridges,' ***which instructed site level accounting personnel to make specific unsupported manual journal entries needed to hit those targets***, again with no apparent business justification.  This process generated more than 38,000 posting lines of unsupported 'Special' manual journal entries between January 2024 and September 2025 alone, touching nearly every line of the Debtors' balance sheet and income statement."  Id. (emphasis added).

[14]   See, e.g., Declaration Of Charles M. Moore In Support Of Debtors' Chapter 11 Petitions ¶¶ 8-10., Bankr. Dkt. No. 22 (the "**First Moore Decl.**").

[15]   See First Moore Decl. ¶ 12 ("Although the Company has implemented this acquisition strategy to great effect over the past fifteen years, in recent months geopolitical uncertainty and headwinds from newly imposed tariffs

9.      The Debtors' tacitly concede the Company they argue was infected with fraud was nonetheless capable of generating significant liquidity by seeking to recover approximately **$25.5 billion** of transfers the Company distributed over a four (4)-year period to various creditors.[16] Year-after-year, First Brands borrowed and then repaid billions of dollars in principal along with interest and fees.  According to the Debtors, First Brands transferred those funds to, among others, Leucadia (approximately $9.4 billion); Katsumi (approximately $5.7 billion); Raistone Financing Parties (approximately $1.9 billion); Prime Revenue Financing Parties (approximately $1.4 billion); Liquid X Financing Parties (approximately $979 million);[17] and Onset (approximately $2.9 billion).[18]

10.      Also, the Debtors claim finance-providers like Katsumi, Leucadia, and Prime Revenue knew or should have known invoices they were purchasing were not bona fide, i.e., they "were aware of unusual or extraordinary activities that [the Declarant] consider[s] to be red flags."[19]  But that contradicts the Debtors' other premise that these lenders were "victims" of a

---

have pressurized global supply chains and layered additional complications to the Company's Operations …. At the same time, the Company faced mounting funded debt and lease obligations between May and August 2025, particularly with respect to its equipment and inventory lessor, Onset.  These factors snowballed into a liquidity crisis …."); Tr., Hr'g Ch. 11 First Day at 21:11-19 ("[DEBTORS' COUNSEL:]  [H]ow did we get here? ... We'll start off with the tariffs .... The tariffs have caused additional landing costs for good for the company, but also provided the company with an opportunity, given where some of its facilities were, to try to minimize the future exposure to tariffs, especially between the United States and Mexico, but that required capital and reinvestments.").

[16]    Moore Decl. ¶ 61.

[17]    Moore Decl. ¶ 61.

[18]    Complaint ¶ 159, First Brands Group, LLC, et al. v. Onset Financial, Inc., et al. (In re First Brands Group, LLC, et al.), Adv. Proc. No. 26-03005 [Dkt. No. 1] (the "**Onset Adversary Proceeding**"); Moore Decl. ¶¶ 61, 111 ("The Onset Facilities also featured a sale-lease back of PP&E whereby the SPV Entity (Carnaby FA) would obtain funds from Onset to pay FBG for equipment, assign it to Onset and then lease it back under a schedule that required the SPV Entity to pay Onset the original amount plus significant interest and fees.").

[19]    See Moore Decl. ¶¶ 62-69; 128-133.  With respect to those "red flags," the Debtors point to an **internal** Apollo document that was not publicly disclosed that questioned the Company's financial performance and Mr. James' prior businesses.  See Moore Decl. ¶ 66.  Given that this document was Apollo's, the question arises how the Debtors obtained it, especially when they complain about other third-parties not producing internal documents.  See Moore Decl. ¶ 67 (counter parties to transfers have not produced documents); ¶ 94 (company had 'not yet

6

purported fraud or misconduct.  Presumably these lenders were happy to deploy capital by making high-interest loans that performed for years.  Even the Examiner noted in its Report some of these parties charged the Company exorbitant interest, e.g., **20%-30%**.[20]  In the same vein, third-party factors acknowledged to the Examiner they became accustomed to being paid countless millions year-after-year without incident.[21]  Statements made to the market by some of these creditors, e.g., Raistone, confirm the point: "a lot of people made a lot of money over many, many, years on First Brands .... So they're not all sad. They're not all kicking themselves."[22]  Some of these lenders' own creditors and limited partners are suing them with respect to First Brands.[23]

---

had an opportunity to obtain internal documents from various factoring and other counterparties");  ¶ 101 (PrimeRevenue's participating banks have not provided internal documents).

[20]  See Report pp. 58-59 ("The factoring arrangements *operated at extraordinarily high interest rates, with evidence indicating rates of 20-30%, significantly above market rates for traditional asset-based lending*. These elevated rates reflected both the risk profile of the transactions and, as would later become apparent, FBG's desperate liquidity needs.") (emphasis added).

[21]  See, e.g., Report p. 59 ("The Investigation has uncovered that the factoring operation expanded substantially over time. *The Third-Party Factors' confidence was sustained by consistent payment performance*.  Counsel for Leucadia explained that *for five years, every time a payment was due, it was paid*.  This track record appears to have mitigated concerns that might otherwise have prompted more rigorous scrutiny of the underlying business model") (emphasis added).

[22]  See, e.g., Eric Platt et al., First Brands Financier Says 'A Lot of People Made a Lot of Money' From Bankrupt Group, Fin. Times (Dec. 3, 2025), https://www.ft.com/content/40e93423-b551-478c-ab0d-447a62dcfda5 ("One of the largest middle men in the First Brands' financings has said that 'a lot of people made a lot of money' lending to the bankrupt car parts maker, as they chased the high yields that it paid on its debt. The comments came from Raistone chief executive David Skirzenski on Wednesday at a conference for investors in trade and supply chain finance . . . . 'Frankly a lot of people made a lot of money over many, many, years on First Brands,' Skirzenski said at the Global Trade Review annual conference in New York. 'So they're not all sad. They're not all kicking themselves.'"); Objection Of Official Committee Of Unsecured Creditors To Aequum Capital Financial II LLC's Motion To Quash Committee's Rule 2004 Requests And Related Relief ¶¶ 4-5 [Dkt. No. 2493] ("[T]he Committee … has unearthed evidence suggesting that Aequum too has unclean hands and that its claims are invalid …. [I]n or around October 2023, Aequum was introduced to Edward James through Helios Strategic Advisors ('**Helios**'), the same third-party that paid kickbacks, disguised as 'co-brokerage fees,' to Edward James in connection with other First Brands financing transactions").

