United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 21, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
|  | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.**[1] | § |  |

**ORDER IN FURTHERANCE OF THE WIND DOWN ORDER**
**REGARDING SALE OF CERTAIN ASSETS OF DALTON CORPORATION;**
**DALTON CORPORATION, WARSAW MANUFACTURING FACILITY INC.;**
**AND DALTON CORPORATION, STRYKER MACHINING**
**FACILITY CO. TO MIDDLEGROUND CAPITAL**

Upon the request of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of this order (this "**Order**") in furtherance of the Wind Down Order and in connection with the sale of the Transferred Assets to MiddleGround Capital ("**Buyer**"); and the Court having considered the Notice of Proposed Order, the Purchase Agreement, the Wind Down Motion, the Wind Down Order, the Declaration of Charles M. Moore in support of the Wind Down Motion [Docket No. 2217], and the record before it; and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Sale and the Order having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and all objections, if any, to the Sale having been withdrawn or resolved; and it appearing that the relief granted herein

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

is in the best interests of the Debtors and their respective estates and creditors; and after due deliberation and sufficient cause appearing therefor

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

B. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.  On October 9, 2025, the United States Trustee for Region 7 appointed an official committee of unsecured creditors [Docket No. 113].

C. The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

D. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E. On January 8, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing,*

*and (IV) Granting Related Relief* [Docket No. 1253] (the "**Bidding Procedures Motion**"), which sought Court approval of an expedited timeline and auction procedures for the Debtors' sale process. The Debtors filed the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* [Docket No. 1324] (the "**Initial Notice**"), which provided all interested parties with notice of the Debtors' intent to sell all their assets pursuant to one or more sale transactions.  On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix, and the Sale Notice Parties (as defined in the Bidding Procedures Motion). *See Affidavit of Service* [Docket No. 1718]. The Debtors subsequently published the Initial Notice in the national edition of The New York Times on January 16, 2026, as reflected in the *Certificate of Publication* [Docket No. 1645] (the "**Initial Notice Publication**").

F.      On March 23, 2026, the Debtors filed the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2216] (the "**Wind Down Motion**"), which disclosed the Debtors' intention to wind down certain brands and asset classes.  On March 24, 2026, the Wind Down Motion was served on the Debtors' Master Service List [Docket No. 2239].

G.      On April 16, 2026, the Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under The Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens,*

*Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2454] (the "**Wind Down Order**").[2]

H.     On May 15, 2026, the Debtors filed the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**Notice of Expansion of Wind Down Brands**"), which was served on the Debtors' Master Service List. *See* Docket No. 2761.  On May 28, 2026, the Debtors filed the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829] (the "**Second Notice of Expansion of Wind Down Brands**"), which was served on the Debtors' Master Service List (*see* Docket No. 2877) and expanded the Wind Down to First Brands Holdings, LLC and all Debtor subsidiaries.

I.     In accordance with the Wind Down Order, on May 27, 2026, the Debtors and Hilco Merchant Resources, LLC entered into a Machinery and Equipment Agreement under which Hilco Merchant Resources, LLC serves as the Debtors' exclusive agent with respect to specified machinery and equipment.

J.     In accordance with the Wind Down Order, on May 28, 2026, the Debtors and Hilco IP Services, LLC, Hilco Real Estate, LLC, and Hilco Global Mexico, S. de R.L. de C.V. entered into an Intangible Assets, Real Estate and Other Assets Marketing Agreement under which those entities serve as the Debtors' exclusive agents with respect to specified intangible assets, real estate, and other assets.

K.     In accordance with the Wind Down Order, the Debtors selected Buyer as the purchaser of certain assets associated with the Dalton business unit and owned by Dalton Corporation (f/k/a Dalton Foundries, Inc.) ("**Dalton**"), Dalton Corporation, Warsaw

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Wind Down Order or the Purchase Agreement, as applicable.

Manufacturing Facility Inc. ("**Warsaw**"), and Dalton Corporation, Stryker Machining Facility Co. ("**Stryker**" and, together with Dalton, Warsaw, each, a "**Seller**," and collectively, the "**Sellers**"), as more particularly described in the Purchase Agreement (the "**Transferred Assets**").

L.      On July 2, 2026, the Sellers and Buyer entered into that certain *Assignment and Bill of Sale* (as may be amended, restated, supplemented, or otherwise modified, the "**Purchase Agreement**"), attached hereto as **Exhibit 1**, under which Buyer agreed to purchase the Transferred Assets for $6,000,000 in cash, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order, free and clear of all Liens, Liabilities, claims, and interests other than the Assumed Liabilities (the "**Sale**").

M.      In accordance with the Wind Down Order, on June 19, 2026, the Debtors served a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties comprising: the U.S. Trustee, the Ad Hoc Group, the Creditors' Committee, the known creditors with an Asserted Interest, and the Landlord for the applicable Location with respect to the Transferred Assets.  The Wind Down Sale Notice: (a) identified the Transferred Assets (including the business units and legal entities with which the Transferred Assets are associated), (b) identified Buyer as the purchaser of the Transferred Assets, (c) stated the $6,000,000 purchase price, (d) stated that the Transferred Assets constitute Overlapping Collateral, and (e) described the other significant terms of the Sale.  The Notice Period has expired, and the Debtors obtained the consent of all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets. *See* Wind Down Order ¶¶ 25-26, 42.

N.      In furtherance of the Wind Down Order, on July 2, 2026, the Debtors filed the *Notice Regarding Proposed Order in Furtherance of the Wind Down Order Regarding Sale of Certain Assets of Dalton Corporation, Warsaw Manufacturing Facility Inc., Dalton Foundries,*

*Inc., and Stryker Machining Facility Co. to MiddleGround Capital* (the "**Notice of Proposed Order**").

O.      Entry of this Order is necessary and appropriate to approve the Purchase Agreement and the Sale, authorize the transfer of the Transferred Assets, and grant Buyer the protections set forth herein.

**IT IS HEREBY ORDERED THAT:**

**A. <u>Jurisdiction and Statutory Predicates</u>**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

2.      The statutory predicates for the relief granted herein are sections 105(a), 363, and 541 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.  This Order is a final and appealable order. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014.

3.      As evidenced by the Initial Notice, the Wind Down Motion, the Notice of Expansion of Wind Down Brands, the Second Notice of Expansion of Wind Down Brands, the related affidavits and certificates of service, the Initial Notice Publication, service of the Notice of Proposed Order on the Debtors' Master Service List and the creditor matrix for each Debtor selling Transferred Assets, the Wind Down Sale Notice, notice of the Sale and the relief granted herein was good, sufficient, and appropriate under the circumstances and complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Wind Down Order, and all other applicable orders of this Court.

B. **Background, Business Justification, and Notice**

4.     Under the Purchase Agreement, Buyer will pay a cash purchase price of $6,000,000 for the Transferred Assets, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order.

5.     The purchase and sale of the Transferred Assets was marketed, brokered, and facilitated by the Consultant solely in the Consultant's capacity as agent for the Debtors pursuant to the Wind Down Order.  For the avoidance of doubt, the Consultant is not taking title to the Transferred Assets before the Sale.

6.     The Debtors, in consultation with the Consultant and their advisors, reasonably determined in their business judgment that the Purchase Agreement represents the highest or otherwise best actionable transaction available for the Transferred Assets under the circumstances and is in the best interests of the Debtors, their estates, creditors, and parties in interest.

7.     The Sale is a Wind Down Sale under the Wind Down Order.  The Transferred Assets are Wind Down Assets under the Wind Down Order or are otherwise authorized to be sold under this Order, the Bankruptcy Code, the Purchase Agreement, and any other applicable orders. All requirements under the Wind Down Order, including any required notice, consent, asset designation, asset-class or legal-entity addition, objection-period expiration, or further-order requirement has been satisfied, waived, resolved, or approved by this Order.

8.     The Debtors have noticed the Sale through the (i) Wind Down Sale Notice on all parties required to receive notice under the Wind Down Order, and (ii) Notice of Proposed Order on the Debtors' Master Service List and the creditor matrix for each Debtor selling Transferred Assets. The Wind Down Sale Notice and Notice of Proposed Order each identified the Transferred Assets, the applicable business units and legal entities, Buyer, the purchase price, whether the

Transferred Assets constitute Overlapping Collateral, and the other significant terms of the Sale. The applicable notice period has expired, and all objections, if any, have been resolved, withdrawn, waived, or are overruled by this Order.  The Debtors have obtained consent to the Sale from all known creditors with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets.

9.      The notice provided in connection with the Sale, the Purchase Agreement, and this Order, including the Wind Down Sale Notice served on the Wind Down Sale Notice Parties and the Notice of Proposed Order served on the Debtors' Master Service List and the creditor matrix for each Debtor selling Transferred Assets,  is good, sufficient, and adequate under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Wind Down Order, and the circumstances of these chapter 11 cases.  No other or further notice is required.

**C.  Transferred Assets and Property of the Estate**

10.     The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code or otherwise consist of transferable interests held by one or more Debtors.  Those assets and interests may be sold under sections 363(b) and 363(f) of the Bankruptcy Code, and the transfer approved by this Order shall vest Buyer with the Debtors' right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims and interests, except solely for Assumed Liabilities.

