**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*,[1] | Case No. 25-90399 (CML) |
| Debtors. | (Jointly Administered) |

**JOINDER AND OBJECTION OF FIRST-CITIZENS BANK & TRUST COMPANY
TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF FIRST BRANDS
GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**

First-Citizens Bank & Trust Company ("First-Citizens"), by and through its undersigned counsel, submits this joinder ("Joinder") and objection (the "Objection") to confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3019] (as amended, modified, or supplemented, the "Plan"), filed together with the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3020] (the "Disclosure Statement"). First-Citizens joins in and adopts the objections to confirmation of the Plan identified in the Joinder below (collectively, the "Joined Objections"), and in support of this Objection[2] respectfully represents as follows:[3]

**PRELIMINARY STATEMENT**

1. First-Citizens is a large unsecured creditor in these cases, holding filed claims of approximately $84 million. The Plan offers it—and every creditor situated like it—a recovery that is *speculative* in every dimension: a beneficial interest in a litigation trust whose

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] First-Citizen's deadline to timely object to confirmation and to vote on the Plan was extended on consent of the Debtors through July 22, 2026 at 5:00 p.m. (Central).

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

1

10064967.1

value no party has quantified, payable only if a stayed, unliquidated fraud-litigation portfolio produces extraordinary proceeds years from now.  The Plan gives the DIP lenders finality today and creditors speculation tomorrow—and asks the Court to confirm it on a record that proves neither feasibility nor fairness.  And it does so unevenly: the Plan singles out the categories into which the Debtors would place creditors like First-Citizens for treatment materially worse than that of other members of the same class, requiring them to surrender irrevocably their direct claims and grant releases in exchange for purported protections the Litigation Trustee may exercise (or not) in his "reasonable discretion."

2.      It is evident that the Litigation Trust will put the burdens of getting the Liquidation Trust "off-the-ground" on innocent unsecured creditors, in particular supply chain creditors ("Supply Chain Creditors") [4] such as First-Citizens, through its leveraging technicalities of avoidance actions in a case involving otherwise consolidated business operations poisoned with a massive fraud which made technical lines blurry or non-existent. The form and terms of the Plan are all constructed to allow the DIP lenders to have their "cake and eat it too" at the expense and risk of unsecured creditors like First-Citizens.

3.      Confirmation requires proof, and the burden of that proof rests on the Plan Proponents as to every element of section 1129 of the Bankruptcy Code.[5]  On the present record, that burden cannot be carried for multiple reasons.  Specifically, for the reasons set forth below and in the Joined Objections, the Plan:

> a.    as a gating feasibility defect, promises approximately $300 million of administrative and priority payments but provides only a $25 million cash contribution and $50 million of funding commitments principally dedicated to litigation and trust administration, leaving effectiveness dependent on approximately $1.965 billion of future litigation proceeds, future creditor concessions, or both, without a dedicated reserve or binding shortfall

---

[4]      Referred to in the Plan as "Supply Chain Financers," with respect to which characterization First-Citizens reserves all rights.

[5]      The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 et seq. Specific sections of the Bankruptcy Code are identified herein as "section __." The Federal Rules of Bankruptcy Procedure are set forth in Fed. R. Bankr. P. 1001 et seq. and are identified herein as "Bankruptcy Rule __."

2

commitment (11 U.S.C. §§ 1123(a)(5), 1129(a)(9)(A), (a)(11); addressed in the Joined Objections);

b.   requires Trade Creditors, Supply Chain Creditors, and Factors to surrender the same categories of consideration—third-party releases and all Direct Creditor Claims—while granting complete preference peace only to Trade Creditors, denying Supply Chain Creditors and Factors the same post-suit election, and permitting their settlement protection to be suspended by an unadjudicated allegation of "Adverse Conduct" (11 U.S.C. §§ 1123(a)(4), 1129(a)(1); Fed. R. Bankr. P. 9019; Section I below);

c.   transfers the Litigation Trust Assets—including Avoidance Actions expressly excluded from the DIP liens—to the DIP Secured Parties through a credit bid whose dollar amount and allocation the Plan never states, and seeks immediate section 363(m) protection, yet nowhere requires those assets to be returned to the estates if the Plan is confirmed but the Effective Date never occurs (11 U.S.C. §§ 363(b), (k), (m); addressed in the Joined Objections);

d.   releases estate claims against substantial financing and fiduciary constituencies notwithstanding an admittedly incomplete investigation, and burdens claims that may belong directly to creditors by requiring an advance ownership determination and authorizing fee-shifting if the Court later concludes that the claim belonged to the estates (11 U.S.C. § 1123(b)(3)(A); Fed. R. Bankr. P. 9019; *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024); addressed in the Joined Objections);

e.   pools claims and eliminates guarantees for distribution purposes— substantive consolidation's central distributional consequences—without the debtor-by-debtor showing section 1129(a)(7) of the Bankruptcy Code requires (11 U.S.C. § 1129(a)(7) or simple fairness when such consolidation is specifically excluded from other parts of the Plan; Section II below); and

f.   gives Ad Hoc Group appointees decisive voting rights over Major Decisions until the DIP lenders' Final Return Threshold is satisfied and permits uncapped Additional Waterfall Litigation Trust Funding to prime the waterfall on economic terms not fixed in the Plan, subject to the approval procedures and other conditions stated in section 6.4 (11 U.S.C. §§ 1123(a)(7), 1125; Section III below).

