## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| | § | (Jointly Administered) |
| | § | |
| Debtors.[1] | § | |
| | § | |

### APPLICATION OF GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT, FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

GLAS Trust Company LLC,[2] as Administrative Agent (the "Administrative Agent") for the Carnaby II and III Secured Lenders by and through its undersigned counsel, respectfully submits this application (the "Application") requesting that this Court enter an order, substantially in the form attached hereto, (i) allowing and directing payment of Administrative Agent's administrative expense claims (the "Administrative Claims") pursuant to sections 503(b), 507(a)(2), and 507(b) of title 11 of the United States Code (the "Bankruptcy Code"), and (ii) granting such other and

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* [ECF No. 230] (the "Stipulation").  The term "Carnaby II and III Secured Lenders" includes the Carnaby II Lenders and the Carnaby III Lenders as defined in the Stipulation, in the Carnaby II Credit Agreement, or in the Carnaby III Credit Agreement, as applicable.

further relief as is just and proper.  In support of this Application, the Administrative Agent respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to decide this matter under 28 U.S.C. § 1334(b), and the *General Order of Reference* from the United States District Court for the Southern District of Texas, dated as of May 24, 2012.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicate for the relief requested herein are sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

## BACKGROUND

4.      On September 24, 2025 (the "Initial Petition Date"), certain Debtors, including Carnaby Inventory II, LLC ("Carnaby II"), Carnaby Inventory III, LLC ("Carnaby III" and together with Carnaby II, the "SPV Debtors") Carnaby Inventory Holdings II, LLC ("Carnaby II Holdings") and Carnaby Inventory Holdings III, LLC ("Carnaby III Holdings" and together with Carnaby II Holdings, "Holdings"), commenced these chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  Between September 28, 2025 and September 29, 2025, approximately 99 additional debtors, including First Brands Group Holdings, LLC ("FB Holdings"), First Brands Group, LLC ("FBG"), Brake Parts Inc. LLC ("BPI"), Trico Products Corporation ("TPC"), and Trico Technologies Corporation ("TTC") (collectively, the "FBG Debtors"), filed their respective petitions for relief under chapter 11 (each such date, as applicable, the "Petition Date").

5.      The Credit Agreements.  Pursuant to that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement"), Carnaby II, as Borrower, FBG, as Servicer, FB

Holdings and Carnaby II Holdings, as Guarantors, and the Carnaby II Secured Lenders, as Lenders, with GLAS Trust Company LLC, as Administrative Agent, entered into an asset-based revolving loan facility providing for aggregate borrowings of up to $60 million.

6.      Pursuant to that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement" and, together with the Carnaby II Credit Agreement, the "Credit Agreements"), Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby III Holdings, as Guarantors, and the Carnaby III Secured Lenders, as Lenders, with GLAS Trust Company LLC, as Administrative Agent, entered into an asset-based revolving loan facility providing for aggregate borrowings of up to $100 million.  On July 6, 2022, the parties to both Credit Agreements entered into a Cross-Collateralization Agreement, pursuant to which the collateral securing each Credit Agreement also secures the obligations under the other.

7.      The obligations of each borrower and the guarantors under the Credit Agreements are secured by first-priority liens on the applicable collateral (collectively, the "Carnaby II and III Collateral") granted pursuant to certain New York Law-governed pledge and security agreements issued substantially concurrently with the Credit Agreements (the "U.S. Pledge and Security Agreements") and certain Mexican Law-governed floating lien pledge agreements (the "Mexican Floating Lien Pledge Agreements"), in each case, executed substantially contemporaneously with the respective Credit Agreements.  The security interests granted under the U.S. Security Agreements encumber substantially all of the assets of the SPV Debtors and Holdings party thereto and were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  The security interests granted under the Mexican Floating Len Pledge Agreements encumber all inventory of Carnaby II and Carnaby III located in Mexico and were properly registered with the *Registro Único de Garantías Mobiliarias* (the "RUG"), Mexico's national

registry for security interests in personal property governed by Mexico's General Law of Negotiable Instruments and Credit Transactions.

