# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

)  CASE NO: 25-90399-cml
)
FIRST BRANDS GROUP, LLC        )  Houston, Texas
AND OFFICIAL COMMITTEE OF      )
UNSECURED CREDITORS,           )  Thursday, November 6, 2025
)
Debtors.       )  9:03 a.m. to 3:35 p.m.
-----------------------------)


HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For  First Brands Group,  MATTHEW BARR
LLC:                       SUNNY SINGH
CLIFFORD WILLIAM CARLSON
ROBERT S. BEREZIN
JESSICA LYNN FALK
Weil Gotshal and Manges
700 Louisiana Street
Houston, TX 77002

For Official Committee     IAN ROSS PHILLIPS
of Unsecured Creditors:    Cole Schotz P.C.
901 Main Street
Dallas, TX 75202

For U.S. Trustee:          JAYSON B. RUFF
Office of the United States Trustee
515 Rusk Street
Houston, TX 77002

For Ad Hoc Prepetition     SCOTT J. GREENBERG
Lenders and the DIP        JASON ZACHERY GOLDSTEIN
Lenders:                   ANNELYSE SCARLETT GAINS
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166

For Committee:          JEFFREY L. JONAS
                        MICHAEL WINOGRAD
                        HAYDEN A. MILLER
                        Brown Rudnick
                        Address 1
                        City, State Zip

For Katsumi Servicing,  CHARLES STEPHEN KELLEY
LLC:                    RICHARD A. STIEGLITZ
                        SEAN T. SCOTT
                        KYLE J. TUMSUDEN
                        Mayer Brown LLP
                        700 Louisiana Street
                        Houston, TX 77002

For Onset Financial,    BENJAMIN BUTTERFIELD
Inc.:                   BRYAN KOTLIAR
                        ANTHONY S. FIOTTO
                        JULIA KOCH
                        Morrison Foerster LLP
                        250 W. 55th Street
                        New York, NY 10019

For Carnaby Secured     ALLAN S. BRILLIANT
Lenders:                GARY J. MENNITT
                        STEPHEN M. WOLPERT
                        Dechert LLP
                        1095 Avenue of the Americas
                        New York, NY 10036

                        MEGAN N. YOUNG-JOHN
                        Porter Hedges LLP
                        1000 Main Street
                        Houston, TX 77002

For Aequum Capital      KENNETH J. OTTAVIANO
Financial II LLC:       Blank Rome LLP
                        1201 N. Market Street
                        Wilmington, DE 19801

For UMB Bank, N.A.:     STEPHEN MARK BLANK
                        Alston Bird
                        90 Park Avenue
                        New York, NY 10016

| | |
|---|---|
| For Bank of America, N.A.: | DANIEL J. MCGUIRE<br>AMILA GOLIC<br>Winston & Strawn LLP<br>800 Capitol Street<br>Houston, TX 77002 |
| For Leucadia Asset Management, LLC: | EMIL A. KLEINHAUS<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019 |
| | PAUL E. HEATH<br>Vinson & Elkins<br>845 Texas Avenue<br>Houston, TX 77002 |
| For Raistone Capital, LLC: | LAURA D. METZGER<br>NICHOLAS J. SABATINO<br>EMANUEL GRILLO<br>Orrick Herrington & Sutcliffe LLP<br>51 West 52nd Street<br>New York, NY 10019 |
| For ING Bank: | DOUGLAS DEUTSCH<br>Clifford Chance<br>375 9th Avenue<br>New York, NY 10001 |
| For Evolution Credit Partners: | VINCENT INDELICATO<br>CHARLES A. DALE<br>MATTHEW R. KOCH<br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036 |
| | JASON S. BROOKNER<br>Gray Reed & McGraw LLP<br>1601 Elm Street<br>Dallas, TX 75201 |
| For FactoFrance: | CASEY WILLIAM DOHERTY, JR.<br>Dentons US LLP<br>1300 Post Oak Blvd.<br>Houston, TX 77056 |
| For LBA RV Company XVII, LP: | IVAN M. GOLD<br>Allen Matkins<br>3 Embarcadero Center<br>San Francisco, CA 94111 |

| For US Bank National Association: | SCOTT F. GAUTIER<br>Faegre Drinker Biddle & Reath LLP<br>1800 Century Park East<br>Los Angeles, CA 90067 |
|---|---|
| For RLI Insurance Company: | ALANA L. PORRAZZO<br>Jennings Haug Cunningham LLP<br>2800 N Central Avenue<br>Phoenix, AZ 85004 |
| Court Reporter: | UNKNOWN |
| Courtroom Deputy: | UNKNOWN |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|

HOUSTON, TEXAS; THURSDAY, NOVEMBER 6, 2025; 9:03 AM

(Call to Order)

THE COURT:  Okay.  Good morning, everyone.  This is Judge Lopez.  I'm going to turn on my camera.  Today is November 6th.  I'm going to call the 9 o'clock docket.  If folks can just, please simmer down.

I'm going to call the 9 o'clock docket, 25-90399, First Brands Group.  We're in second day hearings.  I'm turning my camera on.  And I'll take -- why don't I take appearances in the courtroom, and then there may be some folks on the line who wish to make appearances, I'll give you that opportunity to do so now.  And we'll see where we go from here.

MR. BARR:  Good morning, Your Honor.  Matthew Barr of Weil Gotshal & Manges on behalf of the Debtors.  With me in the courtroom I have Mr. Sunny Singh, Mr. Cliff Carlson, Rob Berezin, and Jessica Falk, among others.  And thank you for your time this morning.

THE COURT:  Thank you.  Good morning. Mr. Ruff, good to see you.

MR. RUFF:  Good morning, Your Honor.  Jayson Ruff for the U.S. Trustee.

MR. PHILLIPS:  Good morning, Your Honor.  Ian Ross Phillips of Cole Schotz P.C. on behalf of the Unsecured Creditors Committee.

THE COURT:  Very nice to meet you.  Welcome.

MR. GREENBERG:  Good morning, Your Honor.  Scott Greenberg, Gibson Dunn & Crutcher on behalf of the Ad Hoc Prepetition Lenders and the DIP Lenders.  And I'm joined in the courtroom by my partners, Jason Goldstein, AnnElyse Gains, and others.

THE COURT:  Okay.

MR. GREENBERG:  Thank you, Your Honor.

MR. JONAS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. JONAS:  Jeff Jonas from Brown Rudnick.  You'll also be hearing -- for the Committee.  You'll also be hearing from Mike Winograd and Hayden Miller today.  Thank you.

THE COURT:  Good morning.

MR. KELLEY:  Good morning, Judge.  How are you?

THE COURT:  Good.

MR. KELLEY:  Charles Kelley from Mayer Brown on behalf of Katsumi Servicing.  I'm joined in the courtroom with my partner, Rich Stieglitz and on the video, Sean Scott, whom you probably saw yesterday, in yesterday's first day, and Kyle TumSuden.

THE COURT:  Perfect.  Thank you.

MR. BUTTERFIELD:  Good morning, Your Honor.  Ben Butterfield of Morrison & Foerster for Onset Financial.  I'm

joined here by my colleagues, Bryan Kotliar, Tony Fiotto, and Julia Koch.

THE COURT:  Good morning.

MR. BUTTERFIELD:  Thank you, Your Honor.

MR. BRILLIANT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BRILLIANT:  Allen Brilliant from Dechert LLP on behalf of the Carnaby Secured Lenders.  I'm here with my partner, Gary Mennitt, and colleague, Stephen Wolpert, in the courtroom as well as our local counsel at Porter Hedges, Megan Young-John.

THE COURT:  Good morning.  I see you there.  Good morning, Ms. John.

MR. OTTAVIANO:  Good morning, Your Honor.  Kenneth Ottaviano, Blank Rome LLP, on behalf of one of the SPV lenders, Aequum Capital Financial II LLC.

THE COURT:  Good morning.

MR. BLANK:  Good morning, Judge.  Steve Blank from Alston & Bird on behalf of UMB as agent for the lenders under the facility by Debtors, Global Assets LLC, and Global Assets GMBH.  I'm joined by some of my colleagues on the line, and my declarant is in the audience today, who is also Mr. Ottaviano's declarant as well.

THE COURT:  Good morning.  Good morning, good to see you.

MR. MCGUIRE:  Good morning, Your Honor.  Dan McGuire from Winston & Strawn on behalf of Bank of America as ABL agent.  I'm here with my colleague, Amila Golic.

THE COURT:  All right.  Good morning.

MR. KLEINHAUS:  Good morning, Your Honor.  Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz.  I'm here on behalf of Leucadia Asset Management LLC, which is an affiliate of Jeffries Group and Associated Funds.  I'm here with Paul Heath from Vinson & Elkins.

THE COURT:  Good morning.

MS. METZGER:  Good morning, Your Honor.  Laura Metzger from Orrick, Herrington & Sutcliffe on behalf of Raistone Purchasing LLC Series XXXII and Raistone Purchasing LLC Series XXXVIII.  I'm joined here by my colleague, Nick Sabatino, as well as my partner on the line, Emanuel Grillo.

THE COURT:  Good morning.

MS. METZGER:  Good morning.

THE COURT:  Good to see you again.

MS. METZGER:  Good to see you.

MR. DEUTSCH:  Good morning, Your Honor.  Doug Deutsch from Clifford Chance on behalf of ING Bank.  We're one of the factors.

THE COURT:  Good morning.

MR. INDELICATO:  Your Honor, good morning.  For the record, Vincent Indelicato, Proskauer Rose LLP on behalf

of Evolution Credit Partners.  With me today in the courtroom, my partners Chad Dale and Matt Koch and co-counsel from the Gray Reed firm, Jason Brookner.

THE COURT:  Good morning.

MR. DOHERTY:  Good morning, Your Honor.  Casey Doherty, Dentons US LLP, representing FactoFrance SA.  We're a factoring purchaser.

THE COURT:  Good to see you, Mr. Doherty.

MR. DOHERTY:  Good to see you.

MR. GOLD:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GOLD:  Ivan Gold of Allen Matkins for LBA RV Company XVII LP.

THE COURT:  Good morning.

MR. GOLD:  Good to see you.

THE COURT:  Okay.  Let me turn to the phone line. Anyone wish to make an appearance on the line?  There's one line at a 310 number.

MR. GAUTIER:  Your Honor, this is Scott Gautier with the law firm of Gaegre Drinker Biddle & Reath.  I would advise the Court my Pro Hoc Vice application, that has been filed but has not yet been approved.  We represent the U.S. Bank.

THE COURT:  Perfect.  Good morning.  And you're more than welcome to appear today.  And anyone else who has

a pending Pro Hoc, we'll get to it.  We've been working through them.  But you're more than welcome to appear for purposes of today.  We'll get to it.  Thank you.

MR. GAUTIER:  Thank you, Your Honor.  I'm not sure how to mute this again.

THE COURT:  Oh, you just mute yourself, just kind of on yourself, on your own.

MR. GAUTIER:  Thank you.

THE COURT:  You got it.  Anyone else?  One more line and I'll turn to the Debtors, a 303 number.

MS. PORRAZZO:  Good morning, Your Honor.  Alana Porrazzo of the law firm Jennings Haug Keleher McLeod Waterfall, on behalf of surety creditor, RLI Insurance Company.

THE COURT:  Okay.  Good morning.  Okay.

MR. BARR:  Good morning again, Your Honor.  Matthew Barr of Weil Gotshal.

THE COURT:  Good morning.

MR. BARR:  After all those intros, Your Honor, I have a request for a short adjournment.  We have a number of proposals out to a number of parties to resolve some of the open objections.  We've been able to resolve a lot of them.  And we think another 30 minutes would be helpful.

If we can't resolve it in the 30 minutes, we will be prepared to move forward, Your Honor.

THE COURT:  All right.

MR. BARR:  There's one other question.

THE COURT:  Go ahead.

MR. BARR:  You may have seen last night in connection with our adversary proceeding in the temporary restraining order, we filed a stipulation with the Defendants.

Your Honor, we would ask, if possible, that you consider that only because of the timing, we, the Debtors, have consented to certain payments being made to make sure that those operations can continue.  And that's a consensual stip that we filed on the docket.

THE COURT:  I did see it.  If parties are okay with me doing it now, I'll sign it right now.  I think it made a lot of sense.  I got a chance to read it.  I'll get it signed and on the docket during the break.  We'll take a 30-minute break.

And I know there was also a request if parties can bring in chairs.  And if you can find one, you're good. I've got no issues.  The only request is just remember where you got it because it would be me trying to put it back. And it's easier if you kind of find it and put it back wherever you are.  Okay.  We'll take a 30-minute break. Thank you.

(Recess)

THE COURT:  Okay.  Good morning.  Back on the record in First Brands.  Mr. Singh, any update?

MR. SINGH:  Good morning, Your Honor.  Sunny Singh, Weil Gotshal, proposed counsel to the Debtors.  Your Honor, parties are still in conference rooms and in the hallways trying to see if we can get this settlement done. We'd respectfully request another brief adjournment to a 10:00 a.m. start time, if that's acceptable to Your Honor.

THE COURT:  Okay.  Another 20 minutes?

MR. SINGH:  Yeah, another 20 minutes would be much appreciated.

THE COURT:  Okay.  I'll give everyone another 20 minutes.  There are a number of folks on the line.  I just wanted to make sure that they knew as well.

MR. SINGH:  Appreciate it.

THE COURT:   So, I will step back off and I'll come back on at 10:00 a.m.  Thank you.

MR. SINGH:  Thank you, Your Honor.

(Recess)

THE COURT:  Okay.  This is Judge Lopez.  Today is November 6th.  We're back on the record in Case Number 25-90399, First Brands Group.  Mr. Barr, good morning.

