IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | Re:  Docket Nos. 3019 & 3020 |

**NOTICE OF FILING OF (I) SOLICITATION VERSIONS OF
CHAPTER 11 PLAN AND DISCLOSURE STATEMENT AND (II) REDLINES**

**PLEASE TAKE NOTICE THAT**, on June 12, 2026, First Brands Group, LLC and certain affiliated Debtors (the "**FBG Debtors**") filed a revised *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 2981) (the "**Revised Joint Plan**").

**PLEASE TAKE FURTHER NOTICE THAT**, on June 12, 2026, the FBG Debtors filed a revised *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 2982) (the "**Revised Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE THAT**, on June 16, 2026, the FBG Debtors filed the solicitation version of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3019) (the "**Solicitation Plan**").  On June 17, 2026, the FBG Debtors filed the solicitation version of the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3020)

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

(the "**Solicitation Disclosure Statement**").   The Solicitation Plan and Solicitation Disclosure Statement contain certain revisions to the Revised Joint Plan and Revised Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE THAT** a redline of the Solicitation Plan marked against the Revised Joint Plan is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE THAT** a redline of the Solicitation Disclosure Statement marked against the Revised Disclosure Statement is attached hereto as **Exhibit B**.

Dated: June 17, 2026
      Houston, Texas

                      */s/  Clifford W. Carlson*
                      WEIL, GOTSHAL & MANGES LLP
                      Gabriel A. Morgan (24125891)
                      Clifford W. Carlson (24090024)
                      700 Louisiana Street, Suite 3700
                      Houston, Texas 77002
                      Telephone:  (713) 546-5000
                      Facsimile:  (713) 224-9511
                      Email:   gabriel.morgan@weil.com
                                clifford.carlson@weil.com

                      -and-

                      WEIL, GOTSHAL & MANGES LLP
                      Matthew S. Barr (admitted *pro hac vice*)
                      Sunny Singh (admitted *pro hac vice*)
                      Andriana Georgallas (admitted *pro hac vice*)
                      Kevin Bostel (admitted *pro hac vice*)
                      Jason H. George (admitted *pro hac vice*)
                      767 Fifth Avenue
                      New York, New York 10153
                      Telephone:  (212) 310-8000
                      Facsimile:  (212) 310-8007
                      Email:   matt.barr@weil.com
                                sunny.singh@weil.com
                                andriana.georgallas@weil.com
                                kevin.bostel@weil.com
                                jason.george@weil.com

                      *Attorneys for Debtors*
                      *and Debtors in Possession*

**DEBTORS' EXHIBIT NO. 7**
**Page 3 of 272**

**<u>Certificate of Service</u>**

I hereby certify that on June 17, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


  */s/  Clifford W. Carlson*
Clifford W. Carlson

## Exhibit A

**Redline of Plan**

*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**JOINT CHAPTER 11 PLAN OF**
**FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS**[2]

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

June ~~12~~16, 2026
Houston, Texas

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] All Definitive Documents, including the Plan and the Disclosure Statement, remain subject to ongoing review, revisions, and further negotiations by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties in all respects.

**Table of Contents**

**Page**

**ARTICLE I.      Definitions and Interpretation.** ........................................................... **1**

   1.1     Definitions. ................................................................................................. 1
   1.2     General Applicability. .......................................................................... ~~29~~30
   1.3     Interpretation; Application of Definitions; Rules of Construction. ....... ~~29~~30
   1.4     Reference to Monetary Figures. ............................................................... 30
   1.5     Consent Rights. ........................................................................................ 30
   1.6     Controlling Document. ......................................................................... ~~30~~31

**ARTICLE II.     Administrative Expense Claims, DIP A Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims.** ................. **31**

   2.1     Administrative Expense Claims. .............................................................. 31
   2.2     DIP A Claims. ......................................................................................... 31
   2.3     Professional Fee Claims. ...................................................................... ~~31~~32
   2.4     Restructuring Expenses. ....................................................................... ~~32~~33
   2.5     Priority Tax Claims. ................................................................................. 33

**ARTICLE III.    Classification of Claims and Interests Against the FBG Debtors.** ... ~~33~~34

   3.1     Classification in General. ..................................................................... ~~33~~34
   3.2     Summary of Classification of Claims and Interests. ............................ ~~33~~34
   3.3     Special Provision Governing Unimpaired Claims. .................................. 34
   3.4     Elimination of Vacant Classes. ............................................................ ~~34~~35
   3.5     Voting Classes; Presumed Acceptance by Non-Voting Classes. .......... ~~34~~35
   3.6     Voting; Presumptions; Solicitation. ..................................................... ~~34~~35
   3.7     Cramdown. .............................................................................................. 35
   3.8     No Waiver. ............................................................................................... 35

**ARTICLE IV.    Treatment of Claims and Interests Against the FBG Debtors.** .......... **35**

   4.1     Class 1:  Other Priority Claims. .............................................................. 35
   4.2     Class 2:  Other Secured Claims. ........................................................... ~~35~~36
   4.3     Class 3:  Roll-Up Claims. ....................................................................... 36
   4.4     Class 4:  First Lien Claims. ................................................................... ~~36~~37
   4.5     Class 5:  Second Lien Claims. ................................................................ 37
   4.6     Class 6:  ABL Claims. ........................................................................... ~~37~~38
   4.7     Class 7:  General Unsecured Claims. .................................................... ~~38~~39
   4.8     Class 8:  Subordinated Claims. ............................................................. ~~38~~39
   4.9     Class 9:  Intercompany Claims. ............................................................... 39
   4.10    Class 10:  FBG Debtor Interests. ............................................................. 39

**ARTICLE V.     Means for Implementation.** ........................................................... ~~39~~40

5.1     Compromise and Settlement of Claims, Interests, and Controversies. ............ ~~39~~40
5.2     Plan Settlement. ........................................................................................ 40
5.3     Implementation. ........................................................................................ ~~43~~44
5.4     Factored Receivables Account. .................................................................. 45
5.5     Wind Down Accounts. ............................................................................... ~~45~~46
5.6     Corporate Action. ..................................................................................... ~~45~~46
5.7     Wind Down Administrator. ........................................................................ 46
5.8     Governance. .............................................................................................. ~~47~~48
5.9     Cancellation of Existing Securities, Agreements, and Liens. ....................... ~~47~~48
5.10    Dissolution of FBG Debtors. ..................................................................... 48
5.11    Effectuating Documents; Further Transactions. .......................................... ~~48~~49
5.12    Closing of the Chapter 11 Case. ................................................................. ~~48~~49

**ARTICLE VI.    Litigation Trust.** ........................................................................... 49

6.1     Establishment of the Litigation Trust. ........................................................ 49
6.2     Funding of and Transfer of Assets into the Litigation Trust. ....................... ~~49~~50
6.3     Initial Litigation Trust Funding Commitments and Litigation Trust Backstop
        Commitments. ........................................................................................... ~~52~~53
6.4     Additional Litigation Trust Funding. .......................................................... 54
6.5     Litigation Trust Waterfall. ......................................................................... ~~55~~56
6.6     Minimum Distribution; No Fractional Distributions. ................................... ~~59~~60
6.7     Lender Distribution Agent. ........................................................................ ~~59~~60
6.8     Administration of the Litigation Trust. ....................................................... 60
6.9     Litigation Trust Oversight Committee. ....................................................... 60
6.10    Litigation Trustee. .................................................................................... ~~60~~61
6.11    Preference Settlement. ............................................................................... ~~62~~63
6.12    Fees and Expenses of the Litigation Trust. ................................................. ~~65~~66
6.13    Indemnification. ........................................................................................ ~~65~~66
6.14    Dissolution of the Litigation Trust. ............................................................ ~~65~~66
6.15    Records. .................................................................................................... ~~65~~66
6.16    Turnover of Litigation Trust Assets. ........................................................... ~~65~~66
6.17    Assignment of Horizon Alester IP. ............................................................. ~~66~~67
6.18    Non-Transferability. .................................................................................. ~~66~~67
6.19    Litigation Trust Tax and Other Matters. ..................................................... ~~66~~67

**ARTICLE VII.   DIP Collateral Trust.** ................................................................... ~~70~~71

7.1     Establishment of the DIP Collateral Trust. ................................................. ~~70~~71
7.2     Transfer of Assets into the DIP Collateral Trust. ........................................ ~~70~~71
7.3     DIP Collateral Trust Funding. .................................................................... ~~71~~72
7.4     DIP Collateral Trust Waterfall. .................................................................. ~~72~~73
7.5     DIP Collateral Trustee. .............................................................................. ~~73~~74
7.6     Fees and Expenses of the DIP Collateral Trust. .......................................... ~~75~~76

ii

7.7     DIP Collateral Trust Oversight Committee. ........................................... 7576
7.8     Indemnification. ................................................................................... 7576
7.9     Minimum Distribution; No Fractional Distributions. .............................. 7677
7.10    Dissolution of the DIP Collateral Trust. ............................................... 7677
7.11    Records. .............................................................................................. 7677
7.12    Turnover of DIP Collateral Trust Assets. ............................................. 7778
7.13    Non-Transferability. ............................................................................ 7778
7.14    Maintenance of Lender Registers Post-Confirmation Date. .................... 7778
7.15    DIP Collateral Trust Tax and Other Matters. ........................................ 7879

ARTICLE VIII. ABL Collateral Trust. .......................................................... 8081

8.1     Establishment of the ABL Collateral Trust. .......................................... 8081
8.2     Transfer of Assets into the ABL Collateral Trust. .................................. 8182
8.3     ABL Collateral Trust Waterfall. ........................................................... 8283
8.4     ABL Collateral Trustee. ....................................................................... 8283
8.5     Fees and Expenses of the ABL Collateral Trust. .................................... 8384
8.6     Indemnification. ................................................................................... 8485
8.7     Dissolution of the ABL Collateral Trust. ............................................... 8485
8.8     Records. .............................................................................................. 8485
8.9     Turnover of ABL Collateral Trust Assets. ............................................. 8485
8.10    Non-Transferability. ............................................................................ 8485
8.11    ABL Collateral Trust Tax and Other Matters. ....................................... 8485

ARTICLE IX.    Distributions. ......................................................................... 8889

9.1     No Postpetition Interest on Claims. ...................................................... 8889
9.2     Distribution Record Date. .................................................................... 8889
9.3     Date of Distributions. .......................................................................... 8990
9.4     Reserve on Account of Disputed Claims of the FBG Debtors. ................ 8990
9.5     Distributions After Effective Date. ....................................................... 9091
9.6     Delivery of Distributions. ..................................................................... 9091
9.7     Unclaimed Property. ............................................................................ 9091
9.8     Satisfaction of Claims. ......................................................................... 9192
9.9     Manner of Payment Under Plan. ........................................................... 9192
9.10    Minimum Distribution. ......................................................................... 9192
9.11    Setoffs and Recoupments. .................................................................... 9192
9.12    Withholding and Reporting Requirements. ............................................ 9192
9.13    Disbursing Agent. ................................................................................ 9293
9.14    Allocation of Distributions Between Principal and Interest. .................... 9394

ARTICLE X.    Procedures for Resolving Claims Against the FBG Debtors. .... 9394

10.1    Allowance of Claims. ........................................................................... 9394
10.2    Objections to Claims. ........................................................................... 9394
10.3    Estimation of Claims. ........................................................................... 9495
10.4    Claim Resolution Procedures Cumulative. ............................................ 9495

iii

10.5     Adjustment to Claims Register Without Objection. ......................... 94 95
10.6     No Distributions Pending Allowance. ............................................. 94 95

**ARTICLE XI.    Executory Contracts and Unexpired Leases. ..................... 95 96**

11.1     Rejection of Executory Contracts and Unexpired Leases. ............... 95 96
11.2     Survival of Indemnification Obligations. ....................................... 95 96
11.3     Rejection Damages Claims. ............................................................ 95 96
11.4     Insurance Policies. ......................................................................... 96 97
11.5     Reservation of Rights. .................................................................... 97 98

**ARTICLE XII.    Conditions Precedent to Occurrence of Effective Date. ..... 97 98**

12.1     Conditions Precedent to Effective Date. ......................................... 97 98
12.2     Waiver of Conditions Precedent. .................................................. 99 100
12.3     Effect of Failure of a Condition. ................................................... 99 100
12.4     Effect of Vacatur of Confirmation Order. ..................................... 99 100

**ARTICLE XIII. Effect of Confirmation. ................................................. 99 100**

13.1     Binding Effect. .............................................................................. 99 100
13.2     Vesting of Assets. ........................................................................ 100 1
13.3     Pre-Confirmation Injunctions and Stays. ...................................... 100 1
13.4     Plan Injunction. ........................................................................... 101 2
13.5     Releases. ...................................................................................... 103 4
13.6     Exculpation. ................................................................................. 106 7
13.7     Waiver of Statutory Limitation on Releases. ................................ 107 8
13.8     Injunction Related to Releases and Exculpation. .......................... 107 8
13.9     Subordinated Claims. ................................................................... 107 8
13.10   Retention of Causes of Action and Reservation of Rights. ........... 107 8
13.11   Ipso Facto and Similar Provisions Ineffective. ............................. 108 9
13.12   Solicitation of Plan. ..................................................................... 108 9

**ARTICLE XIV. Retention of Jurisdiction. ............................................. 108 9**

14.1     Retention of Jurisdiction. ............................................................. 108 9
14.2     Courts of Competent Jurisdiction. ................................................ 110 1

**ARTICLE XV.    Miscellaneous Provisions. ........................................... 111 2**

15.1     Statutory Fees. ............................................................................. 111 2
15.2     Exemption from Certain Transfer Taxes. ...................................... 111 2
15.3     Dissolution of Creditors' Committee. ........................................... 111 2
15.4     Request for Expedited Determination of Taxes of the FBG Debtors. ..... 112 3
15.5     Dates of Actions to Implement Plan. ............................................ 112 3
15.6     Amendments. ............................................................................... 112 3
15.7     Revocation or Withdrawal of Plan. ............................................... 112 3
15.8     Notice of Confirmation Date and Effective Date. ......................... 113 4

iv

15.9    Substantial Consummation. ................................................................................ 113 ~~4~~

15.10  Governing Law. .................................................................................................... 113 ~~4~~

15.11  Immediate Binding Effect. .................................................................................. 113 ~~4~~

15.12  Successors and Assigns. ....................................................................................... 114 ~~5~~

15.13  Entire Agreement. ................................................................................................ 114 ~~5~~

15.14  Severability of Plan Provisions. .......................................................................... 114 ~~5~~

15.15  Additional Documents. ......................................................................................... 114 ~~5~~

15.16  Deemed Acts. ........................................................................................................ 114 ~~5~~

15.17  Computing Time. .................................................................................................. 115 ~~6~~

15.18  Exhibits to Plan. ................................................................................................... 115 ~~6~~

15.19  Notices. ................................................................................................................. 115 ~~6~~

15.20  Reservation of Rights. .......................................................................................... 117 ~~8~~

v

First Brands Group Holdings, LLC ("**FBGH**"), FBGH's direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC (collectively, the "**FBG Debtors**") propose the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

## ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### 1.1     *Definitions.*

The following terms shall have the respective meanings specified below:

*ABL Agent* has the meaning set forth in the DIP Order.

*ABL Borrowers* has the meaning set forth in the DIP Order.

*ABL Claims* means all Secured Claims (including all accrued and unpaid interest, fees, charges, expenses, and other amounts) arising from (i) the ABL Credit ~~Agreement and~~Documents (as defined in the DIP Order ~~relating to the ABL Credit Agreement.~~) or (ii) the DIP Order or any other applicable order of the Bankruptcy Court, in each case, that are on account of the ABL Obligations and Cash Management Obligations (each as defined in the DIP Order) and including all Secured Claims held by any ABL Secured Party secured by any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*ABL Collateral Trust* means that certain liquidating trust to be established upon entry of the Confirmation Order in accordance with <u>ARTICLE VIII</u> of the Plan to hold, transfer, sell, monetize, or abandon the ABL Collateral Trust Assets and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan.

*ABL Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the ABL Collateral Trust, establishing the terms and conditions of the ABL Collateral Trust, the rights of, and limitations on, the ABL Collateral Trust Interests, and pursuant to which the ABL Collateral Trustee shall manage and administer the ABL Collateral Trust Assets.

*ABL Collateral Trust Assets* means any (i) ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (x) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, and (ii) rights, title, and interests of the holders of ABL Deficiency Claims in respect of any amounts or proceeds to be realized on account of such ABL Deficiency Claims (which rights, title, and interests are contributed to the ABL Collateral Trust pursuant to <u>Section 4.6(b)</u> of the Plan by holders of ABL Deficiency Claims and are not assets of the FBG Debtors transferred in connection with the foreclosure upon the ABL Collateral Trust Assets of the FBG Debtors).  The ABL Collateral

Trust Assets include (a) any amounts in the Factored Receivables Account that are determined by a Final Order to be property of an FBG Debtor's Estate, but excluding any amounts in the Factored Receivables Account that the Bankruptcy Court determines by a Final Order that a Factor has a validly perfected first-priority security interest in such amounts, (b) the ABL Reserved Claims, and (c) all Insurance Rights of the FBG Debtors in respect of ABL Priority Collateral (solely to the extent such rights result from insured assets or property that constituted ABL Priority Collateral prior to the event giving rise to such Insurance Rights).  The ABL Collateral Trust Assets will be identified in a schedule annexed to the ABL Collateral Trust Agreement, which schedule shall be prepared in consultation with the ABL Agent.  To the extent the ABL Agent disagrees with the scope of the ABL Collateral Trust Assets set forth in the ABL Collateral Trust Agreement schedule, the ABL Agent may seek appropriate relief from the Bankruptcy Court.  For the avoidance of doubt, (i) in no event shall any assets that constitute Litigation Trust Assets or DIP Collateral Trust Assets be considered ABL Collateral Trust Assets, and (ii) ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor, the SPV Lenders, or the DIP Secured Parties.

*ABL Collateral Trust Beneficiaries* means the holders of the ABL Collateral Trust Interests.

*ABL Collateral Trust Interests* means the beneficial interests in the ABL Collateral Trust granted to holders of Allowed ABL Claims upon entry of the Confirmation Order, which beneficial interests shall entitle holders to share in distributions in accordance with the ABL Collateral Trust Waterfall.

*ABL Collateral Trust Waterfall* means the method for  making distributions to the holders of ABL Collateral Trust Interests in the order of priority set forth in Section 8.3 of the Plan and the ABL Collateral Trust Agreement.

*ABL Collateral Trustee* means the trustee for the ABL Collateral Trust, which, unless otherwise disclosed in the Plan Supplement, shall be the ABL Agent (or its designee).

*ABL Credit Agreement* means that certain *ABL Credit Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Group Intermediate, LLC, (iii) the other borrowers from time to time party thereto, (iv) Bank of America, N.A., as administrative agent and collateral agent, and (v) the lenders from time to time party thereto.

*ABL Deficiency Claims* has the meaning set forth in Section 4.6(b) of the Plan.

*ABL Guarantors* has the meaning set forth in the DIP Order.

*ABL Intercreditor Agreement* has the meaning set forth in the DIP Order.

*ABL Lenders* has the meaning set forth in the DIP Order.

*ABL Loan Parties* means, collectively, the ABL Borrowers and other ABL Guarantors.

*ABL Parties* means Bank of America, N.A., Truist Bank, U.S. Bank National Association, and the ABL Agent, in their capacities as lenders or providers of financing or liquidity to one or more FBG Debtors prior to the Petition Date.

*ABL Priority Collateral* has the meaning set forth in the DIP Order.

*ABL Reserved Claims* means, collectively, the following, each of which shall vest in the ABL Collateral Trust: (i) all claims, Causes of Action, and rights (excluding any Estate Claims or Recovery Action Proceeds) against any customer, Account, Debtor, or other Person arising from, relating to, or in connection with, any prepetition credits, rebates, chargebacks, deductions, or offsets applied or asserted against accounts or other ABL Priority Collateral of any FBG Debtor; and (ii) all claims, Causes of Action, and rights (excluding any Estate Claims or Recovery Action Proceeds) against any SPV Lender, SPV Debtor, or other Person arising from, relating to, or in connection with, any competing or adverse claim to ownership, priority, or possession of any ABL Priority Collateral or the proceeds thereof.

*ABL Secured Parties* has the meaning set forth in the DIP Order.

*Account* has the meaning ascribed to such term in the ABL Intercreditor Agreement.

*Ad Hoc Group* has the meaning set forth in the DIP Order.

*Ad Hoc Group Advisors* has the meaning set forth in the DIP Order.

*Ad Hoc Group SteerCo* means the holders of DIP A Claims that comprised the members of the steering committee of the Ad Hoc Group as of the date of the entry of the Agreed Mediation Order.

*Additional Class 1 Litigation Trust Funding* means, if applicable, up to $37,500,000 in principal amount of funding commitments and/or contributions.

*Additional Class 1 Litigation Trust Interests* means, if applicable, any Class 1 Litigation Trust Interests issued on account of any Additional Class 1 Litigation Trust Funding.

*Additional Litigation Trust Funding* means, collectively, Additional Class 1 Litigation Trust Funding and Additional Waterfall Litigation Trust Funding.

*Additional Unencumbered Property* has the meaning set forth in the DIP Order.

*Additional Waterfall Litigation Trust Funding* means, if applicable, any additional funding for the Litigation Trust that primes the entire Litigation Trust Waterfall.

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328,

330, 365, and 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving an FBG Debtor's Estate and operating an FBG Debtor's business, other than Professional Fee Claims, Restructuring Expenses, DIP A Claims, Roll-Up Claims, Intercompany Claims, and Priority Tax Claims.

*Administrative Expense Claims Consent Program* means the consent program offered to holders of Administrative Expense Claims against the FBG Debtors pursuant to which such holders may elect to compromise the Allowed amount of their Administrative Expense Claims against the FBG Debtors in exchange for receiving the treatment provided to Settled Administrative Expense Claims under the Plan, including receiving distributions from the Litigation Trust before payment of other Allowed Administrative Expense Claims in accordance with Section 6.5(d)(i) of the Plan; *provided* that the Claims Ombudsman shall not be required to reserve on account of distributions to holders of Claims junior in priority to Administrative Expense Claims (including for distributions to holders of Administrative Expense Claims who do not opt in to the Administrative Expense Claims Consent Program); *provided further* that, in the event the Litigation Trust is unable to make distributions sufficient to satisfy Allowed Administrative Expense Claims in full, payments made to holders of Settled Administrative Expense Claims are not subject to clawback or disgorgement.

*Administrative Expense Claims Consent Program Opt-In Form* means the opt-in form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims against the FBG Debtors pursuant to which such holders may opt in to participating in the Administrative Expense Claims Consent Program.

*Adverse Conduct* means (i) engaged in wrongful, actual, or constructively fraudulent conduct against any Debtor or Affiliate of any Debtor, or otherwise participated, conspired with, or acted in concert with, any Person that engaged in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or Affiliates of Debtors), (ii) received an avoidable transfer on grounds other than section 547 of the Bankruptcy Code from any of the Debtors, or (iii) received a transfer not in good faith.

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity.  As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Agreed Market Check* means a third-party solicitation or marketing process conducted by or on behalf of the Litigation Trust to solicit funding, bids, or other expressions of competitive interest, including from multiple unaffiliated and independent market participants, that is: (i) designed and implemented in good faith by the Litigation Trustee in consultation with its retained professionals; (ii) reasonably tailored to prevailing market conditions, the nature of the Litigation Trust Assets, and the objectives of the Litigation Trust; (iii) inclusive of meaningful outreach to a sufficient number of credit and active market participants to permit an informed comparison of available alternatives; and (iv) documented in writing and performed consistent with the Litigation Trustee's duties.

*Agreed Mediation Order* means the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 1822).

*AHG Member(s)* means the member(s) of the Litigation Trust Oversight Committee appointed by the Ad Hoc Group SteerCo in accordance with the Litigation Trust Agreement.

*Alester Agreements* means, collectively, (i) that certain *Contribution Agreement*, dated December 30, 2022, by and between TAE Brakes, LLC and Alester Technologies, LLC; (ii) that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC; (iii) that certain *Intellectual Property License Agreement*, dated as of February 8, 2023, by and between First Brands Group, LLC and Alester Technologies, LLC; (iv) that certain *Contribution Agreement*, dated July 3, 2023, by and between Cardone Industries, Inc. and Alester Technologies, LLC; and (v) that certain *Contribution Agreement*, dated September 29, 2023, by and between Carter Carburetor Holdings, LLC and Alester Technologies, LLC.

*Allowed* means, with respect to any Claim against or Interest in an FBG Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder; (ii) any Claim against or Interest in an FBG Debtor as to which the liability of the FBG Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (iii) any Claim against or Interest in an FBG Debtor expressly Allowed under the Plan; or (iv) any Claim against an FBG Debtor that is listed in the applicable FBG Debtor's Schedules as liquidated, non-contingent, and undisputed.

*Allowed Lender Claims* means, collectively, the (i) DIP Claims, (ii) First Lien Claims, ~~and~~ (iii) Second Lien Claims, ~~including~~and (iv) the Remaining Lender Claims, each of which shall be deemed Allowed under this Plan upon entry of the Confirmation Order.

*Available Cash* means, with respect to each Trust, (i) Cash on hand (including any amounts invested pending distribution) of such Trust, as of the date of determination, realized from the Trust's assets *less* (ii) (a) any fees and costs incurred by the Trust associated with the collection of such proceeds, (b) any amounts reserved in respect of Disputed Claims, and (c) any reserves established in the good faith discretion of the Trustee to pay (w) any

5

obligations or liabilities of the Trust, (x) any costs or expenses of the Trust or the Trustee, (y) any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or (z) any amounts needed to maintain the value of any assets of the Trust.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the FBG Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Avoidance Proceeds* means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

*Cash Management Order* means the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (Docket No. 604).

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right,

6

guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession or Trustee to assert rights to extend time under 11 U.S.C. § 108.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any Estate Claims, Recovery Actions, and Avoidance Actions; and (vi) with respect to each of the Specified Non-Released Parties, all of the aforementioned items that can be or may be asserted against any Specified Non-Released Party.

*Challenge Period* has the meaning set forth in the DIP Order.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Claims and Noticing Agent* means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*Claims Ombudsman* means a ~~representative~~Person selected by the Creditors' Committee, with the consent of the FBG Debtors and Ad Hoc Group SteerCo~~–~~ (not to be unreasonably withheld, conditioned, or delayed), that shall have the qualifications, duties, and responsibilities described in Section 5.2(g) of the Plan, subject to the terms of the Litigation Trust Agreement.  The identity of the Claims Ombudsman will be disclosed in the Plan Supplement.

*Claims Register* means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*Class* means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

DEBTORS' EXHIBIT NO. 7
Page 18 of 272

*Class 1 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to the DIP Collateral Trust Funding Contributors upon entry of the Confirmation Order.

*Class 1 Litigation Trust Interests* means, collectively, the beneficial interests in the Litigation Trust granted to the Litigation Trust Class 1 Funding Contributors on account of the Initial Litigation Trust Funding Commitments upon entry of the Confirmation Order or, if applicable, on account of any Additional Class 1 Litigation Trust Funding.

*Class 2 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order; *provided* that no Class 2 DIP Collateral Trust Interests shall be granted to a holder of Allowed DIP A Claims that holds less than $1,000 in principal amount of Allowed DIP A Claims.

*Class 2 Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order; *provided* that no Class 2 Litigation Trust Interests shall be granted to a holder of Allowed DIP A Claims that holds less than $1,000 in principal amount of Allowed DIP A Claims.

*Class 3 Litigation Trust Interests* means, collectively, the (i) Class 3(a) Litigation Trust Interests, (ii) Class 3(b) Litigation Trust Interests, and (iii) Class 3(c) Litigation Trust Interests.

*Class 3(a) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed Roll-Up Claims upon entry of the Confirmation Order; *provided* that no Class 3(a) Litigation Trust Interest shall be granted to a holder of Allowed Roll-Up Claims that holds less than $1,000 in principal amount of Allowed Roll-Up Claims.

*Class 3(b) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the Claims Ombudsman, as agent to the holders of Allowed General Unsecured Claims and Allowed Subordinated Claims.

*Class 3(c) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed First Lien Claims and/or Allowed Second Lien Claims upon entry of the Confirmation Order; *provided* that no Class 3(c) Litigation Trust Interest shall be granted to a holder of Allowed First Lien Claims and/or Allowed Second Lien Claims that holds less than $1,000 in principal amount of Allowed First Lien Claims or Allowed Second Lien Claims, respectively.

*Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order and the Definitive Documents are in form and substance acceptable to the Ad Hoc Group SteerCo and the Creditors' Committee.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

*Contracts Procedures Order* means the *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* (Docket No. 1244).

*Court-Approved Additional Waterfall Litigation Funding* means Additional Waterfall Litigation Trust Funding on terms substantially similar to those identified in the Agreed Market Check approved by an order of the Bankruptcy Court. The Bankruptcy Court may approve such Additional Waterfall Litigation Trust Funding upon a finding that the requested funding and/or contribution of additional funds are reasonably necessary to adequately monetize the Litigation Trust Assets or are otherwise in the best interests of Litigation Trust Beneficiaries.

*Credit Bid Claims* means, collectively, the amount of Claims retired pursuant to the (i) Estate Claims Credit Bid and (ii) DIP Collateral Credit Bid.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *United States Trustee's Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 313) filed on October 9, 2025, as reconstituted from time to time.

*D&O Policy* means all directors and officers liability insurance policies (including any runoff policies or tail policies related to or associated with the foregoing) issued or providing coverage at any time to any of the Debtors, any of their Affiliates (including, without limitation, Mayfair Enterprises, LLC), or any of their predecessors or subsidiaries, for current or former directors', managers', officers', and employees' liability and all agreements, documents, or instruments relating thereto.

*D&O Proceeds Appeals* means the appeals of the *Order Regarding Motion for Entry of an Order (I) Authorizing and, to the Extent Necessary, Modifying the Automatic Stay to Allow Use of Proceeds of Directors and Officers Liability Insurance Policies Issued to Non-Debtor Mayfair Enterprises, LLC for Insureds' Defense Costs or, in the Alternative, (II) Confirming that Advancement of Defense Costs and Providing Notice in Accordance with Directors and Officers Liability Insurance Policies Does Not Violate the Automatic Stay* (Docket No. 1231).

*Debtors* means, collectively, the FBG Debtors and the SPV Debtors.

*Defaulting Contributor* means any Litigation Trust Class 1 Funding Contributor that (i) has failed to fund all or any portion of its Litigation Trust Class 1 Funding Contributions within ten (10) Business Days of the date the same were required to be funded hereunder; (ii) has

9

notified the Litigation Trustee in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect; (iii) has, prior to the full funding of its Litigation Trust Class 1 Funding Contributions, failed, within ten (10) Business Days after written request by the Litigation Trustee, to confirm in writing to the Litigation Trustee that it will comply with its prospective funding obligations hereunder (*provided* that such Litigation Trust Class 1 Funding Contributor shall cease to be a Defaulting Contributor pursuant to this clause (iii) upon receipt of such written confirmation by the Litigation Trustee); or (iv) has, or has a direct or indirect parent company that has, prior to the full funding of its Litigation Trust Class 1 Funding Contributions, (a) become the subject of a proceeding under the Bankruptcy Code or any other applicable debtor relief law or (b) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.  Any determination by the Litigation Trustee that a Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor shall be conclusive and binding absent manifest error. The Litigation Trustee may agree in writing in its sole discretion, subject to the satisfaction of any conditions determined by the Litigation Trustee in its sole discretion, that a Defaulting Contributor is no longer a Defaulting Contributor, whereupon such Litigation Trust Class 1 Funding Contributor will, to the extent applicable, purchase at par that portion of outstanding Litigation Trust Class 1 Funding Contributions of the other Litigation Trust Class 1 Funding Contributors or take such other actions as the Litigation Trustee may determine to be necessary to cause the Litigation Trust Class 1 Funding Contributions to be held pro rata by the Litigation Trust Class 1 Funding Contributors in accordance with their applicable Litigation Trust Class 1 Funding Commitments, whereupon such Litigation Trust Class 1 Funding Contributor will cease to be a Defaulting Contributor; *provided* that no adjustments will be made retroactively with respect to fees payable in respect of such Litigation Trust Class 1 Funding Contributor's Litigation Trust Class 1 Funding Commitment while that Litigation Trust Class 1 Funding Contributor was a Defaulting Contributor; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, such cessation of Defaulting Contributor status will not constitute a waiver or release of any claim of any party hereunder arising from that Litigation Trust Class 1 Funding Contributor having been a Defaulting Contributor.

*Definitive Documents* means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the ABL Collateral Trust Agreement; (viii) the DIP Collateral Trust Agreement; (ix) the Litigation Trust Agreement; and (x) the DIP Collateral Credit Bid APA (if applicable).

*DIP A Claims* means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest (including default interest, as applicable), fees (including any DIP Fees and Expenses, as defined in the DIP Order, as applicable), charges, expenses, indemnities, premiums (including any Extension Premiums and Exit Premiums, each as defined in the DIP Credit Agreement), other amounts, and/or deficiency Claims) arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in

the DIP Credit Agreement); or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court; in each case, that are on account of the New Money DIP Loans.

*DIP Claims* means, collectively, the DIP A Claims and Roll-Up Claims.

*DIP Collateral* has the meaning set forth in the DIP Order.

*DIP Collateral Credit Bid* means a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust.

*DIP Collateral Credit Bid APA* means, if the parties decide to enter into a separate purchase agreement, a purchase and sale agreement providing for, among other things, the sale of DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust.

*DIP Collateral Credit Bid Transaction* means the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust pursuant to the DIP Collateral Credit Bid APA in accordance with Section 5.2(f) of the Plan.

*DIP Collateral Sale Proceeds* means the proceeds from any sale of assets of the FBG Debtors allocated but not yet distributed to holders of DIP A Claims on or before the Confirmation Date.

*DIP Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VII of the Plan to hold, transfer, sell, monetize, or abandon the DIP Collateral Trust Assets and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan.

*DIP Collateral Trust Additional Payments* means all rights to Additional Payments, in respect of the Letter of Credit and/or otherwise pursuant to and as contemplated by Section 3.03 of the *Asset Purchase Agreement*, dated as of March 25, 2026, as amended, by and among First Brands Group Holdings, LLC, as Seller, and PGI Northstar LLC, as Buyer and Premium Guard Incorporated, as Guarantor.

*DIP Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the DIP Collateral Trust, establishing the terms and conditions of the DIP Collateral Trust, the rights of, and limitations on, the DIP Collateral Trust Interests, and pursuant to which the DIP Collateral Trustee shall manage and administer the DIP Collateral Trust Assets.

*DIP Collateral Trust Assets* means (i) all DIP Collateral (other than the Litigation Trust Assets) for which, on the date the DIP Collateral Trust is established, (x) no bona fide dispute exists as to whether the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims; (ii) all reversionary interests and/or second lien interests of the

11

DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties in the ABL Priority Collateral; and (iii) all Ultinon Claims and Interests. The DIP Collateral Trust Assets include any DIP Collateral Trust SPV Recoveries and the DIP Collateral Trust Additional Payments. The DIP Collateral Trust Assets will be identified in a schedule annexed to the DIP Collateral Trust Agreement. For the avoidance of doubt, DIP Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor or SPV Lender.

*DIP Collateral Trust Beneficiaries* means the holders of the DIP Collateral Trust Interests.

*DIP Collateral Trust Funding* means, collectively, the Primary DIP Collateral Trust Funding and the Secondary DIP Collateral Trust Funding.

*DIP Collateral Trust Funding Contributors* means, collectively, the Primary DIP Collateral Trust Funding Contributors and the Secondary DIP Collateral Trust Funding Contributors.

*DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order, which beneficial interests shall entitle holders to share in distributions in accordance with the DIP Collateral Trust Waterfall, including the (i) Class 1 DIP Collateral Trust Interests, and (ii) Class 2 DIP Collateral Trust Interests.

*DIP Collateral Trust Oversight Committee* means an unpaid oversight committee created on the Confirmation Date and that consists of three (3) holders of DIP Claims selected by the Ad Hoc Group SteerCo.

*DIP Collateral Trust SPV Recoveries* means any SPV Recovery that arises out of litigation, settlement, or negotiation involving a Lien or ownership dispute over tangible property (including, among others, disputes with Onset Financial, Inc. regarding interests in machinery and equipment) that would otherwise constitute a DIP Collateral Trust Asset.

*DIP Collateral Trust Waterfall* means the method for making distributions to the holders of DIP Collateral Trust Interests in accordance with the priorities set forth in Section 7.4 of the Plan and DIP Collateral Trust Agreement.

*DIP Collateral Trustee* means the trustee for the DIP Collateral Trust. The identity of the initial DIP Collateral Trustee will be disclosed in the Plan Supplement.

*DIP Credit Agreement* means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of October 2, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among (i) First Brands Group, LLC, as Borrower and Debtor and Debtor-in-Possession, (ii) First Brands Group Intermediate, LLC, as Parent and a Debtor and Debtor-in-Possession, (iii) the lenders

party thereto, (iv) Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, and (v) OPY Credit Corp., as Trading Agent.

*DIP Documents* has the meaning set forth in the DIP Order.

*DIP Loan Parties* has the meaning set forth in the DIP Order.

*DIP Obligations* has the meaning set forth in the DIP Order.

*DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

*DIP Secured Parties* has the meaning set forth in the DIP Order.

*DIP Term Priority Collateral* has the meaning set forth in the DIP Order.

*Direct Creditor Claims* means any direct (non-derivative) Claims held by a Preference Settlement Electing Creditor (i) against any non-Debtor Person and (ii) that relate to the conduct of the Debtors and/or Affiliates or professionals of the Debtors on or before the Petition Date; *provided* Direct Creditor Claims shall not include any Claims against a Released Party that are released under the Plan.  For the avoidance of doubt, Direct Creditor Claims shall not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.

*Disbursing Agent* means the Trustees or such Entity or Entities designated by a Trustee to make or facilitate distributions required by the Plan.

*Disclosure Statement* means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

*Disclosure Statement Order* means the order entered by the Bankruptcy Court (i) conditionally approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) authorizing solicitation of the Plan.

*Disputed* means, with respect to a Claim against any FBG Debtor, (i) any Claim that is disputed under ARTICLE X of the Plan or as to which any FBG Debtor or any party in interest has interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules of an FBG Debtor as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by the FBG Debtors, the Claims Ombudsman, or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the FBG Debtors, Claims Ombudsman, or any party in

interest disputes the amount of an asserted Claim against an FBG Debtor, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim. Any and all Claims asserted by any of the Specified Non-Released Parties are Disputed. For the avoidance of doubt, none of the Allowed Lender Claims shall be Disputed by the FBG Debtors, Claims Ombudsman, or Trustees.

*Disputed Alester IP* means all assets, including intellectual property, covered by the Alester Agreements.

*Disputed Claim Reserve* means any assets of the FBG Debtors, ABL Collateral Trust Assets, or Litigation Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded with Cash and/or proceeds of such assets, as applicable, in accordance with the terms of the Plan.

*Distribution Record Date* means: (i) for all Claims against the FBG Debtors (other than Allowed Lender Claims), the Confirmation Date and (ii) for Allowed Lender Claims, June 22, 2026 (as may be extended by the Ad Hoc Group Advisors).

*Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of the Plan set forth in Section 12.1 of the Plan have been satisfied or waived in accordance with Section 12.2 of the Plan.

*Employee Lease Accounts* means any bank account of the FBG Debtors that is established in connection with an employee lease arrangement entered into in connection with a sale transaction and funded by the sale transaction purchaser with certain amounts to cover costs and expenses associated with employees incurred during the applicable employee lease period.

*Employee Liability Account* has the meaning set forth in the OEM Order.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Estate Claims* means any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates against any Entity or Affiliate or Representative of any Entity (including each other through intercompany claims, intercompany interests, and/or other intercompany obligations), seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors taken as a whole, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates; and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with an FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations,

rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, (a) any Disputed Alester IP recovered from an Avoidance Action or Recovery Action of an FBG Debtor, (b) all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action that the FBG Debtors have and/or are entitled to assert against any Person, and (c) any and all initial and subsequent transfers related to the items within this definition; *provided* that Estate Claims shall also include any Claim that is duplicative of an Estate Claim, any Claim related to (i) – (iv) above that is a general claim with no particularized injury arising from it, or any other Claim that is in substance an Estate Claim.  For the avoidance of doubt, any claims and/or remedies of the FBG Debtors or their Estates against any SPV Lender, including any Aequum Lender (as defined in Docket No. 215), or its Affiliates, whether asserted by or assertable by the FBG Debtors, their Estates, or the Creditors' Committee, shall also be Estate Claims.

*Estate Claims Credit Bid* means a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the Litigation Trust Assets and transfer of such assets to the Litigation Trust.

*Estate Claims Credit Bid Transaction* means the sale of the Litigation Trust Assets and transfer of such assets to the Litigation Trust in accordance with Section 5.2(e) of the Plan.

*Evolution Adequate Protection Stipulation* means the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 609).

*Examiner* means Martin De Luca, in his capacity as examiner, appointed pursuant to the *Order Approving the Appointment of Examiner* (Docket No. 1260).

*Examiner Account* means the segregated bank account established by the Debtors to hold amounts that are exclusively available for the payment of fees and expenses of the Examiner and his professionals.

*Exculpated Parties* means each of the following in their capacity as such: (i) the FBG Debtors; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of the FBG Debtors; and (iv) the Creditors' Committee and each of its members in their official capacity.

15

*Factor* means any Person that purchased, or intended or agreed to purchase, accounts receivable at a discount from one or more FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

*Factored Receivables Account* has the meaning set forth in the Cash Management Order.

*FBG Debtor Interests* means an Interest in an FBG Debtor.

*FBG Debtors* has the meaning set forth in the introductory paragraph of the Plan.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*Final Return Threshold* has the meaning set forth in the Section 6.5 of the Plan.

*First Lien Claims* means, collectively, the First Lien Term Loan Claims and the Side-Car Term Loan Claims.

*First Lien Secured Parties* has the meaning set forth in the DIP Order, and shall include, for the avoidance of doubt, the Sidecar Term Loan Secured Parties.

*First Lien Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders and letter of credit issuers from time to time party thereto.

*First Lien Term Loan Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the First Lien Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the First Lien Term Loan Agreement.

16

*First Lien Term Loan Collateral* has the meaning set forth in the DIP Order.

*General Unsecured Claim* means any Claim (other than an Intercompany Claim or a Subordinated Claim) that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.  For the avoidance of doubt, the Roll-Up Claims, First Lien Claims, and Second Lien Claims shall not be General Unsecured Claims.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Health Escrow Account* means any escrow account established to hold funds to be used to pay run-out health claims of employees or former employees (and their covered dependents and beneficiaries) of the FBG Debtors.

*Horizon Alester Agreement* means that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC.

*Horizon Alester IP* means all assets, including intellectual property, covered by the Horizon Alester Agreement.

*Impaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Indemnification Obligations* means an FBG Debtor's indemnification obligations in place prior to the Confirmation Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, officers, and employees of the FBG Debtors, and the attorneys, accountants, investment bankers, and Professionals that are retained by the FBG Debtors.

*Independent Manager Policies* means the primary and excess D&O Policies issued to Mayfair Enterprises, LLC, as named insured, that have a policy period of September 26, 2025 to September 26, 2026 and are numbered: (i) XDO000165-0925 (issued by Convex North American Insurance Services, Inc.), (ii) AMB06760 (issued by Ambridge Partners LLC), (iii) EQ5EX00296-251 (issued by Everest National Insurance Company), (iv) 100625436251 (issued by Starr Indemnity & Liability Company), (v) 833891932 (issued by Continental Casualty Company), (vi) CRDO-0000058-00 (issued by Celerity Risk), (vii) B1976DO00007206 (issued by Lloyds Syndicate BEAT 4242), and (viii) ELU206779-25 (issued by XL Specialty Insurance Company).

*Independent Managers* means Neal Goldman and William Transier, in their capacities as members of the governing bodies of any Debtor.

*Initial Litigation Trust Funding Commitments* means commitments on the Confirmation Date to fund Cash contributions to the Litigation Trust pursuant to the terms of the Litigation Trust Agreement and/or any Litigation Trust Funding Agreement, in a principal

17

amount of $50,000,000; *provided* that no holder of Allowed DIP A Claims may provide Initial Litigation Trust Funding Commitments unless such holder holds at least $1,000 in principal amount of Allowed DIP A Claims.

*Insurance Company* means all Persons that issued, or that have any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under, or with respect to, any Insurance Policy, and any third party administrator, parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing, solely in their capacity as such with respect to an Insurance Policy.

*Insurance Policies* means any insurance policies, insurance contracts, binders, certificates, or reinsurance policies, whether currently known or unknown, issued to or that provides or may provide coverage (whether as the primary or additional insured or otherwise) at any time to any of the Debtors, any of their Affiliates (including, without limitation, Mayfair Enterprises, LLC), or any of their predecessors or subsidiaries, or under which any of the foregoing, or any of their current or former directors, managers, officers, or employees, have sought or may seek such coverage, including, but not limited, to any such policies for directors' and officers' liability, general liability, workers' compensation, any excess or umbrella policies, and all agreements, documents, or instruments relating thereto.

*Insurance Rights* means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the FBG Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Insurance Policies now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including: (i) any Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (ii) the refusal of any Insurance Company to compromise and settle any claim or provide defense to any claim; (iii) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (iv) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (v) any right to receive proceeds with respect to any Insurance Policy or a coverage action.

*Intercompany Claim* means any Claim held by an FBG Debtor against another FBG Debtor arising before the Petition Date.  For the avoidance of doubt, any Claim held by an SPV Debtor or a non-Debtor Affiliate against an FBG Debtor shall not be an Intercompany Claim but shall be a General Unsecured Claim, Subordinated Claim, or Administrative Expense Claim, as determined by the Bankruptcy Court.

*Interest* means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in an FBG Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such FBG Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including

any Claim against an FBG Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

*Interim Compensation Procedures Order* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 699), as may be amended, modified, or supplemented from time to time.

*International Emergency Economic Powers Act* means sections 1701–1708 of title 50 to the United States Code, as may have been amended from time to time.

*Inventory* has the meaning ascribed to such term in the ABL Intercreditor Agreement.

*IRS* means the United States Internal Revenue Service.

*James Complaint* means the adversary proceedings against Patrick James et al. (Adv. Pro. Case No. 25-03803).

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Litigation Trust* means that certain liquidating trust to be established upon entry of the Confirmation Order in accordance with ARTICLE VI of the Plan to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

*Litigation Trust Agreement* means the agreement evidencing the terms and provisions governing the Litigation Trust, establishing, among other things, the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets.

*Litigation Trust Assets* means   (i) the Litigation Trust Cash Funding; (ii) all Estate Claims, including, for the avoidance of doubt, all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action that the FBG Debtors have and/or are entitled to assert against any Person; (iii) all rights, privileges, and defenses of the FBG Debtors relating to the Estate Claims; (iv) the FBG Debtors' and Creditors' Committees rights, privileges, and defenses in respect of the D&O Proceeds Appeals; (v) all Insurance Rights of the FBG Debtors with respect to Insurance Policies that provide or may provide coverage for the Estate Claims, including for the avoidance of doubt, the rights to the proceeds of the D&O Policies; (vi) all Direct Creditor Claims of Preference Settlement Electing Creditors (which claims are thus contributed to the Litigation Trust by Preference Settlement Electing Creditors and are not assets of the FBG Debtors transferred in connection with the Estate Claims Credit Bid Transaction); (vii) all books, records, and investigative and/or discovery findings of the FBG Debtors, including to the extent such records are owned or controlled by advisors to the FBG Debtors, any independent director or manager of the FBG Debtors, the Examiner and the advisors thereto (subject to a mutual agreement on cooperation/transfer), and the advisors to the Creditors' Committee; *provided* that (a) the FBG Debtors' Professionals, (b) any independent director or manager of the FBG Debtors, (c) the Examiner and the advisors thereto (subject to a mutual

agreement on cooperation/transfer), and (d) the Creditors' Committee's Professionals shall not be required to turnover all work product and communications but each such professional, in its sole discretion, may compile (in a digest or other appropriate format) its material findings, information, and records and provide the Litigation Trust with such compilation and/or enter into common interest or other agreements sufficient to facilitate the turnover of work product or communications; (viii) all Litigation Trust SPV Recoveries; and (ix) all assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their Estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement. The Litigation Trust Assets will be identified in a schedule annexed to the Litigation Trust Agreement. For the avoidance of doubt, Litigation Trust Assets shall not include any assets that are determined by Final Order to be property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders.

*Litigation Trust Backstop Commitments* means the commitments, on a pro rata basis, provided by the Litigation Trust Backstop Parties to provide the Initial Litigation Trust Funding Commitments on the Confirmation Date that are not subscribed to by other holders of Allowed DIP A Claims.

*Litigation Trust Backstop Parties* means, collectively, the holders of DIP A Claims that are members of the Ad Hoc Group SteerCo and sign a backstop commitment letter on or before the Confirmation Date.

*Litigation Trust Beneficiaries* means the holders of the Litigation Trust Interests.

*Litigation Trust Cash Funding* means $25,000,000 in Cash from the FBG Debtors' balance sheet that will be provided to the Litigation Trust upon the establishment of the Litigation Trust.

*Litigation Trust Class 1 Funding Commitments* means, collectively, the Initial Litigation Trust Funding Commitments provided on the Confirmation Date and, if applicable, any additional commitments to provide Additional Class 1 Litigation Trust Funding.

*Litigation Trust Class 1 Funding Contributions* means the funding under the Litigation Trust Class 1 Funding Commitments approved upon entry of the Confirmation Order.

*Litigation Trust Class 1 Funding Contributors* means (i) holders of Allowed DIP A Claims that, on or before the Confirmation Date, commit to provide the Initial Litigation Trust Funding Commitments, and (ii) if applicable, following the Confirmation Date, holders of Class 1 Litigation Trust Interests that commit to provide the Additional Class 1 Litigation Trust Funding.

*Litigation Trust Funding Agreements* means any agreement (which may be included in the Litigation Trust Agreement) pursuant to which a Litigation Trust Class 1 Funding Contributor contributes or commits to contribute Cash or other property to the Litigation Trust in exchange for Class 1 Litigation Trust Interests.

*Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted upon entry of the Confirmation Order as provided herein, which beneficial interests shall entitle holders to share in distributions in accordance with the Litigation Trust Waterfall, including the (i) Class 1 Litigation Trust Interests, (ii) Class 2 Litigation Trust Interests, and (iii) Class 3 Litigation Trust Interests.

*Litigation Trust Oversight Committee* has the meaning set forth in the Litigation Trust Agreement and initially shall be comprised of four (4) members established on the Confirmation Date.

*Litigation Trust SPV Recoveries* means any SPV Recovery that is not a DIP Collateral Trust SPV Recovery.

*Litigation Trust Waterfall* means the method for making distributions to the holders of Litigation Trust Interests in accordance with the priorities set forth in Section 6.5 of the Plan and the Litigation Trust Agreement.

*Litigation Trustee* means Gerard Uzzi of Uzzi & Lall, in his capacity as the trustee for the Litigation Trust.

*Major Decision* shall have the meaning set forth in the Litigation Trust Agreement.  Any decision of the Litigation Trust that qualifies as a Major Decision (i) before the Final Return Threshold is satisfied, shall require the affirmative vote of at least two AHG Members and a majority of the members of the Litigation Trust Oversight Committee; and (ii) after the Final Return Threshold is satisfied, shall require the affirmative vote of a majority of the members of the Litigation Trust Oversight Committee.

*New Money DIP Loans* has the meaning set forth in the DIP Order.

*OEM Order* means the *Order (I) Approving Funding Arrangement With Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1848).

*Onset Complaint* means the adversary proceedings against Onset Financial, Inc. et al. (Adv. Pro. Case No. 26-03005).

*Other Priority Claim* means any Claim entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

*Other Secured Claim* means any Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim.

*Parent Guarantors* has the meaning set forth in the DIP Order.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means, with respect to an FBG Debtor, the date on which such FBG Debtor commenced its Chapter 11 Case.

*Plan* means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of the Plan.

*Plan Settlement* has the meaning set forth in Section 5.2(a) of the Plan.

*Plan Supplement* means a supplemental appendix to the Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms the Plan, the Bankruptcy Code, and the Bankruptcy Rules, which may include: (i) the Schedule of Retained Causes of Action; (ii) the disclosure of the identity of the Wind Down Administrator; (iii) the disclosure of the identity of the Claims Ombudsman; (iv) the Litigation Trust Agreement, any separate Litigation Trust Funding Agreement(s), and the form of any backstop commitment letter with the Litigation Trust Backstop Parties; (v) a non-exhaustive schedule of Specified Non-Released Parties; and (vi) any other agreement, instrument, schedule, exhibit, or document designated by the FBG Debtors (with the consent of the Ad Hoc Group SteerCo and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed)) as a Plan Supplement document.  Through the Confirmation Date, the FBG Debtors shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.

*Preference Actions* means all Causes of Action arising under section 547 of the Bankruptcy Code.

*Preference Settlement* has the meaning set forth in Section 6.11 of the Plan.

*Preference Settlement Electing Creditor* means any Trade Creditor, Supply Chain Financer, or Factor who (i) timely elects on the Preference Settlement Opt-In Form to (a) participate in, and receive the benefits of, the Preference Settlement, (b) grant the releases contained in Section 13.5(b) of the Plan, and (c) contribute all of its Direct Creditor Claims to the Litigation Trust; *provided* that any such creditor that is later determined to be ineligible for the Preference Settlement in accordance with Section 6.11 hereof shall not be a Releasing Party.

*Preference Settlement Opt-In Form* means the form, approved under the Disclosure Statement Order, sent to Trade Creditors, Supply Chain Financers, and Factors, pursuant to which such Persons may opt in to (i) participating in, and receiving the benefits of, the Preference Settlement; (ii) granting the releases contained in Section 13.5(b) of the Plan; and (iii) contributing all of their Direct Creditor Claims to the Litigation Trust.

22

*Prepetition Collateral* has the meaning set forth in the DIP Order.

*Prepetition Secured Parties* has the meaning set forth in the DIP Order, and shall include, for the avoidance of doubt, the Sidecar Term Loan Secured Parties.

*Primary DIP Collateral Trust Funding* means the use of DIP Collateral Sale Proceeds by Primary DIP Collateral Trust Funding Contributors to fund Cash for the DIP Collateral Trust pursuant to the terms of this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order, in an amount up to $20,000,000.

*Primary DIP Collateral Trust Funding Contributors* means the members of the Ad Hoc Group SteerCo that agree to withhold their pro rata share of DIP Collateral Sale Proceeds and direct such amounts to fund the DIP Collateral Trust pursuant to the terms of the DIP Collateral Trust Agreement, this Plan, and the Confirmation Order.

*Priority Tax Claim* means any Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata Share* means (i) that proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class; and (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

*Professional* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court and the Examiner and advisers thereto.

*Professional Fee Claim* means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date.

*Professional Fees Escrow Account* has the meaning set forth in the DIP Order.

*Proof of Claim* means a proof of Claim filed against any FBG Debtor in the Chapter 11 Cases.

*Recovery Actions* has the meaning set forth in the DIP Order.

*Recovery Action Proceeds* has the meaning set forth in the DIP Order.

*Reinstate, Reinstated, or Reinstatement* means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

*Released Parties* means collectively, and in each case solely in their capacities as such, (i) the FBG Debtors and their Estates; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of one or more

of the FBG Debtors; (iv) the Specified Executives; (v) the Professionals; (vi) the Creditors' Committee and each of its members; (vii) the Ad Hoc Group and members thereof, including the Ad Hoc Group SteerCo; (viii) the DIP Secured Parties; (ix) the Prepetition Secured Parties; (x) the ABL Parties; (xi) the Litigation Trust Backstop Parties; (xii) the Litigation Trust Class 1 Funding Contributors and the DIP Collateral Trust Funding Contributors; and (xiii) solely with respect to each of the foregoing Persons in clauses (vii) – (xii), their Affiliates and Representatives; *provided* that, notwithstanding anything in the Plan to the contrary, and for the avoidance of doubt, no Specified Non-Released Party shall be a Released Party and no Estate Claims shall be released against any Specified Non-Released Party; *provided further* that any Person that is given the opportunity to grant the releases set forth in the Plan and does not grant such releases shall not be a Released Party.

***Releasing Parties*** means, collectively: (i) the holders of all Claims that vote to accept the Plan and opt in to granting the releases set forth in the Plan; (ii) the holders of all Claims that are presumed to accept the Plan and opt in to granting the releases set forth in the Plan; (iii) the holders of all Claims that vote to reject the Plan, but opt in to granting the releases set forth in the Plan; (iv) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or reject the Plan, but opt in to granting the releases set forth in the Plan; (v) the Persons that receive the Preference Settlement Opt-In Form and opt in to granting the releases set forth in the Plan; and (vi) the holders of DIP A Claims that are given notice of the ability to opt in to granting the releases set forth in the Plan and opt in to granting such releases. For the avoidance of doubt, none of the Debtors (including SPV Debtors) shall be Releasing Parties.

***Remaining DIP A Claims*** means the Allowed DIP A Claims against the FBG Debtors not included in the Estate Claims Credit Bid or the DIP Collateral Credit Bid. For the avoidance of doubt, the Remaining DIP A Claims shall continue to accrue interest, fees, and expenses (including default interest, as applicable), fees, charges, expenses, indemnities, premiums (including any Extension Premiums and Exit Premiums, each as defined in the DIP Credit Agreement), other amounts, and/or deficiency Claims, in accordance with the DIP Order following the Confirmation Date until the Effective Date, at which point such Claims shall be released.

***Remaining First Lien Claims*** has the meaning set forth in Section 4.4(b) of the Plan.

***Remaining Lender Claims*** means, collectively, (i) the Remaining DIP A Claims, (ii) the Remaining Roll-Up Claims, (iii) the Remaining First Lien Claims, and (iv) the Remaining Second Lien Claims.

***Remaining Roll-Up Claims*** has the meaning set forth in Section 4.3(b) of the Plan. For the avoidance of doubt, the Remaining Roll-Up Claims shall continue to accrue interest (including default interest, as applicable), fees, charges, and expenses, indemnities, premiums, other amounts, and/or deficiency Claims, in accordance with the DIP Order following the Confirmation Date until the Effective Date, at which point such Claims shall be released.

***Remaining Second Lien Claims*** has the meaning set forth in Section 4.5(b) of the

Plan.

       ***Representative*** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

       ***Restructuring Expenses*** means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the advisors to the (i) Ad Hoc Group, (ii) the DIP Secured Parties, (iii) the First Lien Secured Parties, and (iv) the Second Lien Term Loan Secured Parties, accrued since the inception of their respective engagements and continuing through the implementation of the restructuring transactions and in accordance with their respective engagement letters or fee letters with the FBG Debtors and/or any applicable order of the Bankruptcy Court.

       ***Roll-Up Claims*** means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest (including default interest, as applicable), fees (including any DIP Fees and Expenses, as defined in the DIP Order, as applicable), charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement); or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court, in each case, that are on account of the Roll-Up Obligations.

       ***Roll-Up Obligations*** has the meaning set forth in the DIP Order.

       ***Sacred Right*** shall have the meaning set forth in the Litigation Trust Agreement. Any decision of the Litigation Trust that qualifies as a Sacred Right (i) before the Final Return Threshold is satisfied, shall require the affirmative vote of at least two AHG Members and the UCC Member; and (ii) after the Final Return Threshold is satisfied, shall require the affirmative vote of the AHG Member and at least one UCC Member.

       ***Schedule of Retained Causes of Action*** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the FBG Debtors and transferred to the Litigation Trust.

       ***Schedules*** means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

       ***Second Lien Claims*** means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the Second Lien Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Second Lien Term Loan Agreement.

25

*Second Lien Term Loan Agreement* means that certain *Second Lien Term Loan Agreement*, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Second Lien Term Loan Collateral* has the meaning set forth in the DIP Order.

*Second Lien Term Loan Secured Parties* has the meaning set forth in the DIP Order.

*Second Return Threshold* has the meaning set forth in the Section 6.5 of the Plan.

*Secondary DIP Collateral Trust Funding* means, if needed, the use of DIP Collateral Sale Proceeds by Secondary DIP Collateral Trust Funding Contributors to fund any shortfall in Cash for the DIP Collateral Trust that is not funded by the Primary DIP Collateral Trust Funding on the Confirmation Date, pursuant to the terms of this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order.

*Secondary DIP Collateral Trust Funding Contributors* means the holders of DIP A Claims on the Confirmation Date that are not Primary DIP Collateral Trust Funding Contributors.

*Secured Claim* means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the FBG Debtors or the Claims Ombudsman, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

*Segregated Accounts* has the meaning set forth in the Evolution Adequate Protection Stipulation.

*Settled Administrative Expense Claims* means Administrative Expense Claims held by holders of Administrative Expense Claims who receive the Administrative Expense Claims Consent Program Opt-In Form and affirmatively elect to participate in the Administrative Expense Claims Consent Program on or before the deadline set forth in the Administrative Expense Claims Consent Program Opt-In Form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-In Form or otherwise agreed to by the FBG Debtors or Claims Ombudsman and the holder of such Administrative Expense Claim.  Pursuant to Section 6.5(d)(i) of the Plan, Allowed Settled

26

Administrative Expense Claims shall receive distributions from the Litigation Trust before payment of other Allowed Administrative Expense Claims.

*Side-Car Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) GLAS USA LLC, as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Side-Car Term Loan Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the Side-Car Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Side-Car Term Loan Agreement.

*Sidecar Term Loan Collateral* has the meaning set forth in the DIP Order.

*Sidecar Term Loan Secured Parties* has the meaning set forth in the DIP Order.

*Special Committees* means, collectively, the special committees of the boards of managers of (i) First Brands Group Holdings, LLC, First Brands Group Intermediate, LLC, and First Brands Group, LLC, each comprised of Neal Goldman and William Transier; and (ii) Viceroy, comprised of Benjamin Duster, Neal Goldman, and William Transier.

*Specified Executives* means, collectively, (i) Charles M. Moore, as Interim Chief Executive Officer and/or Chief Restructuring Officer of the Debtors; (ii) Daniel Jerneycic and Gaurav Malhotra, as Chief Restructuring Officers of the Debtors; and (iii) Paul Kosturos, as Chief Financial Officer of the Debtors.

*Specified Non-Released Parties* means (i) any Person (or Affiliate of any Person) against which any action has been commenced on behalf of a Debtor or its Estate in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing, including, for the avoidance of doubt, any defendants named or to be named by the Debtors in the James Complaint or named by the Debtors in the Onset Complaint; (ii) any Person (or Affiliate of any Person) identified as a defendant or a potential defendant of a Cause of Action in the Plan Supplement; (iii) any Person (or Affiliate of any Person) that is charged with a crime (whether before or after the Confirmation Date) based on conduct related to the Debtors; (iv) any Person (or Affiliate of any Person) that meets the definition of Adverse Conduct, as determined by a Final Order of the Bankruptcy Court; and (v) any subsequent transferee of any of the foregoing with respect to any assets of or transfers by the Debtors or their Affiliates or Representatives.  Notwithstanding the foregoing or anything else in the Plan to the contrary (including anything in the definition of Released Party), and for the avoidance of doubt, neither the FBG Debtors and their Estates, nor any member of the Ad Hoc Group, Ad Hoc Group Advisors, Creditors' Committee and each of its members, Special Committee member, Independent Manager, Specified Executive, Professional, Prepetition Secured Party, nor DIP Secured Party, with respect to each of the foregoing, solely in their capacities as such, shall be construed to be or deemed to be a Specified Non-Released Party.

*SPV Debtors* means the direct and indirect Debtor subsidiaries of Viceroy other

than the FBG Debtors.  For the avoidance of doubt, Viceroy is not an SPV Debtor.

*SPV Independent Manager* means Benjamin Duster, in his capacity as independent manager of Viceroy.

*SPV Lender* means (i) any lender or financing party (including any litigation financing party) (including, for the avoidance of doubt, Onset Financial, Inc.) that provided and/or asserts that it provided financing to an SPV Debtor and/or its agents, and (ii) any subsequent transferee, Affiliate, and/or Representative of the foregoing.

*SPV Recoveries* means any recoveries or proceeds on account of any Lien asserted by the DIP Secured Parties in any assets owned by an SPV Debtor pursuant to the DIP Order, any adequate protection stipulation entered by the Bankruptcy Court, or any other order of the Bankruptcy Court.

*SPV-ABL Wind Down Account* has the meaning set forth in the Wind Down Order.

*SPV-DIP Wind Down Account* has the meaning set forth in the Wind Down Order.

*Statutory Fees* means all fees and charges assessed against the FBG Debtors' Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subordinated Claims* means a Claim that is determined by a Final Order to be subordinated under section 510(c) of the Bankruptcy Code.

*Supply Chain Financer* means any financial institution, fund, or other Person (other than any ABL Lender in its capacity as such) that (i) provided (or asserts that it provided) financing or liquidity to suppliers or vendors of one or more FBG Debtors or reimbursed any FBG Debtor Affiliate for providing such financing or liquidity in connection with such suppliers' or vendors' accounts receivable  arising from the supply of goods or services to such FBG Debtors, whether through supply chain financing programs, reverse factoring arrangements, receivables purchase facilities, or similar arrangements; or (ii) remitted payments (or asserts that it remitted payments) on behalf of one or more FBG Debtors relating to accounts payable arising from the supply of goods or services to such FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

*Term Claimholders* has the meaning set forth in the ABL Intercreditor Agreement.

*Term Collateral Agents* has the meaning set forth in the ABL Intercreditor Agreement.

*Trade Creditor* means any Person (including any Person that was paid through a payment intermediary but excluding any such payment intermediary) that, as of the Petition Date, holds a General Unsecured Claim against an FBG Debtor arising from the ordinary course of the

FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date, excluding any Person whose claim arises from a (secured or unsecured) loan, financing arrangement, bond, note, or other financial indebtedness.  For the avoidance of doubt, a Trade Creditor shall not include any Entity that qualifies as a Factor or Supply Chain Financer.

*Trademarks* means all trademarks, service marks, trade names, corporate names, trade dress, logos and other similar indica of source or origin, including all applications, registrations, extensions and renewals of the foregoing and all goodwill associated with the foregoing.

*Treasury Regulations* means the regulations of the United States Treasury.

*Trust Agreements* means, collectively, the ABL Collateral Trust Agreement, the DIP Collateral Trust Agreement, and the Litigation Trust Agreement.

*Trust Beneficiaries* means, collectively, the ABL Collateral Trust Beneficiaries, the DIP Collateral Trust Beneficiaries, and the Litigation Trust Beneficiaries.

*Trust Documents* means, collectively, (i) the Litigation Trust Agreement, (ii) the DIP Collateral Trust Agreement, and (iii) the ABL Collateral Trust Agreement.

*Trustees* means, collectively, the ABL Collateral Trustee, the DIP Collateral Trustee, and the Litigation Trustee.

*Trusts* means, collectively, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust.

*UCC Member(s)* means the member(s) of the Litigation Trust Oversight Committee appointed by the Creditors' Committee in accordance with the Litigation Trust Agreement.

*Ultinon Claims and Interests* means Debtor KTRI Holdings, Inc.'s (i) claims in respect of the loans (including sub-participation interests) made available to Liberty I B.V. and its direct and indirect subsidiaries under: (a) the senior facilities agreement originally dated July 20, 2024, as amended on October 27, 2025, November 17, 2025 and November 25, 2025 (as amended and/or amended and restated from time to time) between, amongst others Liberty II B.V. as the company, KTRI Holdings, Inc., and Deva Capital Investment Company S.L.U. as lenders and Banco Santander, S.A. as agent and security agent, and (b) the funded participation agreement dated November 26, 2025 (as amended and/or amended and restated from time to time) between Deva Capital Investment Company S.L.U. as grantor and KTRI Holdings, Inc. as participant; and (ii) Liens in respect of such claims.

*U.S. Bank Obligations* has the meaning set forth in the DIP Order.

*U.S. Trustee* means the United States Trustee for Region 7.

29

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Viceroy* means Viceroy Private Capital, LLC.

*Wind Down* means the process to sell, abandon, wind down, dissolve, liquidate, or distribute the assets owned by the FBG Debtors following the Confirmation Date, if any, pursuant to a process to be agreed upon by the ABL Agent, the Ad Hoc Group SteerCo, and the Creditors' Committee.

*Wind Down Administrator* means the administrator appointed by the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee whose duties will include, among other things, effectuating the Wind Down in accordance with the Plan.

*Wind Down Budget* means a budget approved by the ABL Lenders, the Ad Hoc Group, SteerCo, and the Creditors' Committee, setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the date the Wind Down is completed.

*Wind Down Order* means *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2454).

*Wind Down Reserve* means a deposit account or other Cash reserve held by the Wind Down Administrator to be funded in accordance with the Wind Down Budget, which shall be available and used only to satisfy costs and expenses of the Wind Down; *provided* that any funds remaining in the Wind Down Reserve on the date the Wind Down is completed (as determined in the Wind Down Administrator's sole discretion) shall be turned over to the DIP Collateral Trust.  Absent the consent of the Ad Hoc Group SteerCo, the Wind Down Reserve shall not include any DIP Term Priority Collateral, First Lien Term Loan Collateral, Sidecar Term Loan Collateral, or Second Lien Term Loan Collateral.

### 1.2    *General Applicability.*

The provisions of the Plan (including, for the avoidance of doubt, the provisions of Articles II-IV) only apply to Claims against and Interests in the FBG Debtors and not to any Claims against or Interests in the SPV Debtors.

### 1.3    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in the Plan are for convenience of reference only and

30

shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.4    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.5    *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the Ad Hoc Group SteerCo, the DIP Secured Parties, the ABL Agent, or the Creditors' Committee set forth herein or in the DIP Order, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference (including the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.  For the avoidance of doubt, the Debtors may accept and rely on emails from counsel for any required consents or approvals.

### 1.6    *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement or any other exhibit, schedule, or annex to the Plan, the terms of the relevant document in the Plan Supplement or such exhibit, schedule, or annex, shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each.  If there is any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

**ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, DIP A CLAIMS, PROFESSIONAL FEE CLAIMS, RESTRUCTURING EXPENSES, AND PRIORITY TAX CLAIMS.**

**2.1     *Administrative Expense Claims.***

(a)     Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each such holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and release of such Administrative Expense Claim, (i) Cash payable by the Litigation Trust and/or the DIP Collateral Trust in accordance with the Litigation Trust Waterfall and the DIP Collateral Trust Waterfall, as applicable, in an amount equal to such Allowed Administrative Expense Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**2.2     *DIP A Claims.***

(a)     **Allowance**.   On the Confirmation Date, the DIP A Claims shall be deemed Allowed against the FBG Debtors ~~in the full amount then outstanding under the DIP Credit Agreement and DIP Order~~.   The Allowed amount of the DIP A Claims against the FBG Debtors <u>as of the Confirmation Date</u> shall be set forth in the notice of entry of the Confirmation Order filed in accordance with <u>Section 15.8(a)</u> of the Plan.

(b)     **Treatment**.   Except to the extent that a holder of an Allowed DIP A Claim agrees to less favorable treatment of such Claim, on the Confirmation Date, each such holder shall receive, in full and final satisfaction, settlement, and release of such Allowed DIP A Claim (other than the Remaining DIP A Claim), (i) on account of the Estate Claims Credit Bid, its Pro Rata Share of the Class 2 Litigation Trust Interests; (ii) on account of the DIP Collateral Credit Bid, its Pro Rata Share of the Class 2 DIP Collateral Trust Interests; (iii) if applicable, on account of any Initial Litigation Trust Funding Commitments, its pro rata share of the Class 1 Litigation Trust Interests in accordance with the Litigation Trust Agreement; and (iv) if applicable, on account of any DIP Collateral Trust Funding, its pro rata share of the Class 1 DIP Collateral Trust Interests in accordance with the DIP Collateral Trust Agreement.   The Remaining DIP A Claims shall not be discharged or released on the Confirmation Date, shall remain enforceable against the DIP Loan Parties, Parent Guarantors, and/or the SPV Debtors, as applicable, and shall continue to accrue interest, fees, and expenses in accordance with the DIP Order ~~until the Effective Date, at which point such Remaining DIP A Claims shall be released.~~ <u>;</u> *provided* <u>that, for the avoidance of doubt, any such accruals following the Confirmation Date shall not increase the amounts distributable to holders of Class 2 Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan.</u>

**2.3     *Professional Fee Claims.***

(a)     All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is ninety (90) calendar days after the

Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)     Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court (i) upon such terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the FBG Debtors, out of the Professional Fees Escrow Account; or (ii) on the date upon which an order relating to any such allowed Professional Fee Claim is entered. The Plan Settlement is conditioned upon the FBG Debtors', Ad Hoc Group SteerCo's, and Creditors' Committee's agreement to a budget for amounts payable by the FBG Debtors from the date of entry of the order approving the Disclosure Statement on a conditional basis to the Confirmation Date (the "**Agreed Budget**"). Pursuant to the Plan Settlement, no allowed Professional Fees of Professionals may be paid from the Litigation Trust Cash Funding, the Litigation Trust, or the DIP Collateral Trust. All Professionals waive their right to any Post-Carve Out Amount (as defined in the DIP Order); *provided*, for the avoidance of doubt, this provision shall not act as a waiver of any condition precedent set forth in Section 12.1 of the Plan.

(c)     Any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order, may be paid at the times and in the amounts authorized pursuant to such orders.

(d)     Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims; *provided* that, notwithstanding the foregoing, the Debtors may not fund any amounts into the Professional Fees Escrow Account that would cause the FBG Debtors to have in the aggregate less than $25,000,000 in Cash on their balance sheet on the Confirmation Date without the consent of the Ad Hoc Group SteerCo. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account shall be released from such escrow and revert to, and ownership thereof shall vest in, the DIP Collateral Trust without any further action or order of the Bankruptcy Court.

(e)     Pursuant to the terms of the Wind Down Budget, the Wind Down Administrator is authorized to pay compensation for services rendered to the FBG Debtors or reimbursement of expenses incurred on behalf of the FBG Debtors after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

33

**2.4** *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Confirmation Date, shall be paid in full in Cash on the Confirmation Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the Plan and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the  FBG Debtors' receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses.  All Restructuring Expenses to be paid on the Confirmation Date shall be estimated prior to and as of the Confirmation Date, and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Confirmation Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

**2.5** *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Priority Tax Claim, at the option of the Claims Ombudsman, either: (i) Cash payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) equal annual Cash payments payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Claims Ombudsman reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**ARTICLE III.**   **CLASSIFICATION OF CLAIMS AND INTERESTS AGAINST THE FBG DEBTORS.**

**3.1** *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the FBG Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | Roll-Up Claims | Impaired | Yes |
| 4 | First Lien Claims | Impaired | Yes |
| 5 | Second Lien Claims | Impaired | Yes |
| 6 | ABL Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Subordinated Claims | Impaired | Yes |
| 9 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 10 | FBG Debtor Interests | Impaired | No (Deemed to Reject) |

### 3.3    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the FBG Debtors, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims against the FBG Debtors, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims against the FBG Debtors.

### 3.4    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim against or Interest in the FBG Debtors that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.5**     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contained Claims eligible to vote and no holder of such Claims votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**3.6**     *Voting; Presumptions; Solicitation.*

**(a)**     **Acceptance by Certain Impaired Classes**.  Only holders of Claims in Classes 3, 4, 5, 6, 7, and 8 are entitled to vote to accept or reject the Plan.

**(b)**     **Presumed Acceptance by Unimpaired Classes.**  Holders of Claims in Classes 1, 2, and 9 are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**(c)**     **Deemed Rejection by Certain Impaired Classes.**  Holders of Interests in Class 10 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**3.7**     *Cramdown.*

If any Class entitled to vote on the Plan does not vote to accept the Plan, the FBG Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**3.8**     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a FBG Debtor's or other Person's right to object on any basis to any Claim against the FBG Debtors.

**ARTICLE IV.     TREATMENT OF CLAIMS AND INTERESTS AGAINST THE FBG DEBTORS.**

**4.1**     *Class 1:  Other Priority Claims.*

**(a)**     **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Other Priority Claim becomes an Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Other Priority Claim: (i) Cash distributions from the Litigation Trust in an amount equal to such Allowed Other Priority Claim payable by the Litigation Trust in accordance with

36

the Litigation Trust Waterfall; or (ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

**(b)** **Impairment and Voting**:  Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

**4.2**   *Class 2: Other Secured Claims.*

**(a)** **Treatment:**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Other Secured Claim, at the option of the Claims Ombudsman:

> (i)      payment in full in Cash in an amount equal to such Claim, payable on the later of (x) the Effective Date, and (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

> (ii)     transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

> (iii)    such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)** **Impairment and Voting:**  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**4.3**   *Class 3:  Roll-Up Claims.*

**(a)** **Allowance**.  On the Confirmation Date, the Roll-Up Claims shall be deemed Allowed against the FBG Debtors ~~in the full amount then outstanding under the DIP Credit Agreement and DIP Order~~.  Solely for purposes of the Litigation Trust Waterfall, the Allowed amount of the Roll-Up Claims shall be $3,300,000,000.

**(b)** **Treatment**:  Except to the extent that a holder of an Allowed Roll-Up Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Roll-Up Claim (other than the Remaining Roll-Up Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed Roll-Up Claim, its Pro Rata Share of the Class 3(a) Litigation Trust Interests.  The Roll-Up Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Roll-Up Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii)

37

of the Plan (the "**Remaining Roll-Up Claims**"), shall not be discharged or released on the Confirmation Date, shall remain enforceable against the DIP Loan Parties, Parent Guarantors, and/or the SPV Debtors, as applicable, and shall continue to accrue interest, fees, and expenses in accordance with the DIP Order ~~until the Effective Date, at which point such Remaining Roll-Up Claims shall be released.~~; *provided* that, for the avoidance of doubt, any such accruals following the Confirmation Date shall not increase the amounts distributable to holders of Class 3(a) Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan.

(c)    **Impairment and Voting:**  Class 3 is Impaired, and, thus, holders of Roll-Up Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

4.4    *Class 4:  First Lien Claims.*

(a)    **Allowance**.  On the Confirmation Date, the First Lien Claims shall be deemed Allowed against the FBG Debtors ~~in the full amount then outstanding~~.  The Allowed amount of the First Lien Claims against the FBG Debtors as of the Confirmation Date shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)    **Treatment:**  Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed First Lien Claim (other than Remaining First Lien Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed First Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The First Lien Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed First Lien Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining First Lien Claims**"), shall remain outstanding until the Effective Date, at which point such Remaining First Lien Claims shall be deemed to be released.

(c)    **Impairment and Voting:**  Class 4 is Impaired, and, thus, holders of First Lien Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

4.5    *Class 5:  Second Lien Claims.*

(a)    **Allowance**.  On the Confirmation Date, the Second Lien Claims shall be deemed Allowed against the FBG Debtors ~~in the full amount then outstanding~~.  The Allowed amount of the Second Lien Claims against the FBG Debtors as of the Confirmation Date shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)    **Treatment:**  Except to the extent that a holder of an Allowed Second Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Second Lien Claim (other than Remaining Second Lien Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed Second Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The Second Lien Claims in

excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Second Lien Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining Second Lien Claims**"), shall remain outstanding until the Effective Date, at which point such Remaining Second Lien Claims shall be deemed to be released.

(c)     **Impairment and Voting:**   Class 5 is Impaired, and, thus, holders of Second Lien Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.6     *Class 6: ABL Claims.*

(a)     **Allowance**.   On the Confirmation Date, the ABL Claims shall be deemed Allowed against the FBG Debtors in the full amount then outstanding under the ABL Credit Agreement and the DIP Order, other than with respect to the U.S. Bank Obligations.   Upon a determination by the Bankruptcy Court, or mutual agreement of the applicable parties, that the U.S. Bank Obligations are Allowed Secured Claims against an FBG Debtor, such U.S. Bank Obligations shall be treated as ABL Claims against the FBG Debtors in accordance with the Plan.   Notwithstanding anything to the contrary herein, if the U.S. Bank Obligations are determined by the Bankruptcy Court not to be Allowed Secured Claims, then any provision herein regarding contributions to the ABL Collateral Trust shall be deemed inapplicable to the U.S. Bank Obligations.   The Allowed amount of the ABL Claims shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)     **Treatment**:   On the Confirmation Date, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, the ABL Agent, by and on behalf of the ABL Secured Parties, shall be deemed to have foreclosed upon the ABL Collateral Trust Assets of the FBG Debtors and transferred all such assets to the ABL Collateral Trust.   Except to the extent that a holder of an Allowed ABL Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed ABL Claim, on the Confirmation Date, each such holder shall receive, on account of its Allowed ABL Claim, its Pro Rata Share of the ABL Collateral Trust Interests.   The ABL Claims against the ABL Loan Parties in excess of the fair market value of the ABL Collateral Trust Assets, as determined in accordance with Section 8.11(d)(ii) of the Plan (the "**ABL Deficiency Claims**"), shall remain outstanding and enforceable against such ABL Loan Parties; *provided* that such ABL Deficiency Claims shall not be secured by the ABL Collateral Trust Assets, which assets shall be held free and clear of ABL Deficiency Claims by the ABL Collateral Trust; *provided further* that, on the EffectiveConfirmation Date and immediately following the foreclosure upon the ABL Collateral Trust Assets, the holders of the ABL Deficiency Claims shall be deemed to have contributed all of their rights, title, and interests in respect of any amounts or proceeds to be realized on account of the ABL Deficiency Claims to the ABL Collateral Trust to be distributed in accordance with the waterfall set forth in Section 8.3 of the Plan.

(c)     To the extent the ABL Secured Parties hold Allowed ABL Claims against the FBG Debtors that are oversecured (i.e., the value of the ABL Priority Collateral exceeds the Allowed amount of the ABL Claims), as determined by the Bankruptcy Court, the holders of such Allowed ABL Claims shall be entitled to receive postpetition interest on such Claims at the applicable contractual rate under the ABL Credit Agreement to the extent permitted by section

506(b) of the Bankruptcy Code, which interest shall be paid from the ABL Collateral Trust Assets prior to any turnover of excess proceeds to the DIP Collateral Trust pursuant to Section 7.12 of the Plan.

(d)     **Impairment and Voting**:  Class 6 is Impaired, and, thus, holders of ABL Claims are entitled to vote to accept or reject the Plan.

### 4.7     *Class 7:  General Unsecured Claims.*

(a)     **Treatment**:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final settlement, and release of such Allowed General Unsecured Claim, on the Confirmation Date, each such holder shall receive its Pro Rata Share of the Class 3(b) Litigation Trust Interests.

(b)     **Impairment and Voting:**  Class 7 is Impaired, and, thus, holders of ~~Allowed~~ General Unsecured Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.8     *Class 8:  Subordinated Claims.*

(a)     **Treatment**:  All Subordinated Claims, if any, shall be cancelled, released, and extinguished, and shall be of no further force or effect, and holders of Allowed Subordinated Claims shall receive their Pro Rata Share of the Class 3(b) Litigation Trust Interests.

(b)     **Impairment and Voting**:  Class 8 is Impaired, and, thus, holders of ~~Allowed~~ Subordinated Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.9     *Class 9:  Intercompany Claims.*

(a)     **Treatment**:  On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or released to the extent reasonably determined to be appropriate by the Wind Down Administrator; *provided* that no distributions will be made on account of Intercompany Claims.

(b)     **Impairment and Voting:**  Class 9 is Impaired.  Holders of Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

### 4.10     *Class 10:  FBG Debtor Interests.*

(a)     **Treatment**:  On the date that an FBG Debtor's Chapter 11 Case is closed (which in the case of FBGH and Viceroy, shall not occur until all distributions under the Plan with respect to the FBG Debtors have been made), and without the need for any further corporate or limited liability company action or approval of any members, board of managers, managers, management, or Interest holders of such FBG Debtor, all FBG Debtor Interests in such FBG

Debtor shall be cancelled, and holders of FBG Debtor Interests in such FBG Debtor shall not receive any distributions on account of such FBG Debtor Interests unless and until any Allowed Claims for which such FBG Debtor has a continuing obligation to pay following the Confirmation Date are satisfied in full, in which case each holder of an FBG Debtor Interest in such FBG Debtor shall receive its Pro Rata Share of any residual distributable value of such FBG Debtor.  The continuing rights of holders of Debtor Interests in FBGH and Viceroy shall be nontransferable and non-assignable except by will, intestate, succession, or (subject to the prior written consent of the Wind Down Administrator, which is not to be unreasonably withheld) operation of law.

**(b)**   **Impairment and Voting:**  Class 10 is Impaired.  Holders of FBG Debtors Interest are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of FBG Debtor Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to FBG Debtor Interests.

**ARTICLE V.**   **MEANS FOR IMPLEMENTATION.**

### 5.1   *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and the releases contained in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim against or Interest in an FBG Debtor and any distribution to be made on account of such Claim or Interest.  The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan, including the Plan Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the Plan Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the FBG Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.

### 5.2   *Plan Settlement.*

**(a)**   **Overview**.  Pursuant to sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee (the "**Plan Settlement**").  The compromises and settlements included in the Plan Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is

41

fair, equitable, reasonable and in the best interests of the FBG Debtors' Estates.  The terms of the Plan Settlement are reflected below.

(b)     **Enforcement of Remedies**.  The DIP Secured Parties have superpriority liens on (i) all prepetition and postpetition property of the FBG Debtors, including the DIP Loan Parties and Parent Guarantors, and all proceeds thereof, including all Estate Claims (excluding Avoidance Actions but including Avoidance Proceeds), (ii) all Additional Unencumbered Property, and (iii) all Prepetition Collateral (other than ABL Priority Collateral, on which the liens of the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are junior to those of the ABL Secured Parties).  The DIP Secured Parties have alleged that various events of default have occurred and are continuing under the DIP Documents.  The DIP Loan Parties and Parent Guarantors do not have sufficient funds to indefeasibly pay the DIP Obligations in full in Cash.  The Plan Settlement incorporates a consensual arrangement to (i) permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto and (ii) provide recoveries to junior creditors of the FBG Debtors which allows such creditors to participate in recovery prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

(c)     **Expiration of Challenge Rights**.  The Challenge Period shall be deemed to expire against the Creditors' Committee and all other parties in interest (unless already expired pursuant to the terms of the DIP Order) upon the (i) establishment of the Litigation Trust, (ii) consummation of the Estate Claims Credit Bid Transaction, and (iii) funding of the Litigation Trust Cash Funding to the Litigation Trust.

(d)     **Cash Funding and Agreed Budget**.  On the Confirmation Date, the Litigation Trust shall receive the Litigation Trust Cash Funding.  No Allowed Professional Fees of Professionals may be paid from the Litigation Trust Cash Funding.

(e)     **Estate Claims Credit Bid Transaction**.   The FBG Debtors are conducting a marketing and sale process for the Estate Claims.  Pursuant to the Plan Settlement, on the Confirmation Date or soon thereafter as reasonably practicable, unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee (not to be unreasonably withheld, conditioned, or delayed)), the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned, conveyed, transferred, and delivered, the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the DIP Secured Parties and such assets shall then transfer to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).  The aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets shall be the Estate Claims Credit Bid as the same may be increased at any auction.  The Plan shall serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the Estate Claims Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the Estate Claims Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due

42

notice and opportunity for hearing; and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

(f)     **DIP Collateral Credit Bid Transaction**.     Pursuant to the Plan Settlement, on the Confirmation Date or as soon thereafter as reasonably practicable, the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned conveyed, transferred, and delivered, the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the DIP Collateral Credit Bid APA, (if applicable), to the DIP Secured Parties and such assets shall then transfer to the DIP Collateral Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).   The aggregate consideration to be paid by the DIP Secured Parties for the DIP Collateral Trust Assets shall be the DIP Collateral Credit Bid.   The Plan shall serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the DIP Collateral Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the DIP Collateral Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing, and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

(g)     **Claims Ombudsman**.  The Claims Ombudsman shall be appointed on the Confirmation Date (or as soon thereafter as reasonably practicable) and shall serve as the holder of record of the Class 3(b) Litigation Trust Interests (and, in such capacity shall provide the Litigation Trustee with a properly completed IRS Form W-9).  The Claims Ombudsman shall be responsible for reconciling all Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims) against the FBG Debtors and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith.  As permitted or required by applicable law, the Claims Ombudsman may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity.  *See* Section 6.19(d) of the Plan.  The Claims Ombudsman shall only withhold distributions where necessary and shall otherwise be required to make minimum and/or interim distributions expeditiously.  All costs of the Claims Ombudsman to reconcile Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) and make distributions to holders of Class 3(b) Litigation Trust Interests shall be paid from the distributions otherwise distributable to holders of Class 3 Litigation Trust Interests and shall not be otherwise chargeable against the Litigation Trust.  The Litigation Trust shall advance funds to the Claims Ombudsman to fund the claims reconciliation process, subject to an agreed budget.  The Litigation Trustee and Claims Ombudsman shall negotiate such agreed budget in good faith.  The Claims Ombudsman shall have a fiduciary duty to all holders of Litigation Trust Interests to maximize value in connection with the reconciliation of Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims).  The Litigation Trust Agreement shall provide that certain settlements of Disputed Claims shall require approval by the Litigation Trust Oversight Committee.

43

(h)      **Survival of Claims**.  The Remaining Lender Claims and ABL Deficiency Claims against the Estates of the FBG Debtors (collectively, the "**Surviving Claims**") are preserved and may continue to be asserted against the Estates of the applicable FBG Debtors and shall not be reduced by the amount of any Trust distributions made on or after the Confirmation Date.  For the avoidance of doubt, no Allowed Claims shall be reduced by any Trust distributions on or after the Confirmation Date.  The SurvivingRemaining First Lien Claims and Remaining Second Lien Claims shall be deemed to be released against the FBG Debtors on the Effective Date.  Any property recovered on account of the Remaining Lender Claims (other than any Litigation Trust SPV Recoveries) shall be deemed to be contributed to the DIP Collateral Trust and shall constitute DIP Collateral Trust Assets.

(i)      **DIP Order and Intercreditor Agreement Preservation.**  Nothing in the Plan, the Confirmation Order, or any Definitive Document shall modify, amend, waive, reject, or impair the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Intercreditor Agreements (as defined in the DIP Order) and the DIP Order, except to the extent expressly agreed to in writing by the ABL Agent and the DIP Agent.  Subject to the terms of the Plan, Confirmation, and DIP Order, the Intercreditor Agreements and the DIP Order shall remain in full force and effect following the Confirmation Date and shall not be rejected, modified, supplemented, or otherwise altered by the Plan, the Confirmation Order, or any Definitive Document without the prior written consent of the ABL Agent and the DIP Agent.  The DIP Collateral Trust (and any trustee or fiduciary thereof) shall be deemed a successor to the Term Collateral Agents and the Term Claimholders for purposes of the Intercreditor Agreements and shall be bound by all restrictions and obligations applicable to the Term Claimholders thereunder.

(j)      **Bona Fide Disputes Among the Trusts.**

(i)      If there is a dispute as to whether an asset is a Litigation Trust Asset, DIP Collateral Trust Asset, or ABL Collateral Trust Asset, such dispute shall be resolved either by the mutual consent of the DIP Secured Parties, the ABL Secured Parties, and/or the Litigation Trust or by the Bankruptcy Court and, upon entry of a Final Order or mutual agreement, such asset, as applicable, shall automatically vest in the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust, as applicable. Until such bona fide dispute is resolved, the DIP Secured Parties and the ABL Secured Parties may determine that the FBG Debtors shall hold such asset in trust pending an adjudication or settlement, or the DIP Secured Parties and ABL Secured Parties may determine to have the asset remain in the estates of the FBG Debtors.  This section shall only apply to assets to which there is a dispute between the ABL Secured Parties and DIP Secured Parties.

(ii)     For the avoidance of doubt, a dispute exists with respect to whether any amounts (excluding the agreed $3,000,000 tariff refunds currently in the FBG Debtors' possession, which constitute ABL Priority Collateral) recovered by the Debtors that were

44

unlawfully collected under the International Emergency Economic Powers Act are Litigation Trust Assets, DIP Collateral Trust Assets, or ABL Collateral Trust Assets. Until the Litigation Trustee, the DIP Secured Parties, and ABL Secured Parties resolve such dispute, all amounts recovered under the International Emergency Economic Powers Act shall be placed in a segregated escrow account maintained by the FBG Debtors and shall only vest to the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust pursuant to a Final Order or consensual agreement of the parties. For the avoidance of doubt, the $3,000,000 tariff refunds currently in the FBG Debtors' possession is not subject to dispute and constitute ABL Priority Collateral.

**(k)** Solely for purposes of distributions under the Plan: (i) each Claim filed or to be filed against any FBG Debtor shall be deemed filed as a single Claim against, and a single obligation of, the FBG Debtors; (ii) any Claims on account of a guarantee provided by an FBG Debtor of the obligations of another FBG Debtor shall be treated as eliminated so that any Claim against any FBG Debtor and any Claim based upon a guarantee thereof by any other FBG Debtor shall be treated as one Claim against a single consolidated Estate; and (iii) any joint or joint and several liability of any of the FBG Debtors shall be one obligation of the FBG Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

**5.3** *Implementation.*

(i) On the Confirmation Date or as soon as reasonably practicable thereafter, the FBG Debtors shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction.

(ii) On the Confirmation Date or as soon as reasonably practicable thereafter, the Litigation Trust shall be established and administered pursuant to the Litigation Trust Agreement and the Plan. Upon the establishment of the Litigation Trust, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the Litigation Trust, the Litigation Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iii) On the Confirmation Date or as soon as reasonably practicable thereafter, the DIP Collateral Trust shall be established and administered pursuant to the DIP Collateral Trust Agreement and the Plan. Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trust Assets shall transfer to the DIP Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the DIP Collateral Trust, the DIP Collateral Trustee, and any other necessary party shall execute (or be

45

deemed to have executed) all documentation necessary to effectuate such transfer.

(iv)    On the Confirmation Date or as soon as reasonably practicable thereafter, the ABL Collateral Trust shall be established and administered pursuant to the ABL Collateral Trust Agreement and the Plan.  Upon the establishment of the ABL Collateral Trust, the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets and transferred such ABL Collateral Trust Assets to the ABL Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the ABL Collateral Trust, the ABL Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(v)     On the Confirmation Date or as soon as reasonably practicable thereafter, the Wind Down Reserve shall be established and funded in accordance with the Wind Down Budget.

(vi)    On the Confirmation Date or as soon as reasonably practicable thereafter, the FBG Debtors shall transfer the (a) Professional Fees Escrow Account, (b) the Factored Receivables Account, (c) the Examiner Account, (d) the Employee Liability Account, (e) any Employee Lease Accounts, and (f) the Segregated Accounts to the Wind Down Administrator.

(vii)   Following the Confirmation Date, the Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order and the Plan.

(viii)  Following the Confirmation Date, the Wind Down Administrator shall administer the Employee Liability Account in accordance with the OEM Order.

(ix)    Following the Confirmation Date, the Wind Down Administrator shall administer any Employee Lease Accounts in accordance with any applicable order of the Bankruptcy Court, purchase agreement, and/or employee lease agreement.

(x)     Following the Confirmation Date, any funds remaining in the Health Escrow Account that are required to be returned to the FBG Debtors shall be remitted to the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget until transferred by the Wind Down Administrator to the DIP Collateral Trust.

### 5.4   *Factored Receivables Account.*

Following the Confirmation Date, the Factored Receivables Account shall be transferred to the Wind Down Administrator, and the Wind Down Administrator shall assume the obligations for administering the Factored Receivables Account.   The Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order, including providing the reporting set forth in paragraph 7 of the Cash Management Order.   The Confirmation Order shall provide that (i) the FBG Debtors shall continue to direct, to the extent received by the FBG Debtors, and segregate all prepetition collections into the Factored Receivables Account and (ii) the FBG Debtors and the Wind Down Administrator shall not disburse any such segregated funds from the Factored Receivables Account pending further order of the Bankruptcy Court after notice to the ABL Agent and all other affected parties and all such parties being provided an opportunity to be heard; *provided*, for the avoidance of doubt, that the FBG Debtors and the Wind Down Administrator shall not be required to segregate any funds received on account of any postpetition sale and related invoice. The Confirmation Order shall further provide that the Wind Down Administrator shall be authorized to administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the funds on deposit in the Factored Receivables Account; *provided* that the  Wind Down Administrator shall do so at the ABL Collateral Trust's sole cost and expense (paid in advance); *provided further* that the ABL Agent shall have the right to direct the Wind Down Administrator with respect to the prosecution of the FBG Debtors' interests in the Factored Receivables Account and the ABL Agent's prior written consent shall be required for any settlement, compromise, or other disposition of such interests.

### 5.5   *Wind Down Accounts.*

As soon as reasonably practicable following the Confirmation Date, (i) the SPV-ABL Wind Down Account shall be transferred to the ABL Collateral Trust and the ABL Collateral Trust shall assume the obligations for administering such account; and (ii) the SPV-DIP Wind Down Account shall be transferred to the DIP Collateral Trust, and the DIP Collateral Trustee shall assume the obligations for administering such account.   The ABL Collateral Trustee and the DIP Collateral Trustee shall administer the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account, respectively, in accordance with the Wind Down Order.

### 5.6   *Corporate Action.*

**(a)**   Following the Confirmation Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan or the Confirmation Order (including any action to be undertaken by the FBG Debtors, the Wind Down Administrator, the Trustees, or the Trusts) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the FBG Debtors, or any other Entity or Person.   All matters provided for in the Plan involving the organizational structure of the FBG Debtors, and any other action required by the FBG Debtors in connection therewith, shall be deemed to have occurred

47

and shall be in effect, without any requirement of further action by the FBG Debtors or their Estates.

**(b)** The authorizations and approvals contemplated by this Section 5.6 shall be effective notwithstanding any requirements under non-bankruptcy law.

**(c)** The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 5.7 *Wind Down Administrator.*

**(a)** **Wind Down**.  After the Confirmation Date, pursuant to the Plan, the Wind Down Administrator shall effectuate the Wind Down without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to the Wind Down Budget.  The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner following the Confirmation Date.

**(b)** **Authority of the Wind Down Administrator**.  The Wind Down Administrator shall have the authority and right on behalf of the FBG Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i) coordinate with the Trustees with respect to the transfer and turnover of information;

(ii) administer the FBG Debtors' tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the FBG Debtors or their Estates under Bankruptcy Code section 505(b) for all taxable periods of the FBG Debtors ending after the Petition Date through the liquidation of the FBG Debtors as determined under applicable tax laws, and (c) representing the interest and account of the FBG Debtors or their Estates before any taxing authority in all matters including, without limitation, any action, suit, or proceeding or audit;

(iii) (a) administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the Factored Receivables Account in accordance with the Cash Management Order and the Plan, (b) administer the Professional Fees Escrow Account in accordance with the DIP Order and facilitate distributions from such account to satisfy allowed Professional Fee Claims, (c) administer the Examiner Account and facilitate distributions from such account to satisfy the allowed fee and expenses of the Examiner and his professionals, (d) administer the Employee

Liability Account in accordance with the OEM Order, (e) administer any Employee Lease Accounts in accordance with any applicable order of the Bankruptcy Court, purchase agreement, and/or employee lease agreement, and (f) administer the Segregated Accounts in accordance with the Evolution Adequate Protection Stipulation;

(iv)     pay statutory fees in accordance with <u>Section 15.1</u> of the Plan;

(v)     close the Chapter 11 Case of the FBG Debtors; and

(vi)     perform other duties and functions that are consistent with the Plan or as the Wind Down Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan.

**(c)**     **Indemnification**.  The FBG Debtors shall indemnify and hold harmless the Wind Down Administrator, solely in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of the Wind Down Administrator's bad faith, gross negligence, willful misconduct, fraud, or criminal conduct.

### 5.8     *Governance.*

**(a)**     On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, managers, members, officers, and other authorized persons of the FBG Debtors shall be terminated and such persons shall be deemed to have resigned.  On the Confirmation Date, the Wind Down Administrator shall serve as the initial director or manager, as applicable, and sole officer of each FBG Debtor after the Confirmation Date until such time as such FBG Debtor goes out of existence, by dissolution or otherwise.

**(b)**     The Wind Down Administrator, on behalf of the FBG Debtors, may appoint one or more directors or managers of any FBG Debtor to serve after the Confirmation Date.  The Wind Down Administrator, on behalf of the FBG Debtors, may elect such additional directors(s), manager(s), and/or officer(s) of the FBG Debtors as the Wind Down Administrator deems necessary to implement the Plan and the actions contemplated herein.  The Wind Down Administrator, on behalf of the FBG Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of the FBG Debtors at any time with or without cause.

**(c)**     As of the Confirmation Date, the governing documents of the FBG Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of the Plan.

### 5.9     *Cancellation of Existing Securities, Agreements, and Liens.*

Subject to <u>Section 4.8</u> of the Plan, and except for the purpose of evidencing a right to a distribution pursuant to the Plan, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or holders of FBG Debtor Interests, all notes, instruments, other

49

securities, and other evidence of debt issued by the FBG Debtors, and any rights of any holder in respect thereof, shall be deemed cancelled and of no force or effect and the obligations of the FBG Debtors thereunder shall be deemed fully satisfied, settled, and released; *provided* that the foregoing shall not apply to the DIP Documents, Remaining DIP A Claims, Remaining Roll-Up Claims, First Lien Term Loan Liens, Sidecar Term Loan Liens, and Second Lien Term Loan Liens (each, as defined in the DIP Order).

### 5.10    *Dissolution of FBG Debtors.*

On and after the Confirmation Date, the Wind Down Administrator may complete the winding up of the FBG Debtors without the necessity for any other or further actions to be taken by or on behalf of the FBG Debtors or its members, managers, directors, management, or holders of FBG Debtor Interests or any payments to be made in connection therewith, other than the filing of a certificate of dissolution or cancellation with the appropriate governmental authorities, and any such certificate of dissolution or cancellation may be filed by the Wind Down Administrator without need for any authorization, signature or other act of any Person, including without limitation any holder of any Claim or Interest.  Any such transactions may be effective without any further action by the members, managers, directors, management, or Interest holders of the FBG Debtors.

### 5.11    *Effectuating Documents; Further Transactions.*

**(a)**    On and after the Confirmation Date, the Wind Down Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the FBG Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(b)**    On and after the Confirmation Date, the Trustees are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(c)**    Before, on, or after the Confirmation Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Interest holders, directors, managers, or members of the FBG Debtors shall be deemed to have been so approved and shall be in effect before, on, or after the Confirmation Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Interest holders, directors, managers, or members of the FBG Debtors, or the need for any approvals, authorizations, actions or consents.

### 5.12    *Closing of the Chapter 11 Case.*

After the Confirmation Date, the Wind Down Administrator shall be authorized,

50

but not directed, to submit a motion for orders that close and issue final decree for any of the FBG Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, subject to the consent of the Litigation Trustee and the Claims Ombudsman (not to be unreasonably withheld, conditioned, or delayed).  Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the FBG Debtors' Chapter 11 Cases two (2) years after the Effective Date has occurred.

**ARTICLE VI.**     **LITIGATION TRUST.**

**6.1**     *Establishment of the Litigation Trust.*

**(a)**     On the Confirmation Date, or as soon thereafter as reasonably practicable, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement and the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

**(b)**     Upon the establishment of the Litigation Trust, each holder of Litigation Trust Interests shall be deemed to be a party to the Litigation Trust Agreement without the need for execution by such holder.  The Litigation Trust Agreement shall be binding on all Entities receiving, and all holders of, Litigation Trust Interests (and their respective successors), whether such Litigation Trust Interests are received or are to be received on or after the Confirmation Date and regardless of whether such Entity executes or delivers a signature page to the Litigation Trust Agreement.

**6.2**     *Funding of and Transfer of Assets into the Litigation Trust.*

**(a)**     Following the Confirmation Date and the consummation of the Estate Claims Credit Bid Transaction, the FBG Debtors, the DIP Secured Parties, and, with respect to Direct Creditor Claims, each Preference Settlement Electing Creditor, shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for U.S. federal, state, and local income tax purposes) automatically vested in the Litigation Trust its remaining interests in the Litigation Trust Assets, and all such assets shall be deemed to have vested in the Litigation Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the Litigation Trustee, in accordance with the Plan and the Litigation Trust Agreement; *provided* that with respect to any Insurance Rights ~~being~~ transferred to the Litigation Trust, such transfer shall not impair the rights of any other Person in the relevant Insurance Policies.  The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.  The act of transferring the Litigation Trust Assets, as authorized by the Plan

51

and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (including, for the avoidance of doubt, any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors' Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b)     All Causes of Action, claims, rights, and interests purchased, transferred, assigned, or otherwise conveyed to the Litigation Trust from each FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, shall remain separate and distinct from the Causes of Action, claims, rights, and interests transferred from the Estates of any other FBG Debtor or Preference Settlement Electing Creditor, as applicable. The Litigation Trust shall hold, administer, and prosecute such Causes of Action on behalf of each contributing FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, as though such Causes of Action continued to be held by such FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, independently. The consolidation of Causes of Action within the Litigation Trust shall not entitle any defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust to assert, as a defense, setoff, recoupment, counterclaim, or reduction of any kind, any claim, defense, or right arising from or relating to such party's dealings, transactions, or relationships with any FBG Debtor or Preference Settlement Electing Creditor, as applicable, other than the specific FBG Debtor or Preference Settlement Electing Creditor, as applicable, who or whose Estate originally held the Cause of Action being prosecuted. For the avoidance of doubt, the consolidation of Causes of Action within the Litigation Trust for administrative convenience shall not operate to merge, consolidate, or otherwise combine the separate and distinct claims of the respective FBG Debtor Estates or Preference Settlement Electing Creditors, as applicable, nor shall such consolidation permit any party to assert cross-FBG Debtor and/or cross-Preference Settlement Electing Creditor defenses, as applicable, or to reduce its liability on a Cause of Action held by one FBG Debtor's Estate or a Preference Settlement Electing Creditor, as applicable, by reference to any claim, credit, or defense arising from such party's relationship with a different FBG Debtor or Preference Settlement Electing Creditor, as applicable.

(c)     Notwithstanding anything to the contrary in this Plan, nothing in this Plan shall in any way impair, prevent, affect, or prejudice any defendant, counterparty, or other party

52

against whom a Cause of Action is asserted by the Litigation Trust from asserting, in response to any such Cause of Action, any defense or legal argument, including any defense of recoupment, setoff, or offset, arising from or relating to such defendant or party's dealings, transactions, or relationships with any FBG Debtor (including the ability to assert such defenses or legal arguments regardless of whether such FBG Debtor is the FBG Debtor whose estate may have held the Cause of Action being asserted). Nothing in this Plan shall modify any defense, response, or argument relating to any Cause of Action based on the doctrine of substantive consolidation, veil piercing, alter ego or any similar doctrine, including any defense, including any defense of recoupment, setoff, or offset, response, or argument that subsequent new value or other value provided to one debtor or related entity should be treated as value provided to another FBG Debtor or to the FBG Debtors in the aggregate; *provided, however, that* nothing in the Plan shall in any way impair, prevent, or affect the FBG Debtors' or the Litigation Trustee's right to contest any such defense or legal argument raised by any party.

(d)    All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by (1) any one or more of the FBG Debtors or (2) any prepetition or postpetition committee or subcommittee of the board of managers or equivalent governing body of any of the FBG Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the purpose of the Litigation Trust (the "**Transferred Privileges**"), along with all information, documents, and other materials covered by any of the Transferred Privileges (the "**Transferred Privileged Information**"), shall be deemed transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Transferred Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

(e)    The foregoing transfer and assignment shall vest the Transferred Privileges concerning the Transferred Privileged Information in the Litigation Trust, in trust, and consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Transferred Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust) have an interest on the other, such Transferred Privileges and Transferred Privileged Information shall vest jointly in the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust), as applicable, (or their designee) and the Litigation Trust. As relates to any Transferred Privileges or Transferred Privileged Information held jointly with the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which an FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the applicable FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) shall maintain the Transferred Privileges and keep the Transferred Privileged Information confidential, and may only waive any Transferred Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written

53

consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where an FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Transferred Privileges and keep the Transferred Privileged Information confidential, and may only waive any Transferred Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the applicable FBG Debtor (or the ABL Collateral Trustee or DIP Collateral Trustee).  The Trusts and FBG Debtors have agreed that they do not intend to provide a general waiver of all Transferred Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Transferred Privileges.

**(f)**      Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Transferred Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

**(g)**      Pursuant to, *inter alia,* Federal Rule of Evidence 502(c), if a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such disclosure shall not be deemed to destroy any of the Transferred Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the disclosure notify the Litigation Trust of the disclosure and shall demand that all recipients of the inadvertently disclosed Transferred Privileged Information return or confirm the destruction of such materials.  Notwithstanding anything herein to the contrary, the Litigation Trustee has no obligation to waive privilege over any communications, information, or other similar materials when fulfilling its duties to meet and confer with any party in interest.

**(h)**      On the Confirmation Date, the Litigation Trustee shall be substituted as the party in interest for the Creditors' Committee without the need for any court order or Final Order with respect to any (i) motion filed by the Creditors' Committee seeking standing to assert any cause of action on behalf of the FBG Debtors not released or waived under the Plan; and (ii) complaint filed by the Creditors' Committee on behalf of the FBG Debtors against any party in interest pursuant to a grant of standing by the Bankruptcy Court.  The Litigation Trustee shall inherit all "challenge" rights possessed by the Creditors' Committee not otherwise waived in the Plan on the same terms and with the same deadlines as possessed by the Creditors' Committee on the Confirmation Date, and to the extent the Creditors' Committee is not bound by any stipulation of the FBG Debtors pending resolution of such "challenge," the Litigation Trustee shall not be bound by such stipulation.  For the avoidance of doubt, nothing in this paragraph modifies or affects the expiration of the Challenge Deadline (as defined in the DIP Order) as set forth in the Plan.

**6.3**     *Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments.*

**(a)**     On the Confirmation Date, the Litigation Trust Class 1 Funding Contributors will provide the Initial Litigation Trust Funding Commitments (and the Litigation Trust Class 1 Funding Contributions) to the Litigation Trust pursuant to the Litigation Trust Agreement and/or any Litigation Trust Funding Agreement, which commitments and contributions shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust, and costs of monetizing the Litigation Trust Assets. Additionally, the Litigation Trust Backstop Parties shall provide a backstop commitment on the Confirmation Date to ensure adequate capitalization of the Litigation Trust notwithstanding the rate of participation from holders of DIP A Claims to participate in the Initial Litigation Trust Funding Commitments. The Litigation Trust Class 1 Funding Commitments and Litigation Trust Backstop Commitments are necessary and incidental to the liquidating purpose of the Litigation Trust. The Litigation Trust Backstop Commitments are bargained-for and integral parts of the restructuring transactions contemplated under the Plan.

**(b)**     The terms of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments shall be set forth in the Litigation Trust Agreement and/or in any Litigation Trust Funding Agreement. Upon execution of the Litigation Trust Agreement or any Litigation Trust Funding Agreement, the Initial Litigation Trust Funding Commitments and the Litigation Trust Backstop Commitments shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, usury, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur or enforce the obligations under the Litigation Trust Agreement or in any Litigation Trust Funding Agreement with respect to the Initial Litigation Trust Funding Commitments and the Litigation Trust Backstop Commitments and use the proceeds of such Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments, in each case, in accordance with the terms of the Plan, the Confirmation Order, the Litigation Trust Agreement, and any Litigation Trust Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Trust Agreement and any Litigation Trust Funding Agreement, in each case, shall bind the Litigation Trust and each other Entity that enters into such agreement.

**(c)**     Entry of the Confirmation Order shall constitute approval of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments. Subject only to the provision of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments, the terms and conditions of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments are satisfied and earned as of the entry of the Confirmation Order. The Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments are bargained-for and integral parts of the restructuring transactions contemplated under the Plan.

**DEBTORS' EXHIBIT NO. 7**
**Page 66 of 272**

**(d)** *Oversubscription*.  To the extent that any Litigation Trust Class 1 Funding Contributor fails to fund, declines to fund, or is otherwise unable to fund all or any portion of its pro rata share of  the Initial Litigation Trust Funding Commitments (the "**Unfunded Amount**"), the Litigation Trust Backstop Parties, pursuant to the terms of any backstop commitment letter, shall subscribe for and fund such Unfunded Amount, on a pro rata basis based on their respective commitments (or as otherwise agreed among such participating parties).  Each applicable Litigation Trust Backstop Party shall be entitled to receive Class 1 Litigation Trust Interests in respect of any Unfunded Amount actually funded by such party.

**(e)** *Commitment Period*.  Five (5) years.

**(f)** *Minimum Funding*.  Available in one or more draws, equal to the lesser of (i) $10 million and (ii) the undrawn commitment amount.

**(g)** *Consequences of Breach of Funding Commitments*.  If any Litigation Trust Class 1 Funding Contributor elects to provide an Initial Litigation Trust Funding Commitment but fails to actually fund all or a portion of such Initial Litigation Trust Funding Commitment when requested by the Litigation Trustee at any point during the Commitment Period, the Litigation Trustee shall be entitled to seek enforcement of any applicable commitment agreement, the Plan, the Litigation Trust Agreement, or the Litigation Trust Funding Agreement against such Litigation Trust Class 1 Funding Contributor or take other actions as allowed under applicable Law.

**6.4** ***Additional Litigation Trust Funding.***

**(a)** The Litigation Trust may obtain Additional Litigation Trust Funding on the following terms and conditions:

(i) the Litigation Trust may obtain all or a portion of the Additional Class 1 Litigation Trust Funding as Additional Class 1 Litigation Trust Interests if such commitments are (a) on the same terms as the Initial Litigation Trust Funding Commitments (including Section 6.5(b)(i)–(iv)), and (b) approved by the Litigation Trust Oversight Committee as a Major Decision; and

(ii) if the Litigation Trust has already obtained all Additional Class 1 Litigation Trust Funding, the Litigation Trust (unless a determination has been made pursuant to Section 6.4(c) below) may obtain Additional Waterfall Litigation Trust Funding if such Additional Waterfall Litigation Trust Funding is (a) approved by a unanimous vote of the Litigation Trust Oversight Committee, including the UCC Member(s), or (b) approved by the Bankruptcy Court pursuant to the Court-Approved Additional Waterfall Litigation Funding.

**(b)** All Additional Litigation Trust Funding obtained by the Litigation Trust shall be subject to the following conditions:

56

(i)     the Litigation Trustee shall conduct an Agreed Market Check;

(ii)     at the time of seeking such funding, the Litigation Trust has, or the Litigation Trustee reasonably expects, that the Litigation Trust will have in the near term, less than $7,500,000 (on a pro forma basis); and

(iii)     if the Additional Litigation Trust Funding is provided by an insider (including an existing holder of Class 1 Litigation Trust Interests), then the Additional Litigation Trust Funding must be on economic terms no more expensive for the Litigation Trust than Section 6.5(b)(i)–(iii) hereof.

(c)     Notwithstanding anything to the contrary herein, the Litigation Trustee may, in its sole discretion, decide not to obtain or cause the funding of the Additional Class 1 Litigation Trust Funding if it determines that such actions may result in the Litigation Trust or Litigation Trust Interests being or having been subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act.

(d)     *Preemptive Rights for Additional Litigation Trust Funding*.   Any additional funding of the Litigation Trust (including any Additional Litigation Trust Funding) shall be offered *first* to holders of Class 1 Litigation Trust Interests on a pro rata basis pursuant to the terms of the Litigation Trust Agreement and in accordance with applicable Law.   Each holder of a Class 1 Litigation Trust Interest shall be deemed to have declined such offer if it has not committed to provide such additional funding within ten (10) business days of a request therefor.

(e)     *Additional Class 1 Litigation Trust Interests*.   For the avoidance of doubt, any Additional Class 1 Litigation Trust Interests issued by the Litigation Trust shall participate pro rata in the Class 1 Litigation Trust Waterfall solely with respect to distributions made after closing of such Additional Class 1 Litigation Trust Funding and providers of Additional Class 1 Litigation Trust Funding shall be entitled to distributions the Class 1 Litigation Trust Waterfall only with respect to their own undrawn or backstopped commitments. Any person providing such Additional Class 1 Litigation Trust Funding shall be a "**Funding Party**," and any contributions and/or commitments in connection therewith shall be "**Committed Funding,**" "**Commitment Amounts**," and/or "**Contributions**," each as defined in the Litigation Trust Agreement.

(f)     The Litigation Trust Class 1 Funding Contributors may decline to fund a requested Litigation Trust Class 1 Funding Contribution in the reasonable discretion of the Required Litigation Trust Funding Contributors (as defined in the Litigation Trust Agreement) if they determine based on a written valuation or status report from the Litigation Trustee that the remaining liquidation value of the Litigation Trust Assets would be insufficient to repay the outstanding Class 1 Litigation Trust Interests; *provided* that, if a Litigation Trust Class 1 Funding Contributor declines to fund a requested Litigation Trust Class 1 Funding Contribution, the

57

Litigation Trust shall be prohibited from obtaining any future Additional Litigation Waterfall Trust Funding from such holder of Class 1 Litigation Trust Interests or its Affiliates.

(g)      *Priming Effect of Additional Waterfall Litigation Trust Funding*.  If the Litigation Trustee receives any Additional Waterfall Litigation Trust Funding, such amounts may be structurally and contractually senior to the Litigation Trust Waterfall.  For the avoidance of doubt, providers of Additional Waterfall Litigation Trust Funding shall not receive any Class 1 Litigation Interests or any Additional Class 1 Litigation Trust Interests on account of any Additional Waterfall Litigation Trust Funding.

### 6.5    *Litigation Trust Waterfall.*

(a)      **Litigation Trust Waterfall**.  Except as may be altered by the provisions of Additional Waterfall Litigation Trust Funding, proceeds from the monetization of the Litigation Trust Assets, net of fees, costs, or other expenses pursuant to the terms of the Litigation Trust Agreement, shall be distributed to Litigation Trust Beneficiaries as follows:

(i)      *First*, to holders of Class 1 Litigation Trust Interests (or, if applicable, Additional Class 1 Litigation Trust Interests), which shall receive the amounts to which they are entitled pursuant to Section 6.5(b)(i), (ii), and (iii) of the Plan in respect of principal and investment return from the Litigation Trust Class 1 Funding Commitments, the Litigation Trust Class 1 Funding Contributions, and any Additional Class 1 Litigation Trust Funding (the "**First Return Threshold**");

(ii)     *Second*, following satisfaction of the First Return Threshold until aggregate distributions from the Litigation Trust (including distributions pursuant to Section 6.5(b) below) equal $350,000,000 (the "**Second Return Threshold**"):

(1)      15% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and

(2)      85% to holders of Class 2 Litigation Trust Interests;

(iii)    *Third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests from the Litigation Trust equal to the amount of  the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) (the "**Final Return Threshold**"):

(1)      10% to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable),

(2)    74% to holders of Class 2 Litigation Trust Interests, and

(3)    16% to the holders of Class 3 Litigation Trust Interests (subject to payment of Allowed Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims in full, set forth in accordance with Section 6.5(d) below); and

(iv)    *Fourth*, following the satisfaction of the Final Return Threshold: (1) 10% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and (2) 90% to the holders of Class 3 Litigation Trust Interests (subject to payment of Allowed Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims in full, set forth in accordance with Section 6.5(d) below).

**(b)**    **Class 1 Litigation Trust Interests Distributions**.  Distributions to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) pursuant to the Litigation Trust Waterfall shall be paid as follows:

(i)    *First*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with their respective Litigation Trust Class 1 Funding Contributions, until each Litigation Trust Class 1 Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (b) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x, with such returns being measured from the date of each Litigation Trust Class 1 Funding Contribution;

(ii)    *Second*, to the Litigation Trust Class 1 Funding Contributors, in an amount accrued on the daily undrawn amounts of their respective Litigation Trust Class 1 Funding Commitments, at the rate of 5.0% *per annum*; *provided* that no Litigation Trust Class 1 Funding Contributor shall be entitled to receive any such distribution in respect of undrawn Litigation Trust Class 1 Funding Commitments for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor;

(iii)    *Third*, to the Litigation Trust Backstop Parties until each such Litigation Trust Backstop Party has received an amount equal to 5.0% of the amount of such Litigation Trust Backstop Party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party; *provided* that (1) no Litigation Trust Backstop Party shall be

59

entitled to receive any such distribution for any period during which such Litigation Trust Backstop Party is a Defaulting Contributor and (2) if a Litigation Trust Backstop Party becomes a Defaulting Contributor, such Litigation Trust Backstop Party's Litigation Trust Backstop Commitments and fees in respect thereof may be terminated or reallocated in Litigation Trustee's reasonable discretion; and

(iv)     *Fourth*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Class 1 Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Class 1 Funding Contributors, for the life of the Litigation Trust; *provided* that no Litigation Trust Class 1 Funding Contributor shall be entitled to receive any such distribution for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor.

Any payment of principal, interest, fees or other amounts received by the Litigation Trustee for the account of a Defaulting Contributor or received by the Litigation Trustee from a Defaulting Contributor shall be applied at such time or times as may be determined by the Litigation Trustee as follows: *first*, to the payment of any amounts owing by such Defaulting Contributor to the Litigation Trustee hereunder; *second*, to the funding of any Litigation Trust Class 1 Funding Contribution in respect of which such Defaulting Contributor has failed to fund its portion thereof, as determined by the Litigation Trustee; *third*, to the payment of any amounts owing as a result of any judgment of a court of competent jurisdiction against such Defaulting Contributor as a result of such Defaulting Contributor's failure to fund; and *fourth*, to such Defaulting Contributor or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Contributor that are applied (or held) to pay amounts owed by such Defaulting Contributor shall be deemed paid to and redirected by such Defaulting Contributor.

(c)     **Class 2 Litigation Trust Interests Distributions**.  Distributions to the holders of Class 2 Litigation Trust Interests pursuant to the Litigation Trust Waterfall shall be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders.

(d)     **Class 3 Litigation Trust Interests Distributions**.  Distributions to the holders of Class 3 Litigation Trust Interests (and holders of Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) pursuant to the Litigation Trust Waterfall shall be paid as follows:

**DEBTORS' EXHIBIT NO. 7**
**Page 71 of 272**

(i)     *First*, to the holders of Settled Administrative Expense Claims, pro rata based on the aggregate amount of Allowed Settled Administrative Expense Claims, until each such holder has received distributions equal to the amount of its Allowed Settled Administrative Expense Claim;

(ii)    *Second*, to the holders of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims), pro rata based on the aggregate amount of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims) held by such holders, until each such holder has received distributions equal to the amount of its Allowed Administrative Expense Claim;

(iii)   *Third*, to holders of Allowed Other Priority Claims, pro rata based on the aggregate amount of Allowed Other Priority Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Other Priority Claim;

(iv)    *Fourth*, to holders of Priority Tax Claims, pro rata based on the aggregate amount of Allowed Priority Tax Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Priority Tax Claim;

(v)     *Fifth*, to holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, pro rata based on the aggregate amount of $3,300,000,000 of Allowed Roll-Up Claims (i.e., $3,300,000,000), Allowed First Lien Claims as of the Confirmation Date, Allowed Second Lien Claims as of the Confirmation Date, and Allowed General Unsecured Claims held by such holders, until each holder has received distributions equal to the amount of its respective $3,300,000,000 of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, as applicable; and

(vi)    *Sixth*, to holders of Allowed Subordinated Claims, pro rata based on the amount of Allowed Subordinated Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Subordinated Claim.

Following aggregate distributions equal to the amount of all Allowed Subordinated Claims, any residual value shall be paid as directed by the Litigation Trust Oversight Committee, subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

**6.6     *Minimum Distribution; No Fractional Distributions.***

61

(a)      Notwithstanding anything herein or the Litigation Trust Agreement to the contrary, no fractional interests of Litigation Trust Interests shall be issued, and no Cash shall be distributed in lieu of such fractional amounts.  If any issuance or distribution on account of an Allowed Claim would otherwise result in the issuance of a number of interests of Litigation Trust Interests that is not a whole number, the actual distribution of shares of Litigation Trust Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized interests of Litigation Trust Interests shall be adjusted as necessary to account for the foregoing rounding.

(b)      Notwithstanding anything herein or the Litigation Trust Agreement to the contrary, including the Litigation Trust Waterfall and Class 1 Litigation Trust Waterfall, no Litigation Trust Interests shall be issued to a holder of an Allowed Lender Claim if the entitlement to Litigation Trust Interests is for less than $1,000.00 in principal amount of such Allowed Lender Claim, and no Cash or other distribution shall be made as a result of such adjustment.  The Litigation Trustee shall have no obligation to make a distribution under the Litigation Trust Agreement (including pursuant to the Litigation Trust Waterfall and the Class 1 Litigation Trust Waterfall) to the holder of Class 1 Litigation Trust Interests, Class 2 Litigation Trust Interests, Class 3(a) Litigation Trust Interests, or Class 3(c) Litigation Trust Interests that is either (i) less than $500.00 in Cash or (ii) that does not exceed any transaction costs associated with such distribution.  For the avoidance of doubt, this Section 6.6(b) shall not apply to Class 3(b) Litigation Trust Interests.

### 6.7      *Lender Distribution Agent.*

Distributions owed to holders of ~~Allowed Lender Claims (including through a holding company, as applicable) to be made by the~~Class 1, Class 2, Class 3(a), and Class 3(c) Litigation Trust Interests shall be made by one or more distribution agents to be selected by the Ad Hoc Group SteerCo (the "**Lender Distribution Agent**").  The Litigation Trust shall pay all reasonable costs of such Lender Distribution Agent.  Such costs shall be subject to a budget to be agreed by the Litigation Trustee and the Lender Distribution Agent.

### 6.8      *Administration of the Litigation Trust.*

The Litigation Trust shall be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control.

### 6.9      *Litigation Trust Oversight Committee.*

(a)      On the Confirmation Date, the Litigation Trust Oversight Committee shall be appointed in accordance with the terms of the Litigation Trust Agreement.  The initial Litigation Trust Committee shall be comprised of four members, including three AHG Members and one UCC Member.  Following the satisfaction of the Final Return Threshold, the Litigation Trust Oversight Committee shall be comprised of three members, including one AHG Member

and two UCC Members.  The duties and obligations of the members of the Litigation Trust Oversight Committee shall be set forth in the Litigation Trust Agreement.

(b)        The Litigation Trust Agreement shall provide that the UCC Member (i) must be a Preference Settlement Electing Creditor; and (ii) shall be entitled to compensation of $125,000 per year, paid by the Litigation Trust.  If the initial UCC Member (the "**Initial UCC Member**") does not timely opt in to being a Preference Settlement Electing Creditor (as such deadline may be extended pursuant to Section 6.11(b) of the Plan), then the Litigation Trustee may remove the Initial UCC Member in its sole discretion.  In the event the Initial UCC Member is removed, the replacement UCC Member shall be selected by the prior members of the Creditors' Committee from the pool of eligible candidates, as set forth in the Litigation Trust Agreement, which selection process shall be coordinated by the Claims Ombudsman.  If the prior members of the Creditors' Committee do not select the replacement UCC Member from the pool of eligible candidates within seven (7) days of the removal of the Initial UCC Member, then the prior Creditors' Committee members may select either the Claims Ombudsman or an independent person who was not a Professional retained by the Creditors' Committee that otherwise satisfies the criteria for serving as the Claims Ombudsman, as set forth in the Litigation Trust Agreement, as the replacement UCC Member.  The Claims Ombudsman shall inform the Litigation Trustee of the ultimate selection of the UCC Member.

### 6.10    *Litigation Trustee.*

(a)        **Appointment of Litigation Trustee.**  Upon the establishment of the Litigation Trust, the Litigation Trustee shall be appointed.  The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 6.10 of the Plan.  Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

(b)        **Functions of the Litigation Trustee.**  On and after the date the Litigation Trust is established, the Litigation Trustee shall carry out the functions set forth in this Section 6.10 and may take such actions, under the supervision or with the approval of the Litigation Trust Oversight Committee, without supervision or approval by the Bankruptcy Court (including without the need to seek Bankruptcy Court approval pursuant to section 363 of the Bankruptcy Code and/or Bankruptcy Rule 9019 with respect to any Litigation Trust Assets) and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)        perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)       take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

63

(iii)　open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iv)　maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(v)　coordinate with the Wind Down Administrator, the Claims Ombudsman, and the other Trustees;

(vi)　accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(vii)　conduct investigations of the Litigation Trust Assets, including of any Estate Claims and Direct Creditor Claims of Preference Settlement Electing Creditors, pursuant to Bankruptcy Rule 2004;

(viii)　pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including with respect to any Estate Claims and Direct Creditor Claims of Preference Settlement Electing Creditors and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement;

(ix)　protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law;

(x)　administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(xi)　calculate and make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan;

(xii)　invest Cash, as available, and any income earned thereon;

(xiii)　retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable;

64

(xiv)   dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement; and

(xv)   take any other actions not inconsistent with the provisions hereof and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**6.11**   *Preference Settlement.*

**(a)**   Section 6.11 hereof shall be defined as the "**Preference Settlement**."   The Preference Settlement applies only to Trade Creditors, Supply Chain Financers, and Factors who:

(i)   do not meet the definition of Adverse Conduct, as determined by a Final Order;

(ii)   are not Specified Non-Released Parties; and

(iii)   are Preference Settlement Electing Creditors.

**(b)**   **Preference Settlement Opt-In Deadline**.   Trade Creditors, Supply Chain Financers, and Factors shall have until forty-five (45) days following the Confirmation Date to opt in to the Preference Settlement; *provided* that if a Preference Action is brought against a Trade Creditor that did not timely opt in to the Preference Settlement, such Trade Creditor shall have an additional thirty (30) days following service of the Preference Action to opt in to the Preference Settlement.   The Litigation Trustee shall be authorized to extend the UCC Member's deadline to opt in to the Preference Settlement in its sole discretion.   Any demand or summons related to a Preference Action against a Trade Creditor that is not a Preference Settlement Electing Creditor shall reiterate in clear and conspicuous language the extended deadline to participate in the Preference Settlement.

**(c)** **Implementation of the Preference Settlement**.

(i) With respect to a Preference Settlement Electing Creditor that is not expressly named in the schedule of Specified Non-Released Parties in the Plan Supplement, the Preference Settlement shall be inapplicable to such creditor only if the Litigation Trustee either alleges and/or pleads facts alleging Adverse Conduct as (a) an element of the Preference Action or (b) (x) a cause of action in a complaint or (y) in a pleading or other filing, and in the case of both (x) and (y), in a complaint, pleading, or other filing, as applicable, that is filed prior to or substantially contemporaneously with the filing of a Preference Action. If a Preference Settlement Electing Creditor obtains a verdict in their favor on all such alleged Adverse Conduct in a Final Order, or such allegations of Adverse Conduct are withdrawn or counts related to such Adverse Conduct are dismissed with prejudice or on a voluntary basis by the Litigation Trustee, or dismissed without prejudice but the Litigation Trustee makes a final determination not to refile, then such Preference Settlement Electing Creditor shall retain the benefits of the Preference Settlement (assuming all other conditions of the Preference Settlement are met).

(ii) For the avoidance of doubt, nothing herein shall require the Litigation Trustee to obtain a finding, determination, or Final Order related to Adverse Conduct prior to initiating a Preference Action.

**(d)** **Preference Actions Against Trade Creditors**. No Preference Actions shall be brought against Trade Creditors who meet the criteria set forth in Section 6.11(a) of the Plan.

**(e)** **Preference Actions Against Supply Chain Financers and Factors**. Preference Actions against Supply Chain Financers and Factors who meet the criteria set forth in Section 6.11(a) of the Plan shall be brought only after the Litigation Trustee conducts reasonable due diligence and makes a good faith attempt to meet and confer with the putative defendant, which meet and confer shall include providing such putative defendant with the Litigation Trustee's analysis with respect to such putative defendant's defenses under section 547(c)(4) of the Bankruptcy Code (the "**New Value Defense**") and providing such putative defendant with an opportunity to identify additional new value (as defined in section 547 of the Bankruptcy Code) which was not included in the Litigation Trustee's analysis. Prior to commencing a Preference Action, the Litigation Trustee must consider the information timely provided by such putative defendant and any other affirmative defenses timely articulated by such putative defendant and provide a report to the Litigation Trust Oversight Committee setting forth the basis for litigating the Preference Action.

(i) If the Litigation Trustee, in his reasonable discretion, prosecutes a Preference Action against a Supply Chain Financer or Factor, and

66

the Litigation Trustee agrees that in such prosecution new value includes any subsequent payment made by a Supply Chain Financer or Factor at the request of the FBG Debtors as part of the factoring or supply chain financing agreement (*i.e.*, it shall include payments to legitimate vendors of the FBG Debtors and payments made at the direction of the FBG Debtors on non-legitimate or "cover invoices"), without regard to which FBG Debtor entity such payment by a Supply Chain Financer or Factor was made on behalf of, as long as it was made on behalf of a Debtor (the "**Modified New Value Elements**"), then the prosecution shall not be considered a Sacred Right but instead a Major Decision.  For the avoidance of doubt, all other elements of any Preference Action and affirmative defenses thereto, including any other component of a New Value Defense, shall apply in accordance with applicable law, including that such new value must still have been provided by the Supply Chain Financer or Factor subsequent to the applicable alleged preferential payment by the Debtor.

(ii)     In connection with any prosecution by the Litigation Trustee that utilizes the Modified New Value Elements, to the extent that any payment made by a Supply Chain Financer or Factor was received by a non-Debtor and the Supply Chain Financer or Factor has the right to recover such payment from that non-Debtor, such right must be assigned to the Litigation Trust for prosecution by the Litigation Trust in order for such payment to qualify as new value and for the creditor to receive the benefit of a prosecution utilizing Modified New Value Elements (and that such assignment may be conditional upon the payment being considered new value).

(iii)    If the Litigation Trustee, in his reasonable discretion, seeks to prosecute a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee determines, in his reasonable discretion, to seek to prosecute such Preference Action without utilizing all of the Modified New Value Elements, then proceeding with the Preference Action shall be considered a Sacred Right instead of a Major Decision; *provided* that, the only modifications to the Modified New Value Elements that the Litigation Trustee is permitted to make under this subparagraph is to assert that (a) the alleged new value was provided on behalf of a non-Debtor entity (*e.g.*, a payment on an invoice owed by a non-Debtor); or (b) the alleged new value provided was not received directly or indirectly by a Debtor or by Bowery Finance II,  and therefore, in both cases, does not qualify as new value.

(iv)    For the avoidance of doubt, if a Supply Chain Financer or Factor (i) meets the definition of Adverse Conduct or (ii) did not transact with the Debtors in good faith, then none of the provisions of this

67

Section 6.11(e) shall apply to such Person.  Nothing in this Section 6.11(e) shall shift the burden of proof under applicable law with respect to Preference Actions.

**(f)     Litigation Trust's Authority to Commence Preference Actions**.  The Litigation Trust's authority to commence Preference Actions against Supply Chain Financers and Factors who meet the criteria set forth in Section 6.11(a) of the Plan shall exist only if the process in Section 6.11(e) above is undertaken by the Litigation Trustee in good faith.  Good faith shall be conclusively established if the Preference Action is authorized by a majority of the Litigation Trust Oversight Committee, including the affirmative vote of one UCC Member; *provided* that the absence of any such authorization shall not establish a lack of good faith.

**6.12    *Fees and Expenses of the Litigation Trust.***

Following the establishment of the Litigation Trust, expenses of the Litigation Trust shall be paid in the ordinary course of business, in accordance with the Litigation Trust Agreement.  Subject to the terms of the Litigation Trust Agreement, and without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred.  Subject to the terms of the Litigation Trust Agreement, the Litigation Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Assets, including any Estate Claims).

**6.13    *Indemnification.***

The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and the members of the Litigation Trust Oversight Committee, in their capacities as such, for any losses incurred in such capacities, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**6.14    *Dissolution of the Litigation Trust.***

In no event shall the Litigation Trust be dissolved later than five (5) years from the date the Litigation Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 6.15   *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of the Litigation Trust Assets.

### 6.16   *Turnover of Litigation Trust Assets.*

If the DIP Collateral Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, Litigation Trust Assets, such Litigation Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the Litigation Trust.

### 6.17   *Assignment of Horizon Alester IP.*

To the extent (i) all or a portion of the Horizon Alester IP is sold (the "**Purchased Horizon Alester IP**") and (ii) the resolution, final judgment  or settlement of the James Complaint results in the avoidance of purported transfers of such Purchased Horizon Alester IP and recovery of such Purchased Horizon Alester IP by the Litigation Trust (as assignee of the applicable FBG Debtors and their Estates), the Litigation Trustee, on behalf of the Litigation Trust, shall, in accordance with any applicable purchase agreements, execute a supplemental assignment agreement assigning, conveying, transferring, and delivering  the Purchased Horizon Alester IP to the applicable purchaser.

### 6.18   *Non-Transferability.*

The Litigation Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

### 6.19   *Litigation Trust Tax and Other Matters.*

(a)   **Tax Treatment.**  The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the Litigation Trust Assets of the FBG Debtors to the Litigation Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust.  Accordingly, absent definitive guidance to the contrary, the Litigation Trust

69

Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

      **(b)**      **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trust shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan, the DIP Order, any other Final Order, or the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

      **(c)**      **Cash Investments.**    The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

**DEBTORS' EXHIBIT NO. 7**
**Page 81 of 272**

**(d)** **Tax Reporting and Tax Payments.**

(i) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.19(d). The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii) As soon as practicable following the establishment of the Litigation Trust, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets (on an asset-by-asset basis) as of the date the Litigation Trust is established, taking into account (among other things) the anticipated recoveries on the respective Litigation Trust Assets based on probability of success, timing of such recoveries and estimated litigation costs and expenses; it being understood that the aggregate fair market value of the Litigation Trust Assets ~~shall~~may be equal to the amount of the Estate Claims Credit Bid. The Litigation Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In furtherance of the treatment of the Roll-Up Claims, First Lien Claims, and Second Lien Claims under ARTICLE IV of the Plan, the Litigation Trustee shall also determine as of the date the Litigation Trust is established (based on the information taken into account in determining the fair market value of the Litigation Trust Assets) the aggregate amount of distributions that are anticipated to be made to holders of Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims under the Litigation Trust Waterfall over the term of the Trust. The Litigation Trustee shall provide all relevant parties with the aggregate amount so determined.

(iii) Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) under the Litigation Trust Agreement if, immediately prior to such deemed distribution,

71

the Litigation Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve established within the Litigation Trust or its assets will be paid out of the assets of such Disputed Claim Reserve (including any Litigation Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in such Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of such Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of such Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)      The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Litigation Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the Litigation Trust. Similarly, the Claims Ombudsman may request expedited determinations of taxes under section 505(b) of the Bankruptcy Code in respect of any assets allocable to, or held on account of

72

Disputed Claims that it has treated as a disputed ownership fund or other separate taxable entity.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee or the Claims Ombudsman in respect of Class 3(b) Litigation Trust Interests, so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Litigation Trustee), the Litigation Trustee or the Claims Ombudsman (as applicable) may elect to treat any Litigation Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes.  If a "disputed ownership fund" election is made (or all or any portion of the Litigation Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Litigation Trustee, the Claims Ombudsman, and Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)   The treatment provided in this Section 6.19, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**ARTICLE VII.        DIP COLLATERAL TRUST.**

> **7.1**    *Establishment of the DIP Collateral Trust.*

On the Confirmation Date, or as soon thereafter as is reasonably practicable, the DIP Collateral Trust shall be established in accordance with the DIP Collateral Trust Agreement for the purpose of being vested with and liquidating the DIP Collateral Trust Assets, and making distributions to the DIP Collateral Trust Beneficiaries in accordance with the terms of the DIP Collateral Trust Agreement and the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the DIP Collateral Trust's primary purpose is liquidating the DIP Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the DIP Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the DIP Collateral Trust Assets and provide for the orderly liquidation thereof.

> **7.2**    *Transfer of Assets into the DIP Collateral Trust.*

(a)    Following the Confirmation Date and consummation of the DIP Collateral Credit Bid Transaction, the FBG Debtors shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for

U.S. federal, state, and local income tax purposes) automatically vested in the DIP Collateral Trust its remaining interests in the DIP Collateral Trust Assets, and all such assets shall be deemed to have vested in the DIP Collateral Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the DIP Collateral Trustee, in accordance with the Plan and the DIP Collateral Trust Agreement. The DIP Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the DIP Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the DIP Collateral Trust. The act of transferring the DIP Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the DIP Collateral Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust, the Debtors shall have no interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust. Upon delivery of the DIP Collateral Trust Assets to the DIP Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the DIP Collateral Trust shall vest in the DIP Collateral Trust and its representatives, and the FBG Debtors and the DIP Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The DIP Collateral Trustee shall agree to accept and hold the DIP Collateral Trust Assets in the DIP Collateral Trust for the benefit of the DIP Collateral Trust Beneficiaries, subject to the terms of the Plan and the DIP Collateral Trust Agreement.

(b)     Notwithstanding anything in this Plan to the contrary, on, prior to, or following the Confirmation Date, the DIP Collateral Trustee (in consultation with the Ad Hoc Group) may cause one or more domestic corporations to be formed, each of which shall be wholly owned by the DIP Collateral Trust and classified as a C corporation for U.S. federal income tax purposes (each, a "**U.S. Holding Corporation**" and, together, the "**U.S. Holding Corporations**"). The DIP Collateral Trustee shall designate, in consultation with the Ad Hoc Group, the DIP Collateral Trust Assets that constitute "U.S. real property interests" within the meaning of Section 897(c) of the United States Internal Revenue Code of 1986, as amended from time to time, or are otherwise appropriate to be held through such corporate structure, that shall be held through each U.S. Holding Corporation (such designated assets, the "**Designated Assets**").

(c)     In addition to the U.S. Holding Corporations, the DIP Collateral Trustee (in consultation with the Ad Hoc Group) shall have the authority to form, organize, and capitalize one or more other entities (each, an "**Other Holding Entity**") to hold any DIP Collateral Trust Assets the DIP Collateral Trustee determines, in consultation with the Ad Hoc

Group, are appropriate to be held through such structure, on such terms (including with respect to the legal form, jurisdiction of organization, and U.S. and non-U.S. tax classification of any such Other Holding Entity) as the DIP Collateral Trustee determines in consultation with the Ad Hoc Group.  Any DIP Collateral Trust Assets to be held through an Other Holding Entity shall vest in the DIP Collateral Trust in accordance with the otherwise applicable provisions of this Plan and shall thereafter be contributed by the DIP Collateral Trust to the applicable Other Holding Entity, or otherwise transferred to the Other Holding Entity on terms determined by the DIP Collateral Trustee in consultation with the Ad Hoc Group.

**(d)**    The transfers described in this Section 7.2 shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax pursuant to Section 1146(a) of the Bankruptcy Code.

### 7.3    *DIP Collateral Trust Funding.*

**(a)**    The DIP Collateral Trust Funding Contributors will provide the DIP Collateral Trust Funding to the DIP Collateral Trust pursuant to this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order, which commitments and contributions shall be available to pay costs of the DIP Collateral Trust, costs of administration of the DIP Collateral Trust, and costs of monetizing the DIP Collateral Trust Assets.  The DIP Collateral Trust Funding is necessary and incidental to the liquidating purpose of the DIP Collateral Trust.  The DIP Collateral Trust Funding is a bargained-for and integral parts of the restructuring transactions contemplated under the Plan.

**(b)**    The terms of the DIP Collateral Trust Funding shall be set forth in this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order.  Upon execution of the DIP Collateral Trust Agreement, the DIP Collateral Trust Funding shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, usury, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order, and the DIP Collateral Trust shall be authorized to incur or enforce the obligations thereunder with respect to the DIP Collateral Trust Funding set forth therein and use the proceeds of such DIP Collateral Trust Funding in accordance with the terms of the Plan, the Confirmation Order, and the DIP Collateral Trust Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The terms and conditions of the DIP Collateral Trust Agreement shall bind the DIP Collateral Trust and each other Entity that enters into such agreement.

**(c)**    Entry of the Confirmation Order shall constitute approval of the DIP Collateral Trust Funding.  Subject only to the provision of the DIP Collateral Trust Funding, the terms and conditions of the DIP Collateral Trust Funding are satisfied and earned as of the entry of the Confirmation Order. The DIP Collateral Trust Funding is a bargained-for and integral parts of the restructuring transactions contemplated under the Plan.  On and as of the Effective Date, each holder of DIP Collateral Trust Interests shall be deemed to be a party to the DIP Collateral Trust Agreement without the need for execution by such holder. The DIP Collateral Trust Agreement shall be binding on all Entities receiving, and all holders of, DIP Collateral

Trust Interests (and their respective successors), whether such DIP Collateral Trust Interests is received or to be received on or after the Confirmation Date and regardless of whether such Entity executes or delivers a signature page to the DIP Collateral Trust Agreement.

### 7.4 *DIP Collateral Trust Waterfall.*

(a)     Proceeds of the DIP Collateral Trust Assets, net of expenses, shall be distributed to DIP Collateral Trust Beneficiaries as follows:

(i)     *First*, to the Primary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Primary DIP Collateral Trust Funding, until each Primary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Primary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Primary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Primary DIP Collateral Trust Funding;

(ii)     *Second*, to the Secondary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Secondary DIP Collateral Trust Funding, until each Secondary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Secondary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Secondary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Secondary DIP Collateral Trust Funding;

(iii)     *Third*, to the holders of Class 2 DIP Collateral Trust Interests until such holders receive aggregate distributions equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims); and

(iv)     *Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Allowed Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full.

Following aggregate distributions equal to the amount of Allowed DIP A Claims as of the Confirmation Date, any residual value shall be paid as directed by the DIP Collateral Trust Oversight Committee, subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

Distributions to each class of DIP Collateral Trust Interests shall be made pro rata.  Notwithstanding the foregoing, upon each distribution, the DIP Collateral Trustee shall have no obligation to make a distribution that would be in an amount that is either (i) less than $500 in Cash or (ii) less than the cost for the DIP Collateral Trustee to make the distribution.

### 7.5 *DIP Collateral Trustee.*

**(a)  Appointment of DIP Collateral Trustee.**  Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall be appointed as trustee of the DIP Collateral Trust.  The powers, rights and responsibilities of the DIP Collateral Trustee shall be as specified in the DIP Collateral Trust Agreement and Plan and shall include, among other rights and duties, the authority and responsibility to fulfill the items identified in this Section 7.5 of the Plan.

**(b)  Functions of the DIP Collateral Trustee.**  Following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee and/or the DIP Collateral Trust, as applicable, shall carry out the functions set forth in this Section 7.5 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the DIP Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)  perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the DIP Collateral Trust;

(ii)  take any actions necessary to (A) resolve all matters related to the DIP Collateral Trust Assets and (B) vest such assets in the DIP Collateral Trust;

(iii)  open and maintain bank accounts on behalf of or in the name of the DIP Collateral Trust;

(iv)  maintain the books and records and accounts of the DIP Collateral Trust and obtain any necessary insurance;

(v)  administer the SPV-DIP Wind Down Account in accordance with the Wind Down Order;

(vi)  coordinate with the Wind Down Administrator and the other Trustees;

DEBTORS' EXHIBIT NO. 7
Page 88 of 272

(vii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the DIP Collateral Trust Assets in accordance with the DIP Collateral Trust Agreement;

(viii)    administer the DIP Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the DIP Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(ix)    calculate and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan;

(x)    invest Cash, as available, and any income earned thereon;

(xi)    retain, compensate and employ professionals to represent the DIP Collateral Trust or the DIP Collateral Trustee, as applicable;

(xii)    form, organize, capitalize, recapitalize, dissolve, and liquidate any U.S. Holding Corporation, Other Holding Entity, or other wholly-owned subsidiary of the DIP Collateral Trust;

(xiii)    hold and exercise all rights of equity ownership in any U.S. Holding Corporation, Other Holding Entity, or other wholly-owned subsidiary of the DIP Collateral Trust, including the appointment and removal of officers and directors, and cause any such subsidiary to engage in transactions consistent with the purposes of the DIP Collateral Trust, including the acquisition, holding, monetization, sale, exchange, and other disposition of assets;

(xiv)    maintain, control, administer, and oversee the voting and economic rights of any DIP Claims, First Lien Claims, and Second Lien Claims (subject to the terms and conditions of this Plan and the applicable oversight from the DIP Collateral Trust Oversight Committee);

(xv)    dissolve the DIP Collateral Trust in accordance with the terms of the DIP Collateral Trust Agreement; and

(xvi)    take any other actions not inconsistent with the provisions hereof that the DIP Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

78

**7.6**    *Fees and Expenses of the DIP Collateral Trust.*

Following the establishment of the DIP Collateral Trust, expenses of the DIP Collateral Trust shall be paid in the ordinary course of business, in accordance with the Plan and the DIP Collateral Trust Agreement.  Subject to the terms of the DIP Collateral Trust Agreement and without any further notice to any party or action, order or approval of the Bankruptcy Court, the DIP Collateral Trustee, on behalf of the DIP Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred.  Subject to the terms of the DIP Collateral Trust Agreement, the DIP Collateral Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in monetizing the DIP Collateral Trust Assets).  Distributions owed to holders of DIP Collateral Trust Interests to be made by the DIP Collateral Trust shall be made by one or more distribution agents to be selected by the Ad Hoc Group SteerCo. Costs associated with such distribution agents shall be paid by the DIP Collateral Trust.

**7.7**    *DIP Collateral Trust Oversight Committee.*

On the Confirmation Date, the DIP Collateral Trust Oversight Committee shall be appointed in accordance with the terms of the DIP Collateral Trust Agreement.  The duties and obligations of the members of the DIP Collateral Trust Oversight Committee shall be set forth in the DIP Collateral Trust Agreement.  With respect to any DIP Claims, First Lien Claims, and Second Lien Claims not contributed into the DIP Collateral Trust, the Plan, the DIP Collateral Trust Agreement, and the Confirmation Order shall provide that Required Lenders (as defined in the DIP Order) under the DIP Order, Required Lenders (as defined in the Side-Car Term Loan Agreement) under the Side-Car Term Loan Agreement, Required Lenders (as defined in the First Lien Term Loan Agreement), and Required Lenders (as defined in the Second Lien Term Loan Agreement) under the Second Lien Term Loan Agreement, shall delegate all voting and economic rights with respect thereto to the DIP Collateral Trust Oversight Committee and the DIP Collateral Trust, respectively.

**7.8**    *Indemnification.*

The DIP Collateral Trust shall indemnify and hold harmless the DIP Collateral Trustee and the DIP Collateral Trust Oversight Committee, in their capacities as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**7.9**    *Minimum Distribution; No Fractional Distributions.*

**(a)**    Notwithstanding anything herein or the DIP Collateral Trust Agreement to the contrary, no fractional interests of DIP Collateral Trust Interests shall be issued, and no Cash shall be distributed in lieu of such fractional amounts.  If any issuance or distribution on account of an Allowed Claim would otherwise result in the issuance of a number of interests of DIP Collateral Trust Interests that is not a whole number, the actual distribution of shares of DIP Collateral Trust Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall

79

be rounded to the next lower whole number with no further payment therefore. The total number of authorized interests of DIP Collateral Trust Interests shall be adjusted as necessary to account for the foregoing rounding.

(b)    Notwithstanding anything herein or the DIP Collateral Trust Agreement to the contrary, including the DIP Collateral Trust Waterfall, no DIP Collateral Trust Interests shall be issued to a holder of an Allowed Claim if the entitlement to DIP Collateral Trust Interests is for less than $1,000.00 in principal amount of such Allowed Claim and no Cash or other distribution shall be made as a result of such adjustment.  The DIP Collateral Trustee shall have no obligation to make a distribution under the DIP Collateral Trust Agreement (including pursuant to the DIP Collateral Trust Waterfall) that is either (i) less than $500.00 in Cash or (ii) that does not exceed any transaction costs associated with such distribution.

### 7.10    *Dissolution of the DIP Collateral Trust.*

In no event shall the DIP Collateral Trust be dissolved later than five (5) years from the date the DIP Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the DIP Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the DIP Collateral Trust Assets.

### 7.11    *Records.*

The DIP Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the DIP Collateral Trustee, for the disposition of DIP Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

### 7.12    *Turnover of DIP Collateral Trust Assets.*

If the Litigation Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, DIP Collateral Trust Assets, such DIP Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the DIP Collateral Trust.

### 7.13    *Non-Transferability.*

The DIP Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

80

**7.14** *Maintenance of Lender Registers Post-Confirmation Date.*

(a)     Maintenance of the lender registers for holders of any ~~Remaining~~Allowed Lender Claims shall vest to the DIP Agent upon the Confirmation Date.  Costs associated with the maintenance of the lender registers post-Confirmation Date shall be paid by the DIP Collateral Trust.

(b)     If any advisors or professionals are hired, requested, and/or directed by the DIP Collateral Trust Oversight ~~Board~~Committee to litigate or otherwise take actions in furtherance of the preservation of DIP Collateral Trust Assets and/or any ~~Remaining~~Allowed Lender Claims, such advisors and/or professionals shall be directed, paid and funded by the DIP Collateral Trust.

(c)     Upon the ~~Effective~~Confirmation Date, the lender registers maintained by the applicable agents under the DIP Credit Agreement, First Lien Term Loan Agreement, and Second Lien Term Loan Agreement shall be and remain frozen and will not be transferable other than to facilitate:

(i)     transfers among Affiliates;

(ii)    transfers required in connection with the termination, wind-down, or expiration of a collateralized loan obligation vehicle, collateralized debt obligation, or similar structured finance vehicle that holds such claims (including transfers to a liquidating trust, warehouse facility, or other entity established in connection with such wind-down);

(iii)   transfers required in connection with a replacement of, or succession to, the investment manager or collateral manager of any collateralized loan obligation vehicle, collateralized debt obligation, or similar structured finance vehicle that holds such claims, including transfers to a new vehicle managed by a successor manager; and

(iv)    transfers required by applicable law or by the organizational or governing documents of the holder in effect as of the Confirmation Date.

**7.15** *DIP Collateral Trust Tax and Other Matters.*

(a)     **Tax Treatment.**  The DIP Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the DIP Collateral Trustee), all parties (including, without limitation, the Debtors, the DIP Collateral Trustee, and the DIP Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the DIP Collateral Trust Assets of the FBG Debtors to the DIP Collateral

81

Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in satisfaction of their Claims, followed by (ii) the transfer of such assets by such holders to the DIP Collateral Trust in exchange for the beneficial interests in the DIP Collateral Trust. Accordingly, absent definitive guidance to the contrary, the DIP Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of DIP Collateral Trust Assets.

(b)     **Liquidation Purpose of the DIP Collateral Trust; No Successor in Interest.** The DIP Collateral Trust shall be established for the primary purpose of liquidating and distributing the DIP Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the DIP Collateral Trust. Accordingly, the DIP Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the DIP Collateral Trust Assets, make timely distributions to the DIP Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration. The DIP Collateral Trustee shall distribute at least annually to the DIP Collateral Trust Beneficiaries any Available Cash. The DIP Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan, the DIP Order, any other Final Order, or the DIP Collateral Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the DIP Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or DIP Collateral Trust Agreement to the contrary, the DIP Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the DIP Collateral Trust as set forth in the Plan.

(c)     **Cash Investments.** The right and power of the DIP Collateral Trustee to invest the DIP Collateral Trust Assets, the proceeds thereof, or any income earned by the DIP Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The DIP Collateral Trustee may expend the Cash of the DIP Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the DIP Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the DIP Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the DIP Collateral Trust in accordance with the Plan and the DIP Collateral Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The DIP Collateral Trustee shall file tax returns for the DIP Collateral Trust treating the DIP Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 7.15(d). The DIP Collateral Trustee also shall annually send to each holder of a DIP Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the DIP Collateral Trust as relevant for U.S. federal income tax purposes

82

and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall make a good faith determination of the fair market value of the DIP Collateral Trust Assets (on an asset-by-asset basis) as of the date the DIP Collateral Trust is established, taking into account (among other things) the anticipated recoveries on the respective DIP Collateral Trust Assets based on probability of success, timing of such recoveries and estimated litigation costs and expenses; it being understood that the aggregate fair market value of the DIP Collateral Trust Assets ~~shall~~may be equal to the amount of the DIP Collateral Credit Bid.  The DIP Collateral Trustee shall provide all parties with such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of DIP Collateral Trust taxable income among DIP Collateral Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the DIP Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of DIP Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the DIP Collateral Trust.  Similarly, taxable loss of the DIP Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining DIP Collateral Trust Assets.  The tax book value of DIP Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date DIP Collateral Trust Assets are transferred to the DIP Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

DEBTORS' EXHIBIT NO. 7
Page 94 of 272

(iv)     The DIP Collateral Trust shall be responsible for payment, out of DIP Collateral Trust Assets, of any taxes imposed on the DIP Collateral Trust or the DIP Collateral Trust Assets.

(v)      The DIP Collateral Trustee may request an expedited determination of taxes of the DIP Collateral Trust under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the DIP Collateral Trust for all taxable periods through the dissolution of the DIP Collateral Trust.

(vi)     The treatment provided in this Section 7.15, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**(e)     Assignment of DIP Collateral Trust Assets.**  To the extent any DIP Collateral Trust SPV Recoveries, DIP Collateral Trust Additional Payments, or other DIP Collateral Trust Asset can be validly assigned under applicable law (including applicable provisions of the Internal Revenue Code, Treasury Regulations, and U.S. Customs regulations), the FBG Debtors and their successors shall, at the direction of the DIP Collateral Trustee and at the DIP Collateral Trust's sole cost and expense (paid in advance), take all commercially reasonable actions to assign assets to the DIP Collateral Trust, including the execution of any assignment forms, powers of attorney, or other instruments required by any applicable governmental authority.  To the extent any such assets cannot be validly assigned under applicable law,  the FBG Debtors and their successors shall, to the extent applicable, liquidate such assets at the direction and sole cost and expense of the DIP Collateral Trust (paid in advance), and any proceeds received shall be held in trust for the DIP Collateral Trust and promptly remitted to the DIP Collateral Trust.

**(f)     DIP Credit Bidding Rights**.  The DIP Collateral Trustee, on behalf of the DIP Collateral Trust, shall have the right, pursuant to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the Remaining DIP A Claims in any sale of DIP Collateral, whether such sale is effectuated through sections 363, 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  No provision of the Plan, the Confirmation Order, or any Definitive Document shall be construed to limit, restrict, or otherwise impair the DIP Collateral Trustee's right to credit bid the Remaining DIP A Claims for any DIP Collateral.

**ARTICLE VIII.     ABL COLLATERAL TRUST.**

### 8.1     *Establishment of the ABL Collateral Trust.*

On the Confirmation Date, or as soon thereafter as is reasonably practicable, the ABL Collateral Trust shall be established in accordance with the ABL Collateral Trust Agreement for the purpose of being vested with and liquidating the ABL Collateral Trust Assets and making distributions to holders of Allowed Claims in accordance with the terms of the ABL Collateral Trust Agreement and the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the ABL Collateral Trust's primary purpose is liquidating

the ABL Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the ABL Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the ABL Collateral Trust Assets and provide for the orderly liquidation thereof.

### 8.2    *Transfer of Assets into the ABL Collateral Trust.*

On the Confirmation Date, or as soon thereafter as reasonably practicable, and in connection with the foreclosure of the ABL Collateral Trust Assets by the ABL Collateral Trust, the FBG Debtors shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for U.S. federal, state, and local income tax purposes) automatically vested in the ABL Collateral Trust its remaining interests in the ABL Collateral Trust Assets, and all such assets shall be deemed to have vested in the ABL Collateral Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the ABL Collateral Trustee, in accordance with the Plan and the ABL Collateral Trust Agreement.  The ABL Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the ABL Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the ABL Collateral Trust.  The act of transferring the ABL Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the ABL Collateral Trust as if the asset or right was still held by the applicable Debtor.  Upon the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust, the Debtors shall have no interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust.  Upon delivery of the ABL Collateral Trust Assets to the ABL Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the ABL Collateral Trust shall vest in the ABL Collateral Trust and its representatives, and the FBG Debtors and the ABL Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.  The ABL Collateral Trustee shall agree to accept and hold the ABL Collateral Trust Assets, including, for the avoidance of doubt, any amounts or proceeds realized on account of any ABL Deficiency Claims, in the ABL Collateral Trust for the benefit of the ABL Collateral Trust Beneficiaries, subject to the terms of the Plan and the ABL Collateral Trust Agreement.

### 8.3    *ABL Collateral Trust Waterfall.*

Proceeds of the ABL Collateral Trust Assets, net of expenses, shall be distributed to ABL Collateral Trust Beneficiaries as follows:  one-hundred percent (100%) of such proceeds

shall be distributed to the ABL Collateral Trust Beneficiaries in accordance with the waterfall under the ABL Credit Agreement until aggregate distributions equal the Allowed amount of the ABL Claims; *provided* that any proceeds of the ABL Collateral Trust Assets in excess of the Allowed amount of the ABL Claims shall be deemed to be DIP Collateral Trust Assets and shall be turned over to the DIP Collateral Trust and distributed in accordance with the Plan. Distributions to holders of ABL Collateral Trust Interests shall be paid in accordance with the ABL Credit Agreement.

### 8.4  *ABL Collateral Trustee*.

(a)  **Appointment of ABL Collateral Trustee.**  Upon the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall be appointed as the trustee of the ABL Collateral Trust.  The initial ABL Collateral Trustee shall be selected and appointed by the ABL Agent, and the ABL Agent shall have the sole right to remove and replace the ABL Collateral Trustee.  The powers, rights and responsibilities of the ABL Collateral Trustee shall be as specified in the ABL Collateral Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 8.4 of the Plan.  Other rights and duties of the ABL Collateral Trustee and the ABL Collateral Trust Beneficiaries shall be as set forth in the ABL Collateral Trust Agreement.

(b)  **Functions of the ABL Collateral Trustee.**  Following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee and/or the ABL Collateral Trust, as applicable, shall carry out the functions set forth in this Section 8.4 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the ABL Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)  perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the ABL Collateral Trust;

(ii)  take any actions necessary to (A) resolve all matters related to the ABL Collateral Trust Assets and (B) vest such assets in the ABL Collateral Trust;

(iii)  open and maintain bank accounts on behalf of or in the name of the ABL Collateral Trust;

(iv)  maintain the books and records and accounts of the ABL Collateral Trust and obtain any necessary insurance;

(v)  coordinate with the Wind Down Administrator, the Claims Ombudsman, and the other Trustees;

(vi)  accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as

86

applicable, the ABL Collateral Trust Assets in accordance with the ABL Collateral Trust Agreement;

(vii)    administer the ABL Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the ABL Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)    calculate and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan;

(ix)    invest Cash, as available, and any income earned thereon;

(x)    retain, compensate and employ professionals to represent the ABL Collateral Trust or the ABL Collateral Trustee, as applicable;

(xi)    provide funding for the administration of the Factored Receivables Account and prosecution of the FBG Debtors' interests in the Factored Receivables Account in accordance with the Plan;

(xii)    dissolve the ABL Collateral Trust in accordance with the terms of the ABL Collateral Trust Agreement; and

(xiii)    take any other actions not inconsistent with the provisions hereof that the ABL Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 8.5    *Fees and Expenses of the ABL Collateral Trust.*

Following the establishment of the ABL Collateral Trust, expenses of the ABL Collateral Trust shall be paid in the ordinary course of business, in accordance with the Plan and the ABL Collateral Trust Agreement.  Subject to the terms of the ABL Collateral Trust Agreement and without any further notice to any party or action, order or approval of the Bankruptcy Court, the ABL Collateral Trustee, on behalf of the ABL Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred.  Subject to the terms of the ABL Collateral Trust Agreement, the ABL Collateral Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in monetizing the ABL Collateral Trust Assets).

### 8.6    *Indemnification.*

The ABL Collateral Trust shall indemnify and hold harmless the ABL Collateral Trustee and the ABL Agent, in their capacities as such, for any losses incurred in such capacity,

except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

### 8.7    *Dissolution of the ABL Collateral Trust.*

In no event shall the ABL Collateral Trust be dissolved later than five (5) years from the date the ABL Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the ABL Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the ABL Collateral Trust Assets.

### 8.8    *Records.*

The ABL Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the ABL Collateral Trustee, for the disposition of ABL Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

### 8.9    *Turnover of ABL Collateral Trust Assets.*

If the DIP Collateral Trust or the Litigation Trust receives, or otherwise obtains possession or ownership of, ABL Collateral Trust Assets, such ABL Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the ABL Collateral Trust.

### 8.10    *Non-Transferability.*

The ABL Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

### 8.11    *ABL Collateral Trust Tax and Other Matters.*

(a)    **Tax Treatment.**  The ABL Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the ABL Collateral Trustee), all parties (including, without limitation, the Debtors, the ABL Collateral Trustee, and the ABL Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the ABL Collateral Trust Assets of

88

the FBG Debtors to the ABL Collateral Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive ABL Collateral Trust Interests in satisfaction of their Claims, and, by reason of the DIP Collateral Trust's beneficial interest in any excess proceeds from the sale of ABL Collateral Trust Assets, to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders of ABL Collateral Trust Interests to the ABL Collateral Trust (in the case of holders of DIP Collateral Trust Interests, indirectly by first transferring such assets to the DIP Collateral Trust) in exchange for the beneficial interests in the ABL Collateral Trust. Accordingly, absent definitive guidance to the contrary, the ABL Collateral Trust Beneficiaries (including for purposes of this Section 8.11, holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in respect of the DIP Collateral Trust's beneficial interest in the ABL Collateral Trust) shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of ABL Collateral Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)     **Liquidation Purpose of the ABL Collateral Trust; No Successor in Interest.**  The ABL Collateral Trust shall be established for the primary purpose of liquidating and distributing the ABL Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the ABL Collateral Trust.  Accordingly, the ABL Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the ABL Collateral Trust Assets, make timely distributions to the ABL Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The ABL Collateral Trustee shall distribute at least annually to the ABL Collateral Trust Beneficiaries any Available Cash.  The ABL Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the ABL Collateral Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the ABL Collateral Trustee expressly for such purpose.  Notwithstanding anything in the Plan or ABL Collateral Trust Agreement to the contrary, the ABL Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the ABL Collateral Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the ABL Collateral Trustee to invest the ABL Collateral Trust Assets, the proceeds thereof, or any income earned by the ABL Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements.  The ABL Collateral Trustee may expend the Cash of the ABL Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the ABL Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the ABL Collateral Trust) and (iii) to satisfy other respective liabilities

incurred by the ABL Collateral Trust in accordance with the Plan and the ABL Collateral Trust Agreement (including, without limitation, the payment of any taxes).

        **(d)**     **Tax Reporting and Tax Payments.**

        (i)     The ABL Collateral Trustee shall file tax returns for the ABL Collateral Trust treating the ABL Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 8.11(d). The ABL Collateral Trustee also shall annually send to each holder of an ABL Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the ABL Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

        (ii)     As soon as practicable following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall make a good faith determination of the fair market value of the ABL Collateral Trust Assets as of the date the ABL Collateral Trust is established. The ABL Collateral Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

        (iii)     Allocations of ABL Collateral Trust taxable income among ABL Collateral Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the ABL Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of ABL Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the ABL Collateral Trust. Similarly, taxable loss of the ABL Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining ABL Collateral Trust Assets. The tax book value of ABL Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date ABL Collateral Trust

90

Assets are transferred to the ABL Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    The ABL Collateral Trust shall be responsible for payment, out of ABL Collateral Trust Assets, of any taxes imposed on the ABL Collateral Trust or the ABL Collateral Trust Assets.   More particularly, any taxes imposed on any Disputed Claim Reserve established within the ABL Collateral Trust or its assets will be paid out of the assets of such Disputed Claim Reserve (including any ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims.   In the event, and to the extent, any Cash in such Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of such Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of such Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)     The ABL Collateral Trustee may request an expedited determination of taxes of the ABL Collateral Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the ABL Collateral Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the ABL Collateral Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the ABL Collateral Trust.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the ABL Collateral Trustee of a private letter ruling if the ABL Collateral Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such ABL Collateral Trustee), the ABL Collateral Trustee may elect to treat any ABL Collateral Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes.   If a "disputed ownership fund" election is made (or all or any portion of the ABL Collateral Trust Assets allocable to, or

91

held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the ABL Collateral Trustee and ABL Collateral Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)     The treatment provided in this Section 8.11, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**(e)     Assignment of ABL Collateral Trust Assets.**  To the extent any ABL Collateral Trust Asset can be validly assigned under applicable law (including applicable provisions of the Internal Revenue Code, Treasury Regulations, and U.S. Customs regulations), the FBG Debtors and their successors shall, at the direction of the ABL Agent and at the ABL Collateral Trust's sole cost and expense (paid in advance), take all commercially reasonable actions to assign such assets to the ABL Collateral Trust, including the execution of any assignment forms, powers of attorney, or other instruments required by the applicable governmental authority.  To the extent any such assets cannot be validly assigned under applicable law, the FBG Debtors and their successors shall, to the extent applicable, liquidate such assets at the direction and sole cost and expense of the ABL Collateral Trust (paid in advance), and any proceeds received shall be held in trust for the ABL Collateral Trust and promptly remitted to the ABL Collateral Trust.

**(f)     ABL Credit Bidding Rights.**  Following the foreclosure of the ABL Collateral Trust Assets by the ABL Collateral Trust, the ABL Agent, for itself and on behalf of the ABL Secured Parties, shall have the right, pursuant to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the ABL Deficiency Claim (as determined in accordance with Sections 4.6(b) and 8.11(d)(ii) of the Plan) in any sale of any ABL Priority Collateral by the FBG Debtors that has not been foreclosed upon, whether such sale is effectuated through sections 363, 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  No provision of the Plan, the Confirmation Order, or any Definitive Document shall be construed to limit, restrict, or otherwise impair the ABL Agent's right to credit bid the ABL Deficiency Claim for ABL Priority Collateral that has not been foreclosed upon.

**ARTICLE IX.     DISTRIBUTIONS.**

**9.1     *No Postpetition Interest on Claims.***

Unless otherwise provided in the Plan, the Confirmation Order, the DIP Order, the Trust Agreements, as applicable, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

92

**9.2** *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the FBG Debtors, the DIP Agent, or the Prepetition Agents (as defined in the DIP Order), shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date, other than as provided in the solicitation procedures and Disclosure Statement Order. Neither the FBG Debtors, the Claims Ombudsman, nor the Trustees shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

**9.3** *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**9.4** *Reserve on Account of Disputed Claims of the FBG Debtors.*

**(a)** From and after the Confirmation Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Claims Ombudsman or the applicable Trustee shall retain, for the benefit of each holder of a Disputed Claim against the FBG Debtors, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim against the FBG Debtors if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in a filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Claims Ombudsman. Property held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Claims Ombudsman or the applicable Trustee for the benefit of holders of Disputed Claims against the FBG Debtors pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Claims Ombudsman or the applicable Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim against the FBG Debtors pending the entire resolution thereof by Final Order or settlement.

**(b)** Subject to the other provisions of the Plan regarding timing of distributions, after a Disputed Claim becomes an Allowed Claim, the Claims Ombudsman or the applicable Trustee shall distribute to the holder thereof the distributions, if any, to which such

DEBTORS' EXHIBIT NO. 7
Page 104 of 272

holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto).  The balance of any property previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.  Each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for distribution pursuant to the foregoing clause (i) is insufficient to remit distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from the FBG Debtors' assets or the applicable Trust's assets.

(c)      The Claims Ombudsman and the Trustees shall not be required to make any distributions from the Disputed Claim Reserve as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

(d)      Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserves shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 9.4.

### 9.5      *Distributions After Effective Date.*

Distributions made after the Confirmation Date to holders of Disputed Claims that are not Allowed Claims as of the Confirmation Date but which later become Allowed Claims shall be deemed to have been made on the Confirmation Date.

### 9.6      *Delivery of Distributions.*

(a)      Subject to Bankruptcy Rule 9010, the Claims Ombudsman and the Trustees, as applicable, shall make all distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by the Plan at (a) the address of such holder on the books and records of the FBG Debtors or its agents, (b) at the address in any written notice of address change delivered to the Claims Ombudsman or the Trustees, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable.  Subject to Section 9.7 of the Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Claims Ombudsman or Trustees, as applicable, have been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

(b)      The FBG Debtors shall use commercially reasonable efforts to provide the Claims Ombudsman and the Trustees with the amounts of Claims against the FBG Debtors and the identities and addresses of holders of Claims against the FBG Debtors, in each case, as set forth in the FBG Debtors' books and records.

94

### 9.7    *Unclaimed Property.*

(a)    Six (6) months from the later of:  (i) the Confirmation Date and (ii) the date that is ten (10) Business Days after the date a Claim against or Interest in the FBG Debtors is first Allowed, all distributions payable on account of such Claim or Interest that are unclaimed pursuant to Section 9.7(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the applicable Trust, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be forever barred. The Claims Ombudsman and the Trustees, as applicable, shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the FBG Debtors' books and records and the Bankruptcy Court's filings.

(b)    A distribution made pursuant to the Plan shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Claims Ombudsman or applicable Trustee of an intent to accept a particular distribution, (iii) responded to a request by the Claims Ombudsman, Trustee, or a Disbursing Agent for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 9.8    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and exchange for such Allowed Claims.

### 9.9    *Manner of Payment Under Plan.*

Except as otherwise specifically provided herein, at the option of the Claims Ombudsman, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Claims Ombudsman.  Any wire transfer fees incurred by the Claims Ombudsman in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's distribution.

### 9.10    *Minimum Distribution.*

The Claims Ombudsman shall have no obligation to make a distribution under the Plan that is less than $500.00 in Cash.

### 9.11    *Setoffs and Recoupments.*

Except as otherwise provided in the Plan or the DIP Order, including in all respects Sections 13.5(a), 13.5(b), 13.6, and 13.7, the Claims Ombudsman may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the FBG Debtors or its successors may hold against the holder of such Allowed Claim; *provided* that neither the failure

95

to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the FBG Debtors, their Estates, or the Claims Ombudsman of any claims, rights, or Causes of Action that the FBG Debtors may possess against the holder of such Claim.

### 9.12  *Withholding and Reporting Requirements.*

(a)  **Withholding Rights**.  In connection with the Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any Entity issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)  **Forms**.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the FBG Debtors, the Claims Ombudsman, a Trustee, or Disbursing Agent, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the FBG Debtors, the Claims Ombudsman, a Trustee, Disbursing Agent, or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding.  If such request is made and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the FBG Debtors or the applicable Trust and any Claim in respect of such distribution under the Plan shall be forever barred from assertion against the FBG Debtors, the FBG Debtors' Estates, the Trusts, and their respective property.

(c)  The FBG Debtors shall cooperate in good faith with the Claims Ombudsman and the Trustees to comply with the withholding and reporting requirements outlined in this Section 9.12 of the Plan.

### 9.13  *Disbursing Agent.*

(a)  Subject to Section 6.7 of the Plan and the terms of the Litigation Trust Agreement, the Claims Ombudsman and the Trustees shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the

**DEBTORS' EXHIBIT NO. 7**
**Page 107 of 272**

Plan, the Confirmation Order, and the Trust Agreements.  The Claims Ombudsman and the Trustees may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

**(b)** From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Persons, including, without limitation, holders of Claims against the FBG Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or the Trust Documents or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

**(c)** The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(d)** Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Confirmation Date shall be paid in Cash by the Claims Ombudsman or the applicable Trust in the ordinary course of business.

### 9.14 *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in the Plan, the DIP Order, or as otherwise required by law (as determined by the Claims Ombudsman or the Trustees, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest (including original issuance discount).

## ARTICLE X.   PROCEDURES FOR RESOLVING CLAIMS AGAINST THE FBG DEBTORS.

### 10.1   *Allowance of Claims*.

Except as expressly provided in the Plan or in any order entered in the FBG Debtors' Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim against the FBG Debtors shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order in the FBG Debtors' Chapter 11 Cases allowing such Claim.

### 10.2   *Objections to Claims*.

As of the Confirmation Date, the Claims Ombudsman shall be entitled to object to Claims against the FBG Debtors.  Any objections to Claims against the FBG Debtors shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Claims Ombudsman may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in its sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

### 10.3   *Estimation of Claims*.

The Claims Ombudsman may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the FBG Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Claims Ombudsman may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 10.4   *Claim Resolution Procedures Cumulative*.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and

98

subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 10.5   *Adjustment to Claims Register Without Objection.*

Any Claim against or Interest in the FBG Debtors that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Claims Ombudsman upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 10.6   *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim against the FBG Debtors is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim against the FBG Debtors is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## ARTICLE XI.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 11.1   *Rejection of Executory Contracts and Unexpired Leases.*

**(a)**   As of and subject to the occurrence of the Confirmation Date, all executory contracts and unexpired leases to which any of the FBG Debtors are a party shall be deemed rejected by the FBG Debtors  except for an executory contract or unexpired lease that: (i)  was previously assumed or rejected by the FBG Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a separate assumption or rejection motion or request filed by the FBG Debtors on or before the Effective Date; (iv) is a contract, lease, or other agreement or document entered into in connection with the Plan; (v) is a contract, lease, or other agreement or document transferred to the FBG Debtors in connection with the Estate Claims Credit Bid Transaction or DIP Collateral Credit Bid Transaction and subsequently transferred to the DIP Collateral Trust or Litigation Trust on or before the Confirmation Date.  For the avoidance of doubt, the FBG Debtors may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Confirmation Date, including pursuant to the Contracts Procedure Order or otherwise in accordance with applicable bankruptcy law; *provided* that the FBG Debtors shall not assume and assign any executory contract or unexpired lease to the DIP Collateral Trust or Litigation Trust without the consent of the Ad Hoc Group SteerCo (such consent not to be unreasonably withheld, conditioned, or delayed).

**(b)**   Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections provided for in the Plan pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

99

**11.2** *Survival of Indemnification Obligations.*

Any and all obligations of the FBG Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the FBG Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by the applicable FBG Debtors solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims against the FBG Debtors arising under the foregoing documents shall be treated as General Unsecured Claims against the FBG Debtors to the extent Allowed and not subordinated. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable FBG Debtor effective as of the Confirmation Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 11.2.

**11.3** *Rejection Damages Claims.*

**(a)** Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the FBG Debtors' executory contracts or unexpired leases pursuant to the Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Confirmation Date.

**(b)** Any Claims against the FBG Debtors arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor of the FBG Debtors with respect to such Claim, or (ii) participate in any distribution in the FBG Debtors' Chapter 11 Cases on account of such Claim, and any Claims against the FBG Debtors arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the FBG Debtors, their Estates, or the property for any of the foregoing without the need for any objection by the FBG Debtors or Claims Ombudsman or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim against the FBG Debtors arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims against the FBG Debtors arising from the rejection of the FBG Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims.

**11.4** *Insurance Policies.*

**(a)** Each of the FBG Debtors' Insurance Policies and any agreements, documents, or instruments related thereto, as of the Confirmation Date, shall be deemed to be and treated as executory contracts and shall be assumed by the FBG Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.

100

**(b)** Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the FBG Debtors' Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law.

**(c)** All officers, managers, directors, agents, or employees who served in such capacity at any time before the Confirmation Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Confirmation Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Confirmation Date, in each case, to the extent set forth in such D&O Policies.

**(d)** On the Confirmation Date, all rights and obligations of the FBG Debtors, if any, under the D&O Policies shall transfer to the Litigation Trust in accordance with the Plan and the Litigation Trust shall assume the FBG Debtors' obligations for administering such policies.  For the avoidance of doubt, the transfer of the Insurance Rights of the FBG Debtors' and their Estates to recover proceeds from D&O Policies to the Litigation Trust shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

**(e)** On the Confirmation Date, the Wind Down Administrator shall assume the FBG Debtors' obligations, if any, for administering the Independent Manager Policies, subject to the Wind Down Budget.

### 11.5 *Reservation of Rights.*

**(a)** Neither the exclusion nor the inclusion by the FBG Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the FBG Debtors or any other party that any such contract or lease is or is not an executory contract or unexpired lease or that the FBG Debtors, their Estates, or their Affiliates has any liability thereunder.

**(b)** Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the FBG Debtors, the Estates, the Claims Ombudsman, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**(c)** Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the FBG Debtors, the Estates, the Claims Ombudsman, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**DEBTORS' EXHIBIT NO. 7**
**Page 112 of 272**

**ARTICLE XII. CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

**12.1** *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied on or before the Effective Date:

**(a)** the Disclosure Statement Order shall have been entered;

**(b)** the closings of the Estate Claims Credit Bid Transaction and DIP Collateral Credit Bid Transaction each shall have occurred;

**(c)** the Litigation Trust shall have been established and the Litigation Trust Assets shall have been transferred to the Litigation Trust;

**(d)** the Litigation Trust Interests shall have been issued in a form and manner satisfactory to the Ad Hoc Group SteerCo and the Creditors' Committee;

**(e)** the DIP Collateral Trust shall have been established and the DIP Collateral Trust Assets shall have been transferred to the DIP Collateral Trust;

**(f)** the DIP Collateral Trust Interests shall have been issued in a form and manner satisfactory to the Ad Hoc Group SteerCo;

**(g)** the ABL Collateral Trust shall have been established and the ABL Collateral Trust Assets shall have been transferred to the ABL Collateral Trust;

**(h)** the Plan Supplement and all of the schedules, documents, supplements, and exhibits thereto shall have been filed in form and substance reasonably acceptable to the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed);

**(i)** the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay or injunction;

**(j)** all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

**(k)** all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received;

**(l)** the Professional Fees Escrow Account shall have been fully funded as provided for in the Plan;

102

**(m)**      all actions, documents, certificates, and agreements necessary to implement the Plan, including the Plan Settlement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws;

**(n)**      the Restructuring Expenses and all other fees, expenses, and other amounts due and payable to the Ad Hoc Group Advisors pursuant to the DIP Order and the Plan shall have been paid in full;

**(o)**      the Litigation Trust and/or the DIP Collateral Trust shall have sufficient Cash on hand to (i) satisfy (x) all Allowed Administrative Expense Claims against the FBG Debtors (unless an applicable holder consents to different treatment) in accordance with section 1129(a)(9)(A) of the Bankruptcy Code and (y) all Allowed Priority Tax Claims and Allowed Other Priority Claims against the FBG Debtors (unless an applicable holder consents to different treatment) that are required to be paid on the Effective Date under the terms of the Plan (the "**Effective Date Priority Claims**"), and (ii) reserve for all Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims actually asserted in a timely filed proof of claim; *provided* that no amounts shall be required to be reserved for any Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims that have been disallowed by order of the Bankruptcy Court (whether or not subject to appeal); and

**(p)**      the Definitive Documents shall have been filed and/or executed, as applicable, in form and substance acceptable to the Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee.

### 12.2    *Waiver of Conditions Precedent.*

**(a)**      Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XII (other than the condition precedent set forth in Section 12.1(o)) may be waived, in whole or in part, by the FBG Debtors, with the consent of the Ad Hoc Group SteerCo and the Creditors' Committee or the Claims Ombudsman, as applicable (not to be unreasonably withheld, conditioned, or delayed), without leave of or order of the Bankruptcy Court.

**(b)**      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

**(c)**      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 12.3    *Effect of Failure of a Condition.*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the FBG Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or

undertaking by the FBG Debtors or any other Entity; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

### 12.4 *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the FBG Debtors and all holders of Claims and Interests in the FBG Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of the FBG Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the FBG Debtors or any other Entity or to prejudice in any manner the rights of the FBG Debtors or any other Entity in any further proceedings involving the FBG Debtors or otherwise; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

### ARTICLE XIII.    EFFECT OF CONFIRMATION.

### 13.1 *Binding Effect.*

As of the Confirmation Date, the Plan shall bind (i) the FBG Debtors; (ii) the Wind Down Administrator; (iii) the Claims Ombudsman; (iv) the Litigation Trustee and the Litigation Trust; (v) the DIP Collateral Trustee and the DIP Collateral Trust; (vi) the ABL Collateral Trustee and the ABL Collateral Trust; (vii) any successor to the FBG Debtors; (viii) the Litigation Trust Class 1 Funding Contributors and the DIP Collateral Trust Funding Contributors; (ix) all holders of Claims against and Interests in the FBG Debtors and their respective successors and assigns, regardless of whether any such holders were, as applicable, (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, (d) voted to reject the Plan, and/or (e) received any distribution under the Plan; (x) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; (xi) all Trade Creditors, Supply Chain Financers, and Factors; (xii) all Preference Settlement Electing Creditors; (xiii) each Entity acquiring property under the Plan and the Confirmation Order; (xiv) any and all non-Debtor parties to executory contracts and unexpired leases with the FBG Debtors; and (xv) all Insurance Companies; and (xvi) all beneficiaries of the Trusts.

### 13.2 *Vesting of Assets.*

Except as otherwise provided in the Plan (including in all respects Sections 13.5(a), 13.5(b), 13.6, and 13.7), the Plan Supplement, and/or the Confirmation Order, on and after Confirmation Date, pursuant to sections 363 and 1141(b) and (c) of the Bankruptcy Code, the Litigation Trust Assets, the DIP Collateral Trust Assets, and the ABL Collateral Trust Assets shall vest in the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, respectively, free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and

other interests to the extent permitted under applicable law.  Subject to the terms of the Plan, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, and the ABL Collateral Trust Agreement, on and after the Confirmation Date, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, and/or the ABL Collateral Trustee, as applicable, may use, acquire, and dispose of property and prosecute, compromise, or settle applicable Claims (including Administrative Expense Claims) and Interests against the FBG Debtors, without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan and/or the Confirmation Order.  Without limiting the foregoing, the FBG Debtors and/or Wind Down Administrator may pay the charges that it incurs on behalf of the FBG Debtors' Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 13.3  *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the FBG Debtors' Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, no injunction or stay shall interfere with the administration of the Litigation Trust or the prosecution of claims owned by such Litigation Trust.

### 13.4  *Plan Injunction.*

**(a)     Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, Representatives, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, for the avoidance of doubt, exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims.**

**(b)     Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released pursuant to the Plan, including under Section 13.5(a) or Section 13.5(b) of the Plan, or (ii) subject to exculpation pursuant to Section 13.6 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the FBG Debtors, the FBG Debtors' Estates, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust, the Litigation Trust Assets, the DIP Collateral Trust, the DIP Collateral Trust Assets, the ABL Collateral Trust, the ABL Collateral Trust Assets, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 13.6 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:   (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of**

any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the FBG Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the FBG Debtors as of the ~~Effective~~Confirmation Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to Section 13.5(a) or Section 13.5(b) of the Plan; and (G) exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims; *provided* that such Persons that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, the Debtors or their Estates shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(c)    Subject in all respects to Section 14.1 of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated

106

Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been exculpated and, only to the extent legally permissible and as provided for in Section 14.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(d)      As of the Effective Date, all Persons other than the Litigation Trust are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Claim (including in any proceeding in a judicial, arbitral, administrative, or other forum).  If any Person other than the Litigation Trust commences, conducts, or continues litigation or prosecution of an Estate Claim without a prior determination by the Bankruptcy Court that the claim or cause of action is not an Estate Claim, the Litigation Trust shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such claim or Cause of Action is an Estate Claim and that this injunction has been violated. Upon such determination, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Litigation Trust.  For the avoidance of doubt, no Person other than the Litigation Trust (including a defendant in such action) is entitled to enforce this Section 13.4(d).

(e)      The injunctions in this Section 13.4 shall extend to any successors of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust and the Litigation Trustee, the DIP Collateral Trust and the DIP Collateral Trustee, and the ABL Collateral Trust and the ABL Collateral Trustee and each of their respective property and interests in property.

(f)      FOR THE AVOIDANCE OF DOUBT NONE OF THE SPECIFIED NON-RELEASED PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN. THE RELEASING PARTIES ARE HEREBY PRESERVING AND TRANSFERRING, VESTING, AND/OR SELLING TO THE LITIGATION TRUST AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION (INCLUDING ANY ESTATE CLAIMS) WHICH CAN AND MAY BE BROUGHT BY THE LITIGATION TRUST.

DEBTORS' EXHIBIT NO. 7
Page 118 of 272

**13.5** *Releases.*

(a) **Releases by the FBG Debtors and their Estates. Except as otherwise expressly set forth below in this Section 13.5, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and Effective Date, as applicable, the FBG Debtors, their Estates, and successors and assigns, including the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust, the Litigation Trustee, the DIP Collateral Trust, the DIP Collateral Trustee, the ABL Collateral Trust, and the ABL Collateral Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the FBG Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the FBG Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the**

108

Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before  the Confirmation Date or Effective Date, as applicable.   Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 13.5(a) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party; *provided* that the foregoing exception for Claims and Causes of Action arising from an act or omission that constitutes gross negligence or willful misconduct shall not preserve or retain any Claim or Cause of Action for breach of fiduciary duty against a Released Party, (b) any post-Effective Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (c)  prior to the Effective Date, any post-Confirmation Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) any Intercompany Claims against the FBG Debtors, which, for the avoidance of doubt, shall be treated in accordance with Section 4.8 of the Plan, or (e) any Claims in respect of the U.S. Bank Obligations; *provided* that, for the avoidance of doubt, the releases granted under this Section 13.5(a) are binding on successors to the FBG Debtors.

(b)     Third-Party Releases.  Notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the FBG Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the

109

**other Definitive Documents; any other debt or Security of the FBG Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the FBG Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the FBG Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the FBG Debtors; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 13.5(b) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order.  Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released under the Plan.**

**(c)    FOR THE AVOIDANCE OF DOUBT NONE OF THE SPECIFIED NON-RELEASED PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN. THE RELEASING PARTIES ARE HEREBY PRESERVING AND TRANSFERRING, VESTING, AND/OR SELLING TO THE LITIGATION TRUST AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION (INCLUDING ANY ESTATE CLAIMS) WHICH CAN AND MAY BE BROUGHT BY THE LITIGATION TRUST.**

**(d)    NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, ANY CLAIM OF AN FBG DEBTOR AGAINST (I) AN SPV DEBTOR OR (II) AN AFFILIATE OR SUBSIDIARY OF AN FBG DEBTOR, SHALL NOT BE RELEASED UNDER THE PLAN.**

     **13.6**   *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the

110

DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee;  the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and, in each instance, solely to the extent that such Cause of Action took place from the Petition Date through the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 13.6 shall not release or exculpate (a) any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Exculpated Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**13.7**    ***Waiver of Statutory Limitation on Releases.***

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XIII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542.  THE RELEASES CONTAINED IN SECTION 13.5 OF THE PLAN ARE EFFECTIVE REGARDLESS OF

WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 13.8   *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person (including any Affiliate of any Person), whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 13.9   *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims against and Interests in the FBG Debtors and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims against and Interests in the FBG Debtors in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the FBG Debtors and the Claims Ombudsman reserve the right, to reclassify any Allowed Claim against or Interest in the FBG Debtors in accordance with any contractual, legal, or equitable subordination relating thereto.

### 13.10   *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan in connection with the Preference Settlement and Sections 13.5(a), 13.5(b), 13.6, and 13.7, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the FBG Debtors had immediately prior to the Effective Date on behalf of their Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Except as otherwise provided in the Plan in connection with the Preference Settlement and Sections 13.5(a), 13.5(b), 13.6, and 13.7, the FBG Debtors shall have, retain, reserve, or shall have transferred, sold, and/or vested to the Trusts which Trusts shall be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the FBG Debtors' and the Trusts' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 13.11   *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to an FBG Debtor shall be void and of no further force or effect with respect to any FBG Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the FBG Debtor as a result of, or gives rise to a right of

112

any Entity based on (i) the insolvency or financial condition of an FBG Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

### 13.12 *Solicitation of Plan.*

As of the Confirmation Date: (a) the FBG Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the FBG Debtors and each of its respective managers, directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation in such solicitation, and therefore are not, and on account thereof shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## ARTICLE XIV.    RETENTION OF JURISDICTION.

### 14.1   *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the FBG Debtors' Chapter 11 Cases for, among other things, the following purposes:

**(a)**    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

**(b)**    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

**(c)**    to ensure that distributions to holders of Allowed Claims against and Interests in the FBG Debtors are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

**(d)**    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

**(e)**    to hear and determine settlements and disputes with respect to any (i) Litigation Trust Asset, including any Estate Claims, (ii) DIP Collateral Trust Asset, and (iii) ABL Collateral Trust Asset;

**(f)** to hear and determine any disputes with respect to the Factored Receivables Account and the funds deposited therein;

**(g)** to hear and determine disputes among the Trusts regarding the ownership of assets;

**(h)** to hear and determine any disputes with respect to the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account and the funds deposited therein;

**(i)** to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, or the ABL Collateral Trustee;

**(j)** to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

**(k)** to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

**(l)** to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

**(m)** to hear and determine all Professional Fee Claims;

**(n)** to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

**(o)** to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

**(p)** to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

**(q)** to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the

114

Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, the Plan Supplement, and the Confirmation Order;

**(r)** to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**(s)** to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

**(t)** to hear and determine any other matters related to the FBG Debtors' Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

**(u)** to resolve any disputes concerning whether a Person had sufficient notice of the FBG Debtors' Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the FBG Debtors' Chapter 11 Cases, or any bar date or established in the FBG Debtors' Chapter 11 Cases, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

**(v)** to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XIII of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

**(w)** to enforce all orders previously entered by the Bankruptcy Court;

**(x)** to recover all assets of the Litigation Trust, DIP Collateral Trust, the ABL Collateral Trust, the FBG Debtors and property of the FBG Debtors' Estates, wherever located; and

**(y)** to enter a final decree closing the FBG Debtors' Chapter 11 Cases.

**14.2** *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**ARTICLE XV.    MISCELLANEOUS PROVISIONS.**

**15.1** *Statutory Fees.*

All Statutory Fees for the FBG Debtors due and payable prior to the Effective Date shall be paid by the FBG Debtors (or the Wind Down Administrator on behalf of the FBG Debtors) in full on the Effective Date.  On and after the Confirmation Date, the FBG Debtors (or the Wind Down Administrator on behalf of the FBG Debtors) shall pay any and all Statutory

115

Fees for the FBG Debtors when due and payable and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  After the ~~Effective~~Confirmation Date, the FBG Debtors shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular FBG Debtor's' case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 15.2     *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the FBG Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), including with respect to any transfers to or by the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 15.3     *Dissolution of Creditors' Committee.*

On the Confirmation Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided* that the Creditors' Committee shall continue to exist for the sole purpose of prosecuting any final fee applications of the Professionals of the Creditors' Committee.  The FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Trusts, and the Trustees shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Confirmation Date.

### 15.4     *Request for Expedited Determination of Taxes of the FBG Debtors.*

The FBG Debtors and the Wind Down Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the FBG Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date.

116

**15.5**   *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

**15.6**   *Amendments.*

**(a)**   **Plan Modifications**.   The Plan may be amended, supplemented, or otherwise modified by the FBG Debtors (with the consent of the Ad Hoc Group SteerCo, the Creditors' Committee (or the Claims Ombudsman), and the ABL Agent, not to be unreasonably withheld, conditioned or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.   In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, the treatment of holders of Allowed Claims against the FBG Debtors pursuant to the Plan or the rights or responsibilities of the UCC Member, the FBG Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim against or Interest in the FBG Debtors that has accepted the Plan shall be deemed to have accepted the Plan as amended, supplemented, or otherwise modified.

**(b)**   **Certain Technical Amendments**.   Prior to the Effective Date, the FBG Debtors (with the consent of the Ad Hoc Group SteerCo, the Creditors' Committee (or the Claims Ombudsman), and the ABL Agent, not to be unreasonably withheld, conditioned or delayed) may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, or the treatment of the holders of Claims or Interests against the FBG Debtors under the Plan.

**15.7**   *Revocation or Withdrawal of Plan.*

The FBG Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.   If the Plan has been revoked or withdrawn prior to the Effective Date, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, the FBG Debtors or any other Person, (b) prejudice in any manner the rights of the FBG Debtors or any other Person, including the holders of Claims, or (c) constitute an admission, acknowledgement, offering, or undertaking of any sort by the FBG Debtors or any other Person; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to

117

any transactions consummated in connection with the Plan following entry of the Confirmation Order.

### 15.8 *Notice of Confirmation Date and Effective Date.*

(a)     As soon as reasonably practicable, the FBG Debtors shall file a notice of entry of the Confirmation Order with the Bankruptcy Court.

(b)     As soon as reasonably practicable, the FBG Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 15.9 *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 15.10 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that the Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under the Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 15.11 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, the holders of Claims or Interests against the FBG Debtors (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Preference Settlement Electing Creditors, the Released Parties, the Releasing Parties, the Exculpated Parties, and each of their respective successors and assigns.

### 15.12 *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 15.13 *Entire Agreement.*

On the Confirmation Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants,

agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 15.14  *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the FBG Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan, and (c) non-severable and mutually dependent.

### 15.15  *Additional Documents.*

On or before the Confirmation Date, the FBG Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, holders of Claims receiving distributions pursuant to the Plan, and other applicable parties in interest shall prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 15.16  *Deemed Acts.*

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 15.17  *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 15.18  *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**15.19** *Notices.*

All notices, requests, and demands hereunder to be effective shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the FBG Debtors, to:

**First Brands Group, LLC**
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn: Charles M. Moore, Chief Executive Officer
Email: cmoore@alvarezandmarsal.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:    Matthew S. Barr
         Sunny Singh
         Andriana Georgallas
         Kevin Bostel
         Jason H. George
Email: matt.barr@weil.com
         sunny.singh@weil.com
         andriana.georgallas@weil.com
         kevin.bostel@weil.com
         jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:    Clifford W. Carlson
Email: clifford.carlson@weil.com

(2) If to the Ad Hoc Group and/or the Ad Hoc Group SteerCo to:

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, New York 10166
Attn:    Scott J. Greenberg
         AnnElyse Scarlett Gains
         Christina M. Brown
Email: sgreenberg@gibsondunn.com

120

agains@gibsondunn.com
christina.brown@gibsondunn.com

(3) If to the Creditors' Committee, to:

**Brown Rudnick LLP**
7 Times Square
New York, New York 10036
Attn:   Robert J. Stark
         Bennett S. Silverberg
         Kenneth J. Aulet
Email:  rstark@brownrudnick.com
         bsilverberg@brownrudnick.com
         kaulet@brownrudnick.com

(4) If to the ABL Secured Parties, to:

**Winston ~~& Strawn~~Taylor LLP**
~~35 West Wacker~~300 N. LaSalle Drive
Suite 440
Chicago, IL ~~60601~~60654
Attn:   Daniel J. McGuire
         Jason Bennett
Email:  dan.~~d~~mcguire@winstontaylor.com
         ~~jbennett@winston.com~~jason.bennett@winstontaylor.com

After the Effective Date, the Wind Down Administrator has authority to send a notice to Persons providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Persons must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the Effective Date, the Wind Down Administrator is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons that have filed such renewed requests.

**15.20   *Reservation of Rights.***

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the FBG Debtors with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the FBG Debtors or any other Persons with respect to any Claims or Interests prior to the Confirmation Date.

[*Remainder of Page Intentionally Left Blank*]

121

Dated: June ~~12~~16, 2026
Oakland County, MI

By:    */s/  Charles M. Moore*
Name: Charles M. Moore
Title: Chief Executive Officer

*On behalf of First Brands Group, LLC and certain affiliated Debtors*

[*Signature Page to Joint Chapter 11 Plan*]

**Exhibit B**

**Redline of Disclosure Statement**

*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | |
| **Debtors.[1]** | § | **(Jointly Administered)** |

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS[2]**

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

June ~~12~~17, 2026
Houston, Texas

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] All Definitive Documents, including the Plan and the Disclosure Statement, remain subject to ongoing review, revisions, and further negotiations by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties in all respects.

DISCLOSURE STATEMENT, DATED JUNE ~~12~~17, 2026

**Solicitation of Votes on the**
**Chapter 11 Plan of**
**First Brands Group, LLC and Certain Affiliated Debtors[1]**

---

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PLAN (AS DEFINED HEREIN).

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (CENTRAL TIME) ON JULY 20, 2026, UNLESS EXTENDED BY THE FBG DEBTORS. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS JUNE 15, 2026 (THE "VOTING RECORD DATE").

---

RECOMMENDATION BY THE FBG DEBTORS TO VOTE TO ACCEPT THE PLAN

The Special Committees of the Board of Managers of First Brands Group Holdings, LLC ("**FBG Holdings**"), First Brands Group Intermediate, LLC ("**FBG Intermediate**"), First Brands Group, LLC ("**FBG**"), and Viceroy Private Capital, LLC ("**Viceroy**" and, together with FBG Holdings and its direct and indirect Debtor subsidiaries, the "**FBG Debtors**") each have approved the transactions contemplated by the Plan, including the Plan Settlement. The FBG Debtors believe the Plan is in the best interests of the FBG Debtors' estates and all stakeholders. Accordingly, the FBG Debtors recommend that holders of claims and interests whose votes are being solicited submit ballots to accept the Plan.

---

RECOMMENDATION BY THE CREDITORS' COMMITTEE
TO VOTE TO ACCEPT THE PLAN

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), as stated in the Creditors' Committee Position Letter (as defined herein), (i) recommends that holders of General Unsecured Claims vote to accept the Plan, (ii) supports confirmation of the Plan, and (iii) recommends that all Trade Creditors, Supply Chain Financers, and Factors who are eligible for the Preference Settlement carefully evaluate the terms of the Preference Settlement, including the required contribution of the Direct Creditor Claims to the Litigation Trust.

---

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR MODIFIED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING VOTES ON THE *JOINT CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS*, DATED JUNE ~~12~~16, 2026 (THE "PLAN"),[2] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT

---

[1]   All of the FBG Debtors are listed on **Exhibit H** attached hereto. For the avoidance of doubt, the FBG Debtors exclude the SPV Debtors.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the First Day Declaration (as defined herein), as applicable.

ii

**PURSUANT TO SECTION 1125 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").**

**ALL HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION V (CERTAIN RISK FACTORS INVOLVING PLAN) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE FBG DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS, AND ARE NECESSARILY SPECULATIVE.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD LOOKING STATEMENTS THAT ARE PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISK DESCRIBED IN THIS DISCLOSURE STATEMENT.**

**FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF ANY FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE FBG DEBTORS' BUSINESS (OR THE BUSINESS OF ITS AFFILIATES) OR THE FUTURE RESULTS AND OPERATIONS THEREOF.**

**THE STATEMENTS CONTAINED HEREIN, INCLUDING FORWARD-LOOKING STATEMENTS AND PROJECTED FINANCIAL INFORMATION, ARE BEING MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS SPECIFICALLY NOTED.  THE FBG DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS**

iii

**WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**THE FBG DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.**

**THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**PLEASE BE ADVISED THAT SECTIONS 13.4, 13.5, 13.6, 13.7 AND 13.8 OF THE PLAN CONTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND SUCH SECTIONS ARE ANNEXED HERETO AS EXHIBIT B.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

iv

## TABLE OF CONTENTS

**Page**

**I. Introduction** ........................................................................................................ 1

    **A.**    **Overview of the Plan and Plan Settlement** .................................. 5

        1.    Litigation Trust ................................................................ ~~5~~6

        2.    DIP Collateral Trust ....................................................... ~~14~~15

        3.    ABL Collateral Trust ...................................................... ~~16~~17

        4.    Plan Supplement ............................................................. 18

    **B.**    **Plan Treatment FAQs** ................................................................ ~~18~~19

        1.    What Claims and Interests Are Treated Under the Plan? ...... ~~18~~19

        2.    Does the Estate Claims Credit Bid Impact Recoveries Under the Litigation Trust Waterfall? ................................. ~~18~~19

        3.    When and How Much Will Holders of Class 3 Litigation Trust Interests Recover on Account of Their Claims Under the Litigation Trust? .................. ~~18~~19

        4.    Who Can Vote on the Plan? ............................................ ~~19~~20

        5.    Who Is Not Voting on the Plan? ..................................... 20

        6.    What Happens if There Is a Dispute Between the Trusts Over the Rightful Owner of an Asset? ........................... 20

        7.    <u>The FBG Debtors Will Retain Disputed Assets Until a Judgment is Rendered by a Competent Court of Law or a Settlement is Reached.</u> What is Happening to the Assets (Including Claims) of the SPV Debtors? ................. ~~20~~21

        8.    What is the Estimated Amount of Claims for which Holders may Receive Class 3 Litigation Trust Interests? .... 21

        9.    Have the Debtors Filed a Liquidation Analysis? ............ 21

        10.    Does the Plan Provide for Substantive Consolidation of any of the Debtors? ..................................................... ~~22~~23

        11.    How Will a General Unsecured Creditor of the FBG Debtors Know if their Claim is Subordinated? ............. ~~22~~23

    **C.**    **Administrative Expense Claims Consent Process & Procedures** .... 23

    **D.**    **Administrative Consent Program FAQs** ..................................... ~~24~~25

        1.    How Do I Opt In to the Administrative Expense Claims Consent Program, and What Happens if I Opt In? ......... ~~24~~25

        2.    What Happens if a Holder of an Administrative Expense Claim Does Not Opt In? ............................................... ~~25~~26

**DEBTORS' EXHIBIT NO. 7**
**Page 139 of 272**

|   | 3. | Which Holders of Administrative Expense Claims are Eligible to Participate? | 26 |
|   | 4. | How Will the Debtors Calculate Each Reconciled Amount? | 26 |
|   | 5. | What Happens if a Holder Disagrees with their Reconciled Amount? | ~~26~~27 |
|   | 6. | When do Holders of Allowed Administrative Expense Claims Begin to Receive Recoveries and from what Assets of the FBG Debtors? | ~~26~~27 |
|   | 7. | When do the FBG Debtors Anticipate the Effective Date Will Occur? | ~~27~~28 |
| E. | **Preference Settlement Eligible Creditor FAQs** | | ~~27~~28 |
|   | 1. | What is the Deadline to Make the Preference Settlement Election? | 28 |
|   | 2. | What Happens if a Preference Settlement Electing Creditor is Subsequently Determined to be Ineligible to Participate in the Preference Settlement? | ~~28~~29 |
| F. | **Summary of Plan Treatment** | | ~~28~~29 |
| G. | **Estate Claims Marketing Process** | | 35 |
| H. | **Confirmation Timeline** | | ~~36~~37 |
| I. | **Inquiries** | | ~~37~~38 |
| **II. Overview of Debtors' Operations** | | | ~~37~~38 |
| A. | **History & Formation** | | ~~37~~38 |
| B. | **Historical Operations and Key Assets** | | ~~38~~39 |
|   | 1. | Braking Products | ~~38~~39 |
|   | 2. | Filtration | ~~38~~39 |
|   | 3. | Vision and Lighting | 39 |
|   | 4. | Repairs and Towing | 39 |
|   | 5. | Product Research and Development | 39 |
|   | 6. | Rest-of-World Business | ~~39~~40 |
| C. | **Corporate Governance & Management** | | ~~39~~40 |
|   | 1. | Special Committee | ~~39~~40 |
|   | 2. | Viceroy Subcommittee | 40 |
|   | 3. | Debtors' Management | ~~40~~41 |

vi

| | | | |
|---|---|---|---|
| D. | Capital Structure | | ~~40~~41 |
| **III. Events Preceding the Commencement of the Chapter 11 Cases** | | | ~~41~~42 |
| A. | Industry and Operational Challenges | | ~~41~~42 |
| B. | Prepetition Initiatives | | 42 |
| **IV. Overview of the Chapter 11 Cases** | | | ~~42~~43 |
| A. | Commencement of Chapter 11 Cases | | ~~42~~43 |
| B. | First/Second Day Pleadings | | ~~42~~43 |
| C. | Other Procedural and Administrative Motions | | 46 |
| D. | Exclusivity | | 47 |
| E. | DIP Financing | | 47 |
| F. | Appointment of Creditors' Committee | | 49 |
| G. | Appointment of Examiner | | 49 |
| H. | Overview of Sale Process | | 51 |
| | 1. | Postpetition Sale Process | 51 |
| | 2. | Walbro Sale | 52 |
| | 3. | Intellectual Property Sale | 53 |
| | 4. | TMD Sale | ~~53~~54 |
| | 5. | Horizon North America Sale | 54 |
| I. | OEM Funding Arrangement | | 54 |
| J. | Special Committee Investigation | | 55 |
| K. | Adversary Proceedings and Other Litigation | | ~~55~~56 |
| | 1. | James Adversary Proceeding | ~~55~~56 |
| | 2. | Onset Adversary Proceeding | ~~56~~57 |
| | 3. | WARN Act Adversary Proceedings | 58 |
| | | a.  Giancarlo Hernandez v. First Brands Group, LLC and Brake Parts India LLC, Adv. Pro. No. 26-3038 | 58 |
| | | b.  Maria Tapia and Giancarlo Hernandez v. First Brands Group, LLC, Adv. Pro. No. 26-3052 | 59 |
| | | c.  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. First Brands Group, LLC and Eagle Machining, LLC, Adv. Pro. No. 26-3143 | 59 |
| | 4. | D&O Insurance Litigation | ~~59~~60 |
| L. | SPV Litigation | | 60 |
| | 1. | Aequum | 60 |

vii

a.      Aequum Chapter 11 Litigation ................................................ ~~60~~61

b.      Aequum Adversary Proceeding ............................................... 62

2.   Evolution ........................................................................................ ~~62~~63

a.      Evolution Chapter 11 Litigation ............................................ 63

b.      Evolution Chapter 7 Conversion ............................................ 64

c.      Evolution Adversary Proceeding I ......................................... ~~64~~65

3.   UMB ............................................................................................... 65

4.   CarVal ............................................................................................ 66

5.   Onset ............................................................................................... ~~67~~68

**M.    Third-Party Factoring** ......................................................................... ~~69~~70

1.   Factoring Procedures Motion ......................................................... 70

2.   Evolution Appeal ............................................................................ ~~71~~72

3.   Evolution's Emergency Motion for Adequate Protection ............... 72

4.   Evolution Adversary Proceeding II ................................................ ~~72~~73

**N.    Rest-of-World / Non-Debtor Subsidiaries** ........................................ 74

1.   Stabilization, Contingency Planning, and Funding Arrangements .............. ~~74~~75

2.   Ultinon ........................................................................................... 75

a.      Forbearance Negotiations and Funding ................................ 75

b.      Local Insolvency Filings and Subsequent Chapter 11 Filings of Dutch Holding Companies .................................... 76

3.   Horizon and FMP / Trico Australia ................................................ 76

4.   Other RoW Business Units ............................................................. ~~77~~78

a.      Trico Romania Back-Office Service Center ........................... ~~77~~78

b.      Trico Europe .......................................................................... 78

c.      CoFo and Plastics Germany .................................................. 78

5.   International Non-Debtor North American-Linked Businesses ........ ~~78~~79

**O.    Preference Actions** .............................................................................. ~~78~~79

**P.    Administrative Expense Claims** ........................................................ ~~79~~80

**Q.    Mediation** ............................................................................................ ~~80~~81

**R.    Plan Settlement** .................................................................................. ~~81~~82

1.   Principal Terms of Plan Settlement ................................................ ~~81~~82

a.      Enforcement of Remedies ...................................................... ~~81~~82

b.      Estate Claims Credit Bid Transaction .................................. 82

c.      DIP Collateral Credit Bid Transaction ................................. ~~82~~83

viii

|  |  | d. | Cash Funding and Agreed Budget | 82 83 |
|  |  | e. | Expiration of Challenge Rights | 82 83 |
|  |  | f. | Claims Ombudsman | 82 83 |
|  |  | g. | Survival of Claims | 83 84 |
|  |  | h. | DIP Order and Intercreditor Agreement Preservation | 83 84 |
|  | S. | | Wind Down Asset Sales | 83 84 |
|  | T. | | Motion to Convert Debtors' Cases to Chapter 7 | 84 85 |
|  | U. | | Retiree Benefits | 86 87 |
| V. Certain Risk Factors Involving Plan | | | | 87 88 |
|  | A. | | Certain Bankruptcy Law Considerations | 87 89 |
|  |  | 1. | Risk of Non-Confirmation of Plan | 87 89 |
|  |  | 2. | Non-Consensual Confirmation | 88 89 |
|  |  | 3. | Risk of Non-Occurrence of Effective Date | 88 89 |
|  |  | 4. | Risks Related to Possible Objections to Plan | 88 89 |
|  |  | 5. | Releases, Injunctions, and Exculpation Provisions May Not be Approved | 88 89 |
|  |  | 6. | Risks Related to Classification of Claims and Interests | 89 90 |
|  |  | 7. | Alternative Restructuring | 89 90 |
|  |  | 8. | Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims | 89 90 |
|  |  | 9. | Claims Could Be More than Projected | 89 90 |
|  |  | 10. | Risk of Administrative Insolvency | 90 91 |
|  |  | 11. | Conversion to Chapter 7 | 90 91 |
|  |  | 12. | Dismissal of Chapter 11 Case | 91 92 |
|  |  | 13. | Cost of Administering the FBG Debtors Estates | 91 92 |
|  | B. | | Additional Factors to Be Considered | 91 92 |
|  |  | 1. | FBG Debtors Could Withdraw Plan | 91 92 |
|  |  | 2. | No Duty to Update | 91 92 |
|  |  | 3. | No Representations Outside Disclosure Statement are Authorized | 91 92 |
|  |  | 4. | No Legal or Tax Advice is Provided | 91 92 |
|  |  | 5. | No Admission Made | 91 93 |
|  |  | 6. | Certain Tax Consequences | 92 93 |
|  |  | 7. | The Debtors are Under Investigation | 92 93 |
|  |  | 8. | Ongoing Litigation and Other Contingencies Could Affect Recoveries by Creditors from the Litigation Trust | 92 93 |
|  |  | 9. | The Recoveries on the Estate Claims are Inherently Uncertain | 93 94 |

ix

10.  No Waiver of Right to Object or Right to Recover Transfers and Assets ........ 9394

11.  Failure to Identify Litigation Claims or Causes of Action ........ 9395

12.  Objection to Amount or Classification of Claims ........ 9495

**VI. Certain U.S. Federal Income Tax Consequences of the Plan** ........ 9495

**A.   Consequences to the FBG Debtors** ........ 9596

1.  Wind Down of the FBG Debtors ........ 9697

2.  Cancellation of Debt and the Reduction of Tax Attributes ........ 9697

3.  Limitation of NOL Carryforwards and Other Tax Attributes ........ 9798

**B.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Certain Allowed Claims** ........ 9899

1.  Treatment of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, Allowed ABL Claims, Allowed General Unsecured Claims and Allowed Subordinated Claims ........ 99100

a.   Gain or Loss with Respect to Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims ........ 1001

2.  Distributions in Discharge of Accrued Interest or OID ........ 1023

3.  Character of Gain or Loss ........ 1023

**C.   Tax Treatment of the Trusts and Their Beneficiaries** ........ 1024

1.  Classification of the Trusts as "Liquidating Trusts" ........ 1024

2.  General Tax Reporting by the Trusts and Their Beneficiaries ........ 1045

3.  Tax Reporting for Assets Allocable to or Retained on Account of Disputed Claims ........ 1056

**D.   Withholding on Distributions and Information Reporting** ........ 1057

**VII. Confirmation of Plan** ........ 1067

**A.   Confirmation Hearing** ........ 1067

**B.   Objections** ........ 1067

**C.   Requirements for Confirmation of Plan** ........ 1078

1.  Requirements of Section 1129(a) of Bankruptcy Code ........ 1078

2.  Acceptance of Plan ........ 1089

3.  Cramdown ........ 1089

a.   No Unfair Discrimination ........ 1089

b.   Fair and Equitable Test ........ 108110

4.  Best Interests Test ........ 109110

5.  Feasibility ........ 1101

x

**VIII. Alternatives to Confirmation and Consummation of Plan** ........................ 11~~0~~1

    1.    Liquidation Under Chapter 7 of Bankruptcy Code ........................ 11~~0~~1

    2.    Alternative Chapter 11 Plan ........................ 11~~0~~2

**IX. Conclusion** ........................ 11~~1~~2

xi

**EXHIBITS**

**EXHIBIT A**        Plan

**EXHIBIT B**        Release, Injunction, and Exculpation Provisions

**EXHIBIT C**        Solicitation and Voting Procedures

**EXHIBIT D**        Organizational Structure

**EXHIBIT E**        Marketing Materials

**EXHIBIT F**        Illustrative Recovery Scenarios

**EXHIBIT G**        Liquidation Analysis

**EXHIBIT H**        Schedule of FBG Debtors

**DEBTORS' EXHIBIT NO. 7**
**Page 146 of 272**

## I.   INTRODUCTION[1]

On September 24, 2025, Global Assets LLC and 12 of its Debtor affiliates each commenced with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**" or the "**Bankruptcy Court**") a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025, First Brands Group, LLC and its remaining Debtor affiliates (and, collectively with their non-Debtor subsidiaries, "**First Brands**" or the "**Company**") each commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

The purpose of the Disclosure Statement is to provide creditors of the FBG Debtors with sufficiently detailed information to make an informed decision on whether to vote to accept or reject the Plan.  The Disclosure Statement describes the joint chapter 11 plan of the FBG Debtors and classifies and treats Claims against and Interests in the FBG Debtors only.  The Plan does not apply to claims against or interests in the SPV Debtors.  The Disclosure Statement contains, among other things, a summary of (i) the treatment of Claims against and Interests in the FBG Debtors under the Plan; (ii) the Company's businesses and certain historical events; (iii) key events during these chapter 11 cases; (iv) certain risk factors involving the Plan; and (v) the standard for seeking confirmation of the Plan.

As described in more detail below, faced with a number of operational and financial challenges, the Debtors commenced these chapter 11 cases to, among other things, stabilize their business, raise debtor-in-possession ("**DIP**") financing, pursue value-maximizing transactions, and recover estate property for the benefit of the Debtors' creditors.  After securing $1.1 billion of new money DIP financing, the Debtors, with the assistance of their investment banker, Lazard Frères & Co. LLC ("**Lazard**"), launched a marketing process in January 2026 to sell all or substantially all of their assets.  However, due to ongoing liquidity challenges and an inability to raise new financing, it became clear that consummating a whole-company sale of the Debtors' businesses was no longer feasible.  Accordingly, in late January 2026, the Debtors announced they would wind down certain of their unprofitable business units in chapter 11, while pursuing going-concern sales of other businesses, as well as certain targeted asset sales with the support of their original equipment manufacturer customers (the "**OEMs**"), the Ad Hoc Group, and the ABL Secured Parties.  The Debtors then engaged their key stakeholders, including the advisors to the Ad Hoc Group and the Creditors' Committee, in discussions as to how to orderly wind down the Debtors' estates and bring the chapter 11 cases to a resolution while maximizing recoveries for all constituents.

On January 29, 2026, the Debtors initiated a consensual mediation process overseen by the Honorable Judge Marvin Isgur to address, among other things, a case resolution.  Following months of mediation and subsequent settlement discussions, the Debtors, the Ad Hoc Group, and the Creditors' Committee reached a settlement in principle regarding the terms of the orderly wind down of the Debtors' estates through the Plan and the transactions contemplated thereunder.  The Plan provides for a structure to (i) monetize all of the FBG Debtors' remaining assets and (ii) allocate recoveries on Estate Claims among creditors in accordance with an agreed waterfall without litigation.  Among other things, the Plan contemplates a series of transactions that provide for the transfer of the FBG Debtors' assets to

---

[1]   Capitalized terms used but not defined in the Introduction will have the meanings ascribed to such terms elsewhere in this Disclosure Statement or the Plan, as applicable.

various trusts to be monetized for the benefit of the FBG Debtors' creditors based on their rights and remedies with respect to such assets, including:

- a sale to the DIP Secured Parties via credit bid and other consideration (the "**Estate Claims Credit Bid**") of all Estate Claims and certain other assets of the FBG Debtors as set forth in the Plan (collectively, the "**Litigation Trust Assets**") to a trust (the "**Litigation Trust**") that will prosecute and monetize such Litigation Trust Assets for the benefit of creditors of the FBG Debtors (including administrative, priority, and general unsecured creditors of the FBG Debtors);

- a sale to the DIP Secured Parties via credit bid (the "**DIP Collateral Credit Bid**") of all DIP Collateral (other than the Litigation Trust Assets and ABL Collateral Trust Assets) (the "**DIP Collateral Trust Assets**") to a trust for the benefit of the DIP Secured Parties (the "**DIP Collateral Trust**"); and

- a consensual foreclosure by the ABL Secured Parties of the ABL Priority Collateral (the "**ABL Collateral Trust Assets**") and subsequent transfer of such ABL Collateral Trust Assets to a trust for the benefit of the ABL Secured Parties (the "**ABL Collateral Trust**" and, together with the Litigation Trust and the DIP Collateral Trust, the "**Trusts**").

Disputed assets of the Debtors, including the SPV Debtors, will not be transferred to any Trust prior to a Court determination or consensual resolution regarding the ownership of such assets, and all rights are reserved with respect to any disputes regarding ownership of assets between the FBG Debtors and the SPV Debtors, including disputes as to ownership of Inventory and certain Claims and Causes of Action.  Additionally, in cases where both an FBG Debtor and one or more SPV Debtors assert claims against a common defendant, including the James Adversary Proceeding and Onset Adversary Proceeding, the Plan and Confirmation Order make no determination regarding proper allocation and all rights regarding any allocation dispute will be preserved.  The FBG Debtors (or the Litigation Trust) will have no rights to prosecute any claims owned by the SPV Debtors absent their consent or order of the Bankruptcy Court.  For the avoidance of doubt, DIP Collateral Trust Assets will not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor or SPV Lender.

The Litigation Trust will be funded with at least $75 million, including (i) $25 million of cash from the FBG Debtors' balance sheet (from accounts holding the DIP Lenders' cash collateral), (ii) $50 million of new committed funding (the "**Initial Litigation Trust Funding Commitments**") provided and backstopped by certain holders of DIP A Claims (i.e., the Litigation Trust Class 1 Funding Contributors).  In addition, the Litigation Trust will have the ability to raise up to $37.5 million in Additional Class 1 Litigation Trust Funding (subject to approval of the Litigation Trust Oversight Committee as a Major Decision) and other incremental financing by either the unanimous vote of the Litigation Trust Oversight Committee or approval of the Bankruptcy Court.  Proceeds from the monetization of the Litigation Trust Assets will be distributed in accordance with the agreed waterfall described below (the "**Litigation Trust Waterfall**").

Importantly, the Plan allows junior creditors of the FBG Debtors (including administrative creditors, priority unsecured creditors, and general unsecured creditors) to receive distributions of proceeds of DIP Collateral, including Estate Claims, that the DIP Lenders[2] may be entitled to foreclose

---

[2] "**DIP Lenders**" has the meaning ascribed to such term in the DIP Order and includes the several financial institutions or other entities from time to time party to that certain Senior Secured Superpriority

upon if they were to call a default and obtain relief from the automatic stay under the DIP Order before the repayment in full of the DIP A Claims.  Notwithstanding the DIP Secured Parties' rights and remedies under the DIP Order, as part of the Plan, the DIP Secured Parties have agreed to support the Plan, including reducing the minimum liquidity covenant under the DIP Documents from $50 million to $25 million, consenting to the continued use of cash collateral pursuant to an agreed budget, providing litigation funding to the Litigation Trust, and allowing holders of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims to receive distributions from their purchased assets that will be transferred to the Litigation Trust before DIP A Claims are paid in full. Under the Litigation Trust Waterfall, following aggregate distributions of $350 million from the Litigation Trust, holders of Administrative Expense Claims who agree to participate in the Administrative Expense Claims Consent Program (as defined and described below) will begin sharing in the proceeds from the monetization of the Litigation Trust Assets.  Under the Litigation Trust Waterfall, once aggregate distributions from the Litigation Trust exceed the Second Return Threshold ($350 million), Administrative Expense Claims begin sharing in the proceeds of the Litigation Trust Assets as follows: *first*, to holders of Settled Administrative Expense Claims (i.e., holders of Administrative Expense Claims who affirmatively opt-in to the Administrative Expense Claims Consent Program and agree to have their Administrative Expense Claim Allowed in an amount equal to fifty percent (50%)); *second*, to holders of other Allowed Administrative Expense Claims (i.e., holders who do not opt in to the Administrative Expense Claims Consent Program).  Thereafter, holders of Allowed Other Priority Claims and Allowed Priority Tax Claims are paid from the Litigation Trust in accordance with the Litigation Trust Waterfall; and finally, pro rata, to holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims.  The Litigation Trust Waterfall is described in greater detail in Section I.A.1(c) below.

The Plan, therefore, provides an opportunity for junior creditors to receive distributions on account of their Claims before the repayment in full in cash of the new money DIP Claims (i.e., DIP A Claims) estimated at more than $1.3 billion on the anticipated Confirmation Date of the Plan.  As set forth in the DIP Order, certain of the Estate Claims (i.e., previously encumbered claims) are subject to senior liens for the full amount of the outstanding DIP obligations (including the Roll-Up Claims) and prepetition term loan claims (an aggregate of approximately $7.5 billion) and other Estate Claims (or, in the case of Avoidance Actions, the proceeds thereof) are subject to (x) senior DIP liens for approximately $2.4 billion in aggregate DIP Claims (i.e., approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims) and (y) any Adequate Protection Claims.  Given the outstanding amount of such senior secured obligations and the DIP Lenders' rights and remedies under the DIP Documents, the Debtors believe that, absent the Plan, junior creditors may not receive any recovery on account of their Claims.

As announced on the record at the Disclosure Statement Hearing, the Debtors, the ABL Parties, and the Ad Hoc Group reached an agreement on the Debtors' budget through the proposed confirmation hearing (the "**Confirmation Budget**").  As further described in the *Declaration of Charles M. Moore in Support of (I) The Proposed Confirmation Schedule and (II) The Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2911), the Confirmation Budget will rely on continued OEM funding, funding from the ABL Parties, and freed cash reserves.  In exchange for the AHG's and ABL Parties' support for the Confirmation Budget (including

---

institutions or other entities from time to time party to that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement filed at Docket No. 289 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**").

the ABL Parties' agreement to provide $15 million of funding, the Debtors agree to certain terms and conditions, including:

- a 10% variance testing of the Confirmation Budget;

- the Debtors will seek to obtain the release of $25.7 million in the Factored Receivables Account that was returned to the account as adequate protection pending a determination of Evolution's lien (further described below) and use such funds to pay down the ABL Secured Parties no later than July 10, 2026;

- the Debtors will negotiate with the Ad Hoc Group regarding an extension of the DIP maturity and will seek Court relief with respect to such extension no later than July 10, 2026;

- the Debtors will use best efforts to finalize certain sales of the DIP Lenders' collateral under the Wind Down Order by June 25, 2026;

- clarification that, under the Plan, the Debtors' release of claims against the ABL Parties will include a release of preference claims;

- in connection with the Plan, the ABL Lenders and the Ad Hoc Group have agreed to resolve certain intercreditor disputes regarding lien priority over certain tariff and tax refunds, which will be set forth in the applicable schedules to the ABL Collateral Trust Agreement, the DIP Collateral Trust Agreement, and/or the Litigation Trust Schedule, as applicable, and the parties agree that $3,000,000 in tariff refunds currently in the FBG Debtors' possession constitute ABL Priority Collateral, with all rights reserved as to any additional amounts; *provided, that* such agreements with respect to intercreditor disputes and tariff refunds constitute a settlement for purposes of the Plan; and

- 50% of any favorable variance to the Confirmation Budget shall be used to fund wind down costs and other expenditures relating to the realization and administration of ABL Priority Collateral.

As set forth in more detail below, all Creditors of the FBG Debtors will receive Litigation Trust Interests or Cash distributions from the Litigation Trust on account of their Claims, subject to the Claims Ombudsman's claims reconciliation described in Section 5.2(g) of the Plan, and may receive distributions from the Litigation Trust in accordance with the Litigation Trust Agreement and the Plan.

Separately, in connection with solicitation of the Plan, Trade Creditors, Supply Chain Financers, and Factors (collectively, the "**Preference Settlement Eligible Creditors**") will be afforded the opportunity to participate in the "**Preference Settlement**" and become "**Preference Settlement Electing Creditors**" by completing and returning an opt-in form (the "**Preference Settlement Election Form**"). To do so, such Preference Settlement Eligible Creditors must timely, properly, and affirmatively elect on the Preference Settlement Election Form (which will be approved under the Disclosure Statement Order and sent to such Preference Settlement Eligible Creditors by Kroll) to (i) participate in, and receive the benefits of, the Preference Settlement; (ii) grant the non-Debtor releases contained in Section 13.5(b) of the Plan; and (iii) contribute all of their Direct Creditor Claims (defined below) to the Litigation Trust. Preference Settlement Eligible Creditors that timely opt in to the Preference Settlement will be Preference Settlement Electing Creditors. The Preference Settlement only applies to Trade Creditors, Supply Chain Financers, and Factors who (i) do not meet the definition of Adverse Conduct, as

determined by a Final Order, (ii) are not Specified Non-Released Parties, and (iii) are Preference Settlement Electing Creditors.

Trade Creditors that are Preference Settlement Electing Creditors will be released from Preference Actions under the Plan, and Supply Chain Financers and Factors that are Preference Settlement Electing Creditors will receive the benefit of certain procedures, including the "Modified New Value Element", with respect to Preference Actions asserted against them, as described in more detail in Section 6.11 of the Plan. Preference Settlement Eligible Creditors that fail to timely opt in to the Preference Settlement will not be Preference Settlement Electing Creditors and will not receive the benefits of the Preference Settlement, and Preference Actions against such Persons may be commenced and prosecuted in accordance with the terms of the Plan.  Unless otherwise extended with the consent of the Litigation Trustee, the deadline to submit a completed Preference Settlement Election Form is the date that is forty-five (45) days following the Confirmation Date (the "**Preference Settlement Opt-In Deadline**"); *provided* that if a Preference Action is brought against a Trade Creditor that did not timely opt in to the Preference Settlement, such Trade Creditor will have an additional thirty (30) days following service of the Preference Action to opt in to the Preference Settlement.

Additionally, in light of the amount of secured, administrative, and priority claims asserted against the FBG Debtors' estates, as well as the forecasted timeline for the FBG Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan.  Accordingly, to accelerate cash payments to consenting holders of Allowed Administrative Expense Claims, the Plan provides the Administrative Expense Claims Consent Program, by which holders of Administrative Expense Claims have the opportunity to participate in a settlement of their Administrative Expense Claim at a reduced rate in exchange for receiving an earlier recovery under the Litigation Trust Waterfall.  The Claims Ombudsman will have a claims reconciliation process whereby holders of Administrative Expense Claims can reconcile such claims and any disputes with respect to such reconciliation may be brought before the Bankruptcy Court for resolution.  The Administrative Expense Claims Consent Program will be administered following the Confirmation Date.

If a holder of an Allowed Administrative Expense Claim chooses to affirmatively opt in to the Administrative Expense Claims Consent Program in accordance with the instructions on the Consent Program Opt-In Form, they will receive a Settled Administrative Expense Claim amount equal to 50% of the Reconciled Amount identified in the Consent Program Opt-In Form and will receive the distributions accorded under the Litigation Trust Waterfall to holders of Settled Administrative Expense Claims, in accordance with Section 6.5 of the Plan, which provides that such claims will be satisfied in full before any other Allowed Administrative Expense Claims.  Holders of Administrative Expense Claims[3] will have until the date that is sixty (60) days following the Confirmation Date to submit a Consent Program Opt-In Form in either electronic or paper form, in each case following the procedures outlined in the Disclosure Statement Order and explained in the Consent Program Opt-In Form.  The FBG Debtors will not send Consent Program Opt-In Forms to holders of (i) Professional Fee Claims; (ii) DIP A Claims; (iii) Roll-Up Claims; (iv) Intercompany Claims; or (v) Priority Tax Claims.

The FBG Debtors believe that the Plan, including the Plan Settlement, provides all holders of Claims at each FBG Debtor greater recoveries than any alternative path, including dismissal of the

---

[3]     The FBG Debtors reserve all rights to dispute or seek to disallow any asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the FBG Debtors.

chapter 11 cases or the immediate conversion of the chapter 11 cases to proceedings under chapter 7 of the Bankruptcy Code.

## A.      OVERVIEW OF THE PLAN AND PLAN SETTLEMENT

The FBG Debtors believe the Plan maximizes value for all stakeholders.  The Plan contemplates an orderly wind down of the FBG Debtors and the distribution of value through three liquidating trusts—the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust—to holders of Allowed Claims in accordance with the waterfalls set forth in the Plan.  The nature of the assets to be transferred to the Trusts under the Plan and the beneficiaries of such Trusts corresponds to the rights of the Debtors' creditors in such assets in accordance with the DIP Documents and other agreements. Specifically, (i) the ABL Collateral Trust Assets consist of ABL Priority Collateral (e.g., certain inventory and accounts receivable) and the ABL Collateral Trust Beneficiaries include the ABL Secured Parties, (ii) the DIP Collateral Trust Assets consist of certain DIP Collateral (other than Litigation Trust Assets and ABL Collateral Trust Assets) (e.g., intellectual property, real estate, and certain machinery and equipment) and the DIP Collateral Trust Beneficiaries include the DIP Secured Parties, and (iii) the Litigation Trust Assets include Estate Claims of the FBG Debtors that are, or their proceeds are, DIP Collateral and the Litigation Trust Beneficiaries include the DIP Secured Parties, as well as other junior creditors pursuant to the Plan.  If there is a dispute as to whether an asset is a Litigation Trust Asset, DIP Collateral Trust Asset, or ABL Collateral Trust Asset, such dispute will be resolved either by the mutual consent of the DIP Secured Parties, the ABL Secured Parties, and/or the Litigation Trust or by the Bankruptcy Court and, upon entry of a Final Order or mutual agreement, such asset will automatically vest in the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust, as applicable.  Until any such bona fide dispute is resolved, the FBG Debtors will hold such asset pending an adjudication or settlement.

### 1.   *Litigation Trust*

On the Confirmation Date, or as soon thereafter as reasonably practicable, the Litigation Trust will be established in accordance with the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries, as well as to holders of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims.  The Litigation Trust will be managed by the Litigation Trustee, under the supervision of the Litigation Trust Oversight Committee, the governance of which is described in greater detail in Section I.A.1(d) below.

#### (a)      *Litigation Trust Assets and Funding*

The Litigation Trust Assets will primarily consist of all Claims and Causes of Action of the FBG Debtors' estates (i.e., the Estate Claims) and the Direct Creditor Claims of Preference Settlement Electing Creditors.  The Estate Claims include the Claims and Causes of Action asserted by the FBG Debtors in the James Complaint and Onset Complaint, as defined and described in more detail below, as well as certain additional Claims and Causes of Action of the FBG Debtors, which are described below.

The Litigation Trust will be funded by (i) $25,000,000 in Cash from the FBG Debtors' balance sheet and (ii) $50,000,000 of Initial Litigation Trust Funding Commitments by certain of the DIP Lenders (the "**Litigation Trust Class 1 Funding Contributors**") pursuant to the Litigation Trust Agreement and/or any Litigation Trust Funding Agreement.  In addition, the Litigation Trust will be authorized to obtain Additional Litigation Trust Funding in accordance with the terms of the Litigation Trust Agreement, any Litigation Trust Funding Agreement, and the Plan, and as set forth below.  These funds will be available to pay the costs of administering the Litigation Trust and monetizing the Litigation

Trust Assets, including costs associated with prosecuting, settling, or otherwise disposing of the Estate Claims.  The Litigation Trust will be authorized to use the proceeds of the Litigation Trust Class 1 Funding Contributions in accordance with the terms of the Plan, the Confirmation Order, and the Litigation Trust Agreement without further notice to or order of the Bankruptcy Court.  The Litigation Trust Class 1 Funding Commitments are backstopped by certain of the DIP Lenders (the "**Litigation Trust Backstop Parties**") in exchange for an aggregate fee equal to 5% of the backstop commitments to ensure adequate capitalization of the Litigation Trust notwithstanding the rate of participation from holders of DIP A Claims to participate in the Initial Litigation Trust Funding Commitments.  The Litigation Trust Class 1 Funding Commitments and Litigation Trust Backstop Commitments are necessary and incidental to the liquidating purpose of the Litigation Trust.  The Litigation Trust Backstop Commitments are a bargained-for and integral parts of the restructuring transactions contemplated under the Plan.

The commitment period for the Initial Litigation Trust Funding Commitments will be five (5) years.  The minimum funding will be available in one or more draws, equal to the lesser of (i) $10 million and (ii) the undrawn commitment amount.

The Litigation Trust may obtain Additional Litigation Trust Funding on the following terms and conditions:

(i) the Litigation Trust may obtain up to $37,500,000 of Additional Class 1 Litigation Trust Funding as Additional Class 1 Litigation Trust Interests if such commitments are (a) on the same terms as the Initial Litigation Trust Funding Commitments (including Section 6.5(b)(i)–(iv) of the Plan), and (b) approved by the Litigation Trust Oversight Committee as a Major Decision; and

(ii) if the Litigation Trust has already obtained all Additional Class 1 Litigation Trust Funding, the Litigation Trust may (unless a determination has been made pursuant to Section 6.4(c) of the Plan), obtain Additional Waterfall Litigation Trust Funding if such Additional Waterfall Litigation Trust Funding is (a) approved by a unanimous vote of the Litigation Trust Oversight Committee, including the UCC Member(s), or (b) approved by the Bankruptcy Court pursuant to the Court-Approved Additional Waterfall Litigation Trust Funding.

Any Additional Litigation Trust Funding is subject to additional conditions and protections that are set forth in Section 6.4 of the Plan.

The Litigation Trust's primary purpose is monetizing the Litigation Trust Assets and distributing the proceeds to the Litigation Trust Beneficiaries and to holders of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose.

**DEBTORS' EXHIBIT NO. 7**
**Page 153 of 272**

The Litigation Trust will be vested with the Litigation Trust Assets on the Confirmation Date. The Litigation Trust Assets will include all Estate Claims[4] and certain related assets of the FBG Debtors, including, but not limited to:

- **Patrick James Adversary Claims.**  Claims related to the adversary proceeding among the Debtors, Patrick James (the "**Founder**"), and certain related entities titled *First Brands Group LLC v. James*, Adv. Pro. No. 25-3803 (CML) (Bankr. S.D. Tex. 2025) (as may be amended or supplemented, the "**James Adversary Proceeding**").[5]  In the James Adversary Proceeding, the Debtors seek to recover assets that were transferred to James and related entities from the estate, and pursue various claims against James and other individuals involved in the Founder's alleged fraud.  The complaint alleges that the Founder used his control over First Brands to obtain financing, divert proceeds, and transfer substantial value to himself, his trust, and affiliated entities, including alleged transfers of more than $700 million between 2018 and 2025.  In addition, the complaint asserts claims for actual and constructive fraudulent transfer, unjust enrichment, constructive trust, equitable accounting, money had and received, and illegal dividend claims, with the Debtors also reserving rights to add defendants and causes of action as their investigation develops.  On April 17, 2026, Judge Lopez ordered a stay of discovery in the

---

[4]  "**Estate Claims**" is defined in the Plan to include any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates against any Entity or Affiliate or Representative of any Entity (including each other through intercompany claims, intercompany interests, and/or other intercompany obligations), seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors taken as a whole, based on any legal theory, including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates; and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign, or other relationship with any FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present, or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, (a) any Disputed Alester IP recovered from an Avoidance Action or Recovery Action of an FBG Debtor, (b) all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action that the FBG Debtors have and/or are entitled to assert against any Person, and (c) any and all initial and subsequent  transfers related to the items within this definition; *provided* that Estate Claims will also include any Claim that is duplicative of an Estate Claim, any Claim related to (i)-(iv) above that is a general claim with no particularized injury arising from it, or any other Claim that is in substance an Estate Claim.  For the avoidance of doubt, any claims and/or remedies of the FBG Debtors or their Estates against any SPV Lender, including any Aequum Lender (as defined in Docket No. 215) or its Affiliates, whether asserted by or assertable by the FBG Debtors, their Estates, or the Creditors' Committee, will also be Estate Claims.

[5]  Parties may review details of the James Adversary Proceeding, including the filed complaint, on the Debtors' website at https://restructuring.ra.kroll.com/firstbrands, by referring to Adv. Pro. No. 25-03803 (CML).

**DEBTORS' EXHIBIT NO. 7**
**Page 154 of 272**

James Adversary Proceeding pending the resolution of parallel criminal proceedings which are scheduled for trial in February 2027.

- **Onset Adversary Claims**.  Claims related to the adversary proceeding among the Debtors, Onset Financial Inc. ("**Onset**"), Edward James (the "**Founder's Brother**"), and certain related entities, titled *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. 2026) (as may be amended or supplemented, the "**Onset Adversary Proceeding**").[6]  In the complaint, the Debtors seek to, among other things, avoid and recover more than $2 billion dollars in alleged actual and constructive fraudulent transfers under chapter 5 of the Bankruptcy Code made to Onset and its investors in connection with purported sale-leaseback transactions.  The complaint also asserts claims against the Founder's Brother for breach of contract and fiduciary duties, and against Onset for tortious interference with contract and aiding and abetting breach of fiduciary duty, among other claims.  Onset and its funding partners have filed motions to dismiss the complaint, and asserted various counterclaims, third-party claims, and cross-claims.  On March 24, 2026, Judge Lopez entered an order granting the Debtors' request to stay the Onset Adversary Proceeding for sixty (60) days.  On June 15, 2026, the Court entered an order further extending the stay until the resolution of the appeal on the order staying discovery in the Patrick James Adversary Proceeding.

- **Avoidance Actions.**  Avoidance Actions include any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the FBG Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law, including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers, or conveyances.

- **Recovery Actions.**  The Recovery Actions, as defined in the DIP Order, include (i) any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise; (ii) commercial tort claims, other estate claims and causes of action, and the proceeds of the foregoing; (iii) the proceeds of property recovered, whether by judgment, settlement, or otherwise from all claims and causes of action under section 549 of the Bankruptcy Code (and section 550 of the Bankruptcy Code solely as to claims and causes of action under section 549) to recover any postpetition transfer of property; and (iv) all amounts recovered by the Debtors' estates under section 506(c) of the Bankruptcy Code.

- **Government Forfeiture Proceeds.**  All assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement.

- **All Other Claims.**  Any and all other claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates against any Person, seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtors' estates, or the FBG Debtors' creditors taken as a whole, based on any legal theory, including, without limitation, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance,

---

[6]   Parties may review details of the Onset Adversary Proceeding, including the filed complaint, on the Debtors' website at https://restructuring.ra.kroll.com/firstbrands, by referring to Adv. Pro. No. 26-03005 (CML).

9

agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies.

- **Insurance Recoveries.**  All rights of the FBG Debtors to recover proceeds from insurance policies that provide or may provide coverage for the Estate Claims.  For the avoidance of doubt, these include all liability insurance policies of directors and officers (including any runoff policies or tail policies related to or associated with the foregoing) issued or providing coverage at any time to any of the FBG Debtors, for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

- **Direct Creditor Claims.**  Any direct (non-derivative) Claims held by a Preference Settlement Electing Creditor (i) against any non-Debtor Person and (ii) that relate to the conduct of the Debtors and/or Affiliates or professionals of the Debtors on or before the Petition Date; *provided* Direct Creditor Claims will not include any Claims against a Released Party that are released under the Plan.  For the avoidance of doubt, Direct Creditor Claims will not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.

For the avoidance of doubt, Litigation Trust Assets will not include any assets that are determined by Final Order to be property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders.

### (b)    Litigation Trust Beneficiaries

The Litigation Trust will issue three classes of beneficial interests upon entry of the Confirmation Order:

i.    Class 1 Litigation Trust Interests, granted to the Litigation Trust Class 1 Funding Contributors on account of the Litigation Trust Class 1 Funding Contributions;

ii.    Class 2 Litigation Trust Interests, granted to the holders of Allowed DIP A Claims;

iii.    Class 3 Litigation Trust Interests, comprised of (x) Class 3(a) Litigation Trust Interests, granted to holders of Allowed Roll-Up Claims, (y) Class 3(b) Litigation Trust Interests, granted to the Claims Ombudsman, as agent to the holders of Allowed General Unsecured Claims and Allowed Subordinated Claims, and (z) Class 3(c) Litigation Trust Interests, granted to the holders of Allowed First Lien Claims and/or Allowed Second Lien Claims.

Each such class of beneficial interest will entitle its holders to share in distributions of proceeds from the monetization of the Litigation Trust Assets in accordance with the Litigation Trust Waterfall, which also includes distributions to holders of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims, as described below.

### (c)    Litigation Trust Waterfall

Except as may be altered by the provisions of Additional Waterfall Litigation Trust Funding, proceeds from the monetization of the Litigation Trust Assets, net of fees, costs, or other expenses

pursuant to the terms of the Litigation Trust Agreement, will be distributed to Litigation Trust Beneficiaries as follows:

(i) *First*, to holders of Class 1 Litigation Trust Interests (or, if applicable, Additional Class 1 Litigation Trust Interests), which will receive the amounts to which they are entitled pursuant to Section 6.5(b)(i), (ii), and (iii) of the Plan in respect of principal and investment return from the Litigation Trust Class 1 Funding Commitments, the Litigation Trust Class 1 Funding Contributions, and any Additional Class 1 Litigation Trust Funding (the "**First Return Threshold**");

(ii) *Second*, following satisfaction of the First Return Threshold until aggregate distributions from the Litigation Trust (including distributions pursuant to Section 6.5(b) of the Plan) are equal to $350,000,000 (the "**Second Return Threshold**"), (x) 15% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and (y) 85% to holders of Class 2 Litigation Trust Interests;

(iii) *Third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests from the Litigation Trust equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) (the "**Final Return Threshold**"): (a) 10% to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), (b) 74% to holders of Class 2 Litigation Trust Interests, and (c) 16% to the holders of Class 3 Litigation Trust Interests (subject to payment in full of Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(d) of the Plan); and

(iv) *Fourth*, following the satisfaction of the Final Return Threshold, (x) 10% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) and (y) 90% to the holders of Class 3 Litigation Trust Interests (subject to payment in full of Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, set forth in accordance with Section 6.5(d) of the Plan).

Set forth below is a table demonstrating the percentage of distributions to be made among the various classes of Litigation Trust Interests based on aggregate distributions from the Litigation Trust, assuming an Allowed amount of DIP A Claims of $1.3 billion.  A more detailed analysis of illustrative recovery scenarios is annexed hereto as **Exhibit F**.

| | **Aggregate Distributions** | | | | |
|---|---|---|---|---|---|
| **Class** | **$0 – $90** | | | | |

11

| | million[7] | $90 million – $350 million | $350 million – $1.8 billion | $1.8 billion – $1.9 billion[8] | Over $1.9 billion |
|---|---|---|---|---|---|
| Class 1 (Litigation Funding) | 100% | 15% | 10% | 10% | 10% |
| Class 2 (DIP A Claims) | – | 85% | 74% | – | – |
| Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, Other Priority Claims | – | – | 16% | 90% | – |
| Class 3 (Roll-Up Claims, General Unsecured Claims, First Lien Claims, and Second Lien Claims) | – | – | – | – | 90% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** |

Distributions to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) described above will be paid in accordance with the following, set forth in Section 6.5(b) of the Plan:

1.  *First*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with their respective Litigation Trust Class 1 Funding Contributions, until each Litigation Trust Class 1 Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (b) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x, with such returns being measured from the date of each Litigation Trust Class 1 Funding Contribution;

2.  *Second*, to the Litigation Trust Class 1 Funding Contributors in an amount accrued on the daily undrawn amounts of their respective

---

[7]   This assumes (x) there is no Additional Litigation Trust Funding and (y) the 1.75x multiple on invested capital exceeds the 20.0% internal rate of return on the Litigation Trust Class 1 Funding Contributions.

[8]   This assumes no participation in the Administrative Expense Claims Consent Program.

**DEBTORS' EXHIBIT NO. 7**
**Page 158 of 272**

Litigation Trust Class 1 Funding Commitments at the rate of 5.0% *per annum*; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution in respect of undrawn Litigation Trust Class 1 Funding Commitments for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor;

3. *Third*, to the Litigation Trust Backstop Parties until each such Litigation Trust Backstop Party has received an amount equal to 5.0% of the amount of such Litigation Trust Backstop Party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party; *provided* that (1) no Litigation Trust Backstop Party will be entitled to receive any such distribution for any period during which such Litigation Trust Backstop Party is a Defaulting Contributor and (2) if a Litigation Trust Backstop Party becomes a Defaulting Contributor, such Litigation Trust Backstop Party's Litigation Trust Backstop Commitments and fees in respect thereof may be terminated or reallocated in Litigation Trustee's reasonable discretion; and

4. *Fourth*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Class 1 Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Class 1 Funding Contributors, for the life of the Litigation Trust; *provided* that no Litigation Trust Class 1 Funding Contributor will be entitled to receive any such distribution for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor.

Distributions to the holders of Class 2 Litigation Trust Interests described above will be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders.

Distributions to holders of Class 3 Litigation Trust Interests described above will be paid in accordance with the following, set forth in Section 6.5(d) of the Plan:

13

1.  *First*, to the holders of Settled Administrative Expense Claims, pro rata based on the aggregate amount of Settled Administrative Expense Claims, until each such holder has received distributions equal to the amount of its Settled Administrative Expense Claim;

2.  *Second*, to the holders of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims), pro rata based on the aggregate amount of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims) held by such holders, until each such holder has received distributions equal to the amount of its Allowed Administrative Expense Claim;

3.  *Third*, to holders of Allowed Other Priority Claims, pro rata based on the aggregate amount of Allowed Other Priority Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Other Priority Claim;

4.  *Fourth*, to holders of Priority Tax Claims, pro rata based on the aggregate amount of Allowed Priority Tax Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Priority Tax Claim;

5.  *Fifth*, to all holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, pro rata based on the aggregate amount of $3,300,000,000 of Allowed Roll-Up Claims, Allowed First Lien Claims as of the Confirmation Date, Allowed Second Lien Claims as of the Confirmation Date, and Allowed General Unsecured Claims held by such holders, until each holder has received distributions equal to the amount of its respective $3,300,000,000 of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, as applicable; and

6.  *Sixth*, to holders of Allowed Subordinated Claims, pro rata based on the amount of Allowed Subordinated Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Subordinated Claim.

Following aggregate distributions equal to the amount of all Allowed Subordinated Claims, any residual value will be paid as directed by the Litigation Trust Oversight Committee, subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

To the extent that any Litigation Trust Class 1 Funding Contributor fails to fund, declines to fund, or is otherwise unable to fund all or any portion of its pro rata share of the Initial Litigation Trust Funding Commitments (the "**Unfunded Amount**"), the Litigation Trust Backstop Parties, pursuant to the terms of any backstop commitment letter, will subscribe for and fund such Unfunded Amount, on a pro rata basis based on their respective commitments (or as otherwise agreed among such participating parties).  In consideration for providing this backstop, each Litigation Trust Backstop Party will be entitled to receive a backstop fee equal to 5.0% of the amount of such party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such party, payable in accordance

14

with the Litigation Trust Waterfall set forth above.  Each applicable Litigation Trust Backstop Party will also be entitled to receive Class 1 Litigation Trust Interests in respect of any Unfunded Amount actually funded by such party.

*(d)      Administration of Litigation Trust and Litigation Trust Oversight Committee*

The Litigation Trust will be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan.  The Litigation Trustee will be Gerard Uzzi of Uzzi & Lall.  The initial Litigation Trust Oversight Committee will be comprised of four (4) members, including three (3) members appointed by certain members of the Ad Hoc Group (each, an "**AHG Member**") and one (1) member appointed by the Creditors' Committee (the "**UCC Member**").  Following the satisfaction of the Final Return Threshold, the Litigation Trust Oversight Committee will be comprised of three (3) members, including one (1) AHG Member and two (2) UCC Members.  The duties and obligations of the members of the Litigation Trust Oversight Committee will be set forth in the Litigation Trust Agreement.

The Litigation Trustee will carry out certain functions set forth in Section 6.10(b) of the Plan and may take such actions, under the supervision or with the approval of the Litigation Trust Oversight Committee, without supervision or approval by the Bankruptcy Court (including without the need to seek Bankruptcy Court approval pursuant to section 363 of the Bankruptcy Code and/or Bankruptcy Rule 9019 with respect to any Litigation Trust Assets) and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Litigation Trust Agreement.

Additionally, pursuant to the Litigation Trust Agreement, (i) certain approval rights will be delegated to the Litigation Trustee, (ii) the Litigation Trust Oversight Committee will retain the right to approve certain other decisions ("**Major Decisions**"), and (iii) certain other decisions will require the affirmative vote of the UCC Member ("**Sacred Rights**").  Any decision of the Litigation Trust that qualifies as a Major Decision (i) before the Final Return Threshold is satisfied, will require the affirmative vote of at least two (2) AHG Members and a majority of the members of the Litigation Trust Oversight Committee, and (ii) after the Final Return Threshold is satisfied, will require the affirmative vote of a majority of the members of the Litigation Trust Oversight Committee.  Any decision of the Litigation Trust that qualifies as a Sacred Right (i) before the Final Return Threshold is satisfied, will require the affirmative vote of at least two (2) AHG Members and the UCC Member, and (ii) after the Final Return Threshold is satisfied, will require the affirmative vote of the AHG Member and at least one UCC Member.  The scope of the Major Decisions and Sacred Rights will be set forth in the Litigation Trust Agreement.

*(e)      Preference Settlement*

Pursuant to the Plan Settlement, Trade Creditors, Supply Chain Financers, and Factors will be given the opportunity to opt in to the Preference Settlement by timely submitting a Preference Settlement Election Form, in which case such Person will (i) be a Releasing Party and grant the releases contained in Section 13.5(b) of the Plan and (ii) contribute all of its Direct Creditor Claims to the Litigation Trust.  In exchange, Trade Creditors that timely opt in are released from Preference Actions, and Supply Chain Financers and Factors that timely opt in receive the benefit of the Modified New Value Element with respect to Preference Actions asserted against them, in each case as more fully described in Section 6.11 of the Plan; *provided* that any such creditor that is later determined not to qualify for the Preference Settlement in accordance with Section 6.11 of the Plan will not be a Releasing Party and will retain any claims against the Released Parties.

15

**DEBTORS' EXHIBIT NO. 7**
**Page 161 of 272**

*(f)      Turnover of Litigation Trust Assets*

If the DIP Collateral Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, Litigation Trust Assets, such Litigation Trust Assets will be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the Litigation Trust.

*(g)      Non-Transferability*

The Litigation Trust Interests will be non-certificated and will be non-transferable and non-assignable except by will, intestate succession, or operation of law.

2.  ***DIP Collateral Trust***

On the Confirmation Date or as soon thereafter as is reasonably practicable, the DIP Collateral Trust will be established in accordance with the DIP Collateral Trust Agreement for the purpose of being vested with and liquidating the DIP Collateral Trust Assets and making distributions to the DIP Collateral Trust Beneficiaries.  The DIP Collateral Trust will be administered by the DIP Collateral Trustee.

*(a)      DIP Collateral Trust Assets*

The DIP Collateral Trust Assets consist of (i) all DIP Collateral (other than the Litigation Trust Assets) for which, on the date the DIP Collateral Trust is established, (x) no bona fide dispute exists as to whether the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims; (ii) all reversionary interests and/or second lien interests of the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties in the ABL Priority Collateral; and (iii) all Ultinon Claims and Interests.  The DIP Collateral Trust Assets include any DIP Collateral Trust SPV Recoveries and the DIP Collateral Trust Additional Payments.  The DIP Collateral Trust Assets will be identified in a schedule annexed to the DIP Collateral Trust Agreement.  For the avoidance of doubt, DIP Collateral Trust Assets will not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor or SPV Lender.

The DIP Collateral Trust Assets include, but are not limited to, (i) eight parcels of land which, following the sale process initiated in January, 2026, have not received any bids or indications  of interest for and (ii) machinery and equipment.

*(b)      DIP Collateral Trust Funding*

The DIP Collateral Trust Funding Contributors will provide the DIP Collateral Trust Funding to the DIP Collateral Trust pursuant to the DIP Collateral Trust Agreement, which commitments and contributions will be available to pay costs of the DIP Collateral Trust, costs of administration of the DIP Collateral Trust, and costs of monetizing the DIP Collateral Trust Assets.  The DIP Collateral Trust Funding is necessary and incidental to the liquidating purpose of the DIP Collateral Trust.  The DIP

16

Collateral Trust Funding is bargained for and an integral part of the restructuring transactions contemplated under the Plan.

> *(c)*      *DIP Collateral Trust Beneficiaries*

The DIP Collateral Trust will issue two classes of beneficial interests on the Confirmation Date: (i) Class 1 DIP Collateral Trust Interests, granted to the DIP Collateral Trust Funding Contributors; and (ii) Class 2 DIP Collateral Trust Interests, granted to the holders of Allowed DIP A Claims.

> *(d)*      *DIP Collateral Trust Waterfall*

Proceeds from the monetization of the DIP Collateral Trust Assets, net of expenses (including reasonably projected expenses), will be distributed to the DIP Collateral Trust Beneficiaries as follows:

1. *First*, to the Primary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Primary DIP Collateral Trust Funding, until each Primary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Primary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Primary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Primary DIP Collateral Trust Funding;

2. *Second*, to the Secondary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Secondary DIP Collateral Trust Funding, until each Secondary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Secondary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Secondary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Secondary DIP Collateral Trust Funding;

3. *Third*, to the holders of Class 2 DIP Collateral Trust Interests until such holders receive aggregate distributions equal to the amount of the DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims); and

4. *Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full.

Following aggregate distributions equal to the amount of Allowed DIP A Claims as of the Confirmation Date, any residual value will be paid as directed by the DIP Collateral Trust Oversight

Committee, subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

Distributions to each class of DIP Collateral Trust Interests will be made pro rata. Notwithstanding the foregoing, upon each distribution, the DIP Collateral Trustee will have no obligation to make a distribution that would be in an amount that is either (i) less than $500 in Cash or (ii) less than the cost for the DIP Collateral Trustee to make the distribution.

### (e)     *Turnover of DIP Collateral Trust Assets*

If the Litigation Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, DIP Collateral Trust Assets, such DIP Collateral Trust Assets will be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the DIP Collateral Trust.

### (f)     *Non-Transferability*

The DIP Collateral Trust Interests will be non-certificated and will be non-transferable and non-assignable except by will, intestate succession, or operation of law.

3.   ***ABL Collateral Trust***

On the Confirmation Date, or as soon thereafter as is reasonably practicable, the ABL Collateral Trust will be established in accordance with the ABL Collateral Trust Agreement for the purpose of being vested with and liquidating the ABL Collateral Trust Assets and making distributions to the ABL Collateral Trust Beneficiaries.  The ABL Collateral Trust will be administered by the ABL Collateral Trustee, whose identity will be disclosed in the Plan Supplement.  The ABL Agent will select the initial ABL Collateral Trustee, and the ABL Agent will have the sole right to remove and replace the ABL Collateral Trustee.

### (a)     *ABL Collateral Trust Assets*

The ABL Collateral Trust Assets consist of any (i) ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (x) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, and (ii) rights, title, and interests of the holders of ABL Deficiency Claims in respect of any amounts or proceeds to be realized on account of such ABL Deficiency Claims (which rights, title, and interests are contributed to the ABL Collateral Trust pursuant to Section 4.6(b) of the Plan by holders of ABL Deficiency Claims and are not assets of the FBG Debtors transferred in connection with the foreclosure upon the ABL Collateral Trust Assets of the FBG Debtors).  The ABL Collateral Trust Assets include (a) any amounts in the Factored Receivables Account that are determined by a Final Order to be property of an FBG Debtor's Estate, but excluding any amounts in the Factored Receivables Account that the Bankruptcy Court determines by a Final Order that a Factor has a validly perfected first-priority security interest in such amounts, (b) the ABL Reserved Claims, and (c) all Insurance Rights of the FBG Debtors in respect of ABL Priority Collateral (solely to the extent such rights result from insured assets or property that constituted ABL Priority Collateral prior to the event giving rise to such Insurance Rights).  The ABL Collateral Trust Assets will be identified in a schedule annexed to the ABL Collateral Trust Agreement, which schedule will be prepared in consultation with the ABL Agent.  To the extent the ABL Agent disagrees with the scope of the ABL Collateral Trust Assets set forth in the

18

ABL Collateral Trust Agreement schedule, the ABL Agent may seek appropriate relief from the Bankruptcy Court.  For the avoidance of doubt, (i) in no event will any assets that constitute Litigation Trust Assets or DIP Collateral Trust Assets be considered ABL Collateral Trust Assets, and (ii) ABL Collateral Trust Assets will not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor, the SPV Lenders, or the DIP Secured Parties. The Wind Down Administrator will continue to maintain the Factored Receivables Account after the Confirmation Date and will continue to comply with the Cash Management Order with respect to such account, and no funds will move out of the Factored Receivables Account without further order from the Bankruptcy Court, as required by the Cash Management Order.

ABL Collateral Trust Assets include, but are not limited to the following:

- **FBG Debtors' Interest in Factored Receivables Account**:  The Factored Receivables Account currently holds approximately $97 million, the ownership of which is disputed by several parties, and which includes approximately $25 million that the Court recently determined was not subject to a perfected security interest for Evolution as described further below.

- **FBG Debtors' Interest in Outstanding Accounts Receivable**:  As of the date hereof, there is approximately $446 million in accounts receivable which the FBG Debtors have not collected.  The ownership of certain of such accounts receivables is disputed by various third party factors.  Any interests held by the FBG Debtors in accounts receivable will be transferred to the ABL Collateral Trust.  To date, parties have asserted substantial amounts in setoffs, recoupments, rebates and other similar claims in aggregate.  The amount and enforceability of such claims is subject to dispute and there are risks and uncertainty associated with the collectability of accounts receivable.

- **Inventory**:  Based on the FBG Debtors' advisors work to date, the FBG Debtors believe that the liquidation value of the undisputed ABL inventory is likely no more than $100 million, but could be substantially less than $100 million.

> *(b)      ABL Collateral Trust Beneficiaries*

The ABL Collateral Trust will issue a single class of beneficial interests on the Confirmation Date: ABL Collateral Trust Interests, granted to the holders of Allowed ABL Claims.  Each such beneficial interest will entitle each holder to share in distributions in accordance with the ABL Collateral Trust Waterfall.

> *(c)      ABL Collateral Trust Waterfall*

Proceeds of the ABL Collateral Trust Assets will be distributed pursuant to the ABL Collateral Trust Waterfall set forth in Section 8.3 of the Plan as follows:  one-hundred percent (100%) of such proceeds will be distributed to the ABL Collateral Trust Beneficiaries until aggregate distributions equal the Allowed amount of the ABL Claims; *provided* that any proceeds of the ABL Collateral Trust Assets in excess of the Allowed amount of the ABL Claims will be deemed to be DIP Collateral Trust Assets and will be turned over to the DIP Collateral Trust and distributed in accordance with Section 7.4 of the Plan.  Distributions to holders of ABL Collateral Trust Interests will be paid in accordance with the ABL Credit Agreement.

19

(d)     *Turnover of ABL Collateral Trust Assets*

If the DIP Collateral Trust or the Litigation Trust receives, or otherwise obtains possession or ownership of, ABL Collateral Trust Assets, such ABL Collateral Trust Assets will be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the ABL Collateral Trust.

(e)     *Non-Transferability*

The ABL Collateral Trust Interests will be non-certificated and will be non-transferable and non-assignable except by will, intestate succession, or operation of law.

4.  *Plan Supplement*

The FBG Debtors will file the Plan Supplement by June 22, 2026 (if the Bankruptcy Court approves the FBG Debtors' proposed schedule; otherwise, the deadline to file the Plan Supplement will be at least 28 days prior to the deadline to object to confirmation of the Plan).  The Plan Supplement will contain: (i) the Schedule of Retained Causes of Action; (ii) the disclosure of the identity of the Wind Down Administrator; (iii) the disclosure of the identity of the Claims Ombudsman; (iv) the Litigation Trust Agreement, any separate Litigation Trust Funding Agreement(s), and the form of any backstop commitment letter with the Litigation Trust Backstop Parties; (v) a non-exhaustive schedule of Specified Non-Released Parties; and (vi) any other agreement, instrument, schedule, exhibit, or document designated by the FBG Debtors (with the consent of the Ad Hoc Group SteerCo and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed)) as a Plan Supplement document.  Through the Confirmation Date, the FBG Debtors will have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.

## B.     PLAN TREATMENT FAQS

1.  *What Claims and Interests Are Treated Under the Plan?*

The Plan *only* treats Claims against and Interests in the FBG Debtors (i.e., First Brands Group Holdings, LLC and its direct and indirect Debtor subsidiaries and Viceroy).  The Plan does not treat any Claims against or Interests in the SPV Debtors.  A full list of the FBG Debtors is attached hereto as **Exhibit H**.

2.  *Does the Estate Claims Credit Bid Impact Recoveries Under the Litigation Trust Waterfall?*

If the Estate Claims Credit Bid Transaction is consummated, the amount of the Estate Claims Credit Bid will not have any impact on the amount or allocation of distributions to creditors under the Litigation Trust Waterfall.  Under the Litigation Trust Waterfall, distributions to Class 2 Litigation Trust Interests may total up to the amount of the Allowed DIP A Claims as of the Confirmation Date, without any reduction for any Credit Bid Claims.

3.  *When and How Much Will Holders of Class 3 Litigation Trust Interests Recover on Account of Their Claims Under the Litigation Trust?*

Holders of Class 3 Litigation Trust Interests will recover distributions made to holders of Class 3 Litigation Trust Interests *pro rata* following the repayment in full of all Allowed Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims in accordance with the Litigation Trust Waterfall. Distributions to holders of Class 3 Litigation Trust Interests will be as follows:

20

- Class 3(a) Litigation Trust Interests—holders of Allowed Roll-Up Claims ($3.3 billion);

- Class 3(b) Litigation Trust Interests—holders of Allowed General Unsecured Claims and Allowed Subordinated Claims against one or more of the FBG Debtors (estimated at $5.6 billion in the aggregate); and

- Class 3(c) Litigation Trust Interests—holders of Allowed First Lien Claims and Allowed Second Lien Claims against the FBG Debtors (approximately $2.6 billion in the aggregate).

The amount and timing a holder will ultimately recover on account of its Class 3 Litigation Trust Interests will depend upon a number of factors, including the following: (i) the amount and timing of proceeds recovered by the Litigation Trust through the monetization of the Litigation Trust Assets, (ii) the amount of the particular holder's Allowed Claim, (iii) the aggregate amount of all Claims of holders of Class 3 Litigation Trust Interests sharing pro rata in the same distributions (which is currently estimated to be $11.5 billion, subject to reconciliation process), (iv) whether additional Litigation Trust funding is incurred by the Litigation Trust, and (v) the level of participation in the Administrative Expense Claims Consent Program. The Debtors currently estimate that potential Claims eligible to receive Class 3(b) Litigation Trust Interests total approximately $5.6 billion, all subject to the Claims Ombudsman's reconciliation process.

By way of illustration only: if the Litigation Trust were to obtain and distribute $3.0 billion in aggregate distributable proceeds, holders of Class 3 Litigation Trust Interests would ultimately receive $971 million in the aggregate. However, holders of Class 3 Litigation Trust Interests would receive no recoveries until Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims were repaid in full in accordance with the Litigation Trust Waterfall. This would require approximately $1.9 billion in aggregate distributions to be made before holders of Class 3 Litigation Trust Interests begin to recover. The holders of Class 3 Litigation Trust Interests (i.e., Allowed Roll-Up Claims, Allowed General Unsecured Claims, Allowed First Lien Claims, and Allowed Second Lien Claims) would share *pro rata* in the $971 million in proceeds representing an approximately 8.4% recovery on the assumed $11.532 billion in aggregate Claims. A holder of a Class 3 Litigation Trust Interest with an Allowed Claim in the amount of $10 million would therefore recover approximately $842,000 ($10 million / $11.532 billion x $971 million) on account of its Class 3 Litigation Trust Interest. *See* **Exhibit F** for a more detailed discussion of illustrative recovery scenarios.

The Debtors are not estimating, and cannot guarantee, individual recoveries because the proceeds generated from monetizing the Litigation Trust Assets will depend on litigation outcomes, settlements, defenses, collection risk, timing, and other uncertain factors.

4. *Who Can Vote on the Plan?*

Only holders of Claims against the FBG Debtors may be entitled to vote on the Plan on account of such Claims. These Claims include Roll-Up Claims (Class 3), First Lien Claims (Class 4), Second Lien Claims (Class 5), ABL Claims (Class 6), General Unsecured Claims (Class 7), and Subordinated Claims (Class 8). For the avoidance of doubt, subject to the Solicitation and Voting Procedures, a non-Debtor Affiliate that asserts a General Unsecured Claim against an FBG Debtor is not a holder of an Intercompany Claim in Class 9 (Intercompany Claims) and instead will receive a Class 7 (General Unsecured Claims) Ballot.

21

5. *Who Is Not Voting on the Plan?*

Holders of Claims against any SPV Debtor ("**Non-FBG Debtor Claims**") are not entitled to vote on the Plan on account of such Non-FBG Debtor Claims.  The Plan is proposed only by the FBG Debtors and does not classify or provide treatment on account of any Claims other than those against the FBG Debtors.

Additionally, (i) holders of Other Priority Claims (Class 1) and Other Secured Claims (Class 2) are not entitled to vote because those Claims are unimpaired, (ii) holders of Intercompany Claims (Class 9) are either plan proponents or controlled by Plan proponents and as such are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and (iii)  FBG Debtor Interests (Class 10) are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

6. *What Happens if There Is a Dispute Between the Trusts Over the Rightful Owner of an Asset?*

**Only assets that are not subject to a bona fide dispute can be transferred to the applicable Trust.**  An asset becomes a DIP Collateral Trust Asset only if (i) there is no bona fide dispute as to whether the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien senior to the ABL Liens, or (ii) any such dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien senior to the ABL Liens.

The same rule applies to the ABL Collateral Trust for ABL Priority Collateral.  An asset becomes an ABL Collateral Trust Asset only if (i) there is no bona fide dispute as to whether the ABL Secured Parties have a validly perfected Lien senior to the liens securing the DIP Claims, or (ii) any such dispute exists, including a dispute involving the ABL Liens and the Liens securing the DIP Claims, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected Lien senior to the Liens securing the DIP Claims.  Disputes about whether an asset is a Litigation Trust Asset, DIP Collateral Trust Asset, or ABL Collateral Trust Asset may be resolved by mutual consent of the DIP Secured Parties, the ABL Secured Parties, and/or the Litigation Trust, or by Final Order of the Bankruptcy Court.  No asset subject to a bona fide dispute vests in any Trust unless and until the parties agree or a court confirms the relevant lenders' validly perfected senior Lien.

7. *The FBG Debtors Will Retain Disputed Assets Until a Judgment is Rendered by a Competent Court of Law or a Settlement is Reached.  What is Happening to the Assets (Including Claims) of the SPV Debtors?*

Such Assets will remain in possession of the SPV Debtors, and all rights are reserved with respect to any disputes regarding ownership of assets between the FBG Debtors and the SPV Debtors, including disputes as to ownership of Inventory and certain Claims and Causes of Action.  To the extent any DIP Collateral Trust SPV Recoveries can be validly assigned under applicable law (including applicable provisions of the Internal Revenue Code, Treasury Regulations, and U.S. Customs regulations), the FBG Debtors and their successors will, at the direction of the DIP Collateral Trustee and at the DIP Collateral Trust's sole cost and expense (paid in advance), take all commercially reasonable actions to assign assets to the DIP Collateral Trust, including the execution of any assignment forms, powers of attorney, or other instruments required by any applicable governmental authority. To the extent any such assets cannot be validly assigned under applicable law, the FBG Debtors and their successors will, to the extent applicable, liquidate such assets at the direction and sole cost and expense of the DIP

22

Collateral Trust (paid in advance), and any proceeds received will be held in trust for the DIP Collateral Trust and promptly remitted to the DIP Collateral Trust.

8. ***What is the Estimated Amount of Claims for which Holders may Receive Class 3 Litigation Trust Interests?***

The total estimated amount of Allowed Claims for which holders may receive Class 3 Litigation Trust Interests is approximately $11.5 billion, which is comprised of (i) $3.3 billion of Allowed Roll-Up Claims, (ii) approximately $1.991 billion of First Lien Claims, (iii) approximately $600 million of Second Lien Claims, and (iv) approximately $5.6 billion of General Unsecured Claims. The estimated amount of General Unsecured Claims is based on the Debtors' books and records, Schedules and Statements, and proofs of claims filed, and is subject in all respects to the Claims Ombudsman's claims reconciliation process.

9. ***Have the Debtors Filed a Liquidation Analysis?***

The Debtors' position as to recoveries in a chapter 11 or chapter 7 scenario has been explained in the *Declaration of Charles M. Moore in Support of (I) The Proposed Confirmation Schedule and (II) The Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2911) (the "**Moore Declaration**"). A more formal liquidation analysis will be set forth in the Plan Supplement, but the Moore Declaration provides in relevant part:

> I expect administrative expense, priority, and unsecured creditors to be materially worse off in the event of conversion to chapter 7. As a threshold matter, all or substantially all of the Debtors' remaining assets, including most notably the claims and causes of action (or proceeds thereof) are encumbered by billions of dollars in secured claims. In total, certain Estate Claims are encumbered by as much as $7.9 billion in secured claims (approximately $4.9 billion in DIP Claims, $2.6 billion in term loan claims, and $400 million of ABL Claims). With respect to the Debtors' claims and causes of action and/or proceeds that were unencumbered on the Petition Date (including claims arising under chapter 5 of the Bankruptcy Code), the proceeds of such claims and causes of action are encumbered by at least $1.3 billion of DIP A Claims, and, with the possible exception of $200 million in administrative expense claims, the approximately $2.4 billion of DIP Claims reflected in the DIP Hurdle. Under the Joint Plan, however, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Litigation Trust recovers approximately $1.9 billion in proceeds.
>
> These and other substantial benefits of the Joint Plan would be lost in a chapter 7. I believe that in a chapter 7 scenario, a trustee would have no unencumbered assets with which to provide adequate protection, and the DIP Lenders would likely exercise remedies to foreclose on and/or otherwise control their collateral or would contest any attempt by a chapter 7 trustee to control estate claims or causes of action without their consent. This may result in no available recoveries for a chapter 7

23

trustee to pay any chapter 11 administrative expense, priority, or general unsecured claims.

Even assuming the chapter 7 debtors somehow maintained ownership and control over the Estate Claims, administrative creditors would still not be entitled to any recovery until after the DIP A Claims, any litigation financing claims, and chapter 7 administrative expenses were repaid in full.  Therefore, at a minimum, the first $1.3 billion in DIP A claims must be paid in full before any administrative expense creditor can receive any recovery.  After the DIP A Claims are satisfied in full in cash, administrative expense claims may receive only up to $200 million in total recoveries pursuant to the Administrative Expense Claims Basket established under the DIP Order.  Beyond that $200 million basket, no distributions to holders of remaining administrative expense claims may be made until the DIP Hurdle—totaling approximately $2.4 billion as of the anticipated Confirmation Date (comprising approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims)—is satisfied in full in cash.

Further, the DIP A Claims are estimated to be approximately $1.3 billion as of the anticipated Confirmation Date, and will not accrue post-petition interest for purposes of recoveries under the Litigation Trust Waterfall, which significantly benefits junior creditors.  However, in a chapter 7 scenario, the DIP A Claims will continue to accrue interest (at the default rate which adds an additional 2% per annum on top of the existing rate) until they are repaid in full.

Also, whereas the Joint Plan provides for a clear means of financing the Litigation Trust to monetize Estate Claims, a  chapter 7 trustee would not have access to litigation funding provided under the Joint Plan, or any funds or meaningful runway with which to pursue alternative funding.  In other words, upon conversion, a chapter 7 trustee would lack the means to pursue Estate Claims, including claims arising under chapter 5 of the Bankruptcy Code.  To the extent a trustee were able to secure funding, I believe such funding would likely be on significantly more expensive terms than provided in the Joint Plan.

Moore Declaration ¶¶ 24–28.

10. ***Does the Plan Provide for Substantive Consolidation of any of the Debtors?***

*Solely* for purposes of distributions under the Plan: (i) each Claim filed or to be filed against any FBG Debtor will be deemed filed as a single Claim against, and a single obligation of, the FBG Debtors; (ii) any Claims on account of a guarantee provided by an FBG Debtor of the obligations of another FBG Debtor will be treated as eliminated so that any Claim against any FBG Debtor and any Claim based upon a guarantee thereof by any other FBG Debtor will be treated as one Claim against a single consolidated Estate; and (iii) any joint or joint and several liability of any of the FBG Debtors will be one obligation of the FBG Debtors and any Claims based upon such joint or joint and several liability will be treated as one Claim against a single consolidated Estate.

24

**DEBTORS' EXHIBIT NO. 7**
**Page 170 of 272**

11. *How Will a General Unsecured Creditor of the FBG Debtors Know if their Claim is Subordinated?*

A Holder of a General Unsecured Claim who is a Specified Non-Released Party may have their claim reclassified as a Subordinated Claim in Class 8. There is a chance that certain other General Unsecured Claims may later be determined by a Final Order to be subject to subordination under section 510(c) of the Bankruptcy Code. Holders of Subordinated Claims will only be entitled to receive distributions from the Litigation Trust distributable proceeds after all other holders of Class 3 Litigation Trust Interests receive distributions in the full amount of their Allowed Claims in the aggregate. Given the estimated aggregate amount of senior claims that may be entitled to priority distributions under the Litigation Trust Waterfall, the Debtors believe that holders of Subordinated Claims are unlikely to receive any distributions under the Plan.

### C.     ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROCESS & PROCEDURES

In light of the amount of secured, administrative, and priority claims asserted against the FBG Debtors' estates, as well as the anticipated extended timeline for the FBG Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan.

Accordingly, to accelerate cash payments to consenting holders of Allowed Administrative Expense Claims, the Plan provides for a compromise whereby the holders of Administrative Expense Claims that timely, properly, and affirmatively opt-in to the Administrative Expense Claims Consent Program will have their Administrative Expense Claim deemed Allowed in an amount equal to 50% of the Reconciled Amount (as defined below) (the "**Settled Administrative Expense Claim**") and following $350 million of distributable proceeds paid to holders of Class 1 Litigation Trust Interests and Class 2 Litigation Trust Interests will receive distributions, in accordance with the Litigation Trust Waterfall, prior to holders of Administrative Expense Claims who do not opt in to the Administrative Expense Claims Consent Program until the aggregate amount of the Settled Administrative Expense Claims is satisfied in full in accordance with Section 6.5 of the Plan.

**If holders of Administrative Expense Claims disagree with the amount listed as the Reconciled Amount on their Consent Program Opt-In Form or did not receive a Consent Program Opt-In Form but believed they should have, but still wish to participate in the Administrative Expense Claims Consent Program, such holders are encouraged to contact the Claims Ombudsman at the contact information provided in the Consent Program Opt-In Form.**

Following entry of the Confirmation Order, Kroll Restructuring Administration LLC ("**Kroll**") will send holders of Administrative Expense Claims, as identified by the FBG Debtors' books and records as of the Administrative Claims Record Date (**July 10, 2026**), an opt-in form (the "**Consent Program Opt-In Form**"), which will identify the FBG Debtors' proposed Reconciled Amount and corresponding Settled Administrative Expense Claim amount, equal to 50% of the Reconciled Amount for such holder; *provided that* the FBG Debtors will not send Consent Program Opt-In Forms to holders of (i) Professional Fee Claims; (ii) DIP A Claims; (iii) Roll-Up Claims; (iv) Intercompany Claims; or (v) Priority Tax Claims.[9] Unless otherwise agreed to in writing (e-mail being sufficient) by the FBG

---

[9]   The FBG Debtors reserve all rights to dispute or seek to disallow any asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the FBG Debtors.

Debtors and the holder of the applicable Administrative Expense Claim, holders of Administrative Expense Claims will have until **60 days following the Confirmation Date** (the "**Consent Program Opt-In Deadline**") to submit a Consent Program Opt-In Form in either electronic or paper form, in each case following the procedures outlined in the Disclosure Statement Order (the "**Consent Program Opt-In Procedures**") and explained in the Consent Program Opt-In Form.

To the extent a holder of an Administrative Expense Claim timely, properly, and affirmatively opts in to the Administrative Expense Claims Consent Program, such holder will be deemed to have agreed that its Administrative Expense Claim is Allowed in the amount of its Settled Administrative Expense Claim, in exchange for distributions from the Litigation Trust in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan on account of such Settled Administrative Expense Claim in full and final satisfaction, compromise, settlement, and release of and in exchange for each such Administrative Expense Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.  Holders of Administrative Expense Claims that do not timely, properly, and affirmatively opt in to the Administrative Expense Claims Consent Program will have their Administrative Expense Claims treated in accordance with Section 2.1 of the Plan and, to the extent such Administrative Expense Claims become Allowed by the Bankruptcy Court (through settlement or adjudication), will be paid in full in Cash on the later of (a) the Effective Date, and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

Distributions on account of Settled Administrative Expense Claims will be paid from the Litigation Trust in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan. Under the Litigation Trust Waterfall, once aggregate distributions from the Litigation Trust exceed the Second Return Threshold ($350 million), 16% of distributable proceeds will be distributed to holders of Class 3 Litigation Trust Interests and holders of Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims.  Those proceeds will be distributed in the following order: **first**, to holders of Settled Administrative Expense Claims, who opt-in to the Administrative Expense Claims Consent Program on such holders' Consent Program Opt-In Form, pro rata based on the aggregate amount of Settled Administrative Expense Claims, until each such holder has received distributions equal to the Allowed amount of its Settled Administrative Expense Claim; and **second**, to other holders of Allowed Administrative Expense Claims.  Thus, holders who do not opt-in to participate in the Administrative Expense Claims Consent Program will only begin to receive distributions from the Litigation Trust following payment in full of all Settled Administrative Expense Claims.

### D.   ADMINISTRATIVE CONSENT PROGRAM FAQs

1. ***How Do I Opt In to the Administrative Expense Claims Consent Program, and What Happens if I Opt In?***

All holders of Administrative Expense Claims accruing on or prior to July 10, 2026 will receive an Administrative Expense Claims Consent Program Opt-In Form that will allow such holder to opt in to the Administrative Expense Claims Consent Program.  The deadline to opt into the Administrative Expense Claims Consent Program is sixty (60) days following the Confirmation Date.

Administrative Expense Claimholders who do not timely, properly, and affirmatively opt into the Administrative Expense Claims Consent Program will receive distributions from the Litigation Trust following payment in full of Settled Administrative Expense Claims.

*Illustrative Example*

As an illustrative example, assuming that the total amount of Allowed Administrative Expense Claims is consistent with the FBG Debtors' good faith estimate of approximately $222 million in the aggregate, and the holders of exactly 50% (in dollar amount) of Allowed Administrative Expense Claims opt-in to the Administrative Expense Claims Consent Program, the holders participating in the Administrative Expense Claims Consent Program would agree to settle their $111 million in Administrative Expense Claims for approximately $56 million in Settled Administrative Expense Claims against the FBG Debtors' estates while all non-participating Allowed Administrative Expense Claims would hold $111 million in Allowed Administrative Expense Claims.

As Settled Administrative Expense Claims receive distributions from the Litigation Trust Waterfall beginning at $350 million of aggregate distributable proceeds, in this example Settled Administrative Expense Claims would be satisfied in full prior to payment to any other Allowed Administrative Expense Claim when approximately $697 million in distributable proceeds have been paid out in total under the Litigation Trust Waterfall.  The $111 million in remaining Allowed Administrative Expense Claims would then begin to recover, and would only be satisfied in full after approximately $1.4 billion in aggregate distributions have been made.

To illustrate this further, a holder of a $2 million Allowed Administrative Expense Claim (i.e. the Reconciled Amount) that opts into the Administrative Expense Claims Consent Program would have a $1 million Settled Administrative Expense Claim.  They would receive satisfaction in full of $1 million after $697 million of aggregate distributions are made.

A holder of a $2 million Allowed Administrative Expense Claim who does not opt in would only begin to be paid upon the satisfaction in full of Settled Administrative Expense Claims.  That holder would recover $1 million when approximately $1.04 billion of distributable proceeds have been paid out, and would recover the full $2 million when approximately $1.4 billion in distributable proceeds have been paid out. The below illustrative chart demonstrates this outcome.

| Decision | Aggregate Distributions | | | | |
|---|---|---|---|---|---|
| | Allowed Administrative Expense Claim Amount | Settled Administrative Expense Claim Amount | Amount Received Upon Full Satisfaction | Threshold to Begin Receiving Distributions | Threshold for Full Satisfaction of Claim |
| Affirmative Opt In | $2 million | $1 million | $1 million | $350 million | $697 million |
| No Opt In | $2 million | N/A | $2 million | $697 million | $1.4 billion |

The foregoing example is provided solely for illustrative purposes.  The Debtors cannot guarantee (1) any level of participation in the Administrative Expense Claims Consent Program or (2) the amount or timing of recoveries.

2. ***What Happens if a Holder of an Administrative Expense Claim Does Not Opt In?***

**All holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-in to the Administrative Expense Claims Consent Program will be paid in full on the Effective Date.**  However, the timing of the Effective Date and distributions to holders of Allowed

27

Administrative Expense Claims who do not opt in are indeterminate, are not required to be reserved for, and will depend in part on the level of participation in the Administrative Expense Claims Consent Program.  Further, in the event the Litigation Trust is unable to make distributions sufficient to satisfy Allowed Administrative Expense Claims in full, payments made to holders of Settled Administrative Expense Claims are not subject to clawback or disgorgement.  The Debtors anticipate that the more holders that choose not to timely, properly, and affirmatively opt-in to the Administrative Expense Claims Consent Program, the longer it will take for the FBG Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially contributing to risking the occurrence of the Effective Date.

3.   *Which Holders of Administrative Expense Claims are Eligible to Participate?*

All holders of Administrative Expense Claims are eligible to participate and will receive an Administrative Expense Claims Consent Program Opt-In Form other than holders of (i) Professional Fee Claims; (ii) DIP A Claims; (iii) Roll-Up Claims; (iv) Intercompany Claims, (v) Priority Tax Claims.

If holders of Administrative Expense Claims did not receive a Consent Program Opt-In Form but believed they should have and wish to participate in the Administrative Expense Claims Consent Program, such holders are encouraged to contact the Claims Ombudsman.

4.   *How Will the Debtors Calculate Each Reconciled Amount?*

As detailed above, the FBG Debtors will provide each applicable holder of an Administrative Expense Claim with a Consent Program Opt-In Form.  Each Consent Program Opt-In Form will display a proposed Allowed Administrative Expense Claim amount for the recipient holder (each, a "**Reconciled Amount**"). The FBG Debtors have calculated each Reconciled Amount based upon the FBG Debtors' review of their books and records, stipulations and agreed orders entered into between the FBG Debtors and holders of Administrative Expense Claims, and the results of their efforts to reconcile all Administrative Expense Claims filed with the Bankruptcy Court.

5.   *What Happens if a Holder Disagrees with their Reconciled Amount?*

If a particular holder of an Administrative Expense Claim disagrees with the amount listed as the Reconciled Amount but still wishes to participate in the Administrative Expense Claims Consent Program, that holder is encouraged to contact the Claims Ombudsman as soon as possible upon receipt of the Administrative Expense Claims Consent Program Opt-In Form.

6.   *When do Holders of Allowed Administrative Expense Claims Begin to Receive Recoveries and from what Assets of the FBG Debtors?*

Holders of Allowed Administrative Expense Claims (including Settled Administrative Expense Claims) are entitled to receive distributions from the Litigation Trust following $350 million in aggregate distributions from the Litigation Trust as described below and set forth in Section 6.5 of the Plan.

Under the Litigation Trust Waterfall, the first $350 million in aggregate distributions from the Litigation Trust will be made to Litigation Trust Funding Contributors and holders of DIP A Claims on account of their Class 1 and Class 2 Litigation Trust Interests in accordance with Section 6.5(a)(i)–(ii) of the Plan.  Holders of Allowed Administrative Expense Claims will receive no distributions from this initial $350 million.

Following $350 million in aggregate distributions, 16% of aggregate distributions from the Litigation Trust above $350 million will be paid in the following order until the holders of each of these claims are paid in full:

First, to Settled Administrative Expense Claims;

Second, to Allowed Administrative Expense Claims;

Third, to Allowed Priority Tax Claims; and

Fourth, to Allowed Other Priority Claims.

When the Allowed DIP A Claims have been paid in full, the share of proceeds to be distributed from the Litigation Trust in the above order will increase from 16% to 90%, with the remaining 10% going to the Litigation Trust Funding Contributors on account of their Class 1 Litigation Trust Interests.

Additionally, to the extent Allowed Administrative Expense Claims have not been repaid in full, holders of Allowed Administrative Expense Claims are also entitled to receive distributions from the DIP Collateral Trust, as set forth in Section 7.4 of the Plan, if the Allowed DIP A Claims have been repaid in full from the aggregate distributions made from the Litigation Trust and DIP Collateral Trust. Moreover, following the repayment in full of Allowed ABL Claims, any remaining ABL Priority Collateral will be transferred to the DIP Collateral Trust and distributed in accordance with the DIP Collateral Trust Waterfall, including to holders of Allowed Administrative Expense Claims in accordance with Section 7.4 of the Plan.

7. ***When do the FBG Debtors Anticipate the Effective Date Will Occur?***

Based on the FBG Debtors' reasonable estimates, the FBG Debtors are estimating that the Effective Date is reasonably likely to occur in the second half of 2028, although the Effective Date may reasonably or in fact occur earlier or later than the second half of 2028.

### E.      PREFERENCE SETTLEMENT ELIGIBLE CREDITOR FAQs

**The Preference Settlement is optional and available only to Trade Creditors, Supply Chain Financers, and Factors that satisfy the Plan's requirements. To opt in, a creditor must timely submit the Preference Settlement Election Form. By opting in, the creditor agrees to participate in the Preference Settlement, receive its benefits, grant the releases in Section 13.5(b) of the Plan, and contribute any Direct Creditor Claims to the Litigation Trust.**

Trade Creditors, Supply Chain Financers, and Factors that timely, properly, and affirmatively opt in to the Preference Settlement on the Preference Settlement Election Form (i.e., Preference Settlement Electing Creditors) agree to (i) participate in, and receive the benefits of, the Preference Settlement, (ii) be a Releasing Party and grant the releases contained in Section 13.5(b) of the Plan, and (iii) contribute all of their direct (non-derivative) Claims against non-Debtor parties (other than a Released Party) that relate to First Brands' prepetition operations ("**Direct Creditor Claims**") to the Litigation Trust.

Trade Creditors, Supply Chain Financers, and Factors have until forty-five (45) days following the Confirmation Date to opt in to the Preference Settlement, which means, assuming a Confirmation Date of July 28, 2026, such creditors will have until September 11, 2026 to opt in to the Preference Settlement. If a Preference Action is brought against a Trade Creditor that did not timely opt in, such Trade Creditor has an additional thirty (30) days after service of the Preference Action to opt in. If a

Trade Creditor, Supply Chain Financer, or Factor does <u>not</u> opt in, it will <u>not</u> receive the Preference Settlement benefits, will <u>not</u> grant the third-party releases set forth in the Plan, and will <u>not</u> contribute its Direct Creditor Claims, if any, to the Litigation Trust.  Preference Actions may be brought against any non-opting Trade Creditors, Supply Chain Financer, or Factor in accordance with the Plan.

Trade Creditors that are Preference Settlement Electing Creditors will be released from Preference Actions under the Plan, and Supply Chain Financers and Factors that are Preference Settlement Electing Creditors will receive the benefit of certain procedures, including the Modified New Value Element, with respect to Preference Actions asserted against them, as described in more detail in <u>Section 6.11</u> of the Plan.  Preference Settlement Eligible Creditors that fail to timely opt in to the Preference Settlement will not be Preference Settlement Electing Creditors and will not receive the benefits of the Preference Settlement, and Preference Actions against such Persons may be commenced and prosecuted in accordance with the terms of the Plan.  There is a possibility that a Trade Creditor, Supply Chain Financer, or Factor that timely, properly, and affirmatively opts in may later be determined to be ineligible for the Preference Settlement in accordance with <u>Section 6.11</u> of the Plan, in which case such creditor would no longer receive the benefits of the Preference Settlement and will not be a Releasing Party.

1.   ***What is the Deadline to Make the Preference Settlement Election?***

Within three (3) business days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, Kroll will send the Preference Settlement Election Form to all known Trade Creditors, Supply Chain Financers, and Factors of the FBG Debtors.  As previously stated, unless otherwise agreed to in writing (e-mail being sufficient) by the FBG Debtors or the Litigation Trustee, Trade Creditors, Supply Chain Financers, and Factors will have until forty-five (45) days following the Confirmation Date to opt in to the Preference Settlement by submitting a completed Preference Settlement Election Form in either electronic or paper form, in each case following the procedures outlined in the Preference Settlement Election Form; *provided* that if a Preference Action is brought against a Trade Creditor that did not timely opt in to the Preference Settlement, such Trade Creditor will have an additional thirty (30) days following service of the Preference Action to opt in to the Preference Settlement.  Any demand or summons related to a Preference Action against a Trade Creditor that is not a Preference Settlement Electing Creditor will reiterate in clear and conspicuous language the extended deadline to participate in the Preference Settlement.

2.   ***What Happens if a Preference Settlement Electing Creditor is Subsequently Determined to be Ineligible to Participate in the Preference Settlement?***

If it is determined that Preference Settlement Electing Creditor is ineligible to participate in the Preference Settlement, in accordance with the Plan, such creditor will no longer receive the benefits of the Preference Settlement and the waiver of Preference Actions (for Trade Creditors) or the modified new value defense to Preference Actions (for Supply Chain Financers or Factors) will be reversed. **In such an instance, such creditor will not regain ownership and/or control of their Direct Creditor Claims.**  However, such Preference Settlement Electing Creditor's grant of Third-Party Releases will be reversed and such creditor will no longer be a "Releasing Party" (or a Released Party) under the Plan.

**DEBTORS' EXHIBIT NO. 7**
**Page 176 of 272**

### F.    SUMMARY OF PLAN TREATMENT

The following table summarizes (i) the type of Claims and Interests against the FBG Debtors under the Plan, (ii) which Classes are impaired by the Plan, and (iii) which Classes are entitled to vote on the Plan.  Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims are not classified and will be treated in accordance with the Plan.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| N/A | DIP A Claims | Except to the extent that a holder of an Allowed DIP A Claim agrees to less favorable treatment of such Claim, on the Confirmation Date, each such holder shall receive, in full and final satisfaction, settlement, and release of such Allowed DIP A Claim (other than the Remaining DIP A Claim), (i) on account of the Estate Claims Credit Bid, its Pro Rata Share of the Class 2 Litigation Trust Interests; (ii) on account of the DIP Collateral Credit Bid, its Pro Rata Share of the Class 2 DIP Collateral Trust Interests;  (iii) if applicable, on account of any Initial Litigation Trust Funding Commitments, its pro rata share of the Class 1 Litigation Trust Interests in accordance with the Litigation Trust Agreement; and (iv) if applicable, on account of any DIP Collateral Trust Funding, its pro rata share of the Class 1 DIP Collateral Trust Interests in accordance with the DIP Collateral Trust Agreement.   The Remaining DIP A Claims will not be discharged or released under the Plan, will remain enforceable against the DIP Loan Parties and Parent Guarantors, and/or the SPV Debtors, as applicable, and will continue to accrue interest, fees, and expenses in accordance with the DIP | N/A | $1,335,000,000 |

---

[10]   The estimated Allowed amount of the Claims in each Class is based on, among other things, the Debtors' books and records and the Debtors' and their advisors' analysis of the merits of each asserted Claim, and is subject to potential litigation and disagreement by the holders of such Claims.

31

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| | | Order~~, until the Effective Date, at which point such Claims will be released~~; *provided* that, for the avoidance of doubt, any such accruals following the Confirmation Date shall not increase the amounts distributable to holders of Class 2 Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan. | | |
| 1. | Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Other Priority Claim becomes an Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction, settlement, and release of such Allowed Other Priority Claim: (i) Cash distributions from the Litigation Trust in an amount equal to such Allowed Other Priority Claim payable by the Litigation Trust in accordance with the Litigation Trust Waterfall; or (ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | $0 |
| 2. | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement, and release of such Allowed Other Secured Claim, at the option of the Claims Ombudsman: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) the Effective Date, and (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim | Unimpaired<br><br>(Not entitled to vote because presumed to accept) | $0 |

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| | | Unimpaired. | | |
| 3. | Allowed Roll-Up Claims | Except to the extent that a holder of an Allowed Roll-Up Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Roll-Up Claim (other than the Remaining Roll-Up Claims), on the Confirmation Date, each such holder will receive, on account of its Allowed Roll-Up Claim, its Pro Rata Share of the Class 3(a) Litigation Trust Interests.  The Roll-Up Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Roll-Up Claims under the Litigation Trust Waterfall as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining Roll-Up Claims**"), will not be discharged or released on the Confirmation Date, will remain enforceable against the DIP Loan Parties, Parent Guarantors, and/or the SPV Debtors, as applicable, and will continue to accrue interest, fees, and expenses in accordance with the DIP Order, until the Effective Date, at which point such Remaining Roll-Up Claims will be released; *provided* that, for the avoidance of doubt, any such accruals, following the Confirmation Date shall not increase the amounts distributable to holders of Class 3(a) Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan. | Impaired<br><br>(Entitled to vote) | $3,300,000,000[11] |
| 4. | First Lien Claims | Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and | Impaired<br><br>(Entitled to vote) | $1,991,000,000 |

---

[11]   The total amount of Roll-Up Claims is equal to approximately $3,577,000,000; *however*, in connection with the Plan Settlement and for purposes of receiving Class 3(a) Litigation Trust Interests, the Roll-Up Claims are deemed Allowed against the FBG Debtors under the Plan in the amount of $3,300,000,000.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| | | release of such Allowed First Lien Claim (other than Remaining First Lien Claims), on the Confirmation Date, each such holder will receive, on account of its Allowed First Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The First Lien Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed First Lien Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining First Lien Claims**"), will remain outstanding until the Effective Date, at which point such Remaining First Lien Claims will be deemed to be released. | | |
| 5. | Second Lien Claims | Except to the extent that a holder of an Allowed Second Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Second Lien Claim (other than Remaining Second Lien Claims), on the Confirmation Date, each such holder will receive, on account of its Allowed Second Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The Second Lien Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Second Lien Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining Second Lien Claims**"), will remain outstanding until the Effective Date, at which point such Remaining Second Lien Claims will be deemed to be released. | Impaired (Entitled to vote) | $600,000,000 |
| 6. | ABL Claims | On the Confirmation Date, pursuant to sections 105   363(b)   and   (f),   and 1123(a)(5)(D) of the Bankruptcy Code, the ABL Agent, by and on behalf of the ABL Secured Parties, will be deemed to have foreclosed upon the ABL Collateral Trust Assets of the FBG Debtors and | Impaired (Entitled to vote) | $367,000,000[12] |

---

[12]   For the avoidance of doubt, the Allowed amount of the ABL Claims for voting purposes will exclude the U.S. Bank Obligations (as defined in the DIP Order).

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| | | transferred all such assets to the ABL Collateral Trust.  Except to the extent that a holder of an Allowed ABL Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed ABL Claim, on the Confirmation Date, each such holder will receive, on account of its Allowed ABL Claim, its Pro Rata Share of the ABL Collateral Trust Interests.  The ABL Claims against the ABL Loan Parties in excess of the fair market value of the ABL Collateral Trust Assets, as determined in accordance with Section 8.11(d)(ii) of the Plan (the "**ABL Deficiency Claims**"), will remain outstanding and enforceable against such ABL Loan Parties; *provided* that such ABL Deficiency Claims will not be secured by the ABL Collateral Trust Assets, which assets will be held free and clear of ABL Deficiency Claims by the ABL Collateral Trust; *provided further* that, on the Confirmation Date and immediately following the foreclosure upon the ABL Collateral Trust Assets, the holders of the ABL Deficiency Claims will be deemed to have contributed all of their rights, title, and interests in respect of any amounts or proceeds to be realized on account of the ABL Deficiency Claims to the ABL Collateral Trust to be distributed in accordance with the waterfall set forth in Section 8.3 of the Plan.<br><br>To the extent the ABL Secured Parties hold Allowed ABL Claims that are oversecured (i.e., the value of the ABL Priority Collateral exceeds the Allowed amount of the ABL Claims), as determined by the Bankruptcy Court, the holders of such Allowed ABL Claims will be entitled to receive postpetition interest on such Claims at the applicable contractual rate under the ABL Credit Agreement to the extent permitted by section 506(b) of the Bankruptcy Code, which interest will be paid from the ABL Collateral Trust Assets prior to any turnover of excess proceeds to the DIP Collateral Trust pursuant to | | |

35

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|-------|-------------|----------------------|-----------------------------------|------------------------------|
| | | Section 7.12 of the Plan. | | |
| 7. | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final settlement and release of such Allowed General Unsecured Claim, on the Confirmation Date, each such holder will receive its Pro Rata Share of the Class 3(b) Litigation Trust Interests. | Impaired<br><br>(Entitled to vote) | $5,641,000,000 |
| 8. | Subordinated Claims | All Subordinated Claims, if any, will be cancelled, released, and extinguished, and will be of no further force or effect, and holders of Allowed Subordinated Claims will receive their Pro Rata Share of the Class 3(b) Litigation Trust Interests. | Impaired<br><br>(Entitled to Vote) | TBD |
| 9. | Intercompany Claims | On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims will be adjusted, reinstated, or released to the extent reasonably determined to be appropriate by the Wind Down Administrator; *provided* that no distributions will be made on account of Intercompany Claims. | Impaired<br><br>(Not entitled to vote because presumed to accept) | TBD |
| 10. | FBG Debtor Interests | On the date that an FBG Debtor's Chapter 11 Case is closed (which in the case of FBGH and Viceroy, will not occur until all distributions under the Plan with respect to the FBG Debtors have been made), and without the need for any further corporate or limited liability company action or approval of any members, board of managers, managers, management, or Interest holders of such FBG Debtor, all FBG Debtor Interests in such FBG Debtor will be cancelled, and holders of FBG Debtor Interests in such FBG Debtor will not receive any distributions on account of such FBG Debtor Interests unless and until any Allowed Claims for which such FBG Debtor has a continuing obligation to pay following the Confirmation Date are satisfied in full, in which case each holder of an FBG Debtor Interest in such FBG Debtor will receive its Pro Rata Share of any residual distributable value of such FBG Debtor. The continuing rights of holders of Debtor Interests in FBGH and Viceroy will be nontransferable and | Impaired<br><br>(Not entitled to vote because deemed to reject) | N/A |

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] |
|---|---|---|---|---|
| | | non-assignable except by will, intestate, succession, or (subject to the prior written consent of the Wind Down Administrator, which is not to be unreasonably withheld) operation of law. | | |

Pursuant to the Bankruptcy Code, only those holders of Claims or Interests in classes that are impaired under a chapter 11 plan and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan.  Classes of Claims or Interests in which the holders of Claims or Interests are unimpaired under a proposed plan are presumed to have accepted such proposed plan and are not entitled to vote to accept or reject the plan.  Classes of Claims or Interests in which the holders of Claims or Interests receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the plan.

*Treatment of Administrative Expense Claims[13]*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each such holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, and release of such Administrative Expense Claim, (i) Cash payable by the Litigation Trust and/or the DIP Collateral Trust in accordance with the Litigation Trust Waterfall and the DIP Collateral Trust Waterfall, as applicable, in an amount equal to such Allowed Administrative Expense Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

*Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction, settlement, and release of such Allowed Priority Tax Claim, at the option of the Claims Ombudsman, either: (i) Cash payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) equal annual Cash payments payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Claims Ombudsman reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time

---

[13]   For the avoidance of doubt, Administrative Expense Claims do not include any Professional Fee Claims or Restructuring Expenses.

under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### G.    ESTATE CLAIMS MARKETING PROCESS

Pursuant to the Plan, on the Confirmation Date or as soon as reasonably practicable thereafter, unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee (not to be unreasonably withheld, conditioned, or delayed)), the FBG Debtors will sell, assign, convey, transfer, and deliver the Litigation Trust Assets, and transfer such assets to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).

As an alternative to the Estate Claims Credit Bid, the Debtors are conducting a marketing and sale process for the Litigation Trust Assets, including the Estate Claims, to solicit potential higher or better bids for all Litigation Trust Assets (the "**Estate Claims Marketing Process**").  The Estate Claims Marketing Process is a supplement to the larger Sale Process (as defined below) that the Debtors initiated in January 2026, which included a sale of certain of the Debtors' businesses (in whole or in part).  The Debtors launched the Estate Claims Marketing Process on May 4, 2026, including commencing outreach to approximately 26 financial and strategic bidders and providing bidders with access to a virtual dataroom that includes documents relevant to the Estate Claims.  Any party interested in submitting a bid should contact Charles M. Moore (cmoore@alvarezandmarsal.com), Nicholas Haughey (nhaughey@alvarezandmarsal.com), James Mennie (jmennie@alvarezandmarsal.com), and Matt Uhrin (muhrin@alvarezandmarsal.com).

The Estate Claims Marketing Process will permit an informed comparison of available alternatives and be performed consistent with procedures outlined in the marketing materials annexed hereto as **Exhibit E** (the "**Marketing Materials**"); *provided* that the Debtors may extend that deadline in their sole discretion subject to providing notice to all bidders who expressed interest up to that date, among other procedures.  The Debtors originally contemplated a bid deadline of May 22, 2026, but have since extended such deadline to June 21, 2026 (the "**Bid Deadline**").  The Debtors will review and consider proposed transactions, and identify any qualified bid that constitutes the highest or otherwise best value for the Debtors' assets and for the benefit of the Debtors' Estates.  Below is a list of requirements to constitute a Qualified Bid (which may be supplemented or modified by the Debtors):

- Bid must be a cash bid to acquire all Estate Claims;
- Bidder must provide a cash deposit of no less than 10% of the total amount of such bid; and
- Bid must provide a binding commitment to consummate the transaction in form and substance satisfactory to the Debtors, including a commitment that the closing of such proposed sale is not contingent on any conditions other than entry of an order, in form acceptable to the potential buyers and sellers, approving such sale by the Bankruptcy Court.

If any Bidders are (i) any defendants named or to be named in the James Complaint or Onset Complaint or otherwise have any interest in such adversary proceedings, or (ii) any Person that is or may become the target of an Estate Claim, then such bidder may be excluded from receiving diligence materials in connection with such bid in the Debtors' sole discretion.

The Estate Claims Marketing Process will run simultaneously with the solicitation of the Plan, with the goal of securing potentially higher recoveries for the Debtors' creditors.  The Debtors, in their

sole discretion, reserve the right to adjourn, modify, or cancel the Estate Claims Marketing Process at any time, including to cancel the Estate Claims Marketing Process entirely.

**To the extent that no bid is received by the Bid Deadline or no bid is received that the Debtors determine provides a higher recovery for the Debtors' creditors than the benefits and recoveries being provided by the Estate Claims Credit Bid and Plan, including the Plan Settlement the Debtors will cancel the Estate Claims Marketing Process and may file, at the Debtors' sole discretion, a notice on the docket confirming such course of action and extending the Bid Deadline.**

For the avoidance of doubt, the Estate Claims Credit Bid is non-severable from the terms of the Plan and Plan Settlement.

To the extent the FBG Debtors determine that an alternative offer is in the best interests of the estates and would result in a higher recovery to the FBG Debtors' creditors than the Estate Claims Credit Bid, the Debtors will make the appropriate disclosures no later than ~~June 22~~July 7, 2026, the Debtors will not proceed with confirmation of the Plan, final approval of the Disclosure Statement, and will schedule a hearing to approve such alternative sale.  The timeline for the Estate Claims Marketing Process is as follows:

| Estate Claims Marketing Process Timeline | |
|---|---|
| **Key Event** | **Proposed Date or Deadline** |
| Deadline to Submit Binding Bids | ~~June 21~~**July 6**, 2026 at 5:00 p.m. (Central Time) |
| Qualified Bid Deadline (Debtors to Notify Bidders of Status as Qualified Bidder) | ~~June 21~~**July 6**, 2026 |
| Deadline to Announce Successful Bidder | ~~June 22~~**July 7**, 2026 |
| Deadline to File Objections to Sale Transaction | **July 20, 2026 at 5:00 p.m. (Central Time)** |

## H.     CONFIRMATION TIMELINE

The below chart summarizes a proposed timeline for the solicitation and confirmation of the Plan (as set forth in more detail in the Solicitation and Voting Procedures).

| Proposed Solicitation and Confirmation Table | |
|---|---|
| ~~Conditional~~ Disclosure Statement ~~Hearing~~Approval Order | **June 12, 2026** ~~**at 10:00 a.m. (Central Time)**~~ |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, Non-Voting Packages, Consent Program Election Materials, and Preference Settlement Materials | **No later than 3 business days after entry of the Proposed Order, or as soon as reasonably practicable thereafter** |
| Voting Record Date and Preference Settlement Record Date | **June 15, 2026** |

**DEBTORS' EXHIBIT NO. 7**
**Page 185 of 272**

| | |
|---|---|
| Plan Supplement Filing Deadline | **June 22, 2026** |
| Litigation Trust Distribution Record Date & DIP Collateral Trust Distribution Record Date | **June 22, 2026 (which date may be extended by mutual agreement)** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **July 3, 2026 at 5:00 p.m. (Central Time)** |
| Rule 3018(a) Motion Deadline and Administrative Claims Record Date | **July 10, 2026 at 5:00 p.m. (Central Time)** |
| Litigation Trust Interest Response Deadline & DIP Collateral Trust Interest Response Deadline | **July 13, 2026 (which date may be extended by mutual agreement)** |
| Voting Deadline and Release Opt-In Deadline | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Deadline to Object to Disclosure Statement and Plan | **July 20, 2026 at 5:00 p.m. (Central Time)** |
| Ballot Certification Deadline | **July 27, 2026** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 27, 2026** |
| ~~Requested~~ Combined Hearing | **July 28, 2026 ~~(subject to the Court's availability~~at 9:00 a.m. (Central Time)** |
| Preference Settlement Opt-In Deadline | **5:00 p.m. (Central Time) on the date that is forty-five (45) days following the Confirmation Date (subject to a thirty (30) day extension if a Preference Action is brought against a Trade Creditor that did not timely opt in)** |
| Consent Program Opt-In Deadline | **5:00 p.m. (Central Time) on the date that is sixty (60) days following the Confirmation Date** |

## I.      INQUIRIES

If you have any questions regarding this Disclosure Statement or the packet of materials you have received in connection herewith, please contact Kroll, at +1 (877) 631-1151 (U.S. and Canada; toll-free) or +1 (646) 290-7146 (International, toll) or via e-mail message to: firstbrandsinfo@ra.kroll.com.

## II.  OVERVIEW OF DEBTORS' OPERATIONS

### A.      HISTORY & FORMATION

First Brands was formed in 2013 under the name Crowne Industrial Group by the Company's Founder.  Headquartered in Cleveland, Ohio, First Brands was a leading supplier of aftermarket parts. First Brands' key product categories included brakes, filters, wipers, lights, pumps, and towing solutions. As of the commencement of these chapter 11 cases, the Company employed an estimated approximately

40

26,000 people across five continents, with approximately 6,000 people employed by the Debtors in the U.S., and owned distribution centers, factories, and warehouses around the world as part of a global network of manufacturing and vertically-integrated distribution centers. Helming a diverse portfolio of over twenty-five iconic brands, including household names such as "FRAM" and "Raybestos," First Brands maintained a market position in all aftermarket sales channels, including automotive retailers, aftermarket vehicle dealerships, retail, mass merchants, warehouse distributors, e-commerce, and direct sales to OEMs in the automotive industry.

Between 2013 and 2014, the Company expanded its product offerings by acquiring brands such as Carter Fuel Pumps and Trico, a premium producer and distributor of windshield wiper blades. Beginning in 2019, the Company underwent further expansion by acquiring multiple reputable and, in some cases, decades- or century-old brands, to expand its portfolio of product offerings, with the goal of becoming a leading supplier of a wide variety of products across the aftermarket parts industry. In fewer than 15 years, the Company consummated over 15 acquisition transactions, growing its portfolio to a total of over 25 iconic automotive brands and establishing a significant market share in the global aftermarket parts industry.

In the aftermarket, as of the commencement of these chapter 11 cases, the Company's customer base included several large automotive retailers (including Advance Auto Parts, AutoZone, O'Reilly's, and Napa Auto Parts), wholesale distributors (including United Auto Supply, Federated Auto Parts, and Fischer Auto Parts), and national commercial retailers (including Walmart, Costco, and Amazon). In the OEM market, the Company's customer base includes some of the world's foremost OEMs, including Ford Motor Company, General Motors LLC, Harley-Davidson, Inc., Honda Development & Manufacturing of America, LLC, Polaris Industries Inc., Audi Mexico S.A. de C.V., FCA US LLC, International Motors, LLC, Nissan North America, Inc., Mercury, a division of Brunswick Corporation, Volkswagen de Mexico, S.A. de C.V., Volkswagen Group of America, Inc., Volvo Penta of the Americas, LLC, and BMW Manufacturing Co., LLC.

## B.     HISTORICAL OPERATIONS AND KEY ASSETS

As of the commencement of these chapter 11 cases, the Company's brands generally could be categorized into four product categories: (i) braking products; (ii) filtration products; (iii) vision and lighting products; and (iv) repairs and towing. The Company also maintained research, development, and testing capabilities for the purpose of designing new products.

### 1. *Braking Products*

The Company owned and/or licensed brands, including Raybestos, Centric Parts, StopTech, and Cardone, that are market leaders in braking components such as rotors, brake pads, and calipers. The Company's other brands in the braking category include IBI, Carlson, Bendix, Prima, Break Pro, and Aimco. These products were sold in both the aftermarket and to OEMs.

### 2. *Filtration*

The Company owned several brands, including Luber Finer, PetroClear, Jasper Rubber Products, and FRAM, that manufacture and distribute air filters, cabin filters, fuel filters, and oil filters. These products are sold to car dealerships, OEMs, heavy duty/industrial purchasers, and individual consumers.

41

3. *Vision and Lighting*

The Company also owned and/or licensed several brands that manufactured windshield wipers and lighting and related accessories, including ANCO, Trico, Narva, Philips, and Michelin, among others. These vision and lighting products were offered both domestically and internationally.

4. *Repairs and Towing*

Finally, the Company offered products for under-the-hood repairs and towing. The Company's brands in the repairs space included Airtex, AutoLite, Carter Fuel Pumps, Reese, and StrongArm. These products included under-the-hood repair products such as spark plugs, gas springs, and wire sets, as well as towing and trailering solutions.

5. *Product Research and Development*

First Brands also had a robust product development program geared towards developing innovative new products to complement its existing diverse product offerings. The Company had over 2,900 patents and operated 12 laboratories and testing facilities across ten countries to facilitate development of new products that complemented First Brands' existing products. Drawing on consumer and category insights, field sales, and original research, the Company maintained a continuous evolution of new product offerings to keep up with changing customer needs and evolving vehicle technology, releasing approximately 5,000 stock keeping units with respect to new products each year.

6. *Rest-of-World Business*

As described in greater detail in Section IV.N, as of the commencement of the Chapter 11 Cases, the Debtors directly or indirectly owned equity interests in approximately 200 non-debtor entities incorporated across 24 non-U.S. jurisdictions which comprised both: (i) entities providing production, distribution, or sales support to the North American Debtor business units; and (ii) business units operating outside the U.S.

C.     **CORPORATE GOVERNANCE & MANAGEMENT**

A chart summarizing the Debtors' corporate organization structure, as of the Petition Date, is attached hereto as **Exhibit D**. As set forth therein, each of the Debtors is either a direct or indirect subsidiary of Debtor Viceroy. The FBG Debtors include Viceroy, FBG Holdings, and direct and indirect Debtor subsidiaries of FBG Holdings. Those FBG Debtors, which are manager-managed LLCs, are managed by FBG Holdings.

1. *Special Committee*

In September 2025, the Board of Managers of each of (i) FBG Holdings; (ii) FBG Intermediate; (iii) FBG, and (iv) Viceroy (together with FBG Holdings, FBG Intermediate, and FBG, the "**Parent Entities**") appointed a special committee consisting exclusively of independent managers, William Transier and Neal Goldman (the "**Special Committee**"). The Special Committee has the exclusive power and authority to, among other things, (i) consider and evaluate transactions and other strategic alternatives to address the Company's outstanding funded indebtedness and capital structure, including, without limitation, a financing, refinancing, loan amendment, equity investment, sale, restructuring, reorganization, recapitalization, and/or other strategic transaction (each such transaction or strategic alternative, a "**Potential Transaction**"); (ii) approve and authorize or reject the Company's entry into and consummation of any agreement, contract, or other arrangement with respect to a Potential

42

Transaction and cause and direct the Company's subsidiaries to approve, authorize, execute, and consummate a Potential Transaction; (iii) prosecute, compromise, settle, exculpate, release, abandon, or otherwise dispose of any potential claims and/or causes of action that may exist in favor of the Company and/or its affiliates, including with respect to current and former members of the Board of Managers of the Company and/or its affiliates, current and former members of the applicable governing bodies of the Company and/or its affiliates, as well as affiliates, equity holders, officers, or other insiders of one or more of the Company and/or its affiliates (such potential claims and causes of actions, the "**Specified Matters**"); (iv) conduct and oversee an investigation of the Specified Matters to evaluate the legal basis of any such claims and/or causes of action (the "**Investigation**"); and (v) take such other action as the Special Committee deems necessary or desirable to carry out the purpose of the Special Committee as herein authorized.  A more detailed discussion of the Investigation is contained in Section IV.J.

2. *Viceroy Subcommittee*

On December 5, 2025, the Special Committee of Viceroy established a subcommittee (the "**Viceroy Subcommittee**") to, among other things, oversee and take certain actions with respect to any transaction, agreement, or arrangement (or any series of similar transactions, agreements, or arrangements) in which a conflict exists or is reasonably likely to exist between (i) Viceroy and/or its direct or indirect subsidiaries, excluding FBG Holdings and/or its direct and indirect subsidiaries (the "**FBG Parties**"), on the one hand, and (ii) the FBG Parties on the other hand.  The Special Committee of Viceroy appointed Benjamin Duster to serve as the sole member of the Viceroy Subcommittee.

3. *Debtors' Management*

As of October 13, 2025, the Company's Founder resigned from all positions as an officer, director, manager (or similar) of the Debtors.  The Founder's brother and former officer of the Company, the Founder's Brother, resigned from all positions as an officer, director, manager (or similar) shortly before the Founder's resignation.  Stephen Graham also retired from all positions as an officer, director, manager (or similar) on October 22, 2025.  Numerous other members of the Debtors' former senior management team have also resigned or been terminated from their positions following the commencement of these Chapter 11 Cases.

In September 2025, before the commencement of these Chapter 11 Cases, Charles M. Moore of A&M was appointed as Chief Restructuring Officer of the Debtors.  Following the Founder's resignation, on October 13, 2025, Charles M. Moore was appointed as interim Chief Executive Officer of each of FBG, FBG Holdings, FBG Intermediate, and Viceroy.  On October 23, 2025, Daniel Jerneycic and Gaurav Malhotra were each appointed as co-Chief Restructuring Officer.  On October 30, 2025, Paul Kosturos was appointed as Chief Financial Officer of each of FBG, FBG Holdings, FBG Intermediate, and Viceroy, with an effective date of November 3, 2025.  Effective as of February 28, 2026, A&M and the Debtors agreed that Gaurav Malhotra would no longer serve as the co-Chief Restructuring Officer of the Debtors.

On April 27, 2026, Charles M. Moore was appointed as Chief Executive Officer of the FBG Debtors, Daniel Jerneycic was appointed as Chief Restructuring Officer of the FBG Debtors, and Paul Kosturos was appointed as Chief Financial Officer of the FBG Debtors.

D.   **CAPITAL STRUCTURE**

As of the commencement of the Chapter 11 Cases, the Debtors' capital structure consisted of approximately $11.5 billion in prepetition liabilities, including approximately $6 billion in funded debt

43

obligations, at least $2.3 billion in factoring liabilities,[14] at least $2.3 billion in "off-balance sheet" financing liabilities incurred through special purpose vehicles ("**SPVs**"), and approximately $900 million in unsecured supply chain financing liabilities.  The FBG Debtors are obligors with respect to the approximately $6 billion in aggregate principal amount of funded debt obligations outstanding, and certain of the SPV Debtors are obligors with respect to the approximately $2.3 billion in off-balance sheet debt obligations outstanding.  The table below summarizes the Debtors' prepetition capital structure.

| Prepetition Indebtedness | Principal Amount Outstanding as of the Commencement of The Chapter 11 Cases |
|---|---|
| ABL Loans / Letters of Credit Obligations | $226.9 mm |
| ABL Supply Chain Financing / Cash Management | $197.3 mm |
| **Total ABL Obligations** | **$424.2 mm** |
| First Lien L/C Facility | $100.0 mm |
| First Lien Term Loans (USD) | $3,886.9 mm |
| First Lien Term Loans (EUR) | $763.0 mm |
| Side-Car Term Loans | $250.0 mm |
| Second Lien Term Loans | $540.0 mm |
| **Total Term Loan Obligations** | **$5,539.9 mm** |
| Aequum Facilities | $77.8 mm |
| CarVal Facilities | $159.0 mm |
| Evolution Facilities | $230.0 mm |
| Onset Master Leases | $1,880.0 mm |
| **Total Off-Balance Sheet Obligations** | **$2,346.8 mm** |
| Third-Party Factoring | $2,281.0 mm |
| Supply Chain Financing Obligations | $962.4 mm |
| **Total Factoring and SCF Liabilities** | **$3,243.4 mm** |
| **Total Prepetition Liabilities** | **$11,554.3 mm** |

As discussed herein, following the commencement of the Chapter 11 Cases, the Debtors obtained approximately $4.4 billion in postpetition financing, including (i) $1.1 billion in New Money DIP Loans and (ii) $3.3 billion in Roll-Up Obligations.  A detailed discussion of this financing can be found in Section IV.E of this Disclosure Statement.

---

[14]   In the months following the Petition Date, A&M undertook significant efforts to investigate and understand the Company's historical Third-Party Factoring practices and liabilities, which revealed that the Debtors' factoring liabilities exceeded initial estimations.  *See* Section IV.M.

## III.   EVENTS PRECEDING THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.   INDUSTRY AND OPERATIONAL CHALLENGES

During 2024 and 2025, the Debtors faced mounting liquidity pressure driven by business seasonality, operational disruptions due to geopolitical uncertainty and headwinds from newly imposed tariffs, and irregularities identified in historical third-party factoring practices, together with significant acquisition-related indebtedness.  These systemic factors forced unexpected costs on the Company not only due to the increased cost of goods, but also in connection with new investments required to minimize future tariff exposure.

### B.   PREPETITION INITIATIVES

In July 2025, the Company pursued a comprehensive refinancing process led by Jefferies Finance LLC ("**Jefferies**") to address near-term liquidity needs and strengthen the capital structure.  By early August 2025, potential lenders involved in the process requested additional diligence, including preparation of a quality of earnings report, resulting in the Company pausing the refinancing process. Following the pause in the refinancing process, the Company retained Weil, Gotshal & Manges LLP ("**Weil**") and Lazard to assist the Company in developing and exploring strategic options, including raising new capital and a sale.

In September 2025, the Company retained A&M to support the Company in its liquidity management efforts.  When out-of-court financing proved unavailable and with the Company's liquidity nearly depleted, the Debtors pivoted to engaging existing lenders, including the Ad Hoc Group, in discussions regarding DIP financing needed to stabilize operations and provide runway to a potential transaction in chapter 11.  After first securing a temporary bridge loan and then securing formal DIP financing commitments, the Debtors commenced these chapter 11 cases in September 2025.

Additional information regarding the Debtors' business, capital structure, the circumstances leading to the commencement of these chapter 11 cases, and the Debtors' prepetition restructuring initiatives is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**").

## IV.   OVERVIEW OF THE CHAPTER 11 CASES

### A.   COMMENCEMENT OF CHAPTER 11 CASES

On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025, FBG and the remaining Debtors each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to manage their remaining assets and operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.   FIRST/SECOND DAY PLEADINGS

Upon the commencement of these chapter 11 cases, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed an application to retain a claims and noticing agent and numerous motions (the "**First Day Motions**") designed to allow the Debtors to meet necessary obligations, fulfill their duties as debtors in possession, stabilize operations, and enable the Debtors to transition into, and operate efficiently in, chapter 11 with minimal disruption, as described in greater

detail below.  Following a hearing on October 1, 2025, the Bankruptcy Court granted all of the relief requested in the First Day Motions on a final or an interim basis, as applicable.

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases* (Docket No. 2) (the "**Joint Administration Motion**") seeking an order directing consolidation and joint administration of their chapter 11 cases for procedural purposes only.  An order granting relief under the Joint Administration Motion was entered by the Bankruptcy Court on September 29, 2025 (Docket No. 9).

- On September 29, 2025, the Debtors filed the *Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 4) (the "**Claims Agent Retention Application**") seeking an order authorizing the Debtors to employ Kroll as claims, noticing, and solicitation agent.  An order granting relief under the Claims Agent Retention Application was entered by the Bankruptcy Court on September 29, 2025 (Docket No. 12).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personally Identifiable Information, (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (Docket No. 5) (the "**Consolidated Creditor Matrix Motion**") seeking an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix and a consolidated list of the Debtors' thirty (30) largest unsecured creditors, and (b) redact certain personally identifiable information of individual employees, directors, managers, interest holders, contractors, creditors, and any other individuals who may be parties in interest in the chapter 11 cases; and (ii) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information.  An order granting the relief under the Consolidated Creditor Matrix Motion was entered by the Bankruptcy Court on October 1, 2025 (Docket No. 193).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (Docket No. 7) (the "**Utilities Motion**") seeking an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined the Utilities Motion), (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices.  An order granting relief under the Utilities Motion was entered by the Bankruptcy Court on October 1, 2025 (Docket No. 197).  The Debtors have since filed two amendments to the Utility Services List (as defined in the Utilities Motion), adding and removing certain Utility Companies from the Utility Services List (Docket Nos. 705 and 1085).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (Docket No. 8) (the "**Taxes Motion**") seeking authority

46

to pay certain taxes and regulatory fees, including (i) property taxes, (ii) income taxes, (iii) sales and use taxes, (iv) custom and import duties, (v) franchise, business, and other related taxes, and (vi) government fees and certain other taxes, as more fully described in the Taxes Motion, that arose prior to the commencement of these chapter 11 cases and to continue paying such Taxes and Fees that arose postpetition in the ordinary course of business.  An order granting relief under the Taxes Motion was entered by the Bankruptcy Court on October 1, 2025 (Docket No. 196).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Policies, Surety Bonds, and Letters of Credit and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (Docket No. 10) (the "**Insurance Motion**") seeking an order (i) authorizing the Debtors to (a) continue the Insurance Programs, Surety Bonds, and Letters of Credit (each as defined in the Insurance Motion) in accordance with the applicable insurance programs and in the ordinary course of business, and (b) pay prepetition and postpetition obligations arising under the Insurance Programs, Surety Bonds, and Letters of Credit, and (ii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined in the Insurance Motion).  An order approving the Insurance Motion was entered by the Bankruptcy Court on an interim basis on October 1, 2025 (Docket No. 191) and on a final basis on November 5, 2025 (Docket No. 567).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Non-U.S. Vendor Claims, (C) Lien Claims, and (D) 503(B)(9) Claims, (II) Confirming Administrative Expense Priority of Undisputed Outstanding Prepetition Orders, and (III) Granting Related Relief* (Docket No. 13), seeking authority to pay, in their discretion, the prepetition claims of certain of their vendors and lien claimants, and to pay certain holders of claims with administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "**Critical Vendors Motion**").  An order approving the Critical Vendors Motion was entered by the Bankruptcy Court on an interim basis on October 1, 2025 (Docket No. 190) and on a final basis on November 4, 2025 (Docket No. 519).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Entry of Order Enforcing Protections of 11 U.S.C. §§ 362, 365, 525, and 541* (Docket No. 14) (the "**Automatic Stay Motion**") seeking a comfort order clarifying to non-U.S. based creditors that the protections of the Bankruptcy Code, including sections 362, 365, 525, and 541, prohibit them from taking actions in violations of these sections.  An order granting relief under the Automatic Stay Motion was entered by the Bankruptcy Court on October 1, 2025 (Docket No. 198).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (Docket No. 15) (the "**Customer Programs Motion**") seeking authority to continue their customers programs, including various rebates, product warranties, and volume-based discounts, in the ordinary course of business and pay certain prepetition claims in connection therewith.  An order approving the Customer Programs Motion was entered by the Bankruptcy Court on an interim basis on October 1, 2025 (Docket No. 188) and on a final basis on November 4, 2025 (Docket No. 520).

47

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Obligations and (B) Continue Compensation and Benefits Programs in Ordinary Course, and (II) Granting Related Relief* (Docket No. 16) (the "**Wages Motion**") seeking an order (i) authorizing the Debtors to (a) pay Workforce Compensation Obligations and Employee Benefit Obligations (each as defined in the Wages Motion) and related expenses, fees, and costs attendant thereto, and (b) maintain, and continue to honor and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the commencement of these chapter 11 cases as such may be modified or supplemented in the ordinary course of business.  An order approving the Wages Motion was entered by the Bankruptcy Court on a final basis on October 1, 2025 (Docket No. 187).

- On September 29, 2025, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (Docket No. 17) (the "**Cash Management Motion**") seeking an order (i) authorizing the Debtors to (a) continue using their existing Cash Management System, including through the continued use of their existing Bank Accounts and Business Forms, (b) continue to perform and honor Intercompany Transactions in their business judgment, (c) implement changes to their Cash Management System in the ordinary course of business, including opening new or closing existing Bank Accounts, and (d) honor certain prepetition obligations related to the Cash Management System; (ii) granting administrative expense priority for Intercompany Claims; and (iii) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts (each capitalized term in this description as defined in the Cash Management Motion).  An order approving the Cash Management Motion was entered by the Bankruptcy Court on an interim basis on October 2, 2025 (Docket No. 222) and on a final basis on November 7, 2025 (Docket No. 604).

The First Day Motions, Claims Agent Retention Application, and all orders for relief granted in the chapter 11 cases can be viewed free of charge at https://restructuring.ra.kroll.com/Firstbrands.

C.      OTHER PROCEDURAL AND ADMINISTRATIVE MOTIONS

The Debtors filed various other motions to further facilitate the smooth and efficient administration of the chapter 11 cases and reduce the administrative burdens associated therewith, including:

- SOFAs and Schedules Extension Motion.  The Debtors filed a motion and obtained authority from the Bankruptcy Court to extend the deadline to file (i) the statement of financial affairs ("**SOFAs**") and schedule of assets and liabilities (the "**Schedules**" and, together with the SOFAs, the "**Schedules and Statements**"), and (ii) initial reports of financial information with respect to entities in which the chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), in each case, for each of the 112 Debtors, to November 21, 2025 (Docket Nos. 6, 195).  The Debtors and the U.S. Trustee entered into a stipulation by which the deadline to file the Schedules and Statements was extended through and including January 20, 2026 (Docket No. 690).  The Debtors filed the initial 2015.3 Reports on January 19, 2026 (Docket No. 1389), and the Schedules and Statements on January 20 and 21, 2026 (Docket Nos. 1411–1634).

- Ordinary Course Professionals Motion.  The Debtors filed a motion and obtained authority to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses (such professionals, the "**Ordinary Course Professionals**" and, such procedures, the "**OCP Procedures**") (Docket Nos. 415 and 700).  Pursuant to the OCP Procedures, the Debtors have retained 50 Ordinary Course Professionals.

- Retention Applications and Interim Compensation.  The Debtors filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the chapter 11 cases.  These professionals include: (i) Weil as restructuring counsel (Docket No. 400), (iii) Lazard as investment banker (Docket No. 416) (ii) A&M as financial advisor (Docket No. 417), (iv) Hilco Global as appraiser (Docket No. 331), and (v) Ernst & Young LLP ("**EY**") as tax advisor (Docket No. 418).  The Bankruptcy Court has entered orders authorizing the retention of these professionals (Docket Nos. 774 (EY), 894 (Weil), 897 (Lazard), 896 (A&M), and 898 (Hilco Global)).  In connection with such retentions, the Debtors filed a motion to establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals, which the Bankruptcy Court granted on November 17, 2025 (Docket No. 699).

- Contract Procedures Motion.  On November 21, 2025, the Debtors filed the *Motion for an Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* (Docket No. 758) seeking authority to establish procedures for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases in addition to the abandonment of property in connection with the rejection of unexpired leases (the "**Contract Procedures Motion**").  An order approving the Contract Procedures Motion was entered by the Bankruptcy Court on January 8, 2026 (Docket No. 1244).  As of the date hereof, the Debtors have filed six different notices of rejection of unexpired leases pursuant to the order approving the Contract Procedures Motion.  *See* Docket Nos. 2009, 2160, 2268, 2521, 2557, and 2687.

49

- Removal Deadline Extension Motions.  The Debtors have filed two motions and obtained Court approval to extend the deadline by which the Debtors may remove civil actions (Docket Nos. 1033 and 2520).

### D.      EXCLUSIVITY

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "**Exclusive Filing Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Filing Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "**Exclusive Solicitation Period**" and, together with the Exclusive Filing Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On January 22, 2026, the Debtors filed the *Motion of the Debtors for Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 1674) pursuant to which they sought to extend the Exclusive Filing Period and the Exclusive Solicitation Period to April 22, 2026 and June 22, 2026, respectively.  On February 17, 2026, the Bankruptcy Court entered an order (Docket No. 1939) extending the Exclusive Filing Period to April 22, 2026 and the Exclusive Solicitation Period to June 22, 2026.

On April 22, 2026, the Debtors filed the *Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 2522) pursuant to which they sought to extend the Exclusive Filing Period and the Exclusive Solicitation Period to July 21, 2026 and September 21, 2026, respectively.  On May 19, 2026, Onset filed *Onset Financial, Inc.'s Opposition to Motion of Debtors for an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 2714) objecting to extension of the Exclusive Periods with respect to the Carnaby Debtors.

### E.      DIP FINANCING

The Debtors experienced significant liquidity challenges in the weeks leading up to their chapter 11 filing.  On September 23, 2025, the Debtors became aware that Southstate Bank, one of the Debtors' cash management banks, exercised a setoff with respect to $27 million on deposit in an account.  The setoff nearly depleted all of the Debtors' operating funds.  With the Debtors' comprehensive refinancing process paused, as described above, and no other party willing to provide the Debtors with out-of-court financing, the Debtors pivoted to engaging with the members in the Ad Hoc Group regarding DIP financing.  Over the course of a short period (approximately two weeks), the Debtors and the Ad Hoc Group worked around the clock to negotiate and finalize a DIP financing package.

Despite facing an abbreviated period to conduct diligence and underwrite the proposed DIP financing, certain members of the Ad Hoc Group agreed to provide $1.1 billion in new money postpetition financing.  In addition, on September 25, 2025—days prior to the commencement of the chapter 11 cases for those entities which commenced filing on September 28, 2025—certain First Lien Lenders agreed to provide $24.5 million in emergency bridge funding.  This emergency bridge financing provided this second group of Debtors with additional time to prepare for a more orderly chapter 11 filing, provided the funds necessary to pay employees and other critical expenses, and afforded the Debtors additional time to finalize the DIP Facility (as defined below) and obtain consensual use of

certain cash collateral. The bridge was refinanced with the funding of the Interim Draw (as defined below) under the DIP Facility.

On September 30, 2025, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (C) Grant Liens and Provide Claims with Superpriority Administrative Expense Status, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 49) (the "**DIP Motion**"). Pursuant to the DIP Motion, the Debtors requested authority to, among other things, obtain senior secured superpriority postpetition financing and approval of their entry into a multiple draw senior secured, superpriority debtor-in-possession credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified or waived from time to time prior to the date hereof, the "**DIP Facility**"). The DIP Facility consists of a multiple draw term loan facility providing for (i) $1.1 billion of New Money DIP Loans, of which $500 million was made available upon entry of the interim order approving the DIP Facility (the "**Interim Draw**") and $600 million was made available upon entry of the DIP Order and (ii) $3.3 billion in Roll-Up Obligations, with $1.5 billion rolling up effective upon and subject to entry of the interim order approving the DIP Facility and funding of the Interim Draw and $1.8 billion rolling up effective upon and subject to entry of the DIP Order.

On November 9, 2025, the Bankruptcy Court entered DIP Order, approving on a final basis, among other things, the Debtors' entry into the DIP Facility. The Debtors have fully drawn the New Money DIP Loans under the DIP Facility. As of the date hereof, the aggregate amount outstanding under the DIP Facility is approximately $1.3 billion of New Money DIP Loans and $3.6 billion of Roll-Up Obligations.

The DIP Order reflects a settlement reached with the Creditors' Committee (the "**Committee Settlement**"), which provides for, among other things, the establishment of the DIP Hurdle (as defined below) and that prior to the payment of the Roll-Up Obligations, but following indefeasible payment in full in cash of the New Money DIP Loans (and the related DIP Obligations, including DIP Fees and Expenses but excluding any DIP Obligations related to the Roll-Up Obligations), certain unpaid and undisputed administrative expense claims of the DIP Loan Parties up to an aggregate amount of $200 million will be paid (the "**Administrative Expense Claims Basket**"), covering postpetition trade claims, non-insider postpetition employee and wage claims, taxes (federal and state), tariffs, collective bargaining-related items, claims arising under section 503(b)(9) of the Bankruptcy Code, and lease obligations.

Further, the Committee Settlement also establishes the priority waterfall governing recoveries on account of the DIP Obligations and the Adequate Protection Claims[15] of the Prepetition Secured Parties. Specifically, the DIP Order establishes the "**DIP Hurdle**," which means DIP Obligations in an amount equal to (i) all accrued and outstanding principal, fees, premiums, interest, and all other amounts in respect of the New Money DIP Loans (other than professional fees), which is estimated to be approximately $1.3 billion as of the date hereof, and (ii) $1.1 billion in principal amount of Roll-Up Obligations (for a total of approximately $2.4 billion). Notwithstanding anything to the contrary in the DIP Order or the DIP Documents, and regardless of when any DIP Collateral is recovered or liquidated, the DIP Obligations will be repaid (or deemed repaid) (x) first, from DIP Collateral other than Recovery Action Proceeds (to the extent commercially reasonable), and (y) second, from Previously Unencumbered Property. With respect to Recovery Actions and Recovery Action Proceeds, the New

---

[15]   Capitalized terms used in this Section IV.E but not defined herein or in the Plan have the meanings ascribed to such terms in the DIP Order.

Money DIP Loans (and the related DIP Obligations, excluding Roll-Up Obligations) and the Roll-Up Obligations comprising the DIP Hurdle (collectively, approximately $2.4 billion) are secured by DIP Liens and supported by DIP Superpriority Claims to the extent such Recovery Actions and Recovery Action Proceeds were unencumbered as of the Petition Date.  To the extent any such Recovery Actions or Recovery Action Proceeds were encumbered as of the Petition Date, the full amount of the DIP Obligations together with the prepetition term loan claims (collectively, approximately $7.5 billion) are secured by liens on, and entitled to recovery from, such property in accordance with the relative priorities set forth in the DIP Order and the Prepetition Credit Documents.

Pursuant to the DIP Order, the deadline to assert a Challenge to the Debtors' Stipulations or the Prepetition Secured Debt and Prepetition Liens (the "**Challenge Period**") was set as (i) January 31, 2026 with respect to the Creditors' Committee, the Factoring Parties, and the agents and lenders under the Aequum Facilities, the Onset Facility, the Evolution Facilities, and the CarVal Facilities, and (ii) November 30, 2025 with respect to all other parties in interest.  The Challenge Period was subsequently extended to (i) March 2, 2026, for the Creditors' Committee, the Factoring Parties, and the Evolution/Onset/Aequum/CarVal Creditors (Docket No. 1765); (ii) April 1, 2026 for the Creditors' Committee, the agents and lenders under the CarVal Facilities (solely in their capacity as such) (collectively, "**CarVal**"), and Katsumi Servicing, LLC ("**Katsumi**") (Docket No. 2016); (iii) May 1, 2026 for the Creditors' Committee and CarVal (Docket No. 2290); and (iv) July 1, 2026 for the Creditors' Committee and CarVal (Docket No. 2879).  As of the date hereof, the Challenge Period has expired with respect to all parties in interest other than the Creditors' Committee and the agents and lenders under the CarVal Facilities.

## F.   APPOINTMENT OF CREDITORS' COMMITTEE

On October 9, 2025, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the chapter 11 cases (Docket No. 313).   As of the date hereof, the members of the Creditors' Committee are: (i) First-Citizens Bank & Trust Company; (ii) Motion Industries; (iii) Napier Park Global Capital (US) LP; (iv) Pension Benefit Guaranty Corporation; (v) Yusin Brake Corporation; (vi) Fasanara Capital; (vii) Transend Logistics, LLC; and (viii) T.H.I. Group (Shanghai) LTD.[16]  The Creditors' Committee retained Brown Rudnick LLP ("**Brown Rudnick**"), as co-counsel, Cole Schotz P.C. ("**Cole Schotz**"), as efficiency and local counsel, M3 Advisory Partners, LP ("**M3**"), as financial advisor, Ducera Partners LLC ("**Ducera**"), as investment banker, and Nardello & Co. LLC ("**Nardello**") as specialized forensic financial advisor.  The Bankruptcy Court entered orders authorizing the retention of such professionals by the Creditors' Committee (Docket Nos. 891 (Brown Rudnick), 892 (Cole Schotz), 893 (M3), 1249 (Ducera), and 2367 (Nardello)).

## G.   APPOINTMENT OF EXAMINER

On October 8, 2025, Raistone filed a motion for the appointment of an examiner (Docket No. 307), seeking the appointment of an independent examiner under section 1104(c) of the Bankruptcy Code to investigate, among other things, the Debtors' prepetition financing arrangements, including certain factoring and lease transactions, the disposition of proceeds therefrom, and potential claims arising from those transactions.  Thereafter, on October 15, 2025, the U.S. Trustee filed a motion for the appointment of an examiner (Docket No. 340), likewise requesting appointment of an examiner to conduct an

---

[16]   Raistone Purchasing LLC ("**Raistone**") was also initially a member of the Creditors' Committee but resigned from the Creditors' Committee on February 23, 2026.

independent investigation into alleged financial irregularities, potential fraud, and related insider conduct. Various parties in interest filed statements supporting or opposing the requested relief.

On November 18, 2025, the Debtors filed a proposed agreed order directing the appointment of an examiner (Docket No. 716), reflecting a negotiated resolution of the pending examiner motions with the support of the Creditors' Committee, the Ad Hoc Group, the U.S. Trustee, and Raistone. On November 19, 2025, the Court entered an order directing the appointment of an examiner (Docket No. 726) (the "**Examiner Order**"), directing the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code. The Examiner Order authorized the U.S. Trustee to appoint a disinterested examiner (the "**Examiner**") and provided that the Examiner would have the powers and duties set forth therein.

The Examiner Order authorized the Examiner to investigate the Debtors' prepetition factoring practices and related transactions, including allegations that certain third-party factoring transactions involved fraudulent or inaccurate invoices, duplicative factoring of accounts receivable, and the corresponding treatment of such receivables in the Debtors' books and audit reports, as well as to identify the individuals or entities responsible (such investigation, the "**Examination**"). The Examination also encompasses transactions or transfers among the Debtors, their insiders or affiliates, insider-controlled entities, and unaffiliated third-party factors relating to the factoring transactions and the transfer and use of proceeds, including an accounting of proceeds and any third-party property received by the Debtors. In addition, the Examination covers the Debtors' off-balance sheet financing transactions and any related transfers. The Examiner Order also provides that the cost of the Examination is capped at $7 million (inclusive of all costs, fees and expenses), subject to the Examiner's right to seek an increase after notice and hearing.

On January 9, 2026, the Court approved the appointment of Martin De Luca as Examiner (Docket No. 1260). On April 17, 2026, Martin De Luca, as Examiner, filed a sealed interim report of his findings (as amended, revised, or supplemented, the "**Interim Report**") (Docket No. 2479). The Interim Report presents preliminary findings from the Examiner's investigation, which was paused mid-February 2026 due to budget exhaustion. The Interim Report largely corroborates findings and assertions that the FBG Debtors have made and alleged in the ongoing adversary proceedings, finding that First Brands and a network of affiliated SPVs and non-Debtor entities were operated as a single enterprise directed by the Founder and others for the purpose of generating and extracting liquidity through structures that concealed the true perimeter of the business and depleted value available to creditors.

The Interim Report identifies over $720 million in unexplained transfers from FBG-related entities to the Founder and the Patrick James Trust between March 2021 and April 2025, as well as a pattern of extracting value through acquisitions lacking valid business rationale and diverting real estate, equipment, and intellectual property from acquired companies into entities owned by the Founder outside the FBG corporate umbrella. The investigation also uncovered an apparent third-party factoring fraud encompassing inflated invoices, fabricated invoices, and multi-pledging of invoices to multiple factors, facilitated by FBG's fragmented enterprise resource planning systems and centralized control by a small inner circle. The Interim Report further describes systematic accounting manipulation—including the maintenance of "two sets of books" directed by the Founder and the suppression of employee communications with auditors. On April 27, 2026, the Examiner filed a revised sealed interim report of his findings (Docket No. 2538) (the "**Revised Report**"). On April 28, 2026, the Founder filed a response to the Revised Report (Docket No. 2541).

The Examiner represented in the Revised Report that his investigation was paused due to budget constraints and requested a budget increase to facilitate targeted additional discovery, witness interviews,

and forensic tracing to materially strengthen the Interim Report's findings within approximately 90 days, noting that, in his opinion, several investigative avenues remain open.

On May 4, 2026, the Examiner filed the *Examiner's Emergency Motion to Increase the Examination Budget* (Docket No. 2571) (the "**Examiner Budget Motion**"), seeking entry of an order, on an emergency basis, increasing the $7 million budget set forth in the Examiner Order (the "**Examination Budget**") to an amount not to exceed $10 million.  The Examiner Budget Motion states that, as of April 30, 2026, the Examiner's and his professionals' fees and expenses have exceeded the $7 million Examination Budget by over $2 million as a result of the global scope and complexity of the investigation reflected in the Interim Report.  The Examiner initially requested that the Bankruptcy Court rule on the Examiner Budget Motion no later than 5:00 p.m. on May 15, 2026, but granted an extension for the Debtors to respond no later than May 22, 2026.  The Examiner Budget Motion remains pending.  The Examiner has agreed to extend the response deadline for the Examiner Budget Motion to June 8, 2026 for the Debtors and the Ad Hoc Group.

At the request of, and by, the SPV Independent Manager, this Disclosure Statement notes that the preliminary conclusions of the Examiner and statements contained in this Disclosure Statement, including any characterizations of the SPV financing arrangements herein, do not represent the determination of the Viceroy Subcommittee or the SPV Debtors, have not been proven or substantiated by any finding of fact or conclusion of law, and remain subject to adjudication before the Bankruptcy Court or other applicable venue.  The SPV Debtors reserve all rights to demonstrate that the credit agreements, inventory finance facilities, and lease arrangements entered were bona fide, arms-length transactions undertaken in good faith and for legitimate business purposes, the validity and enforceability of which remain the subject of ongoing litigation.

### H.      OVERVIEW OF SALE PROCESS

1. *Postpetition Sale Process*

On January 5, 2026, the Debtors, with assistance from Lazard, commenced a marketing and sale process for all of their assets, including the equity interests in non-Debtor subsidiaries (the "**Sale Process**").  As a result of outreach performed by Lazard to over 400 potentially interested parties, over 200 potential buyers executed confidentiality agreements and received access to a virtual dataroom containing technical, commercial, and financial information regarding the Debtors' assets and business units.

On January 8, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* (the "**Bidding Procedures Motion**") (Docket No. 1253), which sought Court approval of auction procedures for the Sale Process, including (i) authorizing the designation of stalking horse bidders, (ii) scheduling auctions and sale hearings, and (iii) approving procedures for the assumption and assignment of contracts, among other relief.  However, after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position deteriorated further and it became clear to the Debtors and their advisors that consummating a sale transaction on the timeline contemplated by the Bidding Procedures Motion was no longer possible under the circumstances.  Accordingly, in late January 2026, the Debtors and their advisors reached out to potential bidders and key stakeholders to apprise them of the Debtors' liquidity situation and request that any party interested in the Debtors' assets submit an indication of interest as soon as possible.  Simultaneously, the Debtors engaged with certain OEMs to determine whether they would be willing to provide funding to the Debtors to prevent an entire shutdown

of their North American businesses and allow the Debtors to continue their efforts to pursue going-concern sales of their remaining business lines.

As further discussed herein, the OEM discussions resulted in the parties reaching an agreement on a weekly operational funding arrangement and, on February 1, 2026, the Court entered the *Order (I) Approving Funding Arrangement with Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1848) (the "**OEM Funding Order**").  Pursuant to the OEM Funding Order, as a condition to funding, the Debtors were required to use commercially reasonable efforts to seek approval of the Court of one or more sales on an expedited basis with the consultation of the Participating OEMs.

By February 5, 2026, the Debtors had received approximately 40 non-binding indications of interest ("**IOIs**") spanning several of their business units, which included 25 potentially actionable going-concern IOIs from various bidders for assets across the Debtors' several OEM-focused business units.  In light of the Debtors' limited liquidity runway and the terms of the OEM Funding Order, the Debtors engaged with potential bidders with respect to diligence questions, transaction parameters, the terms of the proposed sale transactions, and definitive documentation for the same.  The Debtors were ultimately able to reach agreements with potential bidders for sales of the following business units and assets:

| **Assets** | **Buyer** | **Proceeds Received**[17] |
|---|---|---|
| Walbro | Overdrive Capital, LLC | $50 million in cash plus certain assumed liabilities |
| Wipers, Filters and Plugs, and Strongarm Intellectual Property | PGI Northstar LLC | $25 million in cash plus royalties over a 10-year period and certain assumed liabilities |
| TMD | TNJ Ohio, LLC | Approximately $80 million of proceeds plus certain assumed liabilities |
| Horizon North America | Ventra Ohio, LLC, Horizon SNK, LLC, Horizon ARK, LLC, K2TR Corporation, Horizon Kansas LLC, with Flex-N-Gate as guarantor thereto | Approximately $64 million of proceeds plus certain assumed liabilities |

2. *Walbro Sale*

On March 9, 2026, the Debtors filed the *Emergency Motion for Order (A) Approving Sale Transaction for Debtors' Walbro Assets, (B) Approving Assumption, Assignment, and Sale of Certain*

---

[17]   In each case, the proceeds of the Debtors' sale transactions were used to reduce the secured claims or the asserted property interests of certain stakeholders, including the Ad Hoc Group, the ABL Secured Parties, and Onset (as applicable).

*Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2081), seeking approval of the sale of the Debtors' Walbro[18] business for $50 million (plus certain assumed liabilities) to Overdrive Capital, LLC (guaranteed by Polaris Industries Inc.), an entity owned and operated by common shareholders and officers of the Active Dynamics Group, and setting a sale hearing to consider approval of the Walbro sale on March 13, 2026.  On March 13, 2026, the Court approved the Walbro sale and entered the *Order (A) Authorizing and Approving Sale of Debtors' Walbro Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2154).  The Walbro sale closed on March 16, 2026 and preserved approximately 600 jobs.

3. ***Intellectual Property Sale***

On March 26, 2026, the Debtors filed the *Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Intellectual Property and Related Assets, (B) Approving Assumption, Assignment, and Sale of Certain Executory Contracts, and (C) Granting Related Relief Filed by Debtor First Brands Group, LLC* (Docket No. 2236) (the "**IP Sale Motion**"), seeking approval of the sale of intellectual property related to three of their business lines—Wipers, Strongarm, and Filters and Plugs—to PGI Northstar LLC for $25 million in cash proceeds plus royalties over a 10-year period and certain assumed liabilities.

The Debtors received one objection to the IP Sale Motion filed by The NOCO Company (Docket No. 2305) ("**NOCO**" and the objection filed by NOCO, the "**NOCO Objection**").  In its objection, NOCO alleged it had sought to submit a bid for a subset of the Debtors' Wipers intellectual property assets but was not provided an adequate opportunity to participate in the Sale Process and was not aware that an intellectual property-only bid could be submitted.  In response, the Debtors filed the *Debtors' Reply to Objection to Intellectual Property Sale Motion* (Docket No. 2325), arguing that, among other things, the Court should overrule the NOCO Objection, that the relief requested in the IP Sale Motion was in the best interests of their estates, and that NOCO had been provided an adequate opportunity to participate in the Sale Process.

On April 7, 2026, at the hearing to consider the relief requested in the IP Sale Motion (the "**IP Sale Hearing**"), the Court determined that the IP Sale Hearing should be adjourned to Friday, April 10, 2026, during which time NOCO could elect to submit a bid for the Debtors' Wipers intellectual property assets.  Following the initial Sale Hearing, the Debtors engaged directly with NOCO and provided NOCO with diligence materials on an expedited timeline.  Subsequently, on April 9, 2026, NOCO filed the *Notice of Withdrawal of Objection of The NOCO Company to Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Intellectual Property and Related Assets, (B) Approving Assumption, Assignment, and Sale of Certain Executory Contracts, and (C) Granting Related Relief* (Docket No. 2394), withdrawing the NOCO Objection.  Thereafter, on April 10, 2026, the Court entered the *Order (A) Authorizing and Approving Sale of Certain of Debtors' Intellectual Property Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts, and (C) Granting Related Relief* (Docket No. 2399), approving the relief requested in the IP Sale Motion.  The IP sale closed on April 13, 2026.

---

[18]   "**Walbro**" means the business operated by the Debtors consisting of the development, design, manufacture, sourcing, marketing, distribution, and sale of products and services under or primarily associated with (a) small engine fuel systems, carburetors, fuel pumps, ignition systems, electronic fuel injection, plastic injection molding and related components across power equipment, powersports, marine, and specialty engines and (b) operations under brand names associated with Walbro or Carter Carburetor, in each case, at, from, or through certain facilities operated by the Debtors.

**DEBTORS' EXHIBIT NO. 7**
**Page 202 of 272**

4. *TMD Sale*

On May 7, 2026, the Debtors filed the *Emergency Motion for Order (A) Approving Sale Transaction for Debtors' TMD Business Line, (B) Approving Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2590) (the "**TMD Sale Motion**"), seeking approval of the sale of the Debtors' TMD[19] business line to TNJ Ohio, LLC, an affiliate of JVIS USA, which will result in approximately $80 million of proceeds to reduce the secured claims or asserted property interests of certain stakeholders (the Ad Hoc Group, the ABL Secured Parties, and Onset). On May 14, 2026, the Court approved the TMD sale and entered the *Order (A) Authorizing and Approving Sale of Debtors' Toledo Molding & Die Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2675). The TMD sale closed on May 15, 2026.

5. *Horizon North America Sale*

On May 19, 2026, the Debtors filed the *Emergency Motion for Order (A) Approving Sale Transaction for Debtors' Horizon North America Business Line, (B) Approving Assumption, Assignment, and Sale of Certain Contracts and Unexpired Leases, and (C) Granting Related Relief and* (Docket No. 2711) (the "**Horizon Sale Motion**"), seeking approval of the sale of the Horizon North America[20] to Ventra Ohio, LLC, Horizon SNK, LLC, Horizon ARK, LLC, K2TR Corporation, and Horizon Kansas LLC, with Flex-N-Gate as guarantor thereto, which will result in approximately $64 million of proceeds to reduce the secured claims or asserted property interests of certain stakeholders (the Ad Hoc Group, the ABL Secured Parties, and Onset). On May 26, 2026, the Court approved the Horizon sale and entered the *Order (A) Approving Sale Transaction for Debtors' Horizon North America Business Line, (B) Approving Assumption, Assignment, and Sale of Certain Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2800). The Horizon sale closed on May 29, 2026 (Docket No. 2846).

Any party interested in submitting a bid for any portion of the Debtors' assets should contact Lazard at project.overdrive.lazard@lazard.com and Hilco at AMcKeown@hilcoglobal.com and ddye@hilcoglobal.com.

---

[19] "**TMD**" means the business commonly known as Toledo Molding and Die, as operated, directly or indirectly, by the applicable Sellers or their respective Affiliates prior to the Closing at, from or through any of the Specified Facilities (and no other locations), consisting of the following business segments of the Sellers (including divisions, brands and operations), together with all assets, properties, rights and interests used in the business operations at the Specified Facilities, and all Liabilities arising out of or relating thereto, which consists of the development, design, manufacture, sourcing, marketing, distribution and sale of products and services primarily associated with (i) integrated, engineered plastics solutions in automotive interiors for injection molded auto and fluid management components, HVAC, fluid reservoirs, air induction and structural plastics, components and assemblies and (ii) the TMD brand name.

[20] "**Horizon North America**" means the Debtors' "Horizon North America" business, consisting of the development, design, manufacture, sourcing, marketing, distribution and sale of towing, hitching, trailering, jacks and couplers, and cargo management in North America and China (excluding the business line and brand names associated with Horizon Europe, Westfalia, and Witter Towbar) under the following brand names: Horizon, REESE, Tekonsha, DrawTite, Bargman, Fulton and Bulldog.

## I.   OEM FUNDING ARRANGEMENT

On January 28, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving Funding Arrangement with Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1763), which sought the Court's approval of a modification of the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the funding arrangement (the "**OEM Funding Arrangement**") by and between the Debtors and certain OEMs (the "**Participating OEMs**"), under which participating OEMs agreed to prepay for critical products and to fund certain operating, labor, and corporate costs at specified business units on a weekly basis, beginning with approximately $48 million for the week of January 25, 2026.  The OEM funding helped avert the immediate shutdown of additional facilities employing approximately 13,000 employees and provided the runway necessary to pursue going-concern sales of the Debtors' remaining business lines, conditioned on the Debtors' commitment to seek expedited approval of one or more going-concern sales.

On February 1, 2026, the Bankruptcy Court entered the OEM Funding Order.  The OEM Funding Arrangement allows the Participating OEMs to provide weekly funding as prepayment for critical products, including covering certain operating, labor, and corporate costs at specified business units.  In addition, pursuant to the OEM Funding Order, the Debtors are also authorized to, among other things, use proceeds of the OEM Funding Arrangement to fund a segregated account to satisfy certain potential liabilities of, and benefits provided by, the Debtors with respect to employees.

In total, 22 Participating OEMs signed the OEM Funding Arrangement term sheet, pursuant to which such Participating OEMs provided weekly operational funding in the form of prepayments to various Debtors.  The Debtors continue to work with Participating OEMs to remove all applicable Participating OEM-owned inventory and tooling from the Debtors' facilities.

## J.   SPECIAL COMMITTEE INVESTIGATION

In September 2025, the Board of Managers at each of the Parent Entities appointed the Special Committee.  The Special Committee has the exclusive power and authority to, among other things, conduct and oversee the Investigation.  The scope of the Investigation includes matters relating to the Company's prepetition factoring and other off-balance sheet financing processes discussed herein.  After the commencement of these chapter 11 cases, the Special Committee, working with Weil, as counsel, and A&M, as financial advisor, approved the independent Investigation of potential claims held by the Company.

The Investigation included:  (i) an investigation of the Debtors' prepetition activities and analysis of estate claims and causes of action; (ii) conducting more than two dozen interviews with current and former employees of the Company; (iii) coordinating with the Debtors' other advisors to preserve evidence obtained in connection with the investigation as well as the email and documents of key custodians; (iv) drafting and serving Rule 2004 discovery requests on multiple third parties and meeting and conferring with counsel of such third parties to discuss discovery productions; (v) reviewing hundreds of thousands of documents and emails collected from the Company and its employees and produced by third parties in response to document requests, and drafting memoranda summarizing same; (vi) coordinating with the Debtors' advisors to establish a whistleblower hotline and analyzing tips received through same; (vii) analyzing bank records and coordinated with Debtors' advisors on cash tracing efforts; (viii) researching potential estate claims and causes of action.  Due to liquidity restraints, however, the Investigation has not been completed.

As a result of the Investigation, the Debtors and their advisors determined that, in order to maximize the value of the Debtors' estates, among other actions, it was necessary to commence the James Adversary Proceeding and the Onset Adversary Proceeding.

## K.    ADVERSARY PROCEEDINGS AND OTHER LITIGATION

### 1. *James Adversary Proceeding*

On November 3, 2025, the Debtors commenced the James Adversary Proceeding. The James Adversary Proceeding asserts eleven counts against the defendants, including turnover of estate property pursuant to 11 U.S.C. § 542; actual and constructive fraudulent transfer under 11 U.S.C. §§ 544(b) and 548(a)(1), and Ohio and Delaware state law; and various Ohio and Delaware state-law claims. The operative complaint seeks, among other relief: (i) to freeze all bank accounts and other property owned or controlled by the defendants, (ii) to avoid and recover certain fraudulent transfers, (iii) to obtain a declaration that the defendants were unjustly enriched at the Debtors' expense, (iv) to avoid and recover improper transfers of the Debtors' property, including its intellectual property, and to direct reversion of title to the Debtors; (v) to impose a constructive trust upon Defendants' account with respect to the fraudulent transfers; (vi) the award of compensatory, consequential, and punitive damages; (vii) an equitable accounting; (viii) pre- and post-judgment interest; and (ix) attorney's fees and costs. On November 3, 2025, the Debtors filed a motion for a temporary restraining order (the "**TRO**") and preliminary injunction, seeking to freeze the defendants' bank accounts and prohibit them from dissipating assets. The Bankruptcy Court entered the TRO that same day. After holding a hearing on the preliminary injunction, the Court denied the application on November 12, 2025. On November 14, 2025, Onset moved to intervene in the adversary proceeding (Adv. Pro. 25-03803, Docket No. 71). On January 7, 2026, the Court held a hearing on the intervention motion. On January 9, 2026, the Court denied Onset's request to intervene. On January 19, 2026, the Debtors filed an amended complaint (Adv. Pro. 25-03803, Docket No. 104), adding new defendants Michael Baker, Peter Andrew Brumbergs, and Stephen Graham, and additional claims. On February 4, 2026, the Court entered an order (Adv. Pro. 25-03803, Docket No. 160) extending the deadline for the defendants to respond to the amended complaint to 60 days after the Court's order, staying all discovery, and striking all other case deadlines pending the 60-day response period.

On January 29, 2026, the Founder and the Founder's Brother were indicted and charged with conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and multiple counts of wire fraud and bank fraud, in each case, in connection with various schemes to defraud lenders regarding the liabilities and financial condition of the Company. In a separate but related matter, Peter Brumbergs and Stephen Graham each pleaded guilty in connection with their roles in the alleged scheme and are cooperating with the government.

On March 12, 2026, the United States of America (the "**U.S. Government**") filed a motion to intervene in the adversary case (Adv. Pro. 25-03803, Docket No. 166) (the "**U.S. Motion to Intervene**"), for the limited purpose of seeking a stay of all discovery, including depositions and witness testimony, pending resolution of the criminal case titled *United States v. Patrick James & Edward James*, 26 Cr. 29 (AT) (S.D.N.Y.) (the "**Criminal Proceeding**"). On April 17, 2026, the Court entered an order (Adv. Pro. 25-03803, Docket No. 181) granting the U.S. Motion to Intervene and staying all discovery pending resolution of the Criminal Proceeding (the "**James Stay Order**"). The Founder appealed the James Stay Order on May 1, 2026, contemporaneously filing a motion in the alternative for leave to appeal (the "**Motion for Leave to Appeal**") (Adv. Pro. 25-03803, Docket Nos. 184, 186). That Motion for Leave to Appeal remains pending.

On April 6, 2026, Peter Brumbergs, Stephen Graham, and Michael Baker each moved to dismiss the adversary proceeding (Adv. Pro. 25-03803, Docket Nos. 170, 173, and 174). Also on April 6, 2026, Michael Baker moved to withdraw the reference as to the claims against him (Adv. Pro. 25-03803, Docket No. 172). On May 29, the Bankruptcy Court issued an order clarifying that all case deadlines are being held in abeyance pending the issuance of a scheduling order scheduling a status conference for July 20, 2026 at 10:00 a.m.

2. *Onset Adversary Proceeding*

On January 9, 2026, the Debtors commenced the Onset Adversary Proceeding. In the Onset Complaint, the Debtors assert claims for fraudulent transfers, preferential transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference, among other claims. The Debtors also assert a claim to recharacterize the leases with Onset as disguised financing arrangements, which are unperfected or subordinated to other liens and, regardless, should be equitably subordinated or disallowed. The Onset Complaint details allegations of a partnership between the Founder's Brother and Onset and their scheme to burden the Debtors with billions of dollars of debt in sham lease transactions that resulted in approximately $2.9 billion transferred to Onset with the Debtors receiving no or grossly inadequate value. Additionally, the alleged scheme provided the Founder's Brother with hundreds of millions of dollars for "investing" alongside Onset, further damaging the Debtors and their rightful creditors.

On February 19, 2026, Onset filed its answer to the Onset Complaint (Adv. Pro. 26–03005, Docket No. 16) (the "**Onset Answer**"), denying the allegations in the Onset Complaint and asserting a series of counterclaims, crossclaims, and third-party claims. In its answer, Onset denies that the challenged transactions constituted disguised financings, fraudulent transfers, or inequitable arrangements. Onset further denies that the use of SPVs, the size or structure of the transactions, or the Founder's Brother's involvement supports an inference of wrongdoing, and instead alleges that Onset and its affiliates were victims of fraud perpetrated by, among others, the Founder's Brother, against whom Onset asserts crossclaims. As part of its answer, Onset asserts crossclaims and third-party claims against the Founder, the Founder's Brother, and various insiders arising from their alleged fraudulent conduct, including claims for fraud, civil conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). The Onset Answer further seeks declaratory relief that the Onset Transactions (as defined in the Onset Answer) constitute "true leases" and that Onset is the rightful owner of the related inventory and equipment. In the alternative, Onset seeks a determination that it holds a valid, perfected, first-priority lien on such assets.

On March 6, 2026, Onset filed a motion for judgment on the Debtors' claims against Onset based on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) ("**Rule 12(c) Motion**") (Adv. Pro. 26–03005, Docket No. 32). On the same day, certain of Onset's funding partners filed a separate motion to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) ("**Rule 12(b) Motion**") (Adv. Pro. 26–03005, Docket No. 33).

On March 13, 2026, the U.S. Government filed a motion to intervene in the adversary proceeding and stay all discovery pending resolution of related criminal proceedings (Adv. Pro. 26–03005, Docket No. 69). The U.S. Government asserts that a stay is necessary to protect the integrity of the federal criminal case against the James brothers, contending that they would otherwise attempt to use civil discovery in the proceeding to undermine the criminal prosecution. On March 20, 2026, the Debtors filed a separate motion seeking to stay all discovery, pleadings, and related deadlines in the Onset Adversary Proceeding for a period of sixty (60) days to allow the Debtors to focus on case resolution issues in the chapter 11 cases and effectuating value-maximizing sales due to the Debtors' severe liquidity constraints (Adv. Pro. 26–03005, Docket No. 75). The Court entered an order (the "**Stay**

**Order**") granting the Debtors' motion and staying all case On March 31, 2026, Onset filed a motion to reconsider the Court's entry of the Stay Order, arguing that the stay should be lifted to allow prosecution of the Rule 12(b) Motion and Rule 12(c) Motion, but not otherwise objecting to the Stay Order (Adv. Pro. 26–03005, Docket No. 103) (the "**Motion to Reconsider**"). The Debtors filed a response in opposition to the motion to reconsider on April 21, 2026, arguing that, among other things, the Court had inherent authority to enter the stay, the stay is necessary to allow the Debtors to complete critical going-concern sales for the benefit of all stakeholders including Onset, and the pre-discovery Rule 12(b) Motion and 12(c) Motion are unlikely to succeed given the detailed, well-pleaded allegations in the Onset Complaint. On April 28, 2026, Onset filed a reply in support of its Motion to Reconsider (Adv. Pro. 26–03005, Docket No. 123).

On May 21, 2026, the Debtors filed a motion to extend the stay of adversary case deadlines and discovery (Adv. Pro. 26–03005, Docket No. 125) (the "**Second Stay Motion**"), seeking a further stay of the proceedings. On May 22, 2026, Onset filed a notice of opposition to the Second Stay Motion (Adv. Pro. 26–03005, Docket No. 126), stating its intent to file a substantive objection. On the same day, the Court entered an order granting the U.S. Government's Amended Motion to Intervene and Stay Discovery (the "**Discovery Stay Order**"), staying all discovery in the Onset Adversary Proceeding pending the resolution of the Criminal Proceeding (Adv. Pro. 26–03005, Docket No. 127). The Court directed the parties to file a status report on the Criminal Proceeding no later than July 13, 2026.

On May 26, 2026, Onset filed an objection to the Second Stay Motion (Adv. Pro. 26–03005, Docket No. 129), arguing that the sixty day stay should not be extended.

On June 1, 2026, the Debtors, WSFS, GLAS, the ABL Lenders, Peter Andrew Brumbergs, Patrick James and related entities, Stephen Graham, Shekhar Kumar, Edward James, JCMC Investment Group, LLC, and Optimus Private Capital LLC (collectively, the "**Stay Proponents**") filed a joint statement regarding the case schedule (Adv. Pro. 26–03005, Docket No. 133). In the joint statement, the Stay Proponents (other than Patrick James and the related entities) took the position that the same stay of all case deadlines that was entered in the James Adversary Proceeding should remain in effect in the Onset Adversary Proceeding pending resolution of the Criminal Proceeding, with an alternative proposal for a stay of sixty days. Separately, on June 1, 2026, Onset and the Onset Funding Partners filed a proposed joint case schedule (Adv. Pro. 26–03005, Docket No. 132), proposing that progress could be made while discovery remains stayed under the Discovery Stay Order.

The Bankruptcy Court has not made any rulings with respect to the Onset Complaint or Onset Answer. Accordingly, there is a bona fide and ongoing dispute concerning the ownership of, and the existence, validity, and priority of any interests or liens asserted by Onset in, the property subject to the Onset Transactions.

3. *WARN Act Adversary Proceedings*

      a. *Giancarlo Hernandez v. First Brands Group, LLC and Brake Parts India LLC, Adv. Pro. No. 26-3038*

On February 10, 2026, plaintiff Giancarlo Hernandez, on behalf of himself and those similarly situated, filed a class-action adversary proceeding complaint against FBG and Brake Parts Inc. India LLC (Adv. Pro. 26-3038, Docket No. 1) (the "**Garza AP**"), asserting claims under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "**WARN Act**"), the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65/1, and the Ohio Worker Adjustment and Retraining Notification Act, Ohio Rev. Code Ann. § 4113.31 (the "**Ohio WARN Act**"). On February 27, 2026, plaintiffs Francisco Garza, Manuel Leal, Ciara Childs, Tim Johnson, and Manuel

Fernandez (the "**Garza Plaintiffs**"), on behalf of themselves and those similarly situated, filed an amended class-action adversary complaint, removing Giancarlo Hernandez as a plaintiff and adding Hopkins Corporation d/b/a Hopkins Manufacturing Corporation and Champion Laboratories, Inc. as defendants (Adv. Pro. 26-3038, Docket No. 14).  On March 4, 2026, the Garza Plaintiffs moved for leave to file a second amended complaint (Adv. Pro. 26-3038, Docket No. 17) (the "**Leave Motion**"), to add additional parties and allegations.

On March 13, 2026, the Defendants moved to dismiss the amended complaint and opposed the Leave Motion (Adv. Pro. 26-3038, Docket No. 18) (the "**Garza Motion to Dismiss**"), arguing, *inter alia*, that the plaintiffs failed to plead the threshold requirements for federal and state WARN Act coverage, failed to state a plausible claim in light of statutory exceptions to the federal and state WARN Acts, and that the Leave Motion should be denied because the proposed second amended complaint did not cure the fundamental deficiencies identified in the Garza Motion to Dismiss and was therefore futile.  The Leave Motion and the Garza Motion to Dismiss are currently pending.

On March 20, 2026, Maria Tapia and Giancarlo Hernandez, the plaintiffs in a parallel adversary proceeding that also asserts WARN Act claims, filed a motion for class certification in both the Garza AP (Adv. Pro. 26-3038, Docket No. 20) and the Tapia AP (as defined below) (Adv. Pro. 26-3052, Docket No. 35) (the "**Class Certification Motion**").  On April 8, the Court entered a stipulation and agreed order in both adversary proceedings that postponed a ruling on the Class Certification Motion until after the Court had adjudicated the motion to dismiss pending in the Garza AP and the Tapia AP (Adv. Pro. 26-3038, Docket No. 24; Adv. Pro. No. 26-3052, Docket No. 39).  A hearing on the issue of interim class counsel designation has been scheduled for May 22, 2026 (Adv. Pro. 26-3038, Docket No. 27; Adv. Pro. 26-3052, Docket No. 50).  On April 10, the Garza Plaintiffs moved to consolidate the two WARN Act adversary proceedings and appoint their attorneys as interim co-lead counsel (Adv. Pro. 26-3038, Docket No. 27; Adv. Pro. 26-3052, Docket No. 42) (the "**Consolidation Motion**").  On June 2, 2026, the Court held a hearing to consider the Consolidation Motion and indicated that it intended to rule on it by the following week.  The Debtors have reserved all rights with respect to the right to oppose class certification.

     b.  *Maria Tapia and Giancarlo Hernandez v. First Brands Group, LLC, Adv. Pro. No. 26-3052*

On February 13, 2026, Maria Tapia and Giancarlo Hernandez (the "**Tapia Plaintiffs**"), on behalf of themselves and all others similarly situated, initiated an adversary proceeding against FBG and Brake Parts Inc. LLC (Adv. Pro. 26-03052, Docket No. 1) (the "**Tapia AP**"), asserting violations of the federal WARN Act and no claims under state law.  On February 27, 2026, the plaintiffs filed an amended class-action adversary complaint, adding plaintiffs and additional Debtor-defendants (Adv. Pro. 26-03052, Docket No. 6).  On March 18, 2026, the Debtor-defendants moved to dismiss the amended complaint (Adv. Pro. 26-03052, Docket No. 34) (the "**Tapia Motion to Dismiss**"), arguing, *inter alia*, that the plaintiffs failed to plead the threshold requirements for federal WARN Act coverage and failed to state a plausible claim in light of statutory exceptions to the federal WARN Act.  The Tapia Motion to Dismiss is currently pending.

On March 20, as described above in connection with the Garza AP, the Tapia Plaintiffs filed their Class Certification Motion in the Garza AP and the Tapia AP.  (Adv. Pro. 26-3038, Docket No. 20; Adv. Pro. 26-3052, Docket No. 35).  On April 8, the Court entered the stipulation and agreed order between the parties that postponed a ruling on the Class Certification Motion until after the Court had adjudicated the Leave Motion and Tapia Motion to Dismiss (Adv. Pro. 26-3038, Docket No. 39).  On April 10, the Garza Plaintiffs filed their Consolidation Motion in both adversary proceedings.  As noted

above, the Court held a hearing on June 2, 2026 and indicated it intended~~eds~~ to rule ~~by the following week~~soon.  The Debtors' right to oppose class certification has been reserved in this matter as well.

          c.          *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. First Brands Group, LLC and Eagle Machining, LLC, Adv. Pro. No. 26-3143*

On April 29, 2026, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") commenced an adversary proceeding against FBG and Debtor Eagle Machining, LLC ("**Eagle Machining**") (Adv. Pro. No. 26-03143, Docket No. 1) (the "**UAW Complaint**").  The UAW asserts claims under the WARN Act and the Ohio WARN Act on behalf of the 251 current and former employees at Eagle Machining's Fayette, Ohio plant, of which the UAW is the exclusive collective bargaining representative.  The UAW alleges that, on January 27, 2026, the defendants shut down the Fayette plant and conducted a mass layoff of 246 UAW members without providing the 60 days' advance written notice (or pay in lieu thereof) required by the WARN Act and the Ohio WARN Act, and that the December 29, 2025 WARN notice and the January 27, 2026 revised WARN notice issued by FBG were inadequate to satisfy the statutory requirements.  The Defendants have not yet responded to the UAW Complaint.

    4.  *D&O Insurance Litigation*

On November 26, 2025, the Founder, along with the Founder's Brother and former executives Stephen Graham and Michael Baker, filed a motion (Docket No. 798) (the "**D&O Motion**") to partially lift the automatic stay to allow them access to proceeds of certain of the Debtors' director and officers' ("**D&O**") insurance policies.  For the annual policy period expiring on February 2, 2026, the Debtors' primary D&O insurance policy was issued by the Berkshire Hathaway Specialty Insurance Company and their excess policies were issued by certain other insurers prior to the commencement of these chapter 11 cases, and all such policies in the aggregate provide up to $200 million of coverage for claims made during that annual policy period, subject to the terms and conditions set forth thereunder.  On January 7, 2026, following a contested hearing, the Court entered an order (Docket No. 1231) (the "**D&O Order**") overruling the objections of the Creditors' Committee and Raistone, allowing the movants to access the Debtors' Side A D&O insurance policies, but not their ABC Policy (as defined in the D&O Motion).

The Founder's Brother filed a notice of appeal on January 21, 2026 (Docket No. 1647) of the D&O Order, and, on February 4, 2026, seven insurance companies (QBE Insurance Corporation, Ironshore Indemnity, Inc., Fair American Insurance and Reinsurance Company, Allianz Global Risks US Insurance Company, Westfield Select Insurance Company, AXIS Insurance Company, and Zurich American Insurance Company, collectively, the "**D&O Insurers**") filed a notice of appeal (Docket No. 1865).  The Founder's Brother and the D&O Insurers appeal the Court's finding that the Debtors have an interest in proceeds of the ABC Policy that constitute property of the estate under section 541 of the Bankruptcy Code.  The appeals are assigned to Judge Lee H. Rosenthal of the U.S. District Court for the Southern District of Texas (the "**District Court**").  On April 3, 2026, the District Court entered an order (Civil Action No. H-26-962, Docket No. 43) (the "**Appeals Consolidation Order**") consolidating the appeals filed by Founder's Brother and the D&O Insurers under Civil Action No. 26-513.  On April 7, 2026, the Creditors' Committee filed a motion to dismiss the D&O Insurers' appeal (Civil Action No. 26-513, Docket No. 44), which the District Court denied on April 24, 2026 (Civil Action No. 26-513, Docket No. 54).  On May 22, 2026, upon a joint motion of the appellants, the District Court entered an order staying the appeals and briefing schedule indefinitely (Civil Action No. 26-513, Docket No. 56).  On May 29, 2026, the Bankruptcy Court issued an order (Docket No. 2845) (i) authorizing Berkshire Hathaway Specialty Insurance Company to make payments, including the advancement of Defense Costs

(as defined in the ABC Policy) to, or on behalf of any eligible party in accordance with the terms of the ABC Policy, without further relief from the Bankruptcy Court and (ii) modifying the automatic stay to the extent necessary to allow such payments.

## L.   SPV LITIGATION

### 1. *Aequum*

On March 28, 2024, SPV Debtor Broad Street Financial, LLC, as borrower ("**BSF**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Aequum Facility**") with, among others, Aequum Capital Financial II, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto (collectively, the "**Aequum Secured Parties**"). Under the Aequum Facility, the Aequum Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million to BSF. Under the Aequum Facility and ancillary agreements, BSF purported to purchase inventory directly from the FBG Debtors and utilize that inventory as a borrowing base to obtain credit from the Aequum Secured Parties. The Aequum Secured Parties assert first priority liens over certain of the Debtors' inventory located at a facility in Arlington, Texas (the "**Aequum Collateral**").

### a.   *Aequum Chapter 11 Litigation*

On October 1, 2025, the Aequum Secured Parties filed the *Limited Objection and Reservation of Rights to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 139), asserting that they were not adequately protected under the proposed financing arrangement.

The same day, following good faith negotiations, the Court entered the *Stipulation and Agreed Order Regarding Adequate Protection of Aequum Capital Financial II, LLC and the Aequum Lenders* (Docket No. 215) (the "**Initial Aequum Adequate Protection Stipulation**"), which permitted the Debtors to continue using and selling the Aequum Collateral for an interim period, including cash collateral, under certain conditions.

On October 31, 2025, the Aequum Secured Parties filed the *Aequum Capital Financial II LLC's (1) Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection of Aequum Capital Financial II LLC and the Aequum Lenders and (2) Second Objection and Reservation of Rights to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 485) (the "**Aequum Second DIP Objection**"), asserting that the Debtors had breached the Initial Aequum Adequate Protection Stipulation.

On November 10, 2025, the Aequum Secured Parties filed the *Motion of Aequum Capital Financial II LLC for Entry of an Order (I) Dismissing Chapter 11 Case of Debtor Broad Street Financial, LLC, or, in the Alternative, (II) Granting Relief from the Automatic Stay, or (III) Appointing a Chapter 11 Trustee* (Docket No. 631) (the "**Aequum Motion to Dismiss**").

**DEBTORS' EXHIBIT NO. 7**
**Page 210 of 272**

On December 19, 2025, the Court entered the *Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* (Docket No. 1018) (the "**Further Aequum Adequate Protection Stipulation**"), which replaced the Initial Aequum Adequate Protection Stipulation and, among other things, allowed the Debtors to continue selling Aequum Collateral until April 4, 2026. Pursuant to the Further Aequum Adequate Protection Stipulation, the Aequum Secured Parties agreed to withdraw the Aequum Second DIP Objection and abate the Aequum Motion to Dismiss.

On January 16, 2026, the Aequum Secured Parties filed the *Motion for Relief from Stay of Aequum Capital Financial II LLC for Entry of an Order Granting Relief from the Automatic Stay* (Docket No. 1370) and the *Emergency Motion of Aequum Capital Financial II LLC for Entry of an Order (I) Prohibiting Use of Cash Collateral, or, in the Alternative, (II) Conditioning Use of Aequum Collateral and Cash Collateral* (Docket No. 1372).

On January 27, 2026, the ABL Agent objected to the *Motion for Relief from Stay of Aequum Capital Financial II LLC for Entry of an Order Granting Relief from the Automatic Stay* (Docket No. 1370).

On January 29, 2026, the Court entered the *Agreed Order Granting Emergency Motion of Aequum Capital Financial II LLC for Entry of an Order Granting Relief from the Automatic Stay* (Docket No. 1820) (the "**Aequum Agreed Lift Stay Order**"), which granted the Aequum Secured Parties relief from the automatic stay to enforce their liens, security interests, rights, and remedies under their loan documents against the Aequum Collateral, while reserving other parties' rights, including those of the Prepetition Secured Parties (as defined in the DIP Order) and DIP Lenders.  The Further Aequum Adequate Protection Stipulation was terminated upon entry of the Aequum Agreed Lift Stay Order.

Since entry of the Aequum Agreed Lift Stay Order, the Debtors and the Aequum Secured Parties have coordinated to provide access to and possession of the Aequum Collateral to the Aequum Secured Parties to the extent provided under the Aequum Agreed Lift Stay Order.

> b.     *Aequum Adversary Proceeding*

On April 1, 2026, BofA, WSFS, and GLAS (collectively, the "**Prepetition Agents**") filed an adversary complaint against Aequum Capital Financial II LLC, FBG, Cardone Industries, Inc. ("**Cardone**"), BSF, and Broad Street Financial Holdings, LLC ("**BSF Holdings**") (Adv. Pro. 26-03091, Docket No. 1) (the "**Aequum AP**").  The complaint seeks (i) a declaratory judgment that BofA, WSFS, and GLAS hold valid, properly perfected, and enforceable liens in the inventory purportedly acquired by BSF from FBG and then pledged by BSF to the Aequum Secured Parties (the "**Aequum Inventory Collateral**"), and (ii) a preliminary injunction prohibiting the Aequum Secured Parties from distributing any proceeds realized from a sale or other disposition of the Aequum Inventory Collateral and directing the Aequum Secured Parties to deposit such proceeds into escrow pending adjudication of the action.

On April 27, 2026, FBG and the named defendant Debtors filed an answer to the Aequum Complaint (Adv. Pro. 26-03091, Docket No. 21).  On May 4, 2026, FBG and Cardone filed an amended answer to the complaint, which did not include an answer by BSF and BSF Holdings (Adv. Pro. 26-03091, Docket No. 25).  Contemporaneously, BSF and BSF Holdings filed a stipulation with BofA extending the time to file their answer to June 3, 2026, which the Court entered on May 6, 2026 (Adv. Pro. 26-03091, Docket Nos. 27, 33).

On May 4, 2026, the Aequum Secured Parties filed a motion to dismiss the Aequum AP (Adv. Pro. 26-03091, Docket No. 2573) (the "**Aequum Motion to Dismiss**"), seeking dismissal of the Aequum AP with prejudice.  The Aequum Motion to Dismiss remains pending.

On May 5, 2026, the Prepetition Agents filed an application for a preliminary injunction (Adv. Pro. 26-03091, Docket No. 30) (the "**Preliminary Injunction Motion**"), further seeking a preliminary injunction prohibiting the Aequum Secured Parties from distributing any proceeds realized from a sale or other disposition of the Aequum Inventory Collateral and directing the Aequum Secured Parties to deposit such proceeds into escrow pending adjudication of the action.  Also on May 5, 2026, the Prepetition Agents filed a motion for expedited discovery (Adv. Pro. 26-03091, Docket No. 31) (the "**Expedited Discovery Motion**"), seeking limited expedited discovery by BofA against all defendants named in the Aequum AP in advance of a hearing on the Preliminary Injunction Motion to be set after the completion of such expedited discovery.  On May 7, 2026, the Aequum Secured Parties filed an objection to the Expedited Discovery Motion (Adv. Pro. 26-03091, Docket No. 37), arguing, among other things, that expedited discovery is unwarranted while the Aequum Motion to Dismiss remains pending. On May 15, 2026, the Court granted the Expedited Discovery Motion in part.

On May 15, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (ii) Exclusive Settlement Authority* (Docket No. 2881) (the "**Standing Motion**"), requesting standing to bring claims in a proposed complaint against Aequum. The objection deadline to the Standing Motion is June 23, 2026.

2. *Evolution*

On November 9, 2023, SPV Debtor Patterson Inventory, LLC ("**Patterson**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Patterson Facility**") with Evolution Credit Opportunity Master Fund II-B, L.P., as lender ("**Evolution**").  Under the Patterson Facility, Evolution provided an uncommitted asset-based revolving credit facility with a maximum aggregate amount of advances of $150 million to Patterson.  Patterson's obligations under the Patterson Facility are (i) guaranteed by SPV Debtor Patterson Inventory Holdings, LLC ("**Patterson Parent**"), (ii) secured by a pledge of 100% equity of Patterson that the Patterson Parent owns, and (iii) secured by a lien on all assets of Patterson.

On March 28, 2024, SPV Debtor Starlight Inventory I, LLC ("**Starlight**" and, together with Patterson, the "**Evolution Borrowers**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Starlight Facility**").  Under the Starlight Facility, Evolution provided an uncommitted asset-based revolving credit facility with a maximum aggregate amount of advances of $150 million to Starlight.  Starlight's obligations under the Starlight Facility are (i) guaranteed by SPV Debtor Starlight Inventory Holdings I, LLC ("**Starlight Parent**"), (ii) secured by a pledge of 100% equity of Starlight that Starlight Parent owns, and (iii) secured by a lien on all assets of Starlight.

a. *Evolution Chapter 11 Litigation*

As of the commencement of the chapter 11 cases, there was approximately (i) $120 million in principal amount outstanding under the Patterson Facility and (ii) $110 million in aggregate principal amount outstanding under the Starlight Facility.  Under these Patterson Facility, Starlight Facility, and ancillary agreements, the Evolution Borrowers purported to purchase eligible inventory from the FBG Debtors and use that inventory as a borrowing base to obtain credit from Evolution.  Evolution asserts a

66

first priority lien over certain of the Debtors' inventory located at four facilities in Illinois and California (the "**Evolution Collateral**").

On October, 1, 2025, the Court entered the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 216), which allowed the Debtors to continue to use and sell the Evolution Collateral under certain conditions.

On October 30, 2025, Evolution filed the *Evolution Inventory Lenders' Limited Objection to Debtors' Cash Collateral Motion* (Docket No. 459) (the "**Evolution DIP Objection**"), arguing that the DIP Order did not adequately protect Evolution's interests in accordance with the Bankruptcy Code.

On November 9, 2025, the Court entered the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 609) (the "**Further Evolution Adequate Protection Stipulation**"), in which Evolution agreed to withdraw the Evolution DIP Objection (Docket No. 459) and abate the *Evolution Inventory Lender's Emergency Motion for an Order Appointing a Chapter 11 Trustee* (Docket No. 461). The Further Evolution Adequate Protection Stipulation allowed the Debtors to continue to use and sell the Evolution Collateral under certain conditions.

On December 23, 2025, Evolution filed *the Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 1076) (the "**Evolution Motion to Enforce**"), asserting that it was not adequately protected and that the Debtors had breached the Collateral Maintenance Covenant (as defined in the Further Evolution Adequate Protection Stipulation) by allowing the value of the Evolution Collateral to drop below the Collateral Maintenance Threshold (as defined in the Further Evolution Adequate Protection Stipulation).

On January 10, 2026, the Debtors filed the *Debtors' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Emergency Request for Use of Alleged Cash Collateral* (Docket No. 1280) (the "**Debtors' Objection and Cross Motion**"), objecting to the Evolution Motion to Enforce on the grounds that, among other things, the Collateral Maintenance Threshold remained satisfied under the plain terms of the Further Evolution Adequate Protection Stipulation, and further argued that Evolution's interests were adequately protected on a go-forward basis. Evolution filed the *Reply in Support of Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 1297) on January 12, 2026.

On January 13, 2026, the Court heard evidence and arguments on the Evolution Motion to Enforce and ruled that the Further Evolution Adequate Protection Stipulation was not facially ambiguous, but requested the Debtors present additional evidence and continued the hearing to January 20, 2026. After hearing additional arguments from the Debtors on January 20, 2026, the Court overruled the Debtors' Objection and Cross Motion and held that the Debtors had breached the Further Evolution Adequate Protection Stipulation. Following the January 20, 2026 hearing, the Debtors stopped all movement of the asserted Evolution Collateral and took steps to segregate any proceeds generated therefrom.

> b.   *Evolution Chapter 7 Conversion*

On March 11, 2026, Evolution filed the *Emergency Motion for Entry of an Order Converting Chapter 11 Cases of Certain SPV Debtors to Chapter 7* (Docket No. 2110) (the "**Evolution Motion to Convert**"), seeking an order converting the chapter 11 cases of Debtors Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC

(the "**Evolution SPV Debtors**").   On April 1, 2026, the Debtors filed the *Debtors' Response to Evolution's Emergency Motion for Entry of an Order Converting Chapter 11 Cases of Certain SPV Debtors to Chapter 7* (Docket No. 2283), explaining that, among other things, conversion of the Evolution SPV Debtors' cases to chapter 7 was premature, but the Debtors would consent to the conversion if the parties could reach an agreement on a proposed form of conversion order that facilitated an orderly conversion and avoided disruption and harm to the remaining Debtors in chapter 11.

On April 8, 2026, the Debtors filed the *Debtors' Emergency Motion for Approval of Settlement in Connection with Agreed Proposed Order Converting Chapter 11 Cases of Certain SPV Debtors to Chapter 7* (Docket No. 2372) (the "**Conversion Settlement Motion**"), announcing that the parties had reached agreement on a proposed form of order converting the Evolution SPV Debtors' cases to chapter 7 and seeking approval of a consensual settlement therein pursuant to Bankruptcy Rule 9019.   That settlement required, among other things, that the remaining Debtors in chapter 11 meet and confer with the chapter 7 trustee upon appointment.   On April 9, 2026, the Court granted the Evolution Motion to Convert and the Conversion Settlement Motion in a combined hearing and entered the *Order (I) Converting Chapter 11 Cases of Evolution SPV Debtors to Cases Under Chapter 7; and (II) Granting Related Relief* (Docket No. 2396).

On April 9, 2026, a *Notice of Chapter 7 Bankruptcy Case* (*see, e.g.*, Case No. 25-90393, Docket No. 11) was entered in each of the Evolution SPV Debtors' cases noticing the (i) conversion of each case, (ii) appointment of Ronald Sommers as interim chapter 7 trustee, and (iii) the section 341(a) meeting of creditors set to be held on May 20, 2026.   The section 341(a) meeting for the Evolution SPV Debtors' cases was ultimately reset and began on June 4, 2026 at 10:00 a.m. (Central Time).   The meeting was held open to potentially re-convene at a later date, as appropriate.

c.      *Evolution Adversary Proceeding I*

On October 31, 2025, Evolution filed an adversary complaint against the Debtors seeking a declaratory judgment as to whether Evolution has a perfected, first priority security interest in collateral in connection with two structured inventory financing facilities: the Patterson Facility and the Starlight Facility (each as defined therein) (Adv. Pro. 25-03800, Docket No. 1) ("**Evolution Adv. Proc. I**").

On December 10, 2025, Evolution filed its first amended complaint (Adv. Pro. 25-03800, Docket No. 10) (the "**First Amended Complaint**") adding Bank of America, N.A ("**BofA**"), Wilmington Savings Fund Society, FSB ("**WSFS**"), and GLAS USA LLC ("**GLAS**") as defendants in the action.

On January 29, 2026, Defendant BofA filed a motion to dismiss the Evolution Adv. Proc. I (Adv. Pro. 25-03800, Docket No. 27), which argued that Evolution had failed to plead that the applicable loan documents permitted the relevant transactions and inventory transfers and that Evolution failed to allege that the inventory subject to its lien claim transferred to Evolution, to which the Debtors filed a joinder (Adv. Pro. 25-03800, Docket No. 32).   On January 29, 2026, Defendants WSFS and GLAS also filed a joint motion to dismiss on the basis of pleading deficiencies (Adv. Pro. 25-03800, Docket No. 33).

On February 19, 2026, Evolution filed an omnibus opposition to the Defendants' motion to dismiss, which argued that the First Amended Complaint properly states a claim for declaratory relief as it adequately alleges that Evolution holds a perfected, first-priority lien against and security interest in the collateral at issue (Adv. Pro. 25-03800, Docket No. 46).   On February 26, 2026, Defendant BofA and Defendants WSFS and GLAS filed reply briefs in support of their respective motions to dismiss (Adv. Pro. 25-03800, Docket Nos. 50, 51).   The motions to dismiss remain pending at this time.

68

3.   *UMB*

SPV Debtors Global Assets LLC and Global Assets GmbH (together, the "**UMB Borrowers**") entered into a credit agreement with UMB Bank, N.A. ("**UMB Bank**"), as administrative agent and collateral agent, and the lenders party thereto (together, the "**UMB Lenders**"), with an outstanding principal amount of $33 million as of the commencement of these chapter 11 cases.  Under the credit agreement and ancillary documents, the UMB Borrowers purported to purchase inventory directly from the FBG Debtors related to the Ultinon business unit and utilize that inventory as a borrowing base to obtain credit from the UMB Lenders.  The UMB Lenders assert a first-priority lien over certain of the Debtors' inventory located at facilities in Germany, Poland, and Michigan (the "**UMB Collateral**").

On October 1, 2025, UMB Bank filed *UMB Bank, N.A's Joinder to Aequum Capital Financial II LLC's Limited Objection and Reservation of Rights to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 149) (the "**UMB DIP Objection**"), asserting that the UMB Lenders were not adequately protected under the proposed financing arrangement.

The same day, following good faith negotiations, the Court entered the *Stipulation and Agreed Order Regarding Adequate Protection of UMB Bank, N.A. and the UMB Lenders* (Docket No. 213) (the "**UMB Adequate Protection Stipulation**"), which permitted the Debtors to continue using and selling the UMB Collateral, including cash collateral, under certain conditions.

On October 31, 2025, UMB Bank filed *UMB Bank N.A.'s (1) Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection of UMB Bank, N.A. and the UMB Lenders and (2) Second Objection and Reservation of Rights to Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 486) (the "**UMB Second DIP Objection**"), asserting that the Debtors had breached the UMB Adequate Protection Stipulation.

At the November 6, 2025 DIP hearing, the Debtors and the UMB Lenders announced on the record an agreement to modify certain provisions of the UMB Adequate Protection Stipulation, which allowed the Debtors to continue using and selling the UMB Collateral and which extended the UMB Adequate Protection Stipulation through January 26, 2026.

On November 21, 2025, UMB Bank filed (i) the *Motion of UMB Bank, N.A. for Entry of an Order Granting Relief from the Automatic Stay* (Docket No. 759) (the "**UMB Lift Stay Motion**") asserting, among other things, that cause existed for the Court to lift the automatic stay, and (ii) the *Motion of UMB Bank, N.A. for Entry of an Order Appointing a Chapter 11 Trustee* (Docket No. 760) (together with the UMB DIP Objection, the UMB Second DIP Objection, and the UMB Lift Stay Motion, the "**UMB Matters**"), asserting, among other things, that the Court should appoint a chapter 11 trustee to oversee the UMB Borrowers' chapter 11 cases.

The Debtors' independent director at Viceroy, Ben Duster, and his counsel continued to negotiate in good faith with UMB Bank regarding the UMB Matters.  On May 21, 2026, Global Assets GmbH filed a *Motion for Approval of Settlement with UMB Bank, N.A. Pursuant to Federal Rule of*

*Bankruptcy Procedure 9019* (Docket No. 2766) (the "**UMB Settlement Motion**").   The deadline to object to the UMB Settlement Motion is June 11, 2026.

While the UMB Settlement Motion is outstanding, the parties have mutually agreed to adjourn the UMB Matters several times, which are currently set to be heard on June 23, 2026 at 10:00 a.m. (Central Time).   *Joint Notice of Adjournment of Certain Matters of UMB Bank, N.A. and the UMB Lenders* (Docket No. 2785).

4.   *CarVal*

Carnaby Inventory II, LLC entered into a credit agreement (the lenders party thereto, the "**Carnaby Secured Lenders**") with the Carnaby Secured Lenders with an outstanding principal amount of $60 million as of the commencement of these chapter 11 cases.  The Carnaby Secured Lenders entered into a similar credit agreement with Carnaby Inventory III, LLC with an aggregate principal amount of $100 million as of the commencement of these chapter 11 cases.  Under these credit agreements and ancillary agreements, Carnaby Inventory II, LLC and Carnaby Inventory III, LLC purported to engage with certain FBG Debtors and *maquiladora* entities in Mexico to manufacture finished goods from raw material inventory.  The Carnaby Secured Lenders assert first-priority liens over certain of the Debtors' inventory located at several facilities in Mexico (the "**CarVal Collateral**").

On October 1, 2025, the Debtors and the Carnaby Secured Lenders entered into the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* (Docket No. 230) (the "**CarVal Adequate Protection Stipulation**"), which permitted the Debtors to continue using and selling the CarVal Collateral, including cash collateral, under certain conditions.

On October 30, 2025, the Carnaby Secured Lenders filed: (i) the *Carnaby Secured Lenders' Objection to the Debtors' Motion for Post-Petition Financing and Certain First Day Relief* (Docket No. 463); (ii) the *Emergency Motion of the Carnaby Secured Lenders to Dismiss the Carnaby II and Carnaby III Chapter 11 Cases, or in the Alternative, the Appointment of a Chapter 11 Trustee or for Adequate Protection* (Docket No. 468); and (iii) the *Emergency Motion of the Carnaby Secured Lenders for Relief From the Automatic Stay for Cause, Including Lack of Adequate Protection* (Docket No. 469) (the "**Carnaby Secured Lenders' Lift Stay Motion**").

At the November 6, 2025 DIP hearing, the Debtors and the Carnaby Secured Lenders announced on the record an agreement to modify certain provisions of the CarVal Adequate Protection Stipulation, which allowed the Debtors to continue using and selling the CarVal Collateral.

On December 1, 2025, the Debtors filed the *Debtors' (I) Objection to Emergency Motion of the Carnaby Secured Lenders for Relief from the Automatic Stay for Cause, Including Lack of Adequate Protection* (Docket No. 810) (the "**CarVal Lift Stay Objection**"), and, on December 15, 2025, the Debtors filed the *Debtors' Objection to Emergency Motion of the Carnaby Secured Lenders to Dismiss the Carnaby II and Carnaby III Chapter 11 Cases, or in the Alternative, the Appointment of a Chapter 11 Trustee or for Adequate Protection* (Docket No. 950) (the "**CarVal Motion to Dismiss Objection**").

On January 16, 2026, the CarVal Adequate Protection Stipulation terminated at the Carnaby Secured Lenders' demand, and the Debtors halted all movement of the CarVal Collateral from the applicable facilities.

On January 22, 2026, the Court held a hearing on the Carnaby Secured Lenders' Lift Stay Motion to consider entry of the *Agreed Order Granting Carnaby Secured Lenders' Motion for Relief*

70

*from the Automatic Stay and (II) Withdrawing Without Prejudice the Carnaby Secured Lenders' Motion to Dismiss* (Docket No. 1651-1) (the "**CarVal Agreed Lift Stay Order**").  Onset objected to entry of the CarVal Agreed Lift Stay Order at the hearing, arguing that Onset had an interest in certain of the inventory subject to the CarVal Agreed Lift Stay Order.  The Court declined to enter the CarVal Agreed Lift Stay Order with Onset's objection outstanding.

Onset, the Carnaby Secured Lenders, and the Debtors since endeavored to negotiate a consensual resolution of disputes among themselves—including the competing asserted interests of Onset and the Carnaby Secured Lenders in certain inventory located at Mexican facilities—and participated in mediation.  *See* CarVal/Onset Mediation Orders (as defined below).  On March 4, 2026, the Carnaby Secured Lenders filed a revised lift stay order (Docket No. 2029) (the "**Amended CarVal Agreed Lift Stay Order**").  On May 28, 2026, the Carnaby Secured Lenders filed a proposed joint stipulation and agreed order among the Debtors, the Carnaby Secured Lenders, Onset, the ABL Lenders, and the Ad Hoc Group resolving the Onset Lift Stay Motion (as defined below) and the Carnaby Secured Lenders' Lift Stay Motion (Docket No. 2831) (the "**CarVal and Onset Joint Lift Stay Order**").  And on May 29, 2026, the Court held a joint hearing to consider the Amended CarVal Agreed Lift Stay Order, the CarVal and Onset Joint Lift Stay Order, and the Agreed Onset Lift Stay Order (as defined below).  On May 29, 2026, the Court entered the Amended CarVal Agreed Lift Stay Order (Docket No. 2840), and on June 1, 2026, the Court entered the CarVal and Onset Joint Lift Stay Order (Docket No. 2871).

5. *Onset*

On June 28, 2022, SPV Debtor Carnaby Inventory IV, LLC ("**Carnaby IV**") entered into that certain *Master Lease Agreement No. OFI1445416* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Onset Master Lease IV**″ ) with Onset.  Specific leases of property under Onset Master Lease IV are documented under separate schedules that are entered into and delivered by Carnaby IV to Onset from time to time.  Obligations of Carnaby IV under Onset Master Lease IV are guaranteed by each of FBG Holdings, Viceroy, Carnaby Capital Holdings, LLC, Carnaby Capital, LLC, and Carnaby Inventory Holdings IV, LLC.

On October 24, 2023, Carnaby FA, LLC ("**Carnaby FA**") entered into that certain *Master Lease Agreement No. OFI1545465* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Onset Master Lease FA**" and, together with Onset Master Lease IV, collectively, the "**Onset Master Leases**") with Onset.  Specific leases of property under Onset Master Lease FA are documented under separate schedules that are entered into and delivered by Carnaby FA to Onset from time to time.  Obligations of Carnaby FA under Onset Master Lease FA are guaranteed by each of Carnaby Capital Holdings, LLC, Viceroy, FBG Holdings, Carnaby Capital, LLC, Carnaby FA Holdings, LLC, Eagle Casting Holdings, LLC, and Eagle Casting, LLC.

Before the commencement of the Chapter 11 Cases, the Debtors entered into three forbearance agreements with respect to the Onset Master Leases.  Under the third forbearance agreement, dated June 30, 2025, the monthly payment schedules under the Onset Master Leases were adjusted to provide for total payments to Onset of $1.9 billion.

The Debtors have asserted, among other things, that the Onset Master Leases are not true leases and are instead disguised financings as more fully described in the Onset Complaint.  Under the Onset Master Leases, Onset initially lent funds to Carnaby IV and Carnaby FA to acquire inventory or property, plant, and equipment ("**PP&E**") from the FBG Debtors on Onset's behalf.  Subsequently, the inventory was leased back to Carnaby IV and Carnaby FA and may ultimately be repurchased by FBG.  The inventory and PP&E purportedly subject to these transactions remained at the FBG Debtors' facilities and continued to be used by the FBG Debtors in the ordinary course of business.  Onset asserts that it

owns certain of the Debtors' inventory and PP&E located at several facilities (the "**Onset Assets**"), or alternatively that it has a first-priority lien in the Onset Assets.

On September 30, 2025, Onset filed the *Preliminary Objection and Reservation of Rights of Onset Financial, Inc. to Debtors' DIP Financing Motion* (Docket No. 135), objecting to entry of the proposed DIP orders to the extent they would grant priming liens or otherwise impair Onset's asserted ownership interests in the Onset Assets, and demanding adequate protection for any use of those assets.

On October 1, 2025, the Court entered the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Onset Financial, Inc.* (Docket No. 214), which permitted the Debtors to continue using and selling the Onset Assets, including cash collateral, during an interim period and under certain conditions, and providing for the provision of adequate protection as set forth in the stipulation.

On October 30, 2025, Onset filed the *Supplemental Objection of Onset Financial, Inc. to Debtors' DIP Financing Motion* (Docket No. 470).

On November 19, 2025, the Debtors and Onset entered into the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset Financial, Inc.* (Docket No. 732) permitting the Debtors to continue using and selling Onset Assets, including cash collateral, and providing for adequate protection as described therein. Subsequently, the Debtors and Onset continued having good faith discussions regarding adequate protection of Onset's interests and the potential disposition of the Onset Assets since entering into such stipulation.

On March 2, 2026, Onset filed *Onset Financial Inc.'s Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* (Docket No. 2015) (the "**Onset Lift Stay Motion**"), arguing that the Debtors are improperly continuing to use certain Onset Assets, including equipment and inventory, and seeking to enforce remedies against such Onset Assets. Onset subsequently filed a *Notice of Emergency Hearing* (Docket No. 2028) setting a hearing on the Onset Lift Stay Motion for March 9, 2026 (as subsequently adjourned, the "**Onset Lift Stay Hearing**"). On March 13, 2026, the Court entered the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 2153) (the "**First CarVal/Onset Mediation Order**"), authorizing mediation among the Debtors, Onset, the Carnaby Secured Lenders, and the Ad Hoc Group to resolve certain case resolution issues, including those raised in the Onset Lift Stay Motion until March 20, 2026. On March 20, 2026, the Court entered the *Second Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 2227) (together with the First CarVal/Onset Mediation Order, the "**CarVal/Onset Mediation Orders**") further extending and authorizing mediation until April 6, 2026.

On April 3, 2026, the Debtors filed the *Debtors' Response to Onset Financial Inc.'s Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* (Docket No. 2306), stating that, while the Debtors disagreed with many of the assertions in the Onset Lift Stay Motion, the Debtors worked with Onset to reach agreement on a consensual form of order that would resolve much of the relief Onset sought, including issues related to Onset's alleged interests in certain equipment. However, the Debtors further noted that issues remained as to Onset's request to lift the automatic stay with respect to inventory located at CarVal Production Locations (as defined in the Onset Lift Stay Motion) in which Onset asserts an interest. On April 3, 2026, the Carnaby Secured Lenders filed the *Carnaby Secured Lenders' Objection to Onset Financial, Inc.'s Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* (Docket No. 2303), objecting to Onset's asserted interest in inventory at certain Mexican facilities at which the Carnaby Secured Lenders also asserted an interest, and which the Carnaby Secured Lenders argued were subject to the Carnaby Secured Lenders' Lift Stay Motion (as defined herein) and a related agreed proposed order that the

72

Carnaby Secured Lenders had reached with the Debtors and other key stakeholders.  The Carnaby Secured Lenders specifically argued that Onset's asserted interest was invalid under Mexican law and filed a Mexican law expert report on the matter.

In advance of the Onset Lift Stay Hearing, on April 8, 2026, the Court set an emergency virtual status conference on the Onset Lift Stay Motion.  At the status conference, the Court adjourned the Onset Lift Stay Hearing to a later date to be determined by the parties due to the complex legal and evidentiary issues implicated by the Onset Lift Stay Motion and the Carnaby Secured Lenders' related objection, including issues concerning the expert report on which the Carnaby Secured Lenders sought to rely, unless all parties could reach an agreement.

After the status conference on April 8, 2026, the Debtors, Onset, the Carnaby Secured Lenders, the Ad Hoc Group, and the ABL Lenders continued to negotiate and reached a consensual resolution as reflected in the CarVal and Onset Joint Lift Stay Order.  Prior to the May 29, 2026 hearing to consider the Amended CarVal Agreed Lift Stay Order and the CarVal and Onset Joint Lift Stay Order, Onset filed a stipulation and agreed order resolving the Onset Lift Stay Motion (Docket No. 2835) (the "**Agreed Onset Lift Stay Order**").  The Court entered the Agreed Onset Lift Stay Order on June 1, 2026 (Docket No. 2871).

### M.      THIRD-PARTY FACTORING

Prior to the commencement of these chapter 11 cases, the Company commonly utilized various factoring arrangements to support liquidity.  The Company historically entered into two types of factoring arrangements:  (i) factoring arrangements with customers and their financial institution partners and (ii) factoring arrangements with unaffiliated third parties ("**Third-Party Factoring**").  Under the Third-Party Factoring arrangements (each, a "**Factoring Facility**"), the Company would sell inventory to a customer (each, a "**Customer**") and subsequently sell the associated receivable of that inventory sale to an unaffiliated third-party factor (each, a "**Third-Party Factor**").  The Third-Party Factor would purchase the Company's receivable, at a discount to face value based on a preset or contractual formula, and remit cash to the Company.  The Third-Party Factoring arrangements allowed the Company to receive cash sooner than it would have under the Customers' payment terms.

After learning of irregularities in the Company's Third-Party Factoring practices, on or about September 12, 2025, prior to the Petition Date, the Debtors discontinued all of its Third-Party Factoring and have not sold any receivables to a Third-Party Factor after that date.  Since the commencement of these chapter 11 cases, the Company and its advisors have undertaken significant efforts to investigate and understand the Company's historical Third-Party Factoring practices and liabilities, which confirmed instances where the invoices provided by the Company to the Third-Party Factors were (i) fabricated (i.e., invoice information (invoice number, customer, supplier, etc.) provided by the Company to the Third-Party Factor did not match the Company's system generated invoice records), (ii) inflated (i.e., the invoice amount provided by the Company to the Third-Party Factors was inflated from the invoice values in the Company's system generated records), or (iii) provided to more than one Third-Party Factor, creating the potential for more than one Third-Party Factor to assert a claim as to the same invoice(s).  The Debtors worked collaboratively with the Third-Party Factors to obtain their internal data regarding what invoices were purchased and the amounts due on account of such invoices.  The records provided by the Third-Party Factors represent that their factored invoices total $3.0 billion in invoice value, with those invoices carrying a loan value of $2.3 billion.

To allow for a reconciliation process of receipts collected, A&M segregated and held all collections received from Customers since the commencement of these chapter 11 cases (the "**Collected Receipts**"), other than funds received on account of any postpetition sales or related invoices, and the

73

Released Funds (as defined in the Initial Factoring Order (as defined herein)) authorized to be released pursuant to the Initial Factoring Order.  After extensive negotiations, the Debtors, their advisors, and the Third-Party Factors agreed in the Cash Management Order to provide for the establishment of a new bank account (the "**Factored Receivables Account**") to segregate and hold the Collected Receipts, which cannot be accessed or disbursed without further order from the Court.  The Collected Receipts include both (i) receipts of accounts receivables that were subject to a Factoring Facility and (ii) receipts of non-factored accounts receivables (the "**Non-Factored Receivables**").

1. *Factoring Procedures Motion*

On December 1, 2025, the Debtors filed the *Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* (Docket No. 807) (the "**Factoring Procedures Motion**"), seeking entry of an order to (i) establish procedures for the Debtors to complete an orderly, efficient, and fair reconciliation of all Collected Receipts, (ii) authorize and provide comfort to Customers to remit receivables to the Debtors without risk of double payment liability, (iii) authorize the Debtors to use Collected Receipts that were not factored following notice to, and an opportunity to be heard by, the Third-Party Factors, and (iv) grant related relief, all as further described therein.  On December 12, 2025, the Debtors supplemented the Factoring Procedures Motion by filing the *Supplement to Debtors' Factoring Procedures Motion and Request for Emergency Relief* (Docket No. 931) (the "**Factoring Procedures Supplement**"), which further modified the relief requested in the Factoring Procedures Motion to (i) approve the relief requested on an emergency basis not later than December 22, 2025, and (ii) incorporate procedures in connection with the First Reconciliation Report and First Notice Period (each as defined therein).

On December 19, 2025, Evolution filed *Evolution's Objection and Reservation of Rights to Debtors' Motion for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* (Docket No. 1031) (the "**Evolution Objection**"), in which it asserted that it has a perfected, first priority lien in all the prepetition receivables of the Evolution Sellers, including receivables that those Debtors never sold (or purported to sell) to Evolution, and that such purported security interest should preclude the Bankruptcy Court from releasing funds to the Debtors from the Factored Receivables Account and require the Debtors to provide Evolution adequate protection for the use of such purported collateral.

Additional Third-Party Factors objected to the Factoring Procedures Motion, as supplemented by the Factoring Procedures Supplement, in advance of the hearing on December 22, 2025 (the "**Initial Factor Hearing**"), including Katsumi (Docket No. 1038), ING Belgium S.A./N.V. ("**ING**") (Docket No. 1045), Arab Banking Corporation B.S.C (Docket No. 1047), and the LAM Parties ("**LAM**") (Docket No. 1049).  However, prior to the Initial Factor Hearing, the Debtors reached an agreement with all Third-Party Factors besides Evolution to (i) permit release of certain funds from the Factored Receivables Account into the Debtors' operating accounts and (ii) adjourn the hearing for approval of the Factoring Procedures Motion.  The Debtors filed a revised proposed order in advance of the Initial Factor Hearing reflecting that agreement with the Third-Party Factors, besides Evolution (Docket No. 1046).

At the Initial Factor Hearing, the Bankruptcy Court heard arguments from multiple parties in interest, including Evolution.  The Bankruptcy Court overruled the Evolution Objection and ruled that up to $60 million would be permitted to be released to the Debtors' operating accounts from the Factored Receivables Account.  The Bankruptcy Court emphasized that further proceedings would follow to

finally determine these questions of security and priority, and that the remaining funds in the Factored Receivables Account would provide adequate protection for the party that prevails on the security and priority disputes once resolved.  The Bankruptcy Court reaffirmed its ruling at a status conference on December 30, 2025, explaining that all parties were receiving adequate protection, including Evolution.

On December 31, 2025, the Court entered the *Order (I) Authorizing Release of Certain Funds to the Debtors' Estates; (II) Adjourning Hearing on Remaining Portions of Factoring Procedures Motion and Supplement; and (III) Granting Related Relief* (Docket No. 1133) (the "**Initial Factoring Order**"), pursuant to which the Debtors released $55 million from the Factored Receivables Account into the Debtors' operating accounts (the "**Released Funds**").  As discussed in more detail below, the Initial Factoring Order was overturned in part on appeal.

On February 13, 2026, the Debtors and the Third-Party Factors filed the *Stipulation and Agreed Order Extending Deadline to Assert Claim to Any Invoice Relating to the Released Funds* (Docket No. 1933), which provides that the deadline in the Initial Factoring Order for the Third-Party Factors to assert a claim to any invoice relating to the Released Funds will be extended through and until April 2, 2026.  The Court entered the stipulation and agreed order on February 17, 2026 (Docket No. 1938).  On April 3, 2026, the Debtors and all Third-Party Factors except Evolution filed the *Amended Stipulation and Agreed Order Further Extending Deadline to Assert Claim to Any Invoice Relating to Released Funds* (Docket No. 2302) (the "**Factor Extension Stipulation**"), which further extended the deadline for those Third-Party Factors to assert a claim to any invoice relating to the Released Funds until further order of the Court issued on at least 14 days' notice.  The Court entered the amended stipulation and agreed order on April 6, 2026 (Docket No. 2322).

Since entry of the Initial Factoring Order, the Debtors have sought the release of additional funds from the Factored Receivables Account that the Debtors assert are Non-Factored Receivables.  However, on February 16, 2026, the Debtors adjourned a hearing to consider relief sought in connection with the Factoring Procedures Motion and Factoring Procedures Supplement, including the release of additional funds from the Factored Receivables Account, to a date and time to be determined (Docket No. 1937).

2. *Evolution Appeal*

On January 5, 2026, Evolution appealed the Initial Factoring Order to the District Court (Civil Action No. 4:26-cv-00073) (the "**Evolution Appeal**").  Evolution moved to expedite its appeal (Evolution Appeal, Docket No. 2), which the Debtors contested (Evolution Appeal, Docket No. 12).  After a hearing on Evolution's motion to expedite held on January 8, 2026, the District Court entered a scheduling order on January 9, 2026, which granted in part the motion to expedite and set a briefing schedule that would allow briefing to be completed and oral argument to be held before the end of January 2026 (Evolution Appeal, Docket No. 14).

On January 16, 2026, Evolution filed its initial brief, which argued that the Initial Factoring Order violated its right of adequate protection (Evolution Appeal, Docket No. 16).  Following further briefing by both parties, the District Court held oral argument on January 29, 2026.  On January 31, 2026, the District Court entered its *Memorandum Opinion and Order*, remanding the case to the Bankruptcy Court for further proceedings consistent with the opinion, but without any instructions to segregate $60.5 million as adequate protection for Evolution's claim (Evolution Appeal, Docket No. 28).  The District Court ruled, among other things, that new facts have created a genuine factual dispute material to determining whether Evolution is currently adequately protected and that the parties may, on remand, litigate whether Evolution is currently adequately protected.

75

**DEBTORS' EXHIBIT NO. 7**
**Page 221 of 272**

3. *Evolution's Emergency Motion for Adequate Protection*

On February 9, 2026, following the District Court's ruling on appeal of the Initial Factoring Order, Evolution filed *Evolution's Emergency Motion for Adequate Protection* (Docket No. 1892) (the "**Evolution Adequate Protection Motion**"), which requested that the Bankruptcy Court order the Debtors to segregate $60.5 million of unencumbered cash to provide Evolution with adequate protection for its claim, along with cash payment of interest and attorneys' fees and expenses, and requested said relief not later than February 13, 2026.

On February 11, 2026, the Debtors filed the *Debtors' Preliminary Objection to Evolution's Emergency Motion for Adequate Protection* (Docket No. 1904) (the "**Objection to Evolution Adequate Protection Motion**"), which argued, among other things, that there were no exigent circumstances existing that would require the Evolution Adequate Protection Motion to be heard before the next already scheduled hearing before the Bankruptcy Court on February 19, 2026.  Furthermore, the Debtors argued that, assuming that Evolution's first priority lien in all the prepetition receivables of the Evolution Sellers is valid, Evolution was adequately protected by funds in the Factored Receivable Account that relate to the Evolution Sellers that cannot be released without further order from the Court and the existence of outstanding prepetition accounts receivable that relate to the Evolution Sellers that would be held in the Factored Receivables Account once collected.  The Objection to Evolution Adequate Protection Motion was joined by BofA (Docket No. 1905) and the Ad Hoc Group (Docket No. 1907).

Evolution filed the *Reply in Support of Evolution's Emergency Motion for Adequate Protection* (Docket No. 2017), which argued, among other things, that the Debtors failed to meet their burden establishing that Evolution is adequately protected.  Multiple Third-Party Factors filed objections to the Evolution Adequate Protection Motion, including LAM (Docket No. 2051), Katsumi (Docket No. 2056), Raistone (Docket No. 2065), and ING (Docket No. 2067).

On March 9, 2026, the Court held an evidentiary hearing on the Evolution Adequate Protection Motion and subsequently took the matter under advisement.  On March 12, 2026, the Court granted the Evolution Adequate Protection Motion in part and ordered the Debtors to deposit $25.7 million to the Factored Receivables Account on or before March 19, 2026 (Docket No. 2127).  On March 19, 2026, the Debtors deposited $25.7 million in the Factored Receivables Account (the "**Returned Funds**").

4. *Evolution Adversary Proceeding II*

On January 9, 2026, Evolution filed an adversary complaint against Debtors FBG, Strongarm, Carter Fuel Systems, LLC, Trico Products Corporation, ASC Industries, Inc., Fram Group Operations LLC, Brake Parts Inc LLC, and Champion Laboratories, Inc. (each, an "**Evolution Seller**" and, collectively, the "**Evolution Sellers**"), BofA, WSFS, Sagard Holdings Manager (US) LLC ("**Sagard**"), and GLAS (together with the Evolution Sellers, the "**Evolution Adv. Proc. II Defendants**"), seeking a declaratory judgment as to whether Evolution has a perfected, first-priority security interest in the Evolution Sellers' receivables under that certain *Master Receivables Purchase Agreement* dated March 28, 2023 (Adv. Pro. 26-03006) ("**Evolution Adv. Proc. II**").

The deadline for the Evolution Adv. Proc. II Defendants to file a responsive pleading in the Evolution Adv. Proc. II was initially February 13, 2026.  On February 11, 2026, the Evolution Adv. Proc. II Defendants jointly filed *Defendants' Unopposed / Agreed Motion for Extension of Deadline* (Adv. Pro. 26-03006, Docket No. 18), representing that Evolution agreed to the Evolution Adv. Proc. II

76

Defendants' requested extension of the responsive pleading deadline until March 6, 2026, which motion remains pending.

On February 19, 2026, Evolution and Sagard filed a joint stipulation of voluntary dismissal of Evolution's claim against Sagard (Adv. Pro. 26-03006, Docket No. 24), which the Bankruptcy Court entered on February 20, 2026 (Adv. Docket No. 25).

On March 4, 2026, Evolution and the other Third-Party Factors (as defined herein) filed the *Stipulation and Agreed Order Regarding the Factoring Parties' Reservation of Rights* (Adv. Pro. 26-03006, Docket No. 27) and, on March 8, 2026, filed the *Amended Stipulation and Agreed Order Regarding the Factoring Parties' Reservation of Rights* (Adv. Pro. 26-03006, Docket No. 37) (the "**Factor RoR Stipulation**").  The Factor RoR Stipulation reserves rights of the other Third-Party Factors with respect to the Evolution Adv. Proc. II, including the right to intervene, and provides that the Bankruptcy Court should exclude from the scope of any order it may enter in the Evolution Adv. Proc. II its applicability to the other Third-Party Factors.  On March 11, 2026, the Bankruptcy Court entered the Factor ROR Stipulation.  (Adv. Pro. 26-03006, Docket No. 41).

On March 6, 2026, the Debtors filed the *Debtors' Memorandum of Law in Support of Motion to Dismiss Evolution's Adversary Complaint* (Adv. Pro. 26-03006, Docket No. 32) (the "**Motion to Dismiss Evolution Adv. Proc. II**"), which argued that Evolution's complaint should be dismissed with prejudice because even taking the facts as alleged in the complaint at face value, Evolution's allegations fail as a matter of law because (i) Evolution's alleged liens in all of the Evolution Sellers' receivables are not perfected, (ii) the relevant prepetition credit agreements (and the relevant security documents related thereto) did not provide a carve-out giving Evolution a first priority lien ahead of the Company's prepetition secured lenders, and (iii) Evolution failed to establish that it is a secured creditor under section 506(a) of the Bankruptcy Code.  Additionally, defendants WSFS and GLAS filed the *Wilmington Savings Fund Society, FSB and GLAS USA LLC's Motion to Dismiss with Prejudice and Joinder to Debtors' Motion to Dismiss Evolution's Adversary Complaint* (Adv. Pro. 26-03006, Docket No. 34) and defendant BofA filed the *Bank of America, N.A.'s Motion to Dismiss with Prejudice and Joinder to Debtors' Motion to Dismiss Evolution's Adversary Complaint* (Adv. Pro. 26-03006, Docket No. 36) (collectively, the "**Defendants' Motions to Dismiss Evolution Adv. Proc. II**").

On March 27, 2026, the Bankruptcy Court entered the *Stipulation and Agreed Order (I) Converting Motions to Dismiss to Motions for Summary Judgment, (II) Setting Briefing Schedule for Cross-Motions for Summary Judgment* (Adv. Pro. 26-03006, Docket No. 45), which (i) converted the Defendants' Motions to Dismiss Evolution Adv. Proc. II to motions for summary judgment pursuant to Federal Rule of Civil Procedure 12(d) and Bankruptcy Rule 7012, (ii) set a briefing schedule for Evolution's response and the Evolution Adv. Proc. II Defendants' reply briefs, and (iii) set a hearing on cross-motions for summary judgment before the Court on April 20, 2026 (the "**Summary Judgment Hearing**").

On April 8, 2026, Evolution filed the *Evolution's Opposition to Defendants' Motions for Summary Judgment and Cross-Motion for Summary Judgment* (Adv. Pro. 26-03006, Docket No. 47).  On April 15, 2026, the Evolution Adv. Proc. II Defendants filed the *Defendants' Reply in Support of Converted Motions for Summary Judgment* (Adv. Pro. 26-03006 Docket No. 48).  On April 20, 2026, the Summary Judgment Hearing was held before the Bankruptcy Court.

On May 29, 2026, the Bankruptcy Court entered the *Summary Judgment Order* (Adv. Pro. 26-03006, Docket No. 67) (the "**Summary Judgment Order**"), granting in part and denying in part the Evolution Adv. Proc. II Defendants' motions for summary judgment and denying in part Evolution's cross-motion for summary judgment.  The Bankruptcy Court held that Evolution does not have a

perfected security interest in all receivables of the Evolution Sellers and that Evolution's unperfected security interest does not have priority over the DIP Lenders' interest in the receivables.  Additionally, the Bankruptcy Court found that material factual disputes preclude summary judgment on the priority between Evolution and the prepetition secured lenders.  As part of the agreement between the Debtors, the ABL Parties, and the Ad Hoc Group regarding the Confirmation Budget, the FBG Debtors will file a motion seeking to obtain release of the $25.7 million in funds to use to pay down the ABL Lenders by no later than July 10, 2026.

### N.        REST-OF-WORLD / NON-DEBTOR SUBSIDIARIES

As of the commencement of the chapter 11 cases, the Debtors directly or indirectly owned equity interests in approximately 200 non-debtor entities incorporated across 24 non-U.S. jurisdictions (collectively, the "**Non-Debtor Subsidiaries**").   These Non-Debtor Subsidiaries comprised both: (i) entities providing production, distribution, or sales support to the North American Debtor business units; and (ii) the Company's rest-of-world ("**Rest of World**" or "**RoW**") Non-Debtor Subsidiaries business units operating outside the U.S.  Given the complex interdependencies between the Debtor entities and the Non-Debtor Subsidiaries—including shared management, intercompany funding arrangements, integrated supply chains, and centralized back-office functions—the Debtors, through their advisors, undertook substantial work to preserve the value of the Non-Debtor Subsidiaries as going concerns for the benefit of the Debtors' estates as equity holders while navigating the challenges arising from the chapter 11 cases.

The Debtor entities operated over 10 different North American business units, each relying on production, distribution, or sales facilities run or owned by Non-Debtor Subsidiaries across numerous jurisdictions, including Mexico, Canada, China, Hong Kong, Japan, India, Thailand, Luxembourg, the Netherlands, Italy, Switzerland, and the United Kingdom.

Additionally, the Debtor entities directly or indirectly owned equity in nine separate Rest of World business units, comprised of Non-Debtor Subsidiaries incorporated across 22 jurisdictions, including: (a) Ultinon (funded by Santander / Deva Capital Investment Company S.L.U. ("**Deva Capital**") (Santander's private credit arm), and later the Ad Hoc Group); (b)  Horizon Europe and FMP / Trico Australia (funded by UBS); (c) Trico Romania (the central back-office service center for FBG, with approximately two-thirds of its work performed for Debtor entities); (d) Trico Europe, Trico South America, and Airtex Europe; and (e) CoFo and Plastics Germany.

1. *Stabilization, Contingency Planning, and Funding Arrangements*

Following the commencement of these chapter 11 cases, the Debtors, through their advisors, focused on several critical areas designed to stabilize operations for the Non-Debtor Subsidiaries and preserve value for the Debtor estates.  To do so, the Debtors' advisors engaged and instructed local counsel across all 24 non-U.S. jurisdictions to assist with: (i) diligence for over 200 Non-Debtor Subsidiaries; (ii) corporate governance matters, including responding to multiple director resignations across the group; (iii) critical contingency planning; (iv) group-wide board updates and meetings; and (v) directors' duties advice, including analysis of any local law requirements to file for insolvency.  In addition, the Debtors' advisors also conducted diligence on various RoW financing arrangements, as described in greater detail below.  When all key RoW management and personnel ultimately stepped away from the RoW business units, the Debtors and their advisors worked to replace RoW management and implement appropriate safeguards and procedures to ensure financial and operational oversight across all Non-Debtor Subsidiaries.

Further, during the chapter 11 cases, multiple sources of funding for the RoW business units were secured, including (i) Santander / Deva Capital (for Ultinon); (ii) the Horizon Lenders[21] (for Horizon Europe and FMP / Trico Australia); (iii) Crédit Agricole (factoring arrangements for Ultinon and Horizon Europe); (iv) the Ad Hoc Group (for Ultinon, Trico Europe, CoFo, and Plastics Germany); and (v) the OEMs (for Trico Europe).  Where incremental funding was not forthcoming, or if it was established that long-term operations were not viable (including in light of local law directors' duties), it has been necessary to plan for, and implement, wind-downs—including via local insolvency proceedings—for various Non-Debtor Subsidiaries, as further set out below.

2.  *Ultinon*

Ultinon represented one of the most significant RoW business units, and was the only lighting division within the Company. Having been purchased from Lumileds in 2024, Ultinon employed approximately 1,700 employees across manufacturing sites in China, Germany, and Poland, and sales offices in approximately 16 jurisdictions.  Ultinon was funded initially by Santander / Deva Capital and was subsequently jointly funded by the Ad Hoc Group and Deva Capital on a 75%–25% basis.

a.        *Forbearance Negotiations and Funding*

The Debtors, through their advisors, engaged in ongoing discussions with Santander / Deva Capital regarding forbearance conditions and extensions to stabilize the business and preserve the value of this business for the benefit of the Debtors' estates.  During the course of October and November 2025, Ultinon had extensive discussions with Santander, Deva Capital, and the Ad Hoc Group, and incremental funding was provided to Ultinon through three amendment and increase agreements between October and November 2025.

On October 27, 2025, Deva Capital provided approximately €5 million of emergency funding to bridge Ultinon's immediate liquidity needs while discussions regarding options to address the group's long-term liquidity needs continued.  On November 25, 2025, the Ad Hoc Group agreed to purchase 75% of Deva Capital's loans under the existing original bridge facility, and Deva Capital and the Ad Hoc Group jointly committed to provide a $60 million super senior facility (rolling up the €5 million already advanced by Deva Capital) on a 25%–75% basis (the "**New Super Senior Facility**" and, together with the original bridge facility, the "**Loan Facilities**").  As of the date hereof, approximately $40 million of the New Super Senior Facility has been drawn.

In line with previous projections, management, with assistance from A&M, identified an incremental funding need of $20 million in February 2026, necessitating a draw of the remaining $20 million under the New Super Senior Facility provided by Deva Capital and the Ad Hoc Group.  Subsequently, the Ad Hoc Group, which initially enabled Ultinon to maintain its ongoing business operations, determined that they would no longer provide incremental funding to the Company, which also meant no more proceeds from the Ad Hoc Group would be made available to Ultinon to maintain its ongoing business operations.

---

[21]   The "**Horizon Lenders**" means various affiliates and/or funds and management accounts of O'Connor Alternative Investments, LLC, including Clover Private Credit Opportunities Origination II LP, Clover Zermatt O LLC, Clover PCO III Origination Aggregator LP, and Bermudez Mutuari Ltd.

**DEBTORS' EXHIBIT NO. 7**
**Page 225 of 272**

b.      *Local Insolvency Filings and Subsequent Chapter 11 Filings of Dutch Holding Companies*

Ultinon was included in the perimeter of the Debtors' broader sales process.  Due to the lack of interest in Ultinon, and in light of the deteriorating cash and operational position of Ultinon, the Debtors' financial advisors launched an additional accelerated sale process targeting European-based investment funds and strategic buyers on January 23, 2026.  The Company's advisors reached out to 40 parties in total, 13 of which entered into non-disclosure agreements and eight of which attended a management meeting.  While there was interest from various parties, no formal bids were received by the bid deadline and all buyers ended up withdrawing from the process for a sale of the group as a going concern.

Having received no bids in the Debtors' broader sale process and being unable to access additional funding from its existing lenders or third-parties, on February 4, 2026, the directors of each of the Ultinon entities other than the three Dutch holding companies resolved to file for local insolvency proceedings.  On February 6, 2026, Ultinon Motion Germany GmbH filed for local German insolvency proceedings.  The majority of the other entities in the Ultinon group—including the companies that own production facilities in Poland and China—have subsequently filed for local insolvency proceedings.  Any companies that have not yet filed for local insolvency proceedings are expected to do so in the coming weeks and months in accordance with local law requirements.

As a condition to entry into the Loan Facilities, Santander / Deva Capital required an independent conflict director to be appointed to the three Dutch holding companies of Ultinon (Ultinon Motion Holdings B.V., Liberty I B.V., and Liberty II B.V.) and a broader review of governance across the Ultinon entities.  On March 26, 2026, these entities each commenced a voluntary case under chapter 11 of the Bankruptcy Code.  *See In re Ultinon Motion Holdings B.V., et al.*, Case No. 26-90428 (CML) (Bankr. S.D. Tex.).

3.  ***Horizon and FMP / Trico Australia***

The Horizon business unit specializes in the production of towbars for the automotive industry, directly supplying primary OEM customers.  The non-Debtor Horizon business operations were split between (i) foreign entities that are linked to the Horizon North America business, including, as of the Petition Date, two Mexican production plants specializing in electricals and metals, a warehouse including a testing facility in Mexico, a Canadian distribution center, and an Indian engineering service center that provides back-office support; and (ii) the Horizon Europe business, which has four production factories located in Germany, France, and Romania.  There is also a shared Indian forgings plant.  The Horizon North America silo employs approximately 1,000 employees, and the Horizon Europe silo employs approximately 1,100 employees.

The FMP/Trico Australia business unit was acquired in 2024 and produces and sells Bendix brakes along with Trico branded wipers to the Australian market.  Trico Australia has a supply arrangement for Trico wipers from certain Trico subsidiaries based in Mexico.  The FMP/Trico Australia business employs approximately 450 employees.  The Horizon Europe business and FMP/Trico Australia business are both funded by UBS.

The Debtors, through their advisors, engaged in ongoing discussions with the Horizon Lenders regarding forbearance conditions and extensions to stabilize the Horizon Europe and FMP/Trico Australia businesses and preserve their value immediately leading up to and following the Petition Date.  Funding was provided to Horizon Europe through three amendment and increase agreements entered into between September and November 2025.  As a condition to the forbearance and further funding, the Horizon Lenders required a new governance framework to be implemented with independent directors

**DEBTORS' EXHIBIT NO. 7**
**Page 226 of 272**

appointed to the Horizon Europe and FMP/Trico Australia business units.  This new governance framework was implemented over the period from November 25, 2025 to January 2026 for Horizon Europe and on January 19, 2026 for FMP/Trico Australia.

On February 13, 2026, the independent director of Horizon Europe notified the Debtors that the Horizon Europe business had been legally separated from the Company.  The Debtors understand that, on or around February 13, 2026, the non-Debtor Horizon Europe holding company, HZ Lux Holdings S.à r.l., transferred its shares in Westfalia Holdings S.à r.l. (fka HZ Lux S.à r.l.) to a newly incorporated Luxembourg holding company owned by a Dutch foundation (*stichting administratiekantoor*) which is not controlled by Company (the "**Horizon Separation**").  On or around March 6, 2026, following satisfaction of certain conditions precedent, the shares in certain foreign Horizon North America entities and one of the Debtors, Horizon Europe Finance, LLC, were transferred along with Horizon Europe to this new holding structure.  Following the Horizon Separation, the Debtors no longer controlled entities with equity interests in Horizon Global Sourcing Operations and Innovation Center India Pvt Ltd, which held a services center located in India related to the Horizon North America business, and Cequent Electrical Products de Mexico S. de R.L. de C.V., which held a major Horizon North America manufacturing facility located in Mexico with over 900 Horizon North America employees.

The Horizon North America business was included in the perimeter of the Debtors' broader sales process, but at the request of UBS, the Horizon Europe business and FMP/Trico Australia business were excluded.  As part of the Debtors' broader sale process, in March 2026, the Company and its advisors began negotiating directly with a third party bidder regarding the potential sale of certain entities and assets of the Horizon North America business unit which resulted in the filing of the Horizon Sale Motion.

In connection with the Horizon Sale Motion, the Debtors filed the *Emergency Motion for Order (I) Approving Settlement Between Debtors and Horizon Europe and the Sale of Certain Assets in Connection Therewith, and (II) Granting Related Relief* (Docket No. 2719).  Among other things, the Horizon Settlement Motion provided for the sale of certain equity and intellectual property to Horizon Europe related to the Horizon Europe business and the release of any postpetition estate claims against Horizon Europe in exchange for Horizon Europe's agreement to, among other things, (i) transfer the aforementioned equity interests in entities with assets required to operate Horizon North America to Flex-N-Gate, thereby enabling the Debtors to effect the Horizon North America sale transaction, and (ii) the mutual release of more than $350 million in aggregate intercompany claims between Horizon North America and Horizon Europe.  On May 26, 2026, the Court entered the *Order (I) Approving Settlement Between Debtors and Horizon Europe and the Sale of Certain Assets in Connection Therewith, and (II) Granting Related Relief* (Docket No. 2799), approving the Horizon Settlement simultaneously with the Horizon Sale Motion.

4. ***Other RoW Business Units***

a.    *Trico Romania Back-Office Service Center*

Trico RO S.R.L. ("**Trico Romania**") employs approximately 200 employees who provide back-office services for the Company, of which approximately two-thirds of services are provided to the Debtor entities.  It was determined that these services were critical to the continuation of the business of the Debtors and required protection from third party and intercompany claims for outstanding liabilities.  To protect these services, the Debtors undertook various strategic initiatives to preserve and protect the Romanian operations, including planning for local debtor-in-possession insolvency proceedings in Romania to preserve continuity of service.  This culminated in Trico Romania filing for local

81

debtor-in-possession insolvency proceedings on December 18, 2025. Trico Romania continues to operate within these local insolvency proceedings.

b.      *Trico Europe*

Trico Europe and Trico South America are Tier 1 suppliers of high-performance windscreen wiper systems and components for passenger cars and commercial vehicles, directly supplying OEMs and the aftermarket segment with replacement parts in the European and South American markets. Trico Europe employs approximately 300 employees across manufacturing sites and sales offices in Belgium, Italy, Romania, and the U.K., and Trico South America employs approximately 30 employees across manufacturing sites and sales offices in Argentina and Brazil. Airtex, a business line which produced water pumps for the European and Asian markets and had ceased operations prior to the commencement of the chapter 11 cases, employs certain employees in Europe who support aftermarket sales for the Ultinon and Trico Europe businesses. The Company continues to explore its strategic options in respect of these business units.

c.      *CoFo and Plastics Germany*

The CoFo Group, comprised of Non-Debtor Subsidiaries CoFo PWK GmbH, CoFo Räuchle GmbH and CoFo IBEX GmbH, is a Tier 2 supplier specializing in the manufacture, distribution, and trade of metal goods. As of October 1, 2025, the CoFo Group employed approximately 500 employees across its operations. The Plastics Group, comprised of Non-Debtor Subsidiaries Diepersdorf Plastic Manufacturing GmbH, Linden Plastic Manufacturing GmbH, SMK Plastic Manufacturing GmbH, and dormant Plastics Germany 1 GmbH, specializes in producing high-quality plastic components for vehicles and interiors, supplying products to leading automobile manufacturers such as the Volkswagen Group and Mercedes-Benz. As of October 1, 2025, the Plastics Group employed approximately 1,000 employees across its operations. The CoFo Group and Plastics Group operate independently within the Company.

Due to ongoing market pressures and the commencement of the chapter 11 cases, the Debtors' advisors and respective directors determined that liquidity in both the CoFo and Plastics Groups had significantly deteriorated, rendering continued long-term operations unviable, particularly given local law mandatory insolvency filing requirements. Consequently, the Debtors determined that these entities were insolvent and the entities in the Plastics Germany Group and the CoFo Group filed for local insolvency proceedings on November 3, 2025 and November 21, 2025, respectively.

5.  ***International Non-Debtor North American-Linked Businesses***

In addition to the RoW business units, the Debtors focused on several critical areas designed to initially stabilize operations for the international Non-Debtor Subsidiaries which support the North American businesses to preserve value for the Debtor estates.

In connection with the wind-down of certain Debtor operations in the U.S. starting in January 2026, certain affiliated Non-Debtor Subsidiaries in parallel have commenced the shutdown of operations across non-U.S. jurisdictions (as applicable), including in Mexico, China, and India. The Debtors continue to pursue all options to maximize value, in consultation with the stakeholders of each applicable Non-Debtor Subsidiary, including the facilitation of: (i) the sale of affiliated Non-Debtor Subsidiaries through the wider chapter 11 sales process and local sale processes; and (ii) for those Non-Debtor Subsidiaries for which there are no viable sale options, the wind-down of those Non-Debtor Subsidiaries, including through local insolvency processes.

The wind-down of certain Mexican Non-Debtor Subsidiaries involves an out-of-court process through which certain Non-Debtor Subsidiaries based in Mexico will be extinguished by realizing all assets, paying creditors as they become due and, if there is any remaining equity, distributing such equity to shareholders.  The partners of the applicable Mexican Non-Debtor Subsidiaries agreed to cause the dissolution of the applicable entities and to appoint a liquidator.  The applicable Non-Debtor Subsidiaries' management will continue to perform their duties until the appointment of the liquidator is registered in the Public Registry of Commerce, but they shall refrain from carrying out any new business operations on behalf of the applicable Non-Debtor Subsidiaries.

The liquidator has authority to, among other things, (i) conclude pending operations or transactions; (ii) collect what is owed to the company and pay the company's debts; (iii) sell the company's assets; (iv) distribute among the partners any remaining equity; (v) prepare the final wind down balance sheet, which shall be submitted for the partners' approval, file such wind down balance sheet before the Public Registry of Commerce, and publish it in the electronic system of the Mexican Ministry of Economy; and (vi) obtain the company's cancellation certificate from the (a) Public Registry of Commerce; (b) the National Registry of Foreign Investments (if applicable), and (c) the Federal Taxpayers Registry.

A court-appointed receiver will oversee the judicial liquidation and will replace the incumbent management (or, in this case, the incumbent corporate liquidator).  The corporate wind down and the judicial liquidation shall be funded with the entity's estate (i.e., the shareholders of the applicable Mexican Non-Debtor Subsidiaries have no obligation to fund).

## O.   PREFERENCE ACTIONS

The FBG Debtors and their advisors have begun identifying and assessing preference claims, avoidance actions, fraudulent transfer claims, and other claims and causes of action arising under chapter 5 of the Bankruptcy Code.  As of the date hereof, the FBG Debtors and their advisors have identified approximately $2 billion in the aggregate in gross transfers made to Trade Creditors (approximately $205 million), Factors (approximately $1.3 billion), and Supply Chain Financers (approximately $487 million), in the aggregate in the ninety (90) days prior to the Petition Date and nearly $2.9 billion in gross transfers made to insiders in the one (1) year period prior to the Petition Date, primarily comprised of transfers to Patrick James (or his related entities) and Onset, who the Debtors contend is an insider, which Onset disputes.

Under the Preference Settlement (as described in Section 6.11 of the Plan and Section I.E of this Disclosure Statement), Trade Creditors that are Preference Settlement Electing Creditors will be released from Preference Actions under the Plan, and Supply Chain Financers and Factors that are Preference Settlement Electing Creditors will receive the benefit of certain procedures, including the "Modified New Value Element", with respect to Preference Actions asserted against them, as described in more detail in Section 6.11 of the Plan.  However, the Preference Settlement only applies to Trade Creditors, Factors, and Supply Chain Financers who (i) do not meet the definition of Adverse Conduct (as determined by a Final Order); (ii) are not Specified Non-Released Parties; and (iii) are Preference Settlement Electing Creditors.

The FBG Debtors are continuing to assess any and all other claims and causes of action that may be available to them, including preference claims, fraudulent transfer claims, and other claims arising under chapter 5 of the Bankruptcy Code.

## P.   ADMINISTRATIVE EXPENSE CLAIMS

83

Based on the results of the Debtors' thorough review of their books and records, the Debtors estimate that the total number of Administrative Expense Claims in the aggregate that are likely to be Allowed and the responsibility of the FBG Debtors is approximately $222 million (the "**Aggregate Administrative Expense Claims Amount**"),[22] comprised of (i) $147 million unpaid administrative expense claims incurred since the Petition Date, (ii) approximately $38 million of 503(b)(9) claims, and (iii) an additional 20% estimate for expenses that have not yet been invoiced.[23]

The Aggregate Administrative Expense Claims Amount includes any and all Administrative Expense Claims that the Debtors have agreed are Allowed (such as, for example, by stipulation or other agreement with the holders of such claims). The Aggregate Administrative Expense Claims Amount includes claims that the Debtors do not dispute, and therefore anticipate will be Allowed based on the present results of (i) their review of their books and records and (ii) the supporting documentation provided by the holders of reconciled Administrative Expense Claims directly to the Debtors' advisors and/or filed with the Bankruptcy Court. The Debtors anticipate that the undisputed portion of each such Administrative Expense Claim will be disclosed to the applicable holder on the Administrative Expense Consent Program Opt-In Form.

The Aggregate Administrative Expense Claims Amount does not take into account potential significant preference claims the FBG Debtors may have against holders of Administrative Expense Claims, which could be used to offset or otherwise reduce such Administrative Expense Claims. As explained in Section IV.O, the FBG Debtors estimate the amount of gross transfers made to creditors in the ninety (90) day period prior to the Petition Date is approximately $2 billion in the aggregate.

Additionally, the Aggregate Administrative Expense Claims Amount does not include contingent administrative expense claims that may be asserted by any Factor. As explained in Section IV.M, pursuant to the Initial Factor Order, as modified by the Factor Extension Stipulation, all Third-Party Factors besides Evolution may assert a claim to any invoice relating to the Released Funds until further order of the Bankruptcy Court. If it is determined by order of the Bankruptcy Court or agreement by and between the Debtors, on one hand, and any Third-Party Factor (besides Evolution), on the other hand, that collections on certain invoices should have been, or should be, paid to a Third-Party Factor, such Third-Party Factor will be entitled to assert an administrative expense claim against the Debtor from whom the invoice was purchased equal to the amount of funds related to such invoice that were collected

---

[22]   The FBG Debtors' estimated $222 million Aggregate Administrative Expense Claims Amount does not include any Administrative Expense Claim held by a Debtor or Affiliate of a Debtor against an FBG Debtor, including, for the avoidance of doubt, the Asserted Longkou Administrative Expense Claim (as defined below) in the amount of approximately $53 million or the approximately $22 million 503(b)(9) claim asserted by Longkou Haimeng Machinery Co., Ltd. ("**Longkou**").

[23]   On May 4, 2026, Longkou filed the *Longkou Haimeng Machinery Co., Ltd.'s Application for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Granting Related Relief* (Docket No. 2569) (the "**Longkou Administrative Expense Motion**") asserting an administrative expense claim in the amount of $53,307,342.79 (the "**Asserted Longkou Administrative Expense Claim**"). The Debtors dispute that the Asserted Longkou Administrative Expense Claim is in fact entitled to administrative expense priority status. However, even if the Asserted Longkou Administrative Expense Claim is entitled to administrative expense priority, the amount entitled to administrative expense priority (if any) is substantially lower than $53 million due to at least $37.9 million in postpetition payments the FBG Debtors made to Longkou, which such payments are entitled to set off against the Asserted Longkou Administrative Expense Claim pursuant to the Cash Management Order. No portion of the Asserted Longkou Administrative Expense Claim is included in the estimated $222 million in the Aggregate Administrative Expense Claims. The Debtors are in ongoing discussions with Longkou to reconcile and reach a resolution regarding the Asserted Longkou Administrative Expense Claim.

and released (the "**Factor Administrative Claim**") and will be paid (including any interest earned on such receivable in accordance with paragraph 22(k) of the DIP Order), from the Factored Receivables Account within five (5) days of such determination.  Third-Party Factors (besides Evolution) may assert an Administrative Expense Claim to the extent the Factored Receivables Account does not have sufficient funds to pay such Factor Administrative Claims.  However, the Factored Receivables Account currently holds approximately $97 million, which is sufficient to satisfy any asserted Factor Administrative Claims (maximum approximately $29.3 million).  No Third-Party Factor has asserted or indicated that it has evidence of a Factor Administrative Claim.

In addition to the FBG Debtors' thorough review of their books and records, the Claims Ombudsman will be responsible for reconciling all Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) against the FBG Debtors and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith.

## Q.    MEDIATION

On January 29, 2026, the Debtors filed the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 1800) (the "**Agreed Mediation Order**"), seeking approval to participate in mediation (the "**Mediation**") with the Honorable Judge Marvin Isgur, among the Debtors, the SPV Independent Manager, the Ad Hoc Group, the ABL Secured Parties, and the Creditors' Committee. Onset and Silver Point Capital, L.P. later agreed to participate in the Mediation and be bound by the terms of the Agreed Mediation Order.  The scope of the Mediation included, among other things: purported security and ownership interests in assets of the Debtors, inter-Debtor and other intercompany disputes, funding for the Chapter 11 Cases, and resolution of the Chapter 11 Cases.  The Court entered the Agreed Mediation Order on January 29, 2026 (Docket No. 1822).

Following multiple extensions of the term of the Mediation, on February 27, 2026, the Court entered the *Second Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 2005) (the "**Second Agreed Mediation Order**"), further extending the term of the Mediation through and including March 13, 2026 and narrowing the scope of the Mediation to issues relating to a resolution of the chapter 11 cases (the "**Case Resolution Issues**").  On March 18, 2026, the Court entered the *Third Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 2186), further extending the term of the Mediation with respect to the Case Resolution Issues through and including March 27, 2026.

Despite extensive progress made in Mediation, the Mediation formally expired on March 27, 2026 without a comprehensive settlement on the Case Resolution Issues.  Following the expiration of the Mediation, however, the Debtors, the Ad Hoc Group, and the Creditors' Committee continued to discuss the Case Resolution Issues.  The Debtors, the Ad Hoc Group, and the Creditors' Committee were eventually able to reach an agreement in principle on the Plan Settlement.  As discussed, the Plan Settlement forms the foundation of the Plan, and is described in more detail below.

## R.    PLAN SETTLEMENT

The Plan incorporates the Plan Settlement by and among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee.  The compromises and settlements included in the Plan Settlement, including, among other things, the Credit Bid Transactions, Preference Settlement, substantive consolidation, solely for distribution purposes, and Administrative Expense Claims Consent Program, are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan.  The Plan will be deemed a motion to

approve the compromises and settlements contained in the Plan, including the Plan Settlement.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the Plan Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the FBG Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein will be deemed non-severable from each other and from all other terms of the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Plan Settlement under sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable and in the best interests of the FBG Debtors' Estates.

1. ***Principal Terms of Plan Settlement***

   a. *Enforcement of Remedies*

The DIP Secured Parties have superpriority liens on (i) all prepetition and postpetition property of the FBG Debtors, including the DIP Loan Parties and Parent Guarantors, and all proceeds thereof, including all Estate Claims (excluding Avoidance Actions but including Avoidance Proceeds), (ii) all Additional Unencumbered Property, and (iii) all Prepetition Collateral (other than ABL Priority Collateral, on which the liens of the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are junior to those of the ABL Secured Parties).  The DIP Secured Parties have alleged that various events of default have occurred and are continuing under the DIP Documents.  The DIP Loan Parties and Parent Guarantors do not have sufficient funds to indefeasibly pay the DIP Obligations in full in Cash.  The Plan Settlement incorporates a consensual arrangement to (i) permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto and (ii) provide recoveries to junior creditors of the FBG Debtors which allows such creditors to participate in recovery prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

   b. *Estate Claims Credit Bid Transaction*

As set forth above, the FBG Debtors are conducting a marketing and sale process for the Estate Claims.  Pursuant to the Plan Settlement, on the Confirmation Date or soon thereafter as reasonably practicable, unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee (not to be unreasonably withheld, conditioned, or delayed)), the FBG Debtors will sell, assign, convey, transfer, and deliver, or cause to be sold, assigned, conveyed, transferred, and delivered, the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, and transfer such assets to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise).  The aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets will be the Estate Claims Credit Bid as the same may be increased at any auction.  The Plan will serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the Estate Claims Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the Estate Claims Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing; and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

**DEBTORS' EXHIBIT NO. 7**
**Page 232 of 272**

c. *DIP Collateral Credit Bid Transaction*

Pursuant to the Plan Settlement, on the Confirmation Date or as soon thereafter as reasonably practicable, the FBG Debtors will sell, assign, convey, transfer, and deliver, or cause to be sold, assigned conveyed, transferred, and delivered, the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the DIP Collateral Credit Bid APA, (if applicable), and transfer such assets to the DIP Collateral Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for the DIP Collateral Trust Assets will be the DIP Collateral Credit Bid. The Plan will serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the DIP Collateral Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the DIP Collateral Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, and reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing, and (ii) relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

d. *Cash Funding and Agreed Budget*

On the Confirmation Date, the Litigation Trust will receive the Litigation Trust Cash Funding. No Allowed Professional Fees of Professionals may be paid from the Litigation Trust Cash Funding.

e. *Expiration of Challenge Rights*

The Challenge Period will be deemed to expire against the Creditors' Committee and all other parties in interest (unless already expired pursuant to the terms of the DIP Order) upon the (i) establishment of the Litigation Trust, (ii) consummation of the Estate Claims Credit Bid Transaction, and (iii) funding of the Litigation Trust Cash Funding to the Litigation Trust.

f. *Claims Ombudsman*

The Claims Ombudsman will be appointed on the Confirmation Date (or as soon thereafter as reasonably practicable) and will serve as the holder of record of the Class 3(b) Litigation Trust Interests (and, in such capacity will provide the Litigation Trustee with a properly completed IRS Form W-9). The Claims Ombudsman will be responsible for reconciling all Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims) against the FBG Debtors and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith. As permitted or required by applicable law, the Claims Ombudsman may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity. *See* Section 6.19(d) of the Plan. The Claims Ombudsman will only withhold distributions where necessary and will otherwise be required to make minimum and/or interim distributions expeditiously. All costs of the Claims Ombudsman to reconcile Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) and make distributions to holders of Class 3(b) Litigation Trust Interests will be paid from the distributions otherwise distributable to holders of Class 3 Litigation Trust Interests and will not be otherwise chargeable against the Litigation Trust. The Litigation Trust will advance funds to the Claims Ombudsman to fund the claims reconciliation process, subject to an agreed budget. The Litigation Trustee and Claims Ombudsman will negotiate such agreed budget in good faith. The Claims Ombudsman will have a fiduciary duty to all holders of Litigation Trust Interests to maximize value in connection with the reconciliation of Disputed Claims

87

(including Disputed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims). The Litigation Trust Agreement will provide that certain settlements of Disputed Claims will require approval by the Litigation Trust Oversight Committee.

g.      *Survival of Claims*

The Remaining Lender Claims and ABL Deficiency Claims against the Estates of the FBG Debtors (collectively, the "**Surviving Claims**") are preserved and may continue to be asserted against the Estates of the applicable FBG Debtor and will not be reduced by the amount of any Trust distributions made on or after the Confirmation Date. For the avoidance of doubt, no Allowed Claims will be reduced by any Trust distributions on or after the Confirmation Date. The SurvivingRemaining First Lien Claims and Remaining Second Lien Claims will be deemed to be released against the FBG Debtors on the Effective Date.

h.      *DIP Order and Intercreditor Agreement Preservation*

Nothing in the Plan, the Confirmation Order, or any Definitive Document will modify, amend, waive, reject, or impair the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Intercreditor Agreements (as defined in the DIP Order) and the DIP Order, except to the extent expressly agreed to in writing by the ABL Agent and the DIP Agent. Subject to the terms of the Plan, Confirmation, and DIP Order, the Intercreditor Agreements and the DIP Order will remain in full force and effect following the Confirmation Date and will not be rejected, modified, supplemented, or otherwise altered by the Plan, the Confirmation Order, or any Definitive Document without the prior written consent of the ABL Agent and the DIP Agent. The DIP Collateral Trust (and any trustee or fiduciary thereof) will be deemed a successor to the Term Collateral Agents and the Term Claimholders for purposes of the Intercreditor Agreements and will be bound by all restrictions and obligations applicable to the Term Claimholders thereunder.

**S.      WIND DOWN ASSET SALES**

On March 23, 2026, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2216) (the "**Hilco Wind Down Motion**"). By the Hilco Wind Down Motion, the Debtors sought entry of an order (i) approving and authorizing the Debtors to enter into and perform under that certain Amended and Restated Consulting and Marketing Services Agreement, dated as of March 13, 2026 (the "**Consulting Agreement**"), by and between the Debtors and Hilco Merchant Resources, LLC, Hilco Receivables, LLC, and Hilco Global Professional Services, LLC (collectively, the "**Consultant**"), pursuant to which the Consultant would serve as the Debtors' exclusive agent with respect to the monetization of inventory, the collection of accounts receivable, and the provision of certain advisory services in connection with the wind down of certain North American business units, including the Brakes, Autolite, and Hopkins brands (collectively and, together with related asset classes, the "**Wind Down Assets**"); (ii) approving the sale and/or abandonment of the Wind Down Assets and waiving any otherwise applicable Liquidation Sale Laws;[24] (iii) authorizing the sale or disposition of the Wind Down Assets free and clear of all liens, claims, and encumbrances; and (iv) granting related relief.

---

[24]    Capitalized terms used in this Section IV.T but not defined herein will have the meanings ascribed to such terms in the Wind Down Motion and/or Wind Down Order, as applicable.

On April 16, 2026, the Bankruptcy Court entered the Wind Down Order, which granted the relief requested in the Hilco Wind Down Motion.  Additionally, the Wind Down Order establishes parameters governing the Wind Down process, including certain notice procedures with respect to the sale of Wind Down Assets in which various parties assert competing interests or liens.  Further, because certain of the Wind Down Assets are subject to disputes among multiple lenders asserting competing liens and/or ownership interests, the Wind Down Order directs the Debtors to establish a series of segregated accounts to hold the Net Proceeds or Gross Proceeds (as applicable) of sales of such Wind Down Assets pending resolution of the underlying disputes by further order of the Court.  In each case, the Asserted Interests of any holder will attach to the funds in the applicable account to the same extent and with the same priority as such holder now has against the underlying Wind Down Assets, and all parties' rights to object to the priority, validity, amount, and extent of such Asserted Interests are fully preserved.  Because certain of the Wind Down Assets are subject to disputes among multiple lenders asserting competing liens and/or ownership interests, the Wind Down Order directs the Debtors to establish a series of segregated accounts to hold the Net Proceeds or Gross Proceeds (as applicable) of sales of such Wind Down Assets pending resolution of the underlying disputes by further order of the Court.  Specifically, (i) with respect to Wind Down Assets sold pursuant to the Wind Down Order that are subject to both Asserted SPV Interests and Asserted ABL Priority Collateral Interests, the proceeds (net of Hilco's fees and expenses, sales, transfer, or similar taxes, and any other applicable surcharges, including pursuant to section 506(c) of the Bankruptcy Code) will be deposited into a segregated account (the "**SPV-ABL Wind Down Account**"); (ii) with respect to Wind Down Assets sold that are subject to both Asserted SPV Interests and Asserted DIP Collateral Interests, the proceeds (net of the foregoing items) will be deposited into a separate segregated account (the "**SPV-DIP Wind Down Account**" and, together with the SPV-ABL Wind Down Account, the "**Wind Down Accounts**"); and (iii) with respect to Wind Down Assets sold that are undisputed DIP Collateral (other than ABL Priority Collateral), the proceeds (net of Hilco's fees and expenses) will be deposited into the Escrow Account (as defined in the DIP Order).  In each case, the Asserted Interests of any holder will attach to the funds in the applicable account to the same extent and with the same priority as such holder now has against the underlying Wind Down Assets, and all parties' rights to object to the priority, validity, amount, and extent of such Asserted Interests are fully preserved.  Funds in the Wind Down Accounts may not be distributed without further order of the Court, and funds in the Escrow Account may not be distributed (other than in connection with payment of Hilco's fees and expenses) without the prior written consent of the Ad Hoc Group (email being sufficient) or further order of the Court.

## T.        MOTION TO CONVERT DEBTORS' CASES TO CHAPTER 7

On May 13, 2026, the U.S. Trustee filed a motion under section 1112(b) of the Bankruptcy Code seeking to convert these Chapter 11 Cases to cases under chapter 7 or, in the alternative, to dismiss them (Docket No. 2670) (the "**Conversion Motion**").  The Conversion Motion asserts that "cause" exists under section 1112(b)(4)(A) because the Debtors are administratively insolvent and cannot satisfy section 1129(a)(9)'s requirement that administrative expenses be paid in full on the Effective Date.  The Conversion Motion further argue~~s~~d that the DIP Secured Parties cannot credit bid for the Estate Claims because they hold liens only on the proceeds of such claims.  ~~A~~Following the hearing ~~for~~on the Conversion Motion ~~is set for~~on June 12, 2026 ~~at 10:00 a.m. (Central Time).~~, the Court denied the Conversion Motion and entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing, (III) Establishing Solicitation and Voting Procedures, (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures, (V) Establishing Preference Settlement Notice and Opt-In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related*

*Relief* (Docket No. 2990) (the "**Disclosure Statement Order**"), conditionally approving the Disclosure Statement and scheduling the Combined Hearing for July 28, 2026.

~~If the Bankruptcy Court grants the Conversion Motion, these cases would be converted to chapter 7 and a chapter 7 trustee would be appointed to liquidate or sell the Debtors' remaining assets, which are largely the Estate Claims, and to distribute proceeds in accordance with the statutory priorities of the Bankruptcy Code.  In that event, the Plan would not be confirmed and the structure on which the proposed recoveries depend would be unwound.  The Debtors dispute the relief requested in the Conversion Motion and filed in response~~In connection with the *Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* (Docket No. 2906)~~.  The Creditors' Committee and Ad Hoc Group have joined the Debtors (Docket Nos. 2908–2909).In connection with their reply to the Conversion Motion, the Debtors have filed the Moore.~~, in his declaration, Mr. Moore has stated, in relevant part to the Conversion Motion,

> I expect administrative expense, priority, and unsecured creditors to be materially worse off in the event of conversion to chapter 7.  As a threshold matter, all or substantially all of the Debtors' remaining assets, including most notably the claims and causes of action (or proceeds thereof) are encumbered by billions of dollars in secured claims.  In total, certain Estate Claims are encumbered by as much as $7.9 billion in secured claims (approximately $4.9 billion in DIP Claims, $2.6 billion in term loan claims, and $400 million of ABL Claims).  With respect to the Debtors' claims and causes of action and/or proceeds that were unencumbered on the Petition Date (including claims arising under chapter 5 of the Bankruptcy Code), the proceeds of such claims and causes of action are encumbered by at least $1.3 billion of DIP A Claims, and, with the possible exception of $200 million in administrative expense claims, the approximately $2.4 billion of DIP Claims reflected in the DIP Hurdle.  Under the Joint Plan, however, administrative and priority creditors begin to share in litigation recoveries after the first $350 million of proceeds is received by the Litigation Trust and are projected to be paid in full when the Litigation Trust recovers approximately $1.9 billion in proceeds.

> These and other substantial benefits of the Joint Plan would be lost in a chapter 7.  I believe that in a chapter 7 scenario, a trustee would have no unencumbered assets with which to provide adequate protection, and the DIP Lenders would likely exercise remedies to foreclose on and/or otherwise control their collateral or would contest any attempt by a chapter 7 trustee to control estate claims or causes of action without their consent.  This may result in no available recoveries for a chapter 7 trustee to pay any chapter 11 administrative expense, priority, or general unsecured claims.

> Even assuming the chapter 7 debtors somehow maintained ownership and control over the Estate Claims, administrative creditors would still not be entitled to any recovery until after the DIP A Claims, any litigation financing claims, and chapter 7 administrative expenses were repaid in full.  Therefore, at a minimum, the first $1.3 billion in DIP A

claims must be paid in full before any administrative expense creditor can receive any recovery.  After the DIP A Claims are satisfied in full in cash, administrative expense claims may receive only up to $200 million in total recoveries pursuant to the Administrative Expense Claims Basket established under the DIP Order.  Beyond that $200 million basket, no distributions to holders of remaining administrative expense claims may be made until the DIP Hurdle—totaling approximately $2.4 billion as of the anticipated Confirmation Date (comprising approximately $1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims)—is satisfied in full in cash.

Further, the DIP A Claims are estimated to be approximately $1.3 billion as of the anticipated Confirmation Date, and will not accrue post-petition interest for purposes of recoveries under the Litigation Trust Waterfall, which significantly benefits junior creditors.  However, in a chapter 7 scenario, the DIP A Claims will continue to accrue interest (at the default rate which adds an additional 2% per annum on top of the existing rate) until they are repaid in full.

Also, whereas the Joint Plan provides for a clear means of financing the Litigation Trust to monetize Estate Claims, a  chapter 7 trustee would not have access to litigation funding provided under the Joint Plan, or any funds or meaningful runway with which to pursue alternative funding.  In other words, upon conversion, a chapter 7 trustee would lack the means to pursue Estate Claims, including claims arising under chapter 5 of the Bankruptcy Code.  To the extent a trustee were able to secure funding, I believe such funding would likely be on significantly more expensive terms than provided in the Joint Plan.

Moore Declaration ¶¶ 24–28.

A more formal liquidation analysis will be set forth in the Plan Supplement.

U.      **RETIREE BENEFITS**

As of the date hereof, certain of the FBG Debtors maintain certain retiree benefit arrangements, including those provided under the First Brands Group, LLC Health and Welfare Employee Benefit Plan (the "~~Retiree~~Welfare Plan"), which provides retiree health and life insurance benefits to certain eligible former employees and their spouses and eligible dependents through various sub-plans.  The ~~Retiree~~Welfare Plan includes both health benefit sub-plans and life insurance sub-plans, as described below.

*Retiree Health Benefits*.  The ~~Retiree~~Welfare Plan provides ~~company-funded~~ retiree ~~healthcare benefits that are~~medical, dental, vision and prescription drug coverage that is fully self-insured (with no stop loss coverage), with estimated monthly costs for such retiree benefits historically averaging approximately $50,000.  The retiree health benefit sub-plans currently cover ~~three~~four groups ~~of retirees~~: (i) ~~former~~retired bargaining unit employees covered under the collective bargaining agreement between FRAM Group Operations, LLC and the United Automobile, Aerospace and Agricultural Implement Workers of America (with respect to the Greenville, Ohio plant) (the "**FRAM Greenville CBA**")~~,~~ which covers ~~approximately 35~~18 retirees and ~~14 dependents~~three spouses with company-provided healthcare benefits (medical, prescription drug, dental~~,~~ and vision), (ii) ~~former~~retired bargaining unit employees

covered under the collective bargaining agreement between FRAM Group Operations, LLC Autolite Spark Plug Plant and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Local 533 (the "**FRAM Fostoria CBA**") which covers 16 retirees and eight spouses with company-provided healthcare benefits (medical, prescription drug, dental and vision), (iii) retired bargaining unit employees covered under the collective bargaining agreement between Carter Fuel System, Logansport and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of Local Union No. 4863 (the "**Carter CBA**"), which covers approximately 13eight retirees (and 9an additional four retirees who are age 65 or over), four spouses and four dependents with company-provided healthcare benefits (medical, prescription drug, dental and vision) to age 65, and (iiiiv) a Dalton Corporation Group legacy plan, which covers 4four retirees and 2 dependentstwo spouses with a Medicare supplement plan including prescription drug coverage, with the Dalton Corporation paying the full cost.  For each of the retiree health benefit sub-plans, the applicable FBG Debtors pay monthly administrative fees plus actual claims costs.

*Retiree Life Insurance Benefits*.  The RetireeWelfare Plan also provides life insurance benefits to eligible retirees, with aggregate estimated monthly premiums of approximately $5560,000 paid by the FBG Debtors.  The life insurance sub-plans include: (i) FRAM Greenville Retiree Life, pursuant to the FRAM Greenville CBA, covering 74 approximately 110 retirees with death benefits ranging from $7,500 to $10,000, (ii) FRAM Fostoria Retiree Life, pursuant to the FRAM Fostoria CBA, covering approximately 36 employees with death benefits of $15,000, (iii)  Dalton Corporation Retiree Life, covering approximately 34 retirees with death benefits ranging from $10,000 to $15,000, (ii) Dalton Corporation Retiree Life, covering 45 salaried employees with death benefits ranging from $10,000 to $50,000, (iiiiv) Champion Labs Retiree Life, covering 713 participants with aapproximately 801 retirees with death benefits equal to 12.5% of the in-force basic life benefit (calculated as three times annual pay), (ivranging from $2,500 to $88,500 (v) Carter Fuel Retirees Life, pursuant to the Carter CBA, covering 85approximately 99 retirees with death benefits ranging from $7,000 to $837,000, (v) and (vi) ASC Industries, Inc. Retiree Life, covering approximately 18 retirees with death benefits ranging from $2,000 to $25,500. In addition, there is a separate Trico Products Retiree Life PlanArrangement, covering 272approximately 223 retirees with an average death benefits of approximatelyranging from $500 to $8124,000. This arrangement is insured with The Hartford (with Gates Corporation as the policyholder and the FBG Debtors reimbursing Gates Corporation for the portion of premiums attributable to Trico retirees), at a monthly cost of approximately $10,660, and (vi) the. There is also a separate Postretirement Medical and Life Plan atarrangement with certain Airtex Products, LP retirees, covering approximately 878 participants who may electindividuals who are eligible to receive a benefit (either $2,000 or $4,000) at retirement or as aan uninsured death benefit, which is not an insuredranging from $1,000 to $23,000, under an arrangement and forpursuant to which the Fedeli Group invoices the FBG Debtors for payment based on the number ofwhen it becomes aware of an approved death benefit claims made.

*Treatment of Retiree Benefits Under the Plan*.  Under the Bankruptcy Code, the Plan must provide for the continuation of all retiree benefit obligations in accordance with the terms of the applicable arrangement, subject to any modifications authorized by the Bankruptcy Court pursuant to section 1114 of the Bankruptcy Code. The FBG Debtors may seek modifications with respect to the Retiree Plan in advance of the confirmation hearing.

## V.  <u>CERTAIN RISK FACTORS INVOLVING PLAN</u>

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement, together with the attachments, exhibits, or documents incorporated by reference herein, including the letter from the Creditors' Committee to holders of unsecured claims setting forth,

among other things, any Creditors' Committee's recommendation that holders of General Unsecured Claims entitled to vote on the Plan vote to accept the Plan (the "**Creditors' Committee Position Letter**").

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.  *Risk of Non-Confirmation of Plan*

Although the FBG Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.

Moreover, the FBG Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if all holders of Claims entitled to vote in favor of the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation (including under section 1129 of the Bankruptcy Code) are not met. Confirmation of the Plan is also subject to certain conditions as described in Article XII of the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive, if anything, with respect to their Claims or Interests in a subsequent plan or otherwise through the bankruptcy proceedings.

2.  *Non-Consensual Confirmation*

In the event any Impaired Class of Claims or Interests entitled to vote on the Plan does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the proponent's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes.  Should any Class vote to reject the Plan, these requirements must be satisfied with respect to such rejecting Class.  The FBG Debtors believe that the Plan satisfies these requirements.

3.  *Risk of Non-Occurrence of Effective Date*

Although the FBG Debtors believe that the Effective Date will occur, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article XII of the Plan, then all distributions contemplated under the Plan to occur on the Effective Date would not be made and the obligations with respect to the applicable Claims and Interests would remain unchanged.

93

4. *Risks Related to Possible Objections to Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the FBG Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5. *Releases, Injunctions, and Exculpation Provisions May Not be Approved*

Article XIII of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the FBG Debtors, the Exculpated Parties, or the Released Parties, as applicable. Nothing contained in the terms of the Plan, nor the release of any claims pursuant thereto, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it evidence, indicative of the merits, or a waiver of any Claims against any non-Released Party. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

6. *Risks Related to Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The FBG Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

The FBG Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

7. *Alternative Restructuring*

If the Plan cannot be confirmed or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the FBG Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan or converting to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the FBG Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The terms of any alternative restructuring proposal are uncertain and may be less favorable to holders of Claims and Interests against the FBG Debtors than the terms of the Plan as described in this Disclosure Statement.

8. *Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims*

It is possible that the amount of Allowed Administrative Expense Claims will be higher than the range the FBG Debtors have estimated to date, and thus recoveries for creditors junior to Allowed Administrative Expense Creditors could be materially reduced or eliminated. In addition, the timing or amount of actual distributions to holders of Allowed Administrative Expense Claims may be affected by

94

many factors, including (1) the level of participation in the Administrative Expense Claims Consent Program and (2) the degree and timing of recoveries from the Litigation Trust, neither of which can be predicted with any certainty. Therefore the Debtors cannot guarantee the timing of any recovery on an Allowed Administrative Expense Claim. The FBG Debtors further cannot guarantee the level of participation, and therefore cannot guarantee the amount of any distributions to the holders of Administrative Expense Claims on account of the Administrative Expense Claims Consent Program, or the timing of distributions.

9. *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and the variation may be material.

Additionally, there can be no assurances that the estimated amount of claims of holders of Class 3(b) Litigation Trust Interests (approximately $5.6 billion) will not be significantly more (or less) than projected, which, in turn, could have a material impact on recoveries for holders of Class 3 Trust Interests (i.e. holders of Administrative Expense Claims, Priority Tax Claims, Roll-Up Claims, First Lien Claims, Second Lien Claims and General Unsecured Claims).

10. *Risk of Administrative Insolvency*

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder on an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., Allowed Administrative Expense Claims) receive Cash equal to the full amount of such claim, unless such holder agrees to different treatment. To the extent that a FBG Debtor is unable to pay such Claims in full or otherwise agree to treatment with the applicable holder, such FBG Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the FBG Debtors' administrative solvency, including reconciliation of asserted Administrative Expense Claims, ongoing litigation, and professional fees which may also impact the FBG Debtors' ability to confirm a chapter 11 plan. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in Cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as Cash equal to the full amount of such claim).

To the extent that the Debtors are unable to pay section 507(a)(2) and (a)(3) claims in full or otherwise agree to treatment with the applicable holder, the FBG Debtors may be unable to achieve the Effective Date of the Plan. In such a scenario, payments made to Settled Administrative Expense Claims **are not subject to clawback or disgorgement under the terms of the Administrative Expense Claims Consent Program**. The FBG Debtors believe they will be able to satisfy all Allowed Administrative Expense Claims in full as of the Effective Date.

11. *Conversion to Chapter 7*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the FBG Debtors, the FBG Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee(s) would be appointed or elected to liquidate the FBG Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, among other duties, collect and convert property of the estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially reduced recoveries.

The FBG Debtors anticipate that liquidation under chapter 7 would likely result in no more than is provided in the Plan—and in any event no more than as provided in the Plan—being made to the FBG Debtors' creditors, including the holders of administrative expense claims under section 503(b) of the Bankruptcy Code, due in part to, among other things, (i) the DIP Secured Parties' ability to exercise remedies against their collateral (including potentially foreclosing on substantially all assets of the FBG Debtors, including the Estate Claims, without any obligation to monetize such assets for the benefit of other creditors); (ii) the likelihood that the assets would have to be sold or otherwise disposed of over a short period of time; (iii) potential additional administrative expenses required for the appointment of a chapter 7 trustee, including a 3% trustee fee, along with other inefficiencies associated with new professionals representing the chapter 7 trustee; (iv) additional expenses and Claims, some of which would be entitled to priority; and (v) the complete lack of any available financing for a chapter 7 trustee to pursue Estate Claims and maximize the remaining assets of the FBG Debtors' estates.  See the Liquidation Analysis attached hereto as **Exhibit G**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of the holders of Claims and Interests.

12. *Dismissal of Chapter 11 Case*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the FBG Debtors, one or more of the FBG Debtors' chapter 11 cases may be dismissed by order of the Bankruptcy Court.

13. *Cost of Administering the FBG Debtors Estates*

Liquidation of the Litigation Trust Assets, DIP Collateral Trust Assets, and ABL Collateral Trust Assets, and the disbursement of the proceeds of such liquidation, will require certain administrative costs that may vary based on a variety of factors, including many out of the FBG Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

B.      ADDITIONAL FACTORS TO BE CONSIDERED

1. *FBG Debtors Could Withdraw Plan*

The Plan may be revoked or withdrawn prior to the Confirmation Date by the FBG Debtors, including in accordance with Section 15.7 of the Plan.

2. *No Duty to Update*

The statements contained in this Disclosure Statement are made by the FBG Debtors as of the commencement of these chapter 11 cases, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set

forth herein since that date.  The FBG Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.  *No Representations Outside Disclosure Statement are Authorized*

No representations concerning or related to the FBG Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement or any Creditors' Committee Position Letter should not be relied upon by you in arriving at your decision.

4.  *No Legal or Tax Advice is Provided*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.  *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the FBG Debtors or on holders of Claims or Interests.

6.  *Certain Tax Consequences*

For a discussion of certain tax considerations to the FBG Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section VI hereof.

7.  *The Debtors are Under Investigation*

The Debtors are or may be subject to various investigations, inquiries, requests for information or informal or formal proceedings from federal, state and international authorities related to certain prepetition conduct of certain Debtor entities, as well as certain affiliated non-Debtor entities and former D&Os of the Debtors.  The Debtors have cooperated with the relevant authorities regarding these investigations and provided documents responsive to the requests, and continue to work with such authorities on investigations related to the businesses and prepetition conduct of certain Debtor and affiliated non-Debtor entities and former D&Os.  At this time, it is impossible to estimate the impact of such investigations.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties may commence additional litigation against the Debtors.  In addition, as a result of these investigations, the Debtors could be subject to additional civil or criminal penalties or administrative sanctions, including fines, disgorgement, restitution, compliance orders and suspension of licenses, any of which could adversely affect the Debtors' financial condition and creditor recoveries.

8.  *Ongoing Litigation and Other Contingencies Could Affect Recoveries by Creditors from the Litigation Trust*

The Plan and Plan Settlement contemplate that the Litigation Trust will collect on certain present and future Claims and Causes of Action and distribute recovered amounts to creditors.  The FBG Debtors

and other Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from such pending and future litigation.  An adverse outcome in any litigation on which distributions under the Plan depend could materially affect the recovery of creditors.  Specifically, the occurrence of such contingencies could, among other things, (i) materially affect the amount of distributions to holders of Claims and Interests under the Plan; and/or (ii) result in delay to the timing of distributions.

The ability for the Litigation Trust to recover on Estate Claims is subject to the inherent risks associated with litigation claims.  These risks include uncertainty concerning whether these actions and litigations will be successful and, even if successful, the amount and timing of recoveries that may be realized.  Accordingly, the Debtors cannot predict with certainty the size or timing of any resulting distributions.

There is no guarantee that the Litigation Trust will recover above the Second Return Threshold (*i.e.* $350 million), at which point the holders of Class 3 Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in <u>Section 6.</u>4 would otherwise begin to recover.  Should the Litigation Trust fail to recover an amount exceeding the Second Return Threshold, the holders of Class 3 Litigation Trust Interests would not share in any recovery from the Litigation Trust.  Similarly, there is a risk that the amount of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, General Unsecured Claims, Roll-Up Claims, First Lien Claims, and Second Lien Claims that are ultimately Allowed exceeds the amount estimated by the Debtors.  If the Claims against the FBG Debtors are larger than the anticipated amount, then recoveries for holders of Class 3(b) Litigation Trust Interests, as well as other holders of Class 3 Litigation Trust Interests, would be diluted.

There is also a risk that the Litigation Trust may require additional funding beyond the $75,000,000 of Litigation Trust Funding and that the Litigation Trust may be required to incur funding that primes the recoveries to holders of Class 2 Litigation Trust Interests and Class 3 Litigation Trust Interests provided for in Litigation Trust Waterfall.  Such an exigency could increase the amount of recoveries required to meet the First Return Threshold, Second Return Threshold, and Final Return Threshold.

Moreover, there may be heightened risks regarding the ability of the Litigation Trust to recover on account of the James Adversary Proceeding.  The Debtors expect that their claims against the defendants in the James Adversary Proceeding will be subject to extensive litigation.  Additionally, recovery may be impeded by complications arising from the ongoing criminal proceedings against certain of the defendants.  Relatedly, the assets held by the defendants may ultimately be subject to potential forfeiture, or they may be frozen in connection with the criminal proceedings.  The Debtors may be unable to recover assets seized by governmental authorities, and there can be no assurance as to the timing or outcome of any adjudication of the ownership of any seized assets.  While the Debtors will continue to cooperate in good faith with these various governmental authorities, the circumstances of these Chapter 11 Cases make it difficult to predict the resolution of proceedings regarding these assets or the timing thereof.  Accordingly, recovery on account of these claims may be speculative.

The Debtors also expect other litigation targets to vigorously contest liability and damages, and certain litigation, such as against Onset, may also be delayed due to the ongoing criminal proceedings against certain named parties to such litigation. Further risk and complication also could arise from individual creditors, who do not contribute their direct claims to the Litigation Trust in connection with the Preference Settlement, asserting purported direct claims and causes of action against the same defendants against whom the Litigation Trust also seeks a recovery.

**DEBTORS' EXHIBIT NO. 7**
**Page 244 of 272**

9. *The Recoveries on the Estate Claims are Inherently Uncertain*

The amount of recoveries on the Estate Claims transferred to the Litigation Trust are unknown and are contingent on numerous factors including general litigation risks and other matters specific to such litigation, many of which are difficult to predict and/or beyond the Debtors' control. Additionally, realizing the value of the Estate Claims may take multiple years. Moreover, whether actual financial results, litigation, and any other future developments are ultimately consistent with the Debtors' expectations and assumptions may depend on factors outside of the Debtors' control that could adversely affect the value of such assets. Furthermore, even if the Litigation Trust were to secure favorable judgments, there is no guarantee that the Trust would be able to collect all or a portion of any judgment due to, among other reasons, the financial condition of defendants.

10. *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors or any entity as the case may be, to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, except as otherwise provided to Preference Settlement Electing Creditors in accordance with the Preference Settlement, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

11. *Failure to Identify Litigation Claims or Causes of Action*

No reliance should be placed on the fact that a particular litigation claim or a projected objection to a particular Claim or Cause of Action is, or is not, identified in this Disclosure Statement. The Litigation Trustee may seek to investigate, file, and prosecute Claims or Causes of Action and may object to Claims or Interests after the Confirmation Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Causes of Action or objections to such Claims or Interests. The Claims Ombudsman will conduct the reconciliation process for Claims against the FBG Debtors.

12. *Objection to Amount or Classification of Claims*

The FBG Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of any Claim whose Claim is or may be subject to an objection may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**VI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the FBG Debtors and to certain holders of Allowed Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are Unimpaired, not entitled to vote on the Plan, deemed to reject the Plan or who will be paid in full in Cash under the Plan, nor to holders of Interests, since such holders are deemed to reject the Plan. This discussion also does not address the Plan Settlement other than where aspects overlap with the Plan. Accordingly, this discussion does not address the U.S. federal income tax consequences specific to holders of Allowed DIP A Claims except as discussed in <u>Section VI.C</u>.

99

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986 (as amended, the "**Tax Code**"), the U.S. Treasury regulations promulgated thereunder (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The FBG Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position as to the federal income tax consequences described herein.

This summary does not address state, local, or non-U.S. income or other tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to certain holders of Claims in light of their individual circumstances or, except as otherwise indicated, to a holder that may be subject to special tax rules (e.g., any person who is not a U.S. Holder (as defined below), controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, broker-dealers, mutual funds, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, governmental authorities or agencies, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders in securities that mark-to-market their securities, certain expatriates or former long-term residents of the U.S., persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated investment, and persons who received their Claim as compensation). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the FBG Debtors such that the FBG Debtors themselves will be liquidated and that all distributions to holders of Claims will be taxed accordingly. The FBG Debtors will remain in existence after the Effective Date solely for the purpose of completing the Wind Down.

Additionally, this discussion assumes that: (i) the various debt and other arrangements to which the FBG Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and (iii) the Estate Claims Credit Bid amount and DIP Collateral Credit Bid amount are each respected as representing an arms' length price reflecting the fair market value of the applicable acquired assets.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

100

### A.   CONSEQUENCES TO THE FBG DEBTORS

FBGH is a partnership for U.S. federal income tax purposes. Accordingly, FBGH is not itself subject to U.S. federal income tax.  Instead, all income, gain, loss, deduction and credit of FBGH is allocable to its equity owners.  Each of the other FBG Debtors is either (i) a corporation (or a limited liability company that elected to be taxed as a corporation) that files an individual U.S. federal income tax return (an "**FBG Corp**"), (ii) a member of an affiliated group of corporations that files a consolidated U.S. federal income tax return (an "**FBG Tax Group**") or (iii) an entity disregarded as separate from its owner for U.S. federal income tax purposes (an "**FBG DRE**") whose activities and operations are reflected on the U.S. federal income tax returns of FBGH, an FBG Corp, or an FBG Tax Group. Specifically, there are eight separate FBG Tax Groups and four individual FBG Corps that file U.S. federal income tax returns and are subject to corporate level tax.

The FBG Debtors estimate that, as of December 31, 2024, the FBG Corps and FBG Tax Groups collectively had net operating loss ("**NOL**") carryforwards of at least $370 million and disallowed interest expense carryforwards and certain other tax attributes (collectively, the "**Tax Attributes**").  Most of such Tax Attributes are subject to existing limitations under Section 382 of the Tax Code.  Among such tax groups and FBG Corps, the NOL carryforwards range from none to approximately $270 million. The FBG Debtors' federal income tax returns for their 2025 taxable year are not yet due and have not yet been prepared.  During their current (2026) taxable year, the FBG Debtors have collectively sold a substantial portion of their assets, including the stock of certain non-U.S. entities.  The FBG Debtors expect that such sales resulted in an overall loss within the respective FBG Tax Groups or FBG Corps to which they related.  Certain equity trading activity and other actions prior to the Effective Date could result in an ownership change of the FBG Corps and FBG Tax Groups independent of the Plan, in which event such corporation's or tax group's ability to utilize its pre-change Tax Attributes against post-change taxable income could be severely limited.  In an attempt to minimize the likelihood of such an ownership change, the FBG Debtors obtained a final order from the Bankruptcy Court authorizing certain protective equity trading procedures (Docket No. 300).

### 1.   *Wind Down of the FBG Debtors*

On the Confirmation Date, in accordance with the Plan and the Plan Settlement, the FBG Debtors will transfer (a) the ABL Collateral Trust Assets to the ABL Collateral Trust, (b) the DIP Collateral Trust Assets to the DIP Collateral Trust, and (c) the Litigation Trust Assets to the Litigation Trust.  The transfer of such assets to the Trusts (including any portion treated as a "disputed ownership fund" or other separate taxable entity in respect of Disputed Claims) is expected to be treated as taxable sales of such assets for U.S. federal income tax purposes at their then fair market value.  In the case of the DIP Collateral Assets and Litigation Trust Assets, the fair market value of such assets should equal the amount of the DIP Collateral Credit Bid and Estate Claims Credit Bid, respectively.  It is uncertain whether any of the FBG Debtors will recognize a material net gain as a result of the transfer of assets to the Trusts – particularly in respect of the transfer of certain causes of actions to the Litigation Trust – or the sale of any remaining assets.  Depending on the FBG Corp or FBG Tax Group, a portion of any resulting net gain may be offset in whole or in part by available Tax Attributes, potentially including current year losses.   Accordingly, it is possible that the transfer of assets to the respective Trusts may result in a material income tax liability to one or more of the FBG Corps and the FBG Tax Groups.

As discussed below, each of the Trusts is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulations section 301.7701-4(d).  *See* Section VI.C.3. — "Tax Reporting for Assets Allocable to or Retained on Account of Disputed Claims."  For U.S. federal income tax purposes, the Plan provides that all parties will treat any transfer of assets to the applicable Trust (other than any assets allocable to any portion of the Trust treated as a disputed

ownership fund or other separate taxable entity in respect of Disputed Claims) as (i) a transfer of such assets directly to the beneficiaries of such Trust in satisfaction of their respective Allowed Claims against the FBG Debtors in accordance with the Plan, immediately followed by (ii) a transfer by such beneficiaries of their interest in such assets to the applicable Trust.  Pursuant to applicable Treasury Regulations, any assets treated as transferred to a disputed ownership fund or other separate taxable entity in respect of Disputed Claims is similarly treated as a taxable sale of such assets by the FBG Debtors. For a further discussion of the tax treatment of the transfers of assets to the Trusts, *see* Section VI.C., below, "Tax Treatment of the Trusts and their Beneficiaries."

2.  *Cancellation of Debt and the Reduction of Tax Attributes*

In general, absent an applicable exception, a taxpayer must recognize cancellation of debt ("**COD**") income from the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income is generally the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of Cash paid, the issue price of any new indebtedness issued, and the fair market value of any other non-Cash consideration, given in satisfaction of such indebtedness at the time of the exchange. The IRS generally has held that the guarantors of indebtedness should not recognize COD income upon the settlement, cancellation, release or discharge of the guarantee.

If a corporate taxpayer is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and the cancellation or discharge of debt occurs pursuant to a bankruptcy court order or confirmed plan, any resulting COD income is excluded from gross income.  As a consequence of such exclusion, a corporate debtor must reduce certain of its tax attributes by up to the amount of the excluded COD income.  Tax attributes are generally reduced in the following order: (i) current year NOLs and NOL carryforwards, (ii) general business credit carryovers, (iii) current year net capital losses and capital loss carryovers, (iv) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge), (v) passive activity loss and credit carryovers, and (vi) foreign tax credit carryovers.  In the absence of contrary guidance, disallowed business interest expense carryovers under section 163(j) of the Tax Code are not subject to reduction under these rules.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, such as the FBG Tax Groups, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the other members of the tax consolidated group also be reduced. Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the debtor's taxable income or loss for the taxable year in which the excluded COD income is incurred.

The FBG Debtors expect to incur a substantial amount of potential COD income in connection with the implementation of the Plan.  As discussed above, because FBGH is a partnership for U.S. federal income tax purposes, the equity owners of FBGH allocated their respective share of any COD income recognized by FBGH. Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, no COD income generally should be incurred by an FBG Debtor as a result of the implementation of the Plan prior to the disposition by such FBG Debtor of all or substantially all of its assets and, at such time, any COD income of the FBG Corps and FBG Tax Groups is expected to be excludable from gross income.  However, when an Allowed Claim's distribution is subject to a maximum amount less than the Allowed amount of such Claim or has been or is separately settled for less than its carrying value, COD income (excludable from gross income in the case of a corporate debtor) will be incurred at the time the Claim is so capped or settled – such as in the case of Allowed Roll-up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims due to the reduction in the amount of such Claims as of the Confirmation Date by the anticipated amount of future distributions from the respective Trusts in which the holders of such Claims receive an interest, rather than only the fair market value of such interests.  As indicated above, any reduction in Tax Attributes due

102

to the application of the bankruptcy exception to COD income for corporate debtors does not occur until the end of the tax year in which the excluded COD income is incurred, after such attributes have been applied to determine the tax for the year. Thus, the FBG Debtors do not expect that any attribute reduction will materially affect the computation of taxable income in respect of the transfers to the Trust because such transfers are expected to occur prior to the year, or end of the year, in which any COD is incurred.

3. ***Limitation of NOL Carryforwards and Other Tax Attributes***

a. *Section 382 Limitations – General*

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation.

In general, the amount of this annual limitation is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (for example, 3.68% for ownership changes occurring in June 2026). For a corporation (or consolidated group) in bankruptcy that undergoes the ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change by taking into account the surrender or cancellation of creditors' claims, also with certain adjustments. The annual limitation can potentially be increased by the amount of certain recognized built-in gains, as discussed below. Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains).

As indicated above, section 382 of the Tax Code also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

b. *Possible Application to the FBG Corps and FBG Tax Groups*

In light of the foregoing, the ability of an FBG Corp and FBG Tax Group to utilize certain Tax Attributes would be potentially subject to additional limitations if it were to undergo an "ownership change" within the meaning of section 382 of the Tax Code by reason of the implementation of the Plan

103

or otherwise.  Pursuant to the Plan, the holders of FBG Debtor Interests will maintain their economic interests in any residual assets of the FBG Debtors after the satisfaction of all Allowed Claims, and which economic interests in FBGH will be nontransferable.  Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not believe that the Plan should result in an ownership change of the FBG Corps and FBG Tax Groups.  However, due to a lack of direct authoritative guidance in the context of a liquidating Chapter 11 plan, there is no assurance that the IRS would not successfully assert a contrary position (including with respect to the treatment for U.S. federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of the FBG Debtors throughout the liquidation process).  If, notwithstanding the FBG Debtors' position, an ownership change were considered to occur, the FBG Corps and FBG Tax Groups could incur additional federal income tax unless (1) the FBG Debtors' assets are distributed pursuant to the Plan on or before the date of such ownership change or (2) the amount of the annual limitation (taking into account the increase therein for certain recognized built-in gains) is large enough to permit the applicable FBG Debtor(s) to utilize an amount of NOL carryforwards and other Tax Attributes sufficient to offset such income tax.

> **B.** **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS OF CERTAIN ALLOWED CLAIMS**

The following discusses certain U.S. federal income tax consequences of the implementation of the Plan to holders of certain Allowed Claims who are U.S. Holders (but not of the Plan Settlement other than where aspects overlap).  As used herein, the term "**U.S. Holder**" means a beneficial owner of an Allowed Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the U.S., any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds any such Claim, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner-level. If you are a partnership holding any such Claim or a partner in any such partnership, you are urged to consult your own tax advisor regarding the U.S. federal income and other tax consequences of the Plan.

1. ***Treatment of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, Allowed ABL Claims, Allowed General Unsecured Claims and Allowed Subordinated Claims***

Pursuant to the Plan:

(a) each holder of an Allowed Roll-Up Claim will receive such holder's Pro Rata Share of the Class 3(a) Litigation Trust Interests in full and final satisfaction, settlement, and release of its Allowed Roll-Up Claim (other than its Remaining Roll-Up Claim) against the FBG Debtors,

(b) each holder of an Allowed First Lien Claim and Allowed Second Lien Claim will receive such holder's Pro Rata Share of the Class 3(c) Litigation Trust Interests in full and final satisfaction, settlement, and release of its Allowed First-Lien Claim or Allowed Second Lien Claim (other than its Remaining First Lien Claim or Remaining Second Lien Claim, as applicable) against the FBG Debtors.

(c) each holder of an Allowed ABL Claim will receive such holder's Pro Rata Share of the ABL Collateral Trust Interests in full and final satisfaction, settlement, and release of such Allowed ABL Claim in an amount equal to the fair market value of the ABL Collateral Trust Assets (any holder's ABL Deficiency Claim will be contributed to, and held by, the ABL Collateral Trust), and

(d) each holder of an Allowed General Unsecured Claim and Allowed Subordinated Claim will receive such holder's Pro Rata Share of the Class 3(b) Litigation Trust Interests.

As indicated, a portion of the Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims may remain outstanding against the FBG Debtors after reduction in the amount of such Allowed Claim by the amount of the anticipated distributions to be received over the term of the Litigation Trust in respect of the Litigation Trust interest received, which amount would necessarily exceed the fair market value of such Litigation Trust interest upon receipt (unless both were zero). As a result of such excess reduction, it is possible that the Remaining Lender Claims with respect to the Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims may be treated – and the following discussion assumes will be treated – as significantly modified for U.S. federal income tax purposes due to a mathematical change in the yield of such claim under applicable Treasury Regulations by more than the greater of 25 basis points or 5% of the original yield. Consequently, the following discussion assumes that, for U.S. federal income tax purposes:

(i) the holders of Allowed Roll-Up Claims will be treated, upon the receipt of Class 3(a) Litigation Trust Interests for their Allowed Roll-Up Claims, as also receiving in satisfaction of their Allowed Roll-Up Claims the Remaining Roll-Up Claims (which the FBG Debtors expect to treat for U.S. federal income tax purposes as a new debt obligation); and

(ii) the holders of Allowed First Lien Claims and Second Lien Claims will be treated, upon the receipt of Class 3(c) Litigation Trust Interests for their Allowed First Lien Claims or Allowed Second Lien Claims, as also receiving in satisfaction of their Allowed First Lien Claims or Second Lien Claims, as applicable, the Remaining First Lien Claims or

Remaining Second Lien Claims (which, in each case, the FBG Debtors expect to treat for U.S. federal income tax purposes as a new debt obligation).

As discussed below, each holder of an Allowed Roll-Up Claim, Allowed First Lien Claim, Allowed Second Lien Claim, Allowed ABL Claim, Allowed General Unsecured Claim, and Allowed Subordinated Claim will be treated for U.S. federal income tax purposes as directly receiving in satisfaction of and in exchange for such Allowed Claim, and thereafter as a direct owner of, an undivided interest in the underlying assets of the Litigation Trust or ABL Collateral Trust, as applicable. As to holders of Allowed General Unsecured Claims and Allowed Subordinated Claims, this treatment is obtained even though the Claims Ombudsman will be the holder of record of the Class 3(b) Litigation Trust Interests. For a further discussion of the U.S. federal income tax treatment of receiving and owning a beneficial interest in any of the Trusts, *see* Section VI.C.

Pursuant to the Plan, the Litigation Trustee, the DIP Collateral Trustee, and the ABL Collateral Trustee (collectively, the "**Trustees**"), or a Trustee's designee, will determine the fair market value of the assets transferred to the applicable Trust (as defined below) as of the date of transfer.  All parties to a Trust (including U.S. Holders of Allowed Claims receiving interests therein) must consistently use such valuation for all U.S. federal income tax purposes.  The Trustees will provide valuations to holders of beneficial interests and other applicable parties.

a.      *Gain or Loss with Respect to Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims*

On the Confirmation Date, a U.S. Holder of an Allowed Roll-Up Claim, Allowed First Lien Claim, or Allowed Second Lien Claim generally should recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property deemed received by reason of its undivided interest in the assets transferred to the Litigation Trust or DIP Collateral Trust, as applicable and the issue price (as determined for U.S. federal income tax purposes) of the relevant Remaining Lender Claims and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim, excluding both from the consideration received and a holder's tax basis in its Claim any amounts attributable to a Claim for accrued but unpaid interest and possibly amortized original issue discount ("**OID**"). *See* Section VI.B.2.  For a discussion of the accrued but unpaid interest and accrued OID, *see* Section VI.B.3.

In the case of Allowed Roll-Up Claims, the tax consequences described above would differ materially to the extent the Allowed Roll-Up Claims are treated as "securities" of a corporate debtor for U.S. federal income tax purposes. In such a case, a U.S. Holder would not be allowed to recognize a loss on the exchange. The determination of whether an instrument constitutes a "security" and the extent to which it may be considered issued in whole or in part by one or more of the FBG Corps or FBG Tax Groups for U.S. federal income tax purposes is complex. Holders of Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims are urged to consult their tax advisor with respect to the income tax consequences of the Plan to them.

Because a holder of a beneficial interest in a liquidating trust is treated as a direct owner of an undivided interest in the underlying assets of the Trust, any income or loss of the Trust will be treated as income or loss of the beneficiary.  In general, a distribution of Cash by a Trust to any of its beneficiaries will not be separately taxable since the beneficiary is already regarded for U.S. federal income tax purposes as owning an undivided interest in the underlying assets.  For a further discussion, *see* Section VI.C.

106

*b.   Gain or Loss With Respect to Allowed ABL Claims, Allowed General Unsecured Claims and Allowed Subordinated Claims*

In general, a U.S. Holder of an Allowed ABL Claim, an Allowed General Unsecured Claim or an Allowed Subordinated Claim should recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the amount of any Cash and the fair market value of any other property deemed received by reason of its undivided interest in the assets transferred to the ABL Collateral Trust or Litigation Trust, as applicable and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor, excluding both from the consideration received and a U.S. Holder's tax basis in its Claim any amounts attributable to a Claim for accrued but unpaid interest or possibly amortized OID.

In the case of an Allowed ABL Claim, the ABL Deficiency Claims are preserved and may continue to be asserted against the Estates of the applicable FBG Debtors.  The FBG Debtors believe, although not free from doubt, that each holder of such an Allowed Claim generally will not be permitted to recognize a loss with respect to such Claim while preserving and continuing to pursue the primary obligation, other guaranty Claims against the Estates of the FBG Debtors, and other sources of collection with respect to its Claim. As indicated above, this discussion assumes, among other things, that the Estate Claims Credit Bid amount and DIP Collateral Credit Bid amount are each respected as representing an arms' length price reflecting the fair market value of the applicable acquired assets.  If this is not the case, or a holder takes a position contrary to that described, the resulting tax consequences may be materially different, including, potentially, the timing of the recognition of any loss and the tax treatment of its surviving Claims against the FBG Debtors and the Parent Guarantors, as applicable.

In the case of an Allowed General Unsecured Claim or an Allowed Subordinated Claim, if the holder is seeking or has the right to receive payments from other sources of collection in respect of such Claim (e.g., due to the subsequent disallowance of any Disputed General Unsecured Claims), the recognition of any loss realized by such a U.S. Holder with respect to its Allowed Claim may be deferred until its full loss is determined with certainty.  *See also* Section VI.C.3 below.  The FBG Debtors believe that the tax treatment described herein with respect to General Unsecured Claims should apply equally to holders of Allowed General Unsecured Claims that are also Preference Settlement Electing Creditors.

Because a holder of a beneficial interest in a liquidating trust is treated as a direct owner of an undivided interest in the underlying assets of the Trust, any income or loss of the Trust will be treated as income or loss of the beneficiary.  In general, a distribution of Cash by a Trust to any of its beneficiaries will not be separately taxable since the beneficiary is already regarded for U.S. federal income tax purposes as owning an undivided interest in the underlying assets.  For a further discussion, *see* Section VI.C.

*c.   Basis and Holding Period*

The aggregate tax basis of a U.S. Holder of an Allowed Claim in its undivided interest in the underlying assets of the applicable Trust (subject to any portion(s) of the Trust which may be treated as a "disputed ownership fund" or other taxable entity for U.S. federal income tax purposes) generally will equal the fair market value of such holder's interest in such assets increased by its share of the liabilities to which such assets remain subject upon transfer to the applicable Trust. The tax basis of a U.S. Holder of an Allowed Roll-Up Claim, Allowed First Lien Claim, or Allowed Second Lien Claim in its applicable Remaining Lender Claim generally will equal the issue price of such Remaining Lender Claim (which such Remaing Lender Claim was treated as contributed to the DIP Collateral Trust). Such U.S. Holder's holding period generally will begin on the day following the date of transfer of such assets to the applicable Trust.

107

2. *Distributions in Discharge of Accrued Interest or OID*

Pursuant to Section 9.14 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest (including amortized OID). However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

In general, to the extent any amount received by a U.S. Holder pursuant to the Plan is received in satisfaction of interest accrued (including amortized OID) during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the U.S. Holder's normal method of accounting). Conversely, a U.S. Holder may be entitled to recognize an ordinary loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of an Allowed Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest (including OID) for tax purposes.

3. *Character of Gain or Loss*

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the holder reports income using the accrual or cash method of accounting, whether such Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction or worthless security deduction with respect to such Claim.

A U.S. Holder that purchased its Claim from a prior holder at a "market discount" (relative to the principal amount of such Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code, unless an exception applies. A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with a "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim (or, in the case of a Claim issued without OID, the sum of all remaining payments to be made on the Claim, excluding "qualified stated interest") by at least a statutorily defined de minimis amount. Under these rules, gain recognized on the taxable disposition of a Claim that is subject to the market discount rules generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.

C.        **TAX TREATMENT OF THE TRUSTS AND THEIR BENEFICIARIES**

1. *Classification of the Trusts as "Liquidating Trusts"*

Each of the Litigation Trust, DIP Collateral Trust, and ABL Collateral Trust (collectively, the "**Trusts**") is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations

108

section 301.7701-4(d) for U.S. federal income tax purposes (except to the extent that any assets of the Litigation Trust or ABL Collateral Trust allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Each of the Trusts will be structured with the intention of complying with such general criteria.

Pursuant to the Plan and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the FBG Debtors, the Trustees, and the beneficiaries of each Trust) must treat the transfer of assets by the FBG Debtors to the applicable Trust for U.S. federal income tax purposes as (1) a transfer of such assets (subject to any liabilities and obligations relating to those assets) directly to recipients of beneficial interests in such Trust (other than in respect of any portion of the assets allocable to any portion treated as a "disputed ownership fund" or other separate taxable entity in respect of Disputed Claims), immediately followed by (2) a transfer by such beneficiaries to the applicable Trust of such assets in exchange for beneficial interests in the applicable Trust.  Because the DIP Collateral Trust holds a residual interest in the ABL Collateral Trust, holders of beneficial interests in the DIP Collateral Trust will be treated for U.S. federal income tax purposes as directly receiving an undivided interest in the underlying assets of the ABL Collateral Trust reflective of the DIP Collateral Trust's interest in the ABL Collateral Trust and immediately transferring such assets to the DIP Collateral Trust which, in turn, will be treated as immediately transferring such assets to the ABL Collateral Trust. At the same time, pursuant to the Plan, and the Litigation Trust Agreement, the holders of Allowed DIP A Claims comprising the Litigation Trust Class 1 Funding Contributors will provide funding for the Litigation Trust in exchange for Class 1 Litigation Trust Interests, and, pursuant to the Plan, the Preference Settlement Electing Creditors will contribute their Direct Creditor Claims to the Litigation Trust, the holders of the Remaining Lender Claims will be treated as contributing their Remaining Lender Claims to the DIP Collateral Trust, and the holders of ABL Deficiency Claims will contribute their right to recoveries to the ABL Collateral Trust. Similarly, pursuant to the Plan and the DIP Collateral Trust Agreement, the holders of Allowed DIP A Claims comprising the DIP Collateral Trust Funding Contributors will provide funding for the DIP Collateral Trust in exchange for Class 1 DIP Collateral Trust Interests.  Accordingly, except in the event of contrary definitive guidance, holders of beneficial interests in the Trusts will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the underlying assets of the Trusts (other than such assets as are allocable to any portion treated as a "disputed ownership fund" or other separate taxable entity).

No ruling is currently being requested from the IRS concerning the tax status of any of the Trusts as a grantor trust or the identity of any particular party as a grantor with respect to any of the Trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of any of the Trusts as a grantor trust or status of any party as a grantor with respect to any of the Trusts (including as a result of the issuance of Class 1 Litigation Trust Interests to the Litigation Trust Class 1 Funding Contributors and Class 1 DIP Collateral Trust Interests to the DIP Collateral Trust Funding Contributors).  If the IRS were to challenge successfully such classification or status, the U.S. federal income tax consequences of the Trusts and the applicable holders of Claims could vary from those discussed herein (including as a result of the Trust potentially being treated for U.S. federal income tax purposes as a partnership or a corporation).  Certain U.S. federal income tax consequences of the Litigation Trust or ABL Collateral Trust or portions thereof being treated as a "disputed ownership fund" or other taxable entity are also discussed below.

The Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests will not be certificated, and will be non-transferable and non-assignable except by will, intestate,

109

**DEBTORS' EXHIBIT NO. 7**
**Page 255 of 272**

succession, or operation of law.  In lieu of receiving Trust Interests, a holder may designate another person to receive such holder's Trust Interests on its behalf at the effective time, subject to compliance with applicable certification and documentation requirements.

2. ***General Tax Reporting by the Trusts and Their Beneficiaries***

Because each of the Trusts will be structured to qualify as a "liquidating trust" for U.S. federal income tax purposes, the Plan provides that, for all U.S. federal income tax purposes, all parties must treat each of the Trusts as a grantor trust of which the holders of beneficial interests in the Trusts are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the assets of each of the Trusts consistent with their relative share therein (other than in respect of any assets allocable to any portion of the Trusts treated as a "disputed ownership fund" or other separate taxable entity in respect of Disputed Claims).  Each of the Trustees will file tax returns for the Trusts treating each of the Trusts as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Trustees will provide annually to their respective holders of record of a beneficial interest in the relevant Trust a separate statement regarding the receipts and expenditures of such Trust as relevant for U.S. federal income tax purposes.

As soon as reasonably practicable after the transfer of the Litigation Trust Assets, the DIP Collateral Trust Assets, and the ABL Collateral Trust Assets to each of the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, respectively, the applicable Trustee will make a good faith valuation of the fair market value of such assets.  All parties (including, without limitation, the FBG Debtors, the Trustees, and the beneficiaries of the Trusts) must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available by the applicable Trustee, from time to time, as relevant for tax reporting purposes.

Allocations of taxable income of the Trusts among the Trust beneficiaries (with the exception of any taxable income and loss allocable to any portion of the Trusts treated as a "disputed ownership fund" or other taxable entity, which would be separately taxable to such fund, *see* Section VI.C.3,will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the applicable Trust had distributed all its assets (valued at their tax book value) to the applicable Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust.  Similarly, taxable loss of any Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of such Trust.  The tax book value of any Trust's assets for purposes of allocating taxable income and loss will be equal to their fair market value on the date of the transfer of such assets to the applicable Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to a Trust beneficiary will be treated as income or loss with respect to such Trust beneficiary's undivided interest in the applicable Trust's assets, and not as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss would depend on the particular situation of the holder of such beneficial interest in any Trust.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in a Trust is not dependent on the Trust distributing any Cash or other proceeds (other than with respect to the portion, if any, of the Trust also treated as a disputed ownership fund or other taxable entity).  Thus, a U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of a Trust's

110

income, even if the Trust does not make a concurrent distribution to the holder. In general, other than in respect of any Cash treated as owned by a disputed ownership fund or other separate taxable entity (the subsequent distribution or reallocation of which to holders of previously Allowed Claims still relates to the holders' Allowed Claims), a distribution of Cash by the Trust will not be separately taxable to a beneficiary of the Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Trust). Holders are urged to consult their own tax advisor regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash from the Trusts.

The Trusts will comply with all applicable governmental withholding requirements, including with respect to non-U.S. Holders. *See* Section VI.D.

3. ***Tax Reporting for Assets Allocable to or Retained on Account of Disputed Claims***

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by any of the Trustees of a private letter ruling if a Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the respective Trustee(s)), the Litigation Trustee and ABL Collateral Trustee may timely elect to treat any portion of the Litigation Trust or ABL Collateral Trust allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 or other separate taxable entity, if applicable. In addition, the Claims Ombudsman, as permitted or required by applicable law, may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" or other separate taxable entity.

A "disputed ownership fund" generally is treated as a separate taxable entity for U.S. federal income tax purposes and is subject to tax annually on any net income earned with respect to the assets allocable thereto, or retained on account thereof (including any gain recognized upon the transfer, resolution, distribution, or other disposition of fund assets). All distributions from such fund (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by a holder in respect of its Claim as if distributed by the FBG Debtors to which such holder's Claim relates. All parties (including, without limitation, the FBG Debtors, the Litigation Trustee, Claims Ombudsman, and Litigation Trust beneficiaries, with respect to the Litigation Trust, and the FBG Debtors, the ABL Collateral Trustee, and the ABL Collateral Trust beneficiaries, with respect to the ABL Collateral Trust) will be required to report for tax purposes consistently with the Litigation Trustee (or Claims Ombudsman) or ABL Collateral Trustee's treatment of any portion of the Litigation Trust (including with respect to Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests) or ABL Collateral Trust, respectively, allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 or other separate taxable entity.

A fund treated as a "disputed ownership fund" or other taxable entity will be responsible for payment, out of the assets of the fund, of any taxes (including any taxes attributable to any income that may arise upon the actual or deemed distribution of the assets) imposed on the fund or its assets. In the event any Cash in such fund is insufficient to pay the costs and expenses of the fund, assets of the fund may be sold to pay such costs and expenses.

D.      **WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING**

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement, or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a

111

recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

In addition, a Trust beneficiary that is *not* a U.S. person may be subject to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders of Allowed Claims.

*The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.*

## VII. CONFIRMATION OF PLAN

### A. CONFIRMATION HEARING

SECTION 1128(A) OF THE BANKRUPTCY CODE REQUIRES THE BANKRUPTCY COURT TO HOLD A CONFIRMATION HEARING UPON APPROPRIATE NOTICE TO ALL REQUIRED PARTIES. NOTICE OF THE CONFIRMATION HEARING WILL BE PROVIDED TO ALL KNOWN CREDITORS AND EQUITY HOLDERS OF THE FBG DEBTORS OR THEIR REPRESENTATIVES. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR THE ANNOUNCEMENT OF THE CONTINUATION DATE MADE AT THE CONFIRMATION HEARING, AT ANY SUBSEQUENT CONTINUED CONFIRMATION HEARING, OR PURSUANT TO A NOTICE FILED ON THE DOCKET FOR THE CHAPTER 11 CASES.

### B. OBJECTIONS

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the FBG Debtors' estate or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the chapter 11 cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY**

112

FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## C.    REQUIREMENTS FOR CONFIRMATION OF PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Interests entitled to vote or, if the Plan is rejected or deemed rejected by an impaired Class, at least one impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) in the "best interests" of the holders of Claims and Interests impaired under the Plan, and (iii) feasible.

1.   *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(a)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    the FBG Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)    the Plan has been proposed in good faith and not by any means forbidden by law;

(d)    any payment made or promised by the FBG Debtors, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    the FBG Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a D&O of the FBG Debtors, or a successor to the FBG Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy;

(f)    with respect to each Class of Claims or Interests, each holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the FBG Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(g)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims and other priority claims will be paid in full on the Effective

113

Date, or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i)     at least one Class that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the FBG Debtors or any successor to the FBG Debtors under the Plan, unless such liquidation is proposed in the Plan; and

(k)     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The FBG Debtors believe the Plan meets all the applicable requirements of section 1129 of the Bankruptcy Code.

2.   *Acceptance of Plan*

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the Allowed Claims in such Class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept such plan.  Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of such plan.

3.   *Cramdown*

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the FBG Debtors if at least one Impaired Class has voted to accept the Plan and as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.

a.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority but are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The FBG Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the FBG Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

114

b.     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (ii) has the right to credit bid, subject to section 363(k) of the Bankruptcy Code, the amount of its claim if its property on which it has a lien is sold and retains its lien on the proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest and (b) the value of the equity interest or (ii) the holders of interest that are junior to the interest of the dissenting class will not receive or retain any property under the plan.

The FBG Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE FBG DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

4.  *Best Interests Test*

As noted above, with respect to each impaired class of Claims and Interests, confirmation of a plan requires that each such holder either (i) accept such plan or (ii) receive or retain under such plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the FBG Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from proceeds of the liquidation of the FBG Debtors' assets and properties (after subtracting amounts attributable to the aforesaid claims) is compared with the value offered to such classes of claims and interests under the plan.

**DEBTORS' EXHIBIT NO. 7**
**Page 261 of 272**

The FBG Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The FBG Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests absent the Plan Settlement and (ii) the Liquidation Analysis attached hereto as **Exhibit G**.

The FBG Debtors believe that any liquidation analysis is speculative, as it necessarily is premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the FBG Debtors.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effect of a hypothetical chapter 7 liquidation of the FBG Debtors, subject to the assumptions set forth therein. There can be no assurance as to the values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the FBG Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

5. *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan.  Because the Plan provides for the liquidation of the FBG Debtors, the Debtors believe the Bankruptcy Court will find that the Plan is feasible.  Further, the Debtors believe that the proceeds from the Litigation Trust will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds to prosecute, monetize, and liquidate the Litigation Trust Assets.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The FBG Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the FBG Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) a liquidation under chapter 7 of the Bankruptcy Code or (ii) the preparation and presentation of an alternative chapter 11 plan.

1. *Liquidation Under Chapter 7 of Bankruptcy Code*

If no plan can be confirmed, the FBG Debtors' chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the FBG Debtors for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that the FBG Debtors expect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit G**.

The FBG Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the chapter 11 cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the chapter 11 cases, and the loss in value attributable to a considerably expeditious liquidation of the FBG Debtors' assets as required by chapter 7.

116

2.  *Alternative Chapter 11 Plan*

If the Plan is not confirmed, the FBG Debtors could attempt to formulate a different plan.  Such a plan might involve an orderly liquidation of the FBG Debtors' assets.  However, the FBG Debtors believe the Plan, as described herein, enables their creditors to realize the most value under the circumstances.  Further, the FBG Debtors believe that failure to confirm the Plan will likely lead to the destruction of value, and, in turn, reduce potential recoveries for holders of Allowed Claims.  In formulating and developing the Plan, the FBG Debtors and their stakeholders explored numerous other alternatives and engaged in an extensive negotiating process.

## IX.  CONCLUSION

The FBG Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of Impaired Claims in Classes 3, 4, 5, 6, 7, and 8 to vote to accept the Plan.

117

Dated:  June ~~12~~17, 2026
          ~~Houston, Texas~~<u>Oakland County, Michigan</u>

                            Respectfully submitted,

                            FIRST BRANDS GROUP, LLC AND
                            CERTAIN AFFILIATED DEBTORS


                            By:      <u>/s/  *Charles M. Moore*       </u>
                            Name:  Charles M. Moore
                            Title:    Chief Executive Officer

## EXHIBIT A

**Plan**

**EXHIBIT B**

**Release, Exculpation, and Plan Injunction Provisions**

## EXHIBIT C

**Solicitation and Voting Procedures**

**EXHIBIT D**

**Organizational Chart**

## <u>EXHIBIT E</u>

**Marketing Materials**

**EXHIBIT F**

**Illustrative Recovery Scenarios**

**EXHIBIT G**

**Liquidation Analysis[25]**

---

[25]   A more formal liquidation analysis will be served with the Plan Supplement, but for the Debtor's response to the U.S. Trustee's Conversion Motion, *see* Section IV.U above.

**EXHIBIT H**

**List of FBG Debtors (excl. SPV Debtors)**