**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**<u>CERTIFICATE OF PUBLICATION</u>**

I, Zachary Steinberg, declare and state as follows:

I am employed by Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent for the Debtors in the above-captioned chapter 11 cases.

This Certificate of Publication includes a certification verifying that the *Notice of (I) Conditional Approval of Disclosure Statement (II) Approval of (A) Solicitation and Voting Procedures, (B) Administrative Expense Claims Consent Program Opt-In Procedures, (C) Preference Settlement Opt-In Procedures, (III) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation of Plan, and (IV) Establishing Notice and Objection Procedures for Final Approval of Disclosure Statement and Confirmation of Plan*, as conformed for publication, was published on June 20, 2026 in the national edition of *The New York Times*, as described in the proof of publication attached as **<u>Exhibit A</u>**.

Dated: June 29, 2026

*/s/ Zachary Steinberg*
Zachary Steinberg

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

SRF 97039

**<u>Exhibit A</u>**



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

June 23, 2026

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher
of The New York Times, a daily newspaper of general circulation
printed and published in the City, County, and State of New York,
hereby certify that the advertisement annexed hereto was published in
the editions of The New York Times on the following date or dates, to
wit on.

6/20/2026, NY/NATL, pg B3

*Larnyce Tabron*








## Direction of Trade Talks Gives Lawmakers Anxiety

FROM FIRST BUSINESS PAGE

Representative Linda T. Sánchez of California, the top Democrat on a House trade panel, said in an interview that she was a "big proponent" of maintaining the trilateral structure of U.S.M.C.A.

"I'm concerned that the Trump administration is going to abandon that and do these bilateral, like M.O.U.s, which don't have the full effect of Congress," she said, comparing Mr. Trump's trade deals to informal memorandums of understanding.

Mr. Trump negotiated U.S.M.C.A. in his first term to revise the North American Free Trade Agreement, which he called one of the worst deals ever. U.S.M.C.A. wrapped in priorities of both Republicans and Democrats, and its "implementation act" passed Congress with bipartisan support in 2020.

Since then, Mr. Trump and his advisers have grown more critical of the pact, seeing it as responsible for trade deficits with Canada and Mexico, America's biggest trading partners.

Under the terms of the agreement, the three countries promised to review the deal by July 1 of this year. During negotiations in Mexico last month, the United States proposed changes to the pact's rules for metals, cars and other goods, including raising the requirement for how much local materials cars need to be made with to be exempt from tariffs.



Jamieson Greer, the U.S. trade representative, said talks with Mexican representatives had been positive.

U.S.M.C.A. requires cars to source 75 percent of their content by value from North America to qualify for tariff-free treatment. The Trump administration would raise that threshold to 82 percent, while requiring 50 percent of a car's content to come from the United States, people familiar with the proposals said. The U.S. is also proposing expanding those requirements to new types of car parts and setting new content requirements for other industries, including electronics.

In an interview on Thursday, Jamieson Greer, the U.S. trade representative, said talks this week with Mexican officials had been positive, and included discussions of how to revive the global electronics supply chain in the United States and Mexico, while keeping the U.S. trade deficit with Mexico down.

"We certainly want more U.S. content, but to the extent we're going to be importing these other things, we want to have them as close to home as possible," he said of the electronics industry.

Mr. Greer has talked about the importance of keeping parts of U.S.M.C.A. intact, but the president has lately seemed far more critical. In France on Wednesday, Mr. Trump said the United States would "do better without" the pact.

"I would rather not have the agreement, but I may sign it," Mr. Trump said. "We do better as a country if we don't have an agreement."

U.S.M.C.A. and its predecessor, NAFTA, have always been somewhat divisive politically, but the three countries are carrying out negotiations over U.S.M.C.A.'s future at a sensitive political moment, as midterms loom and Mr. Trump's economy is on the ballot.

While some parties, like the United Automobile Workers union or Florida tomato growers, have intense criticisms of the pact, it has many defenders. The deal's future is particularly important for states that export farm goods, as well as those on U.S. borders that are economically integrated with Canada or Mexico.

