United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 09, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

**FINAL ORDER (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT
LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES; (III) MODIFYING THE
AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of First Brands Group, LLC and each of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (together, the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**" and, together with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this final order (the "**Final Order**"), among other things:

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]     Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Credit Agreement (as defined herein) or the DIP Motion, as applicable.

UST Exhibit 4
Page 1 of 98

(i)      authorizing First Brands Group, LLC, a Delaware limited liability company (the "**Borrower**" or the "**Company**") to obtain postpetition financing ("**DIP Financing**")[3] pursuant to a senior secured, superpriority and priming debtor-in-possession term loan credit facility (the "**DIP Facility**") subject to the terms and conditions set forth in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 217) (the "**Interim Order**," and together with the Final Order, the "**Orders**"), this Final Order, and that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement filed at Docket No. 289 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), in an aggregate principal amount of $4.4 billion (inclusive of the New Money DIP Loans (as defined herein) and the Roll-Up Obligations (as defined herein)) (the commitments in respect thereof, the "**DIP Commitments**," and such loans, the "**DIP Loans**")[4] from the DIP Lenders (as defined herein) by and among the Borrower, First Brands Group Intermediate, LLC, a Delaware limited liability company (the "**Parent**"), the several financial institutions or other entities from time to time party thereto as "Lenders" (the "**DIP Lenders**"), Wilmington Savings Fund Society, FSB, as administrative agent, escrow agent, and collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Agent**" and, collectively, with the DIP Lenders, the **"DIP Secured Parties"**), consisting of:

a.      $1.1 billion new money term loans (the "**New Money DIP Loans**") of which (i) $175 million became available immediately upon entry of the Interim Order, (ii) $325 million was funded into the Escrow Account (defined below) upon entry of the Interim Order (the "**Intermediate Amount**" and together with clause (i), the "**Initial Draw**"), and (iii) $600 million will be funded into the Escrow Account subject to and upon the date of entry of this Final Order (the "**Final Draw**"); *provided*, that the Intermediate Amount and the Final Draw shall accrue interest and fees pursuant to the DIP Credit Agreement commencing with the funding into the Escrow Account; and

b.      $3.3 billion of Roll-Up Obligations, in each case, calculated in accordance with the DIP Documents and the Syndication Procedures (as defined herein), with:

i.   Interim Roll-Up Obligations:  $1.5 billion rolled up upon entry of the Interim Order and funding of the Initial Draw, accruing interest and fees pursuant to the DIP Credit Agreement upon entry of the Interim Order; and

ii.  Final Roll-Up Obligations:  $1.8 billion rolling up subject to, and effective upon the date of entry of this Final Order and funding of the Final Draw,

---

[3]   Any consent, agreement, amendment, approval, waiver, or instruction of the DIP Borrowers, DIP Guarantors, Parent Guarantors, DIP Agents, or DIP Secured Parties to be delivered hereunder may be delivered by any written instrument, including by way of electronic mail, by the DIP Borrowers, DIP Guarantors, Parent Guarantors, DIP Agents, DIP Secured Parties, or their respective counsel on their behalf.

[4]   Certain of the DIP Loans will be issued and denominated in Euros based on the prevailing market exchange rate as of the Petition Date.

2

UST Exhibit 4
Page 2 of 98

accruing interest and fees pursuant to the DIP Credit Agreement commencing upon entry of this Final Order;

(ii)     authorizing each of the relevant Debtors and, to the extent required by the DIP Documents, any additional Debtors and/or non-Debtors party to the applicable DIP Documents from time to time as guarantors, to jointly and severally guarantee the DIP Loans and the other DIP Obligations (such Debtors, other than the Borrower, the "**DIP Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**"); *provided*, that in the case of Viceroy Private Capital, LLC and First Brands Group Holdings, LLC (collectively, the "**Parent Guarantors**") such entities executed the separate parent guarantee (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Parent Guarantee**") attached to the Interim Order as Exhibit 2;

(iii)    authorizing the DIP Loan Parties and the Parent Guarantors, as applicable, to execute, deliver and perform under the DIP Credit Agreement and Parent Guarantee, as applicable, and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the Fee Letter, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (the Interim Order and this Final Order, collectively, with the DIP Credit Agreement, the Parent Guarantee, and any other Loan Documents, including the Updated DIP Budget and each Approved Budget (each as defined herein), the "**DIP Documents**");

(iv)     authorizing the DIP Loan Parties and the Parent Guarantors to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, the Upfront Premium, Exit Premium, Anchor Premium, Extension Premium (each as defined in the DIP Credit Agreement), administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the DIP Documents), interest, costs, expenses and other liabilities, DIP Fees and Expenses (as defined herein) and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)      upon entry of the Interim DIP Order and reaffirmed by this Final Order, authorizing the DIP Loan Parties to indefeasibly repay in full the Bridge Loans and pay any reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, fronting fees, escrow fees, and any other fees payable pursuant to the Bridge Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the Bridge Documents (each as defined herein);

(vi)     subject and subordinate only to the Carve-Out (as defined herein), authorizing the Adequate Protection Claims (as defined herein) with respect to the Prepetition Collateral (as defined herein) and such other claims as and solely to the extent set forth herein;

(vii)    subject and subordinate only to the Carve-Out, granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims

3

pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties;

(viii)    granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral and any Recovery Action Proceeds (each as defined herein) on the terms described herein, in each case subject and subordinate to the Carve-Out, the ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as, and solely to the extent, set forth herein;

(ix)    authorizing the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) to take all commercially reasonable actions to implement and effectuate the terms of the Orders;

(x)    waiving (a) the DIP Loan Parties' and Parent Guarantors' right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (Prepetition Collateral together with DIP Collateral, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    waiving the equitable doctrine of "marshaling" and other similar doctrines as provided herein;

(xii)    authorizing the DIP Loan Parties to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with the Orders and the other DIP Documents;

(xiii)    reaffirming the Interim Order provisions pursuant to which DIP Loan Parties were authorized to satisfy the Bridge Obligations (as defined herein) indefeasibly in full in cash (the "**Bridge Repayment**");

(xiv)    authorizing the Borrower to incur, and the DIP Guarantors and Parent Guarantors to guarantee, on an unconditional joint and several basis, the principal, all unpaid and accrued interest, fees, premiums, reimbursements, interest on interest, costs, expenses, obligations (whether contingent, unmatured, or otherwise due), and all other amounts and obligations owing under and/or secured by and/or payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xv)    subject to the terms and restrictions set forth in the DIP Documents and the Orders, authorizing the DIP Loan Parties to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Credit Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties to the extent of any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the DIP Loan Parties' and the Parent Guarantors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xvi) vacating and modifying the Automatic Stay to the extent set forth herein and as necessary to permit the DIP Loan Parties and the Parent Guarantors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Orders and the DIP Documents, and to deliver any notices of termination described below and as further set forth herein;

(xvii) reaffirming the provisions of the Interim Order approving the syndication procedures (the "**Syndication Procedures**") attached to the Interim Order as <u>Exhibit 3</u>, pursuant to which, upon the entry of the Interim Order, each First Lien Lender was offered the right to purchase their specified allocation of the DIP Loans and DIP Commitments (with such allocation backstopped by the certain members of the Ad Hoc Group (as defined in the DIP Motion) (the "**Allocation Parties**")); and

(xviii) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

The Court having held an interim hearing on October 1, 2025 (the "**Interim Hearing**") and the Court having held a final hearing (the "**Final Hearing**") on the DIP Motion, and the Court having considered the relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Tyler W. Cowan in Support of the Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 55) (the "**Initial Cowan Declaration**"), the *Declaration of Charles M. Moore in Support of the Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 62) (the "**Moore DIP Declaration**"), the *Amended Supplemental Declaration of Tyler W. Cowan in Support of Debtors' DIP Motion* (Docket No. 548) (the "**Supplemental Cowan Declaration**"), the *Supplemental Declaration of Charles M. Moore in Support of DIP Motion* (Docket No. 527) (the "**Supplemental Moore DIP Declaration**" and, together with the Supplemental Cowan Declaration, the Moore DIP Declaration, and the Initial Cowan Declaration, the "**DIP Declarations**"), the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day**

5

**Petitions Declaration**"), the *Declaration of Charles M. Moore in Support of Debtors' First Day Relief* (Docket No. 51) (the "**First Day Relief Declaration**" and, together with the First Day Petitions Declaration, the "**First Day Declarations**" and, collectively with the DIP Declarations, the "**Declarations**"), the available DIP Documents, and the evidence submitted and arguments made at the Interim Hearing and Final Hearing; and the Court having entered the Interim Order; and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and all objections, if any, to the final relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the DIP Motion on a final basis is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the DIP Loan Parties' and Parent Guarantors' entry into the relevant DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, AND UPON THE PLEADINGS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]

A.      *Petition Date*.  On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned Chapter 11 Cases each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  On September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

---

[5]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

UST Exhibit 4
Page 6 of 98

B.      *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.      *Committee Formation*.  On October 9, 2025, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**").

E.      *Notice*.  Proper, timely, adequate and sufficient notice of the DIP Motion and a final hearing has been provided in accordance with the Interim Order, the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice is required to enter this Final Order.

F.      *Cash Collateral*.  As used herein, the term "**Cash Collateral**" shall mean all of the cash of the DIP Loan Parties and the Parent Guarantors, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G.      *Debtors' Stipulations*.  Upon entry of the Interim Order and as reaffirmed by this Final Order, and after consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest set forth in paragraph 27 and paragraph G(xxii), the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree, as follows (collectively, the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph G, the "**Debtors' Stipulations**"):

7

UST Exhibit 4
Page 7 of 98

(i)      *ABL Facility*.  Pursuant to that certain ABL Credit Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**ABL Credit Agreement**," and collectively with the other Loan Documents (as defined in the ABL Credit Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**ABL Credit Documents**" and the credit facilities evidenced thereby, collectively, the "**ABL Facility**"), among (a) the Company, (b) the Parent, (c) the other borrowers from time to time party thereto (together with the Company, the "**ABL Borrowers**"), (d) Bank of America, N.A. ("**BofA**"), as administrative agent and collateral agent (solely in such capacity, the "**ABL Agent**"), and (e) the lenders from time to time party thereto (collectively, the "**ABL Lenders**," and together with the ABL Agent, any holders of ABL Debt (as defined below) and any holder of other Secured Obligations (as defined in the ABL Credit Agreement), the "**ABL Secured Parties**"), the ABL Lenders provided revolving credit and other financial accommodations to the ABL Borrowers and certain affiliates pursuant to the ABL Credit Documents, and Parent and certain of its subsidiaries (the "**ABL Guarantors**") guaranteed the "Obligations" (as defined in the ABL Credit Agreement, the "**ABL Obligations**") pursuant to that certain ABL Guaranty, dated as of February 2, 2018 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the ABL Guarantors and the ABL Agent;

(ii)      *Sidecar Term Loan*.  Pursuant to that certain First Lien Term Loan Agreement dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Sidecar Term Loan Agreement**" and collectively with the other Loan Documents (as defined in the Sidecar Term Loan Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Sidecar Term Loan Documents**", and the term loans evidenced thereby, collectively, the "**Sidecar Term Loans**"), among (a) the Company, (b) the Parent, (c) Sagard Holdings Manager (US) LLC ("**Sagard**") and GLAS USA LLC ("**GLAS**"), together as administrative agent and collateral agent (solely in such capacity, the "**Sidecar Term Loan Agents**"), and (d) the lenders from time to time party thereto (collectively, the "**Sidecar Term Loan Lenders**", and collectively with the Sidecar Term Loan Agent, and all other

holders of Sidecar Term Loan Debt (as defined below), the "**Sidecar Term Loan Secured Parties**"), the Sidecar Term Loan Lenders provided term loans to the Company pursuant to the Sidecar Term Loan Credit Agreement, and the First Lien Term Loan Guarantors (as defined below) guaranteed on a joint and several basis the "Obligations" (as defined in the Sidecar Term Loan Agreement, the "**Sidecar Term Loan Obligations**") pursuant to that certain First Lien Guaranty, dated as of June 16, 2025 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the First Lien Term Loan Guarantors and the Sidecar Term Loan Agents;

(iii)     *First Lien Term Loans*.  Pursuant to that certain First Lien Term Loan Agreement dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**First Lien Term Loan Agreement**," and together with the Sidecar Term Loan Agreement, the "**First Lien Agreements**", and the First Lien Term Loan Agreement, collectively with the other Loan Documents (as defined in the First Lien Term Loan Agreement), each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**First Lien Term Loan Documents**" and together with the Sidecar Term Loan Documents, the "**First Lien Documents**", and the term loans evidenced thereby by, the "**First Lien Term Loans**", and together with the Letters of Credit and L/C Obligations (each as defined in the First Lien Term Loan Agreement) and the Sidecar Term Loans, the "**First Lien Loans**"), among (a) the Company, (b) the Parent, (c) Jefferies Finance LLC ("**Jefferies**"), as administrative agent and collateral agent[6] (solely in such capacity, the "**First Lien Term Loan Agent**" and together with the Sidecar Term Loan Agents, the "**First Lien Agent**"), and (d) the lenders and letter of credit issuers from time to time party thereto (collectively, the "**First Lien Term Loan Lenders**" and together with the Sidecar Term Loan Lenders, the "**First Lien Lenders**", and the First Lien Term Loan Lenders, collectively with the First Lien Term Loan Agent, and all other holders of First Lien Term Loan Debt (as defined below), the "**First Lien Term Loan Secured Parties**" and together with the Sidecar Term Secured Parties, the "**First Lien Secured Parties**"),  the First Lien Term Loan Lenders provided term loans to the Company pursuant to the First Lien Term Loan

---

[6]     As of November 3, 2025, Wilmington Savings Fund Society, FSB replaced Jefferies as administrative agent and collateral agent.

UST Exhibit 4
Page 9 of 98

Documents, and Parent and certain of its Subsidiaries (the "**First Lien Term Loan Guarantors**") guaranteed on a joint and several basis the "Obligations" (as defined in the First Lien Term Loan Agreement, the "**First Lien Term Loan Obligations**" and together with the Sidecar Term Loan Obligations, the "**First Lien Obligations**") pursuant to that certain First Lien Guaranty, dated February 2, 2018 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**First Lien Guaranty**"), by and among the First Lien Term Loan Guarantors and the First Lien Term Loan Agent;

(iv)     *Bridge Loans*.  Pursuant to that certain Amendment No. 18 to First Lien Term Loan Agreement dated as of September 25, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Bridge Amendment**," and collectively with the other Loan Documents (as defined in the Bridge Amendment by reference to the First Lien Term Loan Agreement) solely executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Bridge Documents**" and the term loans evidenced thereby, the "**Bridge Loans**," which are "Incremental Term Loans" (as defined  in the First Lien Term Loan Agreement) and a separate "Class" (as defined in the First Lien Term Loan Agreement) from the other First Lien Term Loans under the First Lien Term Loan Agreement), among (a) the Company, (b) the Parent, (c) the First Lien Term Loan Agent, and (d) the lenders from time to time party thereto with respect to the 2025 Incremental Term Loans (as defined in the Bridge Amendment) and any other Obligations (as defined in the First Lien Term Loan Agreement) in connection therewith (the "**Bridge Obligations**") (collectively, the "**Bridge Lenders**", and collectively with the First Lien Term Loan Agent, and all other holders of Bridge Debt (as defined below), the "**Bridge Secured Parties**"), the Bridge Lenders provided term loans to the Company pursuant to the Bridge Documents, and the First Lien Term Loan Guarantors guaranteed on a joint and several basis the Bridge Obligations pursuant to the First Lien Guaranty;

(v)     *Second Lien Term Loan*.  Pursuant to that certain Second Lien Term Loan Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Second Lien Term Loan Agreement**," and collectively with the other Loan Documents (as defined in the Second Lien Term Loan Agreement), each as may be

amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Second Lien Term Loan Documents**" and the term loans evidenced thereby (collectively, the "**Second Lien Term Loan**"), among (a) the Company, (b) the Parent, (c) Jefferies,[7] as administrative agent and collateral agent (solely in such capacity, the "**Second Lien Term Loan Agent**" and, together with the ABL Agent and the First Lien Agent, the "**Prepetition Agents**"), and (d) the lenders from time to time party thereto (collectively, the "**Second Lien Term Loan Lenders**," and collectively with the Second Lien Term Loan Agent, and all other holders of Second Lien Term Loan Debt (as defined below), the "**Second Lien Term Loan Secured Parties**" and, together with the ABL Secured Parties, the First Lien Secured Parties and the Bridge Secured Parties, the "**Prepetition Secured Parties**"), the Second Lien Term Loan Lenders provided term loans to the Company pursuant to the Second Lien Term Loan Documents, and Parent and certain of its Subsidiaries (the "**Second Lien Term Loan Guarantors**" and, together with the First Lien Term Loan Guarantors, the "**Term Loan Guarantors**") guaranteed on a joint and several basis the "Obligations" (as defined in the Second Lien Term Loan Agreement, the "**Second Lien Term Loan Obligations**," and together with the First Lien Obligations and the Bridge Obligations, the "**Term Loan Obligations**") pursuant to that certain Second Lien Guaranty, dated as of February 26, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date), by and among the Second Lien Term Loan Guarantors and the Second Lien Term Loan Agent;

(vi)     *ABL Intercreditor Agreement.*  Pursuant to, and to the extent set forth in, that certain Amended and Restated Intercreditor Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, including by that certain Joinder to Amended and Restated Intercreditor Agreement, dated as of June 16, 2025, the "**ABL Intercreditor Agreement**"), by and among (a) the ABL Agent, (b) the First Lien Term Loan Agent, (c) and the Second Lien Term Loan Agent, (d) the Sidecar Term Loan Agent (e) the Company and (f) the other Loan Parties (as defined in the ABL Intercreditor Agreement) party thereto, the parties thereto agreed, among other things:  (i) that the ABL Liens (as defined herein) on the ABL Priority Collateral (as

---

[7] As of November 3, 2025, Wilmington Savings Fund Society, FSB replaced Jefferies as administrative agent and collateral agent.

defined herein) are senior to the First Lien Term Loan Liens on such collateral, which are in turn senior to the Second Lien Term Loan Liens (as defined herein) on such collateral and (ii) that the First Lien Term Loan Liens on Term Priority Collateral (as defined in the ABL Intercreditor Agreement, the "**Prepetition Term Priority Collateral**") are senior to the Second Lien Term Loan Liens (as defined herein) on such collateral, which are in turn senior to the ABL Liens (as defined herein) on such collateral;

