**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**SUPPLEMENTAL DECLARATION OF
CHARLES M. MOORE IN SUPPORT OF DIP MOTION**

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**") and interim Chief Executive Officer of First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together with the Debtors' non-debtor affiliates, "**First Brands**" or the "**Company**").

2.      On September 5, 2025, the Debtors retained A&M to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and assist with contingency preparations for a potential chapter 11 filing.  On September 24, 2025, Global Assets LLC and 12 of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28,

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2025, First Brands Group LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.

3.      From the outset of A&M's retention, my team and I have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts.  As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22) (the "**First Day Declaration**").[2]

4.      I submit this Supplemental Declaration (the "**Supplemental Declaration**")[3] in further support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**") filed by the Debtors.[4]

5.      Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant

---

[2]    My background and qualifications are set forth in more detail in the First Day Declaration.

[3]    On September 30, 2025, the Debtors filed the *Declaration of Charles M. Moore in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 62) (the "**DIP Declaration**").

[4]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, the Interim DIP Order, or the DIP Credit Agreement (each as defined herein), as applicable.

UST Exhibit 5
Page 2 of 26

documents, (iii) information provided to me by A&M employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, or the other advisors to the Debtors, including Weil, Gotshal & Manges LLP ("**Weil**") and Lazard Frères & Co. LLC ("**Lazard**"), and/or (v) my experience as a restructuring professional.  I will receive no additional compensation in exchange for my testimony.  If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases.  I am authorized to submit this declaration on behalf of the Debtors.

## **Corporate Governance Changes**

6.     As of Petition Date, the Debtors were overseen by the independent Special Committee, which held full corporate decision-making authority for the Debtors.  The only members of the Special Committee are Mr. Neal Goldman and Mr. Bill Transier.  I was appointed Chief Restructuring Officer in September 2025 and delegated authority to approve cash expenditures, the incurrence of indebtedness, and oversee the Debtors' cash management system, as more fully described in the First Day Declaration.[5]

7.     At that time, although three of the Company's former executives—Patrick James, Stephen Graham, and Shekhar Kumar—sat on the Boards of the Parent Entities, all corporate authority resided with the Special Committee and its delegees.  Following the commencement of these cases, no full Board meetings have been held (only Special Committee meetings), and these legacy executives have had no control over any of the actions of the Debtors.

8.     The Company's legacy executives, however, could not realistically have exited from their positions before or immediately after the Petition Date without potentially harming the business materially.  Generally, the Company Advisors worked with certain legacy

---

[5]     First Day Declaration ⁋ 33.

UST Exhibit 5
Page 3 of 26

executives to understand and stabilize the Debtors' operations. Without access to the historical knowledge known by the Company's these executives, I believe the Company Advisors would not have been able to gain necessary knowledge and controls to quickly manage the Debtors' business, which would have had significant value-destructive consequences.

9.     As the Company Advisors gained familiarity with the Debtors' business and based on preliminary findings of the Investigation, there have been significant changes to the Debtors' executive management team at the insistence of the Special Committee and recommendation of the Debtors' advisors. All but two of the most senior managers who led the Debtors' day-to-day operations before the chapter 11 filing are no longer with the Company, including:

    i.  On September 25, 2025, Mr. Michael Baker, the Debtors' former Chief Corporate Strategy Officer and board member, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

    ii.  On September 25, 2025, Mr. Ed James, Mr. Patrick James' brother and former Executive Vice President and board member, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

    iii.  On October 12, 2025, Mr. Patrick James, the Debtors' founder and former Chief Executive Officer and controlling shareholder, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

    iv.  On October 30, 2025 Mr. Stephen Graham, the Debtors' former Chief Financial Officer and board member, retired from all positions he held as an officer, director, manager or board member at all Company entities. Mr. Graham stopped working for the Company as of October 22, 2025.

    v.  On October 30, 2025 Mr. Andy Brumbergs, the Debtors' former Vice President, Finance and board member, was removed from all positions he held as an officer, director, manager or board member at all Company entities. Mr. Brumbergs stopped working for the Company on October 22, 2025.

10.     Importantly, no outside party has authority over the Debtors in these proceedings, the Investigation, or the Special Committee. While Mr. James remains the sole equity

UST Exhibit 5
Page 4 of 26

holder of the Company, he has no authority to direct the Special Committee or the Debtors' newly appointed officers in any respect.

11.     These management changes—including their timing—were made with input from both the Special Committee and myself.  In making these decisions, the Special Committee and I carefully considered the need to maintain operational continuity where appropriate, while ensuring that remaining management personnel are best positioned to maximize the value of the estates.  The Special Committee and I continue to work closely with the Company Advisors to evaluate the situation and will take all necessary steps to preserve the value of the Debtors' estates going forward and safeguard the independence of the Investigation.

