# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*, | § § § | Case No. 25-90399 (CML) |
| Debtors.[1] | § § | (Jointly Administered) |
| BANK OF AMERICA, N.A. as Administrative Agent and Collateral Agent to the ABL Lenders; WILMINGTON SAVINGS FUND SOCIETY, FSB as 1L and 2L Term Loan Agent and as DIP Agent; and GLAS USA LLC as Side Car Loan Agent, | § § § § § § § § § | |
| Plaintiffs, | § § § | |
| v. | § § § | Adversary No. 26-_____ |
| AEQUUM CAPITAL FINANCIAL II LLC; FIRST BRANDS GROUP LLC; CARDONE INDUSTRIES, INC.; BROAD STREET FINANCIAL, LLC; and BROAD STREET FINANCIAL HOLDINGS, LLC, | § § § § § § § | |
| Defendants. | § § | |

## COMPLAINT FOR DECLARATORY JUDGMENT TO DETERMINE THE VALIDITY, PRIORITY AND EXTENT OF LIENS AND OTHER RELIEF

Plaintiff Bank of America, N.A., in its capacity as administrative agent (the "**Administrative Agent**") and collateral agent (the "**Collateral Agent**," and together with the Administrative Agent, the "**ABL Agent**") for the prepetition secured ABL lenders, Plaintiff

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these Chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

Wilmington Savings Fund Society, FSB ("**WSFS**"), in its capacity as the First Lien Agent, Second Lien Agent, and DIP Agent for certain prepetition lenders, and Plaintiff GLAS USA LLC ("**GLAS**"), in its capacity as the Side Car Collateral Agent for certain prepetition lenders (collectively, the "**Term Loan Agents**," and together with the ABL Agent, the "**Plaintiffs**," with prepetition term loan lenders being the "**Term Loan Secured Parties**") to certain of the debtors and debtors-in-possession (collectively, the "**Loan Parties**" and each a "**Loan Party**," and together with the other debtors and debtors-in-possession, the "**Debtors,**" and collectively with their non-debtor affiliates, the "**First Brands Enterprise**") in the above-captioned cases (the "**Chapter 11 Cases**"), file this *Complaint for Declaratory Judgment to Determine the Validity, Priority and Extent of Liens and Other Relief* (the "**Complaint**") against the Defendants listed herein. With this Complaint, Plaintiffs allege the following:

## PARTIES

1.      Plaintiff Bank of America, N.A., a national banking association under the laws of the United States of America with its principal place of business in North Carolina, is the administrative agent and collateral agent for the ABL Lenders (as defined below) pursuant to the ABL Credit Agreement (as defined herein).

2.      Plaintiff Wilmington Savings Fund Society, FSB, a federal savings bank organized under the laws of the United States of American and headquartered in Wilmington, Delaware, is the administrative agent and collateral agent for the 1L Term Loan Secured Parties and 2L Term Loan Secured Parties (each as defined herein).

3.      Plaintiff GLAS USA LLC, organized under the laws of and headquartered in New Jersey, is the administrative agent and collateral agent for the prepetition secured Side Car Loan Secured Parties in connection with the Side Car Loan (each as defined herein).

4. Defendant Aequum Capital Financial II LLC ("**Aequum**") is a Delaware limited liability company with an address in Minneapolis, Minnesota. It is the administrative agent and a lender with respect to the Aequum Facility (as defined below).

5. Defendant First Brands Group LLC ("**FBG LLC**") is a Delaware limited liability company with an address in Cleveland, Ohio. It is one of the Debtors in these jointly administered Chapter 11 Cases, a Loan Party and the servicer under the Aequum Credit Agreement (as defined below). FBG LLC was formerly known as Trico Group, LLC.

6. Defendant Cardone Industries, Inc. ("**Cardone**") is a Delaware corporation with an address in Cleveland, Ohio. It is one of the Debtors in these jointly administered Chapter 11 Cases and a Loan Party.

7. Defendant Broad Street Financial, LLC ("**Broad Street**") is a Delaware limited liability company with an address in Cleveland, Ohio. It is one of the Debtors in these jointly administered Chapter 11 Cases. Broad Street was purportedly created by Debtors' former management as a special purpose vehicle to facilitate an off-balance sheet credit facility funded by Aequum.

8. Defendant Broad Street Financial Holdings, LLC ("**Broad Street Holdings**") is a Delaware limited liability company with an address in Cleveland, Ohio and the parent company of Broad Street. It is one of the Debtors in these jointly administered Chapter 11 Cases. Broad Street Holdings purportedly guaranteed Broad Street's obligations to Aequum.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b), as a proceeding arising under Title 11 (the **"Bankruptcy Code"**), arising in a case under Title 11, or related to a case under Title 11.

10.     This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (K), which this Court may hear and determine.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

12.     Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and Bankruptcy Local Rule 7008-1, Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

13.     The relief requested is appropriate pursuant to Bankruptcy Rule 7001(b) and (i), and 28 U.S.C. §§ 2201 and 2202.

## NATURE OF THE ACTION

14.     This adversary proceeding concerns a dispute over the validity, priority and extent of liens claimed by Aequum in inventory (together with any proceeds thereof, the "**Inventory Collateral**") purportedly acquired by Broad Street from FBG LLC and then pledged by Broad Street to Aequum.

15.     Plaintiffs seek declaratory and other relief establishing that they hold valid, perfected liens with priority over Aequum's alleged liens in the Inventory Collateral. The ABL Agent's liens were established in a 2018 credit facility with the Loan Parties that includes first priority liens on the Inventory Collateral and substantially all the Loan Parties' assets. The Term Loan Agents' liens were established in 2018, 2019 and 2025 credit facilities with the Loan Parties

that include liens on the Inventory Collateral and substantially all the Loan Parties' assets. The Term Loan Agents' liens in the Inventory Collateral are contractually subordinated to the ABL Agent's liens in the Inventory Collateral, as described in greater detail below. Plaintiffs' liens secure repayment of hundreds of millions of dollars loaned to the Loan Parties. In contrast, Aequum's purported liens are founded on a 2024 off-balance sheet financing facility based on attempted transfers of Plaintiffs' collateral by FBG LLC to Broad Street.

16. Plaintiffs allege that the Inventory Collateral was owned by Cardone and at all times was subject to Plaintiffs' senior and prior perfected security interest. Because FBG LLC never owned any of Cardone's assets it never had the power to transfer the Inventory Collateral to Broad Street, much less to sell it free and clear of Plaintiffs' liens. Accordingly, Broad Street never acquired any interest in the Inventory Collateral and Aequum's security interest could not attach.

17. The purported sales by FBG LLC to Broad Street, as part of an off-balance sheet financing, were part of an alleged multibillion-dollar fraudulent scheme perpetrated by the Debtors' former executives, including Patrick James and his brother Edward James. The scheme defrauded the Plaintiffs, other prepetition senior lenders, and perhaps the off-balance sheet lenders themselves, who were unaware of the scheme. The James brothers have been indicted in the United States District Court for the Southern District of New York for their actions. The existence of Broad Street and Broad Street Holdings, the purported sales of the Inventory Collateral, and the Aequum credit facility itself were never disclosed to Plaintiffs or reflected on the books and records of FBG LLC or Cardone. Moreover, even though the James brothers, the Debtors (including FBG LLC, Broad Street, Broad Street Holdings), and Aequum knew that the Inventory Collateral had been pledged to Plaintiffs, none ever gave Plaintiffs notice of the purported sales or the Aequum credit facility. It was not until shortly before the Debtors' bankruptcy filings in late-

5

September 2025 that the existence of Broad Street or the Aequum off-balance sheet financing were disclosed to Plaintiffs, the ABL Lenders and the Term Loan Secured Parties.

18.     Before filing this Complaint, Plaintiffs attempted to reach an agreement with Aequum to preserve the Inventory Collateral pending a final determination of the parties' respective interests in the Inventory Collateral. Those efforts were unsuccessful, and Aequum continues to actively dispose of the Inventory Collateral in a manner that threatens Plaintiffs with irreparable harm. Although the Court authorized Aequum to exercise remedies against the Inventory Collateral while expressly preserving Plaintiffs' rights (including those asserted in this Complaint), Aequum has since contracted to dispose of the Inventory Collateral to third parties. Upon information and belief, Aequum intends to distribute the proceeds from those sales (which are encumbered by Plaintiffs' liens) to its own creditors and investors, which will leave Plaintiffs without an adequate remedy at law.

