**Exhibit 29**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.[1]** | § | **(Emergency Hearing Requested)** |

## EMERGENCY MOTION
## OF DEBTORS FOR INTERIM AND FINAL
## ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE
## USING EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS,
## (B) IMPLEMENT ORDINARY COURSE CHANGES TO CASH MANAGEMENT
## SYSTEM, AND (C) HONOR CERTAIN RELATED PREPETITION OBLIGATIONS,
## (II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
## INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
## REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 9:00 A.M. (PREVAILING CENTRAL TIME) ON OCTOBER 1, 2025.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**THE DEBTORS HAVE REQUESTED THAT A HEARING BE CONDUCTED ON THIS MATTER ON OCTOBER 1, 2025, AT 9:00 A.M. (PREVAILING CENTRAL TIME).**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

> **PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

## Relief Requested

1. By this motion (the "**Motion**"), pursuant to sections 105, 345, 363, 364, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order (i) authorizing the Debtors to (a) continue using their existing Cash Management System (as defined below), including through the continued use of their existing bank accounts (the "**Bank Accounts**" and the financial institutions maintaining the Bank Accounts, the "**Banks**") and existing business forms (the "**Business Forms**"), (b) continue to perform and honor intercompany transactions between and among the Debtors and non-Debtor affiliates (the "**Non-Debtor Affiliates**") in the ordinary course of business (the "**Intercompany Transactions**" and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**"), in their business judgment,

2

(c) implement changes to their Cash Management System in the ordinary course of business, including opening new or closing existing Bank Accounts, and (d) honor certain prepetition obligations related to the Cash Management System; (ii) granting administrative expense priority for Intercompany Claims (as defined below); (iii) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts; and (iv) granting related relief.

2.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**"), respectively.

**<u>Background</u>**

3.     On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

4.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

3

5.	Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"),[2] filed contemporaneously herewith and incorporated herein by reference.

## Jurisdiction and Venue

6.	The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Cash Management System

7.	In the ordinary course of business, the Debtors utilize an integrated cash management system in North America (the "**Cash Management System**") to collect, transfer, and disburse funds generated by their operations and the operations of their Non-Debtor Affiliates. The Cash Management System operates as a cash pool among the Debtor entities and is tailored to meet the Debtors' operating needs as a leading global supplier of aftermarket automotive parts.

8.	The Cash Management System has features similar to those commonly employed by businesses of comparable size and scale to the Debtors.  Large, global businesses like the Debtors use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  Thus, every cash pool participant has either a net payable or net receivable position on the Debtors' books.  The Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations,

---

[2]	Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, produce financial forecasts and reports, streamline use of their cash and invested funds, reduce administrative expenses, facilitate tracking between certain entities and business units, and obtain accurate account balances and other financial data.

9.      The Debtors' treasury team, now operating under the control of the Debtors' Chief Restructuring Officer, maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  In addition, the Debtors' treasury and accounting teams regularly reconcile the Debtors' books and records to ensure that all transfers are properly recorded, and periodically settle intercompany balances arising between and among the Debtors and their Non-Debtor Affiliates.  While some of the Debtors' internal and external payments are automated, the Debtors' treasury and accounts payable teams approve and initiate manual wires, checks, and Automatic Clearing House ("**ACH**") payments when necessary.

10.      The Cash Management System is a critical component of the Debtors' day-to-day operations, and any disruption would adversely impact the Debtors' operations to the detriment of the Debtors, their estates, and all parties in interest in these chapter 11 cases.  Simply put, the Debtors' business, like any business of similar size, requires prompt and reliable access to cash and accurate cash tracking.  It is critical that the Cash Management System remains intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

11.      As explained in further detail below, the Bank Accounts that comprise the Cash Management System generally function as follows:  (i) a single centralized concentration account held by FBG and maintained at Bank of America ("**BOFA**" and the centralized

5

concentration account, the "**Main Concentration Account**") serves as the main concentration account for the Cash Management System; (ii) non-BOFA concentration accounts maintained by certain Debtor subsidiaries of FBG (the "**Subsidiary Concentration Accounts**") are swept periodically into the Main Concentration Account; (iii) collection accounts are funded with customer, factored, and non-factored receipts (the "**Collection Accounts**"); (iv) disbursement accounts fund general corporate and operational disbursements (the "**Disbursement Accounts**") with amounts transferred via both automatic and manual transfers from the Main Concentration Account; and (v) investment accounts (the "**Investment Accounts**") are maintained, although they currently carry de minimis balances.

12.     In addition, in connection with these chapter 11 cases, the Debtors also will establish or designate (i) an adequate assurance escrow account for utility providers (the "**Utility Deposit Account**"), (ii) an account for amounts funded pursuant to the proposed interim and final orders approving the DIP Motion[3] (the "**DIP Orders**" and such account, the "**DIP Financing Account**"), and (iii) a professional fees escrow account to be established in accordance with the DIP Orders (the "**Professional Fees Account**").

13.     Finally, the Non-Debtor Affiliates based outside of North America, or the "Rest of World" entities (each, a "**ROW Entity**" and together, the "**ROW Entities**"), utilize a separate cash management system that operates on a regional basis (the "**ROW Cash Management System**").[4]  The ROW Cash Management System and the non-Debtor businesses

---

[3]     The Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Motion**") contemporaneously herewith.

[4]     The ROW Cash Management System is overseen by the International Treasury Director and is supported by a treasury team primarily based in Romania and India (the "**ROW Treasury Team**").  Unlike the Debtors, which

6

that it serves are generally cash flow positive and self-sustaining, subject to the continuation of certain Intercompany Transactions on a postpetition basis. Although the ROW Entities do not participate in external cash pooling with the Debtors and the two cash management systems largely operate independently, the ROW Entities do participate in Intercompany Transactions with the Debtors, as described in greater detail below.

