# EXHIBIT PJ8

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

|  |  |
|---|---|
| | . |
| IN RE: | . Case No.  25-90399 |
| | . Chapter 11 |
| FIRST BRANDS GROUP, LLC, | . |
| | . 515 Rusk Street |
| | . Houston, TX 77002 |
| Debtor. | . |
| | . Wednesday, October 1, 2025 |
| . . . . . . . . . . . . . . . . . | . 9:00 a.m. |

TRANSCRIPT OF FIRST-DAY MOTIONS HEARING
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Weil Gotshal and Manges |
| | By:  CLIFFORD WILLIAM CARLSON, ESQ. |
| | 700 Louisiana Street, Suite 3700 |
| | Houston, TX 77002 |
| | (713) 546-5248 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Yesenia Lila, ERO |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46048 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

2

APPEARANCES (Continued):

| | |
|---|---|
| For the Debtor: | Weil Gotshal and Manges<br>By:  MATTHEW BARR, ESQ.<br>       ANDRIANA GEORGALLAS, ESQ.<br>       SUNNY SINGH, ESQ.<br>       JASON GEORGE, ESQ.<br>       JARRED BARLOW, ESQ.<br>       ANGELINE LEGGIERO, ESQ.<br>       THOMAS PALISI JR., ESQ.<br>       NATHANIEL MCCABE, ESQ.<br>       KEVIN BOSTEL, ESQ.<br>       ROBERT BEREZIN, ESQ.<br>       THEODORE E. TSEKERIDES, ESQ.<br>       CHRISTINE CALABRESE, ESQ.<br>       LOREN FINDLAY, ESQ.<br>767 5th Avenue<br>New York, NY 10153<br>(212) 310-8000 |
| For the Ad Hoc Group<br>of Lenders: | Gibson Dunn<br>By:  SCOTT J. GREENBERG, ESQ.<br>       STEPHEN D. SILVERMAN, ESQ.<br>       JASON Z. GOLDSTEIN, ESQ.<br>200 Park Avenue<br>New York, NY 10166<br>(212) 351-4000<br><br>Gibson Dunn<br>By: ANNELYSE SCARLETT GAINS, ESQ.<br>1700 M St NW<br>Washington, DC 20036<br>(202) 955-8500<br><br>Howley Law PLLC<br>By: THOMAS A HOWLEY, ESQ.<br>    ERIC TERRY, ESQ.<br>700 Louisiana St, Suite 4220<br>Houston, TX 77002<br>(713) 333-9125 |
| For Evolution Credit<br>Partners: | Proskauer Rose<br>By:  VINCENT INDELICATO, ESQ.<br>Eleven Times Square<br>New York, NY 10036<br>(212) 969-3000<br><br>Proskauer Rose<br>By:  CHARLES A. DALE, ESQ.<br>1 International Place<br>Boston, MA 02110<br>(617) 526-9600 |

3

APPEARANCES (Continued):

For Evolution Credit        Gray Reed & McGraw LLP
Partners:                   By:  JASON S. BROOKNER, ESQ.
                            1601 Elm Street, Suite 4600
                            Dallas, TX 75201
                            (469) 320-613

For Onset Financial,        Munsch Hardt Kopf & Harr
Inc.:                       By:  DEBORAH PERRY, ESQ.
                            500 N Akard Street, Ste 3800
                            Dallas, TX 75201
                            (214) 855-7565

                            Morrison & Foerster LLP
                            By:  BENJAMIN BUTTERFIELD, ESQ.
                                 BRYAN KOTLIAR, ESQ.
                                 JAMES A. NEWTON, ESQ.
                            250 W 55th Street
                            New York, NY 10019
                            (212) 468-8000

                            Morrison & Foerster LLP
                            By:  BRIAN R. MICHAEL, ESQ.
                            Aon Center
                            707 Wilshire Blvd Suite 6000
                            Los Angeles, CA 90017
                            (213) 892-5200

                            Morrison & Foerster LLP
                            By:  ANTHONY S. FIOTTO, ESQ.
                                 JULIA KOCH, ESQ.
                            200 Clarendon St Floor 20
                            Boston, MA 02116
                            (617) 648-4700

For LKQ Corporation:        Connolly Gallagher LLP
                            By:  CHRISTINA M. THOMPSON, ESQ.
                            1201 North Market Street, 20th Floor
                            Wilmington, DE 19801
                            (302) 884-6592

For Link Logistics          Singer & Levick, P.C.
Real Estate LLC:            By:  MICHELLE E. SHRIRO, ESQ.
                                 WILLIAM DORWARD, ESQ.
                            16200 Addison Rd
                            Addison, TX 75001
                            (972) 380-5533

4

APPEARANCES (Continued):

| | |
|---|---|
| For Raistone Capital, LLC; Raistone Purchasing LLC-Series XXXII, Raistone Purchasing LLC-Series XXVIII: | Orrick Herrington & Sutcliffe LLP<br>By:  EMANUEL GRILLO, ESQ.<br>    LAURA METZGER, ESQ.<br>51 W 52nd Street<br>New York, NY 10019<br>(212) 506-5000 |
| For Katsumi Servicing, LLC: | Mayer Brown LLP<br>By:  CHARLES KELLEY, ESQ.<br>700 Louisiana Street<br>Houston, TX 77002<br>(713) 238-3000 |
| | Mayer Brown LLP<br>By:  SEAN SCOTT, ESQ.<br>    KYLE J. TUMSUDEN, ESQ.<br>71 South Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600 |
| | Mayer Brown LLP<br>By: RICHARD STIEGLITZ, ESQ.<br>1221 6th Avenue<br>New York, NY 10020<br>(212) 506-2500 |
| For Carnaby II and III Secured Parties: | Dechert LLP<br>By:  ALLAN BRILLIANT, ESQ.<br>1095 6th Avenue<br>New York, NY 10036<br>(212) 698-3500 |
| | Porter Hedges LLP<br>By:  JOHN HIGGINS, ESQ.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>(713) 226-6000 |
| For Volvo Penta of the Americas, LLC: | Baker Donelson<br>By:  SUSAN C. MATHEWS, ESQ.<br>1301 McKinney St #3700<br>Houston, TX 77010<br>(713) 650-9700 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  HA NGUYEN, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4650 |

APPEARANCES (Continued):

| | |
|---|---|
| For Mayfair Enterprises, LLC; Global Technology Partners, LLC; Global Technologies S.a.r.L.; and certain affiliated directors and officers: | Debevoise & Plimpton LLP<br>By:  M. NATASHA LABOVITZ, ESQ.<br>    ERICA WEISGERBER, ESQ.<br>    MATTHEW J. SORENSEN, ESQ.<br>66 Hudson Blvd E<br>New York, NY 10001<br>(212) 909-6000<br><br>Jones Walker LLP<br>By:  SEAN THOMAS WILSON, ESQ.<br>811 Main Street, Ste 2900<br>Houston, TX 77002<br>(713) 437-1869 |
| For Aequum Capital Financial II LLC: | Blank Rome LLP<br>By:  KENNETH J. OTTAVIANO, ESQ.<br>    STEPHANIE K. HOR-CHEN, ESQ.<br>444 W Lake St, Suite 1650<br>Chicago, IL 60606<br>(312) 776-2600 |
| For UMB Bank, N.A.: | Alston & Bird<br>By:  STEPHEN BLANK, ESQ.<br>    WILLIAM HAO, ESQ.<br>90 Park Avenue<br>New York, NY 10016<br>(212) 210-9400 |
| For Leucadia Asset Management LLC, LAM TFG, LAM TFG II, and LAM TFG I SPV: | Herbert Smith Freehills Kramer LLP<br>By:  ADAM ROGOFF, ESQ.<br>    ANDREW J. CITRON, ESQ.<br>    ANDREW POLLACK, ESQ.<br>    SCOTT S. BALBER, ESQ.<br>1177 6th Avenue<br>New York, NY 10036<br>(212) 715-9285 |
| For Bank of America: | Winston & Strawn LLP<br>By: DAN MCGUIRE, ESQ.<br>    GREGORY GARTLAND, ESQ.<br>35 W Wacker Driver<br>Chicago, IL 60601<br>(312) 558-5600 |
| For FactoFrance S.A.: | Dentons US LLP<br>By: CASEY DOHERTY, ESQ.<br>1300 Post Oak Blvd, Suite 701<br>Houston, TX 77056<br>(713) 658-4600 |

APPEARANCES (Continued):

| | |
|---|---|
| For Arab Banking Corporation B.S.C.: | Baker & McKenzie<br>By:  COURTNEY E. GILES ,ESQ.<br>800 Capitol Street, Ste 2100<br>Houston, TX 77002<br>713-427-5086 |
| For Ford Motor Co.: | McGuireWoods LLP<br>By:  MARK E. FREEDLANDER, ESQ.<br>     FRANK J. GUADAGNINO, ESQ.<br>260 Forbes Avenue #1800<br>Pittsburgh, PA 15222<br>(412) 667-6000 |
| For International Motors, LLC: | Barnes & Thornburg LLP<br>By: JONATHAN SUNDHEIMER, ESQ.<br>11 S Meridian St<br>Indianapolis, IN 46204<br>(317) 236-1313 |
| For ING Belgium S.A./N.V.: | Clifford Chance US LLP<br>By:  DOUGLAS DEUTSCH, ESQ.<br>     SARAH CAMPBELL, ESQ.<br>375 9th Avenue<br>New York, NY 10001<br>(212) 878-8000 |
| For Bank ABC: | Baker & McKenzie LLP<br>By:  BLAIRE A. CAHN, ESQ.<br>452 5th Avenue<br>New York, NY 10018<br>(212) 626-4100<br><br>Baker & McKenzie LLP<br>By:  JOHN R. DODD, ESQ.<br>830 Brickell Plaza Suite 3100<br>Miami, FL 33131<br>(305) 789-8900 |
| For Sirva Worldwide, Inc.: | UB Greensfelder LLP<br>By: MICHAEL S. TUCKER, ESQ.<br>1660 W 2nd Street #1100<br>Cleveland, OH 44113<br>(216) 583-7000 |
| For AGL: | Keck Legal, LLC<br>By:  BENJAMIN R. KECK, ESQ.<br>2801 Buford Hwy NE, Suite 115<br>Atlanta, GA 30324<br>(470) 826-6020 |

```
APPEARANCES (Continued):

For TI Group              Dickinson Wright PLLC
Automotive Systems,       By:  DORON YITZCHAKI, ESQ.
LLC:                      350 S Main St #300
                          Ann Arbor, MI 48104
                          (734) 623-7075

For FCA US LLC:           Dickinson Wright PLLC
                          By:  M. KIMBERLY STAGG, ESQ.
                          424 Church St #800
                          Nashville, TN 37219
                          (615) 244-6538

For Grammer Inc. and      Jones Day
Grammer Americas LLC:     By:  MATTHEW C. CORCORAN, ESQ.
                          325 John H McConnell Blvd #600
                          Columbus, OH 43215
                          (614) 469-3939

                          Jones Day
                          By:  T. DANIEL REYNOLDS, ESQ.
                          901 Lakeside Ave E
                          Cleveland, OH 44114
                          (216) 586-3939

For ARC CGMARSC001,       Loeb & Loeb LLP
LLC and ARC               By:  BETHANY D. SIMMONS, ESQ.
CGLGNIN001, LLC:          345 Park Avenue
                          New York, NY 10154
                          (212) 407-4000

For Titanium American     Law Offices of Martin Seidler
Logistics, Inc.:          By:  MARTIN SEIDLER, ESQ.
                          One Elm Place, Suite 504
                          11107 Wurzbach Rd
                          San Antonio, TX 78230
                          (210) 694-0300

For STORE Master          Ballard Spahr, LLP
Funding XIV, LLC and      By: JOEL NEWELL, ESQ.
STORE Capital             1 E Washington St #2300
Acquisitions, LLC:        Phoenix, AZ 85004
                          (602) 798-5400

For Toyota Motor North    Frost Brown Todd LLP
America, Inc.:            By:  PATRICIA BURGESS, ESQ.
                          150 3rd Ave S #1900
                          Nashville, TN 37201
                          (615) 251-5550
```

8

APPEARANCES (Continued):

| | |
|---|---|
| For Washington Penn Plastics Co., Inc., Audia Elastomers and Uniform Color Company: | Leech Tishman<br>By:  JOHN STEINER, ESQ.<br>525 William Penn Pl<br>Pittsburgh, PA 15219<br>(412) 261-1600 |
| | Bonds Ellis Eppich Schafer Jones LLP<br>By:  AARON GUERRERO, ESQ.<br>420 Throckmorton St Suite 1000<br>Fort Worth, TX 76102<br>(817) 405-6900 |

Also Present:          Charles Moore

Tyler Cowan

Sabeen Ahmed

Grace Yeh

Matthew Kleissler

Nicholas Church

Rebecca C. Yu

Tony G. Berbari

Nadeem Kunwar

Brian Laurain

Steve Faraci

Morgan Regenbogen

David Rood

Sean Haas

Charlotte O'Toole

Claudia R. Tobler

Justin A. Cousino

Kenneth Kozack

Emerson Schneeman

Joseph Sedjwick

Atif Baig

David Cole

David Fioriollo

Michael Rich

Ronald Buck

9

APPEARANCES (Continued):

Also Present:             Vincent Spencer

                          Philip Marrone

                          Joe Kuzmicz

                          Joe Montana

                          Matt McAlpine

                          JaKayla DeBera

                          Glenn DeWeese

                          Marvin Fentress

                          Tristan Dresbach

                          William Jentsch

                          Danielle Nyberg

                          Stephan Curran

                          Eric Werwie

                          Scott Freundlich

(Proceedings commence at 9:00 a.m.)

THE COURT:  Good morning.  This is Judge Lopez.  I'm going to call up the nine o'clock case.  Today is October 1st, Case Number 25-90399.  If there's someone from the debtor who can hit "five star",  I'd ask that you please hit "five star".

I just unmuted someone's line.

MS. GEORGALLAS:  Yes.  Good morning, Your Honor.  Can you hear me okay?

THE COURT:  Just fine.  Good morning.

MS. GEORGALLAS:  Andriana Georgallas, Weil, Gotshal as proposed counsel to the debtors, First Brands.  Thank you for the time this morning.

THE COURT:  Ms. Georgallas, may I --

MS. GEORGALLAS:  As chambers is aware --

THE COURT:  Go ahead, go ahead.

MS. GEORGALLAS:  Thank you.  As chambers is aware, the debtors and their advisors are continuing to work to resolve objections that have been filed.  We think a little more time would be useful here.  And we requested that the hearing be pushed by an hour to 10 Central, if that works for Your Honor.

THE COURT:  Okay.  Parties want to keep talking.  But let's come on at 10 Central and get started.  I would ask everyone to please, just during the interim, just jump on the Southern District of Texas homepage.  You'll find a link to my

homepage, and you'll find a place where you can make an electronic appearance.

I'm going to hang up the line and then open it back up at 9:45 a.m. And I'm going to hang up the line and then I'm going to open it back up at 9:45 a.m. Central. And then we will start this first-day hearing in First Brands at 10 a.m. So I'm going to hang up now.

Actually, I'm going to stay on. I'm going to make another announcement at 9:05, Ms. Georgallas. But we will adjourn this hearing until 10 a.m. Central. Parties are free to log off. I'm just going to stay on for another five minutes and make an announcement in a few minutes so anyone who's logging in a little bit after the time period, didn't hear the initial announcement, isn't surprised when the line isn't open.

So everyone is -- we're adjourned until 10 a.m. I've got no issues with that. And then we'll take appearances at 10 a.m. for all parties. And we'll get started with the hearing and we'll see where we go. Thank you.

MS. GEORGALLAS: Thank you, Your Honor. We appreciate the time and flexibility. And just so you know, we will be filing a notice so folks will be aware that we're moving the hearing time.

THE COURT: Okay. Sounds great. Thank you. Alrighty.

MS. GEORGALLAS: Thank you.

THE COURT: I'm just going to stay on. I'm going to make another announcement in about four minutes or so. But parties are free to log off.

Yesenia, let's keep the line open for about five minutes, and then I'll make an announcement.

THE CLERK: Okay.

THE COURT: Thank you.

(Pause)

THE COURT: Good morning. This is Judge Lopez. If you're dialing in for the First Brand's first-day hearing, it has been adjourned to 10 a.m. Central. We're going to hang up the line in a few minutes, and we're going to open the line back up at 9:45 a.m.

If you're calling in for the First Brand's first-day hearing, it has been adjourned until 10 a.m. Central. We're going to hang up the line, and then open it back up at 9:45 a.m.

I forgot to say this a little earlier, but I will -- if you have filed a motion to appear pro hac and we haven't gotten to it, you are more than welcome to appear for purposes of today. There were plenty -- there were a lot of them filed, and we will get to them in due course, but no need to ask me for permission to appear today for purposes of today's first-day hearing. We will get to the pro hacs in due course. I just wanted to make sure that that announcement was made.

I'm going to hang up the line, and we will come back on at 10 a.m. Central, but we'll open up the line at 9:45 a.m. Thank you.

(Recess taken at 9:06 a.m.)

(Proceedings resumed at 10:01 a.m.)

THE COURT: Okay. Good morning. This is Judge Lopez. I'm turning on my camera.

I'm going to call what was originally scheduled at 9 a.m., now starting at 10 a.m., first-day hearings in Case Number 25-90399, First Brands Group.

Let me -- we've got a number of people on the line. I would just ask debtor's counsel, if you're -- please hit "five star." I'm going to ask people to make an electronic appearance. I realize there are some parties who may want to make an appearance. We're currently at about 380 people on the line, so I'm going to just hear from the debtors first. And then I'm going to open it up to see if anyone wishes to be heard.

There's a 646 number.

MR. BARR: Good morning, Your Honor. Matt Barr with Weil Gotshal, proposed counsel for the debtors. Can you hear me okay?

THE COURT: Just fine. Good morning.

MR. BARR: Good morning. Thank you very much, Your Honor. First, thank you very much for hearing us and for

giving us the hour delay.  We were able to resolve three or four outstanding issues in that hour, so thank you very much.

Here with us at Weil, Your Honor, we have a team of people that will come up during the first-days to present orders, motions, seeking orders for you, but we also have with us Chuck Moore from Alvarez & Marsal and his team.  He is the CRO of the company and one of the proposed declarants.

We also have Tyler Cowan.  Tyler is with Lazard and his team this year.  He is also a declarant and the proposed investment banker from Lazard, as well as certain of the management team are online as well, Your Honor.

If it's okay with you, Your Honor, what we thought we would do is we would do a short presentation.  Then we would give Mr. Greenberg an opportunity.  I know he wants to speak to the Court.  He represents the ad hoc group of first lien and second lien lenders, as well as the proposed DIP lender.

And then, whatever Your Honor will do, we can jump right into the agenda, move the evidence and then jump right into the agenda if that works for you.

THE COURT:  Okay.  Mr. Greenberg, just before we begin --

MR. BARR:  Thank you.

THE COURT:  -- can you hit "five star?"  I know there are going to be a number of people that are going to ask to say something, but just so I'm going to unmute your line.  I just

ask that you please keep it muted, so once Mr. Barr's team is finished with their presentations, I'll hear from you. And then I may open it up and allow some before we kind of get into the agenda. If anyone has any preliminary comments, I'll do it at that time.

But, well, I've unmuted a line. Mr. Greenberg, did I get you? Oh --

MR. GREENBERG: Yes, Your Honor.

THE COURT: Okay.

MR. GREENBERG: Scott Greenberg. Good, you can hear me, that's fine.

THE COURT: Yeah. Someone tried to sneak in on the line here. I just wanted to make sure. I promise I'll get to everyone.

Mr. Barr, go ahead and continue.

MR. GREENBERG: All right. Thank you, Your Honor.

THE COURT: And I will --

MR. BARR: We have a computer named Weil PC Share. If Your Honor is willing to allow us to share our presentation, we can put it up on the screen. We did file it with the Court as a demonstrative for this morning's hearing.

THE COURT: Okay. Thank you.

MR. BARR: Your Honor, can you see that?

THE COURT: Just fine. Thank you.

MR. BARR: Thank you, Your Honor. So I'm going to

potentially -- there.

So who are we? This presentation is going to go through who are we, how we got here, and where we would like to go during the Chapter 11 cases. So who are we? Sorry. Technical. (Indiscernible) do it for me? Great. Okay.

Your Honor, First Brands is a leading supplier of aftermarket auto parts, including brakes, filters, wipers, lights, pumps, and towing solutions. It is a tremendous company, Your Honor. We'll get to that in a moment.

It has a global network of manufacturing and very new integrated distribution centers that span five continents and numerous countries. It was founded in 2013 and headquartered in Cleveland, Ohio. There's approximately 26,000 employees globally, with the debtors employing approximately 6,000 employees alone in the United States. Reported total net sales in 2024 was over $5 billion, and reported EBITDA was $1.133 billion.

Besides OEMs, original equipment manufacturers that the company supplies, Your Honor, on the lower left-hand side, you'll see some of our largest customers. They are people that we see every day when we drive around or we turn our computers on. It's the Advance Auto Parts stores, the AutoZones, the O'Reillys, the Walmart, Costco, and Amazons.

The next slide, Your Honor, just gives you a snapshot of how diverse and widespread our products are. There are

2,900 patents.  We constantly are looking and changing with the environment of the businesses that we own and the markets themselves.  Our R&D department roughly pumps out 5,000 new SKUs each year to keep up with the markets.

