**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------------x-----------------------------------------------------------

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,**[1] | : | **Case No. 25-90399 (CML)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |
|  | : |  |

---------------------------------------------------------------x-----------------------------------------------------------

|  |  |  |
|---|---|---|
|  | : |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | : |  |
|  | : |  |
| **Plaintiffs,** | : | **Adv. Pro. No. 25-_____ (CML)** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **PATRICK JAMES, THE PATRICK JAMES** | : |  |
| **TRUST, ALBION REALTY, LLC,** | : |  |
| **ALESTER TECHNOLOGIES LLC,** | : |  |
| **BATTERY PARK HOLDINGS LLC, BOND** | : |  |
| **STREET ASSET MANAGEMENT LLC,** | : |  |
| **IGNITE ACQUISITION HOLDINGS LLC,** | : |  |
| **LARCHMONT LLC,** | : |  |
| **PEGASUS AVIATION, LLC,** | : |  |
| **JOHN AND JANE DOE(S) 1-100, and ABC** | : |  |
| **CORPORATION(S) 1-100,** | : |  |
|  | : |  |
| **Defendants.** | : |  |
|  | : |  |

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00097424

**DEBTORS' EXHIBIT NO. 20**
**Page 1 of 35**

**COMPLAINT**

First Brands Group, LLC and its debtor affiliates ("**Debtors**" or "**Plaintiffs**," and together with Debtors' non-debtor affiliates, "**First Brands**" or "**Company**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases, by their attorneys, Weil, Gotshal & Manges LLP, file this adversary proceeding against Patrick James, the Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC, John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100 (together, "**Defendants**"). Debtors allege as follows:

**NATURE OF THE ACTION**

1.      This action concerns grievous misconduct by Patrick James, the founder and former Chief Executive Officer of First Brands, who fraudulently secured billions of dollars of financing for First Brands, only to turn around and enrich himself and his family by misappropriating hundreds of millions (if not billions) of dollars from First Brands, which contributed to First Brands being insolvent and out of cash.

2.      Founded by Mr. James in 2013, First Brands—spanning five continents and comprising over 100 entities, all 100% indirectly owned by Mr. James—is a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions. First Brands employs approximately 26,000 individuals worldwide and purported to generate net sales of approximately $5 billion in 2024.

3.      Hiding behind First Brands' legitimate business lines, Mr. James—who resigned from his role as Chief Executive Officer on October 13, 2025—commandeered the enterprise to engage in a fraudulent conduct to enrich himself and his family at the expense of Debtors and their creditors. While Debtors' investigation into the full extent of Mr. James' actions remains ongoing,

FBG_CH1_00097425

**DEBTORS' EXHIBIT NO. 20**
**Page 2 of 35**

preliminary findings already show that Mr. James misrepresented First Brands' financial position to secure billions in debt financing that he then inappropriately used for his personal use.

4. Specifically, Mr. James, working with others, deployed at least two discrete strategies to perpetuate this fraud and secure financing from third-party lenders.

5. *First*, Mr. James caused First Brands to incur at least $2.3 billion in accounts receivable factoring liabilities based, at least in significant part, on non-existent or doctored invoices.

6. *Second*, Mr. James engaged in financing transactions involving special purpose vehicles ("**SPVs**"), which incurred another at least $2.3 billion in debt, including by double-pledging collateral that First Brands could not itself borrow against a second time.

7. After having secured this financing, Mr. James did not use all of those funds for the benefit of Debtors. Rather, Mr. James—aided and abetted by the other Defendants, including Jane and John Does 1-100 and ABC Corporations 1-100—secretly pilfered some of the Company's assets to fund his and his family's lavish lifestyle. In short, he lined his pockets at the expense of First Brands and its creditors.

8. For example, hundreds of millions of dollars were transferred from First Brands, directly to Mr. James or his affiliated entities from 2018 to 2025, with the majority of such transfers occurring between 2023 and 2025. The Debtors also understand that during this period, funds may have been transferred into the Company from Mr. James or his affiliated entities, but Mr. James has never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James and his affiliated entities.

9. Similarly, from 2021 through 2025, First Brands transferred approximately $8

3

FBG_CH1_00097426

million from First Brands to his son-in-law's "wellness" company, Archive Health LLC ("**Archive Health**"). At least one transfer to Archive Health was requested by Mr. James' son-in-law to help "cover payroll." It is unclear if fair value was received by First Brands for the funds transferred to Archive Health.

10.    Upon information and belief, Mr. James and his family are also believed to have used the misappropriated funds to pay for or otherwise maintain, among other personal expenses, an extensive collection of lavish homes and cars.

11.    In a rinse and repeat cycle, Mr. James caused First Brands to fraudulently incur debt financing only to then divert—routinely and regularly—funds from the Debtors for his and his family's personal benefit. On information and belief, these funds have not been returned by Mr. James to First Brands and contributed to First Brands' insolvency. Aside from entries in the Company's general ledger, the Company's advisors are unaware of any formal documentation indicating that these payments constituted dividends or distributions in the ordinary course.

12.    The results of Mr. James' actions culminated on September 24, 2025 and September 28, 2025 ("**Petition Date**"), when First Brands Group, LLC and 111 affiliated Debtors each filed with the Court a voluntary case under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned chapter 11 cases. At that time, First Brands—which is comprised of entities believed to have had approximately $5 billion in net annual sales and approximately $9.3 billion in total debt obligations—held just $12 million in cash in its corporate bank accounts as of the commencement of the Debtors' chapter 11 cases, a staggering dissipation of assets.

13.    Mr. James would have continued unabated if certain lenders had not, in July 2025, started asking questions and demanding a quality of earnings report before they would consider

4

FBG_CH1_00097427

issuing any additional debt financing to First Brands. It soon became clear that the quality of earnings report would not be done in any period of time necessary for a refinancing. With the pipeline of future financing screeched to a halt, Debtors were exposed as undercapitalized and unable to meet their most basic payment obligations—including employee payroll. This led to, among other things, the appointment of an independent special committee ("**Special Committee**") and commencement of the ongoing investigation that continues to uncover the full extent of Mr. James' and others' misconduct.

