**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

------------------------------------------------------------x------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **FIRST BRANDS GROUP, LLC, *et al.*,[1]** | : | **Case No. 25-90399 (CML)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x------------------------------------------------------------

| | | |
|---|---|---|
| **FIRST BRANDS GROUP, LLC, *et al.*,** | : | |
| | : | |
| **Plaintiffs,** | : | **Adv. Pro. No. 26-_____ (CML)** |
| | : | |
| **v.** | : | |
| | : | |
| **ONSET FINANCIAL, INC., *et al.*,** | : | |
| **Defendants.** | : | |
| | : | |

## <u>COMPLAINT</u>

First Brands Group, LLC, and certain affiliates identified below (the "**Plaintiffs**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases, by their attorneys, Weil, Gotshal & Manges LLP ("**Weil**"), file this adversary proceeding against Onset Financial Inc. ("**Onset**"), Edward James, Justin Nielsen, Scott Miller, Jonathan Gardner, Dale P. Holt, Todd Pedersen, John Does 1-10 (collectively, the "**Individual Onset Investors**"), Optimus Private Capital LLC ("**Optimus**"), JCMC Investments Group LLC ("**JCMC**"), Asilia Credit Investments, LLC (together with certain of its affiliates, "**Asilia**"), Nielsen Investments, Joshua Tree Holdings,

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00097323

LLC ("**Joshua Tree**"), JA Gardner Holdings ("**JA Gardner**"), Holt Investments 201 LLC ("**Holt Investments**"), Yuma III LLC ("**Yuma**"), Coral Dunes LLC, and Seddie LLC (collectively, the "**Entity Onset Investors**" and, together with the Individual Onset Investors, the "**Onset Investors**" and all, collectively, the "**Defendants**").  Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Onset conspired with the Debtors' former officer, Edward James, in an unlawful scheme to defraud creditors out of billions of dollars and other property.  Simply put, Onset and Edward James made a deal—James would work against the Debtors as Onset's secret partner, and together they would rig scores of supposed "contracts" between the Debtors and Onset to enrich themselves at everyone else's expense.  Onset and Edward James then created—not negotiated—scores of supposed sale-leaseback transactions (which were in fact disguised loans) pursuant to which the Debtors were saddled with billions of dollars in debt on outrageous terms.  As a result, Onset (and its secret partner Edward James) obtained transfers of approximately $2.9 billion in cash, triple digit returns, and alleged interests in inventory and equipment.  This action has been brought to avoid these fraudulent transactions, and to return the conspirators' mountain of ill-gotten cash and property back to the Debtors' estates.

## THE PARTIES

2.      Plaintiff First Brands Group, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.  First Brands—through its operating subsidiaries and portfolio of brands—is a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lighting, pumps, and towing products.  First Brands employs approximately 26,000 people worldwide, including nearly 6,000 in the United States.

3.      Plaintiff Carnaby Inventory IV, LLC ("**Carnaby IV**") is a Delaware limited liability company.

FBG_CH1_00097324

4.      Plaintiff Carnaby FA, LLC ("**Carnaby FA**") is a Delaware limited liability company.  Carnaby Inventory I, LLC ("**Carnaby I**"), Carnaby IV and Carnaby FA, are collectively referred to as the "**Carnaby Entities**."  The Carnaby Entities were established as special purpose vehicles ("**SPVs**") solely to facilitate Plaintiffs' transactions with Onset.

5.      Plaintiff Carnaby Capital Holdings, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

6.      Plaintiff First Brands Group Holdings, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

7.      Plaintiff Viceroy Private Capital, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

8.      Plaintiff Carnaby Capital, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

9.      Plaintiff Carnaby FA Holdings, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

10.     Plaintiff Eagle Casting Holdings, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

11.     Plaintiff Eagle Casting, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

12.     Plaintiff Dalton Corporation is an Indiana corporation with its principal place of business in Cleveland, Ohio.

13.     Plaintiff Horizon Global Americas, Inc. is a Delaware corporation with its principal place of business in Cleveland, Ohio.

FBG_CH1_00097325

14.     Plaintiff Cardone Industries, Inc. is a Delaware corporation with its principal place of business in Cleveland, Ohio.

15.     Plaintiff Trico Technologies Corporation is a Delaware corporation with its principal place of business in Cleveland, Ohio.

16.     Plaintiff Trico Products Corporation is a New York corporation with is principal place of business in Cleveland, Ohio.

17.     Plaintiff FRAMAuto Holdings LLC ("**FRAM**") is a Delaware corporation with its principal place of business in Cleveland, Ohio.

18.     Plaintiff Walbro, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

19.     Plaintiff Toledo Molding & Die, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

20.     Plaintiff FRAM Group Operations, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

21.     Plaintiff Champion Laboratories, Inc. is a Delaware corporation with its principal place of business in Cleveland, Ohio.

22.     Plaintiff Horizon Global Company, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

23.     Plaintiff Brake Parts Inc LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

24.     Plaintiff Hopkins Manufacturing Corporation is a Kansas corporation with its principal place of business in Cleveland, Ohio.

FBG_CH1_00097326

25.     Plaintiff Carter Fuel Systems, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

26.     Plaintiff ASC Industries, Inc. ("**ASC**"), is an Ohio corporation with its principal place of business in Cleveland, Ohio.

27.     Defendant Onset is a Utah corporation, founded in 2008. It describes itself as "a dominant force and leader in the equipment lease and finance industry."[2]  Its Chief Executive Officer is Justin Nielsen, and its Chief Financial Officer is Remington Atwood.

28.     Defendant Edward James is a former executive vice president, board member, and officer of Debtors, who, upon information and belief, resides in Cleveland, Ohio.

29.     Defendant JCMC is a Delaware limited liability company.

30.     Defendant Optimus is a Delaware limited liability company.

31.     Defendant Asilia is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

32.     Defendant Justin Nielsen is the founder, sole shareholder, Chief Executive Officer, and a director of Onset.  He is also the Chief Executive Officer and sole manager of Nielsen Investments.  Upon information and belief, Nielsen is an American national who resides in Draper, Utah.

33.     Defendant Nielsen Investments is a Utah limited liability company.

34.     Defendant Scott Miller is the co-founder and former president of Onset, and the sole member of Joshua Tree.  Upon information and belief, Miller is an American national who resides in South Jordan, Utah.

---

[2] Onset, About Us, https://www.onsetfinancial.com/our-vision/about-us (last visited December 12, 2025).

FBG_CH1_00097327

35.     Defendant Joshua Tree is a Utah limited liability company.

36.     Defendant Jonathan Gardner is an individual resident of Salt Lake City, Utah.  He is the Chief Executive Officer of Asilia, the sole member of JA Gardner, and a member of Holt Investments.

37.     Defendant JA Gardner is a Utah limited liability company.

38.     Defendant Dale P. Holt, upon information and belief, is an individual resident of Salt Lake City, Utah and is a member of Holt Investments 201 LLC.

39.     Defendant Holt Investments is a Utah limited liability company.

40.     Defendant Todd Pedersen is, upon information and belief, an American National who resides in Provo, Utah.  He is a manager of Seddie LLC.

41.     Defendant Yuma is a Delaware limited liability company whose manager is Defendant Todd Pedersen.

42.     Defendant Coral Dunes LLC is a Delaware limited liability company whose managing member is Todd Pedersen.

43.     Defendant Seddie LLC is a Utah limited liability company with, upon information and belief, its principal place of business in Saratoga Springs, Utah.

44.     John Does 1-10 are persons or legal entities, whose names and addresses are unknown.

45.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

FBG_CH1_00097328

46.     This adversary proceeding is commenced pursuant to Sections 105(a), 502, 506, 510, 544, 547, 548, 550, and 551 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 7008-1 of the Local Rules of the Bankruptcy Court (the "**Local Rules**"), and applicable non-bankruptcy law.

47.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and determine this proceeding and to enter a final order and judgment.  If this Court or any other court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to Debtors' bankruptcy cases and will have a material impact on the administration of Debtors' estates.

48.     Debtors consent to entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1.  Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

49.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

**PERSONAL JURISDICTION**

50.     Defendants are subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because Defendants have established minimum contacts with the United States.  Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal

FBG_CH1_00097329

**DEBTORS' EXHIBIT NO. 21**
**Page 7 of 101**

court has personal jurisdiction over any defendant having minimum contacts with the United States.

51. Onset has such minimum contacts. Onset was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

52. Edward James has such minimum contacts. Edward James served as an officer of a United States-based company relevant to the causes of action asserted herein and owns real and personal property in the United States. Edward James is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

53. Optimus also has such minimum contacts. Optimus was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

54. JCMC also has such minimum contacts. JCMC was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

55. Asilia also has such minimum contacts. Asilia was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

56. Justin Nielsen also has such minimum contacts. Nielsen is an American national domiciled in at least one state of the United States.

57. Nielsen Investments also has such minimum contacts. Nielsen Investments was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

FBG_CH1_00097330

58.     Scott Miller also has such minimum contacts.   Miller is an American national domiciled in at least one state of the United States.

59.     Joshua Tree also has such minimum contacts.   Joshua Tree was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

60.     Jonathan Gardner also has such minimum contacts.   Gardner is domiciled in at least one state of the United States.

61.     JA Gardner also has such minimum contacts.   JA Gardner was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

62.     Dale P. Holt also such minimum contacts.   Holt is domiciled in at least one state of the United States.

63.     Holt Investments also has such minimum contacts.   Holt Investments was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

64.     Todd Pedersen also has such minimum contacts.   Pedersen is an American National domiciled in at least one state of the United States.

65.     Yuma also has such minimum contacts.   Yuma was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

66.     Coral Dunes also has such minimum contacts.   Coral Dunes was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

FBG_CH1_00097331

67.     Seddie also has such minimum contacts.  Seddie was created in, and continues to operate in, the United States, and, on information and belief, holds bank accounts located in the United States.

68.     Accordingly, the Court has personal jurisdiction over Defendants based on their contacts with the United States.

**FACTUAL ALLEGATIONS**

I.     **THE FRAUDULENT SCHEME TO CONCEAL THE DEBTORS' INSOLVENCY AND FORMER MANAGEMENTS' ILLEGAL CONDUCT AND TO INDUCE LENDERS, CUSTOMERS AND OTHER STAKEHOLDERS TO CONTINUE TO SUPPORT THE BUSINESS UNTIL IT WAS TOO LATE**

69.     Notwithstanding representations to the contrary, including in financial statements, the Debtors' operating business had been unprofitable for years prior to the bankruptcy filing in September 2025.

70.     Rather than come clean with existing lenders, customers, employees and other stakeholders, the Debtors' former management engaged in an intentionally fraudulent scheme to generate sufficient liquidity to mask the FBG Debtors' financial condition and inability to satisfy existing obligations.  That scheme resulted from, at least in part, Onset's partnership with Edward James in which he had invested, upon information and belief, nearly $150 million alongside Onset in the hopes of extracting nearly $280 million from the Plaintiffs before the house of cards came crashing down.

71.     The scheme was premised on loading up the Plaintiffs with stealth debt utilizing fraudulent factoring and alleged "off-balance sheet" financing.  In terms of factoring, at all relevant times, the FBG Debtors relied on factoring customer invoices to third party factors for liquidity. Under these third-party factoring arrangements, the FBG Debtors would obtain in cash a fraction of the amount stated on newly issued customer invoices, and would be obliged to turnover the full

10

FBG_CH1_00097332

**DEBTORS' EXHIBIT NO. 21**
**Page 10 of 101**

amount of the payment from the customer once it was received months later.  Upon information and belief, the FBG Debtors were unable to obtain sufficient payments from customers relative to the invoice amounts due to be paid to the factoring parties given the underlying weakness of the operating business (which was not profitable).

72.     The FBG Debtors' former management oversaw an effort in which customer invoices were secretly factored multiple times contrary to express representations, were inflated or were simply fabricated out of whole cloth.  These invoices were then factored by third party factors for immediate liquidity.  Third party factors were induced to enter into seemingly profitable factoring transactions as First Brands continued to timely pay factors supposedly from customer invoices that had been factored.  In truth, First Brands used the commitments from new creditors to fund its immediate obligations to old creditors and mask the reality that invoices were factored multiple times or entirely fabricated.  As of September 2025, third-party factoring liabilities were equal to or exceeded $2.3 billion.  A similar fraudulent scheme was utilized by former management in connection with supply chain financing, with similarly dire results.

73.     The liquidity generated by these unlawful practices was, upon information and belief, insufficient to service the Company's debt obligations as they came due.  Meanwhile, FBG Debtors' existing debt facilities precluded them from engaging in affiliate transactions for less than fair market value in exchange for FBG Debtors' inventory and property, plant and equipment ("**PP&E**") located in the United States, or from granting senior liens on such inventory or PP&E. The FBG Debtors only had access to an ABL Facility that was undrawn until just prior to the September 2025 bankruptcy filing.

74.     As a result, Edward James, aided and abetted by Onset, conceived of and implemented a scheme to disguise billions of dollars of debt incurred by the FBG Debtors as

11

FBG_CH1_00097333

supposedly off-balance sheet debt of other (albeit affiliated) entities. This involved creating SPV financing structures whereby special purpose entities would be utilized as "borrowers" to obtain still more liquidity to perpetuate the scheme. Edward James offered SPV lenders quick equity-like returns using an unusually short duration, high cost debt. Lenders successfully earned outsized returns for years starting in 2022 up to the Petition Date. The largest SPV Lender by far was Onset—a secret partner of Edward James.

75.     These follow-on factoring and SPV loan transactions injected cash into the FBG Debtors which could then be used to pay preexisting factoring or loan parties on account of debts coming due. All of this was in service of concealing the true condition of the business from lenders and customers, and to enable still more factoring and SPV borrowing to continue the charade. In reality, payments made to creditors, including Onset, were funded with additional debt, not non-existent free cash and profits from the business.

76.     By September 2025, the Debtors' annual debt service obligations exceeded $900 million excluding the Debtors' obligations to Onset. Onset alone contended it was owed approximately $1.9 billion in total. By then, however, former management had run out of liquidity to keep the scheme going. Before the music stopped, Onset (and its partner Edward James) obtained over $2.3 billion in payments in connection with the SPV financing transactions.

A.     **The Formation of Onset's Partnership with Edward James in Connection with the Scheme to Misuse the FBG Debtors and Carnaby Entities to Conceal Billions of Dollars of Debt Obligations Imposed on the FBG Debtors for Less than Reasonably Equivalent Value**

77.     First Brands' relationship with Onset began in 2018. Allegedly, Onset was first brought in when a First Brands employee responded to a 'cold call' by asking if Onset would do a deal that First Brands' banking partner had refused to participate in. Onset, apparently, was very happy to do so. Beginning in May 2018, the Company entered a series of "direct" lease

12

FBG_CH1_00097334

transactions with Onset. These direct leases were between Trico Products Corporation (an FBG Debtor) and Onset and were governed by the Trico Master Lease Agreement, dated May 9, 2018 (the "**Direct Leases**"). Upon information and belief, there are a minimum of forty-five lease schedules, with the first initiated in May 2018, spanning to July 2025.[3] The identification of equipment and other property leased under these agreements was highly unusual and unclear. The "equipment" often is not equipment at all, and it is challenging to identify exactly what is subject to the lease in any given location. Identifiable equipment is of insufficient value to justify the lease payments, which call for very high rates: the active Direct Leases have internal rates of returns ranging from approximately 16% to 59%. From these leases, Onset received transfers of approximately $629.6 million.

78.     Upon information and belief, in or about 2022 and as part of the overall scheme, Edward James and Onset agreed to secretly impose on the FBG Debtors billions of dollars—far in excess of what the FBG Debtors could possibly have needed for legitimate business purposes—of short-term debt obligations backed by the FBG Debtors' inventory and PP&E, utilizing shell entities, and purported asset transfers and sale-leaseback transactions to give the appearance of legitimate transactions negotiated at arms' length and for fair market value when they were in fact the product of joint collusion and an investment partnership between Edward James and Onset worth hundreds of millions to Edward James.

79.     This conduct was directly contrary to and against the interests of the Debtors, and allowed former management to continue to deceive creditors, customers and employees as to the

---

[3] Plaintiff FRAM is a co-lessee for lease Schedules 7A, 7B, 7C, and 19. Plaintiff ASC is a co-lessee for lease Schedules 6 and 11. Plaintiff Champion is a co-lessee for lease Schedule 14.

FBG_CH1_00097335

**DEBTORS' EXHIBIT NO. 21**
**Page 13 of 101**

true financial condition of the operating businesses resulting in a financial catastrophe for the Plaintiffs and creditors.

80. And, through this aspect of the scheme, Edward James and Onset obtained massive, above-market interest and fee payments totaling over several hundreds of millions of dollars.

81. Those ill-gotten gains were obtained because Onset and Edward James (who controlled the relevant Debtor entities) forced the Debtors to incur debt obligations vastly exceeding their legitimate needs—so much so that hundreds of millions of dollars were diverted to myriad entities not owned directly or indirectly by the Debtors. In doing so, the Debtors were saddled not only with exorbitant debt obligations imposed by Onset and Edward James without arms' length negotiation, but also on account of funds they never received or benefited from.

82. Upon information and belief, in or about the summer of 2022, Edward James and Onset conceived of and became joint participants and partners in this scheme—each sharing in the profits and working together as they implemented and carried it out.

83. Upon information and belief, Onset and Edward James agreed on the elements of the scheme and the role of each conspirator in furtherance of it.

