*Execution Version*

**OMNIBUS SECRETARY'S CERTIFICATE**

May 31, 2022

I, Michael Baker, do hereby certify that I am the duly appointed and acting Chief Corporate Strategy Officer and Secretary of each of the entities listed on Schedule I attached hereto (collectively, the "*Credit Parties*" and each, a "*Credit Party*"), and that, as such, I am authorized to execute and deliver this certificate in connection with that certain Credit Agreement, dated as of May 31, 2022 (as amended, supplemented or otherwise modified from time to time) (the "*Credit Agreement*"), among, First Brands Group, LLC, as the servicer (the "*Servicer*"), Carnaby Inventory II, LLC, a Delaware limited liability company (the "*Borrower*"), Carnaby Inventory Holdings II, LLC, a Delaware limited liability company (the "*Parent*"), the lenders from time to time party thereto (the "*Lenders*") and GLAS Trust Company LLC, as administrative agent for the Lenders, (in such capacity, the "*Administrative Agent*"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Credit Agreement.

I further certify, in my capacity as Chief Corporate Strategy Officer and Secretary of the Credit Parties, that:

1. Attached hereto as Exhibit A is a true, correct and complete copy of the bylaws, limited liability company agreement or other equivalent governing document, as applicable, of each of the Credit Parties (the "*Governing Documents*"), including all amendments thereto, if any, as are in full force and effect on the date hereof. No actions or proceedings for the amendment, modification, supplement or rescission of the Governing Documents are pending or contemplated.

2. Attached hereto as Exhibit B is a true, correct and complete copy of the certificate of incorporation, certificate of formation or other equivalent formation document, as applicable, of each of the Credit Parties (the "*Certified Organizational Documents*"), including all amendments thereto, if any, as are in full force and effect on the date hereof and certified by the Secretary of State of such Credit Party's respective jurisdiction of organization. No action has been taken by any Credit Party or by the stockholders, directors, members, managers or officers, as applicable, of any Credit Party in contemplation of the filing of any amendment or other document with respect to the Certified Organizational Documents.

3. Attached hereto as Exhibit C is a true, correct and complete copy of the resolutions duly adopted by the board of directors, members, managers or other governing body, as applicable, of each Credit Party authorizing, among other things, the execution of the Credit Agreement and all related loan documents to which it is a party and all instruments, notices, certificates and other documents entered into or delivered in connection therewith. Such resolutions or any organizational actions taken pursuant thereto have not been amended, superseded, modified or rescinded, and such resolutions are in full force and effect on the date hereof. No other resolutions have been adopted by the board of directors, members, managers or other governing body, as applicable, of any Loan Party relating to the agreements and the transactions referred to in such resolutions, in each case, since the date of such resolutions attached hereto.

4. Each of the officers of the Credit Parties listed on Exhibit D is as of the date hereof the duly elected or appointed, qualified and acting incumbents of the offices set forth opposite their respective names, and the signatures set forth opposite said officers are their true and correct signatures and each is authorized to execute, in the name and on behalf of each Credit Party, the Credit Agreement and all other Transaction Documents, agreements, documents and instruments executed in connection therewith to which it is a party.

CONFIDENTIAL

FBG_CH1_00097758

5.     Attached hereto as <u>Exhibit E</u> is a copy of the certificate of good standing of each of the Credit Parties certified by the Secretary of State of such Credit Party's respective jurisdiction of organization.

[*Signature page follows.*]

CONFIDENTIAL

FBG_CH1_00097759

IN WITNESS WHEREOF, I have hereunto set my hand as of the date set forth above.

Name: Michael Baker
Title:  Chief Corporate Strategy Officer and
        Secretary

I, Shekhar Kumar, Corporate Finance Manager of each of the Credit Parties, do hereby certify that Michael Baker is the duly elected and qualified Chief Corporate Strategy Officer and Secretary of such Credit Parties, and that his signature set forth above is his genuine signature and that he is authorized on behalf of such Credit Parties to deliver the foregoing certificate.

WITNESS my hand as of the date set forth above.

Name: Shekhar Kumar
Title:  Corporate Finance Manager

[Signature Page to Secretary's Certificate]

CONFIDENTIAL

FBG_CH1_00097760

## SCHEDULE I

|  | Entity Name |
|---|---|
| 1. | First Brands Group, LLC |
| 2. | First Brands Group Holdings, LLC |

CONFIDENTIAL                                                                    FBG_CH1_00097761

**EXHIBIT A**

Governing Documents

CONFIDENTIAL

FBG_CH1_00097762

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF THE UNITS THEREFORE IS RESTRICTED. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING AN INTEREST IN ANY SUCH UNITS BY THE ISSUER FOR ANY PURPOSE, UNLESS (I) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (II) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL FOR THE COMPANY.

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**FIRST BRANDS GROUP, LLC**

Dated: August 14, 2020

LEGAL_US_E # 150128321.2

## TABLE OF CONTENTS

<b>Page</b>

SECTION 1. DEFINITIONS .................................................................................................1

    **1.1.**    Additional Member ...............................................................................1

    **1.2.**    Adjusted Capital Account Deficit .......................................................1

    **1.3.**    Affiliate ...............................................................................................1

    **1.4.**    Assignee ..............................................................................................2

    **1.5.**    Certificate of Formation .....................................................................2

    **1.6.**    Company ..............................................................................................2

    **1.7.**    Company Minimum Gain .....................................................................2

    **1.8.**    Covered Person ...................................................................................2

    **1.9.**    Control ................................................................................................2

    **1.10.**    Effective Date .....................................................................................2

    **1.11.**    Gross Asset Value ...............................................................................2

    **1.12.**    Liquidating Event ...............................................................................3

    **1.13.**    Majority in Interest ............................................................................3

    **1.14.**    Member ...............................................................................................3

    **1.15.**    Member Minimum Gain ......................................................................3

    **1.16.**    Member Nonrecourse Debt ..................................................................3

    **1.17.**    Member Nonrecourse Deductions .......................................................3

    **1.18.**    Nonrecourse Liability .........................................................................3

    **1.19.**    Percentage Interest .............................................................................4

    **1.20.**    Person ..................................................................................................4

    **1.21.**    Profits and Losses ..............................................................................4

    **1.22.**    Regulations .........................................................................................4

    **1.23.**    Subsidiary ...........................................................................................4

    **1.24.**    Substitute Member ..............................................................................5

    **1.25.**    Transfer ...............................................................................................5

    **1.26.**    Unit .....................................................................................................5

SECTION 2. FORMATION ...............................................................................................5

    **2.1.**    Organization .......................................................................................5

    **2.2.**    Name of the Company .........................................................................5

    **2.3.**    Duration ..............................................................................................5

i

LEGAL_US_E # 150128321.2

CONFIDENTIAL

FBG_CH1_00097764

**2.4.** Legal Status of Company ..........................................................................5

**2.5.** Filing Agent for Service of Process ............................................................5

SECTION 3. BUSINESS OF THE COMPANY ..............................................................5

SECTION 4. ACCOUNTING AND RECORDS ..............................................................6

**4.1.** Accounting Period ......................................................................................6

**4.2.** Records to be Maintained ..........................................................................6

**4.3.** Accounts ....................................................................................................6

**4.4.** Reports ......................................................................................................6

**4.5.** Tax Information ..........................................................................................6

SECTION 5. NAME AND ADDRESS OF MEMBER......................................................6

SECTION 6. MEMBERS ................................................................................................7

**6.1.** Members ....................................................................................................7

**6.2.** Additional Members ..................................................................................7

**6.3.** Representations and Warranties..................................................................7

**6.4.** Member Voting Rights ...............................................................................7

**6.5.** Meetings....................................................................................................8

**6.6.** Quorum .....................................................................................................8

**6.7.** Notice of Meetings....................................................................................8

**6.8.** Attendance at Meetings .............................................................................8

**6.9.** Member to Vote in Person or by Proxy .....................................................8

**6.10.** Action by Written Consent ........................................................................8

**6.11.** Liability to Third Parties............................................................................8

**6.12.** Information ................................................................................................9

**6.13.** Participation by Communication Equipment...............................................9

**6.14.** Dealings with the Company.......................................................................9

**6.15.** Reimbursement to the Members ................................................................9

**6.16.** Withdrawal of Member..............................................................................9

**6.17.** Accountable as Trustee .............................................................................9

SECTION 7. MANAGEMENT........................................................................................10

**7.1.** Management Reserved to the Manager........................................................10

**7.2.** Manager ....................................................................................................11

**7.3.** Right to Rely on the Manager ...................................................................11

**7.4.** Limitation on Authority of Manager..........................................................12

ii

CONFIDENTIAL

FBG_CH1_00097765

**DEBTORS' EXHIBIT NO. 58**
**Page 8 of 104**

| | | |
|---|---|---|
| **7.5.** | Authority to Execute Documents | 12 |
| **7.6.** | Officers | 13 |
| **7.7.** | Removal, Resignation or Replacement of Officers | 13 |
| **7.8.** | Reliance on Reports | 13 |
| **7.9.** | Members and the Manager have no Exclusive Duty to Company | 13 |
| **7.10.** | Conflicts of Interest | 14 |
| **7.11.** | Action by Written Consent | 14 |

SECTION 8. LIMITATION ON LIABILITY; EXCULPATION; INDEMNIFICATION; *ETC.* ........14

| | | |
|---|---|---|
| **8.1.** | Liability | 14 |
| **8.2.** | Exculpation | 14 |
| **8.3.** | No Fiduciary Duties | 15 |
| **8.4.** | Interested Transactions | 15 |
| **8.5.** | Indemnity | 15 |
| **8.6.** | Benefit Plans | 17 |
| **8.7.** | Liability Insurance | 17 |
| **8.8.** | Outside Activities | 17 |
| **8.9.** | Severability | 17 |

SECTION 9. CONTRIBUTIONS AND CAPITAL ACCOUNTS ........17

| | | |
|---|---|---|
| **9.1.** | Prior and Concurrent Contributions | 18 |
| **9.2.** | Additional Capital Contributions | 18 |
| **9.3.** | Contribution Returns | 18 |
| **9.4.** | Loans by Members | 18 |
| **9.5.** | Capital Account | 18 |

SECTION 10. ALLOCATIONS AND DISTRIBUTIONS ........19

| | | |
|---|---|---|
| **10.1.** | Allocations of Net Profit and Net Loss | 19 |
| **10.2.** | Distribution of Assets | 19 |
| **10.3.** | Qualified Income Offset | 19 |
| **10.4.** | Gross Income Allocation | 19 |
| **10.5.** | Section 704(c) Allocation | 20 |
| **10.6.** | Distributions from Cash Flow | 20 |
| **10.7.** | Limitations on Distributions | 22 |
| **10.8.** | Minimum Gain Chargeback | 22 |

iii

CONFIDENTIAL

FBG_CH1_00097766

**DEBTORS' EXHIBIT NO. 58**
**Page 9 of 104**

| | | |
|---|---|---|
| **10.9.** | Member Minimum Gain Chargeback | 22 |
| **10.10.** | Nonrecourse Deductions | 22 |
| **10.11.** | Member Nonrecourse Deductions | 22 |
| **10.12.** | Section 754 Adjustments | 22 |
| **10.13.** | Curative Allocations | 23 |
| SECTION 11. | TAXES | 23 |
| **11.1.** | Elections | 23 |
| **11.2.** | Taxes of Taxing Jurisdictions | 23 |
| **11.3.** | Tax Matters Partner | 23 |
| **11.4.** | Method of Accounting | 24 |
| **11.5.** | Tax Returns | 24 |
| SECTION 12. | OWNERSHIP | 24 |
| SECTION 13. | DISSOLUTION AND WINDING UP | 24 |
| **13.1.** | Dissolution | 24 |
| **13.2.** | Certificate of Cancellation | 25 |
| **13.3.** | Winding Up | 25 |
| **13.4.** | Liquidation and Termination | 25 |
| **13.5.** | Deficit Capital Accounts | 26 |
| **13.6.** | Deemed Contribution and Distribution | 26 |
| **13.7.** | Notice of Dissolution | 27 |
| SECTION 14. | TRANSFERS | 27 |
| **14.1.** | Transfers | 27 |
| **14.2.** | Distributions and Allocations with Respect to Transferred Units | 27 |
| **14.3.** | Pledgee's Rights | 27 |
| SECTION 15. | AMENDMENT | 28 |
| SECTION 16. | MISCELLANEOUS PROVISIONS | 28 |
| **16.1.** | Entire Agreement | 28 |
| **16.2.** | Application of Delaware Law | 28 |
| **16.3.** | Execution of Additional Instruments | 28 |
| **16.4.** | Construction | 28 |
| **16.5.** | Headings | 28 |
| **16.6.** | Waivers | 28 |
| **16.7.** | Rights and Remedies Cumulative | 29 |

iv

LEGAL_US_E # 150128321.2

CONFIDENTIAL

FBG_CH1_00097767

**16.8.** Counterparts; Facsimile ...................................................................................29

**16.9.** Banking ..................................................................................................................29

**16.10.** Determination of Matters Not Provided for in This Agreement............................29

**16.11.** Further Assurances................................................................................................29

**16.12.** Invalidity ...............................................................................................................29

**16.13.** Notices ...................................................................................................................29

**16.14.** Waiver of Action for Partition .............................................................................29

EXHIBIT A.....................................................................................................................................31

EXHIBIT B.....................................................................................................................................32

v

LEGAL_US_E # 150128321.2

CONFIDENTIAL

FBG_CH1_00097768

**DEBTORS' EXHIBIT NO. 58**

**Page 11 of 104**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FIRST BRANDS GROUP, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of FIRST BRANDS GROUP, LLC (formerly known as Trico Group, LLC), (the "Company") a limited liability company organized pursuant to the provisions of Title 6, Chapter 18 of the Delaware Limited Liability Company Act (the "Act"), is entered into and shall be effective as of August 14, 2020 (the "Effective Date") by and among the Company, the undersigned Members (as defined below) and the Additional Members (as defined below), and amends and restates in its entirety that certain Amended and Restated Limited Liability Company Agreement among the parties hereto, dated March 27, 2019. The Certificate of Formation of the Company (the "Certificate of Formation") was filed with the Secretary of State of Delaware on May 14, 2013. The rights and liabilities of the Members will be as provided in the Act except as otherwise provided in this Agreement.

SECTION 1.
DEFINITIONS

For purposes of this Agreement unless otherwise defined herein, the following terms shall have the following meanings:

**1.1.** Additional Member. A Member who has acquired Units and been admitted as a Member pursuant to the provisions of Section 14.

**1.2.** Adjusted Capital Account Deficit. With respect to any Member, such Member's Adjusted Capital Account Deficit shall be the deficit balance, if any, in such Member's Capital Account (as defined in Section 9.5) as of the end of the relevant fiscal year or at any time, after giving effect to the following adjustments:

    (a) Credit to such Capital Account any amount which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentence of Sections 1.704-2(g)(1) and 1704-2(i)(5) of the Regulations; and

    (b) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

**1.3.** Affiliate. With respect to any person, (i) in the case of an individual, any relative of such person; (ii) any officer, director, trustee, partner, manager, employee or holder of greater than fifty percent (50%) of any class of the voting securities of or equity interest in such person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled

CONFIDENTIAL

FBG_CH1_00097769

by or under common control with such person; or (iv) any officer, director, trustee, partner, manager, employee or holder of greater than fifty percent (50%) of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such person.

**1.4.** Assignee. A transferee of a Unit who has not been admitted as a Substitute Member; provided, however, that solely for purposes of the allocation and distribution provisions of Sections 9, 10 and 13 of this Agreement, a Substitute Member shall also be deemed to include such Assignee.

**1.5.** Certificate of Formation. The Certificate of Formation of the Company, as properly adopted and amended or restated from time to time by the Members and filed with the Delaware Secretary of State.

**1.6.** Company. First Brands Group, LLC, a limited liability company formed under the laws of the State of Delaware, and any successor limited liability company.

**1.7.** Company Minimum Gain. The aggregate amounts of gain that would be realized by the Company if it disposed of all property subject to Nonrecourse Liabilities in full satisfaction of such liabilities. Such amounts are calculated as described in Regulations Section 1.704-2(d)(1).

**1.8.** Covered Person. Each current or former Member, each Affiliate of each current or former Member, each officer, director, shareholder, partner, manager, member, employee, advisor, representative or agent of each current or former Member and any of their respective Affiliates, and each current or former officer, employee, or agent of the Company or any of its Affiliates.

**1.9.** Control. For the purposes of Sections 1.3 and 1.23 of this Agreement, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

**1.10.** Effective Date. As defined in the Preamble to this Agreement.

**1.11.** Gross Asset Value. Means, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(ii) The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of assets as consideration for an interest in the Company; (c) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by

CONFIDENTIAL                                                                      FBG_CH1_00097770

**DEBTORS' EXHIBIT NO. 58**
**Page 13 of 104**

an existing Member acting as a Member or by a new Member acting as a Member or in anticipation of being a Member pursuant to Regulations Section 1.704-1(b)(2)(iv)(f)(iii); and (d) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a), (b), (c) and (d) above will be made only if the Manager reasonably determines that such adjustments are necessary to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 10.12 of this Agreement; provided, however, that Gross Asset Values will not be adjusted pursuant to this clause (iv) to the extent the Manager determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) above, such Gross Asset Value will thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**1.12.**    Liquidating Event. As defined in Section 13.1.

**1.13.**    Majority in Interest. Shall mean the affirmative vote or consent of Members described as a "Majority in Interest" in Section 12.

**1.14.**    Member. As defined in Section 6.1.

**1.15.**    Member Minimum Gain. An amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

**1.16.**    Member Nonrecourse Debt. Partner nonrecourse debt as defined in Regulations Section 1.704-2(b)(4).

**1.17.**    Member Nonrecourse Deductions. Partner nonrecourse deductions as defined in Regulations Sections 1.704-2(i)(1) and (2).

