EXECUTION COPY

# ASSET PURCHASE AGREEMENT

**by and among**

**ZF ACTIVE SAFETY US INC.,**

**SA Eagle Holdings, LLC,**

**Viceroy Private Capital, LLC**

**and**

**First Brands Group, LLC**

**Dated as of September 30, 2021**

**(effective as of October 13, 2021)**

40531485

CONFIDENTIAL

FBG_CH1_00095575

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................................1

    1.1    Defined Terms. .......................................................................................1
    1.2    Construction. ..........................................................................................9

ARTICLE II PURCHASE AND SALE ....................................................................................10

    2.1    Purchase and Sale of the Purchased Assets. ........................................10
    2.2    Excluded Assets. ...................................................................................11
    2.3    Assumed Liabilities. .............................................................................12
    2.4    Excluded Liabilities for Asset Transactions. .......................................13
    2.5    Consideration. .......................................................................................13

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .................................15

    3.1    Organization and Existence. .................................................................15
    3.2    Authorization; Binding Obligations......................................................15
    3.3    No Conflict or Violation. ......................................................................16
    3.4    Approvals...............................................................................................16
    3.5    Actions. .................................................................................................16
    3.6    Real Property. .......................................................................................16
    3.7    Absence of Certain Changes.................................................................17
    3.8    Assets. ...................................................................................................17
    3.9    Contracts. ..............................................................................................17
    3.10   Taxes, etc. .............................................................................................18
    3.11   Compliance with Law. .........................................................................18
    3.12   Permits. .................................................................................................18
    3.13   Employees.............................................................................................18
    3.14   Environmental Matters..........................................................................19
    3.15   Brokers and Finders. ............................................................................19
    3.16   DISCLAIMER. .....................................................................................19

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER.........................19

    4.1    Organization and Existence. .................................................................20
    4.2    Authorization; Binding Obligations......................................................20
    4.3    No Conflict or Violation. ......................................................................20
    4.4    Approvals...............................................................................................20
    4.5    Actions. .................................................................................................20
    4.6    No Seller Responsibility for Brokers and Finders. ...............................21
    4.7    Independent Investigation......................................................................21
    4.8    Availability of Funds. ...........................................................................21

ARTICLE V COVENANTS......................................................................................................21

i

40531485

CONFIDENTIAL

FBG_CH1_00095576

5.1 Access to Information. ....21
5.2 Conduct of the Business. ....22
5.3 Third Party Consents. ....22
5.4 Confidentiality. ....23
5.5 Insurance. ....23
5.6 Collection of Receivables and Other Property. ....23
5.7 Publicity. ....23
5.8 Employees; Employee Benefits; Labor Matters. ....24
5.9 Satisfaction of Conditions Precedent. ....25
5.10 Notification of Information. ....25
5.11 Tax Matters. ....26
5.12 Transition Planning. ....27
5.13 Real Estate Proration. ....28
5.14 Non-Solicitation of Transactions. ....29
5.15 Post-Closing Transfers. ....29

ARTICLE VI CONDITIONS PRECEDENT TO PURCHASER'S PERFORMANCE ....29

6.1 Conditions Precedent to Purchaser's Performance at Closing. ....29

ARTICLE VII CONDITIONS PRECEDENT TO SELLER'S PERFORMANCE ....30

7.1 Conditions Precedent to Seller's Performance at the Closing. ....30

ARTICLE VIII TERMINATION PRIOR TO CLOSING ....31

8.1 Termination. ....31
8.2 Effect on Obligations. ....32

ARTICLE IX THE CLOSINGS ....32

9.1 Closing. ....32
9.2 Closing Obligations. ....33

ARTICLE X SURVIVAL; GENERAL INDEMNIFICATION ....34

10.1 Survival of Representations and Warranties and Covenants. ....34
10.2 Indemnification Obligations. ....35
10.3 Tax Treatment of Indemnification Payments. ....39
10.4 Exclusive Remedies. ....40

ARTICLE XI MISCELLANEOUS PROVISIONS ....40

11.1 Further Assurances. ....40
11.2 Expenses. ....40
11.3 Entire Agreement. ....40
11.4 Governing Law. ....41
11.5 Specific Performance. ....41

11.6 Waiver and Amendment. .......................................................................41
11.7 Assignment. ............................................................................................41
11.8 Successors and Assigns; No Third Party Beneficiary...........................41
11.9 Notices. ..................................................................................................42
11.10 Severability. ...........................................................................................43
11.11 Transfer Taxes. ......................................................................................43
11.12 No Deduction of Taxes from Purchase Price........................................43
11.13 Interpretation..........................................................................................43
11.14 Counterparts...........................................................................................43
11.15 Facsimile Signatures. .............................................................................43
11.16 Additional Diligence...............................................................................44

iii

40531485

FBG_CH1_00095578

**<u>Schedules Table of Contents</u>:**

Schedule 1.1(a) – Environmental Reports
Schedule 1.1(b) – Permitted Encumbrances
Schedule 1.1(c) – Seller's Knowledge
Schedule 2.1(a) – Transferred Contracts
Schedule 2.1(c) – Tooling
Schedule 2.1(f) – Tangible Personal Property
Schedule 2.1(g) – Permits
Schedule 2.1(h) – Transferred Real Property
Schedule 2.2(p) – Other Excluded Assets
Schedule 3.3 – Seller No Conflict
Schedule 3.4 – Seller Approvals
Schedule 3.5 – Actions
Schedule 3.6 – Real Property
Schedule. 3.7 – Absence of Certain Changes
Schedule 3.8 – Condition
Schedule 3.9 – Material Contracts
Schedule 3.11 – Compliance with Law
Schedule 3.13(a) – Employees
Schedule 3.13(b) – Labor Contracts
Schedule 3.13(c) – Seller Plans
Schedule 3.14 – Environmental Matters
Schedule 3.15 – Brokers
Schedule 4.3 – Purchaser No Conflict
Schedule 4.4 – Purchaser Approvals
Schedule 5.2 – Conduct of Business
Schedule 5.3 – Third Party Consents

iv

40531485

CONFIDENTIAL

FBG_CH1_00095579

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is entered into as of September 30, 2021 (but effective only as of October 13, 2021, the "**Effective Date**"), by and between ZF Active Safety US Inc. ("**Seller**"), and SA Eagle Holdings, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware ("**Purchaser**"), Viceroy Private Capital, LLC ("**Viceroy**") and First Brand Groups, LLC ("**FBG**" and collectively, with Purchaser and Viceroy, "**Purchaser Parties**"). Seller and Purchaser Parties are sometimes each referred to herein individually as a "**Party**," and collectively referred to herein as the "**Parties**."

## R E C I T A L S

A.      Seller owns or has rights to use certain assets primarily for use in the operation of the Plant (as defined below); and

B.      Purchaser desires to acquire the Purchased Assets (as defined herein), including the Plant, and to assume the Assumed Liabilities (as defined herein) from Seller, in each case upon the terms and conditions set forth in this Agreement (the "**Transactions**").

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged by the Parties, the Parties agree as follows, intending to be legally bound:

## ARTICLE I
## DEFINITIONS; CONSTRUCTION

1.1      Defined Terms.

Unless otherwise defined herein, capitalized terms used herein shall have the following respective meanings:

"**Action**" shall mean any action, claim, suit, litigation, proceeding, arbitration or mediation.

"**Affiliate**" shall mean, with respect to any Person, any other Person which, directly or indirectly controls, is controlled by or is under common control with such Person.

"**Agreemen**t" shall have the meaning given to such term in the Preamble to this Agreement.

"**Allocation**" shall have the meaning given to such term in Section 2.5(e).

"**Alternate Transaction**" shall have the meaning given to such term in Section 5.15(a).

"**Ancillary Agreements**" shall mean:

(a)      a bill of sale and assignment and assumption of intangible property with respect to each of the Purchased Assets in form and substance mutually agreeable to the Parties;

40531485

CONFIDENTIAL                                                                 FBG_CH1_00095580

(b)      a limited warranty deed for transfer of the Transferred Real Property subject only to Permitted Encumbrances, and otherwise in form and substance mutually agreeable to the Parties and not otherwise inconsistent with the terms and conditions of this Agreement (the "**Deed**");

(c)      the Transition Services Agreement; and

(d)      a supply agreement between Seller and Purchaser (with each Purchaser Party being jointly and severally liable for all obligations of Purchaser thereunder) for the supply of service parts to Seller following the Closing, in form reasonably acceptable to the Parties (the "**Supply Agreement**").

"**Antitrust Laws**" shall mean all Laws relating to competition, antitrust or antimonopoly in any jurisdiction applicable to either Party and relating to the Transaction Agreements or the transactions contemplated hereby or thereby.

"**Assumed Liabilities**" shall have the meaning given to such term in Section 2.23.

"**Books and Records**" shall mean all: (i) personnel records of the Employees; (iii); (vi) information and data related to owned equipment; (v) specifications, drawings, operation standards, and detailed drawing explanations related to any machinery or equipment of Sellers, including, but not limited to, components, assemblies, subassemblies, replacement parts and spare parts and (vi) other business records, books, ledgers, files, records, manuals and other materials (whether paper, in electronic format or other medium), in each case, to the extent primarily related to the Purchased Assets, excluding Seller's corporate records, such items related primarily to the Plant OEM Business, the Excluded Assets or the Excluded Liabilities.

"**Business Day**" shall mean any day except Saturday, Sunday or any other day on which commercial banks located in Michigan are authorized or required by Law to be closed for business.

"**Cap**" shall have the meaning given to such term in Section 10.2(c)(i).

"**Cash and Cash Equivalents**" shall mean all cash and cash equivalents, including, without limitation, (i) certificates of deposit, (ii) normal or time deposits and (iii) marketable securities, and (iv) the proceeds of accounts receivable and/or any payments in transit to Seller.

"**Closing**" shall have the meaning given to such term in Section 9.1.

"**Closing Date**" shall have the meaning given to such term in Section 9.1.

"**Closing Payment**" shall have the meaning given to such term in Section 2.5(d).

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" shall mean the agreement made and concluded at Fayette, Fulton County, State of Ohio, this October 30, 2018 by and between the Fayette Plant of Kelsey-Hayes Varity Automotive Holding Company (which is a wholly owned subsidiary of TRW Automotive, Inc.), doing business in the City of Fayette, Ohio, and/or its successors or assignees,

2

40531485

CONFIDENTIAL

FBG_CH1_00095581

party of the first part, and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, and Local No. 1181 thereof, party of the second part.

"**Confidentiality Agreement**" shall mean that certain confidentiality agreement dated as of August 17, 2021, by and between ZF Active Safety US Inc. and First Brands Group, LLC.

"**Contracts**" shall mean all contracts, arrangements, licenses, leases, accepted purchase orders and all other agreements, whether written or oral, express or implied, and in any format or medium, including in paper or electronic format.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**Damages**" shall mean any cost or expense, loss, liability, obligation, assessment, levy, damage, including without limitation, interest, penalties, costs and expenses (including reasonable attorneys', accountants' and experts' fees and costs in relation thereto; PROVIDED, HOWEVER, THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE TERM "DAMAGES" SHALL EXCLUDE (A) ANY LOST OR IMPUTED PROFITS, LOSS OF BUSINESS, LOSS OF PRODUCTION, CONSEQUENTIAL, INCIDENTAL, INDIRECT, RELIANCE OR SPECIAL DAMAGES AND (B) ANY EXEMPLARY OR PUNITIVE DAMAGES, EXCEPT IN THE CASE OF THE FOREGOING CLAUSES (A) AND (B), TO THE EXTENT ANY SUCH DAMAGES ARE PAID OR PAYABLE TO THIRD PARTIES IN RESPECT OF ANY THIRD PARTY CLAIM FOR WHICH A PARTY IS ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT.

"**Deductible**" shall have the meaning given to such term in Section 10.2(c)(i).

"**Deposit**" shall have the meaning given to such term in Section 2.5(b).

"**Direct Claim**" shall have the meaning given to such term in Section 10.2(f).

"**Effective Time**" shall have the meaning given to such term in Section 9.1.

"**Employee Benefits**" shall have the meaning given to such term in Section 5.8(a).

"**Employee Benefit Plan(s)**" shall mean any benefit plan, program, agreement or arrangement (whether written or unwritten) maintained, contributed to, or provided by Seller or Purchaser, as applicable, or any Affiliate thereof, for the benefit of any employees, former employees, or their respective dependents or beneficiaries, including, without limitation, all bonuses, deferred compensation, incentive compensation, savings, profit sharing schemes, severance or termination pay, health or other medical, life, disability or other insurance (whether insured or self-insured benefits), supplementary unemployment benefits, pensions, retirement and supplementary retirement plans, programs, agreements or arrangements.

"**Employees**" shall mean the employees or independent contractors of Seller or an Affiliate of Seller (i) whose employment or engagement is primarily related to the operation of the Plant, and (ii) who perform such services at the Plant, including Union Employees.

3

40531485

FBG_CH1_00095582

"**Employment Costs**" shall mean, with respect to an Employee or Former Employee, any Liability resulting from claims for employment and other employee-related relief and/or obligations of any type under any Employment Laws, and all costs, expenses, premiums, contributions, remittances, deductions or claims payable to, or on behalf of, such Employee, Former Employee or group of Employees or Former Employees under the terms of any Employee Benefit Plan, policy, contractual obligation or other legal obligation.  For greater certainty and without limitation, Employment Costs shall include all payroll costs, such as salary, wages, incentive compensation, benefits, commissions, vacation and holiday pay; paid time off; unemployment compensation costs; workers' compensation costs; income tax withholdings; costs and expenses in connection with the administration of the foregoing; any fines or penalties relating to any of the foregoing; and the costs associated with all demands, claims, complaints and proceedings related to the foregoing and any costs of defending such demands, claims, complaints and proceedings.