[23]  See Examiner Report pp. 49-57, 75-82; Eugenia II Investment Holdings Limited, et al. v. Leucadia Asset Management LLC, Jefferies Investment Advisers, LLC, Point Bonita Capital Fund (Cayman) LP, and Point Bonita Capital GP LLC., No. 651123/2026 (N.Y. Sup. Ct.); Bank of America, N.A. et al. v. Aequum Cap. Fin. II, LLC, et al. (In re First Brands Group, LC, et al.), Adv. Proc. No. 26-03091 (Bankr. S.D. Tex.); Kaye Wiggins & Ortenca Aliaj, SEC Probes Jefferies over First Brands, Fin. Times, Nov. 27, 2025, https://www.ft.com/content/86d90ce5-5800-4514-a757-f46a38aa521d ("The US Securities and Exchange Commission is investigating investment bank Jefferies over its relationship with collapsed car parts company First Brands Group.  The regulator is seeking information about whether Jefferies gave investors in its Point Bonita fund enough information about their exposure to the auto business .... It is also looking into internal

Considering that First Brands operated worldwide, employed so many people, offered market-leading products, and borrowed and repaid funds on this scale over a span of several years, the Company cannot be described sensationally as a fraud with a business attached—as has been repeated unfortunately in these cases.[24]

11.     Even if the Debtors are able to flout due process and press their claims, the deficiencies in the proffered evidence preclude any finding they are legitimate or will generate enough money to pay DIP and admin claims by 2028.[25]   So as a legal matter, the Plan does not satisfy section 1129 of the Bankruptcy Code and is not otherwise feasible.  Accordingly, the Plan should not be confirmed.

**OBJECTION**

A.     **DEBTORS' ALLEGATIONS RELATING TO MR. JAMES ARE INSUFFICIENT TO MAKE OUT CLAIMS AGAINST HIM FOR WRONGDOING**

12.     ***Vague, Lumped Assertions.***  Most allegations about the actions and transfers that supposedly involve Mr. James and the Related Entities are made on an indiscriminate basis. Debtors contend they identified 1,400 separate transfers involving Mr. James and the Related

---

controls and potential conflicts within and between different parts of the bank .... [A] specialist invoice-finance fund [Jefferies] manages, Point Bonita Capital, had about $715mn invested in 'receivables'—money owed under customer invoices — from retailers that bought First Brands products such as windscreen wipers to sell to consumers. ***Jefferies has said the receivables were due from blue-chip companies including Walmart. Point Bonita documents did not list any exposure to First Brands as of June, but showed that the fund's second and third largest exposures were to its customers, Walmart and auto parts retailer O'Reilly*** .... Bankruptcy filings have confirmed that invoice lenders that provided $2.3bn of financing linked to receivables were all paid by First Brands rather than its customers .... The Financial Times also reported in October that Jefferies earned extra fees on financing it provided to First Brands through a 'side letter' with the company, which some lenders said was not disclosed to them and may have violated the terms of their loan.  Jefferies has since confirmed the existence of the arrangement.  It stated that First Brands received a legal opinion confirming the fees did not breach its loan terms and that a document listing the letter was disclosed to all of the group's lenders." (emphasis added)).

[24]   <u>See</u>, <u>e.g.</u>, Tr., Hr'g, January 7, 2026 (Adv. Proc.) p. 18:22-25.

[25]   Notably, the Debtors offer no evidence funds will be realized by that date because each declarant purports to rely on the other for the contention funds will be realized by 2028.  <u>Compare</u> Moore Decl. ¶ 229 (pointing to Kirschner Declaration), <u>with</u>, Kirschner Decl. ¶ 143 (stating it is built on Moore Declaration facts).

Entities they want returned that span nearly eight years (2018-2025) and total $966 million.[26]  To assert sustainable claims, the Debtors must put forth the facts and circumstances surrounding each one of those 1,400 transfers, including (a) the supposed actual intent to hinder, delay, and defraud then-existing creditors accompanying each such transfer; (b) an explanation of how that intent was carried out by the transferring debtor; and (c) an illustration of how that transfer rendered that specific transferring-debtor insolvent.  They have not done this.

13.     More generally, the Debtors lump allegations of misconduct without discerning what role (if any) Mr. James supposedly played.  To provide just a few examples:

- Most of the wrongdoing is alleged to have been perpetrated nebulously by "former management" and "senior executives" without specific attribution to Mr. James;[27]

- The Debtors allege Mr. James "caused the FBG Debtors to provide lenders with a version of financial statements that did not reflect the Company's true financial position."[28]  But that discussion revolves around Mr. Brumbergs and Mr. Graham, with the Debtors stating "we understand" the documents Mr. Brumbergs prepared "were based on his discussions with Patrick James" and then retreating to Mr. James' Indictment—which, by definition, is not evidence.[29]

---

[26]   Moore Decl. ¶¶ 140-141.

[27]   See Moore Decl. ¶ 71 ("FBG Debtors' former management manipulated the Company's financial records according to a top-down process"); ¶ 73 ("[T]he Debtors' former management improperly commingled the funds of the FBG Debtors and certain affiliates in order to conceal their financial misconduct.  In January 2022, the Debtors' former management began using a Wells Fargo bank account belonging to Bowery Finance II, LLC ('**Bowery**') to disguise the true sources and uses of cash apparently to keep transactions in furtherance of the Scheme and related liabilities off the Debtors' balance sheet"); ¶ 75 ("[T]he FBG Debtors … could not have serviced their debt absent prior management's ongoing Scheme"); ¶ 78 ("[P]rior management overstated asset values before the Petition Date"); ¶ 83 ("A&M's work identified different methods applied by former management to manipulate invoice"); ¶ 84 ("[F]ormer management relied upon a Scheme to generate cash to remit fund expected by factoring parties"); ¶ 97 ("Debtors' former management systematically created and received payments on account of, billions of dollars of fake invoices"); ¶ 105 ("The SPV entities were controlled by FBG management …. The FBG Debtors' management actively concealed the existence of the SPV Facilities and debt from the FBG Debtors' ABL Secured Parties and Term Lenders and all other stakeholders"); ¶ 106 ("FBG's former management utilized the SPV Facilities to obtain billions of dollars of secret debt they could not repay to generate cash that was utilized to perpetuate the Scheme."); ¶ 157 (referring to instructions from "a senior First Brands executive" with respect to payments involving Eagle Maching, LLC, Eagle Castings, LLC, and Dalton Corporation).

[28]   Moore Decl. ¶ 70.

[29]   Moore Decl. ¶¶ 70-79.