11.     The Debtors are authorized to sell, transfer, convey, assign, and deliver to Buyer or one or more controlled affiliates or designees designated by Buyer under the Purchase Agreement (each, a "**Buyer Designee**") all of the Debtors' right, title, and interest in and to the Transferred Assets, subject only to the Assumed Liabilities.

12.     Any Lien, Liability, claim, or interest in the Transferred Assets other than an Assumed Liability shall attach solely to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that it had against the Transferred Assets immediately before the Effective Date, subject to the Wind Down Order and all rights, claims, objections, defenses, and challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

**D.  <u>Approval of the Purchase Agreement and Sale</u>**

13.     The Purchase Agreement and all transactions contemplated thereby are incorporated herein by reference and approved in all respects.

14.     The Debtors are authorized and empowered to execute, deliver, perform under, consummate, and implement the Purchase Agreement and all additional instruments, bills of sale, assignments, certificates, releases, notices, schedules, and other documents reasonably necessary or appropriate to consummate the Sale and transfer the Transferred Assets to Buyer or any Buyer Designee.

15.     The Debtors are authorized to sell, transfer, assign, convey, and deliver the Transferred Assets to Buyer or any Buyer Designee, and Buyer and any Buyer Designee are authorized to purchase and accept the Transferred Assets.

16.     The transfer of the Transferred Assets to Buyer or any Buyer Designee shall vest Buyer or such Buyer Designee, as applicable, with all right, title, and interest of the Debtors in and to the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities.

17.     Each Buyer Designee shall be entitled to the protections of this Order with respect to the Transferred Assets acquired by such Buyer Designee.

18.     Buyer and any Buyer Designee are good-faith purchasers for value within the meaning of section 363(m) of the Bankruptcy Code and are entitled to the full protections of section 363(m) with respect to the Sale and the Transferred Assets. Buyer is not an "insider" of any Debtor within the meaning of section 101(31) of the Bankruptcy Code.

19.     Neither the Debtors, Buyer, nor any Buyer Designee has engaged in any conduct that would permit the Sale, the Purchase Agreement, or any transaction contemplated thereby to be avoided, set aside, or otherwise challenged under section 363(n) of the Bankruptcy Code.

20.     Except as expressly provided in the Purchase Agreement or this Order, Buyer is purchasing the Transferred Assets on an "as is, where is" basis as to their physical condition, location, completeness, operability, merchantability, fitness for any particular purpose, and quality, and the Sale is final.  This paragraph does not limit, modify, or impair:  (a) the Debtors' obligation to transfer their right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims, and interests as provided in this Order; (b) Buyer's no-successor-liability, excluded-liability, environmental, free-and-clear sale, and other protections under this Order; (c) Buyer's express rights, representations, warranties, covenants, or remedies under the Purchase Agreement or this Order; or (d) any non-waivable state or federal law relating to implied warranties for latent defects.

21.     All persons and entities, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from

asserting, prosecuting, enforcing, collecting, or attempting to enforce any Liens, Liabilities, claims, or interests against Buyer, Buyer's affiliates, Buyer's designees, the Transferred Assets, or any of Buyer's successors or assigns, except solely with respect to Assumed Liabilities.

22. The Debtors, the Consultant, any warehouseman, bailee, custodian, agent, affiliate, employee, representative, or other person or entity in possession, custody, or control of any Transferred Assets shall surrender such Transferred Assets to Buyer or the applicable Buyer Designee on the Effective Date.

23. No executory contract or unexpired lease of any Debtor or Seller is being assumed by the Debtors or assigned to Buyer under section 365 of the Bankruptcy Code or this Order, and Buyer shall not assume or be liable for any obligations thereunder. Nothing in this paragraph limits Buyer's acquisition of rights that constitute Transferred Assets and are transferable without assumption and assignment under section 365 of the Bankruptcy Code; *provided*, that, notwithstanding anything to the contrary in this Order, Purchase Agreement, or any document or agreement related to the foregoing, the Debtors' insurance policies (and/or any agreements or documents related thereto), and any rights, proceeds, benefits, claims, rights to payments and/or recoveries thereunder and/or any claims handling service agreements do not be constitute Transferred Assets and will not be transferred without the express prior written consent of the applicable insurer and/or third-party administrator.

24. Subject to the terms of the Purchase Agreement, Buyer, any Buyer Designee, and their respective employees, agents, representatives, contractors, riggers, haulers, consultants, and professionals shall have reasonable access to the locations where the Transferred Assets are located for the purpose of inspecting, tagging, identifying, rigging, removing, loading, and transporting the Transferred Assets, subject to reasonable site safety protocols and insurance requirements.

25.     No landlord, warehouseman, bailee, custodian, secured party, lienholder, contract counterparty, or other person may interfere with Buyer's rights under this Order or assert any Lien, Liability, claim, right of possession, right of setoff, right of recoupment, storage charge, rent claim, warehouse charge, carrier charge, or similar right against Buyer, any Buyer Designee, or the Transferred Assets to delay, preclude, or condition access, surrender, removal, loading, or transportation of the Transferred Assets.

26.     Buyer and any Buyer Designee shall not be liable for any rent, taxes, utility charges, occupancy charges, storage charges, maintenance charges, warehouse charges, freight charges, carrier charges, landlord claims, or similar amounts relating to any location at which the Transferred Assets are located, except to the extent expressly assumed by Buyer under the Purchase Agreement (collectively, the "**Location Expenses**"). Buyer and any Buyer Designee shall remain responsible for any physical damage caused by their own post-closing removal activities and for commercially reasonable insurance required for such removal activities.

### E.  Section 363(f) Findings

27.     The transfer of the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests (other than Assumed Liabilities) satisfies section 363(f) of the Bankruptcy Code because one or more of the following standards is satisfied with respect to each such Lien, Liability, claim or interest:  (a) applicable nonbankruptcy law permits sale of the Transferred Assets free and clear of such Lien, Liability, claim, or interest; (b) the holder of such Lien, Liability, claim or interest has consented, failed to object after receiving adequate notice, or is deemed to have consented; (c) to the extent such Lien, Liability, claim, or interest constitutes a lien, the purchase price for the Transferred Assets is greater than the aggregate value of all liens on the Transferred Assets; (d) such Lien, Liability, claim, or interest is in bona fide dispute; or (e)

the holder of such Lien, Liability, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Lien, Liability, claim, or interest.

28.     The holders of Liens, Liabilities, claims, and interests will be adequately protected because any valid, enforceable, and non-avoidable Lien, Liability, claim, or interest other than an Assumed Liability shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale to the same extent and with the same validity, priority, force, and effect that such Lien, Liability, claim, and interest had against the Transferred Assets immediately before the Effective Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

### F.  No Successor Liability and No Assumed Liabilities

29.     Buyer is not a successor to any Debtor or any Debtor's estate by reason of the Sale or the transfer of the Transferred Assets.

30.     Buyer shall not be deemed, as a result of the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the ownership, operation or removal of the Transferred Assets, or the consummation of the transactions approved by this Order, to:  (a) be a successor to any Debtor or its estate; (b) be a continuation or substantial continuation of any Debtor or any Debtor's business; (c) have merged with any Debtor; (d) be part of a de facto merger with any Debtor; (e) be a mere continuation of any Debtor; (f) be a successor employer; (g) be a joint employer; (h) have common identity or continuity of enterprise with any Debtor; (i) be liable under any product-line, substantial-continuity, continuity-of-enterprise, successor-liability, transferee-liability, de facto merger, alter ego, veil-piercing, agency, vicarious liability, or similar theory; or (j) be liable for any Lien, Liability, claim, or interest arising from or relating to the Transferred Assets, the

Debtors, the Debtors' businesses, or the Debtors' ownership, operation, shutdown, use, sale, transfer, removal, or disposition of the Transferred Assets before the Effective Date, except solely for the Assumed Liabilities.

31.     For purposes of this Order, "Assumed Liabilities" means only the Assumed Environmental Obligations and any other liabilities expressly assumed by Buyer under the Purchase Agreement. Except for the Assumed Liabilities, Buyer shall not assume, shall not be deemed to assume, and shall have no liability or responsibility for any Liability, Lien, claim, interest, debt, obligation, commitment, demand, expense, loss, cause of action, damage, penalty, fine, cost, duty, contract, lease, agreement, guarantee, warranty, litigation, judgment, assessment, tax, interest, encumbrance, or other obligation in respect of any Debtor, any Debtor's estate, any predecessor, affiliate, owner, equityholder, officer, director, manager, employee, agent, or representative of any Debtor, or any other person or entity, whether known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, asserted or unasserted, arising before, on, or after the Petition Date or before, on, or after the Effective Date.