4.   These flaws are inherent in the Plan's design: everything the DIP Secured Parties bargained for is delivered and insulated at Confirmation, while everything the Bankruptcy Code requires for creditors is deferred for years and conditioned on litigation success. This Court foreshadowed the problem before the Plan was even solicited, warning that "the Debtors are going to have to satisfy every section required under the Code," that "feasibility is going to be an obvious issue," and that "just citing *Steward* and telling me it's the best deal for everyone's not going to get it done." Transcript of June 12, 2026 Hearing ("June 12 Hr'g

3

Tr.") at 231-33.  The operative Plan and Disclosure Statement, filed days later, do not meet that standard.  First-Citizens therefore respectfully requests that the Court deny confirmation, or require revisions that cure the defects identified in the Joined Objections and below.

## **JOINDER**

5.      Rather than repeat the generally applicable confirmation defects that the Joined Objections address in detail, First-Citizens joins in and adopts, to the extent applicable to First-Citizens and consistent with the positions and relief set forth herein, the objections to confirmation filed by the LAM Parties [Docket No. 3262], Katsumi Servicing, LLC [Docket No. 3271], the Carnaby Secured Lenders [Docket No. 3274], and Orbian Corporation and Orbian Financial Services XXVI LLC [Docket No. 3272].  First-Citizens does not adopt any factual allegation or request for relief peculiar to another creditor.

6.      First-Citizens submits this separate Objection[6] to highlight three points that are particularly pertinent to Supply Chain Creditors like it: *First*, the Preference Settlement's disparate treatment of Supply Chain Financers and Factors under section 1123(a)(4) (Section I below); *second*, the Plan's distribution-only pooling, which effects substantive consolidation's central consequences without the debtor-by-debtor showing section 1129(a)(7) requires (Section II below); and *third*, the Trust governance and future-funding provisions, which have not been shown to comply with sections 1123(a)(7) and 1125 (Section III below).

---

[6]      The Preference Settlement Opt-In Form received by First-Citizens (and, apparently, other Supply Chain Creditors) states: "**IF YOU OBJECT TO THE PLAN, CONFIRMATION ORDER, ANY RELATED SETTLEMENTS, OR RELIEF SOUGHT IN FURTHERANCE THEREOF, YOU WILL BE BARRED FROM PARTICIPATING IN THE PREFERENCE SETTLEMENT AND ANY ELECTION YOU MAKE IN ITEM 1 BELOW TO OPT IN TO THE PREFERENCE SETTLEMENT WILL NOT BE COUNTED**." Despite this language, the Debtors have since confirmed in writing that filing an objection to the Plan will not bar or disqualify First-Citizens from electing to participate in the Preference Settlement, and that such language was included in the form inadvertently, is incorrect, does not reflect the terms of the Plan, and has been removed from the updated form.  First-Citizens files this Objection in reliance on that representation and expressly reserves all rights with respect thereto, including, without limitation, the sufficiency of the solicitation of the Plan as a result.

10064967.1

**RELEVANT BACKGROUND**

A.      **First-Citizens and Its Claims**

7.      These cases arise from what the Debtors' advisors describe as a massive prepetition fraud, uncovered in the months before the Debtors commenced these chapter 11 cases in September 2025. *Declaration of Charles M. Moore* [Docket No. 3188] ("Moore Decl.") ¶¶ 9-10.

8.      Since 2016, First-Citizens participated in a supply chain program administered through the PrimeRevenue platform, of which First Brands Group, LLC ("First Brands") was a customer.  In most supply chain programs, there are multiple buyers (customers) that are all under a "topco," which is typically the entity that issues financial statements and manages the program and flow of funds.

9.      The structure of supply chain programs arose from a lack of, and need for, short-term trade credit that buyers wanted/demanded, but suppliers were unwilling or unable to provide.  In today's wholesale and consumer markets, buyers with leverage have demanded and received selling terms of 60, 90, 120, 180 trade terms.   For most suppliers, providing selling terms greater than 30 days stretches their liquidity too thin. Accordingly, they must find a solution if their customer "demands" longer selling terms, such as 120 days.   First Brands suffered from this problem as well on the sell-side of its business, where national auto-parts retailers typically demand selling terms as long as 180 days, or else they would find another supplier.  It is difficult, if not impossible, for such suppliers to refuse demands of these large retail customers such as Wal-Mart, Costco and Advanced Auto.