8.      Transaction Framework.  In addition to and in connection with the execution of the Credit Agreements, the SPV Debtors and various FBG Debtors entered into a series of Transaction Documents (as defined in the Credit Agreements) to finance the Debtors' brakes and windshield wiper manufacturing operations in Mexico (collectively, the "Carnaby II and III Inventory Financings").  Under the Carnaby II and III Inventory Financings' structures, Carnaby II and Carnaby III purchased and sold inventory from and to BPI, TPC, and TTC on a recurring basis, which inventory consisted of raw materials, work-in-process, and finished goods (primarily brakes components, for Carnaby II, and windshield wiper components, for Carnaby III) (the "Carnaby Inventory Collateral").  While owned by Carnaby II and Carnaby III, the Carnaby Inventory Collateral is manufactured and finished at certain Debtor-affiliates' maquiladora facilities in Mexico (the "Maquiladoras") pursuant to Manufacturing Agreements between Carnaby II and BPI and Carnaby III and TPC, and TTC, respectively (the "Manufacturing Agreements").  Once converted into finished goods, the Carnaby Inventory Collateral is sold for cash or in kind for new raw materials back to BPI, TPC, and TTC which then resell the finished goods to third party purchasers.

9.      The vast majority of the Carnaby Inventory Collateral is located at facilities in Mexico.

10.     To effect the recurring sales contemplated under the Carnaby II and III Inventory Financings, Carnaby II executed a purchase agreement and a sale agreement with BPI on May 31, 2022, which together provided for the recurring purchase and sale of brake-related inventory assets constituting the materials and products.  Likewise, Carnaby III executed purchase agreements and

sale agreements with each of TPC and TTC on July 6, 2022, which together provided for recurring purchases and sales of wipers-related inventory assets constituting the materials and products.

11.     Purchases and sales of inventory between Carnaby II and BPI commenced on or about May 31, 2022, and continued up until the cessation of the Debtors' brakes manufacturing operations in early 2026 (including during the 20 days before the applicable Petition Date). Purchases and sales of inventory between Carnaby III and TPC and TTC commenced on or about July 6, 2022, and continued up until the cessation of the Debtors' wipers manufacturing operations in early 2026 (including during the 20 days before the applicable Petition Date).

12.     The Stipulation.  Prior to the Petition Date, the FBG Debtors' operations included the sale of Carnaby Inventory Collateral to the FBG Debtors, who would in turn sell the inventory to third parties.  The Debtors sought to continue such operations postpetition, and requested that Carnaby II and III Secured Parties enter into a stipulation allowing them to do so.  On October 2, 2025, this Court entered the Stipulation, which reflected the Debtors' and the Carnaby Secured Parties' negotiated agreement authorizing the FBG Debtors to continue to sell Carnaby Inventory Collateral in exchange for certain protections of the Carnaby Secured Parties' collateral interests.

13.     Each of the Debtors, including all of the FBG Debtors, were parties to the Stipulation, and incurred various obligations thereunder for the benefit of the Carnaby Secured Parties as further described herein, including, without limitation, (a) to pay cash for Carnaby Inventory Collateral, or in the alternative, (b) provide Eligible Customer A/R (as defined below) on which the Carnaby Secured Parties' liens would attach and deposit the proceeds of any collected Eligible Customer A/R into the Adequate Protection Account (as defined below).

14.     Under the Stipulation, Carnaby II and Carnaby III were permitted to continue to sell Carnaby Inventory Collateral to BPI, TPC, and TTC (the "FBG Debtor Purchasers") solely (i)