MR. BARR:  Good morning.  Matthew Barr of Weil Gotshal.  Your Honor, can you please tell us we have one 15-minutes left and then we're getting on the record, and we

will start?

THE COURT:  Oh, I can promise you that one.

MR. BARR:  I appreciate that.

THE COURT:  I promise.  We'll take another 15-minute break --

MR. BARR:  We will be ready --

THE COURT:  -- and then we will start with openings, no question about it.  Thank you.

MR. BARR:  Appreciate it, Your Honor.  Apologize.

THE COURT:  No worries.

(Recess)

THE COURT:  Okay.  Good morning, this is Judge Lopez.  We're back on the record in First Brands, case number 25-90399.  I'll just make sure everything is on.  Mr. Barr, any update?

MR. BARR:  Yes.  Thank you, Your Honor.  Matt Barr on behalf of the Debtors.  Your Honor, we would like to start.  I would like to give you an update on the last 36 days of the case.  And then, Mr. Singh will take the podium and give you an update on where we stand with respect to the proposed settlements that we've been continuing to negotiate.

THE COURT:  Okay.

MR. BARR:  We're not there yet on one very large, proposed settlement, but we understand that they are talking

to their clients.

THE COURT:  Okay.

MR. BARR:  So it could be that after we start to update you, somebody waves and says, "Wait a second."

THE COURT:  Okay.

MR. BARR:  Which we think is in the best interest of everybody, Your Honor.  But we could get started now if that's okay.

THE COURT:  Okay.

MR. BARR:  Thank you, Your Honor.  So as I mentioned, I'll give you an update on a report on the 36 days since the first day hearing.

First, stabilizing the business.  The Debtors and their advisors have focused on stabilizing the business and learning as much as they could about the operations of the business.  Mr. Moore and his team have met and continue to meet with employees, held numerous town halls.  We've set up communication protocols and hotlines for employees to ask questions or provide information.

Mr. Moore and his team also send out weekly updates to employees, which have been very well received.  The appointment of A&M as CEO, CFO, and co-CROs has been helpful to build the confidence we needed with the employee base as they recognize the great products this company's -- this company has, irrespective of the noise around the

business in these cases.

The Debtors are finalizing the terms of a key employee retention program, which we will present to Your Honor in due course.  Mr. Moore and his team have met with over 20 of our major customers, in person or by phone, and is in regular contact with major customers, suppliers, and vendors.  We have established working groups with some of our major customers to address open issues, and identify ways to improve product flow.  The patience, support, and understanding expressed by our customers has frankly been overwhelming.

Mr. Moore and his team have implemented a vendor strategy program and negotiated trade agreements to ensure continued receipt of goods, services, and payments.  The team is assessing the businesses, both in the United States and abroad, to ensure we allocate sufficient and appropriate resources to the businesses that are valuable or potentially valuable and assessing whether businesses should be sold, sooner rather than later, or shut down.  This, of course, is a fluid and ongoing process, Your Honor.

Mr. Moore and his team have participated in this week's major industry trade show AAPEX, wearing the First Brands' logo literally on their chest and on their sleeve.  Reminding folks about our products and that we still have great products and are open for business.  The business is

operating and filling orders and taking new orders.

It's taking longer than we all would have hoped to refill the pipeline with inventory.  But progress is being made and we project to have more inventory by the end of this month than we did in October.  The Debtors' current expectation is to complete a detailed review of the businesses and produce a long-term business plan by January 31st of 2026.

Corporate changes.  Legacy management has been largely changed.  Patrick James resigned from all executive and board positions of the Debtors shortly after the petition date.  Mr. Moore was appointed interim CEO.  The CFO agreed to retire and was replaced by (indiscernible) from A&M on an interim basis.  The vice president of finance was terminated from all positions and others in the organization have been identified to assist and are working with the team.

Mr. Jerkovic and Mr. Malhotra, both of A&M, were appointed co-CROs.  The executive team is now A&M and some internal folks, not the legacy executive team, Your Honor.

What did we have as of the petition date?   The team has focused on figuring out what businesses, inventory, raw material, equipment, et cetera, existed as of the petition date and every day.  The team has conducted significant diligence on mapping the many businesses that

make up this enterprise and which entities own which assets, share certain assets, or are dependent on one another to operate their businesses, whether the United States or abroad, and whether they're a Debtor or a non-debtor foreign entity.  This is ongoing as well.

Hilco, among others, is assisting the Debtors with these efforts including inventory, machinery, and equipment appraisals.  Some of our financing parties have been extremely helpful in providing information and paperwork to assist us in figuring out what they believed they had as of the petition date, and who potentially has claims against those assets.  And we thank them and continue to thank them for their efforts.

With respect to factoring, the Debtors have made significant progress understanding the company's historic factoring practices and reconciling receipts. Unfortunately, as reported in Mr. Moore's declarations, we have uncovered significant issues with respect to those programs.  We are in a process of working with the factor and counterparties to collect data, reconcile receipts, develop a transparent process, which you will hear about more today to unlock these funds and distribute them to their rightful owners.

There is still work to be done, but a large part of progressing was getting a basic understanding of how

these programs actually worked.  And again, many of the factoring parties have been extremely helpful in help -- in getting us the information necessary, and we thank them as well.

Many of our employees have been essential in helping us figure out the true operations of our businesses.  All of this is still ongoing.  We have a lot more to do, but we now in 36 days have a great base knowledge of our businesses, our operations, and our assets, and people's relative -- we're trying to sort out people's relative rights with respect to those.

We understand and appreciate parties' concerns and frustrations, and are trying our best to be as transparent as possible as we sort through which assets and liabilities and which parties have rights against them.  We will figure it out and all parties' rights and claims are of course reserved.

With respect to the investigation, the special Committee and the advisors have made substantial progress in connection with the investigation.  The scope of the investigation to date includes, among other things, off-balance-sheet financing practices, and arrangements, including accounts receivable factoring practices; pre-petition financing transactions; related party transactions, including among sister companies owned by Mr. James; and

transfers to insiders.

The Debtors have entered into a common interest agreement and protective order with the official Committee of unsecured creditors, and are cooperating with its advisors and coordinating with its advisors in connection with the investigation.

The team has taken substantial steps to advance the investigation and to preserve critical information, including collecting more than 7 million documents, conducting interviews with current and former employees, drafting and serving 2004 examinations and deposition notices, pursuing bank account records from more than 600 banks, collecting electronic devices and imaging them including computers, cell phones, et cetera, placed numerous litigation holds on current and former employees, disabled the company's two-year auto-delete policy, and established a whistle-blowing hotline.

The company is also shoring up financials, historic financials.  The Debtors are in the process of engaging advisors to perform a quality of earnings report and audit past financial information.  A&M is working to review historic financials as well.

As Your Honor knows, the Debtors commenced an adversary proceeding against Mr. James and other defendants on November 3rd, as a result of the investigation performed

to date and obtained a temporary restraining order to protect against the dissipation of assets.  The Debtors have been and will continue to cooperate with the government and governmental agencies in connection with their investigation.

Non-debtor Rest of World.  The Rest of World consists of eight distinct business units that are not currently in Chapter 11, Your Honor.  The Debtors are experiencing various levels of financial -- operational distress and financial distress.  And the advisors are working with stakeholders to analyze what options these particular businesses and non-debtor entities have.

Two of the businesses, in particular, are subject to creditor agreements, the Ultanon (indiscernible), with Santander and Horizon with UBS.  We currently have forbearance agreements in place with those lenders, and the companies are in discussions with those lenders for further funding support as we try to figure out what to do with those businesses.  Certain other businesses, Plastics and Trico, have received funding through the DIP financing, approximately $5.3 million, to meet short-term operational liquidity needs while options for those businesses are discussed.

Unfortunately, no further funding or strategic investor could be identified for the plastics business.  And

on November 3rd, the plastics business filed an insolvency proceeding in Germany.  An independent administrator has been appointed for that non-debtor entity, and we will be working with them to figure out potential restructuring options for the plastics business.

THE COURT:  What was the name of that entity?

MR. BARR:  It's the plastics business.  We can get you the -- and it's a non-debtor foreign entity.

THE COURT:  Okay.

MR. BARR:  The company continues to assess the options available to these business units, and it's possible that we'll have to file other local insolvency proceedings throughout the world.  The Debtors have communicated in our constant communication with our key stakeholders, the creditors Committee, the DIP lenders, the factoring parties, and we will continue to do that and be as transparent as possible as we try to figure this out.

THE COURT:  Thank you.

MR. BARR:  So unless Your Honor has any questions for me.

THE COURT:  No.  No questions at this time.

MR. BARR:  Thank you, Your Honor.

THE COURT:  I will make a small announcement that I am working hard to get AC down for everyone.  Feel free to loosen ties and all that stuff, it's -- while you proceed.

Thank you.  Mr. Singh?

MR. SINGH:  Good morning, Your Honor.  Sunny Singh, Weil, Gotshal, proposed counsel to the Debtors.  Your Honor, you'll have to indulge me a little bit I have a whole script here and points but parties are literally in the hallway and talking to their clients about a settlement.  So I am hopeful that I can cross a lot of this out as we go.

But we're going to get started and what I'd like to get started with is some good news that we do have some settlements that I think we can put on the record to make a little bit of progress while others continue in the hallway.  And I am hopeful we'll be able to report on other settlements as well.  If not, then then, you know, I will just proceed with my remarks.

I think, Your Honor, as Mr. Barr said, though, you know we have been very busy over the last 30 or so days.  Trying to stabilize the business, advance the investigation, and work transparently with our stakeholders.  But there's still a lot of open questions and a lot of work that needs to be done.

And as it relates to the DIP, and if we get to the evidence, should we need it, as the evidence will show, many of the key facts are still being investigated, they're still unknown.  And that's the approach -- you know with that background, we took an approach today's final DIP hearing

with that background and with that context.  Much like when I was before you at the first day hearing.

What we're trying to do is get approval of critical relief today the DIP on a final basis, and maintain status quo as we figure out what's going on in some of the facts and the circumstances, that, frankly, need more time and work amongst the parties.

You know, just a few examples of those is Your Honor read a lot about the SPV issues.  There's a lot of work that needs to be done there to get to the bottom of what happened and what rights and claims people have.  There's information issues.  You know we can't just rely, in A&M in particular, on, you know, pre-petition information and protocols and continue business as usual with respect to those types of items.  You know much, if not all, of that has been rebuilt and is continuing to be rebuilt by the A&M team.

Your Honor knows about the number of findings in -- or preliminary findings coming out of the investigation.  Today's not the day for that, but obviously that has a cloud around everything we are doing here and the information that will be put into evidence and will be discussed.

So, Your Honor, to put it mildly, it's a very uncertain situation.  And we're simply not in a position to have, you know, what you would consider or see as a more

traditional final DIP hearing, you know, where we're stipulating to liens and claims and talking about things like challenge periods and carve-outs and leaving it at that. You know, we've got to take a little bit of a different approach here, given the facts and circumstances in which we find ourselves.

So you know our approach today, Your Honor, is two key objectives. One, we have to get the DIP approved. We have to get the DIP approved on a final basis. Whether it's consensual or on a non-consensual basis, it's got to be done. There is a lot at stake here, Judge. As we've said in our papers, and as the evidence will show, the final DIP if it's not approved the company will liquidate. I think we all believe that, the evidence will show that, and we simply don't have the funds to operate. We're talking high stakes, as high as they get, and without the DIP, it's frankly game over, Your Honor.

The DIP lenders, with or without any further settlements, have agreed to a number of significant concessions for the benefit of the Debtors' estates. I will review those. They're in our reply papers, but I do think it's important to highlight for Your Honor. Those are real and material changes for the benefit of the estate. And, you know, we're glad we were able to negotiate those, and they address a lot of the issues that were raised in the

Committee's objections.

You know with those changes, Your Honor, we believe that we have negotiated the best possible DIP from our only source of financing, and we'll demonstrate to you why we think that's fair and reasonable, and complies with all of the legal requirements for the court to grant the relief we are seeking, as modified by the items mentioned in the reply.

Your Honor, Objective Number 2, to maintain the status quo, particularly with respect to our SPV lenders. As the evidence will show, Your Honor, there's a lot of issues there with the SPVs.  It is a difficult and complicated web of transactions that need to be reviewed and addressed.  And really to get to the bottom of a pretty fundamental question, whose collateral is it -- and well, let me take it back.  What is the collateral?   And Step 2, whose collateral it is?   What's the priority?

And while those disputed issues are addressed and resolved, Your Honor, what we've proposed is in our reply an adequate protection package to maintain the status quo.  I will report on a couple of settlements we have there.  But that was our thinking in approaching today.  We're not trying to prejudice the rights of parties to assert their claims to figure all these issues out.

But at the same time we can't stop operating,

right?   We can't shut down the business today and not have access to inventory that's disputed.  Not have access to PP&E that potentially may be disputed.  Because that's going to be value destructive for everybody and then there will be left -- if we're going to fight, there will be much less to fight about.

So Your Honor, that's our approach today.  I think we'd also say that we are also trying to maintain the status quo with respect to the factoring counterparties, right?  There are no liens being granted on any of the Debtors' receipts that constitute factored monies that's traceable, and that actually belongs to one or more of the factors, whether it was through sale or through a senior lien.

But that is the that is the question, right?  How much money should -- actually was factored on a pre-petition basis and belongs to those parties?   We have a declaration in evidence for Mr. Moore.  You know they his team has started to do a lot of that reconciliation.  We've been working transparently with the factoring counterparties to get them information.  They've been very helpful in giving us information to get to that reconciliation.

Unfortunately, as the declaration says, we don't think a lot of that money is actually factored.  A lot of that money is -- and when I say factored, Your Honor, remember, we're talking about third-party factoring vs.

customer.  We're talking about the third party really.  We think a lot of that money at the end of the day is frankly, you know, estate cash that can be used subject to the DIP, subject to, you know, liens and avoidance and cash collateral stipulations.