In a hearing this month held by the House Committee on Agriculture, Representative Glenn Thompson of Pennsylvania, the committee's Republican chairman, said the agreement had proved "extremely beneficial" to farmers, ranchers, consumers "and the economy as a whole." But he conceded that it had provisions that could be improved.

Democrats are urging changes that they say would benefit workers and the environment. Ms. Sánchez led nearly 20 Democrats in a letter urging Mr. Greer to negotiate provisions that would target threats to economic security, strengthen workers' rights and add environmental protections.

Ms. Sánchez's district is particularly affected because it is close to the Port of Los Angeles. After a public forum in a Los Angeles suburb, a small-business owner told her that he had to close his business because of Mr. Trump's tariffs. She said she was unsatisfied with the administration's engagement on U.S.M.C.A., and she blamed her Republican colleagues for ceding power to the president on trade.

"The administration doesn't seem particularly interested in involving Congress in these trade negotiations," Ms. Sánchez said.

Republicans have an even trickier calculus. Many come from states that are major exporters, but they also face potential political peril for standing up to the president's trade agenda. Since Mr. Trump's return to office, Republicans in Congress have repeatedly moved to try to block votes challenging tariffs.

Many Republicans have tried to walk a line of voicing support for U.S.M.C.A. while saying it has room for improvements.

"A renewed U.S.M.C.A. really, I think, can hold our neighbors accountable, and then work for our own ag producers and our manufacturers," Representative Adrian Smith of Nebraska, the top Republican on a House trade panel, said. "Right now, our role is to elevate the profile of the policy and the issue itself, given its importance to our economy," he added.

Mr. Smith said he was "not a fan of tariffs" but had come around to some of the administration's efforts to open up foreign markets to American business.

Sidelined from the negotiations, Republican and Democratic lawmakers have penned letter after letter, held briefings with experts and traveled to Mexico City during talks last month to make their priorities heard.

The administration is also sparring with some lawmakers about the role Congress will play in the pact's approval. Mr. Greer said Thursday that he would seek Congress's approval if the revised pact made changes to U.S. law, but that the changes were more likely to affect Canada and Mexico than the United States.

"We don't really have to change our laws to get better terms of trade with Canada and Mexico," he said. "We need Canada and Mexico to change the way that they're treating our country."

The Constitution delegates trade as the legislative branch's responsibility. But the bill that Congress passed to enact U.S.M.C.A. gives the executive branch the power to modify certain rules, though some say the changes the administration is pushing for go beyond the scope Congress intended.

Mr. Smith said he could imagine "a path that would mean that Congress wouldn't necessarily need to vote on it again." But Democrats, including Ms. Sánchez, say Mr. Trump should submit the agreement for a congressional vote.

Lawmakers of both parties have also argued that, even if the administration doesn't need them to approve its changes, Mr. Trump should turn to Congress if he wants his policies to be long-lasting. Otherwise, the next president could unwind them.

Greta M. Peisch, a trade lawyer who served in the Office of the U.S. Trade Representative under the Biden administration, said there was a "bright line" legally dictating that Congress must have a role when U.S. law was changed or if the United States entered into a new trade agreement.

But if U.S.M.C.A. is modified without requiring changes to the law, it isn't clear what Congress's role ought to be. That, she said, is a "really big gray area."

*Tony Romm contributed reporting.*



A soybean farm in Virginia. Agriculture has been a main topic of trade talks.

EVELYN HOCKSTEIN/REUTERS



PHOTOGRAPHS BY DeSEAN McCLINTON-HOLLAND FOR THE NEW YORK TIMES

If the buyer of Spirit's slots does not use Terminal A, also known as the Marine Air Terminal, it could leave the terminal underfunded, the Port Authority says.

## A Spirit Estate Sale at LaGuardia: 22 Flights

FROM FIRST BUSINESS PAGE

money to.

The F.A.A. has said it wants Spirit's LaGuardia slots to be absorbed by an airline that will continue to offer relatively low fares. If that does not happen, it might do away with the slots to ease congestion, Bryan Bedford, the F.A.A. administrator, told reporters last month.

The F.A.A. did not respond to requests for comment.

Two large airlines — Delta Air Lines and American Airlines — account for most of the flights at LaGuardia. Last summer, Delta had about 511 slots at the airport and American 327, out of a total of 1,141.