(vii)   *Term Intercreditor Agreement*.   Pursuant to, and to the extent set forth in, that certain Term Intercreditor Agreement, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, including by that certain Joinder to the Term Intercreditor Agreement, dated as of June 16, 2025, the "**Term Intercreditor Agreement**," and together with the ABL Credit Documents, the First Lien Documents, the Bridge Documents, the Second Lien Term Loan Documents and the ABL Intercreditor Agreement, the "**Prepetition Credit Documents**") by and among (a) the First Lien Term Loan Agent, (b) the Second Lien Term Loan Agent, (c) the Sidecar Term Loan Agent, (d) the Company and (e) the other Loan Parties (as defined in the Term Intercreditor Agreement) party thereto, the parties thereto agreed, among other things, that the Second Lien Term Loan Liens (as defined herein) are subordinated to any Lien (as defined in the Term Intercreditor Agreement) on the same assets of any Loan Party securing the First Priority Obligations (as defined in the Term Intercreditor Agreement) of such Loan Party;

(viii)   *ABL Debt*.   The ABL Borrowers and the other ABL Guarantors were justly and lawfully indebted and liable to the ABL Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $133,479,006.83 in outstanding principal amount of ABL Loans (as defined in the ABL Credit Agreement) as of the Petition Date, plus interest and fees thereon (the "**ABL Revolving Debt**"), plus $93,409,474.32 of the aggregate stated principal amount available for drawing under all outstanding letters of credit and all unpaid reimbursement obligations with respect to drawn letters of credit as of the Petition Date (the "**Letters of Credit**"), which loans and outstanding letters of credit were made or issued by the ABL Lenders pursuant to, and in accordance with the terms of, the ABL Credit Documents, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and

US T Exhibit 4
Page 12 of 98

expenses, in each case, that are chargeable or reimbursable under the ABL Credit Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the ABL Credit Documents (collectively, the "**ABL Debt**"), which ABL Debt has been guaranteed by each of the ABL Guarantors.  Pursuant to the ABL Credit Documents, in addition to the ABL Debt, certain Cash Management Obligations (as defined in the ABL Credit Agreement and including, among other liabilities, supply chain financing) of certain Debtors and their respective subsidiaries are owing solely to the extent the underlying agreement of such Cash Management Obligation has been validly designated in writing by the ABL Borrowers and such counterparty to the ABL Agent as a "Cash Management Agreement" under (and in compliance with the terms of) the ABL Facility.  As of the Petition Date, the ABL Borrowers and the other ABL Guarantors were justly and lawfully indebted and liable to the applicable ABL Secured Parties that are counterparties to Cash Management Agreements under the ABL Facility without defense, challenge, objection, claim, counterclaim, or offset of any kind, for $219,447,227 of Cash Management Obligations, which amount and stipulation excludes any obligations that are alleged as constituting "Cash Management Obligations" being owed to U.S. Bank or its applicable subsidiary or affiliate under the ABL Facility (the "**U.S. Bank Obligations**").

(ix)     *First Lien Term Loan Debt*.  The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the First Lien Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $4,625,413,695.97 in outstanding principal amount of First Lien Term Loans (which includes (i) $1,999,060,490.56 in outstanding principal amount of the First Lien Term Loan as of the Petition Date, (ii) $1,863,348,510.82 in outstanding principal amount of the Non-Fungible Incremental First Lien Term Loan as of the Petition Date, and (iii) $763,004,694.59[8] in outstanding principal amount of the Euro First Lien Term Loan), which loans were made or issued by the First Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the First Lien Term Loan Documents as of the Petition Date, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are

---

[8]     Assumes U.S. Dollar to Euro conversion rate of 1.19:1.00.

UST Exhibit 4
Page 13 of 98

chargeable or reimbursable under the First Lien Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the First Lien Term Loan Documents (collectively, the "**First Lien Term Loan Debt**"), which First Lien Term Loan Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors;

(x)      *Sidecar Term Loan Debt*.  The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Sidecar Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $250,000,000.00 in outstanding principal amount of Sidecar Term Loans,[9] which loans were made or issued by the Sidecar Term Loan Lenders pursuant to, and in accordance with the terms of, the Sidecar Term Loan Credit Agreement, as of the Petition Date, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Sidecar Term Loan Credit Agreement), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Sidecar Term Loan Credit Agreement (collectively, the "**Sidecar Term Loan Debt**"), which Sidecar Term Loan Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors;

(xi)      *Bridge Debt*.  The Company, the Parent, and the other First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Bridge Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $24,500,000.00 in outstanding principal amount of Bridge Loans, which loans were made or issued by the Bridge Lenders pursuant to, and in accordance with the terms of, the Bridge Documents, as of the Petition Date, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Bridge Documents), costs, charges, indemnities, and other obligations

---

[9]      Figure excludes make-whole premium to be added to the claim amount and triggered upon acceleration of the Side-Car Term Loans on September 24, 2025, prior to the Petition Date, and after the Company's failure to make an interest payment due September 16, 2025 and a lapse of the grace period relating thereto.

incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Bridge Documents (collectively, the "**Bridge Debt**"), which Bridge Debt has been guaranteed on a joint and several basis by each of the First Lien Term Loan Guarantors.

(xii)   *Second Lien Term Loan Debt*.  The Company, the Parent, and the other Second Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Second Lien Term Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $540,000,000.00 in outstanding principal amount of the Second Lien Term Loan, which loan was made or issued by the Second Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the Second Lien Term Loan Documents, as of the Petition Date, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Second Lien Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Second Lien Term Loan Documents (collectively, the "**Second Lien Term Loan Debt**," and collectively with the ABL Debt, the First Lien Term Loan Debt, the Bridge Debt, and the Sidecar Term Loan Debt, the "**Prepetition Secured Debt**"), which Second Lien Term Loan Debt has been guaranteed on a joint and several basis by each of the Second Lien Term Loan Guarantors;

(xiii)   *Validity of Prepetition Secured Debt*.  The Prepetition Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Company, the Parent, the other ABL Borrowers, the ABL Guarantors, the First Lien Term Loan Guarantors, and the Second Lien Term Loan Guarantors, as applicable, enforceable in accordance with their respective terms and no portion of the Prepetition Secured Debt or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Credit Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is used in the Bankruptcy Code), cause of action (including any claims or avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(xiv)    *Validity, Perfection and Priority of ABL Liens*.  As of the Petition Date, pursuant to and in connection with the ABL Credit Documents, the ABL Borrowers and the ABL Guarantors granted to the ABL Agent, for the benefit of itself and the other ABL Secured Parties, a security interest in and continuing lien on (the "**ABL Liens**") substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**ABL Priority Collateral**," and together with the Prepetition Term Priority Collateral, the "**Prepetition Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the Prepetition Term Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**ABL Junior Collateral**" and, together with the ABL Priority Collateral, the "**ABL Collateral**"), which ABL Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code, any relevant debtor in relief laws outside of the United States or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the ABL Credit Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the ABL Liens as of the Petition Date (the "**ABL Permitted Senior Liens**"); *provided* that the Debtors make no stipulations or admissions regarding the value of the ABL Collateral and the extent to which any ABL Collateral was validly released from the ABL Liens in accordance with the ABL Credit Documents;

(xv)    *Validity, Perfection and Priority of First Lien Term Loan Liens*.  As of the Petition Date, pursuant to and in connection with the First Lien Term Loan Documents, the Company, the Parent, and the First Lien Term Loan Guarantors granted to the First Lien Term Loan Agent, for the benefit of itself and the other First Lien Term Loan Secured Parties, a security interest in and continuing lien on (the "**First**

UST Exhibit 4
Page 16 of 98

Lien Term Loan Liens," which liens, for the avoidance of doubt rank *pari passu* with the Sidecar Term

Loan Liens and the Bridge Liens) substantially all of their assets and property, including, (i) a valid,

binding, properly perfected, enforceable, first priority security interest in and continuing lien on the

Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral)

and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or

existing or thereafter acquired or arising (the "**First Lien Term Loan Senior Collateral**"), and (ii) a valid,

binding, properly perfected, enforceable, second priority security interest in and continuing lien on the ABL

Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds,

products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter

acquired or arising (the "**First Lien Term Loan Junior Collateral**" and, together with the First Lien Term

Loan Senior Collateral, the "**First Lien Term Loan Collateral**"), which First Lien Term Loan Liens are

not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise),

recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset,

crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and

subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted

by the First Lien Term Loan Documents, solely to the extent any such permitted liens were valid, binding,

enforceable, properly perfected, non-avoidable and senior in priority to the First Lien Term Loan Liens as

of the Petition Date (the "**First Lien Term Loan Permitted Senior Liens**");

(xvi)    *Validity, Perfection and Priority of Sidecar Term Loan Liens*.  As of the Petition

Date, pursuant to and in connection with the Sidecar Term Loan  Documents, the Company, the Parent, and

the First Lien Term Loan Guarantors granted to the Sidecar Term Loan Agent, for the benefit of itself and

the other Sidecar Term Loan Secured Parties, a security interest in and continuing lien on (the "**Sidecar

Term Loan Liens**," which liens, for the avoidance of doubt rank *pari passu* with the First Lien Term Loan

Liens and Bridge Liens) substantially all of their assets and property, including, (i) a valid, binding, properly

perfected, enforceable, second priority security interest in and continuing lien on the Prepetition Term

Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds,

products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter

acquired or arising (the "**Sidecar Term Loan Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Sidecar Term Loan Junior Collateral**" and, together with the Prepetition Sidecar Term Loan Senior Collateral, the "**Sidecar Term Loan Collateral**"), which Sidecar Term Loan Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the Sidecar Term Loan Credit Agreement, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Sidecar Term Loan Liens as of the Petition Date (the "**Sidecar Term Loan Permitted Senior Liens**");

(xvii) *Validity, Perfection and Priority of Bridge Liens*. As of the Petition Date, pursuant to and in connection with the Bridge Documents and the First Lien Term Loan Documents, the Company, the Parent, and the First Lien Term Loan Guarantors granted to the First Lien Term Loan Agent, for the benefit of itself and the other Bridge Secured Parties, a security interest in and continuing lien on (the "**Bridge Liens**" which liens, for the avoidance of doubt rank *pari passu* with the First Lien Term Loan Liens and the Sidecar Term Loan Liens) substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Bridge Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Bridge Junior Collateral**" and, together with the Bridge Senior Collateral, the "**Bridge**

UST Exhibit 4
Page 18 of 98

**Collateral**"), which Bridge Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted by the Bridge Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Bridge Liens as of the Petition Date (the "**Bridge Permitted Senior Liens**");

(xviii) *Validity, Perfection and Priority of Second Lien Term Loan Liens*. As of the Petition Date, pursuant to and in connection with the Second Lien Term Loan Documents, the Company, the Parent, and the Second Lien Term Loan Guarantors granted to the Second Lien Term Loan Agent, for the benefit of itself and the other Second Lien Term Loan Secured Parties, a security interest in and continuing lien on (the "**Second Lien Term Loan Liens**," and, together with the ABL Liens, the First Lien Term Loan Liens, the Bridge Liens, the Sidecar Term Loan Liens, and the Second Lien Term Loan Liens, the "**Prepetition Liens**") substantially all of their assets and property, including, (i) a valid, binding, properly perfected, enforceable, second priority security interest in and continuing lien on the Prepetition Term Priority Collateral, (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Second Lien Term Loan Senior Collateral**"), and (ii) a valid, binding, properly perfected, enforceable, third priority security interest in and continuing lien on the ABL Priority Collateral, which, for the avoidance of doubt, includes certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Second Lien Term Loan Junior Collateral**" and, together with the Second Lien Term Loan Senior Collateral, the "**Second Lien Term Loan Collateral**"), which Second Lien Term Loan Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens on the Prepetition Term Priority Collateral and certain other liens permitted

UST Exhibit 4
Page 19 of 98

by the Second Lien Term Loan Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Second Lien Term Loan Liens as of the Petition Date (the "**Second Lien Term Loan Permitted Senior Liens**" and, together with the ABL Permitted Senior Liens, the First Lien Term Loan Permitted Senior Liens, the Bridge Permitted Senior Liens, and the Sidecar Term Loan Permitted Senior Liens, the "**Prepetition Permitted Senior Liens**"));

(xix)   *No Control*.   None of the Prepetition Secured Parties or DIP Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Documents or DIP Documents;

(xx)   *No Claims or Causes of Action*.   No claims or causes of action held by the Debtors or each of their estates exist against, or with respect to, the DIP Secured Parties or Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any DIP Secured Party or Prepetition Secured Party that is in existence as of the Petition Date; and

(xxi)   *Release*.   Effective upon entry of the Interim Order and as reaffirmed by this Final Order, each of the Debtors and (subject only to the Challenge Period) the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby (a) reaffirms the Debtors' Stipulations and releases granted pursuant to the Interim Order and reaffirmed by this Final Order and (b) absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties (solely in their capacity as DIP Lenders and Prepetition Secured Parties) and the DIP Secured Parties and each of their respective Representatives (as defined herein) solely in such capacity (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action[10] arising prior

---

[10]   As used in this Final Order, "causes of action" means any action, claim, cause of action, controversy demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent

20

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 21 of 98

to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "**Released Claims**"), in each case arising out of or related to (as applicable) the Prepetition Credit Documents (excluding any supply chain financing documents), the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Final Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents and the DIP Secured Parties and the Debtors reserve all rights in respect of any breaches of the DIP Documents by any DIP Secured Parties or the Debtors, as applicable.  Further, for the avoidance of doubt, nothing in this Final Order shall release any claims or causes of action against any insiders (as defined in section 101(31) of the Bankruptcy Code) of the Debtors or Jefferies Finance LLC and its affiliates (except in its capacity as First Lien Term Loan Agent and Second Lien Term Loan Agent, as set forth in paragraph G(xx) hereof).

(xxii)   With respect to any supply chain financing obligations asserted by U.S. Bank none of the foregoing Debtor Stipulations shall be binding or constitute factual findings with respect to any interpretation of the requirements under the ABL Credit Agreement for any obligation, including supply

---

or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined in the DIP Credit Agreement), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "cause of action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non- U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer or fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

21

UST Exhibit 4
Page 21 of 98

chain financing, to constitute a Cash Management Obligation thereunder.  Any legal or factual arguments, claims or contentions related to a claim that any supply chain financing provided by an ABL Lender constitutes a Cash Management Obligation thereunder, are hereby preserved..

H.      *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)      Good and sufficient cause has been shown for the entry of the this Final Order and for authorization of the DIP Loan Parties and Parent Guarantors, to immediately obtain and guarantee financing pursuant to the DIP Documents, exchange and continue to effectuate the exchange of the Roll-Up Obligations, to use Cash Collateral as set forth herein, and for reaffirmation of the Interim Order's authorization to consummate the Bridge Repayment.

(ii)      The DIP Loan Parties have an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors.

(iii)      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case as provided for herein subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Final Order and in the DIP Documents.

UST Exhibit 4
Page 22 of 98

(iv)      The DIP Loan Parties and Parent Guarantors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Credit Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Credit Documents, as applicable, unless expressly modified by the DIP Documents.

(v)      The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.   Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date or hereafter created or arising, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)      Effective upon (a) the entry of the Interim Order and the funding of the Initial Draw, and without any further action by the Debtors or any other party, (i) the DIP Loan Parties were authorized and directed to utilize the DIP Loans to effectuate the Bridge Repayment, and (ii) subject only to a successful Challenge, $1,500,000,000.00 of First Lien Obligations held by DIP Lenders that funded the Interim Draw of the New Money DIP Loans (including the Allocation Parties) (the "**Interim Roll-Up**" and "**Interim Roll-Up Obligations**"), were automatically deemed exchanged via assignment on a cashless basis into and were deemed to constitute DIP Obligations and (b) the entry of this Final Order and the funding of the Final Draw, and subject only to a successful Challenge, without any further action by the Debtors or any other party, $1,800,000,000.00 of First Lien Obligations held by DIP Lenders (including Allocation Parties) that fund the Final Draw of the New Money DIP Loans (including the Allocation Parties) shall be automatically deemed exchanged via assignment on a cashless basis into and deemed to constitute DIP Obligations (the "**Final Roll-Up**" and "**Final Roll-Up Obligations**", and collectively with the Interim Roll-Up and Interim Roll-Up Obligations, the "**Roll-Up**" and "**Roll-Up Obligations**"),[11]

---

[11]   Solely with respect to any holders of a Prepetition Letter of Credit (as defined in the DIP Credit Agreement), such holder shall be automatically deemed to have converted and exchanged, on a cashless basis, such holder's portion of the related L/C Borrowing in respect of such Prepetition Letter of Credit into Roll-Up Loans in accordance with the DIP Credit Agreement on the date that (x) such Prepetition Letter of Credit is drawn in accordance with the terms of the First Lien Term Loan Credit Agreement and (y) the amount of any unreimbursed amounts in

pursuant to the terms of the Interim Order, this Final Order, the Prepetition Credit Documents (as expressly modified herein), any other Loan Documents (as defined in the Prepetition Credit Documents) (as expressly modified herein), the DIP Documents, and any other documents evidencing the Roll-Up Obligations.  The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agents and the DIP Lenders were not and would continue to not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties and Parent Guarantors thereunder, without approval of the Bridge Repayment and approval of the Roll-Up.  The Roll-Up Obligations shall be authorized as and deemed for all purposes to be a fee in exchange for, and solely on account of, the agreement of the Prepetition Secured Parties to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any Term Loan Obligations.  Because the Roll-Up Obligations are subject to (a) the reservation of rights in paragraph 27 hereof and (b) the protections set forth in paragraph 2(b), they will not prejudice the rights of any other party-in-interest.

(vii)    The Bridge Repayment and incurrence of fees under the DIP Facility, including the Roll-Up Obligations, was pursuant to the Interim Order and is, pursuant to this Final Order, authorized as a fee and as a necessary inducement, for the DIP Secured Parties to consent to the use of Cash Collateral and the subordination of the Roll-Up Obligations to the Carve-Out to the extent set forth herein.

(viii)    Pursuant to the Intercreditor Agreements, Prepetition Secured Parties are deemed to consent to the DIP Facility (including the Roll-Up) and the use of the Cash Collateral on the terms and conditions set forth in this Final Order.