12.     The Debtors have appointed new officers to replace the officers and senior managers that have departed.  On October 13, 2025, following the resignation of Mr. James, I was appointed interim Chief Executive Officer of the Debtors.  On October 23, 2025, Daniel Jerneycic and Gaurav Malhotra were appointed as co-Chief Restructuring Officers of the Debtors.  Furthermore, and on October 30, 2025, Paul Kosturos was appointed as Chief Financial Officer of the Debtors with an effective date of November 3, 2025.  Each of Mr. Jerneycic, Mr. Malhotra, and Mr. Kosturos is a Managing Director at A&M and brings extensive experience that will be critical to the Debtors as they progress through these chapter 11 cases.  Furthermore, each will report directly to me and the Special Committee in carrying out their duties.

13.     Mr. Jerneycic has nearly 25 years of experience as an advisor to large organizations assisting them with analyzing and stabilizing their financial condition, focused on financial analysis, operational turnarounds, and restructurings. Mr. Jerneycic has proven experience in the automotive industry where he has advised both OEMs and suppliers. His experience has included liquidity management and cash forecasting, financial modeling, cost

5

UST Exhibit 5
Page 5 of 26

reductions, customer and labor negotiations, strategic planning, and business plan development. Prior to joining A&M, Mr. Jerneycic was a Partner in Ernst & Young's Turnaround and Restructuring practice, where he served in a similar capacity. Mr. Jerneycic earned a bachelor's degree from the University of Michigan, and a master's in accounting from University of Michigan's Ross business school. He is a Certified Public Accountant, Certified Insolvency Restructuring Advisor, and certified in Financial Forensics.

14.     Mr. Malhotra has twenty-five years of experience leading financial and operational restructuring assignments and serves on Alvarez and Marsal's Restructuring & Turnaround executive committee.  Prior to joining Alvarez and Marsal, Mr. Malhotra was a partner with Ernst & Young and the leader of their US Restructuring Practice.  A Chartered Financial Analyst, Mr. Malhotra has worked across a variety of industries, including the automotive industry, and has extensive experience with complex in and out of court restructurings, most recently having served as the financial advisor to the Financial Oversight and Management Board for Puerto Rico and assisted in the restructuring of Puerto Rico's $70 billion in debt and $55 billion in pension obligations.

15.     Mr. Kosturos has more than thirty years of experience, specializing in interim CFO assignments, finance and accounting organizational redesigns, forecasting and budgeting improvement, among other things.  A Certified Public Accountant, Mr. Kosturos has served as in interim CFO for companies including The Rockport Group and Harry & David and prior to his time at Alvarez and Marsal, he served as the Vice President and Corporate Controller for JDS Uniphase, a billion-dollar telecom company.

UST Exhibit 5
Page 6 of 26

16.     The current composition of the executive management team of the Debtors is as follows:

| Name | Position |
|---|---|
| Charles Moore | Chief Executive Officer |
| Gaurav Malhotra | Chief Restructuring Officer |
| Dan Jerneycic | Chief Restructuring Officer |
| Paul Kosturos | Chief Financial Officer |

**Liquidity and Forecasts**

17.     The Debtors have updated their weekly cash forecast through January 2026, which shows the proceeds from the DIP financing are sufficient to fund the Debtors' operations through the forecast period.  Through the four-week period ending on October 24, 2025, the Debtors' liquidity is tracking ahead of the DIP budget.  Moreover, the Debtors are undertaking numerous steps to stabilize and improve their business, which should strengthen their liquidity. Those efforts include, but are not limited to: (1) developing a fill rate recovery plan by customer to increase go forward sales; (2) implementing a proactive communication strategy across key stakeholders, including key customers, stakeholders, and employees around the world, and conducting multiple direct customer meetings at the executive level to identify critical issues impacting the level of service provided to key customers; (3) implementing a vendor strategy focused on paying vendors cash in advance for post-petition payables while phasing in trade agreements for pre-petition payables; (4) implementing operational dashboards to track key performance indicators ("**KPIs**") and communicating multiple times per day with internal and external parties to identify issues as soon as they occur and developing action plans to address them; (5) implementing a rigorous review of liquidity needs by business unit to ensure there is justification for cash disbursements and spending decisions; and (6) developing a deeper

UST Exhibit 5
Page 7 of 26

understanding of the critical items impacting the Debtors' liquidity position due to third-party factoring, collateral review, and financial position.  Accordingly, given both the strength of the Debtors' existing position relative to the DIP budget, as well as the numerous steps the Debtors are taking to stabilize and improve their businesses, I believe that the proceeds from the DIP financing are sufficient to fund the Debtors' operations through the forecast period.

18.      For the same reasons, I believe the Debtors' assumptions can now and will be more refined, including new potential disbursements identified after commencement of these cases, as well as areas of expected reductions in cash disbursements.  New potential disbursements identified since the commencement of the chapter 11 cases include, but are not limited to, potential costs of an examiner (if one is appointed by the Court), costs of a third-party quality of earning analysis, cash collateralizing letters of credit and surety bonds, potential adequate protection payments and potential costs associated with a contemplated retention program for rank and file employees of the Debtors ("**KERP**").  To help offset the impact of these new potential disbursements, the Debtors have already achieved at least $20 million in annualized savings in corporate payroll and nonessential overhead expenditures, and continue to be actively focused on further reductions to bolster liquidity.