19.     Accordingly, through this Complaint, Plaintiffs seek (i) a declaratory judgment that Plaintiffs, on behalf of the ABL Lenders and the Term Loan Secured Parties, hold valid, properly perfected, and enforceable liens in the Inventory Collateral that are senior in priority and superior to Aequum's purported liens, and (ii) a preliminary injunction prohibiting Aequum from distributing any proceeds realized from a sale or other disposition of the Inventory Collateral and directing Aequum to deposit such proceeds into escrow, in each case until this Court has adjudicated this action on the merits.

## FACTUAL BACKGROUND

### A.     The Chapter 11 Cases

#### i.     *General Background*

20.     On September 24, 2025 and September 28, 2025 (the "**Petition Date**") the Debtors, including FBG LLC, Cardone, Broad Street and Broad Street Holdings commenced the Chapter

11 Cases under the Bankruptcy Code.

21.    The First Brands Enterprise, which includes 112 Debtors, is a global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions.[2] Each of the Debtors is indirectly owned by the founder and sole equity holder of the First Brands Enterprise, Patrick James.[3] Prior to the Petition Date, the First Brands Enterprise employed approximately 26,000 individuals worldwide and was purported to have generated net sales of approximately $5 billion in 2024.[4]

22.    In September 2025, prior to the Petition Date, Charles M. Moore, a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**"), was appointed Chief Restructuring Officer ("**CRO**") of FBG LLC and the other Debtors.[5]

23.    On October 12, 2025, Patrick James and Edward James resigned from all positions each held as an officer, director, manager or board member at all companies within the First Brands Enterprise.[6]

24.    Mr. Moore was subsequently appointed interim Chief Executive Officer of the Debtors, a position he holds as of the filing of this Complaint.[7] Daniel Jerneycic and Guarav Malhotra, each a Managing Director at A&M, were appointed co-CROs replacing Mr. Moore.[8]

---

[2]    *Declaration Of Charles M. Moore In Support Of Debtors' Chapter 11 Petitions* [Docket No. 22] ("**Moore Declaration**"), at ¶¶ 9, 30.

[3]    *Id.* at ¶¶ 14, 30.

[4]    *Id.* at ¶ 8.

[5]    *Id.* at ¶ 33.

[6]    *See First Brands Group, LLC, et al. v. Patrick James, et al.*, Adv. No. 25-03803 (Bankr. S.D. Tex., Nov. 03, 2025) [Adv. Docket No. 17], ¶ 40.

[7]    *Id.* at ¶ 43.

[8]    *Id.*

### ii. The DIP Motion

25. On September 30, 2025, the Debtors filed the DIP Motion[9] seeking entry of an interim order (the "**Interim DIP Order**") and a final order (the "**Final DIP Order**") authorizing the Debtors to, among other things, obtain post-petition financing and use cash collateral [Docket No 49]. The Bankruptcy Court entered the Interim DIP Order [Docket No. 217] on October 1, 2025, and the Final DIP Order [Docket No. 608] on November 9, 2025.

26. According to Mr. Moore, at the time of the DIP Motion, the Debtors and their advisors were unable to confirm that the Inventory Collateral was properly transferred to Broad Street or that fair market value of the assets was received in connection with the Aequum Facility (as defined below), raising "serious questions" as to whether property interests in those assets were ever acquired by Broad Street.[10]

27. Upon entry of the Interim DIP Order, the Debtors stipulated to the validity, perfection, and priority of the liens granted to Plaintiffs in connection with the ABL Credit Documents and the Term Loan Credit Agreements.[11]

28. The Debtors' stipulations became binding upon third parties upon entry of the Interim DIP Order, subject to the right to assert a Challenge (as defined in the Interim DIP Order).[12]

29. The initial deadline to assert a Challenge with respect to Plaintiffs' liens was January 31, 2026.[13] The deadline for Aequum to assert a Challenge with respect to Plaintiffs' liens

---

9   *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 49] ("**DIP Motion**").

10  *Supplemental Declaration of Charles M. Moore in Support of DIP Motion* [Docket No. 527] (the "**DIP Declaration**"), ¶ 28.

11  Interim Order at ¶ at ¶ G. (xiv); Final Order at ¶ G. (xiv).

12  Interim Order at ¶ 27; Final Order at ¶ 27.

13  Final Order at ¶ 27.

was extended to March 2, 2026.[14]

30.     Aequum did not assert a Challenge with respect to Plaintiffs' liens on or prior to March 2, 2026.

### iii.     Appointment of the Examiner

31.     On November 19, 2025, the Bankruptcy Court entered the *Order Directing Appointment of Examiner* [Docket No. 726] (the "**Examiner Order**"). The Examiner Order directs the appointment of an examiner (the "**Examiner**") to investigate (i) the facts and circumstances concerning the Debtors' prepetition factoring processes and factoring transactions, and (ii) the facts and circumstances concerning the Debtors' Off-Balance Sheet Financing Transactions related to any transactions and/or transfers in connection therewith.[15]

32.     In the Examiner Order, the "Debtors' Off-Balance Sheet Financing Transactions" is expressly defined as "(i) Aequum Facilities, (ii) CarVal Facilities, (iii) Evolution Facilities, and (iv) Onset Master Leases (each as defined in the First Day Declaration)."[16]

33.     On January 9, 2026, the Court approved the United States Trustee's appointment of Martin De Luca as the Examiner.[17] As of the filing of this Complaint, the Examiner has not issued a report.

### iv.     Aequum Adequate Protection Order

34.     On December 19, 2025, the Court entered the *Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 1018] (the "**Aequum**

---

[14]  *Notice Of Extension Of Challenge Period Pursuant To Final Order (I) Authorizing Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, And (C) Grant Liens And Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection To The Prepetition Secured Parties; (III) Modifying Automatic Stay; And (IV) Granting Related Relief* [Docket No. 1765].

[15]  Examiner Order at 3.

[16]  *Id.* at 3, n.3.

[17]  *See Order Approving the Appointment of Examiner* [Docket No. 1260].

**Aequum's Exhibit 4**
**Page 9 of 45**

**Adequate Protection Stipulation**").

35.     Pursuant to the Aequum Adequate Protection Stipulation, the Challenge Deadline (as defined in the Aequum Adequate Protection Stipulation) for the Debtors and any other party in interest to "challenge . . . the validity, amount, extent, perfection, and priority of the Aequum Secured Parties' liens" was March 4, 2026.[18] The Aequum Adequate Protection Stipulation further provided that the rights of the "Debtors, the DIP Secured Parties, the Prepetition Secured Parties (each as defined in the DIP Orders [to include the Plaintiffs]), the Unsecured Creditors Committee, and all other parties in interest to which the Bankruptcy Court grants the requisite standing (to the extent applicable) to challenge the validity, amount, extent, perfection, or priority of the Aequum Secured Parties' claims and liens are reserved[.]"[19]

36.     On March 4, 2026, Aequum stipulated to extend the Challenge Deadline (as defined in the Aequum Adequate Protection Stipulation) for Plaintiffs to assert a challenge with respect to Aequum's purported liens to April 1, 2026 and to Plaintiffs' "standing to challenge the validity, amount, extent, perfection, and priority of the Aequum Secured Parties' liens."[20] Therefore, the filing of this Complaint constitutes a timely challenge to Aequum's purported liens.

> ### v.     *Aequum Lift Stay Order*

37.     On January 29, 2026, the Court entered the *Agreed Order Granting Emergency Motion of Aequum Capital Financial II LLC for Entry of an Order Granting Relief from the Automatic Stay* [Docket No. 1820] ("**Aequum Lift Stay Order**"), which authorized Aequum to

---

[18]     Aequum Adequate Protection Stipulation at 3.

[19]     *Id*. at 7; *see also id*. at 7 ("Nothing in this Stipulation shall be deemed an admission or otherwise prejudice or enhance the rights of any party with respect to the review of the validity, amount, extent, perfection, or priority of the Aequum Secured Parties' claims and liens in the Aequum Collateral prior to the expiration of the Challenge Deadline.")