14. A list of the Bank Accounts is annexed hereto as **Exhibit C**. A diagram illustrating the movement of cash through the Cash Management System is annexed hereto as **Exhibit D** (the "**Cash Management Schematic**").

### A. Bank Accounts and Flow of Funds

15. In connection with the Cash Management System and its cash pooling, the Debtors maintain the Bank Accounts and Investment Accounts with multiple Banks. As of the Petition Date, the Debtors maintained 160 Bank Accounts across 11 Banks for various purposes. The Debtors' primary Bank is BOFA, where the Debtors maintain 92 Bank Accounts. As of the Petition Date, the Debtors have an aggregate amount of approximately $12 million in the Bank Accounts.[5]

---

generally operate under a standardized three-account structure, the ROW Entities typically maintain multiple accounts, each capable of both receiving and disbursing funds across a variety of currencies.

While the structures of the ROW Entities' accounts differ from those of the Debtors, the control environment is broadly consistent with North American practices. Local accounts payable teams that service certain ROW Entities are responsible for payment initiation, after which the ROW Treasury Team reviews, approves, and releases disbursements.

[5] As of the Petition Date, the ROW Cash Management System consisted of 328 bank accounts maintained across 70 banks, all of which, except one, are owned and controlled by Non-Debtor Affiliates.

7

16.    The following table summarizes the function of, and flow of funds to and from, the Bank Accounts:

| Account | Description of Account |
|---|---|
| **Main Concentration Account (BOFA)**<br><br>Account No. 6975 | The Debtors utilize a cash pooling arrangement centered on the Main Concentration Account, which is funded by periodic automatic sweeps of the Subsidiary Concentration Accounts or directly through automatic and manual sweeps of the Collection Accounts. The Debtors maintain the Main Concentration Account at BOFA and fund payroll obligations through the Main Concentration Account via reverse wire to OneSource, their payroll administrator.<br><br>As of the Petition Date, the Main Concentration Account had a balance of approximately $9 million. |
| **Subsidiary Concentration Accounts**<br><br>Account Nos. 1110, 5479, 5487 | Three (3) Debtors and one (1) Non-Debtor Affiliate maintain Subsidiary Concentration Accounts, which are generally maintained at low balances, with amounts in excess of the target balances swept periodically to the Main Concentration Account. The remaining Debtors which are subsidiaries of FBG do not hold Subsidiary Concentration Accounts, but maintain only Collection Accounts and Disbursement Accounts that interface with the Main Concentration Account.<br><br>As of the Petition Date, the Debtors' Subsidiary Concentration Accounts had a combined balance of approximately $825,000. |
| **Collection Accounts**<br><br>Account Nos. 3189, 6892, 8856, 6897, 6878, 4406, 6343, 7312, 7294, 3205, 3213, 3264, 5647, 5655, 8417, 0101, 6101, 3221, 3240, 0287, 4362, 7901, 7753, 4354, 6577, 7002, 6999, 9118, 9340, 1879, 6224, 9126, 9134, 8920, 4377, 4222, 9092, 9100, 8904, 6262, 9571, 7106, 5565, 0366, 2289, 7724, 3919, 3938, 7128, 7136, 2136, 7144, 3617, 5570, 7111, 6637, 7734, 5588, 7149, 7507, 7649, 7521, 7272, 7088, 0213, 8995, 7415, 8573, 9656, | Certain Debtor subsidiaries of FBG maintain Collection Accounts at BOFA, which receive cash generated from the Debtors' day-to-day operations, including on account of customer receipts and factored and non-factored receivables (as described in more detail in the Customer Programs Motion[6] and First Day Declaration).<br><br>The Collection Accounts are generally zero-balance accounts, with funds swept on a daily basis into the Main Concentration Account directly or first through a Subsidiary Concentration Account—with the exception of certain accounts that maintain a balance and are manually swept. The majority of the Collection Accounts are maintained at BOFA, though certain subsidiaries of FBG also continue to maintain legacy Collection Accounts at other Banks to ensure that no customer payments are missed during the transition period to BOFA.[7]<br><br>As of the Petition Date, the Collection Accounts had a combined balance of approximately $2 million. |

---

[6]    The Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (the "**Customer Programs Motion**") contemporaneously herewith.

[7]    The Debtors have largely completed a process of moving the majority of the Bank Accounts to BOFA.

| Account | Description of Account |
|---|---|
| 9210, 9244, 7633, 0956, 5877, 0964, 5872, 6348 | |
| **Disbursement Accounts**<br><br>Account Nos. 3202, 3688, 6910, 0327, 6572, 0974, 7827, 7299, 3269, 3720, 3725, 3744, 6317, 5639, 6309, 6325, 2329, 3159, 3226, 3245, 1476, 7715, 1414, 7021, 7007, 1396, 6216, 7710, 6808, 2114, 0657, 2869, 7120, 7729, 3947, 2305, 3933, 3952, 2324, 8825, 9641, 4117, 4512, 7152, 4125, 4133, 3631, 2263, 5415, 5423, 0025, 0583, 5431, 5596, 8233, 6651, 9299, 1490, 7739, 5639, 7163, 7540, 7526, 7277, 0205, 0221, 7101, 7434, 9775, 8906, 9236, 2548, 9909, 0699, 9945 | The Disbursement Accounts are used to fund general corporate disbursements, including payments to vendors, and to cover general operating costs. The Disbursement Accounts are generally funded daily via automatic transfers from the Main Concentration Account in amounts sufficient to fund the necessary third-party payments.<br><br>As of the Petition Date, the Disbursement Accounts had a combined balance of approximately $1,000. |
| **Investment Accounts**<br><br>Account No. 9394, 1400, 4957, 9161 | The Debtors' four Investment Accounts currently have very little activity and de minimis balances. Historically, the Investment Accounts were funded with excess cash produced by the Debtors' operations as well as borrowings in connection with the Debtors' secured and unsecured credit facilities and invested at the Debtors' discretion. The Investment Accounts also accrue cash interest.<br><br>As of the Petition Date, the Investment Accounts had a combined balance of approximately $200,000. |
| **Utility Deposit Account** | The Debtors will establish or designate a Utility Deposit Account with Bank of America to provide for adequate assurance of payment to utility companies pursuant to section 366 of the Bankruptcy Code in accordance with the Utilities Motion[8] filed contemporaneously herewith. |