And you can see here, Your Honor, the different variety of products we have from braking to consumer, filtration, and the lower part shows you the brands.  And as some of us know, these are brands that we see all the time if we go and try to get windshield wipers or other products aftermarket for our cars.  As I mentioned, it's a significant company with well-known products.

The next slide shows the global footprint that I mentioned.  As I mentioned, we're in five continents with over 26,000 employees.  As you can see, in North America, Mexico, and South America, we have roughly 21,000 employees with multiple distribution centers and factories.  In Europe and Asia, 3,000, and other parts of the world as well.

You can see, Your Honor, how widespread our global reach is and where all of our employees and facilities are across the world.

As I mentioned, in 2013, the company was formed with the original purchase of TRICO, a premium producer and distributor of windshield wipers.  As you can see from this slide, over the next 12 years, the company was able to raise significant capital, including refinancing its capital in 2021,

to purchase a number of well-known, and not so well-known, but now well-known products.  And this just shows you over the years how this company was built to what it is today, as I mentioned, a company with tremendous assets and lots of products.

The next slide shows you -- and this is a very simplified org chart.  The org chart, Your Honor, is the size of a small table, but we didn't think it made sense to put the org chart on this deck for Your Honor to look at.  But if you look, Your Honor, there's 112 debtors.  Those are the ones that have the red boxes around them, and those really are some of the SPV silos, as well as the U.S. and some non-U.S. but North American divisions of the business.

And you can see that from the right-hand upper side plus starting at First Brands and Viceroy and going down and left.  As mentioned, there's 112 debtors that have filed these cases.

The next slide shows a snapshot of our prepetition capital structure.  Your Honor will see that we have approximately $227 million of the ABL.  That's $133 million of borrowed money and $97 million of LCs formal, plus interest.

Our term loan debt, first lien and second lien term loan debt, including our pari passu sidecar term loan, loop interest is approximately $6 billion.  The Gibson Evercore Group represents approximately 99 percent of the first lien and

83 percent of the second lien debt. They were able to organize almost all of our significant -- all of our term loan holders, which has been very helpful, Your Honor, in these cases. And we'll come to the DIP financing at 1.2, but helping stabilize the business and help tell the story that we're going to tell at the end of my presentation about stabilizing the business and continuing business as usual on a go-forward basis.

We then show some of the SPV structures and the borrowed money there, which is approximately $2.4 billion. Those are the Aequum, CarVal, Evolution, and Onset. Some of those, Your Honor, we have seen some filings.

I'm happy to report that most of those we've been able to resolve, but we still have some outstanding issues with some of those holders that either Mr. Carlson or Mr. Singh will address. But in total, with the supply chain financing obligations we have, there's in excess of $10 billion of borrowed money in the capital structure.

The next slide is just a snapshot of -- I'm sorry -- is a slide that has the key parties in the Chapter 11. The board of managers established a special committee comprised of independent managers, Bill Transier and Neal Goldman. That was in September of this year.

The special committee has the exclusive power and authority to consider and evaluate all potential transactions; to approve or reject for itself, for the company, and its

20

subsidiaries' entry into or consummation into an agreement, contract, or other arrangements with respect to those potential transactions; to oversee and implement the execution of a potential transaction; and to conduct an investigation into potential claims and causes of action that may exist in favor of one or more of the debtors, which I'll get to in a few moments.

As mentioned again, Chuck Moore, in September of this year, was appointed the chief restructuring officer of the company, and his delegation of authority has been pretty much taking over all controls over cash, as well as working with the management team on the operations of the business.  Chuck is completely embedded within the company.

Just to give you a little bit more of who's involved, as I mentioned, the special committee, Neal Goldman and Bill Transier, the management team, the founder and chief executive officers, Patrick James, CFO Steve Graham, and senior vice president of mergers and acquisitions is Shekhar Kumar. Proposed counsel is Weil, Gotshal.  Proposed advisor with Chuck as CRO is Alvarez & Marsal, and proposed banker is Lazard.

Importantly, the parties that we've been dealing with, some who have been extremely helpful in stabilizing the company and getting us to this place today, Your Honor, and we thank them for that, are on the right-hand side.  And this is really our material lenders, as well as our equity owners that

are represented by Debevoise.

As mentioned, the ad hoc group of term loan lenders and proposed DIP, that's Gibson Dunn and Evercore. The ADL lenders, which we also have an agreement with, is Winston & Strawn and FTI; Evolution is Proskauer and BRG; Aequum, Blank Rome; CarVal, Dechert and Ankura; Onset, Morrison & Foerster. And these are just some of the parties, but the material parties that we've been working with around the clock with them over the last several weeks, if not days, and we thank them for their efforts.

Your Honor, how did we get here? You can go to the next slide. We'll start off with the tariffs. This is something that I'm sure all of us are aware of, and I know Your Honor is because you have other cases in front of you. The tariffs have caused additional landing costs for goods for the company, but also provided the company with an opportunity, given where some of its facilities were, to try to minimize the future exposure to tariffs, especially between the United States and Mexico, but that required capital and reinvestments.

So the company had lots of orders to try to fulfill, but needed to make sure it had the right capital structure and the right capital, which unfortunately found we didn't have enough capital to fulfill those orders.

Lease obligations and debt obligations started to mount, in particular in May and August of 2025, with respect to

Onset, one of our equipment and inventory lessors. These factors started to snowball and have an effect on liquidity of the company, so the company started to explore potential causes -- courses of action to improve its liquidity and potentially restructure its obligations.

All of these had an effect on the operations of the business, because it started to put pressure on the business. We started to get default notices, we started to get threats of exercise of remedies, we started to get demands for late fees, and forcing the company to make short-term concessions in order to preserve stability. And the company had to do that, because that was in the best interest of the company, and they did do that.

It became clear, though, that the company needed an immediate cash infusion in order to get the runway to get to a maximizing transaction.

In the next slide, Your Honor, the company proactively, for a while now, was trying to address its capital structure and liquidity needs. Last year, in mid to late of 2024, they sought to do a financing using the rest of the world or non-US assets. Unfortunately, they were unable to do that.

In July of this year, with the assistance of Jefferies, they sought to refinance $6.2 billion of the debt on their capital -- on their books through a comprehensive refinancing. During that process, in August of 2025, it became

clear that certain of the lenders insisted on a quality of earnings report, and the company started to -- or hired and started an accounting firm to go through the quality of earnings report.

However, at that same time, the company had the liquidity concerns and the crunch that we just talked about. So in August of this year, the company retained our firm and Lazard to assist it in addressing its liquidity concerns, and really engaged financing to see if we can get from where they were and the liquidity that they needed to allow the quality of earnings to finish in order to get to a place where potentially the refinancing could occur.

It became clear during that process, and -- I'm sorry -- and at the same time, Lazard started to reach out to buyers or potential buyers about an asset sale of the company or certain assets of the company. It became clear at that time that there were questions in diligent sessions that needed time to be answered, that needed more efforts from the company and its advisors, that we didn't have the measure of time or liquidity to get there.

It became very clear that we were going to be in a much more grave liquidity crisis, and that we couldn't let that process completely run out. So we immediately started to focus on preserving the value of the business, stabilizing it, and getting into Chapter 11.

24

It also became clear that certain of the buyers were not interested in purchasing assets outside of the Chapter 11 process. As I mentioned, in September, the special committee was appointed to do, among other things, to do an investigation into any potential causes of action or claims that the company may have. During this process, among other things, it became clear that the company and the special committee needed to look into certain issues surrounding third-party factoring, factoring practices that led to approximately $2.3 billion of factoring.

The collection of approximately 1.9 billion of those factored receivables had come into the company that had not turned over to the factors. That's something that the special committee will be looking at, as well.

The next slide is just a snapshot of the proposed debtor-in-possession financing. I'm not going to spend a lot of time on this, Your Honor, because Mr. Singh will go through it with you in detail, but just to say that the company has secured $1.1 billion of new money financing.

That financing is essential to the business. It's essential not only to operate the business, but it's essential to send a message that we want to make loud and clear. This is a significant company. It's got significant assets and significant businesses. We have the financing to pay our employees. We have our financing to continue our relationships

with our vendors and our customers, and we intend to maximize the value of this business.

And as I mentioned, Mr. Greenberg's clients are substantial, if not almost all of our prepetitioned, first lien secured vendors, and they support the company through this DIP financing.

So where are we going to go? Where would we like to go? First, hopefully, Your Honor, after hearing today, will help us secure, at least on an interim basis, our $1.1 billion DIP financing, $500 million on an interim basis. That will allow us to stabilize our operation, preserve our jobs, preserve our vendor and customer relationships.

In fact, with certain of our customers, we're continuing to negotiate with them, and in the interim, while we decide whether or not they will continue to do business with us and provide us credit, we've agreed to escrow or segregate cash that might be theirs, might be their collateral, and hold it on the side and figure out whether they have claims or don't have claims against it, as a good faith effort to try to continue our relationship with certain of these parties, and you'll hear about that in a little while.

We're going to work with our key stakeholders to explore value-maximizing options, including potential asset sales or sales. We're going to work with the special committee to continue this investigation, and we hope to emerge from

Chapter 11 as soon as practical.

So unless Your Honor has any questions for me, as mentioned before, I know Mr. Greenberg would like to say a few things.

THE COURT: No questions at this time. Thank you.

Mr. Greenberg?

MR. GREENBERG: Good morning, Your Honor. Can you hear me okay?

THE COURT: Just fine. Thank you.

MR. GREENBERG: Okay. Thank you, Your Honor. Good morning. Scott Greenberg of Gibson, Dunn & Crutcher, counsel for the Ad Hoc Term Loan Lender Group and the proposed DIP lenders in the case.

As Mr. Barr already hit on the math, our ad hoc group is comprised of lenders that currently hold approximately 99 percent of the first lien term loan, 100 percent of the debtors' first lien sidecar term loans, and 83 percent of the debtors' second lien term loans.

Certain members of our Ad Hoc Group, Your Honor, over the last several weeks have negotiated and structured the terms and obtained the support from the other first and second lien lenders of this proposed DIP facility, which Mr. Barr mentioned, which obviously, subject to Your Honor's approval, would provide the debtors with $1.1 billion of new money to fund their operations and restructuring efforts during these

Chapter 11 cases.

Your Honor, we filed our 2019 statement yesterday, which obviously lists out all of our clients. That's at Docket Number 119.

Your Honor, with your permission, I'll obviously not try to be repetitive of what Mr. Barr has already covered, I would like to take a few minutes to put a bit of color, at least from our perspective as the ad hoc group of lenders, in terms of how we got here from the lenders' purview, and candidly, just given the facts and circumstances, why this has been such a hard lift to underwrite the DIP.

But before I get into it, I will say I'll finish where Mr. Barr finished, which is obviously the lenders are here today supportive of this company and getting a path forward once we stabilize the business to end up with the most value-maximizing transaction.

That being said, Your Honor, I will say on a personal note, I've had a lot of tough cases over my career. Obviously, all of what we do for a living, by definition in some ways, is an emergency, one way or the other, as a structuring professional. But I will say, and I don't take this lightly, this one, looking back over 23 years, at least the last couple of weeks, may take the cake, and hopefully it gets better from here.

This is not a case where we're only dealing with a

28

liquidity issue leading to a filing. As we saw in Mr. Moore's declaration, the company -- Mr. Barr hit on, the company is estimated to have about $2.3 billion in aggregate off-balance sheet financings, another $800 million in unsecured supply chain financings, approximately $2.3 billion in factoring liabilities. And this is all stuff we've only learned over the last couple of weeks, but a portion of those off-balance sheet financings have allegedly been in default, you know, prior to the filing, which was news to our clients.

There are obviously serious questions about the factoring facilities, supply chain financing, and as you heard from Mr. Barr, there's now a special committee, Weil, A&M, and the newly appointed CRO are just starting to peel back the onion.

As Mr. Barr said, this special committee, among other things, has been tasked with conducting an investigation into potential claims against current and former insiders, and matters relating to the off-balance sheet financing process. And more importantly, Your Honor, we've learned from the -- and we've all been learning on the fly together for what it's worth with Mr. Barr and Lazard and A&M on the debtor's side.

The special committee is also investigating whether certain of these receivables have been turned over to third-party factors upon receipt, and whether certain of the receivables may have been factored more than once. We're going

to have to let that process run its course. Obviously, we'll be doing that under the purview of this Court. But there's just a lot we don't know, to put it bluntly.

All that being said, we're here today trying to save the company from what was almost a complete and immediate implosion, and we're trying to do so with over a billion dollars of financing to let this company operate in the ordinary course.

It shouldn't come as a surprise to the Court, I'm sure having read all the declarations and background, that from our perspective, this was not an easy process, nor was it an easy decision. It wasn't easy for the advisors, in the sense that we're operating on far from perfect information. It wasn't easy for our clients, who, you know, candidly have lost significant investment dollars over the last several weeks. And it certainly wasn't easy from an investment committee process standpoint, with people being asked to put new capital into the business to support it, despite the questions.

The company's financial controls are under serious pressure. The go-forward business plan is obviously under complete scrutiny. And there are substantially more questions than answers.

But nonetheless, as I said, we're here supporting the company with over a billion dollars of additional liquidity, because we intend to work closely as we have over the last past

week, with the debtor's professionals to try to figure this all out over the next couple of months.

And just to rewind the tape a little bit, Your Honor, and you don't need to go back that far in time, and Mr. Barr alluded to this. But as was discussed in Mr. Moore's declaration, just in July of this last year, over the summer, the company was out in the market with a $6.2 billion, what I would call, regular lay market process. It was a refinancing designed to extend the 27 debt maturities to 2030. And Jefferies launched that deal in the market in July of this summer, with commitments due in August.

I think everyone, family, from our clients, assumed that this one was going to play out the regular way and be refinanced. But just one day before the commitment deadline, the company had to put a pause on the process. The deal book was short, and as described in Mr. Moore's declaration, and Mr. Barr hit on it as well, there was concern among investors in the marketplace about the company's financial disclosures, and that's when Duluth was brought in to do a QOE to try to assuage those concerns.

The QOE was delayed. At some point, concerns about the company's balance sheet unfortunately started to leak into the press, and the debtor's liquidity pressure came under great strain, and that's when we got an outreach from the company's advisors.

31

Where did that take us, Your Honor? In less than, effectively, four weeks, from our client's perspective, we went from an assumption that the Jefferies refinance process was on track, and we were going to be refinanced at par. We got a call, I got a call on September 4th, from the company's advisors, which candidly caught us off guard. In fairness to them, I think they were also drinking from, you know, the fire hose, and they told us effectively to fasten our seatbelts because they were in desperate need of capital. We were trying to figure out at the time whether it was something we could do out of court or in court. And at that -- at the time, at least, that our clients would be required to fund no less than $600 million to keep the company's lights on.

Members of our ad hoc group got restricted on a rolling basis beginning on September 17th. So as you can see, Your Honor, a very compressed timeline. Not knowing what to expect, and we and Evercore started doing as much diligence as we could, based on what the company was able to provide.

We've been working, Evercore, and Gibson, with the debtors' professionals, you know, hand in glove ever since, trying to get our arms around the situation together. And I'll spare you the gory details, but just to get a sense of market perspective, Your Honor, over the course of less than a week, as the details of concerns around the company's actual performance and off-balance sheet financing-related concerns

came to light and the press picked up on it, the debtor's prepetition secured first lien debt, which was trading at nearly par a few weeks earlier, expecting to refinance, traded down to $0.36. And the second lien that our lenders owned crated from $0.91 to $0.10.

And during about that same time period over the last week to ten days, the DIP need, after Alvarez was able to really do their work and dig in, ballooned from 600 million to about 1.1 billion.

To put it mildly, Your Honor, our clients are funding $1.1 billion into, as well as we could protect it, and we'll talk about it, but effectively a black box. Our diligence is probably, you know, 10 to 20 percent of where it would typically be to put together a loan of this size in complexity. And as I've said a couple times, but I want to stress this for the Court, Your Honor, that's no fault of the debtors' advisors. I would go in the opposite direction and say that Weil and A&M and Chuck and his team and Lazard have been great teammates in a tough situation and have been extremely transparent, even when it's not good news.

One thing I want to hit on, Your Honor, just to give you a sense of even last week, when we were working with the company in our efforts to put this company into bankruptcy in as smooth of a landing as we could, there were more twists and turns just days before the filing last week.

I think, ironically, on the Rosh Hashanah holiday, we learned that the company's remaining liquidity was a little bit south of $30 million that was being used to get this company into chapter this past weekend. We were seized by one of its banks that had exposure to supply chain financing, and it led to the company to not being able to make payroll last Friday. And there were a lot of conversations going on of whether or not we were just going to put this into a chapter without even having a DIP finalized, given what happened.

I will say our clients, on less than two days' notice, stepped up. They funded $24.5 million of bridge financing last week, which was used last Thursday primarily to fund payroll and crucial vendor payments. And that bridge financing was structured as a tranche that you'll see will be repaid from the DIP facility that is before Your Honor, if that's approved today.

Obviously, there's a bigger task at hand as well, which is the $1.1 billion superpriority DIP facility that's in front of Your Honor today. To be clear, Your Honor, we didn't have the luxury as we typically would, as we try to do when we bring the case to you, of having the entire case mapped out. This is certainly not a prepack. It's not even a pre-arranged.

The goal here, Your Honor, was to get emergency liquidity to make absolutely critical payments to stabilize this business. And obviously, we're going to have to figure

34

out a lot of what happened to get us here as we're in front of Your Honor.

From our client's perspective, Your Honor, the goal has been to make sure that vendors get as comfortable as possible that no one is lending good money after bad. There are obviously more questions than answers, but our clients have stepped up to stop the hemorrhaging and hopefully stabilize the business so we can work with the debtors, specifically their CRO and independent directors, along with the company's advisors, to put together, as Mr. Barr said, a value-maximizing path forward.

So just to wrap it up, Your Honor, I'm going to emphasize that in no way, as I'm sure you're already aware, to downplay the fact that this case is an outlier. From the refinance and debt trading at par about four weeks ago to effectively a controlled crash landing into bankruptcy with serious questions about how we got here and a need for $1.1 billion of fresh capital.

It's not a routine Chapter 11 case. It's not a routine DIP financing. It's a true rescue facility negotiated under extreme pressure with our clients bearing outsized risk. The time constraints were brutal. The uncertainty is enormous. And still, our clients have stepped up and prefer the only real executable capital.

The fee is the structure, and we'll get into it when

Mr. Singh makes his presentation, all reflect the real risk that our lenders are taking by putting new money into a distressed, unstable company with limited downside protection given the uncertainty regarding the reliability of historical, financial, and other governance controls.

So I know, Your Honor, unfortunately, I've painted a picture, but it's a picture that's developed in a month and a lot has happened. All that being said, and I'll say it again, as Your Honor knows better than any of us, that doesn't necessarily mean that we're not in for a case that stabilizes this business and that results in a value-maximizing transaction.

Obviously, that's what we're hopeful for with the assistance of the debtors' advisors. That is our goal. It's certainly the goal of folks putting in $1.1 billion of fresh capital.

And despite the intensity leading up to the filing, the reality is we're here with a deal on the grip, a set of milestones to work through with an RSA, and a willingness to not let the past prejudge the future of this company. So I appreciate you allowing me some time, Your Honor, and if you have any questions, I'd be happy to address them.

THE COURT: No questions at this time. Thank you.

Let me just make a --

MR. GREENBERG: Thank you.

THE COURT: -- statement before I open things up just a little bit before. We are 500 folks on the line and over 250 on video. There may be some folks that are trying to get in that may or may not be able to. I'm going to ask. I know sometimes there are some firms where everybody has their own individual line open. To the extent that you can combine, I would just ask for the courtesy, just so we could kind of ease up the phone pressure a little bit here and maybe allow some other additional people who may be trying to come in to have the opportunity to dial in. I know normal protocol is everyone dials in on their own, but to the extent that is possible, I would just ask that we do so.

Let me -- just briefly, if there's any kind of brief statements that anyone wishes to tell me at this time, everyone's rights are reserved in connection with every individual motion, but if there's kind of a big brief issue that anyone wishes to highlight for me, now would be the time to do so. I'll do it for about 10 or 15 minutes, and then I'll turn things over to Mr. Barr and we can get right into the agenda. Okay.

Here's a 312 number. A 312 number. Here's a 212 number.

MR. INDELICATO: Good morning, Your Honor. Can you hear me?

THE COURT: Just fine. Good morning.

MR. INDELICATO: Terrific. Vincent Indelicato, Proskauer Rose, LLP on behalf of Evolution Credit Partners. Nice to appear before Your Honor again.

THE COURT: Good to see you.

MR. INDELICATO: With me today in the virtual courtroom, my partner, Chad Dale, my colleague, Matt Koch, and co-counsel from the Gray Reed firm, Jason Brookner.

Your Honor, if it would please the Court, I can provide a brief introduction to Evolution and its relationship with First Brands, maybe just to provide some context. And then try to frame quickly and really put into focus for Your Honor the outcome-responsive issues that we see for the next 30 days of the case.

THE COURT: Mr. Indelicato, to the extent you want to add to something that was -- I know, and I'm certainly not using it to frame the issue, but I've read everything that has been filed, so I have a good glimpse of the issues that you're going to talk about, but certainly feel free to dive in.

MR. INDELICATO: Terrific. I appreciate that and am mindful of the time.