14.     While the investigation into Mr. James' misconduct is ongoing, it is already clear that Mr. James' actions contributed to First Brands' insolvency. He is now reported to be the subject of an investigation by the United States Attorney for the Southern District of New York, and others, concerning potential misconduct related to First Brands' financing.[2]

15.     Debtors bring this action to recover significant sums of money—totaling what Debtors currently believe to be in the hundreds of millions, if not billions of dollars, from Patrick James, the Patrick James Trust, business entities controlled by Mr. James (Albion Realty, LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC), John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100, for the benefit of Debtors' estates and their creditors. Debtors are simultaneously moving the Court for immediate relief to freeze any and all assets owned or controlled by Defendants or any other entities under their control, before those moneys are irrevocably and irretrievably gone.

---

[2] Alexander Gladstone & Alicia McElhaney, Bankrupt Auto Supplier First Brands Faces Criminal Investigation, Wall St. J. (Oct. 9, 2025), https://www.wsj.com/articles/first-brands-creditor-raistone-seeks-probe-into-vanished-2-3-billion-5ae03547.

FBG_CH1_00097428

## THE PARTIES

### A. Plaintiffs

16.     Plaintiff First Brands Group, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.[3] Founded by Patrick James in 2013, First Brands—through its operating subsidiaries and portfolio of brands—is a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lighting, pumps, and towing products. First Brands employs approximately 26,000 people worldwide, including nearly 6,000 in the United States.

### B. Defendants

17.     Defendant Patrick James was the Chief Executive Officer of First Brands since he founded the company in 2013 until October 13, 2025, following his resignation. Upon information and belief, Mr. James is a Malaysian national who resides in the state of Ohio.

18.     Defendant Patrick James Trust was created on March 10, 2005 with Patrick James as Grantor and Thomas A. Haught as Trustee.

19.     Defendant Albion Realty, LLC, incorporated on August 4, 2020, is a Delaware limited liability company under the control of Patrick James.

20.     Defendant Alester Technologies LLC, incorporated on May 18, 2020, is a Delaware limited liability company under the control of Patrick James.

21.     Defendant Battery Park Holdings LLC, incorporated on May 30, 2012, is a Delaware limited liability company under the control of Patrick James.

22.     Defendant Bond Street Asset Management LLC, incorporated on October 24, 2022,

---

[3] The remaining Plaintiffs are First Brands Group, LLC's debtor affiliates, as described in the caption of this action.

FBG_CH1_00097429

is a Delaware limited liability company under the control of Patrick James.

23.     Defendant Ignite Acquisition Holdings LLC, incorporated on August 25, 2023, is a Delaware limited liability company under the control of Patrick James.

24.     Defendant Larchmont LLC, incorporated on April 17, 2006, is an Ohio limited liability company under the control of Patrick James.

25.     Defendant Pegasus Aviation, LLC, incorporated on August 24, 2021, is a Delaware limited liability company under the control of Patrick James.

26.     Defendants John and Jane Doe(s) 1-100 are persons yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors will amend this Complaint to show the true names and capacities of John and Jane Doe(s) 1-100 when the same have been ascertained.

27.     Defendants ABC Corporation(s) 1-100 are business entities or trusts yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors will amend this Complaint to show the true names and capacities of ABC Corporation(s) 1-100 when the same have been ascertained.

## JURISDICTION AND VENUE

28.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

29.     This adversary proceeding is commenced pursuant to Sections 105(a), 502, 542, 544, 548, 550, and 551 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

FBG_CH1_00097430

Rule 7008-1 of the Local Rules of the Bankruptcy Court (the "**Local Rules**"), and applicable non-bankruptcy law.

30.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and determine this proceeding and to enter a final order and judgment. If this Court or any other court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to Debtors' bankruptcy cases and will have a material impact on the administration of Debtors' estates.

31.     Debtors consent to entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1. Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

32.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

<div align="center">

**PERSONAL JURISDICTION**

</div>

33.     Defendants are subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because Defendants have established minimum contacts with the United States. Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having minimum contacts with the United States.

34.     Each Defendant has established minimum contacts with the United States by

FBG_CH1_00097431

<div align="center">

**DEBTORS' EXHIBIT NO. 20**
**Page 8 of 35**

</div>

conducting business within the United States, including, but not limited to, the following:

a) Defendant Patrick James owns interests in, and served as an executive of, a United States-based company relevant to the causes of action asserted herein; owns real and personal property in the United States; and fraudulently transferred money from a United States-based company into other accounts within the United States, including to accounts belonging to several United States-based companies controlled by him as well as to accounts belonging to Defendant Patrick James Trust, which, as set forth below, was created in and continues to be held in the United States. Defendant James is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

b) Defendant Patrick James Trust was created in, and continues to be located in, the United States. Defendant Patrick James Trust, on information and belief, holds bank accounts located in the United States.

c) Defendant Albion Realty, LLC ("**Albion Realty**") was created in, and continues to operate in, the United States. Defendant Albion Realty is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

d) Defendant Alester Technologies LLC ("**Alester**") was created in, and continues to operate in, the United States. Defendant Alester is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

e) Defendant Battery Park Holdings LLC ("**Battery Park**") was created in, and continues to operate in, the United States. Defendant Battery Park is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

9

FBG_CH1_00097432

f)   Defendant Bond Street Asset Management LLC ("**Bond Street**") was created in, and continues to operate in, the United States. Defendant Bond Street is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

g)   Defendant Ignite Acquisition Holdings LLC ("**Ignite**") was created in, and continues to operate in, the United States. Defendant Ignite is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

h)   Defendant Larchmont LLC ("**Larchmont**") was created in, and continues to operate in, the United States. Defendant Larchmont is incorporated in Ohio and, on information and belief, holds bank accounts located in the United States.

i)   Defendant Pegasus Aviation, LLC ("**Pegasus Aviation**") was created in, and continues to operate in, the United States. Defendant Pegasus Aviation is incorporated in Delaware and, on information and belief, holds bank accounts located in the United States.