84. For example, upon information and belief, Onset agreed to and knew about Edward James' role and activities in furtherance of the scheme including, among other things, his abuse of his position as a corporate officer of the FBG Debtors and their affiliates to: (a) collude with Onset to develop the structure and terms to be imposed on the Debtors; (b) manipulate these entities and cause them to enter into "transactions" (most of which were not intended to be and were not carried out); (c) actively conceal the true nature of his partnership with Onset from other officers and employees of the Debtors, auditors and creditors; (d) divert hundreds of millions of dollars away from the Debtors; and (e) invest alongside Onset and share with Onset in the scheme's profits.

FBG_CH1_00097336

85.     Likewise, upon information and belief, Edward James knew about and agreed to Onset's role and activities in furtherance of the scheme including, among other things, Onset's: (a) collusion with Edward James to develop the structure and terms to be imposed on the FBG Debtors; (b) actions to conceal the loans to the FBG Debtors from their creditors (including by executing documents to give the appearance of arms' length, fair market value transactions involving FBG Debtors' inventory and equipment and filing UCC-1 statements only against entities created to perpetuate the scheme that were not known to such creditors); (c) investing alongside Edward James and sharing contribution of funding; and (d) sharing with Edward James in the scheme's profits.

86.     That the co-conspirators shared in the profits is without doubt.  Indeed, as Onset itself has explained, to facilitate their predatory dealings with the FBG Debtors, Onset invited Edward James to personally invest "alongside" Onset in the transactions at issue.  *Onset Motion to Intervene*, Dkt. 72 at 11.  Edward James accepted Onset's invitation, and it has already "yield[ed] [him] millions of dollars of gains." *Id.*  Onset was too modest in its description.  On information and belief, Edward James invested nearly $150 million in his partnership with Onset to exploit the Plaintiffs and stood to earn hundreds of millions of dollars from his investment.  On information and belief, Edward James controls and holds an interest in the entities Optimus and JCMC.  And, on information and belief, from October 2022 through April 2025, Edward James received payments in excess of $240 million directly, or through the entities Optimus or JCMC.  An illustrative list of such transfers is set forth in Exhibit C.  Edward James' returns, like Onset's, were excessive.  In just one year, for example, Edward James earned an 80% return on his investment with Onset at the expense of the Plaintiffs.

FBG_CH1_00097337

87.     Upon information and belief, these transfers from Onset to Edward James were funded by transfers made by the Plaintiffs to Onset.  In other words, Onset and Edward James shared in the profits of the scheme, just as they exercised common control over it.

88.     On information and belief, certain of Onset's investors, including Asilia Investments and Keystone National Group, also conspired with Onset and Edward James in developing the scheme.

**B.      The Misuse of the FBG Debtors and Carnaby Entities to Perpetuate and Carry Out the Scheme**

89.     In furtherance of the scheme, Edward James caused the Carnaby Entities to be created.  The Carnaby Entities did not hold board meetings or follow other corporate formalities. The Carnaby Entities had no employees.  The officers of the Carnaby Entities overlapped with the FBG Debtors and their affiliates.  Meanwhile, Edward James was an officer of the Carnaby Entities, FBG Debtors, and other affiliates.  By virtue of his senior positions, relationship with his brother, Patrick James (who directly or indirectly owned 100% of all of the relevant entities), and failure to follow any semblance of corporate formalities, Edward James was able to, and did, control the Carnaby Entities and FBG Debtors as necessary to carry out the scheme.

90.     FBG Debtors' employees performed minimal tasks related to the Carnaby Entities, including maintaining rudimentary books and records.  Inventory and PP&E supposedly purchased by the Carnaby Entities was not properly accounted for on their books and records, and instead continued to be reflected as assets on the books and records of the FBG Debtors.  Contracts executed by the Carnaby Entities were not performed.

91.     The Carnaby Entities were not capitalized and instead had no assets whatsoever when they were formed in connection with the contemplated Onset transactions.  Nor did they

FBG_CH1_00097338

have access to liquidity to perform any of the obligations ostensibly imposed on them either to the FBG Debtors or Onset.

92.     The Carnaby Entities maintained separate bank accounts as a way station for in transit cash.  Incoming cash was promptly transferred out to an account of another entity where it was concentrated, commingled and disbursed to multiple affiliates.  When payments were due to Onset, the Carnaby Entities transferred cash in the amounts owed to Onset that they had received from various FBG Debtors, Patrick James and other entities.  These cash transfers were not derived from business transactions between the Carnaby Entities and the transferors of this cash.

93.     And, in furtherance of the scheme with Onset, Edward James established an intentionally deceptive flows of funds to obscure from auditors and the FBG Debtors' creditors what were in reality the FBG Debtors' loan payments to Onset.  For example, Edward James and others under his direction utilized an entity (owned by Patrick James) "CI Supply" to issue invoices to the FBG Debtors, which would then make payments to the Carnaby Entities through a third-party payment processor, rather than to the relevant Carnaby Entity directly.  The FBG Debtors' personnel also were instructed by Edward James or his subordinates to never directly transfer the Company's funds to Onset.

94.     Through this manipulation of the corporate form, Edward James and Onset misused the FBG Debtors and Carnaby Entities and their illusory status as independent corporate actors to accomplish the scheme and injure the FBG Debtors and their creditors.

**C.     The Transaction Structure as Documented Was Used to Disguise On-Balance Debt Transactions of the FBG Debtors as Mere Arms' Length Inventory and Equipment Sales to the Carnaby Entities**

95.     Given that the FBG Debtors already had numerous creditors, and the assets in question were already encumbered by preexisting liens held by the ABL and Term Lenders that would have been senior to any Onset security interest, Onset and Edward James documented a

FBG_CH1_00097339

series of interdependent transactions: purported sale-leasebacks supposedly involving the FBG Debtors, the Carnaby Entities, and Onset (the "**Sale-Leaseback Onset Transactions**"). The Sale-Leaseback Onset Transactions, the Direct Leases and certain forbearance agreements (the "**Forbearance Agreements**"), which are discussed below, are referred to herein collectively as the "**Onset Transactions**."

96.     The Onset Transactions were not negotiated; rather, they were imposed by Edward James and Onset in furtherance of the scheme. The only party to have substantive communications with Onset about the proposed or actual transactions was Edward James. And Edward James only had such communications directly with Onset CEO Justin Nielsen or on occasion, Onset CFO Remington Atwood.

97.     Edward James directly and strictly policed the communications of the Debtors' other officers and employees' communications with Onset. On numerous occasions, Edward James specifically instructed Onset to exclude other officers or employees of the Company from communications regarding the transactions at issue. When communications between Onset and others associated with the Company occurred without his permission, Edward James reacted strongly. For instance, after Atwood had reached out to another employee of the Company regarding an inventory inspection to be conducted pursuant to the transactions at issue, Edward James told Nielsen and Atwood "ALL [such] communications [from Onset] go through me ALONE."

98.     Edward James also shut down any attempts by others to negotiate with Onset, including specifically for better terms than what Onset was offering. For example, when another officer of the FBG Debtors and the Carnaby Entities suggested pushing back on certain onerous terms in a draft agreement proposed by Onset, Edward James prevented such negotiation,

FBG_CH1_00097340

proclaiming that "we don't comment on Onset's documents." In other words, whatever terms Onset (and its secret partner, Edward James himself) demanded—no matter how outrageous—were imposed. Edward James also inexplicably permitted certain leases to automatically renew at great expense and for no economic benefit in spite of the urging of employees of the FBG Debtors.

99.     Further, upon information and belief, Onset conducted limited or no business diligence; it obtained no appraisals; it did not seek or obtain legal opinions as to the validity of the purported sales or lease transactions; and it did not engage external counsel to negotiate or draft documentation.

100.     Accordingly, the transactions at issue did not result from arms' length negotiations, nor from any meaningful negotiations whatsoever. Instead, Onset worked covertly with its co-investor Edward James to "initiate and structure[]" the transactions directly, *Onset Motion to Intervene*, Dkt. 72 at 4, via communications largely shielded from the FBG Debtors' other officers and employees.

101.     The documentation of the Sale-leaseback Onset Transactions described the following structure:

> **Step 1**: The Carnaby Entities would supposedly purchase PP&E or inventory from FBG Debtors using funds provided by Onset.
>
> **Step 2**: The Carnaby Entities would then supposedly sell that PP&E or inventory to Onset in exchange for the funds Onset had provided for the Carnaby Entities own supposed purchase at Step 1.
>
> **Step 3**: The Carnaby Entities would then supposedly lease that PP&E or inventory back from Onset in exchange for monthly payments, yet they had no means to make such payments, and the PP&E and inventory always remained with the FBG Debtors.
>
> **Step 4**: At the end of the lease term for nearly all of the leases, the Carnaby Entities had the option to either repurchase the PP&E or inventory for a nominal sum, renew the lease, or in some instances enter a new lease, but in reality only the FBG Debtors had the means or reason to exercise any such option.

19

FBG_CH1_00097341

102.    The Sale-leaseback Onset Transactions were governed by Master Lease Agreements (one for each Carnaby Entity), with subsequently entered Asset Purchase Agreements ("**APAs**"), which contemplated Step 1—the purported sale of the FBG Debtors' PP&E or inventory to the Carnaby Entities; and corresponding Assignment Agreements and Lease Schedules, which contemplated Steps 2 and 3, respectively—the purported sale by the Carnaby Entities to Onset of the PP&E or inventory in the corresponding APA, and the leaseback of that PP&E or inventory by the Carnaby Entities, with the FBG Debtors remaining entitled to continue to use the PP&E or inventory as before.   The Lease Schedules also contemplated Step 4—with nearly every lease (and all active leases) requiring that, at the end of the lease term, the Carnaby Entities repurchase the PP&E or inventory from Onset for a nominal price, renew the lease or, in some instances, enter a new lease.   The obligations of the Carnaby Entities were guaranteed by, among others, Viceroy Private Capital, LLC ("**Viceroy**") and First Brands Group Holdings LLC ("**FBG Holdings**"))—with the former also providing in 2025 a pledge of Viceroy's majority interest in FBG Holdings.

103.    After the Master Lease Agreements were executed in 2022, Onset and Edward James caused Debtors and Onset to enter approximately forty-nine Leases total.   Twenty-one of the purported sale-leasebacks involving Carnaby IV related to inventory and four related to PP&E; nine transactions involving Carnaby FA related to PP&E; and ten transactions involving Carnaby I related to inventory and five related to PP&E.   Of those forty-nine total Leases, twelve remained active as of the Petition Date, meaning that the thirty-seven remaining leases were inactive and had been paid in full to Onset.   Six of the active leases involve inventory and Carnaby IV; six involve PP&E and Carnaby FA.   Each of these active leases was entered within two years of Debtors' Petition Date, with the earliest executed on April 22, 2024.

FBG_CH1_00097342

**DEBTORS' EXHIBIT NO. 21**
**Page 20 of 101**

104. For each Lease, Onset filed UCC-1 financing statements against the Carnaby Entities on or about the date the Lease was executed. At no time did Onset file UCC-1 financing statements against any of the FBG Debtors. Upon information and belief, Onset and Edward James specifically discussed their decision not to file such statements against the FBG entities as early as 2022 and maintained that practice through September 2025. Beginning on or about September 13, 2025—just days before the Petition Date—Onset abruptly changed its practice. On that date, Onset caused UCC-1 financing statements to be filed for its benefit against FBG entities, including: First Brands Group, LLC; Horizon Global Company LLC; Horizon Global Americas, Inc.; Trico Technologies Corporation; Eagle Casting, LLC; Toledo Molding & Die LLC; and Walbro LLC. Each of these UCC-1 statements identifies either Carnaby Inventory IV, LLC or Carnaby FA, LLC as the secured party, but lists Onset's counsel as the filer and point of contact. Upon information and belief, Onset caused these UCC-1 statements to be filed in September 2025 without prior approval from either Carnaby entity and in direct contradiction of three years of past practice and agreement. Further, Onset filed these statements on the eve of bankruptcy solely to advance its own interests, deliberately avoiding listing itself as the secured party to obscure its failure to file UCC-1 statements since 2022.

**D.      The Onset Transactions Imposed Debt Obligations on the FBG Debtors**

105. Because they were all part of the same, integrated transaction, each set of APAs, Assignment Agreements, and Lease Schedules (collectively, and with accompanying documents, a single "**Lease**") were executed at or near the same time.

106. None of these transactions were the product of negotiations at arms' length or in good faith. Nor were they intended to effectuate legitimate, bona-fide transactions between the FBG Debtors and the Carnaby Entities, and between them and Onset. This is evident from the surrounding circumstances and numerous red flags evident on the face of the documentation itself.

21

FBG_CH1_00097343

107.    For example, with respect to the supposed sale of the Company's PP&E and inventory to the Carnaby Entities reflected in the APAs (Step 1 of the Sale-leaseback Onset Transactions), the APAs named specific FBG Debtors as sellers and required specific consideration to be paid to them by the Carnaby Entities to close the sales transactions.  Yet, the FBG Debtors either received no payment whatsoever or significantly less than that required under the APAs to effectuate the closing.

108.    Specifically, the purported "sellers" of PP&E to Carnaby FA received (or failed to receive) the below amounts rather than the prices set forth on the corresponding APA:

- Horizon Global Americas received $0—not $40 million (Schedule 3);

- Cardone Industries Inc. received $0—not $67 million (Schedule 4);

- Trico Wipers, Westfalia-Automotive, and Witter Brasov received $0—not $15 million (Schedule 5);

- Ultinon Motion Germany GmbH received $0—not $30 million (Schedule 7);

- Trico Tech, Walbro LLC, and Toledo Molding & Die, LLC received $0—not $165 million (Schedule 8);

- Brake Parts Inc. received approximately $10 million—not $70 million (Schedule 9).

109.    Likewise, the purported "sellers" of inventory to Carnaby IV received (or failed to receive) the below amounts rather than the prices set forth on the corresponding APA:

- Hopkins Manufacturing and Horizon Global Americas received only $0—not $40 million (Schedule 22);

- Champion Laboratories and Cardone Industries received only approximately $31 million—not $210 million (Schedule 23);

- Talleres Mecanicos Montserrat and Trico Componentes received $0—not $200 million (Schedule 24);

- FRAM Group Operations, LLC received approximately $14 million—not $85 million (Schedule 25);

FBG_CH1_00097344

- Subensambles Internacionales, Carter Fuel Systems, and Brake Parts Inc. received approximately $21 million—not $180 million (Schedule 26);

- Hopkins Manufacturing and Horizon Global Americas received $0—not $160 million (Schedule 27).

110.    The Carnaby IV Leases contemplated that Carnaby IV would enter into follow-on purchase agreements for it to buy replacement inventory from the FBG Debtors, and sale agreements for the FBG Debtors to buy additional inventory.  None of these agreements were entered into, nor was there other evidence showing that such transactions occurred.

111.    Next came the supposed sale and leaseback transactions between the Carnaby Entities and Onset.  Though styled as sale-leasebacks, the Leases bore all the hallmarks of loans. For example, they imposed an irrevocable obligation that the Carnaby entities make all payments due to Onset for the entire term of each Lease, with "early termination" permitted only in exchange for payment in full plus a five percent "prepayment penalty" (meaning Onset would have to be paid more to end the Lease early than to continue for the whole term).  There thus was no viable option to terminate the Leases early.

112.    The Leases also required that, at the end of each lease term, the Leases must either be renewed, begin a new lease in some instances, or a purchase of the PP&E or inventory from Onset must be made—meaning the repurchase of the PP&E and inventory or renewal of the leases for the remaining economic life of the goods.  The price to repurchase at the end of the term property was nominal (e.g.,  $101) in nearly all Leases (including all active Leases), and therefore repurchase was the only economically rational option.  Clearly, the FBG Debtors, as the sole beneficiaries and users of the PP&E, would purchase the equipment from Onset.  Documenting this reality, in the Third Forbearance Agreement, discussed below, entered into by the parties on June 30, 2025, requires the FBG Debtors (not the Carnaby entities) to "repurchase" the relevant PP&E and inventory by the end of each lease term.

FBG_CH1_00097345

**DEBTORS' EXHIBIT NO. 21**
**Page 23 of 101**

113.     At all times, the Carnaby Entities had only obligations, not assets, and were mere empty shells.  Indeed, notwithstanding the relevant FBG Debtors' supposed sale of the PP&E in question—and Carnaby FA's supposed lease of that same PP&E from Onset—the relevant FBG Debtors at all times continued to own, possess and use the PP&E.  This arrangement was required by various provisions of the Leases, without any corresponding requirement that the FBG Debtors remit to Carnaby FA payments for their possession and use of the PP&E.  In other words, Carnaby FA ostensibly borrowed money from Onset to pay the FBG Debtors for PP&E and then became responsible for repaying the loan even though it had no assets or liquidity.  On the face of the Onset-Edward James document structure, Carnaby FA was left with absolutely no means of generating revenue to make the payments it supposedly owed to Onset.

114.     Likewise, although the Carnaby IV Leases technically permitted Carnaby IV to sell the initial inventory it was supposedly leasing from Onset, Carnaby IV could not possibly generate sufficient revenue to pay Onset from such sales: As discussed below, the payments Carnaby IV owed Onset and Edward James under the Leases far exceeded the value of the inventory it was supposedly renting.  Accordingly, even if Carnaby IV were to sell this inventory, the proceeds of such sales could not possibly fund Carnaby IV's required payments.