**1.18.**    Nonrecourse Liability. Any Company liability (or portion thereof) for which no Member bears the economic risk of loss as determined in accordance with Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2) (without regard to whether those Sections apply to such liability).

LEGAL_US_E # 150128321.2

3

CONFIDENTIAL

FBG_CH1_00097771

**1.19.**   Percentage Interest. Shall have the meaning set forth in Section 12.

**1.20.**   Person. Shall mean any individual, partnership, corporation, trust, limited liability company or other entity.

**1.21.**   Profits and Losses. Means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

> (i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses will be added to such taxable income or loss;

> (ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(1), and not otherwise taken into account in computing Profits or Losses will be subtracted from such taxable income or loss;

> (iii)    In the event the Gross Asset Value of any Company asset is adjusted, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv)    Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

> (v)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account depreciation for federal income tax purposes for such fiscal year or other period; and

> (vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 10.3-10.4, 10.8-10.12 of this Agreement will not be taken into account in computing Profits or Losses.

**1.22.**   Regulations. Regulations of the Department of Treasury promulgated under the Internal Revenue Code of 1986, as amended from time to time.

**1.23.**   Subsidiary. With respect to any Person (the "parent") at any date, (a) any other corporation, limited liability company, association or other business entity of which (i) securities or other ownership interests representing more than fifty percent (50%) of the voting power of all equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of the board of directors, managers or similar governing body thereof or (ii) the majority interest in the capital or profits of such corporation, limited liability company, association or other business entity, are owned, controlled, directly or indirectly, or held by the parent or one or more

4

CONFIDENTIAL

FBG_CH1_00097772

subsidiaries of the parent and (b) any other Person that is otherwise Controlled by the parent or one or more subsidiaries of the parent.

**1.24.**   Substitute Member. An Assignee who has been admitted to all of the rights of membership pursuant to Section 14 of this Agreement.

**1.25.**   Transfer. Any sale, exchange, conveyance, disposition, pledge, encumbrance, liquidation, or other alienation of a Unit.

**1.26.**   Unit. A unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

SECTION 2.
FORMATION

**2.1.**   Organization. Pursuant to the Act, the Company has been organized as a Delaware limited liability company by filing the Certificate of Formation with the Delaware Secretary of State on January 17, 2018.

**2.2.**   Name of the Company. The name of the Company is First Brands Group, LLC, and all business of the Company shall be conducted in that name or in other assumed names that are in compliance with the Act but in any case only to the extent permitted by applicable law and approved by the Members.

**2.3.**   Duration. The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act and this Agreement.

**2.4.**   Legal Status of Company. The Members do not intend that the Company be a co-partnership, limited partnership, or corporation, except that they do intend it to be treated as a partnership for purposes of federal, state, and local tax law only. None of the Members of the Company is a partner of any other Member as a result of becoming a Member of the Company, and the Certificate of Formation, this Agreement and the relationships created thereby and arising therefrom shall not be construed to suggest otherwise.

**2.5.**   Filing Agent for Service of Process. The Company's filing agent for service of process shall be located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The name of its registered agent is The Corporation Trust Company.

SECTION 3.
BUSINESS OF THE COMPANY

The Company has been organized to transact business for any lawful purpose or purposes not specifically prohibited by the laws of the State of Delaware and shall be permitted to guarantee the debts and obligations of any of its affiliates. The Company shall have the authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Section 3.

CONFIDENTIAL                                                    FBG_CH1_00097773

SECTION 4.
ACCOUNTING AND RECORDS

**4.1.**     Accounting Period. The Company's accounting period shall be the calendar Year.

**4.2.**     Records to be Maintained.

(a)     The Company shall maintain records at its principal office as required by the Act, including:

(i)     A current list of the full name and last known address of each Member.

(ii)     A copy of the Certificate of Formation or Restated Certificate of Formation, together with any amendments thereto.

(iii)     Copies of the Company's federal, state, and local tax returns and reports, if any, for the three most recent years.

(iv)     Copies of any financial statements of the Company for the three most recent years.

(v)     Copies of the limited liability company agreements, including this Agreement.

(vi)     Copies of records that would enable a Member to determine the Members' relative shares of the Company's distributions and their relative voting rights.

(b)     Any Member or his designated representative shall have the right, at such Member's own expense, at any reasonable time, to have access to and inspect and copy the contents of such books or records in accordance with the Act.

**4.3.**     Accounts. The Company shall maintain a record of Capital Accounts for each Member in accordance with Section 9.

**4.4.**     Reports. Within a reasonable period after the end of each Company fiscal year, each Member shall be furnished with pertinent information regarding the Company and its activities during such period.

**4.5.**     Tax Information. Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company. Every effort shall be made to furnish such information within 75 days after the end of each fiscal year or as soon thereafter as is reasonably practicable.

SECTION 5.
NAME AND ADDRESS OF MEMBER

CONFIDENTIAL                                                                                            FBG_CH1_00097774

The name and address of the Member is set forth on Exhibit A.

SECTION 6.
MEMBERS

**6.1.**     Members. The Members of the Company as set forth in this Agreement and any Substitute Members along with any Additional Members admitted pursuant to Section 6.2 shall constitute the Members of the Company.

**6.2.**     Additional Members. Members in addition to the Members set forth in this Agreement and any Substitute Members ("Additional Members") may be admitted upon the approval of a Majority in Interest.

**6.3.**     Representations and Warranties. Each Member hereby represents and warrants to each other Member and to the Company that:

(a)     such Member has full power and authority to execute and deliver this Agreement, and to perform its obligations hereunder and thereunder;

(b)     all actions necessary for the due authorization, execution, delivery and performance by such Member of this Agreement have been duly taken and no consent or approval of, or filing with or notice to, any person, entity or governmental authority is required therefor;

(c)     such Member's execution, delivery and performance of this Agreement does not violate any other agreement or instrument to which such Member is a party or by which his property is bound;

(d)     this Agreement has been duly executed and delivered by such Member;

(e)     this Agreement is the legal, valid and binding obligation of such Member enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity);

(f)     the Member is acquiring the Units for the Member's own account as an investment and without an intent to distribute the Units; and

(g)     the Member acknowledges that the Units have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

**6.4.**     Member Voting Rights. Each Member shall be entitled to vote on all matters to be submitted for a vote or to be determined by the Members with each Member having one (1) vote for each Unit held by such Member; and the approval of all such matters shall be by Majority in

CONFIDENTIAL

FBG_CH1_00097775

Interest at an annual or special meeting of the Members, unless a higher percentage is required for approval elsewhere in this Agreement.

**6.5.** Meetings. Any Member or Members holding at least 50% of the Units may call a meeting of the Members for any reasonable time at any reasonable place upon giving proper notice to all the Members.

**6.6.** Quorum. Except as otherwise required by the Act or the Certificate of Formation, the presence of all Members, either in person or by proxy, is required to obtain a quorum for the transaction of business. Regardless of whether a quorum is present, the meeting may be adjourned by a vote of the Members present. The Members present in person or by proxy at such meeting may continue to do business until adjournment, notwithstanding the withdrawal of one or more Members. At the adjourned meeting at which the requisite quorum shall be represented, any business may be transacted which might have been transacted at the meeting as originally notified.

**6.7.** Notice of Meetings. The Members shall cause notice of the time, place and purposes of each meeting of the Members to be delivered in accordance with Section 16.13, at least 7 days but not more than 60 days prior to the meeting, to each Member of record entitled to vote at the meeting. Notice of a meeting of Members need not be given to any Member who signs a waiver of notice in writing, whether before or after the time of the meeting. The notice shall state the nature of the business to be transacted and the matters, if any, upon which the Members will be requested to vote; provided, however, that action may be taken on any matter brought before a meeting of the Members regardless of whether such matter is set forth in the notice. Notice of any adjourned meeting of the Members need not be given if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken.

**6.8.** Attendance at Meetings. Attendance of a person at a meeting of Members in person or by proxy constitutes waiver of objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

**6.9.** Member to Vote in Person or by Proxy. A Member entitled to vote at a meeting of Members or to express consent or dissent without a meeting shall be entitled to vote in person, or by proxy appointed by an instrument in writing authorizing other persons to act. A proxy shall be signed by the Member or authorized agent or representative and shall not be valid after the expiration of three (3) years from its date unless otherwise provided.

**6.10.** Action by Written Consent. Any action required or permitted to be taken at a meeting of Members or a committee appointed by the Members may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by all of the Members and delivered to the custodian of the Company's records for filing with the Company records. Any action taken hereunder is effective when the Members holding the number of necessary Units have signed the consent, unless the consent specifies a different effective date.

**6.11.** Liability to Third Parties. Unless provided by law or expressly assumed, a person who is a Member shall not be liable for the acts, debts, obligations or liabilities of the Company,

CONFIDENTIAL

FBG_CH1_00097776

including those under a judgment, decree or order of a court. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company. This Section 6.11 is intended to expand the protections afforded by Section 8.1 of this Agreement, and shall be read and interpreted in such fashion.

**6.12.** Information. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated, including, without limitation, the books, records of account, business records, the Certificate of Formation and this Agreement.

**6.13.** Participation by Communication Equipment. A Member may participate in a meeting of the Members by a conference telephone or by other similar communications equipment through which all persons participating in the meeting may communicate with the other participants. All participants shall be advised of the communications equipment and the names of the parties in the conference shall be divulged to all participants. Participation in a meeting pursuant to this Section constitutes presence in person at the meeting.

**6.14.** Dealings with the Company. The Members, and any Affiliates thereof, shall have the right to contract and otherwise deal with the Company with respect to the sale or lease of real and/or personal property, the rendition of services, the lending of money, and for other purposes, and to receive the purchase price, costs, fees, commissions, interest, compensation and/or other amounts and/or other forms of consideration in connection therewith, as a Majority in Interest of the Members entitled to vote thereon may determine, without being subject to claims for self-dealing; provided, however, notwithstanding anything contained in this Agreement to the contrary, no Member shall have the right to vote on, or participate in, the decision concerning the Company's dealing with such Member or his Affiliate pursuant to this Agreement.

**6.15.** Reimbursement to the Members. The Members shall be reimbursed by the Company for all reasonable costs and expenses of every kind or nature paid or incurred by them for or on behalf of the Company.

**6.16.** Withdrawal of Member. The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 13. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's dissolution pursuant to Section 13 of this Agreement. The Members covenant not to withdraw as a Member without the unanimous prior written consent of the Members if such withdrawal would cause the Company to be taxed in any way other than as a partnership for federal income tax purposes or would jeopardize the Company's status as a Certified Minority Business Enterprise except as otherwise specifically provided for and permitted by this Agreement.

**6.17.** Accountable as Trustee. A Member shall account to the Company and hold as trustee for it any profit or benefit derived by the Member from any transaction connected with the

9

LEGAL_US_E # 150128321.2

**DEBTORS' EXHIBIT NO. 58**
**Page 20 of 104**

conduct of the business of, or winding up of, the Company or from any personal use by the Member of the Company's property.

SECTION 7.
MANAGEMENT

**7.1.** Management Reserved to the Manager. Subject to the limitations imposed by the Act and this Agreement, one or more managers (the "Manager"), in its full and exclusive discretion, shall have the exclusive right to manage and control, have authority to obligate and bind, and make all decisions affecting the business, operations and assets of the Company including, without limitation, the power to:

(a) acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company ("Property");

(b) operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(c) execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of Property, or in connection with managing the affairs of the Company, including executing amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement;

(d) borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Property;

(e) execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Property;

(f) prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the Property and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Property;

(g) care for and distribute funds to the Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(h) contract on behalf of the Company for the employment and services of employees and or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

LEGAL_US_E # 150128321.2

10

CONFIDENTIAL

FBG_CH1_00097778

(i)      engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Property and Member liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(j)      make any and all elections for federal, state, and local tax purposes, including, without limitation, any election, if permitted by applicable law; to adjust the basis of Property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with transfers of Company interests and Company distributions;

(k)      take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company; and

(l)      institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

7.2.      Manager. Management of the Company shall be vested in the Manager. The Manager does not have to hold Units as a Member of the Company in order to serve as the Manager. The Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes of the Company set forth in this Agreement. The Manager shall devote only such time to the Company as is reasonably required to manage and conduct the activities of the Company in the Manager's full and exclusive discretion. The Manager may resign as the Manager at any time by giving written notice to the Company. The resignation of the Manager shall take effect upon receipt of notice thereof or at such later time as may be specified in such notice. Any vacancy in the Manager for any reason shall be filled by such Person as the Manager may designate in its written notice of resignation to the Company. Notwithstanding anything to the contrary contained in this Agreement, the Manager shall continue to serve as Manager until the appointment of a replacement Manager. The Manager may designate one or more committees, each committee to consist of one or more of the Members. A committee, and each member thereof, shall serve at the pleasure of the Manager.  The Manager shall initially be Patrick James.

7.3.      Right to Rely on the Manager. Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(a)      the identity of any member,

(b)      the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company,

(c)      the Persons who are authorized to execute and deliver any instrument or document of the Company, or

11

CONFIDENTIAL

FBG_CH1_00097779

(d)     any act or failure to act by the Company on any other matter whatsoever involving the Company or the Manager.

**7.4.**     Limitation on Authority of Manager.

(a)     Without the consent of all of the Members, the Manager shall not have the authority to:

(i)     do any act in contravention of this Agreement,

(ii)     do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement,

(iii)     confess a judgment against the Company, or

(iv)     possess Property, or assign rights in specific Property, for other than a Company purpose.

(b)     Without the consent of all of the Members, neither the Company nor the Manager shall:

(i)     amend the Certificate of Formation or this Agreement,

(ii)     issue additional Units, or any security convertible into Units,

(iii)     redeem any Member's Units except as provided for herein,

(iv)     dissolve the Company except as otherwise permitted pursuant to Section 13 hereof,

(v)     sell all or substantially all of the Property of the Company, or

(vi)     merge or consolidate with or into any Person.

(c)     Except as otherwise provided by this Agreement, no Member shall have any right to act for or bind the Company in any way. Any Member who acts beyond the scope of the authority granted by this Agreement shall, in addition to any other remedy available to the Company or the other Members, be liable in damages to the Company and each other Member for any loss or damages that they may incur or suffer as a consequence of such act.

**7.5.**     Authority to Execute Documents. All deeds, documents, contracts, agreements, bonds, debentures, notes, obligations, evidences of indebtedness, checks, drafts and other instruments requiring execution by the Company shall be executed and delivered by the Manager or such other person or persons as the Manager may authorize. All funds of the Company not otherwise employed shall be deposited to the credit of the Company in such financial institutions as designated by the Manager. The Manager may execute or cause to be executed, in the name and on behalf of the Company, as the holder of stock or other securities in any entity, all written

LEGAL_US_E # 150128321.2

12

CONFIDENTIAL

FBG_CH1_00097780

proxies, powers of attorney or other written instruments as the Manager may deem necessary for the Company to exercise such powers and rights.

7.6.    Officers. The Company shall have no officers unless appointed by the Manager or Members after the date hereof. To the extent the Company has officers as provided in the prior sentence, the Company may have one or more officers who may be appointed by the Manager or Members, and who shall have the title, authority and duties as authorized or directed by the Manager or Members. An officer shall hold office for the term for which appointed and until a successor is appointed and qualified, or until resignation or removal.

7.7.    Removal, Resignation or Replacement of Officers. An officer elected or appointed by the Manager may be removed by the Manager with or without cause. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer does not of itself create contract rights. An officer may resign by written notice to the Company, which resignation is effective upon its receipt by the Company or at a subsequent time specified in the notice of resignation. Vacancies in any office may be filled by the Manager.

7.8.    Reliance on Reports. In discharging his or her duties, the Manager or an officer may rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by any of the following:

(a)    One or more officers, Members or employees of the Company whom the Manager or officer reasonably believes to be reliable and competent in the matter presented.

(b)    Legal counsel, professional accountants, engineers, or other persons as to matters the Manager or officer reasonably believes are within the person's professional or expert competence.

(c)    A committee of officers of which he or she is not a member if the Manager or officer reasonably believes the committee merits confidence.

A Manager or officer is not entitled to rely on the information, opinions, reports, or statements set forth in this Section if the Manager or officer has knowledge concerning the matter in question that makes reliance otherwise permitted by this provision unwarranted. The Manager or officer is not liable for an action taken as the Manager or officer or the failure to take any action if he or she performs the duties of his or her office in compliance with this Section.

7.9.    Members and the Manager have no Exclusive Duty to Company. Except to the extent agreed to in any written employment agreement entered into by and between the Company and any Member, neither the Manager nor any Member shall be required to manage the Company as his or her sole and exclusive job and he or she, may have other interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor the Manager or any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of any Member or to the income or proceeds derived therefrom. Except to the extent provided for in some other agreement, neither the Manager nor any Member shall incur any liability to the Company or to any Member as a result of engaging in any other business or venture.

LEGAL_US_E # 150128321.2

13

CONFIDENTIAL

FBG_CH1_00097781

**7.10.**   Conflicts of Interest. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever pursuant to the terms of this Agreement the Manager is permitted or required to make a decision (a) in his "sole discretion," the Manager shall be entitled to consider only such interests and factors as the Manager or such Member desires, including his own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person whatsoever, or (b) in "good faith" or another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard. If any questions should arise with respect to the operation of the Company that are not specifically provided for in this Agreement or the Act, or with respect to the interpretation of this Agreement, the Manager is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in his sole discretion, and his determination and interpretation so made shall be final and binding on all parties, absent manifest error.

**7.11.**   Action by Written Consent. Any action required or permitted to be taken at a meeting of the Manager or a committee appointed by the Manager may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by the Manager and delivered to the custodian of the Company's records for filing with the Company records. Any action taken hereunder is effective when the Manager has signed the consent, unless the consent specifies a different effective date.