"**Employment Laws**" shall mean all Laws relating to employment and labor relations, including without limitation, those Laws relating to wages, hours of employment, collective bargaining, civil rights, individual employment rights, workers' compensation, occupational health and safety, privacy, hazardous materials, immigration, unemployment insurance, income tax withholdings, and the common law as it relates to employment, applicable to any Employee or Former Employee.

"**Employment Offers**" shall have the meaning given in Section 5.8(a).

"**Encumbrances**" shall mean any claim, lien, pledge, option, charge, security interest, equitable interest, mortgage, deed of trust, financing statement, assignment of leasehold interest or rents, judgment, lis pendens, option, right of first refusal, right of first offer, easement, encroachment, title defect, right of way, hypothecation, conditional sale or title retention agreement, restriction, encumbrance or other similar right of any Person of any kind or nature.

"**Environmental Laws**" shall mean all applicable Laws with respect to: (a) the installation, existence or removal of, asbestos in building materials; (b) the storage or treatment of, discharge or release of, or removal of any Hazardous Materials or the disposal thereof; or (c) the protection of the environment, as it relates to soil, surface water, groundwater, or air.

"**Environmental Liabilities**" shall mean any Liability arising out of or relating to any Environmental Laws with respect to the Purchased Assets (including the Transferred Real Property).

"**Environmental Reports**" shall mean the environmental reports relating to the Transferred Real Property as listed on Schedule 1.1(a)[1].

"**Excluded Assets**" shall have the meaning given to such term in Section 2.2.

---

[1] Note to Purchaser: Schedule will list the reports that currently exist for the Transferred Real Property and the Phase I reports and other similar reports obtained in connection with the transactions.

4

40531485

FBG_CH1_00095583

"**Excluded Books and Records**" shall have the meaning given to such term in Section 5.1(a).

"**Excluded Liabilities**" shall have the meaning given to such term in Section 2.4.

"**FBG**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Former Employee**" shall mean any Person who is not an Employee as of the Closing Date, but who was employed by Seller to perform services or provide work in relation to the Plant prior to such time.

"**Fraud**" means the conscious, intentional omission or misrepresentation of a fact or circumstance under this Agreement or Transaction Documents by the Person being charged with such Fraud which (i) is made or omitted by such Person for the purpose of deceiving, or with the intent to deceive, the claiming Person to induce the claiming Person to enter into the Transactions and (ii) which the claiming Person reasonably relied upon in making its decision to execute this Agreement and to enter into the Transactions.

"**GAAP**" shall mean generally accepted accounting principles as in effect under Seller's accounting standards.

"**Governmental Authority**" shall mean any federal, state, local, municipal, territorial, provincial or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality with applicable jurisdiction.

"**Hazardous Materials**" shall mean hazardous substances, hazardous waste or hazardous materials, or pollutants or contaminants, as such terms are defined in any Environmental Laws and waste oil, petroleum and petroleum derivatives.

"**Hired Employees**" shall have the meaning given to such term in Section 5.8(c).

"**Indemnitee**" shall have the meaning given to such term in Section 10.2(d).

"**Indemnitor**" shall have the meaning given to such term in Section 10.2(d).

"**Indemnitor's Defense**" shall have the meaning given to such term in Section 10.2(e)(i)(A).

"**Independent Auditor**" shall have the meaning given to such term in Section 2.5(c)(i).

"**Intellectual Property**" shall mean (a) all trademarks, trademark registrations, trademark applications, service marks, trade names, business names, Internet domain names, brand names, logos, copyrights, copyright registrations, utility models, utility model registrations, designs, design registrations and patents (including registrations, licenses and applications pertaining thereto), (b) any and all trade secrets, confidential information, inventions, know-how, formulae, processes, procedures, customer lists, research records, market surveys and any and all other intellectual property rights, (c) all computer software programs and subsequent versions thereof, including all source code, object, executable or binary code, comments, screens, user interfaces,

5

40531485

CONFIDENTIAL

FBG_CH1_00095584

report formats, templates, menus, buttons and icons, operating systems, applications, firmware, and all files, data, materials, manuals, design notes and other items and documentation, and (d) all other intellectual or industrial property and proprietary rights.

"**Laws**" shall mean the applicable laws of any country or any political division thereof, including, without limitation, all applicable federal, state, territorial, provincial and local statutes, regulations, rules, codes, ordinances, orders, decrees or any other laws or legal requirements, common law theories, or enforceable and applicable reported decisions of any applicable Governmental Authority.

"**Liability**" or "**Liabilities**" shall mean any direct or indirect liability, indebtedness, obligation, expense, claim, loss, damage, deficiency, guaranty, or endorsement of or by any Person, absolute or contingent, asserted or unasserted, accrued or unaccrued, due or to become due, liquidated or unliquidated.

"**Mandatory Cure Items**" means, collectively, any and all (a) existing monetary liens encumbering the Transferred Real Property with the exception of Encumbrances referred to in clause (c) of the definition of Permitted Encumbrances, and (b) delinquent real property Taxes payable with respect to the Transferred Real Property.

"**Material Adverse Effect**" shall mean any circumstance or event that has had or is having a material adverse effect, taken as a whole, on (i) the Purchased Assets or (ii) Seller's ability to consummate the transactions contemplated hereby, excluding (a) circumstances or events created by the seasonal and cyclical nature of the automotive supplier industry, (b) circumstances or events created by general economic or industry conditions, (c) the occurrence or continuance of any material disruption or a material adverse change in worldwide financial or capital markets, (d) natural or manmade disasters, acts of God, epidemics, pandemics or disease outbreaks (including COVID-19) and similar events, (e) actions taken or omitted as required by this Agreement or at a Purchaser Party's request, or (f) circumstances or events created by conditions affecting the relevant industry as a whole.

"**Material Contracts**" shall have the meaning given to such term in Section 3.9(a).

"**Notice**" shall have the meaning given to such term in Section 10.2(d).

"**Ordinary Course of Business**" shall mean the ordinary course of business of Seller; provided that, actions taken (or omitted) in response to a condition or conditions arising from the COVID-19 pandemic shall be deemed ordinary course, so long as such actions (or omissions) are consistent with such Person's actions (or omissions) taken prior to the Effective Date in response to COVID-19.

"**Party**" and "**Parties**" shall have the meanings given to such terms in the Preamble to this Agreement.

"**Permits**" shall mean all franchises, permits, licenses, qualifications, municipal and other approvals, authorizations, orders, consents and other rights from, and filings with, any Governmental Authority of any jurisdiction worldwide primarily relating to the operation and conduct of the Purchased Assets.

6

40531485

CONFIDENTIAL

FBG_CH1_00095585

"**Permitted Encumbrances**" shall mean (a) with respect to the Transferred Real Property (i) those certain exceptions set forth in Schedule B of the Policy Pro Forma, (ii) matters and exceptions disclosed by the Survey, and any Title Exceptions and Zoning Issues deemed a Permitted Encumbrance pursuant to Section 5.13(b), (b) liens for current Taxes not yet due and payable or which are being contested in good faith by appropriate legal proceedings, (c) mechanics', carriers', workmen's, repairmen's or other like liens as well as retention of titles by suppliers arising or incurred in the ordinary course of business consistent with past practice and (d) any other Encumbrances set forth on Schedule 1.1(b).

"**Person**" shall mean any natural person, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, political subdivision or Governmental Authority, agency, or other legal entity or organization.

"**Plant**" shall have the meaning given to such term in Section 2.1(h).

"**Plant OEM Business**" shall mean the production of front and rear axle corner assemblies and related components by Seller and its Affiliates at the Plant for Ford Motor Company.

"**Policy Pro Forma**" shall mean a pro forma title insurance policy for a basic ALTA form 2006 owner's policy, insuring Purchaser's fee interest in the Transferred Real Property, to be issued by the Title Company as of the Closing Date.

"**Post-Closing Operation Liabilities**" shall have the meaning given to such term in Section 10.2(b)(iv).

"**Purchase Price**" shall have the meaning given to such term in Section 2.5(a).

"**Purchased Assets**" shall have the meaning given to such term in Section 2.1.

"**Purchaser**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Purchaser Indemnified Parties**" shall have the meaning given to such term in Section 10.2(a).

"**Purchaser Parties**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Purchaser's Statement**" shall have the meaning given to such term in Section 2.5(c)(i).

"**Real Property Liability**" shall mean any Liability arising out of or relating to the Transferred Real Property.

"**Release**" shall mean any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, or into or out of any property, including the movement of any Hazardous Material or other substance through or in the air, soil, surface water, groundwater or property.

7

40531485

CONFIDENTIAL

FBG_CH1_00095586

"**Representative**" shall mean any officer, director, principal, shareholder, member, Affiliate, partner, attorney, accountant, advisor, lender, agent, trustee, employee or other representative of a Party.

"**Schedule Supplement**" shall have the meaning given to such term in Section 5.10.

"**Seller**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Seller Indemnified Parties**" shall have the meaning given to such term in Section 10.2(b).

"**Seller Plans**" shall mean Employee Benefit Plans maintained, contributed to, or required to be contributed to, by Seller or any Affiliate thereof for the benefit of any Employee or Former Employee or their respective dependents or beneficiaries.

"**Seller's Knowledge**" shall mean the actual knowledge of any of the persons listed on Schedule 1.1(c).

"**Seller's Statement**" shall have the meaning given to such term in Section 2.5(b).

"**Straddle Period**" shall have the meaning given to such term in Section 5.11(c).

"**Supplemental Due Diligence Materials**" shall have the meaning given to such term in Section 11.16.

"**Survey**" means that certain ALTA/NSPS Land Title Survey to be prepared by Fishbeck, designated as Project No. 211305.

"**Tax(es)**" shall mean all taxes, charges, fees, levies or other assessments imposed by and required to be paid to any federal, state, local, municipal, territorial, provincial or foreign taxing authority, including, without limitation, income, gross receipts, excise, capital gains, real property, personal property, stamp, value added, withholding, employment, unemployment, health, insurance, social security, workers' compensation, profits, customs, duties, alternative or add-on minimum, sales, use, goods and services, transfer, ad valorem, payroll and franchise taxes (including any interest, penalties or additions attributable to or imposed on or with respect to any such assessment) and any estimated payments or estimated taxes, including any transferee or secondary Liability for a tax and any Liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group, or being included or required to be included in any tax return relating thereto.

"**Tax Return**" shall mean any return, report or similar statement required to be filed with respect to any Tax (including any schedule attached thereto), including any information return, claim for refund, amended return or declaration of estimated Tax or any affiliated, consolidated, combined, unitary or similar return.

"**Third Party**" shall mean a Person other than Seller, Seller's Affiliates, Purchaser, or Purchaser's Affiliates.

8

40531485

CONFIDENTIAL

FBG_CH1_00095587

"**Third Party Claim**" shall have the meaning given to such term in Section 10.2(e).

"**Threshold**" shall have the meaning given to such term in Section 10.2(c)(i).

"**Title Company**" means Fidelity National Title Insurance Company.

"**Transactions**" shall have the meaning given to such term in the Recitals.

"**Transaction Agreements**" shall mean collectively, this Agreement and the Ancillary Agreements.

"**Transaction Documents**" shall mean collectively, the Transaction Agreements and any other certificate, document or agreement executed and delivered by a Party pursuant hereto or thereto.

"**Transfer Taxes**" shall have the meaning given to such term in Section 11.11.

"**Transferred Contracts**" shall have the meaning given to such term in Section 2.1(a).

"**Transferred Real Property**" shall have the meaning given to such term in Section 2.1(g).

"**Transition Services Agreement**" shall have the meaning given to such term in Section 5.12(b).

"**Union**" shall mean any labor or trade organization or association of employees that has as one of its purposes the representation of employees with respect to the employees' wages, hours, and other terms and conditions of employment.

"**Union Employees**" shall mean Employees who are represented by a Union.

"**United States dollars**" or "**US$**" shall mean the lawful currency of the United States of America.

"**Viceroy**" shall have the meaning given to such term in the Preamble to this Agreement.

"**ZF Intellectual Property**" shall mean any and all Intellectual Property owned by or licensed to ZF Group, Seller or any of the their respective subsidiaries or Affiliates.

"**Zoning Report**" shall mean a zoning report prepared by GRS Group to be delivered to Purchaser by Seller.

1.2     Construction.

(a)     The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. Any reference herein to an Article or Section shall be deemed to refer to the applicable Article or Section of this Agreement unless otherwise expressly stated herein. Unless otherwise expressly stated herein, any reference to a Schedule shall be deemed to refer to the applicable Schedule attached hereto, and any reference to an Exhibit shall be deemed to refer to the applicable

9

40531485

CONFIDENTIAL

FBG_CH1_00095588

Exhibit attached hereto, with all such Schedules and Exhibits being incorporated herein and made a part hereof by this reference.  Words used herein in the singular, where the context so permits, shall be deemed to include the plural and vice versa.  The definitions of words in the singular herein shall apply to such words when used in the plural where the context so permits and vice versa.  Unless the context of this Agreement clearly requires otherwise, the words "includes" or "including" shall mean "including without limitation," and the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.  Currency amounts referenced herein, unless otherwise specified, are in United States dollars.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  Where any deadline in this Agreement falls on a day other than a Business Day, such deadline shall be automatically extended to the immediately following Business Day.

(b)      The Parties agree that each Party and its counsel have reviewed and revised or will have reviewed and revised the Transaction Documents and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of any Transaction Document or any amendments, schedules or exhibits thereto.