- The Debtors contend as much as "$236.5 million" was "redirected from SPV Lender fundings to Patrick James and his related entities,"[30] also without providing any context for those payments.

- The Debtors are deliberately imprecise when discussing "entities affiliated with Patrick James," e.g., causally referring to both "the Patrick James Trust" and "Patrick James and his affiliated entities" in the same paragraph so as to suggest there is no substantive or operational distinction among them.  The former is a family trust; the later includes entities like Debtor "First Brands Group, LLC"—the operating company.[31]

- When discussing whether SPV-financing was properly disclosed, the Debtors provide no substantive articulation of Mr. James' supposed role, instead contending "[i]nterviews with FBG's corporate accounting staff uncovered that staff were instructed by Andy Brumbergs not to disclose the existence of the SPV Entities to FBG's auditors."[32]

- When discussing purported misconduct relating to accounts receivable factoring, again no substantive description of Mr. James' alleged wrongdoing is put forth.  Instead, the purported misconduct is claimed to have been perpetrated by Mr. Brumbergs.[33]

- In contending there was "False and Misleading Activity Relating to SPV Entities," Mr. James appears twice in the discussion with no detail about what Mr. James did, e.g., he supposedly "caused the FBG Debtors to transfer funds to Onset using a variety of intermediaries to mask these transfers."[34]  These allegations are conclusory and appear to lack evidentiary support.  Attempts to tie Mr. James to Onset are actually contradicted by the weight of allegations concerning Onset.[35]

- The facts relating to supply-chain financing do not reference Mr. James, including in the discussion of supposed "Dummy" invoices, and instead name only Mr. Brumbergs.[36]

- When arguing the accounts-receivable factoring and SPV lenders ignored various "Red Flags,"—e.g., so-called "falsified invoices," discrepancies in schedules to purchase agreements and borrowing base certificates which were facially deficient, and the absence of appropriate documentation—only three purported "red flags" are listed as involving Patrick James.  They are hardly are the stuff of fraud:  (1) an unidentified "prior litigation related to falsified financial data;" (2) his ownership of the Company, e.g., "Patrick-James

---

[30]   Moore Decl. ¶ 154.

[31]   See Moore Decl. ¶¶ 133, 154.

[32]   Moore Decl. ¶ 124.

[33]   Moore Decl. ¶¶ 80-95.

[34]   Moore Decl. ¶¶ 103-107.

[35]   See Moore Decl. ¶¶ 103; 110-114; 117; 119; 123-124; 134-139.

[36]   Moore Decl. ¶¶ 96-102.

controlled entities;" and (3) "available information (or the lack thereof) about FBG's controlling owner, Patrick James, showed almost no information about him personally."[37]

14.    Nor do the Debtors identify documents showing Mr. James concealed the transfers—a basic tenet of fraud.  Concealment is alleged generally without explaining what role Mr. James played (if any).[38]  And, the Debtors admit the payments appear in the Company's general ledger.[39]

15.    Moreover, First Brand's financial statements were reviewed by outside auditors the Company engaged, specifically BDO after 2020.  Here again the Debtors have nothing but opaque contentions that do not identify Mr. James:  "First Brands' senior leadership transitioned the external audit engagement from Cohen & Company to BDO, because BDO was viewed as having 'the most unsophisticated audit process,' such that '[w]e can do what we want with these guys.'"[40] The support for statement is simply "Examiner's Report," which itself cites to an employee interview—not any underlying documentation.[41]

16.    Also, the Debtors' criticize what they call Mr. James' "very limited relevant corporate experience"[42] and the Company's supposedly poor record keeping.  The Examiner made

---

[37]    Moore Decl. ¶¶ 62-69; 128-138.

[38]    See Moore Decl. ¶¶ 59, 73, 98, 105, 140 ("As discussed above, Patrick James and other members of former management caused the FBG Debtors to incur billions of dollars in liabilities in order to conceal the FBG Debtors' actual financial performance and their Scheme."); 148, 158.

[39]    See Am. Compl. ¶¶ 13, 18; Moore Decl. ¶¶ 71 ("Andy Brumbergs implemented corresponding accounting changes, including having the Debtors' accounting personnel make entries in local general ledger systems"); 141 ("*Aside from the Company's general ledger*, the A&M team found no ordinary course documentation indicating that the payments constituted legitimate dividends, tax distributions, or payment for services") (emphasis added); 143 ("[M]y team estimates that James received an overpayment of approximately $209 million to $236 million on account of tax distributions alone, *a portion of which had been reclassified in the general ledger* from restricted equity distributions to tax distributions.") (emphasis added). See also Am. Compl. ¶¶ 13, 81.

[40]    See Moore Decl. ¶¶ 59, 73, 98, 105, 140 ("As discussed above, Patrick James and other members of former management caused the FBG Debtors to incur billions of dollars in liabilities in order to conceal the FBG Debtors' actual financial performance and their Scheme."); 148, 158.

[41]    Moore Decl. ¶ 168.

[42]    Moore Decl. ¶ 65. See also Moore Decl. ¶ 67 (SPV entities tracked inventory with "generic, continuously turning SKU numbers"); ¶ 115 (SPV entities "failed to observe corporate formalities;" maintained "rudimentary books

similar complaints, e.g., fragmented ERP systems, geographically-dispersed finance functions, and lack of consolidated financial statements accessible to regional leadership.[43]  None of these constitutes fraud.   Even the Examiner conceded First Brands' infrastructure was a direct byproduct of its acquisition strategy.[44]  The "geographic dispersion of finance and accounting functions" the Examiner characterizes as having "contributed to operational opacity"[45] is an equally apt description of any rapidly-growing company employing more than 26,000 employees globally and operating across different countries, e.g., India, Thailand, Japan, China, Poland, Belgium, Italy, Romania, France, Germany, Australia, South Africa, Argentina, Brazil, Mexico, Canada, and the United States.[46]

17.     ***James' Contributions.***  The Debtors narrowly focus on the funds transferred out of First Brands without accounting for hundreds-of-millions Mr. James invested back into the Company.  The Bowery bank accounts are discussed, as is the allegation they were controlled by Edward and Patrick James, claiming at a very high level that as much as $12 billion "flowed through" those accounts—but with no further analysis, e.g., breaking down the amounts that

---

and records;" did not execute "follow-on asset purchase agreements;" activities were "carried out by FBG employees (or employees of other entities controlled by Patrick James);"); ¶ 120 ("[T]here is no record in Carnaby II and Carnaby III's books and records of replacement inventory being purchased, manufactured, or sold consistent with the transaction structure contemplated by the agreements"); ¶ 131 ("the books and records of the FBG Debtors, Patterson, and Starlight likewise do not reflect any purchases or sale of replacement inventor to or from each other"); ¶ 133 (complaining SPV entities "had no employees of their own;" overlapping management; "transaction documents were signed by the same overlapping personnel;" maintained "rudimentary books and records").