32.     Without limiting the foregoing, except solely for the Assumed Liabilities, if any, Buyer shall not assume or be liable for any Liens, Liabilities, claims, or interests arising under, relating to, or based upon:

(a)     any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, conditional sale right, title retention right, mechanic's lien, materialman's lien, warehouse lien, carrier lien, judgment lien, tax lien, statutory lien, possessory lien, or similar interest;

(b)     any debt, claim, obligation, or liability of any Debtor or any Debtor's estate;

(c)     any executory contract or unexpired lease of any Debtor or Seller;

(d)     any cure cost or default, claim, liability, or obligation under any executory contract or unexpired lease of any Debtor or Seller;

(e)     any collective bargaining agreement, memorandum of understanding, side letter, grievance, arbitration, labor agreement, union agreement, or obligation to any labor organization;

(f)     any claim under the Worker Adjustment and Retraining Notification Act, any state WARN Act, including the Ohio WARN Act, or any similar plant-closing, mass-layoff, wage, notice, severance, or employee-protection statute;

(g)     any wage, salary, payroll, commission, bonus, incentive, vacation, paid-time-off, severance, retention, change-in-control, workers' compensation, unemployment, employee-benefit, retiree-benefit, health, welfare, medical, life insurance, disability, COBRA, pension, retirement, withdrawal-liability, multiemployer-plan, defined-benefit-plan, defined-contribution-plan, ERISA, PBGC, controlled-group, fiduciary, funding, termination, premium, contribution, or benefit claim;

(h)     any claim under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the National Labor Relations Act, the Labor Management Relations Act, the Occupational Safety and Health Act, ERISA, COBRA, or any other federal, state, or local labor, employment, employee-benefit, pension, workplace, health, safety, discrimination, wage, hour, leave, retaliation, or similar law;

(i)     any successor-liability, successor-employer, single-employer, joint-employer, de facto merger, substantial-continuity, mere-continuation, continuity-of-enterprise, product-line, alter-ego, agency, veil-piercing, transferee-liability, vicarious liability, or similar claim or theory;

(j)        any product liability, warranty, recall, customer claim, personal injury, property damage, tort, negligence, strict liability, indemnity, contribution, reimbursement, or similar claim arising from or relating to any Debtor's pre-Effective Date ownership, operation, design, manufacture, sale, distribution, repair, service, warranty, or use of any product, asset, equipment, inventory, tooling, or property;

(k)        any tax, bulk sale, bulk transfer, unclaimed property, escheat, sales, use, transfer, recording, stamp, documentary, value-added, excise, property, franchise, income, payroll, withholding, or similar claim, except as expressly allocated to Buyer under the Purchase Agreement;

(l)        any environmental claim, environmental liability, environmental fine, environmental penalty, environmental violation, environmental response cost, remediation cost, closure cost, corrective-action obligation, disposal liability, off-site disposal claim, natural resource damage claim, contamination claim, permit violation, air-emission claim, wastewater claim, stormwater claim, hazardous-waste claim, release claim, or claim under any Environmental Law, except solely for the Assumed Environmental Obligations expressly set forth in this Order and the Purchase Agreement;

(m)        any liability arising from any litigation, arbitration, administrative proceeding, investigation, audit, notice of violation, regulatory action, enforcement action, consent order, settlement, judgment, decree, or claim against any Debtor or relating to any Debtor's pre-Effective Date conduct; and

(n)        any liability arising from or relating to the Debtors' operation, ownership, use, possession, shutdown, storage, removal, abandonment, rejection, sale, transfer, disposition, or

wind-down of any assets, facilities, properties, contracts, leases, businesses, or operations before the Effective Date.

33.     All persons and entities holding Liens, Liabilities, claims or interests of any kind or nature against any Debtor, any Debtor's estate, the Transferred Assets, or the proceeds thereof, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce any such Liens, Liabilities, claims or interests against Buyer, Buyer's affiliates, the Transferred Assets, or any of Buyer's or its affiliates' successors or assigns, except solely with respect to Assumed Liabilities as against Buyer as expressly set forth in the Purchase Agreement.

### G.  Environmental Matters

34.     For purposes of this Order:

(a)     "Environmental Laws" means the Environmental, Health and Safety Requirements, as defined in the Purchase Agreement, and all federal, state, local, and foreign statutes, rules, regulations, ordinances, codes, orders, decrees, judgments, directives, permits, licenses, and common law relating to pollution, contamination, protection of human health, worker health and safety, natural resources, or the environment, including laws relating to Hazardous Material, hazardous substances, hazardous waste, solid waste, toxic substances, air emissions, wastewater, stormwater, noise, odor, radiation, contamination, remediation, corrective action, closure, post-closure, environmental permits, and environmental reporting.

(b)     "Environmental Liabilities" means any and all claims, liabilities, obligations, losses, damages, costs, expenses, fines, penalties, response costs, remediation costs, corrective-action costs, closure costs, post-closure costs, natural resource damages, contribution claims, indemnity claims, or obligations arising under or relating to Environmental Laws.

(c)     "Known Ground Contamination" means the known soil, groundwater, subsurface or similar ground contamination existing on, under or migrating from the Transferred Real Property (as defined in the Purchase Agreement) as of the Effective Date, solely to the extent specifically identified on Schedule D of the Purchase Agreement or in this Order.

(d)     "Acquired Real Property" means only the real property, if any, included in the Transferred Assets under Schedule A to the Purchase Agreement as real property being acquired by Buyer.

(e)     "Assumed Environmental Obligations" means only those obligations, if any, imposed on Buyer under applicable Environmental Laws solely by reason of Buyer's post-Effective Date ownership or operation of the Acquired Real Property, including with respect to Known Ground Contamination or any other subsurface condition later discovered at, under, or migrating from the Acquired Real Property, but only to the extent such obligations are imposed on Buyer as the post-Effective Date owner or operator of the Acquired Real Property and not by reason of Buyer's succession to, or assumption of, any Debtor's, Seller's, or affiliate's pre-Effective Date acts, omissions, violations, fines, penalties, or liabilities.

(f)     "Excluded Environmental Liabilities" means all Environmental Liabilities other than Assumed Environmental Obligations, including all Environmental Liabilities arising from or relating to any Debtor's, Seller's, or affiliate's pre-Effective Date acts, omissions, ownership, operation, use, storage, disposal, release, migration, contamination, noncompliance, permit

violation, regulatory violation, notice of violation, air emissions, wastewater discharge, stormwater discharge, hazardous-waste handling, off-site disposal, shutdown, closure, abandonment, or other conduct, and all fines, penalties, damages, costs, claims, or obligations arising from or relating thereto.

35. Nothing in this Order or the Purchase Agreement shall release, nullify, enjoin, limit, or otherwise affect any governmental unit's ability to enforce its police and regulatory powers under applicable Environmental Laws against Buyer with respect to Buyer's post-Effective Date acts or omissions or, to the extent applicable, Buyer's obligations first arising and accruing after the Effective Date as the owner or operator of the Acquired Real Property.

36. Nothing in the foregoing reservation shall be deemed to: (a) make Buyer a successor to any Debtor; (b) impose on Buyer any Environmental Liabilities arising from or relating to any Debtor's, Seller's, or affiliate's pre-Effective Date acts, omissions, ownership, operation, use, disposal, release, migration, contamination, noncompliance, permit violation, regulatory violation, notice of violation, fine, penalty, or other conduct; (c) impose on Buyer any obligation for pre-Effective Date fines, penalties, notices of violation, air-emissions violations, wastewater violations, stormwater violations, hazardous-waste violations, off-site disposal claims, closure obligations, or corrective-action obligations of any Debtor; or (d) expand the Assumed Environmental Obligations beyond those expressly set forth in this Order and the Purchase Agreement.

37. For the avoidance of doubt, nothing in this Order shall limit Buyer's obligations to comply with laws of general applicability with respect to Buyer's own post-Effective Date conduct; *provided*, *however*, that Buyer's prospective compliance obligations shall not impose on

Buyer any liability in respect of the Debtors' pre-Effective Date acts, omissions, operations, Liabilities, claims, or interests.

38.     Unless expressly identified in Schedule A to the Purchase Agreement as Transferred Assets, Buyer is not purchasing, assuming, accepting, or taking title to any hazardous waste, regulated waste, contaminated media, environmental permits, confidential information, customer data, excluded hazardous materials, or materials requiring disposal or remediation under Environmental Laws.

39.     Nothing in this Order authorizes the transfer, removal, storage, handling, disposal, or abandonment of hazardous substances, hazardous waste, regulated waste, contaminated media, confidential information, customer data, or any other materials in violation of applicable law.

40.     Buyer shall not be required to remove, move, accept, transport, store, or dispose of any hazardous materials, regulated waste, contaminated media, or excluded hazardous materials unless expressly included as Transferred Assets or required by applicable law solely as a result of Buyer's post-Effective Date ownership or operation of the Acquired Real Property or Buyer's own post-Effective Date conduct.

41.     To the extent any environmental permit, license, registration, authorization, or approval is included among the Transferred Assets, if any, such permit, license, registration, authorization, or approval shall transfer only to the extent transferable under applicable non-bankruptcy law and only upon satisfaction of any required governmental approval, notice, consent, transfer, reissuance, amendment, or similar requirement.  Nothing in this Order authorizes the transfer of any environmental permit, license, registration, authorization, or approval in violation of applicable law.