10.      Effectively, through this program, the Supply Chain Creditor manufactures 90 days (or so) of trade credit by extending accommodations to the customer and the supplier.  This process results in the extension of "trade credit," not funded debt.  Absent First-Citizens', among

5

others, participation in the PrimeRevenue supply chain program, First Brands would not have had access to nearly $1 billion in trade credit.

11.     In terms of mechanics, once First Brands "confirmed" an invoice due to a supplier (payable in, say, 30 days), a negotiable time "draft" was issued in the amount of the confirmed payment obligation that was due—in this case, 120 days after the original invoice date rather than the supplier's 30 days.  First-Citizens then purchased the "draft" at a discount from the supplier, thereby creating the additional time for First Brands to pay.  Upon maturity, the confirmed amount was drawn from a designated First Brands account and remitted to First-Citizens.  All the "drafts" were paid on the due date and new trade credit was thereafter extended by First-Citizens, until the "house of cards" tumbled down.[7]

12.     First-Citizens' proofs of claim, timely filed on March 17, 2026, assert against twelve of the Debtors an identical aggregate claim of approximately $84,041,501.44, each stating that only a single satisfaction is sought.[8]  First-Citizens also asserts that approximately $932,185.48 of its claims is entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. 11 U.S.C. § 503(b)(9).[9]  First-Citizens is accordingly a holder of General Unsecured Claims in Class 7, an asserted holder of an administrative priority claim, and a party

---

[7]     First-Citizens provides this description upon presently known facts and for background only. First-Citizens does not concede, and expressly reserves all rights regarding, the legally operative characterization of its claims and of the transactions described above.  Nothing in this Objection is an admission bearing on any claim objection, preference action, direct-claim dispute, or other proceeding. Furthermore, in filing this Objection in its individual capacity, First-Citizens does not speak for the Committee or any other Committee member.  First-Citizens preserves all of its claims, defenses, direct causes of action, and other rights.

[8]     The details of each claim are set forth in First-Citizens' filed proofs of claim: Carter Fuel Systems, LLC (Claim No. 1995); First Brands Group, LLC (Claim No. 1996); ASC Industries, Inc. (Claim No. 1997); Brake Parts Inc LLC (Claim No. 1998); Cardone Industries, Inc. (Claim No. 1999); Champion Laboratories, Inc. (Claim No. 2000); FRAM Group Operations LLC (Claim No. 2001); Hopkins Manufacturing Corporation (Claim No. 2002); Horizon Global Americas Inc. (Claim No. 2003); Jasper Rubber Products, Inc. (Claim No. 2004); Strongarm, LLC (Claim No. 2005); and Trico Products Corporation (Claim No. 2006).

[9]     First-Citizens' asserted section 503(b)(9) claim, 11 U.S.C. § 503(b)(9), has not been allowed, and First-Citizens reserves all rights with respect to its allowance, amount, and priority.  Nothing in this Objection concedes any element of, or any defense to, that claim, and First-Citizens' arguments concerning the treatment of administrative claims are made both in its capacity as an asserted administrative claimant and as a Class 7 creditor whose recovery is junior to all administrative and priority claims.

6

in interest with standing to object under section 1109(b) of the Bankruptcy Code. 11 U.S.C. § 1109(b).

**B.      The Plan and the Confirmation Record**

13.      As the fraud's scope emerged, the Debtors abandoned a going-concern sale of the enterprise in favor of a wind-down. Moore Decl. ¶¶ 9-10.  Following a mediation before the Honorable Marvin Isgur, the Debtors, an ad hoc group of the Debtors' lenders (the "Ad Hoc Group"), and the Official Committee of Unsecured Creditors (the "Committee") reached the settlement now embodied in the Plan (the "Plan Settlement"), whose compromises the Proponents describe as each "integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan." *Id.* ¶¶ 10, 13.

14.      On June 12, 2026, over the United States Trustee's motion to convert, the Court conditionally approved the Disclosure Statement for solicitation only, expressly preserving all confirmation objections and observing that, "[b]ased on what I heard today, feasibility is going to be an obvious issue." June 12 Hr'g Tr. at 231-34; Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement, *et seq*. [Docket No. 2990] (the "Conditional DS Order").

15.      The operative documents followed.  The Debtors filed the operative Plan on June 16, 2026 [Docket No. 3019] and the Disclosure Statement on June 17, 2026 [Docket No. 3020].  On June 23, 2026, the Debtors filed the Plan Supplement and the Liquidation Analysis. [Docket No. 3046, Exs. 1-9]. On July 14, 2026, the Proponents filed their confirmation declarations: the Moore Declaration [Docket No. 3188] and the *Declaration of Marc S. Kirschner* [Docket No. 3190] (the "Kirschner Decl.").