for payment by the FBG Debtor Purchasers of cash on delivery at Fair Market Value (the "Purchase Price") or (ii) with respect to up to $20 million in the aggregate of Carnaby Inventory Collateral, to the extent the FBG Debtor Purchasers immediately resold such inventory to customers that have a credit rating of at least BB or its equivalent from a nationally recognized credit rating agency ("Eligible Customers") for accounts receivable with a tenor of not longer than 45 days (the "Eligible Customer A/R"). *See* Stipulation ¶ 3. To the extent the FBG Debtor Purchasers paid the Purchase Price in cash, the Stipulation required the cash to be deposited in an account (the "Adequate Protection Account") subject to the Carnaby II and III Secured Parties' liens. *See id.* ¶ 3(b). To the extent the sales were for Eligible Customer A/R, the Court granted the Carnaby Secured Parties (a) a first-priority, automatically perfected lien on all Carnaby Inventory Collateral transferred to each Debtor Purchaser pending resale to a customer; and (b) a first-priority, automatically perfected lien on all Eligible Customer A/R constituting proceeds of any resale by a Debtor Purchaser to Eligible Customers. *See id.* ¶¶ 3(a), 3(c). The Stipulation provided that such Carnaby Inventory Collateral and Eligible Customer A/R could not be subject to any other liens, claims, or encumbrances, including in connection with the DIP Facility, and upon collection of any Eligible Customer A/R, each of the FBG Debtor Purchasers was obligated to immediately deposit cash equal to the Purchase Price in the Adequate Protection Account, with any balance to be remitted to the FBG Debtors. To ensure that the Carnaby Secured Parties were properly informed of (a) the sales for which cash proceeds were required to be deposited in the Adequate Protection Account and (b) the Eligible Customer A/R on which they were granted perfected first priority liens, the Debtors were obligated to provide, among other things, (i) weekly reporting on the transfer of any Carnaby II and III Collateral and related customer sales, including, without limitation, relevant purchase orders, (ii) weekly Borrowing Base Certificates (as defined in the

6

respective Credit Agreements), and (ii) bank statements for all bank accounts at Carnaby II and Carnaby III (the Debtors' obligations under the Stipulation described in this Paragraph 14, the "Debtor Purchase and Sale Obligations").

15.     Under the Stipulation, because the Carnaby Inventory Collateral was to be sold at Fair Market Value for cash or Eligible Customer A/R at Fair Market Value, it was expected that the Carnaby II and III Collateral would increase to a value higher than the book value of such collateral on the Petition Date.  Thus, none of the Debtor Purchase and Sale Obligations were limited by reference to diminution in value of the Carnaby II and III Collateral.  To the extent Carnaby Inventory Collateral was transferred to an FBG Debtor, the Stipulation simply obligated that FBG Debtor to either pay for such inventory in cash at Fair Market Value for the benefit of the Carnaby Secured Parties or to provide the Carnaby Secured Parties with a lien on Eligible Customer A/R.

16.     In addition to the Debtor Purchase and Sale Obligations, which were obligations of all the Debtors, including the FBG Debtors, the Stipulation granted the Carnaby Secured Parties certain adequate protection against diminution of the Carnaby II and III Collateral as against the SPV Debtors in the form of:

(a)     first-priority, automatically perfected liens on the Carnaby II and III Collateral, the Holdings Collateral, and all proceeds thereof;

(b)     additional and replacement automatically perfected first-priority postpetition security interests and liens on all presently owned or thereafter acquired property and assets of the SPV Debtors and Holdings pursuant to sections 361 and 363(e) of the Bankruptcy Code; and

(c)     an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code to the extent of any diminution in value of the Carnaby II and III Secured Parties' interests in the Carnaby II and III Collateral and the Holdings Collateral, with priority over any and all administrative expenses and all other claims against the SPV Debtors now existing or hereafter arising.

7

17.     The Stipulation further provided that termination of the Stipulation shall not affect the validity, amount, or priority of any liens or claims (including superpriority administrative claims) granted to the Carnaby II and III Secured Parties thereunder.

18.     <u>The Debtors Breach the Stipulation</u>.  The Debtors never complied with any the Debtor Purchase and Sale Obligations. While the SPV Debtors continued to transfer Carnaby Inventory Collateral to the FBG Debtors, and the FBG Debtors continued to sell such collateral to third parties, the FBG Debtors never paid any cash proceeds or proceeds of Eligible Customer A/R to the SPV Debtors.  The Debtors never provided any reporting on such transfers or customer sales, leaving the Carnaby Secured Parties unable to identify the assets upon which the Court granted them a first priority lien, and the Debtors did not provide the bank statements or weekly borrowing bases they were obligated to provide under the Stipulation.