It's fundamental and critical to have access to that money as part of the DIP, but we're not fighting about that today.  We want to review this process with the factoring counterparties.  We want to get them information about what we did to reconcile all of this information that's been provided.  And then we, frankly, Your Honor, are going to need to file a motion most likely on an emergency basis with you for relief to start using money that we can clearly identify is not factored cash subject to dispute as to -- you know, it's not property of the estate, et cetera.  But anything else, which we think is a significant chunk, we do want access to use.

And we're going to try to work with everybody cooperatively.  We've been telling them that this motion is coming.  We're in the process of drafting it.  We're hopeful it's going to be consensual, and it's going to have procedure so people can kind of take some time to validate the information that we're putting in front of them.

If we can't agree, we'll have to have a disputed hearing.  I really hope that that's not going to be

necessary, but we really need access to this cash, right? It makes the entire DIP model, it makes everything work.

And, Your Honor, the other piece of it is customers are concerned and so they're withholding payments generally, right, which is creating another cash strain on the company. Because they are concerned because they don't know who to pay, right? They've gotten Debtor notices for most, if not all, of the factoring counterparties. And so we're hoping to resolve all of this as part of this motion and hopefully do it on a consensual way.

But today, you know, we are not priming. To the extent it's factored cash, and that's the key, to the extent, right? We're going to figure that out. But if it turns out it is, no DIP liens, no adequate protection liens. We're not priming. We're not doing anything. The money's going to sit there.

And by the way, you know, all receipts that have come in, we've agreed with the factoring counterparties as we did at the interim hearing, we're not spending that until this reconciliation effort happens, and people consent that we can spend it or Your Honor orders that we can spend it, you know, what was it factored.

So Your Honor with that background, that's the approach we took today on status quo. I am pleased to report I can run through a couple of the settlements that we

have with Your Honor.

THE COURT:  Okay.

MR. SINGH:  First, Your Honor, we have a settlement with Evolution.  Evolution is one of our SPV lenders, represented by Proskauer Rose.  We've entered into a stipulation with them, Your Honor, that is, you know, essentially the terms that we describe in our reply brief that we took with respect to all of these counterparties, the SPV counterparty.

So specifically, we're going to keep them flat at the inventory level at the petition date, right?   So and how are we going to do that?   We're either going to purchase and put more inventory at, you know, subject to their disputed liens under review or we'll cash collateralize, right?   And then we're going to have a true-up period.  So I think every seven days or so.  If it turns out that that value relative to the petition date value has fallen, fell down, we'll put cash in there.  If it's gone up, then excess cash can be swept back.  And we're making sure that we're leaving them at status quo pending the resolution of whose collateral is it, who's got senior liens right and figuring that all out?

Full reservation of rights of all parties as to that collateral dispute.  We're going to try to work with parties to see if we can come up with an answer.  If not,

they've filed an adversary proceeding.  You know, we'll figure out if that's the best way to go or what's -- what makes the most sense given that it's not just a one-on-one issue really, right?

It's kind of everybody is involved in this because if it's not their collateral, it could be ABL collateral. It could be one of the other SPV collaterals.  So it's not simply, you know, we can just kind of duke it out with Evolution or settle the issue with Evolution without involving other parties.  So that will be, you know, an issue for another day.

All parties are reserving rights with respect to surcharge, you know, with respect to these boxes.  They're reserving rights also to accrue interest and fees to the extent it turns out they're over secured.  And the stipulation period is 60 days.  We're going to try to do this over the next 60 days.  If we think it's making progress, the parties can agree to extend.  But, you know, that's generally the approach we're taking here.

And, Your Honor, Evolution you might have seen -- and I know we're going to have a scheduling conference with respect to some of the motions that were filed by the SPV counterparties regarding trustees, et cetera.  So this resolution does address that.  You know they've agreed to withdraw their objection to the DIP motion.  I am not going

to put on any evidence or cross.  You know they're good with their settlement.

They've agreed to withdraw their objection to Weil's retention application.  They've agreed to adjourn their motion for a Chapter 11 Trustee at their entities, you know, during this interim period, you know, with an obligation to give notice if they need to bring it back up.

So you know with that Your Honor, I think we're done.  We actually have a signed stipulation that we'll file with the court in connection with the final order that's continuing to move.  Parties are still working.

Your Honor, I will move to the next one, if -- you know and just kind of tick through.  I am actually going to -- sorry.

THE COURT:  Go ahead.

MR. SINGH:  I am actually going to ask my partner Cliff Carlson because he's been working on CarVal and Aequum.  And I think we have you know a similar type of resolution where we can adjourn some of these disputes.  Not exactly on the terms of Evolution, but I will let him come up and just describe those to Your Honor since he's had the most latest conversation if that's okay.

THE COURT:  Perfect.  Thank you.

MR. SINGH:  Thank you.

MR. CARLSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CARLSON:  I will start with the CarVal settlement and that's we've been speaking with Mr. Brilliant.  We have an interim stipulation in place with CarVal that's at docket number 230.  And the agreement is to extend that that stipulation through December 8th.  I understand the court has availability for a hearing on that date.  That's available, and we would have our hearing on this on this on these issues, the adequate protection, or their client.  I will stop there just to make sure you're --

THE COURT:  Well, yes.  That's that Monday December 8th?

MR. CARLSON:  Yep.  And that hearing would be a continuation of the of these issues.  They've also filed a motion to dismiss --

THE COURT:  Right.

MR. CARLSON:  -- their SPV Debtors, and in the alternative, appoint a Trustee as well as --

THE COURT:  Or for adequate protection, too.

MR. CARLSON:  Right.  They have in a motion for lift-stay.  We would have, what I'd call, a scheduling conference on those notions at that hearing as well, and hopefully we're resolved on these issues when we come back to you on the 8th.

THE COURT:  Oh, got it.  Okay.

MR. CARLSON:  But to the extent we're not, though, then we would have -- and we would schedule a final hearing the first week of January, again, subject to Your Honors' availability.  A final hearing on a motion to --

THE COURT:  Yeah.  Let me get a --

MR. CARLSON:  -- to dismiss.

THE COURT:  So what would we be taking care of?  What would happen on December 8th?

MR. BRILLIANT:  Your Honor, I don't know if it's we have disagreement or just that I think it's just nomenclature.  What we had agreed was as part of the DIP motion, they have a motion for use of our cash collateral.  And you know, they want to provide us adequate protection.  That's not going to be heard today.  That's going to be pushed to December to December 8th.

We would extend the interim stipulation as counsel said, also to December 8th, that requires just -- there's going to be just a few changes in the stipulation.  One, you know, it -- the termination date was originally, I believe, October 22.  We extended that to November 7th until today.  We'll extend that again to December 8th.

And then there's a provision in there that limited their ability to use any of the cash collateral other than certain terms, which also would have expired on October 22, and was extended to November 7th.  I think that's in

Paragraph 3 and that'll be extended as well.

The last change in the interim stipulation is under the current stipulation, they're allowed to purchase inventory in only that stipulation three ways.  One, you know for you know cash on delivery.  The second was by providing raw materials, you know, at the time of delivery of the inventory.  And the third was there was a process where it could deliver it directly to the company and we would have retained a lien on their accounts receivable.

With respect to whatever we have, in terms of accounts receivable that were created, you know, prior to day, you know there's a 20-million-dollar cap, we'll still continue to have that.

With respect to, you know, after today, they won't be able to sell the receivables.  And they will only be able to, you know, sell for cash or for raw materials as provided in the stipulation.

THE COURT:  Okay.

MR. BRILLIANT:  So that's just going to come out.  For the convenience of the parties, there's been issues with tracking the AR.  So no reason to create more administrative headaches and doing something that parties, you know, can't have a high confidence level in it.  So that'll be the change with the stipulation.

And then on December 8th, we would have this

continued hearing or on the on the motion, you know, to use our cash collateral, and you know, requests for adequate protection.  We would also have the interim hearing on our motion to lift stay for --

THE COURT:  Oh, got it.

MR. BRILLIANT:  That'll be on December 8th as well.  And then we agreed that for a date, we understand you have availability the first week of January, that we would have a hearing on a motion to dismiss adequate protection in the alternative.  Motion dismiss or alternatively for appointment of a trustee.

THE COURT:  On this week.

MR. BRILLIANT:  And the final hearing on the motion to lift stay the first week of January --

THE COURT:  As long as we mean the first week of January, being January 5th.  That would --

MR. BRILLIANT:  Yes.  Yeah.

THE COURT:  January 1st falls on a Thursday. That's why I was just saying don't get me in trouble with that -- yeah.  I think that week of -- let's just say December 8th would work conceptually for me.  We could -- I'd rather start just to give everyone a full day where I can just kind of start maybe 9:00 a.m., on December the 8th. If we could just block it out, and just the --

And then if we had to do something.  You know you

all can figure out in terms of witnesses and all that stuff. January 7th or the 8th, that's like a Wednesday or a Thursday.  Just get with your -- it's a little bit away. Yeah.  I am looking at 2026 January 7th or the 8th. Whatever time would work, just get with my case manager and pick a date that would work --

MR. BRILLIANT:  Sure.

THE COURT:  -- for me.  Okay?

MR. BRILLIANT:  Thank you, Your Honor.

THE COURT:  All right.

MR. BRILLIANT:  So we would have that hearing on the 8th.  In the meantime as you know, Mr. Singh and Mr. Barr, you know, mentioned, there's just been an ongoing investigation into the validity of the liens at the SPVs, including there was a, you know, a supplemental declaration from Mr. Moore

We, you know, obviously, you know, the hearing is being put off.  Part of it is to investigate some of the assertions in, you know, Mr. Moore's supplemental declaration and for the Debtors to continue to do, you know, their investigation on issues that potentially would be relevant to the hearing.  They have agreed to give us, you know, additional discovery, including another deposition of Mr. Moore and, prior to that, to produce the documents that he relied on and the relevant information in connection with

that matter.

And, then, you know, we're all going to be -- you know, given that it is going to be, you know, the hearing is going to be later, and we are going to have additional information, there may be additional witnesses, including appraisal witnesses, in connection with the hearing, in the interim hearing on the motion to lift-stay.

You know, we have agreed that none of the findings of fact that will occur in this hearing will be binding in connection with these other hearings.  With us leaving, we're going to, you know, continue our hearing and then, we're going to, you know, subject to other things I'm going to tell you, you know, withdraw our objections.

THE COURT:  Not binding with respect to your client?

MR. BRILLIANT:  Yes.  And, Your Honor, well, that's where I want to correct you.  If you want to go back or I can finish.

MAN 1:  Go ahead.

MR. BRILLIANT:  Now, Your Honor, we --

THE COURT:  Can you get close to the mic?   Yeah.

MR. BRILLIANT:  Thank you, Your Honor.  In addition to the -- you know, our objection to the use of our cash collateral and our other collateral, and request for adequate protection, as Your Honor probably knows, we filed

an objection --

THE COURT:  Yes.

MR. BRILLIANT:  -- to the DIP.  You know, subject to an agreement, we have to make certain changes in the DIP order.  We would withdraw that objection as well.  The Debtors and the first-lien lenders have agreed to, you know, clarify language that the SPV Debtors, the special-purpose vehicle Debtors, and carve-out Debtors in particular, are not subject to the carve-out.  I think that has always been the intention, but there has been, you know, ambiguity.

All the parties, you know, reserve their rights in connection with future motions and proceedings to seek -- to surcharge collateral or to oppose that, or to seek, if they want, to try to do a carve-out later, they can do that, but it's not -- nothing in the order that is going to be entered or in the DIP financing agreements that will provide for that with respect to the, you know, CarVal entities, and the other SPV entities where -- that are our borrowers and, you know, guarantors.

There are going to be changes to the language to ensure that the springing guarantees, you know, do not apply to the special-purpose vehicles or the maquiladora entities. And then, you know, given that this investigation is going on into the liens, currently in the proposed DIP order individual, creditors would only have until the end of the

month to file claims asserting that other people's collateral is not appropriately treated.

That is going to be extended for us to be the same deadline that the Committee has.  And to the extent the Chapter 11 Trustee is appointed, it would -- that party would get, you know, 60 days after the appointment of the trustee rather than 30 days.

So, I think, Your Honor, that's -- and you know, with those changes, which have been agreed, we would withdraw our motion on the DIP.  And with respect to the cash collateral, that would be put off to the 8th.  And with respect to the other motions, they would be put off until the first week of January.

THE COURT:  Perfect.  Thank you very much.  Oh, Counsel, can you just -- I know it might be helpful.  Can we just have you, counsel, can you just -- I know your name, but just so we have a clean record?

MR. BRILLIANT:  Oh, yes.

THE COURT:  Just state your name just for the record??

MR. BRILLIANT:  Yes, for the record, Allen Brilliant on behalf of the CarVal secured lenders.

THE COURT:  Thank you very much, Mr. Brilliant.

MR. BRILLIANT:  Thank you, Your Honor.

MR. CARLSON:  Your Honor, we agree with all that.

I think just one clarification.  Is that this is just with respect to the SPV Debtor than it is with his client.  I just wanted to make that --

THE COURT:  Correct.

MR. CARLSON:  -- make sure that was clear.

THE COURT:  Yeah.  That is how I took it.

MR. CARLSON:  Yep.  And then, Your Honor, the other settlement is with Aequum, and it is very similar.  It's an extension of the interim stipulation for adequate protection that we had with Aequum.  That is docket number 215.  We would be extending that stipulation, and the consensual use of their collateral, through December 8th, the same date, and ask to have a hearing, you know, the hearing adjourned with respect to the use of their collateral to that date as well.