But flying at LaGuardia is not cheap. All airports charge airlines fees to fund infrastructure and other improvements. Those costs have been on the rise across the country, and LaGuardia is among the most expensive airports for carriers, aviation experts said.

"Slots are just not the same today that they were 20 years ago, just not the same value," said William Swelbar, an aviation consultant and economist.

JetBlue Airways, which has a large hub at Kennedy Airport, has cut back on flying at LaGuardia in recent years because of those rising costs. At an investor conference in March, the airline's president said JetBlue paid about $40 per departing passenger to fly at LaGuardia. JetBlue said in a statement that it was evaluating the opportunity to expand at LaGuardia but that it was also "mindful of the significant costs associated with operating at New York-area airports."

Frontier Airlines, Spirit's biggest rival among budget airlines, may bid for the slots, too. After Spirit and JetBlue proposed a merger in 2022, Frontier agreed to take those slots once the deal was completed. But the merger fell through when the Justice Department successfully sued to stop it, arguing that it was bad for consumers. Frontier had four slots at LaGuardia last year and declined to comment on whether it planned to bid for Spirit's slots.

Flying at LaGuardia could be risky for budget airlines. Spirit



Spirit has said its 22 LaGuardia flights could be worth up to $87 million.

failed partly because it flew at too many airports like LaGuardia that were dominated by larger carriers that had deeper pockets, owned more planes and flew to more places. The larger airlines can offer travelers more departures, more connecting flights and other perks that a smaller carrier cannot, experts said.

Spirit's 11 round-trip flights may not be enough to justify the expense of flying out of such a busy airport.

"The question is, what would you do with 22 slots at LaGuardia?" said Bob Mann, an industry consultant and a former airline executive.

Larger carriers like Delta or United Airlines, which dominates flying at Newark Liberty, have an easier time offsetting high airport costs because they make a lot of money from business and first-class seats, corporate customers, branded credit cards and loyalty programs.

The Port Authority of New York and New Jersey, which oversees the region's airports, bridges and other infrastructure, has pushed back on Spirit's planned auction, saying it should be more involved. Slots are useless without airport gates, the Port Authority argued, so any company assuming Spirit's slots must also take over its lease at Terminal A, which is also known as the Marine Air Terminal.

If an airline buys the slots but does not use Terminal A, it could cause congestion at other parts of the airport while leaving that terminal underfunded, the Port Authority argued. Terminal A opened in 1940 and is highly regarded by architecture and art experts for its Art Deco design and the large mural in its public spaces.

The process of replacing Spirit at Newark and LaGuardia should be "driven by competition, access and serving new or underserved markets," the Port Authority's executive director, Kathryn Garcia, said in a May letter to Mr. Bedford of the F.A.A. that was obtained by The New York Times.

At a hearing last week, Judge Sean H. Lane of U.S. Bankruptcy Court for the Southern District of New York, who is overseeing Spirit's bankruptcy, acknowledged the Port Authority's concerns but allowed the bidding process to begin anyway, saying his decision would amount to a "starting gun" in the race to find a buyer.

Airlines sometimes trade slots, especially when they are merging or selling themselves. But federal regulators often review such transactions and sometimes force companies to give up some airport access as a condition of merger approval. In 2013, for example, Southwest acquired a dozen slots at LaGuardia after American Airlines was forced to put them up for sale as part of its merger with US Airways.

Spirit's executives could earn big bonuses from the slot sales, according to a proposed incentive plan, a common part of bankruptcy proceedings intended to encourage top managers to maximize asset sales.

The Justice Department and unions representing pilots, flight attendants and other Spirit employees have pushed back on that plan, saying executives have already been handsomely paid while workers have been left without compensation for vacation and sick leave. But Judge Lane said he was inclined to allow it.

The bids for Spirit's slots are due by the end of this month.

Whatever happens, the slots will be a drop in the bucket compared with Spirit's other assets. Its planes, which are mostly sitting in desert storage in Arizona and California, and engines are worth up to $1.35 billion, according to a bankruptcy court document Spirit submitted in April.

**DEBTORS' EXHIBIT NO. 12**

Page 4 of 4