(ix)    Based on the DIP Motion, the Declarations, and the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraphs 22(a) – 22(n) of this Final Order (the "**Adequate Protection**"), and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to the Interim Order, this Final Order, and the

---

respect of such drawn Prepetition Letter of Credit is converted into a Prepetition L/C Borrowing (as defined in the DIP Credit Agreement) in accordance with the First Lien Term Loan Credit Agreement.

UST Exhibit 4
Page 24 of 98

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 25 of 98

DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(x)     The DIP Financing, the Roll-Up, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the Parent Guarantors, the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties, and all of the DIP Loan Parties' and Parent Guarantors obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties and Parent Guarantors pursuant to the DIP Documents (including the Roll-Up) and any other DIP Obligations shall be deemed to have been extended by the DIP Agent, the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties, and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent, the Allocation Parties, the Prepetition Secured Parties, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Orders or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(xi)     The DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties have acted in good faith regarding the DIP Financing, the Roll-Up, and the DIP Loan Parties' and Parent Guarantors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the DIP Secured Parties, the Allocation Parties, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order or any provision hereof or thereof is vacated, reversed or modified, on appeal or otherwise, or any DIP Secured Party, Prepetition Secured Party, or Allocation Party is subject to any claim or cause of action in any forum.  The DIP Facility is not in violation of the Prepetition Credit

UST Exhibit 4
Page 25 of 98

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 26 of 98

Documents and, in all respects, the DIP Documents and DIP Obligations (including the Roll-Up) comply with the Prepetition Credit Documents.

(xii)     The Prepetition Secured Parties are entitled to the Adequate Protection provided in the Orders as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion, the Declarations, and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and, to the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, on the terms set forth in the Orders, and the priming of the Prepetition Liens on the First Lien Term Loan Collateral, Second Lien Term Loan Collateral, and the Sidecar Term Loan Collateral by the DIP Liens pursuant to the terms set forth in this Final Order and the DIP Documents; *provided* that nothing in the Orders or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in the Orders and in the context of the DIP Financing authorized by the Orders to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by the Orders, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert any rights of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties, to object to such relief are hereby preserved.

(xiii)    The DIP Loan Parties have prepared and delivered to the advisors to the DIP Secured Parties an updated budget attached hereto as **Exhibit 1** (the "**Updated DIP Budget**").  The Updated DIP Budget reflects, among other things, the DIP Loan Parties' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby.  The Updated DIP Budget may be modified, amended, extended,

UST Exhibit 4
Page 26 of 98

and updated from time to time in accordance with the DIP Credit Agreement, and once approved by the Required Lenders (in their sole discretion), shall modify, replace, supplement or supersede, as applicable, the Updated DIP Budget for the periods covered thereby (the Updated DIP Budget and each budget subsequently approved by the Required Lenders in their sole discretion shall constitute, without duplication, an "**Approved Budget**").  The DIP Loan Parties believe that the Updated DIP Budget is reasonable under the circumstances.  The DIP Secured Parties are relying, in part, upon the DIP Loan Parties' and Parent Guarantors' agreement to comply with the Approved Budget (subject to permitted variances), the other DIP Documents, the Interim Order, and this Final Order in determining to enter into the postpetition financing arrangements provided for in this Final Order.

(xiv)   Each of the Prepetition Secured Parties and DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties and DIP Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral or DIP Collateral.

(xv)   The Syndication Procedures are reasonable and proper, and were formulated in good faith by the Debtors, the Prepetition Secured Parties, the Allocation Parties, the DIP Agent, and the DIP Lenders in order to reasonably identify the opportunity to participate in the DIP Facility.

I.   *Relief Essential; Best Interest*.  Consummation of the DIP Financing and the permitted use of Prepetition Collateral (including Cash Collateral), in accordance with the Orders and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion, the Interim Order, and this Final Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

J.   *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability,

UST Exhibit 4
Page 27 of 98

perfection, or extent of any alleged Prepetition Permitted Senior Lien and/or security interests. The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Senior Lien, as used herein, and is expressly subject to the DIP Liens (as defined herein) and the Prepetition Liens. The Prepetition Liens and the DIP Liens are continuing liens and the Collateral is and will continue to be encumbered by such liens.

K.    *Intercreditor Agreements.* Pursuant to Section 510 of the Bankruptcy Code, the ABL Intercreditor Agreement and the Term Intercreditor Agreement (the "**Intercreditor Agreements**") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the DIP Loan Parties under the Orders or otherwise), (iii) shall not be deemed to be amended, altered or modified by the terms of the Orders or the DIP Documents, unless expressly set forth herein or therein, and (iv) any proceeds of the sale of Collateral that includes both ABL Priority Collateral and Term Priority Collateral or of the equity of any Debtor shall be subject to section 3.5(c) of the ABL Intercreditor Agreement, as applicable.

L.    *Certain Agreed Contractual Rights between the DIP Lenders*.

(i)    Pursuant to Section 2.07(a) of the DIP Credit Agreement, the DIP Lenders have agreed that the DIP Obligations may be satisfied in accordance with a Chapter 11 Plan (as defined in the DIP Credit Agreement) supported by Required Supermajority Lenders (as defined in the DIP Credit Agreement). Notwithstanding anything to the contrary, if the Chapter 11 Plan supported by Required Supermajority Lenders provides for the DIP Lenders to receive non-Cash distributions on account of the DIP Obligations and related DIP Loans on account thereof, each DIP Lender shall be deemed to have consented to have its DIP Loans paid on the effective date of such Chapter 11 Plan with the non-cash option provided in the Chapter 11 Plan.

Based upon the foregoing findings and conclusions, the Declarations, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefore,

UST Exhibit 4
Page 28 of 98

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*.  The relief sought in the DIP Motion is granted, the financing described herein is authorized and approved, and the use of Cash Collateral is authorized, in each case, on a final basis, subject to the terms and conditions set forth in the DIP Documents and this Final Order.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      *Authorization of the DIP Financing and the DIP Documents*.

(a)      The DIP Facility was approved by the Interim Order, and is hereby approved as set forth herein in this Final Order.  The DIP Loan Parties and Parent Guarantors were, by the Interim Order, and are, pursuant to this Final Order, hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the relevant DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower was, by the Interim Order, and is hereby authorized pursuant to this Final Order to borrow money pursuant to the DIP Credit Agreement and the Debtors who are DIP Guarantors or Parent Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Obligations, subject to any limitations on borrowing under the DIP Documents, which borrowings shall be used for all purposes permitted under the DIP Documents and this Final Order (and subject to and in accordance with the Approved Budget) (subject to any permitted variances).

(b)      The DIP Loan Parties and the Parent Guarantors were, by the Interim Order, and are, as reaffirmed by this Final Order, hereby authorized and directed to pay, all principal, unpaid and accrued interest, premiums, fees, interest on interest, payments, costs, expenses, the Upfront Premium, Exit Premium, Anchor Premium, Extension Premium, and other amounts (including any payoff, arrangement, backstop, commitment, exit, and/or administrative fees, including in any separate letter agreement or in any other DIP Document) described in the DIP Documents as such amounts become due and payable, without the need to obtain further Court approval, whether or not such fees arose before, on, or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in the Orders or the DIP Documents; *provided*

UST Exhibit 4
Page 29 of 98

that the payment of legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the closing of the DIP Facility) shall be subject to the requirements of paragraph 27 hereof.  The DIP Loan Parties and the Parent Guarantors shall pay, in accordance with this Final Order, the reasonable and documented fees and disbursements of the DIP Secured Parties, in each case whether or not such fees or other amounts arose before, on, or after the Petition Date, in accordance with the Orders or the DIP Documents.

(c)     In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party and the Parent Guarantors were, by the Interim Order, and are, as reaffirmed by this Final Order, hereby authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' and Parent Guarantors' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement) may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses, including attorneys', accountants', appraisers' and financial advisors' fees, amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder, increase the aggregate commitments, increase the rate of interest payable or fees that are payable calculated on commitments thereunder; *provided, however,* that the Debtors shall provide the Creditors' Committee and the ABL Agent with five (5) days' written notice (e-mail shall suffice) with respect to any material amendment or modification to

UST Exhibit 4
Page 30 of 98

any of the DIP Documents and two (2) days' written notice (e-mail shall suffice) with respect to any other amendment or modification of the DIP Documents.  Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court.  The Debtors shall provide notice of the inclusion of additional guarantors under the DIP Credit Agreement;

(iii)   the non-refundable payment to and authorization for the DIP Agent and the DIP Secured Parties, as the case may be, all premia, fees and rights received as consideration under, or in connection with, the DIP Facility, whether paid pursuant to the Interim Order or this Final Order, including the Roll-Up, Upfront Premium, Exit Premium, Anchor Premium, Extension Premium, and any amendment fees, prepayment premiums, early termination fees, rights of repayment (each of which, for the avoidance of doubt, was fully earned upon entry of the Interim Order (or such other date as prescribed by the DIP Documents) and was due and payable upon the Closing Date (or as otherwise provided for in the DIP Documents)), servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, fronting fees, escrow fees, upfront fees, closing fees, commitment fees, exit fees, closing date fees, backstop fees, prepayment fees or agency fees, rights under the DIP Documents, indemnities and professional fees (the payment of which fees shall be irrevocable), and was and shall be, and was and shall be deemed to have been, approved upon entry of the Interim Order and reaffirmed by this Final Order, as applicable, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents, and the costs and expenses as may be due from time to time in accordance with the DIP Documents, including, without limitation, the reasonable and documented fees and expenses of the professionals retained by, or on behalf of, the Ad Hoc Group (including, without limitation, those of Gibson, Dunn & Crutcher LLP, Evercore Group L.L.C., Howley Law PLLC, and any other foreign counsel,

31

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 32 of 98

legal counsel, and any other advisors or consultants as permitted under the DIP Documents, the "**Ad Hoc Group Advisors**") and the DIP Agent (including ArentFox Schiff LLP), in each case, as provided for in the DIP Documents, (collectively, the "**DIP Fees and Expenses**"), without the need to file retention motions or fee applications;

(iv)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents; and

(v)     the Debtors were, by the Interim Order, and are, pursuant to this Final Order, hereby authorized and directed to implement, and the DIP Agent and DIP Lenders are hereby authorized to comply with, the Syndication Procedures. The Syndication Procedures and the allocations with respect thereto (as confirmed by the DIP Lenders in writing (email being sufficient)) were  approved in their entirety pursuant to the Interim Order and are incorporated into this Final Order by reference as if set forth fully herein, and shall govern the syndication, allocation, and participation of the DIP Facility. The Debtors, the DIP Agent, and the DIP Lenders were, by the Interim Order, and are, pursuant to this Final Order, hereby authorized to take all actions necessary or appropriate to continue to effectuate the Syndication Procedures without further notice, hearing, or order of the Court.  For the avoidance of doubt, any actions taken in accordance with the Syndication Procedures shall be deemed to comply with the terms of the Orders and shall not constitute a transfer subject to avoidance, recharacterization, or subordination under the Bankruptcy Code or applicable law.

(d)     The entry of the Interim Order constituted final approval of the DIP Fees and Expenses, including without limitation, the Roll-Up and Roll-Up Obligations, Upfront Premium, Exit Premium, Anchor Premium (payable to the Allocation Parties), and Extension Premium.  Furthermore, upon the entry of the Interim Order, the terms and conditions of the Anchor Premium were fully satisfied by the DIP Lenders and the Allocation Parties, and the Anchor Premium and Roll-Up apportioned to the Allocation Parties were fully and finally earned as a bargained for and integral part of the DIP Facility.

(e)      From the entry of the Interim Order and as reaffirmed pursuant to this Final Order, the DIP Guarantors and Parent Guarantors were and are hereby authorized and directed on a final basis to jointly, severally, and unconditionally guarantee, and shall be deemed to have guaranteed, in full, all of the DIP Obligations.  Upon the effectiveness of the DIP Credit Agreement that occurred on October 2, 2025, (i) all holders of the DIP Loans were deemed to be a party to, and bound by, the DIP Credit Agreement and DIP Documents, regardless of whether such holder has executed a signature page thereto (solely with respect to the DIP Credit Agreement) and (ii) DIP Lender participation in the DIP Facility operates as a deemed consent to the DIP Documents and DIP Facility (including Roll-Up) and DIP Fees and Expenses.

3.      *Repayment of Bridge Loan Obligations*.

(a)      Upon the entry of the Interim Order, the DIP Loan Parties and the First Lien Term Loan Agent were authorized and directed on a final basis to effectuate the Bridge Repayment.  Pursuant to the Bridge Repayment, the Bridge Loans were indefeasibly paid in full and the DIP Loan Parties were authorized to pay any reimbursement obligations, fees and premiums (including, without limitation, commitment fees, backstop fees or premiums, administrative agency fees, and any other fees payable pursuant to the Bridge Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the Bridge Documents.

4.      *Roll-Up of First Lien Obligations*.  Upon the entry of the Interim Order, and subject only to a successful Challenge pursuant to paragraph 27, the Roll-Up was approved on a final basis.  Approval of the Roll-Up Obligations shall be subject only to the reservation of rights set forth in paragraph 27 hereof and, in the event of a successful Challenge, the Court may fashion any appropriate remedy.  To the extent that any interest payment on account of Roll-Up Obligations is not allowed under section 506(b) of the Bankruptcy Code, the Debtors or Creditors' Committee may seek to recharacterize and apply such payment toward principal owed under the First Lien Documents.

5.      *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents constituted and continue to constitute legal, valid, binding and non-avoidable obligations (including, for the avoidance of doubt, the Roll-Up and the Bridge Repayment) of the DIP Loan Parties and Parent Guarantors,

UST Exhibit 4
Page 33 of 98

enforceable against each relevant DIP Loan Party and Parent Guarantor and their estates in accordance with the terms of the DIP Documents and the Orders, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations included (and, as of the date of the entry of this Final Order, continue to include) all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties or Parent Guarantors to any of the DIP Agent or DIP Secured Parties, in such capacities, in each case, under, or secured by, the DIP Documents (including the Orders), including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including the Orders).  The DIP Loan Parties and Parent Guarantors are and shall be jointly and severally liable for the DIP Obligations.  Except as permitted by the Orders, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Secured Parties (including their Representatives) is or shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.    *No Obligation to Extend Credit*.  The DIP Lenders shall have no obligation to make any loans under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and/or the Orders, as applicable, have been satisfied in full or waived by the DIP Agent (at the direction of the Required Lenders) or as otherwise contemplated by the DIP Documents.

UST Exhibit 4
Page 34 of 98

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 35 of 98

7.      *Carve-Out*.

(a)      <u>Priority Carve-Out</u>. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Claims, and any other liens, claims, or interests that any creditor, the Prepetition Secured Parties, the DIP Secured Parties, or any of their respective affiliates hold, own or control in relation to the Debtors or their affiliates, shall be subject and subordinate to payment of the Carve-Out (as defined herein).  The Carve-Out shall be senior to all claims and liens, including DIP Superpriority Claims, DIP Liens, Adequate Protection Claims, and Adequate Protection Liens, over any assets of the Debtors, including any DIP Collateral and Prepetition Collateral, as set forth in the Orders.  For the avoidance of doubt, after delivery of a Termination Notice or the date upon which the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the New Money Loan Commitments have been terminated, the Carve-Out shall remain in effect as to all claims and obligations, including the Prepetition Secured Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Final Order.

(b)      <u>Carve-Out</u>. As used in this Final Order, "Carve-Out" means the sum of:  (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717; (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $125,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) subject, in each case, to application of any retainers that may be held and to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued but unpaid claims for fees and expenses (including any restructuring, sale, success or other transaction fees that have been fully earned, and accrued, and are due and payable in accordance with the applicable engagement letter, but excluding any fee payable under any "tail" obligation or any other fees that have not been earned and accrued in accordance with the applicable engagement letter) (the "**Allowed Professional Fees**"), incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") or retained by the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**" and, together with the

UST Exhibit 4
Page 35 of 98

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 36 of 98

Debtor Professionals, the "**Professional Persons**"), at any time before the date of delivery by the DIP Agent or ABL Agent of a Carve-Out Notice (as defined below), whether allowed by the Court prior to or after the Carve-Out Trigger Notice Date (as defined below) and without regard to whether such fees and expenses are provided for in the Approved DIP Budget (the amounts set forth in the foregoing clauses (i)–(iii), the "**Pre-Carve-Out Notice Amount**"); and (iv) Allowed Professional Fees of Professionals Persons incurred on or after the date of delivery by the DIP Agent of a Carve-Out Notice in an aggregate amount not to exceed $25,000,000 (the amount set forth in this clause (iv) being the "**Post-Carve-Out Notice Amount**" and, the Post-Carve-Out Notice Amount together with the Pre-Carve-Out Notice Amount, the "**Carve-Out Amount**").  The "**Carve-Out Notice**" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the Required Lenders) or the ABL Agent (acting at the instruction of the ABL Lenders) to Weil, Gotshal & Manges LLP ("**Weil**"), as lead restructuring counsel to the Debtors, the U.S. Trustee, and the lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Carve-Out has been invoked.  For the avoidance of doubt, the Carve-Out (including the Carve-Out Amount) and Professional Persons shall not include (i) any chapter 11 trustees or examiners appointed at, or for the benefit of, a non-DIP Loan Party (including at the SPV Debtors) or (ii) any fees or expenses incurred by any professional that is providing services to a non-Debtor upon the commencement of any foreign winddown or liquidation process, unless expressly consented to by the Required Lenders (such Debtors defined as "**Alternative DIP Debtors**").

(c)  Professional Fees Escrow Account.  In accordance with the Interim Order, the DIP Loan Parties have opened a new bank account or designated an existing bank account to function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons (the "**Professional Fees Escrow Account**").  In addition to the initial funding authorized under the Interim Order, the Debtors shall transfer cash, including proceeds from DIP Loans, in an amount equal to the total budgeted (or actual, if available) weekly fees and expenses incurred or to be incurred by Professional Persons for the applicable periods set forth in the Approved Budget into the Professional Fee Escrow Account.  The Professional Fees Escrow Account shall not be subject to the control

UST Exhibit 4
Page 36 of 98

of the DIP Agent, any DIP Lender, or any of the Prepetition Secured Lenders and all of the funds transferred to the Professional Fees Escrow Account shall not (i) be property of the estate of any of the Debtors, under section 541 of the Bankruptcy Code, (ii) be subject to the DIP Liens or Adequate Protection Liens, or (iii) constitute Collateral.