19.      The Debtors and their advisors are in the process of identifying additional actions that can be taken to enhance liquidity during and beyond the forecast period.  These additional actions include, but are not limited to:  (1) increasing the Debtors' revenue through higher shipping volumes and improved pricing; (2) continuing to implement cost reductions throughout the Debtors' enterprise; (3) identifying parts of the Debtors' business that are not operating economically and may be candidates to shut down or for asset sales; (4) rebuilding customer trust including through a key customer fill rate recovery plan, establishing economic and

UST Exhibit 5
Page 8 of 26

operational working groups, and resolving key short-term issues such as the collection of post-petition receivables and non-disputed credits; (5) developing a framework for vendor management and the stability of long-term supply, including through an ongoing review of critical vendors, identifying alternate sources of supply, and aligning with a customer recovery plan; (6) retaining the Debtors' employees, including through the November bonus payments for 2024 contemplated by the DIP budget and KERP programs; (7) establishing a reliable set of metrics that serve as KPIs to help guide decisions on operational performance management; (8) producing restatements of the Debtors' historical financials, including with respect to transactional alternatives and quality of earnings; and (9) further developing the Debtors' overall business plan through strategic assessments of the Debtors' go-forward business including (a) interdependencies of brands and portfolio of business units; (b) assessing profitability of the current book of business and business units to identify and categorize by performance, improvement, and whether the Debtors should consider a strategic exit, including a sale of non-core businesses; (c) implementing cost rationalization and "no regrets" decisions; (d) identifying and assessing overall performance improvement opportunities to improve the Debtors' current operations; and (e) developing long-term forecasts by business unit. I believe that these and other actions that the Debtors and their advisors identify and implement will further enhance the Debtors' liquidity during the forecast period.

20. The Debtors have adequate time to identify and execute on these initiatives prior to the end of the forecast period. The Debtors, with the assistance of their advisors, expect to have completed a detailed review of each of the business units by the end of November 2025. That review will serve as the basis for developing and implementing detailed action plans over the following sixty days to improve financial performance. In my experience, this is a reasonable time

9

Case 25-90399   Document 527   Filed in TXSB on 11/04/25   Page 10 of 26

period for conducting this analysis and taking the necessary steps to implement improvement actions.

21.     The Debtors also expect to produce a longer-term business plan by January 31, 2026, which will reflect stability in business operations and incorporation of liquidity enhancing actions identified and implemented over the previous ninety days.  This is an iterative process that begins during the month of November, providing sufficient time to conduct detailed analyses, implement initiatives within the control of the Debtors, and negotiate with external parties in areas that require revisions to agreements.  Conducting this process in chapter 11 enhances options available to the Debtors and allows the process to be accelerated based on the tools available through chapter 11.

22.     For these reasons, I believe the Debtors have good and reasonable prospects of achieving positive net cash flows before DIP funds are exhausted.

## Adequate Protection for the SPV Secured Parties

### A. The Uncertain Validity, Priority, and Extent of the Liens Held by SPV Secured Parties in Alleged Collateral

23.     In the First Day Declaration, I described the Debtors' then understanding of the off-balance sheet financing structures to which the SPV Debtors are party, including lease, inventory and equipment financing arrangements.  These arrangements include the CarVal II/CarVal III Facilities, Aequum/Global Assets Facilities, Evolution Facilities, and the Onset Master Leases.  The Evolution Facilities and Onset Facilities involve an arrangement whereby an SPV Debtor purportedly (i) first purchases inventory and/or equipment from certain subsidiaries of FBG and then (ii) utilizes those assets either as (a) collateral to support a loan from an SPV Lender (in the case of the Evolution Facilities) or (b) in connection with an alleged sale-leaseback transaction (in the case of the Onset Master Leases).

UST Exhibit 5
Page 10 of 26

24.     Commencing prior to and continuing after the Petition Date, the Debtors' advisors, under the guidance of the Special Committee, have reviewed documents and conducted diligence related to the credit facilities and arrangements of the SPV Debtors.  The Debtors' proposed counsel, Weil, has reviewed documentation related to the asserted liens purportedly granted under the SPV Debtors' credit facilities.  A&M has reviewed and continues to review the flow of funds between First Brands entities, the Debtors' books and records, transaction documents, and inventory reports.  The Debtors' proposed investment banker, Lazard, has analyzed the commercial transaction structure of each facility and various documents.  The statements made herein are based on the Debtors' advisors' understanding as of today, subject to ongoing review.  As described further below, the facts underlying these transactions raise serious concerns and questions about whether certain SPV Lenders have any collateral at all or if they do, what the status is of their liens relative to prepetition lenders.

25.     I understand that the prepetition ABL Lenders and Term Loan Lenders (as defined in the DIP Motion) claim to have perfected liens in (among other assets) the FBG Debtors' inventory and property, plant and equipment ("**PP&E**"), and that, under the Prepetition Credit Agreement,  certain requirements must be met for these liens to be released, such as a sale for fair market value and updated and accurate borrowing base certificates when the transaction involves ABL Lender borrowing base inventory.  With limited exceptions, the assets utilized in these facilities was at some point included in the asserted ABL Lender borrowing base or otherwise pledged under the ABL Facility and Term Loans.