[20]     *See Stipulation and Agreed Order Extending the Challenge Period Pursuant to Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 2031] at 1, 2.

exercise remedies available to it under applicable non-bankruptcy law against "Cardone inventory" located at 3000 E Pioneer Pkwy, Ste. 190, Arlington, Texas 76010 (the "**Cardone Warehouse**") in which Aequum has asserted purported liens, provided that all other parties' liens, security interests, rights, or remedies to the inventory were preserved.

38.     On February 5, 2026, Aequum gave notice (the "**Article 9 Notice**") to Broad Street and Broad Street Holdings (with a copy to counsel for the Debtors and the ABL Agent) of its intention to conduct one or more private foreclosure sales of the Cardone inventory under Article 9 of the Uniform Commercial Code, as enacted in Delaware, and Section 5.01 of the Aequum Security Agreement (as defined below).

39.     Since issuance of the Article 9 Notice, Aequum has entered into one or more contracts with third parties to dispose of Broad Street's alleged interest in certain goods, including the Inventory Collateral in which Plaintiffs hold a superior security interest.

40.     Upon information and belief, Aequum intends to distribute the proceeds realized from sales of the Inventory Collateral, even though encumbered by Plaintiffs' liens, to its own creditors and investors, causing Plaintiffs irreparable harm and leaving them without an adequate remedy at law for the relief sought in this adversary proceeding.

**B.     The Criminal Indictment of the James Brothers**

41.     On January 27, 2026, a nine-count criminal indictment was filed by the United States Attorney for the Southern District of New York against Patrick James and Edward James in the U.S. District Court for the Southern District of New York. *United States of America v. Patrick James, et al.*, No. 26-cr-00029 (S.D.N.Y. Jan. 27, 2026) [Docket No. 2] (the "**Indictment**").

42.     According to the Indictment, from 2018 through 2025, the James brothers used certain of the Debtors to fraudulently obtain billions of dollars in financing from lenders, which

enabled the James brothers to reap millions of dollars in proceeds to enrich themselves.[21]

43. As detailed in the Indictment, the James brothers deliberately concealed massive amounts of debt incurred through off-balance sheet financing arrangements that they directed and negotiated.[22] Under these arrangements, an off-balance sheet lender would advance funds to an entity controlled by the James brothers, such as Broad Street, which would then purportedly use those funds to purchase inventory from a First Brands Group entity, such as FBG LLC.[23] The entity controlled by the James brothers would then pledge that same inventory to the off-balance-sheet lender as collateral.[24]

44. The Indictment further alleges that the James brothers, among other things, (i) concealed the nature and scale of these off-balance-sheet financings, including at times expressly disavowing that the agreements existed, (ii) pledged inventory to off-balance-sheet lenders subject to liens by senior lenders as purportedly unencumbered, (iii) submitted falsified inventory schedules and account documentation both to the off-balance-sheet lenders and senior lenders to evade reporting requirements under the operative loan documents, and (iv) routed transfers of funds through various entities owned by the James brothers to mimic the purchase and resale of inventory from the First Brands Group entity to give the false appearance of legitimate collateral and transaction activity.[25]

---

[21] Indictment at ¶ 1.

[22] *Id.* at ¶¶ 21, 23.

[23] *Id.* at ¶ 22.

[24] *Id.*

[25] *Id.* at ¶¶ 23 – 29.

## C. The ABL Credit Documents[26]

45. Pursuant to the ABL Credit Agreement, dated as of February 2, 2018 (as amended or otherwise modified from time to time, the "**ABL Credit Agreement**" and together with the other Loan Documents, the "**ABL Facility**"), by and among Defendants FBG LLC, Cardone, other borrowers and the other Loan Parties thereto, the lenders, including Bank of America, N.A. (collectively, the "**ABL Lenders**"), and the ABL Agent, provided revolving credit and other financial accommodations to the Loan Parties and certain of their affiliates.

46. On or about June 30, 2023, Debtor BPI Acquisition Company, LLC acquired Cardone. Thereafter, pursuant to Supplement No. 8 to the ABL Security Agreement, dated as of August 22, 2023, Cardone became a Loan Party. Cardone granted a security interest to the ABL Agent, for the benefit of the ABL Lenders, in substantially all of its assets, including inventory, accounts, deposit accounts, and proceeds of the foregoing, to secure the obligations under the ABL Facility.

47. In contrast, Defendants Broad Street and Broad Street Holdings are not Loan Parties, or otherwise party to the ABL Facility, but rather are parties to the Aequum Facility (described below).

48. Pursuant to the stipulations in the Final DIP Order, as of the Petition Date, the Loan Parties were "justly and lawfully indebted and liable . . . without defense, challenge, objection, claim, counterclaim, or offset of any kind" to the applicable ABL Secured Parties for not less than the aggregate amount of $446,335,708.15 in ABL Debt and Cash Management Obligations (each as defined in the Final DIP Order).[27]

---

[26] Capitalized terms used but not defined in this section shall have the meanings ascribed in the ABL Credit Documents.

[27] Final Order at ¶ G.(viii). The amount of Cash Management Obligations listed in the Final DIP Order was $219,447,227. Since the entry of the Final DIP Order, that amount has been reconciled with the Debtors and

49.     Pursuant to the ABL Facility, certain of the Loan Parties, including Defendants FBG LLC and Cardone, granted to the ABL Agent, for the benefit of the ABL Lenders, a first priority lien (subject to certain other liens held by certain term loan lenders) on substantially all of their respective assets, including inventory, accounts receivable, and the proceeds thereof as security for repayment of the obligations under the ABL Credit Documents.

50.     UCC-1 financing statements were filed to perfect the ABL Agent's liens created under the ABL Facility, including with respect to FBG LLC on February 5, 2018 (which financing statement was continued in accordance with applicable law) and with respect to Cardone on August 22, 2023. Each such financing statement was effective as of the Petition Date and remains effective as of the filing date of this Complaint.

51.     The liens and security interests granted to the ABL Agent pursuant to the ABL Credit Documents and the Term Loan Agents pursuant to the Term Loan Credit Agreements (as defined below), and the exercise of any right or remedy by the Plaintiffs thereunder, are subject to the provisions of that certain Amended and Restated Intercreditor Agreement, dated as of February 26, 2019, among the ABL Agent, as administrative agent and collateral agent under the ABL Credit Documents, Jefferies Finance LLC ("**Jefferies**"), as administrative agent and collateral agent under the First Lien Loan Documents (with WSFS, as Jefferies' successor and assignee), Jefferies, in its capacity as administrative agent and collateral agent under the Second Lien Loan Documents (with WSFS, as Jefferies' successor and assignee), and GLAS USA LLC, as collateral agent for the holders of Additional Pari Passu Obligations (the "**Intercreditor Agreement**", as amended by Amendment No. 1 to Amended and Restated Intercreditor Agreement, dated as of July 31, 2020).

---

should be $197,324,229, reflecting a reduction in supply chain financing obligations owed to Bank of America, N.A. from $119,453,813 to $97,330,815.73.

Pursuant to the Intercreditor Agreement, the ABL Agent holds a first priority lien in accounts receivable and inventory of the ABL Loan Parties.

**D.      The Term Loan Credit Agreements**

52.      The 1L Term Loans arise under that certain First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**1L Credit Agreement**" and, collectively with related lien and collateral documents, the "**1L Term Loan Documents**"), by and among First Brands, First Brands Group Intermediate LLC (f/k/a Trico Group Holdings, LLC) ("**Parent**"), WSFS, as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA and thereafter Jefferies Finance LLC as collateral agent, pursuant to the 1L Agency Succession Agreement defined below), and the lenders party thereto (together with the collateral agent, the "**1L Term Loan Secured Parties**").