---

[8]   The Debtors filed the *Emergency Motion of Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "**Utilities Motion**") contemporaneously herewith.

| Account | Description of Account |
|---|---|
| | The Utility Deposit Account will be funded with amounts from the Main Concentration Account and in accordance with the terms of any order of the Court approving the Utilities Motion. |
| **DIP Financing Account** | As more fully set forth in the DIP Motion, the Debtors will maintain a segregated account where the proceeds from the Debtors' DIP financing will be deposited. |
| **Professional Fees Account** | As described in the DIP Motion, the Debtors will maintain a segregated account that the Debtors propose will hold the professional fees escrow amounts that will accrue during the pendency of the chapter 11 cases. |

B. **Receipts and Disbursements**

17.     *Collection Accounts*.  The Collection Accounts regularly receive funds on account of sales of automotive parts and other products.  Customers are typically billed for these services on a daily basis as shipments occur, and collections are received in the form of ACH transfer, physical check, or wire transfer.  Receipts primarily flow through the Collection Accounts held by Debtors subsidiary to FBG and, subsequently, to the Main Concentration Account to be distributed as necessary to other Debtor entities.  The Debtors also receive payments from factor counterparties on account of factored and non-factored accounts receivable in the Collection Accounts.

18.     *Disbursement Accounts.*  The Disbursement Accounts make disbursements to other Debtors, Non-Debtor Affiliates, and third parties to meet the Debtors' payment obligations.  These disbursements primarily consist of payments to vendors and suppliers for general corporate and operating costs or to affiliates in connection with Intercompany Transactions.  Disbursements made from Debtors to Non-Debtor Affiliates is discussed in greater detail below with respect to intercompany transactions and claims.  Disbursements are made utilizing Check Positive Pay, ACH, ACH Positive Pay and wires.  Vendor disbursements are

approved, and payments are entered by the accounts payables team. Payments are approved and released by the treasury team.

19. An average of approximately $55 million in receipts and approximately $35 million in disbursements are processed through the Cash Management System per week.

## C. Bank Fees

20. In the ordinary course of business, the Debtors incur and pay, as well as honor and/or allow to be deducted, certain service charges and other fees, costs, and expenses charged by the Banks in connection with the maintenance of the Cash Management System (such charges and fees, the "**Bank Fees**"). The Bank Fees average approximately $150,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $150,000 in unpaid Bank Fees, all of which will come due within 30 days of the Petition Date.

21. To maintain the integrity of their Cash Management System, the Debtors request authority, but not direction, to pay all prepetition Bank Fees and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis and consistent with historical practice.

## D. Intercompany Transactions and Claims

22. In the ordinary course of their business, the Debtors maintain relationships with each other and certain of their Non-Debtor Affiliates, including certain ROW Entities. In turn, the Debtors engage in Intercompany Transactions with each other and with Non-Debtor Affiliates, including the ROW Entities. The Debtors and the applicable Non-Debtor Affiliates regularly engage in cash settlements of amounts owed on account of Intercompany Claims on an as-needed basis, with the exception of Non-Debtor Affiliates in Mexico, with whom the Debtors engage in such settlements on a weekly basis.

11

23.     The Intercompany Transactions typically arise from (i) operational activities, including commercial trade transactions and non-inventory transactions, such as shared services (the "**Operational Intercompany Transactions**"), and (ii) cash pooling arrangements. The following table summarizes the Intercompany Transactions:

| Intercompany Transaction Type | Description of Intercompany Transaction |
|---|---|
| **Operational Intercompany Transactions** | Operational Intercompany Transactions carried out among the Debtors and between the Debtors and their Non-Debtor Affiliates are essential components of the Debtors' global operations and relate to, among other things: (i) intercompany production costs, which primarily consist of contract manufacturing costs; (ii) intercompany product sales; (iii) payment for global shared services, which include certain centralized treasury, accounting, and other management and administrative services—documented via intercompany invoices.<br><br>As described in further detail below, the operational Intercompany Transactions take place between and among the Debtors and certain Non-Debtor Affiliates. |
| **Cash Pooling** | As part of the Cash Management System, funds flow into the Main Concentration Account from customer receipts and out of the Main Concentration Account for general corporate and operational costs. The funds in the Collection Accounts are swept daily into the Main Concentration Account. Funds also flow out for payroll, taxes, and vendor disbursements. Amounts transferred to or drawn from the Main Concentration Account are recorded on the Debtors' books and records as intercompany payables and receivables. Thus, every cash pool participant has either a net payable or net receivable position in the Debtors' books and records. These cash pool transactions are largely conducted automatically within the Cash Management System and recorded as Intercompany Claims. |
| **Financing** | The Debtors and Non-Debtor Affiliates engage in intercompany financing through the use of intercompany loans (the "**Intercompany Loans**"). Specifically, 23 Intercompany Loans are maintained between Debtors and Non-Debtor Affiliates, and 4 Intercompany Loans are maintained between Non-Debtor Affiliates. The Intercompany Loans with an outstanding principal of approximately $674 million. The Intercompany Loans are issued by the Debtors and their Non-Debtor Affiliates, including ROW Entities. The interest rates on the Intercompany Loans range from zero percent to approximately 11% percent. |