Your Honor, for the last several years, Evolution has been a reliable partner to First Brands through a number of different financing facilities that together approximate more than $300 million of obligations, which include mission-critical secured inventory financings in the company's brake

division with the Starlight and Patterson SPV debtors as well as exposure to the company's top customers through the factoring in what had been contemplated and executed as a true sale receivable purchase of First Brands accounts receivables as well as suppliers through a practice known as reverse factoring.

And so just to take a step back, when you think about three buckets, Evolution finances the company's inventory, it factors the company's accounts receivables with customers, and it reverse factors the receivables of the company's suppliers.

And just to give Your Honor a sense of the criticality and the magnitude of the Evolution inventory, I think as the debtors highlighted in their first-day declaration, we understand the sales of the brake parts inventory alone approximates something like 33 percent of the company's revenue, so quite meaningful to the business.

In the spirit, Your Honor, of Evolution's ongoing partnership with First Brands, when we surfaced about a week ago that First Brands may have been considering a bankruptcy filing, Evolution contacted the company to express its willingness to discuss how it could continue to support the company's liquidity and inventory needs, including whether it could support the company with a DIP facility that had the benefit of providing the company with the use of Evolution's collateral while also injecting new and incremental liquidity.

Less than 24 hours after Evolution made that proposal, Your Honor, it woke up and learned that Starlight and Patterson SPVs had filed petitions for Chapter 11 overnight.

Later that same day, on September 25th, the company's advisors informed Evolution for the very first time that they had discovered that Evolution's inventory collateral had been transferred out of the Starlight and Patterson SPVs, where Evolution is the only creditor, to an entity in the First Brands credit group for no consideration. Even worse, they disclosed that the transferring entity had pledged the inventory, which is incumbent with the first lien to Evolution, to the ADA lenders, who had then advanced funds against that inventory as part of its borrowing base.

And Your Honor, if that wasn't enough bad news, the company's advisors informed us that the customer accounts factored by Evolution, and again, would have been contemplated and executed as a true sale transaction, may have been factored more than once by the company, leaving Evolution and customers of First Brands in a state of disarray and confusion.

And so very simply put, Your Honor, we stand before you today not just as a lender, not just as a supporter of the business and the capital structure, but also as a victim. Because while we don't have all the facts, what we do know, Your Honor, is that someone, and we don't know who, we don't know why, we don't know when, took our collateral, transferred

it to another entity, and then used that same collateral for a loan from another lender.

How in the world that possibly could happen within a sophisticated multibillion-dollar enterprise is a mystery to us and to our client. And, Your Honor, while we commend the debtors' professionals for the candor and the transparency that they have exhibited to their stakeholders during this very challenging time, and we have the utmost respect for the debtors' legal and financial advisors, as Mr. Greenberg emphasized, we still have more questions than answers.

And so, Your Honor, as a matter of law, we believe we start these cases with a first lien against more than $300 million of inventory that was inexplicably transferred for no consideration from a special purpose vehicle to another First Brands entity. And importantly, no one is standing up today, Your Honor, to say that that purported transfer eliminated our lien.

Indeed, as you'll hear later in the hearing, we reached a consensual stipulation to permit the use of our collateral for the interim period until the facts prove otherwise. And my partner, Mr. Dale, can speak to that agreement.

And again, we thank Weil and A&M and Lazard for working to put that interim stipulation in place. And again, over the next 30 days, we will work collaboratively with the

debtors to gather the facts, to identify our collateral, and to sort through these issues without a necessary delay in protracted litigation.

And to that end, Your Honor, we also had a constructive call with counsel to the EBO lenders at Winston & Strawn and believe they also share our desire for a collaborative and swift resolution.  We are optimistic that we can work closely with the EBO lenders and the debtors to quickly determine what the inventory is and ultimately, Your Honor, who's on first.

We hope the debtors will continue to provide full cooperation and transparency in the coming days.  But given the history of what happened here, especially given that our bankruptcy without SPV borrowers were placed into Chapter 11 and a majority of insiders still remain on the board that was front and center of the first-day declaration, Evolution has to reserve all of its rights, Your Honor, to request the appointment of an examiner or a Chapter 11 trustee and/or move to dismiss the Starlight and Patterson SPV bankruptcy cases if necessary.

And I would note, and this is important, that we appreciate the debtors have retained the assistance of independent directors.  Under the circumstances, Your Honor, as Mr. Greenberg noted, this isn't any ordinary case, and so there isn't any way that anyone could take comfort in that alone as

the concept of independent directors who just arrived on scene after the fact is not at all a panacea and should not cause Your Honor to designate the special committee exclusively as fact finder or investigator.

And I think this feels especially important here, Your Honor, when we have the same estate fiduciaries, the same directors, wearing both First Brands debtor hats and SPV debtor hats for Starlight and Patterson as it relates to our client and acting as agents for separate debtor entities that we already know on the very first day of these Chapter 11 cases have a direct and irreconcilable conflict between them. Mr. Barr conceded just that in his opening remarks when he talked about how the same set of directors is undertaking an investigation of claims that one silo of debtors likely can assert against another silo of debtors.

And so, Your Honor, in closing, for these reasons, absent potentially the appointment of a trustee, we really believe that this forensic examination, investigation, whatever we want to call it, can only happen with the participation of the agreed parties working alongside the special committee with full cooperation and access. And so we look forward to that process and, of course, Your Honor, we'll seek your assistance as needed. But just thought it was important to highlight those issues for you.

THE COURT: Thank you very much.

MR. INDELICATO: Thank you.

THE COURT: All right. I'm going to go to a 214 number and then a 212 number and then Mr. Barr. So I don't know who's on the 214 or the 212, but Mr. Barr, after I finish with that, I'm going to turn to you.

Here's a 214 number.

MS. PERRY: Good morning, Your Honor. Deborah Perry with Munsch Hardt Kopf & Harr representing Onset Financial, Inc. today. And as seen in the virtual courtroom, I have Ben Butterfield who's going to make a very brief comment, and then we'll hold the rest of our presentation for the DIP motion.

THE COURT: Okay. Thank you.

Let's see. Here's a 212 number.

Mr. Butterfield, if you could hit "five star," I just want to make sure I've got you. All right. I believe I have you. Well, both of you can't be Mr. Butterfield. Here's a 516 number?

MR. GRILLO: Yes, Your Honor. 516 number is me, Emanuel Grillo of Orrick, Herrington & Sutcliffe.

THE COURT: You got it. I'll get you, Mr. Grillo, but let me get Mr. Butterfield, and then I'll --

MR. GRILLO: Sure.

THE COURT: -- go from there.

Mr. Butterfield, did I get you?

MR. BUTTERFIELD: Can you hear me, Your Honor?

THE COURT: Yes, just fine. Good morning.

MR. BUTTERFIELD: Good morning. And thanks for giving me a few seconds. I promise I'll keep it super short, 30 seconds max.

Look, we're going to reserve our comments for the DIP motion. That's where most of our issues arise. At a high level, we believe we have the exact same issues as Evolution. I won't repeat, you know, what they said. We are completely in the dark here. We've been a huge supporter of the company. We extended a billion dollars in credit to the company, a billion dollars of actual liquidity during the year prior to this bankruptcy, and we've been repaid, like, a tiny sliver of that.

There are very complicated issues of who has liens on what, who owns what, and the fact that the property is that of debtor doesn't mean that that debtor's creditors have first priority because under the ECC rules that we will get into down the road, you know, previously liens (indiscernible) through.

So with -- I'll save all of that for down the road, but we're very concerned about the prejudice that's taken now before most of us have adequate information.

THE COURT: Thank you. Mr. Grillo?

MR. GRILLO: Yes, Your Honor. Again, Emmanuel Grillo, along with my partner, Laura Metzger, on behalf of, again, Orrick, Herrington & Sutcliffe on behalf of what was characterized in our objections as the Raistone parties.

45

Just very briefly, Your Honor, not more than 30 seconds, to say that we agree with everything Mr. Indelicato said. We appreciate all of the work that the professionals have done. But at the same time, we reiterate his concerns with respect to sort of the independence of the parties involved.

We note, just as one additional point, that even though there is a special committee that's undertaking an investigation, typically we're used to seeing that being done with the assistance of independent counsel. That's not the case here. That increases, I think, our degree of concern as far as that goes.

And I think the point most important to reiterate is that there's been no change over in management. We have a $2.3 billion accounting irregularity. Our clients, the Raistone parties, have extended, you know, with their investors $172 million approximately in AR facility and another $684 million in an unsecured AT facility as far as that goes.

So the bottom line is that our clients are a material player, but we just want to say that we agree with Mr. Indelicato's comments and look forward to sort of seeing how this plays out. We trust the professionals. At the same time, there's a lot of concern here for us.

THE COURT: Thank you. Okay. Mr. Barr.

MR. BARR: Thank you, Your Honor. Before I turn it

over to Mr. Singh to go through the agenda, I just want to reiterate, from our perspective, and you heard it from Mr. Greenberg as well, we are trying to stabilize this business, stabilize the operations, save people's jobs, save customer relations, and make sure that we have an asset that can be maximized for all of our creditors and all of our stakeholders. We'll see where that value falls. We'll see how we do it.

We appreciate everything everybody is saying. We thank them for their comments. We have a lot to figure out. The special committee has started with the assistance. We're happy to talk to these parties about involvement, appropriate involvement and ways to figure it out.

Today, of course, is a heated day. We're happy that we've been able to resolve a lot of these issues, because I think these parties also agree that stabilization is the first thing that we all should focus on to maximize value. And the other stuff we absolutely need to look at and figure out.

So with that, Your Honor, unless you have any questions for me, I'm going to cede the podium to Mr. Singh. He will move in evidence and get to the agenda.

THE COURT: Okay. Thank you.

MR. BARR: Thank you.

MR. SINGH: Good morning, Your Honor. Sunny Singh, Weil Gotshal, proposed counsel to the debtors. It's a

47

privilege to be here before you today.

Your Honor, what I thought I would start with is just a little bit of housekeeping before we get into the first motion today will be the DIP motion that I'll handle, and then I'll turn it over to some of my colleagues. And maybe what I'll just start with is to take tally and update you on kind of where we are with the parties so you know who is still open and outstanding and who we think we're resolved with. We may have some issues as we go down.

Obviously, everybody's on the phone, on the line, and they'll correct me if I get any of this wrong, but I think I've got it straight. So, Your Honor, just starting with Evolution, we're resolved. We have a stipulation with them that's on file. I was scratching my head a little bit as Mr. Indelicato was making his comments as to whether that's still an open issue, but I think he agrees that they're resolved and those issues are for another day.

Your Honor, we are resolved with CarVal, who is represented by Mr. Brilliant at Dechert. CarVal is another SPV lender to one of the SPV debtors, or one or more of the SPV debtors, I should say. They had reached out to us. We've been working with them. We have an agreed term sheet, final documentation, and their review of the DIP order that we just filed on the docket prior to the hearing, and the cash management order remains outstanding, but I'm hopeful we can

48

just finalize language there, but I believe we are resolved.

Your Honor, we are also resolved with Katsumi and ING Belgium. These are both factoring counterparties. Katsumi filed an objection represented by Mayer Brown. ING filed a joinder. We have some -- they're factoring counterparties, and we put in some language into the DIP order and cash management order to make it clear that any proceeds received by the debtors on account of prepetition factoring will be segregated, set aside, so they don't have to worry about that until we come back to the Court.

I'm just looking at my notes here, Your Honor. I think we are also resolved with Jefferies, who is represented by HSF Kramer, and Grammer, who is represented by Jones Day, with respect to factoring, and Grammer has its own issues that's reflected in the revised DIP order.

I believe, Your Honor, the last one is the ABL lender, represented by Winston & Strawn. I'm sure they want to be heard in connection with the DIP motion. And, you know, they are reviewing, and we just sent them some comments to the final DIP order, which is on file. I believe they're in the process of getting clients signed off, and will, of course, need a chance to review the DIP order. But I expect we will be resolved there, and hopefully don't have to have contested hearings with those parties.

I'm not trying to say people can't speak, Your Honor.

I just wanted to give you a status update.

Your Honor, with that, maybe what I'll do, if it's okay with you, is then move to the evidentiary portion of the hearing and move into evidence our exhibits, as well as declarations. Your Honor, what I would propose, with respect to the declarations, is move them in now, obviously subject to cross, but perhaps cross can wait for the relevant motion, rather than try to do it all up front, but obviously happy to proceed however you would like.

THE COURT: I think that makes a lot of sense.

MR. SINGH: Your Honor, so our exhibit -- okay. Thank you, Your Honor. Sorry.

Your Honor, the exhibits, I'll start with, these are not the declarations, so the other exhibits, and we did file our exhibit list at Docket Number 136 with the Court. So Exhibits 1 and 11 through 12 -- 22, excuse me, I'd like to move those into evidence. These are not the declarations, but documents that would be part of the evidentiary record.

THE COURT: Any objection to the admission of -- let's see. Mr. Singh, can you repeat the numbers again for me?

MR. SINGH: Sure. It's Exhibit Number 1, which is the organizational chart.

THE COURT: The org chart.

MR. SINGH: And then it's 11 through 22.

THE COURT: Ah, okay. so 1 is the org chart, and

then 11 through 22, 11 is the DIP credit agreement. And then you've got 12 is the first lien term agreement. You've got the term intercreditor agreement there, the amendments, a cash management schematic, and then you've got 16 through 22, which are really kind of exhibits attached to other various motions like utilities, insurance, critical vendor, cash man. Any objection to the admission of 1 or 11 through 22, just for purposes of today's hearing?

There's a 713 number. A 713 number?

MR. KELLEY: Good morning, Your Honor. Charles Kelley for --

THE COURT: Good morning.

MR. KELLEY: -- Mayer Brown on (audio interference) Katsumi.

THE COURT: Okay.

MR. KELLEY: I'm joined by my colleagues, Sean Scott and Rich Stieglitz, who are also online and may be speaking at the hearing, so I'll just go ahead and introduce ourselves for purposes of the record.

While we thought we had reached agreement on the language before the hearing, a proposal came over that materially changed some of the language, so in fairness to the comments made to the Court about the resolution of the Katsumi objection, I just want to note that appears to be up in the air at the moment. But I am not raising my hand to object to the

introduction of the exhibits that was proposed, and I --

THE COURT: Yeah.

MR. KELLEY: -- just want to clarify that.

THE COURT: Thank you. Okay. I'll admit exhibit 136-1 and 136-11 through 22 for purposes of today's hearing.

(ECF Numbers 136-1 and 136-11 through 136-22 admitted into evidence)

MR. SINGH: Thank you, Your Honor. Your Honor, next would be the declaration of Charles Moore, the debtor's chief restructuring officer. This is Exhibit Number 2 to the exhibit list, as well as Exhibit A, which is a simplified version of the organizational chart to that declaration, which is Exhibit Number 3. So if I can move in Exhibits Number 2 and 3 with the evidence. Mr. Moore is here, and with respect to any relevant motion, of course, he can be cross-examined.

THE COURT: Are you going to try to move in 2 through 6 too, Mr. Singh?

MR. SINGH: Yeah. Yeah, do you want me to just do it together, Your Honor? If that --

THE COURT: Why don't --

MR. SINGH: That's fine.

THE COURT: Why don't I just see if anyone has an objection --

MR. SINGH: Yeah.

THE COURT: -- to 2 through 6. And if anyone, you've

52

got to hit "five star," and I will unmute your line if you're there.

MR. SINGH:  Your Honor, you may as well add 6 through 10 to that, because those are exhibits to his declaration.

THE COURT:  Yeah, I think that's right.  So 2 through 10, which are --

MR. SINGH:  Yeah.

THE COURT:  -- declarations, both of Mr. Moore's declarations that were filed on the docket, the Cowan declaration, the initial DIP budget, the receivable report, the compliance certificate, and the AVL inventory collateral overview.

Anyone on the line, hit "five star."  I will unmute your line.  Just one moment.  Mr. Brilliant, I think you're trying to get there.  If you can, I'll unmute you.  There you are.

MR. BRILLIANT:  Thank you, Your Honor.  Like the previous person, like -- and I apologize, I didn't realize I had to hit "five star" as well as --

THE COURT:  No worries.

MR. BRILLIANT:  -- raise my hand to recognize.  I -- we actually -- we -- Allan Brilliant on behalf of, you know, what, you know, Mr. Singh had referred to as the carve-out entities.  We do believe, in fact, that we have an, you know, an agreement to resolve all the issues today, subject to, you

53

know, our, you know, reservation rights on going forward.

We've agreed to a, you know, a term sheet, which we're turning into a stipulation. The DIP order, you know, needs to be, you know, revised in order to be, you know, consistent with the term sheet. That's the agreement that we have with Mr. Singh, as well as he mentioned the cash management order. And then we agreed to make certain statements in connection with other issues on the record.

You know, because of, you know, the fact that we've been working so hard with the debtors, and we thank them for, you now, spending the time in, you know, resolving, you know, the issues with us, we weren't able to finalize the issues in connection with the, you know, the DIP order and the cash management order, so those are still open and we're, you know, still working through them.

I just wanted to let Your Honor know what the process is that we have here. You know, we believe we're --

THE COURT: Yeah.

MR. BRILLIANT: -- subject to working out language in the particular orders. I would like to be heard at the time we get into the DIP and tell you a little bit more about our clients, what we're trying to accomplish, and to give Your Honor some flavor as to what the agreement we have is, which unfortunately is not on the docket yet.

THE COURT: Okay. I'm going to want you --

MR. BRILLIANT: Thank you, Your Honor.

THE COURT: No worries.

MR. BRILLIANT: Apologize for --

THE COURT: No, no, no worries.

MR. BRILLIANT: -- coming out of order.

THE COURT: It's completely fine.

Mr. Singh, what I'm going to do is just note for the record that I've admitted Exhibits 1 through 22, at Docket 136.

(ECF Numbers 136-1 through 136-22 admitted into evidence)

MR. SINGH: Thank you, Your Honor. Your Honor, before I go into the DIP motion, I understand that the -- Ms. Labovitz of Debevoise, I think, or one of her colleagues, I can't find anybody on the screen, wanted to make some opening remarks, if that's okay with Your Honor.

THE COURT: Yep. Not a problem at all. If you can just hit "five star," I will unmute their line. Let's see, can you do it one more time? All right. Give me a second, I'll find you. You already may be unmuted is what it's showing me. It's a 212 number.

MS. WEISGERBER: Good morning, Your Honor. Can you hear me?

THE COURT: Just fine. Good morning.

MS. WEISGERBER: Good morning. Erica Weisgerber of Debevoise & Plimpton on behalf of non-debtor affiliates and equity holders, Global Technologies Partners, Global

Technologies S.a.r.L., Mayfair Enterprises, and certain directors and officers of those entities.

Your Honor, the founder of First Brands and other members of the management team built this company from its infancy into the vertically integrated global manufacturer and supplier of automotive parts that is here today. During that time, First Brands has grown from a company that generated roughly $500 million in annual revenue in 2018 to generating $5 billion in annual revenue today. A substantial amount of that growth has been due to management's tireless efforts and driving of operational efficiencies at the company.

Today the company employs roughly 26,000 people worldwide and operates approximately 200 manufacturing and distribution facilities. In short, First Brands is a company that generates tremendous value, and my clients are committed to preserving and maximizing that value through these Chapter 11 cases, as they have done since the company's inception.

As the Court has started to hear today, these cases were largely precipitated by macroeconomic factors and other headwinds that were outside of management's control. We've also heard, and I believe we'll continue to hear, allegations this morning about the company and its management. And on behalf of our clients, we want to be on the record categorically refuting those allegations.

Today is not the day to litigate the merits of those

56

allegations, but needless to say, we disagree with virtually all of them, and we look forward to addressing them at the appropriate time, and we'll do so. Thank you, Your Honor.

THE COURT: Thank you very much. All right. Mr. Singh?

MR. SINGH: Yep. Thank you, Your Honor. Your Honor, I think that brings us to the DIP motion, the debtor's motion to approve the DIP financing arrangements as well as cash collateral use. So I'll go ahead and present that motion now.

Your Honor, I think the general theme you're going to hear from me today, and I don't think anyone can refute this, is we absolutely need the DIP. We need the DIP proceeds, and we need access to cash collateral to continue to stabilize this business and get the company on the right track so we can be on our path to a value-maximizing transaction.

So in exchange for that, we were willing to agree to appropriate stipulations and consideration with the DIP lenders, including the roll-up that I will talk about. But those things are essential, and simply stated, Your Honor, there's no DIP financing without those pieces of consideration going to the DIP lenders who have stepped up to support us at this time.

Due to the mad dash into Chapter 11, Your Honor, notwithstanding those stipulations, the approach we took today with respect to everything else is it's an interim DIP hearing.

57

We understand that parties are operating, including, frankly, the debtors, professionals, and the special committee, just given how quickly we got into Chapter 11, with incomplete or imperfect information.

And so our goal for today is to get the essential relief we need today for the next 21 to 30 days, depending on which party you talk to, but roughly the next couple of weeks until we all have more time to get a better understanding of the facts, have time to think about the issues, and see if we can work together for more permanent arrangements that would be needed to put in place in connection with a final DIP order.

So the goal today is to not prejudice or enhance any party's rights, but give ourselves the breathing room we need in order to get from today into Day 30 when we come back, Your Honor, or approximately Day 30 when we come back, Your Honor, for a final hearing.  This is all as contemplated by Chapter 11 and, frankly, the entire purpose, and that's the approach that we took.

Your Honor, you know, I do want to thank all of our stakeholders.  I know Mr. Barr did it, but just to echo how quickly, you know, they came together to understand our predicament and, you know, have agreed or are trying to work with us and continue to try to work with us to take a rational and measured approach today to the situation and the interim relief that we are seeking.