35.   Accordingly, this Court has personal jurisdiction over Defendants based on their contacts with the United States.

<u>FACTUAL ALLEGATIONS</u>

**I.   MR. JAMES CAUSED FIRST BRANDS TO FRAUDULENTLY INCUR BILLIONS OF DOLLARS IN FINANCING**

36.   On September 28, 2025 (the "**Petition Date**"), Debtors commenced the above-captioned chapter 11 cases.

37.   As of the Petition Date, First Brands had approximately $6.1 billion in aggregate principal of on-balance sheet outstanding funded debt obligations, at least $2.3 billion in aggregate

10

FBG_CH1_00097433

"off-balance sheet" financings incurred through special purpose vehicles, and approximately $800 million in unsecured supply chain financing liabilities. First Brands, additionally, had at least $2.3 billion in factoring liabilities.

38.     Despite stated annual net sales of approximately $5 billion, First Brands' cash position is dire. As of the Petition Date, Debtors had only approximately $12 million in cash in corporate bank accounts.

39.     Since the filing of Debtors' bankruptcy petition, First Brands has continued to vigorously investigate Mr. James' conduct, the conduct of his co-conspirators, and potential claims held by the Debtors.

40.     Since the Petition Date, there have been significant changes to the Debtors' executive management team at the insistence of the Special Committee and recommendation of the Debtors' advisors.  Several senior managers who led the Debtors' day-to-day operations before the chapter 11 filing are no longer with the Company, including:

a) On September 25, 2025, Mr. Michael Baker, the Debtors' former Chief Corporate Strategy Officer and board member, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

b) On September 25, 2025, Mr. Ed James, Mr. Patrick James' brother and former Executive Vice President and board member, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

c) On October 12, 2025, Mr. Patrick James, the Debtors' founder and former Chief Executive Officer and controlling shareholder, resigned from all positions he held as an officer, director, manager or board member at all Company entities.

d) On October 30, 2025, Mr. Stephen Graham, the Debtors' former Chief Financial

11

Officer and board member, retired from all positions he held as an officer, director, manager or board member at all Company entities. Mr. Graham stopped working as of September 22, 2025.

e) On October 30, 2025, Mr. Andy Brumbergs, the Debtors' former Vice President, Finance and board member, was terminated from all positions he held as an officer, director, manager or board member at all Company entities. Mr. Brumbergs stopped working as of September 22, 2025.

41.    Since the Petition Date, the Debtors and their advisors have been working tirelessly to stabilize operations, confirm the value of assets, and improve the performance of the business for customers, suppliers, employees and all other stakeholders, while at the same time conducting an investigation of the Debtors' pre-petition operations while the Debtors were under the control of their former CEO, Patrick James. To date, that investigation has involved, among other steps: (a) the collection of over 7,000,000 documents and other data from 37 custodians and email listservs; (b) the pursuit of bank account records from more than 600 bank accounts; (c) the collection of devices from on-site employees and the coordination of the collection of devices from remote employees; and (d) interviews with current and former employees.

42.    While more work needs to be done, based on information learned to date, Debtors believe Mr. James improperly secured funding for First Brands from third parties. Because of the concern that Mr. James may dissipate or hide assets, Debtors bring this action now to attempt to preserve and recover assets that properly belong to the estates based on the results to date of their ongoing investigation.

43.    On October 13, 2025, following the resignation of Mr. James, Charles Moore—Managing Director at Alvarez & Marsal North America, LLC—was appointed interim Chief

12

FBG_CH1_00097435

**DEBTORS' EXHIBIT NO. 20**
**Page 12 of 35**

Executive Officer of the Debtors. Mr. Moore had been appointed as Chief Restructuring Officer in September 2025. On October 24, 2025, Daniel Jemeycic and Gaurav Malhotra were appointed as co-Chief Restructuring Officers of the Debtors. On October 30, 2025, Paul Kosturos was appointed Chief Financial Officer of the Debtors. His appointment is effective as of November 3, 2025.

44. The news media has reported that Mr. James is the subject of an ongoing investigation by the United States Attorney for the Southern District of New York, and others, in connection with First Brands' financing arrangements.

45. As described below, Mr. James and his co-conspirators' activities included, at a minimum: (a) using erroneous or fabricated invoices in connection with accounts receivable factoring activities; and (b) issues involving off-balance sheet financing arrangements.

46. Mr. James induced third-party lenders to lend to First Brands irrespective of its true financial condition to bring more money into First Brands only so that portions of it could be siphoned away into Defendants' accounts for the personal use of Mr. James and his family, including on terms First Brands would never be able to repay.

**A. Third-Party Factoring**

47. Prior to the Petition Date, Debtors used a variety of factoring arrangements to obtain liquidity. Under these arrangements, First Brands would sell accounts receivables generated from the sale of goods in exchange for near-term payment on invoices with extended payment terms.

48. First Brands historically entered into two primary types of factoring arrangements before the Petition Date, including arrangements with (i) customers and their financial institution partners ("**Customer Factoring**") and (ii) unaffiliated third parties ("**Third-Party Factoring**"). In both Customer Factoring and Third-Party Factoring, the Company would transfer a receivable

13

FBG_CH1_00097436

to either a customer partner or third-party factor in exchange for a near-term discounted payment on an invoice with lengthy payment terms. Under Customer Factoring arrangements, the customer would pay the factor directly when the receivable came due. However, under Third-Party Factoring arrangements, the third-party factor would purchase invoices from the Debtors and the Debtors were then required to turn over the payment, once received, to the third-party factor.

49.     Debtors believe that at least $2.3 billion has accrued with respect to Third-Party Factoring arrangements as of the Petition Date.

50.     In connection with the Court's first day hearing, the Debtors' Chief Restructuring Officer and now-interim CEO informed the Court that "[t]he Debtors' factoring practices are subject to the Special Committee's ongoing Investigation including (i) whether receivables had been turned over to third-party factors upon receipt and (ii) whether receivables may have been factored more than once."

51.     The Company's advisors have undertaken significant efforts to understand more about the Third-Party Factoring liabilities. Following interviews and conversations with legacy executive management and other employees, the Company advisors became aware that the Company had incurred significant liabilities to the third-party factors. A&M subsequently deployed its team to conduct a forensic audit and investigate transactions related to the Third-Party Factoring liabilities, conduct background investigations, and trace cash flows. The Company's advisors worked collaboratively with the Company's third-party factors to obtain other parties' external data regarding what invoices were purchased and the amounts due on account of such invoices. The Company's advisors then reconciled the data acquired from the third-party factors against the Company's internal records, leading to the discovery of significant discrepancies.