115.     The Sale-leaseback Onset Transactions with Carnaby I involving PP&E and inventory suffered from the same defects.

116.     Thus, the terms and structure of the Sale-leaseback Onset Transactions themselves placed the Carnaby Entities irredeemably in the red, and incapable of paying Onset what it was owed.  That fact, the guarantees issued by various Debtors of the Carnaby Entities' obligations and various provisions of the Sale-leaseback Onset Transactions ensured the FBG Debtors would have no choice but to service the debt imposed on them by Onset and Edward James.

FBG_CH1_00097346

DEBTORS' EXHIBIT NO. 21
Page 24 of 101

117.    For example, the Sale-leaseback Onset Transactions featured draconian cross-default provisions in both the Master Lease Agreements and the Lease Schedules, under which, if either Carnaby Entity missed a single payment, Onset could take possession of all PP&E subject to the various Leases—which would only harm the FBG Debtors' operations.   The Leases expressly required the FBG Debtors to acknowledge Onset's ability to take away this business property.   Thus, the Sale-leaseback Onset Transactions imposed debt obligations on the FBG Debtors utilizing as collateral the FBG Debtors' inventory and PP&E, while intentionally concealing these facts from the FBG Debtors' lenders and other creditors.

118.    As the true borrowers, the FBG Debtors were forced to make hundreds of millions of dollars of payments to Onset (and Edward James) via the Carnaby Entities acting as mere conduits.   In fact, the Carnaby Entities were considered to be nothing more than "vendors" set up by Edward James to pass the FBG Debtors' payments to Onset without triggering FBG auditor or creditor scrutiny.

### E.    The Scheme Imposed Exorbitant Terms on the Debtors for Grossly Inadequate Value, with an Intent to Hinder, Delay or Defraud Creditors and While the Debtors Were (or Were Rendered) Insolvent

119.    Between approximately January 2022 to April 2025, the Sale-leaseback Onset Transactions involved more than forty-five separate integrated transactions that imposed more than $3.7 billion of obligations in exchange for financing worth no more than about $1.7 billion and resulting in fraudulent transfers of at least $2.3 billion in favor of Onset and its partner Edward James.   These obligations were imposed on the Debtors without negotiation, on excessive, wildly above-market terms, and in exchange for woefully insufficient value.   Indeed, most of the effective interest rates set by Onset and Edward James were in the high-double and triple digits (e.g., as high as nearly 200%).   This is in stark contrast to interest rates on similar ABL-type arrangements (including FBG's existing ABL facility) with interest rates closer to 6%.

FBG_CH1_00097347

**DEBTORS' EXHIBIT NO. 21**
**Page 25 of 101**

120. There are approximately thirty-seven purported sale-leaseback transactions for which Onset and Edward James have been fully paid according to their terms. At a minimum, Onset received transfers of at least about $700 million in cash in excess of any value it could possibly claim to have provided. Onset and Edward James, as well as Onset's other partners, received these transfers in bad faith and for no or less than reasonably equivalent value.

121. There are also approximately twelve purported sale-leaseback transactions for which Onset and Edward James have not been paid in full according to their terms. At a minimum, these transactions resulted in nearly $1.8 billion of fraudulent transfers and obligations incurred to Onset and its partners, which they received in bad faith and for no or less than reasonably equivalent value.

122. Furthermore, these figures do not account for the fact that Onset and Edward James intentionally imposed outsized financial obligations on the Debtors purportedly utilizing their inventory and PP&E for funds the Debtors did not need, receive or otherwise benefit from. These obligations also were incurred for the benefit of the other parties at the expense of the Debtors to generate still more outsized returns for Onset and Edward James.

123. As part of Onset's and Edward James' scheme, they caused three Forbearance Agreements to be executed shortly before the Plaintiffs filed for bankruptcy. At the time of the Forbearance Agreements, the Plaintiffs no longer had the cash to pay Onset (and its partner Edward James) $200 million ostensibly due each month. At the same time, however, the Plaintiffs had significant claims and causes of action against Onset and other grounds to successfully challenge any exercise of remedies or rights by Onset related to the Onset Transactions, including for all of the reasons described herein. Moreover, given the Plaintiffs' true financial condition (and ongoing

26

FBG_CH1_00097348

fraud), a short forbearance period had little to no value. Edward James, in furtherance of his scheme with Onset, plainly knew these facts. Onset knew or should have known them as well.

124. And while the Forbearance Agreements had no legitimate value to the Plaintiffs, they were incredibly valuable to Edward James and Onset. First, the Forbearance Agreements served to enable Onset, Edward James and other former executives to conceal their actions from creditors, customers, employees and other victims for a few months more. Second, the Forbearance Agreements could be used to show potential lenders or buyers who might become or remain interested in refinancing Onset's debt or otherwise providing the James' with the means of paying it. This directly benefited Onset and Edward James. Third, the Forbearance Agreements enabled Edward James and Onset to leverage what appeared to be negotiated agreements (which upon information and belief the Forbearance Agreements were not) and the appearance of consideration in the form of a short forbearance from exercising remedies (which as explained was of no legitimate value) to extract still more fraudulent transfers and obligations from the Plaintiffs for grossly inadequate consideration at a time when they were plainly insolvent.

125. The Forbearance Agreements include, among other things, the following fraudulently incurred transfers and obligations imposed on the relevant Plaintiffs by Edward James and Onset in furtherance of their scheme and not as a result of arms' length, good faith negotiations: (a) releases granted in favor of Onset (and secretly Edward James); (b) acknowledgements and assumptions of the risk; (c) massive additional fees and other payment obligations; (d) pledges of stock; (e) hundreds of millions of dollars of obligations ostensibly to purchase the Plaintiffs' own inventory and PP&E; (f) indemnities; (g) default remedies and (h) non-disparagement obligations owed to Onset (and secretly Edward James).

FBG_CH1_00097349

126.    Onset and its partners' fraudulent intent is clear from the facts.  Under the Onset Transactions, the obligations incurred and transfers made by the Debtors, including via the Carnaby Entities, to Onset and its partner and co-conspirator Edward James were for vastly less than reasonably equivalent value.  This is evidenced by triple digit interest rates and higher internal rates of return, and when compared to the Debtors' cost of capital in negotiated, arms' length transactions.

127.    Furthermore, the obligations incurred and transfers made to the Debtors, via the Carnaby Entities, were for the benefit of an insider, Edward James, who was a co-conspirator with, and joint-venturer and partner of, Onset.

128.    Upon information and belief, Edward James, in furtherance of its scheme with Onset, intentionally caused the Plaintiffs to incur excessive fees and interest costs on numerous occasions so that the profits could be reaped by Onset and Edward James.

129.    The obligations incurred and transfers made by the Debtors were actively and intentionally concealed by Edward James and Onset from lenders, creditors and auditors of the FBG Debtors.  Indeed, many of the transfers to Onset occurred at or near when First Brands Group incurred significant on balance sheet debt.  Documentation such as APAs between the FBG Debtors and the Carnaby Entities were intended by Edward James and Onset to appear to be arms' length transactions to purchase inventory and PP&E already subject to senior liens in favor of FBG lenders for fair market value, when the opposite was true.

130.    Documentation of asset transfers ostensibly between the Carnaby Entities and Onset, and leases masked massive loan obligations of the FBG Debtors.  The scheme also included a complex flow of funds intended to disguise transfers from the FBG Debtors to Onset via the Carnaby Entities.  Upon information and belief, Onset was aware of the lending and lien

FBG_CH1_00097350

restrictions in the ABL and Term Loan facilities, including restrictions on affiliate transactions involving inventory and PP&E for less than fair market value, yet Onset did not notify the lenders or seek to participate in intercreditor agreements, and it intentionally filed UCC-1 financing statements against the Carnaby Entities but not Onset's true borrower to conceal the facts from lenders and other creditors of the Debtors.

131.    Onset's bad faith and knowledge that the transfers were fraudulent is also evident by, among other things, its partnership with Edward James, the truly excessive rates of return it enjoyed, double pledging of assets, the process for entering into, and the nature of, each of the transactions, which was extremely unusual and outside of the ordinary course for legitimate lenders, and the obviously unsustainable debt burden it was imposing on the Plaintiffs.

132.    The Debtors' financial distress, and insolvency, during and as a result of the Onset Transactions were, upon information and belief, known to Onset since they began.  Under the literal terms of the Onset Transactions, for example, enormous, above-market financial obligations were imposed on the Carnaby Entities (and by extension, by virtue of guarantees, contractual obligation or practical reality, the Plaintiffs as a whole) that they could not possibly satisfy, e.g., servicing lease obligations for PP&E they neither owned nor benefited from and with no other means even suggested in the transaction documents to generate revenue, or servicing obligations for leasing inventory intended to be sold and replaced in the ordinary course without any means for doing so.  Onset also leveraged its secret partnership and business relationship with Edward James to impose on the Plaintiffs onerous "forbearance agreements" that increased their obligations to Onset by hundreds of millions of dollars in exchange for little or no value.

133.    The Debtors were insolvent at the time of, or were rendered insolvent by the Onset Transactions.  Indeed, the operating business was in fact losing money and not profitable.  And,

FBG_CH1_00097351

the Company's books and records indicate that the Company had inadequate capital to conduct its business and, accordingly, was insolvent prior to and as of the Petition Date.

134.    The Company was rendered insolvent well before the Petition Date and sustained itself only through a series of increasingly complex, fraudulent and intentionally deceptive off-balance sheet arrangements—including the Onset Transactions—which masked its solvency and prejudiced legitimate creditors.   Upon information and belief, the Company's actual financial condition demonstrates that it was insolvent well before the Petition Date and during the period in which the Onset Transactions occurred.

135.    For example, there were several wide-sweeping issues with the Company's accounting and business practices that obscured the true financial condition of the Company well before the Petition Date, and which indicate that the Company was insolvent at the time of—or rendered insolvent by—its transactions with Onset.  In addition to failing to disclose massive liabilities arising from the factoring fraud, the Company also systemically failed to accurately and completely report its liabilities.  As of the Petition Date, the Company carried more than $5 billion in off-balance sheet debt obligations.  Of this amount, approximately $2.3 billion arose from off-balance sheet financing through SPVs.  The Company also had approximately $2.3 billion in aggregate factoring liabilities and approximately $800 million in unsecured supply chain financing liabilities which were not recorded as liabilities on the Company's balance sheets.

136.    The Company's practices in incurring these obligations, and its wholesale failure to record them, predate the Petition Date by years.  The off-balance sheet financing transactions, factoring arrangements, and supply chain financing obligations should have been recognized as liabilities in the Company's books and records when the debt was actually incurred.  On information and belief, had these liabilities been properly accounted for, they would have

FBG_CH1_00097352

demonstrated that the Company was insolvent at the time of—or rendered insolvent by—the Onset Transactions.

137.    The Company also overstated the gross book value of its inventory, which improperly inflated the value of its assets.  Specifically, the Company failed to write down significant excess and obsolete inventory at multiple locations.  On information and belief, after accounting for this excess and obsolete inventory, the Company was undercapitalized and functionally insolvent at the time of—or rendered insolvent by—the Onset Transactions.

138.    At the same time, Onset received more than $1 billion from the insolvent Debtors in the year leading up to the Petition Date.  These payments include exorbitant and abusive fees and expenses imposed upon the Company by Edward James and Onset while the Company was insolvent and deepened such insolvency.  Each of these payments were on account of antecedent debt and exceed what Onset would have been entitled to in the Bankruptcy proceedings.

139.    The Onset Transactions constitute fraudulent transactions.  An illustrative list of the obligations incurred and transfers made to Onset by the Debtors for less than reasonably equivalent value as fraudulent transfers are set forth on Exhibit A hereto (the "**Onset Transaction Transfers**").  For the avoidance of doubt, the Onset Transaction Transfers include the Onset Transactions, and both obligations and monetary transfers, as well as transfers of property, including pursuant to the Direct Leases, and Sale-Leaseback Onset Transactions.

F.    **Onset's Financial Backers Participated in the Fraud and Received Proceeds of Onset's Fraudulent Conduct**

140.    Numerous other parties participated in Onset's fraud, investing alongside Edward James.  Those parties include entities owned by Onset executives, funds associated with Asilia, the Individual Onset Investors, and others.

FBG_CH1_00097353

141.     Those financial backers were aware, or should have been aware, of the involvement of Edward James.  Numerous agreements between the backers of various Onset loans were signed that included Edward James' entities Optimus and/or JCMC.  For example, Joshua Tree Holdings, JA Gardner Holdings, and Holt Investments signed an Intercreditor Agreement that included JCMC Investment Group, LLC (an Edward James entity): in the signature block for JCMC the signature "James" is clearly visible.  Joshua Tree Holdings and Nielsen Investments – both co-"investors" – were owned and controlled by Onset executives (former Onset president Scott Miller and Onset CEO James Nielsen, respectively).  JA Gardner Holdings and Holt Investments are owned by Jonathan Gardner, founder of Asilia.

142.     In another example, an Intercreditor Agreement dated August 25, 2023 was entered into by Onset, Asilia, JA Gardner, and Optimus.  Per the agreement, lessor Onset and lessee Carnaby IV adopted Lease Schedule No. 012 dated August 18, 2023, which relates to Master Lease Agreement OFI1445416 dated June 28, 2022, pursuant to which Onset agreed to purchase and lease to lessee certain property designated in the schedule for consideration of $50 million.  An Asilia affiliate (Asilia Special Opportunity I LLC) agreed to provide $35 million of the purchase price; JA Gardner, Optimus, and Onset itself only contributed $5 million each.

143.     For a similar Intercreditor Agreement dated November 4, 2024, "Onset" agreed to purchase and lease to lessee certain property for consideration of $210 million: Asilia provided $170 million, JA Gardner provided $25 million, Optimus provided $15 million.  **Onset provided $0 towards the purchase price.**

144.     The known parties that "invested" through Onset in loans that included Edward James as a co-investor are:

- Entities Affiliated with Onset Executives:
  - Joshua Tree Holdings

FBG_CH1_00097354

- o   Nielsen Investments
- Entities Affiliated with Asilia/Gardener:
  - o   JA Gardner Holdings
  - o   Holt Investments 201
  - o   Asilia Special Opportunity I
  - o   Asilia Special Opportunity III
- Entities Affiliated with Todd Pendersen:
  - o   Yuma III
  - o   Coral Dunes, LLC
  - o   Seddie LLC

**G.   Onset Induced Edward James to Violate the Debtors' LLC Agreements and Employment Agreements**

145.   Pursuant to his Employment Agreements, Edward James was required to serve the Debtors faithfully and to the best of his ability—not to saddle them with ruinous debts through loans with extreme above-market terms to benefit himself and Onset.

146.   Likewise, pursuant to the Debtors' LLC Agreements, Edward James owed fiduciary duties to the Company, including the implied covenant of good faith and fair dealing.  He was also forbidden from engaging in any transactions with the Company absent approval of "the Members holding a Majority in Interest" in the Debtors.  On information and belief, Edward James did not receive such approval before entering into any of the Onset Transactions.  On information and belief, Edward James also did not fully disclose the material terms of his self-interest in the Onset Transactions and the extent to which he colluded with Onset on structuring them to his and Onset's own benefit.

147.   Upon information and belief, Onset knew that, as Debtors' officer and manager, Edward James would have owed such standard duties to the Debtors, and that the Onset Transactions and personal investment in them was plainly violative of such duties.

33

FBG_CH1_00097355

148.     Onset induced Edward James to join and implement the scheme in violation of his obligations and duties.

## COUNT I

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a); Ohio Rev. Code Ann. §§ 1336.04(A)(1);**
**6 Del. Code § 1304(a)(1)**

149.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

150.     Upon information and belief, the Debtors' former management, including Patrick James and Edward James, conceived of and implemented a fraudulent scheme to conceal the true financial condition of the Debtors from lenders and customers. Specifically, the operating business was in fact not profitable and it was unable to generate sufficient cash flow from legitimate business operations to service its debts as they came due. The scheme was utilized to conceal these facts by funneling funds to winners while the losers would ultimately hold the bag when liquidity finally and inevitably ran out.

151.     Thus, under the scheme, the Debtors funneled money from new creditors to pay old creditors.

152.     Onset and Edward James, acting in concert and in furtherance of their scheme, effectuated the Onset Transaction Transfers with the intent to hinder, delay or defraud creditors of the Debtors.

153.     As a result, Onset obtained fraudulent transfers of more than $2.9 billion. An illustrative list of such transfers is set forth in Exhibit B.

154.     The Onset Transaction Transfers harmed creditors of the Debtors.

155.     The Debtors incurred, directly or indirectly, billions of dollars of obligations under the Onset Transaction Transfers in exchange for less than reasonably equivalent value.

FBG_CH1_00097356

156.     The Debtors also transferred, directly or indirectly, to Onset hundreds of millions of dollars more than the funds received by the Debtors as a result of the Onset Transaction Transfers.

157.     The relevant Debtors directly or indirectly incurred obligations and made transfers in connection with the Onset Transaction Transfers to Onset directly, or through agents, intermediaries or alter egos, including the Carnaby Entities.

158.     At all relevant times, Defendants acted in bad faith, including before and throughout the scheme and when it received the Onset Transaction Transfers for no or less than reasonably equivalent value.

159.     Each of the Onset Transaction Transfers, whether made directly by the FBG Debtors or indirectly through the Carnaby Entities, including but not limited to all obligations incurred, and transfers of inventory, PP&E and cash, should be avoided as fraudulent transfers, and recoverable from Onset in the full amount of the more than $2.9 billion transfers it received.