SECTION 8.
LIMITATION ON LIABILITY; EXCULPATION; INDEMNIFICATION; *ETC.*

**8.1.**   Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Covered Person. This Section 8.1 is intended to expand the protections afforded by Section 6.11 of this Agreement, and shall be read and interpreted in such fashion.

**8.2.**   Exculpation. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's, willful misconduct, fraud, or willful breach of this Agreement. If any legal action or other proceeding is brought by the Company or any Covered Person against any other Covered Person, and the defendant Covered Person in such action or proceeding shall be the successful or prevailing party, such defendant shall be entitled to recover attorneys' fees and other costs incurred in that action or proceeding in addition to any other relief to which such defendant may be entitled. For purposes of this Section 8.2, a defendant shall be deemed to be the successful or prevailing party if the Company or Covered Person shall have failed to obtain the relief requested in a final judgment by a court of competent jurisdiction.

LEGAL_US_E # 150128321.2

CONFIDENTIAL

**8.3.**    No Fiduciary Duties. Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, *provided* that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Covered Person takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty (fiduciary or other) to consider the interests of the Company, its Subsidiaries, or the other Members, and may act exclusively in its own interest (or in the interest of the Member that appointed it).

**8.4.**    Interested Transactions. To the fullest extent permitted by law, no Covered Person shall be deemed to have breached any duty of loyalty to the Company, any Member, or other Person (and no Covered Person shall be liable to the Company, any Member, or other Person for breach of any duty of loyalty or analogous duty) with respect to any action or inaction in connection with or relating to any transaction that was approved by the Manager, including any transaction involving the Manager or any of his Affiliates.

**8.5.**    Indemnity.

(a)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage, or claim (whether civil, criminal, administrative, investigative, or otherwise) incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage, or claim incurred by such Covered Person that is finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's willful misconduct, fraud, or breach of this Agreement with respect to such acts or omissions, *provided* that any indemnity under this Section 8.5 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account of such indemnity.

(b)     To the fullest extent permitted by applicable law, expenses (including, without limitation, attorneys' fees, disbursements, fines, and amounts paid in settlement) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding made by one or more third parties relating to or arising out of the performance of their duties on behalf of the Company shall, from time to time, be advanced by the Company prior to the final disposition of such third party claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified as authorized in Section 8.5.

(c)     The indemnification authorized by this Section 8.5 is not exclusive of and shall be in addition to any other rights granted to those seeking indemnification under this

CONFIDENTIAL                                                                          FBG_CH1_00097783

Agreement, any other agreement, a vote of Members or a determination by the disinterested Manager of the Company, or otherwise, both as to action in their official capacities and as to action in another capacity while holding their offices or positions. The indemnification shall continue as to a Person who has ceased to be a Member, Manager, officer, employee or agent of the Company and shall inure to the benefit of such Person's heirs, executors, administrators, successors and assigns.

(d)     The Company shall purchase and maintain insurance or furnish similar protection, including, but not limited to, trust funds, letters of credit or self-insurance, for or on behalf of any Person who is or was a Member, Manager or officer of the Company. The insurance or similar protection purchased or maintained for those Persons may be for any liability asserted against them and incurred by them in any capacity described in this Section 8.5 or for any liability arising out of their status as described in this Section 8.5, whether or not the Company would have the power to indemnify them against that liability under this Section 8.5. Insurance may be so purchased from or so maintained with a Person in which the Company has a financial interest.

(e)     The authority of the Company to indemnify Persons pursuant to paragraphs (a) or (b) of this Section 8.5 does not limit the payment of costs and expenses as they are incurred, in advance of the final disposition of an action, suit or proceeding, or the payment of indemnification, insurance or other protection that may be provided pursuant to paragraphs (c) or (d) of this Section 8.5. Paragraphs (a) or (b) of this Section 8.5 do not create any obligation to repay or return payments made by the Company pursuant to paragraphs (c) or (d) of this Section.

(f)     In the event that any Indemnified Person has rights to indemnification, advancement of expenses and/or insurance provided by any Member or Affiliate of a Member (any of the foregoing being a "Secondary Indemnitor"), then between the Company and the Secondary Indemnitor the following shall apply: the Company (i) shall be the indemnitor of the first resort (i.e., its obligations to the Indemnified Person shall be primary to any obligation of the Secondary Indemnitor to advance expenses or to provide indemnification resulting from the Indemnified Person's service to the Company) and (ii) the Secondary Indemnitor shall not be liable to the Company for contribution, subrogation or any other recovery of any kind in respect to the Company's indemnification of and advancement of expenses to the Indemnified Person. No advancement or payment by the Secondary Indemnitor to or on behalf of an Indemnified Person with respect to any expenses or liabilities resulting from the Indemnified Person's service to the Company shall affect the Indemnified Person's rights to indemnification and/or advancement of expenses under this Section 8.5. Each Secondary Indemnitor is an express third party beneficiary of this Section 8.5(f).

(g)     A Person who is not a party to this Agreement has no right to enforce directly any term of this Agreement save that each Person entitled to indemnification pursuant to this Section 8.5 and Covered Person may enforce directly its rights pursuant to this Agreement.

LEGAL_US_E # 150128321.2

CONFIDENTIAL                                                     FBG_CH1_00097784

**DEBTORS' EXHIBIT NO. 58**
**Page 27 of 104**

**8.6.** Benefit Plans. For purposes of this Section 8, serving an employee benefit plan at the request of the Company shall include any service as a director, officer, employee or agent of an entity which imposes duties on, or involves services by such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries. A Person who acted in good faith and in a manner reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Company" referred to in this Section. For purposes of this Section, "party" includes any individual who is or was a plaintiff, defendant or respondent in any action, suit or proceeding, or who is threatened to be made a named defendant or respondent in any action, suit or proceeding.

**8.7.** Liability Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was the Manager, a Member, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, member, manager, partner, trustee, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Section or the Act.

**8.8.** Outside Activities. Each Member has the right to, and shall have no duty (contractual, fiduciary, or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries. In the event that any Member acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company or one or more of its Subsidiaries, on the one hand, and such Member or any other Person, on the other hand, such Member shall have no duty (contractual, fiduciary, or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries, as the case may be, and notwithstanding anything herein to the contrary, shall not be liable to the Company or any of its Subsidiaries, Affiliates, Members, or creditors for breach of any duty (contractual, fiduciary, or otherwise) by reason of the fact that such Member directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries.

**8.9.** Severability. To the fullest extent permitted by applicable law, if any portion of Section 8 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify any Covered Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative, or investigative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of Section 8 (including Section 8.5) that shall not have been invalidated.

SECTION 9.
CONTRIBUTIONS AND CAPITAL ACCOUNTS

LEGAL_US_E # 150128321.2

CONFIDENTIAL

FBG_CH1_00097785

**DEBTORS' EXHIBIT NO. 58**
**Page 28 of 104**

**9.1.** Prior and Concurrent Contributions. Any capital contributions of any Member and any initial capital contribution of any Additional or Substitute Member shall be reflected on an "Addendum" to Exhibit B (any such Addendum and Exhibit B are referred to collectively as "Exhibit B").

**9.2.** Additional Capital Contributions. No Member shall be required to advance or contribute any funds other than the initial capital contributions required to be made by each Member pursuant to Section 9.1 of this Agreement to the Company.

**9.3.** Contribution Returns. A Member is not entitled to the return of any part of the Member's capital contributions except as set forth herein. A Member is not entitled to be paid interest in respect of either his Capital Account or capital contributions. An unrepaid capital contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable it to return any Member's capital contribution.

**9.4.** Loans by Members. Should the Company lack sufficient cash to pay its obligations, any Member that agrees to do so may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section constitutes a loan from the Member to the Company, bears interest at the interest rate agreed to by the Company and the lending Member from the date of the advance until the date of payment, and is not a capital contribution.

**9.5.** Capital Account. "Capital Account" means an account that shall be maintained for each Member and which, as of any given date, shall be an amount equal to the following:

(a)     The aggregate amount of cash that has been contributed to the capital of the Company as of such date by or on behalf of such Member; plus

(b)     The Gross Asset Value of any property other than cash that has been contributed to the capital of the Company as of such date by such Member and the Member's share of the Company's liabilities under Section 1.752 of the Regulations or which are secured by any Company property distributed to such Member; plus

(c)     The aggregate amount of the Company's net profit that has been allocated to such Member as of such date pursuant to the provisions of Section 10 or any items of income or gain which are specifically allocated to such Member or other positive adjustments required by the Regulations and which have not been previously taken into account in calculating Capital Accounts; minus

(d)     The aggregate amount of the Company's net loss that has been allocated to such Member as of such date pursuant to Section 10 and the amount of any item of expense, deduction or loss which is specially allocated to such Member; and minus

(e)     The aggregate amount of cash and the Gross Asset Value of all other property (as of the date of distribution) that has been distributed to or on behalf of such Member and the amount of any liabilities of such Member assumed by the Company under Section 1.752 of the Regulations or which are secured by any property contributed by such Member to the Company and other negative adjustments required by the Regulations.

CONFIDENTIAL                                                                            FBG_CH1_00097786

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such regulations.

SECTION 10.
ALLOCATIONS AND DISTRIBUTIONS

**10.1.**   Allocations of Net Profit and Net Loss.

(a)   The Company's Profits and Losses for each tax year (including gains and losses resulting from sales, financings or refinancing) shall be allocated for both financial accounting and income tax purposes to the Members according to their respective Percentage Interests.

(b)   Losses allocated pursuant to Section 10.01(a) shall not exceed the maximum amount of net loss that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 10.1(a), the limitation set forth in this Section 10.1(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations. Any such Losses that may not be allocated to a Member shall be reallocated to the other Members in proportion to the positive balances in their adjusted Capital Accounts.

**10.2.**   Distribution of Assets. If the Company at any time distributes any of its assets in kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share of the net profits or net losses that would have been realized by the Company had it sold its assets that were distributed at their respective fair market values immediately prior to their distribution.

**10.3.**   Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.3 shall be made only if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 10 have been tentatively made as if this Section 10.3 were not in this Agreement.

**10.4.**   Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 10.4 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 10 have been tentatively made as if Section 10.3 and this Section 10.4 were not in this Agreement.

CONFIDENTIAL

FBG_CH1_00097787

**10.5.**   Section 704(c) Allocation.

(a)      Notwithstanding any other provision of this Agreement to the contrary, any gain or loss and any depreciation or other cost recovery deductions recognized by the Company for income tax purposes in any fiscal year with respect to all or any part of the Company's property that is required or permitted to be allocated among the Members in accordance with Section 704(c) of the Code and any Regulations promulgated thereunder so as to take into account the variation, if any, between the adjusted tax basis of such property at the time of its contribution and the Gross Asset Value of such property at the time of its contribution, shall be allocated to the Members for income tax purposes in the manner so required or permitted.

(b)      In the event the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss, and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)      Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 10.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of net profit, net loss, other items, or distributions pursuant to any provision of this Agreement.

**10.6.**   Distributions from Cash Flow.

(a)      Subject to Section 10.6(b) and except as otherwise provided in Section 13 with respect to distributions upon liquidation of the Company, cash from operations shall be applied and distributed in the following manner and order of priority, at such time or times as the Manager shall determine:

(i)      First, to payment of any and all due and outstanding debts or liabilities, expenses or obligations of the Company, including notes payable, operating expenses and interest expenses; and

(ii)      Second, to the Members in proportion to their Percentage Interests.

(b)      Mandatory Tax Distributions.

(i)      Within ninety (90) days, or as soon thereafter as practicable, after the end of each taxable year of the Company (or, in the Manager's discretion, such earlier date as individual taxpayers are required to make estimated tax payments), the Company shall calculate and distribute to each Member such Member's Mandatory Tax Distribution Amount (as defined herein); provided, however, that the payment of any Mandatory Tax Distribution Amount shall be deferred, on a pro rata basis based on each Member's Mandatory Tax Distribution Amount, in the Manager's sole discretion if the Company does not have sufficient cash (including

CONFIDENTIAL

FBG_CH1_00097788

under a line of credit) to fund such Mandatory Tax Distribution Amount or the payment of any Mandatory Tax Distribution Amount would cause a default under the terms of any funded indebtedness of the Company. The deferral shall continue until such time as the Manager determines that sufficient cash to fund the Mandatory Tax Distribution Amount is available or the payment of such Mandatory Tax Distribution Amount would not cause a default under the terms of any funded indebtedness. The Mandatory Tax Distribution Amount for each Member for each taxable year means an amount equal to (x) the excess of the product of (A) the net taxable income of the Company allocated to (or reasonably estimated to be allocable to) such Member for the taxable year attributable to the items allocated to such Member under Section 4 and Appendix A to this Agreement (excluding any allocations of income or gain to a Member with respect to any compensation, interest or other amount properly treated as a guaranteed payment for federal income tax purposes) multiplied by (B) the sum of the maximum Federal individual income tax rate (which shall include the tax under Section 1411 of the Code) and the maximum combined state and local individual income tax rate to which any Member (or, if any Member is a pass-through entity for Federal income tax purposes, any owner of such pass-through entity) is subject (less the effect of the deduction of state and local income taxes on the federal return, assuming no limitation of such deduction under Section 68 of the Code), taking into account for this purpose the character of items allocated to such Member as ordinary income or capital gain, over (ii) the sum of the aggregate Mandatory Tax Distribution Amounts distributed to such Member with respect to such taxable year and the aggregate distributions made to such Member pursuant to Section 10.6(a) with respect to such taxable year.

(ii)     Solely for purposes of this Section 10.6(b), if a Member is allocated a net loss for federal income tax purposes under this Agreement for any taxable year or period of the Company (calculated under the principles described in clause (i) of the preceding sentence) beginning after the date of this Agreement, such net loss shall be offset against, and shall reduce the net income allocated (or reasonably estimated to be allocable) to such Member this Agreement in subsequent taxable years of the Company (until such net loss is exhausted) for purposes of calculating the Mandatory Tax Distribution Amount for such Member for such subsequent fiscal quarters.

(iii)     Mandatory Tax Distribution Amounts shall be treated as distributions pursuant to Section 10.6(a), and to the extent such distributions result in a ratio other than in the ratio required by Section 10.6(a), the first distributions pursuant to Section 10.6(a) that are not Mandatory Tax Distribution Amounts shall be made so as to cause the aggregate distributions pursuant to Section 10.6(a) and this Section 10.6(b) (to the extent treated as distributions pursuant to Section 10.6(a)) to be as nearly as possible in the ratio required by Section 10.6(a). It is the intent of the Members that distributions made pursuant to this Section 10.6(b) are not intended to change the aggregate distribution amounts which each Member is entitled to receive pursuant to Section 10.6(a). Accordingly, notwithstanding anything to the contrary contained herein, the Managers shall apply distributions

CONFIDENTIAL

FBG_CH1_00097789

made pursuant to this Section 10.6(b) in such manner as is necessary to produce such result.

**10.7.** Limitations on Distributions. No distribution shall be made to Members if the Manager (i) determines that such a distribution would violate any covenants contained in any agreement between the Company and its lender or lenders, or (ii) determines that such a distribution would compromise the Company's ability to pay its debts as they become due in the usual course of business or would leave the Company with total assets that would be less than the sum of its liabilities (both absolute and contingent), or (iii) determines that such a payment would be in violation of applicable provisions of Delaware law.

**10.8.** Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), if there is a net decrease in Company Minimum Gain during any fiscal year, each Member must be specially allocated items of income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence are made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated are determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This provision is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and must be interpreted consistently therewith.

**10.9.** Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-1(i)(4), if there is a net decrease in Member Minimum Gain during any fiscal year, each Member who has a share of the Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(5), must be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence are made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated are determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This definition is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and is to be interpreted consistently therewith.

**10.10.** Nonrecourse Deductions. Nonrecourse deductions (as defined in Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for any fiscal year are specially allocated among the Members in accordance with their then Percentage Interests.

**10.11.** Member Nonrecourse Deductions. Member Nonrecourse Deductions for any fiscal year are specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

**10.12.** Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 732, 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts must be treated as an item of gain

CONFIDENTIAL                                                    FBG_CH1_00097790

(if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss must be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

**10.13.** Curative Allocations. To the extent possible, the allocations in Sections 10.3, 10.4 and 10.8-10.12 are to be offset either with other allocations described in those sections or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Agreement. Such offsetting allocations of income, gain, loss or deduction must be made in whatever manner the Manager determines appropriate so that, after such offsetting allocations are made, each Capital Account balance is, to the extent possible, equal to the Capital Account balance the Members would have had if such allocations were not part of this Agreement. In exercising their discretion hereunder, the Manager must take into account future allocations that, although not yet made, are likely to offset other allocations previously made.

SECTION 11.
TAXES

**11.1.**   Elections. The Tax Matters Partner shall make such tax elections for the Company as a Majority in Interest of the Members shall approve from time to time.

**11.2.**   Taxes of Taxing Jurisdictions. To the extent that the laws of any taxing jurisdiction having jurisdiction over a Member or the Company so require, upon request by the Members, each affected Member will submit an agreement indicating that the Member will make timely income tax payments to the taxing jurisdiction and that the Member accepts personal jurisdiction of the taxing jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such taxing jurisdiction the amount of any tax, penalty and interest determined under the laws of the taxing jurisdiction with respect to such income. The Tax Matters Partner may, where permitted by the rules of any taxing jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing jurisdiction. Any payments by the Company of tax and penalty or interest with respect to the income of a Member shall be treated as a distribution to such Member for purposes of Section 10.6(b) (and shall be charged against its Capital Account accordingly) and the next distributions pursuant to Section 10.6(b) shall be made so as to cause the aggregate distributions pursuant to Section 10.6(b) and the deemed distributions pursuant to this Section 11.2 to be in the ratio required by Section 10.6(b).