<center>ARTICLE II<br>PURCHASE AND SALE</center>

2.1    Purchase and Sale of the Purchased Assets.

On the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, assign, convey and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the following assets and properties primarily used or held for use in operation of the Plant (the "**Purchased Assets**"), but for the avoidance of doubt, excluding the Excluded Assets:

(a)      all contracts and purchase orders issued with respect to the Plant listed on Schedule 2.1(a) (the "**Transferred Contracts**");

(b)      the Collective Bargaining Agreement;

(c)      all rights, causes of action, defenses, rights of recovery, rights of reimbursement, set off and claims, counterclaims, credits, rights and interests, rights to indemnification or similar rights, known or unknown, matured or unmatured, assumed or contingent, against Third Parties related to or arising from the Purchased Assets or the Assumed Liabilities;

(d)      all prepaid expenses, prepayments for tooling (to the extent such tooling is a Purchased Asset), claims, security, refunds, rights of recovery primarily related to or arising from the Purchased Assets;

(e)      all goodwill associated with the Purchased Assets;

(f)      all furniture, fixtures, equipment, machinery, tooling, information technology and communications hardware, tools and dies, molds and parts, capital spares, spare parts, supplies,

<center>10</center>

40531485

CONFIDENTIAL
FBG_CH1_00095589

telephones and other tangible personal property primarily used or held for use in the operation of the Plant, in each case, listed on Schedule 2.1(f);

(g)     the Permits held by Seller that are required primarily for operation or ownership of the Purchased Assets and listed on Schedule 2.1(g), in each case, only to the extent transferable; and

(h)     the real property, facility, structures and improvements located at 705 North Fayette Street, Fayette, Ohio 43521, including the manufacturing facility located thereon (the "**Plant**"), all as more specifically described on Schedule 2.1(h) (the "**Transferred Real Property**").

2.2     Excluded Assets.

Notwithstanding anything contained in this Agreement to the contrary, the Purchased Assets shall not include, and Seller shall not sell to Purchaser, and Purchaser shall not acquire (x) any rights, properties or assets owned or used by Seller not expressly included in Section 2.1, (y) any rights, properties or assets of Seller that are not primarily used in the operation of the Plant as presently conducted, and (z) any of the following rights, assets or properties (collectively, the "**Excluded Assets**"):

(a)     all Cash and Cash Equivalents of Seller and its Affiliates;

(b)     all bank accounts of Seller and its Affiliates;

(c)     all accounts receivable of Seller and its Affiliates;

(d)     all rights, claims, credits, causes of action and rights of set-off against third parties relating to or arising from the Excluded Assets or Excluded Liabilities;

(e)     all ZF Intellectual Property;

(f)     all rights and interest in and to the Plant OEM Business, including revenue therefrom;

(g)     scrap generated in connection with the Plant OEM Business;

(h)     all customer-owned tooling and customer-owned assets used in the operation of the Plant, including the Plant OEM Business;

(i)     computer equipment, information technology and communications hardware (unless specifically listed on Schedule 2.1(f)),  servers and the network system used in connection with operation of the Plant;

(j)     all rights and interest under Contracts that are not Transferred Contracts, including, without limitation, the rights and interests of Seller under the Contracts for the Plant OEM Business;

11

40531485

FBG_CH1_00095590

(k)      the temporary staffing contracts held by Seller or its Affiliates with respect to certain Employees that provide services at the Plant;

(l)      Seller's status as a legal entity and its organizational documents and records relating to its existence and capitalization, including all minute books, member registry books and variations of capital books of Seller;

(m)      all Tax refunds, rebates or credits payable to Seller which corresponds to Seller's operation of the Plant or the Purchased Assets prior to Closing;

(n)      all liability insurance policies maintained by Seller or its Affiliates for the benefit of Seller and all Seller Plans;

(o)      all rights of Seller arising under the Transaction Documents or with respect to the Transactions;

(p)      any assets set forth on Schedule 2.2(p); and

(q)      all rights and interests under the Parts POs (as such term is defined on Schedule 2.1(f) to this Agreement), and the underlying master contracts with such counterparty suppliers or providers associated with such Parts POs held by Seller or its Affiliates.  For clarity, such Parts POs and underlying master contracts are not Transferred Contracts. Purchaser will need to enter into new and separate contracts with any such suppliers or providers if and to the extent Purchaser desires to order new or additional parts, supplies or other assets from such suppliers or providers after Closing.

2.3      Assumed Liabilities.

On the terms and subject to the conditions of this Agreement, as of the Closing, Purchaser shall assume and become obligated to pay, perform and discharge as the same shall become due, the Liabilities arising out of or relating to the Purchased Assets (whether arising before, on or after Closing), excluding only the Excluded Liabilities (the Liabilities that will be assumed by Purchaser, collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

(a)      all Liabilities arising under the Transferred Contracts on or after the Closing;

(b)      except as specifically provided in Section 2.4, all Liabilities relating to employee benefits, compensation or other arrangements with respect to any Hired Employee arising on or after the Closing;

(c)      all liabilities and obligations for Taxes relating to the Purchased Assets for any taxable period ending after the Closing Date;

(d)      all Liabilities under the WARN Act resulting from employment losses relating to the sale of the Purchased Assets ("**WARN Act Liabilities**"); and

12

40531485

FBG_CH1_00095591

(e)    all Liabilities arising out of or relating to the Purchased Assets or the ownership or operation thereof, in each case, whether prior to, on or after the Closing, including, without limitation, Environmental Liabilities and Real Property Liabilities.

2.4    Excluded Liabilities for Asset Transactions.

On the terms and subject to the conditions of this Agreement, Purchaser shall not assume, or become obligated or otherwise liable for, the following Liabilities of Seller, whether presently existing or arising hereafter: (a) Liabilities arising out of severance obligations owing to Employees prior to or on the Closing Date and retention bonus obligations owing to certain Employees upon the completion of the Plant OEM Business, in each case, pursuant to policies or written agreements of Seller or its Affiliates, (b) all liabilities and obligations for Taxes relating to the Purchased Assets for any taxable period ending prior to the Closing Date and any income, franchise or similar Taxes imposed on any Seller or its Affiliate, (c) Liabilities arising out of or relating to the Excluded Assets (but for clarity, excluding Environmental Liabilities and Real Property Liabilities and excluding the obligation to reimburse Seller for Purchased Assets delivered under the Parts POs after Closing), (d) any Liabilities or obligations of Seller with respect to any products that were manufactured, marketed or sold prior to Closing by Seller or its Affiliates in connection with the Plant OEM Business, including product liability and infringement claims and any related claims and litigation arising prior to, on or after the Closing Date with respect thereto; (e) all Liabilities relating to or arising from Employees relating to service with a Seller or its Affiliates incurred prior to the Closing Date (but for clarity, excluding WARN Act Liabilities); (f) any and all Liabilities of the Seller or its Affiliates arising or incurred in connection with their negotiation, investigation and performance of this Agreement and the Transaction Documents, including fees and expenses of advisors, accountants and counsel (collectively, the "**Excluded Liabilities**").

2.5    Consideration.

(a)    Purchase Price.  The "**Purchase Price**" shall mean an amount equal to the Closing Payment (as defined below), subject to adjustment pursuant to and in accordance with this Section 2.5. In addition to the foregoing payment, as consideration for the sale, assignment, transfer and delivery of the Purchased Assets, Purchaser shall assume and pay, perform, satisfy and discharge the Assumed Liabilities, when due.

(b)    Deposit.  Upon the execution of this Agreement, Purchaser shall immediately pay to Seller the sum of $2,000,000 as a deposit for the Purchase Price (the "**Deposit**") by wire transfer of immediately available funds.  At the Closing, the Deposit shall be credited by Seller against the Purchase Price. If the Agreement is terminated prior to Closing, the Deposit shall be payable pursuant to Section 8.2 hereof, and thereafter shall either be retained by Seller or returned to Purchaser, as applicable, pursuant to Section 8.2 hereof.

(c)    Purchase Price Adjustments.  At Closing, the Purchase Price shall be adjusted as necessary to reflect the following:

(i)    any adjustments resulting from Section 5.13 relating to the Transferred Real Property;

40531485

CONFIDENTIAL

FBG_CH1_00095592

(ii)     any adjustments resulting from payroll and/or accounts payable for pre-Closing services, prepaid expenses and other similar items as agreed by the Parties (including, without limitation, a credit for Seller with respect to accounts payable under Parts POs outstanding as of the Closing Date for which delivery has not occurred prior to Closing, as Seller will pay the obligations under such Parts POs directly to the suppliers or providers).

No later than three (3) Business Days prior to the anticipated Closing Date, Seller shall prepare and deliver to Purchaser a written statement ("**Seller's Statement**") setting forth its good faith estimate of the adjustments referenced in this Section 2.5(c).

(d)     Closing Payment.  Subject to the terms hereunder, on the Closing Date, Purchaser Parties shall pay or cause to be paid Eight Million Five Hundred Thousand United States Dollars ($8,500,000), plus or minus, as applicable, any adjustment pursuant to Section 2.5(c) as set forth in the Seller's Statement (the "**Closing Payment**"), to Seller by wire transfer of immediately available funds pursuant to wire transfer instructions to be provided by Seller.

(e)     Allocation of Purchase Price.

(i)     Prior to the Closing Date, the Parties will mutually agree upon the allocation of the Purchase Price to the Purchased Assets and Assumed Liabilities in accordance with Section 1060 of the Code (the "**Allocation**").

(ii)     (1) Each of Purchaser and Seller agrees to timely file an Internal Revenue Service Form 8594 reflecting the Allocation for the taxable year that includes the Closing Date and to make any timely filing required by applicable state or local Laws, (2) the Allocation shall be binding on Purchaser and Seller for all Tax purposes, (3) the Parties shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such Allocation and (4) neither Purchaser nor Seller shall take any position inconsistent with the Allocation in connection with any Tax proceeding. If any taxing authority disputes the Allocation, the Party receiving notice of the dispute shall promptly notify the other Party hereto of such dispute, and the Parties hereto shall cooperate in good faith in responding to such dispute in order to preserve the effectiveness of the Allocation.  If Purchaser and Seller cannot agree upon such allocations of the Purchase Price, each Party shall file U.S. federal, state, local and non-U.S. Tax Returns based on each Party's own determination of the proper allocations of the Purchase Price, each bearing its own consequences of any discrepancies, and there shall be no further obligation of either party under this Section 2.4(e)(ii).

(iii)     Any adjustments to the Purchase Price pursuant to Section 2.5 and any indemnification payment treated as an adjustment to the Purchase Price pursuant to Article X shall be reflected as an adjustment to the price allocated to the specific asset, if any, giving rise to the adjustment, and if any such adjustment does not relate to a specific asset, such adjustment shall be allocated among the Purchased Assets in a manner consistent with the Allocation.

(f)     Post-Closing Reconciliation.

(i)     Within forty-five (45) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement ("**Purchaser's Statement**") setting forth its calculation of the adjustments contemplated by Section 2.5(c) as of the Closing Date, with all documentation and

14

40531485

FBG_CH1_00095593

information for Seller to properly review and analyze the calculations and adjustments set forth in the Purchaser's Statement and to reconcile the adjustment amounts set forth in Seller's Statement. Seller will be afforded a period of thirty (30) days following receipt to review Purchaser's Statement. If Seller disagrees with Purchaser's Statement, within such thirty-day period, Seller shall deliver to Purchaser a notice and detailed written explanation of those items in Purchaser's Statement that Seller disputes (an "**Objection Notice**"), in which case, the Parties will attempt to resolve in good faith any disputed items. If the Parties are unable to resolve any disputed items within thirty (30) days of the delivery of an Objection Notice, the remaining unresolved disputed items will be referred for final binding resolution to an internationally-recognized firm of certified public accountants mutually acceptable to Seller and Purchaser (the "**Independent Auditor**"), and the Independent Auditor shall determine, to the extent unresolved, the adjustments as contemplated by Section 5.2(c)(i) and (ii). The Independent Auditor shall not assign to any item in dispute a value that is (x) greater than the greatest value for such item assigned by Purchaser or Seller, or (y) less than the smallest value for such item assigned by Purchaser or Seller. The decision of the Independent Auditor will be non-appealable and incontestable by Seller or Purchaser and will not be subject to collateral attack for any reason. The fees and expenses of the Independent Auditor shall be allocated between Purchaser, on the one hand, and Seller, on the other hand, in proportion to the difference between the Independent Auditor's determination of the Purchase Price and the value claimed by Purchaser and Seller. If the Purchase Price as finally determined in accordance with this Section 2.5(f) is greater than the Closing Payment, then Purchaser will promptly after such determination pay or cause to be paid the amount of the excess to Seller by wire transfer of immediately available funds. If the Purchase, as finally determined in accordance with this Section 2.5(f) is less than the Closing Payment, then Seller will promptly after such determination pay the amount of difference to Purchaser by wire transfer of immediately available funds.

<div align="center">

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

</div>

Except as set forth in the attached Schedules, Seller represents and warrants as of the Effective Date and as of the Closing Date (unless otherwise stated in this ARTICLE III) to Purchaser as follows:

3.1     Organization and Existence.

Seller is duly organized and validly existing under the laws of the jurisdiction of its organization. Seller is duly authorized to own, lease and operate their assets and properties in relation to the Purchased Assets and to operate at the Plant as presently conducted. Seller has the requisite power and authority to own and carry on the Purchased Assets and operation thereof as presently conducted.

3.2     Authorization; Binding Obligations.

Seller has the requisite power and authority to enter into the Transaction Documents to which it is a party, and to fully perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Seller and upon execution, each of the other Transaction Documents to which Seller is a party will be duly executed and delivered by Seller. This Agreement constitutes, and upon

<div align="center">

15

</div>

40531485

CONFIDENTIAL

FBG_CH1_00095594

<div align="center">

</div>

signing, each of the other Transaction Documents to which Seller is a party, will constitute, legal, valid and binding agreements of Seller, enforceable against it, in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

3.3     No Conflict or Violation.

Except as set forth in Schedule 3.3 and subject to Section 5.3, neither the execution and delivery of the Transaction Documents to which Seller is, or will be, a party, nor the consummation of the transactions contemplated hereby or by the other Transaction Documents, will result in (i) a violation of, or a conflict with, its articles of incorporation or formation; (ii) a breach of or a default (or an event that, with notice or lapse of time or both would constitute a default) under or the termination of, any Material Contract of Seller; (iii) a violation by Seller of any applicable Laws; (iv) a violation by Seller of any order, judgment, writ, injunction, decree or award to which it is a party or by which it or the Purchased Assets are affected; or (v) an imposition of an Encumbrance on any of the Purchased Assets, in each case of clauses (ii) – (v), as would reasonably be expected to have a Material Adverse Effect.