[43]     See Report pp. 60-63.

[44]     See Report p. 60 ("FBG maintained numerous ERP systems … with system usage dictated largely by the legacy platforms of acquired entities rather than by a centralized system;" "[t]his fragmentation was exacerbated by FBG's acquisition driven growth strategy, under which acquired businesses generally retained their existing ERP environments rather than being integrated into a unified platform.").

[45]     Report p. 62.

[46]     Moore First Day Declaration ¶ 21 [Dkt. No. 22].

flowed in and out of the Bowery accounts with more detail as among other First Brands companies and payments to creditors.[47]

18.     The Debtors do finally acknowledge—as they must—that over the years, *Mr. James invested hundreds of millions of dollars into First Brands*.  This appears in a single sentence admitting that between 2022 and 2025, the Debtors identified *$592 million* of inflows from the Patrick James Trust.[48]  Omitted from the Debtors' analysis is investments directly or indirectly made by any other entities related to Patrick James, i.e., not just the Patrick James Trust. When considered in connection with the $592 million from the trust, the amounts Mr. James invested in First Brands through other Related Entities exceed the $966 million the Debtors now try to recover.  Instead, the Debtors limit their analysis to contributions by the Patrick James Trust and try to minimize the relevance of the $592 million investment with an editorial statement of their unsubstantiated "belief" of why this happened.

19.     Ultimately, the Debtors' refusal to account for Mr. James' cash investments reveals a fundamental flaw in their analysis.  When assessing value, aggregating and collapsing the transfers is appropriate, especially given how the companies operated and the long-established legal significance of taking into account cash that flowed into First Brands from the Related Entities.[49]

---

[47]    Moore Decl. ¶¶ 71-72, 73, 74 (money in Bowery account "was regularly used in circular fashion to pay factors, SCF Lenders, and SPV Lenders"), 97, 98 (Bowery funds distributed to operating First Brands entities).

[48]    Moore Decl. ¶ 155 ("My team's tracing identified approximately $592 million in direct and indirect payments from the Patrick James Trust to Debtor entities between September 2022 and the Petition Date, where we believe these inflows were to prevent defaults under SPV and factoring obligations as they came due.").

[49]    See Renewed Motion Of Patrick James And Related Entities To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(6) Debtors' Amended Complaint For Failure To State A Claim, Or, Alternatively, Pursuant To Fed. R. Civ. P. 12(e) For A More Definitive Statement ¶ 9, First Brands Group, LLC, et al. v. James et al. (In re First Brands Group, LLC, et al.), Adv. Proc. No. 25-03803 [Dkt. No. 155] ("**Mot. Dismiss Am. Compl.**"); Swift v. Holdridge, 1840 WL 44, at *2 (Ohio Dec. 1840) ("[If the so-called fraudulent alienee] has honestly parted with what he fraudulently received before the rights of the creditors are fixed … he must be exonerated from further liability. Though a party may have intended to defraud the creditors of a debtor by taking and converting his property into

13

20.     ***Tax Distributions.***  The Debtors contend Patrick James received $378 million of tax distributions between 2019 and 2024, of which between $209 million and $236 million supposedly were overpayments.[50]  This claim raises several issues.  ***First,*** the Debtors own evidence at the preliminary injunction hearing, i.e., the ledger, showed a different number, i.e., $339 million.[51]  ***Second***, far from being concealed, those amounts were recorded in the Company's general ledger, where the external auditors could review them; indeed those distributions were accounted for in the audited financial statements.  ***Third***, the Debtors do not break the tax distribution payments down on a date-by-date, debtor-by-debtor basis showing the transferring entity was insolvent or rendered insolvent.  ***Fourth***, the discrepancy ($378 million versus $339 million) actually begs the question of whether Mr. James' taxes as the sole owner of a company that generated hundreds of millions in revenue (and later billions) over the years was higher than even the Debtors are reporting.

21.     Nor can they make out a particularized actual-intent to defraud with respect to tax payments, especially given First Brand's corporate structure.  Dividend payments to cover tax distributions were not concealed and instead appeared in the general ledger.[52]  The disputed payments originated from First Brands Holdings LLC—a Delaware limited liability company owned by Mr. James.[53]  Delaware law purposely affords First Brands Group Holdings LLC

---

cash, such intent is rendered harmless by his delivering the proceeds of the sale to the debtor or his authorized agent.").

[50]    Moore Decl. ¶¶ 142; 143.

[51]    Debtors' Exhibit No. 4 from the Preliminary Injunction Hearing shows at least $145 million and $125 million relating to taxes in 2023 and 2024, respectively.  See Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 90:2-91:8.

[52]    Id.

[53]    See Am. Compl. Ex. A; Decl. of Charles M. Moore in Support of Debtors' Chapter 11 Pets. ¶ 14, Bankr. Dkt. No. 22; Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 24:20-25:3 ("[DEBTORS' COUNSEL:]  You testified that First Brands organization includes over 100 entities.  We just saw that on Exhibit 51, the web of entities.  Can you tell the Court the ownership structure of those 100-plus entities?  [MR. MOORE:]  They eventually roll up to

freedom to craft the members' rights and obligations as it deems fit.[54]  Also, pass-through entities like Delaware LLCs commonly reimburse their members for tax payments[55] and can otherwise distribute dividends when they are solvent.[56]

22.     What is more, the Debtors inaccurately describe the relevant credit agreements with the first-lien, second-lien, and ABL lenders.  They submit "First Brands was restricted from making distributions other than permitted tax distributions."[57]  Not correct.  The Debtors' analysis overlooks several critical facts:

- The first-lien and second-lien credit agreements[58] relate to the "First Brands" side of the Company, i.e., the "Borrower" is "First Brands Group, LLC" under the term-loan agreement.  And obviously the relevant limited-liability-company agreements are among those First Brands entities, i.e., again First Brands Group, LLC.  That means any alleged restrictions in covenants in those documents applied only to the First Brands debtors—not their other debtor affiliates, e.g., the SPV affiliates.