42.     Buyer shall not be deemed an owner, operator, lessor, lessee, or person in control of any real property that is not expressly identified as Acquired Real Property in Schedule A to the Purchase Agreement solely because Buyer purchases the Transferred Assets, enters any facility to inspect or remove the Transferred Assets, or conducts post-Effective Date removal activities in accordance with the Purchase Agreement, this Order, and applicable law.  With respect to any Acquired Real Property, Buyer shall have only those obligations expressly assumed under the Purchase Agreement or imposed on Buyer by applicable law for its post-Effective Date actions as owner or operator of such Acquired Real Property, and Buyer shall not be deemed to assume any Excluded Environmental Liabilities or any Liabilities arising from the Debtors' pre-Effective Date ownership, operation, use, or control of any real property.

### H.  Liens, Proceeds, and Recording

43.     All Liens, Liabilities, claims, and interests released from the Transferred Assets shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that such Liens, Liabilities, claims, and interests had against the Transferred Assets immediately before the Effective Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Debtors, their estates, the Creditors' Committee, the DIP Secured Parties, the ABL Lenders, any trustee, any party in interest, and any other person.

44.     Notwithstanding anything in this Order, the Purchase Agreement, the Wind Down Order, or any other document to the contrary, IA Mechanical Inc. ("**IA Mechanical**") shall have a lien on the escrowed proceeds of the Sale in accordance with paragraph 49 of this Order, arising from its alleged pre-petition lien on the real property and improvements located at 1900 E. Jefferson Street, Warsaw, Indiana, including in connection with the lien recorded in the Office of

the Recorder of Kosciusko County, Indiana as Instrument No. 2025071587, as corrected by Instrument No. 2025120808, that purportedly secures the Claim asserted by IA Mechanical in Proof of Claim No. 1760 (the "**IA Mechanical Claim**"), which lien shall have the same validity, priority, extent, force, and effect, if any, that such lien had against the real property immediately before the Effective Date, subject to all rights, claims, objections, defenses, and challenges of IA Mechanical and the Debtors.

45. Notwithstanding anything to the contrary in this Order or the Purchase Agreement, or in connection with any actions taken in connection herewith or therewith, nothing shall, on behalf of IA Mechanical, the Debtors, or the Ad Hoc Group in connection with the Sale and their consent thereto, as a result of the Order or Purchase Agreement, or as a result of the agreement of the Debtors to escrow the asserted amount of the IA Mechanical Claim in the SPV-DIP Wind Down Account (as defined in the Wind Down Motion): (a) constitute, or be deemed to constitute, an admission, determination, or finding as to the validity, enforceability, priority, perfection, amount, or extent of any claim, lien, security interest, encumbrance, or other interest held by IA Mechanical or the Debtors or any affiliate, designee, or transferee thereof, including with respect to the IA Mechanical Claim; (b) constitute, or be deemed to constitute, a waiver, release, compromise, settlement, relinquishment, determination, or finding with respect to any rights, claims, defenses, causes of action, or remedies against IA Mechanical or the Debtors or any affiliate, designee, or transferee thereof, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; or (c) have any preclusive effect (including res judicata, collateral estoppel, judicial estoppel, law of the case, or otherwise) or be used or admitted as evidence in any proceeding, contested matter, adversary proceeding, or other litigation or negotiation (other than in connection with the enforcement of this Order) for any purpose,

including, without limitation, as evidence of liability, wrongdoing, or the validity, priority, or extent of any claim or lien, or to impute any adverse inference.

46.     This Order shall be effective as a determination that, as of the Effective Date, all Liens, Liabilities, claims, and interests against the Transferred Assets have been unconditionally released, discharged, and terminated as to Buyer and the Transferred Assets, except solely for Assumed Liabilities.

47.     This Order is binding upon and shall govern the acts of all filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities.   All such persons, agencies and entities are authorized and directed to accept this Order, the Purchase Agreement, any agreement, assignment, certificate, or other transfer document as conclusive evidence of the release, discharge, and termination of all Liens, Liabilities, claims, and interests against Buyer or the Transferred Assets and as authority to record, file, or register the transfer of the Transferred Assets to Buyer free and clear of all Liens, Liabilities, claims and interests, except solely for Assumed Liabilities.

48.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, Liabilities, claims, or interests against or in the Transferred Assets does not deliver appropriate termination statements, instruments of satisfaction, releases, or other documents, Buyer and the Debtors are authorized to execute and file such termination statements, releases, satisfactions, or other instruments on behalf of such person or entity solely with respect to the Transferred Assets.

49.     At the Closing and notwithstanding anything to the contrary in the DIP Order,[3] the Buyer shall pay the Purchase Price, less the Tax Payoff Amount,[4] to the Wind Down deposit account maintained by Consultant for funds flow purposes only and without the Consultant obtaining any legal interest therein other than in respect of such amounts payable to the Consultant pursuant to the Wind Down Order.  Consultant shall thereafter distribute the Net Proceeds or Gross Proceeds, as applicable, net of Consultant's Fees and Expenses and the Tax Payoff Amount (the "**Distributable Proceeds**") in the following manner:  (i) $502,750.71 to the SPV-DIP Wind Down Account to be held in escrow pending a final order of the Bankruptcy Court determining the allowance, amount, validity, extent, priority, and/or enforceability of the IA Mechanical Claim; and (ii) the remainder of the Distributable Proceeds to the DIP Secured Parties and Onset Parties[5] (collectively, the "**Creditor Consenting Parties**" and, with the Debtors, the "**Sale Consenting Parties**") in accordance with the schedule agreed to by the Ad Hoc Group and Onset Parties regarding the allocation and distribution of the Net Proceeds or Gross Proceeds, as applicable, of the Sale (the "**Value Allocation Schedule**"), attached hereto as **Exhibit 2**, and wire instructions provided to the Consultant by counsel to Creditor Consenting Parties, as applicable. The Consultant shall use commercially reasonable efforts to distribute such funds as promptly as practicable.  For the avoidance of doubt, none of the Distributable Proceeds may be used to fund

---

[3]   "**DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 597].

[4]   "**Tax Payoff Amount**" means the aggregate amount of taxes owed by the Sellers to be paid from the Purchase Price at Closing in respect of any Transferred Assets.

[5]   "**Onset Parties**" means Onset Financial, Inc. and its affiliates, Silver Point Capital, L.P., and each affiliate of Silver Point Capital, L.P. and each fund or account for which Silver Point Capital, L.P. or its affiliates serves as investment advisor, sub-advisor, or manager.

the Carve-Out (as defined in the DIP Order) and none of the escrowed proceeds shall be released from the Escrow Account in violation of the Value Allocation Schedule.

### I.   Bulk Sales, Transfer Taxes, and Resale Certificates

50.     No bulk sales, bulk transfer, bulk notice, successor-liability tax notice, or similar law shall apply to the Sale, the Purchase Agreement, the transfer of the Transferred Assets, or any transactions authorized by this Order.

51.     The transfer of the Transferred Assets shall not be subject to any stamp, transfer, recording, documentary, sales, use, or similar tax, fee, assessment, or charge.

52.     Buyer and the Debtors are authorized to provide and execute any resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate, or similar document available under applicable law in connection with the Sale or transfer of the Transferred Assets.

53.     All filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities are authorized and directed to accept this Order and any resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate, or similar document as sufficient evidence of any applicable exemption.

### J.   United States

54.     Notwithstanding any provision to the contrary in this Order, the Purchase Agreement, or any other document related to the Sale, nothing shall:

(a)     release, nullify, preclude or enjoin the United States from enforcing itspolice or regulatory powers under applicable non-bankruptcy law against Buyer or any Buyer Designee with respect to Buyer's or such Buyer Designee's post-Effective Date acts or omissions or, to the extent

applicable, obligations first arising and accruing after the Effective Date as the owner or operator of the Acquired Real Property; provided, however, that nothing in this clause (a) or this Section J shall be deemed to: (i) make Buyer or any Buyer Designee a successor to any Debtor, Seller, or affiliate; (ii) impose on Buyer or any Buyer Designee any Environmental Liabilities arising from or relating to any Debtor's, Seller's, or affiliate's pre-Effective Date acts, omissions, ownership, operation, use, storage, disposal, release, migration, contamination, noncompliance, permit violation, regulatory violation, notice of violation, fine, penalty, or other conduct; (iii) impose on Buyer or any Buyer Designee any obligation for pre-Effective Date fines, penalties, notices of violation, air-emissions violations, wastewater violations, stormwater violations, hazardous-waste violations, off-site disposal claims, closure obligations, or corrective-action obligations of any Debtor or Seller; or (iv) expand the Assumed Environmental Obligations beyond those expressly set forth in this Order and the Purchase Agreement;

(b)  affect the setoff or recoupment rights of the United States against the Debtors or their estates; provided, however, that any such rights shall not be asserted against Buyer, any Buyer Designee, or the Transferred Assets except solely to the extent arising from an Assumed Liability, Buyer's or such Buyer Designee's post-Effective Date acts or omissions, or Buyer's or such Buyer Designee's post-Effective Date ownership or operation of the Acquired Real Property under applicable non-bankruptcy law;

(c)  confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(d)  authorize the assumption, assignment, sale or other transfer of any federal  grants, grant funds, contracts, agreements, awards, task orders, property, () intellectual property, patents, leases, certifications, applications, registrations, billing numbers, national provider identifiers,

provider transaction access numbers, licenses, permits, covenants, inventory, guarantees, indemnifications, data, records, or any other interests belonging to the United States (collectively, "**Federal Interests**") without compliance by the Debtors, Buyer, and any Buyer Designee with all terms of the Federal Interests and with all applicable non-bankruptcy law; provided, however, that nothing in this clause (d) shall limit the transfer of the Transferred Assets free and clear of Liens, Liabilities, claims, and interests under this Order, except to the extent such Transferred Assets constitute property of the United States or are nontransferable without federal consent under applicable non-bankruptcy law;

(e) be interpreted to set cure amounts or to require the United States to novate, approve, or otherwise consent to the sale, assumption, assignment, or other transfer of any Federal Interests;

(f) waive, alter, or otherwise limit the United States' property rights, except for claims and interests related to the Transferred Assets that are released, discharged, or otherwise addressed by this Order; or

(g) expand the scope of 11 U.S.C. § 525.