16.      Two dates define the Plan's architecture.  On the Confirmation Date, the Plan implements the Plan Settlement through three trusts—the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, Plan Arts. VI-VIII—and the estates' claims and causes of

10064967.1

action (the "Estate Claims") are sold through the Estate Claims Credit Bid Transaction and vested in the Litigation Trust. Plan §§ 5.2(e), 6.2.

17.     The Effective Date, by contrast, remains contingent on satisfaction of the conditions in section 12.1 of the Plan, including the nonwaivable condition that sufficient cash be available to pay or reserve for allowed and disputed administrative and priority claims. Plan §§ 12.1(o), 12.2(a). In the intervening time, the recovery of every junior constituency, administrative, priority, and general unsecured creditors alike, depends on monetization of the Estate Claims through the Litigation Trust Waterfall. Moore Decl. ¶¶ 55-57.  The particular Plan provisions and confirmation evidence supporting each of First-Citizens' objections are addressed in the corresponding sections below.

## OBJECTION

### I.     THE PREFERENCE SETTLEMENT VIOLATES SECTION 1123(a)(4) AND CANNOT BE APPROVED UNDER SECTION 1123(b)(3)(A) AND RULE 9019

18.     The Debtors have identified First-Citizens as a "Supply Chain Financer" (as defined in the Plan) on Exhibit G to the Litigation Trust Agreement. [Docket No. 3046-4, at 91.] Although First-Citizens does not concede that it is a "Supply Chain Financer," to the extent the Debtors contend that First-Citizens is a "Supply Chain Financer" subject to section 6.11(e), First-Citizens objects as follows.

### A.     The Settlement Demands the Same Consideration from Each Cohort in Class 7 While Providing Materially Different Protection

19.     The Preference Settlement election in Section 6.11 must be justified under the Bankruptcy Code provisions governing the relief it actually provides.  To the extent its benefits and burdens constitute treatment of claims classified together in Class 7, the Plan must comply with section 1123(a)(4). That inquiry is concerned with economic substance, not identical language, and requires equality of opportunity and approximate equality in the value of the treatment provided. The touchstone is whether class members enjoy the "same opportunity" for

8

recovery, not whether they nominally receive the same election. *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citing *Ad Hoc Committee of Personal Injury Asbestos Claimants v. Dana Corp.* (*In re Dana Corp.*), 412 B.R. 53, 62 (S.D.N.Y. 2008)). And where facial uniformity conceals unequal value, the Court must "look below the surface to determine whether the distributions [are] in fact equal in value." *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 591-92 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 397 (2025); *ConvergeOne Holdings, Inc. v. Ad Hoc Grp. of Excluded Lenders* (*In re ConvergeOne Holdings, Inc.*), 2025 WL 4700341, at *6-10 (S.D. Tex. Sept. 25, 2025); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986).

20.     To the extent the Preference Settlement compromises estate causes of action in exchange for releases and contributed creditor claims, on the other hand, it must satisfy section 1123(b)(3)(A) and Bankruptcy Rule 9019: the Court must apprise itself of the probability of success in the litigation, the complexity, expense, and delay of the alternative, and the other factors bearing on the wisdom of the compromise, sufficiently to make an "informed and intelligent decision." 11 U.S.C. § 1123(b)(3)(A); *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 321 (Bankr. S.D. Tex. 2024) (citations omitted). Either way, the Proponents must supply an informed comparison of the rights surrendered and the consideration received. They have *not*.

21.     The consideration demanded in exchange for the Preference Settlement is facially uniform. To become a Preference Settlement Electing Creditor, a Trade Creditor, Supply Chain Financer, or Factor must timely elect to participate, grant the third-party releases in section 13.5(b) of the Plan, and contribute all of its Direct Creditor Claims to the Litigation Trust. Plan Art. I (definition of "Preference Settlement Electing Creditor"); § 6.11(a); Conditional DS Order, Ex. 12 at 3 ("Contribution of your Direct Creditor Claims is irrevocable."). The Plan defines Direct Creditor Claims broadly as direct, nonderivative claims

10064967.1

against non-Debtors relating to the prepetition conduct of the Debtors, their Affiliates, or their professionals, subject to exclusions for claims the Plan characterizes as Estate Claims or duplicative of Estate Claims. Plan Art. I.

22.     But the Plan then provides different protection to similarly situated electors.  An eligible Trade Creditor receives complete peace: "[n]o Preference Actions shall be brought" against it. Plan § 6.11(d).  An eligible Supply Chain Financer or Factor, on the other hand, remains subject to suit and receives only due-diligence, a meet-and-confer, and Modified New Value procedures. Plan § 6.11(e); Moore Decl. ¶¶ 24-31.  As noted above, a Supply Chain Creditor, like First Citizens, is an originator of trade credit, whose rights are partly derivative of the relevant Trade Creditor, so why should it be treated substantively differently?