19.     The Debtors' continuous material breaches of the Stipulation persisted for over a month.  On November 6, 2026, at the request of and as an accommodation to the Debtors and in order to help address their dwindling liquidity, the Carnaby Secured Parties confirmed on the record that, in addition to cash and Eligible Customer A/R, they would permit payments in-kind for future sales of Carnaby Inventory Collateral between the SPV Debtors and the FBG Debtor Purchasers under the Stipulation.  Tr. Hr'g. 11/6/2025 at 34:9-36:3 (attached hereto as Exhibit A).

20.     Throughout this time, the Debtors never properly reported the shipment of finished goods made from the manufacturing facilities in Mexico, any sale of such goods for cash or accounts receivable (whether Eligible Customer A/R or otherwise), any collections of Eligible Customer A/R, or in-kind sales of finished goods for raw materials.  Nevertheless, the Debtors continued to make sales of Carnaby Inventory Collateral to third parties and to use the proceeds of

such sales to fund their operations and the administrative costs of the Debtors' Chapter 11 Cases (including the cases of the FBG Debtors).

21.     The Debtors eventually acknowledged that, despite their obligations under the Stipulation to do so, they could not provide adequate protection for the Carnaby II and III Secured Parties, and agreed that from and after January 16, 2026, they would no longer make sales of Carnaby Inventory Collateral without the Carnaby Secured Parties' consent.

## BASIS FOR RELIEF

### I.     Administrative Claim for Breach of Stipulation.

22.     Section 503(b)(1)(A) of the Bankruptcy Code provides administrative priority for the "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A). Section 507(a)(2) grants administrative expense status priority to claims allowed under section 503(b).  11 U.S.C. § 507(a)(2).

23.     In the Fifth Circuit, "[t]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate."  *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019). Section 503's purpose is "to encourage third parties to provide necessary services to the debtor-in-possession so that it can continue to conduct its business, thus generating funds from which prepetition creditors can be paid."  *In re Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992).

24.     A creditor establishes a prima facie case for an administrative expense claim under section 503(b)(1)(A) by showing that the expense (1) arises from a transaction with the bankruptcy estate and (2) benefitted the estate.  *In re Marquez Constr. & Maint., LLC*, 675 B.R. 341, 347

9

(Bankr. W.D. Tex. 2025) (citing *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 441 (5th Cir. 2019)).

26. Where a debtor-in-possession enters into a contract after the commencement of a chapter 11 case, the creditor counterparty generally satisfies the Fifth Circuit's standards for establishing that claims for related expenses are attributable to the actions of the bankruptcy estate. *See In re Marquez Constr. & Maint., LLC*, 675 B.R. 341, 347 (Bankr. W.D. Tex. 2025) (standard set forth in *In re Whistler* met where rental agreement was entered into on request of the Debtor, as debtor in possession, after the petition date). The Stipulation is a postpetition contract. Under New York law (which is the law that governs the Credit Agreements), "[a] so-ordered stipulation is a contract between the parties thereto and as such, is binding on them and will be construed in accordance with contract principles and the parties' intent." *Xie v. Chen*, 247 A.D.3d 1242, 1243, 253 N.Y.S.3d 305, 306 (2026) (internal citations omitted) (enforcing so-ordered stipulation to produce tax returns pursuant to contract principles). The Fifth Circuit has similarly held that "[a] consent decree is akin to a contract yet also functions as an enforceable judicial order," and that "[g]eneral principles of contract interpretation govern the interpretation of a consent decree." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998) (enforcing plain terms of consent decree under which party thereto assumed responsibility for certain oversight costs); *see also In re Bourbon Saloon, Inc.*, 647 F. App'x 342, 347 (5th Cir. 2016) (applying *Chromalloy Am. Corp.* in the context of a chapter 11 debtor's postpetition agreed order resolving a motion to assume or reject a lease).