And the modifications to that stipulation are very similar.  One is, you know, we can transfer -- we can no longer transfer inventory from the SPV Debtor to the First Brands Group, FBG --

THE COURT:  The FBG.

MR. CARLSON:  -- what we call the FBG Debtor in exchange for granting accounts receivable.  So that option is no longer available.  In lieu of that, we can -- two options, either through cash or through replacing their inventory with new inventory as it cycles in.  So those are

the two options, and that --

THE COURT:  You're kind of keeping it at a certain level.

MR. CARLSON:  Exactly.

THE COURT:  All right.

MR. CARLSON:  The same structure that Mr. Singh walked through.  And so, and for -- with respect to the accounts receivable that was granted to them during the petition date to day, in lieu of that, that it will be the same.  It will be the inventory that's cycled through during that period of time.  We will have a replacement lien over that.

All of this is with a full reservation of rights as to the issues of whose collateral was it, as of the petition date and validity, extent, priority, et cetera.  So we are not stipulating to any of that.

THE COURT:  How far is this step going...  It is going to mirror --

MR. CARLSON:  It's going to mirror CarVal, so it will also to December 8th --

THE COURT:  Okay.

MR. CARLSON:  -- for that hearing.  I think that is it.  I will stop there in of if you have anything you wanted to --

THE COURT:  Yes.  If you can just state your name

for the record.

MR. OTTAVIANO:  Hi.  Yes.

THE COURT:  I'm getting good at this now.

MR. OTTAVIANO:  Yeah.  Kenneth Ottaviano, Blank Rome, on behalf of Aequum Capital Financial II LLC.  And I concur that our deal is essentially the same as CarVal's deal, and we are going to come back on the 8th and have it out if we do not have a final deal.

THE COURT:  Okay.

MR. OTTAVIANO:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CARLSON:  And, Your Honor, that's all I have. I will turn it back over to Mr. Singh.

THE COURT:  Thank you.

MR. BLANK:  Your Honor, before Mr. Singh goes back, I'll quickly comment only because we are one of the parties who did not get a deal.  So I just wanted to say a few comments into the record.

THE COURT:  Just state your name for the record.

MR. CARLSON:  Sure.  Your Honor, Stephen Blank from Alston & Bird on behalf of UMB.

THE COURT:  Yes.

MR. BLANK:  Apologies, of course, when I came up here, my computer closed on me.  Give me one quick second.

THE COURT:  Are you giving me an intro, or you are

just kind of outlining kind of?   I have read your objection.  Is it --

MR. BLANK:  This is a little different.   There have been some new issues --

THE COURT:  Oh, okay.

MR. BLANK:  -- that have come to light, Your Honor.

THE COURT:  Okay.

MR. BLANK:  And, frankly, before I start, also congrats to your clerk.  That was really cool before.

THE COURT:  Yeah.

MR. BLANK:  So, Your Honor, for the record, Stephen Blank from Alston & Bird on behalf of UMB Bank, N.A., in its capacity as administrative agent for the lenders under a revolving credit facility to Debtors Global Assets LLC and Debtor Global Assets GmbH.

So the facility we are talking about, this was initially a $45 million facility, and my clients are currently owed in excess of 33 million, all of which is, or was at the outset of the case, secured, and our proof of claim is on file.

Our collateral generally consists of finished products and some raw materials which is held in three locations in Europe and one location in the U.S.  In all instances, this is segregated and readily identifiable

collateral, which has been subject to ongoing audits, one of which ended just a couple of days ago.  I mean, with respect to the European collateral, it is literally in a warehouse in a cordoned-off section to comply with the perfection requirements under local law.

So let me start with the punch line and then we can move backwards from there.  The Debtors are giving away property owned by a Debtor SPE to a non-debtor affiliate for zero value.  In concrete terms, our Debtor's SPV owns cordoned-off property sitting in a non-debtor warehouse, and the non-debtor entity, who is also represented by Weil, is taking that inventory out of that cordoned-off area and selling it.  Our understanding from Weil is that this collateral is needed to help facilitate an out-of-court financing for the non-debtor, which non-debtor is having liquidity issues.

So, in short, they are using Debtor collateral to shore up a non-debtor.  The Debtor SPV is getting nothing in exchange.  My client is getting nothing.  The gifting of our collateral needs to stop, and at a minimum, my client is entitled to adequate protection, and we have been offered none.

So as I am sure you remember, we previously negotiated an adequate protection stip.

THE COURT:  Yep.

MR. BLANK:  Among other things, in that stipulation, we agreed that the Debtors could access up to $20 million of our collateral, subject to various restrictions.  And frankly, the fact that the cap was 20 million, each in and of itself shows that the Debtors were putting a significant value on this stuff.

The Debtors breached that stipulation immediately.  Standing here today, we have no idea how much of our collateral was used since the petition date, and, frankly, I do not think the Debtors have any idea how much of it was used.

THE COURT:  Are you arguing your emergency motion?

MR. BLANK:  Your Honor, I am arguing for adequate protection because, at the end of the day, we were told on Tuesday that the Debtors have come to the decision that they don't think our stuff is our stuff.  It is owned by a non-debtor.  They are refusing to assert the automatic stay.  They're effectively doing an abandonment motion without giving due process to anyone.

THE COURT:  Okay.

MR. BLANK:  So, and this was on Tuesday, for the first time, relayed on a phone call that there may be a dispute between the Debtor SPV and the non-debtor entity over the ownership of that collateral.  The Debtors point to that dispute as a basis to not provide any adequate

protection to my client.

The most shocking part of all this is the Debtors doing nothing to maintain the status quo. Mr. Singh said about four or five different times, "We want to maintain the status quo." He apparently forgot the carve-out, that that does not include my client.

So let's be perfectly clear. Weil represents both entities in this dispute, the SPV Debtor and the non-debtor, and yet the decision has been made to prioritize a non-debtor entity over the Debtor SPV and the estate and the creditors, giving away millions of dollars in collateral for nothing in return.

And frankly, this flies in the face of bankruptcy law, which is expressly designed to provide breathing room, and prevent this sort of dissipation of estate property. So as of now, the Debtors have only flagged this as a dispute, nothing certain at this point.

Even if the Debtors were to take a more definitive position that this property does not belong to the Debtor SPV, they'd be doing so on admittedly less than all of the relevant information. There is no evidence establishing definitively that these are not estate assets. And, as of late last night, Debtors admitted in phone calls that they don't have and haven't reviewed all of the documents relevant to this dispute.

So it is pretty insane that, without reading the documents, the Debtors' fallback position is, "Let's just give it to the non-debtor," rather than take refuge in the automatic stay until the dispute can be resolved.  Weil is conflicted from representing this non-debtor in a dispute with the Debtor SPV.  The Debtor SPV deserves unconflicted counsel.

Now, the Debtors' fiduciary similarly must act in the best interest of the Debtor SPV.  It's obviously in the best interest of the Debtor SPV to vigorously assert the automatic stay and its turnover rights.  And that's what these provisions were designed for.

And instead, the Debtors have effectively abandoned this property without a 554 motion.  They haven't sought court permission to transfer the property outside the ordinary course of business, as required by section 363.  And because these transfers are not authorized by a court order, they're avoidable under 549.

The Debtors can't circumvent due process by omission, which is what is happening here.  There needs to be a process.  It needs to be fair.  We offered them an off-ramp.  We said, "Hey, put this on ice, maintain the status quo until we can all negotiate something."

We proposed they freeze any sale of the collateral for a short period of time, or instead, just trap the

proceeds in an account so that it's safe, and we can all hash it out in short order.  We wanted to maintain our status quo.  They've refused to do any of these things, and they're intent on letting a non-debtor continue to take and sell estate assets.

It's obvious that certain important parties will benefit from this, but it's clearly not my client here. There's no legal justification to give away the Debtor SPV's property to achieve this goal.

And so, as we sit here today, our collateral -- or stand here -- our collateral is continuing to be taken without any adequate protection.  The estate is being drained of an asset in direct violation of the law.  So we're asking for adequate protection to preserve our status quo.

THE COURT:  What is the difference between what you are arguing now and your emergency motion?

MR. BLANK:  The emergency motion was enforcement of the previous stipulation.

THE COURT:  But it also had a second component to it, right?

MR. BLANK:  It did.  It was enforcement of the stipulation they previously entered into, as well as an objection to the DIP, and it was a bring-down objection that was previously filed with respect to DIP.

THE COURT:  So what -- because I remember reading it.  So what is different?

MR. BLANK:  What is different now, is that before, we were talking about adequate protection for the use of estate assets.  And here, they're effectively saying, "We have decided these aren't estate assets, so there is no need to have any adequate protection."

THE COURT:  I see.

MR. BLANK:  There is no evidence that these are not estate assets.  They made the decision, and told us Tuesday night, and there is nothing in the record of it.  So, we -- until this can get hashed out, they have to offer us something to maintain the status quo.  And we have offered a bunch of suggestions and they have said, "Yeah, no, but let's try to get all the parties on the phone."

That's not going to do it.  We're not going to stand here naked hoping that people come to play.  Things need to be frozen.  Our status quo needs to be retained and then we can figure it out.  We're trying to be reasonable, but we were told on Tuesday, "By the way, we have decided, without any evidence, that maybe this is not your property, so you guys are different from everyone else, and we're going to carve you out."

And if that's really where they want to go, then this is something the Debtors should be protecting.  We

believe this is a Debtor estate asset.  No one is disputing this is worth tens of millions of dollars.  It should not be just given over to a non-debtor SPE.  The Debtor should be enforcing the automatic stay.

And if the Debtor doesn't want it, then I will orally move to lift the automatic stay so we can protect our rights.  But the Debtor, as a fiduciary to this SPV entity, is not doing that right now.  So our witness is here.  We're ready to go.  I don't think I'm being unreasonable.  We reserve all rights.

We're looking for adequate protection to preserve our status quo so that we can all keep talking and try to figure this out.  So thank you for indulging me, Your Honor.

THE COURT:  Thank you very much.  Hold on.  Are there are other deals before I hear an objection?

MR. SINGH:  Yeah.  Your Honor, I wasn't really finished with my remarks.

THE COURT:  That's okay.  No.  No.  I mean, everybody is going to speak.  I can tell everybody the way this is going because I know there may be some parties that want to speak.  I would rather -- looking at it, it's 11:00 central.  I think we ought to read into the record proposed agreements.  Let me hear from parties who wish to be heard, and we're probably going to get close to the noon hour at that point.  I'd rather -- I don't want to put a witness up.

Maybe we can move something, you know, talk about getting some evidence in too, some housekeeping, and then maybe we start officially around 1:00.

MR. SINGH:  Yeah.

THE COURT:  This is the way this is kind of just going.

MR. SINGH:  One second, Your Honor.

THE COURT:  Yeah.  Oh, okay.  Your Honor, one of our witnesses, is I think we filed a motion for Mr. Cowen to appear virtually.  He is actually overseas and running six hours ahead, Your Honor.  If we can, he has slotted out time to try to get this done.  If there is any chance that we could take his testimony and cross earlier that would be --

THE COURT:  How much direct do you have?

MR. SINGH:  Well, I think we're just submitting his direct through his declarations.

THE COURT:  Let me ask.  Does anyone have any cross for this witness?

MR. WINOGRAD:  Yes, Your Honor.  We do.

THE COURT:  How much cross do you have?

MAN 2:  I -- it's hard to say and I do not know what will happen with the technology, but I suspect it will probably be an hour or so, potentially, a little bit longer.

THE COURT:  yeah.

MR. KOTLIAR:  Your Honor, Brian Kotliar, Morrison

& Foerster on behalf of Onset Financial.  We probably have 15, 20 of cross for this account.

THE COURT:  Yeah.  I mean, I guess we could work for an hour, take a break, and then come back.  I don't --

MR. SINGH:  Let's see where we get, Your Honor, and we'll do the best we can with Mr. Cowen.

THE COURT:  Yeah.

MR. SINGH:  I just wanted to let you know he is seven hours ahead.  Okay.

MAN 3:  Excuse me.  I am sorry.  I didn't stand up quickly enough, Your Honor.  We're reserving for cross, Judge.  We're going to wait and see how the Debtors' case presents to their witness.

THE COURT:  Okay.  Yeah.

MAN 3:  We're still discussing some of those issues.  I just didn't want the lack of standing up to let you know there might be another party cross.

THE COURT:  Thank you.  So let's keep talking.

MR. SINGH:  Yeah.

THE COURT:  I do not think he is going to get on, but we will keep it going.

MR. SINGH:  Understood, Your Honor.  We will do the best we can.  I just wanted to put it out.

THE COURT:  No.  I appreciate it.

MR. SINGH:  So, Your Honor, going back to settlements, I think the other ones that I wanted to mention are the ABL lenders.  We're not quite done with the ABL lenders, but people are talking, and I think we will get it done, Your Honor, and they have to review the language. They're represented by Mr. McGuire at Winston, who is here.

And so, rather than, you know, lay out a settlement that's still being finalized, I think we'll just come back to it.  I am very confident we will get that done.

THE COURT:  Okay.

MR. SINGH:  So, Your Honor, that leaves, in terms of -- and the last one, I would says, is, you know, we put in some factoring language consistent with my remarks earlier.  I think we have gotten sign-off from some of the factoring counterparties.  I am not going to try to say which ones they're because it's moving.  I think it's -- the language is consistent with everything I have said earlier. I think people are still reviewing language, so if any of them end up getting up, I am not trying to say they can't, but I am hopeful that they will all agree that we're done, or, if it's just some language, we can clean it up.

So I think who that leaves, Your Honor, at this point, to my knowledge, is -- are the main objectors, and I am not trying to minimize anybody else, but I think we have either got language out to people or are resolved in

principle, you know, with landlords and things like that.