(d)    Pre-Carve-Out Notice.   Prior to the delivery of a Carve-Out Notice, on the third Business Day of each week, each Professional Person shall deliver to counsel to the Debtors, counsel to the DIP Agent, and the Ad Hoc Group Advisors a weekly statement (each, a "**Weekly Statement**") setting forth a reasonable good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "**Weekly Estimated Fees and Expenses**"), and the Debtors shall, on a weekly basis, transfer cash proceeds from cash on hand and, if necessary to cover any shortfall from cash on hand, from DIP Loans in the Proceeds Account and Escrow Account into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account).   The DIP Agent shall be authorized to post each Weekly Statement on the public side of the lender data site.   If, at any time, the amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by a Professional Person exceeds the actual amount accrued by such Professional Person during such applicable weekly period, such excess amount shall be credited against the subsequent Weekly Estimated Fees and Expenses.   The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, in accordance with any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.

(e)    Notwithstanding anything to the contrary herein, each Weekly Statement and the Weekly Estimated Fees and Expenses include an allocation for all Professional Persons segregating fees and expenses incurred by or on behalf of the DIP Loan Parties and fees and expenses incurred by or on

37

behalf of non-DIP Loan Parties.  The DIP Secured Parties and the Prepetition Secured Parties reserve all rights with respect to the allocation of Professional Persons.

(f)      Post-Carve-Out Notice.  On the date on which a Carve-Out Notice is delivered in accordance with this paragraph 7(e) of this Final Order (the "**Carve-Out Trigger Date**"), the Carve-Out Notice shall constitute a demand to the Debtors and all of their subsidiaries to, subject to the terms of the Cash Management Order and paragraph 46 hereof, utilize available cash on hand, any cash held in the Proceeds Account, any cash held in the Escrow Account, and DIP Loans, but in any event funded such that exposure is shared on a ratable basis based on the total outstanding DIP Obligations, First Lien Term Loan Obligations (excluding any amounts that are Roll-Up Obligations), and ABL Obligations; *provided that* such demand by the Debtors shall be strictly limited to the amount of any shortfall needed to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount ((i) and (ii), each to the extent not previously funded to the Professional Fees Escrow Account).  Not later than two (2) Business Days after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Agent, and the Ad Hoc Group Advisors, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement through and including the Carve-Out Trigger Date, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account.  Notwithstanding anything to the contrary in the Orders, the Post-Carve-Out Notice Amount shall promptly be funded into the Professional Fees Escrow Account on the Carve-Out Trigger Date; *provided, however,* that any unused amounts shall be returned to the DIP Lenders.  Notwithstanding anything to the contrary in the Orders, the DIP Documents, or the Prepetition Credit Documents, after delivery of a Carve-Out Notice, if the Professional Fees Escrow Account has not been funded with the full Carve-Out Amount within three (3) business days of delivery of such Carve-Out Notice (to run concurrently with the delivery of the last Weekly Statement), any shortfall shall be funded first from cash on hand, and then cash in the Proceeds Account and, solely if necessary, from cash in the Escrow Account on a ratable basis, as described *infra*.

UST Exhibit 4
Page 38 of 98

(g)　　Notwithstanding anything to the contrary in the Orders, the DIP Documents, or the Prepetition Credit Documents, following delivery of a Carve-Out Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets and any cash in the Escrow Account or Proceeds Account, solely to the extent necessary to fund any shortfall as set forth in paragraph 7(e)) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein.  If, after paying all amounts set forth in the definition of Carve-Out, the Professional Fees Escrow Account has not been reduced to zero, all remaining funds in the Professional Fees Escrow Account shall be distributed to the DIP Agent for application to the DIP Obligations until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the New Money Loan Commitments have been terminated, or, in the event the DIP Obligations have been indefeasibly paid in full in cash, to the Debtors or their estates.

(h)　　Notwithstanding anything to the contrary in the Orders, the DIP Documents, or the Prepetition Credit Documents, (i) funds transferred to the Professional Fees Escrow Account shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to the obligations arising out of the Carve-Out, (ii) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Documents or the Prepetition Credit Documents or otherwise increase or reduce the DIP Obligations or the Senior Secured Obligations, (iii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, (iv) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons, and (v) the Carve-Out and the entitlement of the Professional Persons to the Carve-Out and the Professional Fee Escrow Account proceeds shall be senior to all liens and claims against the assets of the Debtors, including those securing the DIP Facility, the Adequate Protections Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing any claims and liens against the DIP Loan Parties' assets, including the DIP Obligations, the Senior Secured Obligations.

UST Exhibit 4
Page 39 of 98

(i)       Payment of Carve-Out on or After the Carve-Out Trigger Date.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.  Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and any applicable Court orders.

(j)       No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be directly responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code or any fees or costs incurred for or on behalf of a Debtor or its subsidiaries.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or any fees or costs incurred for or on behalf of a Debtor or its subsidiaries, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; provided that nothing herein shall limit the requirement that any shortfall shall be funded from the Escrow Account or Proceeds Account as contemplated in paragraph 7(e) above.  Nothing in this Final Order shall be construed as a waiver of any right of the DIP Secured Parties or the Prepetition Secured Parties with respect to any retention application, fee statement, interim application, or monthly application issued or filed by the Professional Persons.

(k)       The DIP Secured Parties and Prepetition Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget.  None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees, disbursements or expenses of the U.S. Trustee, Clerk of the Court, the Creditors' Committee, any other statutory committee, trustee or examiner, any Professional Person, or any fees or costs incurred for or on behalf of a Debtor or its subsidiaries, in each case, incurred in connection with the Chapter 11 Cases or any successor case(s) under any chapter of the Bankruptcy Code (a "**Successor Case**") under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court.  Nothing in the Orders or

UST Exhibit 4
Page 40 of 98

otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to pay compensation to or reimburse expenses of any Professional Person, or to guarantee that the DIP Loan Parties have sufficient funds to pay such compensation or expense reimbursement.

8.       *DIP Superpriority Claims*.

(a)       Pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties and Parent Guarantors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, including the DIP Loan Parties and Parent Guarantors, but excluding the SPV Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to (i) all prepetition and postpetition property of the Debtors, including the DIP Loan Parties and Parent Guarantors, but excluding the SPV Debtors, and all proceeds thereof (excluding the Carve-Out), excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but including:  (w) any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**"), (x) commercial tort claims, other estate claims and causes of action, and the proceeds of the foregoing, (y) the proceeds of property recovered, whether by judgment, settlement, or otherwise from all claims and causes of action under section 549 of the Bankruptcy Code (and section 550 of the Bankruptcy Code solely as to claims and causes of action under section 549) to recover any postpetition transfer of property, and (z) all amounts recovered by the Debtors' estates under section 506(c)

UST Exhibit 4
Page 41 of 98

Case 25-90399   Document 3356-4   Filed in TXSB on 07/24/26   Page 42 of 98

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 42 of 98

of the Bankruptcy Code ((i)(w) through (z), the "**Recovery Actions**," and the proceeds of property recovered, whether by judgment, settlement, or otherwise from Recovery Actions ("**Recovery Action Proceeds**")) (ii) all Additional Unencumbered Property (as defined below) (the foregoing clauses (i) and (ii), to the extent not already encumbered as of the Petition Date, the "**Previously Unencumbered Property**")) and (iii) all Prepetition Collateral ((i) through (iii) collectively, the "**DIP Collateral**"), in accordance with the DIP Documents and the Orders, subject and subordinate only to the Carve-Out; *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary herein, that the DIP Collateral shall not include (i) any Excluded Assets (as defined in the DIP Documents) but shall include any and all proceeds and products of the Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets, and (ii) any assets of (x) Carnaby Inventory II, LLC, Carnaby Inventory III, LLC, Carnaby Inventory Holdings II, LLC, and Carnaby Inventory Holdings III, LLC (the "**Carnaby II and III Debtors**"), and (y) FRAM Group Operations Mexicali, S.A. de C.V., Subensambles Internacionales, S. de R.L. de C.V, Trico Componentes, S.A. de C.V., BPI Brake Manufacturing Juarez, S.A. de C.V., and BPI Braking Systems Mexico, S.A. de C.V. (collectively, the "**Maquiladora Entities**"); *provided*, *further*, that any such Previously Unencumbered Property that is Recovery Action Proceeds shall constitute DIP Term Priority Collateral (as defined below) for all purposes of lien and claim priority in this Final Order, notwithstanding anything to the contrary in any DIP Document, Prepetition Secured Document, or the Intercreditor Agreements.

(b)     Notwithstanding anything in the Interim Order or this Final Order to the contrary, prior to the payment of the Roll-Up Obligations, but following indefeasible payment in full in cash of the New Money DIP Loans (including any and all applicable DIP Obligations, including DIP Fees and Expenses but excluding any DIP Obligations related to the Roll-Up Obligations), unpaid and undisputed administrative expense claims of the DIP Loan Parties (the "**Specified Administrative Expense Claims**") up to an aggregate amount of $200 million shall be paid (the "**Administrative Expense Claims Basket**"), and (i) upon any Carve-Out Trigger Date, funds sufficient to satisfy the Specified Administrative Expense Claims (up to the amount of the Administrative Expense Claims Basket) shall be funded into a segregated account, and (ii) as long as the New Money DIP Loans (including any all applicable DIP Obligations,

UST Exhibit 4
Page 42 of 98

including DIP Fees and Expenses but excluding any Roll-Up Obligations) are indefeasibly paid in full in cash, the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket.   The Specified Administrative Expense Claims shall include the following categories of administrative expense claims: (i) postpetition trade claims, (ii) non-insider postpetition employee and wage claims, (iii) taxes (federal and state), (iv) tariffs, (v) collective bargaining related items, (vi) claims arising under section 503(b)(9) of the Bankruptcy Code, and (vii) lease obligations.   For the avoidance of doubt, Specified Administrative Expense Claims shall not include claims of Alternative DIP Debtors and Adequate Protection Claims, including Adequate Protection Claims of any SPV Lender or the ABL Lenders or ABL Agent (if any) or any other category of claim.

9.       The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

10.      *Intercompany Cost Claims.*

(a)       Pursuant to section 503(b)(1) of the Bankruptcy Code, all postpetition payments on account of any Intercompany Transaction (as defined in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply With Requirements of 11 U.S.C. § 345(B), and (IV) Granting Related Relief* (Docket No. 17) (the "**Cash Management Motion**")), including any interest and fees related thereto, made by a Debtor to another Debtor, shall be accorded administrative expense status; *provided* that any such administrative expense status shall be junior to the Carve-Out and any approved superpriority administrative expense claims under this Final Order.

11.      *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of the Interim Order and without the necessity of the execution, recordation or filing

UST Exhibit 4
Page 43 of 98

by the Debtors, Parent Guarantors, or any of the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Agent, the DIP Secured Parties, the DIP Loan Parties and Parent Guarantors, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to the Orders and the DIP Documents, the "**DIP Liens**") were, by the Interim Order, and are, pursuant to this Final Order, hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below being collectively included in the definition of DIP Collateral):

(a)     *Liens on Unencumbered Property*.   Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtors, including the DIP Loan Parties and Parent Guarantors, but excluding the SPV Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non- avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, (x) the Previously Unencumbered Property and (y) without duplication, any and all unencumbered cash of the Debtors, including the DIP Loan Parties and the Parent Guarantors (whether maintained with any of the DIP Secured Parties or otherwise and whether existing and/or acquired on or after the Petition Date) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, subrogation claims, chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts,

44

Case 25-90399   Document 608   Filed in TXSB on 11/09/25   Page 45 of 98

patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**Additional Unencumbered Property**").  Notwithstanding anything in this Final Order or the DIP Documents to the contrary, in no event shall DIP Collateral (and the DIP Liens and Adequate Protection Liens thereon) include:  (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases and (b) any security deposits held by a landlord under any non-residential real property lease or the DIP Loan Parties' interest in any pre-paid rent under any such lease (but shall include the DIP Loan Parties' revisionary interests therein), in each case, unless such lien is expressly permitted under such lease.

(b)      *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully- perfected first priority senior priming security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties and Parent Guarantors, of the same nature, scope, and type as the Prepetition Term Priority Collateral (the "**DIP Term Priority Collateral**"), regardless of where located (the "**DIP Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) senior in all respects to the other Prepetition Liens on DIP Term Priority Collateral, (ii) senior to any Adequate Protection Liens on DIP Term Priority Collateral and (iii) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the DIP Loan Parties and the Parent Guarantors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Term Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)      *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, including DIP Loan Parties and Parent Guarantors, but excluding the SPV Debtors, that, on or as of the Petition Date, is subject

UST Exhibit 4
Page 45 of 98

to either (i) valid, perfected and non-avoidable Prepetition Permitted Senior Liens, or (ii) valid and non-avoidable Prepetition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be (x) immediately junior and subordinate to any such Prepetition Permitted Senior Liens and (y) junior to the Adequate Protection Liens and the Prepetition Liens.

(d)     *Liens Senior to Certain Other Liens*.  The DIP Liens shall not be subject or subordinate to or made *pari passu* with:  (i) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties or their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in the DIP Documents or in this Final Order, any liens or security interests on asset of the DIP Loan Parties or Parent Guarantors arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties or Parent Guarantors, or (iii) any intercompany or affiliate liens of the DIP Loan Parties or Parent Guarantors or security interests of the DIP Loan Parties or Parent Guarantors; or (iv) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.

12.     *Protection of DIP Lenders' and Prepetition Secured Parties' Rights*.

(a)     So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments under the DIP Documents, the Prepetition Secured Parties, shall:  (i) except as otherwise ordered by the Court, have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the

UST Exhibit 4
Page 46 of 98

DIP Collateral other than, (x) solely as to this clause (iii), the Prepetition Secured Parties filing financing statements or other documents to perfect the liens granted pursuant to the Interim Order or Final Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' or Parent Guarantors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by the DIP Documents and this Final Order.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Secured Parties, subject to the lien priorities set forth herein, and such Prepetition Secured Party, as applicable, shall comply with the instructions of the DIP Agent, acting at the direction of the Required Lenders, with respect to such notation or the exercise of such control or possession.

(c)     Reserved.

(d)     Immediately upon the occurrence of and during the continuation of (x) an Event of Default that has not been waived by the Required Lenders and following delivery of written notice (a "**Termination Notice**") or (y) an ABL Event of Default that has not been waived by the ABL Lenders and following delivery of written notice (a "**ABL Termination Notice**") (in each case including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "**Remedies Notice Period**") to lead restructuring counsel to the Debtors, lead restructuring counsel to the ABL Agent, lead restructuring counsel to the First Lien Term Loan Agent, lead restructuring counsel to the Second Lien Term Loan Agent, lead counsel to the Creditors' Committee, and the U.S. Trustee, (the "**Remedies Notice**

UST Exhibit 4
Page 47 of 98

**Parties**"), the (i) DIP Agent may, acting at the direction of the Required Lenders, and (ii) solely with respect to the immediately following clause (a) in this paragraph 12(d), Prepetition Secured Parties (acting under the direction of the applicable required lenders), subject to the DIP Obligations, the DIP Superpriority Claims, and consistent with the Prepetition Credit Documents, including the Intercreditor Agreements, and the relative rights and priorities, without further notice to, hearing of, or order from this Court, may, unless the Court orders otherwise:  (a) immediately terminate and/or revoke the DIP Loan Parties' and Parent Guarantors' rights under this Final Order and any other DIP Documents or Prepetition Secured Documents, as applicable, to use any Cash Collateral (subject only to the Carve-Out, including the provisions set forth in paragraph 7 of this Final Order) except as solely necessary to fund expenses critically necessary to preserve the value of the DIP Loan Parties' business and the DIP Collateral, which expenses are in accordance with the Approved Budget; (b) solely with respect to a Termination Notice, terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) solely with respect to a Termination Notice, declare all DIP Obligations to be immediately due and payable; (d) solely with respect to a Termination Notice, invoke the right to charge interest at the default rate under the DIP Documents; and (e) solely with respect to a Termination Notice, terminate, reduce, or restrict any further commitment to extend credit to the DIP Loan Parties to the extent any such commitment remains under the DIP Facility.  The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically modified with respect to the DIP Secured Parties and the Prepetition Secured Parties, as applicable, at the end of the Remedies Notice Period, without further notice or order of the Court, unless (A) the DIP Agent (at the direction of the Required Lenders) and the Prepetition Agents (at the direction of the applicable requisite lenders), as applicable, elect otherwise in a written notice to the Debtors, and/or (B) the Court has determined that an Event of Default has not occurred and/or is not continuing and/or (C) the Court orders otherwise.

(e)     Upon delivery of such Termination Notice by the DIP Agent or an ABL Termination Notice by the ABL Agent and subject to the Carve-Out and related provisions set forth in paragraph 7, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition

UST Exhibit 4
Page 48 of 98

Secured Parties' consent to use Cash Collateral and the DIP Loan Parties' and the Parent Guarantors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations; *provided* that, during the Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Agent consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral; *provided* further that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.

(f)      Following an Event of Default and the delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 12(e)), the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' notice to the Remedies Notice Parties (which may run concurrently with the Remedies Notice Period) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties and Prepetition Secured Parties to, subject to the ABL Intercreditor Agreement, the Term Intercreditor Agreement, the Carve-Out and related provisions:  (a) freeze monies or balances in the DIP Loan Parties' and the Parent Guarantors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the DIP Loan Parties and the Parent Guarantors with the DIP Agent or the DIP Secured Parties against the DIP Obligations; (c) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the DIP Loan Parties' and the Parent Guarantors' premises, sale or disposition of the DIP Collateral; (d) the Prepetition Secured Parties may exercise any rights and remedies to satisfy the Prepetition Secured Obligations and Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, and consistent with the Prepetition Credit Documents, including the Intercreditor Agreements, including, without limitation, to

UST Exhibit 4
Page 49 of 98

charge interest at the default rate; and (e) take any other actions or exercise any other rights or remedies permitted under the Orders, the DIP Documents or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the DIP Loan Parties and the Parent Guarantors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the DIP Loan Parties may use the proceeds of the DIP Facility to extent drawn from the Escrow Account prior to the occurrence of an Event of Default or Cash Collateral solely necessary to fund expenses critically necessary to preserve the value of the DIP Loan Parties' business and the DIP Collateral, which expenses are in accordance with the Approved Budget (including the Carve-Out, including the provisions set forth in paragraph 7 of this Final Order).  For the avoidance of doubt, following an Event of Default and delivery of a Termination Notice, no further draws from the Escrow Account may be made absent the consent of the Required Lenders.  The DIP Lenders shall promptly cause a copy of any Stay Relief Motion to be served on any party that has filed a request for notices with this Court.