26.     In order to determine the validity, extent, and priority of each SPV Lender's asserted interest in the Debtors' inventory, the Debtors and their advisors have been evaluating,

UST Exhibit 5
Page 11 of 26

among others, the following important questions to determine whether the ABL Lenders' liens were automatically released under one of two alternatives:

1. Sale for Fair Market Value:   Was the inventory or PP&E that was purportedly pledged or transferred by the applicable SPV Debtor to the applicable SPV Lender actually conveyed by the ABL Obligor to the SPV Debtor pursuant to valid, executed sale agreements?  If so, did the SPV Debtor pay the ABL Obligor fair market value for the transferred inventory, whether with at least 75% cash consideration or exchange in-kind, such that FBG's ABL and Term lenders would likely concede that the transferred inventory was released from the ABL Lenders' lien in the ABL Obligors' collateral under the ABL Credit Agreement?

2. Payment Conditions:   Alternatively, solely with respect to inventory, were the Payment Conditions (which I understand are a series of requirements that include the borrower not being in an event of default, a specified fixed charge coverage ratio, and a minimum amount of excess ABL Borrowing Base availability according to a formula) under the ABL Credit Agreement satisfied at the time of the transfer of such inventory?  If so, was an updated ABL Borrowing Base Certificate delivered to the ABL Agent at the time of the transfer and if so, was the transferred inventory excluded from the ABL Borrowing Base set forth in such certificate?

27.     In the prepetition period, I understand that the FBG Debtors and SPV Debtors frequently failed to observe corporate formalities or strictly follow the terms of the relevant credit documents.  In many instances concerning the SPV Debtors, no transfer of inventory or PP&E ever occurred.  Even in certain cases where the inventory or PP&E was transferred to the SPV Debtor, it is unclear whether any or adequate consideration was paid to the FBG Debtors.  In other instances involving the sale of assets in the ABL Borrowing Base, the Borrowing Base Certificates provided to the ABL Lenders continued to include the inventory allegedly sold to the applicable SPV Debtor.

28.     In light of these preliminary findings and open questions, I believe that there are serious questions as to whether each of the SPV Debtors ever acquired a property interest in inventory flowing into FBG Debtor locations after the initial "sale" of inventory by the FBG Debtor to the relevant SPV Debtor.  In fact, as the initial inventory from these "sale" transactions

12

was sold by the FBG Debtors in the ordinary course of its business, there is scant evidence of transactions whereby the SPV Debtors would purchase or otherwise acquire for fair value inventory from the FBG Debtors or where the SPV Debtors would exchange inventory to replace inventory purportedly sold to the FBG Debtor.

29.     I further understand that there is limited evidence of transactions and documentation that would support the construct as it was intended to function (based on my commercial understanding of the different structures) between the FBG Debtors and relevant SPV Debtors.  With respect to Onset and Evolution, for example, the Debtors understand, based on discussions with the Company, an examination of records and email searches, the SPV Debtors and the FBG Debtors did not execute purchase agreements or similar transaction documents after the initial "sale" to document transactions in respect of replacement inventory (*i.e.*, inventory that would have replaced the inventory originally "sold" by the FBG Debtor to the relevant SPV Debtor).  Further, in many instances, the FBG Debtors' books and records do not show all the expected transactions between the relevant SPV Debtors and the FBG Debtors.

30.     After the alleged sale transactions, I further understand that, with possible exceptions, the inventory and PP&E remained on the FBG Debtors' books and records.  In addition, the inventory and equipment also remained in the FBG Debtors' physical possession. Based on these facts, the priority and existence of any asserted lien held by Evolution, Onset, CarVal II/CarVal III Lenders, or Aequum/UMB Lenders against the collateral allegedly sold to their respective SPV Debtor counterparty is subject to legitimate dispute relative to the liens held by at least the ABL Lenders and Term Loan Lenders (as well as the DIP Lenders).

31.     Moreover, on many occasions, funds were never transferred by the applicable SPV Debtors to the FBG Debtors in exchange for assets purportedly transferred to the

13

UST Exhibit 5
Page 13 of 26

applicable SPV Debtors.  Rather, the manner in which cash was handled was unusual.  SPV Debtor funds were commingled in an entity apparently controlled by Mr. Patrick James.  With the exception of Evolution (which transferred funds to the FBG Debtors directly), the majority of incoming transfers from Onset and other SPV Lenders received by the relevant SPV Debtor were simply transferred to Mr. James' entity (referred to as Bowery Finance II) with remaining funds transferred to other SPV Debtors, and in some cases, to Mr. James' trust, not the relevant FBG Debtor seller of the equipment or inventory.

32.    Given the lack of evidence that replacement inventory was purchased or was otherwise the property of the relevant SPV Debtors as of the Petition Date, I believe that there are legitimate questions about whether and to what extent (if any) the SPV Lenders have any lien or property interest in inventory or PP&E, given that they would have obtained their lien or interest through the SPV Debtors (which themselves may not have had any interests), not FBG Debtors.