53.      As of November 9, 2025, term loans issued under the 1L Credit Agreement had an outstanding principal balance of not less than $4,625,413,695.97, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable), costs, charges, indemnities, and other obligations incurred in connection therewith (hereafter the "**1L Term Loans**").[28]

54.      Pursuant to the 1L Credit Agreement, Parent provided a guaranty in favor of the collateral agent, whereby Parent and certain of its subsidiaries guaranteed on a joint and several basis "Obligations" (as defined in the 1L Credit Agreement) thereunder. In order to secure the Obligations, the Lead Borrower (as defined in the 1L Credit Agreement), Parent, certain

---

[28]      *See* Final DIP Order, ¶ G(ix).

subsidiaries of the Lead Borrower and the collateral agent entered into a Security Agreement (as amended, restated, amended and restated, supplemented, modified, or otherwise in effect from time to time), dated as of February 2, 2018 (the "**1L Security Agreement**"), by and among the Lead Borrower, the Parent, each Restricted Subsidiary that is a party thereto, and WSFS, as collateral agent (as successor to Goldman Sachs Bank USA and thereafter Jefferies Finance LLC as collateral agent, pursuant to the Agency Resignation, Appointment and Assumption Agreement, dated as of November 3, 2025, by and among Jefferies Finance LLC, as the existing agent, WSFS, as the successor agent, and the Loan Parties party thereto (the "**1L Agency Succession Agreement**")).

55. On or about June 30, 2023, Debtor BPI Acquisition Company, LLC acquired Cardone. Thereafter, pursuant to Supplement No. 9 to the 1L Credit Agreement, dated as of August 22, 2023, Cardone became a Loan Party. Cardone granted a security interest to the 1L Term Loan Agent, for the benefit of the 1L Term Loan Secured Parties, in substantially all of its assets, including inventory, accounts, deposit accounts, and proceeds of the foregoing, to secure the obligations under the 1L Term Loan Facility.

56. In contrast, Defendants Broad Street and Broad Street Holdings are not Loan Parties, or otherwise party to the 1L Credit Agreement.

57. The 1L Security Agreement and corresponding UCC-1 financing statements granted WSFS and its predecessors a perfected lien over Collateral, including Term Priority Collateral (in each case, as defined in the 1L Credit Agreement) as of February 2018, subject to the Intercreditor Agreement, as stated above. The 1L Term Loan Secured Parties also filed or caused to be filed UCC-1 financing statements to perfect the liens created under the Collateral Documents (as defined in the 1L Credit Agreement) with respect to Cardone on August 23, 2023.

58.     As of November 9, 2025, the outstanding principal balance of the term loans made pursuant to the 2L Credit Agreement was not less than $540,000,000.00, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable), costs, charges, indemnities, and other obligations incurred in connection therewith (hereafter "**2L Term Loans**").[29]

59.     The 2L Term Loans arise under that certain Second Lien Term Loan Agreement, dated as of February 26, 2019 (as amended, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**2L Credit Agreement**" and, collectively with related lien and collateral documents, the "**2L Term Loan Documents**"), by and among First Brands, Parent, WSFS, as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA and thereafter Jefferies Finance LLC as collateral agent, pursuant to the 2L Agency Succession Agreement defined below), and the lenders party thereto (together with the collateral agent, the "**2L Term Loan Secured Parties**").

60.     Pursuant to the 2L Credit Agreement, Parent provided a guaranty in favor of the collateral agent, whereby Parent and certain of its subsidiaries guaranteed on a joint and several basis "Obligations" (as defined in the 2L Credit Agreement) thereunder. In order to secure the Obligations, the Lead Borrower (as defined in the 2L Credit Agreement), Parent, certain subsidiaries of the Lead Borrower, and WSFS, as collateral agent, entered into a Security Agreement (as amended, restated, amended and restated, supplemented, modified, or otherwise in effect from time to time), dated as of February 26, 2019 (the "**2L Security Agreement**"), by and among the Lead Borrower, the Parent, each Restricted Subsidiary that is a party thereto, and

---

[29]     *See* Final DIP Order, ¶ G(xii).

WSFS, as collateral agent (as successor to Credit Suisse AG, Cayman Islands Branch, and then Jefferies Finance LLC, as collateral agents, pursuant to the Agency Resignation, Appointment and Assumption Agreement, dated as of November 3, 2025, by and among Jefferies Finance LLC, as the existing agent, WSFS, as the successor agent, and the Loan Parties party thereto (the "**2L Agency Succession Agreement**")).

61. Pursuant to Supplement No. 7 to the 2L Credit Agreement, dated as of August 22, 2023, Cardone became a Loan Party. Cardone granted a security interest to the 2L Term Loan Agent, for the benefit of the 2L Term Loan Secured Parties, in substantially all of its assets, including inventory, accounts, deposit accounts, and proceeds of the foregoing, to secure the obligations under the 2L Term Loan Facility.

62. In contrast, Defendants Broad Street and Broad Street Holdings are not Loan Parties, or otherwise party to the 2L Credit Agreement.

63. The 2L Security Agreement and corresponding UCC-1 financing statements granted WSFS and its predecessors a perfected lien over Collateral, including Term Priority Collateral (in each case, as defined in the 2L Credit Agreement) as of February 2019, with priority that was subordinated to the ABL Secured Parties with respect to ABL Priority Collateral, as defined under and pursuant to the Intercreditor Agreement. This includes perfected liens on the inventory of First Brands and the domestic subsidiaries of First Brands that are parties to the ABL Credit Agreement, including both replenished inventory and the original inventory that existed in 2019. The 2L Term Loan Secured Parties also filed or caused to be filed UCC-1 financing statements to perfect the liens created under the Collateral Documents (as defined in the 2L Credit Agreement) with respect to Cardone on August 23, 2023.

64. The Side Car Loans arise under that certain First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**Side Car Credit Agreement**," collectively with related lien and collateral documents, the "**Side Car Loan Documents**," and together with the 1L Term Loan Documents and the 2L Term Loan Documents, the "**Term Loan Documents**"), by and among First Brands, Parent, GLAS, as administrative agent and collateral agent, and the lenders party thereto (together with the collateral agent, the "**Side Car Loan Secured Parties**," and collectively with the 1L Term Loan Secured Parties and 2L Term Loan Secured Parties, the "**Term Loan Secured Parties**").

65. As of November 9, 2025, the outstanding principal balance of the term loans made pursuant to the Side Car Credit Agreement was not less than $250,000,000.00, plus, to the extent not otherwise included, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable), costs, charges, indemnities, and other obligations incurred in connection therewith (hereafter "**Side Car Term Loans**").[30]

66. Pursuant to the Side Car Credit Agreement, Parent provided a guaranty in favor of the collateral agent, whereby Parent and certain of its subsidiaries guaranteed on a joint and several basis "Obligations" (as defined in the Side Car Credit Agreement) thereunder. In order to secure the Obligations, First Brands, Parent, certain First Brands subsidiaries and the collateral agent entered into a Security Agreement (as amended, restated, amended and restated, supplemented, modified, or otherwise in effect from time to time), dated as of June 16, 2025 (the "**Side Car Security Agreement**"), by and among First Brands, Parent, and GLAS, as collateral agent, among others.

---

[30] *See* Final DIP Order, ¶ G(x).

67. Cardone became a Loan Party the day the Side Car Loan was incurred. In contrast, Defendants Broad Street and Broad Street Holdings are not Loan Parties, or otherwise party to the Side Car Credit Agreement.

68. The Side Car Security Agreement and corresponding UCC-1 financing statements granted GLAS a perfected lien over Collateral, including Term Priority Collateral (in each case, as defined in the Side Car Credit Agreement) as of June 2025, subject to the Intercreditor Agreement. The Side Car Loan Secured Parties also filed or caused to be filed UCC-1 financing statements to perfect the liens created under the Collateral Documents (as defined in the Side Car Credit Agreement) with respect to Cardone on June 17, 2025.

69. Together, the 1L Credit Agreement, the 2L Credit Agreement and the Side Car Credit Agreement shall be known as the "Term Loan Credit Agreements".

**E.      Broad Street and the Aequum Facility**

70. Broad Street is among several entities formed by the Debtors under the management of Patrick and Edward James and other former officers and directors, purportedly as a special purpose vehicle to facilitate off-balance sheet financing from Aequum without disclosure to Plaintiffs.

71. Specifically, Broad Street was formed on March 1, 2024, as a limited liability company under Delaware law to "purchase Acquired Assets from First Brands Group, LLC and such other suppliers as approved in writing by the [Aequum] Agent and to sell Eligible Inventory to Qualified Purchasers and any related business activities directly related thereto, in each case pursuant to and to the extent not prohibited by the [Aequum] Credit Agreement."

72. Patrick James was Broad Street's President and Chief Executive Officer, and Edward James was its Executive Vice President.