24.     Although general cash transfers between the Debtors and their Non-Debtor Affiliates are infrequent, in connection with the Operational Intercompany Transactions, the Debtors provide regular funding to certain of their Non-Debtor Affiliates for invoiced goods and services provided and purchased for the benefit of the Debtors' enterprise. Such goods and

12

services include manufacturing, administrative functions, inventory, accounting, and treasury. The Non-Debtor Affiliates—whose locations include, but are not limited to, Mexico, China, India, and Romania—invoice Operational Intercompany Transactions on an arm's length basis, and the Debtors record these invoices on their books as Intercompany Claims, which are settled in the ordinary course. Such services include, but are not limited to, back-office services and inventory in Mexico; the manufacturing of brakes, rotors, and pumps in China; and treasury and service centers in India and Romania. These services resulting from these Operational Intercompany Transactions enable the Debtors to run their global business and service customers around the world. The benefits of the Intercompany Transactions ultimately inure to the Debtors' estates, and failing to honor prepetition Intercompany Claims among the Debtors and between Debtors and Non-Debtor Affiliates, or ceasing Intercompany Transactions in the ordinary course postpetition, would negatively impact the Debtors' ability to operate in chapter 11. As of the Petition Date, the Debtors estimate they pay, on average, between $30 million and $40 million on a monthly basis on account of the Operational Intercompany Transactions.

25. The Debtors anticipate that the quantum of postpetition Intercompany Transactions with Non-Debtor Affiliates will continue at prepetition levels. This will ensure the Debtors have access to critical goods and services without interruption. The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis and will implement such other internal mechanisms as needed to permit them, with the assistance of their advisors, to accurately track the balance of, and account for, all prepetition and postpetition Intercompany Transactions. By this Motion, the Debtors request authority to continue entering into ordinary course Intercompany Transactions among the Debtors and between the Debtors and Non-Debtor Affiliates consistent with prepetition practices.

13

26.     In addition, to help ensure that each individual Debtor will not disadvantage its creditors by funding the operations of its Debtor affiliates, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, the Court grant administrative expense status to all Intercompany Claims against a Debtor that arise postpetition from Intercompany Transactions.  For the avoidance of doubt, the Debtors are not seeking to pay, satisfy or set-off any prepetition Intercompany Transaction against post-petition amounts.

**E.  Business Forms**

27.     In the ordinary course of business, the Debtors use a variety of correspondence and business forms, including, among other things, checks, purchase orders, invoices, and letterheads (collectively, the "**Business Forms**").  To minimize expenses, the Debtors seek authority to continue using all Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without reference to the Debtors' status as debtors in possession.  The Debtors have prepared communications to the various parties with which they conduct business, which will, among other things, notify such parties of the commencement of these chapter 11 cases.  The Debtors believe that these communications will provide adequate notice of the Debtors' status as debtors in possession. Nevertheless, the Debtors will use reasonable efforts to have electronic checks include a legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable following the Petition Date.

**F.  Credit Card Program**

28.     In the ordinary course of business, the Debtors utilize corporate credit cards issued by BOFA, American Express, and HSBC, which employees use to make authorized business purchases on behalf of the Debtors or in connection with their employment duties (collectively, the "**Credit Cards**" and the program under which the Credit Cards are maintained,

14

the "**Credit Card Program**").  Historically, the Credit Cards are used by certain of the Debtors' employees for various corporate expenses in the ordinary course of business, including, but not limited to, travel expenses that these employees incur in the course and scope of their employment with the Debtors—such as airfare, accommodations and meals—as well as minor vendor expenses for marketing purposes.  The Debtors pay for expenses charged to such cards directly.

29.     As of the Petition Date, there are approximately 200 issued and active Credit Cards, for which the Debtors owe approximately $250,000 on account thereof.  Based on historical figures, the Debtors estimate that they incur total liabilities of approximately $500,000 per month on account of the Credit Cards.

30.     By this Motion, the Debtors seek authority to continue the Credit Card Program in the ordinary course of business, including making ordinary course modifications thereto, and to pay any outstanding amounts, regardless of whether such amounts arose before or after the Petition Date, in the ordinary course and consistent with historical practices.

### Relief Requested Should Be Granted

**I.  Continuation of Cash Management System Is Warranted Under Sections 363 and 105(a) of Bankruptcy Code**

31.     The efficient and economical operation of the Debtors' business requires that the Cash Management System continue during the pendency of these chapter 11 cases.  As a practical matter, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash management systems would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations.  Any such disruption would have a severe and adverse impact upon the success of these chapter 11 cases.  Accordingly, the Debtors seek authority to continue using the Cash Management System in the same manner as the Cash

15

Management System was utilized prior to the Petition Date, and to implement ordinary course changes to it consistent with past practices. The Bankruptcy Code provides for such relief.

32. Section 363(c)(1) of the Bankruptcy Code authorizes the debtor-in-possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) is to provide a debtor-in-possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the Court. *In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by its cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). A cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets." *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995). Accordingly, section 363(c)(1) authorizes the continuation of the Cash Management System as it operated prepetition without the Court's approval.

33. The Court may also grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

16

of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

34. In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491–93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *In re CEI Roofing*, 315 B.R. at 56. Moreover, Bankruptcy Rule 6003 implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the debtor's estate.

35. Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved. The Cash Management System constitutes an ordinary course and essential business practice of the Debtors and provides significant benefits to the Debtors, including the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account information. Authorizing the Debtors to continue operating under the existing Cash Management System is necessary to avoid severe disruptions to the Debtors' operations, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates. Accordingly, the Debtors request authority to maintain their existing Cash Management System to the extent set forth herein.