58

That doesn't just include our DIP lenders. It includes our ADL lenders, the various SPV parties, the lenders we've been working with, and, of course, the Office of the United States Trustee. But it really has been an around-the-clock effort by all of those parties to get us to where we are today. And I think, although we're not at a fully consensual DIP hearing, we have certainly narrowed the issues considerably so that we can have a much more orderly process today to move things forward and have focused issues that Your Honor needs to address and decide on.

Your Honor, just to continue to lay out the land just a little bit, as you heard earlier today, we now, today we are proceeding with the DIP with the consent of 99 percent of the first lien lenders, 100 percent of the sidecar lenders, and I think it's 84 or 86 percent, but certainly a huge amount of second lien lenders.

We have what we think is an interim agreement with our ADL lenders, as I mentioned. They're reviewing the latest version of the final -- excuse me, of the interim DIP order and reviewing those recent edits. So at those levels, under -- and with the ADL consent, under our prepetition intercreditor arrangements, we are proceeding with the DIP-finding liens on a fully consensual basis.

And just as a reminder, Your Honor, I know you've seen this in the pleadings, but the prepetition structure, it's

59

a crisscross lien structure. And I'm going to talk just about -- for a minute about the what I'll refer to as the FBG debtors, the First Brands Group debtors. If you look at our org chart, sort of the left side of the chart is our First Brands Group operating companies, you know, where essentially all the relief that we're going to talk about today for the most part resides.

And on the right-hand side, the Carnaby SPV silo, special purpose vehicle silo, those are special purpose entities, as you've heard from some of them today and saw in the papers. And the goal of today was, look, the FBG debtors, they have liens against their assets under the ADL and the prepetition credit documents. Those liens are a crisscross lien structure, where the ADL has a first lien on current assets, primarily inventory and accounts receivables. And the term lenders have liens, first lien on the remaining assets of the company, you know, equity interest in various subsidiaries, including some foreign subsidiaries, IP, et cetera.

And the idea is, on a prepetition basis, that, you know, the term lenders have a second lien with respect to ADL priority collateral and vice versa. The ADL lenders have a third lien. I mean, they sit behind the entire stack.

On the SPV side of the house, we've got a number of SPV financings, right? We talked about CarVal. We talked about Evolution. e talked about Onset. And then the other one

is Aequum. The goal of today is, with respect to the DIP liens and adequate protection liens that we're providing on the FBG debtors, those should not creep into the SPV debtors.

And likewise, the adequate protection stipulations that we are agreeing to, or arrangements that we are agreeing to with respect to the SPV debtors, should not creep over into the SPG debtors. Your Honor, much easier said than done, but that is the goal, and we're trying to get the documents exactly right to make sure that they reflect and say that.

So, Your Honor, when my colleagues make the presentations today with respect to the remaining motions, wages, insurance, vendors, et cetera, it will relate to the FBG debtor side of the house, because that's where operations sit. And if there's on occasion something that the SPV debtors, you know, may be affected, we will note that, for Your Honor. But the goal is not, and the purpose of any of these motions where we refer to, quote, "debtors" is not somehow making the SPV entities liable on a first-day hearing all of a sudden for obligations that didn't exist prepetition or authorized to make payments.

Frankly, to send any money over to the FBG debtor side of the house, Mr. Greenberg and his clients made absolutely sure we couldn't do that without their consent. So not a cent can even go over there.

So, Your Honor, with that prepetition capital

structure and consensual DIP priming lien structure, let me just address the roll-up. Your Honor, as you saw under the proposed DIP, we have requested approval of a cashless exchange of the prepetition 1L debt, which includes the sidecar. That is a 1L facility, it's parried, into debt claims at a 3 to 1 ratio.

So, Your Honor, just in terms of numbers, what that means is if Your Honor approves the DIP today, we will have access to $500 million of new cash, new financing, and $1.5 million -- $1.5 billion, excuse me, of the prepetition 1L debt will be exchanged into DIP debt.

In that sense, Your Honor, this is a creeping roll-up. We're not asking you to approve the entire amount because the balance of the DIP loan, the $600 million that's subject to final court approval, at that time, should Your Honor approve it, we would get access to the incremental $600 million, and therefore, at that point in time, would the $1.8 billion on that 3 to 1 exchange ratio kick in. So it's a creeping roll-up in the sense that they're only getting, quote, "rolled up" or exchanged for dollars they're actually providing to the debtors right out of the gate.

Your Honor, the other thing I would note on the roll-up is the interest rate for the rolled-up amounts is the same under the -- as it exists today on the prepetition debt, plus 2 percent for default interest. So they're not picking up

62

economics, Your Honor, in that sense. It's really just a matter of DIP protections and consideration in terms of treatment going forward that we've agreed to provide them, and we think under the circumstances with, you know, the evidence that is in now, obviously subject to cross, and the speed at which this has all come together, that is more than fair, and certainly they have earned it.

Your Honor, the other piece of the fees that I wanted to highlight is what's referred to as an anchoring fee. This is a 10 percent fee that's payable to certain of the DIP lenders who have really anchored the DIP. And as you heard Mr. Greenberg say, I think it was really honestly, I'm not even sure we had two weeks. It might just be ten days where we went to them and said, you know, here's the situation as described in Mr. Cowan's declaration. Here's the situation we think we need to immediately pivot and focus on DIP financing.

In that period, not only did certain -- at that point we were not at 99 percent, not only did only certain of the DIP lenders provide us the bridge financing that he mentioned earlier of 24-and-a-half, but we only had some of them, I can't recall, maybe even 50 or 60 percent of the 1Ls at the time who were willing to anchor the DIP. And the idea was we would come in, get that approved, and run a syndication process.

But to our surprise and pleasure, Mr. Greenberg, his team, and the Evercore team, and their clients have been

running around like crazy and have now managed to basically run an out-of-court syndication process and gotten a 99 percent and DIP allocations agreed.  So for that work that they've done in about 72 hours, we think they are -- they've more than earned the anchoring fee of 10 percent.  But that will go to certain of the lenders, Your Honor, and that's the story and how we landed on that number and why I think it's appropriate for Your Honor to approve it in connection with today's hearing.

Of course, I think if that 1 percent or less than 1 percent is still out there, they've committed and said, including in our papers, they've allowed us to make a statement that they will continue to talk to whoever that is, so those parties, I think it's not an issue of the answer was no, we simply just ran out of time.  So if those parties emerge, I know Mr. Greenberg and his team will speak to them.

Your Honor, with that, the other key points that I wanted to highlight just around the facility, this is a 270-day DIP facility.  As you know or saw from the papers, there is a lot of work to be done here.  We expect, you know, that this will go nine months.  We've got extensions built in to get us to a year if we need it at the debtor's discretion and then further extensions with the consent of DIP lenders holding at least 50 percent.

So this is a commitment that they've agreed to provide us, not just for a couple of months or a couple of

weeks. Everybody appreciates and recognizes this is longer term. And we've been asking them and essentially have asked them to do this, as he said, without complete information and probably a lot of incomplete information, to give us a massive amount of dollars to go ahead and do what we need to do for the next nine to twelve months.

Your Honor, interest rates -- just on the new money, I already mentioned the roll-up. It's -- so for cash plus 155 bits, and then it's cash plus 845 bits is on the new money. You know, fees, I think I covered the anchor premium. There is an upfront premium of 5 percent pick for each draw, and I think that is payable to everybody. That's not just the anchoring parties, as well as the exit premium of 5 percent to the extent of an exit transaction. That also is payable to all of the DIP lenders, not exclusively for certain of the parties that are entitled to the anchor premium. And then we've got an extension fee of 75 bits to the extent that that extension is requested and granted by those clients.

What are milestones? What we don't see, I mean, it's pretty bare bones, right? We have to get a final DIP order within 30 days -- excuse me, 45 days. What we are going to try to do within 30 days is come to a transaction support agreement with the ad hoc group.

As I said earlier, we are working on getting information, exchanging information on both sides. So rather

than to have something premature before Your Honor that locks us in, and parties and interests have to worry about that or think about, you know, where this case is going before we even know, we've agreed that we're going to try to do that over the next 30 days, and obviously we'll be back to Your Honor to report on that, and parties and interests will get an update if we reach that agreement on what we see collectively as a value-maximizing path.

And then, Your Honor, we're going to -- we're in process of getting a quality of earnings report. I did just given the prepetition issues that we've had here and some of the back-and-forth that's been reported in the press, we just simply need to do that. I mean, people just need to figure out value and information, and that's going to happen over the next 75 days.

So that's really to get our, you know, feet under us here as we go forward, to get that information and figure out next steps. But really it's a pretty straightforward milestone package here in the sense that we've got to be back before you within 45 days to get a final DIP order, get better information, and see if we can reach an agreement on a TSA.

I think the last point I'll just make on the DIP, Your Honor, Mr. Greenberg mentioned that there is a bridge repayment. That's the $24.5 million that they provided critical funding pre-filing after our, you know, remaining

working capital was swept unexpectedly.

Your Honor, let me just describe for you just generally where we are with respect to or what we try to achieve with respect to the ABL lenders.  Big picture, I'm not going to go through, you know, every last line item in the DIP order.  I'm sure Mr. McGuire and his colleagues will correct me if I get any of this wrong.

You know, what we really just agreed to is a 30-day use of cash collateral.  You know, we don't have a borrowing base.  I mean, we have a borrowing base, but we haven't had an opportunity to say to them, yeah, yeah, just keeping this borrowing base in place, the structure that you see in many of these situations is going to work because we just simply haven't had the time.  We're going to talk to them about those issues over the next 30 days.  Are there appropriate reserves?  Are there not?  Is there cash collateralization?  Should there not be?  All of that is on the table.

You know, they've agreed to work with us for 30 days to give us, you know, use of cash collateral untied to a borrowing base, but we understand we've got a lot of work to chop with them in the next 30 days.

There's no priming lien on their assets, right?  The ABL priority lien stays senior.  It's not being primed by the DIP.

We can't move FBG debtor collateral into the SPV

boxes. This is a point I mentioned earlier. Assets are not moving back and forth. We need to keep them separate and track them, which we're going to continue to do.

Your Honor, they're not agreeing to the full extent of the carve-out today, in the sense that there's the pre-trigger notice carve-out, right, which what we've proposed is essentially pipelines will give estimates of those proceeds will be moved or those estimated amounts will be moved into an escrow account.

They're fine with that, but to the extent there's a post-trigger carve-out notice within the next 30 to 45 days, which I really don't expect, Your Honor, but if there is, they haven't had a chance to look at that. They're not agreeing to be subordinated to that amount, and that's fine with us, Your Honor, but at the same time, today they're not getting the 5060 surcharge waiver or 552(b) equity with the case exception, because we'll deal with that, and, you know, there'll be a committee, and we'll all figure that out going forward.

Your Honor, one issue I did want to point out is there's supply chain financing under our ABL, provided by some of our ABL lenders. So the supply chain financing, for the most part, the non-ABL supply chain financing is unsecured debt. There's lenders out there. They're identified in our top 30.

I'm now talking about to the extent, the way our

prepetition ABL credit agreement works, to the extent supply chain financing is provided by one of the ABL lenders and certain documentation is executed and properly and validly exchanged, then the ABL lenders that have supplied that supply chain financing or fronted that supply chain financing, those obligations would be secured, and that's, I think, about $350 to $400 million.  So in addition to the $230 of just regular way ABL loans that we have, the LCs and the advances, it's possible that that 350 to 400 is also secured on a first lien basis by ABL priority collateral.

Now, the ABL lenders, they've shared a bunch of information with us.  We, frankly, haven't had the time to go through and confirm whether or not that ABL supply chain financing, you know, all the I's were dotted and T's were crossed to make that secured.  So what you'll see in the stipulations and in the proposed DIP order is a reservation of rights on that issue.

You know, we're not going to pay them cash interest on that point.  We're going to let it pick at the contract rate, and if they turn out to be secure and only secure, that's fine.  If they turn out not to be, we'll be back before Your Honor.  But we're not agreeing to that on day one because we simply don't know.  And then, Your Honor, I would also say that there is going to be parity of information sharing with the ABL lenders.

69

Let me just switch then to the SPV deals that we have, and you've heard from some of the parties already. But, again, generally speaking, with respect to all four of them, this is Onset, this is Aequum, this is CarVal, and this is Evolution. We're only resolved with CarVal and Evolution. But notwithstanding, we took the same approach to all of these parties, notwithstanding that we're not resolved.

And Aequum and Onset have stipulations that I believe they're reviewing. They're not done. They may not get done, but the general theme is the same. Let's reserve rights for this interim period. We're not trying to prejudice people. We're not trying to move assets out of their box without making sure there is a way to protect those liens and claims to the extent they're senior.

But right now, sitting here today, the debtors and their professionals simply do not know if those liens are valid, if those claims are valid. On some of them, we don't even have full document sets quite yet, and we're working to piece all of that puzzle together.

So with respect to the SPV counterparties, there's no agreement today or stipulations from the debtors or the DIP lenders or anybody, frankly, that, you know, all of that stuff is good, valid, perfected, et cetera. We'll figure that out in the next couple of weeks in connection with the final order.

But in order to protect their asserted rights, what

we've said is, okay. let's just start very simply with the case of Evolution because I think it's the simplest fact pattern. Evolution had inventory that was, you know, at a warehouse. It's identifiable. What we're saying is, look, post-petition, to the extent we sell that inventory, you, Evolution, will retain your asserted lien, your senior asserted lien, on that inventory that goes out the door to a customer.

And while it sits there as an account receivable, you will retain your lien. If the cash actually comes in the door between now and the final, we will take that cash, we'll park it in a box at your SPV debtor at a bank account. They have their own separate bank accounts. And it will sit there with all rights of the parties being reserved as to whether or not they're secured, whether or not they're oversecured and entitled to be paid fees, interest, what have you, including the ABL lenders, right? You heard this morning about Mr. Indelicato -- during Mr. Indelicato's comments, their inventory may have been moved over to FBG.

So we're not going to figure that issue out today, right? Hopefully we can figure it out in 30 days. My guess is it's going to take longer. But whatever it is, everybody's rights are reserved, and we're not saying this is, you know, inventory that belongs to or the collateral is, you know, property of Evolution.

At the same time, we're not saying it's the ABL

lenders.  It'll sit in an account.  Nobody's getting a 5060 surcharge waiver.  Nobody's getting a 552(b) waiver.  And nobody is being subject to senior leave in the SPV debtor boxes, that is, or CarVal.  Those are TBD.

And so, Your Honor, it's kind of funny that I said that that is the simplest one because it kind of hits, notwithstanding those issues.  But let's take it up a level and go to basically Aequum and CarVal.

I'll start with CarVal since we're, you know, generally agreed, or we are agreed, excuse me, I should say, subject to documentation with Mr. Brilliant that he's reviewing and getting authorization with his clients for final documentation.

You know, those assets basically under the CarVal facility, and he'll correct me if I get any of this wrong, but generally speaking, the CarVal facility relates to raw materials, right?  There's raw materials that are produced and made in Mexico.  They make their way into the U.S.  CarVal retains the lien prepetition right now on those raw materials until they become finished product.  Prepetition, when they become finished product, the FBG debtors essentially buy those assets from the CarVal debtors, right?  And they pay them what's referred to as fair market value under the contract.

At that point, CarVal releases its lien under the prepetition documents.  You know, money has been moved over to

72

their box, or at least inventory has been replenished in their box. They have borrowing bases, and they can check that. And then when the FBG debtors sell that inventory, it is an AR, and it is a first lien of the ABL priority collateral.

So what are the tweaks that we have to make to that in order to continue this function, because we do need that inventory? So what we've agreed to is, okay. we're not going to move inventory between boxes. Let's agree to that. We said that's fine.

What we are going to do, though, is we still need to sell this -- when this raw material becomes finished product, we do need to sell it to our customers. So we've agreed with Mr. Brilliant's clients that we will be able to sell it, but unlike prepetition where at the point of completion, the FBG debtors would, you know, essentially transfer funds unless new -- you know, new property, new raw materials went into those boxes to keep them in compliance with their borrowing base. Can't comply with the borrowing base right now. We'll kick the can on that issue.

But essentially what we're going to do is we can't then -- we will be able to sell that to the customers. His clients retain a lien on that finished inventory. They retain a lien on that AR. It will go and sit in a cash collateral account with all rights reserved, as we've talked about already. And, you know, we'll have to figure it out in the

future.

And what they're going to retain a lien on is essentially the fair market value. So if we have inventory that's worth $2 that we sell for $2 and the fair market value was $1, $1 goes into the account of the SPV debtor subject to his client's lien. Until so we figure out whether those liens are valid, it's going to sit in escrow, not going to be used to pay down. And the other $1 will work its way to the FBG debtors sort of up the chain as ABL priority collateral.

THE COURT: Can you --

MR. SINGH: That's the status quo stipulation.

THE COURT: Can you repeat that to me? Just wanted to make sure -- I was taking notes.

MR. SINGH: Yeah.

THE COURT: I just wanted to make sure I got it.

MR. SINGH: Sure. So, Your Honor, so when we get finished inventory from the SPV debtors that are subject to the CarVal liens, right, there's a cost that we're supposed to pay for that inventory.

THE COURT: Right.

MR. SINGH: Under the contract, that cost is defined as fair market value. Right? We then sell that inventory, that finished product, to our customers, and we collect a margin.

THE COURT: Mm-hmm.

74

MR. SINGH:  So if the debtors, FBG debtors, sell that product and they get $2, right, and the fair market value was $1, we're going to take that $1, stick it in the SPV debtor box that CarVal has a lien on, and it's going to sit in a cash account there with all rights reserved.  We're not going to pay down CarVal.  That other dollar, the margin in this example, is going to go to the FBG debtors, right, and are going to -- and that's ABL priority collateral works its way through the DIP order.

What we've agreed to with Mr. Brilliant's clients is, okay, but during this preposition period, we can't have their inventory converted into more than $20 million of collateral, of AR, and we can't have AR -- we can't sell it if the AR is more than 30 days, right, so we have -- excuse me, 45 days.

So we can't have long-dated AR on these things.  That's -- you know, we can't go that far, and in the aggregate, we can't exceed $20 million.  Otherwise, we have to go get their consent.

Your Honor, we're trying to work out a similar structure with Aequum, so that's still a pending point.  I would let them comment on it.

And then finally, with respect to Onset, what we've proposed is the following.  Onset has, you know, inventory financing, and then they also have equipment financing.  On the inventory financing, --Your Honor, Mr. Brilliant's raising his

hand.  I'm sure I got 99 percent of that wrong.  I'm sure he'll correct you -- correct me --

THE COURT:  Oh.

MR. SINGH:  -- once I'm done.  Onset on the inventory side of the house, same deal as Evolution.  Right?  So if -- that we've proposed.  They haven't accepted this.

Same deal as Evolution.  If we sell Onset inventory and cash comes in, we'll park it in a Onset SPV debtor cash account, and, you know, they'll retain their asserted lien. If, to the extent they're oversecured, they can get interest and fees under 506(b), we retain 506(b) surcharge rights, and so that cash will sit there until we figure out whose it is and what we need to do with it.

They also have equipment that the FBG debtors use. And frankly, whether there's an issue about is this a lease, is this a financing, I don't think we need to decide that today because either we owe them rent for it -- or when I say we, the FBG debtors owe rent or they owe adequate protection.  Either way, there needs to be some compensation, we acknowledge and agree, for use of that equipment.

To our understanding, what they've asserted is there's some equipment that they, quote, "directly bought" from manufacturers and have just been leasing that to the debtors. Our understanding is that that is roughly $7.4 million a month in rent that they are asserting.  And then there's other

equipment that wasn't directly bought from the manufacturers, but was bought from one of the debtor entities through this SPV financing structure, and, you know, their asserted amount of rent is another, I think, $13.4 million.  Don't hold me on these numbers, Your Honor, but roughly if you combine these two, it's about $20.8 million of, quote, "rent" that they think is due with respect to the equipment.

So, Your Honor, what we would agree to and what we propose I think makes sense is to the extent the FBG debtors are using this equipment, which they are, Onset or the SPV debtor that they lend to would have an administrative expense claim against the FBG debtors that's not going to exceed the asserted amount that they are asserting but is going to remain subject to dispute and review by all parties.  So we can figure out what the number is.  If we can't agree, we can come back, Your Honor, and have a hearing on it.

They would have an administrative expense claim, Your Honor, and because this is personal property, in our view, consistent with 365(b)(5), we don't have to pay that rent until 60 days anyway, and so we'll agree that we'll pay it on Day 60, whatever that agreed amount is, and if it's not agreed, we can come in and have a dispute before the Court on that particular issue.

And so, you know, and the other thing is we've agreed to reporting with all these parties about their collateral,

whatever information A&M has, so people can see what's happening here.

We think that structure doesn't prejudice them, and, you know, to the extent they don't agree, that's a proposed adequate protection structure for Your Honor to consider, but that's where, you know, how we think the issue is learned with Onset.

Your Honor, the last point is then on factoring. I think I made this point earlier in my opening remarks. But as Your Honor heard about already, and as in some of the papers, prepetition, you know, the debtor factored a significant amount of dollars. There's disputes as to who owns those dollars because multiple factoring counterparties are asserting claims to those.