52.     Specifically, the Special Committee and Company advisors have identified three

14

FBG_CH1_00097437

**DEBTORS' EXHIBIT NO. 20**
**Page 14 of 35**

significant issues or discrepancies with the Company's prepetition factoring practices under Mr. James' leadership and direction:

a) *First*, in many instances, the amount set forth on a factored invoice did not accurately reflect a customer's order, without any apparent reason for the discrepancy. For example, in some instances, the amount set forth in a factored invoice was ten or more times higher than the actual amount of an invoice.

b) *Second*, in many instances, purported invoices representing customer orders were created and submitted to third-party factoring parties for payment *even though the Debtors' books and records, in some cases, do not reflect that such customer invoices existed*.

c) *Third*, in many instances the same invoice was factored more than once to different third-party factors. There were also instances of factoring the same receivable to both a customer partner factor and a separate third-party factor.

53.     In other words, it appears that in certain instances the Debtors sold erroneous or fabricated invoices to the third-party factors.

54.     As an example, on May 9, 2025, Brake Parts Inc. LLC sold automotive parts to General Motors Corporation SPO. An invoice for this sale showed a total of $179.84. On May 19, 2025, that invoice, along with thousands of others, were sent to a former First Brands executive as part of a package of invoices to be nominated to Katsumi Global, LLC, d/b/a Ja Mitsui Capital America ("**Katsumi**") for factoring. When the executive sent the list to Katsumi later that day, it listed the very same Brake Parts Inc. LLC invoice, but this time with a value of $9,271.25, representing an extreme modification from the original May 9, 2025 invoice amount of $179.84. The values of numerous other invoices in the package also had been changed, including some

15

FBG_CH1_00097438

invoices that were listed at net values and purchase prices approximately more than $15,000 and $12,000 higher, respectively, than the invoice value listed in the original document. Ultimately, the factoring company purchased the package of invoices including the modified invoice (along with other invoices) at a cost of approximately $11.18 million, but the actual value of the invoices was only approximately $2.3 million.

55.    Even more shockingly, upon information and belief, at Mr. James' direction, First Brands fabricated and sold non-existent receivables to unsuspecting third-parties, totaling millions of dollars.

### B.  Off-Balance Sheet Financing Practices

56.    The SPV Debtors are party to off-balance sheet financing structures, including lease, inventory, sale-leaseback, and equipment financing arrangements.

57.    These arrangements include the CarVal Facilities, Aequum Facilities, Evolution Facilities, and the Onset Master Lease and transactions related thereto (the "**Onset Facility**"). Certain of these off-balance sheet facilities, including the Evolution Facilities and Onset Facilities, involve an arrangement whereby an SPV Debtor (i) first purchases inventory and/or equipment from certain subsidiaries of First Brands and then (ii) utilizes those assets either as (a) collateral to support a loan (in the case of the Evolution Facilities) or (b) in connection with an alleged sale-leaseback transaction (in the case of the Onset Facilities). The Special Committee and Company's advisors have identified multiple potential issues with the Company's off-balance sheet financing arrangements under Mr. James' leadership and direction, each of which is subject to ongoing investigation.

58.    *First*, it is the Company's advisors' current understanding that, in the case of the Onset facilities, upon information and belief, in many cases, the amounts paid from the off-balance

16

FBG_CH1_00097439

sheet SPV to the FBG subsidiary for inventory and/or property, plant and equipment (PP&E) was less than the stated sale price specified in the relevant asset purchase agreements.

59.     *Second*, upon information and belief, it appears that inventory that was purportedly transferred by First Brands subsidiaries to the SPV Debtors in connection with certain of the off-balance sheet facilities, namely the Evolution Facility and the Onset Facility, remained on the First Brands subsidiaries' balance sheets, notwithstanding the alleged transfers. Also, the value of such inventory appears to have remained in the borrowing base for the First Brands credit facilities, including the Debtors' ABL Facility. Accordingly, Debtors' current understanding is that the value of the same inventory was used to support loans to both (i) the First Brands subsidiaries and (ii) the SPV Debtors.

60.     *Third*, based on Debtors' current knowledge and belief, cash from Onset was transferred to a non-Debtor entity controlled by Mr. James known as "Bowery Finance II." Upon information and belief, inadequate books or records were maintained for these SPV Debtors, and cash that was supposed to be transferred to the FBG subsidiaries under the applicable transaction documents was transferred to Bowery Finance II instead. Upon information and belief, the Bowery Finance II account was used as a slush fund. From 2022 through 2025, nearly $12 billion flowed through the account, including transfers between Patrick James, his Trust and his affiliated entities, and transfers with FBG and FBG's business units. The transfers were apparently made in order to meet repayments due to Onset and the factoring companies. Similarly, upon information and belief, Evolution Credit Opportunity Master Fund II-B, L.P. ("**Evolution**") lent approximately $240 million to a SPV Debtor, against what First Brands represented was $370 million of First Brands' inventory on the SPVs balance sheet. First Brands, however, kept that inventory for itself, without paying the SPV, and by the end of September 2025, few if any assets remained in the SPV.

17

FBG_CH1_00097440

61.     The Company advisors are currently reviewing to determine which transactions and proceeds related to the Onset Facility benefitted either the applicable SPV Debtors or FBG, or if fair consideration was ever received by the FBG subsidiaries for inventory and PP&E transferred.