160.     The Debtors are therefore entitled to a judgment (1) avoiding the Onset Transaction Transfers under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

## COUNT II

**Constructive Fraudulent Transfer**
**Pursuant to 11 U.S.C. § 548(a)(1)(B), Ohio Rev. Code Ann. §§ 1336.04(A)(2),**
**6 Del. Code § 1304(a)(2)**

161.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

162.     The Onset Transaction Transfers were made for less than reasonably equivalent value.

35

FBG_CH1_00097357

163.    The Debtors incurred, directly or indirectly, billions of dollars of obligations to Onset in exchange for less than reasonably equivalent value.

164.    The FBG Debtors also transferred, directly or indirectly, to Onset hundreds of millions of dollars more than the funds received by the Debtors as a result of the Onset Transaction Transfers.

165.    The Onset Transaction Transfers harmed creditors of the Debtors.

166.    The relevant Debtors directly or indirectly incurred obligations and made transfers in connection with the Onset Transaction Transfers to Onset directly, or through agents, intermediaries or alter egos, including the Carnaby Entities.

167.    At the time of the Onset Transaction Transfers, the Debtors were insolvent, or were rendered insolvent as a result of the Onset Transaction Transfers.

168.    At all relevant times, Onset acted in bad faith before and throughout the scheme, including when it received the Onset Transaction Transfers for no or less than reasonably equivalent value.

169.    Each of the Onset Transaction Transfers, whether made directly by the FBG Debtors or indirectly through the Carnaby Entities, including but not limited to all obligations incurred, and transfers of inventory, PP&E and cash, should be avoided as constructive fraudulent transfers, and recoverable from Onset.

170.    Debtors are thus entitled to a judgment (1) avoiding the Onset Transaction Transfers under Section 548(a)(B) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

FBG_CH1_00097358

**DEBTORS' EXHIBIT NO. 21**
**Page 36 of 101**

## COUNT III

### Recovery Against Subsequent Transferees
### Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a)

171.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

172.    Each of the Onset Transaction Transfers are avoidable as actual or constructive fraudulent transfers as set forth herein.

173.    Between 2022 and the Petition Date, during the period of the avoidable Onset Transaction Transfers, Onset made millions of dollars of transfers to Edward James or his wholly controlled entities Optimus and JCMC, as well as to the other Onset Investors.

174.    Upon information and belief, Onset's payments to Edward James, Optimus, JCMC, and the other Onset Investors were funded with proceeds of the avoidable Onset Transaction Transfers.

175.    Edward James, directly or through his wholly controlled entities Optimus and JCMC, as well as the other Onset Investors, received these transfers in furtherance of the scheme, with knowledge that, at the time of the Onset Transaction Transfers, the Debtors were insolvent, or were rendered insolvent as a result of the Onset Transaction Transfers.

176.    At all relevant times, Edward James, Optimus, JCMC, and the other Onset Investors acted in bad faith before and throughout the scheme, including when receiving transfers from Onset which were funded by the Onset Transaction Transfers made for no or less than reasonably equivalent value.

177.    On information and belief, Edward James, Optimus, JCMC, and the other Onset Investors also received the distribution for no or inadequate value to Onset.

FBG_CH1_00097359

178.    All Onset Transaction Transfers, or their value, are avoidable by the Debtors as fraudulent transfers and should be recovered from Edward James, Optimus, JCMC, and the other Onset Investors as subsequent transferees pursuant to 11 U.S.C. §§ 544, 548, and 550.

## COUNT IV

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a); Ohio Rev. Code Ann. §**
**1336.04(A)(1); 6 Del. Code § 1304(a)(1)**

179.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

180.    Viceroy Private Capital, LLC and First Brands Group Holdings, LLC entered into Guaranty Agreements with Onset on June 28, 2022 to guarantee the payment and performance of all obligations incurred by Carnaby IV to Onset and, on October 24, 2023, First Brands Group Holdings, LLC, Viceroy Private Capital, LLC, Eagle Casting, LLC and Eagle Casting Holdings, LLC entered into Guarantee Agreements with Onset to guarantee the payment and performance of all obligations incurred by Carnaby FA to Onset (collectively, the "**Guarantors**" and the "**Guarantee Agreements**").

181.    Edward James and Onset caused the Guarantors to enter into the Guarantee Agreements in furtherance of the scheme with the intent to hinder, delay or defraud creditors of the Guarantors.

182.    The Guarantors incurred billions of dollars of guarantee obligations to Onset for no or less than reasonable equivalent value.

183.    The Onset Transaction Transfers and Guarantee Agreements harmed creditors of the Guarantors and other Debtors.

184.    Onset acted in bad faith before and throughout the scheme, including when in connection with the execution of the Guarantee Agreements.

38

FBG_CH1_00097360

185.     The obligations incurred pursuant to the Guarantee Agreements should be avoided as fraudulent transfers, and recoverable from Onset.

186.     The Debtors and Guarantors are therefore entitled to a judgment (1) avoiding the Guarantees under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

## COUNT V

**Constructive Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B); Ohio Rev. Code Ann. §§ 1336.04(A)(2); 6 Del. Code § 1304(a)(2)**

187.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

188.     Viceroy Private Capital, LLC and First Brands Group Holdings, LLC entered into Guaranty Agreements with Onset on June 28, 2022 to guarantee the payment and performance of all obligations incurred by Carnaby IV to Onset and, on October 24, 2023, First Brands Group Holdings, LLC, Viceroy Private Capital, LLC, Eagle Casting, LLC and Eagle Casting Holdings, LLC entered into Guarantee Agreements with Onset  to guarantee the payment and performance of all obligations incurred by Carnaby FA to Onset.

189.     The obligations undertaken by the Guarantors pursuant to the Guarantee Agreements were made for less than reasonably equivalent value.

190.     The Guarantors incurred billions of dollars of guarantee obligations to Onset for no or less than reasonably equivalent value.

191.     Onset Transaction Transfers and Guarantee Agreements harmed creditors of the Guarantors and other Debtors.

192.     At the time of, or as a result of, the execution of the Guarantees and Onset Transaction Transfers, the Guarantors were insolvent, or were rendered insolvent.

39

FBG_CH1_00097361

**DEBTORS' EXHIBIT NO. 21**
**Page 39 of 101**

193.     Onset acted in bad faith before and throughout the scheme, including when it obtained the Guarantees for no value or less than reasonably equivalent value.

194.     Each of the Guarantees should be avoided as constructive fraudulent transfers, and recoverable from Onset.

195.     The Debtors and Guarantors are therefore entitled to a judgment (1) avoiding the Guarantees under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551.

## COUNT VI

### Breach of LLC Agreement

196.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

197.     The LLC Agreements are valid contracts between Edward James and the Debtors.

198.     Pursuant to the LLC Agreements, Edward James, as a manager and officer of the Debtors, was bound by fiduciary and contractual duties, the implied covenant of good faith and fair dealing, and other standard terms prohibiting Edward James from engaging in the scheme. He was also forbidden from engaging in any transactions with the Company absent approval of "the Members holding a Majority in Interest" in the Debtors.

199.     By engaging in the scheme with Onset and entering into the Onset Transactions, Edward James breached the LLC Agreements and the obligations set forth therein.

200.     Debtors and their creditors suffered damages that were proximately caused by Edward James' breach of the LLC Agreements.

201.     Debtors are thus entitled to a judgment awarding damages against Edward James for breach of the LLC Agreements in an amount to be proven at trial.

FBG_CH1_00097362

**DEBTORS' EXHIBIT NO. 21**
**Page 40 of 101**

## COUNT VII

### Tortious Interference with LLC Agreement

202.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

203.     The LLC Agreements are valid contracts between Edward James and the Debtors.

204.     Onset knew or acted with reckless disregard of the facts that Edward James, as a manager and officer of the Debtors, would be bound by fiduciary and contractual duties, the implied covenant of good faith and fair dealing, and other standard terms prohibiting Edward James from engaging in the scheme.

205.     Onset knew or acted in reckless disregard of the facts that, as a manager and officer of the Debtors, Edward James at minimum had a standard and express duty of good faith and fair dealing and could therefore not engage in the scheme.

206.     By engaging in the scheme with Edward James and entering into the Onset Transactions, Onset knowingly, wrongfully, intentionally, and without justification caused Edward James to breach the LLC Agreements and the obligations set forth therein.

207.     Debtors and their creditors suffered damages that were proximately caused by Onset's tortious interference with the LLC Agreements.

208.     Debtors are thus entitled to a judgment awarding damages against Onset for tortious interference with the LLC Agreements in an amount to be proven at trial.

## COUNT VIII

### Breach of Employment Agreement

209.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

FBG_CH1_00097363

**DEBTORS' EXHIBIT NO. 21**
**Page 41 of 101**

210. The Employment Agreement is a valid contract between Edward James and First Brands Group LLC.

211. Edward James, pursuant to the Employment Agreement and as a manager and officer of the Company, was bound to serve the Company faithfully and to the best of his ability, and was thus prohibited from engaging in the scheme.

212. By engaging in the scheme with Onset and entering into the Onset Transactions, Edward James breached the Employment Agreement and the obligations set forth therein.

213. Debtors and their creditors suffered damages that were proximately caused by Edward James' breach of the Employment Agreement.

214. Debtors are thus entitled to a judgment awarding damages against Onset for tortious interference with the Employment Agreement in an amount to be proven at trial.

## COUNT IX

### Tortious Interference with Employment Agreement

215. The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

216. The Employment Agreement is a valid contract between Edward James and the Company.

217. Onset knew or acted with reckless disregard of the facts that Edward James, as a manager and officer of the Company, would be bound to serve the Company faithfully and to the best of his ability, and thus prohibited from engaging in the scheme.

218. By engaging in the scheme with James and entering into the Onset Transactions, Onset knowingly, wrongfully, intentionally, and without justification caused Edward James to breach the Employment Agreement and the obligations set forth therein.

FBG_CH1_00097364

219.    Debtors and their creditors suffered damages that were proximately caused by Onset's tortious interference with the Employment Agreement

220.    Debtors are thus entitled to a judgment awarding damages against Onset for tortious interference with the Employment Agreement in an amount to be proven at trial.

## COUNT X

### Breach of Fiduciary Duties under Delaware Law

221.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

222.    Edward James owed fiduciary duties to the Debtors, including the implied covenant of good faith and fair dealing.

223.    Edward James breached such duties to the Debtors in connection with and as a result of the scheme with Onset.

224.    Debtors and their creditors suffered damages that were proximately caused by Edward James' breach of his fiduciary duties.

225.    Debtors are thus entitled to a judgment awarding damages against Edward James for breach of fiduciary duties in an amount to be proven at trial.

## COUNT XI

### Aiding and Abetting Breach of Fiduciary Duties under Delaware Law

226.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

227.    Edward James owed fiduciary duties to the Debtors, including the implied covenant of good faith and fair dealing.

228.    Edward James breached such duties to the Debtors in connection with and as a result of the scheme.

43

FBG_CH1_00097365

229.    Onset knew or acted with reckless disregard of the facts that Edward James, as a manager and officer of the Debtors, owed them fiduciary duties including the implied covenant of good faith and fair dealing, and that Edward James' conduct would violate such duties.

230.    Onset aided and abetted the breach of fiduciary duties by Edward James by knowingly participating in the breach of such duties by engaging in the scheme with Edward James.

231.    Debtors and their creditors suffered damages that were proximately caused by Edward James' breach of his fiduciary duties.

232.    Debtors are thus entitled to a judgment awarding damages against Onset for aiding and abetting breach of fiduciary duties in an amount to be proven at trial.

## COUNT XII

**Recharacterization of the Sale-Leaseback Transactions as Disguised Financing Transactions Pursuant to 11 U.S.C. §§ 105(a); 28 U.S.C. § 2201; Bankruptcy Rule 7001(2)**

233.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

234.    The true purpose of the Sale-Leaseback Onset Transactions was for Onset (and Edward James) to loan billions of dollars to the Debtors secured by a lien in the Debtors' inventory and PP&E undetected by the Debtors' existing secured lenders and other creditors in furtherance of the scheme.

235.    The SPV sale and other agreements were not negotiated or intended to document genuine transactions, nor were they performed as documented.  In addition, the schedules of inventory included in these sale documents and that were provided to Onset were too general to identify specific items of inventory for sale or PP&E.  Nor did the FBG entities and Carnaby Entities execute subsequent purchase agreements for Carnaby IV to sell inventory or buy

FBG_CH1_00097366

replacement inventory, and Onset never received (or upon information and belief even asked for) any such agreement.  Consistent with the foregoing, the books and records of the FBG Debtors and when relevant the Carnaby Entities do not reflect true sales of inventory or PP&E.

236.    The purported sale-leaseback was not a true sale and lease.  For example, the consideration owed to Onset for use of the PP&E and inventory could not be terminated, as there was an excessive pre-payment penalty that exceeded the amounts under the normal schedule and the PP&E or inventory could be obtained for a nominal amount (about $101) at the end of the lease in nearly all instances.  If that option were not exercised, the lease could continue with another twelve months of payments such that it would be economically nonsensical not to exercise the repurchase option.  The transaction documents have all of the hallmarks of a disguised secured financing, not true sales and a lease. Onset further admitted in documentation that the true nature of its property interests were those of liens or security interests, not outright ownership as a lessor.

237.    The SPV transaction structure also rendered the Carnaby Entities without adequate means to perform their obligations, and they otherwise lacked adequate capitalization, independent management and employees or other means to perform under the Onset Transactions.

238.    The FBG Debtors' direct and/or indirect parents guaranteed the "lessee's" obligations,  the relevant FBG Debtors were direct parties to the Onset "lease" documentation, and were obligated to abide by their terms and permit Onset to obtain the inventory and PP&E used by the FBG Debtors in the ordinary course of their business in the event the Carnaby Entities did not pay Onset in full.

239.    The FBG Debtors received Onset funds in exchange for undertaking direct and indirect obligations to repay Onset a multiple of that amount each month according to the schedule,

FBG_CH1_00097367

and to retain the property they supposedly transferred for so long as the FBG Debtors repaid Onset in full.

240. The Debtors request a judgment recharacterizing the sale-leaseback transactions with Onset, including the Onset Sale-Leaseback Transactions (and including but not limited to the purported transfers of ownership of PP&E and inventory to Onset), to be mere loans by Onset secured by, at most, a lien in the property purportedly transferred to it.

## COUNT XIII

**Avoidance of Unperfected Security Interests in Inventory and PP&E
Pursuant to 11 U.S.C. §§ 544, 550, 551**

241. The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

242. Section 544(a)(1) affords the FBG Debtors the rights and powers of a hypothetical judicial lien creditor under applicable non-bankruptcy law.

243. To the extent the Onset Transactions are deemed to be secured financings to the FBG Debtors, the inventory or PP&E allegedly subject to security interests in favor of Onset under the Onset Transactions are owned by the FBG Debtors that executed the purported asset purchase agreements and related lease documentation.

244. These FBG Debtors filed chapter 11 petitions on or about September 28, 2025 (the **"Petition Date"**).

245. As of the Petition Date, Onset had not filed applicable UCC-1 financing statements in the applicable jurisdictions against any of the FBG Debtors.

246. To the extent the Onset Transactions are deemed to be secured financings to the FBG Debtors, Onset's alleged security interests were unperfected as of the Petition Date.

46

FBG_CH1_00097368

247.     As a result of such lack of perfection, Onsets purported liens are subordinate to the rights of a judicial lien creditor under applicable law as of the Petition Date.

248.     To the extent the Onset Transactions are deemed to be secured financings to the FBG Debtors, pursuant to section 544(a)(1) of the Bankruptcy Code, each applicable FBG Debtors, standing in the shoes of a hypothetical judicial lien creditor as of the Petition Date, may avoid any lien or transfer that is voidable by such a creditor, including any liens asserted by Onset.

249.     Pursuant to Bankruptcy Code sections 544(a) and 551, to the extent the Onset Transactions are deemed to be secured financings to the FBG Debtors, the FBG Debtors are entitled to a judgment (i) disallowing any Onset claim asserting any unperfected security interests against the inventory and PP&E or proceeds thereof, and (ii) avoiding and recovering for the benefit of the FBG Debtors pursuant to Bankruptcy Code section 550, and/or automatically preserving for the benefit of the FBG Debtors' estates pursuant to Bankruptcy Code section 551, any such unperfected security interests.

## COUNT XIV

### Declaratory Judgment
### Pursuant to 28 U.S.C. § 2201
### *Onset Has No Property Interest in Replacement Inventory*

250.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

251.     Only one asset purchase agreement per lease schedule was executed between Carnaby IV and the relevant FBG Debtor, and the identified inventory attached to that asset purchase agreement (the "**Initial Inventory**") did not include after acquired inventory.

252.     As the Initial Inventory has been sold in the ordinary course of business, the applicable FBG Debtors purchased and obtained title to new inventory to replace each item of Initial Inventory (the "**Replacement Inventory**").

FBG_CH1_00097369

253.     The FBG Debtors paid for and acquired the Replacement Inventory, and have not transferred or assigned the Replacement Inventory to any other party, other than in the ordinary course of business as sales to the third-party customers.

254.     Therefore, Onset never obtained a property interest in the Replacement Inventory.

255.     The Debtors therefore request a declaratory judgment that Onset does not have a property interest in the Replacement Inventory.