**11.3.**   Tax Matters Partner. The Members hereby designate Patrick James as the "tax matters partner" of the Company pursuant to § 6231(a)(7) of the Code (the "Tax Matters Partner"). Any person designated as Tax Matters Partner shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of § 6223 of the Code. The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member

CONFIDENTIAL                                                                                     FBG_CH1_00097791

with respect to any tax audit or tax related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the Members. Any Member who is designated as the Tax Matters Partner may not take any action contemplated by §§ 6222 through 6223 of the Code without the written consent of a Majority in Interest of the Members.

**11.4.** Method of Accounting. The records of the Company shall be maintained on the cash method of accounting, which method may be changed by the Manager from time to time in his discretion.

**11.5.** Tax Returns. The Tax Matters Partner shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 11.1. Each Member shall provide the Tax Matters Partner with all pertinent information in its possession relating to Company operations that is necessary for the Company to prepare and file its income tax returns.

SECTION 12.
OWNERSHIP

The Percentage Interest of a Member shall be calculated by dividing the number of Units owned by such Member by the total Units held by all of the Members (each Member's, "Percentage Interest"). The phrase "Majority in Interest" shall mean Members who, in the aggregate, hold at least a majority of the outstanding Units and Assignees shall not be considered Members for purposes of calculating the Percentage Interests of the Members except with respect to allocation and distribution provisions of Sections 9, 10 and 13 of this Agreement.

SECTION 13.
DISSOLUTION AND WINDING UP

**13.1.** Dissolution. The Company is dissolved and its affairs shall be wound up when the first of the following occurs (each a "Liquidating Event"):

(a)    upon the happening of an event specified in this Agreement as causing dissolution;

(b)    upon the unanimous vote of all the Members entitled to vote;

(c)    the happening of any event that makes it unlawful or impossible to carry on the business of the Company;

(d)    any event which causes there to be zero (0) members; or

(e)    upon the entry of a decree of judicial dissolution.

However, upon the occurrence of a Liquidating Event pursuant to Subsections (a) through (e) above, the Company may be continued under the terms and conditions of this Agreement by the unanimous written consent of the remaining Members.

CONFIDENTIAL                                                                    FBG_CH1_00097792

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.

**13.2.**   Certificate of Cancellation. Upon the dissolution and commencement of winding up the Company, a certificate of dissolution shall be duly executed and filed with the Secretary of State of the State of Delaware containing the information required by the Act.

**13.3.**   Winding Up. Except as otherwise provided in the Certificate of Formation, this Agreement, or Section 18-803 of the Act, upon and after dissolution the Members shall wind up the Company's affairs. The Members shall continue to function, for the purpose of winding up, in accordance with the procedures set by the Act, the Certificate of Formation, and this Agreement, shall be held to no greater standard of conduct than that described by the Act. The Company may sue and be sued in its name and process may issue by and against the Company in the same manner as if dissolution had not occurred.

**13.4.**   Liquidation and Termination. Upon dissolution of the Company, the Manager or a Member shall serve as liquidators ("Liquidators"). The Liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the Liquidators shall continue to operate the Company properties with all of the power and authority of the Members and the officers. The steps to be accomplished by the Liquidators are as follows:

(a)   As promptly as possible after dissolution and again after final liquidation, the Liquidators shall cause a professional accountant to make a proper accounting of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)   The assets shall be distributed in accordance with Section 18-804 of the Act, except as set forth in (c) below.

(c)   The distribution of assets to the Members shall be as follows:

(i)   The Liquidators may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii)   With respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not previously been reflected in the Capital Accounts would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)   Remaining cash and Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company

CONFIDENTIAL

FBG_CH1_00097793

**DEBTORS' EXHIBIT NO. 58**
**Page 36 of 104**

occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation). The parties intend that the allocation provisions contained in Section 10 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances pursuant to this Section 13.4(c) to be made in a manner identical to the order of priorities contained in Section 10.6(b) hereof, taking into account Section 10.6(b)(iii) and the last sentence of Section 11.2. To the extent that the allocation provisions contained in Section 10 fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager if and to the extent necessary to produce such result, (ii) Profits and Losses of the Company for any open years (or items of gross income and deduction of the Company for such open years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of Profits or Losses (or items of gross income and deduction) for the current and future years, and (iii) the provisions of this sentence shall control notwithstanding any reallocation or adjustment or Profits or Losses (or items thereof) by the Internal Revenue Service or other taxing authority.

Any distribution to a Member pursuant to clause 13.4(c) above will be net of any amounts owed to the Company by such Member.

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities shall be allocated to the distributee pursuant to this Section. The distribution of cash and/or property to a Member in accordance with the provisions of this Section constitutes a complete return to the Member of his or her capital contributions and a complete distribution to the Member of his or her Units and all the Company's property.

**13.5.**   Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation access) such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero and such deficit will not be considered a debt owed to the Company or any other person for any purpose whatsoever.

**13.6.**   Deemed Contribution and Distribution. Notwithstanding any other provision of this Section 13, in the event the Company is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but no Liquidation Event has occurred, the Company's assets will not be liquidated, the Company's liabilities will not be paid or discharged, and the Company's affairs will not be wound up. Instead, except as otherwise provided in applicable Regulations, the Company will be deemed to have contributed all of its assets and liabilities to a new limited liability company and immediately thereafter to have distributed the interest in such new limited liability company to the Members in proportion to their respective Interests in the Company.

CONFIDENTIAL                                                                                                FBG_CH1_00097794

**13.7.**   Notice of Dissolution. In the event a Liquidating Event occurs or an event occurs that would, but for the provisions of Section 13.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Members).

SECTION 14.
TRANSFERS

No Member shall encumber, transfer, or dispose of any Units in any of the Company which such Member now owns, or hereafter acquires, except as follows:

**14.1.**   Transfers. Notwithstanding anything to the contrary contained herein, a Member may sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose of, in whole or in part, its Membership Interests (as defined below) in the Company, either voluntarily or by operation of law, and such transferee shall be admitted as a Member automatically, succeeding in all respects to the interests, title, rights and powers of the Member in its capacity as a member, and any consents required under this Agreement or under applicable law shall be deemed given without any further action by the Member or the Company; provided, that such transferee shall not be liable for the obligations of the Member to make contributions to the Company. Upon the transfer of all of its Membership Interests in the Company, the Member transferring such Membership Interests shall be automatically withdrawn from and shall cease to be a Member of the Company. "Membership Interests" shall mean a Member's interest in the Company that is inclusive of economic, management and voting rights (including, without limitation, the rights to participate in the management of the business and the business affairs of the Company, to replace, appoint, direct, and substitute the Manager (or any other manager of the Company), to share profits and losses, to receive, cause and declare distributions, to compel dissolution, and to receive allocations of income, gain, loss, deduction, credit or similar item). No such sale, assignment, pledge, hypothecation, encumbrance, transfer or disposition shall constitute an event of dissolution under Section 13 or any other provision hereunder or otherwise. The provisions of this Section 14 shall be binding upon and inure to the benefit of such transferee, the parties hereto, each of their respective successors and assigns and any future Members, Managers or Officers and their respective successors and assigns

**14.2.**   Distributions and Allocations with Respect to Transferred Units. If any Unit is transferred during any accounting period in compliance with the provisions of this Section 14, Profits, Losses, each item thereof, and all other items attributable to the transferred Unit for such period will be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of such transfer will be made to the transferor, and all distributions thereafter will be made to the transferee.

**14.3.**   Pledgee's Rights. So long as any pledge or hypothecation of any ownership interests is in effect, the Company shall not elect that its ownership interests become governed by

CONFIDENTIAL   FBG_CH1_00097795

Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction without the delivery of any applicable limited liability company certificate or control agreement necessary to perfect the interests of all pledgees of such ownership interest in the applicable ownership interests. Each recipient of a pledge or hypothecation of the ownership interests shall be a third party beneficiary of the provisions of this <u>Section 14</u>.

SECTION 15.

AMENDMENT

This Agreement may only be amended or modified by a writing signed by all of the Members.

SECTION 16.

MISCELLANEOUS PROVISIONS

**16.1.**   Entire Agreement. This Agreement, together with the Certificate of Formation of Organization, as each of the foregoing may be amended in writing from time to time (the "Organizational Documents"), contains the entire understanding of the Members and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement. There are no representations, agreements, arrangements or undertakings, oral or written, between or among the parties relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents.

**16.2.**   Application of Delaware Law. This Agreement and the application and interpretation hereof shall be governed exclusively by its terms and the laws of the State of Delaware and specifically the Act. In the event that any term hereof shall not be enforceable for whatever reason, then the applicable provision of the Act governing the subject matter of such term shall be controlling.

**16.3.**   Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**16.4.**   Construction. Whenever the singular form is used in this Agreement, and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**16.5.**   Headings. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

**16.6.**   Waivers. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

LEGAL_US_E # 150128321.2

28

CONFIDENTIAL

FBG_CH1_00097796

**16.7.**   Rights and Remedies Cumulative. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**16.8.**   Counterparts; Facsimile. This Agreement may be executed in counterparts and delivered via facsimile, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**16.9.**   Banking. All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Manager. All funds of the Company shall be used solely for the business of the Company.

**16.10.**   Determination of Matters Not Provided for in This Agreement. The Manager shall decide any questions arising with respect to the Company and this Agreement that are not specifically or expressly provided for in this Agreement.

**16.11.**   Further Assurances. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary, to effectuate the purposes of this Agreement.

**16.12.**   Invalidity. The invalidity of any provision of this Agreement shall not affect the validity of the remainder of any such provision or the remaining provisions of this Agreement.

**16.13.**   Notices. All notices, demands, requests and other communications required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt); (b) sent by telecopier (with written confirmation of receipt), provided that a copy is promptly mailed by registered mail, return receipt requested; (c) on the fifth business day following the date of deposit in the United States mail if such notice or other communication is sent by certified or registered mail with return receipt requested and postage thereon fully prepaid; or (d) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth on Exhibit A with respect to such Members or, with respect to any Additional or Substitute members, to the appropriate addresses and telecopier numbers set forth in a writing delivered to the Company in connection with such Additional or Substitute Member's admission as a Member of the Company (or to such other addresses and telecopier numbers as a party may designate by notice to the Company).

**16.14.**   Waiver of Action for Partition. Each of the Members irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Company Property.

[rest of page blank]

CONFIDENTIAL

FBG_CH1_00097797

DocuSign Envelope ID: C5B2848E-A129-4D5C-8A6B-9B288C73A412

IN WITNESS WHEREOF, the Member has made this Agreement effective as of the Effective Date.

FIRST BRANDS GROUP INTERMEDIATE, LLC

By

Name: Brian Troyer
Title: General Counsel, EVP and Secretary

LEGAL_US_E # 150128321.2

30

FBG_CH1_00097798

**DEBTORS' EXHIBIT NO. 58**
**Page 41 of 104**

## EXHIBIT A

### TO
### FIRST BRANDS, LLC
### LIMITED LIABILITY COMPANY AGREEMENT
### NAME AND ADDRESS OF MEMBER

Member Name                                          Address

First Brands Group Intermediate, LLC        Key Tower, 127 Public Square, Suite 5300,
                                                              Cleveland, OH 44114

31

LEGAL_US_E # 150128321.2

CONFIDENTIAL                                                          FBG_CH1_00097799

## EXHIBIT B

### TO
### FIRST BRANDS GROUP, LLC
### LIMITED LIABILITY COMPANY AGREEMENT

| MEMBER | UNITS | PERCENTAGE INTEREST | CAPITAL CONTRIBUTION |
|---|---|---|---|
| First Brands Group Intermediate, LLC | 100 | 100% | $1.00 |

LEGAL_US_E # 150128321.2

32

CONFIDENTIAL

FBG_CH1_00097800

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF THE UNITS THEREFORE IS RESTRICTED. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING AN INTEREST IN ANY SUCH UNITS BY THE ISSUER FOR ANY PURPOSE, UNLESS (I) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (II) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL FOR THE COMPANY.

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIRST BRANDS GROUP HOLDINGS, LLC

Dated: January 10, 2022

CONFIDENTIAL

FBG_CH1_00097801

## TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS ................................................................................................1

    **1.1.**    Additional Member ................................................................................1

    **1.2.**    Adjusted Capital Account Deficit ........................................................1

    **1.3.**    Affiliate .................................................................................................1

    **1.4.**    Assignee ................................................................................................2

    **1.5.**    Certificate of Formation .......................................................................2

    **1.6.**    Company ................................................................................................2

    **1.7.**    Company Minimum Gain ......................................................................2

    **1.8.**    Covered Person .....................................................................................2

    **1.9.**    Control ..................................................................................................2

    **1.10.**    Effective Date .......................................................................................2

    **1.11.**    Gross Asset Value ................................................................................2

    **1.12.**    Liquidating Event .................................................................................3

    **1.13.**    Majority in Interest ..............................................................................3

    **1.14.**    Member .................................................................................................3

    **1.15.**    Member Minimum Gain .......................................................................3

    **1.16.**    Member Nonrecourse Debt ...................................................................3

    **1.17.**    Member Nonrecourse Deductions ........................................................3

    **1.18.**    Nonrecourse Liability ...........................................................................4

    **1.19.**    Percentage Interest ...............................................................................4

    **1.20.**    Person ....................................................................................................4

    **1.21.**    Profits and Losses ................................................................................4

    **1.22.**    Regulations ...........................................................................................4

    **1.23.**    Subsidiary .............................................................................................4

    **1.24.**    Substitute Member ................................................................................5

    **1.25.**    Transfer .................................................................................................5

    **1.26.**    Unit .......................................................................................................5

SECTION 2. FORMATION .............................................................................................5

    **2.1.**    Organization .........................................................................................5

    **2.2.**    Name of the Company ..........................................................................5

    **2.3.**    Duration ................................................................................................5

i

CONFIDENTIAL

FBG_CH1_00097802

**DEBTORS' EXHIBIT NO. 58**
**Page 45 of 104**

**2.4.** Legal Status of Company.................................................................5

**2.5.** Filing Agent for Service of Process.................................................5

SECTION 3. BUSINESS OF THE COMPANY.................................................5

SECTION 4. ACCOUNTING AND RECORDS.................................................6

 **4.1.** Accounting Period.........................................................................6

 **4.2.** Records to be Maintained................................................................6

 **4.3.** Accounts.......................................................................................6

 **4.4.** Reports.........................................................................................6

 **4.5.** Tax Information..............................................................................6

SECTION 5. NAME AND ADDRESS OF MEMBER........................................7

SECTION 6. MEMBERS..............................................................................7

 **6.1.** Members.......................................................................................7

 **6.2.** Additional Members.......................................................................7

 **6.3.** Representations and Warranties.......................................................7

 **6.4.** Member Voting Rights....................................................................8

 **6.5.** Meetings.......................................................................................8

 **6.6.** Quorum........................................................................................8

 **6.7.** Notice of Meetings.........................................................................8

 **6.8.** Attendance at Meetings..................................................................8

 **6.9.** Member to Vote in Person or by Proxy.............................................8

 **6.10.** Action by Written Consent..............................................................8

 **6.11.** Liability to Third Parties.................................................................9

 **6.12.** Information....................................................................................9

 **6.13.** Participation by Communication Equipment......................................9

 **6.14.** Dealings with the Company............................................................9

 **6.15.** Reimbursement to the Members.......................................................9

 **6.16.** Withdrawal of Member...................................................................9

 **6.17.** Accountable as Trustee.................................................................10

SECTION 7. MANAGEMENT......................................................................10

 **7.1.** Management Reserved to the Manager............................................10

 **7.2.** Manager......................................................................................11

 **7.3.** Right to Rely on the Manager.......................................................11

 **7.4.** Limitation on Authority of Manager...............................................12

ii

CONFIDENTIAL

FBG_CH1_00097803

| | | |
|---|---|---|
| **7.5.** | Authority to Execute Documents | 12 |
| **7.6.** | Officers | 13 |
| **7.7.** | Removal, Resignation or Replacement of Officers | 13 |
| **7.8.** | Reliance on Reports | 13 |
| **7.9.** | Members and the Manager have no Exclusive Duty to Company | 14 |
| **7.10.** | Conflicts of Interest | 14 |
| **7.11.** | Action by Written Consent | 14 |

SECTION 8. LIMITATION ON LIABILITY; EXCULPATION; INDEMNIFICATION; *ETC.* ..... 14

| | | |
|---|---|---|
| **8.1.** | Liability | 14 |
| **8.2.** | Exculpation | 14 |
| **8.3.** | No Fiduciary Duties | 15 |
| **8.4.** | Interested Transactions | 15 |
| **8.5.** | Indemnity | 15 |
| **8.6.** | Benefit Plans | 17 |
| **8.7.** | Liability Insurance | 17 |
| **8.8.** | Outside Activities | 17 |
| **8.9.** | Severability | 17 |

SECTION 9. CONTRIBUTIONS AND CAPITAL ACCOUNTS ..... 18

| | | |
|---|---|---|
| **9.1.** | Prior and Concurrent Contributions | 18 |
| **9.2.** | Additional Capital Contributions | 18 |
| **9.3.** | Contribution Returns | 18 |
| **9.4.** | Loans by Members | 18 |
| **9.5.** | Capital Account | 18 |

SECTION 10. ALLOCATIONS AND DISTRIBUTIONS ..... 19

| | | |
|---|---|---|
| **10.1.** | Allocations of Net Profit and Net Loss | 19 |
| **10.2.** | Distribution of Assets | 19 |
| **10.3.** | Qualified Income Offset | 19 |
| **10.4.** | Gross Income Allocation | 20 |
| **10.5.** | Section 704(c) Allocation | 20 |
| **10.6.** | Distributions from Cash Flow | 20 |
| **10.7.** | Limitations on Distributions | 22 |
| **10.8.** | Minimum Gain Chargeback | 22 |

iii

CONFIDENTIAL

FBG_CH1_00097804

**10.9.** Member Minimum Gain Chargeback ...................................................................22

**10.10.** Nonrecourse Deductions ...................................................................................23

**10.11.** Member Nonrecourse Deductions .....................................................................23

**10.12.** Section 754 Adjustments ...................................................................................23

**10.13.** Curative Allocations .........................................................................................23