3.4     Approvals.

Except as set forth in Schedule 3.4 and subject to Section 5.3, no consent or authorization of (a) any Governmental Authority or (b) any other Person under any Material Contract, is required to be made or obtained by Seller to approve or authorize the execution, delivery or performance of the Transaction Documents to which it is a party or the consummation of the transactions contemplated hereby or thereby, except as would not reasonably be expected to have a Material Adverse Effect. Seller will complete all internal corporate procedures necessary to execute this Agreement and the other Transaction Documents, and to consummate the transactions contemplated hereby and thereby, as required under the Laws and the organizational documents of Seller.

3.5     Actions.

Except as set forth in Schedule 3.5, Seller is not subject to any pending or, to Seller's Knowledge, threatened Action that would have a Material Adverse Effect.

3.6     Real Property.

        (a)     Schedule 3.6 contains a true, correct, and complete list of all physical addresses of the Transferred Real Property.  The Transferred Real Property is only real property owned by Seller or its Affiliates that is primarily used in connection with the Plant and the Purchased Assets.

        (b)     To Seller's Knowledge, except for the rights of Governmental Authorities with respect to the Transferred Real Property, (i) Seller has good and marketable title in fee simple to such Transferred Real Property, and at Closing the Transferred Real Property will be free and clear of all Encumbrances (other than Permitted Encumbrances), (ii) no third party has any option or right of first refusal or right of first offer relating to the Transferred Real Property, (iii) there are no Persons (other than Seller or its Affiliates) in possession of the Transferred Real Property, (iv)

16

40531485

there exist no leases, subleases, licenses, concessions or other agreements, written or oral, granting to any party or parties the right to use or occupy any portion of the Transferred Real Property.

(c)     There is no real property leased by Seller and primarily used in the operation of the Plant and the Purchased Assets, other than ordinary course warehouse leases for storage.

(d)     To Seller's Knowledge, there are no proceedings, claims, disputes or conditions (including, without limitation, any condemnation, eminent domain, or similar proceedings) pending or threatened in writing against the Transferred Real Property.  To Seller's Knowledge, Seller has not received any written notice of the intention of any Governmental Authority or other Person to take, use or rezone any Transferred Real Property or any part thereof or interest therein.

3.7     <u>Absence of Certain Changes</u>.

Except as set forth in Schedule 3.7, since July 1, 2021 through the Effective Date, except as would not reasonably be expected to have a Material Adverse Effect:

(a)     Seller has not transferred, leased or disposed of or agreed to sell, transfer, lease or dispose of, any material assets comprising the Purchased Assets other than sales or leases in the Ordinary Course of Business;

(b)     None of the Purchased Assets has been destroyed, damaged or otherwise lost and not covered by insurance, except for normal wear and tear arising out of the Ordinary Course of Business;

(c)     Except in the Ordinary Course of Business, Seller has not terminated any Transferred Contract involving a total remaining commitment by Seller or the counterparty to such Transferred Contract or transaction of $100,000 or more with respect to or arising out of the operation of the Purchased Assets; and

(d)     Seller has not applied for, consented to, or acquiesced in, the appointment of a trustee, receiver, sequestrator or other custodian for any assets, or made a general assignment for the benefit of creditors, or permitted or suffered to exist the commencement of any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency Laws, or any dissolution, winding up or liquidation proceeding, in respect of Seller.

3.8     <u>Assets</u>.

(a)     Seller has (or will have at Closing) good and valid title to, or a valid leasehold interest in, all tangible personal property included in the Purchased Assets, free and clear of Encumbrances except for Permitted Encumbrances.

(b)     Except as set forth in Schedule 3.8, the material machinery and equipment included in the Purchased Assets have been maintained in accordance with normal industry practice, normal wear and tear excepted.

3.9     <u>Contracts</u>.

17

40531485

FBG_CH1_00095596

(a)    Schedule 3.9 sets forth a list of the Transferred Contracts (other than purchase orders) relating primarily to the operation and use of machinery or equipment included in the Purchased Assets (including without limitation, such Contracts relating to tooling, spare parts or supplies) for which Seller has annual obligations under each such Contract in excess of $100,000 (collectively, the "**Material Contracts**").

(b)    Except as set forth in Schedule 3.9, (i) each such Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect, and (ii) to Seller's Knowledge, Seller is not in breach of any Material Contract in any material respect to which it is a party and no conditions exist with respect to any such Material Contract that, with notice or lapse of time or both, would constitute a default thereunder in any material respect by Seller.

3.10    Taxes, etc.

Seller has filed or will have filed in accordance with all Laws on a timely basis all material Tax Returns relating to the Purchased Assets and the operation of the Plant that are due on or before the Closing Date, as applicable, and Seller has or will have timely paid all material Taxes due. All Taxes required to be paid or withheld and deposited through and including the Effective Date in connection with Seller's operation of the Plant have been duly and timely paid or deposited by Seller. Seller has properly withheld or collected all amounts required by Laws for income Taxes and employment Taxes. To Seller's Knowledge, there are no Tax audits with respect to the operation of the Plant or the Purchased Assets in process by any Governmental Authority.

3.11    Compliance with Law.

Except for matters relating to Employees and Environmental Laws (which are exclusively governed by Sections 3.13 and 3.14, respectively) and except as set forth in Schedule 3.11, (i) the operation of the Plant and the Purchased Assets is in compliance in all material respects with all applicable Laws and (ii) except as set forth in Schedule 3.11, Seller has not received any written notice from any applicable Governmental Authority claiming any material violation of any Laws by Seller relating to the Plant or Purchased Assets, in each case except as would not reasonably be expected to have a Material Adverse Effect.

3.12    Permits.

Other than Permits relating to applicable Environmental Laws (which is exclusively governed by Section 3.14 below), as to the Purchased Assets, Seller maintains all material licenses, Permits and other authorizations from all Governmental Authorities as are reasonably necessary for the operation of the Plant, as presently conducted or in connection with the ownership or use of the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

3.13    Employees.

(a)    Schedule 3.13(a) sets forth a complete and accurate list as of the date identified on such Schedule of the Employees, including the Union Employees, identified by employee number, seniority date, job title, work location, current salary, bonus (whether monetary or otherwise), and the status and classification (as "exempt" or "non-exempt"). Employees to include contract employees servicing the plant.

18

40531485

CONFIDENTIAL

FBG_CH1_00095597

(b)      Schedule 3.13(b) sets forth (i) the Contracts to which Seller is a party with any labor organization with respect to the Employees and (ii) any Union that represents the Employees in relation to the operation of the Plant.

(c)      Schedule 3.13(c) lists each Seller Plan.  With respect to such Seller Plan, Seller has provided to Purchaser a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof.

3.14    Environmental Matters.

Except as set forth in the Environmental Reports, and except as set forth on Schedule 3.14:

(a)      To Seller's Knowledge, the Purchased Assets, including the Plant: (1) are in compliance in all material respects with the requirements of Environmental Laws; and (2) are not the subject of any federal, state or local governmental investigation or administrative proceeding evaluating whether any remedial action is necessary to respond to a Release of Hazardous Materials.

(b)      To Seller's Knowledge, in the operation of the Plant, Seller has obtained all Permits and other authorizations which are required under Environmental Laws and Seller is in compliance in all material respects therewith, and to Seller's Knowledge, there are no material violations of Environmental Laws which would preclude Purchaser from operating the Plant in a similar manner as presently conducted.

3.15    Brokers and Finders.

Except as set forth on Schedule 3.15, all negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any Person acting on behalf of Seller in such manner as to give rise to any claim against Purchaser or its Affiliates for any brokerage or finders' commission, fee or similar compensation.

3.16    DISCLAIMER.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE TRANSACTION AGREEMENTS OR ANY MANAGEMENT PRESENTATIONS, FINANCIAL INFORMATION, OR OTHER MATERIALS RELATING TO THE PURCHASED ASSETS OR SELLER, THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN THIS ARTICLE III ARE THE ONLY REPRESENTATIONS AND WARRANTIES BEING MADE WITH RESPECT TO THE PURCHASED ASSETS, ASSUMED LIABILITIES AND THE OTHER MATTERS PROVIDED IN ARTICLE III. SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE TRANSACTION AGREEMENTS, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS AS TO THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PURCHASED ASSETS.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

19

40531485

FBG_CH1_00095598

Purchaser Parties, jointly and severally, represent and warrant as of the Effective Date and as of the Closing Date (unless otherwise stated in this ARTICLE IV) to Seller as follows:

4.1     Organization and Existence.

Each Purchaser Party is a limited liability company, duly organized and validly existing under the laws of Delaware.  Each Purchaser Party is duly authorized to own, lease and operate its assets and properties and to conduct business as presently conducted.

4.2     Authorization; Binding Obligations.

Each Purchaser Party has the requisite power and authority to enter into this Agreement and the Transaction Documents to which it is a party and, to fully perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Assuming this Agreement has been duly executed and delivered by Seller, and upon execution, each of the Transaction Documents to which a Purchaser Party is a party will be duly executed and delivered by such Purchaser Party.  This Agreement constitutes, and upon execution, each of the other Transaction Documents to which a Purchaser Party Purchaser is a party constitutes legal, valid and binding agreements of such Purchaser Party, enforceable against it, in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.3     No Conflict or Violation.

Except as set forth in Schedule 4.3, neither the execution and delivery of the Transaction Documents to which a Purchaser Party is, or will be, a party, nor the consummation of the transactions contemplated hereby or thereby, will result in (i) a violation of, or a conflict with, the organizational documents of such Purchaser Party; (ii) a breach of, a modification of the effect of, or a default (or an event that, with notice or lapse of time or both would constitute a default) under, the termination of, the acceleration of performance required by or the creation of a right of termination or acceleration under, any Contract or Permit of such Purchaser Party; (iii) a violation by Purchaser of any applicable Laws; or (iv) a violation by such Purchaser Party of any order, judgment, writ, injunction, decree or award to which it is a party or by which it or its business is affected, each in all material respects.

4.4     Approvals.

Except as set forth in Schedule 4.4, no consent, Permit, approval or authorization of, or declaration, filing, application, transfer or registration with, any Governmental Authority, or any other Person, is required to be made or obtained by a Purchaser Party or its Affiliates for the execution, delivery or performance of the Transaction Documents to which it is, or will be, a party.

4.5     Actions.

No Purchaser Party is subject to any pending, or to Purchaser Parties' knowledge, threatened Action that could materially adversely affect the ability of any Purchaser Party to consummate the Transactions.

20

40531485

CONFIDENTIAL                                                                                      FBG_CH1_00095599

4.6     No Seller Responsibility for Brokers and Finders.

All negotiations relating to the Transaction Documents and the transactions contemplated hereby and thereby have been carried on without the intervention of any Person acting on behalf of a Purchaser Party in such manner as to give rise to any claim against Seller or its Affiliates for any brokerage or finders' commission, fee or similar compensation.

4.7     Independent Investigation.

Each Purchaser Party has conducted its own independent investigation, review and analysis of the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Each Purchaser Party acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, each Purchaser Party has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement (including related portions of the Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Purchased Assets or this Agreement, except as expressly set forth in ARTICLE III of this Agreement (including the related portions of the Schedules).

4.8     Availability of Funds.

Purchaser has (or Purchaser Parties will cause Purchaser to have) cash or other liquid funds in amounts sufficient to make the Closing Payment under this Agreement on the Closing Date.

ARTICLE V
COVENANTS

5.1     Access to Information.

        (a)     Beginning as of the Closing Date until the third anniversary of the Closing Date, to the extent reasonably necessary and legally permitted to do so, Seller shall provide Purchaser and its Representatives, at Purchaser's request and expense, reasonable access at reasonable times, in a manner that does not interfere with the normal operations of Seller, with respect to the Purchased Assets and Assumed Liabilities, to all retained Books and Records and other documents, information and materials not included in the Purchased Assets but which relate to the Purchased Assets or Assumed Liabilities (but excluding such Books and Records and other materials relating to the Plant OEM Business or any Excluded Asset) ("**Excluded Books and Records**"), for any reasonable and proper purpose; provided, that the requirements of this provision shall not apply to Excluded Books and Records subject to an attorney client privilege or subject to any litigation or other adversarial proceedings between the Parties or to the extent copies have already been provided to Purchaser.

        (b)     Beginning as of the Closing Date until the third anniversary of the Closing Date, to the extent reasonably necessary and legally permitted to do so, Purchaser shall (i) provide Seller and its Representatives, at Seller's request and expense, with reasonable access at reasonable times, in a manner that does not interfere with the normal operations of Purchaser, to all Books and Records included in the Purchased Assets and transferred to Purchaser under the Transaction

21

40531485

CONFIDENTIAL

FBG_CH1_00095600

Documents, relating to periods ending on or prior to the Closing Date, for any reasonable and proper purpose other than books and records subject to an attorney client privilege or subject to any litigation or other adversarial proceedings between the Parties, and (ii) cooperate with such personnel as Seller or its Representatives may reasonably request upon reasonable notice. If during such period, Purchaser elects to dispose of any such books and records, Purchaser shall give Seller at least sixty (60) days' written notice of such intention, and Seller shall have the right during such sixty (60) day period to require that such books and records be transferred to Seller.

(c)     After the Closing Date, and upon the request of Seller, and in a manner that does not unreasonably interfere with Purchaser's business: (i) Purchaser will reasonably cooperate with Seller and its Representatives, and cause its employees to reasonably cooperate, at Seller's sole expense, with Seller and its Representatives, in furnishing certain information, evidence and testimony, and providing other assistance in connection with any claims made against or incurred by Seller prior to the Closing with respect to the Purchased Assets and (ii) Purchaser will reasonably make available to Seller and its Representatives certain relevant information Seller or its Representatives may reasonably need in order to defend or prosecute any legal or administrative claims made against or incurred by Seller or any of its Affiliates prior to Closing and which relates the Purchased Assets.