- A proper reading of the provisions in those agreements concerning restricted payments shows they contain cumulative baskets that go beyond tax distributions.  For example, first-lien credit agreement contains a restricted-payments-exemption basket permitting distributions out of First Brands Holdings, LLC (owned by Mr. James) of the greater of $90 million or 15% of EBITDA.[59]

- The same First-Lien Credit Agreement contains a separate basket allowing for restricted payments "in an unlimited amount" so long as after the restricted payment,

---

ownership by Mr. Patrick James.  [DEBTORS' COUNSEL:]  So is Mr. James the sole owner of each and one of those entities?  [MR. MOORE:]  That's my understanding.").

[54]  See 6 Del. Code § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").

[55]  Cf. In re F-Squared Inv. Mgmt., LLC, 633 B.R. 663, 671 (Bankr. D. Del. 2021) (gathering cases "where the respective courts found reasonably equivalent value for tax distributions because the debtor elected into a pass-through tax status").

[56]  The Delaware Limited Liability Act provides that an LLC may not make a distribution to any member if, after giving effect to the distribution, all liabilities of the LLC exceed the fair market value of its assets.  6 Del. Code § 18-607(a).

[57]  Moore Decl. ¶ 143.

[58]  See First Lien Term Loan Agreement [Bankr. Dkt. 1285-9] (the "**First Lien Credit Agreement**"); Second Lien Term Loan Agreement [Bankr. Dkt. 1285-11] (the "**Second Lien Credit Agreement**"); ABL Credit Agreement [Bankr. Dkt. 1285-7].

[59]  First Lien Credit Agreement § 7.06(l).

15

the total leverage ratio of the Company did not exceed 2:25:1.00 at the relevant time.[60] The Debtors do not appear to have made this calculation with respect to any transfer.

23.     ***Larchmont.***  The Debtors take issue with payments involving Larchmont totaling $38 million over an eight (8) year period—again neglecting to identify the date, amount, and circumstances surrounding each payment.[61]  But this was no secret and instead was contemplated in the very same first-lien, second-lien, and ABL credit agreements the Debtors invoke with respect to tax distributions.  They identify contemplated payments of as much as $5 million each year will be made to Larchmont LLC in connection with a management services agreement.[62]

24.     Another $18 million is alleged to have been paid for "personal expenses," but the Debtors provide no detail when these amounts were transferred over a six (6) year period; no document containing Patrick James' instruction to transfer the amounts; and instead rely on a supposed Larchmont employee's cryptic email indicating "Patrick has asked that we invoice weekly."[63]

25.     ***Acquisitions.***  The Debtors contend Mr. James engaged in misconduct by extracting value when First Brands acquired various companies by supposedly inflating their valuations.[64] The Examiner took the same position,[65] but neither has put forth facts supporting claims of wrongdoing.

26.     Like the Examiner, the Debtors focus on the ownership of these entities and questions of why transfers took place—but do not identify documents showing Mr. James

---

[60]     First Lien Credit Agreement § 7.06(m).

[61]     Moore Decl. ¶ 145.

[62]     First Lien Credit Agreement § 7.06(j); Second Lien Credit Agreement § 7.06(j); ABL Credit Agreement § 7.06(j).

[63]     Moore Decl. ¶ 147.

[64]     Moore Decl. ¶¶ 153-162.

[65]     Report pp. 30-39.

instructed anyone to commit fraud.  Instead, they raise speculative accusations based on a review of unspecified and selected First Brands' records.[66]  Here again the particulars of Mr. James' alleged involvement are lacking.  The Debtors do not identify Mr. James and instead refers to the actions of a generic "First Brands executive."[67]

27.     In any event, First Brands' acquisitions and the consideration paid for those companies are the product of the exercise of First Brands' business judgment.  These transactions took place with third parties; are evaluated under the deferential business-judgment standard; and are not easily second-guessed.  The Examiner similarly questioned the business-judgment of buying foreign affiliates but partly answered that by indicating the companies had significant operations with large headcounts.[68]

28.     The Debtors' argument that the Company overpaid for the companies in these acquisitions rests on the values they realized in the chapter-11 cases through their Sale Process, some of which they contend were "nominal."[69]  While the Debtors complain their post-petition Sale Process did not yield meaningful results to provide creditor recoveries,[70] they started the cases with an influx of $1.3 billion in new money through the DIP financing to fund the cases.[71] The Company secured that cash infusion at the same time it ejected Mr. James, i.e., October 2025.

---

[66]   Moore Decl. ¶ 157; Report pp. 31-33.

[67]   Moore Decl. ¶ 157 ("In each instance, after the acquisition closed, a senior First Brands executive directed the accounting department to retroactively inflate the recorded value of the acquired assets in an effort to justify the purchase price.").

[68]   See, e.g., Report p. 29 (questioning "valid business rationale"); p. 30 (noting FRAM "had significant manufacturing operations in Jaurez Mexico as well as facilities in Mississauga, Canada, and Kentucky"); p. 31 ("Winning has eight plants and a headcount of 1,670 employees").

[69]   Moore Decl. ¶¶ 161-162.

[70]   Moore Decl. ¶¶ 45-51.

[71]   Discl. St. p. 51.

17

It may be that in their zeal to prosecute Mr. James and months-long disparagement campaign, the Debtors needlessly destroyed value and tanked the Sale Process.

29.   ***IP Transfer.***   According to the Debtors, there were improper transfers of real and intellectual property involving Alester Technologies LLC in connection with First Brands' acquisition of Horizon Global Corporation and other entities.[72]   But tax or similar financial considerations often drive these types of internal restructurings in large corporations.[73]   The Debtors again fail to point to specific evidence showing Mr. James' directed the transfers of IP they challenge, offering only passing reference to "internal FBG communications" sent by others stating opaquely that "the Boss" had directed that FBG would "pay Alester's invoices."[74]   As for the isolated transfer of $7 million the Debtors try to tie to the Patrick James Trust as "a purported loan repayment,"[75] they make no effort to consider whether it was offset by other transfers—as the Report would need to do in order to objectively evaluate the transfer.

### B.   DEBTORS DO NOT CONNECT MR. JAMES TO THIRD-PARTY FACTORING

30.   The Debtors concede third-party factors were paid more than $15 billion by First Brands during the challenge period.[76]   These relate to funds borrowed and repaid and suggests these lenders benefitted greatly from the alleged "Scheme."

---

[72]   Moore Decl. ¶¶ 148-150.

[73]   See, e.g., Report p. 34 ("[I]t was noted that a transfer of PPE would require consideration of tax and accounting implications, including how such a disposition would be reflected for tax purposes.").