55. In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and applicable federal law shall govern; provided, however, that except as expressly preserved in this Section J, nothing in this Section J shall limit, modify, or impair the free-and-clear, no-successor-liability, no-assumption, excluded-liability, environmental, or recording protections granted to Buyer and any Buyer Designee under this Order or the Purchase Agreement.

**K. Additional Provisions**

56. Notwithstanding anything to the contrary in this Order or the Purchase Agreement, or in connection with any actions taken in connection herewith or therewith, nothing shall, on

behalf of the Sale Consenting Parties in connection with the Sale, the consent of the Sale Consenting Parties thereto, as a result of the Order or Purchase Agreement, or as a result of the agreement of the Sale Consenting Parties to consent to the Value Allocation Schedule: (a) constitute, or be deemed to constitute, an admission, determination, or finding as to the validity, enforceability, priority, perfection, amount, or extent of any claim, lien, security interest, encumbrance, or other interest held by any Sale Consenting Party or any affiliate, designee, or transferee thereof; (b) constitute, or be deemed to constitute, a waiver, release, compromise, settlement, relinquishment, determination, or finding with respect to any rights, claims, defenses, causes of action, or remedies against any Sale Consenting Party or any affiliate, designee, or transferee thereof, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; or (c) have any preclusive effect (including res judicata, collateral estoppel, judicial estoppel, law of the case, or otherwise) or be used or admitted as evidence in any proceeding, contested matter, adversary proceeding, or other litigation or negotiation (other than in connection with the enforcement of this Order) for any purpose, including, without limitation, as evidence of liability, wrongdoing, or the validity, priority, or extent of any claim or lien, or to impute any adverse inference; *provided*, *however*, that this Order shall constitute a final settlement and release of all claim, lien, ownership, and priority disputes between and among the Debtors and the other Sale Consenting Parties solely and exclusively in relation to the Transferred Assets and any allocation or payment of the Purchase Price pursuant to this Order and the Value Allocation Schedule. Such release shall not extend to any other collateral, property, equipment, assets, proceeds, replacements, or products thereof, nor shall it affect, limit, or prejudice any other rights, claims, or defenses of the Sale Consenting Parties or any other Debtor affiliate, including in any pending or future lawsuit, Successor Case (as defined in the DIP Order) (including that may be

brought by a post-confirmation Debtor or post-effective date Debtor or by any estate representative appointed under a confirmed plan, including any litigation trust or litigation trustee acting as successor-in-interest to the bankruptcy estate, or adversary proceedings including, without limitation, in the adversary proceeding captioned Adv. Pro. No. 26 03005 (CML).

57.     Nothing in any chapter 11 plan, confirmation order, conversion order, dismissal order, appointment order, trustee appointment, plan supplement, trust agreement, collateral trust agreement, wind-down agreement, or other document or order in these chapter 11 cases or any successor case (including a converted case under chapter 7) shall conflict with, supersede, modify, impair, or otherwise affect Buyer's rights under the Purchase Agreement or this Order.

58.     This Order and the Purchase Agreement shall be binding upon the Debtors, their estates, Buyer, all creditors, all holders of Liens, Liabilities, claims, and interests, all contract counterparties, all governmental units, all landlords, all employees, all labor organizations, all benefit plans, all pension funds, all successors and assigns, any subsequently appointed chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary, and all other parties in interest.

59.     No chapter 7 or chapter 11 trustee, examiner, responsible person, estate representative, plan administrator, wind-down administrator, liquidating trustee, collateral trustee, or other fiduciary appointed in these chapter 11 cases or any successor case shall have authority to reject, avoid, unwind, rescind, revoke, modify, or otherwise impair the Purchase Agreement, the Sale, the transfer of the Transferred Assets, or Buyer's rights under this Order.

60.     To the extent this Order conflicts with any prior order of this Court, including any order governing rejection, abandonment, assignment, disposition, wind-down, sale, transfer, liens,

collateral, cash collateral, or adequate protection, this Order shall govern solely with respect to the Sale, the Transferred Assets, Buyer, and the transactions approved herein.

61.     No access agreement, utility agreement, landlord agreement, service-provider agreement, licensor agreement, creditor agreement, contract-counterparty agreement, or other agreement entered into under or in connection with the Wind Down Order shall modify, impair, condition, or limit Buyer's rights under the Purchase Agreement or this Order, or impose any liability or obligation on Buyer, unless Buyer is a party to such agreement or expressly agrees in writing to be bound by it.

62.     To the extent of any conflict between this Order and the Purchase Agreement, this Order shall govern.

63.     The Debtors, Buyer, and any Buyer Designee are authorized and directed to take all actions necessary or appropriate to implement and effectuate the relief granted in this Order, including executing and delivering any further instruments of sale, transfer, conveyance, assignment, confirmation, or correction reasonably necessary to transfer, convey, and assign to Buyer or any Buyer Designee all Transferred Assets and any additional assets or properties that should have been transferred or assigned to Buyer or any Buyer Designee as Transferred Assets under the Purchase Agreement.

64.     The requirements of Bankruptcy Rule 6004(h) are waived.  This Order is effective and appealable immediately upon entry, without any stay.

65.     The Court retains exclusive jurisdiction to interpret, implement, enforce, and resolve any disputes arising under or related to this Order, including, without limitation, the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the Assumed Liabilities, the liabilities excluded under the Purchase Agreement or this Order, the Assumed Environmental

Obligations, the Excluded Environmental Liabilities, access to and removal of the Transferred

Assets, transfer documents, and any related documents, claims, disputes, or proceedings.

Signed:  July 21, 2026

Christopher Lopez
United States Bankruptcy Judge

Case 25-90399   Document 3301   Filed in TXSB on 07/21/26   Page 32 of 49

## Exhibit 1

**Purchase Agreement**

*Execution Version*

This ASSIGNMENT AND BILL OF SALE (this "**Bill of Sale**"), dated as of July 2, 2026 (the "**Agreement Date**"), is made by and among (a) each of Dalton Corporation, an Indiana corporation ("**Dalton**"), Dalton Corporation, Warsaw Manufacturing Facility, an Indiana corporation ("**Warsaw**"), and Dalton Corporation, Stryker Machining Facility Co., an Ohio corporation ("**Stryker**", and together with Dalton and Warsaw, each a "**Seller**", and collectively, the "**Sellers**"), and (b) each of Dalton Foundry, LLC, a Delaware limited liability company ("**Dalton Buyer**"), Stryker Manufacturing, LLC, a Delaware limited liability company ("**Stryker Buyer**"), Dalton Real Property, LLC, a  Delaware limited liability company ("**Dalton RP**"), Stryker Real Property, LLC, a Delaware limited liability company ("**Stryker RP**"), and Muskellunge Real Property, LLC, a Delaware limited liability company ("**Muskellunge**", and together with Dalton Buyer, Stryker Buyer, Dalton RP and Stryker RP, each a "**Buyer**" and collectively, the "**Buyers**"), and shall be effective on the first business day following the date  upon which the Bankruptcy Court (as defined below) has entered an order, in the form attached as Exhibit A and with any changes in substance acceptable to the Parties, approving and authorizing (i) Sellers' entry into this Bill of Sale and the terms and conditions hereof, including pursuant to Section 363 of the Bankruptcy Code (as defined below) and (ii) Sellers to consummate the transactions contemplated by this Bill of Sale (such order, the "**Sale Order**" and such date, the "**Effective Date**"). The Buyers and Sellers, collectively, shall sometimes be referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

On or about September 24, 2025 and September 28, 2025, Sellers and certain of their respective affiliates (the "**Debtors**") filed voluntary petitions for relief commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**" and such cases, the "**Bankruptcy Cases**");

On April 16, 2026, the Bankruptcy Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter into and Perform under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2454] (the "**Wind Down Order**"); and