23.     The election periods also differ.  Each cohort has forty-five days after Confirmation to elect, but a Trade Creditor that initially declines and is later sued receives an additional thirty days after service to opt in; no comparable post-suit right is provided to a Supply Chain Financer or Factor. Plan § 6.11(b); Conditional DS Order ¶ 40 & Ex. 12 at 3. That is, one cohort receives peace and the ability to decide after seeing a complaint; the others receive process and must elect before knowing whether they will be sued.

24.     Nothing in the record provides a justification for such disparate treatment.  No analysis provides a creditor-by-creditor or cohort-by-cohort valuation of the Direct Creditor Claims surrendered by any cohort, compares those values with the preference protection received, and/or establishes that the narrower protection afforded Supply Chain Financers and Factors is commensurate with the same categories of consideration they must transfer.  Cohort-level aggregates—approximately $205 million in ninety-day transfers to Trade Creditors, $1.3 billion to Factors, and $487 million to Supply Chain Financers (*see* Disclosure Statement at 81)—cannot perform that analysis: preference exposure and direct-claim value alike depend on the transfers received by, the defenses available to, and the injuries suffered by particular

10

creditors. That disparity is one of kind, not merely degree: Trade Creditors are released from all preference liability while Supply Chain Financers and Factors remain fully exposed.  "An exclusive opportunity resulting in a significant disparity in value, without consideration for the . . . opportunity itself," is itself treatment that section 1123(a)(4) forbids. *ConvergeOne Holdings, Inc.*, 2025 WL 4700341, at *7, *9-10.  The Plan's categorical exclusion of Specified Non-Released Parties from the Preference Settlement altogether, addressed in the Joined Objections, is also a violation of the same requirement.

25.     The Plan Proponents acknowledge this disparate treatment but fail to explain it. The Moore Declaration's averment that potentially valuable Preference Actions against Supply Chain Financers and Factors should not be released without "due consideration and a commensurate benefit," Moore Decl. ¶ 28, does not explain why those defendants are distinguished from Trade Creditors, who are not subject to any "due consideration" requirement and have no prospective value to contribute to the estate, similar to that of "go-forward" creditors in other cases.  The contrast with *Robertshaw* is instructive: the settlement there was approved after two independent investigations, review of thousands of documents, witness interviews and depositions, and evidence of the value contributed through the compromise. 662 B.R. at 314-17.  No comparable showing supports section 6.11.

**B.     The Plan Gives an Unadjudicated Allegation of Broadly Defined "Adverse Conduct" the Operative Effect of a Final Order**

26.     Separate and apart from the disparate treatment of creditors within Class 7, the Preference Settlement election threatens to be illusory as applied to Supply Chain Creditors.

27.     An elector's realization of the benefits of a Preference Settlement can be cut off (at least temporarily) upon an unadjudicated allegation of "Adverse Conduct."  Although Section 6.11(a) conditions eligibility on the absence of "Adverse Conduct" "as determined by a Final Order," Section 6.11(c) permits the Litigation Trustee to commence a Preference Action

11

and suspend the settlement's application by "alleg[ing] and/or plead[ing] facts alleging Adverse Conduct" in, or substantially contemporaneously with, the action, without first obtaining "a finding, determination, or Final Order." Plan § 6.11(a), (c). Thus, although the ultimate determination of eligibility requires a Final Order, an allegation of "Adverse Conduct" alone may deprive the creditor of the settlement's protection while the dispute is pending.

28.     "Adverse Conduct," in turn, includes not only participation in adjudicated fraudulent or otherwise culpable conduct but also the receipt of a transfer allegedly avoidable on grounds other than 11 U.S.C. § 547 and the receipt of a transfer allegedly not made in good faith—receipt-based legal conclusions that may be disputed even where no wrongdoing has been established.[10] Plan Art. I. In cases the Debtors themselves describe as pervasively fraudulent, an allegation of constructive avoidability could sweep in a wide range of financing counterparties before any court has determined anything.  Because the definition excludes only transfers avoidable under section 547, and not those the Litigation Trustee may allege to be avoidable under section 548, the Litigation Trustee could recharacterize the very payments protected by the Modified New Value Elements as constructively fraudulent transfers under the Debtors' own Ponzi-scheme theory and thereby nullify the Preference Settlement—rendering it illusory for the Supply Chain Financers and Factors it purports to benefit. 11 U.S.C. §§ 547, 548.