26. The Stipulation was the result of a negotiation between the Carnaby Secured Parties and the Debtors, was entered into postpetition at the Debtors' request, and the payment obligations thereunder arose post-petition through actions of the Debtors' estates. Thus, the FBG

Administrative Claim arises from a post-petition transaction with the Debtors estates, and meets the first requirement for an allowable administrative expense claim.

27.     With respect to the second requirement, by providing the FBG Debtors access to the Carnaby Inventory Collateral to be sold to third parties under the Stipulation, the Carnaby Secured Lenders allowed the FBG Debtors to continue operating and earning revenue, which clearly provided a benefit to those Debtors' estates.  Moreover, merely by entering into the Stipulation, the FBG Debtors "indicated that [they] believed that [it was] necessary to [their] operations and thus beneficial to [their] reorganization efforts." *In re Marquez Constr. & Maint., LLC*, 675 B.R. at 348.  The FBG Debtors accepted those benefits, but for at least the first month that the Stipulation was in effect, performed none of the obligations that the Court ordered they perform in exchange for those benefits.  Further, even after the Stipulation was amended on the record to permit payments in-kind for sales of Carnaby Inventory Collateral between the SPV Debtors and the FBG Debtor Purchasers occurring after November 6, 2025, any raw materials transferred to the SPV Debtors were not, as required under the Stipulation, of a value equal the Fair Market Value of the Carnaby Inventory Collateral transferred to them.

28.     As the FBG Debtors enjoyed all the benefits of the post-petition Stipulation, but materially breached their obligations under it, the Carnaby Secured Parties have an allowed administrative expense claim under section 503(b)(1)(A) for, among other things, (i) the FBG Debtor Purchasers' failure to deposit required cash Purchase Price proceeds (including proceeds of Eligible Customer A/R) into the Adequate Protection Account in exchange for the transfer of Carnaby Inventory Collateral to the FBG Debtor Purchasers prior to November 6, 2026, (ii) with respect to all Carnaby Inventory Collateral transferred to the FBG Debtor Purchasers after November 6, 2026, the failure to deposit required cash into the Adequate Protection Account in

11

the amount of the difference between (x) the value of any raw materials transferred to the SPV Debtors in exchange for such Carnaby Inventory Collateral and (y) the Purchase Price of such Carnaby Inventory Collateral, (iii) the FBG Debtors' failure to identify and make available to the Carnaby Secured Parties all Eligible Customer A/R received by the FBG Debtors from Eligible Customers in exchange for sales of Carnaby Inventory Collateral, and (iv) any sales of Carnaby Inventory Collateral to customers that are not Eligible Customers or for consideration that was not cash or Eligible Customer A/R (the "FBG Administrative Claim").  The Carnaby Secured Parties assert the FBG Administrative Claim against all of the FBG Debtors, and the claim is secured by first-priority, exclusive, automatically perfected liens granted under the Stipulation against: (i) all Carnaby Inventory Collateral transferred to any FBG Debtor Purchaser pending resale; and (ii) all Eligible Customer A/R constituting proceeds of resales by any FBG Debtor Purchaser to any Eligible Customers.

29.     Because the Debtors—not the Carnaby Secured Parties—maintain sole possession of the books and records necessary to confirm the precise amount of the administrative expense due and have not provided those records to the Carnaby Secured Parties as required under the Stipulation, the precise amount of the FBG Administrative Claim remains unknown to the Carnaby Secured Parties.  The Carnaby Secured Parties do, however, have access to the Debtors' aggregate postpetition sales data broken down by category of product, as well as prepetition trial balances with historical data showing sales of products originating from the Maquiladora locations associated with the Carnaby Secured Parties' loan facilities.  From the prepetition data, the Carnaby Secured Parties calculated the percentages of the Debtors' aggregate sales of windshield wiper and brake parts over the six-month period preceding the Petition Date.  Applying those percentages to the aggregate pospsetition wiper and brake part sales, the Carnaby Secured Lenders

estimate that the FBG Administrative Claim is approximately $60.7 million ($24.5 million for the period from October 2, 2025 through November 7, 2025 and $36.2 million for the period from November 8, 2025 through January 16, 2026) *minus* the liquidation value of any raw materials transferred to the SPV Debtors during the period from which such transfers became allowed under the Stipulation (November 8, 2025) through the Debtors' shutdown of operations at the Maquiladoras (January 16, 2026).