So, you know, to my knowledge, the main show for today right now is the UCC objection, as well as Onset, represented by Morrison & Foerster.  So those are the two main ones.  And again, I am not trying to prevent anybody from standing up, and I could have a little bit of that wrong, but I think that's the current state of play.

So, Your Honor, before we move to the evidence, I would like to make a few remarks with respect to those objections to set the stage from the Debtors' perspective, and I think others will have remarks as well for them, again.  So if that's okay, and again, you know, I will keep it quick.

Judge, you know, we couldn't get there.  You know, I am hopeful we can still get there, but we couldn't get there right now.  We're not at a final settlement.  But where we have gotten to, you know, thanks in many parts to the UCC's objections, and the work we have all been doing in the background, working with the DIP lenders and the UCC, is a number of material concessions that have been achieved, right?

So, if there is no UCC settlement, there are a bunch of things that I will review now that are in our reply papers that address the objections, or a lot of the objections, I should say, that the UCC has raised, and I

think all to the benefit of the estate.

Starting, most significantly, Your Honor, from our perspective, is the administrative expense claims basket. You know, there were some objections filed by the UCC and other parties that, hey, you know, there is a risk of administrative insolvency here, but we do not have any evidence of that, and you know, if we have to get to it, we'll get to it.

But notwithstanding, the concern was, and if you have a roll-up, you know, the amount of the roll-up here is going to swamp potentially other administrative expense claims.  It's a super priority claim, et cetera, et cetera.

And so what we have agreed to with our DIP lenders is to carve out a $200 million administrative expense claims basket that would only be subject to the new-money portion of the DIP.  So it would only be subordinate to that, and if we're administratively insolvent, then 200 million dollars' worth of admin expense claims, you know, properly allowed, have to go through the process, et cetera, go next, right, so before the roll-up amount is paid.

So we think that's a significant change, and gives people some good assurance in terms of the administrative, you know, sort of the downside scenario in this case, which we hope does not happen.

And besides that, you know, you (indiscernible)

Mr. Moore, and he's got some stuff in his declaration, and we working with the UCC's advisors.  We worked with the advisors to the ad hoc group and our DIP lenders to really size that based on spend that's happening in the case.  You know, what is going on with employees, how often we pay them, et cetera.

And so, it's not perfect, right?  We don't know what we don't know.  But we -- you know, we didn't just pick a number out of thin air.  We sat down and tried to size it and show it to people, and it's $200 million, we think is a massive win for the Debtors' estate.

THE COURT:  Mr. Ruff is going to stand up at some point and tell me that there is still not anything to show where an examiner is going to get paid.

MR. SINGH:  Yes.

THE COURT:  At some point, he is going to stand up and say it, so I will save him the time.

MR. RUFF:  Thank you, Your Honor.

THE COURT:  So what thoughts do parties have?  And again, it's not up for today.  I will tell everyone, I intentionally pushed that out.  A Committee had not been formed yet.  There were a lot of moving pieces and the motions got filed.  They obviously needed to be heard, but I wanted to make sure, in part, that a committee got up, that a committee got formed, that a committee was able to hire

professionals, that a committee was able to get up to speed, to then have conversations. So that when I took it up, everyone was a little bit smarter about what was going on and, you know, 30, 40 days would have passed in connection with this case.

So I wanted to put that out there. It's not for today. The scope of it is something completely different. I don't want to talk about that today. I just know that that objection is coming.

MR. SINGH: Yeah.

THE COURT: So that's one of the outstanding ones and I figured I would flag it.

MR. SINGH: Yeah. And, Your Honor, it's a good -- you know, first, Your Honor, we appreciate the way in which you schedule that motion. And I think it was very helpful because it's not up for today, but it -- as you said, it is somewhat connected.

What I would tell Your Honor, is if we have a settlement on -- you know, with the players, on this, I think we're going to have an agreed approach. I am not trying to bind Mr. Ruff or anybody that moved. But at least as between the UCC, the DIP lenders, and the Debtors. We're trying to come up with an agreed approach that makes sense and is efficient for these cases to go talk to people. We're not there yet, right?

THE COURT:  Got it.

MR. SINGH:  Assuming we don't get there, Your Honor, I don't think we have consent today from our DIP lenders to say, "Yeah.  They're going to foot the bill on an examiner.  This is where it's going to sit in the carve-out."  You know, frankly, they have made it clear that they're not consenting to that today.

But obviously, the motion's going to be heard by Your Honor.  You're going to either have a settlement before you with respect to that motion or you're going to make some determination.  And I think we'll have to address when we know the scope, the anticipated cost of a potential examiner, where it fits within the structure.  Does it fit within the carve-out?  Does it fit within the 200 million admin claim basket?

So we're not trying to prejudice that conversation.

THE COURT:  And let me just say --

MR. SINGH:  -- either way.

THE COURT:  I don't want to say too much, but I conceptually understand that if you create a carve-out someone will meet the carve-out, right?  And so you got to -- without knowing what the scope is, you got to have more information before you can do it.  I can give folks Like Mr. Ruff some comfort there.  The code says, there has to be one

so there's going to be one.  The scope of what it is, I think everyone should look closely at the text of -- and see exactly what examiners do.

And I am going to stick really close to what that is.  And so I know that in some instances, some cases have kind of examiners did some extra stuff.  They won't be doing it in this case.  We're going to stick right to the text in terms of what examiners are, are there to do.  And the text will guide us to what that is.

And I just -- everybody knows the cases in which they exist, I think.  You know I will share this thought and then we can move on to something else.  Because I don't want to talk about it more, but it may be helpful as parties think about the way I think about this in terms of what parties could present to me.

It seems, you know, someone getting appointed and disappearing for four months and showing up, but the report is not helpful.  I think four to five months out, six months out, it's just not beneficial.  I think at some point, there are some questions that the public there needs to be an answer to.  And someone can go -- and I know that others, there's a bunch of other professionals who are working on this.  And so, it's finding that balance.\

And I think, you know, you look at some other-- I don't, probably you all know the cases.  Some of them, folks

just -- and it was just the nature of the case.  You know, it took a year for an examiner to write a report.  And I think those are too long for purposes of this case.

I think you know, someone writing a report eight months later is probably just not going to -- that's the nature of the case.  It's just too long.  So I think as parties think about what it is, I think it ought to be tight, to the point, and relevant to what the parties would need to provide an answer to, to provide some clarity from an independent person that the statute requires.

So that's the most that I'll say.  But obviously, if -- you know, whoever that is, which I think is going to require some specialized expertise.  And then also someone who can write something in plain English, and I can kind of get it out there for the public.

I know it's really hard in a case like this, but someone, I think, you know, whoever that is, they will be paid, but I got -- but today's not the day to pick out a budget --

MR. SINGH:  Yeah.

THE COURT:  -- for it or scope.  It's just, you know, I don't want folks contemplating, which I think stick to the text.  Stick to what is relevant.  Stick to what someone could provide some public information on, and that is important.  And figure out a budget.  And I have no

insight into what that would be or what that would cost

But I do know that there are -- you know, someone who wants, you know an examiner to do 15 things, it's just -- I don't want that.  I want targeted.  I think but parties can present what they want.  I am just sharing my thoughts up front.  But let the text guide you.  All right.

MR. SINGH:  Okay.  Thank you.

THE COURT:  Where are we going next?

MR. SINGH:  Thank you, Your Honor.  That's helpful.  So, Your Honor, going through the other key changes, we do have -- you know, one of the other issues that the UCC has raised in its objection is by rolling up the -- oh, sorry honor.  Just one second.  Oh, sorry.

Your Honor, breaking news.  I am told that we have a settlement with the creditors Committee on its objection.  So, Your Honor, what I would suggest is if we could maybe -- yeah.  Your Honor rather than proceed, it might make sense if we could take a quick 15-minute break to confirm or correct, and then I can or somebody can read the settlement into the record.

And we'll see if we can also finalize some of the other objections because they were contingent not necessarily done.

THE COURT:  No.

MR. SINGH:  But I think it would be --

THE COURT:  I got it.

MR. SINGH:  -- helpful to clear this out.  So I defer to Your Honor how you want to proceed.

THE COURT:  No.  I am going to step off and let folks confirm with each other to make sure that you've got a deal.  You don't have one until you have one.

MR. SINGH:  Yeah.

THE COURT:  So I got it.  So I will -- I think you mentioned 15 minutes.  Do you think that would be adequate?

MR. SINGH:  No, Your Honor.  I am sorry.  I wish Your Honor, why don't we why don't we do 30 minutes if that's okay?

THE COURT:  So, yeah, let's do this.  Let's do --

MR. SINGH:  Or --

THE COURT:  Yeah.  Here's what I'd like to do because there's a number of parties on the line and just within 30 minutes, we'll come back on the record and at least announce kind of where we are.

MR. SINGH:  Yeah.

THE COURT:  And then maybe -- at some point, if there's no deal, at some point, someone's going to have to get on the stand get exhibits in and make rulings.

MR. SINGH:  Yeah.

THE COURT:  And I'll do it.  But maybe it makes more sense to -- if there's a deal that you read it into the

record.  And then parties can then start to talk about what the other ones look like.  And maybe for the last 15 minutes, for example, if Onset wished to tell me something or Mr. Ruff wished to tell me something, we can use that --

MR. SINGH:  Exactly.

THE COURT:  -- time.  And then everybody can break, and we can take an hour and then come back.

MR. SINGH:  Thank you, Your Honor.  That would be great.

THE COURT:  All right?  Thank you.

MR. SINGH:  Thank you.

CLERK:  All rise.

THE COURT:  We're back on the record in First Brands.  Parties are still speaking.

MAN 4:  I was going to filibuster, Your Honor.  Tell some jokes.

THE COURT:  I will give folks time to come in and at least tell me where we are.

MR. RUFF:  If you'd like to hear my opening anyway, you're all right.

THE COURT:  Mr. Ruff, maybe I can just ask and I will give you the option.  I mean, is there anything you wish to tell me at this time?  I think we do have representative from the Debtor here.  So everybody's here and they're walking in.

MR. RUFF:  But yeah, no, that's fair enough, Your Honor, I appreciate it.  So Jayson, for the record, Jayson Ruff, the United States Trustee's Office.  Your Honor, we did file our reservation of rights.  I think you saw that at Docket 427.  And I think your comments I was very appreciative of earlier.

We understand that, you know, whatever is in the budget or going to need to be in the budget is really going to be tied to the scope of an examiner, presuming that one is appointed.  And so we just need to see that at some point.  I was a little surprised to see that an examiner was specifically excluded from a carve-out.  But I understand and appreciated Debtors' comments on that, that maybe they're in the 200-million-dollar general admin fund or.

But I think they're -- like if there's professionals, and in the estate professionals, the United States Trustee's Office believes they belong in the carve-out.  So we just wanted to reserve those rights.

And then, just finally, Your Honor, as far as standing for -- excuse me, for a challenge period.  I understand the Committee has -- and I saw on the revised order they had extended a challenge period out.  Look, Your Honor is going to order not only the scope of the examiner, but you're also going to be telling the examiner how long he or she has to do their work and to get their report online.

I don't think what anybody wants to see is where a report is filed, and we learn all these things.  And the value of a report, obviously, and I will save most of this for when it -- but it's a report to the Court.  It's an uncolored report.  It doesn't worry about how does this look for my client, because Your Honor is essentially the client.  And so there's the value in that.

And so when that report comes out, whatever it tells us, if there's claims there, if there is a challenge or excuse me, a basis to challenge any of the releases, we think that those need to be preserved.  So that's just the, I think, the things that we wanted to mention for the record, I think that are relevant today.

THE COURT:  Thank you, Mr. Ruff.  Let me just ask counsel for Onset if there's anything you wish to tell me at this time or anyone else who would address the Court.

MR. BUTTERFIELD:  Good morning.  I guess it's still morning.

THE COURT:  Still morning.

MR. BUTTERFIELD:  We have 10 minutes.  Ben Butterfield, Morrison & Foerster LLP, for Onset Financial.  Your Honor, you've read our objections.  I will try to keep this short.  Onset is the largest inventory and equipment lender to the Debtors.  Based on our calculations, their claim is 2.2 billion.  We just read a complaint that the

Debtors have filed against the sole shareholder of the company, which suggested that 200 million of our cash was siphoned out the door to the sole shareholder.

So in addition to being the largest individual creditor of the company, we may be the largest or one of the largest victims of the fraud that happened if it did happen. So we're looking at this DIP very closely.

We -- based on reps from Debtors' counsel and based on settlements that have happened to date, I think we're really down to one issue.  And that issue is Viceroy. I don't know if you recall that from our objection --

THE COURT:  I do.

MR. BUTTERFIELD:  But we have a $1 -- (indiscernible) billion-dollar guarantee claim against Viceroy.  We think we are the only creditor of Viceroy, and it's an SPV entity.  It sits -- if you look at that big org chart with 200 boxes on it, at the far-right upper corner of the org chart, above all of the SPV entities, and it owns 100 percent of their equity.  And as part of our SPV transaction, as part of our off-balance-sheet financing transaction, we obtained a guarantee from that box and the only guarantee offered by that box for our deals.

Look, the Debtors are proposing to have that box grant the DIP guarantee, and there's an issue.  Like maybe we actually don't care.  Because information flow here, and

that's no fault of the Debtors, is not good.  No one knows what's in the box.  No one knows if it has assets.  We were offered it as a guarantee because we were told it had value, so we think it has value.

And I think the fact that we think it has value, although we have no real knowledge of that, or just -- this is just based on information that was told to us, which may be completely wrong, they want it, right?  So we want it.  Because we want it, they want it, and because they want it, we want it.  We're in one of these situations.

We are working on a settlement, and I think that the fact that the Committee has gotten their deal over the finish line apparently, is going to be helpful towards that.