(g)     Notwithstanding the foregoing, and irrespective of the Remedies Notice Period, but except solely as otherwise expressly provided with respect to the Carve-Out, the DIP Lenders shall not be obligated to provide any DIP Loans, withdrawals from the DIP Account, or advances at any time a Default (as defined in the applicable DIP Credit Agreement) or Event of Default has occurred and is continuing after a DIP Termination Event.

(h)     Notwithstanding anything in the Interim Order or the DIP Documents to the contrary, except as otherwise ordered by the Court, none of the Prepetition Secured Parties shall be permitted to exercise any rights or remedies with respect to any Prepetition Collateral or DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full.

(i)     No rights, protections or remedies of the DIP Agent or the DIP Secured Parties or the Prepetition Secured Parties granted by the provisions of the Orders or the DIP Documents shall be limited, modified or impaired in any way by:  (i) any actual or purported withdrawal of the consent of any

50

party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

13.     *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the ABL Agent and/or the Second Lien Term Loan Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the ABL Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties, and nothing contained in the Interim Order or this Final Order shall be deemed to be a consent by the DIP Agent, the DIP Secured Parties, the First Lien Term Loan Agent, the Sidecar Term Loan Agent, the ABL Agent, the Second Lien Term Loan Agent, or the Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

14.     *Equities of the Case.*  In no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Collateral.

15.     *Payments and Exchanges Free and Clear.*  Any and all payments, fees, premiums, or proceeds remitted, reimbursed, or exchanged to the DIP Agent by, through or on behalf of the DIP Secured Parties or by, through or on behalf of the Prepetition Secured Parties (on behalf of themselves or any other Prepetition Secured Party) pursuant to the provisions of the Interim Order or this Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of

UST Exhibit 4
Page 51 of 98

or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the DIP Loan Parties and the Parent Guarantors.

16.     *Use of Cash Collateral*.  The DIP Loan Parties were, by the Interim Order, and are hereby authorized, subject to the terms and conditions of this Final Order, to use all Cash Collateral in accordance with the DIP Documents and Approved Budget (subject to permitted variances); *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth, (b) except on the terms and conditions of this Final Order, the DIP Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court, and (c) the DIP Loan Parties remain in compliance at all times during the Chapter 11 Cases with the ABL Borrowing Base (as defined herein).

17.     *Disposition of DIP Collateral*.  The DIP Loan Parties and Parent Guarantors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or an order of the Court.

18.     *Use of DIP Facility Proceeds*

(a)     Subject to satisfaction (or waiver) of all applicable conditions precedent under the DIP Documents, the DIP Loans shall have been or shall be made available to the DIP Loan Parties:  (i) on the Closing Date, to pay the Bridge Repayment, and the fees, premia, costs, and expenses incurred in connection with the transactions contemplated by the Interim Order and this Final Order, and (ii) on and/or after the Closing Date:  (A) for the DIP Loan Parties (and non-DIP Loan Parties, solely as permitted under the DIP Documents) working capital requirements and for general corporate purposes (including, to fund the costs, fees, and expenses in connection with administration of the Chapter 11 Cases) in accordance with the Approved Budget, (B) for the payment of all reasonable and documented out-of-pocket costs, fees, and expenses required by the DIP Documents, and (C) to fund the Carve-Out as provided in the Orders, in the case of each of (i) and (ii) above, in accordance with the terms of the Orders and the DIP Documents.

(b)     Unless expressly consented to by the Required Lenders (in their sole discretion), no proceeds of the DIP Loans (including payments from Collateral, the Proceeds Account, or the Escrow Account) shall be used (i) to make any payment in settlement or satisfaction of any prepetition claim or administrative claim (other than the DIP Obligations as provided in the Orders and the DIP Credit

UST Exhibit 4
Page 52 of 98

Agreement); (ii) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and the Approved Budget; (iii) except as expressly provided or permitted hereunder or under the DIP Credit Agreement (in accordance with the Approved Budget), or as otherwise approved in advance in writing by Required Lenders (and approved by the Court, if necessary), to make any payment or distribution, directly or indirectly (including through an intercompany set-off), to, or on behalf of, any SPV Debtor[12] and any other non-DIP Loan Party; *provided that*, notwithstanding anything else in the Orders or any First Day Pleadings (as defined in the DIP Credit Agreement), any consent of the Required Lenders to payments, set offs, or distributions to non-DIP Loan Parties shall not be deemed, inferred, or assumed absent express line-item approval of such payment, set off, or distribution in the Approved Budget; (iv) except as expressly provided or permitted hereunder, under the DIP Credit Agreement or in the Approved Budget, or as otherwise approved in advance in writing (and approved by the Court, if necessary), to make any payment or distribution to, or on behalf of, any insider of the Debtors (whether ordinary course or non-ordinary course), and in no event shall any management, advisory, consulting, or similar fees be paid to or for the benefit of any non-Debtor affiliate (whether ordinary or non-ordinary course); (v) to make any payment otherwise prohibited by this Final Order; (vi) to make any intercompany loans and investments (including to and in foreign subsidiaries) unless expressly permitted by the Orders or the other DIP Documents and the Approved Budget or consented to by the Required Lenders; or (vii) for any purpose not authorized by any Approved Budget.

(c)     Subject to the terms and conditions of the Orders and the other DIP Documents, the DIP Loan Parties, Parent Guarantors, and, if applicable, any non-DIP Loan Party authorized to receive proceeds of DIP Collateral in accordance with the DIP Documents, are only authorized to use proceeds of the DIP Collateral in the amounts and for the stated purpose set forth in the Approved Budget (subject to permitted variances).

(d)     For the avoidance of doubt, except as otherwise set forth in the Approved Budget or otherwise consented to by the Required Lenders, proceeds of the DIP Loans may not be used (i) by any

---

[12] "**SPV Debtors**" means collectively, Carnaby Capital Holdings, LLC and each of its Debtor subsidiaries.

non-Debtor entity or any foreign subsidiary or affiliate of the Debtors or (ii) to pay any fees, costs, expenses, and/or any other amounts of any non-Debtor or foreign entity.

19.     *Budget Maintenance.*

(a)     The DIP Secured Parties shall, as soon as reasonably practicable upon authorization to advance DIP Loans under the DIP Facility pursuant to this Final Order, deposit such amounts from the DIP Facility into a segregated escrow account (the "**Escrow Account**") maintained by the DIP Agent, which amounts may only be disbursed with the consent of the Required Lenders in accordance with the Escrow Agreement (as defined in the DIP Credit Agreement) and the Approved Budget, the terms and conditions of the Orders, and the DIP Credit Agreement, and with all funds held in the Escrow Account deemed to be DIP Collateral (provided that the Escrow Account shall not be subject to any liens of the ABL Agent or the other ABL Secured Parties).   Funds in the Escrow Account will become available to be drawn by and/or shall be disbursed to the DIP Loan Parties in accordance with the Approved Budget, the Orders, and the DIP Credit Agreement.   The DIP Agent shall be deemed to have "control" over the Escrow Account for all purposes of perfection under the Uniform Commercial Code pursuant to the Orders.   Once disbursed from the Escrow Account, the DIP Loans shall be placed into an account maintained with the DIP Agent (the "**Proceeds Account**") and shall continue to be DIP Term Priority Collateral until such funds are first used by the DIP Loan Parties and the Parent Guarantors, and at all times the DIP Loan Parties and the Parent Guarantors shall, notwithstanding any potential commingling, establish strict internal cash management procedures acceptable to the Required Lenders to allow for the continued tracing of such funds, including oversight by the Debtors' chief restructuring officer and the Proceeds Account shall not be subject to any liens of the ABL Agent or the other ABL Secured Parties. The DIP Agent shall be deemed to have "control" over the Proceeds Account for all purposes of perfection under the Uniform Commercial Code pursuant to the Orders and pursuant to a control agreement acceptable to the Required Lenders.

(b)     All cash withdrawals from the Escrow Account or the Proceeds Account or otherwise on account of DIP Term Priority Collateral shall be, and in any event shall be deemed to be,

UST Exhibit 4
Page 54 of 98

pursuant to the Orders and notwithstanding anything to the contrary in any Intercreditor Agreement, DIP Term Priority Collateral for the benefit of the DIP Agent (for the benefit of the DIP Secured Parties).

(c)     Except as permitted by this Final Order or any DIP Document, the Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest, or other amount payable in respect of any secured funded indebtedness prior to its scheduled maturity, other than the obligations expressly authorized by an order of the Court.

(d)     The DIP Loan Parties shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the Approved Budget (subject to permitted variances), provided that the Approved Budget will not operate as a cap on professional fees.

(e)     The Debtors shall provide the DIP Secured Parties with a schedule in support of the Approved Budget (and each subsequent budget), on a line item basis, of each Professional Person's reasonable estimated fees in connection with such Professionals Persons' services provided on behalf of each of the (i) non-DIP Loan Parties that are Debtors, including, the SPV Debtors, and (ii) non-Debtor entities; *provided that* such estimates in the Approved Budget will not operate as a cap on Professional Persons' fees and such fees will be included in the Carve Out in accordance with paragraph 7 hereof.

(f)     Subject to the terms and provisions of the Cash Management Order, the Debtors may open and close bank accounts only with the consent in a writing of the Required Lenders.

20.     *DIP Information Rights.*

(a)     The Debtors will (i) reasonably cooperate with, consult with, and provide to the DIP Secured Parties, the Ad Hoc Group Advisors (with copies to the Prepetition Agents), and counsel to the Creditors' Committee, respectively, all such information and documents that any or all of the Debtors are obligated (upon their reasonable request) to provide under the DIP Documents, or the provision of the Orders, excluding any information subject to attorney-client, work product, or similar privilege, (ii) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of the DIP Secured Parties to discuss, and provide advice with respect to, the Debtors' respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel), and

UST Exhibit 4
Page 55 of 98

(iii) permit the DIP Secured Parties and their respective consultants, advisors, and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Secured Parties, the Prepetition Agents, or any of their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

21.    *Proceeds of Subsequent Financing*. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), and 364(d) of the Bankruptcy Code in violation of the DIP Documents or the Orders at any time, including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied to repay only outstanding DIP Obligations in accordance with the Final DIP Order, the Intercreditor Agreements, and the DIP Documents.

22.    *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) to the extent any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for under the Bankruptcy Code ("**Diminution of Value**"), including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents and the Orders, the payment of any amounts under the Carve-Out or pursuant to the Interim Order, this Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "**Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition Agents, as applicable, and for the benefit of the applicable Prepetition Secured Parties, are hereby granted the following as Adequate Protection on account of their Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the

UST Exhibit 4
Page 56 of 98

priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)        *Section 507(b) Claims*. Solely to the extent of any diminution in value of their respective interests in the Prepetition Collateral, under the Interim Order and as reaffirmed by this Final Order, each Prepetition Agent, for the benefit of the applicable Prepetition Secured Parties, was, by the Interim Order, and is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (each, an "**Adequate Protection Claim**") against the DIP Loan Parties and the Parent Guarantors and their estates on a joint and several basis, which Adequate Protection Claims shall have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726(b), 1113, and 1114 of the Bankruptcy Code, in each case subject only to the Carve-Out and the DIP Superpriority Claims and shall otherwise have the relative rank and priority set forth in the Intercreditor Agreements, except as provided for in the Orders.

(b)        *ABL Adequate Protection Liens*.  The ABL Agent, for itself and for the benefit of the ABL Lenders was, by the Interim Order, and is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**ABL Adequate Protection Liens**"), in the case of the Prepetition ABL Priority Collateral, subject to and subordinate only to the Carve-Out, *provided* that the ABL Adequate Protection Liens on the ABL Priority Collateral shall not be primed by any new, incremental postpetition financing that may be provided to the DIP Loan Parties for the remainder of the Chapter 11 Cases; but in the case of the Prepetition Term Priority Collateral, subject and subordinate to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the First Lien Term Loans Adequate Protection Liens and (v) the Second Lien Term Loans Adequate Protection Liens, and in the case of the proceeds from Avoidance Actions, subject and subordinate to the DIP Liens; *provided that* all credit card obligations shall be cash collateralized as reasonably acceptable to the ABL Agent and DIP Agent (at the direction of the

Required Lenders).  For the avoidance of doubt, all Letters of Credit, when drawn, will be converted on a dollar-for-dollar basis for ABL Revolving Debt (as defined in the ABL Credit Agreement) pursuant to the LC reimbursement provisions in the ABL Credit Agreement.

(c)　　*First Lien Term Loans Adequate Protection Liens*.  The First Lien Agent, for itself and for the benefit of the First Lien Term Loan Lenders was, by the Interim Order, and is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**First Lien Term Loans Adequate Protection Liens**"), in the in the case of Prepetition Term Priority Collateral, subordinate only to the (A) Carve-Out, (B) the DIP Liens, and (C) Prepetition Permitted Senior Liens, and in the case of Prepetition ABL Priority Collateral, subject and subordinate only to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, and (iii) the DIP Liens, and (iv) the ABL Adequate Protection Liens.

(d)　　*Second Lien Term Loan Adequate Protection Liens*.  The Second Lien Term Loan Agent, for itself and for the benefit of the Second Lien Term Loan Lenders was, by the Interim Order, and is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the Collateral to the extent of any Diminution of Value (the "**Second Lien Term Loan Adequate Protection Liens**" and, together with the ABL Adequate Protection Liens, and the First Lien Term Loans Adequate Protection Liens, the "**Adequate Protection Liens**"), in the case of Prepetition Term Priority Collateral, subordinate only to the (A) Carve-Out, (B) the DIP Liens, (C) Prepetition Permitted Senior Liens, and (D) First Lien Term Loans Adequate Protection Liens, and in the case of Prepetition ABL Priority Collateral, subject and subordinate only to (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the ABL Adequate Protection Liens, and (v) the First Lien Term Loans Adequate Protection Liens.

UST Exhibit 4
Page 58 of 98

(e)      *ABL Secured Parties' Adequate Protection Fees and Expenses*.   As further adequate protection, the DIP Loan Parties shall provide the ABL Agent, for the benefit of the ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the ABL Agent under the ABL Credit Documents, including, but not limited to, (i) the reasonable and documented fees and out-of-pocket expenses of Winston & Strawn LLP (solely in its capacity as counsel to the ABL Agent), (ii) FTI Consulting (solely in its capacity as financial advisor to the ABL Agent), (iii) one local counsel, in each applicable jurisdiction, to the ABL Agent, and (iv) all field examination and appraisal costs, including the fees of third-party appraisers and examiners engaged pursuant to the ABL Credit Documents, and any Letter of Credit fees in accordance with the ABL Credit Documents (the "**ABL Adequate Protection Fees and Expenses**"), which may be advanced from the proceeds of the DIP Facility, with the consent of Required Lenders, subject to the review procedures set forth in paragraph 26 of this Final Order.

(f)      *First Lien Term Loan Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the First Lien Term Loan Agent and any successor agent under the First Lien Term Loan Agreement, for the benefit of the First Lien Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Ad Hoc Group Advisors and the First Lien Term Loan Agent (and any such successor) under the First Lien Term Loan Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of counsel to the First Lien Term Loan Agent (and any such successor), and one local counsel to the First Lien Term Loan Agent (and any such successor) (the "**First Lien Term Loans Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 26 of this Final Order.

(g)      *Second Lien Term Loan Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, the DIP Loan Parties shall provide the Second Lien Term Loan Agent and any successor agent under the Second Lien Term Loan Agreement, for the benefit of the Second Lien Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Second Lien Term Loan Agent (and any such successor) under the Second Lien Term

UST Exhibit 4
Page 59 of 98

Loan Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of counsel to the Second Lien Term Loan Agent (and any such successor), and one local counsel to the Second Lien Term Loan Agent (and any such successor) (the "**Second Lien Term Loan Adequate Protection Fees and Expenses**" and, together with the ABL Adequate Protection Fees and Expenses, and the First Lien Term Loans Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 26 of this Final Order.

(h)     *ABL Postpetition Interest Payments*.  From and after entry of the Interim Order, the ABL Agent, on behalf of itself and the ABL Lenders, shall receive (a) monthly current payment in cash during the Chapter 11 Cases of all accrued interest on the ABL Obligations under the ABL Credit Agreement (except with respect to any supply chain obligations) as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder and in the amounts specified in the ABL Credit Agreement and (b) solely with respect to the supply chain obligations, at a rate of 8.00%, which the Debtors shall pay in cash. The first such interest payment date shall be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek (i) to the extent that any payment on account of ABL Obligations and supply chain obligations (as set forth in this paragraph 22(h)) is not allowed under section 506(b) of the Bankruptcy Code, to recharacterize and apply such payment toward principal owed under the ABL Credit Documents and (ii) a determination with respect to the accrual and amount of default interest.  To the extent the supply chain obligations are valid "Cash Management Obligations," interest on such amounts shall accrue and be paid in cash, subject to the satisfaction of section 506(b) of the Bankruptcy Code.

(i)     *First Lien Term Loans Postpetition Interest Payments*.  From and after entry of the Interim Order, the First Lien Term Loan Agent, on behalf of itself and the First Lien Term Loan Lenders, shall receive current payment-in-kind during the Chapter 11 Cases of all accrued interest on the First Lien Term Loan Obligations under the First Lien Term Loan Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder and in the amounts specified in the First Lien Term Loan Agreement.  The first such interest payment date shall

UST Exhibit 4
Page 60 of 98

be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek (i) to the extent that any payment on account of First Lien Term loan Obligations (as set forth in this paragraph 22(i)) is not allowed under section 506(b) of the Bankruptcy Code, to recharacterize and apply such payment toward principal owed under the First Lien Term Loan Documents and (ii) a determination with respect to the accrual and amount of default interest.

(j)      *Second Lien Term Loan Postpetition Interest Payments*.  From and after entry of the Interim Order, the Second Lien Term Loan Lenders, shall receive current payment-in-kind during the Chapter 11 Cases of all accrued interest on the Second Lien Term Loan Obligations under the Second Lien Term Loan Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual default rate thereunder and in the amounts specified in the Second Lien Term Loan Agreement.  The first such interest payment date shall be November 3, 2025 and thereafter, the first business day of every calendar month; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek (i) to the extent that any payment on account of Second Lien Term Loan Obligations (as set forth in this paragraph 22(j)) is not allowed under section 506(b) of the Bankruptcy Code, to recharacterize and apply such payment toward principal owed under the Second Lien Term Loan Documents and (ii) with respect to the accrual and amount of default interest.