33.    Further, the ABL Lenders and Term Loan Lenders may have perfected priority liens in the alleged collateral held by the SPV Lenders.  Accordingly, it is my current understanding that the value of the same inventory may have been used to support loans to both (i) the FBG Debtors and (ii) certain of the SPV Debtors.

(a)    *Evolution*

34.    In the case of Evolution, the applicable FBG Debtors received some cash (but I understand less than 75% of the stated book value of the inventory, which funds were transferred from Evolution itself).  I also understand that the inventory purportedly sold by the FBG Debtors to Patterson Inventory, LLC and Starlight Inventory I, LLC was part of the ABL Borrowing Base and remained on the Borrowing Base Certificates issued after the purported sale transactions, which I believe will result in serious disputes as to whether an automatic lien release occurred of the ABL and Term Lenders' liens.  After the alleged sale transactions, the inventory

14

UST Exhibit 5
Page 14 of 26

remained on the FBG Debtors' books and records and the inventory and equipment also remained in the FBG Debtors' physical possession.  In addition, I understand that proper documentation is missing with respect to subsequent sales of inventory.  Accordingly, even if Evolution had a valid first lien position on the inventory initially transferred, most of that inventory would have been sold or transferred out of the relevant SPV Debtor.  Based on these facts, the priority of any asserted lien held by Evolution against the collateral allegedly sold to their respective SPV Debtor counterparty is uncertain relative to the liens held by at least the ABL Lenders and the Term Loan Lenders.

        (b)    *Onset*

        35.    In the case of Onset, the FBG Debtors executed an asset purchase agreement with the applicable SPV Debtor (*i.e.*, Carnaby Inventory IV, LLC or Carnaby FA, LLC), pursuant to which specific FBG subsidiaries allegedly sold inventory and PP&E to the SPV Debtors in exchange for a stated purchase price of approximately $1.3 billion during the period February 9, 2024 through March 26, 2025.  The specific FBG Debtor seller designated in the purchase agreements appears to have received only approximately $38.4 million directly from the specific off-balance sheet SPV Debtor upon that SPV Debtor receiving the funding from Onset.  The Debtors have identified an additional $217 million that may have been paid from Bowery Finance II to the FBG Debtor seller of the equipment or inventory.  It is unclear whether the applicable FBG Debtor received fair market value of the assets sold to the applicable SPV Debtor through indirect transfers as these amounts were significantly less than the amounts set forth in the applicable asset purchase agreements.  In addition, it does not appear that the SPV Debtors paid for or otherwise acquired an ownership interest in the replacement inventory that purportedly flowed through the Onset SPV Debtors after the initial purchase.  I further understand that the inventory pledged to Onset was not removed from the FBG Debtors' balance sheet.

UST Exhibit 5
Page 15 of 26

36.     In connection with the Onset Facility, the SPV Debtors entered into alleged "sale leaseback" transactions for inventory and PP&E related to certain U.S., European, and Mexican company businesses.  These arrangements obligated the applicable SPV Debtor to make monthly rental payments to Onset.  Of the 49 sale-leasebacks reviewed by the Debtors' advisors, it appeared as though the Debtors had ongoing payment obligations under 12 such leasebacks. And in the case of Carnaby FA, LLC, that SPV Debtor had no means of repaying Onset for the PP&E due to how the documents were structured with no consideration flowing to Carnaby FA (although that was corrected as part of the third Onset forbearance).

37.      Some of the Onset lease agreements had short tenors (*e.g.*, matured within 6 to 12 months).  Based on the Debtors' advisors current understanding, the "sale-leaseback" transactions entered into between the SPV Debtors and Onset starting in 2022 often resulted in an approximate 1.5x multiple on invested capital with implied annual returns to Onset in excess of 100%, in many cases ranging from 100% to 300%, and in one case up to approximately 580%.

38.     Moreover, my current understanding is that Onset has been paid $390 million more than it funded into the Debtors under the Onset Facility, despite allegedly still being owed approximately $1.88 billion under the Third Onset Forbearance.  The documents reviewed by the Debtors' advisors suggest that there could have been approximately $2.5 billion of inflows from Onset to the Debtors between September 2018 and May 2025 and that Onset received in excess of $2.9 billion in principal and interest payments during that time period (excluding the approximately $1.88 billion allegedly owed under the Third Onset Forbearance as of the Petition Date).

(c)     *CarVal II/CarVal III Lenders*

39.     As described in greater detail in the First Day Declaration, under the CarVal II/CarVal III Facilities, certain SPV Debtors may engage certain subsidiaries of the FBG

16

UST Exhibit 5
Page 16 of 26

Debtors to manufacture inventory on their behalf, which have contractual relationships with certain Maquiladora entities that import materials into Mexico and then export finished goods.  The SPV Debtors may also purchase manufactured inventory and raw materials from the FBG Debtors, and may utilize that inventory as a borrowing base to obtain credit from the CarVal II/CarVal III Lenders.