73.    On March 28, 2024, Broad Street entered into that certain Credit Agreement (as amended or otherwise modified, the "**Aequum Credit Agreement**" and the credit facility evidenced thereby, the "**Aequum Facility**"), by and among Broad Street, FBG LLC, as the servicer, Broad Street Holdings, as a loan party, the Aequum Lenders, and Aequum, as the administrative agent (the "**Aequum Agent**").

74.    Under the Aequum Facility, the Aequum Lenders purportedly provided an asset based revolving credit facility to Broad Street in an aggregate principal amount of $45 million.

75.    Pursuant to that certain Pledge and Security Agreement dated as of March 28, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Aequum Security Agreement**"), Broad Street and Broad Street Holdings purported to grant liens to Aequum in substantially all of their assets, including inventory, accounts, deposit accounts, and proceeds of the foregoing, to secure the obligations under the Aequum Facility.

76.    Aequum filed UCC-1 financing statements with respect to Broad Street and Broad Street Holdings on March 28, 2024, and with respect to FBG LLC on April 26, 2024. Upon information and belief, the security interested granted by FBG LLC to Broad Street is the backup security interest contained in the Purchase Agreement.[31] Those financing statements were filed more than six years after Plaintiffs filed their financing statements against FBG LLC (on February 5, 2018) and more than seven months after Plaintiffs filed their financing statement against Cardone (on August 22, 2023).

77.    Upon information and belief, Cardone did not pledge any assets to Aequum in connection with the Aequum Facility and Aequum did not file UCC-1 financing statements with

---

[31]    *See* Purchase Agreement, § 9.

respect to Cardone.

**F.      The FBG-Broad Street Transactions Did Not Result In a Transfer of the Inventory Collateral to Broad Street to Which Aequum's Liens Could Have Attached**

78.      In connection with the Aequum Facility, Broad Street entered into a series of agreements with FBG LLC for the ostensible purpose of purchasing and selling finished goods inventory, although the Debtors' books and records confirm that FBG LLC never owned or held any interest in the Inventory Collateral. After entering into the transaction documents, Broad Street then purported to pledge that finished-goods inventory to Aequum as security for the Aequum Facility. From time to time after Broad Street purportedly purchased the finished inventory, Broad Street purportedly sold and transferred the goods back to FBG LLC in exchange for other finished goods.

79.      In reality, Broad Street and FBG LLC did not comply with the terms of the agreements between them. On paper, it appeared as if millions of dollars of inventory had been exchanged, but in reality FBG LLC never owned any of the finished goods inventory it purported to sell to Broad Street. Instead, at all relevant times, the Inventory Collateral was continuously owned by Cardone and subject to Plaintiffs' prior and perfected security interests.

*i.      How the FBG-Broad Street Transaction Agreements and Related Schedules were Supposed to Work According to the Documents.*

80.      On paper, the commercial relationship between Broad Street and FBG LLC involved a series of two-step transactions similar to the scheme set forth in the Indictment.[32] Upon

---

[32]    *See Declaration Of Eric Weisheit In Support Of UMB Bank N.A.'s (1) Emergency Motion To Enforce Stipulation And Agreed Order Regarding Adequate Protection Of UMB Bank, N.A. And The UMB Lenders And (2) Second Objection And Reservation Of Rights To Emergency Motion Of Debtors For Interim And Final Orders (I) Authorizing Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, And (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To The Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief* [Docket 486-1].

**Aequum's Exhibit 4**
**Page 22 of 45**

information and belief, the scheme set forth in the Indictment is a loan involving Aequum.

81.    Step One was for FBG LLC to sell finished goods inventory to Broad Street in exchange either for cash consideration or for eligible replacement inventory, as reflected in the Purchase Agreement, dated as of March 28, 2024, by and between FBG LLC, as seller, and Broad Street, as purchaser (the "**Purchase Agreement**").

82.    Under the Purchase Agreement, FBG LLC agreed to sell Broad Street certain inventory meeting enumerated quality and title criteria identified on an accompanying schedule to Broad Street "free and clear" of liens. Despite having no interest in the goods, FBG LLC represented it had title to such inventory.

83.    The Purchase Agreement provides that "[t]he purchase Price for the Acquired Assets will be the fair market value thereof, as determined by [Broad Street], in its reasonable discretion (the '**List Price**')." The cash purchase price for the inventory is the List Price less the Deferred Purchase Price (as defined in the Purchase Agreement), which is an amount determined by Broad Street on the applicable schedule.

84.    The Purchase Agreement further provides that "[i]n lieu of the List Price (or as part of a partial payment thereof), upon mutual agreement by [Broad Street] and [FBG LLC], each in their respective sole and absolute discretion, [Broad Street] and [FBG LLC] may agree to an Exchange-in-Kind[.]" The Purchase Agreement defines Exchange-in-Kind as "any transaction in which Inventory owned by [Broad Street] (such Inventory, the "**Exchange-in-Kind Assets**") is conveyed, transferred and/or assigned to [FBG LLC] in exchange for Acquired Assets of equal or greater market value, as determined by [Broad Street], in its sole discretion." The Purchase Agreement also provides that Broad Street "shall convey, transfer, assign and deliver Inventory having a fair market value equal to the Acquired Assets being delivered to [Broad Street] in

connection with such Exchange-in-Kind."

85.     Between March 28, 2024 and August 31, 2025, Broad Street and FBG LLC executed nineteen (19) schedules with respect to the Purchase Agreement (each a "**Purchase Agreement Schedule**"). Each Purchase Agreement Schedule contains identical terms, and provides that, as of the "Closing Date," Broad Street would (i) purchase for cash all of FBG LLC's rights in the inventory identified on Exhibit A to the Purchase Agreement Schedule, or (ii) exchange Broad Street's rights in inventory listed on an Exhibit B to the Purchase Agreement Schedule for FBG LLC's rights in the inventory identified on Exhibit A to the Purchase Agreement Schedule. Exhibit C was to be a completed Purchase Order from a Qualified Purchaser (each as defined in the Purchase Agreement Schedule).

86.     Despite those requirements, no Exhibit B or Exhibit C was ever attached to any Purchase Agreement Schedule.

87.     Each Purchase Agreement Schedule further provides that FBG LLC "acknowledges and agrees that the List Price for the Acquired Assets described on Exhibit A to this Schedule is $60,000,000" and that Broad Street "has determined the Deferred Purchase Price adjustment to be 25%." Each Purchase Agreement Schedule also provides that FBG LLC "agrees to sell, and [Broad Street] agrees to purchase, the Acquired Assets, described on Exhibit A to this Schedule for a List Price equal to $45,000,000[.]" The List Price was to be paid (a) "in cash by wire transfer in immediately available funds[,]" (b) with Inventory of [Broad Street], as an Exchange-in-Kind," or (iii) "a combination of (a) and (b), so long as in any event the total amount paid by [Broad Street] equal the applicable List Price."

88.     Step Two of the transaction cycle provides for FBG LLC to re-purchase all the inventory it had purportedly sold to Broad Street in exchange for cash consideration or in-kind

inventory. Step Two was described in that certain Sale Agreement, also dated as of March 28, 2024, this time with FBG LLC, as buyer, and Broad Street, as seller (the "**Sale Agreement**" and together with the Purchase Agreement, the "**FBG-Broad Street Transaction Agreements**"). Pursuant to the Sale Agreement, Broad Street agreed to sell the inventory identified on an accompanying schedule to FBG LLC "free and clear" of liens, other than liens that are automatically released upon the consummation of each sale. There is also a Parent Purchase Agreement, dated March 28, 2024, by and between Broad Street, as seller, and Viceroy Private Capital, LLC, as buyer (the "**Parent Purchase Agreement**"). Pursuant to the Parent Purchase Agreement, Viceroy Private Capital, LLC ("**Viceroy**") agreed to purchase inventory from Broad Street in the event that FBG LLC failed to comply with its obligations under the Sale Agreement within 180 days after the applicable Closing Date for the sale to be consummated under the Sale Agreement. As with the Sale Agreement, the sale to Viceroy Private Capital, LLC was to be "free and clear" of liens, other than liens that are automatically released upon the consummation of each sale. Upon information and belief, Broad Street did not sell any goods to Viceroy under the Parent Purchase Agreement.