## II.    Maintenance of Debtors' Existing Bank Accounts is Warranted

36. The Operating Guidelines for Chapter 11 Cases (the "**UST Operating Guidelines**") of the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**")

18

generally require that a chapter 11 debtor, among other things (i) open new bank accounts at a depository approved by the U.S. Trustee, (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes), (iii) close all existing bank accounts and open new debtor-in-possession accounts, (iv) maintain a separate debtor-in-possession account for cash collateral, (v) obtain checks that bear the designation "Debtor-in-Possession," and (vi) reference the debtor's bankruptcy case number and type of account on each such check. *See* U.S. Dep't of Justice, Region 7 Guidelines for Debtors-in-Possession § IV (2024).

37.     Accordingly, the Debtors request that the Court waive the requirements of the UST Operating Guidelines with respect to the Debtors' Bank Accounts and Business Forms, including checks. Strict enforcement of the UST Operating Guidelines with respect to the Cash Management System will severely disrupt the Debtors' ordinary course financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. These chapter 11 cases will be more orderly and efficient if the Debtors are permitted to maintain all Bank Accounts with the same account numbers during these cases and to continue to use their Business Forms, including checks, in the ordinary course.

38.     Nevertheless, as previously discussed, with respect to checks that the Debtors or their agents print themselves, the Debtors and their agents will begin printing the "Debtor-in-Possession" legend and include the jointly administered bankruptcy case number on such checks within 10 business days after the date of entry of the Proposed Interim Order and, to the extent that the Debtors order new Business Forms, the Debtors will use reasonable efforts to include the "Debtor-in-Possession" legend and the jointly administered bankruptcy case number on such checks.

39. In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash Management System such as opening or closing their Bank Accounts or opening new Bank Accounts at authorized depositories designated by the U.S. Trustee in accordance with the terms of the Proposed Order.

40. By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, the relief requested herein will benefit all parties in interest, including employees, vendors, and customers.

III. **An Extension of Time to Comply with Requirements of Section 345(b) of Bankruptcy Code is Warranted to the Extent They Apply to the Bank Accounts and Cash Management System**

41. Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes such deposits as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the debtor obtain from the "entity with which such money is deposited or invested a bond in favor of the United States [that is] secured by the undertaking of a[n adequate] corporate surety, . . . unless the court for cause orders otherwise." 11 U.S.C. § 345(b). In the alternative, the debtor may require the entity to deposit governmental securities in accordance with 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, such person may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.

42. Additionally, the UST Operating Guidelines generally require chapter 11 debtors, among other things, to deposit all estate funds into an account with a financial institution

20

that has executed a Uniform Deposit Agreement ("**UDA**") with, and is designated as an authorized depository by, the U.S. Trustee (each, an "**Authorized Depository**").

43. In complex chapter 11 cases such as these involving debtors with far-reaching, global operations, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of chapter 11 by unduly disrupting the debtor's cash management system and banking relationships. Investment of cash in strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in cases such as this, be inconsistent with section 345(a), which permits a debtor to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the court so orders "for just cause." 140 Cong. Rec. H. 10,767 (Oct. 4, 1994).

44. The Debtors' Bank Accounts are located in the United States, Canada, and India. All but nine (9) of the Debtors' active Bank Accounts are maintained at a financial institution that is an Authorized Depository. Seven (7) Bank Accounts are located in Canada, one (1) Bank Account is located in India, and all other Bank Accounts are located in the United States. Each of the Debtors' Bank Accounts located outside the United States is maintained at BOFA, which is an Authorized Depository, and each is also covered under the applicable non-U.S. equivalent to the Federal Deposit Insurance Corporation (the "**FDIC**"). Those accounts located in the United States are insured by the FDIC. Of those accounts insured by the FDIC, three (3) hold amounts which exceed the FDIC insurance limit of $250,000. Nevertheless, there is no risk known to the Debtors suggesting that funds in excess of the FDIC insurance limit held in those Bank Accounts will be in jeopardy during the pendency of these chapter 11 cases. Thus,

21

the Debtors believe that any funds that are deposited in the Bank Accounts are secure, and, therefore, the Debtors are in compliance with section 345 of the Bankruptcy Code with respect to such Bank Accounts.

45.     Nevertheless, out of an abundance of caution, to the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 354(b) of the Bankruptcy Code, the Debtors request a 45-day period (or such additional time to which the U.S. Trustee may agree) following the Petition Date in which the Debtors have to either come into compliance with section 345(b) of the Bankruptcy Code or to make other arrangements that would be acceptable to the U.S. Trustee (without prejudice to the Debtors' rights to request further extensions by motion to this Court).  Prior to the Petition Date, the Debtors discussed the requested 45-day extension with the U.S. Trustee and understand that the U.S. Trustee does not object to that extension.

**IV.     Payment of Bank Fees Should Be Approved**

46.     Payment of the prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed.  Payment of prepetition Bank Fees will not prejudice any parties in interest.  Indeed, because the Banks likely have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not prejudice the rights of unsecured creditors in these chapter 11 cases.  Accordingly, the Debtors request authority to pay any outstanding prepetition Bank Fees and other similar service charges to maintain the Cash Management System.

**V.** **Continuation of Credit Card Program and Payment of Prepetition Amounts Due Thereunder Should be Authorized**

47.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order. 11 U.S.C. § 364(a). Purchases made using the Credit Cards fall within the ordinary course of business under section 363(c)(1) of the Bankruptcy Code. The use of Credit Cards and similar payment methods is widespread as a means of facilitating day-to-day business activities. As a result, the Debtors believe they do not require the Court's approval to continue using the Credit Cards on a postpetition basis.