What we propose, and language we're willing to put into the DIP order and cash management order, Your Honor, is to -- if we get those prepetition factored dollars, we'll park them in another escrow or another sort of segregated account controlled by the debtors. We can't use that cash for anything until we come back to Your Honor, and the idea would be we have to work out some sort of protocol that's centered around the timing of this forensic exercise to figure out whose money we think it is and give parties and interests an opportunity to be heard on that issue. But we don't want anybody to be prejudiced.

So if prepetition factored dollars come in, whether they came in prepetition, whether they come in post-petition, they're going to be set aside in this account to the extent we have them. And then going forward, Your Honor, the only factoring we're doing is on account of post-petition account receivables, and we would be only doing that really with our customer factoring counterparties, and so that will continue in the ordinary course of business. And we wouldn't be required to segregate those amounts.

Your Honor, let me pause in case you have questions, or maybe at this time if other parties want to correct or clarify anything I said, or, you know, just be heard generally, I'm happy to pause.

THE COURT: Okay. Why don't I start with Mr. Brilliant?

And then, Mr. Grillo, why don't I hear from you afterwards?

Mr. Brilliant.

MR. BRILLIANT: Thank you, Your Honor. Thank you, Your Honor. Alan Brilliant on behalf of the, you know, the CarVal lenders and the administrative agent for the two facilities.

I think, you know, on a 30,000-foot basis, you know, Mr. Singh, you know, got it right, but it's a little more complicated than that. And I think it's important that the,

you know, the Court and the record, you know, have a full understanding of what this transaction that we entered, you know, we've agreed to, you know, here to resolve our objections is.

The -- you know, the borrowers, you know, for the CarVal facilities are special purpose entities, you know, the Carnaby II and III  Both those entities are Delaware LLCs.  And what they do is, as Mr. Singh said, you know, they take raw material that, you know, contracts with certain entities in Mexico, you know, that are called maquiladora entities.  The raw materials are turned into finished goods.

Our borrowing base consists of raw material, partially finished, you know, goods, as well as finished goods. And then ultimately, prior to the petition, prior to an event of default, the Carnaby entities had the right to sell that inventory pursuant to a purchase and sale agreement that was part of, you know, the package for the financing, sell that inventory on a COD basis, you know, for cash to certain of the subsidiaries, you know, on the First Brands Group, you know, side of the, you know, of the, you know, corporate structure. Or, you know, prior to an event of default, you know, they could be sold, you know, for, you  know, for goods in kind, for, you know, more raw materials.

You know, the contracts, you know, provided that the transactions had to be done on a fair market value basis, and

that's defined in the credit agreement as to what's a fair market basis.

As Mr. Singh said, our concern, like all of creditors here, in light of, you know, the allegations of, you know, improprieties with people's perspective, you know, on a collateral basis was, one, you know, we want to get into our facilities. We want to, you know, audit, you know, what our inventory is so we can see where we are on a buying basis.

And we want to, you know, find out that, in fact, we are oversecured. In our first-day pleadings, you know, the debtors, you know, gave, you know, amounts of, you know, for our collateral, you know, as of August 2, which were, you know, significantly, you know, more than $159 million, $160 million of exposure our clients have.

But in the short term, you know, we want to make sure that the debtors didn't use our cash collateral, that the -- these provisions in the DIP, which because of the fact they use, you know, the words debtors, could have been interpreted as being able, you know, to use our cash collateral. We don't consent to that. We want to make sure that that didn't happen.

And we wanted to make sure that there were no more, you know, sales or transfers of the inventory outside of our box. So, one, you know, for cash, a fair market value cash on delivery. We didn't want to provide any, you know, credit to, you know, the debtors given the amount of, you know, DIP

financing they're asking Your Honor to approve today including the roll-up.

We -- what we ultimately agreed to was from, you know, you know, you know, from the filing of the case, you know, until the date of the termination of the, you know, the stipulation, you know, they agreed that they shall not sell or transfer any inventory, you know, that's our collateral, basically, the, you know, the quantity entities, or otherwise use any other assets, including without limitation, our cash collateral, you know, that is Carnaby II and Carnaby III cash collateral, you know, that's been, you know, pledged to us, you know, except under certain terms.

And then, you know, Mr. Singh generally got it right, and I'm not going to read the entire agreement to you, but basically what they can do in this transaction, you know, the termination date will likely be, unless it's extended by the parties, 21 days, you know, from today. So during this 21-day period, they can sell for cash, you know, to, you know, the, you know, First Brand debtor entities, you know, our collateral cash on delivery that the fair market value is provided in the document, they can do it for cash.

Or alternatively, we gave them a basket, you know, for $20 million, you know, that they could sell $20 million of inventory at fair market, you know, value, you know, so long as they're going to have it immediately, you know, resold, you

82

know, to customers that have a credit rating of at least a BB or equivalent from a nationally recognized credit rating agency, and a tenor on the accounts receivable of no more than, you know, 35, you know, 45 days.

And so -- and then we, you know, provide that we would retain a lien in the inventory until it's sold, and then we would retain a lien on the accounts receivable after it's sold, and that the DIP lenders and none of the other, you know, parties in the First Brands case will have any interest, second lien or any interest at all in the receivables, and it will be our collateral. And as Mr. Singh said, you know, when, you know, it's paid, it will be put into our cash collateral account.

So the DIP order, you know, needs to be modified to, you know, provide for this. And then in addition to that, we agreed that through the DIP, that the DIP will not provide any indebtedness, you know, or liens, you know, whatsoever in, you know, the SPVs, where our clients are, you know, the two entities that are the parents of those entities, and the (indiscernible), you know, entities, and any direct parent entity of any (indiscernible) entity. So they're agreeing that those entities will be, you know, remain, you know, separate, and that the debt from the DIP won't be, you know, you know, put into, you know, those entities.

They agreed to give us replacement liens, you know,

as, you know, adequate protection.  And then everyone is preserving their rights in the expectation that that, you know, over the next 21 days, we will negotiate an agreement, you know, we'll get on board, you know, with the DIP financing prior to the final order, and that, you know, we'll figure out some way to have this process, you know, go forward in an appropriate, you know, consensual way.

To the extent we can't, we, you know, like Mr. Indelicato, we reserve the rights to, you know, seek to dismiss the Chapter 11 cases, you know, to have a -- in order for -- to have a trustee appointed, you know, for additional adequate protection, you know, and all other, you know, all other rights that we could, you know, potentially, you know, have here.

They've also agreed to, you know, give us certain reporting and additional access to the books and records and to the site, you know, you know, where our inventory is located, and we are there now.  We have agents there now, you know, auditing, you know, our inventory.  And everyone's agreed that there'd be, you know, that there'd be no waiver of claims in either, you know, direction at this point in time.

And as Mr. Singh said, you know, there's not going to be any, you know, surcharging in our collateral in the short term.  There's not going to be any use of our cash collateral or the ability to use any of our collateral outside of, you

know, you know, the boxes, you know, that we have unless it complies with the, you know, the provision about purchasing or cash or up to this, you know, cap for the accounts receivable.

So that's the, you know, the deal we're reaching in for 21 days. And, you know, we're in the process of making sure that the DIP and the cash management, you know, orders, you know, comply with this so this all, you know, can, you know, can work and that the separation that Mr. Singh mentioned actually occurs here.

And, you know, we're -- we don't have any expectation that we're not going to have any issues, you know, not going to have anything that we can't resolve in those issues given, you know, you know, or bring it here (indiscernible) but the stipulation when it's, you know, finalized through Your Honor for approval, you know, to, you know, sale order and, you know, grant the replacement liens and, you know, have this be, you know, the force of order.

THE COURT: Thank you very much. Mr. Grillo, and then I will turn to Mr. Ottaviano.

Mr. Grillo, I think I've -- your line should already be unmuted. Mr. Grillo, I can't hear you. You may have your line on mute. I cannot. Can you hit "five star" one more time? Your line should be unmuted. It may be on your end. Yep. Here we go. Let's see if this works. Mr. Grillo, I still can't hear you. Your line may be on -- can you check the

mute on your end?

MR. GRILLO: Is that better, Your Honor?

THE COURT: Yes, I do it all the time.

MR. GRILLO: Okay. Apologies. I kept --

THE COURT: No worries.

MR. GRILLO: -- going back and forth.

A couple of things, you know, and to be brief to the extent possible, Your Honor. Mr. Singh talked about no enhancement of rights to any of the parties. Obviously, our remaining objection with respect to the DIP loan relates to the roll-up that takes place.

Obviously, as supply chain financiers, you know, we have a very substantial $670 million unsecured claim. But he characterized it as a creeping roll-up. I think we would look at it more like a leaping roll-up because it takes place in two jumps at the end of the day. You know, when the $500 million is drawn, even though that money is just going to be drawn and then sit into escrow for some period of time, what the record doesn't reflect, and, you know, we obviously have consulted to the admission of the declarations, but what the declarations don't say is they talk about a range of ratios that are available.

But the bottom line is that they don't make any comparison to the cases where the ratios are higher. And so as we sit here today notwithstanding the debtors' burden with

respect to the roll-up, I think they've done very little here to sort of say that this is why it was needed in this instance.

And so what we'd propose in the interim, frankly, is to have the ceiling continued or at least until the amounts are actually used by the debtors instead of being drawn into escrow as far as that goes. And this way we can figure out what's going on. As Your Honor is obviously aware, the papers came in yesterday after, you know, in the afternoon. So going through them has been somewhat, but obviously we have a series of questions. This is not the time and the place.

But if they're going to lock in at a three-to-one ratio, which is a substantial enhancement of those rates, we don't know what's going to happen with the contemplating with respect to the next 30 days and the PSA and the like. You know, there's obviously the quality of earnings report.

You know, we've resolved our issues with respect to cash management and resolved some of the issues here with respect to the guardrails. But, for example, we don't even know the answer to the question, is there really 1.9 billion sitting somewhere as it sits today? You know, is there 2.3 billion? I haven't heard any answer to that question, you know, from the debtors' advisors at this point.

And I think that would go a long way to sort of understanding where we can get, because certainly the enhancement makes sense, you know, depending on the risk

perhaps over a longer period of time when a committee is appointed and can look at it. But sort of from here right now, on less than 24 hours' notice, it seems to me we need perhaps another interim hearing before that should be approved.

THE COURT: Thank you. Mr. Ottaviano.

MR. SINGH: Your Honor?

THE COURT: Yes. Just --

MR. SINGH: Sorry, I just had a question.

THE COURT: Go ahead, Mr. Singh.

MR. SINGH: Do you want me to respond objection?

THE COURT: No. I want to hear -- I want to -- no.

MR. SINGH: I'm sorry, Your Honor. I don't mean to be speaking over you.

THE COURT: I want to hear from everyone, and then I'll give you a chance to respond to everyone.

MR. SINGH: Okay.

THE COURT: Perfect.

MR. SINGH: Thank you.

THE COURT: No, no, no, I appreciate it.

Let me hear from Mr. Ottaviano, and then I'll hear from Mr. Butterfield.

MR. OTTAVIANO: Good morning, Your Honor. Kenneth Ottaviano on behalf of Aequum Capital Financial II, LLC. It's one of the SPV lenders in this case. Your Honor, a pleasure to be back in front of you so quickly. Just wrapped up another

one.

Obviously, we reserve all of our rates.  We are in negotiations with the debtor's counsel on a stipulation that we're hopefully going to work through here either today or first thing tomorrow.  And I just want to make sure that our collateral is not going to be used until we reach said stipulation, and that the collateral will remain at the warehouse.

THE COURT:  Okay.  I'm going to give Mr. Singh an opportunity to respond to everything at one time, because if not, we'll -- but you're so noted.

Mr. Butterfield?

And then I'll hear from Mr. Blank.  Mr. Blank, I see you there.  Great.

Go ahead, Mr. Butterfield.

MR. BUTTERFIELD:  Oh, thank you, Your Honor.  Can you hear me?

THE COURT:  Just fine.

MR. BUTTERFIELD:  Great.  Your Honor, Ben Butterfield, Morrison & Foerster for Onset Financial.

Your Honor, we filed an objection last night.  Part of the reason we filed the objection is because we wanted to introduce Onset to the Court.  I have to say, just looking at the debtor's papers, there were a lot of pop shots.  You know what I'm saying there?  For better or for worse, I get it.

Your Honor, we need to reach a speed in trying to figure out the role that everyone is playing, you know, in the lead-up to this. But, you know, to -- from our perspective, we were really surprised.

Onset is the largest, one of the largest, if not the largest single funder of the company. There are -- we have a relationship with First Brands that dates back to 2017. They're owed $1.9 billion.

Onset is an inventory and equipment restorer. They do this in several different ways. They buy inventory primarily from First Brands Group and then lease it back to First Brands Group. For equipment, they buy equipment from First Brands Group or from other suppliers and then lease it. So once this happens within really Carnaby, sometimes they happen direct.

So, Your Honor, the chart here of transactions is actually quite big for Onset. It's very complicated. I'll note, just in passing, as I'm sure the Court knows that these types of arrangements are incredibly common in the auto parts space in particular. And they're a very efficient way for FBG to, you know, its working capital needs, you know, given its credit profile.

In the year prior to bankruptcy -- I think this is very important, because we've talked a lot about the ad hoc groups supporting the company and working with the company. We

are the pre-bankruptcy DIP lender here.  In the year before the bankruptcy, we loaned the company $1 billion.  And we got a sliver of that back, like maybe $50 million or less.  Nothing back.

The company has been in default to us for -- since May on obligations that have (indiscernible) dates that were $860 million.  We stood by because we wanted to support the company through what started out as a routine refinancing process, what turned into a full refinancing of the term loan, what turned into a sale of a piece of the company, what turned into a sale of all of the company.

We've been here the whole time, assume our rights, allowing Onset to explore this, because we care about what -- we were trying to be a good partner and we care about what's good for Onset -- for First Brands Group.

And we got no information in the months leading up to the bankruptcy.  We were completely in the dark.  We're learning things in real time, just like every other creditor in the case.  And frankly, it's very disappointing from someone who has been supporting the company through a very difficult time.

With respect to our transactions, look, we understand that we are going to have to prove our rights.  From our position, we are an owner of the equipment and inventory that we lease to the company.  We understand that sometimes leases

can be re-characterized, but that's not a risk to us, because we have a secure -- we have a first priority affected security interest in all of our assets, in all of the assets that we lease.

The one thing that did concern us, and I heard some commentary from Mr. Singh that I think has given us more comfort, is that the inventory has changed possession among the parties. What I don't want people to think is that just because the inventory is sitting at the credit party under the first lien term loan, that now it's their collateral and stuff that happens under this order is going to -- or will prime our security interest or our ownership interest. It doesn't. What I'm hearing from Mr. Singh is that the state of play is being preserved at least through the interim period, which is good.

There are two things that we came into this hearing wanting. And I think we're up at the five-yard line, and we've had people up all night working on stipulations with Weil, and we've gone back and forth three or four or five times now, and I think we're almost there. But we want two things. One, a full reservation of rights, a reservation of rights even if the assets were transferred. It sounds like, based on the comments made today, that we are there on that point, and we appreciate that.

The second thing we need is we need adequate protection. We have two things we need adequate protection on.

We need adequate protection on our inventory, inventory that the debtors hold for sale and then sell to customers, like Amazon, like AutoZone, et cetera. And the equipment that the debtors use to make more inventory. We need adequate protection on both.

I think on inventory, we are there. We've talked about a concept. I won't belabor it. But the basic idea is that we stay where it is and it's not primed, and then transfers to the AR, and then the cash that comes in the door, and then that cash goes into an account. I think that general structure works for us, and we can live with it.

On the equipment, it's a little bit more difficult. They are proposing an adequate protection claim -- sorry, an adequate protection claim consisting of an administrative expense claim, which means that we have to take the post-petitioning debtor's credit risk.

Now, we have a roll-up. We have an uncertain contributable, a lot of unknown. Mr. (indiscernible) said there's so much that we don't know. I have not read the DIP credit agreement, but I can bet that there are five different ways the lenders can call default. And that puts us in a very precarious situation with our admin claim as adequate protection for critical equipment to the business.

That said, I think we're close to a construct with Weil that will resolve the issue. The only concern I think

that we have at this point, or what we could agree on, I'll give it to you in two seconds, is that the fair market value for the use of the equipment will become an admin claim. So it needs to be paid in 60 days. Our concern is that gains can be plead to object to our arrangement and then just go away in an admin claim. That's not acceptable.

From our perspective, our interest in the property is valid until it's proven not. And so we hope that we can work through this last little point with the debtors' counsel. And if we do, I think we hope to have a situation signed. But at this point, that's where Onset stands.

THE COURT: Thank you. All right. Let me hear from Mr. Blank and then Mr. Rogoff. And if I've unmuted your lines, great. If not, please hit "five star" and I'll do so at this time.

Mr. Blank.

MR. BLANK: Your Honor, are we able to hear me?

THE COURT: Yes, just fine. Thank you.

MR. BLANK: Perfect. Good morning, Your Honor. Stephen Blank from Alston & Bird on behalf of UMB Bank as administrative agent under the revolving facility of Global Assets LLC and Global Assets GmbH. I'm also joined in my office by my colleague, William Hao. I think you see about half of him in the frame there.

Judge, I'm really going to piggyback off of

Mr. Ottaviano's comments. We're also continuing to negotiate a stipulation with the debtors. We've reserve all our rights. And our understanding is, based on our read of the interim order, is that the debtors are not looking to use any of our collateral right now. They are pumping any of the issues with respect to our collateral until the final, and I would just like the debtors to confirm that on the record. That's all I have, Judge.

THE COURT: Thank you. Mr. Rogoff, have I unmuted you?

MR. ROGOFF: Good morning, Your Honor.

THE COURT: Good morning.

MR. ROGOFF: I thought it might be good afternoon, but Mr. Blank still made it good morning, which I appreciate.

THE COURT: Yeah, no. You got three minutes on my end before it turns to good afternoon, so I think we're in good shape.

MR. ROGOFF: Excellent. I'm part of the chorus from today, but I'm going to have a very short solo. So for the record, Adam Rogoff, Herbert Smith Freehills Kramer on behalf of Leucadia Asset Management and certain related entities. Mr. Singh referred to our clients earlier today, I believe, as the Jefferies entities.

Our client is the purchaser of various of the debtor's receivables, which I'll refer to as a factoring party

in Paragraph 42 of the interim DIP order.  Like a number of the other factoring parties who filed limited objections to the DIP loan and the cash management, we have some of the same concerns over the DIP order and the interim DIP order and cash management affecting our rights to the purchased accounts receivables and the proceeds thereof.  So I echo a number of the concerns that were raised before the Court this morning.

We did not file a pleading, because we reached out to Weil to work out language to be put into the proposed interim DIP order.  As of last night, we had agreement on the language.  We saw this morning that the language, which is in Paragraph 42 of the order, was modified a bit, and so I only rise briefly to say we're looking at the order.  We believe our issues are resolved, but we still need some time to finalize that language with our client and just confirm that it's acceptable.

And with that, I think it's still good morning.

THE COURT:  Yeah.  Thank you.

Mr. McGuire, if you can hit "five star," unless I've unmuted your line.  There you are.

MR. MCGUIRE:  I believe you have, Your Honor.  Can you hear me?

THE COURT:  Good morning.  Good morning.

MR. MCGUIRE:  Good morning, Your Honor.  Dan McGuire for Bank of America, the ABL agent here.

Your Honor, we'd like nothing better than to say that

we're fully resolved and, you know, agree with the DIP financing and cash collateral arrangements that were made. We have made tremendous progress on that front, Your Honor. Frankly, we're down to, I think, one issue, but it's an important issue to us. That is, the arrangements you've described of collateral are, you know, problematic for us.

Insofar as we're allowing current AR inventories as our collateral to be used, the cash collateral generated from that to be used, instead of new AR inventory that's generated being our replacement collateral, and now be told that they're someone else's collateral we can't have a lien on. That would effectively destroy our borrowing base, which we don't even know what that will be in this situation.

So, you know, we're looking to get this situation (indiscernible) worse. This is a very messy situation, and it should be -- a lot needs to be ironed out in the first 30 days, and we're on board with that. But we're not on board with the situation (indiscernible) a severe deterioration of the ABL lender's position during this interim period due to the (indiscernible) being treated. This just came up, you know, this morning, in terms of it, different than what we've been proposing on this side. We're hoping we can work that out here with the debtors. But we aren't there yet, you know, because of this one point.

THE COURT: Okay. Thank you.

Mr. Singh -- let me just tell everybody. I'll give you an opportunity to respond to everything. I want to just kind of tell everybody. We can probably go for another 30 minutes, and then we're probably going to have to take -- I've got a hearing at 1 that I need to prepare for, and then we can pick up at 2 Central, if that works. But I want to keep working the entire time. I just want to give everyone kind of a heads up on that. But let's keep working.

MR. SINGH: Thank you, Your Honor. Your Honor, I'll take these in turn and in no particular order, but just let me start with the ABL issue.

So the ABL does not have a lien on raw materials. I think Mr. McGuire and I can stipulate to that, right? So if it's sitting as raw material in the carve-out entities' boxes, there's no ABL lien. We are agreeing that we're not going to send any, quote, "ABL collateral," which is the FBG debtors' inventory, into the carve-out boxes. So he should still be good, right?

What we -- prepetition, what would happen is, at the time that the carve-out assets converted into finished product, so the raw material converted into finished product, the FBG debtors would pay carve-out cash, right, at fair market value. And at that point, Mr. Brillian's saying, great, thanks, cash or inventory, I'm good. You can have this because my lien, quote, "is either satisfied or you've given me replacement

98

collateral and I'm good to go." And at that point prepetition, that finished product would become ABL collateral. But very importantly, right, we, the FBG debtors, would actually pay fair market value, COD, up front at that point.