## II.     MR. JAMES' MISAPPROPRIATION OF DEBTORS' FUNDS FOR HIS AND HIS FAMILY'S PERSONAL BENEFIT

62.     At the same time he was bringing funds into First Brands, Mr. James was misappropriating massive sums—in the hundreds of millions, if not billions, of dollars—from First Brands to fund his and his family's lavish lifestyle. This sort of misconduct is not new for Mr. James, who has been accused at least three times previously of diverting corporate proceeds through fraudulent and deceptive business practices to enrich himself.[4]

---

[4] In 2009, Tristate Capital Bank filed a lawsuit against Mr. James and companies under his control for repeatedly misleading a borrower group about the nature and value of collateral, the condition of the businesses, and the disposition of assets and proceeds. *Tristate Capital Bank v. Red Rock Stamping LLC et al.*, No. 09-cv-01455 (N.D. Ohio June 26, 2009). Mr. James, and companies under his control, allegedly (1) overstated eligible accounts receivable by concealing substantial offsets owed to major customers, (2) manipulated internal records to hide these offsets, (3) transferred collateral inventory to a related entity without consideration, (4) diverted substantial "management" and "consulting" fees despite subordination and distribution restrictions, and (5) withheld collateral and business records after default and execution of a wind-down agreement. The case settled and Mr. James agreed to pay $1 million.

In 2011, Fortress Value Recovery Fund filed a similar lawsuit against Mr. James and companies under his control. Plaintiff, an unpaid creditor, accused Mr. James of creating and using a web of affiliated entities to move money from his heavily indebted company, Columbus Components Group, LLC ("CCG"), to other management entities. *Fortress Value Recovery Fund I LLC v. Columbus Components Group, LLC et al.*, No. 11-cv-200 (N.D. Ohio Jan. 27, 2011). The creditor alleged that tens of thousands of dollars per month were diverted in "management fees," including during periods when CCG was in default and prohibited from making such payments. CCG, at Mr. James' direction or with his knowledge, allegedly withheld accurate information to avoid triggering an event of default, thereby allowing continued fee payments to Mr. James' affiliated companies. Mr. James' company ultimately settled this lawsuit for $6 million. *Fortress Value Recovery Fund I LLC v. Columbus Components Group, LLC et al.*, No. 11-cv-200 (N.D. Ohio July 6, 2011).

In 2018, a number of plaintiffs filed as similar lawsuit against Mr. James *See Fairlie, William, et al. v Vari-Form Group, L.L.C., et al.*, No. 18-012988-CB (Michigan Circuit Ct. Oct. 4, 2018). Mr. James allegedly promoted a segment of his conglomerate Vari-Form as an independent asset and

18

FBG_CH1_00097441

63.     While Debtors' investigation into these transfers remains ongoing, Debtors have already uncovered that approximately hundreds of millions of dollars were transferred from First Brands directly to Mr. James or his affiliated entities from 2018 to 2025. The scale of Mr. James' transfers has increased in recent years, with the majority of such transfers occurring between 2023 and 2025. While Mr. James or his affiliated entities may have transferred some funds back to First Brands, Mr. James has never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James and his affiliated entities.

64.     On information and belief, Mr. James' misappropriated funds from First Brands involved, at a minimum, (i) improper dividends or distributions to the Patrick James Trust, (ii) direct transfers of the proceeds of financing transactions, and (iii) brazen use of First Brands' funds to pay for Mr. James' and his family's lifestyle and personal businesses.

65.     On information and belief, funds may have been transferred into the Company from Mr. James or his affiliated entities during this period. Mr. James, however, has never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James and his affiliated entities. And the ultimate result of Mr. James' actions was that First Brands was left with just $12 million in cash in its corporate bank accounts as of the Petition Date.

### A.  Improper Dividends and Distributions to Mr. James' Trust

66.     Based on evidence uncovered to date, it seems that the principal vehicle through which Mr. James misappropriated First Brands' funds was through direct transfers from First Brands' accounts to Defendant Patrick James Trust.

---

secured new debt financing from investors such as Apollo Global Management, according to securities filings and a person familiar with the matter. The following year, Vari-Form filed for insolvency in Canada. *Id.*

FBG_CH1_00097442

Case 25-03803   Document 4 *SEALED*   Filed in TXSB on 11/03/25   Page 20 of 35

67.     The majority of funds transferred out of the Company appear to have been distributed to Defendant Patrick James Trust. The Debtors are not aware of any information to suggest these transactions were made for any benefit or consideration received by the Company.

68.     Upon information and belief, Mr. James personally directed distributions from the Company to his trust, specifying the amount and destination accounts for each payment. For example, in January 2024, internal communications among senior individuals at First Brands indicated that Mr. James "wanted to have the distribution funds sent" to two accounts belonging to Defendant Patrick James Trust, divided into batches of $21 million and $4 million. That day, First Brands distributed $25 million into an account belonging to Defendant Patrick James Trust. Again, in October 2024, a senior individual at First Brands indicated that he had been "instructed to make a $25 million USD distribution" to a Patrick James Trust account. First Brands distributed $25 million into the specified account that same day.

69.     Aside from entries in the Company's general ledger, the Company's advisors are unaware of any formal documentation indicating that these payments constituted dividends or distributions in the ordinary course. These payments continued well into 2025 irrespective of First Brands' true financial position.

70.     Simply put, upon information and belief, there was no legitimate business reason for Mr. James to transfer hundreds of millions of dollars from First Brands to Defendant Patrick James Trust, especially given that First Brands was left with just $12 million in the bank as of the Petition Date. Over $700 million was funneled from First Brands directly to Mr. James and his affiliated entities from 2018 to 2025. Over $600 million was distributed directly from First Brands' bank accounts to Defendant Patrick James Trust, a trust held by Mr. James, for no consideration and for no valid business purpose.

20

FBG_CH1_00097443

### B. Fraudulent Transfers of the Proceeds of Debt Financings

71.     On information and belief, Mr. James' dissipation of First Brands' funds for his own personal use was directly and proximately connected to his efforts to secure funding for First Brands described above.

72.     A single day in the life of a single First Brands SPV is illustrative. At the start of the day on April 4, 2025, Carnaby FA, an SPV that sits under Viceroy Private Capital, LLC (both siloed SPVs that are not subsidiaries of First Brands Group, LLC) had just $4,833.98 in its accounts. On that same day Carnaby FA received $67.2 million as part of a purported sale-leaseback transaction from Onset, ostensibly collateralized by First Brands' assets. Then, also on April 4, 2025, Carnaby FA—an entity which, that very morning had less than five thousand dollars in its bank account—paid Defendant Patrick James Trust approximately $17 million.