## COUNT XV

**Declaratory Judgment**
**Pursuant to 28 U.S.C. § 2201**
*Any Security Interest of Onset is Subordinate to the ABL and Term Loan Lenders' Liens*

256.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

257.     The ABL and Term Loan Lenders were granted perfected liens ("ABL/Term Loan Liens") in the FBG Debtors' PP&E and inventory located in the United States prior to any such purported liens or property interests being granted to Onset.

258.     The ABL/Term Loan Liens could only be released under two conditions: if the collateral was purchased for fair market value or if certain "Payment Conditions" were satisfied.

259.     The purported sellers of the PP&E and inventory to the Carnaby Entities received either no or insufficient value for the sale of the ABL and Term Loan Lenders' collateral, and for less than the fair market value.

260.     Additionally, the Payment Conditions were not satisfied to release the ABL/Term Loan Liens absent sale for fair market value.

261.     Any property or security interest held by Onset in PP&E or inventory is subject to the prior and senior liens under the ABL/Term Loan Liens.

FBG_CH1_00097370

262.   The Debtors request a declaratory judgment that any security interest held by Onset in PP&E or inventory is subordinate to the ABL/Term Loan Lenders' liens in the same.

## COUNT XVI

**Declaratory Judgment**
**Pursuant to 28 U.S.C. § 2201**
*The Maquiladoras Entities that Purportedly Assigned Inventory and PP&E to Onset Did Not Have Legal or Equitable Title to Such Property, and Accordingly Did Not Transfer Any Legal or Equitable Interest Directly or Indirectly to Onset*

263.   Debtor Brake Parts Inc LLC ("**BPI**") and Debtor Trico Technologies Corporation and Trico Products LLC (collectively "**Trico**") are parties to certain manufacturing agreements (the "Manufacturing Agreements") with certain Mexican manufacturers, Talleres Mecanicos Montserrat, S.A. DE C.V., Trico Componentes, S.A. DE C.V., and Subensambles Internacionales, S. DE. R.L. C.V (collectively the "Maquiladoras").

264.   Pursuant to the Manufacturing Agreements, BPI and Trico provide certain materials—including raw materials, components, subassemblies, and supplies, on consignment, under gratuitous bailment.

265.   At no time do the Maquiladora entities own or otherwise have title to the inventory provided by BPI or Trico.

266.   Onset has asserted an interest in inventory located at three Maquiladoras locations—Trico Inventory in Matamoros, Mexico; Trico Inventory in Juarez, Mexico; and Trico Inventory in Brownsville, Texas.

267.   At no time did the Maquiladoras entities hold title to the inventory located at these locations.

268.   Onset and Edward James caused the Maquiladoras entities to enter into various transactions as part of the scheme in which they purported to transfer certain inventory.

FBG_CH1_00097371

269. The Debtors request a declaratory judgment that the Maquiladoras entities that purportedly assigned inventory and PP&E to Onset did not have legal or equitable title to such property, and accordingly did not transfer any legal or equitable interest directly or indirectly to Onset.

## COUNT XVII

**Declaratory Judgment**
**Pursuant to 28 U.S.C. § 2201, 11 U.S.C. §§ 502, 506(a)**
*The Value of Onset's Purported Collateral Is Materially Less Than Its Asserted Claims*

270. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

271. To the extent Onset has any security interest in PP&E or inventory, the amount of Onset's claim exceeds the value of such property.

272. Accordingly, Onset holds at best a substantial deficiency claim and does not hold a valid fully secured claim against the Debtors pursuant to section 506(a) of the Bankruptcy Code.

273. Debtors request a judgment of this Court declaring the value of Onset's purported secured claim is materially less than the amount of its claim and therefore it does not hold a fully secured claim against the Debtors estate within the meaning of section 506(a) of the Bankruptcy Code, and determine the extent of Onset's secured claim, if any.

## COUNT XVIII

**Preferential Transfer**
**Pursuant to 11 U.S.C. §§ 547(b), 550(a)**

274. The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

275. Viceroy pledged its majority interest in FBG Holdings to Onset on or about June 30, 2025.

FBG_CH1_00097372

276.     Onset filed its first UCC statement against Viceroy relating to the pledge of its interest in FBG Holdings on September 12, 2025.

277.     Viceroy filed its chapter 11 petition on September 28, 2025.

278.     Therefore, Onset attempted to perfect its security interest in Viceroy's pledge of its interest in FBG Holdings during the 90 days preceding Viceroy's petition date.

279.     Viceroy was insolvent at the time Onset filed the UCC statement relating to Viceroy's pledge of its interest in FBG Holdings.

280.     Onset sought to perfect its interest in the pledge purely on account of antecedent debt in the form of the Viceroy guarantee, and Viceroy received no value in exchange for Onset's purported perfection of its security interest.

281.     In a liquidation under chapter 7, Onset would benefit from holding a perfected security interest in Viceroy's interest in FBG Holdings as it would be entitled to the value of the equity interest ahead of unsecured creditors whereas Onset would otherwise be an unsecured creditor at Viceroy and would share ratably in the value of the equity interest with other unsecured creditors, including the DIP Lenders.

282.     The Debtors and Viceroy request a judgment (1) avoiding Onset's attempted perfection of its security interest in Viceroy's pledge of its interest in FBG Holdings pursuant to Section 547(b), and (2) recovering and preserving such avoidance under Sections 550 and 551.

### COUNT XIX

**Preferential Transfer**
**Pursuant to 11 U.S.C. §§ 547(b), 550(a)**

283.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

FBG_CH1_00097373

284.   The Debtors, directly or through the Carnaby Entities, made cash transfers to Onset amounting to approximately $1 billion on or within one year of the Petition Date, and more than $46 million of which was transferred on or within 90 days of the Petition Date.

285.   During the entirety of the year preceding the Petition Date, Onset was engaged in a financial partnership with Edward James, by which Edward James and Onset together shared the profits of the scheme.

286.   Onset entered into this financial partnership knowing Edward James was a statutory insider of the Debtors.

287.   Onset's close financial partnership with the statutory insider overseeing the scheme, in direct conflict with the Debtors interests, made it clear and obvious that Onset could not engage in arms-length transactions with the FBG Debtors, and certainly not in arms-length transactions involving Onset's financial partner, Edward James.

288.   Onset's relationship with Edward James, which included Onset sharing the profits of the joint scheme with Edward James, allowed Onset to influence and control the financial decisions of the Debtors to cause the Debtors to agree to predatory loan terms and to conceal those loans from the FBG Debtors' other creditors.

289.   Onset's collusion with Edward James also afforded Onset access to inside information which it could use to its advantage to obtain the predatory terms pursuant to which the Debtors made transfers to Onset during the year prior to the Petition Date, to the detriment of the Debtors and their creditors.

290.   Onset's close partnership with Edward James qualifies it as an insider, necessitating a greater degree of scrutiny of its transactions with the FBG Debtors which were, by definition, not conducted at arms-length.

FBG_CH1_00097374

291. Onset's relationship with Edward James and the one-sided nature of the transactions with Onset based on terms wholly devoid of rational market influence exemplify Onset's insider status and that the transfers the Debtors made to Onset in the one year prior to the Petition Date were not made at arms-length.

292. These transfers were made to Onset during the year preceding the Petition Date while the Debtors were insolvent.

293. The Debtors made these transfers purely on account of antecedent debt owing to Onset under the Leases.

294. The Debtors received no or insufficient value in exchange for the transfers made to Onset.

295. The transfers enabled Onset to receive more than they would receive if (a) the Debtors' case was a case under chapter 7, (b) the transfers had not been made, and (c) Onset received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

296. The Debtors therefore request a judgment (1) avoiding the transfers amounting to $1 billion made to Onset on or within the year prior to the Petition Date (2) recovering and preserving such avoidance under Sections 550 and 551.

## COUNT XX

### Equitable Subordination
### Pursuant to 11 U.S.C. § 510

297. The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

298. Onset engaged in inequitable conduct in connection with its participation in the scheme with Edward James, and in connection with the Onset Transaction Transfers.

53

FBG_CH1_00097375

**DEBTORS' EXHIBIT NO. 21**
**Page 53 of 101**

299.     Onset's inequitable conduct injured the creditors of the Debtors as Onset sought to obtain property interests free and clear of pre-existing liens, imposed billions of dollars of liabilities on the Debtors and drained them of liquidity and dramatically weakened their value and viability.

300.     By virtue of the scheme and Onset Transaction Transfers, Onset has gained an unfair advantage as it claims the Debtors transferred inventory and PP&E free and clear of liens to the Carnaby Entities and then to Onset, asserts billions of dollars of guarantee and other claims against certain Debtors and/or Viceroy and has obtained or will obtain a greater recovery of assets than it would have but for the scheme.

301.     Onset did not act in good faith and participated in the scheme with its co-conspirator and partner, Edward James, an insider of the Debtors.

302.     Onset's claims against the Debtors should be equitably subordinated to all other creditors.

## COUNT XXI

### Unjust Enrichment

303.     The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

304.     Onset was enriched and received economic benefits from the Debtors including, but not limited to, through the receipt of funds and purported transfer of interests in PP&E and inventory from Debtors via the Onset Transactions.

305.     Onset had knowledge that it was so enriched and received such benefits from the Debtors.

FBG_CH1_00097376

DEBTORS' EXHIBIT NO. 21
Page 54 of 101

306.    Onset has retained those benefits—to which it has no lawful claim or justification and for which the Debtors have received no reciprocal benefit—to the detriment of the Debtors and their Creditors.

307.    The Debtors suffered financial losses as a result of the Onset Transactions. Among other losses, the Debtors did not receive reasonably equivalent value for the Onset Transactions, and, as a result of the Onset Transactions, the Debtors were left burdened with liabilities without corresponding assets or value.  There is a close and proximate relationship between Onset's enrichment and the Debtors' losses, as Onset conspired with Edward James to siphon funds away from the Debtors to themselves.

308.    The Debtors conferred a benefit in the form of their funds and purportedly interests in their PP&E and inventory, Onset accepted that benefit, and Onset's continued retention of that benefit would be inequitable under the circumstances.

309.    Equity and good conscience will not permit Onset to retain the benefit they wrongfully obtained at the Debtors' (and their creditors) expense. Legal remedies are inadequate to the extent that the relief required is restitutionary and equitable in nature, including the recovery of specific, identifiable funds or assets traceable to Onset's unjust enrichment.

310.    Accordingly, the Debtors are entitled to judgment for restitution in the amount of the benefits unjustly obtained.

## COUNT XXII

**Disallowance of Claims**
**Pursuant to 11 U.S.C. § 502(d)**

311.    The Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

FBG_CH1_00097377

**DEBTORS' EXHIBIT NO. 21**
**Page 55 of 101**

312.     Onset was the initial transferee, the immediate or mediate transferee of such initial transferee, or the person for whose benefit each avoidable transfer was made that is alleged in this Complaint.

313.     The transfers alleged herein are avoidable pursuant to Sections 544, 547, and 548.

314.     The amounts transferred are recoverable pursuant to Section 550.

315.     Onset has not paid the amount of the avoidable transfers, or turned over such property to the Debtors, for which Onset is liable under section 550.

316.     The Debtors are thus entitled to a judgment pursuant to Section 502(d) that any and all claims of Onset and/or its assignee, against the Debtors' chapter 11 estates must be disallowed until such time as Onset pays to Debtors all amounts sought herein.

**Requested Relief**

The Debtors and the Guarantors request that this Court enter a judgment in their favor and against the Defendants as follows:

1.     a judgment (1) avoiding the Onset Transaction Transfers under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 from initial and subsequent transferees;

2.     a judgment (1) avoiding the fraudulent transfer and obligations incurred under Section 548(a)(B) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 from initial and subsequent transferees;

3.     a judgment awarding damages against Edward James for breach of the LLC Agreements in an amount to be proven at trial;

4.     a judgment (1) avoiding the Guarantees under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551;

5.     a judgment awarding damages against Onset for tortious interference with the LLC Agreements in an amount to be proven at trial;

6.     a judgment awarding damages against Edward James for breach of Employment Agreement in an amount to be proven at trial;

FBG_CH1_00097378

7.    a judgment awarding damages against Onset for tortious interference with the Employment Agreement in an amount to be proven at trial;

8.    a judgment awarding damages against Edward James for breach of fiduciary duties in an amount to be proven at trial;

9.    a judgment awarding damages against Onset for aiding and abetting breach of fiduciary duties in an amount to be proven at trial;

10.   a judgment recharacterizing or unwinding the Onset Transactions to be loans made by Onset;

11.   a judgment (1) avoiding Onset's attempted perfection of a security interest in the FBG Debtors inventory and PP&E pursuant to Section 547(b), and (2) recovering and preserving such avoidance under Sections 550 and 551;

12.   a declaratory judgment that Onset does not have a property interest in the Replacement Inventory;

13.   a declaratory judgment that any security interest held by Onset in PP&E or inventory is subordinate to the ABL/Term Loan Lenders' liens in the same;

14.   a declaratory judgment that the Maquiladoras entities that purportedly sold inventory and PP&E to Onset did not have legal or equitable title to such property, and accordingly did not transfer any legal or equitable interest directly or indirectly to Onset;

15.   a judgment of this Court declaring the value of Onset's purported secured claim is materially less than the amount of its claim and therefore it does not hold a fully secured claim against the Debtors' estates within the meaning of section 506(a) of the Bankruptcy Code, and determining the extent of Onset's secured claim, if any;

16.   a judgment (1) avoiding Onset's attempted perfection of its security interest in Viceroy's pledge of its interest in FBG Holdings pursuant to Section 547(b), and (2) recovering and preserving such avoidance under Sections 550 and 551;

17.   a judgment (1) avoiding preferential transfers in excess of $1 billion made to the Defendants on or within the one year prior to the Petition Date (2) recovering and preserving such avoidance under Sections 550 and 551;

18.   a judgment equitably subordinating Onset's claims against the Debtors to all other creditors;

19.   a judgment for restitution in the amount of the benefits unjustly obtained;

20.   a judgment pursuant to Section 502(d) that any and all claims of Onset and/or its assignee, against the Debtors' chapter 11 estates must be disallowed until such time as Onset pays to Debtors all amounts sought herein;

FBG_CH1_00097379

**DEBTORS' EXHIBIT NO. 21**
**Page 57 of 101**

21.     grant such other relief as the Court may deem just and proper.

FBG_CH1_00097380

Respectfully submitted on the 9th day of January, 2026.

Houston, Texas

　　　　　　　　　　　　　　　　　_/s/  Clifford W. Carlson_
　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　Gabriel A. Morgan (24125891)
　　　　　　　　　　　　　　　　　Clifford W. Carlson (24090024)
　　　　　　　　　　　　　　　　　700 Louisiana Street, Suite 3700
　　　　　　　　　　　　　　　　　Houston, Texas 77002
　　　　　　　　　　　　　　　　　Telephone:  (713) 546-5000
　　　　　　　　　　　　　　　　　Facsimile:  (713) 224-9511
　　　　　　　　　　　　　　　　　Email:  gabriel.morgan@weil.com
　　　　　　　　　　　　　　　　　　　　　clifford.carlson@weil.com

　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　　Matthew S. Barr (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　Sunny Singh (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　Robert S. Berezin (admitted _pro hac vice_)
　　　　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　　　　New York, New York 10153
　　　　　　　　　　　　　　　　　Telephone:  (212) 310-8000
　　　　　　　　　　　　　　　　　Facsimile:  (212) 310-8007
　　　　　　　　　　　　　　　　　Email:  matt.barr@weil.com
　　　　　　　　　　　　　　　　　　　　　sunny.singh@weil.com
　　　　　　　　　　　　　　　　　　　　　robert.berezin@weil.com

　　　　　　　　　　　　　　　　　_Attorneys for Debtors_
　　　　　　　　　　　　　　　　　_and Debtors in Possession_

FBG_CH1_00097381

**DEBTORS' EXHIBIT NO. 21**
**Page 59 of 101**

# EXHIBIT A

FBG_CH1_00097382

Illustrative Fraudulent Transfers To Onset

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory I, LLC | Master Lease Agreement No. OFI1445408 | | Onset | 1/19/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01A | *Property cost:* $10,000,000 <br><br> *Monthly rental:* $451,800 <br><br> *Monthly lease rate factor*: 0.04518 <br><br> *Disbursement*: $9,900,000 | Onset | 1/19/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01B | *Property cost:* $15,000,000 <br><br> *Monthly rental:* $677,700 <br><br> *Monthly lease rate factor*: 0.04518 <br><br> *Disbursement*: $14,850,000 | Onset | 1/19/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01C | *Property cost:* 5,000,000 <br><br> *Monthly rental:* $225,900 <br><br> *Monthly lease rate factor*: 0.04518 | Onset | 2/7/2022 |

---

[1] Carnaby Inventory I, LLC, Carnaby Inventory IV, LLC or Carnaby FA were alter egos and/or agents of First Brands Group, LLC in making each transfer.