SECTION 11. TAXES ...........................................................................................................23

**11.1.** Elections ............................................................................................................23

**11.2.** Taxes of Taxing Jurisdictions ...........................................................................23

**11.3.** Tax Matters Partner ...........................................................................................24

**11.4.** Method of Accounting .......................................................................................24

**11.5.** Tax Returns .......................................................................................................24

SECTION 12. OWNERSHIP ................................................................................................24

SECTION 13. DISSOLUTION AND WINDING UP ...........................................................24

**13.1.** Dissolution .........................................................................................................24

**13.2.** Certificate of Cancellation .................................................................................25

**13.3.** Winding Up ........................................................................................................25

**13.4.** Liquidation and Termination ..............................................................................25

**13.5.** Deficit Capital Accounts.....................................................................................26

**13.6.** Deemed Contribution and Distribution...............................................................27

**13.7.** Notice of Dissolution .........................................................................................27

SECTION 14. TRANSFERS .................................................................................................27

**14.1.** Transfers ............................................................................................................27

**14.2.** Distributions and Allocations with Respect to Transferred Units .......................28

**14.3.** Pledgee's Rights.................................................................................................28

SECTION 15. AMENDMENT...............................................................................................28

SECTION 16. MISCELLANEOUS PROVISIONS................................................................28

**16.1.** Entire Agreement ...............................................................................................28

**16.2.** Application of Delaware Law..............................................................................28

**16.3.** Execution of Additional Instruments..................................................................28

**16.4.** Construction .......................................................................................................29

**16.5.** Headings ............................................................................................................29

**16.6.** Waivers ..............................................................................................................29

**16.7.** Rights and Remedies Cumulative.......................................................................29

iv

CONFIDENTIAL

FBG_CH1_00097805

**16.8.** Counterparts; Facsimile ........................................................................................29

**16.9.** Banking ............................................................................................................29

**16.10.** Determination of Matters Not Provided for in This Agreement............................29

**16.11.** Further Assurances.............................................................................................29

**16.12.** Invalidity ..........................................................................................................29

**16.13.** Notices .............................................................................................................29

**16.14.** Waiver of Action for Partition ..........................................................................30

EXHIBIT A..........................................................................................................................32

EXHIBIT B..........................................................................................................................33

v

CONFIDENTIAL

FBG_CH1_00097806

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## FIRST BRANDS GROUP HOLDINGS, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of First Brands Group Holdings, LLC, (the "Company") a limited liability company organized pursuant to the provisions of Title 6, Chapter 18 of the Delaware Limited Liability Company Act (the "Act"), is entered into and shall be effective as of January 10, 2022 (the "Effective Date") by and among the Company, the undersigned Member (as defined below) and the Additional Members (as defined below), and amends and restates in its entirety that certain Limited Liability Company Agreement among the parties hereto, dated July 31, 2020. To the extent enforceable, and notwithstanding the foregoing, the "Effective Date" of this Agreement shall be deemed to be January 10, 2022 for all purposes and it is the intention of the parties that the provisions included in this Agreement be considered effective as of such earlier Effective Date. The Certificate of Formation of the Company (the "Certificate of Formation") was filed with the Secretary of State of Delaware on July 13, 2020 (the "Commencement Date"). The rights and liabilities of the Members will be as provided in the Act except as otherwise provided in this Agreement.

## SECTION 1.
## DEFINITIONS

For purposes of this Agreement unless otherwise defined herein, the following terms shall have the following meanings:

**1.1.** Additional Member. A Member who has acquired Units and been admitted as a Member pursuant to the provisions of Section 14.

**1.2.** Adjusted Capital Account Deficit. With respect to any Member, such Member's Adjusted Capital Account Deficit shall be the deficit balance, if any, in such Member's Capital Account (as defined in Section 9.5) as of the end of the relevant fiscal year or at any time, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amount which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentence of Sections 1.704-2(g)(1) and 1704-2(i)(5) of the Regulations; and

(b) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

**1.3.** Affiliate. With respect to any person, (i) in the case of an individual, any relative of such person; (ii) any officer, director, trustee, partner, manager, employee or holder of greater than

1

FBG_CH1_00097807

fifty percent (50%) of any class of the voting securities of or equity interest in such person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such person; or (iv) any officer, director, trustee, partner, manager, employee or holder of greater than fifty percent (50%) of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such person.

**1.4.** Assignee. A transferee of a Unit who has not been admitted as a Substitute Member; provided, however, that solely for purposes of the allocation and distribution provisions of Sections 9, 10 and 13 of this Agreement, a Substitute Member shall also be deemed to include such Assignee.

**1.5.** Certificate of Formation. The Certificate of Formation of the Company, as properly adopted and amended or restated from time to time by the Members and filed with the Delaware Secretary of State.

**1.6.** Company. First Brands Group Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, and any successor limited liability company.

**1.7.** Company Minimum Gain. The aggregate amounts of gain that would be realized by the Company if it disposed of all property subject to Nonrecourse Liabilities in full satisfaction of such liabilities. Such amounts are calculated as described in Regulations Section 1.704-2(d)(1).

**1.8.** Covered Person. Each current or former Member, each Affiliate of each current or former Member, each officer, director, shareholder, partner, manager, member, employee, advisor, representative or agent of each current or former Member and any of their respective Affiliates, and each current or former officer, employee, or agent of the Company or any of its Affiliates.

**1.9.** Control. For the purposes of Sections 1.3 and 1.23 of this Agreement, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

**1.10.** Effective Date. As defined in the Preamble to this Agreement.

**1.11.** Gross Asset Value. Means, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(ii) The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of assets as consideration for an interest in the Company; (c) the

2

FBG_CH1_00097808

grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting as a Member or by a new Member acting as a Member or in anticipation of being a Member pursuant to Regulations Section 1.704-1(b)(2)(iv)(f)(iii); and (d) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a), (b), (c) and (d) above will be made only if the Manager reasonably determines that such adjustments are necessary to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 10.12 of this Agreement; provided, however, that Gross Asset Values will not be adjusted pursuant to this clause (iv) to the extent the Manager determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) above, such Gross Asset Value will thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**1.12.**    Liquidating Event. As defined in Section 13.1.

**1.13.**    Majority in Interest. Shall mean the affirmative vote or consent of Members described as a "Majority in Interest" in Section 12.

**1.14.**    Member. As defined in Section 6.1.

**1.15.**    Member Minimum Gain. An amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

**1.16.**    Member Nonrecourse Debt. Partner nonrecourse debt as defined in Regulations Section 1.704-2(b)(4).

**1.17.**    Member Nonrecourse Deductions. Partner nonrecourse deductions as defined in Regulations Sections 1.704-2(i)(1) and (2).

CONFIDENTIAL

FBG_CH1_00097809

**1.18.**   Nonrecourse Liability. Any Company liability (or portion thereof) for which no Member bears the economic risk of loss as determined in accordance with Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2) (without regard to whether those Sections apply to such liability).

**1.19.**   Percentage Interest. Shall have the meaning set forth in Section 12.

**1.20.**   Person. Shall mean any individual, partnership, corporation, trust, limited liability company or other entity.

**1.21.**   Profits and Losses. Means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

> (i)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses will be added to such taxable income or loss;

> (ii)   Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(1), and not otherwise taken into account in computing Profits or Losses will be subtracted from such taxable income or loss;

> (iii)   In the event the Gross Asset Value of any Company asset is adjusted, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv)   Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

> (v)   In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account depreciation for federal income tax purposes for such fiscal year or other period; and

> (vi)   Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 10.3-10.4, 10.8-10.12 of this Agreement will not be taken into account in computing Profits or Losses.

**1.22.**   Regulations. Regulations of the Department of Treasury promulgated under the Internal Revenue Code of 1986, as amended from time to time.

**1.23.**   Subsidiary. With respect to any Person (the "parent") at any date, (a) any other corporation, limited liability company, association or other business entity of which (i) securities or other ownership interests representing more than fifty percent (50%) of the voting power of all

4

CONFIDENTIAL

FBG_CH1_00097810

equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of the board of directors, managers or similar governing body thereof or (ii) the majority interest in the capital or profits of such corporation, limited liability company, association or other business entity, are owned, controlled, directly or indirectly, or held by the parent or one or more subsidiaries of the parent and (b) any other Person that is otherwise Controlled by the parent or one or more subsidiaries of the parent.

**1.24.** Substitute Member. An Assignee who has been admitted to all of the rights of membership pursuant to Section 14 of this Agreement.

**1.25.** Transfer. Any sale, exchange, conveyance, disposition, pledge, encumbrance, liquidation, or other alienation of a Unit.

**1.26.** Unit. A unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

SECTION 2.
FORMATION

**2.1.** Organization. Pursuant to the Act, the Company has been organized as a Delaware limited liability company by filing the Certificate of Formation with the Delaware Secretary of State on July 13, 2020.

**2.2.** Name of the Company. The name of the Company is First Brands Group Holdings, LLC, and all business of the Company shall be conducted in that name or in other assumed names that are in compliance with the Act but in any case only to the extent permitted by applicable law and approved by the Members.

**2.3.** Duration. The term of the Company shall be perpetual unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act and this Agreement.

**2.4.** Legal Status of Company. The Members do not intend that the Company be a co-partnership, limited partnership, or corporation, except that they do intend it to be treated as a partnership for purposes of federal, state, and local tax law only. None of the Members of the Company is a partner of any other Member as a result of becoming a Member of the Company, and the Certificate of Formation, this Agreement and the relationships created thereby and arising therefrom shall not be construed to suggest otherwise.

**2.5.** Filing Agent for Service of Process. . The Company's filing agent for service of process shall be located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The name of its registered agent is The Corporation Trust Company.

SECTION 3.
BUSINESS OF THE COMPANY

The Company has been organized to transact business for any lawful purpose or purposes not specifically prohibited by the laws of the State of Delaware and shall be permitted to guarantee the debts and obligations of any of its affiliates. The Company shall have the authority to do all

5

FBG_CH1_00097811

things necessary or convenient to accomplish its purposes and operate its business as described in this Section 3.

SECTION 4.
ACCOUNTING AND RECORDS

**4.1.**    Accounting Period. The Company's accounting period shall be the calendar Year.

**4.2.**    Records to be Maintained.

(a)    The Company shall maintain records at its principal office as required by the Act, including:

(i)    A current list of the full name and last known address of each Member.

(ii)    A copy of the Certificate of Formation or Restated Certificate of Formation, together with any amendments thereto.

(iii)    Copies of the Company's federal, state, and local tax returns and reports, if any, for the three most recent years.

(iv)    Copies of any financial statements of the Company for the three most recent years.

(v)    Copies of the limited liability company agreements, including this Agreement.

(vi)    Copies of records that would enable a Member to determine the Members' relative shares of the Company's distributions and their relative voting rights.

(b)    Any Member or his designated representative shall have the right, at such Member's own expense, at any reasonable time, to have access to and inspect and copy the contents of such books or records in accordance with the Act.

**4.3.**    Accounts. The Company shall maintain a record of Capital Accounts for each Member in accordance with Section 9.

**4.4.**    Reports. Within a reasonable period after the end of each Company fiscal year, each Member shall be furnished with pertinent information regarding the Company and its activities during such period.

**4.5.**    Tax Information. Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company. Every effort shall be made to furnish such information within 75 days after the end of each fiscal year or as soon thereafter as is reasonably practicable.

6

CONFIDENTIAL

SECTION 5.
NAME AND ADDRESS OF MEMBER

The name and address of the Member is set forth on Exhibit A.

SECTION 6.
MEMBERS

**6.1.**    Members. The Members of the Company as set forth in this Agreement and any Substitute Members along with any Additional Members admitted pursuant to Section 6.2 shall constitute the Members of the Company.

**6.2.**    Additional Members. Members in addition to the Members set forth in this Agreement and any Substitute Members ("Additional Members") may be admitted upon the approval of a Majority in Interest.

**6.3.**    Representations and Warranties. Each Member hereby represents and warrants to each other Member and to the Company that:

(a)    such Member has full power and authority to execute and deliver this Agreement, and to perform its obligations hereunder and thereunder;

(b)    all actions necessary for the due authorization, execution, delivery and performance by such Member of this Agreement have been duly taken and no consent or approval of, or filing with or notice to, any person, entity or governmental authority is required therefor;

(c)    such Member's execution, delivery and performance of this Agreement does not violate any other agreement or instrument to which such Member is a party or by which his property is bound;

(d)    this Agreement has been duly executed and delivered by such Member;

(e)    this Agreement is the legal, valid and binding obligation of such Member enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity);

(f)    the Member is acquiring the Units for the Member's own account as an investment and without an intent to distribute the Units; and

(g)    the Member acknowledges that the Units have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

7

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 58**
**Page 56 of 104**

**6.4.**     Member Voting Rights. Each Member shall be entitled to vote on all matters to be submitted for a vote or to be determined by the Members with each Member having one (1) vote for each Unit held by such Member; and the approval of all such matters shall be by Majority in Interest at an annual or special meeting of the Members, unless a higher percentage is required for approval elsewhere in this Agreement.

**6.5.**     Meetings. Any Member or Members holding at least 50% of the Units may call a meeting of the Members for any reasonable time at any reasonable place upon giving proper notice to all the Members.

**6.6.**     Quorum. Except as otherwise required by the Act or the Certificate of Formation, the presence of all Members, either in person or by proxy, is required to obtain a quorum for the transaction of business. Regardless of whether a quorum is present, the meeting may be adjourned by a vote of the Members present. The Members present in person or by proxy at such meeting may continue to do business until adjournment, notwithstanding the withdrawal of one or more Members. At the adjourned meeting at which the requisite quorum shall be represented, any business may be transacted which might have been transacted at the meeting as originally notified.

**6.7.**     Notice of Meetings. The Members shall cause notice of the time, place and purposes of each meeting of the Members to be delivered in accordance with Section 16.13, at least 7 days but not more than 60 days prior to the meeting, to each Member of record entitled to vote at the meeting. Notice of a meeting of Members need not be given to any Member who signs a waiver of notice in writing, whether before or after the time of the meeting. The notice shall state the nature of the business to be transacted and the matters, if any, upon which the Members will be requested to vote; provided, however, that action may be taken on any matter brought before a meeting of the Members regardless of whether such matter is set forth in the notice. Notice of any adjourned meeting of the Members need not be given if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken.

**6.8.**     Attendance at Meetings. Attendance of a person at a meeting of Members in person or by proxy constitutes waiver of objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

**6.9.**     Member to Vote in Person or by Proxy. A Member entitled to vote at a meeting of Members or to express consent or dissent without a meeting shall be entitled to vote in person, or by proxy appointed by an instrument in writing authorizing other persons to act. A proxy shall be signed by the Member or authorized agent or representative and shall not be valid after the expiration of three (3) years from its date unless otherwise provided.

**6.10.**     Action by Written Consent. Any action required or permitted to be taken at a meeting of Members or a committee appointed by the Members may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by all of the Members and delivered to the custodian of the Company's records for filing with the Company records. Any action taken hereunder is effective when the Members holding the number of necessary Units have signed the consent, unless the consent specifies a different effective date.

8

**6.11.**  Liability to Third Parties. Unless provided by law or expressly assumed, a person who is a Member shall not be liable for the acts, debts, obligations or liabilities of the Company, including those under a judgment, decree or order of a court. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.  This Section 6.11 is intended to expand the protections afforded by Section 8.1 of this Agreement, and shall be read and interpreted in such fashion.

**6.12.**  Information. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated, including, without limitation, the books, records of account, business records, the Certificate of Formation and this Agreement.

**6.13.**  Participation by Communication Equipment. A Member may participate in a meeting of the Members by a conference telephone or by other similar communications equipment through which all persons participating in the meeting may communicate with the other participants. All participants shall be advised of the communications equipment and the names of the parties in the conference shall be divulged to all participants. Participation in a meeting pursuant to this Section constitutes presence in person at the meeting.

**6.14.**  Dealings with the Company. The Members, and any Affiliates thereof, shall have the right to contract and otherwise deal with the Company with respect to the sale or lease of real and/or personal property, the rendition of services, the lending of money, and for other purposes, and to receive the purchase price, costs, fees, commissions, interest, compensation and/or other amounts and/or other forms of consideration in connection therewith, as a Majority in Interest of the Members entitled to vote thereon may determine, without being subject to claims for self-dealing; provided, however, notwithstanding anything contained in this Agreement to the contrary, no Member shall have the right to vote on, or participate in, the decision concerning the Company's dealing with such Member or his Affiliate pursuant to this Agreement.

**6.15.**  Reimbursement to the Members. The Members shall be reimbursed by the Company for all reasonable costs and expenses of every kind or nature paid or incurred by them for or on behalf of the Company.

**6.16.**  Withdrawal of Member. The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 13. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's dissolution pursuant to Section 13 of this Agreement. The Members covenant not to withdraw as a Member without the unanimous prior written consent of the Members if such withdrawal would cause the Company to be taxed in any way other than as a partnership for federal income tax purposes or would jeopardize the Company's status as a Certified Minority Business Enterprise except as otherwise specifically provided for and permitted by this Agreement.

9

FBG_CH1_00097815

**6.17.**   Accountable as Trustee. A Member shall account to the Company and hold as trustee for it any profit or benefit derived by the Member from any transaction connected with the conduct of the business of, or winding up of, the Company or from any personal use by the Member of the Company's property.