5.2     Conduct of the Business.

Except (a) as set forth in Schedule 5.2, (b) as otherwise specifically contemplated by the Transaction Documents, or (c) as otherwise consented to by Purchaser in writing (which consent shall not be unreasonably withheld, conditioned or delayed), from the Effective Date through the Closing Date, Seller shall (i) not transfer, lease or dispose of or agree to sell, transfer, lease or dispose of, any of the tangible personal property included in the Purchased Assets except for such transfers or sales and dispositions in the Ordinary Course of Business, (ii) not increase the salary or compensation of any Employee, except in the Ordinary Course of Business or as provided for in any existing written agreements, (iii) use commercially reasonable efforts to preserve the relationships of the Employees and (iv) conduct its business in the Ordinary Course of Business consistent with past practice with respect to maintaining the material machinery and equipment included in the Purchased Assets (normal wear and tear excepted).

5.3     Third Party Consents.

(a)     Governmental Authority Approvals.  Each Party shall employ its commercially reasonable efforts to obtain all authorizations, consents, orders and approvals of, and to give all notices to and make all filings with, all Governmental Authorities required for the performance of its obligations under this Agreement and will cooperate fully with the other Party in promptly seeking to obtain all such authorizations, consents, orders, and approvals, giving such notices, and making such filings.  Without limiting the generality of the foregoing, Purchaser and Seller will (i) endeavor to respond as promptly as practicable to any inquiries or requests received from any Governmental Authority for additional information or documentation, and (ii) not enter into any agreement with any Governmental Authority not to consummate the transactions contemplated hereby except with, in the case of Purchaser, the prior written consent of Seller, and in the case of Seller, the prior written consent of Purchaser, such consent in any such case not to be unreasonably withheld or delayed. Purchaser will be responsible for payment of any filing fees and other costs

22

40531485

CONFIDENTIAL

and expenses associated with such notifications and filings. If required by the HSR Act and if the appropriate filing pursuant to the HSR Act has not been filed prior to the Effective Date, each Party hereto agrees to make an appropriate filing pursuant to the HSR Act with respect to the transactions contemplated by this Agreement within ten (10) Business Days after the Effective Date and to supply as promptly as practicable to the appropriate Governmental Authority any additional information and documentary material that may be requested pursuant to the HSR Act. Notwithstanding the foregoing, each of the Parties hereby waives compliance with the requirements of the "bulk-sale" or "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the conveyance of any or all of the Purchased Assets.

(b)    Other Third Party Consents. Seller and Purchaser shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are set forth on Schedule 5.3; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

(c)    Nonassignable Assets. Notwithstanding anything to the contrary in the Transaction Documents, to the extent that the sale, assignment, transfer or conveyance to Purchaser of any Contract or other Purchased Asset would result in a violation of applicable Law, breach of an obligation thereunder or would require the consent, authorization, approval or waiver of a Third Party or otherwise constitute a breach thereunder, no Transaction Document shall constitute a sale, assignment, transfer, or conveyance thereof; provided, that, subject to the satisfaction or waiver of the conditions contained in Section 6.1, the Closing shall occur notwithstanding the foregoing.

5.4    Confidentiality.

The Parties acknowledge and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, applies to each Purchaser Party as though a direct party thereto, and each Party covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to the other Party pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 5.4 shall nonetheless continue in full force and effect.

5.5    Insurance.

No Purchaser Party shall (a) make or present any claims to or against Seller's insurance policies or (b) pursue claims for recovery under Seller's insurance policies, in each case, regardless of occurrence date and regardless of coverage or policy period.

5.6    Collection of Receivables and Other Property.

From and after the Closing, Purchaser shall deliver and pay over to Seller within five (5) Business Days of the beginning of each month, any cash or other property received directly or indirectly by it or any of its Affiliates in the prior month to the extent such cash or other property was paid in respect of, or constitutes, an Excluded Asset or arises out of the pre-Closing operation of the Purchased Assets.

5.7    Publicity.

40531485

CONFIDENTIAL

FBG_CH1_00095602

Seller may inform the Employees, customers and suppliers of the substance of this Agreement. From the Effective Date through the Closing Date, no public release or announcement concerning the Transactions contemplated hereby or the activities or conduct pursued in connection with the Transactions shall be issued by any Party without the prior consent of the other Party (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by any Laws or the rules or regulations of any United States or foreign securities exchange, in which case the Party required to make the release or announcement shall provide the other Party with prior notice, and, to the extent possible, allow the other Party reasonable time to comment on such release in advance of such issuance. Notwithstanding the foregoing, after the initial public release of the Transactions is made, each Party may issue additional releases or announcements without the prior consent of the other Party after the Closing if and to the extent that the information relating to the Transactions contained in such additional release or announcement is either substantially the same as the information contained in such initial release or announcement or otherwise publicly available.

5.8     Employees; Employee Benefits; Labor Matters.

(a)     As soon as practicable prior to Closing (but no later than thirty (30) days prior to Closing), Purchaser shall make written offers of employment ("**Employment Offers**") to the Employees, with effect from the Closing Date.  Employment Offers shall include Employees who are absent due to vacation, family leave, short-term disability or other approved leave of absence. The Parties agree that such Employment Offers shall be substantially equivalent in the aggregate to the terms and conditions (including salaries or wage rates and employee benefit packages) provided to such Employees immediately prior to the Closing Date (collectively, the "**Employee Benefits**"), except Employment Offers to Union Employees, which shall be as set forth below in this Section 5.8. The Parties shall use commercially reasonable efforts to cause each Employee to accept the Employment Offer by, among other things, holding explanatory sessions for the Employees and encouraging the Employees to accept their respective Employment Offer. The Parties agree that upon acceptance of an Employment Offer, it is anticipated that each such Employee (subject to their terms of employment) will remain an employee of Seller or its Affiliate, as applicable, until the Closing Date, at which time such Employee's employment or engagement with Seller or its Affiliate will be terminated by mutual agreement of Seller or its Affiliate and the Employee, and such Employee will be hired or engaged by Purchaser pursuant to the terms of its Employment Offer.

(b)     Seller shall notify any Unions in advance of Closing and inform any such Union that Purchaser has agreed to recognize the Union as the exclusive representative of the Union Employees, maintain the terms and conditions of employment for Union Employees, and assume the obligations of the Collective Bargaining Agreement.  Seller may engage in bargaining with the Union representing the Union Employees concerning Seller's entering into this Agreement or the potential effect of this Agreement, and Seller and such Union may enter into agreements reflecting the outcome of any such bargaining.

(c)     Purchaser shall recognize the Union as the exclusive representative of the Union Employees, assume the obligations of the Collective Bargaining Agreement and provide all Union Employees with the same terms and conditions (including Employee Benefits) as set forth in the Collective Bargaining Agreement. To the extent required by applicable Law or the Collective

24

40531485

FBG_CH1_00095603

Bargaining Agreement, Purchaser shall engage in collective bargaining with the Union representing any Hired Employee.

(d)     Employees who have accepted their Employment Offers and do not revoke such acceptance prior to Closing are hereafter referred to as "**Hired Employees**". Purchaser shall (i) with respect to Hired Employees who are Union Employees, recognize and honor any service years, seniority, waiting period waivers and similar obligations as required by the Collective Bargaining Agreement, and (ii) with respect to other Hired Employees (x) include the years of continuous employment with Seller or its Affiliates as part of the years of continuous employment with Purchaser when calculating periods for paid leave and eligibility for other Employee Benefits for eligibility and vesting purposes; and (y) with respect to any health insurance program of Purchaser or its Affiliate, waive any actively-at-work or waiting period requirements to the extent possible under any Laws and agreements with the relevant insurance company or other entity which runs such program (except to the extent such requirements would not have applied under the applicable Employee Benefit Plan in which the Hired Employees participated immediately prior to the Closing Date).

(e)     Until the twelve month anniversary of the Closing or such longer period as may be required by applicable Law (including the minimum duration necessary to avoid creating any obligation under the WARN Act on the part of Seller), Purchaser shall continue to employ the Hired Employees and maintain the Employee Benefits for the Hired Employees as set forth in the Employment Offers, except for (i) increases in wages or Employee Benefits or (ii) any alteration, modification or withdrawal where such alteration, modification or withdrawal is justified under any Laws in light of any wrong-doing on the part of the respective Hired Employee, including (x) absence without justifiable reason, (y) injury or sickness not sustained in the course of employment which necessitates a reduction in working hours, workload or responsibilities, or (z) conduct which is in violation of any rules of employment, Laws or public policy. Notwithstanding the foregoing, Purchaser Parties, jointly and severally, shall bear any and all Liabilities under the WARN Act resulting from employment losses relating to the sale of the Purchased Assets.

(f)     Nothing in this Section 5.8, express or implied, is intended to confer any rights, benefits, remedies, obligations or Liabilities under this Agreement upon any Person (including any Employees or Former Employees) other than the Parties and their respective successors and assigns to continued employment or any severance or other employee benefits from Seller, Purchaser or any of their respective Affiliates.

5.9     Satisfaction of Conditions Precedent.

(a)     Seller shall exercise commercially reasonable efforts to ensure that each of the conditions precedent set forth in ARTICLE VI of this Agreement shall be satisfied prior to or as of the Closing Date.

(b)     Purchaser Parties shall exercise commercially reasonably efforts to ensure that each of the conditions precedent set forth in ARTICLE VII of this Agreement shall be satisfied prior to or as of the Closing Date.

5.10     Notification of Information.

25

40531485

FBG_CH1_00095604

(a)    From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Schedules to this Agreement with respect to any information or update arising or of which it becomes aware after the Effective Date (each a "**Schedule Supplement**"). If such information constitutes a breach of representation and warranty that results in a Material Adverse Effect, then Purchaser shall be permitted, as its sole and exclusive remedy, and subject to Section 8.1(b), to terminate this Agreement pursuant to and in accordance with Section 8.1(a)(iii) by providing such notice to Seller within five (5) days of Purchaser receiving the Schedule Supplement (or five (5) days following the cure period set forth in Section 8.1(b)). If Purchaser does not so notify Seller of termination of this Agreement in accordance with this Section 5.110, Purchaser shall be deemed to have waived such right to terminate this Agreement and such information and/or update shall be deemed to be incorporated into the Schedules and there shall not be any breach of the subject representations or warranties.

(b)    Notwithstanding the foregoing, the termination right set forth in Section 5.10(a) shall not apply, and Seller shall have the right, to update or supplement the Schedules to this Agreement to reflect changes to the assets, properties, Contracts, employees and other informational disclosures occurring in the Ordinary Course of Business between the Effective Date and the Closing Date or that do not result in a Material Adverse Effect and such updates shall be deemed to be incorporated into the Schedules and there shall not be any breach of the subject representations or warranties.

5.11   Tax Matters.

From and after the Closing for a period of seven (7) years:

(a)    Seller will prepare and timely file all Tax Returns with respect to the Purchased Assets for all Tax periods ending on or prior to the Closing Date.  Purchaser will prepare and timely file all other Tax Returns that are required to be filed in respect of the Purchased Assets; provided that to the extent such Tax Returns relate to Taxes for which Seller may be responsible, Purchaser shall provide copies of such Tax Returns to Seller for review.

(b)    Seller and Purchaser will provide each other with such assistance and non-privileged information relating to the Purchased Assets as may reasonably be requested in connection with the preparation of any Tax Return or the performance of any audit, examination or any other proceeding by any taxing authority, whether conducted in a judicial or administrative forum, and, to the extent in such Party's possession as of the Effective Date, each will retain and provide to the other Party all non-privileged records and other information which may be relevant to any such Tax Return, audit, examination or any other proceeding.

(c)    For purposes of this Agreement, whenever it is necessary to determine liability for Taxes relating to a period that begins before and ends after the Closing Date (a "**Straddle Period**"), the determination of such Taxes for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning after, the Closing Date shall be determined by assuming that the Straddle Period consisted of two taxable years or periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date, and (x) in the case of any real and personal property Taxes, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which

26

40531485

FBG_CH1_00095605

is the number of days in the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period (but only to the extent such real and personal property Taxes are not otherwise addressed pursuant to Section 5.14), and (y) in the case of any other Tax, be deemed equal to the amount which would be payable if the relevant Straddle Period ended on the Closing Date and items of income, gain, deduction, loss or credit were allocated between such two taxable years or periods on a "closing of the books basis" at the close of business on the Closing Date.

(d)     Seller will exercise control, at its expense (including any required deposit of Tax), over the handling, disposition and settlement of any inquiry, examination, or proceeding by a taxing authority (or that portion of any such inquiry, examination, or proceeding by a taxing authority) that could result in a determination with respect to Taxes due or payable by Purchaser for which Seller may be required to indemnify Purchaser; provided, Purchaser may participate, at Purchaser's expense, in any such matter and Seller shall, in any event, provide all material correspondence related thereto to Purchaser. Purchaser will notify Seller in writing promptly upon learning of any such inquiry, examination or proceeding. Purchaser will cooperate with Seller, as Seller may reasonably request, in any such inquiry, examination or proceeding. Purchaser will not extend the statute of limitations for any Tax for which Seller may be required to pay or indemnify Purchaser without Seller's prior written consent.

(e)     No Party will agree to settle any Liability for Taxes or compromise any claim with respect to Taxes relating to the Purchased Assets, which settlement or compromise may affect the Liability for Taxes hereunder (or right to Tax benefit) of another Party, without such other Party's consent, which consent will not be unreasonably withheld or delayed.