[74]   Moore Decl. ¶ 149.   The Examiner Report came up similarly short.   It either identifies other First Brands employees as responsible persons for various "diversions" or refrains from naming any employees at all, opting instead to refer to (1) messages discussing the transfer of property, plant, and equipment between unidentified "FBG finance executives;" (2) intellectual-property contribution agreements "executed by Mr. Baker on behalf of Alester and Mr. Kumar on behalf of the acquired entity;" or (3) communications regarding the treatment of intellectual property among unidentified "FBG executives." See Report pp. 35-38.

[75]   Moore Decl. ¶ 149.

[76]   Moore Decl. ¶ 95.

31.     The exchanges concerning invoices to which the Debtors refer do not involve Mr. James and instead revolve around Andy Brumbergs.[77]  The Debtors do not mention Mr. James in their allegations about accounts receivable factoring, including those concerning allegedly manipulated invoices and communications with factors requesting audits.[78]  Similarly, Daniel Jerneycic—First Brands' co-Chief Restructuring Officer—previously declined to identify Patrick James in response to his 30(b)(6)-deposition questions:  "Q. Does First Brands know whether Patrick James was involved in fabricating or inflating invoices?"; "Q. Does First Brands … have an opinion or a view as to whether Patrick or Ed James was involved in fabricating or inflating invoices?"; and "Q. Which particular individuals were involved in fabricating invoices?"[79]

32.     The Examiner also did not link Mr. James to allegations of misconduct concerning third-party factoring, though like the Debtors he paid particular attention to Mr. Brumbergs.[80]  By the Examiner's own account, it was Mr. Brumbergs who directed downstream personnel, Mr. Brumbergs who modified invoice nominations, and Mr. Brumbergs, together with Edward James, who "implemented a system whereby incoming communications from Third-Party Factors were automatically rerouted to Mr. Brumbergs or Edward James, effectively preventing other company

---

[77]   See Moore Decl. ¶ 80 ("Andy Brumbergs has admitted under oath that, between approximately 2020 and 2025, he and others knowingly submitted falsified invoice information to factoring companies and investors in order to secure "a higher financing or higher proceeds" than the true receivables would have justified."); ¶ 83 ("[T]he nomination file prepared by an accounting team in Romania was sent to Andy Brumbergs totaling approximately $11.9 million in invoice value to upload. This was the amount of real invoices nominated for factoring. FBG had additional capacity of $31.2 million available above and beyond that $11.9 million. Andy Brumbergs falsified invoices totaling $29.8 million to take advantage of the additional capacity and a total of $41.7 million was factored.").

[78]   Moore Decl. ¶¶ 80-95.

[79]   See Mot. Dismiss Am. Compl.; see also Exhibit 5 to Decl. of Mitchell S. Levy in Support of Leucadia Parties' Opposition to Patrick James Motion to Quash, December 19, 2025, Transcript of Rule 30(b)(6) Deposition of Daniel Jerneycic at 33:9-14, 22:18-23, 38:17-22 [Dkt. No. 1279-5].

[80]   Report pp. 64-65.  By the Examiner's own account, it was Mr. Brumbergs who directed downstream personnel, Mr. Brumbergs who modified invoice nominations, and Mr. Brumbergs, together with Edward James, who "implemented a system whereby incoming communications from Third-Party Factors were automatically rerouted to Mr. Brumbergs or Edward James, effectively preventing other company personnel, including treasury and accounting staff, from receiving such communications. Id.

19

personnel, including treasury and accounting staff, from receiving such communications."[81]  Mr. James is conspicuously absent from the described communication chain.

### C.    DEBTORS DO NOT TIE MR. JAMES TO SUPPLY-CHAIN FINANCING

33.    First Brands paid the various supply-chain lenders with approximately $4.7 billion in the four years before the bankruptcy.[82]  As in the Amended Complaint, the Debtors' allegation ultimately reduces to a balance-sheet characterization:  that certain accounts payable to First Brands' vendors were not recorded or disclosed in the manner the Debtors now contend they should have been.  Much of this in the Amended Complaint is plead only "upon information and belief."[83]  The Debtors do not, however, connect Mr. James to the preparation of any of the invoices they question, or to the way supply-chain-financing funds were recorded as they moved through Bowery to other First Brands subsidiaries or affiliates. Those invoicing, recording, and disclosure functions rested with the Company's finance and accounting personnel.

34.    Moreover, the Debtors focus on operational mechanics without explaining why they were—for example, using schedules to load invoices into a financing portal; the manner in which the third-party bill payer remitted and distributed funds among First Brands entities; or so-called "roundtrips" the Debtors do not define.  Absent from the Debtors' analysis is any examination of the governing agreements themselves, even though the Debtors purported to perform that kind of agreement-level analysis in other contexts, e.g., when parsing the first-lien and second-lien credit agreements in connection with tax distributions.

---

[81]    Report pp. 64-65.

[82]    Moore Decl. ¶ 102.

[83]    See Moore Decl. ¶¶ 96-102; Am. Compl. ¶¶ 7, 62-66.

### D.   DEBTORS DO NOT IDENTIFY ANY ROLE PLAYED BY MR. JAMES WITH RESPECT TO OFF-BALANCE SHEET FINANCING

35.    The Debtors paid various off-balance-sheet lenders $2.5 billion before the bankruptcy filing.[84]  Importantly, the Debtors do not point to any specific documents in which Mr. James directs anyone at First Brands to do anything in connection with off-balance-sheet financing.[85]  The Debtors reference Viceroy, but omit specifics of why transfers involving Viceroy were wrongful, e.g., whether they were concealed; transferred with fraudulent intent by Mr. James; transferred for less than reasonably equivalent value; or transferred without a corresponding setoff.[86]  The other references to Mr. James appear with respect to a payment for a "tax distribution" and subsequent transfer to Onset as well as $207 million transferred to the Patrick James Trust.  Again the Debtors provide no context concerning those transfers.

36.    Most of the off-balance sheet lending was done through Onset, that is, $2.3 billion out of $2.5 billion.[87]  But the Debtors make clear Patrick James is not the Onset relationship person at First Brands.[88]  The Debtors actually brought a separate lawsuit against Onset, i.e., the

---

[84]    Moore Decl. ¶ 139.

[85]    Moore Decl. ¶ 122 ("Andy Brumbergs admitted under oath that, between approximately 2020 and 2025, he and others misrepresented the nature of the collateral pledged").

[86]    Moore Decl. ¶ 106.

[87]    Moore Decl. ¶ 139.