Sellers desire to sell to Buyers, and Buyers desire to purchase from Sellers, all of the Transferred Assets on the terms and subject to the conditions set forth in this Bill of Sale.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Bill of Sale, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Section 1.01.    Purchase and Sale of Transferred Assets.  Each Seller hereby sells, conveys, assigns, transfers and delivers (at Buyers' expense) to the Buyers, and the Buyers hereby purchase, acquire and accept from each such Seller, all of such Seller's right, title and interest in, to and under the assets expressly set forth on Schedule A hereto that are physically present at the Transferred Real Property (as defined on Schedule A) on the Effective Date (the "**Transferred Assets**"), free and clear of all Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities, as provided in the Sale Order; provided, that nothing herein shall limit any Permitted Liens that are not released, discharged, terminated, barred, enjoined, or required to attach solely to sale proceeds under the Sale Order or the Wind Down Order. Buyers shall be responsible for all costs, expenses, taxes, fees, and charges levied or billed to the Buyer by a governmental agency to transfer title of the Transferred Assets to Buyers (collectively, "**Transfer Taxes**"), except to the extent such amounts are reduced or eliminated by any applicable resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate or similar documentation. Sellers shall reasonably cooperate with Buyers, at Buyers' request and expense,

to provide, execute and deliver any resale certificates, exemption certificates, direct-pay permits, manufacturing exemption certificates, tax-exemption certificates or similar documentation available under applicable Law in connection with the transfer of the Transferred Assets. No Seller will be responsible for any costs or expenses, including, but not limited to, pick-up fees, detention charges, and similar expenses. The Transferred Assets shall be allocated among, and purchased by the applicable Buyer entities as follows: (i) Dalton Buyer shall purchase and acquire all non-real property Transferred Assets relating to the operation of the Dalton foundry, including all such non-real property Transferred Assets physically present at the Transferred Real Property in the State of Indiana, (ii) Stryker Buyer shall purchase and acquire all non-real property Transferred Assets relating to the operation of the Stryker facility, including all such non-real property Transferred Assets physically present at the Transferred Real Property in the State of Ohio, (iii) Dalton RP will acquire the parcels of Transferred Real Property associated with 1900 E Jefferson Street (as noted on Schedule A), (iv) Stryker RP will acquire the parcels of Transferred Real Property associated with 310 Ellis Street, Stryker, OH 43577 (as noted on Schedule A), and (v) Muskellunge will acquire the parcels of Transferred Real Property associated with each of 1614 E Market Street, Warsaw, IN 46580 and 221 S. Grant Street, Warsaw, IN 46580 (as noted on Schedule A).

Section 1.02.    No Assumption of Liabilities.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that, except solely for (i) the Assumed Environmental Obligations, if any, (ii) Transfer Taxes referred to in Section 1.01 hereof, and (iii) Liabilities relating to the ownership or operation of the Transferred Assets arising from events, facts or circumstances that first occur on or after the Effective Date (the "**Assumed Liabilities**"), Buyers shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of any Seller, whether existing at any time before or after the Effective Date or arising thereafter (the "**Excluded Liabilities**").  Without limiting the foregoing, the Buyers shall not be obligated to assume, does not assume and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any Seller whether incurred or accrued at any time before or after the Effective Date:

(a)    (i) all Taxes payable by any Seller or any of its affiliates, and (ii) all Liabilities for Taxes relating to the Transferred Assets for all Taxable periods (or portions thereof) ending on or prior to the Effective Date, and any sales, use, ad valorem or similar Tax;

(b)    all Liabilities arising in connection with any actual or alleged violation of any applicable Law relating to the period prior to the Effective Date by any Seller or any of its affiliates, including any Environmental, Health and Safety Requirements, except solely to the extent expressly included in the Assumed Environmental Obligations;

(c)    all litigation claims and any other Liabilities, including any tort claims, breach of contract claims, employment claims and discrimination claims, to the extent relating to circumstances (including claims instituted after the Effective Date), events or conditions arising out of or relating in any way to the conduct or operation of the Sellers' business or the ownership or operation of the Transferred Assets prior to the Effective Date even if instituted after the Effective Date;

(d)    all Liabilities of Sellers with respect to, or relating to or arising out of the employment, service or termination of employment or service of Service Providers of any Seller or relating to the ownership or operation of the Transferred Assets;

(e)    all Liabilities arising in connection with or in any way relating to any Seller or any of its affiliates (or any predecessor or any prior owner of all or part of their business and assets), any property now or previously owned, leased or operated by any Seller or any of its affiliates or the Transferred Assets or any activities or operations occurring or conducted at any real property used or held for use by any Seller (including offsite disposal), which (i) arise under or relate to any Environmental, Health and Safety Requirements and (ii) relate to actions occurring or conditions existing on or prior to the Effective Date, except solely to the extent expressly included in the Assumed Environmental Obligations;

2

(f)      for the avoidance of doubt, the Assumed Environmental Obligations shall not include any pre-Effective Date fines, penalties, notices of violation, regulatory violations, air-emission claims, wastewater claims, stormwater claims, hazardous-waste claims, offsite disposal claims, closure obligations, corrective-action obligations, or other Liabilities arising from or relating to any Seller's or any of its affiliates' pre-Effective Date acts, omissions, ownership, operation, use, noncompliance, violations or conduct; and

(g)      all other Liabilities of the Sellers or any of its affiliates, including but not limited to, those constituting accounts payable incurred prior to the Effective Date.

Section 1.03.    Purchase Price.  The aggregate consideration to be paid by Buyers on the Effective Date, by wire transfer, for the sale of all of the Transferred Assets and obligations of Sellers set forth in this Bill of Sale shall be an amount in cash equal to $6,000,000 (the "**Purchase Price**").

## ARTICLE II
## "AS IS, WHERE IS" TRANSACTION

Section 2.01.    "As Is, Where Is"; No Representations or Warranties.  **BUYERS UNDERSTAND AND AGREE THAT THE TRANSFERRED ASSETS ARE BEING TRANSFERRED ON A "WHERE-IS" AND, AS TO CONDITION, "AS-IS" BASIS, SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 3.09, WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN, LATENT OR PATENT, AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE.** Without limiting the foregoing, no Seller makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyers regarding the probable success, profitability or value of the Transferred Assets or with respect to compliance of the Transferred Assets with industry standards or any other safety standards and Buyers acknowledge that Seller has made no such representations or warranties.  **OTHER THAN AS SET FORTH IN SECTION 3.09, SELLERS HEREBY EXPRESSLY DISCLAIM, AND BUYERS HEREBY EXPRESSLY WAIVE, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR ANY PURPOSE OR FOR A PARTICULAR PURPOSE, THE IMPLIED WARRANTY OF CONFORMITY TO MODELS OR SAMPLES, QUIET ENJOYMENT, TITLE, POSSESSION OR OTHERWISE AND ANY WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE.**

## ARTICLE III
## MISCELLANEOUS

Section 3.01.    Post-Closing Operation of the Sellers.  The Sellers hereby acknowledge and agree that upon the consummation of the transactions contemplated hereby, the Buyers shall have the sole right to the use of the names set forth on Schedule B or similar or other relevant names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Assumed Trade Names**").  After the Effective Date, none of the Sellers nor any of their respective affiliates shall use the name or mark set forth on Schedule B or any derivatives thereof or other relevant names or service marks (collectively, the "**Assumed Marks**").  Buyers shall be solely responsible, at Buyers' own cost and expense, for filing with the applicable governmental entities all documents necessary to effectuate the foregoing; provided, that Sellers shall reasonably cooperate with Buyers by executing such de minimis documents as may be required in connection therewith, at Buyers' sole cost and expense.

Section 3.02.    Cooperation; Further Assurances.  Each of the Parties shall cooperate with each other and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Transferred Assets from the Sellers to the Buyers. In case at any time

3

from and after the Effective Date any further action is necessary or reasonably required to carry out the purposes of this Bill of Sale, subject to the terms and conditions of this Bill of Sale and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption or confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to the Buyers all of the Transferred Assets; provided, however, that no Seller shall be obligated to take any action that would impose any cost or liability on such Seller or the estate beyond the de minimis execution of transfer documents; and provided, further, that Buyers shall compensate the Sellers for any reasonable, out-of-pocket costs with respect to the foregoing. Further to and in no way limiting the foregoing, in the event Sellers have not moved all machinery, inventory and equipment from the leased property at 211 S. Lincoln Street, Warsaw Indiana, to 1900 E Jefferson Street, Warsaw Indiana, prior to the closing of the transactions contemplated hereby, Sellers shall grant Buyers access to the leased property at 211 S. Lincoln Street until July 31, 2026 in order to move such assets.

Section 3.03.    Expenses.  Except as otherwise specified in this Bill of Sale, each Party will pay its own costs and expenses, including legal, consulting, financial advisor, accounting and other fees and expenses, incurred in connection with this Bill of Sale, irrespective of when incurred or whether or not the Effective Date occurs.