29.     In short, the creditor must perform first and irrevocably: it elects within the prescribed period, grants the Plan's third-party releases, and contributes its Direct Creditor Claims before knowing whether the Litigation Trustee will allege Adverse Conduct. Plan § 6.11(a)–(c).  If the Litigation Trustee makes that allegation, the creditor may lose the

---

[10]     "Adverse Conduct" means that a person: "(i) engaged in wrongful, actual, or constructively fraudulent conduct against any Debtor or Affiliate of any Debtor, or otherwise participated, conspired with, or acted in concert with, any Person that engaged in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or Affiliates of Debtors), (ii) received an avoidable transfer on grounds other than section 547 of the Bankruptcy Code from any of the Debtors, or (iii) received a transfer not in good faith." Plan Art. I.

12

settlement's protection while the issue is adjudicated, even though its contributed claims remain with the Trust. If the creditor ultimately is determined ineligible, the Disclosure Statement states that it "will not regain ownership and/or control" of those contributed claims. *See* Disclosure Statement at 29. The Plan therefore permits the Trust to retain the contributed property while the benefit that induced the contribution is suspended and, following a final ineligibility determination, permanently withheld.

30. The Court identified this problem at the June 12 hearing, asking how permitting the Litigation Trustee to "just allege a wrongful act" could be "grounded in a legal basis" and constitute "an objective metric," and requiring disclosure that a creditor could "voluntarily give something" and later face an allegation of wrongful conduct. June 12 Hr'g Tr. at 232-34. Disclosure of the risk does not cure it.

31. The defect is readily curable without restricting the Litigation Trustee's authority to pursue colorable claims. For example, the Plan could (and should) offer materially equivalent Preference Settlement protection and election rights, condition suspension of the settlement benefit on a prompt determination by a neutral decisionmaker under an identified standard, segregate the transferred consideration while eligibility is adjudicated, or require restoration of that consideration if the creditor is ultimately denied the settlement benefit. What has not been justified is the arrangement actually proposed: irrevocable performance by the creditor, suspension by allegation, and retention of the creditor's property throughout the dispute. As drafted, section 6.11(c) is inconsistent with section 6.11(a)'s Final Order standard and has not been shown to be fair under section 1123(b)(3)(A) and Rule 9019; section 1129(a)(1) therefore precludes confirmation unless the provision is revised or the Proponents carry their burden on a materially fuller record. 11 U.S.C. §§ 1123(b)(3)(A), 1129(a)(1).

10064967.1

C.    **Section 6.11(f)'s Conclusive Good-Faith Presumption Improperly Forecloses Proof of Bad Faith**

32.    Section 6.11(f) compounds the problem.    It provides that the Litigation Trustee's good faith in commencing a Preference Action against an eligible Supply Chain Financer or Factor is "conclusively established" if a majority of the Oversight Committee, including one UCC Member, authorizes the action—while "the absence of any such authorization shall not establish a lack of good faith." Plan § 6.11(f).  Committee authorization may be relevant evidence, but the Plan does not explain why it should operate as an irrebuttable presumption foreclosing proof of bad faith, improper purpose, or disabling conflict in a later proceeding before this Court. Because sections 6.11(c) and (f) permit the Litigation Trustee's allegation and an interested committee's authorization to displace judicial determination, they have not been shown to satisfy section 1129(a)(1) of the Bankruptcy Code, 11 U.S.C. § 1129(a)(1), and should be revised to preserve judicial review.

II.    **THE PLAN'S DISTRIBUTION-ONLY POOLING EFFECTS SUBSTANTIVE CONSOLIDATION'S CENTRAL CONSEQUENCES WITHOUT THE REQUIRED SHOWING**

33.    Although the Plan does not expressly order substantive consolidation for all purposes, section 5.2(k) imposes consolidation's central distributional consequences: "Solely for purposes of distributions," every claim against any FBG Debtor is deemed a single claim against a single obligation of the FBG Debtors; guarantee claims are eliminated and treated as one claim against a single consolidated estate; and joint or joint-and-several obligations are treated as one obligation against a single consolidated estate.[11] Plan § 5.2(k).   Although nominally limited to distributions, such treatment may change the assets supporting a claim, the

---

[11]    Section 5.2(k) provides: "Solely for purposes of distributions under the Plan: (i) each Claim filed or to be filed against any FBG Debtor shall be deemed filed as a single Claim against, and a single obligation of, the FBG Debtors; (ii) any Claims on account of a guarantee provided by an FBG Debtor of the obligations of another FBG Debtor shall be treated as eliminated . . . ; and (iii) any joint or joint and several liability of any of the FBG Debtors shall be one obligation of the FBG Debtors . . . ." Plan § 5.2(k).