**II.     507(b) Superpriority Administrative Expense Claim.**

30.     In addition to the FBG Administrative Claim, the Carnaby Secured Parties also have administrative expense claims for diminution of their interests in the Carnaby II and III Collateral.  Section 507(b) of the Bankruptcy Code provides that where adequate protection has been granted to a secured creditor and such protection proves insufficient, the secured creditor is entitled to a superpriority administrative expense claim with priority over all other administrative expenses.  11 U.S.C. § 507(b); *see also In re Scopac*, 624 F.3d 274, 282 (5th Cir. 2010) (Section 507(b) of the Bankruptcy Code allows an administrative expense claim under § 503(b) where adequate protection payments prove insufficient to compensate a secured creditor for the diminution in the value of its collateral.).  Under the Stipulation, the Court granted the Carnaby II and III Secured Parties an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "507(b) Claim") to the extent of any diminution in value of the Carnaby Secured Parties' interests in the Carnaby II and III Collateral and the Holdings Collateral, with priority over all other administrative expenses and claims against the SPV Debtors and Holdings.  *See* Stipulation ¶ 4.  In other words, the 507(b) Claim has already been expressly allowed by the Court to the extent of any postpetition diminution in the value of the Carnaby Secured Parties' interests in the Carnaby II and III Collateral.

31.	The value of the Carnaby II and III Collateral, and thus the Carnaby Secured Parties' interests therein, diminished during the cases.  Where a secured creditor's collateral is eventually liquidated, courts have found that it is appropriate for diminution purposes to compare the petition date value of the collateral with the value on the date of sale.  *In re Bailey Tool & Mfg. Co.*, No. 16-30503-BJH, 2018 WL 550581, at *4 (Bankr. N.D. Tex. Jan. 23, 2018).  With respect to determining the Petition Date value of the Carnaby II and III Collateral, "the proposed disposition or use of collateral is of paramount importance to a valuation."  *See In re Diamond Beach VP, LP*, 506 B.R. 701, 715 (Bankr. S.D. Tex. 2014), aff'd, 551 B.R. 590 (S.D. Tex. 2016) (citing *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 954 (1997) and *In re Peerman,* 109 B.R. 718, 721 (Bankr.W.D.Tex.1989)).  As of the Petition Date, the Debtors intended to use the Carnaby II and III Collateral to "stabilize their operations, pursue and implement a value-maximizing transaction, and … position the Company for long-term growth and success." *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [ECF No. 22] at ¶ 17.  In addition, Mr. Moore stated that "[n]ot only will the significant size of the DIP allow the Company to optimize operations, fill customer orders, and operate in the ordinary course, but it reinforces the potential go-forward value of the Company." *Id*.  Thus, it is clear that the Debtors' proposed disposition or use of the Carnaby II and III Collateral was to continue its use in operations in furtherance of either a chapter 11 reorganization or a going concern sale of the Debtors.

32.	In light of the above, the appropriate valuation for purposes of valuing the Carnaby II and III Collateral as of the Petition Date is going concern value or, at a minimum, book value. According to the Debtors' perpetual inventory reporting closest in time to the Petition Date (September 30, 2025), the book value of the Carnaby II and III Collateral (which was confirmed to be present and accounted for at the Maquiladora locations through multiple site visits conducted

by the Carnaby Secured Lenders' agent) was $240.5 million, which secured the Carnaby Secured Parties' secured claim of no less than $160,717,187.33.