But if we are not able to resolve the issue, the things that you should be thinking about today as you hear evidence are things like whether this guarantee makes sense for Viceroy.  Is the guarantee and entry into the DIP facility in the best interest of Viceroy?

And when you think what's in the best interest of Viceroy, well, you think about its estate and its creditors. The way that the guarantee is structured, it would be $1.1 or $1-point-something billion of new money.  There would be no marshaling away from the business assets.  Meaning if they go to repay the DIP, they can just start with the business assets of Viceroy until they're exhausted, and then

they can move on to the operational side.

No marshaling, dollar in, dollar out on the new DIP money, even though these boxes, this Viceroy box, is really non-operational.  It sits there, and it holds equity.  It may -- we were told it has no actual assets.  All of the assets that it has are by virtue of its equity.  So it really shouldn't need that much money.

If there are professional fees that need to be covered, let us know what they are, and we'll cover them.  But we are struggling with the idea that Viceroy, exercising its own business judgment, could look at this DIP guarantee and say, out of this DIP, I get what?  I get maybe a couple million dollars for my legal fees.

And what am I giving in exchange?  I am giving a $1.1 billion guarantee claim.  Like outside of bankruptcy, if they had done something like this right before bankruptcy, it would be a fraudulent transfer.  It would be gone.  But they didn't.  They're doing it in bankruptcy, and it's getting blessed by the Court.

So that's the issue.  I'll stop.  There are a few other, you know, collateral issues, things like we want notice of new DIP obligors, and we think the challenge period should be our challenge period, because we're the only creditor at a lot of boxes.  You should actually mirror the Committee's challenge period, stuff like that.  I don't

think that's going to hold up the deal.

The big issue right now is Viceroy.  And so that's where we are.  We're going to use the lunch hour to try to settle it, and we'll see if we can get there.  Maybe we'll get there.  Maybe we'll not.  But, you know, as you hear evidence this afternoon, if that ends up happening, that's what you should be thinking about.

THE COURT:  Thank you.

MR. BUTTERFIELD:  Okay.

THE COURT:  Before I turn to Mr. Singh, let me just see if there's anyone else who wishes to address the Court at this time.  Okay.  Mr. Singh.

MR. SINGH:  Thank you, Your Honor.  Your Honor, again, for the record, Sunny Singh, Weil, Gotshal, proposed counsel to the Debtors.  Your Honor, I am not going to respond on Onset.  We have a different view.  But I am just hopeful that we can settle this and then -- but, you know, later at some point, Your Honor, if I need to, I will address those issues.

Let me review for you, Your Honor, the proposed -- terms, not proposed, of the settlement.

THE COURT:  Hold on.

MR. SINGH:  Oh, I am sorry.

MR. SINGH:  Oh, that's disappointing, Your Honor.  I am concerned.  Hang on.  I need a minute, Your Honor.  I

am sorry.

THE COURT:  You got it.  It feels like an old school case, you know.

MR. KELLEY:  We have objections on file.  I think there was a misstatement earlier to suggest that our objections have been addressed as it relates to the DIP.  We've resolved our objections with the Debtor.  I believe conceptually we're waiting on language with the cash management order.  But ours -- and we understand.  The Debtors are turning their attention to the unsecured creditors Committee.  I've reserved my statements.  Probably before the hearing ends, we'll want to make some statements to the Court.

But we intend to use the lunch hour and see if the language we floated to them can be resolved.

THE COURT:  Okay.

MR. KELLEY:  There are a number of receivable counterparties who are talking about language we need in the order, and I understand the Debtors have not yet had a chance to turn their attention to that.

THE COURT:  It's still out there.

MR. KELLEY:  But I think the lunch hour may need to be a little bit longer than the lunch hour, but I think there's room to make things happen.  But I will leave that for Your Honor --

THE COURT:  Perfect.

MR. KELLEY:  -- to decide.

THE COURT:  Thank you.

MR. SINGH:  Excuse me.  This is the second time I've done this, Charles Kelley.

THE COURT:  Rather than having folks here waiting, Mr. Barr, maybe what makes sense is that we all come back at 1:30 and either start with something, someone starts putting on evidence at 1:30, and if there's a deal with all the language, and I'm -- and it sounds like that's -- I think, that's in everyone's best interest.  To just button up language and take a little bit of time, and get some food and hammer out language.

But if not, we just need to start just because logistics --

MR. SINGH:  Understood.

THE COURT:  -- and things of that nature, so.

MR. SINGH:  My only pushback, and I apologize for pushing back, is if we have the deal finalized, I would love to announce it.  Because an hour and a half will get people time to rethink things.

THE COURT:  No.  No.  No.  What I am saying is maybe -- I am just thinking in terms of buttoning everything up.  It may take some time for people to leave, a bunch of folks to leave.  Which I am thinking about logistics in

terms of leaving, a bunch of folks exiting, and then having to come back into the building.  I am really only giving you --

MR. SINGH:  An hour.

THE COURT:  Yeah.

MR. SINGH:  Okay.

THE COURT:  That's exactly right.  So I was thinking I am going -- yeah.  I am going to wait five minutes.  I am just going to turn my camera off, turn to some other matters --

MR. SINGH:  I appreciate that, Your Honor.

THE COURT:  - and then start.  But I was just thinking in terms of it's going to take a while to kind of just get through the security and all that stuff, and I want to give everyone a full hour to kind of go and do the deal and get to wherever they need to be.

So I think 1:30 would make the most sense from a logistics standpoint.  Okay.  But I will turn my camera off. Folks on the line, I am going to stay here.  I am just going to wait and see what happens.  I am just going to mute the line, but I'm -- actually, I will keep my camera on.  I will just mute the line.

Folks, I -- we are taking our break.  We're going to come back at 1:30 for those that are on the line.  We'll come back on at 1:30.  There were no updates other than we

need to take the break.  I apologize.  I had the phone line on mute.  I just wanted to let everybody know.  Thank you.

(Recess)

MR. BARR:  Your Honor, the Committee has asked for a ten-minute recess.  However, there is a procedural issue that we would like to bring in front of you with the Committee and the folks that are from the Committee can handle that better in the courtroom.  And that may take the ten minutes.  So, we will then roll right into it.

THE COURT:  Okay.

MR. BARR:  And the reason for the -- is we understand some of the Committee professionals are on the phone with their clients finalizing some conversations.

THE COURT:  Okay.

MR. BARR:  Thank you for the time.  It was hopefully helpful and we do believe that we should get there.  The issue that we have, and I'm sure Your Honor remembers, one of our witnesses, Mr. Cowan --

THE COURT:  Oh, yes.

MR. BARR:  -- is in Paris.  He said I can tell you this so I'm going to say it.  On his anniversary date, walking into a show and dinner.  He had -- we messed up, obviously, asking for the adjournments but they've all been helpful but missed a window.  We've asked the Committee -- because if we're not going to get to a deal, it is highly

likely we're going to be here tomorrow as well -- if we could hear that witness tomorrow morning.  And I believe they object, believing that it's unfair that the Debtors get to put their witness on potentially last, as opposed to putting on our burden and then having the ability to object.

My response to that, Your Honor, is we're not in front of a jury.  We are in front of Your Honor.  Your Honor could take the evidence in how you see fit, whether it's in order or out of order.  So, if we are going to go forward --

THE COURT:  What would he testify to?

MR. BARR:  He's testifying to the propriety of the DIP, the process of getting the DIP, the fees, the rollup, the economics of the DIP.

THE COURT:  Okay.

MR. BARR:  So, that's our request, Your Honor, and I'm sure the Committee would like to speak on it as well.

THE COURT:  No, I'm just going to shut this down and we'll start back up in the morning.  I'm going to do all this at one time.  If it's going to live or die on the merits, everybody's asked me for adjournments.  Everybody's been okay with them.  No one's objected to any of the adjournments.  I'll just shut this down and we'll start tomorrow morning but we won't leave, and we may go undecided.  It's just going to be one of those hearings, if that's what we end up doing.

So, I don't know if he's going to go first or last but he'll be doing it on Friday if that's what we end up doing.  But it'll be all done at one time.  I know that there's concerns with travel and stuff like that.  Everybody's asked me for the time.  We're going to do this once, we're going to do it the right way.  You're going to get to put on your case in chief.  They'll be able to cross however they want, and we'll just go.

MR. BARR:  Okay.  I appreciate that, Your Honor.  Obviously, we will move forward that way.

THE COURT:  Okay, what's going on?

MR. BARR:  We'll use the rest of the time --

THE COURT:  Hold on a second.

MAN 1:  The follow-up audio is not working.

THE COURT:  The audio is not working?  The line is open.  Hold on a second, let me just --

MAN 1:  (indiscernible)

THE COURT:  Well, it's not -- oh, hold on a second.  Rosario, can you hear me now?  Okay.  Okay, well, let me just tell folks -- you've missed nothing exciting.  The question is, there is a witness who is essentially part of the Debtor's case in chief and he will be unable to testify today.  So, the question is can they go -- can the witness go last?  There's an objection by the Committee as to that procedure.  I've indicated that if that witness is

unable to testify today that we would then start tomorrow morning.

I will let folks know I've got a first day I think around two p.m., so we would have to take a break if that's what we did. And then we'd keep working and we may go into Saturday if we have to, to kind of get it done. But I think we need to just do it one time. Maybe there's documents we can get in and things of that nature, housekeeping that we could figure it out. If we're not there, we're just going. I'm prepared to go and we'll just see what we do.

MR. BARR: Understood, Your Honor.

THE COURT: Okay.

MR. BARR: So, I guess then we would request the remainder of that ten-minute recess that the UCC asked for?

THE COURT: No, no, I think where we are now is -- you know, we can stay here and you can continue to talk or we can continue to talk. But at some point, if things don't go fine, we'll start in the morning at 9 a.m. And just let me know from a timing standpoint what we do. We'll just -- but I would like to use the time productively. I'll give you all as much time as you want.

What I think makes the most sense -- someone tell me if it doesn't -- I'll just step off and then you all can -- if someone needs me, you can -- we can, whenever it makes the most sense, just call me back up and then we'll take --

I would say if there are other witnesses, that it doesn't matter the order in which they go, you all should think about that and maybe just try to use the time productively. Because we're here this afternoon, but I got it.

MR. BARR:  We'll try, Your Honor.

THE COURT:  Yeah, just to see where it goes.  I'll give you all as much time.  So, for the folks on the phone, I don't want to keep you hanging but I do want to do some periodic check-ins.  What makes the most sense?

MR. GEORGE:  Your Honor, for the record, Jason George, Weil Gotshal & Manges, on behalf of the Debtors.  We filed an emergency motion on Monday.  It was at Docket Number 502 for an order authorizing the Debtors to enter into an Assurity Credit facility with RLI.

THE COURT:  I did see that, yeah.

MR. GEORGE:  Yeah.  I understand that the Court has not yet docketed that motion.

THE COURT:  No, and I'll tell you why.  Because we were all coming today and I wanted to figure out if there were any objections to it.  It was -- I knew everybody who I needed to talk to would be here.  So, I just -- it was easier for me to just ask is there -- can you remind me of the docket number?

MR. GEORGE:  It's 502.

THE COURT:  Is there any objection to 502?  Okay,

I'll get it on the docket.

MR. GEORGE:  All right, thank you, Your Honor.

THE COURT:  Let me ask the Committee -- let me ask the Committee how much time do you think -- I do want to do periodic check-ins just because there's apparently 306 people on the phone and I don't want them just -- what makes the most sense?  How much time do you think you need?  I'm going to find this docket.  Remind me of the docket number again.  5 --

MR. GEORGE:  502, Your Honor.

THE COURT:  Five-zero-two.  I'm going to -- I'll get that signed right now.

MR. WINOGRAD:  Your Honor, Mike Winograd from Brown Rudnick for the Committee.  When you asked how much time we need, I'm not sure what you're referring to.

THE COURT:  Oh, I heard you needed ten minutes, or a request for ten minutes.

MR. WINOGRAD:  That was the first we heard as well, but I assume what counsel meant is that our client's talking to some of our other colleagues.  But I believe that -- I don't think we need more time for that adjournment, is that right?

MR. CARTY:  To talk to clients?

MR. WINOGRAD:  Yeah.

MR. CARTY:  No.  Good afternoon, Your Honor.

Andrew Carty from Brown Rudnick on behalf of the official creditors Committee.  I think at this point, maybe an hour to try to get folks on the phone and talk through what we hope will be sort of final issues.  I think that would be the request.

THE COURT:  Okay.  I'm going to give you all -- yeah, it's 1:42.  We'll come back at 2:42.  I really am encouraging the parties -- I don't know what the outstanding issues are so I can just say it.  And I think it's in everyone's best interest to just -- it's an expensive room -- just to get a deal done or let's figure out what we do and tee the issues up and go.  So, I -- but I do think it makes a lot of sense for parties to continue to talk if it's productive and parties want to continue to kind of see if they can get this done, then great.  You've got an hour.  I'm going to sit here and sign 502 so I don't forget it.  I have to ask counsel one more time what the docket number is and I'll give everyone an hour.  We'll come back at 2:42.  Thank you.

MR. BARR:  Thanks, Your Honor.

THE COURT:  Hold on.  Did you hang up the line?

entity.  And I do believe, Your Honor, that when we get to the end of this hearing, you will agree with us that the Debtors have carried their burden of proof.  And the fees and the associated provisions and economics are

warranted under the circumstances.

Your Honor, we've agreed to a bunch of bespoke provisions, some of which Mr. Singh took you through in the DIP order and the revised DIP order.  And despite what I would characterize as off-the-shelf accusations, that we were the only DIP lender and therefore, we had the proverbial gun to the Debtor's head and got whatever we wanted.  I think the changes to the order (indiscernible) between interim and final, we'd rebut that argument.  To put it bluntly, Your Honor, you can't have it both ways.  They expect our clients, everyone in this room, including the Debtors, to effectively lend into a black box which doesn't seem to have a bottom, but complain in the same breath that we haven't lent enough or we haven't funded enough professionals, while at the same time, stripping both the mechanical and the economic protections that we negotiated with the Debtor to underwrite this DIP at the outset.