(k)      *Factored Receivables Postpetition Interest Payments.* Upon the release of any Factored Receivable from the Factored Receivables Account (as defined in the Final Cash Management Order) and the disbursement to any Factoring Party, such disbursement shall include all interest earned on the Factored Receivable while held in the Factored Receivables Account, with such interest calculated at the applicable interest rate of the bank at which the Factored Receivables and any amounts therein are held or maintained and such interest shall not be paid by the proceeds of the DIP Loan; *provided* that the Factoring Parties' rights are fully reserved to seek additional adequate protection.

(l)      *Adequate Protection Information Rights*.  The Debtors shall provide to the Prepetition Agents, at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent, all written reporting required to be provided to the DIP Lenders or DIP Agent under the DIP Documents.

UST Exhibit 4
Page 61 of 98

The Debtors shall provide the Prepetition Agents with all other written reporting required under the DIP Credit Agreement, as applicable, when due in accordance with its terms (without, for the avoidance of doubt, any approval rights with respect thereto).

(m)    *Disposition of DIP Collateral.*  Except as otherwise provided for in the DIP Documents or the Approved Budget, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Agent (at the direction of the Required Lenders), or solely in the case of any ABL Priority Collateral, the ABL Agent (at the direction of the ABL Required Lenders), or solely in the case of any DIP Term Priority Collateral, the DIP Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Secured Parties, respectively, or any order of this Court, until the DIP Obligations are paid in full in cash (or with respect to any letters of credit, cash collateralized) and, thereafter, subject to the Intercreditor Agreements, without the prior written consent of the applicable Prepetition Agents (acting at the direction of the applicable required Prepetition Secured Parties) (and no consent shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured Party or any order of this Court) until the Prepetition Secured Obligations are paid in full in cash.

(n)    From the Petition Date until the DIP Obligations have been paid in full in cash (or with respect to any letters of credit, cash collateralized) or such other treatment with respect to the DIP Obligations solely to the extent expressly consented to in a writing prior thereto by the Required Lenders, as applicable, all cash receipts, Cash Collateral, and all proceeds from the sale, lease, transfer, encumbrance, or other disposition of, or other revenue of any kind attributable to, any DIP Collateral or Prepetition Collateral that is now in, or shall hereafter come into, the possession or control of any of the Debtors, or to which any of the Debtors is now or shall hereafter become entitled shall, to the extent provided in the Orders, be subject to the DIP Liens and Adequate Protection Liens, respectively (and shall be treated in accordance with the Orders, the DIP Documents, and the Intercreditor Agreements). Thereafter, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any DIP Collateral shall be remitted in accordance with the Intercreditor Agreements.

UST Exhibit 4
Page 62 of 98

(o)      *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Documents.  Unless (a) the DIP Loan Parties have the consent of the DIP Agent (at the direction of the Required Lenders) or (b) the DIP Secured Parties' obligations to extend credit under the DIP Documents as provided therein has been terminated, the DIP Loan Parties shall (i) insure the Prepetition Collateral and the DIP Collateral as required under DIP Documents and the Prepetition Credit Documents, and (ii) maintain the cash management system in effect following entry of the Cash Management Order, as modified by the Orders, or as otherwise agreed to by the DIP Agent (at the direction of the Required Lenders). The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Secured Parties, and any such accounts shall be subject to the lien priorities and other provisions set forth in the Orders. To the extent that any of the Prepetition Secured Parties are listed as additional insured and/or loss payee under the DIP Secured Parties' insurance policies, upon the entry of this Final Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that covers the DIP Collateral, and the DIP Agents shall distribute any proceeds recovered or received in respect of any such insurance policies, subject to the Carve-Out, in accordance with the terms DIP Documents and the Orders, and subject to the terms and conditions of the Intercreditor Agreements.

(p)      *SPV Debtors*.  For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the DIP Documents, none of the SPV Debtors are DIP Guarantors.  Nothing in this Final Order or any of the DIP Documents shall grant any liens or claims against any of the SPV Debtors or any assets of SPV Debtors or the proceeds thereof, except to the extent set forth in any separate order of this court or stipulation between the SPV Debtors and SPV Lenders (each, a "**SPV Stipulation**"). Notwithstanding anything herein to the contrary, no carve-out (including, without limitation, the Carve-Out, including the provisions set forth in paragraph 7 hereof), shall apply to or be granted against, and no administrative claims in connection with the DIP Facility shall be granted against, any of the Onset Debtors, Evolution Borrowers (as defined in the Stipulation and Agreed Order Regarding Adequate Protection

63

UST Exhibit 4
Page 63 of 98

Among Debtors and Evolution Credit Partners) (or any of their direct parent entities and, together with the Evolution Borrowers, collectively, the "**Evolution Debtors**"), Carnaby II and III Debtors, or any assets of the Onset Debtors, Evolution Debtors, or Carnaby II and III Debtors, except to the extent set forth in any separate order of this Court or stipulation with the Carnaby II and III Debtors.  With respect to any Excess Cash transferred postpetition from the SPV Debtors to the FBG Debtors, all such transferred Excess Cash shall be Term Priority Collateral and deposited into the Proceeds Account, solely to the extent that any Curative Action (as defined in the SPV Stipulations) was funded by the proceeds of the DIP Loans.

(q)     *ABL Borrowing Base*.  The terms of the ABL borrowing base, including a borrowing base threshold and remedies if the Debtors are determined to be out-of-formula, are set forth on Schedule 1 attached hereto (the "**ABL Borrowing Base**"), which the ABL Agent shall receive according to the following schedule:

(i)     on a monthly basis and no later than the twenty-first day of each month, beginning with November 21, 2025, an ABL Borrowing Base for the prior month; and

(ii)     on a weekly basis and no later than 12:00 noon prevailing Eastern Time each Thursday, beginning November 13, 2025, a detailed reporting of the Total Gross Collateral components for the prior week through Friday.

(r)     *ABL Milestones and Reporting*. Notwithstanding any provision to the contrary herein, the ABL Secured Parties shall receive as additional adequate protection, the following:

(i)     The same written information reporting as DIP Lenders and SPV Lenders;

(ii)     Consultation rights with respect to the Updated Budget;

(iii)     Weekly reporting relating to the ABL Collateral, including postpetition flash sale reports, and a detailed reporting of the Total Gross Collateral components;

(iv)     Weekly calls with ABL advisors;

(v)     Compliance with requirement that all domestic cash to be on deposit with the ABL Agent, other than the accounts described in Section 7 hereof or listed here (including the Escrow Account, the Proceeds Account, and the Professional Fees Escrow Account);

UST Exhibit 4
Page 64 of 98

(vi)     Continued assignment of dedicated personnel with access and authority to assist with field exam and asset appraisal and continued prioritization of field exam and appraisal diligence until such time as such field exam and asset appraisal are complete and delivered to the ABL Agent; and

(vii)     Copies of any restructuring support agreement or asset purchase agreement to which any Debtors becomes party.

(viii)     *ABL Covenant*.   In in the event that the Debtors become party to a restructuring support agreement or asset purchase agreement, or file a chapter 11 plan of reorganization, that contemplates treatment of any allowed administrative expense claims of ABL Secured Parties that does not result in repayment of such administrative expense claims in full in cash (unless otherwise agreed with the ABL Lenders), the ABL Secured Parties shall withdraw their consent to the Debtors' use of continued Cash Collateral.

23.     *Reservation of Rights*.   Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 507(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties (subject to any applicable contractual limitations on such rights) may request further or different adequate protection and the DIP Loan Parties or any other party in interest may contest any such request. Subject only to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any diminution in value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted in the Orders does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral).

24.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     Without in any way limiting the automatically valid effective perfection of the DIP Liens granted pursuant to this Final DIP Order and the Adequate Protection Liens granted pursuant to this

65

UST Exhibit 4
Page 65 of 98

Final DIP Order, the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties were, by the Interim Order, and are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, Parent Guarantors, and the Prepetition Secured parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("**Perfection Actions**").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order.  Upon the request of the DIP Agent, the Prepetition Agents, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, and at the sole cost of the DIP Loan Parties and the Parent Guarantors as set forth herein, is authorized (in the case of the DIP Loan Parties and Parent Guarantors) and directed (in the case of the Prepetition Secured Parties), and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Prepetition Credit Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of the Interim Order and/or or this Final Order may, in the discretion of the DIP Agent and the Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar

66

UST Exhibit 4
Page 66 of 98

instruments, and all filing offices were, by the Interim Order, and are hereby authorized and directed to accept a certified copy of the Interim Order and/or this Final Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the DIP Agent and Prepetition Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)     No later than sixty (60) days following the entry of the Final Order (or such later date as reasonably agreed to by the Required Lenders), each Foreign Subsidiary (each as defined in the DIP Credit Agreement) that the Required Lenders request, in their commercially reasonable discretion, shall become a Subsidiary Guarantor.  Counsel to Onset shall receive five (5) business days' notice prior to any entity becoming a Subsidiary Guarantor.  In addition, the Debtors, as a condition precedent to the transfer of any cash from a DIP Loan Party to a non-DIP Loan Party (other than the Parent Guarantors, Maquiladora Entities, and the Carnaby II and III Debtors), shall obtain secured guarantees from such non-DIP Loan Party to secure any DIP Obligations that are incurred as a result of any Debtor transferring any cash and shall deliver such documents and take such actions reasonably requested by the Required Lenders in connection with such.  The requirement to cause any Foreign Subsidiary or non-DIP Loan Party to provide guarantee under this paragraph 24(c) shall not apply if, as reasonably determined by the Borrower and the Required Lenders, (i) such entity is prohibited from doing so under any valid contractual obligation existing prior to the Petition Date or created in the ordinary course of business after the Petition Date (including pursuant to any stipulation in form and substance acceptable to the Lender Advisors on behalf of the Required Lenders entered into prior to or upon the entry of this Final Order) (and not in contemplation of this paragraph 24(c)), in each case, to the extent such prohibition is not rendered ineffective by the Bankruptcy Code or other applicable law, (ii) the provision of such guarantee would result in adverse tax consequences or would be prohibited or restricted by applicable law, rule or regulation or (iii) the provision of such guarantee would be prohibited or restricted by local law or similar "corporate benefit" or "financial assistance" limitations in any relevant jurisdiction.  Unless extended or expressly waived by the Required Lenders, failure to abide by paragraph 24(c) of this Final Order shall constitute an immediate Event of Default under the DIP Credit Agreement.

UST Exhibit 4
Page 67 of 98

(d)     Upon the request of the DIP Agent (at the direction of the Required Lenders), each applicable DIP Loan Party and Parent Guarantor shall use commercially reasonable efforts to execute, acknowledge, and deliver, or shall cause to be executed, acknowledged, and delivered, all such further agreements, instruments, certificates or documents, that the DIP Agent (at the direction of the Required Lenders) shall require in order to ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Agent and the DIP Lenders with respect to the DIP Collateral, including any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States.  Further, the DIP Agent (at the direction of the Required Lenders) may, subject to the terms of the DIP Documents, require certain of the DIP Loan Parties or Parent Guarantors to enter into non-U.S. security documentation with respect to collateral owned by non-U.S. DIP Loan Parties or Parent Guarantors or located in non-U.S. jurisdictions and each DIP Loan Party and Parent Guarantor and its respective officers or agents are authorized to execute, file and record any documents or instruments as the DIP Agent (at the direction of the Required Lenders) shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order.

(e)     The DIP Loan Parties and Parent Guarantors agreed pursuant to the Interim Order and continue to agree on a go-forward basis, to use commercially reasonably efforts to identify any additional unencumbered property of the DIP Loan Parties, Parent Guarantors and other affiliates to the extent that proceeds of DIP Loans were lent to such affiliate, and, if practicable, cause non-Debtor subsidiaries (other than the Maquiladora Entities) to pledge any applicable assets (including, without limitation any and all proceeds and products of such assets) to secure the DIP Obligations, or such other actions as may be reasonably requested by the Required Lenders, in each case, except to the extent such pledge or actions (i) are restricted by (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by valid contract, lease, license, stipulation or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date or, in the case of any stipulation, solely to the extent in form and substance acceptable to the Lender Advisors on behalf of the Required Lenders, entered into prior to or upon the entry of this Final Order, or

UST Exhibit 4
Page 68 of 98

(ii) would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and in each case of clauses (ii) and (iii) above, other than to the extent such prohibition or limitation is rendered ineffective under the Uniform Commercial Code (or similar code or statute), the Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such restriction, prohibition or limitation.

25.     *Preservation of Rights Granted Under the Orders.*

(a)     Other than (i) the Carve-Out, and (ii) other claims and liens expressly granted or permitted by this Final Order, no claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Secured Parties or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Final Order, the DIP Liens and the Adequate Protection Liens shall not be:  (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)     The occurrence and continuance of any Event of Default (as defined in the DIP Credit Agreement) shall, after notice by the DIP Agent (acting at the direction of Required Lenders in accordance with the terms of this Final Order) in writing to the Borrower, counsel to the Borrower, counsel to the ABL Agent, the U.S. Trustee, and counsel to the Creditors' Committee constitute an event of default under this Final Order (each an "**Event of Default**").  The occurrence and continuance of any Event of Default (as defined in this Final Order), including being out-of-formula with the ABL Borrowing Base, shall, after notice by the ABL Agent in writing to the Borrower, counsel to the Borrower, the U.S. Trustee,

UST Exhibit 4
Page 69 of 98

and lead counsel to the Creditors' Committee constitute an event of default under this Final Order (each an "**ABL Event of Default**").  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these Chapter 11 Cases to cases under chapter 7:  (A) the DIP Superpriority Claims, the Prepetition Adequate Protection Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in the Orders until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by the Orders, including with respect to the Carve-Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(c)      If any or all of the provisions of the Interim Order or this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect:  (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens, or the Carve-Out. Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Loan Parties and granted to the DIP Agent, the DIP Secured Parties, the Prepetition Agents, or the other Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of the Interim Order, this Final Order, and the DIP Agent, the DIP Secured Parties, the Prepetition Agents, and the other Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy

UST Exhibit 4
Page 70 of 98

Code, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Claims and all other rights and remedies of the DIP Agent, the DIP Secured Parties, the Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents and the Carve-Out shall survive, and shall not be modified, impaired or discharged by:  (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, the Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of the Interim Order, this Final Order, and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Claims are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of the Prepetition Agent, and the other Prepetition Secured Parties, shall remain in full force and effect thereafter, subject to the terms of the Orders), and the Carve-Out shall continue in full force and effect.

(e)     Notwithstanding anything herein to the contrary, the Roll-Up Obligations will not be required to be repaid in full in cash, subject to compliance with the terms and conditions of this

UST Exhibit 4
Page 71 of 98

paragraph. Notwithstanding that the Roll-Up Obligations are and remain superpriority administrative expense claims, any party with requisite authority to solicit a plan pursuant to Section 1121 of the Bankruptcy Code may classify the Roll-Up Obligations as one or more class(es) of claims entitled to vote, solely for the purposes outlined in this paragraph (any such plan, a "**Roll-Up Classification Plan**"). Under any Roll-Up Classification Plan, the holders of Roll-Up Obligations may be given non-cash treatment as long as the Roll-Up Classification Plan meets all applicable standards under the Bankruptcy Code, other than any Bankruptcy Code requirement to un-impair or pay the Roll-Up Obligations in full in cash. In the event a class of holders of Roll-Up Obligations does not vote to accept the Roll-Up Classification Plan under section 1126(c) of the Bankruptcy Code, any party with requisite authority to solicit a plan pursuant to Section 1121 of the Bankruptcy Code shall have the right to seek confirmation of such Roll-Up Classification Plan pursuant to section 1129(b) of the Bankruptcy Code. Holders of Roll-Up Obligations shall be entitled to object to the Roll-Up Classification Plan on any ground or for any reason whatsoever (without limitation, that the plan does not meet all applicable standards under section 1129(b), or any other section, of the Bankruptcy Code) other than (i) that the Roll-Up Obligations are not being un-impaired or repaid in full in cash; (ii) the fact that the Debtors are seeking to provide treatment respecting any Roll-Up Obligations pursuant to section 1129(b) of the Bankruptcy; or (ii) that the Roll-Up Obligations are classified as a voting class. For the avoidance of doubt, any restructuring support agreement or other agreement entered into between the Debtors and any DIP Secured Parties, while this Final Order is in full force and effect, shall not include any waivers or terminations of the terms agreed to pursuant to this paragraph nor shall the DIP Secured Parties be entitled to enforce any Event of Default under this Final Order or the DIP Documents solely because any applicable party proposes or solicits a Roll-Up Classification Plan.

26. *Payment of Fees and Expenses*. The DIP Loan Parties were, by the Interim Order, and are authorized to and shall pay the Adequate Protection Fees and Expenses. Subject to the review procedures set forth in this paragraph 26, payment of all Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Secured Parties, the Ad Hoc Group, and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the DIP Loan Parties prior to

UST Exhibit 4
Page 72 of 98

confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices including aggregate amounts of fees and expenses and total amount of time on a per-professional basis (which shall not be required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, or any information constituting attorney work product, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) to the DIP Loan Parties, counsel to the Ad Hoc Group, counsel to the Creditors' Committee, and the U.S. Trustee (together, the "**Review Parties**"); *provided, however*, that the U.S. Trustee and the Creditors' Committee reserve their rights to request additional details regarding the services rendered and expenses incurred by such professionals (an "**Information Request**"). Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt by the Review Parties (the "**Review Period**"), which shall not be extended by the delivery of an Information Request or the timing of any reply thereto. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the DIP Loan Parties shall pay such invoices within three (3) business days. If an objection to a professional's invoice is received within the Review Period, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the DIP Loan Parties and the Parent Guarantors were, by the Interim Order authorized and directed to pay on the Closing Date any DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the DIP Loan Parties and Parent Guarantors). No attorney or advisor to any DIP Secured Party, the Ad Hoc Group, or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs,

UST Exhibit 4
Page 73 of 98

and expenses paid prior to the Petition Date by any of the DIP Loan Parties or Parent Guarantors to (i) the DIP Secured Parties in connection with or with respect to the DIP facility and (ii) Prepetition Secured Parties in connection with or with respect to these Chapter 11 Cases were, by the Interim Order, and are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the DIP Loan Parties or Parent Guarantors or any other person.