40.     I understand that the raw material inventory that would purportedly become collateral for the CarVal II/CarVal III Lenders was not part of the ABL Borrowing Base, but was part of the ABL Collateral.  At this time, the Debtors and their advisors are unable to confirm based on current information (*e.g.*, by reviewing purchase agreements or a funds flow indicative of the transactions) that the applicable FBG Debtor properly transferred and received fair market value for the raw material inventory sold to the SPV Debtors that are parties to the CarVal II/CarVal III Facilities.

(d)     *Aequum/UMB*

41.     The Aequum/Global Assets Facilities each enabled certain SPV Debtors to purchase finished parts, raw materials, and semi-finished products purchased from the FBG Debtors as a borrowing base.  At this time, the Debtors and their advisors have yet to confirm based on current information (*e.g.*, by reviewing purchase agreements or a funds flow indicative of the transactions) that the applicable FBG Debtor properly transferred and received fair market value for the assets sold to the SPV Debtors that are parties to the Aequum/Global Assets Facilities.

B. **Adequate Protection Proposals**

42.     Although the validity, scope and priority of each of the SPV Lenders' interests against the assets of the applicable SPV Debtors remain under review, the Debtors' advisors have engaged in extensive negotiations with each of the SPV Lenders regarding the proposed adequate protection terms for use of their alleged inventory collateral.  I understand that

17

UST Exhibit 5
Page 17 of 26

the Debtors have not yet finalized an agreement with any of their SPV Lenders, though discussions with each SPV Lender are ongoing.  Absent an agreement, the Debtors intend to propose an adequate protection package in advance of the November 6, 2025 hearing for each of the SPV Lenders that seeks to preserve the status quo while the disputes regarding the validity of the SPV Lenders' asserted interests are determined.  Specifically, that proposal will provide that the Debtors will maintain the Petition Date value of the alleged inventory and collateral asserted by the SPV Lenders through either additional inventory and/or cash collateral.  The proposal will also preserve the rights of any SPV Lender to seek postpetition interest and fees to the extent they are oversecured in accordance with section 506(c) of the Bankruptcy Code, and likewise, will also propose that the Debtors' estates reserve rights under sections 506(c) and 552(b) of the Bankruptcy Code.

43.     The Debtors' proposal also allows the Debtors to continue using and selling their inventory and generating income, which benefits the Debtors' entire enterprise and all of their creditors.  It would cause a significant liquidity strain if the Debtors are unable to use and sell their inventory.  In the case of CarVal II/CarVal III Lenders, for example, the FBG Debtors fund the initial purchase of raw inventory as well as the manufacturing and distribution processes that convert the raw materials into finished goods that ultimately generate customer accounts receivable.  The proposed adequate protection package permits that cycle to continue while preserving status quo.  And without the FBG Debtors, the SPV Debtors have no operations and would simply need to liquidate whatever assets they do have an interest in.  The FBG Debtors propose to purchase collateral inventory for an amount relative to its cost value that accounts for the fact that the FBG Debtors maintain all operations involved and pay the entirety of other costs

18

of turning a piece of inventory into a finished good, including marketing and shipping to customers.

44.     In addition, the Debtors will track and report on the SPV Lenders' asserted collateral to the best of their ability and to the extent commercially reasonable.

## C.  Reporting

45.     The Debtors' Interim Adequate Protection Orders required elevated weekly reporting requirements for each SPV Debtor in addition to the weekly reporting required per the Interim DIP Order.  The SPV Debtors' reporting obligations include, but are not limited to:

    i.    weekly reporting on inventory levels;

    ii.    weekly Borrowing Base Certificates;

    iii.    weekly reporting on the sale or transfer of any of the collateral in which the SPV Lenders and ABL Lenders have asserted secured interests ("**SPV Collateral**") and related customer sales, including relevant purchase orders and collections.

46.     I understand that the SPV Lenders assert that the Debtors have not satisfied all of their reporting obligations under the interim adequate protection stipulations.  The Debtors satisfied each of the reporting obligations under the interim adequate protection stipulations other than the weekly tracking of SPV Collateral sales by customer sales and associated collections.  Based on guidance from the Company, A&M initially believed that the weekly tracking of such SPV Debtor receivables and collections would be achievable using existing available reporting.  However, in the days that followed the Petition Date, A&M discovered that the Company had not previously tracked receivables and collections related to the sale of SPV Collateral in the ordinary course of business. As such, significant effort was required by Company personnel to modify existing reporting or generate new reporting that detailed weekly SPV

UST Exhibit 5
Page 19 of 26

Collateral movements. A&M was also made aware that inventory is frequently transferred between locations, often more than once, before the eventual sale of that inventory to a customer, which significantly increases the complexity of the tracking process along with the number of weekly reports required to track SPV Collateral through its entire lifecycle.