89. The "Closing Date" of each sale was to occur within 180 days of the Sale Agreement or applicable schedule.

90. Between March 28, 2024 and August 31, 2025, Broad Street and FBG LLC executed nineteen (19) schedules with respect to the Sale Agreement (each a "**Sale Agreement Schedule**" and together with each Purchase Agreement Schedule, the "**Schedules**"). Like the Purchase Agreement Schedules, each Sale Agreement Schedule contains identical terms. No purchase price for the inventory is identified on any of the Sale Agreement Schedules.

**Aequum's Exhibit 4**
**Page 25 of 45**

91.     Each Purchase Agreement Schedule includes the same inventory on each Sale Agreement Schedule. Each Schedule is signed by Edward James on behalf of Broad Street and by Michael Baker on behalf of FBG LLC. According to the Debtors, Michael Baker, the Debtors' former Corporate Strategy Officer, worked closely with Edward James to "implement the fraudulent financings[.]"[33]

### ii.     FBG LLC and Broad Street Did Not Follow the Terms of the FBG-Broad Street Transaction Agreements and Related Schedules

92.     During the Chapter 11 Cases, the Debtors' professionals examined the books and records, financial records, and inventory reports, and conducted diligence related to the Aequum Facility and prepetition business practices of the Debtors, including FBG LLC, Cardone and Broad Street. Based on that examination, the Debtors' co-CRO, Daniel Jerneycic, concluded that neither Broad Street nor FBG LLC complied with the terms of the FBG-Broad Street Transaction Agreements.[34]

93.     From the inception of the FBG LLC-Broad Street relationship until the Debtors filed their Chapter 11 proceedings, the two-step transaction cycle was attempted 19 times. Only the initial transaction involved cash. All other purported transfers of finished goods inventory were allegedly "paid" for with in-kind exchanges of inventory despite no Purchase Agreement Schedule ever including an Exhibit B.

94.     The Debtors' examination also determined that Broad Street did not directly or indirectly transfer any funds to FBG LLC or Cardone for inventory purportedly purchased and sold under the FBG-Broad Street Transaction Agreements.[35]

---

[33]    *See Amended Complaint* [Docket No. 141] filed in Adv. Pro. No. 25-03803 (CML), at ¶ 115.

[34]    *Amended Declaration Of Daniel Jerneycic* [Docket No. 836] ("**Jerneycic Declaration**"), at ¶ 44.

[35]    *Id.* at ¶ 47.

**Aequum's Exhibit 4**
**Page 26 of 45**

95.    Rather, of the approximately $43.8 million purportedly loaned by Aequum to Broad Street, approximately $42.9 million was transferred as six separate wires, all under $10 million, by Broad Street to Bowery Finance II (a non-First Brands' entity alleged by the Debtors to have been used to effect the alleged fraudulent scheme) and not to FBG LLC.[36]



96.    The $42.9 million was then split among five First Brands' entities other than FBG LLC, the supposed seller, or Cardone, the actual owner of the Inventory Collateral. Of course, even if the funds had gone to FBG LLC or Cardone (which they did not), the amount was $2.1 million less than the cash amount required to be paid under the Purchase Agreement and Purchase Agreement Schedule No. 1. Upon information and belief, $900,000 of the $2.1 million shortfall was paid by Aequum to Helios Strategic Advisors ("**Helios**"), an entity not a part of the First Brand Enterprise. Helios was allegedly engaged "to assist in identifying potential sources of funding" and advised on the Aequum Facility.[37]

---

[36]    *See Amended Complaint* [Docket No. 141] filed in Adv. Pro. No. 25-03803 (CML), at ¶ 61.

[37]    *See Objection Of The Official Committee Of Unsecured Creditors To Onset's Motion To Quash Or, In The Alternative, For A Protective Order* [Docket No. 1162], at 29.



97.     The flow of funds reflected in the preceding paragraphs is consistent with the allegations included in the Indictment, which references obfuscating funds as customer receipts.[38]

98.     After Purchase Agreement Schedule No. 1, each purported sale of inventory from FBG LLC to Broad Street was apparently considered by the parties as an Exchange-in-Kind under the Purchase Agreement. Under an Exchange-in-Kind, inventory had to be "conveyed, transferred and/or assigned" to FBG LLC as consideration. Upon information and belief, that never occurred at the time of the purported sale to Broad Street. Instead, the Purchase Agreement provided only for FBG LLC to act as a backstop purchaser, obligated to buy the inventory 180 days after the date of the relevant Purchase Agreement Schedule only if the inventory had not been sold in the interim.

99.     The Debtors' books and records also reflect that Broad Street received periodic cash inflows from seemingly random entities other than FBG LLC in order to make interest payments under the Aequum Facility, rather than receiving payments from FBG LLC or another entity for

---

[38]    *See* Indictment, ¶ 26.

the repurchase of inventory.[39]

100.    The Debtors' records also reflect an approximate $49 million increase in Broad Street's inventory immediately following the initiation of the FBG-Broad Street Transactions but no subsequent increases or decreases to inventory for subsequent purported purchases or resales.[40] In contrast, at all relevant times, FBG LLC's records reflect that it never owned any inventory.[41] The books and records of Debtor First Brands Group Holdings, LLC, the indirect parent company of FBG LLC, and certain of its Debtor subsidiaries, also do not show any inventory transfers to Broad Street.[42]

101.    Upon information and belief, (i) all of the inventory FBG LLC purported to sell to Broad Street was owned by Cardone, (ii) Cardone was the tenant for the Cardone Warehouse in Arlington, Texas where the Inventory Collateral was stored, and (iii) FBG LLC did not have the right to sell inventory belonging to Cardone.

102.    According to the Debtors, "the available books and records of Cardone reflect relatively flat inventory levels, without evidence of [the] periodic transactions reflecting decreases (sales) or increases (purchases) of inventory from Aequum or Broad Street"[43] papered by FBG LLC and Broad Street.

103.    Plaintiffs allege that none of the purported sales and repurchases between FBG LLC and Broad Street involved actual goods; instead the Inventory Collateral remained at the Cardone Warehouse in Cardone's possession and subject to Plaintiffs' prior perfected liens. Even assuming

---

[39]    Jerneycic Declaration, at ¶ 9.

[40]    *Id*. at ¶ 49.

[41]    *Id*. at ¶ 50.

[42]    *Id*. at ¶ 10.

[43]    *Id*. at ¶ 50.

FBG LLC had the power to sell and claimed to be holding the goods in storage, Article 2 of the Uniform Commercial Code, as enacted in Texas, provides that such retention of possession by the alleged seller is fraudulent as to the seller's creditors.[44] As creditors of FBG LLC, Plaintiffs may treat the purported sales to Broad Street as void. Plaintiffs have elected to treat the purported sales to Broad Street as void. Because the transfers are void, title in the Inventory Collateral never transferred to Broad Street and Aequum's liens never attached to the Inventory Collateral.

104. The Debtors' co-CRO further concluded that the inventory listed on the Schedules to the FBG-Broad Street Transaction Agreements were inadequately described, containing generic descriptions and SKU numbers.[45] Thus, any individual piece of inventory could not have possibly been identified for purchase (after the initial Purchase Agreement) or subsequent sale without additional documentation. Nor could its fair market value be determined with such limited information. In fact, the purchase price set forth on the Schedules often differed from the value ascribed on the applicable borrowing base certificate.[46] It thus appears that Broad Street and FBG LLC purported to sell and re-purchase the same inventory for no legitimate business purpose.

105. These facts were easily determinable by Aequum had it exercised basic due diligence to establish the legitimacy of Broad Street's purported acquisition of finished goods inventory from FBG LLC.

106. Aequum apparently never confirmed FBG LLC's claim of ownership or authority to sell Cardone's inventory to Broad Street, nor did Aequum determine whether the Inventory Collateral could be transferred free and clear of Plaintiffs' first and prior perfected security interests. Aequum apparently accepted false representations made by FBG LLC and Broad Street

---

[44] *See* Tex. Bus. & Com. Code 2.402(b).

[45] Jerneycic Declaration, at ¶ 14.

[46] *Id*.

representatives, including Edward James, now indicted for fraud, as to whether the sales to Broad Street were free and clear of Plaintiffs' liens.

107.    In fact, Broad Street never obtained an interest in the inventory to which Aequum's security interest could attach and at all times the Inventory Collateral remained subject to Plaintiffs' prior perfected liens against Cardone and the other Loan Parties, including FBG LLC. Therefore, Plaintiffs have the right to take possession of the Inventory Collateral and exercise all rights and remedies permitted under applicable law, subject to obtaining relief from the automatic stay.