48.     Nonetheless, out of an abundance of caution, the Debtors request authority to continue using the Credit Card Program in the ordinary course of business consistent with past practices and to pay all obligations related thereto, including any obligations that arose before the Petition Date but remain outstanding. Yet, in the event the Court finds that such transactions do not fall within the ordinary course of business, the Debtors request authority pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code to continue using the Credit Card Program and to pay all obligations related thereto.

49.     The Credit Card Program is essential to the Debtors' operations. The Credit Card Program allows the Debtors' employees to charge certain business-related expenses directly to the Debtors, thereby enabling the employees to conduct business more efficiently. Continuing the Credit Card Program and satisfying any prepetition and postpetition amounts outstanding thereunder, including any credit card processing fees, will help minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' business. Accordingly, the Debtors

23

request authority to continue the Credit Card Program in the ordinary course of business, including making ordinary course modifications thereto, and to pay any outstanding obligations, whether arising prepetition or postpetition, regarding the same.

50. The Debtors also seek authorization to pay all outstanding prepetition amounts owing on the Credit Cards. If the Debtors do not pay these outstanding amounts, there is a risk that the credit card issuers could restrict the Debtors' access to their Credit Card Program or cease extending credit to the Debtors after the Petition Date. If that were to occur, it would be costly, disruptive to the Debtors' operations, burdensome to the Debtors and their estates, and time-consuming for the Debtors to establish new credit card programs with one or more alternative providers. Accordingly, the Court should authorize the Debtors to maintain their Credit Card Program and pay all obligations related thereto.

## VI. Continued Performance of Intercompany Transactions Is Warranted and Granting Administrative Expense Priority to Postpetition Intercompany Claims Is Appropriate

51. As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing." The Debtors enter into and perform Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code. The Intercompany Transactions are not just a matter of routine in the Debtors' business—they are the sort of transactions that are common among many business enterprises that operate through multiple affiliates. It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtors' ability to operate their business and successfully emerge from these chapter 11 cases. Accordingly, while the Debtors believe that they do not require the Court's approval to continue entering into and performing Intercompany Transactions, out of an abundance of caution, the Debtors request express authority to engage in such transactions postpetition. This

will ensure the Debtors have access to critical goods and services without interruption, as the Intercompany Transactions are essential to the Debtors' core business operations.  If the Debtors and Non-Debtor Affiliates are not permitted to continue engaging in Intercompany Transactions, the Debtors and the Non-Debtor Affiliates may not be able to sufficiently fund their expenses.

52.     Additionally, if the Debtors were not authorized to engage in postpetition Intercompany Transactions, several Debtors and Non-Debtor Affiliates would be immediately cut off from their principal sources of financing, triggering a cascade of operational challenges.  As certain Non-Debtor Affiliates provide critical services to the Debtors necessary to their ongoing operations, the shutdown of such businesses would be to the detriment of the Debtors and their estates.

53.     The Debtors also request that the Court grant administrative expense status to all Intercompany Claims arising postpetition as a result of Intercompany Transactions under section 503(b)(1)(A) of the Bankruptcy Code, which provides, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ."  11 U.S.C. § 503(b)(1)(A).  If the Intercompany Claims are accorded administrative expense status, each entity that participates in the Cash Management System and provides a benefit to the Debtors' estates will be assured that it will be compensated for its efforts.

**<ins>Applicable Financial Institutions<br>Should Be Authorized to Receive, Process,<br>Honor, and Pay Checks Issued and Transfers<br>Requested to Pay Obligations Related to Cash Management System</ins>**

54.     The Debtors further request that the Court authorize applicable Banks to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors relating to the Cash Management System, to the extent that sufficient funds are on deposit and standing in the Debtors'

25

credit in the applicable Bank Accounts to cover such payment. The Debtors represent that these checks are drawn on identifiable Disbursement Accounts and can be readily identified as relating directly to the authorized payment of the Cash Management System. Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently. Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of prepetition obligations related to the Cash Management System that are dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**Debtors Have Satisfied Bankruptcy Rule 6003(a)**

55. Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003. Bankruptcy Rule 6003(a) provides that, to the extent relief is needed to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting a motion to "use, sell, or lease property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" or a motion to "incur any other obligation regarding the property of the estate" prior to 21 days after the Petition Date. Fed. R. Bankr. P. 6003(a). As explained above and in the First Day Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is needed to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

**Debtors' Compliance with Bankruptcy Rule 6004(a) and 6004(h)**

56.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

57.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.  The Debtors expressly reserve all rights with respect to the foregoing matters.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

27

## Notice

58.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

59.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 29, 2025
      Houston, Texas

                             /s/ Clifford W. Carlson
                             WEIL, GOTSHAL & MANGES LLP
                             Gabriel A. Morgan (24125891)
                             Clifford W. Carlson (24090024)
                             700 Louisiana Street, Suite 3700
                             Houston, Texas 77002
                             Telephone: (713) 546-5000
                             Facsimile: (713) 224-9511
                             Email: gabriel.morgan@weil.com
                                               clifford.carlson@weil.com

                             -and-

                             WEIL, GOTSHAL & MANGES LLP
                             Matthew S. Barr (*pro hac vice* pending)
                             Sunny Singh (*pro hac vice* pending)
                             Andriana Georgallas (*pro hac vice* pending)
                             Kevin Bostel (*pro hac vice* pending)
                             Jason H. George (*pro hac vice* pending)
                             767 Fifth Avenue
                             New York, New York 10153
                             Telephone: (212) 310-8000
                             Facsimile: (212) 310-8007
                             Email: matt.barr@weil.com
                                               sunny.singh@weil.com
                                               andriana.georgallas@weil.com
                                               kevin.bostel@weil.com
                                               jason.george@weil.com