So now what are we changing post-petition? Mr. Brilliant's clients are saying, okay, fine, still going to make my inventory, and I'm going to let you sell that inventory to a customer without buying it from me at COD. So the FBG debtors, Mr. McGuire's clients, are much better off, right, because now I'm not using cash from their box to buy it from Mr. Brilliant's clients to then send it out the door to a customer. He's giving me float, right? And all he's saying is, hey, wait a second. While that float is happening, you can't discharge my lien because you haven't paid me, and he's only asking for a lien up to the fair market value. He's not asking for a lien up to the margin, right?

So the FBG debtors don't have to pay. The finished inventory goes out the door to a customer, right? When the -- and while that inventory -- while that AR now, right, the customer has bought it, we have an account receivable. When that AR comes back, we're going to settle up, and at that point, the fair market value will go into Mr. Brilliant's box, right? He offered us the float. Thank you very much. Here is the money back. It's sitting there, and Mr. McGuire's clients get that margin. They get that extra dollar of AR.

So, you know, we're not bribing him. What we're saying is we're actually not paying cash. We're not bribing Mr. McGuire's ABL lenders. We're not paying cash up front. And while we don't pay cash, Mr. Brilliant has to keep that lien. Otherwise, we have to satisfy his lien and pay cash. So this is a win-win arrangement. And when that margin, that dollar in my original hypothetical, makes its way back to FBG debtors, his clients have -- his clients -- that's his clients' collateral. So he's better off. I don't understand how he's not adequately protected.

I didn't take any inventory from his box and deplete the value of his current box and move it over to Mr. Brilliant's client. If anything, I'm adding to it, right? Because now Mr. Brilliant is saying, go ahead, use 30 days' float or whatever, 45 days' float, and when that inventory comes in, that additional dollar is inventory that Mr. McGuire's client doesn't have today. So he's actually much better off because the value of his inventory is going up in that arrangement without having -- without the FBG debtors having to front cash up front.

So rather than complain about it, I think -- I don't know why he wouldn't be -- I mean, from our business judgment perspective, Your Honor, that's a win-win for the debtors' estate. Maybe it's a confusion of how it works, but I'm surprised that the ABL lenders are not, you know, jumping up

and down and celebrating that they've now just gotten extra collateral that they didn't have to pay for as a result of this arrangement.

Your Honor, I'll confirm the points at Aequum. I forget who asked, but I think there was two or three counsel. We're not moving their collateral. We're trying to get this arrangement finished. Obviously, there is a reservation of rights. If we don't have an agreement, you know, we may have to come back, Your Honor, and prove that they're adequately protected. I hope that doesn't have to happen.

Let me go to -- I'll come back to Onset, Your Honor, but really Mr. Grillo -- you know, to me this is sort of the most disturbing objection of the day. Everyone is better off by virtue of getting this DIP approved. I mean, if this DIP isn't approved today with the proposed roll-up, we may as well all go home because the company is going to be liquidated. Everybody can go fight over the assets. They can fight over the collateral for the next 10 years and have no organization and recover close to nothing is my guess.

And Mr. Grillo wanted to know, well, where is the $2 billion of factoring cash, et cetera? It's not here. We don't have it. Zero dollars. There's $12 million in the bank account today. That's it. There is nothing else.

And so if he wants to liquidate this company and continue to object to the DIP and defer the DIP roll-up for

five days, we don't have that luxury. We have $12 million in the bank account, as Mr. Moore testified, and if we don't get the DIP approved today, we are talking about a liquidation of this massive enterprise.

So that hopefully addresses his clients' issue. I was going to address the escrow point too.

THE COURT: Okay.

MR. SINGH: Your Honor, the escrow -- the reason that they're getting a roll-up on the escrow is the lenders are funding that amount into escrow, and it's available to the debtors subject to compliance with the DIP liens -- excuse me, the DIP loan documents. So it's out of their hands, right? They funded it. They're not just holding it on their books and records as a to-be-funded amount. It's sitting in escrow, frankly, because one of the reasons is Mr. Greenberg and his clients are concerned that it may get swept if we put it anywhere else, just like what happened prepetition, and you've got a gazillion parties who are asserting liens and we don't know where it is. He wants to make sure, and frankly, we agree, that that $500 million is not going to go immediately on the debtors' books and records as something more for people to have a food fight about.

And it's going to be in the DIP escrow. They're funding it, and we have conditions on which we can draw. As long as we comply with those conditions, we're going to get the

money because they're contractually obligated to give it to us.

So this is not a situation where, you know, they're not lending us the money. These are safety measures that are being put in place, but we are getting that $500 million day one. We have to comply with the DIP documents to get it out of escrow and keep this thing rolled.

So Your Honor -- and the last thing I would say, Mr. Greenberg's clients are unsecured. Okay. This is an unsecured supply chain factor he's talking about. He already sits behind the $4- or $5 billion of debt that's in the existing capital structure. I'm adding the $1.1 billion of new money cash that's going on top of it, which I believe I've satisfied my burden to do. And with respect to the rollup, it's subject to the challenge.

So if his clients or an unsecured creditors' committee shows up at some point and says their liens on the first lien wasn't good or there's a challenge, Your Honor can effectuate whatever remedy you want in the future. But other than that, this rollup needs to happen today in order to get this money in. And he's an unsecured creditor who already sits behind this pile of debt.

So I don't see how he's prejudiced. I'm not increasing the interest rates. And all we're doing is getting $1.1 billion of new money. That's for the benefit of everybody, including his clients.

Your Honor, last with respect to Onset, I don't know that there's much to say. I hope we'll be in an agreement pretty soon. I haven't seen the latest terms of the stipulations, but, Your Honor, we agree. We're not trying to ask -- we're not trying to prejudice them with respect to the go-forward arrangements. I don't think he's prejudiced by an administrative expense claim against the FBG debtors because his claim has to be paid within 60 days if we agree. If we don't agree, then I think Onset can come in and complain to Your Honor that the amount is subject to dispute and needs to be addressed, but we're not going to run out of $1.1 billion in 60 days, Your Honor. There's going to be -- there's an administrative expense claim against that estate, assuming you approve the final order, even $500 million.

So he's not taking -- Onset's not taking risk for the entire case. I know Mr. Butterfield wasn't saying that, but I just want to be clear. We're fine with the 60 days, and that's why we proposed it, is that so he's not sitting out, you know, sort of taking risk with respect to the case.

Look, if the DIP proceeds -- if there's a termination event or something like that happens, I mean, that's a bad day for all of us, but he's certainly going to be better off by getting the DIP in and having the opportunity to actually collect rent on his equipment, just like all other creditors, than if he were to not get the DIP and just liquidate the whole

104

enterprise today.

Your Honor, I'm happy to take any questions. I think I addressed all the comments. I don't know if Mr. Greenberg or anybody else wants to be heard with respect to the objections, but we'd like to proceed, Judge.

THE COURT: Let me tell you where I am. I have had an opportunity to, obviously -- the declarations are in evidence, which includes the proposed DIP budget and related documents. I've obviously had an opportunity to read the Evolution stip, and those -- that stip makes sense to me. I've read it, and it worked for me, and I'd be prepared to sign that stip now. I haven't done so because it didn't make sense to do it before. We kind of ruled on all outstanding issues.

It is clear that this debtor needs financing and an incredible amount of financing. It's also clear, even from reading the first-day declaration, that professionals are still learning and getting smarter on some issues there, and not just the lender professionals. You can see it in Mr. Moore, as well, as describing, for example, kind of the current understanding of certain structures.

And, Mr. Singh, to the extent that some of the descriptions are inaccurate or you learn more at the appropriate time, I don't want a timetable. It's just if there's better information at some point, I want kind of a supplemental declaration from Mr. Moore, just kind of providing

105

me the latest understanding of the chart.  Once you think you know what the right answer is, if it changes, but obviously as people get smarter on the issues, I don't need kind of interims or latest thinkings.  I just need, you know, we did our research, and here's where we are at some point in time.

Yeah, they were -- I think when it comes to financing, it's -- I appreciate that there was transparency to the extent that you know about potential issues that are there.  Yeah, I agree.  This is a hard case if one was to finance it to a comp.  You know, a company with, I don't know, 11 billion-ish, you know, 9.3 funded debt and a couple of billion in additional, you know, kind of factoring-related liabilities, and tell me that they had $12 million in the bank, and then tell me, you know, payroll wasn't made and someone had to do bridge financing, and then now everyone's still learning, and tell me that someone's going to put in a billion dollars because that's what's needed.  It's incredibly difficult circumstances.

And -- but at the same time, I hear what every party is telling me from the FBG side of the house and kind of the SPV side of the house, which is, you know, we can't do anything today that prejudices the rights because there are a lot of moving pieces, literally and figuratively, here, and more information is going to -- will be known.

The construct of the DIP, I'm comfortable approving

on an interim basis, subject to all rights, subject to a final. I've read the papers. I know, I don't need to know the name -- to know the name of the bank, but it's in the (indiscernible), right? Someone took $27 million and exercised a setoff, and so that creates risk as to whether the money's going to get swept or where the money goes.

And so -- but I think the debtor's going to have to -- you know, there's a lot of different accounts. It looks like money's going to get parked, and what's going to be important to me is that there's transparency as to where the money is parked. And so if someone on the SPV side of the house believes that, you know, their cash is -- or some cash is put there until we figure out whose cash it is and whose rights are, that there's transparency, that there's not going to be any risk of commingling or any concerns there. So just kind of making sure that there's transparency on the -- of where that is and where the money is and how much it is. And so it's probably a lot of book accounting, but it's going to be really important to me that -- you know, anything that's done today, because it's going to be done in a couple of different places, and I want to make sure that everyone feels comfortable.

As it relates to what I would call the 60-day admin rent, what I can tell frontside is 60 days is going to mean 60 days, and it won't be where someone files something on Day 59 and asks for kind of a, you know, push out of the day and cites

107

105. And, you know, if we're going to do it, we're going to do it, and it's going to be 60 days, and there's going to have to be certainty on what that is, not subject to further extension of the Court based on the reasonable circumstances. If we're going to give 60 -- you know, payment within 60 days on this one -- and obviously I'm just talking about this deal -- that's what -- it will have to be kind of something that people can rely on for purposes of today, and that gives me comfort.

As to what I would call the ABL lender dispute, it seems to me that, as described, Mr. Singh, and assuming that that's the way it's as described is it would work out in practice. What you're really doing is just preventing raw material from sitting somewhere during this period where it could be made to use money, and the lenders, these DIP lenders -- you know, there's other cash that needs to be used for other purposes, so you can either take the material, convert it, pay for it, but someone's going to have to pay for the material, and it's usually the debtor who would have to pay for it on step one to then go out and try to make a margin on step two. This is just getting it out and -- where someone's going to allow that product to go out so that everybody can make money during this period, and it's not just either sitting there, or the debtor's going to not have the ability to go and pay the cash because that's going to create an additional burden on the estate. If that's what's happening, and

everybody's rights are preserved in terms of kind what you would normally pay, and we're not getting into -- in other words, there's an ordinary course as to what this stuff was worth, and when it went out, and playing within the margins on that there makes sense to me so that -- you know, there's just not a lot of disagreement when $2 comes in, where the money -- you know, how much normally would have gone to pay off Mr. Brilliant's client, and then how much would have turned into ABL collateral.  There's a -- I'm just trying to -- this stuff was being done prepetition.  It should just continue on whatever terms.  And I got it, the market could change, but clearly this was done before, and it should just continue for the purposes of the next 30 days on whatever kind of prepetition terms we were here.

The other stips that I've seen, or that I will see, it sounds like, Mr. Singh, you're going to have to work out some language, and it's subject to everyone kind of reviewing it, but kind of the constructs make sense to me, and I'll approve them, and I'm going to overrule any objection for purposes of where we are in terms of an interim.  It's clear this debtor needs money, and it's clear that this is really rescue financing, and it's clear that someone is lending an incredible amount of money into an uncertain box.  But you're talking, you know I think about -- I haven't approved them yet, but some of the money is going to go towards, you know, keeping

109

insurance, right, and paying employees. And folks walk off the job, we've got real problems on our hands because it's going to be really hard to go find stuff. And that's just the reality of where we are, dealing with multiple countries, multiple jurisdictions. I'm thinking about all these things that were described in the declaration. To lend a billion dollars into that is -- there's risk.

I think the roll-up, you know, and kind of -- quite frankly, it's helping the ABL folks as well in kind of getting to a place. Everybody's rights are reserved in connection with a final. I don't think anyone should cite this case on an interim as a comp to me, or, you know, as precedent in another case. Like, you know, this is just different than, quite frankly -- I don't think on my time on the bench I've seen anything like this. And it just reflects the reality of where we are, so we can -- it's where we are.

Mr. Singh, you know, I -- someone's going to have to kind of continue to work on language, and maybe I need to call balls and strikes on kind of what final language looks like on some stuff, but the constructs make sense. In terms of a second-day hearing, I can tell you, I know that -- I think my case manager has told you all, you know, that October 30th at 1 Central would work. Here's what you need to think about. I want the second-day hearing in person, right? We're just going to just -- I don't know where it goes, and I don't know what

everybody learns between now and then, so anybody who's going to speak or cross witnesses or -- it'll be cooler in Houston, so then there'll be no complaints. You can come down to Houston. I'm teaching at a law school at 5:45, and there's some students that I promised that I would be there at 5:45 that evening, between 5:45 and 7:45. So -- but I have the 29th available, and so if the 29th makes more sense, then let's do it on the 29th if you think it's just going to be a few hours. And I don't know, I'd rather hedge a little bit on this one, and so maybe one can start on the 29th and finish on the 30th, but if you just wanted the 29th, right now it's wide open, and if that date would work, then you can kind of work an objection deadline that would make sense from there. I don't know. You would have to just think about that as you kind of think about what dates and witnesses and things of that nature, just give that some thought. But I'm going to want everybody here on that day, and probably maybe in my new courtroom at that time, but we'll see. If not, we'll be here.

MR. SINGH: Understood, Your Honor.

THE COURT: So just give that some thought, but let y'all keep talking about that.

So I'm approving the amount, the fees, the interest, the -- you know, the use of cash collateral, and those terms, subject to final language. Obviously, this is subject to final term, but the construct makes sense, the proposed lenders, the

111

statements that are made there -- the reservations, all the reservations of rights are approved, and they really are reservations of rights, both in connection with the final hearing. It's an interim order, right, and so there's going to be a final hearing. But, again, what you hear me saying is, you know, this order is different because this order creates a bunch of escrow and buckets and things of that nature, and there's just going to have to be a lot of transparency and certainty that goes along with every one of these stips. And if there's more stips, I'm comfortable signing. I'm comfortable with the Evolution stip, but I think what I'd like to do is sign a DIP order and then sign the stip so that Evolution isn't kind of placed in a position where I've signed something.

And then -- so I'd like to do it all at the same time. I don't know when it makes sense. Maybe we can use kind of the 12:30 to 2 period to talk about kind of what makes sense in terms of the next hearings.

I'm going to steal some thunder. I'm going to approve the -- you know, let me just take a look at what we have here. No, I don't want to do that. I don't want to do that. Let's just come back at 2.

Mr. Singh, at two o'clock, what would make sense for me is an update as to kind of where we are on the DIP, kind of order and other stips of that nature, and then we can move to

112

kind of the other matters at that time. And then kind of let me know what you want in terms of second-day hearing, whether it's the 29th, because I'm going to have to fill it in, I suspect, for some of the other interim orders at that time. And we'll go from there. But everybody's rights are preserved, and keep working.

It sounds like you all are going to be working while you're eating, but nothing new. You would have been stuck in a hallway outside here, otherwise, if we would have had a first day out here. So why don't you keep working, and then let's just come back on at 2 p.m. and see where we are.

All right. Thank you.

MR. SINGH: That makes sense, Your Honor. Thank you.

THE COURT: All right.

(Recess taken at 12:25 p.m.)

(Proceedings resumed at 2:13 p.m.)

THE COURT: Okay. Good afternoon, everyone. This is Judge Lopez. Back to First Brands.

I think I'm -- what I would just ask is if parties who had already made appearances, can you please hit "five star" again? You don't need to make an appearance again. I'm just going to unmute a bunch of lines and just ask that you please just monitor your own emails. I'll just give it a second. I'm unmuting lines, so please be careful. You can just mute your lines.

113

Let's see.  Is there anyone from debtors' counsel on the line?

MR. SINGH:  Yes, Your Honor.  There's -- Sunny Singh.  I don't know if you can hear me, Your Honor.

THE COURT:  I can hear you.

MR. SINGH:  Oh, good.

THE COURT:  Oh, there you are.  All right.

MR. SINGH:  Okay.  Good afternoon again, Your Honor.  Sunny Singh, Weil Gotshal, proposed counsel to the debtors.  I think we're ready to proceed and pick up back on the DIP motion, a couple of the open points.  I can give you a status report of where we are.

But first, Your Honor, I think just for scheduling purposes, I think we would take you up on October 29th to start, preferably in the afternoon if you could, Your Honor.  And then if we needed to, we could carry over to the 30th if necessary.

THE COURT:  Let's do October 29 at 1 p.m. Central.

MR. SINGH:  Great.  Okay.  Thank you, Your Honor.

Okay.  Just let me, with that, just report kind of where we are with each of the parties.  So carve-out, Mr. Brilliant's clients, the stipulation is done.  It's in the process of being filed.  There was some additional language Mr. Brilliant sent over to the DIP order that we're incorporating right now that basically just says -- you know, it's expanding

the "for the avoidance of doubt" paragraph that was in there that makes it clear that, you know, DIP liens are not being granted against the, quote, "carve-out assets" that are identified in the stipulation DIP or adequate protection liens, which obviously I think I said multiple times on the record today and in the case. So we were happy to incorporate that change. So you'll see that in a revised order. So I think that takes care of carve-out.

The ABL lenders, Your Honor my understanding from Mr. McGuire was they wanted some clarification in the stipulation that's set in, in the carve-out stipulation or order that says you know, when the sort of premium after fair market value is paid comes back to the FBG debtors, it's ABL priority collateral because it was AR. You know, rather than go and wordsmith a stipulation with a third party in the order, I think I've made this statement multiple times on the record. I'm happy to just stipulate on the record that that is the case. And hopefully that's acceptable to the Court so we don't have to keep holding on to the order and making more changes.

Your Honor, Onset, I think we're done. I don't know if Mr. Newton or Butterfield is on the line. I don't see them, but I see people are joining. We sent them the stipulation. It's essentially the same form as Evolution plus dealing with the inventory -- excuse me, the equipment point that I outlined on the record. So we -- they're just looking at the stip. As

soon as that's done, it'll get filed shortly.

Aequum, I believe we have an agreement subject to client approval, at least without the client approval on the Aequum. They're basically going to follow the carve-out format. But they're going to give us a cap of $30 million. That basket -- that carve-out is 20. $30 million for the two facilities, 65-day payment terms, and it must be sold to a list of customers that we will provide, and it can be supplemented. So the same sort of point, and I'm happy to confirm again before Mr. McGuire asks that the ABL priority liens attach after we have paid off -- after we have paid down or deposited into the account the Aequum dollar amounts.

That stipulation, Your Honor, they're reviewing with their client, so hopefully they can get back to us. Maybe there's a few tweaks, but hopefully that can be done and we can get that on file.

I think -- and we're done with all the factoring reservation of rights. All of those parties, whether they file joiners or reservations of rights, to my knowledge, have accepted the language. If anybody is still out there, they can obviously speak up and be heard.

So, Your Honor, I would propose that it's critical that we get this order entered today. Payroll needs to go out tomorrow. So I would propose that we give people just a little bit of time here to finalize their stipulations. If for some

reason it takes longer or can't get done Your Honor, frankly, with respect to Aequum or Onset, I hope we're never going to get here.  The debtors would propose that we simply just insert the -- sort of the terms that I laid out on the record that resemble Evolution or (indiscernible) and ask Your Honor to approve them over any objections for the next interim period. Because I'd really, you know, love to continue to negotiate more with these counterparties through the end of the night, but we really have to get done and get the DIP over on file so we make payroll tomorrow.

I think that's it, Judge.

THE COURT:  Okay.  Let me just see if anyone wishes to be heard before we --

MR. MCGUIRE:  Yeah.

THE COURT:  Yes.

MR. MCGUIRE:  Yes, Your Honor.  Dan McGuire on behalf of the ABL lenders.

THE COURT:  Mr. McGuire, yes, sir.

MR. MCGUIRE:  If you will so order what Mr. Singh said on the record so that it's actually in front of the Court as opposed to (indiscernible) relative to these things being ABL priority collateral.  I think we can live with that not being in the documents so they can enter (indiscernible). That's perfectly fine.  But (indiscernible) reporting, just cut off (indiscernible) arrears (indiscernible) October 31st.  But

with that, Your Honor, we would be (indiscernible) today.

THE COURT:  Thank you so much.  It is so ordered on the record, Mr. McGuire.  Thank you.

MR. MCGUIRE:  Thank you, Your Honor.

THE COURT:  Mr. Blank.

MR. BLANK:  Your Honor, I'll actually let Mr. Ottaviano go first, and then I'll piggyback on what he has to say.

THE COURT:  Okay.  I'm sorry.  Can you repeat that? I was taking notes here.  Mr. Blank.

MR. BLANK:  Your Honor, I said I would let Ken Ottaviano go first, and then I'll piggyback on what he has to say.