73.     This was not an isolated occurrence. On January 15, 2025, for example, the bank account for Carnaby Inventory IV LLC ("**Carnaby IV**")—another SPV sitting under Viceroy Private Capital, LLC—had just $22,137.40 in deposits in its account at the beginning of the day. On that same day, Onset provided approximately $192 million in purported sale-leaseback funding, again ostensibly collateralized by First Brands' assets. The same day, Carnaby IV paid $25 million into an account belonging to Defendant Patrick James Trust.

74.     Similarly, Onset provided a purported sale-leaseback in the amount of $115.2 million on March 10, 2025, which was followed the same day by a $35 million transfer from Carnaby IV to Defendant Patrick James Trust. Following additional transfers, Carnaby IV held only $16.9 million in its account by March 11, and on March 12, Onset provided another $57.6 million from a purported sale-leaseback. On March 13, Carnaby IV transferred an additional $35 million to Patrick James Trust. By the beginning of the day on March 17, 2025, Carnaby IV held

21

FBG_CH1_00097444

only a balance of $2,952.95.

75.     Debtors' investigation has revealed over $1 billion in total financing received from Onset between April 2024 and March 2025, over approximately $200 million of which was paid to Mr. James or his affiliated entities.

76.     These examples lay bare Mr. James' conduct and show the direct connection between his front-end conduct and back-end misappropriation. Mr. James was using First Brands to secure, and then pocket, fraudulent purported sale-leaseback proceeds.

### C.  Mr. James Commingled His Personal Accounts With Company Accounts and Diverted First Brands's Funds to Pay for His and His Family's Lavish Lifestyle

77.     Upon information and belief, Mr. James also intentionally commingled First Brands' business accounts with personal funds and used First Brands' funds for his and his family's personal expenses and personal businesses.

78.     Indeed, upon information and belief, certain of the SPV Debtors' cash was frequently commingled with the cash of non-Debtor entities, including Bowery Finance II, controlled by Mr. James.

79.     Upon information and belief, the funds received by Defendants have not been returned by Mr. James to First Brands, were not documented or treated by First Brands as ordinary dividends, and contributed to First Brands' insolvency.

80.     The Debtors have identified payments that were made directly from First Brands accounts to Mr. James, his family, and their personal staff and businesses. These include over $2 million in 2025 in payroll for Mr. James' "family office," at least $3 million paid towards rent of Mr. James New York City townhouse from 2019 through 2024, and approximately $500,000 paid to Mr. James' private celebrity chef in 2025.

81.     In 2024 alone, Mr. James moved over $100 million out of bank accounts belonging

22

FBG_CH1_00097445

to First Brands and into bank accounts belonging to him or entities associated with him, including personal businesses and Defendant Patrick James Trust.

82.     Other payments were made from First Brands to entities controlled by Mr. James, named as Defendants in this action. For example, Battery Park—which is not directly affiliated with First Brands—is 100% owned by Mr. James and is described as a "personal" business in Mr. James' financial documents. On information and belief, more than $10 million was transferred from First Brands to Battery Park from 2018 to 2025 to pay Mr. James and his family's personal expenses, including approximately $150,000 for a celebrity personal trainer.

83.     Indeed, upon information and belief, Mr. James directed colleagues to submit invoices to First Brands for reimbursement to Battery Park, wherein line items for personal and business expenses were included in the same invoice. For example, in an invoice submitted by Battery Park to First Brands on August 23, 2023, Mr. James' entity, Battery Park, sought reimbursement for over $110,000 for a six week "Southampton hotel" stay for two individuals who were not affiliated with First Brands.

84.     Upon information and belief, Defendants Albion Realty, LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC were likewise recipients of transfers of funds from First Brands during this period.

85.     From 2018 to 2025, approximately $35 million was transferred to Larchmont LLC, another entity owned and controlled by Mr. James that is unrelated to First Brands and appears to bear no legitimate business relationship to First Brands. Significant additional transfers totaling in the millions of dollars were also made from First Brands to Mr. James' real estate holding company (Albion Realty LLC) over the same period.

FBG_CH1_00097446

86.     Upon information and belief, money transferred from First Brands to Mr. James also occurred in close proximity to his acquisition of various real estate properties and cars. For example, in the two months prior to purchasing a home in Malibu on September 13, 2019, various entities unrelated to First Brands over which Mr. James has complete control received disbursements from First Brands amounting to several million dollars. Likewise, in the two months prior to purchasing a home in the Hamptons on August 31, 2021, certain entities controlled by Mr. James received over $1 million from First Brands.

87.     On information and belief, Mr. James owns at least seven properties. Mr. James also owns an extensive car collection, including at least seventeen exotic cars.

88.     The transaction documentation that Debtors have uncovered fails to show that Mr. James' transfers were made for any legitimate business purpose.

89.     Upon information and belief, many of the transactions seem to have been made without any contemporaneous documentation of their purpose at all.

***

90.     Mr. James continues to have the ability to further deplete the estate's funds by spending or diverting money that has been transferred to accounts and entities under his control. If his assets are not frozen, there is an immediate and significant risk that he will transfer the estate's funds to entities outside of the United States, potentially in ways that may make these funds difficult or impossible to recover in First Brands' bankruptcy proceedings.

91.     Mr. James, moreover, is a Malaysian national with hundreds of millions of dollars at his disposal and is reported to be the subject of an investigation by the United States Attorney for the Southern District of New York, and others, giving rise to significant concerns regarding abscondment.

FBG_CH1_00097447

92.     Debtors accordingly bring this action to recover the proceeds of Defendants' misconduct for the benefit of the Debtors, their creditors, and other stakeholders. Debtors are further seeking immediate injunctive relief to prevent Defendants from further dissipating any of the misappropriated funds to ensure that they can be recovered.

## COUNT I

### Turnover of Estate Property
### Pursuant to 11 U.S.C. § 542
### (Against All Defendants)

93.     Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

94.     Under Section 542(a), an entity in possession of Debtors' property or an entity that owes a debt to the debtor shall deliver such property or pay such debt.