FBG_CH1_00097383

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| | | *Disbursement*: $4,950,000 | | |
| Carnaby Inventory I, LLC | Lease Schedule No. 01D | *Property cost:* $5,000,000<br><br>*Monthly rental:* $225,900<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $4,950,000 | Onset | 2/7/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01E | *Property cost:* $5,000,000<br><br>*Monthly rental:* $225,900<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $4,950,000 | Onset | 3/8/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01F | *Property cost:* $5,000,000<br><br>*Monthly rental:* $225,900<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $4,950,000 | Onset | 3/8/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01G | *Property cost:* $2,500,000<br><br>*Monthly rental:* $112,950<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $2,475,000 | Onset | 3/21/2022 |

2

FBG_CH1_00097384

**DEBTORS' EXHIBIT NO. 21**
**Page 62 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory I, LLC | Lease Schedule No. 01H | *Property cost:* $2,500,000<br><br>*Monthly rental:* $112,950<br><br>*Monthly lease rate factor:* 0.04518<br><br>*Disbursement:* $4,950,000 | Onset | 3/21/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01I | *Property cost:* $2,500,000<br><br>*Monthly rental:* $112,950<br><br>*Monthly lease rate factor:* 0.04518<br><br>*Disbursement:* $2,475,000 | Onset | 3/21/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01J | *Property cost:* $2,500,000<br><br>*Monthly rental:* $112,950<br><br>*Monthly lease rate factor:* 0.04518<br><br>*Disbursement:* $2,475,000 | Onset | 3/21/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01K | *Property cost:* $10,000,000<br><br>*Monthly rental:* $451,800<br><br>*Monthly lease rate factor:* 0.04518<br><br>*Disbursement:* $9,900,000 | Onset | 3/21/2022 |

FBG_CH1_00097385

Case 25-90399   Document 1255-1   Filed in TXSB on 01/09/26   Page 5 of 27

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory I, LLC | Lease Schedule No. 01L | *Property cost:* $8,000,000<br><br>*Monthly rental:* $361,440<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $7,920,000 | Onset | 5/10/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01M | *Property cost:* $12,000,000<br><br>*Monthly rental:* $542,160<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $11,880,000 | Onset | 5/10/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01N | *Property cost:* $5,000,000<br><br>*Monthly rental:* $225,900<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $4,950,000 | Onset | 6/14/2022 |
| Carnaby Inventory I, LLC | Lease Schedule No. 01O | *Property cost:* $5,000,000<br><br>*Monthly rental:* $225,900<br><br>*Monthly lease rate factor*: 0.04518<br><br>*Disbursement*: $4,950,000 | Onset | 6/14/2022 |

4

FBG_CH1_00097386

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory I, LLC[2] | Cash Transfers | $141,658,890.50 | Onset | 3/1/2022-1/8/2025 |
| Carnaby Capital Holdings, LLC (for Carnaby Inventory I, LLC Master) | Guaranty Agreement | | Onset | 1/19/2022 |
| First Brands Group Holdings, LLC (for Carnaby Inventory I, LLC Master) | Guaranty Agreement | | Onset | 1/19/2022 |
| Viceroy Private Capital, LLC (for Carnaby Inventory I, LLC Master) | Guaranty Agreement | | Onset | 1/19/2022 |
| Carnaby Inventory Holdings I, LLC (for Carnaby Inventory I, LLC Master) | Guaranty Agreement | | Onset | 1/19/2022 |
| Carnaby Capital, LLC (for Carnaby Inventory I, LLC Master) | Guaranty Agreement | | Onset | 1/19/2022 |

---

[2] Further details concerning these transfers are provided in Exhibit B to the Complaint.

5

FBG_CH1_00097387

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby FA, LLC | Master Lease Agreement No. OFI1545465 | | Onset | 10/24/2023 |
| Carnaby FA, LLC | Lease Schedule No. 001 | *Property cost:* $95,000,000<br><br>*Monthly rental:* $10,017,750<br><br>*Monthly lease rate factor*: 0.10545<br><br>*Disbursement*: $91,200,000 | Onset | 10/24/2023 |
| Carnaby FA, LLC | Lease Schedule No. 002 | *Property cost:* $12,400,000<br><br>*Monthly rental:* $1,426,000<br><br>*Monthly lease rate factor*: 0.11500<br><br>*Disbursement*: $11,904,000 | Onset | 12/11/2023 |
| Carnaby FA, LLC | Lease Schedule No. 003 | *Property cost:* $40,000,000<br><br>*Monthly rental:*<br>Months 1-6: $1,333,200<br>Months 7-36: $1,864,400<br><br>*Monthly lease rate factor*:<br>Months 1-6: .03333<br>Months 7-36: .04661<br><br>*Disbursement*: $38,400,000 | Onset | 4/22/2024 |
| Carnaby FA, LLC | Lease Schedule No. 004 | *Property cost:* $67,000,000<br><br>*Monthly rental:*<br>Months 1-6: $2,333,110<br>Months 7-36: $3,122,870 | Onset | 4/22/2024 |

FBG_CH1_00097388

**DEBTORS' EXHIBIT NO. 21**
**Page 66 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| | | *Monthly lease rate factor*: Months 1-6: .03333 Months 7-36: .04661<br><br>*Disbursement*: $64,320,000 | | |
| Carnaby FA, LLC | Lease Schedule No. 005 | *Property cost*: $15,000,000<br><br>*Monthly rental*: $1,166,700<br><br>*Monthly lease rate factor*: 0.7778<br><br>*Disbursement*: $14,400,000 | Onset | 6/18/2024 |
| Carnaby FA, LLC | Lease Schedule No. 006 | *Property cost*: $40,000,000<br><br>*Monthly rental*: Months 1-5: $8,000,000 Month 6: $6,666,800 Month 7: $4,000,000<br><br>*Monthly lease rate factor*: Months 1-5: .20000 Month 6: .16667 Month 7: .10000<br><br>*Disbursement*: $38,400,000 | Onset | 8/12/2024 |
| Carnaby FA, LLC | Lease Schedule No. 007 | *Property cost*: $35,000,000<br><br>*Monthly rental*: Months 1-5: $7,000,000 Month 6: $5,833,450 Month 7: $3,500,000<br><br>*Monthly lease rate factor*: Months 1-5: .20000 Month 6: .16667 Month 7: .10000<br><br>*Disbursement*: $33,600,000 | Onset | 10/3/2024 |

7

FBG_CH1_00097389

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby FA, LLC | Lease Schedule No. 008 | *Property cost:* $165,000,000<br><br>*Monthly rental:* $18,562,500<br><br>*Monthly lease rate factor*: 0.11250<br><br>*Disbursement*: $158,400,000 | Onset | 11/27/2024 |
| Carnaby FA, LLC | Lease Schedule No. 009 | *Property cost:* $70,000,000<br><br>*Monthly rental:* $16,916,900<br><br>*Monthly lease rate factor*: 0.24167<br><br>*Disbursement*: $67,200,000 | Onset | 4/7/2025 |
| Carnaby FA, LLC | Cash Transfers | $428,532,089.17 | Onset | 11/1/2023-4/3/2025 |
| Carnaby Capital Holdings, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| Viceroy Private Capital, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| First Brands Group Holdings, LLC (for Carnaby | Guaranty Agreement | | Onset | 10/24/2023 |

8

FBG_CH1_00097390

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| FA, LLC Master) | | | | |
| Carnaby Capital, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| Carnaby FA Holdings, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| Eagle Casting Holdings, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| Eagle Castings, LLC (for Carnaby FA, LLC Master) | Guaranty Agreement | | Onset | 10/24/2023 |
| Carnaby Inventory IV, LLC | Master Lease Agreement No. OFI1445416 | | Onset | 6/28/2022 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 001 | *Property cost:* $20,000,000 <br><br> *Monthly rental:* $779,800 <br><br> *Monthly lease rate factor:* .03899 <br><br> *Disbursement:* $19,800,000 | Onset | 6/28/2022 |

9

FBG_CH1_00097391

**DEBTORS' EXHIBIT NO. 21**
**Page 69 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory IV, LLC | Lease Schedule No. 002 | *Property cost:* $20,000,000<br><br>*Monthly rental:* $779,800<br><br>*Monthly lease rate factor:* .03899<br><br>*Disbursement*: $19,800,000 | Onset | 7/27/2022 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 003 | *Property cost:* $50,000,000<br><br>*Monthly rental:* Months 1-3: $708,500 Month 4-6: $22,500,000<br><br>*Monthly lease rate factor:* Months 1-3: .01417 Months 4-6: .45000<br><br>*Disbursement*: $49,500,000 | Onset | 9/20/2022 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 004 | *Property cost:* $25,000,000<br><br>*Monthly rental:* $11,250,000<br><br>*Monthly lease rate factor:* .4500<br><br>*Disbursement*: $24,700,000 | Onset | 12/1/2022 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 005 | *Property cost:* $25,000,000<br><br>*Monthly rental:* $1,743,750<br><br>*Monthly lease rate factor:* .06975<br><br>*Disbursement*: $24,700,000 | Onset | 1/23/2023 |

FBG_CH1_00097392

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory IV, LLC | Lease Schedule No. 006 | *Property cost:* $70,000,000<br><br>*Monthly rental:*<br>Month 1: $10,000,000<br>Month 2-5: $21,125,000<br><br>*Monthly lease rate factor:*<br>Month 1: .14286<br>Months 2-5: .301786<br><br>*Disbursement*: $69,300,000 | Onset | 2/13/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 007 | *Property cost:* $30,000,000<br><br>*Monthly rental:*<br>Month 1-2: $3,300,000<br>Month 3-6: $8,850,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $28,800,000 | Onset | 4/11/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 008 | *Property cost:* $45,000,000<br><br>*Monthly rental:*<br>Month 1-2: $4,950,000<br>Month 3-6: $13,275,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $43,200,000 | Onset | 5/1/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 009 | *Property cost:* $50,000,000<br><br>*Monthly rental:*<br>Month 1-2: $5,500,000<br>Month 3-6: $14,125,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000 | Onset | 6/1/2023 |

11

FBG_CH1_00097393

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| | | Months 3-6: .28250<br><br>*Disbursement*: $48,000,000 | | |
| Carnaby Inventory IV, LLC | Lease Schedule No. 010 | *Property cost:* $30,000,000<br><br>*Monthly rental:*<br>Months 1-2: $3,300,000<br>Months 3-6: $8,850,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $28,800,000 | Onset | 7/18/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 011 | *Property cost:* $50,000,000<br><br>*Monthly rental:*<br>Months 1-2: $5,500,000<br>Months 3-6: $14,750,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $48,000,000 | Onset | 8/14/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 012 | *Property cost:* $50,000,000<br><br>*Monthly rental:*<br>Months 1-2: $5,500,000<br>Months 3-6: $14,750,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $48,000,000 | Onset | 8/18/2023 |

FBG_CH1_00097394

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory IV, LLC | Lease Schedule No. 013 | | Onset | |
| Carnaby Inventory IV, LLC | Lease Schedule No. 014 | *Property cost:* $30,000,000<br><br>*Monthly rental:*<br>Months 1-2: $3,300,000<br>Months 3-6: $8,850,000<br><br>*Monthly lease rate factor:*<br>Months 1-2: .11000<br>Months 3-6: .29500<br><br>*Disbursement*: $28,800,000 | Onset | 9/15/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 015 | *Property cost:* $93,600,000<br><br>*Monthly rental:*<br>$9,048,312<br><br>*Monthly lease rate factor:*<br>.09667<br><br>*Disbursement*: $89,856,000 | Onset | 12/11/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 016 | *Property cost:* $61,000,000<br><br>*Monthly rental:*<br>$7,015,000<br><br>*Monthly lease rate factor:*<br>.11500<br><br>*Disbursement*: $58,560,000 | Onset | 12/11/2023 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 017 | *Property cost:* $32,000,000<br><br>*Monthly rental:*<br>$7,360,000<br><br>*Monthly lease rate factor:*<br>.23000 | Onset | 1/23/2024 |

13

FBG_CH1_00097395

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| | | *Disbursement*: $30,720,000 | | |
| Carnaby Inventory IV, LLC | Lease Schedule No. 018 | *Property cost:* $40,000,000<br><br>*Monthly rental:* $9,200,000<br><br>*Monthly lease rate factor:* .23000<br><br>*Disbursement*: $38,400,000 | Onset | 2/12/2024 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 019 | | Onset | |
| Carnaby Inventory IV, LLC | Lease Schedule No. 020 | *Property cost:* $75,000,000<br><br>*Monthly rental:* $17,250,000<br><br>*Monthly lease rate factor:* .23000<br><br>*Disbursement:* $72,000,000 | Onset | 2/12/2024 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 021 | *Property cost:* $25,000,000<br><br>*Monthly rental:* $5,750,000<br><br>*Monthly lease rate factor:* .23000<br><br>*Disbursement:* $24,000,000 | Onset | 2/12/2024 |

14

FBG_CH1_00097396

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory IV, LLC | Lease Schedule No. 022 | *Property cost:* $40,000,000<br><br>*Monthly rental:*<br>Months 1-6: $8,000,000<br>Month 7: $6,666,800<br>Month 8:<br>$4,000,000<br><br>*Monthly lease rate factor:*<br>Months 1-6: .20000<br>Month 7: .16667<br>Month 8: .10000<br><br>*Disbursement*: $38,400,000 | Onset | 9/12/2024 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 023 | *Property cost:* $210,000,000<br><br>*Monthly rental:*<br>Months 1-5: $42,000,000<br>Month 6: $35,000,700<br>Month 7:<br>$21,000,000<br><br>*Monthly lease rate factor:*<br>Months 1-5: .20000<br>Month 6: .16667<br>Month 7: .10000<br><br>*Disbursement*: $201,600,000 | Onset | 11/4/2024 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 024 | *Property cost:* $200,000,000<br><br>*Monthly rental:*<br>$24,166,600<br><br>*Monthly lease rate factor:*<br>.120833<br><br>*Disbursement*: $192,000,000 | Onset | 1/16/2025 |

FBG_CH1_00097397

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Inventory IV, LLC | Lease Schedule No. 025 | *Property cost:* $85,000,000<br><br>*Monthly rental:* $15,406,250<br><br>*Monthly lease rate factor:* .18125<br><br>*Disbursement*: $81,600,000 | Onset | 2/18/2025 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 026 | *Property cost:* $180,000,000<br><br>*Monthly rental:* $43,500,600<br><br>*Monthly lease rate factor:* .24167<br><br>*Disbursement*: $172,800,000 | Onset | 3/10/2025 |
| Carnaby Inventory IV, LLC | Lease Schedule No. 027 | *Property cost:* $160,000,000<br><br>*Monthly rental:* $38,667,200<br><br>*Monthly lease rate factor:* .24167<br><br>*Disbursement*: $153,600,000 | Onset | 4/7/2025 |
| Carnaby Inventory IV, LLC | Cash Transfers | $1,740,686,811.66 | Onset | 8/8/2022-7/3/2025 |
| Carnaby Capital Holdings, LLC (for Carnaby Inventory IV, LLC Master) | Guaranty Agreement | | Onset | 6/28/2022 |

16

FBG_CH1_00097398

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Carnaby Capital, LLC (for Carnaby Inventory IV, LLC Master) | Guaranty Agreement | | Onset | 6/28/2022 |
| Carnaby Inventory Holdings, IV (for Carnaby Inventory IV, LLC Master) | Guaranty Agreement | | Onset | 6/28/2022 |
| First Brands Group Holdings, LLC (for Carnaby Inventory IV, LLC Master) | Guaranty Agreement | | Onset | 6/28/2022 |
| Viceroy Private Capital, LLC (for Carnaby Inventory IV, LLC Master) | Guaranty Agreement | | Onset | 6/28/2022 |
| Carnaby Inventory IV, LLC; Carnaby FA, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby Inventory Holdings, IV, LLC; First Brands Group Holdings, LLC; Viceroy Private Capital, LLC, Carnaby FA | First Forbearance Agreement | *Total Forbearance Payments:* $1,520,741.769.90 | Onset | 5/1/2025 |

17

FBG_CH1_00097399

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Holdings, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC | | | | |
| Carnaby Inventory IV, LLC; Carnaby FA, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby Inventory Holdings, IV, LLC; First Brands Group Holdings, LLC; Viceroy Private Capital, LLC, Carnaby FA Holdings, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC | Second Forbearance Agreement | *Total Forbearance Payments:* $281,811,863.88 | Onset | 6/1/2025 |
| Carnaby Inventory IV, LLC; Carnaby FA, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby Inventory Holdings, IV, LLC; First Brands Group Holdings, LLC; Viceroy Private | Third Forbearance Agreement | *Total Forbearance Payments:* $1,900,000,000.00 | Onset | 6/30/2025 |

18

FBG_CH1_00097400

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Capital, LLC, Carnaby FA Holdings, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC | | | | |
| Trico Products Corporation | Master Lease Agreement | | Onset | 5/9/2018 |
| Trico Products Corporation | Lease Schedule 01 | *Total Property Cost:* $3,487,973.85<br><br>*Monthly Rental:* $96,756.39 | Onset | 5/9/2018 |
| Trico Products Corporation | Lease Schedule 02 | *Total Property Cost:* $3,901,340.98<br><br>*Monthly Rental:* $115,089.56 | Onset | 5/9/2018 |
| Trico Products Corporation | Lease Schedule 03 | *Total Property Cost:* $532,677.96<br><br>*Monthly Rental:* $15,714 | Onset | 9/10/2018 |
| Trico Products Corporation | Lease Schedule 04 | *Total Property Cost:* $15,000,000<br><br>*Monthly Rental:* $540,000 | Onset | 9/10/2018 |
| Trico Products Corporation; ASC Industries, Inc. | Lease Schedule 06 | *Total Property Cost:* $15,000,000<br><br>*Monthly Rental:* $733,480 | Onset | 1/11/2019 |