SECTION 7.
MANAGEMENT

**7.1.**   Management Reserved to the Manager.  Subject to the limitations imposed by the Act and this Agreement, one or more managers (the "Manager"), in its full and exclusive discretion, shall have the exclusive right to manage and control, have authority to obligate and bind, and make all decisions affecting the business, operations and assets of the Company including, without limitation, the power to:

(a)     acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company ("Property");

(b)     operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(c)     execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of Property, or in connection with managing the affairs of the Company, including executing amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement;

(d)     borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Property;

(e)     execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Property;

(f)     prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the Property and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Property;

(g)     care for and distribute funds to the Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(h)     contract on behalf of the Company for the employment and services of employees and or independent contractors, such as lawyers and accountants, and delegate

10

CONFIDENTIAL

to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(i)      engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Property and Member liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(j)      make any and all elections for federal, state, and local tax purposes, including, without limitation, any election, if permitted by applicable law; to adjust the basis of Property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with transfers of Company interests and Company distributions;

(k)      take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company; and

(l)      institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

**7.2.**    Manager. Management of the Company shall be vested in the Manager. The Manager does not have to hold Units as a Member of the Company in order to serve as the Manager. The Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes of the Company set forth in this Agreement. The Manager shall devote only such time to the Company as is reasonably required to manage and conduct the activities of the Company in the Manager's full and exclusive discretion. The Manager may resign as the Manager at any time by giving written notice to the Company. The resignation of the Manager shall take effect upon receipt of notice thereof or at such later time as may be specified in such notice. Any vacancy in the Manager for any reason shall be filled by such Person as the Manager may designate in its written notice of resignation to the Company. Notwithstanding anything to the contrary contained in this Agreement, the Manager shall continue to serve as Manager until the appointment of a replacement Manager. The Manager may designate one or more committees, each committee to consist of one or more of the Members. A committee, and each member thereof, shall serve at the pleasure of the Manager.  The Manager shall initially be Patrick James.

**7.3.**    Right to Rely on the Manager. Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(a)      the identity of any member,

(b)      the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company,

11

FBG_CH1_00097817

(c)     the Persons who are authorized to execute and deliver any instrument or document of the Company, or

(d)     any act or failure to act by the Company on any other matter whatsoever involving the Company or the Manager.

**7.4.**     Limitation on Authority of Manager.

(a)     Without the consent of all of the Members, the Manager shall not have the authority to:

(i)     do any act in contravention of this Agreement,

(ii)     do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement,

(iii)     confess a judgment against the Company, or

(iv)     possess Property, or assign rights in specific Property, for other than a Company purpose.

(b)     Without the consent of all of the Members, neither the Company nor the Manager shall:

(i)     amend the Certificate of Formation or this Agreement,

(ii)     issue additional Units, or any security convertible into Units,

(iii)     redeem any Member's Units except as provided for herein,

(iv)     dissolve the Company except as otherwise permitted pursuant to Section 13 hereof,

(v)     sell all or substantially all of the Property of the Company, or

(vi)     merge or consolidate with or into any Person.

(c)     Except as otherwise provided by this Agreement, no Member shall have any right to act for or bind the Company in any way. Any Member who acts beyond the scope of the authority granted by this Agreement shall, in addition to any other remedy available to the Company or the other Members, be liable in damages to the Company and each other Member for any loss or damages that they may incur or suffer as a consequence of such act.

**7.5.**     Authority to Execute Documents. All deeds, documents, contracts, agreements, bonds, debentures, notes, obligations, evidences of indebtedness, checks, drafts and other instruments requiring execution by the Company shall be executed and delivered by the Manager or such other person or persons as the Manager may authorize. All funds of the Company not otherwise employed shall be deposited to the credit of the Company in such financial institutions

12

CONFIDENTIAL

FBG_CH1_00097818

as designated by the Manager. The Manager may execute or cause to be executed, in the name and on behalf of the Company, as the holder of stock or other securities in any entity, all written proxies, powers of attorney or other written instruments as the Manager may deem necessary for the Company to exercise such powers and rights.

7.6.    Officers. The Company shall have no officers unless appointed by the Manager or Members after the date hereof. To the extent the Company has officers as provided in the prior sentence, the Company may have one or more officers who may be appointed by the Manager or Members, and who shall have the title, authority and duties as authorized or directed by the Manager or Members. An officer shall hold office for the term for which appointed and until a successor is appointed and qualified, or until resignation or removal. The Manager or Members may, from time to time, designate one or more officers with such titles as may be designated by the Manager or Members to act in the name of the Company with such authority as may be delegated to such officers by the Manager or Members. Any number of offices may be held by the same individual. The following individuals are hereby appointed as officers of the Company as of the date hereof: Patrick James: President and Chief Executive Officer, Stephen Edward Kingsley Graham: Treasurer and Chief Financial Officer, Edward James: Executive Vice President, Michael Baker: Chief Corporate Strategy Officer and Secretary, Shekhar Kumar: Corporate Finance Manager, and Matthew Liebson: General Counsel.

7.7.    Removal, Resignation or Replacement of Officers. An officer elected or appointed by the Manager may be removed by the Manager with or without cause. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer does not of itself create contract rights. An officer may resign by written notice to the Company, which resignation is effective upon its receipt by the Company or at a subsequent time specified in the notice of resignation. Vacancies in any office may be filled by the Manager.

7.8.    Reliance on Reports. In discharging his or her duties, the Manager or an officer may rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by any of the following:

(a)    One or more officers, Members or employees of the Company whom the Manager or officer reasonably believes to be reliable and competent in the matter presented.

(b)    Legal counsel, professional accountants, engineers, or other persons as to matters the Manager or officer reasonably believes are within the person's professional or expert competence.

(c)    A committee of officers of which he or she is not a member if the Manager or officer reasonably believes the committee merits confidence.

A Manager or officer is not entitled to rely on the information, opinions, reports, or statements set forth in this Section if the Manager or officer has knowledge concerning the matter in question that makes reliance otherwise permitted by this provision unwarranted. The Manager or officer is not liable for an action taken as the Manager or officer or the failure to take any action if he or she performs the duties of his or her office in compliance with this Section.

13

CONFIDENTIAL

FBG_CH1_00097819

**7.9.**     Members and the Manager have no Exclusive Duty to Company. Except to the extent agreed to in any written employment agreement entered into by and between the Company and any Member, neither the Manager nor any Member shall be required to manage the Company as his or her sole and exclusive job and he or she, may have other interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor the Manager or any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of any Member or to the income or proceeds derived therefrom. Except to the extent provided for in some other agreement, neither the Manager nor any Member shall incur any liability to the Company or to any Member as a result of engaging in any other business or venture.

**7.10.**     Conflicts of Interest. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever pursuant to the terms of this Agreement the Manager is permitted or required to make a decision (a) in his "sole discretion," the Manager shall be entitled to consider only such interests and factors as the Manager or such Member desires, including his own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person whatsoever, or (b) in "good faith" or another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.  If any questions should arise with respect to the operation of the Company that are not specifically provided for in this Agreement or the Act, or with respect to the interpretation of this Agreement, the Manager is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in his sole discretion, and his determination and interpretation so made shall be final and binding on all parties, absent manifest error.

**7.11.**     Action by Written Consent. Any action required or permitted to be taken at a meeting of the Manager or a committee appointed by the Manager may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by the Manager and delivered to the custodian of the Company's records for filing with the Company records. Any action taken hereunder is effective when the Manager has signed the consent, unless the consent specifies a different effective date.

SECTION 8.
LIMITATION ON LIABILITY; EXCULPATION; INDEMNIFICATION; *ETC.*

**8.1.**     Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Covered Person.  This Section 8.1 is intended to expand the protections afforded by Section 6.11 of this Agreement, and shall be read and interpreted in such fashion.

**8.2.**     Exculpation. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement,

14

FBG_CH1_00097820

except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's, willful misconduct, fraud, or willful breach of this Agreement. If any legal action or other proceeding is brought by the Company or any Covered Person against any other Covered Person, and the defendant Covered Person in such action or proceeding shall be the successful or prevailing party, such defendant shall be entitled to recover attorneys' fees and other costs incurred in that action or proceeding in addition to any other relief to which such defendant may be entitled. For purposes of this Section 8.2, a defendant shall be deemed to be the successful or prevailing party if the Company or Covered Person shall have failed to obtain the relief requested in a final judgment by a court of competent jurisdiction.

8.3.    No Fiduciary Duties. Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, *provided* that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing. In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Covered Person takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty (fiduciary or other) to consider the interests of the Company, its Subsidiaries, or the other Members, and may act exclusively in its own interest (or in the interest of the Member that appointed it).

8.4.    Interested Transactions. To the fullest extent permitted by law, no Covered Person shall be deemed to have breached any duty of loyalty to the Company, any Member, or other Person (and no Covered Person shall be liable to the Company, any Member, or other Person for breach of any duty of loyalty or analogous duty) with respect to any action or inaction in connection with or relating to any transaction that was approved by the Manager, including any transaction involving the Manager or any of his Affiliates.

8.5.    Indemnity.

(a)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage, or claim (whether civil, criminal, administrative, investigative, or otherwise) incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage, or claim incurred by such Covered Person that is finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's willful misconduct, fraud, or breach of this Agreement with respect to such acts or omissions, *provided* that any indemnity under this Section 8.5 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account of such indemnity.

(b)    To the fullest extent permitted by applicable law, expenses (including, without limitation, attorneys' fees, disbursements, fines, and amounts paid in settlement)

15

CONFIDENTIAL

FBG_CH1_00097821

incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding made by one or more third parties relating to or arising out of the performance of their duties on behalf of the Company shall, from time to time, be advanced by the Company prior to the final disposition of such third party claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified as authorized in Section 8.5.

(c)     The indemnification authorized by this Section 8.5 is not exclusive of and shall be in addition to any other rights granted to those seeking indemnification under this Agreement, any other agreement, a vote of Members or a determination by the disinterested Manager of the Company, or otherwise, both as to action in their official capacities and as to action in another capacity while holding their offices or positions.  The indemnification shall continue as to a Person who has ceased to be a Member, Manager, officer, employee or agent of the Company and shall inure to the benefit of such Person's heirs, executors, administrators, successors and assigns.

(d)     The Company shall purchase and maintain insurance or furnish similar protection, including, but not limited to, trust funds, letters of credit or self-insurance, for or on behalf of any Person who is or was a Member, Manager or officer of the Company. The insurance or similar protection purchased or maintained for those Persons may be for any liability asserted against them and incurred by them in any capacity described in this Section 8.5 or for any liability arising out of their status as described in this Section 8.5, whether or not the Company would have the power to indemnify them against that liability under this Section 8.5.  Insurance may be so purchased from or so maintained with a Person in which the Company has a financial interest.

(e)     The authority of the Company to indemnify Persons pursuant to paragraphs (a) or (b) of this Section 8.5 does not limit the payment of costs and expenses as they are incurred, in advance of the final disposition of an action, suit or proceeding, or the payment of indemnification, insurance or other protection that may be provided pursuant to paragraphs (c) or (d) of this Section 8.5. Paragraphs (a) or (b) of this Section 8.5 do not create any obligation to repay or return payments made by the Company pursuant to paragraphs (c) or (d) of this Section.

(f)     In the event that any Indemnified Person has rights to indemnification, advancement of expenses and/or insurance provided by any Member or Affiliate of a Member (any of the foregoing being a "Secondary Indemnitor"), then between the Company and the Secondary Indemnitor the following shall apply: the Company (i) shall be the indemnitor of the first resort (i.e., its obligations to the Indemnified Person shall be primary to any obligation of the Secondary Indemnitor to advance expenses or to provide indemnification resulting from the Indemnified Person's service to the Company) and (ii) the Secondary Indemnitor shall not be liable to the Company for contribution, subrogation or any other recovery of any kind in respect to the Company's indemnification of and advancement of expenses to the Indemnified Person. No advancement or payment by the Secondary Indemnitor to or on behalf of an Indemnified Person with respect to any expenses or liabilities resulting from the Indemnified Person's service to the Company

16

CONFIDENTIAL

shall affect the Indemnified Person's rights to indemnification and/or advancement of expenses under this Section 8.5. Each Secondary Indemnitor is an express third party beneficiary of this Section 8.5(f).

(g)     A Person who is not a party to this Agreement has no right to enforce directly any term of this Agreement save that each Person entitled to indemnification pursuant to this Section 8.5 and Covered Person may enforce directly its rights pursuant to this Agreement.

**8.6.**     Benefit Plans. For purposes of this Section 8, serving an employee benefit plan at the request of the Company shall include any service as a director, officer, employee or agent of an entity which imposes duties on, or involves services by such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries. A Person who acted in good faith and in a manner reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Company" referred to in this Section. For purposes of this Section, "party" includes any individual who is or was a plaintiff, defendant or respondent in any action, suit or proceeding, or who is threatened to be made a named defendant or respondent in any action, suit or proceeding.

**8.7.**     Liability Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was the Manager, a Member, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, member, manager, partner, trustee, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Section or the Act.

**8.8.**     Outside Activities. Each Member has the right to, and shall have no duty (contractual, fiduciary, or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries.  In the event that any Member acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company or one or more of its Subsidiaries, on the one hand, and such Member or any other Person, on the other hand, such Member shall have no duty (contractual, fiduciary, or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries, as the case may be, and notwithstanding anything herein to the contrary, shall not be liable to the Company or any of its Subsidiaries, Affiliates, Members, or creditors for breach of any duty (contractual, fiduciary, or otherwise) by reason of the fact that such Member directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries.

**8.9.**     Severability. To the fullest extent permitted by applicable law, if any portion of Section 8 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify any Covered Person as to costs, charges and expenses

17

CONFIDENTIAL

(including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative, or investigative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of Section 8 (including Section 8.5) that shall not have been invalidated.

SECTION 9.
CONTRIBUTIONS AND CAPITAL ACCOUNTS

**9.1.**    Prior and Concurrent Contributions. Any capital contributions of any Member and any initial capital contribution of any Additional or Substitute Member shall be reflected on an "Addendum" to Exhibit B (any such Addendum and Exhibit B are referred to collectively as "Exhibit B").

**9.2.**    Additional Capital Contributions. No Member shall be required to advance or contribute any funds other than the initial capital contributions required to be made by each Member pursuant to Section 9.1 of this Agreement to the Company.

**9.3.**    Contribution Returns. A Member is not entitled to the return of any part of the Member's capital contributions except as set forth herein. A Member is not entitled to be paid interest in respect of either his Capital Account or capital contributions. An unrepaid capital contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable it to return any Member's capital contribution.

**9.4.**    Loans by Members. Should the Company lack sufficient cash to pay its obligations, any Member that agrees to do so may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section constitutes a loan from the Member to the Company, bears interest at the interest rate agreed to by the Company and the lending Member from the date of the advance until the date of payment, and is not a capital contribution.

**9.5.**    Capital Account. "Capital Account" means an account that shall be maintained for each Member and which, as of any given date, shall be an amount equal to the following:

(a)    The aggregate amount of cash that has been contributed to the capital of the Company as of such date by or on behalf of such Member; plus

(b)    The Gross Asset Value of any property other than cash that has been contributed to the capital of the Company as of such date by such Member and the Member's share of the Company's liabilities under Section 1.752 of the Regulations or which are secured by any Company property distributed to such Member; plus

(c)    The aggregate amount of the Company's net profit that has been allocated to such Member as of such date pursuant to the provisions of Section 10 or any items of income or gain which are specifically allocated to such Member or other positive adjustments required by the Regulations and which have not been previously taken into account in calculating Capital Accounts; minus

18

CONFIDENTIAL

FBG_CH1_00097824

(d)      The aggregate amount of the Company's net loss that has been allocated to such Member as of such date pursuant to Section 10 and the amount of any item of expense, deduction or loss which is specially allocated to such Member; and minus

(e)      The aggregate amount of cash and the Gross Asset Value of all other property (as of the date of distribution) that has been distributed to or on behalf of such Member and the amount of any liabilities of such Member assumed by the Company under Section 1.752 of the Regulations or which are secured by any property contributed by such Member to the Company and other negative adjustments required by the Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such regulations.

SECTION 10.
ALLOCATIONS AND DISTRIBUTIONS

**10.1.**    Allocations of Net Profit and Net Loss.

(a)      The Company's Profits and Losses for each tax year (including gains and losses resulting from sales, financings or refinancing) shall be allocated for both financial accounting and income tax purposes to the Members according to their respective Percentage Interests.

(b)      Losses allocated pursuant to Section 10.01(a) shall not exceed the maximum amount of net loss that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 10.1(a), the limitation set forth in this Section 10.1(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations. Any such Losses that may not be allocated to a Member shall be reallocated to the other Members in proportion to the positive balances in their adjusted Capital Accounts.

**10.2.**    Distribution of Assets. If the Company at any time distributes any of its assets in kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share of the net profits or net losses that would have been realized by the Company had it sold its assets that were distributed at their respective fair market values immediately prior to their distribution.

**10.3.**    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.3 shall be made only if and only to the extent that such Member would have an Adjusted Capital Account Deficit after

19

all other allocations provided for in this Section 10 have been tentatively made as if this Section 10.3 were not in this Agreement.

**10.4.** Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 10.4 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section 10 have been tentatively made as if Section 10.3 and this Section 10.4 were not in this Agreement.

**10.5.** Section 704(c) Allocation.

(a) Notwithstanding any other provision of this Agreement to the contrary, any gain or loss and any depreciation or other cost recovery deductions recognized by the Company for income tax purposes in any fiscal year with respect to all or any part of the Company's property that is required or permitted to be allocated among the Members in accordance with Section 704(c) of the Code and any Regulations promulgated thereunder so as to take into account the variation, if any, between the adjusted tax basis of such property at the time of its contribution and the Gross Asset Value of such property at the time of its contribution, shall be allocated to the Members for income tax purposes in the manner so required or permitted.

(b) In the event the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss, and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c) Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 10.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of net profit, net loss, other items, or distributions pursuant to any provision of this Agreement.