5.12    Transition Planning.

(a)     From the Effective Date until the Closing, Purchaser shall, and shall cause its respective Affiliates to, cooperate with Seller and its Affiliates for the planning of the separation and orderly transition of the Purchased Assets to Purchaser from Seller, including, without limitation, with respect to the separation of any information technology assets and systems and other assets not included in the Purchased Assets. Without limiting the foregoing, in connection with such transition of the Purchased Assets (both before and after Closing), (i) Purchaser shall be responsible for the costs and expenses relating to the transfer or purchase of software licenses, including, but not limited to, any additional licenses, sublicenses, access or transfer fees, for the operation of the Purchased Assets by Purchaser following the Closing and (ii) to the extent Seller provides transition services to Purchaser after Closing under the Transition Services Agreement with respect to any information technology assets included in the Purchased Assets, the Parties agree that Seller shall retain exclusive control of and access to any such information technology assets for purposes of providing such transition services until the expiration of such service period under the Transition Services Agreement.

(b)     From the Effective Date until the Closing, Purchaser and Seller shall use commercially reasonable efforts to negotiate a transition services agreement and documents relating thereto (including, without limitation, data handling agreements and similar items, as may be reasonably necessary) (the "**Transition Services Agreement**") and the Supply Agreement, in each case on terms reasonably satisfactory to the Parties.

27

40531485

FBG_CH1_00095606

5.13    Real Estate Proration.

(a)    The Parties acknowledge that real estate property taxes are paid in arrears in the State of Ohio.  Accordingly, Purchaser and Seller shall prorate and adjust between them (i) such real estate property taxes based on Closing Date (and in the event that current year tax bill amounts are not available, the proration will be based upon the prior years' tax bills and the parties will re-prorate upon receipt of the actual bills for the Transferred Real Property) and (ii) any tax deposits made by Seller.  The Parties will cooperate to make arrangements for the transfer of utilities, including gas, electricity and water failing which, said utility charges will be prorated on the basis of actual use to the Closing, if possible, otherwise on the basis of the last billing.

(b)    Title and Zoning Report Review. Seller has (or will cause) the Title Company to issue to Purchaser an owner's title insurance commitment (as initially issued to Purchaser, the "**Title Commitment**") and deliver the Title Commitment to Purchaser, along with copies of all exception matters listed in the Title Commitment and has obtained (or is obtaining) a Zoning Report and will deliver the Zoning Report to Purchaser.  No later than fifteen (15) days after receipt of the Title Commitment or the Zoning Report, as applicable (the "**Objection Date**"), if such Title Commitment reveals any exceptions to title ("**Title Objections**") or such Zoning Report reveals any zoning issue ("**Zoning Issues**"), in each case, that materially and adversely affects operation of the Plant at the Transferred Real Property consistent with current operations (other any Permitted Encumbrances, to which Purchaser is not permitted to object), Purchaser shall notify Seller in writing and in reasonable detail of such Title Objections or Zoning Issues.  Prior to notifying Seller of any such Title Objections, Purchaser shall endeavor in good faith to cause Title Company to modify and update the Title Commitment to reflect Purchaser's requested corrections and revisions.  Failure to so timely notify Seller is deemed a Purchaser waiver of Purchaser's rights under this Section 5.13(b).

(i)    Seller shall notify Purchaser within five (5) days after receiving Purchaser's notice of such Title Objections or Zoning Issues, as applicable, of whether Seller will cause any such Title Objections to be removed from title, insured over or cured (either by endorsement or by "insuring over" in a manner reasonably satisfactory to Purchaser) or will cause any Zoning Issues to be corrected.  Seller's failure to provide such notice to Purchaser within the required period as to the action Seller will take with respect to any Title Objection or Zoning Issue is deemed an election by Seller to not remove from title, insure over or cure the Title Objections or correct any such Zoning Issue.

(ii)    If Seller so notifies, or is deemed to have notified, Purchaser under this Section 5.13(b) that Seller will not remove, insure over or cure any or all of the Title Objections or correct any Zoning Issue, as applicable, then Purchaser shall have until five (5) days following receipt of Seller's notification hereunder to notify Seller whether it will (A) proceed with the Transactions and acquire the Purchased Assets subject to any of the Title Objections and Zoning Issues that have not been cured or which Seller is deemed to have elected not to cure, and without any reduction in the Purchase Price, in which case the exceptions shown on the Title Commitment or other matters giving rise to Title Objections or Zoning Issues are deemed approved, including with respect to any closing deliveries, covenants and conditions relating to the Transferred Real Property (and such matters relating to the Title Objections and/or Zoning Issues shall be deemed a Permitted Encumbrance and may appear on the Policy Pro Forma), or (B) terminate this

28

40531485

FBG_CH1_00095607

Agreement, in which case the Deposit shall be refunded to Purchaser. Purchaser's failure to give Seller such notice shall be deemed to be an election by Purchaser under clause (A) above.

(iii)     Notwithstanding anything to the contrary, Seller has no obligation to take any steps, bring any action, or incur any costs, effort or expenses whatsoever in order to cure any Title Objection or Zoning Issues, other than Mandatory Cure Items.

5.14     Non-Solicitation of Transactions.

From the Effective Date until the Closing Date or the earlier termination of this Agreement in accordance with Article VIII, Seller shall not, directly or indirectly, (a) solicit, initiate or encourage any competing offers from any third party for the sale of all or substantially all of the Purchased Assets, whether by merger, sale of assets or securities, or any other form of transaction (an "Alternate Transaction"), (b) engage in negotiations or discussions concerning an Alternate Transaction, or provide any confidential information relating to the Purchased Assets in response to any proposals or inquiries with respect to such an Alternate Transaction to any third party other than Purchaser or its Representatives or (c) accept any competing offer or proposal for an Alternate Transaction.

5.15     Post-Closing Transfers.

To the extent that, from time to time after the Closing, (i) any Party or its Affiliate identifies any Excluded Asset that was inadvertently transferred to Purchaser or its Affiliates hereunder, Purchaser and its Affiliates shall take such reasonable actions as are necessary to transfer such Excluded Asset to Seller or its designee and (ii) any Party or its Affiliate identifies any Purchased Asset that was inadvertently retained by Seller or any of its Affiliates, Seller and its Affiliates shall take such reasonable action as is necessary to transfer such asset to Purchaser or its designee; and in such case, such asset shall be deemed a Purchased Asset or an Excluded Asset, as applicable.

<div align="center">

ARTICLE VI
CONDITIONS PRECEDENT TO PURCHASER'S PERFORMANCE

</div>

6.1     Conditions Precedent to Purchaser's Performance at Closing.

The performance of Purchaser's obligations to consummate the Transactions is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, unless waived in writing by Purchaser:

(a)     Accuracy of Representations and Warranties.

The representations and warranties of Seller contained in this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Seller's Performance of Covenants.

<div align="center">29</div>

40531485

<div align="center">
**DEBTORS' EXHIBIT NO. 64**
**Page 34 of 51**
</div>

All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Seller on or before the Closing Date shall have been duly and properly performed in all material respects, except where the failure to perform would not have a Material Adverse Effect.

(c)     No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions.

(d)     Laws.

All Governmental Authorities required to approve the Transactions have approved the Transactions and no applicable Governmental Authority has opposed the Transactions under any Laws, and any mandatory waiting period under any Laws, including the Antitrust Laws, has expired.

ARTICLE VII
CONDITIONS PRECEDENT TO SELLER'S PERFORMANCE

7.1     Conditions Precedent to Seller's Performance at the Closing.

The performance of Seller's obligations to consummate the Transactions is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, unless waived in writing by Seller:

(a)     Accuracy of Purchaser's Representations and Warranties.

The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Purchaser's Performance of Covenants.

All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Purchaser on or before the Closing Date shall have been duly and properly performed in all material respects, except where the failure to perform would not have a material adverse effect on Purchaser's ability to consummate the Transactions.

(c)     No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order which has the effect of making the

30

40531485

CONFIDENTIAL

FBG_CH1_00095609

transactions contemplated by this Agreement and the Transfer Agreements illegal or otherwise restraining or prohibiting consummation of such transactions.

(d)     Laws.

All Governmental Authorities required to approve the Transactions have approved the Transactions and no applicable Governmental Authority has opposed the Transactions under any Laws, and any mandatory waiting period under any Laws, including the Antitrust Laws, has expired.

(e)     Completion of Plant OEM Business.

Seller has fulfilled and completed its contractual obligations with respect to the Plant OEM Business and no longer requires use of the Plant, the Purchased Assets and Employees for such purpose, or alternatively, at Seller's election in its discretion, the Parties have negotiated a mutually acceptable access and lease arrangement for Seller's continued use of the Plant, Purchased Assets and Employees necessary to complete its contractual obligations with respect to the Plant OEM Business for a certain period after Closing ("**Access Agreement**").

(f)     Supply Agreement.

The Parties shall have executed and delivered a Supply Agreement in form reasonably satisfactory to Seller.

ARTICLE VIII
TERMINATION PRIOR TO CLOSING

8.1     Termination.

(a)     This Agreement may be terminated at any time prior to the Closing Date:

(i)     by the mutual written agreement of Purchaser and Seller;

(ii)     by either Purchaser or Seller by written notice to the other Party if the Closing has not occurred by January 31, 2021; provided, however, that the Party seeking termination pursuant to this clause (ii) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement; or

(iii)     by either Purchaser or Seller by written notice to the other Party if the other shall (A) materially breach its covenants contained in this Agreement required to be performed prior to the Closing Date and such breach results in the failure to satisfy a condition to Closing set forth in Section 6.1 or 7.1, as applicable, or (B) breach any of its representations or warranties contained in this Agreement or the Transfer Agreements and such breach results in the failure to satisfy a condition to Closing set forth in Section 6.1 or 7.1, as applicable; provided, however, that the Party seeking termination pursuant to this clause (iii) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

31

40531485

FBG_CH1_00095610

(iv)     by either Purchaser or Seller if any Governmental Authority having competent jurisdiction has issued a final and non-appealable statute, rule, regulation, injunction or other order which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions such that the conditions specified in Sections 6.1(c), 6.1(d), 7.1(c) or 7.1(d) would not be satisfied at Closing; provided, however, that the Party seeking termination pursuant to this clause (iv) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement; or

(v)     by Purchaser pursuant to Section 5.13(b)

(b)     Notwithstanding Section 8.1(a) above, in the event a Party fails to perform in any material respect any of its agreements contained in this Agreement required to be performed prior to the Closing Date or breaches any of its representations or warranties, such Party shall have thirty (30) days to remedy such failure or breach if such Party notifies the other Party of such failure or breach.

8.2     Effect on Obligations.

(a)     Upon termination of this Agreement pursuant to Section 8.1, all obligations of the Parties hereunder will terminate without any Liability on the part of any Party, except for the obligations set forth under Sections 5.4 (Confidentiality), 5.7 (Publicity), Section 8.2 (Effect on Obligations), Article X (Indemnification), and Article XI (Miscellaneous Provisions), which obligations will continue indefinitely or as otherwise provided in such Sections or Articles; provided, however, nothing herein shall relieve any Party from liability for a breach that resulted in the other Party's exercise of its termination right under Section 8.1(a)(iii) or any liability that results from any Fraud or intentional breach of any provision in this Agreement.

(b)     In the event Seller terminates this Agreement pursuant to Section 8.1(a)(iii), then Seller shall be entitled to retain the Deposit and none of the Purchaser Parties shall have any claim with respect to the return or refunding of the Deposit; provided, however, that Seller's retention of the Deposit in accordance with this Section 8.2 shall not relieve any Purchaser Party from any liability that results from any Fraud or intentional breach of any provision in this Agreement.

(c)     In the event this Agreement is terminated under Article VIII other than pursuant to Section 8.1(a)(iii), then Purchaser shall be entitled to a return of the Deposit from Seller; provided, however, that return of the Deposit from Seller shall not relieve any Purchaser Party from any liability that results from any Fraud or intentional breach of any provision in this Agreement.

ARTICLE IX
THE CLOSINGS

9.1     Closing.

Subject to the terms and conditions contained in this Agreement, and the deliveries provided in Section 9.2(a) and Section 9.2(b), the closing of the Transactions, which includes the sale to and purchase by Purchaser of the Purchased Assets and the assumption of the Assumed Liabilities by Purchaser (the "**Closing**") will occur within the later of (i) the five (5) days after the conditions to

32

40531485

**DEBTORS' EXHIBIT NO. 64**
**Page 37 of 51**

the Closing set forth in this Agreement are satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date) and (ii) December 31, 2021, (the "**Closing Date**") or on such other date mutually agreed upon by the Parties.  The Closing will be deemed effective at 11:59 p.m. local time in Michigan on the Closing Date (the "**Effective Time**"). With respect to the Transferred Real Property, the Closing shall be a "New York-style" escrow closing between the parties hereto and the Title Company (with the Title Company to handle the funding of any fees or costs associated with the Title Commitment and the closing documents prepared by the Title Company), in accordance with mutually-acceptable escrow closing instructions; provided that the Purchase Price and Transaction Documents (including with respect to the Transferred Real Property) shall be handled by the Parties through a customary transaction funds flow and exchange of documents and signatures at Closing.

9.2     Closing Obligations.

(a)     Seller Deliveries.  Subject to ARTICLE VII, at the Closing, Seller shall deliver, or cause to be delivered, to Purchaser the following items:

(i)     a certificate, dated as of the Closing Date signed by an authorized representative of Seller certifying: (x) that the conditions set forth in Section 6.1 have each been satisfied; (y) the incumbency, authorization and signature or seal of the Person authorized to execute and deliver on behalf of Seller, the Transaction Documents, including the Exhibits and Schedules hereto and thereto, any other documents executed or to be executed by Seller or its Affiliate in connection with the Transactions, and (z) the appropriate governing body of Seller has approved the execution and delivery of the Transaction Documents and the consummation of the Transactions; and

(ii)     the Ancillary Agreements executed by Seller;

(iii)     a non-foreign status affidavit in customary form, as required by Section 1445 of the Internal Revenue Code to confirm that the transaction is exempt from the withholding tax requirement imposed such Section 1445;

(iv)     duly-completed State, County, municipal, and other required real estate transfer tax and sales tax returns that are required for the conveyance of real property in the jurisdictions of the Transferred Real Property (collectively, the "**Real Estate Transfer Tax Forms**");

(v)     evidence that Mandatory Cure Items have been satisfied and/or discharged;

(vi)     a signature page to the settlement statement to be issued by the Title Company in connection with the sale of the Transferred Real Property, reflecting the prorations, credits, and other adjustments required hereunder (the "**Real Estate Settlement Statement**");

(vii)     such other documents or instruments of conveyance and transfer as Purchaser reasonably requests for the purpose of assigning, transferring, granting, conveying, and confirming the sale of the Purchased Assets to Purchaser.