[88]    Moore Decl. ¶ 107.  See also ¶ 111 ("the economic structure as written by Onset and Edward James"); ¶ 134 ("Edward James was an officer of FBG and the Onset SPVs, and the only party representing these entities in discussions with Onset. After the initial SPV Facilities were negotiated and executed between Onset and Edward James in the summer of 2022, Edward James became one of Onset's financing partners in the Onset SPV Facilities. Upon Edward James investing in the SPV Facilities, the interest rates jumped to triple digits (from ~25% in May 2022 to ~200% in December 2022), and they remained higher than the initial rates for over 30 transactions over the next three years. This was at a time when FBG had ABL capacity available at single-digit rates."); ¶ 135 ("In each new lease schedule over this time period, Edward James was the sole representative for FBG and the SPV Entities across the table from Onset in deals in which Edward James personally profited from above market terms provided to Onset. Edward James therefore sat on both sides of the Onset Sale-Leaseback Transactions and his interests were in direct conflict to those of FBG and the Onset SPVs, a fact that was known to Onset at the time.  As the senior FBG and SPV executive who negotiated and controlled the Onset Sale-Leaseback Transactions, Edward James simultaneously served as the Debtors' representative and as Onset's own funding partner. Edward James policed all communications, instructing Onset to exclude other officers and employees of the Company, and declared that "ALL [such] communications [from Onset] go through me

21

Onset Adversary Proceeding, that does not name Patrick James actually alleges the misconduct of the defendants in that case was done in secret, without others' knowledge (even Mr. James).[89]

      **E.**      **DEBTORS DO NOT REVEAL SPECIFIC CONDUCT BY MR. JAMES WITH RESPECT TO ALLEGED FALSE FINANCIAL REPORTING**

37.      The Debtors contend the Company's financial reporting was not accurate, but as that relates to Mr. James lodge only generic and conclusory accusations, e.g., he "among others, caused the FBG Debtors to provide lenders with a version of financial statements that did not reflect the Company's true financial position."[90]  What is lacking is any documentary evidence that Mr. James manipulated books and records.[91]  Moreover, the Debtors argue the Bowery accounts were used to conceal financial misconduct, but here again the particulars as they relate to Mr. James are not set forth—even though the Debtors finally acknowledge at least some of the cash contributions that Mr. James invested in the Company, e.g., $592 million between 2022 and 2025.[92]  And  the Debtors' challenge is compromised by the Company maintaining a general ledger[93] that listed payments to and from entitles affiliated with Patrick James, e.g., the Patrick James Trust.[94]

38.      Some important top-line financial metrics have not been challenged.  For example, the Debtors do not dispute figures like sales revenues of $5 billion in 2024 reported in the

---

ALONE." Interviews with FBG Debtors' staff after the Petition Date indicated that, when concerns were raised about certain onerous terms, they were specifically instructed that First Brands does not comment on Onset's documents.").

[89]   See, e.g., Onset Litigation, Dkt. No. 1, Compl. ¶¶ 78, 84, 96-98.

[90]   Moore Decl. ¶¶ 70; 71-79.  See also ¶ 71 ("Andy Brumbergs prepared document setting target financial outcomes for the Company known as 'Results Bridges.' which *we understand were based* on his discussions with Patrick James") (emphasis added).

[91]   Moore Decl. ¶ 70.

[92]   Moore Decl. ¶ 73.

[93]   See id. ¶¶ 13, 81; Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 90:2-91:16.; Adv. Proc. Hr'g Nov. 12, 2025. at 24:7-9.

[94]   See Tr., Adv. Proc. Hr'g Nov. 12, 2025 at 24:7-9; Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 152:22-24 ("[F]rom 2020 . . . through on or around December 31st, 2024, BDO provided an audit report for First Brands.").

Company's consolidated financial statements. Instead, they challenge EBITDA for FY 2024 and FY 2025 to argue the company may have been insolvent during these years.[95] The Debtors concede, though, that this analysis has not been done for 2022 or 2023 which would undermine any ability to maintain avoidance claims for transfers made during those years.[96] It already would be difficult to show insolvency going back that far from the petition date.[97] And of the approximately $830 million of payments in the Amended Complaint, approximately $336 million was transferred before 2024.[98]

      39.    The Examiner made similar assertions about Mr. James' supposed "control." He said Patrick James "restricted communications to an 'inner circle of First Brands executives involved in the fraudulent scheme.'" But that came verbatim from the Indictment.[99] Beyond that, the Examiner's Report points to witness interviews as supposed substantiation; but those witnesses identified "Mr. Brumbergs, Mr. Ruminski, and Mr. DiFranco as the principal—and

---

[95]    Moore Decl. ¶¶ 75-79.

[96]    Moore Decl. ¶ 76 (team "has not had the time to conduct a similar forensic analysis of adjustments").

[97]    See In re Extended Stay, Inc., 2020 WL 10762310, at *97 (Bankr. S.D.N.Y. Aug. 8, 2020) ("[F]act[s] necessary to establish liability" when alleging an Illegal Dividend claim include "the dates, amounts and recipients of [the] dividends and distributions" and by whom they were "authorized."); ATP Oil, 711 F. App'x at 223 (finding the "conclusory assertions about ... financial condition and subjective determinations regarding the amount of available capital" do not state a claim); In re Northstar, 616 B.R. at 738 (connection between the two transactions was "far too tenuous;" declining to "leap from 2012 to 2014" (citation omitted)); In re Bateman, 2012 WL 3061181, at *4, *4 n.1 (Bankr. E.D.N.C. July 26, 2012) ("[T]he Amended Complaint fails on its face ... under the Twombly and Iqbal pleading standards .... The petition date was over a year and a half after the transfer date. As such, the Amended Complaint fails to reasonably allege the value of the Property at the time of the transfer."); In re Nanodynamics, Inc., 474 B.R. 422, 427-28, 427 n.5 (Bankr. W.D.N.Y. 2012) (rejecting plausibility of allegations of insolvency between 90 days and one year before petition date; noting "Twombly and Iqbal call upon a court to use its 'experience.'"). Cf., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."); Credit Managers Assoc. of S. Cal. v. Fed. Co., 629 F. Supp. 175, 186-87 (C.D. Cal. 1986) (refusing to find unreasonably small capital when debtor "pa[id] its creditors and its debt service" for twelve months after transaction).

[98]    Adv. Proc. Dkt. 141 (Am. Compl. Ex. A.).