Section 3.04.    Assignment.  This Bill of Sale will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of law or otherwise) this Bill of Sale or any rights, interests or obligations provided by this Bill of Sale without the prior written consent of the other Parties; *provided, however*, that any Seller may assign any of its rights or obligations under this Bill of Sale to any plan administrator, liquidator, liquidating trust, "winddown" vehicle, examiner, receiver, trustee or similar party appointed as its successor and assign on its behalf following that Effective Date; *provided, further*, that no such assignment pursuant to the foregoing clause shall release any other Party from any liability under this Bill of Sale.  Any attempted assignment in violation of this Section 3.04 shall be void *ab initio*.

Section 3.05.    Entire Agreement.  This Bill of Sale (and all schedules hereto), the Sale Order and the Domain Name Assignment collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 3.06.    Amendments; Waiver.  This Bill of Sale (including the schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by Buyers and Sellers.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Bill of Sale shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 3.07.    Governing Law.  This Bill of Sale, and any action or proceeding or claim that may be based upon, arise out of or relate or be incidental to any transaction, this Bill of Sale, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the Bankruptcy Code in the first instance, to the extent applicable, and in the alternative the internal laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

Section 3.08.    Counterparts.  This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

4

Section 3.09.   <u>Representations and Warranties</u>. Each Party hereby represents and warrants to the other Party that: (a) it is an entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the laws of its jurisdiction of incorporation, formation or organization; (b) it has the requisite corporate or other appropriate power to execute, deliver and perform its obligations under this Bill of Sale; (c) it has the requisite corporate or other power to operate its business, that it owns as now conducted and is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to its business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had and would not reasonably be expected to have, a material adverse effect; and (d) except, in the case of the Sellers, for such authorizations as may be required by the Bankruptcy Court, this Bill of Sale has been duly executed and delivered by such Party, and upon execution and delivery thereof, this Bill of Sale constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms. Each Buyer further represents and warrants that it is not an "insider" of the Debtors, as such term is defined in Section 101(31) of the Bankruptcy Code.  Subject to the entry of the Sale Order, Sellers further represent and warrant that each Seller has good and valid title to, or, in the case of leased assets, has good and valid unexpired leasehold interests in, the Transferred Assets, and at the Effective Date will convey the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities, as provided in the Sale Order; provided, that nothing herein shall limit any Permitted Liens that are not released, discharged, terminated, barred, enjoined, or required to attach solely to sale proceeds under the Sale Order or the Wind Down Order.

Section 3.10.   <u>Bankruptcy Covenants</u>.  Sellers shall use commercially reasonable efforts to seek entry of the Sale Order on an expedited basis and to obtain approval of the transactions contemplated by this Bill of Sale. Sellers shall support entry of the Sale Order, serve all notices required by the Bankruptcy Code, the Bankruptcy Rules, the Wind Down Order and any applicable order of the Bankruptcy Court, oppose any objection to the Sale Order or the transactions contemplated hereby, and request that the Sale Order include findings and relief reasonably requested by Buyers, including approval under Section 363 of the Bankruptcy Code, sale of the Transferred Assets free and clear of Liens, Liabilities, claims, and interests, except solely for Assumed Liabilities, good-faith purchaser protection under Section 363(m) of the Bankruptcy Code, no-successor-liability findings, bulk-sales and transfer-tax protections to the fullest extent permitted by applicable Law, authority to use resale certificates, exemption certificates and similar documentation, and waiver of any stay under Bankruptcy Rule 6004(h).

Section 3.11.   <u>Conditions to Effective Date; Outside Date</u>.  Buyers' obligation to consummate the transactions contemplated by this Bill of Sale shall be subject to the satisfaction or waiver by Buyers of the following conditions: (a) the Bankruptcy Court shall have entered the Sale Order; (b) the Sale Order shall not be stayed, reversed, vacated or modified in any material manner, and no order, writ, judgment, injunction, ruling or decree shall prohibit or restrain consummation of the transactions contemplated hereby; (c) all requirements under the Wind Down Order applicable to the sale of the Transferred Assets, including any required Wind Down Sale Notice, notice period, consent or objection-resolution requirement, shall have been satisfied, waived or resolved by the Sale Order; (d) no governmental approval or consent shall be required to consummate the transactions contemplated hereby other than any approval or consent that has been obtained, waived or satisfied by the Sale Order; and (e) the Effective Date shall have occurred on or before July 31, 2026 (the "**Outside Date**"), unless extended by written agreement of Buyers and Sellers. If the conditions set forth in this paragraph are not satisfied or waived by Buyers on or before the Outside Date (other than as a result of any act or omission of the Buyer), Buyers may terminate this Bill of Sale by written notice to Sellers.

Section 3.12.   <u>Agency Acknowledgement</u>.  The purchase and sale of the Transferred Assets hereunder is being made through Hilco Merchant Resources, LLC, Hilco Receivables, LLC, Hilco Global Professional Services, LLC or their affiliates (collectively, "**Agent**"), in their capacity as agent for Sellers pursuant to that certain Amended and Restated Consulting and Marketing Services Agreement, dated as of March 13, 2026, by and between First Brands Group, LLC and Agent (as amended, restated, or modified from time to time), as approved pursuant to the

5

Wind Down Order.  For the avoidance of doubt, in its capacity as agent to Sellers, Agent is not taking title to the Transferred Assets prior to sale.

Section 3.13.    Limitation on Liability; No Post-Closing Recourse.  Notwithstanding anything in this Agreement to the contrary: (a) Sellers shall have no Liability to Buyers or any of their respective affiliates following the Effective Date with respect to any matter arising under or relating to this Agreement, other than Liability for willfully and knowingly committed fraud with the specific intent to deceive and mislead; (b) each Buyer acknowledges that, as of the Effective Date, it shall have no right of recourse, offset, claim, counterclaim or action of any kind against any Seller or any of their respective affiliates, representatives, advisors or agents (including Hilco Merchant Resources, LLC, Hilco Receivables, LLC, Hilco Global Professional Services, LLC or their affiliates) with respect to any matter arising under or relating to this Agreement or the Transferred Assets, except as expressly set forth in this Agreement with respect to covenants that by their terms survive the Effective Date; and (c) in no event shall any party have any Liability under this Agreement for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); provided, that such limitation set forth in clause (c) shall not limit any party's right to recover contract damages in connection with or resulting from such party's failure to close the transactions in breach or violation of this Agreement. Notwithstanding the foregoing, nothing in this Section 3.13 shall limit Buyers' right to enforce the Sale Order, any transfer document, the further-assurances obligations set forth in Section 3.02, the name-related covenant set forth in Section 3.01, or any access or removal rights granted under the Sale Order, including Buyers' right to seek specific performance, injunctive relief, or other equitable relief from the Bankruptcy Court.

Section 3.14.    Definitions.  Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in Schedule C attached hereto.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

**HIGHLY CONFIDENTIAL**

IN WITNESS WHEREOF, Sellers and Buyers have caused this Bill of Sale to be executed as of the Effective Date by their respective duly authorized officers.

**SELLER:**

**DALTON CORPORATION**

By: _____

Name: Shekhar Kumar

Title: Vice President

**DALTON CORPORATION, WARSAW MANUFACTURING FACILITY**

By: _____

Name: Shekhar Kumar

Title: Vice President

**DALTON CORPORATION, STRYKER MACHINING FACILITY CO.**

By: _____

Name: Shekhar Kumar

Title: Vice President

[SIGNATURE PAGE TO BILL OF SALE]

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, Sellers and Buyers have caused this Bill of Sale to be executed as of the Effective Date by their respective duly authorized officers.

**SELLER:**

**DALTON FOUNDRIES, INC.**

Signed by:

By: _____
DA79075C0815417...

Name: Shekhar Kumar
Title: Authorized Signatory

[SIGNATURE PAGE TO BILL OF SALE]

**HIGHLY CONFIDENTIAL**

IN WITNESS WHEREOF, Sellers and Buyers have caused this Bill of Sale to be executed as of the Effective Date by their respective duly authorized officers.