14

liabilities competing with it, and the value of debtor-specific guarantees. Similarly, the Preference Settlement permits specified new value to be counted "without regard to which FBG Debtor entity" the payment was made on behalf of, so long as it was made on behalf of a Debtor—a cross-Debtor methodology that may alter defenses that otherwise depend on the particular transferor and recipient. Plan § 6.11(e)(i). Substantive consolidation is an extraordinary equitable remedy precisely because it can redistribute value among creditors who extended credit to different obligors; it requires proof of creditor reliance on entities' supposed unity, hopeless entanglement, or necessity—not convenience. *In re Owens Corning*, 419 F.3d 195, 205-11 (3d Cir. 2005); *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518-19 (2d Cir. 1988); *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 91-101 (Bankr. N.D. Tex. 2017).[12]

34.     The Plan is plagued by asymmetry in this regard. Notwithstanding that section 5.2(k) of the Plan pools creditor claims, eliminates guarantees, and treats liabilities as obligations of a single consolidated estate, for prosecution purposes, the Plan preserves separateness: section 6.2(b) states that causes of action transferred from each Debtor "shall remain separate and distinct" and that their consolidation in the Trust is only for "administrative convenience." Plan § 6.2(b). The asymmetry falls directly on First-Citizens. First-Citizens filed claims against twelve Debtors but seeks a single satisfaction; only First Brands Group, LLC signed the drafts, while the operating-subsidiary Debtors received the goods and services. Yet, for distribution purposes, section 5.2(k) eliminates the guarantees and debtor-specific recourse

---

[12]     Limited or "deemed" consolidation may be approved in an appropriate case, but only upon evidence supporting that relief or a demonstrably fair compromise of the competing estate-specific rights. *See In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 92–101 (Bankr. N.D. Tex. 2017). There is no such evidence here. The Liquidation Analysis addresses the FBG Debtors collectively; it does not identify the assets, liabilities, guarantees, intercompany claims, lien burdens, or creditor bodies of the Debtors against which First-Citizens holds claims. Without that debtor-specific evidence, the Court cannot determine whether section 5.2(k) dilutes First-Citizens' rights or find, as section 1129(a)(7) requires, that First-Citizens will receive at least as much under the Plan as it would in a chapter 7 liquidation of each obligated Debtor. First-Citizens' agreement to accept only one satisfaction prevents a double recovery; it does not surrender entity-specific claims, guarantees, or recourse against the assets of the relevant obligors.

10064967.1

that may apply. This asymmetry reinforces the need for a debtor-by-debtor showing that the distribution provisions do not redistribute value among creditors of distinct entities.

35.     Section 1129(a)(7) of the Bankruptcy Code requires exactly such a showing: for each impaired nonaccepting holder, there must be a comparison against a chapter 7 liquidation of the particular Debtor obligated on its claim. 11 U.S.C. § 1129(a)(7). Without debtor-by-debtor evidence, compliance with section 1129(a)(7) cannot be found, and section 5.2(k) cannot be approved in its present form. While the facts in this case may suggest that the Debtors are hopelessly entangled warranting substantive consolidation,[13] it must be applied across the board and for all purposes. Deploying it selectively—for distributions and to extend Modified New Value benefits to favored Preference Settlement electors while withholding it from others— "remake[s] substantive consolidation not as a remedy, but rather a stratagem" and impermissibly wields it "as a sword and not a shield." *Owens Corning*, 419 F.3d at 216. The DIP lenders and Debtors cannot have their "cake and eat it too."

## III.     THE TRUST GOVERNANCE AND FUTURE-FUNDING PROVISIONS HAVE NOT BEEN SHOWN TO COMPLY WITH SECTIONS 1123(a)(7) AND 1125

36.     The Plan's proposed trust governance and future-funding provisions also fall short of satisfying the requirements under the Code. Section 1123(a)(7) of the Bankruptcy Code permits a plan to select post-confirmation managers only in a manner "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1123(a)(7). Here, until the Final Return Threshold is satisfied, the Litigation Trust Oversight Committee consists of three AHG Members and one UCC Member; only after that threshold is satisfied does it change to one AHG Member and two UCC Members. Plan § 6.9(a). Before the threshold is satisfied, a Major Decision requires the affirmative vote of at least two AHG Members and a majority of the committee, and a Sacred Right requires at least two AHG

---

[13]     Indeed, the Examiner concluded—and the Debtors have adopted the finding—that First Brands and its affiliates were operated as a single enterprise. *See* Disclosure Statement at 51.

10064967.1

Members and the UCC Member. Plan Art. I. The Plan thus gives Ad Hoc Group appointees decisive voting power over Major Decisions during the very period in which the DIP lenders remain the principal senior beneficiaries of the waterfall. The sole initial UCC Member, moreover, must itself be a Preference Settlement Electing Creditor—and therefore must grant the Plan's releases and contribute its Direct Creditor Claims—and may be removed by the Litigation Trustee "in its sole discretion" if it does not timely opt in. Plan § 6.9(b); Art. I.