33.     In late January, 2026, the Debtors, in consultation with the Carnaby Secured Lenders, the Debtors began selling certain of the Carnaby II and III Collateral to original equipment manufacturers and depositing those proceeds in a collateral account.  Pursuant to the *Agreed Order (I) Granting Carnaby Secured Lenders' Motion for Relief from the Automatic Stay, and (II) Withdrawing Without Prejudice the Carnaby Secured Lenders' Motion to Dismiss* [ECF No. 2840], the Carnaby Secured Lenders have been authorized to liquidate the remaining Carnaby II and III Collateral, but no additional proceeds of liquidation of Carnaby II and III Collateral have yet been realized.  As of the date hereof, the net proceeds of the sale of Carnaby II and III Collateral are approximately $15,795,390.  The amount of additional proceeds that may be realized from the liquidation process is uncertain.  Accordingly, the Carnaby Secured Parties assert a 507(b) Claim against the SPV Debtors in the amount of up to $144,921,797.33.

**RESERVATION OF RIGHTS**

34.     The Administrative Agent expressly reserves all rights with respect to this Application and under applicable law, including, but not limited to, the right to amend, supplement, or modify this Application at any time prior to the Court's determination of the Application, to quantify the amounts of the Administrative Claims asserted herein as further information becomes available, to file additional papers with this Court as circumstances may warrant, and to assert any and all other claims, rights, and remedies at law or in equity that the Administrative Agent[3] has or

---

[3]     As set forth above, purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022, and continued up until and after the applicable Petition Date, including during the 20-day period preceding such date.  Similarly, purchases and sales of inventory between Carnaby III and Trico (TPC and TTC) occurred beginning on or about July 6, 2022, and continued up until and after the applicable Petition Date, including during the 20-day period preceding such date.  These transactions were conducted pursuant to the Purchase Agreements and Sale Agreements.  To the extent BPI and Trico received inventory from Carnaby II and Carnaby III, respectively, during the 20-day period preceding the applicable Petition Date and Carnaby II and

may have against the FBG Debtors, the SPV Debtors, and any other party.  Nothing herein shall be deemed a waiver of any right, claim, or argument not expressly raised herein.

## NO PRIOR REQUEST

35.   No prior request for the relief sought in this Application has been made to this or any other court.

WHEREFORE, GLAS Trust Company LLC, as Administrative Agent for the Carnaby II and III Secured Lenders, respectfully requests that this Court enter an order, (i) allowing the Administrative Claims asserted herein as administrative expense claims under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code; (ii) directing payment of such Administrative Claims in accordance with the priority afforded by the Bankruptcy Code and the Stipulation; and (iii) granting such other and further relief as is just and proper.

[*Remainder of Page Left Intentionally Blank*]

---

Carnaby III did not receive payment equal to the fair value of such inventory from BPI and Trico, the SPV Debtors are entitled to administrative expense priority for such amounts under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Since the Carnaby Secured Parties have liens on those claims, any proceeds received by the SPV Debtors on account of the 503(b)(9) Claims should be promptly paid over to the Carnaby Secured Parties.  To the extent the SPV Debtors do not assert the 503(b)(9) Claims, the Carnaby Secured Parties reserve the right to assert them on the SPV Debtors' behalf under section 501 of the Bankruptcy Code and Rule 3001 of the Federal Rules of Bankruptcy Procedure.

Dated: July 23, 2026
Houston, Texas

Respectfully submitted,


*/s/ Allan S. Brilliant*

Allan S. Brilliant (admitted *pro hac vice*)
Gary J. Mennitt (admitted *pro hac vice*)
Stephen M. Wolpert (admitted *pro hac vice*)
Eric O. Hilmo (admitted *pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Email:  allan.brilliant@dechert.com
         gary.mennitt@dechert.com
         stephen.wolpert@dechert.com
         eric.hilmo@dechert.com

       -and-

John F. Higgins (TX Bar No. 09597500)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email:  jhiggins@porterhedges.com
         myoung-john@porterhedges.com
         jkeefe@porterhedges.com


*Counsel to the Carnaby II and III Secured Lenders*

17

## Certificate of Service

I certify that on July 23, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*

John F. Higgins