Your Honor, I said I was going to do the Reader's Digest version, so I'll stick with it.  I think, to the extent we don't get to a deal with the Creditor's Committee, obviously, we'll reserve for closing or more details there.

THE COURT:  Thank you.

MR. GREENBERG:  Thank you, Your Honor.

MR. SINGH:  Your Honor, if I can come back up.  Your Honor, again, Sunny Singh on behalf of the Debtors.

I'm pleased to announce we have a deal.  I just really wanted Mr. Greenberg -- I really wanted Mr. Greenberg to get through that.  He's been dying all morning to just make his statements.  Your Honor, if it's okay with you -- and this deal is with the UCC, the Debtors and the DIP lenders that will resolve the UCC's objection.  If it's okay with you, the parties have agreed that I can read into the record the terms of the deal, in principle.  I'm not going to read the actual language of where we are, obviously answer any questions Your Honor may have with respect to this, and then, what we would do, at least with respect to the UCC, is work on the order language, which will probably take us the rest of the day and either submit it to Your Honor or overnight or we'll be back -- if we've got an agreed order, we'll be back before Your Honor tomorrow if you can hear us. There's still other parties that are, I think, getting closer, but at least we'll be done with the UCC, and we can take stock of where we are with everybody else and maybe finish that overnight, as well.

THE COURT:  Okay.

MR. SINGH:  So, if that's okay, Judge.  So, Your Honor --

THE COURT:  Let me just confirm that Mr. Singh -- y'all are okay with reading these terms on the record?

MR. CARTY:  Subject to hearing them.  Your Honor,

for the record, Andrew Carty, Brown Rudnick, on behalf of the Committee.  We're fine with Mr. Singh reading into the record his view of the deal, but to the extent we have comments, we'll make those comments and then we'll work --

THE COURT:  All right.  Why don't we get you a chair and you can hang close and just make sure we keep him honest.

MR. CARTY:  -- we'll work to document it.

MR. SINGH:  Your Honor, I'll live by that rule.  As my wife always says, "Just because I say it, doesn't make it right."  So, okay, yeah.  All right.  I'm going to start.

THE COURT:  Okay.

MR. SINGH:  Okay.  So, Your Honor, the settlement is all of the terms that I outlined for your Honor this morning and that are already in the proposed order, the administrative claims basket, the cram up, that stays.  So, this is just on top of that, the remaining terms --

THE COURT:  The extension of the milestones, as well.

MR. SINGH:  The extension of the milestones, the Committee budget.

THE COURT:  Got it.

MR. SINGH:  The extension of the challenge period.  Everything that was in the -- and by the way, we've agreed to make, on some of the smaller points, a couple more

additional modifications in favor of the Committee.  I'm not going to necessarily read through those today, but we've got a couple of additional things.  So, the settlement is that the roll up will be -- the Committee will drop its objection and should Your Honor approve it, the roll up would be approved on a 3 to 1 basis, as proposed, with all of the fees, subject to the following: that with respect to proceeds of avoidance actions or commercial tort claims that are not otherwise encumbered already, and I'm just going to come back to that.

THE COURT:  Okay.

MR. SINGH:  So, litigation proceed recovery, right.  In that category, the roll up would be approved on a 1 to 1 basis, right.  And so, and I'll explain this in a second.  Let me just get it all out, Your Honor.  And the way that would work is, it would be -- when you're thinking about just the avoidance proceeds, it's the new money DIP obligations, including interest.  Plus, only the principal amount of the roll up.  So, on a 1 to 1 basis.  So, $1.1 billion.  So, the way to think about it is, at that level, right, the -- excuse me, the DIP lenders will agree that they will marshal away from avoidance proceeds for those amounts and look just to their other assets, right, including the unencumbered assets.  So, the way I, sort of, think about it, Your Honor, is, basically that, assume that

interest is $300-400 million.  So, the first $2.5 billion, if you add up the principal amount, the $2.1 plus the new money DIP with interest, $1.4 -- sorry, I said the principal amount $2.1.  The principal amount $1.1 of the roll up obligations, plus you've got the new money DIP with interest, that's about $1.4, we're just estimating.  So, you've got $2.5 billion of what we call, what I'm talking about here.

So, what they're going to do, the DIP lenders, is, with respect to that $2.5 billion, they'll first look to enterprise value, right, so, non-litigation proceed recovery.  If they get cashed out from that, then the balance of the roll up does not attach to the avoidance proceeds.  But what happens with respect to that is, the DIP lenders retain their adequate protection liens, right.  So, we treat that as if it was pre-petition.  They have to prove, and they have the right to prove diminution in value, Creditor's Committee and others can object.  And if there's no diminution in value or if there is, whatever is left over, to the extent they have a deficiency claim, there's no waiver with respect to the deficiency claim, right, so they have an unsecured claim with respect to that.  And so, that's how we would, sort of, try to resolve this issue, Your Honor.  That's the proposed settlement.  The one other point, just going back to when I said, it includes not only

avoidance proceeds, but commercial tort claims to the extent they are not already encumbered.  That issue we're reserving rights on, right.  So, the DIP lenders can say, "Look, I already had pre-petition liens on this particular commercial tort claim", and the UCC or the Debtors could say, "Well, no you didn't", and we can, sort of, fight about that issue. It is what it is.  But they're not -- the DIP lenders are not waiving those rights, if you follow what I'm saying.

THE COURT:  Mm hmm.

MR. SINGH:  So, Your Honor, and then the rest of the order is basically they get the 3 to 1 roll up with respect to all other assets that we're talking about here. So, I know that's insanely complicated, but it's really -- if you think about the avoidance proceeds, what we focused on is, what is the hurdle that you have to clear with respect to --

THE COURT:  Where you can look to.

MR. SINGH:  -- other assets and you know, assuming my interest rates that I went through, it's basically $2.5 billion, right.  And then if you clear that with other assets, then the DIP liens, which includes the 1 to 1 roll up on a principal basis, don't get to collect from the avoidance proceeds or the litigation recovery proceeds.

THE COURT:  Yeah.  I get it.

MR. SINGH:  Okay.  A couple of other points to

this, Your Honor.  The idea here is, you know, timing should not affect the settlement.  So, you know, if avoidance proceeds come in first versus sales proceeds coming in second or vice versa, the idea is, we can do things that make sense and sort of, deal with timing and allocation at the end, right.  The idea is not supposed to -- the timing is not supposed to prejudice either side, right.  So, when proceeds come in, sort of, it doesn't matter under this settlement, this deal applies.

THE COURT:  It's the allocation.

MR. SINGH:  The allocation, exactly.  And then Your Honor, with respect to the examiner motion, I mentioned earlier that we were going to get together and -- we are still going to do that, right.  The idea is, look, we really want to have an efficient case.  You know, I think from the DIP lenders' perspective, they're buying not just peace on the settlement, they're trying to buy global peace on that issue and whatever else makes sense for us to, kind of, move forward in a more efficient way in these cases.  Obviously, we're not binding anybody to anything, but what we've agreed and thanks to Ray Stone, who has been helpful on this.  You know, they filed their motion, it's supposed to be heard, right now, on the 17th.  What we've agreed is to request that Your Honor, and of course, we want to consult with the U.S. Trustee's office if they're okay with all of this, I

didn't get a chance to talk to Mr. Ruff, is to just push that motion onto the December 8th hearing that Your Honor provided this morning for (indiscernible) and some of the other stuff we're adjourning.

In the meantime, we would also push discovery off for a week, come up with a schedule, but really use this week to see if we can agree on a scope and potentially a budget, in line with Your Honor's comments this morning and what we think makes sense. So, hopefully this will lead to a path to a resolution of the examiner motion as well. If it doesn't, we'll have to deal with it on the 8th, so we're not binding anybody to this. But the idea is, let's see if we can wrap this up together, and so, that's how we would treat the examiner motion.

THE COURT: What about the schedule, with respect to the examiner motion? I know that there was a schedule. I think that extending the time to file a response in a Sunday reply.

MR. SINGH: Yes. We're going to -- I should have mentioned, we've agree to extend those. We don't have the dates.

THE COURT: No.

MR. SINGH: But everybody's agreed that we're going to push all that out, including the discovery.

THE COURT: Can I --

MR. SINGH:  So, we don't --

THE COURT:  Y'all can -- I will sign the order.  I was just telling everybody, I will sign a stipulation that pushes it out.  I'm not guaranteeing I'll read it if you file it on Sunday night.  But I promise you, I will sign the order if you want to file a reply on that time.  So, just use your time wisely.

MR. SINGH:  I appreciate your comments, Your Honor.  We'll come back to you and give you a better -- a more refined schedule consistent with this.

THE COURT:  Okay.

MR. SINGH:  So, Your Honor, I'm going to let --

THE COURT:  Yeah, obviously, I want you to consult with Mr. Ruff on that.  Mr. Ruff, I will --

MR. RUFF:  Yeah.

THE COURT:  -- my gut is, if everybody's rights are preserved with respect to the motion and parties want to engage in dialog, I'm open to it.  But obviously, I want folks to be able to talk to you.  I want you to be able to talk to your folks and I want to give you as much time as you need.  And we have time because that hearing isn't up till, what is it, the 17th?

MR. RUFF:  It's currently scheduled for the 17th.

THE COURT:  So, I think parties have time to talk, and if this agreement --

MR. RUFF:  We have time to talk, and I need to talk with my client.

THE COURT:  Yeah.  That's what I'm saying.

MR. RUFF:  I have no authority to do anything that --

THE COURT:  I don't want you to do anything today other than just be able to talk.

MR. RUFF:  This is the first I'm hearing of it, just as you are, Your Honor.  So --

THE COURT:  Yeah.  You got it.  Thank you, Mr. Ruff.  So, I think, let's not say anymore about that.

MR. SINGH:  Yeah, and Your Honor, I'll personally apologize to Mr. Ruff.  This is moving and he's been patiently waiting here all day, and I didn't get a chance to update him right before I jumped --

THE COURT:  He's watching folks walk in and out of here.  I think (indiscernible)

MR. SINGH:  Yeah.  So, Your Honor, that's the -- again, those are the key terms of the settlement that I've just outlined.  So, what we'd like to do is work on the order.  It'll probably take us a better part of today, probably into overnight.  And then we can figure out where we are with the other parties.  We are advancing the ball there, as well, and so, I'll let Mr. Carty or anybody stand up if they've got any clarifications or Mr. Greenberg.  But

that was all I wanted to say on the settlement.  Thank you.

MR. CARTY:  Good afternoon, Your Honor.  Andrew Carty from Brown Rudnick on behalf of the Official Creditors Committee.  First off, thank you, Your Honor for your accommodations today.  Very productive, very fruitful.  I think Mr. Singh's summation generally captures the deal.  We obviously need to document it and we're going to be working very hard to do that over the next couple of hours.  There are some other items.  Mr. Singh, I think alluded to some of them that kind of get into the weeds.  I don't think we need to get into that and I don't envision that it should be an issue finalizing language on that.  There is going to be some language around that cram up option that's in the order that we're going to have to clarify some things, especially how it's going to function.  And then there was also a discussion, to the extent that exclusivity is opened up, the Committee would also have that right.  I think right now it's limited to the Debtors, but the Committee would have that, to the extent exclusivity is opened.

With that, Your Honor, the only other thing, and this is, sort of, a funky one, but we -- and again, this is something that I discussed with Mr. Singh and I believe he discussed it with Mr. Greenberg, which is that, to the extent that the Debtors or the Committee, to the extent exclusivity is opened up, propose a cram up plan, there

can't be a provision in the RSA, for example, or some other agreement with the lenders that would trigger a default of the DIP.  That would essentially undo the spirit of that deal.  And so, we'll have to work through that.  It's odd because I think it's sort of a timing issue.  We have this RSA milestone as an example, that's five months from now, and so what we do here in the DIP, essentially it can't be undone by requirements of an RSA acceptable plan that prohibit what we've agreed to in the DIP and that would result in a default under the DIP to the extent the Debtors move forward with it.  That's the idea.  And again, I think we can work through language on that.

THE COURT:  I understand the concept.

MR. CARTY:  But with that, Your Honor, thank you very much.

THE COURT:  Thank you very much.  So, Mr. Greenberg, yes?

MR. GREENBERG:  Thank you, Your Honor.  Scott Greenberg, Gibson Dunn & Crutcher.  Just since this is, kind of a tri-parte discussion that's been going on, I'm glad to see my opening served a purpose (indiscernible) enough time. I've burned enough time for the Committee to finally tell us we're good to go.  But in all seriousness, obviously, we're happy to try to get this resolved and behind us.  I know, as Mr. Singh said, there's probably some ancillary parties we

still need to deal with.  As it relates to the, kind of, key economics that Mr. Singh outlined, it's our understanding, as well, we can obviously, as you know from all the adjournments working hard to try to get this done.  I think at this point, I wouldn't belabor the record.  I think we've just got to get it in the order and agree on it and put something in front of Your Honor.  But the key economic terms, I just wanted to confirm, were good as the DIP lenders, Your Honor.

THE COURT:  Thank you.  From a -- so, I had some things scheduled for 10 a.m. and I've moved them.  So, we've got the entire morning.  I've got a First Day at 1.  Does 9 a.m. make sense for tomorrow morning?

MR. SINGH:  Yes, Your Honor.