27.    *Effect of Stipulations on Third Parties*.  Upon entry of the Interim Order, the Debtors' Stipulations, including any other admissions, agreements and releases contained in the Interim Order, as reaffirmed in this Final Order were binding upon the Debtors in all circumstances and for all purposes. Upon entry of the Interim Order, the Debtors' Stipulations and any other admissions, agreements, releases and the Roll-Up Obligations contained in the Interim Order and as reaffirmed in this Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless:  (a) such committee or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the deadline to assert a Challenge and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) as to (x) the Creditors' Committee, (y) the Factoring Parties (as defined herein), and (z) the agents and lenders under the Aequum Facilities, Onset Facility, Evolution Facilities, and the CarVal Facilities (each as defined in the First Day Petitions Declaration) (the "**Evolution/Onset/Aequum/CarVal Creditors**"), January 31, 2026, (ii) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, then the Challenge Period for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee and chapter 11 trustee) to the date that is the later of (1) November 30, 2025, or (2) the date that is 30 calendar days after

UST Exhibit 4
Page 74 of 98

its appointment, and (iii) as for all other parties in interest, November 30, 2025; and any such later date as (a) has been agreed to by the ABL Agent with respect to the ABL Debt or the ABL Liens, (b) has been agreed to by the First Lien Term Loan Agent with respect to the First Lien Term Loan Obligations or the First Lien Term Loan Liens, (c) has been agreed to by the Second Lien Term Loan Agent with respect to the Second Lien Term Loan Obligations or the Second Lien Term Loan Liens, (d) has been agreed to by the DIP Agent (at the direction of Required Lenders) with respect to the Roll-Up, or (e) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(iii), the "**Challenge Period**") (provided that the filing of a motion by the Creditors' Committee, Factoring Parties or Evolution/Onset/Aequum/CarVal Creditors seeking standing with respect to a Challenge, attaching a particularized complaint setting forth such Challenge prior to the expiration of the Challenge Period, shall toll the Creditors' Committee's, Factoring Parties or Evolution/Onset/Aequum/CarVal Creditors Challenge Period in respect of such Challenge until two (2) business days after the entry of a final order of the Court ruling on such standing motion with respect to such Challenge (or to such later date as agreed by the Debtors, the Creditors' Committee, the DIP Agent, and each agent of affected debt set forth in clause (iii)(a)-(d) of this paragraph), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens, the Prepetition Collateral, and the Roll-Up Obligations; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any

UST Exhibit 4
Page 75 of 98

Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred; *provided, that*, solely with respect to the Creditors' Committee, Factoring Parties and the Evolution/Onset/Aequum/CarVal Creditors, the filing of a standing motion attaching a particularized complaint prior to the expiration of the Challenge Period shall toll the Challenge Period deadline as set forth above.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then:  (1) the Debtors' Stipulations, including any and all admissions, agreements and releases contained in the Interim Order and this Final Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral (including the Roll-Up Obligations) shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on

behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the DIP Secured Parties, Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral (including with respect to the Roll-Up Obligations) shall be deemed forever waived, released and barred. If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order and reaffirmed in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in the Orders vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Debt, the Prepetition Liens, or the Roll-Up Obligations, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any chapter 11 plan; *provided, however,* that any and all time periods for commencing an action or asserting a claim or cause of action, whether fixed by applicable non-bankruptcy law, an order entered in a non-bankruptcy proceeding or an agreement, is hereby tolled and otherwise stayed and extended pursuant to Sections 108(a) and 108(c) of the Bankruptcy Code with respect to any and all claims and causes of action in favor of, belonging to, or otherwise assertable by (or on behalf of) a Factoring Party that relates to or arises from any Factored Receivable or any related assets, accounts or the proceeds thereof, or any related programs, facilities, agreements, or documents to which one or more Debtors is a party.  The Court may fashion any appropriate remedy following a successful Challenge.

UST Exhibit 4
Page 77 of 98

28.      *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of the Interim Order or this Final Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-DIP Loan Party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the Orders, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $250,000), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Agents', the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or this Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and the Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent,

78

UST Exhibit 4
Page 78 of 98

or the DIP Secured Parties under the Orders, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with the Orders; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and the Adequate Protection Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court and expressly permitted under the Orders or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, Prepetition Agents, and Prepetition Secured Parties under the Orders, have been refinanced or indefeasibly paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties.  For the avoidance of doubt, this paragraph 28 shall not limit the DIP Loan Parties' right to use DIP Collateral and Cash Collateral to contest that an Event of Default has occurred hereunder pursuant to and consistent with paragraph 12 of this Final Order.

29.     *Indemnification*.  The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility (including the Roll-Up) or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Allocation Parties, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) by the DIP Loan Parties and Parent Guarantors from and against all costs, expenses and liabilities arising out of or relating to the transactions, procedures, and/or relief approved by the Orders, including, without limitation, pursuant to the DIP Credit Agreement, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction

UST Exhibit 4
Page 79 of 98

to have resulted from the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, actual fraud or willful misconduct.  The DIP Loan Parties and Parent Guarantors agree that no exception or defense in contract, law, or equity exists as of the date of the Interim Order to any obligation set forth, as the case may be, in paragraph 29 of the Interim Order, in this Final Order, in the DIP Documents, or in the Prepetition Credit Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, Allocation Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

30. *Final Order Governs*.  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or the Prepetition Credit Documents, the provisions of this Final Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Final Order and the DIP Documents, including, without limitation, the Approved Budget (subject to permitted variances).

31. *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be, subject only to the challenge rights in paragraph 26, binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Secured Parties, the Prepetition Agents, the other Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Secured Parties, the Prepetition Agents, the other Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Secured Parties, the Prepetition Agents, and the other Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral

UST Exhibit 4
Page 80 of 98

(including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, examiner, or similar responsible person appointed for the estates of the Debtors.

32.      *Limitation of Liability.*  Nothing in the Orders, the DIP Documents, the Prepetition Credit Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, (a) be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person or (b) bear any risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to the Orders or the DIP Documents or Prepetition Credit Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in the Interim Order or this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, DIP Secured Parties, the Prepetition Agents, or other Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

UST Exhibit 4
Page 81 of 98

33.     *Master Proofs of Claim.*  The Prepetition Secured Parties and the DIP Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or any other party for payment of the any claim arising under the Orders or any Prepetition Secured Debt arising under the Prepetition Credit Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Credit Documents. The statements of claim in respect of such indebtedness set forth in the Orders is deemed sufficient to and does constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, the DIP Agent and the Prepetition Agents was, by the Interim Order, and are each hereby authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re First Brands Group, LLC*, Case No. 25-90399 (CML), a master proof of claim on behalf of its respective DIP Secured Parties or Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by the DIP Agent, ABL Agent, the Prepetition Agents, as applicable, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable DIP Documents and Prepetition Credit Documents, and the claim of each applicable DIP Secured Party and Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any DIP Secured Party or Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 33 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each DIP Secured Party or Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable DIP Secured

UST Exhibit 4
Page 82 of 98

Parties and Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the DIP Agent and the Prepetition Agents, as applicable. The DIP Agent and the DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the Declarations, the evidence presented with the DIP Motion, the record established at the Interim Hearing, and this Final Order are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

34.     *Insurance*.  To the extent that the Prepetition Agents are listed as loss payee under the Borrower's, DIP Guarantors' or Parent Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies, (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein) and, except with respect to the ABL Priority Collateral prior to the indefeasible payment in full of the ABL Obligations, shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and thereafter to the payment of the applicable Prepetition Secured Debt; *provided* that nothing herein is intended to alter the rights, if any, of a lessor under any non-residential real property lease with respect to such insurance proceeds.

35.     *Credit Bidding*.  In accordance with the DIP Documents, and subject to the provisions of section 363(k) of the Bankruptcy Code, the DIP Agent shall have the right to credit bid up to the full amount of the DIP Obligations (including any Roll-Up Obligations, subject to a successful Challenge) in any sale of the DIP Collateral and, subject to the provisions of section 363(k) of the Bankruptcy Code, the Prepetition Agents, shall each have the right, consistent with the provisions of the Prepetition Credit Documents, as applicable, to credit bid up to the full amount of the applicable Prepetition Secured Debt in the sale of the Prepetition Collateral subject to the lien priorities set forth herein, as applicable, in each case, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k),

UST Exhibit 4
Page 83 of 98

1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  For credit bidding purposes, DIP Lenders holding a majority of the then-outstanding New Money DIP Loans may credit bid up to the full amount of the then-outstanding New Money DIP Loans and, subject to a successful Challenge, DIP Lenders holding a majority of the then-outstanding Roll-Up Obligations may credit bid up to the full amount of the then-outstanding Roll-Up Obligations; *provided however*, that no Roll-Up Obligations may be credit bid unless the proposed transaction (y) indefeasibly repays in full the New Money DIP Loans or (z) DIP Lenders holding a majority of the then-outstanding New Money DIP Loans otherwise consent.

36. *Preservation of Rights Granted Under this Final Order*.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Secured Parties' and the Prepetition Secured Parties', as applicable, right to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Term Loan Lenders to seek the payment by the Debtors of postpetition interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Secured Parties and the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral, (v) object to any sale of assets, or (vi) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; *provided that* the rights of the DIP Secured Parties and the Prepetition Secured Parties, respectively, with respect to the foregoing clauses (a) through (c) of this paragraph 36 shall be subject to the Intercreditor Agreements and the Prepetition Credit Documents, as applicable; *provided, further that*, the rights and defenses of the Debtors with respect to the foregoing clauses (a) through (c) of this paragraph 36 are expressly preserved. Other than as expressly set forth in the Orders, any other rights, claims or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties are preserved.

UST Exhibit 4
Page 84 of 98

37. Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all DIP Commitments are terminated, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or the Orders, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 12 hereof.

38. Subject to the Carve-Out, unless the DIP Secured Parties and the DIP Agents have provided their prior written consent, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, other than the Carve-Out, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Fees and Expenses provided to the DIP Secured Parties; (ii) the use of Cash Collateral for any purpose that is not permitted in the Orders and the DIP Documents, or (iii) any modification of any of the DIP Secured Parties' rights under the Orders and the DIP Documents with respect to any DIP Obligations.

39. Notwithstanding any order dismissing any of the Chapter 11 Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and the other administrative claims granted pursuant to the Orders shall continue in full force and effect and shall maintain their priorities as provided in the Orders until all DIP Obligations and Adequate Protection Obligations are paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations, and the other administrative claims granted pursuant to the Orders, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in the foregoing clause (x).

UST Exhibit 4
Page 85 of 98

40.     Except as expressly provided in the Orders or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of the Orders and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases, or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of the Orders and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of the Orders shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders). To the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding a dismissal of these Chapter 11 Cases, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph 40.

41.     *Milestones*. The required Milestones set forth in Section 6.16 of the DIP Credit Agreement shall be modified as follows: (a) the Milestone for the Debtors to provide a go-forward business plan shall be extended to January 31, 2026; (b) the Milestone for the Debtors' delivery of a final quality of earnings report shall be extended to January 31, 2026; (c) the Milestone for entry into a restructuring support agreement shall be extended to March 28, 2026; and (d) a new Milestone for the deadline to launch a sale process shall be March 28, 2026, each as provided in the DIP Credit Agreement (as amended).

UST Exhibit 4
Page 86 of 98

42.     *Borrower Maturity Date Election*. Each Borrower Maturity Election (as defined in the DIP Credit Agreement) set forth in Section 2.18(a)(vi) shall extend the then applicable Maturity Date by 90 days.

43.     *Acceptable Plan*.  Notwithstanding anything to the contrary in the DIP Credit Agreement, the term "Chapter 11 Plan," as defined in the DIP Credit Agreement, shall include a plan of reorganization that indefeasibly pays in full in cash the DIP Obligations as to the New Money DIP Loans (including any and all applicable DIP Obligations, including DIP Fees and Expenses, but excluding any Roll-Up Obligations), so long as the New Money DIP Loans have not been repaid, prepaid, paid, replaced, converted, refinanced, or otherwise satisfied prior to the effective date of such plan.

44.     *Grammer*.  Notwithstanding anything to the contrary in this Final Order or the DIP Documents, to the extent that any funds received or held by the Debtors are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors and Grammer, Inc. and Grammer Americas, LLC (collectively, "**Grammer**"), to be the property of or held in trust for Grammer as of the Petition Date (the "**Disputed Funds**"), neither this Interim Order nor the DIP Documents shall be deemed to grant liens, claims, or encumbrances in favor of any current or future lienholder, including the DIP Liens or the Adequate Protection Liens on such Disputed Funds.  If the Court rules, pursuant to a final non-appealable order, that Grammer owns the Disputed Funds and that the Debtors held such funds in trust for Grammer as of the Petition Date, then entry of this Final Order and the subsequent use of such funds shall not prejudice Grammer's alleged trust claims and any remedies in connection therewith.  The Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and Grammer reserve all of their rights and remedies with respect to the Disputed Funds under the Bankruptcy Code, Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

45.     *Factoring Counterparties*. Notwithstanding anything to the contrary in this Final Order or the DIP Documents, (i) any and all rights, claims and remedies of any party that purchased (or purported to purchase) or entered into an agreement to purchase (whether directly or indirectly) (each a "**Factoring**

87

**Party**")[13] accounts receivable, documentary time drafts, bills of exchange or similar payment obligations (the "**Factored Receivables**") from any of the Debtors are expressly reserved, including, without limitation, any and all causes of action, commercial tort claims, and other rights and claims of such Factoring Party related to, or arising out of, the Factored Receivables or any documentation in connection therewith (including claims against any party to recover proceeds therefrom); *provided* that the Factoring Parties remain subject to the Challenge Period, as applicable, to the extent they seek to assert causes of action or claims (including lien challenges) on behalf of the Debtors' estates, and (ii) the Debtors, the DIP Secured Parties, Prepetition Secured Parties, and any other party in interest reserves all of their rights, remedies and claims relating to the Factored Receivables, including, without limitation, any and all causes of action, commercial tort claims, and other rights and claims related to, or arising out of, the Factored Receivables or any documentation in connection therewith (including claims against any party to recover proceeds therefrom). Without limiting the generality of the foregoing, (a) neither this Final Order nor the DIP Documents grants or shall be deemed to grant any liens, claims, or encumbrances in favor of any current or future lienholder, including the DIP Liens or the Adequate Protection Liens, on Factored Receivables (and any related funds, accounts or the proceeds thereof) to the extent such property does not constitute property of any of the Debtors' estates, with all rights reserved by the parties regarding property of the Debtors' estates, as determined by a court of competent jurisdiction in a final non-appealable order, and (b) nothing set forth in this Final Order or the DIP Documents grants or shall be deemed to grant any lien of senior or equal priority in any Collateral or any other asset to the extent that such Collateral is (i) secured by a Prepetition Permitted Senior Lien or (ii) secured by a lien of a Factoring Party that constitutes a valid, binding, enforceable, properly perfected, and non-avoidable lien, or (iii) is property of a Factoring Party.

46.      *Liberty*. Notwithstanding anything to the contrary in this Final Order or the DIP Documents, nothing in the Orders or the DIP Documents shall: (i) grant or be deemed to grant any liens,

---

[13]   "**Factoring Parties**" include, without limitation, Raistone Purchasing Series LLC-Series XXXII, Raistone Purchasing LLC-Series XXVIII, Leucadia Asset Management LLC, LAM Trade Finance Group LLC, LAM Trade Finance Group, Katsumi Servicing, LLC, Evolution Credit Partners Trade Finance Master L.P., and related affiliates of each, and subsequent purchasers of Factored Receivables, including Arab Banking Corporation B.S.C. and ING Belgium S.A./N.V.

UST Exhibit 4
Page 88 of 98

security interests or claims (including any DIP Liens or Adequate Protection Liens) on or against any property of Liberty I B.V. and its respective direct and indirect subsidiaries that are, or become, part of the Group as defined under that certain Senior Facilities Agreement, dated July 30, 2024 (the "**Liberty Group**"); or (ii) authorize or direct any members of the Liberty Group to become DIP Loan Parties.

47.     *Chubb*. For the avoidance of doubt, (a) the DIP Loan Parties shall not grant liens and/or security interests in  (i) any property received and/or held by ACE American Insurance Company and/or any of its U.S.-based affiliates (collectively, together with each of their successors, and solely in their roles as insurers, "**Chubb**") as collateral or other security to secure obligations under any insurance policies issued by Chubb and related agreements, including any and all letters of credit, cash, trusts, accounts, credits, and other collateral and security (collectively, the "**Chubb Collateral**") or (ii) subject to subpart (c) hereof, any insurance policy (or rights or claims thereunder) issued by Chubb; *provided, however*, that with regard to (i) hereof, solely to the extent that Chubb has valid and enforceable, perfected and non-avoidable liens and/or security interests on such property as of the Petition Date; (b) the Interim Order, this Final Order, and/or any other order of this Court granting liens related to this DIP Facility (including adequate protection liens), does not grant the DIP Loan Parties any right to use the Chubb Collateral; provided, however, that to the extent any of the Chubb Collateral reverts to the Debtors or their estates, subject to the terms and conditions of any insurance policies issued by Chubb and related agreements governing the Chubb Collateral, it shall constitute DIP Collateral; (c) the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral and subject to any lien (including adequate protections liens) granted by the Interim Order, this Final Order, and/or any other order of this Court, to the extent such proceeds are paid to the Debtors pursuant to the terms of any such applicable insurance policy or applicable non-bankruptcy law; and (d) except that the DIP Agent shall be designated as the loss payee under any insurance policy that the Prepetition Secured Parties were designated the loss payee prior to the Petition Date, nothing, including the DIP Documents, the Interim Order, and/or this Final Order, alters or modifies the terms and conditions of any insurance policies or related agreements issued by Chubb; provided, that nothing set forth in this paragraph shall operate as a waiver of the rights, defenses, or privileges of the Debtors, DIP Secured Parties, and the Prepetition Secured Parties from challenging or

UST Exhibit 4
Page 89 of 98

otherwise objecting to the validity, priority, or extent of the Chubb Collateral, liens, and/or security interests of Chubb or any claims relating thereto, and any and all such rights shall be fully reserved.