47.     I understand that A&M engaged in multiple dialogues and working sessions with SPV Lenders' advisors with the goal of refining the weekly SPV Collateral tracking process to meet each SPV Lender's respective requirements, and it was ultimately determined that the weekly tracking of SPV Debtors' receivables and collections was not commercially feasible or possible to achieve within the required weekly timeframe. A&M is working diligently with the Company and the SPV Lenders' advisors to align on go-forward reporting obligations that are achievable by the Debtors as well as responsive to the SPV Debtors' requirements under the interim adequate protection stipulations. The Debtors will continue to track and report on the SPV Lenders' asserted collateral to the best of their ability and to the extent commercially reasonable.

48.     I understand the ABL Agent asserts that the Debtors have not satisfied their reporting obligations under the Interim DIP Order and, therefore, the ABL Agent lacks the appropriate documentation to assess (i) its status as a secured lender and (ii) the validity of competing claims. The Debtors were able to satisfy each of the reporting obligations under the Interim DIP Order other than delivering certain specific roll-forward reporting that was verbally requested by the ABL Agent and incremental to the reporting obligations specified in the Interim DIP Order. A&M initially believed we would be in a position to deliver such reporting in a timely manner; however, in the days that followed the Petition Date, A&M discovered that the Debtors' existing accounting and reporting procedures were in a state that made satisfying these reporting obligations impossible. A&M is working diligently to develop and implement a process for

20

preparing and delivering all required reporting to the ABL Agent. The weekly roll-forward reporting had not previously been performed in the ordinary course of business, and, as such, significant effort was required by Company personnel to generate reports across multiple ERP systems and reconcile outputs to meet the needs of the ABL Agent's request. Further, the Debtors encountered staffing constraints and limitations, as the employees responsible for weekly roll-forward reporting were also responsible for assisting with numerous other reporting obligations and information requests, including those related to the ABL field exam. A&M is working diligently to develop and implement a process for preparing and delivering all required reporting to the ABL Agent in a timely manner.

49.     The Debtors also worked diligently to provide the full reporting to SPV Lenders such as Evolution and Onset, but were unable to do so in spite of their best efforts.

### Administrative Expense Claims Basket

50.     The DIP Lenders have agreed to subordinate all $3.3 billion in Roll-Up Obligations to certain categories of administrative expense claims (including payroll, trade claims, section 503(b)(9) claims) up to an aggregate cap of $200 million (the "**Aggregate Administrative Expense Claims Basket**") in the event the Debtors' estates are administratively insolvent. Under my supervision, the A&M team sized the Administrative Expense Claims Basket based on a variety of factors, including, but not limited to, the Debtors' average run rate over a two-week period, the amount of two weeks of accrued and unpaid payroll for U.S. salaried and hourly employees, and approximately one and a half weeks of total vendor spend, among other things.

51.     I believe the sizing of the Aggregate Administrative Expense Claims Basket and underlying assumptions are reasonable given the Debtors' average historical spend since commencing these cases and will materially reduce and potentially eliminate the risk to parties providing postpetition goods and services to the Debtors.

UST Exhibit 5
Page 21 of 26

**Adequate Protection For The ABL Secured Parties**

52.     I understand the ABL Agent has also objected to the DIP Motion on the basis that the Debtors have not provided the ABL Lenders with sufficient adequate protection.  However, the Debtors have agreed to provide the ABL Lenders with a comprehensive adequate protection package consisting of (i) senior replacement liens on postpetition ABL Priority Collateral (subject and subordinate to the Carve-Out), (ii) junior replacement liens on post-petition Term Priority Collateral and unencumbered assets of the Debtors (including proceeds from avoidance actions and commercial tort claims) of the same type as Term Priority Collateral (to the extent such assets secure the DIP financing), (iii) interest payments in-kind as adequate protection at the default rate under the ABL Facility (excluding any of the supply chain financing obligations), and (v) payment of reasonable and documented fees of the ABL Lenders' professionals.

53.     Further, the ABL Lenders' collateral package will continue to grow as DIP proceeds are used to buy and sell inventory and receivables are generated.  Specifically, the Company's termination of its historical Third-Party Factoring practices results in the growth of the Debtors' unencumbered accounts receivable balances, which is first lien ABL Collateral.  Accounts receivable is expected to grow from approximately $395 million as of October 24, 2025 to $469 million by December 26, 2025.

54.     Additionally, the DIP budget assumes approximately $80 million of incremental inventory spending to build and replenish the Debtors' raw material and component inventory balances, which had been depleted up until the Petition Date due to liquidity constraints and supply-chain disruption, impacting the Debtors' ability to manufacture finished goods required to generate customer sales.  This additional inventory is first lien ABL Collateral.  The DIP budget also assumes $120 million of critical vendor spending, which is expected to improve inventory flow across various vendor groups, including shippers and lienholders, who may have been holding

22

UST Exhibit 5
Page 22 of 26

critical inventory. Free flow of this inventory will help to ensure much needed inventory will make its way to the Debtors' various production facilities, warehouses, and distribution centers. Thus, even though the ABL Lenders have not provided any incremental financing to address the Debtors' significant liquidity issues, the ABL Lenders will benefit from the DIP Facility.