### iii.    *Broad Street Did Not Operate as a Special Purpose Vehicle*

108.    In addition to FBG LLC and Broad Street failing to comply with the terms of their agreements, the Debtors' co-CRO also concluded that Broad Street did not operate as a stand-alone, discrete corporate entity.

109.    For example, although an independent manager was appointed for Broad Street, the remaining managers overlapped with management of Patrick James' other entities.[47] In addition, the Debtors found no evidence of board meetings, resolutions, or other functions undertaken by the managers of Broad Street.[48]

110.    Furthermore, as previously alleged, the monies flowing from Aequum into Broad Street were disbursed to a cash pooling account used by several other special purpose entities, from which they were swept and distributed to a number of entities (none of which were the supposed seller of inventory under the FBG-Broad Street Transaction Agreements or related Schedules).[49]

---

[47]    Jerneycic Declaration, at ¶ 8.

[48]    *Id.*

[49]    *Id.* at ¶¶ 45 – 46.

111.    Finally, Broad Street's books and records were not consistent with maintaining separateness of ownership of inventory. Indeed, as previously alleged, after Broad Street's initial "purchase" of inventory, Broad Street's books and records do not reflect increases to inventory for purchases of additional inventory or decreases for subsequent sales.[50]

## G.    Plaintiffs' Liens Were Not Released in Favor of Aequum

112.    Pursuant to the terms and conditions of the ABL Credit Facility and the Term Loan Credit Agreements, the Inventory Collateral could not be sold free and clear of Plaintiffs' liens unless the parties complied with the disposition provisions of the facilities, including obtaining Plaintiffs' consent or approval of the disposition and affirmative release of their liens.

113.    Plaintiffs did not learn of the existence of Broad Street, Broad Street Holdings, the Aequum Facility or the FBG-Broad Street Transaction Agreements until shortly before the Debtors; bankruptcy filings in late-September 2025. Neither FBG LLC nor any Loan Party informed Plaintiffs of them prior to that time. In contrast, Aequum knew, or should have known, that the ABL Agent and the Term Loan Agents had superior and priority liens on all inventory of Cardone and FBG LLC.

114.    Plaintiffs never consented to, or otherwise approved, authorized or ratified, any purported sales of Inventory Collateral to Broad Street. Nor could they have, since Plaintiffs had no notice of the purported sales until sometime prior to the bankruptcy filings in late-September 2025.

115.    None of Broad Street's activities, including the purported purchases and sales of the Inventory Collateral or the Aequum loans, were reflected on the Debtors' financial statements.

---

[50]    *Id*. at ¶¶ 10, 49.

116.    Moreover, even though the Loan Parties and Aequum knew that the Inventory Collateral had been pledged to Plaintiffs, they never gave Plaintiffs notice of the Aequum Facility or purported purchases or sales of Inventory Collateral until sometime prior to the bankruptcy filings in late-September 2025. Furthermore, neither Aequum nor the Loan Parties ever sought a release of Plaintiffs' liens from Plaintiffs at any point in time.

117.    Simply put, the Loan Parties, Broad Street and Broad Street Financial, did not comply with the disposition covenants in the ABL Credit Agreement or the Term Loan Credit Agreements.

118.    Plaintiffs' liens were not automatically released pursuant to the lien release provisions of the ABL Credit Agreement or the Term Loan Credit Agreements.

119.    Therefore, even if an interest in the Inventory Collateral had been conveyed to Broad Street under the FBG-Broad Street Transaction Agreements (which, as set forth above, did not happen), the Inventory Collateral remained subject to Plaintiffs' prior, perfected liens because (i) the express terms of the ABL Credit Agreement, the Term Loan Credit Agreements, and their respective and related loan documents did not provide for the automatic release of such liens under the circumstances, and (ii) Plaintiffs never released their liens.

120.    Thus, Broad Street's interest in the Inventory Collateral, if any, was at all times subject to Plaintiffs' liens, which always have had priority over any liens claimed by Aequum.

**H.    A Preliminary Injunction is Necessary Due to (i) Aequum's Refusal to Recognize Plaintiffs' Senior First Priority Liens in the Inventory Collateral, and (ii) Aequum's Clear Intent to Sell the Inventory Collateral and Not Escrow the Proceeds**

121.    Aequum has refused to recognize that its liens, if any, are subordinate to Plaintiffs' senior priority liens in the Inventory Collateral. Even after Plaintiffs attempted to reach agreement with Aequum to preserve the Inventory Collateral pending a final determination by this Court of the Plaintiffs' competing claim to that collateral, Aequum continues to sell the Inventory Collateral

without agreeing to escrow the proceeds.

122. Upon information and belief, Aequum intends to continue to sell the Inventory Collateral and, upon information and belief, distribute the proceeds from the sale to creditors of its own in an attempt to thwart Plaintiffs' rights and ability to seek the very relief requested therein. If these transactions are consummated and the proceeds are not escrowed, Aequum will be rewarded for disregarding Plaintiffs' liens and causing Plaintiffs imminent and irreparable harm for which there will be no adequate remedy at law.

**COUNT I**
**Declaratory Judgment**
**Pursuant to 28 U.S.C. §§ 2201 and 2202**
*Plaintiffs' Liens in the Inventory Collateral Are Senior to Aequum's Liens*

123. Plaintiffs repeat, reallege, and incorporate by reference all allegations set forth above as if fully set forth herein.

124. This is a claim for declaratory relief brought under 28 U.S.C. §§ 2201 and 2202 and Bankruptcy Rules 7001(b) and (i).

125. Plaintiffs have valid, properly perfected, and enforceable first-priority liens and security interests upon all of the Inventory Collateral and proceeds thereof. Plaintiffs' liens and security interests have been in place and perfected since at least February 5, 2018, with respect to FBG LLC and August 22, 2023 with respect to Cardone.

126. Aequum asserts it has valid, properly perfected, and enforceable first-priority liens and security interests upon all of the assets of Broad Street, including inventory and proceeds thereof, dating from no earlier (if at all) than March 28, 2024.

127. FBG LLC never held an interest in the Inventory Collateral or in any of the finished goods inventory purported to be sold or repurchased under the terms of the FBG-Broad Street Transaction Agreements, and FBG LLC and Broad Street failed to comply with the FBG-Broad

34
**Aequum's Exhibit 4**
**Page 34 of 45**

Street Transaction Agreements.

128.    The inventory purportedly sold to Aequum by FBG LLC was retained in the Cardone Warehouse in Arlington, Texas, leased exclusively by Cardone, not FBG LLC, and such retention of possession by Cardone was fraudulent as to Plaintiffs.

129.    Broad Street did not acquire title or any interest in the inventory purportedly sold to it by FBG LLC, or from Cardone.

130.    Broad Street lacked any interest in the inventory it purportedly pledged to Aequum.

131.    Aequum's security interest did not attach to the Inventory Collateral.

132.    Aequum nonetheless claims an interest in the Inventory Collateral that it asserts is superior to Plaintiffs' interests.

133.    A real and justiciable controversy exists as to whether Aequum holds valid, perfected liens in the Inventory Collateral.

134.    Plaintiffs never consented to the purported sale of the Inventory Collateral nor released their liens. None of the provisions of the ABL Credit Agreement or Term Loan Credit Agreements permitting dispositions of property free and clear of Plaintiffs' liens apply to the transactions under which Broad Street purportedly acquired an interest in the Inventory Collateral. Thus, to the extent Aequum claims valid, perfected liens in the Inventory Collateral, a real and justiciable controversy exists as to the priority of the liens in such collateral as between Plaintiffs and Aequum under applicable state law.

135.    Alternatively, even if the provisions of the ABL Credit Agreement or Term Loan Credit Agreements permitted the disposition of the Inventory Collateral, the August 2025 Sale Agreement Schedule shows Inventory Collateral was to be re-sold by Broad Street to FBG LLC free and clear of Aequum's purported liens. To the extent such Inventory Collateral was actually

conveyed to FBG LLC, it would be subject to Plaintiffs' liens, not Aequum's liens, as of the Petition Date.