                             *Proposed Attorneys for Debtors*
                             *and Debtors in Possession*

**Certificate of Service**

I hereby certify that on September 29, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Clifford W. Carlson*
Clifford W. Carlson

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |

**INTERIM ORDER (I) AUTHORIZING
DEBTORS TO (A) CONTINUE USING EXISTING
CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS, (B) IMPLEMENT
ORDINARY COURSE CHANGES TO CASH MANAGEMENT SYSTEM,
AND (C) HONOR CERTAIN RELATED PREPETITION OBLIGATIONS,
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System, (b) implement changes to their Cash Management System in the ordinary course of business, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) grant administrative expense priority for Intercompany Claims, (iii) extend time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Interim Order. For the avoidance of doubt, nothing in this Interim Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy

2

Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2.      The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Exhibit C** to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3.      The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4. The Debtors are authorized, but not directed, with the consent of Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Interim Order, (i) be deemed a Bank Account as if it had been listed on **Exhibit C** to the Motion; (ii) must be subject to deposit account control agreements acceptable to the Required Lender; and (iii) shall be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and any statutory committee appointed in these chapter 11 cases within 14 days after opening a new bank account or closing an existing bank account.

5. Within 14 days from the date of the entry of this Interim Order, the Debtors shall (i) contact each Bank, (ii) provide each Bank with each of the Debtors' tax identification numbers and the jointly administered case number, and (iii) identify each of their Bank Accounts held at such Banks as being held by a debtor-in-possession.

6. Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

7. The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and

4

recorded properly and shall make such records available to the Lender Advisors (as defined in the DIP Orders), the U.S. Trustee, and any statutory committee appointed in these cases upon request.

8. Subject to the limitations provided in this Interim Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions solely to the extent necessary to maintain operations pending entry of a final order; *provided*, however, the Debtors are not authorized, on an interim basis, to provide any Intercompany Loans absent the consent of the Required Lenders. Subject to the terms of this Interim Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices. Notwithstanding anything herein to the contrary, the Debtors may not amend, modify, change, or terminate their existing Intercompany Transactions without the prior consent of the Required Lenders. All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the Interim DIP Order) and approved superpriority administrative expense claims provided for under the DIP Orders (defined below). For the avoidance of doubt, this Interim Order only authorizes the payment or set-off of any postpetition obligations against any prepetition obligations to the extent necessary to maintain operations, pending entry of a final order. All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget.

9. The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases,

without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable, and if the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors-in-Possession."

10.     To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 45 calendar days (or such additional time as the U.S. Trustee may agree to) from the Petition Date within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on **Exhibit C** or to make such other arrangements as agreed to by the U.S. Trustee with the consent of the Required Lenders. Such extension is without prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

11.     Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for: (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of

6

the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

12. The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date, should be honored or dishonored pursuant to this Interim Order or any other order of this Court, without any duty to inquire otherwise. Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

13. The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or ACH transfers, and to replace any prepetition checks or electronic fund or ACH transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Interim Order.

14. The Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

15. Notwithstanding anything to the contrary contained in the Motion or this Interim Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition

7

debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances). To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Interim Order, the terms of the DIP Orders shall control. Nothing in the Motion or this Interim Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

16. Nothing in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Interim Order, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

17. The requirements of Bankruptcy Rule 6003(a) have been satisfied.

18. Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

19. Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

20. The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Interim Order.

21. This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

22. The Final Hearing to consider the relief requested in the Motion shall be held on _____, **2025, at** ____ (Prevailing Central Time) and any objections or responses to the Motion shall be filed and served on or prior to _____, **2025, at** _____ (Prevailing Central Time).

Dated: _____, 2025
        Houston, Texas

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**FINAL ORDER
(I) AUTHORIZING DEBTORS TO (A) CONTINUE
USING EXISTINGCASH MANAGEMENT SYSTEM
AND BANK ACCOUNTS, (B) IMPLEMENT ORDINARY COURSE
CHANGES TO CASH MANAGEMENT SYSTEM, AND (C) HONOR
CERTAIN RELATED PREPETITION OBLIGATIONS, (II) GRANTING
ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System, (b) implement changes to their Cash Management System in the ordinary course of business, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) grant administrative expense priority for Intercompany Claims, (iii) extend time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and this Court having entered an order granting the relief requested in the Motion on an interim basis; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1. The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Final Order. For the avoidance of doubt, nothing in this Final Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or

2

indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2. The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Exhibit C** to the Motion, in the names and with the account numbers existing immediately before the Petition Date, (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3. The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4.     The Debtors are authorized, but not directed, with the consent of Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Final Order, (i) be deemed a Bank Account as if it had been listed on **Exhibit C** to the Motion; (ii) must be subject to deposit account control agreements acceptable to the Required Lender; and (iii) shall be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and any statutory committee appointed in these chapter 11 cases within 14 days after opening a new bank account or closing an existing bank account.

5.     The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly and shall make such records available to the Lender Advisors (as defined in the DIP Orders), the U.S. Trustee, and any statutory committee appointed in these cases upon request.

6.     Subject to the limitations provided in this Final Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions solely to the extent necessary to maintain operations pending entry of this Final Order. Subject to the terms of this Final Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices.

4

Notwithstanding anything herein to the contrary, the Debtors may not amend, modify, change, or terminate their existing Intercompany Transactions without the prior consent of the Required Lenders. All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the Interim DIP Order) and approved superpriority administrative expense claims provided for under the DIP Orders (defined below). All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget.

7. The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable, and if the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors-in-Possession."