THE COURT:  Got it.  Mr. Ottaviano, are you

MR. OTTAVIANO:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. OTTAVIANO:  Ken Ottaviano for Aequum Capital Financial as an SPV lender.

Your Honor yes, we are in agreement.  We are working through the language, but I would ask the Court not to just insert some language into the order without us.  If he can't come to the deal, it's not fair to insert some language into an order.  I think we should reappear in front of Your Honor and be heard regarding the language, as Your Honor, earlier in this hearing, so stated.

118

THE COURT: You will, but on a final. So if you leave it up to me, I'm going to insert language that gets this over the language that I think is appropriate under the law. I'll give you all some time, but if not, I'll enter the order and everybody will have whatever rights they have. But when -- and we'll see each other on October 30th. Just don't leave it to the judge. I will -- I'll answer the question if the question is presented as to -- y'all can tell me what you think both of you are proposing, and I'll pick one or come up with one on my own. No, that's going to be the answer. You know, I don't know if any of one of you are going to want what I write, but there will be an answer.

MR. BLANK: And Your Honor, Steve Blank from Alston on behalf of UMB. Just to that point, I was a little bit confused only because the debtors have mentioned on the record previously that the language already in their proposed order was effectively punting the issues with respect to UMB and Mr. Ottaviano's client. So now to -- we are working as fast as we can to get some language with the stipulation, but they already have language saying this is going to get punted to the final hearing. And so just getting jammed is -- we're working as fast as we can. (Indiscernible)

THE COURT: Well, I guess I'm just trying to figure out -- you guys -- Mr. Singh, what's the -- I don't want to kind of get into the specifics of it, but on a high level,

what's the outstanding issue?  Mr. Singh?

MR. SINGH:  Your Honor, did you ask me?

THE COURT:  Yes, sir.

MR. SINGH:  I didn't know you were asking.

THE COURT:  Yes, sir.  I'm just trying to figure out kind of what's the --

MR. SINGH:  Your Honor, I think they're just confirming that they're good with the 30 million cap and the 65 days on terms from the debtors' perspective.  If Your Honor's ordered that, I'm good with it.  But if they are confirming that with their client, I'm happy to wait a little bit.  But other than that, we don't really have an issue.

THE COURT:  Mr. Blank or Mr. Ottaviano.

MR. OTTAVIANO:  Yeah, Your Honor, we confirmed the 65 days payables and confirm the list of customers.  And we just need to see the language.  We did discuss a few other minor issues that I don't think would require the Court's intervention.  But just blanketly agreeing to agree against their language is just fundamentally unfair.

THE COURT:  No, no, no, I think --

UNIDENTIFIED:  Your Honor --

THE COURT:  Yeah.  I think you're going to see the language.  I don't -- I didn't mean to imply.  I'm just saying if we get to a logjam, that's when I'll come in and make the call.  But I do think -- I'm not just -- they're not just going

to upload something to me and then I'll sign it or insert my language. I think they're going to send you something and try to continue to work on stuff. And at some point, if things just get too tight, I'll just -- I'll make the call on the language. That's where I'm going. But I do agree that you should see language, and you will.

MR. SINGH: Yeah. Your Honor, and I'm happy to confirm that, one, we're sending them a redline; two, any -- if we can't agree, the language we will submit would -- will mirror the carveout language with the modifications to the numbers and amounts we just recited. So that would be our proposal, so there's no surprises. I believe that stipulation is being filed on the docket momentarily. And so we're not trying to pull any surprises. We just -- we can't wait any longer for interim approval of the DIP.

MR. BLANK: And Your Honor, the only point I would make is because there was already language in the proposed DIP pushing this issue, if this fell through, this issue shouldn't hold up the DIP. And our stipulation could always come tomorrow. It doesn't seem as though that would be prejudicing given that there was already language punting this issue in the order.

THE COURT: Mr. Singh.

MR. SINGH: Well, Your Honor, I would clarify. The language in the order or motion said that we are working to try

to get stipulations with these parties.  To the extent we don't, we believe we've shown adequate protection.  I believe that's in our motion.  And Your Honor now has uncontested evidence in the record.  So, you know, as much as I'd love to negotiate this tomorrow, I really wouldn't.

THE COURT:  Yeah, I think you all are going to get there.  You hear what I'm saying.  So let's just get -- Mr. Singh, what I would ask is once you feel you've either gotten to the point or you've gotten sign off -- and I know that there's a bunch of folks who are going to need to look at it -- kind of upload an order, let my case manager know.  If there's disagreement on language, then I'm going to ask that that party, whoever it is, file something immediately and tell me because I'm going to sign an order today on the DIP.

MR. SINGH:  Thank you, Your Honor.

THE COURT:  But it could be late that I sign it.  I'm just --

MR. SINGH:  Understood, Your Honor.  That's fine.  We just have to close tomorrow morning to make payroll.  That's understood.

THE COURT:  No, no.  Okay.

MR. SINGH:  Thank you.

THE COURT:  All right, folks.  Where do we go next?

MR. SINGH:  Your Honor, I don't know if anybody else has any issues with what I've said.  But other than that, I

122

think we're done with the DIP.  And I will turn it over to my colleague, Jason George, to handle the next motion on the agenda.

THE COURT:  Okay.  Thank you.

MR. SINGH:  Thank you.

MR. GEORGE:  Good afternoon, Your Honor.  For the record, Jason George.

THE COURT:  Good to see you.

MR. GEORGE:  Good to see you as well, Your Honor. I'll present the cash management employee and customer programs motion.  If it's okay with the Court, I'll start with the cash management.

THE COURT:  Okay.

MR. GEORGE:  Thank you.  The cash management motion was filed at Docket Number 17.  Pursuant to the motion, the debtors request authority to continue their existing cash management system in the ordinary course, including maintaining the existing bank accounts, continuing to perform under intercompany transactions in the ordinary course, continue their credit card programs, and pay prepetition obligations in connection therewith, and an extension of time to comply with Section 345 of the Bankruptcy Code.

As set forth in the motion, the debtors operate a centralized cash management system consisting of 173 bank accounts at 11 different banks.  The majority of these

accounts, including the debtors' main concentration account, are maintained at Bank of America.  The debtors also maintain various collection accounts where receivables generated from operations are deposited.  These are zero-balance accounts that are swept into the main concentration account on a daily basis. Due to the size and the complexity of the debtors' cash management system, it would be extremely burdensome and disruptive to the debtors to be required to open all new accounts.  Accordingly, the debtors seek authority to maintain their current cash management system in the ordinary course.

Of the debtors' 173 bank accounts, 22 of those are maintained at banks that are not authorized depositories.  The debtors intend to discuss accommodations with the U.S. Trustee's Office in respect of these accounts and are requesting a 45-day extension of time to have those conversations.  We understand the United States Trustee is amenable to that request.

In addition, Your Honor, the debtors seek relief with respect to their corporate credit card programs.  The debtors currently owe approximately $250,000 under those programs and seek to honor those obligations and continue the programs in the ordinary course.  As was mentioned earlier today, there were two objections filed to the motion.  One was filed by Katsumi at Docket Number 118 and the other by Raistone at Docket Number 137.  ING Belgium and Arab Banking Corporation,

also filed joinders to those objections.

Both Katsumi and Raistone entered into what we refer to in our papers as third-party factoring arrangements with the debtors. Under these arrangements, when a factored receivable comes into the account -- or comes due, excuse me, the customer pays the receivable over to the debtors, which is then supposed to turn the funds over to the factor. This is different than the customer receivables that were also mentioned earlier today, where in those arrangements, the receivable comes into -- or when the receivable comes due, the customer that owes the receivable pays it over directly to the factor and the funds don't come into the debtors' possession.

As Mr. Singh mentioned, the debtors were able to resolve these objections prior to the hearing by adding language to the proposed interim order stating explicitly that the funds on account of third-party factoring arrangements will be segregated. We've since filed a revised proposed order at Docket Number 182. The relevant paragraphs are numbered 9 through 11. I'd be happy to take the Court through those, but I also have a couple clarifications. We received an email from CarVal's counsel, as well as Jefferies' counsel during the hearing, and there's a couple additional clarifications to make to the order.

THE COURT: Keep going.

MR. SINGH: Okay. Otherwise, Your Honor, we did

share the draft of the motion with the U.S. Trustee's Office and the DIP lenders. Their comments have been incorporated into the proposed order. Unless Your Honor has any questions, we'd respectfully request the motion be granted.

THE COURT: Anyone wish to be heard with respect to this motion? And if I haven't unmuted your line already, please hit "five star" and I will do so.

MR. KELLEY: Yes, Your Honor. Charles Kelley from Mayer Brown --

THE COURT: Yes, sir.

MR. KELLEY: -- on behalf of Katsumi, one of the objecting parties. Good afternoon, Your Honor.

We have worked out language with the debtors, so it is our understanding it's been incorporated in the orders. I haven't actually seen the filing, but we will confirm that in the upload. But I thought now would be a brief opportunity to introduce my client.

My client, Your Honor, Katsumi Servicing LLC -- we call it KS Servicing -- is the buyer representative with respect to receivables that were purchased in the course of business. These are true sale transactions, and we service and act on behalf of a number of other investors. But fundamentally, as of the petition date, there were approximately 210,000 outstanding purchased receivables with an aggregate net balance of approximately $1.75 billion, or

roughly $9,000 outstanding per receivable.

We are working with limited information. We are appreciative of the information that the debtors have shared with us. We understand there is an open issue as to what may have occurred prepetition with respect to others receivables have been sold to us or others. It's unclear. But we understand there's a special process of investigation that is ongoing. We obviously support the debtors going through the normal process to assess and evaluate these issues.

An item that I would just note, because we view the purchased receivables and the proceeds as separate property, not property of the estate, but property that we have acquired, we have slightly different interests than many of the other equity-related transactions. And so while we appreciate the special committee's process and investigation, we intend to work closely with the debtors. They have put language in about updating this weekly, which we are grateful for. And we intend to stay carefully attentive. But needless to say, while we know these processes take a while, we are hopeful the process will move quickly so we can receive proceeds and not see them held in accounts for any length of time. But for the interim period, we understand what the debtors want to do, and we've agreed to the language.

Our rights have been reserved with respect to that. But we are interested in understanding the true nature of the

127

receivables we purchased and whether or not they've been compared or otherwise affected some of the disclosures that occurred prepetition. But with that, we are appreciative of the efforts that have occurred. It's a significant amount of receivables that we represent, at the $1.7 billion. And we will be probably active shortly after the first-day hearings with the debtors to get as much information as we can. So with that, I appreciate the opportunity to sort of introduce the client (indiscernible) and to let you know that we are working cooperatively with the debtors where we can, and we hope to continue doing so. But we need to get our hands around what occurred with respect to ourselves.

THE COURT: Thank you.

MR. GEORGE: (Indiscernible).

THE COURT: Thank you very much. Does anyone else wish to be heard?

MR. BRILLIANT: Your Honor, Allan Brilliant on behalf of CarVal.

THE COURT: Yes, on CarVal, and then I'll turn to Mr. Doherty.

MR. BRILLIANT: Yes, Your Honor. Your Honor, as I mentioned earlier, we had said that we had some issues on the cash management order. As counsel said, we sent a few minor clarifying comments earlier today. (Indiscernible). With that, we have, you know, no objection to the entry of the

order.  Thank you.

THE COURT:  Thank you.

Mr. Doherty?

MR. DOHERTY:  Good afternoon, Your Honor.  I'm -- Dentons US LLP.  We represent  Factofrance, S.A. also known as the factoring party.  I've been in communication with Mr. Kelley and his colleagues and the debtors' colleagues, and the lender's colleagues this morning were on emails.  We're also reserving rights.  We believe that the issues have been taken care of and agreed language.  I haven't seen the order (indiscernible).  I have no reason to think it won't be in there.  I just wanted to, you know, make an appearance on the record for our client.  We share a lot of the same concerns that Mr. Kelley and others have spoken about.  Thank you, Your Honor.

THE COURT:  Thank you.

So there was an order that was filed with respect to cash management at 182.  Is that the order we've been talking about?  Or is there another order?  I just want to make sure.

MR. GEORGE:  Your Honor, that's the revised order we filed earlier today.  It covers a lot of the issues for the factoring counterparties.

THE COURT:  Uh-huh.

MR. GEORGE:  We -- (indiscernible) all of them.  But Mr. Brilliant's comments came subsequent to that, and we still

129

have to incorporate those into the order.

THE COURT: Okay. So you're going to upload a revised order?

MR. GEORGE: Yes, Your Honor, we can do that.

THE COURT: Oh, no, no, I'm asking. Yes, I am asking. Go ahead and do it, just so I'm clear, because I don't -- and just, you know, if there's any attachments to the order, if there's a proposed -- let's -- I guess I ought to set an objection. Is this an interim? It is an interim, right? If we're doing October 29, can we do October 22nd as the objection deadline?

MR. GEORGE: Works for the debtors, Your Honor?

THE COURT: And let's do 5, 5 p.m. Central. And can you -- if you could just plug in everything and just kind of a revised order, and I'd ask Mr. Singh to do it as well when the DIP gets uploaded, just kind of have it all ready to go. And then, we'll take a look at that one, and I'll get them signed.

MR. GEORGE: Will do, Your Honor.

THE COURT: Thank you. Where do we go next?

MR. GEORGE: Next, Your Honor, is employee --

THE COURT: Go ahead. Let me just note, there's a number of parties listening, and I should make a note. I think there's, like, 330 parties on the line.

I'm approving the cash management motion, which allows the debtor to ease into the Chapter 11 process by

130

maintaining existing bank accounts that have certain agreements that have been made with respect to how the money moves. And so I'm going to honor those. But the purpose is to allow the debtor to maintain its existing bank accounts to avoid the disruption that would happen in connection with a Chapter 11 case. Sometimes bank accounts close. Sometimes there are requirements to open up new bank accounts and then change the names of the bank accounts. This motion just allows the debtor to ease into the process without administrative problems. And there's a lot of money moving, but there's still transparency in the process. So everybody knows where the money is going, where the money is going to be parked, if it's going to get parked somewhere.

So this motion really provides very little, what I would say, in terms of substantive relief. This really just allows the debtor to ease into the Chapter 11 process without having to open up new bank accounts, change names on banks, but still provides transparency that the debtor can still use those existing bank accounts without running afoul of any other provisions of the Bankruptcy Code. So I will authorize those.

I'll authorize an extension under what is called Section 345 of the Bankruptcy Code. There are certain authorized depository banks. And if not, then there could be a motion that could be raised as to kind of move the money from one bank into another.

131

Here, there's going to be an extension of time that is authorized under the Bankruptcy Code to allow additional discussions to occur on those points. Everybody's rights are reserved with respect to that. There's going to be an uploaded order, and I'll sign it when it hits the docket. But I've approved the cash management motion.

Where do we go next?

MR. SINGH: Thank you, Your Honor. The employee wages motion is filed at Docket Number 16. Pursuant to the motion, the debtors seek authority to pay prepetition wage and benefit obligations and continue their benefit program in the ordinary course.

The total relief sought by the debtors in the motion is approximately $34 million, including approximately $11 million of accrued leave and PTO, for which there should be no remittable cash outlays, just employees taking time off. The debtors do not believe that any wages are owed to any employees in excess of the priority cap. I have included language in the proposed order stating that any workforce compensation obligations owed to employees above the priority cap requires notice and consent from the U.S. Trustee, any statutory committee appointed, and the DIP lenders.

As part of the relief, the debtors also seek to pay bonuses to a select number of rank and file employees. These bonuses are on account of the 2024 calendar year. They're part

of the employee's normal compensation package, were promised to the employee's and have already been delayed due to the company's liquidity situation. The total amount to be paid is approximately eight-and-a-half-million dollars. Importantly, no bonus will be paid to any insider or anyone on the debtors' executive management team or executive payroll.

Finally, the debtors are also seeking authority to honor certain prepetition severance agreements. It's a relatively modest amount. The debtors owe approximately $790,000 under those agreements. It is important to the debtors that these outstanding obligations, both the bonuses and the severances, are honored, along with the other prepetition obligations owed to employees. The debtors are rightfully concerned with retention at this time and the potential ramifications if they start picking and choosing, you know, which benefit programs to honor.

In advance of the hearing, we discussed the relief requested with the U.S. Trustee and the DIP lenders. They're in support of the proposed order.

Unless Your Honor has any questions, we'd also request that this motion be granted.

THE COURT: Anyone wish to be heard with respect to the employee wage motion?

Okay. I'm going to consider a motion to pay prepetition wages, salaries, employee benefits, and other

obligation to continue compensation and benefit programs in the ordinary course.

For those who may not be familiar with the bankruptcy process, the Bankruptcy Code provides a priority rank for certain wages earned by employees within a certain amount of time before the case was filed. That -- this order allows the debtor to pay kind of accrued but unpaid pre-bankruptcy employee wages up to the amount, which is what they were calling the cap that is provided in the Bankruptcy Code. It's going to allow for certain bonus payments that were promised to these employees. It continues the -- allows them to continue and pay work compensation and employee benefit programs in the ordinary course so that employees can feel comfortable. They can continue to do the work that is required on a day-to-day basis in connection with this case.

No insider, no CEO, no CFO bonuses are going to be paid in connection with this. This is to pay -- you know, we consider the employees the lifeblood of this company and to make sure that they can feel comfortable. It goes without saying, today is October the 1st and bankruptcy judges are well aware that today is the day rent is due, mortgage payments are due, and people want to make sure that their kids have health insurance and that they have health insurance for themselves and that it will continue and that they're allowed to take a day off and they're not worried about getting fired. So this

134

is all really important.  I've reviewed the proposed order.

Is the one at 16 the one that we're still signing?

MR. SINGH:  Yes, Your Honor.

THE COURT:  Okay.  I'll get it signed and on the docket.  Thank you.

Where do we go next?

MR. GEORGE:  Thank you.  Last, Your Honor, for me, is the customer programs motion.  It's filed at Docket Number 15.  Pursuant to this motion, the debtors seek authority to continue their existing customer programs to honor prepetition obligations related thereto.  The debtors also seek to continue their customer factoring program with respect to any post-petition accounts receivable.  The debtors estimate that as of the petition date, they have accrued approximately $252 million of outstanding obligations related to their customer programs.  These obligations relate to, among other things, discounts and rebates granted to customers in connection with volume purchases and signing new contracts, return programs for customers that have excess inventory, and customer compliance programs that require the debtors to compensate customers if they fail to meet certain order rates.

Each of these programs is integral to the debtors' business, including maintaining customer loyalty and generating new sales.  Certain programs, such as the customer compliance program, are also required by the debtors' customers to

continue to do business with them. Accordingly, the debtors seek to continue honoring those programs in the ordinary course.

With respect to the factoring program, the debtors are only seeking to continue their customer factoring program and not the third-party factoring. I explained the difference earlier on in my presentation. But the customer factoring program really relates to the debtors' mass retail customers.

As set forth in the motion, this program or these programs are very similar in the automotive parts industry. Many of the customers have extended payment terms, sometimes up to 360 days, and therefore the debtors need to factor the receivables to ensure access to near-term liquidity. If they're unable to do this, the debtors will have very limited operating receipts in the near term, considering they're segregating all the third-party factored receivables. And the DIP budget also contemplates that the debtors will continue this practice in the post-petition period.

As with the other motions, the United States Trustee and the DIP lenders have signed off on the proposed form of order. So unless you have any questions, we'd also request that the Court enter this order.

THE COURT: Anyone wish to be heard with respect to the request for interim relief with respect to honoring customer programs?

136

Okay. The purpose of this motion is to allow the debtor to --- as counsel indicated, to continue programs that are in effect to its customers, to allow customers to continue to -- you know, encouraged to continue to do business with the debtor. So if there's kind of incentives or kind of rebates that are in effect, that this just allows everything to continue in the ordinary course of business. It's just an interim order. Everybody's rights are reserved to a final.

Can you confirm for me? I said October 29th at 1 for the hearing, right? Did I get that right?

MR. GEORGE: Yes, Your Honor.

THE COURT: I'm really good at giving dates, really bad at remembering which ones I said. So I just -- I will get this order signed, and it'll hit the docket shortly.

MR. GEORGE: Thank you, Your Honor. I'll turn the podium over to Mr. Barlow.

MR. BARLOW: Good afternoon, Your Honor. For the record, Jared Barlow of Weil Gotshal, proposed counsel for the debtors.

The next item on the agenda, item number six, is the debtors' critical vendors motion. This was filed at Docket Number 13. By this motion, the debtors are seeking interim authority to pay certain prepetition claims of critical vendors, non-U.S. vendors, lien claimants, and 503(b)(9) claimants. Specifically, the debtors are requesting authority

137

to pay in the interim period up to $39 million in critical vendor claims, $26 million in non-U.S. vendor claims, $2 million in lien claims, and $12 million in 503(b)(9) claims for a total of $79 million in the interim period.

The debtors are not requesting authority to pay that amount as a lump sum. The debtors would intend to pay those amounts as they come due in the ordinary course and only after the debtors have determined in their sound business judgment that payment to a particular vendor is necessary to avoid immediate harm to their business. The debtors also request authority to pay and confirm the administrative priority of vendors who have issued purchase orders prior to the petition date that will not be fulfilled until after the petition date.

In advance of the hearing, we previewed the relief requested with the U.S. Trustee's Office and understand that there's no objection to the relief requested, and additionally, the debtors' DIP lenders are in support of the relief request as well.