95.     As of the date of this Complaint, Defendants, and/or other entities and trusts Mr. James controls, are in possession of property of the estate. Such property and debts include, without limitation, cash, accounts receivable, and other matured payment obligations due and payable to the creditors, and any proceeds thereof.

96.     Under Section 542(a), Defendants shall deliver to Debtors and account for such property or the value of such property.

97.     Defendants' refusal to deliver property impedes administration of the estate. Turnover is appropriate because the property is estate property within Section 541 and is necessary to the administration of this case.

98.     Debtors seek an order compelling an immediate turnover and a full accounting, with appropriate safeguards for any proven lienholder's interest.

FBG_CH1_00097448

## COUNT II

### Actual Fraudulent Transfer
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(1), 6 Del. Code § 1304(a)(1)
### (Against All Defendants)

99.     Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

100.     On information and belief, Mr. James secured funding from lenders for First Brands based on knowingly and intentionally false representations about First Brands' financial position.

101.     On information and belief, Mr. James caused First Brands to complete payment of numerous transfers made to benefit Mr. James, his family, and/or his personal affiliates.

102.     Each transfer was concealed.

103.     Each of the fraudulent transfers was made within the applicable lookback period prior to the Petition Date.

104.     Each relevant payment was made by First Brands at Mr. James' direction.

105.     Mr. James directed First Brands to pay Defendants with the actual intent of hindering, delaying, and/or defrauding First Brands' creditors and investors.

106.     Defendants are initial transferees within the meaning of that term as used in Section 550(a)(1).

107.     Each of the transfers was made with actual intent to hinder, delay, or defraud creditors.

108.     Mr. James did not direct any of the transfers in good faith.

109.     At the time of each of the transfers, First Brands had at least one general unsecured creditor holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover actual fraudulent transfers.

26

FBG_CH1_00097449

110.    The payments to Defendants are voidable pursuant to Section 548(a)(1)(A) and may be recovered from Defendants pursuant to Section 550.

111.    Accordingly, First Brands is entitled to a judgment (1) avoiding the fraudulent transfers under Section 548(a)(1)(A) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

## COUNT III

### Constructive Fraudulent Transfer
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(2),
### 6 Del. Code § 1304(a)(2)
### (Against All Defendants)

112.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

113.    First Brands seeks to avoid the fraudulent transfers made on numerous occasions from First Brands' accounts to Mr. James' personal accounts and affiliated entities, including, but not limited to, Defendant Patrick James Trust and the other named Defendants, and to recover and preserve the value thereof.

114.    On information and belief, Mr. James caused First Brands to complete numerous transfers to benefit Defendants and/or Mr. James' family and personal affiliates.

115.    First Brands did not receive reasonably equivalent value in exchange for the transfers.

116.    Each of the transfers was made within the applicable lookback period.

117.    On the date of each relevant transfer, First Brands: (1) was insolvent or became insolvent as a result of such transfer; (2) engaged in a business dealing or a transaction, or was about to engage in a business dealing or a transaction, for which any property remaining with First Brands was unreasonably small in relation to the business or transaction; or (3) intended to incur,

27

FBG_CH1_00097450

or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

118. At the time of each of the fraudulent transfers, First Brands had numerous unsecured creditors holding an allowable claim who, but for First Brands' bankruptcy filing, would have standing to bring claims to avoid and recover constructive fraudulent transfers.

119. Accordingly, First Brands is entitled to a judgment (1) avoiding the fraudulent transfers under Sections 548(a)(1)(B) and/or 544(b) of the Bankruptcy Code, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 of the Bankruptcy Code.

## COUNT IV

### Money Had and Received
### (Against All Defendants)

120. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

121. By receiving funds from First Brands' accounts for personal gain, Defendants wrongfully had or held money that belongs to First Brands in equity and good conscience.

122. Accordingly, First Brands is entitled to equitable recovery of any benefits Defendants received that rightfully belong to First Brands.

## COUNT V

### Unjust Enrichment
### (Against All Defendants)

123. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

124. Defendants were enriched and received direct, concrete economic benefits without legal or equitable justification, including, but not limited to, through the diversion and receipt of funds from First Brands.

28

FBG_CH1_00097451

125.    Defendants have unjustly retained the sums procured through, funded by, or serviced with First Brands' assets—sums to which Defendants had no lawful claim and for which First Brands received no reciprocal benefit—to the detriment of First Brands and its creditors, thereby shifting value from the enterprise to Defendants.

126.    First Brands suffered financial losses as a result of these transactions. Among other losses, First Brands did not receive reasonably equivalent value for any of the transfers; the challenged conduct facilitated and perpetuated efforts that siphoned substantially all of First Brands' assets; and the estates were left burdened with liabilities without corresponding assets or value.

127.    There is a direct, proximate, and traceable relationship between Defendants' enrichment and the losses accrued by First Brands: the transfers emanated from First Brands' accounts and were made directly to Defendants or other entities or affiliates owned or controlled by or related to Mr. James.

128.    No legitimate corporate purpose, consideration, or fair value supports these transfers. They were the product of self-dealing and other misconduct, conferred unique personal benefits upon Mr. James that were not shared by First Brands or its stakeholders, and were not supported by reasonably equivalent value or fair consideration.

129.    First Brands conferred a benefit in the form of corporate funds and value, Defendants appreciated and accepted that benefit, and Defendants' continued retention of that benefit would be inequitable under the circumstances.

130.    Equity and good conscience will not permit Defendants to retain the benefits he wrongfully obtained at First Brands' expense. Legal remedies are inadequate to the extent the relief required is restitutionary and equitable in nature, including the recovery of specific, identifiable

29

FBG_CH1_00097452

funds or assets traceable to Mr. James' unjust enrichment.

131.    Accordingly, First Brands is entitled to judgment for restitution in the amount of the benefits unjustly obtained, together with disgorgement of all proceeds traceable to the transfers, the imposition of a constructive trust and/or equitable lien over assets and proceeds in Mr. James' control, an accounting, and pre- and post-judgment interest at the maximum rate permitted by law, as well as such other and further equitable relief as the Court deems just and proper.

## COUNT VI

### Constructive Trust
### (Against All Defendants)

132.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

133.    A constructive trust is an equitable remedy imposed to prevent unjust enrichment where a defendant, through fraud, breach of fiduciary duty, unfair or unconscionable conduct, or abuse of confidence, acquires or retains property that which in equity and good conscience belongs to another.