19

FBG_CH1_00097401

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation; FRAMAuto Holdings, LLC | Lease Schedule 07A | *Total Property Cost:* $7,500,000<br><br>*Monthly Rental:*<br>Months 1-6: $155,250<br>Months 7-36: $314,625 | Onset | 7/31/2019 |
| Trico Products Corporation; FRAMAuto Holdings, LLC | Lease Schedule 07B | *Total Property Cost:* $7,500,000<br><br>*Monthly Rental:*<br>Months 1-6: $155,250<br>Months 7-36: $314,625 | Onset | 7/31/2019 |
| Trico Products Corporation; FRAMAuto Holdings, LLC | Lease Schedule 07C | *Total Property Cost:* $15,000,000<br><br>*Monthly Rental:*<br>Months 1-6: $310,500<br>Months 7-36: $629,250 | Onset | 7/31/2019 |
| Trico Products Corporation | Lease Schedule 08A | *Total Property Cost:* $13,747,886<br><br>*Monthly Rental:*<br>$374,492 | Onset | 10/8/2019 |
| Trico Products Corporation | Lease Schedule 08B | *Total Property Cost:* $41,920,476<br><br>*Monthly Rental:*<br>$1,141,913.77 | Onset | 10/8/2019 |
| Trico Products Corporation | Lease Schedule 09A | *Total Property Cost:* $7,000,000<br><br>*Monthly Rental:*<br>Months 1-6: $199,150<br>Months 7-30: $506,940 | Onset | 11/19/2019 |
| Trico Products Corporation | Lease Schedule 09B | *Total Property Cost:* $10,000,000<br><br>*Monthly Rental:*<br>$333,400 | Onset | 11/14/2019 |

20

FBG_CH1_00097402

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 09C | *Total Property Cost:* $13,330,000 <br><br> *Monthly Rental:* $848,135 | Onset | 12/12/2019 |
| Trico Products Corporation | Lease Schedule 09D | *Total Property Cost:* $7,000,000 <br><br> *Monthly Rental:* Months 1-6: $379,238.50 Months 7-30: $965,358.60 | Onset | 12/16/2019 |
| Trico Products Corporation | Lease Schedule 09E | *Total Property Cost:* $13,330,000 <br><br> *Monthly Rental:* Months 1-6: $379,238.50 Months 7-30: $965,358.60 | Onset | 1/10/2020 |
| Trico Products Corporation | Lease Schedule 09F | *Total Property Cost:* $9,340,000 <br><br> *Monthly Rental:* Months 1-6: $265,723 Months 7-30: $676,402.80 | Onset | 1/30/2020 |
| Trico Products Corporation | Lease Schedule 10 | *Total Property Cost:* $10,000,000 <br><br> *Monthly Rental:* Months 1-6: $284,500 Months 7-30: $724,200 | Onset | 2/19/2020 |
| Trico Properties Corporation; ASC Industries, Inc. | Lease Schedule 11 | *Total Property Cost:* $30,000,000 <br><br> *Monthly Rental:* Months 1-6: $853,500 Months 7-30: $1,920,600 | Onset | 7/21/2020 |
| Trico Products Corporation | Lease Schedule 12 | *Total Property Cost:* $3,572,300 <br><br> *Monthly Rental:* $133,925.53 | Onset | 12/6/2020 |

21

FBG_CH1_00097403

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 13 | *Total Property Cost*: Not to Exceed $3,000,000<br><br>*Monthly Rental:* $109,500 | Onset | 12/15/2020 |
| Trico Products Corporation; Champion Laboratories, Inc. | Lease Schedule 14 | *Total Property Cost:* $50,956,926<br><br>*Monthly Rental:* $1,490,490 | Onset | 1/15/2021 |
| Trico Products Corporation | Lease Schedule 14R | *Total Property Cost:* $50,000,000<br><br>*Monthly Rental:* $1,325,000 | Onset | 7/10/2023 |
| Trico Products Corporation | Lease Schedule 15 | *Total Property Cost:* $14,002,046<br><br>*Monthly Rental:* $376,095 | Onset | 4/7/2021 |
| Trico Products Corporation | Lease Schedule 15A | *Total Property Cost:* $4,707,244<br><br>*Monthly Rental:* $116,740 | Onset | 6/24/2022 |
| Trico Products Corporation | Lease Schedule 16 | *Total Property Cost:* $19,835,647<br><br>*Monthly Rental:* $567,498 | Onset | 4/7/2021 |
| Trico Products Corporation | Lease Schedule 17 | *Total Property Cost:* $25,000,000<br><br>*Monthly Rental:* $597,000 | Onset | 4/7/2021 |

22

FBG_CH1_00097404

**DEBTORS' EXHIBIT NO. 21**
**Page 82 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 18 | *Total Property Cost:* $5,000,000<br><br>*Monthly Rental:* $119,400 | Onset | 4/7/2021 |
| Trico Products Corporation; FRAMAuto Holdings, LLC | Lease Schedule 19 | *Total Property Cost:* $40,000,000<br><br>*Monthly Rental:* $955,200 | Onset | 4/7/2021 |
| Trico Products Corporation | Lease Schedule 20R | *Total Property Cost:* $7,510,522.47<br><br>*Monthly Rental:* $204,586.63 | Onset | 6/11/2021 |
| Trico Products Corporation | Lease Schedule 21 | *Total Property Cost:* Not to Exceed $50,000,000<br><br>*Monthly Rental:* Months 1-6: $1,000,000<br>Months 7-36: $1,433,000 | Onset | 7/14/2021 |
| Trico Products Corporation | Lease Schedule 21A | *Total Property Cost:* Not to Exceed $15,000,000<br><br>*Monthly Rental:* Months 1-6: $300,000<br>Months 7-36: $429,900 | Onset | 8/30/2021 |
| Trico Products Corporation | Lease Schedule 21B | *Total Property Cost:* Not to Exceed $50,000,000<br><br>*Monthly Rental:* Months 1-6: $1,000,000<br>Months 7-36: $1,433,000 | Onset | 9/7/2021 |
| Trico Products Corporation | Lease Schedule 22 | *Total Property Cost:* $28,263,534<br><br>*Monthly Rental:* $745,027 | Onset | 5/24/2022 |

FBG_CH1_00097405

**DEBTORS' EXHIBIT NO. 21**
**Page 83 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 23 | *Total Property Cost:* $4,601,386 <br><br> *Monthly Rental:* $159,898 | Onset | 3/31/2023 |
| Trico Products Corporation | Lease Schedule 24 | *Total Property Cost:* $1,439,231 <br><br> *Monthly Rental:* $50,229 | Onset | 4/19/2023 |
| Trico Products Corporation | Lease Schedule 24A | *Total Property Cost:* $6,288,535 <br><br> *Monthly Rental:* $223,117 | Onset | 10/1/2023 |
| Trico Products Corporation | Lease Schedule 25 | *Total Property Cost:* $10,364,300 <br><br> *Monthly Rental:* $303,467 | Onset | 5/19/2023 |
| Trico Products Corporation | Lease Schedule 26 | *Total Property Cost:* $958,407 <br><br> *Monthly Rental:* $33,008 | Onset | 6/23/2023 |
| Trico Products Corporation | Lease Schedule 27 | *Total Property Cost:* $3,064,815 <br><br> *Monthly Rental:* $132,553 | Onset | 6/28/2023 |
| Trico Products Corporation | Lease Schedule 28 | *Total Property Cost:* $3,997,807 <br><br> *Monthly Rental:* $116,936 | Onset | 8/1/2023 |

24

FBG_CH1_00097406

**DEBTORS' EXHIBIT NO. 21**
**Page 84 of 101**

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 29 | *Total Property Cost:* $9,955,826 *Monthly Rental:* $340,987 | Onset | 8/14/2023 |
| Trico Products Corporation | Lease Schedule 30 | *Total Property Cost:* $2,928,994 *Monthly Rental:* $100,318 | Onset | 11/27/2023 |
| Trico Products Corporation | Lease Schedule 31 | *Total Property Cost:* Not To Exceed$30,000,000 *Monthly Rental:* $1,027,500 | Onset | 2/20/2024 |
| Trico Products Corporation | Lease Schedule 31A | *Total Property Cost:* Not To Exceed$7,750,000 *Monthly Rental:* $265,438 | Onset | 10/15/2024 |
| Trico Products Corporation | Lease Schedule 31B | *Total Property Cost:* Not To Exceed$10,000,000 *Monthly Rental:* $342,500 | Onset | 10/15/2024 |
| Trico Products Corporation | Lease Schedule 31C | *Total Property Cost:* $9,987,984 *Monthly Rental:* $342,088 | Onset | 3/1/2025 |
| Trico Products Corporation | Lease Schedule 31D | *Total Property Cost:* $9,692,505 *Monthly Rental:* $331,968 | Onset | 4/1/2025 |

25

FBG_CH1_00097407

| Transferor or, alternatively, Subsequent Transferee of Debtors[1] | Property Transferred or Obligation Incurred | Estimated Amount | Transferee or, alternatively, Subsequent Transferee | Date |
|---|---|---|---|---|
| Trico Products Corporation | Lease Schedule 31E | *Total Property Cost:* $9,306,146<br><br>*Monthly Rental:* $318,735 | Onset | 7/1/2025 |
| First Brands Group, LLC | Cash Transfers | $629,622,821.86 | Onset | 4/30/2018-9/9/2025 |

26

FBG_CH1_00097408

**EXHIBIT B**

FBG_CH1_00097409

| Illustrative Fraudulent Transfers to Onset | |
|---|---|
| 4/30/2018 | $62,500.00 |
| 7/11/2018 | $8,701.99 |
| 9/3/2019 | $338,950.00 |
| 9/3/2019 | $173,657.00 |
| 9/3/2019 | $173,350.00 |
| 9/13/2019 | $310,500.00 |
| 9/13/2019 | $155,250.00 |
| 9/13/2019 | $155,250.00 |
| 9/19/2019 | $109.15 |
| 10/1/2019 | $625,470.23 |
| 10/9/2019 | $239,351.24 |
| 10/10/2019 | $378.49 |
| 10/21/2019 | $597,285.39 |
| 10/31/2019 | $1,325,049.80 |
| 11/7/2019 | $217,396.03 |
| 11/20/2019 | $3,500.00 |
| 12/2/2019 | $455,038.66 |
| 12/2/2019 | $1,489,789.45 |
| 12/4/2019 | $210,489.84 |
| 12/5/2019 | $276,600.33 |
| 1/2/2020 | $4,326,818.33 |
| 1/3/2020 | $281,651.37 |
| 1/3/2020 | $1,932,697.10 |
| 1/8/2020 | $324,701.78 |
| 2/3/2020 | $2,628,653.70 |
| 2/10/2020 | $936,437.20 |
| 2/26/2020 | $18,200.00 |
| 3/2/2020 | $4,452,419.10 |
| 3/11/2020 | $111,253.30 |
| 4/6/2020 | $5,534,257.34 |
| 5/4/2020 | $2,174,982.20 |
| 5/6/2020 | $115,089.65 |
| 5/13/2020 | $129,064.10 |
| 6/1/2020 | $2,290,071.85 |
| 7/6/2020 | $6,404,340.04 |
| 8/7/2020 | $9,232,818.04 |
| 9/8/2020 | $6,438,040.14 |
| 1/11/2021 | $9,848,562.39 |
| 2/8/2021 | $11,919,604.08 |
| 3/8/2021 | $10,333,418.78 |

FBG_CH1_00097410

**DEBTORS' EXHIBIT NO. 21**
**Page 88 of 101**

| | |
|---|---|
| 3/11/2021 | $415.00 |
| 4/13/2021 | $7,052,039.13 |
| 5/10/2021 | $8,437,686.91 |
| 6/7/2021 | $7,317,486.09 |
| 7/12/2021 | $7,394,638.62 |
| 8/10/2021 | $7,153,272.11 |
| 9/10/2021 | $7,509,648.50 |
| 10/7/2021 | $9,722,000.04 |
| 10/8/2021 | $9,067,346.10 |
| 11/8/2021 | $8,329,302.22 |
| 11/9/2021 | $7,453,392.24 |
| 12/7/2021 | $7,767,973.24 |
| 12/8/2021 | $8,077,761.29 |
| 1/10/2022 | $8,194,864.49 |
| 2/8/2022 | $7,711,789.89 |
| 2/9/2022 | $596,410.22 |
| 3/1/2022 | $613,640.00 |
| 3/1/2022 | $440,026.00 |
| 3/8/2022 | $700,290.00 |
| 3/8/2022 | $466,860.00 |
| 3/8/2022 | $233,430.00 |
| 3/8/2022 | $233,430.00 |
| 3/8/2022 | $55,203.50 |
| 3/8/2022 | $54,996.00 |
| 3/20/2022 | $8,293,413.37 |
| 3/21/2022 | $175,476.00 |
| 3/21/2022 | $175,476.00 |
| 4/8/2022 | $677,700.00 |
| 4/8/2022 | $451,800.00 |
| 4/8/2022 | $225,900.00 |
| 4/8/2022 | $225,900.00 |
| 4/8/2022 | $225,900.00 |
| 4/8/2022 | $225,900.00 |
| 4/8/2022 | $8,806,215.45 |
| 4/14/2022 | $165,910.00 |
| 4/14/2022 | $41,665.00 |
| 4/14/2022 | $41,665.00 |
| 4/14/2022 | $41,665.00 |
| 4/14/2022 | $41,665.00 |
| 4/27/2022 | $461,366.00 |
| 4/27/2022 | $118,766.00 |
| 4/27/2022 | $118,796.00 |
| 4/27/2022 | $118,766.00 |

FBG_CH1_00097411

**DEBTORS' EXHIBIT NO. 21**
**Page 89 of 101**

| | |
|---|---|
| 4/27/2022 | $118,766.00 |
| 5/6/2022 | $677,700.00 |
| 5/6/2022 | $466,860.00 |
| 5/6/2022 | $451,800.00 |
| 5/6/2022 | $225,900.00 |
| 5/6/2022 | $225,900.00 |
| 5/6/2022 | $225,900.00 |
| 5/6/2022 | $225,900.00 |
| 5/6/2022 | $116,715.00 |
| 5/6/2022 | $116,715.00 |
| 5/6/2022 | $116,715.00 |
| 5/6/2022 | $116,715.00 |
| 5/10/2022 | $8,817,318.75 |
| 6/6/2022 | $677,700.00 |
| 6/6/2022 | $542,160.00 |
| 6/6/2022 | $451,800.00 |
| 6/6/2022 | $451,800.00 |
| 6/6/2022 | $361,440.00 |
| 6/6/2022 | $244,752.00 |
| 6/6/2022 | $225,900.00 |
| 6/6/2022 | $225,900.00 |
| 6/6/2022 | $225,900.00 |
| 6/6/2022 | $225,900.00 |
| 6/6/2022 | $166,609.00 |
| 6/6/2022 | $112,950.00 |
| 6/6/2022 | $112,950.00 |
| 6/6/2022 | $112,950.00 |
| 6/6/2022 | $112,950.00 |
| 6/10/2022 | $8,871,618.15 |
| 7/6/2022 | $60,490.00 |
| 7/6/2022 | $60,490.00 |
| 7/6/2022 | $112,950.00 |
| 7/6/2022 | $112,950.00 |
| 7/6/2022 | $112,950.00 |
| 7/6/2022 | $112,950.00 |
| 7/6/2022 | $225,900.00 |
| 7/6/2022 | $225,900.00 |
| 7/6/2022 | $225,900.00 |
| 7/6/2022 | $225,900.00 |
| 7/6/2022 | $361,440.00 |
| 7/6/2022 | $451,800.00 |
| 7/6/2022 | $451,800.00 |
| 7/6/2022 | $542,160.00 |

FBG_CH1_00097412

| 7/6/2022 | $677,700.00 |
| 7/8/2022 | $9,113,922.62 |
| 8/8/2022 | $4,793,272.00 |
| 8/8/2022 | $832,036.67 |
| 8/9/2022 | $8,922,440.75 |
| 9/1/2022 | $4,292,100.00 |
| 9/9/2022 | $1,507,863.33 |
| 9/9/2022 | $8,954,458.71 |
| 9/20/2022 | $1,580,416.00 |
| 10/3/2022 | $4,292,100.00 |
| 10/3/2022 | $2,372,481.67 |
| 10/7/2022 | $8,940,460.71 |
| 10/17/2022 | $334.00 |
| 11/1/2022 | $4,292,100.00 |
| 11/1/2022 | $2,268,100.00 |
| 11/9/2022 | $9,093,426.14 |
| 12/1/2022 | $4,292,100.00 |
| 12/1/2022 | $2,268,100.00 |
| 12/9/2022 | $9,356,064.10 |
| 12/14/2022 | $668,099.28 |
| 1/3/2023 | $4,292,100.00 |
| 1/4/2023 | $263,199.78 |
| 1/4/2023 | $35,309,600.00 |
| 1/9/2023 | $9,212,463.65 |
| 2/1/2023 | $4,292,100.00 |
| 2/1/2023 | $2,092,677.50 |
| 2/8/2023 | $350,000.00 |
| 2/8/2023 | $35,377,500.00 |
| 2/9/2023 | $9,446,439.08 |
| 2/13/2023 | $33,750,000.00 |
| 3/1/2023 | $4,292,100.00 |
| 3/10/2023 | $9,353,022.60 |
| 3/31/2023 | $6,281,000.84 |
| 4/3/2023 | $4,292,100.00 |
| 4/3/2023 | $13,303,350.00 |
| 4/10/2023 | $9,536,141.92 |
| 4/20/2023 | $1,549,965.00 |
| 5/1/2023 | $4,292,100.00 |
| 5/1/2023 | $27,838,350.00 |
| 5/9/2023 | $9,582,829.72 |
| 5/15/2023 | $3,970,172.50 |
| 6/1/2023 | $4,292,100.00 |
| 6/1/2023 | $32,678,350.00 |