**10.6.** Distributions from Cash Flow.

(a) Subject to Section 10.6(b) and except as otherwise provided in Section 13 with respect to distributions upon liquidation of the Company, cash from operations shall be applied and distributed in the following manner and order of priority, at such time or times as the Manager shall determine:

(i) First, to payment of any and all due and outstanding debts or liabilities, expenses or obligations of the Company, including notes payable, operating expenses and interest expenses; and

(ii) Second, to the Members in proportion to their Percentage Interests.

20

FBG_CH1_00097826

(b)     Mandatory Tax Distributions.

(i)     Within ninety (90) days, or as soon thereafter as practicable, after the end of each taxable year of the Company (or, in the Manager's discretion, such earlier date as individual taxpayers are required to make estimated tax payments), the Company shall calculate and distribute to each Member such Member's Mandatory Tax Distribution Amount (as defined herein); provided, however, that the payment of any Mandatory Tax Distribution Amount shall be deferred, on a pro rata basis based on each Member's Mandatory Tax Distribution Amount, in the Manager's sole discretion if the Company does not have sufficient cash (including under a line of credit) to fund such Mandatory Tax Distribution Amount or the payment of any Mandatory Tax Distribution Amount would cause a default under the terms of any funded indebtedness of the Company. The deferral shall continue until such time as the Manager determines that sufficient cash to fund the Mandatory Tax Distribution Amount is available or the payment of such Mandatory Tax Distribution Amount would not cause a default under the terms of any funded indebtedness. The Mandatory Tax Distribution Amount for each Member for each taxable year means an amount equal to (x) the excess of the product of (A) the net taxable income of the Company allocated to (or reasonably estimated to be allocable to) such Member for the taxable year attributable to the items allocated to such Member under Section 4 and Appendix A to this Agreement (excluding any allocations of income or gain to a Member with respect to any compensation, interest or other amount properly treated as a guaranteed payment for federal income tax purposes) multiplied by (B) the sum of the maximum Federal individual income tax rate (which shall include the tax under Section 1411 of the Code) and the maximum combined state and local individual income tax rate to which any Member (or, if any Member is a pass-through entity for Federal income tax purposes, any owner of such pass-through entity) is subject (less the effect of the deduction of state and local income taxes on the federal return, assuming no limitation of such deduction under Section 68 of the Code), taking into account for this purpose the character of items allocated to such Member as ordinary income or capital gain, over (ii) the sum of the aggregate Mandatory Tax Distribution Amounts distributed to such Member with respect to such taxable year and the aggregate distributions made to such Member pursuant to Section 10.6(a) with respect to such taxable year.

(ii)     Solely for purposes of this Section 10.6(b), if a Member is allocated a net loss for federal income tax purposes under this Agreement for any taxable year or period of the Company (calculated under the principles described in clause (i) of the preceding sentence) beginning after the date of this Agreement, such net loss shall be offset against, and shall reduce the net income allocated (or reasonably estimated to be allocable) to such Member this Agreement in subsequent taxable years of the Company (until such net loss is exhausted) for purposes of calculating the Mandatory Tax Distribution Amount for such Member for such subsequent fiscal quarters.

CONFIDENTIAL

FBG_CH1_00097827

(iii)    Mandatory Tax Distribution Amounts shall be treated as distributions pursuant to Section 10.6(a), and to the extent such distributions result in a ratio other than in the ratio required by Section 10.6(a), the first distributions pursuant to Section 10.6(a) that are not Mandatory Tax Distribution Amounts shall be made so as to cause the aggregate distributions pursuant to Section 10.6(a) and this Section 10.6(b) (to the extent treated as distributions pursuant to Section 10.6(a)) to be as nearly as possible in the ratio required by Section 10.6(a). It is the intent of the Members that distributions made pursuant to this Section 10.6(b) are not intended to change the aggregate distribution amounts which each Member is entitled to receive pursuant to Section 10.6(a). Accordingly, notwithstanding anything to the contrary contained herein, the Managers shall apply distributions made pursuant to this Section 10.6(b) in such manner as is necessary to produce such result.

**10.7.**    Limitations on Distributions. No distribution shall be made to Members if the Manager (i) determines that such a distribution would violate any covenants contained in any agreement between the Company and its lender or lenders, or (ii) determines that such a distribution would compromise the Company's ability to pay its debts as they become due in the usual course of business or would leave the Company with total assets that would be less than the sum of its liabilities (both absolute and contingent), or (iii) determines that such a payment would be in violation of applicable provisions of Delaware law.

**10.8.**    Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), if there is a net decrease in Company Minimum Gain during any fiscal year, each Member must be specially allocated items of income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence are made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated are determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This provision is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and must be interpreted consistently therewith.

**10.9.**    Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-1(i)(4), if there is a net decrease in Member Minimum Gain during any fiscal year, each Member who has a share of the Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(5), must be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence are made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated are determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This definition is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and is to be interpreted consistently therewith.

CONFIDENTIAL

FBG_CH1_00097828

**10.10.** Nonrecourse Deductions. Nonrecourse deductions (as defined in Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for any fiscal year are specially allocated among the Members in accordance with their then Percentage Interests.

**10.11.** Member Nonrecourse Deductions. Member Nonrecourse Deductions for any fiscal year are specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

**10.12.** Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 732, 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts must be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss must be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

**10.13.** Curative Allocations. To the extent possible, the allocations in Sections 10.3, 10.4 and 10.8-10.12 are to be offset either with other allocations described in those sections or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Agreement. Such offsetting allocations of income, gain, loss or deduction must be made in whatever manner the Manager determines appropriate so that, after such offsetting allocations are made, each Capital Account balance is, to the extent possible, equal to the Capital Account balance the Members would have had if such allocations were not part of this Agreement. In exercising their discretion hereunder, the Manager must take into account future allocations that, although not yet made, are likely to offset other allocations previously made.

SECTION 11.
TAXES

**11.1.** Elections. The Tax Matters Partner shall make such tax elections for the Company as a Majority in Interest of the Members shall approve from time to time.

**11.2.** Taxes of Taxing Jurisdictions. To the extent that the laws of any taxing jurisdiction having jurisdiction over a Member or the Company so require, upon request by the Members, each affected Member will submit an agreement indicating that the Member will make timely income tax payments to the taxing jurisdiction and that the Member accepts personal jurisdiction of the taxing jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such taxing jurisdiction the amount of any tax, penalty and interest determined under the laws of the taxing jurisdiction with respect to such income. The Tax Matters Partner may, where permitted by the rules of any taxing jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing jurisdiction. Any payments by the Company of tax and penalty or interest with respect to the income of a Member shall be treated as a distribution to such Member for purposes of Section 10.6(b) (and

23

shall be charged against its Capital Account accordingly) and the next distributions pursuant to Section 10.6(b) shall be made so as to cause the aggregate distributions pursuant to Section 10.6(b) and the deemed distributions pursuant to this Section 11.2 to be in the ratio required by Section 10.6(b).

11.3.   Tax Matters Partner. The Members hereby designate Patrick James as the "tax matters partner" of the Company pursuant to § 6231(a)(7) of the Code (the "Tax Matters Partner"). Any person designated as Tax Matters Partner shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of § 6223 of the Code. The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the Members. Any Member who is designated as the Tax Matters Partner may not take any action contemplated by §§ 6222 through 6223 of the Code without the written consent of a Majority in Interest of the Members.

11.4.   Method of Accounting. The records of the Company shall be maintained on the cash method of accounting, which method may be changed by the Manager from time to time in his discretion.

11.5.   Tax Returns. The Tax Matters Partner shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 11.1. Each Member shall provide the Tax Matters Partner with all pertinent information in its possession relating to Company operations that is necessary for the Company to prepare and file its income tax returns.

SECTION 12.
OWNERSHIP

The Percentage Interest of a Member shall be calculated by dividing the number of Units owned by such Member by the total Units held by all of the Members (each Member's, "Percentage Interest"). The phrase "Majority in Interest" shall mean Members who, in the aggregate, hold at least a majority of the outstanding Units and Assignees shall not be considered Members for purposes of calculating the Percentage Interests of the Members except with respect to allocation and distribution provisions of Sections 9, 10 and 13 of this Agreement.

SECTION 13.
DISSOLUTION AND WINDING UP

13.1.   Dissolution. The Company is dissolved and its affairs shall be wound up when the first of the following occurs (each a "Liquidating Event"):

(a)   upon the happening of an event specified in this Agreement as causing dissolution;

24

FBG_CH1_00097830

(b)     upon the unanimous vote of all the Members entitled to vote;

(c)     the happening of any event that makes it unlawful or impossible to carry on the business of the Company;

(d)     any event which causes there to be zero (0) members; or

(e)     upon the entry of a decree of judicial dissolution.

However, upon the occurrence of a Liquidating Event pursuant to Subsections (a) through (e) above, the Company may be continued under the terms and conditions of this Agreement by the unanimous written consent of the remaining Members.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.

**13.2.**   Certificate of Cancellation. Upon the dissolution and commencement of winding up the Company, a certificate of dissolution shall be duly executed and filed with the Secretary of State of the State of Delaware containing the information required by the Act.

**13.3.**   Winding Up. Except as otherwise provided in the Certificate of Formation, this Agreement, or Section 18-803 of the Act, upon and after dissolution the Members shall wind up the Company's affairs. The Members shall continue to function, for the purpose of winding up, in accordance with the procedures set by the Act, the Certificate of Formation, and this Agreement, shall be held to no greater standard of conduct than that described by the Act. The Company may sue and be sued in its name and process may issue by and against the Company in the same manner as if dissolution had not occurred.

**13.4.**   Liquidation and Termination. Upon dissolution of the Company, the Manager or a Member shall serve as liquidators ("Liquidators"). The Liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the Liquidators shall continue to operate the Company properties with all of the power and authority of the Members and the officers. The steps to be accomplished by the Liquidators are as follows:

(a)     As promptly as possible after dissolution and again after final liquidation, the Liquidators shall cause a professional accountant to make a proper accounting of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)     The assets shall be distributed in accordance with Section 18-804 of the Act, except as set forth in (c) below.

(c)     The distribution of assets to the Members shall be as follows:

(i)     The Liquidators may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

25

CONFIDENTIAL

(ii)     With respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not previously been reflected in the Capital Accounts would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)     Remaining cash and Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation). The parties intend that the allocation provisions contained in Section 10 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances pursuant to this Section 13.4(c) to be made in a manner identical to the order of priorities contained in Section 10.6(b) hereof, taking into account Section 10.6(b)(iii) and the last sentence of Section 11.2. To the extent that the allocation provisions contained in Section 10 fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager if and to the extent necessary to produce such result, (ii) Profits and Losses of the Company for any open years (or items of gross income and deduction of the Company for such open years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of Profits or Losses (or items of gross income and deduction) for the current and future years, and (iii) the provisions of this sentence shall control notwithstanding any reallocation or adjustment or Profits or Losses (or items thereof) by the Internal Revenue Service or other taxing authority.

Any distribution to a Member pursuant to clause 13.4(c) above will be net of any amounts owed to the Company by such Member.

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities shall be allocated to the distributee pursuant to this Section. The distribution of cash and/or property to a Member in accordance with the provisions of this Section constitutes a complete return to the Member of his or her capital contributions and a complete distribution to the Member of his or her Units and all the Company's property.

**13.5.** Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that a Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation

26

access) such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero and such deficit will not be considered a debt owed to the Company or any other person for any purpose whatsoever.

**13.6.** Deemed Contribution and Distribution. Notwithstanding any other provision of this Section 13, in the event the Company is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but no Liquidation Event has occurred, the Company's assets will not be liquidated, the Company's liabilities will not be paid or discharged, and the Company's affairs will not be wound up. Instead, except as otherwise provided in applicable Regulations, the Company will be deemed to have contributed all of its assets and liabilities to a new limited liability company and immediately thereafter to have distributed the interest in such new limited liability company to the Members in proportion to their respective Interests in the Company.

**13.7.** Notice of Dissolution. In the event a Liquidating Event occurs or an event occurs that would, but for the provisions of Section 13.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Members).

SECTION 14.
TRANSFERS

No Member shall encumber, transfer, or dispose of any Units in any of the Company which such Member now owns, or hereafter acquires, except as follows:

**14.1.** Transfers. Notwithstanding anything to the contrary contained herein, a Member may sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose of, in whole or in part, its Membership Interests (as defined below) in the Company, either voluntarily or by operation of law, and such transferee shall be admitted as a Member automatically, succeeding in all respects to the interests, title, rights and powers of the Member in its capacity as a member, and any consents required under this Agreement or under applicable law shall be deemed given without any further action by the Member or the Company; provided, that such transferee shall not be liable for the obligations of the Member to make contributions to the Company. Upon the transfer of all of its Membership Interests in the Company, the Member transferring such Membership Interests shall be automatically withdrawn from and shall cease to be a Member of the Company. "Membership Interests" shall mean a Member's interest in the Company that is inclusive of economic, management and voting rights (including, without limitation, the rights to participate in the management of the business and the business affairs of the Company, to replace, appoint, direct, and substitute the Manager (or any other manager of the Company), to share profits and losses, to receive, cause and declare distributions, to compel dissolution, and to receive allocations of income, gain, loss, deduction, credit or similar item). No such sale, assignment, pledge, hypothecation, encumbrance, transfer or disposition shall constitute an event of dissolution under Section 13 or any other provision hereunder or otherwise. The provisions of this Section 14 shall be binding upon and inure to the benefit of such transferee, the parties hereto, each of their

27

FBG_CH1_00097833

respective successors and assigns and any future Members, Managers or Officers and their respective successors and assigns

**14.2.**   Distributions and Allocations with Respect to Transferred Units. If any Unit is transferred during any accounting period in compliance with the provisions of this Section 14, Profits, Losses, each item thereof, and all other items attributable to the transferred Unit for such period will be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of such transfer will be made to the transferor, and all distributions thereafter will be made to the transferee.

**14.3.**   Pledgee's Rights. So long as any pledge or hypothecation of any ownership interests is in effect, the Company shall not elect that its ownership interests become governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction without the delivery of any applicable limited liability company certificate or control agreement necessary to perfect the interests of all pledgees of such ownership interest in the applicable ownership interests. Each recipient of a pledge or hypothecation of the ownership interests shall be a third party beneficiary of the provisions of this Section 14.

SECTION 15.
AMENDMENT

This Agreement may only be amended or modified by a writing signed by all of the Members.

SECTION 16.
MISCELLANEOUS PROVISIONS

**16.1.**   Entire Agreement. This Agreement, together with the Certificate of Formation of Organization, as each of the foregoing may be amended in writing from time to time (the "Organizational Documents"), contains the entire understanding of the Members and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement. There are no representations, agreements, arrangements or undertakings, oral or written, between or among the parties relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents.

**16.2.**   Application of Delaware Law. This Agreement and the application and interpretation hereof shall be governed exclusively by its terms and the laws of the State of Delaware and specifically the Act. In the event that any term hereof shall not be enforceable for whatever reason, then the applicable provision of the Act governing the subject matter of such term shall be controlling.

**16.3.**   Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

28

CONFIDENTIAL

FBG_CH1_00097834

**DEBTORS' EXHIBIT NO. 58**
**Page 77 of 104**

**16.4.** Construction. Whenever the singular form is used in this Agreement, and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**16.5.** Headings. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

**16.6.** Waivers. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

**16.7.** Rights and Remedies Cumulative. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**16.8.** Counterparts; Facsimile. This Agreement may be executed in counterparts and delivered via facsimile, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**16.9.** Banking. All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Manager. All funds of the Company shall be used solely for the business of the Company.

**16.10.** Determination of Matters Not Provided for in This Agreement. The Manager shall decide any questions arising with respect to the Company and this Agreement that are not specifically or expressly provided for in this Agreement.

**16.11.** Further Assurances. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary, to effectuate the purposes of this Agreement.

**16.12.** Invalidity. The invalidity of any provision of this Agreement shall not affect the validity of the remainder of any such provision or the remaining provisions of this Agreement.

**16.13.** Notices. All notices, demands, requests and other communications required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt); (b) sent by telecopier (with written confirmation of receipt), provided that a copy is promptly mailed by registered mail, return receipt requested; (c) on the fifth business day following the date of deposit in the United States mail if such notice or other communication is sent by certified or registered mail with return receipt requested and postage thereon fully prepaid; or (d) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth on Exhibit A with respect to such Members or, with respect to any Additional or Substitute members, to the appropriate

29

CONFIDENTIAL

FBG_CH1_00097835

addresses and telecopier numbers set forth in a writing delivered to the Company in connection with such Additional or Substitute Member's admission as a Member of the Company (or to such other addresses and telecopier numbers as a party may designate by notice to the Company).

     **16.14.**  Waiver of Action for Partition. Each of the Members irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Company Property.

[rest of page blank]

30

CONFIDENTIAL

IN WITNESS WHEREOF, the Members have made this Agreement effective as of the Effective Date.