33

40531485

CONFIDENTIAL

FBG_CH1_00095612

(b)      Purchaser Deliveries.   Subject to ARTICLE VI, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following items:

(i)      subject to the terms hereunder, payment of the Closing Payment in accordance with Section 2.5, in immediately available funds;

(ii)      a certificate, dated as of the Closing Date, signed by an authorized representative of Purchaser certifying: (w) that the conditions set forth in Section 7.1 have each been satisfied; (x) the incumbency, authorization and signature or seal of the Person authorized to execute and deliver on behalf of Purchaser, this Agreement, the Transaction Documents, including Exhibits and Schedules hereto and thereto, and any other documents executed or to be executed by Purchaser or its Affiliate in connection with the Transactions, (y) the organizational documents of Purchase, as amended, through Closing and (z) the appropriate governing body of Purchaser has approved the execution and delivery of the Transaction Documents and the consummation of the Transactions; and

(iii)      the Ancillary Agreements executed by Purchaser, as applicable;

(iv)      such other documents or instruments of conveyance and transfer as Seller reasonably requests for the purpose of assigning, transferring, granting, conveying, and confirming the sale of the Purchased Assets to Purchaser.

## ARTICLE X
## SURVIVAL; GENERAL INDEMNIFICATION

10.1      Survival of Representations and Warranties and Covenants.

(a)      All representations and warranties contained in this Agreement, the Transfer Agreements and the other Transaction Agreements and indemnification obligations relating thereto shall survive for a period ending one (1) year after the Closing Date and no indemnity claim for breach of representation or warranty may be brought after that time; provided, however, that (i) the representations and warranties contained in Sections 3.2 (Authorization; Binding Obligations) and 4.2 (Authorization; Binding Obligations) and related indemnification obligations shall survive indefinitely and (ii) the representations and warranties contained in Section 3.10 (Taxes) and related indemnification obligations shall survive through the applicable statute of limitations, including any extensions thereof.

(b)      Performance of the covenants and other agreements contained in this Agreement and the other Transaction Documents that are required by their terms to be performed at or prior to the Closing shall survive until the Closing Date and the period in which a Party may deliver written notice of a claim for a breach of such covenant or other agreement that occurred at or prior to Closing shall continue until ninety (90) days following the Closing Date; (ii) performance of the covenants and other agreements contained in Section 5.4 (Confidentiality) shall survive for the period contemplated by its terms and the period in which a Party may deliver written notice of a claim for breach of such covenant or other agreement shall continue for six (6) months following the expiration of such performance period; (iv) performance of the covenants and other agreements contained in Section 5.11 (Tax Matters) and the period in which a Party may deliver a notice with respect to breach of such covenant and other agreement shall survive for sixty (60) days following

34

40531485

CONFIDENTIAL

FBG_CH1_00095613

the expiration of the applicable statute of limitations, including any extensions thereof; and (v) each of the other covenants and agreements shall survive indefinitely or for the term explicitly specified therein, and if a specific term applies, then the period in which a Party may deliver written notice of a claim for breach of such covenant or other agreement shall continue for six (6) months following the expiration of such performance period.

(c)     The obligations to indemnify for Excluded Assets or Excluded Liabilities (Section 10.2(a)(iii)), Purchased Assets or Assumed Liabilities (Section 10.3(a)(iii)) and Post-Closing Operation Liabilities (Section 10.3(a)(iv)) shall survive until the expiration of the applicable statute of limitations, if any, with respect to any Direct Claim or underlying Third Party Claim for which indemnification is sought hereunder.

(d)     The delivery of written notice of any claim pursuant to this ARTICLE X prior to the expiration of the applicable survival period shall extend the survival of such claim through the date such claim is finally determined in accordance with this Agreement.

10.2    Indemnification Obligations.

(a)     Indemnification by Seller.  Subject to the limitations set forth in this ARTICLE X, Seller shall indemnify, defend and hold harmless the Purchaser Parties and all of their Representatives, officers, employees, directors and successors and assigns (collectively, the "**Purchaser Indemnified Parties**") from and against, and will compensate and reimburse each Purchaser Indemnified Party for, any and all Damages any such Purchaser Indemnified Party may suffer, incur, sustain, pay or become subject to, directly or indirectly, and regardless of whether such Damages relate to a Third Party Claim or a Direct Claim, based upon, arising out of or resulting from any of the following:

(i)     any breach of warranty or representation made by Seller in any Transaction Agreement;

(ii)     any breach or default in the performance by Seller of any of its covenants or agreements contained in any Transaction Agreement; and

(iii)     any Excluded Assets or any Excluded Liabilities (but for clarity, excluding Environmental Liabilities and Real Property Liabilities).

(b)     Indemnification by Purchaser.  Purchaser Parties, jointly and severally with each other, shall indemnify, defend and hold harmless Seller, its Affiliates and all of their Representatives, officers, employees, directors and successors and assigns (collectively, the "**Seller Indemnified Parties**") from and against, and will compensate and reimburse each Seller Indemnified Party for, any and all Damages any such Seller Indemnified Party may suffer, incur, sustain, pay or become subject to, directly or indirectly, and regardless of whether such Damages relate to a Third Party Claim or a Direct Claim, based upon, arising out of or resulting from any of the following:

(i)     any breach of warranty or representation made by a Purchaser Party in the Transaction Agreements;

35

40531485

CONFIDENTIAL

FBG_CH1_00095614

(ii)    any breach or default in the performance by a Purchaser Party of any covenant or agreement of a Purchaser Party contained in the Transaction Agreements;

(iii)    any Purchased Assets and any Assumed Liabilities; and

(iv)    Liabilities arising out of the ownership and operation of the Purchased Assets and employment of the Employees following the Closing (collectively, "**Post-Closing Operation Liabilities**"), including without limitation: (A) Liabilities for Taxes imposed on the Purchased Assets for taxable periods or portions thereof beginning after the Closing, (B) Liabilities arising under the Transferred Contracts, (C) Liabilities associated with goods manufactured and sold by Purchaser using the Purchased Assets, including Liabilities arising out of, resulting from, or related to claims founded upon negligence, product liability, patent infringement, breach of express or implied warranty, strict liability or tort, or under any Law, (D) all Liabilities to the Employees with respect to any events occurring after the Closing Date, (E) Liabilities arising out of or resulting from any termination of employment of any such Employee by Purchaser or its Affiliates and (F) Liabilities arising out of or resulting from any violation or noncompliance by Purchaser or its Affiliates with applicable Laws.

(c)    <u>Limitations on Indemnification</u>.

(i)    Notwithstanding anything in any Transaction Document to the contrary, Seller shall not be obligated to indemnify, and shall have no Liability to, any Purchaser Indemnified Party under Section 10.2(a)(i) (whether for a Direct Claim by a Purchaser Indemnified Party or a Third Party Claim), (A) (x) a Purchaser Party otherwise had knowledge of such breach prior to Closing or (y) with respect to any matters disclosed on the Schedules to the Transaction Documents, and (B) unless and until the Purchaser Indemnified Parties have otherwise incurred aggregate Damages under Section 10.2(a)(i) in excess of $85,000 (the "**Deductible**"); provided that no incident giving rise to Damages under Section 10.2(a)(i) shall be counted for purposes of the Deductible (and shall not be entitled to indemnification hereunder) unless such incident giving rise to Damages involves an individual amount in excess of $8,500 (the "**Threshold**"). Once the Deductible has been satisfied, Purchaser Indemnified Parties shall be entitled to seek indemnification only for Damages in excess of the Deductible.

(ii)    Notwithstanding anything contained herein or in the Transaction Documents to the contrary (and subject to the immediately following subparagraph (iii)), except in the case of Fraud, in no event shall all Damages payable, in the aggregate, to the Purchaser Indemnified Parties under Section 10.2(a)(i) exceed five percent (5%) of the Purchase Price (the "**Cap**").

(iii)    In the event Damages suffered by an Indemnitee are recoverable under any provision of this Agreement, such Indemnitee shall not be permitted to recover the same Damages under another provision of this Agreement to the extent such recovery would constitute "double" recovery of the same amount (which for the avoidance of doubt, includes that a Purchaser Indemnified Party shall not be entitled to indemnification under this Article X to the extent Purchaser has otherwise been compensated with respect thereto pursuant to a purchase price adjustment under this Agreement). For purposes of this ARTICLE X, the amount of any Damages incurred by the Purchaser Indemnified Parties or the Seller Indemnified Parties, as applicable, shall

36

40531485

CONFIDENTIAL

FBG_CH1_00095615

be reduced by (1) the net amount of the Tax benefits actually realized by such indemnified party as a result of such Damages, and (2) any amounts recoverable from any Third Party including an insurer (other than from any fronting, captive or Affiliate including either Party's captive insurance companies), that would ultimately result in such Damages being borne directly or indirectly by the Indemnitor or other Third Party liable for such Damages, and if any such Third Party recovery is obtained after recovering Damages from the other Party hereunder, such indemnified Party shall repay amounts received as Damages hereunder to the extent of any double recovery from any such Third Party sources.

(d)     Notice of Claims for Indemnity.  Whenever a claim for Damages arises for which one Party ("**Indemnitee**") shall be entitled to indemnification hereunder, Indemnitee shall notify the other Party ("Indemnitor") in writing (each, a "**Notice**") within (60) days of the first receipt of notice of such claim (or such shorter period as may be necessary for Indemnitor to take appropriate action to resist such claim); provided that the failure to give Notice as herein provided shall not relieve Indemnitor of its obligation to indemnify Indemnitee except to the extent that Indemnitor shall have been prejudiced in its ability to defend or mitigate such claim.  Such Notice shall specify in reasonable detail the basis for Indemnitee's request for indemnification hereunder and a reasonable estimate of the amount of Damages arising therefrom (if available). Indemnitee shall provide Indemnitor with copies of any documents and materials received from Third Parties in connection with such claim promptly following receipt thereof by Indemnitee.

(e)     Third Party Claims.

Except as provided in Section 5.11 with respect to Tax claims (for which such provision shall control):

(i)     Upon receipt by Indemnitor of a Notice from Indemnitee with respect to any claim of a Third Party against Indemnitee (as applicable, a "**Third Party Claim**"), Indemnitor shall either:

(A)     acknowledge within a reasonable time no later than sixty (60) days after receipt of such Notice from Indemnitee (whether after resolution of a dispute or otherwise) Indemnitee's right to indemnification hereunder with respect to Damages arising out of such claim, in which case Indemnitor shall have the right to control the defense of such claim with counsel selected by Indemnitor, with the fees and expenses of such counsel to be paid by Indemnitor ("**Indemnitor's Defense**"), or

(B)     dispute within a reasonable time no later than sixty (60) days after receipt of such Notice from Indemnitee, Indemnitor's obligation to indemnify Indemnitee hereunder for such claim, in which case Section 10.2(e)(iii) shall apply.

(ii)     In the case of Indemnitor's Defense:

(A)     Indemnitee shall reasonably cooperate to the extent reasonably requested by Indemnitor in defense or prosecution thereof and shall reasonably furnish such records, information and testimony, provide reasonable access to its property, utilities and equipment and reasonably attend all such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by Indemnitor in connection therewith;

37

40531485

(B)    Indemnitee shall have the right to employ its own counsel to participate (not control) in any such case; provided, that the fees and expenses of such counsel shall be at the expense of Indemnitee; and

(iii)    If Indemnitor does not acknowledge Indemnitee's right of indemnification for such claim pursuant to this Section 10.2(e) or elects not to assume control of such defense, Indemnitee shall have the option to take control of the defense of such claim with counsel selected by Indemnitee.  Indemnitor shall reasonably cooperate to the extent reasonably requested by Indemnitee in defense or prosecution thereof and shall reasonably furnish such records, information and testimony and reasonably attend all such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by Indemnitee in connection therewith. Indemnitor shall have the right to employ its own counsel to participate (not control) in any such case; provided, that the fees and expenses of such counsel shall be at the expense of Indemnitor.

(iv)    Notwithstanding any other provision of this Agreement, the Indemnitor shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), except as provided in this Section 10.2(e)(iv). If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee and provides, in customary form, for the unconditional release of each Indemnitee from all liabilities and obligations in connection with such Third Party Claim and the Indemnitor desires to accept and agree to such offer, the Indemnitor shall give written notice to that effect to the Indemnitee. If the Indemnitee fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnitee may assume the defense of such Third Party Claim and in such event, the maximum liability of the Indemnitor as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnitee fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnitor may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnitee has assumed the defense pursuant to Section 10.2(e)(iii), it shall not agree to any settlement without the written consent of the Indemnitor (which consent shall not be unreasonably withheld, conditioned or delayed).

(f)    Direct Claims.  For claims that are not Third Party Claims covered by Section 10.2(e) ("**Direct Claims**"), within sixty (60) days after receipt of Notice from Indemnitee, Indemnitor shall:

(i)    acknowledge the right of Indemnitee to indemnification for Damages related to such claim, in which case Indemnitor shall have the right to control the defense, remediation and/or other resolution of such claim, and if applicable, with counsel selected by Indemnitor, with the fees and expenses of such counsel to be paid by Indemnitor, and Indemnitee shall reasonably cooperate to the extent reasonably requested by Indemnitor in such defense, remediation or other remedy of such claim and shall reasonably furnish such records, information and testimony, provide reasonable access to its property, utilities and equipment and reasonably attend all such conferences, meetings and other proceedings as may be reasonably requested by Indemnitor in connection therewith; or

38

40531485

CONFIDENTIAL

FBG_CH1_00095617

(ii)     dispute Indemnitor's obligation to indemnify Indemnitee hereunder for such claim, in which case Section 10.2(h) shall apply.