[99]    Report p. 98 n.417 (citing Indictment ¶¶ 13, 34); p. 98 ("As alleged in the Indictment …"; "According to the Indictment …").

often the exclusive—points of contact" with auditors.[100]   More specifically, when speaking to Mr. James' supposed personal involvement in accounting manipulation and auditor obstruction, the Report acknowledges it is just "independently corroborat[ing] certain public allegations"[101] and then draws directly from the Indictment[102] and from the interview of Mr. Tomaszewski to support its contention that "[w]itness accounts are consistent with that allegation."[103]   This one witness contends Mr. James made "regular[] withdraw[s of] available cash from company accounts,"[104] without stating that Mr. James directed subordinates to fabricate invoices, falsify receivables, or deceive lenders.  With respect to Mr. Brumbergs, however, the Report says more, i.e., "Mr. Brumbergs operationalized these directives.  According to those accounts, once Patrick James communicated desired outcomes, Mr. Brumbergs implemented corresponding accounting changes, including by making entries directly in HFM, the company's consolidation system."[105]

### F.    PLAN CANNOT BE CONFIRMED AS A MATTER OF LAW

40.    Because the claims against Mr. James lack merit and in no way will generate sufficient value to pay DIP financing and administrative expense claims in full, the Plan does not satisfy the requirements of section 1129(a)(9) of the Bankruptcy Code.  Nor can the Plan be described as feasible.  See 11 U.S.C. § 1129(a)(9); In re Cavu/Rock Prop. Project I, LLC, 530 B.R. 349, 355 (W.D. Tex. 2015) (feasibility elements); In re Southwestern Water Corp., 227 B.R.

---

[100]    Report p. 99 n.421 (citing Examiner Interview of Kevin Ruminski (Vice President of Finance and Treasury, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026)).

[101]    Report p. 23.

[102]    Report p. 95 ("*As alleged in the Indictment*, Patrick James 'direct[ed]' employees to implement financial adjustments 'designed to achieve benchmarks' he established.") (emphasis added).

[103]    Report p. 95.

[104]    Report p. 95 & n.394.

[105]    Report p. 95 n.397 (citing Examiner Meeting with Weil and A&M (January 5, 2026); Examiner Meeting with A&M (January 13, 2026)); p. 95 n.398 (citing Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026)).

24

262, 263 (Bankr. W.D. Tex. 1998) ("This is a policy decision that has been made by Congress ….
1129(a)(9) allows a court to confirm a plan only if the plan provides for full payment of all priority claims in cash on the effective date of the plan unless other treatment has been agreed to, and here, there is no such agreement.  The Fifth Circuit Court of Appeals has ruled that liquidation plans must meet all the requirements of § 1129(a) except for subparagraph (a)(8).") (citing In re Sandy Ridge, 881 F.2d 1346, 1352 (5th Cir. 1989)); In re Digital Impact, Inc., 223 B.R. 1, (Bankr. N.D. Ok. 1998) ("Section 1129(a)(9) specifically requires each holder of each 'particular claim' to enter into an agreement with the plan proponent to waive the right to payment of administrative expenses in full …. [I]n order to waive the protection of Section 1129(a)(9)(A), a claimant must individually and affirmatively agree to such treatment …. [F]ailure of priority claimant to object to treatment less favorable than that required by Section 1129(a)(9) is not consent").

41.     Moreover, while the Plan contemplates substantive consolidation, Mr. James does not agree the estates should be substantively consolidated.  The steep requirements for substantive consolidation have not been met, and according, that aspect of the Plan should be rejected outright. But regardless, in no event can any finding of substantive consolidation excuse the Debtors of having to prove their various claims in the Adversary Proceeding against Mr. James on a debtor-by-debtor basis, e.g., transfer-by-transfer, with findings for each transferor of, among other things, intent and insolvency.  See In re Lyondell Chem. Co., 567 B.R. 55, 104-05, 107 (Bankr. S.D.N.Y. 2017) (finding testimony "regarding [debtor's] insolvency on a consolidated basis" to be "seriously flawed;" observing "Maxwell's testimony regarding LBI's insolvency is simply not reliable. Notably, the Trustee chose not to present specific evidence of Lyondell's stand-alone insolvency at trial"); ATP Oil, 711 F. App'x at 216 (insolvency not pled by "conclusory assertions about . . . financial condition and subjective determinations regarding the amount of available

25

capital"); In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008) (plaintiff must "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, and the consideration paid" (citation omitted)); Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006) (dismissing fraudulent transfer claims that lumped a series of cash transfers made over three-to-five-year periods and failed to identify how many transfers were being challenged or specific dates or amounts of those transfers).

42.     Finally, Mr. James and the Related Entities also reserve all rights to join any other objection filed in connection with the Confirmation Hearing.  In particular, they join in the objections of Aequum Capital Financial II LLC [Dkt. No. 3263] and the LAM Parties [Dkt. No. 3262] to the extent that they identify ways in which the proposed Plan abrogates parties' defenses, setoff, and related rights, as well as the Plan's one-sided and prejudicial use of substantive consolidation (for which no adequate showing has been made).

**G.     RESERVATION OF RIGHTS**

43.     Mr. James reserves any and all rights to supplement this objection; to file additional pleadings in connection with confirmation; and where appropriate join in the objections of others. Nothing herein should be construed as a waiver or admission by Mr. James or the Related Entities with respect to any right, claim, or defense in this or any other proceeding.

## CONCLUSION

44.    For the foregoing reasons, Mr. James and the Related Entities respectfully submit the Plan should not be confirmed.

Date:   July 20, 2026
        Houston, Texas

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

 */s/ Cameron M. Kelly*
_____
Cameron Kelly
TX SBN: 24120936
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
cameronkelly@quinnemanuel.com

James C. Tecce*
Anil Makhijani*
Grace Sullivan*
295 5th Avenue
New York, NY  10016
Telephone: (212) 849-7000
jamestecce@quinnemanuel.com
anilmakhijani@quinnemanuel.com
gracesullivan@quinnemanuel.com

-and-

**DEBEVOISE & PLIMPTON LLP**
Erica S. Weisgerber*
Matthew J. Sorensen*
Emily Morgan*
66 Hudson Boulevard
New York, NY  10001
Telephone: (212) 909-6000
eweisgerber@debevoise.com
mjsorensen@debevoise.com
emorgan@debevoise.com
*admitted *pro hac vice*

*Attorneys for Patrick James and the Related Entities*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing Motion was filed on the 20th of July, 2026, and served on parties in interest through the Court's CM/ECF filing system.

<u>/s/ Cameron M. Kelly</u>
Cameron M. Kelly