**BUYERS:**

DALTON FOUNDRY, LLC

By: _John Stewart_
   Signed by:
   23D3D9DA3DAE480...
   Name: John Stewart
   Title: Authorized Person


STRYKER MANUFACTURING, LLC

By: _John Stewart_
   Signed by:
   23D3D9DA3DAE480...
   Name: John Stewart
   Title: Authorized Person


DALTON REAL PROPERTY, LLC

By: _John Stewart_
   Signed by:
   23D3D9DA3DAE480...
   Name: John Stewart
   Title: Authorized Person


STRYKER REAL PROPERTY, LLC

By: _John Stewart_
   Signed by:
   23D3D9DA3DAE480...
   Name: John Stewart
   Title: Authorized Person


MUSKELLUNGE REAL PROPERTY, LLC

By: _John Stewart_
   Signed by:
   23D3D9DA3DAE480...
   Name: John Stewart
   Title: Authorized Person


[SIGNATURE PAGE TO BILL OF SALE]

ACTIVE 724202102V11

## Schedule A

## Transferred Assets

(a) All machinery, fixtures, tools, vehicles, equipment (including IT equipment), supplies and other tangible personal property of the Sellers that is physically present at 1900 East Jefferson Street, Warsaw, IN 46580, 211 S. Lincoln Street, Warsaw, IN 46580, 310 Ellis Street, Stryker, OH 43577, 1614 E Market Street, Warsaw, IN 46580 and 221 S. Grant Street, Warsaw, IN 46580 and any of the other Transferred Real Property, in each case on the Effective Date;

(b) The following parcels of real property (as further depicted in the site maps attached as Schedule A-1) owned by the Sellers, and any improvements thereon (the "**Transferred Real Property**"):

| Parcel | Address |
|---|---|
| 064-050-01-004.000 | 310 Ellis Street, Stryker, OH 43577 |
| 064-050-01-005.000 | 310 Ellis Street, Stryker, OH 43577 |
| 004-047-403 | 1614 E Market Street, Warsaw, IN 46580 |
| 004-047-403.A | Market Street, Warsaw, IN |
| 004-047-404 | Jefferson Street, Warsaw, IN |
| 004-047-407 | Jefferson Street, Warsaw, IN |
| 004-047-407.A | 221 S. Grant Street, Warsaw, IN 46580 |
| 004-047-425 | Jefferson Street, Warsaw, IN |
| 004-047.440 | Jefferson Street, Warsaw, IN |
| 004-047-440.A | Jefferson Street, Warsaw, IN |
| 004-047-443 | Market Street, Warsaw, IN |
| 004-047-444 | Jefferson Street, Warsaw, IN |
| 004-048-070 | Jefferson Street, Warsaw, IN |
| 004-048-070.A | 1900 E. Jefferson Street, Warsaw, IN 46580 |
| 004-048-070.B | Winona Ave., Warsaw, IN |
| 004-048-152 | 1900 E Jefferson Street, Warsaw, IN 46580 |
| 004-048-177 | Hendricks St., Warsaw, IN |
| 004-048-178 | Hendricks St., Warsaw, IN |
| 004-048-179 | Hendricks St., Warsaw, IN |
| 004-048-180 | Hendricks St., Warsaw, IN |
| 004-048-181 | Hendricks St., Warsaw, IN |
| 004-048-284 | Lindberg St., Warsaw, IN |
| 004-073-042 | Harrison St., Warsaw, IN |
| 004-073-043 | Harrison St., Warsaw, IN |
| 004-073-044 | Harrison St., Warsaw, IN |
| 004-073-045 | Winona Ave., Warsaw, IN |
| 004-073-046 | Durbin St., Warsaw, IN |

(c)   all inventory (including merchandise, raw materials, component parts, supplies, packing and shipping materials, products in-process and finished products) of any Seller that is physically present at the Transferred Real Property on the Effective Date, and all other Inventory (as defined in the UCC) located thereon;

(d)   all Intellectual Property of the Sellers, including all domain names, trade names, trademarks, service marks, source identifiers, goodwill associated therewith and other Intellectual Property used in or related to the Transferred Assets; provided, however, that Sellers make no representation or warranty as to the completeness, validity, or enforceability of any Intellectual Property;

(e)   all customer or potential customer lists and files, vendor lists and files, mailing lists, email lists, advertiser lists, databases (including archived databases) and similar material, whether in print or electronic form, including any lists relating to past, present or prospective customers;

(f)   to the extent permitted by law, all books, records, ledgers, files, reports, plans, documents, manuals, and all customer sales, marketing, advertising, packaging and promotional materials, data, software (including all data and other information whether written, recorded or stored on discs, tapes or other media and including all computerized data), technical data and all other and all telephone, telex and telephone facsimile numbers and other directory listings, email addresses and domain names (for the avoidance of doubt, the Transferred Assets shall not include (A) any attorney work product, attorney-client communications and other items protected by attorney-client privilege or (B) books and records relating to Taxes);

(g)   any bonds, deposits, prepaid expenses, permit deposits, utility deposits, insurance proceeds, insurance claims, rights, defenses or similar assets, in each case only to the extent specifically identified on this Schedule A or another written schedule agreed by Buyers and Sellers; provided that cash, bank accounts, insurance policies, and proceeds of Excluded Assets are excluded unless specifically identified on this Schedule A or another written schedule agreed by Buyers and Sellers;

(h)   Claims, rights and defenses in respect of any Liability expressly assumed by Buyers under this Bill of Sale;

(i)   all permits, licenses, authorizations, and approvals in each case to the extent transferable; and

(j)   all of the goodwill, customer relationships, going concern value and other intangible assets of the Sellers.

**Schedule A-1 – Real Property Site Maps**

See attached.

**Schedule B**

**Assumed Trade Names and Assumed Marks**

1. Dalton Corporation
2. Dalton Foundry
3. Warsaw Manufacturing Facility
4. Stryker Machining Facility

**Schedule C**

**Definitions**

"Assumed Environmental Obligations" means only those obligations, if any, imposed on Buyers under applicable Environmental, Health and Safety Requirements solely by reason of any Buyer's post-Effective Date ownership or operation of the Transferred Real Property with respect to the Known Ground Contamination. Assumed Environmental Obligations shall not include any fines, penalties, costs, fees, notices of violation, regulatory violations, enforcement actions, agreed orders, penalties, air-emission-related claims, wastewater-related claims, stormwater-related claims, hazardous-waste-related claims, offsite transportation, arrangement, release, migration, or disposal-related claims, employee or other party exposure-related claims, legal obligations, closure obligations, corrective-action obligations, contractual obligations, or other Liabilities arising from any Seller's or any of its affiliates' or predecessors' pre-Effective Date acts, omissions, ownership, operation, use, noncompliance, violations or conduct.

"Environmental, Health and Safety Requirements" means, as enacted and in effect on or prior to the Effective Date, all applicable Laws concerning worker health and safety, the treatment, disposal, emission, discharge, Release or threatened Release of, or exposure to, Hazardous Material, pollution or the protection of the environment.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental, Health and Safety Requirements, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition, per- and polyfluoroalkyl substances, and polychlorinated biphenyls.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, provisionals, continuations, continuations-in-part, divisionals, renewals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, internet domain names, social media accounts and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals and extensions in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including software, databases, websites, exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof and all moral rights associated with any of the foregoing; and (d) trade secrets, know-how and other proprietary and confidential information, including inventions (whether or not patentable), invention disclosures, improvements, algorithms, source code, data analytics, methods, processes, designs, drawings, customer lists, supplier lists, together with all embodiments and fixations of any of the foregoing and all related documentation.

"Known Ground Contamination" means the known soil, groundwater, subsurface or similar ground contamination of which a Buyer is aware as of the date of the Agreement Date existing on or under the Transferred Real Property as of the Effective Date.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or decree of any governmental entity.

"Liability" means any liability, indebtedness, guaranty, claim, demand, cause of action, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured and whether matured or not yet matured).

"Lien" means any Liability, claim, demand, cause of action, mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property).

"Permitted Liens"  means the following Liens, solely to the extent such Liens are not released, discharged, terminated, barred, enjoined, or required to attach solely to sale proceeds under the Sale Order or the Wind Down Order: (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings or that may thereafter be paid without penalty; and (b) with respect to Transferred Real Property: (i) defects or imperfections of title, exceptions, easements, licenses, options to license, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances or any non-monetary title matters that are revealed in an investigation of title report or commitment made available to any Buyer, or (ii) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a government authority. For the avoidance of doubt, no Permitted Lien shall include any Lien, Liability, claim, interest, monetary encumbrance, possessory right, or other right that is released, discharged, terminated, barred, enjoined, or required to attach solely to sale proceeds under the Sale Order or the Wind Down Order.

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Representative" of a person or entity means such person's or entity's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such person.

"Service Provider" means any director, officer, full-time or part-time employee, independent contractors, independent consultants or temporary employees, of any Seller.

"Tax" or "Taxes" means any net or gross income, net or gross receipts, net or gross proceeds, capital gains, capital stock, sales, use, user, leasing, lease, transfer, natural resources, premium, ad valorem, value added, franchise, profits, gaming, license, capital, withholding, payroll or other employment, estimated, goods and services, severance, excise, stamp, fuel, interest equalization, registration, recording, occupation, turnover, personal property (tangible and intangible), real property, unclaimed or abandoned property, alternative or add-on, windfall or excess profits, environmental, social security, disability, unemployment or other tax or customs duties or amount imposed by (or otherwise payable to) any governmental entity, or any interest, any penalties, additions to tax or additional amounts assessed, imposed or otherwise due or payable under applicable Laws with respect to taxes, in each case, whether disputed or not.

## Exhibit 2

**Value Allocation Schedule**

**Project Overdrive – Dalton Transaction Sources & Uses**                                              7/20/2026

| Dalton Transaction Sources & Uses | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Purchase Price | $6,000,000.00 | DIP Lender Distribution | $3,294,156.67 |
| | | Onset Distribution | 1,250,000.00 |
| | | Hilco Commssion | 650,000.00 |
| | | Escrow for IA Mechanical Lien | 502,750.71 |
| | | Property Taxes | 303,092.62 |
| **Total Sources** | **$6,000,000.00** | **Total Uses** | **$6,000,000.00** |