37.    Further, those appointees may exercise broad authority over the Trust assets "without supervision or approval by the Bankruptcy Court," including without ordinary approval under section 363 or Rule 9019, when investigating, prosecuting, settling, selling, transferring, or abandoning Trust assets. Plan § 6.10(b), (b)(vi)-(viii).   That allocation of authority makes the composition, voting requirements, independence standards, and conflict procedures of the Oversight Committee material to creditors whose recoveries depend entirely on the Trust portfolio, and none of those safeguards has been established by evidence.

38.    Control also extends beyond the committee room.  Section 6.8 provides that, in the event of an inconsistency between the Plan and the Litigation Trust Agreement, "the Litigation Trust Agreement shall control," and section 1.6 more generally provides that the relevant Plan Supplement document controls over an inconsistent Plan provision.  Further, the Litigation Trust Interests, Plan Supplement, and Definitive Documents must be in forms satisfactory or acceptable to the Ad Hoc Group SteerCo and other identified parties before effectiveness, Plan §§ 1.6, 6.8, 12.1(d), (h), (p).   Section 12.1(n) separately conditions effectiveness on payment in full of the Restructuring Expenses and amounts due to the Ad Hoc Group Advisors.  Moreover, section 12.2(a) permits the remaining conditions to be waived by the Debtors only with the consent of the Ad Hoc Group SteerCo and the Committee or Claims Ombudsman, as applicable—so while the Ad Hoc Group cannot waive those conditions unilaterally, neither can they be waived without its consent. Plan §§ 12.1(n), 12.2(a).

10064967.1

39.     The future-funding authority compounds the problem and renders the disclosures inadequate.  The Plan authorizes Additional Waterfall Litigation Trust Funding that "may be structurally and contractually senior to the Litigation Trust Waterfall." Plan § 6.4(g). The Plan includes safeguards: the Litigation Trustee must conduct an Agreed Market Check; the Trust must have, or reasonably expect to have, less than $7.5 million in the near term; insider funding may be no more expensive than specified Class 1 economics; and the funding requires either unanimous Oversight Committee approval, including the UCC Member, or Court approval. Plan § 6.4(a)-(b).  But the Plan states no maximum amount, pricing formula, rate of return, repayment schedule, or dilution formula for such funding.  A Litigation Trust Interest is only a right to proceeds remaining after all senior obligations are paid.  Because the Plan leaves the priority and economic dilution that future priming funding may impose unresolved, Class 7 creditors cannot determine from the Plan the value of the interests distributed to them, and compliance with sections 1123(a)(7) and 1125 of the Bankruptcy Code has not been established. 11 U.S.C. §§ 1123(a)(7), 1125.

## CONCLUSION

40.     The choice before the Court is not confirmation of this Plan or conversion; it is this Plan or a confirmable one.  For the reasons set forth above and in the Joined Objections, First-Citizens respectfully requests that the Court deny confirmation or require revisions that cure the identified defects, including: a funded or otherwise demonstrably feasible means of satisfying administrative and priority claims; materially equivalent Preference Settlement protection and election rights; an objective and adjudicated Adverse Conduct standard; disclosure and allocation of the Estate Claims Credit Bid consideration; deferral or appropriate limitation of section 363(m) protection; a fixed outside Effective Date and an express unwind; preservation of creditor-owned direct claims and a neutral ownership procedure; debtor-by-debtor evidence supporting the distribution pooling; and Trust governance and future-funding

protections adequate to preserve the value and priority of junior creditors' interests—together with such other and further relief as is just and proper.

## RESERVATION OF RIGHTS

41.     First-Citizens reserves the right to amend, modify, or supplement this Objection and to file further or supplemental objections at or before the confirmation hearing, including following review of the Plan Supplement, the confirmation brief, the declarations, the voting report, the proposed confirmation order, and any discovery, and reserves the right to introduce evidence and to examine and cross-examine witnesses at the confirmation hearing.  Nothing herein shall be construed as a waiver of, and First-Citizens expressly preserves, all of its claims, interests, rights, remedies, defenses, setoff and recoupment rights, appellate rights, and direct causes of action.

 Dated: July 22, 2026
 Houston, Texas

Respectfully submitted,

*/s/ Nicholas R. Lawson*
**LAWSON & MOSHENBERG PLLC**
Nicholas R. Lawson
Avi Moshenberg
2301 Commerce St., Suite 200
Houston, TX 77002
Telephone:   (903) 316-9155
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

-and-

*/s/ Daniel F. Fiorillo*
**OTTERBOURG P.C.**
Daniel F. Fiorillo (*pro hac vice* forthcoming)
Pauline McTernan (*pro hac vice* forthcoming)
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104
dfiorillo@otterbourg.com

10064967.1

pmcternan@otterbourg.com

*Attorneys for First-Citizens Bank & Trust Company*

20

10064967.1