THE COURT:  So, what I would ask is, if it's possible, what I'd really like to do is, I don't know, sometime like 7:00 TO 8:00 a.m., just come in and just -- somebody can have something, even if it's the latest and greatest that everyone can read, something on the docket that someone can take an hour in the morning.  Like, sometime between -- in the morning, so myself, Mr. Ruff and (indiscernible) just can read whatever the latest version of the proposed order is, if you've got something there, so I can at least get my head wrapped around, kind of, what version it is.  If it gets filed late tonight, but at least,

that's fine.  What I would like to do is, kind of, walk in around 7:30 in the morning and just read for an hour-hour-and-a-half before I, kind of, just got in.  But also, at the same time, give everyone else an opportunity to, kind of, read to see to what extent.  And I got it, things can move by the time that paper gets here, but at least I know and the general public has something here.

Other than that, I'm going to end up taking an hour reading it on the spot and I don't want to do that or give people just as much notice as we can in terms of what the order would look like so that the parties -- and I know you're going to be talking with other parties.  Just, I got it, subject and you can put all the reservation rights language and all that good stuff in there on a one-pager.  But I would just -- I really just -- it would help me quite a bit to just take an hour and just read, kind of, where things are.  I understand it conceptually.  It all makes sense to me.  It would just -- I think the latest and greatest, just so we can give people notice.  There's plenty of people --

MR. SINGH:  Yeah.

THE COURT:  -- who have interest in this case, and I think it'd just be helpful to just give the public notice, as well.

MR. SINGH:  No problem, Your Honor.  We're

obviously happy to do that and we'll be sharing versions, not just with the UCC --

THE COURT:  Correct.

MR. SINGH:  -- and the DIP lenders, but we're talking the ABLs and other people (indiscernible), etc.

THE COURT:  Okay, so --

MR. SINGH:  So, we're happy to circulate it to as many people as we can.  So, that makes sense, Your Honor.  I think, to move forward, there's a couple of option.  I mean, I think -- I don't want to ask for another brief recess to take stock of where we are.  We could move --

THE COURT:  They're so much fun.

MR. SINGH:  We could -- I think we'd want to move our evidence in for the record since we are moving forward with that but I'm not hesitant to do that.  I just want to know if people are going to cross, etc. if we still have any open issues.  So, I'm trying to figure out if we're resolved or people are okay to defer or how others want to proceed. And I haven't had a chance to speak to people because now they're just learning of this news, so --

THE COURT:  Yeah.  No, let's just -- let's just break so that everybody's rights are going to be reserved. Let's just -- and then figure out what evidence you've got to move in tomorrow.  Just have the witness available, I guess, just in case.

MR. SINGH:  Okay.  That makes sense, Your Honor.

THE COURT:  And let's just -- let parties keep working and get it all buttoned up and let's just --

MR. SINGH:  That makes sense, Your Honor.

THE COURT:  -- let's just have a good morning.

MR. SINGH:  Okay.

THE COURT:  All right, folks.  Mr. Carlton?

MR. BLANK:  I'm sorry.  Mr. Blank.  We settled with -- we reached a short-term settlement with UMB.

THE COURT:  Oh, yeah.  Can you read that on the record, then?  That's great.

MR. BLANK:  I can read that into the record and (indiscernible) come back tomorrow.  So, Your Honor, it's a one-week --

THE COURT:  So, this is with UMB?

MR. BLANK:  This is with UMB.

THE COURT:  Thank you.

MR. BLANK:  It's a one-week settlement.  So, it's -- there's this dispute over ownership of the inventory and whether it's owned by the Debtors' entities or a non-Debtor entity called (indiscernible).  And that's obviously not going to be decided today and rights are reserved.  To keep the status quo over the next seven days, it's -- to the extent that UMB holds an interest in the inventory as of the petition date, a lien will attach to any interest of the

Debtors and the inventory to the extent that the inventory is replenished. So, they'll have a replacement lien. Again, to the extent that they had it as of the petition date over the next seven days. So, it'll be -- it'll cycle in.

THE COURT: Got it.

MR. BLANK: So, that's to keep them at those sites. And then the second piece of the settlement for the next seven days is that the Debtors will undertake to have (indiscernible), the non-Debtor operating in the ordinary course over the next seven days, consistent with how it's been operating over the past few weeks. It is a distressed company, but the way in which it buys and sells inventory at those facilities. Did I get that right?

THE COURT: So, and then -- so, I'll ask you before I -- what happens on November 13th?

MR. BLANK: So, we were in discussion. We're going to set up a call and try to resolve this, is the short answer.

THE COURT: Okay. The reason I'm saying is, I won't be in town on those days. And so --

MR. BLANK: Your Honor, Stephen --

THE COURT: And I'm on a flight on the 12th. What I'm saying is, I can -- if we do something, we may have to go -- if -- I'm not encouraging this --

MR. BLANK:  If UMB is fine with more time, I don't know.  If --

THE COURT:  Yeah.  No, no, let -- what I'm saying is, I'm going to give you two options.  Either just on the 13th, if we had to do something, it's going to have to be, like, old school, like on the phone, you know.

MR. BLANK:  Yeah.

THE COURT:  Dial in, no video kind of stuff. It'll just be an old school dial in hearing, and you can figure out if you want that.  If you want to stip it out just till Monday or something, I'd be fine with that, as well.  But, obviously, I'm just -- yeah, that's going to be --

MR. BLANK:  I think we should be fine to have it extended to Monday.  But for now, let's --

THE COURT:  No, no, no, no.  Keep it there.  I'm just giving you that so just --

MR. BLANK:  Your Honor?

THE COURT:  I'm just giving everyone timing.  But we may to have to go old school.

MR. BLANK:  Your Honor, I'm more than okay -- Steve Blank for the record, from Alston for UMB.  More than okay going old school.  The only thing I would point out is, if we don't get to a resolution, then we're going to be back in front of you asking for more adequate protection, which

also means it's going to be an evidentiary hearing.  So, clearly, reserving rights, whether it's Mr. Moore and to be able to cross-examine him, to bring my witness back.  I'm recognizing there's going to be limitations with doing that old school, on the phone.  So, to the --

THE COURT:  Yeah, that's why I'm saying, if it's just -- that's why I'm telling you.  But everybody's rights will be preserved on that.  Just wanted to give you a sense of my schedule here on the record as you think about this.  But that makes perfect sense, a one-week extension, got no issues.

MR. BLANK:  And then a few other clarifications, Your Honor.  And just to be clear, my understanding of the way the DIP order is working is that --

THE COURT:  (indiscernible)

MR. BLANK:  Well, no because just to make clear that any of the goodies that were in the DIP order, clarifying that the liens are not attaching to SPEs, that the SPE collateral is carved out.  All of that stuff is going to apply to us, as well.  There is no admin claims.  When it comes to 549, Chapter V, none of those types of causes of -- the DIP is not getting anything like that at our boxes right now, and we clearly reserve rights with all Chapter Vs and 549s.  And then, yeah, continuing to reserve rights and I appreciate the Debtors working with us to get

an extension.  And either we'll be back in front of you on the 13th or that Monday.

THE COURT:  All right.  Thank you.

MR. BLANK:  And Your Honor, to the extent that it ends up having to be for Monday, I assume the protections will just roll to Monday?

THE COURT:  Yeah, that's my understanding.  That's what I mean.  You just give that some thought.  What do I have on Monday?  Ooh, that Monday is -- yeah, you're already coming on Monday, that Monday, the 17th.  So, just give it some thought.

MR. BLANK:  That may move in light of the settlement, but yeah.

THE COURT:  Yeah.  So, just give that some thought.  We'll all be here.

MR. BLANK:  Appreciate it, Your Honor.

THE COURT:  Okay.  Thank you.

MR. SINGH:  And one other brief update.

THE COURT:  Yes, sir.

MR. SINGH:  We've also reached a deal in principle with the ABL lenders.  I told Mr. McGuire, counsel for the ABL lenders that just you wanted -- we're still working out stuff in the order, but we've got a deal in principle, and we can talk about what that settlement is at tomorrow's hearing.  But I just wanted to --

THE COURT:  Okay.  Thank you.  Mr. Kelley?

MR. KELLEY:  Good afternoon, Judge.  Charles Kelley for Mayer Brown on behalf of one of the more recently christened ancillary parties by Mr. Greenberg, on behalf of Katsumi Financing.  There are a number of -- excuse me, Katsumi Servicing, forgive me.  There are a number of receivables parties who may have similar or additional views on this, and they'll probably speak to this.  I have some things that I will want to address before the end of the hearing.  We have floated some ideas with the Debtors and I'm not going to announce what those ideas are, giving the Debtors a chance to process those.  But if we reach agreement, we'll be explaining those tomorrow.  If we do not, then we'll be arguing those tomorrow.  So, I appreciate the record won't be built until tomorrow because --

THE COURT:  That's correct.

MR. KELLEY:  -- we'll determine whether we're cross-examining witnesses or challenging the admission of exhibits.  But for now, I was heartened by the Court's comments recognizing the fundamental issue that we have been focused on, which is, we attempted pre-petition to purchase, and we do believe those transactions are defensible and structured as truth sales of receivables.  On First Day, we started with a declaration that informed us that there might have been some double charging or double billing of those

receivables to third parties where maybe proceeds weren't made there.  The protections we put in the interim order were constructed specifically to protect our rights.  Either we own outright separate property and therefore, it's not property of the estate, or we've got proceeds that are proceeds that we have to go track down, that is our proceeds.

We now were told, as of three or four days ago, there's a little bit of ground shifting going on of size and proportion we're going to get into.  And now there's maybe bigger issues than just double selling receivables is what we've heard.  We have been talking about process and procedure with Debtors, and we hope to have more flesh on the bones on that.  But the big thing from our perspective is, those are individual harms to these parties, not estate causes of action, they're individual harms.  So, we have been trying to be very judicious in the way we put our objections together and a lot of the remedies we seek which are all tied to those coins.  We don't really think the challenge period applies to us because these are individual causes of action or state causes of action.  We've been trying to draw clearly where we think that line is.  There may be some things that we have to look at as to how we deal with the two procedures we're talking about with the Debtors.  But those causes of action are ours.

The causes of action related to whether they're actual receivables, meaning there's money in the hands of the Debtors that we have to get, whether there's been defrauding and our proceeds were just stolen property from us, the money went somewhere else.  We have rights (indiscernible) recover those against third parties.  Obviously, the stay prevents us from going directly after the Debtor and we respect that.  We are concerned about those parameters and how we have to deal with (indiscernible).  We're the biggest, perhaps parties here who are trying to find information.  We've provided a lot of information to the Debtors.  The Debtors have assured us that they're going to reciprocate and provide us information.  We don't have it as we stand here today.  For that reason, there's a lot of protections we've been asking because on Day 1, we were looking at one sort of problem.  Now, here we are on Second Day, looking at a variety of different issues and we've put some language out there that we think protects us.  I heard the settlement with the Committee talked about commercial tort claims going to the Committee.  That's fine, but those are estate causes of action, not our causes of action.  And those are issues that we will be looking at the language on.  But we were heartened that the Court recognized those issues and we've been very crisp on staying focused on those because we still

don't know the full scope of what we're talking about.

We will be constructive.  We hope everything will be able to be addressed in language in the order.  We've had some very robust conversations with the Debtors.  But for now, we did not want to be a creditor of this estate.  We were thinking we were doing a transaction and buying separate property and would not be.  We have been told, obviously, by these actions, we may be involuntary creditors of the estate, to an order and magnitude we're going to learn about.

But for that reason, I wanted to say a few words while you -- before you got a chance to see the form of order, so you know what issues we're going to be attuned to. We are going to try to work within the parameters of what is in the state cause of action versus what may be our individual causes of action.  We are open to working very cooperatively with the estate on how we navigate those channels.  But we find ourselves with a landscape that has dramatically changed in the past 72 hours.  We're still learning and processing and are positioning ourselves, Judge.  Thank you for the opportunity.  I'm going to want to speak more after we figure out what we can work out with the Debtors and if not, we'll be making arguments on what we think should belong in that order.

THE COURT:  Thank you very much.

MR. KELLEY:  Thank you.

THE COURT:  Let me just see one thing.  I wanted to clarify on the record on the Mr. Carlton.  I know I said we'd be back on the 17th.  I know that, at the same time, you asked that potentially that hearing get moved.  What I intended to say, and I didn't want to prejudice, is that there's time already slotted out for First Brands on that day.  So, if we had to move to the 17th, that time slot works, in other words.  That's a better time slot.  I understand that there may be a hearing that day or not that day and I want to let y'all work that out.  But at least there was a slot available, and we could use that time slot as an available time slot.  That's what I meant.

MR. CARLTON:  Understood.

THE COURT:  Okay.  Thank you.

MR. BLANK:  Your Honor, since you brought us back up and just to clarify the second point that he said in terms of the ordinary course and what the non-Debtor entity would continue to do.  Conceptually, this is just to make sure that in the next week, all of our collateral is taken out of the box and nothing (indiscernible)

THE COURT:  I got it.  That makes sense to me.  Okay.  All right.  Thank you very much.  I very much appreciate everyone's time.  We'll see each other 9 a.m.  I'm going to sit here.  If -- how do I want to do this?  If

there are chairs, why don't you -- yeah, why don't we -- why don't we just put them back and just grab them in the morning because -- just because the people who are here will remember where they are and they may not be back tomorrow. So, if you took a chair, please put it back.  If not, it will be Nia, my law clerk, trying to figure out what you did.  But if not, I think everyone, we'll see each other tomorrow morning.  You're adjourned.  Thank you.

MR. BLANK:  Your Honor, may we leave boxes?

THE COURT:  Yes, absolutely.  Absolutely.  You can leave all your stuff.

MR. SINGH:  Thank you, Your Honor.

MR. BLANK:  Thank you.

(Proceedings adjourned at 3:35 p.m.)

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  November 10, 2025