48.     *Royal Bank of Canada*.  Notwithstanding anything to the contrary in the DIP Orders or the DIP Documents, nothing in the DIP Orders or the DIP Documents shall: (i) grant or be deemed to grant any lien, security interest or claim (including any DIP Liens or Adequate Protection Liens) on or against the Collateral (as defined in that certain Pledge Agreement Deposit Account and Deposit Balances, dated February 18, 2025 (the "**Pledge Agreement**"), by and between FRAM Group Operations LLC ("**FRAM**"), as Pledgor, and Royal Bank of Canada) securing the Secured Obligations (as defined in the Pledge Agreement), including FRAM's reimbursement obligations in respect of that certain Standby Letter of Credit (#10018386) issued by Royal Bank of Canada, that is senior or equal to any properly perfected, unavoidable, prepetition lien or security interest in the Collateral, including the Account (in each case, as defined in the Pledge Agreement), held by Royal Bank of Canada (or any of its affiliates or any of its or its' affiliates successors or assigns) securing such Secured Obligations or (ii) authorize or direct the Debtors to use such Collateral, including the Account and all deposit balances credited thereto, unless otherwise expressly consented to in writing by Royal Bank of Canada.

49.     *LBA*. Notwithstanding the foregoing, the rights of the DIP Lenders to use or occupy any premises subject to a lease of non-residential real property with LBA RV-Company XVII, LP, as landlord, for premises in Patterson, California, shall be limited to (a) any such rights agreed in writing by LBA RV-Company XVII, LP, as landlord, (b) any such rights under applicable non-bankruptcy law, if any, or (c) further order of the Court following a notice and hearing appropriate under the circumstances.

50.     *KitKat*.  Notwithstanding the foregoing, the rights of the DIP Lenders to use or occupy any premises subject to two leases of non-residential real property with KitKat (IL), LLC, as landlord, for premises in McHenry, Illinois, shall be limited to (a) any such rights agreed in writing by KitKat (IL), LLC, as landlord, (b) any such rights under applicable non-bankruptcy law, if any, or (c) further order of the Court following a notice and hearing appropriate under the circumstances.

51.     *STORE Capital*.  Notwithstanding the foregoing, the rights of the DIP Lenders to use or occupy any premises subject to leases of non-residential real property with STORE Capital Acquisitions,

UST Exhibit 4
Page 90 of 98

LLC and STORE Master Funding IV, LLC, as landlords, shall be limited to (a) any such rights agreed in writing by STORE Capital Acquisitions, LLC or STORE Master Funding IV, LLC, as landlords, (b) any such rights under applicable non-bankruptcy law, if any, or (c) further order of the Court following a notice and hearing appropriate under the circumstances.

52.     *FactoFrance*. For the avoidance of doubt, and notwithstanding anything to the contrary herein, this Order does not (i) provide the Debtors or any other person with any rights in favor of cash deposited by customers of Novares US LLC and Novares US Engine Components (together, "**Novares**") into segregated accounts held by non-debtors for the benefit of FactoFrance S.A. and affiliates (the "**FactoFrance Accounts**"), unless the parties have rights pursuant to applicable non-bankruptcy law or (ii) authorize the Debtors or Novares to take any action outside of the ordinary course of business with respect to the FactoFrance Accounts.  Further, for the avoidance of doubt, to the extent any lien of FactoFrance is a valid, binding, enforceable, properly perfected, and non-avoidable lien on Collateral (a "**Factofrance Lien**"), nothing set forth in this Final Order or the DIP Documents grants or shall be deemed to grant any lien of senior or equal priority as to any FactoFrance Lien, provided that nothing in this Final Order shall operate to approve, perfect, or otherwise elevate any Factofrance Lien.

53.     Notwithstanding anything to the contrary, nothing in this Order shall be construed to prime or subordinate any post-petition claims of Terra Worldwide Logistics, LLC d/b/a American Global Logistics ("**AGL**") or otherwise affect any right of AGL to assert a priority claim status or maritime lien with respect to any of its postpetition claims, which liens, if properly perfected and not subject to avoidance under applicable non-bankruptcy law, shall be entitled to first-priority secured status with respect to all applicable postpetition amounts owed to AGL, and AGL, the Debtors, DIP Secured Parties, and Prepetition Secured Parties' rights and remedies based on applicable non-bankruptcy law are explicitly preserved; provided however that upon receipt of the payment agreed to by the Debtors pursuant to this Court's *Interim Order (i) Authorizing Debtors to Pay (a) Critical Vendor Claims, (b) Non-U.S. Vendor Claims, (c) Lien Claims, and (d) 503(b)(9) Claims, (ii) Confirming Administrative Expense Priority of Undisputed Outstanding Prepetition Orders, and (iii) Granting Related Relief* (Docket No. 190), AGL shall be deemed to have released its maritime lien rights and priority status with respect to any of its prepetition claims.

UST Exhibit 4
Page 91 of 98

54.     *Committee Settlement*.  Notwithstanding anything to the contrary in this Final Order or in any DIP Documents, upon entry of this Final Order, the following shall be approved:

(a)     The New Money DIP Loans (including all DIP Obligations, including DIP Fees and Expenses, but excluding any Roll-Up Obligations) shall receive DIP Liens and DIP Superpriority Claims on all encumbered and unencumbered Collateral, including all Previously Unencumbered Property. To repay the DIP Liens and DIP Superpriority Claims in this paragraph (a), the DIP Secured Parties shall use commercially reasonable efforts to first seek recovery from Collateral other than Recovery Action Proceeds that are unencumbered as of the Petition Date.

(b)     The Prepetition Secured Parties shall receive Adequate Protection Claims and Adequate Protection Liens on all encumbered and unencumbered Collateral, including all Previously Unencumbered Property.  The Prepetition Secured Parties shall not be subject to any marshaling restrictions.  The Adequate Protection Claims and Adequate Protection Liens for the Prepetition Secured Parties shall extend only to the value of any diminution in value of their interests in Prepetition Collateral (including Cash Collateral), for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the Automatic Stay.  For the avoidance of doubt consistent with applicable bankruptcy and non-bankruptcy law, the Prepetition Secured Parties bear the burden with respect to the extent, if any, of any diminution of value with respect to their interests in the Prepetition Collateral.

(c)     The Roll-Up Obligations shall receive DIP Liens and DIP Superpriority Claims on all Collateral, including all Previously Unencumbered Property, on the terms outlined below:

(i)     With respect to (x) Recovery Actions that are encumbered by the Prepetition Liens (if any) or (y) Recovery Action Proceeds that are encumbered by the Prepetition Liens (if any), the DIP Liens and DIP Superpriority Claims shall extend to the full amount of the Interim Roll-Up Obligations and the Final Roll-Up Obligations (including all DIP Obligations, including DIP Fees and Expenses).

(ii)    With respect to (x) Recovery Actions that are unencumbered by the Prepetition Liens (if any) or (y) Recovery Action Proceeds that are unencumbered by the Prepetition Liens

92

(if any), the DIP Liens and DIP Superpriority Claims shall only extend to the Roll-Up Obligations in an amount equal to the principal amount of the New Money DIP Loans (excluding all DIP Fees and Expenses).

(d)  To repay the DIP Liens and DIP Superpriority Claims in paragraph (c) above, the DIP Secured Parties and Prepetition Secured Parties shall use commercially reasonable efforts to first seek recovery from Collateral other than Recovery Action Proceeds that are unencumbered as of the Petition Date.

(e)  For purposes herein, the term "**DIP Hurdle**" shall mean DIP Obligations in an amount equal to: (i) all accrued and outstanding principal, fees, premiums, interest and all other amounts in respect of the New Money DIP Loans (other than professional fees) and (ii) $1.1 billion in principal amount of Roll-Up Obligations.  Notwithstanding anything set forth in this Final Order, the DIP Documents, or any other agreement to the contrary, and regardless of when any DIP Collateral may be recovered or liquidated by the Debtors, the DIP Obligations shall be repaid or deemed repaid, (x) first, from DIP Collateral other than Recovery Action Proceeds (to the extent commercially reasonable), and (y) second, from Previously Unencumbered Property.

(f)  For the avoidance of doubt, (i) in the event of any recovery or liquidation of DIP Collateral (including Previously Unencumbered Property) that occurs prior to recovery or liquidation of any other DIP Collateral (including Previously Unencumbered Property), or other satisfaction of the DIP Hurdle, proceeds of such DIP Collateral (including Previously Unencumbered Property) shall be allocated by further order of this Court consistent with this Final Order and (ii) no Challenge Period or other timing restriction shall apply pursuant to this Final Order with respect to any dispute concerning the existence, validity or perfection or otherwise enforceability of any alleged prepetition lien upon any recovery or liquidation of property that is alleged to be Recovery Action Proceeds that are unencumbered as of the Petition Date, and the rights of all parties with respect to any prior or current encumbrance of such property shall be preserved and the allocation or encumbrance of such property shall be subject to further order of this Court.

(g)  All parties' rights are reserved and no Challenge Period or other timing restriction shall apply with respect to (i) the encumbered or unencumbered status of Recovery Actions and Recovery

UST Exhibit 4
Page 93 of 98

Action Proceeds and (ii) the allocation and application of encumbered or unencumbered Collateral (including, without limitation, the Recovery Actions and Recovery Action Proceeds).

55.     *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3) and 6004(h), or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

56.     *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Final Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

57.     *No Waiver by Failure to Seek Relief*. The failure or delay on the part of any of the DIP Agent, DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Orders, the DIP Documents, the Prepetition Secured Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under the Orders shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under the Orders shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder by any of the DIP Secured Parties or Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

58.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

UST Exhibit 4
Page 94 of 98

59.     *Payments Held in Trust*.  Except as expressly permitted in this Final Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments or, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Secured Parties and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

60.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

61.     *No Third Party Rights*.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

62.     *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Final Order.

63.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

64.     *Interim Order*. Except as specifically amended, superseded, or modified hereby, the provisions of the Interim Order and any actions taken by the Debtors, the DIP Secured Parties or the Prepetition Secured Parties in accordance therewith shall remain in effect and are hereby ratified by this Final Order.

Signed: November 09, 2025

_____
Christopher Lopez
United States Bankruptc

UST Exhibit 4
Page 95 of 98

## Schedule 1

### ABL Borrowing Base

- The go-forward ABL borrowing base shall be the sum of all gross inventory, prepetition non-factored AR and postpetition AR balances owned by all Debtor entities party to the ABL Credit Agreement and located in the United States ("**Total Gross Collateral**"), subject to delivery of a roll-forward that is reasonably acceptable to the ABL Agent (the "**Approved Collateral Rollforward**")
  - Such Approved Collateral Rollforward to show total ABL exposure (incl. designated supply chain exposure) as a percentage of Total Gross Collateral (the "**Effective Advance Rate**")
- On a weekly basis, Debtors shall report actual total gross inventory, prepetition non-factored AR and postpetition AR balances
  - Total gross inventory to include a breakdown of raw materials, work in process ("**WIP**"), finished goods, in-transit, Cores, and other
- On a weekly basis, actual Total Gross Collateral cannot be less than 90% of projected Total Gross Collateral in the Approved Collateral Rollforward, provided that for the purpose of the actual Total Gross Collateral calculation, the amount of raw materials ("**RM**") and WIP inventory included shall not exceed 30% of actual Total Gross Collateral (prior to such reduction)
  - The Maximum Effective Advance Rate to be defined as total ABL exposure (including designated supply chain exposure) as a percentage of 90% of the projected Total Gross Collateral in the Approved Collateral Rollforward.
  - In the event of a breach of the Total Gross Collateral Covenant, Debtors shall segregate cash (the "**Segregated Cash**") for the benefit of the ABL lenders such that the pro forma Effective Advance Rate does not exceed the Maximum Effective Advance Rate. Each of the Debtors, the ABL Secured Parties, and the DIP Lenders reserve their rights with respect to the Segregated Cash.
  - A breach of the Total Gross Collateral Covenant cannot be caused by adjustments to Total Gross Collateral caused by facts and circumstances that existed prior the effective date of this agreement.
- On a monthly basis, Debtors' advisors to prepare a revised collateral rollforward in the same cadence as DIP Budget refreshes, with such rollforward subject to the approval of the ABL Agent, with such approval not to be unreasonably withheld
  - Any such approved rollforward to become the Approved Collateral Rollforward for testing purposes
- The borrowing base, the actual value of the Total Gross Collateral at any time and the Approved Collateral Rollforward are based on the facts and circumstances known to the ABL lenders on the date hereof. The ABL lenders retain the right to implement additional reserves if there has been a material change in such facts and circumstances, including additional claims and disputes as to the ownership and priority of collateral, degradation as to the quality and mix of inventory, and degradation of account debtors, their payments, rebates or counterclaims. Change in facts and circumstances leading to possible implementation of reserves can relate to both historical and expected future collateral position. Failure to comply with this provision shall constitute an ABL Event of Default.

UST Exhibit 4
Page 96 of 98

**Exhibit 1**

**Updated DIP Budget**

## Project Overdrive - North America
### DIP Budget

*$ in millions USD*

| | Wk 1 11/7/25 | Wk 2 11/14/25 | Wk 3 11/21/25 | Wk 4 11/28/25 | Wk 5 12/5/25 | Wk 6 12/12/25 | Wk 7 12/19/25 | Wk 8 12/26/25 | Wk 9 1/2/26 | Wk 10 1/9/26 | Wk 11 1/16/26 | Wk 12 1/23/26 | Wk 13 1/30/26 | Total 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Week Ending* | | | | | | | | | | | | | | |
| **Total receipts** | – | – | $5.9 | $11.7 | $11.0 | $110.3 | $75.0 | $76.6 | $48.7 | $56.5 | $48.5 | $44.0 | $44.0 | **$532.2** |
| **Operating disbursements:** | | | | | | | | | | | | | | |
| Vendor Payments | ($34.7) | ($57.7) | ($57.7) | ($57.7) | ($57.7) | ($51.3) | ($51.3) | ($45.5) | ($31.3) | ($33.1) | ($33.1) | ($33.1) | ($33.1) | ($577.4) |
| Payroll - Wages & Benefits | (11.4) | (26.9) | (18.4) | (16.9) | (13.6) | (16.6) | (23.6) | (11.1) | (16.6) | ($11.4) | ($23.9) | ($11.4) | ($16.9) | (218.8) |
| Tariffs | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) | (39.0) |
| Leases & Rent | (2.8) | (10.3) | (2.8) | (2.8) | (10.3) | (2.8) | (2.8) | (2.8) | (9.5) | (2.8) | (2.8) | (2.8) | (2.8) | (58.0) |
| Insurance | (1.5) | (0.1) | (0.1) | (0.1) | (1.4) | (0.1) | (0.1) | (0.1) | (1.4) | (0.1) | (0.1) | (0.1) | (0.1) | (5.5) |
| Taxes | – | – | (8.1) | (2.0) | – | – | (1.0) | (2.0) | – | – | – | – | (2.0) | (15.0) |
| Other | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (13.0) |
| **Total operating disbursements** | **($54.4)** | **($99.0)** | **($91.1)** | **($83.5)** | **($87.1)** | **($74.8)** | **($82.8)** | **($65.5)** | **($62.8)** | **($51.4)** | **($63.9)** | **($51.4)** | **($58.9)** | **($926.6)** |
| **Net operating cash flow** | **($54.4)** | **($99.0)** | **($85.2)** | **($71.8)** | **($76.1)** | **$35.5** | **($7.8)** | **$11.1** | **($14.1)** | **$5.1** | **($15.4)** | **($7.4)** | **($14.8)** | **($394.4)** |
| **Non-operating items:** | | | | | | | | | | | | | | |
| ABL Interest | ($1.6) | – | – | – | ($1.6) | – | – | – | – | ($1.6) | – | – | – | ($4.7) |
| DIP Interest | (3.1) | – | – | – | (6.5) | – | – | – | – | (6.5) | – | – | – | (16.1) |
| Rx costs | (13.8) | (13.2) | (12.6) | (11.1) | (13.8) | (12.6) | (12.0) | (11.4) | (14.0) | (11.3) | (10.7) | (11.1) | (10.7) | (158.2) |
| Other non-operating | (4.5) | (15.2) | (2.5) | (8.2) | (6.5) | (2.5) | (2.5) | (2.5) | (8.2) | (2.5) | – | – | – | (55.1) |
| **Total non-operating items** | **($23.0)** | **($28.4)** | **($15.1)** | **($19.3)** | **($28.4)** | **($15.1)** | **($14.5)** | **($13.9)** | **($22.2)** | **($21.9)** | **($10.7)** | **($11.1)** | **($10.7)** | **($234.1)** |
| **Net cash flow** | **($77.3)** | **($127.5)** | **($100.4)** | **($91.1)** | **($104.4)** | **$20.4** | **($22.3)** | **($2.8)** | **($36.3)** | **($16.7)** | **($26.1)** | **($18.4)** | **($25.5)** | **($628.5)** |
| Bank cash balance, beg. | $92.4 | $22.1 | $94.6 | $94.2 | $103.1 | $98.7 | $219.1 | $196.8 | $193.9 | $157.7 | $140.9 | $114.8 | $96.4 | $92.4 |
| Net cash flow | (77.3) | (127.5) | (100.4) | (91.1) | (104.4) | 20.4 | (22.3) | (2.8) | (36.3) | (16.7) | (26.1) | (18.4) | (25.5) | (628.5) |
| DIP Funding | 7.0 | 200.0 | 100.0 | 100.0 | 100.0 | 100.0 | – | – | – | – | – | – | – | 607.0 |
| **Bank cash balance, end.** | **$22.1** | **$94.6** | **$94.2** | **$103.1** | **$98.7** | **$219.1** | **$196.8** | **$193.9** | **$157.7** | **$140.9** | **$114.8** | **$96.4** | **$70.9** | **$70.9** |
| (-) Minimum cash need | (20.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) |
| **Cash surplus (shortfall)** | **$2.1** | **$44.6** | **$44.2** | **$53.1** | **$48.7** | **$169.1** | **$146.8** | **$143.9** | **$107.7** | **$90.9** | **$64.8** | **$46.4** | **$20.9** | **$20.9** |
| (+) DIP Funds in Escrow | – | 400.0 | 300.0 | 200.0 | 100.0 | – | – | – | – | – | – | – | – | – |
| **Total liquidity surplus (shortfall)** | **$2.1** | **$444.6** | **$344.2** | **$253.1** | **$148.7** | **$169.1** | **$146.8** | **$143.9** | **$107.7** | **$90.9** | **$64.8** | **$46.4** | **$20.9** | **$20.9** |

Case 25-90399   Document 3356-4   Filed in TXSB on 07/24/26   Page 98 of 98

UST Exhibit 4
Page 98 of 98