55.     I understand that certain supply chain financing obligations are secured under the ABL Credit Agreement to the extent that certain requirements are satisfied by the lenders thereunder. The Debtors have reviewed the information provided by the three ABL Lenders who provided supply chain financing and are satisfied that obligations owed to Bank of America and Truist Bank are secured under the ABL Credit Agreement; however, the Debtors do not believe the information from U.S. Bancorp ("**U.S. Bank**") is sufficient to confirm compliance with the terms of the ABL Credit Agreement. I understand that both the Debtors and U.S. Bank failed to deliver a certification designating the supply chain financing under the ABL Credit Agreement. So, at this time, the Debtors cannot stipulate to the treatment of U.S. Bank's obligations as secured under the ABL Credit Agreement, but the Debtors are continuing to review the facts and circumstances and plan to discuss further with U.S. Bank.

**Third-Party Factoring Programs**

A.  **Diligence by A&M to Understand What Interest If Any the Third-Party Factors Have in Unpaid Receivables**

56.     Since the Petition Date, A&M has undertaken significant efforts to investigate and understand the Company's historical Third-Party Factoring practices and liabilities. To that end, A&M deployed a team to conduct a forensic audit and investigate transactions related to the Debtors' Third-Party Factoring liabilities. A&M developed a rigorous reconciliation process to tie collections received after the Petition Date (the "**Collected Receipts**") to the invoices of any purchased receivables. As part of this process, the Debtors' advisors worked

23

collaboratively with the Third-Party Factors,[6] to obtain their internal data regarding what invoices were purchased and the amounts due on account of such invoices.  A&M also obtained access to the Debtors' system generated invoice records, which included key invoice level details (invoice number, amount, customer, supplier, invoice date, etc.).  The Debtors accounts receivable team performed a receipts reconciliation process to match Collected Receipts to invoices (the "**Mapped Invoices**").  This process is performed by teams in the shared service centers and is governed by a 359 page cash application SOP document that outlines procedures for each business unit.  A&M has reviewed this process and considers it to be satisfactory.  A&M then compared the Mapped Invoices to (i) the data from the Debtors' system generated invoices and (ii) records received from each of the Third-Party Factors.  This data comparison allowed A&M to trace the Collected Receipts to determine whether the funds are property of a Third-Party Factor (or Third-Party Factors) or the Debtors' estate (i.e., not factored), and conclude which Third-Party Factor (or Third-Party Factors) may have a claim to a particular Collected Receipt(s) and related Mapped Invoice(s).

57.     A&M's investigation and reconciliation process led to the discovery of significant issues with the Debtors' historical Third-Party Factoring practices, including many instances where the invoices provided by the Debtors to the Third-Party Factors were (i) fabricated (i.e.,  invoice information (invoice number, customer, supplier) provided by the Debtors to the Third-Party Factor did not match the Debtors' system generated invoice records), (ii) inflated (i.e., the invoice amount provided by the Debtors to the Third-Party Factors was significantly inflated

---

[6]     The Debtors' primary Third-Party Factors include Raistone Purchasing Series LLC-Series XXXII, Raistone Purchasing LLC-Series XXVIII, Leucadia Asset Management LLC, Katsumi Servicing, LLC, , Evolution Credit Partners Trade Finance Master L.P., and related affiliates of each.  In some instances, the Factored Receivables were subsequently sold again by the Third-Party Factor to additional purchasers, including Arab Banking Corporation B.S.C. and ING Belgium S.A./N.V.

UST Exhibit 5
Page 24 of 26

from the invoice values in Debtors' system generated records), or (iii) the same invoices were provided to more than one Third-Party Factor, creating the potential for more than one party to assert a claim to the same invoice(s).

### B. Preliminary Reconciliation of Collected Receipts

58.     The Debtors have collected a total of $91.6 million in Collected Receipts since the Petition Date through October 24, 2025. A&M, with support from the Debtors' accounts receivables team, has completed reconciliation on approximately $73.2 million of the Collected Receipts and determined that $3.7 million match to invoices purchased by Third-Party Factors. In accordance with the Interim Cash Management Order, the $3.7 million will be transferred to the Factored Receivable account. The balance of the $91.6 million remains subject to ongoing reconciliation and any factored receivables will be processed in the same manner as described above.

59.     Additionally, the Debtors estimate that, as of October 24, 2025, approximately $75 million in receivables are being withheld by customers. The Debtors have received comments from their customers that this is due, at least in part, to certain Third-Party Factors sending assignment notices and creating confusion as to where the customers should remit funds.

### Conclusion

60.     Based on my experience as a restructuring professional, my familiarity with the Debtors, and my extensive discussions with the Debtors' management team and advisors, I believe the Debtors will materially benefit from final approval of the DIP Facility. For these reasons and those set forth above, I believe that the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment, and it would be appropriate for the Court to grant final approval of the DIP Facility as contemplated by the DIP Motion.

UST Exhibit 5
Page 25 of 26

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

November 4, 2025                                    */s/ Charles M. Moore*
Las Vegas, Nevada                            Charles M. Moore, Managing Director
                                                          Alvarez & Marsal

UST Exhibit 5
Page 26 of 26