136. Resolution of these controversies is necessary to determine the validity, priority, or extent of a lien or other interest in property of the Debtors and to define the Debtors' rights and obligations under the ABL Facility and Aequum Facility.

137. Based upon the foregoing, Plaintiffs request this Court to enter a judgment declaring that Plaintiffs, on behalf of the ABL Lenders and the Term Loan Secured Parties, hold valid, properly perfected and enforceable liens in the Inventory Collateral that are senior in priority and superior to the liens (if any) of Aequum.

## PRAYER FOR RELIEF

For the reasons stated herein, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs for the following relief:

A. Enter a preliminary injunction prohibiting Aequum from distributing any proceeds realized from a sale or other disposition of the Inventory Collateral and directing Aequum to deposit such proceeds into escrow in an interest-bearing account, which proceeds must remain pending the adjudication of this action;

B. Enter a judgment declaring that Plaintiffs, on behalf of the ABL Lenders and the Term Loan Secured Parties, hold valid, properly perfected and enforceable liens in the Inventory Collateral that are senior in priority and superior to Aequum's purported liens in that collateral;

C. Award Plaintiffs their reasonable and necessary attorneys' fees and court costs; and

D. Award Plaintiffs such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

Date: April 1, 2026

Respectfully submitted,

By: */s/ Toby L. Gerber*

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Jason I. Blanchard (SBT 24130197)
Michael Berthiaume (SBT 24066039)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
kristian.gluck@nortonrosefulbright.com
jason.blanchard@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to Plaintiff Bank of America, N.A., as Administrative Agent and Collateral Agent to the ABL Lenders*

By: */s/ Tom A. Howley*

Tom Howley (Texas Bar No. 24010115)
Eric Terry (Texas Bar No. 00794729)
HOWLEY LAW PLLC
700 Louisiana Street, Suite 4220
Houston, TX 77002
Telephone: 713-333-9125
Email: tom@howley-law.com
eric@howley-law.com

-and-

Scott J. Greenberg (admitted *pro hac vice*)
Christopher M. Joralemon (admitted *pro hac vice*)
Jordan Estes (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
Email: sgreenberg@gibsondunn.com
cjoralemon@gibsondunn.com
jestes@gibsondunn.com

37

-and-

Robert Marsters (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202-955-8500
Email: rmarsters@gibsondunn.com

*Co-Counsel for Plaintiff Wilmington Savings Fund Society, FSB and Co-Counsel for Plaintiff GLAS USA LLC*

-and-

Jeffrey R. Gleit (admitted *pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212-484-3900
Email: jeffrey.gleit@afslaw.com

Justin A. Kesselman (admitted *pro hac vice*)
ARENTFOX SCHIFF LLP
800 Boylston Street
Boston, MA 02199
Telephone: 617-973-6100
Email: justin.kesselman@afslaw.com

Matthew R. Bentley (admitted *pro hac vice*)
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Chicago, IL 60606
Telephone: 312-258-5500
Email: matthew.bentley@afslaw.com

*Co-Counsel to Plaintiff Wilmington Savings Fund Society, FSB*

38

-and-

Alexandra P. Kolod (admitted *pro hac vice*)
MOSES SINGER
405 Lexington Avenue
New York, NY 10174
Telephone: 212-554-7800
Email: aoliver@mosessinger.com
      kkolbig@mosessinger.com
      apkolod@mosessinger.com

*Co-Counsel to Plaintiff GLAS USA LLC*

B1040 (FORM 1040) (12/24)

<table>
<tr><td colspan="2"><b>ADVERSARY PROCEEDING COVER SHEET</b><br>(Instructions on Reverse)</td><td colspan="2"><b>ADVERSARY PROCEEDING NUMBER</b><br>(Court Use Only)</td></tr>
</table>

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| See attached. | See attached. |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>See attached. | **ATTORNEYS** (If Known)<br><br>See attached. |
| **PARTY** (Check One Box Only)<br>□ Debtor   □ U.S. Trustee/Bankruptcy Admin<br>X Creditor   □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor   □ U.S. Trustee/Bankruptcy Admin<br>X Creditor   □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Pursuant to 28 U.S.C. §§ 2201 and 2202, this adversary proceeding concerns a dispute over the validity, priority and extent of liens claimed by Aequum in certain inventory purportedly acquired by Broad Street from FBG LLC and then pledged by Broad Street to Aequum.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
X 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
X 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
X 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ Over $1 million |

Other Relief Sought

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>FIRST BRANDS GROUP, LLC, et al., | BANKRUPTCY CASE NO.<br>25-90399 (CML) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Hon. Christopher M. Lopez |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/ Toby L. Gerber* | | |
| DATE<br><br>4/1/2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Toby L. Gerber | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## Plaintiffs and their Counsel

**Counsel to Plaintiff Bank of America, N.A., as Administrative Agent and Collateral Agent to the ABL Lenders**
c/o Toby L. Gerber
Kristian W. Gluck
Jason I. Blanchard
Michael Berthiaume
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
kristian.gluck@nortonrosefulbright.com
jason.blanchard@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com


**Co-Counsel for Plaintiff Wilmington Savings Fund Society, FSB and Co-Counsel for Plaintiff GLAS USA LLC**
c/o Tom Howley
Eric Terry
HOWLEY LAW PLLC
700 Louisiana Street, Suite 4545
Houston, TX 77002
Telephone: 713-333-9125
Email: tom@howley-law.com
        eric@howley-law.com


-and-

Scott J. Greenberg
Christopher M. Joralemon
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
Email: sgreenberg@gibsondunn.com
        cjoralemon@gibsondunn.com
        jestes@gibsondunn.com


-and-

Robert Marsters
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Telephone: 202-955-8500
Email: rmarsters@gibsondunn.com

**Co-Counsel to Plaintiff Wilmington Savings Fund Society, FSB**
c/o Jeffrey R. Gleit
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212-484-3900
Email: jeffrey.gleit@afslaw.com

-and-

Justin A. Kesselman
ARENTFOX SCHIFF LLP
800 Boylston Street
Boston, MA 02199
Telephone: 617-973-6100
Email: justin.kesselman@afslaw.com

-and-

Matthew R. Bentley
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Chicago, IL 60606
Telephone: 312-258-5500
Email: matthew.bentley@afslaw.com

**Co-Counsel to Plaintiff GLAS USA LLC**
c/o Alexandra P. Kolod
MOSES SINGER
405 Lexington Avenue
New York, NY 10174
Telephone: 212-554-7800
Email: aoliver@mosessinger.com
        kkolbig@mosessinger.com
        apkolod@mosessinger.com

<u>**Defendants and their Counsel**</u>

**Counsel to Defendant AEQUUM CAPITAL FINANCIAL II LLC**
c/o Kenneth J. Ottaviano
Stephanie K. Hor-Chen
**BLANK ROME LLP**
444 West Lake Street
Suite 1650
Chicago, IL 60606

- 2 -
**Aequum's Exhibit 4**
**Page 43 of 45**

Telephone: (312) 776-2600
Facsimile: (312) 776-2601
Email: Ken.Ottaviano@blankrome.com
    Stephanie.Horchen@blankrome.com

-and-

Jennifer K. Malow
BLANK ROME LLP
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: Jennifer.Malow@blankrome.com

**Counsel to Defendants FIRST BRANDS GROUP LLC, CARDONE INDUSTRIES, INC., BROAD STREET FINANCIAL, LLC, and BROAD STREET FINANCIAL HOLDINGS, LLC**
c/o Clifford William Carlson
WEIL GOTSHAL AND MANGES
700 Louisiana Street
Suite 3700
Houston, TX 77002
713-546-5248
Fax : 713-224-9511
Email: clifford.carlson@weil.com

**Counsel to Defendants BROAD STREET FINANCIAL, LLC, and BROAD STREET FINANCIAL HOLDINGS, LLC**
c/o Michael Fishel
FISHEL LAW GROUP
602 Sawyer, Suite 400
Houston, Texas 77007
Telephone: (713) 294-0379
Email: Michael@fishellawgroup.com

-and-

Elisha D. Graff
Bryce L. Friedman
David R. Zylberberg
Nicholas E. Baker
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Email: egraff@stblaw.com
    bfriedman@stblaw.com

david.zylberberg@stblaw.com
nbaker@stblaw.com

**Aequum's Exhibit 4**
**Page 45 of 45**