8. To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 45 calendar days (or such additional time as the U.S. Trustee may agree to) from the Petition Date within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on **Exhibit C** or to make such other arrangements as agreed to by the U.S. Trustee with the consent of the Required Lenders. Such extension is without

5

prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

9. Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for: (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

10. The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date, should be honored or dishonored pursuant to this Final Order or any other order of this Court, without any duty to inquire otherwise. Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

11. The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any

prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order

12.    The Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

13.    Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances).  To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Final Order, the terms of the DIP Orders shall control.  Nothing in the Motion or this Final Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

14.    Nothing in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Final Order, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any

7

appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

15.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

16.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order.

18.     This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated: _____, 2025
       Houston, Texas

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

8

**Exhibit C**

**List of Bank Accounts**

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| Airtex Products LP | Bank of America | 8856 | Collection |
| Airtex Products LP | Wells Fargo | 8904 | Collection |
| ASC Industries Inc | Bank of America | 6878 | Collection |
| ASC Industries Inc | Bank of America | 6572 | Disbursement |
| BPI EC LLC | Bank of America | 4406 | Collection |
| BPI Holdings International LLC | Bank of America | 6343 | Collection |
| Brake Parts Inc India LLC | Bank of America | 6348 | Collection |
| Brake Parts Inc LLC | Bank of America | 0974 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 7312 | Collection |
| Brake Parts Inc LLC | Bank of America | 7294 | Collection |
| Brake Parts Inc LLC | Bank of America | 7827 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 7299 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 3205 | Collection |
| Brake Parts Inc LLC | Bank of America | 3213 | Collection |
| Cardone Industries, Inc | Bank of America | 3264 | Collection |
| Cardone Industries, Inc | Bank of America | 3269 | Disbursement |
| Cardone Industries, Inc | Bank of America | 3725 | Disbursement |
| Cardone Industries, Inc | Citizens | 6317 | Disbursement |
| Cardone Industries, Inc | Citizens | 5639 | Disbursement |
| Cardone Industries, Inc | Citizens | 5647 | Collection |
| Cardone Industries, Inc | Citizens | 5655 | Collection |
| Cardone Industries, Inc | Citizens | 6309 | Disbursement |
| Cardone Industries, Inc | Citizens | 6325 | Disbursement |

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| Cardone Industries, Inc | Citizens | 2329 | Disbursement |
| Cardone Industries, Inc | JP Morgan Chase | 3159 | Disbursement |
| Cardone Industries, Inc | JP Morgan Chase | 0101 | Collection |
| Cardone Industries, Inc | JP Morgan Chase | 6101 | Collection |
| Carter Carburetor Holdings, LLC | Bank of America | 3720 | Disbursement |
| Carter Carburetor Holdings, LLC | Bank of America | 3221 | Collection |
| Carter Carburetor Holdings, LLC | Bank of America | 3226 | Disbursement |
| Carter Carburetor LLC | Bank of America | 3744 | Disbursement |
| Carter Carburetor LLC | Bank of America | 3240 | Collection |
| Carter Carburetor LLC | Bank of America | 3245 | Disbursement |
| Carter Fuel Systems LLC | Bank of America | 6892 | Collection |
| Carter Fuel Systems LLC | Bank of America | 6577 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7002 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7021 | Disbursement |
| Carter Fuel Systems LLC | Bank of America | 6999 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7007 | Disbursement |
| Champion Laboratories Inc | Bank of America | 1396 | Disbursement |
| Champion Laboratories Inc | Bank of America | 1879 | Collection |
| Champion Laboratories Inc | Bank of America | 6216 | Disbursement |
| Champion Laboratories Inc | Bank of America | 7710 | Disbursement |
| Champion Laboratories Inc | Bank of America | 6224 | Collection |

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| Champion Laboratories Inc | Wells Fargo | 9092 | Collection |
| Champion Laboratories Inc | Wells Fargo | 9100 | Collection |
| CWD LLC | Wells Fargo | 4362 | Collection |
| CWD LLC | Bank of America | 1476 | Disbursement |
| CWD LLC | Bank of America | 7715 | Disbursement |
| CWD LLC | Bank of America | 7901 | Collection |
| CWD LLC | Wells Fargo | 4354 | Collection |
| Dalton Corporation | CIBC | 5872 | Collection |
| Dalton Corporation | CIBC | 1110 | Concentration |
| Eagle Casting, LLC | HSBC | 5479 | Concentration |
| Eagle Machining, LLC | HSBC | 5487 | Concentration |
| First Brands Group LLC | Bank of America | 6975 | Concentration |
| First Brands Group LLC | Bank of America | 6262 | Collection |
| First Brands Group LLC | Bank of America | 6808 | Disbursement |
| First Brands Group LLC | Bank of America | 9394 | Investment |
| First Brands Group LLC | Bank of America | 2114 | Disbursement |
| First Brands Group LLC | Bank of America | 0657 | Disbursement |
| First Brands Group LLC | US Bank | 1400 | Investment |
| First Brands Group LLC | SouthState | 4957 | Investment |
| First Brands Group LLC | Bank United | 9656 | Collection |
| First Brands Group LLC | Bank United | 9161 | Investment |
| FRAM Group Operations LLC | Bank of America | 9571 | Collection |
| FRAM Group Operations LLC | Bank of America | 2869 | Disbursement |

3

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| HEATHERTON HOLDINGS LLC | Bank of America | 7106 | Collection |
| HEATHERTON HOLDINGS LLC | Bank of America | 7120 | Disbursement |
| Hopkins Manufacturing Corp | US Bank | 5565 | Collection |
| Hopkins Manufacturing Corp | US Bank | 0366 | Collection |
| Hopkins Manufacturing Corp | US Bank | 2289 | Collection |
| Hopkins Manufacturing Corp | Bank of America | 7724 | Collection |

**Exhibit D**

**Cash Management System Schematic**