The debtors have a capital-intensive business that relies on the cooperation and services of their vendors and trade claimants every step of the way, so the debtors believe that the relief requested is reasonable and supported by business judgment and is in the best interest of the debtors, their estates, and in the interest of their stakeholders. Unless the Court has any questions, we respectfully request the

entry of the interim order.

THE COURT: Anyone wish to be heard with respect to the critical vendor motion?

Alrighty. Which is then -- oh, can you hit "five star," sir? I just want to make sure that I can hear you, Mr. Garcia. You hit "five star" on your phone and -- oh, there you are. Mr. Garcia.

MR. GARCIA: Thank you very much. I am one of those critical vendors, non-U.S. vendors as well, and we have not seen any of this information before, and you have here some amounts of 79 million, but we don't know if it's going to be enough for us, for all the critical vendors that are -- been supplying for all these year and we have not received any payments from the companies.

My company is a small business, and I think it's very unjust that, of course, here I am with a lot of important lawyers, big companies, but we are a small company as well, and we would like to see a list of when we are going to get paid and that it's going to be not just that amount that the companies are going to discretionarily distribute when they need only the parts that they don't have in inventory to continue producing. But they need to honor the commitments that we have been supplying month after month of the important raw materials that you need to produce the final goods. And that is all that I have to say.

139

THE COURT: Mr. Garcia, thank you very much for your -- what is the name of your company?

MR. GARCIA: My company is Polypack (phonetic). We are a polybag. We produce packaging, and I supply two of the debtors in (indiscernible).

THE COURT: And which companies do you provide business to? Which debtors? Do you know the name of the companies that you --

MR. GARCIA: Tridonex.

THE COURT: Uh-huh.

MR. GARCIA: Yes, Tridonex and Trico.

THE COURT: Okay.

MR. GARCIA: It is not much, probably $150,000, but for us, it is a significant amount.

THE COURT: No, it's -- I -- what I am approving today is for the debtor to have an amount of money to then to go out and reach out to vendors to be able to -- so they can start to -- the law -- the bankruptcy law prevents them from making any payments on amounts that are due as of right now. And what I am doing now is being asked to authorize the debtor to have a certain amount of money for which they can go out and reach out to vendors. So what I am going to ask the debtors to do is -- and their professionals -- to make sure -- I don't know if you are on this, but I am going to ask that someone reach out to you and to have -- at least have a line of

140

communication with you so you can explain who you are and the amounts that are owed. Okay?

I can't -- I am not here to -- they exercise their business judgment as to what it is, but you appeared today, and I very much appreciate you taking the time. And I know that you were here earlier, and you have been listening to the hearing. So thank you very much, Mr. Garcia.

MR. GARCIA: Thank you very much, Your Honor. I really appreciate it.

THE COURT: Thank you.

Mr. Daniel, can you hit "five star," and I will unmute your line. Mr. Daniel, I can't hear you. Can you --

MR. DANIEL: Can you hear me?

THE COURT: Yes, I can hear you now. Very much. Thank you.

MR. DANIEL: Okay. So I just want to get a clarification from counsel for (indiscernible). You mentioned that critical vendors by definition -- and I have got my general counsel online and also our bankruptcy lawyers also just to make sure that we understand exactly what is going on. So we are owed about $1.2 million. We supply about 7 or 8 (indiscernible) transportation services.

Now, just to put things in perspective, you can -- I am not sure if you have come across the United States Code for the Bills of Lading Act. So anyways, I will leave that with

you.

THE COURT: I can --

MR. DANIEL: I'm sure you know exactly what that is.

THE COURT: I am familiar with it, but I would -- you know, to tell you that I, you know, spend plenty of time with it, I --

MR. DANIEL: Okay.

THE COURT: -- that would be -- I'm being intellectually honest and telling you I am aware of it. I am aware of some provisions, but certainly not probably to the extent that you are, sir.

MR. DANIEL: I am not an expert at it. I am not -- I am not lead counsel, but I do rely on the expertise of my advisors.

But anyways, putting that aside. So I mean, just in its simplicity, obviously, you know, we have all the rights to go after (indiscernible) shipper or consignee supplier or customer should we not be paid. But I do not think that is the relevant answer. What I am trying to get clarification on from counsel is -- and maybe I missed this and just -- you know, there is just a ton of language going on. You mentioned that critical vendors, which were clearly being defined, and we have got a prepetition amount of approximately $1.2 million. And in the ordinary course of business, of course, we are going to be paid over time. But you mentioned that payments will be judged

142

based on the potential harm to the business should a vendor, you know, I guess, stop supplying services or whatever the case may be. Is there going to be some kind of a split? Like, are you -- is there going to be some vendors that are not going to be paid and some vendors are going to be paid depending on whether, you know, whether management feels that they are a critical supplier or not? Or is it -- because we are a transportation, we have provided supply chain solutions. You know, we have trucked a lot of product to and from the company and to numerous customers over the last -- well, the receivable's about 120 days old. So --

THE COURT: Here is what I can tell you, Mr. Daniel, is that --

MR. DANIEL: (Indiscernible).

THE COURT: -- the amount that is -- so there is an interim relief request, and then there is kind of a total relief. So what they are asking for is about $79 million now into certain buckets between what they call critical vendor claims, non-U.S. vendor claims, some folks who have liens, like suppliers and warehousemen, someone who may have like a mechanic's liens, those types, and then there are certain suppliers who provided goods within 20 days before the bankruptcy, and I do not want to get into specific who they are, but they are -- the Bankruptcy Code gives certain parties priority. So you got to have these four buckets of claims. It

is being requested 79 on an interim basis, and then at the October 29th hearing would be for the remainder of the amount that would be included.

So, you know, I think about another $41 million will be asked for at the final hearing. So they are not -- so, I think just by definition, there are some vendors -- the debtor is going to have to take a hard look and then figure out what it believes it needs over the next 20 to 30 days, and it will begin discussions with the parties about a payment in order -- you know, kind of a payment on the pre-bankruptcy in order to continue based on an agreement to do it, you know, in the ordinary course of business. Sometimes that is a total payment; sometimes, it's a partial payment. Sometimes, you know -- it just depends on kind of the debtors' business judgment, and that is what the ask is. So it's, like, 79 million now and then 120 in total at the end.

So by its very nature, there is going to be some -- what they are asking for now are kind of buckets of cash that they can then get with management, get with the team, get with the business folks, and then figure out how -- the best way to use the amount of money that I am going to -- that they are asking me to utilize in the ordinary course, which is -- but just by definition, I am not sure everyone is going to get paid in full under one of these orders, but it certainly leads for discussion between the parties, and that's what I am being

144

asked for in the motion. I think that's the most I am going to probably be able to tell you because that is really what I can authorize at this time.

MR. DANIEL: So, Your Honor, do you mind me asking -- I am curious, how do they come up with the number? Do they take the total payable to vendors, or are they coming up with just, you know, a portion of that? You know, how does that -- and I guess my other question is will the company, you know, I guess, take the risk that if we don't know in the meantime whether or not we are going to get paid, then I think that certain transportation companies are going to put potentially suppliers and customers on notice for the possibility of being held liable for freight payments under the Bills of Lading Act.

THE COURT: Yeah. I think the answer is --

MR. DANIEL: So I think that --

THE COURT: I don't think anybody is going to tell you right now, but I suspect your bankruptcy lawyer is going to reach out to their bankruptcy lawyers, and that's what happens. That's what these discussions kind of take place, to be honest. It's --

MR. DANIEL: It sounds like a plan.

THE COURT: What I'm here to do is just authorize the use, but -- which I am going to do. I think it certainly, from listening to Mr. Garcia and Mr. Daniel, there are critical vendors out there, and there is a need. if they're showing up

145

on a first day. And so I think they have, quite frankly, established the need, in addition to the declarations, for the relief requested, and so I am going to grant the interim order and allow debtors' counsel and the business folks to start having those conversations in terms of how the money gets allocated. I do not make findings on that today.

What I am authorizing is the payment of pre-bankruptcy claims, which normally people would have to wait until the end of a case to get, which creates issues and avoids disputes with respect to the automatic stay in terms of seeking collection against the debtor because parties cannot seek to threaten the debtor or exercise self-help remedies with respect to debtors because that violates the automatic stay. And so this allows a bucket of money for the debtor to be able to use on an interim basis to allow the debtor to pay and legally be authorized to pay certain creditors and to engage in a conversation where the debtor and the creditors can have a conversation. Other than that, the automatic stay would have went into effect and it would have been limited in the types of discussions that could have been made with respect to pre-bankruptcy payments. So I think it makes sense.

Is the order at 13 still the one that I am supposed to sign, Counsel?

MR. BARLOW: Yes, Your Honor. That is correct.

THE COURT: Okay. I will get it signed and on the

146

docket. Where do we go next?

MR. BARLOW: All right. I will cede in the podium for my colleague, Angeline Leggiero.

THE COURT: Actually, let me just make sure I have got that right. It's the order -- yes, at 13, right?

MR. BARLOW: Yes, that is correct, Your Honor.

THE COURT: All right. Thank you.

MR. BARLOW: Thank you.

MS. LEGGIERO: Good afternoon, Your Honor. Can you hear me okay?

THE COURT: Just fine. Good afternoon.

MS. LEGGIERO: for the record, Angeline Leggiero of Weil Gotshal on behalf of the debtors. I will be addressing items one and five on the agenda, the insurance motion, and creditor matrix motion. If it would be okay with you, Your Honor, I would like to start with the insurance motion.

THE COURT: Okay.

MS. LEGGIERO: Thank you. The insurance motion is item number five on the agenda, filed at Docket Number 10. By this motion, the debtors seek authority to continue their insurance policies and programs, surety bond program, and letters of credit. The debtors also seek to continue their workers' compensation program in the ordinary course, grant relief from the automatic stay to permit employees to proceed with their workers' compensation claims, and for the insurance

carriers to administer such claims in the ordinary course.

As set forth in the motion, the debtors have a wide variety of insurance policies that provide coverage for various business risks. For many of the insurance policies, the debtors have entered into premium financing arrangements to cover the cost of those policies. By the motion, the debtors seek to honor their obligations under those financing arrangements and to continue to enter into financing arrangements in the ordinary course.

I don't believe we've received any opposition to the relief sought in the insurance motion. We did receive comments from the U.S. Trustee's Office and the DIP lenders that have been incorporated into the proposed orders.

Unless Your Honor has any questions, the debtors respectfully request that the Court grant the requested in the insurance motion.

THE COURT: Okay. Anyone wish to be heard with respect to the insurance motion?

Okay. I'm going to just note this is an important request because it allows the debtor to continue to make payments to insurance providers to maintain its insurance coverage. And it is actually required under U.S. Trustee guidelines, but it also helps preserve value for the estate.

I have reviewed the proposed order, and I will get it signed and on the docket. Counsel.

148

MS. LEGGIERO: Thank you, Your Honor. Next is agenda item number one, which is the creditor matrix motion filed at Docket Number 5.

With this motion, the debtors request authority to file a consolidated creditor matrix and a consolidated list of the debtors' 30 largest unsecured creditors. As Your Honor is aware, there are 112 debtors in these cases, and the preparation of separate lists of creditors for each debtor would be expensive, time-consuming, and administratively burdensome.

Second, the debtors seek authorization to redact personal information of the individuals included in the debtors' filings.

Third, Your Honor, the debtors seek approval of the form and manner of notifying the creditors of commencement of these Chapter 11 cases and the scheduling of the 341 meeting of creditors.

In advance of this hearing, we shared a draft of this motion with the U.S. Trustee, who did not have any comments. Unless Your Honor has any questions, the debtors respectfully request that the Court grant the relief requested in the motion.

THE COURT: Okay. Let me -- just give me one moment. Anyone wish to be heard with respect to the creditor matrix motion? And this is more of an administrative motion. Let's

see.

I meant to tell you on the -- I think it was on the insurance motion, or was it the creditor matrix motion? You're going to see my name signed really small. It will still have the same effect. I just can't -- I'm prohibited from signing pages when they're just blank, and my name, just so somebody doesn't cut and paste it and add it somewhere else, or the concern would be. So you'll have a shrunken Chris Lopez signing the order, but it works just fine. All right. But I will grant the creditor matrix motion. It -- quite frankly, it just provides a large protection for parties to make sure that personal identifiable information isn't just disseminated because the company filed for Chapter 11 bankruptcy.

So I'll get that signed and on the docket. Let me just make sure. Okay. Where do we go next?

MS. LEGGIERO: Thank you, Your Honor. With that, I'm going to turn the podium over to my colleague, Thomas Palisi.

THE COURT: All right. Good afternoon.

MR. PALISI: Good afternoon, Your Honor. For the record, Thomas Palisi of Weil Gotshal & Manges on behalf of the debtors.

Today, I will be presenting two motions on today's agenda. First, the motion to extend time to file the debtors' schedules and SOFAs, which can be found at item number two on the agenda and filed at Docket Number 6. And then second, the

150

taxes motion, which is item number four on the agenda, and can be -- and it was filed at Docket Number 8. And I will proceed in that order, unless Your Honor prefers otherwise.

THE COURT: Okay. Thank you. Please proceed.

MR. PALISI: So first, the schedules and SOFA extension motion. For this motion, the debtors request the authority to extend the deadline by which the debtors must file their schedules of assets and liabilities and statements of financial affairs and also the initial reports of financial information as set forth in Bankruptcy Rule 2015.3. The debtors request to extend the deadline to file these schedules and reports through and including November 21st without prejudice to their ability to request additional extensions for cause shown.

As described in the motion, cause exist for granting the extensions requested based on the size and complexity of the debtors' business. There's 112 entities. And because of that, collecting the voluminous information necessary to prepare these schedules and reports would require a significant amount of time and effort for the debtors' employees and advisors, and their time and effort would be best spent stabilizing the debtors' business in these early days.

The motion was reviewed by the U.S. Trustee prior to filing, and the U.S. Trustee had no comments. Unless Your Honor has any further questions, the debtor submits the relief

requested as necessary, appropriate, and consistent with cases of similar size.

THE COURT: What is similar to this size? This is pretty bit. I -- no, I got it. Let's U.S. Trustee see. Just give me one moment. Let's see.

I don't mean to keep you in suspense. I will grant the relief requested. If there's any -- these schedules need to be filed under penalty of perjury, and so accuracy is incredibly important, especially in this case. And so I will grant the relief requested.

It's -- I know that much has been said about the investigation, and that there are independent managers looking into this, and I'm sure if Mr. Goldman and Mr. Transier want counsel, they'll get it. So I am -- today, I'm just being asked to approve an extension of the time to file the schedules. I think it's appropriate in this case, and the time they request is appropriate, and I will grant the relief requested. Thank you.

MR. PALISI: Thank you, Your Honor. And next, the taxes motion. By this motion, the debtors seek authority to pay taxes and fees to various local, state, and federal taxing authorities that arose prior to the petition date.

As described in the motion, the amounts provided are good faith estimates based on the debtors' books and records, so they remain subject to audits and other adjustments. The

152

debtors generally pay six types of taxes:  property taxes; income taxes; sales and use taxes; customs and import duties; franchise, business, and other related taxes; and finally government fees and other miscellaneous taxes.  In total, the debtors seek authority to pay an estimated $22.29 million in accrued and unpaid taxes and assessments.

Your Honor, if unpaid, the taxing authorities may take actions that would interfere with the debtors' transition into Chapter 11 and potentially impose costs on the debtors' estate.  For example, personal liability against D's and O's, the potential assertion of liens, or the occurrence of interest and penalties.  Moreover, because certain tax -- certain of such tax claims may qualify as priority claims, the relief requested should not prejudice general unsecured creditors.

This motion was also reviewed by the U.S. Trustee, as well as the DIP lender, prior to filing.  We implemented all their comments as was discussed, and unless Your Honor has any further questions, the debtors respectfully request the Court enter their order granting the tax motion.  Thank you.

THE COURT:  Granted.  Pay your taxes.

MR. PALISI:  Sounds good.  Thank you, Your Honor. And now I'll cede the podium to my colleague, Nate McCabe.

MR. MCCABE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. MCCABE:  Nate McCabe of Weil, Gotshal & Manges.

Good afternoon.  Proposed counsel for the debtors.

Your Honor, I will be addressing items number three and seven on the agenda, which are the utilities motion and the automatic stay motion, respectively.  Unless Your Honor has any objection, I will proceed in that order.

THE COURT:  Okay.

MR. MCCABE:  Your Honor, the debtors utility motion was filed at Docket Number 7, and by this motion, the debtors request entry of an order approving the proposed form of adequate assurance of payments to utility companies, establishing procedures for resolving objections by utility companies, and prohibiting utility companies from altering, refusing, or discontinuing service.

The debtors require standard utility services to operate their business effectively.  Based on the monthly average for the past 12 months, the debtors estimate that the cost of their utilities for the next 30 days would be approximately $3.4 million.  To provide the utility companies with adequate assurance pursuant to Section 366 of the Bankruptcy Code, the debtors propose to deposit cash in the amount of two-week utility services into a segregated account maintained for the benefit of the utility companies.  Here, the total amount of that deposit would come to $1,705,219.  We have also proposed certain adequate assurance procedures that we are asking Your Honor to approve today, and if the debtors do

receive any additional demand, we will proceed in accordance with those procedures.

Your Honor, preserving utility services on an uninterrupted basis is essential to the debtors' ongoing operations, and therefore critical to the success of these chapter 11 cases.

This motion was reviewed by the U.S. Trustee and DIP lenders prior to filing. The U.S. Trustee had no comments, and the DIP lenders are supportive of the relief requested. So, unless Your Honor has any questions, the debtors would respectfully request that the Court enter the utilities order.

THE COURT: Anyone wish to be heard?

And before I forget, let me just publicly thank the Office of the United States Trustee who are -- you know, they always read everything that I read, but they read it before I do and give comments, and they're just incredible, the amount of work that they do, and I very much appreciate them working here.

I've reviewed the proposed utilities motion, and for those that may be listening -- and we still have about 300 people on the line -- the utilities under the Bankruptcy Code are provided for in a section all to themselves, Section 366, and the debtor must put forth adequate assurance of the ability to pay to perform. If not, there's a certain amount of time the utilities can actually stop providing services, so you're

talking about no internet, no phone, which can lead to very serious consequences, obviously. So on the first day, the debtor comes in and provides a proposed form of adequate assurance, which is typically two weeks in a deposit form for them, so they can look to it. But the utilities, if they want to, they can come back if they don't think it's enough.

I'm going to mute someone's line here.

They can always come back, so the debtor gets to comply with the Bankruptcy Code, and the utilities can come back if they feel the need to do so, and parties can always talk. So I've reviewed the proposed order, and it looks good to me. It is customary, and I will grant the relief requested.

MR. MCCABE: Thank you, Your Honor.

So with that, I will turn to our last item on the agenda, which is item seven, the automatic stay motion filed at Docket Number 14.

By this motion, the debtors request entry of an order enforcing the protection of Section 362, 365, 525, and 541 of the Bankruptcy Code to help ensure that the debtors' global business operations are not disrupted. As explained in the critical vendors motion, many of the debtors' vendors are not based in the U.S. Because international parties may be less familiar with the global and self-effectuating nature of these provisions, the debtors simply seek a comfort order reiterating the effect of these sections.

156

The United States Trustee has also reviewed this motion and did not have any comments. So, unless Your Honor has any questions, the debtors would request that the Court enter the comfort order.

THE COURT: Can you remind me which Docket Number -- oh, it's 14, right?

MR. MCCABE: That's correct, Your Honor.

THE COURT: Okay. I did get a chance to look at this. This is what is called a comfort motion because it's just to -- it's an order that I sign that restates what is property -- excuse me, what is the automatic stay and the effects of it. And we're doing nothing here but kind of requoting what the automatic stay is. But it allows the debtors to show it to parties who may not be familiar with it, certainly foreign companies in terms of what it requires and certain other sections, including property of the estate, which I'm not talking about anymore today.

So, I will grant the relief requested. I reviewed the order to make sure that it doesn't say anything more than what the Code already provides. And I'm comfortable that that has been accomplished. So, I will sign that order as well.

MR. MCCABE: Thank you, Your Honor. That's all for me, so now I'll cede the podium back to my colleague, Jason George, for some final remarks.

THE COURT: Thank you.

MR. GEORGE: Your Honor, we don't have anything further for the Court today other than to thank Your Honor for your time and hearing us on short notice. The debtors very much look forward to using the relief granted today to stabilize their business and run a process that will maximize the value of their enterprise.

THE COURT: Okay.

MR. GEORGE: Thank you.

THE COURT: Thank you. And I would just ask again that you just reach out to Ms. Saldana once those orders have been uploaded. If you get a really fancy title like the one that you put in there, it means she entered it. If it just says something like DIP order, you can tell it was me that signed it. So that's the code. You can tell who actually entered the order.

So having all said, I very much appreciate anything. Let me just open it up. Does anyone else wish to be heard on anything before we conclude for today? I very much appreciate it. I look forward to seeing everyone in Houston at the end of the month. Everyone's rights are preserved. And I know much has been said, but we take every case like we always do, one day at a time, one motion at a time, and we'll consider everything as it comes up. I very much appreciate it.

Anything else we need to talk about today? Anyone else have any additional matters before the Court in this case?

158

Okay. Thank you very much. Everyone is excused. Thank you. Have a good day.

(Proceedings concluded at 3:19 p.m.)

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ALICIA JARRETT, AAERT NO. 428    DATE: October 3, 2025

ACCESS TRANSCRIPTS, LLC