134.    As detailed in this Complaint, Defendants—acting at Mr. James' direction and in breach of his fiduciary duties to First Brands—engaged in fraudulent, unfair, and unconscionable conduct, including the diversion and misappropriation of corporate funds.

135.    By virtue of this misconduct, Defendants were directly and materially enriched. Defendants obtained and continue to retain specific, identifiable property traceable to First Brands.

136.    Defendants received and retain the fraudulent transfers by fraud, self-dealing, and wrongful diversion. Continued possession of such property is inequitable and would unjustly enrich Defendants at the expense of First Brands and its creditors.

137.    Equity therefore deems Defendants constructive trustees of the fraudulent transfers

FBG_CH1_00097453

and all traceable proceeds, substitutions, and products (collectively, the "**Constructive Trust Property**") for the benefit of Debtors in their chapter 11 cases.

138.     The Constructive Trust Property is sufficiently specific and traceable: the transfers originated from identified First Brands accounts and were directed to Defendants or other entities and accounts Mr. James owned or controlled, and can be followed into property acquired therewith.

139.     Legal remedies are inadequate because First Brands seeks restitutionary, in-kind relief as to specific funds and assets; equitable relief is necessary to permit tracing, preserve the Constructive Trust Property, and avoid dissipation. An accounting is warranted to identify all property constituting or derived from the Constructive Trust Property.

140.     Accordingly, First Brands seeks entry of judgment: (a) declaring and imposing a constructive trust over the Constructive Trust Property and all proceeds, products, offspring, and substitutions; (b) directing Mr. James, as constructive trustee, to convey, transfer, and turn over the Constructive Trust Property to First Brands; (c) imposing, in the alternative, an equitable lien to the extent any portion of the Constructive Trust Property cannot be specifically traced; (d) ordering an accounting and tracing of all relevant accounts and assets; and (e) awarding pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

## COUNT VII

### Accounting
### (Against Defendants Patrick James and John and Jane Doe(s) 1-100)

141.     Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

142.     The facts surrounding Mr. James' unlawful actions and the accounts mentioned herein are so complex that adequate relief may not be obtained through standard discovery procedures, such as production and interrogatories.

31

FBG_CH1_00097454

143.    Accordingly, First Brands is entitled to an equitable accounting.

## COUNT VIII

**Illegal Dividend**
**Pursuant to 8 Del.C. § 160 and 8 Del.C. § 174**
**(Against Defendants Patrick James and John and Jane Doe(s) 1-100)**

144.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

145.    While serving as a director for numerous First Brands entities, Mr. James directed First Brands to approve and complete numerous dividend distributions to himself, his trust, and other entities he controlled.

146.    Mr. James was aware of his fraudulent conduct and misrepresentations, and he knew his obfuscation would deceive creditors.

147.    The dividends contributed to Debtors' insolvency. Alternatively, and in addition, First Brands' liabilities exceeded its assets such that First Brands did not have a capital surplus at the time Mr. James directed dividend distributions to himself. First Brands' net profits also were insufficient to fund Mr. James' dividend distributions.

148.    Accordingly, the dividend distributions were not lawful dividends under Delaware General Corporation Law.

149.    Mr. James orchestrated the dividend distributions for himself and therefore is liable for the amount of the distributions.

## RESERVATION OF RIGHTS

150.    During the course of this proceeding, Debtors may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. Debtors reserve all rights to amend this original

32

FBG_CH1_00097455

Complaint to, among other things: (i) modify or revise Defendants' names; (ii) add additional defendants; and/or (iii) add claims or causes of action, if applicable, that may become known to Debtors at any time during this adversary proceeding, through formal discovery or otherwise, and for such amendments to relate back to the filing of this original Complaint.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Debtors respectfully request that this Court enter judgment against Defendants:

a) Freezing any and all bank accounts and other property owned or controlled by Defendants or any other entities under their control;

b) Avoiding and recovering the fraudulent transfers as actual or constructive fraudulent transfers, in an amount to be determined at trial;

c) Declaring that Defendants were unjustly enriched at the expense of Debtors, and awarding damages in an amount to be determined at trial;

d) Imposing a constructive trust upon Defendants' accounts with respect to the fraudulent transfers;

e) Compensatory and consequential damages, in amounts to be determined, together with pre- and post-judgment interest at the maximum rate allowed by law;

f) Ordering an equitable accounting;

a) An award of pre- and post-judgment interest; and

b) Such other and further relief as this Court deems just and equitable.

33

FBG_CH1_00097456

Respectfully submitted on the 3rd day of November, 2025.

Houston, Texas

<div style="margin-left: 40%;">

_/s/ Clifford W. Carlson_

WEIL, GOTSHAL & MANGES LLP
Clifford W. Carlson (24090024)
Gabriel A. Morgan (24125891)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   clifford.carlson@weil.com
          gabriel.morgan @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted _pro hac vice_)
Sunny Singh (admitted _pro hac vice_)
David Lender (_pro hac vice_ pending)
Nili T. Moghaddam (_pro hac vice_ pending)
Robert Niles-Weed (_pro hac vice_ pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   matt.barr@weil.com
          sunny.singh@weil.com
          david.lender@weil.com
          nili.moghaddam@weil.com
          robert.niles-weed@weil.com

_Proposed Attorneys for Debtors
and Debtors in Possession_

</div>

FBG_CH1_00097457

**DEBTORS' EXHIBIT NO. 20**
**Page 34 of 35**

## VERIFICATION

I, Charles Moore, hereby certify and verify under penalty of perjury that:

I am the interim Chief Executive Officer of First Brands Group, LLC, the Debtor in the above-captioned cases. I have read the factual allegations contained in the Verified Complaint and affirm such allegations are true and correct to the best of my knowledge, information, and belief.


Dated: November 3, 2025                   By: First Brands Group, LLC

                                          Signed: */s/ Charles M. Moore*

                                          Name: Charles Moore

                                          Title: Interim Chief Executive Officer, First Brands Group, LLC


FBG_CH1_00097458