FBG_CH1_00097413

**DEBTORS' EXHIBIT NO. 21**
**Page 91 of 101**

| | |
|---|---|
| 6/9/2023 | $9,604,614.90 |
| 6/15/2023 | $2,109,975.00 |
| 7/3/2023 | $4,292,100.00 |
| 7/3/2023 | $38,178,350.00 |
| 7/10/2023 | $9,523,669.62 |
| 8/8/2023 | $4,292,100.00 |
| 8/8/2023 | $400,000.00 |
| 8/8/2023 | $42,148,362.50 |
| 8/10/2023 | $9,699,253.81 |
| 8/25/2023 | $2,578,966.10 |
| 9/1/2023 | $4,292,100.00 |
| 9/1/2023 | $48,353,350.00 |
| 9/6/2023 | $6,794,008.33 |
| 9/11/2023 | $9,852,823.17 |
| 10/2/2023 | $4,292,100.00 |
| 10/2/2023 | $58,153,370.00 |
| 10/10/2023 | $10,579,470.37 |
| 11/1/2023 | $5,552,216.67 |
| 11/1/2023 | $4,292,100.00 |
| 11/1/2023 | $57,153,350.00 |
| 11/9/2023 | $9,918,633.15 |
| 12/1/2023 | $4,908,333.33 |
| 12/1/2023 | $4,292,100.00 |
| 12/1/2023 | $50,503,350.00 |
| 12/6/2023 | $195.00 |
| 12/6/2023 | $245.00 |
| 12/8/2023 | $223,117.22 |
| 12/28/2023 | $9,474,147.63 |
| 1/8/2024 | $1,050,000.00 |
| 1/8/2024 | $12,265,614.67 |
| 1/8/2024 | $4,292,100.00 |
| 1/8/2024 | $111,939,195.47 |
| 1/8/2024 | $9,857,524.09 |
| 2/8/2024 | $11,443,750.00 |
| 2/8/2024 | $4,292,100.00 |
| 2/8/2024 | $1,200,000.00 |
| 2/8/2024 | $70,310,356.83 |
| 2/8/2024 | $9,253,946.23 |
| 2/9/2024 | $813,633.80 |
| 3/7/2024 | $11,443,750.00 |
| 3/7/2024 | $4,292,100.00 |
| 3/7/2024 | $1,000,000.00 |
| 3/7/2024 | $91,369,787.83 |

6

FBG_CH1_00097414

| | |
|---|---|
| 3/8/2024 | $10,734,468.00 |
| 4/5/2024 | $11,443,750.00 |
| 4/5/2024 | $4,292,100.00 |
| 4/5/2024 | $58,926,662.00 |
| 4/9/2024 | $10,426,237.96 |
| 5/2/2024 | $4,292,100.00 |
| 5/2/2024 | $58,926,662.00 |
| 5/10/2024 | $10,414,534.21 |
| 6/3/2024 | $2,184,680.52 |
| 6/5/2024 | $19,312,597.00 |
| 6/5/2024 | $4,292,100.00 |
| 6/5/2024 | $58,926,662.00 |
| 6/6/2024 | $1,556,500.00 |
| 6/10/2024 | $10,657,553.54 |
| 6/12/2024 | $29,804.55 |
| 7/5/2024 | $16,575,612.50 |
| 7/5/2024 | $4,292,100.00 |
| 7/5/2024 | $58,926,662.00 |
| 7/9/2024 | $14,294,177.99 |
| 8/6/2024 | $16,176,760.00 |
| 8/6/2024 | $500,000.00 |
| 8/6/2024 | $4,292,100.00 |
| 8/6/2024 | $58,926,662.00 |
| 8/9/2024 | $11,173,551.20 |
| 9/9/2024 | $28,453,379.17 |
| 9/9/2024 | $4,292,100.00 |
| 9/9/2024 | $2,400,000.00 |
| 9/9/2024 | $70,966,662.00 |
| 9/10/2024 | $11,170,180.25 |
| 9/13/2024 | $5,076,626.67 |
| 9/30/2024 | $434,999.52 |
| 10/4/2024 | $24,176,760.00 |
| 10/4/2024 | $2,259,000.00 |
| 10/4/2024 | $25,622,912.00 |
| 10/9/2024 | $12,596,459.61 |
| 11/1/2024 | $57,562,962.50 |
| 11/1/2024 | $2,259,000.00 |
| 11/1/2024 | $36,907,912.00 |
| 11/8/2024 | $11,596,840.92 |
| 11/25/2024 | $19,966,343.33 |
| 11/25/2024 | $2,259,000.00 |
| 11/25/2024 | $18,607,912.00 |
| 11/29/2024 | $81,212,044.00 |

FBG_CH1_00097415

**DEBTORS' EXHIBIT NO. 21**
**Page 93 of 101**

| | |
|---|---|
| 12/10/2024 | $11,484,668.87 |
| 1/7/2025 | $61,383,605.00 |
| 1/7/2025 | $451,800.00 |
| 1/7/2025 | $60,607,912.00 |
| 1/8/2025 | $900,000.00 |
| 1/8/2025 | $903,600.00 |
| 1/10/2025 | $11,784,292.20 |
| 1/15/2025 | $39,716,470.00 |
| 1/15/2025 | $60,607,912.00 |
| 2/7/2025 | $35,454,744.36 |
| 2/7/2025 | $100,000.00 |
| 2/10/2025 | $11,881,279.30 |
| 3/6/2025 | $38,383,270.00 |
| 3/6/2025 | $10,607,912.00 |
| 3/6/2025 | $50,000,000.00 |
| 3/6/2025 | $46,551,858.48 |
| 3/7/2025 | $650,000.00 |
| 3/10/2025 | $11,734,152.88 |
| 4/3/2025 | $35,716,470.00 |
| 4/3/2025 | $46,200,500.00 |
| 4/3/2025 | $22,073,050.00 |
| 4/4/2025 | $24,166,600.00 |
| 4/4/2025 | $42,000,000.00 |
| 4/10/2025 | $10,043,460.75 |
| 5/2/2025 | $11,443,750.00 |
| 5/9/2025 | $10,182,361.79 |
| 6/10/2025 | $9,701,907.33 |
| 7/3/2025 | $20,000,000.00 |
| 7/10/2025 | $8,592,382.11 |
| 8/8/2025 | $8,771,568.42 |
| 8/11/2025 | $185,238.84 |
| 9/9/2025 | $8,593,907.73 |
| **Total to Onset:** | $2,940,500,613.19 |

FBG_CH1_00097416

**DEBTORS' EXHIBIT NO. 21**
**Page 94 of 101**

# EXHIBIT C

FBG_CH1_00097417

Illustrative Fraudulent Transfers to Edward James

| | |
|---|---|
| 10/5/2022 | $42,500.00 |
| 11/5/2022 | $42,500.00 |
| 12/5/2022 | $42,500.00 |
| 1/5/2023 | $1,350,000.00 |
| 2/5/2023 | $1,350,000.00 |
| 3/5/2023 | $1,557,826.67 |
| 4/5/2023 | $714,285.71 |
| 5/5/2023 | $2,208,928.57 |
| 6/5/2023 | $3,058,928.57 |
| 7/5/2023 | $4,068,928.57 |
| 8/5/2023 | $4,858,928.57 |
| 9/5/2023 | $6,162,500.00 |
| 10/5/2023 | $7,242,500.00 |
| 11/5/2023 | $4,295,000.00 |
| 12/5/2023 | $5,435,000.00 |
| 1/5/2024 | $15,002,727.00 |
| 2/5/2024 | $7,317,727.00 |
| 3/5/2024 | $6,347,727.00 |
| 4/5/2024 | $4,772,727.00 |
| 05/05/24 | $6,076,037.00 |
| 06/05/24 | $4,356,037.00 |
| 07/05/24 | $6,959,302.70 |
| 08/05/24 | $4,463,837.00 |
| 09/05/24 | $9,273,837.00 |
| 10/05/24 | $14,023,837.00 |
| 11/05/24 | $27,091,110.00 |
| 12/5/2024 | $26,991,110.00 |
| 1/5/2025 | $20,784,070.00 |
| 2/5/2025 | $18,684,070.00 |
| 3/5/2025 | $18,017,470.00 |
| 4/5/2025 | $15,437,470.00 |
| **Total to Edward James:** | $248,029,422.37 |

FBG_CH1_00097418

B1040 (FORM 1040) (12 24)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br><br>**FIRST BRANDS GROUP, LLC,** *et al.*[1] | **DEFENDANTS**<br><br>**ONSET FINANCIAL, INC., EDWARD JAMES, JCMC INVESTMENT GROUP LLC, OPTIMUS PRIVATE CAPITAL LLC, ASILIA CREDIT INVESTMENTS, LLC, JUSTIN NIELSEN, NIELSEN INVESTMENTS, SCOTT MILLER, JOSHUA TREE HOLDINGS, LLC, JONATHAN GARDNER, JA GARDNER HOLDINGS, DALE P. HOLT, HOLT INVESTMENTS 201 LLC, TODD PEDERSEN, YUMA III LLC, CORAL DUNES LLC, SEDDIE LLC, JOHN DOES 1-10** |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>**WEIL, GOTSHAL & MANGES LLP**<br>**Gabriel A. Morgan (24125891)**<br>**Clifford W. Carlson (24090024)**<br>700 Louisiana Street, Suite 3700<br>Houston, Texas 77002<br>Telephone: (713) 546-5000<br>Facsimile: (713) 224-9511<br>Email:  gabriel.morgan@weil.com<br>         clifford.carlson@weil.com<br><br>**WEIL, GOTSHAL & MANGES LLP**<br>**Matthew S. Barr (admitted *pro hac vice*)**<br>**Sunny Singh (admitted *pro hac vice*)**<br>**Robert Berezin (admitted *pro hac vice*)**<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Email:  matt.barr@weil.com<br>         sunny.singh@weil.com<br>         robert.berezin@weil.com | **ATTORNEYS** (If Known)<br><br>**Deborah M. Perry**<br>MUNSCH HARDT KOPF & HARR, PC<br>500 N. Akard Street, Suite 4000<br>Dallas, Texas 75201-6659<br><br>**James Newton**<br>**Ben Butterfield**<br>**Bryan Kotliar**<br>MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, New York 10019<br><br>**Anthony S. Fiotto**<br>**Julia Koch**<br>MORRISON & FOERSTER LLP<br>200 Clarendon Street, Floor 21<br>Boston MA, 02116<br><br>**Brian R. Michael**<br>MORRISON & FOERSTER LLP<br>707 Wilshire Boulevard<br>Los Angeles, CA 90017-3543<br><br>**David A. Shargel**<br>**Mark E. Dendinger**<br>BRACEWELL LLP<br>31 West 52nd Street<br>New York, New York 10019 |

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00097419

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PARTY** (Check One Box Only)

☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor   ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☒ Creditor   ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Plaintiffs bring claims for (I) Actual Fraudulent Transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a); Ohio Rev. Code Ann. §§ 1336.04(A)(1); 6 Del. Code § 1304(a)(1), (II) Constructive Fraudulent Transfer pursuant to 11 U.S.C. § 548(a)(1)(B), Ohio Rev. Code Ann. §§ 1336.04(A)(2), 6 Del. Code § 1304(a)(2), (III) Recovery Against Subsequent Transferees pursuant to 11 U.S.C. §§ 544, 548, & 550, (IV) Actual Fraudulent Transfer pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a); Ohio Rev. Code Ann. § 1336.04(A)(1); 6 Del. Code § 1304(a)(1), (V) Constructive Fraudulent Transfer pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B); Ohio Rev. Code Ann. §§ 1336.04(A)(2); 6 Del. Code § 1304(a)(2), (VI) Breach of LLC Agreement, (VII) Tortious Interference with LLC Agreement, (VIII) Breach of Employment Agreement, (I ) Tortious Interference with Employment Agreement, (  ) Breach of Fiduciary Duties under Delaware Law, (  I) Aiding and Abetting Breach of Fiduciary Duties under Delaware Law, (  II) Recharacterization pursuant to 11 U.S.C. §§ 105(a); 28 U.S.C. § 2201; Bankruptcy Rule 7001(2), (  III) Avoidance of Unperfected Security Interests pursuant to 11 U.S.C. §§ 544, 550, 551, (  IV) Declaratory Judgment pursuant to 28 U.S.C. § 2201, (  V) Declaratory Judgment pursuant to 28 U.S.C. § 2201, (  VI) Declaratory Judgment pursuant to 28 U.S.C. § 2201, (  VII) Declaratory Judgment pursuant to 28 U.S.C. § 2201, 11 U.S.C. §§ 502, 506(a), (  VIII) Preferential Transfer Pursuant to 11 U.S.C. §§ 547(b), 550(a), (  I ) Preferential Transfer pursuant to 11 U.S.C. §§ 547(b), 550(a), (  ) Equitable Subordination pursuant to 11 U.S.C. § 510, (  I) Unjust Enrichment, (  II) Disallowance of Claims Pursuant to 11 U.S.C. § 502(d).

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001 (a)   Recovery of Money Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b)   Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c)   Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d)   Objection Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e)   Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f)   Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(f)   Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g)   Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☒ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ Check if this case involves a substantive issue of state law      ☐ Check if this is asserted to be a class action under FRCP 23
☐ Check if a jury trial is demanded in complaint      Demand $

Other Relief Sought

**Plaintiffs respectfully request that this Court enter judgment against Defendants:**

2

FBG_CH1_00097420

DEBTORS' EXHIBIT NO. 21
Page 98 of 101

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

a.   a judgment (1) avoiding the Onset Transaction Transfers under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 from initial and subsequent transferees;

b.   a judgment (1) avoiding the fraudulent transfer and obligations incurred under Section 548(a)(B) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 from initial and subsequent transferees;

c.   a judgment awarding damages against Edward James for breach of the LLC Agreements in an amount to be proven at trial;

d.   a judgment (1) avoiding the Guarantees under Section 548(a)(1) and/or Section 544(b), and (2) recovering and preserving all such avoided transfers under Sections 550 and 551;

e.   a judgment awarding damages against Onset for tortious interference with the LLC Agreements in an amount to be proven at trial;

f.   a judgment awarding damages against Edward James for breach of Employment Agreement in an amount to be proven at trial;

g.   a judgment awarding damages against Onset for tortious interference with the Employment Agreement in an amount to be proven at trial;

h.   a judgment awarding damages against Edward James for breach of fiduciary duties in an amount to be proven at trial;

i.   a judgment awarding damages against Onset for aiding and abetting breach of fiduciary duties in an amount to be proven at trial;

j.   a judgment recharacterizing or unwinding the Onset Transactions to be loans made by Onset;

k.   a judgment (1) avoiding Onset's attempted perfection of a security interest in the FBG Debtors inventory and PP&E pursuant to Section 547(b), and (2) recovering and preserving such avoidance under Sections 550 and 551;

l.   a declaratory judgment that Onset does not have a property interest in the Replacement Inventory;

m.   a declaratory judgment that any security interest held by Onset in PP&E or inventory is subordinate to the ABL/Term Loan Lenders' liens in the same;

n.   a declaratory judgment that the Maquiladoras entities that purportedly sold inventory and PP&E to Onset did not have legal or equitable title to such property, and accordingly did not transfer any legal or equitable interest directly or indirectly to Onset;

o.   a judgment of this Court declaring the value of Onset's purported secured claim is materially less than the amount of its claim and therefore it does not hold a fully secured claim against the Debtors' estates within the meaning of section 506(a) of the Bankruptcy Code, and determining the extent of Onset's secured claim, if any;

p.   a judgment (1) avoiding Onset's attempted perfection of its security interest in Viceroy's pledge of its interest in FBG Holdings pursuant to Section 547(b), and (2) recovering and preserving such avoidance under Sections 550 and 551;

q.   a judgment (1) avoiding preferential transfers in excess of $1 billion made to the Defendants on or within the one year prior to the Petition Date (2) recovering and preserving such avoidance under Sections 550 and 551;

r.   a judgment equitably subordinating Onset's claims against the Debtors to all other creditors;

s.   a judgment for restitution in the amount of the benefits unjustly obtained;

t.   a judgment pursuant to Section 502(d) that any and all claims of Onset and/or its assignee, against the Debtors' chapter 11 estates must be disallowed until such time as Onset pays to Debtors all amounts sought herein;

u.   grant such other relief as the Court may deem just and proper.

FBG_CH1_00097421

**DEBTORS' EXHIBIT NO. 21**
**Page 99 of 101**

**B1040 (FORM 1040) (12 24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>FIRST BRANDS GROUP, LLC, *et al.* | BANKRUPTCY CASE NO.<br><br>Case No. 25-90399 (CML) | |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Southern District of Texas | DIVISION OFFICE<br><br>Houston | NAME OF JUDGE<br><br>Hon. Christopher M. Lopez |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Clifford Carlson | | |
| DATE<br>1/9/2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Clifford Carlson | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

FBG_CH1_00097422

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

FBG_CH1_00097423

**DEBTORS' EXHIBIT NO. 21**
**Page 101 of 101**