**Viceroy Private Capital, LLC**

By _____
Name:   Patrick James
Title:    President and Chief Executive Officer

**Brake Parts Holdings, Inc.**

By: _____
Name:   Patrick James
Title:    President and Chief Executive Officer

**Aztec Corporation**

By: _____
Name:   Patrick James
Title:

31

CONFIDENTIAL

FBG_CH1_00097837

## EXHIBIT A
## TO
## FIRST BRANDS GROUP HOLDINGS, LLC
## LIMITED LIABILITY COMPANY AGREEMENT

### NAME AND ADDRESS OF MEMBER

| Member Name | Address |
| --- | --- |
| Viceroy Private Capital, LLC | 3010 LBJ Freeway, Suite 1200, Dallas, TX 75234 |
| Brake Parts Holdings, Inc. | Key Tower, 127 Public Square, Suite 5300, Cleveland, OH 44114 |
| Aztec Corporation | Key Tower, 127 Public Square, Suite 5300, Cleveland, OH 44114 |

32

CONFIDENTIAL

FBG_CH1_00097838

## EXHIBIT B
## TO
## FIRST BRANDS GROUP HOLDINGS, LLC
## LIMITED LIABILITY COMPANY AGREEMENT

| MEMBER | UNITS | PERCENTAGE INTEREST | CAPITAL CONTRIBUTION |
|---|---|---|---|
| Viceroy Private Capital, LLC | 66 | 66% | $0.66 |
| Brake Parts Holdings, Inc. | 33 | 33% | $0.33 |
| Aztec Corporation | 1 | 1% | $0.01 |

33

CONFIDENTIAL

**EXHIBIT B**

Certified Organizational Documents

CONFIDENTIAL

FBG_CH1_00097840

# Delaware

Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "FIRST BRANDS GROUP, LLC", FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF MAY, A.D. 2013, AT 3:20 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

5304130  8100

SR# 20222342381

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203526785

Date: 05-26-22

CONFIDENTIAL

FBG_CH1_00097841

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 03:20 PM 05/14/2013*
*FILED 03:20 PM 05/14/2013*
*SRV 130578519 - 5304130 FILE*

CERTIFICATE OF FORMATION
OF

CROWNE INDUSTRIAL GROUP, LLC

1.      The name of the limited liability company is Crowne Industrial Group, LLC.

2.      The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of its registered agent at such address is The Corporation Trust Company.

3.      This Certificate of Formation shall be effective upon filing with the State of Delaware.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Crowne Industrial Group, LLC this 14th day of April, 2013.

_____
Claudia J. Taller, Authorized Person

7650970.1

CONFIDENTIAL

FBG_CH1_00097842

## STATE OF DELAWARE
## APPLICATION FOR TRANSFER OF
## LIMITED LIABILITY COMPANY NAME
## PURSUANT TO TITLE 6, SECTION 18-103
## OF THE DELAWARE CODE

**TO THE SECRETARY OF STATE**
**OF THE STATE OF DELAWARE:**

1.  NAME AND ADDRESS OF APPLICANT:

> MICHAEL LAMANNA
> 17119 NORTHBROOK TR
> CHAGRIN FALLS, OH  44023

2.  WE RESERVED THE FOLLOWING LIMITED LIABILITY NAME FOR
    A PERIOD OF 120 DAYS:

> CROWNE INDUSTRIAL GROUP LLC

3.  PLEASE HAVE THE RESERVATION TRANSFERRED TO:

THE CORPORATION TRUST COMPANY

By: _____
Signature of Applicant

Name: MICHAEL LAMANNA
Print or Type

DE164 - 07/28/2009 C T System Online

CONFIDENTIAL

FBG_CH1_00097843

**DEBTORS' EXHIBIT NO. 58**
**Page 86 of 104**



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "CROWNE INDUSTRIAL GROUP, LLC", CHANGING ITS NAME FROM "CROWNE INDUSTRIAL GROUP, LLC" TO "CROWNE AUTOMOTIVE AFTERMARKET, LLC", FILED IN THIS OFFICE ON THE EIGHTH DAY OF AUGUST, A.D. 2014, AT 1:02 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

5304130  8100
SR# 20222342381

Authentication: 203526784
Date: 05-26-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

CONFIDENTIAL

FBG_CH1_00097844

*State of Delaware
Secretary of State
Division of Corporations
Delivered 01:27 PM 08/08/2014
FILED 01:02 PM 08/08/2014
SRV 141051518 - 5304130 FILE*

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT

1.  Name of Limited Liability Company: Crowne Industrial
    Group, LLC

2.  The Certificate of Formation of the limited liability company is hereby amended
    as follows:

    ```
    Section 1 is changed to read as follows:

    "1.  The name of the limited liability company is
    Crowne Automotive Aftermarket, LLC."
    ```

**IN WITNESS WHEREOF**, the undersigned have executed this Certificate on
the 8th _____ day of August _____, A.D. 2014 .

By: _____

Authorized Person(s)

Name: Michael Lamanna, *General Counsel*

Print or Type

CONFIDENTIAL

FBG_CH1_00097845



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "CROWNE AUTOMOTIVE AFTERMARKET, LLC", CHANGING ITS NAME FROM "CROWNE AUTOMOTIVE AFTERMARKET, LLC" TO "TRICO GROUP, LLC", FILED IN THIS OFFICE ON THE SECOND DAY OF FEBRUARY, A.D. 2018, AT 9:39 O`CLOCK A.M.

Jeffrey W. Bullock, Secretary of State

5304130  8100
SR# 20222342381

Authentication: 203526783
Date: 05-26-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

CONFIDENTIAL

FBG_CH1_00097846

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT

1.   Name of Limited Liability Company: _____

Crowne Automotive Aftermarket, LLC

2.   The Certificate of Formation of the limited liability company is hereby amended
as follows:

Section 1 is changed to read as follows:

"1.  The name of the limited liability company is Trico Group, LLC."

**IN WITNESS WHEREOF**, the undersigned have executed this Certificate
on the _____31st_____ day of _____January_____ , A.D. 2018 .

By: _____
Authorized Person(s)

Name: Patrick James _____
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:39 AM 02/02/2018
FILED 09:39 AM 02/02/2018
SR 20180679449 - File Number 5304130

DE084 - 05/18/2007 C T System Online

CONFIDENTIAL

FBG_CH1_00097847



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "TRICO GROUP, LLC", CHANGING ITS NAME FROM "TRICO GROUP, LLC" TO "FIRST BRANDS GROUP, LLC", FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF JULY, A.D. 2020, AT 2:29 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

5304130  8100
SR# 20222342381

Authentication: 203526782
Date: 05-26-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

CONFIDENTIAL

FBG_CH1_00097848

**STATE OF DELAWARE**
**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF FORMATION**

1.    The name of the limited liability company is Trico Group, LLC.

2.    Section ONE of the Certificate of Formation of the limited liability company is hereby amended to read as follows:

"The name of the limited liability company is First Brands Group, LLC."

IN WITNESS WHEREOF, the undersigned authorized person has executed, signed and acknowledged this Certificate of Amendment this 14th day of July, 2020.

/s/ Alana Gramer
Alana Gramer, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:29 PM 07/14/2020
FILED 02:29 PM 07/14/2020
SR 20206218361 - File Number 5304130

LEGAL_US_E # 149438435.1

CONFIDENTIAL

FBG_CH1_00097849

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "FIRST BRANDS GROUP HOLDINGS, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE THIRTEENTH DAY OF JULY, A.D. 2020, AT 11:34 O`CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "FIRST BRANDS GROUP HOLDINGS, LLC".



Jeffrey W. Bullock, Secretary of State

7962867  8100H
SR# 20222007659

Authentication: 203434884
Date: 05-16-22

You may verify this certificate online at corp.delaware.gov/authver.shtml

CONFIDENTIAL

FBG_CH1_00097850

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:34 AM 07/13/2020
FILED 11:34 AM 07/13/2020
SR 20206188241 - File Number 7962867

## *State of Delaware*
## *Limited Liability Company*

## CERTIFICATE OF FORMATION

### *of*

## First Brands Group Holdings, LLC

The undersigned, an authorized natural person, for the purpose of forming a limited liability company under the provisions and subject to the requirements of the State of Delaware (particularly Chapter 18, Title 6 of the Delaware Code and the acts amendatory thereof and supplemental thereto, and known, identified and referred to as the "Delaware Limited Liability Company Act"), hereby certifies that:

1.   The name of the limited liability company (hereinafter called the "Company") is **First Brands Group Holdings, LLC**.

2.   The address of the registered office and the name and address of the registered agent for service of process of the Company required to be maintained by Section 18-104 of the Delaware Limited Liability Company Act is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle.  The name of the registered agent of the Company at such address is The Corporation Trust Company.

Executed on July 13, 2020

/s/Alana Gramer
Alana Gramer
Authorized Person

LEGAL_US_E # 147034471.1

CONFIDENTIAL

FBG_CH1_00097851

**EXHIBIT C**

Resolutions

CONFIDENTIAL                                        FBG_CH1_00097852

**FIRST BRANDS GROUP, LLC**

**Action of the Sole Member and the Manager**

May 31, 2022

The undersigned, being the sole member (the "Sole Member") and the manager (the "Manager") of First Brands Group, LLC, a Delaware limited liability company, hereby consents to the adoption of the resolutions attached hereto as Exhibit A.  As used in Exhibit A, the term "Governing Body" shall refer to the Sole Member, the Manager or the Sole Member and Manager collectively, as applicable.

This written adoption shall be effective as of the date first written above when executed by each of the Sole Member and the Manager in the place designated for their respective signatures below.

Upon execution of this written consent, the undersigned hereby directs this consent to be filed in the minute book of First Brands Group, LLC.

> **FIRST BRANDS GROUP**
> **INTERMEDIATE, LLC**,
> as the Sole Member
>
> By: _____
> Name: Patrick James
> Title:   Chief Executive Officer
>
> _____
> Patrick James, as Manager

[Resolutions to Follow]

**DEBTORS' EXHIBIT NO. 58**
**Page 96 of 104**

# FIRST BRANDS GROUP HOLDINGS, LLC

## Action of the Members and the Manager

May 31, 2022

The undersigned, being the members (the "Members") and the manager (the "Manager") of First Brands Group Holdings, LLC, a Delaware limited liability company, hereby consents to the adoption of the resolutions attached hereto as Exhibit A. As used in Exhibit A, the term "Governing Body" shall refer to the Members, the Manager or the Members and Manager collectively, as applicable.

This written adoption shall be effective as of the date first written above when executed by each of the Members and the Manager in the place designated for their respective signatures below.

Upon execution of this written consent, the undersigned hereby directs this consent to be filed in the minute book of First Brands Group Holdings, LLC.

**VICEROY PRIVATE CAPITAL, LLC,**
as a Member

By: _____
Name: Patrick James
Title:   Chief Executive Officer

**BRAKE PARTS HOLDINGS, INC.,**
as a Member

By: _____
Name: Patrick James
Title:   Chief Executive Officer

**AZTEC CORPORATION,**
as a Member

By: _____
Name: Patrick James
Title:   Chief Executive Officer

_____
Patrick James, as Manager

[Resolutions to Follow]

CONFIDENTIAL

FBG_CH1_00097854

**EXHIBIT A**

Capitalized terms used but not defined herein shall have the meaning given to them on the previous page.

**Credit Agreement**

RESOLVED, that the Credit Agreement, dated as of May 31, 2022 (as amended, supplemented or otherwise modified from time to time) (the "***Credit Agreement***"), among, First Brands Group, LLC, a Delaware limited liability company (the "***Servicer***"), Carnaby Inventory II, LLC, a Delaware limited liability company (the "***Borrower***"), Carnaby Inventory Holdings II, LLC, a Delaware limited liability company (the "***Parent***"), First Brands Group Holdings, LLC, a Delaware limited liability company ("***Holdings***"), the lenders from time to time party thereto (the "***Lenders***") and GLAS Trust Company LLC, as administrative agent for the Lenders, (in such capacity, the "***Administrative Agent***"), and the other parties party thereto, and any and all amendments thereto, in the form approved by any officer or officers of Holdings and Servicer (each, an "***Authorized Officer***" and collectively, the "***Authorized Officers***"), and the transactions, other actions and instruments contemplated by or incident to the Credit Agreement, be and hereby are authorized, confirmed, ratified and approved;

FURTHER RESOLVED, that the Governing Body has determined that Holdings will derive substantial benefits from the Credit Agreement to which it is a party;

FURTHER RESOLVED, that the U.S. Security Agreement (as defined in the Credit Agreement), the Mexican Security Agreement (as defined in the Credit Agreement) and all other Transaction Documents (as defined in the Credit Agreement), and any and all amendments thereto, in the form approved by any Authorized Officer, and the transactions, other actions and instruments contemplated by or incident to the U.S. Security Agreement, the Mexican Security Agreement and the other Transaction Documents, be and hereby are authorized, confirmed, ratified and approved;

FURTHER RESOLVED, that each of Holdings and Servicer is hereby authorized, empowered and directed to perform its obligations under the Credit Agreement, the U.S. Security Agreement, the Mexican Security Agreement and each of the other Transaction Documents to which it is a party;

FURTHER RESOLVED, that Holdings be, and hereby is, authorized to guaranty the obligations of the Loan Parties under the Transaction Documents and is authorized to execute and deliver any certificates, instruments, agreements, amendments or any other documents as are necessary, appropriate or advisable to effectuate the intent of these resolutions, and such other matters as are reasonably contemplated or implied hereby, and to file or cause to be filed or consent to the filing with the appropriate governmental authorities all forms, agreements, documents or instruments necessary, appropriate or desirable, all in such form and having such other terms and conditions as any Authorized Officer executing the same may determine to be necessary, desirable, advisable or appropriate (the execution thereof by such Authorized Officer to be conclusive (but not exclusive) evidence of such determination; and

FBG_CH1_00097855

FURTHER RESOLVED, that Servicer be, and hereby is, authorized to act as "Servicer" under the Credit Agreement and the other Transaction Documents and is authorized to execute and deliver any certificates, instruments, agreements, amendments or any other documents as are necessary, appropriate or advisable to effectuate the intent of these resolutions, and such other matters as are reasonably contemplated or implied hereby, and to file or cause to be filed or consent to the filing with the appropriate governmental authorities all forms, agreements, documents or instruments necessary, appropriate or desirable, all in such form and having such other terms and conditions as any Authorized Officer executing the same may determine to be necessary, desirable, advisable or appropriate (the execution thereof by such Authorized Officer to be conclusive (but not exclusive) evidence of such determination.

**General**

RESOLVED, that each of the officers in his or her respective capacity be, and each of them individually hereby is, authorized to act as an Authorized Officer under and for the purposes set forth in the Credit Agreement and the other Transaction Documents;

FURTHER RESOLVED, that any Authorized Officer be, and each of them individually hereby is, authorized, empowered and directed, in the name of and on behalf of each of Holdings and Servicer to (a) negotiate, execute and deliver, for and on behalf of each of Holdings and Servicer, the Transaction Documents, together with any other agreements, documents, letters or instruments in connection therewith and any schedules, exhibits, annexes, certificates or attachments thereto, in each case with such changes therein, additions thereto or omissions therefrom as such Authorized Officers may deem necessary, advisable or appropriate, such execution and delivery by any such Authorized Officer to be conclusive evidence of such authorization and approval from and by the Governing Body, and (b) execute and deliver, or cause to be executed and delivered, any and all such further agreements, certificates, documents and instruments, and to do, or cause to be done, and perform such other acts and things arising under, related to or made in connection with the foregoing resolutions, in each case, as such Authorized Officer deems necessary, expedient or appropriate to effect the resolutions set forth above;

FURTHER RESOLVED, that any and all actions heretofore or hereafter taken, and all agreements, instruments, amendments, waivers, documents or certificates executed, delivered or filed through the date hereof by any Officer or any other authorized person in connection with the transactions described in or contemplated by these resolutions are hereby, authorized, adopted, ratified, confirmed and approved in all respects;

FURTHER RESOLVED, that the Authorized Officers be, and each of them individually hereby is, authorized and empowered in the name and on behalf of the Company, to execute, deliver and file all additional agreements, instruments, letters and documents, and to take or cause to be taken such other actions, as such Authorized Officer or Authorized Officers may determine to be necessary or advisable or desirable in connection with and arising out of the foregoing resolutions and the transactions contemplated by the foregoing resolutions to implement the purposes and intent of the

CONFIDENTIAL

FBG_CH1_00097856

foregoing resolutions; each such agreement, instrument, letter and document to be in such form and to contain such terms and conditions, consistent with the foregoing resolutions, as such Authorized Officer or Authorized Officers executing the same may approve, the execution and delivery of any such agreement, instrument, letter or document by any such Authorized Officer or the taking of such action to be conclusive evidence of such authorization and approval from and by the Governing Body; and

FURTHER RESOLVED, that this unanimous written consent may be executed by facsimile or otherwise in one or more counterparts, each of which shall be deemed an original, but which shall together constitute one and the same document.

CONFIDENTIAL

FBG_CH1_00097857

**DEBTORS' EXHIBIT NO. 58**
**Page 100 of 104**

**EXHIBIT D**

| Name | Office | Signatures |
|------|--------|------------|
| Patrick James | President and Chief Executive Officer | |
| Edward James | Executive Vice President | |
| Michael Baker | Chief Corporate Strategy Officer and Secretary | |
| Shekhar Kumar | Corporate Finance Manager | |
| Stephen Graham | Treasurer and Chief Financial Officer | |
| Matthew Liebson | General Counsel | |

CONFIDENTIAL

FBG_CH1_00097858

**EXHIBIT E**

Certificate of Good Standing

CONFIDENTIAL

FBG_CH1_00097859



# Delaware

Page 1

The First State

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF*

*DELAWARE, DO HEREBY CERTIFY "FIRST BRANDS GROUP, LLC" IS DULY*

*FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD*

*STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS*

*OFFICE SHOW, AS OF THE THIRTY-FIRST DAY OF MAY, A.D. 2022.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "FIRST BRANDS*

*GROUP, LLC" WAS FORMED ON THE FOURTEENTH DAY OF MAY, A.D. 2013.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN*

*PAID TO DATE.*

Jeffrey W. Bullock, Secretary of State

5304130  8300

SR# 20222476713

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203550261

Date: 05-31-22

CONFIDENTIAL

FBG_CH1_00097860



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "FIRST BRANDS GROUP HOLDINGS, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE THIRTY-FIRST DAY OF MAY, A.D. 2022.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "FIRST BRANDS GROUP HOLDINGS, LLC" WAS FORMED ON THE THIRTEENTH DAY OF JULY, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

7962867  8300

SR# 20222476713

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203550262

Date: 05-31-22

CONFIDENTIAL

FBG_CH1_00097861