(g)     Mitigation.  Each Party shall take all commercially reasonable steps to mitigate its respective claims for indemnification hereunder upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any such claims that are indemnifiable hereunder; provided, that if Indemnitor reasonably requests in writing that Indemnitee commence an Action against any third party in connection with its efforts to mitigate any claim for indemnification and Indemnitee determines not to commence such Action, such Indemnitee shall assign its right, title and interest to bring such Action to the applicable Indemnitor to the extent legally permissible (and, in the event the Indemnitor determines to commence an Action against a third party with respect to such assigned claim, such Indemnitor shall notify Indemnitee in writing at least ten (10) Business Days prior to commencing such Action).

(h)     Dispute Resolution.  In the event of any dispute under this Agreement (other than under Section 2.5(e) or as otherwise expressly provided herein), the Parties shall attempt in good faith to resolve such dispute promptly by good faith negotiations between executives who have authority to settle the controversy.  Within sixty (60) days following Indemnitee's receipt of Indemnitor's initial notice of such dispute, Indemnitee shall submit to Indemnitor a written response thereto.  The notice from Indemnitor, and the response from Indemnitee, shall each include (i) a statement of such Party's position and a summary of arguments supporting that position, and (ii) the name and title of the executive who will represent that Party and of any other Person who will accompany the executive during negotiations.  Within thirty (30) days after delivery of Indemnitee's response to Indemnitor's initial notice, the Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, in order to resolve the dispute.  All reasonable requests made by one Party to the other Party for information regarding the dispute will be honored.  If the dispute has not been resolved by negotiation within forty-five (45) days of Indemnitee's response, or if the Parties fail to meet within thirty (30) days from delivery of said response, any Party may request that the Parties proceed to settle the dispute by mediation administered by the American Arbitration Association before resorting to arbitration as set forth below.  If the dispute has not been resolved by mediation as provided above within thirty (30) days of initiation of such procedure, any Party may request that the Parties proceed to binding arbitration in New York by the American Arbitration Association under the rules of the American Arbitration Association then in effect by a panel of three arbitrators, with one arbitrator appointed by Seller and one by Purchaser and a third independent and impartial arbitrator appointed by the American Arbitration Association.  Any rights of indemnification established by reason of such settlement, compromise, mediation or arbitration shall promptly thereafter be paid and satisfied by Indemnitor in accordance with the terms hereof.  If either Party does not participate in a non-binding mediation procedure, the other Party may initiate arbitration immediately.  Judgment upon the award rendered by the arbitrators may be entered in any court having competent jurisdiction thereof. The language of the arbitration proceedings shall be English.

10.3    Tax Treatment of Indemnification Payments.

Except as otherwise required pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of state, local, or non-U.S. Law), Seller and Purchaser shall and shall cause their respective Affiliates to, treat any and all payments under this ARTICLE X as an

40531485

CONFIDENTIAL

FBG_CH1_00095618

adjustment to the Purchase Price for all Tax purposes.  Seller and Purchaser agree, for all Tax purposes, to allocate any such adjustment among the Transactions and the Purchased Assets (as applicable) based upon the item or items to which such adjustment is principally attributable.

10.4     Exclusive Remedies.

Except with respect to claims for equitable relief set forth in this Agreement or with respect to claims for Fraud, after the Closing, the indemnification provisions of this ARTICLE X shall provide the sole and exclusive remedy for the Parties and their Affiliates for any misrepresentations, breaches of warranty, covenants, agreements, obligations set forth in the Transaction Documents or otherwise relating to the subject matter of the Transaction Documents, including, without limitation, any other claims, rights, remedies or matters resulting from, arising out of or relating to the Transactions and the Transaction Documents; provided, however that any specific remedies agreed to by the Parties as expressly set forth in the Supply Agreement or any Access Agreement shall remain available to the Parties in addition to the indemnification provisions of this ARTICLE X.

ARTICLE XI
MISCELLANEOUS PROVISIONS

11.1     Further Assurances.

After the Closing Date, from time to time, at the reasonable request of a Party and without cost or expense to the non-requesting Party, the non-requesting Party shall execute and deliver such other documents, including any further deeds, assignments, conveyances or other assurances, documents and instruments of transfer, and shall take such other actions as are reasonably requested in order to effectively consummate the transactions (including the making of the Tax elections) contemplated by this Agreement.

11.2     Expenses.

Each Party shall bear the remittance charges and other costs to make its wire-transfer.  Except as otherwise specifically set forth in this Agreement, each of the Parties shall separately pay all costs and expenses incurred by it or on its behalf in connection with the Transaction Documents and the Transactions, including, without limiting the generality of the foregoing, fees and expenses of its own financial consultants, accountants and counsel.  Without limiting the generality of the foregoing, no expenses of Seller related to the Transactions shall become Assumed Liabilities. Purchaser shall pay and be responsible for all fees in connection with obtaining any necessary approvals of any Governmental Authority with respect to the Transactions, including approvals under any Antitrust Laws, which are sought by Purchaser or its Affiliates and all costs of any sales, transfer, registration, land transfer, stamp duty, notarization cost or fees or any similar fees or charges in connection with consummation of the Transactions.

11.3     Entire Agreement.

Notwithstanding anything to the contrary contained in any Transaction Document, management presentations, financial information or other materials relating to the Purchased Assets or Seller, the Transaction Documents and the Exhibits and Schedules thereto set forth the entire agreement

40

40531485

FBG_CH1_00095619

between the Parties with regard to the subject matter hereof and thereof, and supersede all prior agreements, understandings, negotiations, discussions, presentations, and other materials relating to the Purchased Assets or Seller, whether written or oral. There are no conditions, covenants, agreements, representations, warranties or other provisions, express or implied, collateral, statutory or otherwise, relating to the subject matter hereof except as provided herein and therein.

11.4    Governing Law.

The validity, construction and performance of this Agreement, and any Action arising out of or relating to this Agreement, shall be governed by, and construed in accordance with, the Laws of Delaware, excluding any choice of law rules that may direct the application of the Laws of another jurisdiction.

11.5    Specific Performance.

The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

11.6    Waiver and Amendment.

This Agreement may be amended, supplemented, modified and/or rescinded only through an express written instrument signed by the Parties or their respective successors and permitted assigns.  Any Party may specifically and expressly waive in writing any portion of this Agreement or any breach hereof or misrepresentation herein, but only to the extent such provision is for the benefit of the waiving Party, and no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach or misrepresentation of the same or any other provision.  The consent by one Party to any act for which such consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or similar acts in the future, and no forbearance by a Party to seek a remedy for noncompliance, misrepresentation or breach by the other Party shall be construed as a waiver of any right or remedy with respect to such noncompliance or breach subject to the express terms of this Agreement.

11.7    Assignment.

Except as specifically provided otherwise in this Agreement, neither this Agreement nor any interest herein or therein shall be assignable (whether voluntarily, involuntarily, by judicial process, operation of Law or otherwise), in whole or in part, by any Party without the prior written consent of the other Party; provided, however, Purchaser may assign this Agreement or any portion of its rights hereunder to an Affiliate; provided further that no such assignment pursuant to the foregoing shall release the assigning Party from any Liability or obligations under this Agreement. Any assignment or delegation in contravention of this provision is void ab initio.

11.8    Successors and Assigns; No Third Party Beneficiary.

Each of the terms, provisions, and obligations of this Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by the Parties and their respective legal representatives,

40531485

CONFIDENTIAL                                                                 FBG_CH1_00095620

permitted successors and permitted assigns. Except as set forth below, nothing in this Agreement will be construed as giving any Person, other than the Parties to this Agreement and their successors and permitted assigns, any right, remedy or claim under, or in respect of, this Agreement or any provision hereof. Notwithstanding the foregoing, the provisions of ARTICLE X are intended for the benefit of the Purchaser Indemnified Parties and the Seller Indemnified Parties as and to the extent applicable in accordance with their terms; and such applicable provisions shall be enforceable by each such Purchaser Indemnified Party and Seller Indemnified Party, as the case may be.

11.9    Notices.

All notices, requests, demands and other communications made under this Agreement shall be in writing, correctly addressed to the recipient as follows:

| | |
|---|---|
| If to Seller: | ZF Active Safety US Inc.<br>12001 Tech Center Drive<br>Livonia, MI 48150<br>Attn: Marcio Delgado<br>Email: marcio.delgado@zf.com |
| with a copy to: | ZF Active Safety US Inc.<br>12001 Tech Center Drive<br>Livonia, MI 48150<br>Attn:  Holly Osterholm Swanson<br>Vice President, Legal<br>Email: holly.swanson@zf.com |
| If to Purchaser: | SA Eagle Holdings, LLC<br>19111 Dallas Parkway<br>Suite 170<br>Dallas, Texas 75287<br>Attn:  Michael Baker, Managing Director<br>Email: michael.baker@viceroyprivatecapital.co |

Notices, requests, demands and other communications made under this Agreement shall be deemed to have been duly given (i) upon delivery, if served personally on the Party to whom notice is to be given, (ii) on the date of receipt, refusal or non-delivery indicated on the receipt if mailed to the Party to whom notice is to be given by first class mail, registered or certified, postage prepaid, or by overnight courier, (iii) upon confirmation of transmission, if sent by facsimile on a Business Day during normal business hours, but if not, then on the next succeeding Business Day or (iv) upon transmission, if sent by email on a Business Day during normal business hours and so long as the sender does not receive an automated response indicating a delivery failure, but if not, then on the next succeeding Business Day on which delivery is completed.  Any Party may give written notice of a change of address in accordance with the provisions of this Section and after such notice of change has been received, any subsequent notice shall be given to such Party in the manner described at such new address.

42

40531485

CONFIDENTIAL

FBG_CH1_00095621

11.10   Severability.

Each provision of this Agreement is intended to be severable.  Should any provision of this Agreement or the application thereof be judicially declared to be or become illegal, invalid, unenforceable or void, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties.

11.11   Transfer Taxes.

Purchaser Parties, jointly and severally, will bear 100% of the cost of any sales, use, excise, registration, documentary, recording, land transfer, stamp, value added or other similar Taxes and notarial fees, if any, as well as any penalties or interest thereon that may result from the transfer of the Purchased Assets and the Assumed Liabilities to Purchaser ("**Transfer Taxes**").  If Seller or any Affiliate thereof pay all or any part of any Taxes (including any Transfer Tax) for which a Purchaser Party is responsible hereunder, whether as a result of self-assessment, assessment, reassessment or any for any other reason, then Purchaser shall promptly reimburse Seller or its Affiliate upon presentation of reasonable evidence of payment without setoff of any kind. Notwithstanding anything else in this Agreement, such reimbursement is not subject to any thresholds, caps or other restrictions, and Purchaser Parties' liability to make such payment to Seller or any Affiliate thereof shall survive Closing indefinitely.  The Parties shall cooperate in the filing of any Tax Returns with respect to Transfer Taxes. If any Party is obligated to withhold Taxes on a payment required under this Agreement, then such Party will notify the other Party and will promptly furnish the other Party with an original receipt evidencing each such withholding Tax payment in a form sufficient to enable the other Party to obtain any Tax credit or deduction to which it may be entitled.

11.12   No Deduction of Taxes from Purchase Price.

All payments of the Purchase Price due to Seller hereunder will be paid to Seller without any deduction for withholding Taxes.

11.13   Interpretation.

The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any Party.  The captions of the Sections and Subsections of this Agreement are for convenience only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

11.14   Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement.

11.15   Facsimile Signatures.

This Agreement, any Ancillary Agreement and any other document or agreement executed in connection herewith may be executed by delivery of a facsimile copy or other electronic

<div align="center">43</div>

40531485

FBG_CH1_00095622

transmission of an executed signature page with the same force and effect as the delivery of an originally executed signature page. In the event any Party delivers a facsimile copy or other electronic transmission of a signature page to this Agreement, any Ancillary Agreement or any other document or agreement executed in connection herewith, such Party shall deliver an originally executed signature page within three (3) Business Days of any request therefor; provided, however, that the failure to deliver any such originally executed signature page shall not affect the validity of the signature page delivered by facsimile other electronic transmission, which has and shall continue to have the same force and effect as the originally executed signature page. Except where prohibited by Law, minor variations in the form of the signature page, including footers from earlier versions of this Agreement, the Transfer Agreements, any Ancillary Agreement or any such other document, shall be disregarded in determining the Party's intent or the effectiveness of such signature.

11.16   Additional Diligence.

Seller shall make available for review by Purchaser or its representatives at all reasonable times prior to the commencement of Closing any additional due diligence materials related to the Purchased Assets reasonably requested by Purchaser (collectively, "**Supplemental Due Diligence Materials**").

[The remainder of this page has been intentionally left blank.]

44

40531485

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized representative to execute this Agreement as of the date first set forth hereinabove.

"PURCHASER PARTIES"

SA Eagle Holdings, LLC

By: _____

Name:  Michael Baker
Title:    Managing Director


Viceroy Private Capital, LLC

By: _____

Name:  Michael Baker
Title:    Managing Director


First Brands Group, LLC

By: _____

Name:  Michael Baker
Title:    Chief Corporate Strategy Officer


[signatures continue on following page]


Signature Page to Asset Purchase Agreement

CONFIDENTIAL

FBG_CH1_00095624

DocuSign Envelope ID: 3B7A432C-42E2-4FD0-8C1E-F70D8056000E

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized representative to execute this Agreement as of the date first set forth hereinabove.

**"SELLER"**

ZF Active Safety US Inc.

By:_____

Name: Richard C. Wolfe_____

Title: President

Signature Page to Asset Purchase Agreement

CONFIDENTIAL

FBG_CH1_00095625